## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 2005-WM-377 (BNB) MOISES CARRANZA-REYES,

      Plaintiff,

vs.

PARK COUNTY, a public entity of the State of Colorado and its governing board, THE PARK COUNTY BOARD OF COUNTY COMMISSIONERS; PARK COUNTY SHERIFF'S OFFICE, a public entity of the State of Colorado; FRED WEGENER, Individually, and in his official capacity as Sheriff of Park County, Colorado; MONTE-GORE, Individually, and in his capacity as Captain of Park County Sheriffs Department; VICKIE PAULSEN, Individually, and in her official capacity as Registered Nurse for Park County, Colorado; JAMES BACHMAN, M.D., Individually and his official capacity as Medical Director of the Park County jail,

      Defendants.

---

## SECONDED AMENDED COMPLAINT AND JURY DEMAND

---

Plaintiff, MOISES CARRANZA-REYES, by and through his attorney, Joseph Archuleta, and for his Amended Complaint states as follows:

### JURISDICTION

The Federal Courts have jurisdiction on multiple bases. The Plaintiff does not rely on a single basis for jurisdiction but all of them that are applicable to his certain causes of action.

1.    The Plaintiff, Moses Carranza-Reyes, is and was at the time of the occurrences described in this Amended Complaint a citizen of Mexico. All Defendants were citizens of the United States. The amount in controversy exceeds $75,000,

exclusive of interest and costs. This Court has jurisdiction under diversity of citizenship, pursuant to 28 USCA §1332(2).

2.      This is an action for medical and nursing negligence, and civil rights violations, attorneys fees and costs, and punitive damages pursuant to the applicable Colorado statutes, 42 USCA § 1983 and § 1988, and the Eighth and Fourteenth Amendments to the Constitution of the United States.

3.      This Court has supplemental jurisdiction to consider state causes of action under 28 USCA §1367, the ancillary state claims *'form part of the same case or controversy"* as other counts for which this Court has established jurisdiction.

4.      All governmental entities were notified of this claim by certified mail on or about July 7, 2003 under the Colorado Governmental Immunity Act.

## FACTS GIVING RISE TO THIS COMPLAINT

5.      The Plaintiff, Moises Carranza-Reyes, was arrested on March 1, 2003 and held in custody as a detainee by the Immigration and Nationalization Service ("INS").

6.      On March 1, 2003, the INS transported Mr. Carranza-Reyes to be confined in the Park County jail as a status detainee. Plaintiff was not charged with any crime, nor was he convicted of any crime and was simply being detained as a status prisoner.

7.      In the evening of March 1, 2003, Plaintiff was transported in custody by Park County sheriffs at the direction of the INS to the Park County jail. At the Park County jail, there was no translator available with proper knowledge of Spanish to

provide translation, but rather a prisoner trustee who spoke broken Spanish and who was apparently an American by birth. This translator, in broken Spanish, told Plaintiff and other detainees being admitted that they should immediately contact the Mexican Consulate because of deplorable and inhumane conditions that were then present in the Park County jail.

8.   The Plaintiffs clothes were taken from him and he was provided a smelly, dirty uniform, pants, and a shirt, which had been worn by others. These clothes had not been laundered and he was required to put these clothes on. He had no socks and was given flop-flops to wear. Mr. Carranza-Reyes was escorted into a very cold cellblock, which was two stories; one story for sleeping, which was a partial story with a balcony, and a lower story with two toilets, a shower, and a dining area with tables that were near the toilet and bathroom facility. There were no internal walls in the cellblock.

9.   The cellblock was holding as many as 60 inmates in a small area. Mr. Carranza-Reyes was provided a mattress that was on the floor between two other prisoners. This mattress was filthy. The bedding was filthy and had a terrible odor. This was on the upper floor of the jail. Mr. Carranza-Reyes discovered that he was sleeping between two persons who were so ill that they were unable to go down to the lower level to have their meals. Mr. Carranza-Reyes was required to bring the meals to these sick detainees.

