IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 05-cv-00377-WDM-BNB

MOISES CARRANZA-REYES,

     Plaintiff,

v.

THE PARK COUNTY BOARD OF COUNTY COMMISSIONERS;
FRED WEGENER, individually and in his official capacity as Sheriff of Park County, Colorado;
MONTE GORE, individually and in his official capacity as Captain of Park County Sheriff's Department; and
VICKIE PAULSEN, individually, and in her official capacity as Registered Nurse for Park County, Colorado,

     Defendants

---

## MOTION FOR SUMMARY JUDGMENT FROM DEFENDANTS PARK COUNTY BOARD OF COUNTY COMMISSIONERS, FRED WEGENER AND MONTE GORE

---

     Defendants Park County Board of County Commissioners, Fred Wegener, and Monte Gore, by and through their counsel, Andrew D. Ringel, Esq. and Jennifer L. Veiga, Esq. of Hall & Evans, L.L.C., hereby submit this Motion for Summary Judgment, as follows:

### **INTRODUCTION**

     Plaintiff Moises Carranza-Reyes brings this action pursuant to 42 U.S.C. § 1983 and Colorado law against the Defendants arising from his incarceration in the Park County Jail from March 1, 2003, through March 8, 2003. Plaintiff's remaining claims are: (1) a claim pursuant to 42 U.S.C. § 1983 against Defendants Park County Board of County Commissioners, Fred Wegener, and Monte Gore alleging violations of the Plaintiff's rights protected by the Eighth and Fourteenth Amendments to the United States Constitution; (2) a claim pursuant to 42 U.S.C. §

1983 against Defendant Vicki Paulsen, R.N. for violations of his Eighth and Fourteenth Amendment rights to adequate medical care; and (3) negligence against Ms. Paulsen.[1]

Defendants Board of County Commissioners of Park County ("Board"), Fred Wegener, the Sheriff of Park County, and Monte Gore, then a Captain of Park County, respectfully move for summary judgment on all of the Plaintiff's claims against them.   First, the Board is not appropriately held liable to the Plaintiff.   Under Colorado law, the Board has absolutely no supervisory or oversight responsibility for the operations of the Park County Jail.   Moreover, no custom, policy or practice adopted or approved by the Board caused any constitutional injury to the Plaintiff.   Second, Sheriff Fred Wegener is entitled to qualified immunity from the Plaintiff's claims against him in his individual capacity.   Sheriff Wegener had no personal participation with respect to the Plaintiff, and Sheriff Wegener also never violated Plaintiff's constitutional rights in any supervisory capacity.   Third, Sheriff Wegener in his official capacity cannot be held liable to the Plaintiff for any constitutional violation pursuant to 42 U.S.C. § 1983 as no custom, policy, or practice of the Park County Jail violated any of the Plaintiff's constitutional rights. Fourth, Captain Monte Gore is entitled to qualified immunity from the Plaintiff's claims against him in his individual capacity.   Captain Gore did not personally participate in any alleged violation of the Plaintiff's constitutional rights and also may not be appropriately held liable in his supervisory capacity.

---

[1]   Plaintiff's Second Amended Complaint also attempted claims against Park County and the Park County Sheriff's Office.   On November 3, 2005, this Court granted the Motion to Dismiss filed by those Defendants and dismissed them as Defendants in this action.   [*See* Order on Motion to Dismiss, 11/3/05].   Plaintiff's claims against Defendant James Bachman, M.D. were dismissed by stipulation between those parties.   [*See* Notice of Dismissal as to James Bachman, M.D. Only On All Claims, 11/30/06].

Plaintiff raises a variety of different allegations concerning the conditions of his confinement in the Park County Jail from March 1-8, 2003. In reviewing the Plaintiff's allegations, this Court must focus on the applicable legal standards governing Plaintiff's claims against the Board, Sheriff Wegener, and Captain Gore to determine whether Plaintiff states any cognizable claim. Rigorous legal standards apply for the Plaintiff to succeed with his 42 U.S.C. § 1983 claims against these Defendants. It is not enough for the Plaintiff to prove an undeniably tragic event occurred to him. Instead, Plaintiff must come forward with sufficient evidence to state a viable claim based on the applicable law. Close examination by this Court of the undisputed facts contained in the summary judgment record against the applicable legal principles demonstrates summary judgment is appropriate for these Defendants.

## STATEMENT OF UNDISPUTED MATERIAL FACTS[2]

### The Park County Jail

1.     The Park County Jail was constructed by a private company in 1994 and was originally privately operated. [*See* Wegener Dep., at 15-16, Exh. A-1].

2.     Frederick W. Wegener, III is the Sheriff of Park County and has served in that capacity since January 1999. [*See* Wegener Dep., at 4-5, Exh. A-1].

3.     As Sheriff of Park County, Sheriff Wegener is statutorily responsible for overseeing the operations of the Park County Jail. [*See* Wegener Dep., at 9, Exh. A-1].

4.     Monte Gore joined the Park County Sheriff's Department in September 2000 as a Captain and Jail Administrator of the Park County Jail. [*See* Wegener Dep., at 28, Exh. A-1;

---

[2]     Defendants state the following facts are undisputed for purposes of this Motion for Summary Judgment only. Defendants specifically reserve the right to contest each and every one of these facts at any later stage of these proceedings including at trial.

Gore Dep., at 6, Exh. A-2].

5.      The Park County Sheriff's Department took over responsibility for the operations of the Park County Jail from the private company after Sheriff Wegener became Sheriff and after Captain Gore became Jail Administrator.  [*See* Wegener Dep., at 19, Exh. A-1; Gore Dep., at 6-7, Exh. A-2].

6.      As Jail Administrator, Captain Gore is responsible for the overall daily operations of the Park County Jail.  [*See* Gore Dep., at 19, Exh. A-2].

7.      Park County contracted with James J. Bachman, M.D. to provide medical services at the Park County Jail.  [*See* Agreement for Professional Services, 2/15/01, Exh. A-3; Bachman Dep., at 12, Exh. A-4].

8.      Dr. Bachman served as the physician overseeing medical care at the Park County Jail in March 2003.  [*See* Bachman Dep., at 22-24 & 30, Exh. A-4].

9.      Vicki Paulsen, RN served as the nurse for the Park County Jail in March 2003. [*See* Paulsen Dep., at 13, Exh. A-5].

**Polices and Procedures of the Park County Jail**:

10.      The Park County Jail has policies and procedures governing the operations of the Park County Jail.  [*See* Park County Jail Policy and Procedure Manual, Introduction, Exh. A-6].

11.      The Park County Jail provided a Handbook in Spanish for INS detainees.  [*See* Policy and Procedure Manual, J-116-A, Exh. A-6; Ellis Dep., at 17, Exh. A-7].

12.      When a new INS detainee arrived at the Park County Jail there was an intake process.  [*See* Policy and Procedure Manual, J-119-A, Exh. A-6; Allen Dep., at 49, Exh. A-8].

13.     Park County Jail policy included "a clothing and bedding issue program be established to ensure every inmate is properly clothed and warm bedding provided at all times." [*See* Policy and Procedure Manual, J-112-A, Exh. A-6].

14.     A laundry clerk assisted the Deputies in issuing clean clothes and bedding to the new INS detainees.  All INS detainees received a clean uniform, a t-shirt, boxers, shoes, sheets, blankets, a pillow case, a towel, a wash rag, a roll of toilet paper, and a hygiene bag containing soap, a comb, a toothbrush and toothpaste.  [*See* Allen Dep., at 50-55, Exh. A-8].

15.     Mattresses were issued to the INS detainees when they were taken to their assigned Pod.  [*See* Allen Dep., at 50, Exh. A-8].

16.     INS detainees had their uniforms and underwear exchanged on Tuesdays and their uniforms, underwear, and linens exchanged on Saturdays.  [*See* Policy and Procedure Manual, J-112-A, Exh. A-6; Laundry Procedures, Exh. A-9; Theobald Dep., at 20, Exh. A-10].

17.     The Park County Jail had specific housekeeping and cleaning policies.  [*See* Policy and Procedure Manual, J-111-B, Exh. A-6].

18.     Each Pod in the Park County Jail was responsible for cleaning the Pod under the supervision of Deputies.  Cleaning supplies were provided to the inmates and detainees three times daily after each meal.  Cleaning supplies consisted of a dust mop, a wet mop, a mop bucket with a ringer, two or more rags for cleaning, a broom, a dustpan, one bottle of disinfectant consisting of Pine Sol or bleach, and one bottle of window cleaner.  [*See* Cleaning Procedures, Exh. A-11; Ellis Dep., at 57, Exh. A-7; Gore Dep., at 51-54, Exh. A-2; Flint Dep., at 40-44, Exh. A-12; Allen Dep., at 77-80, Exh. A-8].

19.     If the Park County Jail was in the cold and flu season, the inmates and detainees were required to clean thoroughly with a bleach solution.  [*See* Cleaning Procedures, Exh. A-11].

20.     The bathroom area including the showers, toilets and sinks were cleaned once a day.  Inmates and detainees were given a hose which attaches to the faucet of the sink, a scrub brush, disinfectant, Soft Scrub containing bleach, and a green scrub pad to clean the bathroom area.  [*See* Cleaning Procedures, Exh. A-11; Gore Dep., at 191-193, Exh. A-2].

21.     Mattresses issued to inmates and detainees were cleaned with a bleach solution and wiped down after use and placed to air out before being reissued.  [*See* Cleaning Procedures, Exh. A-11; Gore Dep., at 191-193, Exh. A-2; Allen Dep., at 56, Exh. A-8].

22.     The Park County Jail policy was to provide all inmates and detainees with access to medical care.  "It is the policy of the Sheriff's Office that a staff member from the medical profession arranges for all levels of health care, assuring the quality of all health reviews, and assuring that inmates have access to them.  The health authority may be a registered nurse, physicians assistant or other health care authority operating under the supervision of a single designated physician."  [*See* Policy and Procedure Manual, J-121-A, Exh. A-6].

23.     At intake, all INS detainees completed a medical screening form in Spanish and a Deputy would review the medical condition of the detainees upon intake with the Nurse following-up as needed and appropriate.  [*See* Gore Dep., at 33-35, Exh. A-2; Paulsen Dep., at 174, Exh. A-5].

24.     Nurse Paulsen and Deputies would deliver medication to each Pod typically three times a day in the morning, afternoon, and evening.  The Nurse delivered medications when on duty to allow her to observe the physical conditions of the detainees and to allow detainees to

communicate with the Nurse about any medical issues.  [*See* Gore Dep., at 68-69, Exh. A-2; Muldoon Dep., at 29-31, Exh. A-13; Crawford Dep., at 27-28, Exh. A-14; Paulsen Dep., at 192, Exh. A-5].

25.     Deputies conducting medication deliveries were trained to note any medical issue and forward that information to the Nurse.  Deputies were also trained to note any medical issue on routine Pod walks and in the engagement of their normal everyday duties and forward that information to the nurse as well.  [*See* Gore Dep., at 69, Exh. A-2].

26.     Occasionally Deputies would receive complaints about the water temperature of the showers.  The maintenance person for the Park County Jail, Jim Deathrage, would address such issues as quickly as possible.  [*See* Flint Dep., at 50-51, Exh. A-12; Allen Dep., at 67-69, Exh. A-8].

27.     Deputies would also occasionally receive complaints about the heating system and temperature of the Pods and Mr. Deathrage would address those issues as well as soon as possible.  [*See* Flint Dep., at 49, Exh. A-12; Crawford Dep., at 46-47, Exh. A-14; Allen Dep., at 60-66, Exh. A-8].

28.     The policy of the Park County Jail was to conduct weekly and monthly sanitation inspections.  [*See* Policy and Procedure Manual, J-111-A, Exh. A-6].

29.     Captain Gore delegated to Corporal Crawford the responsibility to conduct weekly inspections of the Park County Jail.  [*See* Gore Dep., at 268-269, Exh. A-2].

30.     Captain Gore conducted monthly inspections of the Park County Jail.  [*See* Gore Dep., at 268-269, Exh. A-2].

31.     Sheriff Wegener walked through the Park County Jail approximately once ever two weeks.  [*See* Wegener Dep., at 63, Exh. A-1].

32.     Dr. Bachman performed quarterly inspections of the Park County Jail.  [*See* Bachman Dep., at 62-63, Exh. A-4].

**Immigration and Naturalization Service Detainees at the Park County Jail**:

33.     Park County contracts with the Immigration and Naturalization Service ("INS") to house INS detainees in the Park County Jail.  [*See* Intergovernmental Service Agreement for Housing Federal Detainees, Exh. A-15].[3]

34.     The INS regularly conducts inspections of the Park County Jail and the conditions of confinement of the INS detainees housed in the Jail.  [*See* Intergovernmental Service Agreement for Housing Federal Detainees, Article IX, Exh. A-15].

