1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Case No. 2005-WM-377 (BNB)

_____

DEPOSITION OF:  MONTE GORE, VOLUME 1
October 31, 2005

_____

MOISES CARRANZA-REYES,

Plaintiff,

v.

PARK COUNTY, a public entity of the State of Colorado and its
governing board, THE PARK COUNTY BOARD OF COUNTY
COMMISSIONERS; PARK COUNTY SHERIFF'S OFFICE, a public entity
of the State of Colorado; FRED WEGENER, individually and in
his official capacity as Sheriff of Park County, Colorado;
MONTE GORE, individually and in his capacity as Captain of
Park County Sheriff's Department; VICKIE PAULSEN, individually
and in her official capacity as Registered Nurse for Park
County, Colorado; JAMES BACHMAN, M.D., individually and in his
official capacity as Medical Director of the Park County Jail,

Defendants.

_____

TAKEN PURSUANT TO NOTICE AND AGREEMENT on behalf of the

Plaintiff at 824 Castello, Fairplay, Colorado at 9:04 a.m.

before Theresa A. Coffman, Federal Certified Realtime

Reporter, Registered Professional Reporter and Notary Public

within Colorado.

COFFMAN REPORTING          303.893.0202
* SUBJECT TO CONFIDENTIALITY DESIGNATIONS *

EXHIBIT
A-2

6

1          A.     Monte K. Gore.

2                 MR. RINGEL:  Mr. Gore, go ahead and give

3     your work address, please.

4          A.     P.O. Box 27, Fairplay, Colorado 80440.

5          Q.     (BY MR. TRINE)  And what is your occupation

6     or profession?

7          A.     I'm a law enforcement officer currently with

8     the rank of captain serving for the Park County Sheriff's

9     Office.

10         Q.     And when did you first go to work for the

11    sheriff's office in Park County?

12         A.     September of 2000.

13         Q.     And when you started in September of 2000,

14    am I correct that the jail was essentially losing money

15    every year, and in September of 2000, there were only 12

16    inmates?

17         A.     At that time, the jail was actually managed

18    by a private entity and had turned over operations to the

19    county.  The county sheriff then took over operations,

20    and there were only 12 inmates in the jail when I took

21    over.

22         Q.     And your understanding when you took over

23    was that the jail had been losing money annually; is that

24    correct?

25         A.     I believe it would have been.

1      Q.      And was it your intent and objective, when

2   you took over, to turn that around so that it would

3   become a profit-making jail?

4      A.      It was my intent to run the best facility I

5   could, and in doing that, the only way we could do it

6   with a limited tax base would be to rent out cell space

7   for revenue.

8      Q.      Yeah, but my question was, was it your

9   intent when you took over to turn that around so that it

10   became profit-making?

11      A.      I think my intent would have been probably

12   to run the best jail that I could and try to be

13   profitable.  If I'm bringing in revenue, then I can put

14   that money back into the facility.

15      Q.      And am I correct that in November of 2003,

16   you had increased the jail occupancy and brought in

17   $900,000 in your first year?

18      A.      Without looking at my notes, I believe that

19   would be accurate.

20          MR. RINGEL:  Clarification.  You said

21   November 2003, Mr. Trine, and then you said his first

22   year.  I'm confused.

23      Q.      (BY MR. TRINE)  Okay.  Let me clarify that.

24   Am I correct that in your first year as captain, the jail

25   brought in $900,000?

16

1    foundation.

2          A.    I never had a policy, written or verbal,

3    where we were going to overload Pod D.  If we had a call,

4    typically at that time from immigration, where they would

5    do an arrest, multiple offenders, and they didn't have

6    any place to keep them, I would go ahead and allow them

7    to bring in that overflow into the jail.

8          Q.    (BY MR. TRINE)  So it was your policy that

9    if INS wanted you to overflow, you would do so?

10               MR. RINGEL:  Object to the form and

11   foundation.

12         Q.    (BY MR. TRINE)  Is that correct?

13               MR. RINGEL:  Same objection.

14         A.    If they were in a bind where we're going to

15   be keeping offenders or detainees in a van versus

16   bringing them into a facility, then my decision would be

17   to bring them into the facility.

18         Q.    (BY MR. TRINE)  Are you saying that INS had

19   no other facilities that they could transfer detainees to

20   other than Park County?

