**COPY**  1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Case No. 2005-WM-377 (BNB)

---

DEPOSITION OF: JAMES BACHMAN, M.D.
January 19, 2006

---

MOISES CARRANZA-REYES,

Plaintiff,

v.

PARK COUNTY, a public entity of the State of Colorado and its governing board, THE PARK COUNTY BOARD OF COUNTY COMMISSIONERS; PARK COUNTY SHERIFF'S OFFICE, a public entity of the State of Colorado; FRED WEGENER, individually and in his official capacity as Sheriff of Park County, Colorado; MONTE GORE, individually and in his capacity as Captain of Park County Sheriff's Department; VICKIE PAULSEN, individually and in her official capacity as Registered Nurse for Park County, Colorado; JAMES BACHMAN, M.D., individually and in his official capacity as Medical Director of the Park County Jail,

Defendants.

---

TAKEN PURSUANT TO NOTICE on behalf of the Plaintiff at 340 Peak One Drive, Frisco, Colorado 80443 at 9:22 a.m. before Theresa A. Coffman, Federal Certified Realtime Reporter, Registered Professional Reporter and Notary Public within Colorado.

Coffman Reporting
303.893.0202
303.893.2230 FAX

EXHIBIT A-4

Case 1:05-cv-00377-WDM-BNB   Document 117-4   Filed 12/13/06   USDC Colorado   Page 2 of 8
Carranza-Reyes v. Park County                                              James Bachman, M.D.

12

1   Q.   Okay. Do you recall approximately when
2   Correctional Health Services of America was discontinued
3   and some other company servicing the jail?
4   A.   I can only give you the vaguest of
5   recollections. My best timeline, and I apologize for my
6   memory or lack thereof, would be 1997 I started working
7   for Correctional Health Services.
8            In 1999, that company changed to virtually
9   the identical company with a different name. I believe
10  my direct services started with Park County in 2001. And
11  I apologize if that information's not correct.
12  Q.   When you were working for Correctional
13  Health Services of America, was it your understanding
14  that company was only providing medical health services
15  and not operating the entire jail?
16  A.   That's correct.
17  Q.   Then when a company by a different name took
18  over in 1999, was that company doing the same things,
19  just providing medical and health services, or were they
20  also operating the jail?
21  A.   The former.
22  Q.   Operating the jail?
23  A.   No.
24  Q.   Just the medical and health services?
25  A.   Just the medical and health services.

* SUBJECT TO CONFIDENTIALITY DESIGNATIONS *

1   Health Services of America. I remember meeting with
2   people from those companies. I remember meeting with
3   Officer Gore. I don't remember interviewing nurses, no.
4   I'm sure it happened, but I don't remember.
5        Q.   When Park County took over operation of the
6   jail, did you have, then, a meeting with Captain Gore,
7   who interviewed you for the position of medical director?
8        A.   My memory's again a little weak, but I do
9   remember having a face-to-face discussion with Officer
10  Gore about assuming that job.
11       Q.   Do you remember the gist of that discussion,
12  what general topics were discussed?
13       A.   My memory's bad, but I remember that we
14  discussed general duties. I have specific memories in
15  terms of what I was offering him in terms of my services.
16  I remember offering him that I could be available to
17  physically come and see patients twice a month. I
18  remember offering him the use of my office in Frisco at
19  no charge, that is, any contract would include the
20  services I'm describing.
21            So I remember offering him that I would be
22  happy to see patients from Park County five days a week
23  in my office as part of our contract. I remember
24  offering to be available -- I'm sorry -- available by
25  phone or beeper 24 hours a day, seven days a week, except

Case 1:05-cv-00377-WDM-BNB   Document 117-4   Filed 12/13/06   USDC Colorado   Page 4 of 8
Carranza-Reyes v. Park County                                              James Bachman, M.D.

23

1  when I was not available. I remember offering to make
2  sure there were other arrangements for coverage when I
3  was not available. I remember making sure that he
4  understood that I was excluding lab, X-ray, emergency
5  services and specialists as not part of my offer or not
6  part of what I wanted to cover in the contract. So it
7  was just a discussion of what I was offering and what he
8  needed.
9       Q.   And what did you offer to receive in the way
10 of compensation for all of that?
11      A.   My compensation was $450 a month.
12      Q.   Is that what you suggested, or was that a
13 subject of discussion?
14      A.   I don't remember. I'm sure I asked that he
15 pay me as much as he could, and I assume that was as much
16 as he could offer. I don't remember.
17      Q.   So the four --
18      A.   I just remember we agreed on that figure.
19      Q.   So the $450 a month was to cover all of your
20 services?
21      A.   That's correct. It was an all-inclusive
22 contract for those services I talked about, not for the
23 services that I specifically excluded.
24      Q.   Right. And you would receive $450 a month
25 no matter how many patients you saw, no matter how many

```
                                                            24
```

1   inmates you saw?

