COPY                                    1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Case No. 2005-WM-377 (BNB)

_____

DEPOSITION OF:  VICKI ANN PAULSEN, R.N.
January 18, 2006

_____

MOISES CARRANZA-REYES,

Plaintiff,

v.

PARK COUNTY, a public entity of the State of Colorado and
its governing board, THE PARK COUNTY BOARD OF COUNTY
COMMISSIONERS; PARK COUNTY SHERIFF'S OFFICE, a public
entity of the State of Colorado; FRED WEGENER,
individually and in his official capacity as Sheriff of
Park County, Colorado; MONTE GORE, individually and in
his capacity as Captain of Park County Sheriff's
Department; VICKIE PAULSEN, individually and in her
official capacity as Registered Nurse for Park County,
Colorado; JAMES BACHMAN, M.D., individually and in his
official capacity as Medical Director of the Park County
Jail,

Defendants.

_____


TAKEN PURSUANT TO NOTICE on behalf of the Plaintiff at

1125 17th Street, Suite 600, Denver, Colorado 80202 at

9:04 a.m. before Theresa A. Coffman, Federal Certified

Realtime Reporter, Registered Professional Reporter and

Notary Public within Colorado.

*Coffman Reporting*

303.893.0202
303.893.2230 FAX

EXHIBIT
A-5

*  SUBJECT TO CONFIDENTIALITY DESIGNATIONS  *

1    Part 14, starting on page 11.  And in case you forget, my

2    question is simply whether this is one of the documents

3    that you became familiar with --

4         A.     Similar to this.

5         Q.     -- when you started working in corrections.

6         A.     Similar to this.  Not exactly this as far as

7    DOC is concerned.

8         Q.     Okay.  So it wasn't that particular

9    document --

10        A.     Not this particular --

11        Q.     I'm sorry.  But it was something similar?

12        A.     Um-hum.

13        Q.     Okay.  Now, you apparently started work

14   in -- at Park County in January '03?

15        A.     Um-hum.  Yes.

16        Q.     And then gave two weeks' notice that you

17   were leaving on September 30, '03?

18        A.     Yes.

19               (Discussion off the record.)

20               MR. SARGENT:  I'm sorry, but I didn't hear

21   your question.  What was the question, Theresa?

22               (The last question was read back.)

23        Q.     (BY MR. TRINE)  And why did you give two

24   weeks' notice that you were going to leave on September

25   30?

* SUBJECT TO CONFIDENTIALITY DESIGNATIONS *

45

1          Q.       When you saw that there were two toilets and

2      knew at times that there were more than 30 inmates in

3      there, did you ever say anything to Monte Gore or any of

4      the deputies about the overcrowding?

5                   MS. LEWIS:   Object to the form of the

6      question.

7          A.       I did say, you know, how long are they going

8      to be there, is INS picking up, they're -- it's not a

9      good thing to have that many people in there.  But other

10     than that, I did not talk to Monte Gore about it.

11         Q.       (BY MR. TRINE)  Who are these conversations

12     with that you were just describing?

13         A.       Corporal Crawford, Sergeant Muldoon.

14         Q.       And when you had said it's not a good idea

15     to have that many people in there, what was their

16     response?

17         A.       That INS would probably be picking them

18     up -- the extra up.  Because they were in and out all the

19     time.  I mean, I didn't have detainees there for long

20     periods.  I think I had two, but they were going to

21     court.  I mean, I can remember two or three cases where I

22     had detainees that were longer than that, but they were

23     going to court, so they were there longer.  But other

24     than that, they picked them up weekly.

25         Q.       Were you personally concerned about the

*  SUBJECT TO CONFIDENTIALITY DESIGNATIONS  *

1    medical issues.   That was from the protocols.

2         Q.       In other words, you read protocols that

3    indicated that would occur, and therefore, you assume it

4    did?

5         A.       It did not occur while I was there.

6         Q.       But what's your assumption, then?   It

7    occurred before you came on board?

8         A.       I didn't ask.   I assumed that it did, yes.

9         Q.       Did you ever request that Dr. Bachman come

10   to the jail and instruct deputies on any particular

11   medical issues?

12        A.       No.

13        Q.       Did you ever feel that there was a need to

14   do that?

