IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Case No. 2005-WM-377 (BNB)

---

DEPOSITION OF: DANIEL MULDOON
November 1, 2005

---

MOISES CARRANZA-REYES,

Plaintiff,

v.

PARK COUNTY, a public entity of the State of Colorado and its governing board, THE PARK COUNTY BOARD OF COUNTY COMMISSIONERS; PARK COUNTY SHERIFF'S OFFICE, a public entity of the State of Colorado; FRED WEGENER, individually and in his official capacity as Sheriff of Park County, Colorado; MONTE GORE, individually and in his capacity as Captain of Park County Sheriff's Department; VICKIE PAULSEN, individually and in her official capacity as Registered Nurse for Park County, Colorado; JAMES BACHMAN, M.D., individually and in his official capacity as Medical Director of the Park County Jail,

Defendants.

---

TAKEN PURSUANT TO NOTICE AND AGREEMENT on behalf of the

Plaintiff at 825 Castello, Fairplay, Colorado 80440 at 1:48

p.m. before Theresa A. Coffman, Federal Certified Realtime

Reporter, Registered Professional Reporter and Notary Public

within Colorado.

EXHIBIT
A-13

29

1    Q.    Do you know why it's addressed to you and
2    not the graveyard shift supervisor?
3    A.    Because I was day shift supervisor.
4    Q.    I thought the interoffice memorandum idea
5    was to let the very next shift know what had happened
6    during that --
7    A.    No, sir.
8    Q.    -- previous shift?
9    A.    Everybody.  When I come in -- when I came in
10   today, I read swing shift pass-on from last night, I read
11   graveyard's pass-on from last night, and anything else
12   that was put into the pass-on book.
13   Q.    Now, there's an indication here that Inmate
14   Herbert Maprazo-Hazariegos is complaining of serious
15   pains on his left side, D Pod.  Recommend he see the
16   nurse as soon as possible.  If this was being passed on
17   to the evening shift, the nurse wouldn't be in during the
18   night, would she?
19   A.    I don't believe so.
20   Q.    So would you be responsible, then, for
21   seeing that this inmate saw the nurse when you came on
22   the day shift the next day?
23   A.    No, sir.
24   Q.    Who would be?
25   A.    The inmate.

1    Q.    He would be responsible for going in to see
2    the nurse?
3    A.    No.  When she comes around, he can approach
4    the nurse.  What I do is I would be apprised of the
5    situation here, recommend he see the nurse as soon as
6    possible, but that's a medical issue, not a security
7    issue.
8    Q.    So you wouldn't follow up on that?
9    A.    Not necessarily.  I might advise medical
10   there's a guy in David pod that needs to see you, but
11   when she goes around at med pass, he has every
12   opportunity in the world to go up and talk to her.
13   Q.    Now, what record do you have that would
14   indicate that the nurse saw the inmates and passed
15   medications out on every med pass?
16         MS. LEWIS:  Object to the form of the
17   question.
18   A.    The only thing I would have possibly would
19   be the sergeant's log, if it was checked off that med
20   pass occurred on my shift.  But as far as what inmates
21   medical saw that day, I have no records of that at all.
22   Q.    (BY MR. TRINE)  Right.  And the sergeant's
23   records would only -- the sergeant's records would
24   indicate who, in fact, participated in the med pass,
25   wouldn't it?

31

1     A.    No, sir.

2     Q.    Where do we find out who participated in the
3   med pass that was done?

4     A.    It's just that med pass was done.  That's
5   the only thing on the sergeant log.

6     Q.    There are no records of who passes out the
7   meds?

8          MS. VEIGA:  Objection, foundation.

9     Q.    (BY MR. TRINE)  Is that right?

10    A.    I have no records of who passes out meds.
11  Medical doesn't work for me.

12    Q.    Okay.  So there are no records, outside of
13  the medical department itself, that indicate who passed
14  out the meds; is that right?

15         MS. LEWIS:  Objection to the form.

16    A.    We have a different form of keeping a daily
17  log than we did in 2003, so I don't know what entries
18  were made in 2003 in the handwritten log, but who did med
19  pass or who participated with medical when they went
20  around.

21    Q.    (BY MR. TRINE)  Okay.  You say you use a
22  different form now?

23    A.    Yeah.  Now we have a computer form.

24    Q.    And you don't remember what was used at that
25  time?

43

1    you might have to transport him?

