1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Case No. 2005-WM-377 (BNB)

---

DEPOSITION OF:  STEVEN CRAWFORD
November 2, 2005

---

MOISES CARRANZA-REYES,

Plaintiffs

v.

PARK COUNTY, a public entity of the State of Colorado
and its governing board, THE PARK COUNTY BOARD OF COUNTY
COMMISSIONERS; PARK COUNTY SHERIFF'S OFFICE, a public
entity of the State of Colorado; FRED WEGENER,
individually and in his official capacity as Sheriff of
Park County, Colorado; MONTE GORE, individually and in
his capacity as Captain of Park County Sheriff's
Department; VICKIE PAULSEN, individually and in her
official capacity as Registered Nurse for Park County,
Colorado; JAMES BACHMAN, M.D., individually and in his
official capacity as Medical Director of the Park County
Jail,

Defendants.

---

TAKEN PURSUANT TO NOTICE on behalf of the Plaintiff at
824 Costella, Fairplay, Colorado 80440 at 1:31 p.m.
before Laura L. Corning, Federal Certified Realtime
Reporter, Certified Shorthand Reporter and Notary Public
within Colorado.

EXHIBIT
A-14

27

```
 1         A.      No, I didn't.
 2         Q.      I see.  Okay.  Now, I notice that with
 3   meds, were they passed out every day during your shift
 4   while you were on shift, medications to --
 5         A.      On day shift, I don't know.
 6         Q.      And were you careful about noting when
 7   medications were passed out?
 8         A.      I tried to be.
 9         Q.      The -- on the date on 0976 at 1409, it
10   says that Vicki and Walker -- do you see that?
11         A.      Yes.
12         Q.      -- were the officers that started the
13   meds.
14         A.      Yes.
15         Q.      And the 3rd was a Monday.  Was the nurse
16   working on Monday through Friday?  Were those her
17   normal hours?
18         A.      I believe so.
19         Q.      So the earlier entries we had from the
20   1st and the 2nd, those don't mention Vicki being the
21   one doing it; they mention deputies would have been
22   doing the medications, correct?
23         A.      Would have been passing them out, yes.
24         Q.      And they were marked for the deputies to
25   pass out to the prisoners?
```

28

```
 1       A.      Yes.
 2       Q.      From the week before, I'm assuming.
 3       A.      From whenever the nurse prepared the
 4   meds.  We don't prepare them.
 5       Q.      Okay.  And then it also, I believe,
 6   states that on 1333 -- it says, Meds emote attack, or
 7   something.  What does that say?  Do you see where I'm
 8   at?
 9       A.      Yes.
10               MS. VEIGA:  Did you have a question,
11   Mr. Kordick?
12       Q.      (BY MR. KORDICK)  Yeah.  Do you know what
13   that says?
14       A.      Everything except the second word.  I'm
15   not sure what "emote" was.
16       Q.      Okay.  Tell me what everything else says,
17   then.
18       A.      "Meds," it says, "attack inmate cold meds
19   sent."
20       Q.      Okay.  Do you know what --
21       A.      I think -- I think that's emotional
22   attack, and inmate cold and the nurse took him his
23   meds.
24       Q.      I see.  So that would have been at 1333
25   hours, correct?
```

46

1    temperature.

2    Q.    (BY MR. KORDICK)  Okay.  The control for
3    the heat of D Pod is in the control unit, right?

4    A.    In the control room, yes.

5    Q.    Did you frequently get calls from the
6    pods asking them to regulate the heat?

7    A.    On occasion.

8    Q.    Was there a problem with A and -- and I
9    believe it's -- I'm going to misspeak here -- A and
10    B -- is that right? -- pods being too hot, and D and
11    C pods being too cold?

12    A.    I don't recall.

13    Q.    Did you have problems with the heat in
14    D Pod during the time you were there in the last
15    10 years?

16    A.    Problems in what way?

17    Q.    That the heat was not working.  It was
18    cold in the cell block.

19    A.    In the last 10 years?

20    Q.    Yeah.

21    A.    We've had some problems with the heaters,
22    yes.

23    Q.    Okay.  And has it been very cold in D Pod
24    on occasion?

25    A.    I would not say very cold.

47

1     Q.     Okay.  Were -- were there complaints
2     about it being cold in March of 2003?
3     A.     I don't recall.
4     Q.     You just don't remember?
5     A.     I don't remember, no.
6     Q.     Okay.  Who was in charge of -- of fixing
7     the heating at the -- at the jail?
8     A.     We have -- we had a jail maintenance
9     person that was assigned to the jail, and who we used,
10    I don't know.
11    Q.     Did you know a Jim Deathrage?
12    A.     Yes.
13    Q.     Was he the person in charge?
14    A.     He could have been at that time.
15    Q.     Okay.  Do you know what happened to Jim
16    Deathrage?
17    A.     He left.
18    Q.     Was he in charge of repairing toilets
19    that got clogged up in the jail?
20    A.     Yes.  Ones that a plunger couldn't clear.
21    Q.     Yeah.  It was my understanding that the
22    toilets frequently got clogged up and the staff would
23    plunge them out; is that right?
24           MS. VEIGA:  Objection to form and
25    foundation.

