IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 05-cv-377-WDM-BNB

MOISES CARRANZA-REYES,

     Plaintiff,

v.

THE PARK COUNTY BOARD OF COUNTY COMMISSIONERS;
FRED WEGENER, individually and in his capacity as sheriff of Park County, Colorado;
MONTE GORE, individually and in his capacity as captain of Park County Sheriff's
Department; and
VICKI PAULSEN, individually and in her official capacity as registered nurse for Park County,
Colorado,

     Defendants.

---

**BRIEF IN SUPPORT OF DEFENDANT VICKI PAULSEN'S
MOTION FOR SUMMARY JUDGMENT**

---

Defendant Vicki Paulsen, by and through her undersigned counsel and pursuant to

D.C.COLO.LCivR 56.1, respectfully submits this Brief in Support of Motion for Summary

Judgment, and in support thereof states as follows:

## INTRODUCTION

In this case, Plaintiff seeks compensation from the Defendants, including former Park

County Jail nurse Vicki Paulsen, R.N., for alleged injuries he claims to have sustained as an

illegal alien detainee held at the Park County Jail in March 2003.  Plaintiff's causes of action

against Paulsen consist of a 42 U.S.C. § 1983 claim for constitutionally inadequate medical care,

which is brought against Paulsen in both her individual and official capacities, and a state law

negligence claim.   Paulsen is entitled to qualified immunity with regard to Plaintiff's constitutional claims against her in her individual capacity, as Plaintiff simply cannot satisfy the difficult burden required to overcome Paulsen's qualified immunity defense.   There is no evidence that Paulsen acted with deliberate indifference to Plaintiff's medical condition, and thus no evidence of a constitutional violation.   Nor has Plaintiff demonstrated that Paulsen's actions were unreasonable in light of clearly established law at the time of the alleged violation.   In addition, Plaintiff's claim against Paulsen in her official capacity is the equivalent of a claim against Park County and should be dismissed as duplicative.   Accordingly, Paulsen is entitled to summary judgment on Plaintiff's 42 U.S.C. § 1983 claims against her in their entirety.   Finally, if the Court dismisses these claims and grants the remaining defendants' Motion for Summary Judgment, the Court will no longer have supplemental jurisdiction over Plaintiff's state law negligence claims and should dismiss those as well.

**STATEMENT OF UNDISPUTED MATERIAL FACTS**

**Defendant Paulsen's Employment at the Park County Jail**

1.      Defendant Vicki Paulsen ("Nurse Paulsen") is a registered nurse with over 40 years of nursing experience.   (*See* deposition of Vicki Paulsen, attached hereto as **Exhibit A-1**, at 5, 90).

2.      Nurse Paulsen worked at the Park County Jail (the "Jail") from January 2003 until September 2003.   (*Id.* at 13).

3.      Nurse Paulsen generally put in 40-hour work weeks, usually arriving at the Jail to begin her shift at approximately 6:00 a.m.   (*Id.* at 31).

4.       During Nurse Paulsen's tenure at the Jail, medication rounds were generally made to the pods three times daily.  (*Id.* at 192).  Nurse Paulsen usually made two of those rounds herself, as they occurred during her shift.  (*Id.*).

5.       The usual procedure for inmates to request a visit to the nurse was to fill out a written "kite" containing that request.  (*Id.* at 29).  Nurse Paulsen would also see inmates who requested an appointment directly with her during medication rounds.  (*Id.* at 29, 32).

6.       Dr. James Bachman, the Jail's medical director, usually came to the Jail clinic to see inmates once a week on Wednesdays.  (*Id.* at 24).

7.       On days when Dr. Bachman was not at the Jail, Nurse Paulsen understood that she could call Dr. Bachman or his nurse practitioner if there were any problems with inmates and that arrangements would then be made for Dr. Bachman to see the inmate either at his own office or during his next weekly visit to the Jail.  (*Id.* at 20-21).

8.       If neither Dr. Bachman nor his nurse practitioner was available, then an inmate who required further medical attention would need to be transported to another facility, which was usually Summit Medical Center.  (*Id.* at 21).

**Plaintiff's Journey to the United States and Arrival at the Jail**

9.       On or about February 18, 2003, Plaintiff Moises Carranza-Reyes ("Plaintiff") traveled with his brother and sister-in-law from Mexico to the United States.  (*See* deposition of Moises Carranza-Reyes, attached hereto as **Exhibit A-2**, at 80-81).

10.      After crossing the border with a group of immigrants whom they did not know and staying in Phoenix for several days, the group boarded a pickup truck to travel to Chicago.  (*See generally id.* at 84-94).

11.     The pickup truck was stopped by a police officer in Colorado, and the immigrants were spotted and detained.  (*Id.* at 98-99).  They were transported to the Jail the same day, March 1, 2003.  (*Id.* at 152).

12.     Plaintiff did not feel ill when he arrived at the Jail; he did not believe he needed medical attention at that time, nor did he request any.  (*Id.* at 139).  He filled out a medical intake questionnaire in Spanish upon arrival, indicating he had no medical problems at that time.  (*Id.* at 128; Park County Jail Reporte Para El Doctor, attached hereto as **Exhibit A-3**).

**Progression of Plaintiff's Illness and Treatment**

13.     Plaintiff began feeling ill on Tuesday, March 4, 2003.  He had a headache, a sore throat, and his body felt heavy.  (Carranza-Reyes depo., Ex. A-2 at 212).

14.     Nurse Paulsen was not at the Jail on March 4, 2003; she had oral surgery and returned to work on Wednesday, March 5, 2003.  (Paulsen depo., Ex. A-1 at 63-64).

15.     On March 5, 2003, Plaintiff felt worse, and he had pain in his stomach.  He wanted to see the nurse, but was lying down during medication rounds and could not get Nurse Paulsen's attention.  (Carranza-Reyes depo., Ex. A-2 at 236-38).

16.     Nurse Paulsen first saw Plaintiff on Thursday, March 6, 2003, and there is no allegation or evidence that Nurse Paulsen was aware that Plaintiff wanted to see her prior to that date.  (Paulsen depo., Ex. A-1 at 51-52).

17.     During his appointment with Nurse Paulsen on March 6, 2003, Plaintiff complained, through an interpreter who was also an inmate, of a headache, stomachache, diarrhea, congestion, a sore throat, and dizziness.  (Carranza-Reyes depo., Ex. A-2 at 263-64; Paulsen depo., Ex. A-1 at 51-52).  Plaintiff was walking on his own, and his color was good.

(Ex. A-1 at 52).  His skin was warm and dry to the touch, and his abdomen was slightly tender. (Nurse's Note dated 3/6/03, attachment to Affidavit of Vicki Paulsen which is attached hereto as **Exhibit A-4**, at PARK 3525).

18.     Plaintiff had a temperature of 100.2, a pulse of 88, and a respiratory rate of 24. (3/6/03 Nurse's Note, Ex. A-4 attachment, at PARK 3525).

19.     Nurse Paulsen gave Plaintiff Motrin 400mg for the body aches and headache, Chlortrimeton (CTM) for the nasal congestion, and Pepto Bismol for the nausea.  (*Id.*).

20.     At that time, Nurse Paulsen "didn't feel that what was going on with [Plaintiff] was anything major."  (Paulsen depo., Ex. A-1 at 52).

