**1/18/2006  Vicki Ann Paulsen, R.N.**

0001

1       IN THE UNITED STATES DISTRICT COURT
         FOR THE DISTRICT OF COLORADO

2

         Case No. 2005-WM-377 (BNB)

3       _____

4       DEPOSITION OF:  VICKI ANN PAULSEN, R.N.
         January 18, 2006

5       _____

6       MOISES CARRANZA-REYES,

7       Plaintiff,

8       v.

9       PARK COUNTY, a public entity of the State of Colorado and
         its governing board, THE PARK COUNTY BOARD OF COUNTY

10      COMMISSIONERS; PARK COUNTY SHERIFF'S OFFICE, a public
         entity of the State of Colorado; FRED WEGENER,

11      individually and in his official capacity as Sheriff of
         Park County, Colorado; MONTE GORE, individually and in

12      his capacity as Captain of Park County Sheriff's
         Department; VICKIE PAULSEN, individually and in her

13      official capacity as Registered Nurse for Park County,
         Colorado; JAMES BACHMAN, M.D., individually and in his

14      official capacity as Medical Director of the Park County
         Jail,

15

         Defendants.

16      _____

17

18

19      TAKEN PURSUANT TO NOTICE on behalf of the Plaintiff at

20      1125 17th Street, Suite 600, Denver, Colorado 80202 at

21      9:04 a.m. before Theresa A. Coffman, Federal Certified

22      Realtime Reporter, Registered Professional Reporter and

23      Notary Public within Colorado.

24

25

1            WHEREUPON, the within proceedings were taken

2    pursuant to the Federal Rules of Civil Procedure:

3            VICKI ANN PAULSEN, R.N.,

4    having been first duly sworn to state the whole truth,

5    was examined and testified as follows:

6            (At this time Mr. Jurs was not present in

7    the deposition room.)

8            (Deposition Exhibits 20 and 21 were marked.)

9                    EXAMINATION

10   BY MR. TRINE:

11        Q.    Please state your full name and address.

12        A.    Vicki Ann Paulsen, and it's 348 Aspen Lane,

13   Hartsel, Colorado.

14            (Discussion off the record.)

15        Q.    And what is your profession or occupation?

16        A.    I'm a registered nurse.

17        Q.    And I believe that there's an Exhibit 20

18   right in front of you there --

19        A.    Um-hum.

20        Q.    -- that is titled "Personnel Action Form."

21        A.    Um-hum.

22        Q.    And it contains your personnel file at Park

23   County.  Do you see that?

24        A.    Yes.

25        Q.    And am I correct that you apparently became

1/18/2006  Paulsen, R.N., Vicki Ann

```
1      Part 14, starting on page 11.  And in case you forget, my

2      question is simply whether this is one of the documents

3      that you became familiar with --

4           A.    Similar to this.

5           Q.    -- when you started working in corrections.

6           A.    Similar to this.  Not exactly this as far as

7      DOC is concerned.

8           Q.    Okay.  So it wasn't that particular

9      document --

10          A.    Not this particular --

11          Q.    I'm sorry.  But it was something similar?

12          A.    Um-hum.

13          Q.    Okay.  Now, you apparently started work

14     in -- at Park County in January '03?

15          A.    Um-hum.  Yes.

16          Q.    And then gave two weeks' notice that you

17     were leaving on September 30, '03?

18          A.    Yes.

19               (Discussion off the record.)

20               MR. SARGENT:  I'm sorry, but I didn't hear

21     your question.  What was the question, Theresa?

22               (The last question was read back.)

23          Q.    (BY MR. TRINE)  And why did you give two

24     weeks' notice that you were going to leave on September

25     30?
```

1/18/2006  Paulsen, R.N., Vicki Ann

1    Q.    And what did he say about what he expected

2    of you?

3    A.    That I would -- I mean, anything that was

4    medical would go through him as far as if I get someone

5    in that was on medications, then I always called him to

6    tell him what they were on and get an order from him so

7    that we had a current order.  If I had a problem with

8    someone, I'd call and talk to him about it, and either we

9    would arrange for them to see him at his office or he

10   would put them on the list to be seen when he visited

11   weekly.

12   Q.    Okay.

13   A.    And just general nursing duties.

14   Q.    Had you already decided to take the job when

15   you met with Dr. Bachman, or were you still undecided?

