**1/18/2006  Paulsen, R.N., Vicki Ann**

```
 1        Q.    Okay.  Where was he when you saw him, the

 2   interpreter?

 3        A.    He was with Mr. Carranza-Reyes.

 4        Q.    So he was behind Carranza-Reyes, who was on

 5   a mat on the floor?

 6        A.    He was kneeling beside him talking to him.

 7        Q.    So what did you do besides talk to

 8   Carranza-Reyes and watch him be assisted down below?  Did

 9   you examine him?

10        A.    Looked him over, and then I --

11        Q.    What do you mean, "looked him over"?

12   Visually looked him over?

13        A.    I palpated his back and his abdomen to see

14   where his pain was.

15        Q.    He didn't first point out where his pain

16   was?  You palpated it?

17        A.    No.  He described his pain as here

18   (indicated), and so I palpated to make sure exactly where

19   his pain was.

20        Q.    And you have a distinct memory of that

21   today?

22        A.    Yes, I do.

23        Q.    Of palpating for pain?

24        A.    Yes.

25        Q.    What else did you do?
```

**Exhibit A-1, part 2**

1/18/2006  Paulsen, R.N., Vicki Ann

```
1          A.      I asked -- told the deputies he needed to be

2     transported.

3          Q.      Which deputy did you --

4          A.      I talked to Corporal Crawford.

5          Q.      And you did that just based on looking him

6     over?

7          A.      I felt that at that point he needed to be

8     transported.

9          Q.      Did you tell him that he needed to be

10    transported immediately?

11         A.      I asked if we could transport him, and I was

12    informed I had to call INS.

13         Q.      That you had to call INS?

14         A.      Yes.  I had to call INS.

15         Q.      Who told you that?

16         A.      Corporal Crawford.

17         Q.      And did he explain why you had to call INS

18    before they could transport him?

19         A.      They said I had to get permission from INS.

20         Q.      Had you ever had to get permission from INS

21    before that date --

22         A.      No.

23         Q.      Wait.  Let me finish.  Had you ever had to

24    get permission from INS before that date when you were

25    asking for transport of an INS detainee to Summit County?
```

1    A.    No.

2    Q.    You had asked that detainees be transported

3    to Summit County previously, hadn't you?

4    A.    Yes.

5    Q.    And you'd never had to get INS permission?

6    A.    No.

7    Q.    So were you surprised at that time that --

8    A.    Yes, I was.

9    Q.    -- you had to call the INS?

10   A.    Yes.

11   Q.    Did you ask Crawford why you had to get INS

12   permission?

13   A.    I don't recall if I asked him why.  I just

14   went and called.

15   Q.    When you first talked to Crawford about

16   getting him transported, did you indicate you thought his

17   condition could be something serious and you wanted him

18   transported by ambulance?

19   A.    I didn't -- no, I did not talk to him about

20   the kind of transportation at that time.

21   Q.    What kind of transport did you ask for?

22   A.    I didn't ask for any specific transport when

23   I talked to him at that time.

24   Q.    You just said he had to be transferred?

25   A.    I just said he needed to be transferred.

1/18/2006  Paulsen, R.N., Vicki Ann

1     Q.    And you wanted him transported where?

2     A.    To Frisco Medical Center, or Summit County.

3     Q.    To the emergency department?

4     A.    Yes.

5     Q.    You felt his condition was sufficiently

6 severe that he couldn't wait for a daily appointment with

7 Dr. Bachman but should be taken to the emergency room?

8     A.    Yes.

9     Q.    So before calling the emergency room to make

10 all of those arrangements, you first called INS?

11    A.    Yes.

12    Q.    And if you'd look, please, at Exhibit 3.

13 It's in the binder, I believe, which is the master

14 control log.

15        MR. SARGENT:  Bill, when you find a stopping

16 point -- I know you're kind of in the middle of

17 something -- I'd like to take a break for five minutes

18 and swap out here.

19        MR. TRINE:  Sure.  This would be a good time

20 to do that.

21        (Break from 1:06 p.m. to 1:15 p.m., at which

22 time Mr. Sargent was not present in the deposition room.)

