11/1/2005 Don Stanley Frye

```
         0001
 1       IN THE UNITED STATES DISTRICT COURT
         FOR THE DISTRICT OF COLORADO
 2
         Case No. 2005-WM-377 (BNB)
 3       _____
 4       DEPOSITION OF:  DON STANLEY FRYE
         November 1, 2005
 5       _____
 6       MOISES CARRANZA-REYES,
 7       Plaintiff,
 8       v.
 9       PARK COUNTY, a public entity of the State of Colorado and its
         governing board, THE PARK COUNTY BOARD OF COUNTY
10       COMMISSIONERS; PARK COUNTY SHERIFF'S OFFICE, a public entity
         of the State of Colorado; FRED WEGENER, individually and in
11       his official capacity as Sheriff of Park County, Colorado;
         MONTE GORE, individually and in his capacity as Captain of
12       Park County Sheriff's Department; VICKIE PAULSEN, individually
         and in her official capacity as Registered Nurse for Park
13       County, Colorado; JAMES BACHMAN, M.D., individually and in his
         official capacity as Medical Director of the Park County Jail,
14
         Defendants.
15       _____
16
17
18       TAKEN PURSUANT TO NOTICE AND AGREEMENT on behalf of the
19       Plaintiff at 824 Castello, Fairplay, Colorado 80440 at 9:00
20       a.m. before Theresa A. Coffman, Federal Certified Realtime
21       Reporter, Registered Professional Reporter and Notary Public
22       within Colorado.
23
24
25
```

Exhibit A-8

1

11/1/2005 Frye, Don

```
 1    before you went to work at Park County?
 2         A.    My work history, I was in the military for
 3    two years as an advanced combat medic in Vietnam.  I
 4    was --
 5         Q.    Excuse me for interrupting, but as an
 6    advanced combat medic, what sort of medical training did
 7    you have?
 8         A.    I was trained as a 91A10, which is a medic
 9    in the military.  When I went to Vietnam, I was advanced
10    to 91B20, which you advance either -- I don't remember,
11    if it's from rank or experience in the field, but I had
12    both.
13         Q.    And how would that medical training compare
14    to the medical training that is required to become, for
15    example, an EMT?  Do you know?
16         A.    Well, I'm not an EMT; I'm a first
17    medical/first responder, and it's very similar.  Do a lot
18    of trauma cases.
19         Q.    You're certified?
20         A.    I'm certified for medical first responder
21    from the fire department.
22         Q.    Okay.  I'm sorry for interrupting, but you
23    were in the military, then, for how long?
24         A.    Two years.
25         Q.    And then what?
```

11/1/2005 Frye, Don

1  A.  -- whether I had it written down on a piece
2  of paper or I looked at the log that I reported.
3  Q.  The master log?
4  A.  Yes.
5  Q.  So at 1:00 in the morning, according to your
6  incident report, you entered D Block, and upon entering,
7  Inmate Carranza stated that he was sick. Now, we know
8  now that Carranza-Reyes doesn't speak English. Are you
9  sure Carranza-Reyes told you that he was sick?
10     MS. VEIGA: Objection to form and
11 foundation.
12 A.  Through his interpreter.
13 Q.  (BY MR. TRINE) Okay. That doesn't say that
14 here. Do you remember that there was an interpreter with
15 you?
16 A.  I remember that his interpreter was right
17 across the hallway that I walk from.
18 Q.  Is this the same person that had been
19 interpreting for you for several nights prior to this?
20     MS. LEWIS: Object to the form.
21 A.  Yes.
22 Q.  (BY MR. TRINE) So you asked that person to
23 come help you speak to Carranza-Reyes?
24 A.  Yes.
25 Q.  Could you tell just from looking at

80

11/1/2005 Frye, Don

1  A.  Yes.
2  Q.  And which ones?  Do you remember them by
3  name?
4  A.  I can remember only one that I remember by
5  name.
6  Q.  Who is that?
7  A.  Candelaria.
8  Q.  I'm sorry.  Were you aware of the fact that
9  there were employed interpreters who were not inmates
10 that were available on call by the jail?
11      MS. LEWIS:  Object to foundation.
12 A.  I was aware that we had trusteed inmates
13 that we used on a variety of occasions that spoke
14 Spanish.
15 Q.  (BY MR. TRINE)  So it was your understanding
16 that you had to use trustee inmates, that there wasn't an
17 outside, independent contract interpreter that you could
18 call; is that right?
19 A.  An outside, contracted interpreter?
20 Q.  Right, right, right.
21 A.  I don't know if I was aware of that or not
22 at that time.  All I know is there was an ample number of
23 people who spoke Spanish that we used on a regular basis.
24 Q.  Okay.  Then again looking at that incident
25 report, Park 0155, you indicate that at 3:00 a.m., you

