3/15/2006 Timothy Barnes Keeling, D.O.

0001

1   IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

2

Case No. 2005-WM-377 (BNB)

3   _____

4   DEPOSITION OF:   TIMOTHY BARNES KEELING, D.O.
March 15, 2006

5   _____

6   MOISES CARRANZA-REYES,

7   Plaintiff,

8   v.

9   PARK COUNTY, a public entity of the State of Colorado and its governing board, THE PARK COUNTY BOARD OF COUNTY

10  COMMISSIONERS; PARK COUNTY SHERIFF'S OFFICE, a public entity of the State of Colorado; FRED WEGENER,

11  individually and in his official capacity as Sheriff of Park County, Colorado; MONTE GORE, individually and in

12  his capacity as Captain of Park County Sheriff's Department; VICKIE PAULSEN, individually and in her

13  official capacity as Registered Nurse for Park County, Colorado; JAMES BACHMAN, M.D., individually and in his

14  official capacity as Medical Director of the Park County Jail,

15

Defendants.

16  _____

17

18

19  TAKEN PURSUANT TO NOTICE on behalf of the Defendants at

20  340 Peak One Drive, Frisco, Colorado at 1:45 p.m. before

21  Laura L. Corning, Federal Certified Realtime Reporter,

22  Certified Shorthand Reporter and Notary Public within

23  Colorado.

24

25

Exhibit A-12

1

3/15/2006 Keeling, D.O., Timothy Barnes

```
 1      A.    No.
 2      Q.    In this case -- and I apologize if I asked
 3  this -- do you recall if you or anyone else received a
 4  call from Park County about an inmate who was going to be
 5  brought over?
 6      A.    No.
 7      Q.    You don't remember or you think that there
 8  was no call?
 9      A.    I don't recall.
10      Q.    You personally didn't speak to anyone?
11      A.    No.
12      Q.    When is the first time, then, that you
13  learned that Moises Carranza-Reyes was going to or was a
14  patient at Summit Medical Center -- going to be or was a
15  patient?
16      A.    At approximately 1:30 p.m.
17      Q.    And that was approximately 45 minutes after
18  he had arrived?
19      A.    Yes.
20      Q.    At 1:30 did you actually see the patient, or
21  did you learn he was there?
22      A.    I did not see the patient.  The nurse saw
23  the patient.
24      Q.    Did you speak to the nurse about what was
25  going on with the patient?
```

17

3/15/2006  Keeling, D.O., Timothy Barnes

```
 1      A.    Sometime after 1:30.
 2      Q.    So what happened at 1:30?  They informed you
 3   that Moises Carranza-Reyes was a patient here?
 4      A.    No.  The nurse was checking the patient in
 5   at 1:30.  After she is done with her assessment, then I
 6   find out that he is there.
 7      Q.    Got it.  And you find out what's going on by
 8   reviewing the chart or by speaking to the nurse?
 9      A.    Both.
10      Q.    And it was both in this case?
11      A.    Probably.
12      Q.    Do you recall speaking to the nurse about
13   the patient Moises Carranza-Reyes?
14      A.    Yes.
15      Q.    And which nurse were you speaking to?
16      A.    Colleen.
17      Q.    What's her full name?
18      A.    I believe her last name is Seyer, S-e-y-e-r.
19      Q.    What did -- tell me everything you know
20   about or remember about that conversation.
21      A.    I'll refer to the chart.  She told me that
22   there was an ill man who was vomiting and having
23   difficulty breathing.
24      Q.    Anything else?
25      A.    She said his heart rate was fast and that he
```

18

3/15/2006  Keeling, D.O., Timothy Barnes

1    was breathing rapidly.
2            MR. RINGEL:  Just for the record, let it
3    reflect that Dr. Keeling is looking at what I believe is
4    page 4 of Exhibit 24.
5        Q.    (BY MR. JURS)   And you also had a chance
6    to review the written notes on page 4?
7        A.    At some time.
8        Q.    And at what point did you determine or go
9    and visit with the patient?
10       A.    My best guess is within 15 minutes or so of
11   his arrival in the emergency room proper.
12       Q.    So that would have been around 1:45 in the
13   afternoon?
14       A.    Approximately.
15       Q.    And where was the patient when you saw him?
16       A.    On a gurney in an examination room.
17       Q.    Was he lying down or elevated, or what was
18   his body position?
19       A.    I don't remember.
20       Q.    And when you entered the room, who was
21   present with the patient at that time?
22       A.    I don't remember.
23       Q.    Do you remember if anyone else was in that
24   room?
25       A.    My recollection would be that the nurse was

