IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 05-cv-00377-WDM-BNB

MOISES CARRANZA-REYES,

     Plaintiff,

v.

THE PARK COUNTY BOARD OF COUNTY COMMISSIONERS;
FRED WEGENER, individually and in his official capacity as Sheriff of Park County, Colorado;
MONTE GORE, individually and in his official capacity as Captain of Park County Sheriff's Department; and
VICKIE PAULSEN, individually, and in her official capacity as Registered Nurse for Park County, Colorado,

     Defendants

---

## DEFENDANTS' MOTION TO LIMIT EXPERT TESTIMONY BY MICHAEL S. NIEDERMAN, M.D. AND ROBERT B. GREIFINGER, M.D.

---

Defendants Park County Board of County Commissioners, Fred Wegener, Monte Gore, and Vicki Paulsen, by and through their respective counsel, Andrew D. Ringel, Esq. and Jennifer L. Veiga, Esq. of Hall & Evans, L.L.C. and Josh A. Marks, Esq. and Melanie B. Lewis, Esq. of Berg Hill Greenleaf and Ruscitti, LLP, pursuant to Fed. R. Evid. 702, hereby submit this Motion to Limit Expert Testimony by Michael S. Niederman, M.D. and Robert B. Greifinger, M.D., as follows:

### INTRODUCTION

Plaintiff Moises Carranza-Reyes brings this action pursuant to 42 U.S.C. § 1983 and Colorado law against the Defendants arising from his incarceration in the Park County Jail from March 1, 2003, through March 8, 2003.  On June 14, 2006, Plaintiff submitted his expert witness

disclosures, which listed as specially retained expert witnesses Michael S. Niederman, M.D., and Robert B. Greifinger, M.D.   [*See* Plaintiff's F.R.C.P. 26(a)(2)(B) Disclosures, Exh. A-1].   Dr. Niederman is offered to testify that Plaintiff was not sick when he arrived at the Park County Jail and that the conditions at the jail caused Plaintiff to develop Group A beta-hemolytic streptococcal ("Strep A") pneumonia, which caused complications ultimately leading to the amputation of his lower left leg.   Dr. Niederman submitted an expert report dated June 8, 2006, [*see* Letter from Michael S. Niederman to William A. Trine ("Niederman Report"), Exh. A-2], and was deposed by counsel for Defendants on September 8, 2006.   Dr. Greifinger is offered to testify that the conditions at the Park County Jail fell below the standard of correctional health care and constituted deliberate indifference to Plaintiff.   Dr. Greifinger submitted an expert report dated July 29, 2005, and supplemental reports dated April 27, 2006, June 2, 2006, and October 9, 2006.   [*See* Letters from Robert B. Greifinger to William A. Trine ("Greifinger Report"), Exh. A-3].   Dr. Greifinger was initially deposed on August 25, 2006, and the deposition was completed on October 9, 2006.

The expert testimony proposed to be procured from Dr. Niederman and Dr. Griefinger with respect to the cause of Plaintiff's illness does not satisfy the tests of reliability and relevance under Fed. R. Evid. 702 as interpreted and applied by ***Daubert v. Merrell Dow Pharms., Inc.***, 509 U.S. 579 (1993), and its progeny.   Defendants therefore request that these two witnesses each be precluded from testifying the conditions at the Park County Jail caused Plaintiff to acquire Strep A infection, or caused any existing infection to develop into pneumonia and sepsis. In addition, Defendants also request Dr. Niederman be precluded form testifying that earlier

treatment of the Plaintiff by a physician would have made any difference to the ultimate outcome of his illness.

