ROBERT B. GREIFINGER, M.D.                         EXHIBIT 15

July 29, 2005

William A. Trine, Esq.
Trine & Metcalf, P.C.
1435 Arapahoe Avenue
Boulder, CO 80302-6390

                              Re:    Moises Carranza-Reyes

Dear Mr. Trine:

This is a report on the medical and mental health care provided to Moises Carranza-Reyes at the Park County Jail, between his arrest on March 1, 2003 and his hospitalization on March 8, 2002. My opinions are based on the materials I have reviewed and are expressed to a reasonable degree of medical certainty. This is a preliminary report, subject to change if I receive additional materials that would warrant a supplementary report.

**Background**

1. I am a physician licensed in New York and Pennsylvania. I have been a physician since 1971. I have practiced in the field of correctional medicine for the past 18 years. From 1987 to 1989, I managed the medical care at Rikers Island, New York City's jail. From 1989 until 1995, I was the Chief Medical Officer for the New York State Department of Correctional Services.

2. From 1995 until the present, I have consulted in the design, management, and quality improvement programs for correctional health care systems. As part of this work, I was a court-appointed monitor for the medical care in the jails in Philadelphia, Fulton County, Georgia and DeKalb County, Georgia. As a consultant to the cities/counties, I currently monitor medical care in the jails in Philadelphia, PA and Washington, D.C. I am the court auditor for the jail in Albuquerque, NM. I monitor eight jails and prison correctional health care systems for the Civil Rights Division of the United States Department of Justice. I have consulted on correctional health care issues in 33 states.

3. As the principal investigator for a study and report issued by the National Commission on Correctional Health Care in 2002, I made recommendations to Congress on identifying public health opportunities for soon-to-be-released inmates. In addition, I am a consultant for the Centers for Disease Control and Prevention and John Jay College of Criminal Justice. I have written numerous articles in the field and I authored two chapters in *Clinical Practice in Correctional Medicine*, the sole textbook on correctional medicine.

---

ROBERT B. GREIFINGER, M.D.                  **EXHIBIT**                PHONE: (914) 693-9205
32 PARKWAY DRIVE                                                       FAX: (914) 674-0113
DOBBS FERRY, NEW YORK 10522-3517              **A-3**                  E-MAIL: robert.greifinger@verizon.net

Report on Moises Carranza-Reyes
July 29, 2005
Page 2 of 5

4. A more detailed listing of my experience in correctional health care, my participation in the development of national correctional policy and standards, my experiences as a consultant and expert witness, and a list of my publications are included in my curriculum vitae, which is attached. I have also attached my fees for this case and a list of testimony within the past four years.

5. I am familiar with that degree of care and skill ordinarily exercised by members of the medical and behavioral health professions involving the care and treatment of inmates and detainees, such as Moises Carranza-Reyes, in correctional facilities such as those operated by Park County Colorado, both generally and under the same or similar circumstances and surrounding conditions that involved Mr. Carranza-Reyes, as is reflected in the records that I have reviewed.

**Materials Reviewed**

6. Plaintiff's Second Amended Complaint;

7. Jail records;

8. Denver Health Hospital Records Bate-stamped 200-202, 1232-1236, 638-643, 3018, 2462, and 2357.

9. Index and outline of hospital records 0001-3344;

10. Photographs of Plaintiff numbered 1A - 22B;

11. Hospital records pages 1223-1224, 1873-74, 2357, 2358, 2462, 3017-3029;

12. June 10, 2003 letter requesting medical records from Summit Medical Center with responding records;

13. Second set of photographs numbered 1A - 13B;

14. State of Colorado Sanitary Standards for Penal Institutions;

15. Jail Health Standards, National Commission on Correctional Health Care, Chicago 1996 (especially standards J-30 Receiving Screening, J-35 Sick Call, J-36 Emergency Services, J-41 Assessment Protocols and J-58 Health Record Format and Contents);

16. State of Colorado Board of Nursing Scope of Practice; and

17. Internet news articles on Park County Jail and the Plaintiff.

**Basis for Opinions**

18. Moises Carranza-Reyes was detained by the Immigration and Naturalization Service (INS) on March 1, 2003. He was sent to the Park County Jail, a facility built by the County to generate revenue by housing prisoners for the INS and other government agencies.

