

EXHIBIT

A-4

1

1   IN THE UNITED STATES DISTRICT COURT
    FOR THE DISTRICT OF COLORADO
2
    Case No. 2005-WM-377 (BNB)
3   _____

4   DEPOSITION OF:  HELEN M. WOODARD, M.A.
    July 12, 2006
5   _____

6   MOISES CARRANZA-REYES,

7   Plaintiff,

8   v.

9   PARK COUNTY, a public entity of the State of Colorado and
    its governing board, THE PARK COUNTY BOARD OF COUNTY
10  COMMISSIONERS; PARK COUNTY SHERIFF'S OFFICE, a public
    entity of the State of Colorado; FRED WEGENER,
11  individually and in his official capacity as Sheriff of
    Park County, Colorado; MONTE GORE, individually and in
12  his capacity as Captain of Park County Sheriff's
    Department; VICKIE PAULSEN, individually and in her
13  official capacity as Registered Nurse for Park County,
    Colorado; JAMES BACHMAN, M.D., individually and in his
14  official capacity as Medical Director of the Park County
    Jail,
15
    Defendants.
16  _____

17

18  TAKEN PURSUANT TO NOTICE on behalf of the Defendant Park

19  County at 1435 Reed Street, Lakewood, Colorado 80214-5368

20  at 4:04 p.m. before Sylvia E. Noneff, Registered

21  Professional Reporter and Notary Public within Colorado.

22

23

24

25

7

1    care plan for an individual such as Mr. Carranza-Reyes?

2         A.    We use a pretty straightforward process.

3    And so typically I see the client and interview them, try

4    to get an understanding from their perspective of what

5    their problems are, what the history is, look at the

6    basic psychosocial issues, and then the history of the

7    disability and the history of their treatment.

8              And following that, I review medical

9    records -- that's what's sitting on the corner of this

10   desk -- and do a short summary of medical records.  I

11   mean, sometimes a short summary is still pretty long --

12   and then outline a life care plan based on my experience

13   and the medical records and begin to make contacts with

14   the treating people in the case.

15             And I'm particularly interested in current

16   treaters of the client, because those are the people who

17   usually have been seeing them about what their current

18   problems are.  And that's what we did in this case.

19        Q.    Okay.

20        A.    As part of that, we did a vocational

21   assessment with testing and a survey in Mexico of

22   problems that people with disabilities have in obtaining

23   and retaining employment, and we also looked at some of

24   the issues here.

25        Q.    Persons with disabilities such as Mr.

13

1      One of the other counselors is, and she has someone

2      assigned to her.

3            Q.    Got it.  But two counselors for every case?

4            A.    Yes.

5            Q.    And how many counselors work here?

6            A.    Nine -- well, two of them aren't working

7      because they just had babies, but they're coming back.

8            Q.    Understood.  Okay.  And how long has Miss

9      Morgan worked with you?

10           A.    I think she's been here three years, maybe a

11     little bit longer than that, even.

12           Q.    And during -- does she have prior experience

13     being a counselor?  I guess it would be a rehabilitation

14     counselor.

15           A.    She did not.  She has training in case work.

16           Q.    Okay.

17           A.    And I can't remember what her undergraduate

18     agree is offhand.  And then I trained her in life care

19     planning --

20           Q.    Right.

21           A.    -- and she's been to some seminars.

22           Q.    About how many life care plans has Miss

23     Morgan assisted you with?

24           A.    She probably has a better idea of that than

25     I do, but I suppose 40.

15

```
1    right?

2         A.    Yes.

3         Q.    Did anybody else serve as an interpreter?

4         A.    No.

5         Q.    Ms. Valenzuela helped with contact with Mr.

6    Carranza-Reyes to communicate with him?

7         A.    Exactly.

8         Q.    And then helped with surveying information,

9    presumably in conjunction with Miss Morgan, for data out

10   of Mexico?

11        A.    That's right.

12        Q.    I understand.  Okay.  Have you ever done a

13   life care plan involving the kind of data that we're

14   talking about here with the country of Mexico before?

15        A.    Yes.

16        Q.    How many?

17        A.    It's not real common, but I've probably had,

18   in the course of the last 10 or 12 years, half a dozen.

19        Q.    Would there be any way, if you refer to

20   Exhibit 47, that you could tell me any that involved

21   that, that are on this list or --

22        A.    Well, if they happen to be on the list.

23        Q.    Because they may or may not be, because they

24   may not have involved testimony?

25        A.    Right.
```

1    use some additional diagnostics, and I understand there's

2    not -- he doesn't have insurance.  There isn't a resource

3    for that.

