IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 05-cv-00377-WDM-BNB

MOISES CARRANZA-REYES,

      Plaintiff,

v.

THE PARK COUNTY BOARD OF COUNTY COMMISSIONERS;
PARK COUNTY SHERIFF'S OFFICE, a public entity of the State of Colorado;
FRED WEGENER, individually and in his official capacity as Sheriff of Park County, Colorado;
MONTE GORE, individually and in his official capacity as Captain of Park County Sheriff's Department; and
VICKIE PAULSEN, individually, and in her official capacity as Registered Nurse for Park County, Colorado;

      Defendants.

_____

**DEFENDANTS' MOTION TO EXCLUDE PLAINTIFF'S
EXPERT WITNESS PATRICIA L. PACEY, Ph.D.**

_____

Defendants Park County Board of County Commissioners, Fred Wegener, Monte Gore, and Vicki Paulsen, by and through their respective counsel, Andrew D. Ringel, Esq. and Jennifer L. Veiga, Esq. of Hall & Evans, L.L.C. and Josh A. Marks, Esq. and Melanie B. Lewis, Esq. of Berg Hill Greenleaf and Ruscitti, LLP, pursuant to Fed. R. Evid. 702, hereby submit this Motion to Exclude Plaintiff's Expert Witness Patricia L. Pacey, Ph.D., as follows:

## ARGUMENT

### I.  PLAINTIFF'S EXPERT WITNESS, PATRICIA L. PACEY, Ph.D.
MUST BE EXCLUDED FROM TESTIFYING AT TRIAL

Plaintiff endorsed Patricia L. Pacey, Ph.D. as an expert witness to opine as to the economic loss resulting from "the medical condition or health condition [Mr. Carranza-Reyes]

now experiences as a result of his treatment at the [Park County] detention center." [*See* Deposition of Patricia L. Pacey, at 7, Exh. A-1 (alterations added); Economic Appraisal of Loss for Moises Carranza-Reyes, May 17, 2006 ("Pacey Report"), Exh. A-2].

Dr. Pacey opines and makes entirely conclusory assertions respecting this matter, without providing supporting documentation or demonstrating she conducted an acceptable, recognized methodology of any kind. Dr. Pacey's calculations do not translate into a competent analysis of any alleged loss in this case. Dr. Pacey failed to conduct even rudimentary research or to employ an acceptable methodology in her calculation of any economic losses. Many of Dr. Pacey's assumptions are grounded upon numbers without basis or support. In addition, Dr. Pacey's proposed expert testimony is inconsistent and often contrary to the actual facts of the case. As such, Defendants now request an order from this Court that excludes Dr. Pacey's testimony pursuant to Fed. R. Evid. 702 and precedent interpreting Rule 702.

### A. FED. R. EVID. 104(a)

Preliminarily, the Court is both authorized and directed to determine initial questions respecting witness qualifications by the Federal Rules of Evidence. Pursuant to Fed. R. Evid. 104(a), preliminary questions respecting the admissibility of expert witness testimony should be initially determined by the trial court in a pretrial evidentiary hearing outside the presence of the jury. In its entirety, Fed. R. Evid. 104(a) provides:

> **(a) Questions of Admissibility Generally**. Preliminary questions concerning the qualification of a person to be a witness, the existence of a privilege, or the admissibility of evidence shall be determined by the court, subject to the provisions of subdivision (b). In making its determination it is not bound by the rules of evidence except those with respect to privileges.

Fed. R. Evid. 104(a).

Under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), proposed expert testimony must be supported by scientific principles and "appropriate validation – i.e., 'good grounds,' based on what is known." *Mitchell v. Gencorp, Inc.*, 165 F.3d 778, 780 (10th Cir. 1999). In evaluating proposed testimony of an expert nature, the Court is also expected to "consider a theory's susceptibility to testing and whether the theory has been subjected to such testing." *Id.* As more fully discussed below, Dr. Pacey's calculations are not based on solid scientific methodology and are unreliable. Accordingly, Dr. Pacey's testimony will not assist the trier of fact in this matter and must be excluded in its entirety by this Court as a matter of law.

## B. FED. R. EVID. 702

Rule 702 of the Federal Rules of Evidence provides:

> If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702. In *Daubert,* the United States Supreme Court, interpreting Fed. R. Evid. 702, held that "when faced with a proffer of expert scientific testimony, a district court 'must determine at the outset, pursuant to [Fed. R. Evid.] 104(a), whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue.'" *Hollander v. Sandoz Pharmaceuticals Corp.,* 289 F.3d 1193, 1203-4 (10th Cir.), *cert. denied,* 537 U.S. 1088 (2002) (quoting *Daubert*, 509 U.S. at 592; (alteration in original)). "Under Rule 702, the district judge must act as a gatekeeper to insure proffered expert testimony is relevant and reliable." *United States v. Turner,* 285 F.3d 909, 912 (10th Cir.), *cert. denied,*

537 U.S. 895 (2002).   This gatekeeper role requires a district court to determine whether proposed expert testimony rests upon sound scientific principles and a reliable scientific foundation.  **Black v. M & W Gear Co.,** 269 F.3d 1220, 1237 (10th Cir. 2001).  The touchstones for evaluating proposed expert testimony are reliability and relevance.  "Reliability is determined by assessing whether the reasoning or methodology underlying the testimony is scientifically valid.  Relevance depends upon whether that reasoning or methodology properly can be applied to the facts in issue."  **Hollander,** 289 F.3d 1204 (citations, internal quotation marks and alterations omitted); **Alfred v. Caterpillar, Inc.,** 262 F.3d 1083, 1086 (10th Cir. 2001), *cert. denied,* 535 U.S. 928 (2002).

