1

1   IN THE UNITED STATES DISTRICT COURT
    FOR THE DISTRICT OF COLORADO
2
    Case No. 2005-WM-377 (BNB)
3
    _____

4   DEPOSITION OF:   PATRICIA L. PACEY, Ph.D.
    July 13, 2006
5
    _____

6   MOISES CARRANZA-REYES,

7   Plaintiff,

8   v.

9   PARK COUNTY, a public entity of the State of Colorado and
    its governing board, THE PARK COUNTY BOARD OF COUNTY
10  COMMISSIONERS; PARK COUNTY SHERIFF'S OFFICE, a public
    entity of the State of Colorado; FRED WEGENER,
11  individually and in his official capacity as Sheriff of
    Park County, Colorado; MONTE GORE, individually and in
12  his capacity as Captain of Park County Sheriff's
    Department; VICKIE PAULSEN, individually and in her
13  official capacity as Registered Nurse for Park County,
    Colorado; JAMES BACHMAN, M.D., individually and in his
14  official capacity as Medical Director of the Park County
    Jail,
15
    Defendants.
16  _____

17

18  TAKEN PURSUANT TO NOTICE on behalf of the Defendant Park

19  County at 6630 Gunpark Drive, Suite 200, Boulder,

20  Colorado 80301 at 10:11 a.m. before Sylvia E. Noneff,

21  Registered Professional Reporter and Notary Public within

22  Colorado.

23

24

25

1           (Interruption of the proceedings by a knock

2    at the door.)

3       Q.    Do you have all the information that you

4    need to -- or did you have all the information you needed

5    to prepare a complete and thorough analysis?

6       A.    I believe I did.

7       Q.    Okay.  And the analysis was of Mr. Reyes'

8    loss as a result of, what, him being in jail in Park

9    County, is that -- and the medical problem that he had

10   after that, after his arrest; is that correct?

11      A.    My understanding is, and my analysis is

12   based on my understanding, that these are damages as a

13   result of the medical condition or health condition he

14   now experiences as a result of his treatment at the

15   detention center.

16           (At this time Mr. Archuleta entered the

17   deposition room.)

18      Q.    Okay.  Who did the work on this report?

19      A.    Well, I will do it, and along with an

20   associate.  And in this particular case, my associate

21   that worked with me on it is Paul Park.

22      Q.    Okay.

23      A.    And there will be a third person in the

24   office who will do a double-check, so there will be three

25   of us that ultimately work on any particular case.

1       A.       And so -- and then there was some data from

2    OECD on health data about costs in Mexico compared to --

3    how do costs in Mexico compare to here.  So that was

4    more -- because of my background, I felt like I could at

5    least track down a little bit of information to see how

6    the rates compared in Mexico with the U.S. if, in fact,

7    Mr. Carranza-Reyes was required to go back to Mexico.

8       Q.       Okay.

9       A.       More sort of supportive information of what

10   Ms. Woodard's office had been doing than trying to

11   specifically identify the costs, which I would not be

12   comfortable doing.  But generically or generally trying

13   to identify the relationship of U.S. costs to Mexican

14   costs was what I was trying to get a handle on.

15      Q.       So you would not be comfortable trying to

16   figure out the cost of a physician or, say, a family

17   practitioner or a pulmonologist in Mexico or equipment,

18   medical equipment, down there; is that -- that would be

19   more Ms. Woodard's -- is it Ms. Woodard, or Dr. Woodard?

20      A.       It's Ms. Woodard.

21      Q.       Okay.  That would be more Ms. Woodard's

22   bailiwick?

23      A.       The short answer is largely, yes, that would

24   be Ms. Woodard's bailiwick.  To the extent that I can

25   do -- and in the U.S. we'll do some -- you know, labor

1   market wage rates and things like that, I can do some

2   cross-checks to see if the range that a life care planner

3   has identified would be in the range I would reasonably

4   expect to see in the labor market.

