

1

```
 1   IN THE UNITED STATES DISTRICT COURT
     FOR THE DISTRICT OF COLORADO
 2
     Case No. 2005-WM-377 (BNB)
 3   _____

 4   DEPOSITION OF:   HELEN M. WOODARD, M.A.
     July 12, 2006
 5   _____

 6   MOISES CARRANZA-REYES,

 7   Plaintiff,

 8   v.

 9   PARK COUNTY, a public entity of the State of Colorado and
     its governing board, THE PARK COUNTY BOARD OF COUNTY
10   COMMISSIONERS; PARK COUNTY SHERIFF'S OFFICE, a public
     entity of the State of Colorado; FRED WEGENER,
11   individually and in his official capacity as Sheriff of
     Park County, Colorado; MONTE GORE, individually and in
12   his capacity as Captain of Park County Sheriff's
     Department; VICKIE PAULSEN, individually and in her
13   official capacity as Registered Nurse for Park County,
     Colorado; JAMES BACHMAN, M.D., individually and in his
14   official capacity as Medical Director of the Park County
     Jail,
15
     Defendants.
16   _____

17


18   TAKEN PURSUANT TO NOTICE on behalf of the Defendant Park

19   County at 1435 Reed Street, Lakewood, Colorado 80214-5368

20   at 4:04 p.m. before Sylvia E. Noneff, Registered

21   Professional Reporter and Notary Public within Colorado.

22

23

24

25
```

74

1    same case as in Mexico.

2        Q.    Okay.

3        A.    So I was just interested in an overview.

4        Q.    So if there was data, for instance, from a
5    national statistical institute that publishes data by --
6    from Mexico or the Bank of Mexico, if it's not reflected
7    in the data that Shannon developed, you don't have access
8    to that data?

9        A.    Of course I have access.  I don't have it,
10   but I could get -- presumably pull it up --

11       Q.    Okay.

12       A.    -- either write for it or get it online.

13       Q.    Okay.  But that wasn't data that was
14   utilized by you in preparing your expert report in this
15   case; is that correct?

16       A.    No.  In fact, I didn't deal with Mexico in
17   my expert report.

18       Q.    Why not?

19       A.    I think we already discussed that.  But in
20   terms of Moises, his preference would be to stay in the
21   United States, if that's possible.  And from a legal
22   standpoint, I think he still has to work that out.  It
23   seemed unnecessarily complicated, since his desire is to
24   get treatment here and to remain here.  And so I got
25   information that would allow me to issue a report if I

75

1    needed to, but I decided not to.
2         Q.    Okay.  Got it.  The next --
3         A.    And I didn't discuss it with the attorney
4    before I issued my report.
5         Q.    Okay.  So that was your own decision,
6    independent of any communication you had with anyone
7    who's an attorney representing Mr. Carranza-Reyes?
8         A.    Yes.
9         Q.    Okay.  Did you discuss that issue with Dr.
10   Pacey?
11        A.    I did.
12        Q.    The next part, 235 to 239, looks like it's
13   information from the ESL program at CCD; is that right?
14        A.    Yes.
15        Q.    All right.  The next sort of section of this
16   file that I have, 240, and I think it's the rest of them,
17   the rest of the file, is either vocational testing
18   information or information about vocational opportunities
19   in the United States.  Does that seem right to you?
20        A.    Okay.  What we have, first of all, is the --
21   is the information on the testing.  And technically,
22   they're not supposed to cover anything -- copy anything
23   but the cover sheets, because it's all copyrighted.
24        Q.    Okay.
25        A.    And so please don't use it outside of this

97

```
1        A.      Probably not.
2        Q.      Okay.  Have you ever done a labor market
3   survey in Mexico related to someone who had disabilities
4   similar to Mr. Carranza-Reyes?
5        A.      I think all the ones that I've done have had
6   mobility impairments of one kind or another.
7        Q.      Okay.  Can you read Dr. Pacey's notes that
8   are Exhibit 50?
9        A.      I think mostly.
10       Q.      Would you read them all to yourself?
11       A.      "Teleconference" --
12       Q.      Just --
13       A.      -- "with Woodard" --
14       Q.      -- to yourself.
15       A.      Oh, okay.
16       Q.      Just read the whole thing, and then I'll ask
17  you some questions about the whole thing.
18       A.      Okay.
19       Q.      Do you know what Dr. Pacey's referring to in
20  the last line, "50 to 60 percent of U.S. costs"?
21       A.      I think we had a brief conversation about
22  the value or cost of services there versus here.
23       Q.      All right.  And am I right in thinking
24  that -- did you tell her that you believed that certain
25  costs of services in Mexico was 50 to 60 percent less
```

98

```
1    than -- or of U.S. costs?
2         A.    I can't remember whether she said that's
3    what they found.  I mean, they did a separate survey from
4    the one that we did.
5         Q.    Okay.
6         A.    And I can't remember how that came about.  I
7    don't -- you'd have to ask her what this note exactly
8    means.
9         Q.    Dr. Pacey's deposition is tomorrow --
10        A.    Oh, okay.
11        Q.    -- so she will be asked.  Do you -- what
12   makes you think they did a separate survey of costs than
13   you?
14        A.    I think she said they did.
15        Q.    But other than that, you don't have any
16   source of information or --
17        A.    That's right.
18        Q.    Okay.  All right.  And this conversation
19   reflected in these notes was your only conversation with
20   Dr. Pacey about Mr. Carranza-Reyes; is that right?
21        A.    I can't swear that it's the only one, but
22   it's the one that I remember.  I mean, over the course of
23   time, if you're working on a case with someone, you might
24   call them back three or four times to clarify some small
25   thing.
```