## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 2005-WM-377 (BNB)

MOISES CARRANZA-REYES

       Plaintiff,

vs.

PARK COUNTY, a public entity of the State of Colorado and its governing board, THE PARK
COUNTY BOARD OF COUNTY COMMISSIONERS; PARK COUNTY SHERIFF'S OFFICE, a
public entity of the State of Colorado; FRED WEGENER, individually and in his official capacity as
Sheriff of Park County, Colorado; MONTE GORE, individually and in his capacity as Captain of
Park County Sheriff's Department; VICKIE PAULSEN, individually and in her official capacity as
Registered Nurse for Park County, Colorado,

       Defendants.

---

## PLAINTIFF'S RESPONSE TO MOTION FOR SUMMARY JUDGMENT
## FROM DEFENDANTS PARK COUNTY BOARD OF COUNTY
## COMMISSIONERS, FRED WEGENER AND MONTE GORE

---

Plaintiff, Moises Carranza-Reyes, by and through his counsel, Bill Trine of Trine & Metcalf, P.C.,

hereby responds to the Motion for Summary Judgment filed by the Park County Board of County

Commissioners, Fred Wegener, and Monte Gore (collectively hereinafter referred to as the "Park

County Defendants"), and requests that the Motion be denied for the reasons hereinafter stated.

### INTRODUCTION

      The Motion for Summary Judgment filed by the Park County Defendants omits important

disputed and undisputed material facts, which support Plaintiff's claims, and many of the

"undisputed material facts" listed on pages 3 through 22 in Paragraphs 1 – 138 are in dispute and

some are taken out of context, are incomplete statements, or are not "material." However, to narrow

the controversy over material facts which are undisputed, Plaintiff concedes that the following numbered paragraphs of the Park County Defendants' statement of undisputed material facts are correct, although perhaps incomplete:

**The Park County Jail**

Paragraphs 1 through 7 and 9 are undisputed.

**Policies and Procedures of the Park County Jail**

Paragraphs 10, 12, 13, 15, 17, 23, and 31 are undisputed.

**Immigration and Naturalization Service Detainees at the Park County Jail**

Paragraphs 33, 37, 39, 43, 44, and 45 are undisputed.

**Colorado Department of Corrections Inmates at the Park County Jail**

These inspections relate to Colorado DOC inmates and not the INS inmates in Pod D and the inspection are therefore not relevant or material. However, the inspection documents speak for themselves.

**Plaintiff Travels from Mexico to the United States**

Paragraphs 54 through 68 are not in dispute.

**Plaintiff Housed at the Park County Jail**

Paragraphs 69 through 72; 74 through 77; 79 through 82; 84 through 87; 90; 93 through 95; 98; 100 through 103; 106 through 113; 115; 120; 123 through 126 are not in dispute.

**Plaintiff Transported to Summit Medical Center**

Paragraphs 128 through 133 are not in dispute.

**Plaintiff Transported to Denver Health Medical Center**

Paragraphs 134 through 138 are not in dispute.

## PLAINTIFF'S STATEMENT OF DISPUTED AND
## UNDISPUTED MATERIAL FACTS WHICH SUPPORT
## PLAINTIFF'S CLAIMS FOR RELIEF

### Practice of Overcrowding INS Detainees in Pod D.

1.      The Park County Sheriff's Office's Policy and Procedure Manual required that inmates housed in dormitory sleeping areas be provided "at least 80 square feet of total living space per occupant." (see Policy and Procedure Manual, Park 1450, **Exhibit 1**).

2.      Pod D contained 740 square feet in the upper tier and 735 square feet in the lower tier, so the maximum capacity in Pod D based on 80 sq. ft. per inmate was 18 people (see Monte Gore Depo. at 24, **Exhibit 2**).

3.      The jail was constructed in 1994-1995, it was designed for 8 double-bunk beds in Pod D that would sleep 16 inmates (see Wegener Depo. at 21, **Exhibit 3**). Sheriff Wegener worked in the Sheriff's Office when the jail was constructed (see Wegener Depo. at 15, **Exhibit 3**).

4.      Sheriff Wegener agrees that the jail adopted ACA standards, which requires a minimum of 80 sq. ft. of total living space per inmate and that Pod D was designed for a maximum of 18 inmates with 18 seats available at the dining tables (see Wegener Depo. at 61-2, **Exhibit 3**).

5.      Sheriff Wegener walks through the facility once every two weeks and is aware of the total number of inmates being housed (see Wegener Depo. at 63, **Exhibit 3**).

6.      The deputies who worked in the jail understood that Pod D was designed to house a maximum of 18 inmates and Deputy Edward Allen step-measured the unit to confirm that only 18 inmates could be housed in Pod D (see Allen Depo. at 40-1, **Exhibit 4**).

7.      However, the jail began adding triple bunks to accommodate more detainees in Pod D. The bunks were added in the upstairs sleeping area (see Allen Depo. at 42-3, **Exhibit 4**).

3

8.      Bunks were added as the INS population at the jail increased and was steadily growing in January and February of 2003 (see Allen Depo. at 45, **Exhibit 4**).

9.      Eventually the jail placed 42 beds, three-tiered, in Pod D, which was the maximum number of bunk beds that could be squeezed in the upper tier (see Muldoon Depo. at 17-18, **Exhibit 5**).

10.     Once the 42 bunks on the upper tier were filled, additional INS detainees would be provided mattresses and told to sleep on the floor (see Gore Depo. at 28, **Exhibit 2**).

11.     Pod D was constructed with only two toilets and two urinals located on the lower level and the jail provided only one large wastebasket, which was located on the lower level (see Gore Depo. at 28-9, **Exhibit 2**).

12.     During January 2003, the jail billed the INS for 810 inmate-days, which would be an average of 26.1 detainees in Pod D each day during the month of January (see Gore Depo. at 262, **Exhibit 2,** and **Exhibit 6,** Park 0443).

13.     In February 2003, the jail billed the INS for 883 inmate-days, which would be an average of 31.1 detainees per day housed in Pod D (see Gore Depo at 262, **Exhibit 2,** and **Exhibit 7,** Park 0444).

14.     The jail billed the INS for 632 inmate-days for the month of March 2003, although Pod D was vacant for a week or two during March so that it could be thoroughly cleaned after Plaintiff was taken to the hospital. The jail billed the INS for 632 inmate-days for an average of 20.3 detainees per day, which also exceeded the design and jail policy limitations of 18 per day (see Gore Depo. at 267, **Exhibit 2**).

15.     Before March 2003, Sheriff Wegener knew that it was a common practice at the jail for detainees to sleep on mats on the floor when the bunk beds were filled to capacity (see Wegener

4

Depo. at 67-8 and 72-3, **Exhibit 3**).  As the person in charge of the jail, he placed no limitations on

the number of detainees that could be housed in Pod D (see Wegener Depo. at 70, **Exhibit 3**).

16.     There were 41 detainees housed in Pod D on 3/1/03 before 9 new INS detainees,

including Plaintiff, were incarcerated and with the arrival of 9 new detainees, there were 48 detainees

housed in Pod D on the evening of 3/1/03 (see Daily Jail Logs, **Exhibit 7,** pp. 7 and 15).

17.     On 3/4/03, there were 50 detainees in Pod D (see Daily Jail Logs, **Exhibit 7,** pp. 30).

18.     On 3/6/03 during the day count, there were 55 detainees in Pod D (see Daily Jail

Logs, **Exhibit 7,** at p. 53).  That evening 6 more INS detainees were picked up (see Daily Jail Logs,

**Exhibit 7,** at p. 54) and that evening the count showed 61 detainees in Pod D (see Daily Jail Logs,

**Exhibit 7,** at p. 57).

19.     50 INS detainees were transferred out of the Park County Jail by the INS on 3/7/03

leaving 11 detainees in Pod D on the morning of 3/8/03, including the Plaintiff (see Daily Jail Logs,

**Exhibit 7,** at p. 84).

**With overcrowding, the conditions of confinement were inhumane, filthy and unsanitary.**

20.     When Plaintiff arrived at the Park County Jail on the evening of 3/1/03, he was given

a torn uniform that smelled bad, dirty blankets, and dirty, torn slippers and a "really thin mattress"

(see Plaintiff Depo. at 130-134, **Exhibit 8**).

21.     When Plaintiff entered Pod D, he noted that "it stinks," the bunk beds were all in use

and he had to place his mattress on the floor in the space between bunk beds (see Plaintiff Depo. at

140, **Exhibit 8**).

22.     When Plaintiff arrived, other detainees were sneezing and coughing and there was

tissue and toilet paper "thrown all over the place, which had people's saliva or mucous on it" (see

Plaintiff Depo. at 143, **Exhibit 8**).

23.     There was toilet paper thrown all over the floor in the downstairs area of Pod D and the bathroom was dirty, smelled, and you could "see poop in the bowl" (see Plaintiff Depo. at 141, **Exhibit 8**).

24.     There were 2 toilet bowls and showers in Pod D and the bathroom floor was dirty and the showers "looked like they were black and it smelled like mold" (see Plaintiff Depo. at 142-3, **Exhibit 8**).

25.     Plaintiff had to sleep on the floor on a mattress the entire time he was there and he could feel the cold from the floor through the mattress and could touch the wall, which was cold and humid (see Plaintiff Depo. at 144-45, **Exhibit 8**).

26.     Plaintiff had to go barefoot to the shower because he had cloth slippers and wasn't provided sandals to wear and the shower floor was dirty (see Plaintiff Depo. at 154-5, **Exhibit 8**).

27.     Pod D was never cleaned the entire time Plaintiff was there and "it was really dirty" (see Plaintiff Depo. at 159, **Exhibit 8**).

28.     Detainees would take their trays up to the sleeping area to eat because it smelled so bad downstairs, the toilet was plugged up with poop and didn't work (see Plaintiff Depo. at 171, **Exhibit 8**).

29.     When Plaintiff arrived, one of the detainees sleeping next to him was so sick he couldn't get out of his bunk, so Plaintiff brought his food tray up to him. Another detainee was very sick and Plaintiff had to clean up the space where he placed his mattress and wipe it with towels because there was saliva all over and spit "and it was really filthy" (see Plaintiff Depo. at 185, **Exhibit 8**).

30.     The detainees covered the air duct with blankets because of cold air coming in through the ducts (see Plaintiff Depo. at 190, **Exhibit 8**).

31.     Some of the detainees were sick on 3/3/03 and were coughing, in pain, were sweating and had covered themselves up and some were shaking and shivering with illness (see Plaintiff Depo. at 209, **Exhibit 8**).

32.     By 3/6/03, there were 50 or 60 detainees in Pod D and about 30 of them were vomiting and were sick and they were only given water, without chemicals, to clean the Pod (see Plaintiff Depo. at 277, **Exhibit 8**).

33.     Plaintiff's twin brother, Abraham Carranza-Reyes, was also given clothing at the jail, which was torn and "smelled dirty" and towels and linen which were stained and smelled bad (see Abraham Carranza-Reyes Depo. at 117-19, **Exhibit 9**).

34.     Abraham also had to sleep on the floor, which "was very filthy" between bunk beds and the floor was covered with "tissue paper that had gook in it, snot in it" and there was no trash can upstairs (see Abraham Depo. at 124-25, **Exhibit 9**).

