Carranza-Reyes v Park County

Monte K. Gore, Volume I

### SHEET 1 PAGE 1

1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Case No. 2005-WM-377 (BNB)

DEPOSITION OF: MONTE GORE, VOLUME 1
October 31, 2005

MOISES CARRANZA-REYES,

Plaintiff,

v.

PARK COUNTY, a public entity of the State of Colorado and its governing board, THE PARK COUNTY BOARD OF COUNTY COMMISSIONERS; PARK COUNTY SHERIFF'S OFFICE, a public entity of the State of Colorado; FRED WEGENER, individually and in his official capacity as Sheriff of Park County, Colorado; MONTE GORE, individually and in his capacity as Captain of Park County Sheriff's Department; VICKIE PAULSEN, individually and in her official capacity as Registered Nurse for Park County, Colorado; JAMES BACHMAN, M.D., individually and in his official capacity as Medical Director of the Park County Jail,

Defendants.

TAKEN PURSUANT TO NOTICE AND AGREEMENT on behalf of the Plaintiff at 824 Castello, Fairplay, Colorado at 9:04 a.m. before Theresa A. Coffman, Federal Certified Realtime Reporter, Registered Professional Reporter and Notary Public within Colorado.

### PAGE 3

3

I N D E X

EXAMINATION OF MONTE GORE                           PAGE
Volume I
October 31, 2005

By Mr. Trine                                           5
By Mr. Kordick                                        --
By Mr. Archuleta                                      --
By Mr. Ringel                                         --
By Mr. Groome                                         --
By Ms. Lewis                                          --
By Mr. Jurs                                           --

                                                   INITIAL
DEPOSITION EXHIBITS:                             REFERENCE

1   Park County Jail Sergeants Daily Logs,         144
    various dates and attachments

2   The Park County Jail's Response to the          64
    Consulate General of Mexico Regarding the
    Medical Concerns of Moises Carranza, 3/14/03

3   Master Control Logs, 3/1 through 3/10           70

4   Park County Jail Policies and Procedures,     193
    Establishment of Health Care Unit Policy and
    Procedure Manual

5   Park County Sheriff's Office Policy and        22
    Procedure Manual, 11/1/00, three pages

6   Policy, "Communicable Diseases"                 39

7   Policy and Procedure Manual, Housekeeping,    190
    description of cleaning/disinfecting,
    Bates Nos. 0416, 1530, 1528, 1529

(Original exhibits attached to original deposition; copy exhibits included in continuing exhibit file; copies provided to counsel as requested.)

### PAGE 2

2

APPEARANCES

For the Plaintiff:      WILLIAM A. TRINE, ESQ.
                        Trine & Metcalf, P.C.
                        1435 Arapahoe
                        Boulder, Colorado 80302

                        LLOYD C. KORDICK, ESQ.
                        805 South Cascade
                        Colorado Springs, Colorado 80903

                        JOSEPH J. ARCHULETA, ESQ.
                        Law Office of Joseph J. Archuleta
                        1724 Ogden Street
                        Denver, Colorado 80218

For the Defendants      ANDREW D. RINGEL, ESQ.
Park County, Park       Hall & Evans, LLC
County Board of         1125 17th Street
Commissioners, Park     Suite 600
County Sheriff's Office, Denver, Colorado 80202
Wegener and Gore:

                        STEPHEN A. GROOME, ESQ.
                        P.O. Box 1373
                        501 Main Street
                        Fairplay, Colorado 80440

For the Defendant       MELANIE B. LEWIS, ESQ.
Paulsen:                Berg Hill Greenleaf & Ruscitti LLP
                        1712 Pearl Street
                        Boulder, Colorado 80302

For the Defendant       ANDREW W. JURS, ESQ.
Bachman:                Johnson McConaty & Sargent, P.C.
                        400 South Colorado Boulevard
                        Suite 900
                        Glendale, Colorado 80246

Also Present:           None

### PAGE 4

4

REQUESTED PORTIONS OF TESTIMONY:                   PAGE

Request for document production                     --
or information

Certified question                                  --

Instruction not to answer                           43

Other requests or marked testimony                  --

REFERENCES TO EXHIBITS MARKED PREVIOUSLY:

(None.)

Notes:

Coffman Reporting
303.893.0202
303.893.2230 FAX

EXHIBIT 2

*** SUBJECT TO CONFIDENTIALITY DESIGNATIONS ***

## Page 5

1  WHEREUPON, the within proceedings were taken
2  pursuant to the Federal Rules of Civil Procedure:
3      (At this time Mr. Groome was not present in
4  the deposition room.)
5      (Deposition Exhibits 1 through 6 were
6  marked.)
7      MONTE GORE,
8  having been first duly sworn to state the whole truth, was
9  examined and testified as follows:
10     MR. RINGEL:  We all collectively learned
11 this morning that the deponent, Monte Gore, apparently
12 has some kind of cold, and, as a result, his voice is
13 weak this morning.  We've all agreed that we'll proceed
14 with his deposition provided that counsel for the
15 plaintiff can understand Mr. Gore's responses and
16 provided that it doesn't become painful in some way for
17 Mr. Gore to continue with the deposition, and we've
18 tentatively agreed that if there needs to be some kind of
19 continuation of this deposition at a later date, that we
20 will all make ourselves available to do that.
21     MR. TRINE:  Agreed, yes.
22     MONTE K. GORE,
23 having been first duly sworn to state the whole truth, was
24 examined and testified as follows:
25     EXAMINATION

## Page 6

1  BY MR. TRINE:
2      Q.   Please state your full name and address for
3  the record.
4      A.   Monte K. Gore.
5      MR. RINGEL:  Mr. Gore, go ahead and give
6  your work address, please.
7      A.   P.O. Box 27, Fairplay, Colorado 80440.
8      Q.   (BY MR. TRINE)  And what is your occupation
9  or profession?
10     A.   I'm a law enforcement officer currently with
11 the rank of captain serving for the Park County Sheriff's
12 Office.
13     Q.   And when did you first go to work for the
14 sheriff's office in Park County?
15     A.   September of 2000.
16     Q.   And when you started in September of 2000,
17 am I correct that the jail was essentially losing money
18 every year, and in September of 2000, there were only 12
19 inmates?
20     A.   At that time, the jail was actually managed
21 by a private entity and had turned over operations to the
22 county.  The county sheriff then took over operations,
23 and there were only 12 inmates in the jail when I took
24 over.
25     Q.   And your understanding when you took over

