IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Case No. 2005-WM-377 (BNB)

DEPOSITION OF: FREDERICK WILLIAM WEGENER, III
January 20, 2006

MOISES CARRANZA-REYES,
Plaintiff,
v.
PARK COUNTY, a public entity of the State of Colorado and its governing board, THE PARK COUNTY BOARD OF COUNTY COMMISSIONERS; PARK COUNTY SHERIFF'S OFFICE, a public entity of the State of Colorado; FRED WEGENER, individually and in his official capacity as Sheriff of Park County, Colorado; MONTE GORE, individually and in his capacity as Captain of Park County Sheriff's Department; VICKIE PAULSEN, individually and in her official capacity as Registered Nurse for Park County, Colorado; JAMES BACHMAN, M.D., individually and in his official capacity as Medical Director of the Park County Jail,

Defendants.

TAKEN PURSUANT TO NOTICE on behalf of the Plaintiff at 824 Costilla, Fairplay, Colorado at 9:23 a.m. before Theresa A. Coffman, Federal Certified Realtime Reporter, Registered Professional Reporter and Notary Public within Colorado.

APPEARANCES

For the Plaintiff:
WILLIAM A. TRINE, ESQ.
Trine & Metcalf, P.C.
1435 Arapahoe
Boulder, Colorado 80302

LLOYD C. KORDICK, ESQ.
805 South Cascade
Colorado Springs, Colorado 80903

JOSEPH J. ARCHULETA, ESQ.
Law Office of Joseph J. Archuleta
1724 Ogden Street
Denver, Colorado 80218

For the Defendants Park County, Park County Board of Commissioners, Park County Sheriff's Office, Wegener and Gore:
ANDREW D. RINGEL, ESQ.
Hall & Evans, LLC
1125 17th Street
Suite 600
Denver, Colorado 80202

STEPHEN A. GROOME, ESQ.
P.O. Box 1373
501 Main Street
Fairplay, Colorado 80440

For the Defendant Paulsen:
SARA HOLMES, ESQ.
Berg Hill Greenleaf & Ruscitti LLP
1712 Pearl Street
Boulder, Colorado 80302

For the Defendant Bachman:
CRAIG A. SARGENT, ESQ.
Johnson McConaty & Sargent, P.C.
400 South Colorado Boulevard
Suite 900
Glendale, Colorado 80246

Also Present: None

INDEX

| EXAMINATION OF FREDERICK WILLIAM WEGENER, III January 20, 2006 | PAGE |
|---|---|
| By Mr. Trine | -- |
| By Mr. Archuleta | -- |
| By Mr. Kordick | 4 |
| By Mr. Ringel | -- |
| By Ms. Holmes | -- |
| By Mr. Sargent | -- |

| DEPOSITION EXHIBITS: | | INITIAL REFERENCE |
|---|---|---|
| 31 | Copy of online article from Summit Daily News, "Park County to expand its money-making jail" by Linda Balough, 11/21/03 | 24 |
| 32 | Copy of online article from Summit Daily News, "Park County Jail hits record income" by Linda Balough, 3/26/04 | 34 |
| 33 | Copy of Denver Post article, "Officials aim to lock in profits from jail" by Kirk Mitchell, unknown date | 38 |

(Original exhibits retained by Mr. Kordick; copies included in continuing exhibit file and provided to counsel as requested.)

| REQUESTED PORTIONS OF TESTIMONY: | PAGE |
|---|---|
| Request for document production or information | -- |
| Confidentiality Designation by Mr. Ringel | 48 |

REFERENCES TO EXHIBITS MARKED PREVIOUSLY:

| Exhibit No. | Page Reference | Exhibit No. | Page Reference |
|---|---|---|---|
| 5 | 64 | 21 | 54 |
| 6 | 79 | 29 | 17 |

WHEREUPON, the within proceedings were taken pursuant to the Federal Rules of Civil Procedure:

(At this time Mr. Groome was not present in the deposition room.)

FREDERICK WILLIAM WEGENER, III, having been first duly sworn to state the whole truth, was examined and testified as follows:

EXAMINATION

BY MR. KORDICK:

Q. Could you please state your full name for the record.

A. Full name. Frederick William Wegener III.

Q. Mr. Wegener, are you the elected sheriff for Park County?

A. Yes, I am.

Q. Can you tell me, before you were sheriff, did you have any kind of personal experience in law enforcement?

A. Oh, yes. Let's see. I started -- in 1981 I was in the Air Force as a military police officer until 1987. Went to work for Park County in '87 for eight and a half years. I was a patrol deputy, patrol sergeant and investigator. Left Park County in 1995 and started for the Aurora Police Department. I was a detention officer opening their new jail. Was there for -- till '97, and

EXHIBIT 3
PENGAD 800-631-6989

* SUBJECT TO CONFIDENTIALITY DESIGNATIONS *

Q. Okay. But would it be fair to say that you would go into the central area where the pods are at least once a week? Maybe not a full walk-through of the jail, but just in there?
A. I wouldn't say once a week, no.
Q. Once every two weeks?
A. Yeah. Once every two weeks.
Q. And do you have a running total of the population of the jail, how many people are being held in the jail?
A. If I look on the screen, I mean, for that day I would know, yes.
Q. It's available to you every day?
A. Yeah. Pretty much, yes.
Q. Now, there are certain -- I was provided by your attorney, Mr. Ringel, at our request certain documents concerning the personnel manual and procedure for the jail facility, and there's a policy and procedure manual. Is that something that you're familiar with?
A. Yes.
Q. And there's an introduction to that document, and tragically, I don't have a copy of it, as I've advised counsel. It's Park 1324. I'll just show it to you. Are you familiar with this?
A. Yes, I am.

