Carranza-Reyes v. Park County                                    Vicki Ann Paulsen, R.N.

**1**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Case No. 2005-WM-377 (BNB)

DEPOSITION OF:  VICKI ANN PAULSEN, R.N.
January 18, 2006

MOISES CARRANZA-REYES,
Plaintiff,
v.
PARK COUNTY, a public entity of the State of Colorado and
its governing board, THE PARK COUNTY BOARD OF COUNTY
COMMISSIONERS; PARK COUNTY SHERIFF'S OFFICE, a public
entity of the State of Colorado; FRED WEGENER,
individually and in his official capacity as Sheriff of
Park County, Colorado; MONTE GORE, individually and in
his capacity as Captain of Park County Sheriff's
Department; VICKIE PAULSEN, individually and in her
official capacity as Registered Nurse for Park County,
Colorado; JAMES BACHMAN, M.D., individually and in his
official capacity as Medical Director of the Park County
Jail,

Defendants.

TAKEN PURSUANT TO NOTICE on behalf of the Plaintiff at
1125 17th Street, Suite 600, Denver, Colorado 80202 at
9:04 a.m. before Theresa A. Coffman, Federal Certified
Realtime Reporter, Registered Professional Reporter and
Notary Public within Colorado.

**2**

APPEARANCES
For the Plaintiff:       WILLIAM A. TRINE, ESQ.
                         Trine & Metcalf, P.C.
                         1435 Arapahoe
                         Boulder, Colorado 80302

                         LLOYD C. KORDICK, ESQ.
                         805 South Cascade
                         Colorado Springs, Colorado 80903

                         JOSEPH J. ARCHULETA, ESQ.
                         Law Office of Joseph J. Archuleta
                         1724 Ogden Street
                         Denver, Colorado 80218
For the Defendants       JENNIFER L. VEIGA, ESQ.
Park County, Park        Hall & Evans, LLC
County Board of          1125 17th Street
Commissioners, Park      Suite 600
County Sheriff's Office, Denver, Colorado 80202
Wegener and Gore:

For the Defendant        MELANIE B. LEWIS, ESQ.
Paulsen:                 Berg Hill Greenleaf & Ruscitti LLP
                         1712 Pearl Street
                         Boulder, Colorado 80302
For the Defendant        CRAIG A. SARGENT, ESQ.
Bachman:                 ANDREW W. JURS, ESQ.
                         Johnson McConaty & Sargent, P.C.
                         400 South Colorado Boulevard
                         Suite 900
                         Glendale, Colorado 80246

Also Present:            Moises Carranza-Reyes

**3**

I N D E X
EXAMINATION OF VICKI ANN PAULSEN, R.N.              PAGE
January 18, 2006

By Mr. Trine                                        5, 225

By Mr. Archuleta                                    --

By Mr. Kordick                                      --

By Ms. Veiga                                        --

By Mr. Sargent                                      --

By Mr. Jurs                                         223

By Ms. Lewis                                        220

                                                    INITIAL
DEPOSITION EXHIBITS:                                REFERENCE

20   Paulsen Park County personnel file             5

21   Pass-On records                                55

22   Code of Colorado Regulations, Department      12
     of Public Health and Environment Consumer
     Protection Section.

23   Park County Sheriff's Office Detention         46
     Center INS Detainee Intake Form, 3/6/03

24   Summit Medical Center records                  135
25   Park County Sheriff's Office Detention         173
     Center Job Description

26   INS Detention Standard, Medical Care           215

(Original exhibits attached to original deposition; copy
exhibits included in continuing exhibit file; copies
provided to counsel as requested.)

**4**

REQUESTED PORTIONS OF TESTIMONY:                    PAGE
Request for document production                     --
or information

Certified question                                  --

Instruction not to answer                           77

Other requests or marked testimony                  --

REFERENCES TO EXHIBITS MARKED PREVIOUSLY:

Exhibit No.      Page Reference

2                201
3                69
4                183

Coffman Reporting

303.86?.0202
303.893.2230 FAX

Pages 1 to 4

EXHIBIT
10

PENGAD 800-631-6989

Carranza-Reyes v. Park County                                                    Vicki Ann Paulsen, R.N.

41

1    A.   That he saw?
2    Q.   Right. At his office.
3    A.   I can't even do that for you. I don't
4  recall.
5    Q.   Were there ever weeks when no one went to
6  Dr. Bachman's office?
7    A.   Sure. Definitely.
8    Q.   Were there weeks when more than one inmate
9  went on one trip to his office?
10   A.   Yes.
11   Q.   If Dr. Bachman -- strike that. Did you know
12  in advance that there would be weeks when Dr. Bachman
13  wouldn't be coming to Park County and he said, "Send them
14  to me"?
15   A.   He tried to keep me apprised of that, yes.
16   Q.   About how often did that happen during your
17  tenure that you were informed in advance that he wouldn't
18  be there that week, but you could send inmates down to
19  him?
20   A.   Four to five times at the maximum.
21   Q.   And when that occurred, would you send
22  whatever inmates would normally be scheduled to see
23  him --
24   A.   Correct.
25   Q.   -- in Park County? Would you send all of

42

1  them in one group on one day down to Summit County?
2    A.   Correct. He would open up a time, tell me
3  what time to have them there, and I would send them over.
4    Q.   Now, were you discouraged by anyone at Park
5  County from doing that because of the extra expense
6  involved in sending inmates to Summit County as opposed
7  to the doctor coming to Park?
8    A.   No, no. It was basically working out
9  transport with Mr. Sallee, because he's usually the one
10  that took them over, and what time, and that he didn't
11  have something else that he had to do, you know,
12  transportwise. And then I'd let Dr. Bachman know, and
13  we'd go from there.
14   Q.   Now, you initially said that when you first
15  started there, you remember you would be there about 6:00
16  a.m. because you had a couple of inmates that were
17  diabetics.
18   A.   Um-hum.
19   Q.   Did your schedule vary? Were there times
20  when you came in later or earlier, or did you always try
21  to be there at 6:00?
22   A.   There were times when I'd go in a little
23  later, usually around 7:00, not often, but usually I
24  tried to keep that 6 o'clock schedule.
25   Q.   Now, you indicated that there were times

43

1  when there were more than 30 detainees in Pod D. Do you
2  remember times when Pod D was filled to capacity as far
3  as the bunk beds, and detainees were sleeping on the
4  floor?
5    A.   Yes, I do.
6    Q.   And about how often did that happen while
7  you were there?
8    A.   I'm trying to think. Probably three to four
9  times. It wasn't -- it didn't occur all the time.
10   Q.   Were you ever informed, either through
11  pass-on records or by anyone else, any of the deputies
12  there, of how many were in Pod D? You could only
13  visualize --
14   A.   You could look and see that it was crowded,
15  yes.
16   Q.   And did you become familiar with the
17  sheriff's office rules and regulations that provided that
18  there should be only one inmate housed for every 80
19  square feet available?
20   A.   Yes.
21   Q.   And were you ever informed that using --
22  following that policy and regulation, Pod D could
23  accommodate no more than 18 detainees?
24         MS. LEWIS: Object to the form of the
25  question. Foundation.

44

1    A.   No.
2    Q.   (BY MR. TRINE) You were never informed of
3  that?
4    A.   No.
5    Q.   You could see, though, that the three tables
6  that they had in there that people could sit and eat
7  at --
8    A.   Right.
9    Q.   -- would only accommodate comfortably about
10  18; isn't that right?
11   A.   Right, correct. But I was never informed of
12  what that pod could hold.
13   Q.   And you never did the mathematics yourself?
14  You never looked at anything showing what the square
15  footage was?
16   A.   No.
17   Q.   You probably knew when you worked at DOC
18  that the regulations required one toilet for every 12
19  inmates, didn't you?
20         MS. LEWIS: Object to the form and
21  foundation.
22   A.   Yes.
23   Q.   (BY MR. TRINE) And your observations in Pod
24  D was that there were two toilets?
25   A.   Correct.

Pages 41 to 44

*  SUBJECT TO CONFIDENTIALITY DESIGNATIONS  *

Carranza-Reyes v. Park County                                                      Vicki Ann Paulsen, R.N.

45

1    Q.    When you saw that there were two toilets and
2  knew at times that there were more than 30 inmates in
3  there, did you ever say anything to Monte Gore or any of
4  the deputies about the overcrowding?
5        MS. LEWIS: Object to the form of the
6  question.
7    A.    I did say, you know, how long are they going
8  to be there, is INS picking up, they're -- it's not a
9  good thing to have that many people in there. But other
10 than that, I did not talk to Monte Gore about it.
11   Q.    (BY MR. TRINE) Who are these conversations
12 with that you were just describing?
13   A.    Corporal Crawford, Sergeant Muldoon.
14   Q.    And when you had said it's not a good idea
15 to have that many people in there, what was their
16 response?
17   A.    That INS would probably be picking them
18 up -- the extra up. Because they were in and out all the
19 time. I mean, I didn't have detainees there for long
20 periods. I think I had two, but they were going to
21 court. I mean, I can remember two or three cases where I
22 had detainees that were longer than that, but they were
23 going to court, so they were there longer. But other
24 than that, they picked them up weekly.
25   Q.    Were you personally concerned about the

46

1  potential health hazards of having an overcrowded pod?
2    A.    Any nurse would be.
3        MR. SARGENT: I didn't hear the answer.
4  Would be?
5        MS. VEIGA: I didn't hear.
6        THE DEPONENT: Any nurse would be.
7    Q.    (BY MR. TRINE) And what were your concerns?
8    A.    Just health issues. You know, I mean, if
9  someone got a cold, then everyone got the cold. That
10 type of thing.
11       MR. TRINE: Why don't we take a short break.
12       (Break from 10:10 a.m. to 10:25 a.m.)
13       (Deposition Exhibit 23 was marked.)
14   Q.    (BY MR. TRINE) I'll hand you what has been
15 marked Deposition Exhibit 23, and there is a stamp on
16 that exhibit stating, "Any medical info can be located in
17 the nurse's office." Do you remember when and under what
18 circumstances that stamp was used?
19   A.    I would assume when he -- when they came
20 into the facility.
21   Q.    Did you stamp --
22   A.    No, I didn't.
23   Q.    Did you use this stamp?
24   A.    I didn't use that stamp, no.
25   Q.    Well, let me explain that there were 50

47

1  detainees who were transported out of Park County on
2  March 7, 2003, and we received this face sheet for all 50
3  detainees, but only 33 of them had this stamp marked on
4  them. And the rest didn't.
5    A.    I don't know.
6    Q.    That's why I asked you if you knew when and
7  under what circumstances they actually stamped these
8  sheets.
9    A.    I would --
10       MS. LEWIS: Object to form and foundation.
11   A.    I would assume when they were -- when they
12 came in.
13   Q.    (BY MR. TRINE) Well, did every detainee
14 have a separate medical chart in your office that was
15 locked up?
16   A.    Every detainee had their -- what they filled
17 out in a little folder in my office. You know, the
18 little medical questionnaire.
19   Q.    That they filled out when they were booked
20 in?
21   A.    Right. And I would assume that this was
22 done at the same time. I don't know.
23   Q.    Okay.
24   A.    I had not ever seen one of these.
25       MR. SARGENT: Bill, just so I'm clear, this

48

1  is not one for Mr. Carranza-Reyes, right?
2        MR. TRINE: Obviously not.
3        MR. SARGENT: I didn't know if I was missing
4  something.
5        THE DEPONENT: I was going to say -- I don't
6  know.
7    Q.    (BY MR. TRINE) So your testimony is that
8  you would open a new file on every detainee that was
9  booked in and would keep that locked up in your file
10 cabinet?
11   A.    It would be a folder with their medical
12 information that they gave us in there, in the file
13 cabinet locked up, yes.
14   Q.    And someone else would stamp this stamped
15 information on the form?
16   A.    Evidently.
17   Q.    Now, did you understand from any source that
18 Dr. Bachman had a specialty, if you will, in altitude
19 sickness?
20   A.    No.
21   Q.    He never informed you of that?
22   A.    No.
23   Q.    Did he give you any specific information
24 about altitude sickness?
25   A.    No.

