## SHEET 1 PAGE 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Case No. 2005-WM-377 (BNB)

DEPOSITION OF: DON STANLEY FRYE
November 1, 2005

MOISES CARRANZA-REYES,

Plaintiff,

v.

PARK COUNTY, a public entity of the State of Colorado and its governing board, THE PARK COUNTY BOARD OF COUNTY COMMISSIONERS; PARK COUNTY SHERIFF'S OFFICE, a public entity of the State of Colorado; FRED WEGENER, individually and in his official capacity as Sheriff of Park County, Colorado; MONTE CORE, individually and in his capacity as Captain of Park County Sheriff's Department; VICKIE PAULSEN, individually and in her official capacity as Registered Nurse for Park County, Colorado; JAMES BACHMAN, M.D., individually and in his official capacity as Medical Director of the Park County Jail,

Defendants.

TAKEN PURSUANT TO NOTICE AND AGREEMENT on behalf of the Plaintiff at 824 Castello, Fairplay, Colorado 80440 at 9:00 a.m. before Theresa A. Coffman, Federal Certified Realtime Reporter, Registered Professional Reporter and Notary Public within Colorado.

## PAGE 2

APPEARANCES

For the Plaintiff:
WILLIAM A. TRINE, ESQ.
Trine & Metcalf, P.C.
1435 Arapahoe
Boulder, Colorado 80302

LLOYD C. KORDICK, ESQ.
805 South Cascade
Colorado Springs, Colorado 80903

JOSEPH J. ARCHULETA, ESQ.
Law Office of Joseph J. Archuleta
1724 Ogden Street
Denver, Colorado 80218

For the Defendants Park County, Park County Board of Commissioners, Park County Sheriff's Office, Wegener and Core:
JENNIFER L. VEIGA, ESQ.
Hall & Evans, LLC
1125 17th Street
Suite 600
Denver, Colorado 80202

STEPHEN A. GROOME, ESQ.
P.O. Box 1373
501 Main Street
Fairplay, Colorado 80440

For the Defendant Paulsen:
MELANIE B. LEWIS, ESQ.
Berg Hill Greenleaf & Ruscitti LLP
1712 Pearl Street
Boulder, Colorado 80302

For the Defendant Bachman:
ANDREW W. JURS, ESQ.
Johnson McConaty & Sargent, P.C.
400 South Colorado Boulevard
Suite 900
Glendale, Colorado 80246

Also Present: None

## PAGE 3

INDEX

| EXAMINATION OF DON STANLEY FRYE November 1, 2005 | PAGE |
|---|---|
| By Mr. Trine | 4 |
| By Mr. Archuleta | -- |
| By Mr. Kordick | -- |
| By Ms. Veiga | -- |
| By Mr. Groome | -- |
| By Ms. Lewis | -- |
| By Mr. Jurs | 132 |

| DEPOSITION EXHIBITS: | | INITIAL REFERENCE |
|---|---|---|
| 8 | Hand-drawn diagram | 84 |

| REQUESTED PORTIONS OF TESTIMONY: | PAGE |
|---|---|
| Request for document production or information | -- |
| Certified question | -- |
| Instruction not to answer | 35 |
| Other requests or marked testimony | 75 |

REFERENCES TO EXHIBITS MARKED PREVIOUSLY:

| Exhibit No. | Page Reference |
|---|---|
| 1 | 64 |
| 2 | 50 |
| 3 | 29 |
| 4 | 119 |
| 6 | 53 |

## PAGE 4

    WHEREUPON, the within proceedings were taken pursuant to the Federal Rules of Civil Procedure:

    (At this time Mr. Groome was not present in the deposition room.)

    DON STANLEY FRYE,
having been first duly sworn to state the whole truth, was examined and testified as follows:

    EXAMINATION
BY MR. TRINE:

Q. Would you please state your full name and office address for the record.

A. Office address?

Q. Or home address, whichever you prefer using.

MS. VEIGA: Why don't you give them your work address.

A. My name is Don Stanley Frye, and my work address is 1180 County Road 16, Fairplay, Colorado 80440.

Q. (BY MR. TRINE) And what is your occupation or profession?

A. I am a detentions deputy.

Q. And you're employed at the Park County Jail?

A. That's correct.

Q. What is your educational background?

A. I have two years of college.

Q. Okay. And your work history and summary

Notes:

Coffman Reporting
303.893.0202
303.893.2230 FAX

EXHIBIT 13

Page 57

1   A.   Yes.
2   Q.   And then on 1996, it states, "There are two
3   main goals regarding the recognition of communicable
4   disease: Number 1, to identify the disease as early as
5   possible so that treatment can be started, and, 2, to
6   prevent the spread of the disease."
7        And then it explains, "In this section, some
8   general information about communicable diseases will be
9   covered. In addition, there is a chart of some
10  communicable diseases which might be encountered in a
11  jail. This chart gives specific information regarding
12  incubation period, method of transmission, symptoms,
13  possible complications, and so on."
14       At this time, you were aware of all that in
15  March of 2003. This was information you had read and
16  been provided; is that right?
17       MS. VEIGA: Objection, foundation.
18  A.   I can't recall exactly when I was given
19  this, but it was sometime early in 2003.
20  Q.   (BY MR. TRINE) It indicates down below
21  that, under methods of transmission, that communicable
22  diseases can be spread and transmitted in a variety of
23  ways, but the more common methods are, and they list
24  direct contact, indirect contact, and inhalation. And
25  under Direct Contact, contact with an infected person or

