**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Case No. 2005-WM-377 (BNB)

DEPOSITION OF: TIMOTHY BARNES KEELING, D.O.
March 15, 2006

MOISES CARRANZA-REYES,
Plaintiff,
v.
PARK COUNTY, a public entity of the State of Colorado and its governing board, THE PARK COUNTY BOARD OF COUNTY COMMISSIONERS; PARK COUNTY SHERIFF'S OFFICE, a public entity of the State of Colorado; FRED WEGENER, individually and in his official capacity as Sheriff of Park County, Colorado; MONTE GORE, individually and in his capacity as Captain of Park County Sheriff's Department; VICKIE PAULSEN, individually and in her official capacity as Registered Nurse for Park County, Colorado; JAMES BACHMAN, M.D., individually and in his official capacity as Medical Director of the Park County Jail,

Defendants.

TAKEN PURSUANT TO NOTICE on behalf of the Defendants at 340 Peak One Drive, Frisco, Colorado at 1:45 p.m. before Laura L. Corning, Federal Certified Realtime Reporter, Certified Shorthand Reporter and Notary Public within Colorado.

**Page 2**

APPEARANCES

For the Plaintiff:
WILLIAM A. TRINE, ESQ.
Trine & Metcalf, P.C.
1435 Arapahoe
Boulder, Colorado 80302

For the Defendants Park County, Park County Board of Commissioners, Park County Sheriff's Office, Wegener and Gore:
ANDREW D. RINGEL, ESQ.
Hall & Evans, LLC
1125 17th Street
Suite 600
Denver, Colorado 80202

For the Defendant Paulsen:
JOSH MARKS, ESQ.
Berg Hill Greenleaf & Ruscitti LLP
1712 Pearl Street
Boulder, Colorado 80302

For the Defendant Bachman:
ANDREW W. JURS, ESQ.
Johnson McConaty & Sargent, P.C.
400 South Colorado Boulevard
Suite 900
Glendale, Colorado 80246

For the Deponent:
RICHARD L. MURRAY, JR., ESQ.
Montgomery Little Soran Murray & Kuhn, P.C.
5445 DTC Parkway
Suite 800
Englewood, Colorado 80111

Also Present: None

**Page 3**

INDEX

EXAMINATION OF TIMOTHY BARNES KEELING, D.O.
March 15, 2006                                      PAGE

By Mr. Trine                                         83
By Mr. Ringel                                        60
By Mr. Marks                                         42
By Mr. Jurs                                       4, 108
By Mr. Murray                                        --

DEPOSITION EXHIBITS:                              INITIAL
                                                REFERENCE
24-A  Document                                       65

(Original exhibits attached to original transcript; copies included in continuing exhibit file maintained by Coffman Reporting; copies provided to counsel as requested.)

REQUESTED PORTIONS OF TESTIMONY:                   PAGE
Request for document production                   43, 74
or information

REFERENCES TO EXHIBITS MARKED PREVIOUSLY:

EXHIBIT NO.      PAGE REFERENCE
    24                 6

**Page 4**

1       WHEREUPON, the within proceedings were taken
2  pursuant to the Federal Rules of Civil Procedure
3       TIMOTHY BARNES KEELING, D.O.,
4  having been first duly sworn to state the whole truth,
5  was examined and testified as follows:
6                    EXAMINATION
7  BY MR. JURS:
8       Q.   Good afternoon, Dr. Keeling. My name is
9  Andrew Jurs and I represent Dr. Bachman in this case. We
10 met each other just a moment ago before the deposition
11 started. I'm going to be asking you questions about your
12 involvement in this lawsuit, if I could.
13      MR. MURRAY: Let me interrupt a minute. I
14 have a short comment that I'd like to put on the record
15 for everybody, just to make sure everybody is on the same
16 page, at least with me, about what's going to happen
17 today.
18      Dr. Keeling is here today. He's available
19 to provide testimony about his care and treatment, the
20 records that he's familiar with regarding his emergency
21 department contact. It is not his desire to formulate or
22 provide opinions regarding care that occurred before he
23 was involved with the patient or for care that occurred
24 after he was involved with the patient. Although I'm
25 sure you all know there are a couple of records that came

