**1**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Case No. 2005-WM-377 (BNB)

DEPOSITION OF: GEORGE KENT ROHWER
September 18, 2006

MOISES CARRANZA-REYES,

Plaintiff,

v.

PARK COUNTY, a public entity of the State of Colorado and
its governing board, THE PARK COUNTY BOARD OF COUNTY
COMMISSIONERS; PARK COUNTY SHERIFF'S OFFICE, a public
entity of the State of Colorado; FRED WEGENER,
individually and in his official capacity as Sheriff of
Park County, Colorado; MONTE GORE, individually and in
his capacity as Captain of Park County Sheriff's
Department; VICKIE PAULSEN, individually and in her
official capacity as Registered Nurse for Park County,
Colorado; JAMES BACHMAN, M.D., individually and in his
official capacity as Medical Director of the Park County
Jail,
Defendants.

TAKEN PURSUANT TO NOTICE on behalf of the Defendants at
1435 Arapahoe Street, Boulder, Colorado 80302 at
10:07 a.m. before Laura L. Corning, Federal Certified
Realtime Reporter, Certified Shorthand Reporter and
Notary Public within Colorado.

**2**

APPEARANCES

For the Plaintiff:
WILLIAM A. TRINE, ESQ.
CHERYL TRINE, ESQ.
Trine & Metcalf, P.C.
1435 Arapahoe
Boulder, Colorado 80302

For the Defendants
Park County, Park
County Board of
Commissioners, Park
County Sheriff's Office,
Wegener and Gore:
JENNIFER L. VEIGA, ESQ.
Hall & Evans, LLC
1125 17th Street
Suite 600
Denver, Colorado 80202

For the Defendant
Paulsen:
JUSTIN C. BERG, ESQ.
Berg Hill Greenleaf
& Ruscitti, LLP
1712 Pearl Street
Boulder, Colorado 80302

For the Defendant
Bachman:
ANDREW W. JURS, ESQ.
Johnson McConaty
& Sargent, P.C.
400 South Colorado Boulevard
Suite 900
Glendale, Colorado 80246

Also Present:
None

**3**

INDEX
EXAMINATION OF GEORGE KENT ROHWER                    PAGE
September 18, 2006

By Mr. Trine:                                          4

By Ms. Trine:                                         --

By Ms. Veiga:                                         60

By Mr. Berg:                                          58

By Mr. Jurs:                                          34

                                                  INITIAL
DEPOSITION EXHIBITS:                             REFERENCE
84   Summit County Emergency Services Patient         9
     Contact Report

85   Summit Medical Center Emergency Department      11
     Record
86   DHMC Emergency Department Visit                 32
87   Transfer Consent                                50
(Original exhibits attached to original deposition; copy
exhibits included in continuing exhibit file; copies
provided to counsel as requested.)

REQUESTED PORTIONS OF TESTIMONY:                     PAGE
(None.)

REFERENCES TO EXHIBITS MARKED PREVIOUSLY:
(None.)

**4**

1    WHEREUPON, the within proceedings were taken
2 pursuant to the Federal Rules of Civil Procedure:
3    (Deposition Exhibits 84 through 87 were
4 marked.)
5        GEORGE KENT ROHWER,
6 having been first duly sworn to state the whole truth,
7 was examined and testified as follows:
8        EXAMINATION
9 BY MR. TRINE:
10    Q.   Would you please state your full name and
11 address for the record.
12    A.   George Kent Rohwer, R-o-h-w-e-r. My
13 address is 139 Eagle's Nest Trail, Kremmling, Colorado
14 80459. My -- do you want my mailing address as well?
15    Q.   That's fine. Okay. And what is your
16 occupation or profession?
17    A.   I'm a paramedic with Summit County
18 Ambulance Service in Frisco.
19    Q.   Would you -- would you briefly summarize
20 your educational background, experience and training as
21 it relates to your profession?
22    A.   Okay. I started in medicine in 1988. I
23 was a volunteer fireman with the Red, White and Blue Fire
24 Department in Breckenridge. I went on to get my EMT
25 intermediate in 1990.

