**1**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Case No. 05-CV-377-WDM-BNB

DEPOSITION OF: VINCE MARKOVCHICK, M.D.
April 11, 2006

MOISES CARRANZA-REYES,
Plaintiff,
v.
PARK COUNTY, a public entity of the State of Colorado and its governing board, THE PARK COUNTY BOARD OF COUNTY COMMISSIONERS; PARK COUNTY SHERIFF'S OFFICE, a public entity of the State of Colorado; FRED WEGENER, individually and in his official capacity as Sheriff of Park County, Colorado; MONTE GORE, individually and in his capacity as Captain of Park County Sheriff's Department; VICKIE PAULSEN, individually and in her official capacity as Registered Nurse for Park County, Colorado; JAMES BACHMAN, M.D., individually and in his official capacity as Medical Director of the Park County Jail,

Defendants.

TAKEN PURSUANT TO NOTICE on behalf of the Defendant Bachman at 660 Bannock Street, Denver, Colorado 80204 at 9:09 a.m. before Rebecca S. Tafoya, Registered Professional Reporter and Notary Public within Colorado.

**2**

APPEARANCES

For the Plaintiff:
WILLIAM A. TRINE, ESQ.
Trine & Metcalf, P.C.
1435 Arapahoe Avenue
Boulder, Colorado 80302

JOSEPH J. ARCHULETA, ESQ.
Law Office of Joseph J. Archuleta
1724 Ogden Street
Denver, Colorado 80218

For the Defendants Park County, Park County Board of Commissioners, Park County Sheriff's Office, Wegener and Gore:
GILLIAN DALE, ESQ.
Hall & Evans, LLC
1125 17th Street
Suite 600
Denver, Colorado 80202

For the Defendant Paulsen:
MELANIE B. LEWIS, ESQ.
Berg Hill Greenleaf & Ruscitti LLP
1712 Pearl Street
Boulder, Colorado 80302

For the Defendant Bachman:
ANDREW W. JURS, ESQ.
Johnson, McConaty & Sargent, P.C.
400 South Colorado Boulevard
Suite 900
Glendale, Colorado 80246

Also Present: None

**3**

I N D E X
EXAMINATION OF VINCE MARKOVCHICK, M.D.    PAGE
April 11, 2006

By Mr. Trine                              41
By Mr. Archuleta                          --
By Ms. Dale                               37
By Ms. Lewis                              48
By Mr. Jurs                               4, 47

DEPOSITION EXHIBITS:                      INITIAL REFERENCE
39   Denver Health Medical Center         5
     Emergency Department records,
     3/8/03
(Originals exhibits attached to original deposition; copy exhibits included in continuing exhibit file; copies provided to counsel as requested.)

REQUESTED PORTIONS OF TESTIMONY:          PAGE

Request for document production          —
or information
Certified question                        --
Instruction not to answer                 --
Other requests or marked testimony        --

REFERENCES TO EXHIBITS MARKED PREVIOUSLY:

(None.)

**4**

1    WHEREUPON, the within proceedings were
2 taken pursuant to the Federal Rules of Civil
3 Procedure:
4    (Deposition Exhibit 39 was marked.)
5    VINCE MARKOVCHICK, M.D.,
6 having been first duly sworn to state the whole
7 truth, was examined and testified as follows:
8         EXAMINATION
9 BY MR. JURS:
10   Q.  Sir, my name is Andrew Jurs, and I
11 represent Dr. James Bachman in this litigation, and
12 we met off the record, but I wanted to reintroduce
13 myself. I also wanted to thank you for your time
14 today, because you made yourself available so
15 quickly, and that's extremely convenient for us,
16 and I wanted to thank you on behalf of the
17 litigation.
18        Could you please state your full name
19 for the record.
20   A.  Vincent John Markovchick.
21   Q.  And what is your business address, sir?
22   A.  Department of emergency medicine, Denver
23 Health, 777 Bannock Street, Denver, 80204.
24   Q.  Have you been deposed before in a legal
25 setting like this?

