## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 05-cv-377-WDM-BNB

MOISES CARRANZA-REYES,
Plaintiff,
v.
PARK COUNTY, a Public Entity of the State of Colorado and its Governing Board, and

THE PARK COUNTY BOARD OF COUNTY COMMISSIONERS, and
PARK COUNTY SHERIFF'S OFFICE, a Public Entity of the State of Colorado, and

FRED WEGENER, Individually and in his Capacity as Sheriff of Park County, Colorado, and
MONTE GORE, Individually and in his Capacity as Captain of Park County Sheriff's Department, and

VICKI PAULSEN, Individually and in her Official Capacity as Registered Nurse for Park County, Colorado, and
JAMES BACHMAN, M.D., Individually and in his Official Capacity as Medical Director of the Park County Jail,

Defendants.

DEPOSITION OF:  IVOR SAMUEL DOUGLAS, M.D. - July 12, 2006

PURSUANT TO NOTICE, the deposition of IVOR SAMUEL DOUGLAS, M.D., was taken on behalf of the Defendant Vicki Paulsen at 660 Bannock Street, 4th Floor, Denver, Colorado 80204, on July 12, 2006, at 8:34 a.m., before Carin C. Geist, Registered Merit Reporter and Notary Public within Colorado.

## Page 2

APPEARANCES

For the Plaintiff:
WILLIAM A. TRINE, ESQ.
Trine & Metcalf, P.C.
1435 Arapahoe Avenue
Boulder, Colorado 80302-6390

JOSEPH J. ARCHULETA, ESQ.
Archuleta Law Office
1724 Ogden Street
Denver, Colorado 80218-1018

For the Defendants:
Park County, Park County Board of County Commissioners, Fred Wegener and Monte Gore
ANDREW D. RINGEL, ESQ.
Hall & Evans, L.L.C.
1125 17th Street, Suite 600
Denver, Colorado 80202-2052

For the Defendant: Vicki Paulsen
MELANIE B. LEWIS, ESQ.
Berg Hill Greenleaf & Ruscitti, L.L.P.
1712 Pearl Street
Boulder, Colorado 80302

For the Defendant: James Bachman, M.D.
ANDREW W. JURS, ESQ.
Johnson, McConaty & Sargent, P.C.
400 South Colorado Boulevard Suite 900
Glendale, Colorado 80246

## Page 3

INDEX

EXAMINATION OF IVOR SAMUEL DOUGLAS, M.D.: July 12, 2006                           PAGE

By Ms. Lewis                                                                         4
By Mr. Ringel                                                                       86
By Mr. Jurs                                                                        124
By Mr. Trine                                                                       140

*   CONFIDENTIAL EXCERPTS
    Pages 126 through 127

DEPOSITION EXHIBITS:                                                            INITIAL
                                                                              REFERENCE

39  Curriculum Vitae                                                                 6
40  Progress Record, 3/9/03                                                         19
41  Denver Health Medical Center Physician Order Sheet, Ongoing Orders, 3/9/03      44
42  Denver Health Medical Center Physician Order Sheet, Ongoing Orders, 3/9/03      45
43  Progress Record, 3/9/03                                                         47
44  Plaintiff's Fourth Supplemental Rule 26(a)(1) Disclosures                       66
45  Letter to Douglas from Trine, 3/21/06                                           80
    (Attached to original, Ms. Lewis's, and Mr. Trine's copy transcripts.)

*   Pursuant to protective order, confidential material is filed under separate cover.

## Page 4

WHEREUPON, the following proceedings were taken pursuant to the Federal Rules of Civil Procedure.
(Deposition Exhibits 39 through 43 were marked.)
* * * * *

IVOR SAMUEL DOUGLAS, M.D., having been first duly sworn to state the whole truth, testified as follows:

EXAMINATION

BY MS. LEWIS:

Q. Good morning, Dr. Douglas. My name is Melanie Lewis, and I represent Vicki Paulsen, a registered nurse who used to work for the Park County jail. Could you please state your full name for the record.

A. Yeah, Dr. Ivor Samuel Douglas.

Q. And what is your business address?

A. It's Denver Health Medical Center, 777 Bannock Street, Denver, Colorado 80204.

Q. Have you been deposed before?

A. No.

Q. No?

A. Isn't that interesting. I've been in practice for 16 years. I never had a deposition, so . . .

Q. Okay.

MR. RINGEL: We'll try to be nice, Doctor.

**5**

1       THE DEPONENT: Be nice.
2       Q. (BY MS. LEWIS) We should be nice. I'll go
3   over the rules of a deposition just real quickly, just
4   kind of logistical matters first. If you could wait for
5   me to finish asking my question before you answer, that
6   would help the court reporter a lot. Also, if you could
7   answer verbally instead of nodding your head.
8       A. Yeah.
9       Q. That needs to be done so we can preserve our
10  record. Likewise, instead of saying "uh-huh" or
11  "huh-uh," if you could say "yes" or "no" when a question
12  calls for that, that would help clarify our record as
13  well.
14      If you don't understand a question, please tell
15  me. I'll be happy to rephrase it. I don't always ask
16  the best questions, so please let me know. And if you
17  don't tell me you don't understand something, I'm going
18  to assume that you understood my question. Is that okay?
19  Is that fair?
20      A. It is fair.
21      Q. Okay. We could --
22      A. Affirmative.
23      Q. And we could take a break at any time that you
24  feel the need. Just let us know.
25      What did you do in preparation for your

**6**

1   deposition today?
2       A. I read through the notes, the hospital record
3   notes just pertinent to the interactions that I had with
4   the patient.
5       Q. How many pages do you estimate that was?
6       A. Well, a good amount of whatever you have as the
7   file. It's got to be -- I don't know how much I read in
8   very, very great detail. But many, many tens of pages.
9       Q. Okay. I'm going to hand you what's been marked
10  as Deposition Exhibit 39.
11      A. Thank you.
12      Q. Could you identify that for the record, please.
13      A. That is my current curriculum vitae, including
14  training records, academic and publication record, and
15  research funding activities.
16      Q. Are you aware of anything on this CV that is
17  inaccurate or incorrect?
18      A. There are about four additional publications
19  that aren't -- very recent publications that aren't
20  included in there.
21      Q. Do you have an updated CV?
22      A. Yeah. I'd be happy to submit an updated CV.
23      Q. That would be great.
24      A. There is nothing substantive other than just
25  more recent publications over the last six months.

**7**

1       Q. So other than those four publications, this is
2   true and accurate to the best of your knowledge, right?
3       A. It is.
4       Q. What is your current position?
5       A. I have a clinical appointment to Denver Health
6   Medical Center as director of medical critical care
7   services. I have an academic appointment as assistant
8   professor of pulmonary sciences and critical care
9   medicine at the University of Colorado Health Sciences
10  Center and Denver Health.
11      Q. Can you describe, generally, your job duties
12  and responsibilities?
13      A. My job is divided in time between
14  responsibilities for clinical care and administration for
15  critically ill adult patients admitted to Denver Health
16  Medical Center, and the other component of my job is
17  performing/conducting research activities funded by the
18  federal government through the National Institutes of
19  Health, as well as some industry-supported critical care
20  research studies in our ICU. And I run a large research
21  laboratory at the Health Science Center on 9th Avenue.
22      Q. Do you supervise people in your position?
23      A. I do. I have three direct reports and then
24  have co-collaborative responsibility for about 65
25  critical care nurses and about 15 respiratory therapists.

**8**

1   They're not direct reports, but they're co-administered,
2   co-supervised.
3       Q. What are the positions of the direct reports to
4   you?
5       A. I have a clinical critical care research
6   coordinator. I have two laboratory professional research
7   associates that are research scientists that do work with
8   me.
9       Q. Have your duties and responsibilities changed
10  since 2003 and today?
11      A. No. I think my time allocations are slightly
12  different in that I spend a lot more of my time doing
13  research and ICU administration than in the early part of
14  my career when I was very much more clinically
15  responsible, yeah.
16      Q. How much time do you spend a week -- or let's
17  talk about 2003, if we could.
18      A. Sure.
19      Q. How much time were you spending in the ICU
20  unit?
21      A. I was spending somewhere between 25 and 30
22  percent of my time in the intensive care unit mixed
23  between doing research, administration, and direct
24  clinical care, and then about 65 to 75 percent at the
25  university in my laboratory.

