## SHEET 1 PAGE 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Case No. 2005-WM-377 (BNB)

---

DEPOSITION OF: GREGORY SCOTT FLINT
November 2, 2005

---

MOISES CARRANZA-REYES,

Plaintiffs

v.

PARK COUNTY, a public entity of the State of Colorado
and its governing board, THE PARK COUNTY BOARD OF COUNTY
COMMISSIONERS; PARK COUNTY SHERIFF'S OFFICE, a public
entity of the State of Colorado; FRED WEGENER,
individually and in his official capacity as Sheriff of
Park County, Colorado; MONTE GORE, individually and in
his capacity as Captain of Park County Sheriff's
Department; VICKIE PAULSEN, individually and in her
official capacity as Registered Nurse for Park County,
Colorado; JAMES BACHMAN, M.D., individually and in his
official capacity as Medical Director of the Park County
Jail,

Defendants.

---

TAKEN PURSUANT TO NOTICE on behalf of the Plaintiff at
824 Costella, Fairplay, Colorado 80440 at 8:31 a.m.
before Laura L. Corning, Federal Certified Realtime
Reporter, Certified Shorthand Reporter and Notary Public
within Colorado.

## PAGE 2

APPEARANCES

For the Plaintiff:
WILLIAM A. TRINE, ESQ.
Trine & Metcalf, P.C.
1435 Arapahoe Avenue
Boulder, Colorado 80302-6390

LLOYD C. KORDICK, ESQ.
805 South Cascade
Colorado Springs, Colorado 80903

JOSEPH J. ARCHULETA, ESQ.
Law Office of Joseph Archuleta
1724 Ogden Street
Denver, Colorado 80128

For the Defendants Park County, Park County Board of County Commissioners, Park County Sheriff's Office, Wegener, Gore:
JENNIFER L. VEIGA, ESQ.
Hall & Evans, LLC
1125 17th Street
Suite 600
Denver, Colorado 80202-2037

STEPHEN A. GROOME, ESQ.
P.O. Box 1373
501 Main Street
Fairplay, Colorado 80440

For the Defendant Paulsen:
MELANIE B. LEWIS, ESQ.
Berg Hill Greenleaf & Ruscitti LLP
1712 Pearl Street
Boulder, Colorado 80302

For the Defendant Bachman:
ANDREW W. JURS, ESQ.
Johnson McConaty & Sargent, P.C.
400 South Colorado Boulevard
Suite 900
Glendale, Colorado 80246

Also Present: None

## PAGE 3

INDEX

| EXAMINATION OF GREGORY SCOTT FLINT: November 2, 2005 | PAGE |
|---|---|
| By Mr. Trine | 4 |
| By Mr. Kordick | -- |
| By Mr. Archuleta | -- |
| By Ms. Veiga | -- |
| By Mr. Groome | -- |
| By Ms. Lewis | -- |
| By Mr. Jurs | 127 |

| DEPOSITION EXHIBITS | INITIAL REFERENCE |
|---|---|
| 10   Inmate Worker Trustee Program | 119 |

(Original exhibits attached to original deposition; copy exhibits included in continuing exhibit file; copies provided to counsel as requested.)

REQUESTED PORTIONS OF TESTIMONY:     PAGE
(None.)

REFERENCES TO EXHIBITS MARKED PREVIOUSLY:

| Exhibit No. | Page Reference |
|---|---|
| 1 | 14 |
| 2 | 84 |
| 3 | 15 |
| 6 | 98 |

## PAGE 4

4

1  WHEREUPON, the within proceedings were
2  taken pursuant to the Federal Rules of Civil
3  Procedure:
4      GREGORY SCOTT FLINT,
5  having been first duly sworn to state the whole truth,
6  was examined and testified as follows:
7      EXAMINATION
8  BY MR. TRINE:
9      Q.  Please state your full name and office
10 address for the record.
11     A.  Detective Corporal Gregory Scott Flint,
12 and that's F-l-i-n-t. I work for the Park County
13 Sheriff's office. The address would be 1180 Park
14 County Road 16, Fairplay, Colorado. Zip Code is 80440.
15     Q.  And what is your educational background?
16     A.  Varied. I have about 2 1/2 years in
17 criminal justice, some other college as it relates to
18 the law enforcement field, Agan Tech, and approximately
19 4,000 hours in specialized training in law enforcement,
20 including three police academies and Marietta training
21 through the FBI and other trains of thought.
22     Q.  And what did you first go to work at the
23 Park County Jail?
24     A.  It would be May of 1999. I'm sorry.
25 That's when I started employment with the sheriff's

