## 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Case No. 2005-WM-377 (BNB)

DEPOSITION OF: JAMES BACHMAN, M.D.
January 19, 2006

MOISES CARRANZA-REYES,
Plaintiff,
v.
PARK COUNTY, a public entity of the State of Colorado and its governing board, THE PARK COUNTY BOARD OF COUNTY COMMISSIONERS; PARK COUNTY SHERIFF'S OFFICE, a public entity of the State of Colorado; FRED WEGENER, individually and in his official capacity as Sheriff of Park County, Colorado; MONTE GORE, individually and in his capacity as Captain of Park County Sheriff's Department; VICKIE PAULSEN, individually and in her official capacity as Registered Nurse for Park County, Colorado; JAMES BACHMAN, M.D., individually and in his official capacity as Medical Director of the Park County Jail,

Defendants.

TAKEN PURSUANT TO NOTICE on behalf of the Plaintiff at 340 Peak One Drive, Frisco, Colorado 80443 at 9:22 a.m. before Theresa A. Coffman, Federal Certified Realtime Reporter, Registered Professional Reporter and Notary Public within Colorado.

## 3

INDEX
EXAMINATION OF JAMES BACHMAN, M.D.                    PAGE
January 19, 2006

By Mr. Trine                                          4, 142
By Mr. Kordick                                          --
By Ms. Veiga                                            --
By Mr. Marks                                          139
By Mr. Sargent                                          --

                                                    INITIAL
DEPOSITION EXHIBITS:                                REFERENCE
27  Curriculum Vitae, Dr. Bachman                       4
28  Agreement for Professional Services,               24
    2/15/01
29  Special Systems Plan, Second Floor, The            15
    Western Corrections Group, as built 4/3/95
30  Letter form Calzada-Gomez to Weber, 3/10/03       107
    with attachments

(Original exhibits attached to original deposition; copy exhibits included in continuing exhibit file; copies provided to counsel as requested.)

REQUESTED PORTIONS OF TESTIMONY:                      PAGE

Request for document production
or information                                          --
Certified question                                      --
Other requests or marked testimony                      --
REFERENCES TO EXHIBITS MARKED PREVIOUSLY:
Exhibit No.  Page Reference    Exhibit No.  Page Reference
    2            72                 6            116
    4            50                21            130
    5            42                24             78

## 2

APPEARANCES
For the Plaintiff:      WILLIAM A. TRINE, ESQ.
                        Trine & Metcalf, P.C.
                        1435 Arapahoe
                        Boulder, Colorado 80302

                        LLOYD C. KORDICK, ESQ.
                        805 South Cascade
                        Colorado Springs, Colorado 80903

For the Defendants      JENNIFER L. VEIGA, ESQ.
Park County, Park       Hall & Evans, LLC
County Board of         1125 17th Street
Commissioners, Park     Suite 600
County Sheriff's Office, Denver, Colorado 80202
Wegener and Gore:
For the Defendant       JOSH A. MARKS, ESQ.
Paulsen:                Berg Hill Greenleaf & Ruscitti LLP
                        1712 Pearl Street
                        Boulder, Colorado 80302

For the Defendant       CRAIG A. SARGENT, ESQ.
Bachman:                Johnson McConaty & Sargent, P.C.
                        400 South Colorado Boulevard
                        Suite 900
                        Glendale, Colorado 80246

Also Present:           None

## 4

1  WHEREUPON, the within proceedings were taken
2  pursuant to the Federal Rules of Civil Procedure:
3  (Deposition Exhibit 27 was marked.)
4  JAMES BACHMAN, M.D.,
5  having been first duly sworn to state the whole truth,
6  was examined and testified as follows:
7  EXAMINATION
8  BY MR. TRINE:
9     Q.  Please state your full name and address for
10 the record.
11    A.  James J. Bachman. Business address or
12 personal address?
13    Q.  Business is fine.
14    A.  P.O. Box 545, Frisco, Colorado 80443.
15    Q.  Your occupation or profession?
16    A.  I am a physician.
17    Q.  And, Dr. Bachman, I'll hand you what has
18 been marked Deposition Exhibit 27, which was provided to
19 us by your counsel and appears to be your resume; is that
20 correct?
21    A.  Yes, sir.
22    Q.  Is that current?
23    A.  Yes, sir.
24    Q.  When did you become board certified in
25 family medicine?

