**1**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Case No. 2005-WM-377 (BNB)

DEPOSITION OF: MANUEL D. ROMERO
August 21, 2006

MOISES CARRANZA-REYES,

Plaintiff,

v.

PARK COUNTY, a public entity of the State of Colorado and its governing board, THE PARK COUNTY BOARD OF COUNTY COMMISSIONERS; PARK COUNTY SHERIFF'S OFFICE, a public entity of the State of Colorado; FRED WEGENER, individually and in his official capacity as Sheriff of Park County, Colorado; MONTE GORE, individually and in his capacity as Captain of Park County Sheriff's Department; VICKIE PAULSEN, individually and in her official capacity as Registered Nurse for Park County, Colorado; JAMES BACHMAN, M.D., individually and in his official capacity as Medical Director of the Park County Jail,
Defendants.

TAKEN PURSUANT TO NOTICE on behalf of the Defendants at 1125 17th Street, Suite 600, Denver, Colorado 80202 at 8:08 a.m. before Laura L. Corning, Federal Certified Realtime Reporter, Certified Shorthand Reporter and Notary Public within Colorado.

**2**

APPEARANCES

For the Plaintiff:          WILLIAM A. TRINE, ESQ.
                            CHERYL TRINE, ESQ.
                            Trine & Metcalf, P.C.
                            1435 Arapahoe
                            Boulder, Colorado 80302

For the Defendants          ANDREW D. RINGEL, ESQ.,
Park County, Park           Hall & Evans, LLC
County Board of             1125 17th Street
Commissioners, Park         Suite 600
County Sheriff's Office,    Denver, Colorado 80202
Wegener and Gore:

For the Defendant           MELANIE B. LEWIS, ESQ.
Paulsen:                    Berg Hill Greenleaf & Ruscitti LLP
                            1712 Pearl Street
                            Boulder, Colorado 80302

For the Defendant           ANDREW JURS, ESQ.
Bachman:                    Johnson McConaty & Sargent, P.C.
                            400 South Colorado Boulevard
                            Suite 900
                            Glendale, Colorado 80246

Also Present:               None

**3**

I N D E X
EXAMINATION OF MANUEL D. ROMERO                    PAGE
August 21

By Mr. Trine                                        --
By Ms. Trine                                        --
By Mr. Ringel                                    87, 195
By Ms. Lewis                                      4, 192
By Mr. Jurs                                        151

                                                 INITIAL
DEPOSITION EXHIBITS:                            REFERENCE
59   Curriculum Vitae of Manuel Romero              7
60   Report of Plaintiff Expert Manuel D.          22
     Romero, 5/2/06
61   File                                          18
62   Deposition outline of James Bachman, M.D.     41
63   Handwritten notes                             41
64   Deposition outline of James Bachman, M.D.    186
     with handwritten notations
(Original exhibits attached to original deposition; copy exhibits included in continuing exhibit file; copies provided to counsel as requested.)

REFERENCES TO EXHIBITS MARKED PREVIOUSLY:

Exhibit No.       Page Reference

    6                 43
   28                  5

**4**

1       WHEREUPON, the within proceedings were
2  taken pursuant to the Federal Rules of Civil Procedure:
3       (Deposition Exhibits 59 through 61 were
4  marked.)
5       (At this time Cheryl Trine was not present
6  in the deposition room.)
7       MANUEL D. ROMERO,
8  having been first duly sworn to state the whole truth,
9  was examined and testified as follows:
10           EXAMINATION
11 BY MS. LEWIS:
12     Q.   Good morning. My name is Melanie Lewis.
13 We met out in the hallway a moment ago, but I represent
14 Nurse Vicki Paulsen in this lawsuit.
15     A.   Okay.
16     Q.   I assume you've been deposed, or I notice
17 from your CV you've been deposed --
18     A.   Yes, I have.
19     Q.   -- many times.
20     A.   Yes, I have.
21     Q.   What did you do to prepare for your
22 deposition today?
23     A.   What I did to prepare for my deposition
24 today was basically read -- re-review the records that
25 have been provided to me by Mr. Trine in this case and

