# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 2005-WM-377 (BNB) MOISES CARRANZA-REYES,

      Plaintiff,

vs.

PARK COUNTY, a public entity of the State of Colorado and its governing board, THE PARK COUNTY BOARD OF COUNTY COMMISSIONERS; PARK COUNTY SHERIFF'S OFFICE, a public entity of the State of Colorado; FRED WEGENER, Individually, and in his official capacity as Sheriff of Park County, Colorado; MONTE GORE, Individually, and in his capacity as Captain of Park County Sheriffs Department; VICKIE PAULSEN, Individually, and in her official capacity as Registered Nurse for Park County, Colorado; JAMES BACKMAN, M.D., Individually and his official capacity as Medical Director of the Park County Jail.

      Defendants.

---

**Report of Plaintiff Expert**
**Manuel D. Romero**
**1607 Ben San Ave.**
**Belen, New Mexico  87002**

**May 2, 2006**

---

EXHIBIT

30

PENGAD 800-631-6989

## I. INTRODUCTION

I have been retained by Plaintiff's Counsel in the case of Moises Carranza-Reyes vs. Park County (Civil Action No. 2005-WM-377(BNB)). Plaintiff's Counsel requested that I review documents and other evidence produced for this case and provide my opinion, as a corrections expert, whether or not, Park County officials violated Plaintiffs Section 1983 constitutional right to the basic human need for sanitary and adequate clothing, shelter, and medical care as alleged in the Second Amended Complaint. Also, I was asked to offer opinions as to whether or not each of the Defendants' conduct constituted deliberate indifference to Plaintiff's serious medical needs and the degrading and inhumane conditions of his confinement. Lastly, I was requested to offer opinions as to whether or not each of the Defendant's constitutes a reckless or callous disregard for Plaintiff's rights.

## II. PROFESSIONAL QUALIFICATIONS

I have attached as Exhibit A a copy of my Curriculum Vitae. The following is a brief summary of my education and experience in the criminal justice field. I possess an Associates Degree in Correctional Studies and a Bachelor of Arts in Criminal Justice from the University of New Mexico in Albuquerque, New Mexico. I have been working in the criminal justice field for over twenty-four years. I have substantial hands-on experience as a correctional administrator and a jail and prison auditor. I commenced my career in the corrections field as a correctional officer and progressed through the ranks to the level of Deputy Secretary of Operations with the New Mexico Corrections Department. I also served as a deputy court monitor in the United States District of

Puerto Rico.    I have intimate knowledge and experience in prison operations, administration and programs.  I serve as a consultant to the Special Litigation Section of the Civil Rights Division and the United States Marshals Service both of the United States Department of Justice.   My work with the Civil Rights Division involves inspections related to the Civil Rights of Institutionalized Persons Act 42U.S.C.S1997 ("CRIPA") primarily in the area of staff and inmate safety and security matters.  My work with the United States Marshals Service has been in connection with conducting facility operational assessments.  I have inspected a total of eight (8) facilities for these two entities and have inspected some of those facilities several times and continue to do so.

I also served as an expert in conducting conditions of confinement reviews for Pricewaterhouse Coopers (currently IBM Global Services Business Unit).  These reviews were pursuant to contracts with the United States Department of Justice concerning non-federal facilities that housed United States Marshals Service and Immigration and Naturalization detainees.  The conditions of confinement reviews included several core detention standards for jails.  I participated in conducting approximately nineteen (19) conditions of confinement reviews of jails across America.  I was also an active participant in the revision of the Conditions of Confinement Review Standards with a final presentation made to the Office of the Federal Detention Trustee and the U.S. Marshal's Service in Washington, D.C.

Currently, I continue to work as a corrections consultant and am the President of Manuel D. Romero Inc., located in the town of Belen, in the State of New Mexico.

## III.  TESTIMONY AT TRIAL, DEPOSITIONS AND AFFIDAVITS

A listing of the cases I have been involved in may be found at pages fourteen (14), fifteen (15) and sixteen (16) of my Curriculum Vitae, attached hereto as Exhibit A.

