---

**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Case No. 2005-WM-377 (BNB)

DEPOSITION OF: ROBERT B. GREIFINGER, M.D.
Volume I
August 25, 2006

MOISES CARRANZA-REYES,

Plaintiff,

v.

PARK COUNTY, a public entity of the State of Colorado and its governing board, THE PARK COUNTY BOARD OF COUNTY COMMISSIONERS; PARK COUNTY SHERIFF'S OFFICE, a public entity of the State of Colorado; FRED WEGENER, individually and in his official capacity as Sheriff of Park County, Colorado; MONTE GORE, individually and in his capacity as Captain of Park County Sheriff's Department; VICKIE PAULSEN, individually and in her official capacity as Registered Nurse for Park County, Colorado; JAMES BACHMAN, M.D., individually and in his official capacity as Medical Director of the Park County Jail,
Defendants.

TAKEN PURSUANT TO NOTICE on behalf of the Defendants at 1435 Arapahoe Street, Boulder, Colorado 80302 before Laura L. Corning, Federal Certified Realtime Reporter, Certified Shorthand Reporter and Notary Public within Colorado.

---

**Page 2**

APPEARANCES

For the Plaintiff:
WILLIAM A. TRINE, ESQ.
CHERYL TRINE, ESQ.
Trine & Metcalf, P.C.
1435 Arapahoe
Boulder, Colorado 80302

JOSEPH J. ARCHULETA, ESQ.
Law Office of Joseph J. Archuleta
1724 Ogden Street
Denver, Colorado 80218

For the Defendants Park County, Park County Board of Commissioners, Park County Sheriff's Office, Wegener and Gore:
ANDREW D. RINGEL, ESQ.
Hall & Evans, LLC
1125 17th Street
Suite 600
Denver, Colorado 80202

For the Defendant Paulsen:
MELANIE B. LEWIS, ESQ.
Berg Hill Greenleaf & Ruscitti LLP
1712 Pearl Street
Boulder, Colorado 80302

For the Defendant Bachman:
CRAIG A. SARGENT, ESQ.
Johnson McConaty & Sargent, P.C.
400 South Colorado Boulevard
Suite 900
Glendale, Colorado 80246

Also Present: None

---

**Page 3**

INDEX
EXAMINATION OF ROBERT B. GREIFINGER, M.D.          PAGE
August 25, 2006

By Mr. Trine:          --
By Mr. Archuleta:      --
By Ms. Trine:          --
By Mr. Ringel:         5
By Ms. Lewis:          --
By Mr. Sargent:        107

DEPOSITION EXHIBITS:                                INITIAL REFERENCE
71  Curriculum Vitae of Robert B. Greifinger, M.D.   8
72  Publications                                     33
73  Expert Testimony at Trial or by Deposition       40
    within the Past Four Years
74  Letter/Report to Trine from Greifinger,          55
    7/29/05
75  Letter/Report to Trine from Greifinger,          56
    4/27/06
76  Letter/Report to Trine from Greifinger,          57
    6/2/06
77  File                                             55
78  Various documents not attached to file           59

(Original exhibits attached to original deposition; copy exhibits included in continuing exhibit file; copies provided to counsel as requested.)

---

**Page 4**

INDEX
(Continued)

EXHIBITS PREVIOUSLY MARKED:      EXHIBIT    PAGE
                                 24         59
                                 60         60

---

Coffman Reporting
303.893.0202
303.893.2230 FAX
WWW.COFFMANREPORTING.COM

**EXHIBIT 31**

**5**

1  WHEREUPON, the within proceedings were taken
2  pursuant to the Federal Rules of Civil Procedure:
3      (At this time Ms. Trine was not present in
4  the deposition room.)
5      ROBERT B. GREIFINGER, M.D.,
6  having been first duly sworn to state the whole truth,
7  was examined and testified as follows:
8           EXAMINATION
9  BY MR. RINGEL:
10     Q.  Good morning, Doctor.
11     A.  Good morning.
12     Q.  We met off the record. My name is Andrew
13 Ringel. I represent the Board of County Commissioners of
14 Park County, the Sheriff, Fred Wegener, and Captain Monte
15 Gore in this lawsuit. I understand that -- and from
16 reviewing your materials -- you've been an expert witness
17 many times and, therefore, generally understand the
18 process of a deposition; is that fair?
19     A.  Yes, sir.
20     Q.  Okay. I'm not going to, therefore, go over
21 the rules of the deposition, except for the following
22 one: If you don't understand a question that I ask you,
23 please tell me that you don't understand it. Okay?
24     A.  Okay.
25     Q.  And if you don't do that and you answer one

**6**

1  of my questions, I'm going to assume that you understood
2  the question; is that fair?
3     A.  Yes.
4     Q.  Okay. What did you do to prepare for this
5  deposition?
6     A.  I read my three reports. I reviewed the
7  file that I had reviewed earlier, and I received some
8  additional information from Mr. Trine, which I looked at
9  yesterday.
10    Q.  Did you do anything else to prepare for the
11 deposition?
12    A.  I had a meeting with Mr. Trine.
13    Q.  Okay. Yesterday and today or -- yesterday
14 or today or both?
15    A.  We met yesterday. Today the meeting was
16 fairly unsubstantial in regard to the case.
17    Q.  Okay. How long did you meet with Mr. Trine
18 yesterday?
19    A.  Approximately one hour.
20    Q.  And generally talk to me -- generally
21 describe for me what you and Mr. Trine talked about
22 yesterday.
23    A.  Well, we -- we reviewed -- we mostly talked
24 about what information I might not have seen that I ought
25 to look at later, and we talked about my reports.

**7**

1     Q.  Okay. Did you do anything else to prepare
2  for your deposition today?
3     A.  Just as I mentioned, I reviewed the
4  additional materials that I was given yesterday.
5     Q.  Okay. After your -- you reviewed them
6  after your meeting with Mr. Trine?
7     A.  Yes.
8     Q.  Okay. How much time did you spend
9  reviewing the additional materials?
10    A.  I spent approximately two hours reviewing
11 the materials and then an additional hour reviewing the
12 materials I had seen previously.
13    Q.  Let me back up. I didn't ask you this, and
14 it's my fault for not doing so. Can you state your name
15 for the record, please?
16    A.  Certainly. Robert Greifinger.
17    Q.  Would you spell your last name, Doctor,
18 please?
19    A.  G-r-e-i-f-i-n-g-e-r.
20    Q.  Okay. Thank you. I'm sorry. I forgot
21 that. That's inexcusable by me, but, you know, it's
22 early yet.
23        When you say the materials that you
24 previously had, are we talking about prior to the
25 materials you received from Mr. Trine yesterday,

