Catherine knox, 10/4/2006 — Carranza vs. Park County Board of County Commissioner

## Page 1

UNITED STATES DISTRICT COURT
DISTRICT OF COLORADO

MOISES CARRANZA-REYES,

Plaintiff,

v.  No. 05CV-00377-WD-BNB

THE PARK COUNTY BOARD OF COUNTY COMMISSIONER; FRED WEGENER, individually and in his official capacity as Sheriff of Park County, Colorado; MONTE GORE, individually and in his official capacity as Captain of Park County Sheriff's Department; VICKIE PAULSEN, Individually, and in her official capacity as Registered Nurse for Park County Colorado; and JAMES BACHMAN, M.D., individually and in his official capacity as Medical Director of the Park County Jail,

Defendants.

DEPOSITION OF
CATHERINE M. KNOX
Taken in behalf of Defendants
* * *
October 4, 2006
805 Broadway Street
Portland, Oregon

Shon McClements
Court Reporter

## Page 2

APPEARANCES:

For the Plaintiff:  MR. WILLIAM A. TRINE
Attorney at Law
1435 Arapahoe Avenue
Boulder, CO 80302

For the Defendants,  MS. MELANIE B. LEWIS
Paulsen:  Attorney at Law
1712 Pearl Street
Boulder, CO 80302

For the Defendants,  MR. ANDREW W. JURS
Bachman:  Attorney at Law
Suite 900
400 South Colorado Blvd
Glendale, Colorado 80246

For the Defendants,  MS. JENNIFER L. VEIGA
Park County, Wegener,  Attorney at Law
Gore:  Suite 600
(Via Phone)  1125 17th Street
Denver, Colorado 80202

Also Present:  (None)

INDEX

EXAMINATION BY:  PAGE NO.
Ms. Lewis  4 - 109
Mr. Jurs  109 - 138
Ms. Veiga  138 - 142
Ms. Lewis  142
Mr. Trine  142 - 147

## Page 3

EXHIBITS

No. 88  E-mail to Mr. Trine from Ms. Knox, 5/11/05  9
No. 89  Catherine M. Knox Time and Expense Report  11
No. 90  CV for Catherine M. Knox  16
No. 91  Report of Catherine M. Knox  29
No. 92  Pages from APIC Text of Infection Control and Epidemiology  31
No. 93  State of Colorado Nurse Practice Act  49

## Page 4

PORTLAND, OREGON; WEDNESDAY, OCTOBER 4, 2006
8:17 a.m.
* * *

CATHERINE M. KNOX

called as a witness in behalf of the Defendants, having first been sworn by the Reporter, testifies as follows:

EXAMINATION

BY MS. LEWIS:

Q. Could you please state your name and business address for the record.

A. My name is Catherine M. Knox. My business address is One Lincoln Center, Suite 380, 10300 S.W. Greenburg Road, Portland, Oregon, 97223.

Q. Have you ever been deposed before?

A. I have been deposed before.

Q. I will go over some rules anyway to try to make this process a little bit easier. Basically if you could wait until I finish asking my questions before you answer, it helps the court reporter get a cleaner record down.

Also, if you can answer verbally instead of nodding your head because the court reporter can't get that on the record. If you could answer by saying yes or no when the question calls for that

---

SCHMITT & LEHMANN, INC.
(360) 695-5554 *** (503) 223-4040

EXHIBIT 36

Case 1:05-cv-00377-WDM-BNB   Document 133-36   Filed 01/11/07   USDC Colorado   Page 2 of 5

Catherine knox, 10/4/2006                                    Carranza vs. Park County Board of County Commissioner

**Page 17**

1  A. I haven't worked in that type of setting for
2  years. My area of practice has been psychiatric
3  nursing. I worked with children in a mileau,
4  M-I-L-E-A-U, therapy. I have -- my other area of
5  specialty is nursing administration.
6      Q. And how long did you work in a clinical
7  setting? You said with children, correct?
8      A. For I believe two and a half years.
9      Q. Did you ever work with adults in a clinical
10 setting as I have defined it?
11     A. No, I have not. I guess let me just add one
12 clarification. I think part of being an
13 administrator is the ability to work clinically, and
14 so I have on occasion for brief periods of time --
15 for instance, there have been two or three occasions
16 where in my employment there has been a union action
17 causing a strike, and I have provided direct clinical
18 care as a manager in a strike situation.
19     I have had some other occasions where
20 because of staffing I have gone in and provided
21 direct care, but it is not really -- in my opinion I
22 don't consider myself facile in the provision of
23 direct patient care.
24     Q. And have you done what you have just
25 described in the correctional setting?

