RECEIVED OCT 1 1 2006

# In The Matter Of:

## MOISES CARRANZA-REYES v.
## THE PARK COUNTY BOARD OF COUNTY COMMISSIONERS

---

### MICHAEL S. NIEDERMAN, M.D.
### September 8, 2006

---

*Precise Court Reporting*
*200 Old Country Road*
*Suite 110*
*Mineola, NY 11501*
*(516) 747-9393*

Original File 44671MN.V1, 178 Pages
Min-U-Script® File ID: 1967631022

**Word Index included with this Min-U-Script®**

EXHIBIT
39

| MICHAEL S. NIEDERMAN, M.D. | MOISES CARRANZA-REYES v. |
|---|---|
| September 8, 2006 | THE PARK COUNTY BOARD OF COUNTY COMMISSIONERS |

**Page 13**

M. Niederman

[1]
[2] here.
[3]   Q: But the medical school itself is at
[4] Stony Brook?
[5]   A: Correct.
[6]   Q: So you're a faculty member of both?
[7]   A: Again, I'm on the staff here at
[8] Winthrop Hospital and my teaching appointment
[9] and faculty appointment is at Stony Brook, and
[10] because of my position as the chairman of the
[11] Department of Medicine here, I'm also the vice
[12] chairman for the Department of Medicine at the
[13] medical school.
[14]   Q: Can you give me a sense of what
[15] your day-to-day job is?
[16]   A: I have, of course, administrative
[17] responsibilities here at the hospital related
[18] to quality in the Department of Medicine,
[19] privileging of the physicians, supervision of
[20] the residency, fellowship and faculty,
[21] supervision of the faculty practice. I also
[22] spend probably two half days a week seeing
[23] outpatients and, on average, one week a month
[24] on some sort of service in the hospital, and
[25] then I have my clinical research and other

**Page 14**

M. Niederman

[1]
[2] academic activities.
[3]   Q: So two half days a week you have
[4] direct patient care?
[5]   A: At least two half days a week,
[6] plus, as I said, at least one week a month,
[7] and, actually, the other part is one out of
[8] every seven weekends here in the hospital on
[9] call for the ICUs.
[10]   Q: It sounded like that when you had
[11] your sort of — your responsibility is to do
[12] patient care in a hospital setting, inpatient
[13] versus outpatient, that there might be a
[14] variety of different places where you do
[15] that. Did I understand your answer correctly?
[16]   A: Correct. When we work in the
[17] hospital, we're either working in the ICU or
[18] we're doing pulmonary consultation, so two of
[19] the three rotations that I might do are
[20] ICU-based rotations. One of them is
[21] consultation, and, as I said, one out of every
[22] seven weekends, which is Friday night through
[23] Monday morning, most of that time is spent
[24] working in the ICU.
[25]   Q: Do you have a focus of your

**Page 15**

M. Niederman

[1]
[2] practice?
[3]   A: My practice is in pulmonary and
[4] critical care.
[5]   Q: Has it been that way since you were
[6] at — since you've been at Winthrop University
[7] Hospital or has it changed?
[8]   A: That's been my practice for the
[9] last 23 years.
[10]   Q: Do you have a subspecialty in any
[11] particular thing within the broad category of
[12] pulmonary and critical care medicine?
[13]   A: My clinical research interests have
[14] been in infectious respiratory disease,
[15] particularly pneumonia, and some research
[16] related to sepsis, and that means that I've
[17] focused a lot on that from a research
[18] standpoint and also often, either inpatient or
[19] outpatient, get asked to give opinions about
[20] those disease processes and often those are
[21] second opinions after somebody else has given
[22] an opinion.
[23]   Q: Does your outpatient practice
[24] primarily consist of consultations from other
[25] physicians about particular issues in your

**Page 16**

M. Niederman

[1]
[2] areas of expertise or do you follow patients
[3] on an ongoing basis?
[4]   A: Both. Again, patients usually with
[5] complicated lung diseases are referred by
[6] primary care doctors, and if they need ongoing
[7] care, I follow them along with their primary
[8] care doctor.
[9]   Q: But your initial relationship with
[10] a patient is typically a referral from a
[11] primary care doctor?
[12]   A: Typically it's a referral.
[13] Sometimes patients find out my name and come
[14] to see me, but yeah, it's usually referrals.
[15]   Q: Do you do research, other than
[16] clinical research?
[17]   A: Not currently. In the past I've
[18] done some basic science research on mechanisms
[19] of respiratory colonization and infection, but
[20] not currently.
[21]   Q: At what point in time did that
[22] transition occur?
[23]   A: It's been gradual, but at least for
[24] the last 10 or 12 years.
[25]   Q: Do you have particular people that

MICHAEL S. NIEDERMAN, M.D.
September 8, 2006

MOISES CARRANZA-REYES v.
THE PARK COUNTY BOARD OF COUNTY COMMISSIONERS

Page 61

M. Niederman

[1]
[2] have pneumonia when he was seen on the 7th.
[3] Although, he may have, and, again, I'm not
[4] sure whether the examination was incorrect or
[5] if he didn't have pneumonia, but clearly, when
[6] he was seen on the 8th in the afternoon, had a
[7] far advanced form of pneumonia, so there's
[8] really only two possibilities; either this was
[9] slowly progressing for days or this is a
[10] rapidly progressive pneumonia and the natural
[11] history of this infection is that it can be a
[12] rapidly progressing pneumonia, so I would
[13] think that probably he developed — he made
[14] that transition from streptococcal sore throat
[15] to streptococcal pneumonia some time during
[16] the day of the 7th, either shortly before or
[17] shortly after the nurse saw him, but that he
[18] was very sick with advanced pneumonia on the
[19] 8th.
[20]    Q: The way I understand it is that
[21] what the blood culture revealed, the bacteria
[22] in this case was Group A beta-hemolytic strep?
[23]    A: Correct.
[24]    Q: Is there particular biological
[25] courses related to that bug, for lack of a

