IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 05-cv-0037-WDM-BNB

MOISES CARRANZA-REYES

      Plaintiff,

vs.

PARK COUNTY, a public entity of the State of Colorado and its governing board, THE PARK COUNTY BOARD OF COUNTY COMMISSIONERS; PARK COUNTY SHERIFF'S OFFICE, a public entity of the State of Colorado; FRED WEGENER, individually and in his official capacity as Sheriff of Park County, Colorado; MONTE GORE, individually and in his capacity as Captain of Park County Sheriff's Department; VICKIE PAULSEN, individually and in her official capacity as Registered Nurse for Park County, Colorado,

      Defendants.

---

## PLAINTIFF'S RESPONSE TO DEFENDANT VICKI PAULSEN'S MOTION FOR SUMMARY JUDGMENT

---

Plaintiff, Moises Carranza-Reyes, by and through his counsel, Bill Trine of Trine & Metcalf, P.C., respectfully responds to Defendant Vicki Paulsen's Motion for Summary Judgment and requests that the Motion be denied for the reasons hereinafter stated.

### INTRODUCTION

The Motion for Summary Judgment filed by Vicki Paulsen omits important disputed and undisputed material facts which support Plaintiff's claims, and many of the "undisputed material facts" listed on pages 2 through 12 in Paragraphs 1 – 68 are in dispute and some are taken out of context, or are incomplete statements. However, to narrow the controversy over material facts which are undisputed, Plaintiff concedes that the following numbered paragraphs of Defendant Vicki Paulsen's statement of undisputed material facts are correct, although perhaps incomplete:

1

**Defendant Paulsen's Employment at the Park County Jail**

Paragraphs 1 through 5, 7 and 8 are undisputed.

**Plaintiff's Journey to the United States and Arrival at the Jail**

Paragraphs 9 through 12 are undisputed.

**Progression of Plaintiff's Illness and Treatment**

Paragraphs 13 through 15; 17 through 19; 22 through 27; 32 through 34; 36, 37, 41, 42, 56; 59 through 61; 63, 64, 67 and 68 are undisputed.

## PLAINTIFF'S STATEMENT OF DISPUTED AND UNDISPUTED MATERIAL FACTS WHICH SUPPORT PLAINTIFF'S CLAIMS FOR RELIEF

**Practice of Overcrowding INS Detainees in Pod D.**

1.      Plaintiff hereby incorporates by reference Paragraphs 1 through 19 on pages 3 through 5 of Plaintiff's Response to Motion for Summary Judgment filed by Defendants Park County Board of County Commissioners, Fred Wegener, and Monte Gore.  In addition:

2.      When Nurse Paulsen was first employed at Park County, she understood, from Sheriff Wegener, that she would be responsible for her duties as set forth in Colorado statutes and in the Park County Sheriff's Office Policies and Procedures Manual and was given a copy of that manual to review when she commenced employment.  She also then kept a copy in the nurse's office (see Paulsen Depo. at 14-15, **Exhibit 1**).

3.      Paulsen read through the policies and procedures, understood them, and knew what her obligations and duties were (see Paulsen Depo. at 14-15, **Exhibit 1**).

4.      Paulsen was familiar with the Sheriff's office rules and regulations that provided that there should be only one inmate housed for every 80 sq. ft. available (see Paulsen Depo. at 43, **Exhibit 1**).

5.      Paulsen observed that the D Pod population would vary anywhere from 7 or 8 to 30 and at times more than 30 because "you could look in the pod and tell there were more than 30 in there" (see Paulsen Depo. at 33, **Exhibit 1**).

6.      Paulsen could also see that there were 3 tables in Pod D for detainees to sit and eat and the tables would only comfortably accommodate about 18 people (see Paulsen Depo. at 44, **Exhibit 1**).

7.      Paulsen knew from working at the Colorado Department of Corrections that regulations required 1 toilet for every 12 inmates and knew that there were only 2 toilets in Pod D (see Paulsen Depo. at 44, **Exhibit 1**).

8.      At times when there were more than 30 detainees in Pod D and only 2 toilets, Paulsen expressed her concern about overcrowding to Corporal Crawford and Sgt. Muldoon, asking when the INS was going to pick up detainees and asking how long they were going to be there, complaining that "it's not a good thing to have that many people in there" (see Paulsen Depo. at 45, **Exhibit 1**).

9.      When Paulsen was asked, "Were you personally concerned about the potential health hazards of having an overcrowded pod," she stated, "Any nurse would be" (see Paulsen Depo. at 46, **Exhibit 1**).  Her concerns about overcrowding were related to "health issues" and "if someone got a cold, then everyone got the cold.  That type of thing" (Paulsen Depo. at 46, **Exhibit 1**).

10.     Paulsen recalled times when there were so many detainees in Pod D that they ran out of the blue uniforms that were designated for detainees and had to use other colored uniforms (see Paulsen Depo. at 62, **Exhibit 1**).

11.     Based upon all of Paulsen's extensive nursing experience, when she became employed at Park County, she was concerned about the general policies and procedures being used as related to the care of detainees.  Her concern was about continuity of care and there were times when

the policies and procedures were not being enforced. The jail needed another nurse for continuity of care rather than relying on jail personnel when she was absent. With a nightshift nurse and dayshift nurse, there would be less risk of "something falling through the cracks." However, she was a new employee and reluctant to discuss her concerns with Gore or other personnel (see Paulsen Depo. at 198-200, **Exhibit 1**).

12.   Deputy John Bellantonio worked for the DOC for 23 years, then went to work at the Park County Jail in 2001 (see Bellantonio Depo. at 9-11, **Exhibit 2**). From 2001 until March of 2003, there was a gradual increase in bunks in Pod D with mattresses made available on the floor (see Bellantonio Depo. at 29, **Exhibit 2**).

13.   The Sheriff's Office Policy and Procedure Manual, effective 11/1/00, refers to ACA Standard 3-4128, which requires that inmates be housed in sleeping areas that are safe, clean, proper lighting and heating, and with dormitory sleeping areas that provide at least 80 sq. ft. of living space per occupant. Bellantonio was sure that this standard was not being followed at the Park County Jail (see Bellantonio Depo. at 30-1, **Exhibit 2**). With a limitation by that standard of 18 inmates in Pod D, "it's apparent to me that the standard was not being followed" (see Bellantonio Depo. at 30-1, **Exhibit 2**).

14.   In practice, Park County did not have a capacity limit for Pod D and the "operational capacity was an open-ended number." Operationally, there was no limitation on the number that could be placed in Pod D (see Bellantonio Depo. at 32, **Exhibit 2**). From Bellantonio's own observation, Pod D was designed for approximately 18 people based on the seating capacity for eating with 3 tables that seat 6 each (see Bellantonio Depo. at 32, **Exhibit 2**).

15.   When the 42 three-tiered bunks were filled on the upper level, additional detainees were given mattresses to place on the floor (see Bellantonio Depo. at 34, **Exhibit 2**). There were

4

times when all of the available floor space was taken up with either bunks or mattresses because there was no cap on how many people could be placed in Pod D (see Bellantonio Depo. at 35, **Exhibit 2**).

16.     With as many as 50 inmates in Pod D, it was very difficult to keep it clean because much of the floor space was covered with mattresses or bunks, which made it difficult to adequately mop the floors (see Bellantonio Depo. at 35, **Exhibit 2**).  Further, the jail provided no place that you could take sick inmates to isolate them from the other inmates (see Bellantonio Depo. at 36, **Exhibit 2**).

