**1**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Case No. 2005-WM-377 (BNB)

DEPOSITION OF: VICKI ANN PAULSEN, R.N.
January 18, 2006

MOISES CARRANZA-REYES,
Plaintiff,
v.
PARK COUNTY, a public entity of the State of Colorado and
its governing board, THE PARK COUNTY BOARD OF COUNTY
COMMISSIONERS; PARK COUNTY SHERIFF'S OFFICE, a public
entity of the State of Colorado; FRED WEGENER,
individually and in his official capacity as Sheriff of
Park County, Colorado; MONTE GORE, individually and in
his capacity as Captain of Park County Sheriff's
Department; VICKIE PAULSEN, individually and in her
official capacity as Registered Nurse for Park County,
Colorado; JAMES BACHMAN, M.D., individually and in his
official capacity as Medical Director of the Park County
Jail,

Defendants.

TAKEN PURSUANT TO NOTICE on behalf of the Plaintiff at
1125 17th Street, Suite 600, Denver, Colorado 80202 at
9:04 a.m. before Theresa A. Coffman, Federal Certified
Realtime Reporter, Registered Professional Reporter and
Notary Public within Colorado.

**2**

APPEARANCES

For the Plaintiff:
WILLIAM A. TRINE, ESQ.
Trine & Metcalf, P.C.
1435 Arapahoe
Boulder, Colorado 80302

LLOYD C. KORDICK, ESQ.
805 South Cascade
Colorado Springs, Colorado 90903

JOSEPH J. ARCHULETA, ESQ.
Law Office of Joseph J. Archuleta
1724 Ogden Street
Denver, Colorado 80218

For the Defendants
Park County, Park
County Board of
Commissioners, Park
County Sheriff's Office,
Wegener and Gore:
JENNIFER L. VEIGA, ESQ.
Hall & Evans, LLC
1125 17th Street
Suite 600
Denver, Colorado 80202

For the Defendant
Paulsen:
MELANIE B. LEWIS, ESQ.
Berg Hill Greenleaf & Ruscitti LLP
1712 Pearl Street
Boulder, Colorado 80302

For the Defendant
Bachman:
CRAIG A. SARGENT, ESQ.
ANDREW W. JURS, ESQ.
Johnson McConaty & Sargent, P.C.
400 South Colorado Boulevard
Suite 900
Glendale, Colorado 80246

Also Present:
Moises Carranza-Reyes

**3**

I N D E X

EXAMINATION OF VICKI ANN PAULSEN, R.N.        PAGE
January 18, 2006

By Mr. Trine                                   5, 225
By Mr. Archuleta                               ---
By Mr. Kordick                                 ---
By Ms. Veiga                                   ---
By Mr. Sargent                                 ---
By Mr. Jurs                                    223
By Ms. Lewis                                   220

DEPOSITION EXHIBITS:                        INITIAL
                                          REFERENCE

20   Paulsen Park County personnel file        5

21   Pass-On records                          55

22   Code of Colorado Regulations, Department  12
     of Public Health and Environment Consumer
     Protection Section,

23   Park County Sheriff's Office Detention    46
     Center INS Detainee Intake Form, 3/6/03
24   Summit Medical Center records            135
25   Park County Sheriff's Office Detention   173
     Center Job Description

26   INS Detention Standard, Medical Care     215

(Original exhibits attached to original deposition; copy
exhibits included in continuing exhibit file; copies
provided to counsel as requested.)

**4**

REQUESTED PORTIONS OF TESTIMONY:              PAGE
Request for document production               ---
or information

Certified question                            ---

Instruction not to answer                     77

Other requests or marked testimony            ---

REFERENCES TO EXHIBITS MARKED PREVIOUSLY:

Exhibit No.        Page Reference

    2                 201
    3                 69
    4                 183

Coffman Reporting

303.883.0202
303.893.2230 FAX

Pages 1 to 4

EXHIBIT
1

PENGAD 800-631-6989

Carranza-Reyes v. Park County                                          Vicki Ann Paulsen, R.N.

13

1 Part 14. starting on page 11. And in case you forget, my
2 question is simply whether this is one of the documents
3 that you became familiar with --
4    A.   Similar to this.
5    Q.   -- when you started working in corrections.
6    A.   Similar to this. Not exactly this as far as
7 DOC is concerned.
8    Q.   Okay. So it wasn't that particular
9 document --
10   A.   Not this particular --
11   Q.   I'm sorry. But it was something similar?
12   A.   Um-hum.
13   Q.   Okay. Now, you apparently started work
14 in -- at Park County in January '03?
15   A.   Um-hum. Yes.
16   Q.   And then gave two weeks' notice that you
17 were leaving on September 30, '03?
18   A.   Yes.
19        (Discussion off the record.)
20        MR. SARGENT: I'm sorry, but I didn't hear
21 your question. What was the question, Theresa?
22        (The last question was read back.)
23   Q.   (BY MR. TRINE) And why did you give two
24 weeks' notice that you were going to leave on September
25 30?

14

1    A.   My husband and I had been planning to
2 move -- to go to California for the winter to visit
3 family who we hadn't seen in a long time, and I was going
4 out there to work for the winter.
5    Q.   And then you did so?
6    A.   Yes.
7    Q.   And I note on page 295, Park 295 of Exhibit
8 20, in the appointment appointing you as a detentions
9 nurse --
10   A.   Um-hum.
11   Q.   -- by Sheriff Wegener that it indicates that
12 you would be responsible for performing the duties, acts
13 and obligations of your position as set forth in Colorado
14 statutes and the Park County Sheriff's Office policies
15 and procedures. Were you given a copy of the Park County
16 Sheriff's Office policies and procedures to review?
17   A.   There is a -- yes. It's in the nurse's
18 office.
19   Q.   And when were you provided with that? When
20 you first started?
21   A.   Yes. It was there.
22   Q.   And did you read through the policies and
23 procedures?
24   A.   Yes, I did.
25   Q.   Did you have any questions about those that

15

1 you asked of people?
2    A.   Not at that -- no.
3    Q.   You felt you understood what they were?
4    A.   Um-hum.
5    Q.   And what your obligations and duties were?
6    A.   Yes.
7    Q.   Now, during the course of your work in
8 correctional facilities, did you attend continuing
9 nursing education programs or seminars that were
10 specifically related to work in correctional facilities?
11   A.   That's provided by DOC, yes. You have
12 yearly updates.
13   Q.   Okay. And where did the yearly updates
14 occur?
15   A.   Usually at your facility.
16   Q.   So that you had your first when?
17   A.   I had -- my first one, I went through the
18 academy.
19   Q.   When was that?
20   A.   That was in June of 2000. June or July.
21 I'm sorry.
22   Q.   And where did that take place at?
23   A.   Canon City.
24   Q.   And what did the update consist of?
25   A.   Well, it's six weeks of training.

16

1    Q.   Was that required when you first went to
2 work for DOC?
3    A.   Everybody has to go through academy, yes.
4    Q.   And summarize what that six weeks of
5 training consisted of.
6    A.   Policies and procedures, dealing with
7 inmates on a daily basis, self-defense. There are -- I
8 mean, all the paperwork that you have to become familiar
9 with in Department of Corrections because there's a form
10 for everything. So they make you familiar with all your
11 forms and that type of thing.
12   Q.   And the six-week course was, what, five days
13 a week?
14   A.   Yes.
15   Q.   For six weeks?
16   A.   Yes.
17   Q.   And you attended the academy initially
18 before you actually went to work?
19   A.   I worked at Territorial through an agency,
20 and they asked me if I would hire on, and I put my
21 application in, and they accepted my application. Then I
22 went to academy.
23   Q.   And then you had an update a year after
24 that?
25   A.   Yes. You have to do your self-defense and

Pages 13 to 16

* SUBJECT TO CONFIDENTIALITY DESIGNATIONS *

21

1  day or night?
2      A.    Yes.
3      Q.    What information did he give you on what you
4  should do if he was unavailable?
5      A.    Then if it was during the week, I could talk
6  to his nurse practitioner. Otherwise I would have to
7  transport to another facility, and that would probably be
8  Frisco, Summit Medical Center.
9      Q.    Now, did you meet Dr. Bachman at the Frisco
10 Medical Center?
11     A.    Yes.
12     Q.    And what was your understanding of where
13 patients would be transported for emergency care?
14     A.    Frisco Medical Center.
15     Q.    And did you understand they had an emergency
16 department there, emergency room?
17     A.    Yes. That was my understanding.
18     Q.    Did he give you the name of any other
19 physician that you should contact if he was on vacation
20 or unavailable?
21     A.    No, he did not.
22     Q.    Did you meet his nurse practitioner?
23     A.    Yes, I did.
24     Q.    Did she participate in this meeting with Dr.
25 Bachman?

22

1      A.    No, she did not.
2      Q.    Did you meet her on that day, the same day?
3      A.    No, I did not.
4      Q.    When did you meet the nurse practitioner?
5      A.    We were taking female inmates over for -- I
6  don't remember, but we transport over there. She saw the
7  female inmates, and that's when I met her.
8      Q.    And what is her name?
9      A.    I don't recall.
10     Q.    Did you only meet her on that one occasion?
11     A.    There were several occasions when I went
12 over to the office with inmates.
13     Q.    Was it always the same nurse practitioner?
14     A.    Yes.
15     Q.    Until you terminated your employment?
16     A.    Yes.
17     Q.    Did you have any conversation with Dr.
18 Bachman about standing protocols or standing orders that
19 might be available to you --
20     A.    No, I did not.
21     Q.    That might be available to you at the Park
22 County Jail?
23     A.    No, I did not.
24     Q.    Did you ask about that?
25     A.    No, I did not.

23

1      Q.    Did you ever discover that there were
2  protocols and standing orders available for your use at
3  Park County?
4      A.    I did not see them, no.
5      Q.    During your employment there, did you ever
6  request that standing orders be drafted for your use
7  under any medical circumstances?
8      A.    No, I did not.
9      Q.    Were standing orders used at any of the
10 correctional facilities you worked at previously?
11     A.    There were protocols, yes.
12     Q.    Any similar protocols in use at Park County?
13     A.    Yes, because -- yes.
14     Q.    In what areas?
15     A.    The protocols were from Department of
16 Corrections.
17     Q.    So you were using the DOC protocols at Park
18 County?
19     A.    Yes.
20     Q.    Were there DOC -- excuse me. Were there
21 physician standing orders available for your use at Buena
22 Vista?
23     A.    No. Oh, yes. Excuse me. Yes, there were.
24     Q.    And at Territorial?
25     A.    You had some standing orders. You have some

24

1  standing orders in every facility.
2      Q.    So Dr. Bachman then explained to you that he
3  would be present one day per week at the Park County Jail
4  to see inmates?
5      A.    Yes.
6      Q.    And was that a particular day of each week?
7      A.    Usually Wednesdays.
8      Q.    And he explained to you that any inmates
9  that you felt he should see, you would schedule for those
10 appointments?
11     A.    Yes.
12     Q.    Was he, then, there every Wednesday after
13 you started working at Park County?
14     A.    He missed a couple of weeks, but yes, he was
15 there every week.
16     Q.    What time would he normally arrive?
17     A.    Usually right after lunch.
18     Q.    And would you customarily have scheduled
19 appointments for him in the afternoon on Wednesdays?
20     A.    Yes.
21     Q.    And approximately how many inmates would he
22 see, on the average, on a Wednesday afternoon?
23     A.    It could vary anywhere from three to seven
24 or eight. It just depended on how many needed to be
25 seen.

Carranza-Reyes v. Park County                                          Vicki Ann Paulsen, R.N.

