--- SHEET 1 PAGE 1 ---

1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Case No. 2005-WM-377 (BNB)
_____

DEPOSITION OF: JOHN BELLANTONIO
November 4, 2005
_____

MOISES CARRANZA-REYES,

Plaintiff,

v.

PARK COUNTY, a public entity of the State of Colorado and its governing board, THE PARK COUNTY BOARD OF COUNTY COMMISSIONERS; PARK COUNTY SHERIFF'S OFFICE, a public entity of the State of Colorado; FRED WEGENER, individually and in his official capacity as Sheriff of Park County, Colorado; MONTE GORE, individually and in his capacity as Captain of Park County Sheriff's Department; VICKIE PAULSEN, individually and in her official capacity as Registered Nurse for Park County, Colorado; JAMES BACHMAN, M.D., individually and in his official capacity as Medical Director of the Park County Jail,

Defendants.
_____

TAKEN PURSUANT TO NOTICE AND AGREEMENT on behalf of the Plaintiff at 824 Castello, Fairplay, Colorado 80440 at 8:31 a.m. before Theresa A. Coffman, Federal Certified Realtime Reporter, Registered Professional Reporter and Notary Public within Colorado.

--- PAGE 3 ---

3

I N D E X

EXAMINATION OF JOHN BELLANTONIO                PAGE
November 4, 2005

By Mr. Kordick                                    4
By Mr. Archuleta                                 --
By Mr. Ringel                                   110
By Mr. Groome                                    --
By Ms. Holmes                                    --
By Mr. Jurs                                     166

                                              INITIAL
DEPOSITION EXHIBITS:                         REFERENCE

6-A   Continuation of Exhibit 6, Park 2000       75

(Original exhibits attached to original deposition; copy exhibits included in continuing exhibit file; copies provided to counsel as requested.)

REQUESTED PORTIONS OF TESTIMONY:               PAGE

Request for document production                  --
or information

Certified question                               --

Instruction not to answer                       161

Other requests or marked testimony               --

REFERENCES TO EXHIBITS MARKED PREVIOUSLY:

Exhibit No.      Page Reference

     1                 21
     2                 15
     3                 14
     4                172
     5                 13

--- PAGE 2 ---

2

APPEARANCES

For the Plaintiff:        LLOYD C. KORDICK, ESQ.
                          805 South Cascade
                          Colorado Springs, Colorado 80903

                          JOSEPH J. ARCHULETA, ESQ.
                          Law Office of Joseph J. Archuleta
                          1724 Ogden Street
                          Denver, Colorado 80218

For the Defendants        ANDREW D. RINGEL, ESQ.
Park County, Park         Hall & Evans, LLC
County Board of           1125 17th Street
Commissioners, Park       Suite 600
County Sheriff's Office,  Denver, Colorado 80202
Wegener and Gore:

                          STEPHEN A. GROOME, ESQ.
                          P.O. Box 1373
                          501 Main Street
                          Fairplay, Colorado 80440

For the Defendant         SARA HOLMES, ESQ.
Paulsen:                  Berg Hill Greenleaf & Ruscitti LLP
                          1712 Pearl Street
                          Boulder, Colorado 80302

For the Defendant         ANDREW W. JURS, ESQ.
Bachman:                  Johnson McConaty & Sargent, P.C.
                          400 South Colorado Boulevard
                          Suite 900
                          Glendale, Colorado 80246

Also Present:             None

--- PAGE 4 ---

4

                WHEREUPON, the within proceedings were taken pursuant to the Federal Rules of Civil Procedure:
                JOHN BELLANTONIO,
having been first duly sworn to state the whole truth, was examined and testified as follows:
                EXAMINATION
BY MR. KORDICK:
    Q.  Sir, could you please state your full name.
    A.  John Frank Bellantonio.
    Q.  Mr. Bellantonio, could you please explain for the record what your educational background is, starting with high school and the year you graduated from high school.
    A.  I graduated from Valley Stream High School in Valley Stream, New York in 1966, attended Adelphi University, receiving a bachelor of arts in sociology in 1970. That's about it.
    Q.  Now, let me take your work history. I don't need to know about jobs you had for six months or anything like that, but just your general work history from 1970.
        (At this time Mr. Archuleta left the deposition room.)
    A.  Do you want specific years and stuff like that?

Notes:

Coffman Reporting
303.893.0202
303.893.2230 FAX

EXHIBIT
2

*** SUBJECT TO CONFIDENTIALITY DESIGNATIONS ***

PAGE 9

1 Corrections?
2   A.   Education in the sense of in-service
3 training, yes.
4   Q.   And did you train personnel in the system?
5   A.   Was I a trainer?
6   Q.   Yes.
7   A.   Yes.
8   Q.   What kind of things did you train?
9   A.   I was a certified police firearms instructor
10 for revolver and shotgun. Let's see. I was also -- I
11 did emergency response training, and I was in charge of
12 the 55-man emergency response team for the facility,
13 which included all levels of force right up and including
14 lethal force. I trained that team. Let's see.
15   Q.   It's sort of like a SWAT team, only it's
16 internal to the prison?
17   A.   Correct. I was also a member of the
18 department's special operations response team, received
19 specialized training in California to be on that team. I
20 was one of the first first one of the first 12 people on
21 the department-level special operation response team.
22   Q.   Well, if my figures are correct, it looks
23 like if you worked there from '77 to 2000, you were at
24 the Department of Corrections for 23 years or 24 yours?
25   A.   23 years and eight months.

