### SHEET 1  PAGE 1

```
                                                         1
IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Case No. 2005-WM-377 (BNB)

DEPOSITION OF:  MONTE GORE, VOLUME 1
October 31, 2005

MOISES CARRANZA-REYES,
Plaintiff,
v.
PARK COUNTY, a public entity of the State of Colorado and its
governing board, THE PARK COUNTY BOARD OF COUNTY
COMMISSIONERS; PARK COUNTY SHERIFF'S OFFICE, a public entity
of the State of Colorado; FRED WEGENER, individually and in
his official capacity as Sheriff of Park County, Colorado;
MONTE GORE, individually and in his capacity as Captain of
Park County Sheriff's Department; VICKIE PAULSEN, individually
and in her official capacity as Registered Nurse for Park
County, Colorado; JAMES BACHMAN, M.D., individually and in his
official capacity as Medical Director of the Park County Jail,
Defendants.

TAKEN PURSUANT TO NOTICE AND AGREEMENT on behalf of the
Plaintiff at 824 Castello, Fairplay, Colorado at 9:04 a.m.
before Theresa A. Coffman, Federal Certified Realtime
Reporter, Registered Professional Reporter and Notary Public
within Colorado.
```

### PAGE 3

```
                                                         3
 1                       I N D E X
 2  EXAMINATION OF MONTE GORE                          PAGE
    Volume I
 3  October 31, 2005
 4  By Mr. Trine                                         5
 5  By Mr. Kordick                                      --
 6  By Mr. Archuleta                                    --
 7  By Mr. Ringel                                       --
 8  By Mr. Croome                                       --
 9  By Ms. Lewis                                        --
10  By Mr. Jurs                                         --
11                                                   INITIAL
12  DEPOSITION EXHIBITS:                             REFERENCE
13   1   Park County Jail Sergeants Daily Logs,        144
         various dates and attachments
14
     2   The Park County Jail's Response to the         64
15       Consulate General of Mexico Regarding the
         Medical Concerns of Moises Carranza, 3/14/03
16
     3   Master Control Logs, 3/1 through 3/10          70
17
     4   Park County Jail Policies and Procedures,     193
18       Establishment of Health Care Unit Policy and
         Procedure Manual
19
     5   Park County Sheriff's Office Policy and        22
20       Procedure Manual, 11/1/00, three pages
21   6   Policy, "Communicable Diseases"                39
22   7   Policy and Procedure Manual, Housekeeping,    190
         description of cleaning/disinfecting,
23       Bates Nos. 0416, 1530, 1528, 1529
24  (Original exhibits attached to original deposition; copy
    exhibits included in continuing exhibit file; copies provided
25  to counsel as requested.)
```

### PAGE 2

```
                                                         2
 1                    APPEARANCES
 2  For the Plaintiff:      WILLIAM A. TRINE, ESQ.
                            Trine & Metcalf, P.C.
 3                          1435 Arapahoe
                            Boulder, Colorado 80302
 4
                            LLOYD C. KORDICK, ESQ.
 5                          805 South Cascade
                            Colorado Springs, Colorado 80903
 6
                            JOSEPH J. ARCHULETA, ESQ.
 7                          Law Office of Joseph J. Archuleta
                            1724 Ogden Street
 8                          Denver, Colorado 80218
 9  For the Defendants      ANDREW D. RINGEL, ESQ.
    Park County, Park       Hall & Evans, LLC
10  County Board of         1125 17th Street
    Commissioners, Park     Suite 600
11  County Sheriff's Office, Denver, Colorado 80202
    Wegener and Gore:
12
                            STEPHEN A. CROOME, ESQ.
13                          P.O. Box 1373
                            501 Main Street
14                          Fairplay, Colorado 80440
15  For the Defendant       MELANIE B. LEWIS, ESQ.
    Paulsen:                Berg Hill Greenleaf & Ruscitti LLP
16                          1712 Pearl Street
                            Boulder, Colorado 80302
17
    For the Defendant       ANDREW W. JURS, ESQ.
18  Bachman:                Johnson McConaty & Sargent, P.C.
                            400 South Colorado Boulevard
19                          Suite 900
                            Glendale, Colorado 80246
20
    Also Present:           None
```

### PAGE 4

```
                                                         4
 1  REQUESTED PORTIONS OF TESTIMONY:                   PAGE
 2  Request for document production                     --
    or information
 3
    Certified question                                  --
 4
    Instruction not to answer                           43
 5
    Other requests or marked testimony                  --
 6
 7  REFERENCES TO EXHIBITS MARKED PREVIOUSLY:
 8  (None.)
```

