UNITED STATES DISTRICT COURT
DISTRICT OF COLORADO

MOISES CARRANZA-REYES,            )
                                  )
            Plaintiff,            )
                                  )
      v.                          )  No. 05CV-00377-WD-BNB
                                  )
THE PARK COUNTY BOARD OF          )
COUNTY COMMISSIONER; FRED         )
WEGENER, individually and in      )
his official capacity as          )
Sheriff of Park County,           )
Colorado; MONTE GORE,             )
individually and in his           )
official capacity as Captain      )
of Park County Sheriff's          )
Department; VICKIE PAULSEN,       )
Individually, and in her          )
official capacity as              )
Registered Nurse for Park         )
County Colorado; and JAMES        )
BACHMAN, M.D., individually       )
and in his official capacity      )
as Medical Director of the        )
Park County Jail,                 )
                                  )
            Defendants.           )
                                  )

DEPOSITION OF
CATHERINE M. KNOX
Taken in behalf of Defendants
*   *   *
October 4, 2006
805 Broadway Street
Portland, Oregon

Shon McClements
Court Reporter





400 Columbia, Suite 140
Vancouver, WA 98660
(360) 695-5554
Fax (360) 695-1737

Schmitt & Lehmann, Inc.
C O U R T   R E P O R T E R S

121 SW Morrison St., Suite 850
Portland, OR 97204
(503) 223-4040
slinc@qwest.net

EXHIBIT
6

Catherine knox, 10/4/2006                                    Carranza vs. Park County Board of County Commissioner

**Page 17**

1    A. I haven't worked in that type of setting for
2  years. My area of practice has been psychiatric
3  nursing. I worked with children in a mileau,
4  M-I-L-E-A-U, therapy. I have -- my other area of
5  specialty is nursing administration.
6    Q. And how long did you work in a clinical
7  setting? You said with children, correct?
8    A. For I believe two and a half years.
9    Q. Did you ever work with adults in a clinical
10 setting as I have defined it?
11   A. No, I have not. I guess let me just add one
12 clarification. I think part of being an
13 administrator is the ability to work clinically, and
14 so I have on occasion for brief periods of time --
15 for instance, there have been two or three occasions
16 where in my employment there has been a union action
17 causing a strike, and I have provided direct clinical
18 care as a manager in a strike situation.
19          I have had some other occasions where
20 because of staffing I have gone in and provided
21 direct care, but it is not really -- in my opinion I
22 don't consider myself facile in the provision of
23 direct patient care.
24   Q. And have you done what you have just
25 described in the correctional setting?

**Page 18**

1    A. Yes.
2    Q. Gone in and treated patients or worked with
3  patients?
4    A. Yes.
5    Q. And was that in Oregon or Washington?
6    A. Both.
7    Q. Do you supervise registered nurses?
8    A. Yes, I do.
9    Q. How many nurses now do you supervise?
10   A. I haven't counted. There are 16 facilities
11 in the State of Washington that employ nurses, and I
12 have a supervisory responsibility for their clinical
13 practice. The nurse group who I supervise more
14 directly would be considered the nursing managers or
15 nursing supervisors, and there are I believe 27 of
16 those. There are perhaps another 200 line-registered
17 nurses supervised by the supervising authority
18 currently.
19   Q. So if I understand it, there is about 200
20 line nurses, as you have described it, and then above
21 them there is a layer of supervision; is that
22 correct?
23   A. Correct.
24   Q. But that's not you, right?
25   A. That's correct.

**Page 19**

1    Q. But you're above that layer of supervision?
2    A. Yes.
3    Q. So when you say you supervise registered
4  nurses, what type of things do you do to supervise
5  them?
6    A. I, for example, in the last, say, six months
7  have revised the position description for LPNs and
8  RNs in the Washington Department of Corrections to be
9  more explicit and to -- more -- be more closely
10 aligned to the Practice Act in the State of
11 Washington.
12          I worked with a group of supervising
13 registered nurses to ensure that the description and
14 expectations that go along with that were reasonable
15 in terms of the practice expectations for nurses in
16 that setting. I review incidents of -- where there
17 are performance problems and make decisions about
18 discipline of registered nurses relative to their
19 practice. I develop protocols or instructions about
20 how to accomplish certain kinds of tasks in the
21 correctional setting.
22   Q. When you say you review disciplinary type of
23 actions, what level are you involved in that? What
24 I'm trying to figure out is does the middle
25 supervisor come up with a recommendation for you or

**Page 20**

1  do you come up with your own recommendation? How
2  does that work?
3    A. In Washington -- I guess I want to
4  editorialize a little bit and I shouldn't. In
5  Washington the appointing authority, which is the
6  level that I am at, is the level within the
7  organization that is required to make decisions, and
8  the advice that we have been given by the attorney
9  general is that you don't want to receive
10 recommendations from subordinates within the
11 organization because it ties your hands relative to
12 discipline.
13          In that regard I have both investigated --
14 we call it investigation, but it is the collection of
15 information, the interview of people, to develop the
16 facts around the case, to look at or to compare the
17 actual facts against policy, procedure and so forth,
18 what should have happened, then from that to make a
19 decision.
20          I have also reviewed investigations that
21 have been done by others and have used that to
22 basically make a decision about discipline.
23   Q. Do you have any experience with nursing in
24 Colorado?
25   A. No, I do not. As a direct -- I'm not

Catherine knox, 10/4/2006                    Carranza vs. Park County Board of County Commissioner

21

1  licensed in Colorado, and I have not practiced in
2  Colorado.
3      Q.  And you have not supervised any nurses
4  working in Colorado, correct?
5      A.  Correct.
6      Q.  Have you ever worked in a county jail
7  setting?
8      A.  It depends on your definition.  I have --
9  did have a consulting agreement with the Yuma County
10  Jail and in that capacity was responsible for helping
11  a vendor kind of establish the health care operations
12  at that facility and in that capacity supervised the
13  nursing staff.
14      Q.  Is that Yuma County in?
15      A.  Arizona.
16      Q.  Arizona.  Okay.
17      A.  I'm sorry.  Your question was have I worked
18  in a county jail?
19      Q.  Correct.
20      A.  And so that would be the only situation
21  where I have had -- that's the most direct
22  responsibility that I have had.
23      Q.  When you did that role, were you actually
24  there on site?
25      A.  Yes, I was.

22

1      Q.  How long were you there?
2      A.  Three and a half weeks.
3      Q.  If you could look at the first page of your
4  CV, the paragraph that is under the heading
5  Consultant, there is a line that says, Evaluated
6  nursing services at Pierce County on behalf of the
7  court monitor and provided recommendations on
8  staffing, scheduling and program development.
9          Do you see that?
10      A.  Yes, I do.
11      Q.  What does that mean, that you evaluated
12  nursing services at Pierce County on behalf of the
13  court monitor?
14      A.  Pierce County is in Tacoma, Washington, and
15  had been involved in a -- what I understand is a
16  class action lawsuit about adequacy of care for
17  several years and had a court monitor appointed.  The
18  court monitor asked or recommended to the County that
19  they retain my services to do exactly that, evaluate
20  how the health nursing services were organized, the
21  number of FTE, where they were allocated, what
22  functions -- and what functions they performed, and
23  so that is the basis of the advice for consultation
24  that I gave them.
25      Q.  Did you give written recommendations?

23

1      A.  I thought that I did.  I believe so.  That
2  would have been in I think 2001, and I might have a
3  vivid recollection of verbal recommendations than I
4  do of the written report, but I believe a written
5  report was required.
6      Q.  Do you know if that report was filed in any
7  court?
8      A.  I do not know.
9      Q.  What were the recommendations regarding
10  staffing for Pierce County?
11      A.  Pierce County was constructing a new
12  facility, and so the staffing recommendations were
13  what FTEs and what types of FTEs were necessary to
14  operate in the old jail during the time of transition
15  to the new facility, and then once the new facility
16  was fully operational what kind of staffing would be
17  necessary to deliver services.
18      Q.  Do you know what the inmate population was
19  there?
20      A.  I don't remember specifically.  I would say
21  that it's a medium-sized jail in an urban setting.
22      Q.  So it's not like 50 inmates, you know, a
23  ballpark?  It would be more than that, right?
24      A.  It was more like 400 to 600.
25      Q.  Were nurses working at Pierce County

24

1  responsible for setting the staffing levels?
2      A.  No.
3      Q.  Who was responsible?
4      A.  The health care administrator and the County
5  Sheriff.
6      Q.  So is it your experience that the decision
7  of how many registered nurses to have on staff is
8  made by administration --
9      MS. VEIGA:  Objection as to form.
10      Q.  (By Ms. Lewis) -- at a county jail?
11      A.  I'm sorry.  Would you repeat the question?
12      Q.  Is it your experience that a decision about
13  how many nurses to have on staff is made by
14  administration or the nurses?
15      MS. VEIGA:  Objection as to form.
16      Q.  (By Ms. Lewis) Which one?
17      A.  What I would -- here is my -- I will answer
18  your question the best I can.  It is my experience
19  that the health authority, whoever that is, and in
20  some cases that may be a nurse, is in a position to
21  make recommendations about the staffing at a
22  facility.  Usually there are many other people who
23  also have input into the process as well, but the
24  health authority -- and if the health authority is
25  not a nurse, many times some nurse who is in a

Catherine knox, 10/4/2006                                Carranza vs. Park County Board of County Commissioner

25

1  position of authority will have some input into the
2  staffing, nurse staffing at a facility.
3      Q.  Do you know whether your recommendations at
4  Pierce County were implemented or not?
5      A.  I believe that they were partially
6  implemented but not fully implemented.
7      Q.  And which parts were not implemented; do you
8  know?
9      A.  Well, again, what I have understood is that
10  the staffing recommendations were implemented more
11  slowly and not as completely because the population
12  numbers changed and the time frame for opening
13  sections of the new facility were changed.
14      Q.  To your knowledge, have there been any
15  inmates who have sued Pierce County claiming that
16  anything that was implemented on your recommendation
17  was somehow unlawful?
18      A.  I do not have any knowledge.
19      Q.  Have you ever been sued before?
20      A.  I have been a named defendant in some
21  litigation with the Oregon Department of Corrections.
22      Q.  And was that a suit filed by an inmate?
23      A.  Yes.
24      Q.  Do you know the name of that inmate?
25      A.  No, I don't.  I know that it was a group

