Anthony G. Volz MSN, RNC, ANP
6416 Peak Vista Circle
Colorado Springs, CO 80918
Ph. No. 719-528-1130

CASE REVIEW: Moises Carranza-Reyes

## PERSONAL PROFESSIONAL INFORMATION:

**Education:**
Bachelor of Science in Nursing, 1978- The University of Southern Mississippi. Clinical
    degree, Hattiesburg, Mississippi.
Masters of Science in Nursing, 1984- The University of Colorado Health Sciences
Administrative Degree- Center School of Nursing. Denver Colorado.
Post Masters Certificate as an Adult Nurse Practitioner- 1995 from the Beth El School of
    Nursing, Colorado Springs, Colorado; Clinical degree.

**Work History:**
1978 – 1984: Clinical positions in Coronary Care, Critical Medical Care, Post Operative
    Cardiac Care.
1984 – 1992: Manager of Cardiac Care Step Down Unit. Assistant Director of Nursing
    Director of Nursing: including oversight of budgets and operations of all nursing
    units, Infection Control, Physical therapy, Dietary and Housekeeping
    departments. Assured standards of patient care and personnel competencies were
    maintained.
1992-1995: Hospital Quality Improvement consultant. Evaluated hospital departments for
    performance decencies and developed plans of improvement.
1995- present: Adult Nurse Practitioner in a large group practice in Colorado Springs,
    Colorado. Provide primary care to the adult patient with regards to acute and
    chronic illnesses, as well as health wellness, maintenance and disease prevention.

**Licensure and Certification:**
Licensed as an Advanced Practice Nurse, State of Colorado, which includes prescriptive
    authority.
Previously licensed to practice nursing in Mississippi, Kentucky and Texas; I've allowed
    all to lapse in good standing.
DEA Licensure to prescribe controlled substances.
American Nurses Credentialing Center certified as an Adult Nurse Practitioner – in good
    standing. Maintain currency to practice by obtaining 175 hours of continuing
    education, precepting 90 hours and providing continuing education classes to
    peers or the community every five years.

**Other:**
Former Adjunct faculty member at the University of South Texas Health Sciences Center
    – School of Nursing.
Current Adult Nurse Practitioner preceptor for Beth El School of Nursing at the
    University of Colorado – Colorado Springs.

2




Patient Educator for Eli Lilly Pharmaceuticals for the management of osteoporosis.

I have had the opportunity to review the client book regarding Moises Carranza-Reyes (MCR) v. INS, ET AL. The case involves MCR an INS detainee in the Park County Detention Center, in Colorado, during early March 2003. During his detainment, MCR fell gravely ill and, consequently, was transferred to Denver General Hospital where he was found to be critically ill with a bacterial sepsis. MCR was in a coma for almost a month, suffered kidney, liver, pulmonary and skin/soft tissue damage, including below-the-knee amputation of the left leg. The question raised is this bad medical outcome due to negligence or malpractice that occurred while under the care of those at the Park County Detention Center.

Besides the Detention Center records, including those of deputies and nursing, I also reviewed the records from Summit Medical Center and heard the deposition of MCR by teleconference on 02/15/2005. I assume all written records to be accurate and MCR's, statements to be true. The following is a summary of events by the Detention Center staff and MCR, followed by a legal clinical review of the summary.

**SUMMARY #1**
According to the Detention Center records, on 3/01/2003, MCR was initially detained with several other travelers for possible illegal entry into the country. None of the detainees were found to be exhibiting signs of illness. Upon arrival, MCR completed a Health History form presented and completed in Spanish, stating he was free of illness and was not under any doctor's care at that time.

MCR reports that upon entry to the cell block, the Detention Center (DC) was less than sanitary, including unclean jumpsuits, and a crowded cell with several inmates laying on bunks exhibiting cold type symptoms. MCR was given a mat to sleep on a floor between two very ill inmates with severe cold type symptoms, too weak to go to the dining area to eat, with MCR retrieving food for them. The floor on which he slept was not cleaned and had tissues from nose blowing and coughing thrown on the floor. Due to the crowding, the toilets were disgusting due to heavy use and poor cleanup. The cell was cold and bedding meager for those on the floor. Showering was brief, due the volume of those needing a shower and scalding temperature. Such conditions are an obvious set up to even the medically untrained to produce an environment highly conducive to the transmission of communicable diseases, in particular those common during that time of year, such as influenza, viral upper respiratory illnesses, bronchitis, streptococcal respiratory infections such as strep throat.

