Carranza-Reyes v. Park County

Anthony Volz, MSN, RNC, ANP

---

**1**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Case No. 2005-WM-377 (BNB)

DEPOSITION OF: ANTHONY G. VOLZ, MSN, RNC, ANP
December 13, 2006

MOISES CARRANZA-REYES,
Plaintiff,
v.
PARK COUNTY, a public entity of the State of Colorado and
its governing board, THE PARK COUNTY BOARD OF COUNTY
COMMISSIONERS; PARK COUNTY SHERIFF'S OFFICE, a public
entity of the State of Colorado; FRED WEGENER,
individually and in his official capacity as Sheriff of
Park County, Colorado; MONTE GORE, individually and in
his capacity as Captain of Park County Sheriff's
Department; VICKIE PAULSEN, individually and in her
official capacity as Registered Nurse for Park County,
Colorado; JAMES BACHMAN, M.D., individually and in his
official capacity as Medical Director of the Park County
Jail,

Defendants.

TAKEN PURSUANT TO NOTICE on behalf of the Defendant
Paulsen at 805 South Cascade Avenue, Colorado Springs,
Colorado 80903 at 9:10 a.m. before Sylvia E. Noneff,
Registered Professional Reporter and Notary Public within
Colorado.

---

**3**

I N D E X
EXAMINATION OF ANTHONY G. VOLZ, MSN, RNC, ANP:       PAGE
December 13, 2006

By Mr. Kordick                          144, 160, 163

By Ms. Veiga                       116, 159, 162, 166

By Ms. Lewis                          4, 144, 159, 162

                                                    INITIAL
DEPOSITION EXHIBITS:                              REFERENCE
102  Curriculum vitae of Anthony G. Volz,               9
     MSN, RNC, ANP, not dated

103  Case review by Volz re Carranza-Reyes,            10
     6/20/06

104  Fax cover sheet from Elizabeth to Knox,           16
     5/25/05; transcript of telephone meeting
     between Kordick, Archuleta, Carranza-
     Reyes, 2/16/05

105  Handwritten notes by Volz re Paulsen's           159
     deposition transcript, not dated

106  Park County Jail chart notes re                  159
     Carranza-Reyes, 3/6/03 and 3/7/03

107  Notes by Volz re Park County Policy and          160
     Procedure Manual, not dated
(Original exhibits attached to original deposition; copy
exhibits included in continuing exhibit file; copies
provided to counsel as requested.)

REQUESTED PORTIONS OF TESTIMONY:                     PAGE
(None.)

REFERENCES TO EXHIBITS MARKED PREVIOUSLY:

Exhibit      Page
2            16

---

**2**

APPEARANCES
For the Plaintiff:      LLOYD KORDICK, ESQ.
                        Lloyd C. Kordick & Associates
                        805 South Cascade Avenue
                        Colorado Springs, Colorado 80903

For the Defendants      JENNIFER L. VEIGA, ESQ.
Park County, Park       Hall & Evans, LLC
County Board of         1125 17th Street
Commissioners, Park     Suite 600
County Sheriff's        Denver, Colorado 80202
Office, Wegener and
Gore:

For the Defendant       MELANIE B. LEWIS, ESQ.
Paulsen:                Berg Hill Greenleaf & Ruscitti LLP
                        1712 Pearl Street
                        Boulder, Colorado 80302

Also Present:           None

---

**4**

1      WHEREUPON, the within proceedings were taken
2 pursuant to the Federal Rules of Civil Procedure:
3      ANTHONY G. VOLZ, MSN, RNC, ANP,
4 having been first duly sworn to state the whole truth,
5 was examined and testified as follows:
6                EXAMINATION
7 BY MS. LEWIS:
8      Q.   Would you please state your name and
9 business address for the record.
10     A.   Anthony Gerard Volz; V, as in Victor, o-l-z,
11 as in zebra.  My business address is -- we just moved --
12 2222 North Nevada, Suite 2100, 80907.
13     Q.   We met just a moment ago.  And my name is
14 Melanie Lewis, and I represent Nurse Vicki Paulsen in
15 this case.
16     A.   Okay.
17     Q.   And I noticed from the materials that you
18 have provided that you have been deposed before; is that
19 right?
20     A.   Correct.
21     Q.   Okay.  And is that just one time you were
22 deposed?
23     A.   Correct, yeah.
24     Q.   I'll still go over some ground rules to try
25 to make this process a little easier.  If you could

---

* SUBJECT TO CONFIDENTIALITY DESIGNATIONS *



PENGAD 800-631-6989

EXHIBIT
9

Carranza-Reyes v. Park County

Anthony Volz, MSN, RNC, ANP

---

**29**

1  Practice Act, but by the nature of our education, by our
2  American Nurses Association -- we have a code of
3  conduct -- we are -- this is just an expected job duty,
4  to evaluate and monitor for the risk of infectious
5  disease or transmission of infectious disease or
6  communicable diseases, and to prevent that.
7      Q.   When you say "small hospital," or in your
8  report you say a "community hospital" --
9      A.   Correct.
10     Q.   -- can you describe what type of facility
11 you're talking about?
12     A.   Generally, that's a hospital that's 30 to
13 20 to 150 beds.
14     Q.   Now, would you agree with me that the
15 population of a hospital being patients is going to be
16 different than the population of a jail in terms of
17 medical needs?
18     A.   No. I look at them as basically being
19 similar. You have people that are in a group setting,
20 and these people in the group settings have, in my
21 opinion, equal risk of cross-contaminating each other.
22 So I think what you're asking is, is the standard less in
23 a jail setting versus a hospital setting as far as what
24 is expected of a registered nurse, and I don't feel that
25 standard is any different between the two.

---

**30**

1      Q.   That's not exactly what I'm asking.
2      A.   Okay.
3      Q.   A population of a community hospital is
4  going to consist of patients who are admitted for at
5  least one overnight stay, right?
6      A.   Correct.
7      Q.   And so those patients -- all of that
8  population have some sort of medical need that requires
9  admission to a hospital; would you agree?
10     A.   Correct.
11     Q.   On the other hand, in a jail you don't have
12 the same issues with that general population; would you
13 agree?
14     A.   I agree with that.
15     Q.   Okay. So I'm curious why you feel that the
16 level of care for a hospital, given that the population
17 consists of patients who have a diagnosed medical need
18 that requires overnight stay, is the same as the level of
19 care, medical care, that would be provided at a county
20 jail.
21     A.   Okay.
22     Q.   If you could explain, please.
23     A.   Okay. First of all, I didn't make the
24 regulation for that. Okay? That's a federal mandate
25 that that standard is to be held. Second of all, these

---

**31**

1  individuals that are being housed in a prison setting,
2  the first thing that is done with these individuals, to
3  my understanding, in jails and prisons, is a medical
4  history is taken. From that history, these prisoners,
5  from the nurse's perspective, aren't prisoners as much as
6  they are patients, because during that medical
7  history-taking medical issues are identified.
8      And the nurse is practicing as if she might
9  in a hospital setting where she's doing medical rounds,
10 she's seeing patients with health issues, and she's
11 addressing those health issues. So as far as the nurse's
12 duty goes, she's functioning as if she were in a hospital
13 setting. So I address them as, you know, pretty much
14 similar.
15     Q.   But you're not saying that, for example, the
16 levels of staffing would need to be the same at a county
17 jail as they would need to be in a community hospital?
18     A.   I don't think that has anything to do with
19 the initial question that you had asked. This isn't a
20 staffing issue, I don't believe, as far as until they get
21 into overbedding the facility. But from a general care
22 perspective, which is what I believe we were talking
23 about, it's not a staffing issue. It's a nursing care
24 issue.
25     Q.   So the comparison between the two just

---

**32**

1  relates to your opinion about the level of nursing care
2  that would be provided to a particular patient; is that
3  right?
4      A.   Correct.
5      Q.   It's not going to other areas, such as
6  staffing or facilities, medical equipment available,
7  things like that?
8      A.   Correct.
9      MR. KORDICK: Melanie, you know that -- we
10 talked about this -- that he's got to be teaching a class
11 at 2:00 --
12     MS. LEWIS: Um-hum.
13     MR. KORDICK: -- and we've got to leave by
14 1:30, so I'm just --
15     MS. LEWIS: Yeah, I know. What time is it?
16     MR. KORDICK: It's about 10 to 10:00.
17     MS. LEWIS: Okay.
18     MR. KORDICK: I'm not trying to disrupt you.
19 I just wanted to . . .
20     Q.   (BY MS. LEWIS) Do you know one way or the
21 other whether Nurse Paulsen ever advised the officers in
22 the facility regarding the need for adequate hygiene for
23 detainees, or just as a general matter in a facility?
24     A.   The only thing that I recall seeing prior to
25 Moises being transferred was her making a side comment to

---

(Pages 29 to 32)

* SUBJECT TO CONFIDENTIALITY DESIGNATIONS *

Carranza-Reyes v. Park County                                           Anthony Volz, MSN, RNC, ANP

33

1  one of the guards that it was overcrowded and appeared to
2  be unmanageable. And I don't recall if she discussed it
3  as a sanitary-type issue. Following Moises' situation --
4  and I think I address this later on in my summaries --
5  she finally took measures to decrease the risk of
6  communicable disease being transmitted to other
7  prisoners.
8       Q.  Do you know whether she did or didn't ever
9  tell the guards about general hygiene issues at any time?
10      A.  No.
11      Q.  So you can't conclusively say she didn't
12 ever discuss those issues with the guards, right?
13      A.  I found only in one deposition that I can
14 recall where she talked to one guard about the
15 conditions.
16      Q.  So in other words, you have an example of
17 one occasion where she did talk to somebody, but you
18 don't know what else she might have done, right?
19      A.  That's correct. However, by the jail's own
20 policies, procedures and protocols, there's supposed to
21 be a quality improvement and infection-control committee.
22 And to the best of my knowledge, I didn't see any of that
23 material in any of the material that I reviewed that
24 there was any form of infection-control measures being
25 evaluated, monitored or reported to anybody in authority.

34

1  There was no meeting minutes. It doesn't look like
2  meetings were ever held.
3       And those are the type of issues that would
4  have specifically been addressed, which is hygiene,
5  crowding, you know, staffing, if those are issues with
6  regards to crowding. And I'm not talking about,
7  necessarily, nursing. I'm talking about maybe, you know,
8  care measures as far as number of guards. I'm not an
9  expert on that, but I am with regards to what the nurse's
10 expectations would be. So I don't know if that answers
11 your question, but . . .
12      Q.  Do you agree if Nurse Paulsen talked to the
13 officers about hygiene issues and the need for good
14 hygiene that she would not be negligent? She would have
15 fulfilled her duties under the Nurse Practice Act, as you
16 understand it?
17      MR. KORDICK: And I object to the form of
18 the question.
19      THE DEPONENT: That's very broad with
20 regards to this situation. With regards to one part of
21 that part of the Nurse Practice Act--
22      Q.  (BY MS. LEWIS) Okay.
23      A.  -- she would have fulfilled her duties.
24      Q.  I don't mean to cut you off, and if I do
25 interrupt you, let me know. Okay?

35

1       A.  Yeah, um-hum.
2       Q.  In the second full paragraph of page 4 --
3       A.  Um-hum, yes.
4       Q.  -- you say, "She had a duty to insure risk
5  of transmission of diseases was minimized by advising the
6  uniformed officers the need for adequate patient hygiene
7  and clean facility at a minimum." Okay?
8       A.  Where do you -- are you reading that?
9       Q.  The second full paragraph, the last sentence
10 of page 4.
11      A.  Yes.
12      Q.  So my question is, are you saying that if
13 she had advised the uniformed officers of the need for
14 adequate patient hygiene and a clean facility that she
15 would have fulfilled her duties, as you understand them
16 to be?
17      A.  Yes.
18      Q.  Let's look at Review of Summary Number 2,
19 the same page. Am I correct that the Review of Summary 2
20 and Summary 2 as well, relates to the events that
21 occurred on March 6, 2003?
22      A.  Yes.
23      Q.  And when you say," The nurse's note" -- and
24 that's the first sentence under Review of Summary Number
25 2. It says, "The nurse's note must be reviewed from both

36

1  as a legitimate document and a clinical perspective."
2  What do you mean by "as a legitimate document"?
3       A.  Okay. The Nurse Practice Act actually
4  dictates what should be in a documented record with
5  regards to patient care, and that's what I'm addressing
6  with that. It's a bit of format and things of that
7  nature include, does it have a signature of the person
8  that prepared the document on it? Is it dated and timed
9  appropriately? Is it concurrent, or is it a
10 retrospective document? And if it is retrospective, is
11 it documented that this is after the fact?
12      In addition to that, there's a bit of a
13 legitimate document and clinical aspect that's a little
14 bit of an overlay. Nurses practice and document within
15 their realm of nursing. Okay? In this particular case,
16 her document is kind of a hybrid between a medical
17 document and a nursing document. It doesn't really
18 reflect the nursing process, which is how we think and
19 process our information so that we gain all the
20 information that's necessary to make a proper assessment.
21      And I don't believe hers was legitimate from
22 that perspective as a document. And, as I say, that's
23 kind of a clinical overlap as well. But those are
24 specific things that we look at from a legitimate
25 document from the Nurse Practice Act as far as being

* SUBJECT TO CONFIDENTIALITY DESIGNATIONS *

Carranza-Reyes v. Park County                    Anthony Volz, MSN, RNC, ANP

---

37

1  true.
2     Q.   So what specifically about this note --
3     A.   Um-hum.
4     Q.   -- was missing that made you conclude it's
5  not a legitimate document?
6     A.   Yeah. One was -- let's see here. Is this
7  the 6th? Yeah. Potentially not a legitimate document
8  was that she didn't sign it. I didn't know if it was
9  James Bachman that was writing the document, or was it
10  Vicki Paulsen. It's not timed. I didn't know if this
11  was a document that was done after the fact. It was
12  dated.
13         As far as the Nurse Practice Act goes, in
14  this type of document she's doing what's called SOAP
15  charting: Subjective, Objective, Assessment and Plan.
16  That's a medical format of documenting a patient
17  encounter. And even at that, it's not a good
18  representative of a SOAP format. She has no
19  documentation in here, as far as format goes, that is
20  relative to the Nurse Practice Act or as far as what is
21  common nursing practice.
22     Q.   So what is common nursing practice?
23     A.   Yeah. In common nursing practice, if a
24  patient presented, we would have a chief complaint. And
25  his chief complaint would be this subjective line that

---

38

1  she prepared. Off of that, you would have an assessment.
2  And in that assessment, she would talk about what each of
3  these individual complaints are, and then expand upon
4  them.
5         She didn't put in here -- I like to call it
6  the P-Q-R-S-T of an assessment. For example, he talked
7  about headache. She didn't expand on the headache to
8  give more information: What makes it better? What makes
9  it worse? What is the quality of the headache? How long
10  has he had it?
11        There's no documentation in there as to how
12  long he has been sick before she has seen him. That's a
13  key information -- piece of information. So it's --
14  well, I'm getting a little bit into the clinical
15  perspective there as far as this goes.
16        But from a valid document, it's -- the
17  nursing document would have in it the chief complaint and
18  assessment. It would have a nursing diagnosis. It would
19  have a plan of care. It would have an implementation and
20  evaluation of care. And I don't see that in this type of
21  a note here. So I -- there's parts missing, and that's
22  what makes it an invalid note.
23     Q.   So are you saying that she violated the
24  Nurse Practice Act with this --
25     A.   Yes, I am.

