**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 05-cv-00377-WDM-BNB

MOISES CARRANZA-REYES

      Plaintiff,

vs.

PARK COUNTY, a public entity of the State of Colorado and its governing board, THE PARK COUNTY BOARD OF COUNTY COMMISSIONERS; PARK COUNTY SHERIFF'S OFFICE, a public entity of the State of Colorado; FRED WEGENER, individually and in his official capacity as Sheriff of Park County, Colorado; MONTE GORE, individually and in his capacity as Captain of Park County Sheriff's Department; VICKIE PAULSEN, individually and in her official capacity as Registered Nurse for Park County, Colorado,

      Defendants.

_____

**PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION**
**TO EXCLUDE PLAINTIFF'S EXPERT WITNESS, HELEN M. WOODARD, M.A.**
_____

      Plaintiff, through his attorneys, Bill Trine and Cheryl Trine of Trine and Mecalf, P.C., hereby responds to Defendants' Motion to Exclude Plaintiff's Expert Witness, Helen M. Woodard, M.A., and respectfully requests that the Motion be denied for the following reasons:

## ARGUMENT

**I.**    **MS. WOODARD'S QUALIFICATIONS AS A REHABILITATION COUNSEL AND LIFE CARE PLANNER ARE NOT DISPUTED.**

      Ms. Woodard is qualified to testify to the life care plan that she wrote for the Plaintiff. She received her M.A. from the University of Northern Colorado in Special Education with a major in rehabilitation counseling (see Woodard's CV at 1, **Exhibit 1**). She has been a rehabilitation counselor since 1978, receiving numerous certifications in the field. She has conducted research on

1

rehabilitation and has been published on life care planning issues.  Defendants do not dispute her qualifications as an expert witness, but claim that in this case, her expert testimony fails to meet both the reliability and relevance requirements of Fed.R.Civ. 702 as interpreted by *Daubert v. Merrel Dow Pharms., Inc.,* 509 U.S. 579 (1993).

## II.     *DAUBERT* FINDINGS ARE UNNECESSARY BECAUSE MS. WOODARD DID NOT EMPLOY NOVEL METHODS IN DEVELOPING A LIFE CARE PLAN.

Defendants have failed to meet their threshold burden of showing this is not an "ordinary case where the reliability of an expert's methods is properly taken for granted." *Kumho Tire co., Ltd. v. Carmichael,* 526 U.S. 137, 152 (1999).  A trial judge must have the discretionary authority to "avoid unnecessary 'reliability' proceedings in ordinary cases where the reliability of an expert's methods is properly taken for granted, and to require appropriate proceedings in the less usual or more complex cases where cause for questioning the expert's reliability arises." *Id.*  "Indeed, the Rules seek to avoid 'unjustifiable expense and delay' as part of their search for 'truth' and the 'just determine[ation]' of proceedings." *Id.* (citing Fed.R.Evid. 102).

*Daubert* findgs are required in the case of a novel medical causation theory which takes the case out of the realm of an ordinary case where the reliability of an expert's methods could properly be taken for granted. *Dodge v. Cotter Corp.,* 328 F.3d 1212, 1229 (10th Cir. 2003). *Daubert's* "four, non-exclusive factors suggested for determining whether an expert's theories are scientifically reliable are 'most relevant in the context of a new and novel scientific theory…" *Hoy v. DRM, Inc.,* 114 P.3d 1268, 1278-79 (Wyo. 2005) (citing *Kumho Tire,* 526 U.S. at 152).

Defendants must demonstrate that a methodology lacks support in the relevant scientific community by calling "'sufficiently into question' the principles, methods, or applications" the expert employed. *McCoy v. Whirlpool Corp.,* Not Reported in F.Supp.2d, 2003 WL 1923016, 7

(D.Kan. 2003) (citing *Daubert v. Merrel Dow Pharms., Inc.,* 509 U.S. 579, 592 (1993)) (*McCoy,* unpublished disposition, attached as **Exhibit 2**).  Defendants must articulate how an expert's test if inconsistent with established standards.  *McCoy* at 4.  "To the extent that different investigators might utilize the same methodologies and arrive at different conclusions, the matter involves the credibility of witnesses and the weighing of the evidence – both of which are well suited for resolution by the jury."  *Id.*

Ms. Woodard's methodology in developing Plaintiff's life care plan is not novel.  Ms. Woodard testified that first she interviews the client, then she reviews and writes a short summary of the medical records, then she outlines a life care plan based on her experience and the medical records, and finally she beings to contact the treating providers with a particular interest in current providers and current problems.  (See Woodard Depo. at 7, **Exhibit 3**).

The following cases illustrate the methodology commonly used and accepted in the field of life care planning.  The cases show that life care planners commonly rely on health care providers, medical records, research and statistics, all of which were used by Ms. Woodard in the instant case.

