RECEIVED OCT 1 1 2006

# In The Matter Of:

## MOISES CARRANZA-REYES   v.
## THE PARK COUNTY BOARD OF COUNTY COMMISSIONERS

---

## MICHAEL S. NIEDERMAN, M.D.
### September 8, 2006

---

*Precise Court Reporting*
*200 Old Country Road*
*Suite 110*
*Mineola, NY  11501*
*(516) 747-9393*

*Original File 44671MN.V1, 178 Pages*
*Min-U-Script® File ID: 1967631022*

## Word Index included with this Min-U-Script®

EXHIBIT

2

PENGAD 800-631-6989

**Page 9**

*M. Niederman*

[2] University of Kentucky and Dr. Doukas, if I
[3] pronounced that right, case, do you remember
[4] what party you testified for?

[5]  A: There I testified on behalf of a
[6] doctor.

[7]  Q: For example, the Gosland case, when
[8] you say "undiagnosed pneumonia," what do you
[9] mean by that?

[10]  A: That was a case where a patient
[11] developed pneumonia, he was treated with
[12] antibiotics and subsequently died. His
[13] cultures revealed a bacteria that hadn't been
[14] treated by the antibiotics, and the case
[15] revolved around that discussion.

[16]  Q: Are all of the cases where you
[17] testified either in deposition or trial what
[18] could be characterized as a medical
[19] malpractice case?

[20]  A: All of these are medical
[21] malpractice cases, correct.

[22]  Q: Have you ever testified as an
[23] expert in any deposition or any trial in a
[24] case that's not a medical malpractice case?

[25]  A: Yes. I was involved once in a

**Page 10**

*M. Niederman*

[2] product liability case that involved Copley
[3] Pharmaceuticals, and they were accused of
[4] producing a contaminated nebulizer solution,
[5] and I testified against the company.

[6]  Q: When was that?

[7]  A: I can't remember the date, but it
[8] was probably about six or seven years ago.

[9]  Q: Do you remember the name of the
[10] plaintiff?

[11]  A: No. It was a class action suit,
[12] and I don't remember a lot of the details. I
[13] remember the defendant was Copley
[14] Pharmaceuticals.

[15]  Q: Do you remember the name of the law
[16] firm or lawyer who retained you as an expert?

[17]  A: I don't right now, no.

[18]  Q: Other than that instance, have you
[19] provided expert testimony in any case that was
[20] not a medical malpractice case?

[21]  A: I can't remember any others.

[22]  Q: Would you agree with me that the
[23] scope of your expert opinion in this case that
[24] we're here for today is different or broader
[25] than a medical malpractice opinion?

**Page 11**

*M. Niederman*

[2]  A: Correct. I'm not commenting
[3] directly on issues related to a doctor's
[4] treatment of this patient.

[5]  Q: Or any medical providers; is that
[6] correct?

[7]  A: Indirectly I'm going to touch on
[8] some of the medical providers assessments, so
[9] I won't quite go that far.

[10]  Q: Understood.

[11]  MR. RINGEL: Let's mark this as
[12] number 80.

[13]  (Curriculum vitae was marked as
[14] Exhibit-80 for identification; 9-8-06,
[15] P.W.)

[16]  Q: Take a look, doctor, at what's been
[17] marked for purposes of this deposition as
[18] Exhibit Number 80. Can you identify this?

[19]  A: Yes. This is a copy of my
[20] curriculum vitae that was updated in April of
[21] 2006.

[22]  Q: Do you have one that is more
[23] current than that?

[24]  A: There may be — I'm trying to see.
[25] There may be a couple of additions to it, but,

**Page 12**

*M. Niederman*

[2] generally, this is pretty up to date.

[3]  Q: They would be additions in
[4] vocations or lectures or papers or that kind
[5] of thing?

[6]  A: Correct.

[7]  Q: You still have the same positions
[8] that are reflected on the first and second
[9] page of this exhibit; is that correct?

[10]  A: Correct.

[11]  Q: What is your current position?

[12]  A: I'm the chairman of the Department
[13] of Medicine at Winthrop University Hospital in
[14] Mineola, New York.

[15]  Q: Now, I noticed on your report that
[16] you also hold a faculty position at the State
[17] University of New York at Stony Brook; is that
[18] correct?

[19]  A: Correct.

[20]  Q: Is Winthrop University Hospital a
[21] teaching institution?

[22]  A: Yes. We are a major teaching
[23] affiliate of the SUNY at Stony Brook, and we
[24] have residencies, fellowships here and we have
[25] medical students rotating from medical school

MICHAEL S. NIEDERMAN, M.D.
September 8, 2006

MOISES CARRANZA-REYES   v.
THE PARK COUNTY BOARD OF COUNTY COMMISSIONERS

---

**Page 13**

*M. Niederman*

[1]
[2] here.
[3]    Q: But the medical school itself is at
[4] Stony Brook?
[5]    A: Correct.
[6]    Q: So you're a faculty member of both?
[7]    A: Again, I'm on the staff here at
[8] Winthrop Hospital and my teaching appointment
[9] and faculty appointment is at Stony Brook, and
[10] because of my position as the chairman of the
[11] Department of Medicine here, I'm also the vice
[12] chairman for the Department of Medicine at the
[13] medical school.
[14]    Q: Can you give me a sense of what
[15] your day-to-day job is?
[16]    A: I have, of course, administrative
[17] responsibilities here at the hospital related
[18] to quality in the Department of Medicine,
[19] privileging of the physicians, supervision of
[20] the residency, fellowship and faculty,
[21] supervision of the faculty practice. I also
[22] spend probably two half days a week seeing
[23] outpatients and, on average, one week a month
[24] on some sort of service in the hospital, and
[25] then I have my clinical research and other

---

**Page 14**

*M. Niederman*

[1]
[2] academic activities.
[3]    Q: So two half days a week you have
[4] direct patient care?
[5]    A: At least two half days a week,
[6] plus, as I said, at least one week a month,
[7] and, actually, the other part is one out of
[8] every seven weekends here in the hospital on
[9] call for the ICUs.
[10]    Q: It sounded like that when you had
[11] your sort of — your responsibility is to do
[12] patient care in a hospital setting, inpatient
[13] versus outpatient, that there might be a
[14] variety of different places where you do
[15] that. Did I understand your answer correctly?
[16]    A: Correct. When we work in the
[17] hospital, we're either working in the ICU or
[18] we're doing pulmonary consultation, so two of
[19] the three rotations that I might do are
[20] ICU-based rotations. One of them is
[21] consultation, and, as I said, one out of every
[22] seven weekends, which is Friday night through
[23] Monday morning, most of that time is spent
[24] working in the ICU.
[25]    Q: Do you have a focus of your

---

**Page 15**

*M. Niederman*

[1]
[2] practice?
[3]    A: My practice is in pulmonary and
[4] critical care.
[5]    Q: Has it been that way since you were
[6] at — since you've been at Winthrop University
[7] Hospital or has it changed?
[8]    A: That's been my practice for the
[9] last 23 years.
[10]    Q: Do you have a subspecialty in any
[11] particular thing within the broad category of
[12] pulmonary and critical care medicine?
[13]    A: My clinical research interests have
[14] been in infectious respiratory disease,
[15] particularly pneumonia, and some research
[16] related to sepsis, and that means that I've
[17] focused a lot on that from a research
[18] standpoint and also often, either inpatient or
[19] outpatient, get asked to give opinions about
[20] those disease processes and often those are
[21] second opinions after somebody else has given
[22] an opinion.
[23]    Q: Does your outpatient practice
[24] primarily consist of consultations from other
[25] physicians about particular issues in your

---

**Page 16**

*M. Niederman*

[1]
[2] areas of expertise or do you follow patients
[3] on an ongoing basis?
[4]    A: Both. Again, patients usually with
[5] complicated lung diseases are referred by
[6] primary care doctors, and if they need ongoing
[7] care, I follow them along with their primary
[8] care doctor.
[9]    Q: But your initial relationship with
[10] a patient is typically a referral from a
[11] primary care doctor?
[12]    A: Typically it's a referral.
[13] Sometimes patients find out my name and come
[14] to see me, but yeah, it's usually referrals.
[15]    Q: Do you do research, other than
[16] clinical research?
[17]    A: Not currently. In the past I've
[18] done some basic science research on mechanisms
[19] of respiratory colonization and infection, but
[20] not currently.
[21]    Q: At what point in time did that
[22] transition occur?
[23]    A: It's been gradual, but at least for
[24] the last 10 or 12 years.
[25]    Q: Do you have particular people that

---

JAN-02-2001 03:49 FROM-03717 03717

Case 1:05-cv-00377-WDM-BNB   Document 144-2   Filed 01/25/07   USDC Colorado   Page 4 of 22

MOISES CARRANZA-REYES  v.
THE PARK COUNTY BOARD OF COUNTY COMMISSIONERS

MICHAEL S. NIEDERMAN, M.D.
September 8, 2006

Page 17

**M. Niederman**

work with you on ongoing clinical research
projects? Do you run a clinical research
team, in other words?

A: We have projects, and the people
who are involved in that change over time. We
have other fellows. We have a research
nurse. We've now got a new research clinical
coordinator here at the hospital, so that
those may be pharmaceutical funded research.
We've had fellows that have done investigator
initiated research and chart reviews, and so
the people who do that frequently change
because of the nature of a teaching hospital.

Q: Fellows are here for a year or two
years, something like that?

A: Usually three years, but we've also
had visiting fellows from other institutions
who come for a year.

Q: Let me ask you about sort of the
categories of clinical research. One is
research to test the efficacy of particular
pharmaceuticals; is that correct?

A: Correct, and that's some of the
research that we have done, correct.

Page 18

**M. Niederman**

Q: Is that the majority of your
research or a minority?

A: I would say it's probably about
half. Again, that's the pharmaceutical funded
research.

Q: And then another category, you
talked about chart review. What is that?

A: We might have a specific clinical
question and would collect a number of charts
and go through them and try to answer that
question.

Q: Are there any other types of
clinical research that you conduct?

A: I've also collaborated with
physicians that I've met at different meetings
and reviewed their research and helped them
write-up their data, and we've also got one
big community-acquired pneumonia project that
we conducted as a trial here at the hospital
that we're in the process of finishing and
writing up.

Q: I understand that you wouldn't want
to say anything, and I'm not going to ask you
anything, if it might be considered

Page 19

**M. Niederman**

proprietary with ongoing research, but can
give me a sketch of what you mean by the
"community-acquired pneumonia project"?

A: We were looking at ways to improve
the delivery of care in community-acquired
pneumonia in the hospital, and we tested the
value of having a set of guidelines versus not
or versus an intensive application with
additional help, and we were trying to
evaluate the most effective way to improve the
length of stay and outcomes of our pneumonia
patients.

