## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Case No. 2005-WM-377 (BNB)

DEPOSITION OF:  ROBERT B. GREIFINGER, M.D.
Volume I
August 25, 2006

MOISES CARRANZA-REYES,

Plaintiff,

v.

PARK COUNTY, a public entity of the State of Colorado and its governing board, THE PARK COUNTY BOARD OF COUNTY COMMISSIONERS; PARK COUNTY SHERIFF'S OFFICE, a public entity of the State of Colorado; FRED WEGENER, individually and in his official capacity as Sheriff of Park County, Colorado; MONTE GORE, individually and in his capacity as Captain of Park County Sheriff's Department; VICKIE PAULSEN, individually and in her official capacity as Registered Nurse for Park County, Colorado; JAMES BACHMAN, M.D., individually and in his official capacity as Medical Director of the Park County Jail,

Defendants.

TAKEN PURSUANT TO NOTICE on behalf of the Defendants at 1435 Arapahoe Street, Boulder, Colorado 80302 before Laura L. Corning, Federal Certified Realtime Reporter, Certified Shorthand Reporter and Notary Public within Colorado.

## Page 2

APPEARANCES

For the Plaintiff:      WILLIAM A. TRINE, ESQ.
                        CHERYL TRINE, ESQ.
                        Trine & Metcalf, P.C.
                        1435 Arapahoe
                        Boulder, Colorado 80302
                        JOSEPH J. ARCHULETA, ESQ.
                        Law Office of Joseph J. Archuleta
                        1724 Ogden Street
                        Denver, Colorado 80218

For the Defendants      ANDREW D. RINGEL, ESQ.
Park County, Park       Hall & Evans, LLC
County Board of         1125 17th Street
Commissioners, Park     Suite 600
County Sheriff's Office, Denver, Colorado 80202
Wegener and Gore:

For the Defendant       MELANIE B. LEWIS, ESQ.
Paulsen:                Berg Hill Greenleaf & Ruscitti LLP
                        1712 Pearl Street
                        Boulder, Colorado 80302

For the Defendant       CRAIG A. SARGENT, ESQ.
Bachman:                Johnson McConaty & Sargent, P.C.
                        400 South Colorado Boulevard
                        Suite 900
                        Glendale, Colorado 80246

Also Present:           None

## Page 3

INDEX
EXAMINATION OF ROBERT B. GREIFINGER, M.D.                PAGE
August 25, 2006

By Mr. Trine:                                             --
By Mr. Archuleta:                                         --
By Ms. Trine:                                             --
By Mr. Ringel:                                             5
By Ms. Lewis:                                             --
By Mr. Sargent:                                          107

                                                      INITIAL
DEPOSITION EXHIBITS:                                 REFERENCE
71  Curriculum Vitae of Robert B. Greifinger, M.D.       8
72  Publications                                        33
73  Expert Testimony at Trial or by Deposition          40
    within the Past Four Years
74  Letter/Report to Trine from Greifinger,             55
    7/29/05
75  Letter/Report to Trine from Greifinger,             56
    4/27/06
76  Letter/Report to Trine from Greifinger,             57
    6/2/06
77  File                                                58
78  Various documents not attached to file              59
(Original exhibits attached to original deposition; copy exhibits included in continuing exhibit file; copies provided to counsel as requested.)

## Page 4

INDEX
(Continued)

EXHIBITS PREVIOUSLY MARKED:     EXHIBIT    PAGE
                                  24        59
                                  60        60

