Slip Copy

Page 81

Slip Copy, 2006 WL 3533049 (D.Colo.)
**(Cite as: Slip Copy)**

admitted because it rebuts anticipated testimony from Plaintiffs' expert Wayne Hunsperger on this point. It is not clear to me from a review of the portions of Mr. Hunsperger's expert report cited by Defendants that he intends to testify regarding the pace of development, job growth and the like in the Class Area. *See* Defs.' Resp. to Pls.' Mot. to Exclude Test. of Certain Defense Witnesses (Doc. 1398) [hereinafter "Defs.' Resp. to Pls.' *Daubert* Mot."] at 37 (citing Hunsperger Report at 63, 252). If Mr. Hunsperger does so testify, then I will consider whether Mr. Conway may testify in rebuttal on this point. Mr. Conway may not, however, testify regarding his valuation conclusions, because I find them unreliable for the reasons stated above.

Plaintiffs' motion to exclude the proffered testimony of defense expert Daniel Conway is, therefore, granted except as it may be relevant and appropriate in rebuttal.

### 2. John Dorchester

**\*79** John Dorchester holds a Masters Degree in Land Economics, the MAI (Member Appraisal Institute) designation from the Appraisal Institute and the CRE (Counselor of Real Estate) designation from the Counselors of Real Estate. He has forty-five years of experience in real estate valuation, is a past president of the American Institute of Real Estate Appraisers (now known as the Appraisal Institute) and has served on the International Valuation Standards Committee for many years. *See* App. to Pls.' *Daubert* Mot. (Doc. 1352), Tab 6 [hereinafter "Dorchester Report"] at 1-5 to 1-6.

In 1996, Mr. Dorchester and his company authored a 142-page expert report (not including appendices) directed at the question of "whether there was a basis for plaintiffs' claims that real property in the property class area had been economically harmed by operations and management of the Rocky Flats Plant." *Id.* at 1-5. Mr. Dorchester authored a 9-page supplement to this report in 2004. App. to Pls.' *Daubert* Mot. (Doc. 1352), Tab 7 [hereinafter "Dorchester Suppl. Report"]. In both, Mr. Dorchester concluded Defendants' operation of Rocky Flats did not cause a decrease in property values or other economic harm in the Class Area. Dorchester Report at 7-15; Dorchester Suppl. Report at 9. According to his expert reports, Mr. Dorchester also intends to testify and render opinions on a number of other diverse topics, including the history of operations at Rocky Flats, the risks posed by the plant, the nature of the Class property claims and whether the named Plaintiffs suffered economic harm with respect to their individual properties. *See, e.g.,* Dorchester Report at 7-1 to 7-16.

Plaintiffs have moved to exclude all of Mr. Dorchester's intended testimony on the ground that he failed to demonstrate that the methodologies he used in reaching his valuation opinion are reliable and that other aspects of his intended testimony are either irrelevant or beyond his expertise as an appraiser.[FN92]

> FN92. Although the discussion that follows focuses on Mr. Dorchester's 1996 expert report, it applies equally to the opinions set forth in Mr. Dorchester's 2004 supplemental report.

Mr. Dorchester's 1996 report is difficult to review and analyze under the Rule 702 criteria because it rambles and perseverates through numerous topics, some of which have only marginal relevance to the issues addressed in the report. The relationship of much of Mr. Dorchester's prolix discussion to his conclusions regarding Rocky Flats' effect on property values is also difficult to discern in many instances.

As best I can determine, Mr. Dorchester set out the methodologies he used to determine whether operations at Rocky Flats have caused any economic harm to the Class in Chapter 3 of his report. *Id.* at 3-14 to 3-16. Although he listed six different study methods there,[FN93] they break down into three separate analyses: (1) analysis of the pace and pattern of development around Rocky Flats; (2) analysis of news reports and anecdotal data; and (3) analysis of real estate prices and price

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Page 82

Slip Copy, 2006 WL 3533049 (D.Colo.)
**(Cite as: Slip Copy)**

trends in the vicinity of Rocky Flats. *See id.* at 5-1 to 5-52.[FN94] Mr. Dorchester provided additional information about these analyses and his conclusions based on them in Chapters 4, 5 and 7 and Appendix L. I examine the reliability of Mr. Dorchester's proffered testimony regarding each of these analyses in turn.

> FN93. The admissibility of Mr. Dorchester's seventh listed study, an analysis of the named Plaintiffs' claims, and the conclusions he drew from it is addressed separately below.
>
> FN94. An additional study methodology reportedly undertaken by Mr. Dorchester, titled "analysis of expert opinion," consisted of his interviews with unnamed "Denver area real estate experts," government officials and agency staff personnel and "others who could furnish information about Rocky Flats." Dorchester Report at 3-16. In Chapter 5, however, where Mr. Dorchester reported on how he conducted his overall study and the results it produced, he did not discuss this method, how it was implemented or any conclusions he drew from it. The only further mention of this "expert opinion analysis" methodology in the 1996 report that I could locate is a single summary paragraph in the report's conclusion to the effect that these interviews confirmed Mr. Dorchester's conclusions. *Id.* at 7-5.

*80 Mr. Dorchester's development-related analysis consisted of a lengthy examination of the history of development in the Denver metropolitan area and in the vicinity of Rocky Flats, as well as a discussion of some of the factors that might explain this history. *Id.* at 3-14; *see id.* at 4-1 to 4-23, 5-1 to 5-36. Based on this analysis, Mr. Dorchester concluded the pattern of development in the vicinity of Rocky Flats "appears to be reasonable and understandable" and "do[es] not evidence a reluctance of the market to develop towards or in proximity to Rocky Flats." *Id.* at 7-3. Based on his analysis of demographic and economic data, Mr. Dorchester further concluded that "the rate and nature of growth in the property class area are not consistent with indicators of economic harm" identified in his report. *Id.* at 7-4.

The difficulty with this development-based analysis, as with Mr. Conway's proffered testimony, is that neither Mr. Dorchester nor Defendants link this analysis to land values or the key damages issue to be decided by the jury: whether there is a difference between the actual value of the Class Properties and the value these properties would have had but for Defendants' alleged trespass and nuisance through operation of Rocky Flats. Mr. Dorchester, like Mr. Conway, provided no authority or explanation demonstrating that analysis of development patterns and related demographic and economic data is a reliable or accepted method for answering this question. It was Defendants' burden to prove that Mr. Dorchester's development-based analysis is a reliable method for assessing the effect of an externality, such as Rocky Flats, on the *value* of affected properties.[FN95] Defendants failed to carry that burden with respect to this portion of Mr. Dorchester's study.[FN96]

> FN95. Defendants assert the reliability of all of Mr. Dorchester's methods is established by Mr. Dorchester's statements in a supplemental declaration that the methods he used are "the most appropriate and generally expected" research methodologies for testing for economic harm to real property. *See* Defs.' Resp. to Pls.' *Daubert* Mot. (Doc. 1398) at 45 (quoting Ex. 26 (Dorchester Decl.), ¶ 2.11). I could not verify Mr. Dorchester's reported statements, however, because the declaration included in Defendants' appendix does not contain the quoted language or address the reliability of Mr. Dorchester's methodology. *See id.*, Ex. 26. More importantly, even if Defendants had submitted a declaration by Mr. Dorchester to this effect, it would not be sufficient to establish the reliability of his methodology. *See, e.g., Mitchell,* 165 F.3d at 781 ("The expert's assurance that the methodology

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                              Page 83

Slip Copy, 2006 WL 3533049 (D.Colo.)
**(Cite as: Slip Copy)**

and supporting data is reliable will not suffice."); Fed.R.Evid. 702 2000 advisory commitee's note ("The trial court's gatekeeping function requires more than simply 'taking the expert's word for it." ').

FN96. Mr. Dorchester's proffered testimony on the history or pattern of development in the vicinity of Rocky Flats may, however, be admissible in rebuttal to testimony by Plaintiffs' witnesses on these issues. *See supra* Section II.A.1 (regarding use of Mr. Conway's testimony in rebuttal).

Defendants also failed to carry their burden with respect to Mr. Dorchester's second methodology, his analysis of news reports and anecdotal data. Mr. Dorchester reported he gathered 950 articles regarding Rocky Flats that were published in Denver newspapers between 1951 and 1989. *Id.* at 5-38. He explained he collected and reviewed this information "to identify the nature, extent, and types of information that was publicly available" regarding Rocky Flats at various points in time. *Id.* at 5-36 to 5-38; *see id.* at 3-14 to 3-15. He then concluded "it is apparent that the [publicly available] information did not deter development from occurring in the Rocky Flats environs, nor does it appear that it reduced development timing." *Id.* at 7-4. He also reported that discussions with " various experts," who were not identified, confirmed these conclusions. *Id.* at 7-5.

Neither Mr. Dorchester nor Defendants link his review of newspaper articles and his conclusions regarding their effect on development in the vicinity of Rocky Flats to his opinion that the value of Class properties has not been diminished by Defendants' operations at Rocky Flats. Mr. Dorchesters' reported but unsubstantiated discussions with unspecified "experts" also do not provide a reliable basis for these conclusions. *See* Fed.R.Evid.2000 advisory committee's notes ("The trial court's gatekeeping function requires more than simply taking the expert's word for it."). Accordingly, Defendants have failed to carry their burden of demonstrating that this analysis was a reliable method for determining whether Defendants' alleged misconduct has negatively affected the value of Class properties.