10.   The detainees included many sick individuals. Many of the individuals had severe diarrhea and symptoms that caused them to vomit. The individuals on the upper story were coughing up phlegm and other materials from their lungs

3

and spitting it into pieces of toilet paper. These infected pieces of toilet paper could not be thrown away as there was no wastebasket or trash container in the cellblock. These pieces of toilet paper were thrown about the floor in the sleeping area. The prisoners, who were wearing flip-flops, walked on top of the pieces of toilet paper containing phlegm and other body materials, causing it to be spread throughout the entire cellblock.

11.  Because there were only two toilets for approximately 60 people and many of the prisoners were vomiting and had diarrhea, there was fecal material and human vomit all around the areas of the toilet. The odor of the entire cellblock was almost intolerable.

12.  The prisoners who were not sick were required to use the toilets that were covered by human excrement and vomit.

13.  When Mr. Carranza-Reyes came into the cell, he realized that the cell was very cold and was freezing. He had no shoes or socks to wear, but only flip flops and simply a pair of dirty pants and a shirt. The inmates had no jackets and were given a single blanket, which was filthy.

14.  Inmates in the jail attempted to protest the appalling conditions in the jail by sending a petition to the Mexican Consulate as a large number of the detainees were Mexican citizens. This petition was seized by sheriffs deputies and destroyed.

15.  Then inmates demanded that they be provided clean clothing or that their clothes be laundered. After being in the jail for approximately five days, the jailers came into the cellblock and ordered all of the prisoners to strip naked in the freezing cold. Their clothes were collected and taken to the laundry to be washed all at the same

time. The shivering prisoners were required to remain huddled with no clothes except their blankets.

16.    The prisoners demanded soap, water, and disinfectant to clean the cellblock. The guards refused and ridiculed the prisoners when they insisted on cleaning supplies.

17.    The Defendants, Sheriff Wegener, whose office is in the jail, and Captain Monte Gore, knew of these conditions and took no steps to clean the cellblock. The cellblock was not mopped nor were the prisoners provided cleaning materials, such as soap and disinfectant to clean the area themselves.

18.    The prisoners were provided two towels, one small towel, and one large towel. The large towel was used to dry when they bathed and was not regularly laundered, nor was the small towel laundered. The showers were either scalding hot or freezing cold. The showers could not be adjusted to any in between temperature. Prisoners had to jump in and out of the showers to keep from being scalded in the open room, causing them to be subjected to freezing temperatures of the air in the cellblock.

19.    Because of the refusal of guards to provide basic human needs of cleaning materials and soap and water to clean the floors or to provide any janitorial services themselves, the prisoners used water and their small towels to clean the floor of the cellblock. These towels, after cleaning the floor, had to clean up human waste in the form of excrement, phlegm, and vomit. These towels had to be stored in a corner with the prisoners' regular towels that were used for bathing.

20.    Because of the large number of people that were sick in the cellblock, the contagion spread rapidly. At least six detainees were ultimately removed for immediate

medical treatment and were suffering from infectious diseases.

21.   The conditions described herein were known to Sheriff Wegener and Captain Gore, who worked in and visited the jail on a regular basis and physically observed the condition of the detainees.

22.   That the filthy and inhumane conditions subjected the Plaintiff, who was healthy upon arrival, to exposure to infections, which Plaintiff ultimately caught and resulted in the amputation of his leg.

23.   Dr. Bachman, Medical Director, visited the jail, and was aware of over-crowding inhumane and humiliating conditions in the jail. As Medical Director, Dr. Bachman knew of the inhumane conditions in the jail, that a contagion was rampant in the jail, and that the jail conditions were unsanitary. Dr. Bachman took no steps to protect the health and safety of the Plaintiff or other prisoners in the jail. As Medical Director, he had authority to remedy the condition, but did nothing.

24.   That Nurse Paulsen, an employee of the jail, while acting in her official capacity under color of law, was aware of the general contagion in the jail, but was deliberately indifferent to Plaintiffs medical condition. She failed to call a doctor to examine the sick inmates and she was not authorized to make diagnoses as she was not a nurse practitioner, but an R.N., and could only act under the supervision of a physician.

25.   In spite of this, she diagnosed jail inmates as having altitude sickness and flu and prescribed them Tylenol and Pepto Bismol.