35.     The INS conducted a detailed inspection of the Park County Jail in September 2002.  [*See* INS Inspection Report, 9/02, Exh. A-16].

36.     The INS inspection found that detainees were issued appropriate clothing, bedding and towels, and that laundry and cleaning of those items were generally done appropriately.  [*See* INS Inspection Report, at 0191-0192, Exh. A-16].

37.     The INS inspection found:  "The facility provides and replenishes personal hygiene items as needed.  Gender-specific items are available.  INS detainees are not charged for these items."  [*See* INS Inspection Report, at 0173, Exh. A-16].

_____

[3]   Park County's contract is with the Immigration and Naturalization Service.  During the time of the events of this matter, the INS was still referred to as the INS.  Since that time, the INS has become  Immigration and Customs Enforcement ("ICE").  For purposes of consistency, throughout this Motion, the INS is referred to as the INS.

38.     The INS inspection determined the Park County Jail maintained a handbook for detainees that was in Spanish and provided appropriate information for the INS detainees.   [*See* INS Inspection Report, at 0179-0180, Exh. A-16].

39.     The INS inspection found appropriate recreation was provided to the INS detainees by the Park County Jail.  [*See* INS Inspection Report, at 0196-0197, Exh. A-16].

40.     The INS inspection report determined that the INS detainees were provided with appropriate access to medical care by the Park County Jail.  [*See* INS Inspection Report, at 0208-0210, Exh. A-16].

41.     INS would contact the Park County Jail to request placement of additional INS detainees in the Jail.   While Captain Gore did not have a formal policy about the number of detainees to be housed in D-Pod, Captain Gore determined that if they received a call from the INS that they had arrested multiple detainees and had nowhere else to place them he would agree to house them and they would be placed in D-Pod.  [*See* Gore Dep., at 16-20, Exh. A-2].

42.     The population of the Park County Jail changes fairly dramatically with INS detainees coming into and leaving the Jail regularly.   [*See* Gore Dep., at 19, Exh. A-2; Paulsen Dep., at 45, Exh. A-5; Master Control Log, at 0986, 0987 & 0995, Exh. A-17].

43.     In March 2003, male INS detainees were housed in D-Pod and female INS detainees were housed in E-Pod.  [*See* Bellantonio Dep., at 17-18, Exh. A-18].

44.     In March 2003, there were a total of 42 bunk beds in D-Pod.  [*See* Gore Dep., at 27, Exh. A-2].

45.     Any additional individuals housed in D-Pod over 42 would receive mattresses to place on the floor.  [*See* Gore Dep., at 28, Exh. A-2].

**Colorado Department of Corrections Inmates at the Park County Jail**:

46.     Park County also contracts with the Colorado Department of Corrections ("DOC") to house DOC inmates in the Park County Jail.   [*See* 6/1/02 Renewal Contract with DOC, Exh. A-19].

47.     The DOC conducts regular inspections of the Park County Jail concerning the conditions of confinement of the DOC inmates housed in the Jail.   [*See* Flanagan Memorandum, 9/17/02, Exh. A-20; Bongirno Memorandum, 2/27/03, Exh. A-21].

48.     The DOC inspected the Park County Jail on September 17, 2002.   [*See* Flanagan Memorandum, 9/17/02, Exh. A-20].

49.     The DOC inspection found:   "The facility is clean in most of the common offender areas but other areas not accessible to offenders a little closer scrutiny is in order i.e., corners, vents and walls."   [*See* Flanagan Memorandum, 9/17/02, at 0017, Exh. A-20].

50.     The DOC inspected the Park County Jail on February 27, 2003.   [*See* Bongirno Memorandum, 2/27/03, Exh. A-21].

51.     The DOC found:   "CCAP Pod, cells and showers were quite clean.   Cells were organized, inmates respectful."   [*See* Bongirno Memorandum, 2/27/03, at 0021, Exh. A-21].

52.     The DOC inspected the Park County Jail on April 3, 2003.   [*See* Bongirno Memorandum, 4/3/03, Exh. A-22].

53.     The DOC inspection found:   "Addressed CCAP inmates, inmates respectful. CCAP Pod living area was clean."   [*See* Bongirno Memorandum, 4/3/03, at 0022, Exh. A-22].

**Plaintiff Travels from Mexico to the United States**:

54.     Plaintiff began his journey to the United States with his brother, Abraham

Carranza-Reyes, and his sister-in-law, Brisleda Gomez-Villalobos, on February 18 or 19, 2003, from where they were living in the Federal District of Mexico City.  [*See* Moises Carranza-Reyes Dep., at 79-80, Exh. A-23].

55.     Plaintiff traveled approximately 36 hours by bus from the Federal District of Mexico City to the City of Agua Prieta near the border between Mexico and the United States. [*See* Moises Carranza-Reyes Dep., at 81-82, Exh. A-23].

56.     Plaintiff stayed in Agua Prieta for approximately five or six days.  [*See* Moises Carranza-Reyes Dep., at 83, Exh. A-23].

57.     Plaintiff, his brother, and his sister-in-law made arrangements to cross the border by paying $1,500 or $1,600 each to an individual to assist them across the border.  [*See* Moises Carranza-Reyes Dep., at 83-84, Exh. A-23].

58.     The border crossing was with a party of approximately 12 persons and involved walking for about 14 hours into the United States.  [*See* Moises Carranza-Reyes Dep., at 84-85, Exh. A-23].

59.     Plaintiff and his fellow travelers were picked-up by a pickup truck with a covering on the back.  Ten or twelve people were riding in the back of the pickup truck with him for approximately three hours.  [*See* Moises Carranza-Reyes Dep., at 87-89, Exh. A-23].

60.     The pickup truck took Plaintiff and his traveling companions to Phoenix, Arizona. [*See* Moises Carranza-Reyes Dep., at 89, Exh. A-23].

61.     Plaintiff and his family stayed in a house in Phoenix for around four or five days. [*See* Moises Carranza-Reyes Dep., at 89, Exh. A-23].

62.     Plaintiff, his brother, and his sister-in-law then traveled in a pickup with a camper. Three or four people were in the front cabin and there were eight or nine in the back lying down including the Plaintiff.  [*See* Moises Carranza-Reyes Dep., at 90, Exh. A-23].

63.     They rode in the pickup with a camper from 9:00 p.m. the night they left and were stopped the next day by a patrol car.  [*See* Moises Carranza-Reyes Dep., at 90-92, Exh. A-23].

64.     After they were stopped by the patrol car, later a white pickup pulled up and several individuals who informed the travelers they were from immigration took them in their pickup truck to an office.  [*See* Moises Carranza-Reyes Dep., at 101-103, Exh. A-23].

65.     Plaintiff agreed to INS officials to voluntarily return to Mexico.  [*See* Moises Carranza-Reyes Dep., at 75, Exh. A-23].

66.     After being processed by INS officials at the office, Plaintiff and his family traveled again in the pickup truck with INS officials.  [*See* Moises Carranza-Reyes Dep., at 109-110, Exh. A-23].

67.     Plaintiff and his family were transferred from the INS vehicle to a sheriff's vehicle.  [*See* Moises Carranza-Reyes Dep., at 115-116, Exh. A-23].

68.     Plaintiff and his family were taken to the Park County Jail.  [*See* Moises Carranza-Reyes Dep., at 119-120, Exh. A-23].

**Plaintiff Housed at the Park County Jail:**

69.     On March 1, 2003, Deputy John Thomas picked up nine INS detainees, including the Plaintiff, his brother, and his sister-in-law, at the Eagle County Jail and transported them to the Park County Jail.   [*See* Thomas Memorandum, 3/13/03, Exh. A-24; Order to Detain or Release Aliens, 3/1/03, Exh. A-25].

70.     The nine INS detainees arrived at the Park County Jail at approximately 9:07 p.m. and were processed into the Jail by Deputy Don Woodward and Deputy Michael Guerin.  [*See* Bellantonio Memorandum, 3/12/03, Exh. A-26; Master Control Log, 3/1/03, at 0968, Exh. A-17].

71.     Plaintiff signed an INS Detainee Intake Form on March 1, 2003, at 9:39 p.m.  [*See* INS Detainee Intake Form, 3/1/03, Exh. A-27].

72.     Plaintiff completed a medical screening form in Spanish in which he identified no medical needs.  [*See* Park County Jail Reporte Para El Doctor, Exh. A-28].

73.     After the arrival of the nine INS detainees on March 1, 2003, there were 41 INS detainees housed in D-Pod.  [*See* Park County Jail Count Sheets, 3/1/03, Exh. A-29].

74.     Either Vicki Paulsen, RN, or a Deputy distributed medication at 7:10 a.m., 2:24 p.m. and 9:07 p.m. in D-Pod on March 2, 2003.  [*See* Master Control Log, 3/2/03, at 0970-0971, Exh. A-17].[4]

75.     Deputies conducted pod walks of D-Pod multiple times on March 2, 2003.  [*See* Master Control Log, 3/2/03, at 0968-0972, Exh. A-17; Park County Jail Pod Walk Log Sheet, 3/2/03, Exh. A-30].

76.     Deputies provided cleaning supplies to D-Pod at 10:06 a.m., and 3:35 p.m. on March 2, 2003.  [*See* Master Control Log, 3/2/03, at 0971, Exh. A-17].

---

[4] The references to the number of times different things occurred in the Park County Jail between March 1-8, 2003, are based on the specific notations found in the Master Control Log. Defendants believe that these references demonstrate a minimum of when these various things occurred during Plaintiff's detention in the Park County Jail.  Different individuals responsible for completing the Master Control Log had different abilities and styles about how much detail they provided in their recordings in the Master Control Log.  [*See* Gore Dep., at 89, Exh. A-2].

77.     Deputies removed trash from D-Pod at 3:29 p.m. and 6:30 p.m. on March 2, 2003. [*See* Master Control Log, 3/2/03, at 0971-0972, Exh. A-17].

78.     On March 2, 2003, 48 INS detainees were housed in D-Pod.  [*See* Park County Jail Count Sheets, 3/2/03, Exh. A-29].

79.     Nurse Paulsen or a Deputy distributed medication at 7:00 a.m., 2:09 p.m. and 8:45 p.m. in D-Pod on March 3, 2003.  [*See* Master Control Log, 3/3/03, at 0974, & 0976-977, Exh. A-17].

80.     Deputies conducted pod walks of D-Pod multiple times on March 3, 2003.  [*See* Master Control Log, 3/3/03, at 0972-0977, Exh. A-17].

81.     Deputies provided cleaning supplies to D-Pod at 12:50 p.m. on March 3, 2003. [*See* Master Control Log, 3/3/03, at 0976, Exh. A-17].

82.     Deputies removed trash from D-Pod at 5:30 p.m. on March 3, 2003.  [*See* Master Control Log, 3/3/03, at 0976, Exh. A-17].

83.     On March 3, 2003, between 48 and 50 INS detainees were housed in D-Pod.  [*See* Park County Jail Count Sheets, 3/3/03, Exh. A-29].

84.     A Deputy distributed medication at 2:30 p.m. on March 4, 2003.  [*See* Master Control Log, 3/4/03, at 0981, Exh. A-17].

85.     Deputies conducted pod walks of D-Pod multiple times on March 4, 2003.  [*See* Master Control Log, 3/4/03, at 0977-0983, Exh. A-17; Park County Jail Pod Walk Log Sheet, 3/4/03, Exh. A-30].

86.     Deputies provided cleaning supplies to D-Pod at 8:39 a.m. and 4:20 p.m. on March 4, 2003.  [*See* Master Control Log, 3/4/03, at 0979 & 0982, Exh. A-17].

87.    Deputies removed trash from D-Pod at 9:28 a.m. and 5:46 p.m. on March 4, 2003. [*See* Master Control Log, 3/4/03, at 0980 & 0982, Exh. A-17].

88.    Laundry was picked up from D-Pod at 9:12 a.m. on March 4, 2003.  [*See* Master Control Log, 3/4/03, at 0979, Exh. A-17].

89.    Uniforms were exchanged in D-Pod on March 4, 2003, at 10:33 p.m.  [*See* Master Control Log, 3/4/03, at 0982, Exh. A-17].

90.    Deputies reported several inmates in D-Pod appeared to be experiencing chest colds or flu symptoms or altitude sickness on March 4, 2003.   As a result, Deputies provided coolers in D-Pod overnight with drinks and water.  [*See* Flint Memorandum, 3/4/03, Exh. A-31; Flint Dep., at 80, Exh. A-12].