21               (At this time Mr. Groome entered the

22   deposition room.)

23               MR. RINGEL:  Object to the foundation.

24         A.    I would say that a lot of times the requests

25   that were made of me about "Can you really help us out,"

17

1    "We're in a bind and we need to offload these inmates" or

2    these detainees, and I would make room.

3         Q.    (BY MR. TRINE)  Were you afraid that if you

4    turned them down or rejected them that they might, in the

5    future, cancel their contract with Park County?

6              MR. RINGEL:  Object to the form.  The

7    attorney who just walked in is Steve Groome, which is the

8    county attorney for Park County.

9         A.    No, to answer your question.

10        Q.    (BY MR. TRINE)  So you had no pressure on

11   you from INS to overload Unit D?

12        A.    No.

13        Q.    You did that voluntarily; is that correct?

14             MR. RINGEL:  Object to the form and

15   foundation.

16        A.    Essentially, what I was doing was helping

17   out INS if they had times when they had a lot of

18   detainees that they needed to offload.

19        Q.    (BY MR. TRINE)  What I'm saying is you

20   didn't feel you had any legal or contractual obligation

21   to overload; is that right?

22        A.    What I'm telling you is we tried to help out

23   INS.

24        Q.    My question is, you didn't feel you had a

25   legal or a contractual obligation to overload; is that

18

1    correct?

2              MR. RINGEL:  Object to the form and

3    foundation.

4         A.    No.

5         Q.    (BY MR. TRINE)  That's not correct or it is

6    correct?

7              MR. RINGEL:  Same objection.

8         A.    No, I don't feel I had an obligation.

9         Q.    (BY MR. TRINE)  So that you then were doing

10   that voluntarily?

11        A.    Correct.

12             MR. RINGEL:  Object to foundation.

13        Q.    (BY MR. TRINE)  Now, were you aware that on

14   March 1, when Carranza-Reyes and other detainees were

15   booked into Unit D, that there were a total of 48 inmates

16   in Pod D?

17             MR. RINGEL:  Object to the form and the

18   foundation.

19        A.    I would have to check logs to verify that.

20        Q.    (BY MR. TRINE)  Well, at that point in time

21   in March of 2003, were you generally aware of what your

22   population was in each of the units?

23        A.    The population changed fairly dramatically,

24   either increases or decreases.

25        Q.    I understand that.  Were you there on a

19

1    day-to-day basis?

2        A.    Yes.

3        Q.    And you were responsible, as jail captain,

4    for the operation of the jail?

5        A.    Correct.

6        Q.    And you would know if the INS was sending in

7    additional detainees, wouldn't you?

8        A.    Yes, we generally get a call.

9        Q.    And if you got a call, for example, on March

10   1 that you were going to be receiving eight or nine new

11   detainees, you would want to know what your current

12   population of detainees was in Unit D, wouldn't you?

13       A.    If I got a call requesting to put detainees

14   in a particular pod or that there had been a raid or

15   something like that and we needed to make room, we would

16   certainly look at that.

17       Q.    Okay.  You have no reason to believe that

18   you weren't aware of what was going on in terms of the

19   number of detainees coming into Pod D?

20       A.    No.

21       Q.    So if you already had 41 detainees in Pod D

22   on March 1 and received word that INS wanted to transfer

23   nine more detainees, you apparently would not have

24   objected to that; is that right?

25               MR. RINGEL:  Object to the form.

20

1      A.      Typically, if we're looking at that and

2   there's no other place for them to house them, then we

3   would probably go ahead and take those individuals, put

4   them on cots or mattresses on the floor if we had to, and

5   typically, those would be for very short periods of time.

6      Q.      (BY MR. TRINE)  How would you know at that

7   time, that there was no other place to house them?

8      A.      Well, because typically, in those

9   communications with INS, I'd tell them we would be full.

10     Q.      Do you remember learning from INS they had

11  no other place to house these nine detainees on March 1?

12     A.      For the most part, when I would get a

13  call -- and once again, that was some time ago, but the

14  general gist of the call would be we have X amount of

15  detainees, we don't have any place, can you please take

16  them.

17     Q.      Well, did you know that these detainees were

18  already being detained in the Eagle County jail?