2      A.   Right. It was not per patient. It was for

3   activities described.

4      Q.   Any additional compensation for

5   out-of-pocket expenses for travel, that sort of thing?

6      A.   No, sir. My stipend included travel.

7      Q.   If you would look, please, at Exhibit 28.

8   Do you have that?

9      A.   It's right here.

10     Q.   Which has been identified in the lower

11  right-hand corner by some Bates stamp numbers, Park 0312

12  through 320.

13     A.   Yes, sir.

14     Q.   Does this appear to you to be a copy of a

15  contract that you entered into with Park County on or

16  about February 5, 2001? Or February 15, 2001?

17     A.   Yes, sir.

18     Q.   So after your discussion and conversation

19  with Captain Gore, the items that you had proposed and

20  discussed with Captain Gore were reduced to written form,

21  and you entered into a contract to provide those

22  services?

23     A.   Yes, sir.

24     Q.   Looking at Park 0313 defining the scope of

25  your services, indicating you shall perform the following

1   and make decisions that I would review and consider
2   completely appropriate. The agreement was that she would
3   call me if she had any questions at all that I could help
4   her with. So that by definition, this would be a
5   situation where she needed help with decision-making. If
6   that decision was obvious, someone's unconscious,
7   someone's having a seizure, someone's having a heart
8   attack, she would make the appropriate decision and then
9   notify me afterwards.
10      Q.   Doctor, again referring to Park 313 of
11  Exhibit 28, the next item on scope of services is that
12  you would have responsibility for all the medical care of
13  inmates provided while they are in the custody of Park
14  County, and you understood that that was your
15  responsibility, right?
16      A.   I understood that I was the physician
17  consultant to that facility and was available, either by
18  phone or in person, to see anyone who they wanted me to
19  see.
20      Q.   And you would distinguish, I assume, between
21  medical care and nursing care, that there is a
22  difference?
23      A.   Yes, sir.
24      Q.   And that nurses are not qualified to make
25  medical diagnoses, but they are to make nursing

* SUBJECT TO CONFIDENTIALITY DESIGNATIONS *

Case 1:05-cv-00377-WDM-BNB   Document 117-4   Filed 12/13/06   USDC Colorado   Page 7 of 8
Carranza-Reyes v. Park County                                            James Bachman, M.D

62

1    another opportunity.

2    Q.    So if I understand it, then, if there were
3    61 inmates crowded into Pod D with many of them sleeping
4    on mattresses and many of them ill and vomiting and
5    spitting into tissues that they were stuffing under their
6    mattresses and spitting at times in cans or on the floor
7    and the place smelled, you wouldn't know about that
8    because you never inspected; is that right?

9              MR. SARGENT:   Form and foundation.

10   A.    That's not correct.  My inspections were not
11   scheduled.  My inspections occurred every three to four
12   months.  My inspections then, in the situation you
13   described, I would not be allowed in the pod, but I would
14   be allowed to go up to the window.  They were fairly
15   large windows, and I was allowed a visual inspection of
16   that pod, but I was not allowed to physically enter that
17   pod.

18   Q.    (BY MR. TRINE)  Well, on any of those
19   inspections did you observe inmates in Pod D sleeping on
20   mattresses on the floor?

21   A.    No, sir, I never observed that.

22   Q.    Would that have been of any concern to you
23   if you had observed it?

24             MR. SARGENT:   Form and foundation.

25   A.    That would not have been a concern of mine,

Case 1:05-cv-00377-WDM-BNB   Document 117-4   Filed 12/13/06   USDC Colorado   Page 8 of 8
Carranza-Reyes v. Park County                                              James Bachman, M.D.

63

1  no. I may have asked questions, as I think I tried to
2  answer earlier. If they had said to me, "Well, Jim, this
3  is just for two days," I would have said, "Oh." If they
4  had said, "Yes, we're going to keep it at this number for
5  two months," I might have made a mental note to address
6  that with appropriate people at a later date.
7        Q.    (BY MR. TRINE) Why would you do that?
8        A.    Why would I do that?
9        Q.    Um-hum.
10       A.    If I felt that there was overcrowding, I
11 might bring up the issue. You have to understand that in
12 my five years, I never once saw overcrowding, I never
13 once saw unsanitary conditions. Just the opposite. I
14 felt like that was the cleanest, most appropriately
15 populated, best -- I felt like I could have been in that
16 jail and felt comfortable.
17       Q.    You'd have liked to have slept there and ate
18 there and felt comfortable?
19             MR. SARGENT: Object to form and foundation.
20       A.    I didn't want to be under arrest, no. But I
21 thought they did a tremendous job. I was very impressed
22 with not only their medical care, but I thought the whole
23 facility was very well run. I'm sure I could have missed
24 something, but I made regular, unannounced, surprise
25 inspections, and I never saw anything close to the

* SUBJECT TO CONFIDENTIALITY DESIGNATIONS *