15        A.       No.

16        Q.       Now, do you presently have any memory, apart

17   from documents, of Moises Carranza-Reyes?

18        A.       Yes.

19        Q.       Okay.   And do you have any present memory of

20   any contact you had with him?

21        A.       Yes.

22        Q.       And what is your memory of your first

23   contact with him?

24        A.       I saw him on the 6th of March, and he came

25   to me with an interpreter, and he was complaining of a

*  SUBJECT TO CONFIDENTIALITY DESIGNATIONS  *

1    headache, congestion, stuffy nose, sore throat, achy.

2          Q.      You mean you remember all that without

3    reference to notes --

4          A.      Yes, I do.

5          Q.      -- or records?  Why does that stand out in

6    your mind that he came to you with those --

7          A.      There are many inmates that stand out in my

8    mind.  Or detainees.  I work with it.

9          Q.      And what was his appearance at that time in

10    March when you first saw him?

11          A.      When I first saw him?

12          Q.      Yeah.

13          A.      He was walking, his color was good.  He came

14    in.  Through the interpreter we talked back and forth

15    about his problems, and I examined him.  At that time I

16    didn't feel that what was going on with him was anything

17    major.

18          Q.      Now, you see him here with us in the

19    deposition today?

20          A.      Um-hum.

21          Q.      Is that basically how he looked at that

22    time?

23          A.      He was thinner, and he was -- he was -- he

24    was -- how do you want me to say he looked?  I mean, he

25    walked in, he was alert, he was . . .

*  SUBJECT TO CONFIDENTIALITY DESIGNATIONS  *

53

1        Q.      Was his hair cut as it is now?

2        A.      I don't remember.

3        Q.      Would you say he -- how much thinner was he

4    then?

5        A.      Quite a bit, I think. · Just from looking at

6    him sitting down, it appears he's gained a little weight.

7        Q.      Well, from the records -- you've reviewed

8    the records --

9        A.      Um-hum.

10       Q.      -- didn't you, for the deposition?

11       A.      Um-hum.

12       Q.      From the records, you know he was very thin,

13   wasn't he?

14       A.      Um-hum.

15       Q.      Weighed what?  Do you remember?

16       A.      I don't remember what he weighed.

17       Q.      120 or something?

18       A.      He was thin.  He was not as heavy as he is

19   now.

20       Q.      Okay.  Do you remember what time of the day

21   it was --

22       A.      In the morning.

23       Q.      -- that you saw him on the 6th?

24       A.      It was in the morning.

25       Q.      Do you remember what time?

*  SUBJECT TO CONFIDENTIALITY DESIGNATIONS  *

54

1       A.      It would have been right after breakfast,

2   probably around 9 o'clock.  I don't know for sure.

3       Q.      And did you review or have available his

4   patient chart?

5       A.      Had his questionnaire that was filled out.

6       Q.      When you saw him on the 6th?

7       A.      Um-hum.

8       Q.      And in order to -- and in preparation for

9   your deposition today, did you have an opportunity to see

10  his patient chart that you kept locked up?

11      A.      I saw his -- the form that he filled out.

12  That's all I saw.

13      Q.      Okay.  You didn't see his file?  We haven't

14  seen it either.  I'm asking you --

15      A.      I haven't seen his file, no, no.  Just my

16  notes and the form that he filled out.

17      Q.      And what's your next memory, then, of

18  Moises?

19      A.      I saw him that morning, and then I saw him

20  again on the 7th.

21      Q.      You remember today having an independent

22  memory of seeing him on the 7th without regard to notes

23  or charts?

24      A.      Yes, because he became very ill.  Those

25  things stand out in a nurse's mind.  I'm sorry.

* SUBJECT TO CONFIDENTIALITY DESIGNATIONS *

55

1       Q.     Okay.  He became very ill when?

2       A.     On the -- during the night of the 7th.

3       Q.     And you remember the events on the 7th?

4       A.     Um-hum.

5       Q.     What time did you see him on the 7th?

6       A.     It was in the morning.  He asked to be seen

7 again, so I saw him after breakfast.

8       Q.     And what was his condition at that time?

9       A.     It was -- the only difference in his

10 condition at that time was that he had had some vomiting

11 going on.