2        A.    No, sir.

3        Q.    You were just being brought up-to-date on

4    what was going on; is that right?

5        A.    Yes, sir.

6        Q.    And you weren't the supervisor on the day

7    shift that day, or were you?

8        A.    No, I was the sergeant.  Corporal Crawford

9    was the officer in charge, but he was bringing me up to

10   speed so that I knew what was going on.

11        Q.    Okay.

12        A.    So I was aware of the situation.

13        Q.    And then when you indicated about 11:15 you

14   were called at your residence, was that by memory, or did

15   you again look at Crawford's timeline?

16        A.    I'll have to say I looked at Crawford's

17   timeline, because I would have a rough approximation of

18   what time it was.

19        Q.    And you were told that Nurse Paulsen had

20   ordered that the inmate be transported as soon as

21   possible?

22        A.    Yes, sir.

23        Q.    So why did you then go on duty at 11:30?

24        A.    No one else was available.

25        Q.    No one else was available to transport?

```
 1        A.    Yes, sir.
 2        Q.    So you were told in that phone call that no
 3   one else was available to transport?
 4        A.    No.  I knew it because of who I had on my
 5   shift, who was working, who was not available, what the
 6   options were.  It was too early in the day to call
 7   anybody in from swing shift because they would have had
 8   to have worked an incredibly extended shift to assist
 9   with the transport.
10              My recollection is I had two also-
11   weekend-off daytime employees who were at overtime
12   training for pressure point control tactics over in the
13   Bailey substation.  So the transport officer at that time
14   was Deputy William Sallee.  He was unavailable because he
15   was occupied.  So there was no one else, so I did the
16   transport.
17        Q.    Okay.  Did you know all of that when you
18   were called at 8:35 that morning?
19        A.    I'm going to have to say I did, because when
20   I am brought up to speed on a particular situation, I go
21   over all the options and the different combinations that
22   I can come up with to solve the problem.
23        Q.    Okay.  So when you went on duty at 11:30,
24   you knew you were going to be making the transport?
25        A.    Yes, sir.
```

54

```
 1    transported to Denver Health Medical Center"?
 2         A.    I remember them showing me an X-ray that I
 3    thought indicated he had half a lung, and they said he
 4    has to go down to Denver Medical.
 5         Q.    Did the doctor explain to you that
 6    Carranza-Reyes had pneumonia?
 7         A.    I believe so.
 8         Q.    Did he also tell you that the blood tests
 9    showed that he had septicemia?  Was septic?
10         A.    No, sir.
11               MS. VEIGA:  Objection to form and
12    foundation.
13         Q.    (BY MR. TRINE)  Did the doctor tell you that
14    all of their testing indicated that he could be going
15    into septic shock?
16               MS. VEIGA:  Objection to form and
17    foundation.
18         A.    No, sir.
19         Q.    (BY MR. TRINE)  Did you object to the
20    recommendation that he be transported to Denver Health?
21         A.    No, sir, not to the need to go to Denver
22    Health.
23         Q.    Well, did you object about something else
24    that was occurring?
25         A.    No, sir.  No.  My question was -- I was
```

                                                                55

1    dealing with INS, and I was hoping they were going to
2    come take charge of their inmate.
3        Q.    You had been in contact by phone with INS;
4    isn't that right?
5        A.    I believe sporadically, yes, sir.
6        Q.    Did you contact INS before you left for
7    Summit County?
8        A.    I don't remember whether I did or Corporal
9    Crawford did.  I do remember talking to them on occasion
10   at the Summit Medical Center on my own cell phone, but
11   cell service was sporadic in that building.
12       Q.    What was the gist of the conversations you
13   had with INS when you were in Summit County?
14       A.    My recollection is that they were unable to
15   come and take charge of their inmate, so we needed to
16   continue with the transport.  I was hoping to have been
17   relieved at Summit so that they could continue on down to
18   Denver.
19       Q.    So instead, you followed the ambulance to
20   Denver?
21       A.    Yes, sir.  And that's my recollection of
22   dealing with the ambulance drivers.
23       Q.    Now, when you were called at 8:35 that
24   morning -- I assume you were home; is that right?
25       A.    Yes, sir.