80

```
1       A.      No, I --
2               MS. VEIGA:   Objection to form and
3       foundation.
4       A.      No, I don't.
5       Q.      (BY MR. KORDICK)  Was it your impression
6       when you got there that he needed to be called right
7       away?
8       A.      I had probably talked with the nurse by
9       8:20 and was advising the captain, which is what I do.
10      Q.      Okay.  And then 8:27, what does that note
11      indicate?
12      A.      That I advised INS -- Ben at INS of what
13      was going on with -- at this point with Mr. Carranza-
14      Reyes.
15      Q.      Did you ask INS to transport Mr.
16      Carranza-Reyes?
17      A.      I don't recall if I did or not.  I think
18      the call was mostly to let them know what his
19      condition -- apparent condition was at that time.
20      Q.      Well, the nurse indicates that she came
21      in earlier -- I believe it -- I'm not positive.  I
22      think it was like 7:20, if I'm not mistaken -- and that
23      she recommended that he be transported to be examined
24      by a physician.  Did you know about that when you came
25      in?
```

85

```
 1    are.
 2         Q.      Did you need their permission to
 3    transport?
 4         A.      I believe so.
 5         Q.      Did you need their authorization to pay
 6    for it?
 7         A.      Pay for the transport?
 8         Q.      Yes.
 9         A.      I don't know.
10         Q.      Now, if you look at the note at 9:20, it
11    looks like -- well, I'm sorry.  Wait a second.  Let's
12    go back up here.  8:50 there is a note, and it's not --
13    doesn't look like it's your note.  Do you see that?
14         A.      Yes.
15         Q.      Before that it -- at 8:35 it says,
16    "Sergeant Muldoon called, briefed, transferred to med."
17    What does that mean?
18         A.      The phone call was transferred to
19    medical.
20         Q.      To the nurse?
21         A.      Yes.
22         Q.      So the nurse would have talked to Muldoon
23    at 8:35?
24         A.      I would assume so.
25         Q.      And he lived about 15 minutes away?
```

86

```
 1      A.      15, 20 minutes, yes.
 2      Q.      Okay.  Then at 8:50 it says, "Deputy
 3  Theobald to store for juice for inmate."  Was that
 4  something unusual, in your experience?
 5      A.      No.  Strangely enough, no.
 6      Q.      So you frequently would send a deputy out
 7  to get juice for one of the inmates?
 8              MR. JURS:  Object to the form of the
 9  question.
10      A.      Not frequently, on occasion, when it's
11  medically prudent to do so.
12      Q.      (BY MR. KORDICK)  Well, you thought he
13  was pretty sick, then.
14              MS. VEIGA:  Objection to form and
15  foundation.
16      A.      I'm not a doctor.  I'm not a nurse.
17      Q.      (BY MR. KORDICK)  Well, did you --
18      A.      I knew he was ill.
19      Q.      Yes, if you called Gore when you first
20  got in, you clearly thought there was --
21      A.      There was something, yes.
22              MR. JURS:  Objection to form.
23      Q.      (BY MR. KORDICK)  -- something pretty
24  serious.
25              MR. JURS:  Object to form on the last
```

87

1    question and the question being asked now.

2        Q.    (BY MR. KORDICK)  Did you think it was

3    pretty serious, to call Gore at home --

4        MS. VEIGA:  Objection to form and

5    foundation.

6        Q.    (BY MR. KORDICK)  -- first?

7        A.    I thought it was serious enough that the

8    captain needed to be advised.

9        Q.    And you thought it was serious enough to

10    let one of the deputies take off to get juice for him,

11    right?

12        MS. VEIGA:  Same objections.

13        Q.    (BY MR. KORDICK)  Theobald, correct?

14        A.    The nurse had stated that she wanted us

15    to get juice.  I sent the deputy to get the juice.

16        Q.    Okay.  Now, at 8:53 it says, "Blood in

17    spit," and it's your notation, "Crawford."

18        A.    No.  I'm the officer reporting.

19        Q.    Okay.  I'm sorry.  By "notation" -- I

20    didn't mean that.  You're the reporting officer.

21        A.    Yes.

22        Q.    All right.  Apparently it was recorded by

23    someone else.  TW, it looks like, or . . .

24        A.    Could have been JW.

25        Q.    JW.  If -- so you saw him spitting blood?

88

```
 1      A.      I saw it in a tissue.
 2      Q.      Okay.  And at 9:20 it says, "Inmate
 3   Carranza-Reyes given chair to ease discomfort."
 4      A.      Yes.
 5      Q.      And you made that log, and it looks like
 6   Jennifer Walker was the reporting officer?
 7      A.      Yes.
 8      Q.      The chair he was given, that was a
 9   wheelchair, wasn't it?
10      A.      I thought it was a plastic chair, one of
11   those white plastic ones.
12      Q.      Where was that chair at?
13      A.      When we got it?
14      Q.      No.  Where did you put him?
15      A.      In the lower tier.
16      Q.      Was he still in D Pod?
17      A.      Yes, I believe so.
18      Q.      Okay.  Then at 11:07 on the 8th, it looks
19   like this is your writing.  The note is ST.
20      A.      It's Deputy Theobald.  That's not my
21   writing.
22      Q.      It's not your writing?
23      A.      No.
24      Q.      Okay.  "Nurse called, said to take
25   Carranza to hospital"?
```

91

```
 1    captain just asked him to do it because I didn't have
 2    enough people on staff to release one more out of the
 3    jail.
 4         Q.    Then on 11:45 you called INS again?
 5         A.    I don't have an 11:45 entry.
 6         Q.    11:43.  I'm sorry.  I wrote through the
 7    top of it.  My fault.
 8         A.    Yeah.
 9         Q.    You called Ben at INS?
10         A.    Yeah, to advise him that we were
11    transporting.
12         Q.    And then at 11:46 you called SMC?
13         A.    Summit Medical Center, to let them know
14    we have somebody coming up, so they're not caught cold.
15         Q.    Now, wasn't there a closer facility you
16    would have taken him to?
17         A.    With a doctor?
18         Q.    Yeah.
19         A.    Summit was the closest.
20         Q.    Where is Timberline?
21         A.    Timberline has a physician advisor.
22         Q.    Not a physician?
23         A.    Not a physician.
24         Q.    And what about Silver Hills; did they
25    have a physician?
```