21.     Plaintiff did not request further medical attention or assistance on March 6th. (Carranza-Reyes depo., Ex. A-2 at 270).

22.     Plaintiff testified that he had a painful cough starting on the evening of March 6th. (*Id.* at 271-72).

23.     The next morning, March 7, 2003, Plaintiff was asleep during Nurse Paulsen's morning medication rounds.  Later that morning, Plaintiff began vomiting.  He testified that several other detainees were also vomiting.  (*Id.* at 273, 275-76).

24.     The inmate who had acted as an interpreter for Plaintiff the previous day filled out a request for Plaintiff to see the nurse, and he was again taken to the infirmary on the morning of March 7th.  (*Id.* at 277-78).

25.     Plaintiff complained through the interpreter of similar symptoms as the previous day, except that he was also coughing and had vomited.  Again, his skin was warm and dry to the

touch, and his abdomen was slightly tender.  (*Id.* at 279; *see also* Nurse's Note dated 3/7/03, attachment to Ex. A-4 (Paulsen Affidavit), at PARK 3528).

26.     Plaintiff had a temperature of 97.4, a pulse of 92, and a respiratory rate of 24. (3/7/03 Nurse's Note, Ex. A-4 attachment, at PARK 3528).

27.     Nurse Paulsen again gave Plaintiff Motrin 400mg, CTM, and Pepto Bismol.  (*Id.*; Carranza-Reyes depo., Ex. A-2 at 280).

28.     Nurse Paulsen did not feel it was necessary at that time to call and relay Plaintiff's symptoms to Dr. Bachman.  (Paulsen depo., Ex. A-1 at 91).

29.     Dr. Bachman testified that, in his opinion, Plaintiff's symptoms on March 6th would most likely reflect a viral illness, and that he likely would not order diagnostic testing if a patient presented with those symptoms.  (*See* deposition of James Bachman, M.D., attached hereto as **Exhibit A-5**, at 92-95).

30.     Dr. Robert Greifinger, an expert for Plaintiff, also testified that, while Plaintiff was potentially diagnosable with group A strep on March 6th, Plaintiff's symptoms on March 6th and 7th were also consistent with a combination of altitude sickness and viral illness.  (*See* deposition of Robert Greifinger, M.D., attached hereto as **Exhibit A-6**, at 266-68).

31.     Plaintiff's expert Dr. Michael Niederman similarly testified that Plaintiff's symptoms on March 6th and 7th were consistent with a generic viral infection and that some of his symptoms on those dates were consistent with altitude sickness.  (*See* deposition of Michael Niederman, M.D., attached hereto as **Exhibit A-7**, at 157-58).

32.     As March 7, 2006 was a Friday, Nurse Paulsen left instructions for the Jail staff to keep an eye on Plaintiff over the weekend and informed them of the medications he could have. (Paulsen depo., Ex. A-1 at 92-93).

33.     That night, Plaintiff continued to feel worse and vomited a lot.  (Carranza-Reyes depo., Ex. A-2 at 281).

34.     At approximately 1:00 a.m. on March 8, 2003, Deputy Don Frye was conducting a "pod walk", and Plaintiff told Deputy Frye through an interpreter that he was feeling ill. Deputy Frye gave Plaintiff Ibuprofen and Pepto Bismol.  (*See* deposition of Deputy Don Frye, attached hereto as **Exhibit A-8**, at 80; Frye Incident Report dated 3/8/03, attached hereto as **Exhibit A-9**; Carranza-Reyes depo., Ex. A-2 at 286).

35.     Deputy Frye, who is certified as a medical first responder, continued to check on Plaintiff, who had no complaints between 1:00 a.m. and 3:00 a.m.  (Frye depo., Ex. A-8, at 5; Frye Incident Report, Ex. A-9).

36.     At approximately 3:00 a.m., Plaintiff again informed Deputy Frye through an interpreter that he was sick.  At that point, Deputy Frye took Plaintiff to the infirmary, where he examined Plaintiff, took his vital signs, and gave him oxygen.  (Frye Incident Report, Ex. A-9; *see also* Frye depo., Ex. A-8 at 93-94, 96-98).

37.     Deputy Fikejs called Nurse Paulsen at 3:30 to 3:45 a.m. and informed her that Deputy Frye had taken Plaintiff to the infirmary.  (Paulsen depo., Ex. A-1 at 93).

38.     Nurse Paulsen was told that Plaintiff had complained of shortness of breath, nausea and vomiting, but that he had received oxygen and was feeling better.  (Paulsen depo.,

Ex. A-1 at 93-94, 96; *see also* Nurse Report dated 3/8/03, attachment to Ex. A-4 (Paulsen Affidavit), at PARK 3542).

39.     Based on Plaintiff's condition, Nurse Paulsen determined that it was not necessary for her to come in right away.  She left instructions to give Plaintiff Motrin 800mg and Pepto Bismol, and to contact her if his condition changed.  (Paulsen depo., Ex. A-1 at 94, 97-99; Ex. A-4, ¶¶ 3-4; 3/8/03 Nurse Report, Ex. A-4 attachment, at PARK 3542).

40.     Nurse Paulsen called the Jail a little before 6:00 a.m. on Saturday, March 8, 2003, to check on Plaintiff and was told that he was resting and had used the bathroom once.  (Paulsen depo., Ex. A-1 at 97; Paulsen Affidavit, Ex. A-4, ¶ 5; 3/8/03 Nurse Report, Ex. A-4 attachment, at PARK 3542).

41.     Although March 8th was a Saturday and Nurse Paulsen was usually off work, she arrived at the Jail that morning at around 7:50 a.m. to check on Plaintiff.  (Paulsen depo., Ex. A-1 at 98; Paulsen affidavit, Ex. A-4, ¶ 6).

42.     Shortly after Nurse Paulsen arrived at the Jail, Plaintiff collapsed in the pod while attempting to get up to go to the bathroom.  (Carranza-Reyes depo., Ex. A-2 at 298).

43.     Nurse Paulsen went to the pod, where Plaintiff was lying on a mat on the upper level and complaining of pain in the kidney area radiating around to his groin.  (Paulsen depo., Ex. A-1 at 99-101).

44.     A deputy assisted Plaintiff down the stairs, and Nurse Paulsen palpated his back and abdomen to clarify the location of the pain.  (*Id.* at 101, 103).

45.     At that point, Nurse Paulsen determined that Plaintiff's condition was sufficiently serious that he should be examined by a physician.  (*Id.* at 106; Paulsen Affidavit, Ex. A-4, ¶ 7; 3/8/03 Nurse Report, Ex. A-4 attachment, at PARK 3542).

46.     Because it was a Saturday, and Dr. Bachman was on vacation, Plaintiff would need to be transported to a hospital emergency room in order to be seen by a physician, regardless of how serious or minor his condition was.  (Paulsen Affidavit, Ex. A-4, ¶ 8).

47.     Nurse Paulsen informed one of the deputies, Corporal Crawford, that Plaintiff needed to be transported to the hospital.  However, she did not think Plaintiff was emergent or needed to be transferred by ambulance.  (Paulsen depo., Ex. A-1 at 104-05, 117; Paulsen Affidavit, Ex. A-4, ¶ 8-9).