16   A.    No, I had decided to take the job.

17   Q.    Okay.  Did you inform him of that?

18   A.    Yes.

19   Q.    Is that why you then had a more detailed

20   conversation about what your duties would be --

21   A.    Right.  He asked me --

22   Q.    -- what your duties and responsibilities

23   would be?

24   A.    Yes.

25   Q.    And did he indicate that he could be called

20

1    day or night?

2         A.    Yes.

3         Q.    What information did he give you on what you

4    should do if he was unavailable?

5         A.    Then if it was during the week, I could talk

6    to his nurse practitioner.  Otherwise I would have to

7    transport to another facility, and that would probably be

8    Frisco, Summit Medical Center.

9         Q.    Now, did you meet Dr. Bachman at the Frisco

10   Medical Center?

11        A.    Yes.

12        Q.    And what was your understanding of where

13   patients would be transported for emergency care?

14        A.    Frisco Medical Center.

15        Q.    And did you understand they had an emergency

16   department there, emergency room?

17        A.    Yes.  That was my understanding.

18        Q.    Did he give you the name of any other

19   physician that you should contact if he was on vacation

20   or unavailable?

21        A.    No, he did not.

22        Q.    Did you meet his nurse practitioner?

23        A.    Yes, I did.

24        Q.    Did she participate in this meeting with Dr.

25   Bachman?

**1/18/2006  Paulsen, R.N., Vicki Ann**

1    standing orders in every facility.

2         Q.      So Dr. Bachman then explained to you that he

3    would be present one day per week at the Park County Jail

4    to see inmates?

5         A.      Yes.

6         Q.      And was that a particular day of each week?

7         A.      Usually Wednesdays.

8         Q.      And he explained to you that any inmates

9    that you felt he should see, you would schedule for those

10   appointments?

11        A.      Yes.

12        Q.      Was he, then, there every Wednesday after

13   you started working at Park County?

14        A.      He missed a couple of weeks, but yes, he was

15   there every week.

16        Q.      What time would he normally arrive?

17        A.      Usually right after lunch.

18        Q.      And would you customarily have scheduled

19   appointments for him in the afternoon on Wednesdays?

20        A.      Yes.

21        Q.      And approximately how many inmates would he

22   see, on the average, on a Wednesday afternoon?

23        A.      It could vary anywhere from three to seven

24   or eight.  It just depended on how many needed to be

25   seen.

1/18/2006  Paulsen, R.N., Vicki Ann

```
 1        A.      Right.

 2        Q.      And you would only forward the information

 3   that you placed on the computer to Dr. Bachman if you

 4   felt it was something that he should see right away?

 5        A.      Yes.

 6        Q.      Otherwise you didn't forward it to him?

 7        A.      No.  He would see it when he came weekly.

 8        Q.      Yeah, I know, but otherwise you wouldn't

 9   immediately forward it to him on the computer?

10        A.      No, no.

11        Q.      Now, how would you know that an inmate

12   wanted an appointment with you?

13        A.      They could either fill out what we call a

14   kite or they could ask me.

15        Q.      Okay.  Now, do you speak Spanish?

16        A.      No, I do not.

17        Q.      Did you understand when you took the job at

18   Park County that you would at times be dealing with

19   Spanish-speaking --

20        A.      Yes, I did.

21        Q.      -- people who didn't understand English?

22        A.      Yes, I understood that.

23        Q.      Did Monte Gore tell you that?

24        A.      Yes, he did.

25        Q.      What instructions were you given with regard
```

1/18/2006  Paulsen, R.N., Vicki Ann

1        THE DEPONENT:   7 or 8 to 30.

2        Q.    (BY MR. TRINE)   What was your practice on a

3   daily basis when you first took the job as nurse at Park

4   County?  About what time would you come to work?

5        A.    Usually at 6:00.

6        Q.    And you were required to put in a 40-hour

7   week?

8        A.    Yes.

9        Q.    You usually arrived at 6:00.  Why at 6:00?

10       A.    Because when I started, we had two

11  diabetics, and they were insulin-dependent, and they

12  needed their insulin prior to breakfast, and so I would

13  take their insulin and do med rounds at that time, or

14  right after 6:00, and I just continued with that

15  schedule.

16       Q.    Okay.  So you'd arrive at 6:00, do your

17  rounds, meaning passing out meds --

18       A.    Medication, morning medication.

19       Q.    You probably spent some time getting

20  medications ready?

21       A.    Um-hum.

22       Q.    And about what time would you usually pass

23  out medications?