23    Q.    (BY MR. TRINE)  Let's see.  I had just

24 referred you, I think, to Exhibit 3, master control log,

25 at Park 1002, and if you look at the entry at 8:02, it

1/18/2006  Paulsen, R.N., Vicki Ann

1    indicates "Nurse in facility," and that's about the time

2    you think you arrived?

3         A.    Yeah.   I got there just a little before

4    8:00.

5         Q.    And then it indicates there's a sick inmate

6    in D Pod, Carranza-Reyes, at 8:10 and that he -- the

7    controller called Captain Gore at 8:20.   Do you remember

8    asking that Captain Gore be called?

9         A.    I didn't ask he be called.   I -- I was told

10   he was out of town.

11        Q.    And then at 8:27, it indicates that the

12   controller called Ben at INS and talked with the nurse.

13   Did the controller place the call and relay it to you and

14   put you on the line, or did you call Ben at INS directly?

15        A.    I called Ben.

16        Q.    Now, did you know Ben?

17        A.    No, I did not.   I had spoken to him on the

18   phone several times, but I didn't meet him.

19        Q.    But at any rate, you had a telephone number

20   and knew how to reach him?

21        A.    Yes.

22        Q.    And were you instructed to call Ben

23   specifically, or how did that come about?

24        A.    I was just told to call INS, and that's who

25   I talked to.

**1/18/2006  Paulsen, R.N., Vicki Ann**

1       Q.      And what did you tell Ben at INS?

2       A.      I told him that Mr. Carranza-Reyes had been

3   ill for a couple of days and his symptoms had worsened

4   and he needed to be transported.

5       Q.      Okay.  And what response did you get?

6       A.      He asked me how ill he was, and I said that

7   he was ill enough to be transported.  I wanted him

8   transported.  And he said -- he asked me what I thought

9   it was, and at that point I said it could be anything.

10  It could be a kidney stone, it could be anything right

11  now.  And so he told me if it got worse, I could

12  transport.  I said, "If it gets worse, can we transport?"

13  And he said yes.

14      Q.      So you're the one that said, "If it gets

15  worse can we transport"?

16      A.      No.  He said if it gets worse, that we could

17  transport.  I didn't say that; he said that.

18      Q.      What symptoms did you relate to him that

19  Carranza-Reyes had?

20      A.      That he had shortness of breath, that he was

21  complaining of side and low back pain or midback pain,

22  that he just needed to go to a facility with higher care.

23      Q.      Did you tell him that for at least two days

24  he had had a headache and sore throat and had been

25  vomiting for over a day?

**1/18/2006 Paulsen, R.N., Vicki Ann**

1       A.     INS prefers to transport their own, and I

2   asked him when they could transport, and he said it would

3   be three hours, and I . . .

4       Q.     What was your response?

5       A.     I told him he needed to be transported prior

6   to that.

7       Q.     And what was his response?

8       A.     He told me if his symptoms got worse, then

9   we could transport.

10      Q.     Did you complain to anyone at the jail that

11  you felt he should be transported now and you shouldn't

12  be letting Ben call the shots?

13      A.     I talked to Corporal Crawford about it.

14      Q.     And what did you tell Corporal Crawford?

15      A.     I said he -- this is what Ben told me, and I

16  said, "I don't agree with it."  I don't -- you know.

17      Q.     You thought he should be transported now?

18      A.     Um-hum.

19      Q.     What did Corporal Crawford say?

20      A.     I don't recall how he answered me when I

21  told him.

22      Q.     Well, did he in any way discourage you from

23  transporting him?