93

11/1/2005 Frye, Don

```
 1   again entered D Block for a routine pod walk, and Inmate
 2   Carranza again stated he was sick.  "I got an interpreter
 3   and took the interpreter and Inmate Carranza back to
 4   medical."  I assume that he again said that he was sick
 5   through an interpreter; is that right?
 6             MS. VEIGA:  Counsel, what time did you ask
 7   him about?
 8             MR. TRINE:  At 3:00 a.m. on March 8.
 9        Q.   (BY MR. TRINE)  It indicates you again
10   entered the pod, and Carranza stated he was sick.  "I got
11   an interpreter and took the interpreter and Inmate
12   Carranza back to medical."  I'm assuming that, again, he
13   didn't say he was sick, but you used an interpreter; is
14   that right?
15        A.   I believe so.
16        Q.   (BY MR. TRINE)  And why did you take him
17   back to medical on this occasion as opposed to taking him
18   back at 1:00 in the morning?  Was his condition worse?
19        A.   No.  He just then decided he wanted -- he
20   would try some oxygen.
21        Q.   He decided that?  He said, "I want oxygen"?
22        A.   No.  I offered oxygen at various points
23   during the night.  I don't remember the exact times.  At
24   that time he said, "Yeah, I'll try it," as well as I
25   recall.  I don't remember specifically what times I
```

Case 1:05-cv-00377-WDM-BNB   Document 122-9   Filed 12/15/06   USDC Colorado   Page 6 of 8

11/1/2005 Frye, Don

1  Q. Well, which is it? Do you think you have a
2  better memory now than you had on March 8 of those
3  events?
4  A. Of this event? No.
5  Q. Okay. Do you think your memory was better
6  on March 8 of the events that occurred at that time than
7  it is now?
8  A. Yes.
9  Q. Okay. Again, at 3:00 a.m. in the morning,
10 you decided to take him back to medical, and is it your
11 testimony that you only took him back to medical because
12 he requested to go back to medical?
13 A. I do not believe he requested to go to
14 medical.
15 Q. Did you feel that it would be good to take
16 him back to medical because you were concerned about him?
17 A. Yes.
18 Q. And were you concerned because he wasn't
19 getting any better, he seemed to be sick?
20 A. I noticed he had discomfort. I felt oxygen
21 might help.
22 Q. What discomfort did you believe he had that
23 oxygen would help?
24 A. I felt, since it had been mentioned about
25 the elevation, that oxygen might give him more comfort.

11/1/2005 Frye, Don

1  Q.  That "it had been mentioned about
2  elevation." What had been mentioned?
3  A.  I think sometime earlier when we were told
4  it was flulike conditions, that the altitude might have
5  something to do with it.
6  Q.  Who told you that?
7  A.  I don't recall.
8  Q.  Do you remember Nurse Paulsen at some time
9  telling you or stating in your presence that all these
10 detainees just had altitude sickness, don't worry about
11 it, it's just altitude sickness?
12         MS. VEIGA:  Objection to form and
13 foundation.
14 A.  No.
15 Q.  (BY MR. TRINE)  Did you feel that that's all
16 he had, was altitude sickness?
17 A.  No.  I felt that he had flulike symptoms,
18 but my experience tells me that, with the altitude,
19 sometimes that's a problem.  People get altitude sickness
20 up this high.
21 Q.  So you decided to treat him for altitude
22 sickness with oxygen?
23         MS. LEWIS:  Object to the form.
24         MS. VEIGA:  Join.
25 A.  No.  What I decided to do was offer oxygen

```
 1     to see if it gave him any additional comfort.
 2          Q.    (BY MR. TRINE)  But the reason you did that
 3     is, if he had altitude sickness, apparently that might
 4     help, right?
 5          A.    If -- yes.
 6          Q.    And you indicate that at 3:00 in the
 7     morning, you took his blood pressure, and the result was
 8     143 over 78.  You probably looked at some records later
 9     on to dictate this because you wouldn't have remembered
10     the precise vital signs 15 hours later, would you?
11          A.    I don't remember specifically.  I may have
12     gotten them from the log, I may have got them on a sheet
13     of paper.  I don't recall.
14          Q.    And did you feel the blood pressure was
15     within normal range?
16                MR. JURS:  Foundation.
17          Q.    (BY MR. TRINE)  For a his age and size?
18          A.    Did I feel it was within range?
19          Q.    Within normal range.
20                MS. LEWIS:  Same objection.
21          A.    It's not that bad of a blood pressure.  Not
22     knowing his history, I wouldn't know whether that would
23     be normal for him or not.
24          Q.    (BY MR. TRINE)  So why did you take it?
25          A.    As a standard procedure of what I do when
```