3/15/2006  Keeling, D.O., Timothy Barnes

1       A.      Not inpatient.
2       Q.      Is there a specific reason why not?
3       A.      Yes.  In 2003 Summit Medical Center was
4   essentially a stand-alone emergency department.  We had
5   no hospital, no ICU, no other doctors.
6       Q.      So you weren't able to have overnight
7   patients?
8       A.      No.
9       Q.      Same for sepsis?
10      A.      Yeah.  There was no overnight beds at Summit
11  Medical Center.
12      Q.      That's the basis of the transfer in this
13  case?
14      A.      Yes.
15      Q.      Is there anything about this -- treating
16  this particular patient, Mr. Carranza-Reyes, that you
17  recall doing, seeing or anything that's not in the
18  medical record, that's not written in these documents?
19      A.      No.
20              MR. JURS:  I don't have any other questions.
21              MR. MARKS:  Doctor, I have a few -- more
22  than a few questions for you, but I'll try and ask them
23  efficiently.
24
25

3/15/2006 Keeling, D.O., Timothy Barnes

1  medicine, rendering opinions about what may have happened
2  before he saw the patient or afterwards, are not areas
3  about which he wants to testify. I'm trying to be
4  straight with everybody so everybody gets the same deal.
5            MR. RINGEL: Okay. Explain to me why his
6  wish matters. That's what I'm trying to understand.
7            MR. MURRAY: Well, because he is a
8  professional, and his decision about whether he chooses
9  to provide his professional opinion about something is
10 something that he has a proprietary interest in. He
11 controls that; you don't.
12           MR. RINGEL: And you think that's a
13 legitimate basis under the Federal Rules of Civil
14 Procedure?
15           MR. MURRAY: I do.
16           MR. RINGEL: I just wanted to establish
17 that.
18      Q.   (BY MR. MARKS) So getting back to my
19 question, is there -- I can rephrase it, but, Dr.
20 Keeling, did you see any evidence of a strep infection
21 when you reviewed the throat area of this particular
22 patient?
23      A.   No.
24      Q.   And what kind of evidence would -- or
25 symptom would you be looking for if someone had had strep

49

3/15/2006 Keeling, D.O., Timothy Barnes

1   or you suspected strep?
2       A.   Oftentimes they'll have a hyperemia or
3   reddish appearance to their throat.  If they have
4   tonsils, they could be enlarged, they could be -- have an
5   exudate over -- you know, on them.
6       Q.   Okay.  Going down to the Database area.
7   There is an indication here of oxygen -- oxygen
8   saturation percentage.  Do you see that, right?  The
9   first line under Database on page 2 of Exhibit 24.
10      A.   I do.
11      Q.   Okay.  And as I see it, the results said
12  91 percent on 15 liters per minute by mask.  Did I read
13  that correctly?
14      A.   That's correct.
15      Q.   And is that within the normal limits for
16  oxygenation?
17      A.   Yes, it is.
18      Q.   Upon your -- let me just ask, upon your just
19  physical examination of the patient, and in talking with
20  him, was there anything within that examination that led
21  you to believe that the patient had pneumonia at that
22  time?
23      A.   It certainly was within the differential
24  diagnosis.
25      Q.   Okay.  And why so?