## ARGUMENT

### A.  EXPERT TESTIMONY PURSUANT TO FED. R. EVID. 702 AND APPLICABLE PRECEDENT

Rule 702 of the Federal Rules of Evidence provides:

> If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.  The Supreme Court has interpreted the word "knowledge" in Fed. R. Evid. 702 as connoting "more than subjective belief or unsupported speculation," *Daubert*, 509 U.S. at 590, and has further stressed that proposed expert witness testimony "must be supported by appropriate validation." *Id.*

In *Daubert*, the Supreme Court held that the former test of the admissibility of expert testimony, as set forth in *Frye v. United States*, 293 F. 1013, 1014 (D. D.C. 1923), did not survive the enactment of Fed. R. Evid. 702.  Instead, under the rule, when faced with a proffer of expert scientific testimony, a district court must perform a gatekeeper function and "determine at the outset, pursuant to [Fed. R. Evid.] 104(a), whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." *Daubert*, 590 U.S. at 592.  This determination "entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*,

509 U.S. at 592; *see also **Black v. M & W Gear Co.**,* 269 F.3d 1220, 1237 (10th Cir. 2001).  The party offering the expert testimony need not prove that the expert is indisputably correct, but instead must show that the method employed by the expert is scientifically sound and that the opinion is based on facts that sufficiently satisfy Fed. R. Evid. 702's reliability requirements.  *See **Mitchell v. Gencorp Inc.**,* 165 F.3d 778, 781-782 (10th Cir. 1999) (citations omitted).  Under ***Daubert***, any step that renders the expert witness' analysis unreliable renders the expert's testimony inadmissible.  *See **Mitchell v. Gencorp Inc.**,* 165 F.3d 778, 782 (10th Cir. 1999).

The touchstones for evaluating proposed expert testimony under ***Daubert*** are reliability and relevance.  *See **United States v. Turner**,* 285 F.3d 909, 912 (10th Cir.) ("Under Rule 702, the district judge must act as a gatekeeper to ensure proffered expert testimony is relevant and reliable."), *cert. denied,* 537 U.S. 895 (2002).  Drawing from ***Daubert***, the courts have outlined four non-exclusive factors that may be considered when making the reliability assessment required by Fed. R. Evid. 702:  "whether the opinion at issue is susceptible to testing and has been subjected to such testing; (2) whether the opinion has been subjected to peer review; (3) whether there is a known or potential rate of error associated with the methodology used and whether there are standards controlling the technique's operation; and (4) whether the theory has been accepted in the scientific community."  ***Dodge v. Cotter Corp.**,* 328 F.3d 1212, 1222 (10th Cir.), *cert. denied,* 540 U.S. 1003 (2003) (citing ***Daubert***, 509 U.S. at 593-95)); *see also **Magdaleno v. Burlington Northern R. Co.**,* 5 F.Supp.2d 899, 902 (D. Colo. 1998).  However, the Supreme Court also emphasized that the listing of these factors was not intended to be a "definitive checklist or test," ***Daubert***, 509 U.S. at 593, but instead "the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether

particular expert testimony is reliable," and should consider the specific factors identified in *Daubert* only where they are reasonable measures of the reliability of expert testimony. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999); *see also Dodge*, 328 F.3d at 1222 ("[T]he list is not exclusive, and district courts applying *Daubert* have broad discretion to consider a variety of other factors.")

The focus under *Daubert* is the principles and methodology employed by the proposed expert, not the results reached. *Daubert*, 509 U.S. at 595. However, "conclusions and methodology are not entirely distinct from one another," and a district court is not required to admit expert testimony "which is connected to existing data only by the ipse dixit of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *General Electric v. Joiner*, 522 U.S. 136, 146 (1997). The importance of requiring expert opinions to be based on reliable scientific methodology is that "[i]t is axiomatic that an expert, no matter how good his credentials, is not permitted to speculate." *Goebel v. Denver & Rio Grande Western R.*, 215 F.3d 1083, 1088 (10th Cir. 2000); *see also Dodge*, 328 F.3d at 1222 ("It is critical that the district court determine whether the evidence is genuinely scientific, as distinct from being unscientific speculation offered by a genuine scientist.") (citation omitted). "To be reliable under *Daubert*, an expert's scientific testimony must be based on scientific knowledge, which 'implies a grounding in the methods and procedures of science' based on actual knowledge, not 'subjective belief or unsupported speculation.'" *Dodge*, 328 F.3d at 1222 (quoting *Daubert*, 509 U.S. at 590)). "Proposed testimony must be supported by appropriate validation -- i.e., 'good grounds,' based on what is known." *Daubert*, 509 U.S. at 590.