Report on Moises Carranza-Reyes
July 29, 2005
Page 3 of 5

19. He was placed in a cell with approximately 60 other inmates and two toilets. The cell was reportedly filthy and malodorous. Sanitary conditions were poor, for example, the Mr. Carranza-Reyes' clothing was not laundered for the first five days of confinement.

20. Mr. Carranza-Reyes was monolingual in Spanish. On intake, he was asked to fill out a form, using an inmate translator. No Spanish-speaking staff was available for him during this interview and throughout his incarceration. He reported no health problems at intake.

21. Mr. Carranza-Reyes submitted a sick call request on March 4, 2003, but was not seen. He reported chills, and a sore throat. Chills is a symptom of fever, a condition that requires medical diagnosis and treatment. Mr. Carranza-Reyes did not refuse to be seen.

22. He was seen by Nurse Paulsen on March 6, 2003, complaining of fever, body aches, headache, nausea and diarrhea. These are symptoms of infection, some types of which can be life-threatening. Nurse Paulsen chose not to examine her patient, nor did she call the facility medical director, Dr. Bachman. Without a medical history (which would have revealed that the patient had no difficulty with altitudes, such as that in Mexico City), without an examination and with no consultation with a physician, she diagnosed altitude sickness. Altitude sickness does not cause fever, body aches, nausea or diarrhea.

23. Still feeling ill, Mr. Carranza-Reyes again asked for medical attention. Nurse Paulsen saw him on March 7, 2003 for the same symptoms and vomiting. She found that he had a tender abdomen, a potentially life-threatening condition. He had an elevated respiratory rate of 24 breaths per minute. Yet she still did not call the physician.

24. As far as I could tell from the materials presented to me, Ms. Paulsen did not use a nursing assessment protocol and did not write contemporaneous progress notes. The dictated notes for the visits on March 4 and 6, 2003 are unsigned and have the appearance of being authored or approved by the medical director, Dr. James Bachman.

25. Having been informed of inmates having "flu-like symptoms" late March 7, 2003, Deputy Frye was alerted to Mr. Carranza-Reyes. Instead of calling the nurse or doctor, he prescribed over-the-counter medication including ibuprofen and Pepto Bismol at 1:00 A.M. At 3:00 A.M., Deputy Frye took Mr. Carranza-Reyes' vital signs, interviewed him and prescribed oxygen. Mr. Carranza-Reyes' respiratory rate was 34 breaths per minute, a highly abnormal rate. Witnessing the high respiratory rate, to have used the oxygen, Deputy Frye must have realized that Mr. Carranza-Reyes was quite ill. Notwithstanding, Deputy Frye did not call for help.

26. Deputy Fikejs contacted Nurse Paulsen at home at 3:45 A.M., telling her that the patient was having trouble breathing, among other things. Instead of telling the facility to transfer Mr. Carranza-Reyes to the emergency department of the local hospital, she diagnosed him over the phone and ignored his trouble breathing. In fact, she did not appear at the jail until 7:50 A.M. Her patient was vomiting, short of breath and in pain. These are symptoms that even a prudent layperson realizes is a life-threatening emergency. But it wasn't until 11:55 A.M. that she arranged for transportation of her patient to the hospital. There was no reason for this delay. The INS explicitly allows jails to provide emergency transportation, when necessary, to hospitals without getting

Report on Moises Carranza-Reyes
July 29, 2005
Page 4 of 5

permission in advance.

27. Mr. Carranza-Reyes is transferred from Summit Medical Center, the local hospital, to Denver Health. He arrived in critical condition, with pneumonia, sepsis and hypoxia. He had a difficult hospital course, including cardiorespiratory arrests and life-support. He had multiple surgeries including chest surgery and an amputation of his lower extremity. His physicians at Denver Health had not been optimistic about his outcome.