4              And his current person who treats him is a

5    registered nurse, and she made recommendations for some

6    of those evaluations, which we included.  And she -- she

7    provided some information about both current status and

8    future needs, and so we used that information in the life

9    care plan.

10             And then we got information about costs.

11   And we used costs in the United States, although we did a

12   little bit of a survey to find out how costs in Mexico

13   compare and to understand how the Mexican health care

14   system works.

15        Q.    Okay.  How much time would the -- well, let

16   me ask it this way:  Were you present for the interview

17   with Mr. Carranza-Reyes?

18        A.    I did the interview.

19        Q.    You did the interview.  How long was it?

20        A.    I'll have to look at my intake notes, but it

21   was probably -- I mean, not my notes, but my time sheet.

22   It was probably two hours.

23        Q.    With -- do you speak Spanish?

24        A.    No.

25        Q.    So you were needing the interpretation of

19

1    Miss Valenzuela to communicate with Mr. Carranza-Reyes?

2         A.    Yes.

3         Q.    Was anyone else present?

4         A.    No.

5         Q.    So just the three of you?

6         A.    Yes.

7         Q.    Do you have a kind of standard set of

8    questions that you ask someone in that kind of interview?

9         A.    I have a pretty structured initial interview

10   I go through.  And sometimes, you know, you wander off

11   base with the client, but I usually try to get the same

12   information in the initial interview of every client.

13        Q.    Okay.  And that information is the kind of

14   things that you've already talked about?

15        A.    Yes.

16        Q.    Would -- when you are analyzing someone in

17   terms of their needs, I assume part of it is medical, and

18   part of it is kind of -- I think your terminology might

19   be psychosocial resulting from their medical issues or

20   their disability or their limitations; is that fair?

21        A.    Yes.

22        Q.    So when you're asking a client like Mr.

23   Carranza-Reyes questions, are you wanting to figure out,

24   Okay, what can you not do on a day-to-day basis because

25   of your limitations, or are you asking him, How much does

1        Q.      -- is that correct?  All right.  And then

2    I'll represent to you, and then you can confirm or tell

3    me whatever is right or wrong about what I'm about to

4    say:  Number 49 is a copy of the file that we received

5    from your office.

6        A.      Yes.

7        Q.      And the only difference is, it's a copy, and

8    we put Bates numbers on it so that we could talk about

9    specific pages today.

10       A.      Yes.  This is labor market information and

11   various and sundry information with regard to health care

12   issues.  And then it has the testing that was done --

13   which shouldn't have been photocopied, except you got it

14   anyway -- and the various surveys we did for costs.

15       Q.      Okay.  Am I correct in understanding that

16   the only other thing that's in your file is medical

17   records on Mr. Carranza-Reyes?

18       A.      Yes.

19       Q.      And that would be the approximately 2-foot

20   file of paper that's sitting on your desk in front of me?

21       A.      Well, it's that pile of paper, those two

22   notebooks, and that pile of paper.

23       Q.      Okay.

24       A.      It's a lot.

25       Q.      I understand.  I have a set of it, so . . .

24

```
 1               Do you have a sense of approximately how
 2     many pages we're talking about, just so that the record
 3     can be clear?
 4         A.      Probably 3,000.
 5         Q.      Okay.  And the -- you used the medical
 6     records that you received and reviewed to create the
 7     Medical Records Review portion of your April 28th report;
 8     is that right?
 9         A.      Yes.  And, as I say, it's not -- if you
10     wanted to know everything that happened to him, you
11     should review the records.
12         Q.      I understand.
13         A.      But this just gives the basic information
14     about what happened.
15         Q.      Okay.  Did you personally review all of
16     these records, or did someone else?
17         A.      Char reviewed part of them, and I reviewed
18     part of them.
19         Q.      And then you took notes on it?
20         A.      No.  We put it directly into the computer,
21     and it becomes the report.
22         Q.      Got it.  Okay.  Would you -- did you have
23     access to the records before you interviewed Mr.
24     Carranza-Reyes?
25         A.      No, we didn't, because -- I know that
```

25

1    because we had to request them after.  And I interviewed

2    him -- I wouldn't have reviewed them anyway --

3            Q.      Okay.

4            A.      -- because I see the client before I review

5    the records.  But we requested them following the

6    interview.

7            Q.      Okay.  Any other documentary source of

8    information that is not -- that you used in forming your

9    opinion, as reflected in the April 28th report, that's

10   not reflected -- that's not contained in Exhibit 49 or

11   Mr. Carranza's medical -- Mr. Carranza-Reyes's medical

12   records that you have in your possession?