The Supreme Court has outlined four nonexclusive factors for consideration when making the reliability assessment required by Fed. R. Evid. 702:  (1) whether the opinion at issue is susceptible to testing and has been subjected to such testing; (2) whether the opinion has been subjected to peer review; (3) whether there is a known or potential rate of error associated with the methodology and whether there are standards controlling the technique's operation; and (4) whether the theory has been accepted by the scientific community.  **United States v. Lauder,** 409 F.3d 1254, 1263 (10th Cir. 2005) (citing **Daubert,** 509 U.S. at 593-94).  *See also* **Magdaleno v. Burlington Northern R. Co.**, 5 F.Supp.2d 899, 902 (D. Colo. 1998).

Assuming the proffered expert testimony meets this reliability criterion, this Court must also determine the proffered expert testimony's relevance to the case.  "Further, the expert testimony must 'fit' the facts at issue, requiring a valid scientific connection between the testimony and issue sought to be proved."  **Id.** at 902.  In applying **Daubert** to any particular proffered expert testimony, this Court has considerable flexibility so long as the Court actually

performs its required gatekeeper function. ***Goebel v. Denver & Rio Grande Western R.R.,*** 215 F.3d 1083, 1087 (10th Cir. 2000). The focus under ***Daubert*** is on the principles and methodology employed by the proposed expert, not the results reached. ***Daubert,*** 509 U.S. at 595. Requiring expert opinions to be based on reliable scientific methodology is essential because, "[i]t is axiomatic that an expert, no matter how good his credentials, is not permitted to speculate." ***Goebel***, 215 F.3d at 1088. Ultimately, the purpose of a ***Daubert*** analysis is to "make sure that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." ***Kumho Tire Co. v. Charmichael,*** 526 U.S. 137, 152 (1999); ***Hollander,*** 289 F.3d at 1206-7.

The ***Daubert*** analysis applies to all experts endorsed pursuant to Fed. R. Evid. 702. The approach is not limited only to experts whose testimony is based on scientific knowledge, but also applies to experts whose testimony is based on technical or other specialized knowledge. ***Kumho Tire***, 526 U.S. at 147-50; ***Ralston v. Smith & Nephew Richards Inc.,*** 275 F.3d 965, 970 n. 2 (10th Cir. 2001). Specifically, federal courts regularly apply ***Daubert*** and Fed. R. Evid. 702 to experts in economics or related fields retained to opine concerning damages suffered by a particular party. *See, e.g., Atlantic Richfield Co. v. Farm Credit Bureau of Wichita,* 226 F.3d 1138, 1163-68 (10th Cir. 2000) (applying methodology to economist); ***Blue Dane Simmental Corp. v. American Simmental Association,*** 178 F.3d 1035, 1039-41 (8th Cir. 1999) (same); ***Garay v. Missouri Pacific R. Co.,*** 60 F.Supp.2d 1168, 1172-74 (D. Kan. 1999) (same); ***Cochrane v. Schnieder Nat. Carriers, Inc.,*** 980 F.Supp. 374, 376-80 (D. Kan. 1997) (same).

## C. FED. R. CIV. P. 26(a)(2)(B)

Federal Rules of Civil Procedure 26(a)(2)(B) requires retained experts to prepare a report containing "a complete statement of all opinions to be expressed and the basis and reasons therefore; the ***data or other information considered*** by the witness in forming the opinions; . . ." Fed. R. Civ. P. 26(a)(2)(B) (emphasis added). "A party that without substantial justification fails to disclose information required by Rule 26(a) . . . is not, unless such failure is harmless, permitted to use as evidence at trial . . . any . . . information not so disclosed." Fed. R. Civ. P. 37(c)(1). Possible sanctions for a violation of Rule 26(a)(2)(B)'s disclosure requirements include exclusion of the undisclosed information. ***Id.***; *see also* ***103 Investors I, L.P. v. Square D Co.***, 372 F.3d 1213, 1217 (10th Cir. 2004) (possible sanctions include exclusion of expert witness).

## II.  APPLICATION OF FED. R. EVID. 104(a), FED. R. EVID. 702, FED. R. CIV. P. 26(a)(2)(B) AND APPLICABLE PRECEDENT TO THE PROPOSED EXPERT TESTIMONY OF PATRICIA L. PACEY, Ph.D

A review of Dr. Pacey's proposed expert testimony demonstrates the methodology she used in arriving at her expert opinion is both unreliable and irrelevant. Applying the applicable Federal Rules of Evidence and precedent interpreting those rules requires this Court to exclude Dr. Pacey's proposed expert testimony as a matter of law. Dr. Pacey's analysis and calculations are not based on any acceptable scientific or technical methodology, lack any sense of reliability, and could not assist the trier of fact in understanding the evidence or determining any fact at issue. In addition, based on the testimony of Dr. Pacey, it would be impossible for any other person to test the results attained by Dr. Pacey in the course of her analysis for validity. Further, there is no indication that any peer review or publication respecting the approach taken by Dr.

Pacey ever occurred; there is no known or potential rate of error detectible with regard to her results and there exists no potential for establishing that there is any general acceptance in the relevant scientific community of the approach taken by Dr. Pacey.   Further, the underlying factual basis of Dr. Pacey's proposed expert opinion is not supported by appropriate data and information fundamentally undermining the relevance of her proposed expert opinions as well. For all such reasons, Dr. Pacey's testimony must be excluded by this Court as a matter of law.

> **A.    Dr. Pacey's opinion Plaintiff will remain in the United States working as a legal resident and that he will earn wages comparable to the wages earned by males legally working in the United States with less than a high school education is not supported by any proven or reliable methodology**

Dr. Pacey prepared two scenarios relating to the Plaintiff's economic losses: (1) a scenario in which she assumed Plaintiff would stay in the United States as a legal immigrant; and, (2) an alternative scenario in which she assumed Plaintiff would return to Mexico.   [*See* Pacey Report, Exh. A-2].