5           But I can't really identify how the skills

6   of a physician in another area or what it is that they do

7   compared to the U.S. and whether those rates are

8   appropriate or not, so I'm largely relying upon the life

9   care plan in this case.  But to the best of my ability, I

10  try to do a cross-check as to the overall rates compared

11  to U.S.  And that's all I did in this case.

12          So normally I can do some modicum of

13  cross-checks on certain items, but I would not be the

14  person that would be comfortable identifying the cost of

15  a wheelchair, because I don't know what else might need

16  to go on a wheelchair and how that might differ in price

17  if I knew all the details of it.  And so I would defer

18  those things to the life care planner.

19      Q.    So, like, a prosthesis, you wouldn't want to

20  go in and try to price a comparable prosthesis in Mexico

21  versus the one that she came up with for the United

22  States; is that correct?

23      A.    I would -- I would not be comfortable doing

24  that.  I think there's a lot of detail about the

25  specifics of the medical equipment that I would not be

1    educated enough to address --

2         Q.     Okay.

3         A.     -- at least in that area.

4         Q.     All right.  You've done two scenarios; is

5    that correct?  Well, the first one is -- well, that is

6    right, isn't it?

7         A.     Yeah.

8         Q.     The first one is if he were to stay in the

9    United States?

10        A.     Correct.

11        Q.     And the second one is if he, Mr. Reyes --

12   does he go by Carranza-Reyes or Reyes?

13               MR. TRINE:  Carranza-Reyes.

14        Q.     (BY MR. ZARLENGO)  Carranza-Reyes.  And the

15   second would be if Mr. Carranza-Reyes went back to Mexico

16   and lived there the rest of his life; is that correct?

17        A.     Yeah.

18        Q.     Of the two, which one is, in your opinion,

19   more likely or probable?

20        A.      I don't know that I'm the person that can

21   address which one is more likely or probable, because it

22   appears to not be an economic issue.  It appears to be a

23   noneconomic issue.

24        Q.     What kind of issue is it, then?

25        A.     Well, I would assume it's an immigration

1    think we talked a little about it -- you're staying

2    totally away from the issue of whether or not he's going

3    to get a green card and be able to stay in the United

4    States; is that correct?

5         A.    I'm not --

6         Q.    Other than that did you two calculations?

7         A.    I'm making -- I have no opinions as to that

8    and would not have opinions as to that issue.

9         Q.    Okay.

10        A.    So I don't know that I'd say I'm totally

11   staying away from it by anything other than it is not my

12   area of expertise, and I have no expectations of opining

13   as to whether he will or will not obtain a green card.

14        Q.    Very good.  Okay.  That's fine.  Okay.  Mr.

15   Carranza-Reyes had a junior high equivalence; is that

16   correct?

17        A.    Approximately, yes.

18        Q.    Okay.  And what do you base that on?

19        A.    Our understanding of the documents from the

20   documents that he had.  There were, I think, two sources.

21   One was in -- I think Ms. Woodard notes that in her

22   report.  I believe it was also in his deposition, is my

23   recollection.  I don't see it any other place right

24   offhand.  But we assumed he had less than a high school

25   degree, and it was our understanding that he had less

1    no.  I'm sorry.  I'm sorry.  Never mind.  Never mind.

2         A.    Okay.

3         Q.    "In Scenario I, the pre-injury earnings

4    opportunities anticipate that [he] would likely have

5    wages comparable to other males in the United States with

6    less than a high school education"; is that correct?

7         A.    That's what I say, yes.

8         Q.    He doesn't even speak English.  Wouldn't you

9    anticipate that he could expect lower wages than what you

10   would find in a government table showing what average

11   earnings for someone with less than a high school

12   education would have?

13        A.    I wouldn't think so.

14        Q.    Why not?

15        A.    Well, first of all, most of the time the

16   types of jobs they would do would be more physical, more

17   construction.  And those jobs are still likely to fall in

18   that same range, with or without English-speaking skills.