35.     Plaintiff slept against the outer wall, which was cold and wet (see Abraham Depo. at 126-27, **Exhibit 9**).

36.     The toilet was "absolutely filthy, filled up with excrement, and to the side of the toilet you could see dry urine" (see Abraham Depo. at 129-30, **Exhibit 9**).

37.     There was mold in the bathroom and the shower water could not be regulated and was either scalding hot or very cold, which made it impossible to take a shower (see Abraham Depo. at 130-31, **Exhibit 9**).

38.     On 3/2/03, many detainees were sick and coughing, couldn't eat and were vomiting and the toilet seats also had vomit on them (see Abraham Depo. at 133-34, **Exhibit 9**).

39.     The detainees talked of a hunger strike because of the conditions in Pod D and prepared a petition to the Mexican Consulate complaining of the conditions at the jail (see Abraham Depo. at 189-90, **Exhibit 9**).

40.     The filthy, overcrowded conditions in Pod D were confirmed by Deputy Edward Allen. During March 1-8, 2003, there was a problem with showers not draining and the toilets were overflowing and would not flush. They went in with plungers and several times with a snake and sometimes the toilets then worked, but often they did not (see Allen Depo. at 70-1, **Exhibit 4**).

41.     The detainees were not responsible for the plugged toilets because when they were snaked, they were just plugged with human waste. They tried to clean everything up, but couldn't get it real clean because there were too many people in the pod (see Allen Depo. at 74-6, **Exhibit 4**).

42.     Deputy Allen saw feces on the floor when he ran the snake (see Allen Depo. at 76, **Exhibit 4**). He also saw vomit on the floor between March 1-8, 2003, in Pod D and they would clean up the vomit and he would try to determine who had vomited, but there "was quite a few of them that were sick" and he saw detainees with their heads in the toilets vomiting (see Allen Depo. at 81, **Exhibit 4**).

43.     Each cell block had only 1 trash can downstairs, but Pod D got so crowded, they put a small trash can upstairs "because there was just too many people blowing their nose" (see Allen Depo. at 82, **Exhibit 4**).

44.     Deputy Allen was aware of a threatened hunger strike and detainees were complaining that there were too many in Pod D and they were sick and wanted to write the Mexican Consulate (see Allen Depo. at 93-95, **Exhibit 4**).

45.     Abraham Carranza-Reyes then became sick, but not nearly as sick as Plaintiff and there were so many who had runny noses and the flu and Abraham was not as sick as some of the

others.  At least 20 detainees had flu-like symptoms with runny noses and chills (see Allen Depo. at 111-13, **Exhibit 4**).

46.     On 3/4/03, all detainees in Pod D were asked to strip down and wrap themselves in blankets because their clothing had not been washed for more than 5 days (see Daily Jail Logs, **Exhibit 7** at p. 45; Allen Depo. at 126-28, **Exhibit 4;** Carranza-Reyes Depo. at 221-22, **Exhibit 8;** and Abraham Carranza-Reyes Depo. at 157, **Exhibit 9**).

47.     While Plaintiff was incarcerated, the toilets were overflowing and the toilets are located right next to the sinks and showers and a detainee would have to stand in the overflow to use the sink and would have to walk through the overflow to get to the showers (see Allen Depo. at 186, **Exhibit 4**).

48.     With overcrowding in Pod D, cleaning the floors was not likely to happen because mattresses placed on the floor would have to be stacked on top of somebody else's bedding on the bunks in order to clean the floors.  With fluids and tissues on the floor, there was no way to avoid stepping in fluids with the paper shoes detainees were wearing when they went to the sink to brush their teeth or wash their hair, and even if the toilet was cleaned up, the bacterial, fecal material would continue to be tracked around the cell on detainees' shoes (see Allen Depo. at 187-89, **Exhibit 4**).

49.     With mattresses on the floor between the bunk beds, people were coughing, spitting phlegm, and placing tissue papers on the floor and detainees would step on those materials with their paper shoes.  If the shoes were not washed for 5 days, the materials stepped in would be tracked all over the cell, whether or not the floor was cleaned in the interim (see Allen Depo. at 187-89, **Exhibit 4**).

50.     The unsanitary conditions of confinement occurred whenever there was overcrowding, and was not limited to the days of Plaintiff's incarceration (see Allen Depo. at 159-60, **Exhibit 4**).

51.     Deputy Allen complained to his shift supervisor about the conditions of confinement with overcrowding, but nothing was done because "they were making money off of this" (see Allen Depo. at 138-39, **Exhibit 4**).

**With overcrowding and unsanitary conditions of confinement, communicable disease spread throughout Pod D and Plaintiff became ill.**

52.     When Plaintiff arrived, there were inmates sleeping on either side of him and one was so sick he could not leave his bunk and another was "very sick" (see Carranza-Reyes Depo. at 184-5, **Exhibit 8**).

53.     On 3/3/03, some of the detainees had the flu and were coughing, in pain, were sweating, shaking and shivering (see Plaintiff Depo. at 208, **Exhibit 8**).

54.     Plaintiff became ill on Tuesday, March 4, with a very bad headache, a very sore throat, and was having the shakes. His request to see a nurse that day was denied (see Plaintiff Depo. at 212-17, **Exhibit 8**).

55.     On 3/4/03, Sgt. Flint, by inter-office memorandum, informed Captain Gore and others with an entry in the Daily Jail Logs that "several inmates in D Pod appear to be experiencing chest colds/flu or altitude sickness" (see Daily Jail Logs, p. 45, **Exhibit 7**).

56.     The detainees who had traveled with Plaintiff then also became sick and were in bad shape with the same symptoms Plaintiff had, and some of them were vomiting (see Plaintiff Depo. at 234-36, **Exhibit 8**).

57.     The Defendant, Nurse Paulsen, did not report to work at the jail on Tuesday, March 4, because of scheduled oral surgery and she was the only nurse employed at the jail (see Paulsen Depo. at 64, **Exhibit 10**).

58.     On Wednesday, March 5, Plaintiff's symptoms were worse and he also developed stomach pain and was in bed upstairs and he asked a detainee who spoke some English to try to get the nurse to see him, but the nurse came by the cell downstairs and left before he could get to her. He then complained to an officer through a detainee/interpreter and was told that the nurse was gone and to fill out a form (see Plaintiff Depo. at 237-240, **Exhibit 8**).

59.     By Wednesday night, 3/5/03, Plaintiff's throat was worse and when he coughed, there was blood on the paper (see Abraham Depo. at 140-41, **Exhibit 9**).

60.     Plaintiff came downstairs wrapped in a blanket Wednesday night and Deputy Allen was informed by Plaintiff's twin brother, Abraham, that Plaintiff had not yet been seen by a nurse, so Deputy Allen helped fill out forms in Spanish and placed them in the medical box in the control room (see Allen Depo. at 98, **Exhibit 4**).

61.     On the evening of 3/5/03, it was reported to Deputy Allen that Plaintiff had pain in his side or stomach, was cold, had diarrhea, and Allen knew he had been vomiting because he smelled like vomit (see Allen Depo. at 108-10, **Exhibit 4**).

62.     By 3/5/03, at least 20 detainees had flu-like symptoms (see Allen Depo. at 112-13, **Exhibit 4**).

63.     On Wednesday morning, 3/5/03, Plaintiff didn't have the strength to get down the stairs, but when the nurse came by that morning, she was told that there were sick people upstairs, but she didn't go up the stairs (see Plaintiff Depo. at 274, **Exhibit 8**). Later that morning, Plaintiff was getting worse and began vomiting and others were doing the same (see Plaintiff Depo. at 275,

11

**Exhibit 8**). Plaintiff vomited wherever he was located and although his brother tried to help him get to the bathroom, when he couldn't make it, he vomited on the floor and others who were sick were doing the same thing (see Plaintiff Depo. at 275-6, **Exhibit 8**). They would clean up the vomit with paper and throw it to one side (see Plaintiff Depo. at 276, **Exhibit 8**). If there were 50 or 60 detainees, about 30 of them were vomiting (see Plaintiff Depo. at 277, **Exhibit 8**).

64.     Nurse Paulsen first saw Plaintiff on Thursday, 3/6/03, and Plaintiff complained, through an interpreter who was also an inmate, of a headache, stomachache, diarrhea, congestion, a sore throat, dizziness, and the shakes (see Plaintiff Depo. at 263-4, **Exhibit 8**; Paulsen Depo. at 51-2, **Exhibit 10;** and Paulsen record of 3/6/03, **Exhibit 11**, Park 1041). Plaintiff's skin was warm, he was slightly tender over the stomach, he had a temperature of 100.2, pulse 88, and respiration 24 (see Paulsen record, **Exhibit 11,** Park 0141).

65.     Nurse Paulsen took no medical history, it was a short meeting, and Plaintiff was informed that he had altitude sickness and would feel better, "just drink a lot of water" (see Plaintiff Depo. at 263-67, **Exhibit 8**). He was given medications for headache, nasal congestion and nausea (see Paulsen record, **Exhibit 11,** Park 0141).

66.     Despite the medications, Plaintiff's condition deteriorated, he had trouble standing, his skin tone was changing, he was very weak and dizzy, and his other symptoms had not diminished (see Abraham Depo. at 144-46, **Exhibit 9**). He was again seen by Nurse Paulsen who continued the same medications (see Paulsen record, **Exhibit 12,** Park 0142). Plaintiff was again told that he had altitude sickness (see Abraham Depo. at 154, **Exhibit 9**).

67.     Friday night, 3/8/03, Plaintiff "felt like I was dying" (Carranza-Reyes Depo. at 286, **Exhibit 8**), and Deputy Frye came on duty at midnight Friday night and entered Pod D at 1:00 a.m. and observed Plaintiff holding his stomach and looking sick (see Frye Depo. at 80-1, **Exhibit 13**; and

Frye Incident Report, **Exhibit 14,** Park 0155). He communicated with Plaintiff through another detainee as interpreter and with gestures (see Frye Depo. at 71, **Exhibit 13**).

68. At approximately 3:00 a.m. on 3/8/03, Plaintiff again complained to Deputy Frye through an interpreter that he was sick and was having trouble breathing. Deputy Frye took his vital signs, which were abnormal, with a blood pressure of 143/78, respiration 34, and pulse 62 (see Frye's entries in Master Control Log, **Exhibit 15,** Park 1001). Frye administered oxygen to the Plaintiff, called Nurse Paulsen at home, and was told to have Plaintiff drink water and to give him ibuprophen and Peptobismal (see **Exhibit 15**). A respiration of 34 indicates shallow breathing (see Frye Depo. at 101, **Exhibit 13**). Frye decided that if Plaintiff had altitude sickness, oxygen might help (see Frye Depo. at 98, **Exhibit 13**), but he discontinued the oxygen because it didn't help (see Frye Depo. at 102-03, **Exhibit 13**).

69. Nurse Paulsen then informed the controller, who informed Deputy Frye, that Plaintiff had the flu and she was aware of his condition (see Frye Depo. at 104, **Exhibit 13**; and see **Exhibit 14,** Park 0155).