## Page 7

1  was that the jail had been losing money annually; is that
2  correct?
3      A.   I believe it would have been.
4      Q.   And was it your intent and objective, when
5  you took over, to turn that around so that it would
6  become a profit-making jail?
7      A.   It was my intent to run the best facility I
8  could, and in doing that, the only way we could do it
9  with a limited tax base would be to rent out cell space
10 for revenue.
11     Q.   Yeah, but my question was, was it your
12 intent when you took over to turn that around so that it
13 became profit-making?
14     A.   I think my intent would have been probably
15 to run the best jail that I could and try to be
16 profitable.  If I'm bringing in revenue, then I can put
17 that money back into the facility.
18     Q.   And am I correct that in November of 2003,
19 you had increased the jail occupancy and brought in
20 $900,000 in your first year?
21     A.   Without looking at my notes, I believe that
22 would be accurate.
23     MR. RINGEL:  Clarification.  You said
24 November 2003, Mr. Trine, and then you said his first
25 year.  I'm confused.

## Page 8

1      Q.   (BY MR. TRINE)  Okay.  Let me clarify that.
2  Am I correct that in your first year as captain, the jail
3  brought in $900,000?
4      A.   I believe that would have been for 2001.
5      Q.   And then in 2002, $1.6 million?
6      A.   I believe that would be correct.
7      Q.   And in 2002, you projected the income for
8  2003 to be 1.8 million.  That was your projected income;
9  is that right?
10     A.   I believe that's correct.
11     Q.   And at that time in 2003, most of the
12 occupants were prisoners from other counties as well as
13 state and federal agencies; is that right?
14     A.   Correct.
15     Q.   Am I correct that it was your understanding
16 in 2003 that the jail was one of the few sources of
17 income for the county that was not restricted by the
18 Taxpayers Bill of Rights amendment?
19     MR. RINGEL:  Object to the form and the
20 foundation.
21     Q.   (BY MR. TRINE)  Is that correct?
22     MR. RINGEL:  Same objection.
23     THE DEPONENT:  You want me to go ahead and
24 answer or . . .
25     MR. RINGEL:  Yes, Mr. Gore.  Unless I

Page 9

1  instruct you not to answer a question, even if I object,
2  you have the obligation to respond to all of Mr. Trine's
3  questions.
4      A.   The jail was never included on TABOR.
5      Q.   (BY MR. TRINE) So that you could increase
6  the profits and keep those profits?
7      A.   Correct.
8      Q.   Now, am I correct that you exceeded the 2003
9  projected revenues by over $350,000?
10     A.   Without looking at my notes, I know we
11 exceeded it, but I'm not sure the exact amount. That
12 sounds reasonable.
13     Q.   In any event, do you recall that the
14 revenues were over $1.9 million?
15     A.   Correct.
16     Q.   And was it your understanding and did you
17 represent to people that the jail had become one of the
18 most financially successful jails in the area?
19          MR. RINGEL: Object to the form.
20          MS. LEWIS: Join.
21     A.   I think good management. I think it has
22 been.
23          MR. RINGEL: Mr. Trine, do you have an
24 objection, so that we don't have, you know, multiple
25 "joins," that one objection by counsel for the defendants

Page 10

1  could be considered an objection for all counsel by the
2  defendants?
3          MR. TRINE: Yes.
4          MR. RINGEL: That's okay with you?
5          MR. TRINE: Yes, it is.
6          MR. RINGEL: Okay. Thank you.
7      Q.   (BY MR. TRINE) Do you recall telling the
8  reporter from the Summit Daily News in March of 2004 that
9  the jail provided over 4,000 hours of free labor within
10 the community, and at $10 an hour, Park County received
11 $41,000 in free labor?
12     A.   Actually, it would have been closer, at that
13 rate, to about $400,000.
14     Q.   $400,000?
15     A.   Correct.
16     Q.   In free labor?
17     A.   Correct.
18     Q.   So that was erroneously reported, then?
19     A.   Well, the amount.
20     Q.   The amount was?
21     A.   Yeah, we use inmates -- we actually -- I
22 have an inmate fund where we pay them. We actually pay
23 them at a higher rate than the State of Colorado. We
24 also send them out in the community. They work with the
25 fire departments, they work with the forest service, they

Page 11

1  work with the town of Fairplay, they work with the
2  county. They also get good time for that, and they've
3  done some -- a lot of really good projects as far as
4  replanting trees and stuff like that after the Snaking
5  fire, different things like that.
6      Q.   Now, you indicated that Park County
7  received, what, 400,000 in free labor?
8      A.   If you were looking at that, and I assessed,
9  I think, a $10 an hour per-hour figure, then that would
10 have been about 400,000.
11     Q.   And how much were the inmates paid for their
12 labor?
13     A.   Typically a dollar a day. I think they're
14 paid 60 cents in the state.
15     Q.   You typically paid a dollar a day?
16     A.   Correct.
17     Q.   Back in 2004?
18     A.   I believe so.
19     Q.   Is that still the case?
20     A.   Yes.
21     Q.   And of the dollar a day, were the inmates
22 charged for seeing the nurse?
23     A.   I think under contracts, some -- I do know
24 we have a cost-of-care program in place. Depending on
25 the situation, some would be possibly charged. I'd have

Page 12

1  to look at those reports.
2      Q.   Anything else the inmates would be charged
3  for, other than perhaps some prescription medications and
4  nursing and doctor visits?
5          MR. RINGEL: Object to the form.
6      A.   Not that I can think of right now.
7      Q.   (BY MR. TRINE) And you were quoted in The
8  Denver Post earlier this year, 2005, as saying that "I
9  don't think there's another jail in the county" -- I'm
10 sorry, "I don't think there's another jail in the country
11 that is offsetting costs like we do." In what way were
12 you offsetting costs?
13     A.   Well, by bringing in revenues, we're
14 offsetting cost.
15     Q.   Now, the only way that you can -- well, tell
16 me in what ways you can actually reduce costs in addition
17 to increasing revenue.
18     A.   What ways we can reduce cost?
19     Q.   Um-hum.
20     A.   Typically we don't reduce costs. Typically
21 in the management of Park County jail, we have actually
22 increased costs.
23     Q.   Well, can you decrease costs by
24 understaffing for the number of inmates?
25     A.   You could. We've done just the opposite and