Q. This is an introduction?
MR. RINGEL: Let me ask something.
MR. KORDICK: Sure.
MR. RINGEL: Are you intending to make whatever you talk about as a policy and procedure manual -- in terms of the policy and procedure manual, are you intending to mark it as an exhibit, or are you just going to refer to Bates numbers and not mark it as an exhibit for purposes of the sheriff's deposition?
MR. KORDICK: I would prefer not to mark it as an exhibit because there's no copying machine in the building, and I don't have the facilities up here to copy it. So I'd prefer to keep it because it's part of my record of materials that you produced. But I'd like to identify it so we know what it is. If that's okay?
MR. RINGEL: That's okay.
MR. KORDICK: We could mark it and add it later, if you want. It's fine with me.
MR. RINGEL: I don't care one way or the other. I just want the record clear in terms of what you're showing the sheriff, and if you can do that with the Bates numbers, that's fine with me.
MR. KORDICK: Okay.
Q. (BY MR. KORDICK) This is Park 1324, and before I ask you about the policy and procedure manual,

were you working for the sheriff's office when the jail facility was constructed?
A. Yes. When it was constructed, yes, I was.
(At this time Mr. Groome entered the deposition room.)
Q. Who constructed the jail facility?
A. It was Wesley Box I think was the construction company. That was his name. That was our contractor back in -- was it '94, I think, it was built.
Q. Okay. And who managed that jail after it was constructed?
A. Fenton Security is the name of the company that ran it. It was a private company.
Q. Did you ever enter the jail when Fenton Security ran the jail?
A. Yes, I did.
Q. In what circumstance would you enter the facility?
A. Drop off prisoner, somebody I arrested.
Q. Okay. Would you ever go back into the pod area?
A. It was a long time ago, but -- no, not that I recall. If there was a problem, maybe they asked for assistance, but like I say, I didn't always go back. No. I don't recall.

Q. Do you know when it was constructed, was it constructed at the behest of the private contractor or the county?
A. It was at the behest of the county.
Q. And do you know if it complied with ACA standards?
A. No, I do not recall.
Q. Okay. Who managed it next?
A. Fenton got bought up by, I believe it was, CiviGenics.
Q. Were you ever in the facility when CiviGenics owned the facility?
A. Yes, I was.
Q. Not owned the facility but operated the facility?
A. Yes, I was.
Q. Were you ever in the pod area at that time?
A. Yes. Sure.
Q. Did you observe D Pod at that time?
A. Yes, um-hum.
Q. Do you know if they were required to comply with ACA standards?
A. Required to comply?
Q. Yes.
A. No, I don't know if they were required to

segregation in the D Pod.
MR. SARGENT: They actually had 100 inmates in that little area.
A. That's a dormitory-style pod, so that's what's throwing me off with that wall. Dormitory-style pod normally don't have that.
Q. (BY MR. KORDICK) Okay. So if it were eight beds and it were double beds, it would be for 16 inmates, correct?
A. Yes, correct.
Q. If it were nine beds, it would be for 18 inmates, correct?
A. Correct.
Q. In relationship to this Exhibit 29, it doesn't show the whole jail facility, just the areas where the cells are at and the central area between the cells and maybe the rec room. This is the rec room, isn't it?
A. I believe it is.
Q. Where would your office be located in relationship to this?
A. About right here.
Q. Okay. So you're pointing to an area outside of the drawing but in relatively close proximity to this area, correct?

MR. RINGEL: Object to the form and foundation.
A. Yeah. I mean separated by the -- you got the waiting room, and then you go -- then you go down into the sheriff's office side of the building.
Q. (BY MR. KORDICK) Getting back now to Park 1324, the introduction, I'm going to read portions of it, and was this something, by the way, that you participated in? I notice your name is at the bottom of it.
A. Oh, yes. Um-hum.
Q. You did participate in preparation of this?
A. No, I didn't. It just, I think, identified me as the sheriff.
Q. Okay. Did you review this document?
A. I saw it, yes.
Q. Did it accurately reflect the -- kind of the mission statement of what the jail was supposed to do?
A. Yes.
MR. RINGEL: Can you show him the document?
MR. KORDICK: Yes. Sure. Take as much time as you want to look at it.
Q. (BY MR. KORDICK) And for the record, there is a separate mission statement at 1331. But that's more or less your mission statement, isn't it?
A. For the jail, yes. I guess I could say it

somewhat reflects that, yes.
Q. In the first two sentences it says, "Park County taxpayers are providing an incredibly costly investment in our jail and our staff, and jails take a big bite out of the county budget." Was that a concern of the county and you when you took office?
MR. RINGEL: Object to the form and the foundation.
A. It's definitely a concern, yes.
Q. (BY MR. KORDICK) It states, "It is incumbent upon us as jail professionals to not only house incarcerated persons safely, humanely and at the same time protect their constitutional rights. We must also make the jail as self-supporting as possible." Correct?
MR. RINGEL: Object to the form.
A. Yes. Somewhat, yes.
Q. (BY MR. KORDICK) What does the statement mean by "as self-supporting as possible"?
MR. RINGEL: Object to the form and foundation.
A. The way the jail is -- we understand that, first of all, just having a jail is always very costly. So we try and, through our practices and procedures, try and limit the liability so it doesn't -- so it doesn't become a liability to the county.

Q. (BY MR. KORDICK) Okay. As a sheriff that's an elected official, are you cognizant of newspaper coverage of the jail and the sheriff's office?
A. Yes.
Q. And do you track that when articles talk about -- you mentioned your quote. Is that something you try to be aware of?
A. One way or another, yes.
Q. Are you aware of a Linda Balough, I believe her name is, from the Summit Daily News?
A. It's actually Balough.
Q. "Baylow"?
A. "Baylow."
Q. So you do know who she is?
A. Yes. She lives here.
Q. Is that something that you normally would read or permit yourself to be interviewed for? And I'm referring to a nonmarked document which is not part of the production, and it's a Summit Daily News article dated November 21, 2003.
A. Yes.
Q. That's an article that you would have read, correct?
A. I remember talking to Linda.
Q. And she quotes you in the article, doesn't

* SUBJECT TO CONFIDENTIALITY DESIGNATIONS *

she?

A. Let's take a look. Yes, that's correct.

MR. RINGEL: Lloyd, do you have any objection to, subsequent to the deposition, producing any newspaper articles as a supplemental disclosure?

MR. KORDICK: No, I don't. I tried to get a copy machine, but they're not accessible.

MR. RINGEL: I understand.

MR. KORDICK: It should be marked, actually.

MR. RINGEL: I'm not criticizing you of anything. I'm just wanting to get it produced.

MR. KORDICK: In fact, if she would like to mark the ones I'm going to mention, I could copy them later. I don't know where we're at.

MR. SARGENT: What are we on? 31.