Pages 45 to 48

* SUBJECT TO CONFIDENTIALITY DESIGNATIONS *

Carranza-Reyes v. Park County                                          Vicki Ann Paulsen, R.N.

49

1    Q.    Did you become aware of problems at Park
2  County that winter when you came on board in January with
3  the heating system and people in Pod D complaining of its
4  being cold?
5         MS. LEWIS: Object to form and foundation.
6    A.    They had problems --
7         MS. VEIGA: I'm sorry. So I'm clear, I have
8  not been making objections on the assumption that our
9  rule applied that one objection applies to all.
10        MR. TRINE: Sure.
11        MS. VEIGA: Thank you.
12   A.    They had problems on and off with the
13  heating system, but it wasn't -- it would not be only Pod
14  D that would have a problem. They'd say, you know, we're
15  cold in here, and they'd get up and start working on it
16  and get it fixed.
17   Q.    (BY MR. TRINE) How often did that occur
18  while you were there?
19   A.    Probably three times that I can think of off
20  the top of my head.
21   Q.    And were they having problems while you were
22  there with the washer and dryer that they used for
23  inmates' clothing?
24   A.    I recall them having trouble with the washer
25  at one time. I don't remember when it was, but most of

50

1  the time that thing was going 24 hours a day. They had
2  somebody on evenings that did laundry and somebody during
3  the day.
4    Q.    And were you aware of inmate complaints of
5  the showers not working properly and the temperature of
6  the water sometimes being cold and sometimes very, very
7  hot?
8    A.    I heard that complaint several times.
9    Q.    And were complaints coming out of Pod D
10  about that?
11   A.    I did not hear -- not about water, no.
12        MR. SARGENT: I didn't hear the answer,
13  ma'am. I'm sorry.
14        THE DEPONENT: Not about water, no, not out
15  of Pod D.
16   Q.    (BY MR. TRINE) Now, did Dr. Bachman, to
17  your knowledge, conduct educational sessions or training
18  sessions with the deputies there at the jail instructing
19  them on medical issues or protocols?
20   A.    I believe he did at one time, yes. Not when
21  I was there.
22   Q.    Okay. You say you believe he did at one
23  time. That information is from what source?
24   A.    From the protocols that they had -- they had
25  meetings where they got together and discussed certain

51

1  medical issues. That was from the protocols.
2    Q.    In other words, you read protocols that
3  indicated that would occur, and therefore, you assume it
4  did?
5    A.    It did not occur while I was there.
6    Q.    But what's your assumption, then? It
7  occurred before you came on board?
8    A.    I didn't ask. I assumed that it did, yes.
9    Q.    Did you ever request that Dr. Bachman come
10  to the jail and instruct deputies on any particular
11  medical issues?
12   A.    No.
13   Q.    Did you ever feel that there was a need to
14  do that?
15   A.    No.
16   Q.    Now, do you presently have any memory, apart
17  from documents, of Moises Carranza-Reyes?
18   A.    Yes.
19   Q.    Okay. And do you have any present memory of
20  any contact you had with him?
21   A.    Yes.
22   Q.    And what is your memory of your first
23  contact with him?
24   A.    I saw him on the 6th of March, and he came
25  to me with an interpreter, and he was complaining of a

52

1  headache, congestion, stuffy nose, sore throat, achy.
2    Q.    You mean you remember all that without
3  reference to notes --
4    A.    Yes, I do.
5    Q.    -- or records? Why does that stand out in
6  your mind that he came to you with those --
7    A.    There are many inmates that stand out in my
8  mind. Or detainees. I work with it.
9    Q.    And what was his appearance at that time in
10  March when you first saw him?
11   A.    When I first saw him?
12   Q.    Yeah.
13   A.    He was walking, his color was good. He came
14  in. Through the interpreter we talked back and forth
15  about his problems, and I examined him. At that time I
16  didn't feel that what was going on with him was anything
17  major.
18   Q.    Now, you see him here with us in the
19  deposition today?
20   A.    Um-hum.
21   Q.    Is that basically how he looked at that
22  time?
23   A.    He was thinner, and he was -- he was -- he
24  was -- how do you want me to say he looked? I mean, he
25  walked in, he was alert, he was . . .

* SUBJECT TO CONFIDENTIALITY DESIGNATIONS *

61

1 authorized pizzas and sodas all around tomorrow evening.
2 This is also excepting the above-mentioned disagreement
3 in D Pod."
4        Do you remember at times being informed in
5 advance of a DOC inspection that an inspection was going
6 to take place and everyone being asked to prepare for
7 that?
8    A.   No.
9    Q.   Were you ever present during a DOC
10 inspection?
11   A.   Yes.
12   Q.   And you're saying that you didn't receive
13 advance warning of that inspection?
14   A.   No. I was --
15   Q.   Do you ever remember seeing in the pass-on
16 reports information that an inspection was going to take
17 place and everyone should clean up and get ready for it?
18   A.   I don't recall that.
19   Q.   Do you remember that particular incident of
20 there being some disagreement in B Pod and everyone
21 preparing for the inspection except D Pod?
22        MS. LEWIS:  Object to the form.
23   A.   I do not.
24   Q.   (BY MR. TRINE) And if you look at 3499, it
25 states, "We ran out of blues again while processing INS.

62

1 Some were put in stripes until laundry is done." Do you
2 remember there being times when there were so many
3 detainees in Pod D that they ran out of their blue
4 uniforms and they had to be put in other colored
5 uniforms?
6    A.   Um-hum.  Yes.
7    Q.   And how often did that happen?
8    A.   I can't tell you. I really don't know.
9    Q.   Do you know how many uniforms they had for
10 people in Pod D? How many blue uniforms?
11   A.   No, I do not.
12   Q.   Then if you'll refer to the pass-on record
13 for March 1, 2003 at Park 3502. And I'll represent to
14 you that March 1 was a Saturday. At the bottom it
15 indicates "Vicki is back at home," and it has the date
16 3/1/03. Do you see that?
17   A.   Yes.
18   Q.   And if you refer to Park 3503 on 3103,
19 indicating "Vickie called to let us know she'll be back
20 in Canon" -- "she will be in Canon City and can be
21 reached by cell and/or pager if an emergency arises."
22 Does that refresh your memory for what you were doing
23 commencing the week of March 1?
24   A.   I went to Canon to go grocery shopping.
25   Q.   And you would normally let people know where

63

1 you were going to be on weekends in case an emergency
2 should arise?
3    A.   Yes. or I'd tell them I'll be unavailable.
4    Q.   And apparently you also advised Graves -- do
5 you recall who Graves is?
6    A.   I don't recall.
7    Q.   To issue an inhaler to Santos-Flores, Jose,
8 INS, type, albuterol. Do you remember that incident?
9    A.   I do. The detainee had asthma, and he came
10 in without an inhaler.
11   Q.   And had just recently been admitted?
12   A.   Um-hum. Yes.
13   Q.   Then if you'll refer to 3514 -- and this is
14 on March 3, 2003, which would be a Monday.
15   A.   Correct.
16   Q.   And you indicate that you won't be in on
17 March 4 because of an appointment with a doctor?
18   A.   Yes.
19   Q.   Do you remember that?
20   A.   Yes.
21   Q.   And that night will have to pass out the
22 a.m. meds?
23   A.   Yes.
24   Q.   So you were not in on Monday, on the 4th?
25 Or I mean on Tuesday?

64

1    A.   I was not there all day.
2    Q.   On Tuesday, the 4th?
3    A.   Right.
4    Q.   And when you say nights will have to pass
5 a.m. meds, you're talking about the shift that would be
6 on duty after midnight?
7    A.   Yes.
8    Q.   And they would be passing off the meds
9 before they went off duty at 8:00 a.m.?
10   A.   Yes.
11   Q.   And do you remember whether you had an M.D.
12 appointment because of any illness you had at the time?
13   A.   I had oral surgery.
14   Q.   Okay. And were able to return to work on
15 the 5th?
16   A.   Yes.
17   Q.   Then if you look at Park 3517, which is a
18 March 4, 2003 entry by Sergeant Flint, and in the first
19 paragraph he indicates that "Inmate Herbert
20 Maprazo-Hazarlegos is complaining of serious pains in his
21 left side (D Pod). Recommend he see the nurse as soon as
22 possible." When you came on duty on the 5th, you would
23 have reviewed this; is that right?
24   A.   Um-hum, correct.
25   Q.   And do you remember that incident?

*  SUBJECT TO CONFIDENTIALITY DESIGNATIONS  *

Carranza-Reyes v. Park County                                      Vicki Ann Paulsen, R.N.

---

77

1  specifically she reviewed at the direction of her
2  attorneys because I think that's privileged and work
3  product, and so I'm instructing her not to answer about
4  specific documents that she reviewed at my direction.
5      Q.   (BY MR. TRINE) In any event, you say you're
6  upset right now, seeing it in the pass-on records; is
7  that right?
8      A.   Yes. Yes, I am.
9      Q.   Now, would you customarily record the time
10  you would see an inmate when you authored a document like
11  this?
12      A.   Not necessarily the time. Always the date.
13      Q.   And would you have made handwritten notes of
14  the symptoms and your assessment and plan that you would
15  later then record in the -- on the computer?
16      A.   No, I would not make any written notes. I
17  make little notes to myself then destroy them.
18      Q.   You'd make some notes?
19      A.   Right, to myself, you know.
20      Q.   To remind you of what happened?
21      A.   Right.
22      Q.   So you could later --
23      A.   Right.
24      Q.   -- that day record it on the computer?
25      A.   Usually I did it right after I saw someone

---

78

1  so it was fresh in my mind.
2      Q.   Okay. Well, you said you saw five people
3  that morning.
4      A.   Um-hum.
5      Q.   And one of them was Carranza-Reyes.
6      A.   Um-hum.
7      Q.   Did you record your assessment for each of
8  those five right after seeing each one or after you saw
9  all five?
10      A.   I -- I don't remember. To be honest, I
11  don't remember.
12      Q.   What was your custom and practice at that
13  time if a whole handful were brought into the clinic and
14  you were seeing them one at a time while the others were
15  waiting?
16      A.   Usually I would wait till after I saw them
17  so that we could get them seen and do what we needed to
18  do and the deputies could get them back.
19      Q.   Now, was it highly unusual for the deputies
20  to bring as many as five in at once as opposed to
21  bringing them one at a time?
22      A.   No. They had to bring them that way just
23  because of staffing.
24      Q.   What do you mean, they had to bring them in
25  in groups because of staffing?

---

79

1      A.   Right. They had so many deputies on the
2  floor, and you had to have one on the floor, and one was
3  free to bring back inmates.
4      Q.   Wasn't it the custom and practice to bring
5  inmates in one at a time?
6      A.   I didn't -- oh, you mean into my office?
7      Q.   Yes.
8      A.   Oh. One at a time, yes. I thought you
9  meant back to the holding -- where they were sitting. So
10  I misunderstood.
11      Q.   The custom and practice was to bring them to
12  your office one at a time?
13      A.   Right.
14      Q.   Do you know why they brought five in at once
15  on this day?
16      A.   They didn't bring them all into my office at
17  one time. They brought them to the back and had them sit
18  there so I could see them one at a time.
19      Q.   Was that standard practice?
20      A.   Yes.
21      Q.   With all inmates or just INS detainees?
22      A.   All inmates.
23      Q.   Do you know who the interpreter was that you
24  referred to?
25      A.   No, I do not.

---

80

1      Q.   And he was complaining of body aches?
2      A.   Correct.
3      Q.   What parts of his body?
4      A.   Just general body aches.
5      Q.   And complaining of headache?
6      A.   Right.
7      Q.   And nausea?
8      A.   Correct.
9      Q.   And diarrhea?
10      A.   Um-hum.
11      Q.   And had nasal congestion?
12      A.   Correct.
13      Q.   And a sore throat?
14      A.   (Deponent nodded head.)
15           MS. LEWIS: You need to answer.
16      A.   Yes.
17      Q.   (BY MR. TRINE) And did you swab his throat?
18      A.   No.
19      Q.   Did you look at his throat?
20      A.   Yes, I did.
21      Q.   How do you know you looked at it?
22      A.   We always look at somebody's throat when
23  they say they have a sore throat.
24      Q.   You didn't record any findings as a result
25  of looking at his sore throat. What did you see?