Page 58

1   eating infected food or infection of an open skin wound;
2   under Indirect Contact, contact with contaminated
3   objects, such as soiled dressings or clothing from an
4   infected person; Inhalation, inhaling the droplets spread
5   from an infected person when he sneezes or coughs; or
6   inhaling dust contaminated with infected agents."
7        Now, these inmates that were sick in Pod D
8   with the symptoms described by Nurse Paulsen, do you
9   remember that they were coughing and sneezing?
10  A.   I don't recall specifically to that
11  occasion.
12  Q.   Do you remember that they were sleeping on
13  three tiers, one right on top of another, in close
14  proximity to one another?
15  A.   There are -- their bunks are in twos and
16  threes, stacked like that, yes.
17  Q.   Do you remember that some of them were
18  sleeping right next to each other on mattresses on the
19  floor?
20       MS. LEWIS: Object to the foundation.
21  A.   I don't remember stepping over anybody on a
22  mattress during my pod walk.
23       MR. KORDICK: Ask him --
24  Q.   (BY MR. TRINE) Do you remember seeing
25  inmates sleeping in close proximity to each other on

Page 59

1   mattresses?
2   A.   In their bunks.
3   Q.   On the floor?
4   A.   I don't recall anyone at that time on the
5   floor.
6   Q.   Now, on Park 1997, this policy and procedure
7   manual tells you what to look for in the way of common
8   signs and symptoms of communicable disease, doesn't it?
9   A.   Yes.
10  Q.   And it lists the more common signs as fever;
11  chills; headache; rash; cough, especially in which phlegm
12  is coughed up; diarrhea or cramps; sore throat; sudden
13  joint swelling and pain; weakness; itching. And Nurse
14  Paulsen had charted that Carranza-Reyes was complaining
15  of headaches, nausea, vomiting, body aches, diarrhea,
16  nasal congestion. All of that is consistent with a
17  communicable disease, isn't it?
18       MS. LEWIS: Object to the form of the
19  question.
20  A.   Certainly consistent to flulike symptoms.
21       MR. TRINE: Wasn't my question.
22       MR. JURS: Objection to the foundation of
23  the last question.
24  Q.   (BY MR. TRINE) Isn't that consistent with
25  many of the symptoms many of which are listed on Park

Page 60

1   1997?
2   A.   Yes.
3   Q.   Now, at that time did you give any
4   consideration to the possibility that Carranza-Reyes may
5   have a developing infection?
6   A.   I may have.
7   Q.   And did you give consideration to
8   quarantining him, or any of the others, who had similar
9   symptoms so that that wouldn't spread throughout Pod D?
10       MS. LEWIS: Object to the foundation.
11  A.   I may have considered that at the time.
12  Q.   (BY MR. TRINE) Do you remember recommending
13  it to anybody?
14  A.   I don't believe I did recommend that, based
15  on all the medical history questions I asked.
16  Q.   You have a memory now of all the questions
17  you asked?
18  A.   I have a --
19       MS. VEIGA: Objection as to form and
20  foundation.
21  A.   I have a standard set of medical questions
22  that I ask, yes.
23  Q.   (BY MR. TRINE) When an inmate is
24  complaining of headaches, nausea, vomiting, body aches,
25  diarrhea and nasal congestion, you have a common set of

**65**

1  A.  I might not record an interview. I might
2  record any actions that came from any type of
3  questioning.
4  Q.  And would that be in that pass-on book at
5  the end of your shift?
6  A.  If the controller deemed that they wanted to
7  put it in there, yes.
8  Q.  Okay. You would be reporting to the
9  controller, and it would be up to the controller --
10  A.  To log it.
11  Q.  -- to log whatever he felt was important or
12  relevant to log. So you wouldn't know for sure whether
13  your reports were contained in the pass-on?
14  A.  What reports would be contained is
15  anything -- if I had reported something that I felt was
16  worsening, that would be in there. If I was told to give
17  ibuprofen and Pepto-Bismol and I did that during the
18  course of my evening, they would probably log that, but
19  if I hand somebody a cold tablet, it might not get
20  logged.
21       MR. KORDICK: You're right. This is D
22  Block, it's not March 8.
23  Q.  (BY MR. TRINE) Now, if you look at the
24  bottom of Park 1997, which is in the policy and procedure
25  manual, it tells you what to do if you do suspect a