Coffman Reporting
303.893.0202
303.893.2230 FAX

Pages 1 to 4

EXHIBIT 17

* SUBJECT TO CONFIDENTIALITY DESIGNATIONS *

**25**

1  Q.  Starting three lines from the bottom of that
2  paragraph and ending two lines, there is a sentence which
3  states, "The patient had mild cold symptoms for the past
4  week." Do you see that sentence?
5  A.  Yes.
6  Q.  Where did you learn that information?
7  A.  From the interview of the patient.
8  Q.  That's what the patient told you, then?
9  A.  Or the nurse. Us.
10 Q.  When you use the language "mild cold
11 symptoms," what does that mean to you as a physician?
12 A.  To me it means runny nose, possibly a sore
13 throat.
14 Q.  Anything else?
15 A.  Sometimes earache.
16 Q.  In the Chief Complaint section there is also
17 other information. Does this paragraph as a whole
18 accurately reflect what you saw of the patient at the
19 time you saw him on March 8, 2003?
20 A.  I'm sorry. Direct me to where we're
21 looking.
22 Q.  The Chief Complaint paragraph, page 2, at
23 the top, starting "Patient complains of" and ending "for
24 the past three days."
25 A.  And your question one more time.

**26**

1  Q.  There is a description of the patient's
2  condition in that paragraph, and I'm wondering if that
3  description accurately reflects what you observed of the
4  patient on March 8, 2003.
5  A.  Yes.
6  Q.  Further down, let's see, there is the Review
7  of Symptoms and then there is Physician Exam, and
8  directly below that is a line that says, "Patient status:
9  Alert and cooperative." Do you see that on page 2?
10 A.  Yes.
11 Q.  What does "Alert and cooperative" mean?
12 A.  Just as it says. The patient was alert and
13 he was cooperative.
14 Q.  So he's conscious and able to answer
15 questions?
16 A.  Yes.
17 Q.  He is alert and cooperative means he is not
18 in shock; is that true?
19 A.  Yes.
20 Q.  Not in critical condition?
21 A.  That's true.
22 Q.  When you saw the patient, you took the
23 history, you did the exam. At what point did you
24 determine that you needed to have blood tests or other
25 lab work done?

**27**

1  A.  At that same time.
2  Q.  So that was as a result of that examination
3  and history?
4  A.  Yes.
5  Q.  When you ordered tests, what did you order?
6  A.  Refer back to page 1. Reading from the top
7  to the bottom, EKG; IV lactated Ringer's times two;
8  Levaquin, 500 milligrams IV; Tylenol, 750 milligrams
9  oral; CBC; chemistry 22; blood culture and sensitivity
10 times two; chest X-ray.
11 Q.  And you're referring to page 1 in answering
12 that question?
13 A.  Yes.
14 Q.  Did you order the variety of tests that you
15 just listed at the same time or at different times?
16 A.  At different times.
17 Q.  Could you tell me the order in which you
18 made that -- those orders?
19 A.  The blood work would have been obtained at
20 the same time as the IV was started. The EKG, I don't
21 recall exactly if it was before or after the IVs. The
22 blood -- the chest X-ray was sometime within that
23 process. And lastly, the blood cultures were done last
24 with the antibiotics, the Levaquin being administered
25 after the blood cultures.

**28**

1  Q.  So the blood culture was the last diagnostic
2  test of the list of tests that you went over a moment
3  ago, and as a result of that you ordered Levaquin?
4  A.  The blood cultures was the last diagnostic
5  test, yes. The Levaquin, the antibiotic, was
6  administered after the blood cultures are obtained but
7  not necessarily as a consequence of the blood culture, as
8  those results would not be available until a later date.
9  Q.  I understand. So prior to -- strike that.
10 Are you able to estimate what time you would have ordered
11 the Levaquin in this case?
12 A.  My estimation is after 3:00 p.m.
13 Q.  And prior to the Levaquin being ordered at
14 approximately 3:00 p.m. -- or after 3:00 p.m. I'm not
15 sure -- the patient had received just Tylenol, isn't that
16 the case, as a medication?
17 A.  Well, if you exclude oxygen and lactated
18 Ringer's.
19 Q.  The patient would have received oxygen,
20 lactated Ringer's and Tylenol.
21 A.  Yes.
22 Q.  Got it. What are the lactated Ringer's for?
23 A.  That's an IV fluid for volume expansion.
24 And I'll add that he also received potassium chloride,
25 20 milliequivalents orally.