*Coffman Reporting*

303.893.0202
303.893.2230 FAX
WWW.COFFMANREPORTING.COM

**EXHIBIT**

*18*

Pages 1 to 4

Carranza-Reyes v. Park County                                    George Kent Rohwer

---

17

1   Q.      What does that mean?
2   A.      In the triage codes there is red, yellow
3   and green, green being not very severe, they can wait.
4   We don't have to use the lights. We don't have to use
5   the sirens. Yellow is they're pretty sick. They have a
6   potential for worsening condition, but we'll just keep
7   them -- we'll just keep them going -- we'll just keep
8   moving towards the appropriate facility. Red is a
9   critical patient that needs to be transported as quickly
10  as possible.
11  Q.      And I notice that on that same page you've
12  put the total mileage at 85 miles?
13  A.      Um-hum.
14  Q.      And is that the mileage from the Summit
15  County facility going through Frisco and on to Denver
16  Health?
17  A.      Yes.
18  Q.      And you left -- in the ambulance you left
19  Summit County at what time?
20  A.      1555.
21  Q.      And you arrived at Denver Health at what
22  time?
23  A.      1655.
24  Q.      So you were averaging 85 miles an hour the
25  entire distance?

---

18

1   A.      Um-hum. Yes.
2   Q.      And going on with the call notes, after
3   that section, Patient moved to ambulance, transported
4   1040, would you read the rest of your notes and decipher
5   and explain them, please?
6   A.      Okay. The second -- the 2 with the degree
7   sign is my writing for secondary exam. His skin is warm
8   and diaphoretic.
9   Q.      What do you mean "diaphoretic"?
10  A.      Sweaty. His pupils are equal and reactive
11  to light. His chest has wheezing in all fields, extreme
12  shortness of breath. His abdomen, he is nauseated;
13  pelvis and his upper extremities are negative; movement
14  causes shortness of breath; complains of right lateral --
15  which is his side -- chest discomfort. The Levaquin,
16  which was started at Summit Medical Center, was
17  finished -- was running IV at 400 cc's per hour. The
18  cardiac monitor showed a sinus tachycardia without
19  changes.
20          En route his breathing remained difficult.
21  He vomited -- vomited blood -- blood-tinged two times,
22  approximately 10 cc's, and then we did a transfer again
23  at 1700 at Denver Health and there was no further
24  incident.
25  Q.      Okay. So you arrived at Denver Health at

---

19

1   1655 and apparently took about five minutes to get him
2   inside?
3   A.      It takes some time to get him inside, yes.
4   Q.      Now, under "Treatments" on that first page
5   of Exhibit 84, would you read that and decipher and
6   explain it?
7   A.      Okay. 1555 the patient was loaded into the
8   ambulance. He was on oxygen with a nasal cannula and a
9   nonrebreather. The cardiac monitor was in place and he
10  had two IVs. There were 950 cc's out of one bag and
11  there were 900 cc's out of the other bag. Levaquin, he
12  had 50 cc's in, and his pulse ox was applied. You can
13  see what his saturation was on the vital signs.
14  Q.      Okay. So --
15  A.      No. I'm -- let me --
16  Q.      Yeah. Continue.
17  A.      -- backtrack a little bit. I monitored the
18  IVs. Cardiac monitor was put in place at 1608.
19  Q.      Okay.
20  A.      At 1610 he had 2,000 cc's. I changed the
21  bags.
22  Q.      Now -- excuse me -- does that mean that the
23  2,000 cc's were administered en route?
24  A.      He had had a total of 2,000 cc's.
25  Q.      And that IV was already running when he

---

20

1   was --
2   A.      It was down -- one of them was down --
3   there was only 100 cc's left in the one bag and there
4   were only 50 cc's in another bag. So they were completed
5   and I hung two new bags of, I'm assuming, normal saline,
6   since that's all we carry, and then the IVs were
7   continued.
8   Q.      What is the Levaquin?
9   A.      Levaquin is an antibiotic that was started
10  at Summit Medical Center, and 1630 that's when the
11  Levaquin ended.
12  Q.      Okay. Now, looking at vital signs on that
13  page, on Exhibit 84, apparently the first vital signs
14  that you took was at 1608.
15  A.      Um-hum.
16  Q.      And what was your assessment of the vital
17  signs?
18  A.      Well, his blood pressure was 110 by
19  palpation, and usually when -- usually in the
20  ambulance -- I believe that was before we had a
21  monitoring -- we had vital sign monitoring devices.
22          With a 110, the way that we take their blood
23  pressure is we'll pump the cuff up to a higher number,
24  we'll feel for a radial pulse and then let the air out,
25  and as the air goes out, when you start to feel a radial