Coffman Reporting
303.893.0202
303.893.2230 FAX
Pages 1 to 4

EXHIBIT 19

* SUBJECT TO CONFIDENTIALITY DESIGNATIONS *

**21**

1  minutes, the time that the ambulance arrived, yes.
2     Q.  Are you able to determine what -- the
3  first time you saw the patient?
4     A.  First time I saw the patient?
5     Q.  Yes.
6     A.  No. It's not noted on the medical
7  records, but I'm sure I saw him. According to the
8  nurse's notes -- I probably didn't see him when
9  he -- immediately on arrival because I'm focusing
10 on our six major resuscitation rooms, and I see
11 those patients first. But when the patient was
12 noted to desat rate, drop his oxygen saturations
13 and his blood pressure --
14    Q.  And which page are you looking at, sir?
15    A.  I'm looking at page 0055, the nursing
16 notes, where it says, 1810, moved to 2B. So I
17 would have become aware of him probably around 6:00
18 p.m. or a little before 1810. That would have been
19 the latest that I knew about him.
20        When it was called -- it would be called
21 to my attention that the patient is deteriorating
22 or -- or is getting sicker, and then either I or
23 the senior resident made the decision to move him
24 from the -- from a normal treatment room to a
25 resuscitation room, because it became obvious to us

**22**

1  that we were going to have to intubate the patient
2  at that time.
3     Q.  And that was -- the move to 2B, that's a
4  resuscitation room?
5     A.  Correct.
6     Q.  And that would be done on order of a
7  physician?
8     A.  Yes.
9     Q.  But in this particular case you're not
10 sure if that was done on your order or a resident's
11 order?
12    A.  Yeah. I'm not sure if it was the senior
13 resident or me that ordered the patient to be moved
14 to the front room.
15    Q.  But it's possible that that was the
16 first time you became aware of this particular
17 patient's condition?
18    A.  Sure, it's possible. I mean, I don't
19 know if I saw him shortly after he arrived at -- at
20 5:10. I know I saw him when he was moved to the
21 front room.
22    Q.  Okay. Do you recall meeting with this
23 patient and examining him to -- as a physician
24 would in the ER to determine what was going on with
25 the patient?

**23**

1     A.  No, I don't recall this patient
2  specifically at all. I can only refer to the
3  notes.
4     Q.  When you did have an opportunity to
5  examine the patient, what were your observations?
6  And if you could tell me what page you're looking
7  at.
8     A.  Well, the brief note I made is on page
9  0052, where I reference back to the resident's
10 notes that basically indicate at the time the
11 resident saw the patient, his oxygen saturation was
12 low and that it was only 91 percent on a
13 nonrebreather mask. His heart rate was very high,
14 at 150. He was hypotensive, at 76 over 52. Very
15 tachypneic, at a respiratory rate of 40, and had an
16 elevated temperature of 38.2.
17        And then clearly he -- so the 91 percent
18 is acceptable oxygenation at that time, but then he
19 dropped his saturations to 78 percent, and that is
20 when we moved him up front to -- because it was
21 clear to us that we had to paralyze him and
22 intubate him. And then -- let's see. Basically --
23 so basically I clearly got involved at that point
24 in time. He --
25    Q.  And that's at 6:10 p.m.?

**24**

1     A.  Well, it was -- it would have been
2  shortly before that or no later than 6:10 p.m.
3     Q.  Okay.
4     A.  And I was with him for a -- for 30
5  minutes constantly, and that is the critical care
6  note, Critical care time 30 minutes, unable to get
7  oxygen saturat --
8     Q.  Which one are you reading?
9     A.  It's my note on 0052 at the bottom of
10 the page, where I talk about, Critical care time,
11 unable to get O2 sat. I meant O2 sat up.
12 Decreased blood pressure, decreased pulse, very
13 labored respirations. And then the note about
14 rapid sequence intubation with a Number 8 tube on
15 the first attempt.
16        And I reviewed his chest X-ray, which
17 I -- we would have taken a chest X-ray immediately
18 after intubating him, and he had pneum -- a
19 bilateral pneumonia on the chest X-ray. And my --
20 I'm sorry.
21    Q.  No, please continue.
22    A.  And my diagnoses were respiratory
23 failure, acute pneumonia. Let's see. And sepsis.
24    Q.  Are you --
25    A.  And he really was in septic shock.