**13**

1  single space where you see all the patients, which is
2  where the current matter pertains to, to our new ICU,
3  where -- you know, very beautiful facility but every
4  patient is in their own cubicle, and it's a very
5  different environment.
6      I think with reflecting on it, the circumstance
7  that pertains to the matter we're discussing today, we
8  were in a very different, very well-established
9  environment than we are today.
10     Q. And how many beds --
11     A. 11 plus 1. So 11 open beds and then there was
12 one what we call isolation room. It's a closed-off room
13 for infectious patients.
14     Q. So if I'm understanding correctly, at any given
15 time, you might be in charge of the care of 11 plus 1
16 patients?
17     A. And sometimes more. There was a cardiac care
18 unit adjacent to that. Not infrequently, some patients
19 were housed in that environment simply that we had so
20 many patients. So anywhere, I guess, maybe up to 16 or
21 17 critically ill patients would be about where we are
22 now.
23     Let me just frame that up. Sometimes these
24 days, I'm responsible for 24-plus patients, so sometimes
25 we get up to 27 patients. So it's very -- substantially

**14**

1  larger number of patients but very comparable to national
2  standards for attending-level responsibility.
3      Q. Do you recall Moises Carranza-Reyes?
4      A. I do.
5      Q. First of all, do you know what this case is
6  about that you're here for today?
7      A. I have only the very vaguest sense of it, and I
8  think it would be helpful for me to have a better sense
9  of this. Unfortunately, I really had contact only with
10 his legal representative. I was contacted about maybe 18
11 months ago by National Public Radio that wanted to
12 interview me about this case, and I -- we declined the
13 interview, but it was a time that I re-reviewed all his
14 records. So it's very -- I sort of had these different
15 perceptions, but I'm not clear at all. You said you
16 represented a nurse; is that correct?
17     Q. That's correct.
18     A. I assume others represent other parties in this
19 matter. So it's hard for me to know what clearly the
20 suit is about. It may be helpful for me to get a sense
21 of that.
22     Q. Well, I don't know if I should explain that
23 right now.
24     A. That's fine. I'm here to give you my
25 testimony.

**15**

1      Q. I understand that. I'm just trying to
2  understand what your understanding is of the claims or if
3  you have any understanding.
4      A. I really have, I think, only that there is --
5  there must be a suit out there, but I don't have a full
6  sense of its scope or what is at issue. My involvement
7  has been as the attending physician and as the ICU
8  director, and that's really my framework of approach to
9  this.
10     Q. Okay. Do you have a recollection of Moises
11 Carranza-Reyes that's independent from the medical
12 records?
13     A. A recollection. In other words, do I have a
14 mental picture of him? Is that what you're asking?
15     Q. Yes.
16     A. I do have a very vivid mental picture of him,
17 but I have a fairly vivid mental picture of virtually any
18 patient that I've treated, and it's just part of the way
19 I approach medicine. It's just the way my brain works,
20 but a lot of the way that critical care doctors are able
21 to hold together large amounts of data is to use visual
22 patterns of memory to associate facts and observations
23 and things like that.
24     But at the same time, I think that some of that
25 has been supplemented, I guess, by my rereading his case

**16**

1  notes in some detail on several occasions in the time
2  sense.
3      Q. How many times have you reread his case notes
4  or medical records?
5      A. I think, including preparation for today's
6  discussion, probably three or four times over the
7  intervening years. Yeah. Certainly not many more times
8  than that but something like that.
9      Q. When is the first time that you recall having
10 contact with Mr. Carranza-Reyes?
11     A. When he was rolled into my intensive care unit
12 from the emergency medicine department.
13     Q. Did you see him when he was in the emergency
14 medical department?
15     A. I don't think -- yeah. I may have actually
16 escorted -- I know I helped to escort him into the ICU,
17 which is incredibly unusual for me to do that. Five
18 times a year that I actually help a patient into the ICU
19 if they are -- if my fellow is or my resident or somebody
20 is -- a term that's used colloquially is "crashing";
21 that's somebody that needs serious urgent attention.
22     Whether I actually walked all the way down to
23 the emergency medicine department or met him at the door
24 and helped him into the room, I lack complete -- that's
25 not an item I would have documented in the notes, and I'm

**17**

1  certain I didn't make a note of I personally escorted him
2  into the ICU, but I am certainly aware that we actually
3  were involved from the minute he arrived in the intensive
4  care unit.
5     Q.  And you said that that was unusual?
6     A.  That is very unusual. The unusual ebb and flow
7  of critical care is that patients are admitted at any
8  time of the day or night, and so triage responsibilities
9  follow very strict lines of command and control, really.
10  So there's this accountability process for reporting
11  where, depending on triage status, severity of illness,
12  there's a delegation process where by seniority the
13  junior resident will stabilize somebody that has modest
14  critical illness, and then we'll take the whole team to
15  the bedside at any time of the day or night for somebody
16  that's very unstable, may become very unstable. So
17  there's a sequence.
18       I mean, I have very vivid memories because I
19  remember the bed that he was in, of this being one of
20  the -- the teams there from the beginning, I think at
21  least two or three nurses to get things getting going.
22     Q.  Can you tell me what you recall about him
23  entering the ICU unit?
24     A.  He was supine, flat, actively treated for
25  respiratory failure, critically ill, needing vascular

**18**

1  access. In other words, placing of central lines, tubes.
2  General hubbub, melee, as is often the case in those
3  circumstances.
4       Again, trying to triage these things, people
5  are in and out during the day. What we term a routine
6  critical care admission is very stylized. You know, you
7  have the delegated bedside nurse, and then we bring in
8  usually a nurse assistant and the charge nurse, and they
9  just get things packed away, get all the documentation
10  done, get the early orders in, and off they go.
11       This was some -- some order of magnitude more
12  intensive than that.
13     Q.  And what was it about the situation that made
14  it more intensive?
15     A.  I think just the imminent and apparent rapidly
16  progressive multi-organ dysfunction.
17     Q.  Was he conscious when he came in?
18     A.  I need to refer back to my notes to really make
19  some certain ascertainment of that. My recollection is
20  that he wasn't fully conscious, but I would need to refer
21  to my notes to be certain of that.
22     Q.  Do you have a recollection of talking to him
23  when he arrived?
24     A.  No. I don't have a recollection of having a
25  substantive interaction with him; but again, you know,

**19**

1  I'd need to refer back to my notes to make certain of
2  that. Thanks.
3     Q.  I'll hand you -- I've handed you what's been
4  marked as Deposition Exhibit 40. If you could take a
5  look at that for a moment --
6     A.  Yeah.
7     Q.  -- and identify it for the record when you're
8  done.
9     A.  Sure.
10       (Pause in the proceedings.)
11     A.  Yeah. And I think that -- let me give a little
12  context to this, just for the record. This is my
13  cumulative critical care documentation. Critical care
14  works a little differently from routine hospital visits
15  in that a routine hospital visit, both from a
16  documentation perspective and from a billing perspective,
17  is based on what is called an E&M code, evaluation and
18  management code.
19       The episodes of assessment and treatment for an
20  E&M-coded visit is like a snapshot. I came in. I
21  interacted with patient, took the history, did the
22  examination, looked at these tests, made an assessment.
23  Here is my recommendations of care.
24       Critical care is both performed and managed on
25  a time-based encounter, and time-based encounters can --

**20**

1  don't go by clock time. In other words, it's not -- the
2  first 24 hours is from this morning at 7 a.m. until
3  tomorrow morning at 7 a.m. The first 24 hours of
4  critical care are from the time the patient hits the ward
5  or the ICU for 24 hours.
6       So it's often -- it is virtually impossible to,
7  say, as you're performing resuscitative care, critical
8  care, making your notes and documenting. The standard
9  approach, both from a documentation perspective -- and
10  this is, you know -- I mean, a two-page note from the
11  attending physician in addition to everything else
12  reflects quite how complex this problem was, is a
13  cumulative assessment of usually the first period of
14  time, close to 24 hours, 24-hour clock time.
15       So what I've written here is certainly
16  suggestive of the aggregated effects of 24 hours of
17  resuscitative acute care, all of which are meant to
18  endorse, detail, summarize the detailed notes of the
19  resident physicians that I have read through previously.
20       And I think that as you'll see, for example, I
21  don't repeat the labs. I say the labs are per the
22  admission sheet. Really, what this is doing is taking
23  the laboratory data from that sheet, integrating it into
24  the assessment and the plan. I think my impression here
25  was, 27-year-old strep pneumonia in septic shock, concern

**21**

1  for being positive for the HIV virus. You can imagine
2  coming in with no history, no reportable ability to
3  communicate and overwhelming infection, these are the
4  kinds of things that go through the clinician's mind.
5      And then a sequence of problems. We've put
6  four big problems here. Shock; the disease state sepsis,
7  which is discrete from the disease state shock; renal
8  failure, which to come in, have I think I said 22 liters
9  of fluid resuscitation, and still have renal failure is
10 very worrying; and then the disease state acute
11 respiratory distress syndrome. ARDS is the fourth.
12     And then I've written a prognosis status here,
13 which is standard for us to write a prognosis statement.
14 Again, this is a global prognosis. It's really to help
15 the providers at the bedside share data with others.
16 Remember, although HIPAA was just getting going, our
17 ability to share detailed information with others is
18 limited. And so "prognosis is grave" is a way for us to
19 make a brief assessment of the expectations.
20     Q. And for the record, you're referring to the
21 second page of Exhibit 40 —
22     A. Thanks.
23     Q. — which is marked in the lower right-hand
24 corner as DHMC-0288, right?
25     A. Correct.