Notes:

Coffman Reporting
303.893.0202
303.893.2230 FAX

EXHIBIT
23

**Page 69**

1 foundation.
2   A.   Yes, probably, because he would have been
3 required to write up something as well. He should have
4 made, you know, notations or something on his report as
5 well.
6   Q.   (BY MR. TRINE)  On what report would that
7 be?
8   A.   Well, he could attach that to the log
9 book. He could make an entry on the master control
10 log. I mean, I -- I have no recollection of that,
11 so -- and I know I would have logged it here
12 (indicated). So --
13   Q.   Well, apparently you did log that there
14 were several inmates in D Pod appearing to experience
15 chest colds, flu or altitude sickness and officers
16 placed coolers in there overnight with drinks and
17 water.
18   A.   Right.
19   Q.   And you don't know where that information
20 came from?
21   A.   Right.
22   Q.   It could have come from Eddie Allen?
23        MS. VEIGA:  Objection to form and
24 foundation.
25        MR. KORDICK:  I need a second to speak

**Page 70**

1 with my cocounsel.
2        THE DEPONENT:  Sure.
3        (Discussion off the record.)
4   Q.   (BY MR. TRINE)  Now, again, looking at
5 page 45 of Exhibit 1, in the fourth paragraph you've
6 stated that there have been no laundry changes in B, C,
7 and D Pods for over five days, and you've emphasized
8 the word "no" there. Were you upset or concerned over
9 that?
10   A.   Yes.
11   Q.   And -- and do you remember what your
12 concern was or why you were concerned that there had
13 been no laundry change for more than five days?
14   A.   I just wanted to minimize the risk of any
15 health issues and get clean linens into those pods.
16   Q.   And you indicate that you -- "We had our
17 laundry person, Forester, out our whole shift to deal
18 with D Pod." And do you remember what the problem was
19 that evening in D Pod that caused you to have the
20 laundry person involved?
21        MS. VEIGA:  Objection as to form.
22   A.   May I take a minute to review this,
23 please?
24   Q.   (BY MR. TRINE)  Sure.
25   A.   Taking this in the context that I wrote

**Page 71**

1 it at the time, what I'm saying is we had Forester out
2 the whole shift to help deal with correcting the linen
3 problem in D Pod. I may have -- I don't recall for
4 sure, but I would make assessments, and if that was
5 probably the voluminous pod -- the pod with the most
6 people in it at that time -- I probably started with
7 that particular pod to start that linen rotation, just
8 because it was -- probably had the largest volume of
9 folks in it.
10        When I say "Forester out," I don't mean
11 he was out of the loop. Taking this in the context I
12 wrote it, it means that he was probably dealing
13 specifically with D Pod, probably trying to get their
14 linens up to speed, getting their things washed.
15   Q.   Do you remember Forester and whether it
16 was a man or a woman?
17   A.   I don't have any direct recollection at
18 this time.
19   Q.   I believe someone told us it was a
20 female, but I don't know whether it was or not.
21   A.   You know, we moved thousands of inmates
22 and detainees through that facility in my time, so I
23 don't have any direct recollection.
24   Q.   Now, I don't know whether this would
25 refresh your memory or not, but let me find out:

**Page 72**

1 Carranza-Reyes and his brother, twin brother, who were
2 in D Pod that evening inform us that they were asked to
3 shed their uniform, strip down, during that evening and
4 put blankets around them while their clothes were taken
5 to be laundered, and within a couple hours or so they
6 brought their clothes back and they were able to get
7 into their clothing again, with the explanation that
8 there wasn't enough clean clothing to substitute
9 clothes. Does that sound familiar to you?
10        MS. VEIGA:  Objection to form and
11 foundation.
12   A.   That actually sounds way out of context.
13 I've never heard of that being done unless somebody was
14 sick at the time or had created a disciplinary problem,
15 you know, something that they actually directly caused
16 through their uniform and it was contaminated somehow.
17 But that was -- if that happened, I have no knowledge
18 of it, because that would be way out of context of the
19 normal way we would proceed. We wouldn't ask you to
20 strip until we had other uniforms ready for you. I'm
21 not aware of that.
22   Q.   (BY MR. TRINE)  He said the entire pod
23 was asked to strip down, not just he and his brother --
24   A.   Okay.
25   Q.   -- all of them, so that they could wash