Coffman Reporting
303.893.0202
303.893.2230 FAX


EXHIBIT 24

Pages 1 to 4

* SUBJECT TO CONFIDENTIALITY DESIGNATIONS *

105

1  during the time you worked together as a team?
2       MR. SARGENT: Form and foundation.
3       A. No, sir. I thought she was superb,
4  excellent, appropriate, competent, wonderful,
5  compassionate. I certainly can't speak -- I can't -- I
6  can't find the words to praise her enough.
7       Q. You would speak as highly of her as you
8  previously did the whole jail staff, right?
9       A. I thought they did a very good job. I was
10 impressed. As you pointed out, I have not worked at a
11 correctional facility before, so I didn't know what to
12 expect. And I was very interested and curious as to
13 their operation, and I just thought -- I was impressed
14 that they did a very, very good job in all aspects,
15 especially medical.
16      Q. (BY MR. TRINE) Right. So in conclusion,
17 it's pretty obvious that your opinion is a very, very
18 high opinion, both of you and your own care of everyone
19 there, of the nurse's care, and of the jail staff. Is
20 that a good summary?
21      MR. SARGENT: Form and foundation.
22      A. I thought everyone tried very hard to do a
23 good job, and I never saw any instance of disrespect or
24 anything but the most caring approach. Especially of
25 Nurse Paulsen. She was very, very appropriate and

106

1  compassionate with her patients.
2       Q. (BY MR. TRINE) Now, was it your practice to
3  review any documents in the controller's room when you
4  came into the controller's room?
5       A. No, sir.
6       Q. So you never reviewed pass-on records or the
7  master log, sergeant's master log?
8       A. I don't think I was invited. Again, there
9  were windows, so I could look in the window, and there
10 was a place where your voice could be transmitted
11 through, so I communicated -- and I think we're talking
12 about the same room, but I'm not sure I was ever invited
13 into that room. Maybe once. Again, they were pretty
14 thoughtful about where they took me and when they took
15 me, and that was a controlled situation. I certainly did
16 not have free access.
17      Q. Doctor --
18      A. Yes, sir.
19      Q. -- were you informed that the Mexican
20 consulate and INS had requested that additional remaining
21 detainees in Pod D be examined by a physician when it was
22 discovered that Carranza-Reyes was at the hospital in
23 Denver?
24      A. No, sir. I was not aware of that.
25      Q. All you knew is that Nurse Paulsen was

107

1  asking you to see additional detainees?
2       A. That's correct. I thought the request came
3  from Nurse Paulsen.
4       Q. And if you look at Exhibit 30, which for the
5  record is Park 496 through 493.
6       A. The numbers are not sequential in this
7  document.
8       MR. SARGENT: Would you say that again?
9       MR. TRINE: 496 -- that's not right.
10      MR. KORDICK: The first page is out of
11 order.
12      MR. TRINE: Let me change that, then.
13 Exhibit 30 contains pages of Park 496 and then 473 to
14 493.
15      MR. MARKS: Let me state for the record I
16 think there's a couple pages missing from your
17 chronology.
18      MR. TRINE: Excuse me?
19      MR. MARKS: There's a couple pages missing
20 from your description of the page range in this exhibit.
21      MR. TRINE: On 473 through 493?
22      MR. MARKS: That's correct. But you said
23 497 at the end of your range. Now you're correct. So
24 it's 473 to 493 and page 496?
25      MR. TRINE: Correct.