Coffman Reporting
303.893.0202
303.893.2230 FAX
WWW.COFFMANREPORTING.COM

EXHIBIT 29

Pages 1 to 4

*   SUBJECT TO CONFIDENTIALITY DESIGNATIONS   *

**Page 5**

1   that I also provided to defendants' counsel through
2   Mr. Trine and, in addition to that, I met with Mr. Trine
3   yesterday at his office for several hours and we went
4   over some additional documents that I did not have, and
5   then we talked verbally about the expert report of
6   Dr. Greifinger.
7   Q.   What were the additional documents you went
8   over?
9   A.   Yes. The additional documents that I --
10  that I was provided was the deposition outline of James
11  Bachman, M.D. and also the contract between Dr. Bachman
12  and the Park County department -- between Dr. Bachman and
13  Park County regarding his services at that facility
14  that's dated 2/5 of '01. And that has already been
15  marked as Deposition Exhibit Number 28, except that I
16  don't recall seeing that document. That's why I asked
17  for a document.
18  Q.   I noticed that you were referring to those
19  two documents, so you brought them with you today?
20  A.   Yes, I did.
21  Q.   What type of issues did you discuss
22  yesterday with Mr. Trine?
23  A.   Basically, Mr. Trine gave me an overview --
24  a verbal overview of Dr. Greifinger's report again,
25  because I had not read it and I don't have his report,

**Page 6**

1   and we basically discussed the case, I mean, from start
2   to finish, in terms of, you know, when Mr. Carranza-Reyes
3   came into the system and ultimately what happened to him
4   and what he's doing now and everything in between. So
5   basically the case itself.
6   Q.   Is Mr. Trine the person who retained you in
7   this case?
8   A.   Yes -- yes, he is.
9   Q.   Have you worked with him before?
10  A.   I have on another case, and that's in the
11  case of Crowley inmates -- the Crowley -- Crowley
12  facility here in Colorado.
13  Q.   Is that related to a riot that occurred at
14  that facility?
15  A.   That's correct.
16  Q.   And that case is presently ongoing; is that
17  right?
18  A.   Yes -- yes, it is.
19  Q.   Any other cases you've worked on with him?
20  A.   No, ma'am. Those are the two, that one and
21  the one that we have here today.
22  Q.   How about Lloyd Kordick; have you worked
23  with that attorney in the past?
24  A.   No. I -- I don't know Lloyd.
25  Q.   How about Joseph Archuleta?

**Page 7**

1   A.   No.
2   Q.   Adele Kimmel?
3   A.   I've heard Archuleta's name but I've never
4   met him and have never had any conversations with him or
5   anything of that nature.
6   Q.   Okay. How about Adele Kimmel?
7   A.   No, ma'am.
8   Q.   If you could look at what's been marked as
9   Deposition Exhibit Number 59.
10  A.   Okay.
11  Q.   Is that a true and accurate copy of your
12  CV, to the best of your knowledge?
13  A.   It is, with the exception of some updates
14  of work that I have done subsequent to me filing this
15  report today, and some examples -- I didn't bring the
16  list in with me, but I'm involved in a case in New Mexico
17  assisting defendants in a county jail regarding a female
18  inmate who alleges that she was raped at the facility. I
19  conducted another visit for the U.S. Department of
20  Justice to Santa Fe County in New Mexico. I developed a
21  report for an attorney here in Colorado in the law firm
22  of Townsend & Townsend for plaintiff's counsel. And
23  those are the only ones that I can recall offhand. Those
24  would be in addition to what I have there.
25  Q.   Are those the only additions that you know

**Page 8**

1   of?
2   A.   To the best of my recollection today, yes.
3   Q.   If you could, please, turn to page 12 of
4   that exhibit.
5   A.   Okay.
6   Q.   I am -- refer you to about halfway down the
7   page, the entry it starts, 2002, slash, Conductive
8   Conditions of Confinement Reviews for Price Waterhouse
9   Coopers. Do you see that?
10  A.   Page 12. Okay. I got that. 2001 or --
11  Q.   No. Right above that entry, 2002. The one
12  that mentions Price Waterhouse Coopers. Do you see that?
13  A.   Yes, I do.
14  Q.   See, it's four paragraphs down?
15  A.   I got it.
16  Q.   Could you explain what is a conditions-
17  of-confinement review?
18  A.   Yes, I can. What -- what I was involved in
19  as an expert was with Price Waterhouse Coopers. Price
20  Waterhouse Coopers had a contract with the U.S.
21  Department of Justice and -- specifically, it was the
22  U.S. Marshal Service and INS at the time. And what the
23  U.S. Department of Justice wanted was a group of experts,
24  number one, to develop some standards for jails and
25  prisons where they house INS detainees and U.S. Marshal