## IV.  COMPENSATION

My fee for this case is $200.00 per hour for document review, report writing and facility visits.  My fee for testimony at trial or depositions is $300.00 per hour.  In addition to these fees is reimbursement for reasonable expenses.

## V.  INFORMATION AND DATA CONSIDERED IN FORMING OPINIONS

The materials I reviewed and analyzed in preparation for this report consisted of the following, but not necessarily limited to:

1. Second Amended Complaint

2. Health Care records for Moises Carranza-Reyes

3. Newspaper article, Denver Post, by Kirk Mitchell regarding the Park County Jail

4. Colorado Sanitary Standards for Penal Institutions

5. Park County Budget document for 2005

6. INS agreement with Park County, Bate-stamped Park 0268-0287

7. American Correctional Standards for Adult Local Detention Facilities, Third Edition

8. The deposition outline of Monte Gore, Volumes I and II

9. The deposition outline of Daniel Muldoon

10. The deposition outline of Darlene Ellis

11. The deposition outline of John Bellantonio

12. The deposition outline of Moises Carranza-Reyes, Volumes I and II

13. The deposition of Vicki Paulsen, R.N., and the deposition outline of Vicki Paulsen

14. Statement of Edward Allen, 10/28/05

15. Deposition Exhibit 24 (Summit Medical Center records).

16. Deposition Exhibit 26 (INS Detention Standard - Medical Care).

17. Deposition Exhibit 1 (Daily jail logs from March 1, 2003 - March 10, 2003)

18. Deposition Exhibit 2 (The Park County Jail's response to the Consulate General of Mexico regarding the medical concerns of Moises Carranza-Reyes)

19. Deposition Exhibit 3 (Master Control Log)

20. Deposition Exhibit 5 (Park County Sheriff's Policy & Procedure Manual on number of detainees to be incarcerated in Pod D).  80 square feet per occupant

21. Deposition Exhibit 6 (Communicable Diseases)

22. Deposition Exhibit 4 (Park County Jail Policies & Procedures - establishment of health care unit policy & procedure manual)

23. Deposition Exhibit 30 (the Consulate General of Mexico, Denver, CO)

24. Deposition Exhibit 21 (Pass-on records)

25. Deposition Exhibit 35 (Park County bills to INS for number of detainess housed in January, February and March of 2003)

26. Deposition Exhibit 36 (sanitation and hygiene)

## VII. BASIS AND REASONS FOR OPINIONS

### Background Information

On or about March 1, 2003, Moises Carranza-Reyes, among other individuals, was arrested in the State of Colorado and held as a detainee by the Immigration and Naturalization Service (INS). Mr. Carranza-Reyes was transported to the Park County Jail as a status detainee on the evening of March 1, 2003. On March 8, 2003, Mr. Carranza-Reyes was transported to the Summit County emergency room in critical condition. He was diagnosed with a number of health related problems and then transferred to the Denver General Hospital, in near-death condition, with a multitude of medical problems and the subsequent amputation of one of his legs.

The Second Amended Complaint, page two (2) - eleven (11), FACTS GIVING RISE TO THIS COMPLAINT, items five (5) - thirty-nine (39) allege numerous facility breakdowns regarding issues of inmate safety, sanitation, health, medical care, hygiene, language barriers, environmental conditions, jail overcrowding, medical access, among others. Ultimately, the failures of the Park County staff exposed and caused serious risk of harm to Moises Carranza-Reyes.