**8**

1  everything that would constitute your file that you had
2  forwarded to Mr. Trine's office and then they forwarded
3  to me?
4     A.  Yes.
5     Q.  Okay. All right.
6         (Deposition Exhibit 71 was marked.)
7     Q.  Doctor, directing your attention to what's
8  been marked for purposes of this deposition as
9  Exhibit 71, can you identify this document for me?
10    A.  Yes. This is a resume without a list of
11 publications.
12    Q.  And I will -- I have your list of
13 publications, and that's going to be Exhibit 72 in a
14 minute, but, as far as you're concerned, is this a
15 current resume for you?
16    A.  It's pretty much current. I have had some
17 additional court monitoring positions since this resume
18 was prepared. I am a federal court monitor for the
19 prison on St. Croix in the Virgin Islands. I'm also
20 federal court monitor for the Tutwiler Women's Prison in
21 Alabama, and I'm a monitor for a settlement agreement
22 between a class of plaintiffs and the New Mexico juvenile
23 justice system. I have begun those positions since this
24 resume was prepared.
25    Q.  Okay. When you say you're a federal court

Page 9

1  monitor, for instance, related to the prison system in
2  St. Croix, how does that come about? Do you get
3  appointed by a federal court judge, for instance?
4  A. In that case, the judge appointed a special
5  master, and the special master asked me to help her with
6  the medical care component of the review with the consent
7  of the parties.
8  Q. Okay. Are you effectively, when you serve
9  in that role, an expert for the federal court?
10 A. Yes.
11 Q. Okay. You understand that there are
12 procedures in the Federal Rules of Civil Procedure about
13 court-appointed experts. Is that how you've been
14 designated, if you know?
15 A. I don't know.
16 Q. Okay. Who is the special master in that
17 case?
18 A. Susan McCampbell.
19 Q. And where is Ms. McCampbell's office?
20 A. Florida.
21    (At this time Ms. Trine entered the
22 deposition room.)
23 Q. Where in Florida?
24 A. I believe it's Fort Lauderdale.
25 Q. Have you worked with her in other

Page 10

1  capacities outside of this monitoring relationship that
2  fairly recently started in St. Croix?
3  A. Yes.
4  Q. What other capacities?
5  A. She and I are both consultants and experts
6  for the special litigation section of the civil rights
7  division of the United States Department of Justice, and
8  we've worked together in a case called USA vs. Shelby
9  County, Tennessee.
10 Q. Where is that located in Tennessee?
11 A. Memphis.
12 Q. How did you become an expert and a
13 consultant for the United States Department of Justice
14 Civil Rights Division?
15 A. Soon after I left my position as deputy
16 commissioner and chief medical officer for the New York
17 State Department of Correctional Services, I received a
18 call from someone in the special litigation section
19 asking me if I would work with them on a case that they
20 were involved in, and that began what's now an 11-year
21 association. I'm currently working with them on 10 or
22 11 different cases.
23 Q. And what do you do, generally speaking, in
24 your role as an expert consultant for the civil rights
25 division special litigation section of the United States

Page 11

1  Department of Justice?
2  A. The special litigation section works under
3  a law called the Constitutional Rights of
4  Institutionalized Persons -- the acronym is CRIPA -- and
5  sometimes they ask me to help them with an investigation
6  to help determine if there are any constitutional
7  violations in medical care. Other times, if they have
8  worked with the jurisdiction to get a settlement
9  agreement, they'll ask me to help monitor the performance
10 of the state or county against the settlement agreement.
11 So I'm either an investigator or a monitor. And in one
12 case I'll be an expert in litigation against one of those
13 jurisdictions.
14 Q. But you are involved, it sounds like, as --
15 in an investigator role as the special litigation section
16 of the civil rights division decides whether to pursue
17 litigation. Is that a fair assessment? Fact gathering?
18 A. I gather facts and offer opinions, and then
19 the United States makes decisions, obviously.
20 Q. Okay. All right. And that's -- when
21 you're an investigator, it's that stage of the
22 proceedings. Am I correct about that?
23 A. Yes.
24 Q. Prelitigation.
25 A. I'm using the term "investigator." They

Page 12

1  call it "consultant."
2  Q. Okay. And your role as a monitor would be
3  after some kind of settlement agreement or consent
4  decree, or whatever, is entered into between the United
5  States and a particular jurisdiction, you would monitor
6  compliance with that agreement?
7  A. Yes.
8  Q. And when you do that for the Department of
9  Justice, do you write reports?
10 A. Yes.
11 Q. Are they in a similar format as the expert
12 reports that you've written in this case, or do they vary
13 in some way?
14 A. Most of them are in similar format.
15 Q. Are they public records, if you know?
16 A. Typically, they are not, but sometimes they
17 are.
18 Q. If it got filed with the court -- with the
19 court, it would be a public record, for instance?
20 A. I assume so.
21 Q. Okay. Are you aware of any of your reports
22 being filed with the court? And when I say "reports,"
23 related to your work for the United States Department of
24 Justice.
25 A. No. The justice department usually takes

* SUBJECT TO CONFIDENTIALITY DESIGNATIONS *

**33**

1  been marked for purposes of this deposition as
2  Exhibit 72, can you identify that document for me?
3      A.   Yes. This is a three-page list of my
4  publications dated January, 2006.
5      Q.   How much -- how many additions to this have
6  occurred since January of 2006?
7      A.   None.
8      Q.   So is this current, as far as you're
9  concerned?
10     A.   It's current for actual publications, yes.
11     Q.   Okay. I assume that there are some that
12  are in the pipeline, so to speak, that wouldn't be
13  appropriate to put on this list?
14     A.   Yes, sir.
15         MR. SARGENT:  That are somewhere in the
16  United airplane system.
17         THE DEPONENT:  That's correct.
18     Q.   (BY MR. RINGEL) How many of those are
19  there that are in the pipeline, so to speak?
20     A.   There are three scholarly articles and one
21  book.
22     Q.   Okay. Fair enough. And I understand the
23  issue of -- I'm not going to ask you specifically about
24  those, because I understand the issue of things being in
25  the pipeline and your potential restrictions on talking

**34**

1  about them, other than in perhaps general terms before
2  they are published. Is that a restriction that you
3  understand exists on you, or --
4      A.   I can mention what they're about.
5      Q.   Yeah. That's what I mean. I don't want to
6  know what journal or anything like that. Generally
7  speaking, what I want to understand is do you have any
8  background in terms of publications on the infection
9  streptococcus A?
10     A.   I'm not sure what you mean by do I have any
11  background.
12     Q.   Have you written anything on the infectious
13  disease streptocuccus A? I didn't see anything on this
14  list of publications. Is any of the forthcoming
15  publications on that topic?
16     A.   No. Except that it may be discussed in a
17  chapter in my textbook that won't be published until
18  October of 2007.
19     Q.   And is that --
20     A.   That's not a chapter authored by me. I'm
21  the editor of the book.
22     Q.   Okay. I understand. I understand. Are
23  you an author of any of the chapters in the books -- or
24  in that book?
25     A.   I don't know yet.