**Page 18**

1  A. Yes.
2      Q. Gone in and treated patients or worked with
3  patients?
4      A. Yes.
5      Q. And was that in Oregon or Washington?
6      A. Both.
7      Q. Do you supervise registered nurses?
8      A. Yes, I do.
9      Q. How many nurses now do you supervise?
10     A. I haven't counted. There are 16 facilities
11 in the State of Washington that employ nurses, and I
12 have a supervisory responsibility for their clinical
13 practice. The nurse group who I supervise more
14 directly would be considered the nursing managers or
15 nursing supervisors, and there are I believe 27 of
16 those. There are perhaps another 200 line-registered
17 nurses supervised by the supervising authority
18 currently.
19     Q. So if I understand it, there is about 200
20 line nurses, as you have described it, and then above
21 them there is a layer of supervision; is that
22 correct?
23     A. Correct.
24     Q. But that's not you, right?
25     A. That's correct.

**Page 19**

1      Q. But you're above that layer of supervision?
2      A. Yes.
3      Q. So when you say you supervise registered
4  nurses, what type of things do you do to supervise
5  them?
6      A. I, for example, in the last, say, six months
7  have revised the position description for LPNs and
8  RNs in the Washington Department of Corrections to be
9  more explicit and to -- more -- be more closely
10 aligned to the Practice Act in the State of
11 Washington.
12     I worked with a group of supervising
13 registered nurses to ensure that the description and
14 expectations that go along with that were reasonable
15 in terms of the practice expectations for nurses in
16 that setting. I review incidents of -- where there
17 are performance problems and make decisions about
18 discipline of registered nurses relative to their
19 practice. I develop protocols or instructions about
20 how to accomplish certain kinds of tasks in the
21 correctional setting.
22     Q. When you say you review disciplinary type of
23 actions, what level are you involved in that? What
24 I'm trying to figure out is does the middle
25 supervisor come up with a recommendation for you or

**Page 20**

1  do you come up with your own recommendation? How
2  does that work?
3      A. In Washington -- I guess I want to
4  editorialize a little bit and I shouldn't. In
5  Washington the appointing authority, which is the
6  level that I am at, is the level within the
7  organization that is required to make decisions, and
8  the advice that we have been given by the attorney
9  general is that you don't want to receive
10 recommendations from subordinates within the
11 organization because it ties your hands relative to
12 discipline.
13     In that regard I have both investigated --
14 we call it investigation, but it is the collection of
15 information, the interview of people, to develop the
16 facts around the case, to look at or to compare the
17 actual facts against policy, procedure and so forth,
18 what should have happened, then from that to make a
19 decision.
20     I have also reviewed investigations that
21 have been done by others and have used that to
22 basically make a decision about discipline.
23     Q. Do you have any experience with nursing in
24 Colorado?
25     A. No, I do not. As a direct -- I'm not

Catherine Knox, 10/4/2006 — Carranza vs. Park County Board of County Commissioner

**Page 81**

1  stay would have been appropriate for her to do as a
2  registered nurse.
3  Q. Well, don't you agree that once you know the
4  outcome of a patient's -- if the outcome happens to
5  worse or bad, that you would go back in hindsight
6  and --
7  A. I very much agree.
8  Q. You very much agree?
9  A. Uh-huh.
10  Q. So are your opinions about Ms. Paulsen based
11  on what you know with the benefit of hindsight, of
12  looking back and saying she should have done this,
13  she should have done that, only because you know what
14  happened eventually to Mr. Carranza-Reyes?
15  A. No, they're not. I think that's a risk, you
16  know, that you run every time you're asked to review
17  a case where you know the outcome, and I guess -- so
18  once you have acknowledged that you can set it aside
19  and look very carefully at what in the norm you would
20  expect given these presenting facts or symptoms or
21  descriptions, what action would you reasonably expect
22  to have occurred, even if the outcome, you know, was
23  less or something else, and so that is the
24  methodology in evaluating these contacts that I used.
25  Q. So given the facts that Ms. Paulsen was