Page 62

M. Niederman

[1]
[2] better word?
[3]    A: I'm not sure I understand your
[4] question.
[5]    Q: Fair enough. It's not a very clear
[6] question.
[7]    Can you describe for me if there's
[8] a particular way that that infection presents
[9] itself or the course of its infection in a
[10] patient like Mr. Carranza-Reyes or is there a
[11] variant of how it would present itself?
[12]    A: I think any infection can have
[13] variability, but this is a very unusual
[14] bacteria to cause pneumonia, and so just its
[15] identification, I think, raises a number of
[16] issues. This is not a normal pneumonia
[17] bacteria. The source is very likely to be a
[18] preceding sore throat. Although, many
[19] pneumonias begin with colonization of the
[20] mouth and then aspiration into the lung, but
[21] this could have been an invasive sore throat
[22] that progressed to pneumonia, but what we do
[23] know, and, again, we don't see a lot of this,
[24] I mean, I've probably seen no more than three
[25] or four patients with this disease ever, it

Page 63

M. Niederman

[1]
[2] can be a very rapidly progressive necrotizing
[3] pneumonia and patients can go from okay to
[4] very sick over a 24-hour period.
[5]    Q: And that's what leads you to
[6] believe that at least the possibility exists
[7] that he didn't have pneumonia at the time he
[8] was seen by the nurse on March 7th?
[9]    A: Correct. I think — I wasn't —
[10] I'm not entirely sure, but I think that it's
[11] very possible that, assuming her exam was
[12] accurate, either he didn't have pneumonia or
[13] had early pneumonia on the 6th or the 7th, but
[14] it seems much more likely he didn't have it on
[15] the 6th, maybe not on the 7th, and it
[16] progressed some time during the 7th into the
[17] 8th, and, again, that's why I said I do have
[18] the opinion, which is not in the letter,
[19] thinking about that time line a little bit
[20] more, that there might have been an
[21] opportunity to intervene and prevent this
[22] pneumonia, if they had diagnosed his strep
[23] throat on the 6th.
[24]    Q: Would it have been appropriate for
[25] the nurse on the 6th to do a blood — you

Page 64

M. Niederman

[1]
[2] know, do a strep culture of this individual?
[3]    A: That's what I said earlier, yes.
[4]    Q: Is that within the scope of
[5] practice of a nurse in Colorado?
[6]    A: I don't know.
[7]    Q: Is that within the scope of
[8] practice of a registered nurse in New York?
[9]    A: Certainly in that setting nurses do
[10] that all the time in doctors' offices.
[11]    Q: Make a decision on their own that a
[12] throat culture is appropriate?
[13]    A: Well, rapid strep screen. I mean,
[14] I could tell you that — I mean, to give you
[15] the context of this, I spent a summer, two
[16] summers working as a camp doctor and the
[17] nurses in the infirmary did this all the
[18] time. When kids came in with sore throats and
[19] if they were positive, they told me about it
[20] and then we made a decision about antibiotic
[21] therapy.
[22]    Q: What is a rapid strep screen?
[23]    A: It's a swab in the back of the
[24] throat looking for the antigenic material in
[25] strep. You could get a result in minutes, so

Case 1:05-cv-00377-WDM-BNB   Document 133-39   Filed 01/11/07   USDC Colorado   Page 4 of 13
JAN-9-2007  05:48P FROM:                                                    TO:3034437677   P.5

MICHAEL S. NIEDERMAN, M.D.                           MOISES CARRANZA-REYES   v.
September 8, 2006                              THE PARK COUNTY BOARD OF COUNTY COMMISSIONERS

Page 69

M. Niederman

[1]
[2] have chronic illness. He wasn't diabetic. He
[3] was really — there's really no clear
[4] precipitating factor. We do know that there
[5] are genetic variations in the immune system
[6] that make some people predisposed, but, I
[7] mean, this case you almost have a biologic
[8] experiment that tells you that didn't happen
[9] because he had a twin brother in the same
[10] environment who didn't get the same illness.
[11]    Q: What's the basis for your knowledge
[12] about what Mr. Carranza-Reyes' prior medical
[13] history or condition is?
[14]    A: Just his deposition and deposition
[15] of his brother.
[16]    Q: You don't have any access to any
[17] medical record or medical information of
[18] Mr. Carranza-Reyes from any previous medical
[19] encounter he had in Mexico?
[20]    A: No, I have not seen any records of
[21] his.
[22]    Q: Let me direct your attention to the
[23] third paragraph on Exhibit-83, your report.
[24] The second sentence in that paragraph
[25] indicates "his deposition," and I assume you

Page 70

M. Niederman

[1]
[2] mean Mr. Carranza-Reyes' deposition, "and the
[3] information from the Park County Jail indicate
[4] that he arrived at the jail completely
[5] healthy."
[6]    A: Correct.
[7]    Q: When you say "the information from
[8] the Park County Jail," is that the form in
[9] Spanish that Mr. Carranza-Reyes filled out
[10] upon his intake?
[11]    A: I don't remember all of the
[12] information I used to make that statement, but
[13] I remember, again, having read through the
[14] depositions of the people who saw him when he
[15] arrived from the jail and nobody commented on
[16] him being sick at that time.
[17]    Q: The mechanism of a Group A
[18] beta-hemolytic streptococcal pneumonia is that
[19] it would initially colonize in the throat or
[20] mouth; is that true?
[21]    A: Initially colonize, and in this
[22] case probably infect the oral pharynx,
[23] correct.
[24]    Q: Is there a latency period?
[25]    A: It can be variable between

Page 71

M. Niederman

[1]
[2] progressing from sore throat to pneumonia,
[3] and, again, there isn't a specific absolute
[4] time period.
[5]    Q: Is there a time period for the
[6] colonization?
[7]    A: I'm not sure I understand.
[8]    Q: Let me ask it more directly.
[9] Mr. Carranza-Reyes arrived at the jail March
[10] 1st. Is there any way to know when he caught
[11] the bug that eventually colonized that
[12] eventually led him to be sick?
[13]    A: No.
[14]    Q: Could that have been prior to March
[15] 1st of 2003?
[16]    A: He conceivably could have been
[17] colonized prior to arrival, but he had no
[18] symptoms of infection when he arrived.
[19]    Q: If he was colonized prior to
[20] arrival, would the conditions of his
[21] confinement make any difference to whether the
[22] colonization became an infection?
[23]    A: Certainly it's possible that if he
[24] was in an environment where he was not
[25] sleeping well, if he was in an environment