17.     When Pod D was overcrowded, it was very common to find soiled tissue paper stuffed under mattresses and around the area of the mattresses (see Bellantonio Depo. at 44, **Exhibit 2**).

18.     Early in his employment at Park county, the INS called wanting to transfer "X-amount of detainees" and Bellantonio said, "we've got more than we can handle right now, don't bring them," and the next day he was reprimanded by Sgt. Muldoon who told him that, "when they call, that we will take them.  We will make accommodations" Bellantonio was told, "basically, make room for them, you know, this is our moneymaker" (see Bellantonio Depo. at 57, **Exhibit 2**).  At that time, Park County was paid either $45 a day or $55 a day for INS detainees (see Bellantonio Depo. at 57, **Exhibit 2**).

19.     After Bellantonio was reprimanded by Sgt. Muldoon, "we expanded greatly after that, more bunks were added," and there was no maximum capacity for occupants of Pod D (see Bellantonio Depo. at 58, **Exhibit 2**).

20.     When Pod D was overcrowded, moving detainees to the general population to reduce the overcrowding was not allowed (see Bellantonio Depo. at 69, **Exhibit 2**).

**With overcrowding, the conditions of confinement were inhumane, filthy and unsanitary.**

21.     Plaintiff refers to and incorporate herein by reference Paragraphs 20 through 51 of Plaintiff's Response to the Park County Defendants' Motion for Summary Judgment and the references therein to exhibits. In addition:

22.     On 3/6/03, with 61 detainees in Pod D, the pod was very crowded, ventilation was poor, there was a body odor, it was very uncomfortable for everyone involved, and mattresses placed on the floor were literally touching one another side by side (see Bellantonio Depo. at 61, **Exhibit 2**).

23.     Based on Bellantonio's experience in working for the DOC and as a probation officer and in conducting investigations in county jails, the conditions at the Park County Jail in Pod D were substandard (see Bellantonio Depo. at 120-22, **Exhibit 2**). In Bellantonio's opinion, the conditions were substandard because profit was a very big issue at the Park County Jail (see Bellantonio Depo. at 122, **Exhibit 2**).

24.     Bellantonio informed people at the INS that he believed the conditions of confinement were substandard and that the jail was overcrowded (see Bellantonio at 133-36, **Exhibit 2**).

25.     Bellantonio believed in going through the chain of command and his sergeant was aware of the substandard conditions and they discussed them frequently (see Bellantonio Depo. at 144, **Exhibit 2**). He also discussed the substandard conditions on an ongoing basis with Flint and with his co-workers, including Sgt. Muldoon (see Bellantonio Depo. at 144-45, **Exhibit 2**).

**With overcrowding and unsanitary conditions of confinement, communicable disease spread through Pod D and Plaintiff became ill.**

26.    Plaintiff refers to and incorporates herein by reference Paragraphs 52 through 82 of in Plaintiff's Response to the Park County Defendants' Motion for Summary Judgment, and to the exhibits referred to in those paragraphs.  In addition:

27.    Paulsen was not required to obtain INS permission to transfer a detainee who is sick in an emergency and she was obligated to order transfer of any inmate needing medical attention, whether INS gave permission or not.  A detainee could be transported for medical attention without even calling the INS and Park County could transport without the INS providing the transportation (see Gore Depo. at 119, **Exhibit 3**).

28.    Paulsen admits that she had the ultimate authority or power to have a detainee transferred for medical attention and emergencies would be sent to the Summit Medical Center Emergency Department (see Paulsen Depo. at 38, **Exhibit 1**).  Paulsen had previously had inmates transported to see Dr. Bachman for medical attention and made that decision as the nurse and would see that arrangements were made for transport (see Paulsen Depo. at 38-39, **Exhibit 1**).

29.    Paulsen understood that the sheriff's policy, rules and procedures obligated her to send any medical chart with a detainee being transported to a hospital or the emergency department and when transporting an inmate, she customarily made copies of the charts and sent them with the ambulance driver and called ahead to the emergency department to tell them "what was coming" (see Paulsen Depo. at 39-40, **Exhibit 1**).

30.    Paulsen understood that it could be very important to the people receiving a patient from her to know what had been done previously and what the medical chart showed (see Paulsen Depo. at 40, **Exhibit 1**).  However, she did not make arrangements to have any of her charting or medical records delivered with the transport of Plaintiff to the emergency department (see Paulsen Depo. at 146, **Exhibit 1**).

31.     Paulsen was authorized to make the final decision on whether an ambulance should be used as opposed to a jail vehicle to transport inmates for medical attention (see Paulsen Depo. at 194, **Exhibit 1**).  Although the ambulance service was 5 minutes from the Park County Jail, Paulsen requested transport of the Plaintiff by a sheriff's deputy (see Muldoon Depo. at 46, **Exhibit 4;** see Paulsen Depo. at 68, **Exhibit 1**).

32.     There is nothing in the Park County/INS contract requiring that the INS had to approve the transport of a detainee to a medical facility (see Paulsen Depo. at 204, **Exhibit 1**). Paulsen then admits that when she called the INS on the morning of 3/8/03, the INS did not refuse to allow the transport of Plaintiff, unless his condition got worse (see Paulsen Depo. at 221-22, **Exhibit 1**).

33.     In an unrelated incident, Paulsen was called to the jail on 3/6/03 arriving at 3:49 a.m. after 2 inmates had been injured in a fight and she arranged for an inmate to be transported to the hospital, by ambulance, and did not have to have Gore's approval to do so (see Paulsen Depo. at 67-70, **Exhibit 1**).

34.     Paulsen has no explanation for why there was a 3-hour delay from 8:00 a.m. until 11:00 a.m. on 3/8/03 before Plaintiff was transported to the Summit County Emergency Department (see Paulsen Depo. at 206-07, **Exhibit 1**).

35.     The sheriff's Policy and Procedure Manual states that while awaiting the arrival of an ambulance or other EMS response, "a nurse will assume on-site care of the inmate and continue with assessment, treatment and emergency medical procedures" and Paulsen acknowledged that that was her duty after arranging for transport (see Paulsen Depo. at 196, **Exhibit 1**).

36.     When Paulsen was asked why she went home (at 9:00 a.m.) on the morning of March 8th, essentially abandoning Plaintiff until he was later transported, she states, "I should have stayed

with him, I admit that I should have stayed with him...." "It was an error on my part" (see Paulsen Depo. at 197, **Exhibit 1**).

37.     Paulsen's record of her activities on 3/8/03 was not contemporaneous with the events she later recorded on her home computer (see Paulsen Depo. at 129-30, **Exhibit 1**; and see Paulsen computer entries, **Exhibit 5,** Park 3542-43).  Exhibit 5 appears to be a summary of events on 3/8/03 authored to explain Paulsen's conduct on that day (see **Exhibit 5**).

38.     Gore called Paulsen at 11:00 p.m. on 3/8/03 at her home, telling her that Plaintiff was in critical condition at Denver General and Gore seemed upset, asking her if she had rendered treatment at Park County (see Paulsen Depo. at 131-32, **Exhibit 1**).

**Summit County Medical Emergency Department**

39.     Plaintiff hereby refers to and incorporates by reference paragraphs 83 through 88 of Plaintiff's Response to the Park County Defendants' Motion for Summary Judgment.

40.     The Summit Medical Center triage assessment indicates that Plaintiff had had right-sided chest pain for 3 days and Paulsen agrees that this would be consistent with pneumonia in the right lung, as well as accumulation of fluid in the right lung (see Paulsen Depo. at 137, **Exhibit 1**).