---

**33**

1    A.    They would be brought in, processed, and I
2  would see them the next week.
3    Q.    To your knowledge, was there a rule or a
4  requirement at the jail that any INS detainees brought in
5  over the weekend would be segregated from the general
6  population until there was a TB test and until you could
7  see them?
8    A.    No, not to my knowledge.
9    Q.    As far as you knew, they were just placed in
10  general population?
11    A.    They were placed in D Pod.
12    Q.    Now, you indicated that the D Pod population
13  would vary anywhere from seven or eight people to 30.
14  Were there times when there were more than 30 in D Pod?
15    A.    Yes.
16    Q.    And how did you become aware of that?
17    A.    You could look in the pod and tell there
18  were more than 30 people in there.
19    Q.    Now, was it your practice, when you first
20  came in in the morning, to go to the --
21    A.    Control room.
22    Q.    -- controller booth and check records?
23    A.    I would go to control, look at the pass-on
24  book, pick up my keys.
25    Q.    And why would you look at the pass-on book?

---

**34**

1    A.    It was just -- they wanted everybody to be
2  sure and look at pass-on. That was part of it. And I
3  would get a report if there was anything going on with
4  anybody, any of the inmates, if they had -- whatever --
5  in the pods.
6    Q.    Would you also look at the master control
7  log kept there?
8    A.    No.
9    Q.    Just the pass-on records?
10    A.    Just the pass-on.
11    Q.    And have a conversation with whoever --
12    A.    Right, whoever's going off shift.
13    Q.    Whatever sergeant's on duty?
14    A.    Whoever's going off shift at that time.
15    Q.    Now, as I understand it -- and correct me if
16  I'm wrong -- all of your charting of appointments that
17  you had with inmates was kept in the medical department
18  and was confidential?
19    A.    Yes.
20    Q.    And you understood it was important that
21  those charts remain confidential and not be available to
22  all the employees and deputies and so on --
23    A.    That's correct.
24    Q.    -- that worked there?
25    A.    That's correct.

---

**35**

1    Q.    And do you know why that confidentiality was
2  important?
3    A.    Because that is a patient's personal
4  history. That's his property.
5    Q.    So how did you maintain confidentiality
6  within the medical department? Did you have locked
7  drawers of some type?
8    A.    There were two files that locked.
9    Q.    Okay. So you kept them in locked files?
10    A.    Yes.
11    Q.    And only you and Dr. Bachman would have
12  access to those?
13    A.    Yes.
14    Q.    And when you say when you arrived in the
15  morning and went to the controller and looked at pass-on
16  records and picked up keys, what keys are you referring
17  to?
18    A.    The keys to my office.
19    Q.    So your office would remain locked?
20    A.    The deputies had access to those keys.
21    Q.    Okay. It would remain locked, but the
22  deputies had access?
23    A.    Right.
24    Q.    What sort of diagnostic testing equipment
25  did you actually have right there in the medical room?

---

**36**

1    A.    We had an EKG machine, AED.
2    Q.    What's an AED?
3    A.    That is if you have someone who goes into
4  cardiac arrest, that you can deliver a shock if you have
5  to. It analyzes.
6    Q.    And what type EKG machine?
7    A.    It was new. I asked for a new machine when
8  I started there.
9    Q.    Did it have 10 or 12 electrodes?
10    A.    12-lead.
11    Q.    12 leads?
12    A.    Um-hum.
13    Q.    When did you receive that? Shortly after
14  you went to work?
15    A.    It took probably two months to get it.
16    Q.    Any other equipment?
17    A.    Equipment from the lab, a centrifuge, lab
18  supplies such as vials and that kind of thing for blood
19  draws.
20    Q.    If you did blood draws, where did you send
21  the blood?
22    A.    LabCorp.
23    Q.    Where was that located?
24    A.    In Denver. It had a courier that picked up.
25  If I had a blood draw, I would call and ask for the

---

*  SUBJECT TO CONFIDENTIALITY DESIGNATIONS  *

Carranza-Reyes v. Park County

Vicki Ann Paulsen, R.N.

---

37

1  courier to pick up.
2  Q.  So if you were in a rush, you would get the
3  results within what? 24 hours?
4  A.  Probably.
5  Q.  Any other diagnostic-type equipment that you
6  had available?
7  A.  Otoscope, you know, stethoscope. I mean, I
8  don't know what you're asking. I don't know.
9  Q.  Did you request any additional diagnostic
10  equipment that you didn't receive?
11  A.  No.
12  Q.  What instructions or information, if any,
13  were you given with regard to the budget, or how much was
14  available to you for purposes of sending inmates or
15  patients for treatment or using an ambulance --
16  A.  I wasn't -- it was never discussed.
17  Q.  When and under what circumstances could you
18  request or order that an inmate be transferred to Frisco
19  or Summit County for emergency care and treatment?
20  A.  If I saw them, I would ask whoever -- the
21  sergeant on duty or whoever and tell them that I needed
22  him transported, and they would talk to Captain Gore, and
23  then we'd get the -- by then, of course, the ambulance
24  was en route, and so -- if we needed an ambulance to
25  transport.

---

38

1  Q.  Did you ever request that an inmate be
2  transported to see Dr. Bachman in Frisco when the request
3  was denied for any reason?
4  A.  No, I don't believe so.
5  Q.  So it was your understanding you had the
6  ultimate authority or power to have an inmate transferred
7  to Dr. Bachman? You didn't have to get anyone's
8  permission?
9  A.  I had to talk to security. I mean, there
10  was a security issue. I had to tell them I wanted a
11  person transported. If we were taking people to his
12  office, then we made a time with the transport officer so
13  that he could take them over. So we'd take them over.
14  It had to be set up if I had someone to take over. In an
15  emergency situation -- I never transported to his office
16  in a emergency situation.
17  Q.  But did you ever have patients transported
18  to Frisco to be evaluated by Dr. Bachman when it was not
19  an emergency?
20  A.  Yes.
21  Q.  Okay. And you made that decision as the
22  nurse?
23  A.  Um-hum. Yes.
24  Q.  You didn't have to get someone's permission
25  to do that? You just had to make the arrangements?

---

39

1  A.  I had to see that the arrangements were
2  made, see when I could do it.
3  Q.  And if I understand what you're saying, if
4  you decided an inmate should be examined by Dr. Bachman
5  at his office, you would simply arrange that with
6  security and for transportation and probably call Dr.
7  Bachman --
8  A.  Yes, and tell him who I had and why.
9  Q.  To let him know; is that right?
10  A.  Yes.
11  Q.  And when you did that, would you generally
12  fax any medical charts or documents that you had that
13  might be relevant to that appointment?
14  A.  If he requested them, yes.
15  Q.  Only if Dr. Bachman requested them?
16  A.  Yes.
17  Q.  You didn't do it as a matter of course?
18  A.  Not normally, no.
19  Q.  Okay. What if you were transporting an
20  inmate to Frisco or Summit County to the emergency
21  department? Would you customarily fax them any
22  medical -- any relevant medical records you had?
23  A.  If they went by ambulance, I made copies and
24  sent them with the ambulance driver or the ambulance
25  company, and I called ahead and told them what was

---

40

1  coming.
2  Q.  And did you understand that that was
3  actually one of the sheriff's policy rules and
4  procedures, and that is that you were obligated to send
5  any medical charts or records that you had with a patient
6  going to a hospital or emergency department?
7  A.  Right.
8  MS. LEWIS: Object to the form of the
9  question.
10  Q.  (BY MR. TRINE) You understood as a nurse
11  that that could be very important to the people receiving
12  a patient, to know what had been done previously and --
13  A.  Correct.
14  Q.  -- what the chart showed?
15  A.  Correct.
16  Q.  Now, during the time that you were at Park
17  County as a nurse, how many inmates or detainees on the
18  average did you actually send to Bachman at his office
19  for further diagnostic work or treatment?
20  A.  I sent -- I can't tell you for appointments.
21  I mean, that was -- if he couldn't come to Park County,
22  they were sent to him for appointments, but I can't tell
23  you the number.
24  Q.  Okay. Can you give me an average of how
25  many per week or per month?

---

\* SUBJECT TO CONFIDENTIALITY DESIGNATIONS \*

41

1    A.    That he saw?
2    Q.    Right. At his office.
3    A.    I can't even do that for you. I don't
4    recall.
5    Q.    Were there ever weeks when no one went to
6    Dr. Bachman's office?
7    A.    Sure. Definitely.
8    Q.    Were there weeks when more than one inmate
9    went on one trip to his office?
10   A.    Yes.
11   Q.    If Dr. Bachman -- strike that. Did you know
12   in advance that there would be weeks when Dr. Bachman
13   wouldn't be coming to Park County and he said, "Send them
14   to me"?
15   A.    He tried to keep me apprised of that, yes.
16   Q.    About how often did that happen during your
17   tenure that you were informed in advance that he wouldn't
18   be there that week, but you could send inmates down to
19   him?
20   A.    Four to five times at the maximum.
21   Q.    And when that occurred, would you send
22   whatever inmates would normally be scheduled to see
23   him --
24   A.    Correct.
25   Q.    -- in Park County? Would you send all of

42

1    them in one group on one day down to Summit County?
2    A.    Correct. He would open up a time, tell me
3    what time to have them there, and I would send them over.
4    Q.    Now, were you discouraged by anyone at Park
5    County from doing that because of the extra expense
6    involved in sending inmates to Summit County as opposed
7    to the doctor coming to Park?
8    A.    No, no. It was basically working out
9    transport with Mr. Sallee, because he's usually the one
10   that took them over, and what time, and that he didn't
11   have something else that he had to do, you know,
12   transportwise. And then I'd let Dr. Bachman know, and
13   we'd go from there.
14   Q.    Now, you initially said that when you first
15   started there, you remember you would be there about 6:00
16   a.m. because you had a couple of inmates that were
17   diabetics.
18   A.    Um-hum.
19   Q.    Did your schedule vary? Were there times
20   when you came in later or earlier, or did you always try
21   to be there at 6:00?
22   A.    There were times when I'd go in a little
23   later, usually around 7:00, not often, but usually I
24   tried to keep that 6 o'clock schedule.
25   Q.    Now, you indicated that there were times

43

1    when there were more than 30 detainees in Pod D. Do you
2    remember times when Pod D was filled to capacity as far
3    as the bunk beds, and detainees were sleeping on the
4    floor?
5    A.    Yes. I do.
6    Q.    And about how often did that happen while
7    you were there?
8    A.    I'm trying to think. Probably three to four
9    times. It wasn't -- it didn't occur all the time.
10   Q.    Were you ever informed, either through
11   pass-on records or by anyone else, any of the deputies
12   there, of how many were in Pod D? You could only
13   visualize --
14   A.    You could look and see that it was crowded,
15   yes.
16   Q.    And did you become familiar with the
17   sheriff's office rules and regulations that provided that
18   there should be only one inmate housed for every 80
19   square feet available?
20   A.    Yes.
21   Q.    And were you ever informed that using --
22   following that policy and regulation, Pod D could
23   accommodate no more than 18 detainees?
24        MS. LEWIS: Object to the form of the
25   question. Foundation.

44

1    A.    No.
2    Q.    (BY MR. TRINE) You were never informed of
3    that?
4    A.    No.
5    Q.    You could see, though, that the three tables
6    that they had in there that people could sit and eat
7    at --
8    A.    Right.
9    Q.    -- would only accommodate comfortably about
10   18; isn't that right?
11   A.    Right, correct. But I was never informed of
12   what that pod could hold.
13   Q.    And you never did the mathematics yourself?
14   You never looked at anything showing what the square
15   footage was?
16   A.    No.
17   Q.    You probably knew when you worked at DOC
18   that the regulations required one toilet for every 12
19   inmates, didn't you?
20        MS. LEWIS: Object to the form and
21   foundation.
22   A.    Yes.
23   Q.    (BY MR. TRINE) And your observations in Pod
24   D was that there were two toilets?
25   A.    Correct.