PAGE 10

1   Q.   Did you take retirement from there?
2   A.   Yes. I purchased six years of service time
3 and have a 30-year retirement.
4   Q.   So currently you receive retirement benefits
5 from the --
6   A.   Yes.
7   Q.   -- from your job at the Department of
8 Corrections?
9   A.   Right.
10   Q.   Now, after you left the Department of
11 Corrections, you testified that you went to work for the
12 Park County Jail in 2001?
13   A.   Correct.
14   Q.   I'm not sure if it's relevant or not, but
15 why did you go back to work? Was it just to supplement
16 your income from your retirement?
17       (At this time Mr. Archuleta entered the
18 deposition room.)
19   A.   Actually, it was for the purpose of
20 continuing insurance for my family. I was covered under
21 COBRA after leaving the state, and when COBRA was about
22 to expire, I wanted to continue coverage for my daughter,
23 who had a preexisting condition with fairly significant
24 costs every month, and it would have been very difficult
25 for me to obtain a policy if I wasn't under continual

PAGE 11

1 coverage. So by working for Park County, I was able to
2 have a group plan, which covered her, as well as my wife
3 and myself.
4   Q.   When you went to work for Park County, I'm
5 assuming, if you've already retired, it wasn't your
6 intention of advancing into management, or were you?
7   A.   No. I had no aspirations of making a second
8 career out of it or advancing up the ladder, no. As a
9 matter of fact, I was offered a -- later on, after
10 interviews, I was offered a sergeant's position, which I
11 turned down and accepted and a corporal's position.
12   Q.   At Park County?
13   A.   Yes.
14   Q.   They offered you a sergeant's position?
15   A.   After I'd worked there a while, there was an
16 opening, and there was interviews for an opening for
17 sergeant. I was offered that position, and I turned it
18 down, and I accepted a corporal position.
19   Q.   Why did you take the lesser position?
20 Because you didn't want the responsibility or you --
21   A.   I didn't want the responsibility. At the
22 level of sergeant, you weren't compensated for any
23 overtime in any way, and, frankly, I did not want to give
24 that much of myself to Park County. I didn't want to
25 commit that much time.

PAGE 12

1   Q.   I see. Well, this case -- my client, Mr.
2 Carranza-Reyes, was incarcerated in Park County Jail as
3 an INS detainee from March 1 through the 8th of March,
4 2003. Were you employed at the Park County Jail as a
5 corporal at that time?
6   A.   Yes, I was.
7   Q.   And which shift were you working on or at?
8   A.   My entire stay at Park County I was assigned
9 to the swing shift, which is from 4:00 p.m. until
10 midnight, with the exception of a brief time during the
11 Hayman Fire when I was reassigned to the midnight shift.
12   Q.   So you would have come on -- officially, you
13 would have come on at 4:00 p.m. and gotten off at
14 midnight, but did you come a few minutes early to work?
15   A.   In general, I --
16       MR. RINGEL: Object to the form and the
17 foundation.
18       THE DEPONENT: Pardon?
19   Q.   (BY MR. KORDICK) Let me explain. In these
20 depositions -- this is a federal case, and the only
21 reason that you can object to a question is the form of
22 the question or the foundation of the question, and he's
23 going to make objections to the form and foundation of
24 the question, but that in no way stops you from answering
25 the question. You're still supposed to answer the

**Page 29**

```
 1   worked from 2001 to this time, did the number of bunks
 2   continue to increase in D Pod, or do you remember?
 3        MR. RINGEL: Object to the form and the
 4   foundation.
 5        A.   I remember a gradual increase in bunks, yes,
 6   and also there was bedding made available with mattresses
 7   on the floor.
 8        Q.   (BY MR. KORDICK) Okay. Were you aware
 9   of -- are you aware of the ACA standards? Are you
10   generally aware of what those are?
11        MR. RINGEL: Object to the form and the
12   foundation.
13        A.   There are so many ACA standards, and I
14   forget the exact amount, that cover just about every
15   aspect of correctional environment. I'm aware of many of
16   the standards in a general sense.
17        Q.   (BY MR. KORDICK) Okay. Do you know what
18   ACA standards -- is that the golden rule in the -- I
19   guess I could call it the industry now because it's
20   privately operated in many cases. But is that the golden
21   rule in the -- should I call it detention business?
22        MR. RINGEL: Object to the form and the
23   foundation.
24        A.   The ACA standards are the goals that all
25   correctional facilities -- I shouldn't say all -- but
```

**Page 30**

```
 1   most correctional facilities try to attain.
 2        Q.   Now, some correctional or government
 3   entities actually adopt them as their regulations, and
 4   some don't, correct?
 5        MR. RINGEL: Object to the form and the
 6   foundation.
 7        A.   In my experience, the regulations were
 8   guided by the ACA standards, and the regulations were
 9   written to conform with ACA regulations. And then
10   practice -- the actual practice would be verified against
11   the written standards and regulations to show that
12   compliance was in accord with ACA standards.
13        Q.   (BY MR. KORDICK) Would you look at Exhibit
14   5. It's a small exhibit. I think it's right here.
15        A.   Okay.
16        Q.   Yeah. You've got it in your hand there.
17   With reference to this particular exhibit, this was
18   produced by Park County as a standard Park County
19   Sheriff's Office policy and procedure manual standard
20   that was effective on November 1, 2000, and it references
21   a Standard 3-4128, which is an ACA standard, and it
22   requires that the inmates be housed in sleeping areas
23   that are safe, clean, proper lighting and heating, and it
24   is the policy of the sheriff's office that inmates are
25   housed in cell or dormitory sleeping areas that provide
```

**Page 31**

```
 1   at least 80 square feet of living space per occupant;
 2   proper lighting, both artificial and natural. Lighting
 3   in inmate housing units is at least 20 foot-candles at
 4   desk level and in personal grooming areas.
 5             Was this standard that had been adopted by
 6   the county, was that followed with reference,
 7   particularly, to the D Pod or any of the other pods?
 8        MR. RINGEL: Object to the form and
 9   foundation.
10        A.   I don't have the exact measurements, but I'm
11   sure that -- I'm sure that this standard was not
12   followed.
13        Q.   (BY MR. KORDICK) It's been represented to
14   us the square footage, up and down, of D Pod is 1,475
15   feet, and -- 1,475 square feet -- I'm sorry -- and at 80
16   square feet per inmate, that would only allow 18.3
17   inmates in this particular D Pod. If that were the case,
18   would it be true that the county was not following their
19   own standard?
20        MR. RINGEL: Object to the form and the
21   foundation.
22        A.   Well, it's apparent to me that the standard
23   was not being followed.
24        Q.   (BY MR. KORDICK) Were you ever told or
25   advised as to what the design capacity was for D Pod as
```

**Page 32**

```
 1   far as the number of inmates?
 2        MR. RINGEL: Object to the form and the
 3   foundation.
 4        A.   There were no capacities delineated to me.
 5   It was an open-ended capacity. Not design capacity but
 6   operational capacity was an open-ended number.
 7        Q.   (BY MR. KORDICK) So operationally, if you
 8   had 70 or 80 people, there was no cap or limitation on
 9   that?
10        A.   Not to my knowledge.
11        MR. RINGEL: Object to the form and the
12   foundation.
13        Q.   (BY MR. KORDICK) What about design
14   limitations? Were you ever advised there were design
15   limitations on D Pod when it was built?
16        MR. RINGEL: Object to the form and the
17   foundation.
18        A.   I was never advised as to design
19   limitations. My own observation would indicate that the
20   unit was designed for approximately 18 people, and that
21   was -- or the pod was designed for 18 people, and I base
22   that assumption on the seating capacity at the tables
23   that were provided for eating. It appeared that there
24   were 18 -- there were three tables that seated six each.
25   It appeared that the initial design -- this is only my
```