Notes:

Coffman Reporting
303.893.0202
303.893.2230 FAX

**EXHIBIT 3**

### Page 117

1  A.  Right.
2  Q.  And then Crawford, probably at your
3  direction, calls Ben at INS?
4  A.  I believe that would have been what I would
5  have advised him to do, and probably keep me appraised on
6  what's going on with this detainee.
7  Q.  And where would you probably be at that
8  point in time? You're not in the facility?
9  A.  I think this may have been on a weekend.
10  Q.  And if so, you would not have been there?
11  A.  Typically I work Monday through Friday.
12  Q.  Okay. And then at 8:35 when it states,
13  "Sergeant Muldoon called and briefed on a potential" --
14  or "a transfer to medical," was that at your order or
15  recommendation?
16  A.  I believe so. I believe the nurse was
17  called in to come and check on this inmate because the
18  officers had had some issues and felt that he needed to
19  be looked at. I was notified and I think later received
20  a call that INS had been notified, but that they could
21  not respond to the jail to take this individual to the
22  doctor.
23       So I had Sergeant Muldoon placed on stand-by
24  at his residence and, I think, waiting for the nurse to
25  specifically do an assessment, see what we needed to do.

### Page 118

1  And if I had had to have him transported out, Muldoon was
2  to come in and do that transport.
3  Q.  Okay. Well, I'll get to some of these
4  records later, but my recollection from some other
5  records is that the nurse had to get INS's permission to
6  transfer him. Was that the procedure at that time?
7  A.  I don't know if -- typically, anything that
8  had to do with whoever's inmate it was that we were
9  holding, we wanted to notify them. I believe that the
10  nurse -- once again, this is three years ago, but I
11  believe the nurse had called INS and asked for a medical
12  transport and was told it was going to take long -- or,
13  in her opinion, it was going to take too long.
14  Q.  We'll get to those records, but to save some
15  time here, my recollection is the nurse called the INS
16  about the transfer, and INS instructed her that it would
17  be at least three hours before they could get anyone
18  there to transport, but she was not to transport unless
19  his condition got worse.
20       MR. RINGEL:  Object --
21  Q.  (BY MR. TRINE) Now, if that's the case, was
22  it your understanding that you had to have INS's
23  permission to transport an inmate who is sick in an
24  emergency?
25       MR. RINGEL:  Object to the form and

### Page 119

1  foundation.
2  A.  No. I think I would have had a moral
3  obligation, if we have an inmate that needs medical --
4  we're going to take the inmate whether I get permission
5  or not.
6  Q.  (BY MR. TRINE) And wouldn't you be able to
7  take that inmate without even calling INS in an
8  emergency?
9  A.  If it was deemed an emergency.
10  Q.  You could?
11  A.  Yes.
12  Q.  Okay. In other words, you wouldn't have to
13  wait for INS to provide transportation in an emergency,
14  would you?
15  A.  Well, if we had an emergency taking place,
16  then typically we're going to respond to that as an
17  emergency.
18  Q.  So I guess the answer to my question is you
19  could do that without INS providing the transportation;
20  is that right?
21  A.  And we did. We actually -- I had my staff
22  do the transportation. And I believe that was due to the
23  nurse feeling that he had to see a doctor.
24  Q.  So at 8:35, Muldoon was called and told to
25  stand by, he might have to transfer someone to Summit

### Page 120

1  County, right?
2  A.  Yes.
3  Q.  And then at 8:50, Deputy Theobald went to
4  the store to get some juice for this inmate,
5  Carranza-Reyes, right?
6       MR. RINGEL:  Object to the form and the
7  foundation.
8  A.  That's what the log indicates.
9  Q.  (BY MR. TRINE) And then at 8:53, it was
10  noted that Carranza-Reyes had blood in his spit; is that
11  right?
12  A.  That's what's indicated by the log.
13  Q.  And that was apparently noted by who?
14  Crawford?
15  A.  That's what it looks like, Officer Crawford.
16  Q.  Were you notified of the fact that he
17  apparently was spitting up blood?
18       MR. RINGEL:  Object to the form and
19  foundation.
20  A.  I don't recall specifically. I was getting
21  calls. I think I did get one call where I was notified
22  that we had a pretty ill inmate in D Pod and that the
23  nurse had been called to do an evaluation.
24  Q.  (BY MR. TRINE) Well, the records of those
25  calls would be either the nurse's cell phone calls or the