26

1  of -- there were several suits that got collected
2  together into one, and I don't know the name of it.
3  The case was actually heard after I left Oregon.
4      Q.  Do you know what the outcome of the case
5  was?
6      A.  I believe that the state settled.
7      Q.  Do you know what the nature of the
8  allegations against you were?
9      A.  The nature of the allegations I believe
10  against me had to do with my role as the
11  administrator of the health services department and
12  the department's policies relative to the treatment
13  of Hepatitis C.
14      Q.  Did you believe that the lawsuit had any
15  merit to it?
16      A.  That's a hard question to answer.  I think
17  every lawsuit has some merit to it.
18      Q.  Have you ever established any standards or
19  procedures addressing issues that are similar to the
20  ones that are in this present case with Moises
21  Carranza-Reyes?
22      A.  Yes, I have.
23      Q.  And what standards or procedures are those?
24      A.  I guess I would first say that in the Oregon
25  Department of Corrections, so this would be prisons

27

1  rather than jails, I established policies and
2  procedures for health services when there were none
3  to begin with.
4      So, for example, kind of making an analogy
5  to this case, establishing the policy procedure for
6  receiving screening, establishing policies and
7  procedures for how to receive and act on requests for
8  medical attention, policies and procedures about
9  infection control, policies and procedures about
10  access to emergency services, policies and procedures
11  relative to the transfer of patients to another, like
12  a hospital for care, policies and procedures -- these
13  all would relate to how you process a request for
14  medical attention, development of nursing protocols.
15      Q.  Where would I find a copy of those policies
16  and procedures?
17      A.  At the DOC website.
18      Q.  DOC for --
19      A.  Oregon Department of Corrections website.
20      Q.  And is it your opinion that these policy --
21      A.  I guess -- let me continue.  I have done --
22  had similar responsibilities when I was with the
23  contractor who was providing services at the New
24  Mexico Department of Corrections facilities and have
25  begun to do the same for the Washington Department of

28

1  Corrections.
2      Q.  So you have actually made policies and
3  procedures that are now implemented in New Mexico?
4      A.  In New Mexico I was working for a contractor
5  called Addus Health Care, and those policies and
6  procedures were in place during the time that Addus
7  Health Care had the contract, that the State of New
8  Mexico no longer contracts with Addus.  They contract
9  with another vendor, so those policies and procedures
10  were only in effect during the time that Addus was
11  there.
12      Q.  And then you are working on some for
13  Washington, right?
14      A.  Correct.
15      Q.  Are all of the policies and procedures the
16  same?
17      A.  No.
18      Q.  Why are they different?
19      A.  Lots of reasons.  An example would be in
20  Washington the Nurse Practice Act is a little bit
21  different than it is in Oregon and in New Mexico.
22  Specifically in Washington the Practice Act does not
23  recognize the ability of nurses to -- they do not
24  recognize yet the ability of nurses to assess and
25  implement some forms of either additional data

Catherine knox, 10/4/2006                    Carranza vs. Park County Board of County Commissioner

---

**37**

1    Q.  What else?

2    A.  It depends.  Sometimes you will see O2 sats.

3  It depends on what the presenting complaint is.

4    Q.  How do you measure for O2 sats?

5    A.  It's with a little machine.

6    Q.  Do you know what the normal range for a

7  temperature is?

8    A.  Yes.

9    Q.  98.6; is that right?

10   A.  Yes.

11   Q.  Is anything other than 98.6 within normal

12  range?

13   A.  You mean is there a range?

14   Q.  Right.

15   A.  Yes, there is.

16   Q.  What's the range?

17   A.  Anywhere from, I don't know, 98 to 99.  This

18  is a low temperature.

19   Q.  And low you mean above the normal range?

20   A.  Correct.

21   Q.  But a low fever?

22   A.  Yes.

23   Q.  And pulse, what's the normal range for a

24  pulse?

25   A.  Well, it's a wider range for what would be

---

**38**

1  considered normal, but somewhere between 60 to 80.

2    Q.  And how about respirations?

3    A.  Again, the range may be a little bit more

4  narrow.  Well, anywhere from 14 to 20.

5    Q.  How does a nurse determine if a patient has

6  a history of heart, stomach or gastrointestinal

7  problems?

8    A.  I beg your pardon?

9    Q.  In your experience how does a nurse go about

10  determining--if a patient has a history of heart,

11  stomach or gastrointestinal problems?

12   A.  By asking a series of questions.  Do you

13  have a history of heart problems.  Do you have a

14  history of stomach problems.

15   Q.  From looking at this can you tell whether

16  Ms. Paulsen asked the patient about his history?

17   A.  I believe she did ask him about his history

18  for these problems, yes.

19   Q.  In your report you state that Ms. Paulsen

20  did not look at his throat.  Why did you reach that

21  conclusion?

22   A.  Because I would -- if she had looked at his

23  throat, she would have described it, and she did not.

24   Q.  Are you aware that she testified under oath

25  that she did look at his throat?

---

**39**

1    A.  I have a recollection that she said that she

2  did.  It would be expected that she would.

3    Q.  Despite that testimony you still believe she

4  did not look at the throat; is that right?

5    A.  That's correct.  I think part of what

6  weighed into that is, one, it's not documented that

7  she did.  With a complaint of a sore throat you would

8  expect to see some documentation of what the inside

9  of the throat looked like, and I believe that

10  Carranza-Reyes described her not doing that as well.

11   Q.  So if I understand it, you're deciding to

12  disbelieve Ms. Paulsen on that point, correct?

13   A.  Correct.

14   Q.  You said she did not take a complete set of

15  vital signs.  Do you see that in the first paragraph?

16   A.  Yes.

17   Q.  And from what you've just said, I'm

18  determining that you think she should have taken

19  blood pressure; is that right?

20   A.  I think blood pressure would have been

21  appropriate.  This is his first opportunity to see

22  her, so it basically is what would be considered the

23  entry health appraisal and the opportunity to collect

24  baseline data, so other, quote, vital signs, would be

25  his body weight.  Blood pressure would be important.

---

**40**

1  I think that's it.

2    Q.  You state that her examination was not

3  adequate.  How do you reach that conclusion?

4    A.  When I say that, what I'm meaning is both

5  the combination of what I consider the subjective and

6  the objective portion of the assessment, so it's the

7  things that we have already talked about.  It's the

8  asking of the questions about the subjective

9  complaint to gather more information, the physical

10  examination, the looking at the throat and the

11  collection of vital signs.

12   Q.  How would that information, collecting of

13  the additional vital signs, more questions to the

14  patient, have changed the examination in your

15  opinion?

16   A.  Well, since this is the first contact I

17  think the most important thing that would have been

18  established is a more solid baseline of what his

19  condition was and the length of time that he had been

20  experiencing these symptoms.

21   Q.  In other words, if she had done the things

22  that you think she should have done, would it have

23  changed her examination, the steps she took to

24  examine the patient?

25   A.  Would it have changed the outcome?

---

Catherine knox, 10/4/2006                    Carranza vs. Park County Board of County Commissioner

---

**41**

1  Q.  Would it have changed not the outcome but
2  what she did to determine the outcome?  Do you
3  understand what I'm saying?
4  A.  No, I don't.
5  Q.  Okay.  If she had obtained the additional
6  information, would she have done other examination of
7  him that wasn't done, other than the vital signs and
8  asking questions?
9  A.  I'm not sure I yet understand your question,
10  but let me try to answer what I think you're asking
11  me.  What I'm trying to convey is that her
12  examination was so narrowly focused that I think she
13  missed important information that she would have
14  collected had she asked questions and established a
15  broader basis for this initial contact against which
16  she could evaluate his symptoms and progression in
17  subsequent contacts.
18      It's hard for me to speculate what she would
19  have done differently had she asked these questions.
20  Since she did not, I don't know.
21  Q.  Okay.
22  A.  Am I understanding your question?
23  Q.  I think you answered what I was trying to
24  find out, in that you said that you think she missed
25  important information that would have given her --

**42**

1  that would have guided her overall assessment,
2  correct?
3  A.  Correct.
4  Q.  And what information is that?
5  A.  I believe that most important what -- well,
6  I need to think about this, but my first reaction is
7  that the most important information that she missed
8  was the length of time that he had been experiencing
9  symptoms, the fact that he had requested medical
10  attention I believe the day before.  He had been
11  having symptoms I think for two days prior to the day
12  that she saw him; that if she did not already know
13  would have had information about others in the block
14  experiencing similar symptoms, which might have
15  resulted in a different conclusion that she reached.
16  Q.  Can you say with a reasonable degree of
17  certainty that that information would have resulted
18  in a different conclusion or just that it might have?
19  A.  I can say with a reasonable degree of
20  certainty that knowing more specifically how long he
21  had been experiencing symptoms was significant.
22  Q.  But that's a different issue than what I was
23  asking, which is would this information to a
24  reasonable degree of certainty have altered the
25  outcome or would it just might have altered it?

**43**

1  A.  Define what you mean.  The outcome of this
2  episode of contact here or the ultimate outcome in
3  the case?
4  MS. LEWIS:  Can you read two questions back.
5  (The Reporter read back Lines 16 through 18
6  of Page 42.)
7  Q.  (By Ms. Lewis) Do you understand that
8  question?
9  A.  I would ask you the same question.
10  Different conclusion at the end of this encounter or
11  a different conclusion in terms of the case?
12  Q.  A different conclusion at the end of this
13  encounter.
14  A.  Okay.  What I think the difference it would
15  have made is -- when she says she asked the
16  interpreter to tell him to let medical know if he is
17  not improving, that she's -- and she does say in
18  the -- she is treating -- in my opinion, she's
19  treating this as though it is a more recent
20  complaint, and a person who has experienced symptoms
21  like these already for two days who is not improving
22  when she saw him the following day, I believe that
23  would have changed the outcome.  That's probably not
24  as clearly stated as it could be.
25  Q.  So if I understand you correctly, you

**44**

1  believe that that additional information would have
2  changed her conclusions at the end of that visit,
3  right, not just that it might have?
4  A.  The end of the second visit I believe it
5  would have changed her conclusions.
6  Q.  So the first visit was March 6th, correct?
7  A.  Correct.
8  Q.  And so you're saying at the end of the
9  second visit on March 7th, is that right, it would
10  have changed her conclusions?
11  A.  I believe so.
12  Q.  So with respect to what she did on
13  March 6th, the first visit, do you believe she acted
14  below the standard of care?
15  A.  Well, on March 6th where I think she acted
16  outside of or below the standard of care is that she
17  is treating him symptomatically for body aches, the
18  nasal congestion and the nausea with symptomatic
19  treatment that she has no protocols to use or to do.
20  If she had sought medical direction at this
21  point, I believe that at least there would have been
22  consideration of whether or not to do any lab work at
23  this point to try to identify the cause of the sore
24  throat, whether he had influenza.
25  Q.  To be clear, what would the standard of care