**REVIEW of SUMMARY #1**
The Eighth and the Fourteenth Amendments to the U.S. Constitution extend the right to healthcare to those incarcerated in jails and prisons. The 1976 landmark U.S. Supreme Court Decision of Estelle vs. Gamble initiated a profound change in the care and treatment of incarcerated adults. In 1987, the National Commission on Correctional Health Care put forth basic treatment standards for correctional facilities. This

3

organization updates standards annually. The essence here is that the standard of care in a correctional facility is no different than the standard of care in a community hospital. Based on these rulings and standards, the DC, including nonmedical personnel, is negligent in allowing an environment of overcrowding, filth with lack of appropriate opportunity for adequate self hygiene, unclean toilets, floors, jumpsuits and poor air temperature control.

C.R.S. 12-38-103 (12)states, "Treating" means the selection, recommendation, execution and monitoring of those nursing measures essential to the effective determination and management of actual or potential human health problems .... In addition C.R.S. 12-38-103 (10)(a) states, "Practice of professional nursing" .... Such functions include disease prevention.... In this instance, the nurse Vicky Paulsen was negligent in not treating the potential for human health problems, including disease prevention, inevitable in the scenario described by MCR. By the nurse practice act C.R.S. 12-38-101 and the standard that a correctional facility is no different than a community hospital, Nurse Paulsen had a duty to ensure that the risk of transmission of communicable diseases was minimized by advising the uniformed officers the need for adequate patient hygiene and a clean facility at a minimum. Overcrowding is, of course, an additional issue.

**SUMMARY #2**
The DC record time line of events states that on 03/06/2003 MCR, for the first time, reported feeling unwell and was referred to medical for evaluation and treatment. In Appendix A is a presumed nurse's note by Nurse Paulsen for this medical encounter. Documented is MCR complaining through a detainee interpreter about body aches, headache, nausea, diarrhea, nasal congestion and sore throat. Vitals signs were taken with temperature elevation to 100.2 degrees. His exam included that of the skin, abdomen, lungs, heart and neck – which are normal. In addition, she documents he denies and history of heart, stomach or gastrointestinal, asthma or lung problems. Her plan of care was to treat his symptoms with fluids, Motrin, and Pepto Bismol. No diagnosis was noted.

MCR states he was indeed seen as noted above by the nurse for these complaints, but at no time did she actually examine him. MCR states he was told he had high altitude sickness, to take the medicines, and drink lots of fluids. He was told he would be fine soon, but to let the nurse know if he wasn't getting better.

**REVIEW OF SUMMARY #2**
The nurse's note must be reviewed from both as a legitimate document and a clinical perspective. Generally clinical notes are prepared at time of service. If later than this, it is to be noted. This note appears to be transcribed from a dictated note. The American Association of Medical Transcriptionist's standard for transcription is that the note indicate the date of visit, the date the note is dictated, and the date the note is transcribed. This note only shows the date of visit so it is difficult to discern the timing the note was actually dictated. This is of particular import as the type on this note is quite different from the type on another nurse report dated 3-8-03 found in Appendix A. Further, all notes are to be signed off. This note has both James Bachman MD and Vicki Paulsen, RN

4

typed at the bottom, neither of which is signed, making it difficult to determine who actually saw the patient.

I find Ms. Paulsen's exam to be incomplete based on MCR's complaints, including the complaints of nasal congestion and sore throat. No nasal or throat exams were done. This is poor nursing practice.

I find the diagnosis of high altitude sickness given to MCR to be wrong in light of his symptoms and the reported exam. One does not find his symptoms or a fever compatible with high altitude sickness. Rather his symptoms are more consistent with some sort of infectious process. This first assessment sets the tone for future follow-up with the patient. An inaccurate first assessment can make for bad monitoring and follow up.

Nurse Paulsen's notes do not reflect her making a medical diagnosis, though her statement to MCR was medical. A medical diagnosis is out of the realm of nursing.