---

39

1     Q.   -- with this entry?
2     A.   Sorry.
3     Q.   That's okay.
4     A.   Yes, I am.
5     Q.   And the authority for that conclusion is the
6  Nurse Practice Act itself?
7     A.   Yes, it is.
8     Q.   Does it spell out how notes should be
9  prepared?
10     A.   Yes, it does.
11     Q.   And what section is that?
12     A.   Let's see. Okay. 12-38-117, and it's Roman
13  Numeral III. And it's F, G -- oh, I'm sorry, not G. F
14  and H, H is particular: "Has falsified or in a negligent
15  manner made incorrect entries or failed to make essential
16  entries on patient records." And when we make these type
17  of documents or do our documentation, it's that nursing
18  format. It's our nursing process that we utilize as far
19  as documentation goes. And in my opinion, she failed to
20  make essential entries on the patient record.
21     Q.   And just so the record is clear, because the
22  court reporter can't write down what you're looking at --
23     A.   Oh, yes.
24     Q.   -- unless I say it --
25     A.   Yes.

---

40

1     Q.   -- it looks like you're looking at a version
2  of the Nurse Practice Act; is that correct?
3     A.   Yes.
4     Q.   Can you show me the cover of that, please?
5     A.   Sure.
6     Q.   It says, "Colorado Nurse Practice Act,
7  12-38-101, C.R.S," and it's dated 2002.
8     A.   Correct.
9     Q.   And also for the record, you were referring
10  to a moment ago -- or at least you were looking at it
11  when you were answering -- a couple pages that are before
12  you. And on the break we'll probably make copies of
13  those and just mark them so we have a clear record about
14  what you were referencing.
15        Are you familiar with the form that the
16  Department of Corrections uses for their nursing
17  assessments?
18     A.   No, I'm not.
19     Q.   If the Department of Corrections had a form
20  that nurses used that tracked this format, is it your
21  opinion that all of those entries on a form like that
22  would also violate the Nurse Practice Act?
23     A.   No, because the Nurse Practice Act also does
24  address what is typical policy and procedure for
25  particular institutions.

---

(Pages 37 to 40)

* SUBJECT TO CONFIDENTIALITY DESIGNATIONS *

Carranza-Reyes v. Park County

Anthony Volz, MSN, RNC, ANP

**45**

1  swelling, most likely postnasal drainage.

2  Q.  Can you -- when you say "it probably would

3  have shown," are you saying that to a reasonable degree

4  of medical certainty --

5  A.  Yes, I am.

6  Q.  -- that it would have shown --

7  A.  I'm sorry.

8  Q.  You're interrupting a little bit --

9  A.  Yeah.

10  Q.  -- which makes it really hard for her.

11  A.  Sorry.

12  Q.  Do you know -- let's assume that the

13  examination of the throat showed the things that you just

14  mentioned. Okay?

15  A.  Okay.

16  Q.  That there was an examination, and it showed

17  the very things you just mentioned.

18  A.  Okay.

19  Q.  How would that change the plan of treatment

20  for this patient?

21  A.  Not just the throat, but the lack of the

22  other information that I was alluding to earlier would

23  certainly have changed -- in my nursing experience, my

24  job, and any nurse's job, is to be the eyes, ears and

25  hands of the physician.

**46**

1      And in this particular case, I would have

2  called the physician to give him a report on what's going

3  on with this patient. And that likely would have set

4  into a chain of events of a throat culture, throat swab,

5  being done.

6      It's also found in Paulsen's notes that she

7  had the ability and the right to go ahead and do that

8  type of study. But because she didn't examine the

9  throat, it did not prompt her to do that type -- my

10  opinion is that it did not prompt her to do that study,

11  basically a throat swab, to evaluate whether or not it

12  was a streptococcal infection or a viral-type process.

13  Q.  So let's focus on just the throat. Okay?

14  A.  Okay.

15  Q.  If she would have examined the throat --

16  A.  Yes.

17  Q.  -- and it would have showed what you said,

18  would that, in your opinion, change the course of

19  treatment, that alone?

20  A.  Yes.

21  Q.  And it would have changed the course of

22  treatment how?

23  A.  Again, it would have set that chain of

24  events in process where she should have called the

25  physician and advised him of her findings, or she also

**47**

1  had the right -- and the physician most likely would have

2  ordered a throat culture.

3      But she also had the material available to

4  do a throat swab, and a throat swab most likely would

5  have given the information that Moises had a

6  streptococcal infection of the throat. That would have

7  been reported to the physician. The physician would have

8  ordered antibiotics, and the rest of the whole event

9  would be uneventful.

10  Q.  And are you basing that conclusion that it

11  would have changed in the ways you just described -- the

12  course of treatment, that is -- on any protocols or

13  procedures that are -- exist, to your knowledge?

14  A.  I go back to the nursing process, what we

15  have all been trained in school, what is the minimum

16  expectation of a registered nurse. I don't think you

17  need a protocol to do a good nursing evaluation. That's

18  expected of us. That's our job. And off of that

19  information, report it in a timely fashion to a physician

20  so that a proper medical diagnosis can be made.

21  Q.  So there's nothing written or standard that

22  you know of -- a written standard that says if a person

23  has body aches, headaches, nausea, diarrhea and a red

24  throat, you must call a physician and get a strep test?

25  A.  That's correct. And I'll flip it another

**48**

1  way: For her to do something other than what is in the

2  Nurse Practice Act and common nursing practice, she would

3  have had protocols that would have allowed her to go

4  beyond that, which would include if a red throat is

5  found, you have the right to go ahead and get the swab.

6      If the swab comes back positive, you have a

7  protocol that talks about how to treat this. Okay? So

8  she is, to me, my opinion is, she did not practice common

9  nursing practice with this evaluation. This should have

10  been reported to the physician.

11  Q.  "This" being his symptoms, or the -- explain

12  what you mean by "this."

13  A.  The symptoms and the bit of an exam that she

14  did.

15  Q.  In your experience, can protocols be verbal?

16  A.  If they're verbal, they need to be

17  documented.

18  Q.  Is it a violation of the Nurse Practice Act

19  to operate under protocols that are not written?

20  A.  What you're really -- there's -- there is no

21  such thing as a protocol that's verbal, unless it's a

22  verbal order, and that has to be documented. It's -- a

23  physician order is really what you're describing.

24      MS. LEWIS: Can you read back my question,

25  please?

(Pages 45 to 48)

* SUBJECT TO CONFIDENTIALITY DESIGNATIONS *

**53**

1  A.  She -- there's no diagnosis, either a
2  nursing diagnosis or a medical diagnosis, on this page.
3  And that's -- that's part of the issue of what makes this
4  a weak document from a Nurse Practice Act. It's missing
5  information.
6  Q.  So she should have made a diagnosis?
7  A.  A nursing diagnosis.
8  Q.  Which -- how do you distinguish between a
9  diagnosis and a nursing diagnosis?
10  A.  Okay. A medical diagnosis will give you the
11  definition of the disease process. A nursing diagnosis
12  is basically based upon the risks of that disease
13  process. For example, you have somebody with nausea.
14  That's a symptom. It's not a diagnosis as to what's
15  going on. It could be food poisoning. It could be a
16  viral gastroenteritis.
17  But what you're working with in this
18  particular case would be a nursing diagnosis of nausea
19  related to whatever the medical diagnosis might be, or
20  you can do nausea as general discomfort, risk of
21  dehydration. That would be the nursing diagnosis. The
22  plan on that would be general comfort measures. It would
23  not include medications for treating the nausea.
24  These are nondelegated-type measures.
25  Delegated measures are those that are directed by the

**54**

1  physician. Nondelegated are those that are defined by
2  the nurse. And in this particular case, the nursing plan
3  would include things like adequate hydration, strategies
4  to minimize the nausea, such as using soda water, cold
5  compresses to the forehead.
6  The implementation would be actually doing
7  those. The evaluation is, did it work? Is his nausea
8  better? Is he maintaining adequate hydration? That's
9  the difference between a medical diagnosis and a nursing
10  diagnosis.
11  Q.  Okay.
12  A.  Okay?
13  Q.  Let's go back to what you said a moment
14  ago --
15  A.  Um-hum.
16  Q.  -- which was that, if I understand you
17  correctly, you're saying that Nurse Paulsen should have
18  relayed this information to a physician on March 6 --
19  A.  Yes.
20  Q.  -- 2003, right?
21  A.  Yeah. I -- go ahead.
22  Q.  No. Please, if you have something to
23  add . . .
24  A.  She had -- she would have been more likely
25  to refer this to the physician if she had gathered more

**55**

1  adequate information.
2  Q.  And --
3  A.  She did not do a good job nursing.
4  Q.  And the more adequate information is the
5  throat, the nasal, and then --
6  A.  Oh --
7  Q.  -- how long the headache or the vomiting had
8  existed? Is that a fair summary?
9  A.  How long was he sick? When did it start?
10  Are there others around him that are sick? What type of
11  things has she seen in the last few days as part of her
12  analysis that may give her an idea as to what's going on
13  here?
14  It would have included, you know, certainly,
15  the P, Q, R, S, T of each complaint that he's got: you
16  know, the headache, the body aches, the nausea, the
17  diarrhea. What makes it better? What makes it worse?
18  How long has he had it? Is there any blood in the
19  diarrhea? Is there any blood in his vomit? She didn't
20  ask any of these questions.
21  Q.  How do you know she didn't ask any of
22  these --
23  A.  It's not documented. I'm sorry.
24  Q.  That's okay.
25  A.  It's not documented.

**56**

1  Q.  So essentially, you conclude from the fact
2  that it's not on the document that that must mean she
3  didn't ask him?
4  A.  Correct.
5  Q.  Okay. If physicians had the opinion that
6  Ms. Paulsen didn't have enough information to know to
7  contact a physician until the morning of March 8th, are
8  you challenging -- would you challenge those opinions of
9  the physicians?
10  A.  I don't think I understand your question.
11  Q.  All right. I agree. It was bad. If
12  physicians had an opinion that Ms. Paulsen had no reason
13  to call them until the morning of March 8 -- in other
14  words, that Mr. Carranza-Reyes's symptoms didn't suggest
15  Nurse Paulsen should call the physician until the morning
16  of March 8th -- would you challenge those opinions?
17  MR. KORDICK: And I object to the form. Do
18  you mean disagree? "Challenge," I don't know what that
19  means.
20  Q.  (BY MS. LEWIS) Do you disagree, challenge,
21  however you want to say it?
22  A.  If -- and they have the same accumulated
23  data that's in here?
24  Q.  Correct.
25  A.  Okay. And you're saying that the physicians

(Pages 53 to 56)

* SUBJECT TO CONFIDENTIALITY DESIGNATIONS *

Carranza-Reyes v. Park County

Anthony Volz, MSN, RNC, ANP

---

57

1  have this same information that she has, that she did not
2  have enough information to warrant calling them or
3  transporting him earlier than the morning of the 8th?
4  And you're talking about the morning of the 8th being
5  when she came into the jail at 8:00 in the morning?
6      Q.   Let me phrase it differently.  Let's try
7  again.
8      A.   Okay.
9      Q.   A physician is reviewing the exact same
10 information that you have seen, come to the conclusion
11 that Mr. Carranza-Reyes's symptoms did not suggest
12 anything significant enough for the nurse to raise to the
13 physician until the morning of March 8th, when he
14 developed some additional symptoms; would you disagree
15 with that opinion?
16     A.   I disagree.  Physicians have an M.D.
17 license, and what the physician's opinion is with regards
18 to what the nurse did right or wrong -- what the nurse
19 did right or wrong really should lay upon nurses to
20 evaluate that standard of care.
21     And I -- I just -- I have a problem with
22 that, that physicians would -- well, I'll leave it at
23 that.  But I disagree.  There was plenty of information
24 there for her to have contacted a physician prior to the
25 8th, or even trans -- well, at least contact a physician

---

58

1  prior to him being transported.
2      Q.   So if physicians evaluated this information
3  and determined that the symptoms up until the morning of
4  March 8th didn't suggest any need for immediate
5  treatment, other than over-the-counter medications, you
6  would disagree?
7          MR. KORDICK:  Asked and answered.
8          THE DEPONENT:  I disagree.
9      Q.   (BY MS. LEWIS) Okay.  Can a nurse advise a
10 patient to take over-the-counter medications --
11     A.   No.
12     Q.   -- under the Nurse Practice Act?
13     A.   No.
14     Q.   And that's as a result of the Nurse Practice
15 Act?  In other words, that's the authority for that
16 position?
17     A.   That's correct.
18     Q.   If Dr. Bachman regularly reviewed her notes,
19 Nurse Paulsen's notes --
20     A.   Um-hum, yes.
21     Q.   -- as a matter of course, and he had an
22 understanding with her that she could provide
23 over-the-counter medications to inmate detainees as she
24 saw fit, is it your opinion that she would still be
25 acting in violation of the Nurse Practice Act?