For example, in 1994, Helen Woodard presented a range of reasonable costs for each component of a life care plan for a five-year-old who was severely brain damaged as an infant in *Hill v. U.S.,* 854 F.Supp. 727, 729 (C.Colo. 1994).  Woodard's life care plan included medical care for the rest of the plaintiff's life; medications and supplies; personal care; psychological counseling and family support services; case management services; travel and transportation expenses; development assessments; rehabilitation services; special equipment; home modification costs; and future loss in earnings capacity.  *Id.* at 729-732.  Costs for the plaintiff's medical care were based on designating which specialists the plaintiff would need to visit in order to determine her future care needs, and on

the likelihood that she would be hospitalized frequently throughout her life, to which an average of seven days per year was assigned.  *Id.* at 729-730.

Further, in *O'Shea v. Welch,* Not Reported in F.Supp.2d, 2002 WL 1974046, *2 (D.Kan. 2002) (unpublished disposition attached as **Exhibit 4**), the life care planner testified she discussed and confirmed the plaintiff's future medical needs with his treating physician.  Based on those communications alone, the life care planner projected the amount of future medical expenses the plaintiff would incur.  *Id.   See also Merryweather v. Callister,* Not Reported in P.3d, 2002 WL 1291987, *2 (Utah App., 20020 (holding analysis used by physician to create a life care plan by discussing future medical needs with treating doctors and researching the costs of the items and services where plaintiff lived not a "newly discovered procedure") (*Merryweather,* unpublished disposition attached as **Exhibit 5**); *Morales v. E.D. Etnyre & Co.,* 382 F.Supp.2d 1273 (D.N.M. 2005) (treating physician who examined the plaintiff, interviewed his wife, evaluated his medical records and consulted life care statistics could testify on future medical expenses but not on retraining, lifestyle changes or special clothing because he was not a trained life care planner).

Also, in *Williams v. Missouri Pacific R.,* 11 F.3d 132, 134 (10th Cir. 1993), both defendant's and plaintiff's witnesses testified plaintiff, who had a below knee amputation would probably be restricted to light or sedentary work without specifying which jobs the plaintiff might perform, and the plaintiff's lost earnings included the possibility that he might never work again, which produced the greatest dollar figure.

The cases cite by Defendants in their Motion do not support Defendants' argument that Ms. Woodard's methods are novel and her conclusions based on speculation.  The plaintiff in *Balance v. Wal-Mart Stores, Inc.,* 1999 U.S. App. LEXIS 18995 (4th Cir. 1999), had a progressive disease.  Two life care plans were presented:  one based on a scenario in which the plaintiff had a recommended

surgery and her condition stabilized, and the other assumed she became wheelchair-bound. *Id.* at 3. In that case, medical experts testified to the eventual consequences of the disease and the treatment options available as part of the case in chief. *Id.* at *16-17. The *Balance* Court did not rule that a life care plan must be based on the assessments of medical experts to be reliable.

Similarly, the court in *Joseph Israel v. Springs Industries, Inc.,* 2006 U.S. Dist. LEXIS 80863, 26-27 (E.D.N.Y. 2006), criticized the life care plan because it relied on inadequate conclusions about causation; it did not attempt to separate out which costs related to which conditions; and the physician who completed the life care plan did not speak with any treating physicians or review any medical records in formulating the plan. *Id.* at 25. The court found the physician's opinion that the plaintiff would be "virtually unemployable" to be speculation because the physician was not a vocational specialist and did not explain the foundation for his conclusory conclusion. *Id.* at 32.

Finally, *Garay v. Missouri Pacific R.,* 60 F.Supp.2d 1168, 1173 (D.Kan. 1999) is distinguishable from the present case because in that case the expert wholly failed to take into account the fact that illegal status could potentially preclude future employment in the U.S. In the present case, Ms. Woodard took into account the fact that Plaintiff might return to Mexico and fully explained her methodology and reasoning for the conclusions she reached.

## III.   DEFENDANTS' CRITICISMS GO TO THE WEIGHT, NOT THE ADMISSIBILITY OF THE LIFE CARE PLAN.

In the present case, the Defendants claim Ms. Woodard's life care plan, which identifies which assessments need to be made throughout the Plaintiff's life, must be based on assessments by medical experts rather than on the recommendations of the current treating medical care provider, medical records, interviews with the patient and the planner's own expertise. Without providing any

scientific or legal evidence that life care planning is a novel methodology or that Ms. Woodward's methodology differs from that used by others in her field, the Defendants' complaints go to the weight, not admissibility of evidence.