Q: That makes sense to me. Thank
you.

Are there any other types of
clinical research that we haven't covered?

A: I think that covers it.

Q: When you were doing what I would
consider basic science research to distinguish
it from clinical research, is that a fair —

A: Correct.

Q: Did you have any particular
focuses?

A: At that time we were interested in

Page 20

**M. Niederman**

problems related to hospital-acquired
pneumonia, and we looked at the interaction
between pseudomonas aeruginosa,
P-S-E-U-D-O-M-O-N-A-S, and then separate word,
A-E-R-U-G-I-N-O-S-A, so interaction between
that particular bacteria and airway epithelial
cells and mechanisms of colonization of the
airway is the first step to the development of
hospital-acquired pneumonia.

Q: When you say "colonization in the
airway," can you describe what you mean?

A: Bacteria frequently grow in the
lung or on other sites in the body without
actually invading and causing infection, and
that often is the first step before infection,
and that process is referred to as
colonization.

Q: The bacteria essentially colonizing
the human host, is that the notion?

A: Correct. So we were studying the
cellular mechanisms that allowed that to
occur.

Q: Because, presumably, each different
human host, some kind of trigger has to happen

MICHAEL S. NIEDERMAN, M.D.
September 8, 2006

MOISES CARRANZA-REYES  v.
THE PARK COUNTY BOARD OF COUNTY COMMISSIONERS

---

**Page 21**

*M. Niederman*

[1]
[2] in their body to go from a colonization stage
[3] to a disease stage; is that fair?
[4]   A: Well, we were even farther back
[5] than that. We were trying to understand why
[6] some patients become colonized and others
[7] don't.
[8]   Q: Assuming that the two patients are
[9] exposed to the same potential bacteria?
[10]   A: Correct.
[11]   Q: When was sort of the time frame
[12] that you were doing that kind of research?
[13]   A: I started that research in 1980 and
[14] continued that into the mid 1990s. We still
[15] have a basic science lab here at the
[16] hospital. It's continuing that research, but
[17] I'm really only very peripherally involved, so
[18] I have very little input into that right now.
[19]   Q: Who is your colleague or colleagues
[20] that are doing that now here?
[21]   A: There's a Dr. Kazzaz, K-A-Z-Z-A-Z.
[22]   Q: What's his or her first name?
[23]   A: Jeffrey.
[24]   Q: When you do critical care work in
[25] the ICU, either during a one week a month

**Page 22**

*M. Niederman*

[1]
[2] rotation or on a weekend when you're on call,
[3] is the nature of your critical care practice
[4] consultative or would you have primary
[5] responsibility of a patient in the ICU at this
[6] institution?
[7]   A: It's both, and it's probably more
[8] oriented towards primary responsibility,
[9] because when we're making rounds, for example,
[10] in the medical ICU, we're not only seeing
[11] patients that we're — were the attending for
[12] or the consultant, but we're making quality
[13] and teaching rounds with the house staff, and
[14] so we're seeing all the patients and
[15] commenting on all of their management issues.
[16]   Q: And the medical ICU at this
[17] institution, I would assume, is broader than
[18] just pulmonary issues?
[19]   A: Correct.
[20]   Q: It would be anything that could
[21] occur to get someone in a medical ICU unit?
[22]   A: Correct. We don't deal as much in
[23] that unit with cardiac disease because there's
[24] a separate cardiac ICU, but, otherwise, we
[25] deal with all of the other medical issues that

**Page 23**

*M. Niederman*

[1]
[2] come up.
[3]   Q: So one gets shot, for instance, and
[4] gets to the emergency room and gets put in the
[5] ICU, you might follow that or is that —
[6]   A: That would be surgical, so we
[7] probably don't follow that. Someone who has
[8] surgery or trauma usually goes to the surgical
[9] ICU. If they have a head injury, they go to
[10] our neuroscience ICU. Medical ICU would be
[11] medical illnesses, so a GI bleed, diabetic
[12] ketoacidosis, sepsis, lung disease, asthma.
[13]   Q: If someone has a bad epileptic
[14] attack, they would end up in the neurological
[15] ICU?
[16]   A: It really depends. We would
[17] sometimes take care of those patients. It
[18] depends on what else is going on with that
[19] patient and what our bed availability is.
[20]   Q: There are four ICUs here; cardiac,
[21] medical, surgical and neuroscience?
[22]   A: There's a cardiac surgical ICU,
[23] which is for patients who specifically have
[24] had heart surgery.
[25]   Q: It's a post surgery ICU where they

**Page 24**

*M. Niederman*

[1]
[2] would go immediately after their heart
[3] surgery?
[4]   A: Correct.
[5]   Q: I have a few questions about some
[6] of the things on Exhibit-80, on your CV, if
[7] you could turn to page three for me.
[8]   A: Okay.
[9]   Q: The certification in critical care
[10] medicine, who certifies you for that?
[11]   A: This is the American Board of
[12] Internal Medicine.
[13]   Q: So that's your general
[14] certification and then the sub certifications
[15] in critical care medicine and pulmonary
[16] subspecialty are also under the auspices of
[17] the American Board of Internal Medicine?
[18]   A: Correct.
[19]   Q: Take a look at page 48.
[20]   A: Okay.
[21]   Q: The last item, number 33,
[22] "Guidelines for the initial management of
[23] community-acquired pneumonia," do you see
[24] where I am?
[25]   A: Yes.

---

MOISES CARRANZA-REYES   v.

THE PARK COUNTY BOARD OF COUNTY COMMISSIONERS

MICHAEL S. NIEDERMAN, M.D.
September 8, 2006

---

Page 57

*M. Niederman*

[2] that supports that expert opinion.

[3]   **A:** Correct.

[4]   **Q:** So it sounds like you may, based on

[5] the new information, have some more data that

[6] you would believe supports your expert opinion

[7] but your expert opinion, all the expert

[8] opinions you have are reflected in this

[9] report, is that —

[10]   **A:** The only thing that's not in this

[11] report relates to, I guess, as I've looked at

[12] the facts and reread the data, there's one

[13] more opportunity for intervention that I did

[14] not include in my report, and that is an

[15] opportunity that could have involved the

[16] actual prevention of this patient developing

[17] pneumonia with a timely throat culture and

[18] administration of antibiotics, and that, I

[19] think, is relevant, but it's not in this

[20] report.

[21]   **Q:** Explain for me that opinion of

[22] yours.

[23]   **A:** Again, I included in the report the

[24] fact that Mr. Carranza-Reyes was seen by the

[25] nurse on March 6th and that he had complaints,

---

Page 58

*M. Niederman*

[2] which included a sore throat, and he was

[3] treated symptomatically and came back again

[4] with worse complaints and again was treated

[5] symptomatically, and, again, in thinking about

[6] those facts and looking at the course of

[7] events, it's my opinion that if he had had a

[8] more thorough evaluation of his symptoms and a

[9] throat culture, a rapid strep-test, for

[10] example, and that had been positive, he would

[11] have been treated with antibiotics at that

[12] point, and had that happened, I think there

[13] would have been a much lower chance that he

[14] actually would have ever even developed this

[15] serious pneumonia that he had, because that's

[16] not in this report.

[17]   **Q:** Do you have an opinion about when

[18] it would have been appropriate for him to have

[19] been given a strep test based on the

[20] information that was available on any

[21] particular day? Can you put it in a time

[22] frame?

[23]   **A:** Yes. Again, I'm having a little

[24] trouble with the timing of his illness,

[25] because he was clearly seen by the nurse on

---

Page 59

*M. Niederman*

[2] March 6th, so that's the time for sure there

[3] was an opportunity to do that. In his

[4] deposition and his brother's deposition he

[5] claims to have been sick since March 4th and

[6] was asking to see someone and wasn't given

[7] that opportunity until March 6th, so if those

[8] facts are correct, then he could potentially

[9] have been diagnosed and treated even earlier.

[10]   **Q:** Based on the records that you

[11] reviewed from Nurse Paulsen's visit with

[12] Mr. Carranza-Reyes on March 6th, do

[13] Mr. Carranza-Reyes' symptoms lead you to

[14] conclude that at that time it would have been

[15] appropriate for him to have a throat culture?

[16]   **A:** Yes.

[17]   **Q:** So the first time that any medical

[18] person who saw Mr. Carranza-Reyes could have

[19] made an assessment that a throat culture was

[20] appropriate would have been Ms. Paulsen's

[21] visit with him on March 6th; is that right?

[22]   **A:** Correct.

[23]   **Q:** And then there's an issue about

[24] whether or not he tried to access health care

[25] previous to that?

---

Page 60

*M. Niederman*

[2]   **A:** Correct.

[3]   **Q:** What does it mean when you note

[4] that the nurse reported that

[5] Mr. Carranza-Reyes' lungs were clear

[6] bilaterally on March 6th?

[7]   **A:** Means that she did not find any

[8] evidence on her examination that would support

[9] him having findings of pneumonia at that

[10] time.

[11]   **Q:** And that's also true on her visit

[12] with him on March 7th, correct?

[13]   **A:** Correct.

[14]   **Q:** Does it make sense to you from a

[15] disease mechanism perspective that there

[16] wouldn't be signs of pneumonia given

[17] ultimately how Mr. Carranza-Reyes presented at

[18] Summit Medical Center at 12:45 p.m. on the

[19] 8th?