Coffman Reporting
303.893.0202
303.893.2230 FAX
WWW.COFFMANREPORTING.COM

EXHIBIT 4

* SUBJECT TO CONFIDENTIALITY DESIGNATIONS *

33

1  been marked for purposes of this deposition as
2  Exhibit 72, can you identify that document for me?
3      A.   Yes. This is a three-page list of my
4  publications dated January, 2006.
5      Q.   How much -- how many additions to this have
6  occurred since January of 2006?
7      A.   None.
8      Q.   So is this current, as far as you're
9  concerned?
10     A.   It's current for actual publications, yes.
11     Q.   Okay. I assume that there are some that
12 are in the pipeline, so to speak, that wouldn't be
13 appropriate to put on this list?
14     A.   Yes, sir.
15          MR. SARGENT: That are somewhere in the
16 United airplane system.
17          THE DEPONENT: That's correct.
18     Q.   (BY MR. RINGEL)  How many of those are
19 there that are in the pipeline, so to speak?
20     A.   There are three scholarly articles and one
21 book.
22     Q.   Okay. Fair enough. And I understand the
23 issue of -- I'm not going to ask you specifically about
24 those, because I understand the issue of things being in
25 the pipeline and your potential restrictions on talking

34

1  about them, other than in perhaps general terms before
2  they are published. Is that a restriction that you
3  understand exists on you, or --
4      A.   I can mention what they're about.
5      Q.   Yeah. That's what I mean. I don't want to
6  know what journal or anything like that. Generally
7  speaking, what I want to understand is do you have any
8  background in terms of publications on the infection
9  streptococcus A?
10     A.   I'm not sure what you mean by do I have any
11 background.
12     Q.   Have you written anything on the infectious
13 disease streptocuccus A? I didn't see anything on this
14 list of publications. Is any of the forthcoming
15 publications on that topic?
16     A.   No. Except that it may be discussed in a
17 chapter in my textbook that won't be published until
18 October of 2007.
19     Q.   And is that --
20     A.   That's not a chapter authored by me. I'm
21 the editor of the book.
22     Q.   Okay. I understand. I understand. Are
23 you an author of any of the chapters in the books -- or
24 in that book?
25     A.   I don't know yet.

35

1      Q.   Okay. Depends on whether you can get
2  someone else to do it or not?
3      A.   Yes.
4      Q.   I understand. Okay. Now, the general
5  topic of that forthcoming book is what?
6      A.   Public health in criminal justice.
7      Q.   So it's kind of a follow-up to the Clinical
8  Practice in Correctional Medicine book that you were an
9  associate editor of that was published this year?
10     A.   No. It's different. This -- this is
11 about -- a lot of about prevention and reentry.
12     Q.   You mean reentry into society?
13     A.   Yes.
14     Q.   And what the potential impact of reentry of
15 people in a correctional setting who have diseases to
16 come back into society -- what that might mean to
17 society, generally speaking?
18     A.   Well, it -- it -- it's about the impact of
19 the health status of returning inmates on the community
20 and what can be done to not only ease those inmate's
21 reentry for -- inevitably almost all return to the
22 community, but to lessen the impact healthwise on the
23 community.
24     Q.   Have you, as a doctor, ever treated someone
25 with streptococcus A?

36

1      A.   Certainly.
2      Q.   When's the last time that you provided
3  primary medical care to anyone?
4      A.   1985.
5      Q.   Okay. And when you -- so your treatment of
6  streptococcus A would have been 1985 or before?
7      A.   Yes.
8      Q.   In what context did you treat streptococcus
9  A?
10     A.   I was a pediatrician.
11     Q.   So you treated children with streptococcus
12 A?
13     A.   Yes.
14     Q.   Is streptococcus A the common version of
15 what I might think of in lay terms as strep throat?
16     A.   Yes.
17     Q.   So this was something that you saw in your
18 pediatric practice on probably a daily basis?
19     A.   Yes.
20     Q.   Okay. Would you consider yourself an
21 expert in streptococcus A and it's infection mechanisms?
22     A.   No.
23     Q.   And am I -- is it fair to say that you're
24 not offering an opinion in this case about the infection
25 mechanisms of streptococcus A?