*81 In his third approach to assessing any economic harm caused by Defendants' Rocky Flats operations, Mr. Dorchester performed a number of price studies for Denver, the northwest Denver metropolitan area and the Class Area and environs. *Id.* at 5-39 to 5-51. Mr. Dorchester's basic methodology, which he refers to as his "time series methodology," *see id.,* App. L, was to determine the average price of homes sold in these various markets from the early 1970s through 1994 using MLS and other available data. *See id.* at 5-39. He then examined the price trend in each analysis area to determine average price variability and to compare this variability to what he expected to occur with normal market shifts over time. *Id.* at 5-40. According to Mr. Dorchester, any "unexplained variation" or "shock" in these price trends would indicate that an "abnormality, such as adverse economic effects of a contaminating situation or event, may have occurred." *Id.; see id.* at L-3. Mr. Dorchester concluded that his price trend series for the Class Area and environs showed "no observable 'shocks' that would evidence significant changes in pricing" that might be attributable to Rocky Flats. *Id.* at 7-6; *see id.* at 5-48, L-6 to L-7.

Plaintiffs' first complaint is again that Mr. Dorchester and Defendants have not carried their burden of demonstrating that Mr. Dorchester's time series methodology is a reliable method of showing whether and to what extent Rocky Flats and Defendants' conduct there has affected real property values in the Class Area. They also argue that his method of examining pricing trends to identify " shocks" to Class property values, especially before and after the FBI raid, is too subjective to yield reliable results and is not consistent with the "but for " measure of damages that governs this action.

Defendants cite a footnote in the Reference Manual on Scientific Evidence and two antitrust cases as establishing that use of a time series analysis to detect market reaction is a generally accepted methodology. Defs.' Resp. to Pls.' *Daubert* Mot. (Doc. 1398) at 47 (citing *Ref. Guide on Multiple Regression* at 191 & n.31; *Allapattah Servs., Inc. v. Exxon Corp.,* 61 F.Supp.2d 1335, 1348

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Page 84

Slip Copy, 2006 WL 3533049 (D.Colo.)
**(Cite as: Slip Copy)**

(S.D.Fla.1999); *In re Indus. Silicon Antitrust Litig.*, No. 95-2104, 95-1131, 96-2003, 96-2111, 96-2338, 1998 WL 1031507, at *2-3 (W.D.Pa. Oct.13, 1998) ). The cited authorities have some relevance, but are not conclusive. The cited passage in the Reference Manual, for example, states only that "moving average time-series models" are "appropriate when nonlinearities are important." *Ref. Guide on Multiple Regression* at 191 & n.31. The Reference Manual further states that "the expert should be prepared to explain why any chosen method ... was more suitable than the alternatives." *Id.* at 191. The question here is whether Mr. Dorchester has sufficiently explained his pricing method and why it is suitable and reliable to assess whether Defendants' alleged misconduct at Rocky Flats affected Class property values. This is a close question but I find Mr. Dorchester and Defendants provided enough explanation and authority regarding this form of analysis to demonstrate its reliability within the meaning of Rule 702. Plaintiffs' complaint that Mr. Dorchester's method of looking for pricing "shocks" is subjective and inconsistent with the "but for" measure of damages has some merit, but I find it goes to the weight to be accorded Mr. Dorchester's testimony, and does not render his testimony inadmissible.[FN97] Accordingly, I find Mr. Dorchester's proffered expert testimony regarding the pricing studies he performed and the conclusions he reached based on them, as set forth in the subsection of Chapter 5 titled "Real Estate Prices and Price Trends" and in related portions of his 1996 report, is admissible. Plaintiffs' motion to exclude this portion of his testimony is denied.

> FN97. If Plaintiffs are concerned that Mr. Dorchester's testimony on pricing trends might confuse the jury into applying something other than the "but for" damages measure, they may propose a limiting instruction addressing this concern.

*82 Plaintiffs also seek to exclude Mr. Dorchester's testimony regarding each of the named Plaintiffs' properties. As disclosed in his expert report, this proffered testimony consists of Mr. Dorchester's summary of each named Plaintiff's deposition testimony and document production regarding their Class property or properties, *see* Dorchester Report at 6-1 to 6-6, followed by commentary and the conclusion for each that there is no basis for finding any economic harm to their properties attributable to Rocky Flats. *See id.* at 7-6 to 7-13. For each property, Mr. Dorchester based the latter conclusion "on the other studies we performed" and the absence "of evidence to the contrary." *See id.* at 7-8 to 7-12.

Plaintiffs argue that the opinions offered by Mr. Dorchester based on this process are unreliable because his review was cursory and based on incomplete information. They also contend his discussion regarding each of the named Plaintiffs' properties is irrelevant because he did not rely on it in stating his ultimate conclusions regarding the lack of economic harm to each property. I agree on both points and therefore find Mr. Dorchester's proffered expert testimony on this subject inadmissible.

The remainder of Mr. Dorchester's testimony as disclosed in his expert report is also excluded because it is irrelevant and/or beyond his area of expertise. In Chapter 1 of his report, for example, Mr. Dorchester provided a verbose statement of his assignment as well as his interpretation of the Plaintiffs' damages claims as stated in their Second Amended Complaint and a 1993 Declaration filed by Plaintiffs' expert Wayne Hunsperger. This discussion is not evidence, is out-of-date and is beyond Mr. Dorchester's expertise as a property appraiser.

In Chapter 2 of his report, Mr. Dorchester set out a 19-page "brief" history of Rocky Flats. This history begins with Rocky Flats' origins in the Cold War, discusses the site selection process, reports on historical operations at the Plant, includes 12 pages opining on Rocky Flats' many positive contributions to the local and Denver area economy and its lack of negative effect on development or the environment, and closes with a discussion of the " history of public controversy surrounding Rocky Flats." *Id.* at 2-1 to 2-19. Testimony on these subjects is beyond Mr. Dorchester's appraisal expertise and is not relevant to his opinion

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Page 85

Slip Copy, 2006 WL 3533049 (D.Colo.)
(Cite as: Slip Copy)

regarding alleged diminution in Class property values. Contrary to Defendants' assertion, this historical summary is in no way similar to the half-page, bare-bones account of Rocky Flats' history in Mr. Hunsperger's expert report. *Compare* Dorchester Report at 2-1 to 2-19 *with* Hunsperger Report at 73.

Plaintiffs' motion to exclude Mr. Dorchester's testimony is granted in part and denied in part as stated above.

### 3. Geneva Smart

Geneva Smart is a Certified Residential Appraiser in Colorado and Senior Residential Appraiser member of the Appraisal Institute. She has 20 years of residential real estate appraisal experience in Boulder County and surrounding areas.

**\*83** For this litigation, Ms. Smart authored a 14-page expert report in which she opined that Rocky Flats has not had a negative effect on the value of the named Plaintiffs' individual properties or the value of other residential properties in northeast Jefferson County. App. to Pls.' *Daubert* Mot. (Doc. 1352), Ex. 12 [hereinafter "Smart Report"] at 9, 14. Ms. Smart stated in her report that these conclusions were based on her review of area maps, Plaintiffs' depositions, certain property appraisals, the Denver and Boulder area MultiList Services, and Jefferson County Assessor Records, as well as telephone interviews with officials with the Jefferson County Assessor's Office, Jefferson County Mapping Office, and Jefferson County School Administration. *Id.* at 2. She also cited as sources her years of experience in the area and discussions with real estate agents, homeowners and appraisers over the years. *Id.* at 2, 11. Plaintiffs move to exclude Ms. Smart's proffered testimony on the ground that it is biased and based on a cursory, inadequate and therefore unreliable methodology.

Ms. Smart's deposition testimony regarding the bases for her conclusions demonstrates that her methodology was indeed unreliable for purposes of offering an expert opinion. Ms. Smart reported in her deposition that she informed defense counsel at their first meeting, before she was retained as an expert witness or done any investigation, that she believed Rocky Flats had not negatively affected property values. App. to Pls.' *Daubert* Mot. (Doc. 1352), Ex. 13 [hereinafter "Smart Dep."] at 26, 160. Her primary method of confirming this conclusion before writing her report was to review approximately 100 appraisals made between 1988 and 1993 by a single company that were selected for her by Defendants. *Id.* at 32, 45-46, 56-57. The conversations with various Jefferson County officials she cites in her expert report were minimal and did not address any potential property value effects of Rocky Flats. *Id.* at 81-85, 143-44, 147-50 (regarding contacts with Jefferson County's Assessor's office, mapping office and School District).

Ms. Smart also testified that her use of the MultiList database of home sales and conversations with real estate agents or home owners consisted only of her impression of these sources over the years, and did not include any systematic or scientific survey or even any inquiry in connection with her expert report. *See id.* at 151-154 (Multilist and conversations with realtors); 182-84 (conversations with homeowners). Ms. Smart testified she did not rely on the deposition transcripts she reviewed, *id.* at 144, or some of the few interviews she had with appraisers because they did not support her previously announced conclusion, *see id.* at 154-60.

Ms. Smart also does not explain how her experience in the area allowed her to reach her conclusions. Her deposition, in fact, reveals that she had only performed one appraisal in the Class Area in the previous five years and that she knew very little about Rocky Flats and the problems ascribed to it that might affect area property values. *See id.* at 95-100, 152-53. As a result, it is unclear how her appraisal experience would allow her to opine that there was no value effect attributable to a property's proximity to Rocky Flats. *See, e.g., Fredette,* 315 F.3d at 1239-40 (expert opinion is unreliable when there is no clear link between expert's experience and the conclusions reached).

**\*84** Finally, neither Ms. Smart nor Defendants produced evidence demonstrating that her reported

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Page 86

Slip Copy, 2006 WL 3533049 (D.Colo.)
(Cite as: Slip Copy)

use of these sources and overall methodology are consistent with the level of intellectual rigor that characterizes the practice of an expert in the relevant field of property appraisal and valuation. *See Kumho Tire,* 526 U.S. at 152 (stating standard for reliability determination).