26.   That she was aware from the observation of the inmates that they were wearing filthy, unclean uniforms. She was generally aware from observing the cell block, as

she would stand in the entrance door to the cell looking into it, that the cell was filthy and the bathroom was wretched and the smell insufferable, but took no action and made no complaint to have these serious general health care threats remedied and was indifferent to the medical needs of the Plaintiff.

27.    That when the Plaintiff entered the facility, he was in good health. During the time that he was in the jail, he was required to sleep between two seriously ill individuals, who could not get out of bed to go and eat. He was required, as a humanitarian issue, to procure food for these sick individuals and to feed the prisoner on either side of him. These prisoners were coughing continuously throughout the night and spitting on either side of him. He could not keep this material off of his shoes or his bedding material, which was filthy.

28.    On or about the afternoon of March 4, 2003, Plaintiff began to experience symptoms of chills, sore throat, and other symptoms which he reported to guards. He filled out a form requesting permission to see the nurse, but because he was so sick, he slept through the time of the nurse's visit. He saw the nurse on or about March 6, 2003. When he saw her on March 6, he was suffering a fever, body aches, headache, nausea, and diarrhea. He had nasal congestion and a sore throat. The nurse, Defendant Vickie Paulsen, noted that his skin was warm and his abdomen was slightly tender. She told him, through an interpreter, that he had altitude sickness and gave him Motrin 400 mg for body aches and headaches and Pepto Bismol for his nausea.

29.    Plaintiffs condition deteriorated and he was again seen by nurse Paulsen on March 7, 2003, still complaining of body aches, headaches, nausea, diarrhea, nasal congestion and sore throat. In addition, he had been vomiting and was suffering from

abdominal pain. Defendant Paulsen again noted that his skin was warm and his abdomen was slightly tender over the stomach. Despite the onset of additional symptoms, frequent vomiting since she last saw him, nurse Paulsen, failed to note the Medical Director of the Park County jail, James Bachman,M.D., failed to obtain medical consultation, and failed to render a proper nursing assessment of his condition. Instead, she again prescribed Motrin 400 mg and Pepto Bismol for nausea and diarrhea. She informed the guards that the Plaintiff and several other inmates were experiencing altitude and flu-like symptoms, and the guards were instructed to give the inmates Ibuprofen and Pepto Bismol when the guards determined they needed to do so.

30.   On March 7, 2003, at 11:45 p. m., Deputy Don Frye arrived to work at the jail and was told that several inmates in the cell containing the detainees, including the Plaintiff, were experiencing altitude and flu-like symptoms and Nurse Paulsen had left instructions to give Ibuprofen and Pepto Bismol as needed to the inmates.

31.   On March 8, 2003, at 1: 00 a.m., Deputy Frye entered the cell containing the Plaintiff, who complained of his ongoing illness and symptoms and Deputy Frye gave him Ibuprofen and Pepto Bismol as instructed by nurse Paulsen.

32.   On March 8, 2003, at 3:00 a.m., Deputy Frye again entered the cell containing Plaintiff and other detainees and Plaintiff again complained of his illness. Because of his obviously deteriorating condition, Deputy Frye obtained an interpreter and took the Plaintiff to the medical unit to obtain vital signs, which were abnormal. Plaintiff complained he had been sick for the last three days and Deputy Frye noted that Plaints breathing was shallow so he was placed on oxygen which did not

relieve his symptoms and he was returned to his cell. Deputy Frye immediately contacted nurse Paulsen at her home to inform her of Plaintiffs deteriorating condition. Nurse Paulsen stated she was aware of his condition and that he had the flu. She made this nursing assessment without further examination, despite the reported abnormal vital signs, and again failed to contact the medical director or obtain medical consultation.

33.     On March 8, 2003, between 5:20 a.m. and 6:40 a.m., Deputy Frye determined that Plaints condition had not improved and he was now complaining of pain to the midsection of his back on the right side and each time he observed the Plaintiff in his cell, Plaintiff was kneeling on the floor in apparent pain.

34.     On March 8, 2003, at 7: 00 a.m., Deputy Frye gave Plaintiff two more Ibuprofen and two Pepto Bismol following nurse Paulsen's instructions. He observed that the Plaintiffs condition had not improved and he still had shallow breathing.