91.    On March 4, 2003, 50 INS detainees were housed in D-Pod.  [*See* Park County Jail Count Sheets, 3/4/03, Exh. A-29].

92.    Nurse Paulsen or a Deputy distributed medication at 6:53 a.m. and 1:50 p.m. in D-Pod on March 5, 2006.  [*See* Master Control Log, 3/5/03, at 0984 & 0986, Exh. A-17].

93.    Deputies conducted pod walks of D-Pod multiple times on March 5, 2003.  [*See* Master Control Log, 3/5/03, at 0983-0988, Exh. A-17; Park County Jail Pod Walk Log Sheet, 3/5/03, Exh. A-30].

94.    Deputies provided cleaning supplies to D-Pod at 10:30 a.m. and 5:55 p.m. on March 5, 2003.  [*See* Master Control Log, 3/5/03, at 0985 & 0987, Exh. A-17].

95.    On March 5, 2003, 50 INS detainees were housed in D-Pod.  [*See* Park County Jail Count Sheets, 3/5/03, Exh. A-29].

96.     On March 6, 2003, Plaintiff was seen by Nurse Paulsen complaining of aches, headache, nausea, diarrhea, nasal congestion, and a sore throat.   [*See* Paulsen Nursing Notes, 3/6/03, Exh. A-32; Paulsen Dep., at 51-54, Exh. A-5].

97.     Nurse Paulsen treated Plaintiff by providing him with the over-the-counter medications of Motrin/Ibuprofen for body aches and headache, Chlortrimeton (CTM) for nasal congestion, and Pepto Bismol for nausea.   Nurse Paulsen informed Plaintiff to inform medical if he did not improve. [*See* Paulsen Nursing Notes, 3/6/03, Exh. A-32].

98.     Plaintiff was one of five INS detainees who Nurse Paulsen saw for medical issues on March 6, 2003.  [*See* Paulsen Dep., at 71, Exh. A-5].

99.     Nurse Paulsen or a Deputy distributed medication at 2:00 p.m. and 10:00 p.m. in D-Pod on March 6, 2006.  [*See* Master Control Log, 3/6/03, at 0993 & 0995, Exh. A-17].

100.     Deputies conducted pod walks of D-Pod multiple times on March 6, 2003.   [*See* Master Control Log, 3/6/03, at 0988-0995, Exh. A-17; Park County Jail Pod Walk Log Sheet, 3/6/03, Exh. A-30].

101.     Deputies provided cleaning supplies to D-Pod at 10:30 a.m. on March 6, 2003. [*See* Master Control Log, 3/6/03, at 0993, Exh. A-17].

102.     Deputies removed trash from D-Pod at 10:30 a.m. and 4:10 p.m. on March 6, 2003.  [*See* Master Control Log, 3/6/03, at 0993 & 0994, Exh. A-17].

103.     Sixty-one INS detainees were housed in D-Pod on March 6, 2003.   [*See* Park County Jail Count Sheets, 3/6/03, Exh. A-29].

104.     On March 7, 2003, Plaintiff was seen by Nurse Paulsen complaining of headache, nausea, vomiting, body aches, diarrhea and nasal congestion.   [*See* Paulsen Nursing Notes,

3/7/03, Exh. A-32; Paulsen Dep., at 54-55, Exh. A-5].

105.   Nurse Paulsen treated Plaintiff on March 7, 2003, by continuing the over-the-counter medications of Motrin/Ibuprofen for body aches and headache, Chlortrimeton (CTM) for nasal congestion, and Pepto Bismol for nausea.   Nurse Paulsen also again informed Plaintiff to inform medical if he did not improve.   [*See* Paulsen Nursing Notes, 3/7/03, Exh. A-32].

106.   Nurse Paulsen or a Deputy distributed medication at 6:55 a.m., 1:45 p.m. and 9:30 p.m. in D-Pod on March 7, 2006.   [*See* Master Control Log, 3/7/03, at 0997-0999, Exh. A-17].

107.   Deputies conducted pod walks of D-Pod multiple times on March 7, 2003.   [*See* Master Control Log, 3/7/03, at 0995-0999, Exh. A-17; Park County Jail Pod Walk Log Sheet, 3/7/03, Exh. A-30].

108.   Deputies provided cleaning supplies to D-Pod at 10:57 a.m. on March 7, 2003. [*See* Master Control Log, 3/7/03, at 0998, Exh. A-17].

109.   Deputies removed trash from D-Pod at 10:10 a.m. on March 7, 2003.   [*See* Master Control Log, 3/7/03, at 0997, Exh. A-30].

110.   On March 7, 2003, 61 INS detainees were housed in D-Pod until 3:45 p.m..   [*See* Park County Jail Count Sheets, 3/7/03, Exh. A-17].

111.   On March 7, 2003, at 3:45 p.m., the INS picked up 51 detainees from the Park County Jail. [*See* Master Control Log, 3/7/03, at 0998, Exh. A-17].

112.   On March 8, 2003, 10-11 INS detainees were in D-Pod.   [*See* Park County Jail Count Sheets, 3/8/03, Exh. A-30].

113.   On March 8, 2003, at 1:00 a.m., Deputy Don Frye gave Plaintiff Ibuprofen/Motrin and Pepto Bismol.   [*See* Frye Incident Report, 3/8/03, Exh. A-33].

114.    Between 1:00-3:00 a.m. on March 8, 2003, Deputy Frye conducted pod walks of D-Pod and received no complaints from Plaintiff.  [*See* Frye Incident Report, 3/8/03, Exh. A-33].

115.    At 3:00-3:30 a.m. on March 8, 2003, Deputy Frye checked on Plaintiff and assisted him to medical where he took his vital signs and gave Plaintiff oxygen.  [*See* Frye Incident Report, 3/8/03, Exh. A-33; Master Control Log, 3/8/03, at 1001, Exh. A-17].

116.    At 3:45 a.m. on March 8, 2003, Deputy William Fikejs called Nurse Paulsen at home and informed her that Plaintiff was having trouble breathing and that he was vomiting and had nausea.  Nurse Paulsen informed Deputy Fikejs to continue to monitor Plaintiff's condition and to call her if Plaintiff's condition changed.  Deputy Fikejs gave Plaintiff oxygen and reported to Nurse Paulsen that Plaintiff was feeling better.  Nurse Paulsen also informed Deputy Fikejs he could give Plaintiff more Ibuprofen/Motrin and Pepto Bismol.  [*See* Paulsen Nursing Notes, 3/8/03, Exh. A-32].

117.    At between 5:20-5:40 a.m. on March 8, 2003, Deputy Frye offered Plaintiff more oxygen but Plaintiff declined.  Deputy Frye also checked Plaintiff's side and found no swelling.  [*See* Frye Incident Report, 3/8/03, Exh. A-33].

118.    At 6:00 a.m. on March 8, 2003, Nurse Paulsen called from home to check on Plaintiff.  Nurse Paulsen was informed by Deputy Fikjes that he was resting, and had used the restroom once in the past two hours.  [*See* Paulsen Nursing Notes, 3/8/03, Exh. A-32].

119.    At 7:00 a.m. on March 8, 2003, Deputy Frye gave Plaintiff Motrin/Ibuprofen and Pepto Bismol.  Deputy Frye believed Plaintiff appeared to be better because he was walking around.  Plaintiff declined oxygen.  [*See* Frye Incident Report, 3/8/03, Exh. A-33; Master Control Log, 3/8/03, at 1002, Exh. A-17].

120.    At approximately 8:00 a.m. on March 8, 2003, Nurse Paulsen arrived at the Jail. [*See* Master Control Log, 3/8/03, at 1002, Exh. A-17; Paulsen Nursing Notes, 3/8/03, Exh. A-32].

121.    At 8:10 a.m. on March 8, 2003, Plaintiff collapsed to the floor of D-Pod. Nurse Paulsen was called to check on the Plaintiff.  Nurse Paulsen noted Plaintiff had acute pain on his right side over his right kidney, radiating to his right flank and down into the right lower abdomen slightly above his groin.  Nurse Paulsen had Jail staff move Plaintiff to the lower tier of D-Pod for his safety.  Nurse Paulsen also spoke to Ben Baca at INS and received permission to transport Plaintiff for evaluation by a physician if his condition worsened.  When Mr. Baca asked Nurse Paulsen what she thought Plaintiff's problem was she responded that it could be anything from possibly kidney stones to gall bladder to something else.   [*See* Crawford Memorandum, 3/8/03, Exh. A-34; Master Control Log, 3/8/03, at 1002, Exh. A-17; Paulsen Nursing Notes, 3/8/03, Exh. A-32].

122.    At 8:27 a.m. on March 8, 2003, Corporal Crawford contacted Mr. Baca of INS concerning Plaintiff and INS approved Plaintiff's transfer to a hospital if his condition worsened. [*See* Crawford Memorandum, 3/8/03, Exh. A-34; Master Control Log, 3/8/03, at 1002, Exh. A-17; Crawford Dep., at 80, Exh. A-14].

123.    At 8:35 a.m. on March 8, 2003, Sergeant Dan Muldoon was advised of the situation and placed on standby to potentially transport Plaintiff to a hospital.   [*See* Crawford Memorandum, 3/8/03, Exh. A-34; Muldoon Memorandum, 3/12/03, Exh. A-35; Master Control Log, 3/8/03, at 1002, Exh. A-17; Crawford Dep., at 85, Exh. A-14].

124.    At 8:50 a.m. on March 8, 2003, Corporal Crawford sent Deputy Scott Theobald out for cranberry juice for Plaintiff because of a possible kidney stone.  [*See* Crawford Memorandum, 3/8/03, Exh. A-34; Second Crawford Memorandum, 3/8/03, Exh. A-36; Master Control Log, 3/8/03, at 1002, Exh. A-17; Gore Dep., at 175, Exh. A-2; Crawford Dep., at 86-87, Exh. A-14].

125.    At 8:53 a.m. on March 8, 2003, Corporal Crawford noted Plaintiff had a small amount of blood in his saliva.  [*See* Master Control Log, 3/8/03, at 1002, Exh. A-17; Crawford Dep., at 88, Exh. A-14].

126.    At 9:20 a.m. on March 8, 2003, a chair was ordered for Plaintiff to sit in to ease his discomfort.  [*See* Crawford Memorandum, 3/8/03, Exh. A-34; Master Control Log, 3/8/03, at 1002, Exh. A-17; Crawford Dep., at 88, Exh. A-14].

127.    At 10:30 a.m. on March 8, 2003, Nurse Paulsen received another update concerning Plaintiff and was informed he was vomiting more frequently.  Nurse Paulsen ordered Plaintiff transported to Summit Medical Center at 11:07 a.m. based on her concern Plaintiff's vomiting might lead to dehydration and because of his right side pain.  [*See* Crawford Memorandum, 3/8/03, Exh. A-34; Master Control Log, 3/8/03, at 1003, Exh. A-17; Paulsen Nursing Notes, 3/8/03, Exh. A-32].

**Plaintiff Transported to Summit Medical Center**.

128.    At 11:13 a.m. on March 8, 2003, Sergeant Muldoon was called to transport Plaintiff to a hospital.  [*See* Crawford Memorandum, 3/8/03, Exh. A-35; Muldoon Memorandum, 3/12/03, Exh. A-17; Master Control Log, 3/8/03, at 1003, Exh. A-17; Muldoon Dep., at 43-44, Exh. A-13].

129.    At 11:43 a.m. on March 8, 2003, Corporal Crawford left a message for Mr. Baca of INS to advise him of Plaintiff's transport to Summit Medical Center.   [*See* Crawford Memorandum, 3/8/03, Exh. A-34; Master Control Log, 3/8/03, at 1003, Exh. A-17; Crawford Dep., at 91, Exh. A-14].

130.    At 11:55 a.m. on March 8, 2003, Plaintiff was transported to the Summit Medical Center by Sergeant Muldoon and arrived at 12:40 p.m.   [*See* Crawford Memorandum, 3/8/03, Exh. A-34; Muldoon Memorandum, 3/12/03, Exh. A-35; Master Control Log, 3/8/03, at 1003, Exh. A-17].

131.    At 12:46 p.m. on March 8, 2003, Corporal Crawford spoke with Dan Fitzgibbons of INS concerning Plaintiff.   Mr. Fitzgibbons stated "that they had no place to put this inmate and he would probably return to Park County after eval/treatment."   [*See* Crawford Memorandum, 3/8/03, Exh. A-34].

132.    Plaintiff was treated in the emergency department at Summit Medical Center by Timothy B. Keeling, D.O.  [*See* Keeling Treatment Notes, 3/8/03, Exh. A-37].