19     A.      I think we may not have had particular

20  knowledge of that.  I know we did -- when we were picking

21  up INS detainees a lot of times, they wouldn't even go

22  into a jail.  We would meet them in the jail parking lot,

23  because a lot of the jails up in that area did not have

24  room for the detainees.

25     Q.      Do you remember on March 1 telling INS, "We

COFFMAN REPORTING        303.893.0202
* SUBJECT TO CONFIDENTIALITY DESIGNATIONS *

27

1     A.     I believe that's correct.

2     Q.     Now, how many bunk beds were in there when

3  you came on board in September of 2003?

4     A.     I believe it would have been a number around

5  that specific number.  I'm not sure.

6     Q.     Well, when you agreed earlier that

7  additional bunk beds have been moved in expanding that

8  number, when did that expansion occur?  When were

9  additional bunk beds moved in?

10          MR. RINGEL:  Object to the form.

11    A.     Let me clarify.  Depending on the amount of

12  inmates, if there's a need to put more bunks in there to

13  support more inmates, we'd put more bunks in.  That's

14  even currently being done today.  As inmate numbers drop,

15  we will remove those bunks, typically.

16    Q.     (BY MR. TRINE)  Am I correct that with 42

17  bunks in the upper tier of Pod D, that the upper tier is

18  filled and there's not room for additional bunk beds?

19    A.     If -- you actually could get additional bunk

20  beds into the lower level if you had to.

21    Q.     I didn't ask about the lower level.  Let me

22  rephrase the question.

23    A.     Okay.

24    Q.     Am I correct that with 42 bunk beds in the

25  upper tier of Pod D, it's filled, and you can't get more

1   bunk beds in that upper tier?

2          A.     I would say that if you had 42 beds in the

3   upper tier, I believe it would be sufficiently full.

4          Q.     So that if you're filled to maximum capacity

5   in the upper tier with 42 inmates, you know if you take

6   more inmates, they're going to have to sleep on

7   mattresses on the floor, right?

8          A.     Correct.

9                 MR. RINGEL:  Object to the form.

10         Q.     (BY MR. TRINE)  And how much space is left

11  on the upper tier to place mattresses on the floor when

12  you have 42 bunks in there?

13         A.     I would say probably there would be no room

14  left on the upper tier.  Most of the mattresses would

15  have had to have been placed on the lower level to handle

16  any overflow.

17         Q.     Okay.  And how many toilets in Pod D?

18         A.     Two.

19         Q.     And where are they located?

20         A.     They're located on the lower level.

21         Q.     How many urinals?

22         A.     I believe there's two.

23         Q.     Lower level?

24         A.     Correct.

25         Q.     How many wastebaskets?

33

1    seeing the detainee and questioning the detainee and, if

2    necessary, performing some kind of physical examination.

3    She did not do that with INS detainees; isn't that

4    correct?

5              MR. RINGEL:  Object to the form and the

6    foundation.

7         A.    I don't know.

8         Q.    (BY MR. TRINE)  Well, what was your policy

9    at that time?  Was she instructed to see each INS

10   detainee and conduct a physical examination, if needed,

11   when they were booked?

12        A.    I know that we did medical screening on

13   the -- all inmates, not only the INS detainees.

14        Q.    Well, I know that, but what did the medical

15   screening consist of?

16             MR. RINGEL:  Object to the foundation.

17        A.    I believe it would have consisted of a

18   screening done by the officer, and then I believe it

19   would have consisted of a screening done by having the

20   inmate fill out a questionnaire.  That information would

21   have then been placed into a nurse's box.  I believe,

22   then, based on the medical -- the information received

23   from the officer and the information that would have been

24   received from the inmate, that the nurse would then

25   follow up accordingly.

34

1      Q.     (BY MR. TRINE)  Okay.  That was the policy

2   at that time?

3      A.     I believe so.

4      Q.     Okay.  Were the officers trained to look for

5   signs and symptoms of communicable disease?

6      A.     The officers are advised, and I think we

7   can -- to kind of give a once-over of the inmate.  For

8   instance, if we've had somebody that's been involved in a

9   car wreck or there's any obvious signs of trauma or

10  anything like that, or they appear sick, they're advised

11  to contact their supervisor.  Typically, if you have

12  somebody that's been in a car wreck, for instance, we

13  want to have them medically cleared before they come into

14  the facility.

15     Q.     My question was, were officers trained to

16  look for and detect signs of communicable disease?