12       Q.     He was the same except he'd been vomiting?

13       A.     Um-hum.

14       Q.     And then when was your next contact with

15 him?

16       A.     On the morning of the 8th.

17       Q.     Okay.  Why don't we start with what has been

18 marked Deposition 21, which has been represented to us to

19 be the so-called pass-on records that you referred to

20 earlier.

21       MS. LEWIS:  Mr. Trine, do you have a copy

22 for the witness?  I have my own copy, but . . .

23       MR. TRINE:  Here's the -- I'm sorry.  Here

24 it is.

25       THE DEPONENT:  Thank you.  Um-hum.

* SUBJECT TO CONFIDENTIALITY DESIGNATIONS *

71

1          A.          It's a form that we use to show any injuries

2    or abrasions, that kind of thing.

3          Q.          And then at 9:24 a.m. on the 6th, if you

4    look at Park 993, it indicates "Five back to medical."

5          A.          Um-hum.

6          Q.          Do you see that?

7          A.          Yes.

8          Q.          And do you know why you were seeing five

9    people all at the same time at 9:24?

10         A.          They would bring them all back, sit them

11   back there, and I'd see them one at a time.

12         Q.          Do you remember that these were five people

13   from D Pod who were all sick?

14         A.          No, I do not.

15         Q.          Do you remember who these five people were?

16         A.          One of them was Mr. Carranza-Reyes.

17         Q.          Okay.  How do you know that?

18         A.          How do I know that?

19         Q.          Yeah.

20         A.          Because that's the day I saw him.

21         Q.          You know that from the chart that you had?

22         A.          I don't have the chart.

23         Q.          You know that from what you entered in the

24   computer?

25         A.          I know that because that's the day I saw

*   SUBJECT TO CONFIDENTIALITY DESIGNATIONS   *

Carranza-Reyes v. Park County                                    Vicki Ann Paulsen, R.N.

174

1          A.      Yes.

2          Q.      And it indicates under Specific Duties that

3    you're to complete a medical history and physical on

4    incoming inmates; is that right?

5          A.      Correct.

6          Q.      And did you take a medical history and

7    perform a physical examination on every incoming detainee

8    in Pod D?

9          A.      Not all of them, no.

10         Q.      When and under what circumstances would you

11   take a medical history and perform a physical?

12         A.      If they indicated on their incoming medical

13   sheet that there was -- that they had any problems in any

14   way.

15         Q.      Okay.  If they presently had any kind of a

16   medical problem they were experiencing, then you would

17   examine them?

18         A.      Yes.

19         Q.      Then on the next page, 1357, it states at

20   the top, "Prepares a monthly report to the sheriff on all

21   medical issues, including treatment, emergency medicals,

22   number of inmate patients seen and meds dispensed."

23                 Did you prepare such a report on a monthly

24   basis?

25         A.      Part of it.  Not all of it.

*  SUBJECT TO CONFIDENTIALITY DESIGNATIONS  *

Carranza-Reyes v. Park County                                    Vicki Ann Paulsen, R.N.

192

1        A.      Yes.

2        Q.      And it states that provision for appropriate

3   infirmary isolation according to type of infection should

4   be available.  And did you have provisions where people

5   could be quarantined or isolated?

6        A.      If the segregation cells were empty, I could

7   use those.

8        Q.      And if they were full, you couldn't?

9        A.      I didn't have a place.

10       Q.      And if you'll refer to 599, please, it

11   indicates "Nursing staff will conduct medication pass in

12   the housing pods at least three times a day," and you

13   were doing that; is that right?

14       A.      Yes.

15       Q.      And that would be normally at what hours?

16       A.      It would be at around -- just before 7:00

17   and just before 2:00, and in the evening I prepared the

18   meds, and the officers passed them, and I think it was

19   around 6:00.

20       Q.      And then if you look at 602 of Exhibit 4, it

21   indicates in that second paragraph under Policy that the

22   Park County Jail will maintain a contract for the

23   processing of lab results, and in the next paragraph, it

24   indicates that the contract is with LabCorp.  Is that the

25   lab that you were sending blood to for lab results?

*  SUBJECT TO CONFIDENTIALITY DESIGNATIONS  *