48.     Corporal Crawford informed her that they had to get permission from the INS to transport Plaintiff.  (Paulsen depo., Ex. A-1 at 104; Paulsen Affidavit, Ex. A-4, ¶ 9).

49.     Because Nurse Paulsen did not believe Plaintiff's condition was emergent, Nurse Paulsen called Ben Baca with the INS and explained Plaintiff's symptoms and her opinion that he needed to be transported to see a physician.  (Ex. A-1 at 107-08; Ex. A-4, ¶ 9).

50.     Baca informed her that it would take up to three hours for the INS to provide a transport.  Nurse Paulsen replied that she thought Plaintiff should be transported prior to that.  Baca then told her that, if Plaintiff's symptoms got worse, the Jail staff could transport him to the hospital rather than wait for the INS.  (Paulsen depo., Ex. A-1 at 108, 110; Ex. A-4, ¶ 10).

51.     Based on her conversation with Baca, Nurse Paulsen's understanding was that arrangements had been made to transport Plaintiff to the hospital.  (Paulsen depo., Ex. A-1 at 114-18, 221-23).

52.     Specifically, Nurse Paulsen's understanding was that the INS would be arriving within three hours to transport Mr. Carranza-Reyes, and that Jail staff would be transporting him earlier than that if his condition worsened before the INS arrived.  (*Id.*; Paulsen Affidavit, Ex. A-4, ¶ 11).

53.     Nurse Paulsen left the Jail at around 9:00 a.m.  Before she left, she called Summit County Medical Center to inform them that Plaintiff would be coming.  She did not, however, copy his chart to accompany Plaintiff to the emergency room.  (*Id.* at 114-17).

54.     Nurse Paulsen asked Corporal Crawford to call her if Plaintiff's condition worsened.  (*Id.* at 119).

55.     Given Plaintiff's symptoms and stable condition, Nurse Paulsen did not believe it was necessary for her to stay at the Jail pending Plaintiff's transport to the hospital.  (*Id.* at 222; Paulsen Affidavit, Ex. A-4, ¶ 12).

56.     Later that morning at around 11:00 a.m.,[1] Nurse Paulsen called the Jail to check on Plaintiff and to inquire whether he had been transported yet.  (*See* Master Control Log, attached hereto as **Exhibit A-10**, at PARK 1003; Paulsen depo., Ex. A-1 at 121-22).

57.     When she called, Nurse Paulsen was informed that Plaintiff had not yet been transported and that the Jail staff still had not heard back from the INS regarding when they would be arriving.  She was also told that Plaintiff was vomiting more frequently and was unable to keep fluids down.  (Paulsen Affidavit, Ex. A-4, ¶ 14; 3/8/03 Nurse Report, Ex. A-4 attachment, at PARK 3542-43; Paulsen depo., Ex. A-1 at 122-23).

---

[1] Defendant Paulsen's recollection, as reflected in her notes and testimony, is that she called the Jail at 10:30 a.m. (*See* Paulsen Affidavit, Ex. A-4, ¶ 13; Ex. A-4 attachment, at PARK 3542).  Because there is conflicting evidence that she called at 11:07 a.m., Defendant Paulsen recognizes that, for summary judgment purposes only, her testimony is not controlling on this issue, and the Court should view the evidence in Plaintiff's favor.

58.     At that point, concerned about the pain in Plaintiff's side, the potential that Plaintiff could become dehydrated, the fact that the INS had not called back regarding their time of arrival, and the fact that Plaintiff's condition was not improving, Nurse Paulsen instructed Corporal Crawford not to wait for the INS and to go ahead and transport Plaintiff to the hospital. (Paulsen Affidavit, Ex. A-4, ¶ 15; 3/8/03 Nurse Report, Ex. A-4 attachment, at PARK 3543; Master Control Log, Ex. A-10, at PARK 1003).

59.     The Jail's master control log indicates that Sergeant Muldoon arrived at the Jail at 11:39 a.m. to do the transport, and that he and Plaintiff arrived at Summit Medical Center at 12:42 p.m.  (*See* Master Control Log, Ex. A-10, at PARK 1003).

60.     Plaintiff was checked in at 12:45 p.m. in the emergency room of Summit Medical Center.  (*See* Summit E.R. Record for Plaintiff, attached hereto as **Exhibit A-11**, at 1, 4).

61.     A nursing assessment was conducted at 1:30 p.m., and Dr. Timothy Keeling first saw Plaintiff about 15 minutes later, at approximately 1:45 p.m.  (*See id.* at 4; *see also* deposition of Timothy B. Keeling, D.O., attached hereto as **Exhibit A-12**, at 17-19).

62.     Upon examining Plaintiff's throat, Dr. Keeling saw no evidence of a strep infection such as a reddish appearance, enlarged tonsils, or exudate.  (Ex. A-12 at 49-50).

63.     Dr. Keeling ultimately diagnosed Plaintiff with: (1) right middle lobe and right lower lobe pneumonia; (2) sepsis; (3) hypokalemia; and (4) elevated creatinine, abnormal chemistries.  (*See* E.R. Record, Ex. A-11 at 3).

64.     Dr. Keeling determined that, because Summit Medical Center had no overnight beds and Plaintiff needed inpatient treatment, Plaintiff needed to be transferred to another hospital.  (*Id.* at 3; Keeling depo., Ex. A-12 at 41).

65.     At the time of his transfer at 3:28 p.m. on March 8, 2003, Plaintiff's condition was stable.  Accordingly, Dr. Keeling made the determination to transport him by ambulance, rather than helicopter, and without lights or sirens.  (Ex. A-11 at 3; Ex. A-12 at 55, 81).

66.     Dr. Keeling testified that the symptoms Plaintiff complained of in the emergency room were consistent with the diagnosis of pneumonia and sepsis, but that such symptoms could be found in many conditions.  (*See* Keeling depo., Ex. A-12 at 86-87).

67.     Nurse Paulsen called the Jail at around 1:30 p.m. to inquire whether the staff had heard anything from the hospital.  She asked Corporal Crawford to get in touch with her if he heard anything.  (Paulsen depo., Ex. A-1 at 126-28).

68.     Corporal Crawford subsequently called Nurse Paulsen to inform her Plaintiff was en route to a hospital in Denver and that he had pneumonia.  (*Id.* at 128).

## STANDARD OF REVIEW

Summary judgment is granted when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  Generally, when applying this standard, the court views the evidence and draws reasonable inferences therefrom in the light most favorable to the nonmoving party.  *English v. Colorado Dep't of Corr.*, 248 F.3d 1002, 1007 (10th Cir.2001) (quoting *Simms v. Oklahoma ex rel. Dep't of Mental Health & Substance Abuse Servs.*, 165 F.3d 1321, 1326 (10th Cir.1999)).  The moving party bears the initial burden of showing that there is an absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  This does not require the movant to disprove the plaintiff's claims, but rather only requires the movant to point out their lack of evidentiary and factual support.  *Id.* at 324.  Once the movant meets its burden, the burden shifts to the non-

moving party to come forward with specific facts showing that there is a genuine issue of material fact for trial. *Martin v. Nannie & Newborns, Inc.*, 3 F.3d 1410, 1414 (10th Cir. 1993), *aff'd after remand*, 54 F.3d 788 (1995). The non-moving party cannot merely rest on the allegations in the pleadings to meet its burden. *Id.*; *Celotex*, 477 U.S. at 324. If the non-movant fails to meet its burden, then the moving party is entitled to judgment.