24       A.    Anywhere from 20 after 6:00 to 6:30.

25       Q.    Then what were your activities after that?

1/18/2006  Paulsen, R.N., Vicki Ann

1    A.    Then I would go back, and if I got any

2    requests from inmates just talking to me or they gave me

3    a kite to be seen, then I'd make a list and take it to

4    control and tell them these are the people I needed to

5    see after breakfast, and usually I started seeing

6    patients right after breakfast, as soon as breakfast

7    trays were up.  As soon as I could get an officer to

8    bring them back.

9    Q.    Then what were your activities during the

10   day?  Just seeing inmates all day?

11   A.    Seeing inmates usually in the morning.  We

12   did PBTs.  I mean, there's . . .

13   Q.    What is that?

14   A.    That's a TB test.  Gosh.  My day was full.

15   I just know I was busy the whole time, so . . .

16   Q.    What was your understanding of who would

17   receive TB tests?

18   A.    Basically, any new inmate into the facility.

19   The only ones that would not would be boot camp -- those

20   are DOC inmates that they held for boot camp at Buena

21   Vista.  They had already been screened and been through

22   the procedure.

23   Q.    Now, when you were off duty on weekends,

24   what was your understanding of the procedure with new

25   inmates coming in?

1     medical issues.  That was from the protocols.

2          Q.     In other words, you read protocols that

3     indicated that would occur, and therefore, you assume it

4     did?

5          A.     It did not occur while I was there.

6          Q.     But what's your assumption, then?  It

7     occurred before you came on board?

8          A.     I didn't ask.  I assumed that it did, yes.

9          Q.     Did you ever request that Dr. Bachman come

10    to the jail and instruct deputies on any particular

11    medical issues?

12         A.     No.

13         Q.     Did you ever feel that there was a need to

14    do that?

15         A.     No.

16         Q.     Now, do you presently have any memory, apart

17    from documents, of Moises Carranza-Reyes?

18         A.     Yes.

19         Q.     Okay.  And do you have any present memory of

20    any contact you had with him?

21         A.     Yes.

22         Q.     And what is your memory of your first

23    contact with him?

24         A.     I saw him on the 6th of March, and he came

25    to me with an interpreter, and he was complaining of a

1    headache, congestion, stuffy nose, sore throat, achy.

2         Q.    You mean you remember all that without

3    reference to notes --

4         A.    Yes, I do.

5         Q.    -- or records?  Why does that stand out in

6    your mind that he came to you with those --

7         A.    There are many inmates that stand out in my

8    mind.  Or detainees.  I work with it.

9         Q.    And what was his appearance at that time in

10   March when you first saw him?

11        A.    When I first saw him?

12        Q.    Yeah.

13        A.    He was walking, his color was good.  He came

14   in.  Through the interpreter we talked back and forth

15   about his problems, and I examined him.  At that time I

16   didn't feel that what was going on with him was anything

17   major.

18        Q.    Now, you see him here with us in the

19   deposition today?

20        A.    Um-hum.

21        Q.    Is that basically how he looked at that

22   time?

23        A.    He was thinner, and he was -- he was -- he

24   was -- how do you want me to say he looked?  I mean, he

25   walked in, he was alert, he was . . .

1/18/2006  Paulsen, R.N., Vicki Ann

1   you were going to be on weekends in case an emergency

2   should arise?

3       A.    Yes, or I'd tell them I'll be unavailable.

4       Q.    And apparently you also advised Graves -- do

5   you recall who Graves is?

6       A.    I don't recall.

7       Q.    To issue an inhaler to Santos-Flores, Jose,

8   INS, type, albuterol.  Do you remember that incident?

9       A.    I do.  The detainee had asthma, and he came

10  in without an inhaler.

11      Q.    And had just recently been admitted?

12      A.    Um-hum.  Yes.

13      Q.    Then if you'll refer to 3514 -- and this is

14  on March 3, 2003, which would be a Monday.

15      A.    Correct.

16      Q.    And you indicate that you won't be in on

17  March 4 because of an appointment with a doctor?

18      A.    Yes.

19      Q.    Do you remember that?

20      A.    Yes.

21      Q.    And that night will have to pass out the

22  a.m. meds?

23      A.    Yes.

24      Q.    So you were not in on Monday, on the 4th?

25  Or I mean on Tuesday?

**1/18/2006  Paulsen, R.N., Vicki Ann**

1    A.    I was not there all day.

2    Q.    On Tuesday, the 4th?

3    A.    Right.

4    Q.    And when you say nights will have to pass

5    a.m. meds, you're talking about the shift that would be

6    on duty after midnight?