24      A.     No.  No, he didn't.

25      Q.     So why didn't you?

1/18/2006  Paulsen, R.N., Vicki Ann

```
1     the conversation with Crawford?

2          A.     I talked to them again at -- before 10:00.

3          Q.     Talked to who?

4          A.     Deputy Theobald.

5          Q.     Did you remain at the jail?

6          A.     No, I did not.

7          Q.     You went home?

8          A.     Yes, I did.

9          Q.     You went home right after talking to Ben and

10    to Crawford?

11         A.     Oh, I was there a while.  I don't know how

12    long I was there.

13         Q.     Well, about how long?

14         A.     Over an hour.

15         Q.     So you think you left for home around 9

16    o'clock?

17         A.     Right around 9 o'clock.

18         Q.     And it takes you how long to get home?

19         A.     Takes me about 40, 45 minutes to get home.

20         Q.     How were you going to find out medically

21    whether or not his condition continued to deteriorate,

22    not being present on the premises?

23         A.     I thought I had made arrangement for him to

24    be transported.

25         Q.     If his condition got worse?
```

114

1/18/2006  Paulsen, R.N., Vicki Ann

```
 1              MS. LEWIS:  Objection, form.
 2        Q.    (BY MR. TRINE)  Is that right?
 3        A.    I thought I had made arrangements for him to
 4   be transported.
 5        Q.    When did you make an arrangement for him to
 6   be transported?
 7        A.    When I talked to Corporal Crawford, I
 8   thought that that was the arrangement that was made.
 9        Q.    Well, did you call Summit County to arrange
10   for his arrival?
11        A.    I called them and told them that I had an
12   INS detainee that would be coming to them, yes.
13        Q.    When did you make that call?
14        A.    I made it after my discussion with Corporal
15   Crawford.
16        Q.    Between 8:00 and 9:00 in the morning?
17        A.    I don't know exactly what time it was.
18        Q.    Well, you said you remained on the premises
19   for about an hour?
20        A.    Right.
21        Q.    And you arrived about 8:00?
22        A.    Right.
23        Q.    You left about 9:00; is that right?
24        A.    Right.
25        Q.    Did you make that call while you were there
```

**1/18/2006  Paulsen, R.N., Vicki Ann**

1    between 8:00 and 9:00?

2         A.    Yes, I did.

3         Q.    Who did you speak to at Summit County?

4         A.    I don't remember who I spoke to.

5         Q.    What did you tell them?

6         A.    I told them -- I gave them the particulars

7    of what was going on with Mr. Carranza-Reyes and told

8    them he would be transported.

9         Q.    So you knew he was going to be transported?

10        A.    I assumed -- I assumed he was going to be

11   transported, yes.

12        Q.    When did you assume he would be transported?

13        A.    When I asked for it.

14        Q.    Oh.  When you left at 9:00, you assumed he

15   was already being -- arrangements were already being made

16   for him to be transported?

17        A.    I assumed that, yes.

18        Q.    Who told you that --

19              MS. LEWIS:  Object to the form.

20        Q.    (BY MR. TRINE)  -- that yes, they were now

21   making the arrangements for transport?

22              MS. LEWIS:  Same objection.

23        A.    No one told me that.

24        Q.    (BY MR. TRINE)  So I gather you copied his

25   chart and gave it to Crawford to go with the transport

1/18/2006 Paulsen, R.N., Vicki Ann

1     team before you left?

2          A.     No, I did not.

3          Q.     Well, wasn't that your custom and practice?

4          A.     Yes, it was.

5          Q.     Why didn't you copy his chart before you

6     left so that the transport team would have it?

7          A.     I -- I don't know.  I didn't.

8          Q.     Is it because you didn't believe he was

9     going to be transported?

10         A.     No.

11         Q.     You believed he was going to be?

12         A.     Yeah.

13         Q.     Did Corporal Crawford ask for a copy of his

14    chart to take with the transport team?

15         A.     No, he did not.

16         Q.     Did you know how he was going to be

17    transferred?

18         A.     I assumed he would go by vehicle to Summit

19    County.

20         Q.     By ambulance?

21         A.     No.

22         Q.     You didn't feel he needed an ambulance?

23         A.     No.

24         Q.     You felt he should be transported right away

25    but not necessarily by ambulance, right?