3/15/2006  Keeling, D.O., Timothy Barnes

1     the mode of transport?  In other words, whether someone
2     gets taken by, what, helicopter, Flight for Life
3     helicopter or by ambulance?
4          A.    I am the one who decides.
5          Q.    Okay.  And in this case did you decide to
6     have him transfer by ambulance?
7          A.    Yes.
8          Q.    Okay.  And what was your reasoning behind
9     having him transfer by ambulance as opposed to
10    helicopter?
11         A.    I chose ambulance because the patient's
12    condition was stable.
13         Q.    When would you utilize, let's say, a
14    helicopter transport?  What kind of factors would you
15    consider for that?
16         A.    I consider helicopter when it's available,
17    weather permitting, I consider it for someone who has a
18    heart attack, that needs an intervention done or other
19    procedure done immediately.
20         Q.    So it's some kind of emergent condition that
21    someone needs --
22         A.    Yes, sir.
23         Q.    -- other kinds of facilities or treatments?
24    Is that a way to say it?
25         A.    I interrupted you, and I apologize.  Do you

3/15/2006  Keeling, D.O., Timothy Barnes

```
1       A.   Yes.
2       Q.   Okay.  Do those record reflect the level of
3  transport that was given at the time?
4       A.   No.
5       Q.   Are you aware of any record that would
6  memorialize what level of transport you ordered in this
7  instance?
8       A.   No.
9       Q.   Does that mean there's none that exist or --
10      A.   I don't know.
11      Q.   Based on your assessment of Mr. Carranza-
12 Reyes, do you have a medical judgment, sitting here
13 today, what level transport you would have done in this
14 instance?
15      A.   At the time that he was discharged, he was
16 in a stable condition.  I would have requested a Level II
17 transport.
18      Q.   Which would mean no sirens and lights?
19      A.   Yes.
20      Q.   So if someone following the ambulance
21 testified that there were no sirens and lights, that
22 would be consistent with your assessment of Mr.
23 Carranza-Reyes and your belief in terms of what the level
24 of transport was and what that meant.
25      A.   I'm sorry.  You're going to have to rephrase
```

81

3/15/2006  Keeling, D.O., Timothy Barnes

```
 1    accompanied the patient or directly from the patient or
 2    some other source?
 3             MR. RINGEL:  Object to the form and the
 4    foundation.
 5         A.    I don't know.
 6         Q.    (BY MR. TRINE)   Then the triage assessment
 7    indicating that for three days the patient had
 8    right-sided chest pain, fever, nausea, vomiting and
 9    diarrhea, would all of those symptoms be consistent with
10    a septic condition?
11             MR. RINGEL:  Object to the form and the
12    foundation.
13             MR. MURRAY:  You mean in terms of his
14    analysis that day, Bill?  I think I have to interpose a
15    comment to be consistent with what I've done with others.
16         Q.    (BY MR. TRINE)   No, no, no.  Would that be
17    consistent with the diagnosis that you made of sepsis
18    that day --
19             MR. RINGEL:  Same objections.
20         Q.    (BY MR. TRINE)   -- that for three days he
21    had had right-sided chest pain, fever, nausea, vomiting
22    and diarrhea?
23             MR. RINGEL:  Same objections.
24         A.    I think that those symptoms could be found
25    in many different conditions.
```

3/15/2006  Keeling, D.O., Timothy Barnes

```
 1       Q.      (BY MR. TRINE)    I understand that.  That
 2  wasn't my question, though.  Among those conditions,
 3  would those symptoms be consistent with the sepsis that
 4  you had diagnosed that day?
 5       A.      Fever, chills are oftentimes associated with
 6  sepsis.  I don't know if the other ones need to be
 7  included to make a diagnosis of sepsis.
 8       Q.      Okay.  The right-sided chest pain would
 9  certainly be consistent with the pneumonia that you
10  subsequently diagnosed in the right lower lobe of the
11  lung; is that right?
12       A.      Yes.
13       Q.      Now, it indicates that -- under that triage
14  assessment that he came from the bathroom unable to void.
15  And would that be consistent with dehydration resulting
16  from sepsis?
17               MR. RINGEL:  Object to the form and the
18  foundation.
19               MR. MURRAY:  Where are you, please?  On the
20  form, where are you?
21               MR. TRINE:  Excuse me?
22               MR. MURRAY:  Where are you?
23               MR. TRINE:  On the triage assessment where
24  he indicates "from WR" -- I assume waiting room -- "to
25  BR" -- bathroom -- "unable to void."
```