For the district court to conduct its review under *Daubert*, the documentation supporting the expert's opinion must be described in sufficient detail that the district court can make a determination as to whether the testimony is scientifically valid. *See United States v. Rincon*, 28 F.3d 921, 924 (9th Cir.), *cert. denied,* 513 U.S. 1029 (1994). "At a minimum, the expert testimony should include a description of the method used . . . and scientific data supporting the determination. The expert's assurance that the methodology and supporting data is reliable will not suffice." *Mitchell*, 165 F.3d at 781. The trial court has discretion to determine how to perform its gatekeeping function under *Daubert*, and may hold what is referred to as a "*Daubert* hearing" if necessary to properly assess the reliability and relevance of the proposed testimony. *Goebel*, 215 F.3d at 1087.

### B. APPLICABILITY OF *DAUBERT* TO MEDICAL CAUSATION OPINIONS

*Daubert* is applicable to opinions offered by medical experts on the causation of injuries or illnesses. *See, e.g., Dodge*, 328 F.3d at 1212; *Hollander v. Sandoz Pharm. Corp.*, 289 F.3d 1193, 1204 (10th Cir.), *cert. denied,* 537 U.S. 1088 (2002); *In re Breast Implant Litigation*, 11 F.Supp.2d 1217, 1224 (D. Colo. 1998). The study of the cause of diseases in humans is referred to as epidemiology, and to prove the cause of a particular medical condition, it is necessary to conduct controlled epidemiological studies. *See Implant Litigation*, 11 F.Supp.2d at 1224. "A valid epidemiologic study requires that study subjects, cases, and controls are chosen by an unbiased sampling method from a definable population." *Id.* (experts designated to testify that

breast implants caused particular illnesses rejected under ***Daubert*** where no valid epidemiological study supported link between implant and illnesses).[1]

This Court, applying Colorado law on causation, has held that where the injuries complained of can also occur under circumstances unlike those experienced by the plaintiff, the body of epidemiology must demonstrate that the circumstances experienced by the plaintiff more than doubled his or her risk of injury. *See **id.*** at 1225-26 (where injuries suffered by plaintiffs commonly occur in women without breast implants, plaintiffs were required to present expert testimony demonstrating that implants more than doubled their risk of claimed injuries). However, even if the epidemiology demonstrates a doubling of the risk from the activity in question, an additional set of criteria referred to as the Bradford-Hill criteria are applied to determine whether there is a cause and effect relationship. *See **id.*** at 1234 n.5. The Bradford-Hill criteria include "the temporal sequence of events, the strength of the association, the dose-response relationship, and the biologic plausibility of the observed association." ***Id.*** In the medical field, "[a]n untested hypothesis cannot be a scientifically reliable basis for an opinion on causation," ***id.*** at 1228, and "[a] statement does not become scientific knowledge because it is uttered by a doctor." ***Id.*** at 1234.

## C.  DR. NIEDERMAN'S MEDICAL CAUSATION OPINION IS NOT SUFFICIENTLY RELIABLE UNDER *DAUBERT* AND MUST BE EXCLUDED

Dr. Niederman is a specialist in pulmonary and critical care medicine. [*See* Niederman Report, at 3, Exh. A-2]. In his career, Dr. Niederman has treated only a small number of inmates

---

[1]   Where epidemiological studies are unavailable for purposes of a lawsuit, a medical expert may also look to other methods of investigating causation, such as toxicology and animal studies or clinical research. *See **id.*** at 1228.

from correctional facilities, and he does not recall ever treating an inmate who acquired pneumonia at a correctional facility.  [*See* Deposition of Michael S. Niederman, M.D., 9/8/2006 ("Niederman Dep."), at 40-42, Exh. A-4)].  Dr. Niederman testified the Strep A bacteria is a very unusual bacteria to cause pneumonia, and in fact he had seen no more than three or four patients with this disease in his entire career.  [*See* Niederman Dep., at 62, Exh. A-4).