## Opinions

28. Mr. Carranza-Reyes was housed in a crowded and unsanitary cell. There were fewer toilets than the number required by the Colorado Sanitary Standards for Penal Institutions and the American Correctional Association. The toilets were soiled and unsanitary; inmates had nothing to clean them with but their personal linens. Laundry and linen exchange were deficient, in that clean clothing and linens were not available to Mr. Carranza-Reyes. Crowding and unsanitary conditions lead to high stress levels and facilitate the transmission of communicable diseases such as diarrheal illness, tuberculosis and skin infection with drug-resistant organisms. These are serious medical needs. The conditions in this jail fell far below the standard of correctional health care and were demonstrations of deliberate indifference to serious medical needs.

29. Prisoners have a right to privacy concerning their medical information. The use of inmate translators violates this privacy and falls far below the standard of correctional health care.

30. Mr. Carranza-Reyes should have been seen by Nurse Vicki Paulsen on March 4, 2003 when he first became ill with fever. But she did not call him out. She saw him on March 6, 2003 and failed to take a history, failed to examine him, and failed to call a physician for her patient. She did note an elevated respiratory rate of 24, which should have confirmed to her that her patient needed to see a physician, that day. Instead, she exceeded the scope of her license by making a medical diagnosis, one that happened to unsoundly-based and wrong. Failure to take an adequate history, failure to perform a physical assessment, and failure to call a physician in this case fell far below the standard of correctional health care. By this time, it was clear that Mr. Carranza-Reyes potentially had a life-threatening condition and definitely a serious medical need. Her conduct was deliberately indifferent to his serious medical need.[1]

31. The lack of nursing protocols for patients such as Mr. Carranza-Reyes and the inadequate medical records indicate a systemic deficiency in care. This falls far below the standard of correctional health care.

---

[1] A serious medical need is a valid health condition that, without timely medical intervention, will cause (1) unnecessary pain, or (2) measurable deterioration in function (including organ function), or (3) death, or (4) substantial risk to the public health.

Report on Moises Carranza-Reyes
July 29, 2005
Page 5 of 5

32. From 1:00 to 3:45 A.M., Deputy Frye realized that Mr. Carranza-Reyes was in respiratory distress, sufficient for him to have tried oxygen as therapy. Oxygen as therapy, when not used for cardiopulmonary resuscitation is practicing medicine. Deputy Frye was practicing well beyond the scope of his training. Instead of calling for emergency medical assistance, he let Mr. Carranza-Reyes suffer for almost three hours. This falls far below the standard of correctional care and is deliberately indifferent to Mr. Carranza-Reyes' serious medical needs.

33. On March 8, 2003, Nurse Paulsen was cruel. She chose to ignore symptoms of life-threatening illness and delayed Mr. Carranza-Reyes transport to a hospital for more than eight hours since she was notified that he was vomiting and having trouble breathing. This is egregious and unconscionable behavior for anyone, no less a nurse. This inaction falls far below the standard of correctional health care and was deliberately indifferent to serious medical needs.

34. As the medical director for the facility, Dr. Bachman should have had policies and procedures in place to prevent serious harm to acutely ill patients. Insofar as I could tell, there were no nurse protocols used. The medical record-keeping practices were inadequate. Nurse Paulsen was neither trained nor supervised to respond appropriately to acute medical problems. In fact, she was practicing beyond the scope of her license with the knowledge of Dr. Bachman, who either knew or should have known how she was conducting herself professionally.

35. Mr. Carranza-Reyes survived a grueling and painful ordeal. He is left with scars and an amputation, making him unable to find employment. His pain and suffering would have been prevented had he had access to timely medical care for his pneumonia. The care he received at the jail did not come close to being competent.