13           A.      I don't think so.

14           Q.      Okay.  All right.  Vocational testing was

15   used for Mr. Carranza-Reyes; is that correct?

16           A.      Yeah, he did vocational testing.

17           Q.      And that was done by Mr. Smith of your

18   office?

19           A.      Yes.

20           Q.      Do you interpret the results of the

21   vocational testing, or does Mr. Smith?

22           A.      Well, he scores them.  It's a standardized

23   scoring process.  And I interpret what they mean in the

24   context of this client.

25           Q.      Okay.  So you can analyze what the scores on

26

1    these various vocational tests mean in terms of your

2    client's capacity to work?

3          A.     To do various tasks, yeah.

4          Q.     Okay.  Including work?

5          A.     Well, work is -- work is generally a series

6    of tasks.

7          Q.     Okay.  Understood.  So that the vocational

8    testing would be more basic than can this person work or

9    not?  It would be an analysis of what different tasks

10   might a particular job require, and then can this person

11   do those particular tasks?  No?

12         A.     No.  You've got it backward.

13         Q.     Okay.

14         A.     The testing tells you what a person's

15   strengths or weaknesses are, and you can then compare

16   their strengths and weaknesses with demands of particular

17   kinds of jobs.

18         Q.     Got it.  That makes sense to me.  Okay.

19   Then you did two interviews with Meredith Poppish; is

20   that correct?

21         A.     Yes.  Actually, those were done by Char.

22         Q.     Okay.  But presumably Char shared with you

23   the information that she learned from Miss Poppish?

24         A.     That's correct.

25         Q.     Did you talk to anybody else?

27

1          A.      Not besides Moises.

2          Q.      Okay.  Did you --

3          A.      I mean, other people were contacted, but not

4    with specifics regarding this client.  That is, we got

5    cost information, we got information about prosthetics,

6    but not with regard to this client per se.

7          Q.      Your -- the file that was sent to me has

8    charts that have a variety of data on them that includes

9    information, the source of that data, that are both in

10   the United States and Mexico.  And that's what you're

11   talking about?

12         A.      Yes.

13         Q.      So that's a collection of information about

14   how much a visit to a particular specialist might cost in

15   both countries?

16         A.      Yes.

17         Q.      All right.  So any other health care

18   provider of Mr. Carranza-Reyes, other than Miss Poppish,

19   the only information you have about their treatment or

20   opinions about Mr. Carranza-Reyes is whatever's in his

21   medical records that were looked at?

22         A.      Yes, that's correct, because he moved out of

23   the medical system into this clinic, and all of his

24   current treatment has been through the clinic.

25         Q.      Okay.  Did you talk to Bill Trine about Mr.

37

```
 1    education.  And at least that would give him something to
 2    do, an outlet.
 3         Q.     What do you know of his immigration status?
 4         A.     He's allowed to stay here -- what did he
 5    say?  He doesn't have a green card, so he's not able to
 6    work.  And he said his father was a citizen, and so he
 7    therefore ought to be entitled to become a citizen.  But
 8    I don't know where in the process that is.
 9         Q.     Okay.
10         A.     Let me see what he -- I think that's all I
11    know about it.
12         Q.     Okay.  Do you have an understanding of how
13    the immigration system in the United States works for
14    someone like Mr. Carranza-Reyes?
15         A.     Probably about as well as the people reading
16    the newspaper.  I've had a lot of clients who were here
17    illegally who became injured, and some of them have
18    become citizens, and others of them are still allowed to
19    stay here because of their medical situation.  But they
20    don't have a legal status, so they can't get a driver's
21    license, and they can't get a job.
22         Q.     Okay.  So there's a -- I mean, is it your
23    understanding that there's some federal government policy
24    that indicates if you get injured in the United States,
25    we will give you some kind of permit to allow you to stay
```

42

1        A.      Char did.

2        Q.      Okay.  And then you got the information that

3    Miss Poppish conveyed to you -- conveyed to Char from

4    Char?

5        A.      Yes.

6        Q.      Okay.

7        A.      She actually wrote a little note about it.

8    It's in the file.

9        Q.      And Miss Poppish is a nurse practitioner?

10       A.      That's true.

11       Q.      Okay.  Then the Current Status -- take a

12   look at the next page, page 4.  It looks like Miss

13   Poppish was interviewed for a second time on April 17th

14   of '06.