In Scenario I, Dr. Pacey assumed not only that the Plaintiff would have stayed in the United States but that he would have stayed as a legal resident; that he would begin working in that status the moment he got out of jail; and that he would have earned wages comparable to wages earned by males in the United States with less than a high school education.   Dr. Pacey's Scenario I is supported by no appropriate methodology and no actual facts concerning the Plaintiff.   Instead, Dr. Pacey's Scenario I is supported by nothing other than Dr. Pacey's own speculation.

1.      **Nothing supports Dr. Pacey's Conclusion Plaintiff would have stayed in the United States**

In her Report, Dr. Pacey stated as follows: "Scenario I is predicated upon Mr. Carranza-Reyes' remaining, working, and living in the United States." [*See* Pacey Report, at 8, Exh. A-2].

Dr. Pacey confirmed and reinforced this statement in her deposition, in the following exchange:

Q.      Okay.   And you're assuming that he would have started working essentially the moment he got out of jail; is that correct?

A.      This does consider that, yes.

[*See* Pacey Dep. at 62-63, Exh. A-1].   However, the fact that Plaintiff had agreed to return to Mexico is something Dr. Pacey must have known, yet chose to ignore, when she wrote her Report.   [*See* Pacey Report, at 4 (citing Plaintiff's deposition as one of the documents she reviewed in preparing her report), Exh. A-2].   Plaintiff testified in his deposition unequivocally he had agreed to return to Mexico when he was picked up by United States immigration authorities:

Q.      When you were first picked up by United States immigration officials, did you agree to voluntary return to Mexico?

A.      Yes.

[*See* Deposition of Moises Carranza-Reyes, at 75, Exh. A-3].   Clearly Dr. Pacey's assumption Plaintiff would have begun working in the United States the moment he got out of jail is pure speculation since the actual facts do not support such an assumption.   Further, there is nothing to indicate when, if ever, Plaintiff would have returned to the United States so any opinion concerning the potential economic loss to Plaintiff had he worked in the United States is unreliable and must be excluded.

    **2.**    **Nothing supports Dr. Pacey's conclusion Plaintiff would have stayed in the United States and worked as a legally documented worker**

Even assuming *arguendo* that Plaintiff would have returned to the United States, there is absolutely no support for Dr. Pacey's assumption Plaintiff would have returned to the United States and become a legally documented worker, other than the Plaintiff's stated desire to do so. Dr. Pacey conducted no research to determine the likelihood that Plaintiff could return as a legal immigrant or how long such a process would take, if it were even possible.  On this subject, Dr. Pacey testified as follows:

A.    . . .   My Scenario I assumes that he is allowed to remain in the U.S. and is properly documented to go forward.

Q.    Okay.

A.    All right?  And so I haven't done a scenario assuming he remains in the U.S. as an undocumented worker.

. . .

Q.    Then, why did you -- why did you choose to assume that he would be here legally, as opposed to an undocumented worker, which is what his status was on the day he was injured?

A.    Because I understood that was – my understanding is is that his intent in coming here was to get proper documentation.  My analysis reflects that had he received the proper documentation, this is what I expect he would make in the U.S.  That's my assumption.  I think I make that pretty clear in the report.

[*See* Pacey Dep. at 107-108, Exh. A-1].   Here, Dr. Pacey engages in speculation with this assumption because there is absolutely no evidence on the following critical issues underlying Dr. Pacey's assumption:   (1) whether or not Plaintiff would ever have returned to the United States; (2) when, if ever, Plaintiff would have returned to the United States: (3) when Plaintiff would ever become a legally documented worker; and, (4) establishing how long it would take

Plaintiff to become a documented worker, if his doing so were even possible.  In the absence of any reliable information on these fundamental questions, Dr. Pacey's assumption is unreliable and entirely unsubstantiated.

**3.      Nothing supports Dr. Pacey's conclusion Plaintiff would have earned wages similar to wages earned by males in the United States with less than a high school education**

Dr. Pacey further assumed Plaintiff would have earned wages similar to males legally working in the United States with less than a high school education.  Dr. Pacey made no adjustments for the reality Plaintiff was in the United States illegally.  Further, Dr. Pacey failed to consider the fact that Plaintiff spoke no English, and admitted that she conducted no research to see if Plaintiff's immigration status and his lack of English proficiency would result in an adjustment to her assumptions.  Such failure to conduct any such research establishes the methodology underlying her opinion is unreliable.

In her Report Dr. Pacey assumed the following with respect to Plaintiff's earnings in the United States:

> based on earnings consistent with that of a male in the United States with less than a high school education, working year round full time

[*See* Pacey Report, at 8, Exh. A-2].  Additionally, in her deposition, Dr. Pacey confirmed:

Q.      Scenario I of your report analyzes future earnings or past earnings if Mr. Carranza-Reyes stays in the United States based on what, a comparison to other males in the United States would earn?

A.      Not quite.  I think it's really more accurate to state that the earnings I've identified in Scenario I represents my opinion regarding the wage levels of the types of jobs that Mr. Carranza-Reyes would likely be able to secure in the labor market in the U.S. being in the range of 10 to 12 dollars an hour. My focus initially was on jobs likely as a laborer or those more physically related jobs, but that that wage rate is also consistent with earnings of other males in the U.S. economy working full time who have less than a

high school degree.   In fact, most of that is largely even less than ninth grade.