19   And one would assume over time he would acquire some

20   English-speaking skills as well.

21        Q.    What do you have to support that opinion?

22        A.    Well, the jobs that you typically would

23   expect somebody with limited educational training to be

24   in, particularly for men, are going to be the semiskilled

25   or unskilled construction and labor types of jobs.  And

1      Q.      And that is your opinion on this; is that

2   correct?

3      A.      Well, it's my opinion based on my

4   understanding of his function preincident, that he was

5   physically able to handle those types of jobs, and that

6   he would -- he would be able to, with basic functional

7   skills, physically functional skills, with nonacademic

8   skills, that's the labor market that he would likely be

9   assigned to, as a labor economist and as an economist.

10      Q.      And then, just so we can get off the

11   subject, you don't have any independent resource --

12   government studies, private studies or anything of the

13   kind -- to support your opinion that he will earn the

14   same -- that a non-English-speaking worker can expect the

15   same as an English-speaking worker; is that correct?

16                I mean, do you have anything -- any -- any

17   support other what you have just now told us?  And I

18   don't want you to go through that whole explanation

19   again.  But do you just -- do you have anything that you

20   can point to, any government study or a private study

21   that says that?

22                MR. TRINE:  Object to form.  Go ahead.

23      A.      Other than what I've already explained to

24   you, the Bureau of Census data and any number of the

25   academic articles that I've cited in my appendix that

1    talk about immigrants and their earnings profiles, et

2    cetera, would support what I just said.

3        Q.    (BY MR. ZARLENGO)   Well, would you show us

4    that, then, in the Bureau of Census or these studies that

5    you're talking about?

6        A.    Well, what I said is that the Bureau of

7    Census wages and the Dictionary of Occupational Titles

8    identify what skills you have to have for certain jobs.

9    And the jobs that we're talking about are the jobs that

10   are largely secondary labor market jobs.  That will

11   support it.  And my appendix identifies the various

12   publications.  There are books on them, as well as

13   studies on it.

14          And then, I haven't got them readily

15   available, but I certainly can get you a series of

16   academic articles and studies that have dealt with

17   immigrants coming to the U.S. that actually particularly

18   focus on the Hispanic immigrants coming to the U.S. and

19   how their profile changes over time as they enter.

20          And so it's a fairly common field or subset

21   of data or articles that deals with how immigrants

22   assimilate in terms of their earnings.  But no, I can't

23   cite it off the top of my head.  But yes, I can certainly

24   provide it if you request it.

25       Q.    I went through your file, and I looked at

33

1    what you've listed as research that you've done.   I

2    didn't see any such articles or data either mentioned

3    specifically in this case or in any of your files.   I

4    presume you did not look at any of that in preparing your

5    report; is that correct?

6        A.    Well, again, you have a couple questions

7    there.  Your last question about presuming I didn't look

8    at any of it is incorrect, because the articles are

9    available in all -- multiple journals that I've cited in

10   my appendix.  So no, I don't cite out each and every

11   article I've read over the last 25 years.

12            But I keep up with those journals:   the

13   Journal of Labor Economics, the Journal of Human

14   Resources, the American Economics Review, et cetera, and

15   in many of those there are specific articles.  But I

16   don't cite the thousands of articles that I've read and

17   kept up with as part of my background and experience.

18   But if you have a special request for some, I can sort

19   through those that I keep up with and provide them.   Did

20   I read them specifically before issuing this report?

21       Q.    That was my question.

22       A.    Well, I don't know that that was your

23   question.  But that aside, I would say that I don't know

24   that I pulled them out specifically.  But do I read these

25   articles on a monthly or quarterly basis so that I can

34

1    keep up with that knowledge when I do these reports?

2    Absolutely.  Did I pull each and every one of those out

3    to specifically make a decision on this report?  No.

4         Q.    Okay.  On page 8, in the second paragraph --

5    now we're talking about Scenario II -- you say, "Also,

6    based on information by the rehabilitation specialist" --

7    that would be Ms. Woodard, correct?