70. When Deputy Frye saw Plaintiff at 3:00 a.m., Plaintiff placed his hand on the right lower side of his back and the upper part of his throat to describe his pain and placed both hands on his chest to demonstrate pain (See Plaintiff Depo. at 293-4, **Exhibit 8**).

71. During Pod walks after 3:00 a.m., Frye several times observed Plaintiff in pain kneeling on the floor with his upper body on a bunk (see Frye Depo. at 113, **Exhibit 13**).

72. Nurse Paulsen arrived at the jail around 7:45 a.m. on Saturday, 3/8/03 to check on the Plaintiff (see Paulsen Depo. at 98-9, **Exhibit 10**). At 8:10 a.m., Plaintiff passed out and Deputy Crawford was notified and immediately went upstairs and observed Plaintiff lying on his back between the rows of bunk beds and he immediately summoned Nurse Paulsen, who "did a quick

check" and through an interpreter was told that Plaintiff had severe pain on his right side in the area of the kidney. Nurse Paulsen determined that he probably had a kidney stone and it was agreed that he would be moved downstairs with his bedding where it would be safer for him to use the urinal (see Crawford's Inter-Office Memorandum in the Pass-On Records, **Exhibit 16,** Park 3530).

73.     Plaintiff's brother, Abraham, and another detainee carried Plaintiff downstairs and they brought him a chair to sit on to ease his pain (see Plaintiff Depo. at 301-2, **Exhibit 8**). Plaintiff was told to try to urinate to get a stone out that they could send for analysis, but when he urinated, it was bloody (see Plaintiff Depo. at 302, **Exhibit 8**).

74.     At 8:50 a.m., Deputy Crawford sent Deputy Theobald to a local store to purchase cranberry juice because Plaintiff probably had a kidney stone (see Pass-on Records, **Exhibit 16,** Park 3530; and Master Control Log, **Exhibit 15,** Park 1002). Plaintiff attempted to drink the juice, but vomited into the garbage can (see Plaintiff Depo. at 302-3, **Exhibit 8**).

75.     When Nurse Paulsen first examined Plaintiff at 8:10 a.m. that morning, she informed Deputy Crawford that Plaintiff needed to be transported out of the jail for medical attention and was told by Crawford that she had to call the INS to get permission to transport (see Paulsen Depo. at 104, **Exhibit 10**). Paulsen wanted Plaintiff to be taken to the Summit County Emergency Department, but before calling the Emergency Department to make those arrangements, she first called the INS (see Paulsen Depo. at 105-6, **Exhibit 10**).

76.     At 8:53 a.m., blood was observed in Plaintiff's spittle (see Pass-On Records, **Exhibit 16,** Park 3530).

77.     Paulsen called Ben at the INS, telling him that Plaintiff's symptoms had worsened and he needed to be transported and he gave her permission to transport "if it gets worse." She told Ben that she thought Plaintiff had a kidney stone, but "it could be anything" (see Paulsen Depo. at 108,

14

**Exhibit 10**).  Ben told Paulsen that the INS could transport the Plaintiff, but it would be three hours

before that could occur, and Nurse Paulsen responded, "I told him he needed to be transported prior

to that" (see Paulsen Depo. at 110, **Exhibit 10**).  Paulsen understood that if the Plaintiff's symptoms

got worse, they could transport the Plaintiff and Paulsen explained to Deputy Crawford that she

disagreed with the INS because "he should be transported now" (see Paulsen Depo. at 110, **Exhibit

10**).  When Nurse Paulsen was asked why she didn't order immediate transport, she stated, "I don't

know" (see Paulsen Depo. at 110-111, **Exhibit 10**).  At that time, Paulsen thought it was either

Plaintiff's kidney or appendix (see Paulsen Depo. at 112, **Exhibit 10**).

78.     Paulsen lived 40-45 minutes from the jail, and left the jail and went home around 9:00

a.m., thinking that she had made arrangements with Crawford for Plaintiff to be transported, so it

was okay to go home.  Before leaving the jail at 9:00 a.m., she called Summit County Emergency

Department and informed them that Plaintiff would be transported (see Paulsen Depo. at 115-116,

**Exhibit 10**).

79.     When Paulsen left the jail at 9:00 a.m., she thought they were in the process of getting

Plaintiff transported by vehicle (see Paulsen Depo. at 117-18, **Exhibit 10**).  Paulsen then called the

jail from her home at 11:07 a.m. and recommended that "Plaintiff be taken to Summit Medical

Center for evaluation/treatment" (see Pass-On Records, **Exhibit 16,** Park 3530).  Paulsen called

Deputy Crawford at 11:07 a.m. to make sure that Plaintiff had been transported, and she was upset

when she learned that the transport had not taken place, "and I asked him to please transport him"

(see Paulsen Depo. at 122-23, **Exhibit 10**).

80.     Plaintiff had been continuing to vomit into the garbage can, was having trouble

breathing, and to prepare him for transport, they gave him clean clothes and shoes, handcuffed him

and chained him around the waist, placed him in a vehicle and gave him a plastic bag to put between his hands so he could vomit during the trip (see Plaintiff Depo. at 303-4, **Exhibit 8**).

81.     On the trip to the Emergency Department, Plaintiff continued vomiting in the back seat, and felt like "I was suffocating" (see Plaintiff Depo. at 306-7, **Exhibit 8**).

82.     Sgt. Muldoon left the jail with Plaintiff at 11:55 a.m. and arrived at Summit Medical Center at 12:42 (see Pass-On Records, **Exhibit 16,** Park 3530).

## Summit County Medical Emergency Department

83.     At Summit County, the triage assessment indicated that for 3 days, Plaintiff had suffered from right-sided chest pain, fever, nausea, vomiting and diarrhea (see Keeling Depo. at 86, **Exhibit 17**). X-rays of the chest showed extensive abnormalities in the lungs consistent with pneumonia (see Keeling Depo. at 97, **Exhibit 17**). Plaintiff's 3 days of right-sided chest pain was consistent with the pneumonia that Dr. Keeling diagnosed in the right lower lobe of the lung (see Keeling Depo. at 87, **Exhibit 17**). Plaintiff's headaches and dizziness was consistent with Keeling's diagnosis of pneumonia and sepsis (see Keeling Depo. at 91, **Exhibit 17**).

84.     The history of shortness of breath and coughing up blood was consistent with pneumonia (see Keeling Depo. at 92, **Exhibit 17**).

85.     Plaintiff was not stable when his initial vital signs were taken (see Keeling Depo. at 95, **Exhibit 17**), with a pulse of 126, respiration 24, and blood pressure of 66/___ (no diastolic) (see Keeling Depo at 85, **Exhibit 17**).

86.     Plaintiff's blood chemistry results, as well as multiple episodes of vomiting for 3 days, were all consistent with Keeling's diagnosis of sepsis (see Keeling Depo. at 101-102, **Exhibit 17**), and abnormal platelet count and abnormal metabolic panel were all consistent with Keeling's diagnosis of septicemia or septic condition (see Keeling Depo. at 103-04, **Exhibit 17**). Plaintiff was

16

also pale and jaundiced, consistent with sepsis, which can affect the liver (see Keeling Depo. at 89-90, **Exhibit 17**).

87.     Plaintiff was administered antibiotics, oxygen, IV fluids for hydration, and potassium chloride to stabilize him for transfer to Denver Health Hospital (see Keeling Depo. at 28-9, **Exhibit 17**).

88.     Nurse Paulsen agrees that based on Plaintiff's symptoms on arrival at Summit County and the description of his having chest pain and shortness of breath for 3 days, that he probably had had pneumonia for days (see Paulsen Depo. at 149, **Exhibit 10**).  She also agrees that Plaintiff's complaints to her on March 6 of general body aches, headache, nausea, diarrhea, and a red, sore throat were signs and symptoms of the beginning of a septic condition or sepsis (see Paulsen Depo. at 81, **Exhibit 10**).

**Ambulance Trip to Denver Health Medical Center**

89.     The ambulance left Summit County at 3:55 p.m. and arrived at Denver Health at 4:55 p.m., averaging 85 miles per hour the entire distance (see Rohwer Depo. at 17-18, **Exhibit 18**). During the trip, Plaintiff's skin was warm and sweaty, his chest had wheezing in all fields with extreme shortness of breathe, he had difficulty breathing and was given antibiotics IV and twice vomited blood (see Rohwer Depo. at 18-19, **Exhibit 18**).  He was on oxygen (see Rohwer Depo. at 19, **Exhibit 18**), his level of discomfort was severe (see Rohwer Depo. at 23-4, **Exhibit 18**), and he was in shock (see Rohwer Depo. at 29, **Exhibit 18**).  His blood pressure was low, he had a rapid heart rate and respiratory rate, and his oxygen saturation never went above 92, despite being on oxygen (see Rohwer Depo. at 30, **Exhibit 18**).  His condition was unstable when he arrived at Summit County and remained unstable during the ambulance trip (see Rohwer Depo. at 31-2, **Exhibit 18**).

**Denver Health Medical Center**

90.     Plaintiff was diagnosed in the Emergency Department with respiratory failure, acute pneumonia, sepsis, and was in septic shock (see Markovchick Depo. at 24, **Exhibit 19**). He was in critical condition and his blood pressure continued to drop despite emergent treatment (see Markovchick Depo. at 29, **Exhibit 19**) and he was discharged to Intensive Care at 6:45 p.m. on March 8, 2003 (see Markovchick Depo. at 33, **Exhibit 19**). He was in septic shock when he arrived at Denver Health and had pneumonia in both lungs and was intubated and put on a ventilator because he had respiratory failure from pneumonia (see Markovchick Depo. at 43, **Exhibit 19**). He was also suffering from acute renal failure (see Markovchick Depo. at 44, **Exhibit 19**). Based on his overall condition in the Emergency Department, he "absolutely" would have died in a short period of time without treatment (see Markovchick Depo. at 46, **Exhibit 19**).

91.     Dr. Ivor Douglas, Director of Medical Critical Care Services at Denver Health (see Douglas Depo. at 7, **Exhibit 20**), escorted Plaintiff into the ICU, which he only does when someone is "crashing" and needing serious urgent attention (see Douglas Depo. at 16, **Exhibit 20**). He was in respiratory failure, was critically ill, and had rapidly progressive multi-organ dysfunction (see Douglas Depo. at 18, **Exhibit 20**). The lab isolated streptococcus Group A bacteria as the cause of pneumonia (see Douglas Depo. at 23, **Exhibit 20**). Strep A releases a toxin that can dissolve body tissues, such as lung tissue, by causing the death of the tissue (see Douglas Depo. at 26-7, **Exhibit 20**).

92.     On arrival, Plaintiff had severe septic shock described as "intractable shock," meaning that despite extensive resuscitation efforts, blood pressure remains low (see Douglas Depo. at 29-30, **Exhibit 20**). Intractable shock means the process had been going on for awhile (see Douglas Depo. at 30, **Exhibit 20**), and there was a lead-up period of "some days" (see Douglas Depo. at 38, **Exhibit**

**20**).  The lung infection became so invasive that the lung eventually liquefied and had to be drained and resected (see Douglas Depo. at 43, **Exhibit 20**).  The multi-organ dysfunction with poor blood flow to the limbs resulted in both lower legs becoming seriously compromised so they had to amputate one leg below the knee to save his life and nearly had to amputate his other leg (see Douglas Depo. at 43-4, **Exhibit 20**).