PAGE 21

1   because a lot of the jails up in that area did not have
2   room for the detainees.
3       Q.   Do you remember on March 1 telling INS, "We
4   don't have room for them, we're overcrowded already"?
5       A.   I do not remember specifically telling
6   anyone that. What I'm giving you is a generality as far
7   as some of the conversations that I do recall.
8       Q.   And then were you aware that by March 6,
9   there were 61 detainees housed in Unit D?
10      A.   I believe that's correct.
11      Q.   And did the same thing happen, that is, INS
12  called saying, "We've got these additional detainees,
13  will you take them?"
14      A.   I would say that's probably what happened.
15      Q.   Do you remember at times bragging to some of
16  your deputies that we're making a fortune off of these
17  detainees, the county is?
18          MR. RINGEL: Object to the form.
19      A.   I don't recall bragging to deputies that
20  we're making a fortune.
21      Q.   (BY MR. TRINE) Do you remember bragging to
22  deputies that we're making a profit off of all these
23  detainees?
24      A.   As far as making a profit, I think most of
25  the deputies were aware of that.

PAGE 22

1       Q.   And you were aware of that?
2       A.   Yes.
3       Q.   So there would be no reason for you to not
4   make that statement?
5       A.   Let me correct that. At that time I don't
6   know that we were making a profit. We were offsetting
7   cost.
8       Q.   Now, at that time, that is, in March of
9   2003, Park County had a written policy that you had to
10  provide 80 square feet per inmate in Pod D; is that
11  correct?
12      A.   I'd have to review that policy.
13          (Discussion off the record.)
14      Q.   Mr. Gore, I'll hand you what has been marked
15  for identification as Deposition Exhibit 5, and can you
16  identify Exhibit 5, which consists of three pages marked
17  1450 through Park 1452 as pages out of the Park County
18  policy and procedure manual?
19      A.   Yes, I can.
20      Q.   And the effective date of this policy and
21  procedure was November 1 of 2000; is that correct?
22      A.   That's reflected as the date.
23      Q.   And this was a policy and procedure that was
24  in effect when you became the jail captain; is that
25  right?

PAGE 23

1       A.   Correct.
2       Q.   And when you became jail captain, you had to
3   familiarize yourself with all of the policies and
4   procedures; is that correct?
5       A.   That's correct.
6       Q.   Because you were responsible for
7   implementing those policies and procedures throughout the
8   jail, weren't you?
9       A.   Correct.
10      Q.   There's a reference here to ACA Standard
11  3-4128, and am I correct that since you've been jail
12  captain, the Park County Jail has used the ACA standards
13  and adopted them; is that correct?
14      A.   We're in the process of trying to become ACA
15  accredited.
16      Q.   That wasn't my question. Am I correct that
17  since you've been jail captain, you have utilized and
18  adopted the ACA standards?
19          MR. RINGEL: Object to the form and the
20  foundation.
21      A.   Actually, that would be incorrect. We've
22  probably adopted components of the ACA and not adopted
23  some of those components.
24      Q.   (BY MR. TRINE) And does Exhibit 5 represent
25  some of the components of the ACA standards that you did

PAGE 24

1   adopt?
2       A.   That would be correct.
3       Q.   And ACA Standard 3-4128 indicates that the
4   purpose of this particular standard is to ensure that
5   inmates are housed in sleeping areas that are safe,
6   clean, with proper lighting and heating, correct?
7       A.   Correct.
8           MR. RINGEL: Object to the form and the
9   foundation.
10      Q.   (BY MR. TRINE) And the policy states that
11  "It is the policy of the sheriff's office that inmates
12  are housed in cell or dormitory sleeping areas that
13  provide at least 80 square feet of total living space per
14  occupant"; is that correct?
15      A.   That's what that policy states.
16      Q.   And Unit D, in March of 2003, contained 740
17  square feet in the upper tier; is that right?
18      A.   That sounds reasonable.
19      Q.   And 735 square feet in the lower tier?
20      A.   I think that sounds reasonable.
21      Q.   And so the maximum capacity in Pod D would
22  be 18.3 inmates at 80 square feet per inmate; is that
23  right?
24      A.   I didn't do the math. I'd have to take your
25  word for that.

**25**

1  Q. Okay. Well, assuming that the maximum
2  capacity, based on that standard, is 18.3 inmates in Pod
3  D, by housing 61 inmates, you were way overloaded and
4  overcrowded, weren't you?
5      A. According to this policy.
6      Q. Well, that was the jail's policy, right?
7      A. Um-hum.
8      Q. Okay. Now, am I correct that this pod was
9  originally designed to hold no more than 18 inmates and
10 at one time had 18 bunks or beds in that pod?
11     A. I have never seen a time when that pod had
12 18 bunks. I think the ACA standard would actually be 35
13 square feet per inmate. Even in a lock-down situation, I
14 think, where you actually lock an inmate down for
15 administrative seg, I think at that point you only have
16 to give them 70 square feet. So I think that the jail
17 policy would have actually been in excess of ACA standard
18 as far as per-square-footage requirements.
19     Q. Do you dispute that Exhibit 5 is, in fact,
20 the ACA standard at 80 square feet per inmate? Is that
21 what that says?
22     A. I believe it's actually 35 square feet per
23 inmate.
24     Q. Do you recall that there is another
25 standard, not the ACA standard, that requires 35 square

**26**

1  feet in the day room but 80 square feet in the living
2  quarters?
3      A. Typically, most of our cells are actually
4  designed to have a hundred square feet. I am aware of
5  that 35-square-foot standard. I am not aware of an
6  80-square-foot standard other than the one that's in this
7  policy.
8      Q. Well, this was the jail's policy, correct?
9      A. That's correct.
10     Q. Can you tell, just from the dining room
11 seating arrangement or area of the dining facility, where
12 the inmates eat was really designed for only about 18
13 inmates from Pod D? The seating capacity?
14     A. I would have to review that.
15     Q. Now, how many bunks or how many beds,
16 permanent beds, were in Pod D when you came on board in
17 September of 2000?
18     A. I think there's always been about 41 to 42
19 spaces in that cell block.
20     Q. So you deny that additional bunk beds were
21 being moved into Pod D from time to time, expanding the
22 number of beds while you were there?
23     A. No, I do not deny that additional bunks were
24 moved in from time to time. We still move additional
25 bunks in today from time to time if we need additional