(Deposition Exhibit 31 was marked.)

MS. HOLMES: What about Park 1234? Are you going to mark that?

MR. KORDICK: No, we've already produced that. It's available to everybody.

MR. RINGEL: So for purposes of the record, Exhibit 31 is a Summit Daily News article.

MR. KORDICK: November 21, 2003.

MR. RINGEL: By?

MR. SARGENT: Linda Balough.

Q. (BY MR. KORDICK) Is it "Balouf"?

A. Balough.

Q. And it's entitled "Park County to expand its money-making jail." It says, "Fairplay - Park County commissioners have given Sheriff Fred Wegener and jail Captain Monty Gore the go-ahead to work out a contract for construction of a 100-bed expansion of the Park County Jail. Most of the occupants of the jail are prisoners from other counties as well as state and federal agencies. The expansion will allow the jail to bring in more income from outside the county," and then it quotes you as saying, "We have 142 inmates right now, and only 22 of them are from Park County." Is that an accurate quotation of what you told her?

A. As far as -- oh, the inmates we had right then?

Q. Yes.

A. Yeah, it sounds like it.

Q. So you were tracking the number of inmates because it was a source of revenue, wasn't it?

MR. RINGEL: Object to the form and foundation.

A. No. I was tracking it to know how many inmates I had in the jail.

Q. (BY MR. KORDICK) Okay. So "The lawmen plan

to continue and expand contracts with other agencies to increase revenue. Currently, the facility receives $45 a day per inmate." And then it says, "I was a little" -- this is a quote -- "I was a little unsure at first that the state could pay us (for housing inmates.) but it is so short on space that we expect to continue to expand the contracts over time. If we do this and it is successful, this will be a big help to Park County," and that's the quote from you; is that correct?

A. That's correct.

Q. And then it says, "Gore has managed the jail for the last three years, building its profit margin each year by bringing in paying prisoners from other counties and agencies." That accurate, that statement?

A. That we've been bringing in paying prisoners?

Q. Building a profit margin each year by bringing in paying prisoners.

A. Yes. We've been bringing in paying prisoners.

Q. But it's increasing your profit margin when you're bringing in paying prisoners, isn't it?

A. It depends. If more staff is needed, then it's -- you know, cuts down on there. And then more staff means there's more food that has to be prepared and

medical needs, so I don't know what the profit margin would be.

Q. Okay. Well, let's go on. It says, "The jail was previously a privately managed facility, serving as a financial albatross around the neck of the commissioners and Park County taxpayers." Is that an accurate statement?

A. Yes, sir.

Q. I'm sorry?

A. Yes, it does cost.

Q. It says, "In September 2000, when Gore came on board from his previous position as jail captain of Summit County, the jail had only 12 inmates and was losing money." Is that right?

A. I'm going to say yes, that's correct, other than Monte wasn't -- he was the undersheriff at Summit County, not the jail captain.

Q. Okay. But in September of 2000 when he came on, there were only 12 inmates in that facility, correct?

A. It depends on what month. Yeah. There could have been. I'd have to look.

Q. So probably some of those bunks in D Pod that we looked at in the original architectural drawing would have been empty when you took it over, right?

MR. RINGEL: Object to the form and the

* SUBJECT TO CONFIDENTIALITY DESIGNATIONS *

foundation.
A. They could have been.
Q. (BY MR. KORDICK) Probably were, with 12 people in that jail?
MR. RINGEL: Object to the form and foundation.
A. I don't know.
Q. (BY MR. KORDICK) "Gore has consistently increased jail occupancy, bringing in $900,000 in his first year of operation and $1.6 million in 2002." Is that accurate?
A. That -- without seeing it in front of me, yeah, that could be.
Q. And that's probably information you provided to the reporter at that time?
A. No, it wasn't information I provided, no.
Q. Okay. Do you dispute that information's accuracy?
A. Yeah, I would, because I don't have the budget sitting in front of me, so I don't know what the revenues were for that year.
Q. So you don't agree or disagree; you just aren't sure if it's exactly correct?
A. I don't have the figures in front of me.
Q. "He said his projected $1.8 million income

this year will not only cover his operating costs but will even make this year's payment on the original construction bond." Is that correct?
A. I believe we did that year, yes, that's correct.
Q. It quotes Mr. Gore. It says, "'How many other government departments can make enough to cover the cost of the building they occupy,' Gore said."
MR. SARGENT: Move to strike if there's no question. You just read a statement, and I'm just going to move to strike your statement if there's no question.
Q. (BY MR. KORDICK) Is that an accurate statement, that you were covering your costs of the building construction at that time, the cost of the bond?
MR. RINGEL: Object to the form and the foundation.
A. Again, I'd have to look and see if we did.
Q. (BY MR. KORDICK) Okay. Then it quotes Commissioner Leni Walker, and who is Leni Walker?
A. She's the chairman of the Board of County Commissioners.
Q. It says in quotation marks, "'We know that you have been able to keep the jail full, but if you have this expansion, will you still be able to make it pay its way?'" Do you remember that question being asked?

A. Yes.
Q. Were you at the meeting?
A. Yes, I believe I was.
Q. And that's an accurate recitation?
A. Yeah, it sounds close.
Q. And then there's a quote. "'I've gone over the numbers with Kathy Boyce" -- this is a quotation from Gore -- "county budget and financial director) and even on a 50 percent occupancy (of the new part) we can bring in money for the county,' Gore answered." You were there. Is that more or less what he said, as you remember it?
A. I think that --
MR. RINGEL: Object to the form and the foundation.
Q. (BY MR. KORDICK) So that's an accurate quote?
A. Yes.
MR. RINGEL: Object to the form and the foundation.
Q. (BY MR. KORDICK) And then they say, He also said that when we contacted the state correctional officials about his expansion plans, the biggest response was "How soon can we get it built?" Is that correct? Is that what he said at the meeting?