---

* SUBJECT TO CONFIDENTIALITY DESIGNATIONS *

Carranza-Reyes v. Park County                                    Vicki Ann Paulsen, R.N.

81

1    A.    A slightly red throat.
2    Q.    And a slightly red throat can be a sign of
3  strep infection; isn't that right?
4    A.    Not necessarily.
5    Q.    A red throat is a sign, a possible sign, of
6  a strep infection; isn't that correct?
7    A.    Possible.
8        MS. LEWIS:  Mr. Trine, I think it's 11:30
9  now.
10       MR. TRINE:  It's 11:27.  Let me have three
11 minutes.
12   Q.    (BY MR. TRINE)  And am I correct that
13 general body aches, a headache, nausea, diarrhea, and a
14 red, sore throat are also signs and symptoms of the
15 beginning of a septic condition of sepsis?
16   A.    They can be.
17   Q.    And his skin was warm and dry to the touch?
18   A.    Correct.
19   Q.    And he was slightly tender over his stomach
20 area?
21   A.    Correct.
22   Q.    And you apparently didn't palpate his
23 throat --
24       MS. LEWIS:  Object to the form of the
25 question.  Foundation.

82

1    Q.    (BY MR. TRINE)  -- for any swelling of lymph
2  nodes?
3    A.    Yes, I did.
4    Q.    Where do you indicate you did that?
5    A.    I did not indicate that.
6    Q.    Excuse me?
7    A.    I did not indicate that.
8    Q.    But today you just have a memory of actually
9  touching him and palpating him for lymph nodes; is that
10 right?
11   A.    If you have a sore throat, you palpate for
12 lymph nodes.
13   Q.    I know you're supposed to do that.  Do you
14 have a memory of doing that?
15   A.    Yes, I do.
16   Q.    You have a memory today of touching him and
17 palpating for lymph nodes?
18   A.    Yes.
19   Q.    Is that right?
20   A.    Correct.
21       MR. TRINE:  Okay.  Let's take a break.
22       (Break from 11:29 a.m. to 12:33 p.m.)
23       (Deposition Exhibit 24 was marked.)
24   Q.    (BY MR. TRINE)  Ms. Paulsen, when we broke
25 for lunch, we were discussing from Exhibit 21, Park 3525,

83

1  the document that contains your name and James Bachman
2  that's dated March 6, '03, and at that time you chart
3  that he had an elevated temperature of 100.2; is that
4  correct?
5    A.    Correct.
6    Q.    And that would be consistent with your
7  assessment of his having warm skin, dry to the touch?
8    A.    Correct.
9    Q.    And you indicate that you asked the
10 interpreter to tell him to let medical know if he's not
11 improving?
12   A.    Yes.
13   Q.    And at that time you apparently knew that
14 Bachman would probably not be in, at the earliest, until
15 the following Wednesday?
16   A.    Correct.
17   Q.    And March 6 was a Thursday?
18   A.    Um-hum.  Yes.
19   Q.    Did you consider calling Bachman just to
20 tell him that Carranza-Reyes had symptoms of a possible
21 strep throat?
22   A.    No, because --
23       MS. LEWIS:  Object to the form of the
24 question.
25   A.    Because his -- his symptoms were not

84

1  consistent with what I've seen with strep.
2    Q.    (BY MR. TRINE)  What symptom was not
3  consistent with --
4    A.    Elevated temperature of over 101.
5    Q.    That's consistent with a sepsis condition.
6  isn't it?
7    A.    Or strep.  Yeah.
8    Q.    Okay.
9    A.    101 temp.
10   Q.    Did you consider calling Bachman to tell him
11 that he had not only possible symptoms of a strep throat
12 but of septicemia or a septic condition?
13   A.    No, I didn't --
14       MS. LEWIS:  Object to form.
15   A.    No, I did not.
16   Q.    (BY MR. TRINE)  There's no indication on
17 Park 3525 as to what your nursing diagnosis was.  Did you
18 have a nursing diagnosis?
19   A.    No.
20   Q.    So you had no thoughts at all on what was
21 causing his condition at that time?
22   A.    It could have been a number of things.
23   Q.    But since you couldn't eliminate any of
24 those things, you didn't make a nursing diagnosis in your
25 assessment?

*  SUBJECT TO CONFIDENTIALITY DESIGNATIONS  *

93

1  congestion and for his upset stomach and diarrhea.
2     Q.    And in order to make sure that everyone is
3  on the same page and knows what your instructions are,
4  wouldn't you put that in the pass-on record?
5     A.    Yes.
6     Q.    Did you find that anywhere in the pass-on
7  record --
8     A.    No, I did not.
9     Q.    -- those instructions?
10    A.    No, I did not.
11    Q.    It would have been your custom and practice,
12 however, to enter some kind of note in the pass-on record
13 if you wanted an inmate to be watched carefully, wouldn't
14 you?
15    A.    Yes.
16       MS. LEWIS: Object to the form.
17    Q.    (BY MR. TRINE) Do you know why that wasn't
18 done here?
19    A.    No, I do not.
20    Q.    What's your next memory, then, of any
21 contacts with anyone related to Carranza-Reyes after
22 Friday, March 7?
23    A.    They called me the early morning of the 8th
24 that he had become short of breath. They had to take him
25 back to medical, and he -- Deputy Frye had taken his

94

1  vital signs and had given him some oxygen.
2     Q.    And when were you called? About what time?
3     A.    About 3:00.
4     Q.    And was it your impression, then, that his
5  condition had deteriorated from the time you saw him on
6  the 7th?
7     A.    Yes.
8     Q.    Did you at that time consider coming in
9  immediately to assess him?
10    A.    I did, and I talked to the deputies, and
11 they didn't feel at that point that it was necessary for
12 me to come in right then.
13    Q.    Which deputy did you talk to?
14    A.    I talked to Deputy Fikejs.
15       MR. SARGENT: I'm sorry. I didn't hear you.
16       THE DEPONENT: Deputy Fikejs.
17    Q.    (BY MR. TRINE) And what was your
18 understanding of what medical training, if any, Deputy
19 Fikejs had?
20    A.    Deputy Frye was taking care of Mr.
21 Carranza-Reyes.
22    Q.    But you spoke to Mr. Fikejs?
23    A.    Deputy Frye was with him and in medical, and
24 so it was Deputy Fikejs, and he was relating to me
25 what -- and I could hear what Mr. Frye was saying.

95

1     Q.    You didn't directly talk to Frye?
2     A.    Not until I went in.
3     Q.    So your understanding was that Deputy Fikejs
4  was relaying to you information he was getting from Frye?
5     A.    Yes.
6     Q.    And they were both in the same room
7  together?
8     A.    Yes.
9     Q.    Did you ask to speak to Frye?
10    A.    He was busy with Mr. Carranza-Reyes.
11    Q.    He was busy with Carranza-Reyes?
12    A.    Yes, yes.
13    Q.    Doing what?
14    A.    Taking his vital signs and keeping check on
15 him.
16    Q.    So the phone conversation took place while
17 Frye was actually examining --
18    A.    While he was with him.
19    Q.    Is that right?
20    A.    Yes.
21    Q.    Were you giving instructions on the
22 examination: Do this, do that?
23    A.    I asked if they had taken his blood pressure
24 and pulse and respiration and just what his appearance
25 was, what was going on.

96

1     Q.    Were you informed that the vital signs were
2  abnormal?
3       MS. LEWIS: Object to the form.
4     A.    No.
5     Q.    (BY MR. TRINE) You were informed that the
6  vital signs were normal and stable?
7     A.    Yes.
8     Q.    What do you remember --
9     A.    I don't remember the vital signs.
10       MS. LEWIS: Wait until he finishes his
11 question.
12       THE DEPONENT: Okay.
13    Q.    (BY MR. TRINE) What do you remember about
14 the conversation specifically? What did they tell you
15 about his condition, that is, what did Deputy Fikejs tell
16 you about his condition?
17    A.    That they had taken him back to medical,
18 that he was short of breath -- complained of shortness of
19 breath, and he still had nausea and vomiting.
20    Q.    What about his temperature?
21    A.    I don't remember.
22    Q.    Did you take handwritten notes at home of
23 this information, this conversation?
24    A.    Yes.
25    Q.    And what did you do with those notes?

Carranza-Reyes v. Park County                                    Vicki Ann Paulsen, R.N.

---

97

1   A.   Took them with me, I think, into the office.
2   Q.   And put them in his chart? Put them in
3 Carranza-Reyes' chart?
4   A.   I don't recall if I did or not.
5   Q.   What was your understanding of why oxygen
6 was being administered at that time?
7   A.   Because he had complained of shortness of
8 breath.
9   Q.   Was this, as far as you were concerned, a
10 new sign or symptom?
11   A.   Yes.
12   Q.   So what instructions, if any, did you give
13 to Fikejs in that phone conversation?
14   A.   That they needed to keep an eye on him and
15 to contact me if he became any worse than what he was
16 then.
17   Q.   So what was your next contact with anyone
18 after that phone call?
19   A.   I called at -- a little before 6:00, and he
20 had been resting and used the bathroom once, then I
21 went --
22   Q.   You called from home --
23   A.   Yes.
24   Q.   -- a little before 6:00?
25   A.   Um-hum.

---

98

1       (At this time Mr. Jurs entered the
2 deposition room.)
3   Q.   Who did you talk to?
4   A.   I don't remember who I talked to.
5   Q.   Any other contact before you arrived at the
6 facility?
7   A.   No.
8   Q.   And approximately what time did you arrive?
9   A.   Quarter to 8:00, somewhere around in there.
10   Q.   And you customarily would come in at 6:00.
11 How come 8 o'clock --
12   A.   This was Saturday.
13   Q.   Did you tell them that you would be coming
14 in that morning?
15   A.   Yes, I did.
16   Q.   Did you tell them what time you would be
17 coming in?
18   A.   No, I didn't.
19   Q.   Am I correct that after that phone
20 conversation, you didn't feel that there was any urgency
21 in your seeing him right away?
22   A.   I can't say there wasn't any urgency.
23   Q.   What?
24   A.   I . . .
25   Q.   I didn't hear you.

---

99

1   A.   Was there any urgency at that point?
2   Q.   Yeah. When you got the telephone call at
3 night --
4   A.   Um-hum.
5   Q.   -- I gather you didn't feel there was any
6 urgency in your coming in immediately to assess him; is
7 that right?
8       MS. LEWIS: Object to the form of the
9 question.
10   A.   Not at that time.
11   Q.   (BY MR. TRINE) Otherwise you probably would
12 have been there right away, correct?
13   A.   Yes.
14   Q.   Or come in before 8 o'clock at least?
15   A.   Yes.
16   Q.   So your only reason for coming in on the 8th
17 was because of Carranza-Reyes?
18   A.   Yes.
19   Q.   It was a Saturday, and otherwise you
20 wouldn't have been in?
21   A.   No, I would not have.
22   Q.   Okay. What did you do when you arrived?
23   A.   Checked in with control, picked up my keys,
24 went back to open up medical, and he had fallen in the
25 tier, and I went back out to check him out.

---

100

1   Q.   How did you know he'd fallen in the tier?
2   A.   Corporal Crawford called me in the back.
3   Q.   So you checked into medical --
4   A.   I went out to open my office, yes.
5   Q.   And how soon after you opened your office
6 did --
7   A.   Almost -- I had just gotten back.
8   Q.   -- the corporal come in?
9   A.   He didn't come in. He called me.
10   Q.   Called you on what?
11   A.   On the phone from control. I had just
12 gotten through the door.
13   Q.   And do you remember the gist of exactly what
14 he told you about Carranza-Reyes?
15   A.   He said that he was going up to the pod. He
16 had evidently fallen down on the tier, so I just went out
17 to the tier.
18   Q.   Accompanied by whom? Anyone?
19   A.   One of the deputies. I don't remember who.
20   Q.   But some deputy went with you?
21   A.   Yeah. Um-hum.
22   Q.   And you went to Pod D?
23   A.   Yes.
24   Q.   And what did you do?
25   A.   Went upstairs.