**66**

1  communicable disease. You see that? It says, "If an
2  inmate says that he has or thinks that he has
3  communicable disease, or if you notice signs or symptoms
4  indicating possible disease, then you're to do the
5  following: Number 1, isolate the inmate from other
6  inmates. Place him in a single cell. 2, call M.D. to
7  report the observed symptoms and to receive specific
8  instructions." And then "3, treat as the M.D.
9  indicates."
10       Did you understand that that was the policy
11  and procedure that you were expected to follow if you
12  noticed signs and symptoms indicating possible disease?
13       MS. VEIGA: Objection to form and
14  foundation. Excuse me.
15  A.  The protocol was that we were to treat as
16  indicated by the pass-on from the nurse; that if anything
17  got worse from that or we found any other additional
18  information, that would be reported to the nurse. Nurse
19  is our first contact.
20  Q.  (BY MR. TRINE) So you did not, then,
21  understand that you were to follow this procedure of
22  isolating the inmate and reporting it to the M.D.?
23       MR. JURS: Form.
24  Q.  (BY MR. TRINE) Is that correct?
25  A.  Again, I was told and went under the

**67**

1  assumption, since the symptoms, to me, appeared to be
2  flulike conditions, and since the nurse had already told
3  us that that's what we're treating for -- flulike
4  symptoms, should they get worse -- call me, that's pretty
5  much what I did.
6  Q.  Okay. Did you ever follow this procedure
7  with any inmate, that is, if you noticed possible signs
8  and symptoms of communicable disease, to isolate the
9  inmate and call an M.D.? Did you ever follow that
10  procedure?
11  A.  I followed the procedures that said to me --
12  certainly if I had an inmate that had a known disease,
13  that I knew he had a known disease by asking him and he
14  tells me or by someone else having asked and told me and
15  that's passed on, then, yes, we would isolate him.
16  Q.  Okay. Now, that wasn't my question. Have
17  you ever, since you've been working at the jail, followed
18  this procedure when noticing signs and symptoms of a
19  possible disease, isolating the inmate and calling an
20  M.D.? Have you ever followed that procedure?
21       MS. VEIGA: Object to the form.
22  A.  I have, based on knowledge of a disease.
23  Q.  (BY MR. TRINE) No, I'm asking you where you
24  only know that it's a possible disease. That's what this
25  states. "Or if you notice signs and symptoms indicating

**68**

1  possible disease, do the following." Isolate him and
2  call a doctor. Have you ever done that, just when you
3  thought it was possible?
4  A.  I'm sure I have.
5  Q.  Okay. Now, apparently, on the nights of the
6  4th of March, 5th of March and 6th of March, you didn't
7  think it was possible that any of these inmates in Pod D
8  had a communicable disease; is that right?
9       MS. VEIGA: Objection to form and
10  foundation.
11  A.  I had no knowledge that they had anything
12  other than flulike symptoms. They looked like they had
13  the flu to me.
14  Q.  (BY MR. TRINE) I think that's indirectly
15  answering my question. So you didn't think it was
16  possible they had a communicable disease; is that right?
17       MS. LEWIS: Objection, form.
18       MS. VEIGA: Same.
19  A.  I don't recall what I thought at that time.
20  Q.  (BY MR. TRINE) Okay. Let's look at Exhibit
21  3 again. That's the pages from the master control log,
22  and if you'll look at page 1001 on the master control log
23  for March 8, 2003. It looks like at 3:06 a.m. on your
24  shift, ibuprofen was given to Forester, a cold pill, and
25  is that your initials, DF?

**Page 69**

1    A.    That is my initials.
2    Q.    But is that your handwriting, DF, or is that
3  someone else putting your initials down?
4    A.    That is not my handwriting, so it would be
5  the controller.
6    Q.    And how would you interpret that entry? Is
7  that something that you did?
8    A.    Evidently, yes.
9    Q.    And who was Forester?
10   A.    Forester was an inmate.
11   Q.    And he was a trustee, wasn't it?
12   A.    Forester? I don't recall.
13         MR. KORDICK: Ask him if it was a man or a
14  woman.
15   Q.    (BY MR. TRINE) And do you remember that
16  incident? Do you remember what Forester's symptoms were?
17   A.    No, sir, I don't.
18   Q.    Do you know whether you were giving him an
19  ibuprofen because of complaints he made to you or because
20  the nurse had already ordered it --
21        MR. JURS: Form.
22   Q.    (BY MR. TRINE) -- as part of the protocol?
23   A.    I was allowed to give ibuprofen,
24  Pepto-Bismol, nonprescription type of meds during the
25  night to those upon request.