Page 29

1  Q.  And what is that for?
2  A.  That was after the lab work was back, while
3  the patient was still in the facility. His potassium was
4  low, so that is a supplement.
5  Q.  So from the time that you first saw the
6  patient at approximately 1:30 -- I'm sorry -- 1:45 in the
7  afternoon, to sometime after 3:00 when you ordered the
8  Levaquin, you did not order any other oral medications or
9  IV medications beside the Tylenol; isn't that true?
10 A.  Yes.
11 Q.  During that time period, how many times did
12 you visit with the patient, if you remember?
13 A.  I don't remember.
14 Q.  Could you estimate?
15 A.  I had many contacts from the nurse, but I
16 don't know how many times I would have spoke to the
17 patient. I may not have spoken to him at all, other than
18 on the initial intake. I may have asked him how he was
19 feeling. I don't remember.
20 Q.  Either by direct observation or through the
21 nurse, you would have been aware of his condition during
22 the time he was being treated and as a patient at Summit
23 Medical Center, though?
24 A.  Frequently.
25 Q.  During that period of time, from the time

Page 30

1  you first saw him to when he was transferred to Denver,
2  what was the nature -- strike that. Was his condition
3  changing or was it getting better, getting worse, staying
4  the same? Could you quantify it?
5  A.  He was staying the same, in a stable
6  condition.
7  Q.  When you spoke to Dr. Shockley at
8  approximately 3:04 p.m., what were you talking about?
9  A.  Dr. Shockley was the attending at the
10 emergency department at Denver Health Medical Center. I
11 was talking to him about accepting Mr. Carranza-Reyes as
12 a patient at his facility.
13 Q.  And you gave a synopsis of the patient's
14 condition to Dr. Shockley?
15 A.  As my routine, yes.
16 Q.  And he agreed to accept Mr. Carranza-Reyes
17 as a patient?
18 A.  Yes.
19 Q.  What was the -- what had happened before
20 3:04 that indicated to you that this patient needed to be
21 transferred?
22 A.  The patient's lab and X-ray was coming back
23 and as I was able to review those I realized he had a
24 condition that we would not be able to treat as an
25 outpatient, and we certainly couldn't keep him at our

Page 31

1  facility, so he necessitated transfer to another
2  facility.
3  Q.  So the two major factors in your decision
4  for transfer were the lab results and the chest X-ray
5  results?
6  A.  Yes.
7  Q.  By looking at this record, can you tell me
8  at what time you received each of those reports back?
9  A.  I can do a reasonable guess, but by
10 answering -- looking at the chest X-ray report, I cannot
11 say at what time that I saw the X-ray. And for the blood
12 work, I am going to guess that I saw the first part of
13 the CBC sometime around 2:00 p.m. or thereafter.
14 Q.  And what page are you referring to?
15 A.  That would be page 13, for the top half of
16 the CBC. That's -- excuse me. It says, "Automated blood
17 count." CBC is a definition that we use. It's "complete
18 blood count." It means the same thing. But I'll make it
19 clear that I only saw the top half of this at around
20 2:00 p.m. or -- and it could be substantially -- it could
21 be longer than that. I'm not sure how soon after -- it
22 says 1358 that it was recorded, but I don't know if it
23 was printed out, delivered to me at that time. It might
24 have been later.
25     Now, the other lab you asked about was

Page 32

1  identified on page 14 as Comprehensive Metabolic Panel,
2  and I have my doubts that I -- that this was recorded at
3  1358. As a matter of fact, now that I'm looking at the
4  collection and the -- I think "REC" stands for received.
5  So it was collected at 1348. It was received 10 minutes
6  later, and then would be sometime after that.
7     Typically, for a comprehensive metabolic
8  panel, it can be anywhere from 30 minutes to an hour. So
9  it's possible I didn't see that until about 3:00 at the
10 time that I -- and it would make sense, because that
11 would be the time that I would be speaking with the
12 receiving physician, once I have my lab in hand.
13 Q.  So the comprehensive labs -- metabolic panel
14 from page 14, that indicates to you that it was received
15 for analysis at 1358, 1:58 p.m., and then sometime after
16 that, 30 to 60 minutes later, you would have received the
17 results?
18 A.  Yes.
19 Q.  Is it the receipt of this metabolic panel
20 that was the blood work result that allowed -- was
21 critical to making the decision to transfer, or was it
22 the results from the previous page, page 13, or was it
23 both?
24 A.  It was both.
25 Q.  For the blood count on page 13, again, it