---

*  SUBJECT TO CONFIDENTIALITY DESIGNATIONS  *

21

1  pulse again, then that's the systolic number, which is
2  the top number.
3        You can't -- because you're not listening.
4  you can't get a second number, diastolic number. So we
5  just palpate it, because it's accurate, and it's just an
6  easier way to do it than trying to listen to them while
7  you're rolling down the highway.
8     Q.   Okay. And -- and you measured the heart
9  rate?
10    A.   Um-hum.
11    Q.   And respiration?
12    A.   Yeah. You observe the respirations, rise
13 and fall of his chest and then the pulse oximetry
14 reading, which is 91 percent, is done with a finger probe
15 stuck on the end of the finger.
16    Q.   And that's with his getting the oxygen from
17 two sources?
18    A.   Yes.
19    Q.   So how did you generally assess his overall
20 condition as an EMT on this trip to Denver?
21        MR. JURS: Objection to form and
22 foundation. I get to object to his questions, and you
23 should answer them, unless -- well --
24    Q.   (BY MR. TRINE)  You can answer the
25 question.

22

1     A.   What's the question again?
2     Q.   How did you assess as an EMT his overall
3  general condition on this trip to Denver?
4     A.   Clinically, with the wheezing in the chest
5  and his presentation of his posture, the difficulty that
6  he was having breathing, the pain in his chest and his
7  general appearance, he was very sick.
8     Q.   Now, I notice under Breath Sounds, it looks
9  like a line has been run through the word "wheezing" on
10 right and left, and "rhonchi" written in. Is that your
11 handwriting?
12    A.   Yes, it is.
13    Q.   And -- and why was that change made and
14 when was it made?
15    A.   It was made sometime en route. When I
16 initially listened to him, it sounded like he was having
17 wheezing in his chest, but then when I assessed him
18 again, it sounded like he had more moist, wetter sounds
19 in his chest.
20    Q.   And what is -- is that the definition of
21 rhonchi?
22    A.   Yeah. Moisture.
23    Q.   Moisture?
24    A.   Yeah. More moisture.
25    Q.   And how -- how do you determine the

23

1  difference between wheezing and -- and rhonchi when
2  you're actually doing an evaluation?
3     A.   It's just the two different sounds that
4  they make. It's -- assessing lung sounds are pretty
5  object -- pretty -- it's -- leaves you up to a lot of
6  interpretation. Wheezing would be more of a squeaking
7  sound, and rhonchi would be more like -- just as an
8  example that you could relate to, like taking soda out of
9  the bottom of a -- with a straw. It's a wetter sound.
10 It kind of gurgles a little bit more.
11    Q.   Okay. And what position was Mr. Carranza-
12 Reyes in when being transported in the ambulance?
13    A.   He spent the whole -- the whole -- the
14 entire trip upright with his arms back, and I believe he
15 was kind of leaning over to his left-hand side and
16 supporting his -- supporting his weight on a handrail,
17 which people with respiratory distress will do that.
18 That's how they prefer to be. If you lay them back, they
19 will not tolerate it.
20        I would say bolt upright -- bolt upright and
21 leaning to the side. But he was agitated. He was moving
22 quite a bit, if I recall correctly.
23    Q.   Now, if you look at page 1 of 4 of
24 Exhibit 84, you have under Findings, "Level of
25 discomfort: Severe," and is there anything else that you

24

1  observed about his condition that caused you to believe
2  he was in severe discomfort, other than what you've
3  already described?
4     A.   Just his vital signs and his discomfort.
5     Q.   Okay. And, "Level of distress: Severe."
6  What's the difference between discomfort and distress?
7  Are they essentially the same?
8  -  A.   They're -- they're -- kind of go hand in
9  hand, I would say.
10    Q.   And then "On-Scene Condition," does that
11 mean while in the ambulance or when you first arrived at
12 the Summit?
13    A.   That's primarily in the ambulance. That is
14 all in the ambulance.
15    Q.   And what do you mean by "accessory muscle
16 usage"?
17    A.   You know, when a person breathes normally,
18 they just use their diaphragm. When somebody is in
19 distress, they'll use their neck muscles, because it is
20 just harder to -- harder to draw a breath, so they use
21 their neck muscles, they use the muscles in their chest.
22 It's like trying to breathe through a straw.
23    Q.   Okay. And then under Suspected Origin,
24 "pulmonary edema," is that your assessment or something
25 that the nurse told you?