29

1  pneumonia, but that he was not critical; however,
2  your opinion changed during his stay at the
3  emergency department, and you changed the
4  condition?
5    A.  Correct.
6    Q.  Okay. And that would have been because
7  of the lowered O2 sats --
8    A.  And the lowered blood pressure.
9    Q.  If you could flip to page 0052, please,
10 sir.
11   A.  Yes.
12   Q.  You indicated that this document was
13 filled out by yourself, and I'm wondering if you
14 would be kind enough to read each one of these
15 entries just so we have --
16   A.  Sure.
17   Q.  -- a clear record.
18   A.  On the top is, I performed a history and
19 physical on this patient and observed his
20 management -- and discussed his management with Dr.
21 Mitchusson, the emergency medicine resident. I
22 have reviewed and agree with her documentation and
23 care plan. And then where it says, X-ray re --
24 it's X-ray reviewed by me. That was a chest
25 X-ray. Infiltrate, right middle lobe, right lower

30

1  lobe.
2         Assessment: One, respiratory failure;
3  two, acute pneumonia. And I may have written in
4  there, Rule out pulmonary embolus as well. Then
5  under Procedures I really put the additional note
6  in the wrong place, which is why I circled it with
7  an arrow. Critical care time 30 minutes, unable to
8  get increased O2 sat, decreased -- decreased blood
9  pressure, increased pulse, increased respiratory
10 rate, very labored.
11        And then under procedures participated
12 in by me, Rapid sequence intubation with a Number 8
13 tube on first attempt. That's what that sheet
14 says.
15   Q.  Could you turn to page 0053, please.
16   A.  Yes.
17   Q.  And what is this document?
18   A.  That is the nursing medical screening
19 exam done on -- by the -- a nurse on his arrival.
20   Q.  Is there anything on this page that you
21 filled out personally?
22   A.  No.
23   Q.  And who was the nurse who filled out
24 this document?
25   A.  Kerri Wenke. It looks -- the signature

31

1  is -- that's who -- I believe whose signature that
2  is.
3    Q.  Is Kerri Wenke an R.N.?
4    A.  Yes, I believe she is -- yes, she's an
5  R.N.
6    Q.  Is she -- she? She -- it's a woman?
7  Kerri?
8    A.  I believe so. Yeah, I mean, I can't
9  remember every one of our nurses, but I believe so.
10   Q.  Is she someone you've worked with in the
11 past?
12   A.  Yes.
13   Q.  Do you rely on her notes to make
14 evaluations of patients?
15   A.  Yes.
16   Q.  Did you do so in this case?
17   A.  I don't recall. I mean, I don't recall
18 if I -- when I saw the patient, it was pretty
19 obvious what we needed to do. I don't think I went
20 back and reviewed the nursing notes, except to get
21 what the vital signs were.
22   Q.  And the vital signs are in column two at
23 the top there. Would those be the signs upon entry
24 to the emergency department?
25   A.  Those would have been the first set of

32

1  vital signs that were taken shortly after arrival.
2    Q.  And so at the time you filled out the
3  admission report in which you initially checked
4  that the patient's condition was serious, those
5  would have been the vital signs that you were aware
6  of for this patient?
7    A.  I don't recall. I don't recall how we
8  got from -- specifically from serious to critical,
9  but those vital signs indicate a critical patient.
10   Q.  These do?
11   A.  So when I became -- you know, I'm not
12 sure if the doctor came to me -- the resident came
13 to me and said, you know, this person needs to be
14 admitted to the ICU. But clearly when I became
15 aware of how sick he was, I changed his condition
16 from serious to critical. I don't know exact
17 timing of that.
18   Q.  In the second column about halfway down,
19 there's a box indicating mental status?
20   A.  Yes.
21   Q.  And the three boxes that are checked in
22 that area are Alert, Conscious and Cooperative?
23   A.  Yes.
24   Q.  Is that consistent with your observation
25 of this patient?