**22**

1      Q. About middle of the page there, those notes.
2  Does this refresh your memory about —
3      A. Yeah. I think to return to the question, did I
4  have a meaningful kind of interaction with him, I
5  certainly didn't. He was critically ill from the minute
6  he came in. Based on my inability to supplement the
7  history from him directly, you can see the multiple
8  competing concerns here about other underlying disorders
9  that might have precipitated his acute state.
10     Q. What was his diagnosis upon his entry?
11     A. It was pneumonia and shock was the working
12 diagnosis. Now, as I remember from the emergency room —
13 again, I would need to refer back to those notes — I
14 think that they didn't have any different opinion about
15 that, but my understanding is we didn't have the organism
16 at the time that he left the emergency room, that that
17 emerged very early on during the course of the first 24
18 hours.
19     He was clearly totally appropriately treated in
20 terms of the antibiotics that were selected for that bug,
21 but it was only identified during the course — I see
22 here that he had these bugs in the pleural fluid and the
23 sputum. This is the middle of page DHMC-0288. I've
24 written copious GPC chains and clusters, gram positive
25 cocci; and that refers to the organism streptococcus

**23**

1  pneumonia, later characterized in multiple fluid samples
2  that we took.
3      And even the suggestion that we would have
4  taken multiple fluid samples to get the bug early on
5  represents what I would call a no-nonsense, aggressive
6  approach to treating him, caring for him.
7      Q. Is the bug that you're referring to also called
8  strep A?
9      A. No. At this point — at this point, we didn't
10 have a definitive identification. So when the sample
11 comes back, and it's gram positive cocci, it could have
12 many different subforms of the streptococcus bug. We
13 treated him — and you'll see I've written the impression
14 was actually that he had streptococcus pneumoniae,
15 possibly, but I didn't say pneumoniae, I said pneumonia.
16 That's streptococcus pneumonia. So that's a broad,
17 global diagnosis.
18     Later on, the lab calls us and says, you know,
19 the isolant that he has is a streptococcus group A, as
20 opposed to strep what's called untypable, also known as
21 streptococcus pneumoniae with the a-e at the end, a
22 specific bacterial cause.
23     The reason that it would have been totally
24 appropriate to treat him for streptococcus pneumoniae,
25 a-e at the end, as the bug, is that it is very common.

**24**

1  It causes this extremely invasive, rapidly progressive
2  multi-organ dysfunction syndrome, has a high resistance
3  to certain antibiotics. So if you treat just with simple
4  antibiotics, with penicillin, you may actually not get
5  treatment effect.
6      And the reason, if you look at point 2 in the
7  assessment, again on page 0288, I actually supported not
8  only treating him for the resistant form of the bug with
9  three what we term broad-spectrum antibiotics,
10 ceftriaxone, levofloxacin, and vancomycin. My
11 recommendation then was to treat him for invasive fungal
12 infection because of the concern that there may have been
13 an intracranial, an intracerebral collection associated
14 with unrecognized HIV disease.
15     And so the idea being in critical care is that
16 although something looks to be the most obvious, we
17 are — our responsibility is never to be reductivist in
18 our approach. We have to look broadly, particularly
19 early on in the course of critical illness, and ascertain
20 by probability risk of other infections.
21     And here, the addition of the agent
22 amphotericin-B was the real concern that there may have
23 been an invasive fungal infection underlying some of
24 this. You know, thank goodness that turned out not to be
25 the case. I'm frequently incorrect about things, and

**25**

1 here is a case where I have no problem being incorrect.
2 This was, again, I think what's broadly referred to as
3 no-nonsense, aggressive care early on in this course.
4     Q.  So if you look on page 1 of Exhibit 40, it says
5 at the top, near the top, "strep A pneumonia."
6     A.  Yeah.
7     Q.  So if I understand you correctly, you didn't
8 know it was strep A at the time he came into the ICU.
9     A.  At the very time. Now remember, I wrote this
10 at the end of the day; in fact, the end of a very long
11 day. So it's really recognizing that even though we have
12 an organism in the empyema fluids, I am still very
13 concerned that there are other mixed -- what we call a
14 mixed picture or multi-bacterial infection.
15         Those are not uncommon. It's not uncommon to
16 have more than one isolant and if I had known this was
17 all strep A, in our hospital, streptococcus A is very
18 sensitive to the antibiotic penicillin. I might have
19 suggested just treat him with only penicillin. But the
20 reflection of this, as I read through it, suggests still
21 too early, still too sick, haven't excluded or lowered
22 the likelihood that there is a multi-bacterial infection
23 going on.
24         So I've recognized that there's empyema, pus in
25 the pleural fluid from streptococcus A, but we haven't

**26**

1 excluded the possibility of other forms of gram positive
2 or other infections concomitant to that. Does that
3 address that issue?
4     Q.  Yes. So what are -- are there any signs or
5 symptoms of a strep A infection as opposed to other type
6 of infection?
7     A.  You know, if there had been a very strong
8 history of pharyngitis or upper-respiratory infections,
9 sinus or ear infections; but in adults, that does not
10 have to be the case. Invasive strep A pneumonia
11 can present -- pneumonia can present just as the invasive
12 disease without many of those other early signs, as we
13 see more commonly in, let's say, youth, children.
14         So the answer is, really, no. Strep A can tend
15 to be this very destructive -- what we call necrotic or
16 destructive pneumonia. It releases a toxin. Many of
17 these bugs release toxins, but the toxin itself can
18 actually almost dissolve out tissues, really dissolve out
19 the lung tissue in some respect and cause death of the
20 tissue and rapid formation of cavities.
21     Q.  Does it do that in every case, to your
22 knowledge?
23     A.  No, not at all. Otherwise, everybody in the
24 community that's got a little bit of strep sitting in the
25 back of their throat would have invasive disease. Some

**27**

1 bugs gain genetic variations in them that allow them to
2 produce these chemicals that destroy tissues more
3 aggressively than others. And that's at a level of
4 analysis that is three or four steps beyond just the
5 simple blood culture or sputum culture test that would be
6 obtained at the bedside.
7     Q.  So when he came in, did you know he was in
8 severe septic shock?
9     A.  I need -- when he came in -- I need to look at
10 our flow sheets for the emergency room and the ICU to be
11 certain that at the time he came in, which is your
12 question, he was in severe septic shock.
13         Septic shock is an assessment of the
14 hemodynamic state. Let me say it again. It's -- the
15 disease state of sepsis is a multisystem inflammation
16 process. Septic shock is an assessment of the blood
17 circulation response to that invasive disease state
18 characterized by an abnormality of blood pressure and of
19 oxygen extraction in the tissues. And so I need to
20 actually go back and refresh my memory from the records
21 to be certain that from the moment he came in, he was in
22 septic shock or not.
23     Q.  What are the signs and symptoms of septic
24 shock?
25     A.  So they are central and peripheral, but the

**28**

1 things that we most concern ourselves about is
2 abnormality of profusion, blood flow and oxygen delivery
3 to vital organs: brain, kidneys, the intestines, the
4 heart, the adrenal glands; and then last but not
5 insignificantly is the peripheral tissues. In him, that
6 became the critical issue. But it -- the fact that we've
7 noted the presence of shock from very early in his course
8 suggests that this is a manifestation of the underlying
9 disease process, of this invasive bacterial infection
10 early on.
11     Q.  So how would you diagnose someone with septic
12 shock -- being in septic shock?
13     A.  In general now -- I'm speaking specifically not
14 about Mr. Carranza-Reyes, but in general, it's an
15 assessment of brain function and kidney function, tissue
16 profusion, where we look using both clinical examination
17 and special examination, as well as measurements of the
18 hemodynamic parameters, blood pressure, heart rate,
19 pulse. Sometimes putting in special catheters into the
20 circulation, the heart, the lungs. A flow abnormality,
21 so impaired flow in oxygen delivery associated with
22 usually lower blood pressure, and shock being below
23 cutoffs, where we measure the mean arterial pressure.
24 It's a way that we calculate a certain blood pressure,
25 and if it's below a cutoff level in the face of having