PAGE 77

77

1 maybe spending several more hours; is that correct?
2     MS. VEIGA: Objection, form and
3 foundation.
4   A.   That's correct.
5   Q.   (BY MR. TRINE) Okay.
6   A.   Because it would be a rotational -- a
7 rotational thing. You wouldn't be able to accomplish
8 that mission in one fell swoop. We didn't have enough
9 equipment there. It rotated through. That's what kept
10 the trustees busy throughout their shift; there was a
11 constant rotation of laundry going through there.
12 So . . .
13   Q.   Now, upon learning that you have several
14 inmates -- I don't know how many --
15   A.   Um-hum.
16   Q.   -- but apparently several inmates who
17 might have the flu --
18   A.   Right.
19   Q.   -- which can be communicable and spread,
20 right?
21   A.   Right.
22     MS. VEIGA: Wait until he finishes his
23 question.
24   Q.   (BY MR. TRINE) With your vast experience
25 up to that point in time, you recognized that this

PAGE 78

78

1 could be a problem. We might have an epidemic if we've
2 got 50 people crowded into that Pod D, right?
3     MS. VEIGA: Objection to form and
4 foundation.
5   A.   There is a possibility of an epidemic
6 with those types of confined spaces.
7   Q.   (BY MR. TRINE) Right. And then you find
8 out that there hasn't even been clean clothing in that
9 pod for more than five days. That, combined with
10 inmates in there maybe having the flu, would cause you
11 concern, wouldn't it?
12     MS. VEIGA: Objection to form and
13 foundation.
14   A.   It did cause me concern; that's why I
15 took the action I took.
16   Q.   (BY MR. TRINE) And you would want that
17 clothing changed as quickly as possible, wouldn't you,
18 into clean clothing?
19     MS. VEIGA: Same objections.
20   A.   Yes, I would.
21   Q.   (BY MR. TRINE) Okay. And one of the
22 things we all do is try to change our clothes every day
23 because there are possible health problems involved if
24 you don't; isn't that right?
25     MS. VEIGA: Objection, foundation.

PAGE 79

79

1   A.   That's correct.
2   Q.   (BY MR. TRINE) And you know that when
3 you have that many people in three tiers in bunk beds
4 who, if they do have the flu or colds, may be sneezing
5 and coughing, contaminating the air around other
6 inmates, that this -- this infection could spread,
7 right?
8     MS. VEIGA: Objection to form and
9 foundation.
10   A.   Correct. It could spread.
11   Q.   (BY MR. TRINE) Okay.
12   A.   There is a possibility.
13   Q.   Okay. And the last thing you would want
14 is an epidemic of flu spreading through the entire
15 jail, right?
16   A.   Nobody would want that, no.
17   Q.   Okay.
18     MR. JURS: Object to form on that last
19 question.
20   Q.   (BY MR. TRINE) Was any effort made, to
21 your knowledge, to identify the inmates who might have
22 the flu and getting them out of there and segregating
23 them?
24   A.   Well, what we do normally is move them
25 down to either the lower level onto mattresses

PAGE 80

80

1 temporarily, you know, so that you could assess. I
2 think as I've indicated here, you know, there is a
3 possibility of many things I had to look at. Was it
4 altitude sickness? Because some of these folks had
5 come from, you know, around 2,000 feet into a 9600-foot
6 environment. That's why I want to make sure they were
7 hydrated, give them enough water, et cetera, and other
8 drinks that we had made up.
9   Q.   Now, you say you wanted to make sure of
10 that. Are you the one that ordered the officers to
11 place the coolers in there?
12   A.   That's correct.
13   Q.   Okay. So you were concerned about
14 dehydration, too?
15   A.   Dehydration from many potential
16 scenarios.
17   Q.   Right.
18   A.   I mean, altitude is a concern here. As
19 any first responder you have to be aware of that.
20 So -- and I might add that, you know, the officers were
21 working in the very same scenario that the inmates were
22 and trustees and detainees were working in. So, I
23 mean, you didn't want to contaminant your own
24 environment. So . . .
25   Q.   And were you aware of officers calling in