108

1       MS. VEIGA: Although I'm missing page Park
2  481.
3       MR. TRINE: I'm sorry. Off the record for a
4  second.
5       (Discussion off the record.)
6       MR. TRINE: Okay. Back on the record.
7  Again, for the record, Deposition Exhibit 30 apparently
8  consists only of Park 496 and Park 473 through 480 and
9  Park 482 through 493.
10      Q. (BY MR. TRINE) Doctor, referring to Park
11 473, this is a document indicating that this INS detainee
12 was seen at the Summit Medical Center but apparently was
13 not seen by you; is that right?
14      A. Yes, sir.
15      Q. And was diagnosed with bronchitis, correct?
16      A. Yes, sir.
17      Q. And bronchitis, by definition, is some type
18 of infection, isn't it?
19      A. Yes, sir.
20      Q. And this was on March 10, '03?
21      A. Yes, sir.
22      Q. Do you know why this patient was seen by
23 Dr. -- is that Denkinger? Or --
24      A. Denkinger.
25      Q. Denkinger?

```
                                    109                                               111
 1   A.   Denkinger.                              1  given that documentation, I assumed he was one of them.
 2   Q.   Now, is that an emergency room physician?  2  I certainly remember all six collectively. I'm not sure
 3   A.   Sir, Summit Medical Center is the emergency  3  I could put names on individuals if you brought them in
 4  room.                                          4  this room.
 5   Q.   Do you know why this detainee was seen by  5   Q.   And in order to diagnose an acute
 6  him on the 10th and was not seen by you?       6  pharyngitis, would it have been necessary that he
 7   A.   Do you know if the 10th was a Sunday or a  7  indicate to you in some fashion that his throat was sore?
 8  Monday?                                        8  That he had a sore throat?
 9   Q.   Tuesday. No, wait. Monday, Monday. It was  9   A.   I don't know. I would assume the answer is
10  a Monday.                                     10  yes, but I don't know. I assume so, yes.
11   A.   And do you know what time of day this   11   Q.   If you look at Park 475, you also saw a
12  patient was seen?                             12  Villano-DeJesus, patient?
13   Q.   I can't tell from this record.          13   A.   Yes, sir.
14   A.   I can't either. I don't know. It's      14   Q.   And that was also on the 11th?
15  possible this patient was seen when my office was not  15   A.   Yes, sir.
16  open.                                         16   Q.   And he also had pharyngitis, correct?
17   Q.   The patients you saw who were INS detainees,  17   A.   Yes, sir.
18  you apparently saw on the 11th?               18   Q.   It indicates you prescribed medications, but
19   A.   That's when I -- the date I put on these  19  it doesn't indicate what medications.
20  documents, so I would assume that's correct.  20   A.   I would draw that same conclusion, yes.
21   Q.   Well, the date indicates the appointment  21   Q.   In all probability, you probably prescribed
22  date, the 11th, correct?                      22  the same medications for pharyngitis as you did for
23   A.   That would make that most likely the date,  23  Villande-Jesus?
24  yes.                                          24   A.   I don't know for sure, but that would be a
25   Q.   You saw an INS detainee whose last name was  25  fair assumption, yes.

                                    110                                               112
 1  Villande-Jesus?                                1   Q.   He also most likely had a sore throat?
 2   A.   Yes, sir.                               2   A.   I think that's a fair assumption. I can't
 3   Q.   And made a diagnosis of acute pharyngitis  3  remember specific details, but most likely.
 4  and fever?                                    4   Q.   Then you, looking at Park 476, the next
 5   A.   Yes, sir.                               5  page, you also saw another detainee. It looks like
 6   Q.   With a temp of 101.7?                   6  Coredo-Saedad on the 11th. Do you see that?
 7   A.   Yes, sir.                               7   A.   I'm looking at the same document, yes.
 8   Q.   And what did you prescribe?             8   Q.   He apparently indicated to you that he'd had
 9   A.   Amoxicillin, 500 milligrams three times a  9  a fever last week?
10  day, number 21.                              10   A.   That's what the document says, yes.
11   Q.   And why did you prescribe that?        11   Q.   And course of treatment, you have Rx and
12   A.   Why?                                   12  then no treatment. What does that mean?
13   Q.   Yes.                                   13   A.   That means there was no treatment provided.
14   A.   To treat the pharyngitis.              14   Q.   Because he had already recovered from
15   Q.   Because that, by definition, is an infection  15  whatever fever he had or illness?
16  that would require antibiotic treatment?     16   A.   I did not see clinical evidence of an
17   A.   I clinically felt that he had a bacterial  17  infection, and I didn't wish to treat with antibiotics in
18  infection that I wished to treat with antibiotics.  18  that patient on that day.
19   Q.   Do you have any present memory of seeing  19   Q.   Then on Park 477 you saw a detainee whose
20  that detainee?                               20  last name was Hernandez?
21   A.   Do I remember seeing him? Yes.         21   A.   I'm looking at the same document. That
22   Q.   Apart from the record, you have a      22  would indicate that, yes.
23  recollection of the man?                     23   Q.   There is nothing listed under course of
24   A.   I specifically remember seeing six patients  24  treatment or diagnosis. Do you remember why you saw him?
25  in the immediate period following Mr. Reyes' illness, and  25   A.   My document does have something listed under
```