9

1 Detainees and what kind of conditions are those people
2 housed in in terms of safety, security, and are the
3 conditions humane and things of that nature.
4       So what the U.S. Department of Justice did
5 with Price Waterhouse -- Price Waterhouse actually did it
6 with experts. I wasn't involved at the initial phase --
7 they developed some core standards of what would be
8 audited, and then the first audit that we did -- I got
9 involved at the point where they activated the standards
10 and we were going to audit facilities.
11       So the first facility that we audited was in
12 Arizona, facility operated by CCA, correctional -- well,
13 CCA, and then after that, basically, is -- as you can
14 tell there, I started reviewing more facilities for them
15 in -- throughout the United States.
16       But basically what they were is that they
17 had -- it's a book, and it has standards that were
18 developed by experts in the area of medical, mental
19 health, security, operations, staffing, training, similar
20 to what you might see in the America Correctional
21 Association standards. But they were more targeted at
22 INS facilities, short-term facilities, where they housed
23 detainees in nonfederal facilities, so that would involve
24 county jails, would involve private prisons or private-
25 operated facilities.

10

1    Q.   And Price Waterhouse developed these
2 standards; is that what --
3    A.   What they did is they got the contract for
4 doing -- for performing this work, actually, starting
5 with Attorney General Janet Reno. She is the one that
6 wanted -- at the time that she was the attorney general
7 of the United States, she wanted to know what kind of
8 conditions these people were being housed in.
9       So then what happened is that they sent out
10 a bid, the justice department did, to see consulting
11 firms or whatever of who wanted to do this work,
12 conditions-of-confinement reviews.
13       So then one of the phases was that they
14 would develop some core standards of what those
15 conditions should be like. So they hired experts
16 throughout the United States in corrections, experts in
17 jail management, psychiatrists, doctors and so forth, and
18 they basically developed the standards, and it's a book
19 that's about maybe an inch thick or so of standards.
20    Q.   Do you know what it's called?
21    A.   Conditions of Confinement Reviews.
22    Q.   When you conducted a conditions-of-
23 confinement review, would you actually physically go to
24 the location of the detention center?
25    A.   Yes, ma'am. To each of those facilities we

11

1 would go as a team. For example, I was on the operations
2 part, and I would review certain areas, like security,
3 classification, administration, training, programs,
4 anything having to do with security of the facility. And
5 the doctor had his area, the expert, which was basically
6 standards related to medical treatment and access to
7 medical.
8       And then we had a psychiatrist or sometimes
9 a psychologist would do the mental health part.
10 Sometimes we would have an environmentalist, and then
11 sometimes we would also have an expert in food service.
12 So it was basically a team of experts that had these core
13 standards.
14       We'd go to a facility, and we'd be there for
15 maybe, two, three, maybe up to four days, and we would go
16 in at all times of the -- of the day and night, review
17 the operations. In the evening, we'd go back to our
18 hotel rooms, and they had it on a computer, and then we'd
19 go ahead and input our information that we picked up that
20 day and what we thought we were looking at and how they
21 measured against this core detention -- the standards.
22       And by the time we left on the last day of
23 our visit, two, three, four days, then we would give an
24 oral presentation to the facility hierarchy, and anybody
25 else who they may have invited, and also a representative

12

1 from the Civil Rights Division of U.S. DOJ, the U.S.
2 Marshal Service and INS officials.
3    Q.   You're familiar with the ACA or American
4 Correctional Association standards, correct?
5    A.   Yes, I am.
6    Q.   How do these standards that you were just
7 talking about for your conditions-of-confinement reviews
8 differ if at all from the ACA standards?
9    A.   They -- they're pretty similar. There are
10 some differences, but I would say that generally they're
11 pretty similar in terms of security and operations and
12 training. In some cases they might not be as specific in
13 terms of, like, how many training hours do you need and
14 things of that nature. The ACA standards may be more
15 specific in terms of what you would include in your
16 emergency plan, but overall I think that they're actually
17 pretty similar to the ACA standards and those standards
18 that we used.
19    Q.   Did the standards address any different
20 needs of the population at an INS detention center versus
21 a regular detention center?
22    A.   Can you repeat the question?
23    Q.   Sure. Let me rephrase it. To your
24 knowledge, does -- do INS detainees at an INS facility
25 have different needs than a standard inmate at a regular