Moreover, the testimony of Moises Carrenza-Reyes is consistant with the testimony of several Park County Jail staff, primarily regarding inhumane conditions at Park County Jail. Some of the more egregious and obvious failures of the facility are as follows:

### A. <u>Crowding</u>

Records reflect that Pod D, where INS detainees are incarcerated, is designed for eighteen (18) inmates, with double bunk beds, three (3) tables to accommodate eighteen (18) inmates, two (2) showers and two (2) toilets. According to the Park County Policy and Procedure Manual, Policy Number J-108-A, Effective Date: 11-01-00, referencing Inmate Living Areas, "...inmates are housed in cell or dormitory sleeping areas that provide at least 80 square feet of total living space per occupant..." Park County Officials are aware of this limitation; however, they still entered into a contract with INS to house detainees. In order to accommodate the INS detainee population, Park County Officials had to add a three (3) tier bunk to the double bunks as well as have further overflow detainees sleep on mattresses on the floors of the upper and lower tiers of Pod D.[1] Records reflect that during the week of March 1, 2003 there were as many as sixty-one (61) detainees housed in Pod D. The overcrowding conditions in this Pod were extreme, as it was approximately 238% above the design capacity. This overcrowding condition not only defies common sense, but also violates Park County Policy and Procedure, Number; J-108A, regarding Inmate Sleeping Areas. Additionally, the Intergovernmental Service Agreement for Housing Federal Detainees (Bates Park 0268-0287) between INS and Park County, Article III. Covered Services, in part, requires the following:

### Article III. Covered Services

**A. Bed space** The Service Provider shall provide beds in the Park County Road 16, Fairplay, Colorado 80440 on a space available basis. The Service Provider shall house all detainees and may spread the detainees throughout the population. The INS will be financially liable only for the actual detainee days as defined in Paragraph C. of this article.

**B. Basic needs**. The Service Provider shall provide adult INS

---

[1] It appears that ACA Standard 3-4129 was also violated in that detainees who slept on a mattress on the floor did not have a sleeping surface of at least twelve (12) inches off of the floor.

Detainees (gender as specified in Paragraph A. of this Article) with safekeeping, housing, subsistence, medical and other services in accordance with this Agreement. In providing these services, the Service Provider shall ensure compliance with all applicable laws, regulations, fire and safety codes, policies, and procedures. If the Service Provider determines that INS has delivered a person for custody who is under the age of 18, the Service Provider shall not house that person with adult detainees, and shall notify the INS immediately. The types and levels of services shall be those the Service Provider routinely affords to other inmates.

Some descriptions of the extreme overcrowding are exemplified in Corporal John Bellantonio's deposition and others, in part, as follows:

P - 59  They even housed detainees in the rec room when they were overcrowded, but it was very small and had gym equipment and weightlifting equipment in it and no restroom or shower facility or sink or water facility. So if they were locked in there and had to use a restroom, it would require an escort to one of the units.

P - 61  D Pod was then very crowded with mattresses on the floor in the upper bunking area and it was very difficult to walk through the unit to do inspections or counts or even count the individuals accurately...the ventilation was poor, there was a body odor and it was noisy and it was crowded to the point of being very uncomfortable for everyone involved and mattresses placed on the floor were literally touching one another side by side.

Captain Monte Gore deposition:

P – 250  To his knowledge, detainees in Pod D, at times, continued to be placed on mats or mattresses on the floor when all the bunk beds were filled.

Edward Allen, deposition:

P – 5  Question by (LK) Can you tell me when these pods, how big was D Pod? (Response) Originally, it was an 18 man unit. There was an upstairs where they had the bunks where the 18 inmates and downstairs was basically the living area that had several stationary tables, an open area and then the bathroom and shower facilities.

P – 10  Question by (LK) Were they jammed in there pretty tight? (Response) They were. They were packed in there about as good as you could pack them.

P – 11  Question by (LK)  Were there some mattresses placed on the floor up there or do you know? (Response)  They would put, all the INS guys kind of liked to stick together so they would pretty much put the mattresses on the floor up there in between the bunks or in the where the bunks lining one wall and the front rail, mattresses wherever there was an open spot and sometimes there were mattresses down stairs.