**35**

1      Q.   Okay. Depends on whether you can get
2  someone else to do it or not?
3      A.   Yes.
4      Q.   I understand. Okay. Now, the general
5  topic of that forthcoming book is what?
6      A.   Public health in criminal justice.
7      Q.   So it's kind of a follow-up to the Clinical
8  Practice in Correctional Medicine book that you were an
9  associate editor of that was published this year?
10     A.   No. It's different. This -- this is
11  about -- a lot of about prevention and reentry.
12     Q.   You mean reentry into society?
13     A.   Yes.
14     Q.   And what the potential impact of reentry of
15  people in a correctional setting who have diseases to
16  come back into society -- what that might mean to
17  society, generally speaking?
18     A.   Well, it -- it -- it's about the impact of
19  the health status of returning inmates on the community
20  and what can be done to not only ease those inmate's
21  reentry for -- inevitably almost all return to the
22  community, but to lessen the impact healthwise on the
23  community.
24     Q.   Have you, as a doctor, ever treated someone
25  with streptococcus A?

**36**

1      A.   Certainly.
2      Q.   When's the last time that you provided
3  primary medical care to anyone?
4      A.   1985.
5      Q.   Okay. And when you -- so your treatment of
6  streptococcus A would have been 1985 or before?
7      A.   Yes.
8      Q.   In what context did you treat streptococcus
9  A?
10     A.   I was a pediatrician.
11     Q.   So you treated children with streptococcus
12  A?
13     A.   Yes.
14     Q.   Is streptococcus A the common version of
15  what I might think of in lay terms as strep throat?
16     A.   Yes.
17     Q.   So this was something that you saw in your
18  pediatric practice on probably a daily basis?
19     A.   Yes.
20     Q.   Okay. Would you consider yourself an
21  expert in streptococcus A and it's infection mechanisms?
22     A.   No.
23     Q.   And am I -- is it fair to say that you're
24  not offering an opinion in this case about the infection
25  mechanisms of streptococcus A?

69

1   A.   And also, certainly, the INS contract.
2   Q.   Okay. And that's also contained in
3   Exhibit 77, I believe.
4   A.   Yes.
5   Q.   Okay. But if there are policies and
6   procedures that exist for the Park County Jail that are
7   not contained in Exhibit 77, you didn't review them; is
8   that correct?
9   A.   That's correct. But I did review Mr.
10  Romero's report, and if he saw any of those policies and
11  procedures and opined on them, I would have no
12  disagreement with his opinion.
13  Q.   Okay. Are you -- do you believe that it's
14  within the scope of your expert opinion to opine about
15  nonmedical policies and procedures of the Park County
16  Jail?
17  A.   It would depend on how you define
18  "medical." If you define "medical" in the broadest
19  sense, including public health, sanitation, risks of
20  harm, then I would limit my opinions to those.
21  Q.   Okay. Fair enough. You have talked
22  about -- that your opinion in part is related to the
23  phrase "standards of care." Do you remember using that
24  phrase?
25  A.   Yes.

70

1   Q.   What do you mean by that?
2   A.   Well, "standard of care" means -- in the
3   case of correctional health care is a national standard,
4   and it refers to the expectation for prudent jail
5   operations, correctional health care and medical care
6   behind bars, refers to well-accepted expectations to
7   prevent harm.
8   Q.   Is it a written standard or is it a
9   standard that you have knowledge of based on your
10  experience and expertise in this particular area?
11  A.   It's a combination. There are some written
12  standards, including standards promulgated by the
13  National Commission on Correctional Health Care, which
14  have evolved to become standards of care. But I base my
15  opinion, also, on my knowledge, experience and wisdom in
16  the field of correctional health care, which may be
17  different from -- or go beyond the standards of the
18  national commission.
19  Q.   Okay. So the National Commission on
20  Correctional Health Care has standards for correctional
21  facilities such as the Park County Jail?
22  A.   Yes.
23  Q.   And it's a written publication that I could
24  get by contacting the National Commission on Correctional
25  Health Care or go into their Web site or something along

71

1   those lines?
2   A.   Yes.
3   Q.   Okay. What -- that standard was not
4   something you specifically referred to in creating your
5   opinions in this case; is that correct? Or --
6   A.   I believe I did refer to some specific
7   standards.
8   Q.   Can you point that out to me among these
9   reports? I think I found one. Take a look at Exhibit --
10  well, your first report, July 29, 2005, in the Material
11  Reviewed section, is Item Number 15 what you're talking
12  about?
13  A.   Yes. And copies of those standards are
14  contained in Exhibit 77. I did not opine specifically
15  about those standards --
16  Q.   Okay.
17  A.   -- in my reports, now that I look at them.
18  Q.   Okay. If -- is there a version of the
19  jailhouse standards promulgated by the National
20  Commission on Correctional Health Care between 1996 and
21  March of 2003?
22  A.   No.
23  Q.   Okay. So the events in this case, in March
24  of 2003, to the extent that they would be judged against
25  the jailhouse standards of the National Commission on

72

1   Correctional Health Care, that would be the 1996 edition
2   of them?
3   A.   The 2003 standards were published in 2002,
4   and I don't recall the exact time they became effective
5   for an accreditation standard, but they were certainly
6   widely known and promulgated.
7   Q.   But you -- but you reviewed the 1996
8   standards in conjunction with coming up with your expert
9   opinions in this case?
10  A.   I reviewed the 1996 standards in my first
11  report dated July 29, and then in my report dated June 2,
12  2006 I mention both standards, the 1996 and the 1993 --
13  Q.   2003?
14  A.   2003.
15  Q.   Okay.
16  A.   -- because I didn't want to get into the
17  question as to what point the 2003 standards became
18  applicable.
19  Q.   Okay. Are there marked deferences in those
20  two standards in the areas that you focused on in your
21  expert opinions?
22  A.   No.
23  Q.   Generally speaking, they're similar?
24  A.   Yes. As far as I know, they are.
25  Q.   Okay.