**Page 82**

1  presented with at 9:00 a.m. on March 8th, is it your
2  opinion that she should have known that unless he was
3  transported immediately he was going to go into
4  septic shock?
5      MR. TRINE: Objection. Lack of foundation.
6      THE WITNESS: My opinion is that at
7  nine o'clock on Saturday morning she should have
8  known that it was important to stay with him until
9  transport occurred.
10  Q. (By Ms. Lewis) And what would she have done
11  if she stayed with him?
12  A. She would have continued to do assessments
13  of his condition and have documented those. If -- I
14  guess at this point I do think she should already
15  have contacted a medical provider. She would have
16  had the opportunity to have contacted a medical
17  provider for more specific direction and advice about
18  urgency had she stayed.
19      If he had collapsed or more urgently become
20  ill, she would have been able to intervene as a first
21  responder, and I guess that's my answer.
22  Q. In your report you're critical of
23  Ms. Paulsen for not preparing copies of the record,
24  the health records of Mr. Carranza-Reyes, and sending
25  them to Summit Medical; is that right?

**Page 83**

1  A. Correct.
2  Q. Why do you reach that opinion?
3  A. That she did not prepare copies?
4  Q. That's a fair question. That --
5  A. That she should have?
6  Q. That she should have.
7  A. Any time there is a transfer of a patient
8  from one provider to another, it is important to the
9  provider who is going to receive that patient to have
10  the benefit of any records, especially those that are
11  pertinent to the kind of presenting complaint, at the
12  time that they receive the patient.
13  Q. Is it negligence not to provide them?
14  A. The result of not providing it is that the
15  receiving provider is without important information,
16  has to collect that information again and sometimes
17  makes an error as a result of not having that
18  information.
19      So my point here is that it is a common
20  practice that is expected that you provide at least a
21  verbal report, if not copies. The point I'm trying
22  to make here is had she stayed she would have had
23  time to make copies and fax those to Summit.
24  Q. Do you know whether she called in the same
25  information that was contained in her written records

**Page 84**

1  to the medical center?
2  A. Well, in her deposition she recalls having
3  called. There isn't any clear, that I could tell,
4  documentation on the part of either Summit or her
5  records that she did make that phone call. Summit --
6  on the Summit, the 01 sheet, I think there is a
7  little notation that she called, but I believe that
8  that's after he had arrived and not before, based on
9  the information that was provided.
10      She was unsure I thought in -- my
11  recollection is that she was -- she thought she had,
12  but she wasn't clear. She thought she had
13  telephoned, but neither the physician -- the
14  physician at the ER could not recall, and there is no
15  documentation to support it.
16  Q. You make the opinion in your report that
17  Ms. Paulsen was deliberately indifferent to
18  Mr. Carranza-Reyes. How do you define deliberate
19  indifference?
20  A. I believe that deliberate indifference is
21  when a person, in this case a registered nurse, had
22  reason to know or knew of something that caused grave
23  danger or the potential for medical harm and did not
24  act to either prevent the harm or to mitigate the
25  risk.