Page 72

M. Niederman

[1]
[2] where he was emotionally and physically
[3] stressed, all of those could have interfered
[4] with his immune function to the point that the
[5] colonization could have progressed to
[6] infection.
[7]    Q: So it would be his environment's
[8] reaction —
[9]    A: His reaction to the environment.
[10]    Q: Yes.
[11]    A: It could interfere with his — in
[12] other words, I think there's two possibilities
[13] here, either he came in colonized but not
[14] infected and the environment he was in
[15] interfered with his immune function and
[16] allowed this to progress or he came in without
[17] it and acquired it from the conditions he was
[18] in and the combination of the acquisition and
[19] the stress allowed it to progress.
[20]    Q: Let's talk about number two first.
[21] Okay? One possibility is he acquired it in
[22] the jail?
[23]    A: Correct.
[24]    Q: If he acquired this in the jail,
[25] based on your understanding of the mechanism

MICHAEL S. NIEDERMAN, M.D.  
September 8, 2006

MOISES CARRANZA-REYES v.  
THE PARK COUNTY BOARD OF COUNTY COMMISSIONERS

---

Page 93

M. Niederman

(2) factors that played a role? And yes, in
(3) retrospect, these issues are probably
(4) relevant.
(5)   Q: Can you offer an opinion about when
(6) medical intervention for Mr. Carranza-Reyes
(7) would have made a difference in his outcome?
(8)   A: Well, there's several medical
(9) interventions. Again, if you assume, as I
(10) have and as we talked about, that he did not
(11) have pneumonia on the 6th, then doing a rapid
(12) strep test and giving him penicillin might
(13) have prevented this whole thing. That's one
(14) medical attention that could have made none of
(15) this happen.
(16)   Q: Let's talk about the 8th. Is there
(17) any way to put a point in time where him
(18) arriving at Summit Medical Center, instead of
(19) at 12:45, at some time earlier than that would
(20) have made a difference to him getting sepsis
(21) and all of the, you know, pretty horrible
(22) things that happened to him after that?
(23)   A: Again, we know with severe
(24) pneumonia that the sooner it's treated the
(25) better the outcome, and timing is important,

Page 94

M. Niederman

(2) and the more severely ill patients are, the
(3) more important timing is, so I would believe
(4) that he probably, again, this relates to the
(5) records I don't have that we talked about,
(6) probably somebody observed him even late on
(7) the 7th and if they had observed him late on
(8) the 7th, they might have thought he was sick,
(9) brought him to a medical center and taken care
(10) of him. I think if he hadn't been
(11) incarcerated and he was with his brother on
(12) the 8th and he was as sick as it was described
(13) at 3:45 in the morning, I would — I believe
(14) he would have sought medical attention at that
(15) point and might have gotten antibiotics as
(16) much as six or eight hours earlier than he
(17) actually did, and that's a huge time frame
(18) where it's very likely some of these
(19) complications could have been avoided.
(20)   Q: Can you testify to a reasonable
(21) degree of medical probability that the
(22) complications would have been avoided had he,
(23) say, gotten antibiotics at 5 o'clock a.m. on
(24) the 8th?
(25)   A: I think so, because, again, what I

Page 95

M. Niederman

(2) can say is that he got these complications and
(3) that the majority of patients with pneumonia
(4) don't get these complications and that there
(5) had to be a time where if he had been treated
(6) he would not have gotten these complications,
(7) and, as I said in the report, I was trying to
(8) really not be too demanding in terms of what
(9) they did. They probably could have and should
(10) have treated him before 3:45, but 3:45 was an
(11) obvious time to have intervened, and it took
(12) nine hours after that before he got anything
(13) done.
(14)   Q: How close to 12:45 would his
(15) earlier arrival at Summit Medical Center have
(16) made a difference? How fine can you make that
(17) distinction if — do you understand what I'm
(18) getting at?
(19)   A: Well, as I tried to say in the
(20) report, this sort of standard for giving
(21) antibiotic therapy sooner is better, and for
(22) as sick as he was described at 3:45, I would
(23) have probably not been critical of his care if
(24) he got antibiotics within four hours of that.
(25) Say by 8:00 a.m. he got antibiotics, I would

Page 96

M. Niederman

(2) have said that's pretty reasonable. I think
(3) beyond that he's at greater risk for all of
(4) the complications he got.
(5)   Q: If he had gotten the antibiotics at
(6) 8 o'clock, can you say that he wouldn't have
(7) had the complications or is there really no
(8) way to know?
(9)   A: I think it's much less likely,
(10) because, again, by experience and
(11) statistically, majority of patients with
(12) pneumonia don't get the complications he got.
(13)   Q: Let me see if I'm understanding
(14) it. The general proposition that nobody can
(15) argue with is earlier treatment with
(16) antibiotics with patients with pneumonia is
(17) better and patients who have pneumonia who get
(18) antibiotics sooner have better outcomes?
(19)   A: Correct.
(20)   Q: And you are trying to extrapolate
(21) from your knowledge of that data and your
(22) experience of treating patients with pneumonia
(23) how that might have impacted
(24) Mr. Carranza-Reyes in this instance?
(25)   A: Correct.

---

THE PARK COUNTY BOARD OF COUNTY COMMISSIONERS  
MICHAEL S. NIEDERMAN, M.D.  
September 8, 2006

**Page 97**

M. Niederman

Q: Your understanding of the general standard of care is within four hours of presentation to a health care provider in the community, that health care provider, if they're doing their job, should have known enough to figure out to start antibiotics?

A: Correct.

Q: And so anybody who interacted with Mr. Carranza-Reyes who was a health care provider failed in that general standard of care if they didn't do something within four hours of when they should have known it was pneumonia or could have been pneumonia?