41.     When Plaintiff arrived at Summit Medical Center ("SMC"), the blood pressure was 66/(nothing), indicating that they could not hear a diastolic pressure; Plaintiff's pulse was 126, which was very elevated, and respiration was 24, which is slightly elevated (see Paulsen Depo. at 136, **Exhibit 1**).

42.     Plaintiff was unable to void at SMC, which Paulsen states would indicate possible dehydration; and Paulsen remembers that Plaintiff was pale before transfer (see Paulsen Depo. at 138, **Exhibit 1**).

43.     The SMC triage states that Plaintiff had right-sided abdominal pain for 3 days and Paulsen states that she charted abdominal tenderness on March 6 and 7, and agrees that once a person becomes septic and organs start to fail, you can have abdominal pain (see Paulsen Depo. at 138, **Exhibit 1**).

44.     Based on x-rays taken at SMC and blood cultures showing gram-positive cocci in chains, Paulsen agrees that these diagnostic tests, with the other clinical observations, indicate that he had both pneumonia and septicemia on arrival at SMC (see Paulsen Depo. at 141, **Exhibit 1**).  The blood test results at SMC showing elevated bands with low lymphocytes and neutrophils indicate that Plaintiff had a shift to the left which Paulsen agrees was consisted with septicemia (see Paulsen Depo. at 142, **Exhibit 1**).

45.     Plaintiff's platelet count at SMC of 118 indicates that, "he has an infection, a massive infection, and his platelet count is terribly low."  The platelet count continues dropping as you go into septic shock (see Paulsen Depo. at 142, **Exhibit 1**).  The abnormal lab results at SMC with high creatine and low potassium are also consistent with septicemia (see Paulsen Depo. at 142, **Exhibit 1**).

46.     Plaintiff's EKG at SMC was abnormal and Paulsen agrees that this is typical of someone with sepsis (see Paulsen Depo. at 145, **Exhibit 1**).  Plaintiff's potassium was low and if it gets too low, it is life-threatening (see Paulsen Depo. at 146, **Exhibit 1**).

**Ambulance trip to Denver Health Medical Center**

47.     Plaintiff refers to and does hereby incorporate by reference Paragraph 89 in Plaintiff's Response to Park County Defendants' Motion for Summary Judgment.

**Denver Health Medical Center**

10

48.     Plaintiff hereby incorporates by reference Paragraphs 90 through 95 on pages 18 and 19 of Plaintiff's Response to Park County Defendants' Motion for Summary Judgment.

**Park County Jail's Communicable Disease Policy**

49.     Plaintiff hereby incorporates by reference Paragraphs 96 through 111 on pages 19 through 23 of Plaintiff's Response to Park County Defendants' Motion for Summary Judgment.

**Deliberate Indifference to Spread of Infection**

50.     Plaintiff hereby incorporates by reference Paragraphs 112 through 121 on pages 23 through 25 of Plaintiff's Response to Park County Defendants' Motion for Summary Judgment.

**The "for-profit" motive for deliberate indifference to overcrowding and unsanitary conditions of confinement.**

51.     Plaintiff hereby incorporates by reference Paragraphs 122 through 132 on pages 25 through 27 of Plaintiff's Response to Park County Defendants' Motion for Summary Judgment.

**Additional on-going material violations of the jail's Policy and Procedure Manual.**

52.     Plaintiff hereby incorporates by reference Paragraphs 133 through 137 on pages 27 and 28 of Plaintiff's Response to Park County Defendants' Motion for Summary Judgment.   In addition:

53.     Under the Policy and Procedure Manual, Paulsen was to serve as the health services administrator and together with the responsible physician was responsible for the development and implementation of all programs and practices related to jail medical services (see Paulsen Depo. at 184-86, **Exhibit 1**).

54.     As health services administrator, Paulsen was to produce a monthly statistical report on the health unit's activities, but she never did so and was never requested to do so (see Paulsen Depo. at 186-87, **Exhibit 1**).

55.    When Paulsen first reviewed the Policy and Procedure Manual, which indicated she was to serve on the infection control committee and the continuous quality improvement committee, she was concerned when she discovered that none of these committees existed, but she took no action (see Paulsen Depo. at 187-88, **Exhibit 1**).

56.    It was Paulsen's understanding, having worked with the DOC, that the DOC required Park County to have these policies and procedures in effect before the DOC would contract to have inmates incarcerated at Park County (see Paulsen Depo. at 188, **Exhibit 1**).

57.    The policy provides that there must be available appropriate infirmary isolation according to the type of infection, and Paulsen was authorized to quarantine or isolate any inmate with an infection, "if the segregation cells were empty." If the seg cells were full, Paulsen had no place to isolate an inmate with an infection (see Paulsen Depo. at 192, **Exhibit 1**).

58.    No new policies or procedures were implemented by Paulsen and the medical director and Paulsen never recommended changes to the manual (see Paulsen Depo. at 205-06, **Exhibit 1**).

**Standing nursing orders and nursing protocols.**

59.    When Paulsen became employed at the Park County nurse, she did not ask about standing orders or protocols that might be available to her at the jail, and did not discuss that with the medical director, Dr. Bachman. She later discovered that there were no protocols and standing orders available for her use at the jail, and she never requested that standing orders be drafted (see Paulsen Depo. at 22-23, **Exhibit 1**).

60.    When Paulsen was employed at DOC correctional facilities and at the Buena Vista and Territorial correctional facilities, physicians' standing orders were available for her use and, "you have some standing orders in every facility" (see Paulsen Depo. at 23-24, **Exhibit 1**).

61.     Although Paulsen had no standing orders to use in her assessment of Plaintiff's condition, she at no time recommended that Dr. Bachman provide her with standing orders of any type (see Paulsen Depo. at 206, **Exhibit 1**).

**Plaintiff's claims are supported by expert testimony.**

62.     Plaintiff hereby incorporates by reference Paragraphs 138 through 152 on pages 28 through 32 of Plaintiff's Response to Park County Defendants' Motion for Summary Judgment. In addition:

63.     Plaintiff's designated expert, Catherine M. Knox, R.N., has extensive experience in correctional nursing and was retained by the DOC in Oregon to review the policies and procedures being utilized in the Oregon prisons and to establish standards and procedures for nursing care. She then established the policies and procedures on how to receive inmates, how to act on requests for medical attention, infection control, access to emergency services, transfer, and development of nursing protocols (see Knox Depo. at 26-27, **Exhibit 6**).

64.     Nurse Knox was employed in New Mexico to develop policies and procedures in the prison system, similar to the work that she did in Oregon (see Knox Depo. at 28, **Exhibit 6**).

65.     As a result of a class action lawsuit in 2001, the court in Pierce County, Washington, appointed a court monitor who retained Nurse Knox to evaluate the organization of the health nursing services and to recommend staffing, scheduling and program development. This was a medium-sized jail in an urban setting with 400-600 inmates (see Knox Depo. at 22-23, **Exhibit 6**). She presently supervises 27 nursing managers who have 200 registered nurses working under them at 16 DOC facilities in the State of Washington (see Knox Depo. at 18-19, **Exhibit 6**).

66.     Paulsen failed to obtain a blood pressure and did not take a complete set of vital signs when she first saw Plaintiff on March 6 and failed to obtain a history, or she would have learned that

Plaintiff had requested medical attention on March 5, had been having symptoms starting March 4, and that others in Pod D were experiencing similar symptoms. Had she obtained this information, she could have reached a different conclusion on March 6 (see Knox Depo. at 39-42, **Exhibit 6**).