Pages 41 to 44

*  SUBJECT TO CONFIDENTIALITY DESIGNATIONS  *

Carranza-Reyes v. Park County                                                    Vicki Ann Paulsen, R.N.

---

45

1    Q.    When you saw that there were two toilets and
2 knew at times that there were more than 30 inmates in
3 there, did you ever say anything to Monte Gore or any of
4 the deputies about the overcrowding?
5        MS. LEWIS:  Object to the form of the
6 question.
7    A.    I did say, you know, how long are they going
8 to be there, is INS picking up, they're -- it's not a
9 good thing to have that many people in there.  But other
10 than that, I did not talk to Monte Gore about it.
11   Q.    (BY MR. TRINE) Who are these conversations
12 with that you were just describing?
13   A.    Corporal Crawford, Sergeant Muldoon.
14   Q.    And when you had said it's not a good idea
15 to have that many people in there, what was their
16 response?
17   A.    That INS would probably be picking them
18 up -- the extra up.  Because they were in and out all the
19 time.  I mean, I didn't have detainees there for long
20 periods.  I think I had two, but they were going to
21 court.  I mean, I can remember two or three cases where I
22 had detainees that were longer than that, but they were
23 going to court, so they were there longer.  But other
24 than that, they picked them up weekly.
25   Q.    Were you personally concerned about the

---

46

1 potential health hazards of having an overcrowded pod?
2    A.    Any nurse would be.
3        MR. SARGENT:  I didn't hear the answer.
4 Would be?
5        MS. VEIGA:  I didn't hear.
6        THE DEPONENT:  Any nurse would be.
7    Q.    (BY MR. TRINE) And what were your concerns?
8    A.    Just health issues.  You know, I mean, if
9 someone got a cold, then everyone got the cold.  That
10 type of thing.
11       MR. TRINE:  Why don't we take a short break.
12       (Break from 10:10 a.m. to 10:25 a.m.)
13       (Deposition Exhibit 23 was marked.)
14   Q.    (BY MR. TRINE) I'll hand you what has been
15 marked Deposition Exhibit 23, and there is a stamp on
16 that exhibit stating, "Any medical info can be located in
17 the nurse's office."  Do you remember when and under what
18 circumstances that stamp was used?
19   A.    I would assume when he -- when they came
20 into the facility.
21   Q.    Did you stamp --
22   A.    No, I didn't.
23   Q.    Did you use this stamp?
24   A.    I didn't use that stamp, no.
25   Q.    Well, let me explain that there were 50

---

47

1 detainees who were transported out of Park County on
2 March 7, 2003, and we received this face sheet for all 50
3 detainees, but only 33 of them had this stamp marked on
4 them.  And the rest didn't.
5    A.    I don't know.
6    Q.    That's why I asked you if you knew when and
7 under what circumstances they actually stamped these
8 sheets.
9    A.    I would --
10       MS. LEWIS:  Object to form and foundation.
11   A.    I would assume when they were -- when they
12 came in.
13   Q.    (BY MR. TRINE) Well, did every detainee
14 have a separate medical chart in your office that was
15 locked up?
16   A.    Every detainee had their -- what they filled
17 out in a little folder in my office.  You know, the
18 little medical questionnaire.
19   Q.    That they filled out when they were booked
20 in?
21   A.    Right.  And I would assume that this was
22 done at the same time.  I don't know.
23   Q.    Okay.
24   A.    I had not ever seen one of these.
25       MR. SARGENT:  Bill, just so I'm clear, this

---

48

1 is not one for Mr. Carranza-Reyes, right?
2        MR. TRINE:  Obviously not.
3        MR. SARGENT:  I didn't know if I was missing
4 something.
5        THE DEPONENT:  I was going to say -- I don't
6 know.
7    Q.    (BY MR. TRINE) So your testimony is that
8 you would open a new file on every detainee that was
9 booked in and would keep that locked up in your file
10 cabinet?
11   A.    It would be a folder with their medical
12 information that they gave us in there, in the file
13 cabinet locked up, yes.
14   Q.    And someone else would stamp this stamped
15 information on the form?
16   A.    Evidently.
17   Q.    Now, did you understand from any source that
18 Dr. Bachman had a specialty, if you will, in altitude
19 sickness?
20   A.    No.
21   Q.    He never informed you of that?
22   A.    No.
23   Q.    Did he give you any specific information
24 about altitude sickness?
25   A.    No.

---

Pages 45 to 48

*  SUBJECT TO CONFIDENTIALITY DESIGNATIONS  *

Carranza-Reyes v. Park County                                          Vicki Ann Paulsen, R.N.

---

**61**

1  authorized pizzas and sodas all around tomorrow evening.
2  This is also excepting the above-mentioned disagreement
3  in D Pod."
4          Do you remember at times being informed in
5  advance of a DOC inspection that an inspection was going
6  to take place and everyone being asked to prepare for
7  that?
8      A.   No.
9      Q.   Were you ever present during a DOC
10  inspection?
11     A.   Yes.
12     Q.   And you're saying that you didn't receive
13  advance warning of that inspection?
14     A.   No. I was --
15     Q.   Do you ever remember seeing in the pass-on
16  reports information that an inspection was going to take
17  place and everyone should clean up and get ready for it?
18     A.   I don't recall that.
19     Q.   Do you remember that particular incident of
20  there being some disagreement in B Pod and everyone
21  preparing for the inspection except D Pod?
22         MS. LEWIS: Object to the form.
23     A.   I do not.
24     Q.   (BY MR. TRINE) And if you look at 3499, it
25  states, "We ran out of blues again while processing INS.

---

**62**

1  Some were put in stripes until laundry is done." Do you
2  remember there being times when there were so many
3  detainees in Pod D that they ran out of their blue
4  uniforms and they had to be put in other colored
5  uniforms?
6      A.   Um-hum. Yes.
7      Q.   And about how often did that happen?
8      A.   I can't tell you. I really don't know.
9      Q.   Do you know how many uniforms they had for
10  people in Pod D? How many blue uniforms?
11     A.   No, I do not.
12     Q.   Then if you'll refer to the pass-on record
13  for March 1, 2003 at Park 3502. And I'll represent to
14  you that March 1 was a Saturday. At the bottom it
15  indicates "Vicki is back at home," and it has the date
16  3/1/03. Do you see that?
17     A.   Yes.
18     Q.   And if you refer to Park 3503 on 3103,
19  indicating "Vickie called to let us know she'll be back
20  in Canon" -- "she will be in Canon City and can be
21  reached by cell and/or pager if an emergency arises."
22  Does that refresh your memory for what you were doing
23  commencing the week of March 1?
24     A.   I went to Canon to go grocery shopping.
25     Q.   And you would normally let people know where

---

**63**

1  you were going to be on weekends in case an emergency
2  should arise?
3      A.   Yes, or I'd tell them I'll be unavailable.
4      Q.   And apparently you also advised Graves -- do
5  you recall who Graves is?
6      A.   I don't recall.
7      Q.   To issue an inhaler to Santos-Flores, Jose,
8  INS, type, albuterol. Do you remember that incident?
9      A.   I do. The detainee had asthma, and he came
10  in without an inhaler.
11     Q.   And had just recently been admitted?
12     A.   Um-hum. Yes.
13     Q.   Then if you'll refer to 3514 -- and this is
14  on March 3, 2003, which would be a Monday.
15     A.   Correct.
16     Q.   And you indicate that you won't be in on
17  March 4 because of an appointment with a doctor?
18     A.   Yes.
19     Q.   Do you remember that?
20     A.   Yes.
21     Q.   And that night will have to pass out the
22  a.m. meds?
23     A.   Yes.
24     Q.   So you were not in on Monday, on the 4th?
25  Or I mean on Tuesday?

---

**64**

1      A.   I was not there all day.
2      Q.   On Tuesday, the 4th?
3      A.   Right.
4      Q.   And when you say nights will have to pass
5  a.m. meds, you're talking about the shift that would be
6  on duty after midnight?
7      A.   Yes.
8      Q.   And they would be passing off the meds
9  before they went off duty at 8:00 a.m.?
10     A.   Yes.
11     Q.   And do you remember whether you had an M.D.
12  appointment because of any illness you had at the time?
13     A.   I had oral surgery.
14     Q.   Okay. And were able to return to work on
15  the 5th?
16     A.   Yes.
17     Q.   Then if you look at Park 3517, which is a
18  March 4, 2003 entry by Sergeant Flint, and in the first
19  paragraph he indicates that "Inmate Herbert
20  Maprazo-Hazarlegos is complaining of serious pains in his
21  left side (D Pod). Recommend he see the nurse as soon as
22  possible." When you came on duty on the 5th, you would
23  have reviewed this; is that right?
24     A.   Um-hum, correct.
25     Q.   And do you remember that incident?

---

\* SUBJECT TO CONFIDENTIALITY DESIGNATIONS \*

Carranza-Reyes v. Park County                                      Vicki Ann Paulsen, R.N.

65

1    A.   Not -- no. I do not.
2    Q.   You don't remember that particular detainee?
3    A.   No, I do not.
4    Q.   Or what the problems were?
5    A.   No, I do not.
6    Q.   Do you know whether or not you saw that
7  particular detainee?
8    A.   I'm sure that I did. If there was someone
9  having a problem, I saw them.
10   Q.   And if you saw him, you would have made some
11  reference to your evaluation or assessment and what
12  treatment, if any, you rendered?
13   A.   Yes.
14   Q.   And that would have been placed in his
15  chart?
16   A.   Yes.
17   Q.   And not in these records because it's
18  confidential?
19   A.   Correct.
20   Q.   Then if you'll refer to Park 3523,
21  indicating -- and this is a memo to staff from Corporal
22  Guerrero?
23   A.   Correct.
24   Q.   And when did you first become acquainted
25  with Corporal Guerrero?

66

1    A.   When I started working there.
2    Q.   Okay. And in this memorandum, there's
3  reference to a fight occurring at 1:29 a.m. on the 6th;
4  is that right?
5    A.   Correct.
6    Q.   And do you remember getting a call that
7  night to come to the jail because of injuries arising out
8  of that fight?
9    A.   Yes, I do.
10   Q.   And who called you?
11   A.   I don't know if it was Deputy Fikejs. I
12  don't remember who was in control that night.
13   Q.   And approximately what time were you called?
14   A.   I don't know off the top of my head.
15   Q.   Well, why don't you describe what you do
16  recall about that night. What happened?
17   A.   They called because there had been an
18  altercation. The first call said that he had just had a
19  laceration of his head. I asked how bad it was, and it
20  wasn't all that bad, so we thought we could let it go
21  till morning because that --
22   Q.   "We thought"?
23   A.   I thought we could let it go till morning.
24  Lacerations don't have to be stitched immediately. And
25  then they called back, and he was having some more

67

1  problems, so I went in.
2    Q.   And do you know about what time you arrived?
3    A.   I can't tell you.
4    Q.   When you arrived, was Captain Gore present?
5    A.   Yes, he was.
6    Q.   And what was going on when you arrived?
7    A.   The inmate was in medical, and he was on my
8  exam table. Did an examination and sent him out.
9    Q.   And you apparently recommended that he be
10  taken to the emergency room by ambulance because of his
11  condition?
12   A.   Yes.
13   Q.   In that second paragraph, it states that
14  "The nurse was also called in per Captain. The nurse
15  will not be in" --
16   A.   This should be "later."
17   Q.   -- "later today. She will do 0700-hour meds
18  and prep all medications." What was going on that day so
19  that you wouldn't be in later?
20   A.   I stayed from the time I got there when they
21  called me until noon.
22   Q.   Okay. So because you were being called in
23  very early in the morning, you were only going to work
24  until noon and then go home?
25   A.   I worked eight hours, yes.