### Page 33

1  assumption. It appeared that the initial design was for
2  18 individuals.
3     Q.  (BY MR. KORDICK) There were a number of
4  people that had worked there before this became a jail
5  operated by the county when it was still a private
6  facility. One of those individuals was a Sergeant
7  Crawford. I think he may have been a corporal when you
8  were there. And one was a Darlene Ellis, I believe. Did
9  you know those deputies?
10    A.  Yes, I did.
11    Q.  Did either of those deputies ever tell you,
12  to your recollection, what the capacity was designed for
13  those cells, when built?
14       MR. RINGEL: Object to the form.
15    A.  I have a vague memory of about complaining
16  about the overcrowdedness in general of the pods in a
17  discussion with Deputy Ellis. If I remember correctly,
18  we were commiserating about the burden it on the deputies
19  to have the units, the pods, as crowded as they were, and
20  I believe she and I discussed the seating capacity, and I
21  believe she made a reference to the fact that when she
22  worked at the place when it was a private establishment,
23  that it was designed for 18 individuals as well.
24    Q.  (BY MR. KORDICK) Now, as part of your job,
25  were you required to go into the D Pod?

### Page 34

1     A.  Yes, I was.
2     Q.  And there's been testimony that there were
3  42 bunks in D Pod and that there isn't any more room to
4  put any more bunks into D Pod. When the population --
5  and is that consistent with your recollection?
6        MR. RINGEL: Object to the form and the
7  foundation.
8     A.  Frankly, I don't -- I never thought to count
9  how many actual bunks were in that unit. I would have to
10  take that as truth. It seems accurate.
11    Q.  (BY MR. KORDICK) If you accept that as
12  true, that there were 42 bunks and that there is no more
13  capacity to hold bunks in the upper tier, when you got up
14  to 50, there would have been a shortage of at least --
15  you know, at least nine or more bunks. What was done to
16  let these people sleep in this D Pod?
17       MR. RINGEL: Object to the form and the
18  foundation.
19    A.  They were given mattresses to sleep on. The
20  mattresses were placed on the floor.
21    Q.  (BY MR. KORDICK) Okay. Were they placed
22  between the bunks that were against the wall?
23       MR. RINGEL: Object to the form and the
24  foundation.
25    A.  The individual detainee would place his

### Page 35

1  mattress where there was room. Almost -- my recollection
2  was there were times when almost all of the available
3  floor space was taken up with either bunks or mattresses.
4     Q.  (BY MR. KORDICK) Okay. Because there was
5  no cap on how many people could be put into that?
6     A.  Right.
7        MR. RINGEL: Object to the form and the
8  foundation.
9     Q.  (BY MR. KORDICK) Now, I'd like to ask you
10  about some of the standards we talked about in Exhibit 5.
11  With as many as 50 inmates in the D Pod, was it possible
12  to keep this place clean?
13       MR. RINGEL: Object to the form and the
14  foundation.
15    A.  It was certainly very difficult.
16    Q.  (BY MR. KORDICK) Okay. Was it possible to,
17  for instance, mop the floors when you had mattresses on
18  the floors?
19       MR. RINGEL: Object to the form and the
20  foundation.
21    A.  My recollection, much of the floor space was
22  covered with mattresses or bunks, and it made it very
23  difficult to adequately mop the floors.
24    Q.  (BY MR. KORDICK) Were there a number of
25  people that were sick in D Pod in March of 2003?

### Page 36

1        MR. RINGEL: Object to the form and the
2  foundation.
3     A.  I seem to remember that sickness was an
4  issue in that pod, yes.
5     Q.  (BY MR. KORDICK) And was there any place
6  you could take these sick inmates to isolate them from
7  the other inmates that weren't sick?
8        MR. RINGEL: Object to the form and the
9  foundation.
10    A.  Not in general, no. There was no place to
11  put them.
12    Q.  (BY MR. KORDICK) Was there ever a time --
13  all the people in D Pod were INS detainees; is that
14  correct?
15       MR. RINGEL: Object to the form and the
16  foundation.
17    A.  That's correct.
18    Q.  (BY MR. KORDICK) Was there ever a time
19  before this March time when INS detainees were housed
20  with the general population in the jail?
21    A.  Yes.
22    Q.  Was there a problem that developed with them
23  being housed with Department of Corrections prisoners and
24  the general population?
25    A.  Yes. There was a problem in that Department

**Page 41**

1 foundation.
2 　　A.　During the distribution of medications,
3 which involved many, many inmates -- this doesn't only
4 regard the D Pod. This involved all inmates housed
5 there. The deputy was required to roll a medication cart
6 to the entrance of the pod door, announce medications,
7 and then distribute the medications from bulk containers.
8 For an example, if you were given X medication, you
9 know -- if Joe Smith was issued -- I can't think of
10 something right now, whatever -- brand X or medication X
11 in dosage 100 milligrams, the deputy was required to pull
12 that medication from a bulk container, sometimes divide
13 that medication in halves or thirds to administer to the
14 individual, and then record that.
15 　　　　There was a lot of room, in my opinion, for
16 error -- not intentional, just for error -- which could
17 have devastating results to the individual, liability
18 coming back to the deputy and liability coming back to
19 the jail.
20 　　　　I checked with the person who was the head
21 nurse, the head medical administrator at Buena Vista who
22 had retired and was then working for the American
23 Correctional Association monitoring their standards, and
24 I asked her about that, and she indicated that that was
25 not the correct way to do it, which verified what I had