Catherine knox, 10/4/2006                Carranza vs. Park County Board of County Commissioner

45

1  dictate she would have done on this visit of
2  March 6th, 2003, that she didn't do?
3      A.  If she was going to treat him with the
4  Motrin, the CTMs and the Pepto-Bismol, I believe she
5  would have called for orders.
6          MS. VEIGA:  I'm sorry.  I didn't hear that
7  last response.
8          THE WITNESS:  I will just repeat it.
9          If she was going to treat him with Motrin,
10  the CTMs and the Pepto-Bismol, that she would have
11  called for orders.
12         MS. VEIGA:  Thank you.
13     Q.  (By Ms. Lewis) So it's your opinion that a
14  nurse has to call for orders before instructing a
15  patient to take over-the-counter medications; is that
16  right?
17     A.  Correct.
18     Q.  And that any failure to do that was
19  negligence, below the standard of care, right?
20     A.  Correct.  These medications are not
21  available in the cell block for a person to select.
22  They have to be provided to the patient, so it puts
23  the nurse in the position of administering treatment.
24         The other thing I think could have occurred
25  is that there would have been consideration by a

46

1  higher medical authority about whether or not
2  additional objective data should be collected, such
3  as lab work.
4      Q.  But you would agree with me that these
5  medications are ones that are available over the
6  counter to the general population who are not
7  incarcerated, right?
8      A.  These are available to the general
9  population in the community without a prescription.
10  In correctional facilities, if there is nursing
11  contact and the nurse is recommending that the
12  patient take them, rather the patient freely taking
13  them, then it falls into the nursing administration
14  medication, and in most states that would be
15  considered something that either required a nurse to
16  have a protocol or a direct order.
17     Q.  So let me understand your position.  If this
18  scenario had occurred in a general practice that was
19  not in the correctional setting, do you believe that
20  her actions would have been below the standard of
21  care?
22     A.  I can't comment on kind of the
23  non-correctional setting because that's not where I
24  practice.  I believe that in the -- I know that these
25  are available in the local supermarket, and if a

47

1  nurse had said to someone in a clinic, you know, what
2  have you taken to help you with your body aches, what
3  the patient has the free ability to choose what
4  symptomatic treatments they want to take.
5      Q.  But is it below the standard of care for a
6  nurse to recommend that a patient take
7  over-the-counter medications to alleviate their
8  symptoms?
9      A.  I don't believe that it's below the standard
10  of practice for a nurse to say, Have you tried
11  Motrin.  Have you tried Pepto-Bismol.  Have you tried
12  whatever; even to provide some education to the
13  patient about what kind -- what can symptomatically
14  relieve symptoms, but to package and to provide an
15  over-the-counter is essentially to administer
16  treatment that should be -- should be done under a
17  prescription or a standing order.
18     Q.  So in the non-correctional setting, if the
19  nurse gives a sample of Advil, is that below the
20  standard of care because the nurse administrates it?
21  Is that what I'm understanding you to say?
22     A.  So say your question again so I make sure I
23  understand it before I answer.
24     Q.  If a nurse in a non-correctional setting
25  gives you a sample of Advil, that's usually over the

48

1  counter, you know, a couple of pills to take, is that
2  below the standard of care just because the nurse
3  hands it to you rather than you going to the store
4  and buying it yourself?
5      A.  What I don't know about the scenario that
6  you're describing is that I believe that there would
7  be -- you're in a clinic.  You have seen a provider
8  who has probably recommended and prescribed that you
9  take that.  In that case then the nurse would give it
10  to you.
11         MS. LEWIS:  If we could just take a break
12  for a little bit.
13         (A recess was taken from 9:25 a.m. to 9:42
14  a.m.)
15     Q.  (By Ms. Lewis) Ms. Knox, to go back to what
16  we were discussing before the break, I want to make
17  sure I understand your question because the questions
18  have been a little confusing, and I'm not sure that I
19  understand your answer.
20         Are you saying that only a doctor can
21  instruct a patient to take over-the-counter
22  medications for nausea, diarrhea, nasal congestion,
23  body aches and sore throats in a correctional
24  setting?
25     A.  Correct.  In the absence of written

Catherine knox, 10/4/2006                         Carranza vs. Park County Board of County Commissioner

49

1    directions, like protocols or standing orders.
2         Q.  So if protocols were in place allowing a
3    nurse to do that, then that would be okay?
4         A.  Correct.
5             MR. LURS:  Objection.
6         Q.  (By Ms. Lewis) Do you know whether protocols
7    were in place or not?
8         A.  My understanding from Vickie Paulsen's
9    testimony is that protocols were not in place.
10        Q.  You rely on the Nurse Practice Act for
11   Colorado in your report, right?
12        A.  Correct.
13        Q.  Does the Nurse Practice Act say whether or
14   not a nurse can instruct a patient to take
15   over-the-counter medications for symptoms such as
16   Mr. Carranza-Reyes had without protocols?
17        A.  I --
18            (Deposition Exhibit No. 93 was marked for
19   identification.)
20        Q.  (By Ms. Lewis) For the record, I have marked
21   your copy as Exhibit 93.
22        A.  Is it all right if I refer to my copy of the
23   same thing?
24        Q.  That's fine.
25        A.  It's highlighted.

50

1             I think the -- let me just -- I think a
2    nurse under the Colorado Nurse Practice Act can
3    provide advice to a patient about self-care.  Where I
4    think this case -- and just referring to the
5    documentation that nurse Paulsen wrote in her
6    encounter on 3/6, is that what I understood was she
7    basically was providing more than advice.  She was
8    providing the medication.  That for me is the
9    distinction.
10        Q.  And the reason she was providing the
11   medication is because all medications in a
12   correctional setting are controlled, right?
13        A.  Correct.  Which means that the nurse moves
14   from providing advice to providing treatment.
15        Q.  So the standard of care for a nurse in a
16   correctional setting is different for one in a
17   general practice setting; is that right?
18        A.  No.  The setting is different.  That's what
19   causes the difference that you are describing in
20   terms of practice, but it is the setting that is
21   different.  The patient is unable to take -- is
22   unable to be responsible for their own actions
23   relative to the advice that the nurse has given them
24   and is dependent upon the nurse for the symptomatic
25   treatment.

51

1         Q.  Let's go to March 7th, the part of your
2    report that talks about March 7th.  It's at the
3    bottom of page 1.
4         A.  Okay.
5         Q.  Now, Mr. Carranza-Reyes' symptoms changed
6    between the 6th and the 7th, correct?
7         A.  Correct.
8         Q.  As with the 6th I would like to ask you what
9    information did she not obtain on March 7th that you
10   think she could have?  If you need to, you can look
11   at what's Bate numbered Park 3528 which was
12   previously marked as an exhibit in the case.
13        A.  Thank you.
14            MS. LEWIS:  That's the nursing note from
15   March 7th, 2003, Jennifer.
16            MS. VEIGA:  Yeah.  I have it in front of me.
17   Thank you.
18            THE WITNESS:  I'm just taking a look at it
19   quickly.  Okay.  Your question again?
20        Q.  (By Ms. Lewis) Your report at the bottom of
21   page 1 says, At the second encounter Ms. Paulsen, RN,
22   failed to do an adequate assessment.  Why do you
23   reach that conclusion?
24        A.  Well, again, it's based on what's documented
25   here in the way of her charting, and I think the

52

1    next -- the paragraph at the top of page 2 describes
2    at least partially what I think is missing.  He had
3    diarrhea.  Do you want me to go on or am I -- I guess
4    I'm not -- I'm not sure I'm responsive to your
5    question.
6         Q.  I think you are.  If you can go on and
7    then --
8         A.  About what I think is missing?
9         Q.  Right.
10        A.  He complained of nausea and diarrhea on 3/6,
11   and I think -- so he continues with diarrhea, but now
12   he has vomiting in addition, and this is a person who
13   has traveled from Mexico over a period of days here
14   to arrive in a jail I believe on the 1st of March and
15   probably was dehydrated as a result of that
16   experience as well, so I would imagine it's highly
17   likely that he had some dehydration to begin with, so
18   now he's got diarrhea and in addition vomiting.
19            At this point one of the things she didn't
20   ask in the first interview and she doesn't ask in the
21   second interview is, you know, how much, how long,
22   how often, to get a sense of really to what extent
23   dehydration is a factor in the symptoms that are
24   presenting.  That could be the rapid pulse.  It could
25   effect changes in blood pressure, things like that.

**53**

1      Let's see.  She fails again to inquire about
2  the history and frequency and so forth of all of the
3  symptoms, not just the new ones.  Vital signs are
4  incomplete, again, without a blood pressure.  She had
5  a -- again, she had -- on the first encounter on the
6  6th she asked him to return if he wasn't getting
7  better.  He returns because he's not getting better
8  and in addition has new symptoms.  It's the second
9  opportunity again to do a more thorough physical
10  examination which would include looking at his ears,
11  as I have said here, nose and throat.
12      Let's see if there is anything else.  I
13  think that's it.
14      Q.  Again, you don't know for a fact whether she
15  did inquire how much, how long, how often of the --
16  he was experiencing diarrhea or vomiting, correct?
17      A.  If she had, she would have documented it.
18      Q.  So you're assuming from the fact that she
19  did not document it that she therefore did not
20  inquire; is that right?
21      A.  Correct.
22      Q.  But you weren't there.  You don't know
23  whether she did or didn't, right?
24      A.  Well, there is her deposition, and there is
25  Moises Carranza-Reyes' deposition, and my

**54**

1  recollection of both of those is that it confirms
2  that -- not specifically, but I came away with the
3  opinion that it confirmed or was consistent with what
4  she had charted in that her inquiries were very much
5  focused on what he told her his presenting symptoms
6  were and not any background or additional
7  questioning.
8      Q.  But you have previously testified today that
9  you're disbelieving her sworn testimony, right?
10      A.  I think your question was that in
11  relationship to something specific about the first
12  encounter.  There was her testimony.  There is the
13  written documentation, and then there is Moises
14  Carranza-Reyes.  That had to do with checking his
15  neck, if I recall, and I said that, yes, I was not
16  believing that she had examined his throat I think is
17  what I recall.
18      Q.  Are you giving more weight in this case to
19  Moises Carranza-Reyes' version of events than
20  Ms. Paulsen's version of events?
21      A.  I don't believe that I am.
22      Q.  Do you agree that their description of the
23  events that transpired on March 6th and March 7th are
24  different?
25      A.  I think there is a lot of consistency

**55**

1  between their description of events.
2      Q.  Again, when you say didn't get the full set
3  of vital signs, we were talking about the blood
4  pressure is the one that you think she should have
5  obtained on March 7th, right?
6      A.  Correct.
7      Q.  And later in that paragraph you say, She did
8  not examine his ears, nose or throat or look more
9  closely at the extent to which he may be dehydrated.
10  Do you see that?
11      A.  Yes, I do.
12      Q.  With regard to the throat, again, are you
13  disbelieving her testimony that she did look at the
14  throat to reach that conclusion?
15      A.  I don't recall any specific testimony from
16  her on this occasion about whether she looked at his
17  throat.  I -- my recollection is that had to do with
18  the contact on the 6th, so I'm relying on what's
19  charted here and not her testimony.
20      Q.  In the next paragraph on page 2 it says,
21  Ms. Paulsen, RN, did not consider the possibility
22  that the illness Mr. Carranza-Reyes had was
23  infectious and communicable.
24      A.  You know, I'm not tracking you.  Where are
25  you?