Her assessment of health status reflects his complaints, which is more consistent with a nursing diagnosis, and is in line with C.R.S. 12-38-103 (5) regarding diagnosing. Her plan of care was appropriate for the symptoms; however, the selection and administration of medications falls under C.R.S. 12-38-103 (4) as a "delegated medical function". The medication part of her plan must be physician directed. Nothing in her notes reflects a physician was contacted for this part of the plan. Unless the Medication Plan is based on standing orders or a protocol previously agreed upon, she is practicing out of her scope of practice.

## SUMMARY #3

The DC timeline of events documents that on 03/07/2003 MCR was once again taken to medical for persistent complaints from the previous day. Nurse Paulsen's notes again report complaints of headache, nausea, vomiting, body aches, diarrhea and nasal congestion. His vital signs were stable, including without fever. Skin, lungs, heart and abdomen were examined with only tenderness over the stomach noted. Plan of Care was the same as the previous visit.

MCR states he was feeling worse, otherwise, he would not have called for reevaluation. In particular, he was weaker and throwing up more, had trouble holding down food and water, both because of the nausea and his sore throat. He reports that he has now little diarrhea. Again, he states the nurse never examined him, and she just gave him the same medicine. He mentions to the interviewer that others are getting sick in his cell as well.

## REVIEW OF SUMMARY #3

Same issues with the document.

Again, Nurse Paulsen's exam is incomplete based on complaint and the last 36 hours of history. His nose and throat were again not looked at. In light of his ongoing nausea and vomiting and inability to hold down fluids, he should have been examined more closely for dehydration. This includes an examination of the oral mucosa, skin turgor check,

5

along with a question as to how often he is urinating and how much. This is neglect of basic nursing assessment for someone with his symptoms. This examination would have more accurately reflected his level of illness in light of his symptoms. In fact, I suspect his decreased diarrhea was more due to dehydration than resolving gastrointestinal symptoms.

Based on Nurse Paulsen's notes, MCR seems to be improving if at least stable. This is an inaccurate assessment.

### SUMMARY #4
Later in the day of 03/07/2003, MCR reports that after the nurse had gone home, he noted blood in his urine. He was able to obtain a sample, which his brother tried to show to a female deputy, who just shook her head and walked away.

### REVIEW OF SUMMARY #4
This was a very important piece of information that should have been passed along to the nurse but never was. Likely MCR was getting critical at this time. I am not sure if the issue was a lack of ability to communicate or some other barrier to get the message to Nurse Paulsen. This is neglect on the part of DC.

### SUMMARY #5
The DC time line reads, "Deputy Frye was informed that alien detainees were experiencing altitude and flu-like symptoms and to keep an eye on them". Also noted in incident report made out by Deputy Frye (can be found in Appendix C).

### REVIEW OF SUMMARY #5
There is no indication as to who informed Deputy Frye of this concern. Regardless, the whole DC Center has been put on notice of this illness being transmitted. DC and the healthcare team are negligent for not enacting Universal Medical Precautions at that time to prevent further spread of the infection. At minimum, I truly believe that infection transmission would have been minimized if the DC health and environmental issues had been addressed appropriately in the first place as previously discussed in Summary #1.

### SUMMARY #6
The DC timeline of events of 03/08/2003 and Deputy Frye's Incident Report indicate that at 0100 hours Deputy Frye finds MCR in his cell sick and gives him Pepto Bismol and Ibuprofen. At 0300 while on his pod walk, Deputy Fyre finds MCR continues to be ill with ongoing vomiting and difficulty breathing. He takes MCR back to Medical with a detainee as an interpreter to do a more complete exam. The exam reveals blood pressure of 143/78, pulse of 62, respirations of 34 and shallow. Deputy Frye put MCR on oxygen with no benefit and MCR stating he wanted to go back to his cell. While in Medical, Deputy Frye at 0345 called Nurse Paulsen at home and apprised her of MCR's current status. She told the deputy "it was flu-like symptoms, and she was aware of his condition". Call her back if he worsens.

Nurse Paulsen's report of this phone message at 0345 was the same as Deputy Fryes, except that she reports that MCR is "on oxygen and he was feeling better". She told Deputy Frye to give ibuprofen and Pepto, and call if there was any change in MCR's condition.

MCR states he was just getting worse and worse. Deputy Frye tried to help, and that he even called the nurse, but after the deputy got off the phone, he just shook his head and took MCR back to his cell.