---

59

1      A.   Yes.
2      Q.   And why is that?
3      A.   There are no protocols, there's no written
4  orders that she could do this.
5      Q.   You don't know whether there were verbal
6  protocols, though?
7      A.   We already talked about that before.
8      Q.   Right.
9      A.   That's -- to me, and to the profession of
10 nursing, a verbal order or a protocol needs to be
11 documented.
12     Q.   So it needs to be written?
13     A.   It needs to be written.
14     Q.   In other words, there's no --
15     A.   There's no such thing as a verbal protocol.
16     Q.   Okay.  Do you agree that protocols could
17 change, depending on the experience of a nurse?
18     A.   No.
19     Q.   Let's look at Summary Number 3.
20         THE DEPONENT:  Do we have any water?
21         MR. KORDICK:  Yeah, we sure do.
22         (Discussion off the record.)
23     Q.   (BY MS. LEWIS) Okay.  Review of Summary
24 Number 3, it looks like you conclude that "Her exam is
25 incomplete based on complaint" -- presumably Mr.

---

60

1  Carranza-Reyes's complaint -- "and the last 36 hours of
2  history."  Do you have an opinion as to whether Mr.
3  Carranza-Reyes actually told Nurse Paulsen all of the
4  symptoms he was having?
5      A.   Well, let's take a look here.  To the best
6  of my recollection, at that time, yes.
7      Q.   And that's just based on your review of the
8  materials that are in the report --
9      A.   In the records, yeah.
10     Q.   -- right?  For instance, you say, "He has
11 decreased diarrhea on March 6, 2003."  And do you know
12 whether he told her that?
13     A.   I believe -- I don't know if it was March
14 6th, because that was his first visit with her.
15     Q.   I'm incorrect.  The Summary of Number 3
16 refers to March 7th, right? .
17     A.   Correct, yes.
18     Q.   Okay.  So --
19     A.   I think that was in -- it's not on the
20 nurse's note of that day's visit about decreased
21 diarrhea.  I think it may have been in another -- I think
22 it might have been even in her note, or it was her
23 summary of events.
24     Q.   So it's either in one of those two places?
25     A.   Yeah.

---

(Pages 57 to 60)

* SUBJECT TO CONFIDENTIALITY DESIGNATIONS *

Carranza-Reyes v. Park County

Anthony Volz, MSN, RNC, ANP

61

1   Q.   And you say, "Based on Nurse Paulsen's
2   notes, he seems to be improving if at least stable," and,
3   "This is inaccurate." And why do you conclude it's
4   inaccurate?
5   A.   Oh, let's see. Because he now has abdominal
6   tenderness on her exam. That's a new finding. The --
7   and what I would have looked at, as a nurse, is that I
8   was controlling the symptoms, not necessarily making him
9   resolve his health status. She was giving him
10  medications that would have relieved the symptoms that he
11  was experiencing. He still had nausea and vomiting.
12  Q.   Okay. Let's go back to where you said the
13  abdomen was a new --
14  A.   Correct.
15  Q.   -- symptom.
16  A.   Um-hum.
17  Q.   If you look at the note of March 6th, and if
18  you could, let's look at the Exhibit Number 2 so that
19  we're on the same page.
20  A.   Sure.
21  Q.   Because I think what you have is the same as
22  two pages in Exhibit Number 2, and I just want to make
23  sure we're talking about the same information.
24  A.   There's a stamp at the bottom. It's 3515.
25  Q.   Park 3515?

63

1   Q.   So you were mistaken a moment ago when you
2   said --
3   A.   I was mistaken, correct.
4   Q.   And if you could let me finish -- when you
5   said that it was a new symptom, right? Okay. So what
6   information did she have that would indicate to her that
7   Mr. Carranza-Reyes was not stable on March 7, 2003?
8   A.   Okay. The fact that Moises said he was not
9   stable, that he was not getting better. If he was
10  getting better -- and this was part of my evaluation, not
11  just the stomach. But if he was getting better, he
12  wouldn't have asked for another visit.
13  Q.   Okay. Anything else?
14  A.   Again, also -- he's still continuing to have
15  nausea, vomiting, diarrhea, still has the same symptoms.
16  He's not getting better. And, then again, she does not
17  do an adequate nursing assessment to determine where he's
18  at. I'm getting beyond what the question was. I
19  apologize.
20  Q.   That's okay. On March 7th, you would agree
21  her notes reflect that he doesn't have a fever at this
22  point, right?
23  A.   That's what her notes say, correct.
24  Q.   And the day before he did have a low-grade
25  fever, right?

62

    A.   Yes.
2   Q.   And it could be a duplicative Bates Number.
3   But if you could look at page Park 0141 of Exhibit Number
4   2.
5       MR. KORDICK: Is it 01?
6       MS. LEWIS: 0141.
7       MR. KORDICK: Just 41? Is that what it is?
8       MS. LEWIS: 141.
9       MR. KORDICK: Oh, 141. I'm sorry.
10      THE DEPONENT: Yeah, it's the same thing.
11  Q.   (BY MS. LEWIS) Okay. So pages 141 and 142
12  are the same documents that you were looking at in front
13  of you, right?
14  A.   Um-hum.
15  Q.   Except for yours have some notes on them,
16  which we'll copy --
17  A.   Yeah.
18  Q.   -- in a little bit. Okay. So if you could
19  look at page 141, it looks like from that document, she
20  notes, "Abdomen nonrigid and slightly tender over
21  stomach." That's from March 6th.
22  A.   Yes. Okay, I see what you're getting at.
23  Q.   And on March 7th, she says, "Abdomen
24  slightly tender over stomach."
25  A.   Correct, correct.

64

1   A.   Correct.
2   Q.   And so you don't view that as an improvement
3   at all in his condition?
4   A.   No, I don't, the reason being, she's
5   treating his symptoms, and the ibuprofen that she's been
6   giving him is keeping him with a normal temperature. But
7   he is feeling worse. Otherwise, he would not have come
8   to her.
9   Q.   On March 6, 2003, do you have any opinion as
10  to whether Ms. Paulsen knew on that date that Mr.
11  Carranza-Reyes was going to become seriously ill?
12  A.   No.
13  Q.   Do you believe she did know that he was
14  going to become seriously ill?
15  A.   No.
16  Q.   And the same question as to March 7th: Do
17  you think that the information presented to her, that
18  she -- based on that information, she knew he was going
19  to become seriously ill?
20  A.   With the way she gathered the information
21  and her decision-making, she did not know.
22  Q.   Based on -- let's assume that the
23  information is what's reflected in the note of March 7th,
24  okay? And I understand you might think this is
25  inadequate because there were other symptoms that aren't

(Pages 61 to 64)

* SUBJECT TO CONFIDENTIALITY DESIGNATIONS *

Carranza-Reyes v. Park County

Anthony Volz, MSN, RNC, ANP

65

1  reflected in here. as you understand it, right? Correct?
2      A.   Right.
3      Q.   But assume that this is what she knew. Just
4  go with me on that for a second.
5      A.   Sure, um-hum.
6      Q.   Do you think that that information would
7  lead a nurse to conclude that he was in danger of
8  becoming seriously ill?
9      A    No. But she's now had two visits with him.
10  He's not improving. She should have called the physician
11  and gotten him involved at that point.
12      Q.   Okay. On March 7th, do you conclude that
13  Mr. Carranza-Reyes was dehydrated at that point?
14      A.   Highly likely.
15      Q.   And why do you reach that conclusion?
16      A.   Because he's been ill going on four days
17  now -- or, actually, three days. I believe the fourth
18  was the first time that he reported being ill and having
19  some fevers and some nausea. He's been throwing up for
20  two to three days. He's had diarrhea for two to three
21  days. She's made no effort in her plan of care to do any
22  hydration measures.
23      Q.   And what --
24      A.   She's not -- she's not asked him any
25  information with regards to how many times he's

66

1  urinating, what color is his urine. You just -- you
2  don't have an adequate assessment at this point for
3  somebody that's had three days of nausea and vomiting.
4  She hasn't performed the nursing process to evaluate him
5  properly. When I apply the nursing process to this, I
6  find that he is at high risk for developing dehydration.
7      Q.   Do you know whether she was informed that he
8  had sought medical attention earlier than March 6th?
9      A.   No.
10      Q.   Do you agree that if someone -- if you're
11  treating a patient or you're examining a patient who
12  speaks Spanish, and you're using an interpreter, that
13  some of the information could be lost in the translation?
14      A.   I agree.
15      Q.   Particularly, would you agree with that if
16  the translator is not an official translator? They are
17  just someone who speaks Spanish and English, and it's
18  unknown how much of each they speak.
19      A.   I agree.
20      Q.   Do you know whether any of the information
21  that you claim or that you contend that Ms. Paulsen
22  didn't obtain from Mr. Carranza-Reyes was information
23  that was lost in a translation?
24      A.   Ask that again?
25      Q.   Do you know whether -- well, let me

67

1  rephrase. You're critical of Ms. Paulsen for failing to
2  obtain certain information or not documenting certain
3  information that you think was received from the patient,
4  right?
5      A.   Correct.
6      Q.   Do you know whether any of that information
7  is information that was somehow lost in translation
8  between the interpreter and her?
9      A.   I can't answer that. I don't know.
10      Q.   Do you usually credit a patient's
11  self-assessment of their condition over a medical
12  professional's assessment?
13      A.   What are you asking?
14          MR. KORDICK: Object to form.
15          THE DEPONENT: I'm not sure I understand the
16  question.
17      Q.   (BY MS. LEWIS) You've dealt with many
18  patients over your years of experience, right?
19      A.   Correct, yeah.
20      Q.   And do you find that patients sometimes
21  think their condition is one thing: They have an opinion
22  about it; they assess themselves as having a certain
23  ailment?
24      A.   Yes.
25      Q.   And as a medical professional, you might

68

1  have a different assessment; would you agree?
2      A.   Yes.
3      Q.   Do you find that the patient's assessment is
4  usually accurate, or do you rely -- let me rephrase.
5  Strike that. Do you usually rely on the patient's
6  self-assessment in the terms I just talked about more so
7  than the assessment that a medical professional would
8  make about what's going on with that patient?
9          MR. KORDICK: I object to the form of that
10  question.
11          THE DEPONENT: There's -- there's a
12  difference between assessment and diagnosis. I put a
13  great deal of weight upon a patient's assessment or
14  presentation of symptoms. As far as what their decision
15  is as to what they have, I put all that information
16  together to make the appropriate diagnosis.
17      Q.   (BY MS. LEWIS) Let's look at Summary Number
18  4, which is on page 6, and it talks about blood in Mr.
19  Carranza-Reyes's urine.
20      A.   Um-hum, yes.
21      Q.   Do you agree that no one told this
22  information to Nurse Paulsen?
23      A.   I agree.
24      Q.   So that's not something you're faulting
25  her --

(Pages 65 to 68)

* SUBJECT TO CONFIDENTIALITY DESIGNATIONS *

Carranza-Reyes v. Park County

Anthony Volz, MSN, RNC, ANP

---

**69**

A.   No, I'm not.

Q.   -- for not doing?

A.   No.

Q.   Okay. Review of Summary Number 5, you, in this first paragraph of Summary Number 5, conclude that both the jail and Nurse Paulsen are negligent for not enacting universal medical precautions on March 7, 2003, as far as I understand it, and tell me I'm wrong; is that right?

A.   Yes.

Q.   What would the enactment of universal medical precautions on March 7th have done for Mr. Carranza-Reyes? In other words, would they have changed the outcome of his condition?

A.   No, they would not have changed his outcome.

Q.   Now, if you assume that the detainees in D Pod were suffering from a common cold, do you still feel like universal medical precautions should have been enacted on March 7th?

A.   Absolutely.

Q.   And so when, in your opinion, would medical -- universal medical precautions need to be enacted in the jail?

A.   You have to understand that the universal precautions includes proximity of patients. There are

---

**70**

specific guidelines and protocols to prevent transmission of communicable diseases with a number of square footage per patient, bed space between patients. That's the start of the universal precautions.

And my understanding in this particular situation -- and I'm not privy to what all the square footages are, and such. I work basically in a hospital -- but I assume that jails and prisons have square-footage space per prisoner. And that's not just for comfort. That's to prevent disease as well.