"Perceived flaws in expert's testimony, including that an expert relied on an allegedly unreliable opinion by another expert, 'are matters properly tested in the crucible of adversarial proceedings; they are not the basis for truncating that process.'" *Cook v. Rockwell Intern.,* Slip copy, 2006 WL 3533049, 14 (D.Colo. 2006) (citing *United States v. 0.161 Acres of Land,* 837 F.2d 1036, 1039-41 (11th Cir. 1988) (*Cook,* unpublished disposition attached as **Exhibit 6**). "[V]igorous croxx-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert,* 509 U.S. at 596.

In the instant case, Defendants complaint about Ms. Woodard's scope of analysis and which details must be included in a life care plan without showing that Ms. Woodard's methodology differs from others in her field.  As a result, their complaints go to the weight and not the admissibility of Ms. Woodard's testimony.   Where the Defendants complain that Ms. Woodard's employee conducted interviews and that all Ms. Woodard's information must be verified for accuracy, this complaint goes to the quality, not quantity, of data and is not cognizable under *Daubert.*

"By its terms, the *Daubert* opinion applies only to the qualifications of an expert and the methodology or reasoning used to render an expert opinion."  *U.S. v. Lauder,* 409 F.3d at 1264 (citing *Daubert*, 509 U.S. at 592-93).  "Daubert generally does not, however, regulate the underlying facts or data that an expert relies on when forming her opinion." *Id.* (citing Fed.R.Evid. 703) ("The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing").  The reference to "sufficient

facts or data" in Federal Rule of Evidence 702 refers to a quantitative rather than a qualitative analysis. *Id.* at 1264, FN 5 (citing Fed.R.Evid. 702 advisory committee notes (2000 amends.)).

Further, subjectivity in data does not necessarily make the resulting opinion untenably speculative if the underlying data is of the type generally relied on by other practitioners; any potential baise therein can be fully explored on croxx-examination or by presentation of competing evidence. *Potter ex rel. Potter v. Bowman,* Slip Copy, 2006 WL 3760267, 2 (D.Colo. 2006) (citing *Daubert* 113 S.Ct. at 2797-98) (*Potter,* unpublished disposition attached as **Exhibit 7**).

Also, Defendants complain that an analysis that includes the Plaintiff's current residence is irrelevant if a possibility of moving to Mexico exists.  In contrast, the Tenth Circuit has set the standard for the relevancy/fit requirement by reference to Federal Rule 401, which defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than return to Mexico.

Finally, the Defendants in the present case complain that in order for Ms. Woodard's opinions to have a scientific basis, she must have empirically tested for erroneous results by determining whether former clients eventually needed every recommendation that she made.  However, the burden is on the Defendants to provide some evidence that life care planning is a novel methodology or principle, for which "testing" might be required.  The Defendants misconstrue *Daubert* as requiring testing in every situation.  In this case, such testing would be inappropriate because, as Ms. Woodard testified, to the extent litigation is a compromise and there is not enough money, people get fewer services than needed or recommended (see Woodard Depo. at 119, **Exhibit 3**).

Ms. Woodard is well qualified, by education and experience, to evaluate Plaintiff's needs for services in a life care plan.  During her career, she has had over 100 clients with amputations and

neuropathic pain and currently has 6-8 clients with amputations in her caseload.   So-called "additional testing" is not necessary or even helpful to determine Ms. Woodard's reliability.  A trial court may consider one or more of the more specific factors that *Daubert* mentioned  when doing so will help determine that testimony's reliability.  *Kumhon Tire co., Ltd. v. Carmichael,* 526 U.S. 137, 141 (1999).  The test of reliability is flexible and *Daubert's* list of specific factors neither necessarily nor exclusively applies to all experts or in every case.  *Id.*

Further, "{The reliability] step of the analysis does not require that all theories must be proven by tests specific to the facts in question."  *Hoy,* 114 P.3d at 1279.  Where testimony is generally consistent with national standards regarding appropriate methodology, then there is no need for independent testing.  *McCoy* at 2 (attached as **Exhibit 2**).  The law does not require an expert to back his or her opinion with independent tests that unequivocally support his or her conclusions.  *Id.* at 3 (attached as **Exhibit 2**).  See *Bonner v. ISP Techs., Inc.,* 259 F.3d 924 (8th Cir. 2001).  Where an expert otherwise reliably utilizes scientific methods to reach a conclusion, lack of independent testing may go to the weight, not the admissibility.  *Zuchowicz v. United States,* 140 F.3d 381, 387 (2nd Cir. 1998).

The Supreme Court has held that an expert may draw a conclusion fromn a set of observations based on extensive and specialized experience.  *Kumh,* 526 U.S. at 156.  Experts may testify based on experience alone, or experience in conjunction with other knowledge, skill, training or education where the methodology used is explained in detail.  *U.S. v. Jones,* 107 F.3d 1147 (6th Cir. 1997).  Reliability may be established by reference to the expert's experience with similar situations if there is some explanation of how that experience and knowledge renders the proffered opinion reliable.  *Hoy v. DRM, Inc.,* 114 P.3d at 1283.