[20]   **A:** I think so, and, again, that's

[21] where I've been spending a little more time

[22] thinking in the last day about the time line

[23] that I was referring to earlier. I think my

[24] assessment is that probably he did not have

[25] pneumonia on the 6th. He probably did not

---

MICHAEL S. NIEDERMAN, M.D.                          MOISES CARRANZA-REYES   v.
September 8, 2006                    THE PARK COUNTY BOARD OF COUNTY COMMISSIONERS

Page 61

**M. Niederman**

[1]
[2] have pneumonia when he was seen on the 7th.
[3] Although, he may have, and, again, I'm not
[4] sure whether the examination was incorrect or
[5] if he didn't have pneumonia, but clearly, when
[6] he was seen on the 8th in the afternoon, had a
[7] far advanced form of pneumonia, so there's
[8] really only two possibilities; either this was
[9] slowly progressing for days or this is a
[10] rapidly progressive pneumonia and the natural
[11] history of this infection is that it can be a
[12] rapidly progressing pneumonia, so I would
[13] think that probably he developed — he made
[14] that transition from streptococcal sore throat
[15] to streptococcal pneumonia some time during
[16] the day of the 7th, either shortly before or
[17] shortly after the nurse saw him, but that he
[18] was very sick with advanced pneumonia on the
[19] 8th.
[20]     Q: The way I understand it is that
[21] what the blood culture revealed, the bacteria
[22] in this case was Group A beta-hemolytic strep?
[23]     A: Correct.
[24]     Q: Is there particular biological
[25] courses related to that bug, for lack of a

Page 62

**M. Niederman**

[1]
[2] better word?
[3]     A: I'm not sure I understand your
[4] question.
[5]     Q: Fair enough. It's not a very clear
[6] question.
[7]     Can you describe for me if there's
[8] a particular way that that infection presents
[9] itself or the course of its infection in a
[10] patient like Mr. Carranza-Reyes or is there a
[11] variant of how it would present itself?
[12]     A: I think any infection can have
[13] variability, but this is a very unusual
[14] bacteria to cause pneumonia, and so just its
[15] identification, I think, raises a number of
[16] issues. This is not a normal pneumonia
[17] bacteria. The source is very likely to be a
[18] preceding sore throat. Although, many
[19] pneumonias begin with colonization of the
[20] mouth and then aspiration into the lung, but
[21] this could have been an invasive sore throat
[22] that progressed to pneumonia, but what we do
[23] know, and, again, we don't see a lot of this,
[24] I mean, I've probably seen no more than three
[25] or four patients with this disease ever, it

Page 63

**M. Niederman**

[1]
[2] can be a very rapidly progressive necrotizing
[3] pneumonia and patients can go from okay to
[4] very sick over a 24-hour period.
[5]     Q: And that's what leads you to
[6] believe that at least the possibility exists
[7] that he didn't have pneumonia at the time he
[8] was seen by the nurse on March 7th?
[9]     A: Correct. I think — I wasn't —
[10] I'm not entirely sure, but I think that it's
[11] very possible that, assuming her exam was
[12] accurate, either he didn't have pneumonia or
[13] had early pneumonia on the 6th or the 7th, but
[14] it seems much more likely he didn't have it on
[15] the 6th, maybe not on the 7th, and it
[16] progressed some time during the 7th into the
[17] 8th, and, again, that's why I said I do have
[18] the opinion, which is not in the letter,
[19] thinking about that time line a little bit
[20] more, that there might have been an
[21] opportunity to intervene and prevent this
[22] pneumonia, if they had diagnosed his strep
[23] throat on the 6th.
[24]     Q: Would it have been appropriate for
[25] the nurse on the 6th to do a blood — you

Page 64

**M. Niederman**

[1]
[2] know, do a strep culture of this individual?
[3]     A: That's what I said earlier, yes.
[4]     Q: Is that within the scope of
[5] practice of a nurse in Colorado?
[6]     A: I don't know.
[7]     Q: Is that within the scope of
[8] practice of a registered nurse in New York?
[9]     A: Certainly in that setting nurses do
[10] that all the time in doctors' offices.
[11]     Q: Make a decision on their own that a
[12] throat culture is appropriate?
[13]     A: Well, rapid strep screen. I mean,
[14] I could tell you that — I mean, to give you
[15] the context of this, I spent a summer, two
[16] summers working as a camp doctor and the
[17] nurses in the infirmary did this all the
[18] time. When kids came in with sore throats and
[19] if they were positive, they told me about it
[20] and then we made a decision about antibiotic
[21] therapy.
[22]     Q: What is a rapid strep screen?
[23]     A: It's a swab in the back of the
[24] throat looking for the antigenic material in
[25] strep. You could get a result in minutes, so

THE PARK COUNTY BOARD OF COUNTY COMMISSIONERS

MICHAEL S. NIEDERMAN, M.D.
September 8, 2006

Page 65

M. Niederman

[1]
[2] that even though cultures can take 24 hours,
[3] this test can be positive quickly and it gets
[4] supported by a culture.
[5]    Q: Growing up in Colorado, strep
[6] throat, it's fairly prevalent. I don't know
[7] whether you know that or not. As a child, we
[8] would go to the doctor's office and get
[9] swabbed to exercise our gag reflex when they
[10] thought we had sore throats. They were doing
[11] a rapid strep screen of me, in all likelihood?
[12]    A: Probably.
[13]    Q: When did that start?
[14]    A: Oh, I don't know the history of
[15] that. I know it's been available for a long
[16] time.
[17]    Q: So if I grew up in the '70s, it
[18] probably was available?
[19]    A: Probably.
[20]    Q: Are you aware of either empirical
[21] evidence based medicine or basic science
[22] research on Group A beta-hemolytic strep?
[23]    A: There's been a lot of research on
[24] it. I have not tried to extensively review
[25] that literature. I pulled out a few relevant

Page 66

M. Niederman

[1]
[2] clinical studies, both in abstract and full
[3] article form, that I included in the material
[4] that I sent to you and that I looked through
[5] again last night.
[6]    Q: Can you describe for me how this
[7] infection differs from other either streps or
[8] pneumonia?
[9]    A: Well, again, it's not a common
[10] cause of pneumonia. Usually it remains a sore
[11] throat, but what's been described in epidemic
[12] settings where there's crowding, close contact
[13] of people, particularly, for example, in
[14] military recruits, which is the large series
[15] that I looked at, having people very close
[16] together facilitates the spread of this
[17] organism person to person, and in a small
[18] percentage of those people who get colonized
[19] and infected, they can progress to pneumonia.
[20] Whether that's purely statistical or whether
[21] it's related to the stress of the crowding and
[22] the multiple people together, I think, isn't
[23] really clear.
[24]    Q: Is there anything about a
[25] particular person that may lead them to be one

Page 67

M. Niederman

[1]
[2] of the unlucky people that have this go to
[3] pneumonia or is there no data on that one way
[4] or the other?
[5]    A: Well, I think everybody assumes
[6] that there's a factor that does that, but I
[7] don't think that anybody knows exactly what
[8] that is just yet.
[9]    Q: There's not that kind of precision
[10] in the data that is available, as far as you
[11] know?
[12]    A: No, because, again, from a
[13] practical standpoint, when epidemic outbreaks
[14] like this are identified, everybody gets
[15] prophylaxis. In other words, it's not
[16] targeted prophylaxis at certain high risk
[17] individuals.
[18]    Q: Generally speaking, what kinds of
[19] events or background in someone's life could
[20] make them more susceptible, from your
[21] experience, to have something like this
[22] transfer from a strep in a throat to
[23] strep-induced pneumonia or strep-caused
[24] pneumonia?
[25]    A: Probably the most common thing is

Page 68

M. Niederman

[1]
[2] altered immune response from an acquired viral
[3] infection, but, in general, for any infection,
[4] and the formula is simple, we all encounter
[5] bacteria. Some of us get infected, some
[6] don't, and it's usually that balance between
[7] the bacteria and our own host defenses. Some
[8] bacteria like this can be very virulent and
[9] overcome even a normal host defense system,
[10] particularly if the concentration of the
[11] bacteria is very high or even a low
[12] concentration of bacteria could lead to
[13] infection, if the host defenses were impaired
[14] as a result of, say, viral infection,
[15] medications, coexisting chronic illnesses, any
[16] of those are possibilities.
[17]    Q: You didn't make any analysis in
[18] this case of anything about Mr. Carranza-Reyes
[19] specifically that may have led him to be one
[20] of the unlucky ones that had strep in his
[21] throat become strep pneumonia?
[22]    A: No. The only thing, I think, that
[23] was striking is he really didn't have any
[24] predisposing factors that were identifiable.
[25] He wasn't on chronic medications. He didn't

MOISES CARRANZA-REYES V.

MICHAEL S. NIEDERMAN, M.D.
September 8, 2006                    THE PARK COUNTY BOARD OF COUNTY COMMISSIONERS

---

**Page 69**

*M. Niederman*

[1]
[2] have chronic illness. He wasn't diabetic. He
[3] was really — there's really no clear
[4] precipitating factor. We do know that there
[5] are genetic variations in the immune system
[6] that make some people predisposed, but, I
[7] mean, this case you almost have a biologic
[8] experiment that tells you that didn't happen
[9] because he had a twin brother in the same
[10] environment who didn't get the same illness.
[11]    Q: What's the basis for your knowledge
[12] about what Mr. Carranza-Reyes' prior medical
[13] history or condition is?
[14]    A: Just his deposition and deposition
[15] of his brother.
[16]    Q: You don't have any access to any
[17] medical record or medical information of
[18] Mr. Carranza-Reyes from any previous medical
[19] encounter he had in Mexico?
[20]    A: No, I have not seen any records of
[21] his.
[22]    Q: Let me direct your attention to the
[23] third paragraph on Exhibit-83, your report.
[24] The second sentence in that paragraph
[25] indicates "his deposition," and I assume you

---

**Page 70**

*M. Niederman*

[1]
[2] mean Mr. Carranza-Reyes' deposition, "and the
[3] information from the Park County Jail indicate
[4] that he arrived at the jail completely
[5] healthy."
[6]    A: Correct.
[7]    Q: When you say "the information from
[8] the Park County Jail," that the form in
[9] Spanish that Mr. Carranza-Reyes filled out
[10] upon his intake?
[11]    A: I don't remember all of the
[12] information I used to make that statement, but
[13] I remember, again, having read through the
[14] depositions of the people who saw him when he
[15] arrived from the jail and nobody commented on
[16] him being sick at that time.
[17]    Q: The mechanism of a Group A
[18] beta-hemolytic streptococcal pneumonia is that
[19] it would initially colonize in the throat or
[20] mouth; is that true?
[21]    A: Initially colonize, and in this
[22] case probably infect the oral pharynx,
[23] correct.
[24]    Q: Is there a latency period?
[25]    A: It can be variable between

---

**Page 71**

*M. Niederman*

[1]
[2] progressing from sore throat to pneumonia,
[3] and, again, there isn't a specific absolute
[4] time period.
[5]    Q: Is there a time period for the
[6] colonization?
[7]    A: I'm not sure I understand.
[8]    Q: Let me ask it more directly.
[9] Mr. Carranza-Reyes arrived at the jail March
[10] 1st. Is there any way to know when he caught
[11] the bug that eventually colonized that
[12] eventually led him to be sick?
[13]    A: No.
[14]    Q: Could that have been prior to March
[15] 1st of 2003?
[16]    A: He conceivably could have been
[17] colonized prior to arrival, but he had no
[18] symptoms of infection when he arrived.
[19]    Q: If he was colonized prior to
[20] arrival, would the conditions of his
[21] confinement make any difference to whether the
[22] colonization became an infection?
[23]    A: Certainly it's possible that if he
[24] was in an environment where he was not
[25] sleeping well, if he was in an environment

---

**Page 72**

*M. Niederman*

[1]
[2] where he was emotionally and physically
[3] stressed, all of those could have interfered
[4] with his immune function to the point that the
[5] colonization could have progressed to
[6] infection.
[7]    Q: So it would be his environment's
[8] reaction —
[9]    A: His reaction to the environment.
[10]    Q: Yes.
[11]    A: It could interfere with his — in
[12] other words, I think there's two possibilities
[13] here, either he came in colonized but not
[14] infected and the environment he was in
[15] interfered with his immune function and
[16] allowed this to progress or he came in without
[17] it and acquired it from the conditions he was
[18] in and the combination of the acquisition and
[19] the stress allowed it to progress.
[20]    Q: Let's talk about number two first.
[21] Okay? One possibility is he acquired it in
[22] the jail?
[23]    A: Correct.
[24]    Q: If he acquired this in the jail,
[25] based on your understanding of the mechanism

---

---

Page 73

[1]                    **M. Niederman**

[2] of this type of infection, what is the likely

[3] outcome for other people that were in the

[4] jail?