73

1  A.  The 2003 standards, it may be more specific
2  or explicit.
3  Q.  Okay. Is the National Commission on
4  Correctional Health Care an accrediting agency?
5  A.  Among other things, that's what they do.
6  Accreditation is voluntary and they only have accredited
7  a small proportion of the correctional facilities in the
8  United States. Nevertheless, their standards are widely
9  known and widely accepted as standards of care.
10 Q.  Okay. Other than the jailhouse standards
11 of the National Commission on Correctional Health Care,
12 are there any other written standards that you utilized
13 in what you conclude is the applicable standard of care
14 in this case?
15 A.  I believe I looked at the Colorado, either
16 statute or regulations which are included in Exhibit 77.
17 Q.  And that would be the State of Colorado
18 Sanitary Standards for Penal Institutions?
19 A.  Yes.
20 Q.  Any other written standard that you looked
21 at?
22 A.  Not in the context of this case.
23 Q.  There is a mention -- and I can find it if
24 you need me to -- somewhere in one of your reports about
25 American Correctional Association standards. Did you

74

1  specifically look at CCA standards for this case?
2  A.  No. I didn't look, but I'm aware of the
3  CCA standards for the ratio of inmates to toilets and
4  showers.
5  Q.  And I assume that the National Commission
6  on Correctional Health Care has similar standards; is
7  that correct?
8  A.  No. The national commission doesn't
9  address that.
10 Q.  Okay. It is more focused on medical
11 standards as opposed to what might be considered public
12 health standards?
13 A.  Yes.
14 Q.  All right. Have we exhausted all of the
15 written standards that helped you form the basis of your
16 determination of what the applicable standard of care is
17 in this case?
18 A.  Yes.
19 Q.  Can you just sort of generally describe for
20 me how your own experience and background and expertise
21 goes into the creation of your standard of care that
22 you're applying in this case, in addition to the written
23 standards of care that we've talked about?
24 A.  Well, I have almost 20 years of experience
25 in correctional health care: In prisons, jails, police

75

1  lockups and juvenile detention facilities. I've had
2  operational responsibilities, consultation
3  responsibilities, oversight responsibilities, and I've
4  been an expert witness in litigation, and I visited,
5  perhaps, more than 100 correctional facilities across the
6  United States, and I'm familiar with the state of
7  professional development and the expertise in risk
8  management that's developed in correctional health care
9  since Estelle v. Gamble in 1976.
10     So from my work and my observations, I've
11 come up with a method to form opinions about what I
12 believe is the standard of care.
13 Q.  How does the standard of care that you
14 applied in this case differ from the written standard of
15 care contained in the national commission's jailhouse
16 standards or the State of Colorado Sanitary Standards for
17 Penal Institutions?
18 A.  Well, I'm not sure. I can certainly say
19 it's not a higher standard or lower standard. I just may
20 have mentioned things in my report that are not
21 considered in the national commission standards, for
22 example, the ratio of toilets, showers and lavatories in
23 the Park County Jail on D pod.
24 Q.  Would it be possible, in your opinion, for
25 another expert to replicate what you've done in this

76

1  case, given that you have your own individual standard of
2  care that you're applying?
3      MR. TRINE: I'll object to the form. Go
4  ahead and answer. I'm just doing that for the record.
5  A.  I really don't know. There are certainly
6  other experts in correctional health care, and they would
7  form their own opinions.
8  Q.  (BY MR. RINGEL) But to the extent that
9  you're relying on a standard of care that's based on your
10 own personal experience and background, wouldn't you
11 agree that it would be difficult for another expert to
12 know exactly what that standard of care is?
13 A.  No. In -- in my opinion, another expert in
14 correctional health care would come to the same or
15 similar conclusions as I did in this case.
16 Q.  Okay. Based on -- but how would that other
17 expert know what standard of care you're applying?
18 A.  Because there is an understanding about
19 access to care, the timeliness of the access to care and
20 the quality of care in correctional facilities that's
21 universal within the United States.
22 Q.  Okay. Is it your opinion that the standard
23 of care that is applicable to the correctional facilities
24 is applicable to every correctional facility in the
25 United States?