Under these circumstances, I find Defendants have not carried their burden of establishing that Ms. Smart's proffered expert opinions are based on sufficient facts and data and are the product of a reliable methodology reliably applied. As a result, I find her expert testimony is inadmissible under Rule 702.

### 4. Dr. Jack M. Holl

Dr. Jack M. Holl is a historian who, with Dr. Richard Hewlett, prepared a 45-page expert report in this case. App. to Pls.' *Daubert* Mot. (Doc. 1352), Tab 11 [hereinafter "Holl/Hewlett Report"]. [FN98] This report discloses that the majority of Dr. Holl's proffered testimony consists of information regarding the "Dawn of the Nuclear Age" before and during World War II, *id.* at 3-11, the United States' efforts immediately after the war to maintain its nuclear monopoly and develop a nuclear weapons stockpile, *id.* at 11-19, and the acceleration and expansion of the United States' nuclear weapon program in the late 1940s and early 1950s in response to international crises, the Soviet Union's development of nuclear technology and the discovery of Soviet espionage directed at the United States' nuclear weapons program, *id.* at 20-27. The remainder of Dr. Holl's intended testimony describes the federal government's decision to construct a new nuclear weapons fabrication plant, its decision to build this plant at the Rocky Flats site, and the construction and subsequent expansion of the Rocky Flats plant. *See id.* at 27-38.

> FN98. Defendants originally designated Dr. Hewlett as an expert witness and disclosed his expert report in 1996. *See* App. to Pls.' *Daubert* Mot. (Doc. 1352), Tab 10. Defendants state that Dr. Hewlett's health subsequently deteriorated and will prevent him from testifying at trial. Defendants have designated Dr. Holl, a former colleague of Dr. Hewlett, to testify in his stead. The Holl/Hewlett Report, produced as a supplemental report in 2004, appears to be a somewhat edited version of Dr. Hewlett's 1996 expert report.

Plaintiffs move to exclude all testimony on these subjects. They assert the proffered expert testimony of Dr. Holl is irrelevant to their property damage claims, or, to the extent it has any probative value, that this value is outweighed by the danger of unfair prejudice and juror confusion because this testimony seeks to play on jurors' patriotic sentiments by suggesting that Defendants' operations at Rocky Flats were so beneficial to national security that any harm caused to the plant's neighbors should be disregarded. Plaintiffs also contend Dr. Holl's account of the Cold War arms race will not assist the jury and will waste valuable trial time because the jury does not need an expert's assistance to understand that the Rocky Flats plant played a role in protecting national security during the Cold War.

I grant this motion in part and deny it in part. One of the issues to be decided in this case in connection with Plaintiffs' nuisance claims is whether any proven interference with Class members' use and enjoyment of property is unreasonable. Under Colorado law and the Restatement (Second) of Torts, determination of this issue requires the jury to consider whether the gravity of the harm caused by Defendants' conduct outweighs the utility of that conduct. *See Cook IX,* 273 F.Supp.2d at 1202. To assess the utility of Defendants' conduct, the jury must consider several factors, including the primary purpose of Defendants' conduct and the social value of that purpose, *i.e.,* the extent to which achievement of this purpose generally advances or protects the public good. *See* Restatement (Second) of Torts § 828 & cmt. e; *see also* Mem. Op. re: Jury Instructions, Section II.B (discussing Restatement § 828 in connection with Defendants' proposed nuisance Instruction No. 6). Consideration of the primary purpose of the Rocky Flats plant and the social value of that purpose is thus relevant to this action.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Page 87

Slip Copy, 2006 WL 3533049 (D.Colo.)
**(Cite as: Slip Copy)**

*85 As I understand the parties' arguments, it is undisputed that the primary purpose or mission of Rocky Flats was to produce nuclear weapon components and that this mission advanced the public good by protecting national security. Defendants nonetheless apparently intend to introduce a great deal of evidence on this subject, including the expert testimony set forth in the Holl/Hewlett Report.

Dr. Holl's proffered testimony regarding the "dawn of the nuclear age" in World War II, the origins of the Cold War armament race and related Soviet espionage, has little to no probative value here. Whatever probative value this testimony might have in providing a background to the federal government's decision to construct and operate Rocky Flats is substantially outweighed by the danger of unfair prejudice and confusion of the issues, and will needlessly waste trial time. This is particularly true given the lack of dispute regarding Rocky Flats' mission and the social value of that mission, and the capability of a lay jury to understand this mission and its value without expert assistance.[FN99]

> FN99. Defendants argue Dr. Holl's testimony regarding the beginnings and nature of the Cold War threat to national security is highly probative and admissible because a showing that events at Rocky Flats resulted from national security needs will prove that these events were reasonable, and thereby defeat Defendants' nuisance claims. *See, e.g.,* Defs.' Resp. to Pls.' *Daubert* Mot. (Doc. 1398) at 58-60. This is not correct. As stated above, the reasonableness of any interference with Plaintiffs' use and enjoyment of property depends on the balance between the utility of Defendants' conduct and the harm it causes. The utility of Defendants' conduct, in turn, depends on more than just the social value it provided, and includes consideration of whether Defendants took all steps practicable to avoid all or part of the harms they allegedly caused. *See* Restatement (Second) of Torts § 828; *see generally* Mem. Op. re: Jury Instructions, Section II.B (discussing Defendants' proposed nuisance Instruction No. 6). The undisputed fact that Rocky Flats served national security needs is not, therefore, determinative of the reasonableness of the alleged interference.

Dr. Holl's proffered testimony regarding events directly relating to the establishment, siting and operation of Rocky Flats does not present these concerns to the same degree. In addition, testimony on these subjects may be relevant to help explain the plant's operations over time, as demonstrated by the proffered testimony of Plaintiffs' expert Dr. Cochran on these subjects. *See* Pls.' Cons.*Daubert* Resp. (Doc. 1399), Ex. 6 (Cochran Overview Report).

Accordingly, I grant Plaintiffs' motion to exclude expert testimony by Dr. Holl on the background, "pre-Rocky Flats" subjects set out in the Holl/Hewitt Report at pages 1-27. Dr. Holl may, however, testify regarding the history of Rocky Flats' creation and expansion as generally set out beginning on page 27 of the Holl/Hewitt report under the title "Project Apple-Establishing Rocky Flats" and continuing to the end of the report.

B. Request to Limit Certain Expert Testimony

1. Dr. Ward Whicker

In 1991, Defendants retained Dr. F. Ward Whicker, a professor in Colorado State University's Department of Environmental and Radiological Health Sciences, to sample and measure the distribution and transport of plutonium and other radionuclides in the off-site environs of the Rocky Flats plant and to assess related human exposure to these substances. Upon receiving additional funding from the Colorado Department of Public Health and Environment, Dr. Whicker extended this sampling program to include certain on-site areas. App. to Pls.' *Daubert* Mot. (Doc. 1352), Tab 17 [hereinafter "Whicker Report"].

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                    Page 88

Slip Copy, 2006 WL 3533049 (D.Colo.)
**(Cite as: Slip Copy)**

Defendants designated Dr. Whicker as one of their expert witnesses, and in November, 1996, disclosed his intended expert testimony in a voluminous report as required by Rule 26(a). In his expert report, Dr. Whicker described his sampling study, provided the data generated by it and interpreted these data to state conclusions regarding the spatial distribution and environmental transport of plutonium and americium in the soils and vegetation on and adjacent to Rocky Flats.[FN100] *Id.* at 2. Plaintiffs deposed Dr. Whicker concerning his expert testimony as disclosed in this report in April, 1997.

> FN100. In his report, Dr. Whicker also provided the preliminary results of an on-going study designed to measure the potential magnitude of human exposure to plutonium released from Rocky Flats and of studies to assess the level of plutonium and other radioactive substances in Great Western Reservoir sediments and ambient natural background radiation levels along the Colorado Front Range. *See* Whicker Report at 1-2.

*86 Subsequently, in 2004 and 2005, Defendants produced additional statements by Dr. Whicker describing his intended expert testimony. The first, produced in August, 2004, is titled "Supplemental Expert Report." *See* App. to Pls.' *Daubert* Mot. (Doc. 1352), Tab 18 [hereinafter "Whicker Suppl. Report"]. In it, Dr. Whicker discussed and stated opinions on a number of topics beyond his sampling study and its results, including: the difficulty of measuring plutonium levels in soil; the procedures used and results generated by other, earlier studies that measured plutonium in Rocky Flats area soil; potentially relevant regulatory and other environmental standards for plutonium in soil and how plutonium levels near Rocky Flats compare to these standards; potential changes in plutonium levels in soil over time; and the feasibility and justification for removing plutonium from Class members' properties. *See id.* at 2. Dr. Whicker stated his 1996 report was "the starting point" for these additional analyses and opinions. *Id.* at 1.

In a second supplemental submission, a declaration dated January 14, 2005, Dr. Whicker set out additional discussion and opinions, including opinions relating to the effect of soil disturbance on measurements of plutonium concentrations in soil and whether it was possible to demonstrate scientifically that plutonium from Rocky Flats remains on Class properties that have been disturbed through development, agriculture or landscaping. *See* App. to Pls.' *Daubert* Mot. (Doc. 1352), Tab 19 [hereinafter "First Whicker Decl."]. In a final declaration, dated March 16, 2005, Dr. Whicker expanded on the opinions stated in his January 2005 declaration and responded to arguments made by Plaintiffs in response to it. *See* Defs.' Reply to Pls.' Resp. to Objs. to Identification of Stip. Facts (Doc. 1330), Ex. 3 [hereinafter "Second Whicker Decl."].[FN101]

> FN101. Defendants submitted Dr. Whicker's declarations in support of objections to a proposed stipulation (based on Defendants' admissions) that the Class Area was contaminated with plutonium from Rocky Flats. *See* Defs.' Objs. to Identification of Stip. Facts (Doc. 1315); Defs.' Reply to Pls.' Resp. to Objs. To Identification of Stip. Facts (Doc. 1330). Although Plaintiffs did not specifically identify Dr. Whicker's second declaration in their *Daubert* motion, their arguments there clearly encompass it.