35.     On March 8, 2003, at approximately 8:00 a.m., the Plaintiff passed out and fell to the floor of his cell and this was reported to the deputies at approximately 8:10 a.m. Corporal Crawford responded and observed the Plaintiff lying on his back between the rows of bunks and quickly determined that he was still breathing and immediately summoned nurse Paulsen who was somewhere in the facility at the time. Through an interpreter, nurse Paulsen was informed of Plaintiffs severe pain on his right side and she did a nursing assessment and made a nursing diagnosis of a kidney stone. Despite Plaintiffs obvious severe illness, nurse Paulsen did not order his immediate transport to a physician or hospital, did not contact the medical director of Park County jail, and did not consult with a physician. Instead, she called

a person at INS who gave permission to transport the patient if his conditioned worsened.

36. On March 8, 2003, at approximately 10:30 a.m., nurse Paulsen called the jail and learned that Plaintiffs condition had further deteriorated, that he was vomiting frequently and coughing up blood in his spittle, had severe right-sided pain and she finally requested that Plaintiff be transported to Summit Medical Center for treatment. At approximately 11:40 a.m., the Plaintiff was carried to the main level, unable to stand, and transported by wheelchair to a Sheriffs vehicle, not an ambulance, and transported in chains, to the Summit County emergency room, where he was in critical condition on arrival at 12: 45 p.m.

37. In the emergency room of the Summit Medical Center, Plaintiff was diagnosed with right middle lobe and right lower lobe pneumonia; sepsis; hypokalemia; elevated creatinine, and abnormal chemistries. In the emergency room, they advised that he must be immediately transported to a hospital in Denver and that his survival was in doubt. He was throwing up blood while being transported to Frisco from Fairplay and was continuing to do so. The Sheriffs deputy resisted allowing him to go to Denver without being handcuffed. Ultimately, the medical personnel prevailed and he was taken by ambulance and being followed by the Park County Sheriff deputy to Denver General Hospital, where he was handcuffed to the bed.

38. Upon arrival at Denver General Hospital, the Plaintiff was near death in extreme respiratory distress and hypotensive. He was diagnosed with pneumonia and sepsis and despite emergent life saving care, at 11:20 p.m., March 8, 2003, he went into cardiac arrest and respiratory arrest, but was resuscitated by the core zero team.

Because of the late and untimely treatment of his infectious disease, he developed a necrotic right lower lobe of his lung, suffered acute respiratory distress syndrome, acute renal failure, and left foot gangrene. His leg had to be amputated.

39.    That after Mr. Carranza-Reyes was removed from the jail, only then did the Defendants, Sheriff Wegener, and Captain Gore, arrange to have the jail disinfected and the laundry in the jail cleaned.

## FIRST CLAIM FOR RELIEF

**(§1983 Constitutional Violations of Defendants Park County, a public entity of the State of Colorado and its governing board, Park County Board of County Commissioners, Park County Sheriff's Office, a public entity of the State of Colorado; Fred Wegener, Individually, and in his official capacity as Sheriff of Park County, Colorado; and Monte Gore, Individually, and in his capacity as Captain of Park County Sheriffs Department)**

40.    All previous allegations are incorporated herein by reference.

41.    Each of the Defendants, Park County, a public entity of the State of Colorado, acting through its governing body, the Park County Board of County Commissioners ("Park County'), the Park County Sheriffs Office, a public entity of the State of Colorado ("P. C.S.O. '), Fred Wegener, Individually, and in his official capacity as Sheriff of Park County, ("Wegener'), and Monte Gore, Individually, and in his capacity as Captain of Park County Sheriff' s Department, ("Gore') violated Plaintiffs §1983 Constitutional right to the basic human need for sanitary and adequate clothing, shelter, and medical care, in the following particulars:

(a)    Each of these Defendants failed to enact and enforce policies and procedures requiring that the cell in which Plaintiff was housed to be kept sanitary and clean to prevent the spread of bacteria and communicable disease.