133.    Dr. Keeling diagnosed Plaintiff with the following:   "1.   Right middle lobe and right lower lobe pneumonia 2.  Sepsis 3.  Hypokalemia 4.  Elevated creatinine, abnormal chemistries."  [*See* Keeling Treatment Notes, 3/8/03, Exh. A-37].

**Plaintiff Transported to Denver Health Medical Center**:

134.    Dr. Keeling ordered Plaintiff transported to Denver Health Medical Center for further treatment.   Plaintiff left Summit Medical Center via ambulance at 3:28 p.m.  [*See* Keeling Treatment Notes, 3/8/03, Exh. A-37].

135.    Sergeant Muldoon followed the ambulance with Plaintiff from Summit Medical Center to Denver Health Medical Center.   [*See* Muldoon Memorandum, 3/12/03, Exh. A-35; Muldoon Dep., at 54-55, Exh. A-13].

136.    The INS was advised of Plaintiff being transferred to Denver Health Medical Center at 3:04 p.m. on March 8, 2003.  [*See* Master Control Log, 3/8/03, at 1004, Exh. A-17].

137.    Plaintiff arrived at Denver Health Medical Center at 4:55 p.m. on March 8, 2003. [*See* Summit Ambulance Service Prehospital Care Report, 3/8/03, Exh. A-38].

138.    Sergeant Muldoon turned over custody of Plaintiff to the Denver County Sheriff's Department.  [*See* Muldoon Memorandum, 3/12/03, Exh. A-35].

## ARGUMENT

### I.  THE BOARD OF COUNTY COMMISSIONERS OF PARK COUNTY HAS NO SUPERVISORY RESPONSIBILITY OVER THE PARK COUNTY JAIL AS A MATTER OF COLORADO LAW AND NO CUSTOM, POLICY OR PRACTICE OF THE BOARD OF COUNTY COMMISSIONERS VIOLATED PLAINTIFF'S CONSTITUTIONAL RIGHTS

Plaintiff cannot legitimately hold the Board of County Commissioners of Park County ("Board") legally responsible for anything that occurred during his detention in the Park County Jail as a matter of law.  First, under Colorado law, the Board is not responsible for the operations of the Park County Jail.  Rather, the Sheriff of Park County possesses the legal responsibility over the Jail.  Second, no custom, policy or practice of the Board violated any of the Plaintiff's constitutional rights.  Plaintiff cannot demonstrate that any custom, policy or practice adopted or approved by the Board violated his rights or caused him any constitutional injury.

## A.  COLORADO LAW PROVIDES THE SHERIFF, NOT THE BOARD OF COUNTY COMMISSIONERS, EXERCISES RESPONSIBILITY OVER COUNTY JAILS

In Colorado, counties are created by the Constitution.  *See* Colo. Const. art. XIV, § 1. Sheriffs and county commissioners are separate and distinct elected county officials.  *See* Colo. Const. art. XIV, § 6 (establishing the office of county commissioner) and Colo. Const. art XIV, § 8 (establishing other county officers including the office of Sheriff); *see also* C.R.S. § 1-4-205 (statutory authority for county commissioners) and C.R.S. § 1-4-206 (statutory authority for other county officers).  The powers of the counties of Colorado are defined by the Colorado Constitution and Colorado statutes.  *See generally* C.R.S. §§ 30-1-101 *et seq.*

The office of county sheriff has proscribed duties, responsibilities, authority and liability under Colorado law.  *See* C.R.S. §§ 30-10-501 *et seq.*  Sheriffs in Colorado have the authority and responsibility to oversee all county jails, *see* C.R.S. § 30-10-511, to transport prisoners to correctional facilities, *see* C.R.S. § 30-10-514, to act as fire warden for the county, *see* C.R.S. § 30-10-512, to serve and execute legal writs and assist all courts of record located in the county, *see* C.R.S. § 30-10-515, and to generally preserve the peace from unlawful and disorderly activities, *see* C.R.S. § 30-10-516.  Sheriffs have the authority to appoint all undersheriffs and deputy sheriffs with their salaries fixed by the sheriff and approved by the board of county commissioners.  *See* C.R.S. § 30-2-106(1).  The undersheriff and all deputies serve at the pleasure of the sheriff.  *See* C.R.S. § 30-10-504, C.R.S. § 30-10-506 and C.R.S. § 30-10-510.  In contrast, the board of county commissioners' statutory authority does not include oversight of the operations of the county jail.  *Compare* C.R.S. § 30-11-107 (enumerating the powers of the board of county commissioners); ***Board of County Commissioners of the County of Dolores v. Love,*** 470 P.2d 861, 862-63 (Colo. 1970) ("As a political subdivision, a county, and its

commissioners, possess only such powers as are expressly conferred upon them by the constitution and statutes, and such incidental powers as are reasonably necessary to carry out such express powers."); *Skidmore v. O'Rourke,* 383 P.2d 473, 474-76 (Colo. 1963) (same).

The Colorado Supreme Court has specifically held that a board of county commissioners lacked authority over the operations of the county jail.   In *Richart v. Board of County Commissioners of Boulder County,* 33 P.2d 971 (Colo. 1934), the Colorado Supreme Court concluded the Sheriff's authority over the operation of the county jail precluded the Board of County Commissioners from precluding the Sheriff and his family from living in part of the jail. *Id.* at 971-73.   "A sheriff, in his capacity as jailer, has a great responsibility, and he cannot perform his duties properly if subject to interference by a board of county commissioners."  *Id.* at 973.  *See also* *Van Cleave v. Board of County Commissioners of the County of Adams,* 518 P.2d 1371, 1373 (Colo. App. 1973) ("The issue in *Richart* was whether the board of county commissioners' general authority to control the county's property took precedence over the sheriff's more specific authority, as county jailer, to administer the functioning of the jail.   The Supreme Court concluded that the board's general powers must yield to the particular powers conferred upon the sheriff with reference to the jail, and held that the board had no authority to forbid the defendant [sheriff] from occupying the room as part of the sheriff's living quarters."). The Colorado Supreme Court's decision in *Richart* was based on the following statute:

> The sheriff of the county, in person or by deputy appointed for that purpose, shall be the keeper of the county jail.   He shall be responsible for the manner in which the same is kept.   He shall see that the same is kept clean, safe, and wholesome.   The expenses of keeping the jail in good order and repair and of lighting and warming that part thereof wherein prisoners are confined and the office in the jail shall be paid by the county wherein the jail is situated.   Nothing in this section shall authorize the lighting or warming of that part of the jail occupied by the keeper thereof as his dwelling house.

C.R.S. § 17-26-102.  *See also*  C.R.S. § 30-10-511 (providing the sheriff is the custodian of the county jail).

The Colorado Court of Appeals addressed the question of whether a board of county commissioners could be held liable for the actions of a deputy sheriff under respondeat superior principles.  ***Tunget v. Board of County Commissioners of Delta County,*** 992 P.2d 650 (Colo. App. 1999).   In ***Tunget,*** the plaintiffs attempted to hold the Board of County Commissioners liable for the alleged tortious behavior of a deputy sheriff arising from an automobile accident. *Id.* at 650.  In concluding the Board was not a proper defendant, the Court of Appeals reasoned:

> Under both the Colorado Constitution and applicable statutes, sheriffs and boards of county commissioners are treated as separate public entities having different powers and responsibilities.  Colo. Const. art. XIV, § 8 and 8.5, treat boards of county commissioners and sheriffs as separate entities, and various statutory provisions enumerate the respective specific responsibilities and powers of a county sheriff, a county, and a county board of commissioners.  *See* §§ 30-10-501, *et seq.,* 30-11-101, and 30-11-107, C.R.S. 1998.

*Id.* at 650-51.  Similarly, the Tenth Circuit has held a board of county commissioners was not a deputy sheriff's "employer" for purposes of the duty to reasonably accommodate the deputy sheriff under the Americans with Disabilities Act due to the separate constitutional and statutory status of boards of county commissioners and sheriffs under Colorado law.  *See* ***Bristol v. Board of County Commissioners of the County of Clear Creek,*** 312 F.3d 1213, 1219-21 (10th Cir. 2002) (en banc).

### B.  MUNICIPAL LIABILITY PRINCIPLES

An underlying constitutional violation must exist to hold a public entity liable under 42 U.S.C. § 1983.  ***Trigalet v. City of Tulsa, Okla.,*** 239 F.3d 1150, 1154-56 (10th Cir.), *cert. denied,* 534 U.S. 814 (2001); ***Butler v. City of Prairie Village***, 172 F.3d 736, 747 (10th Cir.

1999); *Wilson v. Meeks*, 98 F.3d 1247, 1255 (10th Cir. 1996).  However, a municipality cannot be held liable pursuant to 42 U.S.C. § 1983 simply because it employed a person or persons who violated a plaintiff's civil rights.  In *Monnell v. New York City Dep't of Social Services,* 436 U.S. 658 (1978)*,* the Supreme Court explicitly rejected the notion of governmental entity liability based on either a respondeat superior or vicarious liability theory.  *Id.* at 694.  Instead, "[t]o establish municipal liability, a plaintiff must show (1) the existence of a municipal custom or policy and (2) a direct and causal link between the custom or policy and the violation alleged." *Jenkins v. Wood,* 81 F.3d 988, 993 (10th Cir. 1996) (citing *City of Canton v. Harris,* 489 U.S. 378, 385 (1989)).  Subsequently, the Supreme Court described the requirements a plaintiff must meet to impose public entity liability as follows:  "[I]t is not enough for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality.  The plaintiff must also demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged.  That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Board of County Commissioners of Bryan County v. Brown,* 520 U.S. 397, 404 (1997).

Under these standards, a municipality can be liable only for its official customs or policies, or for the actions of a final policymaker.  A custom is a "persistent and widespread" practice that "constitutes the standard operating procedure of the local governmental entity." *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989).  Municipal liability only attaches where "a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in

question." ***Pembaur v. City of Cincinnati,*** 475 U.S. 469, 483 (1986); ***Myers v. Oklahoma County Board of County Commissioners,*** 151 F.3d 1313, 1319 (10th Cir. 1998). "When the asserted policy consists of a failure to act, the plaintiff must demonstrate that the municipality's inaction was the result of 'deliberate indifference' to the rights of its inhabitants." ***Gaylor v. Does,*** 105 F.3d 572, 577 (10th Cir. 1997) (quoting ***City of Canton,*** 489 U.S. at 389); ***Hinton v. City of Elwood,*** 997 F.2d 774, 782 (10th Cir. 1993).

### C.  THE BOARD OF COUNTY COMMISSIONERS OF PARK COUNTY CANNOT BE HELD LIABLE TO PLAINTIFF AS A MATTER OF LAW

Colorado law clearly and unambiguously provides the Sheriff, not the Board of County Commissioners, possesses the legal authority and responsibility to oversee the County Jail. Further, even assuming *arguendo* the Board had any responsibility over the Park County Jail under Colorado law, no basis exists to hold the Board liable to the Plaintiff because no custom, policy or practice of the Board caused any injury to the Plaintiff.  As a result, no basis exists here to hold the Board legally responsible to the Plaintiff pursuant to 42 U.S.C. § 1983.

Initially, the applicable provisions of the Colorado Constitution, Colorado statutes, and the above precedent demonstrate the Sheriff of Park County, not the Board of County Commissioners of Park County, exercises oversight responsibility over the Park County Jail. Under Colorado law, sheriffs and boards of county commissioners are separate and distinct county officers with different powers, authority and responsibility.  A board of county commissioners cannot encroach on a sheriff's authority in the sheriff's areas of control including operation of the county jail.  Indeed, Sheriff Wegener  recognizes he is statutorily responsible for

overseeing the operations of the Park County Jail.   [¶ 3].[5]   Accordingly, no basis exists to hold the Board liable pursuant to 42 U.S.C. § 1983 for any conditions of confinement of the Plaintiff at the Park County Jail.

Further, even if the Board possessed any responsibility over the Park County Jail, no basis whatsoever exists to hold the Board liable to the Plaintiff pursuant to the applicable municipal liability standards governing Plaintiff's 42 U.S.C. § 1983 claim.   Multiple problems exist with holding the Board liable pursuant to 42 U.S.C. § 1983 here.   First, based on the above Colorado law, it is clear the Sheriff, and not the Board, is the final policymaker for any custom, policy or practice of the Park County Jail.   Second, the Plaintiff can point to absolutely no evidence that the Board adopted, approved, or even was aware of any specific custom, policy, or practice of the Park County Jail Plaintiff alleges violated his constitutional rights.   Third, no custom, policy or practice involving the Board caused any injury to the Plaintiff.