17             MR. RINGEL:  Object to the foundation and

18  the form.

19     Q.     (BY MR. TRINE)  That was the question.

20     A.     I don't know that they were specifically

21  trained to identify different types of disease or

22  something that a medical professional would have better

23  training to identify.  What they were trained to do was

24  to report if -- any obvious signs of ailments, sickness

25  or anything like that so that we could get those

1    inmates -- typically, I would have the arresting officer

2    take them back and have them medically cleared before we

3    accepted responsibility for them.  And they were -- and

4    that is actually included, I think, in part of the

5    booking training as an FTO program.

6         Q.    Okay.  You described the screening process

7    as the inmate filling out the screening form and the

8    officer observing the inmate and seeing him, and then the

9    screening form being placed in the nurse's box for her to

10   review?

11        A.    Correct.

12        Q.    And when she looked at that screening form,

13   if it appeared to her that there was any inmate that

14   maybe she ought to see, that she would follow up; is that

15   correct?

16             MR. RINGEL:  Object to the form.

17        A.    I believe that's correct.

18        Q.    (BY MR. TRINE)  Now, when would this TB test

19   take place with every inmate?

20        A.    It wasn't with every inmate.  It was with, I

21   believe, the INS inmates.

22        Q.    When did that take place during this

23   screening process?  When was a TB test done?

24        A.    I'm not sure when the nurse would actually

25   do that process.

51

1        A.      No, that's not what I'm saying.  Typically

2    we have pod janitors within the jail.  The pod janitors

3    are actually paid to perform janitorial duties within the

4    pod and keep it clean, keep it squared away, keep the

5    showers clean, keep the trash up, things like that.

6    Typically, if we can't find a janitor or if I have

7    inmates that would refuse to clean something like that,

8    then typically we would go in with staff and have

9    trustees clean that cell block.

10                (At this time Mr. Groome entered the

11   deposition room.)

12       Q.      Now, if --

13       A.      We also put in -- typically, we put in

14   cleaning equipment after every meal as well, or three

15   times a day.

16       Q.      Now, if your answers to interrogatories

17   indicate that the inmates in Pod D were expected to clean

18   Pod D, would that be incorrect?

19       A.      No, that would not be incorrect.

20       Q.      Well, are you saying that your -- I need to

21   know what your testimony is.  Are you saying the trustees

22   were assigned to clean Pod D?

23       A.      I'm not saying that.  What I'm telling you

24   is if we have inmates in that particular cell block, say,

25   they refuse to clean, we would still go in there and

52

1    clean that pod.

2        Q.    Now, how would we determine which detainees

3    in Pod D during the first week of March were assigned the

4    task of cleaning Pod D?

5        A.    Well, if we don't have any records to that

6    effect -- and I don't know that we do or don't at this

7    point, and we'd have to reflect on those.  Typically,

8    once again, cleaning equipment will be put into A

9    Pod three times a day.  We do have pod janitors, and we

10   have a program in place where the pod janitors will

11   clean, but the inmates are expected to clean those pods

12   and will keep them clean.

13       Q.    Am I correct the practice and procedure the

14   first week of March 2003 was to put buckets inside the

15   pod with a mop and some cleansing fluid once a day, and a

16   couple hours later, come back and pick up those buckets?

17            MR. RINGEL:  Object to the form and the

18   foundation.

19       A.    I don't believe that was correct.  I believe

20   that we typically put stuff in three times a day.

21       Q.    (BY MR. TRINE)  That you put cleaning

22   supplies --

23       A.    Cleaning supplies.

24       Q.    -- buckets and mops in three times a day to

25   clean each pod; is that right?

53

1        A.      I believe so.

2        Q.      Am I correct that no deputy was assigned the

3   task of monitoring the cleaning of the pod?

4        A.      That would be incorrect as well.

5        Q.      How was the cleaning of the pod monitored?

6        A.      Typically, the cleaning equipment is put in

7   there, and typically, the floor officers will ensure that

8   cleaning takes place.  Also, I have assigned my sergeants

9   to go in and to verify that those pods are clean along

10  with the rest of the jail, and they'll indicate that on

11  their supervisor's log.

12       Q.      What records would reflect the name of the

13  deputy assigned to enforce the cleaning of Pod D the

14  first week of March 2003?