## ARGUMENT

Plaintiff's claims against Nurse Paulsen can be divided into two general categories: (1) claims against Nurse Paulsen in both her individual and official capacities under 42 U.S.C. § 1983 for violating Plaintiff's Eighth and Fourteenth Amendment right to adequate medical care while he was detained at the Jail in March 2003; and (2) a claim for alleged negligence in her provision of medical care to the Plaintiff while he was detained at the Jail. (*See* Second Amended Complaint, ¶¶ 55-64). Plaintiff's claims against Nurse Paulsen in her individual capacity fail because she is entitled to qualified immunity. Nurse Paulsen is also entitled to summary judgment on Plaintiff's claims against her in her official capacity, which are duplicative of the claims against Park County and should be dismissed. Finally, if the Court grants summary judgment on the constitutional claims against Nurse Paulsen and grants the remaining Defendants' separately filed Motion for Summary Judgment in its entirety, then the Court should also dismiss Plaintiff's state law negligence claims against Nurse Paulsen for lack of subject matter jurisdiction.

## I.   OVERVIEW OF QUALIFIED IMMUNITY ANALYSIS.

Qualified immunity is an affirmative defense against 42 U.S.C. § 1983 damage claims available to public officials sued in their individual capacities. *Barney v. Pulsipher*, 143 F.3d

1299, 1309 (10th Cir. 1998).   When the defendant in a section 1983 case raises qualified immunity as a defense, the burden shifts to the plaintiff to show "both facts and law to establish that the defendant is not entitled to qualified immunity." *Workman v. Jordan*, 32 F.3d 475, 479 (10th Cir. 1994).  To meet this burden, the plaintiff must show both that (1) the official violated a constitutional or statutory right, and (2) the right was clearly established when the alleged violation occurred.  *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1313 (10th Cir. 2002).  If the plaintiff satisfies his burden, then the normal summary judgment burden falls back on the defendant. *See Workman*, 32 F.3d at 479.  The court views the facts in the light most favorable to the plaintiff to determine whether the plaintiff's version of the facts amounts to the violation of a clearly established constitutional right.  *Perez v. Ellington*, 421 F.3d 1128, 1131 (10th Cir. 2005).  If the plaintiff does not satisfy either prong of this inquiry, the court must grant the defendant qualified immunity.  *Olsen*, 312 F.3d at 1313.

II.   **NURSE PAULSEN IS ENTITLED TO QUALIFIED IMMUNITY ON PLAINTIFF'S CLAIMS AGAINST HER IN HER INDIVIDUAL CAPACITY BECAUSE THERE IS NO EVIDENCE THAT SHE VIOLATED A CLEARLY ESTABLISHED CONSTITUTIONAL RIGHT.**

   A.   **The Plaintiff Cannot Demonstrate That Nurse Paulsen Violated His Constitutional Right To Adequate Medical Care Because There Is No Evidence That She Was Deliberately Indifferent To Plaintiff's Medical Condition.**

   The first step in the qualified immunity analysis is to determine whether the facts, taken in the light most favorable to Plaintiff, show a constitutional violation.  *Simkins v. Bruce*, 406 F.3d 1239, 1241 (10th Cir. 2005).  In this case, Plaintiff claims Nurse Paulsen violated his Eighth and Fourteenth Amendment right to adequate medical care.  (Plaintiff's Second Amended Complaint, ¶ 58).  However, Plaintiff has failed to satisfy his burden because the evidenced facts do not show such a violation.

1. __The Tenth Circuit recently clarified the analysis for determining the__
__subjective component of an Eighth Amendment claim.__

Prison officials violate the Eighth Amendment's Cruel and Unusual Punishment Clause when their conduct demonstrates that they were deliberately indifferent to the serious medical needs of prisoners. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). Although pretrial detainees are protected under the Due Process Clause of the Fourteenth Amendment, rather than the Eighth Amendment, the court applies an analysis identical to that applied in Eighth Amendment cases in determining whether a detainee's rights were violated. *Olsen*, 312 F.3d at 1315 (citing *Lopez v. LeMaster*, 172 F.3d 756, 759 n.2 (10th Cir. 1999)).[2] To demonstrate an Eighth Amendment violation under *Estelle*, a plaintiff must satisfy both an objective component involving whether the prisoner's medical need was sufficiently serious, and a subjective component involving whether the particular prison official was deliberately indifferent to the prisoner's medical condition. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Riddle v. Mondragon*, 83 F.3d 1197, 1203 (10th Cir. 1996).

The subjective component of the *Estelle* test stems from the principle that a prison official must have a culpable state of mind in order to violate the Eighth Amendment. *See Grimsley v. McKay*, 93 F.3d 676, 681 (10th Cir. 1996); *Wilson v. Seiter*, 501 U.S. 294, 300 (1991) ("The source of the intent requirement is . . . the Eighth Amendment itself, which bans cruel and unusual punishment. If the pain inflicted is not formally meted out as punishment by the statute or the sentencing judge, some mental element must be attributed to the inflicting officer before it can qualify."). Thus, a prison official acts with deliberate indifference when the

---

[2] Like the Park County Defendants, Ms. Paulsen assumes for purposes of this motion that an illegal immigrant held for hearing or deportation by federal immigration officials is a pretrial detainee.

official wantonly inflicts unnecessary pain.  *Estelle*, 429 U.S. at 105.  It is not enough to show that prison officials failed "to alleviate a significant risk that [they] should have perceived but did not."  *Kikumura v. Osagie*, 461 F.3d 1269, 1293 (10th Cir. 2006) (quoting *Farmer*, 511 U.S. at 838).  Instead, to be found deliberately indifferent, a prison official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and also draw the inference.  *Garrett v. Stratman*, 254 F.3d 946, 949 (10th Cir. 2001) (citing *Farmer*, 511 U.S. at 833-34).  The symptoms displayed to a prison official, and not the ultimate diagnosis, are the relevant factor in evaluating whether the official acted with deliberate indifference.  *Mata v. Saiz*, 427 F.3d 749, 753 (10th Cir. 2005).  Significantly, differences of opinion over the medical treatment an inmate received do not rise to the level of a constitutional violation.  *Jennings v. Natrona County Detention Ctr. Medical Facility*, 175 F.3d 775, 781 (10th Cir. 1999); *Johnson v. Stephen*, 6 F.3d 691, 692 (10th Cir. 1993).

The Tenth Circuit recently reaffirmed in *Self v. Crum* that "the subjective component is not satisfied, absent an extraordinary degree of neglect, where a [medical professional] merely exercises his considered medical judgment."  439 F.3d 1227, 1232 (10th Cir. 2006).  In so holding, the Court relied on three of its previous decisions.  First, the Court discussed *Sealock v. Colorado*, 218 F.3d 1205 (10th Cir. 2000), in which the Tenth Circuit had distinguished a scenario involving negligent misdiagnosis from one involving the deliberate disregard of a known risk.  In *Sealock*, the Court concluded in part that *Estelle*'s subjective component was not met where a prison nurse misdiagnosed an inmate who presented with chest pains, which she did not consider to be a cardiac symptom under the circumstances.  *Id.* at 1208, 1211, 1212 n.7.  On the other hand, a physician's assistant at the prison who arguably was told about the plaintiff's

unexplained chest pain and testified that he *knew* such symptoms constituted an emergency and required an ambulance, but failed to call an ambulance, was not entitled to summary judgment on the deliberate indifference claim. *Id.* at 1211. Thus, the distinction between the nurse and the physician's assistant in *Sealock* is whether they had actual knowledge of the seriousness of the plaintiff's condition.