7    A.    Yes.

8    Q.    And they would be passing off the meds

9    before they went off duty at 8:00 a.m.?

10   A.    Yes.

11   Q.    And do you remember whether you had an M.D.

12   appointment because of any illness you had at the time?

13   A.    I had oral surgery.

14   Q.    Okay.  And were able to return to work on

15   the 5th?

16   A.    Yes.

17   Q.    Then if you look at Park 3517, which is a

18   March 4, 2003 entry by Sergeant Flint, and in the first

19   paragraph he indicates that "Inmate Herbert

20   Maprazo-Hazarlegos is complaining of serious pains in his

21   left side (D Pod).  Recommend he see the nurse as soon as

22   possible."  When you came on duty on the 5th, you would

23   have reviewed this; is that right?

24   A.    Um-hum, correct.

25   Q.    And do you remember that incident?

1/18/2006  Paulsen, R.N., Vicki Ann

1    sounds were clear bilaterally?

2         A.    With a stethoscope.

3         Q.    And what kind of stethoscope did you have?

4         A.    The brand name?  Is that what you're asking?

5         Q.    Yeah.

6         A.    I don't know.  I had a stethoscope.

7         Q.    You've had substantial experience and

8    training in the use of a stethoscope over the years,

9    haven't you?

10        A.    Yes, I have.

11        Q.    You've been a nurse for how many years?

12        A.    42.

13        Q.    42.  Okay.  And so you know what to listen

14   for to hear a rhonchi sound in the lungs or wheezes or --

15        A.    Yes, I do.

16        Q.    Is that right?

17        A.    Yes.

18        Q.    And on both the 6th and the 7th, the lungs

19   were clear?

20        A.    Yes.

21        Q.    Is that right?

22        A.    They sounded clear.

23        Q.    And I believe you said earlier in your

24   testimony that when you saw him on the 7th, everything

25   was pretty much the same except he had been vomiting now?

**1/18/2006  Paulsen, R.N., Vicki Ann**

1      A.      Yes.

2      Q.      So his condition had gotten worse; isn't

3  that right?

4              MS. LEWIS:   Object to the form of the

5  question.

6      A.      Slightly.

7      Q.      (BY MR. TRINE)   Slightly?

8      A.      Yes.

9      Q.      Did you at that time consider calling Dr.

10  Bachman and relating all of these signs and symptoms to

11  him to see if he thought he should see the patient?

12     A.      No, I did not.

13     Q.      And again, was there anything about the

14  procedures and policies that discouraged you from calling

15  Dr. Bachman?

16     A.      No.

17     Q.      Had you ever called Dr. Bachman just to

18  relate symptoms to him to see if he had any advice that

19  he could render on what you should do?

20     A.      Yes.

21     Q.      Had you ever done that before March 7?

22     A.      Yes.  I'm sure I have.

23     Q.      Under what circumstances?

24     A.      I'm sure I have.  I can't give you a date or

25  what it was about.

**1/18/2006  Paulsen, R.N., Vicki Ann**

1       Q.   Was Dr. Bachman always cooperative?

2       A.   Yes.

3       Q.   Was he readily available when you wanted him

4 by phone?

5       A.   Yes.

6       Q.   Did you at times call Dr. Bachman to review

7 your assessment with him when a decision was then made by

8 Dr. Bachman to "Bring the patient in, I'll take a look at

9 him"?

10      A.   Yes.

11      Q.   That happened from time to time?

12      A.   From time to time.

13      Q.   And after March 7, which was a Friday --

14      A.   Correct.

15      Q.   You would have been off on the 8th and 9th?

16      A.   Yes.

17      Q.   Saturday and Sunday?

18      A.   Yes.

19      Q.   Did you leave any instructions with people

20 there at the jail about Carranza-Reyes' condition and

21 what to do in your absence on the 8th and 9th?

22      A.   Yes.

23      Q.   And what instructions did you leave?

24      A.   I told them to keep an eye on him and, you

25 know, what he could have for his headache and his nasal

1/18/2006  Paulsen, R.N., Vicki Ann

1    congestion and for his upset stomach and diarrhea.

2           Q.    And in order to make sure that everyone is

3    on the same page and knows what your instructions are,

4    wouldn't you put that in the pass-on record?