**1/18/2006  Paulsen, R.N., Vicki Ann**

```
1          A.      Correct.

2          Q.      Had any of the arrangements been made yet

3     when you left by about 9 o'clock?

4          A.      I thought they were in the process of

5     getting transport because they would have had to have

6     brought somebody in from the outside to transport him.

7          Q.      So you didn't leave any instructions on what

8     to look for in the way of his condition getting worse so

9     that they could then transport because you assumed he was

10    going to be transported, right?

11              MS. LEWIS:  Object to the form.

12         A.      I talked to them about his condition and

13    that he needed to be transported, that any -- any

14    worsening of symptoms, he needed to go, period.  I wanted

15    him gone.

16         Q.      (BY MR. TRINE)  If you look at Exhibit 21

17    again at that same page, at 3530, it indicates that at

18    8:53, a small amount of blood was observed in the

19    inmate's spittle.  Do you remember being informed of

20    that --

21         A.      No.

22         Q.      -- or observing that?

23         A.      No, I did not observe that.

24         Q.      Would that have been of concern to you?

25         A.      Yes.
```

**1/18/2006 Paulsen, R.N., Vicki Ann**

1    Q.    And why is that?

2    A.    Because he would have had something going on

3    in his chest.

4    Q.    And it's probably in his lungs, right?

5    A.    And it's probably in his lungs, yes.

6    Q.    And no one informed you of that?

7    A.    No.

8    Q.    And at 9:20 a.m., it indicates that Corporal

9    Crawford authorized a chair be placed in D Block to aid

10   the inmate in his discomfort.  Were you there when that

11   happened, or had you left?

12   A.    I had gone.

13   Q.    Did anyone call you about that?

14   A.    No.

15   Q.    Or describe his discomfort?

16   A.    No.

17   Q.    Did you ask to be called if his condition

18   got worse?

19   A.    Yes.

20   Q.    Who did you ask?

21   A.    Corporal Crawford.  He was in the control.

22   Q.    Now, why would you ask Corporal Crawford to

23   call you at home if his condition got worse if you

24   assumed they were transporting him when you left?

25   A.    You just cover all the bases, say keep me

1/18/2006  Paulsen, R.N., Vicki Ann

1    11:07 is erroneous?

2         A.    I am.

3         Q.    And that's based on your nurse's report that

4    we'll get to in a little bit?

5         A.    Okay.

6         Q.    You drafted that nurse's report after he was

7    taken to the hospital, didn't you?

8         A.    Yes, I did.

9         Q.    And you drafted that at Captain Gore's

10   request, didn't you?

11        A.    No.

12        Q.    Why did you draft a report dated March 8

13   after he was taken to the hospital?

14        A.    Why wouldn't I?

15        Q.    Why did you?

16        A.    Why did I?  For a record of what happened.

17        Q.    And where did you place that record?

18        A.    I had it in his file.

19        Q.    You kept it in his confidential file?

20        A.    I put it in his file.

21        Q.    And no one asked you to draft that report?

22        A.    I don't recall anybody asking me to draft

23   that report.  They asked me for a copy of it.

24        Q.    Looking again at page 3530 of that same

25   Exhibit 21, after the note at 11:07 indicating that the

### 1/18/2006 Paulsen, R.N., Vicki Ann

1      nurse called and recommended he be taken to Summit

2      Medical Center -- and you say that happened at 10:30?

3          A.      Um-hum.

4          Q.      Why did you call them at 10:30?

5          A.      What do you mean by that comment?

6          Q.      Well, you'd assumed he was already on his

7      way to the medical -- to Summit County when you left at

8      9:00, didn't you?

9                  MS. LEWIS:   Object to the form of the

10     question.

11         A.      I thought they were preparing to get -- to

12     take him, yes.

13         Q.      (BY MR. TRINE)   Okay.   So why did you call

14     at 10:30?

15         A.      To see if he had been transported, to see if

16     they heard anything.

17         Q.      Who did you talk to?

18         A.      I had -- Corporal Crawford.

19         Q.      Okay.   And you asked Corporal Crawford what?

20         A.      I asked him if they were going to transport,

21     and he said he was still there, and I said, "He needs to

22     be transported."