Dr. Niederman opines in his expert report:  "it is my medical opinion that Mr. Carranza-Reyes developed Group A beta-hemolytic streptococcal pneumonia as a consequence of his incarceration in the Park County Jail."  [*See* Niederman Report, at 1, Exh. A-2].  Dr. Niederman further opines that Plaintiff "arrived at the jail completely healthy" and "first became ill while he was an inmate in the Park County Jail."  [*See* Niederman Report, at 1-2, Exh. A-2]  Dr. Niederman goes on to state:  "It is my opinion that if Mr. Reyes has [sic] been put in a better maintained holding cell, with less crowding, he would have been much less likely to have acquired this communicable respiratory illness.   In addition, if sick individuals had been removed from the cell, and placed in a proper medical facility, he would have never been exposed to them to the extent that he could have developed his infection and subsequent pneumonia."  [*See* Niederman Report, at 1, Exh. A-2].

Even his expert report indicates that Dr. Niederman cannot testify to a reasonable degree of medical certainty that the conditions at the Park County Jail actually caused Plaintiff to develop Strep A.   Dr. Niederman does not state unequivocally that Plaintiff would not have developed the disease if the jail conditions had been better, but instead only that he would have been "much less likely" to have acquired the disease.   This blatant speculation does not satisfy the requirement of reliability under ***Daubert***.  *See **Implant Litigation***, 11 F.Supp.2d at 1233

("[A] suggestion or possibility of a relationship is insufficient for a causation opinion under Colorado law, the Federal Rules of Evidence, and ***Daubert***." (citations omitted)).

Dr. Niederman's deposition testimony further demonstrates why his opinion that the conditions at the Park County Jail caused Plaintiff's illness is not sufficiently reliable under ***Daubert***. Dr. Niederman testified "for a variety of different pneumonias, there's both local factors with bacteriology, antibiotic susceptibility, as well as ***patient specific historical factors*** that make infection of a certain bacteria more or less likely." [*See* Niederman Dep., at 27 Exh. A-4 (emphasis added)]. However, Dr. Niederman admitted he did not review Plaintiff's medical records and did not attempt to analyze what patient specific historical factors of Plaintiff may have caused him to progress from strep throat to pneumonia. [*See* Niederman Dep., at 68-69, Exh. A-4].

Dr. Niederman's opinion that Plaintiff was healthy when he arrived at the jail was based upon Plaintiff's deposition and the depositions of jail personnel who saw Plaintiff when he arrived at the jail and did not comment on him being sick. [*See* Niederman Dep., at 70, Exh. A-4]. However, Dr. Niederman specifically admitted there is a latency period from the time a person is colonized with a bacteria and the time the bacteria causes the person to become ill, and ***there is no way to know when he caught the bug that eventually led him to be sick***. [*See* Niederman Dep., at 70-71, 76, 77-78, Exh. A-4 (emphasis added)]. Dr. Niederman even went so far as to state that Plaintiff could have been colonized prior to his arrival at the Park County Jail, [*see* Niederman Dep., at 71, Exh. A-4], directly contradicting the statement from his own expert report that Plaintiff arrived at the jail completely healthy and first became ill at the jail. [*See* Niederman Report, at 1-2, Exh. A-2]. According to Dr. Niederman, a person can be colonized

with Strep A bacteria for months before showing any signs of infection. [*See* Niederman Dep., at 133, Exh. A-4].