36. The poor care was due to policies and practices that were encouraged or at least tolerated by the County, the Board of County Commissioners, the Sheriff's Office, Sheriff Fred Wegener, Monte Gore, Vicki Paulsen, and James Bachman, M.D. These poor policies and practices led to inadequate training and supervision of Vicki Paulsen by Dr. Bachman. The inadequate training and supervision, combined with the decisions of Nurse Paulsen were the proximate causes of Mr. Carranza-Reyes' hospitalization, near-death, amputation, other surgery, and pain. The overall system of care fell far below the standard of correctional health care and was deliberately indifferent to Mr. Carranza-Reyes.

Sincerely,

Robert B. Greifinger, M.D.

Attachments

ROBERT B. GREIFINGER, M.D.

EXHIBIT 16

April 27, 2006

William A. Trine, Esq.
Trine & Metcalf, P.C.
1435 Arapahoe Avenue
Boulder, CO 80302-6390

Re:     Moises Carranza-Reyes

Dear Mr. Trine:

This is a supplementary report on the medical care provided to Moises Carranza-Reyes while he was incarcerated in the Park County Jail, March 1 - 8, 2003. My opinions are based on additional materials that I have reviewed since my initial report, dated July 29, 2005.

My updated resume, list of publications, list of testimony and fees are attached.

**Materials Reviewed**

1.  Ambulance records, March 8, 2003;

2.  Deposition and deposition outline of James Bachman, MD;

3.  Deposition outlines of Vicki Paulsen, RN, Daniel Muldoon, Monte Gore (two volumes), and John Bellantonio;

4.  Deposition Exhibit 26 (INS Detention Standard–Medical Care);

5.  Deposition Exhibit 27 (James J. Bachman, MD resume);

6.  Deposition Exhibit 6 (Communicable Diseases);

7.  Deposition Exhibit 4 (Park County Jail Policies and Procedures–Establishment of Health Care Unit Policy and Procedure Manual);

8.  Deposition Exhibit 30 (the Consulate General of Mexico, Denver, Colorado); and

9.  Statement of Edward Allen, October 28, 2005.

**Opinions**

10. Nothing in these documents changes the opinions expressed in my initial report, dated July 29, 2003. In fact my opinions are strengthened.

11. The Defendants (the County, the Board of County Commissioners, the Sheriff's Office,

Supplemental Report on Moises Carranza Reyes
Page 2 of 2
April 27, 2006

    Sheriff Fred Wegener, Monte Gore, Vicki Paulsen, and James Bachman, M.D.) Did not meet the INS standards for contract facilities, specifically to provide primary care, timely arrangements for specialty care and timely arrangements for transport (Bates 1688).

12. The Defendants did not follow their own policies, especially J-121-B (continuity of care), J-121 E (screening), and J-121-F appropriate levels of care (Bates 1699-);

13. The Defendants did not meet their policy and procedure on ethics, specifically to meet established professional standards in keeping with the licensing board in that Vicki Paulsen diagnosed and treated Moises Carranza-Reyes beyond the scope of her license (Bates 553).

14. The Defendants violated their policy on autonomy by compromising medical care for security reasons, resulting in, at least, a three-hour delay in transportation to the hospital (Bates 555).

15. The problems with heating, cooling, crowding, plumbing and laundry are confirmed by Edward Allen and John Bellantonio.

16. In his deposition testimony, Captain Gore confirmed that there was no quality improvement program, no infection control program and no reporting, all of which are required by facility policy and National Commission on Correctional Health Care standards. He agreed that Mr. Carranza-Reyes' privacy was breached by putting his medical records in the "pass-on book." Captain Gore also confirmed that he did nothing to manage the crowding in the jail, even when inmates were sleeping on mats on the floor and that he did not provide or receive written inspection reports.

17. Ms. Paulsen confirmed that there was no place to isolate patients, even though policy required isolation of patients who might transmit communicable disease. She agreed that it was an error for her to leave her patient and go home during his acute illness. And she acknowledged that she knew about the use of oxygen for Mr. Carranza-Reyes, yet she did not consider that an emergency. She stated that Dr. Bachman came to the facility weekly, while Dr. Bachman testified that he only came to the facility twice monthly.