15       A.      Yes.

16       Q.      Would that have been Miss Morgan again?

17       A.      Yes.

18       Q.      Okay.  And again, she conveyed the

19   information from Miss Poppish.  She took notes, and then

20   you talked to her and reviewed the notes; is that right?

21       A.      Yes.

22       Q.      The Current Status part of this report is

23   based on information from who?

24       A.      It's information from Moises, from the

25   provider, and a little from the medical records.

45

1      A.      These are United States costs.

2      Q.      Okay.  And there isn't -- you didn't do, as

3   part of your life care plan, Mexico pesos; is that

4   correct?

5      A.      We did not convert this to Mexico pesos, and

6   we didn't convert it to costs in Mexico.

7      Q.      But you did some of that data in -- some of

8   that data research is in your file?

9      A.      That's right.

10      Q.      Okay.  How come it wasn't done in the

11   preliminary life care plan?

12      A.      The issue of whether he stays here or goes

13   to Mexico is kind of an interesting one, and it's -- it's

14   caught up in that legal issue that I don't know about,

15   as -- as we discussed earlier.  If he stays here, which

16   is where he is, this plan would be generally valid for

17   the United States.

18              If he were to go to Mexico, if he were to be

19   deported, he would have an option of receiving medical

20   care two different ways.  The first would be under the

21   medical system, under the national medical system, which

22   has a lot of faults.  And then the other way would be to

23   purchase private care in Mexico, which might be somewhat

24   cheaper than here, but would be hard to access without

25   American dollars.

47

1          Q.       And they would see people who have the
2     ability to pay for them --
3          A.       Right.
4          Q.       -- pay for their services?
5          A.       Yes.
6          Q.       Can one get private health insurance to get
7     that kind of thing paid for at that secondary system in
8     Mexico?
9          A.       I don't think so.  I looked for it, but I
10    didn't find it.
11         Q.       Okay.  So it's --
12         A.       I think you either have the means to pay, or
13    you're thrown into that three-tier (sic) system in -- in
14    the national health system.
15         Q.       Okay.  Let me sort of ask you some kind of
16    macroquestions about your report before we move on to
17    something else.  Does your -- does this expert report,
18    dated April 28, '06, marked as Exhibit 48, accurately
19    reflect the scope of your expert opinion in this case?
20         A.       With the caveat that if we had additional
21    information, we might be able to fill out some of the
22    things that we left to be determined or to narrow the
23    range of costs in some cases.  And probably the thing
24    that it doesn't address is what I told you before, which
25    is with his -- in his current situation he's not

48

1    employable here, and he's likely not employable in

2    Mexico, and so he's in the worst of all -- of both

3    possible worlds.

4            If -- if his legal status were to change

5    here, and he had good circumstances with regard to his

6    medical care, then maybe we could do some rehabilitation

7    with him.  And that would be an additional cost to

8    everything that's in here.

9        Q.    Okay.  Do you hold any opinions about Mr.

10   Carranza-Reyes that aren't reflected in this report?

11       A.    He's a really nice guy.

12       Q.    Okay.

13       A.    I think he's a nice guy.

14       Q.    Well, I spent two days with him taking his

15   deposition.  I agree with you.  He's a nice guy.  Okay.

16   Is it fair to say that an opinion of your, other than the

17   fact that your client's a nice guy, isn't -- if such an

18   opinion is not reflected in your report, you don't

19   anticipate testifying about such an opinion in Federal

20   Court if this were to go to trial?

21       A.    Or unless I've expressed the opinion in my

22   deposition.

23       Q.    Fair enough.  Okay.  Why is your report

24   called a preliminary report?

25       A.    Because it's missing information.  And if we

1          Q.     Okay.  The medical needs analysis that you

2     have done in your report, is there a basis for the

3     medical needs analysis other than information you

4     received from Miss Poppish?

5          A.     And my experience?

6          Q.     And your experience.  That's the only other

7     thing?

8          A.     Those are the primary things.  And, you

9     know, there's not anyone who's seeing him to give an

10    opinion, other than Miss Poppish and, apparently, me.

11         Q.     Understood.  Okay.  Am I correct in

12    understanding that you don't have a specific medical

13    background; is that --

14         A.     Only as it applies to rehabilitation

15    counseling.  And that means that I'm supposed to

16    understand what medical conditions are and what kinds of

17    providers people should be seeing, and that I should be

18    able to make appropriate assessment referrals.

19         Q.     And that -- is it fair to draw a distinction

20    between -- that what you do is a rehabilitation

21    assessment, as opposed to a medical assessment?

22         A.     Sure.  It's rehabilitation.

23         Q.     And that would be a distinction that makes

24    sense to you to draw?