Q.   Are those other males that you just mentioned documented or undocumented workers?

A.   I would expect those to be documented workers.

Q.   Do you know, is Mr. Carranza-Reyes documented to work presently?

A.   No, not to my knowledge.

[*See* Pacey Dep., at 102-103, Exh. A-1].   Dr. Pacey did not even bother to do a scenario consistent with the facts of the case, that is, that Plaintiff was an undocumented worker at the time he was detained by United States immigration officials.

A.   All right?   And so I haven't done a scenario assuming he remains in the U.S. as an undocumented worker.

Q.   But that's a possibility, correct?

A.   I suppose.

[*See* Pacey Dep., at 107, Exh. A-1].

Further, regarding Plaintiff's inability to speak English and its effect on his potential earnings, Dr. Pacey testified as follows:

Q.   He doesn't even speak English.   Wouldn't you anticipate that he could expect lower wages than what you would find in a government table showing what average earnings for someone with less than a high school education would have?

A.   I wouldn't think so.

. . .

Q.   And then, just so we can get off the subject, you don't have any independent resource -- government studies, private studies or anything of the kind -- to support your opinion that he will earn the same -- that a non-

11

English-speaking worker can expect the same as an English-speaking worker; is that correct?

I mean, do you have anything -- any – any support other what you have just now told us?  And I don't want you to go through that whole explanation again.  But do you just -- do you have anything that you can point to, any government study or a private study that says that?

. . .

A.  Other than what I've already explained to you, the Bureau of Census data and any number of the academic articles that I've cited in my appendix that talk about immigrants and their earnings profiles, et cetera, would support what I just said.

Q.  Well, would you show us that, then, in the Bureau of Census or these studies that you're talking about?

A.  Well, what I said is that the Bureau of Census wages and the Dictionary of Occupational Titles identify what skills you have to have for certain jobs. And the jobs that we're talking about are the jobs that are largely secondary labor market jobs.  That will support it.  And my appendix identifies the various publications.  There are books on them, as well as studies on it.

And then, I haven't got them readily available, but I certainly can get you a series of academic articles and studies that have dealt with immigrants coming to the U.S. that actually particularly focus on the Hispanic immigrants coming to the U.S. and how their profile changes over time as they enter.

And so it's a fairly common field or subset of data or articles that deals with how immigrants assimilate in terms of their earnings.  But no, I can't cite it off the top of my head.  But yes, I can certainly provide it if you request it.

[*See* Pacey Dep., at 25, 27 & 31, Exh. A-1].   As the above exchange during Dr. Pacey's deposition reveals, Dr. Pacey has tried to support her claim that Plaintiff's inability to speak English would not adversely affect his earning capacity by referring to data that was  so vaguely referenced that it would be impossible for anyone else to verify.  Dr. Pacey references nothing

specific to substantiate her opinion.  In fact, had she done even a modicum of research, Dr. Pacey would have found that the inability to speak English has a definite bearing on a person's income, even when education levels are taken into account.  A number of articles and papers that clearly contradict Dr. Pacey's opinion exist in literature regularly relied upon by persons in Dr. Pacey's field of expertise.  [*See, e.g.,*  University Avenue Undergraduate Journal of Economics, ***English Language Proficiency and Wage Rates of Mexican Immigrants***, by Jeremy Sandford, Illinois Wesleyan University (2002), Exh. A-4, ***English Language Ability and the Labor Market Opportunities of Hispanic and East Asian Immigrant Men*** by Sherrie A. Kossoudji, University of Michigan (2001), Exh. A-5; Congressional Budget Office paper entitled ***The Role of Immigrants in the U. S. Labor Market,*** Congressional Budget Office (Nov. 2005), Exh. A-6].  Dr. Pacey's failure to rely on this type of scholarly literature specific to any analysis involving an individual such as the Plaintiff demonstrates her flawed and unreliable methodology and overall approach.

During her deposition, Dr. Pacey produced an exhibit which is part of a table published by the U. S. Census Bureau showing, among other things, earnings of males by age.  [*See* Table PINC-04, Pacey Deposition Exhibit 57, Exh. A-7].  The table Dr. Pacey provided was the one for ***all*** males but ***not*** the one for males ***of Hispanic origin***.  Because of Plaintiff's status as a person of Hispanic origin and especially because he lacks English proficiency, and is undocumented, there is no question that Dr. Pacey used the wrong table.  Dr. Pacey clearly should have used a similar table for men of Hispanic origin.  [*See, e.g.*, ***English Language Proficiency and Wage Rates of Mexican Immigrants***, at 4 (table providing the earning difference between U.S. males

and immigrants), Exh. A-4].   Dr. Pacey had no reasonable explanation of why she failed to use the correct table as evidenced by the following exchange during her deposition:

> Q.    Why didn't you use the Hispanic origin, since Mr. Carranza-Reyes is Hispanic?
>
> A.    I typically don't differentiate by ethnic backgrounds, and I don't believe I ever have used that.  But I think for less than a high school degree, it's probably not significantly different.

[*See* Pacey Dep., at 70-71, Exh. A-1].   As discussed below, Dr. Pacey, when asked for documentation and authority for her assumptions, cited nothing specific, but rather directed the questioner to the eight-page Bibliography that is part of the Appendix included with her Report. [*See* Pacey Dep., at 31-34, 64-65, 67, & 70, Exh. A-1; Pacey Report, Bibliography, Exh. A-2].  If the separation of the data into ethnic origin was meaningless as Dr. Pacey apparently thinks, why did the U. S. Census Bureau bother to break the data down as it did?