8         A.    Yes, or her office.

9         Q.    -- "and our own research, costs for medical

10   and life care needs are anticipated to be some 50 to 60

11   percent of U.S. costs under Scenario II."  Let's take

12   that in -- I see two parts in there.  The one is, you

13   spoke with Ms. Woodard, correct --

14        A.    Yes.

15        Q.    -- about how much it would cost in Mexico

16   versus the United States?

17        A.    That was part of our discussion.

18        Q.    What exactly -- tell me about the

19   discussion.  Just describe the conversation.  What did

20   you say, what did she say, and so forth?

21        A.    Well, I don't know that I can describe it

22   verbatim.  But I talked to her, and my notes on that

23   indicated that their research had suggested it was -- the

24   cost would be -- if, in fact, you could get the same

25   items, or something like that, it would be in the

1    neighborhood of 50 to 60 percent of what it would cost in

2    the U.S.  And I think that's on an interview note I had

3    with her.  Let me see if I can find it.  Yes, 50 to 60

4    percent of U.S. costs is what she ultimately indicated

5    their information suggested.

6         Q.    What information did she have; do you know?

7         A.    You'd have to ask her what the specific

8    information she had was.

9         Q.    Oh, let me back up.  Did you ask her what

10   information she had?

11        A.    Maybe generically.  I don't have any note

12   that I asked her, but I would imagine in the course of

13   the conversation she made reference to what it was.  But

14   I didn't try to track down her information.

15        Q.    So you didn't ask how she got that data; is

16   that correct?

17        A.    I wouldn't ask her how she got her data.  I

18   would rely on her information.  And I did -- I told her

19   I'd do a little cross-checking on my own, or maybe had

20   already done it.

21        Q.    Okay.  Are you aware that she had done a

22   considerable amount of research into various -- well,

23   costs of services, at least, in Mexico versus the United

24   States?  Did you know that, or not?

25        A.    That was my general understanding, that she

36

1    had done some research.  I don't know how extensive it

2    was.  It sounded like she had done some research, and I

3    didn't know the -- I don't recall asking her how

4    extensive it was.

5         Q.    Okay.  Then you say, "and then based on your

6    own research."  What research is that?

7         A.    The articles I mentioned earlier and the

8    data I mentioned earlier.

9         Q.    Okay.  You have a specific number, 50 to 60

10   percent.  Would you show me where you got that amount --

11        A.    Well --

12        Q.    -- in your file?

13        A.    Well, I used the 50 to 60 -- I guess I don't

14   understand your question.

15        Q.    Well, you say, "Based on information from

16   Ms. Woodard," okay, "and our own research, costs for

17   medical and life care needs are anticipated to be some 50

18   to 60 percent of U.S. costs."  So what I am -- what I

19   would like to see is what you looked at that led you to

20   the 50 to 60 percent range. .

21        A.    Well, I ultimately relied on Ms. Woodard's.

22   But the data that I pulled out as a cross-check for my

23   own purposes were in the articles that you were provided,

24   where one says in Mexico, health care costs are about 40

25   to 50 percent lower than in California --

62

1    correct?

2         A.      That's correct.

3         Q.      Okay.  But -- so you don't know what his

4    education equivalent would be?

5         A.      I don't.

6         Q.      It could be eighth grade?

7         A.      It could be.

8         Q.      Okay.  Getting back to your report, on page

9    16 you have "Past losses -- earnings, $73,300."  Where

10   did that come from?

11        A.      If you turn to my -- page 16?

12        Q.      Yes.

13        A.      If you turn to the work papers, what you'll

14   see is, I've considered that he would find a job making

15   this average 10 to 12 dollars an hour and work full time

16   over the past time frame of 3.2 years.

17        Q.      At 22,900; is that correct?

18        A.      At 10 to 12 dollars an hour, with no

19   benefits.

20        Q.      But the number you're using is 22,9; is

21   that correct?

22        A.      Well, we used an average of $11 an hour,

23   yeah.