93.     Once septic shock develops, there is a golden 4-hour window of opportunity to treat it.  If Plaintiff had not been hydrated and provided antibiotics within that time frame, he probably would have died (see Douglas Depo. at 79, **Exhibit 20**).  When Dr. Douglas saw Plaintiff at Denver Health, Plaintiff had been sick for a good while prior to coming to Denver because when he arrived at Denver Health, he was in life-threatening septic shock (see Douglas Depo. at 84-5, **Exhibit 20**).

94.     Strep A bacteria can be harbored in the throat and then become invasive (see Douglas Depo. at 107, **Exhibit 20**) and Plaintiff must have gotten it on March 1 or later because he had it sometime within the 7 days before he came to the hospital (see Douglas Depo. at 109, **Exhibit 20**).

95.     If Plaintiff was in a similar condition at the jail, then a guard should have been able to determine that he was very sick (see Douglas Depo. at 117, **Exhibit 20**).

**Park County Jail's Communicable Disease Policy.**

96.     In March 2003, the Park County Jail included information on communicable diseases in its Policy and Procedure Manual so that jail personnel would be informed on the signs and symptoms of "a communicable (or infectious) disease" (see, "Communicable Diseases," **Exhibit 21,** Park 1995-1999).

97.     Jail personnel were informed that: "Disease can spread rapidly through the jail, infecting inmates and staff alike.  For that reason, it is very important to be aware of the possibility

that an inmate has an infectious disease, and then to know what to do about that" (see **Exhibit 21,** Park 1995).

98.     Jail personnel are instructed to observe inmates for signs and symptoms of possible communicable disease and if an inmate is suspected of having such a disease, the inmate should be isolated from other inmates (see **Exhibit 21,** Park 1995).

99.     Jail personnel were informed that: "It is also important to be aware of signs and symptoms of possible disease after an inmate has been admitted to the jail. Because such diseases have an incubation period, the signs or symptoms may not become apparent until he has been in jail for some time" (see **Exhibit 21,** Park 1995).

100.    Jail personnel were informed of the various ways communicable diseases can be spread and transmitted, including contact with an infected person, with contaminated objects such as soiled dressings or clothing, from inhaling droplets spread when an infected person sneezes or coughs (see **Exhibit 21,** Park 1996).

101.    The jail personnel were then instructed to watch for some of the more common signs and symptoms of communicable disease: "Fever, chills, headache, rash, cough (especially in which phlegm is coughed up), diarrhea or cramps, sore throat, sudden joint swelling and pain (commonly along with fever), weakness and itching" (see **Exhibit 21,** Park 1997).

102.    If jail personnel notice these signs and symptoms, they are instructed to: "(1) isolate the inmate from other inmates. Place him in a single cell. (2) Call M.D. to report the observed symptoms and to receive specific instructions. (3) Treat as M.D. indicates" (see **Exhibit 21,** Park 1997).

103.    Sheriff Wegener testified that this is a guide lines for the detention officers to follow (see Wegener Depo. at 83, **Exhibit 3**). This information was provided to Deputy Frye and read by

him in early 2003 (see Frye Depo. at 57, **Exhibit 13**). Frye agreed that Plaintiff's signs and symptoms as charted by Nurse Paulsen on March 6 and 7 are all common signs and symptoms of communicable disease based on the information provided to jail personnel in Exhibit 21 (see Frye Depo. at 59-60, **Exhibit 13**). Frye may have considered the possibility that Plaintiff was developing an infection (see Frye Depo. at 60, **Exhibit 13**), but did not call the M.D. to report the observed symptoms and receive specific instructions because Nurse Paulsen was aware of the signs and symptoms (see Frye Depo. at 66-67, **Exhibit 13**).

104. Had Flint been aware of Plaintiff's symptoms as charted by Nurse Paulsen on March 6, he would have been concerned because those symptoms describe any number of communicable diseases and if it was strep throat, it could spread rapidly throughout the pod (see Flint Depo. at 86-87, **Exhibit 22**). Flint was upset when he discovered there had been no laundry changes in Pod D for over 5 days, which is why he authored a memo (see Flint Depo. at 70, **Exhibit 22**; and Inter-Office Memorandum, **Exhibit 23**, Bate 45). Flint's memo of 3/4/03 describes several inmates in Pod D who were sick and he recognized a possibility of an epidemic (see Flint Depo. at 78, **Exhibit 22**, and Inter-Office Memorandum, **Exhibit 23**). Flint's Inter-Office Memorandum describing sick detainees and no laundry changes for over 5 days was placed in all of the jail records to inform the entire jail staff, the Pass-On Records, the Sergeant's Log, and a copy to Gore (see Flint Depo. at 83-4, **Exhibit 22**).

105. Flint and Nurse Paulsen had the authority to have a detainee removed from the general population and put in segregation to prevent the spread of disease and Flint or any supervisor had authority to call Dr. Bachman directly for assistance and advice in the nurse's absence (see Flint Depo. at 93-95, **Exhibit 22**).

106.    When Plaintiff exhibited evidence of possible fever, warm skin, complaining of headaches, coughing, diarrhea, and a sore throat, Flint agrees that this would alert anyone who has read the communicable disease policy to the fact that Plaintiff may have a communicable disease (see Flint Depo. at 100, **Exhibit 22**).

107.    Nurse Paulsen was personally concerned about the potential health hazards of having an overcrowded pod, stating, "any nurse would be" and she complained to Corporal Crawford and Sgt. Muldoon about the overcrowding because of possible health problems (see Paulsen Depo. at 45-46, **Exhibit 10**).  Paulsen also observed that there were only two toilets in Pod D when there were more than 30 inmates, and complained to Corporal Crawford and Sgt. Muldoon because she knew that the regulations required 1 toilet for every 12 inmates (see Paulsen Depo. at 44-45, **Exhibit 10**).

108.    When Nurse Paulsen examined Plaintiff on March 6 and he was complaining of general body aches, headache, nausea, diarrhea, nasal congestion and a sore throat, she did not swab his throat for a culture even though it was slightly red and she knew that a red throat is a sign of strep infection.  She also knew that these symptoms were signs and symptoms of the beginning of a septic condition or sepsis (see Paulsen Depo. at 80-1, **Exhibit 10**).  However, Paulsen did not consider calling Dr. Bachman to inform him of possible symptoms of a strep throat and possible septicemia or a septic condition (see Paulsen Depo. at 84, **Exhibit 10**).

109.    When Paulsen received a call from the jail about 3:00 a.m. on March 8, and was told that Frye had taken vital signs and given the Plaintiff oxygen, she believed Plaintiff's condition had deteriorated from the time she saw him on March 7 and considered coming in immediately to assess him, but the deputies "didn't feel at that point it was necessary," referring to Deputy Fikejs and Deputy Frye (see Paulsen Depo. at 93-4, **Exhibit 10**).

110.     Paulsen doesn't remember ever segregating detainees and taking them out of Pod D because of flu, infection or a possible communicable disease (see Paulsen Depo. at 158, **Exhibit 10**). Detainees would be left in Pod D if they had signs and symptoms of the flu or an infection (see Paulsen Depo. at 158-9, **Exhibit 10**).

111.     When strep throat is suspected, a "rapid strep test" can be used with results within 10 to 20 minutes, but Paulsen did not have the capability of doing a rapid strep test at the jail. After the Plaintiff was hospitalized, Paulsen requested Park County to provide her with rapid strep tests, but they said it was too expensive (see Paulsen Depo. at 169, **Exhibit 10**).

**Deliberate indifference to spread of infection.**

112.     Dr. Bachman was the medical director of the Park County Jail, but was never informed of the illness spreading among the detainees in Pod D before the Plaintiff was transported to the hospital (see Bachman Depo. at 114-15, **Exhibit 24**).  Nurse Paulsen was to call him if there was any evidence of any infectious or communicable disease process spreading among detainees in Pod D, but he was never called (see Bachman Depo. at 115-16, **Exhibit 24**).

113.     With none of the sick detainees receiving medical care and 50 of the detainees being moved out of the Park County Jail on March 7, there were only 9 detainees left in Pod D on March 8 when Plaintiff was transported to the hospital.  On 3/10/03, the Consulate General of Mexico informed the INS that Plaintiff had been diagnosed with streptococcus Group A, "an illness that begins with a simple cold or nasal infection and is considered highly contagious.  According to the doctor's opinion, the rest of the group is in high risk of getting the same illness, so they would need medical attention as soon as possible."  The Consulate General expressed concern over Plaintiff's life and the causes of his condition, "we are concerned about the prevention of the propagation of

this illness to the rest of the group." The Consulate General then requested that the rest of the group be treated medically (see **Exhibit 25**, Park 0496).

114.    The remaining detainees were then examined and treated medically on 3/10/03 and 3/11/03.  One was diagnosed with a bronchitis infection and treated with antibiotics; two were diagnosed with acute pharyngitis and fever and prescribed antibiotics because Dr. Bachman felt they had a bacterial infection; and two were treated for colds and given medication that breaks up mucous.  Two of the detainees had no acute illness, but indicated they had a fever the previous week (see Bachman Depo. at 106-114), **Exhibit 24**).

115.    Dr. Bachman prescribed antibiotics for a bacterial infection because it was his practice when he believed a patient had strep throat not to do a throat culture, but treat it as if it was a strep infection (see Bachman Depo. at 144, **Exhibit 24**).

116.    There were no plans to have the remaining detainees seen by Dr. Bachman for possible treatment prior to Plaintiff's hospitalization (see Paulsen Depo. at 217, **Exhibit 10**).

117.    Pharyngitis can be a precursor to strep throat, bronchitis is caused by some type of infection, and bronchitis can lead to pneumonia if not treated (see Paulsen Depo. at 217, **Exhibit 10**).

118.    All of the remaining detainees were transported out of the jail on 3/13/03 so that Pod D was vacant (see Paulsen Depo. at 171, **Exhibit 10**).  A decision was reached that they needed to clean Pod D, disinfect it and paint some areas before again putting detainees in there and no INS detainees would use that pod until Paulsen was certain it had been disinfected (see Paulsen Depo. at 172, **Exhibit 10**).  It was several weeks before they again began taking INS detainees (see Paulsen Depo. at 172-3, **Exhibit 10**).  Before 3/13/03, there was no opportunity to clear Pod D and totally disinfect it, remove existing mold, and clean it up because detainees were coming in and out of it constantly (see Paulsen Depo. at 159, **Exhibit 10**).

119.    On 3/9/03, one day after Plaintiff was hospitalized, Corporal Crawford authored a memo to "all staff," stating "talked with Nurse Paulsen about cleaning all pods with a 10% bleach solution and she concurs.   Heavy attention to removing any mold that has accumulated on the housing unit walls.   Complete linen change done in D and C Blocks along with uniform and underwear exchange in D Block" (see **Exhibit 26,** Park 3545).