**27**

1  bunk space.
2      Q. In March of 2003, there were a total of 42
3  bunk beds in there, weren't there?
4      A. I believe that's correct.
5      Q. Now, how many bunk beds were in there when
6  you came on board in September of 2003?
7      A. I believe it would have been a number around
8  that specific number. I'm not sure.
9      Q. Well, when you agreed earlier that
10 additional bunk beds have been moved in expanding that
11 number, when did that expansion occur? When were
12 additional bunk beds moved in?
13         MR. RINGEL: Object to the form.
14     A. Let me clarify. Depending on the amount of
15 inmates, if there's a need to put more bunks in there to
16 support more inmates, we'd put more bunks in. That's
17 even currently being done today. As inmate numbers drop,
18 we will remove those bunks, typically.
19     Q. (BY MR. TRINE) Am I correct that with 42
20 bunks in the upper tier of Pod D, that the upper tier is
21 filled and there's not room for additional bunk beds?
22     A. If -- you actually could get additional bunk
23 beds into the lower level if you had to.
24     Q. I didn't ask about the lower level. Let me
25 rephrase the question.

**28**

1      A. Okay.
2      Q. Am I correct that with 42 bunk beds in the
3  upper tier of Pod D, it's filled, and you can't get more
4  bunk beds in that upper tier?
5      A. I would say that if you had 42 beds in the
6  upper tier, I believe it would be sufficiently full.
7      Q. So that if you're filled to maximum capacity
8  in the upper tier with 42 inmates, you know if you take
9  more inmates, they're going to have to sleep on
10 mattresses on the floor, right?
11     A. Correct.
12        MR. RINGEL: Object to the form.
13     Q. (BY MR. TRINE) And how much space is left
14 on the upper tier to place mattresses on the floor when
15 you have 42 bunks in there?
16     A. I would say probably there would be no room
17 left on the upper tier. Most of the mattresses would
18 have had to have been placed on the lower level to handle
19 any overflow.
20     Q. Okay. And how many toilets in Pod D?
21     A. Two.
22     Q. And where are they located?
23     A. They're located on the lower level.
24     Q. How many urinals?
25     A. I believe there's two.

**Page 29**

1  Q. Lower level?
2  A. Correct.
3  Q. How many wastebaskets?
4  A. I think there's one large wastebasket,
5  approximate size of 55 gallons.
6  Q. And where it's located?
7  A. Lower level.
8  Q. And was that true in March of 2003?
9  A. Yes.
10 Q. Now, after you became jail captain, were INS
11 detainees sometimes placed in the general population in
12 Units A, B or C?
13 A. I believe so.
14 Q. And did you start receiving complaints from
15 other inmates in those pods that they had to undergo a
16 physical examination and blood tests for a communicable
17 disease, and yet you were putting INS detainees in with
18 them who didn't have to undergo those tests?
19 A. I believe I did receive some complaints.
20 Q. And basically the complaints were "We could
21 end up with some kind of communicable disease because
22 you're putting these people in with us and they're not
23 being tested," right?
24         MR. RINGEL: Object to the form and
25 foundation.

**Page 30**

1  A. Generally, if they went into general
2  population, they were tested. I know we do the little
3  thing that's called the PBT where we actually test --
4  test INS inmates or detainees for TB. We have -- I think
5  we had a high incidence of them testing positive for TB.
6  Q. (BY MR. TRINE) That wasn't my question. My
7  question was that the inmates in the general population
8  of A, B and C were complaining that the INS inmates were
9  coming in without having a physical examination and
10 testing for a communicable disease, and they didn't want
11 them in there. Isn't that what the complaint was?
12        MR. RINGEL: Object to the form and the
13 foundation.
14 A. I don't think -- when you indicate inmates
15 were complaining, I think we had a very few complaints
16 from some individuals at the time that they didn't like
17 being housed with INS inmates.
18 Q. (BY MR. TRINE) They didn't tell you why?
19 A. Well, no, they told me a lot of them. For
20 the reasons that you stated. I think it was maybe one or
21 two inmates. I can't recall it being the majority of
22 inmates or anything like that, but I do recall that there
23 was a complaint.
24 Q. Well -- and didn't you, in fact, also have
25 deputies complaining to you that the INS detainees should

**Page 31**

1  not be placed in that general population because you were
2  not testing the INS detainees for communicable disease?
3  A. We were actually testing them, I think, for
4  TB.
5  Q. In 2003?
6  A. I believe so.
7  Q. And who did those tests?
8  A. That would have been done by our medical
9  department. We typically do tests, medical screens and
10 things like that, for any trustees that we were going to
11 use in the kitchen. And typically with the INS, we do
12 the PB test to check for TB.
13 Q. Now, where would those test results be
14 located? Because we didn't receive them with all the
15 documents we received.
16 A. I would imagine -- at that time I was
17 contracting with Dr. Bachman, and he might have those
18 records. That's speculation on my part.
19 Q. So that when Mr. Carranza-Reyes and the
20 detainees he was with on March 1 were booked in, Dr.
21 Bachman tested them for TB; is that right?
22 A. Well, I don't know if Dr. Bachman would have
23 personally tested them, but typically our nurses do.
24 Q. Well, was that the nurse's responsibility in
25 2003, to test all new INS detainees for tuberculosis?

**Page 32**

1  A. I believe so.
2  Q. And if she failed to do that, she apparently
3  didn't follow the policy, right?
4         MS. LEWIS: Object to the form of the
5  question.
6  A. Well, as far as my recollection goes for
7  2003, I believe we tested all INS detainees for TB, and
8  we also did medical screens when they came in.
9  Q. (BY MR. TRINE) So that --
10 A. And that was on all inmates.
11 Q. And the medical screen was a form filled out
12 in Spanish by each detainee; is that right?
13 A. Actually, it was Spanish and English.
14 Q. But the detainees filled out a form, and
15 that was the screening; is that right?
16 A. I believe that was part of it. I think we
17 may have also had officers filling out a screen. I'd
18 have to go back and look. I know we do so now.
19 Q. Mr. Gore, isn't it correct that the nurse,
20 Vicki Paulsen, did not conduct a physical examination on
21 INS detainees in 2003 as a matter of policy?
22        MR. RINGEL: Object to the form and the
23 foundation.
24 Q. (BY MR. TRINE) As a part of the booking?
25        MR. RINGEL: Same objection.