MR. RINGEL: Object to the form and the foundation.
A. I believe that's -- that was said, yes.
Q. (BY MR. KORDICK) Okay. Since you were at this meeting, I'm going to ask you about some other quotes. It quotes Walker. It says -- and this is Commissioner Walker. "'It just makes sense to do this while the rates are low,' said Walker, noting that the number of local prisoners is sure to increase with increased population growth of Park County." Is that a correct quote?
MR. RINGEL: Object to the form.
Q. (BY MR. KORDICK) As you remember?
MR. RINGEL: And to the foundation.
A. I don't think I recall everything about that meeting.
Q. (BY MR. KORDICK) Okay. I understand. But that's the gist of what you remember?
MR. RINGEL: Object to the form and the foundation.
A. I do remember talking about the number of local prisoners increasing because of the growth in Park County.
Q. (BY MR. KORDICK) The next quote is from Jim Gardner, also a commissioner, saying "We want this to be

* SUBJECT TO CONFIDENTIALITY DESIGNATIONS *

a cash generator, not a cash consumer, for as long as possible." Do you remember that statement?
A. I'm not sure what the contents [sic] was, but -- I don't know what contents [sic] he had that, but . . .
Q. Okay. Then it quotes you as saying that the contract with Newcastle would be ready in the next month, and there would be a groundbreaking. In fact, that's occurred since that time, hasn't it?
A. Oh, yes.
Q. And it says -- the last sentence in the article, "Jail income is one of the few sources of revenue for the county that is not restricted by the Taxpayers Bill of Rights amendment." Is that right?
A. That's correct. That is correct.
Q. And what's the significance of that?
A. That it's not -- doesn't have the cap put on it from TABOR.
Q. So you can raise money from this source, and you don't have to refund it back to the taxpayers?
A. That's correct.
Q. And so you can take money out of the jail, and you can use it -- the county commissioners can use it for other things than the sheriff's department or the jail, correct?

MR. RINGEL: Object to the form and the foundation.
A. They could, yes.
MR. KORDICK: Then I'd like the next article marked, if we could get a stamp on that.
(Deposition Exhibit 32 was marked.)
MR. RINGEL: Lloyd, can you just read the source of the article?
MR. KORDICK: I'm going to do that.
MR. RINGEL: Thank you.
Q. (BY MR. KORDICK) This is another Summit Daily News article, and it is dated March 26, 2004 by Linda Balough, I guess?
A. Balough.
Q. And it says, "Park County Jail hits record income" is the title of the article. And in this article it says, "Park County commissioners sported wide smiles when Park County Jail Captain Monte Gore completed his report on the financial status of the Park County Jail last week. The jail exceeded 2003 revenues by over $350,000 for an income of over $1.9 million." Do you remember that?
A. Yes, that's correct.
Q. And it says, "Gore came to the Park County position in 2001 from a similar post in Summit County.

Under his direction, the jail has undergone a transformation from operating at a severe loss under private management to that of one of the most financially successful jails in the area." Is that correct?
A. Part of it, yes.
Q. Okay. What part of it's correct?
A. I think Gore came to Park County in 2000, not 2001.
Q. But the portion about it being financially the most successful jail in the area, is that true?
MR. RINGEL: Object to the foundation.
A. Yeah. Since we're the only jail in the area, I guess it would be.
Q. (BY MR. KORDICK) Well, there are other jails in other counties, aren't there?
A. Oh. I don't know. It doesn't say that. It says "in the area." I don't know what she's talking about.
Q. You don't know what that means exactly?
A. I don't know.
Q. It says, "Currently, the jail is undergoing a $2 million expansion to increase the occupancy capability by another 110 beds," which tells us that this 1.9 is based upon the facility as it existed before your expansion, correct?

MR. RINGEL: Object to the form and the foundation.
Q. (BY MR. KORDICK) Because it's talking about this is still in the works --
A. That's correct.
Q. -- and the new expansion had not been completed?
A. (Deponent nodded head.)
Q. So the 1.9 million income is based on the size of the jail as it existed before the expansion?
A. Correct. That's correct.
Q. And then it says -- and it talks about passing inspection by the federal government with flying colors. Do you see that?
A. That's correct.
Q. And then it talks -- were you at a meeting where these things were discussed? Do you remember reading this article at the time?
A. No, I don't remember that.
Q. Okay. It says that Gore said the county taxpayers have reaped an additional sometimes hidden benefit from the jail. Inmates at the jail have provided over 4,000 hours of free labor within the community. Is that true?
A. I don't know the exact number of hours, but

* SUBJECT TO CONFIDENTIALITY DESIGNATIONS *

standards. There's a lot of variables to that.
Q. Are there any standards for the amount of space that has to be allowed for a prisoner in a facility?
A. There's a standard that covers that.
Q. And it's 80 feet that's the standard adopted by Park County, isn't it?
MR. RINGEL: Object to the form and the foundation.
Q. (BY MR. KORDICK) 80 feet per prisoner?
MR. RINGEL: Object to the form and the foundation..
A. I believe so, but I can't quote it right off the top of my head.
MR. SARGENT: Can we take a break?
(Break from 10:39 a.m. to 10:53 a.m., at which time Messrs. Groome and Gore were not present in the deposition room.)
Q. (BY MR. KORDICK) Refer you to Park 1450. Do you see that?
A. Yes.
Q. "It is the policy of the sheriff's office that inmates are housed in cell or dormitory sleeping areas that provide at least 80 square feet of total living space per occupant," correct?

A. Correct.
Q. Now, assuming that the architectural drawing at the time of the construction of the jail shows 18 occupants, that there are 18 seats available for inmates to sit at the dining tables, and that there is 1,475 square feet upstairs and downstairs in the facility, and divided by 80, that equals 18.4 prisoners per D Pod, it's true that D Pod was designed for 18 prisoners, isn't it?
MR. RINGEL: Object to the form and the foundation.
A. Yes, that's correct.
Q. (BY MR. KORDICK) If, in fact, all of the original bunks as drawn by the architect and as the facility was built were occupied, you'd be in compliance with this ACA standard for inmate sleeping areas, correct?
A. Yes.
Q. You've testified that you are in the jail on a daily basis, that at least once every two weeks you walk through the facility, correct?
MR. RINGEL: Object to the form and the foundation.
A. I'm not in the jail daily. I'm in the building daily.
Q. (BY MR. KORDICK) Where the jail is?