---

* SUBJECT TO CONFIDENTIALITY DESIGNATIONS *

Carranza-Reyes v. Park County

Vicki Ann Paulsen, R.N.

101

1    Q.    And what did you observe upstairs and what
2 did you do?
3    A.    He was laying on a mat on the floor, and he
4 was complaining of flank pain.
5    Q.    Laying on a mat on the floor and complaining
6 of what?
7    A.    Flank pain.
8    Q.    What do you mean, "flank pain"? That's not
9 a word he used. What do you mean?
10    A.    In the kidney area. In this area, radiating
11 around.
12    Q.    When you say "this area," describe what area
13 of the body you're referring to.
14    A.    In the midback.
15    Q.    In the midback and then around. Around
16 where?
17    A.    Around to his groin.
18    Q.    And what did you do?
19    A.    We moved him -- he was up on the upper tier,
20 and we went to the lower tier.
21    Q.    How can you do that?
22    A.    He walked down the tier.
23    Q.    Unassisted?
24    A.    He had a deputy holding him, yeah.
25    Q.    Deputy holding him?

102

1         THE REPORTER: I'm sorry. I couldn't hear
2 you.
3         THE DEPONENT: The deputy was helping him
4 down the stairs.
5    Q.    (BY MR. TRINE) And where were you when this
6 was happening?
7    A.    I was right behind him.
8    Q.    Okay. Just one deputy?
9    A.    As I remember, yes.
10    Q.    And who was that?
11    A.    It seemed like it was Theobald, but I would
12 not be certain. He's the one that walked me to the pod,
13 so . . .
14    Q.    And you apparently had some conversation
15 with Carranza-Reyes. Who did you use as an interpreter?
16    A.    There was someone in the pod.
17    Q.    Can you describe that person?
18    A.    No, not really.
19    Q.    Was it the same person that you used as an
20 interpreter on the 6th and 7th?
21    A.    Yes.
22    Q.    And how do you know the interpreter was from
23 that pod?
24    A.    Because he was in the pod, and that's where
25 he slept.

103

1    Q.    Okay. Where was he when he saw him, the
2 interpreter?
3    A.    He was with Mr. Carranza-Reyes.
4    Q.    So he was behind Carranza-Reyes, who was on
5 a mat on the floor?
6    A.    He was kneeling beside him talking to him.
7    Q.    So what did you do besides talk to
8 Carranza-Reyes and watch him be assisted down below? Did
9 you examine him?
10    A.    Looked him over, and then I --
11    Q.    What do you mean, "looked him over"?
12 Visually looked him over?
13    A.    I palpated his back and his abdomen to see
14 where his pain was.
15    Q.    He didn't first point out where his pain
16 was? You palpated it?
17    A.    No. He described his pain as here
18 (indicated), and so I palpated to make sure exactly where
19 his pain was.
20    Q.    And you have a distinct memory of that
21 today?
22    A.    Yes, I do.
23    Q.    Of palpating for pain?
24    A.    Yes.
25    Q.    What else did you do?

104

1    A.    I asked -- told the deputies he needed to be
2 transported.
3    Q.    Which deputy did you --
4    A.    I talked to Corporal Crawford.
5    Q.    And you did that just based on looking him
6 over?
7    A.    I felt that at that point he needed to be
8 transported.
9    Q.    Did you tell him that he needed to be
10 transported immediately?
11    A.    I asked if we could transport him, and I was
12 informed I had to call INS.
13    Q.    That you had to call INS?
14    A.    Yes. I had to call INS.
15    Q.    Who told you that?
16    A.    Corporal Crawford.
17    Q.    And did he explain why you had to call INS
18 before they could transport him?
19    A.    They said I had to get permission from INS.
20    Q.    Had you ever had to get permission from INS
21 before that date --
22    A.    No.
23    Q.    Wait. Let me finish. Had you ever had to
24 get permission from INS before that date when you were
25 asking for transport of an INS detainee to Summit County?

105

1   A.   No.
2   Q.   You had asked that detainees be transported
3   to Summit County previously, hadn't you?
4   A.   Yes.
5   Q.   And you'd never had to get INS permission?
6   A.   No.
7   Q.   So were you surprised at that time that --
8   A.   Yes, I was.
9   Q.   -- you had to call the INS?
10  A.   Yes.
11  Q.   Did you ask Crawford why you had to get INS
12  permission?
13  A.   I don't recall if I asked him why. I just
14  went and called.
15  Q.   When you first talked to Crawford about
16  getting him transported, did you indicate you thought his
17  condition could be something serious and you wanted him
18  transported by ambulance?
19  A.   I didn't -- no, I did not talk to him about
20  the kind of transportation at that time.
21  Q.   What kind of transport did you ask for?
22  A.   I didn't ask for any specific transport when
23  I talked to him at that time.
24  Q.   You just said he had to be transferred?
25  A.   I just said he needed to be transferred.

106

1   Q.   And you wanted him transported where?
2   A.   To Frisco Medical Center, or Summit County.
3   Q.   To the emergency department?
4   A.   Yes.
5   Q.   You felt his condition was sufficiently
6   severe that he couldn't wait for a daily appointment with
7   Dr. Bachman but should be taken to the emergency room?
8   A.   Yes.
9   Q.   So before calling the emergency room to make
10  all of those arrangements, you first called INS?
11  A.   Yes.
12  Q.   And if you'd look, please, at Exhibit 3.
13  It's in the binder, I believe, which is the master
14  control log.
15       MR. SARGENT: Bill, when you find a stopping
16  point -- I know you're kind of in the middle of
17  something -- I'd like to take a break for five minutes
18  and swap out here.
19       MR. TRINE: Sure. This would be a good time
20  to do that.
21       (Break from 1:06 p.m. to 1:15 p.m., at which
22  time Mr. Sargent was not present in the deposition room.)
23  Q.   (BY MR. TRINE) Let's see. I had just
24  referred you, I think, to Exhibit 3, master control log,
25  at Park 1002, and if you look at the entry at 8:02, it

107

1   indicates "Nurse in facility," and that's about the time
2   you think you arrived?
3   A.   Yeah. I got there just a little before
4   8:00.
5   Q.   And then it indicates there's a sick inmate
6   in D Pod, Carranza-Reyes, at 8:10 and that he -- the
7   controller called Captain Gore at 8:20. Do you remember
8   asking that Captain Gore be called?
9   A.   I didn't ask he be called. I -- I was told
10  he was out of town.
11  Q.   And then at 8:27, it indicates that the
12  controller called Ben at INS and talked with the nurse.
13  Did the controller place the call and relay it to you and
14  put you on the line, or did you call Ben at INS directly?
15  A.   I called Ben.
16  Q.   Now, did you know Ben?
17  A.   No, I did not. I had spoken to him on the
18  phone several times, but I didn't meet him.
19  Q.   But at any rate, you had a telephone number
20  and knew how to reach him?
21  A.   Yes.
22  Q.   And were you instructed to call Ben
23  specifically, or how did that come about?
24  A.   I was just told to call INS, and that's who
25  I talked to.

108

1   Q.   And what did you tell Ben at INS?
2   A.   I told him that Mr. Carranza-Reyes had been
3   ill for a couple of days and his symptoms had worsened
4   and he needed to be transported.
5   Q.   Okay. And what response did you get?
6   A.   He asked me how ill he was, and I said that
7   he was ill enough to be transported. I wanted him
8   transported. And he said -- he asked me what I thought
9   it was, and at that point I said it could be anything.
10  It could be a kidney stone, it could be anything right
11  now. And so he told me if it got worse, I could
12  transport. I said, "If it gets worse, can we transport?"
13  And he said yes.
14  Q.   So you're the one that said, "If it gets
15  worse can we transport"?
16  A.   No. He said if it gets worse, that we could
17  transport. I didn't say that; he said that.
18  Q.   What symptoms did you relate to him that
19  Carranza-Reyes had?
20  A.   That he had shortness of breath, that he was
21  complaining of side and low back pain or midback pain,
22  that he just needed to go to a facility with higher care.
23  Q.   Did you tell him that for at least two days
24  he had had a headache and sore throat and had been
25  vomiting for over a day?

Pages 105 to 108

109

1    A.    Yes.
2          MS. LEWIS: Object to the form.
3    Q.    (BY MR. TRINE) Did you tell him that he had
4    had an elevated temperature and was warm to the touch?
5    A.    Not --
6          MS. LEWIS: Object to the form.
7    A.    I don't believe I told him that, no. I told
8    him I had seen him and that his symptoms had worsened and
9    he needed to be transported.
10   Q.    (BY MR. TRINE) Did you tell him he had been
11   on oxygen during the night?
12   A.    Yes.
13   Q.    And it was Ben who said that you could only
14   transport if his condition got worse?
15   A.    Yes.
16   Q.    Now, what was your understanding of Ben's
17   medical background?
18   A.    I don't think he had any. I don't know.
19   Q.    Did anyone tell you that you would have to
20   rely on Ben to determine --
21   A.    No.
22   Q.    -- when to transport?
23   A.    No.
24   Q.    Did you tell Ben, "I'm going to transport
25   him now because he needs medical attention now"?

110

1    A.    INS prefers to transport their own, and I
2    asked him when they could transport, and he said it would
3    be three hours, and I . . .
4    Q.    What was your response?
5    A.    I told him he needed to be transported prior
6    to that.
7    Q.    And what was his response?
8    A.    He told me if his symptoms got worse, then
9    we could transport.
10   Q.    Did you complain to anyone at the jail that
11   you felt he should be transported now and you shouldn't
12   be letting Ben call the shots?
13   A.    I talked to Corporal Crawford about it.
14   Q.    And what did you tell Corporal Crawford?
15   A.    I said he -- this is what Ben told me, and I
16   said, "I don't agree with it." I don't -- you know.
17   Q.    You thought he should be transported now?
18   A.    Um-hum.
19   Q.    What did Corporal Crawford say?
20   A.    I don't recall how he answered me when I
21   told him.
22   Q.    Well, did he in any way discourage you from
23   transporting him?
24   A.    No. No, he didn't.
25   Q.    So why didn't you?

111

1    A.    I don't know.
2    Q.    Then if you'll again look at Exhibit 21,
3    which is the pass-on record, to page Park 3530, 3530,
4    which is authored by Corporal Crawford and contains the
5    date of 3/8/03, there's a notation in that first
6    paragraph at 8:10 indicating that "Upon arrival I went
7    upstairs and observed that Inmate Carranza-Reyes, Moises,
8    was lying on his back between the rows of bunks. I
9    quickly ascertained that he was breathing and immediately
10   summoned the nurse, who was in the facility at the time.
11   I did a quick check of the ABCs of the patient," and do
12   you know what ABCs stands for?
13   A.    Airway and breathing and cardiac.
14   Q.    "And ascertained his airway was free, his
15   pulse was normal and circulation was okay. Through an
16   interpreter I was told that he had severe pain on his
17   right side in the area of the kidney. The nurse arrived
18   and was also told of the pain. The nurse did a quick
19   assessment and determined that the inmate probably had a
20   kidney stone."
21         Do you recall telling Dr. Crawford that -- I
22   mean Corporal Crawford?
23   A.    I said it was a possibility.
24   Q.    You didn't say he probably had a kidney
25   stone?

112

1    A.    No.
2    Q.    At the time, was that what you were
3    thinking, that that was probably what it was?
4    A.    There were a number of things I was thinking
5    at that point.
6    Q.    And what other things were you thinking?
7    A.    Kidney, appendix, many things. Just -- I
8    mean . . .
9    Q.    What other things went through your mind, if
10   you remember?
11   A.    Those were the two main things I was
12   considering because of the pain in his groin. He was
13   complaining of pain in his groin.
14   Q.    Did you know at that time that when
15   bacteremia is developing into a sepsis that major organs
16   can start failing, like the kidneys?
17         MS. LEWIS: Object to form and foundation.
18   A.    That's part of bacteremia, yes.
19   Q.    (BY MR. TRINE) Did you have any thoughts
20   like that at that time or not?
21   A.    No, I did not.
22   Q.    And he indicates that the inmate was well
23   hydrated and was then taken downstairs. How was he well
24   hydrated upstairs?
25   A.    I don't know how he came to that conclusion.