**Page 70**

1    Q.    And then you have an entry at 3:29. Is that
2  in your handwriting, or is that the controller's?
3    A.    Controller's.
4    Q.    And that entry indicates that
5  Carranza-Reyes, Moises, reported to Frye that he is not
6  feeling well and is having trouble breathing. Was put on
7  oxygen and called the nurse. Do you remember what time
8  that happened?
9         MS. VEIGA: Objection to form and
10  foundation.
11   A.    I don't remember specifically, but it says
12  3:29 here.
13   Q.    (BY MR. TRINE) That would be the time that
14  the controller entered it, at 3:29?
15   A.    Yes.
16   Q.    So that it happened either at 3:29 or
17  sometime before that, and then you reported it to him?
18        MS. LEWIS: Object to the form.
19   A.    Typically if I move an inmate, I report what
20  I'm doing, so it would have been real close.
21   Q.    (BY MR. TRINE) Now, who did you use as an
22  interpreter at that time?
23   A.    I used someone he knew from his hometown. I
24  don't remember his name or what relationship he had.
25   Q.    Someone out of Pod D?

**Page 71**

1    A.    Yes. It was someone in close proximity to
2  him. We were right across the hall.
3    Q.    Right across the hall?
4    A.    Walkway, hallway.
5    Q.    In Pod D?
6    A.    Yes.
7    Q.    Oh, okay. And you don't remember who it
8  was?
9    A.    No.
10   Q.    How did you select an interpreter?
11   A.    I don't recall specifically, but I asked. I
12  talked to the inmates. I found out someone that knew
13  him, that was friends with him, that was from the same --
14  as I recall, same place that he came from.
15   Q.    Do you remember anything about him? His
16  appearance?
17   A.    Could I pick him out of a lineup? Probably
18  not.
19   Q.    Okay. Do you remember about what age he
20  appeared to be?
21   A.    I would say they were in their mid to latter
22  twenties.
23   Q.    And what do you remember about how fluently
24  he spoke or understood English?
25        MS. LEWIS: Object to the form.

**Page 72**

1    A.    The interpreter spoke English very well, and
2  they seemed to be good friends and have a history.
3    Q.    (BY MR. TRINE) So you thought he spoke
4  pretty good English, whoever you were using?
5    A.    Yes.
6    Q.    And why did you give oxygen or administer
7  oxygen?
8    A.    I could see that he didn't feel well. I
9  felt that altitude might have an impact on it. I thought
10  if the oxygen would make him feel better, I'd give him
11  oxygen.
12   Q.    If you look down further, at the bottom of
13  that page, after entries at earlier times, 3:40, 4:20,
14  4:57, 5:00, 5:20, then there's another 3:29 entry. Do
15  you see that?
16   A.    Yes, I do.
17   Q.    And that's not in your handwriting, is it?
18   A.    No.
19   Q.    None of it is?
20   A.    I don't think anything on that page is my
21  handwriting.
22   Q.    Okay. And so do you know what that B/C or 6
23  is, whatever that is, under Date?
24   A.    It's his blood pressure, pulse.
25   Q.    No. Right under the column under Date, next

### Page 77

1  Q.   So this report was probably not authored on
2  the 8th?
3         MS. VEIGA:  Objection as to form and
4  foundation.
5  Q.   (BY MR. TRINE)  Is that right?
6  A.   It could have been the late hours of the 8th
7  when I came in or the wee hours of the 9th.  I don't
8  recall.
9  Q.   Could have been the next shift, the night of
10 the 8th?
11 A.   Yes.
12 Q.   And did you do one or more drafts of this
13 document before you finalized it?
14 A.   I don't recall.
15 Q.   Now, the first paragraph indicates that when
16 you came on duty at 2345 hours, just shortly before
17 midnight on March 7, you received a briefing at shift
18 change indicating that several inmates in D Block were
19 experiencing altitude and flulike symptoms, and the swing
20 shift indicated the nurse's instructions were to give
21 ibuprofen and Pepto-Bismol, as needed, to the inmates.
22 Do you have any memory of that at this time?
23 A.   Yes, I remember that.
24 Q.   Okay.  And you had known for several shifts
25 by this time that there were inmates in Block D who had

### Page 78

1  these symptoms, right?
2         MS. LEWIS:  Object to the form and
3  foundation.
4  A.   Yes.
5  Q.   (BY MR. TRINE)  So this was nothing new to
6  you.  You were aware that, yes, there were inmates in
7  Block D who had symptoms, and you had been medicating
8  them in the past, right?
9         MS. VEIGA:  Objection to form and
10 foundation.
11 A.   Yes.
12 Q.   (BY MR. TRINE)  And then at 1:00 in the
13 morning -- and let me ask you, in order to draft this
14 document, did you do it all from memory, or was it
15 partial memory and reviewing logs?  What did you do to
16 draft this?
17 A.   As well as I recall, I probably did it from
18 memory.  We're talking less than 12 hours from when the
19 thing occurred.  I did it from memory and probably looked
20 at the log to get the specifics on what I had told the
21 controller about respiration and blood pressure and so
22 forth.
23 Q.   And the logs you would have looked at would
24 have been what?  The master log sheet?
25 A.   Probably, yes.