85

1  Q.  (BY MR. TRINE)  Okay. And if they were
2  able to get a diastolic, it would be custom and practice
3  to record it, wouldn't it?
4        MR. RINGEL:  Object to the form and the
5  foundation.
6        THE WITNESS:  Do I answer?
7        MR. MURRAY:  Only if you can.
8  A.  Yeah. I don't know what their thoughts
9  were, why they didn't put something under that Diastolic
10 box.
11 Q.  (BY MR. TRINE)  And the pulse at 126 and
12 respiration at 24, in combination with the blood pressure
13 of 66 and perhaps no diastolic would indicate that, at
14 least at that time, the patient had not yet been
15 stabilized; is that correct?
16       MR. RINGEL:  Object to the form and
17 foundation.
18 A.  The patient had not been stabilized at that
19 time.
20 Q.  (BY MR. TRINE)  Okay. And then the O2
21 sats at 91 percent, is that on room air or oxygen?
22 A.  I don't know.
23 Q.  And then under Chief Complaint it indicates
24 that -- vomiting and possible kidney stone, and do you
25 know whether that information came from the officer who

86

1  accompanied the patient or directly from the patient or
2  some other source?
3        MR. RINGEL:  Object to the form and the
4  foundation.
5  A.  I don't know.
6  Q.  (BY MR. TRINE)  Then the triage assessment
7  indicating that for three days the patient had
8  right-sided chest pain, fever, nausea, vomiting and
9  diarrhea, would all of those symptoms be consistent with
10 a septic condition?
11       MR. RINGEL:  Object to the form and
12 foundation.
13       MR. MURRAY:  You mean in terms of his
14 analysis that day, Bill? I think I have to interpose a
15 comment to be consistent with what I've done with others.
16 Q.  (BY MR. TRINE)  No, no, no. Would that be
17 consistent with the diagnosis that you made of sepsis
18 that day --
19       MR. RINGEL:  Same objections.
20 Q.  (BY MR. TRINE)  -- that for three days he
21 had had right-sided chest pain, fever, nausea, vomiting
22 and diarrhea?
23       MR. RINGEL:  Same objections.
24 A.  I think that those symptoms could be found
25 in many different conditions.

87

1  Q.  (BY MR. TRINE)  I understand that. That
2  wasn't my question, though. Among those conditions,
3  would those symptoms be consistent with the sepsis that
4  you had diagnosed that day?
5  A.  Fever, chills are oftentimes associated with
6  sepsis. I don't know if the other ones need to be
7  included to make a diagnosis of sepsis.
8  Q.  Okay. The right-sided chest pain would
9  certainly be consistent with the pneumonia that you
10 subsequently diagnosed in the right lower lobe of the
11 lung; is that right?
12 A.  Yes.
13 Q.  Now, it indicates that -- under that triage
14 assessment that he came from the bathroom unable to void.
15 And would that be consistent with dehydration resulting
16 from sepsis?
17       MR. RINGEL:  Object to the form and the
18 foundation.
19       MR. MURRAY:  Where are you, please? On the
20 form, where are you?
21       MR. TRINE:  Excuse me?
22       MR. MURRAY:  Where are you?
23       MR. TRINE:  On the triage assessment where
24 he indicates "from WR" -- I assume waiting room -- "to
25 BR" -- bathroom -- "unable to void."

88

1        MR. MURRAY:  Okay.
2  Q.  (BY MR. TRINE)  If he was unable to void,
3  would that also be consistent with dehydration from
4  vomiting and possible sepsis?
5        MR. RINGEL:  Object to the form and the
6  foundation.
7  A.  Unable to void could be from a number of
8  reasons, including dehydration, or just -- some people
9  just aren't able to void when -- on demand.
10 Q.  (BY MR. TRINE)  And then under "Skin," it
11 indicates that he's pale and jaundiced. Is being pale
12 and jaundiced consistent with sepsis?
13 A.  People with sepsis can be pale.
14 Q.  And what would cause jaundice?
15 A.  Jaundice is seen in a number of conditions.
16 It's --
17       THE WITNESS:  Am I being a medical expert
18 here?
19 A.  Amongst which -- we see people with jaundice
20 with viral hepatitis, alcoholic hepatitis, amongst other
21 conditions.
22 Q.  (BY MR. TRINE)  And what about liver being
23 affected by sepsis?
24 A.  Liver can be affected by many things, and
25 sepsis could affect the liver.