Pages 21 to 24

---

**29**

1   A.   No.
2   Q.   As an EMT, are you taught what to look for
3   in the way of clinical signs and symptoms of a patient
4   that may be in septic shock?
5   A.   Yes.
6   Q.   And from your observations, did this
7   patient have any of the signs and symptoms of septic
8   shock while in transport to Denver General?
9        MR. JURS: Objection.
10       MR. BERG: Objection.
11       MR. JURS: Foundation.
12   Q.   (BY MR. TRINE)  You can answer.
13   A.   Respiratory, septic shock, there is
14   hypovolemia. I can't say specifically septic shock, but
15   I can say he was in shock, either respiratory,
16   hypovolemic, and septic shock certainly falls in there as
17   well. Those are three that I can give him.
18   Q.   Okay. So speaking, then, just of shock,
19   without knowing whether it's hypovolemic --
20   A.   Without being specific, yeah, I would
21   say --
22       MR. JURS: Form, foundation.
23   Q.   (BY MR. TRINE)  -- what signs and symptoms
24   of shock did he have?
25       MR. JURS: Form and foundation.

---

**30**

1        THE DEPONENT: Go ahead.
2   Q.   (BY MR. TRINE)  Yeah.
3        MR. JURS: Please, continue. Sorry.
4   A.   Okay. The low blood pressure that he
5   presented with, both with me as well as Summit Medical
6   Center; his rapid heart rate, which was up in the low to
7   mid 150s; his respiratory rate, which went from 60 to 42
8   at the rate; the delivery system of both a nasal cannula
9   and a nonrebreather, his saturations never got above 92;
10   also his level of discomfort and the way he presented
11   would lead me down the path of shock.
12   Q.   (BY MR. TRINE)  Okay. Looking at the
13   Summit County medical records, Exhibit 85, as well as
14   your records, which is Exhibit 84, what is the difference
15   in vital signs on the Summit County medical records when
16   he first arrived as compared to the vital signs when you
17   took over his care?
18   A.   Of course I wasn't there when the clinic
19   took these vital signs. I hadn't been dispatched yet.
20   With the -- with him getting -- getting fluid
21   resuscitation, his blood pressure went from 66 -- and
22   they didn't have a lower number, which --
23   Q.   Lower number meaning diastolic?
24   A.   Diastolic number. Yes.
25   Q.   Okay.

---

**31**

1   A.   Didn't have a diastolic number. When I
2   first took charge of the patient, his blood pressure had
3   increased to 110 by palpation, which there's also not a
4   second number.
5        His pulse rate was 156 when I had him, and
6   his initial blood pressure was -- or his initial heart
7   rate was 66. His respiratory rate had increased from
8   24 up into the 40s, as I have them documented.
9        A big one is initially his room air
10   saturation -- I'm assuming that's a room air
11   saturation -- was in the 40s, and with treatment he
12   increased to 91 percent.
13   Q.   91 percent was with oxygen?
14   A.   I'm assuming, yes.
15   A.   Not on room air.
16   A.   Not on room air.
17   Q.   So would your assessment as an EMT be that
18   he was stable or unstable on arrival at Summit County?
19       MR. JURS: Form, foundation.
20       MR. BERG: Objection to form.
21       MS. VEIGA: Objection to form.
22   A.   I would say he was unstable when he arrived
23   at Summit Medical Center.
24   Q.   (BY MR. TRINE)  And after getting treated
25   at Summit Medical Center, when you took over his care,

---

**32**

1   was his condition still unstable?
2   A.   It was.
3        MR. JURS: Form and foundation.
4   Q.   (BY MR. TRINE)  Or had they stabilized it?
5   A.   He was more stable.
6   Q.   Okay. And then if you look at what's been
7   marked -- I don't see that -- oh, here it is --
8   Exhibit 86, the emergency department record at Denver
9   Health, and if you look at the medical screening exam
10   which is at the bottom, has the Bates stamp of
11   DHMC0053 --
12   A.   Okay.
13   Q.   -- do you see that there is a Medical
14   Screening Exam category and also Vital Signs?
15   A.   Um-hum. Yes, sir.
16   Q.   And what is the difference in the vital
17   signs, if any, when they screened him at Denver Medical
18   Center as compared to the last vital signs that you took?
19   A.   His blood pressure had gone down or they
20   got a different reading than I. His heart rate was about
21   the same. His respiratory rate was essentially the same.
22   His pulse oximetry -- I believe that's a 78 percent. It
23   doesn't say on here whether he's -- stays on a nasal
24   cannula and a mask. And then also the pain score, the
25   five out of ten for pain.

---

*  SUBJECT TO CONFIDENTIALITY DESIGNATIONS  *