33

1  A. I don't recall. As I told you, I don't
2  recall observing the patient. All I can do is read
3  the docs.
4  Q. Okay.
5  A. I don't recall. I can't recall from
6  three years ago when I see 5,000 patients a year.
7  I just don't know.
8  Q. Okay. The admission in this case was at
9  what time?
10 A. He left the emergency department at
11 1845.
12 Q. From that point forward were you
13 involved in any of the patient care in this case?
14 A. No.
15 Q. Would this patient be placed into the
16 lockdown unit that is here in Denver Health?
17 A. No.
18 Q. Is that because of his seriousness of
19 his condition?
20 A. It's because he's being admitted to an
21 intensive care unit, and that's not a locked unit.
22 Q. Do you know what happened to this
23 patient after he was admitted?
24 A. I didn't know what happened to him until
25 I spoke with the attorney a couple weeks ago. You

34

1  know, it's conceivable I heard about it afterward,
2  but I don't recall specifics, and I didn't know
3  what happened to him until I found out that this
4  case had been filed.
5  Q. And that was when you spoke to Mr. Trine
6  a few weeks ago?
7  A. Yes.
8  Q. Could you tell us what Mr. Trine told
9  you about this patient's course after you saw him?
10 A. Yes. That basically he had group A
11 strep, pneumonia and sepsis and had a long, rocky
12 course with multiple organ failure, which is the
13 normal course of someone who has group A strep and
14 sepsis. And ultimately survived with some
15 disabilities.
16 Q. Anything else that you recall?
17 A. No.
18 Q. Is that meeting -- that one meeting with
19 Mr. Trine the only time you've met with either
20 plaintiff's counsel or someone who is an agent for
21 the plaintiff?
22 A. Yes.
23 Q. What else can you tell us about that
24 meeting?
25 A. He called and asked if he could come to

35

1  my office and ask some questions about the medical
2  record, and I said yes, but I also told him that --
3  that I wasn't in any position to be a medical
4  expert or to render any opinions about someone
5  else's care in this case. Obviously, since I was
6  involved for an hour and 40 minutes in this
7  patient's care while he was in the emergency
8  department, I certainly would be happy to answer
9  questions about the care rendered in the ED.
10 Q. Anything else?
11 A. No.
12 Q. Do you remember how long that meeting
13 lasted?
14 A. I don't know. 45 minutes, 30, 45
15 minutes. Something like that.
16 Q. And during that time you also had a
17 chance to review the records, medical records in
18 this case?
19 A. Yes.
20 Q. Did you see any documents or records
21 besides the medical records that we've gone over
22 that are in the exhibit?
23 A. I -- as I said, I did see the dictated
24 note from the doctor at the Summit Medical Center,
25 and I may have seen a radiology or lab report from

36

1  up there as -- attached to that record. And I
2  think I saw a summary or something from the doctor
3  at the Summit Medical Center, and I may have seen a
4  radiology or lab report from up there as --
5  attached to that record.
6        And I think I saw a summary or something
7  from the intensive care unit here which were
8  attached to those records as well. In fact, I know
9  I saw some -- the initial ICU note, because I
10 identified Dr. Douglas as being the attending
11 physician in the -- in the medical ICU.
12 Q. Did you see any documents that you
13 thought may have been legal documents that had been
14 filed in this lawsuit?
15 A. No.
16 Q. Okay.
17 A. You know, I don't know if he gave me a
18 copy of the complaint or not. I don't recall. I
19 mean, I have it in my file, but I -- quite
20 honestly, it didn't really concern me.
21 Q. Okay. I think we already have this, but
22 I want to be a hundred percent sure. There's
23 nothing about this case that you recall that's not
24 in the medical records? Every -- let me rephrase
25 that. I'm sorry.