**29**

1  ongoing resuscitation. that would be a shock state.
2     Now. shock can be of many different causes; but
3  generally. shock has three broad causes. The kind that
4  he has is called vasodilatory -- vaso. the blood vessels
5  dilated up -- shock; and the cause of his vasodilatory
6  shock was presumed septic shock. infection. overwhelming
7  infection. But additionally. shock can occur from
8  cardiovascular. cardiogenic heart causes. or they can
9  come from a low blood volume. So bleeding out.
10 dehydration.
11    Those are the three broad categories of shock
12 and the assessments of the kinds of shock. When he comes
13 in, we think he has severe septic shock, and I note that
14 in my -- in my comments here. I say that he's developing,
15 quote, intractable shock, which means that we've
16 administered extensive resuscitation efforts to him.
17 including medications to squeeze the blood vessels.
18 increase flow, given him lots of fluid; and despite that.
19 the blood pressure remains at this -- below this critical
20 profusion level for the organs.
21    Now. that is very troubling. Intractable shock
22 suggests that the ability of the blood -- of the
23 circulation of the blood vessels to respond to normal
24 stimuli to make them squeeze up has been lost, and that
25 is a characteristic of a very advanced stage of -- of

**30**

1  decompensation and really, in many patients, suggests
2  that the process has been going on a while. And I need
3  to emphasize that.
4     It's unusual for somebody to develop their
5  infection -- it's a really -- they just started getting
6  the infection, and if we are very super-aggressive about
7  getting them resuscitated, the likelihood that they will
8  go into intractable shock is somewhat lower. When people
9  have been smoldering on for a while, their system builds
10 up such that the blood vessels progressively lose their
11 ability to respond; and the effect, ultimately, is that
12 they lose the ability to maintain blood pressure and
13 flow.
14 Q. Do you know what signs or symptoms
15 Mr. Carranza-Reyes had before he came to Denver Health?
16 A. You know, I only have looked at the emergency
17 room records pertaining to this, and as I remember -- and
18 again, I need to only really speak from what I have,
19 because I'm basing my comments on it. I only know that
20 there was a report that he had been unwell for some few
21 days before he came to Denver Health Medical Center. But
22 again, I'm speaking from memory, not from the record; and
23 I would need to go back to the record to refresh my
24 memory on that.
25 Q. The emergency room records?

**31**

1  A. That may help us. I don't know. I don't
2  remember that they were particularly detailed about the
3  antecedent history other than to recognize -- again.
4  it's -- I need to speak from the record, not from my
5  memory as much. But I had a sense that this was not
6  something that exploded out of the blue on the day that
7  he came to Denver Health. I think the sense was that
8  there had been some prodrome leadup to this event.
9  Q. If you could give me a moment, I might be able
10 to find those just to help us out here.
11 A. I think that that's a formal use of them. Just
12 digging into three years' distant memory . . .
13    MR. RINGEL: Does anybody mind if I ask a
14 clarification question?
15    MR. TRINE: Fine with me.
16    MR. RINGEL: When you're saying "emergency
17 room." are you talking about the Denver Health emergency
18 room?
19    THE DEPONENT: Pertinent to the -- what she's
20 looking up now?
21    MR. RINGEL: Well, you used emergency room. and
22 we're talking about records. Is it the Denver Health
23 emergency room?
24    THE DEPONENT: Yeah. I mean. that's the
25 information that would be readily available to me. You

**32**

1  know, the process of evaluating our patients is always
2  helped when there is outside records available; but I
3  know at the time that they came, there was a transfer
4  record, and then there was the note from my colleagues in
5  the emergency room that was readily available to us.
6     MR. RINGEL: Because you understand that he was
7  seen in the emergency room in Summit County.
8     THE DEPONENT: I became aware of that later on,
9  but you're asking me about this document, and at the time
10 that I had -- wrote this document, I don't think I knew
11 that.
12    MR. RINGEL: Okay.
13    THE DEPONENT: I knew that he had been
14 transferred to us, but I don't believe I had any
15 understanding in documentary form of a lot of that other
16 than what was in our emergency room record. Do you have
17 that?
18 Q. (BY MS. LEWIS) I can't find it readily. Maybe
19 on a break we could do that.
20    MR. TRINE: I have mine if you would like to
21 use it.
22    MS. LEWIS: From the exhibit notebook?
23    MR. TRINE: But since this isn't marked as an
24 exhibit, you'll probably have to refer to the Bates stamp
25 pages. I think this is it.

**33**

1    THE DEPONENT: Is it acceptable for me to go
2 through this? Here it is. Here we go.
3    MR. TRINE: Okay.
4    A. So this is DHMC 0051. It's entitled, "DHMC
5 emergency department visit." Date is 03/08/2003. Time
6 of arrival is 1706, and the assessment was by -- oh,
7 Dr. Markovchick, who is the chief of emergency medicine
8 here at Denver Health Medical Center. Don't get it much
9 more senior than that.
10    So the point is -- that's made here by the
11 resident and countersigned by Dr. Markovchick is that by
12 record this is somebody who had a previously healthy
13 antecedent history. So there wasn't a strong documented
14 history of underlying disease, and there is no question
15 that the initial blood pressure measurements -- to answer
16 your question, at the time the patient was in the
17 emergency room, blood pressure of 76 over 52 and heart
18 rate of 150 would be entirely consistent with shock state
19 at the time the patient came to the emergency room, and
20 the temperature was extremely high at that stage.
21    So yeah, just as I had suggested. Their
22 assessment when they made their first impression was
23 pneumonia, sepsis, and acute renal failure. Now, sepsis
24 is on the continuum of septic shock, and so it would be a
25 broad catchall of that disorder. They clearly recognized

**34**

1 that the patient has shock state, and they responded to
2 that, although they hadn't used the term "shock." Sepsis
3 is on the continuum of that disease state, and I am -- I
4 am reading this consistent with their fluid management as
5 being a treatment for shock.
6    Q. (BY MS. LEWIS) If you could take a moment,
7 review those emergency records, tell me what pages you've
8 reviewed.
9    A. Sure. I've reviewed DHMC 0051 through 0055.
10    Q. Does that refresh your memory about whether or
11 not you knew what his signs or symptoms were before he
12 came to Denver Health? Not before he came to the ICU --
13    A. No. I think all it does is recapitulate the
14 fact that I had very little antecedent -- or
15 understanding of the antecedent background to his
16 immediate admission to the ICU. I mean, literally
17 "brought in by ambulance" is as nebulous a statement of
18 background history as I can get. 93 percent of everybody
19 that comes in the ICU is BIBA, brought in by ambulance.
20 But from jail also would be rather unusual --
21 rather unremarkable in that we service a substantial
22 number of detained patients, and it's an important part
23 of the history, but it gives me very little insight of
24 antecedent background that would be informative.
25    Clearly, the -- the fact that he was from --

**35**

1 that he was from Mexico only adds to my assessment of
2 what underlying causes could be, and I've discussed that
3 already in my admission note that our thinking was that
4 we need to be very broad in our initial approach, think
5 about other causes.
6    Q. Do you know what his signs and symptoms were
7 when he was in the jail?
8    A. Again, I'm basing my comments on this document,
9 No. 40, Exhibit 40. At the time that I would have seen
10 and assessed him, that data would not have been available
11 to me. I would have had Denver Health Medical Center
12 Department visit information, plus information in front
13 of me from the patient, and that would have been used to
14 develop my evaluation.
15    Q. Do you recall ever reviewing the medical
16 records that were created at the Park County jail
17 relating to Mr. Carranza-Reyes?
18    A. I have seen those. I have seen those, but very
19 much subsequent to the -- you know, even probably to his
20 discharge. I don't think I ever saw any of those,
21 certainly that I have obvious memory of, during the time
22 that I cared for him in the intensive care unit.
23    Q. How did you come to look at those records?
24    A. I think that those were given to me --
25    THE DEPONENT: I think it was when I spoke with

**36**

1 you. Were those given to --
2    MR. TRINE: I think so. I'm not sure.
3    A. I think that was the occasion that I looked at
4 those. Yeah. I think that probably is the only occasion
5 I've ever looked at those records, but that must have
6 been -- you know, that's years subsequent to the clinical
7 events.
8    Q. (BY MS. LEWIS) Do you recall today what any of
9 those records said?
10    A. Very vaguely. Those, again, are things I would
11 need to look at the documents to make comments on, if
12 that would be helpful. Other than they put in context
13 the comment I made earlier, which was that we had a sense
14 that he had some development of this process; but again,
15 you know, without actually referring to those records, I
16 don't have a clear memory of those.
17    Q. And when you say we had a sense that he had
18 developed this as a part of a process, you're talking
19 about in 2003?
20    A. Yes. I mean, the very close proximate period
21 of time to him getting very sick and coming to Denver
22 Health.
23    Q. Do you know whether you determined when he
24 contracted the infection?
25    A. I'm sorry, could you clarify the question?