**Page 81**

1 sick that week?
2    A.   No, no.
3    Q.   Not on your shift.
4    A.   Not on my shift. I wouldn't have
5 knowledge of anybody else, but . . .
6    Q.   You wouldn't necessarily have knowledge
7 of other officers on other shifts calling in sick.
8    A.   Generally not. I mean, that's not --
9 wouldn't have been my area of responsibility, unless it
10 was a supervisor and it impacted them directly and they
11 needed me to cover or something.
12    Q.   Now -- now, why would inmates who perhaps
13 had the flu be placed down on the lower level where
14 everyone eats and where they could still cough and
15 sneeze and contaminant everything?
16    A.   We'd keep them kind of isolated from the
17 table area, if you could. You just try and do the best
18 you could with what you had. The bathrooms are close
19 by, they would have access to the drinks and et cetera.
20 And also, I don't know if you've seen the jail or at
21 least the way it was laid out at that time is the
22 control room officer, which was generally a sergeant or
23 corporal or a designee, would have an actual visual
24 view through the pod bay windows of those folks. So if
25 somebody was, you know, seriously ill, you'd have

**Page 82**

1 somewhat of a little bit more of a visual look or you
2 could monitor them better on the camera system.
3    So -- so it was a -- a move based on
4 availability of things and -- and availability to watch
5 them versus trying to put them in an area where they
6 were eating. That wasn't our goal. Our goal was to
7 keep them closer to the front door, keep them closer to
8 the facilities downstairs. That's where routinely, for
9 safety reasons, we kept our coolers full of ice, water
10 and fruit drinks.
11    MS. LEWIS: I wanted to interpose an
12 objection to the last question. Thanks.
13    Q.   (BY MR. TRINE) Okay. So I guess my
14 question still is, why weren't those who were
15 identified with, perhaps, having flulike symptoms
16 placed in segregation and getting them out of
17 Pod D where they could contaminant other people?
18    MS. VEIGA: Objection to form and
19 foundation.
20    A.   I'm not sure why they weren't. We may
21 not have had the room. I don't know. We may have had
22 people in other areas with other symptoms until they
23 could be assessed properly. And usually by
24 administering water and -- and getting -- getting them
25 back up to par, getting them hydrated, tended to slow

**Page 83**

1 down on a lot of the issues, so . . .
2    Q.   (BY MR. TRINE) Now, I see that -- that
3 you made sure that copies of this interoffice
4 memorandum, page 45 of Exhibit 1, was -- was also
5 placed in the sergeant's log and provided to Captain
6 Gore. Do you see that?
7    A.   That's correct, sir.
8    Q.   And -- and was that because of your
9 concern this could turn out to be a serious problem if
10 it wasn't remedied right away and you wanted everyone
11 to know what the problem was?
12    MS. LEWIS: Object to the form and
13 foundation.
14    A.   Yes. I -- I obviously had concerns or I
15 wouldn't have wrote this memo and signed it. My goal
16 is to treat everybody fairly and get them up to a
17 living condition that I felt that we could provide as
18 officers in the jail. So that's not a one-man-or-girl-
19 type thing. We rely on teamwork. So I had to
20 communicate with all the other supervisors and Captain
21 Gore to make sure that this goal got accomplished, to
22 make sure that these linens got changed out, et cetera.
23    Q.   So that this interoffice memorandum would
24 appear literally in all the records that people see;
25 that is, it would be in the pass-on records, it would

**Page 84**

1 be in the sergeant's log, and would also be given
2 directly to Captain Gore --
3    MR. JURS: Object to the form.
4    Q.   (BY MR. TRINE) -- is that right?
5    A.   Should have been. I mean, I wasn't
6 involved in the filing, but that's why I requested the
7 copies to be distributed as such.
8    Q.   And with your expectation that the nurse
9 would probably also become involved when she came on
10 duty.
11    A.   That's correct.
12 {P2 Q.   Now, if you -- if you'll take a look at
13 Deposition Exhibit 2, and those pages are -- are
14 numbered in the lower right-hand corner as Park
15 numbers, and if you look at page 141, you'll see
16 that -- and, by the way, we asked for the nurse's
17 records as -- on Carranza-Reyes as part of this
18 discovery, and this was one of the records provided to
19 us.
20    Park 141 is dated March 6, '03, and we
21 have no record of the nurse -- at this point we don't
22 have any records of the nurse seeing any of these
23 inmates on the 5th, the day after your memorandum.
24 This is the earliest record we have. But you'll see
25 that on March 6, '03 the nurse did see Carranza-Reyes