                                    113

1  course of treatment.
2   Q.  Oh, it does? And what is that?
3   A.  0477? Mine says Rx OTC, Robitussin q.h.s.
4  p.r.n.
5   Q.  What is OTC?
6   A.  Over the counter.
7   Q.  And why did you prescribe that over-the-
8  counter medication?
9   A.  Robitussin is also guaifenesin, and it
10 breaks up mucus. So I must have, either by history or by
11 exam, felt he was congested.
12  Q.  Then the next one, which is 478, and the
13 last name is Valentin or Valentine-Diaz; is that correct?
14  A.  I'm looking at that same document as you.
15  Q.  And apparently that was a normal exam with
16 no complaints?
17  A.  That's what I'm reading as well.
18  Q.  And do you know why he was referred to you
19 for examination when he had no complaints?
20  A.  My memory is I received a phone call from
21 Vicki Paulsen, who asked me to see some people who may or
22 may not have been in contact with Mr. Reyes.
23  Q.  Then if you look at 479, Hernandez-Sanchez
24 that you also saw on the 11th, this detainee also had no
25 acute illness when you saw him but indicated that he had

                                    114

1  had a fever that last week; is that right?
2   A.  I am looking at the same document as you.
3  Yes, that's correct.
4   Q.  So it was not necessary you render any
5  treatment because he had recovered from that fever?
6   A.  That's what the record indicates. That is
7  my handwriting.
8   Q.  Then you saw, on Park 480, a Perez-Ramirez
9  who had cold symptoms?
10  A.  Go ahead.
11  Q.  I was at 480.
12  A.  I'm back there, yes.
13  Q.  And you saw a Perez-Ramirez, who had cold
14 symptoms at that time?
15  A.  Yes, sir.
16  Q.  You prescribed over-the-counter medication?
17  A.  Yes, sir.
18  Q.  Now, Doctor, I want you to assume
19 hypothetically that there were 61 detainees in Pod D on
20 March 7, and on the afternoon of March 7, 50 of those 61s
21 were transported out of there by the INS, and some of
22 those detainees had an illness of some undiagnosed type.
23  A.  Okay.
24  Q.  Were you informed at any time that there
25 were a number of detainees in Pod D who were evidencing

                                    115

1  symptoms of an illness?
2       MR. SARGENT: Form and foundation.
3   A.  I'm not aware of anything you just said
4  other than the records of the patients that we just
5  reviewed.
6   Q.  (BY MR. TRINE) Did you at any time instruct
7  Nurse Paulsen or anyone at the Park County Jail to call
8  you if it appeared that an illness or an infection of any
9  kind was spreading among detainees?
10      MR. SARGENT: Form and foundation.
11  A.  Are we talking about this specific incident
12 or in general?
13  Q.  (BY MR. TRINE) I said at any time.
14  A.  Was Nurse Paulsen -- well, you --
15  Q.  Have you -- let me --
16  A.  Yeah, please ask the question again.
17  Q.  It's not complicated. Here's my question:
18 Did you instruct Nurse Paulsen or anyone at the jail at
19 any time to let you know if they observed any evidence of
20 any infectious or communicable disease process spreading
21 among the inmates or the detainees in Pod D?
22  A.  Now I have your question.
23      MR. SARGENT: Form and foundation.
24  A.  And my answer is it was my understanding
25 with Nurse Paulsen that she'd call me anytime she had any

                                    116

1  questions about any patient. It's my understanding with
2  Nurse Paulsen that she would call me anytime that there
3  was anything unusual medically happening at that
4  facility, so my answer would be yes. If there was an
5  unusual outbreak of anything, then I would have expected
6  her to call me.
7   Q.  (BY MR. TRINE) Okay. Thank you. If you
8  will, please refer in the binder you have to Deposition
9  Exhibit 6 that is titled Communicable Diseases, and it's,
10 for the record, marked as Park 1995 through 1999. This
11 document was provided to us by the sheriff's office as
12 part of the policy and procedure manual utilized at the
13 jail. And I assume that you became familiar with this
14 document when you reviewed policies and procedures there;
15 is that correct?
16  A.  My best answer is that I've not seen this
17 document before. It is distinctly different in format
18 than all the other documents you have shown me or that I
19 remember reviewing previously. So I do not have a memory
20 of reviewing this particular document before while
21 looking at Park 1995.
22  Q.  Do you agree with the first paragraph that a
23 communicable or infectious disease is one which can be
24 transmitted from one person to another? There are
25 various methods of transmission, some direct and others