* SUBJECT TO CONFIDENTIALITY DESIGNATIONS *

21

1  Second Amended Complaint and whether each of these
2  defendants' conduct constitutes deliberate indifference
3  to plaintiff's serious medical needs and the degrading
4  and inhumane conditions of his confinement."
5      Do you see that?
6  A.  Yes, I do.
7  Q.  My question is, were you asked to provide
8  any opinions about Nurse Vicki Paulsen's conduct?
9  A.  I can't specifically recall at the time,
10 but I interpreted and I took it as anybody at the jail
11 who had anything to do with Mr. Carranza-Reyes, which
12 could include medical staff, could include the sheriff,
13 could include correctional officers, whoever had anything
14 to do with the care and the incarceration of Mr. Reyes,
15 being Carranza-Reyes.
16 Q.  And is that true for Dr. James Bachman as
17 well?
18 A.  Yes.
19 Q.  You understood that you were to offer an
20 opinion about his conduct as well?
21 A.  I -- I understood that I was to provide or
22 to express an opinion on anybody that had any
23 involvement, and that would include Dr. Bachman, and it
24 would include Nurse Paulsen, and it would include any
25 other facility person that had anything to do with

22

1  Mr. Reyes.
2      (At this time Ms. Cheryl Trine entered the
3  deposition room.)
4  Q.  Later in that same paragraph, the next
5  sentence, it says, "I recognize your preliminary opinion
6  must assume that the facts alleged in the Second Amended
7  Complaint will be supported by the evidence."
8  A.  Right.
9  Q.  Did you have a preliminary report?
10 A.  No, I did not.  I don't have a preliminary
11 report.  You mean that I did?
12 Q.  Correct.
13 A.  No.  The only report that I've done in
14 terms of providing to Mr. Trine has been the report that
15 you have before you, which was marked --
16 Q.  Did you -- sorry.
17 A.  I'm not sure what exhibit it's marked, but,
18 anyway, the report in this case that I have is an -- you
19 have as an exhibit.
20 Q.  And just so the record is clear, I've
21 marked that as Exhibit Number 60?
22 A.  Okay.
23 Q.  So you can -- just so you don't have to
24 fiddle through that file, let's just go ahead and put
25 that in the front of you.

23

1  A.  All right.
2  Q.  So did you prepare any written work in
3  2005?
4  A.  In 2005, I -- I don't believe that I did,
5  with the exception of any -- and it may be in here
6  (indicated), because I did see some of my notes.
7  Typically what I do is that when I receive information in
8  a case, you know, I will analyze the information, review
9  the information, review the documents, and I may take
10 some notes as I go along in terms of if there is a
11 deposition or from the Amended Complaint or -- or any
12 other information that's provided to me.  And that's what
13 you see some of my handwritten notes that I use for my
14 own purpose in developing my report.
15 Q.  If you could look at Exhibit 60, which I
16 handed you, which is your report.
17 A.  Yes.
18 Q.  Is that a true and accurate copy of your
19 report, to the best of your knowledge?
20 A.  Yes, it is.
21 Q.  Is the information in the report accurate,
22 to the best of your knowledge and ability?
23 A.  Yes, it is.  Let me see.  With the
24 exception of, like I said, I had a couple of additional
25 documents that I talked about today that I did not

24

1  mention in the information and data considered in forming
2  the opinion.  And then, also, I -- this is for the
3  purpose of clarification, on Item Number -- on page 5 of
4  my report, Item Number 14, it refers to the statement of
5  Edward Alan, who was an employee at the Park County Jail.
6  Anyway, when you look, for example, anywhere that I
7  quoted him -- like I quote him on page number 10, and
8  what I wrote in there was "Deposition" -- "also in the
9  Edward Alan deposition," and I don't believe it was a
10 deposition.  It was actually a statement that he had
11 made.
12 Q.  Okay.  Now, do you have any additions to
13 make to your report after reviewing the two materials
14 that you referenced earlier, the outline of Dr. Bachman's
15 deposition and the other one was --
16     MR. RINGEL:  The contract.
17 Q.  (BY MS. LEWIS) -- the contract?
18 A.  The contract between Park County and Dr.
19 Bachman.  The only other opinion that I would have after
20 reviewing the outline of the James Bachman deposition and
21 then also the -- the contract for services for him at
22 Park County Jail would be that -- and, again, I'm talking
23 from an administrative point of view.  Certainly I'm not
24 a medical expert, nor would I profess myself to be one.
25 But from an administrative point of view, when I reviewed