P – 12-13  Question by (LK)  I have a census here that was taken by Officer Thomas at 03:00 on 3-7-03.  It shows the census in D pod at 61.  And Ficus has one at 6:00 on the 7th of 61 inmates.Do you remember the population getting up in the D Pod  getting up to to 61? (Response) Yes, it did that several times.

It is my opinion, that there is ample testimony and documentary evidence to demonstrate that during the time Moises Carranza-Reyes was at Park County Jail, there was a severe overcrowding condition in D Pod.  Both staff and inmates were aware of this overcrowding condition in D Pod.  The overcrowding condition was obvious and evident by mere observation.  The overcrowding condition was in violation of several documents, to include, but not limited to, Park County Policy and Procedure, American Correctional Association Standards and the Intergovernmental Service Agreement for Housing Federal Detainees between the INS and Park County.

## B. Living Conditions

In large part, but not inclusive, those overcrowding conditions addressed in the preceding paragraphs further contributed to an atmosphere of inhumane living conditions. For example, in John Bellantonio's deposition, at page thirty-five (35), Bellantonio recollected that there were times when almost all of the available floor space was taken up either by bunks or mattresses, as follows:

P – 35  With as many as 50 inmates in D Pod, it was very difficult to keep clean and much of the floor space was covered with mattresses or bunks, which made it difficult to adequately mop the floors

P-35-36  Bellantonio remembers that sickness was an issue in D Pod in March '03.

P – 36  There was no place you could take the sick inmates to isolate them from the other inmates.

P – 44 ...when I conducted shakedowns and when I went through the area, it was very common to find soiled tissue paper stuffed under the mattresses and about the mattresses and around the area of the mattresses.

P – 62  Although mop buckets were placed in the pods and clean water and disinfectant in spray bottles with bleach solution, which was diluted, it might have been possible to clean the toilets and the shower areas, but would have been very difficult to adequately mop the floors because of all of the mattresses and people in there.

Also, in the Edward Allen deposition as follows:

P – 19  Question by (LK)  By the beds that were on the floor, did some people blow their nose or spit and leave it next to the side of their bed? (Response)  Yea, they would do that when you would go up there to count, you would see a lot of wadded up toilet paper right there next to them.

Other examples of poor sanitation and hygiene practices are revealed as follows:

Apparently, there was not a protocol in place for the sanitizing of Mattresses, see (Park Bates 3548) memorandum from Sgt. Muldoon to All Staff, dated March 11, 2003, in part states, "at the suggestion of Medical we need to work up a protocol regarding sanitizing mats when inmates are released.  We will need to pull the vacated mats and wipe them down with a disinfectant and then place them in the sunlight out in the yard for UV disinfectant."

Also, see (Park Bates 3517), Memorandum from Sgt. Flint to Sgt. Muldoon/ day Shift, dated March 4, 2003, in part states, "There have been no laundry changes in B, C and D Pods for over five days."  Detainee Carranza-Reyes was housed in D pod.

Darlene K. Ellis deposition at page fifty-eight (58), agrees there was never an assigned trustee to the D Pod because of the turnover in D Pod.  Although a bucket and mop were placed in D Pod, no inmate was assigned the task of cleaning the pod.

John Bellantonio deposition at page sixty-three (63)  There was no trustee assigned to clean D Pod and in all of the pods, they put a mop in the pod and let the inmates figure it out themselves.

Certainly, the housekeeping practices described by Bellantonio, Ellis and others are in stark contradiction to Park Policy and Procedure Number J-111-B (Park Bates 1530), whereby in part, requires that, "Effective housekeeping requires the development of definite cleaning schedule with staff and inmates assigned specific duties. Cleaning activities by inmate should be supervised at all times to ensure that the work performed is proper and thorough."

The same policy also requires that, (page 87) "Clothing and bedding supplies should be of sufficient amount to provide clothing and bedding supplies for the Jails maximum populations." (Park Bates 1531)

Apparently there was not enough clothing for detainees, as described by John Bellantonio deposition at page fifty-five (55), which in part reads,

> There was one instance where clothes were collected and they sat
> around without clothing wrapped in blankets until the clothing came
> back an hour, 2 or 3 hours later after being washed.