## Page 73

1  A. The 2003 standards, it may be more specific
2  or explicit.
3  Q. Okay. Is the National Commission on
4  Correctional Health Care an accrediting agency?
5  A. Among other things, that's what they do.
6  Accreditation is voluntary and they only have accredited
7  a small proportion of the correctional facilities in the
8  United States. Nevertheless, their standards are widely
9  known and widely accepted as standards of care.
10 Q. Okay. Other than the jailhouse standards
11 of the National Commission on Correctional Health Care,
12 are there any other written standards that you utilized
13 in what you conclude is the applicable standard of care
14 in this case?
15 A. I believe I looked at the Colorado, either
16 statute or regulations which are included in Exhibit 77.
17 Q. And that would be the State of Colorado
18 Sanitary Standards for Penal Institutions?
19 A. Yes.
20 Q. Any other written standard that you looked
21 at?
22 A. Not in the context of this case.
23 Q. There is a mention -- and I can find it if
24 you need me to -- somewhere in one of your reports about
25 American Correctional Association standards. Did you

## Page 74

1  specifically look at CCA standards for this case?
2  A. No. I didn't look, but I'm aware of the
3  CCA standards for the ratio of inmates to toilets and
4  showers.
5  Q. And I assume that the National Commission
6  on Correctional Health Care has similar standards; is
7  that correct?
8  A. No. The national commission doesn't
9  address that.
10 Q. Okay. It is more focused on medical
11 standards as opposed to what might be considered public
12 health standards?
13 A. Yes.
14 Q. All right. Have we exhausted all of the
15 written standards that helped you form the basis of your
16 determination of what the applicable standard of care is
17 in this case?
18 A. Yes.
19 Q. Can you just sort of generally describe for
20 me how your own experience and background and expertise
21 goes into the creation of your standard of care that
22 you're applying in this case, in addition to the written
23 standards of care that we've talked about?
24 A. Well, I have almost 20 years of experience
25 in correctional health care: In prisons, jails, police

## Page 75

1  lockups and juvenile detention facilities. I've had
2  operational responsibilities, consultation
3  responsibilities, oversight responsibilities, and I've
4  been an expert witness in litigation, and I visited,
5  perhaps, more than 100 correctional facilities across the
6  United States, and I'm familiar with the state of
7  professional development and the expertise in risk
8  management that's developed in correctional health care
9  since Estelle v. Gamble in 1976.
10         So from my work and my observations, I've
11 come up with a method to form opinions about what I
12 believe is the standard of care.
13 Q. How does the standard of care that you
14 applied in this case differ from the written standard of
15 care contained in the national commission's jailhouse
16 standards or the State of Colorado Sanitary Standards for
17 Penal Institutions?
18 A. Well, I'm not sure. I can certainly say
19 it's not a higher standard or lower standard. I just may
20 have mentioned things in my report that are not
21 considered in the national commission standards, for
22 example, the ratio of toilets, showers and lavatories in
23 the Park County Jail on D pod.
24 Q. Would it be possible, in your opinion, for
25 another expert to replicate what you've done in this

## Page 76

1  case, given that you have your own individual standard of
2  care that you're applying?
3         MR. TRINE: I'll object to the form. Go
4  ahead and answer. I'm just doing that for the record.
5  A. I really don't know. There are certainly
6  other experts in correctional health care, and they would
7  form their own opinions.
8  Q. (BY MR. RINGEL) But to the extent that
9  you're relying on a standard of care that's based on your
10 own personal experience and background, wouldn't you
11 agree that it would be difficult for another expert to
12 know exactly what that standard of care is?
13 A. No. In -- in my opinion, another expert in
14 correctional health care would come to the same or
15 similar conclusions as I did in this case.
16 Q. Okay. Based on -- but how would that other
17 expert know what standard of care you're applying?
18 A. Because there is an understanding about
19 access to care, the timeliness of the access to care and
20 the quality of care in correctional facilities that's
21 universal within the United States.
22 Q. Okay. Is it your opinion that the standard
23 of care that is applicable to the correctional facilities
24 is applicable to every correctional facility in the
25 United States?

## Page 93

1  this case include the issue of causation?
2  A.  Yes.
3  Q.  So describe your expert opinion about
4  causation in this case.
5  A.  I believe that the crowded and the
6  unsanitary conditions on D pod in the Park County Jail
7  during the period of March 1 through March 8 of 2003
8  caused Mr. Carranza-Reyes to get sick with streptococcal
9  disease, and that the lack of timely and appropriate
10 medical care for him led to his death -- or near-death
11 and to his amputation and to all the other complications
12 he suffered from his illness. It led to his
13 hospitalization at Summit Medical Center, to his
14 hospitalization at Denver Health and to get his current
15 compromised medical condition.
16 Q.  What basis do you have to know what Mr.
17 Carranza-Reyes's current medical condition is today?
18 A.  Well, I know from the records of Denver
19 Health that he lost a good part of his lung and he lost a
20 leg. And I've -- through conversations with Mr. Trine,
21 I'm aware of some other medical problems that he has.
22 Q.  What are those medical problems of which
23 you're aware today?
24 A.  Well, I'm aware of his -- his pain, his --
25 I'm aware of his -- of pain that he testifies to in his

## Page 94

1  deposition. I'm aware of pain with urination he has.
2  I'm aware of difficulties he has with fitting his
3  prosthesis and his lack of ability to get physical
4  therapy and diagnosis and treatment for other maladies
5  that he suffers.
6  Q.  Okay.
7  A.  All of which were, as I understand it, a
8  consequence of the illness in question.
9  Q.  It seems to me that there are two aspects
10 of your opinions in this case: One, the issue of
11 causation, vis-a-vis whether or not Mr. Carranza-Reyes
12 caught the illness of streptococcus A and related
13 complications in the Park County Jail; and the second
14 part of your causation opinion being the -- the extent of
15 Mr. Carranza-Reyes's illness because of what you're
16 concluding to be not timely medical intervention. Is
17 that a fair split of --
18 A.  Not exactly. I think your first is a
19 little too simplistic. The -- many people carry
20 streptococcus A, as they do carry other bacteria, and I'm
21 saying that either he caught it there or he had it in his
22 body, which many of us do, and the stressful conditions
23 of crowding and unhygienic clothing, unhygienic
24 toiletting, unhygienic conditions generally, stressed his
25 body so much that it caused his body to relax its immune

## Page 95

1  system and allow the streptococcal bacteria to cause
2  illness. So that would be for number one.
3       For number two I would say that that
4  illness could have been diagnosed and treated easily if
5  he had been seen by an appropriate medical professional
6  in a timely way. He was prevented from doing that for a
7  variety of reasons. Barriers that were created by the
8  County, by the medical director and by the Nurse Paulsen
9  prevented him from timely treatment, and as a consequence
10 of not getting timely treatment, he was close to death
11 and he suffered all that he did during the next four
12 months and later.
13 Q.  All right. I think I understand your
14 causation opinion. Show me in any of your reports where
15 that first part of the causation opinion is articulated.
16 A.  Paragraph 28, first sentence, second
17 sentence, third sentence, fourth sentence, fifth
18 sentence, and then I have conclusions based on that.
19 Q.  Okay. And is that -- is that articulation
20 of the first part of your causation opinion articulated
21 anywhere else in any of your three reports that you can
22 point out to me?
23 A.  I want to say that it's part of my
24 causation opinion. It's also part of my deliberate-
25 indifference opinion.