Case 1:05-cv-00377-WDM-BNB   Document 133-36   Filed 01/11/07   USDC Colorado   Page 4 of 5

Catherine knox, 10/4/2006                                    Carranza vs. Park County Board of County Commissioner

**85**

1  Q. Talking about deliberate indifference now
2  and not negligence, you understand there is a
3  difference between the two, right?
4  A. Uh-huh.
5  Q. What did she have reason to know or knew at
6  3:00 a.m. on the 8th that Mr. Carranza-Reyes was in a
7  potential of great harm?
8  A. I believe that when she received the call at
9  3:00 a.m., it's premised on her having already seen
10 him twice and leaving I think some general
11 instructions to the officers to watch him and to call
12 if he got worse. They called. He was worse. They
13 called as instructed. I think therefore you have to
14 conclude he was worse. The description of symptoms
15 that they gave would verify that, in fact, his
16 condition was worse, and her response was to call her
17 if his symptoms worsened further.
18      So I -- my conclusion is that she knew that
19 his condition had worsened yet again, and she was --
20 she did not act at three o'clock in the morning when
21 she received that information in a way that would
22 have prevented harm or reduced risk.
23 Q. Let's focus on just part of that, which is
24 what did she know at 3:00 a.m. that would have or
25 should have suggested to her that absent intervention

**86**

1  at that point Mr. Carranza-Reyes was at risk of
2  substantial or great harm?
3  A. Okay. What she knew was that in the
4  deputy's opinion his condition had worsened enough to
5  call her for advice, direction or action, and that my
6  recollection of the deputy's report is that his -- he
7  was having trouble breathing. His respirations I
8  think were something like 36 a minute, so much higher
9  respirations, and I don't recall, but I believe he
10 had complaints of pain, chest pain.
11     So what is new for Ms. Paulsen is the change
12 in respiratory rate, the deputy's concern and the
13 patient's continued or more urgent complaints of pain
14 and discomfort and that in the context of the third
15 day and the middle of the night she failed to
16 appreciate the significance of his condition.
17 Q. Okay. When you say she failed to appreciate
18 the significance of his condition, does the
19 information you just described suggest that -- what
20 does it suggest about what his prognosis is at that
21 point?
22 A. I think it suggests someone who has got the
23 potential for -- who's going to be really ill and has
24 a medical problem that has been insufficiently
25 identified and treated, and I guess the -- I think at

**87**

1  this point the, what would you call it, universe of
2  symptoms, the rapid respiration, the difficulty
3  breathing, that it's highly likely that he has a
4  condition that's going to require intervention that
5  exceeds the capacity of what she can provide or the
6  jail can provide.
7  Q. And how much time would it require
8  intervention? How soon after 3:00 a.m. would she
9  have to do something with this patient in your
10 opinion?
11 A. She needed to do something at that time, and
12 I think that the least she could have done was to
13 call -- to call a provider, call the on-call provider
14 and say, This is the situation, and to have provided
15 more specific information to the deputy about
16 additional data to collect, and if she elected not to
17 order an ambulance at that point, to have called back
18 30 minutes later for new signs and symptoms.
19 Q. So is it your position that at that point
20 she should have known or foreseen that this patient
21 was going to become gravely ill?
22 A. Yes. I believe she should have.
23 Q. And she should have predicted that based on
24 what she was informed about his symptoms at that
25 point?

**88**

1  A. Yes.
2  Q. And so to draw that conclusion don't you
3  have to assume or understand that she would have also
4  known or been able to tell how rapidly his condition
5  was going to deteriorate?
6  A. I think I need to have you ask it again.
7  Q. If I understand it, you're criticizing her
8  and saying she's deliberately indifferent for not
9  doing something at 3:00 a.m. with respect to this
10 patient in terms of getting him transported right
11 away, correct?
12 A. Correct.
13 Q. And that at that point she should have
14 realized that absent intervention he was going to
15 become gravely ill?
16 A. Yes.
17 Q. And that --
18 A. I would like to rephrase that. He had the
19 potential to become gravely ill. There was enough
20 evidence to lead a person to conclude that he was at
21 risk of becoming gravely ill.
22 Q. But you would agree with me that he didn't
23 become gravely ill until 6:00 p.m. on March 8th; is
24 that right?
25 A. No. I would not agree with you about that.