A: Yes, but I think more relevant to your question is what's the time period where if they had treated him the outcome might have been better, and, as I said, I don't think I would have been critical if he had gotten antibiotics by, say, 8:00 a.m., and you're asking about is there a time that I could fine tune it. He got antibiotics — he didn't even get to Summit County until after 1:00, and I don't know the exact moment he got antibiotics, but it was well after that 8:00

**Page 98**

M. Niederman

a.m.

Q: But you don't have the ability to predict what would have been different in his outcome based on when he would have gotten antibiotics, because nobody can predict that; is that fair?

A: No, but I think a reasonable way to look at it is that if you talk about 50 percent probabilities, 50 percent of patients who get treated for pneumonia within four hours don't end up with the complications he got.

Q: Then how does that kind of percentage change if it's five hours or six hours or seven hours or eight hours?

A: Beyond four hours — at least in terms of mortality, there is data that every hour adds — of delay adds to mortality.

Q: Is there data about the kinds of bad outcomes that Mr. Carranza-Reyes had short of mortality?

A: Not specifically.

Q: Is there any way to tell, based on the data that you reviewed, when

**Page 99**

M. Niederman

Mr. Carranza-Reyes' pneumonia became sepsis?

A: Well, he had sepsis when he arrived at Summit County ER, so it may have been present all of that morning. Anybody who measured his vital signs documented findings consistent with sepsis and septic shock. It could have been going on for a long time. It probably was to account for the fact that he developed all these complications, and, again, to put it in context, he got outstanding medical care when he got to Denver, but technically he died. I mean, his heart stopped. He was dead. And they were able to bring him back, and that was fortunate, but he did progress to the point of dieing on March 8th.

Q: And the outcome that was achieved, given how sick he was, was pretty remarkable by Denver Health, right?

A: They did a great job. His outcome, to have been resuscitated and to have survived and apparently have intact neurologic function is a very good outcome, correct.

Q: And Denver Health, are you familiar

**Page 100**

M. Niederman

with Denver Health at all?

A: Only a little bit. I know some of the doctors.

Q: Do you know Ivor Douglas?

A: Don't know him. I know Rick Albert.

Q: In what context, a professional context, at meetings and that sort of thing?

A: Right.

Q: You understand that Denver Health is a level one trauma facility and all of that kind of stuff?

A: Correct.

Q: I assume this institution is too; is that correct?

A: Correct.

Q: When you reviewed Dr. Douglas' deposition and had his descriptions of how they do trauma care, it's similar to what you do here?

A: Yes. Again, I think that they did a great job. They recognized how sick he was, they did an immediate stabilization, the ICU team came down and met him in the ER and took

Case 1:05-cv-00377-WDM-BNB   Document 133-39   Filed 01/11/07   USDC Colorado   Page 7 of 13
JAN-9-2007  05:50P FROM:                                                   TO:3034437677  P.8

MICHAEL S. NIEDERMAN, M.D.                          MOISES CARRANZA-REYES  v.
September 8, 2006                    THE PARK COUNTY BOARD OF COUNTY COMMISSIONERS

Page 109

M. Niederman

[1]
[2] said, I didn't review the medical records, so
[3] I don't know offhand if he had MRSA infection
[4] documented prior to him having his amputation,
[5] but I do know that it was documented, when he
[6] arrived, that he had multiple organ
[7] dysfunction and septic shock and what he
[8] developed. Amputation was probably related to
[9] his lack of organ profusion.
[10]    Q: In other words, his amputation may
[11] have resulted from the septic shock and the
[12] general shutdown of his organs separate and
[13] apart from whether he ever got MRSA or not?
[14]    A: Again, this becomes a philosophical
[15] debate, if he didn't have septic shock to
[16] begin with.
[17]    Q: He may have not gotten MRSA?
[18]    A: He may have not been in a position
[19] where he could have gotten MRSA.
[20]    Q: Because the mechanism of MRSA is
[21] such that he may have not been susceptible to
[22] that bug?
[23]    A: Right, so when you deal with a
[24] community-acquired event like this, you have
[25] to say that everything else that happened

Page 110

M. Niederman

[1]
[2] afterwards wouldn't have happened if it
[3] happened the way it did.
[4]    Q: If one wanted to figure out from —
[5] I'll throw terms, and if you don't think
[6] they're right, tell me, from a scientific or
[7] epidemiologic perspective, when
[8] Mr. Carranza-Reyes got the bug that ultimately
[9] led to this outcome, how would one go about
[10] doing that?
[11]    A: Scientifically it would require
[12] patients to have cultures of their throat on
[13] arrival at the jail.
[14]    Q: Have you ever been involved in any
[15] kind of study like the one that was on that
[16] military base that you pulled and looked at in
[17] your report?
[18]    A: No.
[19]    Q: Is that the kind of thing that —
[20] the steps that they layout and that were done
[21] in this case would be what would be required
[22] to be done to get a full picture of this
[23] disease mechanism?
[24]    A: I mean, if you fully wanted to
[25] understand the epidemiology and pathogenesis

Page 111

M. Niederman

[1]
[2] of his illness, I don't think it's possible,
[3] he was the index case, so it's not really
[4] possible to have designed a study to go back
[5] and figure that out. I think that if there
[6] was real concern about the mechanisms at the
[7] time that his illness was identified, tracking
[8] down all the people that had been in the jail
[9] with him, finding out their medical history
[10] and getting throat cultures from them all
[11] could have been done at that time and might be
[12] very useful information, if we had that.
[13]    Q: Did you study at all any policy or
[14] procedure or practice of the Park County Jail
[15] in terms of access to medical care?
[16]    A: No.
[17]    Q: Who did things wrong in this case
[18] in terms of people?
[19]    A: In terms of people? Well, again, I
[20] don't know enough of the structure of the jail
[21] to answer that too specifically. I think,
[22] obviously, somebody or some group made a
[23] decision that it was okay to put as many
[24] inmates as were put in this small area, so
[25] that to me was a mistake. Somebody made a