67.     Paulsen was negligent in failing to conduct a proper physical examination, obtain a proper history, and in treating Plaintiff with over-the-counter medications, which she can only do if there is a nurse protocol permitting medications or on direct order of a physician (see Knox Depo. at 44-46, **Exhibit 6**). If Paulsen had sought medical direction on March 6, lab work would have been considered to identify the cause of the sore throat (see Knox Depo. at 44, **Exhibit 6**).

68.     Only a physician can instruct a patient to take over-the-counter medications for the symptoms Plaintiff had, unless there are written protocols or standing nursing orders that permit a nurse to do so (see Knox Depo. at 48-49, **Exhibit 6**).

69.     Paulsen was again negligent on March 7, and was also deliberately indifferent to Plaintiff's medical needs on March 7 (see Knox Depo. at 53 and 107-08, **Exhibit 6**). Again, Paulsen failed to obtain a history and a frequency of both the old and the new symptoms, failed to take complete vital signs, and missed a second opportunity to do a more thorough physical (see Knox Depo. at 52-3, **Exhibit 6**). Because Plaintiff had additional symptoms on March 7, Paulsen should have called a physician and obtained specific orders because she knew that it would be 48 hours (Saturday and Sunday) before she would again be present at the jail (see Knox Depo. at 56-7, **Exhibit 6**).

70.     When Paulsen was called by the deputy at 3:00 a.m. on March 8, she should have ordered immediate transport of Plaintiff or called a physician to explain Plaintiff's symptoms and ask for orders (see Knox Depo. at 66-68, **Exhibit 6**).

71.     At 3:00 a.m. on March 8, Paulsen was deliberately indifferent to Plaintiff's medical needs because she knew, or had reason to know, that he was in grave danger and was going to become gravely ill or had the potential to become gravely ill and she did not take action to prevent or mitigate the risk (see Knox Depo. at 84-88, **Exhibit 6**).

72.     At 3:00 a.m., the deputy reported to Paulsen that Plaintiff was having trouble breathing, his respirations were about 36 a minute, and he urgently complained of chest pain. All of this suggested that he had the potential to be really ill, that he had a medical problem that had not been sufficiently identified and treated, and that it was highly likely he would need intervention that exceeds the capacity of the nurse or the jail (see Knox Depo. at 86-87, **Exhibit 6**).

73.     Having failed to call for an ambulance at 3:00 a.m. for transport to Summit County, Plaintiff's condition warranted calling an ambulance at 8:00 a.m. when Paulsen did see the Plaintiff who needed to be transported in a way that would allow the initiation of life-support and treatment during transport (see Knox Depo. at 70, **Exhibit 6**).

74.     Paulsen was negligent in not contacting a physician at 8:00 a.m. because there might have been interventions such as an IV or lab work that she could have initiated (see Knox Depo. at 69-70, **Exhibit 6**). There was an ambulance service close by that could have put in a IV before transport (see Knox Depo. at 70, **Exhibit 6**).

75.     Paulsen was deliberately indifferent to Plaintiff's medical needs when she abandoned him at 9:00 a.m. on March 8 because she knew or should have known that Plaintiff was at risk and she deliberately disregarded a known risk and decided to just go home (see Knox Depo. at 91, **Exhibit 6**). The facts regarding Plaintiff's condition were there, Paulsen was aware of those facts and chose to ignore them by leaving. At 9:00 a.m., she knew there was a risk of grave harm or danger, and instead she left (see Knox Depo. at 91-92, **Exhibit 6**).

76.     Paulsen was reckless and callous in not calling Dr. Bachman or another provider on March 7. If called, Plaintiff more than likely would have been treated with antibiotics, hydrated and provided supportive medical treatment (see Knox Depo. at 98, **Exhibit 6**).

77.     To a reasonable degree of medical probability, had Paulsen called the doctor on March 7, Plaintiff would have received additional treatment based on Knox's experience with the relationship between nurses and providers in a correctional health care setting (see Knox depo. at 103-04, **Exhibit 6**). This opinion is based on Knox's experience in correctional health, in reviewing other cases, and in being familiar with nursing protocols for things like a sore throat and vomiting that give specific instructions on treatment (see Knox Depo. at 104-05, **Exhibit 6**).

78.     With probability greater than 50%, had Paulsen called Dr. Bachman or another provider, Plaintiff would have received appropriate antibiotics, hydration and medical treatment, including lab studies, throat culture and antibiotics, as well as orders relative to hydration (see Knox Depo. at 131-32, **Exhibit 6**).

79.     The Colorado Nurse Practice Act (NPA) does not permit a nurse to provide medications except by protocols/standing orders or on direct order of a physician (see Knox Depo. at 49-50, **Exhibit 6**). However, the Colorado NPA permits an RN to implement a medical plan under a standing order or protocol and initiate diagnosis and treatment and provide therapy and treatment, if there are standing orders permitting this (see Knox Depo. at 134-35, **Exhibit 6**). There were no nursing protocols or standing orders available at the Park County Jail.

80.     Paulsen had a duty to make arrangements to provide health care coverage at the jail during the weekdays when she knew she would be absent, and she failed to do so on March 4, the day that Plaintiff became ill and Paulsen was absent (see Knox Depo. at 92-98, **Exhibit 6**). The

failure to arrange for coverage in her absence was a callous and reckless disregard of detainees needing medical attention (see Knox Depo. at 94-98, **Exhibit 6**).

## ANTHONY VOLZ, R.N.

81.     Anthony Volz is a registered nurse with advanced degrees in nursing and his CV is attached as **Exhibit 7**.  He authored a report containing his opinions that he verified by deposition and his report is attached as **Exhibit 8**.

82.     Nurse Paulsen had a duty to evaluate and monitor the jail for the risk of infectious disease and to take steps to prevent the transmission of infections disease (see Volz Depo. at 29, **Exhibit 9**).  She had a duty to minimize the risk of transmission of disease by advising uniform officers of the need for adequate patient hygiene and to clean the facility (see Volz Depo. at 35, **Exhibit 9**).

83.     Nurse Paulsen was negligent and violated the Nurse Practice Act (NPA) in failing to do an adequate nursing assessment on March 6 and 7.  She failed to take a history of how long Plaintiff had been sick before she saw him,  she failed to obtain more details on each of his symptoms, she did not sign his chart, and she otherwise failed to make essential entries in the patient records (see generally, Volz Depo. at 35-39, **Exhibit 9**).

84.     Had Paulsen performed a throat swab, it most likely would have shown a strep infection and a physician would have ordered antibiotics, thus preventing Plaintiff's serious complications (see Volz Depo. at 47-48, **Exhibit 9**).

85.     In meeting with Plaintiff on March 6, Paulsen should have determined how long Plaintiff had been sick, when it started, if others around him were sick, and asked these questions of each complaint, the headache, body aches, nausea, and diarrhea.  She should have determined what makes it better, what makes it worse, how long he had it, and questioned him about any blood in the

diarrhea or in his vomit, but she didn't ask any of those questions (see Volz Depo. at 55, **Exhibit 9**). Had she obtained this information, it's more likely than not that she would have referred to a physician (Volz Depo. at 54, **Exhibit 9**).

86.     An RN cannot advise a patient to take over-the-counter medications under the Nurse Practice Act, which Paulsen violated (see Volz Depo. at 58, **Exhibit 9**).

87.     On March 7, Plaintiff had the same symptoms, was not getting better, but was feeling worse, and Paulsen again failed to do an adequate nursing assessment (see Volz Depo. at 63, **Exhibit 9**), and she should have called a physician on March 7 because Plaintiff's condition was getting worse and it was highly likely he was dehydrated (see Volz Depo. at 65, **Exhibit 9**). Paulsen failed to ask the questions and conduct an examination to determine if he was dehydrated (see Volz Depo. at 65-66, **Exhibit 9**).