68

1    Q.   So you probably came in -- if you worked
2  eight hours and left at noon, you came in, then, at about
3  what time?
4    A.   Around 4:00.
5    Q.   Around 4:00 in the morning?
6    A.   Um-hum.
7    Q.   And the inmate who was transported by
8  ambulance, was that because you considered it to be an
9  emergency?
10   A.   Yes.
11   Q.   And there was ambulance service available
12  right there in town?
13   A.   Yes.
14   Q.   Just a few blocks from the jail?
15   A.   Yes.
16   Q.   So it would take an ambulance, what, no more
17  than five minutes to get there?
18   A.   Yes.
19   Q.   And then you also evaluated the inmate who
20  had been involved in that fight but not taken by
21  ambulance; is that right?
22   A.   Correct.
23   Q.   And I assume that your evaluations of each
24  of these notes and assessments and so forth was put in
25  their file?

Pages 65 to 68

*  SUBJECT TO CONFIDENTIALITY DESIGNATIONS  *

Carranza-Reyes v. Park County                                              Vicki Ann Paulsen, R.N.

69

1    A.   Correct.
2    Q.   And anything you had in the chart on these
3    inmates would have been -- copies would be provided to
4    the ambulance crew to take?
5    A.   Yes.
6    Q.   With the emergency --
7    A.   I would have written out -- I would not have
8    had time to go to the computer to put that in, but I
9    would have appraised them of the situation, of what had
10   happened.
11   Q.   And that information on each of these
12   inmates would be placed in their chart and would remain
13   confidential?
14   A.   Yes.
15       (Discussion off the record.)
16   Q.   If you'll refer, please, to Deposition
17   Exhibit 3, and I gather it's in that binder.  It's the
18   master control log.
19   A.   Okay.
20   Q.   And if you'll look in Deposition Exhibit 3
21   at Park 990, please.  And you see that the master control
22   log indicates that you were in the facility at 3:49 a.m.
23   on March 6?
24   A.   Correct.
25   Q.   And apparently the first thing you did was

70

1    begin checking Inmate Wheeler?
2    A.   Yes.
3    Q.   And he's the one that was eventually
4    transported to the hospital?
5    A.   Yes.
6    Q.   And after seeing him starting at about 3:50
7    in the morning, within six minutes you realized that he
8    had to be transported to the hospital; is that right?
9    A.   Yes.
10   Q.   And it indicates that he was going to be
11   transported to hospital per the nurse with the captain's
12   approval.  Did you feel that you had to first have the
13   captain's approval before he could be transported?
14   A.   No.
15   Q.   Apparently this was an inmate who they
16   discovered had a brain bleed and had to then be further
17   transported to the hospital in Denver?
18   A.   Correct.
19   Q.   And then if you look at Park 992 at 6:36
20   a.m., the other inmate was apparently taken to medical
21   for your evaluation; is that right?
22   A.   Right.  I did an anatomical on him.
23   Q.   Excuse me?
24   A.   I did an anatomical on both of them.
25   Q.   And what do you mean, "an anatomical"?

71

1    A.   It's a form that we use to show any injuries
2    or abrasions, that kind of thing.
3    Q.   And then at 9:24 a.m. on the 6th, if you
4    look at Park 993, it indicates "Five back to medical."
5    A.   Um-hum.
6    Q.   Do you see that?
7    A.   Yes.
8    Q.   And do you know why you were seeing five
9    people all at the same time at 9:24?
10   A.   They would bring them all back, sit them
11   back there, and I'd see them one at a time.
12   Q.   Do you remember that these were five people
13   from D Pod who were all sick?
14   A.   No, I do not.
15   Q.   Do you remember who these five people were?
16   A.   One of them was Mr. Carranza-Reyes.
17   Q.   Okay.  How do you know that?
18   A.   How do I know that?
19   Q.   Yeah.
20   A.   Because that's the day I saw him.
21   Q.   You know that from the chart that you had?
22   A.   I don't have the chart.
23   Q.   You know that from what you entered in the
24   computer?
25   A.   I know that because that's the day I saw

72

1    him.
2    Q.   Okay.  Describe the other four people you
3    saw on that day.
4    A.   I cannot describe them.
5    Q.   Do you know their names?
6    A.   I do not.
7    Q.   Do you know what their problem was?
8    A.   I don't recall.
9    Q.   Do you know whether they were all INS
10   detainees?
11   A.   I do not recall.
12   Q.   How is it you remember that particular
13   morning with Carranza-Reyes?
14   A.   Because after the fact, he became ill.
15   Q.   And looking again at page 993 at 10:10 a.m.
16   on the 6th, someone had chest pain in D Pod and was taken
17   to medical.  Do you remember that person?
18   A.   No.
19   Q.   Or what treatment might have been rendered?
20   A.   No.
21   Q.   Or name?
22   A.   No.
23   Q.   Have any memory of that incident at all?
24   A.   No.
25   Q.   Then on that same page, 993, at 1400 hours

Pages 69 to 72

*  SUBJECT TO CONFIDENTIALITY DESIGNATIONS  *

129

```
1      A.    No, I did not.
2      Q.    -- about Carranza-Reyes?
3      A.    No, I did not.
4      Q.    So your only contact was that one call
5  between 8:00 and 9:00 in the morning?
6      A.    Correct.
7      Q.    And you never talked to anyone after that?
8      A.    No.
9      Q.    To this day?
10     A.    No.
11     Q.    Now, if you'll refer to 3543 in Exhibit 21.
12 Or actually I guess it starts in 3542. Okay. This is a
13 nurse report, 3/8/03, and this is the nursing report we
14 were earlier referring to; is that right?
15     A.    Yes.
16     Q.    And it's dated March 8, '03, and did you
17 print this?  Is this a print-off of a computer entry?
18     A.    Yes.
19     Q.    When did you make these entries on the
20 computer?
21     A.    I made them late afternoon.
22     Q.    Late afternoon?
23     A.    On the 8th.
24     Q.    Of the 8th?
25     A.    I was at home.  I made them at home on the
```

130

```
1  8th.
2      Q.    On your computer?
3      A.    Yes.
4      Q.    Not the computer at Park County?
5      A.    No.
6      Q.    And that was about what time?
7      A.    I don't know what time it was.
8      Q.    Well, the last time of an entry on Park 3543
9  is 2300 hours.
10     A.    Right.  And I believe I added that after.
11     Q.    Well, what part of these entries did you do
12 earlier?
13     A.    Up to 1430.
14     Q.    Why did you draft this nurse report?
15           MS. LEWIS: Objection, asked and answered.
16 Go ahead and answer again.
17     A.    I -- I guess it comes from a DOC
18 perspective.  You just document everything.  Still do to
19 this day.
20     Q.    (BY MR. TRINE) Did you decide to document
21 everything in a nurse report when you learned that
22 Carranza-Reyes, in fact, had been diagnosed at Summit
23 County with pneumonia and sepsis?
24           MS. LEWIS: Object to the form.
25     A.    No.
```

131

```
1      Q.    (BY MR. TRINE) And was in critical
2  condition?
3      A.    No.
4      Q.    Did you decide to draft this report when you
5  learned that he had been transported to the hospital and
6  might not live?
7            MS. LEWIS: Object to the form and
8  foundation.
9      A.    No.
10     Q.    (BY MR. TRINE) Did you feel that all of
11 those facts would be important and that you would have to
12 draft a report that would explain what happened at the
13 jail?
14     A.    I felt that it was important in the fact
15 that Captain Gore had asked me what happened that day.
16     Q.    When did Captain Gore ask you what had
17 happened?
18     A.    That was on Monday, I believe, when I went
19 back to work.  He had called me, but we -- he talked to
20 me about it after that.
21     Q.    When did he call you?
22     A.    He called me at 11 o'clock that night.
23     Q.    On the 8th?
24     A.    Yes.
25     Q.    At home?
```

132

```
1      A.    Yes.
2      Q.    And what did he tell you?
3      A.    He told me that Mr. Carranza-Reyes was in
4  critical condition at Denver General.
5      Q.    What else did you discuss?  Did he ask you
6  to document what had happened that day?
7      A.    No. No.
8      Q.    Why was he calling you at 11 o'clock at
9  night?  Did he say?
10     A.    He called me at all hours, so it was not out
11 of the ordinary.
12     Q.    Did he tell you why he was calling you at 11
13 o'clock at night?
14     A.    To inform me of Mr. Carranza-Reyes'
15 condition.  I assume.
16     Q.    Did Captain Gore seem to be upset?
17     A.    I guess he was upset.
18     Q.    Did he ask you why he hadn't been treated
19 earlier?
20           MS. LEWIS: Object to the form.
21     A.    He asked me if we had treated him at Park
22 County.
23     Q.    (BY MR. TRINE) Okay.  And what did you tell
24 him?
25     A.    I told him yes.
```

133

1    Q.    And did he ask you about the treatment?
2    A.    No, he didn't.
3    Q.    Did he ask you any questions about what his
4  condition had been and what treatment you'd rendered?
5    A.    No, he didn't.
6    Q.    He just wanted to know if you'd actually
7  treated him?
8    A.    Yes.
9    Q.    Did he indicate what he was upset about?
10 You said he acted somewhat upset.
11   A.    He did not indicate to me why.
12   Q.    How could you tell he was upset?
13   A.    Just his voice, you know. I mean just the
14 tone of his voice.
15   Q.    Did you tell him that you would document
16 everything you did that day in a nurse report?
17   A.    Did I tell him I would?
18   Q.    Yes.
19   A.    I didn't say anything about it.
20   Q.    Why did you --
21   A.    At 11 o'clock at night I would not state to
22 him that I was going to document everything.
23   Q.    Okay. But did you tell him you'd already
24 started documenting everything?
25   A.    No. I didn't say anything to him about it.

134

1    Q.    Okay. Now, when did you place this nurse
2  report in Carranza-Reyes' file?
3    A.    I believe it was Monday morning so I would
4  have it there at the office.
5    Q.    And this is also a privileged document,
6  isn't it, containing all of the treatment you rendered
7  and your assessments?
8         MS. LEWIS:  Object to the form of the
9  question.
10   A.    Yes.
11   Q.    (BY MR. TRINE) So how did it get in the
12 pass-on records, which is a public document that all the
13 people at the jail can see?
14   A.    I do not know, sir.
15   Q.    You didn't place it in the pass-on record?
16   A.    No, I would never place this in the pass-on.
17   Q.    Did you ask someone to?
18   A.    No.
19   Q.    Did anyone tell you they were going to put
20 it in the pass-on record?
21   A.    No. And I never saw it in the pass-on
22 records.
23   Q.    So that when you continued to come to work
24 in the days that followed, it was not in the pass-on
25 records; is that right?

135

1    A.    No, it was not.
2    Q.    Is it your testimony that all entries on
3  both pages, 3542 and 3543, were made by you on March 8,
4  '03?
5    A.    Yes.
6    Q.    And not at some later date?
7    A.    No.
8         MS. LEWIS:  Do you need a break?
9         THE DEPONENT:  I need a break.
10        MR. TRINE:  You want a short break?
11        MS. LEWIS:  Yeah.
12        MR. TRINE:  Let's do it.
13        (Break from 1:56 p.m. to 2:10 p.m.)
14   Q.    (BY MR. TRINE)  I've just handed you what
15 has been marked as Deposition Exhibit 24, which are
16 Summit Medical Center records on Carranza-Reyes, and have
17 you had an opportunity prior to today to review these
18 records?
19   A.    No.
20   Q.    I'll refer you first to Bates Stamp 4, which
21 is the initial emergency room record. Do you see that?
22   A.    Yes.
23   Q.    And the stamps are at the lower right-hand
24 corner.
25   A.    Okay.