**Page 42**

1 already believed, that the medications should be packaged
2 by the nurse, and the deputy should then distribute it
3 and check to make sure that it's taken properly.
4 　　　　And I brought that up to the nurse and was
5 told that it was physically impossible. She didn't have
6 time to do it. I pursued the issue and brought it up to
7 the captain, and it was subsequently corrected.
8 　　Q.　(BY MR. KORDICK) Okay. So that was the
9 modified procedure that was in effect at the time that my
10 client was there?
11 　　A.　Correct.
12 　　　　MR. RINGEL: Object to the form and the
13 foundation.
14 　　Q.　(BY MR. KORDICK) Now, going back to Exhibit
15 Number 5, it requires that beds be made upon rising and
16 that the beds -- there's a provision in the other -- not
17 in this provision, but another provision that requires
18 that the beds be off the ground. Were the beds actually
19 on the floor, the mattresses on the floor, when there was
20 an overload situation?
21 　　　　MR. RINGEL: Object to the form and the
22 foundation.
23 　　A.　We routinely had mattresses on the floor.
24 　　Q.　(BY MR. KORDICK) Did the prisoners that
25 were in the upper area, did they have a wastebasket in

**Page 43**

1 the upper area?
2 　　A.　I don't recall.
3 　　Q.　Mr. Gore has testified that the only waste
4 area was a large bucket in the lower area, that there was
5 no wastebasket in the upper area. Would you disagree
6 with that or agree with it?
7 　　　　MR. RINGEL: Object to the form and the
8 foundation.
9 　　A.　I don't recall what provisions were on the
10 upper floor for disposal of waste. I do remember large
11 containers on the lower floor. And now that I think
12 about it, I think the only formal or for-real container
13 was on the lower floor.
14 　　Q.　(BY MR. KORDICK) When prisoners were
15 sleeping in the upper area -- which was designed as a
16 sleep area; is that right? The upper area was designed
17 as a sleep area?
18 　　A.　That's correct.
19 　　Q.　When they were sleeping, of course, you were
20 there in the swing shift, if they had colds or blew their
21 nose, would they -- do they have something to blow their
22 nose on or spit into?
23 　　　　MR. RINGEL: Object to the form and the
24 foundation.
25 　　A.　Inmates were given -- or detainees were

**Page 44**

1 given rolls of toilet paper each. Each. Pretty much as
2 much as they needed.
3 　　Q.　(BY MR. KORDICK) When they did cough or
4 blow their nose, did they place that, in your
5 observation, next to their bed while they were sleeping?
6 　　　　MR. RINGEL: Object to the form and the
7 foundation.
8 　　A.　I don't remember ever seeing some -- you
9 know, I don't remember noticing anybody blowing their
10 nose or coughing into tissue and then putting it in their
11 mattress, but I do know that when I conducted shakedowns
12 and when I went through the area, it was very common to
13 find soiled tissue paper stuffed under the mattresses and
14 about the mattresses.
15 　　Q.　(BY MR. KORDICK) Okay. And around the area
16 of the mattresses?
17 　　A.　Yes.
18 　　　　MR. RINGEL: Object to the form.
19 　　Q.　(BY MR. KORDICK) I'd like to talk to you
20 about the ACA standards adopted by the county. If there
21 were a standard of one toilet per 12 inmates, 50 inmates
22 would have far exceeded that, wouldn't it?
23 　　　　MR. RINGEL: Object to the form and the
24 foundation.
25 　　A.　Yes.

## Page 57

1  bring to us, I would authorize it if I was on the phone,
2  okay?
3  Q.  (BY MR. KORDICK) Right.
4  A.  And early in my stay at Park County, they
5  called and said we have X amount of detainees, and I
6  didn't know any better. I said, "Well, we've got more
7  than we can handle right now. Don't bring them," okay?
8  And the next day I was corrected.
9  Q.  Really? By whom?
10  A.  By Sergeant Muldoon and told that when
11  they -- when they call, that we will take them. We will
12  make accommodations. And that was very early in the INS
13  process. We hadn't really -- we didn't have that many,
14  so to speak. But I was told, you know, basically, make
15  room for them, you know, this is our moneymaker. Make
16  room for them.
17  Q.  When you say that this was your moneymaker,
18  what was conveyed to you about how much they were paying?
19  Did they tell you?
20  MR. RINGEL: Object to the form and the
21  foundation.
22  A.  If I remember right, it was -- let's see.
23  We had a DOC contract, and they had one amount, I think
24  was $45 a day, and I think INS was $55 a day. I think.
25  Or vice versa.

## Page 58

1  Q.  (BY MR. KORDICK) But that was a big deal
2  for the jail to make that revenue?
3  MR. RINGEL: Object to the form and the
4  foundation.
5  A.  Oh, absolutely. It was a very big deal.
6  Q.  (BY MR. KORDICK) And even though exercising
7  your judgment as a person with a lot of experience as a
8  corrections officer, you were overridden in exchange for
9  them having more prisoners to make more money; is that
10  right?
11  MR. RINGEL: Object to the form and the
12  foundation.
13  A.  As I pointed out, I was relatively new, so I
14  thought it was within my scope of authority to say, you
15  know, we have enough, we can't take the next load. But I
16  was told that that was not what was desired and that we
17  would make accommodations.
18  And I don't remember why I felt that there
19  was enough at that point, but I just remember telling the
20  INS person, "Well, you know, no, we've got enough. We're
21  at capacity as far as I'm concerned." But I was -- we
22  expanded greatly after that. More bunks were added. I
23  was never told of a -- I would ask, "What is the
24  capacity? When do we say no?" And I was told just make
25  room for them, basically.

## Page 59

1  Q.  (BY MR. KORDICK) There is no "no"?
2  A.  I was never told of a top cap, no. That
3  kind of bothered me. I'd never worked in a facility that
4  didn't have a parameter in terms of capacity.
5  Q.  Did you ever have to house people in the
6  recreation room for the D Pod?
7  A.  Yes.
8  Q.  What was the problem with having to house
9  people in the recreation room in D Pod?
10  A.  The recreation room was very small. It had
11  gym equipment, weightlifting equipment, stuff like that,
12  and it had no restroom facility or showers or restroom
13  facility or sinks or any water facilities. So if they
14  were locked in there, if they had to use the restroom, it
15  would require an escort to one of the units where they
16  could use the restroom.
17  Q.  When you got into these crowded positions --
18  and I'd like you to refer back, if we could, to Exhibit
19  Number 1, to the census that was conducted on the 7th.
20  Take a look at that. First of all, if we could look at
21  53, this is dated the 6th of March. What was the
22  population of D Pod on the 6th of March?
23  MR. RINGEL: Object to the form and the
24  foundation.
25  A.  55 individuals.