**56**

1      Q.  That's my fault.  I'm on Exhibit 91 which is
2  your report, second page, second paragraph.
3      A.  Starts with, She did not collect?
4  Ms. Paulsen was negligent?
5      Q.  Yes.  Actually, the second sentence of the
6  second paragraph.  Do you see that sentence?
7      A.  Yes.
8      Q.  How do you know she didn't consider those
9  issues on March 7th?
10      A.  Because there is nothing documented that
11  would indicate that she did.
12      Q.  Again, it's your opinion that she should
13  have documented all of this type of information in
14  the record, right?
15      A.  Absolutely.
16      Q.  What actions should have been taken before
17  the weekend to ensure that Moises Carranza-Reyes'
18  condition didn't deteriorate over the weekend?
19      A.  The things I was thinking about at this
20  point were that the weekends are generally without
21  medical coverage at the jail, so she knew she was not
22  going to be present on Saturday and Sunday.  So
23  Moises' condition would be monitored by what are
24  called deputies in the jail, and I don't see that
25  there are -- I think she gave maybe some general

Catherine knox, 10/4/2006                                Carranza vs. Park County Board of County Commissioner

---

**57**

1　expectations but nothing specific about what to look
2　for to monitor his condition, whether it was getting
3　better or deteriorating.
4　　　　I believe that she -- given that -- and
5　there are some standards to back this up, that he was
6　presenting a second time for the same complaint, and,
7　in fact, his -- he had additional symptoms, so it
8　should have been clear that the symptomatic efforts
9　to treat him were not working and at that point to
10　have called and obtained more specific either orders
11　or medical direction to be implemented before what is
12　essentially a 48-hour wait for the next time health
13　care staff are present in the jail.
14　　　　I think the -- so what I was I guess trying
15　to say and what she did not consider, what actions,
16　the two that I can think of is to have discussed with
17　the physician or the nurse practitioner his case and
18　whether or not lab work or medications, more than
19　these over-the-counter, could be ordered and to have
20　provided I think -- not I think, but more specific
21　instructions to the officers about the things like
22　how much fluid he needed, monitoring his vomiting and
23　diarrhea, being sure that he was kept warm in terms
24　of his convalescence.
25　　　　Q.　You said something interesting just now.

---

**58**

1　You said that his condition on the 7th suggested that
2　the treatment modalities used on the 6th were not
3　working, correct?
4　　　　A.　Correct.
5　　　　Q.　What about with regard to his temperature?
6　Isn't it true that his temperature decreased from the
7　first day to the second day?
8　　　　A.　His temperature did decrease.
9　　　　Q.　Wouldn't that suggest that the ibuprofen was
10　working?
11　　　　A.　I think you're drawing a -- it's not a
12　conclusion that I would draw.
13　　　　Q.　And please explain why not.
14　　　　A.　The reason is that you're -- yes.　The
15　temperature is lower.　It could be a subnormal
16　temperature which could be significant.　You
17　generally can't take a single vital sign out of a
18　group of vital signs and use it in isolation from
19　everything else to predict whether someone is getting
20　better or not.
21　　　　He has a more rapid pulse here.　I think
22　he's got -- based on what's here, he continues to be
23　at risk of dehydration, and the rapid pulse would be
24　evidence of that.　He now has vomiting in addition to
25　all of the other symptoms.　I do not believe that on

---

**59**

1　the basis of temperature alone you could come to the
2　conclusion that he was getting better and not worse.
3　　　　Q.　Is it your opinion that the symptoms he
4　presented with on the 6th and the 7th indicated he
5　had a strep infection to a nurse at the time being
6　presented with that?
7　　　　A.　No, I do not.　I think on the 7th it would
8　be reasonable for the nurse to not know, and I think
9　it would be reasonable for the nurse to see that
10　this -- again, assuming that the nurse had collected
11　the data to know that these symptoms started
12　within -- would it be three -- three days before the
13　7th?　Am I correct on my time frame?　He had had
14　symptoms two days before the 6th which was Thursday.
15　They started Tuesday, so now he's three days on the
16　7th; that he is continuing to have these kinds of
17　symptoms.　He is reporting back -- do you remember
18　her instructions were that if his condition is worse,
19　report back?　He is reporting back; that you would
20　come to the conclusion that he has -- there is some
21　generalized problem here that needs to be worked up.
22　　　　Q.　How did his symptoms differ, if they do,
23　from a run-of-the-mill viral infection?
24　　　　A.　Do you want to describe for me what you mean
25　by run-of-the-mill viral infection?

---

**60**

1　　　　Q.　Sure.　It's my experience just as a person
2　that everybody gets stomach bugs.　They get bugs and
3　fevers at various times throughout the year.　That's
4　what I would describe as kind of the run-of-the-mill
5　viral infection.　You have a fever.　You feel ill.
6　You don't go to the doctor.　You recover on your own.
7　It's non-eventful.
8　　　　My question is:　Did Mr. Carranza-Reyes
9　present with symptoms that indicated he had something
10　more than what the average person, you know,
11　experiences, doesn't go to the doctor for, to the
12　extent you know?
13　　　　A.　The way I would answer your question is that
14　I believe that Vickie Paulsen knew that there were
15　other people in the same pod who were having symptoms
16　of an upper respiratory infection, maybe some nausea
17　and diarrhea.　I have a clear recollection about the
18　flu-like symptoms.　What is different is that this
19　person is seeking her out amongst all others for
20　attention to a sore throat.　He has vital signs that
21　are -- have some abnormalities in them, and
22　symptomatic treatment isn't making a difference.
23　He's not feeling better as a result of this.
24　　　　The last I guess fact that I think is
25　important in distinguishing this is that, and maybe

---

Catherine knox, 10/4/2006                    Carranza vs. Park County Board of County Commissioner

---

65

1    Q.   In this paragraph on page 2, which is the
2  fourth paragraph down --
3    A.   Yes.
4    Q.   -- it says that a deputy gave
5  Mr. Carranza-Reyes oxygen without orders, instruction
6  or delegation by the nurse or physician.  I'm not
7  sure what the extent of this sentence is in terms of
8  your opinions about Ms. Paulsen.  With that preface,
9  are you saying that that was something that you are
10 criticizing her for?
11   A.   Let me clarify what I mean by that.  I'm
12 trying to describe two potential scenarios.  One
13 would be if there had been protocols in place for how
14 to manage a person with these symptoms and it
15 included administration of oxygen, then I believe --
16 and that's -- then I believe the nurse could have
17 given instructions to the deputies about the use of
18 oxygen if it was already covered in a delegated
19 medical protocol.
20        In this case there are no protocols, and so
21 what I'm saying here is she did not instruct the
22 deputies in any way.  The result was the deputies
23 acted or the deputy acted on their own to determine
24 what intervention they were going to provide and did
25 so.  I guess I'm not I guess blaming her or assigning

---

66

1  her responsibility for the deputy's actions but for
2  the absence of giving any direction to the deputy
3  that was specific.  Is that clear?
4    Q.   Yeah.
5         Do you think giving the oxygen to
6  Mr. Carranza-Reyes was harmful?
7    A.   I don't have an opinion about that.  I think
8  giving Mr. Carranza-Reyes oxygen was completely
9  outside of the scope of the deputy.
10   Q.   At the bottom of this paragraph it says, She
11 failed to ascertain the extent to which his
12 conditions had worsened, failed to contact the
13 physician or refer the patient for more urgent
14 assessment and care.
15        Again, what information didn't she have at
16 this time that you believe she should have had
17 obtained?
18   A.   What I'm saying -- when I say failed to
19 ascertain, I think it was clear that when the deputy
20 called at 3:00 a.m., that in the deputy's opinion his
21 condition had worsened such that the deputy felt that
22 he needed to take an action and that what vital signs
23 he did give were my recollection is abnormal, and her
24 response was basically to call if he got worse rather
25 than understanding that he was worse.

---

67

1    Q.   Do you know whether she intended to come in
2  at that point?
3    A.   At 3:00 a.m.?
4    Q.   Right.
5    A.   I don't know what her intentions were.
6    Q.   She eventually came in right around
7  8:00 a.m., right?
8    A.   Correct.
9    Q.   Do you think she should have come in earlier
10 than 8:00 a.m.?
11   A.   No, because she had some distance -- well,
12 let me back up.  If she had left at 3:00 a.m. to come
13 in, let's see, she would have arrived at four.  I
14 guess where I'm struggling is I don't know that it
15 was necessary for her to come in.  I think to me at
16 three o'clock was with this report this individual
17 needed to be under more direct physician supervision,
18 and she could have ordered his transport to a
19 facility that had physician services at 3:00 a.m.
20        Can I just say a little bit more?
21   Q.   Sure.
22   A.   If she had elected to come in and arrive at
23 four and then made an assessment and conclusion, you
24 know, I'm hypothesizing a little bit, but I think it
25 was at three o'clock that his condition was worse and

---

68

1  that nursing care was not going to be sufficient.
2    Q.   So your opinion is that she should have
3  called in a transport at 3:00 a.m.; is that right?
4    A.   Or have contacted a physician or a nurse
5  practitioner for orders.
6    Q.   And when you say contacted them for orders,
7  can you explain what you mean by that?
8    A.   Well, what I mean is calling a provider and
9  saying, I have a patient.  He presents with these
10 kinds of symptoms.  I need some direction about what
11 to do.
12   Q.   Okay.  Do you know whether Dr. Bachman was
13 even in town during this week?
14   A.   My understanding from Ms. Paulsen's
15 deposition is that he was away that weekend.
16   Q.   Would it have been appropriate for her to
17 call the nurse practitioner for these orders?
18   A.   Yes.  I don't want to lose track of the
19 other point.  That would be to simply have requested
20 the ambulance or EMTs to arrive.
21   Q.   Is it your opinion that he was in need of
22 ambulance transport at that point?
23   A.   I don't know that he was.  What he was in
24 need of was someone who could take over care for him
25 from the deputies.