### REVIEW OF SUMMARY #6
MCR is getting worse, not only by his own account but by his physical appearance, which now has the uniformed officers concerned and trying to help to the best of their ability. His exam has changed with reported respirations from a previous rate of 24 to 34 and now shallow. This was reported to Nurse Paulsen who could medically intervene, but instead documents MCR was "feeling better". The report of ongoing nausea, worsening vomiting, and increase in respiratory rate indicates that MCR is seriously ill. At this point, Nurse Paulsen had an obligation by C.R.S. 12-38-103 (5) to refer MCR to appropriate medical resources, or at the least consult by phone with a physician. Failure to do so is negligent.

### SUMMARY #7
DC timeline of events 03/08/03 at 0600, Nurse Paulsen calls jail from home to get an update on detainee. This states that MCR was resting and had used the restroom once. This is consistent with Nurse Paulsen's note in her nurse report timed at 0600. However, Deputy Frye's note for this time period states that MCR reports that he was feeling the same. He continued with shallow and rapid breathing to the point that he once again offered oxygen to MCR. Also, MCR reported to the mid-section of the back on his right side of having pain. Deputy Frye evaluated this site by lifting his shirt to see if there were any changes, but did not notice any deformities or discoloration of skin. He found MCR, during his rounds between 0520 and 0640, to be kneeling on the floor with his upper body on the bunk, grimacing in discomfort, obvious signs of pain.

### REVIEW OF SUMMARY #7
What is documented in Deputy Frye's note versus the timeline of events by the DC and by Nurse Paulsen are in direct conflict with Deputy Frye reporting that the patient advised him he was not doing any better, but he was actually probably doing worse as he was now experiencing pain to the point he had to kneel on the floor beside his bunk to try and obtain comfort. Apparently, there is either some sort of communication problem, documentation problem, or attempt at covering up the details of what was actually going on with MCR at this point.

### SUMMARY #8
DC timeline of events 03/08/03 at 0750, Nurse Paulsen arrives at the jail to evaluate MCR. She is informed by Deputy Frye that MCR has fallen down. Nurse Paulsen goes to the cell to examine MCR, which they are documenting as he is newly to be found in acute pain on his right side. At this time, Nurse Paulsen feels that MCR is in significant enough

7

health decline that he would like to transport him to a physician in Summit County. She contacted the INS agent, Ben Baca, who agreed and stated it would be at least three hours before he could arrange a transport, but gave Nurse Paulsen permission to transport MCR if his symptoms worsened.

Nurse Paulsen's note in her nurse report, timed at the same time of 0750 is consistent with the DC timeline report, with the additional statement where Ben Baca asked Ms. Paulsen as to what she felt was going on. She explained that it could be anything from possible kidney stones, to gallbladder or something else. She told him that MCR needed to be evaluated by a physician. It was also during this time that Nurse Paulsen actually examined MCR in his cell, as she was called to his cell due to his fall. She found MCR to be complaining of pain over his right kidney, radiating to his right flank, down to the right lower abdomen slightly above the groin. At this point, MCR was moved to the lower tier of the Detention Center for his safety and protection.

Interoffice memorandum, dated 03/08/03, by Corporal Crawford, timed at 0810, states that he received word that inmate was on the floor in D-Block. Corporal Crawford went to investigate. On arrival, he found MCR lying on his back between rows of bunks. He assessed the situation and found the patient had open airway, airway and breathing were fine, pulse was normal, and circulation was okay. He determined that MCR was breathing and coherent. He was advised through the detainee's interpreter that MCR had pain on the right area of his kidney. He contacted Nurse Paulsen and advised her of what was going on, and Nurse Paulsen came up to evaluate the patient further. At this point, all agreed that MCR should be moved to the lower tier in the jail cell where he would be safer and easier to monitor.

At 0850, Corporal Crawford reports that he sent a deputy to purchase cranberry juice for the inmate to help him pass his probable kidney stone. At 0853, MCR had coughed up a small amount of "spittle" with a small amount of blood in it.