And this is a facility that was grossly overcrowded and had, to my understanding, patients on the floor. And in a situation like this, where there's inadequate place to put trash, debris, it's going to wind up on the floor. So now you've got patients -- excuse me -- prisoners that are sleeping with the trash.

You've got a situation where you have inadequate hygiene with regards to enough toilet facilities, enough shower facilities. You have a situation, from what I understand both from the guards and Moises, where the prisoners were not given proper clothing exchanges on a regular basis. That's going to promote infection. So you look at this from when a person enters a prison or any situation where there's a large group setting that you have adequate spacing. And

---

**71**

it just goes down the line from general hygiene principles.

Once somebody acquires a communicable disease, you better be looking at what is going to worsen the situation and remediate it so that you can decrease the number of people that are going to be cross-infected with those that are already ill. That might take the measures of, you take these people that are ill out of that situation and put them in another environment where they can be, for lack of a better word, quarantined. These measures weren't taken.

Or at a minimum, you're going to go in, and you're going to be making sure the trash is emptied on a more routine basis. You're going to take care of all those measures that we addressed earlier of adequate trash, adequate cleaning, scrubbing. From my understanding, these things did not happen.

Q.   So to summarize, my question was, when, in your opinion, do you need to enact universal medical precautions. And in your answer, I understood you to say when square footage -- when a certain number of people per square feet --

A.   Exceeds the square foot --

Q.   -- exceeds a certain number of square feet, which we don't know what it is, right?

---

**72**

A.   Correct.

Q.   You're not saying -- and then, also, if someone has a communicable disease. And that is regardless of whether or not the square-footage requirement is exceeded or not, or is that just on top of the square-footage requirement?

A.   That's on top of the square footage.

Q.   Okay. What's the normal range for respirations at high altitude?

A.   That's --

MR. KORDICK: Object to the form of the question.

THE DEPONENT: That's not -- the normal range for respirations at high altitude are the same as those at low altitude for people living at high altitude.

Q.   (BY MS. LEWIS) Okay. Maybe I should have laid a little foundation. Do you have experience or knowledge or training in what the normal rate of respirations is for a person living at high altitude?

A.   It's the same as it is for people living at low altitude.

Q.   Do you have any knowledge about people who are used to living at a different altitude, but then who go visit high altitudes, if their respirations are affected by the altitude?

---

(Pages 69 to 72)

Carranza-Reyes v. Park County

Anthony Volz, MSN, RNC, ANP

---

73

1    A.    Am I an expert at it? No. But I do know,
2  both from clinical experience -- taking care of patients
3  that come into, for example, Colorado Springs from
4  Florida -- that they do have -- and I'm seeing them as
5  patients, I will consider that their respiratory rates
6  may be somewhat elevated. But as far as a normal
7  expectation as to what that adjustment in respiratory
8  rate is, to my knowledge, there is no normal range as far
9  as adjustment for respiratory rate.
10   Q.    Let's look at Review of Number -- Review of
11  Summary 6.
12   A.    Okay.
13   Q.    Do you know whether or not Ms. Paulsen was,
14  in fact, told that Mr. Carranza-Reyes was feeling better
15  after he received oxygen in the early hours of March 8th?
16   A.    Based on this, that information was relayed
17  by Deputy Frye, that he had put her -- put him on oxygen,
18  and that the oxygen was of no benefit to Moises.
19   Q.    And do you know whether that piece of
20  information was relayed to Nurse Paulsen or not?
21   A.    I'm trying to recall what I saw in the
22  depositions. I don't recall.
23   Q.    Well, let's look at the nurse's report
24  that's in Deposition Exhibit Number 2. It's right after
25  those two pages --

---

74

1    A.    Um-hum.
2    Q.    -- so it starts at page 0143, Park 0143.
3  And the top entry is timed 0345.
4    A.    Okay.
5    Q.    And in the middle of that paragraph, it says
6  that, "He stated that they had placed Mr. Carranza-Reyes
7  on oxygen, and he was feeling better." Do you dispute
8  that she was told that information?
9    MR. KORDICK:  Again, I'm going to object to
10  the form of the question, based on this document that was
11  prepared after the fact. But go ahead.
12   MS. VEIGA:  Mr. Kordick, you really cannot
13  give speaking objections.
14   THE DEPONENT:  This -- I had gotten this
15  information -- rephrase your -- say your question again.
16  Did that information --
17   Q.   (BY MS. LEWIS) You would agree that, one,
18  Deputy Frye reports that the oxygen didn't make Mr.
19  Carranza-Reyes feel better, right?
20   A.    Correct.
21   Q.    And Ms. Paulsen, on the other hand, reports
22  that she was told it did make him feel better?
23   A.    Correct. I see that.
24   Q.    And do you have any way of ascertaining what
25  was, in fact, told of her -- to her?

---

75

1    A.    Only -- no, I don't.
2    Q.    Okay.
3    A.    No.
4    Q.    And if she was told that the oxygen made him
5  feel better and he was feeling better, when do you think
6  it was appropriate for her to come to the jail, or when
7  do you think she should have come to the jail to assess
8  the patient in person?
9    A.    On this phone call.
10   Q.    And why is that?
11   A.    You have a sudden change in patient -- in
12  a -- well, she's taking care of him as a patient, not a
13  prisoner. You have a sudden change in patient status.
14  Just because the oxygen helped, in her words -- she's
15  saying it helped -- doesn't mean he's not having an acute
16  change in status.
17   She should have gone in and done an
18  evaluation to find out why he now needs, suddenly,
19  oxygen. There's a change. There's something going on
20  with him that she failed to respond to, to do an
21  evaluation.
22   Q.    Do you know what specifically changed?
23   A.    His respiratory rates.
24   Q.    Do you know what his respiratory rates were?
25   A.    It was 36. She hasn't stated here, but he's

---

76

1  reporting it. She also does state it later on in some
2  other part of the deposition, in her deposition.
3    Q.    Do you believe at 3:45 -- based on your
4  experience as a registered nurse, that Mr. Carranza-Reyes
5  was in need of urgent medical attention at 3:45 a.m.?
6    A.    Yes, urgent medical attention for her to get
7  in there to do further evaluation.
8    Q.    To clarify, you're not saying that he needed
9  an emergency ambulance transport at that point, are you?
10   A.    Correct.
11   Q.    And is it your opinion that the symptoms he
12  had at 3:45 a.m. reflected that he was having -- he was
13  at risk of having a serious medical -- or let me
14  rephrase. Based on what was going on with him at 3:45
15  a.m., as reported to Ms. Paulsen, do you feel like that
16  information would lead her to believe that he was rapidly
17  deteriorating and needed immediate medical care?
18   A.    Yes.
19   Q.    And that's because of the respiratory rate;
20  is that right?
21   A.    In addition to persistence of the symptoms
22  that he had been having. The respiratory rate, as it
23  stands on its on, she should have gone in. But if you
24  put the additional data on there that he is not feeling
25  better -- he's still having the vomiting, he's still

---

81

1    A.    Yes.

2    Q.    And you write here that "Ben Baca agreed and

3  stated it would be at least three hours before he could

4  arrange a transport," right?

5    A.    Correct.

6    Q.    Do you know whether he said "at least three

7  hours" or "up to three hours"?

8    A.    If I recall, it said "two to three hours" in

9  somebody's deposition.  It may have been in Nurse

10  Paulsen's.

11    Q.    But you didn't have the benefit of that

12  deposition when you wrote this report, right?

13    A.    No, huh-uh.

14    Q.    Later on in the same page, under Review of

15  Summary 8, you write that "A transport might take three

16  to four hours to arrange."  And that's in the last

17  paragraph on page 8.

18    A.    Yes, okay.

19    Q.    Where did you get the four hours?

20    A.    That was the time frame from when she first

21  arrived back at the jail that morning.

22    Q.    So she --

23    A.    So she got there at 6:00 and made a

24  decision -- I'm trying to recall now -- made a decision

25  to consider transport at 8:00.  He was finally

82

1  transported after 12:00.  So it was basically a four-hour

2  time frame before he was eventually transported, I think.

3    Q.    Okay.  And just to clarify, I believe the

4  records show that she came in at about 7:50 or 7:45, not

5  6:00 in the morning --

6    A.    Oh, that's right, yeah.

7    Q.    -- would you agree?

8    A.    Yeah.  There was something else that

9  happened at 6:00, I think.  Yeah.

10    Q.    All right.  So you're using the four hours

11  based on what actually happened, not what she was told?

12    A.    Correct.

13    Q.    Okay.  Would you agree that no one told Ms.

14  Paulsen on -- after 8:00 a.m. or at any time before 8:00

15  a.m. that Moises Carranza-Reyes had coughed up spittle

16  containing blood?

17    A.    I agree.

18    Q.    And no one told her also about any blood in

19  his urine by that point, right?

20    A.    Correct.

21    Q.    Based on the information she had at the

22  time, at 8:00 in the morning, where -- do you think she

23  knew he was unstable at this point?  Well, first of all,

24  do you think he was unstable?

25    A.    Yes, I do think he was unstable.

83

1    Q.    And what suggests to you that he was

2  unstable?

3    A.    We have, again, the persistence of the

4  symptoms that he's had going on -- gosh, from the 4th, no

5  real change in his nausea, vomiting, all these symptoms

6  that we've addressed prior.  And then at 3:00 in the

7  morning, or whenever that phone call was to her at her

8  home, he had a change in respiratory rate.

9          A respiratory rate of 34 is excessively

10  high, regardless of altitude.  His baseline respiratory

11  rate was 24, and that's high end of normal.  I might

12  consider 24 in somebody that's having some mild symptoms

13  of an altitude-type process, trying to adjust and adapt,

14  and consider that that's his baseline.  And she's already

15  established a baseline.

16          Now he's at a respiratory rate of 34.

17  That's like breathing once every two seconds.  That would

18  fatigue all of us here.  That's a critical change in

19  status for this gentleman.  There's something going on in

20  his airways that's making it difficult for him to

21  breathe.  He was, in my opinion, critical at 3:00 in the

22  morning.

23    Q.    Critically ill?

24    A.    Critically ill.

25    Q.    What --

84

1    A.    And she should have come in to evaluate him

2  and determine the best approach to take care of him.

3    Q.    I'll just make sure you're done.

4    A.    Sure.

5    Q.    What mode of transport do you think he

6  needed at that time?

7    A.    He needed an ambulance.  And this is one

8  thing that, after reading the different documents that

9  Lloyd had given me, I thought he had been transported by

10  ambulance and those were the arrangements that were made.

11  I found out after some of the material that he had given

12  me last week that he was transported in a private

13  vehicle, with no medical support with him.  That was

14  extremely risky on her part.

15    Q.    Are there any criteria that you use as a

16  registered nurse to determine whether someone's critical

17  or stable?

18    A.    Respiratory is one of them.  It's the ABCs:

19  airway, breathing, circulation.  His breathing was

20  compromised.

21    Q.    So the three ways you determine if someone

22  is critical is the ABCs --

23    A.    Um-hum.

24    Q.    -- which is airway, breathing --

25    A.    Breathing.

* SUBJECT TO CONFIDENTIALITY DESIGNATIONS *

Carranza-Reyes v. Park County

Anthony Volz, MSN, RNC, ANP

85

1    Q.    -- and circulation?

2    A.    And circulation.

3    Q.    So can you explain how you assess those

4 three factors?

5    A.    Airway is, is he able to get air in and out?

6 His airway was not obstructed. His respiratory status,

7 one of the points of the evaluation certainly is rate and

8 quality of respirations. And she had already gotten that

9 information from the deputy when he evaluated Moises in

10 the -- guess he was in the nurse's area and gave him

11 the oxygen.

12         He reported -- well, he found that the

13 respiratory rate was 34, and the respirations were

14 shallow. Just because the oxygen helped does not mean

15 that the respiratory status is healed. She had a duty to

16 come in and evaluate why he suddenly changed from a

17 respiratory rate of 24 to 34.

18         And that evaluation would have included

19 listening to his lungs, listening to his heart. It is

20 with 90-percent likelihood that if she came in, she would

21 have heard a change in his lungs. She had listened to

22 his lungs all along, stated that they looked -- they

23 sounded fine.

24         But when you have a respiratory rate of 34,

25 and it's shallow, there's something obstructing the small

86

1 parts of the airways, and that's usually a pneumonia.

2 There's other disease processes that can do it as well.

3 But in this particular situation, he had a critical turn

4 in event, or sudden turn in event, and she did not

5 evaluate that.

6         The circulatory aspect, there's a lot of

7 parts that go along with that, and that includes: What

8 is the heart rate? What is the blood pressure? Is the

9 blood getting to the areas of the body that need to be

10 gotten to? So we have to look at different parts of the

11 body for discolorations. You might do a pulse oximetry

12 to see if the circulation is sufficient and the

13 respirations are sufficient for oxygenating the body

14 itself, checking the quality of the pulse. Is it weak,

15 thready?

16         She did no assessment following her March

17 7th visit on this gentleman to see what his status was.

18 There's no blood pressure. She didn't take one. She

19 didn't take a pulse. From what I recall, she felt his

20 side, and that was it. And that's -- to me, that's

21 inadequate.

22         Just the respiratory rate alone was enough

23 to make this an urgent, emergent situation. It was

24 urgent she get in there. And if she had done a proper

25 evaluation, she would have found that it was an

87

1 emergency, to transport him by ambulance.