Also, "{E}vidence of adherence to a practice within an industry implies a significant degree of reliability." *Hynes v. Energy West, Inc.,* 211 F.3d 1193, 1205 (10th Cir. 2000).  See *Tassin v. Sears, Roebuck, & Co.,* 946 F.Supp. 1241, 1248 (M.D.La. 1996) (design engineer's testimony can be admissible when the expert's opinions "are based on facts, a reasonable investigation, and traditional technical/mechanical expertise, and he provides a reasonable link between the information and procedures he uses and the conclusions he reaches").

## IV.   MS. WOODARD'S LIFE CARE PLAN IS SUPPORTED BY RELIABLE AND RELEVANT EVIDENCE.

To support her vocational assessment, Ms. Woodard did a survey in Mexico of problems that people with similar disabilities have in obtaining and retaining employment (see Woodard Depo. at 7-8, **Exhibit 3**).  She analyzed the employment opportunities for Plaintiff in both the U.S. and Mexico (see Woodard Depo. at 8, **Exhibit 3**).  For a life care plan, Ms. Woodard analyzed what Plaintiff will need in terms of medical equipment, supplies and assistance over the course of his lifetime (see Woodard Depo. at 8-9, **Exhibit 3**).

As a rehabilitation counselor, she is authorized to arrange and attend medical or therapy appointments with her clients and make arrangements for follow-up, including the purchase of equipment or technology, and to write authorizations for funding (see Woodard Depo. at 9-10, **Exhibit 3**).

Ms. Woodard testified she based Plaintiff's current status on information from him, from his current treatment provider and from his current medical records at Clinica Campesina (see Woodard Depo. at 43, **Exhibit 3**).  She included in her report the recommendations and information provided by the Plaintiff's current medical provider, Ms. Poppish (see Woodard Depo. at 18, **Exhibit 3**).  Ms. Poppish testified that she is licensed to diagnose and treat illness, write prescriptions and manage

9

patients as a primary care provider without needing a physician to countersign her orders (see Poppish Depo. at 8, **Exhibit 8**).  Furthermore, Ms. Poppish testified that she is the Plaintiff's primary care provider (see Poppish Depo. at 13, **Exhibit 8**).  The Plaintiff has no other current treatment providers (see Poppish Depo. at 35-36, **Exhibit 8**).

Dated this _23rd_ day of January, 2007.

Respectfully submitted,

By:  s/ William A. Trine, Esq.____
      William A. Trine, #577
      Cheryl L. Trine, #38150
      Trine & Metcalf, PC
      1435 Arapahoe Avenue
      Boulder Colorado 80302-6390
      (303) 442-0173

      Joseph J. Archuleta, #19426
      Joseph J. Archuleta and Associates
      1724 Ogden Street
      Denver Colorado 80218
      (303) 837-1642

      Lloyd C. Kordick, #6298
      Lloyd C. Kordick & Associates
      805 S. Cascade Avenue
      Colorado Springs Colorado 80903
      (719) 475-8460

      Adele Kimmel, Esq.
      Trial Lawyers for Public Justice
      1717 Massachusetts Avenue, N.W.
      Suite 800
      Washington, D.C. 20030
      (202) 797-8600

      Attorneys for Plaintiff

## CERTIFICATE OF MAILING/SERVICE

The undersigned hereby certifies that on this _23rd_ day January, 2007, a true and correct copy of the foregoing pleading was e-served via Electronic Case Filing and/or placed in the United States Mail, postage prepaid, and properly addressed to:

Joseph Archuleta
Attorney at Law
1724 Ogden Street
Denver, Colorado 80218-1018
*Co-Counsel for Plaintiff*

Lloyd C. Kordick,
Attorney at Law
805 S. Cascade
Colorado Springs, CO 80903
*Co-Counsel for Plaintiff*

Adele P. Kimmel
Richard H. Frankel
Trial Lawyers for Public Justice
1717 Massachusetts Avenue, N.W.
Suite 800
Washington, D.C. 20030
*Co-Counsel for Plaintiff*

Andrew Ringel
Jennifer L. Veiga
Hall & Evans
1125 17th Street, Suite 600
Denver, CO 80202-2052
*Counsel for Defendant Park County, Park County Board of County Commissioners, Park County Sheriff's Office, Fred Wegener, and Monte Gore*

Josh A. Marks
Berg, Hill, Greenleaf & Ruscitti
1712 Pearl Street
Boulder, CO  80302
*Counsel for Defendant Vicki Paulsen*

s/ Elizabeth Peach