[5]      A: If he acquired it in the jail, then

[6] presumably other people in the jail could have

[7] acquired it as well.

[8]      Q: If no one else in the jail, either

[9] an inmate or a staff member acquired this,

[10] what does that do to your analysis, if

[11] anything?

[12]      MR. TRINE: Objection, lack of

[13] foundation. Go ahead and answer. I'm

[14] just objecting for the record.

[15]      A: I'm not sure. I would have to know

[16] more specifically how you came up with the

[17] conclusion that nobody acquired it. In other

[18] words, I mean, in the studies that have been

[19] done, acquisition is defined by cultures.

[20]      Q: So the only way to know whether

[21] anyone else in the jail had this infection is

[22] presumably two ways; one, a culture of

[23] everybody who was in the jail at the same

[24] time, and, two, empirical evidence about what

[25] anybody who is in the jail symptoms might have

---

Page 74

[1]                    **M. Niederman**

[2] been?

[3]      A: Correct.

[4]      Q: And the best evidence, back to the

[5] hierarchy we were talking about before the

[6] type of hierarchy we were talking about

[7] before, would have been a culture of everybody

[8] in the jail?

[9]      A: Our best evidence would have been

[10] both, would have been — best evidence would

[11] have been a culture of everybody and a

[12] thorough medical evaluation and follow-up on

[13] everybody, none of which we really have here.

[14]      Q: The study that you referred to

[15] is in your file on the military outbreak, was

[16] it this infection or a similar type infection?

[17]      A: It was this infection.

[18]      Q: They did both in that case, right?

[19]      A: They did cultures, they had

[20] clinical data, correct.

[21]      Q: In that study of that military

[22] base, do you recall, and take a look at it, if

[23] you need to, how many of those people got

[24] pneumonia?

[25]      A: Again, I don't remember here, so I

---

Page 75

[1]                    **M. Niederman**

[2] would have to look. My recollection is that

[3] it was a surprisingly high number. 127 out of

[4] 4,500 patients developed pneumonia, it

[5] was — 4,500 people that were — having

[6] respiratory symptoms, I'm sorry 4,500 people

[7] were looked at, 127 had pneumonia.

[8]      Q: And that, from a percentage

[9] standpoint, is a pretty high number, isn't it?

[10]      A: It's about three percent.

[11]      Q: And that strikes you as an expert

[12] in this field as a lot in terms of how this

[13] might develop, is that what —

[14]      A: Again, it's not a low number here.

[15] I mean, 127 patients with pneumonia is a large

[16] number. Although, there were a large number

[17] exposed. If we translate it into this setting

[18] here where there were supposedly 60 patients

[19] or 60 persons in the cell, three percent there

[20] could be just one person.

[21]      Q: That's what I was going to ask

[22] you. If the data, the empirical data turns

[23] out to be that only Moises Carranza-Reyes got

[24] pneumonia from this infection, does that

[25] eliminate the possibility that he got it in

---

Page 76

[1]                    **M. Niederman**

[2] the jail?

[3]      MR. TRINE: Objection, form and

[4] foundation.

[5]      A: Again, I don't think it does, and,

[6] again, without really thorough medical records

[7] on all of those people over the subsequent

[8] week to 10 days, I don't think we really know

[9] whether others did or did not have pneumonia,

[10] but doing it as a percentage, again, one or

[11] two people could fall well within the realm of

[12] the percentages in this study.

[13]      Q: Is it fair to say that you cannot

[14] definitively say one way or the other when

[15] Mr. Carranza-Reyes got — was colonized with

[16] the bug that ultimately led him to have

[17] this —

[18]      A: I have no way to know when he

[19] became colonized, but I have information here

[20] that when he had symptoms of a sore throat and

[21] when he had symptoms and findings of

[22] pneumonia.

[23]      Q: And the findings of pneumonia, the

[24] first time that there's any finding of

[25] pneumonia is when?

---

MICHAEL S. NIEDERMAN, M.D.
September 8, 2006

MOISES CARRANZA-REYES v.
THE PARK COUNTY BOARD OF COUNTY COMMISSIONERS

---

Page 77

M. Niederman

[2] A: Well, there's no question he had
[3] pneumonia on the 8th, and it's likely, given
[4] the severity of the pneumonia when it was
[5] diagnosed on the 8th, that it was at least
[6] present on the 7th, if not before.
[7] Q: But the data that you're relying on
[8] in terms of his symptoms is his own testimony,
[9] his brother's testimony and then whatever
[10] other data existed about his condition when he
[11] was at the Park County Jail?
[12] A: Right, and, again, looks like he
[13] arrived in the jail on March 1st, he and his
[14] brother, and, again, some of the other
[15] observations from the jail, I think Mr. Allen,
[16] for example, says that he was beginning to
[17] have symptoms of being sick on the 4th or the
[18] 5th, so I think everybody agrees it was a two
[19] or three-day period when he was in the jail
[20] and had absolutely no symptoms of illness.
[21] Q: But it's fair to say that he could
[22] have caught the bug prior to the time he got
[23] into the jail and just been asymptomatic?
[24] A: It's certainly possible he was
[25] colonized without symptoms when he arrived. I

---

Page 78

M. Niederman

[2] don't think we have anyway of knowing.
[3] Q: If the facts were that someone who
[4] Mr. Carranza-Reyes encountered prior to the
[5] time that he was in the jail developed
[6] pneumonia, what does that do to your opinion?
[7] A: Again, I need to know that it was
[8] the same type of pneumonia and what his
[9] exposure was, whether it was coincidental or
[10] whether he really had enough close contact
[11] that he could have acquired it from that
[12] person.
[13] Q: Would riding in a vehicle with
[14] someone for a few hours give sufficient close
[15] contact, assuming that it was the same bug?
[16] A: Again, is that person coughing, how
[17] close are they, what's the — again, I don't
[18] know the answer to that.
[19] Q: Does that additional fact tip the
[20] scale one way or the other about whether or
[21] not it was more likely that — assuming that
[22] that fact is true, whether it was more likely
[23] that he caught the bug prior to March 1st or
[24] after March 1st?
[25] MR. TRINE: Objection, lack of

---

Page 79

M. Niederman

[2] foundation.
[3] A: Again, I don't know. I think
[4] either is still possible. I don't think it
[5] changes it a lot, because he had no symptoms.
[6] Again, some of that would relate to timing as
[7] well, how long — if he was in the van with
[8] somebody two weeks earlier, I doubt it's
[9] relevant. If he was in the van with someone
[10] the day before, maybe. Again, I just don't —
[11] there's too many speculations there to know
[12] for sure.
[13] Q: If the facts are that he was in the
[14] van with this individual on March 1st, that
[15] might be relevant to the analysis, right?
[16] A: It might. Again, it doesn't relate
[17] to the issue of, wherever he acquired it, why
[18] did it progress in him and was there an
[19] opportunity to interfere with that progression
[20] with medical intervention when he was in the
[21] jail.
[22] Q: I understand that. You understand
[23] that one of the issues in this case is when he
[24] caught the bug?
[25] A: Correct.

---

Page 80

M. Niederman

[2] Q: And that's what I wanted to ask
[3] you. I understand that your opinion is
[4] broader than that and one of the issues
[5] that — one of the opinions that you give is
[6] that he should have been — there should have
[7] been medical intervention for him earlier and
[8] that caused the ultimate outcome?
[9] A: Right, and also, my opinion, as I
[10] said, was that I believe that the environment
[11] in which he was kept may have either led him -
[12] to acquire this bacteria or, if not acquire
[13] it, may have contributed to it progressing the
[14] way it did.
[15] Q: What is the basis for your
[16] understanding of the environment that
[17] Mr. Carranza-Reyes was in at the jail, what
[18] are the sources of your information?
[19] A: There's his deposition, his
[20] brother's deposition and there's — again, I
[21] know the corroboration from Mr. Allen and, I
[22] can't remember, I think Nurse Paulsen
[23] mentioned it as well in her deposition.
[24] Q: But other than the sources of
[25] information that you have reviewed that we

---

Page 81

**M. Niederman**

[1]
[2] talked about earlier, you don't have any other
[3] source of information about whatever the
[4] conditions were during the time that
[5] Mr. Carranza-Reyes was incarcerated in the
[6] Park County Jail; is that right?
[7]     A: Only the information I have looked
[8] at, correct.
[9]     Q: So if there's additional
[10] information about what the conditions were
[11] like in the jail during that period of time,
[12] you don't know it?
[13]     A: Correct.
[14]     Q: What is the basis for your
[15] statement in paragraph three on the first page
[16] of your report that there "were individuals
[17] with respiratory illness, including cough and
[18] sore throat"?
[19]     A: That was Dr. Bachman's — I think
[20] in his deposition, and I think I had some
[21] sheets from the Mexican Consul that showed
[22] there were other detainees who were diagnosed
[23] and treated for sore throat who had been in
[24] that cell.
[25]     Q: Are you aware one way or another

Page 82

**M. Niederman**

[1]
[2] whether any of those detainees were cultured?
[3]     A: I don't know. I didn't see any
[4] culture data.
[5]     Q: What would culture data look like?
[6]     A: It would be a lab report with the
[7] patient's name on it, says what was growing in
[8] his throat.
[9]     Q: Do you see where your sentence says
[10] in that same paragraph "the bacteria that was
[11] isolated from the claimant's blood cultures is
[12] Group A beta-hemolytic strep." do you see that
[13] sentence?
[14]     A: Yes.
[15]     Q: Two sentences after that is the one
[16] I want to ask you about. "It is my opinion
[17] that if Mr. Reyes has been" — I assume that
[18] should be had been?
[19]     A: Had been, correct.
[20]     Q: "Had been put in a better
[21] maintained holding cell, with less crowding,
[22] he would have been much less likely to have
[23] acquired this communicable respiratory
[24] illness," do you see that sentence?
[25]     A: Correct.