85

1   Q.   Okay. Take a look at Exhibit Number --
2   paragraph number 19. What is the basis of the assertion
3   in your report that the Mr. Carranza-Reyes was in a cell
4   with approximately 60 other inmates?
5   A.   I would have to look through the exhibits
6   to find it. Would you like me to do that?
7   Q.   No. Do you have any knowledge of the
8   length of time, in days, hours or minutes, that Mr.
9   Carranza-Reyes was so incarcerated?
10  A.   Well, he was incarcerated, as I understand
11  it, from March 1 through March 8. There were not
12  60 inmates every day during that period. There were up
13  to 61 at the peak, and I'm aware that it varied day by
14  day.
15  Q.   Okay. Take a look at Fact Number 20 or
16  paragraph number 20. The intake form that Mr.
17  Carranza-Reyes was asked to fill out. Do you know what
18  language that was in?
19  A.   It was in Spanish.
20  Q.   Okay. And --
21  A.   But I don't know if he was literate.
22  Q.   Excuse me?
23  A.   But I don't know if he was literate.
24  Q.   Do you have any idea of what it might mean
25  for an INS detainee who reports health problems at intake

86

1   like a facility at the Park County Jail?
2   A.   I'm sorry. Could you reread the question
3   to me?
4        (The last question was read back.)
5   A.   I'm sorry. I don't understand your
6   question.
7   Q.   Okay. Are you aware of any status change
8   that might occur with respect to an INS detainee who
9   reports health problems at intake at a facility such as
10  the Park County Jail in comparison to an inmate who
11  reports no such health problems?
12  A.   No.
13  Q.   Okay. The last sentence of paragraph 22,
14  what experience do you have treating or observing the
15  symptoms of altitude sickness?
16  A.   I'm currently taking Diamox while I'm in
17  Boulder --
18  Q.   Okay.
19  A.   -- to prevent myself having the symptoms of
20  altitude sickness.
21  Q.   Okay. What is your understanding of the
22  symptoms of altitude sickness?
23  A.   Well, the symptoms can -- can really range,
24  often with shortness of breath, pounding of the heart,
25  accelerated rate of the heart, headache and can of course

87

1   get much more severe.
2   Q.   Okay. Have you ever treated an individual
3   with altitude sickness during your professional career as
4   a physician?
5   A.   No.
6   Q.   Have you ever done a differential diagnosis
7   that eliminated altitude sickness as a potential cause of
8   a patient's problems during your career as a physician?
9   A.   I've always practiced at sea level.
10  Q.   So altitude sickness is not something that
11  you have been exposed to as a physician; is that correct?
12  A.   Well, I'm well aware of it. It's part of
13  my medical training and often comes up in the literature,
14  so I'm certainly aware of it. I haven't experienced a
15  lot of diseases, but I need to be aware of them as a
16  knowledgeable physician.
17  Q.   Okay. If you'd take a look at page 4 of --
18  of this document in paragraph 28. This -- there is a
19  reference in here to the American --
20  A.   I'm sorry. Which --
21  Q.   Your July 29 report, paragraph 28.
22  A.   28. Okay.
23  Q.   Okay. There is a reference here to the
24  American Correctional Association standards. Other than
25  the reference in this report to the number of toilets

88

1   that is required by the American Correctional Association
2   standards, is your expert opinion -- are your expert
3   opinions in this case based on any other standards of the
4   American Correctional Association?
5   A.   Well, the ACA has standards on laundry and
6   linens, so I would be referring to those as well. And on
7   hygiene, overflowing toilets without provision to clean
8   them would not meet standards of the American
9   Correctional Association.
10  Q.   If there was an overflowing toilet in the
11  Park County Jail and something was done to -- to attempt
12  to correct the problem, is that a violation of the
13  standard of care?
14  A.   It's only a violation if something
15  wasn't -- depends when that something was done.
16  Q.   Okay.
17  A.   Okay? For how long the problem persisted
18  and what the -- what other alternative arrangements were
19  made for people to have a hygienic place to use a toilet.
20  Q.   Okay. But if -- if there was -- the fact
21  of problems of a toilet in and of themselves isn't a
22  violation of the standard of care, or is it?
23  A.   Toilets overflow in jails all the time, and
24  that's not a violation of the standard of care. But
25  conditions with overflowing toilets over a long period of