Plaintiffs have moved to exclude testimony regarding portions of Dr. Whicker's 2004 supplemental report and 2005 declarations on the ground that the proffered testimony was not disclosed in his original 1996 expert report as required by Rule 26(a) and exceeds the bounds of supplemental expert disclosure permitted by the Rule 26(e). Specifically, Plaintiffs seek to exclude testimony by Dr. Whicker regarding: (1) the difficulty of measuring or detecting plutonium in soil, *see* Whicker Suppl. Report at 3-5; First and Second Whicker Decls. *passim;* (2) governmental or agency standards for permissible levels of plutonium in soil and how plutonium soil levels near Rocky Flats compare to these standards, *see*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Slip Copy, 2006 WL 3533049 (D.Colo.)
**(Cite as: Slip Copy)**

Page 89

Whicker Suppl. Report at 9-10; (3) possible ways in which plutonium in soil can be disturbed, *see id.* at 11; First Whicker Decl., ¶¶ 11-12, 14, 17; Second Whicker Decl., *passim;* and (4) the unfeasibility of removing plutonium from Class properties, *see* Whicker Suppl. Report at 11-13.

Rule 26(a)(2) requires parties to produce a written report by each expert witness that includes "a complete statement of all opinions to be expressed [by that witness] and the basis and reasons therefor." Fed.R.Civ.P. 26(a)(2); *see Miller v. Pfizer, Inc.,* 356 F.3d 1326, 1332 (10th Cir.2004). This report must be "detailed and complete" and state "the testimony the witness is expected to present during direct examination, together with the reasons therefor." Fed.R.Civ.P. 26 1993 advisory committee's note. The expert's report must be produced by the court-ordered deadline, which in this case was in November, 1996. A party that fails to disclose expert testimony in compliance with these rules may not present the expert's testimony at trial unless the failure to disclose was substantially justified or harmless. *See* Fed.R.Civ.P. 37(c)(1).

*87 Rule 26(e)(1) permits, indeed requires, that an expert supplement his report and disclosures in certain limited circumstances. Those circumstances are when the party or expert learns the information previously disclosed is incomplete or incorrect in some material respect. *See* Fed.R.Civ.P. 26(e); *Jacobsen v. Desert Book Co.,* 287 F.3d 936, 953-54 (10 th Cir.2002).FN102 This provision is "not intended to provide an extension of the expert designation and report production deadlines" and may not be used for this purpose. *Metro Ford Truck Sales, Inc. v. Ford Motor Co.,* 145 F.3d 320, 324 (5th Cir.1998). Permissible supplementation under the Rules instead "means correcting inaccuracies, or filling the interstices of an incomplete report based on information that was not available at the time of the initial disclosure." *Kenner v. United States,* 181 F.R.D. 639, 640 (D.Mont.1998); *see Beller v. United States,* 221 F.R.D. 689, 694-95 (D.N.M.2003).

> FN102. A party may also be ordered by the court to supplement or correct an expert's disclosure to include information thereafter acquired. *See* Fed.R.Civ.P. 26(e). In this case, supplementation in accordance with the Rules was authorized by court order. *See* Minute Order (Doc. 1238) (June 17, 2004). The deadline for service of any supplemental expert reports was July 30, 2004 for Plaintiffs and August 6, 2004 for Defendants. *See id.*

A supplemental expert report that states additional opinions or rationales or seeks to "strengthen" or "deepen" opinions expressed in the original expert report exceeds the bounds of permissible supplementation and is subject to exclusion under Rule 37(c). *Beller,* 221 F.R.D. at 695; *see Keener,* 181 F.R.D. at 641-42; *Minebea Co., Ltd. v. Papst,* 231 F.R.D. 3, 6 (D.D.C.2005). "To rule otherwise would create a system where preliminary [expert] reports could be followed by supplementary reports and there would be no finality to expert reports, as each side, in order to buttress its case or position, could 'supplement' existing reports and modify opinions previously given." *Beller,* 221 F.R.D. at 695. This result would be the antithesis of the full expert disclosure requirements stated in Rule 26(a).

The opinions and discussion in Dr. Whicker's 2004 and 2005 supplemental disclosures that are challenged by Plaintiffs are improper supplements to his 1996 expert disclosures under these standards. I have reviewed these disclosures and Dr. Whicker's 1996 expert report and there is no question that Dr. Whicker's proffered testimony on the points identified by Plaintiffs are not attempts to correct inaccuracies in the 1996 report or to complete it based on information that was not available then. Rather, this testimony offers new or expanded opinions and discussion based largely on information that was available at the time of Dr. Whicker's initial disclosures. Such "supplementation" is not permitted under the Federal Rules.FN103

> FN103. Neither party produced a complete copy of Dr. Whicker's 1996 report in their briefing on Plaintiffs' motion to exclude portions of his testimony. At my request, Defendants provided the court with a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Page 90

Slip Copy, 2006 WL 3533049 (D.Colo.)
**(Cite as: Slip Copy)**

complete copy of this report for my review in deciding this motion. I have since discovered Defendants did not enter the complete report in the record at this time. In order to complete the record on this issue, I have directed the court clerk to enter the copy of Dr. Whicker's November 21, 1996 report that I received from Defendants on September 2, 2005 into the case record.

Defendants argue Dr. Whicker's supplemental disclosures are proper because they concern "topics expressly addressed" in his 1996 report. Defs.' Resp. to Pls.' *Daubert* Mot. (Doc. 1398) at 76. The 1996 report excerpts cited by Defendants, however, do not demonstrate that Dr. Whicker expressly addressed or provided opinions on the topics that are the subject of Plaintiffs' motion, but rather that he made a handful of mostly passing references to these subjects in the course of describing his sampling study and the conclusions he drew from it.[FN104] Moreover, even if Dr. Whicker had expressly addressed these topics in his 1996 report, supplementation would only be permitted under the Rules to correct inaccuracies in the 1996 report or to complete it based on information that was not available when the report was issued. *See Kenner*, 181 F.R.D. at 640; *Beller*, 221 F.R.D. at 694-95. Defendants make no showing that Dr. Whicker's 2004 and 2005 supplemental disclosures satisfy either circumstance.[FN105]

FN104. In addition, there are significant discrepancies between Dr. Whicker's report as disclosed in 1996 and some of the purported report excerpts cited, produced and relied upon by Defendants in opposition to Plaintiffs' *Daubert* motion. *Compare* 1996 Whicker Report, Chapter 2 (titled "Draft (11-19-96) Inventory Estimates of $^{239}$Pu in Soil East of Rocky Flats") *with* Defs.' Resp. to Pls.' *Daubert* Mot. (Doc. 1398), Ex. 39A (expanded version of 1996 draft published in 7 Technology 497-507 (2000)); *compare* 1996 Whicker Report, Chapter 11 (data table titled "Americium-241 and Cesium-137 Activity Concentrations and Inventories at Macroplots Along the A Transect") *with* Defs.' Resp. to Pls.' *Daubert* Mot. (Doc. 1398), Ex. 39C at 276-285 (excerpt from article published in 76 Health Physics (Mar.1999) that apparently discusses the data reported in Chapter 11 of Dr. Whicker's 1996 expert report).

FN105. In addition, Dr. Whicker's 2005 declarations were not timely produced. The court-ordered deadline for Defendants to serve any supplemental expert disclosures was August 6, 2004. *See* Minute Order (Doc. 1238).

**\*88** Defendants also argue my 2003 and 2004 rulings narrowing and defining the issues to be tried in this action constitute new information justifying Dr. Whicker's 2004 and 2005 supplemental disclosures. Court rulings, however, do not constitute new information justifying supplementation under Rule 26(e). Granting parties carte blanche to serve a supplemental round of expert reports setting out new and revised opinions based on pretrial rulings would undermine the expert disclosure requirements set forth in Rule 26(a).

Even if this were not the case, there is no merit to Defendants' suggestion that *Cook IX* and other pretrial decisions introduced new elements to the case that necessitated additional expert testimony. Dr. Whicker's supplemental disclosures were directed to the issue of whether the Class Area is contaminated with plutonium from Rocky Flats. This issue has been part of this case from the beginning because it is an element of Plaintiffs' trespass claim. Defendants' suggestion that they were not aware of this issue until the 2003 *Cook IX* decision is not credible. In fact, Defendants' decision to supplement Dr. Whicker's 1996 report to add opinions regarding matters such as the effect of soil disturbance on plutonium measurement and the reliability of pre-development soil sampling results to establish existing contamination, *see, e.g.*, First and Second Whicker Decls., appears to be the result of Defendants' tactical decision to dispute a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                         Page 91

Slip Copy, 2006 WL 3533049 (D.Colo.)
**(Cite as: Slip Copy)**

previously conceded point-that the Class Area is in fact contaminated with plutonium from Rocky Flats. *See* Mem. Op. re: Jury Instructions, Section I.A.2 (discussing Defendants' representations on this issue). The Federal Rules do not permit a party to supplement previously disclosed expert testimony for such a purpose. *See Minebea,* 231 F.R.D. at 6 ( Rule 26(e) does not permit parties to file supplemental reports whenever they believe such reports would be "desirable' or 'necessary' to their case."); *cf. Schweizer v. DEKALB Swine Breeders, Inc.,* 954 F.Supp. 1495, 1509-10 (D.Kan.1997) (party may not expand expert's opinions after disclosure deadline to defend summary judgment motion). Accordingly, I find Dr. Whicker's discussion and opinions in his 2004 and 2005 supplements as identified by Plaintiffs were not disclosed as required by Rule 26(a) and are not permissible supplements under Rule 26(e).