11

(b)     Each of these Defendants failed to enact and enforce policies and procedures ensuring that the County jail be adequately and competently medically staffed to examine prisoners and **diagnose illnesses.**

(c)     Each of the Defendants failed to enact and enforce policies and procedures to ensure that the County jail's medical and nursing staff would be readily available to diagnose and treat inmates' illnesses within the prison when there is not reasonably speedy access to other physicians or other facilities outside the prison.

(d)     Each of the Defendants failed to enact and enforce policies and procedures to ensure that the staff at the County jail would adequately respond to medical emergencies and if outside medical facilities are too remote or too inaccessible to handle emergencies promptly and adequately, then to provide adequate facilities and staff to handle medical emergencies within the jail.

(e)     Each of these Defendants failed to enact, enforce and provide sufficient funding to ensure timely and adequate nursing and medical treatment of inmates incarcerated in the County jail.

(f)     Each of the Defendants failed to enact and enforce policies and procedures to prevent the overcrowding of illegal immigrant detainees in a cell with inadequate toilet and sleeping facilities and to prevent confinement in unsanitary conditions that expose the detainees, including the Plaintiff, to infections and illness.

42.     The conduct of each of these Defendants as above described represents official

governmental policy or custom which violated clearly established Constitutional rights to adequate medical and sanitary housing conditions.

43. Each of the Defendants were acting under color of Colorado State Law by exercising power made possible because the Defendants were clothed with the authority of State law.

44. The Defendant, Fred Wegener, is and was at the time herein alleged, the Sheriff of Park County, Colorado and was charged with managing, operating and administering the Park County jail.

45. That Sheriff Wegener knew of the conditions described in this Complaint, that he had direct contact in the activities and administration of the jail, that his acts or omissions were undertaken in his individual and official capacities as described in this Complaint and were committed under color of law as Park County Sheriff and were committed in the Park County jail and/or Park County Detention Center. Sheriff Wegener is a resident of the State of Colorado. Sheriff Wegener's conduct as described herein violated the Plaintiffs 8th and 14th Amendment rights and constitutes deliberate indifference to Plaintiffs serious medical needs and the inhumane conditions of Plaintiffs confinement.

46. That the Defendant, Monte K. Gore, was at the times herein alleged a Captain in the Park County Sheriffs Office and assigned as the direct administrator of the Park County jail/Detention Center where the incidents described in this Complaint occurred or arose. Captain Gore is a resident of the State of Colorado. Captain Gore's conduct as described herein violated the Plaintiffs 8th and 14th Amendment right and constituted deliberate indifference to Plaintiffs serious medical needs and

the degrading and inhumane conditions of his confinement.

47.   That the Defendants and each of them established and permitted and acted with deliberate indifference to the serious health needs protected generally by the 8th and 14th Amendments to the United States Constitution and subjected the Plaintiff with deliberate indifference to dangerous and debasing conditions of confinement and violated basic fundamental rights to safe and humane confinement. The inhumane conditions of confinement caused Plaintiffs medical injuries as alleged in this Complaint. The conduct was cruel and unusual punishment and a violation of due process and equal protection under the law.

48.   As a result of the Defendants' constitutional violations of Plaintiff's rights, the Plaintiff sustained injuries and damages as follows:

(a)   Non-economic damages consisting of past and future physical and mental pain and suffering, mental anguish, emotional stress, and the loss of the enjoyment of a full and complete life;

(b)   Physical impairment and disfigurement which is permanent; and

(c)   Economic losses consisting of past and future medical and health care expenses and loss of future earning capacity and ability to earn money in the future.

49.   The conduct of each of the Defendants constitutes a reckless or callous disregard of the Plaintiffs Constitutional rights entitling the Plaintiff to punitive damages.

## SECOND CLAIM FOR RELIEF
### (Constitutional Violations of Defendants
### Vickie Paulsen, R.N. and James Bachman, M.D.)

50. All previous allegations are incorporated herein by reference.

51. Before Plaints confinement in the Park County jail and during his confinement, James Bachman, M.D. was the Medical Director of the jail and the person responsible for attending to the medical and pharmaceutical needs of the inmates. He was paid by the Park County Sheriffs Office for the medical services he rendered as Medical Director. As authorized Medical Director, he had a duty to establish medical policies and procedures, medical guidelines and standing orders, to assist jail employees including nurse Paulsen, to assure that detainees, including the Plaintiff, received timely and adequate medical care, and that the jail be kept sanitary and clean to protect the health and safety of the Plaintiff and other detainees in the jail.