The instant situation is analogous to what the Tenth Circuit addressed in *Langley v. Adams County,* 987 F.2d 1473 (10th Cir. 1993).   In *Langley,* the plaintiff attempted to hold the Board of County Commissioners of Adams County liable for the termination of her employment. The Tenth Circuit reversed the District Court after concluding no evidence existed that the commissioners were individually involved in her termination.   *Langley,* 987 F.2d at 1480-81. While *Langley* involved claims against the commissioners in their individual capacity, the underling principle of *Langley*—that one cannot be held liable pursuant to 42 U.S.C. § 1983 absent evidence linking one to the unconstitutional act or omission—applies equally here.   Here,

_____

[5]   For ease of reference, whenever possible, citations to factual references are made to the paragraph numbers contained in the above Statement of Undisputed Material Facts.

no evidence exists the Board had any involvement whatsoever in any custom, policy, or practice of the Park County Jail that allegedly violated the Plaintiff's constitutional rights. Absent such evidence, the Board of County Commissioners of Park County cannot be held liable pursuant to 42 U.S.C. § 1983 as a matter of law.

## II.  PLAINTIFF STATES NO VIABLE CLAIM FOR ANY ALLEGED CONSTITUTIONAL VIOLATION AGAINST SHERIFF FRED WEGENER IN EITHER HIS INDIVIDUAL OR OFFICIAL CAPACITIES

Plaintiff's 42 U.S.C. § 1983 claims against Sheriff Wegener fail as a matter of law. First, Sheriff Wegener is entitled to qualified immunity from the Plaintiff's claims against him in his individual capacity. Plaintiff cannot demonstrate Sheriff Wegener personally participated in any violation of his constitutional rights either individually or in his supervisory capacity as Sheriff of Park County. Second, Plaintiff's claims against Sheriff Wegener in his official capacity also fail. Plaintiff cannot demonstrate any custom, policy, or practice of the Park County Jail violated his constitutional rights. To succeed with his official capacity claim, Plaintiff must establish a custom, policy or practice of the Park County Jail caused him a constitutional injury. Close examination of the undisputed facts contained in the summary judgment record before this Court demonstrates Plaintiff cannot meet this required burden here. Despite Plaintiff's allegations concerning the conditions of confinement in the Park County Jail during March 1-8, 2003, Plaintiff cannot establish a direct causal link between any constitutional injury and any actual custom, policy, or practice of the Park County Jail.

## A.  FOURTEENTH AMENDMENT PRINCIPLES

Plaintiff attempts both an Eighth and a Fourteenth Amendment claim concerning the conditions of his confinement at the Park County Jail. However, the Fourteenth Amendment, not

the Eighth Amendment, applies to a pretrial detainee such as Plaintiff. *Block v. Rutherford,* 468 U.S. 576, 583-85 (1984); *Bell v. Wolfish,* 441 U.S. 520, 536-37 & n. 16 (1979). "Although the Due Process Clause governs a pretrial detainee's claim of unconstitutional conditions of confinement, the Eighth Amendment standard provides the benchmark for such claims." *Craig v. Eberly,* 164 F.3d 490, 495 (10th Cir. 1998); *Ledbetter v. City of Topeka, Kan.,* 318 F.3d 1183, 1188 (10th Cir. 2003).[6]

## 1. CONDITIONS OF CONFINEMENT GENERALLY

The Due Process Clause of the Fourteenth Amendment requires pretrial detainees be provided "humane conditions of confinement by ensuring . . . the basic necessities of adequate food, clothing, shelter, and medical care, and by taking reasonable measures to guarantee his safety." *Ledbetter.,* 318 F.3d at 1188; *Barney v. Pulsipher,* 143 F.3d 1299, 1310 (10th Cir. 1998). To hold an individual jail employee personally liable for violating a pretrial detainee's right to humane conditions of confinement, the Plaintiff must satisfy both an objective and a subjective component. *Craig,* 164 F.3d at 495. First, the objective component requires the alleged deprivation be "sufficiently serious." *Wilson v. Seiter,* 501 U.S. 294, 298 (1991). The

---

[6] A variety of different courts have applied the Fourteenth Amendment to pretrial detainees held for violations of federal immigration laws. *See, e.g., Okocci v. Klien,* 270 F.Supp.2d 603, 610 n. 3 (E.D. Pa. 2003) ("Pretrial detainees are persons who have been charged with a crime, but who have not yet been tried on that charge. The term detainee also includes those in custody awaiting hearing or deportation by the Immigration or Naturalization Service."; citations and internal quotation marks omitted), *aff'd,* 100 Fed. Appx. 127 (3d Cir. 2004), *cert. denied,* 543 U.S. 1061 (2005); *Adegbuji v. Abode,* 2005 U.S. Dist. LEXIS 36393 at **17-18 (D.N.J. Dec. 22, 2005) (unpublished disposition attached as Exh. A-39); *Crosby v. Georgakapoulos,* 2005 U.S. Dist. LEXIS 32238 at ** 7-8 (D.N.J. June 24, 2005 (unpublished disposition attached as Exh. A-40); *Maccado v. Jolley,* 2004 U.S. Dist. LEXIS 29094 at ** 7 n. 2 (D. Md. Aug. 25, 2004), *aff'd,* 124 Fed. Appx. 788 (4th Cir. 2005) (unpublished disposition attached as Exh. A-41).

constitution does not mandate comfortable prisons.   Instead, "only those deprivations denying the minimal civilized measure of life's necessities . . . are sufficiently grave to form the basis of an Eighth Amendment violation." *Id.* at 298.   Both the severity and the duration of the allegedly unconstitutional conditions of confinement are taken into consideration as are the totality of the overall conditions of confinement. *Id.* at 304-5; *Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981).   "[J]ail conditions may be 'restrictive and even harsh' without violating constitutional rights." *Ledbetter,* 318 F.3d at 1188.   "In general, the severity and duration of deprivations are inversely proportional, so that minor deprivations suffered for short periods would not rise to an Eighth Amendment violation, while 'substantial deprivations of shelter, food, drinking water, and sanitation' may meet the standard despite a shorter duration." *Despain v. Uphoff,* 264 F.3d 965, 974 (10th CIr. 2001).

Second, the subjective component of the inquiry requires the jail official to have a sufficiently culpable state of mind.   "In the context of prison-conditions claims, the required state of mind is one of deliberate indifference to inmate health and safety." *Craig,* 164 F.3d at 495. "In other words, the jailer is liable only if he or she knows of and disregards an excessive risk to inmate health and safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Craig,* 164 F.3d at 495.   "It is not enough to establish that the official should have known of the risk of harm." *Barney,* 143 F.3d at 1310.   "The test requires both knowledge and disregard of possible risks, a *mens rea* on a par with criminal recklessness." *Despain,* 264 F.3d at 975.

## 2.  MEDICAL CARE

Similarly, while the Fourteenth Amendment applies to the Plaintiff's claim of

constitutionally inadequate medical care, the Eighth Amendment standard applies. *Ledbetter,* 318 F.3d at 1188.    A prison official violates the Eighth Amendment's Cruel and Unusual Punishment Clause when his conduct demonstrates he was deliberately indifferent to the serious medical needs of prisoners. *Estelle v. Gamble,* 429 U.S. 97, 104 (1976). *Estelle's* two-part inquiry has both an objective component, whether the prisoner's need was sufficiently serious, and a subjective component, whether the particular prison official's state of mind was sufficiently culpable to be deliberately indifferent to the prisoner's medical condition. *Farmer,* 511 U.S. at 834; *Riddle v. Mondragon,* 83 F.3d 1197, 1203 (10th Cir. 1996).  The medical need must be sufficiently serious to satisfy the objective component of this inquiry.  "[A] medical need is sufficiently serious 'if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Hunt v. Uphoff,* 199 F.3d 1220, 1224 (10th Cir. 1999) (quoting *Ramos v. Lamm,* 639 F.2d 559, 575 (10th Cir. 1980), *cert. denied,* 450 U.S. 1041 (1981)).  Further, to meet the subjective component of this test, a plaintiff must establish the defendant "knew he faced a substantial risk of harm and disregarded that risk, 'by failing to take reasonable measures to abate it.'" *Hunt,* 199 F.3d at 1224.  The purpose of the subjective element is to determine whether a defendant "had a sufficiently culpable state of mind." *McClendon v. City of Albuquerque,* 79 F.3d 1014, 1022 (10th Cir. 1996);  *see also* *Whitley v. Albers,* 475 U.S. 312, 319 (1986) ("it is obduracy and wantonness, not inadvertence or error in good faith, that characterize conduct prohibited . . .").  "For a prison official to be found liable of deliberate indifference under the Eighth Amendment, the official must 'know[] of and disregard[] an excessive risk to inmate health or safety; the official must both be aware of facts from which the

inference could be drawn that a substantial risk of harm exists, and he must draw the inference.'" ***Perkins v. Kansas Dept. of Corrections,*** 165 F.3d 803, 809 (10th Cir. 1999).

Finally, individuals who are not medically trained are entitled to rely on the medical treatment decisions of medical professionals. *See* ***McCracken v. Jones,*** 562 F.2d 22, 24-25 (10th Cir. 1997), *cert. denied,* 435 U.S. 917 (1978). A non-medical prison official cannot be held deliberately indifferent to the medical complaints of a prisoner who was already seen by the prison doctor or who was referred for such treatment to appropriate prison health officials. *See, e.g.,* ***Johnson v. Doughty,*** 433 F.3d 1001, 1012 (7th Cir. 2006); ***Spruill v. Gillis,*** 372 F.3d 218, 236 (3d Cir. 2004); ***Shakka v. Smith,*** 71 F.3d 162, 167 (4th Cir. 1995).

## B. QUALIFIED IMMUNITY PRINCIPLES

The applicable inquiry for this Court on summary judgment differs when qualified immunity is raised by an individual defendant. ***Gross v. Pirtle,*** 245 F.3d 1151, 1155 (10th Cir. 2001). After an individual defendant raises the affirmative defense of qualified immunity, the burden shifts to the plaintiff. ***Scull v. New Mexico,*** 236 F.3d 588, 595 (10th Cir. 2000); ***Adkins v. Rodriguez,*** 59 F.3d 1034, 1036 (10th Cir. 1995). At that point, "[t]he plaintiff initially bears a heavy two-part burden when the defendant pleads the defense of qualified immunity." ***Mick v. Brewer****,* 76 F.3d 1127, 1134 (10th Cir. 1996); ***Albright v. Rodriguez****,* 51 F.3d 1531, 1534 (10th Cir. 1995). The plaintiff must demonstrate: (1) the defendant's conduct violated the law; and (2) the law was clearly established when the alleged violation occurred. ***Pueblo Neighborhood Health Centers, Inc. v. Losavio****,* 847 F.2d 642, 646 (10th Cir. 1988). Only if the plaintiff establishes the defendant violated clearly established law, does the burden return to the

defendant.  *County of Sacramento v. Lewis,* 523 U.S. 833, 841 n. 5 (1998);  *Gross,* 245 F.3d at 1156; *Mick,* 76 F.3d at 1134.

Applying these principles, a plaintiff must first demonstrate the individual defendant's conduct violated the law by coming forward with specific facts establishing the violation. *Taylor v. Meacham,* 82 F.3d 1556, 1559 (10th Cir.), *cert. denied,* 519 U.S. 871 (1996). "Plaintiff has the 'burden to show with particularity facts and law establishing the inference that defendant violated a constitutional right.'" *Abeyata By & Through Martinez v. Chama Valley Ind. Sch. Dist. No. 19,* 77 F.3d 1253, 1255 (10th Cir. 1996) (quoting *Walter v. Morton,* 33 F.3d 1240, 1242 (10th Cir. 1994)).   A plaintiff suing public officials must set forth specific facts showing the personal involvement of each named individual defendant. *Camfield v. City of Oklahoma City,* 248 F.3d 1214, 1225 (10th Cir. 2001); *Mitchell v. Maynard,* 80 F.3d 1433, 1441 (10th Cir. 1996); *Green v. Branson,* 108 F.3d 1296, 1302 (10th Cir. 1997).  Conclusory, nonspecific and generalized allegations of constitutional deprivations are insufficient.  *Pride v. Does,* 997 F.2d 712, 716 (10th Cir. 1993).  The Supreme Court's abrogation of the heightened pleading requirement for qualified immunity cases in *Crawford-El v. Britton,* 523 U.S. 574 (1998), is inapposite to qualified immunity determinations made on summary judgment.  *Medina v. Cram,* 252 F.3d 1124, 1128-29 (10th Cir. 2001); *Gross,* 245 F.3d at 1155 n.1.

Second, the plaintiff must also prove the relevant law was clearly established when the alleged violation occurred.   "To be clearly established, '[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Albright,* 51 F.3d at 1535 (quoting *Anderson v. Creighton,* 483 U.S. 635, 640 (1987)). The right must be clearly established in a "particularized" sense.  *Anderson,* 483 U.S. at 640.