15       A.      Like I said, I think the person in charge of

16  the trustee workers was Darlene Ellis.  As far as a

17  particular officer assigned that particular task, I don't

18  know that we would have that.  That would more likely

19  have been assigned by the sergeant daily.

20       Q.      So you're saying this sergeant would assign

21  someone the task of going in and supervising the cleaning

22  of Pod D to make sure it's clean?

23       A.      I would say typically the sergeant would

24  have the cleaning equipment put in, and then part of the

25  officer's responsibilities are to make sure that cleaning

54

```
 1   takes place, and then it's part of the responsibility of

 2   the supervisor to make sure that that has happened.

 3        Q.    What did you consider the capacity of Pod A

 4   to be in March of 2003?

 5        A.    Pod A?

 6        Q.    Yes.

 7        A.    I have to go back and look at records, see

 8   what our bunks were.

 9        Q.    So you keep moving bunks in and out of Pod A

10   too, depending on the number of inmates?

11        A.    Yes.

12        Q.    Same as Pod B and C?

13        A.    Pod C and D typically -- because they're

14   cells, we do not move bunks in and out.

15        Q.    Of B and C?

16        A.    Correct.

17        Q.    You said C and D.

18        A.    Yeah, B and C.

19              MR. RINGEL:  You did say C and D, so . . .

20        Q.    (BY MR. TRINE)  So you don't typically move

21   bunks in and out of B and C?

22        A.    No.

23        Q.    Only Pod A and D?

24        A.    Typically.

25        Q.    So you consider the capacity of Pod A to be
```

68

1    you have kites in Spanish that they could complete, or

2    were they in English?

3         A.    I'm not sure that we had the kites in

4    Spanish, but any request could have been made -- if it

5    was just a piece of notebook paper -- if they have an

6    issue.  And they could submit that.  Also, they have the

7    opportunity to see the nurse when she's serving meds and

8    doing med call.  So they have an opportunity to actually

9    approach the nurse and advise her of an ailment or

10   illness or whatever the situation may be.

11        Q.    But it was part of the nurse's duties to

12   make med call, that is, deliver medications to inmates

13   and INS detainees three times a day?

14        A.    I believe so.

15        Q.    And that would be what?  Morning, afternoon

16   and evening?

17        A.    Typically sometime in the morning, afternoon

18   and evening.

19        Q.    And that was important because the nurse

20   could physically observe the inmates getting medications

21   and note whether or not some of them are ill?

22        A.    Correct.

23        Q.    It would also be important because inmates

24   or detainees could communicate to her if they did have

25   complaints?

1      A.      Correct.

2      Q.      Now, if Nurse Paulsen didn't accompany the

3   deputy in delivering those medications, she apparently

4   wouldn't be aware of the condition of the inmate unless

5   it was reported to her by the deputy; is that right?

6              MR. RINGEL:   Object to the form and the

7   foundation.

8      A.      You're saying if a deputy served meds --

9      Q.      (BY MR. TRINE)   Without the nurse.

10     A.      -- without the nurse?   And that would

11   actually occur, like on the weekends and things like that

12   where we'd have deputies giving out the medication.

13             But if a deputy was serving meds or had --

14   if an inmate would approach the deputy and let him know

15   that he was sick, I'm sure that the deputy would probably

16   take notes and forward that information on to the nurse.

17   Information would also be forwarded to the nurse on pod

18   walks or on just some of the routine duties that the

19   officers engage in every day on a daily basis.

20     Q.      Now, we'll go through these records in a

21   little bit, but my review of the master control records

22   and of the daily logs indicated that between March 1 and

23   March 10 of 2003, the nurse accompanied a deputy on meds

24   on one occasion in those ten days.

25             Would that be a violation of your policy --

89

1   time -- or I don't know that that indicates that she was

2   not accompanying officers on these med calls.

3       Q.    (BY MR. TRINE)  Was it the practice, policy

4   and procedure of the jail to have the officer and/or

5   Vicki Paulsen identified, or the people identified, who

6   actually distributed medications?

7               MR. RINGEL:  Object to the form and the

8   foundation.

9       A.    I don't know that I have a specific policy.

10  I instruct staff to be as accurate as possible, and

11  different staff are probably a little bit more

12  detail-oriented than others.