The *Self* Court next discussed *Oxendine v. Kaplan*, in which the Court had distinguished between a "mere disagreement between the parties" as to the appropriate course of treatment, which is not actionable, and a failure or delay of additional treatment of a problem that is so obvious that a culpable state of mind can be inferred. 241 F.3d 1272, 1277 n.7, 1279-80 (10th Cir. 2001). The issue in *Oxendine* was the delay of a prison doctor in obtaining specialized medical assistance after he re-attached the plaintiff's severed finger. *Id.* at 1274. There were allegations that the plaintiff had informed the doctor that his finger "had turned jet black" and that the severed portion "was gradually falling off," and that the doctor himself had recorded evidence of gangrenous tissue, yet did not seek specialized assistance for at least a week. *Id.* at 1279. Given the allegations of the doctor's knowledge of the "blackening and necrifying tissue" and his corresponding delay in ensuring the plaintiff had access to appropriate medical personnel, the Court held that the plaintiff had stated a claim for deliberate indifference. *Id.*

The Court in *Self* rounded out its analysis of prior Tenth Circuit case law on deliberate indifference with a discussion of *Mata v. Saiz*. In *Mata*, an inmate sought medical attention in the evening from the nurse on duty because she was suffering from severe chest pain, and the nurse simply told the inmate there was *nothing* she could do for her since the infirmary was closed, and she would have to return to the infirmary the following morning. 427 F.3d 745, 755

(10th Cir. 2005).  In addition, there was circumstantial evidence that the nurse was aware of the seriousness of such a symptom.  *Id.* at 758.  The Court determined that the nurse did not simply misdiagnose the inmate; rather, she "completely refused to assess or diagnose" the potential cardiac emergency and failed either to contact appropriate medical personnel or to assist the inmate in any way.  *Id.*  Accordingly, the Court concluded there was an issue of material fact as to the nurse's deliberate indifference.  *Id.*  However, the Court dismissed a claim against a different nurse who saw the inmate the following morning and who established "a good faith effort to diagnose and treat" the inmate's medical condition despite failing to diagnose a heart attack.  *Id.* at 761.  Because that nurse's statement and notes demonstrated "she *subjectively* believed [the inmate] was *not* having a heart attack and her chest pain had been relieved," there was no evidence suggesting that the nurse "was *consciously* aware of a serious medical risk to [the inmate] and disregarded that risk."  *Id.* at 760 (emphasis in original).

After reviewing these cases, the Court in *Self* further refined the appropriate analysis to determine whether a plaintiff has demonstrated the "culpable state of mind" necessary to satisfy the subjective component of a deliberate indifference claim.  439 F.3d at 1233.  To satisfy his burden, a plaintiff must show either (a) conscious disregard of a substantial risk of serious harm arising from the plaintiff's symptoms, or (b) actual knowledge of the plaintiff's condition and refusal to order further treatment.  *Id.*  Applying this standard, the Court found that the plaintiff had presented no evidence that a prison doctor had acted with deliberate indifference.

The plaintiff in *Self* first presented to the doctor with a variety of non-specific symptoms, and the doctor treated him for a respiratory infection.  *Id.* at 1233-34.  Two days later, the plaintiff returned with many of the same symptoms; the doctor again prescribed treatment for a

respiratory infection, ordered lab work, and instructed prison staff to monitor the plaintiff's vital signs.  *Id.* at 1234.   Three days later, when the plaintiff was no longer responding to the medications or improving, the doctor detected signs of pneumonia and sent him to the hospital for x-rays.  *Id.*  The plaintiff was diagnosed at the hospital with endocarditis, a bacterial infection of the heart, and there was evidence that the damage to his heart might have been less severe if the condition had been caught earlier.  *Id.* at 1229.

In applying the above-described standard, the Court first found no evidence that the doctor consciously disregarded a substantial risk of harm arising from the plaintiff's condition. The Court noted that the plaintiff's symptoms were consistent with a variety of conditions, including the respiratory infection for which he was treated.  *Id.* at 1234.  Once the doctor "appreciated a need for further testing," he sent the plaintiff to the hospital.  The Court noted that the doctor's "failure to connect-the-dots distinguishes his conduct from the conduct described in *Sealock.*"  *Id.* at 1235.  Because the plaintiff's "vague symptoms" did not "obviously point to a substantial risk of harm," the Court refused to draw an inference of the doctor's "conscious disregard of an inmate's medical emergency."  *Id.*   Second, the Court found the evidence undisputed that the doctor did *not* know that the plaintiff was suffering from a heart condition. *Id.* at 1236.  Accordingly, the doctor was entitled to summary judgment.

Applying the framework set out in *Self* to the facts at hand, there is no evidence that Nurse Paulsen either consciously disregarded a substantial risk of serious harm to Plaintiff, or that she had actual knowledge of Plaintiff's condition and refused to order further treatment.  The facts surrounding Nurse Paulsen's actions are analogous to the doctor in *Self* and the nurse entitled to summary judgment in *Sealock* who, at worst, misdiagnosed the respective plaintiffs'

condition.  Thus, Plaintiff failed to evidence facts sufficient to satisfy the subjective component of the *Estelle* test, and Nurse Paulsen is entitled to summary judgment on Plaintiff's constitutional claim of inadequate medical care.

### 2.  There is no evidence that Nurse Paulsen consciously disregarded a substantial risk of serious harm.

First, there is no evidentiary or factual support for Plaintiff's allegation that Nurse Paulsen knew of and disregarded a substantial risk of harm concerning Plaintiff's medical condition.

Nurse Paulsen was not aware that Plaintiff either desired or needed medical treatment prior to March 6, 2003.  (*See* Statement of Undisputed Material Facts, *infra*, ¶ 16).  Plaintiff first presented to Nurse Paulsen on March 6th and 7th with vague, non-specific symptoms that were consistent with a variety of conditions, including a viral illness.  (*Id.* ¶¶ 17, 18, 25, 26).  Indeed, Dr. Bachman and Plaintiff's experts, Dr. Greifinger and Dr. Niederman, all testified that Plaintiff's symptoms on March 6th and 7th were consistent with a number of possible conditions, including viral illness and altitude sickness.  (*Id.* ¶¶ 29-31).  Nurse Paulsen ordered treatment to relieve those symptoms and did not believe Plaintiff's condition was serious.  (*Id.* ¶¶ 19, 20, 27, 28).   Given the general nature of Plaintiff's symptoms and Nurse Paulsen's testimony, there is no indication that Nurse Paulsen was aware of a substantial risk of serious harm on March 6th or 7th, much less that she disregarded any such risk.