5           A.    Yes.

6           Q.    Did you find that anywhere in the pass-on

7    record --

8           A.    No, I did not.

9           Q.    -- those instructions?

10          A.    No, I did not.

11          Q.    It would have been your custom and practice,

12   however, to enter some kind of note in the pass-on record

13   if you wanted an inmate to be watched carefully, wouldn't

14   you?

15          A.    Yes.

16                MS. LEWIS:  Object to the form.

17          Q.    (BY MR. TRINE)  Do you know why that wasn't

18   done here?

19          A.    No, I do not.

20          Q.    What's your next memory, then, of any

21   contacts with anyone related to Carranza-Reyes after

22   Friday, March 7?

23          A.    They called me the early morning of the 8th

24   that he had become short of breath.  They had to take him

25   back to medical, and he -- Deputy Frye had taken his

1/18/2006  Paulsen, R.N., Vicki Ann

1    vital signs and had given him some oxygen.

2         Q.    And when were you called?  About what time?

3         A.    About 3:00.

4         Q.    And was it your impression, then, that his

5    condition had deteriorated from the time you saw him on

6    the 7th?

7         A.    Yes.

8         Q.    Did you at that time consider coming in

9    immediately to assess him?

10        A.    I did, and I talked to the deputies, and

11   they didn't feel at that point that it was necessary for

12   me to come in right then.

13        Q.    Which deputy did you talk to?

14        A.    I talked to Deputy Fikejs.

15              MR. SARGENT:  I'm sorry.  I didn't hear you.

16              THE DEPONENT:  Deputy Fikejs.

17        Q.    (BY MR. TRINE)  And what was your

18   understanding of what medical training, if any, Deputy

19   Fikejs had?

20        A.    Deputy Frye was taking care of Mr.

21   Carranza-Reyes.

22        Q.    But you spoke to Mr. Fikejs?

23        A.    Deputy Frye was with him and in medical, and

24   so it was Deputy Fikejs, and he was relating to me

25   what -- and I could hear what Mr. Frye was saying.

1/18/2006 Paulsen, R.N., Vicki Ann

1     Q.     Were you informed that the vital signs were

2     abnormal?

3            MS. LEWIS:  Object to the form.

4     A.     No.

5     Q.     (BY MR. TRINE)  You were informed that the

6     vital signs were normal and stable?

7     A.     Yes.

8     Q.     What do you remember --

9     A.     I don't remember the vital signs.

10           MS. LEWIS:  Wait until he finishes his

11    question.

12           THE DEPONENT:  Okay.

13    Q.     (BY MR. TRINE)  What do you remember about

14    the conversation specifically?  What did they tell you

15    about his condition, that is, what did Deputy Fikejs tell

16    you about his condition?

17    A.     That they had taken him back to medical,

18    that he was short of breath -- complained of shortness of

19    breath, and he still had nausea and vomiting.

20    Q.     What about his temperature?

21    A.     I don't remember.

22    Q.     Did you take handwritten notes at home of

23    this information, this conversation?

24    A.     Yes.

25    Q.     And what did you do with those notes?

1        A.      Took them with me, I think, into the office.

2        Q.      And put them in his chart?  Put them in

3   Carranza-Reyes' chart?

4        A.      I don't recall if I did or not.

5        Q.      What was your understanding of why oxygen

6   was being administered at that time?

7        A.      Because he had complained of shortness of

8   breath.

9        Q.      Was this, as far as you were concerned, a

10  new sign or symptom?

11       A.      Yes.

12       Q.      So what instructions, if any, did you give

13  to Fikejs in that phone conversation?

14       A.      That they needed to keep an eye on him and

15  to contact me if he became any worse than what he was

16  then.

17       Q.      So what was your next contact with anyone

18  after that phone call?

19       A.      I called at -- a little before 6:00, and he

20  had been resting and used the bathroom once, then I

21  went --

22       Q.      You called from home --

23       A.      Yes.

24       Q.      -- a little before 6:00?

25       A.      Um-hum.

1/18/2006 Paulsen, R.N., Vicki Ann

```
1                  (At this time Mr. Jurs entered the

2      deposition room.)

3           Q.    Who did you talk to?

4           A.    I don't remember who I talked to.

5           Q.    Any other contact before you arrived at the

6      facility?

7           A.    No.

8           Q.    And approximately what time did you arrive?

9           A.    Quarter to 8:00, somewhere around in there.

10          Q.    And you customarily would come in at 6:00.

11     How come 8 o'clock --

12          A.    This was Saturday.

13          Q.    Did you tell them that you would be coming

14     in that morning?

15          A.    Yes, I did.

16          Q.    Did you tell them what time you would be

17     coming in?

18          A.    No, I didn't.

19          Q.    Am I correct that after that phone

20     conversation, you didn't feel that there was any urgency

21     in your seeing him right away?

22          A.    I can't say there wasn't any urgency.

23          Q.    What?

24          A.    I . . .

25          Q.    I didn't hear you.
```

1       A.      Was there any urgency at that point?

2       Q.      Yeah.  When you got the telephone call at

3    night --

4       A.      Um-hum.

5       Q.      -- I gather you didn't feel there was any

6    urgency in your coming in immediately to assess him; is

7    that right?