23         Q.      Okay.   Were you upset when you found out --

24         A.      Yes.

25         Q.      -- he hadn't been transported yet?

**1/18/2006  Paulsen, R.N., Vicki Ann**

```
 1        A.    Yes.
 2        Q.    Did you tell Corporal Crawford you were
 3   upset?
 4        A.    I don't remember what I said to Corporal
 5   Crawford.
 6        Q.    Did you ask him why he hadn't been
 7   transported?
 8        A.    I don't recall.
 9        Q.    What do you recall of the conversation?
10        A.    I asked if he had been transported.  He said
11   no, he was there.  He said he had vomited some more, and
12   I asked him to please transport him.
13        Q.    Did he tell you at that time that after you
14   left, he had been spitting up blood?
15        A.    (Deponent shook head.)
16        Q.    You weren't aware of that?
17        A.    No.
18        Q.    So you were asking he be transported for the
19   same reasons you did when you saw him at 8 o'clock or
20   8:10?
21        A.    Correct.
22        Q.    As far as you were concerned, his condition
23   was the same, and they should have transported him
24   earlier; is that right?
25        A.    Correct.
```

**1/18/2006 Paulsen, R.N., Vicki Ann**

1     Q.    Do you have any dispute over that time?  You

2    think it happened earlier?

3     A.    I -- I don't.  I don't know what time he

4    arrived there.  Go by the log, I guess.

5     Q.    It indicates that at 11:43, Sergeant Muldoon

6    left . . .

7     A.    Message.

8     Q.    Left a message with Ben at INS, and it

9    indicates that at 12:42, they arrived at Summit County.

10    Do you see that?

11     A.    Yes.

12     Q.    And do you know approximately how long it

13    takes to travel from Park County Jail to the Summit

14    County Medical Center?

15     A.    It's about an hour.

16     Q.    About an hour?

17     A.    (Deponent nodded head.)

18     Q.    So that would be consistent with their

19    actually leaving the jail, then, at about 11:43; is that

20    right?

21     A.    Um-hum, yes.

22        MS. LEWIS:  Object to the form and

23    foundation.

24     Q.    (BY MR. TRINE)  When did you next have some

25    contact with anyone regarding Carranza-Reyes after you

1/18/2006  Paulsen, R.N., Vicki Ann

1    called the jail from your home that morning on the 8th?

2        A.    Around 1:30.

3        Q.    And what contact was that?

4        A.    I called the jail to see if they had heard

5    anything from Summit Medical Center.

6        Q.    Who did you talk to at that time?

7        A.    Corporal Crawford.

8        Q.    And what did he tell you?

9        A.    He hadn't heard anything at that time.

10       Q.    Up until that point in time at 1:30 in the

11   afternoon on the 8th, had you had any additional

12   conversations with anyone at Summit County Medical?  You

13   described one you had between 8:00 and 9:00 in the

14   morning, right?

15       A.    Correct.

16       Q.    You had no others?

17       A.    No.

18       Q.    Rather than call Corporal Crawford to see if

19   he had heard anything, why didn't you call Summit Medical

20   directly?

21       A.    I was -- I assumed that he would have heard

22   something.

23       Q.    Does Corporal Crawford have any medical

24   background, to your knowledge?

25       A.    No.

1/18/2006  Paulsen, R.N., Vicki Ann

1       Q.      So if he heard anything, he'd be relaying it

2    to you just as a layperson, right?

3       A.      Correct.

4       Q.      If you really wanted to know what was

5    happening with Carranza-Reyes, wouldn't you want to talk

6    to a nurse or a doctor that understands the medical

7    language?

8       A.      Yes.

9       Q.      But you don't know why you didn't call

10   direct?

11      A.      No, I don't.

12      Q.      Okay.  When was the next contact with anyone

13   regarding Carranza-Reyes?

14      A.      I was called by Corporal Crawford about 2:30

15   and told he was en route to Denver.

16      Q.      Corporal Crawford called you?

17      A.      Yes.

18      Q.      Had you asked him to get in touch with

19   you if he heard anything?

20      A.      Yes.

21      Q.      What else did Corporal Crawford tell you at

22   that time?

23      A.      That he had pneumonia.

24      Q.      Did you ever talk to anyone again at Summit

25   Medical Center --

1/18/2006  Paulsen, R.N., Vicki Ann

1        A.      Yes.

2        Q.      And it states that provision for appropriate

3    infirmary isolation according to type of infection should

4    be available.  And did you have provisions where people

5    could be quarantined or isolated?