After acknowledging he cannot determine when Plaintiff actually became infected with the Strep A bacteria, Dr. Niederman attempts to salvage his opinion concerning the cause of the Plaintiff's illness by stating that even if Plaintiff did catch the bacteria prior to arriving at the Park County Jail, the conditions at the jail interfered with his immune function and allowed the disease to progress. [*See* Niederman Dep., at 72, 80, 83, Exh. A-4].[2]   However, Dr. Niederman later admits it would not be possible to design a study to retrospectively determine the pathogenesis of Plaintiff's illness.   [*See* Niederman Dep., at 110-11, Exh. A-4].   Moreover, Dr. Niederman points to no scientific study that states that one's environmental living conditions can interfere with immune function and make Strep A become symptomatic in an individual. Defendants do not believe any such study exists.   Dr. Niederman further admits that the conditions of Plaintiff's travel from Mexico to Colorado could have caused or contributed to the type of infection he ultimately obtained.   [*See* Niederman Dep., at 114-15, Exh. A-4].   While Dr. Niederman offers the general and conclusory assertion the environmental conditions at the Park County Jail contributed to the progression of Plaintiff's illness, he was unable to opine as to what number of inmates the jail could have held without contributing to the progression of the disease. [*See* Niederman Dep., at 128-29, Exh. A-4].   Dr. Niederman admitted that such factors as lack of sleep, lack of proper hydration, and lack of proper nutrition in the preceding week could have contributed to the progression of his illness, but had no information as to whether Plaintiff had

---

[2]   Dr. Niederman admits this opinion is not included in his expert report.   [*See* Niederman Dep., at 83, Exh. A-4].

enough sleep, water, or food during his transport from Mexico to Colorado. [*See* Niederman Dep., at 131-32, Exh. A-4].

The methodology utilized by Dr. Niederman to formulate his opinion on causation plainly fails to satisfy the reliability prong of the ***Daubert*** test. When asked to explain the method by which he formulated his opinion, Dr. Niederman stated only that he read the information provided by Plaintiff's attorneys and formed an opinion. [*See* Niederman Dep., at 105, Exh. A-4]. This is a "generic explanation that defies examination." ***Implant Litigation***, 11 F.Supp.2d at 1243. Dr. Niederman also stated that his approach was analogous, although a little broader, than the approach used for a case study. [*See* Niederman Dep., at 105, Exh. A-4] However, case studies are of questionable value in determining causation, especially where they are few in number and fail to control for other variables potentially causing or contributing to the illness. *See* ***Hollander***, 289 F.3d at 1202, 1211; *see also* ***Implant Litigation***, 11 F.Supp.2d at 1227-28 ("To the extent that there are case or anecdotal reports noting various symptoms or signs in breast implanted women, without controls, these suggest only a potential, untested hypothesis that breast implants may be their cause.").

Here, Dr. Niederman's evaluation is limited to only a single case study, Plaintiff's, and he makes no effort whatsoever to consider the rate of similar illnesses in the general population or to control for any potential causes of Plaintiff's illness aside from the conditions at the jail. *See* ***id.*** (case reports are not reliable scientific evidence of causation because they describe reported phenomena without comparison to the rate at which such phenomena occur in the general population or in a defined control group and do not isolate and exclude potential alternative causes). Because Dr. Niederman "has no measured or quantitative data to support his opinions,"

such opinions "amount to nothing more than subjective opinions." *Implant Litigation*, 11 F.Supp.2d at 1243. It is also significant to note that Dr. Niederman's opinion was not derived from any prior study of this subject, but was instead arrived at solely for purposes of this litigation. *See id.* ("Whether or not testimony is biased and unreliable because it was developed solely for litigation purposes is an important factor in determining the admissibility of evidence.").

Dr. Niederman cites to no testing of his theory relating to the causation of Plaintiff's illness, no peer reviewed publications supporting his theory the conditions at the Park County Jail caused or exacerbated Plaintiff's illness, no discussion of any known or potential rate for error, and no evidence that his theory of causation in this case has attained general acceptance in the relevant scientific community. *See Dodge*, 328 F.3d at 1222; *see also Implant Litigation*, 11 F.Supp.2d at 1234-35 (rejecting expert opinion on medical causation where doctor performed no testing of his hypothesis, did not publish his theories in any peer-reviewed journal, and relied on such non-epidemiological methodologies as anecdotal case reports, which were not objectively tested, had no known rate of error, and were not generally accepted by the medical community). While these four factors were not intended to provide a definitive checklist for evaluating expert testimony, *see Daubert*, 509 U.S. at 593, nothing in Dr. Niederman's report or testimony provides any other support for the reliability of his method of determining causation. In fact, Dr. Niederman specifically acknowledged that because Plaintiff was the "index case," it would not be possible to design a study to retrospectively determine the pathogenesis of his illness. [*See* Niederman Dep., at 110-11, Exh. A-4].