18. Mr. Carranza-Reyes' care fell far below the standard of correctional health care. The Defendants were deliberately indifferent to Mr. Carranza-Reyes' serious medical needs.

Sincerely,

Robert B. Greifinger, M.D.

Attachments

# ROBERT B. GREIFINGER, M.D.

EXHIBIT 17

June 2, 2006

William A. Trine, Esq.
Trine & Metcalf, P.C.
1435 Arapahoe Avenue
Boulder, CO 80302-6390

Re:   Moises Carranza-Reyes

Dear Mr. Trine:

This is a second supplementary report on the medical care provided to Moises Carranza-Reyes while he was incarcerated in the Park County Jail, March 1 - 8, 2003. I am writing this supplement because you asked me to elaborate on Dr. James Bachman's role in this case, as the medical director for the facility.

My prior reports are dated July 29, 2005 and April 27, 2006. My opinions are based on the materials that I had reviewed and listed in the prior reports and the deposition transcript of Vince Markovchick, MD.

My updated resume, list of publications, list of testimony and fees are attached.

Please also note a typographical error in my report dated July 29, 2005, in the first paragraph where I mistyped 2003 as 2002. There may be others, for which I apologize.

**Findings**

1.   The Park County Jail had policies and procedures that were consistent with the standards for health care in jails published by the National Commission on Correctional Health Care.[1] (Park 0550 - 0694) Dr. Bachman was aware of these policies and he approved them annually, in his role as medical director [also referred to as the responsible physician]. (Bachman deposition pp. 11, 14, 24-25, Park 0556, Park 0313) By approving and signing these documents he accepted " . . . responsibility for any omission, commission, or negative outcome which . . ." resulted from deviation from the policies and procedures. (Park 0550) Among other things, the policy requires unobstructed access to health care personnel and services, maintenance of dignity, governance of health staff's own conduct and actions in keeping with established professional standards relative to their level of training or license, monitoring of quality of care. (Park 0551, 0553-4)

---

[1] Standards for Health Services in Jails 2003 and 1996. National Commission on Correctional Health Care. Chicago, 2003 and 1996.

ROBERT B. GREIFINGER, M.D.        PHONE: (914) 693-9205
32 PARKWAY DRIVE         FAX: (914) 674-0113
DOBBS FERRY, NEW YORK 10522-3517        E-MAIL: robert.greifinger@verizon.net

Second Supplemental Report
Moises Carranza-Reyes
June 2, 2006
Page 2 of 3

2. As the responsible physician for the facility, Dr. Bachman was responsible for all final medical judgments, and in cooperation with the health services administrator, for the implementation of all programs and practices related to the jail medical services. (Park 0555, Bachman testimony 51) In addition Dr. Bachman was required to participate in a continuous quality improvement program, including, among other things, review and comment on the adequacy of treatment plans initiated by health care providers, environmental inspections, and reports from the infection control committee. (Park 0559 - 64, 0566-7, 05574-8) The responsible physician is required to provide protocols for nurses evaluation of acutely ill patients. (Park 0627) Medical records are required to be dated and signed, among other things. (Park 0647)

3. Dr. Bachman did not provide any nurse protocols for the facility. (Bachman deposition 26) He did not attend any infection control or quality improvement committee meetings, nor did he inspect the pods, in the period prior to March 2003. (Bachman testimony 53-55, 59 - 61)

## Opinions

4. As I wrote in my report of July 29, 2005, "[t]he lack of nursing protocols for patients such as Mr. Carranza-Reyes and the inadequate medical records indicate a systemic deficiency in care." Dr. Bachman was responsible for developing nursing protocols and for an adequate medical record system, including contemporaneous notes that are signed and dated by the examining health professional. He failed in this duty. This falls far below the standard of correctional health care.