25         A.     Yeah.  I don't do medical assessments --

51

```
1        Q.      Okay.
2        A.      -- but I send people for medical
3   assessments.
4        Q.      I understand.  And you would -- your
5   expertise as a rehabilitation counselor would allow you
6   to know what type of medical assessment might be
7   appropriate for a particular client, based on what their
8   needs are?
9        A.      Yeah.  I'm supposed to recognize that if
10  somebody comes in with an amputation, the right kind of
11  doctor to see would be a rehab doctor or an orthopedist.
12       Q.      Okay.  And if they come in with headaches,
13  it would be a neurologist?
14       A.      Or a pain management specialist.
15       Q.      Okay.  Does it -- does the fact that Miss
16  Poppish is a nurse practitioner instead of a physician
17  undercut any of the information that is -- you've gotten
18  from her in terms of a medical assessment, in your
19  opinion?
20       A.      I don't think so in this matter.
21       Q.      Okay.
22       A.      I think a lot of medical care, especially to
23  poor people in our country, is provided by nurse
24  practitioners.  And people rely on them and get all of
25  their primary care and a lot of their specialty care from
```

53

1       A.      I don't.  I know they're really busy.  I've

2    had other clients who have been treated there, but I

3    don't know anything about them other than that.

4       Q.      Do you know how Mr. Carranza-Reyes is paying

5    for the services at Clinica Campasina?

6       A.      No.

7       Q.      All right.  Let's go look at the life care

8    plan part of Exhibit 48, if you would.  And what I want

9    to ask you globally is, you indicated that this life care

10   plan is based on Mr. Carranza-Reyes staying in the United

11   States; is that right?

12      A.      These are United States costs.  The life

13   care plan would still be the same, but the costs would

14   change to pesos, and the range of costs could conceivably

15   change.

16      Q.      Okay.  Did you do any assessment of the

17   availability of all of the services that are on this life

18   care plan in Mexico?

19      A.      Yeah.  You've got them.  Many of the

20   services are -- are there.

21      Q.      Okay.  So it's a resource issue in Mexico;

22   it's not a health care availability issue?

23      A.      Well, it depends to a large extent on where

24   you're living as to what's available.  And access to --

25   to pure medical resources is probably less of an issue

54

1    than access to technology and, more importantly, to

2    accessibility.  Because there are not -- Mexico is a

3    really old country with a lot of places that are just

4    basically inaccessible to someone with mobility

5    impairments, even mild mobility impairments.

6         Q.    If -- do you know where Mr. Carranza-Reyes

7    lived when he was last residing in Mexico?

8         A.    Mexico City.

9         Q.    Presumably, that would have the most access

10   to medical care of anyplace that he could live in Mexico,

11   or is that wrong?

12        A.    I think that it has the variety of medical

13   specialists that he would need.  I think access is a real

14   big issue, because it's huge.  It's, what, 22 million or

15   24 million.  And just finding the people and being able

16   to get to where they are could be a huge issue for him.

17        Q.    Because of his mobility limitations?

18        A.    Because of his mobility.

19        Q.    Did you do any analysis of the availability

20   of the items listed in the life care plan if Mr.

21   Carranza-Reyes' only access to medical care in Mexico is

22   through the national health insurance?

23        A.    It -- he would probably be treated in their

24   Level I hospitals, which are the lowest level of care,

25   because he -- it wouldn't be an acute medical situation

57

1    just came back.  I was amazed.

2         Q.    I understand.  Take a look at the equipment

3    on the last page of your life care plan, if you would.

4    Were all of these available in -- would all of this --

5    terrible question.  I apologize.  Are all of the items of

6    equipment that you have listed here available in Mexico?

7         A.    Of course.  You might order them from a

8    medical supplier in Texas, or you might order them from a

9    medical supplier down there, but with today's shipping --

10   I mean, DHL will deliver anything anywhere.

11        Q.    That's true.  Okay.  Let me ask you about a

12   couple of these.  When you -- the item "Manual

13   wheelchair," the cost is $2,000 to $4,000 in United

14   States dollars, correct?

15        A.    Yes.

16        Q.    And that's a range based on the type of

17   manual wheelchair; is that right?

18        A.    Yes.

19        Q.    And then your opinion is, the sort of

20   half-life, if you will, of a manual wheelchair as a

21   durable medical equipment is, it would require

22   replacement every five to seven years; is that right?

23        A.    In this circumstance.  It could be more

24   frequent than that if it was used hard or daily.

25        Q.    When I would do an average of that cost,

62

1    percent less in Mexico"?