Additionally, one of the authorities cited in Dr. Pacey's Bibliography is ***Life and Worklife Expectancies*** by Hugh Richards (and Jon R. Abele), Lawyers and Judges Publishing, Inc. (1999).  [*See* Pacey Report, Bibliography, at pp.A-29, A-30, Exh. A-2].  In this book, the authors state the following: ". . . Data for an individual should be derived from the table most representative of the person's characteristics.  For instance, data ***should always be race/Hispanic origin and education specific***.  [*See **Life and Worklife Expectancies*** at 48, Exh. A-8 (emphasis in original)].    Given the imprecise nature of economic projections, there is no logical reason to ignore race/Hispanic origin and Dr. Pacey's doing so here substantially undermines the reliability of her opinions.    No basis exists to suggest that more specific data concerning Hispanic national origin is less reliable than the general and less specific data relied upon by Dr.

Pacey.  And Dr. Pacey offers no reasonable explanation for her failure to use the specific data readily available to her from sources in her own Bibliography.

**B.      Dr. Pacey's Report fails to comply with Fed. R. Civ. P. 26(a)(2)(B) because Dr. Pacey does not adequately disclose the data and other information she relied upon to reach her expert opinions**

Fed. R. Civ. P. 26(a)(2)(B) provides, in part, that an expert's report " . . shall contain a complete statement of all opinions to be expressed and the basis and reasons therefore; the ***data or other information considered*** by the witness in forming the opinions; . . ." Fed. R. Civ. P. 26(a)(2)(B) (emphasis added).   Dr. Pacey's report contains no information about any specific data she may have relied on to arrive at her opinions.  In fact, the Report contains a section for specific research related to the case, which includes only the following statement:

> In addition, specific inquiries and/or research related to this case  were also performed by our office, including:
>
> ??      telephone interview with the client, Mr. Moises Carranza-Reyes; and
>
> ??      telephone interview with the rehabilitation specialist, Ms. Helen Woodward.

[*See* Pacey Report, at p.5, Exh. A-2].  No such research data was provided to the defense.  Since no data was provided it must be assumed that Dr. Pacey either did no such research or she omitted the research in contradiction to the requirements of Rule 26.  When asked for source data in her deposition, Dr. Pacey simply referred to the Appendix attached to her Report and to her "experience."   [*See* Pacey Dep., at 31-34, 64-65, 67, & 70, Exh. A-1].  Unfortunately, the Bibliography that is part of the Appendix to Dr. Pacey's Report to which she refers is so broad and all encompassing that it is of no practical value in determining how Dr. Pacey reached the opinions she will testify about.   [*See* Pacey Report, Bibliography, Exh. A-2].  As discussed

15

throughout this Motion, Dr. Pacey's methodology doesn't even conform to the very authorities she cites in her Bibliography.

When confronted with a specific question concerning how one could replicate her work Dr. Pacey simply gave the following non-responsive answer:

> Q.    So in other words, for me or for anyone -- an expert that I might want to hire, if we wanted to find out what you relied on, it would be up to us to dig through that eight-page appendix and try to ferret out and figure out what exactly you used to come up with this -- what was it? -- 10-to-12-dollar-an-hour number; is that correct?

> A.    What I used is 10 to 12 dollars an hour, and I indicated in my report that it was consistent with that of U.S. males with less than a high school education working year-round full time.

[*See* Pacey Dep. at 65, Exh. A-1]. Dr. Pacey's approach is fundamentally inconsistent with the requirements of the Federal Rules of Civil Procedure and the Federal Rules of Evidence governing the disclosure requirements and underlying data and information for expert witnesses.

### C.    Dr. Pacey's inflated worklife expectancy for the Plaintiff further illustrates the lack of reliability of her proposed expert opinions

Dr. Pacey has inflated Plaintiff's worklife expectancy in a manner unsupported by any reputable economics data, and also contradictory to the authorities contained in Dr. Pacey's Appendix and Bibliography.   Dr. Pacey projected a total worklife expectancy for the Plaintiff of 37.9 years, to age 65.   [*See* Pacey Report, at 3, Exh. A-2].  None of the authorities cited in Dr. Pacey's Bibliography support this projection.   In fact, the authorities indicate a worklife expectancy of considerably less than the 37.9 years used by Dr. Pacey.  Plaintiff was 27.1 years of age at the date of his injury. According to *Life and Worklife Expectancies*, the worklife expectancy of a 27 year old Hispanic male with less than a high school education who speaks no English is only 31.1 years.  [*See Life and Worklife Expectancies,* at p.192, Exh. A-8].  Another

16

authority on the subject cited by Dr. Pacey in her Bibliography, *The New Worklife Expectancy Tables*, A. M. Gamboa and David S. Gibson (Revised 2006) establishes the worklife expectancy for a non-disabled male with less than a high school education at 31.8 years or 29.6, depending on the survey used.  [*See The New Worklife Expectancy Tables*, at p.63, Exh. A-9].   Again, both of these numbers are considerably less than the 37.9 years used by Dr. Pacey.  Moreover, it is important to note that one of the surveys used by *The New Worklife Expectancy* Tables is the Current Population Survey, which is conducted by the Bureau of Census for the U.S. Department of Labor, Bureau of Labor Statistics.  The Bureau of Census, the U. S. Department of Labor and the Bureau of Labor Statistics are also, authoritative sources cited by Dr. Pacey in her Bibliography.  [*See* Pacey Report, Bibliography, at pp. A-27 and A-30, Exh. A-2].

Dr. Pacey has assumed that Plaintiff would have worked continuously from the day of his injury to age 65 with no periods of unemployment and with no consideration of possible early death or disability.   This is an unreasonable assumption, not supported by any authoritative source, which grossly overstates Plaintiff's damages and severely calls into question the reliability of Dr. Pacey's proposed opinion as a whole.