24        Q.      Okay.  And you're assuming that he would

25   have started working essentially the moment he got out of

63

```
 1   jail; is that correct?

 2        A.     This does consider that, yes.

 3        Q.     It's also in 2006 dollars; isn't that

 4   correct?

 5        A.     Well, it says that.  But we're actually

 6   using 10 to 12 dollars an hour back when this happened,

 7   and that we've not assumed any wage increases, so it

 8   probably shouldn't have the '06 there.  We're talking

 9   about 10 to 12 dollars an hour at the time frame, and

10   that would be market rates for those types of jobs.

11        Q.     Okay.  Could you show me where you got that?

12        A.     I used 10 to 12?

13        Q.     Yes.  What authority do you have for that?

14        A.     Well, I used the Bureau of Census data in

15   2006 dollars, but I assumed no wage increases or similar

16   wages over the past three years as well, it looks like.

17        Q.     Okay.  Could you show me the Bureau of

18   Census data that you used?

19        A.     Well, I can -- I don't have it accessible

20   right here, but I can get a copy of it.

21        Q.     Do you have somebody in your office here

22   that can pull it out for us?

23        A.     Let me see if I can do that.

24        Q.     Okay.

25               (Break taken from 11:42 a.m. until 11:45
```

1   a.m.)

2        Q.       What exactly are you getting?

3        A.       I'm getting Bureau of Census data for males

4   by educational levels and age brackets.  I believe it's

5   the last -- I think it's in 2000 --

6                (Interruption of the proceedings by a knock

7   at the door.)

8                THE DEPONENT:  Oh, could you make about four

9   copies of that?  Thanks.

10       A.       -- and to demonstrate that the 10 to 12

11  dollars an hour that we used is consistent with less than

12  a high school degree.

13       Q.       (BY MR. ZARLENGO)  You didn't list that as

14  one of the materials that you relied upon, did you?

15       A.       Of course I do.  It's in my appendix.  It's

16  one I rely upon.  It's a standard one.  Again, I simply

17  said it's consistent with it, so I haven't relied

18  exclusively on that.  I've simply indicated that it is

19  consistent.  I'll give you two copies of it.

20               And you'll see it in my appendix on two

21  places.  It's on the last page of the appendix, which is

22  the Website, which all this information is now on

23  Websites.  It's not hard-copied to us anymore.  And it's

24  also listed in the appendix under the Bureau of U.S. --

25  Bureau of Commerce.  Let me -- you have a copy of my

65

```
 1    appendix.  It's in the appendix, under either the

 2    Department of Labor or Bureau of Census data, yes.  And

 3    it's a standard document I use in almost every case,

 4    because it is --

 5         Q.     So in other words --

 6         A.     Excuse me.  It's U.S. Department of

 7    Commerce.  So it's the earnings by occupation and

 8    education, page 826, and money income of households,

 9    families and persons in the U.S.  And it's a standard

10    publication that I use on a regular basis.

11         Q.     So in other words, for me or for anyone --

12    an expert that I might want to hire, if we wanted to find

13    out what you relied on, it would be up to us to dig

14    through that eight-page appendix and try to ferret out

15    and figure out what exactly you used to come up with

16    this -- what was it? -- 10-to-12-dollar-an-hour number;

17    is that correct?

18         A.     What I used is 10 to 12 dollars an hour, and

19    I indicated in my report that it was consistent with that

20    of U.S. males with less than a high school education

21    working year-round full time.

22         Q.     Okay.

23         A.     I --

24         Q.     Consistent with.  So does this mean that

25    you're confirming it with this data; is that correct?
```

67

1   original 10-to-12-dollar-an-hour number come from?

2       A.      Well, from 25 years of experience using wage

3   data, both in this type of work as well as other work I

4   do, Number 1.  Number 2, the sources that I cite in the

5   Department of Commerce and the Department of Labor online

6   sites that are also identified on the appendix on page

7   832, and the Websites where it will identify by specific

8   types of occupations and even specific regions of the

9   country.