120.    On 3/10/03, Sgt. Muldoon sent a memo to "all staff," stating that "per Medical, each housing unit WILL be cleaned daily with a 10% bleach solution and linen will be exchanged daily if possible.   Also per Medical, every attempt will be made to insure at least one-half hour of outside recreation each day" (see **Exhibit 27,** Park 3544).

121.    In a memo to "all staff" from Sgt. Muldoon, he states: "At the suggestion of Medical, we need to work up a protocol regarding sanitizing mats when inmates are released.   We will need to pull the vacated mats and wipe them down with a disinfectant and then place them in the sunlight out in the yard for UV disinfectant.   All INS detainees have been transported to Summit Medical to be examined for the mysterious disease.   The Mexican Consulate called today and INS has requested this" (see **Exhibit 28,** Park 3548).

## The "for-profit" motive for deliberate indifference to overcrowding and unsanitary conditions of confinement.

122.    Defendant Gore became captain of the jail in September 2000 when there were only 12 inmates and the jail was losing money annually (see Gore Depo. at 6-7, **Exhibit 2**).   It was Gore's intent to make the jail profitable because the jail was a source of income for the county that was not restricted by the Taxpayers' Bill of Rights Amendment and the jail could therefore increase profits and keep those profits (see Gore Depo. at 8-9, **Exhibit 2**).

123.     Gore was successful in bringing inmates to the Park County Jail from other counties, as well as state and federal agencies, thus increasing revenue. In his first year as captain of the jail, for the year 2001, the jail produced $900,000; then in 2002, $1.6 million; and Gore projected the income for 2003 to be $1.8 million and exceeded his projected revenues by $350,000 (see Gore Depo. at 8-9, **Exhibit 2**).

124.     By increasing revenues through an increase in inmates, the Park County Jail became one of the most financially successful jails in the area. In addition, the jail provided over $400,000 of free inmate labor to the county (see Gore Depo. at 9-10, **Exhibit 2**).

125.     The inmates work for the Fire Department, the Forest Service, the Town of Fairplay, and for Park County and receive $1 per day, which can be applied toward charges made by the jail to inmates for prescription medications and for seeing a nurse or doctor (see Gore Depo. at 11-12, **Exhibit 2**).

126.     By overcrowding Pod D, the revenue from the INS for January 2003 was $38,247.50, for February 2003 it was the sum of $41,227.00, and for the first two weeks of March 2003, the sum of $29,561.60 (see **Exhibit 6,** Park 0443, 0444, and 0445).

127.     The Board of County Commissioners was aware of the profits being made at the jail and thought Gore was doing a good job (see Gore Depo. at 37-8, **Exhibit 2**). There was substantial newspaper coverage of the profits made by the jail's increased revenue from housing inmates from other counties and state and federal agencies. Sheriff Wegener acknowledged the accuracy of the articles, which indicated that most occupants were from outside the county and on 11/21/03, the jail had 142 inmates and only 22 were from Park County (see Wegener Depo. at 25-6, **Exhibit 3**).

128.     Sheriff Wegener confirmed the accuracy of the statement that, "Gore has managed the jail for the past three years, building its profit margin each year by bringing in paying prisoners from other counties and agencies" (see Wegener Depo. at 27, **Exhibit 3**).

129.     Some of the 18 bunks in Pod D were empty when Wegener took over as sheriff (see Wegener Depo. at 28-9, **Exhibit 3**).

130.     Sheriff Wegener and Jail Captain Gore had meetings with the Board of County Commissioners who approved an expansion of the jail upon assurance by Gore that even with a 50% occupancy, the jail would generate money for the county (see Wegener Depo. at 30-33, **Exhibit 3**).

**The overcrowding policy is ongoing.**

131.     The jail has not changed its practice of overcrowding detainees in Pod D, which is the same size as it was previously with the same number of three-tiered bunk beds (see Gore Depo. at 252, **Exhibit 2**), and detainees in Pod D are still placed on mats or mattresses on the floor when all the bunk beds are filled (see Gore Depo. at 250, **Exhibit 2**).

132.     After Plaintiff lost his leg, Sheriff Wegener did not monitor the number of people being held in the cells to prevent this from happening in the future (see Wegener Depo. at 95, **Exhibit 3**).  Following this incident, no changes were made to try to make the jail better and safer for inmates (see Wegener Depo. at 98, **Exhibit 3**), and Wegener agrees that they have continued to violate the policy of housing a maximum of 18 people in Pod D (see Wegener Depo. at 101, **Exhibit 3**).

**Additional ongoing material violations of the jail's Policy & Procedure Manual.**

133.     The Policy and Procedure Manual describes a quality improvement committee that will meet no less than twice annually and monitor the quality of health care. The committee does not exist (see Gore Depo. at 212-13, **Exhibit 2**).

134.    The Manual describes an infection control program and infection control report to be presented to the Medical Director at least quarterly. There is no infection control program or committee and no reports were ever submitted (see Gore Depo. at 214, **Exhibit 2**).

135.    Nurse Paulsen read the Policy and Procedure Manual when she became employed at the jail in January 2003 (see Paulsen Depo. at 183-84, **Exhibit 10**). She understood that, as health services administrator, she was responsible for recording minutes of the infection control and continuous quality improvement committee meetings, but there were was no infection control committee or quality improvement committee (see Paulsen Depo. at 186, **Exhibit 10**).

136.    Paulsen was concerned when she discovered that none of these committees existed and asked about that, but nothing was done (see Paulsen Depo. at 188, **Exhibit 10**). During her employment at Park County, she served on no committees of any kind (see Paulsen Depo. at 189, **Exhibit 10**).

137.    When Paulsen went to work at Park County, she was concerned about their general practices and procedures as related to the care of detainees and felt there were times when the policies and procedures were not being enforced and that concerned her (see Paulsen Depo. at 198-99, **Exhibit 10**). As a new employee, she was reluctant to discuss her concerns with Gore or other personnel, but these concerns were a factor in her not returning to the Park County Jail when she returned to Colorado from California (see Paulsen Depo. at 199-200, **Exhibit 10**).

**Plaintiff's claims are supported by expert testimony.**

### Manuel D. Romero

138.    Mr. Romero is a highly qualified expert on conditions of confinement in jails and prisons throughout the United States and he helped develop the standards for housing INS detainees in jails and prisons (see Romero Depo. at 7-9, **Exhibit 29**). He is an expert in auditing jails and

prisons for violations of the American Correctional Association (ACA) standards (see Romero Depo. at 9, **Exhibit 29**).  Mr. Romero reviewed all of the relevant documents and deposition testimony in this case and concluded that the Park County Defendants and Nurse Paulsen violated Plaintiff's §1983 rights and were deliberately indifferent to Plaintiff's unsanitary conditions of confinement and medical needs (see Romero Depo. at 23-24, **Exhibit 29**, confirming the accuracy of his report, and see Romero Report, **Exhibit 30**).

### Robert B. Greifinger, M.D.

139.    Dr. Greifinger has extensive experience as an expert in investigating constitutional violations and in monitoring prisons and jails as a special master appointed by the court, and served as chief medical officer for the New York Department of Correctional Services (see Greifinger Depo. at 8-10, **Exhibit 31**, and Greifinger Resume, **Exhibit 32**).  His publication list is extensive (see Greifinger Depo. at 33, **Exhibit 31,** and Publication List, **Exhibit 33**).

140.    Dr. Greifinger is an expert in the standard of care in correctional health, which is a national standard, and it is within the scope of his expertise to opine about medical policies and procedures, including public health, sanitation, and risks of harm (see Greifinger Depo. at 69-70, **Exhibit 31**).  He has almost 20 years experience in correctional health care and has had operational, consultational, and oversight responsibilities and has been an expert witness in litigation, and visited more than 100 correctional facilities across the U.S. (see Greifinger Depo. at 74-75, **Exhibit 31**).

141.    Dr. Greifinger will testify that the crowded and unsanitary conditions in Pod D during March 1-8, 2003, caused Plaintiff to get sick with streptococcal disease, and the lack of timely and appropriate medical care led to his near-death, amputation and other complications, his hospitalizations, and his current compromised medical condition (see Greifinger Depo. at 93,

**Exhibit 31**; Greifinger report dated April 27, **Exhibit 34**; and his written report dated June 2, attached as **Exhibit 35**).

142.    Dr. Greifinger's opinion on causation is in two parts: first, many people carry Strep A and either Plaintiff caught it at the jail or had it in his body and the stressful conditions of crowding, unhygienic clothing, toileting, and general conditions stressed his body so as to allow the strep bacteria to cause illness. Second, the illness could have been diagnosed and treated easily if Plaintiff had been seen by an appropriate medical professional in a timely way, but he was prevented from doing that by barriers created by the county, the Medical Director, and Paulsen. As a consequence of not getting timely treatment, he was close to death and has suffered since (see Greifinger Depo. at 94-95, **Exhibit 31**).

143.    Dr. Greifinger describes the Board of County Commissioners' responsibility for the operation of the jail and reliance on overcrowding to financially support the county (see Greifinger depo. at 97-99, **Exhibit 31**).

144.    Dr. Greifinger describes Sheriff Wegener's role in violating Plaintiff's constitutional rights to adequate medical care and sanitary conditions of confinement (see Greifinger Depo. at 100-105, **Exhibit 31**).

145.    Dr. Greifinger testified that Monte Gore violated Plaintiff's constitutional rights and was deliberately indifferent in allowing overcrowding, unsanitary conditions, inadequate laundry, plumbing and hot water, and in allowing correctional officers to practice medicine and allowing Nurse Paulsen to practice outside the scope of her license and in failing to provide timely access to medical care (see Greifinger Depo. at 105-107, **Exhibit 31**, and see attached **Exhibits 34 and 35**).

146.    The great majority of cases in which Dr. Greifinger has testified against jails and their employees have involved a deliberate indifference to a serious medical need (see Greifinger Depo. at 199-200, **Exhibit 31**).

147.    Dr. Greifinger testified that Nurse Paulsen was deliberately indifferent to Plaintiff's serious medical needs based on a reasonable degree of medical certainty (see Dr. Greifinger Depo. at 280-282, **Exhibit 31**; and see attached reports, **Exhibits 34 and 35**).

### Catherine M. Knox, R.N.

148.    Ms. Knox is a registered nurse with substantial experience and expertise in Department of Correction health care and nursing care and directly supervises 27 nursing managers with 200 registered nurses working at 16 Department of Correction facilities in the State of Washington (see Knox Depo. at 18-19, **Exhibit 36,** and see attached curriculum vitae, **Exhibit 37**).

149.    Knox testified that Nurse Paulsen was deliberately indifferent in knowing or having reason to know that Plaintiff was in grave danger of potential medical harm and not acting to prevent or mitigate the harm.  She describes in detail the basis for her opinion (see Knox Depo. at 84-92, **Exhibit 36,** and her written report dated May 16, 2006, attached as **Exhibit 38**).