**Page 37**

1  make an entry in that detainee's medical file of that
2  visit?
3      MR. RINGEL: Object to the form and the
4  foundation.
5      A.   I believe so. There should be no difference
6  than if you go to a doctor and they create a medical file
7  on the street as well.
8      Q.   (BY MR. TRINE) Now, am I correct that the
9  Board of County Commissioners at times praised you for
10 the profits you were making in running the jail?
11     A.   They would acknowledge that the jail was
12 being managed well, and they thought I was doing a good
13 job.
14     Q.   And am I correct that the jail becoming a
15 for-profit jail was encouraged and approved by the county
16 commissioners?
17     MR. RINGEL: Object to the form and the
18 foundation.
19     A.   I think that, once again, if we're going to
20 run a good facility and have the services for inmates
21 that we need to have with the limited tax base, that the
22 way that we're going to have to do it is generate
23 revenues.
24     Q.   (BY MR. TRINE) That wasn't my question.
25 Was it your understanding that your efforts to run this

**Page 38**

1  jail at a profit was, in fact, approved by the Board of
2  County Commissioners?
3      MR. RINGEL: Object to the form and the
4  foundation.
5      A.   I believe that the county commissioners
6  were, again, happy at the jail management that they had
7  seen taking place.
8      MR. RINGEL: Just a minute. Just a minute,
9  Mr. Trine. For the record, you have inquired about the
10 Board of County Commissioners. To the extent that any
11 determination by the Board of County Commissioners was
12 made in a legislative proceeding regarding the Park
13 County Jail, it is my position that the deliberative
14 process privilege applies to any such determination.
15     I would interject this as a standing
16 objection to any inquiry about anything that would be
17 protected by the deliberative process privilege as it
18 applies to the Board of County Commissioners of Park
19 County.
20     Q.   (BY MR. TRINE) Now, Mr. Gore, you knew in
21 March of 2003 that that overcrowding in Unit D posed a
22 risk of the spread of any communicable disease among
23 inmates; isn't that correct?
24     MR. RINGEL: Object to the form and the
25 foundation.

**Page 39**

1      A.   If we would have had an inmate that we
2  deemed sick, typically that inmate would have been seen
3  by medical, put on antibiotics. But as far as the
4  statement that you made that I felt that this would aid
5  in disease, that's absolutely incorrect. The reason that
6  we accepted inmates is I felt that it was probably far
7  better for them to come in and get some sleep and a hot
8  meal than have them in a van somewhere.
9      MR. RINGEL: Bill, just so you know, we're
10 around 10 o'clock, so if you get to a stopping place.
11     MR. TRINE: Why don't you stop here, and
12 then you can read the last question and answer to remind
13 me where we're at.
14     (Break from 9:55 a.m. to 10:31 a.m.)
15     (The last question and answer were read
16 back.)
17     Q.   (BY MR. TRINE) Mr. Gore, I am going to hand
18 you what has been marked as Deposition Exhibit 6. I
19 don't have any copies of that, but it's Park 1995 through
20 Park 1999 provided in a request for production of
21 documents by the jail, and I'll first ask you if you're
22 familiar with the document that has the title on it,
23 "Communicable Diseases" on the first page. Is that part
24 of the documents that you utilize in the Park County Jail
25 for instruction to your deputies?

**Page 40**

1      MR. RINGEL: Object to the form and the
2  foundation. For the record, the deposition exhibit
3  that's been marked by Mr. Trine has highlighting on the
4  second paragraph, and I believe that the document as
5  produced by Park County does not have any such
6  highlighting.
7      A.   I've read it. What was your question again.
8      MR. TRINE: Would you repeat the question.
9      (The last question was read back.)
10     A.   I'm not sure that's the exact document.
11     Q.   (BY MR. TRINE) So you have some reason to
12 believe that this may not be the document produced from
13 your records?
14     A.   I would have to verify it.
15     Q.   Well, let's assume hypothetically that it
16 is.
17     A.   Okay.
18     Q.   Read the highlighted part of the first page
19 of that exhibit into the record.
20     A.   "In a jail, like any place where people are
21 obliged to live together in close contact, communicable
22 disease can be a big problem. Disease can spread rapidly
23 through the jail, infecting inmates and staff alike."
24     Q.   You already knew that that was the situation
25 in March of 2003, didn't you? That inmates living in

210

1 this case since your last deposition was taken?
2  A. No.
3  Q. And have you met with anyone other than your
4 counsel with respect to the facts and circumstances
5 surrounding this case or other depositions that have been
6 taken?
7  A. No.
8  Q. So you've not had any discussions with some
9 of the other people who have been deposed or who were
10 going to be deposed, including the sheriff?
11  A. Do not believe I've had any discussion with
12 the sheriff.
13  Q. Or with any of the people that were
14 scheduled for depositions?
15  A. In what sense?
16  Q. I just want to know if you had any
17 discussions with them about the facts, circumstances
18 surrounding their depositions, or yours or this case,
19 anything about Carranza-Reyes.
20  A. I know that -- I believe that Sergeant, now
21 Lieutenant, Muldoon was deposed, and I know we've still
22 been working together, and I've actually made assignments
23 for him to come up with additional information as
24 requested in interrogatories and things like that.
25  Q. Okay. Anything else that you've done?

211

1  A. I don't believe so.
2  Q. When your deposition was last taken, you
3 couldn't remember off the top at that time the names of
4 the doctors that you conferred with between March 8 and
5 March 14, 2003 except you said one of them was from
6 Denver Health. Have you subsequently remembered those
7 names?
8  A. I have not.
9  Q. And I don't know whether I asked you this
10 before or not. Would you have any records anywhere that
11 could give you those names?
12  A. I don't believe so. I think it was just a
13 brief telephonic conversation that I recall.
14  Q. And you couldn't remember last time whether
15 Nurse Paulsen gave you those names to call or whether you
16 got those names from another source. Do you recall now
17 the source of those names of doctors?
18  A. I do not.
19  Q. And when we last met, I was just starting to
20 ask you questions about the policy and procedure manual,
21 which is Exhibit 4 in that binder. And we talked about
22 the responsible physician being Dr. Bachman. In Exhibit
23 4 -- and you can refer to the exhibit at any time you
24 want to if you feel it necessary, but Exhibit 4 at Park
25 559 describes a quality improvement committee that will