A. Sure.
Q. Once every two weeks, you walk through the entire jail facility, more or less, correct?
A. Yes.
Q. And you're aware of the number of prisoners that are being housed in the facility, aren't you?
MR. RINGEL: Object to the form and the foundation.
A. I'm aware of the total number.
Q. (BY MR. KORDICK) Did you know that -- are you aware that from March 1 through March 8 that prisoner totals were 48, 50, 51 and got as high as 61 prisoners in the D Pod?
MR. RINGEL: Object to the form and the foundation.
A. No.
Q. (BY MR. KORDICK) You're not aware of that?
A. No. Huh-uh.
Q. Were those figures available to you on your computer in your office?
A. No. The only thing that's available to me is the total number of prisoners in the jail.
Q. Why is that?
A. Because we don't break it down by pods.
Q. Well, we've had materials produced to us

that show that these, in fact, are broken down by pods, and they show a total number of prisoners. Is that a document that you didn't have?
A. That's a document that I probably don't get, that's correct.
Q. Well, is it up to you to see that you get it?
A. No. I have a jail administrator to take care of that.
Q. And who is that?
A. Monte Gore.
MR. RINGEL: Well, object to the form and the foundation. Belatedly. Apologize. Also, I apologize for interrupting, but I need to make a record. For purposes of the record, with respect to the issue of the incompleteness of the policy and procedure manual, I would note for the record that it appears that Exhibit 5 is page 69 of the policy and procedure manual, and that's marked Bates Number Park Reyes 1450, so it looks like that maybe --
MR. KORDICK: Maybe it takes off again?
MR. RINGEL: Maybe it takes off again, but it's fairly clear that this is part of the policy and procedure manual and after the page 51 that Mr. Kordick referred to earlier in this deposition.

* SUBJECT TO CONFIDENTIALITY DESIGNATIONS *

MR. KORDICK: Yeah. And according to my -- what I'm looking at here, it looks like it goes through 76, and then it ends again -- page 76, by the way, is 1457, then it starts with the INS detention standard at 1458.

MR. RINGEL: It may be, and I'm only speculating at this point, that some of the INS detention standards are put in as applicable in the sections of the manual where they would apply, and so therefore, the manual is probably complete, and the INS standards are interspersed amongst it. Does that make sense to you?

MR. KORDICK: It may be. That's what I was trying to figure out.

MR. RINGEL: I understand.

Q. (BY MR. KORDICK) Do you think that's true? That the INS standards are put in the middle of your book?

A. Yes, that's correct.

Q. So now let's get back to what we were talking about.

MR. RINGEL: I apologize for the interruption. I just wanted to clarify that.

Q. (BY MR. KORDICK) You knew that there were more than 18 prisoners being held in the D Pod, didn't you?

MR. RINGEL: Object to the form and the foundation.

A. No.

Q. (BY MR. KORDICK) Never knew that?

A. No. Like I say, I have a jail administrator to take care of the administration of the jail.

Q. This standard, you knew about this standard because you're responsible for adopting it, aren't you? You took over the jail facility before these were adopted, correct?

A. Yeah. I don't read each individual standard. The jail administrator would take care of that.

Q. Well, you understand why crowding, overcrowding, is a potential problem, aren't you?

A. Yes, I do.

Q. It's a health problem, isn't it?

MR. RINGEL: Object to the form and the foundation.

A. Amongst others, yes.

Q. (BY MR. KORDICK) Now, you indicated earlier that as you understood your mission statement, you were supposed to provide a warm bed; is that correct?

A. My mis -- correct, yes.

Q. Do you know if, in fact, the prisoners even all had beds to sleep in?

MR. RINGEL: Object to the form and the foundation.

A. Yeah. They usually all were provided a mattress.

Q. (BY MR. KORDICK) That's not a bed, is it?

MR. RINGEL: Object to the form and the foundation.

A. I'm sorry. As far as -- your definition of a bed, I guess?

Q. (BY MR. KORDICK) There are beds in Pod D, aren't there?

A. There are beds, yes, correct.

Q. And you're aware that there were prisoners in D Pod that were not allowed to sleep in a bed; they had to sleep on the floor on a mat?

MR. RINGEL: Object to the form and the foundation.

A. I understand that there were some that had to be put on mats, yes.

Q. (BY MR. KORDICK) And you knew that before Mr. Carranza-Reyes was admitted in March of 2003, and you knew that that continued even after he was out of the jail; is that correct?

MR. RINGEL: Object to the form and the

foundation.

A. Did I know it -- no. No.

Q. (BY MR. KORDICK) You didn't know that there were people sleeping on mats upstairs?

A. Your question was did I know it after he left, and I --

Q. Did you know before he was in the jail, there were people sleeping on mats before he was in the jail?

A. Oh, yes. Yes, I did.

Q. That was common practice, wasn't it?

A. Sure.

MR. RINGEL: Object to form and the foundation.

Q. (BY MR. KORDICK) They didn't have beds, did they?

MR. RINGEL: Object to the form and the foundation.

A. Correct.

Q. (BY MR. KORDICK) In fact, there was an ongoing issue in the jail with the heating system in the jail, wasn't there?

A. As far as -- I'm sorry.

Q. Well, for instance, in February, did the administrative office where your staff was have to leave

* SUBJECT TO CONFIDENTIALITY DESIGNATIONS *

the building because there was no heat in the building in February of 2003?

MR. RINGEL: Object to the form and the foundation.

A. I don't recall.

Q. (BY MR. KORDICK) You don't remember that?

A. Oh, no, huh-uh.

Q. If that's recorded in the log, would that be something that you wouldn't remember or you wouldn't take account of?

A. Would I account for the log? No, I don't read the log, so I have no idea.

Q. See if I can locate that quickly here. What was your understanding of the number of people that were being held in D Pod?

MR. RINGEL: Object to the form and the foundation.

A. I don't know.

Q. (BY MR. KORDICK) Do you know if the running average was 30? Would that surprise you if the running average was at least 30?

A. Like I say, I don't know who's in what pod.

Q. Well, when you physically went into the facility and made your inspections, you would have seen the number of people in there, wouldn't you?

A. I've seen people in there, yes, probably.

Q. Did you authorize putting any bunks into D Pod?

A. No. I mean, it's not something that would have been authorized through me, but through the jail administrator.

Q. But you noticed that more bunks were going in there, didn't you?

A. No, I didn't.

Q. You didn't see a change in the D Pod?

A. I don't pay any attention to how many bunks there are in there, no.

(Discussion off the record.)