113

1    Q.   You didn't do anything to hydrate him
2  upstairs?
3    A.   No.
4    Q.   Do you remember doing anything else to
5  physically examine Carranza-Reyes upstairs other than
6  palpating him as you described?
7    A.   No.
8    Q.   That's the only thing you did?
9    A.   Right.
10    Q.   Didn't take vital signs?
11    A.   No, I didn't have the equipment with me to
12  take vital signs.
13    Q.   And then still at Park 3530, Corporal
14  Crawford indicates that at 8:27 he called INS and advised
15  Ben of the situation and the possibility of transport.
16  Did he make the call to Ben himself in your presence?
17    A.   Not in my presence.
18    Q.   So after you spoke to Ben and again to
19  Corporal Crawford, it was your understanding that
20  Carranza-Reyes was not going to be transported at all to
21  Summit County unless his condition got even worse; is
22  that right?
23    A.   That's correct.
24    Q.   So what was the next contact you had with
25  anyone regarding Carranza-Reyes after the call to Ben and

114

1  the conversation with Crawford?
2    A.   I talked to them again at -- before 10:00.
3    Q.   Talked to who?
4    A.   Deputy Theobald.
5    Q.   Did you remain at the jail?
6    A.   No, I did not.
7    Q.   You went home?
8    A.   Yes, I did.
9    Q.   You went home right after talking to Ben and
10  to Crawford?
11    A.   Oh, I was there a while. I don't know how
12  long I was there.
13    Q.   Well, about how long?
14    A.   Over an hour.
15    Q.   So you think you left for home around 9
16  o'clock?
17    A.   Right around 9 o'clock.
18    Q.   And it takes you how long to get home?
19    A.   Takes me about 40, 45 minutes to get home.
20    Q.   How were you going to find out medically
21  whether or not his condition continued to deteriorate,
22  not being present on the premises?
23    A.   I thought I had made arrangement for him to
24  be transported.
25    Q.   If his condition got worse?

115

1    MS. LEWIS:  Objection, form.
2    Q.   (BY MR. TRINE)  Is that right?
3    A.   I thought I had made arrangements for him to
4  be transported.
5    Q.   When did you make an arrangement for him to
6  be transported?
7    A.   When I talked to Corporal Crawford, I
8  thought that that was the arrangement that was made.
9    Q.   Well, did you call Summit County to arrange
10  for his arrival?
11    A.   I called them and told them that I had an
12  INS detainee that would be coming to them, yes.
13    Q.   When did you make that call?
14    A.   I made it after my discussion with Corporal
15  Crawford.
16    Q.   Between 8:00 and 9:00 in the morning?
17    A.   I don't know exactly what time it was.
18    Q.   Well, you said you remained on the premises
19  for about an hour?
20    A.   Right.
21    Q.   And you arrived about 8:00?
22    A.   Right.
23    Q.   You left about 9:00; is that right?
24    A.   Right.
25    Q.   Did you make that call while you were there

116

1  between 8:00 and 9:00?
2    A.   Yes, I did.
3    Q.   Who did you speak to at Summit County?
4    A.   I don't remember who I spoke to.
5    Q.   What did you tell them?
6    A.   I told them -- I gave them the particulars
7  of what was going on with Mr. Carranza-Reyes and told
8  them he would be transported.
9    Q.   So you knew he was going to be transported?
10    A.   I assumed -- I assumed he was going to be
11  transported, yes.
12    Q.   When did you assume he would be transported?
13    A.   When I asked for it.
14    Q.   Oh. When you left at 9:00, you assumed he
15  was already being -- arrangements were already being made
16  for him to be transported?
17    A.   I assumed that, yes.
18    Q.   Who told you that --
19    MS. LEWIS:  Object to the form.
20    Q.   (BY MR. TRINE)  -- that yes, they were now
21  making the arrangements for transport?
22    MS. LEWIS:  Same objection.
23    A.   No one told me that.
24    Q.   (BY MR. TRINE)  So I gather you copied his
25  chart and gave it to Crawford to go with the transport

*  SUBJECT TO CONFIDENTIALITY DESIGNATIONS  *

117

1  team before you left?
2     A.   No, I did not.
3     Q.   Well, wasn't that your custom and practice?
4     A.   Yes, it was.
5     Q.   Why didn't you copy his chart before you
6  left so that the transport team would have it?
7     A.   I -- I don't know.  I didn't.
8     Q.   Is it because you didn't believe he was
9  going to be transported?
10    A.   No.
11    Q.   You believed he was going to be?
12    A.   Yeah.
13    Q.   Did Corporal Crawford ask for a copy of his
14  chart to take with the transport team?
15    A.   No, he did not.
16    Q.   Did you know how he was going to be
17  transferred?
18    A.   I assumed he would go by vehicle to Summit
19  County.
20    Q.   By ambulance?
21    A.   No.
22    Q.   You didn't feel he needed an ambulance?
23    A.   No.
24    Q.   You felt he should be transported right away
25  but not necessarily by ambulance, right?

118

1     A.   Correct.
2     Q.   Had any of the arrangements been made yet
3  when you left by about 9 o'clock?
4     A.   I thought they were in the process of
5  getting transport because they would have had to have
6  brought somebody in from the outside to transport him.
7     Q.   So you didn't leave any instructions on what
8  to look for in the way of his condition getting worse so
9  that they could then transport because you assumed he was
10  going to be transported, right?
11         MS. LEWIS:  Object to the form.
12    A.   I talked to them about his condition and
13  that he needed to be transported, that any -- any
14  worsening of symptoms, he needed to go, period.  I wanted
15  him gone.
16    Q.   (BY MR. TRINE)  If you look at Exhibit 21
17  again at that same page, at 3530, it indicates that at
18  8:53, a small amount of blood was observed in the
19  inmate's spittle.  Do you remember being informed of
20  that --
21    A.   No.
22    Q.   -- or observing that?
23    A.   No, I did not observe that.
24    Q.   Would that have been of concern to you?
25    A.   Yes.

119

1     Q.   And why is that?
2     A.   Because he would have had something going on
3  in his chest.
4     Q.   And it's probably in his lungs, right?
5     A.   And it's probably in his lungs, yes.
6     Q.   And no one informed you of that?
7     A.   No.
8     Q.   And at 9:20 a.m., it indicates that Corporal
9  Crawford authorized a chair be placed in D Block to aid
10  the inmate in his discomfort.  Were you there when that
11  happened, or had you left?
12    A.   I had gone.
13    Q.   Did anyone call you about that?
14    A.   No.
15    Q.   Or describe his discomfort?
16    A.   No.
17    Q.   Did you ask to be called if his condition
18  got worse?
19    A.   Yes.
20    Q.   Who did you ask?
21    A.   Corporal Crawford.  He was in the control.
22    Q.   Now, why would you ask Corporal Crawford to
23  call you at home if his condition got worse if you
24  assumed they were transporting him when you left?
25    A.   You just cover all the bases, say keep me

120

1  informed.
2     Q.   Now, again, that same page of Exhibit 21
3  indicates that at 11:07 a.m., the nurse called and
4  recommended the inmate, Carranza-Reyes, Moises, be taken
5  to Summit Medical Center for evaluation and treatment.
6  Do you remember making that call?
7     A.   Not at 11:00.  At 10:30.
8     Q.   So you think that this is erroneous, this
9  11:07?
10    A.   I do.
11    Q.   What record do you have of having made the
12  call at 10:30?
13    A.   I don't have it.
14    Q.   Is there any record?
15    A.   My -- I have a -- what happened that
16  morning, I made a whole record of it.
17    Q.   Okay.  You're talking now about the nurse's
18  report that you drafted for Captain Gore after he was
19  taken to Summit County?
20         MS. LEWIS:  Object to the form and
21  foundation.
22    A.   I made it.  I made it when -- right after it
23  happened, but it was at 10:30 that I called.  It was not
24  at 11 o'clock.
25    Q.   (BY MR. TRINE)  Okay.  So you're saying the

121

1  11:07 is erroneous?
2     A.   I am.
3     Q.   And that's based on your nurse's report that
4  we'll get to in a little bit?
5     A.   Okay.
6     Q.   You drafted that nurse's report after he was
7  taken to the hospital, didn't you?
8     A.   Yes, I did.
9     Q.   And you drafted that at Captain Gore's
10  request, didn't you?
11     A.   No.
12     Q.   Why did you draft a report dated March 8
13  after he was taken to the hospital?
14     A.   Why wouldn't I?
15     Q.   Why did you?
16     A.   Why did I?  For a record of what happened.
17     Q.   And where did you place that record?
18     A.   I had it in his file.
19     Q.   You kept it in his confidential file?
20     A.   I put it in his file.
21     Q.   And no one asked you to draft that report?
22     A.   I don't recall anybody asking me to draft
23  that report.  They asked me for a copy of it.
24     Q.   Looking again at page 3530 of that same
25  Exhibit 21, after the note at 11:07 indicating that the

122

1  nurse called and recommended he be taken to Summit
2  Medical Center -- and you say that happened at 10:30?
3     A.   Um-hum.
4     Q.   Why did you call them at 10:30?
5     A.   What do you mean by that comment?
6     Q.   Well, you'd assumed he was already on his
7  way to the medical -- to Summit County when you left at
8  9:00, didn't you?
9         MS. LEWIS:  Object to the form of the
10  question.
11     A.   I thought they were preparing to get -- to
12  take him, yes.
13     Q.   (BY MR. TRINE)  Okay.  So why did you call
14  at 10:30?
15     A.   To see if he had been transported, to see if
16  they heard anything.
17     Q.   Who did you talk to?
18     A.   I had -- Corporal Crawford.
19     Q.   Okay.  And you asked Corporal Crawford what?
20     A.   I asked him if they were going to transport,
21  and he said he was still there, and I said, "He needs to
22  be transported."
23     Q.   Okay.  Were you upset when you found out --
24     A.   Yes.
25     Q.   -- he hadn't been transported yet?

123

1     A.   Yes.
2     Q.   Did you tell Corporal Crawford you were
3  upset?
4     A.   I don't remember what I said to Corporal
5  Crawford.
6     Q.   Did you ask him why he hadn't been
7  transported?
8     A.   I don't recall.
9     Q.   What do you recall of the conversation?
10     A.   I asked if he had been transported.  He said
11  no, he was there.  He said he had vomited some more, and
12  I asked him to please transport him.
13     Q.   Did he tell you at that time that after you
14  left, he had been spitting up blood?
15     A.   (Deponent shook head.)
16     Q.   You weren't aware of that?
17     A.   No.
18     Q.   So you were asking he be transported for the
19  same reasons you did when you saw him at 8 o'clock or
20  8:10?
21     A.   Correct.
22     Q.   As far as you were concerned, his condition
23  was the same, and they should have transported him
24  earlier; is that right?
25     A.   Correct.

124

1         MS. LEWIS:  Object to the form of the
2  question.
3     A.   Right.
4     Q.   (BY MR. TRINE)  Then it states on page 3530
5  that at 11:13, Captain Gore and Sergeant Muldoon were
6  advised of the nurse's recommendations and Sergeant
7  Muldoon to do the transport.  Did you know that Captain
8  Gore and Sergeant Muldoon were being advised for the
9  first time at 11:13 of your recommendations for
10  transport?
11         MS. LEWIS:  Object to the form of the
12  question.
13     A.   Sergeant Muldoon, I believe, was alerted
14  earlier.
15     Q.   (BY MR. TRINE)  That there might be a
16  transport?
17     A.   Yes.
18     Q.   If his condition got worse; is that right?
19     A.   I don't know what was said to him.
20     Q.   Well, how do you know he was advised earlier
21  of a possible transport?
22     A.   At 0835.
23     Q.   Just from reading this record?
24     A.   Yes.
25     Q.   But you weren't told that at the time?