### Page 79

1  Q.   The pass-on log that's kept?
2  A.   Yeah, this log.
3  Q.   That's the master log, but you also
4  identified earlier another log that we don't have that
5  summarized what occurred in each shift.  Do you believe
6  you also looked at that?
7  A.   I don't keep a log that summarizes
8  everything for each shift.  What I may have done is when
9  I took his blood pressure and respiration, I may have
10 written it down so that when I've completed when I'm
11 doing a medical, I can report my findings to the control
12 room, but I don't keep a shift-by-shift log in my packet.
13 Q.   I understand that.  I didn't mean to mislead
14 you.  You earlier described to us this pass-on log that
15 you review every time you come on shift.
16 A.   Yes.
17 Q.   That is a supervisor's summary of what
18 occurred on the previous shift, as well as receiving an
19 oral report.  Remember that?
20 A.   Yes.
21 Q.   Okay.  I'm asking if you reviewed that
22 pass-on log in order to also document this incident
23 report.
24 A.   I can't recall --
25 Q.   Okay.

### Page 80

1  A.   -- whether I had it written down on a piece
2  of paper or I looked at the log that I reported.
3  Q.   The master log?
4  A.   Yes.
5  Q.   So at 1:00 in the morning, according to your
6  incident report, you entered D Block, and upon entering,
7  Inmate Carranza stated that he was sick.  Now, we know
8  now that Carranza-Reyes doesn't speak English.  Are you
9  sure Carranza-Reyes told you that he was sick?
10        MS. VEIGA:  Objection to form and
11 foundation.
12 A.   Through his interpreter.
13 Q.   (BY MR. TRINE)  Okay.  That doesn't say that
14 here.  Do you remember that there was an interpreter with
15 you?
16 A.   I remember that his interpreter was right
17 across the hallway that I walk from.
18 Q.   Is this the same person that had been
19 interpreting for you for several nights prior to this?
20        MS. LEWIS:  Object to the form.
21 A.   Yes.
22 Q.   (BY MR. TRINE)  So you asked that person to
23 come help you speak to Carranza-Reyes?
24 A.   Yes.
25 Q.   Could you tell just from looking at

**Page 81**

1  Carranza-Reyes that he was in discomfort and ill? Is
2  that why you asked the interpreter to help you?
3      A.  He looked sick. He looked like he had the
4  flu, yes.
5      Q.  Okay. How does someone look when they look
6  like they have the flu?
7      A.  Holding his stomach. He had, through the
8  interpreter, told me he had thrown up earlier in the day
9  and that he had felt sick.
10     Q.  And that's all the history you got?
11     A.  No, I got -- I asked a number of history
12 questions.
13     Q.  About how he felt?
14     A.  About his symptoms, yes.
15     Q.  What did he tell you through the
16 interpreter?
17     A.  When I asked the interpreter, I asked, have
18 you been in the hospital, have you ever been
19 hospitalized --
20     Q.  No, I'm asking about his symptoms.
21     A.  I asked --
22     Q.  What symptoms did you ask that he, the
23 interpreter, about -- to try to determine what symptoms
24 he presently had?
25     A.  He had upset stomach.

**Page 82**

1      Q.  You remember asking that? Upset stomach or
2  he'd been vomiting? Both?
3      A.  Both. He said he had vomited earlier in the
4  day.
5      Q.  And presently he was holding his stomach and
6  having an upset stomach?
7      A.  He was, through gestures, showing me, sick
8  to my stomach.
9      Q.  Well, I thought you had an interpreter.
10     A.  I had both. I had -- I'm telling you what I
11 saw in him as I asked through the interpreter.
12     Q.  Okay. And you're painting now a mental
13 image of that scene, right?
14     A.  Yeah.
15     Q.  Okay. And what do you see? Where are you,
16 by the way? Are you in the lower tier, the upper tier?
17     A.  When I gave him oxygen, that occurred --
18 before that?
19     Q.  No. At 1:00 a.m. in the morning on March 8
20 when you went in and Carranza stated that he was sick,
21 I'm asking about that interview.
22     A.  That was upstairs by his bunk.
23     Q.  Oh. He had a bunk?
24     A.  Yes.
25     Q.  Everyone tells us he had a mattress,

**Page 83**

1  including Carranza-Reyes; that all the bunks were filled
2  with 42 inmates when he was brought to the jail, but you
3  remember he was in a bunk?
4      MS. VEIGA: Objection, form and foundation.
5      A.  Absolutely he had a bunk.
6      Q.  (BY MR. TRINE) And where was it upstairs?
7      A.  It was at the end of the L right where I
8  turned around for pod walk.
9      Q.  You go up the stairs?
10     A.  Yes.
11     Q.  Here. Why don't we do this. Why don't you
12 draw us a diagram. I know it won't be to scale, but just
13 so we have an idea what you're referring to here. Show
14 us where the stairs go up and where the L is and where
15 the triple bunks are and which bunk he was in and at what
16 level.
17     A.  (Deponent complied.)
18     MR. KORDICK: Can we take a -- just a second
19 break? Can I talk to you for just a second?
20     MR. TRINE: Yeah.
21     MR. KORDICK: Don't get up, just --
22     MR. TRINE: Go ahead and mark it. What's
23 our next number? Oh, you got it on there. Thank you.
24     (Deposition Exhibit 8 was marked.)
25     MR. TRINE: Take a quick break.