89

1    MR. JURS: I'd like --
2    Q.   (BY MR. TRINE) So that would --
3    MR. JURS: Excuse me, Bill. I'd like to
4 interpose an objection on foundation on the last
5 question.
6    Q.   (BY MR. TRINE) And if so, that could
7 result in part in jaundice?
8    MR. MURRAY: You mean in this particular
9 case with this gentleman?
10   Q.   (BY MR. TRINE) Yeah. If there was sepsis
11 affecting the liver.
12   MR. RINGEL: Object to the form and the
13 foundation.
14   A.   I kind of lost track of the question.
15   Q.   (BY MR. TRINE) If there was sepsis in
16 this case that was affecting the liver, could that be
17 evidenced in part by jaundice?
18   MR. JURS: Form and foundation.
19   A.   I think that jaundice is a -- is
20 something -- a sign that is interpreted by who's looking.
21 I did not note jaundice on my note, but in this nurse's
22 opinion the patient had darker skin that could be
23 jaundiced.
24   Q.   (BY MR. TRINE) That wasn't my question.
25 I understand that. Doctor, if in fact this patient had

90

1 sepsis that was affecting the liver, can that result in
2 part in jaundice?
3    MR. JURS: Form and foundation.
4    A.   Jaundice -- sepsis can cause many
5 abnormalities to the blood, notably anemias and chemistry
6 abnormalities, so I think the answer would be yes.
7    Q.   (BY MR. TRINE) And then, Doctor, under
8 "Neuro" it indicates that he has headache and dizziness,
9 and both headache and dizziness can also result from
10 either pneumonia and/or sepsis; is that right?
11   MR. RINGEL: Object to the form and
12 foundation.
13   MR. JURS: Form and foundation.
14   MR. MURRAY: You need to confine your
15 comments to this particular patient, your evaluation of
16 this guy.
17   THE WITNESS: Okay.
18   MR. MURRAY: Bill, I'll just tell you, Dr.
19 Keeling's concern is -- consistent with what he's
20 interested in doing and not interested in doing in this
21 case is he doesn't want to serve as an expert generally
22 for anybody in this case. So I think the way the
23 question is phrased leads him away from his evaluation on
24 this particular patient on this particular day.
25   MR. TRINE: Let me rephrase it.

91

1    Q.   (BY MR. TRINE) Doctor, under "Neuro," the
2 nurse's finding that this patient had headache and
3 dizziness would likewise be consistent with your own
4 diagnosis of pneumonia and sepsis; is that right?
5    A.   Yes.
6    Q.   And, Doctor, with regard to abdominal pain,
7 there is an indication that he's had three days of
8 abdominal pain on the right side and it's described as
9 being sharp. Would that be consistent with -- with your
10 diagnosis of pneumonia and sepsis?
11   A.   I think that that symptom would be more
12 consistent with pneumonia.
13   Q.   Than sepsis?
14   A.   Yes.
15   Q.   Okay. And then down under Cardiovascular --
16 I'm sorry -- Cardiopulmonary there is -- she's checked
17 off shortness of breath, cough that is productive, and I
18 can't interpret color. Can you interpret that? Is that
19 "bloody"?
20   A.   That's "bloody."
21   Q.   "Bloody." Okay. All of that, I assume, is
22 consistent with pneumonia -- with your diagnosis of
23 pneumonia?
24   A.   Again, working with the differential
25 diagnosis of other causes of shortness of breath, you can

92

1 see bloody sputum with pneumonia.
2    Q.   And under Respiratory Effort, there is a
3 check opposite. What is that? Dystonia?
4    A.   That's dyspnea, which is -- means shortness
5 of breath.
6    Q.   Okay. And that's consistent with your
7 diagnosis of pneumonia?
8    A.   Yes.
9    Q.   And under Lung Sounds, on rhonchi in the
10 right upper, right lower, left upper, left lower, that
11 would be consistent with your diagnosis of pneumonia?
12   A.   Yes.
13   Q.   And then under Interventions, it says,
14 Elevated HCV. Is that something that the nurse checked
15 off or something that you did?
16   A.   No.
17   MR. MURRAY: Where?
18   Q.   (BY MR. TRINE) This is all the nurse's?
19   MR. MURRAY: Where are you, Bill?
20   MR. TRINE: Under Interventions,
21 "Elevated" --
22   MR. MURRAY: "HOB."
23   MR. TRINE: That's an O.
24   MR. RINGEL: You need new glasses, Bill.
25   MR. TRINE: Boy, I do.