41

1  significantly ill in any way with an infectious
2  disease that we can get a specimen, blood and/or
3  pus or whatever we can culture.
4         MS. DALE: I just want to take a quick
5  look at my notes. Did you need to ask anything?
6         MS. LEWIS: (Ms. Lewis shook her head.)
7         MS. DALE: That's all I have. Did you
8  have anything else, Andrew?
9         MR. JURS: No. I --
10        MR. TRINE: Yeah, I have some
11 questions.
12             EXAMINATION
13 BY MR. TRINE:
14   Q.  Doctor, with regard to the various
15 diagnoses that you mentioned earlier, first with
16 regard to septic shock, how was that diagnosed in
17 this case; that is, what signs, symptoms or tests
18 supported septic shock?
19   A.  Well, basically --
20        MR. JURS: Object to form.
21   A.  -- low blood pressure, which the patient
22 did have, although it did come up in the emergency
23 department with aggressive fluid resuscitation
24 before he went upstairs. It came up to about 104
25 systolic, but he had hypotension.

42

1         And on Dr. Mitchusson's note she notes
2  acute renal failure. And if you notice above on --
3  this is 0051, she -- there's a circle around
4  "5.8." That's the patient's creatinine. So that
5  tells us that he had acute renal failure at that
6  time. We had that blood test back right before he
7  went upstairs.
8         And so hypotension, the fever, an
9  obvious source for an infection, pneumonia and
10 renal failure. So hypotension and organ failure in
11 the face of what appears to be an infectious
12 etiology defines septic shock. And so he had
13 septic shock when we admitted him.
14        (BY MR. TRINE) And --
15   A.  In septic shock.
16   Q.  And was he treated for the renal
17 failure?
18   A.  Well, the initial treatment for the
19 renal failure is aggressive hydration and get his
20 blood pressure back up, and that's all we could do
21 in the emergency department. And we did put a
22 Foley catheter in, and we would want to monitor
23 urine output as well.
24   Q.  And you indicated he had pneumonia in
25 both lungs, and I assume that was diagnosed with

43

1  the X-rays and clinically?
2    A.  That was diagnosed by X-ray and
3  clinically, and also Dr. Mitchusson notes, Blood
4  cultures times two were taken at Summit Medical
5  Center. So that's the reason we didn't do blood
6  cultures in the ED. They had already been drawn up
7  there, and they were drawn before he got
8  antibiotics up there, which is the Levaquin, which
9  is the reason we didn't give him antibiotics in our
10 department, because he already had the antibiotic,
11 the same dose -- or -- that we would have given
12 him.
13        So I'm sure we had gotten that report
14 either from -- via Dr. Shockley that he had gotten
15 both blood cultures and Levaquin in Summit before
16 they transferred him to us.
17   Q.  And did you commence treatment or do any
18 treatment for the pneumonia in both lungs before he
19 was transferred to ICU?
20   A.  Yes. We intubated him and put him on a
21 ventilator and paralyzed him so we could take over
22 his breathing. I mean, because he was in pneumonia
23 with now respiratory failure. And so in addition
24 to the antibiotics he had already gotten at Summit
25 Medical Center, we now intubated him and took over

44

1  his breathing.
2    Q.  And I noticed somewhere in the records
3  that there was a diagnosis of ARF, A-R-F?
4    A.  Acute renal failure.
5    Q.  Okay. And based on his condition in the
6  emergency room, how severe was the septic shock on
7  arrival?
8         MR. JURS: Objection, form, foundation.
9         MS. LEWIS: And just for the record,
10 we'll just join in the objections instead of each
11 saying join, if that's okay with you, Mr. Trine.
12   A.  Well, I don't know exactly how to answer
13 that. It depends on a lot of issues, what's
14 causing it. We didn't know what the bacteria
15 cause -- we were presuming it was pneumococcus,
16 which is community-acquired pneumonia, which
17 previously healthy people get all the time, and it
18 can cause sepsis and septic shock.
19        So it depends what's causing it, how
20 healthy the host is, how many organs are failing.
21 We could id -- only identified at that time two,
22 respiratory failure and renal failure. So it was
23 severe, but I don't know how to answer how severe.
24 That would be an answer -- a question to ask a
25 critical care doctor.

Carranza-Reyes v. Park County                                              Vincent Markovchick, M.D.