**37**

1  Q. Were you ever able to determine when he
2  contracted strep A? Let's start with that.
3  A. I'm going to answer, but it's not meant to be a
4  flippant answer. Before he came to Denver Health Medical
5  Center, I mean, sometime previous to that.
6  Q. But before that, can you --
7  A. I don't think that was within our purview to
8  look at that. So perhaps differently from somebody who
9  cares for people in the outpatient environment, my brief
10 is, sick patient in front of you who is dying. First
11 order of business, resuscitate. Second order of
12 business, stabilize. Third order of business, find out
13 why all of this happened.
14       We got 2 1/2 way down the order of things and
15 then realized that he was dying, and so that was our
16 primary focus was -- at the time that Exhibit 40 was in
17 discussion.
18 Q. And I understand that. I'm just trying to
19 figure out what you can tell from what you knew about the
20 patient at the time you got him in terms of his previous
21 history, if anything.
22 A. I don't think I can give any -- based on this
23 data, I don't think I have anything additional that I
24 could venture comment on.
25 Q. Is there any way to tell from the records that

**38**

1  you reviewed or from your recollection of this patient
2  how he contracted this illness?
3  A. When you say "the records," are you talking
4  about this record?
5  Q. I'm talking about your general recollection of
6  the patient and just what you've reviewed today.
7  A. Let me reply in as sequential fashion as I can.
8  In terms of the time that I admitted him, cared for him,
9  and stabilized him with my team, no. I don't think that
10 I'm able to answer that.
11      In terms of having some background view on
12 this, I have a vague recollection -- having reviewed the
13 documents that were shown to me from the time previous to
14 this, because he was in an outside emergency room, as I
15 remember, and then transferred here, I have a sense that
16 there was a leadup period of some days; but again,
17 without having those documents in front of me, I can't
18 make a substantive comment on that.
19 Q. And the comment, I was asking about the cause
20 of his --
21 A. The strep A, as to the cause?
22 Q. Yeah.
23 A. Yeah, I mean, that --
24 Q. Like the source of the strep A. Do you know
25 that?

**39**

1  A. That's conjecture. I can only tell you that
2  microbiologic ascertainment is a crude art sometimes,
3  worth a more refined science. First of all, getting a
4  bug out of the pleural fluid and out of the sputum tells
5  you virtually nothing about where it originated from, who
6  it originated from. I mean, there are both microbiologic
7  and epidemiologic ways to go about that, but not from the
8  end data that we would have had available.
9  Q. Is there an incubation time for strep A
10 infection before it becomes sepsis?
11 A. Yes -- oh, before it becomes sepsis?
12 Q. Or you could explain what you mean by "yes."
13 A. Yes. There is a laboratory-defined incubation
14 period for animal strains; and interestingly, for this
15 disease in children, it's fairly well characterized what
16 the exposure to invasive disease, but I'm not talking
17 about sepsis now. I'm not talking about the disseminated
18 form of the disease. I'm talking about the time that
19 kids might get exposed to a sibling with the bacteria to
20 the time that they develop an ear infection. That's
21 several days.
22      But the time that it develops from having that
23 bug, which often lives in the back of the throat and
24 doesn't cause problems. I mean, you might sit around
25 this table and swab all of us, and perhaps one of us has

**40**

1  got this bug in the back of our throat. What makes this
2  bug have a genetic mutation, become invasive, and then,
3  either because the patient's own immune system or risk
4  make that process develop into overwhelming inflammation
5  and sepsis, very difficult to define, very individually
6  based.
7  Q. So is there a standard incubation period or
8  not?
9  A. For this type of disease, no. There's not a
10 published -- there's not a published standard incubation
11 period. There are standard published incubation periods
12 for less invasive forms of the disease; and most of that
13 data that I have read -- I'm not saying it's not out
14 there for adults, but it's from the pediatric population.
15 Q. Can you tell what this patient's incubation
16 period was?
17 A. No.
18 Q. In your notes, which are on Exhibit 40, I saw a
19 reference to rapid onset, severe something I can't make
20 out. It's in the middle of the first page of Exhibit 40.
21 A. I'm sorry.
22 Q. Can you tell me what that says?
23 A. Rapid onset severe, AGMA, anion gap metabolic
24 acidosis, respiratory failure, and shock. Anion gap
25 metabolic acidosis is a disturbance of the body's acid

**41**

1 and base status. The body has to function in what is
2 termed a neutral acid status, an acid base status. Cells
3 become perturbed in a function if the environment is
4 either too acid or too basic.
5         Anion gap metabolic acidosis is a particularly
6 profound form of too much acid. The causes are numerous,
7 but in this patient, it would -- our working
8 possibilities would have been most likely from sepsis and
9 poor delivery of oxygen to the tissues.
10         When there's insufficient oxygen in the
11 tissues, the tissues become acid. They don't clear acid
12 efficiently, and acid builds up in the body. That
13 perturbs the blood vessels' ability to squeeze. It
14 perturbs brain, heart, renal, lung function as well, and
15 it makes breathing very difficult because now the body
16 has only one way to clear acid because the kidneys don't
17 work, and that is to breathe faster. When you can't
18 breathe faster because you've got an infection, you go
19 into respiratory failure. So anion gap metabolic
20 acidosis is in the sequence of events that takes a
21 patient through to this process.
22    Q. Can you tell me what is meant by "rapid onset"?
23    A. The anion gap metabolic acidosis component can
24 develop over days, even sometimes longer than that in
25 patients that have diabetes, for example. People that

**42**

1 have diabetes and don't take their insulin slowly
2 dehydrate and slowly develop anion gap metabolic
3 acidosis. By contrast, rapid onset, hours to a day, is
4 more consistent with a very acute insult like trauma,
5 sepsis, pancreatitis, a heart attack, a stroke.
6         And so it really refers to the difference
7 between a day's evolution for that particular aspect --
8 and I want to just say that it pertains to the
9 development of anion gap metabolic acidosis, respiratory
10 failure, and shock, not to the onset of the antecedent
11 disorder. The antecedent disorder -- again, I have no
12 way to know the time course of events, but this rapid
13 onset does not pertain to that preceding disorder. It
14 pertains to the things I've documented here.
15    Q. We've jumped around quite a bit, and perhaps
16 you could tell me your recollection of the course of his
17 condition while he was in the ICU, generally. I
18 understand there's a lot of detail, some of which you may
19 remember or not remember, but could you describe how his
20 condition was when it -- when he arrived, how it evolved,
21 if you understand my question.
22    A. I want to be helpful to you, so it would be
23 helpful to me if you could try to identify which of the
24 numerous aspects that I could try to give you an
25 assessment of would be helpful. His course was, because

**43**

1 of the multiplicity of disorders, different. How can I
2 give you a more detailed response?
3    Q. We previously talked about diagnosis of his --
4 diagnosis of him when he arrived at the ICU. Septic
5 shock, later on determined strep A pneumonia, at some
6 point initially.
7    A. Sure.
8    Q. And so was there subsequent diagnoses that you
9 recall, sitting here today?
10    A. Sure. Again, always it would be helpful for me
11 to go back and reflect on the numerous notes of myself or
12 my colleagues. I know Dr. Rick Albert is a subsequent
13 attending physician. I think Dr. Hanley was an attending
14 physician at some stage.
15         So to respond directly to additional diagnoses,
16 the ones that are most prominent in my mind is the
17 necrotic lung abscess. This disease became so invasive
18 that the lung eventually got to the point where it
19 liquefied and needed to be drained and resected, and then
20 the progression of the multi-organ dysfunction with bad
21 blood flow and oxygen profusion to the limbs resulted in
22 both of the lower limbs becoming very seriously
23 compromised.
24         And I certainly know that he had one below-knee
25 amputation, and I've got to tell you, he was very close

**44**

1 to having two-sided, bilateral below-knee amputations. I
2 think the fact that he actually had his limb salvaged was
3 that the surgeons took a very measured, systematic
4 approach and said, this one is -- I don't remember if it
5 was his right or left leg, but I'd have to go back. This
6 leg clearly has to be amputated to save his life. The
7 other is touch and go. We'll go minute by minute, and if
8 it is apparent that we have to do some form of
9 amputation, we'll do that.
10         So those are the two major things that stand
11 out in my mind. I know that the evolution of his illness
12 was that he became tremendously weak in a disorder that
13 we call critical illness polyneural myopathy, involving
14 the recognized disorder of this overwhelming inflammation
15 that he had, and a lot of his later course, time on the
16 breathing machine, rehabilitation time, and pain
17 certainly could be accounted for by what we saw as the
18 progression of this profound weakness, neurologic
19 abnormality of critical illness.
20    Q. If you could please look at what's been marked
21 as Deposition Exhibit 41 and identify it for the record
22 when you're done reviewing that, please.
23    A. Okay. This is a -- boy, talk about
24 old-fashioned -- it's interesting how quickly
25 old-fashioned becomes old-fashioned. We no longer write