**SHEET 22 PAGE 85**

**85**

1  in medical with an interpreter, and he was complaining
2  of body aches, headache, nausea and diarrhea, said he
3  had nasal congestion and a sore throat.
4      Do you remember on the 4th, when you
5  learned of inmates having flulike symptoms or colds --
6  do you remember getting a more detailed description of
7  what those symptoms were?
8      MS. LEWIS: Object to the form.
9  A.  No, I do not.
10 Q.  (BY MR. TRINE) Okay. And -- and he also
11 said his skin was warm and he was slightly tender over
12 the stomach. Did you become aware by March 6 that
13 there was an inmate in Pod D that had these symptoms or
14 was in this condition?
15 A.  No. Not specifically, no.
16 Q.  So no one called that to your attention?
17 A.  Not that I recall, no.
18 Q.  Do you remember during the evening shift
19 on March 6 seeing any inmates in Pod D that seemed to
20 be having diarrhea and vomiting and --
21 A.  None that I recall, not specifically.
22 Q.  Okay. If you had been made aware of
23 these symptoms on the evening of March 6, would that
24 have been a concern to you?
25      MS. VEIGA: Objection to form and

**PAGE 86**

**86**

1  foundation.
2  A.  Yes. And if I had been made aware, I
3  would have more than likely generated a memorandum, if
4  I couldn't have covered it on my sergeant's log.
5  Q.  (BY MR. TRINE) Okay. Because from your
6  own experience, you know that that description of
7  symptoms could be a description of any number of
8  communicable diseases; isn't that right?
9      MS. VEIGA: Objection to form and
10 foundation.
11 A.  It could be any number of communicable
12 diseases, it could be dietary issues, it could be many
13 things, but, yes, I would have concerns.
14 Q.  (BY MR. TRINE) And your concern would be
15 that if it was strep throat, for example, or
16 Streptococcus A, that that's something that could
17 spread rapidly throughout the population --
18     MS. VEIGA: Objection to form --
19 Q.  (BY MR. TRINE) -- is that right?
20     MS. VEIGA: Objection to form and
21 foundation.
22 A.  It could spread rapidly throughout the
23 pod. And my other concern, like I said before, we
24 worked in that environment, too. We wouldn't have
25 wanted to let something like that go. We all have

**PAGE 87**

**87**

1  families, and you have to maintain your fitness for
2  duty. So . . .
3  Q.  And if you'd been aware of those symptoms
4  on the evening of March 6, would you have taken steps
5  to see that that inmate either received treatment
6  immediately or would be segregated from the rest of the
7  population?
8      MS. VEIGA: Objection to form and
9  foundation.
10 A.  Segregation would have been one way of
11 dealing with it, seeing the nurse, if she was
12 available, or scheduling an appointment for a nurse.
13 If it was more immediate, you know, first responders
14 could be called to the scene, like an EMT or paramedic.
15 Q.  (BY MR. TRINE) Yeah. If you'd also look
16 at the master control log, which is --
17     MR. KORDICK: Exhibit 3.
18 Q.  (BY MR. TRINE) -- Exhibit 3.
19     MR. KORDICK: 0993. I'm sorry. I'm
20 sorry.
21 Q.  (BY MR. KORDICK) And turn to page Park
22 0993, and you'll see at 10:10 a.m. -- and that would be
23 the day shift; is that right?
24 A.  That's correct.
25 Q.  -- apparently one of the detainees in

**PAGE 88**

**88**

1  Pod D had chest pain and was taken -- was taken to
2  medical. Do you see that?
3  A.  Yes.
4  Q.  And -- and do you know which officer
5  that -- that is listed as CG?
6  A.  I don't recognize those initials.
7  Q.  Okay. Would -- would you expect that to
8  have been -- that information to have been contained in
9  the pass-on report that you would have received when
10 you came on duty at -- at 4:00 that day?
11 A.  That would depend on a myriad of things,
12 one of them being if this problem was handled directly
13 in medical that day by Nurse Paulsen, then there
14 wouldn't have been any reason to notify me, unless
15 there was another existing condition like I spoke of
16 before, like a twisted ankle or something that we
17 needed to give some continued mild first-responder-type
18 treatment.
19     The nurse didn't report to us, so -- I
20 mean, if she handled the situation within the confines
21 of her office and her working day, then she wouldn't
22 have generated a memo and nor would the sergeant
23 necessarily have generated a memo, you know, pertaining
24 to that particular incident.
25 Q.  So that's not necessarily something you