141

1  have done in the past, but if someone came to me today,
2  even knowing the facts of this case, I would still have
3  problems saying that you should isolate everyone with any
4  of these symptoms because you would have to have almost
5  an isolation room for every person you admitted to that
6  jail. So, you know, I couldn't bring myself to make that
7  recommendation.
8       I think that in any situation you want to be
9  cognizant of other standards, but asking my opinion, my
10 opinion would be that would be excessive and unnecessary.
11     Q.   Do you remember ever communicating some of
12 your thoughts similar to what you just talked about to
13 Nurse Paulsen about that some of these symptoms in
14 Exhibit 6 are just so general that it's really not a
15 basis to start isolating people?
16     A.   No. Again, can I bring up that memory and
17 picture talking to her? No. But I know that what I just
18 said to you know is what I believe today, and I now what
19 I said to you just now is what I believed when I was the
20 medical director. So I can't remember, but I know if she
21 asked, I would have said what I just said.
22     Q.   So for example, you do recall situations
23 where there was some very common symptoms consistent with
24 Exhibit 6, and I assume you didn't recommend isolation
25 for those?

142

1      A.   I could only say what I've said already, and
2  that I would hopefully ask more questions, but I would
3  not take any of these one symptoms or even necessarily
4  two symptoms off this list and say anyone with that
5  symptom needs to be isolated. Again, as asked by the
6  other counsel, I never observed crowded conditions. I
7  never observed anything even approaching overcrowded
8  conditions. And everything's different in retrospect,
9  but I never had the sense that that was a problem. So I
10 never felt like I was sending someone back to an
11 overcrowded pod.
12     Q.   In the few days after you'd learned that Mr.
13 Carranza-Reyes was transported from Park County, did you
14 notice any other outbreaks of strep in the jail?
15     A.   No, sir.
16          MR. MARKS: Okay. Thank you. Those are all
17 the questions I have.
18          MR. SARGENT: I don't have any.
19                EXAMINATION
20 BY MR. TRINE:
21     Q.   I have a few follow-up. In the detainees
22 that you saw on March 11, as I understand it, it wasn't
23 your practice to do a culture to determine whether the
24 throat infection was either viral or strep; is that
25 right?

143

1      A.   Not always.
2      Q.   But you medicated in the event it might be?
3      A.   Are you talking about these detainees --
4      Q.   Yes --
5      A.   -- or other people?
6      Q.   No, the detainees that had pharyngitis and
7  throat infection, and you prescribed antibiotics,
8  correct?
9      A.   Yes. Was I diagnosing strep based on my
10 clinical exam? No.
11     Q.   No.
12     A.   But I did put a couple of these patients on
13 antibiotics. I also chose not to treat several others.
14     Q.   Who didn't have symptoms of strep?
15     A.   Who I felt didn't have symptoms that
16 required antibiotics. I -- in all honesty, I did not
17 feel these people had strep. Had I felt that, certainly
18 in this situation, I would have done a culture given the
19 reality. And I did know at that time that Mr. Reyes had
20 had an unfortunate hospitalization, so I would have done
21 a strep culture had I been suspicious of strep.
22     Q.   Why is that?
23     A.   To find out if that was the diagnosis and to
24 see if there had been a spread of that bug.
25     Q.   Why didn't you do that anyway, to make sure

144

1  that it wasn't a spread of strep?
2      A.   I didn't feel it was clinically indicated.
3  I saw no signs and symptoms of strep in those patients.
4      Q.   And it was also your practice, as you said,
5  when you did believe that a patient had strep, to not do
6  a throat culture and to treat it as if it was strep
7  anyway?
8           MR. SARGENT: Form and foundation.
9      A.   I did make that statement, that's correct.
10     Q.   (BY MR. TRINE) And that was your common
11 practice, correct?
12     A.   I made that statement and that is correct.
13     Q.   And with regard to Exhibit 6, do you have
14 any problem with the jail informing their staff on what
15 to look for in the way of possible emergency infections
16 and, if they saw that in an inmate, to isolate that
17 inmate and call you? Do you have a problem with that?
18     A.   No, sir. I have no problem with that.
19     Q.   Don't you think that's good practice to
20 inform laypeople who have no knowledge of what to look
21 for in the way of infection, to let them know what some
22 of the signs and symptoms are?
23          MR. SARGENT: Form and foundation.
24     A.   Yes, sir.
25     Q.   (BY MR. TRINE) So you would have no