There were also problems at Park County Jail related to improper shower water temperatures, ventilation systems and room temperature control, all of which are verified by Park County officials. For example, in the Edward Allen deposition as follows:

> P-8 Question by (LK)  I would like to ask you about the physical
> conditions in the jail during the month of March.  Was there an
> issue with the heat in the jail, in particularly in D Pod?
> (Response)  Like I stated earlier, there was always an issue with the
> heat, because it seemed like nothing was ever regulated.  It was
> either freezing cold or burning hot.

> P-8 Question by (LK)  Were both of those conditions present at
> the same time in D block, freezing and overheat?  (Response)  It seems
> to me like it could be yes.  It seemed like it was always going from one

extreme to the next!  Question by (LK)  Was there a particular wall or something that was cold?  (Response)  The exterior wall on all of those cell blocks was usually in the winter time or late spring and of course in Fairplay, spring is still awful cold, that exterior wall, if you had a bunk up next to it, could be very cold, yes.

Page 9, Question by (LK)  My client and his brother has described that the shower would get either freezing cold or too hot and you would have to jump in and jump out. (Response)  That would definitely happen. Question by (LK) So you observed that yourself? (Response) Yes.

Page 9, Question by (LK) I would like to ask you about plumbing problems with the 2 toilets for the people who were in the pod. Were there problems in your experience with those toilets over-flowing?  (Response)  Yes there was. Question by (LK) Was this a very rare occasion or was it a constant problem?  (Response) Well, it wasn't just every day, but it was often enough that it was a pretty serious problem in my eyes, yes.  Question by (LK) Did it cause a bad odor when the toilets were overflowing? (Response) P – 10, Anytime a toilet goes over, it doesn't smell very good, that's for sure.

Also, in Exhibit twenty-one (21), (Parks Bates 3560) is a memo by Sgt Muldoon dated 3/12/03 stating one of the reasons D Pod was so infected, reads as follows: "Medical tells me, is because the INS detainees were allowed to plug the vents.  This prevented the air from circulating.  On your pod walks, it is critical that all vents be opened, no cardboard, etc. can be permitted to obstruct, the ventilator grates in any pod or cell."

It is obvious, as supported by the testimony and documents in this case that the conditions at Park County Jail were inhumane.  Mr. Carranza-Reyes was exposed to unsanitary conditions, overcrowding conditions, lack of proper bedding and clothing, and unacceptable environmental conditions.

## C. **Medical Care Issues**

Staff testimony supports Carranza-Reyes version that there were sick inmates at Park County Jail.  There was no place to isolate sick inmates.  (See John Bellantonio deposition at P-35 and 36).  On or about March 4, 2003, Carranza-Reyes became ill with a sore throat, headache, nausea, and other symptoms.  His medical condition worsened

and by March 5, 2003, he had diarrhea, pain in his abdomen and on both sides of his chest, a sore throat, among other symptoms.  Mr. Carranza-Reyes, nor any other detainee was referred to the medical doctor, but rather treated by the facility nurse and correctional officers at the direction of the nurse.  Finally, after several days of exhibiting serious illness, Mr. Carranza-Reyes was finally taken to the emergency room at a medical clinic on March 8, 2003, and subsequently to the Denver General Hospital in critical condition.

There is no evidence to indicate that Mr. Carranza-Reyes was provided with any information regarding procedures on how to access medical attention.  There was a language barrier between facility staff and INS detainees, as the nurse nor jail officials could intelligently translate Mr.Carranza-Reyes medical and incarceration needs.  Instead, jail staff relied on another inmate who wasn't trusted by jail officials to translate accurately.  Medical request forms were not available in the Spanish language.[2]

There is no evidence to suggest that jail correctional staff were trained by qualified health personnel to conduct proper medical and mental health screening of detainees and proper dispensing of medications.