## Page 96

1  Q.  I understand that, Doctor.
2  A.  I guess the first sentence of paragraph 36
3  regarding the policies and practices that were encouraged
4  or tolerated, and then in my report dated April 17 --
5  Q.  You mean April 27?
6  A.  -- 27th -- I'm sorry -- paragraph 15,
7  paragraph 16, mention of the infection control program
8  specifically and mention of the crowding in the jail,
9  people sleeping on the floor, paragraph 17 with there
10 being inadequate place to isolate patients, and my report
11 dated June 2, paragraph 6, that Dr. Bachman declined to
12 participate in environmental inspections and infection
13 control committee. Although those were requirements,
14 Dr. Paulsen's [sic] ignorance about the crowding can have
15 adverse health consequences. And that's all for Part 1.
16       I would like to add, with reference to our
17 earlier discussion about mention of National Commission
18 on Correctional Health Care standards, that I do mention
19 them in paragraph 1 of my report dated June 2, 2006.
20 Q.  And I believe we already talked about that,
21 because we talked about the footnote --
22 A.  Okay.
23 Q.  -- and the differences and your reference
24 to both of 2003 and 1996 standards.
25 A.  Okay.

97

1  Q.  But I appreciate that -- that
2  clarification.
3      What I want to ask you now is about
4  paragraph 36 of your July 29 report, and I want to
5  understand from you what your understanding is of the
6  Board of County Commissioners of Park County's
7  responsibility for any -- for the operation or the
8  policies of the Park County Jail.
9      MR. SARGENT: What paragraph?
10     MR. RINGEL: 36.
11 A.  Well, my understanding is that the board is
12 responsible for the funding of the jail and perhaps the
13 operation. And through their inability to properly
14 support a facility that they built, they required the
15 sheriff and Monte Gore and others to generate profits
16 through the incarceration of people from other
17 jurisdictions so that they needed -- they tried to
18 develop a profitable revenue stream in order to support
19 county operations. Through that they created a condition
20 that he had -- that was overcrowded and unhygienic, which
21 contributed to the illness of Mr. Carranza-Reyes.
22 Q.  (BY MR. RINGEL) Are you aware of any role
23 that the board of county commissioners has or does not
24 have with respect to any specific policy or procedure or
25 practice of the Park County Jail?

98

1  A.  No.
2  Q.  If the board of county commissioners as a
3  matter of Colorado law has no responsibility over the
4  jail in terms of its operations, policies, practices and
5  procedures, would that change your opinion about the
6  board of county commissioners reflected in paragraph 36
7  of your July 29, 2005 report?
8  A.  No, because they built the jail that relied
9  on overcrowding to support the county responsibilities,
10 and I believe that they're accountable in this chain of
11 folks.
12 Q.  Okay. Even if the board had no personal
13 participation in any specific policy, practice, procedure
14 or decision related to the operation of the Park County
15 Jail?
16 A.  Yeah. They funded a facility that was
17 unsupportable without outside revenues.
18 Q.  Okay. How does their participation, if
19 what I'm telling you is true, differ from the electorate
20 of Park County?
21 A.  I would guess that they make the decisions
22 about both capital funding and operational funding for
23 the jail based on budgets that are well known to them,
24 operational costs that are well known to them. They're
25 the legislature that makes the final decision. So an

99

1  underfunded jail either collapses or has to rely to
2  tricks like overcrowding.
3  Q.  Are you -- do you have any knowledge of
4  Colorado law about the different roles of the board of
5  county commissioners and the sheriff?
6  A.  No.
7  Q.  Do you have any knowledge of the -- how
8  public financing works in the state of Colorado?
9  A.  No.
10 Q.  Okay. Are you familiar with something
11 called Taxpayer Bill of Rights?
12 A.  No.
13 Q.  Do you have any idea about the finances of
14 Park County?
15 A.  No.
16 Q.  Okay.
17 A.  Except that they -- except within the
18 context of this case.
19 Q.  What do you mean by that?
20 A.  Well, that they needed to subsidize their
21 own responsibilities with outside revenue.
22 Q.  Okay. Do you know -- assuming that that's
23 true, do you know why that's the case for Park County?
24 A.  No.
25 Q.  Would that be information that might be

100

1  important to you in coming up with your expert opinion
2  about the role and responsibilities of the board of
3  county commissioners vis-a-vis Moises Carranza-Reyes?
4  A.  It might.
5  Q.  Okay. What is your understanding of
6  Sheriff Fred Wegener's personal participation in anything
7  that occurred with respect to Moises Carranza-Reyes?
8  A.  It's my understanding that Captain Monte
9  Gore reported to the sheriff and, therefore, the sheriff
10 is accountable for the actions and inactions of the
11 captain and the captain's staff.
12     The sheriff had a direct reporting
13 relationship, regularly toured the jail, knew or should
14 have known, through his tours and through the reports
15 that went to him, about the crowding and sanitary
16 conditions in D pod between March 1 and March 8, 2003.
17 Q.  And you believe that Sheriff Wegener was
18 deliberately indifferent to the conditions of Moises
19 Carranza-Reyes in the Park County Jail based on the
20 reporting relationship and information that you just
21 described?
22 A.  By -- he's accountable by failure to assure
23 that the policies and procedures of the jail were carried
24 out, failing to train and supervise Captain Gore, and
25 failing to assure that Captain Gore was training and

101

1  supervising his staff and providing sufficiently trained
2  health care staff in sufficient numbers to provide the
3  requisite medical care for inmates with serious medical
4  needs.
5      Q.    Is it reasonable for a sheriff to rely on
6  medical personnel to tell the sheriff what was needed in
7  terms of medical care in a jail?
8      A.    It's reasonable for a sheriff to consider
9  the opinions of medical staff, but a sheriff should also
10 be measuring performance to ensure that care is timely
11 and appropriate.
12     Q.    Okay. So --
13     A.    In other words, to perform in an oversight
14 function.
15     Q.    Understood. In terms of your earlier job
16 in New York, it would be reasonable, in your opinion, if
17 I'm understanding you correctly, for your boss, the
18 commissioner of the New York State Department of
19 Correctional Services, to be held individually liable for
20 deliberate indifference if that commissioner did not
21 exercise sufficient oversight over you as chief medical
22 officer in making policies and procedures about the
23 provision of medical care for the inmates in the system;
24 is that correct?
25     A.    Yes. And he often second-guessed me and