Catherine Knox, 10/4/2006                                           Carranza vs. Park County Board of County Commissioner

---

**Page 89**

1  Q. When do you think he became gravely ill?
2  A. I don't know. I think that it was before
3  6:00 p.m. of the day that you describe, but I don't
4  know specifically when.
5  Q. When he arrived at Summit, do you believe he
6  was gravely ill?
7  A. I do believe that he was gravely ill when he
8  arrived.
9  Q. You do believe that he was gravely ill?
10 A. Yes. But that's based upon the intervention
11 that they did at Summit.
12 Q. What I'm trying to determine is at 3:00 a.m.
13 is it your opinion that Ms. Paulsen should have known
14 how soon Mr. Carranza-Reyes needed to be treated in
15 order to prevent him from deteriorating to the point
16 he eventually did?
17 A. Let me say back what I think you're asking.
18 That Vickie Paulsen should have known at 3:00 a.m.
19 how urgently he needed to be transported in order to
20 prevent the grave harm or the potential for grave
21 harm?
22 Q. Well, she's called at 3:00 a.m., right?
23 A. Correct.
24 Q. She gets in there at about 8:00 a.m., right?
25 A. Correct.

---

**Page 90**

1  Q. And you're saying it was deliberately
2  indifferent of her not to do something at 3:00 a.m.,
3  right?
4  A. Correct.
5  Q. So there is a window of five hours between
6  3:00 a.m. and 8:00 a.m. Do you see that?
7  A. Yes.
8  Q. Is it your opinion that at 3:00 a.m. she
9  knew that he had a risk of -- a potential of
10 substantial or great harm over the next five hours
11 until she got into the office?
12 A. I believe that she knew that there was risk
13 of great harm if she waited, if she took no action
14 and elected instead to wait. She should have known.
15 Q. For the five-hour period?
16 A. For that five-hour period.
17 Q. Okay. And how do you reach that conclusion?
18 A. I reach that conclusion based on the two
19 prior contacts that she had with him and the
20 instructions that she gave to the officers and then
21 the officer's description of why he called her.
22 Q. And then the same kind of timeline question,
23 which relates to 8:00 a.m. and when he eventually got
24 into Summit which I'm recollecting was about noon.
25 A. Okay.

---

**Page 91**

1  Q. I could be wrong a little bit on that time
2  frame.
3      MR. TRINE: 12:45.
4      MS. LEWIS: Thank you, Bill.
5  Q. (By Ms. Lewis) So you think when she left at
6  9:00 a.m., again, she knew he was at risk of great or
7  serious harm if she left that would result between
8  nine and 12:45 when he eventually got there?
9  A. Yes. I believe that she knew or should have
10 known that he was at risk as a result of her leaving
11 him and his not being transported from 9:00 a.m. to
12 12:45.
13 Q. So it's your opinion that she deliberately
14 disregarded a known risk about this patient and
15 decided just to go home?
16 A. Yes.
17 Q. Do you have any idea why she would do that?
18 A. No.
19 Q. Back to your answer on that point. You said
20 she knew or should have known. Just to clarify, are
21 you saying she knew or should have known or that in
22 your opinion she knew the facts, she was presented
23 with the facts that led her to know this information
24 and she deliberately chose to ignore it?
25 A. I believe that the facts were there and that

---

**Page 92**

1  her leaving, in fact, was an act of ignoring it.
2  Q. So the answer is you think she knew of the
3  risk and deliberately chose to ignore it?
4  A. Yes.
5  Q. Not that she just should have recognized it
6  and didn't appreciate it, right?
7  A. (Witness nodding head.)
8  Q. You have to answer out loud.
9  A. I know. I'm thinking. I guess my yes head
10 was I'm hearing your question.
11     Yes. I believe that she knew at
12 nine o'clock when she left that there was risk of
13 some grave harm or danger and she left instead. She
14 left knowing that was potentially there.
15 Q. In your report on page 5, paragraph 38, it
16 says she made no arrangements to provide health care
17 coverage at the jail when she was not able to provide
18 services.
19     Do you see that?
20 A. Yes.
21 Q. Is that something that you understand was
22 her responsibility to do?
23 A. Yes. In this respect: looking at the kind
24 of description of -- I'm not sure if it was the
25 duties, she's also the kind of on-site health