Page 112

M. Niederman

[1]
[2] decision about looking at these inmates on a
[3] daily basis and deciding who can and can't go
[4] to the nurse for evaluation, and, you know,
[5] Mr. Carranza-Reyes and his brother claim he
[6] wanted to go a day earlier and they didn't let
[7] him. If that fact is correct, that was a
[8] mistake. Clearly not doing a throat culture
[9] on him when he was in a crowded environment
[10] like that was a mistake. Not giving him the
[11] penicillin was a mistake. I don't know
[12] specifically the individual who you could
[13] point a finger to who did that, but those are
[14] all issues. Then I think that the biggest
[15] mistakes occurred on the 8th when the context,
[16] and I think Nurse Paulsen knew this, was that
[17] this is somebody who for two days in a row had
[18] come to the infirmary, said he wasn't feeling
[19] well and now was found to be quite sick at a
[20] very unusual time of the day. It wasn't like
[21] they were doing the morning rounds and they
[22] said this guy doesn't look well, some
[23] traumatic event happened. They called
[24] attention to him at 3:45 in the morning and
[25] the context of that was he had been

THE PARK COUNTY BOARD OF COUNTY COMMISSIONERS | MICHAEL S. NIEDERMAN, M.D.
September 8, 2006

Page 113

M. Niederman

[1]
[2] complaining about being sick two days earlier
[3] and nobody put that together and said, boy,
[4] this is a problem, let's get him out of here
[5] and get him some medical attention, so those
[6] are all the — the criticisms I have. I'm not
[7] sure I could point a finger at individuals
[8] every step of that way there.
[9]  Q: Whoever was responsible for those
[10] decisions or non-decisions —
[11]  A: Correct.
[12]  Q: — is the people that you are
[13] critical of in this drama?
[14]  A: Correct.
[15]  Q: But you don't know what role, if
[16] any, the Board of County Commissioners of Park
[17] County played in any of those decisions?
[18]  A: I have no idea what — which of
[19] those decisions they were responsible for,
[20] what environment they created that would have
[21] led to people making those decisions.
[22]  Q: And the same is true with respect
[23] to Sheriff Fred Wegener and Captain Monte
[24] Gore?
[25]  A: Correct.

Page 114

M. Niederman

[1]
[2]  Q: What do you know about
[3] Mr. Carranza-Reyes' journey from Mexico to the
[4] United States?
[5]  A: I guess I only know what I read in
[6] the deposition, that he had crossed over the
[7] border, that I think he had somehow paid
[8] someone to allow him to sneak in and was in
[9] the back of a van from Mexico into Colorado
[10] before he was pulled over by the INS, and I
[11] can't remember exactly how many days that
[12] represented, seemed like, if I recall, three
[13] or four days after he entered the country
[14] before he was pulled over.
[15]  Q: Based on your knowledge of the
[16] conditions of Mr. Carranza-Reyes' travels from
[17] Mexico to the United States, would those
[18] conditions be the type of conditions that
[19] could, in terms of crowding or stress or
[20] whatever that you had talked about before,
[21] vis-a-vis the Park County Jail, could those
[22] conditions also be either a contributor or
[23] cause to the type of infection that he
[24] ultimately got?
[25]  A: I think they could contribute in

Page 115

M. Niederman

[1]
[2] theory in the same way. You know, the only
[3] fact that's — that I'm — reason I'm not
[4] thinking about that a lot is that he spent at
[5] least two or three days in the jail afterwards
[6] not being sick.
[7]  Q: Does the infection mechanism of
[8] Group A beta-hemolytic streptococcal pneumonia
[9] have to be colonized in the throat?
[10]  A: I believe so. Again, this is not a
[11] common bacteria that leads to pneumonia. It's
[12] occurred in these epidemic settings, and, in
[13] general, almost all bacterial infections are
[14] acquired by aspiration from a colonized oral
[15] pharynx, and this is the sort of classic
[16] bacteria that resides in the throat.
[17]  Q: So one couldn't get it from an
[18] infected wound or something like that?
[19]  A: It would be real unusual to have —
[20] again, the only mechanism I could think of
[21] from an infected wound is that it would invade
[22] the bloodstream from the infected wound and in
[23] the course of spreading through the
[24] bloodstream reach the lung, and what's against
[25] that in this case is that he did have a sore

Page 116

M. Niederman

[1]
[2] throat and he also, when he presented to the
[3] hospital, had a necrotizing pneumonia with
[4] empyema, a pleural space infection, which
[5] usually is a consequence of a respiratory
[6] infection that's gone on for a while, so,
[7] presumably, this was in the lung for a while
[8] before he became sick.
[9]  Q: Which leads you to believe that it
[10] originally presented —
[11]  A: Began as pneumonia and led to
[12] sepsis, rather than the sepsis that just
[13] happened to spread to the lung.
[14]  Q: The mechanism of getting an
[15] infection through a wound, for example, it
[16] would have to have been sepsis and then
[17] pneumonia?
[18]  A: Correct.
[19]  Q: Do you have any idea who was
[20] responsible for any delay in the transport of
[21] Mr. Carranza-Reyes to Summit Medical Center?
[22]  A: Again, to me the delay was — began
[23] when Nurse Paulsen was contacted at 3:45 in
[24] the morning and her response wasn't call an
[25] ambulance and bring him to the hospital, so

...REYES v.  
THE PARK COUNTY BOARD OF COUNTY COMMISSIONERS

MICHAEL S. NIEDERMAN, M.D.  
September 8, 2006

**Page 129**

M. Niederman

[2] A: I don't have that number. What I  
[3] did read in several depositions is that the  
[4] jail was designed to hold 16 people in that  
[5] pod, and I'm assuming that in the design of  
[6] the jail somebody considered health issues and  
[7] that that was a number that was thought to be  
[8] safe.  
[9] Q: But you can't state that as an  
[10] expert witness in this case, can you?  
[11] A: No. I can state that people claim  
[12] that this jail was designed to hold 16 people  
[13] and it held many more.  
[14] MR. TRINE: I think it was 18,  
[15] for the record. Just so you're not —  
[16] THE WITNESS: I thought somewhere  
[17] it said 16, but okay.  
[18] MR. TRINE: Just so you're not  
[19] misleading anyone.  
[20] Q: Have you ever consulted with a jail  
[21] guard and the number of inmates in which a  
[22] specific pod or cell can hold?  
[23] A: No.  
[24] Q: Is this something that people that  
[25] you work with have done?