88.     Based on the information Paulsen received by telephone from the deputy at 3:45 a.m. on March 8, she should have known Plaintiff was rapidly deteriorating and needed immediate medical care (see Volz Depo. at 76, **Exhibit 9**). He had a respiratory rate of 34, which is excessively high, regardless of altitude, which is like breathing once every 2 seconds which would fatigue anyone and constituted a significant change from his baseline of 24 (see Volz Depo. at 83, **Exhibit 9**).

89.     Had Paulsen examined Plaintiff at 3:45 a.m. on March 8, there is a 90% likelihood she would have heard a change in his lungs, but she did no assessment following her March 7 visit to see what his status was. Just the respiratory rate alone at that time made this "an urgent, emergent situation" and it was urgent that she get to the jail to see Plaintiff (see Volz Depo. at 85-86, **Exhibit 9**).

90.     At 8:00 a.m. on March 8, Paulsen was negligent in failing to do a proper assessment and again failed to take his blood pressure (see Volz Depo at 88, **Exhibit 9**) and she should have

known Plaintiff was in need of emergency treatment and transport by ambulance (see Volz Depo. at 89, **Exhibit 9**).

91.      At 8:00 on March 8, Plaintiff was in critical condition and was in critical condition upon arrival at Summit Medical Center (SMC) with no diastolic blood pressure, gross dehydration and possible body failure (see Volz Depo at 92, **Exhibit 9**), but was not seen immediately at SMC because ambulance patients get first priority and he came by private vehicle (see Volz Depo. at 93, **Exhibit 9**).

92.      Plaintiff's pulse rate was 120 on arrival at SMC and normal is 60-90 and they could not hear a diastolic blood pressure.  He was stable on transport to Denver Health because of IV therapy and antibiotics administered at SMC (see Volz Depo. at 94-95, **Exhibit 9**).

93.      Plaintiff should have been transferred for medical treatment when Paulsen was called at 3:45 a.m. because she knew Plaintiff was in a life-threatening condition and knew this when she decided to come to the jail on Saturday morning, her day off.  She knew Plaintiff was at risk of serious harm if she didn't do something at 3:45 a.m. (see Volz Depo. at 113-15, **Exhibit 9**).

94.      Paulsen violated the NPA by delegating nursing assessments and treatment to deputies who were not trained (see Volz Depo. at 103-06, **Exhibit 9**).

95.      Strep is an airborne and contact-transmitted disease and the closer you are to people, particularly in an unhygienic situation, the likelihood of others acquiring the disease increases significantly (see Volz Depo. at 110-111, **Exhibit 9**).  The facility was grossly overcrowded, with people sleeping on the floor with trash, with inadequate toilet and shower facilities, and improper clothing exchanges on a regular basis, and all of that is going to promote infection (see Volz Depo. at 70, **Exhibit 9**).  It is highly likely that the conditions in the jail caused Plaintiff to contract Strep A (see Volz Depo. at 109, **Exhibit 9**).

96.     Jail personnel were negligent in allowing an environment of overcrowding, filth with lack of opportunity for self-hygiene, unclean toilets, floors, jumpsuits and poor air temperature control (see Volz Depo. at 128 and 140, **Exhibit 9**), and Paulsen was likewise negligent in permitting this to occur (see Volz Depo. at 141, **Exhibit 9**). Paulsen observed these conditions on a daily basis and had a duty to report it and try to rectify it (see Volz Depo. at 148-49, **Exhibit 9**).

97.     A quick strep test could have been done on March 6 and Plaintiff's complications would have been avoided with appropriate antibiotic treatment (see Volz Depo. at 152, **Exhibit 9**).

98.     In order to obtain adequate medical care, a competent translator should have been available at the jail in order to convey accurate information to the nurse and deputies and a contract translator fluent in English and Spanish should have been used, rather than a trustee who doesn't necessarily have skills (see Volz Depo. at 153-54, **Exhibit 9**).

## ARGUMENT

The Court must view the facts in the light most favorable to the Plaintiff in determining whether there is evidence of the violation of a constitutional right. *Perez v. Ellington,* 421 F.3d 1128, 1131 (10th Cir. 2005). Defendant ignores this basic rule of law which governs the determination of a motion for summary judgment and instead relies on disputed facts most favorable to the defense to support Paulsen's Motion. An affidavit signed by Paulsen is attached to her Motion for Summary Judgment which contradicts important testimony that Paulsen rendered under oath in her earlier deposition. Paulsen also attaches the reports of her expert witnesses who were not deposed and who did not file affidavits with the Court to support their written reports. Plaintiff has set forth the facts which convincingly support Plaintiff's claims for relief and which form the evidence most favorable to Plaintiff's claims. Those facts are contained in the paragraphs found in Plaintiff's Response to the Park County Defendants' Motion for Summary Judgment, which are

incorporated by reference in this Response in Paragraphs 1, 21, 26, 39, 47, 48, 49, 50, 51, and 52. The additional facts which support Plaintiff's claims are contained herein in Plaintiff's Statement of Dispute and Undisputed Material Facts Which Support Plaintiff's Claims for Relief.

## I.   NURSE PAULSEN IS NOT ENTITLED TO QUALIFIED IMMUNITY BECAUSE SHE WAS DELIBERATELY INDIFFERENT TO PLAINTIFF'S MEDICAL CONDITION.

Nurse Paulsen knew that Plaintiff's signs and symptoms, which she charted on 3/6/03, in combination with a red sore throat, which she observed on 3/6/03, were an indication of a strep infection and could also be an indication of the beginning of a septic condition (see Paulsen Depo. at 80-81, in Plaintiff's Response to Park County Defendants' Motion for Summary Judgment). She was also familiar with the jail's written policies providing that when the signs and symptoms displayed by Plaintiff are observed, the inmate must be isolated from other inmates and a physician must be called (see Exhibit 21 attached to Plaintiff's Response to Park County Defendants' Motion for Summary Judgment). Despite this knowledge, Paulsen did not swab Plaintiff's throat for a culture, did not act as a "gatekeeper" and call a doctor, and instead violated the Colorado Nurse Practice Act by diagnosing "altitude sickness" and prescribing medications without a doctor's order or a written protocol that would permit her to diagnose or prescribe.

As Plaintiff's condition deteriorated, Paulsen again misdiagnosed altitude sickness and continued to improperly prescribe medications on March 7, without consulting a physician. At 3:30 a.m. on March 8, when Plaintiff was in critical condition having trouble breathing and was placed on oxygen by a deputy who took vital signs which were abnormal, Nurse Paulsen failed to come to the jail to assess Plaintiff's condition, failed to call a physician, failed to order transport to a medical facility, and without examination, diagnosed his condition as the flu.

At 8:10 a.m. on March 8, 2003, when Plaintiff passed out and fell to the floor and it was apparent his condition had further deteriorated with complaints of side pain in addition to all of his other symptoms, Paulsen finally decided that his condition warranted immediate transport to the Summit County Emergency Department, but astonishingly did not order immediate transport. Instead, she decided Plaintiff might have a kidney stone that would pass with time, and returned home at 9:00 a.m., abandoning her patient who was in obvious critical condition. Although Paulsen had the authority to order transport at 8:00 a.m., by ambulance, without obtaining the permission of the INS (see Gore Depo. at 119, **Exhibit 3;** Paulsen Depo. at 38-39, **Exhibit 1**), she failed to do so and went home, which delayed transport by 3 hours.