136

1    Q.    And it indicates that he's being seen in the
2  emergency room at 12:45 on March 8. Do you see that in
3  the upper left-hand corner?
4    A.    Yes.
5    Q.    And apparently they weren't able to get a
6  complete blood pressure, do you see that, 66 slash
7  nothing?
8    A.    Yes.
9    Q.    What would that indicate to you?
10   A.    They didn't hear a diastolic on him.
11   Q.    They couldn't hear a diastolic blood
12 pressure?
13   A.    Right.
14   Q.    And the pulse at that time now is 126, which
15 is very elevated; is that right?
16   A.    Correct.
17   Q.    Respiration is 24, slightly elevated?
18   A.    Correct.
19   Q.    And O2 saturation apparently is 91 percent?
20   A.    Correct.
21   Q.    Now, under Chief Complaint, it indicates
22 vomiting, possible kidney stone, and you didn't phone
23 that information in, did you?
24   A.    No.
25   Q.    Do you remember what information you did

Pages 133 to 136

*  SUBJECT TO CONFIDENTIALITY DESIGNATIONS  *

---

137

1  phone in now when you called between 8:00 and 9:00 in the
2  morning?
3     A.   That he had side pain, that I'd seen him two
4  days, and his symptoms were headache, nausea, vomiting,
5  congestion, sore throat.
6     Q.   Under the triage assessment, it indicates
7  that for three days the patient -- can you interpret
8  that? Three days, patient -- right-sided chest pain?
9  Does CP stand for chest pain?
10    A.   Yeah.
11    Q.   And fever. Now, if he had been complaining
12 of right-sided chest pain for the previous three days, on
13 the 5th, 6th, and 7th, were you ever made aware of that?
14    A.   No, not right-sided chest pain.
15    Q.   Now, would right-sided chest pain be
16 consistent with pneumonia in the right lung as well as
17 accumulation of fluid in the right lung?
18    A.   Possibly, yes.
19    Q.   And do you know what the N in VND stands
20 for?
21    A.   Nausea, vomiting and diarrhea.
22    Q.   So for three days -- at least they're being
23 told in the emergency room that for three days he had
24 right-sided chest pain, fever, nausea, vomiting and
25 diarrhea; is that correct?

---

138

1     A.   Correct.
2     Q.   And apparently he was taken to the restroom
3  and was unable to void; is that correct?
4     A.   Correct.
5     Q.   And that would mean what? That he's
6  dehydrated?
7     A.   Possibly, yes.
8     Q.   Then under Skin, they checked off that he's
9  both pale and jaundiced, and do you remember his being
10 both pale and jaundiced when you saw him that morning?
11    A.   He was pale. I didn't notice jaundice.
12    Q.   And for chest discomfort, they indicate
13 again that he'd been having chest discomfort or pain for
14 three days. Do you see that under Cardiopulmonary?
15    A.   Yes.
16    Q.   And under Abdominal Pain had had right-sided
17 abdominal pain for three days; is that correct?
18    A.   I see that.
19    Q.   And you had actually discovered that he had
20 some abdominal pain on the 6th and 7th; is that right?
21    A.   He had some tenderness.
22    Q.   And as you become septic, if organs start to
23 fail, you can have abdominal pain; is that right?
24    A.   You can -- that can be a number of things,
25 not just sepsis.

---

139

1     Q.   Then under the Neuro, it indicates that --
2  they checked off headache, dizziness, light-headed. You
3  see that?
4     A.   Um-hum. Yes.
5     Q.   And he had had headaches when you saw him?
6     A.   Yes.
7     Q.   And had he complained of dizziness?
8     A.   He did not complain of dizziness to me. He
9  said he had a headache.
10    Q.   Now, do you recall one of the deputies
11 informing you that he saw Carranza-Reyes with blankets
12 wrapped around him and was chilled on the upper tier and,
13 as he was coming down the stairs, couldn't make it all
14 the way and had to sit for a while?
15         MS. LEWIS: Object to the form and
16 foundation.
17    Q.   (BY MR. TRINE) Do you remember hearing that
18 from any deputy?
19    A.   No, I do not remember that.
20    Q.   And did he have blankets wrapped around him
21 when he was on the upper tier when you watched the deputy
22 assist him downstairs?
23    A.   He had a blanket over him.
24    Q.   Around his shoulders?
25    A.   Over him.

---

140

1     Q.   And did he appear to you to be chilled?
2     A.   I can't say that he appeared to be chilled.
3     Q.   You don't remember one way or the other?
4     A.   No.
5     Q.   Then at the very bottom of that page,
6  there's some handwritten information indicating that they
7  noted an increased shortness of breath; is that right?
8     A.   Correct.
9     Q.   And in listening to his lungs, he had rales?
10    A.   I see that.
11    Q.   And they apparently drew blood for labs at
12 that time, is that right, and sent him to --
13    A.   Yes.
14    Q.   And sent him for a chest X-ray?
15    A.   Yes.
16    Q.   Apparently sent him to a chest X-ray at 1410
17 hours? That would be 2:10 p.m.?
18    A.   Yes.
19    Q.   And he continued to have a reduced blood
20 pressure. Do you see that? Continued to have a
21 reduction in blood pressure?
22    A.   Right, decrease.
23    Q.   But was able to stand?
24    A.   Right. And then a blood pressure increase.
25    Q.   And the blood pressure increased when they

---

* SUBJECT TO CONFIDENTIALITY DESIGNATIONS *

141

1  gave him IV fluids, right?
2      A.   Yes.
3      Q.   So that he'd been dehydrated?
4      A.   Yes.
5      Q.   Then they got the results of the chest X-ray
6  on page 5 of Exhibit 24, indicating that he had extensive
7  consolidation of the right middle lobe and likely the
8  right lower lobe, and there was some minimal patchy
9  infiltrate likely present in the left base, the left
10 lobe. Do you see that?
11     A.   Yes.
12     Q.   And they did a blood test that eventually
13 cultured out -- if you look at page 9 -- that cultured
14 out to be gram-positive cocci in chains?
15     A.   Yes.
16     Q.   And that would indicate to you, together
17 with his other clinical -- together with the other
18 clinical observations that he had at least bacteremia?
19         MS. LEWIS: Object to the form of the
20 question.
21     A.   Possibly, yes.
22     Q.   (BY MR. TRINE) Well, if he had gram-
23 positive cocci in chains in the bloodstream, that would
24 indicate septicemia, wouldn't it?
25     A.   Yes.

142

1      Q.   I'm sorry?
2      A.   Yes.
3      Q.   And then if you look at page 13, lab results
4  from the complete blood count, the elevated bands with
5  low lymphocytes and the seg neutrophils being low would
6  all indicate that he had a shift to the left that would
7  be also consistent with septicemia; is that right?
8      A.   That's correct.
9      Q.   And what significance do you attach as a
10 nurse to his low platelet count?
11     A.   Where is that?
12     Q.   118.
13     A.   He has an infection, a massive infection,
14 and his platelet count is terribly low.
15     Q.   The platelet count continues to drop as you
16 are starting to go into septic shock; isn't that right?
17     A.   Right. Correct.
18     Q.   And if you look at page 14, the abnormal lab
19 results you see there with the high creatinine and low
20 potassium, all of that is consistent with a septicemia,
21 isn't it?
22     A.   Correct.
23     Q.   Then looking at page 2, under Chief
24 Complaint at the top, when he arrived at the Summit
25 Medical Center, it indicates that he was complaining of

143

1  right pleuritic nonradiating chest pain, and what is
2  right pleuritic nonradiating chest pain?
3      A.   That would be in the lung area.
4      Q.   In the lung area. And pleuritic, meaning in
5  the lung area?
6      A.   Yes.
7      Q.   And indicates that there had been multiple
8  episodes of vomiting for three days prior to that, and
9  you were aware of that, weren't you?
10     A.   Over two days. For one day and one evening.
11 One night.
12     Q.   So you weren't aware of the vomiting he was
13 doing over a period of three days?
14     A.   No.
15     Q.   And indicates he had had mild cold symptoms
16 for the past week?
17     A.   Yes.
18     Q.   Did you ever see him early on for cold
19 symptoms?
20     A.   I saw him on the 6th and 7th.
21     Q.   Now, there's an indication in the record
22 that there were several detainees in Pod D who seemed to
23 have flu symptoms on the 4th. Was that ever called to
24 your attention?
25     A.   I believe it was.

144

1      Q.   And you would have no way of knowing whether
2  Carranza-Reyes was one of those detainees with flu
3  symptoms on the 4th?
4      A.   Not by name, no.
5      Q.   No one called that to your attention on the
6  4th?
7      A.   I was not there on the 4th.
8      Q.   Okay. Did anyone call that to your
9  attention when you arrived on the 5th?
10     A.   Yes, I believe that -- and I'm sure that
11 those are some of the five that I saw.
12     Q.   You think those are some of the five you saw
13 on the 5th?
14     A.   Yes.
15     Q.   So you think that the inmates that had flu
16 symptoms on the 4th included Carranza-Reyes; is that
17 right?
18         MS. LEWIS: Object to the form.
19     A.   As far as -- I mean, I wouldn't know. I
20 don't know the names of those that had . . .
21     Q.   (BY MR. TRINE) I thought you said that the
22 ones that were complaining on the 4th, you thought you
23 saw on the morning of the 5th.
24     A.   If I had someone who was ill and
25 complaining, I would have seen them the next day.

Carranza-Reyes v. Park County                                                    Vicki Ann Paulsen, R.N.

145

1    Q.   And you saw five people the next day?
2    A.   I did.
3    Q.   In the morning?
4    A.   Yes.
5    Q.   And you now believe one of them was
6  Carranza-Reyes?
7    A.   I don't know that. I don't believe I saw
8  him on Wednesday.
9    Q.   Okay. Then if you look at the bottom of
10  page 2, it indicates that his O2 saturation was 91
11  percent when he was on oxygen by mask, right?
12   A.   Right.
13   Q.   So it would be much lower than that if it
14  was on --
15   A.   Room air.
16   Q.   On room air?
17   A.   Correct.
18   Q.   And then the X-ray, of course, showed the
19  large right middle lobe and right lower lobe pneumonia,
20  and if you look at page 3 of that Exhibit 24, it
21  indicates that the EKG that they took was abnormal, and
22  that's also typical of someone with sepsis to have an
23  abnormal EKG; is that right?
24   A.   Correct.
25   Q.   Did you ever consider performing an EKG on

146

1  Carranza-Reyes while he was at Park County?
2    A.   No, I didn't.
3    Q.   And under Discussion, it says, "Medical
4  records unavailable." You had not made any arrangements
5  to have any of your charting or medical records delivered
6  with the transport; is that right?
7    A.   That's correct.
8    Q.   Now, under Diagnosis, it indicates right
9  middle lobe and right lower lobe pneumonia, sepsis and
10  hypokalemia, and what do you understand hypokalemia to
11  be?
12   A.   Potassium.
13   Q.   And with low potassium, if it gets too low,
14  that's life-threatening, isn't it?
15   A.   That's right.
16   Q.   And the elevated creatinine and abnormal
17  chemistries that you looked at were all consistent with
18  sepsis?
19   A.   Correct.
20        MS. LEWIS: Object to that last question.
21        MR. TRINE: Excuse me?
22        MS. LEWIS: I'm interjecting an objection as
23  to the form of that last question.
24   Q.   (BY MR. TRINE) Now, on page 2, on
25  examination of the lungs, it indicates that on the right