## Page 60

1  Q.  (BY MR. KORDICK) And if you could look at
2  57. Now, this particular document, it looks like there
3  are four different count sheets on here. This is Exhibit
4  1, 57, and it appears that your name is on all four of
5  these. These were produced pursuant to a request -- an
6  Open Records Act request from the county. And it looks
7  like 3/6/03, 1700, there's 55 inmates, and then it seems
8  fixed at 55, and then it goes up to 61 inmates in D, but
9  there's no date or time on that. Do you see that?
10  A.  Oh, yeah. Hum.
11  Q.  The way it was produced was for that same
12  date. Would you assume that that was the same date?
13  MR. RINGEL: Object to the form and the
14  foundation.
15  A.  I can't assume anything on that one.
16  Q.  (BY MR. KORDICK) Okay. Let's look at your
17  3/6 -- Exhibit 3, see if we can confirm the count went
18  up -- and I haven't check this myself -- to 163. If we
19  look on Exhibit 3, 995, at -- it looks like there's a
20  notation from Ed Allen on 2107? Do you see the count's
21  163, which corresponds with 57, the one that's not dated,
22  the same count as 163?
23  MR. RINGEL: Object to the form and the
24  foundation.
25  A.  Correct.

**Page 61**

1    Q.   (BY MR. KORDICK) So it appears that the
2  count went up to 61 inmates in D. Could you explain what
3  the conditions were, with 61 inmates in Pod D, in your
4  opinion as a previous corrections officer and as deputy?
5       MR. RINGEL: Object to the form and
6  foundation.
7    A.   Well, let's start out by saying it was very
8  crowded, that there were mattresses on the floor, on the
9  upper bunking area, and if I remember correctly, there
10 were also mattresses used on the first floor at that
11 point. It was very difficult to walk through the unit to
12 do inspections or counts. It was very difficult to even
13 count the individuals accurately. You want a -- are you
14 asking for a description of the pod?
15   Q.   (BY MR. KORDICK) Yes. Yes.
16      MR. RINGEL: Object to the form and the
17 foundation.
18   Q.   (BY MR. KORDICK) Go ahead.
19      MR. RINGEL: Same objection.
20   A.   The pod was very crowded, the ventilation
21 was poor, there was an odor, body odor, an odor. It was
22 noisy. It was crowded to the point of being very
23 uncomfortable for everybody involved. If I remember
24 correctly, mattresses were placed on the floor literally
25 touching one another, side by side.

**Page 62**

1    Q.   (BY MR. KORDICK) Would it have been
2  possible to adequately mop or clean it -- apparently,
3  there was a mop bucket put in there, correct?
4       MR. RINGEL: Object to the form and the
5  foundation.
6    A.   (Deponent nodded head.)
7    Q.   (BY MR. KORDICK) Would it be possible for
8  someone to adequately clean it with that many people in
9  there and that many mattresses on the floor?
10      MR. RINGEL: Object to the form and the
11 foundation.
12   A.   Cleaning supplies were supplied to the units
13 in the sense of a mop and a mop bucket and clean water
14 and disinfectant and also spray bottles with a bleach
15 solution, if I remember correctly, diluted. And it might
16 have been possible to clean the toilets and the shower
17 areas. It would have been very difficult to adequately
18 mop the floors. It would have been very difficult.
19   Q.   (BY MR. KORDICK) That's because of all the
20 mattresses and people in there, right?
21   A.   Correct.
22      MR. RINGEL: Object to the form and the
23 foundation.
24   Q.   (BY MR. KORDICK) With reference to the
25 pods, it's my understanding that Darlene Ellis was the

**Page 63**

1  person that was in charge of the trustees, at least she
2  testified to that, and cleaning the facilities and the
3  laundry. Was that the case?
4       MR. RINGEL: Object to the form and the
5  foundation.
6    A.   She was given the assignment of more or less
7  hiring, firing and more or less supervising the trustees,
8  but we all shared in the responsibility of supervising
9  the trustees in their duties.
10   Q.   (BY MR. KORDICK) It was my understanding,
11 because of the turnover in D Pod, there was no trustee
12 assigned to clean that pod; that they just put the mop in
13 there and let the inmates figure it out themselves. Is
14 that more or less the case?
15      MR. RINGEL: Object to the form and the
16 foundation.
17   A.   That was the case in all the pods.
18   Q.   (BY MR. KORDICK) Okay. There was no
19 trustee in the pod designated to clean?
20   A.   No.
21      MR. RINGEL: Object to the form and the
22 foundation.
23   A.   No, there wasn't.
24   Q.   (BY MR. KORDICK) With reference to the D
25 Pod, were those prisoners more or less cooperative than

**Page 64**

1  the general prison population?
2       MR. RINGEL: Object to the form and the
3  foundation.
4    A.   I found the INS detainees to be some of the
5  most cooperative individuals that I'd come across. And
6  certainly at the Park County Jail.
7    Q.   (BY MR. KORDICK) Why do you say that?
8    A.   They seemed to have a higher tolerance for
9  less-than-sufficient conditions. They seemed to be more
10 appreciative of the services that we did provide in terms
11 of issuing of hygiene items, toilet paper, et cetera,
12 soap, stuff like that. They were, for the most part,
13 extremely respectful towards the staff. They displayed a
14 more respectful and cooperative attitude than the general
15 United States citizen-type inmate, although that's a
16 generalization. But in general, they were very
17 respectful and cooperative and appreciative.
18   Q.   Were you aware that there was a -- well, let
19 me direct you to a note from the 6th when we talked about
20 the population and what the population got to be in the D
21 Pod.
22      If you could look at Exhibit 3, 0993. Do
23 you see in here that on that date, at 3/6/03, there's an
24 indication of a chest pain in D Pod, something, J-11 back
25 to medical. Can you tell who the initials were for that?

**Page 69**

1  A.  No, I didn't.
2  Q.  (BY MR. KORDICK) You didn't have authority
3  on your own to transfer people to other facilities or
4  other areas where there was more room in your facility,
5  did you?
6       MR. RINGEL:  Object to the form.
7  A.  I certainly had authority to move inmates
8  within the facility to more appropriate places had they
9  been available, but I did not have authority to move
10 people outside the facility on my own, no.
11 Q.  (BY MR. KORDICK) With D Pod, though, you
12 didn't have authority to move detainees in with the
13 general population, did you?
14      MR. RINGEL:  Object to the form.
15 A.  That was not allowed, no.
16 Q.  (BY MR. KORDICK) So you couldn't transfer
17 those people anywhere within the facility, could you?
18      MR. RINGEL:  Object to the form.
19 A.  We didn't have resources to put them
20 anyplace else, no.
21 Q.  (BY MR. KORDICK) And being on the swing
22 shift, was the laundry normally the duty of the day
23 shift?
24      MR. RINGEL:  Object to the form and the
25 foundation.