---

Catherine knox, 10/4/2006                    Carranza vs. Park County Board of County Commissioner

**69**

1    Q. When she comes in at eight in the morning
2    and sees Mr. Carranza-Reyes, do you have an opinion
3    whether he was emergent at that point?
4    A. I'm comfortable saying that my opinion was
5    that he was urgent at that point. I don't know that
6    I could speculate on whether he was emergant at that
7    point.
8    Q. Your report states that Ms. Paulsen was
9    negligent in not contacting or consulting a physician
10   or other provider about his worsening condition at
11   8:00 a.m. on March the 8th, 2003, and specifically I
12   see you looking at your report. I'm looking at page
13   3 of 7, second paragraph down, at the end of that
14   paragraph.
15   A. Okay.
16   Q. Why in your opinion did she need to do this
17   if she knew he was already going to be transported to
18   be evaluated by a physician?
19   A. The reason that I think this was important
20   is that if there were work or interventions that
21   could be started now and transported or continued at
22   the urgent care center or wherever he was sent, it
23   would have been important to -- I guess if there was
24   something that could be initiated now, like lab work
25   or, for example, putting in an IV, given that

**70**

1    transport was going to occur she had an obligation to
2    do that, to initiate what care she could.
3    Q. Do you whether she had the capability of
4    initiating an IV at the jail?
5    A. Actually, I don't know specifically that she
6    did. If she did not, I think my understanding is
7    that there was an ambulance service close by, that
8    they should have been able to put an IV in even
9    before transport.
10   Q. Do you know whether his condition warranted
11   calling an ambulance at that point?
12   A. Let me think here. My recollection of the
13   description of his condition I think warranted
14   ambulance transport because of the distance to the
15   emergency room.
16   Q. So it's your opinion that she should have
17   ordered an ambulance transport of Mr. Carranza-Reyes?
18   A. Well, I would like to just qualify that in
19   this way: she needed to -- I believe that he needed
20   to be transported in a way that would allow the
21   initiation of kind of life-support measures and other
22   treatment measures, IVs and so forth, while he was in
23   transport.
24   Q. Do you know what his condition was on
25   arrival at Summit Medical Center?

**71**

1    A. I reviewed the records from the ER admission
2    at Summit.
3    Q. Do you recall sitting here today what those
4    records said about his condition when he arrived
5    there?
6    A. Not without looking at them.
7    Q. Okay. I'm giving the witness what was
8    marked previously as Exhibit 24. If you could take a
9    look at those. Are those the Summit medical records
10   you were mentioning?
11   A. Yes.
12   Q. Looking at them now do you know what his
13   condition was when he arrived?
14   A. I'm looking at this page.
15   MS. LEWIS: That one has, for the record,
16   the Plaintiff's Bate number of a lot of zeros and
17   then page 4.
18   THE WITNESS: Which I believe is the kind of
19   initial documentation that the nurse did when she saw
20   him upon arrival at the ER.
21   Q. (By Ms. Lewis) What's the title of that
22   document? Does it have one?
23   A. I don't actually see one on it.
24   MR. TRINE: At the very bottom lower
25   left-hand corner it states Emergency Services Flow

**72**

1    Sheet.
2    MS. LEWIS: Yes. I see that. Thank you,
3    Bill.
4    THE WITNESS: And the other one that I guess
5    I think is most pertinent is this one with a lot of
6    zeros and a 1 on it.
7    Q. (By Ms. Lewis) Okay. That one is -- it just
8    says Emergency Department Record.
9    A. Then the last one I think that's pertinent
10   is 002 and 003, which is I think a dictated summary.
11   Q. Yes. And that looks like it was done by a
12   Dr. Keeling, is that correct, at the bottom?
13   A. Yes. So 001, this is a -- they note his
14   condition. They have got orders. He has got IVs
15   that were put in place. These would be orders
16   following his workup in the ER. They put IV fluids
17   in. They have ordered labs, chest X-ray. They are
18   noting here his condition on transfer, that he's
19   stable.
20   I believe that this indicates -- it's
21   written at 12:45. I'm not sure if this is transport
22   from Summit to Denver or from at arrival in Summit.
23   Q. So what does that indicate to you about what
24   kind of shape he was in when he arrived at the
25   emergency room at Summit?

Catherine knox, 10/4/2006                   Carranza vs. Park County Board of County Commissioner

---

81

1  stay would have been appropriate for her to do as a
2  registered nurse.
3       Q.  Well, don't you agree that once you know the
4  outcome of a patient's -- if the outcome happens to
5  worse or bad, that you would go back in hindsight
6  and --
7       A.  I very much agree.
8       Q.  You very much agree?
9       A.  Uh-huh.
10      Q.  So are your opinions about Ms. Paulsen based
11  on what you know with the benefit of hindsight, of
12  looking back and saying she should have done this,
13  she should have done that, only because you know what
14  happened eventually to Mr. Carranza-Reyes?
15      A.  No, they're not.  I think that's a risk, you
16  know, that you run every time you're asked to review
17  a case where you know the outcome, and I guess -- so
18  once you have acknowledged that you can set it aside
19  and look very carefully at what in the norm you would
20  expect given these presenting facts or symptoms or
21  descriptions, what action would you reasonably expect
22  to have occurred, even if the outcome, you know, was
23  less or something else, and so that is the
24  methodology in evaluating these contacts that I used.
25      Q.  So given the facts that Ms. Paulsen was

---

82

1  presented with at 9:00 a.m. on March 8th, is it your
2  opinion that she should have known that unless he was
3  transported immediately he was going to go into
4  septic shock?
5          MR. TRINE:  Objection.  Lack of foundation.
6          THE WITNESS:  My opinion is that at
7  nine o'clock on Saturday morning she should have
8  known that it was important to stay with him until
9  transport occurred.
10      Q.  (By Ms. Lewis)  And what would she have done
11  if she stayed with him?
12      A.  She would have continued to do assessments
13  of his condition and have documented those.  If -- I
14  guess at this point I do think she should already
15  have contacted a medical provider.  She would have
16  had the opportunity to have contacted a medical
17  provider for more specific direction and advice about
18  urgency had she stayed.
19          If he had collapsed or more urgently become
20  ill, she would have been able to intervene as a first
21  responder, and I guess that's my answer.
22      Q.  In your report you're critical of
23  Ms. Paulsen for not preparing copies of the record,
24  the health records of Mr. Carranza-Reyes, and sending
25  them to Summit Medical; is that right?

---

83

1       A.  Correct.
2       Q.  Why do you reach that opinion?
3       A.  That she did not prepare copies?
4       Q.  That's a fair question.  That --
5       A.  That she should have?
6       Q.  That she should have.
7       A.  Any time there is a transfer of a patient
8  from one provider to another, it is important to the
9  provider who is going to receive that patient to have
10  the benefit of any records, especially those that are
11  pertinent to the kind of presenting complaint, at the
12  time that they receive the patient.
13      Q.  Is it negligence not to provide them?
14      A.  The result of not providing it is that the
15  receiving provider is without important information,
16  has to collect that information again and sometimes
17  makes an error as a result of not having that
18  information.
19          So my point here is that it is a common
20  practice that is expected that you provide at least a
21  verbal report, if not copies.  The point I'm trying
22  to make here is had she stayed she would have had
23  time to make copies and fax those to Summit.
24      Q.  Do you know whether she called in the same
25  information that was contained in her written records

---

84

1  to the medical center?
2       A.  Well, in her deposition she recalls having
3  called.  There isn't any clear, that I could tell,
4  documentation on the part of either Summit or her
5  records that she did make that phone call.  Summit --
6  on the Summit, the 01 sheet, I think there is a
7  little notation that she called, but I believe that
8  that's after he had arrived and not before, based on
9  the information that was provided.
10          She was unsure I thought in -- my
11  recollection is that she was -- she thought she had,
12  but she wasn't clear.  She thought she had
13  telephoned, but neither the physician -- the
14  physician at the ER could not recall, and there is no
15  documentation to support it.
16      Q.  You make the opinion in your report that
17  Ms. Paulsen was deliberately indifferent to
18  Mr. Carranza-Reyes.  How do you define deliberate
19  indifference?
20      A.  I believe that deliberate indifference is
21  when a person, in this case a registered nurse, had
22  reason to know or knew of something that caused grave
23  danger or the potential for medical harm and did not
24  act to either prevent the harm or to mitigate the
25  risk.

---

85

1      Q. Talking about deliberate indifference now

2 and not negligence, you understand there is a

3 difference between the two, right?

4      A. Uh-huh.

5      Q. What did she have reason to know or knew at

6 3:00 a.m. on the 8th that Mr. Carranza-Reyes was in a

7 potential of great harm?

8      A. I believe that when she received the call at

9 3:00 a.m., it's premised on her having already seen

10 him twice and leaving I think some general

11 instructions to the officers to watch him and to call

12 if he got worse. They called. He was worse. They

13 called as instructed. I think therefore you have to

14 conclude he was worse. The description of symptoms

15 that they gave would verify that, in fact, his

16 condition was worse, and her response was to call her

17 if his symptoms worsened further.

18      So I -- my conclusion is that she knew that

19 his condition had worsened yet again, and she was --

20 she did not act at three o'clock in the morning when

21 she received that information in a way that would

22 have prevented harm or reduced risk.

23      Q. Let's focus on just part of that, which is

24 what did she know at 3:00 a.m. that would have or

25 should have suggested to her that absent intervention

86

1 at that point Mr. Carranza-Reyes was at risk of

2 substantial or great harm?

3      A. Okay. What she knew was that in the

4 deputy's opinion his condition had worsened enough to

5 call her for advice, direction or action, and that my

6 recollection of the deputy's report is that his -- he

7 was having trouble breathing. His respirations I

8 think were something like 36 a minute, so much higher

9 respirations, and I don't recall, but I believe he

10 had complaints of pain, chest pain.