**REVIEW OF SUMMARY #8**
Based upon the notations above, MCR is apparently declining that much more in his health status, so weak that he is falling. Respirations continue to be shallow. He is coughing up speckles of what is probably blood. Contact has been made to arrange for transport, but may take 3-4 hours to arrange. The situation here is that rather than waiting 3-4 hours for coordination time, Nurse Paulsen should have gone ahead and coordinated transport of MCR to Summit County Medical Center at that moment, rather than waiting for the 3-4 timeframe that she was advised by Ben Baca of INS, as she was given permission by Ben Baca to go ahead and coordinate transport earlier if she felt necessary. Apparently, Nurse Paulsen did not feel that 0750 or at 0853 when he was observed to even have a small amount of blood in his spittle that he should be taken to Summit County Medical Center. This is a delay in care to let a patient that is showing accelerated symptoms of physical decline, at which point any hours saved in implementing care would have been only to MCR's benefit. This delay in care is inconsistent with C.R.S. 12-38-103 (5) Patients should be sent to appropriate medical resources due to significant

decline in health status. This is also an apparent violation of the Eight and Fourteenth Amendment guaranteeing MCR to the right of adequate medical care.

## SUMMARY #9

DC timeline 03/08/03 at 1030, Nurse Paulsen calls in for update on MCR. She is advised that he is vomiting more frequently. It was at this point that Ms. Paulsen decides she can no longer wait for INS to coordinate transport of patient, so arranges transport of MCR to Summit Medical Center. Sergeant Muldoon arrives at 1155 to transport MCR to Summit Medical Center in Frisco, Colorado, arrives there at 1250 hours with patient coherent, ambulatory to the emergency room, where patient is evaluated and eventually transported to Denver General Hospital for more advanced care. Nurse Paulsen's note of the same date, at 0830, is consistent with the DC note, including her notes of transport of MCR to Summit County Medical Center and eventual transport to Denver General Hospital.

Deputy Crawford's interoffice memorandum, timed chronological note taking from 0920 until patient is transported to Summit County Medical Center is consistent of the notes of the DC timeline, as well as Nurse Paulsen.

MCR states that during this period of time, he was developing significant pain, right low back down to the right low abdomen, severe cramping-type pain, and throwing up much more with noticing blood in his emesis. He also started coughing and coughed up some bloody mucus. MCR states he was so weak that he could hardly stand and had fallen. He reports that he also has some trouble recalling what went on as he felt extremely ill. He does admit that during this timeframe from 0800 until transport the Summit County Medical Center, he was essentially attended chiefly by the uniformed officers, that Nurse Paulsen had come in briefly and pushed on his right abdomen and walked out. He states those that were with him and observing him were aware of the sputum blood flecks, were aware of his increasing vomiting with blood in the emesis and what he reports of brown, coffee-ground like vomit. He also did the best he could to explain about the worsening pain in his right groin and right low back.

## REVIEW OF SUMMARY #9

Certainly patient's health was significantly compromised at this point. All parties are in agreement that transporting the patient was appropriate, though significantly delayed.

At 0800, MCR reports he was weaker, had blood in his sputum, he had already had blood in his urine, and had increasing difficulty breathing. Nurse Paulsen had been given the option by INS to transport earlier than waiting the 3-4 hours of INS transport coordination. Rather than transporting at 0800, she delayed transport until 1050.

Unfortunately at this point, the patient declined in health to the point he needed more intensive care than could be given at Summit County Medical Center. Again, this delay in transport and care is negligent, by not meeting the National Commission on Correctional Health Care standards for providing healthcare in correctional institutions, as well as not meeting the principles of the Nurse Practice Act.

### SUMMARY #10
DC timeline of **03/08/03**, 1510 hours, documents that Corporal Crawford faxed a letter of Financial Responsibility to Denver General Hospital accepting financial responsibility for MCR so he can be admitted. This is consistent with Corporal Crawford's memo that is found in appendix A.

### REVIEW OF SUMMARY #10
The Detention Center has accepted financial responsibility for MCR's medical care.

### SUMMARY #11
DC timeline of 03/08/04 indicates that the Center was advised to enact Universal Medical Precautions as MCR may have "introduced" a biological agent into the jail. Concern now turned to protecting the rest of the inmate population and the staff. These precautions included total disinfection of the jail, all cell blocks, all floors, metal bunks, shower areas, sinks, toilets, walls, hand rails and were all cleaned with 10% bleach solution. All uniforms, bedding, sheets, towels, pillowcases and blankets used by the detainees are exchanged for new ones. Their laundry is washed in 10% bleach solution. Recreational areas were also cleaned as well with the 10% solution, including weight machines, countertops, and telephones. All were wiped down with 10% bleach solutions, including transport vehicles. This timeline event is supported by a Detention Center interoffice memorandum, found in Appendix D. This is from Corporal Crawford to Captain Gore explaining the decontamination of the jail.