2    Q.    As part of an assessment of whether

3 someone's critical, in addition to the ABCs, do you do

4 any sort of visual assessment of a person: the way

5 they're acting, are they ambulating, things like that?

6    A.    That's part of it. That's part of it.

7    Q.    And how does that factor in? Can you

8 explain that?

9    A.    It's a small part. Patients are

10 minimizers -- in other words, they can be sicker than

11 what they're actually presenting -- and that's why you

12 use the objective data. By "objective data," I'm talking

13 about doing the hands-on examination. You don't rely on

14 just the complaints the patient is giving you. You don't

15 rely on just the way they look at you, just sitting in a

16 chair. You need to evaluate them, doing a more detailed

17 examination.

18         This guy was -- he was leaning over,

19 obviously ill, required assistance being moved from one

20 level of the jail to the other level of the jail. He

21 wasn't necessarily under his full independent power. She

22 saw that. She walked behind him.

23    Q.    And that's based on her --

24    A.    That's on her documentation.

25    Q.    Okay. And that's in her notes?

88

1    A.    That's in her notes, um-hum.

2    Q.    Okay. Do you feel you're in as good a

3 position as she was to determine what state he was in at

4 the time just by reviewing the documents, where she was

5 actually there observing the patient?

6    A.    Rephrase that.

7    Q.    Ms. Paulsen was actually observing the

8 patient --

9    A.    Um-hum, correct.

10    Q.    -- on -- at 8:00 a.m., right?

11    A.    Correct, correct.

12    Q.    And you weren't there --

13    A.    Correct.

14    Q.    -- right? Is it of any significance to you

15 that based on her observations, she determined she didn't

16 need to do -- to call an ambulance; or do you believe

17 that, just based on written documentation alone -- the

18 objective information, as you've put it -- that you can

19 make the same judgment call as she was able to make?

20    A.    She was negligent in that she did no

21 assessment.

22    Q.    No assessment meaning blood pressure --

23    A.    She came in on her day off. She had a gut

24 feeling that he was not doing well. She did no

25 assessment on him to truly evaluate urgency --

(Pages 85 to 88)

* SUBJECT TO CONFIDENTIALITY DESIGNATIONS *

Carranza-Reyes v. Park County                                    Anthony Volz, MSN, RNC, ANP

89

1   Q.   Do you --
2   A.   -- and -- go ahead.
3   Q.   Do you know whether she had knowledge that
4   he was critical at this point, as you say he was
5   critical?
6   A.   Did somebody tell her that he was critical,
7   or her observations that he was critical?
8   Q.   Let me backtrack.
9   A.   Okay.
10  Q.   What I understand you saying is that she
11  should have known he was critical, right?
12  A.   Yes.
13  Q.   Are you saying that she knew he was
14  critical?
15  A.   Can you give me a distinction between the
16  two?
17  Q.   Well, is it your opinion that she knew this
18  patient was in need of emergency treatment, transport by
19  ambulance, and that she disregarded that and just decided
20  to wait and transport him via --
21  A.   Okay.
22  Q.   -- vehicle?
23  A.   She should have known, had she applied the
24  nursing process to assess him properly.  She should have
25  known.

90

1        (Discussion off the record.)
2   Q.   All right.  In Review of Summary Number 8,
3   you write in the middle of that paragraph that Ms.
4   Paulsen was given permission by Ben Baca to go ahead and
5   coordinate transport earlier than the three hours if she
6   felt it was necessary.
7   A.   Yes.
8   Q.   Do you see that?
9   A.   Yes.
10  Q.   Would you agree with me Ms. Paulsen's note
11  and her deposition stated that Mr. Baca told her she
12  could transport if his condition worsened?
13  A.   Yes.
14  Q.   Okay.
15  A.   Yes.
16  Q.   So you're not saying Ben Baca told her
17  something different than that --
18  A.   No.
19  Q.   -- right?  Okay.  In Summary Number 9, on
20  page 9, the second line down, you say that Nurse Paulsen
21  was advised at 10:30 -- this is after she left the
22  facility and came back -- that Mr. Carranza-Reyes was
23  vomiting more fre -- sorry -- after she left the facility
24  and called in that he was vomiting more frequently.  Do
25  you see that?

91

1   A.   Yes.
2   Q.   Where did you get that information?
3   A.   It would probably be in one of the timelines
4   or in her notes.  Let's see.  Yeah, actually, it's in her
5   own nurse report.
6   Q.   It's on page?
7   A.   Page 2.
8        MR. KORDICK:   144.
9        THE DEPONENT:   0144.  She called for an
10  update on Carranza and was told by Deputy Theobald that
11  he was vomiting more frequently --
12  Q.   (BY MS. LEWIS)   Okay.
13  A.   -- and that she was concerned about Carranza
14  becoming -- actually, I think what it is is, Teobald
15  (sic) was concerned that the patient was becoming more
16  dehydrated, concerned about his right-side pain.
17       MR. KORDICK:   And it's actually "Theobald."
18  It starts with a T on one page --
19       THE DEPONENT:   Yeah.
20       MR. KORDICK:   -- and then it goes -- it's
21  "Theobald."
22       THE DEPONENT:   "Theobald."
23  Q.   (BY MS. LEWIS)   And you're just referring to
24  the sentence that says, "being concerned about Mr.
25  Carranza becoming dehydrated" --

92

1   A.   Yeah.
2   Q.   -- "and concerned about his right side
3   pain" --
4   A.   Actually, she says that, yes.
5   Q.   -- "I asked that he be transported to Summit
6   Medical for evaluation," right?
7   A.   Correct.
8   Q.   Okay.  And again, you feel that at this
9   point he was critical?
10  A.   Yes.
11  Q.   Do you know what condition Summit Medical
12  Center assessed him to be in?
13  A.   Well, one thing that sticks out in my mind
14  is that the initial blood pressure that they got, they
15  weren't able to get a diastolic blood pressure.  That's
16  critical.  His -- I'm trying to recall what his systolic
17  was.  But if you can't get a diastolic blood pressure,
18  there's gross dehydration and possible body failure.
19  That was upon arrival.
20  Q.   And when a patient is critical on arrival to
21  a hospital, do you expect a doctor to see them right
22  away?
23  A.   It's a team effort.  Having worked in
24  emergency rooms, it's going to be a group of people that
25  are gathering information as quick as they can.  So it

(Pages 89 to 92)

* SUBJECT TO CONFIDENTIALITY DESIGNATIONS *

Carranza-Reyes v. Park County                                    Anthony Volz, MSN, RNC, ANP

93

1 could be nurses, along with physicians or
2 advanced-practice individuals: PAs, nurse practitioners.
3 But a doctor would be involved fairly quickly. The staff
4 in an emergency room are trained to triage. I don't know
5 what was going on in that emergency room, but the staff
6 are trained to do basic stabilization, run a code,
7 independent of a physician.
8     Q.    If it took 45 minutes for a physician to see
9 Mr. Carranza-Reyes, would that indicate to you anything
10 about his condition, how the staff at the hospital
11 considered his condition to be?
12     A.    Not for him to actually see him. He's
13 probably giving orders during that time to do -- put in
14 IV lines, do labs, studies. In a busy emergency room,
15 it's not uncommon for a physician to be given the raw
16 data on a patient, especially since he came in by a
17 private vehicle. By ambulance -- ambulance patients are
18 going to get first priority. He came in by private
19 vehicle. The team is going to gather information, run it
20 by him. At that point he's going to make recommendations
21 for more data-gathering and stabilization before he might
22 even go see the patient.
23     Q.    Do you know whether -- do you know who Dr.
24 Keeling is?
25     A.    Was he the ER doctor at Summit?

94

1     Q.    Yes.
2     A.    Yeah. I just recall the name on the
3 records.
4     Q.    Did you read his deposition?
5     A.    No.
6     Q.    Do you know whether he assessed the patient
7 as being critical?
8     A.    I don't recall.
9     Q.    Is "critical" the same as "stable"?
10    A.    No.
11    Q.    And what does "stable" mean?
12    A.    Stable means that the vital signs are
13 stable; in other words, the systolic blood pressure is
14 greater than 90; diastolic, you can at least hear it. It
15 can be at low as 40. Pulse rate, which was not normal
16 for Moises, is going to run between 60 to 90, which is
17 the average rate. His was 120 when he got to the
18 emergency room.
19         Respiratory rate, we could give Moises the
20 benefit of the doubt of being in the 20-to-24 range.
21 That would be stable. He would be alert, oriented,
22 coherent, urinating. Pain might be stabilized. That's
23 what I would consider as a stable situation.
24         I know that when he was transported to
25 Denver General, he was stable on transport. That is most

95

1 likely due to the measures that they implemented,
2 including IV therapy to rehydrate him, and I believe they
3 started antibiotics as well. But his condition
4 apparently deteriorated by the time he got to Denver
5 General.
6     Q.    Did it deteriorate by the time he got to
7 Denver General?
8     A.    I recall somewhere in the notes that -- oh,
9 let's see. And I think -- was it her notes? She had --
10 somewhere in her deposition or in the notes, she had
11 called one of the deputies, and they had told her that
12 upon arrival to Denver General his condition had
13 deteriorated, and that he was on ventilators and a bunch
14 of IVs.
15    Q.    You're just basing that on her notes, right?
16 You haven't reviewed --
17    A.    Well, I reviewed the Denver General notes,
18 too.
19    Q.    Oh, you did?
20    A.    Yeah, yeah. I didn't see any ambulance
21 record, so I don't know what transpired in the ambulance.
22 But upon arrival, he was a critical patient.
23    Q.    On pages 8 to 9 of your report, you conclude
24 that there was a violation of the 8th and 14th
25 Amendments. And as I understand that, you're talking

96

1 about -- your conclusion about that violation is limited
2 to Ms. Paulsen's actions at 8:00 a.m.?
3     A.    Well, that's just one more example of when
4 there were violations. There were a series of them that
5 went along that included the conditions of the jail in
6 general. But this was one more example where there was a
7 violation of those amendments.
8     Q.    Okay. Since you say that's one example, I
9 need to ask you everything that you think -- all of Ms.
10 Paulsen's actions that you consider to be a violation of
11 the 8th and 14th Amendments.
12    A.    No, no --
13    Q.    Okay.
14    A.    -- I'm not saying that.
15    Q.    So -- well, let me rephrase.
16    A.    Go ahead. Go ahead, yeah.
17    Q.    Are you saying any actions of hers are a
18 violation of the 8th and 14th Amendments?
19    A.    In his -- in her delay of transport, her
20 decision-making resulted in a violation of those. But
21 the prior care, no, because it's my opinion that he
22 should have been transferred much sooner, and she did not
23 give him that opportunity for earlier transfer.
24    Q.    And the delay in transport that you're
25 talking about is the delay from 8:00 a.m. to when he

(Pages 93 to 96)

* SUBJECT TO CONFIDENTIALITY DESIGNATIONS *

101

1 Q. But they didn't tell her, you would agree,
2 that -- Go ahead and transport anytime you want, right?
3 A. They -- that's correct.
4 Q. It was conditioned on if he worsened, right?
5 A. Correct.
6 Q. Okay. How much do you know about strep A
7 infections?
8 A. A pretty good amount.
9 Q. Does group A strep infections, do they mimic
10 infections from, like, a viral infection?
11 A. Yes.
12 Q. Can symptoms of them mimic the symptoms of a
13 viral infection?
14 A. They can.
15 Q. And are you aware whether strep A infections
16 can result in rapid deterioration of a person's
17 condition?
18 A. Yes, they can.
19 Q. But the same is not true of a viral
20 infection?
21 A. It can.
22 Q. Typically? Typically, do viral infections
23 progress the same --
24 A. No.
25 Q. -- as a strep A infection?

102

1 A. No, they don't.
2 Q. At the end of your report, under
3 Recommendations, you recommend that a certified
4 correctional nurse be retained as an expert witness. Do
5 you see that?
6 A. Yes.
7 Q. Why is this your recommendation?
8 A. Because I don't have the familiarity with
9 the policies, procedures, rules and regulations of prison
10 facilities.
11 Q. And do you think knowledge of those types of
12 things would be helpful?
13 A. They would be helpful.
14 Q. And do you think a certified correctional
15 nurse is in a better position than you are to assess
16 whether care given in a correctional setting is
17 appropriate or not?
18 A. No.
19 Q. Okay. And why is that?
20 A. Because we all have, as registered nurses,
21 basic duties and expectations under the Nurse Practice
22 Act, and those are the minimum standards. And I don't
23 believe -- and I believe any nurse could sit down with
24 this information and look at the care provided by Ms.
25 Paulsen and take the Nurse Practice Act and evaluate it,

103

1 just as I have, and determine that she practiced out of
2 scope, she delegated inappropriately, she didn't meet the
3 duty of care to the patient. And these are just with the
4 Nurse Practice Act guidelines.
5 Q. When you say she "delegated
6 inappropriately," that's not something I noticed in your
7 report. Is that opinion in your report?
8 A. Actually, that is, I believe. Let's see.
9 Actually, it's not on this. I think this is one of those
10 where -- yeah, I think that might have been through
11 deposition on Paulsen's part, after I got that, that I
12 made that determination. So it wouldn't be in this one.
13 I think that was one of those where I felt that the
14 deposition reinforced my impression that she practiced
15 out of the scope of practice of the Nurse Practice Act.
16 Q. And that was by delegating; is that right?
17 A. Correct.
18 Q. And in what way did she delegate?
19 A. She delegated -- if I might take a look
20 at it, because I can give you -- okay.
21 Q. Just --
22 A. The number the times --
23 Q. And just for the record, you're reviewing --
24 A. Reviewing some --
25 Q. -- handwritten notes?