Page 83

**M. Niederman**

[1]
[2]     Q: Now, that sentence assumes that he
[3] acquired it in the jail; is that right?
[4]     A: Correct.
[5]     Q: But we've already established today
[6] that you can't say that he did in fact acquire
[7] it in the jail, right?
[8]     A: Right. I think that that sentence
[9] would apply if he acquired it in the jail. If
[10] he didn't acquire it in the jail, it would
[11] still apply to the impact — the same
[12] environment, on his immunologic function and
[13] whether or not that in any way contributed to
[14] him progressing the way he did.
[15]     Q: That second opinion that you've
[16] just given and interpret in that sentence
[17] doesn't appear anywhere in this report, does
[18] it?
[19]     A: Correct.
[20]     Q: Why not?
[21]     A: Again, as I explained, I was
[22] thinking this through recently and I realized
[23] exactly the issue that you're raising and
[24] trying to think about what happened here and
[25] the unusual nature of this infection. It was

Page 84

**M. Niederman**

[1]
[2] another possibility that could be relevant
[3] here that I hadn't considered.
[4]     Q: Take a look at page two. Is the
[5] first sentence in the first paragraph still
[6] true?
[7]     A: It's my opinion that
[8] Mr. Carranza-Reyes first became ill while he
[9] was an inmate at the Park County Jail, yes.
[10]     Q: When you say "ill," you mean
[11] symptomatically ill; isn't that right?
[12]     A: Correct. I don't think you know
[13] you're ill if you don't have symptoms.
[14]     Q: And we've already discussed that
[15] colonization does not mean ill? That just
[16] the distinction that I want to understand.
[17]     In that same paragraph you talk
[18] about his report on March 5th of being unable
[19] to eat breakfast because of malaise and
[20] anorexia?
[21]     A: Correct.
[22]     Q: Is malaise a symptom of pneumonia?
[23]     A: Malaise is a symptom of being
[24] sick. It can be a symptom of virtually any
[25] illness.

Page 93

**M. Niederman**

[1]
[2] factors that played a role? And yes, in
[3] retrospect, these issues are probably
[4] relevant.
[5]    **Q:** Can you offer an opinion about when
[6] medical intervention for Mr. Carranza-Reyes
[7] would have made a difference in his outcome?
[8]    **A:** Well, there's several medical
[9] interventions. Again, if you assume, as I
[10] have and as we talked about, that he did not
[11] have pneumonia on the 6th, then doing a rapid
[12] strep test and giving him penicillin might
[13] have prevented this whole thing. That's one
[14] medical attention that could have made none of
[15] this happen.
[16]    **Q:** Let's talk about the 8th. Is there
[17] any way to put a point in time where him
[18] arriving at Summit Medical Center, instead of
[19] at 12:45, at some time earlier than that would
[20] have made a difference to him getting sepsis
[21] and all of the, you know, pretty horrible
[22] things that happened to him after that?
[23]    **A:** Again, we know with severe
[24] pneumonia that the sooner it's treated the
[25] better the outcome, and timing is important,

Page 94

**M. Niederman**

[1]
[2] and the more severely ill patients are, the
[3] more important timing is, so I would believe
[4] that he probably, again, this relates to the
[5] records I don't have that we talked about,
[6] probably somebody observed him even late on
[7] the 7th and if they had observed him late on
[8] the 7th, they might have thought he was sick,
[9] brought him to a medical center and taken care
[10] of him. I think if he hadn't been
[11] incarcerated and he was with his brother on
[12] the 8th and he was as sick as it was described
[13] at 3:45 in the morning, I would — I believe
[14] he would have sought medical attention at that
[15] point and might have gotten antibiotics as
[16] much as six or eight hours earlier than he
[17] actually did, and that's a huge time frame
[18] where it's very likely some of these
[19] complications could have been avoided.
[20]    **Q:** Can you testify to a reasonable
[21] degree of medical probability that the
[22] complications would have been avoided had he,
[23] say, gotten antibiotics at 5 o'clock a.m. on
[24] the 8th?
[25]    **A:** I think so, because, again, what I

Page 95

**M. Niederman**

[1]
[2] can say is that he got these complications and
[3] that the majority of patients with pneumonia
[4] don't get these complications and that there
[5] had to be a time where if he had been treated
[6] he would not have gotten these complications,
[7] and, as I said in the report, I was trying to
[8] really not be too demanding in terms of what
[9] they did. They probably could have and should
[10] have treated him before 3:45, but 3:45 was an
[11] obvious time to have intervened, and it took
[12] nine hours after that before he got anything
[13] done.
[14]    **Q:** How close to 12:45 would his
[15] earlier arrival at Summit Medical Center have
[16] made a difference? How fine can you make that
[17] distinction if — do you understand what I'm
[18] getting at?
[19]    **A:** Well, as I tried to say in the
[20] report, this sort of standard for giving
[21] antibiotic therapy sooner is better, and for
[22] as sick as he was described at 3:45, I would
[23] have probably not been critical of his care if
[24] he got antibiotics within four hours of that.
[25] Say by 8:00 a.m. he got antibiotics, I would

Page 96

**M. Niederman**

[1]
[2] have said that's pretty reasonable. I think
[3] beyond that he's at greater risk for all of
[4] the complications he got.
[5]    **Q:** If he had gotten the antibiotics at
[6] 8 o'clock, can you say that he wouldn't have
[7] had the complications or is there really no
[8] way to know?
[9]    **A:** I think it's much less likely,
[10] because, again, by experience and
[11] statistically, majority of patients with
[12] pneumonia don't get the complications he got.
[13]    **Q:** Let me see if I'm understanding
[14] it. The general proposition that nobody can
[15] argue with is earlier treatment with
[16] antibiotics with patients with pneumonia is
[17] better and patients who have pneumonia who get
[18] antibiotics sooner have better outcomes?
[19]    **A:** Correct.
[20]    **Q:** And you are trying to extrapolate
[21] from your knowledge of that data and your
[22] experience of treating patients with pneumonia
[23] how that might have impacted
[24] Mr. Carranza-Reyes in this instance?
[25]    **A:** Correct.

THE PARK COUNTY BOARD OF COUNTY COMMISSIONERS

MICHAEL S. NIEDERMAN, M.D.
September 8, 2006

---

**Page 97**

[1]                    *M. Niederman*

[2]    **Q:** Your understanding of the general

[3] standard of care is within four hours of

[4] presentation to a health care provider in the

[5] community, that health care provider, if

[6] they're doing their job, should have known

[7] enough to figure out to start antibiotics?

[8]    **A:** Correct.

[9]    **Q:** And so anybody who interacted with

[10] Mr. Carranza-Reyes who was a health care

[11] provider failed in that general standard of

[12] care if they didn't do something within four

[13] hours of when they should have known it was

[14] pneumonia or could have been pneumonia?

[15]    **A:** Yes, but I think more relevant to

[16] your question is what's the time period where

[17] if they had treated him the outcome might have

[18] been better, and, as I said, I don't think I

[19] would have been critical if he had gotten

[20] antibiotics by, say, 8:00 a.m., and you're

[21] asking about is there a time that I could fine

[22] tune it. He got antibiotics — he didn't even

[23] get to Summit County until after 1:00, and I

[24] don't know the exact moment he got

[25] antibiotics, but it was well after that 8:00

---

**Page 98**

[1]                    *M. Niederman*

[2] a.m.

[3]    **Q:** But you don't have the ability to

[4] predict what would have been different in his

[5] outcome based on when he would have gotten

[6] antibiotics, because nobody can predict that;

[7] is that fair?

[8]    **A:** No, but I think a reasonable way to

[9] look at it is that if you talk about

[10] 50 percent probabilities, 50 percent of

[11] patients who get treated for pneumonia within

[12] four hours don't end up with the complications

[13] he got.

[14]    **Q:** Then how does that kind of

[15] percentage change if it's five hours or six

[16] hours or seven hours or eight hours?

[17]    **A:** Beyond four hours — at least in

[18] terms of mortality, there is data that every

[19] hour adds — of delay adds to mortality.

[20]    **Q:** Is there data about the kinds of

[21] bad outcomes that Mr. Carranza-Reyes had short

[22] of mortality?

[23]    **A:** Not specifically.

[24]    **Q:** Is there any way to tell, based on

[25] the data that you reviewed, when

---

**Page 99**

[1]                    *M. Niederman*

[2] Mr. Carranza-Reyes' pneumonia became sepsis?

[3]    **A:** Well, he had sepsis when he arrived

[4] at Summit County ER, so it may have been

[5] present all of that morning. Anybody who

[6] measured his vital signs documented findings

[7] consistent with sepsis and septic shock. It

[8] could have been going on for a long time. It

[9] probably was to account for the fact that he

[10] developed all these complications, and, again,

[11] to put it in context, he got outstanding

[12] medical care when he got to Denver, but

[13] technically he died. I mean, his heart

[14] stopped. He was dead. And they were able to

[15] bring him back, and that was fortunate, but he

[16] did progress to the point of dieing on March

[17] 8th.

[18]    **Q:** And the outcome that was achieved,

[19] given how sick he was, was pretty remarkable

[20] by Denver Health, right?

[21]    **A:** They did a great job. His outcome,

[22] to have been resuscitated and to have survived

[23] and apparently intact neurologic function

[24] is a very good outcome, correct.

[25]    **Q:** And Denver Health, are you familiar

---

**Page 100**

[1]                    *M. Niederman*

[2] with Denver Health at all?

[3]    **A:** Only a little bit. I know some of

[4] the doctors.

[5]    **Q:** Do you know Ivor Douglas?

[6]    **A:** Don't know him. I know Rick

[7] Albert.

[8]    **Q:** In what context, a professional

[9] context, at meetings and that sort of thing?

[10]    **A:** Right.

[11]    **Q:** You understand that Denver Health -

[12] is a level one trauma facility and all of that

[13] kind of stuff?

[14]    **A:** Correct.

[15]    **Q:** I assume this institution is too;

[16] is that correct?

[17]    **A:** Correct.

[18]    **Q:** When you reviewed Dr. Douglas'

[19] deposition and had his descriptions of how

[20] they do trauma care, it's similar to what you

[21] do here?