**Page 89**

1 time, where the toilets have not been repaired and there
2 is no mop and no disinfectant and no soap and no waste
3 containers, certainly can fall far below the standard of
4 correctional care.
5    Q.   And do you believe all of those other
6 things that you just described were not present in the
7 Park County Jail in March of 2003?
8    A.   I'm sorry. I'm having trouble with the
9 negative in your question.
10         I believe, on the basis of the materials
11 that I reviewed, that the sanitary conditions were
12 egregious and unconscionable on D pod during the period
13 of March 1 through March 8, 2003.
14    Q.   You listed a bunch of different things.
15 You are -- you indicated that -- in your earlier answer
16 that the -- the fact of a backup -- a toilet backing up
17 might not be a problem, but the absence of things such as
18 a mop and cleaning supplies and soap and, I think,
19 others, in your answer --
20    A.   Timely repair.
21    Q.   -- and timely repair is. I guess what I'm
22 asking you is, do you believe that there was an absence
23 of a mop and cleaning supplies to address any problem
24 associated with backed-up toilets at the Park County Jail
25 during the time that Mr. Carranza-Reyes was there?

**Page 90**

1    A.   Yes.
2    Q.   Okay. And you believe that there was a
3 problem with untimely correction of the problem with
4 respect to backed-up toilets; is that right?
5    A.   Yes.
6    Q.   The problem wasn't addressed in a timely
7 fashion, fair?
8    A.   Yes.
9    Q.   And you believe there was a lack of soap;
10 is that true?
11    A.   Yes. Cleaning materials.
12    Q.   Okay.
13    A.   And I also believe that the crowding was a
14 significant factor in the creation of an unsanitary and
15 stressful situation to the immune systems of the inmates
16 confined on D pod, including Mr. Carranza-Reyes.
17    Q.   Okay. Take a look at number 29. Is Mr.
18 Carranza-Reyes making a right-to-privacy-related claim in
19 this lawsuit?
20    A.   I don't recall. I don't believe so.
21    Q.   Why is this in your report?
22    A.   It's because I'm trying to describe a
23 system of care and a system of inattention to the human
24 rights and civil rights of people. I'm trying to
25 demonstrate that it's a systematic failure to address the

**Page 91**

1 basic human needs of detained people.
2    Q.   Okay. Paragraph 30 addresses Nurse Vicki
3 Paulsen; is that correct?
4    A.   Yes.
5    Q.   Is your opinion in this case related at all
6 to whether or not Ms. Paulsen committed nursing
7 malpractice?
8    A.   I believe she did.
9    Q.   Okay. And you believe you have the
10 expertise to opine about the standard of care applicable
11 to registered nurses in the state of Colorado?
12    A.   I have testified in other states as to the
13 standard of care of nurses. I don't know how a court
14 would respond to a motion to keep me from testifying in
15 that area. I've survived Daubert and Frye motions in
16 several courts.
17    Q.   Have you ever been stricken or limited in
18 your testimony as an expert by any court?
19    A.   I have been limited mildly on causation in
20 two courts, but not as to standards of care for
21 correctional facilities.
22    Q.   Okay.
23    A.   One case, just for example, was a patient
24 with HIV who developed cryptococcal meningitis, and the
25 court did not want me to comment on the pathophysiology

**Page 92**

1 of the cryptococcal meningitis relative to HIV, but I
2 certainly was able to testify about the delivery of
3 timely inadequate care to that patient.
4    Q.   What court was that, Doctor?
5    A.   Northern District of Georgia.
6    Q.   And what's the other time that you were
7 limited in your testimony?
8    A.   I don't -- I certainly don't recall. But
9 there have been multiple times when I was -- when motions
10 were wholly denied. You can look at Woodward v. Myers,
11 M-y-e-r-s, in an appellate decision for the --wherever
12 the Northern District of Illinois was, and in New Jersey.
13    Q.   Okay. Have you testified at a Daubert or
14 Frye hearing in front of the court in any of these
15 instances, either where your testimony was limited or
16 otherwise challenged under those two --
17    A.   No.
18    Q.   -- cases?
19    A.   Another decision you may want to look at is
20 Collins v. Fowler. It's Western District of
21 Pennsylvania.
22    Q.   And what happened in that decision?
23    A.   I got to -- the -- the court supported my
24 ability to testify on all matters involved in that case.
25    Q.   Does the scope of your expert opinion in