Pursuant to Rule 37(c)(1), Dr. Whicker may not testify regarding these matters unless the failure to disclose this testimony was substantially justified or harmless. *See Jacobsen,* 287 F.3d at 952-53. In determining whether either circumstance exists, I consider the following factors: (1) the prejudice or surprise to the party against whom the testimony is offered; (2) the ability of the party to cure the prejudice; (3) the extent to which introducing the testimony would disrupt the trial; and (4) the offering party's bad faith or willfulness. *Id.* at 953.

*\*89* I find Defendants' violation of the expert disclosure rules with respect to Dr. Whicker was neither harmless nor substantially justified. Expert discovery closed years before Dr. Whicker's supplemental disclosures. At the time the supplemental report and declarations were served, the court and the parties were engaged in the lengthy and difficult process of narrowing and defining the issues to be tried and preparing for trial following more than a decade of discovery and pretrial motions practice. Defendants' improper attempt to supplement and expand Dr. Whicker's expert testimony in the middle of this process, more than seven years after Dr. Whicker's testimony was disclosed and six years after Plaintiffs deposed Dr. Whicker based on this disclosure, prejudiced Plaintiffs in their preparation for trial. Reopening expert discovery to allow Plaintiffs to depose Dr. Whicker and designate a rebuttal expert if desired to cure this prejudice was not a just or viable option at this late stage of trial preparation, especially given the interrelated nature of much of the expert testimony in this case. Allowing introduction of Dr. Whicker's supplemental testimony under these circumstances would have disrupted the trial and possibly delayed it. Given the length of the anticipated trial and the busy schedules of both the court and trial counsel, abandoning the current trial date also would have likely necessitated yet another lengthy delay in this case. While I do not find Defendants acted in bad faith in failing to disclose Dr. Whicker's additional testimony in his 1996 report, their contention that they were not aware of the need for this testimony until after my 2003 decision in *Cook IX* is not credible.

For all of these reasons, I find Defendants' failure to disclose the supplemental testimony challenged by Plaintiffs was neither harmless nor substantially justified. Plaintiffs' motion to exclude this testimony is granted.

### 2. Laurie Van Court

Laurie Van Court is a Colorado certified appraiser holding the MAI designation from the Appraisal Institute. She prepared a 30-page report for this litigation regarding the factors that may affect horse-related properties and businesses and how these factors may have influenced the value of the properties and horse businesses of named Plaintiffs Merilyn Cook, Loren and Gertrude Babb, and Richard and Sally Bartlett. *See* App. to Pls.' *Daubert* Mot. (Doc. 1352), Tab 15 [hereinafter 'Van Court Report'] at 1-2.

Plaintiffs move to exclude Ms. Van Court's proffered testimony on four subjects: the management of horse properties generally; the financial state of these Plaintiffs' horse businesses; the value of Ms. Cook's and the Babbs' properties; and Ms. Cook's alleged debts. Plaintiffs argue Ms. Van Court's opinions on these subjects as disclosed in her report are irrelevant and unsupported.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                              Page 92

Slip Copy, 2006 WL 3533049 (D.Colo.)
**(Cite as: Slip Copy)**

Based on my review of Ms. Van Court's expert report and excerpts from her deposition as provided by the parties, I grant Plaintiffs' motion in part and deny it in part. I find Ms. Van Court's intended testimony regarding Ms. Cook's alleged debts, the Thigpen transactions, the horse business and the participation of Ms. Cook, the Babbs and the Bartletts in the horse business are irrelevant. They are therefore excluded except on rebuttal and then only if such issue or issues are raised by Plaintiffs. Ms. Van Court may testify regarding the real property owned by Ms. Cook, the Babbs and the Bartletts.

### 3. Expert testimony regarding the ability to abate plutonium contamination in the Class Area

**\*90** Several of Defendants' experts offer opinions on the feasibility or desirability of removing plutonium contamination from the Class Area. *See* App. to Pls.' *Daubert* Mot. (Doc. 1352), Ex. 9 [hereinafter "Frazier/Auxier Report"] at 3; Whicker Suppl. Report at 11-13.[FN106] Plaintiffs move to exclude testimony on this subject on the ground that it irrelevant and unfairly prejudicial and that the opinions offered represent personal views unsupported by any methodology.

> FN106. The cited portion of the Dr. Whicker's supplemental report is also excluded for the reasons stated in Section II.B.1 above.

This motion is granted. Whether it is feasible or desirable to abate the plutonium in the Class Area is not an issue to be decided in this action. *See Cook v. Rockwell Int'l Corp. ("Cook X"),* 358 F.Supp.2d 1003, 1007-08 (2004). The relevant question with respect to abatement of plutonium contamination in the Class Area is rather whether abatement has actually occurred or is about to occur. *See id.* at 1013. Neither Dr. Frazier nor Dr. Whicker's proffered testimony on abatement goes to this question, and instead consists of speculation about whether plutonium abatement might be feasible or whether removal of the plutonium would be less desirable than the status quo. To the extent this proffered testimony has any probative value in deciding whether abatement has occurred or is imminent, that value is substantially outweighed by the risk of unfair prejudice and confusion of the issues by the jury.

### 4. Expert testimony regarding RAC and Chem Risk studies

Studies conducted by ChemRisk and the Risk Assessment Corporation ("RAC") regarding the Rocky Flats plant are among the scientific studies discussed and relied upon in the expert disclosures of at least four of Defendants' expert witnesses: Drs. John Till, Chris Whipple, John Auxier and John Frazier. Plaintiffs move to limit these experts' testimony with respect to the ChemRisk and RAC studies on the ground that repeated presentation of these studies through multiple experts would be prejudicial, needlessly cumulative and a waste of trial time. In further briefing on this motion, Plaintiffs clarified that they do not object to Defendants' experts relying on the ChemRisk and RAC study results in reaching their conclusions, but rather seek to prevent repetitive presentations of the study reports themselves. *See* Pls.' Reply in Supp. of *Daubert* Mot. (Doc. 1408) at 4.

This motion is granted. The original and/or supplemental reports of defense experts Drs. John Till, Chris Whipple and John Frazier (substituting for Dr. John Auxier and adopting Dr. Auxier's 1996 expert report) all describe and/or rely in varying degrees on the ChemRisk and RAC studies. *See* App. to Pls.' *Daubert* Mot. (Doc. 1352), Tab 14 [hereinafter "Till Report"]; *id.,* Tab 20 [hereinafter "Whipple Suppl. Report"] at 6-11; *id.,* Tab 1 [hereinafter "Auxier Report"], Chs. IX & X; *id.,* Tab 9 [hereinafter "Frazier Suppl. Report"] at 2-3. Each expert may rely on these studies to support their respective opinions and may reference them as appropriate in their testimony to support their opinions. They will not, however, be permitted to waste trial time by needlessly presenting cumulative testimony regarding the methodologies and findings of the ChemRisk and RAC studies. *See* Fed.R.Evid. 403; *Marsee v. United States Tobacco Co.,* 866 F.2d 319, 324 (10th Cir.1989) (trial court has

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                     Page 93

Slip Copy, 2006 WL 3533049 (D.Colo.)
**(Cite as: Slip Copy)**

discretion to exclude repetitive and cumulative expert testimony).

**\*91** The potential for such unnecessary cumulative testimony is demonstrated in particular by the overlap between what Defendants describe as Dr. Till's "foundation testimony" regarding the processes employed and the conclusions reached in the RAC study and underlying ChemRisk study, *see* Till Report, and Dr. Frazier's proffered testimony regarding the same subjects, *see* Auxier Report, Chs. IX & X. Dr. Whipple's intended testimony as set forth in his 2004 supplemental report does not present these same concerns to the extent it compares and contrasts the ChemRisk and RAC study processes with those employed by some of Plaintiffs' experts.

### C. Request to Exclude Certain Expert and Lay Evidence

1. Evidence of Class Area property values after 1992

In both their *Daubert* motion and motion in limine, Plaintiffs argue that evidence regarding Class Area property values after 1992 should be excluded because it is irrelevant and prejudicial. *See* Pls.' *Daubert* Mot. at 5 (seeking to exclude certain testimony by Mr. Conway, Mr. Dorchester and Dr. Wise); Pls.' Mot. in Limine at 1-3. Plaintiffs separately challenge several exhibits included in Dr. Wise's expert reports on this same basis. *See* Pls.' *Daubert* Mot. at 19-22 (moving to exclude Exs. 5 & 8 of Dr. Wise's 1996 report and Exs. 6 & 9 of his 2004 supplemental report).

As Plaintiffs properly noted at oral argument, this motion addresses two categories of evidence that are subject to different analysis. The first category is evidence regarding absolute property values in the Class Area after 1992. The second is evidence regarding Class Area property values relative to property values in other parts of the Denver metro area after this date.

*Absolute property values.* Defendants seek to present expert and lay evidence that property values in the Class Area have increased in absolute terms since 1992, including the rate of appreciation in their value. Plaintiffs argue this evidence is not relevant to the jury's determination of damages because it does not comport with the "but for" measure of damages governing this action. More particularly, Plaintiffs assert that evidence of absolute property values and appreciation rates for Class properties, without comparison to the value and appreciation rate of other properties not affected by Rocky Flats, cannot assist the jury in deciding the difference (if any) between the actual value of the Class properties and the value these properties would have had but for Defendants' alleged trespass and/or nuisance. Plaintiffs further argue that admission of evidence regarding absolute Class property values and appreciation rates would be unfairly prejudicial and confusing, not only because it would invite the jury to ignore the "but for" damages measure, but also because it would improperly suggest that no damages can have occurred, or that any damages have been erased, as a result of increasing Class Area property values. FN107

> FN107. Plaintiffs do not object to expert testimony that is based on consideration of absolute property values and rates of appreciation or incidental mention of such data, but urge that charts and other evidence showing or highlighting the upward curve of absolute property values in the Class Area over time be excluded.