52. Upon information and belief, Dr. Bachman was aware of the over-crowding, inhumane, and humiliating conditions in the jail, that the jail conditions were unsanitary and that detainees were frequently sick with contagions that were rampant in the jail, and Dr. Bachman took no steps to protect the health and safety of the Plaintiff and other detainees. As Medical Director, he had authority to remedy the inhumane and unhealthy conditions in the jail, but did nothing.

53. Dr. Bachman, as Medical Director of the jail, knew that Nurse Paulsen, as a registered nurse, was not trained or qualified to make medical diagnoses, but knew that it was the Park County Sheriffs Office policy and custom and the policy and custom of Nurse Paulsen to make medical diagnosis and treatment without the direct supervision of the Medical Director or a licensed physician. Dr. Bachman participated and acquiesced in this policy in his official capacity as

15

Medical Director.

54.    Upon information and belief, Dr. Bachman had visited the jail and was generally aware of the over-crowding, inhumane, and unsanitary conditions in the jail exposing detainees to disease that was rampant in the jail, but took no steps to protect the health and safety of the Plaintiff and other detainees.

55.    Each of the Defendants, Dr. Bachman and Nurse Paulsen, individually, and in their official capacities, violated Plaintiffs §1983 Constitutional right to the basic human need for sanitary and adequate clothing, shelter, and medical care, in the following particulars:

(a)    Each of these Defendants failed to enact and utilize medical and nursing policies, procedures and standing orders that would require that the cell in which Plaintiff was housed be kept sanitary and clean to prevent the spread of bacteria and communicable disease.

(b)    Each of these Defendants failed to adopt policies, standing orders and procedures that would insure that the County jail be adequately and competently medically staffed to examine prisoners and detainees and diagnose illnesses.

(c)    Each of these Defendants failed to enact and adopt policies, procedures and standing orders to insure that the County jail's medical and nursing staff would be readily available to diagnose and treat inmates' illnesses within the prison when there is no reasonable speedy access to other physicians or other facilities outside the prison.

(d)    Each of these Defendants failed to adopt policies, procedures, and standing

orders to insure that the staff at the County jail would adequately respond to medical emergencies.

56. The conduct of each of these Defendants as above described represents official governmental policy or custom which violated clearly established Constitutional rights to adequate medical care and sanitary housing conditions.

57. Each of these Defendants were acting under color of Colorado state law by exercising power made possible because the Defendants were clothed with the authority of State law.

58. The conduct of each of these Defendants violated the Plaintiffs 8th and 14th Amendment rights and constitutes deliberate indifference to Plaintiffs serious medical needs and the inhumane conditions of Plaintiffs confinement.

59. The conduct of each of these Defendants was a cause of Plaints injuries and damages heretofore set forth.

60. The conduct of each of these Defendants constitutes a reckless or callous disregard of the Plaintiffs Constitutional rights entitling the Plaintiff to punitive damages.

## THIRD CLAIM FOR RELIEF
### (Negligence of the Defendant, Vickie Paulsen, R.N.)

61. All previous allegations are incorporated herein by reference.

62. At all times material hereto, the Defendant, Vickie Paulsen, was a registered nurse and an employee of the Park County Sheriffs Office.

63. During Plaintiffs confinement in the Park County jail in March, 2003, Nurse Paulsen was negligent, which negligence consisted, inter alia, of the following:

(a) Paulsen negligently failed to timely perform proper nursing evaluations and

assessments and failed to render timely and proper nursing care.

(b)   Nurse Paulsen negligently and improperly made medical decisions including an initial medical diagnosis that Plaintiff was suffering from altitude sickness, and later a medical diagnosis that Plaintiff was suffering from kidney stones.

(c)   Paulsen negligently failed to seek timely and proper medical care for the Plaintiff.

(d)   Paulsen negligently made nursing assessments and prescribed medication by telephone without a proper nursing evaluation and assessment.