For a right to be "'particularized,' there must ordinarily be a Supreme Court or Tenth Circuit decision on point, or 'clearly established weight of authority' from other courts." *Wilson v. Meeks*, 52 F.3d 1547, 1552 (10th Cir. 1995) (quoting *Medina v. City and County of Denver*, 960 F.2d 1493, 1498 (10th Cir. 1992)).  *See also Wilson v. Layne*, 526 U.S. 603, 616  (1999).

### C.  SHERIFF FRED WEGENER IS ENTITLED TO QUALIFIED IMMUNITY FROM THE PLAINTIFF'S CLAIMS AGAINST HIM IN HIS INDIVIDUAL CAPACITY

Plaintiff cannot overcome Sheriff Wegener's entitlement to qualified immunity from his 42 U.S.C. § 1983 claims against him in his individual capacity because Plaintiff cannot demonstrate any constitutional violation by Sheriff Wegener personally.  First, Sheriff Wegener had no personal participation in any violation of Plaintiff's constitutional rights.  Second, Sheriff Wegener also did not violate Plaintiff's constitutional rights in his supervisory capacity.

### 1.  SHERIFF FRED WEGENER HAD NO PERSONAL PARTICIPATION WITH RESPECT TO ANY ALLEGED VIOLATION OF THE PLAINTIFF'S  CONSTITUTIONAL RIGHTS

To succeed with his individual capacity claim against Sheriff Wegener, Plaintiff must demonstrate specific facts establishing Sheriff Wegener personally participated in a violation of his constitutional rights.  *Camfield,* 248 F.3d at 1225; *Mitchell,* 80 F.3d at 1441; *Green,* 108 F.3d at 1302.  Plaintiff simply cannot do so here.  Plaintiff raises a variety of different allegations concerning the conditions of his confinement at Park County Jail.  However, Plaintiff cannot demonstrate Sheriff Wegener was personally involved in any alleged violation of his constitutional rights during his detention in the Park County Jail from March 1-8, 2003.

No evidence exists Sheriff Wegener ever interacted with the Plaintiff during his detention at the Park County Jail.  No evidence exists Sheriff Wegener was either involved with or was contemporaneously aware of any decision made concerning Plaintiff during his detention.  No

evidence exists Sheriff Wegener visited the Park County Jail during any time Plaintiff was detained in the Jail.  No evidence exists Sheriff Wegener was aware of the number of INS detainees housed in D-Pod at the Park County Jail from March 1-8, 2003.  No evidence exists Sheriff Wegener was aware of the conditions of the uniform, bedding, mattress or other items provided to the Plaintiff upon his arrival at the Park County Jail or how or when Plaintiff's uniform, bedding or other items were exchanged or laundered.  No evidence exists Sheriff Wegener knew about the level of cleanliness of D-Pod during Plaintiff's detention.  No evidence exists Sheriff Wegener was aware of the temperature of D-Pod or the temperature of the water in the D-Pod showers.  No evidence exists Sheriff Wegener knew of any ill detainees in D-Pod. And no evidence exists Sheriff Wegener was aware of the Plaintiff's medical condition, Plaintiff's interaction with Deputies and the Nurse concerning his medical condition, any decision made concerning medical treatment of the Plaintiff, or any decision whether and when to transport the Plaintiff for additional medical care from a physician at Summit Medical Center.

To hold Sheriff Wegener liable to Plaintiff in his individual capacity, Plaintiff must demonstrate Sheriff Wegener knew of and disregarded an excessive risk of harm to Plaintiff. *Craig,* 164 F.3d at 495.  Critically, "[i]t is not enough to establish the official should have known of the risk of harm." *Barney,* 143 F.3d at 1310.  Here, absolutely no evidence exists Sheriff Wegener was aware of the overall conditions of confinement in the Park County Jail from March 1-8, 2003, or any specific issue concerning the conditions of confinement complained of by the Plaintiff.  Absent actual knowledge by Sheriff Wegener about the conditions of Plaintiff's confinement, no basis exists to conclude Sheriff Wegener was deliberately indifferent to Plaintiff's health and safety.  Therefore, no basis exists to conclude Sheriff Wegener personally

participated in any violation of Plaintiff's constitutional rights based on the conditions of Plaintiff's confinement.

Similarly, no evidence exists Sheriff Wegener was aware of any medical issue or concern involving the Plaintiff or any other detainee in D-Pod at the Park County Jail from March 1-8, 2003. In addition to this lack of any actual knowledge by Sheriff Wegener dooming Plaintiff's medical care claim, any such claim against Sheriff Wegener in his individual capacity also fails because Sheriff Wegener, who is not medically trained, was entitled to rely on the medical treatment decisions made by Nurse Paulsen. *McCracken,* 562 F.2d at 24-25; *Johnson,* 433 F.3d at 1012; *Spruill,* 372 F.3d at 236; *Shakka,* 71 F.3d at 167. Not only was Sheriff Wegener not aware of Plaintiff's medical condition, but as the Sheriff of Park County his only individual responsibility concerning the treatment of any medical condition of Plaintiff of which he was actually aware would have been to refer Plaintiff for treatment to medical professionals and defer to their medical judgment. Therefore, Sheriff Wegener cannot be held individually liable for any denial of medical care claim raised by Plaintiff.

### 2. SHERIFF FRED WEGENER DID NOT VIOLATE THE PLAINTIFF'S CONSTITUTIONAL RIGHTS IN ANY SUPERVISORY CAPACITY

"[T]o establish a § 1983 claim against a supervisor for the unconstitutional acts of his subordinates, a plaintiff must first show the supervisor's subordinates violated the constitution. Then, a plaintiff must show an 'affirmative link' between the supervisor and the violation, namely the active participation or acquiescence of the supervisor in the constitutional violation by the subordinates." *Serna v. Colorado Dept. of Corrections,* 455 F.3d 1146, 1151 (10th Cir. 2006). "A plaintiff may show that 'an affirmative link exists between the [constitutional] deprivation and either the supervisor's personal participation, his exercise of control or direction,

or his failure to supervise." ***Holland v. Harrington,*** 268 F.3d 1179, 1187 (10th Cir. 2001), *cert. denied,* 535 U.S. 1036 (2002); ***Worrell v. Henry,*** 219 F.3d 1197, 1214 (10th Cir. 2000), *cert. denied,* 533 U.S. 916 (2001).   Under this standard, negligence by the supervisor is insufficient. Instead, the plaintiff must demonstrate an intentional and deliberate violation of his constitutional rights. ***Johnson v. Martin,*** 195 F.3d 1208, 1219 (10th Cir. 1999); ***Serna,*** 455 F.3d at 1151-52.   Actual knowledge, not constructive knowledge, is required to hold a supervisor liable. ***Lankford v. City of Hobart,*** 73 F.3d 283, 287 (10th Cir. 1996).

Application of these standards to the undisputed facts contained in the summary judgment record demonstrates no basis exists to hold Sheriff Wegener individually liable in his supervisory capacity.   As outlined above, no evidence exists Sheriff Wegener was aware of any specific conditions of confinement in the Park County Jail between March 1-8, 2003, or any specific decision made concerning Plaintiff.   As such, no basis exists to hold Sheriff Wegener personally liable as a supervisor.   Plaintiff cannot demonstrate any intentional or deliberate violation of his constitutional rights  by Sheriff Wegener based on any alleged failure to supervise the staff working in the Park County Jail.   Sheriff Wegener was not aware of any issues respecting either the conditions of confinement at the Park County Jail or concerning the Plaintiff at any time during Plaintiff's detention to allow him to be held personally responsible as a supervisor.   Sheriff Wegener neither exercised any control or direction over any specific decision made nor is there any affirmative link between any alleged failure of Sheriff Wegener to supervise anyone and any violation of Plaintiff's constitutional rights.   Sheriff Wegener's lack of actual knowledge of anything concerning Plaintiff and his lack of any personal participation also precludes Plaintiff's supervisory liability theory against him.

### D.  PLAINTIFF'S OFFICIAL CAPACITY CLAIM
### AGAINST SHERIFF WEGENER FAILS

Plaintiff's official capacity claim against Sheriff Wegener is treated as a claim against Park County.  ***McMillian v. Monroe County, Ala.,*** 520 U.S. 781, 785 n. 2 (1997); ***Kentucky v. Graham,*** 473 U.S. 159, 165 (1985).   As a result, the municipal liability principles outlined in Section I(B) above apply to Plaintiff's official capacity claim against Sheriff Wegener.   ***Anaya v. Crossroads Managed Care Systems, Inc.,*** 195 F.3d 584, 593 (10th Cir. 1999); ***Hollingsworth v. Hill,*** 110 F.3d 733, 742 (10th Cir. 1997).

Plaintiff's Second Amended Complaint raises a variety of allegations concerning the conditions of confinement in the Park County Jail.   Plaintiff alleges:   (1) he was given unclean and inadequate clothing, towels, washcloths, mattress and bedding, and on one occasion all of the detainees' laundry was washed while they sat in their underwear in blankets, [*see* Second Amended Complaint, ¶¶ 8-9 & 15]; (2) he was housed  with many other detainees who were ill and presumably contagious and ill detainees were not isolated from the remaining detainees, [*see* Second Amended Complaint, ¶¶ 10 & 21]; (3) the showers did not appropriately regulate water temperature, [*see* Second Amended Complaint, ¶ 18]; (4) the pod was cold and had condensation on the outside wall, [*see* Second Amended Complaint, ¶¶ 9 & 13]; (5) the Pod and the bathroom were dirty generally with waste and trash and cleaning supplies were not provided to the detainees, [*see* Second Amended Complaint, ¶¶ 10-12, 16-17 & 19]; (6) no Spanish-English translator was available other than other detainees and inmates, [*see* Second Amended Complaint, ¶ 7]; and (7) the Pod where Plaintiff was held was overcrowded, [*see* Second Amended Complaint, ¶¶ 9].  Each of these issues raised by the Plaintiff is discussed in turn.

First, Plaintiff alleges he was given unclean and inadequate clothing, towels, washcloths, and bedding, and on one occasion all of the detainees' laundry was washed while they sat in their underwear in blankets. [*See* Second Amended Complaint, ¶¶ 8-9 & 15]. The Park County Jail had policies and procedures in March 2003 to address these issues. All new INS detainees arriving at the Park County Jail participated in an intake process. [¶ 12]. The intake process included the issuance of clean clothing and bedding by a laundry clerk under the supervision of Deputies. [¶¶ 13-14]. Jail policy was to provide a clean uniform, a t-shirt, boxers, shoes, sheets, blankets, a pillow case, a towel, a wash rag, a roll of toilet paper, and a hygiene bag containing soap, a comb, a toothbrush and toothpaste. [¶¶ 14-15]. Clean mattresses were also issued to detainees by policy. [¶¶ 15 & 21]. Jail policy also provided twice weekly exchanges by the INS detainees of uniforms and underwear and weekly exchange of their linens. [¶ 16]. Based on these policies, it is clear the Park County Jail had a policy designed to provide "a clothing and bedding issue program be established to ensure every inmate is properly clothed and warm bedding provided at all times." [¶ 13]. Moreover, specifically, the INS inspection found the INS detainees were issued appropriate clothing, bedding, and towels, and that laundry and cleaning of those items were generally done appropriately and detainees were issued personal hygiene items in September 2002. [¶¶ 36-37]. Laundry was picked up from D-Pod and uniforms were exchanged for the detainees in D-Pod on March 4, 2003. [¶¶ 88-89].

The Park County Jail had policies and procedures designed to address issues related to providing detainees like the Plaintiff with clean and appropriate clothing, bedding, and other necessary items and designed to provide clean such items to each detainee on a regular basis during their detention. None of these policies of the Park County Jail can be considered

constitutionally inadequate.   In particular, nothing about these Park County Jail policies can be considered as constituting deliberate indifference to the Plaintiff's health and safety.   *Craig,* 164 F.3d at 495.   Defendants anticipate Plaintiff will argue the Park County Jail did not follow its own policies.   However, municipal liability pursuant to 42 U.S.C. § 1983 requires proof that a custom, policy or practice of the Park County Jail caused Plaintiff a constitutional injury. *Brown,* 520 U.S. at 404.   An allegation the Park County Jail did not follow or appropriately implement its own policy is insufficient to establish municipal liability.   *Davis v. Scherer,* 468 U.S. 183, 194 (1984); *Hovater v. Robinson,* 1 F.3d 1063, 1068 n. 4 (10th Cir. 1993).   Instead, Plaintiff must identify an unconstitutional custom, policy or practice of the Park County Jail and demonstrate how that unconstitutional custom, policy, or practice deprived him of his constitutional rights.   Plaintiff cannot do so here with respect to the clothing and bedding issuance and laundry exchange policies of the Park County Jail.