13      Q.    (BY MR. TRINE)  And then at 1920 hours on

14  March 3, there is an indication there was a minor medical

15  problem, D Pod.  Do you see that?

16      A.    Yes, I do.

17      Q.    Do you know what that was all about?

18      A.    No, I don't.

19      Q.    And the initials for that entry are EA and

20  DW.  Do you know who EA is?

21      A.    No.

22      Q.    Did you have someone by the name of Ed

23  Allen?

24      A.    Could be Ed Allen.  And the other one could

25  be Don Woodward.

175

1    Q.    And then at 8:50, apparently Crawford sent

2    Deputy Theobald to the local store to purchase some

3    cranberry juice for the inmate.  Was that something that

4    Vicki Paulsen ordered, or do you know?

5         MR. RINGEL:  Object to the form and the

6    foundation.

7    A.    I am making an assumption, but based on the

8    fact that I think she may have felt he was having some

9    kidney stones or some kidney problems and that that might

10   help him, that may have been why Deputy Theobald was sent

11   to the store to get the cranberry juice.

12   Q.    (BY MR. TRINE)  Based on a possible

13   diagnosis of kidney stones?

14   A.    Correct.  And that's an assumption on my

15   part.

16   Q.    And then at 8:53, Crawford noted a small

17   amount of blood in his spit.  You see that?

18   A.    Yes, I do.

19   Q.    And you don't know why a chair was placed in

20   D Block to aid in his discomfort?

21   A.    I would not have a problem with a chair

22   being placed in the pod if it would help the inmate.

23   Q.    And you see -- at least Crawford notes that

24   the call actually came from the nurse at 11:07 a.m.

25   recommending that he be taken for evaluation.  Do you see

1   Ellis actually -- the specifics as far as what she did

2   when she had inmates clean the pod.

3        Q.    It doesn't state the name of the author, but

4   who authored that?

5        A.    I believe it was Deputy Ellis.

6        Q.    And when was it authored?  There's no date

7   on it.

8        A.    I'm not sure.

9        Q.    Did she author that after the Carranza-Reyes

10  incident at your request?

11       A.    I believe I had asked her to produce a

12  document with what our exact and specific cleaning

13  procedures were.

14       Q.    During the time that Carranza-Reyes was

15  there?

16       A.    Yes.

17             MR. RINGEL:  And I --

18             MR. KORDICK:  What's that number for the

19  identification?

20             MR. RINGEL:  Yeah, that's what I was going

21  to do.  For the record, Deposition Exhibit 7 is -- first

22  page is Park 0416; second page is Park 1530; third page

23  is Park 1528; and fourth page is Park 1529.

24       Q.    (BY MR. TRINE)  And it states, "All

25  mattresses are sprayed with a bleach solution and wiped

1   down with a clean rag."  When does that occur, do you

2   know?

3       A.    I believe that would probably be when the

4   inmates leave.

5       Q.    Okay.  And it says, "If the facility was

6   going through the cold and flu, et cetera, season, the

7   inmates were required to clean thoroughly with a bleach

8   solution each and every day."

9            Did you understand that that was the

10  procedure, that is, only if the facility was going

11  through the flu and cold season that they'd be required

12  to clean thoroughly?

13           MR. RINGEL:  Object to the form.

14      A.    I think we require them to clean thoroughly

15  regardless.

16      Q.    (BY MR. TRINE)  It states that showers are

17  cleaned on a daily basis.  The inmates are given a hose

18  which attaches to the faucet at the slop sink, scrub

19  brush, disinfectant or soft scrub soap containing bleach,

20  and a green scrub pad.  If the inmates want to clean the

21  shower more than once a day, they could request

22  shower-cleaning supplies and so forth.

23           Did you understand that that was the

24  procedure, or did you even know what the procedure was?

25           MR. RINGEL:  Object to the form and

193

1     foundation.

2          A.     For cleaning the shower?

3          Q.     (BY MR. TRINE)  Yes.

4          A.     Well, I'd asked her to write up what the

5     procedure was and what we were doing back in March 2003.

6          Q.     Okay.  Because you weren't -- you didn't

7     really know yourself, you wanted her to let you know what

8     was happening, right?

9          A.     Correct.

10         Q.     Is she still employed?

11         A.     Yes.

12         Q.     And what was her name again?

13         A.     Darlene Ellis.  She's now a case manager.

14               MR. RINGEL:  She's scheduled for a

15    deposition Thursday at 8:30, Bill.