The next contact Nurse Paulsen had with Plaintiff's treatment occurred when she was called by the Jail staff at approximately 3:30 to 3:45 a.m. on March 8, 2003.  (*Id.* ¶ 37).  At that time, Jail staff informed Nurse Paulsen that Plaintiff had experienced shortness of breath, and that Deputy Frye, a certified medical first responder, had administered oxygen to Plaintiff with

the result that Plaintiff was feeling better and returned to his cell. (*Id.* ¶ 38). Based on the information communicated to her by the Jail staff, Nurse Paulsen did not feel Plaintiff's condition was emergent or that it was necessary to go in to the Jail right away, but she again prescribed treatment for his symptoms and instructed the Jail staff to contact her if his condition changed. (*Id.* ¶ 39). Nurse Paulsen determined that she would go to the Jail later that morning, even though it was her day off, to check on Plaintiff, but she did not feel that Plaintiff's symptoms were indicative of a serious medical condition that warranted immediate action. (*Id.* ¶ 39, 41). Again, regardless of whether Nurse Paulsen should have recognized the existence of a serious condition at that point, there is no evidence that she in fact *did* recognize that to be the case or that Plaintiff required further treatment.

Although Nurse Paulsen did not hear from Jail staff regarding any change in Plaintiff's condition, she still called the Jail at 6:00 a.m. to inquire about Plaintiff's condition. At that time, she was told that Plaintiff had used the bathroom once and was resting in the cell. (*Id.* ¶ 40). Based on this information, Nurse Paulsen determined that Plaintiff's condition was stable and that he was not in need of immediate medical intervention, but she still decided to go to the Jail at 8:00 a.m. to further assess Plaintiff's condition. (*Id.* ¶ 41).

When she arrived at the Jail at approximately 7:50 a.m. to check on Plaintiff, she learned that Plaintiff had a new complaint of pain in the kidney area radiating around to his groin. (*Id.* ¶ 43). Based on this new complaint, combined with his other symptoms, Nurse Paulsen determined that Plaintiff needed to be evaluated by a physician that day instead of waiting for a regular visit with Dr. Bachman the following week. (*Id.* ¶ 45). Although Nurse Paulsen did not believe Plaintiff's condition was emergent, because Dr. Bachman was on vacation and his office

was closed, transfer to the emergency room was required for Plaintiff to be seen by a physician. (*Id.* ¶ 46).

Contrary to the scenario in *Sealock* and other cases in which prison officials failed to fulfill their gatekeeper roles, Nurse Paulsen made arrangements for Plaintiff's transport to a physician once she determined further treatment was required. Nurse Paulsen first contacted the INS because she was told that she had to get permission from the INS to transport Plaintiff, and because she did not think Plaintiff's condition was emergent. (*Id.* ¶¶ 48, 49). When she left the Jail at around 9:00 a.m., Nurse Paulsen's understanding was that the INS would be arriving within three hours to transport Mr. Carranza-Reyes, and that Jail staff would be transporting him earlier than that if his condition worsened before the INS arrived. (*Id.* ¶¶ 51, 52). At that point, Nurse Paulsen was satisfied with those arrangements and asked Corporal Crawford to call her if Plaintiff's condition worsened. (*Id.* ¶ 52-54). However, when she called to check on Plaintiff later that morning, she learned that he had not yet been transported, that the INS had not called regarding when they would be arriving, and that Plaintiff was still vomiting and could not keep fluids down. (*Id.* ¶ 57). Out of concern over the potential for Plaintiff to become dehydrated, the pain in his side, and the uncertainty as to the INS's arrival time, Nurse Paulsen determined that Jail staff should go ahead and transport Plaintiff to the hospital without waiting for the INS and so informed Corporal Crawford. (*Id.* ¶ 58).

The above evidence demonstrates that Nurse Paulsen recognized when she saw Plaintiff on the morning of March 8th that he should be seen by a physician and made the corresponding arrangements for him to be transported to the hospital. However, there is no evidence that, at the time she left the Jail at 9:00 a.m. on March 8th, she thought Plaintiff required immediate,

emergency treatment.  Her conclusions, even if mistaken, about the seriousness of Plaintiff's condition are consistent with the opinions of Defendants' experts that it was "impossible to diagnose accurately prospectively" the "very rare pneumonia" Plaintiff suffered from.  (*See* expert report of Dr. Donald H. Kearns, M.D. dated September 14, 2006, attached hereto as **Exhibit A-13**, at 2).  Defendants' experts also opined that Plaintiff became ill "with a disease that can begin in a relatively benign fashion, and present with symptoms that look like the common cold or flu."  (*See* expert report of Dr. Ivor Garlick, MD, CCHP, dated September 13, 2006, attached hereto as **Exhibit A-14**, at 4; *see also* Expert Report of Elizabeth Kraft, M.D., attached hereto as **Exhibit A-15**, at 4 ("Mr. Carranza-Reyes simply got sick with a disease that can begin in a relatively benign fashion that can and does present as a common cold or with flu-like symptoms, until it progresses to a more emergent level.  Diseases such as streptococcus pneumonia are often difficult to diagnose and appreciate until such time as the disease has progressed sufficiently in order to declare itself as an urgent or emergent condition. Unfortunately, often times by that time, the patient is critically ill simply as a result of the natural progression of the disease.")).

Nurse Paulsen does not contend that the above statements by Defendants' experts are conclusive with respect to the opinions they assert and recognizes that Plaintiff's experts certainly dispute the conclusions reached by Defendants' experts.  Indeed, the conflicting opinions of the various experts arguably raise fact issues, for purposes of summary judgment, regarding whether Nurse Paulsen's conduct in treating Plaintiff and assessing the severity of his condition fell below the applicable standard of care.  What the above statements do show, however, is that there is a difference of opinion among physicians, even in hindsight, regarding

when Plaintiff should have been diagnosed and when the severity of his condition should have been recognized.

Additionally, the emergency department records indicate that even the personnel at Summit Medical Center did not treat Plaintiff as though he presented with an emergent condition. Approximately one hour elapsed between when Plaintiff arrived at the emergency room and when he was first examined by a physician. (*See* Statement of Undisputed Material Facts, ¶¶ 60, 61). Also, although Dr. Keeling determined that Plaintiff required inpatient treatment, which Summit could not provide, he did not feel that Plaintiff needed to be transported to another hospital by helicopter; rather, he was content to transport Plaintiff in an ambulance, without lights or sirens. (*Id.* ¶¶ 64, 65).

If the expert and treating physicians in this case cannot agree on when the emergent nature of Plaintiff's condition based on his symptoms should have been recognized, there are simply no grounds to assert that Nurse Paulsen had actual knowledge of the substantial risk to Plaintiff's health and consciously disregarded it. As stated above, a difference in medical opinion does not show deliberate indifference. *Jennings v. Natrona County Detention Ctr. Medical Facility*, 175 F.3d 775, 781 (10th Cir. 1999). Rather, Nurse Paulsen's testimony and notes unequivocally demonstrate that she was *not* subjectively aware of Plaintiff's condition until informed of the diagnosis after-the-fact.