8               MS. LEWIS:  Object to the form of the

9    question.

10      A.      Not at that time.

11      Q.      (BY MR. TRINE)  Otherwise you probably would

12   have been there right away, correct?

13      A.      Yes.

14      Q.      Or come in before 8 o'clock at least?

15      A.      Yes.

16      Q.      So your only reason for coming in on the 8th

17   was because of Carranza-Reyes?

18      A.      Yes.

19      Q.      It was a Saturday, and otherwise you

20   wouldn't have been in?

21      A.      No, I would not have.

22      Q.      Okay.  What did you do when you arrived?

23      A.      Checked in with control, picked up my keys,

24   went back to open up medical, and he had fallen in the

25   tier, and I went back out to check him out.

1    Q.    How did you know he'd fallen in the tier?

2    A.    Corporal Crawford called me in the back.

3    Q.    So you checked into medical --

4    A.    I went out to open my office, yes.

5    Q.    And how soon after you opened your office

6    did --

7    A.    Almost -- I had just gotten back.

8    Q.    -- the corporal come in?

9    A.    He didn't come in.  He called me.

10   Q.    Called you on what?

11   A.    On the phone from control.  I had just

12   gotten through the door.

13   Q.    And do you remember the gist of exactly what

14   he told you about Carranza-Reyes?

15   A.    He said that he was going up to the pod.  He

16   had evidently fallen down on the tier, so I just went out

17   to the tier.

18   Q.    Accompanied by whom?  Anyone?

19   A.    One of the deputies.  I don't remember who.

20   Q.    But some deputy went with you?

21   A.    Yeah.  Um-hum.

22   Q.    And you went to Pod D?

23   A.    Yes.

24   Q.    And what did you do?

25   A.    Went upstairs.

**1/18/2006  Paulsen, R.N., Vicki Ann**

1      Q.      And what did you observe upstairs and what

2      did you do?

3      A.      He was laying on a mat on the floor, and he

4      was complaining of flank pain.

5      Q.      Laying on a mat on the floor and complaining

6      of what?

7      A.      Flank pain.

8      Q.      What do you mean, "flank pain"?  That's not

9      a word he used.  What do you mean?

10     A.      In the kidney area.  In this area, radiating

11     around.

12     Q.      When you say "this area," describe what area

13     of the body you're referring to.

14     A.      In the midback.

15     Q.      In the midback and then around.  Around

16     where?

17     A.      Around to his groin.

18     Q.      And what did you do?

19     A.      We moved him -- he was up on the upper tier,

20     and we went to the lower tier.

21     Q.      How can you do that?

22     A.      He walked down the tier.

23     Q.      Unassisted?

24     A.      He had a deputy holding him, yeah.

25     Q.      Deputy holding him?

1/18/2006  Paulsen, R.N., Vicki Ann

```
 1              THE REPORTER:  I'm sorry.  I couldn't hear
 2     you.
 3              THE DEPONENT:  The deputy was helping him
 4     down the stairs.
 5         Q.    (BY MR. TRINE)  And where were you when this
 6     was happening?
 7         A.    I was right behind him.
 8         Q.    Okay.  Just one deputy?
 9         A.    As I remember, yes.
10         Q.    And who was that?
11         A.    It seemed like it was Theobald, but I would
12     not be certain.  He's the one that walked me to the pod,
13     so . . .
14         Q.    And you apparently had some conversation
15     with Carranza-Reyes.  Who did you use as an interpreter?
16         A.    There was someone in the pod.
17         Q.    Can you describe that person?
18         A.    No, not really.
19         Q.    Was it the same person that you used as an
20     interpreter on the 6th and 7th?
21         A.    Yes.
22         Q.    And how do you know the interpreter was from
23     that pod?
24         A.    Because he was in the pod, and that's where
25     he slept.
```