6        A.      If the segregation cells were empty, I could

7    use those.

8        Q.      And if they were full, you couldn't?

9        A.      I didn't have a place.

10        Q.      And if you'll refer to 599, please, it

11    indicates "Nursing staff will conduct medication pass in

12    the housing pods at least three times a day," and you

13    were doing that; is that right?

14        A.      Yes.

15        Q.      And that would be normally at what hours?

16        A.      It would be at around -- just before 7:00

17    and just before 2:00, and in the evening I prepared the

18    meds, and the officers passed them, and I think it was

19    around 6:00.

20        Q.      And then if you look at 602 of Exhibit 4, it

21    indicates in that second paragraph under Policy that the

22    Park County Jail will maintain a contract for the

23    processing of lab results, and in the next paragraph, it

24    indicates that the contract is with LabCorp.  Is that the

25    lab that you were sending blood to for lab results?

1/18/2006  Paulsen, R.N., Vicki Ann

1     A.     Right.

2     Q.     -- I understand from your testimony that

3     there were occasions that you relayed information to jail

4     staff of a medical nature through the pass-on.  Is that

5     correct?

6     A.     True.

7     Q.     How did you relay that information?

8     A.     I would tell -- there were times I would

9     write it in the book, and there were other times where I

10    would tell the officer in control about it, and he would

11    put it in the book.

12    Q.     So the information you relayed would not

13    necessarily be in writing every time?

14    A.     Correct.

15    Q.     Going back to the conversation with Ben at

16    the INS on the morning of March 8, do you remember that?

17    A.     Um-hum.

18    Q.     During that conversation, did Ben tell you

19    that INS refused to transport unless he got worse or that

20    INS agreed to transport Carranza-Reyes, but it would take

21    up to three hours to do so?

22    A.     They would -- it wasn't if he got worse.  I

23    mean, they didn't refuse, but we could -- they said it

24    would take them up to three hours to have an officer

25    there.

1/18/2006  Paulsen, R.N., Vicki Ann

```
1        Q.    So at the time you left the morning of March

2    8, was it your understanding that transport arrangements

3    were in process?

4        A.    Yes.

5        Q.    Was it just a matter of when that transport

6    occurred as far as you knew?

7        A.    Yes.

8        Q.    You testified earlier that you think it was

9    an error on your part to leave the morning of March 8

10   when you did at 9:00 a.m. or so.  Do you reach that

11   conclusion today with the benefit of hindsight of what

12   eventually happened to Mr. Carranza-Reyes?

13       A.    Yes.

14       Q.    If Carranza-Reyes had ended up being fine

15   and had not gotten as sick as he eventually did, would

16   you still feel like it was an error on your part to leave

17   the morning of March 8?

18             MR. TRINE:  Objection, form and foundation.

19       A.    Yeah.

20       Q.    (BY MS. LEWIS)  Well, given the symptoms he

21   presented to you at the time, did you feel like you

22   needed to stay that morning?

23       A.    At the time I saw him, he was fairly

24   comfortable and -- no, not at that time.

25       Q.    So as far as you knew, there was a transport
```

1/18/2006  Paulsen, R.N., Vicki Ann

```
1    being arranged --

2           A.    Yes.

3           Q.    -- to come pick him up, right?

4           A.    Yes.

5                 MS. VEIGA:  No questions.

6                 MS. LEWIS:  That's all I have.

7                 MR. JURS:  Is it okay if I sit down here if

8    I project?

9                        EXAMINATION

10   BY MR. JURS:

11          Q.    I'd like you to look at Exhibit 26, INS

12   detention standards, and I believe your testimony was

13   that you were not provided a copy of these.  Is that

14   true?

15          A.    I didn't have one in the office, no.

16          Q.    I'd like you to turn to the page marked Park

17   1699 and examine that page and the pages that appear

18   after that.  Have you had a chance to look at all those

19   documents, 1699 through 1705?

20          A.    Yes.

21          Q.    And were those Park County Sheriff's Office

22   policies and procedures?

23          A.    Yes, they are.

24          Q.    Would you have been provided those policies

25   and procedures?
```