In essence, Dr. Niederman's opinion consists of nothing more than a description of the

claimed conditions at the Park County Jail, followed by the conclusory assertion that these conditions either caused Plaintiff to become infected or caused an already existing infection to manifest itself.   Dr. Neiderman "offers no tested or testable theory to explain how, from his limited information, he was able to eliminate all other potential causes of [Plaintiff's] conditions, nor does he explain how he alone can state as a fact" that the conditions at the Park County Jail caused Plaintiff's illness and injuries.   *Implant Litigation*, 11 F.Supp.2d at 1234.   Without any description of his methodology for arriving at his opinion and a grounding in actual science, this Court cannot perform its gatekeeping function under *Daubert*, *see Mitchell*, 165 F.3d at 781, and Plaintiff cannot offer expert witnesses, no matter how well qualified, for the purpose of speculating as to the cause of Plaintiff's illness.   *See Goebel*, 215 F.3d at 1088; *Hollander*, 289 F.3d at 1214.

Finally, Dr. Niederman also opines that Plaintiff's outcome may have been different had he been treated earlier by a physician.   [*See* Niederman Dep., at 94-97, Exh. A-4].   Dr. Niederman bases this opinion on what he cites as the general standard of care to provide antibiotic treatment to individuals with pneumonia within four hours.   [*See* Niederman Dep., at 98, Exh. A-4].   However, during his deposition Dr. Niederman admitted that he is unaware of any studies correlating the delay in getting antibiotics to patents whose pneumonia had been created by Strep A.   [*See* Niederman Dep., at 154-56, Exh. A-4].   Dr. Niederman's opinion that Plaintiff's ultimate outcome would have improved had he been treated earlier is made with no actual scientific foundation in any empirical data, survey, study, or literature to support his theory.   As such, Dr. Niederman's opinion fails the relevance and reliability inquiry under Fed. R. Evid. 702, *Daubert*, and its progeny.   In *McDowell v. Brown,* 392 F.3d 1283, 1299-1302 (11th

Cir. 2004), the United States Court of Appeals for the Eleventh Circuit affirmed the district court's exclusion of three experts under Fed. R. Evid. 702 who sought to testify that earlier treatment of the incarcerated plaintiff would have improved his outcome.   In so doing, the Eleventh Circuit concluded:

> We agree with the district court that the testimony "essentially boils down to an opinion that earlier surgical intervention would be preferable."   The experts then made the leap from this "presumably accepted scientific principle. . . to an unsupported scientific principle…that a delay of more than four hours caused Plaintiff's injury."   This "leap of faith" was supported by little more than the fact that early treatment begets improved recovery.   The experts, however, provided no existing research detailing the extent of injury or recovery at different time intervals.
>
> McDowell has offered no reliable evidence that earlier medical intervention would have prevented or diminished his injury.   We hold that the district court did not abuse its discretion in concluding that McDowell's evidence is legally unreliable and inadmissible under the standards set by ***Daubert*** and its progeny.

*Id.* at 1301-2.   Here, Dr. Niederman's opinion that Plaintiff's outcome would have improved by earlier treatment suffers the identical defects recognized by the Eleventh Circuit in ***McDowell***. Dr. Niederman offers no scientific grounding for his opinion sufficient to satisfy the requirements of Fed. R. Evid. 702.