5. I also wrote that "Nurse Paulsen was neither trained nor supervised to respond appropriately to acute medical problems. In fact, she was practicing beyond the scope of her license with the knowledge of Dr. Bachman, who either knew or should have known how she was conducting herself professionally." Dr. Bachman was responsible for training and supervising Nurse Paulsen regarding her medical judgments. He failed in this duty. This falls below the standard of correctional health care.

6. As a result of practices that violated jail policy, Mr. Carranza-Reyes had an obstructed access to an appropriate level of care (physician care at the facility and timely transfer for his life-threatening emergency). His dignity was compromised by the posting of medical information in the "pass-on" log. Ms. Paulsen had a practice of working beyond her training and license. Dr. Bachman declined to participate in environmental inspections, an infection control committee, or a quality management committee, although these were explicit requirements of the facility. Dr. Bachman claims he was not aware of crowding in the jail or of Ms. Paulsen's making inappropriate medical diagnoses, such as altitude sickness in this case. Dr. Bachman did not adequately train or supervise Nurse Paulsen. He did not insure that the facility policies and procedures were enforced. He failed to monitor the conditions on D-pod, and so was never aware of crowding and problems with hygiene. He should have been aware of conditions that could give rise to transmission on communicable disease. Dr. Bachman failed in his duty to perform these duties, duties

that are explicit in facility policy that he approved. This falls below the standard of correctional health care.

### Conclusion

7. In his role as medical director and responsible physician for the jail, James Bachman failed in his duties to inspect, train, supervise, and monitor environmental conditions and quality of care. These were responsibilities that were explicit and consistent with the standard of correctional health care. Dr. Bachman was aware of these duties and he approved them on multiple occasions. As a result of his choices not to attend to these duties, the practices at the jail did not conform to jail policy and standards of care for correctional facilities. As a result of his choices, Mr. Carranza-Reyes suffered grievous harm, physically, emotionally, and occupationally. Dr. Bachman's care fell far below the standard of correctional health care.

8. The jail policies relied on nationally-accepted standards of care for correctional facilities, such as the Park County Jail. Standards of care in correctional facilities have evolved to manage well-known risks. These standards have a purpose which is to minimize harm to patients with actual or potential serious medical needs. Dr. Bachman was aware of the facility policies, based on nationally-accepted standards. His choice to ignore them was deliberate indifference to Mr. Carranza-Reyes' serious medical needs.

Sincerely,

Robert B. Greifinger, M.D.

Attachments

# ROBERT B. GREIFINGER, M.D.

October 9, 2006

William A. Trine, Esq.
Trine & Metcalf, P.C.
1435 Arapahoe Avenue
Boulder, CO 80302-6390

Re: Moises Carranza-Reyes

Dear Mr. Trine:

This is a third supplementary report on the medical care provided to Moises Carranza-Reyes while he was incarcerated in the Park County Jail, March 1 - 8, 2003. I am writing this supplement after my deposition, taken today. The reasons for the supplement are to comment on the reports of three of the defense experts in the case and to correct an error I made in my testimony today.

As I mentioned in my deposition, I have read the reports of Thomas Rosazza, Donald Kearns, M.D., Elizabeth Kraft, M.D. (who I inadvertently referred to as Margaret Kraft in my deposition, and Ivor Garlick, M.D.

1. Mr. Rosazza wrote that the Park County Jail policies and procedures address core standards of the National Commission on Correctional Health Care (NCCHC) and that the NCCHC expects smaller jails to pick and chose which standards to follow. (Rosazza report page 2) The latter statement is patently wrong. Small jails are required to meet all NCCHC essential standards and 85% of the important standards, just as large jails are required to meet these standards. Mr. Rosazza is apparently unfamiliar with NCCHC requirements for accreditation. Although Mr. Rosazza did not list the materials he reviewed to come to his conclusions, if he reviewed the INS standards applicable to the Park County Jail, he apparently missed the INS Detention Standard for Medical Care requirement for the Park County Jail not only to meet NCCHC standards, but to become accredited by the NCCHC. (Greifinger 00674) To the best of my knowledge, the Park County Jail was not accredited by the NCCHC at the time of Moises Carranza-Reyes' incarceration there in 2003.