2          A.    Right.

3          Q.    What does that mean?

4          A.    That means what it says:  Research says 66

5    percent less in Mexico.

6          Q.    And --

7          A.    But that isn't what we found.

8          Q.    And what you found was about a 48 percent --

9          A.    Right.  And it varies quite a bit by -- I

10   mean, I don't think you can average these, because it is

11   a lot different based on different aspects of the care.

12         Q.    Okay.  Depending on what the nature of the

13   care is?

14         A.    That's right.

15         Q.    Let me understand the C.N.A. care systems

16   piece.  When it says 22 hours -- $22 in United States

17   dollars an hour with a four-hour minimum, what does that

18   mean?

19         A.    That means that the agencies that provide

20   that care, the average cost was $17, but they won't come

21   in for one hour.  They only come in for a four-hour

22   shift --

23         Q.    Okay.

24         A.    -- or more.

25         Q.    And when the data there is $88 per day, how

COFFMAN REPORTING          303.893.0202
* SUBJECT TO CONFIDENTIALITY DESIGNATIONS *

1        Q.      Oh, okay.  All right.  So when --

2        A.      So when you go shopping, and it says this is

3   $650, and you think, My God, that's an expensive pair of

4   earrings --

5        Q.      They're using that as a shorthand.  They

6   don't have a symbol for the pesos, other than the dollar?

7        A.      Well, they use a dollar sign in front of it.

8        Q.      Got it.  Okay.  That's helpful.  Take a look

9   at -- beginning on page 52.

10       A.      It's blank.

11       Q.      I understand.  But what I wanted to show you

12   is that this is your equipment part of your folder, of

13   your file that begins, and then on 53 is the data on

14   equipment.  Does that seem right to you?

15       A.      Well, this is just, yeah, different kinds of

16   equipment.

17       Q.      Right.  Okay.  I don't see any information

18   about the cost of equipment in Mexico.  Am I missing

19   something --

20       A.      No.

21       Q.      -- or was that not something you did?

22       A.      We didn't do that.

23       Q.      Why?

24       A.      First of all, because we didn't -- we didn't

25   contact Mexican suppliers and try to describe what we

68

1          Q.      -- just to make sure we have a record of it.

2     Page 80 of your file is -- reflects a telephone

3     conversation between Miss Morgan with Mr. Carranza-Reyes

4     of December 14, 2005, using Miss Valenzuela as an

5     interpreter?

6          A.      Yes.

7          Q.      And you weren't present for that

8     conversation; is that correct?

9          A.      That's correct.

10         Q.      The next page, page 81, is information that

11    you -- that Miss Morgan asked of Mr. Trine's office; is

12    that right?

13         A.      These are things that we knew we were

14    missing that we needed.

15         Q.      Okay.  And --

16         A.      You know, it's really hard to know what

17    you're missing.

18         Q.      I understand.  And this information is now

19    amongst the medical records that you have in your

20    possession?

21         A.      Yes.

22         Q.      You got this information?

23         A.      Yes.

24         Q.      Take a look at page 82.  Do you recognize

25    this handwriting?

70

1    83 through 93.

2         A.    Yes.

3         Q.    I assume that this is the notes from your

4    initial interview with Mr. Carranza-Reyes that you said

5    was about two hours?

6         A.    Yes, that's correct.

7         Q.    And these are your notes?

8         A.    That's right.

9         Q.    Okay.  All right.  Pages 94 through 97 is

10   the personal data sheet?

11        A.    Right, which was actually completed by Deena

12   Valenzuela.

13        Q.    Okay.

14        A.    So that's her handwriting and his signature

15   on the signature block.

16        Q.    Right.  And it would -- this is dated the

17   same date as your notes of your initial meeting with him,

18   so I -- from a process standpoint, he came into your

19   offices and completed the personal data sheet here --

20        A.    Yes.

21        Q.    -- with the assistance of Miss Valenzuela?

22        A.    Yeah.

23        Q.    The next section is what's -- it looks like

24   a two-page sort of write-up of what's called The Mexico

25   Economy.  And if I'm guessing, S.B. is the individual who

74

1    same case as in Mexico.

2         Q.    Okay.

3         A.    So I was just interested in an overview.

4         Q.    So if there was data, for instance, from a

5    national statistical institute that publishes data by --

6    from Mexico or the Bank of Mexico, if it's not reflected

7    in the data that Shannon developed, you don't have access

8    to that data?