**D.** **Dr. Pacey's failure to utilize any Mexican costs for her valuation of the life care plan prepared by Helen M. Woodard, M.A. was fundamentally inappropriate.[1]**

Scenario II Dr. Pacey's Report purports to be Plaintiff's economic loss assuming he returns to Mexico.  [*See* Pacey Report, at p.9, Exh. A-2].  Scenario II is highly speculative and Dr. Pacey's opinions are completely unreliable.

Another of Plaintiff's experts in the case, Helen M. Woodard, M.A., prepared a life care plan for the Plaintiff.  Ms. Woodard prepared her life care plan assuming Plaintiff would remain in the United States.  She clearly stated in her deposition that Dr. Pacey knew that her life care plan assumed Plaintiff remains in the United States:

A.   No.  In fact, I didn't deal with Mexico in my expert report.

Q.   Why not?

A.    I think we already discussed that.  But in terms of Moises, his preference would be to stay in the United States, if that's possible.  And from a legal standpoint, I think he still has to work that out.  It seemed unnecessarily complicated, since his desire is to get treatment here and to remain here. And so I got information that would allow me to issue a report if I needed to, but I decided not to.

Q.   Okay.  Got it.  The next --

A.   And I didn't discuss it with the attorney before I issued my report.

Q.   Okay.  So that was your own decision, independent of any communication you had with anyone who's an attorney representing Mr. Carranza-Reyes?

---

[1]   Defendants have also filed a Motion to Limit Expert Testimony of Helen M. Woodard, M.A. challenging Ms. Woodard's proposed expert opinions.  [*See* Defendants' Motion to Exclude Plaintiff's Expert Witness Helen M. Woodard, M.A., filed January 3, 2007].  Because Dr. Pacey's opinions derive in part from Ms. Woodard's life care plan, to the extent this Court concludes Ms. Woodard's proposed opinions are unreliable such a determination would also impact the reliability of Dr. Pacey's opinions that are based on information from Ms. Woodard as well.

> A.    Yes.
>
> Q.    Okay.  Did you discuss that issue with Dr. Pacey?
>
> A.    I did.

[*See* Helen Woodard Deposition, at 74-75, Exh. A-10].

Dr. Pacey's Scenario II has a total present value economic loss of $950,800.  Of that amount, $684,000 (or 72%) represents the cost of Plaintiff's Medical/Life Care Expenses.  This was based on Dr. Pacey's assumption that these costs in Mexico were 55% of what they would be in the United States.  This assumption is based on little or no meaningful research and certainly not enough authoritative data to be relied upon to support an expert opinion under Fed. R. Evid. 702 and applicable precedent.

Initially, there is confusion between Ms. Woodard and Dr. Pacey as to who initially came up with the number that costs for the Plaintiff's life care plan in Mexico would be 55% of the costs in the United States.  According to Ms. Woodard:

> Q.    All right.   And am I right in thinking that -- did you tell her that you believed that certain costs of services in Mexico was 50 to 60 percent less than -- or of U.S. costs?
>
> A.     I can't remember whether she said that's what they found.   I mean, they did a separate survey from the one that we did.

[*See* Woodard Dep., at 97-98, Exh. A-10].  And according to Dr. Pacey::

> Q.    What exactly -- tell me about the discussion.   Just describe the conversation.  What did you say, what did she say, and so forth?
>
> A.    Well, I don't know that I can describe it verbatim.  But I talked to her, and my notes on that indicated that their research had suggested it was – the cost would be  -- if, in fact, you could get the same items, or something like that, it would be in the neighborhood of 50 to 60 percent of what it would cost in the U.S.  And I think that's on an interview note I had with her.  Let

> me see if I can find it.   Yes, 50 to 60 percent of U.S. costs is what she
> ultimately indicated their information suggested.

[*See* Pacey Dep., at 34, Exh. A-1].   Ms. Woodard did some research into the costs of services in

Mexico, versus the United States, but she did no research into the costs of equipment.   According

to the Pacey Report, the cost of equipment represented $575,800 in Scenario I, which, at 55%,

would convert to $316,690 in Scenario II.   [*See* Pacey Report, at pp.16-17, Exh. A-2].   This is

the largest single expense in the Scenario II life care plan and is about 46% of the total life care

costs.   During her deposition, Dr. Pacey explained:

> Q.      Okay.   Are you aware that she had done a considerable amount of research
> into various -- well, costs of services, at least, in Mexico versus the United
> States?   Did you know that, or not?
>
> A.      That was my general understanding, that she had done some research.   I
> don't know how extensive it was.   It sounded like she had done some
> research, and I didn't know the -- I don't recall asking her how extensive it
> was.

[*See* Pacey Dep., at 35-36, Exh. A-1].   Dr. Pacey tried to create a life care cost scenario for

Mexico when she clearly had insufficient information and data.    As demonstrated by the

testimony of Ms. Woodard above, she did not do a life care plan for Mexico.   [*See* Woodard

Dep., at 74, Exh. A-10 ("No.   In fact, I didn't deal with Mexico in my expert report.")].   Dr.

Pacey based her cost projections on research conducted by Ms. Woodard, research that was

clearly insufficient to support any such expert opinion.   Dr. Pacey compounded this error by

failing to verify her conclusions with any articles about how medical costs in Mexico compare to

those in the United States, instead simply relying on unspecified articles that stated health care

costs in Mexico were about 40 to 50 percent lower than in California, which Dr. Pacey described

in the following colloquy during her deposition:

Q.      Well, you say, "Based on information from Ms. Woodard," okay, "and our own research, costs for medical and life care needs are anticipated to be some 50 to 60 percent of U.S. costs."  So what I am -- what I would like to see is what you looked at that led you to the 50 to 60 percent range.

A.      Well, I ultimately relied on Ms. Woodard's.  But the data that I pulled out as a cross-check for my own purposes were in the articles that you were provided, where one says in Mexico, health care costs are about 40 to 50 percent lower than in California.