10              But I don't -- I don't compile it or

11  download it because it's part of my professional library,

12  and it's too cumbersome to download every wage survey or

13  data survey that's utilized, and I didn't.

14      Q.      But you didn't --

15              MR. ZARLENGO:  Let's mark that.

16              (Deposition Exhibit 57 was marked.)

17      Q.      (BY MR. ZARLENGO)  Okay.  That's Exhibit 57.

18  And this came from where, again?

19      A.      The Bureau of Census.  At the very top it

20  says -- identifies the source.

21      Q.      Okay.  And so you referred to this

22  particular document to say that it was consistent with

23  the government studies, correct?

24      A.      Yes.

25      Q.      Okay.

70

1    than what I used.  I used $11 an hour, on average.

2         Q.    Okay.

3         A.    If you go to less than ninth grade, you see

4    approximately $24,000.  That's approximately $12 dollars

5    an hour, and that's approximately the high end of the

6    10-to-12-dollar range I'm looking at.

7         Q.    Okay.

8         A.    If you look at, then, the categories in

9    between, the 18 to 24, in this case 25 to 29, you're

10   going to see lower wages for the less than ninth grade,

11   in the neighborhood of around $10 an hour, and then those

12   with ninth to 12th grade around $13 an hour, if you

13   translate this into a wage rate.

14              If you go to the other data sources that are

15   identified in my appendix, you can find it by specific

16   occupations, by hourly wage rates, as well as annual wage

17   rates.  If you go to OOH, you can find out all kinds of

18   other information about the availability of the jobs and

19   the prospects of those jobs over the long term, as well

20   as the functional skills required to do the jobs.

21        Q.    This also has it by Hispanic origin, too, is

22   that correct; age, race, Hispanic origin and sex?

23        A.    It would, yes.

24        Q.    Why didn't you use the Hispanic origin,

25   since Mr. Carranza-Reyes is Hispanic?

1      A.      I typically don't differentiate by ethnic

2    backgrounds, and I don't believe I ever have used that.

3    But I think for less than a high school degree, it's

4    probably not significantly different.

5      Q.      Well, there's an easy way to tell, isn't

6    there, by just looking at the second or third page of

7    this table to see what it says for one of Hispanic

8    origin; isn't that correct?

9      A.      It would be easy to find that out, yes.   I

10   don't have those downloaded and copied off because I

11   typically don't use them, particularly when I'm talking

12   about long-term earnings, and, again, when I'm talking

13   about earnings of a person who I expect to be in a

14   physical labor market opportunity; that to the best of my

15   knowledge, they don't pay a Hispanic doing a labor job

16   differently than a first-year Caucasian doing a labor job

17   in the construction industry.

18     Q.      But the dollar amounts would be different

19   for a Hispanic, wouldn't it?  Isn't that your experience?

20     A.      I think I've already indicated to you I've

21   never used them, so I don't have a detailed experience

22   with using them.  But if I looked them up -- I would have

23   to look them up in order to answer that question

24   professionally.

25     Q.      So you don't know?

79

1      Q.     Well, where did that come from, the four

2  hours a week?

3      A.     That's what I determined based on my

4  understanding of his limitations for additional

5  assistance around the house.

6      Q.     Understanding from whom?

7      A.     From -- from my understanding of his

8  limitations and the labor market studies that identify

9  that even if you're married and you're settled into a

10  seminormal lifestyle that the male in the household still

11  does 12 to 18 hours a week of household activities, like

12  yard work or house maintenance or car maintenance, and

13  some of those things he either can't do or shouldn't be

14  doing.  And I've identified four hours a week for either

15  chores that he otherwise would have done or more time he

16  takes to do them.

17      Q.     And how did you identify four hours a week?

18  What's your source for that?  Where did this come -- show

19  me how you got that.  Walk me through it.