### Michael S. Niederman, M.D.

150.    Dr. Niederman is, by reputation, training and experience, one of the nation's leading experts on pulmonary and critical care and has focused his clinical research on infectious respiratory disease, particularly pneumonia and research related to sepsis (see Niederman Depo. at 14-15, **Exhibit 39,** and his curriculum vitae, **Exhibit 40**).  He testified consistent with his report, which is attached as **Exhibit 41,** that Plaintiff's Group A strep infection originated in his sore throat and then spread to his lungs as early pneumonia on March 6 or 7 and progressed during March 7 into March 8, and there was an opportunity to intervene and prevent pneumonia if his strep throat had been

diagnosed on March 6 and treated (see Niederman Depo. at 62-63, **Exhibit 39**). Doing a rapid strep test on March 6 and giving him penicillin could have prevented all of Plaintiff's serious complications (see Niederman Depo. at 93, **Exhibit 39**). The strep throat had probably not yet advanced to pneumonia on the 6[th,] but made the transition to pneumonia sometime during the day of the 7th (see Niederman Depo. at 61, **Exhibit 39**). Dr. Niederman will testify with a reasonable degree of medical probability that Plaintiff's complications would have been avoided had he received antibiotics by 5:00 a.m. on March 8 (see Niederman Depo. at 94-5, **Exhibit 39**). The standard of care is to start antibiotics within 4 hours of the presentation of pneumonia and after 4 hours, every hour of delay adds to mortality (see Niederman Depo. at 97-98, **Exhibit 39**).

151.    Plaintiff had severe pneumonia that was readily diagnosable and pneumonia is associated with septic shock (see Niederman Depo. at 162, **Exhibit 39**). The Plaintiff was in septic shock and critical condition upon arrival at Summit County as evidenced by his very low blood pressure and renal failure (see Niederman Depo. at 134-137, **Exhibit 39**).

152.    Plaintiff either acquired the strep bacteria from the conditions of his confinement or if he was a carrier and it was colonized in his mouth, but not infected, the conditions of his confinement interfered with his immune function and allowed it to progress (see Niederman Depo. at 71-72, **Exhibit 39**). It was a mistake not to do a throat culture and give penicillin, considering this crowded environment (see Niederman Depo. at 111-13, **Exhibit 39**). With up to 60 inmates, some sleeping on mattresses on the floor and wall-to-wall people, the amount of physical space between them was both a stress and a potential vector mechanism for communicable disease (see Niederman Depo. at 130, **Exhibit 39**). Had Plaintiff received antibiotics in a timely way, he would have been spared the amputation and his other medical complications (see Niederman Depo. at 142-3, **Exhibit 39**).

# I. **ARGUMENT**

## I.    **LIABILITY OF THE BOARD OF COUNTY COMMISSIONERS ("BOARD")**

Defense incorrectly argues that, "the Board is not responsible for the operations of the Park

County Jail." To the contrary, by Colorado statute, the Board has the exclusive power to adopt the

annual budget for the jail (C.R.S. §30-11-107(2)(a)), and is empowered to, "use the county jail for

the confinement or punishment of offenders, subject to such conditions as are imposed by law and

with the consent of the Board of County Commissioners" (C.R.S. §30-15-401(1)(f)). Further, "it is

the duty of the Board of County Commissioners to make personal examination of the jail of its

county, its sufficiency, and the management thereof during each session of the Board and to correct

all irregularities and improprieties therein found" (§17-26-126).

Further, Colorado statute requires that counties be sued in the name of the Board of County

Commissioners, and is the exclusive method by which jurisdiction over a county can be obtained

(C.R.S. §30-11-105). The Board has a limited role regarding the jail and it has fiscal obligations

under state law to adequately fund the jail. In addition, the county is a proper defendant whenver one

of its policymakers, such as its sheriff, is alleged to have engaged in unconstitutional activity for

which the county would bear responsibility. *Monell v. New York City Dept. of Social Services,* 436

U.S. 658 (1978); *Oklahoma City v. Tuttle,* 471 U.S. 808 (1985); *Pembaur v. City of Cincinnati,* 475

U.S. 469 (1986).

Defendants argue that only the sheriff, and not the Board, can exercise responsibility over

county jails. However, Defendants' statement that "the Colorado Supreme Court has specifically

held that a board of county commissioners lacked authority over the operations of a county jail" is

too broad. The Colorado Supreme Court in *Richart* decided that "the general powers conferred upon

the board with reference to the county's property generally, **when in conflict** with the special

particular powers conferred upon the sheriff with reference to jails, must yield to the latter, the latter must be treated as exceptions to the former." *Richard v. Board of County Commissioners of Boulder County,* 33 P.2d 971, 972-73 (Colo. 1934) (emphasis added). The *Richard* holding recognized the board's general authority over the jail and is predicated on a conflict existing between the board and the sheriff. In the present case, there is no conflict at issue between the two entities. In contrast, the Plaintiff seeks to hold both entities liable under their separate powers and responsibilities.

Likewise, *Van Cleave v. Board of County Com'rs of Adams County,* 518 P.2d 1371, 1373-74 (Colo. App. 1973) does not support the Defendants' assertion that the Board lacks authority over the operations of the jail because the Court held that the sheriff's salary is set by statute, and the sheriff cannot demand to have living quarters in the jail.

Further, Plaintiff does not seek to hold the Board liable on a vicarious liability theory and the cases cited by Defendants are inapplicable.[1] However, that does not mean that the Board cannot be held liable for the constitutional violations of the sheriff's deputies if the two-part test for deliberate indifference is met.

Defendants argue that there was no custom, policy or practice of the Board that caused injury to the Plaintiff. To the contrary, the Board encouraged and approved the practice of overcrowding, which created unsanitary conditions in Pod D, by approving revenue-producing budgets creating greater and greater profits for the county by increasing the number of inmates and detainees through contracts approved by the county with state and federal agencies, including the INS. In its quest to

---

[1] Defendants cite *Van Cleave v. Board of County Com'rs of Adams County,* 518 P.2d 1371, 1373-74 (Colo. App. 1973); and *Tunget v. Board of County Com'rs of Delta County,* 992 P.2d 650 (Colo. App. 1999). Likewise, Defendants cite *Bristol v. Board of County Com'rs of the County of Clear Creek,* 312 F.3d 1213, 1219-21 (10th Cir. 2002, which was a wrongful termination suit brought by an employee of the sheriff under the ADA, and the issue was whether the Board was the employer. This was not a case of constitutional violations under the 8th or 14th Amendments.

turn the jail into a county profit center, the Board ignored the conditions of confinement created by this practice.

A federal court of the District of Colorado recognized in 1997 that because the Board approves funding for the sheriff, the Board has control over the sheriff's actions. *Robertson v. Board of County Com'rs of County of Morgan,* 984 F.Supp. 980, 985 (D.Colo., 1997). In holding that the Board could be sued for personnel decisions made by the sheriff, the Court in *Robertson* held, "Moreover, the sheriff's budget must be approved and funded by the Board." **"This funding power provides the Board with practical and effective control over the actions of the elected sheriff."** *Id.* (emphasis added).

Further, the Board had a statutory requirement to inspect the jail. In that regard, a Colorado Appeals Court in 1902 held that the individual commissioners could not be held liable for their failure to inspect the jail in that case because even if they had inspected the jail, they would not have become aware of the faulty wiring that led to a prisoner's death, and their failure to inspect did not contribute to the accident. *Miller v. Ouray Electric Light & Power Co., et al,* 70 P.447, 448 (Colo. App. 1902). Here, unlike faulty wiring, conditions in Pod D were obvious.

In a case not cited by Defendants, a board was held liable for under-funding the jail. *Winton v. Board of Com'rs of Tulsa County, Okla.,* 88 F.Supp.2d 1247, 1262 (N.D. Okla., 2000). The *Winton* curt recognized that voters may refuse to fund a jail, but found the lack of funding to be no excuse for depriving inmates of their constitutional rights. *Id.* At 1268. Further, the court noted the county could pay up front or on the back end by satisfying judgments based on unconstitutional conditions at the jail. *Id.* The court found overcrowding, under-staffing, and lack of segregation to be "de facto policies of inaction by the County which created and/or contributed to the conditions which created a serious risk of harm in the jail." *Id.* The county's policy of no or ineffective actions

35

was the moving force behind the conditions which created the risk of harm in the first place." *Id.* At 1269.

The county may be held liable for the sheriff's policies, practice and procedure in operating the jail, and the sheriff's actions are binding upon the county. *Board of County Commissioners v. Brown,* 520 U.S. 397, 403-04 (1997). However, the deliberate indifference standard test to determine municipal liability differs from the one applicable to individual liability in that in municipal liability cases there is no subjective component and the plaintiff need only show an objective risk of injury and a failure to train. *Ginest v. Board of County Commissioners of Carbon County,* 333 F.Supp.2d 1190, 1204 (D.Wyo. 2004) citing *Canton v. Harris,* 489 U.S. 378, 390, and n.10 (1989)). An objective risk is satisfied if the risk is so obvious that the governmental entity should have known of it. *Barney v. Pulsipher,* 143 F.3d 1299, 1308 n. 5 (10th Cir. 1998); *Farmer,* 511 U.S. at 840-42. Thus, to win against the county, Plaintiff need only show an objective risk of substantial harm, and the sheriff's failure to train staff in how to reasonably address and abate that risk. *Ginest v. Board of County Commissioners of Carbon County* at 1204.

The sheriff and Monte Gore failed to train staff to isolate detainees with evidence of communicable disease, to call a doctor when an epidemic of communicable disease occurs, and to obtain a rapid strep test when a detainee has evidence of strep throat. Further, Plaintiff's presentation with a red, sore throat, fever, headaches, nausea, vomiting, body weakness and diarrhea presents a risk of strep throat that is so obvious that a lay person would have recognized the risk. Any parent who has seen similar symptoms with a red, sore throat immediately suspects strep throat and obtains medical treatment.

The sheriff is the final policymaker for the county with regard to how the jail is to be operated on a day-to-day basis and thus the actions of the sheriff are also the official actions/policy of

36

the county with respect to jail operations. *Myers,* 151 F.3d at 1319; *Meade,* 841 F.2d at 1529-30; and *Pembaur v. Cincinnati,* 475 U.S. 469 (1986). The county is aware of the risk if the sheriff, a final policymaker with respect to jail administration, was aware of the risk. *Winton,* 88 F.Supp.2d at 1267.

In *Winton v. Board, supra,* the county argued it took reasonable measures to abate the risk by nearly doubling the jail's budget, hiring an expert, and other similar efforts. *Id.* At 1268. However, the court found that the only practical way for the county to have significantly abated the risk was to build a new facility (the old was overcrowded and unsafe). *Id.* "A reasonable jury could find that the county's inaction or ineffective action was the moving force behind the conditions at the jail which caused or permitted a serious risk of inmate harm to exist in the jail." *Id.* "A jury could find that overcrowding... lack of inmate segregation... dormitory-style housing, all of which existed over a long period of time, were all de facto policies of inaction by the county which created and/or contributed to the conditions which created a serious risk of harm in the jail." *Id.*

The *Winton* court held the plaintiff's claims against the county survived summary judgment because the sheriff's actions or inactions, as the final policymaker for the jail, are attributable to the county and thus were the county's policies as well. *Id.* at 1270. In addition, overcrowding and other conditions which existed over a long period of time were *de facto* policies of inaction by the county which resulted in specific inadequate jail policies such as the watch tour policy.