212

1 meet no less than twice annually and monitor the quality
2 of health care and names all the people that would be on
3 that committee. Did such a committee exist at any time
4 since you've been jail captain?
5  A. I believe the responsibilities were given to
6 our medical director. I don't believe it was a
7 committee.
8  Q. So the responsibilities for medical care at
9 the facility were given to Dr. Bachman, but this
10 particular committee never existed; is that right?
11  A. Let me read. That would be the responsible
12 physician, health service administrator, administrative
13 sergeant, division commander, case manager, environmental
14 compliance officer, maintenance and interim control
15 committee?
16  Q. And infection control committee.
17  A. Or infection control committee. I don't
18 believe they met.
19  Q. Okay. And since the policy and procedure
20 manual calls for there being a quality improvement
21 committee and you had assumed the responsibility for
22 making sure that the jail complied with the policies and
23 procedures, do you know why a quality improvement
24 committee was never organized and functioning?
25  A. Once again, I think that committee was

213

1 probably reduced to one person who probably would be able
2 to guide me in making proper decisions, and that being
3 our medical director.
4  Q. The quality improvement committee was
5 supposed to also receive a report from the infection
6 control committee. Did that committee exist?
7       MR. RINGEL: Object to the form.
8  A. I don't believe so.
9  Q. (BY MR. TRINE) So that Dr. Bachman then
10 would not have had reports to him from any infection
11 control committee; is that correct?
12       MR. RINGEL: Object to the form and the
13 foundation.
14  A. I believe that may be correct.
15  Q. (BY MR. TRINE) And although the policies
16 and procedures call for minutes of the quality
17 improvement committee to be formally prepared, you didn't
18 ask Dr. Bachman to prepare any kind of written report on
19 the kinds of things the quality improvement committee was
20 supposed to do; is that right?
21  A. No.
22  Q. Okay. Then at Park 574 and 575 there's a
23 description under the policies and procedures of an
24 infection control program and indicates that an infection
25 control report shall be prepared by the health services

214

1 administrator designee and presented to the medical
2 director at least quarterly. Do you know whether that
3 infection control program had ever been initiated and
4 reports submitted?
5   A.   No.
6   Q.   Then looking at Park 617 and 618 on
7 emergency services?
8   A.   616 and 618?
9   Q.   617. There's an indication on 617 that it
10 was the policy of the jail that while awaiting the
11 arrival of an ambulance and/or EMS response, a nurse will
12 assume on-site care of the inmate and continue with
13 assessment, treatment and emergency medical procedures
14 until the arrival of the ambulance, and then upon arrival
15 of the ambulance, the nurse will provide the emergency
16 personnel with a report listing physical findings,
17 interventions, history and treatment.
18        Now, when you learned on the morning of
19 March 8, 2003 that the nurse had evaluated Carranza-Reyes
20 and recommended transport to the emergency room, did you
21 instruct her to stay with Carranza-Reyes until the
22 ambulance arrived or until he was transported?
23   A.   No.
24   Q.   Did you understand that she was going to
25 vacate the facility and go home and leave Carranza-Reyes

215

1 that morning?
2   A.   No.
3   Q.   Did you subsequently learn that she had done
4 that?
5   A.   Yes.
6   Q.   And was she admonished for doing that
7 because she violated this policy?
8   A.   No.
9   Q.   And why was she not admonished for violating
10 the policy?
11   A.   Well, based on the information I had, which
12 was pretty limited, is that we needed to get him to be
13 evaluated by a physician, and I believed that Sergeant
14 Muldoon was contacted to do that transport.
15        Depending on the situation, once relayed to
16 me, we can certainly do -- we can have officers take
17 inmates to medical facilities or doctors' appointments.
18 And based on the information I had, I think that's how
19 we -- how we actually arranged the transport. Upon
20 review, it probably wouldn't have been a bad idea to have
21 an ambulance take him.
22   Q.   I'm sorry. We're not communicating. It's
23 probably my fault. Here's my question: Under this
24 policy, once it's determined that there is an emergency
25 and either an ambulance or other response is going to

216

1 take someone in transport, the nurse will assume the
2 on-site care of the inmate and continue with the
3 assessment, treatment and emergency medical procedures.
4 And my question to you was, why was Nurse Paulsen not
5 admonished for violating that policy and leaving the
6 facility, knowing that the inmate was going to be
7 transferred?
8        MR. RINGEL: Object to the form and the
9 foundation.
10   A.   I'm not sure that anybody realized the
11 seriousness of Mr. Carranza's illness. In answering your
12 question, I know that I rely heavily on the opinion of my
13 medical staff to make the right decision, and if they
14 want or feel that an ambulance is needed or that they
15 need to stay with the individual, I leave it to their
16 discretion. If they feel it's something that an officer
17 can transport the individual, I leave that to their
18 discretion.
19        Also, depending on when this policy -- I
20 think it was in effect when I became the jail
21 administrator, but typically in an ambulance -- in this
22 area, we now have enough paramedics to kind of assume the
23 medical care of those -- of an inmate that we maybe
24 transport out of the jail, leaving the nurse at the jail
25 to continue her duties there.

217

1   Q.   (BY MR. TRINE) Now, Captain, when you
2 earlier said that probably an ambulance should have been
3 used, when did you make that conclusion?
4        MR. RINGEL: Object to the form.
5   A.   After I realized the serious health
6 condition of Mr. Carranza.
7   Q.   (BY MR. TRINE) You mean after the fact?
8 After he was transferred and then you learned of what the
9 medical problem was?
10   A.   Yes.
11   Q.   Nurse Paulsen in her deposition indicated
12 that certainly in retrospect, she believes that that was
13 a mistake and she should have stayed with Carranza-Reyes
14 during that time. Did she ever tell you that?
15        MR. RINGEL: Object to the form.
16   A.   No.
17   Q.   (BY MR. TRINE) Now, Nurse Paulsen also
18 testified that she did not have copies of the medical
19 chart or any of her entries in Carranza-Reyes' medical
20 chart prepared so that the transport team would have
21 those and transport those charts to the Summit facility.
22 Were you aware that she had not made copies for Summit
23 County?
24        MR. RINGEL: Object to the form.
25   A.   No.