Q. Did you have any limitations, as the person in charge of the jail, on the number of prisoners that could be housed in the D Pod?

A. No.

Q. So there was no limitation?

A. No. Again, that was up to the jail administrator.

Q. Did you know a Deputy Bellantonio?

MR. RINGEL: Object to the form and the foundation.

A. Bellantonio?

Q. (BY MR. KORDICK) Bellantonio.

A. Yeah. He was one of the detention officers.

Q. Was he pretty experienced in detention, his background? Do you know?

A. I don't recall his background.

Q. How did you know him?

A. He was a detention officer.

Q. Do you know that his deposition was taken in this case?

A. No, I don't.

Q. Do you know that he testified that on one occasion, he tried to tell INS that the jail was filled to overcapacity and they couldn't handle any more prisoners --

A. No.

Q. You didn't know that?

A. No, I didn't know that.

Q. Do you know that he was told by his superiors that he was never supposed to turn down prisoners, no matter how overcrowded the conditions were?

A. No, I don't know that.

Q. Is that something that concerns you?

A. If he said it? Oh, yeah, it would be pretty concerning, yeah.

Q. Why would it concern you?

A. That he felt it was overcrowded? Yeah.

That he never told his folks in his line of supervision, that he never gave any information to me. It would be very concerning.

Q. Well, if Mr. Bellantonio said that he was told by the supervisor, Mr. Gore, that there was no limitation on the number of people who could be admitted, would that be something that you would want to know about?

A. Yes.

Q. Did Captain Gore ever tell you that?

A. No. Or not that I can recall. Not that I can recall.

Q. Now, I want you to tell me if you were aware of the standard at 1451, which is the next one, Park 1451. Do you see this, that it requires a sleeping area with a bed, a mattress and a writing surface? Do you see that?

MR. RINGEL: Object to the form and the foundation.

A. Yes, I do see where it's written there.

Q. (BY MR. KORDICK) And you knew before Mr. Carranza-Reyes was in the jail that prisoners were being housed without beds, that they were sleeping on mats on the floor; is that right?

A. Sleeping on mattresses.

* SUBJECT TO CONFIDENTIALITY DESIGNATIONS *

Q. Is that right?
A. That's correct.
Q. Could you look at 1452. It talks about having an opportunity for a daily shower, and the temperature's not supposed to be over 105 degrees to prevent scalding. Do you know what the conditions were in the jail showers in the D Pod?
A. No.
Q. Do you know if there was any problem with that?
A. No.
Q. What about ventilation for the D Pod? Do you know if there was any problem with the heat in the D Pod?
A. No.
MR. RINGEL: Object to the form.
Q. (BY MR. KORDICK) Are you aware of any problem in the jail with heat in the month preceding Mr. Carranza-Reyes's admission on March 1 into the jail?
A. Not that I can recall.
Q. Now, I've got a pass-along note dated February 3, 2003, and that's Exhibit 21, 3412. And --
MR. RINGEL: Can you wait till he gets to it, please? Thank you.
Q. (BY MR. KORDICK) It states -- at the first

paragraph it says, "The front office was sent home today due to lack of heat in there. Wiggington is expected momentarily to try to fix this situation. The heat is repaired and they have parts on order for A and D Pods." Do you see that?
A. Um-hum.
Q. So if you were at work on February 3, 2003, wouldn't you have been aware that the front office staff was sent home because there was no heat in the building?
A. Yes, that's correct.
Q. Do you remember that now?
A. No.
Q. You have no recollection of that?
A. I don't recall that.
Q. And it also mentions that there was a problem with A and D Pods with the heat and that there were parts on order; is that right?
A. It says the heat's repaired.
Q. It says, "The heat is repaired and they have parts on order for A and D Pods"?
A. Correct.
Q. If there were parts on order for A and D Pods, that means that the heat wasn't fully repaired, was it?
MR. RINGEL: Object to the form and the

foundation.
A. That would be your interpretation. That's not mine.
Q. (BY MR. KORDICK) Why would they be ordering parts if it was already repaired in A and D Pods? Why would you assume they would be ordering other parts?
MR. RINGEL: Object to the form and the foundation.
A. Could be a panel that fell off the unit. There could be all sorts of things.
Q. (BY MR. KORDICK) Now, you don't dispute that during the one week that Mr. Carranza-Reyes was there, that the records reflect there were as many as 61 inmates in the D Pod which was designed for 18 people, do you?
MR. RINGEL: Object to the form and the foundation and asked and answered.
A. I don't recall.
Q. (BY MR. KORDICK) And after he was taken to the hospital, did you stop taking detainees from the Department of Corrections because of what happened to Mr. Carranza-Reyes?
MR. RINGEL: Object to the form and the foundation.
A. I don't recall.

Q. (BY MR. KORDICK) You don't recall?
A. No. That would be up to the jail administrator.
Q. You weren't advised that they had to clear that out until the infection issue was taken care of?
MR. RINGEL: Object to the form and the foundation.
A. They may have. It was up to the jail administrator.
Q. (BY MR. KORDICK) Now, as part of the procedure manuals that you had to adopt, you adopted Deposition Exhibit Number 6, didn't you, which is produced at Park 1995?
A. I don't know about this document.
Q. Well, it was represented to us by your attorney that this was a regulation that was in effect in your jail that was adopted by you to regulate the facility that you were in charge of.
MR. RINGEL: Object to the form and the foundation.
Q. (BY MR. KORDICK) Do you know if it was --
MR. RINGEL: Mischaracterizes the representation made by me.
A. No, I don't know about the document.
Q. (BY MR. KORDICK) Okay. So I want you to

* SUBJECT TO CONFIDENTIALITY DESIGNATIONS *

MR. SARGENT: -- as long as you're talking about this document, with the assumption that you've asked him to accept that it was in effect at the time, and also, to the extent it addresses medical issues, I think it's outside the scope of his knowledge.

MR. RINGEL: I would join in the request for a continuing objection on that basis.

MS. HOLMES: Can we just say that one objection covers all?

MR. KORDICK: Sure. You've got an ongoing objection to these questions pertaining to these documents.

MR. SARGENT: Thank you.