149

1  right-sided chest pain until the morning of the 8th.
2      Q.    (BY MR. TRINE) Assuming hypothetically that
3  he had right-sided chest pain for three days before he
4  arrived, you would agree that that was probably caused by
5  the pneumonia he was diagnosed with; isn't that right?
6          MS. LEWIS: Form.
7      A.    It could be pneumonia, it could be pleurisy.
8      Q.    (BY MR. TRINE) Do you think he had
9  pleurisy --
10      A.    I don't think he had pleurisy. I did not
11  say that.
12      Q.    Okay.
13      A.    I said it could be.
14      Q.    Would you agree that, based on the diagnosis
15  made at Summit Medical Center and his symptoms at that
16  time and his description of having right-sided chest pain
17  for three days and shortness of breath for three days,
18  that he probably had had pneumonia for three days?
19          MS. LEWIS: Object to the form.
20      A.    Yes, I guess.
21      Q.    (BY MR. TRINE) And on page 3 of those same
22  medical records, apparently dictated by Dr. Keeling, it
23  indicates that the risk of complications and morbidity if
24  untreated are potentially high, and based on what you've
25  just reviewed in these records, would you agree with

150

1  that?
2      A.    Yes.
3          (At this time Mr. Kordick left the
4  deposition room.)
5      Q.    Now, if we could go back to the pass-on
6  records, which was Exhibit 21, and refer to Park 3545,
7  please. This is a record dated March 9, '03 from
8  Corporal Crawford to all staff, and in that first
9  paragraph it indicates, "Talked with Nurse Paulsen about
10  cleaning all pods with a 10 percent bleach solution, and
11  she concurs." And then it talks about removing mold and
12  a complete linen exchange done in D and C pods along with
13  uniform and underwear exchange in D Block. Do you recall
14  that conversation or discussion?
15          (At this time Mr. Kordick entered the
16  deposition room.)
17      A.    Yes. Yes.
18      Q.    Where did that take place? By phone or at
19  the facility?
20      A.    By phone.
21      Q.    Let's see. The 9th would have been Sunday,
22  so you would have been --
23      A.    At home.
24      Q.    -- at home. And had you had conversations
25  with anyone after your conversation with Captain Gore at

151

1  11 o'clock the night of the 8th and before this
2  conversation?
3      A.    No.
4      Q.    So this would have been the next contact
5  with anyone about the Carranza-Reyes matter on the 9th,
6  or did you talk to someone else first?
7      A.    I talked to Dr. Bachman on Sunday.
8      Q.    Tell us about that conversation. Did you
9  call or did he?
10      A.    He called me.
11      Q.    And about what time Sunday?
12      A.    I don't remember what time it was.
13      Q.    Called you at home?
14      A.    Called me at home.
15      Q.    And what was the gist of the conversation?
16      A.    That he had heard from the emergency room
17  and what had gone on -- I mean, what they had diagnosed
18  with him, where he went, and asked me about when I had
19  seen him prior to that.
20      Q.    What information did you provide him with?
21      A.    With my findings and then that he was
22  eventually transported.
23      Q.    Did you forward him a copy of your computer
24  notes?
25      A.    I believe he has a copy of those, yes.

152

1      Q.    No. Did you forward a copy of those to him
2  at that time when he asked what had happened or what his
3  condition had been?
4      A.    Yes. He has those notes. Not on that day.
5  I'm sure I did it on Monday.
6      Q.    But you had that on your home computer?
7      A.    Right.
8      Q.    And you could have just faxed it right from
9  your home to him?
10      A.    No, I --
11      Q.    Not faxed. You could have just e-mailed?
12      A.    I don't have that ability on my computer.
13      Q.    You can't forward an e-mail or --
14      A.    No.
15      Q.    -- send something by e-mail?
16      A.    No, I cannot.
17      Q.    Did you have those notes on your monitor, on
18  your screen, when you talked to him and use those notes
19  to tell him what had happened?
20      A.    No.
21      Q.    Did you have your notes from the 6th and
22  7th --
23      A.    No.
24      Q.    -- on your computer?
25      A.    No.

*  SUBJECT TO CONFIDENTIALITY DESIGNATIONS  *

Carranza-Reyes v. Park County                                    Vicki Ann Paulsen, R.N.

---

157

1   A.   That would just be part of taking care of
2   cleaning the pod.
3   Q.   That was also his suggestion or --
4   A.   I don't recall.
5   Q.   And if you look at 3546, the next page, is
6   that your note stating, "D Pod needs to be cleaned and
7   disinfected daily until we are over the flu symptoms"?
8   A.   Yes.
9   Q.   And when did you enter that note?
10   A.   I don't recall. It would probably be the
11   Monday that I went back to work.
12   Q.   March 10?
13   A.   Probably, yes.
14   Q.   Now, by that time on March 10, there were
15   only 10 detainees left in D Pod. 50 had been moved out
16   on March 7?
17   A.   Right.
18   Q.   And were you concerned about the 50 who had
19   been moved out on March 7? In other words, on March 10
20   did you have concern about the 50 that had been moved out
21   on March 7 and how many of those may have had an
22   infectious process going on?
23   A.   No, not really.
24   Q.   What do you mean, "not really"?
25   A.   Mainly because the pods always had inmates

---

158

1   in them who had colds and that kind of thing, and it just
2   wasn't -- it wasn't a contagious process that went on.
3   Just was not.
4   Q.   In other words, detainees were coming in and
5   out of Pod D frequently; is that right?
6   A.   That's correct.
7   Q.   Usually for short stays?
8   A.   For short stays.
9   Q.   And with that kind of turnover coming in and
10   out, there was always someone with a cold or flu or
11   something?
12   A.   Sinusitis. Something.
13   Q.   Something going on?
14   A.   Yeah. Not -- I mean, a lot of it was just a
15   stuffy nose, that type of thing.
16   Q.   Do you remember ever segregating detainees
17   and taking them out of Pod D because of any possible
18   communicable disease?
19   A.   No.
20   Q.   Flu, infection?
21   A.   No.
22   Q.   They'd be left in Pod D if they had signs
23   and symptoms of the flu or an infection?
24   MS. LEWIS: Object to the form.
25   A.   Trying to think if we . . .

---

159

1   Q.   (BY MR. TRINE) Is that right?
2   MS. LEWIS: Same objection.
3   A.   They could be left there, yes.
4   Q.   (BY MR. TRINE) So you usually didn't really
5   have an opportunity, with Pod D inmates coming in and
6   out, to constantly -- you usually didn't have an
7   opportunity to just clear the pod and totally disinfect
8   it, remove mold and clean it up; is that right?
9   A.   Right.
10   Q.   But now, with only 10 detainees left in Pod
11   D and after what happened with Carranza-Reyes, you
12   indicated it really needed to be cleaned and disinfected
13   daily?
14   A.   Right.
15   Q.   Were you also informed at that time by
16   anyone that the jail wasn't going to accept any more
17   detainees until the pod had been disinfected for a number
18   of days and they were certain that it was now okay to
19   move new people in there?
20   A.   No, I was not.
21   Q.   You weren't informed of that by anyone?
22   A.   No.
23   Q.   And if you look at 3544, again, Exhibit 21,
24   at the bottom paragraph there, and this is on a shift
25   update by Sergeant Muldoon, and it states, "Per medical,

---

160

1   each housing unit will be cleaned daily with a 10 percent
2   bleach solution, and linen will be exchanged daily, if
3   possible. Also per medical, every attempt will be made
4   to ensure at least one-half hour of outside recreation
5   each day."
6   Now, do you recall having or making that
7   recommendation to Sergeant Muldoon on the 10th?
8   A.   Yes.
9   Q.   And why did you want to make sure that
10   people got outside recreation each day?
11   A.   Just to be out in the fresh air. Just good
12   for you to be out in the fresh air.
13   Q.   And was it because that hadn't been
14   occurring?
15   A.   It had, but in bad weather, a lot of times
16   it's not possible, so they'd go to the inside rec room.
17   But on nice days, if they could get out, it was just a
18   good idea to get everybody out.
19   Q.   Now, did you hear from any source that the
20   Mexican consulate had contacted the INS, and the INS had
21   called Park County Jail on the 9th requesting that all
22   the remaining INS detainees be examined by a physician?
23   A.   I didn't know that the consulate had asked.
24   That was not told to me.
25   Q.   What information did you receive?

---

*   SUBJECT TO CONFIDENTIALITY DESIGNATIONS   *

169

1  20 minutes?
2     A.    Yes.
3     Q.    Did you have the capability of doing a rapid
4  strep test at the Park County medical room?
5     A.    No.
6     Q.    What would be required for that?
7     A.    It's a test with solutions, and you swab the
8  throat, and then you add the solutions, and you get --
9  and you pour it onto a little strip that has a positive
10 or negative on it, and the fluid goes down through, and
11 then it will come up positive or negative.
12    Q.    And you didn't have that equipment?
13    A.    No, I did not. No.
14    Q.    Or the -- whatever it took?
15    A.    No, I did not.
16    Q.    After this event, did you request that Park
17 County provide you with that?
18    A.    I believe I asked about it, but the kits are
19 $150.
20    Q.    They said it was too expensive?
21    A.    Right.
22    Q.    And if you had done a swab of
23 Carranza-Reyes' throat and sent it to the lab, how much
24 would that have cost?
25    A.    I don't know. I do not know.

170

1     Q.    You don't know whether it costs more than or
2  less than 150?
3     A.    I have no -- I mean, it would be less,
4  definitely, but I don't have any idea what the cost would
5  be.
6     Q.    And if you look at 3560 on Exhibit 21, it
7  states that one of the reasons that D Pod was so infected
8  with disease, medical tells me, is because the INS
9  detainees were allowed to plug the vents. This prevented
10 the air from circulating. And this is dated March 12
11 from Sergeant Muldoon. Do you remember telling Sergeant
12 Muldoon that?
13    A.    I don't remember telling him it was so
14 infected. I said that it was a precipitating factor in
15 someone being ill that there was not fresh air into the
16 pod.
17    Q.    And there's indication here from Sergeant
18 Muldoon that on your pod walks it is critical that all
19 vents be opened, no cardboard, papier-mache, T-shirts,
20 can be permitted to obstruct ventilator grates, et
21 cetera. Were you aware that detainees in Pod D were
22 plugging the vents to try to keep any cold air from
23 entering?
24    A.    No, I was not, until they went in to clean.
25    Q.    How did you learn they were doing that?

171

1     A.    The maintenance person told me that when he
2  was up cleaning the vents, they were all blocked off.
3     Q.    And then there's a paragraph on 3560
4  indicating that in order to protect ourselves as well as
5  other inmates from cross-contamination, it is imperative
6  that everyone glove up when going on pod walks and doing
7  patdowns. Also remember to change gloves between pods
8  for the same reasons. And was this also a recommendation
9  that you made?
10    A.    No, not -- no.
11    Q.    If you look at 3561 at the bottom of the
12 page, it indicates that all of the INS detainees will be
13 leaving at 4:30 on 3/13. Do you remember Pod D
14 essentially being cleared out so there were no detainees
15 left about that time?
16    A.    Yes.
17    Q.    And if you'll refer to 3568, there is a
18 document that appears to be authored by you, saying,
19 "Thanks, Vicki"; is that right?
20    A.    Yes.
21    Q.    And it states, "When we start taking INS
22 holds again, please use the new medical history forms
23 that Ben from INS translated from our English medical
24 history forms. They are more complete in what they ask
25 about an individual's medical history. See the attached

172

1  form."
2           Now, when you say, "When we start taking INS
3  holds again," am I correct that once the pod was cleared
4  out and there were no INS detainees in there, that it was
5  the understanding that there would be no INS detainees
6  using that pod until you were certain it had been
7  disinfected and ready for new detainees?
8     A.    Yes.
9     Q.    Did someone make that recommendation or
10 order that?
11    A.    It was just a general consensus that that's
12 what needed to be done.
13    Q.    How was that general consensus reached? I
14 mean, was it Captain Gore that said that or you, or how?
15    A.    I don't know if it was Captain Gore. It was
16 not myself, but we discussed it, and we felt that we
17 really needed to clean that pod and paint what needed to
18 be painted and get it taken care of before we put anybody
19 else in there.
20    Q.    And paint it?
21    A.    Yeah. There were areas that needed to be
22 painted.
23    Q.    Do you know when after the 13th all of that
24 was done and you began taking INS detainees in?
25    A.    I don't know.