**Page 84**

1      MS. VEIGA: Sure.
2      (Break from 11:17 a.m. to 11:18 a.m.)
3      Q.  (BY MR. TRINE) Before you draw anything
4  further on there, I want to identify your drawing as a
5  drawing that has been marked Exhibit 8, and on that
6  drawing, I know you've indicated the stairs, but I wonder
7  if you could just write in "stairs" so that we'll know in
8  the future what that is.
9      A.  (Deponent complied.)
10     Q.  And then each of the lines that you've drawn
11 in that L are intended to represent bunks; is that right?
12     A.  Yes, but I don't know the exact number.
13     Q.  So this isn't intended to be accurate in
14 terms of the number of bunks?
15     A.  No.
16     Q.  And would you, on that drawing, mark north,
17 south, east, west for us so we have some idea of
18 directions? Or at least put north on there if you know
19 where north is.
20     A.  Okay. I believe this to be north and this
21 to be south.
22     Q.  Okay. And then you started -- and before I
23 interrupted you a moment ago, you were starting to mark
24 up something on this L. What is that intended to be?
25     A.  This is intended to be a bunk, a bunk and a

PAGE 97

1  Q. That "it had been mentioned about
2  elevation." What had been mentioned?
3  A. I think sometime earlier when we were told
4  it was flulike conditions, that the altitude might have
5  something to do with it.
6  Q. Who told you that?
7  A. I don't recall.
8  Q. Do you remember Nurse Paulsen at some time
9  telling you or stating in your presence that all these
10 detainees just had altitude sickness, don't worry about
11 it, it's just altitude sickness?
12     MS. VEIGA: Objection to form and
13 foundation.
14 A. No.
15 Q. (BY MR. TRINE) Did you feel that that's all
16 he had, was altitude sickness?
17 A. No. I felt that he had flulike symptoms,
18 but my experience tells me that, with the altitude,
19 sometimes that's a problem. People get altitude sickness
20 up this high.
21 Q. So you decided to treat him for altitude
22 sickness with oxygen?
23     MS. LEWIS: Object to the form.
24     MS. VEIGA: Join.
25 A. No. What I decided to do was offer oxygen

PAGE 98

1  to see if it gave him any additional comfort.
2  Q. (BY MR. TRINE) But the reason you did that
3  is, if he had altitude sickness, apparently that might
4  help, right?
5  A. If -- yes.
6  Q. And you indicate that at 3:00 in the
7  morning, you took his blood pressure, and the result was
8  143 over 78. You probably looked at some records later
9  on to dictate this because you wouldn't have remembered
10 the precise vital signs 15 hours later, would you?
11 A. I don't remember specifically. I may have
12 gotten them from the log, I may have got them on a sheet
13 of paper. I don't recall.
14 Q. And did you feel the blood pressure was
15 within normal range?
16     MR. JURS: Foundation.
17 Q. (BY MR. TRINE) For a his age and size?
18 A. Did I feel it was within range?
19 Q. Within normal range.
20     MS. LEWIS: Same objection.
21 A. It's not that bad of a blood pressure. Not
22 knowing his history, I wouldn't know whether that would
23 be normal for him or not.
24 Q. (BY MR. TRINE) So why did you take it?
25 A. As a standard procedure of what I do when

PAGE 99

1  I'm taking somebody to medical.
2  Q. Okay. When do you become at all concerned
3  about blood pressure? At what range?
4     MR. JURS: Foundation.
5  Q. (BY MR. TRINE) Based on your own medical
6  training and background?
7     MR. JURS: Foundation.
8  A. I guess it would depend on the nature of an
9  injury. If it was sickness, one thing; trauma, something
10 else. Mainly, I gather this information to report it.
11 Q. (BY MR. TRINE) Okay. You thought that he
12 was sick, and part of it might be altitude sickness.
13 What blood pressure would alarm you, thinking of those
14 conditions?
15 A. It depends. I might have -- I can't recall
16 whether I checked this with previous blood pressure
17 things or just gave it to control. As a matter of
18 standard operation procedure, if I take somebody to
19 medical, I try to do their vitals.
20 Q. Well, why did you take his blood pressure?
21     MS. VEIGA: Objection to form.
22 A. Because that's what I do. That's what a
23 medical first responder does. Takes vitals, asks medical
24 history questions.
25 Q. (BY MR. TRINE) And then you look at those