93

1      MR. MURRAY: Can't Bate stamp. Can't read.
2      MR. TRINE: I've got a C on mine.
3   Q. (BY MR. TRINE) What is HOB?
4   A. That's an abbreviation for head of bed.
5   Q. Okay. Okay.
6      MR. MURRAY: Key to the case, Bill.
7   Q. (BY MR. TRINE) Okay. And then the
8 handwritten note under Interventions indicates, Noted
9 increased shortness of breath, lungs with coarse rales.
10 All of that is, what, consistent with your diagnosis of
11 pneumonia?
12   A. Yes.
13   Q. And can you interpret or read the rest of
14 that line, after "coarse rales"?
15   A. Pulse ox difficult to assess on room air,
16 applied -- oxygen applied, saturation 90 percent,
17 4 liters, no radial pulse palpated, systolic blood
18 pressure 66 --
19      MR. MURRAY: IV.
20   A. Yeah. IV.
21      MR. MURRAY: Started --
22   A. Okay. IV started bilateral AC -- that would
23 be antecubital -- lactated Ringer's up times two, 1,000
24 cc's, labs drawn, to X-ray.
25   Q. (BY MR. TRINE) Let's stop there for a

94

1 moment. And apparently his O2 sats were only -- or were
2 at 90 percent before oxygen was administered, or was that
3 with oxygen?
4      MR. JURS: Asked and answered.
5   A. Oxygen applied, saturation 90 percent --
6   Q. (BY MR. TRINE) And so --
7   A. -- 4 liters.
8   Q. I'm sorry. So she was unable --
9      MR. MURRAY: Wait a minute. Bill, I
10 think -- are you finished with your answer?
11   A. I'm not -- I'm not sure how to interpret
12 what she wrote there.
13   Q. (BY MR. TRINE) Okay. So you don't know
14 whether that 90 percent O2 sats is after she applied the
15 oxygen or before?
16   A. That's correct.
17   Q. And when she states "no radial pulse," is
18 that -- do you know whether that means no radial pulse
19 palpable or palpated?
20   A. I read it as no radial pulse palpated.
21   Q. And do you remember attempting to get a
22 radial pulse?
23   A. I do not.
24   Q. And then there is an indication that at 1410
25 hours he continued to have a reduced blood pressure; is

95

1 that right?
2   A. Continued with low blood pressure, able to
3 stand.
4   Q. And then at 1430 hours there was an increase
5 in his blood pressure after being administered IV fluids?
6   A. Blood pressure increased IV fluids.
7   Q. So would you interpret the -- page 4 of the
8 nurse's notes as this patient not being in stable
9 condition upon arrival but by 1430 hours procedures had
10 been performed to begin stabilizing him?
11      MR. RINGEL: Object to the form and the
12 foundation.
13   A. I believe procedures to stabilize him were
14 initiated earlier than that, that he was stable but was
15 improving at 2:30 -- 1430.
16   Q. (BY MR. TRINE) Are you saying he was in
17 stable condition when his initial vital signs were taken?
18   A. No, I'm not.
19   Q. Okay. So he was not in stable condition
20 when he arrived, but steps were being taken right after
21 the nurse saw him to begin stabilizing his condition, and
22 it became stable. Is that a correct statement?
23   A. Well, I'm not entirely sure that he wasn't
24 stable when he arrived. I'm not sure who did the vital
25 signs that -- with a 66 over blank, and I'm not sure if

96

1 the blood pressure was repeated and not recorded after
2 that period of time but before -- you know, before the
3 IVs were up and running. There is a lapse in time in
4 there, so I'm not sure if I can say at what time . . .
5   Q. You're not sure you can say at what time he
6 became stable?
7      MR. JURS: Object to form.
8   A. I'm not entirely sure that he was unstable
9 when he arrived.
10   Q. (BY MR. TRINE) You said that you're not
11 sure who took these vital signs. I thought that you
12 identified this nurse as Colleen Seyer.
13   A. I don't -- it doesn't look to me like that's
14 her handwriting for the 12:45 or the numbers that follow
15 on that line. The temperature may be her handwriting.
16 It's difficult for me to know. That's -- it looks like
17 several different sets of handwriting on that one line.
18 The 6s look different between the blood pressure and the
19 pulse. The 2s look different between the pulse and the
20 respirations. To me it looks like it's -- it was a
21 collaborative thing. And I don't know if the blood
22 pressure wasn't -- who did it, if it was done correctly,
23 or if it was the cuff size was correct, et cetera,
24 et cetera.
25   Q. Doctor. you can say that about everything on