**Page 45**

1  Q. (BY MR. TRINE) Okay. And then, Doctor,
2  can -- you were asked some questions about MRSA.
3  Can MRSA arise from pneumonia resulting from lung
4  disintegration?
5      MR. JURS: Form, foundation.
6  A. I would defer to a critical care
7  doctor. I know that patients admitted to the
8  hospital with one diagnosis, if they're
9  hospitalized for prolonged periods and they're very
10 ill, they could actually develop MRSA while they're
11 in the hospital. So I would defer to a critical
12 care or infectious disease doctor to answer that.
13 Q. (BY MR. TRINE) And do you recall
14 whether Dr. Douglas was actually in the emergency
15 room with you at time of transfer?
16 A. I don't recall if he came down to see
17 the patient or not. He usually doesn't, but
18 sometimes he will come down. Most of the times he
19 sees them when they get to the intensive care unit.
20 Q. Okay. And was there any indication in
21 the emergency room records of hypovolemic shock as
22 well as septic shock?
23 A. That's not documented, but there is a
24 capacitance type of shock along with sepsis that is
25 a form of hypovolemia, which is again why we gave

**Page 46**

1  him a fair amount of IV fluid in the ED.
2  Q. And with septic shock did he also have
3  evidence then of DIS?
4  A. I don't know what DIS is.
5  Q. Well, did he have any evidence of
6  microvascular clots in the blood vessels being
7  created by the septic shock?
8  A. Not at the time we saw him in the
9  emergency department. There was no evidence that
10 he was having any abnormal bleeding.
11 Q. And based on his overall condition in
12 the emergency department, would he have died in a
13 short period of time without treatment?
14 A. Absolutely.
15     MR. JURS: Form and foundation.
16 Q. (BY MR. TRINE) And would you explain
17 that, please, Doctor.
18 A. Well, anybody in septic shock, the -- it
19 carries a 10 to 90 percent fatality rate depending
20 on what the cause is, how old the patient is, what
21 their underlying condition is. Group A-based strep
22 sepsis has got a 30 to 60 percent mortality, and
23 certainly if these patients aren't aggressively
24 treated not only with antibiotics but all kinds of
25 supportive care, most will die. If they are

**Page 47**

1  aggressively treated, nowadays most will survive.
2  Q. And then, Doctor, there is some
3  indication in the records that he went into cardiac
4  and respiratory arrest that evening on the 8th.
5  Were you present when that occurred?
6  A. No. That -- that occurred -- that would
7  have occurred up in the intensive care unit.
8     MR. TRINE: Okay. That's all I have,
9  Doctor. Thank you.
10    MR. JURS: Just one or two follow-ups,
11 if I could.
12              EXAMINATION
13 BY MR. JURS:
14 Q. You indicated Dr. Mitchusson had
15 indicated a creatinine level of 5.8 on page 51 of
16 Exhibit 39?
17 A. Yes.
18 Q. Do you have any idea when that test
19 result came back?
20 A. Well, it would have come back --
21 obviously, it would have been drawn shortly after
22 he arrived in the ED, and it would have come back
23 sometime before 1845. It usually takes about 45
24 minutes for that test to come back.
25 Q. Do you have any idea if you were aware

**Page 48**

1  of that reading when you admitted this patient to
2  the hospital?
3  A. Yes, I was aware of that.
4     MR. JURS: Okay. I have no further
5  questions.
6     MS. LEWIS: I just have a couple
7  questions.
8              EXAMINATION
9  BY MS. LEWIS:
10 Q. Doctor, do you know what symptoms that
11 Mr. Carranza-Reyes presented with when he was at
12 the jail?
13 A. No, I have no idea.
14 Q. And just so I understand you correctly,
15 you're not making any conclusions or offering
16 opinions on the propriety of the treatment he
17 received by the nurse at the jail, are you?
18 A. No, I am not.
19    MS. LEWIS: That's all I have.
20    MS. DALE: Nothing.
21    MR. JURS: Thank you. .
22    WHEREUPON, the within proceedings were
23 concluded at the approximate hour of 10:15 a.m.
24 this 11th day of April, 2006.
25     *     *     *