**77**

1     I might venture that there may be a small
2  grammatical challenge with the later part of the last
3  sentence, "the body protected the vital organs first, but
4  not the extremities." I think what we're saying is, it's
5  the tendency when you give these medications for these
6  central vital organs, heart, lungs, kidneys, intestines,
7  that you want to keep blood flowing through those
8  critical organs, recognizing that it's not going to
9  improve blood flow to the tissues of the limbs. That's a
10 tradeoff, but it's about the lifesaving tradeoff.
11    The micro-clotting that occurred in small blood
12 vessels and lack of oxygen to the extremities caused
13 tissues to begin dying and necrosis to set in. Again, I
14 think that that's our best understanding of the
15 mechanisms.
16    Both legs, I touched on that, I agree. It was
17 touch-and-go saving the right leg and they took every
18 possible measure to save it rather than amputate it. I
19 think I referred to that.
20    To determine the nature and extent of tissue
21 damage to the right leg, he should undergo
22 electroneurography, being the gold standard. The -- all
23 of these tests that say whether a leg will be fixable or
24 not are open to some discussion. Electroneurography is a
25 commonly used test. Quite how perfect it is, is for some

**78**

1  debate, but it is true that there could be chronic and
2  permanent weakness from this damage to the sensory-motor
3  system, this critical illness polyneuropathy. I think I
4  touched on the fact that that is a very substantially
5  debilitating disorder in critically ill patients.
6     Q. Let me ask a question about this. Do you know
7  whether there's permanent tissue damage to the right leg?
8     A. I do not, but I'm saying it could be evaluated.
9     Q. Okay. I understand.
10       MR. RINGEL: With electroneurography? Others?
11       THE DEPONENT: Right. You know, that is not an
12 area that I specialize in. I'm aware there are a host of
13 other tests that people use to evaluate how good function
14 is.
15    A. After Carranza-Reyes arrived in the ICU,
16 Dr. Douglas realized he would probably die. Staff worked
17 with the Mexican consulate to try to contact a member of
18 the family, in the absence of anybody actually being
19 there. The staff frantically worked through the
20 consulate to locate a relative, and through the consulate
21 was able to contact Carranza-Reyes' mother. What -- we
22 were able to contact the mother who came to the hospital,
23 yeah.
24    Q. (BY MS. LEWIS) So this paragraph is accurate?
25    A. In substance, it's correct. The mom was one of

**79**

1  the people that eventually turned up. Again, the time
2  frame between us initiating that and that person turning
3  up is not in my recollection.
4     Q. Third paragraph?
5     A. Observed that he was thin, strong-looking,
6  deathly ill. I mean, I cannot testify to this being
7  substantively accurate. Yes, the first half. "Gained
8  substantial weight." You can come in a hospital and you
9  will definitely gain weight.
10    It was necessary that Carranza-Reyes be placed
11 on mechanical ventilation to save his life. True. Once
12 septic shock develops, there is a golden four-hour window
13 of opportunity to treat it; and if he had not been
14 hydrated and provided antibiotics within that time frame,
15 he probably would have died because the death rate is
16 exceedingly high. That is just based on our
17 understanding of the currently available medical
18 literature in the area.
19    Dr. Douglas has an independent recollection and
20 memory of his hospitalization, his condition, his course,
21 but I have to refer to details of dates and treatment
22 rendered. Yeah, I have no disagreement with that.
23    I have had many conversations with the family,
24 and I briefed them while he was in my care of what was
25 going on, and I was present when he was discharged. All

**80**

1  of that is substantively correct.
2     Q. How about Nurse Wolf? There is a mention of a
3  Nurse Wolf.
4     A. Correct.
5     Q. This nurse was a male?
6     A. Correct. Neal Wolf.
7     Q. Neal?
8     A. Neal Wolf.
9     Q. And this nurse was involved with
10 Carranza-Reyes's treatment, it sounds like?
11    A. I would say "involved" would be an
12 under-appreciation of what this man did to save
13 Mr. Carranza-Reyes's life.
14    Q. Okay. Do you know where he is now?
15    A. No, I don't.
16    Q. Okay.
17    A. He is certainly not working in my ICU, but I'm
18 not sure where he is today. I'm told -- I know that he
19 was somebody that we were eager as anything to keep in
20 our ICU.
21       (Deposition Exhibit 45 was marked.)
22    Q. I have just handed you what's been marked as
23 Deposition Exhibit 45.
24    A. Yeah.
25    Q. Have you seen this before?

**81**

1  A. Yeah. This was a letter from Mr. Trine. When
2  was this? From March, yeah.
3  Q. And I understood you before to say you visited
4  with Mr. Trine previously?
5  A. Correct. That's correct.
6  Q. What did you guys discuss?
7  A. In principal, the contents of the medical
8  charts that were available to me, including -- I think I
9  alluded to, I reviewed what was available from Summit
10 County and the details, which I think are in this
11 document that you've just reviewed -- whatever the number
12 of that is, 44 or something -- which you've just gone
13 through in detail. That was the bulk of our
14 conversation.
15 Q. How many times have you met with Mr. Trine?
16 A. I think only once. Once in my lab at the
17 university.
18 Q. Did he ask you to provide an opinion regarding
19 the adequacy of the care to Mr. Carranza-Reyes before he
20 came to Denver Health?
21 A. Could you just clarify what you mean by that?
22 Q. I think we've established earlier in your
23 testimony that Mr. Carranza-Reyes was at another medical
24 facility before he came to Denver Health --
25 A. Correct.

**82**

1  Q. -- as far as you know. And that your records
2  reflect he was also in jail at some point.
3  A. Yeah. Absolutely.
4  Q. Right. Did Mr. Trine ask you to give an
5  opinion regarding whether his treatment at the jail, for
6  example, was adequate in any way?
7  A. Was adequate? I think that what we did was
8  review the contents of those records that were available
9  as they were pertinent to my care for him here at Denver
10 Health and tried to get a sense of the tempo, evolution,
11 details of care that led up to the information that we've
12 just reviewed in terms of my care for him.
13 Q. So you didn't discuss whether you had an
14 opinion regarding the adequacy of the medical treatment
15 he received at the Park County jail?
16 A. When you say "adequacy," like in terms of did
17 he get care or -- I'm not sure what you mean by
18 "adequacy."
19 Q. Did you evaluate whether the medical care he
20 might have received at the Park County jail was adequate?
21 A. In terms of emergency care or --
22 Q. I guess in terms of any standard.
23 A. I think only the information that was available
24 to me is what I reviewed, and that was -- it's hard for
25 me to recall. I have those notes that I looked at, and

**83**

1  there was comments about him being assessed, transferred,
2  stabilized, and moved to Denver Health. I think that we
3  just looked at the sequencing of those activities trying
4  to get a sense of the tempo, the evolution of his
5  disorder.
6  Q. So you're not -- you're not offering an opinion
7  regarding whether or not his medical treatment at the
8  Park County jail was adequate or inadequate, either way?
9  A. You know, without substantively looking back at
10 those documents, the opportunity that I had was to look
11 at those documents to learn -- because I had none of that
12 perspective before about what was the time course before
13 he got ill, et cetera.
14    In terms of adequacy, that would infer some
15 ability for me to render an opinion about the consistency
16 of the care that he received relative to some standard.
17 I think that the only opportunities I had to render what
18 you're calling an opinion was about the tempo, which is
19 what I've spoken about, the tempo of the time that he was
20 in the Park County jail to the time that he got to Denver
21 Health and whether that had impacted on his well-being.
22 I think those are really -- as I've said, the content of
23 that discussion was the tempo.
24 Q. For example, do you have an opinion regarding
25 whether he should have been transported out of the jail

**84**

1  sooner or later or anything like that?
2  A. I'd have to relook at our records and ascertain
3  with those records and see. Could he have been
4  transported earlier? I don't know the details of what
5  was involved, but in the context of what I saw him in,
6  this man had been sick for a good while prior to him
7  coming to Denver Health. Certainly, the sooner anybody
8  in that circumstance gets to a medical facility, the
9  better, absolutely.
10 Q. You don't know the symptoms he presented with
11 at the jail?
12 A. I had those in the documents that you're
13 referring to in the discussion I had with Mr. Trine,
14 which I think were the Summit County Medical Department's
15 records, emergency medicine records.
16 Q. What I'm trying to ask, it seems inartfully, is
17 whether you are limiting your testimony to that of
18 testimony as a treater physician, or whether you are
19 giving opinions based on other people's -- other
20 providers' treatment of Mr. Carranza-Reyes.
21 A. I think the information that I have is what you
22 have available, that I've spoken on. My responsibility
23 to this man was at the time he was at Denver Health. The
24 information that was provided to me by Mr. Trine, and
25 that I'm sure you must have, which is I think these