**Page 93**

1  general population and put in segregation?
2  A.  I could have, yeah, depending on the
3  scenario.
4  Q.  You wouldn't rely on a nurse to do that.
5  MS. VEIGA: Objection to form and
6  foundation.
7  A.  Depends on the scenario.
8  Q.  (BY MR. TRINE) Okay. So either you or
9  the nurse could do that.
10  A.  She could, depending on their medical/
11  health issues.
12  Q.  Okay. How would -- how would a nurse go
13  about implementing that, if a nurse wanted an inmate or
14  a detainee placed in segregation for health reasons?
15  A.  She could go -- she was in our chain of
16  command, so she could report directly to the captain or
17  she could facilitate that movement in accordance with a
18  duty supervisor, either a corporal or a sergeant, and
19  have them facilitate that with Captain Gore. But
20  ultimately, to be placed in segregation, sooner or
21  later Captain Gore would have to make the final
22  decision and be made aware of it. For immediate holds,
23  any sergeant or corporal could make that decision in
24  accordance with the nurse's request.
25  Q.  Now, am I correct, based on what you've

**Page 94**

1  earlier said, that if the segregation holding cells
2  already had inmates in them, would there be any other
3  place that a detainee could be placed to segregate them
4  from the general population?
5  A.  They could go into the holding cells if
6  they were available.
7  Q.  And --
8  A.  We also had a small segregation unit that
9  we used to hold witnesses that were in trials that may
10  have had a security status. If that cell was
11  available, they could be moved into that. And then as
12  I explained earlier, they could be moved into -- C and
13  D Pods, when I was there, before the expansion, had
14  individual lockdown cells that they could be moved
15  into.
16  Q.  Okay. Now, what was your understanding
17  of when, if ever, you had authority to directly call
18  Dr. Bachman?
19  A.  Anytime on -- on a shift that I needed
20  assistance, if it was that serious --
21  (Interruption of the proceedings by cell
22  phone.)
23  MS. VEIGA: Can we turn that off, please?
24  MR. KORDICK: That's my phone, but it's
25  not my ring. Sorry.

**Page 95**

1  A.  In the nurse's absence or if she was
2  unavailable and we couldn't get ahold of her, we could
3  call -- any supervisor could call Dr. Bachman directly
4  for assistance and advice and we'd get a call back.
5  Q.  (BY MR. TRINE) And did you do that on
6  occasion?
7  A.  I've had occasions to do that.
8  Q.  When that occurred, did you make some
9  record of it?
10  A.  Generally speaking, yes. It would be
11  probably a memo generated like this (indicated). And
12  there again, if I had room to cover it on my sergeant's
13  log, I would make the notation there. But if it was an
14  expanded incident of some type, then I went to the memo
15  and attached that to my sergeant's log.
16  Q.  But if the nurse was available to see a
17  detainee or inmate, you didn't have the prerogative to
18  go over her head and call the doctor directly.
19  MS. VEIGA: Objection to form.
20  Q.  (BY MR. TRINE) Is that right?
21  A.  I would have never gone over a health
22  professional's judgment. If she was there and on duty,
23  she was in charge for the health situations. I would
24  be there to back her up for any safety, security
25  reasons and any first-responder assistance that I might

**Page 96**

1  be able to provide. But she -- she would be in charge
2  of the medical incident at that time, if she was there
3  and on duty or, like in this case, he was already under
4  her care, so I would refer to her, you know, for any
5  treatment follow-up that a first responder might be
6  able to provide.
7  Q.  Now, do you have any explanation for why
8  the sick detainees were not segregated --
9  MS. VEIGA: Objection to form and
10  foundation.
11  Q.  (BY MR. TRINE) -- out of Pod D?
12  MS. LEWIS: Same objection.
13  A.  When I -- when I first reported it or --
14  I'm not sure when you're asking.
15  Q.  (BY MR. TRINE) At any time.
16  A.  At any time?
17  Q.  Right.
18  A.  Well, it would depend on the severity of
19  their complaints and --
20  Q.  Well, we've gone over their -- the
21  symptoms of Carranza-Reyes.
22  MS. VEIGA: Counsel --
23  Q.  (BY MR. TRINE) Assuming those to be the
24  symptoms of -- of Carranza-Reyes.
25  MS. VEIGA: Objection to form and