The Mexican Consulate and INS demanded that all the other detainees in D-Pod be seen by a medical doctor upon the revelation that Mr. Carranza-Reyes had pneumonia and septicemia.  Records reflect that some of the remaining detainees also had a bacterial infection and were subsequently treated.

It is my opinion that the Park County Jail fell woefully short of providing prompt medical attention to Mr. Carranza-Reyes.

---

[2] Darlene K. Ellis deposition at page 11-12, no one on staff speaks Spanish and at times they have used inmates as translators. Also, at P-16, Kites are in English, not Spanish; and if a detainee needs help in filling it out, they get someone who speaks English to assist them or she helps with a translator.

Report of Plaintiff's Expert
Manuel D. Romero
May 2, 2006

13

**D.** **Violations and Potential Violations from Generally Accepted Correctional Standards and Practices**

For this part of my report I relied upon the 3rd Edition of the Standards For Adult Correctional Institutions. (ACA Standards)  I also relied upon my experience as a corrections professional.  I noted that Park County Jail Officials incorporated some of the ACA Standards into their Jail Policies and Procedures Manual.  From the materials I reviewed in this case, compared against the applicable ACA Standard, I noted the following, but not limited to, as non-compliant:

3-4126  The number of inmates does not exceed the facility's rated bed capacity.

3-4128  Single cells are required for all security levels except minimum.  All cells or sleeping areas in which inmates are confined conform with the following requirements:

| Number of Occupants | Amount of Unencumbered Space |
|---|---|
| 1 | 35 S.F. |
| 2.50 (minimum custody status only) | 38 S.F. per occupant* *Sleeping area partitions required if more than four people in one sleeping area. |

When confinement exceeds 10 hours per day there are at least 80 square feet of total floor space per occupant.

"Unencumbered space" is usable space that is not encumbered by furnishings or fixtures.  At least one dimension of the unencumbered space is no less than seven feet.  In determining unencumbered space, all fixtures must be in operational position and must provide the following minimum areas per person: bed, plumbing fixtures, desk, and locker.

3-4129  Each inmate confined to a cell/room for 10 or more hours daily is provided a Sleeping area with the following: a sleeping surface and mattress at least 12 inches off of the floor; a writing surface and proximate area to sit; storage for personal items; and a place to suspend clothes.

Each inmate confined to a cell/room for less than 10 hours daily is provided a sleeping area with the following: a sleeping surface and mattress at least 12 inches off of the floor; storage for personal items; and a place to suspend clothes.

3-4130 Dayrooms with space for varied inmate activities are situated immediately adjacent to the inmate sleeping areas but are separated from them by a floor-to-ceiling wall.

Dayrooms provide a minimum of 35 square feet of space per inmate (exclusive of lavatories, showers, and toilets) for the maximum number of inmates who use the dayroom at one time, and no dayroom encompasses less than 100 square feet of space (exclusive of lavatories, showers, and toilets).

3-4131 Dayrooms provide sufficient seating and writing surfaces for every inmate using the dayroom at one time. Dayroom furnishings are consistent with the custody level of the inmates assigned.

3-4132 Inmates have access to toilets and hand-washing facilities 24 hours per day and are able to use toilet facilities without staff assistance when they are confined in their cells/sleeping areas.

Toilets are provided at a minimum ratio of one for every 12 inmates in male facilities and one for every eight inmates in female facilities. Urinals may be substituted for up to one-half of the toilets in male facilities. All housing units with three or more inmates have a minimum of two toilets.

3-4133 Inmates have access to operable wash basins with hot and cold running water in the housing units at a minimum ratio of one basin for every 12 occupants.

3-4134 Inmates have access to operable showers with temperature-controlled hot and cold running water at a minimum ratio of one shower for every eight inmates. Water for showers is thermostatically controlled to temperatures ranging from 100° Fahrenheit to 120° Fahrenheit to ensure the safety of inmates and to promote hygienic practices.