102

1  called different people to get consultation to try to
2  affirm whether my recommendations were consistent with
3  the standard of care.
4      Q.    Okay. Was the -- is it fair to say that an
5  individual like the sheriff -- and I don't know, but I
6  assume like the commissioner, who didn't have their own
7  medical training, has a different responsibility than
8  someone who has a medical background in terms of the
9  medical care, policies, procedures of a correctional
10 facility?
11     A.    Yes.
12     Q.    How does that role differ, if you're the
13 head of the -- the -- how would the role of the sheriff,
14 in your opinion, differ from the role of Dr. Bachman as
15 the medical director of the Park County Jail?
16     A.    Well, Dr. Bachman's role was to implement
17 the policies and procedures and, as I mentioned in my
18 report, the policies and procedures for the jail were
19 soundly based, based on the standards of the national
20 commission. And it's the sheriff's responsibility to
21 make sure that those policies and procedures are
22 implemented.
23          Dr. Bachman's job was different. It's his
24 job, among other things, to implement those policies, to
25 train and supervise the nursing staff and to provide

103

1  timely access to appropriate medical care.
2      Q.    Okay. If I'm understanding both your
3  report and -- your reports, plural, and what you said, do
4  you have a criticism of the policies and procedures in
5  any way of the Park County Jail as they were written?
6      A.    No, I don't believe so.
7      Q.    Okay. Your criticism is --
8      A.    I'll reflect on that at our next break and
9  report to you if I have a different opinion.
10     Q.    Understood. But -- but it sounds to me
11 like what you're -- at least your principal criticism
12 is -- is the implementation of those policies and how
13 they were actually done in practice?
14     A.    My critical -- criticism is the
15 implementation of the policies and procedures and the
16 failure to train, supervise from the point of view of
17 your clients.
18     Q.    Okay. What specific training did Monte
19 Gore not have that Sheriff Wegener should have trained
20 him about that caused an injury to Mr. Carranza-Reyes?
21     A.    Well, they should have trained him that
22 crowding is dangerous, that overflowing toilets are
23 unhygienic, that mops and clean water and disinfectant
24 need to be available for times the toilets do overflow.
25 He should have trained him and supervised him to provide

104

1  clean linens; meaning, at a minimum, standards such as
2  clean underwear and jumpsuits three times a week, at a
3  bare minimum. He should have trained and supervised him
4  in the supervision of his nurse, to make sure she was not
5  practicing beyond the scope of her license.
6      Q.    Okay. Anything else that this sheriff
7  should have trained the captain about?
8      A.    Certainly the medical records system, from
9  the little glimpses I got with the two typewritten notes
10 that were unsigned, was an inadequate system of medical
11 records, and the sheriff should have trained the captain
12 to assure that there was a medical records system that,
13 at the least, relied on concurrent notes that were signed
14 by the professional who wrote them.
15     Q.    And you --
16     A.    Furthermore, the sheriff should have
17 assured that correctional officers don't practice
18 medicine, such as using oxygen as treatment for shortness
19 of breath for patients, without the evaluation and order
20 of a physician.
21     Q.    Okay. Other than what is reflected in your
22 report and what you've testified to, did Sheriff Wegener
23 do anything else, in your opinion, to violate Mr.
24 Carranza-Reyes's constitutional rights?
25     A.    If the cause of the delay of the

**105**

1  transportation of Mr. Carranza-Reyes between 8:00 a.m.
2  and approximately 11:00 a.m. was because -- had anything
3  to do with security staffing, then I would say it was the
4  sheriff's responsibility to train Captain Gore on how to
5  provide sufficient security staffing in the event of a
6  life-threatening condition such as that Mr. Carranza-
7  Reyes had.
8      Q.   Okay.
9      A.   Further, the sheriff should have trained
10 and supervised the captain regarding appropriate heating,
11 cooling and plumbing, regarding water that was warm
12 enough, yet not so hot that it could scald, for the
13 showers in D pod during the first week of March 2003. I
14 have nothing further to say regarding the sheriff.
15     Q.   Okay. What did Monte Gore do to violate
16 Mr. Carranza-Reyes's constitutional rights?
17     A.   He didn't follow the policies and
18 procedures of the facility. He allowed overcrowding,
19 unsanitary conditions, inadequate provision of laundry,
20 inadequate plumbing, inadequate provision of hot water.
21 He allowed his correctional officers to practice
22 medicine. He allowed his nurse to have untimely access
23 to medical care. He allowed her to practice medicine --
24 practice nursing beyond the scope of her license, and he
25 allowed an inordinant delay in emergency transportation

**106**

1  for Mr. Carranza-Reyes on the morning of March 8, 2003.
2      Q.   Do you -- are there any facts that support
3  the notion that Mr. Gore knew of the delay on March 8 of
4  2003, or is your criticism of him more of a failure-to-
5  train or failure-to-supervise variety?
6      A.   Well, it's failure to train. Failure to
7  supervise, he either knew or should have known. In a
8  jail that size, a jail administrator like Captain Gore
9  would have been made aware of the nurse's request to have
10 Mr. Carranza-Reyes transported to the hospital. He would
11 have been aware at the moment in the immediate chain of
12 command, and I saw nothing in the documentation that he
13 did anything to expedite that transportation.
14          If he was not informed at 8:00 a.m. of that
15 requirement, then that, too, would be a failure in
16 supervision, because he should have been informed.
17     Q.   Okay. I may have interrupted you. Is
18 there anything else that you would add to your list of
19 things that Mr. Gore did or did not do that violated Mr.
20 Carranza-Reyes's constitutional rights?
21     A.   Well, he didn't provide basic risk
22 protection by not assuring that there was a quality
23 improvement program and infection control program and
24 reporting. He also allowed breaches of privacy, which we
25 discussed earlier, and -- that's all.

**107**

1      Q.   Okay. I don't know if I broadly asked you
2  the question, so I will, and if I have, I apologize.
3  Have we covered all of your opinions about what the Board
4  of County Commissioners of Park County did to violate
5  Moises Carranza-Reyes's constitutional rights?
6      A.   Yes, I believe so.
7      Q.   Are you aware that Park County and the Park
8  County Sheriff's Office have been dismissed by the court
9  as defendants in this case?
10     A.   No.
11     Q.   Okay. What I'm going to do now is, with
12 Mr. Trine's consent, turn it over to one of my colleagues
13 while I review notes so that we don't have to waste time
14 while I'm reviewing notes. And if I have follow-up at
15 the end, I'd indulge you to let me do that.
16          MR. TRINE: That's fine.
17          MS. LEWIS: Let's take a break.
18          MR. RINGEL: Okay.
19          (Break from 11:00 a.m. to 11:09 a.m.)
20               EXAMINATION
21 BY MR. SARGENT:
22     Q.   Doctor, my name is Craig Sargent. I
23 represent Dr. Bachman in the lawsuit, and I've got some
24 questions for you. And my concern, though, and I just
25 want to state on the record first, my understanding is