**Page 130**

M. Niederman

[2] A: No.  
[3] Q: So you can't tell me whether, from  
[4] an infectious disease standpoint, 18 was the  
[5] correct number for this pod or it possibly  
[6] could have held more than that safely?  
[7] A: I can't tell you that. What I  
[8] could tell you is that what's described in the  
[9] depositions is that there were up to 60 and  
[10] that some of the inmates were sleeping on  
[11] mattresses on the floor, and it sounded like  
[12] there were wall to wall people and that the  
[13] amount of physical space between people was  
[14] close enough that that sounded like both a  
[15] stress and a potential vector mechanism for  
[16] communicable diseases.  
[17] Q: Isn't it true that if plaintiff had  
[18] been placed in that pod with just a single  
[19] other person there's the potential for the  
[20] transfer of communicable disease between those  
[21] two individuals?  
[22] A: Absolutely, but there's a greater  
[23] possibility with different and less favorable  
[24] conditions.  
[25] Q: That's one vector that could

**Page 131**

M. Niederman

[2] contribute to the disease. I'm going to ask  
[3] you about some other ones.  
[4] A: That's one possible factor that  
[5] could play a role, correct.  
[6] Q: Could the lack of sleep contribute  
[7] to the development or progression of the  
[8] disease process in plaintiff?  
[9] A: Yes.  
[10] Q: Could the lack of proper hydration  
[11] be a factor in the development or progression  
[12] of the disease?  
[13] A: Yes.  
[14] Q: Could the lack of proper nutrition  
[15] in the week preceding be a factor in the  
[16] development and progression of this disease in  
[17] the plaintiff?  
[18] A: If it happened, yes.  
[19] Q: I think we covered this one, but  
[20] could the close contact with other individuals  
[21] during the time plaintiff crossed the border  
[22] and then traveled to the State of Colorado be  
[23] a factor in the progression or development of  
[24] disease?  
[25] A: Not probably in the development of

**Page 132**

M. Niederman

[2] the disease, but in the — possibly in the  
[3] acquisition of the colonization of this  
[4] bacteria.  
[5] Q: Do you know if Moises  
[6] Carranza-Reyes had a proper amount of water  
[7] for the journey across the Arizona desert,  
[8] which he took to cross the United States  
[9] border?  
[10] A: I don't have any information about  
[11] how much water he drank during his journey.  
[12] Q: Same with food?  
[13] A: Correct.  
[14] Q: Do you know how much sleep he got  
[15] during that period of time?  
[16] A: I don't. As I said, I didn't  
[17] really focus on those issues, because we know  
[18] there was a two or three-day period at least  
[19] when he arrived at the jail where he was not  
[20] sick.  
[21] Q: Do you know what the period from  
[22] colonization to onset of symptoms is for Group  
[23] A Strep like this particular bug?  
[24] A: Again, it can be very rapid in 24  
[25] to 48 hours and it can be more prolonged.

MICHAEL S. NIEDERMAN, M.D.  
September 8, 2006

MOISES CARRANZA-REYES v.  
THE PARK COUNTY BOARD OF COUNTY COMMISSIONERS

---

**Page 133**

M. Niederman

[1]  
[2] Q: How prolonged?  
[3] A: Probably — again, there are people  
[4] who are colonized with this bacteria for  
[5] months and then progress to infection, so  
[6] there's a very wide range.  
[7] Q: So just as a hypothetical, I could  
[8] have this particular bacteria in the back of  
[9] my throat and I could be walking around  
[10] everyday asymptomatic, however, as a result of  
[11] missing a couple nights of sleep or not eating  
[12] well and feeling tired, all of a sudden I  
[13] should start to show symptoms?  
[14] A: It's not well studied, but that's  
[15] certainly a possibility.  
[16] Q: You indicated that the care at the  
[17] Denver Health Medical Center was appropriate  
[18] due to the progressing condition of the septic  
[19] shock and the pneumonia when he presented at  
[20] that location?  
[21] A: I think what I said was that I  
[22] thought he got a good quality of care because  
[23] he arrived there very sick, ended up dieing  
[24] that afternoon and was successfully  
[25] resuscitated and left the hospital alive.

**Page 134**

M. Niederman

[1]  
[2] Q: Do you have an opinion as to his  
[3] condition when he entered the Summit Medical  
[4] Center at 12:45?  
[5] A: Yes. I think the record pretty  
[6] clearly documents that he was in septic shock  
[7] at that time.  
[8] Q: Do you believe that he was in  
[9] critical condition when he entered the Summit  
[10] Medical Center?  
[11] A: Yes.  
[12] Q: Is that based on the clinical  
[13] observations of the physician on duty or is  
[14] that based on the growing out of the cultures  
[15] of his blood which was done later?  
[16] A: That's based on the clinical  
[17] observations.  
[18] Q: Are you critical of Dr. Keeling for  
[19] not agreeing with you that he was in critical  
[20] condition at that moment?  
[21] A: I'm not sure who Dr. Keeling is.  
[22] Q: Dr. Keeling is the emergency room  
[23] physician at the Summit Medical Center who  
[24] evaluated the plaintiff.  
[25] A: In which context did he say he was

**Page 135**

M. Niederman

[1]  
[2] not critically ill?  
[3] Q: Are you aware of his position on  
[4] plaintiff's condition?  
[5] A: No.  
[6] Q: If Dr. Keeling did not designate  
[7] plaintiff as critically ill in his deposition  
[8] at that moment, would that surprise you?  
[9] A: Yes.  
[10] MR. TRINE: Objection, lack of  
[11] foundation.  
[12] A: Well, it would surprise me  
[13] tremendously since he made a decision to  
[14] transfer him to a higher level of care.  
[15] Q: Do you know why he transferred  
[16] plaintiff to a higher — a different facility?  
[17] A: I have no idea. I assume because  
[18] he felt he needed more specialized care than  
[19] he could get there.  
[20] Q: Do you know that Summit Medical  
[21] Center doesn't have an overnight facility?  
[22] A: No.  
[23] Q: If that was the case, would that  
[24] effect the decision making that Dr. Keeling  
[25] had to make at that time?