When Paulsen finally ordered transport at 11:12 a.m., it was by sheriff's vehicle and not ambulance, even though Plaintiff was desperately in need of IV infusion for severe dehydration, which could have been provided by the ambulance during transport. In addition, Paulsen violated written policy by failing to send her medical charts to the Emergency Department with the transport team, failed to inform the Emergency Department of Plaintiff's critical condition, and the deputy transporting the Plaintiff could not speak Spanish and act as a translator. Therefore, when Plaintiff arrived at the Emergency Department at 12:45 a.m., his critical condition was not discovered until the triage team took vital signs showing no diastolic blood pressure and extremely high respiration and pulse. It was then discovered that he had advanced pneumonia, septicemia, and needed urgent treatment in Denver. The ambulance then averaged 85 mph in taking Plaintiff to Denver where he arrived in septic shock and near death.

First, it should be understood that Nurse Paulsen had no advanced degrees in nursing and under the Nurse Practice Act, could not render treatment, could not prescribe over-the-counter medications or make a diagnosis, without a doctor's order or without written standing orders or

protocols. Accordingly, Nurse Paulsen's only role was that of a gatekeeper. "A prison medical professional who serves 'solely… as a gatekeeper for other medical personnel capable of treating the condition' may violate an inmate's Eighth Amendment rights if he 'delays or refused to fulfill that gatekeeper role.'" *Garret v. Stratman,* 254 F.3d 946, 950, FN 4 (10th Cir. 2001). A doctor may be deliberately indifferent for failing to do something to speed up the transfer process. *Id.* at 954.

Deliberate indifference is evidenced "when prison officials prevent an inmate from receiving treatment or deny him access to medical personnel capable of evaluating the need for treatment." *Oxendine v. Kaplan,* 241 F.3d 1272, 1279 (10th Cir. 2001) (holding a gangrenous finger met the objective test because the need for a doctor's attention would be obvious to a lay person, and it met the subjective test because the doctor was not qualified to perform the surgery and did not seek assistance). A medical professional will be liable for deliberate indifference if "the medical professional knows that his role in a particular medical emergency is solely to serve as a gatekeeper for the other medical personnel capable of treating the condition, and if he delays or refuses to fulfill that gatekeeper role due to deliberate indifference." *Sealock v. Colorado,* 218 F.3d 1205 (10th Cir. 2000).

The evidence in this case clearly supports the objective component of deliberate indifference because Paulsen diagnosed a serious medical need mandating treatment, although she improperly diagnosed a kidney stone, and Plaintiff's serious condition was so obvious that even a layperson would easily recognize the necessity for a doctor's attention.

A prisoner alleging a violation of the Eighth Amendment must show from objective facts that he or she is "incarcerated under conditions posing a substantial risk of serious harm." *Farmer v. Brennan,* 511 U.S. 825, 834 (1994). In the context of medical care, the inmate must show the presence of a "serious medical need," that is "a serious illness or injury." *Estelle v. Gamble,* 429

U.S. 97, 104 (1976). A medical need is sufficiently serious "if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Sealock v. Colorado,* 218 F.3d at 1205, 1209 (10th Cir. 2000), in turn quoting *Hunt v. Uphoff,* 199 F.3d 1220, 1224 (10th Cir. 1999), in turn quoting *Ramos v. Lamm,* 639 F.2d 559, 574 (10th Cir. 1980). A serious medical need also includes one that requires preemptive care in order to protect an inmate against a future risk. See *Helling v. McKinney,* 509 U.S.25, 32-33 (1993); *Hunt v. Uphoff,* 199 F.3d at 1224. Prison officials are required to "make available to inmates a level of medical care which is reasonably designed to meet the routine and emergency health care needs of inmates." *Ramos v. Lamm,* 639 F.2d 559, 574 (10th Cir. 1980). In the instant case, Plaintiff has satisfied the objective component of deliberate indifference.

Plaintiff has also satisfied the subjective component of deliberate indifference. The Supreme Court likened deliberate indifference to criminal recklessness, which makes a person liable when he or she "consciously disregard[s] a substantial risk of serious harm." *Farmer* at 837-38. Deliberate indifference does not require a finding of express intent to harm. *Mitchell v. Maynard,* 80 F.3d 1433, 1422 (10th Cir. 1996). This intent can be demonstrated through inferences from circumstantial evidence, and "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Farmer v. Brennan* at 842. When an officer is "exposed to information concerning the risk of future injury, the officer may not turn a blind eye to it." *Id.* A prison official need not know that harm would actually befall a particular inmate because the Eighth Amendment is violated by allowing a substantial risk to safety to exist, regardless of whether harm actually befalls an inmate. *Farmer* 511 U.S. at 849. "[A] plaintiff 'need not show that a prison official acted or failed to act believing that harm actually would befall an inmate,' as long as the

official should have understood the possibility that harm might ensure." *DeSspain v. Uphoff,* 264 F.3d 965, 975 (10th Cir. 2001).

At 8:00 a.m. on 3/8/03, Paulsen knew that Plaintiff's condition was so serious that "he should be transported now" (see Paulsen Depo. at 110, **Exhibit 10,** Plaintiff's Response to Park County Defendants' Motion for Summary Judgment) and when asked why she didn't order immediate transport, she states, "I don't know" (see Paulsen Depo. at 110-111, **Exhibit 10,** Plaintiff's Response to Park county Defendants' Motion for Summary Judgment). Instead, she went home and claims that she was later upset when she learned that transport had not taken place, even though she had not previously ordered immediate transport (see Paulsen Depo. at 122-23, **Exhibit 10,** Plaintiff's Response to Park County Defendants' Motion for Summary Judgment). Thus Paulsen finally recognized the necessity for emergency room treatment, even though that need was obvious to a deputy, a layperson, at 3:30 a.m. on 3/8/03 when the deputy provided oxygen and called the nurse.

"[D]elay in providing medical care may constitute a violation of the Eighth Amendment." *Hunt v. Uphoff,* 199 F.3d 1220, 1224 (10th Cir. 1999). A plaintiff must first show that the medical need was sufficiently serious by showing it is one that has been diagnosed by a physician as mandating treatment or that it is so obvious that even a lay person would easily recognize the necessity for a doctor's attention. *Ramos v. Lamm,* 639 F.2d 559, 575 (10th Cir. 1980). Second, a plaintiff must show that defendant's delay in providing medical care caused either unnecessary pain, or a worsening of the condition. *Hunt v. Uphoff,* 199 F.3d at 1224. Medical treatment must be provided without delay whenever dilatory action would cause harm. *Garret v. Stratman,* 254 F.3d 946, 949-60.

*Hunt v. Uphoff* involved a claim of denial by a prison doctor and guards of treatment for diabetes and high blood pressure that resulted in a heart attack. The *Hunt* Court held that the

plaintiff stated an Eighth Amendment claim. *Hunt,* 199 F.3d 1220, 1224 (10th Cir. 1999). As that Court noted, "Nor does the fact that he has seen numerous doctors necessarily mean that he received treatment for serious medical needs, i.e., that treatment was prescribed at all or that prescribed treatment was provided." *Id.* The Court described, "Delays that courts have found to violate the Eighth Amendment have frequently involved life-threatening situations and instances in which it is apparent that delay would exacerbate the prisoner's medical problems." *Id.* "Officials may also be held liable when the delay results in a lifelong handicap or a permanent loss." *Id.*

Even a brief delay may be unconstitutional. A delay of several hourse in taking an inmate with chest pains to the hospital violated the Eighth Amendment. *Sealock v. Colorado,* 218 F.3d 1205 (10th Cir. 2000). Delay in referring an inmate to a specialist may constitute an Eighth Amendment violation when that referral is medically necessary. See *Oxendine v. Kaplan,* 241 F.3d 1272, 1276 (10th Cir. 2001). The same is true for diagnostic testing. See *H.C. by Hewett v. Jarrard,* 786 F.2d 1080, 1086 (11th Cir. 1986).