147

1  side, rales were auscultated, and what do you understand
2  rales to be?
3    A.   Noise, just very noisy.
4    Q.   And you would expect that if you've got
5  pneumonia with fluid building up, wouldn't you?
6    A.   Yes.
7    Q.   And it also indicates bilateral rhonchi
8  auscultated. What's the difference between rales and
9  rhonchi?
10   A.   Rhonchi are more wheezes, rales are more --
11  how do you -- rubs. Noisy.
12   Q.   But you didn't examine him on the morning of
13  the 8th to determine whether or not he had rales or
14  rhonchi or wheezes in breathing; is that right?
15   A.   I believe I listened to his chest, yes. I
16  listened to his back.
17   Q.   Earlier when I asked you, you said that you
18  palpated his back --
19   A.   And groin area, yes.
20   Q.   -- around to the front, and I asked if you
21  conducted any other examination in addition to that,
22  vitals, anything, and you said no. Do you remember now
23  that you listened to his lungs?
24   A.   I cannot say for sure.
25   Q.   You don't believe that he developed

148

1  pneumonia and sepsis after leaving the jail on his ride
2  to Summit County, do you?
3    A.   I don't know.
4    Q.   Well, in retrospect, looking at these
5  medical records?
6    A.   No.
7    Q.   You know now he had pneumonia and sepsis
8  while he was in jail; isn't that right?
9         MS. LEWIS: Object to form.
10   Q.   (BY MR. TRINE) Correct?
11   A.   Correct.
12   Q.   Thank you. And you know now that his
13  symptoms commenced at least by the time you saw him the
14  first time; is that right?
15        MS. LEWIS: Object to the form.
16   A.   He had symptoms but not symptoms of
17  pneumonia.
18   Q.   (BY MR. TRINE) And least you weren't aware
19  of them? In other words, he says he'd had shortness of
20  breath for three days, he had had chest pain on the right
21  side for three days before he came there. Would that
22  indicate to you that he probably had pneumonia for three
23  days?
24        MS. LEWIS: Object to the form.
25   A.   He did not indicate to me that he had

Pages 145 to 148

*  SUBJECT TO CONFIDENTIALITY DESIGNATIONS  *

181

1    A.   Yes.
2    Q.   And you did that on your own or through
3  Monte Gore? Who authorized you to do that?
4    A.   No. Monte.
5    Q.   Monte Gore did?
6    A.   Yeah.
7    Q.   Then on March 26 at 8:55 p.m., Laura Bublef
8  charted, "Will update Vicki Paulsen, R.N., Park County,
9  regarding status and discussion of rehab needs. Will
10 update team if there is any alternative with payer
11 source." Do you recall what that was about. a discussion
12 regarding rehab needs?
13   A.   No. I think that we -- down the road I was
14 asking, you know, what comes next when he's better or
15 whatever happens, and she said that he would be going to
16 rehab.
17   Q.   And there were two or three additional calls
18 with Laura Bublef indicating that the discussion was
19 regarding rehab options. Do you recall what that was
20 about?
21   A.   I don't recall what that was about.
22   Q.   And also requested by Vicki Paulsen to allow
23 Captain Gore to discuss patient with INS and not to call
24 updates directly to them until we hear from Captain Gore.
25 Did there come a time when you understood that Denver

182

1  Health would be dealing directly with the INS and no
2  longer communicating with you about Carranza-Reyes?
3    A.   I didn't -- I didn't get that. No, I
4  didn't.
5    Q.   Then on April 8, at 8:50 a.m., another
6  nurse. a Laura Buklegum, B-u-k-l-e-g-u-m, Buklegum, R.N.,
7  had a conversation with you. Does that name sound
8  familiar?
9    A.   No.
10   Q.   And provided you with a clinical update.
11 Okay. You don't remember that?
12   A.   I don't remember. I mean, I remember
13 getting updates but not the name.
14   Q.   And then there were several additional calls
15 you had with this Laura Buklegum. But you were
16 continuing to get updates?
17   A.   Right.
18   Q.   Why was that?
19   A.   Because I was concerned about him.
20   Q.   Did you have any additional conversations
21 with anyone at INS about Carranza-Reyes after March the
22 8th or 9th?
23   A.   I don't recall if I did or not. I don't
24 remember having any, but that's not -- I don't recall.
25   Q.   What was your understanding of who

183

1  ultimately was going to be responsible for the bills
2  being incurred at Denver Health?
3    A.   To begin with, Park County. and then it was
4  to be signed over to INS. and that's all I was told.
5    MR. TRINE: Let's take a short break. It's
6  about time for me.
7    THE DEPONENT: Let's go to 4:00. My husband
8  will be here at 4:00.
9    MR. TRINE: You want to go to 4:00?
10   THE DEPONENT: My husband will be here at
11 4:00.
12   MR. TRINE: Let's do that.
13   Q.   (BY MR. TRINE) Why don't you now refer to
14 Exhibit 4 that's in the binder. And it's also identified
15 by Bates stamp as Park 550 through 694, and these were
16 furnished to us by the jail and represented as being the
17 policies and procedures that were in effect in 2003. Are
18 these the policies and practices that you became familiar
19 with when you became employed there?
20   A.   Yes.
21   Q.   How soon after you became employed did you
22 familiarize yourself with this document or --
23   A.   The first week I was there.
24   Q.   And did you review the policies and
25 procedures with anyone else or ask questions about them?

184

1    A.   No. I read them myself.
2    Q.   And were they similar to what you were
3  familiar with in working for the DOC?
4    A.   Similar. Similar.
5    Q.   If you'll refer, please, to 555, which
6  relates to the responsible health authority and indicates
7  that there will be a health services administrator and a
8  responsible physician, was it your understanding that you
9  were serving as the health services administrator?
10   A.   No.
11   Q.   Do you know who was serving as the health
12 services administrator?
13   A.   No.
14   Q.   Do you know whether there was a health
15 services administrator?
16   A.   I do not.
17   Q.   It indicates a responsible physician is a
18 physician who supervises the medical judgments regarding
19 the care provided to patients at this facility. This
20 role is also known as the medical director. When you
21 first reviewed this, you assumed, I guess, that Dr.
22 Bachman was the responsible physician, correct?
23   A.   Yes.
24   Q.   Did you ever ask anyone who the health
25 services administrator was?

*  SUBJECT TO CONFIDENTIALITY DESIGNATIONS  *

Carranza-Reyes v. Park County                                           Vicki Ann Paulsen, R.N.

---

185

1    A.    No, I didn't.
2    Q.    It states under Policy that the health
3  services administrator is routinely on-site at least 40
4  hours per week and is responsible for health care
5  services pursuant to a written agreement, contract or job
6  description, and you don't believe that was you?
7    A.    Evidently it was.
8    Q.    You don't know of anyone else that was doing
9  that?
10   A.    No.
11   Q.    That's what you were doing, right?
12   A.    That's right.
13   Q.    It states also under Policy that the health
14 services administrator, as the responsible health
15 authority for the Park County Jail is responsible for all
16 clinical, ancillary and operational aspects of the jail's
17 health care services, including arrangements for all
18 levels of health care and ensuring of quality and
19 accessibility of all health services provided to
20 patients," and that's essentially also what you were
21 doing; is that right?
22   A.    Right.
23   Q.    And under Procedure at the bottom Procedure,
24 it states that the health services administrator, in
25 cooperation with the responsible physician, is

---

186

1  responsible for the development and implementation of all
2  programs and practices related to jail medical services.
3  All final medical judgments rest with the responsible
4  physician, and was that your understanding?
5    A.    Yes.
6    Q.    And if you look at Park 558, Exhibit 4,
7  under Policy, second paragraph, it states, "The health
8  service administrator shall record minutes of
9  administrative infection control and continuous quality
10 improvement meetings," and did you attend such meetings
11 and record minutes of those meetings?
12   A.    No, I did not.
13   Q.    Was there an infection control committee
14 that you served on?
15   A.    No.
16   Q.    To your knowledge, was there ever an
17 infection control committee at the Park County Jail?
18   A.    I do not know.
19   Q.    Was there a continuous quality improvement
20 committee?
21   A.    Not to my knowledge.
22   Q.    You didn't serve on a committee like that?
23   A.    No.
24   Q.    It states in that next paragraph that the
25 health services administrator shall produce on a monthly

---

187

1  basis a statistical report indicative of the health
2  unit's activities. Did you supply a report like that on
3  a monthly basis outlining your activities for the month?
4    A.    No, I did not.
5    Q.    Were you ever requested to do that?
6    A.    No.
7    Q.    And then the next paragraph states, "A
8  statistical report shall be prepared monthly and compiled
9  again annually to track the number of inmates receiving
10 health services. At a minimum this report shall include
11 the following," then there's a whole list of items.
12   A.    Correct.
13   Q.    Did you ever see such a report?
14   A.    No, I did not.
15   Q.    Were you ever asked to compile such a
16 report?
17   A.    No, I was not.
18   Q.    When you became familiar with this document,
19 did you question anyone about these committees and
20 whether they existed and whether you should be serving on
21 them?
22   A.    No, I didn't.
23   Q.    Do you remember what your thought process
24 was when you reviewed this for the first time? Did you
25 wonder if such committees existed?

---

188

1    A.    Yes.
2    Q.    Did you ask anyone?
3    A.    No, I did not.
4    Q.    Was it your understanding from having worked
5  with the DOC and then at Park County that the DOC
6  required that Park County have these policies and
7  procedures in effect before they would contract with Park
8  County?
9    A.    Yes.
10   Q.    Was that of concern to you, knowing that and
11 finding out that these committees didn't exist?
12   A.    Yes.
13   Q.    But you didn't talk to anyone about that or
14 mention it?
15   A.    I believe I asked about it, and nothing was
16 said to me.
17   Q.    Did Monte Gore at any time tell you that
18 they simply enacted these policies and procedures in
19 order to get DOC business and didn't intend to follow
20 them?
21   A.    No, he never told me that.
22   Q.    Do you know whether the INS requested that
23 Park County have a policy and procedure manual before
24 they would contract with Park County?
25   A.    No, I do not.