**Page 70**

1  A.  Yes.
2  Q.  (BY MR. KORDICK) Would you find it strange
3  that Miss Ellis was unaware that the laundry for the
4  entire jail had broken down for a period of over five
5  days?
6       MR. RINGEL:  Object to the form and the
7  foundation.
8  A.  Could you repeat that?
9  Q.  (BY MR. KORDICK) She's testified that she
10 didn't remember the laundry being broken down in the jail
11 for five days, and she also testified that she made
12 rounds into D Pod the same day that Mr. Allen took the
13 inmates' clothes to clean them himself and had no
14 replacement clothing for them.  Do you find that hard to
15 believe that she wouldn't remember that?
16      MR. RINGEL:  Object to the form and the
17 foundation.
18 A.  I find that hard to believe that she
19 wouldn't remember it.  I don't find it hard to believe
20 that she was unaware of what was going on with the
21 laundry situation.
22 Q.  (BY MR. KORDICK) Okay.  Could you explain
23 that?
24      MR. RINGEL:  Same objection.
25 A.  My recollection tells me that she was not --

**Page 71**

1  did not perform quality work in terms of making sure her
2  responsibilities were done.  That may be a little bit
3  unfair, but there were times when work that was supposed
4  to be performed on day shift was not performed, and it
5  was passed on to us, and it became an issue.  And we
6  would have to pick up the slack, so it became an issue.
7  And laundry was one of those issues.
8  Q.  (BY MR. KORDICK) And that's a health issue
9  and a sanitary issue, isn't it?
10      MR. RINGEL:  Object to the form and
11 foundation.
12 Q.  (BY MR. KORDICK) Laundry?
13 A.  Yes, it is.
14 Q.  I mean, particularly -- you know, it's bad
15 enough not having clean clothes, but being crammed in
16 with 50 to 61 inmates would make that condition much
17 worse, wouldn't it?
18      MR. RINGEL:  Object to the form and the
19 foundation.
20 A.  It certainly would.
21 Q.  (BY MR. KORDICK) Would you be surprised
22 that on the 4th, Miss Ellis testified that she, during
23 the day shift, went into the D Pod -- this is the day of
24 the complaint about the laundry -- and that there were no
25 mattresses on the floor in D Pod, that there never were

**Page 72**

1  mattresses on the floor in D Pod, that there were cots
2  set up for prisoners in D Pod.  Would that testimony
3  surprise you?
4       MR. RINGEL:  Object to the form and the
5  foundation.
6  A.  That testimony would surprise me to a great
7  deal.  I had never seen a cot at the facility.  There
8  were either bunks or the mattresses were on the floor.  I
9  know of no cots, and there certainly were mattresses on
10 the floor during this period of time.
11 Q.  (BY MR. KORDICK) How cold -- in March, how
12 cold did it get outside of the jail in Fairplay here?
13      MR. RINGEL:  Object to the form and the
14 foundation.
15 A.  It wouldn't be unusual to be below zero when
16 I was getting out of work at midnight, according to the
17 thermometer on the bank.
18 Q.  (BY MR. KORDICK) Okay.  What kind of
19 temperatures would it record?
20 A.  It wouldn't be unusual to be 6 below, 9
21 below.  The coldest I remember was 27 below.
22 Q.  And you've talked about the walls being
23 cold.  If you were sleeping next to one of those walls,
24 would that be cold?
25      MR. RINGEL:  Object to the form and the

**117**

1  A. Ollie called me and told me that he had some
2  information that I had requested from Mr. Kordick, and I
3  told him I really don't remember making any requests for
4  information from Mr. Kordick, and he asked me if it would
5  be all right for Mr. Kordick to call me, and I said it
6  would be.
7  Q. All right. Do you remember anything else
8  about this second conversation with Ollie?
9  A. I may have asked him if he was in contact
10 with Eddie Allen, something to that effect.
11 Q. Okay. Do you remember anything else about
12 the second conversation with Ollie?
13 A. We might have chitchatted about this
14 situation one more time, and I was assuming that it was
15 an informal -- not a deposition, it was chitchat, not
16 recorded chitchat.
17 Q. When did the second telephone conversation
18 with Ollie occur?
19 A. A couple of nights ago.
20 Q. This week?
21 A. Yeah.
22 Q. How long was the second conversation with
23 Ollie?
24 A. Five minutes.
25 Q. And I don't know if I asked you this before.

**118**

1  Approximately how long was the first conversation with
2  Ollie?
3  A. Five minutes. Short conversation.
4  Q. Okay. Prior to today, you've spoken to Mr.
5  Kordick; is that correct?
6  A. That's correct.
7  Q. Okay. On how many occasions?
8  A. Two. Maybe three.
9  Q. Okay. In person or by telephone?
10 A. Telephone.
11 Q. When did your first telephone conversation
12 with Mr. Kordick occur?
13 A. I believe it was the night after I was
14 served the subpoena.
15 Q. Did you execute a waiver of service of the
16 subpoena?
17 A. No.
18 Q. You didn't sign anything in terms of
19 accepting the service of a subpoena voluntarily?
20 A. No.
21 Q. How long was your first telephone
22 conversation on that night with Mr. Kordick?
23 A. It was very lengthy.
24 Q. Approximately how long?
25 A. Two hours.

**119**

1  Q. Can you compare the information that you
2  provided Mr. Kordick on that telephone conversation with
3  the information that you've provided on the record today
4  during this deposition?
5  A. Some of the same issues were discussed.
6  Q. Do you recall any issue of significance in
7  your mind that was discussed with Mr. Kordick during that
8  first telephone conversation that you have not discussed
9  during this deposition today?
10 A. I'm going to ask you to repeat that, please.
11    MR. RINGEL: Can you read that back, please.
12    (The last question was read back.)
13 A. No.
14 Q. (BY MR. RINGEL) You spoke to Mr. Kordick by
15 telephone at least a second time; is that correct?
16 A. That's correct.
17 Q. And when did that second telephone
18 conversation with Mr. Kordick occur?
19 A. Last night.
20 Q. How long was that telephone conversation?
21 A. Maybe 15 minutes.
22 Q. Okay. Was there -- was there anything
23 discussed during that telephone conversation last night
24 that hasn't been discussed and addressed during the
25 deposition today?