11      So what is new for Ms. Paulsen is the change

12 in respiratory rate, the deputy's concern and the

13 patient's continued or more urgent complaints of pain

14 and discomfort and that in the context of the third

15 day and the middle of the night she failed to

16 appreciate the significance of his condition.

17      Q. Okay. When you say she failed to appreciate

18 the significance of his condition, does the

19 information you just described suggest that -- what

20 does it suggest about what his prognosis is at that

21 point?

22      A. I think it suggests someone who has got the

23 potential for -- who's going to be really ill and has

24 a medical problem that has been insufficiently

25 identified and treated, and I guess the -- I think at

87

1 this point the, what would you call it, universe of

2 symptoms, the rapid respiration, the difficulty

3 breathing, that it's highly likely that he has a

4 condition that's going to require intervention that

5 exceeds the capacity of what she can provide or the

6 jail can provide.

7      Q. And how much time would it require

8 intervention? How soon after 3:00 a.m. would she

9 have to do something with this patient in your

10 opinion?

11      A. She needed to do something at that time, and

12 I think that the least she could have done was to

13 call -- to call a provider, call the on-call provider

14 and say, This is the situation, and to have provided

15 more specific information to the deputy about

16 additional data to collect, and if she elected not to

17 order an ambulance at that point, to have called back

18 30 minutes later for new signs and symptoms.

19      Q. So is it your position that at that point

20 she should have known or foreseen that this patient

21 was going to become gravely ill?

22      A. Yes. I believe she should have.

23      Q. And she should have predicted that based on

24 what she was informed about his symptoms at that

25 point?

88

1      A. Yes.

2      Q. And so to draw that conclusion don't you

3 have to assume or understand that she would have also

4 known or been able to tell how rapidly his condition

5 was going to deteriorate?

6      A. I think I need to have you ask it again.

7      Q. If I understand it, you're criticizing her

8 and saying she's deliberately indifferent for not

9 doing something at 3:00 a.m. with respect to this

10 patient in terms of getting him transported right

11 away, correct?

12      A. Correct.

13      Q. And that at that point she should have

14 realized that absent intervention he was going to

15 become gravely ill?

16      A. Yes.

17      Q. And that --

18      A. I would like to rephrase that. He had the

19 potential to become gravely ill. There was enough

20 evidence to lead a person to conclude that he was at

21 risk of becoming gravely ill.

22      Q. But you would agree with me that he didn't

23 become gravely ill until 6:00 p.m. on March 8th; is

24 that right?

25      A. No. I would not agree with you about that.

Catherine knox, 10/4/2006                    Carranza vs. Park County Board of County Commissioner

89

1    Q.  When do you think he became gravely ill?

2    A.  I don't know.  I think that it was before

3  6:00 p.m. of the day that you describe, but I don't

4  know specifically when.

5    Q.  When he arrived at Summit, do you believe he

6  was gravely ill?

7    A.  I do believe that he was gravely ill when he

8  arrived.

9    Q.  You do believe that he was gravely ill?

10   A.  Yes.  But that's based upon the intervention

11  that they did at Summit.

12   Q.  What I'm trying to determine is at 3:00 a.m.

13  is it your opinion that Ms. Paulsen should have known

14  how soon Mr. Carranza-Reyes needed to be treated in

15  order to prevent him from deteriorating to the point

16  he eventually did?

17   A.  Let me say back what I think you're asking.

18  That Vickie Paulsen should have known at 3:00 a.m.

19  how urgently he needed to be transported in order to

20  prevent the grave harm or the potential for grave

21  harm?

22   Q.  Well, she's called at 3:00 a.m., right?

23   A.  Correct.

24   Q.  She gets in there at about 8:00 a.m., right?

25   A.  Correct.

90

1    Q.  And you're saying it was deliberately

2  indifferent of her not to do something at 3:00 a.m.,

3  right?

4    A.  Correct.

5    Q.  So there is a window of five hours between

6  3:00 a.m. and 8:00 a.m.  Do you see that?

7    A.  Yes.

8    Q.  Is it your opinion that at 3:00 a.m. she

9  knew that he had a risk of -- a potential of

10  substantial or great harm over the next five hours

11  until she got into the office?

12   A.  I believe that she knew that there was risk

13  of great harm if she waited, if she took no action

14  and elected instead to wait.  She should have known.

15   Q.  For the five-hour period?

16   A.  For that five-hour period.

17   Q.  Okay.  And how do you reach that conclusion?

18   A.  I reach that conclusion based on the two

19  prior contacts that she had with him and the

20  instructions that she gave to the officers and then

21  the officer's description of why he called her.

22   Q.  And then the same kind of timeline question,

23  which relates to 8:00 a.m. and when he eventually got

24  into Summit which I'm recollecting was about noon.

25   A.  Okay.

91

1    Q.  I could be wrong a little bit on that time

2  frame.

3         MR. TRINE:  12:45.

4         MS. LEWIS:  Thank you, Bill.

5    Q.  (By Ms. Lewis) So you think when she left at

6  9:00 a.m., again, she knew he was at risk of great or

7  serious harm if she left that would result between

8  nine and 12:45 when he eventually got there?

9    A.  Yes.  I believe that she knew or should have

10  known that he was at risk as a result of her leaving

11  him and his not being transported from 9:00 a.m. to

12  12:45.

13   Q.  So it's your opinion that she deliberately

14  disregarded a known risk about this patient and

15  decided just to go home?

16   A.  Yes.

17   Q.  Do you have any idea why she would do that?

18   A.  No.

19   Q.  Back to your answer on that point.  You said

20  she knew or should have known.  Just to clarify, are

21  you saying she knew or should have known or that in

22  your opinion she knew the facts, she was presented

23  with the facts that led her to know this information

24  and she deliberately chose to ignore it?

25   A.  I believe that the facts were there and that

92

1  her leaving, in fact, was an act of ignoring it.

2    Q.  So the answer is you think she knew of the

3  risk and deliberately chose to ignore it?

4    A.  Yes.

5    Q.  Not that she just should have recognized it

6  and didn't appreciate it, right?

7    A.  (Witness nodding head.)

8    Q.  You have to answer out loud.

9    A.  I know.  I'm thinking.  I guess my yes head

10  was I'm hearing your question.

11       Yes.  I believe that she knew at

12  nine o'clock when she left that there was risk of

13  some grave harm or danger and she left instead.  She

14  left knowing that was potentially there.

15   Q.  In your report on page 5, paragraph 38, it

16  says she made no arrangements to provide health care

17  coverage at the jail when she was not able to provide

18  services.

19       Do you see that?

20   A.  Yes.

21   Q.  Is that something that you understand was

22  her responsibility to do?

23   A.  Yes.  In this respect:  looking at the kind

24  of description of -- I'm not sure if it was the

25  duties, she's also the kind of on-site health

Catherine knox, 10/4/2006                    Carranza vs. Park County Board of County Commissioner

93

1   authority, and when I say made no arrangements, that
2   in terms of actions could have included saying to
3   Monte Gore, who will cover, saying, Who have you used
4   in the past, talking to Dr. Bachman about who would
5   cover for her.
6           It could include -- I mean, I don't mean it
7   to say that she needed to have paid out of her own
8   pocket to have a nurse come and work for her but that
9   some arrangements would be made to provide coverage
10  for her while she's absent from the facility.
11      Q.  Do you know whether she had control over
12  whether another nurse was available to work at the
13  jail on her days off or when she was ill or in
14  surgery?
15      A.  Well, the control -- the question about
16  control I think goes back to my understanding that
17  she was the on-site health authority and in that
18  sense had control over or influence over insuring
19  that the coverage that the jail required was
20  provided.
21      Q.  And what coverage would that be, that should
22  have been provided but was not provided?
23      A.  I believe that that's daily, a nurse on duty
24  five days a week.
25      Q.  How about on the weekend?

94

1       A.  My understanding is that she or the health
2   authority was to be available on call.
3       Q.  Now, why is it reckless or callous disregard
4   for someone to not have someone on staff one day of
5   the five-day workweek but not on -- but it's
6   different for the weekend?
7       A.  To me the callous disregard is that there
8   are a set of policies and procedures that the jail
9   has for the availability of health care personnel,
10  and the result of not having coverage on the Monday
11  through Friday is that there is a delay in an
12  offender's ability to request medical attention
13  Monday through Friday which is required.
14          So the callous to me -- the reckless and
15  callous disregard portion of that is that she knew
16  she would periodically be gone, whether that was for
17  vacation, appointments, illness or whatever, and that
18  on those days there would be no provision for an
19  offender's medical needs to be taken care of unless
20  it was a medical emergency.
21      Q.  In your opinion that's callous and reckless
22  disregard?
23      A.  Yes.  Let me qualify that a little bit more
24  in that I think that makes more important or what for
25  me kind of moved the issue to callous and willful was

95

1   the failure to inquire on Wednesday or Thursday of
2   the people that she saw for who had requested health
3   care attention if they had requested attention on the
4   Tuesday that she was absent.
5           That is important in that, again, it marks
6   the length of time a person has symptoms, and she
7   essentially by not asking those questions ignored the
8   effect on a patient in their ability to request
9   medical attention when she did see someone who was
10  requesting attention, medical attention, and that
11  purposefully ignored her lack of availability.
12  That's probably a maybe too circular a reasoning.
13      Q.  How do you know that she didn't inquire when
14  she came back in the office about what had happened
15  when she was gone?
16      A.  No.  What I'm saying is what we talked about
17  earlier.  In specific when she saw Moises
18  Carranza-Reyes, she did not ask him, How long have
19  your symptoms -- how long have you had your symptoms
20  and when did you request medical attention.  If she
21  had, she would have known that he had been suffering
22  from these symptoms beginning either Monday night or
23  Tuesday morning.
24      Q.  So you're saying that in relation to
25  Mr. Carranza-Reyes that conduct was reckless or

96

1   callous, right?
2       A.  Right.
3       Q.  But any failure to arrange to have someone
4   else be on site at the jail just as a general matter
5   is not callous or reckless?
6       A.  I'm going to try to answer your question,
7   but I want to talk about it in two parts.  I think
8   her options were to either arrange for someone to
9   cover for her when she was gone, and in the absence
10  of doing that to have been sensitive to the effect on
11  this population of her absence as she kind of worked
12  with them to collect history and to address their
13  medical problems when she was available.
14      Q.  So with respect to the first part, then your
15  opinion is that that's reckless and callous disregard
16  to not ensure someone else was on site when she was
17  gone, right?
18      A.  Correct.
19      Q.  And that's just during the workweek, right?
20      A.  Correct.
21      Q.  On the weekend it didn't matter that someone
22  is not there?
23      A.  Because on the weekends typically services
24  are limited to medical emergencies.
25      Q.  But that's not acceptable during the

Catherine knox, 10/4/2006                          Carranza vs. Park County Board of County Commissioner

97

1  workweek, right?