### REVIEW OF SUMMARY #11
The implementation of the Universal Medical Precautions is quite appropriate and according to Standards. one much keep in mind, that MCR validated the jail was in filthy a condition, during the overcrowding as well to the time when he was transferred when the crowding was earlier relieved to where each detainee had at least a bunk. The floors continued to be full of tissue, sputum, toilets continued to be filthy, showers continued to be excessively hot, intolerable to perform adequate daily hygiene. Much of the potential transmission of infection could have been eliminated if adequate hygiene was maintained from day one of his detention. Again, this is in violation of the Eight and Fourteenth Amendment, in violation of standards established by the National Commission for Correctional Healthcare. Although this particular action is appropriate according to standards, the fact that it violates any human rights issues could have been avoided if all rights of standards were met from day one.

### SUMMARY OF #11
DC timeline dated 03/10/03, based on Nurse Paulsen's recommendation, eight detainees in the same cell area, were sent to Summit County Medical Center for evaluation. Of these eight, two inmates were exhibiting symptoms quite similar to MCR. Of the eight inmates, three were treated with antibiotics for bronchitis, and two were treated for acute pharyngitis, also with antibiotics. All recovered well.

### REVIEW OF SUMMARY #11

The action taken by Nurse Paulsen and the DC is consistent with good health care. Such measures would likely had never been needed if the previous negligences and inactions by the jail had occurred. The need for these measures further underscores the healthcare deficiencies of the Park County Jail.

### SUMMARY #12

DC time line of 03/10/2003 it is recorded by Deputy Thebold that he conducted an interview through a detainee translator with MCR's detained family. The interview revealed that MCR had received chemotherapy while in Mexico for colon cancer, and it was due to this chemotherapy that MCR's immune system was suppressed and that is why his streptococcal infection spread so quickly and deadly through his system. In Appendix C, is both a written and typed report by Clarence Cadelaria. The inmate translator states that MCR was being seen in Mexico for some sort of colon problem. There is no statement in either the written or typed-up report which Mr. Cadelaria had signed that either MCR's sister-in-law, brother-in-law or brother advised him he was being treated for colon cancer.

### REVIEW OF SUMMARY #12

The DC Summary report by Captain Gore from Deputy Thebold's apparent interview with MCR's family is either a fabrication or misinterpretation of the facts as translated by inmate, Clarence Cadelaria.

### FINAL SUMMATION

Moises Carrenas-Reyes, INS detainee in the Park County Jail, detained for possible illegal immigration, developed a serious streptococcal bacterial infection who was arrested as a vigorous healthy 22-year-old young man, recently discharged from the Mexican Army with no history of significant healthcare issues other than hemorrhoids. The records by the Park County Sheriff's office reflect that when booked into the Detention Center, MCR was in good health, but within four days of detention, he fell ill and over the next several days became critically ill, resulting in hospitalization for streptococcal sepsis with complications including a 28-day coma, damage to his lungs, kidney, liver, as well as soft tissue of the skin, muscles of both lower extremities from the low abdomen to the toes resulting in loss of limb with below-the-knee amputation of the left lower extremity.

It is in my opinion that MCR acquired his infection while in the jail under extremely crowded and filthy conditions, during a period of time of the year when both medical and nonmedical individuals are well aware of the high incidents of communicable diseases, including the common cold, influenza and Strept throat. The violation of MCR's Eight and Fourteenth Amendment rights, the negligence of the jail and the negligence of the medical personnel resulted in MCR's acquiring the illness and progressing to a critical state where he had loss of limb and near loss of life. As evidenced by the Park County Jail, proper infection control and immediate care of detainees could have prevented the severe complications that MCR sustained, as was evidenced by their appropriate care of

11

eight other detainees, five of which were treated with milder symptoms and earlier into their symptoms, and who recovered quite nicely without any complications.

## RECOMMENDATIONS

I suggest that if this case does go to trial, that rather than the chart reviewer being used as an expert witness, I recommend that a certified correctional nurse be retained as an expert witness.

Thank you for giving me the opportunity to review this complex and unfortunate case.

Anthony G. Volz, RN, ANP
AGV:jkv

13