104

1 A. -- personal notes.
2 Q. Yeah. And you're interrupting me, and she's
3 going to kill you if you don't stop it. So you're
4 referring to some handwritten notes of yours that you've
5 got in front of you?
6 A. Yes.
7 Q. And we'll make a copy of those on the break.
8 A. Yes.
9 Q. But what was your response?
10 A. Yes. In Nurse Paulsen's deposition, it was
11 pages 94 -- well 92, 94 through 96, 97 where she
12 delegated to nonmedical people to watch him, didn't
13 define what they should be watching for. They're not
14 trained medical people. And the Nurse Practice Act, if
15 we're delegating -- well, let's see. That's 12 -- the
16 Nurse Practice Act, it's 12-38-132.2:
17     "Delegated tasks shall be within the area of
18 responsibility of the delegating nurse and shall not
19 require any delegatee to exercise the judgment required
20 of a nurse. However, the delegating nurse shall be
21 solely responsible for determining the required degree of
22 supervision the delegatee will need after an evaluation
23 of the factors, which shall include, but not be limited
24 to, the following: the stability and condition of the
25 patient, the training and ability of the delegatee, the

* SUBJECT TO CONFIDENTIALITY DESIGNATIONS *

Carranza-Reyes v. Park County                                    Anthony Volz, MSN, RNC, ANP

---

**105**

1  nature of the nursing task being delegated, and whether
2  the delegated task has a predictable outcome."
3          D. isn't as much of an issue as the fact
4  that she was asking these individuals to do nursing
5  assessments on this patient and determine whether or not
6  he was feeling better, worse, or the same. They're not
7  clinically trained to do that.
8          Q.   Didn't she just ask them to let her know if
9  he had any change in symptoms?
10         A.   At one point in pages 94 through 96, she
11  relied on a nonmedical person that told her that he
12  wasn't sick enough for her to come in. That's not that
13  assessment. That's not their job. It's her job to
14  determine whether or not he's sick enough to come in.
15  And she relied on that assessment.
16         Q.   Okay. So you're just --
17         A.   So she delegated her decision-making to come
18  in to a nonmedical person.
19         Q    And that's the example we're talking about?
20         A    That is the example.
21         Q    Okay. Is there any other activity she did
22  that was delegation in violation of her responsibilities
23  under the Nurse Practice Act?
24         A    Essentially, that's the only one, in
25  reviewing it. I had several other incidences, but

---

**106**

1  reviewing it, the delegation was okay. But this one
2  here -- I can't remember which page, but it's 94 through
3  96
4          Q.   Okay. And that's the basis --
5          A.   Yeah.
6          Q.   -- of that opinion is that testimony?
7          A.   Correct.
8          Q.   Okay. On page --
9          A.   The -- oh, I'm sorry.
10         Q.   Go ahead, if you had something to add.
11         A.   Yeah. There are other incidences as well
12  where she's -- she's practicing out of her scope,
13  prescribing medications. Okay? It doesn't matter if
14  they're over-the-counter or if they're prescription
15  medications. And she's delegating to the guards to make
16  a decision on whether or not they can be taking these
17  medications as needed.
18              There was one issue of -- where I guess she
19  is defining in a prepackaged format what the patient is
20  going to be given from a prescription perspective, and
21  the prisoners -- I mean the guards distribute those after
22  she's predispensed them.
23              In this situation she's delegating, I feel
24  inappropriately, to the guards to make a clinical
25  assessment as to whether or not the patient needs more

---

**107**

1  ibuprofen, Tylenol, Chlor-Trimeton, or whatever the
2  medication -- the decongestant was that she was
3  describing. So she was distributing her -- delegating
4  her responsibility to somebody that doesn't have the
5  ability to do that responsibility.
6          Q.   Well, based on what you just said, do you
7  think she should have been at the jail 24 hours a day
8  interacting with inmates?
9          A.   No, I don't. I don't.
10         Q.   Then why are you critical of her for
11  allowing the deputies to hand out medications that she
12  authorized in the amounts she authorized?
13         A.   I guess I look at the difference in
14  prescribed medications, which are those that are
15  prescribed by a physician that she's giving on a routine
16  basis. There's no clinical decision-making being made in
17  that.
18              Whereas when she is having patients take
19  these over-the-counter medications, we've already defined
20  that she can't do that without a physician's order or
21  protocols, and she has neither of those. And now she's
22  delegating it down to somebody that has less experience
23  than she does to do this. That's an inappropriate
24  delegation.
25         Q.   Now, she wasn't delegating to them the

---

**108**

1  determination of whether the patient needed one at that
2  time, right?
3          A.   That was my understanding.
4          Q.   She was just delegating to them that they
5  could give it to them if the patient requested it. Is
6  that inconsistent with your understanding?
7          A.   I don't think Reyes was requesting the
8  Pepto-Bismol. He was still having nausea, and they wound
9  up giving him Pepto-Bismol. That's an assessment on
10  their part that he needed it. I understand what you're
11  getting at, because you could do that as a layperson --
12  you know, give you some Tylenol -- but I think they
13  were --
14         Q.   For the record, your counsel is referring
15  you to page --
16             MS. LEWIS: What page are you referring him
17  to, Lloyd?
18             MR. KORDICK: 143.
19         Q.   (BY MS. LEWIS) -- 143, and he was pointing
20  out to you the first paragraph?
21         A.   Yeah, where Moises was complaining about
22  trouble breathing and also complaining about vomiting and
23  nausea, stated that he put him on oxygen and gave him
24  Motrin. I don't see where -- and also for aches and
25  headaches, gave him Pepto-Bismol for his nausea and

---

(Pages 105 to 108)

* SUBJECT TO CONFIDENTIALITY DESIGNATIONS *

Carranza-Reyes v. Park County                                    Anthony Volz, MSN, RNC, ANP

109

1  diarrhea.
2       I don't see where Moises asked him for it.
3  I look at this individual taking the liberty of making an
4  assessment to give this gentleman this medication. And
5  she had directed them to do this in prior deposition or
6  statements that are in the documents here.
7       MS. LEWIS: And just for the record, Lloyd,
8  I don't think it's appropriate that you refer the witness
9  to a particular page of the document to help him answer.
10       MR. KORDICK: Yeah, I'm sorry. I was
11  just -- I just thought we were wasting time on it. And I
12  apologize. You're right.
13       Q.  (BY MS. LEWIS) Do you conclude that the
14  conditions in the jail caused Mr. Carranza-Reyes to
15  contract strep A?
16       A.  Highly likely.
17       Q.  Even though none of the others in the pod
18  contracted strep A, you still have that conclusion?
19       A.  I don't know that they didn't contract strep
20  A.
21       MR. KORDICK: And I object to the form of
22  the question.
23       THE DEPONENT: You've got a whole group that
24  were sent up to Summit County for other treatment.
25       Q.  (BY MS. LEWIS) Have you seen documentation

110

1  that any of the other detainees in the pod had a strep A
2  infection?
3       A.  They -- what I suspect happened is that
4  there was empirical therapy that was given to these
5  patients that presented at Summit County with symptoms
6  consistent with what Reyes had, and they were given
7  antibiotics appropriately.
8       Q.  So you consider that documentation to
9  suggest that the other detainees -- some of the other
10  detainees did have a strep A infection?
11       A.  Correct.
12       Q.  If Dr. Niederman and Dr. Kearns, who are
13  both infectious disease experts, said that closeness and
14  proximity between people doesn't cause strep A
15  infections, would you have any reason to dispute that?
16  Do you want me to rephrase?
17       A.  By "proximity," I --
18       Q.  Let --
19       A.  It is an airborne- and contact-transmitted
20  disease. The closer you are -- the closer you have
21  people, and particularly in an unhygienic situation, the
22  likelihood of them acquiring this disease increases
23  significantly.
24       Q.  Do you know enough about strep A infections
25  to be able to determine to a reasonable degree of medical

111

1  probability whether or not closeness and proximity of
2  people results in those infections?
3       A.  Yes.
4       Q.  Okay. And more so than infectious disease
5  experts; is that what you're saying?
6       MR. KORDICK: I object to the form of the
7  question.
8       THE DEPONENT: I don't hold myself out to be
9  an infectious disease specialist. To me, this sounds
10  like a trick question.
11       Q.  (BY MS. LEWIS) Well, is there any
12  literature or research that you're aware of that shows
13  what contributes to a strep A infection?
14       A.  Yes, there is.
15       Q.  And what is that research or literature?
16       A.  It's in pathophysiology books that are
17  common to basic -- when I say "basic," I'm talking about
18  primary care physicians, nonspecialists -- that relate to
19  how strep A infections are transmitted, and that is that
20  it is an airborne and contact type of a transmitted
21  disease.
22       Q.  Do you have --
23       A.  Maybe -- maybe I'm making inference in that
24  based upon that, the closer proximity you have, the more
25  likelihood you're going to get strep A. But there is

112

1  literature. It's . . .
2       Q.  I want to follow up on another question I
3  asked earlier. And the question I asked was related to
4  just a certain time period --
5       A.  Yes.
6       Q.  -- 8:00 a.m. on the morning of March 8th.
7  And I believe my question was, generally, do you have any
8  reason to believe that Ms. Paulsen knew at that time that
9  Mr. Carranza-Reyes was going to have a life-threatening
10  illness and that she intentionally disregarded it.
11       A.  Yeah.
12       Q.  Do you recall that line of questioning?
13       A.  Yeah.
14       MR. KORDICK: And I apologize. I didn't
15  catch the time period because the phone rang.
16       MS. LEWIS: Okay. The question that I asked
17  him was, I think, limited to 8:00 a.m.
18       Q.  (BY MS. LEWIS) And I just wanted to follow
19  up and clarify, do you have an opinion that she knew that
20  he had a life-threatening illness, and she intentionally
21  disregarded it and decided not to transport him, even
22  though she had this knowledge that he was in a
23  life-threatening condition at any time?
24       MR. KORDICK: I'm going to object to the
25  form of the question.

(Pages 109 to 112)

* SUBJECT TO CONFIDENTIALITY DESIGNATIONS *

Carranza-Reyes v. Park County

Anthony Volz, MSN, RNC, ANP

113

THE DEPONENT: You're asking two questions:
Did she know that he was in an emergent situation? And I
will say again, she should have known. The second
question, my understanding is, is did she have disregard
for -- knowingly disregarded his need for emergency
transport by delaying the transport?

Q. (BY MS. LEWIS) Right.

A. Yes.

Q. And when did she do that? Like, I'm trying
to --

A. Yeah.

Q. You said she didn't do that at 8:00 a.m.,
but you feel like she did do that at some other time, if
I'm understanding you correctly.

A. She should have transported him at 3:00 in
the morning.

Q. Right. And I really want to focus on the
knowledge aspect --

A. Okay.

Q. -- like, the second part of the question we
were just talking about.

A. Okay.

Q. Because I understand your position is that
she should have done this, she should have known, and she
should have done these things because she should have

114

known, but I want to focus on what you believe she
actually knew. And if she knew it and didn't do it, that
would suggest she disregarded it; would you agree?

A. I would agree with that. Okay.

Q. Okay. And so do you have an opinion that
she knew he was in a life-threatening state, condition,
and that she disregarded that at any point in time?

A. I believe she did. I believe she knew.

Q. And when do you believe she knew?

A. I believe she knew when she decided to come
in on Saturday morning.

Q. And when she decided to come in, you believe
that means she knew he was in a life-threatening
condition?

A. Yes, because of the change in respiratory
rate that he was experiencing.

Q. So now you're -- if I understand it, before
you said you didn't think she knew at 8:00 a.m., but now
you're saying you think she knew as early as 3:45 a.m.,
and that was based on the respiratory rate information?

A. Did I say that she did not know that he was
ill at 8:00 a.m., that he was urgent at 8:00 a.m.? I
don't know that I said that.

Q. I recollect that you said she should have
known at that time --

115

A. Okay.

Q. -- but not that she knew and intentionally
disregarded it. That's my understanding. Earlier in
your testimony you, as an aside, I think, said she was
concerned enough to come in on her day off, right?

A. Correct.

Q. In light of the fact she was concerned
enough to come in on her day off, do you believe that she
was intentionally disregarding --

A. Oh, okay. I see.

Q. -- a risk she knew was going to happen to
this patient if she didn't act sooner?

A. I don't believe she was disregarding that.

Q. And do you believe she knew that he was at
risk of serious harm if she didn't do something at 3:45
a.m.?

A. Yes, I do.

Q. And that's something you think she knew?

A. Yes, I do.

Q. Based on the respiratory rate?

A. Yes, I do. And that she -- and that's what
drove her to come in on her day off.

Q. Now, if she testified she didn't know, do
you think you're better qualified to -- I mean, you're
not offering an expert opinion on whether or not she

116

knew, are you?

A. I can't tell you what she thought.

Q. But no matter what she says, you have an
opinion she knew?

MR. KORDICK: Asked and answered.

THE DEPONENT: That's correct.

MS. LEWIS: I think I want to look through
my notes, but I'm happy to let Ms. Veiga ask questions
while I do that to make it as efficient as possible.

THE DEPONENT: Sure.

EXAMINATION

BY MS. VEIGA:

Q. Mr. Volz, we met at the beginning of this
deposition, but to remind you, my name is Jennifer Veiga.
I represent the Park County Commissioners and the sheriff
and the Park County Jail administrator, Captain Gore, in
this litigation.

THE REPORTER: Captain?