[22]    **A:** Yes. Again, I think that they did

[23] a great job. They recognized how sick he was,

[24] they did an immediate stabilization, the ICU

[25] team came down and met him in the ER and took

---

MICHAEL S. NIEDERMAN, M.D.                    MOISES CARRANZA-REYES v.
September 8, 2006                 THE PARK COUNTY BOARD OF COUNTY COMMISSIONERS

---

**Page 101**

M. Niederman

[1]
[2] over his care immediately, and that's the way
[3] it should be done, and they did a great job.
[4]   Q: Have you ever heard of methylene
[5] blue being used in this kind of context
[6] before?
[7]   A: I've read about it, but I actually
[8] haven't heard about a case where it's been
[9] done, so yes, it was interesting.
[10]   Q: It's clearly a dramatic treatment
[11] option?
[12]   A: Correct.
[13]   Q: How does sepsis present itself, and
[14] let me be more specific, is there any way to
[15] tell either from the documents and data that
[16] you have or from your own experience about
[17] when it was likely that Mr. Carranza-Reyes
[18] started having sepsis?
[19]   A: Well, again, sepsis to me means an
[20] inflammatory response to infection, and he
[21] probably had it at 3:45 in the morning. I
[22] don't know exactly when he progressed to
[23] septic shock, but I know that he had a lot of
[24] the findings of septic shock. As I recall, he
[25] really could barely get up and move and he was

---

**Page 102**

M. Niederman

[1]
[2] laid down, all of which suggests he may have
[3] had a low blood pressure from the very
[4] beginning.
[5]   Q: What is the definition of septic
[6] shock?
[7]   A: Septic shock is a low blood
[8] pressure and low profusion of vital organs as
[9] a result of an uncontrolled infection.
[10]   Q: So, essentially, septic shock is
[11] the infection has gotten into all of the
[12] systems of the body because it's in the blood
[13] and results in general — your organs and
[14] systems generally start to fail, is that —
[15]   A: Well, it's — what probably is
[16] happening in septic shock is the infection is
[17] widespread and the body's response to that
[18] infection leads to all of the organs
[19] dysfunctioning. In other words, the rapidity
[20] with which septic goes to septic shock can't
[21] really be explained by bacteria invading each
[22] of these organs that rapidly. It's really the
[23] body's inflammatory response to the bacteria
[24] which causes the rapid development of the
[25] findings in and the injury to the organs.

---

**Page 103**

M. Niederman

[1]
[2]   Q: Is the progression of this disease
[3] mechanism here colonization, infection of the
[4] mouth or throat, pneumonia sepsis or sepsis
[5] and pneumonia at the same time, how does that
[6] work?
[7]   A: I think it could be both. In other
[8] words, when he developed pneumonia, again, I
[9] think our assumption is you develop pneumonia
[10] that's initially a very small spot of
[11] pneumonia that gets larger and larger and at
[12] some point it initiates an inflammation
[13] response both in the lungs and in the rest of
[14] the body that causes injury, and so in animal
[15] models, it's very unlikely that there wouldn't
[16] be some period where there's pneumonia without
[17] sepsis, but that time period could be pretty
[18] compressed.
[19]   Q: Is there anything in the data that
[20] you have from Vicky Paulsen's observations of
[21] Mr. Carranza-Reyes on either the 6th or the
[22] 7th that is consistent with sepsis?
[23]   A: Not directly. Again, fever and an
[24] elevated respiratory rate could be a sign of
[25] sepsis, and so he had them, but not to the

---

**Page 104**

M. Niederman

[1]
[2] degree that he had them on the 8th.
[3]   Q: He had signs of sepsis on the
[4] morning, in the early morning of the 8th, is
[5] what I'm understanding you?
[6]   A: Correct.
[7]   Q: And that's his inability to —
[8]   A: Well —
[9]   Q: — ambulate?
[10]   A: Those are more signs of septic
[11] shock. Again, if you are to go outside now
[12] and run a mile, you would have signs of sepsis
[13] too.
[14]   Q: I understand.
[15]   A: So sepsis is pretty nonspecific.
[16]   Q: Septic shock is pretty specific,
[17] and the early morning of the 8th he has — the
[18] empirical data you have is he's at least —
[19] has things that are consistent with septic
[20] shock?
[21]   A: Right.
[22]   Q: Let me understand the methodology
[23] that you used to come up with your expert
[24] opinions in this case, and can you describe
[25] that for me?

---

Page 113

[1]                M. Niederman
[2] complaining about being sick two days earlier
[3] and nobody put that together and said, boy,
[4] this is a problem, let's get him out of here
[5] and get him some medical attention, so those
[6] are all the — the criticisms I have. I'm not
[7] sure I could point a finger at individuals
[8] every step of that way there.
[9]      Q: Whoever was responsible for those
[10] decisions or non-decisions —
[11]      A: Correct.
[12]      Q: — is the people that you are
[13] critical of in this drama?
[14]      A: Correct.
[15]      Q: But you don't know what role, if
[16] any, the Board of County Commissioners of Park
[17] County played in any of those decisions?
[18]      A: I have no idea what — which of
[19] those decisions they were responsible for,
[20] what environment they created that would have
[21] led to people making those decisions.
[22]      Q: And the same is true with respect
[23] to Sheriff Fred Wegener and Captain Monte
[24] Gore?
[25]      A: Correct.

Page 114

[1]                M. Niederman
[2]      Q: What do you know about
[3] Mr. Carranza-Reyes' journey from Mexico to the
[4] United States?
[5]      A: I guess I only know what I read in
[6] the deposition, that he had crossed over the
[7] border, that I think he had somehow paid
[8] someone to allow him to sneak in and was in
[9] the back of a van from Mexico into Colorado
[10] before he was pulled over by the INS, and I
[11] can't remember exactly how many days that
[12] represented, seemed like, if I recall, three
[13] or four days after he entered the country
[14] before he was pulled over.
[15]      Q: Based on your knowledge of the
[16] conditions of Mr. Carranza-Reyes' travels from
[17] Mexico to the United States, would those
[18] conditions be the type of conditions that
[19] could, in terms of crowding or stress or
[20] whatever that you had talked about before,
[21] vis-a-vis the Park County Jail, could those
[22] conditions also be either a contributor or
[23] cause to the type of infection that he
[24] ultimately got?
[25]      A: I think they could contribute in

Page 115

[1]                M. Niederman
[2] theory in the same way. You know, the only
[3] fact that's — that I'm — reason I'm not
[4] thinking about that a lot is that he spent at
[5] least two or three days in the jail afterwards
[6] not being sick.
[7]      Q: Does the infection mechanism of
[8] Group A beta-hemolytic streptococcal pneumonia
[9] have to be colonized in the throat?
[10]      A: I believe so. Again, this is not a
[11] common bacteria that leads to pneumonia. It's
[12] occurred in these epidemic settings, and, in
[13] general, almost all bacterial infections are
[14] acquired by aspiration from a colonized oral
[15] pharynx, and this is the sort of classic
[16] bacteria that resides in the throat.
[17]      Q: So one couldn't get it from an
[18] infected wound or something like that?
[19]      A: It would be real unusual to have —
[20] again, the only mechanism I could think of
[21] from an infected wound is that it would invade
[22] the bloodstream from the infected wound and in
[23] the course of spreading through the
[24] bloodstream reach the lung, and what's against
[25] that in this case is that he did have a sore

Page 116

[1]                M. Niederman
[2] throat and he also, when he presented to the
[3] hospital, had a necrotizing pneumonia with
[4] empyema, a pleural space infection, which
[5] usually is a consequence of a respiratory
[6] infection that's gone on for a while, so,
[7] presumably, this was in the lung for a while
[8] before he became sick.
[9]      Q: Which leads you to believe that it
[10] originally presented —
[11]      A: Began as pneumonia and led to
[12] sepsis, rather than the sepsis that just
[13] happened to spread to the lung.
[14]      Q: The mechanism of getting an
[15] infection through a wound, for example, it
[16] would have to have been sepsis and then
[17] pneumonia?
[18]      A: Correct.
[19]      Q: Do you have any idea who was
[20] responsible for any delay in the transport of
[21] Mr. Carranza-Reyes to Summit Medical Center?
[22]      A: Again, to me the delay was — began
[23] when Nurse Paulsen was contacted at 3:45 in
[24] the morning and her response wasn't call an
[25] ambulance and bring him to the hospital, so

MICHAEL S. NIEDERMAN, M.D.                    MOISES CARRANZA-REYES  v.
September 8, 2006                    THE PARK COUNTY BOARD OF COUNTY COMMISSIONERS

---

Page 125

*M. Niederman*

[1]
[2] in this deposition. We met earlier, but
[3] I wanted to reintroduce myself. I have
[4] the privilege of following up
[5] Mr. Ringel's questions, so I'm going to
[6] jump around a little bit. If you have
[7] any confusion about where I am or what
[8] specific part of his questioning I'm
[9] referencing, just ask me. I understand
[10] that could be a little confusing.
[11]     THE WITNESS: Sure.
[12]         EXAMINATION BY
[13]         MR. JURS:
[14]     Q: For your conclusions in this case,
[15] your opinions, you had the assumption that
[16] other inmates had symptoms of respiratory
[17] illness, including cough or sore throat; is
[18] that correct?
[19]     A: Correct.
[20]     Q: And you got that from the
[21] depositions of the brothers, Moises and
[22] Abraham Carranza-Reyes?
[23]     A: And from — I believe it was
[24] Dr. Bachman's deposition and records that he
[25] had treated some of the inmates for sore

---

Page 126

*M. Niederman*

[1]
[2] throat. I could pull that out, if you like.
[3]     Q: Yes, that would be fine.
[4]     A: I know there is the report here
[5] from the Mexican Consulate. I think that that
[6] is one of the — here it is.
[7]     Q: Could you tell me what page is on
[8] the bottom of that?
[9]     A: This is not in your records. I
[10] would have to find it, but it was from the
[11] Mexican Consulate. It was from the Park
[12] County Department Correction Center referred
[13] from the Park County Jail, and it's got the
[14] names of different inmates. Let's see. There
[15] was one here who had bronchitis, one who had
[16] acute pharyngitis and fever, another one with
[17] pharyngitis, another diagnosed no illness.
[18] This one I can't quite make out what they
[19] diagnosed. No complaints, no acute illness,
[20] fever last week, cold symptoms. There were,
[21] again, a bunch of evaluations of patients
[22] who — I believe that, as I recall,
[23] Dr. Bachman had done some of these
[24] evaluations. In fact, his name is on these
[25] requisitions.