93

1 this case include the issue of causation?
2   A.   Yes.
3   Q.   So describe your expert opinion about
4 causation in this case.
5   A.   I believe that the crowded and the
6 unsanitary conditions on D pod in the Park County Jail
7 during the period of March 1 through March 8 of 2003
8 caused Mr. Carranza-Reyes to get sick with streptococcal
9 disease, and that the lack of timely and appropriate
10 medical care for him led to his death -- or near-death
11 and to his amputation and to all the other complications
12 he suffered from his illness. It led to his
13 hospitalization at Summit Medical Center, to his
14 hospitalization at Denver Health and to get his current
15 compromised medical condition.
16   Q.   What basis do you have to know what Mr.
17 Carranza-Reyes's current medical condition is today?
18   A.   Well, I know from the records of Denver
19 Health that he lost a good part of his lung and he lost a
20 leg. And I've -- through conversations with Mr. Trine,
21 I'm aware of some other medical problems that he has.
22   Q.   What are those medical problems of which
23 you're aware today?
24   A.   Well, I'm aware of his -- his pain, his --
25 I'm aware of his -- of pain that he testifies to in his

94

1 deposition. I'm aware of pain with urination he has.
2 I'm aware of difficulties he has with fitting his
3 prosthesis and his lack of ability to get physical
4 therapy and diagnosis and treatment for other maladies
5 that he suffers.
6   Q.   Okay.
7   A.   All of which were, as I understand it, a
8 consequence of the illness in question.
9   Q.   It seems to me that there are two aspects
10 of your opinions in this case: One, the issue of
11 causation, vis-a-vis whether or not Mr. Carranza-Reyes
12 caught the illness of streptococcus A and related
13 complications in the Park County Jail; and the second
14 part of your causation opinion being the -- the extent of
15 Mr. Carranza-Reyes's illness because of what you're
16 concluding to be not timely medical intervention. Is
17 that a fair split of --
18   A.   Not exactly. I think your first is a
19 little too simplistic. The -- many people carry
20 streptococcus A, as they do carry other bacteria, and I'm
21 saying that either he caught it there or he had it in his
22 body, which many of us do, and the stressful conditions
23 of crowding and unhygienic clothing, unhygienic
24 toiletting, unhygienic conditions generally, stressed his
25 body so much that it caused his body to relax its immune

95

1 system and allow the streptococcal bacteria to cause
2 illness. So that would be for number one.
3       For number two I would say that that
4 illness could have been diagnosed and treated easily if
5 he had been seen by an appropriate medical professional
6 in a timely way. He was prevented from doing that for a
7 variety of reasons. Barriers that were created by the
8 County, by the medical director and by the Nurse Paulsen
9 prevented him from timely treatment, and as a consequence
10 of not getting timely treatment, he was close to death
11 and he suffered all that he did during the next four
12 months and later.
13   Q.   All right. I think I understand your
14 causation opinion. Show me in any of your reports where
15 that first part of the causation opinion is articulated.
16   A.   Paragraph 28, first sentence, second
17 sentence, third sentence, fourth sentence, fifth
18 sentence, and then I have conclusions based on that.
19   Q.   Okay. And is that -- is that articulation
20 of the first part of your causation opinion articulated
21 anywhere else in any of your three reports that you can
22 point out to me?
23   A.   I want to say that it's part of my
24 causation opinion. It's also part of my deliberate-
25 indifference opinion.