**\*92** Defendants' counter-argument centers on the jury's determination of the point in time at which to measure any damages suffered by the Class. As explained in prior opinions and the jury instructions, this measuring point is the time when the injurious situation (allegedly) caused by Defendants became "complete" and "comparatively enduring." *See, e.g., Cook IX,* 273 F.Supp.2d at 1210 (citing Restatement (Second) of Torts § 930); May 2005 Order at 15-16; Start of Trial Instructions, No. 3.22. "Complete" in this context means the effects of Defendants' alleged trespass or nuisance were known to their full extent. " Comparatively enduring" means there was no

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                           Page 94

Slip Copy, 2006 WL 3533049 (D.Colo.)
(Cite as: Slip Copy)

reason to expect that these effects will end at a definite time in the future. *See* Start of Trial Instructions, No. 3.22; Restatement (Second) of Torts § 930 cmts. b, d.

Plaintiffs assert this "CCE time" is the period between the FBI raid on the plant in June, 1989, and Rockwell's guilty plea to environmental crimes in March, 1992. Defendants dispute that the injurious situation became complete and comparatively enduring at this or any other time. Nonetheless, they assert that evidence of absolute property values in the Class Area after 1992 is relevant and necessary for the jury to find damages if the jury determines that the CCE period occurred sometime after 1992. Defendants further argue that this probative value outweighs the risk of prejudice, which can be abated by a limiting instruction if necessary.[FN108]

> FN108. Defendants also argue that evidence of an increase in Class Area property values is relevant to the jury's determination of whether any interference with the use and enjoyment of Class properties is substantial as required to find liability for nuisance. This argument is based on statements in *Cook IX* that evidence that the interference caused property values to depreciate is relevant to determining whether the interference is substantial. *See* 273 F.Supp.2d at 1209; *see also* Start of Trial Instructions, No. 3.9 (instructing the jury on this point). Evidence that property values have appreciated or depreciated is not relevant to the "substantial" interference determination in the abstract, however, but only if it is linked to a claimed interference in some fashion. *See* Start of Trial Instructions, No. 3.9.

Plaintiffs have defined their claims based on the injurious situation becoming complete and comparatively enduring in the 1989-92 time period. *See, e.g.,* Pls.' Statement of Claims (Doc. 1419) at 5-6. Accordingly, the jury will be instructed to decide whether Plaintiffs have proved the injurious situation became complete and comparatively enduring in this time period. *See* Start of Trial Instructions, No. 3.22. If the jury finds Plaintiffs have not carried this burden, then no damages will be awarded. *See id.* Plaintiffs are the master of their claims and if they do not wish to give the jury the option of awarding damages based on a CCE time falling outside of the 1989-92 period, then Defendants cannot force that option on them.

As a result, any changes in absolute property values in the Class Area in the post-1992 period, without more, are not relevant to determining either the amount of any damages suffered by the Class or when the injurious situation allegedly caused by Defendants' Rocky Flats operations became complete and comparatively enduring. The relevant evidence on these questions is evidence of *relative* property values, that is how any changes in Class Area property values compare to changes in the value of properties not affected by Rocky Flats. Evidence of absolute property values, without this comparison, is not probative of these questions.

I further find that any probative value that evidence of absolute property values and appreciation rates might have is substantially outweighed by the risk of unfair prejudice and juror confusion. Presentation of such evidence would distract the jury from the proper "but for" measure of damages and improperly suggest that Plaintiffs were not harmed or should bear any harm they suffered because their properties have appreciated in value in absolute terms.

*93 This situation presents many of the same concerns considered by the Tenth Circuit in *Perlmutter v. United States Gypsum Co.*, 4 F.3d 864 (10th Cir.1993), a product liability action brought by the developers of a shopping mall to recover the costs of asbestos removal from the company that made the asbestos-containing materials at issue. The defendants sought to introduce evidence of the large profit the plaintiffs received in selling the mall after the asbestos removal. *Id.* at 871. The Tenth Circuit affirmed the trial court's exclusion of this evidence, finding that it was "potentially very prejudicial" because the jury could have understood it "to show that, despite any loss occasioned by the removal and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                Page 95

Slip Copy, 2006 WL 3533049 (D.Colo.)
**(Cite as: Slip Copy)**

replacement of [defendant's asbestos-containing material], the Northglenn Mall project was very lucrative and the Developers benefited [sic] greatly. This might have persuaded the jury that the Developers could afford to bear any loss associated with the removal of [defendant's material]." *Id.* These same considerations apply here, and substantially outweigh any probative value that evidence of Class Area absolute property values and appreciation rates might have.

*Relative property values.* As the preceding discussion makes clear, a different analysis applies to evidence of relative property values after 1992. Such evidence comparing property values in the Class Area with property values in areas not affected by Defendants' alleged wrongdoing at Rocky Flats is consistent with and relevant to the " but for" measure of damages. Evidence of relative property values is also relevant to determining whether the injurious situation caused by Defendants became "complete" and "comparatively enduring" between 1989 and 1992 as Plaintiffs allege.

Presentation of evidence of relative property values poses some risk of unfair prejudice and confusion of the issues in that a jury might view the mere fact of appreciating Class Area property values as an indication that the Class has not suffered any true harm from Defendants' alleged conduct or is able to bear that harm. *See Perlmutter,* 4 F.3d at 871. I find this risk, however, does not substantially outweigh the probative value of this evidence as just described.

Accordingly, I grant Plaintiffs' motion to exclude evidence of post-1992 property values in part and deny it in part. The motion is granted with respect to evidence of absolute property values in the Class Area after 1992 for the reasons stated above. It is denied with respect to post-1992 evidence of relative property values. Because evidence of relative property values still poses some risk of unfair prejudice and juror confusion, Plaintiffs may propose a limiting instruction addressing this concern.

These rulings also dictate the result of Plaintiffs'

motion to exclude the cited exhibits in Dr. Wise's 1996 and 2004 expert reports. These exhibits compare property values and related sales information in the Class Area with that of properties in other areas and as such are evidence of relative property values. *See* App. to Pls.' *Daubert* Mot. (Doc. 1352), Tab 21 (1996 Wise Report), Exs. 5, 8; *id.,* Tab 22 (2004 Wise Suppl. Report), Exs. 6, 9. Plaintiffs' motion to exclude these exhibits is, therefore, denied.

2. Evidence of Class Members' knowledge of Rocky Flats problems

**\*94** In both their motion in limine and *Daubert* motion, Plaintiffs move to exclude evidence intended to show that Plaintiffs or Class members knew or should have known about problems at Rocky Flats before they bought their property or before the FBI raid. *See* Pls.' Mot. in Limine at 8; Pls.' *Daubert* Mot. at 6 (referencing portions of Mr. Dorchester's expert reports). Plaintiffs argue such evidence is irrelevant and therefore inadmissible as a result of my prior rulings that the defenses of statute of limitations and assumption of the risk, and the closely related defense of coming to the nuisance, are not available in this action. *See Cook X,* 358 F.Supp.2d at 1004, 1013; May 2005 Order at 19-20. Plaintiffs further assert such evidence is inadmissible even if relevant because its probative value (if any) is substantially outweighed by the danger that it will mislead and confuse the jury into improperly blaming class members for any harm they suffered.

Defendants argue that evidence of both actual and constructive Class member knowledge at the time they purchased their Class properties is relevant and admissible with respect to various issues beyond the rejected affirmative defenses. In reply and at oral argument, Plaintiffs acknowledged that such evidence might be relevant to some of these issues, and clarified that the relief they seek is confirmation that, consistent with my prior rulings, evidence concerning individual Plaintiffs' or Class members' actual or constructive knowledge of environmental and other problems at Rocky Flats cannot be offered to show or argue that Plaintiffs or the Class

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Page 96

Slip Copy, 2006 WL 3533049 (D.Colo.)
**(Cite as: Slip Copy)**

came to the nuisance or assumed the risk or that Plaintiffs' claims are barred by the statute of limitations. *See, e.g.,* Pls.' Reply in Supp. of Mot. in Limine (Doc. 1409) at 3-4.

Plaintiffs' motion is granted as narrowed in the preceding paragraph. Consistent with Colorado law and my prior rulings, Defendants are precluded from offering evidence or arguing or suggesting to the jury that Plaintiffs' trespass or nuisance claims are barred because individual Plaintiffs or all or some of the Class knew or should have known of the alleged trespass or nuisance or related problems associated with Defendants' activities at Rocky Flats when they purchased their properties in the Class Area. Evidence concerning Plaintiffs' or Class members' actual or constructive knowledge will only be permitted if it is relevant and admissible for some other purpose, and if the risk of unfair prejudice and confusion of the issues does not substantially outweigh the evidence's probative value.

### 3. Evidence of Defendants' alleged compliance with regulatory standards

In their motion in limine and *Daubert* motion, Plaintiffs also move to exclude evidence of Defendants' alleged compliance with state or federal regulatory standards at Rocky Flats. *See* Pls.' Mot. in Limine at 8-10; Pls.' *Daubert* Mot. at 7-8 (referencing portions of expert reports produced by Drs. Auxier, Frazier and Whicker). Plaintiffs contend this evidence is inadmissible because it is irrelevant to any claim or defense in this case and carries a high risk of unfair prejudice and jury confusion.