(e)   Paulsen negligently failed to maintain daily contemporaneous nursing charts and records of nursing evaluations, assessments and a plan for treatment.

(f)   Paulsen negligently failed to take steps necessary and to make appropriate policy decisions and recommendations to insure that Plaintiff and other detainees were confined in a healthy and sanitary cell.

(g)   Paulsen was aware of the general contagion in the jail and the sick and unhealthy condition of the detainees, but failed to call a doctor to examine the sick inmates or otherwise obtain proper medical treatment for the detainees, including the Plaintiff, and failed to take proper steps to eliminate the contagion.

(h)   Paulsen failed to otherwise comply with the minimum standards of practice of a registered nurse under the same or similar circumstances.

64.   Nurse Paulsen's negligence was a cause of all injuries and damages sustained by the Plaintiff as heretofore set forth.

### FOURTH CLAIM FOR RELIEF
**(Negligence of the Defendant, James Bachman, M.D.)**

65.   All previous allegations are incorporated herein by reference.

66.   During the first week of March, 2003, and prior thereto, the Defendant, James

Bachman, MD., was negligent, which negligence consisted of the following:

(a)   Negligently failed to properly supervise and monitor Nurse Paulsen in her

activities as the jail nurse.

(b)   Negligently failed to properly educate and train Nurse Paulsen and jail

employees on sanitation and health issues of detainees, including the

Plaintiff, that could require medical intervention and treatment.

(c)   Negligently failed to implement practices, procedures, guidelines, and

standing orders to assist Nurse Paulsen and jail employees on monitoring

detainees, including Plaintiff for health problems, illness, and disease.

(d)   In failing to properly supervise and train jail employees and Nurse Paulsen

on when and under what circumstances the Medical Director should be

called and medical assistance rendered.

(e)   In failing to establish systems and protocols in the medical department of the

jail to protect detainees, including the Plaintiff, from communicable disease,

infections, and unsanitary conditions that lead to communicable disease and

infections.

69.   In otherwise failing to properly assume the responsibilities and functions of a

Medical Director.

67.   James Bachman's negligence was a cause of all injuries and damages as sustained

by the Plaintiff as heretofore set forth.

19

## PRAYER FOR RELIEF ON CIVIL RIGHTS VIOLATIONS

WHEREFORE, Plaintiff prays for judgment against the Defendants, Park County; the Park County Board of County Commissioners; Park County Sheriffs Office; Fred Wegener, Individually, and in his official capacity of Sheriff of Park County, Colorado; Monte Gore, Individually, and in his capacity of Captain of Park County Sheriffs Department; Vickie Paulsen, Individually, and in her official capacity as registered nurse for Park County, Colorado; in an amount sufficient to compensate Plaintiff for his injuries, damages, and losses, for interest as provided by law, for his costs, expert witness fees, attorneys fees, exemplary or punitive damages permitted by Federal statute or law, and for such other and further relief as the Court deems proper.

## PRAYER FOR RELIEF ON MEDICAL
## NEGLIGENCE - STATE CLAIM OF DIVERSITY

WHEREFORE, Plaintiff prays for judgment against the Defendants, James Bachman, M.D. and Vickie Paulsen, R.N. on his claim of negligence against these Defendants for an amount sufficient to compensate Plaintiff for his injuries, damages, and losses, for interest as provided by law, for his costs, expert witness fees, and such other and further relief as the Court deems proper.

## JURY DEMAND

PLAINTIFF HEREBY DEMANDS TRIAL TO A JURY OF SIX (6) ON ALL ISSUES SO TRIABLE.

DATED this _____ of May, 2005.

Respectfully submitted,

By: _____
Joseph J. Archuleta, #19426
Joseph J. Archuleta and Associates
724 Ogden Street
Denver Colorado 80218
(303) 837-1642

By: _____
Lloyd C. Kordick, #6298
Lloyd C. Kordick & Associates 805 S.
Cascade Avenue
Colorado Springs Colorado 80903
(719) 475-8460

By: _____
William A. Trine, #577
Trine & Metcalf, PC 1435 Arapahoe
Avenue
Boulder Colorado 80302-6390 (303)
422-0173

Attorneys for Plaintiff