Second, Plaintiff maintains he was housed with many other detainees who were ill and presumably contagious, and ill detainees were not isolated from the remaining detainees.   [*See* Second Amended Complaint, ¶¶ 10 & 21].   Several detainees with chest colds, flu symptoms or altitude sickness were housed along with the Plaintiff in D-Pod on March 4, 2003.   [¶ 90]. However, the Park County Jail had policies in existence in March 2003 to address medical screening of new arrivals at the Park County Jail and to treat any detainees who were ill.   During the intake process at the Park County Jail, all INS detainees completed a medical screening form in Spanish and a Deputy would review the medical condition of the detainees upon intake with the Nurse following-up as needed and appropriate depending on the information provided by the detainee and the Deputy.   [¶ 23].   The medical screening was designed to address serious medical

conditions concerning new INS detainees.   No one with a known serious contagion was housed in D-Pod with other detainees as a result of the medical screening process.   None of the symptoms exhibited by any of the detainees in D-Pod during Plaintiff's detention were such that anyone at the Park County Jail recognized any of the detainees had anything other than a cold, the flu or altitude sickness.   No basis exists to suggest that anyone associated with the Park County Jail knew that any of the detainees housed in D-Pod during Plaintiff's detention had a serious contagious disease that required isolation.   Further, it is unrealistic for Plaintiff to assert that cold, flu or altitude sickness symptoms in a detainee population in March 2003 warranted isolation of ill detainees or that a jail the size of the Park County Jail is required to have space available to isolate individuals for such symptoms to meet constitutional conditions of confinement standards.   Defendants are aware of absolutely no precedent holding that a prison or jail fails to meet constitutional requirements by not isolating individuals with cold and flu symptoms from the general population.   Indeed, Defendants are not aware of any prison or jail system that either has the facilities for or engages in such an isolation policy.

Third, Plaintiff complains the showers did not appropriately regulate water temperature. [*See* Second Amended Complaint, ¶ 18].   Park County Jail Deputies did occasionally receive complaints about the water temperature of the showers.   [¶ 26].   However, on all such occasions, maintenance would address and correct any shower water temperature issue.   [¶ 26].   As such, the policy of the Park County Jail was clearly to address any maintenance issue respecting the water temperature of the showers whenever an issue occurred.   Such a policy cannot be considered unconstitutional.   Moreover, no causal link exists between any injury suffered by the Plaintiff and the water temperature of the showers.   Plaintiff cannot establish any policy of the

Park County Jail concerning the water temperature of the showers caused him any injury of constitutional magnitude. **Brown,** 117 S.Ct. at 1388.

Fourth, Plaintiff asserts the Pod was cold and had condensation on the outside wall. [*See* Second Amended Complaint, ¶¶ 9 & 13].   Again, occasionally, Deputies working in the Park County Jail would receive complaints about the temperature in the Pods.   [¶ 27].   However, again, whenever an issue of Pod temperature would arise it would be reported to and addressed by Park County Jail maintenance.   [¶ 27].   Similarly to the shower water temperature issue discussed above, no basis exists to conclude any policy of the Park County Jail concerning the temperature of the Pods was unconstitutional, and no causal connection exists between the temperature of D-Pod at any particular time during March 1-8, 2003, and any injury suffered by the Plaintiff.   Plaintiff's conditions of confinement claim cannot succeed by reference to an isolated issue concerning the temperature of D-Pod on any given day during his detention. Instead, Plaintiff must establish that a custom, policy or practice of the Park County Jail related to the heating system was unconstitutional and the unconstitutional policy injured him.   Plaintiff simply cannot meet this burden respecting the issue of the temperature of D-Pod.

Fifth, Plaintiff argues the Pod and the bathroom were dirty generally with waste and trash and cleaning supplies were not provided to the detainees.   [*See* Second Amended Complaint, ¶¶ 10-12,  16-17 & 19].   Again, policies existed in the Park County Jail in March 2003 to address sanitation and cleanliness issues respecting D-Pod where Plaintiff was housed.   Each Pod was responsible for cleaning their Pod under Deputy supervision.   Cleaning supplies were to be provided three times daily to the detainees consisting of a dust mop, a wet mop, a mop bucket with ringer, two or more rags for cleaning, a broom, a dustpan, one bottle of disinfectant

consisting of Pine Sol or bleach, and one bottle of window cleaner.  [¶¶ 17-19].  Specifically, Park County Jail policy provided the bathroom area, including the showers, toilets and sinks, were cleaned once a day with a scrub brush, disinfectant, Soft Scrub containing bleach, and a green scrub pad issued to the Pod residents.  [¶ 20].  Further, the Park County Jail was inspected weekly by Corporal Crawford, monthly by Captain Gore, approximately every two weeks during a walk through by Sheriff Wegener, and quarterly by Dr. Bachman.  [¶¶ 28-32].

Not only did the Park County Jail have specific policies to address sanitation issues, but the Master Control Log for March 1-9, 2003, reveals frequent efforts by Deputies to empty trash from D-Pod and to provide cleaning supplies to the detainees housed in D-Pod.  Plaintiff arrived in D-Pod after 9:39 p.m. on March 1, 2003.  [¶ 71].  On March 2, 2003, Deputies provided cleaning supplies to D-Pod twice and emptied trash from D-Pod twice as well.  [¶¶ 76-77].  On March 3, 2003, cleaning supplies were provided to D-Pod once and trash was also removed once. [¶¶ 81-82].  On March 4, 2003, trash was removed from D-Pod twice and cleaning supplies were also provided to the detainees on two occasions.  [¶¶ 86-87].  On March 5, 2003, Deputies provided cleaning supplies to D-Pod twice.  [¶ 94].  On March 6, 2003, cleaning supplies were provided to D-Pod once and trash was removed twice.  [¶¶ 101-102].  On March 7, 2003, trash was removed once and cleaning supplies were provided once to D-Pod.  [¶¶ 108-109].  Finally, between March 1, 2003, and March 8, 2003, Deputies performed frequent pod walks through D-Pod that allowed the Deputies to observe the conditions of D-Pod and to address any sanitation or cleanliness issues they observed.  [¶¶ 75, 80, 85, 93, 100 & 107].

Nothing about the Park County Jail policies on sanitation and cleanliness are constitutionally infirm.  Plaintiff has not identified any aspect of the Park County Jail sanitation

and cleanliness policies as unconstitutional.   Further, the summary judgment record reveals consistent efforts by Park County Jail personnel to address sanitation and cleanliness issues by providing cleaning supplies to the detainees in D-Pod and emptying trash every day of the Plaintiff's detention at the Park County Jail and often more than once per day.

Sixth, Plaintiff contends no Spanish-English translator was available other than other detainees and inmates.   [*See* Second Amended Complaint, ¶ 7].   Plaintiff is correct that in March 2003, no staff member of the Park County Jail knew sufficient Spanish to act as a Spanish-English translator and the Deputies regularly utilized Spanish-speaking inmates and detainees to communicate with the Spanish-speaking INS detainee population.   However, the Park County Jail provided a Handbook in Spanish for the INS detainees.   [¶ 11].   In its September 2002 inspection of the Park County Jail, the INS determined a Handbook for INS in Spanish was provided and gave the INS detainees appropriate information.   [¶ 38].   More importantly, no basis exists for Plaintiff to suggest the lack of a staff member acting as a Spanish-English interpreter caused him any injury.   Plaintiff never alleges that he could not appropriately communicate with either the Deputies or the Nurse during his detention in the Park County Jail or that any language barrier detrimentally impacted anything that occurred during his detention. Absent a causal connection between the lack of a Spanish-English interpreter and an actual injury to the Plaintiff, which does not exist here, Plaintiff cannot state a viable 42 U.S.C. § 1983 claim on this basis.

Seventh, Plaintiff alleges the Pod where he was held was overcrowded.   [*See* Second Amended Complaint, ¶¶ 9].   The Park County Jail accepted detainees pursuant to its contract with the INS based on the determination that if the Park County Jail received a call from the INS

that the INS had arrested multiple detainees and had nowhere else to place them the Park County Jail would agree to house them.   [¶ 41].   This approach sometimes resulted in more detainees housed in D-Pod than the 42 bunks that were in D-Pod.   [¶ 44].   During Plaintiff's detention in D-Pod the highest number of detainees housed in D-Pod was 61.   [¶ 103].   Sixty-one detainees were housed in D-Pod from 9:00 p.m. on March 6, 2003, until 3:45 p.m. on March 7, 2003, a total of 16 hours and forty-five minutes.   [¶¶ 110-111].   Other than this time period, no more than 50 detainees were housed in D-Pod during Plaintiff's detention.   [¶¶ 73, 83, 91 & 95].

No question exists that during Plaintiff's detention in the Park County Jail, there were more detainees in D-Pod than optimum and more detainees than the 42 beds in D-Pod. However, to demonstrate a violation of his constitutional rights based on the number of detainees in D-Pod requires Plaintiff to prove much more.   Initially, Plaintiff must demonstrate it was the official custom, policy or practice of the Park County Jail to house more than a constitutional number of detainees in D-Pod in the Park County Jail.   To do so, Plaintiff must establish the practice of the Park County Jail to do so was a persistent and widespread practice that constituted the standard operating procedure of the Park County Jail.   *Jett,* 491 U.S. at 737.   Here, Plaintiff attempts to create a custom, policy or practice based on the number of detainees housed in D-Pod between March 1-8, 2003.   No such custom, policy or practice of the Park County Jail can be established solely based on the number of detainees housed in the Park County Jail for eight days.   Such a limited data point cannot create a persistent and widespread practice.   Plaintiff must instead come forward with evidence the Park County Jail exceeded a constitutional number of detainees housed in D-Pod on a persistent and ongoing basis.   However, no evidence exists this actually occurred.

Furthermore, the number of detainees housed in D-Pod does not represent a violation of the Plaintiff's constitutional rights.   Under well-established law, the duration of any conditions of confinement must be taken into consideration when evaluating its constitutionality.   **Wilson,** 501 U.S. at 304-5; **Farmer,** 511 U.S. at 834; **Rhodes,** 452 U.S. at 346; **Despain,** 264 F.3d at 974. Here, the nature of the detention of INS detainees in the Park County Jail differs dramatically from other contexts.   The detainees in the Park County Jail are not housed there for extended periods of time.   Instead, the Park County Jail is utilized by the INS as a location where INS detainees can be housed for short periods of time.   As a result, the population of the Park County Jail has fairly dramatic turnover and INS detainees come into and leave the Park County Jail regularly.   [¶ 42].   Accordingly, the number of detainees in the D-Pod of the Park County Jail must be evaluated based on the nature and duration of the detentions involved.   Judged against that standard, the number of detainees housed in the Park County Jail did not violate any of their constitutional rights including the Plaintiff.

Additionally, Plaintiff's Second Amended Complaint also alleges he was denied appropriate access to medical care and the medical care he was provided during his detention was constitutionally inadequate.   [*See* Second Amended Complaint, ¶¶ 50-60].   The Park County Jail had policies and procedures in place in March 2003 to provide appropriate access to health care for INS detainees such as the Plaintiff.   In March 2003, it was "the policy of the Sheriff's Office that a staff member from the medical profession arranges for all levels of health care, assuring the quality of all heath reviews, and assuring that inmates have access to them.   The health authority may be a registered nurse, physicians assistant or health care authority operating under the supervision of a single designated physician."   [¶ 22].   The Park County Jail

implemented a variety of practices to fulfill this policy.  At intake, all INS detainees completed a medical screening form in Spanish, had their medical conditions assessed by a Deputy, and the Nurse would follow-up on the information contained in the screening form and from the Deputy. [¶ 23].  Nurse Paulsen and Deputies would deliver medication to each Pod typically three times a day in the morning, afternoon and evening.  Nurse Paulsen delivered medications herself when she was on duty allowing her to personally observe the physical conditions of the detainees and allowing the detainees to communicate directly with her about any medical issues. [¶ 24]. Further, Deputies conducting medication deliveries were trained to note any medical issue and forward that information to the Nurse.  [¶ 25].  Deputies were also trained to note any medical issue on their routine and regular Pod walks and in the engagement of their normal duties and forward that information to the Nurse as well.  [¶ 25].  Detainees could also request medical attention by completing of a formal request or by contacting a Deputy on duty at any particular time.  Detainees would then be seen by the Nurse for medical attention at her next available opportunity.