16               MR. TRINE:  Okay.  Thank you.

17               MR. RINGEL:  We're at 4:30 if you want to

18    get to a stopping place.

19               MR. TRINE:  Okay.  Let me just ask two or

20    three additional questions, and it will be a good time to

21    stop.

22               MR. RINGEL:  Fair enough.

23         Q.     (BY MR. TRINE)  The Park County Jail medical

24    department policies and procedures manual, which is

25    identified as Park pages 550 through 694, is a manual

COFFMAN REPORTING        303.893.0202
* SUBJECT TO CONFIDENTIALITY DESIGNATIONS *

**COPY** 202

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Case No. 2005-WM-377 (BNB)

---

DEPOSITION OF:  MONTE K. GORE, VOLUME II
January 20, 2006

---

MOISES CARRANZA-REYES,

Plaintiff,

v.

PARK COUNTY, a public entity of the State of Colorado and
its governing board, THE PARK COUNTY BOARD OF COUNTY
COMMISSIONERS; PARK COUNTY SHERIFF'S OFFICE, a public
entity of the State of Colorado; FRED WEGENER,
individually and in his official capacity as Sheriff of
Park County, Colorado; MONTE GORE, individually and in
his capacity as Captain of Park County Sheriff's
Department; VICKIE PAULSEN, individually and in her
official capacity as Registered Nurse for Park County,
Colorado; JAMES BACHMAN, M.D., individually and in his
official capacity as Medical Director of the Park County
Jail,

Defendants.

---

TAKEN PURSUANT TO NOTICE on behalf of the Plaintiff at

824 Costilla, Fairplay, Colorado at 12:38 p.m. before

Theresa A. Coffman, Federal Certified Realtime Reporter,

Registered Professional Reporter and Notary Public within

Colorado.

*Coffman Reporting*

303.893.0202
303.893.2230 FAX

*  SUBJECT TO CONFIDENTIALITY DESIGNATIONS  *

1    Q.    And then under Procedures, it indicates that

2   that can be delegated to one of the supervisors, but the

3   monthly inspection must be conducted by the jail captain.

4   Did you delegate the weekly inspections to someone?

5    A.    Yes, Sergeant Crawford.

6    Q.    And did you conduct the monthly inspections?

7    A.    I tried to.

8    Q.    What did those inspections consist of?

9    A.    Typically I would walk around the facility,

10   look at the facility, make sure bunks were made.  We

11   actually have popcorn machines, and we buy soda, and if

12   inmates passed the inspection -- actually, this is the

13   weekly inspection -- they get to watch a movie of the

14   week, whatever movie they want, and they get pop and

15   popcorn.

16    Q.    No, my question was, what did your monthly

17   inspections consist of?

18    A.    We would walk around and look at the

19   facility.

20    Q.    "We" or you?

21    A.    Typically I'd have a sergeant with me.

22    Q.    Okay.  You and a sergeant monthly would walk

23   around and look at the facility?

24    A.    And I wouldn't necessarily specifically say

25   it was monthly, but we would conduct inspections.

*  SUBJECT TO CONFIDENTIALITY DESIGNATIONS  *

1    Typically, Sergeant Crawford was responsible for the

2    weekly inspections.  But we would typically look at all

3    areas.  We'd look at the kitchen, we'd go into the

4    control room, assess that.  We'd look at the pods for

5    cleanliness.  I'd talk to inmates if they had any issues

6    with the food, staff.  Typically my questions are, are

7    the staff treating you fairly, are there any issues with

8    laundry, are there any issues that you have.

9                I would look at the weight room.  I would

10   look at the pod area.  I would look at the laundry area.

11   I would look at -- looking.

12        Q.    And this policy provides that if you

13   delegate the weekly inspections, a written weekly

14   inspection report will be provided to the jail captain

15   for his information and/or action.  Did you receive

16   weekly inspection reports?

17        A.    You know, typically I might receive

18   inspection reports.  They may not be written, but they

19   would be verbal.

20        Q.    Okay.  The question was, did you receive a

21   written weekly inspection report as required by this

22   policy?

23                MR. RINGEL:  Object to the form and the

24   foundation.

25        A.    I believe there were some weekly inspection