Thus, even taking the facts in the light most favorable to the Plaintiff, Nurse Paulsen, like the doctor in *Self*, simply "fail[ed] to connect-the-dots" and appreciate the emergent nature of Plaintiff's symptoms. 439 F.3d at 1235. Stated another way, she arguably failed "to alleviate a significant risk that [she] should have perceived but did not," which does not amount to

deliberate indifference. *Farmer*, 511 U.S. at 838. On the other hand, Nurse Paulsen's actions are easily distinguishable from those of the physician's assistant in *Sealock*, who was aware of the significant risk associated with the plaintiff's symptoms and failed to call an ambulance, and the nurse in *Mata*, who knew the plaintiff was complaining of severe chest pain, a specific symptom often associated with a heart attack, and literally did absolutely nothing about it. *Sealock*, 218 F.3d at 1211; *Mata*, 427 F.3d at 758.

Rather, over the course of Plaintiff's treatment at the Jail, Nurse Paulsen treated his symptoms with medication; continually asked to be contacted with regard to changes in Plaintiff's condition; proactively called the Jail for updates on his condition; came in to the Jail on her day off for no other reason than to check on Plaintiff; made arrangements to transfer Plaintiff to the hospital when she determined that examination by a physician was necessary; and, once she determined that Plaintiff warranted more immediate treatment, ensured that the transport occurred without further delay.

There is simply no evidence, even viewing it in the light most favorable to Plaintiff, that Nurse Paulsen was aware of facts from which the inference could be drawn that a substantial risk of serious harm existed, that she drew the inference, and nevertheless denied or delayed treatment. Thus, the facts do not support a claim that Nurse Paulsen *consciously disregarded* a known, substantial risk of harm to Plaintiff.

### 3. <u>There is no evidence that Nurse Paulsen had actual knowledge of the plaintiff's condition and refused to order further treatment.</u>

An alternative method under *Self* of showing that the subjective component of a deliberate indifference claim has been met is to show that the medical professional had actual

knowledge of Plaintiff's condition and refused to order further treatment. There is no evidence of such actual knowledge by Nurse Paulsen in this case.

Like the doctor in *Self*, who did not diagnose a heart problem and did not know that the plaintiff suffered from endocarditis, there is no evidence that Nurse Paulsen knew Plaintiff suffered from a rare form of a bacterial infection that could lead to an extremely rapid deterioration in his health. Rather, the evidence unequivocally shows that Nurse Paulsen did *not* know the nature of Plaintiff's diagnoses, or that he was at a substantial risk of serious harm, until she was informed after-the-fact. Again, this is consistent with Defendants' experts' opinions that Plaintiff's condition is rare and difficult to accurately diagnose, oftentimes until the patient is already critically ill. (Ex. A-13, at 2; Ex. A-14, at 4; Ex. A-15, at 4). Without evidence of actual knowledge, Plaintiff cannot demonstrate the requisite culpable state of mind under the *Self* test.

Because there is no evidence of either conscious disregard or actual knowledge by Nurse Paulsen, Plaintiff cannot prove the subjective element of his deliberate indifference claim. Without evidence of this element, there is no Eighth Amendment violation, and Nurse Paulsen is entitled to qualified immunity.

### B. Nurse Paulsen Is Entitled To Qualified Immunity Because Plaintiff Failed To Show That A Reasonable Official Would Have Considered Nurse Paulsen's Actions Unlawful.

The second step in the qualified immunity analysis, assuming the plaintiff has shown the violation of a constitutional right, is to determine whether that right was clearly established. *Simkins*, 406 F.3d at 1241. As argued extensively in § II(A), *supra*, Plaintiff failed to show that Nurse Paulsen violated his constitutional right to adequate medical care; accordingly, Nurse

Paulsen is entitled to qualified immunity on that basis alone, and the Court need not even reach the second step of the analysis.

However, should the Court conclude that Plaintiff has shown his constitutional rights were violated, Nurse Paulsen is still entitled to qualified immunity because Plaintiff cannot show that the law was clearly established when the alleged violation occurred.  Specifically, qualified immunity protects an official from suit "when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004).  In *Anderson v. Creighton*, the Supreme Court expanded on the "clearly established" standard:

> The operation of this standard . . . depends substantially upon the level of generality at which the relevant "legal rule" is to be identified. . . .  [O]ur cases establish that the right the official is alleged to have violated must have been "clearly established" in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.  This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent.

483 U.S. 635, 640 (1987) (citations omitted); *see also Brosseau*, 543 U.S. at 198-99 (quoting *Anderson* and holding that the "dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted") (citation omitted).

Given the above standard, Plaintiff must show that the "unlawfulness" of Nurse Paulsen's conduct was apparent such that a "reasonable official would understand that what she [was] doing violate[d]" Plaintiff's Eighth Amendment rights given the situation she confronted.  As the Supreme Court discussed in the context of an excessive force claim in *Saucier v. Katz*, 533 U.S.

194, 205 (2001), if an official acts under the reasonable but mistaken conclusion as to what the law requires, the official is entitled to qualified immunity.  Plaintiff fails to make this showing.

As explained in Section II(A)(1), *supra*, the case law in 2003, the time of the alleged violation, was still evolving regarding what conduct constitutes a violation of the subjective component of the Eighth Amendment when an inmate presents with vague symptoms that do not clearly indicate a serious medical need.   What was clearly established in 2003 was that an official's complete disregard of obvious signs of a serious condition was a violation of the Eighth Amendment.   *Sealock*, 218 F.3d at 211; *Oxendine*, 241 F.3d at 1279.   *Sealock* and *Oxendine* involved symptoms of medical conditions on the far end of the "obviousness" spectrum— unexplained chest pain and a black gangrenous finger, respectively—that clearly qualify as risks so obvious that knowledge of that risk can be inferred.   Thus, in 2003, public officials were on notice that conscious disregard of those types of obvious risks would be considered a violation of the Eighth Amendment.

For conditions that were not obviously serious, however, the Tenth Circuit in 2003 was still struggling to define what conduct crossed the line from mere negligence to deliberate indifference.   When a medical professional was confronted with symptoms that are more vague and generalized, such as when they are consistent with a viral illness or cold, there was no definition of what conduct, other than complete denial of care, would be considered deliberate indifference.   As such, medical professionals were not on notice that their decision to treat vague undiagnosed symptoms one way, as opposed to another, could possibly be a violation of the Eighth Amendment.

The Supreme Court has recognized the existence of this difficult middle ground in the context of Fourth Amendment excessive force claims. *Brosseau*, 543 U.S. at 201. The issue in *Brosseau* was whether a police officer engaged in excessive force when he shot the plaintiff in the back as he attempted to flee from law enforcement authorities in his vehicle. *Id.* at 194. The Court noted that "this area is one in which the result depends very much on the facts of each case. . . . They [the cases cited by the parties] do suggest that [the plaintiff's] actions fell in the 'hazy border between excessive and acceptable force.'" *Id.* at 201 (quoting *Saucier v. Katz*, 533 U.S. 194, 206 (2001)). Similar to cases involving claims of excessive force, the fact-specific nature of claims of inadequate medical care often makes it difficult for courts, let alone for prison officials who must make on-the-spot decisions, to assess the parameters of what course of treatment in these middle ground cases will constitute deliberate indifference. Accordingly, in all but the most obvious cases, the law regarding what constitutes conscious disregard of a substantial risk is not, and perhaps cannot, be clearly established.