### D.  DR. GREIFINGER'S MEDICAL CAUSATION OPINION IS NOT SUFFICIENTLY RELIABLE UNDER *DAUBERT* AND MUST BE EXCLUDED

Dr. Greifinger is currently a consultant for various correctional health care systems.   [*See* Greifinger Report, 7/29/2005 Letter, at 1, Exh. A-3].   Although Dr. Greifinger has been licensed to practice medicine since 1971, he has not provided primary medical care to any patients since 1985, when he was practicing as a pediatrician.   [*See* Deposition of Robert B. Greifinger, M.D., 8/25/2006 ("Greifinger Dep."), at 36, Exh. A-5)].   Dr. Greifinger has not treated anyone with

Strep A since 1985 or earlier.  [*See* Greifinger Dep., at 36, Exh. A-5]  The last time he provided medical care to anyone in a correctional setting was during his residency, in 1976.  [*See* Greifinger Dep., at 21, 42, Exh. A-5].

In his expert report, Dr. Greifinger asserts:  "Crowding and unsanitary conditions lead to high stress levels and facilitate the transmission of communicable diseases such as diarrheal illness, tuberculosis and skin infection with drug-resistant organisms.  There are serious medical needs.  The conditions in this jail fell far below the standard of correctional health care and were demonstrations of deliberate indifference to serious medical needs."  [*See* Greifinger Report, 7/29/05, at 4, Exh. A-3].  Dr. Greifinger does not opine that Plaintiff caught Strep A at the Park County Jail, nor does he opine that the conditions at the jail caused any illness he may already have had to worsen.  In fact, his opinions relating to the jail conditions are couched in terms of hypothetical possibilities, with no effort to tie these hypotheses to the facts of this case.  Nothing in Dr. Greifinger's report provides any indication that he can testify to any degree of medical certainty that the conditions in the jail actually caused Plaintiff's injuries.

Although Dr. Greifinger's expert report attempts no opinion on the causation, Dr. Greifinger at his deposition nevertheless testified that the scope of his expert opinion included the issue of causation.  [*See* Greifinger Dep., at 92-93, Exh. A-5].  Dr. Greifinger testified:  "I believe that the crowded and the unsanitary conditions on D pod in the Park County Jail during the period of March 1 through March 8 of 2003 caused Mr. Carranza-Reyes to get sick with streptococcal disease, and that the lack of timely and appropriate medical care for him led to his death - - or near-death and to his amputation and to all the other complications he suffered from his illness."  [*See* Greifinger Dep., at 93, Exh. A-5].  Dr. Greifinger then acknowledged Plaintiff

may have carried the Strep A bacteria in his body when he arrived at the Park County Jail, but opined that if Plaintiff did already have the bacteria "the stressful conditions of crowding and unhygienic clothing, unhygienic toileting, unhygienic conditions generally, stressed his body so much that it caused his body to relax its immune system and allow the streptococcal bacteria to cause illness."   [*See* Greifinger Dep., at 94-95, Exh. A-5].   Similarly, Dr. Greifinger testified: "And I also believe that the crowding was a significant factor in the creation of an unsanitary and stressful situation to the immune system of the inmates confined on D pod, including Mr. Carranza-Reyes." [Greifinger Dep. at 90, Exh. A-5].

Despite these conclusory efforts to testify with respect to the issue of causation, Dr. Greifinger also expressly acknowledged that Plaintiff's prior history was relevant to the progression of his illness, and more specifically acknowledged that the facts Plaintiff was exposed to the elements for a number of days, traveled by foot and in a truck crowded with other people, and hid out in a house with other people prior to arriving at the Park County Jail, would all be relevant in evaluating his presentation.   [*See* Deposition of Robert Greifinger, M.D., 10/9/2006 ("Supp. Greifinger Dep."), at 203-04, Exh. A-6].   However, nothing in Dr. Greifinger's report or testimony offers any indication he made any attempt to evaluate these facts in offering his opinions on causation.

When asked to explain the methodology he used to arrive at his opinions, Dr. Greifinger testified only that he read the documents he was presented with, organized and recorded the significant findings, and then formed opinions on standard-of-care and constitutional issues based on his findings.   [*See* Greifinger Dep., at 62, Exh. A-5].   This generic description of Dr. Greifinger's methodology suffers from each of the flaws discussed above in relation to Dr.