2. Mr. Rosazza further wrote that staff provided access to care that met constitutional standards. (Rosazza report page 3) This too is incorrect. The evolving standard of decency codified by the Supreme Court in Estelle v. Gamble requires timely access to care that was not provided by the county Board of Commissioners, the Sheriff, and Vicki Paulsen, R.N. The Court further requires timely access to a professional judgement, which in this case would have been judgement by a physician such as Dr. Bachman or the emergency department at Summit Medical Center. Mr. Carranza-Reyes was not provided with timely access to a physician. As a consequence, he suffered the injuries that I

---

ROBERT B. GREIFINGER, M.D.
32 PARKWAY DRIVE
DOBBS FERRY, NEW YORK 10522-3517

PHONE: (914) 693-9205
FAX: (914) 674-0113
E-MAIL: robert.greifinger@verizon.net

Third Supplemental Report
Moises Carranza-Reyes
October 9, 2006
Page 2 of 3

testified to in my depositions.

3. Mr. Rosazza wrote that the budget of the facility was adequate. (Rosazza report page 5). This is clearly not the case, for example, there was no nursing backup for Ms. Paulsen when she was on sick leave and there were insufficient officers on-site to transport Mr. Carranza-Reyes to the Summit Medical Center in a timely manner.

4. In her undated report, Elizabeth Kraft, M.D. wrote that there are no national standards for medical [sic] protocols. (Kraft report page 2) I assume she was speaking of nursing protocols. She is incorrect. There are national standards for such protocols, as I testified to in my deposition today. These include J-41 from the NCCHC 1997 standards and J-E-11 in the 2003 standards. Dr. Garlick testified similarly. (Garlick report page 2) He is incorrect as well.

5. I disagree with Dr. Kraft's opinions for "responsible physicians." (Kraft report page 1) I disagree with this. I also disagree with Dr. Kraft's opinions regarding Dr. Bachman's supervision and training, the need for nursing protocols, the accountability for medical care in his role as medical director, the responsibility for administrative functions such as infection control and quality management. (Kraft report pages 2-4)

6. Dr. Kraft has little experience with jail health care other than her assistance with a single project for the Colorado Department of Corrections, an agency that operates prisons, not jails.

7. I disagree with Dr. Garlick's contention that Dr. Bachman was medical director "in name only." (Garlick report page 1) If he was contracted to be the medical director, he was the medical director. This role has explicit responsibilities, outlined in Park County Jail policies and procedures and in NCCHC standards.

8. I disagree with both Dr. Kraft and Dr. Garlick that Dr. Bachman is not responsible for administrative functions because he was not asked. Physicians are professionals who are expected to act independently to carry out their assigned duties.

9. I disagree with Dr. Garlick regarding his training and supervision of Nurse Paulsen. (Garlick report page 2) I disagree with Dr. Garlick's opinion that Dr. Bachman did not exhibit deliberate indifference to serious medical needs. (Garlick report pages 3 - 4)

10. It was interesting for me to note that many of the sentences in Drs. Kraft and Garlick's reports are identical. It appears to me that the reports were, for the most part, written by one person. I question whether the opinions expressed were reached independently.

11. I made an error during my deposition testimony earlier today. Although I testified that I believed that I had relied on the deposition transcript or deposition summary of Moises Carranza-Reyes, I have since discovered that I had not read either of these documents. I had relied on information regarding his testimony from other documents and from conversations with William Trine, attorney for the plaintiff. I apologize for this mistaken recollection.

12. I plan to review the deposition testimony and/or deposition summary prior to the trial in

Third Supplemental Report
Moises Carranza-Reyes
October 9, 2006
Page 3 of 3

this case.

13. If asked by counsel for defendants, I will make myself available for further deposition testimony on the issues that I address in this supplemental report, prior to the trial.

Sincerely,

Robert B. Greifinger, M.D.