9         A.    Of course I have access.  I don't have it,

10   but I could get -- presumably pull it up --

11        Q.    Okay.

12        A.    -- either write for it or get it online.

13        Q.    Okay.  But that wasn't data that was

14   utilized by you in preparing your expert report in this

15   case; is that correct?

16        A.    No.  In fact, I didn't deal with Mexico in

17   my expert report.

18        Q.    Why not?

19        A.    I think we already discussed that.  But in

20   terms of Moises, his preference would be to stay in the

21   United States, if that's possible.  And from a legal

22   standpoint, I think he still has to work that out.  It

23   seemed unnecessarily complicated, since his desire is to

24   get treatment here and to remain here.  And so I got

25   information that would allow me to issue a report if I

80

1     Q.     Okay.

2     A.     So technically, that's not a valid test in

3   terms of the standardization, so his score isn't really a

4   standardized score.

5     Q.     Why; because it's typically a timed test,

6   and --

7     A.     Well, it's a timed test, and the client's

8   supposed to read the questions.  But I wanted to know --

9   I was more interested in knowing what he knew than

10  sticking straight to the standardized.  If I -- he would

11  not have been testable in that area.

12    Q.     Understood.  What about the Peabody

13  Individual Achievement Test?  Does the same problem exist

14  there?

15    A.     The same problem exists there.  And we only

16  administered the math part of that.  And how that test is

17  administered is that the client looks at four pictures.

18  And the question is asked and interpreted, and then the

19  client points to the right picture.

20    Q.     But if an English-speaking person was taking

21  the test, they would read the question, right?

22    A.     No.

23    Q.     Oh, they wouldn't?

24    A.     Right.

25    Q.     The same methodology exists for the

82

1   validity of these results because the standardization or

2   norms are English-speaking?

3       A.    Oddly enough, I don't think so.

4       Q.    Okay.

5       A.    They may -- they may understate his actual

6   abilities to a small extent.  It's very unusual to have

7   someone who comes into our office who is a non-English

8   speaker overall do as well as he did.

9       Q.    Okay.

10      A.    And so we know that language is a real issue

11  for some people.  Moises didn't have that same issue,

12  however, and I think these are valid results for him --

13      Q.    Okay.

14      A.    -- within the constraints of what we were

15  trying to find out.

16      Q.    I understand.  But you understand my point

17  that the norm of, say, the Flanagan Industrial Test would

18  have been English speakers, right?

19      A.    Oh, yeah, these are normed on English

20  speakers.  But the pattern test, for instance, is a

21  nonverbal test.

22      Q.    Understood.  So --

23      A.    And so --

24      Q.    -- it shouldn't make a difference,

25  because -- if Mr. Carranza-Reyes understood the

1   test.  And this -- what this measures is how fast you are

2   with common hand tools.

3         Q.     Right.  Okay.

4         A.     And we found that he was at least average in

5   all the dexterity testing.

6         Q.     Do you think it matters that the norm is

7   English speakers in those kind of dexterity tests?

8         A.     Not really.  Usually people kind of like

9   these tests.  It gives them a chance to compete against

10  themselves, because you give more than one trial.  And if

11  they understood the instructions, which you know pretty

12  quick if they're able to do the test, then I think it's

13  usually a pretty valid representation of their skills.

14        Q.     Are there any vocational tests that you're

15  aware of that have a norm of more of a worldwide

16  population?

17        A.     Not -- no, huh-uh.  There -- you can find a

18  few tests that are not normed for Spanish, but where

19  Spanish -- where the Spanish language is used --

20        Q.     Okay.

21        A.     -- and you wouldn't need an interpreter.

22        Q.     Okay.  But the norm wouldn't be a

23  Spanish-language population?

24        A.     No.

25        Q.     The infrastructure of this kind of testing

1    you -- your office did, do you have an opinion of Mr.

2    Carranza-Reyes' ability to work from a physical

3    perspective?

4         A.     I don't think he can work right now.   I

5    think that, first of all, he has the problem with the

6    prosthesis and the pain.   And for him to tolerate even

7    standing and walking around a work site, that has to be

8    resolved.   Secondly, he has no green card, and that's

9    going to be a big issue.   And we don't advise people to

10   go get a job if they don't have legal documents.   And so

11   that's going to be an issue for him here.

12              And I think in Mexico it's a huge problem,

13   because the economy is not as good, and the jobs there

14   tend to be a lot harder, and the work settings tend to be

15   a lot harder.   And so I guess I think that the likelihood

16   is, he is not going to work with his present level of

17   education in English without a green card here and

18   without resolving his physical issues.

19        Q.     And when you say "his physical issues,"

20   you're talking about what we talked about before, related

21   to his prosthesis?