[*See* Pacey Dep., at 36, Exh. A-1].   Dr. Pacey admitted she did not conduct any additional research concerning the costs of health care in Mexico compared to those in the United States and, based on the above testimony, any opinion concerning such costs must be deemed unreliable and excluded from trial.  Further, Dr. Pacey admitted she relied upon Ms. Woodard because she herself was not competent to make such a health care costs comparison:

Q.      So you would not be comfortable trying to figure out the cost of a physician or, say, a family practitioner or a pulmonologist in Mexico or equipment, medical equipment, down there; is that -- that would be more Ms. Woodard's -- is it Ms. Woodard, or Dr. Woodard?

A.      It's Ms. Woodard.

Q.      Okay.  That would be more Ms. Woodard's bailiwick?

A.      The short answer is largely, yes, that would be Ms. Woodard's bailiwick.  To the extent that I can do -- and in the U.S. we'll do some -- you know, labor market wage rates and things like that, I can do some cross-checks to see if the range that a life care planner has identified would be in the range I would reasonably expect to see in the labor market.

But I can't really identify how the skills of a physician in another area or what it is that they do compared to the U.S. and whether those rates are appropriate or not, so I'm largely relying upon the life care plan in this case.  But to the best of my ability, I try to do a cross-check as to the overall rates compared to U.S.  And that's all I did in this case.

So normally I can do some modicum of cross-checks on certain items, but I would not be the person that would be comfortable identifying the cost of a wheelchair, because I don't know what else might need to go on a

> wheelchair and how that might differ in price if I knew all the details of it. And so I would defer those things to the life care planner.
>
> Q.   So, like, a prosthesis, you wouldn't want to go in and try to price a comparable prosthesis in Mexico versus the one that she came up with for the United States; is that correct?
>
> A.   I would -- I would not be comfortable doing that.  I think there's a lot of detail about the specifics of the medical equipment that I would not be educated enough to address --
>
> Q.   Okay.
>
> A.   -- at least in that area.

[*See* Pacey Dep., at 15-17, Exh. A-1].   Rather than take the time and trouble to gather reliable and relevant data on Mexican health care costs, specific to this case, or to find someone competent to gather such data, Dr. Pacey simply took a guess and based her calculations on data that was, at best, dubious and of no actual reliability and relevance.   Such an opinion is unreliable and untrustworthy and must be excluded at trial because it lacks any facts concerning the actual costs in Mexico of the medical, rehabilitative, life care services, and equipment outlined in Ms. Woodard's life care plan for Plaintiff.

>    **E.**    **Dr. Pacey's failure to utilize any Mexican data or statistics is unacceptable and must result in the exclusion of her proposed expert opinion**

Not only did Dr. Pacey have insufficient data to calculate the Mexican life care costs, she used United States statistics upon which to base her assumptions and calculations for Plaintiff's economic losses in Mexico in her Scenario II.   Obviously, every country has its own economic dynamics and Mexico is no exception.   While Dr. Pacey acknowledged this fact, she did absolutely nothing to determine what effect of anything specific to the Mexican economy would have on Plaintiff's losses assuming he returned to Mexico.

Q.      Okay.  If he goes back to Mexico -- I think we talked about this -- he would be working, living, buying, saving, spending, what have you, in a Mexican economy; is that correct?

A.      I would expect so.

Q.      And the dynamics of the Mexican economy would apply, wouldn't it, to him, as opposed to the U.S. economy?

MR. TRINE:  Objection to form.

A.      I would expect so.

Q.      Okay.  I think we established that -- well, never mind.  We've already established that.  To what extent did you study the Mexican economy with respect to growth rates and discount rates and interest rates and whatnot in preparing your analysis of his losses in Scenario II, where he moves back to Mexico?

A.      I think I indicated earlier I did no specific studying of any differential in the net discount rate.

[*See* Pacey Dep., at 92-93, Exh. A-1].  Dr. Pacey's utter failure to specifically use Mexican data and statistics results in her Scenario II calculations being nothing more than mere speculation, completely meaningless, and unreliable.  It is entirely inappropriate for an economics expert to simply assume that the economic conditions of Mexico are identical to the United States and to base an entire opinion concerning Plaintiff's lost income in Mexico on United States not Mexican data and statistics as Dr. Pacey has done here.

    **F.      Dr. Pacey's opinion concerning the loss of four hours per week of home services is not supported by any actual data**

    One of the elements of loss included in both Scenarios in the Pacey Report is for the loss of four hours per week of Home Services.   [*See* Pacey Report, at p.10, Exh. A-2].  In her deposition, Dr. Pacey never could explain how she arrived at the four hours per week determination.

Q.     Well, where did that come from, the four hours a week?

A.     That's what I determined based on my understanding of his limitations for additional assistance around the house.

Q.     Understanding from whom?

A.     From -- from my understanding of his limitations and the labor market studies that identify that even if you're married and you're settled into a seminormal lifestyle that the male in the household still does 12 to 18 hours a week of household activities, like yard work or house maintenance or car maintenance, and some of those things he either can't do or shouldn't be doing.  And I've identified four hours a week for either chores that he otherwise would have done or more time he takes to do them.

Q.     And how did you identify four hours a week?  What's your source for that?  Where did this come -- show me how you got that.  Walk me through it.

A.     Using the studies that say 12 to 18 if you're married and you have -- maintain a household of some kind, those are the typical contributions a male makes to the household.  Based on my understanding of his limitations, in terms of he's got reduced functionality, I've made a provisional opinion that four hours to help with the yard work as he -- as he moves into a normal household environment would help to maintain the cars and the yards and some nominal indoor cleaning.