20      A.     Using the studies that say 12 to 18 if

21  you're married and you have -- maintain a household of

22  some kind, those are the typical contributions a male

23  makes to the household.  Based on my understanding of his

24  limitations, in terms of he's got reduced functionality,

25  I've made a provisional opinion that four hours to help

1    with the yard work as he -- as he moves into a normal

2    household environment would help to maintain the cars and

3    the yards and some nominal indoor cleaning.

4              So if you look at those studies, they'll

5    talk about hours it takes to do those chores, and I've

6    simply identified four hours a week.  Again, I note that

7    doesn't have to be every week.  It could be more like

8    heavy spring cleaning or heavy fall cleaning or cleaning

9    the roof or the gutters or the windows or things that he

10   would have more difficulty handling.

11        Q.    Where did you get this understanding of his

12   limitations?

13        A.    Through the documents that --

14        Q.    Well, show me that in the documents.

15        A.    Well, the medical documents identify what

16   kinds of problems he has.

17        Q.    Okay.  And how did you calculate four hours?

18        A.    Based on the parameter -- the maximum

19   parameter being 12 to 18 for household services, and

20   based on my understanding that he is -- he had a

21   below-the-knee amputation, that the types of chores that

22   he either shouldn't be doing or would benefit from having

23   assistance in handling would be things like getting on

24   ladders and cleaning gutters on the house, or getting on

25   the roof to repair the roof, or painting the house, where

1   that correct?

2        A.    No.

3              MR. ZARLENGO:   Would you read her answer

4   back so we can get on with this, please?

5              (The audio on page 91, lines 9 through page

6   92, line 2 was played back.)

7        Q.    (BY MR. ZARLENGO)   Would you tell me where

8   you got that understanding, please?

9        A.    I don't know that there's any particular

10  document that I can point to as I sit here.

11       Q.    Okay.

12       A.    That's my understanding is, he has pain.

13       Q.    Okay.   If he goes back to Mexico -- I think

14  we talked about this -- he would be working, living,

15  buying, saving, spending, what have you, in a Mexican

16  economy; is that correct?

17       A.    I would expect so.

18       Q.    And the dynamics of the Mexican economy

19  would apply, wouldn't it, to him, as opposed to the U.S.

20  economy?

21             MR. TRINE:   Objection to form.

22       A.    I would expect so.

23       Q.    (BY MR. ZARLENGO)   Okay.   I think we

24  established that -- well, never mind.   We've already

25  established that.   To what extent did you study the

93

1    Mexican economy with respect to growth rates and discount

2    rates and interest rates and whatnot in preparing your

3    analysis of his losses in Scenario II, where he moves

4    back to Mexico?

5         A.    I think I indicated earlier I did no

6    specific studying of any differential in the net discount

7    rate.

8         Q.    Okay.  Would the net discount rate be the

9    same?

10        A.    I think I already indicated earlier in the

11   deposition that the interest earnings would be the same

12   because those are market-driven globally, and that the

13   wage growth rate, to the extent that there is more

14   inflation in the economy outside of the U.S. than less,

15   then my numbers are probably underestimated.  To the

16   extent that they're similar, or they move together

17   similarly, they could be similar.

18        Q.    Is the spread the same?

19        A.    I have assumed that the spread was the same.

20   I have not done any specific research as to the

21   historical relationship between the two.  But to the

22   extent that wages are also driven by inflation, like

23   interest rates, to the extent that that holds across

24   all -- globally, it would largely be true.

25        Q.    But you did not do any specific research on

102

1        A.     Yes.

2        Q.     And if that number remains in your amended

3    report as the same number, can we assume that both you

4    and Helen Woodard are comfortable with that number as the

5    accurate representation of health care costs in Mexico

6    compared to the United States?