## II.   **LIABILITY OF THE SHERIFF**

The evidence supports a claim against Sheriff Wegener in both his official capacity and in his individual capacity. Sheriff Wegener participated in the violation of Plaintiff's constitutional rights both individually and in his supervisory capacity as sheriff of Park County by permitting the practice of overcrowding in Pod D in violation of the jail's own policies, which resulted in filthy and

unsanitary conditions and the prevalence of illness among detainees. In his supervisory capacity, he failed to properly train the jail captain, Monte Gore, Nurse Paulsen, and the deputies to implement and enforce the jail's written policies and procedures, which requires a functioning infection committee, the isolation of anyone suspected of having a communicable disease, calling the medical director when a communicable disease was suspected, and maintaining Pod D in a clean and sanitary condition.

As the person primarily responsible under state law for the general management and administration of the jail, the sheriff has a federal duty to provide proper supervision over and to adequately train staff regarding inmate health and safety. *Farmer v. Brennan; Worrell v. Henry,* 219 F.3d 1197, 1214 (10th Cir. 2000); *Green v. Branson,* 108 F.3d 1296, 1302-03 (10th Cir. 1997); *Berry v. City of Muskogee,* 900 F.2d 1489, 1496-99 (10th Cir. 1990); *Meade v. Grubbs,* 841 F.2d 1512, 1528 (10th Cir. 1988). The Tenth Circuit has made it clear that administrators of penal facilities may be held liable "where there has been a complete failure to train, or training that is so reckless or grossly negligent that future misconduct is almost inevitable." *Meade v. Grubbs,* 841 F.2d 1512, 1528 (10th Cir. 1988). In order to properly supervise and train, an administrator normally must issue clear written policies and then teach subordinates how to implement them. *See Sutton v. Utah State School for the Deaf and Blind,* 173 F.3d 1226, 1239 (10th Cir. 1999).

The Park County Jail had clear written policies, but Sheriff Wegener clearly did not teach his subordinates how to implement them and, to the contrary, knowingly permitted the violation of those policies and acquiesced in the constitutional deprivations. Sheriff Wegener was aware of the limitation on number of inmates that could be housed in Pod D, he walked through the facility every two weeks and was aware of the total number of inmates being housed, and acquiesced in the custom and practice of overcrowding, which created unsanitary and filthy conditions.

Officials may be held liable when their own acts, including their policies, practices and procedures, violate an inmate's Eighth Amendment rights, even if the offending policy, practice, or procedure is unwritten. See *Berry v. City of Muskogee,* 900 F.2d 1489, 1499 (10th Cir. 1990); *Lopez v. LeMaster,* 172 F.3d 756 (10th Cir. 1999); *Green v. Branson,* 108 F.3d 1296, 1303 (10th Cir. 1997). A supervisor may also be held liable for the unconstitutional acts committed by a subordinate when an affirmative link connects that act to the supervisor, which means the supervisor must have participated or acquiesced in the constitutional deprivations. *Meade v. Grubbs,* 841 F.2d 1512, 1528 (10th Cir. 1988). The *Meade* Court explained that an affirmative link must exist "between the [constitutional] deprivation and either the supervisor's personal participation, his exercise of control or direction, or his failure to supervise." *Id.* at 1527. This link is satisfied if a supervisor has established or utilized an unconstitutional policy or custom. *Id.* at 1528. *See Skinner v. Uphoff,* 234 F.Supp.2d at 1214 (holding supervisors responsible for acts committed by their inadequately trained staff).

A federal District Court in Oklahoma found some evidence from which a jury could conclude that the sheriff failed to implement policies and procedures that lead guards to disregard the risk; in that case an adequate segregation system to isolate violent inmates; and that there was a failure to train detention officers which led to the harm the plaintiff experienced. *Winton v. Board of com'rs of Tulsa County, Okla.,* 88 F.Supp.2d 1247, 1265 (N.D. Okla. 2000).

The *Winton* Court found there was some evidence from which a jury could conclude measures taken by the sheriff were not reasonably calculated to ensure safety because there was evidence that the overcrowding committee established by the sheriff was ineffective, and that the classification system stopped at the front door of the jail and thus did not protect inmates. *Id.*

Because the programs and practices were ineffective, a reasonable jury could conclude that the steps taken by the sheriff were not reasonable in light of the significant risk. *Id.*

As to medical care, the plaintiffs in *Winton* alleged the sheriff failed to implement adequate medical screening policies, but presented no evidence of existing policies or what additional policies the sheriff should have enacted. *Id.* at 1269. The *Winton* Court did find some evidence that detention guards were not conducting adequate head couns on their watch tours based on the moving, breathing flesh of inmates and were taking the word of other inmates or simply looking into a dorm without doing an individual head count, which resulted in failing to timely discover an injured inmate. *Id.* The Court held that a jury could, therefore, find an affirmative link between the sheriff's maintenance or acquiescence in an inadequate watch tour policy and the delay in discovering the plaintiff's injuries; and thus the plaintiffs in *Winton* survived summary judgment against the sheriff individually. *Id.*

### III.   THE EVIDENCE SUPPORTS A VIOLATION OF PLAINTIFF'S RIGHT TO HUMANE CONDITIONS OF CONFINEMENT

The Plaintiff has satisfied both the objective and subjective components necessary to establish a violation of his right to humane conditions of confinement. He was placed in a crowded, filthy pod and forced to sleep on the floor between sick detainees and forced to live in a pod contaminated by 20-30 sick detainees and by overflowing toilets and floors filled with tissues and vomit. In addition, the showers did not work properly, there were only two toilets when ACA standards required one toilet for every 12 detainees, the ventilation system was plugged, and the exterior wall was cold and wet from condensation. These were the conditions the entire eight days that Plaintiff was there and there is evidence that these conditions persisted whenever overcrowding occurred and overcrowding was the custom and practice and existed for at least several months

before Plaintiff became deathly ill. These were not "minor deprivations suffered for short periods," as claimed by Defendants.

The standard in *DeSpain v. Uphoff*, 264 F.3d 965 (10th Cir. 2001), requires that prison officials provide humane conditions of confinement by ensuring inmates receive "the basic necessities of adequate food, clothing, shelter and medical care." *Id.* at 974. As noted by the Defendants, the *DeSpain* Court found the severity and duration of deprivations of "shelter, food, drinking water and sanitation" (but not medical care) to be inversely proportional, such that minor deprivations for short periods might not rise to an Eighth Amendment violation. *Id.* However, the *DeSpain* Court **held that conditions that involved exposure to human waste, even for only thirty-six hours, are sufficiently severe to meet the first prong of the *Farmer* test.** *Id.* at 975.

For the second prong, official knowledge of the conditions, the *DeSpain* Court explained that "a plaintiff 'need not show that a prison official acted or failed to act believing that harm actually would befall an inmate,' as long as the official should have understood the possibility that harm might ensure." *Id.* The Court goes on to explain that "whether an official had knowledge may be inferred from circumstantial evidence" and thus, although it is generally not enough to establish that the official should have known of the risk of harm, in some cases a "factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Id.* (citing *Farmer v. Brennan*).

## IV.  EVIDENCE SUPPORTS A VIOLATION OF PLAINTIFF'S RIGHT TO ADEQUATE MEDICAL CARE

Contrary to Defendants' assertion, Plaintiff has met the two-part test of *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). Plaintiff's need for medical attention was obviously sufficiently serious. He had strep throat, which developed into pneumonia, and the bacteria entered his blood stream

causing sepsis and as the pneumonia and sepsis became more severe, he went into septic shock. His condition was so obvious that even a layperson would easily recognize the necessity for a doctor's attention. The jail's own policy on "communicable disease" listed the very symptoms that Plaintiff evidenced with instructions that when jail personnel observed these symptoms, they were to isolate the detainee and immediately call a physician. The symptoms were so obvious on the night of March 7th that the deputy felt it necessary to give the Plaintiff oxygen and call the nurse in the middle of the night. The nurse did not respond, the medical director was not consulted, and Plaintiff was not transported for medical care.

Defendant cites *Hunt v. Uphoff,* 199 F.3d 1220, 1224 (10th Cir. 1999) for the rule that the defendant must know of a substantial risk of harm and disregard that risk, "by failing to take reasonable measures to abate it." *Hunt* involves a prisoner's allegation that he was denied proper diagnosis and treatment for high blood pressure and diabetes which resulted in a heart attack. The *Hunt* Court decided that being examined by numerous doctors does not mean that treatment was prescribed or provided. *Id.* at 1224. The Court held that the plaintiff alleged sufficient facts to state an Eighth Amendment claim based on the denial of medical treatment by both a prison doctor and guards. *Id.* at 1224.

Defendants' statement that "individuals who are not medically trained are entitled to rely on the medical treatment decisions of medical professionals" is vague and not supported by the legal authority cited. "Medical professionals" in the case cited is limited to hospital doctors. The Court in *McCracken v. Jones,* 562 F.2d 22, 24 (10th Cir. 1997) did not rule that guards and wardens could rely on nurses. Instead, the *McCracken* Court found that the plaintiff was examined and treated by the prison doctor, and was referred to the state hospital and treated by University doctors. *Id.* at 24. The

Court held that "defendants were entitled to rely on the diagnosis they received from the **state** medical authorities who examined plaintiff." *Id.* at 24-25 (emphasis added).

Unlike Defendants' cited cases, Nurse Paulsen is not a medical doctor, cannot make a medical diagnosis, although she improperly did so,[2] and Plaintiff was never seen by a physician who made a diagnosis that Defendants could rely upon.

*Johnson v. Doughty* is a 7th Circuit decision and *Spruill v. Gillis* is a 3rd Circuit decision, and thus are not controlling. In *Johnson,* the Court found that prison authorities acted reasonably in referring the plaintiff to medical providers who were doctors and thus "could be expected to address [the plaintiff's] concerns." *Johnson v. Doughty,* 433 F.3d 1001, 1010 (7th Cir. 2006). In addition, the *Johnson* Court noted that a medical professional's erroneous treatment decision can lead to deliberate indifference liability if the decision was made in the absence of professional judgment, which the Court defines as a response "so inadequate" that "no minimally competent professional would have so responded under those circumstances." *Id.* at 1013.

The Court in *Spruill v. Gillis,* 372 F.3d 218, 237 (3rd Cir. 2004), identified scenarios that satisfy deliberate indifference to include the prison authorities' denial of reasonable requests for medical treatment when such denial exposes the inmate to undue suffering or the threat of tangible residual injury, and where knowledge of the need for medical care is accompanied by the intentional refusal to provide that care. *Id.* at 235. The *Spruill* Court explained that if a prisoner is under the care of medical experts, defined as doctors in that case, then a non-medical prison official will generally be justified in believing that the prisoner is in capable hands. However, the *Spruill* Court went on to qualify that for non-medical prison officials to escape a charge of deliberate indifference,

---

[2] She first improperly diagnosed his condition as "altitude sickness" and then later as a "kidney stone."

their reliance must be "absent a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner." *Id.* at 236.

Plaintiff's pleas for medical care resulted in the nurse acting beyond the scope of her Colorado license and making an improper medical diagnosis rather than obtaining medical attention, then failing to respond to an emergency call in the middle of the night when Plaintiff was having trouble breathing and was placed on oxygen, then jail personnel and nurse failing to transport Plaintiff to the hospital at 8:00 a.m. on March 8th and instead, the nurse abandoned the Plaintiff and went home, then delaying transport to Summit County Medical for three hours as the Plaintiff went into septic shock. The evidence clearly supports deliberate indifference to Plaintiff's serious medical needs.