**250**

1  it clear to the staff, all the people on your staff, that
2  there was, in fact, a maximum occupancy that you expected
3  to be enforced in Pod D?
4      MR. RINGEL: Object to the form and the
5  foundation.
6   A.  I don't believe so. I think I left a lot of
7  that to the discretion of the supervisors.
8   Q.  (BY MR. TRINE) And to your knowledge, did
9  detainees in Pod D at times continue to be placed on mats
10 or mattresses on the floor when all the bunk beds were
11 filled after the Carranza-Reyes incident?
12  A.  I believe so.
13  Q.  And is that true to the present day?
14  A.  Typically we have not -- with the jail
15 expansion, I believe we don't have the same -- we added
16 approximately 110 beds, and there may be an occasion
17 where somebody ends up on the floor on a mat, but I think
18 that's pretty -- pretty sparse at this point.
19  Q.  But if INS wanted to move a large group into
20 the jail and you had to use a considerable number of mats
21 on the floor, there's no rule or regulation in existence
22 at the present time that would prevent that?
23  A.  Actually, we're looking at purchasing boats,
24 which are plastic kind of bunks that stack real nice. I
25 know -- I believe after Carranza-Reyes, we ordered cots,

**251**

1  aluminum-framed cots, and ended up having to dispose of
2  those because the inmates tore them up and made weapons
3  and things. Now we're looking primarily at the boats in
4  case something like that were to happen. Right now, I
5  think I actually have about a hundred open beds, so it's
6  not really an issue at this time.
7   Q.  So if I understand you -- correct me if I'm
8  wrong -- what you're telling me is that, no, you have not
9  enacted any policy restricting the number of people that
10 could be placed in Pod D, but you're looking at other
11 ways of accommodating them in Pod D, other types of
12 sleeping facilities?
13  A.  Once again, I think I leave a lot of that to
14 the discretion of the on-duty supervisor. Typically,
15 if -- as an example, I guess if INS did a major raid and
16 didn't have anyplace to house inmates, rather than
17 keeping them in a van somewhere, if we had to make
18 accommodation, we'd probably work with them to do that.
19  Q.  In other words, if INS has problems, you'll
20 make them your problem?
21  A.  Well, we try to resolve the problems.
22  Q.  By accommodating INS?
23  A.  Well, if need be.
24  Q.  Now, Pod D hasn't changed in size since the
25 Carranza-Reyes incident, has it?

**252**

1   A.  No.
2   Q.  It's the same size as it was then?
3   A.  Correct.
4   Q.  And has the same number of bunk beds,
5  three-tiered, on that upper tier?
6   A.  I believe so.
7   Q.  And nothing has changed in terms of any
8  restrictions on the number of people that will be placed
9  in Pod D, right?
10      MR. RINGEL: Object to the form and the
11 foundation.
12  A.  Well, once again, I stated earlier I leave
13 that typically to the discretion of the supervisors.
14  Q.  (BY MR. TRINE) Well, they had that
15 discretion before Carranza-Reyes, right?
16  A.  Um-hum.
17  Q.  So nothing has changed?
18  A.  In that regard.
19  Q.  In that regard?
20  A.  Correct.
21  Q.  Now, have you at any time had a discussion
22 with the sheriff about the Carranza-Reyes incident?
23  A.  Yes.
24  Q.  And when was the first conversation with the
25 sheriff?

**253**

1   A.  He might not have remembered, but the night
2  that I got the telephone call indicating that he was in
3  critical condition, I placed a telephone call to the
4  sheriff and advised him.
5   Q.  And what was his response?
6   A.  I know he was sleepy, but he was, I believe,
7  kind of shocked.
8   Q.  And that would have been the night of the
9  8th when Carranza-Reyes was transferred from Summit
10 County to the hospital?
11  A.  I believe so. I believe it was that same
12 night that I contacted Vicki Paulsen.
13  Q.  And did he suggest that you keep him
14 informed on the status of Carranza-Reyes?
15  A.  I believe I suggested or told him that I
16 would.
17  Q.  And did you?
18  A.  Yes.
19  Q.  And over the course of what period of time
20 did you have contact with the sheriff to keep him
21 up-to-date?
22  A.  I believe the letter that I prepared for the
23 Mexican consulate, which I felt was kind of a complete
24 synopsis with a timeline of events and would give him a
25 pretty good understanding what happened, I believe I

*  SUBJECT TO CONFIDENTIALITY DESIGNATIONS  *

262

1   A.   Yes.
2   Q.   And was she employed at the jail by you?
3   A.   Yes.
4   Q.   Did you interview her and hire her? Or was
5   she already in the facility when you were hired?
6   A.   I believe she was already in the facility
7   when I was hired.
8   Q.   And this invoice indicates that INS was
9   billed for the month of January, 31 days, for a total
10  inmate days of 810 for INS detainees, and that would
11  indicate, if my arithmetic is correct, that you had an
12  average of 26.1 detainees in Pod D during the month of
13  January. Does that sound about right to you?
14       MR. RINGEL: Object to the form and the
15  foundation.
16  A.   That would sound about right.
17  Q.   (BY MR. TRINE) And I assume there would be
18  days when it would be less than 26 and other days when it
19  would be more? In other words, it wouldn't always be 26
20  detainees per day?
21  A.   Correct.
22  Q.   Right?
23       MR. RINGEL: Object to the form and the
24  foundation.
25  A.   That would be correct.

263

1   Q.   (BY MR. TRINE) And so I assume that you
2   knew in the month of January 2003 that Pod D, on the
3   average, was being used for more than the 18 detainees
4   that Pod D was designed for; is that right?
5        MR. RINGEL: Object to the form and
6   foundation.
7   A.   Well, I'm not aware that D Pod was designed
8   to hold only 18.
9   Q.   (BY MR. TRINE) Okay. I think there's
10  another exhibit here you can quick look at, maybe you
11  haven't seen. I don't know. We have to pull it to see
12  what the exhibit number is. Okay. I'll hand you Exhibit
13  29, which is the architectural design for the jail and
14  the date -- let's see. I think it has a date on it.
15  Yeah. As-built on April 3, 1995. Do you see that?
16  A.   Um-hum.
17  Q.   And looking at that, can you identify Pod D
18  for us?
19  A.   I believe this would be Pod D.
20  Q.   Let me look over your shoulder if you don't
21  mind. Excuse me. What were you pointing at?
22  A.   This.
23       MR. RINGEL: Let the record reflect that the
24  witness has pointed to the portion of the drawing that's
25  immediately above the "privileged and confidential" stamp

264

1   on Exhibit 29.
2   Q.   (BY MR. TRINE) And is referring to that
3   section of the exhibit that has the language "double
4   bunks" on it. Do you see that?
5   A.   Yes, I do.
6   Q.   And would you agree that at least the
7   original design of Pod D called for one, two, three,
8   four, five, six, seven -- either eight or nine double
9   bunk beds?
10  A.   According to this representation.
11  Q.   Do you know what this square is right here?
12  A.   I believe that would be the lower level
13  shower.
14  Q.   Okay.
15       MR. RINGEL: Let the record reflect that
16  we're talking about, in the same box that we just
17  referred to, an L-shaped box on the lower right-hand
18  corner of the box if we're at the -- with the writing at
19  the bottom the same box that we tried to talk about in
20  the sheriff's deposition this morning.
21  Q.   (BY MR. TRINE) Now, assuming that the
22  design specifications for Pod D called for eight double
23  bunk beds, 16 people, then you would agree that in
24  January of 2003, on the average, that capacity of 18 was
25  exceeded on a daily basis?