Q. (BY MR. KORDICK) Then on page 1995, the regulation states, There are two main goals regarding the recognition of communicable diseases: One, to identify disease as early as possible so treatment can be started and, two, to prevent the spread of the disease. Would you agree with that?

A. Yes.

Q. Now, these regulations are supposed to be designed, it appears, not for a medical person, but for jail personnel so they can recognize a communicable disease. Is that what you understand from reading these?

MR. RINGEL: If you're going to ask him a question like that, I'd ask him to read the entire document. So go ahead and read the entire document.

MR. KORDICK: Well, I'm not going to --

Q. (BY MR. KORDICK) Can you answer the question?

MR. RINGEL: I'm not going to allow him to answer that question.

MR. KORDICK: Are you directing him not to answer that question?

MR. RINGEL: Until he reads the entire document. You haven't established by foundation that he's ever seen the document before.

MR. KORDICK: Your objection's already been noted. I know what you're objecting to. I mean, I'm not trying to argue with you. I want to move it along.

MR. RINGEL: The nature of the objection that Mr. Sargent placed on the record was to the assumption that was in effect. It was in effect and that it was applicable to medical issues based on the deposition of Dr. Bachman yesterday, which I was not present for. However, you are now asking him generically whether or not -- what his perception of the nature of this document is, and until he has an opportunity to read the document, that's not a fair question, and I'm not going to let him answer it unless you give him the opportunity to read the entire document. If you don't want to have him do that, move on to another question.

Q. (BY MR. KORDICK) Okay. Does this appear to you to be a medical document? You can look at it.

MR. RINGEL: Again, he needs to read the entire document before he answers it.

MR. KORDICK: Go ahead and read it.

MR. RINGEL: Start at the beginning of Exhibit 6 and read the whole document. Previous page. Thank you.

A. It appears that this is some sort of a guideline for the detention officer to follow.

Q. (BY MR. KORDICK) Thank you.

A. It's just not my format, so that's what's throwing me off.

Q. What do you mean, it's not your format?

A. Well, as you have right here. Go back down to the one that says Park County Sheriff's Office. That isn't at the top. That's why it's confusing me. So it's not my format, so it may be something that was added, it may be something that's very valid, but it's just not my format.

(At this time Mr. Gore entered the deposition room.)

Q. I'm not able to clarify that because it was produced by your counsel, and I don't know what it is. But it appears at the beginning that it's a screening document. It tells people that are taking prisoners in how to screen them, doesn't it?

MR. RINGEL: Object to the form and the foundation.

Q. (BY MR. KORDICK) That's not directed to a medical officer; that's directed to a guy that's booking a person, correct?

A. That's what it appears.

Q. And it tries to tell the people general information about communicable diseases, doesn't it?

A. Yeah. That's what it looks like it does.

Q. Okay. And then one of the conditions it talks about is indirect contact. "Contact with contaminated objects, such as soiled dressings or clothing from the infected person." Do you see that? That's on page 1996.

A. Yes. Indirect contact, um-hum.

Q. Then it talks about symptoms of communicable diseases on 1997.

A. Yes.

Q. Common signs and symptoms of a number of diseases that are communicable diseases. It says, "Fever, chills, headache, rash, cough, diarrhea, sore

* SUBJECT TO CONFIDENTIALITY DESIGNATIONS *

A. That would be an assumption, yes.
Q. (BY MR. KORDICK) You were touring the facility, and you didn't know that the facility wasn't operating and the prisoners had dirty clothes?
MR. RINGEL: Object to form and the foundation.
A. Like I said, the laundry was working when I went through.
Q. (BY MR. KORDICK) After Mr. Carranza-Reyes left the facility, the INS insisted that the remaining people in D Pod be taken for medical evaluations; is that correct?
MR. RINGEL: Object to the form and the foundation.
A. That was something that would have gone through the jail administrator.
Q. (BY MR. KORDICK) You knew about it, didn't you?
A. No.
Q. You didn't find out about it?
A. Somebody may have said something later on about something going on, but the particulars of it, I . . .
Q. You read the articles in the newspaper about Mr. Carranza-Reyes, didn't you?

A. After -- yes. After the incident took place and he . . .
Q. And I assume you had meetings concerning what occurred, didn't you?
A. His allegation?
Q. Yes.
A. Yes.
Q. Who did you meet with?
A. Jail captain.
Q. Is that it?
A. Might have been some other folks from the staff in there.
Q. Who else did you meet with?
A. As I said, there might have been some other jail staff in there.
Q. Were you made aware of any attempts to take special precautions to clean up the facilities?
A. No, no.
Q. Do you know if they took any special precautions to clean up the facilities after this occurred?
A. Not that I'm aware of.
Q. Do you know if there was a problem with the ventilators being blocked because the cells were too cold and they were blocking the ventilation in the cell to

keep warm?
MR. RINGEL: Object to the form and the foundation.
A. Not that I'm aware of.
Q. (BY MR. KORDICK) You're not aware of that?
A. No.
Q. When you saw that a guy had lost his leg in your facility, did you feel compelled to investigate to see whether something had gone wrong and how to improve the facility for the future?
MR. RINGEL: Object to the form and the foundation.
A. No.
Q. (BY MR. KORDICK) After this occurred, did you monitor the number of people that were being held in the cells to prevent this from happening in the future?
MR. RINGEL: Object to the form and the foundation.
A. No.
Q. (BY MR. KORDICK) Was it the jail policy to tell the jail personnel that they would take as many prisoners as they possibly could to earn the $45 a person for the prison?
A. I don't recall.
Q. Well, when you saw the newspaper article we

looked at in the Summit Times [sic], it said that Mr. Gore is reducing costs per prisoner. What did you think he meant by that?
MR. RINGEL: Object to the form and the foundation.
A. I'd have to ask you to -- I don't understand what you mean.
Q. (BY MR. KORDICK) Do you know what he meant by reducing the per-prisoner costs and expenses?
MR. RINGEL: Object to the form and the foundation.
A. No, I don't.
Q. (BY MR. KORDICK) Let me ask you this: If D Pod -- if you're getting $45 a prisoner in D Pod and you have 30 prisoners in D Pod, if you increase the number in there to 60, you'd have twice the revenue, wouldn't you?
A. Probably, yes.
Q. So the more people you had in, the more revenue you generated from the jail, correct?
MR. RINGEL: Object to the form and the foundation.
A. Yeah. The more people you have in the facility, the more revenue you generate, yeah. That's correct.
Q. (BY MR. KORDICK) And in order to generate

* SUBJECT TO CONFIDENTIALITY DESIGNATIONS *

this revenue, you had to violate your own regulations as far as the humane space per prisoner in your facility, didn't you?