*  SUBJECT TO CONFIDENTIALITY DESIGNATIONS  *

173

1    Q.   Do you remember whether it was days as
2  opposed to weeks?
3    A.   I believe it was several weeks. I'm not
4  sure. I can't tell you exactly.
5    Q.   And did you make the recommendation that you
6  get a more detailed intake medical form to be filled out
7  by INS detainees in Spanish?
8    A.   The old one was in Spanish and English, but
9  it wasn't as complete as this one, and we had this one in
10 English, so I asked that it be translated over into
11 Spanish so it would be more complete.
12   Q.   And do you remember now what specific areas
13 you felt you needed more information on that you weren't
14 getting under the old form?
15   A.   I really can't. I just wanted it all the
16 same. English and Spanish. I just wanted it all the
17 same.
18        (Deposition Exhibit 25 was marked.)
19   Q.   Okay. I just handed you what has been
20 marked Deposition Exhibit 25, with Park 1356 and 1357,
21 and is this the job description for your position as
22 nurse at Park County?
23   A.   Yes.
24   Q.   And did you receive a copy of this when you
25 became employed there?

174

1    A.   Yes.
2    Q.   And it indicates under Specific Duties that
3  you're to complete a medical history and physical on
4  incoming inmates; is that right?
5    A.   Correct.
6    Q.   And did you take a medical history and
7  perform a physical examination on every incoming detainee
8  in Pod D?
9    A.   Not all of them, no.
10   Q.   When and under what circumstances would you
11 take a medical history and perform a physical?
12   A.   If they indicated on their incoming medical
13 sheet that there was -- that they had any problems in any
14 way.
15   Q.   Okay. If they presently had any kind of a
16 medical problem they were experiencing, then you would
17 examine them?
18   A.   Yes.
19   Q.   Then on the next page, 1357, it states at
20 the top, "Prepares a monthly report to the sheriff on all
21 medical issues, including treatment, emergency medicals,
22 number of inmate patients seen and meds dispensed."
23        Did you prepare such a report on a monthly
24 basis?
25   A.   Part of it. Not all of it.

175

1    Q.   Well, what part did you --
2    A.   Not all medical issues and treatment,
3  emergency medicals and the number of inmates seen and
4  meds dispensed, no.
5    Q.   And was this on a particular form that you
6  used?
7    A.   I had to turn in everything every month
8  to -- it was not really a -- there was a little form. I
9  can't even describe it, so -- but basically, I turned in
10 all my medication records. I mean, as far as what I had
11 purchased, that type of thing. It was not ever -- I was
12 not ever told that I had every individual patient, what
13 they took, that type of -- if that's what you're
14 indicating.
15   Q.   Well, all I want to know is what sort of
16 monthly report did you prepare for the sheriff?
17   A.   I did not prepare any for the sheriff.
18   Q.   Okay. Did you prepare a monthly report that
19 you gave to Monte Gore?
20   A.   No.
21   Q.   Did you prepare a monthly report that you
22 gave to anyone on medical issues, treatment, emergency
23 medicals, number of inmates seen, meds and so forth?
24   A.   I prepared for a budget, and that was it.
25   Q.   Now when you say -- on a monthly basis?

176

1    A.   At my expenses, yes.
2    Q.   Tell us what you prepared monthly that you
3  gave to somebody.
4    A.   I gave to Sherrie in the office -- I gave
5  her all my monthly receipts and a list of inmates seen
6  every month.
7    Q.   And that was in a written report, not oral?
8    A.   Yes. It was -- yes.
9    Q.   And you gave that to who?
10   A.   That would be Sherrie Muldoon. She was in
11 the office at that time.
12   Q.   Is that Sergeant Muldoon's wife?
13   A.   Yes.
14   Q.   And she kept those records?
15   A.   Yes.
16   Q.   You don't know what she did with those?
17   A.   I have no idea.
18   Q.   And who told you to submit reports like that
19 to her?
20   A.   She kept track of that -- all that for the
21 sheriff's office.
22   Q.   She requested it?
23   A.   She requested that so she could -- whatever
24 facility those inmates came from is the facility that was
25 billed for their medical services, so that's why they

Carranza-Reyes v. Park County                                                    Vicki Ann Paulsen, R.N.

181

1    A.    Yes.
2    Q.    And you did that on your own or through
3  Monte Gore? Who authorized you to do that?
4    A.    No. Monte.
5    Q.    Monte Gore did?
6    A.    Yeah.
7    Q.    Then on March 26 at 8:55 p.m., Laura Bublef
8  charted, "Will update Vicki Paulsen, R.N., Park County,
9  regarding status and discussion of rehab needs. Will
10  update team if there is any alternative with payer
11  source." Do you recall what that was about, a discussion
12  regarding rehab needs?
13    A.    No. I think that we -- down the road I was
14  asking, you know, what comes next when he's better or
15  whatever happens, and she said that he would be going to
16  rehab.
17    Q.    And there were two or three additional calls
18  with Laura Bublef indicating that the discussion was
19  regarding rehab options. Do you recall what that was
20  about?
21    A.    I don't recall what that was about.
22    Q.    And also requested by Vicki Paulsen to allow
23  Captain Gore to discuss patient with INS and not to call
24  updates directly to them until we hear from Captain Gore.
25  Did there come a time when you understood that Denver

182

1  Health would be dealing directly with the INS and no
2  longer communicating with you about Carranza-Reyes?
3    A.    I didn't -- I didn't get that. No, I
4  didn't.
5    Q.    Then on April 8, at 8:50 a.m., another
6  nurse, a Laura Buklegum, B-u-k-l-e-g-u-m, Buklegum, R.N.,
7  had a conversation with you. Does that name sound
8  familiar?
9    A.    No.
10    Q.    And provided you with a clinical update.
11  Okay. You don't remember that?
12    A.    I don't remember. I mean, I remember
13  getting updates but not the name.
14    Q.    And then there were several additional calls
15  you had with this Laura Buklegum. But you were
16  continuing to get updates?
17    A.    Right.
18    Q.    Why was that?
19    A.    Because I was concerned about him.
20    Q.    Did you have any additional conversations
21  with anyone at INS about Carranza-Reyes after March the
22  8th or 9th?
23    A.    I don't recall if I did or not. I don't
24  remember having any, but that's not -- I don't recall.
25    Q.    What was your understanding of who

183

1  ultimately was going to be responsible for the bills
2  being incurred at Denver Health?
3    A.    To begin with, Park County, and then it was
4  to be signed over to INS, and that's all I was told.
5    MR. TRINE: Let's take a short break. It's
6  about time for one.
7    THE DEPONENT: Let's go to 4:00. My husband
8  will be here at 4:00.
9    MR. TRINE: You want to go to 4:00?
10    THE DEPONENT: My husband will be here at
11  4:00.
12    MR. TRINE: Let's do that.
13    Q.    (BY MR. TRINE) Why don't you now refer to
14  Exhibit 4 that's in the binder. And it's also identified
15  by Bates stamp as Park 550 through 694, and these were
16  furnished to us by the jail and represented as being the
17  policies and procedures that were in effect in 2003. Are
18  these the policies and practices that you became familiar
19  with when you became employed there?
20    A.    Yes.
21    Q.    How soon after you became employed did you
22  familiarize yourself with this document or --
23    A.    The first week I was there.
24    Q.    And did you review the policies and
25  procedures with anyone else or ask questions about them?

184

1    A.    No. I read them myself.
2    Q.    And were they similar to what you were
3  familiar with in working for the DOC?
4    A.    Similar. Similar.
5    Q.    If you'll refer, please, to 555, which
6  relates to the responsible health authority and indicates
7  that there will be a health services administrator and a
8  responsible physician, was it your understanding that you
9  were serving as the health services administrator?
10    A.    No.
11    Q.    Do you know who was serving as the health
12  services administrator?
13    A.    No.
14    Q.    Do you know whether there was a health
15  services administrator?
16    A.    I do not.
17    Q.    It indicates a responsible physician is a
18  physician who supervises the medical judgments regarding
19  the care provided to patients at this facility. This
20  role is also known as the medical director. When you
21  first reviewed this, you assumed, I guess, that Dr.
22  Bachman was the responsible physician, correct?
23    A.    Yes.
24    Q.    Did you ever ask anyone who the health
25  services administrator was?

*  SUBJECT TO CONFIDENTIALITY DESIGNATIONS  *

Carranza-Reyes v. Park County                                                    Vicki Ann Paulsen, R.N.

185

1    A.   No, I didn't.
2    Q.   It states under Policy that the health
3  services administrator is routinely on-site at least 40
4  hours per week and is responsible for health care
5  services pursuant to a written agreement, contract or job
6  description, and you don't believe that was you?
7    A.   Evidently it was.
8    Q.   You don't know of anyone else that was doing
9  that?
10   A.   No.
11   Q.   That's what you were doing, right?
12   A.   That's right.
13   Q.   It states also under Policy that the health
14 services administrator, as the responsible health
15 authority for the Park County Jail is responsible for all
16 clinical, ancillary and operational aspects of the jail's
17 health care services, including arrangements for all
18 levels of health care and ensuring of quality and
19 accessibility of all health services provided to
20 patients," and that's essentially also what you were
21 doing; is that right?
22   A.   Right.
23   Q.   And under Procedure at the bottom Procedure,
24 it states that the health services administrator, in
25 cooperation with the responsible physician, is

186

1  responsible for the development and implementation of all
2  programs and practices related to jail medical services.
3  All final medical judgments rest with the responsible
4  physician, and was that your understanding?
5    A.   Yes.
6    Q.   And if you look at Park 558, Exhibit 4,
7  under Policy, second paragraph, it states, "The health
8  service administrator shall record minutes of
9  administrative infection control and continuous quality
10 improvement meetings," and did you attend such meetings
11 and record minutes of those meetings?
12   A.   No, I did not.
13   Q.   Was there an infection control committee
14 that you served on?
15   A.   No.
16   Q.   To your knowledge, was there ever an
17 infection control committee at the Park County Jail?
18   A.   I do not know.
19   Q.   Was there a continuous quality improvement
20 committee?
21   A.   Not to my knowledge.
22   Q.   You didn't serve on a committee like that?
23   A.   No.
24   Q.   It states in that next paragraph that the
25 health services administrator shall produce on a monthly

187

1  basis a statistical report indicative of the health
2  unit's activities.  Did you supply a report like that on
3  a monthly basis outlining your activities for the month?
4    A.   No, I did not.
5    Q.   Were you ever requested to do that?
6    A.   No.
7    Q.   And then the next paragraph states, "A
8  statistical report shall be prepared monthly and compiled
9  again annually to track the number of inmates receiving
10 health services.  At a minimum this report shall include
11 the following," then there's a whole list of items.
12   A.   Correct.
13   Q.   Did you ever see such a report?
14   A.   No, I did not.
15   Q.   Were you ever asked to compile such a
16 report?
17   A.   No, I was not.
18   Q.   When you became familiar with this document,
19 did you question anyone about these committees and
20 whether they existed and whether you should be serving on
21 them?
22   A.   No, I didn't.
23   Q.   Do you remember what your thought process
24 was when you reviewed this for the first time?  Did you
25 wonder if such committees existed?

188

1    A.   Yes.
2    Q.   Did you ask anyone?
3    A.   No, I did not.
4    Q.   Was it your understanding from having worked
5  with the DOC and then at Park County that the DOC
6  required that Park County have these policies and
7  procedures in effect before they would contract with Park
8  County?
9    A.   Yes.
10   Q.   Was that of concern to you, knowing that and
11 finding out that these committees didn't exist?
12   A.   Yes.
13   Q.   But you didn't talk to anyone about that or
14 mention it?
15   A.   I believe I asked about it, and nothing was
16 said to me.
17   Q.   Did Monte Gore at any time tell you that
18 they simply enacted these policies and procedures in
19 order to get DOC business and didn't intend to follow
20 them?
21   A.   No, he never told me that.
22   Q.   Do you know whether the INS requested that
23 Park County have a policy and procedure manual before
24 they would contract with Park County?
25   A.   No, I do not.

Pages 185 to 188

* SUBJECT TO CONFIDENTIALITY DESIGNATIONS *

Carranza-Reyes v. Park County                                    Vicki Ann Paulsen, R.N.