PAGE 100

1  vitals and try to decide whether or not to call a nurse,
2  don't you?
3     MR. JURS: Form.
4  A. More so based on questions that he answers
5  about medical history and whether or not he thinks he
6  needs to see a doctor, nurse, or go to the hospital.
7  Q. (BY MR. TRINE) Oh, you let -- you let the
8  patient or the inmate decide whether or not he thinks his
9  condition is so bad he should see a nurse or go to the
10 hospital; is that right?
11     MS. VEIGA: Objection to form.
12 Q. (BY MR. TRINE) You don't make that
13 decision?
14 A. It's hard for me to determine how sick a
15 person feels, but if you tell me that you need to see a
16 nurse, a doctor or go to the hospital, then I would
17 report that to medical. If you're sick enough to believe
18 that that's what you need, that's what I pass on.
19 Q. I see. And you took his pulse, and the
20 result was 62. Was that within normal limits?
21 A. Yes.
22 Q. And what do you consider normal limits to
23 be?
24     MR. JURS: Foundation.
25 A. Well, certainly I don't consider that to be

**Page 101**

1  high.
2  Q.  (BY MR. TRINE) Well, what do you consider
3  to be high?
4  A.  Depends on the circumstances. If a person's
5  going up and down stairs, such as to the restroom and
6  back, his pulse would be higher. We had just walked a
7  trip all the way back to medical. His pulse was 62.
8  That's good. I wish my pulse was 62.
9  Q.  So you can't tell me what you consider to be
10 an abnormal pulse --
11     MS. VEIGA: Objection, foundation.
12 Q.  (BY MR. TRINE) -- as a general rule?
13     MR. JURS: Objection, form.
14 A.  I'm not going to say on a general because I
15 think there's too many variables in that to give that.
16 Q.  (BY MR. TRINE) And you took his
17 respiration, the result was 34, and this indicates
18 shallow breathing. How did you determine that?
19 A.  The number of times that he drew a breath, I
20 felt that after sitting back there for a while on oxygen,
21 that it might be a little high.
22 Q.  When you say that a respiration of 34
23 indicates shallow breathing, where did you learn that?
24 A.  From experience and being taught that.
25 Q.  Okay. And you could see that the way he was

**Page 102**

1  breathing, it looked like there was shallow breathing;
2  isn't that right?
3     MS. VEIGA: Objection, form and foundation.
4  A.  I think he was breathing as one might have
5  shallower breathing when you're feeling sick. You have
6  your stomach, your muscles contract, and you tend not to
7  breathe a full breath.
8  Q.  (BY MR. TRINE) And if you're suffering from
9  altitude sickness, you usually are taking deep breaths
10 because you need oxygen; isn't that right?
11     MS. LEWIS: Object to foundation.
12 Q.  (BY MR. TRINE) Shallow breathing is not a
13 symptom of altitude sickness, is it?
14     MS. LEWIS: Object to foundation.
15 A.  I wouldn't say that.
16 Q.  (BY MR. TRINE) When you placed him on
17 oxygen, and after five minutes, he stated -- and I assume
18 you're talking about an interpreter here, aren't you,
19 when you say "he stated"?
20 A.  Yes.
21 Q.  When you placed him on oxygen after five
22 minutes, he stated the oxygen was not helping him. If it
23 had been altitude sickness, you would expect it to help
24 him, wouldn't you?
25     MR. JURS: Foundation.

**Page 103**

1  A.  Well, again, I didn't assume that he had
2  altitude sickness. I thought that's a possibility. I
3  was trying to give him a better degree of comfort.
4  Q.  (BY MR. TRINE) My question is if he had had
5  altitude sickness, you would expect the oxygen to help
6  him with his breathing; isn't that correct?
7     MR. JURS: Foundation.
8  A.  If he had had it, yes.
9  Q.  (BY MR. TRINE) Okay. And after five
10 minutes, it wasn't helping him, so you could rule out
11 altitude sickness, couldn't you?
12     MR. JURS: Form.
13 A.  There's a lot more symptoms than just
14 breathing with altitude sickness.
15 Q.  (BY MR. TRINE) Didn't you say early on that
16 you wanted to give him oxygen in the event he did have
17 altitude sickness because that might help him? Isn't
18 that what you told us?
19 A.  Yes.
20 Q.  And now you've discovered that, no, it
21 didn't help him, so your impression at that time was that
22 it probably wasn't altitude sickness; isn't that right?
23     MR. JURS: Form.
24 A.  No.
25 Q.  (BY MR. TRINE) So you still thought he had

**Page 104**

1  altitude sickness?
2  A.  I can't tell you what I thought, but there's
3  more symptoms than just breathing involved in altitude
4  sickness.
5  Q.  In any event, you were concerned enough to
6  call Nurse Paulsen; is that correct?
7     MS. VEIGA: Objection to form and
8  foundation.
9  A.  I didn't call Nurse Paulsen.
10 Q.  (BY MR. TRINE) Well, did you ask that she
11 be called?
12 A.  No.
13 Q.  Okay. When you indicate that Nurse Paulsen
14 was informed of Inmate Carranza's condition, "Paulsen
15 stated it was flulike conditions and she was aware of his
16 condition," where did you find that out?
17 A.  From the controller.
18 Q.  So you told the controller that you were
19 concerned about his condition; is that right?
20     MS. VEIGA: Objection to form.
21 A.  I reported to the controller what I did,
22 where I took the inmate, and what my findings were.
23 Q.  (BY MR. TRINE) And did you suggest to the
24 controller that the nurse be called or a doctor be
25 called?