**101**

1 days.
2  Q. (BY MR. TRINE) Okay. And he claims to
3 have palpitations associated with the symptoms. What do
4 you mean by that?
5  A. That he was aware of his heart beating hard.
6  Q. And he complained of right pleuritic
7 nonradiating chest pain, and that, of course, was
8 consistent with your diagnosis of pneumonia?
9  A. Yes.
10  Q. And he told you that he had had multiple
11 episodes of vomiting for three days, correct?
12  A. Yes.
13  Q. And that would also be consistent with your
14 diagnosis of sepsis, wouldn't it?
15  A. Vomiting can be from a number of causes,
16 sepsis included.
17  Q. Okay. Now, on Lungs you indicate -- under
18 Review of Systems, on Lungs, that he had right rales
19 oscillated and bilateral rhonchi oscillated. You related
20 that to your diagnosis of pneumonia?
21  A. Yes. I'd like to point out that was under
22 Physical Examination.
23  Q. Right. I'm sorry.
24  A. Okay.
25  Q. That's fine. And then on Database, oxygen

**102**

1 sat 91 percent, and this is when he's on oxygen by
2 mask --
3  A. Yes.
4  Q. -- and not room air?
5  A. Yes.
6  Q. And we don't know what his O2 sats were on
7 room air.
8  A. No.
9  Q. And then, Doctor, looking at page 13 of
10 Exhibit 24, the abnormal results under Differential are
11 all consistent with sepsis; is that correct? The left
12 shift, the high bands.
13  A. Yes.
14  Q. The low lymphocytes and low segs, seg
15 neutrophils; is that correct?
16  A. Yes.
17  Q. And the platelet count of 118 is consistent
18 with septicemia; is that right?
19  A. Amongst other things, yes.
20  Q. And, Doctor --
21  MR. JURS: Form and foundation on the last
22 question.
23  Q. (BY MR. TRINE) -- as a patient goes into
24 septic shock, the platelet count goes lower and lower,
25 and that can be life threatening, is that right?

**103**

1  MR. JURS: Objection, form and foundation.
2  MR. MURRAY: Mr. Trine, I think that puts
3 into play my position about whether he is going to
4 provide testimony of a general nature, and he is not.
5  Q. (BY MR. TRINE) Doctor, were you at all
6 worried when you -- when you received the results and saw
7 what the platelet count was?
8  A. No.
9  Q. Because he was already in the hospital?
10  MR. MURRAY: Wait a minute. Wait a minute,
11 Bill, he has got his hand up. Are you finished?
12  THE WITNESS: No.
13  A. And I'm going to ask Mr. Trine to repeat
14 that question. I may have misunderstood it when I
15 started to answer.
16  Q. (BY MR. TRINE) Doctor, when you received
17 the results and saw the platelet count, were you worried
18 about that being possibly life threatening?
19  A. No.
20  Q. And is that because he was already in the
21 hospital when you received the results?
22  A. Platelet count of 119,000 I don't consider
23 life threatening.
24  Q. Okay. Was that platelet count consistent
25 with your diagnosis of septicemia or septic condition?

**104**

1  A. Yes.
2  Q. And likewise, on page 14, the comprehensive
3 metabolic panel, are those abnormal results consistent
4 with your diagnosis of a septic condition?
5  A. Yes.
6  Q. Doctor, do you recall having a conversation
7 with the officer who accompanied this patient or with
8 anyone from the Park County Jail asking if there -- if
9 this patient had any kind of preexisting condition, such
10 as HIV or colon cancer?
11  MR. JURS: Object to the form.
12  A. I don't recall. I do not recall that
13 conversation.
14  Q. (BY MR. TRINE) Do you remember anyone in
15 the emergency department reporting to you that the Park
16 County Jail was anxious to find out if he had a
17 preexisting condition or had colon cancer?
18  A. No.
19  MR. JURS: Form.
20  Q. (BY MR. TRINE) And, Doctor, do you
21 remember having a conversation with the officer who
22 accompanied Carranza-Reyes where there was some
23 disagreement about whether Carranza-Reyes should be
24 handcuffed and shackled before being put in the ambulance
25 for the trip down to Denver?