**85**

1  records, there was a time prior to him being here; and
2  what I was asked to look at is the time, the tempo of the
3  events prior to him coming to Denver Health and, you
4  know, get an understanding of how sick he was when he
5  came here relevant -- relative to the time that led up to
6  that.
7       You ask the question, could he have been
8  transferred earlier? My sense is he was already very,
9  very sick when he arrived here. He was in
10 life-threatening septic shock. People in
11 life-threatening septic shock don't get there in a
12 nanosecond. It takes a little bit of time.
13      To reiterate the comment as I said before,
14 yeah, I think sick people need to come to a hospital as
15 soon as possible.
16      Q.  So I represent Nurse Vicki Paulsen, who worked
17 at the Park County jail.
18      A.  Uh-huh.
19      Q.  Okay? Are you -- do you have an opinion on
20 whether or not she did a good job or a bad job in her
21 treatment of this person?
22      A.  Without having the record, again, in front of
23 me, if you're asking me to venture an opinion, I can't do
24 that without the record in front of me, sorry.
25      Q.  So sitting here today, you don't have an

**86**

1  opinion one way or the other?
2       A.  Again, the comments that I could make would be
3  based on the documented record in front of me. I cannot
4  make comments beyond that.
5       MS. LEWIS: I think I'm done with my questions,
6  but these other two have a chance, unfortunately.
7       THE DEPONENT: Bring it on.
8       MR. RINGEL: Thank you.
9       THE DEPONENT: I hope I've been as clear as I
10 can.
11           EXAMINATION
12 BY MR. RINGEL:
13      Q.  Dr. Douglas, I'm Andrew Ringel. I represent
14 the board of county commissioners of Park County --
15      A.  Okay.
16      Q.  -- the sheriff of Park County, and a
17 then-captain at the time of these events and now the
18 undersheriff of Park County.
19      A.  Uh-huh.
20      Q.  I have some follow-up questions from the
21 inquiries that Ms. Lewis talked to you about and a few
22 other areas that shouldn't take that long. I may jump
23 around a little bit.
24      A.  Gee, then you'll be in good company.
25      Q.  If you don't follow where I'm at and it

**87**

1  doesn't -- it seems like I came up with a context out of
2  the blue, ask me to clarify, okay?
3       A.  Okay.
4       Q.  All right. What I understand is,
5  Mr. Carranza-Reyes arrived at Denver Health emergency
6  department the evening of March 8, 2003.
7       A.  Correct.
8       Q.  He became your patient when he was transferred
9  that evening to the ICU or critical care unit.
10      A.  Correct, correct.
11      Q.  You were his attending physician for the
12 remainder of the time that you were scheduled to be the
13 attending during a two-week rotation in early March?
14      A.  Right. And the record will just indicate every
15 day that I wrote a note on him, that's the time I was
16 attending physician.
17      Q.  Is it typical that those blocks of time that
18 people are scheduled to be attending physicians are,
19 like, half a month? Is it Monday to Monday? How does it
20 work or how did it work in '03?
21      A.  As it does now, which is usually half calendar
22 months. So if the switch day is the 15th of a month, if
23 it's a Sunday, that's the day.
24      Q.  So it might have been that you were on as the
25 attending from March 1 of '03 through March 15 of '03?

**88**

1       A.  Almost certainly that's how it was.
2       Q.  Unless you had some other commitment where you
3  required another attending to cover for you?
4       A.  Yeah. That's occasionally the case but not
5  frequently.
6       Q.  Okay. Do you recall who the fellow was in the
7  first part of March of '03 who was working under you as
8  the attending?
9       A.  I don't, but I see in the notes it could be
10 Dr. Dennis Lyu, and I suspect that's who it was.
11      Q.  Do you recall who the chief resident was at
12 that period of time?
13      A.  No.
14      Q.  Give me a sense of how many different people
15 might have been involved in Mr. Carranza-Reyes's
16 treatment when he first sort of hit your unit. And not
17 names, but types of people.
18      A.  Types of people. In any 24-hour period, there
19 would have been three to four nurses, two to three
20 respiratory therapists, three junior physicians -- three
21 or four junior physicians based on the time period, and
22 the fellow and myself, and then some very important
23 ancillary providers who are somewhat near the bedside but
24 don't necessarily put hands on him. So those would be
25 radiology technician, pharmacist, et cetera, et cetera.

## 105

1    A. Spinal tap.
2    Q. That tests the fluid in the spine and the
3 brain, essentially.
4    A. Correct.
5    Q. When a hospital transfers someone in critical
6 condition to Denver Health, they have to comply with
7 EMTALA. You are familiar with that acronym?
8    A. I am familiar with what EMTALA is.
9    Q. Would you get the EMTALA call or would somebody
10 in the emergency room?
11   A. Somebody in the emergency room would get the
12 EMTALA call, and the only time I would become aware of
13 that is when the person who coordinates the admission
14 puts the people in contact to say, patient coming, you
15 need to give them a thumbs-up kind of thing.
16   Q. Do you recall being involved in the decision to
17 transfer Mr. Carranza-Reyes here from Summit County at
18 all?
19   A. The decision -- in other words, actually move
20 him to Denver Health?
21   Q. That this facility was able to accept him, I
22 guess, is more accurate.
23   A. I don't remember being involved in that
24 decision. It would be unusual for me to be making that
25 decision. I tell you the only time I get in that

## 106

1 circumstance is when there literally is not a bed in the
2 house and there is an ambulance crossing the front door,
3 and it's, find a bed, the patient is here. And as I
4 remember, that was not the case.
5    Q. So if a doctor at Summit called someone to
6 fulfill his duties under EMTALA, he would have talked to
7 presumably an attending in the emergency room?
8    A. Yeah. There is a patient care line that's
9 usually staffed, I think, by either a nurse practitioner
10 or a nurse; and there's a sequence of events that goes
11 eventually down to the receiving clinician.
12   Q. Okay. Ms. Lewis asked you a little bit about
13 the sort of incubation period of what Mr. Carranza-Reyes
14 ultimately was diagnosed with.
15   A. Correct.
16   Q. Can you -- is there any way, based on the
17 information you have, for Mr. Carranza-Reyes, based on
18 your treatment of him and your review of the medical
19 records and all sources of information, that you can tell
20 when he got the infection?
21   A. Based on all sources of information independent
22 of the Denver Health record -- I've only looked at the
23 Summit County records. I wonder if I looked -- I'd have
24 to go back and see, but there was a record from the jail,
25 I think. And my impression, but not a hundred percent

## 107

1 surety, is that there was a prodrome of some several
2 days, which is what prompted the call for assistance
3 right back in the community that brought him in. So to
4 answer your question, based on all records but not my
5 records, that's my impression.
6    Q. If -- is it possible that Mr. Carranza-Reyes --
7 let me ask it a different way. Streptococcus A, okay?
8 Can one get streptococcus A and it lie dormant in one's
9 body for any period of time before there would be any
10 manifestation of symptoms about that infection?
11   A. So that is a matter of conjecture and a matter
12 of scientific research, and the reason is, there is no
13 question that, as I stated an hour ago, any one of us
14 could be harboring a streptococcus A in our throat.
15 Whether that is the bug that then ultimately becomes
16 invasive or, more likely, there is a second organism that
17 is gained, is a matter of conjecture, is a matter or area
18 of scientific research. And I don't know that we have a
19 conclusive answer in general or in specific in this case.
20       I think it's very clear that super infection,
21 new infections happen all the time, and we have very good
22 data there. One school will get the bug and it goes from
23 school to sibling to home to community, and it's all the
24 same fingerprint of the bug. That clearly is what's
25 called horizontal transmission, and there's no question

## 108

1 those are all new infections. The question you're asking
2 is, could you have that bug in your throat and it gains a
3 new mutation that makes it invasive, and that is the area
4 that is of scientific debate, and the answer is it's
5 possible but nobody knows for sure.
6    Q. The reason I'm asking, not to hide the ball
7 from you, so you understand, Mr. Carranza-Reyes hit the
8 Park County jail March 1.
9    A. Okay.
10   Q. Okay? The -- this lawsuit in part is about
11 whether he contracted streptococcus A and the other
12 things that he got that you treated him for during the
13 time he was in the Park County jail.
14   A. I understand.
15   Q. Is there any way, based on your understanding
16 of the infectious mechanism of what you treated him for,
17 to tell one way or the other?
18   A. Well, let's look at that. There's a seven-day
19 period of time between the time that he's in an
20 environment and he presents with the symptoms. That's
21 the most I can say. Yeah, that's consistent with an
22 incubation period for new exposure.
23       Other evidence of horizontal transmission in
24 the environment would be suggestive. In other words, if
25 there were others that got sick around the same time,

**109**

1  that would be strong evidence that there was concomitant
2  contraction in an environment from a common source.
3      Comparable symptoms, now, for example, if the
4  other -- the bug elaborated the same toxin and made
5  people similarly sick, not always is the case but that
6  would be suggestive. And then, you know, if there were
7  sophisticated tests available where they all had the same
8  genetic fingerprints, even more consistent.
9      I think the time course and the question of
10 whether others in the same environment had exposure or
11 there was an identified common source, those would be
12 important pieces of information to make that
13 determination.
14     Q. But absent that kind of information, can you,
15 based on what you know, say he got it March 1 or later?
16     A. Your question has a tautology in it which I
17 can't resolve. Yes, he must have got it on March 1 or
18 later, because those are the only times he got it. The
19 question is, did he get it before that? I can't answer
20 that question. Did he have it sometime within the seven
21 days before he came to the hospital? I mean, just based
22 on the natural biology, the answer is yes.
23     Q. Well, but based on the natural biology, could
24 he have gotten it February 24?
25     A. I can't exclude that.