**Page 97**

1  foundation.
2      A.    Right.  There again, you'd have to make
3  an assessment.  Just immediate complaint of a runny
4  nose or something to that effect is not -- I don't
5  know.  It's not telling me that this is in fact a flu
6  symptom.  Flu would be one of the many potential
7  outcomes that it could be, and that's why we isolated
8  him to a lower deck.
9           My first concern would be the altitude,
10 knowing that most of these folks came from such a low
11 environment, and in trying to isolate some of the
12 symptoms and see if we could get them back on track,
13 and the first thing would be -- with any of the things
14 that you've described, flulike symptoms and so on,
15 would also be covered under high-altitude sickness,
16 dehydration, making sure they've been hydrated.  Like I
17 said, they've been on the road, they've been
18 transported, you know, at this altitude.  It's very
19 important to stay hydrated.
20          So those are my first concerns, and then
21 I would work out from there trying to isolate what --
22 what it is they're experiencing.  So . . .
23     Q.    (BY MR. TRINE) Yeah.  And I guess my
24 question was do you have any explanation in this case
25 for why the sick detainees were not segregated outside

**Page 98**

1  of Pod D?
2           MS. LEWIS:  Objection --
3           MS. VEIGA:  Objection, form and
4  foundation.
5      A.    I think the best I can answer that is
6  what I just said, because I want to isolate and assess
7  before I just randomly move people into another area
8  and --
9      Q.    (BY MR. TRINE) Okay.  Why don't you look
10 at Exhibit 6, if you would, please.  And this is a --
11 these are pages right out of the policy and procedure
12 manual utilized at the jail on communicable disease.
13 And did you become familiar with the policy and
14 procedure manual when -- when you worked there as
15 sergeant?
16     A.    I've gone over most of these, yes, sir.
17     Q.    Okay.  And you would agree with the
18 statement on Park 1995 of Exhibit 6 in the second
19 paragraph, that in a jail, like anyplace where people
20 are obligated to live together in close contact,
21 communicable disease can be a big problem, disease can
22 spread rapidly through the jail infecting inmates and
23 staff alike?
24     A.    That's correct.
25     Q.    I mean, you're aware of that just from

**Page 99**

1  having children, that sometimes there will be an
2  epidemic of flu or infection in the school because
3  children are in a crowded condition and exposing one
4  another.
5      A.    That's a possibility, yes.
6      Q.    Has that happened to one of your children
7  at times who has come home sick from school?
8      A.    It's hard to tell where they bring it
9  home from.
10     Q.    Okay.  And then -- and then on Park 1996
11 it states the general information on how an infectious
12 or communicable disease can be spread, and you're
13 probably -- you probably were already very familiar
14 with that, weren't you?
15          MS. VEIGA:  Objection to form and
16 foundation.
17     A.    Like I said, we've trained on these
18 policies and have had training and I'm aware of them.
19     Q.    (BY MR. TRINE) Okay.  And then on Park
20 1997, where it lists the common signs and symptoms of
21 communicable disease, it -- it states that here are
22 some of the more common signs and symptoms, and lists a
23 whole list of signs and symptoms.  Do you see that?
24     A.    Yes.
25     Q.    And the reason this policy and procedure

**Page 100**

1  contains this information is to make the officers who
2  work with these inmates aware of what to look for when,
3  in fact, there could be a communicable disease within
4  the facility; isn't that right?
5           MS. VEIGA:  Object to the form and
6  foundation.
7      A.    This is correct.
8      Q.    (BY MR. TRINE) And so in this case, when
9  Carranza-Reyes had had evidence of possible fever, warm
10 skin, was complaining of headaches, coughing, diarrhea,
11 complaining of a sore throat, complaining of joint
12 pain, this would alert anyone who has read this to the
13 fact that he might have a communicable disease; is that
14 right?
15          MS. VEIGA:  Objection to form and
16 foundation.
17     A.    It would be a possibility.
18     Q.    (BY MR. TRINE) Okay.
19          MS. VEIGA:  Counsel, if I can interrupt
20 for a second.  We have, I think, Officer Greeley
21 scheduled in 10 minutes.
22          MR. TRINE:  Oh, maybe we better --
23          MR. KORDICK:  Move him back.
24          MR. TRINE:  -- move him until, what,
25 maybe 11:30 just to be safe.  I hope he hasn't already