3-4146 Temperatures in indoor living and work areas are appropriate to the summer and winter comfort zones.

3-4216 A rulebook that contains all chargeable offenses, ranges of penalties, and disciplinary procedures is given to each inmate and staff member and is translated into those languages spoken by significant numbers of inmates. Signed acknowledgement of receipt of the rulebook is maintained in the inmate's file. When a literacy or language problem prevents an inmate from understanding the rulebook, a staff member or translator assists the inmate in understanding the rules.

3-4268 Written policy, procedure, and practice protect inmates from personal abuse, corporal punishment, personal injury, disease, property damage, and harassment.

3-4272 Written policies and procedures govern the admission of inmates new to the system. These procedures include at a minimum the following:
- determination that the inmate is legally committed to the institution
- thorough search of the individual and possessions
- disposition of personal property
- shower and hair care, if necessary
- issue of clean, laundered clothing as needed
- photographing and fingerprinting, including notation of identifying marks or other unusual physical characteristics
- medical, dental, and mental health screening
- assignment to housing unit
- recording basic personal data and information to be used for mail and visiting list
- explanation of mail and visiting procedures
- assistance to inmates in notifying their next of kin and families of admission
- assignment of registered number to the inmate
- giving written orientation materials to the inmate
- documentation of any reception and orientation procedure completed at a central reception facility

3-4275 Written policy, procedure, and practice provide that new inmates receive written orientation materials and/or translations in their own language. When a literacy problem exists, a staff member assists the inmate in understanding the material. Completion of orientation is documented by a statement signed and dated by the inmate.

3-4310 Written policy, procedure, and practice require the following inspections:
- weekly sanitation inspections of all institutional areas by a qualified departmental staff member
- comprehensive and thorough monthly inspections by a safety-sanitation specialist
- at least annual inspections by federal, state, and/or local sanitation and health officials or other qualified person(s)

The institution complies with all applicable laws and regulations of the governing jurisdiction, and there is documentation by an independent, outside source that any past deficiencies noted in annual inspections have been corrected.

3-4314 A written housekeeping plan for all areas of the facility's physical plant provides for daily housekeeping and regular maintenance by assigning specific duties and

responsibilities to staff and inmates.

3-4315 The store of clothing, linen, and bedding exceeds that required for the facility's inmate population.

3-4317 Written policy, procedure, and practice provide for the issue of suitable clothing to all inmates. Clothing is properly fitted, climactically suitable, durable, and presentable.

3-4319 Inmates are provided the opportunity to have three complete sets of clean clothing per week. The facility may provide this clean clothing in several ways, including access to self-serve washer facilities, central clothing exchange, or a combination of the two. Wash basins in cells or rooms are not compliant.

3-4320 The institution provides for the thorough cleaning and, when necessary, disinfecting of inmate personal clothing before storage or before allowing the inmate to keep and wear personal clothing.

3-4321 Written policy, procedure, and practice provide for the issue of suitable, clean bedding and linen, including two sheets, pillow and pillowcase, one mattress, and sufficient blankets to provide comfort under existing temperature controls. There is provision for linen exchange, including towels, at least weekly.

3-4323 Water for showers is thermostatically controlled to temperatures ranging from 100° Fahrenheit to 120° Fahrenheit to ensure the safety of inmates and to promote hygienic practices.

3-4328 Written policy, procedure, and practice provide that the health authority meets with the warden/superintendent at least quarterly and submits annual statistical summaries and quarterly reports on the health care delivery system and health environment.

3-4331 Written policy, procedure, and practice provide for unimpeded access to health care and for a system for processing complaints regarding health care. These policies are communicated orally and in writing to inmates upon arrival in the facility and are put in a language clearly understood by each inmate.

3-4335 Written policy, procedure, and practice provide that all treatment by health care personnel other than a physician, dentist, psychologist, optometrist, podiatrist, or other independent provider is performed pursuant to written standing or direct orders by personnel authorized by law to give such orders. Nurse practitioners and physician's assistants may practice within the limits of applicable laws and regulations.