**108**

1  that you have to leave today at 1:00.
2      A.   Approximately, yes.
3      Q.   It's 11:15 now. I can tell you that I'm
4  not going to be done with my questions by then. I didn't
5  understand, when we were all talking about paying to
6  bring you out to Denver, incurring that expense for a
7  half-a-day's worth of depositions. I just didn't
8  understand that. I'm going to reserve the right to
9  continue asking questions, even if we reach 1:00 and
10 we're not done. I guess we'll keep the deposition open
11 and figure out logistics and how we complete the
12 deposition. But I just wanted to put that on the record
13 to begin with. So my questions -- I'll start with my
14 questions.
15          First of all --
16          MR. TRINE: Wait. First, in response to
17 that, I think that the reason we started at 8:00 this
18 morning is that we made everyone aware of his plane
19 schedule, and you probably just didn't get the word,
20 but -- but I have no problem with what -- with the
21 statement you made.
22          MR. SARGENT: I will try to work my way
23 through as expeditiously and as efficiently as possible
24 with my questioning, but I can't imagine that I'll be
25 done by 1:00 with my questioning. I'm certain Ms. Lewis

## Page 198

1  R. Greifinger/Sargent
2  mean Dr. Garlick.
3  Q. Are there any other documents that
4  you received and reviewed since your last
5  deposition?
6  A. I don't believe so.
7  Q. I did receive two invoices, one dated
8  October 9th, 2006 to reflect three hours of review
9  material and prepare for deposition yesterday, the
10 8th of October, and then one hour for preparation of
11 your deposition today. Was that your meeting this
12 morning with Mr. Trine?
13 A. That was my conversation plus my
14 review of documents.
15 Q. Okay. Then I did also receive an
16 invoice dated August 28, 2006 that has charges for
17 August 24th and August 25th and that was for the
18 travel and preparation and for your deposition here
19 in Colorado?
20 A. Yes.
21 Q. And you're saying that there's some
22 other ones that reflect your time before your
23 deposition on August 25th?
24 A. Yes. There are five others.
25 Q. Okay. What I'll have you do is at

## Page 199

1  R. Greifinger/Sargent
2  the end of the deposition we can just mark those.
3  MR. SARGENT: What's the next
4  deposition number? Do you recall, Bill, or Andrew?
5  MR. TRINE: I don't recall.
6  MR. RINGEL: It would have been
7  whatever the last deposition in the Knox, whatever
8  exhibit in the Knox deposition.
9  MR. SARGENT: Okay.
10 Q. Dr. Greifinger, if you wouldn't mind
11 making a copy of the invoices. And do all the
12 invoices even though I received two of them. We'll
13 just make that the next exhibit in the line I guess
14 and if you wouldn't mind giving a copy to Marge that
15 maybe send a copy to Bill Trine, that would be
16 helpful.
17 A. Okay.
18 Q. Moving on now and going to the list
19 of cases where you've testified as an expert witness
20 for the plaintiffs since 2002, in all of those cases
21 did you testify that the employees of the jail or
22 the medical director exhibited a deliberate
23 indifference to a serious medical need in your
24 opinion?
25 A. No.

## Page 200

1  R. Greifinger/Sargent
2  Q. In cases brought under Section 1983
3  against a jail and its employees brought by an
4  inmate, did you testify that there was deliberate
5  indifference to a serious medical need?
6  A. Yes.
7  Q. How many of the cases reflected on
8  Exhibit 73 involved 1983 action?
9  A. The great majority but not all of
10 them.
11 Q. Did all of those cases make
12 allegations against a medical director?
13 A. No.
14 Q. How many of the cases identified on
15 Exhibit 73 included allegations against a medical
16 director?
17 A. I have no idea.
18 Q. Were there cases on that list that
19 involved allegations against a medical director
20 under Section 1983?
21 A. I really don't recall.
22 Q. Do you know if your opinions in any
23 of the cases reflected on Exhibit 73 included an
24 opinion that there was either a system-wide
25 deficiency in the policies and procedures that were

## Page 201

1  R. Greifinger/Sargent
2  in place or that there was a failure of the jail
3  staff to follow the procedures or policies that were
4  in place?
5  THE WITNESS: Could you read that
6  back to me?
7  (Question read.)
8  A. Yes.
9  Q. Can you identify which cases from
10 Exhibit 73 you would have expressed those opinions?
11 A. No.
12 Q. Can you give me a number, and I won't
13 hold you to an exact number, but can you give me a
14 ballpark number of how many of the cases on
15 Exhibit 73 where you expressed those opinions?
16 A. I don't know. Many of them had to do
17 with the failure to follow policies so that there
18 was testimony about the practices as opposed to the
19 policies.
20 Q. In those cases involving allegations
21 against a medical director in which your opinions
22 were critical of the medical director, did all of
23 the opinions include that there was either a
24 system-wide deficiency in the policies and
25 procedures or that there was a failure of the jail

ROBERT GREIFINGER, M.D.   OCTOBER 9, 2006

---

R. Greifinger/Marks

1  
2  A.  Yes.  
3  Q.  And why do you say that?  
4  A.  Well, because I believe it was cruel  
5  for a guy who was so sick that the officer thought  
6  he needed to be on oxygen and short of breath and  
7  having a progressive illness over a few days, I  
8  think it was cruel not to send him right off to the  
9  hospital the minute she heard about it.  
10  Q.  Have you come to an opinion or not as  
11  to what Nurse Paulsen's motives were with respect to  
12  her care of Mr. Carranza-Reyes?  
13  A.  No.  
14  Q.  I realize you have some opinions as  
15  to the adequacy of that, but did you get the  
16  impression that Nurse Paulsen was trying to  
17  intentionally or purposefully make  
18  Mr. Carranza-Reyes's condition worse?  
19  A.  No.  
20  Q.  Okay.  Did it appear to you that she  
21  had some concern over his condition such as by  
22  requesting that she be updated when his condition  
23  got worse over March 8, 2003?  
24  A.  It would suggest she was interested  
25  in hearing if he got worse.  It doesn't suggest one  

Page 278

---

R. Greifinger/Marks

1  
2  way or the other whether she cared about him getting  
3  better.  
4  Q.  You noted that part of your opinion  
5  that she was cruel was the fact that he was  
6  complaining, he being Carranza-Reyes, complaining of  
7  shortness of breath.  Right?  
8  A.  Yes.  
9  Q.  And based on the notes that you have  
10  seen, he was being given oxygen for that.  Am I  
11  right?  
12  A.  Yes, but I'm not sure oxygen is a  
13  treatment for shortness of breath.  
14  Q.  Okay.  But did you understand that he  
15  was actually feeling better after he received some  
16  oxygen?  
17  A.  I don't recall.  Oh, yes, I see in  
18  her note of March 8th she reports that at 3:45 she  
19  was told that he was feeling better.  
20  Q.  Is there anything in her note of 7:50  
21  that indicates that he was continuing to complain  
22  about shortness of breath?  
23  A.  No.  She neglected to follow up on  
24  that symptom in her note.  
25  Q.  All right.  So it's not stated either  