**Page 136**

M. Niederman

[1]  
[2] A: Well, if, as you said, he wasn't  
[3] critically ill, then I'm not sure why he  
[4] needed an overnight facility. I'm not sure  
[5] why he needed hydration, I'm not sure why he  
[6] needed oxygen. In other words, none of their  
[7] actions fit with an assessment that he wasn't  
[8] critically ill.  
[9] Q: What's your definition of  
[10] critically ill?  
[11] A: Somebody who might die as a result  
[12] of their acute illness.  
[13] Q: If I had a patient, if I was a  
[14] physician and I was treating a patient and I  
[15] felt they needed a transfer and they were  
[16] critically ill, by your definition, I would  
[17] get them to that other facility as soon as  
[18] possible because this is a life or death  
[19] situation?  
[20] A: Depends, again, on the  
[21] circumstances. You can't just transport  
[22] someone until they're stabilized, so they  
[23] may — again, to me everything they did points  
[24] to him being critically ill at Summit Medical  
[25] Center. They give him fluids. They give him

---

Min-U-Script®                                    Precise Court Reporting

THE PARK COUNTY BOARD OF COUNTY COMMISSIONERS  v.  MICHAEL S. NIEDERMAN, M.D.  September 8, 2006

---

Page 137

M. Niederman

[1]
[2] oxygen. He came in with a very low blood
[3] pressure. I mean, it's hard for me to imagine
[4] that he wouldn't define that as critically
[5] ill. He had renal failure. I mean, to me
[6] there's not — doesn't really matter whether
[7] someone says he is or he isn't critically
[8] ill. Common sense tells you this guy was
[9] very, very sick, and I don't know how you
[10] would define that as not being critically
[11] ill.
[12]   Q: I'm going to represent to you that
[13] there are several levels of transfer that
[14] Dr. Keeling had at his disposal from the
[15] Summit Medical Center to the Denver Health
[16] Medical Center and he selected choosing the
[17] transfer to be done by ambulance without
[18] lights and sirens, so that they would transfer
[19] him from Summit to Denver Health quickly but
[20] not at the highest level of transfer speed.
[21]   A: What were his other options?
[22]   Q: The other options are lights and
[23] siren on the ambulance or by air, helicopter.
[24]   A: What were the other facilities they
[25] could have transferred him to?

Page 138

M. Niederman

[1]
[2]   Q: Well, he chose to transfer to
[3] Denver Health based on the fact that it
[4] accepts prisoners, it has an overnight
[5] facility, has level one trauma, so —
[6]   A: Why is level one trauma relevant?
[7] I don't understand your question.
[8]   Q: I haven't asked a question yet.
[9] My question is, does that in any
[10] way effect whether or not you believe the
[11] patient's condition, when he entered Summit
[12] Medical Center, was critical?
[13]   A: No.
[14]   Q: Does that effect your opinion in
[15] any way?
[16]   A: Well, that's why I was trying to
[17] clarify. If it effects my — again, the
[18] condition in which he gets transferred to
[19] another facility reflects his medical
[20] condition at the time he got transferred, not
[21] at the time he arrived at the facility, number
[22] one.
[23]   Number two, I was trying to
[24] understand what his other options were and why
[25] he chose — in other words, if Denver Health

Page 139

M. Niederman

[1]
[2] was the only place that accepted prisoners,
[3] then he had no other option. If there were
[4] other places that accepted prisoners, he chose
[5] Denver Health because it's a level one trauma
[6] center. Then, to me, that suggests he knew he
[7] was critically ill. That's why I was trying
[8] to understand your question.
[9]   Q: I'm just going to move on.
[10] Can you describe for me the
[11] symptoms of altitude sickness?
[12]   A: Symptoms of altitude sickness can
[13] involve the brain, can involve the lung, you
[14] could have headache, you could have shortness
[15] of breathe, you could cough up blood, you
[16] could have malaise, nausea, vomiting.
[17]   Q: Could you have difficulty sleeping?
[18]   A: Difficulty sleeping.
[19]   Q: Coughing?
[20]   A: Coughing.
[21]   Q: Heightened respiration?
[22]   A: Yes. Sore throat, as far as I
[23] know, is not a symptom of altitude sickness.
[24] Fever is not a symptom —
[25]   Q: What about congestion?

Page 140

M. Niederman

[1]
[2]   A: Nasal congestion can be, but fever
[3] and sore throat usually are not.
[4]   Q: Can sore throat be associated with
[5] sleeping in a dry climate?
[6]   A: I really don't have any knowledge
[7] of that specifically.
[8]   Q: If you could turn to Nurse
[9] Paulsen's report from her evaluation of March
[10] 7th in your medical records, please.
[11]   A: Okay.
[12]   Q: And what was his fever or
[13] temperature on that day?
[14]   A: 97.4.
[15]   Q: Would you consider that to be
[16] normal?
[17]   A: Yes.
[18]   Q: What was his temperature the day
[19] before, if you know?
[20]   A: 100.2.
[21]   Q: Does the fact that his temperature
[22] reduced over one degree to a normal 97.4
[23] effect your opinions in this case in any way?
[24]   A: Well, there's conflicting data
[25] here, because she describes on the 7th the

---

Page 141

[1]              M. Niederman
[2] skin was warm, and I'm not sure I understand
[3] why it was warm if his temperature was 97, so
[4] no, it doesn't, and, in fact, a low
[5] temperature can sometimes occur with sepsis.
[6] There's complaints here of vomiting, body
[7] aches, diarrhea. He sounds unwell, so no, it
[8] doesn't change my opinion.
[9]     Q: Doesn't it also sound consistent
[10] with flu-like symptoms?
[11]    A: Certainly could be flu-like
[12] symptoms.
[13]    Q: That would also take into account
[14] the lack of fever as well?
[15]    A: You could have fever with flu. I
[16] don't think that that helps one way or the
[17] other.
[18]    Q: You could have no fever with flu as
[19] well; isn't that true?
[20]    A: You could have no fever with
[21] pneumonia.
[22]    Q: Is that a yes to my question?
[23]    A: You could have no fever with flu or
[24] any other illness, correct.
[25]    Q: Let me make sure I have this