Paulsen cites *Garrett v. Stratman,* 254 F.3d 946, 949 (10th Cir. 2001) for the proposition that "a prison official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and also draw the inference." In the instant case, Plaintiff has established that Paulsen was aware of facts that a substantial risk of harm exists, and that Paulsen drew that inference and decided that an immediate transfer to the Emergency Department was necessary, although she failed to order an immediate transfer. More importantly, Paulsen was simply a gatekeeper for other medical personnel, and not qualified to diagnose or render treatment without a doctor's order or written protocol. She therefore had an obligation to refer Plaintiff for medical treatment on March 6 and 7 when he had all the symptoms of an infectious disease, including strep throat, and she most certainly had an obligation to refer Plaintiff for medical treatment at 3:30 a.m.

26

on March 8 when his condition was so serious that a layperson decided to give him oxygen. *Garrett v. Stratman,* 254 F.3d 946 (10th Cir. 2001) noted that "a prison medical professional who serves 'soley... as a gatekeeper for the other medical personnel capable of treating the condition,' may violate an inmate's Eighth Amendment rights if he 'delays or refused to fulfill that gatekeeper role.'" *Id.* at 950, FN4. In addition, the *Garrett* Court noted that knowledge may be inferred from circumstantial evidence including the very fact that the risk was obvious. *Id.* at 950. The Court refused to dismiss the doctor in *Garrett* because it found a jury could find his failure to do something to speed up the transfer process to constitute deliberate indifference. *Id.* at 954.

In *Oxendine v. Kaplan,* 241 F.3d 1272 (10th Cir. 2001), cited by Paulsen on page 17 of her brief, the issue was the failure to refer to a qualified medical professional, and delay in treatment of a gangrenous finger. *Oxendine* involves a prison doctor who failed to refer surgery to a specialist when he was not qualified to operate, and delayed seeking qualified help after the surgery failed and the finger became gangrenous. The *Oxendine* Court referred to the *Farmer* test to prove the subjective element: whether a prison official had the requisite knowledge of a substantial risk to health or safety is a question of fact subject to demonstration in the usual ways including inference from circumstantial evidence and may be concluded from the fact that the risk was obvious. *Id.* at 1276. The Court found that the fact that a plaintiff has seen numerous doctors doe not necessarily mean that he received treatment for serious medical needs. *Id.* at 1277. The Court quoted *Sealock* that deliberate indifference is evidenced "when prison officials prevent an inmate from receiving treatment or deny him access to medical personnel capable of evaluating the need for treatment." *Id.* at 1279. The *Oxendine* Court held the gangrenous finger met the objective test because the need for a doctor's attention would be obvious to a layperson, and it met the subjective test because the doctor was not qualified to perform the surgery and did not seek assistance. *It.* At 1279.

*Sealock v. Colorado,* 218 F.3d 1205 (10th Cir. 2000), cited in the Paulsen brief at page 16, supports Plaintiff's claim of deliberate indifference in the instant case. The nurse in *Sealock,* unlike Nurse Paulsen, correctly assessed the patient's condition and referred the patient to a physician's assistant who was qualified to treat. The nurse in *Sealock* informed the physician's assistant that the patient had "chest pain" and therefore properly fulfilled her role as gatekeeper in referring to the physician's assistant. However, the physician's assistant did not then call an ambulance and arrange for treatment. The nurse was not deliberately indifferent, but the physician's assistant could be found to be deliberately indifferent. In the instant case, Nurse Paulsen did not refer the Plaintiff to a physician on March 6, 7 or at 3:30 a.m. on March 8, nor did she order transport to the Emergency Department between 8:00 a.m. and 11:00 a.m. on March 8. Her conduct, like the physician's assistant in *Sealock,* was deliberately indifferent.

*Wilson v. Seiter,* 501 U.S. 294, 300 (1991) is cited in Paulsen's brief at page 15 for the proposition that a prison official like Paulsen must have a culpable state of mind in order to violate the Eighth Amendment. *Wilson* is a prison conditions case which involved a complaint of overcrowding, excessive noise, insufficient locker space, inadequate heating and cooling, improper ventilation, unclean and inadequate restrooms, unsanitary dining facilities and food preparation, and housing with mentally and physically ill inmates. *Id.* at 296. The Court found "no significant distinction between claims alleging inadequate medical care and those alleging inadequate 'conditions of confinement.'" *Id.* at 303. The Court agreed with retired Justice Powell who concluded, "Whether one characterizes the treatment received by [the prisoner] as inhumane conditions of confinement, failure to attend to his medical needs, or a combination of both, it is appropriate to apply the 'deliberate indifference' standard articulated in *Estelle.*" *Id.* In addition, the Court decided that some conditions of confinement may establish an Eighth Amendment violation

"in combination" when each would not do so alone, but only when they have a mutually enforcing effect that produced the deprivation of a single, identifiable human need such as warmth when a low temperature combines with a failure to issue blankets. *Id.* at 304.

It is noteworthy that Paulsen was aware of the overcrowding in Pod D and the conditions of confinement and had a duty as a the jail's designated health administration officer to take steps to protect the health and safety of the inmates, yet she did nothing to correct the overcrowding and the unhealthy conditions of confinement. She then had knowledge of a communicable disease spreading throughout Pod D and infecting the Plaintiff, but failed to isolate infected inmates, failed to arrange for medical care of the Plaintiff, and as his condition deteriorated and became critical, she failed to order transport by ambulance to the Emergency Department at 3:30 a.m. on March 8 and again at 8:00 a.m. on March 8.

The cases relied upon in Defendant Paulsen's brief support the Plaintiff's claim of deliberate indifference when the facts are viewed in the light most favorable to the Plaintiff.

## II.   NURSE PAULSEN IS NOT ENTITLED TO QUALIFIED IMMUNITY BECAUSE A REASONABLE OFFICIAL WOULD HAVE CONSIDERED HER ACTIONS UNLAWFUL.

Paulsen concedes, at page 28 of her Motion, that the law clearly established in 2003 that an official's disregard of obvious signs of a serious physical condition is a violation of the Eighth Amendment and that unexplained chest pain clearly qualifies as a risk so obvious that knowledge of that risk by the official can be inferred. Paulsen then attempts to show, in looking at the evidence *in the light most favorable to Defendant Paulsen,* that Plaintiff's serious condition was not obvious to her and therefore could not have been obvious to a layperson.