---

Pages 185 to 188

*  SUBJECT TO CONFIDENTIALITY DESIGNATIONS  *

189

1   Q.   Then if you'll look at 559, and 560, this
2   apparently is the policies and procedures for the
3   continuous quality improvement program, and down at the
4   bottom of that page it indicates that that committee,
5   which meets biannually, should be composed of the
6   following personnel, and it lists the responsible
7   physician, the health service administrator and others,
8   including the infection control committee.
9        To your knowledge, there was no such
10  committee, right?
11  A.   Not to my -- I was not aware of it.
12  Q.   During time you were at Park County, did you
13  serve on any committee of any kind?
14  A.   No.
15  Q.   And then on Park 560, in discussing the
16  functions of this continuous quality improvement
17  committee, it indicates what the members of the committee
18  were to do, and do you see the paragraph partway down
19  starting with "Status and discussion concerning
20  monitors" --
21  A.   Yes.
22  Q.   -- "relative to the delivery of health care
23  and are included in each meeting of the committee are the
24  following," that in each meeting of that committee, they
25  would receive a report from the infection control

190

1   committee as well as inmate patient grievances concerning
2   health care and off-site medical care, including
3   transportation, and are you telling me you never
4   participated in any committee meetings where that sort of
5   thing was discussed?
6   A.   No.
7   Q.   If you look at Park 574, Exhibit 4, which is
8   the policies and procedures for the infection control
9   program, it states that the infection control program --
10  this is under Procedure.  "The infection control program
11  will be the responsibility of the medical director and
12  assisted by the health service administrator," and "The
13  program will include, but is not necessarily limited to
14  regular review of environmental inspection conducted by
15  the facility maintenance officer and other inspections
16  conducted by other agencies, including outside agencies."
17       Did you participate in reviewing those
18  inspections?
19  A.   No, I did not.
20  Q.   Four paragraphs down under Procedure, it
21  states, "Within three days of incarceration, all inmates
22  will be evaluated for tuberculosis and sexually
23  transmitted diseases.  Positive findings will be reported
24  by the health service administrator/infection control
25  nurse immediately.  The infection control program nurse

191

1   will notify the appropriate health department and will
2   consult with the staff physician for further orders."
3        Was that something you routinely did?
4   A.   Tuberculosis but not sexually transmitted
5   diseases.
6   Q.   And then the last paragraph on that page
7   indicates, "As inmates are in close proximity to each
8   other, the need to identify and treat infection, and to
9   prevent its spread from one individual to another, must
10  be part of the infection control program.  This should
11  include using the intake screening and screen inmates for
12  infectious diseases upon admission to the facility and
13  treatment of inmates who show evidence of infection."
14  Were you doing that?
15  A.   Screening?
16  Q.   For infection.
17  A.   Yes.
18  Q.   For anything other than TB?
19  A.   Anybody that came in, if they might behave
20  like they were ill, they were screened.
21  Q.   If someone was showing signs and symptoms --
22  A.   Yes.
23  Q.   -- of an infection?
24  A.   Yes.
25  Q.   Then you would screen them?

192

1   A.   Yes.
2   Q.   And it states that provision for appropriate
3   infirmary isolation according to type of infection should
4   be available.  And did you have provisions where people
5   could be quarantined or isolated?
6   A.   If the segregation cells were empty, I could
7   use those.
8   Q.   And if they were full, you couldn't?
9   A.   I didn't have a place.
10  Q.   And if you'll refer to 599, please, it
11  indicates "Nursing staff will conduct medication pass in
12  the housing pods at least three times a day," and you
13  were doing that; is that right?
14  A.   Yes.
15  Q.   And that would be normally at what hours?
16  A.   It would be at around -- just before 7:00
17  and just before 2:00, and in the evening I prepared the
18  meds, and the officers passed them, and I think it was
19  around 6:00.
20  Q.   And then if you look at 602 of Exhibit 4, it
21  indicates in that second paragraph under Policy that the
22  Park County Jail will maintain a contract for the
23  processing of lab results, and in the next paragraph, it
24  indicates that the contract is with LabCorp.  Is that the
25  lab that you were sending blood to for lab results?

* SUBJECT TO CONFIDENTIALITY DESIGNATIONS *

Carranza-Reyes v. Park County

Vicki Ann Paulsen, R.N.

---

193

1    A.    That's the lab I initiated services with,
2    yes.
3    Q.    And that was located where?
4    A.    That's here in Denver.
5    Q.    In Denver?
6    A.    Yes.
7    Q.    And it states that Timberline Clinic will
8    manage the processing of lab work. Where was Timberline
9    Clinic located?
10   A.    That's in Fairplay.
11   Q.    So how would that work? You would give the
12   blood to Timberline Clinic?
13   A.    No. I used LabCorp exclusively. Timberline
14   did not want to process that any longer, so I used
15   LabCorp.
16   Q.    Timberline wasn't involved --
17   A.    No.
18   Q.    -- when you were there?
19   A.    No.
20   Q.    In that next paragraph, it talks about the
21   service being provided by Timberline Clinic, Silverheels
22   Clinic and/or Summit Medical Center. Did you ever use
23   Silverheels Clinic?
24   A.    I never used Timberline or Silverheels
25   because they did not want to do radio -- I mean do X-rays

---

194

1    anymore.
2    Q.    Okay. So for X-rays, you would use Summit?
3    A.    Summit, yes.
4    Q.    Then if you look at 603, toward the bottom
5    of that page, 603, it talks about the nurse or physician,
6    upon assessment of need, will determine the need for
7    emergency room care and/or hospitalization.
8    A.    Um-hum.
9    Q.    And in that next paragraph states, "The
10   nurse will need to determine the appropriate receiving
11   hospital and mode of transport." Did you understand it
12   was up to you to decide whether or not an ambulance
13   should be used as opposed to a jail vehicle to transport
14   inmates?
15   A.    Yes. Yes.
16   Q.    And you had the authority to make that
17   decision?
18   A.    Yes.
19   Q.    And the next paragraph indicates, "The nurse
20   will call the receiving facility and give a complete
21   telephone report to a receiving nurse. The telephone
22   report will include the nature of the illness or injury,
23   the medical history of the patient, including allergies,
24   vital signs, physical findings, treatment rendered and
25   the estimated time of arrival," and I believe that you

---

195

1    stated that you did do that with Carranza-Reyes between
2    8:00 and 9:00 in the morning on the 8th; is that right?
3    A.    Yes.
4    Q.    But you don't know who you talked to?
5    A.    I don't know who I talked to.
6    Q.    Would you have expected the person you
7    talked to to have taken notes and recorded that
8    information?
9    A.    They should have put it down somewhere, yes.
10   Q.    And would you expect it to be in the
11   patient's Summit County files that we looked at?
12   A.    I would assume it should be, yes.
13   Q.    Okay. There's no indication in there --
14   A.    No indication?
15   Q.    -- of any conversation with you, but you
16   believe that there was such a conversation?
17   A.    Yes, I do.
18         MR. TRINE: It's about two or three minutes
19   to 4:00. Off the record.
20         (Discussion off the record.)
21         (Break taken from 3:58 p.m. to 4:08 p.m.)
22   Q.    (BY MR. TRINE) If you'll refer now to page
23   614 of Exhibit 4, which is the policy and procedure for
24   handling of inmate medical request forms, and were these
25   forms available when you were there for inmates to fill

---

196

1    out for medical requests?
2    A.    Yes.
3    Q.    And did you have a form in Spanish at that
4    time?
5    A.    Yes.
6    Q.    Or were all the kites in English?
7    A.    I thought we had both. I mean . . .
8    Q.    Do you remember there being a period of time
9    when they were in English, and a request was made for
10   forms in Spanish?
11   A.    No, I don't. I don't remember that.
12   Q.    And if you look at 617, please, which is the
13   policies and procedures for emergency services, and the
14   next-to-last paragraph on page 617 indicates that while
15   awaiting the arrival of an ambulance and/or other EMS
16   response, a nurse will assume on-site care of the inmate
17   and continue with assessment, treatment and emergency
18   medical procedures. And did you understand that that was
19   one of your duties under these policies, that after you
20   arranged for transport, you were to stay with the patient
21   and continue with your assessment until the patient was
22   transported out of there?
23   A.    Yes.
24   Q.    Is that correct?
25   A.    Yes, correct.

---

Pages 193 to 196

Carranza-Reyes v. Park County                                    Vicki Ann Paulsen, R.N.

197

1    Q.    And so why did you decide to leave the
2  facility on the morning of the 8th and go home,
3  essentially abandoning Carranza-Reyes and not staying
4  with him until he was transported?
5        MS. LEWIS: Object to the form and also
6  asked and answered. Go ahead.
7    A.    Okay. I should have stayed with him. I
8  admit that I should have stayed with him.
9    Q.    (BY MR. TRINE) In other words, that was
10 just an error on your part?
11   A.    That's right. It was an error on my part.
12   Q.    Could you give me just a chronological brief
13 summary of what fields of nursing you worked in before
14 going into correctional work.
15   A.    Neonatal intensive care, pediatrics.
16   Q.    About how many years in neonatal care?
17   A.    Six. And pediatrics, family practice care.
18   Q.    How many years in family practice?
19   A.    Family practice, four, and I participated
20 part-time in some drug research at the old Fitzsimons.
21   Q.    What research? I didn't hear you.
22   A.    Drug research.
23   Q.    Drug research?
24   A.    Um-hum, at the old Fitzsimons. And then I
25 have done hospice and geriatric care and corrections.

198

1    Q.    Okay. And has almost all of that
2  experience -- or all of it -- been in a clinical setting
3  as opposed to an administrative position?
4    A.    Well, in geriatrics, it's in a nursing home
5  type, and then neonatal would be in an intensive care
6  unit, and family practice would be in a family practice
7  office. Pediatrics was in a pediatric office.
8    Q.    It was all clinical?
9    A.    Right, um-hum.
10   Q.    As opposed to spending several years in some
11 kind of administrative position?
12   A.    No, not my --
13   Q.    So you've had a considerable amount of
14 clinical experience, then?
15   A.    Um-hum.
16   Q.    And based on all of that experience, when
17 you went to work at Park County, were you concerned about
18 their general policies and procedures as it would relate
19 to the care of detainees?
20   A.    I had some concerns, yes.
21   Q.    And what was the gist of your concerns?
22   A.    Continuity, I mean, as far as . . .
23   Q.    Continuity of care?
24   A.    Yeah. And that there were times I felt like
25 some of what they had in policies and procedures were not

199

1  enacted.
2    Q.    Were not what?
3    A.    Enacted. I mean, they weren't in . . .
4    Q.    They weren't really enforcing policies and
5  procedures?
6    A.    Right. Right.
7    Q.    And that concerned you?
8    A.    Yes, it did.
9    Q.    And on continuity of care, would you explain
10 that in more detail.
11   A.    Well, you know, instead of having one nurse
12 24 hours a day -- I mean, you're there, but then you're
13 not there -- it would have been better to have even two
14 shifts, a night shift and a day shift, so that you had
15 that continuity, that you didn't have to rely on an EMT
16 or your jail personnel to, you know, let you know what
17 was going on. That you had another license there.
18   Q.    With better continuity of care, there's less
19 risk or chance of something falling through the cracks,
20 so to speak?
21   A.    True. True.
22   Q.    I know that you were a new employee there.
23   A.    Yes.
24   Q.    But nevertheless, did you at any time
25 discuss your concerns with any of the other personnel or

200

1  Monte Gore?
2    A.    No, I didn't.
3    Q.    Were you reluctant to do that because you
4  were a new employee?
5    A.    Yes.
6    Q.    Did your concerns have anything to do with
7  your not returning to Park County when you came back to
8  Colorado?
9    A.    Yes.
10   Q.    Where did you then become employed after you
11 returned to Colorado?
12   A.    I work for Supplemental Health Care. It's
13 an agency, and I work at DOC, Department of Corrections.
14   Q.    And you've been doing that since you
15 returned?
16   A.    Yes.
17   Q.    Do you work out of any particular facility?
18   A.    Buena Vista.
19   Q.    Okay. So it's a longer commute, but --
20   A.    It's a longer commute.
21   Q.    But you prefer doing that to working in Park
22 County?
23   A.    Yes.
24   Q.    If you'd now please refer to Exhibit 2
25 again, which is in the binder, to page 155?

Pages 197 to 200

*  SUBJECT TO CONFIDENTIALITY DESIGNATIONS  *

Carranza-Reyes v. Park County

Vicki Ann Paulsen, R.N.