**120**

1  A. Yes.
2  Q. What was discussed last night that was not
3  discussed today during the deposition?
4  A. The only thing that stands out in my mind is
5  one or two of my opinions.
6  Q. Okay. And what opinions are those?
7  A. That the conditions at the jail were
8  substandard.
9  Q. Substandard based on what standard?
10 A. Based on any standard you might look at,
11 what a common man -- common man's opinion to what I'd
12 experienced working in the field.
13 Q. And when you say "working in the field,"
14 does that describe -- are you referring to your work at
15 the Buena Vista Correctional Facility?
16 A. Yes.
17 Q. Because other than that, you don't have any
18 corrections experience; isn't that correct?
19 A. Not -- well, as a probation officer, I did
20 have to visit and interview inmates and conduct
21 investigations in county jails, yes.
22 Q. Okay.
23 A. And then 23 years and eight months working
24 in a prison and also being trained at other prisons and
25 visiting other prisons, yes.

**Page 121**

1  Q.  Other than Buena Vista Correctional
2  Facility, how many of the other prisons of the Colorado
3  Department of Corrections have you visited?
4  A.  Oh, wow. Let me think for a minute.
5  Q.  You can just name them for the record if you
6  know you've been there.
7  A.  Off the top of my head, the women's
8  facility, CSP, Shadow Mountain, Fremont Correctional
9  Facility, Arkansas Correctional Facility, Denver
10  Diagnostic and Reception Unit. Some of the work release
11  programs. There are more than that, probably, I'm sure.
12  Q.  How many county jails in New York state did
13  you visit during the time that you were a probation
14  officer?
15  A.  There were two jails, but they were both run
16  by the Nassau County, under the auspices of Nassau
17  County.
18  Q.  The Nassau County Sheriff's Department ran
19  that?
20  A.  Nassau County Sheriff's Department ran the
21  big jail, but the police department had a small jail as
22  well.
23  Q.  And what were the names of those two jails?
24  A.  Oh, wow. Nassau County Jail, and I don't
25  remember what the name of the precinct jail was.

**Page 122**

1  Q.  Does Nassau County essentially consist of
2  Long Island?
3  A.  Nassau County consists of the west end of
4  Long Island.
5  Q.  Anything else you remember in terms of an
6  opinion that you have that was discussed with Mr. Kordick
7  in your telephone conversation with him last night that
8  wasn't brought out during the deposition today?
9  A.  I don't know if it was last night or just in
10  conversation -- I want to be up front about all this
11  stuff, and in my conversation with Mr. Kordick, I believe
12  I offered the opinion that the jail was run for profit,
13  that profit was a very big issue, and that the conditions
14  were less than standard.
15  Q.  Have you ever reviewed the budget of the
16  Park County Jail?
17  A.  No.
18  Q.  Has anyone informed you of any profit or
19  loss information regarding the profit -- regarding the
20  Park County Jail at any time?
21  A.  Captain Gore would occasionally comment
22  about the -- about the profitability of contractual
23  agreements with the state and with INS.
24  Q.  During the time that you worked at the --
25  I'll get to that in a minute. I apologize. Anything

**Page 123**

1  else about any conversation that you had with Mr. Kordick
2  that you recall that wasn't discussed during today's
3  deposition?
4  A.  We might have commented on some of our
5  opinions of character of different employees.
6  Q.  Which employees specifically do you recall
7  commenting on the character of?
8  A.  Sergeant Muldoon.
9  Q.  Okay. What is your opinion of Sergeant
10  Muldoon's character?
11  A.  What is my opinion of Sergeant Muldoon's
12  character?
13  Q.  Correct.
14  A.  He's an honest, moral individual who would
15  tell you the truth. That's my opinion.
16  Q.  Do you recall commenting on anyone else's
17  character?
18  A.  Yes.
19  Q.  Who?
20  A.  Darlene Ellis.
21  Q.  Okay. What's your opinion of Miss Ellis's
22  character?
23  A.  My opinion is that she would -- she would
24  portray things in her favor rather than telling the plain
25  truth.

**Page 124**

1  Q.  Okay. Do you recall commenting on anyone
2  else's character?
3  A.  I made a comment about Mr. Fikejs.
4  Q.  Okay. What is your opinion of Mr. Fikejs's
5  character?
6  A.  That he's somewhat guarded in his -- that I
7  would expect him to be somewhat guarded in his responses
8  and somewhat paranoid.
9  Q.  Was there any discussion of Captain Gore's
10  character with Mr. Kordick?
11  A.  Yes.
12  Q.  Did you provide Mr. Kordick with any opinion
13  about Mr. Gore's character?
14  A.  I'm trying to be as honest as I can here and
15  try to think. Did I? I might have said something to the
16  effect that he will -- he will -- how did I say it?
17  Cover his tracks, that he will -- something to that
18  effect.
19  Q.  Okay. Was there any conversation with Mr.
20  Kordick of Sheriff Wegener's character?
21  A.  No.
22  Q.  Do you have an opinion of Sheriff Wegener's
23  character?
24  A.  No -- yes, I do.
25  Q.  What is your opinion of Sheriff Wegener's

141

you know, I wish I did. When the INS population was at its height -- and it might have been during the time in question with this particular lawsuit -- there was a forthcoming INS inspection, and I secretly hoped that they would come when we were packed because -- let's face it. When the conditions become very, very crowded and resources are stretched very, very thin, it's not only a strain and stress on the detainees and the inmates, it's a tremendous strain on the deputies and staff to make things work. The tension is very high, the conditions are very hard on the deputies. So I secretly hoped that INS would inspect and visually see what the heck was going on in terms of people sleeping on the floors and it being very, very crowded and poor ventilation and poor conditions in general.

And I thought Mr. Gore was rather lucky that there was this giant movement of 50 inmates out, and then INS inspected, like, the next day or the day after when we had ten detainees, and I thought, what a stroke of luck for Mr. Gore.

Q. Do you think that INS was not aware of the number of detainees that they were housing at the Park County Jail at any particular time?

A. They knew how many inmates were detained.

Q. Right.

142

A. Yes, they did.

Q. Did you ever go to any member of the Board of County Commissioners of Park County to raise your concerns about the substandard conditions in the Park County Jail?