2      A.  It's not acceptable for more routine

3  requests to go without the ability to request medical

4  attention for periods of time in excess of 24 hours.

5      Q.  Well, if they're routine medical requests,

6  then why do they need emergency treatment or someone

7  to be seen right away?  Why is that reckless and

8  callous disregard?  I'm not understanding.

9      A.  Again, I will back up and say that the

10  jail's expectations were that there be a nurse on

11  duty Monday through Friday to provide routine care.

12  She made no arrangements to provide coverage for

13  those routine duties when she was absent.  That to me

14  is callous and reckless disregard for the medical

15  needs of the people who are incarcerated at that

16  facility.

17          Specifically she also didn't -- she didn't

18  consider the effect of her absence on the offender's

19  ability to access medical attention when she's

20  absent.

21      Q.  Well, do you know if the people that she was

22  unable to see on the days she was gone were, in fact,

23  able to see her the day she came back?

24      A.  What I know is that -- what I know is that

25  Moises Carranza-Reyes' deposition is that he

98

1  requested to be seen I believe on Tuesday and was

2  told he couldn't be seen until the next day, and he

3  was not seen on Thursday.  He was seen on Thursday.

4      Q.  Do you know why he wasn't seen on Wednesday?

5      A.  What is reported I believe in his or his

6  brother's deposition is that they understood that the

7  request had been torn up.

8      Q.  Again, let's go back to March 7th with

9  regard to the reckless and callous disregard issue.

10  Your opinion is that Ms. Paulsen's conduct on

11  March 7th with regard to Carranza-Reyes constituted

12  reckless and callous disregard?

13      A.  Yes.

14      Q.  And the specific conduct that is reckless

15  and callous is that she didn't call Dr. Bachman at

16  that point to discuss this case; is that right?

17      A.  Yes.  Or another prescribing provider.

18      Q.  And you say if she had called, it's more

19  than likely he would have been treated with

20  antibiotics, hydrated and provided supportive medical

21  convalescence.

22          Do you see that?

23      A.  Yes.

24      Q.  But earlier I thought you said that he

25  didn't present with signs of a strep infection in

99

1  your opinion on March 7th, right?

2      A.  I thought your question was whether or not

3  Ms. Paulsen would have been able to tell whether he

4  had strep, and I said I didn't -- it was not my

5  opinion that she would :4 able to know.

6      Q.  But it's your opinion that if she had talked

7  about his case with a provider, such as Dr. Bachman

8  or a nurse practitioner, that it would have been

9  apparent that this is something that needs to be

10  treated with antibiotics?

11      A.  And on these other -- these other things

12  that are listed here, yes.  I can also qualify it.

13  You know, I can't predict what a provider would have

14  said -- what advice a provider would have given if

15  Ms. Paulsen had called for that direction.

16      Q.  If she couldn't have appreciated that this

17  was a strep infection that required antibiotics on

18  her own, then why is it reckless and callous in your

19  opinion for her not to call a doctor to discuss the

20  case with him to try to get antibiotics?

21      A.  Well, you're focusing almost totally on the

22  antibiotics, and I would respond to you more

23  generally.  We're going -- she's going into the

24  weekend where the only coverage that's available is

25  emergency coverage.  She has a patient who has had

100

1  symptoms for four days now which are not being

2  relieved by symptomatic treatment, and the point I'm

3  making is that it was callous disregard and reckless

4  to not have called a provider at that point for any

5  direction or for some direction.  This is a person

6  whose condition is deteriorating, and she's not

7  taking action to intervene, correct or mediate this

8  deterioration.

9          MS. LEWIS:  Can you read back the question I

10  asked.

11          (The Reporter read back the last question.)

12          THE WITNESS:  Did I not answer the question?

13      Q.  (By Ms. Lewis) I believe your answer talked

14  about generalities where as my question was on a

15  specific issue.

16      A.  Having to do with the antibiotics why didn't

17  she call to discuss the case with a physician?

18      Q.  What I'm trying to do is break down your

19  opinion and instead of glomming it all together, look

20  at the individual components and talk about them one

21  by one.  Now I'm talking about the antibiotics.

22      A.  Well, the reason that I have difficulty or

23  am resistant to trying to break it down is that a

24  nurse in this situation is calling for medical

25  direction and advice and shouldn't be seeking a

Catherine knox, 10/4/2006                                   Carranza vs. Park County Board of County Commissioner

---

101

1   specific intervention.  To me the way your question
2   is phrased is that you would understand me to be
3   saying that she should have talked to Dr. Bachman
4   about antibiotics, and that's not what I intended to
5   say in this report.
6        Q.  My understanding of this paragraph is that
7   you're saying that it was reckless and callous
8   disregard for her not to escalate the situation to
9   the physician so that he could have evaluated it
10  because if he had evaluated it, then Carranza-Reyes
11  probably would have gotten antibiotics, hydrated and
12  provided supportive medical convalescence; is that
13  correct?
14       A.  I'm just saying it's more likely that he
15  would have.  I do not know that he would have.
16       Q.  Well, isn't it the fact that you think it's
17  more likely is what makes her failure to do it
18  reckless and callous?
19       A.  Yes.
20       Q.  Right?
21       A.  Yes.  Okay.
22       Q.  Reckless and callous implies that she's
23  disregarding something that she knows could happen to
24  this patient if she doesn't act.  Would you agree
25  with that?

---

102

1        A.  Okay.  Yes.
2        Q.  And so if she couldn't appreciate based on
3   what he presented with that he had a strep infection,
4   then why is it reckless and callous for her not to
5   call the doctor?
6        A.  What I think she should have been able to
7   recognize was that this is a patient who is not
8   improving and is going into a weekend where there is
9   no coverage.
10       Q.  Well, would you agree with me that it was
11  possible that he could have improved the next day?
12       A.  No.  I don't think he would have improved
13  the next day.
14       Q.  Well --
15       A.  Was it possible?
16       Q.  Based on the symptoms that she had in front
17  of her was it reasonable to assume that he could have
18  gotten better on his own?
19       A.  No.  Everything that I have looked at in
20  terms of directions that are provided to nurses about
21  patients who present with these conditions, if he had
22  gone as long as he would -- as he has in this case,
23  you would be -- you would be calling a physician for
24  advice and direction.
25       Q.  And that's based on what she had in front of

---

103

1   her on March 6th and March 7th?
2        A.  Absolutely.
3             MS. LEWIS:  I think it's a good point to
4   take a break, if that's okay.
5             THE WITNESS:  Thank you.
6             (A recess was taken from 11:17 a.m. to 11:31
7   a.m.)
8        Q.  (By Ms. Lewis) If I understand you, you're
9   saying it's callous disregard for Ms. Paulsen not to
10  call the doctor on March 7th because it was more
11  likely that if she had called that Carranza-Reyes
12  would have gotten additional treatment that he didn't
13  receive; is that right?
14       A.  Correct.
15       Q.  Can you say that it was more likely he would
16  have gotten additional treatment to a medical
17  probability?
18       A.  I need to ask you the definition of medical
19  probability.
20       MR. TRINE:  More likely than not, according
21  to the Colorado cases.
22             THE WITNESS:  Do you want me to use that
23  definition?
24       Q.  (By Ms. Lewis) Well, when you say that it's
25  more likely that he would have received additional

---

104

1   treatment, what do you mean by more likely?  How do
2   you come up with that determination?  Is it based on
3   your experience, training, in the field of nursing?
4        A.  That conclusion is drawn from my experience
5   in correctional health care and the relationship
6   between nurses and providers who are trying to
7   provide appropriate care to patients in this setting.
8        Q.  So is it your experience that when a nurse
9   talks to a doctor about a case it's more likely that
10  the doctor is going to give additional_care than the
11  nurse would otherwise provide?
12       A.  Not in all cases.  Sometimes the physician
13  will order more specific kinds of monitoring and
14  intervals to report data back before giving more
15  definitive treatment orders.
16             It's my experience that a nurse would --
17  again, I just would -- again, I'm not sure I'm going
18  to answer your question, but that a nurse needs to
19  shift the responsibility for decisions about care to
20  a physician at this point.
21       Q.  Now, when a nurse calls a doctor about a
22  patient, isn't it true that sometimes the doctor will
23  say, you know, what you're doing is fine.  I don't
24  need to do anything else?
25       A.  Sometimes they will say that.  In this case,

---

Catherine knox, 10/4/2006                                         Carranza vs. Park County Board of County Commissioner

105

1    if you look at the data that Ms. Paulsen had
2    collected, it's pretty brief.  So when she called
3    Bachman I would assume that even with brief
4    information that Bachman would likely have ordered
5    maybe some lab work.  He might have ordered
6    medication beyond the OTCs that are here, that she
7    used for supportive care.  He likely would have
8    ordered more close monitoring of his intake and
9    output to assess for dehydration.
10        Q.  What I want to focus on is you said you
11   would assume he would do these things.  How do you
12   reach that assumption?  What do you base that on?
13        A.  Based on my experience in this -- in the
14   correctional health care setting and how care is
15   delivered.
16        Q.  And specifically what experience leads you
17   to that assumption?
18        A.  Probably most concretely the types of
19   nursing protocols that I'm aware of are in place for
20   things like sore throat, common cold, nausea and
21   vomiting, which would say contact the physician after
22   48 hours if there is no improvement, would have
23   given -- they usually include more specific direction
24   about lab, some things like that.  That's a concrete
25   example.  The other would be review of other cases.

106

1         Q.  Do protocols differ in your experience from
2    facility to facility?  By that I'm not just talking
3    about within the Washington Department of
4    Corrections.  I'm talking more about Oregon versus
5    Washington versus New Mexico.
6         A.  Yes.  They do differ for several reasons.
7    The protocol has to be written to take into account
8    the physician's preferences about approaches to
9    treatment, also considers the nurse's skills and
10   abilities and training to carry out the protocols.
11   They are -- they may be formulated somewhat
12   differently.
13             What I do see that is consistent in
14   situations that I have experience with is that
15   protocols include instructions for -- more specific
16   instructions for when the nurse is to contact the
17   physician for additional orders.
18        Q.  Okay.  Now, is it your experience when the
19   nurse contacts the physician pursuant to the protocol
20   that the physician always does additional workup or
21   examination beyond that?
22        A.  More often than not, yes.
23        Q.  Is the Washington Nurse Practice Act
24   different from the Colorado Nurse Practice Act?
25        A.  Yes.