MS. VEIGA: Gore. Sorry. I will try to
speak up.

Q. (BY MS. VEIGA) In the file documents that
were provided to my office, you had several cases in here
that I believe said they were provided by Mr. Archuleta.
What were the significance of those cases from your
perspective?

(Pages 113 to 116)

Carranza-Reyes v. Park County

125

1 place to allow the build-up of trash at the
2 correctional -- at the detention facility.
3      A.   I'm sorry.  Run that by me again.
4      Q.   In other words, you said there was
5 inadequate place to put the trash, and therefore trash
6 accumulated at the time Mr. Carranza-Reyes was at the
7 detention facility.  Do you recall making that statement?
8      A.   I don't know if I said "adequate" or
9 "inadequate."
10     Q.   Excuse me.  You did say "inadequate."
11     A.   Inadequate, correct.
12     Q.   On what do you base that statement?
13     A.   From what Mr. Moises had reported, as well
14 as the depositions of one of the guards, that trash and
15 debris were on the floors themselves.  And Moises was
16 sleeping on the floor, amongst this trash and debris.
17     Q.   And do you remember the guard, which
18 deposition you're referring to at this point?
19     A.   I think it was Bellatonio, I believe.
20     Q.   How many depositions of the guards at the
21 Park County Jail did you review?
22     A.   I think there was three, and I can't recall
23 all their names.  But one was Frye, Bellantonio.  And I
24 think another one started with another F, Fikejs, or
25 something like that.

126

1      Q.   And other than Mr. Bellantonio's deposition,
2 do you recall any other source that led you to your
3 opinion that there was inadequate place to place trash in
4 the Park County Jail?
5      A.   Yeah, Moises's deposition.
6      Q.   Did you happen to review the depositions of
7 Sheriff Wegener or Captain Gore?
8      A.   No.
9      Q.   And you said you did not -- did you say you
10 reviewed the inspection reports after the preparation of
11 your report?
12     A.   I don't believe I reviewed inspection
13 reports.  What I was getting at is that I was aware that
14 inspections were made.  Oh, and I think at one point I
15 did read where somebody had said they had passed an
16 inspection by INS.
17          But my question is -- and this is after
18 working in nursing administration in a variety of
19 facilities for 15 years -- you can -- unless they're a
20 spot-evaluation, you can spiff up anything to look good
21 for a particular evaluation.  And unless you do a
22 spot-evaluation, you're not going to get the true
23 circumstances of a particular setting.
24     Q.   Do you have any knowledge as to what
25 entities and on what frequency the Park County Jail was

127

1 inspected in March of 2003?
2      A.   The only one that I recall was -- I believe
3 it was an INS visit that -- and I don't recall who
4 alluded to it in the depositions.  That's the only one
5 that I can recall.
6      Q.   So it's fair to say you have not reviewed
7 any inspection reports?
8      A.   Correct.
9      Q.   And you have no knowledge of how -- what
10 entities inspect the jail or the frequency in which the
11 jails are inspected?
12     A.   Correct.
13     Q.   Do you recall reviewing any policies and
14 procedures implemented by the Park County Jail in terms
15 of the pickup of trash?
16     A.   No, I don't recall.
17     Q.   You stated in response to questions from Ms.
18 Lewis that you were aware of a situation where the
19 detainees, including Mr. Carranza-Reyes, was not given
20 adequate clothing exchange.
21     A.   Correct.
22     Q.   Is that based on the testimony of Mr.
23 Carranza-Reyes?
24     A.   Carranza-Reyes and one of the deputies as
25 well.

128

1      Q.   Do you recall which deputy?
2      A.   I think that it was probably Bellantonio
3 again.
4      Q.   Do you know whether the Park County Jail has
5 policies and procedures in place relative to the exchange
6 of --
7      A.   I do recall --
8          THE REPORTER:  "Relative to the exchange
9 of"?
10     Q.   (BY MS. VEIGA) -- uniforms to ensure that
11 the detainees are provided clean uniforms?
12     A.   I recall having read that, but I can't
13 recall what the specific criteria were.
14          (Discussion off the record.)
15          (Ms. Lewis exited the room.)
16     Q.   In your report, you make the statement that
17 "DC" -- I'm assuming detention center -- "including the
18 nonmedical personnel, is negligent in allowing an
19 environment of overcrowding, filth with lack of
20 appropriate opportunity for adequate self hygiene,
21 unclean toilets, floors, jumpsuits and poor air
22 temperature control."  Do you recall that?
23     A.   I do, but if you can point it out to me.
24     Q.   It's the top of page 4, the first paragraph.
25     A.   There we go, yes.

* SUBJECT TO CONFIDENTIALITY DESIGNATIONS *

Carranza-Reyes v. Park County

Anthony Volz, MSN, RNC, ANP

137

1  that.
2  A.  Yeah.
3  Q.  Are you just referring to the conduct of
4  Nurse Paulsen in this Review of Summary Number 8?
5  A.  Yes.
6  Q.  Again, in Review of Summary Number 9, you
7  talk about the delay in transport and care as being
8  negligent, and also not being in the National Commission
9  on Correctional Health Care standards, as well as the
10  Nurse Practice Act.  Again, are you referring only to
11  Nurse Paulsen in your comments concerning the Review of
12  Summary Number 9?
13  A.  Correct.
14  Q.  Under your final summation, beginning on
15  page 11 of your report, you talk briefly about your
16  opinion that "Mr. Carranza-Reyes acquired the infection
17  while in the jail under extremely crowded and filthy
18  conditions."
19  A.  I see that.
20  Q.  What is your -- do you have an opinion as to
21  what the incubation is for streptococcus A?
22  A.  It's around three days.
23  Q.  And tell me all the possible ways that one
24  can contract streptococcus A.
25  A.  It's both an airborne- and

138

1  contact-transmitted type of an infection, in that a
2  patient with strep A would come in general contact with
3  somebody else that has strep A.  And when I say that,
4  what I'm saying is that one person has to already have it
5  or it's existing naturally in the environment, and that
6  person has to have a large enough load to be inoculated
7  with the streptococcal infection to come down with it.
8  When I say "inoculated with it," either they
9  come into hand contact with somebody's -- either sputum,
10  and then they -- sputum or just respiratory particulate
11  landing on a countertop surface, touch the countertop
12  surface, that person touches their eye, that's an area of
13  inoculation, they can acquire the streptococcal
14  infection.  It eventually transmits itself to different
15  body parts.
16  When I talk about it entering, just as
17  naturally as being on the surfaces, you can also get it
18  from an open wound in areas that are not kept
19  hygienically clean.  But again, it's something that is
20  there from somebody else that's already put it there.  So
21  it's a person-to-person transfer, either by direct
22  contact or respiratory-type contact.  And when I say
23  "respiratory," it's not necessarily breathing it in from
24  somebody's breath as much as it is the contact of
25  coughing, sneezing, and then touching the surface of that

139

1  person that has acquired it.
2  You can get it from, for lack of a better
3  word, more intimate contact from somebody that has it as
4  well.  We see it running rampant in families.  When I
5  treat people in our office setting, frequently it's a mom
6  that's already been exposed to two of her kids, so it's a
7  proximity-type situation.
8  Q.  The next -- the second paragraph -- the
9  bottom paragraph on the bottom of page 11, the middle of
10  the paragraph starts with, "The violation of the
11  plaintiff's Eight and Fourteen Amendment rights, the
12  negligence of the jail and the negligence of medical
13  personnel resulted in MCR's acquiring the illness and
14  progressing to a critical state."  Do you see that?
15  A.  Correct.
16  Q.  And when you're referring to "the violation
17  of Mr. Carranza-Reyes's 8th and 14th Amendment rights,"
18  is that what we talked about previously in your opinions
19  summarized in Numbers, I think, 8 and 9, concerning Nurse
20  Paulsen?
21  A.  No.  It also has to do with the jail
22  maintaining an environment that is clean and healthy to
23  those that are housed in the jail.  And that's where I
24  feel the administration, or the nonmedical people, fell,
25  by allowing the overcrowding, not maintaining an

140

1  environment that is clean, both with trash and cleaning
2  down the environment itself, which is what they
3  eventually did after Carranza left.  They wound up
4  taking -- you know, it's like the whole environment was
5  sterilized.
6  Q.  If I can try and clarify, what I --
7  A.  I'm sorry.
8  Q.  We talked earlier about your opinion that
9  you felt jail personnel were negligent in the way they,
10  you know, kept the jail clean, overcrowding, hygiene.
11  Okay?
12  A.  Correct.
13  Q.  Do you -- are you telling me you're stating
14  an opinion also in this report that jail personnel
15  violated Mr. Carranza-Reyes's 8th and 14th Amendment
16  rights somehow?
17  A.  It's my understanding that that -- those
18  amendments assure prisoners a healthy, safe environment,
19  and they did not assure that.
20  Q.  Tell me what different conduct the jail
21  administrators did to make them violate Mr.
22  Carranza-Reyes's 8th and 14th Amendment rights.
23  A.  They allowed overcrowding.
24  Q.  Who specifically allowed overcrowding?
25  A.  The administration, and that would be Monte

(Pages 137 to 140)

* SUBJECT TO CONFIDENTIALITY DESIGNATIONS *

Anthony Volz, MSN, RNC, ANP

Carranza-Reyes v. Park County

141

1    Gore.
2        Q.    Anything else?
3        A.    Well, the -- this is something that was --
4    could not have been but observed by others as well.
5    And -- well, I can't talk about the nurse, I guess, in
6    this part of the deposition.
7            MR. KORDICK:  Yes, you can.
8        Q.    (BY MS. VEIGA)  You can.  I wasn't asking
9    you about the nurse.
10       A.    She is also responsible.  There's several
11   other reports where she actually could visually see what
12   the situation was in that particular pod, and you can't
13   help -- I would assume you can't help but seeing how
14   crowded that pod was.  And from these Amendments, in
15   addition to the Nurse Practice Act, she's obligated to
16   assure that these patients have a safe, healthy, clean
17   environment.  That's her role, by license and by her job.
18       Q.    What knowledge do you have that Captain Gore
19   knew in early March of 2003 that the jail conditions were
20   dangerous?
21       A.    That he personally knew?  I think it's more
22   he personally allowed it to happen.
23       Q.    And I appreciate the distinction.  But I'm
24   asking you what knowledge you have that Monte Gore
25   personally knew?

142

1        A.    When a guard is told, You take whatever
2    prisoners we can get, which is what I believe, again, it
3    was Bellantonio, when he objected to taking any more INS
4    patients (sic), he was rebutted, I believe it was by Mr.
5    Gore, You take what comes through the door, and they're
6    all -- and they've got that excess crowding, they've got
7    more than excess, that's not a safe environment.
8            They've got their policies and procedures
9    for volume for a reason, and that's for safety as far as
10   a health perspective goes, and I assume it's safety as
11   far as the guards go, so that they have an appropriate
12   number of guards to protect themselves and the prisoners
13   from each other.  And Gore is encouraging the jail to be
14   overfilled.
15       Q.    Would you agree with me that just because a
16   jail or a facility could be overcrowded does not
17   necessarily mean it's going to be filthy, that it's going
18   to be -- that there's going to be other problems
19   associated with that?
20           MR. KORDICK:  I don't want to object, but,
21   you know, we're trying to get done because he's got to go
22   teach a class at 2:00, and I do have some questions I'd
23   like to ask.
24           MS. VEIGA:  I appreciate that, Mr. Kordick,
25   but he seems to have an opinion on a lot of things, so

143

1    you're not leaving me a lot of choice.
2            THE DEPONENT:  Ask your question again.  I'm
3    sorry.
4        Q.    (BY MS. VEIGA)  Let's start it a different
5    way.  Tell me, when was that conversation that you
6    referred to between Mr. Bellantonio and Captain Gore?
7        A.    I'd have to look in the deposition from
8    Bellantonio, but I believe it was during either the week
9    of or the week prior when they were experiencing these
10   INS -- this INS volume that was coming in.
11       Q.    And other than the conversation between Mr.
12   Bellantonio, what other information do you have that
13   Captain Gore knew in March of 2003 --
14       A.    Nothing.  I have no other --
15           (Interruption of the proceedings by a
16   telephone call.)
17       A.    Sorry about that. -- no other information.
18       Q.    Do you have any information to suggest that
19   Sheriff Wegener had any information in March of 2003 that
20   the conditions at the jail were dangerous?
21       A.    No.
22       Q.    What about any other correctional officers?
23   Well, strike that one.
24           (Interruption of the proceedings by a
25   telephone call.)