---

Page 127

*M. Niederman*

[1]
[2]     Q: Was there any of those that
[3] indicated any other inmate at the Park County
[4] Jail, inmate or detainee had Group A Strep?
[5]     A: I don't think it's possible,
[6] because I don't think there were cultures
[7] done.
[8]     Q: Was there any inmate that was
[9] diagnosed with having pneumonia?
[10]     A: I don't know.
[11]     Q: Based on the records that you have?
[12]     A: Not in this record, no.
[13]     Q: As far as you know, based on the
[14] records that you've been provided,
[15] Carranza-Reyes is the sole inmate or detainee
[16] at the Park County Jail who had either Group A
[17] Strep or pneumonia in the time period that
[18] we're referencing?
[19]     A: From all the information that I've
[20] seen, yes.
[21]     Q: In your report, on page one,
[22] paragraph three, you indicated that it's your
[23] opinion that Mr. Reyes, if he had been put in
[24] a better maintained cell, with less crowding,
[25] he would have been less likely to have

---

Page 128

*M. Niederman*

[1]
[2] acquired this communicable respiratory
[3] illness. Today you discussed that he either
[4] acquired or the conditions contributed to the
[5] development of the disease after he had
[6] acquired it; isn't that true?
[7]     A: Well, I'm looking at the wording
[8] there. The wording as it's in here is still
[9] correct. In other words, even if it's true
[10] that he arrived at the jail colonized, there's
[11] no evidence that he arrived at the jail ill,
[12] and he acquired the illness, the symptoms
[13] after he was in the jail, so either the
[14] mechanism was that he acquired the bacteria
[15] and then became ill in the jail or arrived
[16] with the bacteria and progressed from
[17] colonization to infection while he was in the
[18] jail. In either instance, the crowding
[19] conditions, I believe, contributed.
[20]     Q: My question is regarding the
[21] crowding conditions. Do you have an opinion
[22] to a degree of medical probability what the
[23] number of inmates in that facility would
[24] prevent that from contributing to the
[25] progression or development of disease?

---

THE PARK COUNTY BOARD OF COUNTY COMMISSIONERS

MICHAEL S. NIEDERMAN, M.D.
September 8, 2006

---

**M. Niederman** Page 129

[1]
[2] A: I don't have that number. What I
[3] did read in several depositions is that the
[4] jail was designed to hold 16 people in that
[5] pod, and I'm assuming that in the design of
[6] the jail somebody considered health issues and
[7] that that was a number that was thought to be
[8] safe.
[9] Q: But you can't state that as an
[10] expert witness in this case, can you?
[11] A: No. I can state that people claim
[12] that this jail was designed to hold 16 people
[13] and it held many more.
[14] MR. TRINE: I think it was 18,
[15] for the record. Just so you're not —
[16] THE WITNESS: I thought somewhere
[17] it said 16, but okay.
[18] MR. TRINE: Just so you're not
[19] misleading anyone.
[20] Q: Have you ever consulted with a jail
[21] guard and the number of inmates in which a
[22] specific pod or cell can hold?
[23] A: No.
[24] Q: Is this something that people that
[25] you work with have done?

---

**M. Niederman** Page 130

[1]
[2] A: No.
[3] Q: So you can't tell me whether, from
[4] an infectious disease standpoint, 18 was the
[5] correct number for this pod or it possibly
[6] could have held more than that safely?
[7] A: I can't tell you that. What I
[8] could tell you is that what's described in the
[9] depositions is that there were up to 60 and
[10] that some of the inmates were sleeping on
[11] mattresses on the floor, and it sounded like
[12] there were wall to wall people and that the
[13] amount of physical space between people was
[14] close enough that that sounded like both a
[15] stress and a potential vector mechanism for
[16] communicable diseases.
[17] Q: Isn't it true that if plaintiff had
[18] been placed in that pod with just a single
[19] other person there's the potential for the
[20] transfer of communicable disease between those
[21] two individuals?
[22] A: Absolutely, but there's a greater
[23] possibility with different and less favorable
[24] conditions.
[25] Q: That's one vector that could

---

**M. Niederman** Page 131

[1]
[2] contribute to the disease. I'm going to ask
[3] you about some other ones.
[4] A: That's one possible factor that
[5] could play a role, correct.
[6] Q: Could the lack of sleep contribute
[7] to the development or progression of the
[8] disease process in plaintiff?
[9] A: Yes.
[10] Q: Could the lack of proper hydration
[11] be a factor in the development or progression
[12] of the disease?
[13] A: Yes.
[14] Q: Could the lack of proper nutrition
[15] in the week preceding be a factor in the
[16] development and progression of this disease in
[17] the plaintiff?
[18] A: If it happened, yes.
[19] Q: I think we covered this one, but
[20] could the close contact with other individuals
[21] during the time plaintiff crossed the border
[22] and then traveled to the State of Colorado be
[23] a factor in the progression or development of
[24] disease?
[25] A: Not probably in the development of

---

**M. Niederman** Page 132

[1]
[2] the disease, but in the — possibly in the
[3] acquisition of the colonization of this
[4] bacteria.
[5] Q: Do you know if Moises
[6] Carranza-Reyes had a proper amount of water
[7] for the journey across the Arizona desert,
[8] which he took to cross the United States
[9] border?
[10] A: I don't have any information about
[11] how much water he drank during his journey.
[12] Q: Same with food?
[13] A: Correct.
[14] Q: Do you know how much sleep he got
[15] during that period of time?
[16] A: I don't. As I said, I didn't
[17] really focus on those issues, because we know
[18] there was a two or three-day period at least
[19] when he arrived at the jail where he was not
[20] sick.
[21] Q: Do you know what the period from
[22] colonization to onset of symptoms is for Group
[23] A Strep like this particular bug?
[24] A: Again, it can be very rapid in 24
[25] to 48 hours and it can be more prolonged.

---

**Precise Court Reporting**

MOISES CARRANZA-REYES  v.

MICHAEL S. NIEDERMAN, M.D.          THE PARK COUNTY BOARD OF COUNTY COMMISSIONERS
September 8, 2006

---

Page 133

**M. Niederman**

[1]
[2]  Q: How prolonged?
[3]  A: Probably — again, there are people
[4]  who are colonized with this bacteria for
[5]  months and then progress to infection, so
[6]  there's a very wide range.
[7]  Q: So just as a hypothetical, I could
[8]  have this particular bacteria in the back of
[9]  my throat and I could be walking around
[10] everyday asymptomatic, however, as a result of
[11] missing a couple nights of sleep or not eating
[12] well and feeling tired, all of a sudden I
[13] should start to show symptoms?
[14] A: It's not well studied, but that's
[15] certainly a possibility.
[16] Q: You indicated that the care at the
[17] Denver Health Medical Center was appropriate
[18] due to the progressing condition of the septic
[19] shock and the pneumonia when he presented at
[20] that location?
[21] A: I think what I said was that I
[22] thought he got a good quality of care because
[23] he arrived there very sick, ended up dieing
[24] that afternoon and was successfully
[25] resuscitated and left the hospital alive.

---

Page 134

**M. Niederman**

[1]
[2]  Q: Do you have an opinion as to his
[3]  condition when he entered the Summit Medical
[4]  Center at 12:45?
[5]  A: Yes. I think the record pretty
[6]  clearly documents that he was in septic shock
[7]  at that time.
[8]  Q: Do you believe that he was in
[9]  critical condition when he entered the Summit
[10] Medical Center?
[11] A: Yes.
[12] Q: Is that based on the clinical
[13] observations of the physician on duty or is
[14] that based on the growing out of the cultures
[15] of his blood which was done later?
[16] A: That's based on the clinical
[17] observations.
[18] Q: Are you critical of Dr. Keeling for
[19] not agreeing with you that he was in critical
[20] condition at that moment?
[21] A: I'm not sure who Dr. Keeling is.
[22] Q: Dr. Keeling is the emergency room
[23] physician at the Summit Medical Center who
[24] evaluated the plaintiff.
[25] A: In which context did he say he was

---

Page 135

**M. Niederman**

[1]
[2]  not critically ill?
[3]  Q: Are you aware of his position on
[4]  plaintiff's condition?
[5]  A: No.
[6]  Q: If Dr. Keeling did not designate
[7]  plaintiff as critically ill in his deposition
[8]  at that moment, would that surprise you?
[9]  A: Yes.
[10] MR. TRINE: Objection, lack of
[11] foundation.
[12] A: Well, it would surprise me
[13] tremendously since he made a decision to
[14] transfer him to a higher level of care.
[15] Q: Do you know why he transferred
[16] plaintiff to a higher — a different facility?
[17] A: I have no idea. I assume because
[18] he felt he needed more specialized care than
[19] he could get there.
[20] Q: Do you know that Summit Medical
[21] Center doesn't have an overnight facility?
[22] A: No.
[23] Q: If that was the case, would that
[24] effect the decision making that Dr. Keeling
[25] had to make at that time?

---

Page 138

**M. Niederman**

[1]
[2]  A: Well, if, as you said, he wasn't
[3]  critically ill, then I'm not sure why he
[4]  needed an overnight facility. I'm not sure
[5]  why he needed hydration, I'm not sure why he
[6]  needed oxygen. In other words, none of their
[7]  actions fit with an assessment that he wasn't
[8]  critically ill.
[9]  Q: What's your definition of
[10] critically ill?
[11] A: Somebody who might die as a result
[12] of their acute illness.
[13] Q: If I had a patient, if I was a
[14] physician and I was treating a patient and I
[15] felt they needed a transfer and they were
[16] critically ill, by your definition, I would
[17] get them to that other facility as soon as
[18] possible because this is a life or death
[19] situation?
[20] A: Depends, again, on the
[21] circumstances. You can't just transport
[22] someone until they're stabilized, so they
[23] may — again, to me everything they did points
[24] to him being critically ill at Summit Medical
[25] Center. They give him fluids. They give him

---

MICHAEL S. NIEDERMAN, M.D.                          MOISES CARRANZA-REYES   v.
September 8, 2006                       THE PARK COUNTY BOARD OF COUNTY COMMISSIONERS

---

Page 141

[1]                      *M. Niederman*
[2] skin was warm, and I'm not sure I understand
[3] why it was warm if his temperature was 97, so
[4] no, it doesn't, and, in fact, a low
[5] temperature can sometimes occur with sepsis.
[6] There's complaints here of vomiting, body
[7] aches, diarrhea. He sounds unwell, so no, it
[8] doesn't change my opinion.
[9]     Q: Doesn't it also sound consistent
[10] with flu-like symptoms?
[11]    A: Certainly could be flu-like
[12] symptoms.
[13]    Q: That would also take into account
[14] the lack of fever as well?
[15]    A: You could have fever with flu. I
[16] don't think that that helps one way or the
[17] other.
[18]    Q: You could have no fever with flu as
[19] well; isn't that true?
[20]    A: You could have no fever with
[21] pneumonia.
[22]    Q: Is that a yes to my question?
[23]    A: You could have no fever with flu or
[24] any other illness, correct.
[25]    Q: Let me make sure I have this

Page 142

[1]                      *M. Niederman*
[2] correct regarding your — I'm done with that
[3] medical record, doctor, thank you.
[4]     The opinion in your report
[5] regarding 3:45 a.m. on March 8th, is it your
[6] opinion that at that point had he been given
[7] antibiotics he would have been spared the
[8] hospital course and amputation which resulted
[9] in this case?
[10]    A: It's my opinion that it's more
[11] likely than not he would not have had the
[12] complications he did if he had gotten — if he
[13] had gone to a hospital and gotten antibiotics
[14] in a timely way.
[15]    Q: And that also is true for an
[16] additional four hours after that time period?
[17]    A: I believe what I said is that if
[18] they had transported him to the hospital so
[19] that he could have gotten antibiotics roughly
[20] within four hours, it's more likely than not
[21] he would have not had the complications he
[22] had.
[23]    Q: You could say that to a medical
[24] probability?
[25]    A: I could say it based on the fact

Page 143

[1]                      *M. Niederman*
[2] that patients who get antibiotics within four
[3] hours more likely than not don't get the
[4] complications he got.
[5]     Q: And determining which antibiotic to
[6] provide to an individual patient is something
[7] that's — based on your experience, as you
[8] discussed earlier, you have to make some
[9] assumptions about what the person's history
[10] and illness is to determine what would be the
[11] most appropriate antibiotic; isn't that true?
[12]    A: Correct.
[13]    Q: So in some respects you're — this
[14] plaintiff would have been relying on
[15] Dr. Keeling's knowledge of antibiotics and
[16] infectious agents to determine which treatment
[17] course to provide before he got the cultures
[18] back?
[19]    A: Correct.
[20]    Q: So even if Dr. Keeling had been
[21] practicing appropriately but had confusion
[22] about which antibiotic to provide, it's
[23] possible that he could have provided an
[24] incorrect one until the cultures came back;
[25] isn't that true?