96

1   Q.   I understand that, Doctor.
2   A.   I guess the first sentence of paragraph 36
3 regarding the policies and practices that were encouraged
4 or tolerated, and then in my report dated April 17 --
5   Q.   You mean April 27?
6   A.   -- 27th -- I'm sorry -- paragraph 15,
7 paragraph 16, mention of the infection control program
8 specifically and mention of the crowding in the jail,
9 people sleeping on the floor, paragraph 17 with there
10 being inadequate place to isolate patients, and my report
11 dated June 2, paragraph 6, that Dr. Bachman declined to
12 participate in environmental inspections and infection
13 control committee. Although those were requirements,
14 Dr. Paulsen's [sic] ignorance about the crowding can have
15 adverse health consequences. And that's all for Part 1.
16       I would like to add, with reference to our
17 earlier discussion about mention of National Commission
18 on Correctional Health Care standards, that I do mention
19 them in paragraph 1 of my report dated June 2, 2006.
20   Q.   And I believe we already talked about that,
21 because we talked about the footnote --
22   A.   Okay.
23   Q.   -- and the differences and your reference
24 to both of 2003 and 1996 standards.
25   A.   Okay.

**Page 258**

R. Greifinger/Marks

1  fact that these outlines are an accurate summary of
2  her testimony?
3  A. Yes.
4  Q. In looking at the records, it sounds
5  as though you were given the actual testimony of
6  Dr. Bachman.
7  A. Yes, I was.
8  Q. Do you know why you were sent that as
9  opposed to just his outline?
10 A. I have no idea.
11 Q. So in terms of your recollection,
12 what you reviewed to form the factual basis of what
13 Nurse Paulsen did or didn't do in terms of her
14 treatment, would you have looked at what's called
15 the nursing notes that we talked about for March 6,
16 7, and 8 and her outline of her deposition?
17 A. Yes.
18 Q. Do you remember anything else you
19 looked at to help form the basis of at least your
20 factual conclusions of what she did or didn't do?
21 A. I read the entire record that was
22 presented to me which may have included other
23 descriptions of what she did by others in the jail.
24 I don't recall specifically.

**Page 259**

R. Greifinger/Marks

1  Q. I want to try and take it visit by
2  visit. I believe that in paragraph 22 of your
3  July 29th report you discuss Nurse Paulsen's
4  examination of Mr. Carranza-Reyes on March 6th,
5  2003. Is that correct?
6  A. Yes.
7  Q. And as I understand it, one of the
8  things that you're critical of Nurse Paulsen here is
9  that she chose not to examine her patient. Is that
10 correct?
11 A. Yes.
12 Q. Okay. And looking at her nurse's
13 note of that date and that's Greifinger 225, would
14 you agree with me that she did a number of things in
15 terms of examination such as taking Mr.
16 Carranza-Reyes' temperature, taking his pulse,
17 measuring his respirations, touching him, putting
18 her hands on him?
19 A. Yes.
20 Q. Why did you choose to say that she
21 chose not to examine her patient?
22 A. I misstated that. I should have said
23 she chose not to do a complete examination of her
24 patient.

**Page 260**

R. Greifinger/Marks

1  Q. Okay. So that's wrong. We should
2  disregard that part of the opinion. What else do
3  you believe she should have done at that point when
4  you say she didn't do a complete examination?
5  A. Well, she didn't examine his throat.
6  She didn't examine his neck for enlarged lymph
7  nodes. And she didn't do a throat culture or a
8  rapid strep test.
9  Q. Okay. Do you recall going back and
10 reviewing Nurse Paulsen's outline in which she
11 claimed that she actually did look at his throat?
12 A. I don't recall.
13 Q. Do you have her deposition outline as
14 part of your materials?
15 A. I should have it.
16 Q. Why don't you look at that. There's
17 a page Greifinger 496.
18     MR. SARGENT: What deposition page is
19 that, Josh?
20     MR. MARKS: I think it's part of his
21 thick material. Exhibit 73 was his file.
22 A. I see her testimony in the middle of
23 page 15 of that outline, which is Greifinger 496.
24 Q. Right. And about two-thirds of the