\*95 Plaintiffs' motions on this point are denied. Evidence that Defendants complied with relevant regulatory standards is relevant to the negligent conduct element of Plaintiffs' nuisance claims and to the issue of punitive damages.[FN109] *See Bayer v. Crested Butte Mountain Resort, Inc.,* 960 P.2d 70, 78 (Colo.1998); *Silkwood v. Kerr-McGee Corp.,* 485 F.Supp. 566, 578-80, 584 (W.D.Okla.1979), *rev'd in part on other grounds,* 667 F.2d 908 (10th Cir.1982), *rev'd* 464 U.S. 238, 104 S.Ct. 615, 78 L.Ed.2d 443 (1984). I am not persuaded that the probative value of this evidence is substantially outweighed by the danger of unfair prejudice or jury confusion. Plaintiffs may, if they wish, submit a limiting instruction addressing their concern that the jury could mistakenly give such evidence undue weight.

> FN109. Defendants' further argument regarding the relevance of this evidence, namely their assertion that proof of compliance with state and federal regulatory standards conclusively establishes that the alleged nuisance was reasonable and therefore not actionable under Colorado law, was extensively briefed in connection the parties' proposed jury instructions. This argument, which I rejected, is addressed in the separate jury instruction opinion issued this date. *See* Mem. Op. re: Jury Instructions, Section II.B (regarding Defendants' proposed nuisance Instruction No. 7).

### D. Request to Exclude Certain Lay Evidence

#### 1. National security evidence

Plaintiffs move to exclude evidence offered to show that Defendants' conduct was justified by the demands of national security. The scope of Defendants' intended evidence on this point is set forth in "Defendants' Statement Regarding National Security Evidence" (Doc. 1442), filed September 14, 2005, at my direction.

This motion in limine and Plaintiffs' arguments in support of it parallel those asserted in connection with Plaintiffs' motion to exclude expert testimony by Dr. Jack Holl regarding the Cold War armaments race and the role of the Rocky Flats plant in building the United States' nuclear weapons stockpile. I granted that motion in part and denied it in part. *See supra* Section II.A.4. I do the same with respect to this motion in limine for the reasons stated earlier. *See id.*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Page 97

Slip Copy, 2006 WL 3533049 (D.Colo.)
**(Cite as: Slip Copy)**

Accordingly, I exclude Defendants' proffered evidence regarding "Weapons Program and the Cold War" as reported in Section I of their September 14 statement, and deny Plaintiffs' motion to exclude evidence regarding the subjects set forth in the Sections II-V of Defendants' September 14 statement. I will, however, scrutinize any evidence that is ultimately offered on the subjects set forth in Sections II-V to ensure that is otherwise admissible and is not needlessly cumulative.

2. Lay testimony by real estate agents

Plaintiffs have moved to exclude certain lay testimony by Defendants' real estate agent witnesses. *See* Pls.' Mot. in Limine at 3-5. Plaintiffs do not object to these witnesses testifying about their personal knowledge of transactions in which they participated, including whether participants in these transactions expressed concerns or requested a discount because of problems associated with Rocky Flats. Rather, Plaintiffs have requested that I bar these real estate agent witnesses from generalizing from this personal knowledge to offer opinion testimony on whether and how problems at Rocky Flats affected the market for properties in the Class Area as a whole.

This request is governed by Federal Rule of Evidence 701, which provides that a lay witness may only offer opinion testimony if the opinion is: " (1) rationally based on the perception of the witness; (2) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue; and (3) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Plaintiffs contend that opinion testimony extrapolating the personal experience of these real estate agents to the market for Class Area properties as a whole does not meet Rule 701's requirements because the agents would then be giving opinions about transactions in which they did not participate, so that their opinions would not be "rationally based on the perception of the witness," and because this extrapolation from personal experience to generalized conclusions would require these witnesses to use their specialized knowledge as real estate agents.

*96 Defendants respond that their real estate agent witnesses are entitled to testify regarding the facts of any transactions in which they participated, including the lack of effect Rocky Flats had on these transactions. This may be true, but it is not responsive to the issue presented, which is whether Rule 701 authorizes lay testimony by these witnesses that draws inferences or offers opinions on Rocky Flats' effect on the market as a whole, which indisputably includes transactions in which these witnesses did not participate. I find Rule 701 does not permit such testimony. The cases cited by Defendants do not go to this larger issue, and instead involve situations in which the lay witness was offering opinions about specific events or circumstances based on their personal participation or knowledge of these events or circumstances.

The analysis of the court in *Estate of Dunia v. Commissioner of Internal Revenue,* No. 6115-00, 2004 WL 1119603 (U.S.Tax Ct. May 20, 2004), is instructive here. In that case, the court considered whether a general partner in a venture that had purchased the land at issue could give lay opinion testimony regarding the value of the land at a time when the partnership did not own the property. The court held he could not because he lacked personal knowledge of the land in question at the valuation date, with the result that his lay opinion would necessarily have been "based upon the specialized knowledge derived from his experience as a real estate developer." *Id.* Similarly, while Defendants' real estate agent witnesses have participated in transactions in the Class Area, they could only state broad opinions encompassing transactions in which they did not participate, and the market as a whole, by drawing on their extrinsic and specialized knowledge as real estate professionals.

Accordingly, for the reasons stated above, I grant Plaintiffs' motion on this point and bar Defendants' real estate agent witnesses from opining on whether or how Rocky Flats and Defendants' activities there affected any transactions in which these witnesses did not personally participate or how Rocky Flats affected the market for Class properties as a whole.

3. Lay testimony by Roy Thigpen

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Page 98

Slip Copy, 2006 WL 3533049 (D.Colo.)
**(Cite as: Slip Copy)**

Plaintiffs move to exclude testimony by lay witness Roy Thigpen. *See* Pls.' Mot. in Limine at 5-8. His anticipated testimony, as described by both parties, concerns his participation in real estate transactions with named Plaintiff Merilyn Cook in 1984-85. *See id.* at 5; Defs.' Resp. to Pls.' Mot. in Limine (Doc. 1394) at 18-24. Mr. Thigpen reportedly will testify that he purchased a parcel of land from Ms. Cook in December, 1984, but then defaulted on the loan in 1985, which allowed Ms. Cook to assume his mortgage and thereby re-acquire the property. Mr. Thigpen testified at deposition that he did not view the 1984 sale as an arms-length transaction, and that it was arranged by a mutual acquaintance with the intent that Ms. Cook would re-acquire the property, subject to the mortgage, to help her consolidate her debts. Plaintiffs seek to exclude this testimony on the grounds that it is irrelevant and would be unfairly prejudicial.

**\*97** This motion is granted in part and denied in part. Mr. Thigpen's account of his 1984-85 dealings with Ms. Cook are of marginal relevance at best to any issue to be decided by the jury. It also poses a substantial risk of unfair prejudice, jury confusion and waste of trial time. His testimony is primarily a personal attack on Ms. Cook, who is but one member of a class of thousands. It would unnecessarily confuse the jury and consume trial time as Plaintiffs countered Mr. Thigpen's account with Ms. Cook's version of events and evidence drawing Mr. Thigpen's own credibility into question. What little probative value Mr. Thigpen's testimony might have is substantially outweighed by these risks and will therefore be excluded. However, if Ms. Cook testifies regarding her dealings with Mr. Thigpen, Defendants may present Mr. Thigpen in rebuttal as appropriate.

*Conclusion*

For the reasons stated above, Defendants' motions to exclude expert testimony by Plaintiffs' experts (Docs.1371, 1374, 1376/1380) were denied; Defendants' motions in limine Nos. 1-16 (Docs.1354-69) were granted in part and denied in part; and Plaintiffs' motion to exclude testimony of certain defense expert witnesses (Doc. 1350) and omnibus motion in limine (Doc. 1341) were granted in part and denied in part. Each of these decisions was issued in summary form before trial in the bench rulings cited in the introduction to this memorandum opinion.

D.Colo.,2006.
Cook v. Rockwell Intern. Corp.
Slip Copy, 2006 WL 3533049 (D.Colo.)

Briefs and Other Related Documents (Back to top)

• 2006 WL 1408380 (Trial Deposition and Discovery) ÝJuror Z Name Redacted" Affidavit (May 9, 2006) Original Image of this Document (PDF)
• 2006 WL 622547 (Trial Filing) Plaintiffs' Request for Guidance Regarding Trial Exhibits (Mar. 7, 2006) Original Image of this Document (PDF)
• 2006 WL 622569 (Trial Motion, Memorandum and Affidavit) Defendants' Reply in Support of Their Motion to Preserve Jury Notes (Mar. 6, 2006) Original Image of this Document (PDF)
• 2006 WL 622568 (Trial Motion, Memorandum and Affidavit) Defendants' Reply in Support of their Motion to Preserve Jury Notes (Mar. 3, 2006) Original Image of this Document (PDF)
• 2006 WL 622567 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Memorandum in Response to Defendants' Motion to Preserve Jury Notes (Feb. 24, 2006) Original Image of this Document (PDF)
• 2006 WL 622546 (Trial Filing) Plaintiffs' Statement Regarding Agenda for Conference (Feb. 17, 2006) Original Image of this Document (PDF)
• 2006 WL 622566 (Trial Motion, Memorandum and Affidavit) Defendants' Motion to Preserve Jury Notes (Feb. 16, 2006) Original Image of this Document (PDF)
• 2006 WL 399316 (Verdict, Agreement and Settlement) Jury Verdict Form (Feb. 14, 2006) Original Image of this Document (PDF)
• 2006 WL 622713 (Verdict, Agreement and Settlement) Jury Verdict Form (Feb. 13, 2006) Original Image of this Document (PDF)
• 2006 WL 622538 (Trial Filing) Plaintiffs' Statement Regarding Jury's Question of February 7, 2006 (Feb. 8, 2006) Original Image of this Document (PDF)
• 2006 WL 622539 (Trial Filing) Defendants'