All of the above practices were in place during Plaintiff's detention in the Park County Jail.  Plaintiff completed a medical screening form in Spanish.  [¶ 72].  Medication rounds were conducted three times on March 2, 2003, three times on March 3, 2003, once on March 4, 2003, twice on March 5, 2003, twice on March 6, 2003, and three times on March 7, 2003.  [¶¶ 74, 79, 84, 92, 99 & 106].  More specifically, Plaintiff received specific medical attention from Nurse Paulsen on March 6, 2003, March 7, 2003, and March 8, 2003, and his medical condition was also regularly assessed by various Deputies during that period of time.  [¶¶ 96-98, 104-105 &

113-127].   Ultimately, Plaintiff was transported for further medical attention from Summit Medical Center on March 8, 2003.  [¶¶ 128-133].

In its totality, the policies of the Park County Jail concerning providing INS detainees with access to medical care meet constitutional requirements.   Plaintiff cannot demonstrate a constitutional infirmity in any policy of the Park County Jail regarding his access to medical care.   Additionally, Plaintiff also cannot point to any policy of the Park County Jail concerning medical care violative of his constitutional rights.   No basis exists to suggest any Deputy who interacted with the Plaintiff violated his constitutional rights or inappropriately referred Plaintiff to the Nurse for assessment and deferred to the Nurse's judgment about appropriate medical care for the Plaintiff.   Finally, even if Nurse Paulsen violated the Plaintiff's constitutional rights based on the nursing care she provided to the Plaintiff, that constitutional violation is not a policy or practice of the Park County Jail because Nurse Paulsen is clearly not a final policymaker for the Park County Jail.

Last, and most importantly, to succeed with any of his claims of an unconstitutional custom, policy and practice of the Park County Jail requires Plaintiff to demonstrate causation between the allegedly unconstitutional policy and a specific injury to the Plaintiff.   *Harris,* 489 U.S. at 385; *Jenkins,* 81 F.3d at 993.   In *Brown,* the Supreme Court cautioned that "[t]o prevent municipal liability for a hiring decision from collapsing into *respondeat superior* liability, a court must carefully test the link between the policymaker's inadequate decision and the particular injury alleged."   *Brown,* 520 U.S. at 410 (emphasis in original).   Application of a causation analysis in this case requires Plaintiff to demonstrate an affirmative link between a specific unconstitutional custom, policy or practice of the Park County Jail and a specific injury

49

he suffered.   Plaintiff must therefore demonstrate that "but for" the unconstitutional custom, policy or practice of the Park County Jail he would not have been injured.   Plaintiff cannot do so in this case and therefore all his claims against Sheriff Wegener in his official capacity fail.

## III.  CAPTAIN MONTE GORE IS ALSO ENTITLED TO QUALIFIED IMMUNITY FROM THE PLAINTIFF'S CLAIMS AGAINST HIM AS A MATTER OF LAW

Plaintiff cannot overcome Captain Gore's qualified immunity from the Plaintiff's 42 U.S.C. § 1983 claims against him in his individual capacity.[7]   First, Plaintiff cannot demonstrate Captain Gore personally participated in any violation of his constitutional rights.   Second, Captain Gore may not appropriately be held liable in his role as Jail Administrator for any supervisory decision respecting the Plaintiff.   Third, to the extent Captain Gore was involved in the decisions to house a more than optimal number of detainees in D-Pod in the Park County Jail, assuming such a decision violated Plaintiff's constitutional rights, no such constitutional right was clearly established for qualified immunity purposes.

## A.  INSUFFICIENT PERSONAL PARTICIPATION OF CAPTAIN GORE EXISTS TO HOLD HIM INDIVIDUALLY LIABLE TO THE PLAINTIFF

Plaintiff's individual capacity claim against Captain Gore initially depends on proof demonstrating Captain Gore personally participated in a violation of his constitutional rights. *Camfield,* 248 F.3d at 1225; *Mitchell,* 80 F.3d at 1441; *Green,* 108 F.3d at 1302.  No evidence exists in the summary judgment record establishing Captain Gore personally participated in any decision that violated Plaintiff's constitutional rights.   Captain Gore had no personal interaction

---

[7]   Plaintiff's Second Amended Complaint appears to attempt a claim against Captain Gore in his official capacity.   [*See* Second Amended Complaint, ¶ 41].   Any official capacity claim against Captain Gore is really a claim against Park County. *McMillian,* 520 U.S. at 785 n. 2; *Graham,* 473 U.S. at 165.  As a result, the analysis contained in Section II(D) above applies.

with the Plaintiff and did not make any specific decision concerning the Plaintiff's conditions of confinement during his detention in the Park County Jail.  At most, Captain Gore may have been aware of the Plaintiff's medical condition from reports he received from Nurse Paulsen and Corporal Crawford and may have participated in the creation of various Park County Jail policies and procedures.  However, no facts exist demonstrating Captain Gore knew of and disregarded an excessive risk of harm to the Plaintiff based on the conditions of his confinement at the Park County Jail.  *Craig,* 164 F.3d at 495; *Barney,* 143 F.3d at 1310.  The analysis contained in Section II(C)(1) concerning Plaintiff's individual capacity claim against Sheriff Wegener applies equally to Plaintiff's individual capacity claim against Captain Gore.

## B.  CAPTAIN GORE MAY NOT APPROPRIATELY BE HELD SUPERVISORY LIABLE

To hold Captain Gore individually liable in his role as Jail Administrator of the Park County Jail requires Plaintiff to establish an affirmative link between an action taken by a subordinate official of the Park County Jail and Captain Gore's personal participation, his exercise of control or direction, or his failure to supervise.  *Serna,* 455 F.3d at 1151; *Holland,* 268 F.3d at 1187; *Worrell,* 219 F.3d at 1214.  Moreover, Plaintiff must demonstrate Captain Gore was deliberately indifferent to his constitutional rights based on Captain Gore's actual knowledge of the Plaintiff's conditions of confinement in the Park County Jail.  *Johnson,* 195 F.3d at 1219; *Lankford,* 73 F.3d at 287.

No evidence exists that Captain Gore participated in any specific decision concerning the Plaintiff.[8]  No evidence exists either that Captain Gore was aware of any specific conditions of

---

[8]    Plaintiff will attempt to hold Captain Gore liable based on his involvement in the number of detainees housed in D-Pod at the Park County Jail.  That issue is addressed in Section

confinement in the Park County Jail in March 2003.  Unless Captain Gore was specifically made aware of the conditions of confinement in the Park County Jail in March 2003 and affirmatively chose not to address those conditions or Captain Gore was personally involved in a decision as a supervisor that created those conditions, no basis exists to hold Captain Gore personally and individually liable pursuant to 42 U.S.C. § 1983 under a supervisory liability theory.  Because the undisputed facts contained in the summary judgment record do not establish any such facts, Captain Gore cannot be held liable in his supervisory capacity.  Finally, the analysis contained in Section II(C)(2) concerning Plaintiff's supervisory liability claim against Sheriff Wegener also applies equally to Plaintiff's supervisory liability claim against Captain Gore.

### C.  NO ALLEGED VIOLATION OF PLAINTIFF'S CONSTITUTIONAL RIGHTS BY CAPTAIN GORE WAS CLEARLY ESTABLISHED FOR QUALIFIED IMMUNITY PURPOSES AS A MATTER OF LAW

To overcome Captain Gore's qualified immunity, Plaintiff must establish Captain Gore violated his constitutional rights and the constitutional right at issue was clearly established for qualified immunity purposes.  *Gross,* 245 F.3d at 1155; *Mick,* 76 F.3d at 1134.   Here, Defendants anticipate Plaintiff will argue Captain Gore's involvement in the number of detainees housed in D-Pod in the Park County Jail in March 2003 is sufficient to hold him liable.  However, Plaintiff cannot meet either prong of the qualified immunity analysis.

---

III(C) below.  In addition, Captain Gore was informed about Plaintiff's medical condition from reports he received from Nurse Paulsen and Corporal Crawford.  However, Captain Gore was not involved in any specific decision concerning any medical attention received by the Plaintiff. Captain Gore cannot be held personally liable related to the medical care provided to Plaintiff by Nurse Paulsen because it was entirely appropriate for him to defer to her nursing assessments concerning the Plaintiff's medical needs including whether Plaintiff required additional medical attention from a physician.  *McCracken,* 562 F.2d at 24-25; *Johnson,* 433 F.3d at 1012; *Spruill,* 372 F.3d at 236; *Shakka,* 71 F.3d at 167.

First, for the reasons discussed in Section II(D) above, no basis exists for this Court to conclude a violation of the Plaintiff's constitutional rights occurred based on the number of detainees housed in D-Pod in the Park County Jail in March 2003.   More fundamentally, however, Plaintiff has no evidence Captain Gore was personally involved with any decision concerning the number of detainees housed with the Plaintiff in March 2003 or even was aware of the number of detainees in D-Pod during the Plaintiff's detention.   Absent such evidence, Captain Gore cannot be said to have personally participated in a decision that violated Plaintiff's constitutional rights.

Second, Plaintiff will argue that Captain Gore maintained a policy of not refusing INS detainees and knew as a general matter that D-Pod in the Park County Jail was overcrowded. Assuming *arguendo* such a decision violated Plaintiff's constitutional rights, no basis whatsoever exists for this Court to conclude that such a circumstance was clearly established for qualified immunity purposes.    To overcome Captain Gore's qualified immunity requires Plaintiff to demonstrate the constitutional right at issue was clearly established in a particularized sense such that a Supreme Court or Tenth Circuit decision is on point or the clearly established weight of authority from other courts exists.  *Anderson,* 483 U.S. at 640; *Wilson,* 52 F.3d at 1552; *Medina,* 960 F.2d at 1498.  Defendants do not argue with the general proposition that an overcrowded county jail can violate a detainee's constitutional rights.   However, under applicable Supreme Court and Tenth Circuit jurisprudence, the inquiry cannot be undertaken at such a level of generality.  Instead, this Court must ask itself the following question:  Was it clearly established in March 2003 that a jail administrator violated an INS detainee's constitutional rights by the placement of the INS detainee in an overcrowded pod for the detainee's eight day stay in the

county jail based on the itinerant status of INS detainees?   When evaluated with the requisite degree of particularity required by qualified immunity precedent, no Supreme Court, Tenth Circuit or the overwhelming weight of authority from other courts could have provided Captain Gore with the foreknowledge that his actions in March 2003 violated clearly established law. Therefore, Captain Gore is entitled to qualified immunity from Plaintiff's overcrowding claim.

## <u>CONCLUSION</u>

In conclusion, for all of the foregoing reasons, Defendants Board of County Commissioners of Park County, Fred Wegener and Monte Gore respectfully request this Court grant them summary judgment on all of the Plaintiff's claims against them, dismiss the Plaintiff's claims against them in their entirety with prejudice, and for all other and further relief as this Court deems just and appropriate.

Dated this 13th date of December, 2006.

Respectfully submitted,


s/ Andrew D. Ringel_____
Andrew D. Ringel, Esq.
Jennifer L. Veiga, Esq.
Hall & Evans, L.L.C.
1125 17th Street, Suite 600
Denver, Colorado 80202-2052
ringela@hallevans.com
veigaj@hallevans.com
Tel:  (303) 628-3300
Fax:  (303) 293-3238

**ATTORNEYS FOR DEFENDANTS**
**BOARD OF COUNTY**
**COMMISSIONERS OF PARK**
**COUNTY, FRED WEGENER**
**AND MONTE GORE**

<u>**CERTIFICATE OF SERVICE (CM/ECF)**</u>

       I HEREBY CERTIFY that on the 13th day of December, 2006, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses:

Joseph J. Archuleta, Esq.
archuletalaw@qwest.net

William A. Trine, Esq.
btrine@trine-metcalf.com

Josh A. Marks, Esq.
jam@bhgrlaw.com

Melanie B. Lewis, Esq.
mbl@bhgrlaw.com

Lloyd C. Kordick, Esq.
lloyd@kordicklaw.com

Adele P. Kimmel, Esq.
akimmel@tlpj.org

                                       <u>s/Dorhla Krening,   Secretary</u>
                                       Andrew D. Ringel, Esq.
                                       Jennifer L. Veiga, Esq.
                                       Hall & Evans, L.L.C.
                                       1125 17th Street, Suite 600
                                       Denver, CO 80202-2052
                                       303-628-3300
                                       Fax: 303-293-3238
                                       ringela@hallevans.com
                                       veigaj@hallevans.com
                                       **ATTORNEYS FOR DEFENDANTS**
                                       **PARK COUNTY BOARD OF COUNTY**
                                       **COMMISSIONERS, FRED WEGENER**
                                       **AND MONTE GORE**

H:\Users\RINGELA\park\Carranza-Reyes\motion for summary judgment.doc