Thus, even assuming, for summary judgment purposes only, that things "should have" been done differently and Nurse Paulsen "should have" recognized that Plaintiff required emergency care earlier, the nature of Plaintiff's symptoms over the three days he was treated at the Jail, the fact that he was ultimately diagnosed with a very rare condition that is difficult to diagnose prospectively, and the apparent stability of his condition when Nurse Paulsen left the Jail on the morning of March 8, 2003, take this case entirely out of the realm of *Sealock* and *Oxendine*. Considering the state of the law, the instant case is not the kind of clear-cut scenario in which Nurse Paulsen could have concluded that her actions in deciding Plaintiff was not emergent and that he could wait for a transport would subject her to liability for cruel and

unusual punishment.  Because it would not have been clear to a reasonable official that Nurse Paulsen's actions with respect to Plaintiff were unlawful, Nurse Paulsen is entitled to qualified immunity on Plaintiff's 42 U.S.C. § 1983 claim for inadequate medical care.

**III.   PLAINTIFF'S CONSTITUTIONAL CLAIMS AGAINST NURSE PAULSEN IN HER OFFICIAL CAPACITY SHOULD BE DISMISSED AS DUPLICATIVE.**

In addition to Plaintiff's claims against Nurse Paulsen in her individual capacity, Plaintiff also claims that Nurse Paulsen violated 42 U.S.C. § 1983 in her official capacity for failing to enact and adopt various policies, procedures, and standing orders related to: (a) ensuring that the cell in which Plaintiff was housed was kept sanitary and clean to prevent the spread of bacteria and communicable disease; (b) ensuring that the Jail was adequately and competently medically staffed; (c) ensuring that the Jail's medical and nursing staff would be readily available to diagnose and treat inmates when there was no reasonably speedy access to other physicians or facilities outside the Jail; and (d) ensuring that the Jail staff adequately responded to medical emergencies.  (*See* Plaintiff's Second Amended Complaint, ¶¶ 50-60).

"A [§ 1983] suit against a municipality and a suit against a municipal official acting in his or her official capacity are the same."  *Watson v. Kansas City*, 857 F.2d 690, 695 (10th Cir.1988) (citations omitted).  In addition, a plaintiff seeking to recover damages in an official capacity suit, or in a suit against a department of a governmental entity, must look to the governmental entity alone for payment.  *See Kentucky v. Graham*, 473 U.S. 159, 166 (1985).  Thus, Plaintiff's official capacity claim against Nurse Paulsen is treated as a claim against Park County. *McMillian v. Monroe County, Ala.*, 520 U.S. 781, 785 n.2 (1997); *Kentucky v. Graham*, 473 U.S. 159, 165 (1985).

Park County and the other defendants in this action have separately filed a Motion for Summary Judgment (the "County Defendants' Motion") on all claims against them. The County Defendants' Motion specifically addresses Plaintiff's claim against the County based on the policies and procedures (or lack thereof) related to Plaintiff's access to appropriate medical care in the Jail. (*See* County Defendants' Motion at 47-50). For the reasons stated therein, Plaintiff's claims against Nurse Paulsen in her official capacity should be dismissed.

## IV.   BECAUSE ALL DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S FEDERAL CONSTITUTIONAL CLAIMS, THE COURT LACKS SUPPLEMENTAL JURISDICTION OVER PLAINTIFF'S REMAINING STATE-LAW NEGLIGENCE CLAIMS AGAINST DEFENDANT PAULSEN.

Plaintiff's only remaining state law claim in this litigation is a negligence claim against Nurse Paulsen based on her medical treatment of Plaintiff. (Plaintiff's Second Amended Complaint, ¶¶ 61-64). Defendant Paulsen has moved for summary judgment on Plaintiff's 42 U.S.C. § 1983 claims against her. As discussed above, the County Defendants have separately filed a motion for summary judgment on all claims against them. For the reasons stated therein, the County Defendants' Motion for Summary Judgment should be granted. Should the Court grant that motion and grant summary judgment to Defendant Paulsen on Plaintiff's 42 U.S.C. § 1983 claims, only the state law negligence claim against Nurse Paulsen will remain.

At that point, without any valid federal claims, Plaintiff's state law claim will no longer be supplemental to any federal question claim; accordingly, absent compelling reasons otherwise, the Court should then dismiss Plaintiff's state law claims without prejudice. *Ball v. Renner*, 54 F.3d 664, 669 (10th Cir. 1995) (citing *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966)). No such compelling reasons exist here to avoid deferral to a state court for

adjudication of Plaintiff's state law claims.   Because the Court will lack subject matter jurisdiction over those claims, they should be dismissed without prejudice.

## CONCLUSION

Plaintiff has failed to present evidence that Nurse Paulsen acted with deliberate indifference to Plaintiff's medical condition.   In addition, the law was not clearly established with respect to the unlawfulness of Nurse Paulsen's conduct.   Because Plaintiff has failed to meet his burden on these issues, Nurse Paulsen is entitled to qualified immunity, and Plaintiff's 42 U.S.C. § 1983 claim against her in her individual capacity must fail.   Plaintiff's section 1983 claims against Nurse Paulsen in her official capacity fail for the reasons stated in the County Defendants' Motion for Summary Judgment.   Finally, should the Court grant summary judgment on Plaintiff's § 1983 claim against Nurse Paulsen and grant the County Defendants' Motion for Summary Judgment, the Court should dismiss without prejudice Plaintiff's state law negligence claim for lack of subject matter jurisdiction.   Accordingly, Defendant Vicki Paulsen respectfully requests that the Court **GRANT** her Motion for Summary Judgment and dismiss Plaintiff's claims against her.

Respectfully submitted:  <u>December 15, 2006</u>

BERG HILL GREENLEAF & RUSCITTI LLP

s/ Melanie B. Lewis

_____

Josh A. Marks
Melanie B. Lewis
1712 Pearl Street
Boulder, CO  80302
Phone:  (303) 402-1600
Fax:  (303) 402-1601
Email:  jam@bhgrlaw.com; mbl@bhgrlaw.com

*Attorneys for Defendant Paulsen*

33

## CERTIFICATE OF SERVICE

I hereby certify that on December 15, 2006, I electronically filed the foregoing **BRIEF IN SUPPORT OF DEFENDANT VICKI PAULSEN'S MOTION FOR SUMMARY JUDGMENT** with the Clerk of the Court using the CM/ECF system which will send notification to such filing to the following e-mail addresses:

Joseph Archuleta
Law Offices of Joseph Archuleta
1724 Ogden Street
Denver, CO 80218
archuletalaw@qwest.net

Adele P. Kimmell
Trial Lawyers for Public Justice, PC
1825 K Street N.W., Suite 200
Washington, D.C. 20006
akimmell@tlpj.org

Lloyd Kordick
Lloyd C. Kordick & Associates
805 S. Cascade Avenue
Colorado Springs, CO 80903
lloyd@kordicklaw.com

Andrew Ringel
Hall & Evans LLC
1125 17th Street, Suite 600
Denver, CO 80202
ringela@hallevans.com

William Trine
Trine & Metcalf PC
1435 Arapahoe Avenue
Boulder, CO 80302
btrine@trine-metcalf.com


s/ Julie Bozeman
_____

Julie D. Bozeman