Niederman, and for the same reasons Dr. Greifinger should not be permitted to offer unexplained, unsupported, and unscientific speculation as to the cause of Plaintiff's illness and injuries. Dr. Greifinger's causation opinion is not supported by an epidemiological or other scientific study or indeed any scientifically reliable basis. At bottom, Dr. Grefinger's causation opinion is nothing more than his unsupported opinion that Plaintiff's illness was either caused or contributed to by the environmental conditions of the Park County Jail. Dr. Greifinger's causation opinion, therefore, suffers from the same flaws as Dr. Niederman's causation opinion and is inadmissible pursuant to Fed. R. Evid. 702 as a matter of law.

**CERTIFICATE OF COMPLIANCE WITH D.C.Colo.LCiv.R. 7.1(A)**

Pursuant to D.C.Colo.LCiv.R. 7.1(A), prior to submitting the instant Motion, the undersigned counsel for Defendants contacted counsel for Plaintiff, William A. Trine, Esq. Mr. Trine indicated that Plaintiff opposes this Motion.

**CONCLUSION**

In conclusion, for all of the foregoing reasons, Defendants Board of County Commissioners of Park County, Fred Wegener, Monte Gore and Vicki Paulsen respectfully request this Court issue an order prohibiting Plaintiff's expert witnesses Dr. Niederman and Dr. Greifinger from testifying that the conditions at the Park County Jail either caused Plaintiff to become infected with Strep A bacteria, or caused any existing infection to manifest itself and develop into pneumonia and sepsis, and an order precluding Dr. Niederman from testifying that earlier treatment of the Plaintiff by a physician would have made a difference in the ultimate

outcome of the Plaintiff's illness, and for all other and further relief as this Court deems just and appropriate.

        Dated this 2nd day of January, 2007.

        Respectfully submitted,

        s/ Andrew D. Ringel
        Andrew D. Ringel, Esq.
        Jennifer L. Veiga, Esq.
        Hall & Evans, L.L.C.
        1125 17th Street, Suite 600
        Denver, Colorado 80202-2052
        Tel:  (303) 628-3300
        Fax:  (303) 293-3238

        **ATTORNEYS FOR DEFENDANTS**
        **BOARD OF COUNTY**
        **COMMISSIONERS OF PARK**
        **COUNTY, FRED WEGENER**
        **AND MONTE GORE**

and

        Josh A. Marks, Esq.
        Melanie B. Lewis, Esq.
        Berg Hill Greenleaf & Ruscitti, LLP
        1712 Pearl Street
        Boulder, CO 80302
        Tel: (303) 402-1600
        Fax: (303) 402-1601
        jam@bhgrlaw.com
        mbl@bhgrlaw.com

        **ATTORNEYS FOR DEFENDANT**
        **VICKI PAULSEN**

## CERTIFICATE OF SERVICE (CM/ECF)

I HEREBY CERTIFY that on the 2nd day of January, 2007, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses:

Joseph J. Archuleta, Esq.
archuletalaw@qwest.net

William A. Trine, Esq.
btrine@trine-metcalf.com

Josh A. Marks, Esq.
jam@bhgrlaw.com

Melanie B. Lewis, Esq.
mbl@bhgrlaw.com

Lloyd C. Kordick, Esq.
lloyd@kordicklaw.com

Adele P. Kimmel, Esq.
akimmel@tlpj.org

s/Loree Trout,   Secretary
Andrew D. Ringel, Esq.
Jennifer L. Veiga, Esq.
Hall & Evans, L.L.C.
1125 17th Street, Suite 600
Denver, CO 80202-2052
303-628-3300
Fax: 303-293-3238
ringela@hallevans.com

**ATTORNEYS FOR DEFENDANTS PARK COUNTY BOARD OF COUNTY COMMISSIONERS, FRED WEGENER AND MONTE GORE**

H:\Users\RINGELA\park\Carranza-Reyes\motion limine niederman and greifinger.doc