22        A.     Related to the prosthesis.   And, of course,

23   the nurse's concern is from a pulmonological standpoint,

24   because he has a lot of fatigue, and, of course,

25   operating a prosthesis takes a lot of energy.   So if you

88

1    also have a pulmonary problem that makes you have less

2    breath, then it can be a big issue, particularly in jobs

3    where you have to walk around.  I think that needs to be

4    evaluated.  I don't know how -- what the interplay might

5    be there.

6         Q.    Okay.  But there are jobs that exist in the

7    American economy -- and setting aside his inability to

8    work on a legal basis in the United States, assuming he

9    had an ability to work legally in the United States -- he

10   could do -- there are jobs that exist that are -- that

11   would be within his education and experience level that

12   he could be sitting at a workbench, correct, working with

13   his hands?

14        A.    Well, it would have to be an unskilled,

15   sedentary job where English wasn't a requirement, and

16   those are relatively few.  A lot of the jobs which are

17   done by immigrants are not bench work.  They're heavier

18   physical labor.

19             I mean, you walk into meat-processing

20   plants, turkey-processing plants, a lot of the heavy

21   warehousing, you go do job surveys in those places, and

22   there's a huge immigrant population doing those jobs.

23   And they're heavy, and they occur in environments that he

24   wouldn't be able to tolerate.

25        Q.    Understood.

93

1       A.      But you really make it much easier for them

2    to function.  And if you have -- if you have no skills,

3    and you're illiterate, and you can't drive to work, and

4    you -- you know, the barriers he faces here or presently

5    in Mexico are really severe, so it's less likely than not

6    that he will return to work.

7       Q.      Do you understand that -- or do you know

8    that Mr. Carranza-Reyes regularly drives a car?

9       A.      I know he does.

10      Q.      So he at least physically can?

11      A.      Yes.  But in the long run, you have to worry

12   about legally.

13      Q.      All right.  As part of this vocational

14   assessment, did you do a labor market survey for Mr.

15   Carranza-Reyes in either the United States or Mexico?

16      A.      No.

17      Q.      Why not?

18      A.      I relied on my past experience in both those

19   places.  And we already had a huge amount of time into

20   this case, and it didn't seem reasonable to me to repeat

21   what I already knew.

22      Q.      I understand.

23              (Deposition Exhibit 50 was marked.)

24      Q.      I'm handing you what's been marked as

25   Exhibit Number 50.  Do you recognize this?

95

```
 1    not vice versa --

 2         A.      Exactly.

 3         Q.      -- for her to complete her report in this

 4    case?

 5         A.      Exactly.

 6         Q.      Okay.  Take a look at -- well, let me ask

 7    you this first:  What do you remember of your

 8    conversation with Dr. Pacey on May 13th?

 9         A.      We really talked about the vocational

10    issues, and not the life care plan.

11         Q.      Okay.

12         A.      She had the life care plan or was going to

13    get it -- I don't remember which -- and so we weren't

14    concerned with that.  We were just addressing the

15    vocational issues.  And essentially what I said to you a

16    few minutes ago and what I said to her was, if he stays

17    here, his chances of working are higher than if he goes

18    to Mexico.  And there are multiple reasons for that.

19             But again, I think he's fairly bright.  And

20    if his medical situation were under control, and if he

21    were able to get some training, both English language

22    training and specific skills training, then I think he

23    would be able to find some kind of work over the course

24    of his life.  I told her I thought probably 20 to 40

25    dollars an hour -- 20 to 40 hours a week, I'm sorry, at
```

119

1   providers as to those people; is that --

2        A.      Well, in doing life care plans, you review a

3   lot of medical records and talk to people about their

4   problems.  But we also do case management, where we see

5   people over time, and so have pretty good experience with

6   understanding what the problems are as people go through

7   the process of adjusting to the disability, getting

8   themselves back into a situation where they're at least

9   accepting and fairly happy with their lives.  And then,

10  as their physical capacities decrease, the depression

11  that goes with that.

12       Q.      Through your case management role, have you

13  had a means to evaluate whether the life care plan you've

14  created for a particular client has worked for that

15  person?

16       A.      We don't do very much of that.  We see life

17  care -- we see some clients for case management after a

18  case has settled.  And to the extent that the life care

19  plan is fully funded, then people tend to get the

20  services.  To the extent that litigation is a compromise,

21  and there's not enough money, they get less of the

22  services.  So that's my experience, but we don't do any

23  research.

24              MS. LEWIS:  Okay.  Those are all the

25  questions I have.