So if you look at those studies, they'll talk about hours it takes to do those chores, and I've simply identified four hours a week.  Again, I note that doesn't have to be every week.  It could be more like heavy spring cleaning or heavy fall cleaning or cleaning the roof or the gutters or the windows or things that he would have more difficulty handling.

Q.     Where did you get this understanding of his limitations?

A.     Through the documents that --

Q.     Well, show me that in the documents.

A.     Well, the medical documents identify what kinds of problems he has.

[*See* Pacey Dep., at 79-80, Exh. A-1].  Dr. Pacey never was able to provide an explanation of how she arrived at four hours per week.  Not only that, but almost all of the assumed lost

services such as his inability to clean the gutters, paint the house, maintain the house, mow the yard and the like are not even supported by the facts of the case. Plaintiff does not own a home and there is no indication of when, if ever, he would own one. This means that he does not now have nor may he ever have a need for the performance of the kinds of home services Dr. Pacey relies upon to support the costs of such services in her opinion. Dr. Pacey didn't even bother to discuss the matter with Plaintiff. Further, nothing indicates that Dr. Pacey as an economist is capable of making any determination of what limitations the Plaintiff would have and how those limitations would impact the types of tasks Plaintiff is unable to perform on a regular basis. Ultimately, it is clear that the four-hour loss is nothing more than mere speculation on the part of Dr. Pacey and such speculation must be excluded at trial.

> **G.      In its entirety, Dr. Pacey's proposed expert opinions are fundamentally flawed and unreliable and must be excluded by this Court from trial**

Fed. R. Civ. P. 26 requires all retained experts to prepare a report containing all the data or other information considered by the expert in forming her opinions. Further, Fed. R. Evid. 702, and applicable precedent require all expert testimony must be supported by reliable scientific research and methodology. Experts are held to a standard of providing opinions within a reasonable degree of probability. To do that requires that the expert base these opinions on relevant and reliable assumptions that are based on relevant and reliable data and statistics. Dr. Pacey's opinion has clearly failed to meet this standard in every phase of her report and deposition testimony. Dr. Pacey neglected to conduct adequate research or to gather adequate facts. When faced with insufficient information she forged ahead with what little information she had and when asked for her source materials, she simply pointed to her years of experience and to the Appendix and Bibliography that she attached to her report, an Appendix and

Bibliography that is insufficient to meet the requirements of *Daubert* and Rule 26.  Dr. Pacey has failed to provide any of the data or information relied upon in a sufficient way and the proposed expert testimony is unsupported by acceptable testing or data of any kind.   Because Plaintiff cannot establish any scientific or other reliable foundation for the proposed opinions of his expert, Dr. Pacey must be precluded from offering any opinion testimony whatsoever at the trial of this matter.

**CERTIFICATE OF COMPLIANCE WITH D.C.Colo.LCiv.R. 7.1(A)**

Pursuant to D.C.Colo.LCiv.R. 7.1(A), prior to submitting the instant Motion, the undersigned counsel contacted counsel for the Plaintiff, William A. Trine, Esq.   Mr. Trine indicated that the Plaintiff opposes this Motion.

**CONCLUSION**

In conclusion, for all of the foregoing reasons, Defendants Board of County Commissioners of Park County, Fred Wegener, Monte Gore and Vicki Paulsen respectfully request this Court issue an order excluding the testimony of Plaintiff's expert witness Patricia L. Pacey, Ph.D. from the trial in this matter, and for all other and further relief as this Court deems just and appropriate.

Dated this 3rd day of January, 2007.

Respectfully submitted,

s/ Andrew D. Ringel
Andrew D. Ringel, Esq.
Jennifer L. Veiga, Esq.
Hall & Evans, L.L.C.
1125 17th Street, Suite 600
Denver, Colorado 80202-2052
Tel:  (303) 628-3300
Fax:  (303) 293-3238
ringela@hallevans.com,
veigaj@hallevans.com

**ATTORNEYS FOR DEFENDANTS
BOARD OF COUNTY
COMMISSIONERS OF PARK
COUNTY, FRED WEGENER AND
MONTE GORE**

and

Josh A. Marks, Esq.
Melanie B. Lewis, Esq.
Berg Hill Greenleaf & Ruscitti, LLP
1712 Pearl Street
Boulder, CO 80302
Tel: (303) 402-1600
Fax: (303) 402-1601
jam@bhgrlaw.com, mbl@bhgrlaw.com

**ATTORNEYS FOR DEFENDANT
VICKI PAULSEN**

27

## <u>CERTIFICATE OF SERVICE (CM/ECF)</u>

I HEREBY CERTIFY that on the 3rd day of January, 2007, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses:

Joseph J. Archuleta, Esq.
archuletalaw@qwest.net

William A. Trine, Esq.
btrine@trine-metcalf.com

Josh A. Marks, Esq.
jam@bhgrlaw.com

Melanie B. Lewis, Esq.
mbl@bhgrlaw.com

Lloyd C. Kordick, Esq.
lloyd@kordicklaw.com

Adele P. Kimmel, Esq.
akimmel@tlpj.org

s/Loree Trout,  Secretary
Andrew D. Ringel, Esq.
Jennifer L. Veiga, Esq.
Hall & Evans, L.L.C.
1125 17th Street, Suite 600
Denver, CO 80202-2052
303-628-3300
Fax: 303-293-3238
ringela@hallevans.com
veigaj@hallevans.com

**ATTORNEYS FOR DEFENDANTS
PARK COUNTY BOARD OF COUNTY
COMMISSIONERS, FRED WEGENER
AND MONTE GORE**

H:\Users\RINGELA\park\Carranza-Reyes\Motion to Exclude Patricia Pacey.doc