7        A.     If it stays at that number, yes.

8               MR. JURS:  I have no further questions.

9    Thank you for your time.

10              THE DEPONENT:  Thanks.

11                      EXAMINATION

12   BY MS. LEWIS:

13       Q.     Hi.

14       A.     Hi.

15       Q.     I'm Melanie Lewis.  I represent Nurse Vicky

16   Paulsen --

17       A.     Okay.

18       Q.     -- who's a defendant in the case.  I have

19   just one line of questions I am interested in.  Scenario

20   I of your report analyzes future earnings or past

21   earnings if Mr. Carranza-Reyes stays in the United States

22   based on what, a comparison to other males in the United

23   States would earn?

24       A.     Not quite.  I think it's really more

25   accurate to state that the earnings I've identified in

1    Scenario I represents my opinion regarding the wage

2    levels of the types of jobs that Mr. Carranza-Reyes would

3    likely be able to secure in the labor market in the U.S

4    being in the range of 10 to 12 dollars an hour.

5              My focus initially was on jobs likely as a

6    laborer or those more physically related jobs, but that

7    that wage rate is also consistent with earnings of other

8    males in the U.S. economy working full time who have less

9    than a high school degree.  In fact, most of that is

10   largely even less than ninth grade.

11        Q.    Are those other males that you just

12   mentioned documented or undocumented workers?

13        A.    I would expect those to be documented

14   workers.

15        Q.    Do you know, is Mr. Carranza-Reyes

16   documented to work presently?

17        A.    No, not to my knowledge.

18        Q.    And I think we talked about -- or Mr.

19   Zarlengo talked about earlier that we don't know and

20   you're not venturing into the area of whether he will or

21   won't be later?

22        A.    Right.  I'm simply in the past identifying

23   that kind of wage rate without benefit of any benefits of

24   a documented worker.  But that if, in fact, he can stay

25   in the U.S. and work in the U.S., that he'd have those --

107

1    an undocumented status and works and does the type of

2    jobs that he's capable of doing, as you've assumed in

3    your report, then do you know what his earnings would be

4    per hour?

5         A.    That's not my Scenario I.  My Scenario I

6    assumes that he is allowed to remain in the U.S. and is

7    properly documented to go forward.

8         Q.    Okay.

9         A.    All right?  And so I haven't done a scenario

10   assuming he remains in the U.S. as an undocumented

11   worker.

12        Q.    But that's a possibility, correct?

13        A.    I suppose.

14             MS. LEWIS:  That's all the questions I have.

15                     EXAMINATION

16   BY MR. ZARLENGO:

17        Q.    Could I ask, why did you not do that

18   scenario?  That's where he was when he got here.

19        A.    I've assumed -- well, one, my understanding

20   was is that his father, who was a U.S. citizen, had

21   started the process for application of citizenship for

22   Mr. Carranza-Reyes.  But that said, I've simply done the

23   analysis twofold:  If he could stay here and he's

24   properly here, and if he can't stay here, and he's back

25   in Mexico, what it is.  And to the extent there might be

COFFMAN REPORTING          303.893.0202
* SUBJECT TO CONFIDENTIALITY DESIGNATIONS *

108

1    a half a dozen different scenarios in between, they

2    would, I assume, fall between those earnings levels.

3        Q.    So you think that had he stayed here as an

4    undocumented worker -- well, back up.  You didn't feel it

5    was necessary to calculate what his earnings would be as

6    an undocumented worker; is that correct?

7        A.    I have not considered that scenario.

8        Q.    Okay.  His father was dead, so how was he

9    going to sponsor Mr. Carranza-Reyes?

10       A.    I think that's one outside of my area of

11   expertise.  All I understood is that the son had

12   understood the papers were filed.  And whether they did

13   or didn't understand that they could continue with or

14   without his death is something that's outside of anything

15   I'm doing.

16       Q.    Then, why did you -- why did you choose to

17   assume that he would be here legally, as opposed to an

18   undocumented worker, which is what his status was on the

19   day he was injured?

20       A.    Because I understood that was -- my

21   understanding is is that his intent in coming here was to

22   get proper documentation.  My analysis reflects that had

23   he received the proper documentation, this is what I

24   expect he would make in the U.S.  That's my assumption.

25   I think I make that pretty clear in the report.  My