## V.   QUALIFIED IMMUNITY OF SHERIFF WEGENER

Defendants argue that Plaintiff cannot demonstrate that Sheriff Wegener was personally involved in a violation of Plaintiff's constitutional rights and therefore Plaintiff's claim against the sheriff in his individual capacity must fail. However, Defendants in this case only partially state the rule regarding "personal involvement." The complete rule requires some affirmative link between the constitutional deprivation and either the supervisor's personal participation, his exercise of control or direction, or his failure to supervise.

Rather than requiring "personal involvement" per se, the Court in *Green v. Branson,* 108 F.3d 1296, 1303 (10th Cir. 1997) required "an affirmative link between the constitutional deprivation and the warden's improper control and failure to supervise." The *Green* Court explained that, "a supervisor is not liable under Section 1983 unless an 'affirmative link' exists between the [constitutional] deprivation and either the supervisor's 'personal participation, his exercise of control

or direction, or his failure to supervise.'" *Id.* at 1304 (citing *Meade v. Grubbs*, 841 F.2d 1512, 1527 (10th Cir. 1988)).

Sheriff Wegener clearly failed to properly supervise the implementation of jail policies that prohibited overcrowding and unsanitary conditions in Pod D and acquiesced in a practice of overcrowding which created unsanitary conditions.

The Defendants are in error in citing *Camfield v. City of Oklahoma City*, 248 F.3d 1214, 1225 (10th Cir. 2001) as establishing that a plaintiff suing public officials must set forth specific facts showing the personal involvement of each named individual defendant. In *Camfield*, the Tenth Circuit ruled that the "district court did not conduct a proper qualified immunity inquiry." *Id.* at 1225. In contrast to the analysis used by the district court, the analysis used by the Tenth Circuit in *Camfield* did not include an analysis of the personal involvement of each named individual defendant. *Id.* at 1225-28. Instead, the Court in *Camfield* identified the right that was violated without analyzing the role individual actors played in violating that right, and went on to decide whether the law was clearly established. *Id.* at 1227-28.

The Court in *Bennet v. Passic*, 545 F.2d 1260, 1262 (10th Cir. 1976) required that the defendants must have "personally participated in or caused" the delay. In referring to the *Bennet* case, Defendants left out the "or caused" part of the rule. Here, Sheriff Wegener's failure to supervise and enforce existing policies and permitting a practice of overcrowding and unsanitary conditions caused Plaintiff's serious medical condition and resulted in the lack of proper and timely medical care.

Contrary to Defendants' assertion, the Court in *Medina v. Cram*, 252 F.3d 1124, 1128-29 (10th Cir. 2001), did not rule that there is a heightened pleading requirement on the issue of intent, but only on the issue of whether the constitutional violation is clearly established. The *Medina* Court

emphasized that the Supreme Court's abrogation of the heightened pleading requirement in *Crawford-El v. Britton* "applies to the plaintiff's showing of improper intent (a pure issue of fact), not to the separate qualified immunity question whether the official's alleged conduct violated clearly established law, which is a legal question." *Medina v. Cram,* 252 F.3d at 1129.

Further, the Supreme Court ruled in *Crawford-El v. Britton,* 523 U.S. 574 (1998), that its holding in *Harlow v. Fitzgerald,* 457 U.S. 800, changed the qualified immunity standard to require clearly established statutory or constitutional rights, but that evidence concerning the defendant's subjective intent was irrelevant to the qualified immunity defense even though it may be an essential component of the plaintiff's affirmative defense *Crawford-El v. Britton* at 574-75.

Defendants state that a right must be clearly established in a "particularized" sense. The *DeSpain* Court explained that whether a particular right is clearly established is determined by whether there is a Supreme Court or Tenth Circuit decision on point, by which "the facts of previous decisions need not correlate exactly with those of the case at issue, as long as there is 'some factual correspondence' between the two." *DeSpain v. Uphoff,* 264 F.3d 965, 979.

In arguing that Fred Wegener has qualified immunity from the §1983 claims against him in his individual capacity, he argues that Plaintiff cannot demonstrate any constitutional violation by Sheriff Wegener personally. The same argument is made with regard to Defendant Gore. In short, the Defendants are focusing only on personal participation. However, the Tenth Circuit in *Serna v. Colorado Dept. of Corrections,* 455. F.3d 1146, 1152 (10th Cir. 2006), established that evidence of an affirmative link "may take various forms: 'the supervisor's personal participation, his exercise of control or direction, or his failure to supervise.'" In the end, the *Serna* Court found the affirmative link must be based on "more than a mere right to control employees." *Id.* at 1153. in *Serna,* the Court made it clear that :failure to supervise is only actionable under §1983 against a defendant who

had a duty to supervise." *Id.* at 1154. In addition, the *Serna* Court found nothing in the record to indicate responsibility for training or planning; and required the plaintiff to present some evidence of the failure to perform some supervisor duty. *Id.*

Defendants argue that actual knowledge, not constructive knowledge, is required to hold a supervisor liable, citing *Lankford v. City of Hobart,* 73 F.3d 283, 297 (10th Cir. 1996). However, *Lankford* is a Title VII employment discrimination case and the standard used in that context is not used by courts in the Eighth and Fourteenth Amendment context.

Defendant also state that the Park County Jail's failure to follow or implement its own policy is insufficient to establish municipal liability, citing *Davis f. Scherer,* 468 U.S. 183, 194 (1984); and *Hovater v. Robinson,* 1 F.3d 1063, 1068 N.4 (10th Cir. 1993). However, the issue in *Davis v. Scherer* was whether the violation of a statute, regulation or policy could constitute a constitutional violation in and of itself and the Court said no. The *Davis* Court ruled that "neither federal nor state officials lose their immunity by violating the clear command of a statute or regulation of federal of of state law unless that statute or regulation provides the basis for the cause of actions sued upon." *Id.* at 195.

The Tenth Circuit has established that the failure to follow a policy or procedure can result in a constitutional violation if it caused the injury. In *Hovater v. Robinson, supra,* the issue was whether the failure to follow a jail policy and procedure that required male guards not to have unsupervised care of female inmates caused the harm alleged, or in other words whether following the policy and procedure would have prevented the harm. The *Hovater* Court ruled that the policy was not intended to prevent the harm because it was intended to protect the guards from false accusations and thus the failure to follow the procedure did not cause the constitutional violation. *Id.*

47

The Court held that "the mere existence of the policy at issue does not establish an obvious risk that females left alone with male guards are likely to be assaulted." *Id.*

However, in the instant case, the failure to follow the jail's policies to prevent overcrowding and unsanitary conditions, to isolate detainees suspected of an infectious communicable disease, and immediately call the medical director, all established an obvious risk of harm to detainees subjected to those conditions of confinement.

In discussing each of Plaintiff's allegations concerning the conditions of confinement in the Park County Jail as set forth in Plaintiff' Second Amended Complaint, Defendants assert that the jail had written policies or procedures to address these issues. However, as demonstrated by Plaintiff's recitation of evidence in this Response, the written policies and procedures were not implemented or enforced and in fact, the unwritten practices and procedures violated Plaintiff's constitutional rights. Further, the unwritten practices and procedures which violated Plaintiff's rights were implemented and condoned by the Defendants acting in a supervisory capacity. As heretofore demonstrated, Defendants Wegener and Gore cannot rely on Nurse Paulsen's inadequate nursing care as an excuse for not fulfilling the constitutional obligation to provide adequate and timely medical care when Plaintiff's need for medical care was obvious and would be apparent to a layperson.

## VI.    LIABILITY OF CAPT. MONTE GORE

Like Sheriff Wegener, Jail Captain Monte Gore likewise claims qualified immunity from Plaintiff's §1983 claims against him in his individual capacity and that he had insufficient personal participation to hold him individually liability. Likewise, he claims that he cannot be held liable in his supervisory capacity. Essentially, his arguments parallel those of Sheriff Wegener and Plaintiff's response to Wegener's arguments are equally applicable to the arguments of Defendant Gore.

In addition, Gore was even more directly involved than Wegener in the supervision of the jail, in implementing the jail's policies, and in implementing or condoning unwritten customs and practices previously described in this Response.

For example, to achieve greater profits each year through increased revenue by increasing the number of detainees stuffed into Pod D, Gore had to increase the policy limit of 18 bunks to 42 bunks, three-tiered, and place the overflow on the floor. This then became the unwritten practice and policy of the jail, which existed for months before March 2003. Gore did not implement the jail's policies requiring a quality improvement committee, an infection control program, nursing protocols to be utilized in the absence of the medical director, isolating a detainee who has a communicable disease and immediately calling the doctor, and maintaining a safe and healthy environment in Pod D. He did not adequately train his staff on the existing policies and the enforcement of those policies.

## CONCLUSION

In conclusion, for all of the foregoing reasons, the Park County Defendants' Motion for Summary Judgment should be denied.

Dated this _12th_ day of January, 2007.

Respectfully submitted,

By:   /s/ William A. Trine, Esq.
William A. Trine, #577
Trine & Metcalf, PC
1435 Arapahoe Avenue
Boulder Colorado 80302-6390
(303) 442-0173

Joseph J. Archuleta, #19426
Joseph J. Archuleta and Associates

1724 Ogden Street
Denver Colorado 80218
(303) 837-1642

Lloyd C. Kordick, #6298
Lloyd C. Kordick & Associates
805 S. Cascade Avenue
Colorado Springs Colorado 80903
(719) 475-8460

Adele Kimmel, Esq.
Trial Lawyers for Public Justice
1717 Massachusetts Avenue, N.W.
Suite 800
Washington, D.C. 20030
(202) 797-8600

**Attorneys for Plaintiff**

## CERTIFICATE OF MAILING/SERVICE

The undersigned hereby certifies that on this _12th_ day January, 2007, a true and correct copy of the foregoing pleading was e-served via Electronic Case Filing and/or placed in the United States Mail, postage prepaid, and properly addressed to:

Joseph Archuleta
Attorney at Law
1724 Ogden Street
Denver, Colorado 80218-1018
*Co-Counsel for Plaintiff*

Lloyd C. Kordick,
Attorney at Law
805 S. Cascade
Colorado Springs, CO 80903
*Co-Counsel for Plaintiff*

Adele P. Kimmel
Richard H. Frankel
Trial Lawyers for Public Justice
1717 Massachusetts Avenue, N.W.
Suite 800
Washington, D.C. 20030
*Co-Counsel for Plaintiff*

Andrew Ringel
Jennifer L. Veiga
Hall & Evans
1125 17th Street, Suite 600
Denver, CO 80202-2052
*Counsel for Defendant Park County, Park County Board of County Commissioners, Park County Sheriff's Office, Fred Wegener, and Monte Gore*

Josh A. Marks
Berg, Hill, Greenleaf & Ruscitti
1712 Pearl Street
Boulder, CO  80302
*Counsel for Defendant Vicki Paulsen*

/s/ Elizabeth Peach