265

1        MR. RINGEL: Object to the form and the
2   foundation.
3   A.   I would not agree to that. This looks like
4   an architectural drawing. It also shows only one table
5   in the pod, apparently, so you could use the same
6   reasoning to say that it was designed for four inmates.
7   Q.   (BY MR. TRINE) Okay. And where do you see
8   it being designed for just one table?
9   A.   Isn't that one table in each pod? I'm not
10  sure.
11  Q.   I don't know. There's no label on it.
12  There is a label on the double bunks.
13       MR. KORDICK: Upper only.
14  A.   And I do know that we have three tables in
15  that pod.
16  Q.   (BY MR. TRINE) And do you know whether
17  that's the design drawings for only the upper tier as
18  opposed to both upper and lower? Can you tell?
19  A.   I do not know.
20  Q.   Now, if you'll look at Park -- let's get
21  that back in there so we don't lose it.
22       MR. RINGEL: I'll do it, Bill.
23  Q.   (BY MR. TRINE) Now, if you'll look at Park
24  444 in that exhibit I just handed you, which is Exhibit
25  35, and again, this is a letter from Sherrie Muldoon

266

1  dated March 13, 2003, and this is the billing invoice for
2  February 2003 for the INS holds indicating that there
3  were 883 inmate days, and with 28 days in February, that
4  would be --
5      A.   Which exhibit are you looking at, sir?
6           MR. RINGEL: The second page of Exhibit 35.
7      Q.   (BY MR. TRINE) Second page?
8      A.   0444.
9      Q.   Yeah, 0444. You see that's a billing
10 invoice for February 2003 for INS holds?
11     A.   Correct.
12     Q.   With a total inmate days of 883 and, with 28
13 days in February, that would be an average of 31.1
14 detainees per day, and does that sound reasonable to you
15 that that would be an average figure for the number of
16 detainees in Pod D on a daily basis?
17          MR. RINGEL: Object to the form and the
18 foundation.
19     A.   That sounds reasonable.
20     Q.   (BY MR. TRINE) And again, there could be
21 fewer than that on some days and an excess than that on
22 others; is that right?
23     A.   Correct.
24     Q.   And then if you look at the next page, at
25 Park 445, the letter of April 14, 2003, which is the

267

1  billing invoice for March 2003, with 31 days in March,
2  there were only 632 inmate days, and that would be
3  consistent with Pod D not being used perhaps for a week
4  or two during March; is that right?
5           MR. RINGEL: Object to the form and the
6  foundation.
7      A.   Could be consistent with that.
8      Q.   (BY MR. TRINE) But even with that drop in
9  occupancy, that would be an average of 20.3 detainees per
10 day in March, and that also would exceed the design
11 limitations we looked at of 18 per day; is that correct?
12          MR. RINGEL: Object to the form and the
13 foundation.
14     A.   According to your interpretation.
15     Q.   (BY MR. TRINE) Okay. Now I'll hand you
16 what has been marked -- let's see -- for identification
17 as Exhibit 36, and for the record, this is Park 1528
18 through 1532, and it's out of the sheriff's policy and
19 procedure manual, Chapter J-111 on sanitation and
20 hygiene, and if you'll look, please, at Park 1529, under
21 Policy, it states that it's the policy of the sheriff's
22 office that weekly and monthly sanitation and safety
23 inspections be conducted by the jail captain. Do you see
24 that?
25     A.   Yes, I do.

268

1      Q.   And then under Procedures, it indicates that
2  that can be delegated to one of the supervisors, but the
3  monthly inspection must be conducted by the jail captain.
4  Did you delegate the weekly inspections to someone?
5      A.   Yes, Sergeant Crawford.
6      Q.   And did you conduct the monthly inspections?
7      A.   I tried to.
8      Q.   What did those inspections consist of?
9      A.   Typically I would walk around the facility,
10 look at the facility, make sure bunks were made. We
11 actually have popcorn machines, and we buy soda, and if
12 inmates passed the inspection -- actually, this is the
13 weekly inspection -- they get to watch a movie of the
14 week, whatever movie they want, and they get pop and
15 popcorn.
16     Q.   No, my question was, what did your monthly
17 inspections consist of?
18     A.   We would walk around and look at the
19 facility.
20     Q.   "We" or you?
21     A.   Typically I'd have a sergeant with me.
22     Q.   Okay. You and a sergeant monthly would walk
23 around and look at the facility?
24     A.   And I wouldn't necessarily specifically say
25 it was monthly, but we would conduct inspections.

269

1  Typically, Sergeant Crawford was responsible for the
2  weekly inspections. But we would typically look at all
3  areas. We'd look at the kitchen, we'd go into the
4  control room, assess that. We'd look at the pods for
5  cleanliness. I'd talk to inmates if they had any issues
6  with the food, staff. Typically my questions are, are
7  the staff treating you fairly, are there any issues with
8  laundry, are there any issues that you have.
9           I would look at the weight room. I would
10 look at the pod area. I would look at the laundry area.
11 I would look at -- looking.
12     Q.   And this policy provides that if you
13 delegate the weekly inspections, a written weekly
14 inspection report will be provided to the jail captain
15 for his information and/or action. Did you receive
16 weekly inspection reports?
17     A.   You know, typically I might receive
18 inspection reports. They may not be written, but they
19 would be verbal.
20     Q.   Okay. The question was, did you receive a
21 written weekly inspection report as required by this
22 policy?
23          MR. RINGEL: Object to the form and the
24 foundation.
25     A.   I believe there were some weekly inspection