MR. RINGEL: Object to the form and the foundation.

A. No.

Q. (BY MR. KORDICK) You didn't violate your own policies --

A. I'd have to look at it.

Q. -- of space per prisoner? We went over it.

A. Yes. With your calculations.

Q. You did violate that, didn't you?

A. We -- I like yours. No. We didn't.

Q. You didn't violate the 80-foot-per-person rule?

A. Oh, the standard.

Q. Yeah.

A. The standard. Yeah, we may have exceeded the standard, yeah, but I'd have to know exactly how many people were in D Pod, and I don't know how many people were in D Pod.

Q. Well, there were 48 to 61 people during March 1 through March 8. Sometimes there were 50, sometimes there were 51. They were coming and going, but they went down to as low as 48 and as high as 61.

MR. RINGEL: Object to the form and the foundation.

Q. (BY MR. KORDICK) You would agree you were exceeding the standard, correct?

MR. RINGEL: Object to the form and the foundation.

A. Depends on how long they were in there. I mean, I don't -- all sorts of variables.

Q. (BY MR. KORDICK) Do you know how many people were sick in D Pod?

A. No, I don't.

Q. Do you know if people were too sick to get up and get their food?

MR. RINGEL: Object to the form and the foundation.

A. I can't imagine that happening.

Q. (BY MR. KORDICK) Do you know?

A. I said I can't imagine that happening.

Q. Now, after the occurrence with Mr. Carranza-Reyes, what changes did you institute after your investigation to try to make it better in the jail and safer for the inmates?

MR. RINGEL: Object to the form and the foundation.

A. That I'm aware of, we didn't make any.

Q. (BY MR. KORDICK) You didn't do anything to provide them the warm bed or even provide them a bed? You still used mattresses on the floor, didn't you?

MR. RINGEL: Object to the form and the foundation.

A. Like I said, you'd have to ask the jail administrator.

Q. (BY MR. KORDICK) Well, you were still continuing to walk through the cells on a two-week basis, weren't you?

MR. RINGEL: Object to the form and the foundation.

A. Yes.

Q. (BY MR. KORDICK) And you continued to exceed, even after Mr. Carranza-Reyes, the 80-square-foot-per-prisoner rule, weren't you?

MR. RINGEL: Object to the form and the foundation.

A. I don't know.

Q. (BY MR. KORDICK) Well, you continued to have people -- people having beds on the floor, didn't you, afterwards?

MR. RINGEL: Object to the form and the foundation.

Q. (BY MR. KORDICK) After March 8 of 2003, you

continued to place INS prisoners on mats on the floor?

MR. RINGEL: Object to the foundation.

A. Not that I recall.

Q. (BY MR. KORDICK) You don't recall that?

A. No.

Q. But you walked through there at least once every two weeks, didn't you?

A. Correct.

Q. And the number of beds in the cell continued to exceed the original architectural drawing for that cell, didn't they?

MR. RINGEL: Object to the foundation.

A. No, not that I recall.

Q. (BY MR. KORDICK) Well, let me ask you this: When you're in the open area looking into the pod, do you see beds along the rail, the outside rail? Are there three-tiered beds along the outside rail?

A. Yes.

Q. Those aren't shown on the architectural drawing, aren't they?

A. I don't think they are. No. They were put in after the fact.

Q. So there are more beds currently than would permit 18 people -- there are more beds for people than there are 18 -- the 18 beds originally placed in there

currently, right?
MR. RINGEL: Object to the form and the foundation.
A. I believe so, yes.
Q. (BY MR. KORDICK) So you've continued to violate that policy since Mr. Carranza-Reyes was in the jail?
MR. RINGEL: Object to the form and the foundation.
A. Which policy would that be?
Q. (BY MR. KORDICK) Well, the policy of having 18 people in that cell.
A. Yeah.
MR. RINGEL: Object to the form and the foundation.
A. Like I say, if I knew what the numbers were and I could see the sheet for the day, I maybe could answer that question, but all I know is the total number of inmates, so that's all I could really speak to.
MR. KORDICK: I don't have any further questions.
MR. SARGENT: No questions.
MS. HOLMES: No questions.
MR. RINGEL: None from me. Thank you, Sheriff.

WHEREUPON, the within proceedings were concluded at the approximate hour of 11:38 a.m. this 20th day of January, 2006.

* * *

C E R T I F I C A T I O N

I, THERESA A. COFFMAN, Federal Certified Realtime Reporter, appointed to take the deposition of FREDERICK WILLIAM WEGENER, III, certify that prior to the deposition the witness was sworn by me to tell the truth; that the deposition was taken by me at 824 Costella, Fairplay, Colorado on January 20, 2006; that the proceedings were reduced to typewritten form by computer-aided transcription consisting of 106 pages herein; that the foregoing is an accurate transcript of the proceedings.

I certify review of the transcript was requested.

I further certify I am not related to any party herein nor their counsel and have no interest in the result of this litigation.

IN WITNESS WHEREOF, I have hereunto set my hand this 1st day of February, 2006.

______________________________
THERESA A. COFFMAN
Federal Certified Realtime Reporter

S I G N A T U R E O F W I T N E S S

I, FREDERICK WILLIAM WEGENER, III, do hereby certify that I have read the deposition and that the foregoing transcript and accompanying change sheets, if any, constitute a true and complete transcript of my testimony.

______________________________
FREDERICK WILLIAM WEGENER, III
Date Read and Signed:____________

SUBSCRIBED AND SWORN TO before me this ____ day of ________________, ______.

( ) Changes attached ( ) No changes

______________________________
NOTARY PUBLIC

Address: ________________________

______________________________

My commission expires: ___________

Re: Carranza-Reyes v. Park County, et al.
Date of Deposition: January 20, 2006
Trial Date: None Set
Volume: --
Reporter: TC
Proofer: MKH
Audio: SC