189

1    Q.   Then if you'll look at 559, and 560, this
2  apparently is the policies and procedures for the
3  continuous quality improvement program, and down at the
4  bottom of that page it indicates that that committee,
5  which meets biannually, should be composed of the
6  following personnel, and it lists the responsible
7  physician, the health service administrator and others,
8  including the infection control committee.
9        To your knowledge, there was no such
10 committee, right?
11   A.   Not to my -- I was not aware of it.
12   Q.   During time you were at Park County, did you
13 serve on any committee of any kind?
14   A.   No.
15   Q.   And then on Park 560, in discussing the
16 functions of this continuous quality improvement
17 committee, it indicates what the members of the committee
18 were to do, and do you see the paragraph partway down
19 starting with "Status and discussion concerning
20 monitors" --
21   A.   Yes.
22   Q.   -- "relative to the delivery of health care
23 and are included in each meeting of the committee are the
24 following," that in each meeting of that committee, they
25 would receive a report from the infection control

190

1  committee as well as inmate patient grievances concerning
2  health care and off-site medical care, including
3  transportation, and are you telling me you never
4  participated in any committee meetings where that sort of
5  thing was discussed?
6    A.   No.
7    Q.   If you look at Park 574, Exhibit 4, which is
8  the policies and procedures for the infection control
9  program, it states that the infection control program --
10 this is under Procedure. "The infection control program
11 will be the responsibility of the medical director and
12 assisted by the health service administrator," and "The
13 program will include, but is not necessarily limited to
14 regular review of environmental inspection conducted by
15 the facility maintenance officer and other inspections
16 conducted by other agencies, including outside agencies."
17       Did you participate in reviewing those
18 inspections?
19   A.   No, I did not.
20   Q.   Four paragraphs down under Procedure, it
21 states, "Within three days of incarceration, all inmates
22 will be evaluated for tuberculosis and sexually
23 transmitted diseases. Positive findings will be reported
24 by the health service administrator/infection control
25 nurse immediately. The infection control program nurse

191

1  will notify the appropriate health department and will
2  consult with the staff physician for further orders."
3        Was that something you routinely did?
4    A.   Tuberculosis but not sexually transmitted
5  diseases.
6    Q.   And then the last paragraph on that page
7  indicates, "As inmates are in close proximity to each
8  other, the need to identify and treat infection, and to
9  prevent its spread from one individual to another, must
10 be part of the infection control program. This should
11 include using the intake screening and screen inmates for
12 infectious diseases upon admission to the facility and
13 treatment of inmates who show evidence of infection."
14 Were you doing that?
15   A.   Screening?
16   Q.   For infection.
17   A.   Yes.
18   Q.   For anything other than TB?
19   A.   Anybody that came in, if they might behave
20 like they were ill, they were screened.
21   Q.   If someone was showing signs and symptoms --
22   A.   Yes.
23   Q.   -- of an infection?
24   A.   Yes.
25   Q.   Then you would screen them?

192

1    A.   Yes.
2    Q.   And it states that provision for appropriate
3  infirmary isolation according to type of infection should
4  be available. And did you have provisions where people
5  could be quarantined or isolated?
6    A.   If the segregation cells were empty, I could
7  use those.
8    Q.   And if they were full, you couldn't?
9    A.   I didn't have a place.
10   Q.   And if you'll refer to 599, please, it
11 indicates "Nursing staff will conduct medication pass in
12 the housing pods at least three times a day," and you
13 were doing that; is that right?
14   A.   Yes.
15   Q.   And that would be normally at what hours?
16   A.   It would be at around -- just before 7:00
17 and just before 2:00, and in the evening I prepared the
18 meds, and the officers passed them, and I think it was
19 around 6:00.
20   Q.   And then if you look at 602 of Exhibit 4, it
21 indicates in that second paragraph under Policy that the
22 Park County Jail will maintain a contract for the
23 processing of lab results, and in the next paragraph, it
24 indicates that the contract is with LabCorp. Is that the
25 lab that you were sending blood to for lab results?

* SUBJECT TO CONFIDENTIALITY DESIGNATIONS *

Carranza-Reyes v. Park County                                    Vicki Ann Paulsen, R.N.

197

1    Q.   And so why did you decide to leave the
2  facility on the morning of the 8th and go home,
3  essentially abandoning Carranza-Reyes and not staying
4  with him until he was transported?
5        MS. LEWIS: Object to the form and also
6  asked and answered. Go ahead.
7    A.   Okay. I should have stayed with him. I
8  admit that I should have stayed with him.
9    Q.   (BY MR. TRINE) In other words, that was
10 just an error on your part?
11   A.   That's right. It was an error on my part.
12   Q.   Could you give me just a chronological brief
13 summary of what fields of nursing you worked in before
14 going into correctional work.
15   A.   Neonatal intensive care, pediatrics.
16   Q.   About how many years in neonatal care?
17   A.   Six. And pediatrics, family practice care.
18   Q.   How many years in family practice?
19   A.   Family practice, four, and I participated
20 part-time in some drug research at the old Fitzsimons.
21   Q.   What research? I didn't hear you.
22   A.   Drug research.
23   Q.   Drug research?
24   A.   Um-hum, at the old Fitsimons. And then I
25 have done hospice and geriatric care and corrections.

198

1    Q.   Okay. And has almost all of that
2  experience -- or all of it -- been in a clinical setting
3  as opposed to an administrative position?
4    A.   Well, in geriatrics, it's in a nursing home
5  type, and then neonatal would be in an intensive care
6  unit, and family practice would be in a family practice
7  office. Pediatrics was in a pediatric office.
8    Q.   It was all clinical?
9    A.   Right, um-hum.
10   Q.   As opposed to spending several years in some
11 kind of administrative position?
12   A.   No, not my --
13   Q.   So you've had a considerable amount of
14 clinical experience, then?
15   A.   Um-hum.
16   Q.   And based on all of that experience, when
17 you went to work at Park County, were you concerned about
18 their general policies and procedures as it would relate
19 to the care of detainees?
20   A.   I had some concerns, yes.
21   Q.   And what was the gist of your concerns?
22   A.   Continuity, I mean, as far as . . .
23   Q.   Continuity of care?
24   A.   Yeah. And that there were times I felt like
25 some of what they had in policies and procedures were not

199

1  enacted.
2    Q.   Were not what?
3    A.   Enacted. I mean, they weren't in . . .
4    Q.   They weren't really enforcing policies and
5  procedures?
6    A.   Right. Right.
7    Q.   And that concerned you?
8    A.   Yes, it did.
9    Q.   And on continuity of care, would you explain
10 that in more detail.
11   A.   Well, you know, instead of having one nurse
12 24 hours a day -- I mean, you're there, but then you're
13 not there -- it would have been better to have even two
14 shifts, a night shift and a day shift, so that you had
15 that continuity, that you didn't have to rely on an EMT
16 or your jail personnel to, you know, let you know what
17 was going on. That you had another license there.
18   Q.   With better continuity of care, there's less
19 risk or chance of something falling through the cracks,
20 so to speak?
21   A.   True. True.
22   Q.   I know that you were a new employee there.
23   A.   Yes.
24   Q.   But nevertheless, did you at any time
25 discuss your concerns with any of the other personnel or

200

1  Monte Gore?
2    A.   No, I didn't.
3    Q.   Were you reluctant to do that because you
4  were a new employee?
5    A.   Yes.
6    Q.   Did your concerns have anything to do with
7  your not returning to Park County when you came back to
8  Colorado?
9    A.   Yes.
10   Q.   Where did you then become employed after you
11 returned to Colorado?
12   A.   I work for Supplemental Health Care. It's
13 an agency, and I work at DOC, Department of Corrections.
14   Q.   And you've been doing that since you
15 returned?
16   A.   Yes.
17   Q.   Do you work out of any particular facility?
18   A.   Buena Vista.
19   Q.   Okay. So it's a longer commute, but --
20   A.   It's a longer commute.
21   Q.   But you prefer doing that to working in Park
22 County?
23   A.   Yes.
24   Q.   If you'd now please refer to Exhibit 2
25 again, which is in the binder, to page 155?

Pages 197 to 200

* SUBJECT TO CONFIDENTIALITY DESIGNATIONS *

217

1    A.    No.
2    Q.    So no one ever called your attention to the
3  fact that there was a separate policy and procedure
4  manual that applied to INS detainees?
5    A.    No.
6    Q.    Now, when those remaining INS detainees in
7  Pod D were transported to Summit County for evaluation,
8  do you remember learning that some of those detainees
9  were also sick?
10   A.    Yes. They had pharyngitis and bronchitis.
11   Q.    And pharyngitis is oftentimes a precursor to
12 strep throat; isn't that right?
13   A.    It can be.
14   Q.    And bronchitis is generally caused by some
15 type of infection process; isn't that right?
16   A.    Usually.
17   Q.    And bronchitis can also lead to pneumonia if
18 not treated; isn't that right?
19   A.    True.
20   Q.    And am I correct there were no plans to have
21 the remaining INS detainees transported to Dr. Bachman
22 for possible treatment prior to the Carranza-Reyes
23 incident occurring; is that right?
24   A.    Yes.
25   Q.    And it was the Carranza-Reyes incident that

218

1  precipitated the other sick detainees then being
2  transported for treatment, correct?
3    A.    Yes.
4    Q.    Do you have any memory at all of whether any
5  of the 50 detainees transported out of there on March 7
6  had similar symptoms?
7    A.    I don't recall.
8    Q.    And do you know where those detainees were
9  taken?
10   A.    I have no idea.
11   Q.    Were you there when they were transported
12 out --
13   A.    No.
14   Q.    -- on the afternoon of the 7th?
15   A.    No.
16   Q.    You just remember one day there being 61,
17 and then the next day only 10?
18   A.    They were gone, um-hum.
19         MR. TRINE: I don't think I have any further
20 questions. Do you want to talk to me for a minute?
21         MR. KORDICK: Yeah, just a second.
22         MR. TRINE: Hold on just a second.
23         (Break from 4:53 p.m. to 4:54 p.m.)
24   Q.    (BY MR. TRINE) I have a couple follow-up
25 questions. In addition to seeing Carranza-Reyes on that

219

1  upper tier at one time when -- on the 8th when he was on
2  the floor and sick, did you examine or see any other INS
3  detainees inside the pod, either upstairs or downstairs?
4    A.    No. My concern was for him, to get him down
5  on the lower level.
6    Q.    No, I don't mean just right at that time,
7  but --
8    A.    That day?
9    Q.    During that week, did you actually enter the
10 pod and examine or see any other INS detainees who were
11 sick?
12   A.    No, I did not enter the pod.
13   Q.    Okay. So the ones that you did see were
14 brought to medical?
15   A.    Yes.
16   Q.    He's the only one you actually saw in the
17 pod?
18   A.    Yes.
19   Q.    And did you ever enter the pod when giving
20 meds?
21   A.    No, because I had a med cart, and you don't
22 leave a med cart -- you don't take a med cart into the
23 pod.
24   Q.    They come to the door?
25   A.    They come to the door and step up to the med

220

1  cart.
2    Q.    And when there were 61 detainees in there,
3  was there an odor about the place from that many
4  detainees being crowded together in that pod?
5    A.    The usual body odor, that type of thing.
6  Not -- I don't know what type of odor you're looking for.
7    Q.    Well, was it more compelling or worse when
8  you actually entered the pod and went upstairs and saw
9  Carranza-Reyes?
10   A.    No. It was not worse.
11   Q.    Now, there's been testimony by one of the
12 deputies that after Carranza-Reyes was removed, that the
13 large trash can had contained vomit, and so had one of
14 the -- or so had the mat he'd been sleeping on, and so
15 both of those were cleaned and disinfected. Do you have
16 any recollection of that?
17   A.    I don't know about that. I don't know about
18 that, no.
19         MR. TRINE: That's all I have. Thank you.
20         EXAMINATION
21 BY MS. LEWIS:
22   Q.    I'd like to ask a couple questions just to
23 follow up on a couple things. Going back to your
24 practice of relaying information through the pass-on, the
25 document known as the pass-on --

Pages 217 to 220

*  SUBJECT TO CONFIDENTIALITY DESIGNATIONS  *