**113**

1  authored this incident report, had you been told that
2  upon examination at the hospital, they had observed dark
3  splotches on his skin? Had you been told that?
4       MS. LEWIS: Object to the foundation.
5   Q.  (BY MR. TRINE) Before you rendered this
6  report?
7       MS. LEWIS: Same objection.
8   A.  No. I saw no deformities, no skin
9  discoloration. I don't know if I've ever heard that
10 before until it just came out of your mouth.
11  Q.  (BY MR. TRINE) Now, when you say in this
12 report, "During these times," and you're talking about
13 the pod walks between 5:40 and 6:40 a.m., "I observed
14 Inmate Carranza kneeling on the floor with his upper body
15 on the bunk. This indicated signs of discomfort." So
16 each time that you went on a pod walk, he was on his
17 knees, folded over his bunk in discomfort; is that right?
18  A.  Each time?
19  Q.  It says, "During these times" --
20  A.  Not each time.
21  Q.  How many times?
22  A.  Several. I don't recall the exact number.
23  Q.  And then at 7:00 in the morning, you report
24 that on pod walk, you were passing out medications to the
25 inmates, and you gave Carranza two more ibuprofen and

**114**

1  Pepto-Bismol per the nurse's instructions. Did you have
2  some conversation with the nurse that morning, or did she
3  pass on instructions through the controller to you?
4       MS. LEWIS: Object to the form.
5   A.  That was the same information I had gotten
6  earlier. I think the controller, at some point during
7  the evening, had reported his situation as being fairly
8  much the same. I don't recall whether I got that
9  information again through the controller at that point or
10 if I was continuing on with the information I had got and
11 passed on. I don't recall.
12  Q.  (BY MR. TRINE) Now, you indicate in this
13 incident report that at 7:00 a.m. in the morning, he was
14 up walking around and appeared to be doing better. Do
15 you have a memory of that?
16  A.  I have a memory of him walking around, yes.
17  Q.  And appearing to be doing better?
18  A.  As well as I recall.
19  Q.  Where was he walking?
20  A.  He was walking to the restroom.
21  Q.  He was downstairs?
22  A.  Downstairs.
23  Q.  You have a visual image of that? You can
24 see him walking to the restroom now? You remember that?
25  A.  Yes.

**115**

1   Q.  Clearly you can remember it?
2       MR. JURS: Form.
3   A.  I remember him walking to the restroom,
4  being downstairs. Yes.
5   Q.  (BY MR. TRINE) And was he holding his
6  stomach? Was he bent over? Was he walking straight?
7  Was he smiling? What was his appearance and his
8  condition when you saw him walking?
9   A.  I don't recall. I just remember him
10 walking. He didn't appear to be worse, he wasn't bent
11 over.
12  Q.  You'd probably be surprised to learn, then,
13 that at an hour and 10 minutes later, at 8:10 in the
14 morning, he was found collapsed on the floor next to his
15 bunk; is that right?
16      MS. VEIGA: Object to form and foundation.
17      MS. LEWIS: Same objection.
18  Q.  (BY MR. TRINE) Does that surprise you?
19      MS. VEIGA: Same objection.
20  A.  I think shocked me is closer.
21  Q.  (BY MR. TRINE) Hum?
22  A.  I think shocked me is a better answer.
23  Q.  You would be shocked to learn --
24  A.  I was shocked to learn that, yes.
25  Q.  Because just an hour earlier, he was walking

**116**

1  and appeared to be doing better, right?
2   A.  I would say he appeared to be no worse. He
3  still looked sick. He looked sick all evening. Stated
4  that.
5   Q.  And by using the same hand gestures, you
6  asked him if he was better, worse or the same, and he
7  indicated he was the same; is that right?
8   A.  At no time in the night did he tell me he
9  was worse.
10  Q.  No, I'm talking about the 7 o'clock entry on
11 March 8. You again asked him if he was better, worse or
12 the same by using the same hand gestures, and he
13 indicated he was the same?
14  A.  That's correct.
15  Q.  And his breathing was still shallow. Did
16 you determine that through hand gestures? Or could you
17 see that his breathing was still shallow?
18  A.  I think I could see that it was still
19 shallow.
20  Q.  And you state, "A short time later, Nurse
21 Paulsen arrived and assessed his situation." Now, the
22 records reflect that after he collapsed on the floor next
23 to his bunk on the upper tier, the nurse was called, and
24 she came in to assess him. Were you present when that
25 occurred?