**110**

1      Q. Okay. Based on the current scientific
2  understanding and your knowledge of it, about
3  streptococcus A, you can't exclude that possibility?
4      A. I can't exclude that possibility.
5      Q. And again, you would have to understand whether
6  there was horizontal transmission or a common source and
7  all of the other things that you just explained?
8      A. A standard epidemiologic analysis.
9      Q. Based on whatever environments he was in at
10 different periods of time?
11     A. I think that would be part of the analysis,
12 correct.
13     Q. What else would be part of the analysis?
14     A. I think prevailing nutritional status,
15 prevailing environmental conditions. So it's not just
16 where -- where was he but what was the nature of the
17 circumstances. If he's in a closed environment, there is
18 higher risk of transmission. If he's in an
19 environment -- yeah, I mean, I think it's the nature of
20 the environment, not just the name of the environment.
21     Q. Do you have any information about the nature of
22 Mr. Carranza-Reyes's environment at the Park County jail?
23     A. I don't think I've read any information about
24 the nature of the environment. I remember reading that
25 there were other people in the environment with him, and

**111**

1  that others may have been sick, but I don't remember
2  specific information about if it was, you know, a very
3  small cell or poorly ventilated cell or if there were 16
4  people in the cell. All of those things would be
5  information that would be relevant to making that
6  determination.
7      Q. Are you aware of any information about
8  Mr. Carranza-Reyes's environment in the weeks preceding
9  his being in the Park County jail?
10     A. It's interesting. I think the only information
11 I've ever read about that was in that rehabilitation
12 report. And I don't remember the details, but I remember
13 some background history about his previous employment,
14 and I thought it interesting the way it was framed that
15 he was looking at residential opportunities. I think his
16 dad lived in Chicago, and that was the reason for him
17 being in the United States.
18     Q. Do you have any understanding of the
19 circumstances, from an environmental perspective, of how
20 Mr. Carranza-Reyes traveled from Mexico to the United
21 States?
22     A. I don't think I have any memory of documented
23 information. Hearsay from family, things like that is
24 different, but I don't think I have documented knowledge
25 of that.

**112**

1      Q. Did you ever have a substantive conversation
2  with Mr. Carranza-Reyes during the time that he was at
3  Denver Health?
4      A. Substantive in that it may be limited by
5  language communication barriers. No question that in my
6  daily walk around, even when I'm not the attending
7  physician, it's my habit to put my nose through the door
8  and say, how are you doing, is there anything we can help
9  you with? Those are not substantive discussions. Those
10 are cursory. No, they were of a cursory nature.
11     Q. Did you ever take a patient history of
12 Mr. Carranza-Reyes directly from him?
13     A. Directly from him? I'm trying to think if when
14 he was better, just by walking around, I ever asked him
15 any history questions. By recollection, the answer is
16 no. That doesn't mean that I never did. I just don't
17 recall doing that. It certainly didn't contribute to any
18 of my clinical decision making.
19     Q. Would you have been the person to take the
20 history from his family members or would it have been
21 someone else?
22     A. That is a delegated task, but it doesn't
23 preclude the attending doing that. It is delegated to
24 the resident physicians. The reason I have a tie-in note
25 is, it's my responsibility to make sure it is reasonable

**117**

1  infectious cause of shock. I won't say we always get the
2  bug out. The reason being is people get antibiotics so
3  very early in their course, that we can't grow the bug to
4  see it.
5      Q. To know what it is from a culture perspective?
6      A. Right, exactly. But nine times out of ten, you
7  can look at a patient and say, you got a bug somewhere.
8  This is septic shock.
9      Q. Would a layperson be able to determine that
10 someone like Mr. Carranza-Reyes had septic shock or some
11 problem like that?
12     A. Would a layperson? How do you mean? Like the
13 village policeman?
14     Q. A guard in a jail.
15     A. Guard in a jail, boy. If he was as sick as he
16 was when he came to our hospital, it would be appreciable
17 to what is colloquially termed the village policeman,
18 because that's the comparator, that this was a very sick
19 person. Could they make the diagnosis of septic shock?
20 No. I mean, that's a clinical assessment. But this was
21 somebody who was very sick. I assume that -- assuming
22 that the way that we saw him was similar to the way he
23 was, then the answer would be yes.
24     Q. I understand. I think I'm just about done. I
25 just need to sort of look at my notes real quick.

**118**

1      Have you read any press or media accounts of
2  Mr. Carranza-Reyes?
3      A. I have.
4      Q. What sources?
5      A. I was interviewed for a piece years ago, which
6  could have been in the paper called the Summit --
7  something Summit County News.
8      Q. Does the Summit Daily News sound --
9      A. Something like that. And I was sent a reprint
10 of that.
11     Q. Does the name Aden Leonard ring a bell for you?
12     A. That's the man's name. That's the man's name.
13 And then I was -- one of my nurses saw, I guess it must
14 have been a picture of him in the newspaper. If I think
15 back, that must be over a year ago. I don't know if it
16 was The Denver Post or a local newspaper. But other than
17 that, those are the two. And then I was contacted by a
18 reporter for National Public Radio, but as I said, we
19 never followed -- it got to the point where it wasn't
20 clear to me if this was, like, you know -- I'm a
21 physician. I looked after this patient. What do you
22 want to know, or is there some other aspect to this? So
23 we declined the interview.
24     Q. Do you remember the name of that reporter?
25     A. Yeah. That was -- what is his name? National

**119**

1  Public Radio. With a Z. It will come to me in a second.
2      Q. Daniel?
3      A. Dan Zwerdling.
4      Q. Something like that?
5      A. Very credible voice.
6      Q. You recognize them by their voices when you
7  hear them on the radio.
8      A. Uh-huh, uh-huh.
9      Q. Other than yourself --
10     A. Yeah.
11     Q. -- do you have, from your review of the --
12 Mr. Carranza-Reyes's medical records, an understanding of
13 who you might characterize as his primary treating
14 physicians at this institution, Denver Health?
15     A. Other people that took direct responsibility to
16 care for him?
17     Q. Correct.
18     A. Well, Dr. Rick Albert, who is our chief of
19 medicine, cared for him for a good amount of the time.
20     Q. Which suggests he was on the medicine service?
21     A. No. Rick at that time, I think, was -- he is
22 an intensivist by training, so he attended in our ICU. I
23 think he was the intensivist of record at some stage.
24 And then Dr. Markovchick clearly was a responsible party
25 at some stage. Beyond that, I'd have to check the

**120**

1  records. I don't know.
2      Q. You, when you were talking about MRSA, you
3  indicated that there was -- 53 percent of people who get
4  it get it from outside.
5      A. 53 percent of the isolants that we find in our
6  institution didn't come from people in our institution.
7  They came in with them.
8      Q. Okay. And conversely, 47 percent of the
9  isolants that you find came from the environment of
10 the --
11     A. Right. Horizontal transmission. What's called
12 institutional acquisition.
13     Q. Do you have any opinion of which of those
14 groups Mr. Carranza-Reyes fits in?
15     A. Without going back to the primary isolation
16 data, no. Because of his circumstance, if he had been in
17 the 47 percent, not the 53 percent, entirely unsurprised
18 by that.
19     Q. Because he had a compromised immune system
20 generally when he came here?
21     A. And what's called structural lung disease. So
22 when you've got a piece of dead lung, that's the ideal
23 growing environment for these bugs.
24     Q. So if -- just my understanding of the medical
25 records is that there was some period of time after he