3-4343 Written policy, procedure, and practice require medical, dental, and mental health screening to be performed by health-trained or qualified health care personnel on

all inmates, excluding intrasystem transfers, upon the inmate's arrival at the facility. All findings are recorded on a form approved by the health authority. The screening includes at least the following:

Inquiry into:
- current illness and health problems, including venereal diseases and other infectious diseases
- dental problems
- mental health problems
- use of alcohol and other drugs, including type(s) of drugs used, mode of use, amounts used, frequency used, date or time of last use, and history of any problems that may have occurred after ceasing use (e.g., convulsions)
- past and present treatment or hospitalization for mental disturbance or suicide
- possibility of pregnancy
- other health problems designated by the responsible physician

Observation of:
- behavior, including state of consciousness, mental status, appearance, conduct, tremor, and sweating
- body deformities, ease of movement, etc.
- condition of skin, including trauma markings, bruises, lesions, jaundice, rashes and infestations, and needle marks or other indication of drug abuse

Medical disposition of inmate:
- general population and/or
- general population with prompt referral to appropriate health care service and/or
- referral to appropriate health care service for emergency treatment

3-4350 Written policy, procedure, and practice provide for 24-hour emergency medical, dental, and mental health care availability as outlined in a written plan. The plan includes arrangements for the following:

- on-site emergency first aid and crisis intervention
- emergency evacuation of the inmate from the facility
- use of an emergency medical vehicle
- use of one or more designated hospital emergency rooms or other appropriate health facilities
- emergency on-call physician, dentist, and mental health professional services when the emergency health facility is not located in a nearby community

- security procedures providing for the immediate transfer of inmates when appropriate

3-4353 Written policy, procedure, and practice require that sick call is conducted by a physician and/or other qualified personnel and is available to all inmates. Sick call is held according to the following schedule:
  - facilities with fewer than 100 inmates - one day per week at a minimum
  - facilities with 100 to 300 inmates - three days per week at a minimum
  - facilities with more than 300 inmates - four days per week at a minimum

If an inmate's custody status precludes attendance at sick call, arrangements are made to provide sick call services in the place of the inmate's detention.

3-4360 Written policy, procedure, and practice require that patients who need health care beyond the resources available in the facility, as determined by the responsible physician, are transferred under appropriate security provisions to a facility where such care is available.

3-4365 Written policy, procedure, and practice address the management of serious and infectious diseases. These are updated as new information becomes available.

Park County Official's departure from sound correctional practices is not limited to the preceding "ACA Standards." Certainly, the conditions at the Park County Jail, as described by both staff and detainees, were inhumane and exposed Mr. Carranza-Reyes to a substantial risk of harm. As noted in the preceding paragraph, these were obvious problems at Park County Jail with, but not necessarily limited to, overcrowding, sanitation, ventilation, clothing, bedding, medical attention, shower ratios, toilet ratios, wash basin rations, physical plant temperature control, among others.

## VIII. OVERALL OPINIONS AND CONCLUSIONS

It is my opinion that the Park County Sheriff's office, through the Park County Board of County Commissioners, the Sheriff, and Monte Gore, as captain of the Park County Sheriff's Office deprived Mr. Moises Carranza-Reyes of the right to basic human necessities, proper sanitary conditions, adequate clothing and shelter and access to

prompt medical care.   The inhumane conditions that Mr. Moises Carranza-Reyes was exposed to at the Park County Jail, in my opinion, constitute deliberate indifference to his safety and well-being.  The risk of harm to Mr. Carranza-Reyes was obvious even to Park County line staff.   Park County officials routinely violated their own policies and procedures in a number of elements of conditions of confinement thus subjecting detainees, including Mr. Carranza-Reyes, to degrading and inhumane conditions of confinement as described in this report.

This report may be supplemented as additional information is received and reviewed.

Respectfully Submitted,

Manuel D. Romero
May 2, 2006