Page 279

---

R. Greifinger/Marks

1  
2  way?  
3  A.  That's correct.  
4  Q.  You conclude that Nurse Paulsen's  
5  behavior on March 8th was deliberately indifferent  
6  to Mr. Carranza-Reyes' serious medical needs?  
7  A.  Yes.  
8  Q.  And you understand that to be a legal  
9  term, deliberate indifference?  
10  A.  I understand it's a term that derives  
11  from a legal case, yes.  
12  Q.  Deliberate indifference is not a  
13  medical term, is it?  
14  A.  No.  I understand it to be a legal  
15  standard.  
16  Q.  And you don't learn about deliberate  
17  indifference in medical school or in medical  
18  seminars, do you?  
19  A.  Not in medical school.  We certainly  
20  do talk about it in medical seminars frequently.  
21  Q.  Do you have any specialized training  
22  as a doctor that leads you to be more competent than  
23  let's say a jury in assessing whether someone is  
24  being deliberately indifferent or not?  
25  A.  No.  I just have an opinion based on  

Page 280

---

R. Greifinger/Marks

1  
2  my knowledge, wisdom, and experience.  
3  Q.  I understand.  But is that an opinion  
4  based upon a reasonable degree of medical science?  
5  A.  It's based on a reasonable degree of  
6  medical certainty from my twenty years experience in  
7  correctional health care.  
8  Q.  Have you ever sought to testify as a  
9  medical expert as to whether a health care prior was  
10  deliberately indifferent and limited in your ability  
11  to make that opinion in a court of law?  
12  A.  I have never been limited regarding  
13  my testimony about deliberate indifference to  
14  serious medical needs.  In one or two courtrooms I  
15  have been limited in using those words.  But in all  
16  the other cases where I've testified at trial, I  
17  have been allowed to testify using the terms  
18  deliberate indifference to serious medical needs.  
19  Q.  And when you say you have been  
20  limited and in a couple cases have not been able to  
21  use those terms, are you telling me that the Court  
22  hasn't allowed you to give the opinion whether  
23  someone was deliberately indifferent or not?  
24  MR. TRINE:  I just want to object to  
25  this line of questioning because he's already been  

Page 281

---

27 (Pages 278 to 281)

### Page 282

1          R. Greifinger/Marks
2   asked that in his first deposition and has explained
3   this at length.
4          MR. MARKS: I understand. I'm not so
5   sure I understand that there was, that this part was
6   explored.
7     Q.   So go ahead and answer it. I'm not
8   going to dwell on it too long.
9     A.   Can you repeat it? Now I lost the
10  train.
11    Q.   Yes. I guess I want to follow up.
12  During the two occasions that you said the Court has
13  not allowed you to use the terms deliberate
14  indifference in your opinion, is that what you're
15  saying?
16    A.   I'm saying there has been at least
17  one occasion but certainly not many. And it was in
18  a case called Shaw versus San Joaquin County,
19  California, I believe.
20    Q.   Okay. I appreciate you anticipating
21  that question for me.
22    A.   If it happened other times, I can't
23  recall which case. But it may not have. I was
24  certainly allowed to testify and there was a verdict
25  in favor of the plaintiff that was substantial.

### Page 283

1          R. Greifinger/Ringel
2          MR. MARKS: Mr. Ringel said he has a
3   few more minutes of questions so I'm going to review
4   my notes and let him ask his questions, but I
5   appreciate your responding to me and holding
6   yourself over a little bit so I can ask questions.
7   Thank you.
8          THE WITNESS: Thank you, sir.
9   EXAMINATION BY MR. RINGEL:
10    Q.   This is Andrew Ringel. Dr. Greifinger,
11  we met before. I represent the Board of County
12  Commissioners of Park County, Sheriff Fred Wegener,
13  and Captain Monte Gore. I just have a few follow-up
14  questions for you.
15    A.   Certainly.
16    Q.   Have you been asked by Mr. Trine to
17  review and offer an opinion about the opinions of
18  Tom Rosazza and Donald Kearns?
19    A.   I received those materials and I
20  reviewed them and I have not been asked for my
21  opinion as of yet.
22    Q.   Okay. Do you know one way or the
23  other whether you're going to be asked to provide
24  what we call rebuttal expert testimony to
25  Mr. Rosazza, Dr. Kearns, or anybody else who's an

### Page 284

1          R. Greifinger/Ringel
2   expert designated by any of the defendants?
3     A.   I know that I would be happy to
4   testify to areas where I disagree with Thomas
5   Rosazza, and I don't believe I have any particular
6   issues with Dr. Kearns. I might. But I certainly
7   do with Mr. Rosazza.
8     Q.   But to date you have not authored any
9   opinion concerning Mr. Rosazza's opinion. Is that
10  correct?
11    A.   That's correct.
12         MR. RINGEL: Just for the record, I'm
13  going to reserve my right to take a continued
14  deposition of Dr. Greifinger to the extent he's
15  designated as a rebuttal expert in that case.
16         MR. SARGENT: I'll join in that
17  reservation of rights. This is Craig Sargent.
18         MR. MARKS: I'll do it as well to the
19  extent he provides any rebuttal to Ms. Fischer.
20         MR. SARGENT: My reservation of
21  rights would be with regard to any rebuttal opinions
22  Dr. Greifinger has with regard to the experts
23  endorsed by Dr. Bachman.
24         THE WITNESS: You guys might want to
25  go through your reservations again for Marge. It

### Page 285

1          R. Greifinger/Ringel
2   wasn't clear who was talking. You were all speaking
3   on top of each other.
4          MR. RINGEL: Let me see if I can
5   summarize everybody. All of the defense counsel
6   have reserved their right to continue or do anew
7   Dr. Greifinger's deposition to the extent he is
8   designated as a rebuttal expert in this case by the
9   plaintiff.
10         Each defense counsel's reservation is
11  related to the experts that were designated as
12  experts by that particular counsel. I think that
13  accurately summarizes it.
14    Q.   Take a look, Dr. Greifinger, at your
15  June 2nd, 2006 report.
16    A.   Okay.
17    Q.   In paragraph two of that report --
18  are you with me?
19    A.   Yes.
20    Q.   -- you opine about various things
21  that are required by the Park County policies for
22  the Park County Jail in that paragraph. Is that
23  correct?
24    A.   Yes.
25    Q.   Okay. Are those things that you