Page 142

[1]              M. Niederman
[2] correct regarding your — I'm done with that
[3] medical record, doctor, thank you.
[4]     The opinion in your report
[5] regarding 3:45 a.m. on March 8th, is it your
[6] opinion that at that point had he been given
[7] antibiotics he would have been spared the
[8] hospital course and amputation which resulted
[9] in this case?
[10]    A: It's my opinion that it's more
[11] likely than not he would not have had the
[12] complications he did if he had gotten — if he
[13] had gone to a hospital and gotten antibiotics
[14] in a timely way.
[15]    Q: And that also is true for an
[16] additional four hours after that time period?
[17]    A: I believe what I said is that if
[18] they had transported him to the hospital so
[19] that he could have gotten antibiotics roughly
[20] within four hours, it's more likely than not
[21] he would have not had the complications he
[22] had.
[23]    Q: You could say that to a medical
[24] probability?
[25]    A: I could say it based on the fact

Page 143

[1]              M. Niederman
[2] that patients who get antibiotics within four
[3] hours more likely than not don't get the
[4] complications he got.
[5]     Q: And determining which antibiotic to
[6] provide to an individual patient is something
[7] that's — based on your experience, as you
[8] discussed earlier, you have to make some
[9] assumptions about what the person's history
[10] and illness is to determine what would be the
[11] most appropriate antibiotic; isn't that true?
[12]    A: Correct.
[13]    Q: So in some respects you're — this
[14] plaintiff would have been relying on
[15] Dr. Keeling's knowledge of antibiotics and
[16] infectious agents to determine which treatment
[17] course to provide before he got the cultures
[18] back?
[19]    A: Correct.
[20]    Q: So even if Dr. Keeling had been
[21] practicing appropriately but had confusion
[22] about which antibiotic to provide, it's
[23] possible that he could have provided an
[24] incorrect one until the cultures came back;
[25] isn't that true?

Page 144

[1]              M. Niederman
[2]    A: It's possible.
[3]    Q: And, therefore, it's possible that
[4] even if plaintiff had been receiving adequate
[5] medical care from Dr. Keeling and any other
[6] medical provider up to the time the cultures
[7] come back, he would not have received the
[8] proper antibiotic up to that point?
[9]    A: It's possible, but it turns out
[10] that the bacteria he had was so sensitive to
[11] so many antibiotics, it's very unlikely.
[12]    Q: Mr. Ringel asked you whether or not
[13] you had criticism of specific jail staff
[14] members or Fred Wegener, the sheriff of Park
[15] County, or Monte Gore, the captain of the
[16] jail. My client is the medical director,
[17] Dr. James Bachman. Do you have specific
[18] criticisms of his role in this case?
[19]    A: Again, I don't know what his
[20] opportunity was by the structure of the jail
[21] and his responsibilities to know where in the
[22] points I am critical of the management of
[23] Mr. Carranza-Reyes he could have intervened,
[24] so if he had supervisory function over the
[25] nurse, if he could have developed a policy

**Page 161**

M. Niederman

Nurse Paulsen because she called back two hours later, and it was clear to her that there was something going on or she would not have on her own volition called back. She was bothered. What I'm not clear about is why with all of this concern nothing more was done at that time point, because that was a point in time when things were done differently, the outcome would have most likely been different.

Q: I understand that. As of 3:45 a.m. on March 8th, would you agree the only additional symptom that Nurse Paulsen notes that she hadn't seen before was that he, being Carranza-Reyes, was having trouble breathing?

A: Correct.

Q: And according to her notes, and, again, this is information she's receiving from another deputy; isn't that correct?

A: Correct.

Q: That Carranza-Reyes was — had been given oxygen and was feeling better?

A: Correct.

Q: The only additional symptom that Nurse Paulsen was given was that

**Page 162**

M. Niederman

Carranza-Reyes was having trouble breathing as of March 8th at 3:45. What about that leads you to believe that he was readily diagnosable with septic shock?

A: Again, I think it's the context of the fact that she had seen him two days previously and he didn't have that symptom, and I think that he was — let me just go back to the wording here. I think I said he had severe pneumonia and it was readily diagnosable at that point. He had rapidly — pneumonia which is rapidly associated with septic shock. I guess that what I was talking about was diagnosable at that point was the severe pneumonia.

Q: What about his symptoms would have made it readily diagnosable at that point in time?

A: Again, as you pointed out, the sudden trouble breathing and the need for oxygen in the context of somebody who for two days previously had complaints of an illness, which could have been the flu, could have been any of the things we've talked about, but, in

**Page 163**

M. Niederman

other words, I guess what I'm saying is if I got a call that said somebody is having trouble breathing and vomiting and nausea and that was the first I ever heard of that person, maybe I would be confused, but given that — the history here of two days in a row this person coming and asking for help and now having this progression, some bells should have been ringing and a different evaluation undertaken.

Q: At that point in time, were Mr. Carranza-Reyes' symptoms also consistent with a potential viral infection and suffering from altitude sickness?

A: I guess it's certainly possible, but I don't understand why a viral illness and altitude sickness prompted a phone call at 3:45 in the morning.

Q: At 3:45, according to the nurse's note, she also gave — she also indicated that Mr. Carranza-Reyes should be given 800 milligrams of Motrin for his aches and headaches?

A: Correct, that's correct.

**Page 164**

M. Niederman

Q: And to be given Pepto Bismol for his nausea?

A: Right.

Q: Then, according to the nurse's report, at 6:00 she had phoned the deputy and the deputy indicated that Mr. Carranza-Reyes had used the bathroom once in the last two hours and appeared to be resting; is that correct?

A: That's what it says, yes.

Q: Do you have any reason to doubt that happened?

A: I'm just reading what's on the report. I don't have an opinion one way or the other whether it happened.

Q: You haven't seen anything that would contradict that information?

A: No, I don't think so, no.

Q: How does that particular information, you know, influence your opinion, if at all, in terms of Mr. Carranza-Reyes actually getting some rest?

A: Well, it's — there's a lot of information here that I would like to know