There is no dispute that the law in 2003 was clearly established in the Tenth Circuit. A plaintiff need only show that his medical need was so obvious that even a layperson would easily

recognize the necessity for a doctor's attention. *Ramos v. Lamm,* 639 F.2d 559, 575 (10th Cir. 1980). In the instant case, any parent knows that a child with a red sore throat, a fever, headaches, nausea, diarrhea and vomiting should be seen by a doctor for at least a throat swab for strep throat, and for a medical evaluation. Looking at the evidence in the light most favorable to Plaintiff, he had chest pain for 3 days, coughed up blood, had blood in his urine, and as his undiagnosed pneumonia progressed, he had difficulty breathing and was placed on oxygen. A sheriff's deputy recognized the severity of his symptoms, took abnormal vital signs, and called Nurse Paulsen in the middle of the night. She refused to travel to the jail to evaluate Plaintiff and failed to order transport to the Emergency Department. When Plaintiff passed out at 8:10 a.m. on March 8, then complained of severe side pain in addition to the previous abdominal tenderness and chest pain, Paulsen finally recognized that he absolutely needed a medical diagnosis and treatment, but instead of ordering immediate transport to the Emergency Department by ambulance, she went home and abandoned the Plaintiff. This delayed transport to the Emergency Department for over 3 hours while Plaintiff continued to suffer from advancing pneumonia and septicemia. Based on clearly established law in the Tenth Circuit, Plaintiff displayed obvious signs of a serious condition and Paulsen, with knowledge of that condition, substantially delayed obtaining medical treatment. See cases cited in Section I, pages 25 through 29, *supra.*

It should be noted that Paulsen improperly relies on several Fourth Amendment cases in arguing that Plaintiff cannot show that the law was clearly established in 2003.[1]

---

[1] The cases cited on page 27 of Paulsen's Motion are all Fourth Amendment cases. Cases under the Fourth Amendment do not require proof of "deliberate indifference," but instead require proof of "objective reasonableness." The objective reasonableness standard is the first part of a qualified immunity analysis in a Fourth Amendment case as is deliberate indifference in an Eighth Amendment case. The "objective reasonableness" of Paulsen's actions are irrelevant in the present case. All that is required to be "clearly established" is a Tenth Circuit or Supreme Court case on point that would give an official notice, even if the facts are not identical. The Fourth Amendment cases cited by Paulsen at page 27 of her brief are *Brosseau v. Haugen; Anderson v. Creighton; and Saucier v. Katz.*

30

Likewise, in disputing her awareness of the risk under the second prong of deliberate indifference, Paulsen relies on standards set forth in 2005 and 2006 cases, which are irrelevant to a qualified immunity analysis. To avoid qualified immunity, the law must be clearly established at the time of the alleged violation so that officials have notice. The constitutional violation of Plaintiff's rights occurred in 2003, yet Paulsen is relying on cases decided in 2005 and 2006 on pages 15 through 19 of Paulsen's brief.[2]

In summary, the constitutional right in the present case is governed by the Eighth Amendment and the standard is deliberate indifference. Whether a constitutional right is clearly established is a question of law to be decided by the Court. *Overdorff v. Harrington,* 268 F.3d 1179, 1193 (10th Cir. 2001). It is not necessary that there be authority holding the precise action in question unlawful so long as preexisting law would have put a reasonable officer on notice that his action was unlawful. *Anderson v. Creighton,* 483 U.S. 635, 640 (1987). The Tenth Circuit has stated that "[O]rdinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Harris v. Robinson,* 273 F.3d 927, 931 (10th Cir. 2001); *Medina v. City & County of Denver,* 960 F.2d 1493 (10th Cir. 1992).

In viewing the evidence in light most favorable to the Plaintiff and in drawing all inferences from disputed and undisputed facts in favor of the Plaintiff, Nurse Paulsen is not entitled to qualified immunity.

III.   **PLAINTIFF'S CONSTITUTIONAL CLAIMS AGAINST NURSE PAULSEN IN HER OFFICIAL CAPACITY SHOULD NOT BE DISMISSED AS DUPLICATIVE.**

---

[2] *Kikumura v. Osagie,* 461 F.3d 1269, 1293 (10th Cir. 2006), cited on page 16 of Paulsen's brief; *Self v. Crum,* 439 F.3d 1227, 1232 (10th Circ. 2006), cited and discussed on pages 16 through 19 of Paulsen's brief; and *Mata v. Saiz,* 427 F.3d 745, 755 (10th Cir. 2005), cited and discussed at pages 17 and 18 of Paulsen's brief.

Paulsen argues that the Park County Defendants' Motion for Summary Judgment specifically addresses Plaintiff's claim against the county based on the policies and procedures (or lack thereof) related to Plaintiff's access to appropriate medical care in the jail.  Nurse Paulsen adopts the Park County Defendants' Motion to for Summary Judgment and for the reasons stated in the Park County Defendants' Motion, argues that Plaintiff's claims against her in her official capacity should therefore be dismissed.

For the reasons stated in Plaintiff's Response to Park County Defendants' Motion, Plaintiff's claims against Nurse Paulsen in her official capacity are supported by material evidence, and should not be dismissed.  See Plaintiff's Response to Park County Defendants' Motion for summary Judgment at pages 37 through 47.

## CONCLUSION

Plaintiff has submitted evidence that Nurse Paulsen acted with deliberate indifference to Plaintiff's medical condition.  In 2003, the law was clearly established with respect to the unlawfulness of Nurse Paulsen's conduct.  Because Plaintiff has introduced sufficient evidence on these issues, Nurse Paulsen is not entitled to qualified immunity, and Plaintiff's §1983 claim against her in her individual capacity is supported by the evidence.  Plaintiff's §1983 claims against Nurse Paulsen in her official capacity are supported by the evidence and cannot be dismissed for the reasons stated in Plaintiff's Response to Park County Defendants' Motion for Summary Judgment. With a court denial of the Motions for Summary Judgment, the Court has subject matter jurisdiction over Plaintiff's state law negligence claim against Nurse Paulsen, and the state law negligence claim should not be dismissed.  Accordingly, Plaintiff respectfully requests that the Court deny Defendant Paulsen's Motion for Summary Judgment.

Respectfully submitted,

Dated this _15th_ day of January, 2007.

Respectfully submitted,


By:   /s/ William A. Trine, Esq.
      William A. Trine, #577
      Trine & Metcalf, PC
      1435 Arapahoe Avenue
      Boulder Colorado 80302-6390
      (303) 442-0173

      Joseph J. Archuleta, #19426
      Joseph J. Archuleta and Associates
      1724 Ogden Street
      Denver Colorado 80218
      (303) 837-1642

      Lloyd C. Kordick, #6298
      Lloyd C. Kordick & Associates
      805 S. Cascade Avenue
      Colorado Springs Colorado 80903
      (719) 475-8460

      Adele Kimmel, Esq.
      Trial Lawyers for Public Justice
      1717 Massachusetts Avenue, N.W.
      Suite 800
      Washington, D.C. 20030
      (202) 797-8600

      **Attorneys for Plaintiff**

## CERTIFICATE OF MAILING/SERVICE

The undersigned hereby certifies that on this _15th_ day January, 2007, a true and correct copy of the foregoing pleading was e-served via Electronic Case Filing and/or placed in the United States Mail, postage prepaid, and properly addressed to:

Joseph Archuleta
Attorney at Law
1724 Ogden Street
Denver, Colorado 80218-1018
*Co-Counsel for Plaintiff*

Lloyd C. Kordick,
Attorney at Law
805 S. Cascade
Colorado Springs, CO 80903
*Co-Counsel for Plaintiff*

Adele P. Kimmel
Richard H. Frankel
Trial Lawyers for Public Justice
1717 Massachusetts Avenue, N.W.
Suite 800
Washington, D.C. 20030
*Co-Counsel for Plaintiff*

Andrew Ringel
Jennifer L. Veiga
Hall & Evans
1125 17th Street, Suite 600
Denver, CO 80202-2052
*Counsel for Defendant Park County, Park County Board of*
*County Commissioners, Park County Sheriff's Office,*
*Fred Wegener, and Monte Gore*

Josh A. Marks
Berg, Hill, Greenleaf & Ruscitti
1712 Pearl Street
Boulder, CO 80302
*Counsel for Defendant Vicki Paulsen*

/s/ Elizabeth Peach