---

**201**

1    A.    What page? 2?
2    Q.    Yeah, Exhibit 2, page 155.
3    A.    Okay. Gotcha.
4    Q.    This is Deputy Frye's incident report for
5 the night of March 7 and early morning of March 8, and if
6 you look down that page 155 at March 8 at 3:00 a.m., he
7 indicates that he got an interpreter and took Carranza to
8 medical where he took his blood pressure and pulse,
9 respiration, and indicated that his respirations and
10 pulse would indicate that he had shallow breathing, and
11 he asked for some medical history, and all he stated was
12 that he had been sick for the last three days. When you
13 had your telephone conversation -- I think you said about
14 3:30 a.m.? Was that right?
15    A.    3:00, 3:30. I mean, I'm not --
16    Q.    3:30?
17    A.    Right.
18    Q.    Were you told that Carranza-Reyes had been
19 sick for the last three days at that time?
20    A.    No.
21    Q.    No. And he indicates he placed him on 3
22 liters of oxygen, and after five minutes, he stated the
23 oxygen was not helping him. Did he report to you that
24 the oxygen wasn't helping him?
25    A.    He said he just didn't want it anymore, that

**202**

1 Mr. Carranza-Reyes didn't want it anymore, that he wanted
2 to go back to the pod.
3    Q.    Because I remember in your nurse's report,
4 you indicated that the report to you was that he felt
5 better after oxygen?
6    A.    Right. Right.
7    Q.    But he didn't tell you that he felt better,
8 did he?
9    A.    He didn't -- he did not state that -- he
10 just said he didn't want oxygen and he wanted to go back
11 to the pod.
12    Q.    And he states that Paulsen stated that it
13 was flulike symptoms, and she was aware of his condition.
14 Is that a correct statement?
15    A.    Yes.
16    Q.    Did you have any knowledge of how often
17 Monte Gore reviewed the pass-on records?
18    A.    I have no idea.
19    Q.    You don't know whether he went into the
20 controller's room?
21    A.    I know he went into the control, but whether
22 he looked at pass-on . . .
23    Q.    You don't know?
24    A.    I never observed him doing that.
25    Q.    So if you had information you wanted Monte

**203**

1 Gore to receive, you would pass it on directly to him?
2    A.    Either directly to him in or in his box.
3 They each had, like, a little mailbox, and I would put it
4 in his mailbox.
5    Q.    Where was that?
6    A.    That was in control.
7    Q.    So you could leave a message specifically
8 for him?
9    A.    Right, right.
10    Q.    Did he at times leave messages for you in
11 control?
12    A.    No.
13    Q.    Did you have a box?
14    A.    Yes. It just was medical. Anything that
15 had to go to medical was stuck in that box.
16    Q.    Monte Gore testified in his deposition at
17 page 163 that it was the custom and practice at the jail
18 to examine the throat of any inmate complaining of a sore
19 throat. Would you agree with that?
20    A.    Yes.
21    Q.    Did you at any time become familiar with the
22 contract between INS and Park County and what its
23 provisions were?
24    A.    I had -- got a copy of that contract, yes,
25 what they expected Park County to do.

**204**

1    Q.    When did you receive a copy?
2    A.    Yesterday.
3    Q.    Oh. For the first time yesterday?
4    A.    Yes.
5    Q.    And in reviewing that contract, did you see
6 anything in the contract about INS having to first
7 approve any transport of someone out of the Park County
8 Jail to a medical facility?
9    A.    I don't recall seeing that. I didn't have
10 time to really study it, but I do not recall seeing that.
11    Q.    Now, on the Wednesdays that Dr. Bachman did
12 come to the facility at Park County, you said he usually
13 would arrive at noon?
14    A.    A little after noon, yes.
15    Q.    And did he likewise, to your knowledge,
16 check into the controller station?
17    A.    Yes.
18    Q.    And what would he do in the controller
19 station?
20    A.    He will just go to the window, tell him he
21 was there so he could go on through.
22    Q.    Did he have to sign in anywhere, to your
23 knowledge?
24    A.    No. No.
25    Q.    During the time that you were there, what

---

\*   SUBJECT TO CONFIDENTIALITY DESIGNATIONS   \*

Carranza-Reyes v. Park County

Vicki Ann Paulsen, R.N.

**205**

1  would be your estimate on how often he actually came to
2  Park County on Wednesdays?
3      A.   Every week except for, like I said, maybe
4  three or four the whole time I was there.
5      Q.   Missed just three or four the whole time you
6  were there?
7      A.   Yeah. And what we would do was make
8  appointments at his office for those weeks that he
9  couldn't be there.
10     Q.   Did you ever sit down with Dr. Bachman and
11 go over any of the policies and procedures --
12     A.   No.
13     Q.   -- and review them with him?
14     A.   No.
15     Q.   Were any new policies and procedures
16 implemented by you and Dr. Bachman that you approved?
17     A.   No.
18     Q.   Were any new policies and procedures
19 implemented by the Park County Jail that you were asked
20 to review and approve?
21     A.   No.
22     Q.   So no changes were made while you were
23 there --
24     A.   No.
25     Q.   -- as far as you know in the policies and

**206**

1  procedures?
2      A.   As far as I know, correct.
3      Q.   Did you recommend any changes to the
4  policies and procedure manual?
5      A.   No.
6      Q.   Did you at any time recommend that you be
7  provided with standing orders of any type?
8      A.   No.
9      Q.   Scott Flint testified in his deposition at
10 page 87 that at 8:50 a.m. on the 8th, that the nurse
11 stated that she wanted them to go to the store and get
12 juice for Carranza-Reyes, so she sent a deputy out to buy
13 juice for him. Do you remember that incident?
14     A.   I remember them asking whether it would help
15 if he had juice or that type of thing, and they didn't
16 have any in the kitchen at that time, and I told them it
17 would be fine for them to go get some juice.
18     Q.   He wanted to know if it would help his
19 condition if you gave him juice?
20     A.   No, I mean -- no. They -- why it was
21 brought up, I don't know.
22     Q.   Do you have any explanation today for why
23 there was a three-hour delay from 8:00 in the morning
24 until 11:00 in the morning for transport to be arranged
25 to take Carranza-Reyes to Summit Medical?

**207**

1      MS. LEWIS: Object to form.
2      A.   No, I do not.
3      Q.   (BY MR. TRINE) By the way. did you know
4  John Bellantonio when he was at Buena Vista?
5      A.   No.
6      Q.   The two of you there?
7      A.   No.
8      Q.   What about Edward Allen? Did you know him
9  at Buena Vista?
10     A.   No.
11     Q.   Do you recall there being any inspections by
12 the INS or DOC during the time that you were at Park
13 County?
14     A.   DOC was there several times, and they did
15 walk-throughs. INS, I can't tell you. I don't remember
16 that.
17     Q.   When you say DOC was there several times and
18 they did walk-throughs, who from DOC?
19     A.   It would be from central office. I don't
20 know the individuals' names, but they were from central
21 office. and they would walk through the pod area and then
22 back around into booking and medical and the case
23 manager's office.
24     Q.   Did you participate in any meetings or
25 discussions with the DOC when they were on the premises?

**208**

1      A.   No.
2      Q.   When you observed them, they were there for
3  about how long?
4      A.   Oh, probably an hour, maybe a little more.
5      Q.   So what did they do in addition to walking
6  through the pods?
7      A.   I don't know. I was in my office. I didn't
8  follow them around.
9      Q.   Well, how do you know they were there an
10 hour?
11     A.   We were -- they would always announce that
12 they were on the premises, and they always announced when
13 they left, so . . .
14     Q.   You don't know what they were doing while
15 they were there?
16     A.   No.
17     Q.   Or who they might have been meeting with
18 or --
19     A.   Captain Gore.
20     Q.   Excuse me?
21     A.   Captain Gore.
22     Q.   But they didn't come into the medical and
23 interview you and talk to you?
24     A.   No.
25     Q.   Or ask you any questions?

\* SUBJECT TO CONFIDENTIALITY DESIGNATIONS \*

Carranza-Reyes v. Park County

Vicki Ann Paulsen, R.N.

221

1    A.    Right.

2    Q.    -- I understand from your testimony that
3  there were occasions that you relayed information to jail
4  staff of a medical nature through the pass-on.  Is that
5  correct?

6    A.    True.

7    Q.    How did you relay that information?

8    A.    I would tell -- there were times I would
9  write it in the book, and there were other times where I
10  would tell the officer in control about it, and he would
11  put it in the book.

12    Q.    So the information you relayed would not
13  necessarily be in writing every time?

14    A.    Correct.

15    Q.    Going back to the conversation with Ben at
16  the INS on the morning of March 8, do you remember that?

17    A.    Um-hum.

18    Q.    During that conversation, did Ben tell you
19  that INS refused to transport unless he got worse or that
20  INS agreed to transport Carranza-Reyes, but it would take
21  up to three hours to do so?

22    A.    They would -- it wasn't if he got worse.  I
23  mean, they didn't refuse, but we could -- they said it
24  would take them up to three hours to have an officer
25  there.

222

1    Q.    So at the time you left the morning of March
2  8, was it your understanding that transport arrangements
3  were in process?

4    A.    Yes.

5    Q.    Was it just a matter of when that transport
6  occurred as far as you knew?

7    A.    Yes.

8    Q.    You testified earlier that you think it was
9  an error on your part to leave the morning of March 8
10  when you did at 9:00 a.m. or so.  Do you reach that
11  conclusion today with the benefit of hindsight of what
12  eventually happened to Mr. Carranza-Reyes?

13    A.    Yes.

14    Q.    If Carranza-Reyes had ended up being fine
15  and had not gotten as sick as he eventually did, would
16  you still feel like it was an error on your part to leave
17  the morning of March 8?

18         MR. TRINE:  Objection, form and foundation.

19    A.    Yeah.

20    Q.    (BY MS. LEWIS)  Well, given the symptoms he
21  presented to you at the time, did you feel like you
22  needed to stay that morning?

23    A.    At the time I saw him, he was fairly
24  comfortable and -- no, not at that time.

25    Q.    So as far as you knew, there was a transport

223

1  being arranged --

2    A.    Yes.

3    Q.    -- to come pick him up, right?

4    A.    Yes.

5         MS. VEIGA:  No questions.

6         MS. LEWIS:  That's all I have.

7         MR. JURS:  Is it okay if I sit down here if
8  I project?

9              EXAMINATION

10  BY MR. JURS:

11    Q.    I'd like you to look at Exhibit 26, INS
12  detention standards, and I believe your testimony was
13  that you were not provided a copy of these.  Is that
14  true?

15    A.    I didn't have one in the office, no.

16    Q.    I'd like you to turn to the page marked Park
17  1699 and examine that page and the pages that appear
18  after that.  Have you had a chance to look at all those
19  documents, 1699 through 1705?

20    A.    Yes.

21    Q.    And were those Park County Sheriff's Office
22  policies and procedures?

23    A.    Yes, they are.

24    Q.    Would you have been provided those policies
25  and procedures?

224

1    A.    I should have been.

2    Q.    Because you were provided with the other
3  Park County policies and procedures?

4    A.    Yes.

5    Q.    I'm going to ask you a question, and this is
6  specifically with regard to Mr. Carranza-Reyes and his
7  medical condition during the period of time he was in the
8  Park County Jail.  Did you need any further standing
9  orders, protocols, policies or procedures from Dr.
10  Bachman in order for you to provide appropriate care and
11  treatment to Mr. Carranza-Reyes based on how he presented
12  to you?

13    A.    Not on how he presented in the beginning,
14  no.  I didn't -- I don't feel that I did, no.

15    Q.    So you had all the standing orders,
16  protocols, procedures and policies that you needed, based
17  on his clinical presentation?

18    A.    If -- for -- I didn't have any standing
19  orders to go by at that time.  At least there were none
20  in there in the office.  But based on what he presented
21  with, I don't know that a policy and procedure would have
22  been advantageous.

23         MR. JURS:  Okay.  I don't have any other
24  questions.  Thank you for your time today.

25

Pages 221 to 224

* SUBJECT TO CONFIDENTIALITY DESIGNATIONS *