A. No.

Q. Why not?

A. As I said, I had a chain of command. I had a sergeant above me, I had a captain above me who were in the jail on a daily basis, or nearly. Conditions were obvious. This is my opinion. It wasn't something that you had to look very hard to see. It was very obvious what the conditions were, and if this is the type of place they wanted to run and they were hiring me to do a job, I did the best I could.

Q. Okay. Did you ever report your concerns with the substandard conditions of confinement at the Park County Jail to the county attorney of Park County at any time?

A. No.

Q. Did you ever report your concerns of the substandard conditions of the Park County Jail to the sheriff at any time?

A. No.

Q. Did you ever report your concerns of the

143

substandard conditions at the Park County Jail to the undersheriff at any time?

A. No.

Q. Did you ever report your concerns of the substandard conditions at the Park County Jail to Captain Gore at any time?

A. Yes.

Q. When?

A. I couldn't give you an exact date.

Q. How many times?

A. I don't know how many times. To clarify, we spoke about specific issues. I wouldn't go to the captain and say, oh, boy, this place is horrible. I wouldn't do that. It was more we need more sheets, we need more towels, we need more soap, we need more space, we need the doors fixed, we need the heating fixed, we need the showers fixed. That kind of stuff.

Q. Did you ever say anything to Captain Gore along the lines of the following: "I believe the conditions at the Park County Jail are substandard"?

A. I don't think I did.

Q. Why not?

A. Because I believed in going through the chain of command, and I had enough -- my sergeant was aware of the conditions, we spoke about them frequently,

144

and I felt it wasn't my place to take it any further.

Q. And when your sergeant -- when you say your sergeant, who are you referring to?

A. Sergeant Flint.

Q. Describe to me your communications with Sergeant Flint about the conditions at the Park County Jail.

A. Well, we worked under those conditions daily, and, you know, it was -- our needs were discussed, and the stress level and the conditions were discussed on an ongoing basis.

Q. When you were having these conversations with Sergeant Flint, did you say anything along the lines of I believe the conditions at the Park County Jail are substandard?

A. I might not have used those exact words, but I'm sure I made that type of estimate or that -- the general meaning of that clear to him.

Q. Did it ever occur to you that maybe you should report your concerns of the conditions at the Park County Jail to somebody?

A. Outside of the organization?

Q. Based on this -- based on our conversation during this deposition, it appears to me that -- and correct my summary if I'm wrong -- that the only people

**Page 145**

1  you raised this issue with were Ben and Dan of the IRS,
2  Sergeant Flint, and Captain Gore. Am I wrong about that?
3      A.  And coworkers.
4      Q.  And coworkers. What are the names of those
5  coworkers?
6      A.  Edward Allen.
7      Q.  Any others?
8      A.  John Thomas.
9      Q.  Any others?
10     A.  Kim Guerrero.
11     Q.  Okay.
12     A.  Let's see. Jack Stanek, who wasn't there at
13 the time frame of this particular incident. Sergeant
14 Muldoon.
15     Q.  Let's use Sergeant Muldoon as an example.
16 Describe your communications with Sergeant Muldoon
17 related to the substandard conditions at the Park County
18 Jail. How would you have raised that issue to Sergeant
19 Muldoon?
20     A.  Simple statements: We got way too many
21 people in this pod; we need sheets; we need -- would you
22 get hold of Jim and get the damn heating fixed. You
23 know, those kind of things.
24     Q.  So that's the way you would raise it to
25 Sergeant Muldoon and your coworkers? Is that a fair

**Page 146**

1  context?
2      A.  It's in the context of trying to make things
3  as livable as possible with the resources I had.
4      Q.  Did you ever have such a conversation with
5  William Fikejs?
6      A.  I would imagine -- I don't know. I would
7  imagine that I might have had a comment, but I couldn't
8  tell you specifically.
9      Q.  Have you ever had such a conversation with
10 Rod Greeley?
11     A.  Not likely.
12     Q.  Have you ever had such a communication with
13 Donald Frye?
14     A.  Not likely.
15     Q.  Have you ever had such a communication with
16 Don Woodward?
17     A.  Yes.
18     Q.  Along similar lines as we were talking about
19 when we used Sergeant Muldoon as an example?
20     A.  Right. Operational issues that needed to be
21 improved.
22     Q.  So specific operational issues -- and when
23 you say "operational issues," you're talking about the
24 heat, the number of sheets, the number of blankets, that
25 kind of thing?

**Page 147**

1      A.  Correct. And overcrowding in general.
2      Q.  Do you recall using the word "overcrowding"
3  with any of your coworkers at the Park County Jail at any
4  time?
5      A.  Not specifically.
6      Q.  When you were working at the Buena Vista
7  Correctional Facility, was it your responsibility to
8  comply with ACA standards?
9      A.  It was, yes.
10     Q.  Did you have any direct responsibility for
11 making sure that the facility complied with ACA
12 standards, or was that someone else's responsibility?
13     A.  No. In my areas of supervision, I had
14 direct responsibility.
15     Q.  Okay. Are you aware of whether or not,
16 during the 23 years that you worked at the -- no, sorry,
17 the -- yeah, 23 years eight months that you worked at
18 Buena Vista Correctional Facility, was that facility
19 always in compliance with ACA standards?
20     A.  No.
21     Q.  Is it a fair statement that many correction
22 facilities don't comply with ACA standards?
23     A.  That's a fair statement, yes.
24     Q.  And it's a -- is it a fair statement that
25 ACA standards are aspirational to a certain extent?

**Page 148**

1      A.  Yes. Some are. Some are mandatory, some
2  are aspirational.
3      Q.  Can you describe, if you were going to do a
4  printout of every ACA standard that would apply to a
5  correctional facility, how much paper are we talking
6  about?
7      A.  We're talking about a file that would be
8  probably half the length of that wall, and so we're
9  talking, like, 15 foot long by 5 feet high.
10     Q.  Entire file cabinet?
11     A.  Yeah.
12     Q.  So is it fair to say that it sometimes is
13 difficult to comply with every single ACA standard?
14     A.  Absolutely.
15     Q.  At the time that you worked at the Park
16 County Jail, it was not ACA accredited; is that correct?
17     A.  That is correct.
18     Q.  What does ACA accreditation mean to you?
19     A.  It means that a certain amount of -- well,
20 that the mandatory standards are met and that the -- I
21 forget what they're called -- discretionary standards are
22 mostly met, and that attempts are being made for all
23 standards to be met.
24     Q.  Does the ACA standards have -- you just
25 talked about it in three categories, right?