107

1         Q.  How is it different?
2         A.  I already described one of the differences.
3    The Colorado Nurse Practice Act is pretty explicit in
4    the nurse's ability to provide care delegated by the
5    physician to use the protocols.  That's one area that
6    is pretty explicit in the Colorado Nurse Practice
7    Act.
8              Most of the rest is very similar.  I was
9    looking at the definition of the practice of nursing.
10   They use some different terminology, but basically it
11   describes the nursing process.
12        Q.  And is the nursing process the same in
13   between the two, as you understand it?
14        A.  Nursing process is very consistent across
15   the nation.
16        Q.  So in your opinion, even though you haven't
17   practiced nursing in Colorado, you believe you have
18   experience practicing under similar acts that make
19   you qualified to testify as a nursing expert
20   regarding a Colorado nurse?
21        A.  I believe so, yes.
22        Q.  I have some questions just to summarize what
23   I understand your opinions are as it relates to the
24   different days in here, and we have talked
25   extensively about the reasons for those opinions, so

108

1    I don't want to get into that, but my understanding
2    is that your opinion is that Nurse Paulsen was
3    negligent with her conduct on March 6th, right?
4         A.  Correct.
5         Q.  But you are not saying that she was
6    deliberately indifferent on that date; is that right?
7         A.  Correct.
8         Q.  On March 7th you have an opinion that she
9    was both negligent and deliberately indifferent; is
10   that right?
11        A.  Correct.  That's the Friday.
12        Q.  Right.  And then on March 8th you have an
13   opinion that she was both on that date; is that true?
14        A.  Correct.
15        Q.  Are you planning on doing a supplement to
16   your report?
17        A.  No.
18        Q.  You brought in some additional materials
19   here today that you have reviewed.  Have any of those
20   materials changed or modified the opinions in your
21   report?
22        A.  Sorry.  I just want to check to make sure.
23        Q.  That's fine.
24        A.  No, they do not.
25        Q.  For the record, you just looked through this

Catherine knox, 10/4/2006      Carranza vs. Park County Board of County Commissioner

---

129

1     Q.  He is one of the experts retained by the
2   plaintiffs.  I didn't know if you had had a chance to
3   review his report.
4     A.  I don't think I received it.  It's not
5   familiar to me at all.
6     Q.  Would you defer to an infectious disease
7   physician in the evaluation of the progression of
8   infectious disease within a patient?
9     A.  I would defer -- I would not defer to an
10   infectious disease specialist about the actions that
11   a nurse would take based on presenting symptoms.
12     Q.  Because that's nursing care?
13     A.  Correct.
14     Q.  But as far as seeing a patient and being
15   able to tell what the future path and progression of
16   the disease is, would you defer to an infectious
17   disease specialist physician on that issue?
18     A.  Yes.
19     Q.  Who was the Health Services Administrator at
20   the Park County Jail on March 1st through 8th of July
21   of 2003?
22     A.  I believe that it is the nurse, Nurse
23   Paulsen.
24     Q.  Page 5 of 7 in Exhibit 91, paragraph 3C, you
25   indicate, If she, meaning Nurse Paulsen, had called

---

130

1   Dr. Bachman or another prescribing provider on
2   Friday, it is more likely that Mr. Carranza-Reyes
3   would have been treated with appropriate antibiotics,
4   hydrated and provided supportive medical
5   convalescence.
6     It's your opinion that the chances of him
7   receiving those interventions would be increased had
8   she called Dr. Bachman or another provider, yes?
9     A.  Yes.
10     Q.  Is that to say that it's more likely than
11   not he would have received those medical
12   interventions?
13     A.  How is your second question different from
14   your first?
15     Q.  The first one is the chances of him getting
16   those things is higher than it would otherwise be.
17   Say the chances initially were five percent and the
18   chances after making that phone call were 25 percent.
19   I'm asking you whether or not you can say that the
20   chances of plaintiff receiving those interventions
21   would be greater than 50 percent.
22     A.  I'm still really having trouble
23   differentiating.
24     Q.  One is more likely, meaning an increased
25   chance, and the other is more likely than not

---

131

1   meaning --
2     A.  It's a level of certainty --
3     Q.  -- 50 percent or higher.
4     A.  It's a level of certainty about what
5   interventions would have taken place?
6     Q.  That's correct.
7     A.  Thank you for explaining that.
8     I think it's the earlier definition of
9   probability than the latter.
10     Q.  Not over 50 percent but more than likely
11   than if she had not made the phone call?
12     A.  Okay.  Thanks.  I appreciate that.
13     So let me try to rephrase how I understand
14   what you're saying.
15     Q.  Okay.
16     A.  Had Ms. Paulsen called a provider, is it my
17   opinion that there is a 51-percent-or-greater chance
18   that he would have received orders for any of these
19   things?
20     Q.  Greater than 50 percent.
21     A.  Greater than 50 percent?
22     Q.  Yes.
23     A.  Yes.
24     Q.  And that is on March 7th?
25     A.  March 7th, Friday.

---

132

1     Q.  So you are saying that he would have
2   received those interventions to a probability?
3     A.  Yes.
4     Q.  And what do you base that on?
5     A.  The fact that they're going into a weekend.
6   He has had these symptoms since Tuesday, and they
7   have not gotten better and that there would be -- I
8   would expect that there would be some consideration,
9   if not antibiotics, at least some kind of lab or
10   throat culture.  Some providers will elect to treat
11   on the basis of symptoms alone.  I most certainly
12   believe that there would have been orders relative to
13   his hydration, including only keeping track, and that
14   there would have been consideration of whether or not
15   he should be moved from the block to a housing area
16   that provided the chance of better convalescence and
17   monitoring.
18     Q.  So Nurse Paulsen on March 7th after the
19   visit should have been able to know that had she
20   called Dr. Bachman there would have been antibiotics,
21   hydration and convalescence ordered?
22     MR. TRINE:  Objection.  It's asked and
23   answered two or three times.
24     MR. LURB:  It hasn't been answered yet.
25   That's the problem.

---

Catherine knox, 10/4/2006                    Carranza vs. Park County Board of County Commissioner

---

133

1    MR. TRINE:  I think she answered it very
2  clearly.
3    Go ahead and try to one more time, and after
4  that I'm going to object.
5    THE WITNESS:  I believe that it is greater
6  than 50-percent chance that had Ms. Paulsen called a
7  prescribing provider she would have received orders
8  or direction which would include consideration of
9  monitoring his hydration status, perhaps additional
10  fluids, some consideration of housing him in an area
11  that was more supportive of convalescence, may have
12  received orders or likely to have received orders for
13  lab and may have received orders for antibiotics.
14    Q.  (By Mr. Lurs) You're not a prescribing
15  provider, are you?
16    A.  No, I'm not.
17    Q.  We talked earlier how protocols can differ
18  from location to location based on the size of the
19  facility.  Do you remember talking about that?
20    A.  Yes.
21    Q.  You also indicated protocols take into
22  account the nurse's training and experience.  Do you
23  remember saying that?
24    A.  Yes.
25    Q.  So that's appropriate for protocols to take

---

134

1  that into account?
2    A.  Yes.
3    Q.  And so a written protocol can be different
4  for a nurse who is straight out of nursing school as
5  for a nurse with 20 years of experience?
6    A.  Yes.
7    Q.  In the Colorado Nurse Practice Act you told
8  us that Colorado is explicit in the limitations of
9  delegating medical functions.  I'm wondering if you
10  can tell me specifically what part you are referring
11  to.
12    A.  You have said it a little differently than
13  what I thought I conveyed.  What I thought I said was
14  that Colorado was explicit in that under delegated
15  medical functions it includes the ability of an RN to
16  implement a medical plan under a standing order
17  protocol and so forth, and that is explicit.
18    Q.  So that's with reference to protocols, that
19  comment that you made?
20    A.  Yes.
21    Q.  Okay.  Under the Colorado Nurse Practice Act
22  may a nurse initiate and perform diagnosis and
23  treatment of human disease?
24    A.  That's within the scope of nursing, yes,
25  they may.

---

135

1    Q.  And a nurse may provide therapy and
2  treatment?
3    A.  That's supportive in restoring life, yes.
4    Q.  I think we established that you had not seen
5  Dr. Niederman's report, but I'm wondering if you have
6  seen any reports or depositions of any experts
7  retained by Moises Carranza-Reyes?
8    A.  Retained by Moises Carranza-Reyes?  We have
9  a list in my report of what I have looked at, and
10  then in this -- let's see.  This is the material that
11  I have received since, and there are expert reports
12  from people who have been retained on behalf of
13  Mr. Carranza-Reyes.
14    Q.  And who are those reports from?
15    A.  Well, Robert Greifinger.  There are three
16  reports from him.  I have the deposition of Vince
17  Markovchick, but he has not been retained.
18    Q.  That's correct.  He's the treating --
19    A.  Manuel Romero's report.  I believe those are
20  the only ones I have that are experts retained by the
21  plaintiff.
22    Q.  Do you --
23    MR. TRINE:  Didn't you also receive
24  Dr. Greifinger's deposition?
25    THE WITNESS:  Yes.  I have Greifinger's

---

136

1  reports and deposition.
2    MR. TRINE:  Because he's also an expert
3  witness.
4    Q.  (By Mr. Lurs) Do you have Mr. Romero's
5  deposition transcript?
6    A.  I believe I only have his report.
7    MR. LURS:  Bill, I'm going to ask that you
8  provide a list of the new material, the so-called new
9  materials that we have been talking about which are
10  in that stack.  I don't think we have a listing.
11  It's not in the report what's in that stack, and
12  instead of asking her to flip through and describe
13  every page I think it would be just more helpful to
14  have a listing of what's in there.
15    MR. TRINE:  That's fine.
16    MR. LURS:  Thank you.
17    MS. VEIGA:  Is that going to be provided to
18  all counsel, either a listing or copies of the
19  supplemental documents?
20    MR. TRINE:  We can provide a list.
21    MS. VEIGA:  That's fine.  I just wanted to
22  make sure.  That was one of the questions I had as
23  well, is to be able to identify what supplemental
24  documents have been provided for her to review.
25    MR. TRINE:  That's fine.

---