144

1            MS. VEIGA:  I'll defer for now, let Ms.
2    Lewis follow up if she has some additional questions.
3                EXAMINATION
4    BY MS. LEWIS:
5        Q.    Just one real quick question to clarify this
6    issue of knowledge, should-have-known knowledge.  Is it
7    your position that Nurse Paulsen intentionally intended
8    that Mr. Carranza-Reyes suffer serious harm?
9        A.    No.
10       Q.    Overall, did you, from your review of the
11   records, including her reaction to the treatment needs of
12   another inmate that had a fight -- do you remember that?
13       A.    Correct.
14       Q.    -- did you get the impression that she was a
15   caring nurse?
16           MR. KORDICK:  I object to the form.
17           THE DEPONENT:  She was a caring nurse.
18           MS. LEWIS:  Okay.  I have no other
19   questions.  But I do want to mark these for the record,
20   just to keep it clear.  We can do that in a minute.
21           MR. KORDICK:  This is Lloyd Kordick, for the
22   record, and we've only got a little bit of time here.
23                EXAMINATION
24   BY MR. KORDICK:
25       Q.    Do you recall -- you remember you read --

(Pages 141 to 144)

* SUBJECT TO CONFIDENTIALITY DESIGNATIONS *

Carranza-Reyes v. Park County

Anthony Volz, MSN, RNC, ANP

145

1 you said you read several depositions. Did you read the
2 deposition of Ed Allen, the guard?
3     A.    Yes.
4     Q.    And you also reviewed the available notes
5 from the jail. Did you -- Mr. Carranza-Reyes was in the
6 jail on March 4 of 2003, wasn't he?
7     A.    Correct.
8     Q.    Do you recall Officer Allen stating that he
9 remembers seeing Carranza-Reyes, and talking to his
10 brother, and that he was very sick on the 4th?
11     A.    I do recall that.
12     Q.    Do you recall him saying that the note that
13 was generated on the 4th of 2003 (sic), when it refers to
14 an Inmate Herbert Maprazo-Hazariegos, who was not -- it
15 is a name, according to the logs -- wasn't even in the
16 jail, probably refers to Mr. Carranza-Reyes, because Mr.
17 Carranza-Reyes was the only one that had pain on his side
18 on that date? Do you remember that?
19     A.    I do remember that.
20     Q.    Okay. I'd like you to look at 45, if you
21 would. Read the whole note from the top to the bottom,
22 if you could, and please look at who the note is copied
23 to.
24     A.    Okay. It's to Sergeant Muldoon, from
25 Sergeant Flint, and copied to Captain Gore.

146

1     Q.    Okay. So that would have been communicated
2 to Mr. Gore presumably on the 4th of March?
3     A.    Correct.
4     Q.    Okay.
5     A.    That's the date of the paper.
6     Q.    Now, let's go over the contents of the note.
7 The first paragraph, "Inmate Herbert Maprazo-Hazariegos
8 is complaining of serious pain on his left side, D Pod.
9 Recommended he see the nurse as soon as possible." Do
10 you see that?
11     A.    I see that.
12     Q.    Now, you remember Mr. Allen said that he
13 told the guard that Mr. Carranza-Reyes had to see the
14 nurse or should see the nurse right away?
15     A.    Correct.
16     Q.    Was there any visit to the nurse on the 5th?
17     A.    No. My understanding is because she wasn't
18 there.
19     Q.    Okay. And was there any other person,
20 medical person, made available for him to see on the 5th
21 that you can figure out?
22     A.    Not that I could tell.
23     Q.    Okay. So he was sick on the 4th, and there
24 was no nurse to see him on the 5th, correct?
25     A.    Correct.

147

1     Q.    Now, let's read the next paragraph.
2     A.    "Several inmates in D Pod appear to be
3 experiencing chest colds, flu or altitude sickness.
4 Officers placed the coolers in there overnight with
5 drinks and water."
6     Q.    Okay. Is this showing that there's at least
7 one person very seriously ill, and other people that are
8 very sick, too?
9     A.    That does.
10         MS. LEWIS: Object to the form.
11     Q.    (BY MR. KORDICK) Okay. Now, this
12 presumably was communicated to Captain Gore on the 4th?
13     A.    That's correct.
14     Q.    Okay. Now, skip to the fourth paragraph.
15 Do you see what that reads?
16     A.    "There have been no laundry changes in B, C
17 and D Pods for over five days. We had our laundry
18 person, Forester, out our whole shift to deal with D Pod.
19 Could somebody check with day shift laundry trustee where
20 we are breaking down? We've had numerous complaints on
21 Hanson."
22     Q.    Okay. So now, this was also presumably
23 communicated, according to their records, to Captain
24 Gore, correct?
25     A.    That's correct.

148

1     Q.    So Captain Gore was aware there hadn't been
2 any laundry changes in this pod that was overcrowded for
3 over five days?
4     A.    Correct.
5         MS. VEIGA: Objection to form and
6 foundation.
7         MS. LEWIS: Join.
8     Q.    (BY MR. KORDICK) Now, this pod, as you
9 know, is open from the center. Anybody can see into the
10 whole pod.
11     A.    That's correct.
12     Q.    Is there any way that Mr. Gore, if he made
13 daily rounds, as he said he did, or Nurse Paulsen could
14 not have observed the conditions in this pod on a daily
15 basis?
16     A.    There's --
17         MS. LEWIS: Object to the foundation.
18         MS. VEIGA: Same.
19     A.    There's no way.
20     Q.    (BY MR. KORDICK) Okay. If Ms. Paulsen
21 observed these conditions, and there's been a description
22 by Mr. Allen of spit being on the floor and Kleenexes and
23 him stepping on it himself, being all over the floor, and
24 people sleeping on that floor --
25     A.    Are you asking if Ms. Paulsen should have

(Pages 145 to 148)

* SUBJECT TO CONFIDENTIALITY DESIGNATIONS *

Carranza-Reyes v. Park County

Anthony Volz, MSN, RNC, ANP

**149**

1  been able to see that?
2      Q.   Yes.
3      A.   I would think so.
4          MS. LEWIS:  Objection, foundation.
5          MS. VEIGA:  The same.
6      Q.   (BY MR. KORDICK)  Would she have some duty
7  to report this?
8      A.   She has --
9          MS. LEWIS:  Object to the form.
10         THE DEPONENT:  She has a duty to report it,
11  and she has a duty to take care of it.
12     Q.   (BY MR. KORDICK) Okay.  And what would be
13  her duty to report?
14     A.   Her duty would be to report to her -- the
15  administration of this facility that it appears that
16  there's overcrowding, that with regards to the trash
17  being on the floor, people being placed on the floor,
18  that there's a high risk for transmission of infectious
19  disease, and pursue resolving that issue through proper
20  administrative channels.
21     Q.   Should that have been in writing?
22     A.   That should have been in writing.
23     Q.   Should she -- did she also have a duty to
24  report this to the physician?
25     A.   By the discussions --

**150**

1          MS. LEWIS:  Object to the form.  Sorry.
2          THE DEPONENT:  -- by the policies and
3  procedures of their infection-control committee, she had
4  that duty.
5      Q.   (BY MR. KORDICK)  Now, that there had been
6  no laundry changes for five days, is that a serious
7  infection-control issue?
8      A.   It is --
9          MS. LEWIS:  Form and foundation.
10         MS. VEIGA:  The same.
11         THE DEPONENT:  It is when you have multiple
12  people that they are already reporting that are ill.
13  These people have the contagions on themselves, and
14  they're intermingling with themselves with these
15  contagions.  And if the laundry was changed on a more
16  frequent basis, you're going to decrease the risk of
17  cross-infection.
18     Q.   (BY MR. KORDICK)  Okay.  In order for these
19  people to see this overcrowding and be aware, for
20  instance, that there had been no laundry change for over
21  five days, would they have to deliberately disregard
22  something that was obvious to them to permit these
23  conditions to continue?
24         MS. LEWIS:  Form.
25         MS. VEIGA:  Objection to form and

**151**

1  foundation.
2          THE DEPONENT:  Yes.
3      Q.   (BY MR. KORDICK)  Would that include both
4  Monte Gore and the nurse in this case?
5      A.   Yes.
6      Q.   Now, let's talk about the throat issue here.
7  What is standard procedure when a person has a sore
8  throat in a doctor's office or a pediatrician's office?
9  What's done normally?
10     A.   In a pediatrician's -- well, I can't really
11  address the pediatrician's office, because I'm an adult
12  and geriatric practitioner.  But in my clinic setting,
13  typically the history would have been obtained, we would
14  have looked in the throat; ascertained, based upon
15  history, exposure risk; what the general physical exam
16  revealed; and get a throat swab to check for a
17  streptococcal infection.
18     Q.   Okay.  And --
19     A.   And the reason I say that is that you can't
20  just look in the throat and say whether or not it's
21  strep.  It's -- you know, everybody thinks pus pockets
22  indicate strep.  That's just not true.  And that's why
23  we've come out with -- or why quick strep tests have come
24  out and why we do streptococcal swabs.  It's for
25  appropriate therapeutic management.

**152**

1      Q.   And is that an inexpensive test?
2      A.   Fairly inexpensive.  You're talking 25 to 30
3  bucks.
4      Q.   And had that test been implemented in this
5  case, would it basically have solved the whole problem?
6      A.   If --
7          MS. LEWIS:  Form.
8          MS. VEIGA:  Objection to form, foundation.
9          THE DEPONENT:  If it had been done on the
10  6th, I believe that all of this would have been avoided.
11  He would have gotten appropriate antibiotic management,
12  and I do not believe he would have gotten into the
13  complicated situation that he did get into.
14     Q.   (BY MR. KORDICK)  Now, you were asked a
15  question about whether or not the translator was a good
16  translator when the nurse saw the patient.
17     A.   Correct.
18     Q.   When you're -- when a jail is intentionally
19  housing INS prisoners which are primarily
20  Spanish-speaking and not English-speaking, and many of
21  these people are sick, is there some duty on the jail and
22  the nurse to see that there's an adequate translator
23  available?
24         MS. VEIGA:  Objection to form and
25  foundation.

(Pages 149 to 152)

* SUBJECT TO CONFIDENTIALITY DESIGNATIONS *

Carranza-Reyes v. Park County

Anthony Volz, MSN, RNC, ANP

153

1      MS. LEWIS: Same. We'll just -- objection
2  by one is objection by both.
3      MR. KORDICK: Yes.
4      MS. LEWIS: Okay.
5      THE DEPONENT: Yes, there is.
6      Q.   (BY MR. KORDICK)  Why?
7      A.   In particular in this situation, most of the
8  people in the jail aren't American citizens. It's not
9  our second language. It's not a common language. If
10  we're going to get adequate and provide adequate care,
11  get adequate information to provide medical care, you're
12  going to need somebody that can speak English and Spanish
13  fluently to be able to translate and give the information
14  back accurately to the person that's trying to work with
15  this patient in a health care perspective.
16      That being said, we talked earlier about the
17  potential breakdown or misinformation about Ms. Paulsen
18  not being able to do an adequate examination. I run into
19  this in my own situation at work. I'm not fluent in
20  Spanish. But that puts me more into a situation to make
21  sure I cover more of my bases with a patient, and that
22  includes doing a more detailed exam, because if I can't
23  get it from the patients verbally, I'm going to have to
24  get more of a hands-on exam with the patient.
25      So I've now answered it in two ways. But

154

1  one, yes, the jail had a duty to have a true, for lack of
2  a better word, contract translator, not a trustee that
3  doesn't necessarily have good English skills, either.
4      And Ms. Paulsen should have had a translator
5  for her evaluations so that the information was
6  translated accurately. But that being short, she should
7  have done a more thorough examination of the patient to
8  cover for that.
9      Q.   Is the knowledge of Spanish or English
10  necessary to get a throat culture and get an accurate
11  result from it?
12      A.   No, it's not.
13      Q.   Is a --
14      A.   You look in the throat. The patient -- I'm
15  sorry.
16      Q.   Go ahead.
17      A.   The patient has -- comes in with these chief
18  complaints, which she got a good piece of information
19  with this. You look at a throat. If it's red and
20  swollen, you swab the throat. You don't rely on the
21  patient's history with this.
22      Q.   Okay. Now, you were asked a question
23  specifically about the note of Mr. Frye, and I believe
24  that was -- wait a minute. I'm sorry -- in reference to
25  143. Do you see that, this note of 3/8/03?

155

1      A.   Yeah.
2      Q.   Is this a contemporaneous medical treatment
3  note?
4      A.   No, it's not.
5      Q.   Okay. What kind of a note do you understand
6  this 3/8/03 note to be from Vicki Paulsen?
7      A.   It's a retrospective note. My understanding
8  is, she did it later in the day to document what had
9  occurred during that period of time on the 8th.
10      Q.   Now, she states in her note that "He was
11  given oxygen, and he felt better." That's what was
12  reported to her.
13      A.   Yes.
14      Q.   Do you see that?
15      A.   Yeah.
16      Q.   That's in conflict with what was said by
17  Frye; is that correct?
18      A.   That's correct.
19      Q.   Frye, in fact, said that he was given
20  oxygen, and it didn't help, and then he called the nurse
21  after that?
22      A.   Correct.
23      Q.   So if the Frye note was done contemporaneous
24  and in handwriting, and then was transferred to the log
25  note, would that have been actually a contemporaneous

156

1  note, versus a reconstruction?
2      MS. LEWIS: Object to the form.
3      THE DEPONENT: Correct.
4      Q.   (BY MR. KORDICK)  And would you accept the
5  Frye note over the note prepared by Ms. Paulsen after the
6  fact?
7      A.   I would rely on the Frye note as being more
8  accurate than the retrospective note.
9      Q.   Now, you're aware, are you not, that before
10  this diagnosis on the 8th that the majority of the
11  prisoners in D Pod had been transferred by the INS and
12  flown back to Mexico?
13      A.   Right.
14      Q.   And the prisoners that were actually taken
15  to the doctor and diagnosed were the ones that were
16  remaining, which were about 11 prisoners, I believe?
17      A.   That's my understanding.
18      Q.   There were no diagnoses of what physical
19  ailments or conditions existed in those prisoners that
20  were sent back to Mexico; is that your understanding?
21      A.   That's my understanding.
22      Q.   Is there any way to know whether any of
23  those prisoners were suffering from a strep infection?
24      A.   Not without doing throat swabs on them.
25      Q.   Okay. Did Mr. Carranza-Reyes describe being

(Pages 153 to 156)

* SUBJECT TO CONFIDENTIALITY DESIGNATIONS *