Page 144

[1]                      *M. Niederman*
[2]    A: It's possible.
[3]    Q: And, therefore, it's possible that
[4] even if plaintiff had been receiving adequate
[5] medical care from Dr. Keeling and any other
[6] medical provider up to the time the cultures
[7] come back, he would not have received the
[8] proper antibiotic up to that point?
[9]    A: It's possible, but it turns out
[10] that the bacteria he had was so sensitive to
[11] so many antibiotics, it's very unlikely.
[12]    Q: Mr. Ringel asked you whether or not
[13] you had criticism of specific jail staff
[14] members or Fred Wegener, the sheriff of Park
[15] County, or Monte Gore, the captain of the
[16] jail. My client is the medical director,
[17] Dr. James Bachman. Do you have specific
[18] criticisms of his role in this case?
[19]    A: Again, I don't know what his
[20] opportunity was by the structure of the jail
[21] and his responsibilities to know where in the
[22] points I am critical of the management of
[23] Mr. Carranza-Reyes he could have intervened,
[24] so if he had supervisory function over the
[25] nurse, if he could have developed a policy

---

THE PARK COUNTY BOARD OF COUNTY COMMISSIONERS

MICHAEL S. NIEDERMAN, M.D.
September 8, 2006

**Page 145**

M. Niederman

[1]
[2] that demanded that certain symptoms be
[3] evaluated in certain ways, if he ran then
[4] appropriate quality controls, reviewing charts
[5] intermittently or inmates had certain symptoms
[6] to see if procedures were being followed,
[7] again, I just don't know the scope of what his
[8] job is, so I can't comment specifically on him
[9] and criticism of him. I'm critical of the way
[10] things happened, but I don't know enough about
[11] the structure to know who individually is
[12] responsible for each of those errors.
[13]     **Q:** You don't intend to offer standard
[14] of care opinions regarding his role as a
[15] medical director in corrections medicine?
[16]     **A:** I don't know enough about the
[17] standards of care of his role to comment on
[18] that.
[19]     **Q:** You've never served as a medical
[20] director in a jail?
[21]     **A:** Correct.
[22]     **Q:** Have you consulted with jail
[23] medical directors before in your practice?
[24]     **A:** As I said, I think I may have in
[25] relation to tuberculosis in the past, but I

**Page 146**

M. Niederman

[1]
[2] can't remember much more specifically than
[3] that.
[4]     **Q:** Is it fair to say that that's a
[5] vague recollection in your mind?
[6]     **A:** Correct.
[7]     **Q:** And that would have been something
[8] that occurred 10 years or more ago?
[9]     **A:** Correct.
[10]     **Q:** Do you deal with patients from
[11] rural areas?
[12]     **A:** Sometimes they end up here in the
[13] big city, but not commonly.
[14]     **Q:** Where would they be coming from?
[15]     **A:** Again, they could be coming from
[16] anywhere. Again, what would bring them here
[17] is family or business in this area.
[18]     **Q:** So that's not a standard part of
[19] your practice?
[20]     **A:** We take care of people who come
[21] here, but if you're asking do people who live
[22] in rural areas occasionally come here and get
[23] medical care, yes.
[24]     **Q:** Do you have an association with any
[25] rural hospitals or physicians, say in eastern

**Page 147**

M. Niederman

[1]
[2] Long Island or in New England or upstate New
[3] York?
[4]     **A:** Yes. Personally I have some
[5] relationship with eastern Long Island doctors
[6] so that that — there are parts of that that
[7] are fairly rural and we do see patients from
[8] them from time to time.
[9]     **Q:** Do you believe that there's a
[10] difference in the level of treatment provided
[11] to patients in a rural setting as opposed to
[12] your facility, which is a level one trauma
[13] center?
[14]     **A:** In the hospital itself, yes.
[15]     **Q:** Is that something you took into
[16] account when forming your opinions in this
[17] case?
[18]     **A:** My opinions weren't about the care
[19] that was given at the hospital, so no.
[20]     **Q:** But your opinions do involve health
[21] care professionals in a rural setting, Nurse
[22] Paulsen, for example, and Dr. Bachman?
[23]     **A:** I don't think the rural setting has
[24] anything to do with my opinions.
[25]     **Q:** You indicated that after four hours

**Page 148**

M. Niederman

[1]
[2] every hour in which a patient does not receive
[3] antibiotic medication can add to the potential
[4] mortality of a disease?
[5]     **A:** Correct.
[6]     **Q:** Do you remember mentioning that
[7] earlier?
[8]     **A:** Correct.
[9]     **Q:** And you said that that's either
[10] well-known or in the literature or something
[11] of that nature. Can you cite to me where that
[12] proposition is?
[13]     **A:** Well, it's become a national
[14] standard for Medicare, so that Medicare, for
[15] example, reviews charts of their beneficiaries
[16] that have community-acquired pneumonia, and
[17] it's become a national standard that every
[18] hospital should try to give antibiotics within
[19] four hours of the patient's arrival to the
[20] hospital. Joint Commission for the
[21] Accreditation of Health Care Organizations has
[22] made it their standard. National Quality
[23] Forum is — has agreed with that and is
[24] evaluating that still. It's been in the
[25] guidelines of the Infectious Disease Society

MICHAEL S. NIEDERMAN, M.D.
September 8, 2006

MOISES CARRANZA-REYES  v.
THE PARK COUNTY BOARD OF COUNTY COMMISSIONERS

---

**Page 149**

*M. Niederman*

[1]
[2] of America, and it's been published by Peter
[3] Houck most recently in the Archives of
[4] Internal Medicine, most recently in 2004.
[5]   Q: If I ran a search on Houck, I
[6] should find a 2004 article which references
[7] that issue?
[8]   A: Correct.
[9]   Q: Do you recall the name of that
[10] article?
[11]   A: I don't remember the name, but,
[12] again, it was in the Archives of Internal
[13] Medicine in 2004.
[14]   Q: You indicated that the guards
[15] provided oxygen in an unsupervised setting.
[16] Was that something that struck you as unusual
[17] about the care provided to plaintiff in this
[18] case? Do you remember discussing that with
[19] Mr. Ringel?
[20]   A: What I believe I said is if he was
[21] sick enough to require oxygen, I was surprised
[22] that they didn't transport him to a health
[23] care facility then for a more detailed
[24] evaluation to figure out why he needed the
[25] oxygen.

**Page 150**

*M. Niederman*

[1]
[2]   Q: The fact that this jail is above
[3] 9,000 feet of elevation doesn't in fact change
[4] that evaluation at all?
[5]   A: It would, if they were giving
[6] oxygen to every inmate that arrived there, but
[7] they felt something happened on that morning
[8] that required him to get oxygen when he didn't
[9] require it the day before, so it is true that
[10] 9,000 feet you might use oxygen quicker than
[11] at sea level, yes, but I think it still
[12] doesn't answer the question what changed that
[13] he didn't need oxygen on the 7th and he needed
[14] it on the 8th.
[15]   Q: If he was experiencing the symptoms
[16] of altitude sickness, couldn't oxygen provide
[17] some relief and comfort from those symptoms?
[18]   A: If that was their diagnosis, yes,
[19] then that would have been the correct
[20] treatment. I don't think the context of him
[21] having gone to the infirmary for two days in a
[22] row with his symptoms and then presenting the
[23] way he did on the 8th probably suggested to
[24] anyone that the most likely diagnosis was
[25] altitude sickness.

**Page 151**

*M. Niederman*

[1]
[2]   MR. JURS: Josh, do we still have
[3] you on the telephone?
[4]   MR. MARKS: Yes.
[5]   Q: When you wrote your report, you
[6] placed in it your opinions regarding the
[7] issues in this case as asked to evaluate them
[8] by Mr. Trine; isn't that true?
[9]   A: Correct.
[10]   Q: Mr. Trine didn't limit what you
[11] could write in your report in any way, did he?
[12]   A: No, but I tried to focus on the
[13] questions he asked.
[14]   Q: So you could have stated in your
[15] report any opinion that you felt was relevant
[16] to the issues Mr. Trine asked you in this
[17] case?
[18]   A: Correct.
[19]   Q: So I can assume that this will
[20] remain the summation of your opinions in the
[21] case until trial?
[22]   A: Correct.
[23]   Q: Have you been asked to go to trial
[24] in this case and testify in front of a jury?
[25]   A: Not specifically. It was my

**Page 152**

*M. Niederman*

[1]
[2] understanding that if I was going to be an
[3] expert and it came to that I would go to
[4] trial.
[5]   Q: Would you travel to Denver to do
[6] so?
[7]   A: If I had to. I would prefer not
[8] to, but if I have to, I will.
[9]   Q: Is it fair to say you haven't
[10] really gone over that issue yet?
[11]   A: Correct.
[12]   Q: But it's not out of the question
[13] for you to come and testify?
[14]   A: No. If I had to, I would do it.
[15]   Q: What is your fee for doing so?
[16]   A: We haven't really negotiated that.
[17] I haven't really worked that out. I've done
[18] it once before, and then my fee was $5,000.
[19]   Q: Per day missed at Winthrop
[20] University Hospital?
[21]   A: Correct. Correct.
[22]   MR. RINGEL: Inclusive or
[23] exclusive of expenses?
[24]   THE WITNESS: Exclusive of
[25] expenses.

---