**Page 261**

R. Greifinger/Marks

1  way up, doesn't the outline indicate that she did
2  not swab his throat but she knows she looked at it?
3  A. Well, she contradicts herself. In
4  the prior sentence she said she knows she looked at
5  it because, quote, "We always look at somebody's
6  throat when they say they have a sore throat."
7  So if that's the way she knows, she
8  never said that she has a direct recollection so
9  it's just a contradiction in those two sentences.
10 Q. Did you look in the next sentence
11 below that where it says she did record the findings
12 as a result of looking at his throat but she saw a
13 slightly red throat?
14 A. Right. But I would have been more
15 comfortable if she said, "I have a very specific
16 recollection of this." She doesn't say that. She
17 says the only way she knows is because that's her
18 standard practice.
19 Q. And then below it indicates, it's
20 suggestive of the fact that she has a specific
21 recollection?
22 A. Well, it's contradictory. One is yes
23 and one is no.
24 Q. And then about two-thirds of the way

**Page 262**

R. Greifinger/Marks

1  down on that same outline, same page, doesn't it
2  indicate that Ms. Paulsen had an actual memory of
3  palpating for lymph nodes?
4      A.   Yes.
5      Q.   Okay. So that information was in the
6  material provided to you. Correct?
7      A.   That's what she testified. I don't
8  know how she could maintain that recollection so
9  many years later.
10     Q.   So --
11     A.   So I'm saying to me it's not credible
12 in my opinion.
13     Q.   So did you disregard that testimony
14 in forming your opinion?
15     A.   Yes. No. I regarded it. I paid
16 attention to it. But I still have the opinion that
17 she did an incomplete exam.
18     Q.   Did you choose to disbelieve that
19 testimony that she had palpated his lymph nodes?
20     A.   Yes.
21     Q.   Did you also chose to disbelieve her
22 testimony about examining Mr. Carranza-Reyes's
23 throat?
24     A.   Yes.

**Page 263**

R. Greifinger/Marks

Q.   So if you had chosen to believe her
testimony on these two points, would your lone
criticism of Ms. Paulsen's inadequacy of her
examination on March 6 be the fact that she did swab
Mr. Carranza-Reyes's throat?
     A.   That is a criticism. I think absent
a protocol, she should have called Dr. Bachman. It
doesn't say on this note but there is information in
the record that she made a diagnosis of altitude
sickness.
     Q.   I was going to ask you about that.
Where did you come up with that factual conclusion
that she had diagnosed him with altitude sickness?
     A.   That's a good question. I don't
recall where it was. I got it somewhere in the
record.
     Q.   Do you still have that outline of
Ms. Paulsen's testimony?
     A.   Yes.
     Q.   Can you look at the next page, it's
Greifinger 497, and do you see in the third to the
top paragraph of that outline it states, "She did
not have a nursing diagnosis"?
     A.   Yes.

**Page 264**

R. Greifinger/Marks

     Q.   And would you agree with me that
that's under the heading about March 6th, 2003?
     A.   Yes.
     Q.   Okay. So it doesn't appear to come
from her testimony, right, your conclusion that she
had diagnosed him with altitude sickness?
     A.   I don't recall where I saw that. I
saw it somewhere in the materials that I was
presented. There's certainly nothing about it on
page 497.
     Q.   Doctor, as you go through your
deposition testimony today, if you do think of where
some of this information may have come from, will
you please let us know?
     A.   Yes.
     Q.   On March 6 would you agree with me
that Nurse Paulsen after seeing him did attempt to
address some of the symptoms that Mr. Carranza-Reyes
was experiencing in terms of giving him Motrin,
chlortrimitrin and Pepto Bismol?
     A.   Yes.
     Q.   Okay. She did do those things. But
you thought more should have been done such as a
throat culture. Is that right?

**Page 265**

R. Greifinger/Marks

     A.   Yes.
     Q.   Based on that opinion, I take it you
believe that his symptoms warranted some kind of
throat culture at this point?
     A.   Yes.
     Q.   What symptoms were those?
     A.   Fever, sore throat in particular but
also the syndrome that included the body aches, the
headache, and the nausea.
     Q.   Do you think that Mr. Carranza-Reyes
was potentially diagnosable with strep at this
point?
     A.   Yes.
     Q.   On March 6th?
     A.   Yes.
     Q.   And I assume that would be true for
March 7th as well?
     A.   Yes.
     Q.   And I'm assuming March 8th as well.
Right?
     A.   Yes.
     Q.   Do you have some familiarity with
group A strep?
     A.   Yes.