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                 Page 99

Slip Copy, 2006 WL 3533049 (D.Colo.)
**(Cite as: Slip Copy)**

Statement Regarding the Court's Proposed Response To the Jury's Question of February 7, 2006 (Feb. 8, 2006) Original Image of this Document (PDF)
• 2006 WL 622540 (Trial Filing) Plaintiffs' Statement Regarding Jury's Question of February 8, 2006, Regarding Instruction No. 3.25 (Feb. 8, 2006) Original Image of this Document (PDF)
• 2006 WL 622541 (Trial Filing) Trial Filing (Feb. 8, 2006) Original Image of this Document (PDF)
• 2006 WL 622542 (Trial Filing) Defendants' Statement Regarding the Court's Proposed Response To the Jury's Question of February 8, 2006 Regarding Jury Instruction 3.25 (Feb. 8, 2006) Original Image of this Document (PDF)
• 2006 WL 622543 (Trial Filing) Plaintiffs' Reply Regarding Jury's Question of February 8, 2006, Regarding Instruction No. 3.25 (Feb. 8, 2006) Original Image of this Document (PDF)
• 2006 WL 622544 (Trial Filing) Defendants' Supplemental Statement Regarding the Court's Proposed Response to the Jury's Question of February 8, 2006 Regarding Jury Instruction 3.25 (Feb. 8, 2006) Original Image of this Document (PDF)
• 2006 WL 622535 (Trial Filing) Defendants' Statement Regarding The Jury's Request for A Calculator (Feb. 6, 2006) Original Image of this Document (PDF)
• 2006 WL 622536 (Trial Filing) Defendants' Statement Regarding P-240 and DX-1290 (Feb. 6, 2006) Original Image of this Document (PDF)
• 2006 WL 622537 (Trial Filing) Plaintiffs' Response to Defendants' Statement Regarding P-240 and DX-1290 (Feb. 6, 2006) Original Image of this Document (PDF)
• 2006 WL 622534 (Trial Filing) Plaintiffs' Statement Re Court's Second Draft Response to Jury's Question Re Setoff (Feb. 1, 2006) Original Image of this Document (PDF)
• 2006 WL 399312 (Jury Instruction) Plaintiffs' Proposed Supplemental Jury Instruction (Jan. 25, 2006) Original Image of this Document (PDF)
• 2006 WL 622565 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Opposition to Defendants' ""Emergency Motion" (Jan. 25, 2006) Original Image of this Document (PDF)
• 2006 WL 622564 (Trial Motion, Memorandum and Affidavit) Defendants' Motion Regarding the Jury's Note with Respect to Jury Verdict Question 2, and Request That, If the Court is to Provide a New Definition of ""intentionally" Based on the Colorado Supreme Court's Decision in Hoery, it Provide a Definition that Comes Verbatim from Hoery (Jan. 24, 2006) Original Image of this Document (PDF)
• 2006 WL 622563 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Motion to Clarify the Record Regarding Certain Exhibits (Jan. 23, 2006) Original Image of this Document (PDF)
• 2006 WL 622712 (Verdict, Agreement and Settlement) Stipulation to Clarify the Record Regarding Certain Exhibits (Jan. 23, 2006) Original Image of this Document (PDF)
• 2006 WL 622533 (Trial Filing) Plaintiffs' Statement Re: Defendants' Motion to Strike Selected Testimony of Wayne Hunsperger, John Radke, and Thomas Cochran (Jan. 22, 2006) Original Image of this Document (PDF)
• 2006 WL 399307 (Jury Instruction) (Jan. 20, 2006) Original Image of this Document (PDF)
• 2006 WL 399308 (Jury Instruction) (Jan. 20, 2006) Original Image of this Document (PDF)
• 2006 WL 399309 (Jury Instruction) (Jan. 20, 2006) Original Image of this Document (PDF)
• 2006 WL 399310 (Jury Instruction) (Jan. 20, 2006) Original Image of this Document (PDF)
• 2006 WL 399311 (Jury Instruction) (Jan. 20, 2006) Original Image of this Document (PDF)
• 2006 WL 622562 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Response to Defendants' Renewed Motion for Judgment As A Matter of Law (Jan. 20, 2006) Original Image of this Document (PDF)
• 2006 WL 393178 (Trial Motion, Memorandum and Affidavit) Defendants' Motion for Clarification and Defendants' Statement Regarding the Court's Ruling Relating to Jury Instruction No. 3.5 (Jan. 19, 2006) Original Image of this Document (PDF)
• 2006 WL 393180 (Trial Transcript) (Jan. 19, 2006) Original Image of this Document (PDF)
• 2006 WL 399306 (Jury Instruction) (Jan. 19, 2006) Original Image of this Document (PDF)
• 2006 WL 622560 (Trial Motion, Memorandum and Affidavit) Defendants' Motion to Strike Portion of Jury Instruction No 3.5 (Jan. 19, 2006) Original Image of this Document (PDF)
• 2006 WL 622561 (Trial Motion, Memorandum

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy  Page 100

Slip Copy, 2006 WL 3533049 (D.Colo.)
**(Cite as: Slip Copy)**

and Affidavit) Plaintiffs' Opposition to Defendants' Overnight Motions Re Jury Instructions (Jan. 19, 2006) Original Image of this Document (PDF)
• 2006 WL 399302 (Jury Instruction) (Jan. 18, 2006) Original Image of this Document (PDF)
• 2006 WL 399303 (Jury Instruction) (Jan. 18, 2006) Original Image of this Document (PDF)
• 2006 WL 399304 (Jury Instruction) (Jan. 18, 2006) Original Image of this Document (PDF)
• 2006 WL 399305 (Jury Instruction) (Jan. 18, 2006) Original Image of this Document (PDF)
• 2006 WL 622532 (Trial Filing) Plaintiffs' Statement in Opposition to Defendants' Oral Motion to Reconsider Revisions to Instruction No. 3.5 (Jan. 18, 2006) Original Image of this Document (PDF)
• 2006 WL 622559 (Trial Motion, Memorandum and Affidavit) Defendants' Reply in Support of Their Proposed Instruction on Corporate Retention of Expert Witnesses (Jan. 18, 2006) Original Image of this Document (PDF)
• 2006 WL 393177 (Trial Motion, Memorandum and Affidavit) Defendants' Renewed Motion for Judgment as a Matter of Law (Jan. 17, 2006) Original Image of this Document (PDF)
• 2006 WL 399301 (Jury Instruction) (Jan. 17, 2006) Original Image of this Document (PDF)
• 2006 WL 403027 (Trial Motion, Memorandum and Affidavit) Defendants' Response to Plaintiffs' Motion for Judgment as a Matter of Law (Jan. 17, 2006) Original Image of this Document (PDF)
• 2006 WL 403028 (Trial Motion, Memorandum and Affidavit) Defendants' Motion to Strike Selected Testimony of Wayne Hunsperger, John Radke, and Thomas Cochran (Jan. 17, 2006) Original Image of this Document (PDF)
• 2006 WL 622531 (Trial Filing) Plaintiffs' Statement on Closing Argument (Jan. 17, 2006) Original Image of this Document (PDF)
• 2006 WL 622553 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Motion to Clarify the Record Regarding Certain Exhibits, and Motion to Admit Exhibits (Jan. 17, 2006) Original Image of this Document (PDF)
• 2006 WL 622554 (Trial Motion, Memorandum and Affidavit) Defendants' Response to Plaintiffs' Motion to Strike the Testimony of Dr. John Till (Jan. 17, 2006) Original Image of this Document (PDF)
• 2006 WL 622555 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Reply in Support of Motion for Judgment As A Matter of Law (Jan. 17, 2006) Original Image of this Document (PDF)
• 2006 WL 622556 (Trial Motion, Memorandum and Affidavit) Defendants' Response to Plaintiffs' January 17, 2006 Motion to Clarify the Record Regarding Certain Exhibits, and Motion to Admit Exhibits (Jan. 17, 2006) Original Image of this Document (PDF)
• 2006 WL 622557 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Statement Re: Defendants' Motion to Strike Selected Testimony of Wayne Hunsperger, John Radke, and Thomas Cochran (Jan. 17, 2006) Original Image of this Document (PDF)
• 2006 WL 622558 (Trial Motion, Memorandum and Affidavit) Defendants' Renewed Motion for Judgment As A Matter of Law (Jan. 17, 2006) Original Image of this Document (PDF)
• 2006 WL 622552 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Supplement to Plaintiffs' Motion to Strike the Testimony of Dr. John Till Regarding the ""Bulldozer Theory" (Jan. 15, 2006) Original Image of this Document (PDF)
• 2006 WL 393176 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Motion for Judgment as a Matter of Law (Jan. 14, 2006) Original Image of this Document (PDF)
• 2006 WL 622551 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Motion to Strike the Testimony of Dr. John Till Regarding the ""Bulldozer Theory" (Jan. 14, 2006) Original Image of this Document (PDF)
• 2006 WL 399299 (Jury Instruction) Plaintiffs' Proposed Revisions to Jury Instructions (Jan. 13, 2006) Original Image of this Document (PDF)
• 2006 WL 399300 (Jury Instruction) Plaintiffs' Proposed Revisions to Jury Instructions (1/12/06) (Jan. 13, 2006) Original Image of this Document (PDF)
• 2006 WL 622530 (Trial Filing) Plaintiffs' Supplemental Proffer for Rebuttal Witness Wayne Hunsperger (Jan. 12, 2006) Original Image of this Document (PDF)
• 2006 WL 622711 (Verdict, Agreement and Settlement) Parties' Stipulated Agreement Regarding Admission of Exhibits (Jan. 12, 2006) Original Image of this Document (PDF)
• 2006 WL 393175 (Trial Motion, Memorandum

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.