IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 05-cv-00377-WDM-BNB

MOISES CARRANZA-REYES

      Plaintiff,

vs.

PARK COUNTY, a public entity of the State of Colorado and its governing board, THE PARK COUNTY BOARD OF COUNTY COMMISSIONERS; PARK COUNTY SHERIFF'S OFFICE, a public entity of the State of Colorado; FRED WEGENER, individually and in his official capacity as Sheriff of Park County, Colorado; MONTE GORE, individually and in his capacity as Captain of Park County Sheriff's Department; VICKIE PAULSEN, individually and in her official capacity as Registered Nurse for Park County, Colorado,

      Defendants.

_____

**PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION
TO LIMIT EXPERT TESTIMONY
BY MICHAEL S. NIEDERMAN, M.D. AND ROBERT B. GREIFINGER, M.D.**

_____

      Plaintiff hereby responds to Defendants' Motion to Limit Expert Testimony by Michael S. Niederman, M.D., and Robert B. Greifinger, M.D., and for the reasons hereinafter stated, requests that the Motion be denied.

## DR. NIEDERMAN'S EXPERTISE AND RESEARCH

**A.**     **EXPERTISE**

      Dr. Niederman is one of the world's leading authorities on community-acquired and hospital-acquired (nosocomial) pneumonia. He has lectured extensively throughout the United States and in other countries on community-acquired pneumonia and its prevention, diagnosis and treatment (see Curriculum Vitae["CV"], Invited Lectures, pp. 18-44, attached as **Exhibit 1**). He has also published

1

extensively on community-acquired pneumonia and hospital-acquired pneumonia in peer review publications (see CV, pp. 45-59, listing 122 publications, **Exhibit 1**), and in publications reviews (see CV, pp. 60-81, listing 235 publications, **Exhibit 1**).  He is also the editor or guest editor in 27 books writing about respiratory infections, including pneumonia (see CV, pp. 82-84, listing 27 publications, **Exhibit 1**).

Dr. Niederman is chairman of the Department of Medicine at Winthrop University Hospital and is professor of medicine at the State University of New York at Stony Brook (see Niederman Depo. at 11-14, **Exhibit 2,** and CV, pp. 1-2, **Exhibit 1**).  His medical practice for the last 23 years has been in pulmonary and critical care with a focus on clinical research on infectious respiratory disease, particularly pneumonia, and some research related to sepsis (see Niederman Depo. at 15, **Exhibit 2**).  He is board-certified in internal medicine, in critical care medicine, and in pulmonary subspecialty (see CV, p. 3, **Exhibit 1**).

**B.    RESEARCH**

Dr. Niederman has been the principal investigator or participant in grants to research the treatment of pneumonia, including community-acquired pneumonia (see CV, p. 10-16, **Exhibit 1**).  There has been a lot of research on Group A Strep, the bacteria involved in this case, and Dr. Niederman pulled only a few of the relevant clinical studies, which he included in his file in this case (see Niederman Depo. at 65-6, **Exhibit 2**).  One of the studies involved an outbreak of Group A Strep throat in a crowded environment in a military facility and the strep throat progressed to pneumonia in 3% of the military population living in crowded conditions (see Niederman Depo. at 66 an 74-75, **Exhibit 2**).

Dr. Niederman is only doing clinical research currently, but in the past did basic science research on the mechanisms of respiratory colonization and infection.  The current clinical research

also involves a large community-acquired pneumonia project that they are now in the process of writing for publication (see Niederman Depo. at 16-19, **Exhibit 2**).

**DR. NIEDERMAN'S OPINIONS IN THIS CASE**

**A.**     **MATERIALS REVIEWED IN ARRIVING AT OPINIONS**

In addition to deposition testimony, Dr. Niederman reviewed all of the medical records in this case, which include the medical records from the Park County Jail; records from the Consulate General of Mexico in Denver; medical records from the Summit County Medical Center; medical records from Denver Health Medical Center; and the ambulance records (see Niederman Report of 6/8/06 attached as **Exhibit A-2** to Defendants' Motion).

**B.**     **OPINIONS ON CAUSATION**

In reviewing all of the relevant records and deposition testimony, Dr. Niederman concluded that when Plaintiff arrived at the jail, he was "completely healthy," but was housed in a cell that was overcrowded and several inmates had respiratory illness, including cough and sore throat.  Plaintiff then also became ill on March 4 and by March 5 had a fever, weakness, vomiting and a sore throat. He was seen by the nurse on March 6 with an elevated temperature and pulse rate, a red sore throat, body aches, headache and nausea.  His symptoms were worse on March 7 when seen by the nurse with the same symptoms plus vomiting.  At 3:45 a.m. on March 8, Plaintiff was having trouble breathing which required oxygen therapy and his symptoms were worse.  When he was finally transported to Summit Medical Center arriving at 12:45 p.m. on March 8, he had severe pneumonia with associated septic shock (see Niederman Report, **Exhibit A-2** attached to Defendants' Motion; and Niederman Depo. at 70, and 134-36, **Exhibit 2**).

Dr. Niederman explained that bacteria frequently grow in the throat, lungs and other sites without invading and causing infection and this is called "colonization," which is often the first step

before infection (see Niederman Depo. at 19-20, **Exhibit 2**).  He conducted studies of the cellular mechanisms that allow bacteria to colonize the host to understand why some patients become colonized and others don't with the same exposure (see Niederman Depo. at 20-21, **Exhibit 2**).

In this case, a streptococcal colonization occurred in Plaintiff's throat causing it to become sore and the invasive sore throat then progressed to early pneumonia on March 6 or 7 into March 8 (see Niederman Depo. at 60-63, **Exhibit 2**).  Medical research and studies show that strep throat is not a common cause of pneumonia because it usually remains a sore throat, but a crowded environment facilitates the spread of the disease and it can progress to pneumonia in a small percent of the people colonized (see Niederman Depo. at 66, **Exhibit 2**).  The mechanism of a Group A beta-hemolytic streptococcal pneumonia is initial colonization in the throat or mouth, and in this case, probably the oral pharynx.  Although it's possible that colonization started before March 1, he had no symptoms of infection on arrival and did not develop symptoms until March 4.  If it was colonized before his arrival, the conditions of his confinement could cause him to become symptomatic if he was in an environment where he was emotionally and physically stressed and not sleeping well.  Dr. Niederman concluded that Plaintiff either came to the jail colonized, but not infected, and the jail environment interfered with his immune function and allowed it to progress, or he acquired it from the conditions he was in at the jail and the combination of acquiring it at the jail and stress allowed it to progress (see Niederman Depo. at 71-2, **Exhibit 2**).  In the study of the outbreak of this infection in a crowded military facility, 3% of the people infected developed pneumonia.  This translated to one in every 60 people in a crowded environment (see Niederman Depo. at 71-75, **Exhibit 2**).

Dr. Niederman reviewed the deposition testimony of Plaintiff and his brother in concluding that other detainees were sick and the cell was overcrowded.  Plaintiff described the crowded, filthy conditions of Pod D and on arrival, other detainees were sick, sneezing and coughing and Plaintiff

4

slept on the floor between two sick detainees.  A summary of Plaintiff's testimony is contained in Plaintiff's Response to Motion for Summary Judgment from Defendants Park County Board of County Commissioners, Fred Wegener and Monte Gore in paragraphs 20 through 38.   Dr. Niederman testified that Plaintiff acquired the bacteria in the jail environment or the jail environment contributed to its progressing the way it did (see Niederman depo. at 80-84, **Exhibit 2**).

Plaintiff then developed sepsis as an inflammatory response to the infection and probably had sepsis at 3:45 a.m. on March 8 (see Niederman depo. at 101-02, **Exhibit 2**).  He explains that when you develop pneumonia, it is initially a very small spot on the lung that gets larger and then at some point it initiates an inflammatory response both in the lungs and the rest of the body and the inflammatory response then develops into septic shock (see Niederman Depo. at 101-04, **Exhibit 2**). By early morning of March 8, Plaintiff was in septic shock (see Niederman Depo. at 104, **Exhibit 2**).

Group A beta-hemolytic streptococcal pneumonia has to be colonized in the throat and this is a classic bacteria that resides in the throat.  If not treated, it can then spread and lead to pneumonia (see Niederman Depo. at 115, **Exhibit 2**).  Then pneumonia can lead to sepsis from the body's inflammatory response (see Niederman Depo. at 116, **Exhibit 2**).

With up to 60 inmates, some sleeping on mattresses on the floor and with wall-to-wall people, the amount of physical space between them was both a stress and a potential vector mechanism for communicable diseases (see Niederman Depo. at 130, **Exhibit 2**).  Even if Plaintiff arrived colonized, there is no evidence that he arrived ill.  He acquired the illness and symptoms after arrival, so he either acquired the bacteria in the jail and became ill, or arrived with the bacteria and became ill because of the overcrowded conditions (see Niederman Depo. at 128, **Exhibit 2**).

**C.**      **PLAINTIFF'S CONDITION WAS TREATABLE**

Since Plaintiff had only a strep throat on March 4, 5 and 6, a rapid strep-test could have been used to diagnose strep throat which could have been successfully treated with antibiotics (see Niederman Depo. at 57-59, **Exhibit 2**).  Giving penicillin would then have prevented pneumonia and the complications that followed (see Niederman Depo. at 93, **Exhibit 2**).  Once the strep throat developed into pneumonia on March 7 and then became severe on March 8 (see Niederman Depo. at 77, **Exhibit2**), Dr. Niederman testified to a reasonable degree of medical probability that the complications would have been avoided had he received antibiotics no later than 5:00 a.m. on March 8.  A majority of patients with pneumonia do not develop these complications because they are timely treated with antibiotics.  Plaintiff should have been treated before 3:45 a.m. on March 8, but that was an obvious time to intervene (see Niederman Depo. at 94-5, **Exhibit 2**).

As sick as Plaintiff was at 3:45 a.m., he should have received antibiotics within 4 hours or by 8:00 a.m. on March 8.  If he had received antibiotics by 8:00 a.m., it is much less likely he would have had complications because by experience and statistical studies, a majority of patients with pneumonia do not get the complications Plaintiff had when timely treated (see Niederman Depo. at 96, **Exhibit 2**).

The standard of care for health care providers in the general community requires that antibiotics be started within 4 hours of the symptoms of pneumonia.  Beyond 4 hours, there is data showing that every hour of delay adds to mortality (see Niederman Depo. at 97-98, **Exhibit 2**).  It is more likely than not had Plaintiff received antibiotics in a timely way, he would have been spared the amputation.  This is based on the fact that patients who receive antibiotics within 4 hours more likely than not do not get the complications Plaintiff did, and Niederman can say with medical probability that had Plaintiff received antibiotics within 4 hours, it is more likely than not the complications would have been avoided (see Niederman Depo. at 142-43, **Exhibit 2**).

The 4 hours has become a national standard for Medicare that every hospital should treat with antibiotics within 4 hours of a patient's arrival with pneumonia.  Further, the Joint Commission for the Accreditation of Health Care Organizations has made that their standard and the National Quality Forum agrees with this standard and is evaluating it.  Further, it has been in the guidelines of the Infectious Disease Society of America and the standard has been published by Peter Houck in the Archives of Internal Medicine in 2004 (see Niederman Depo. at 148-49, **Exhibit 2**).  The 4-hour standard to give antibiotics relates to pneumonia, and not the treatment of strep throat (see Niederman at 154, **Exhibit 2**).

### DR. GREIFINGER'S OPINIONS ON CAUSATION

Dr. Greifinger is a nationally recognized expert on correctional health care with particular expertise in the spread of tuberculosis, a communicable disease of the lungs, in prisons and jails in the United States.  A summary of his experience and his CV are attached as **Exhibit 3**.  He is a board-certified pediatrician and certified as a fellow in the Society of Correctional Physicians.  From 1976-2002, he was an assistant professor of epidemiology and social medicine at the Albert Einstein College of Medicine and is presently an adjunct professor of health.  He has implemented infection control programs in correctional facilities and managed those programs.  He has published extensively on the prevention and treatment of TB in correctional systems.  By experience and training, he has substantial knowledge of the conditions that create the spread of communicable disease and on how to prevent the spread of communicable disease in prisons and jails.

Dr. Greifinger has 20 years of experience in correctional health care, has had operational, consultational, and oversight responsibilities in correctional health care and has visited more than 100 correctional facilities across the United States (see Greifinger Depo. at 74-5, **Exhibit 4**).  He is familiar with the ACA national standards on conditions of confinement and based on the materials

he reviewed in this case, the sanitary conditions were egregious and unconscionable in Pod D during the period of March 1-8, 2003 (see Greifinger Depo. at 87-89, **Exhibit 4**).  Overcrowding was a significant factor in the creation of unsanitary conditions and stress to the immune systems of the inmates confined in Pod D including the Plaintiff (see Greifinger depo. at 90, **Exhibit 4**).

Dr. Greifinger testified that the crowded and unsanitary conditions in Pod D during March 1-8 caused Plaintiff to get sick with streptococcal disease, and the lack of timely and appropriate medical care led to his near-death, amputation and other complications (see Greifinger Depo. at 93, **Exhibit 4**).  His causation opinions are set forth in Paragraph 28 and in his conclusions in his report of 7/29/05; in Paragraphs 15, 16 and 36 of his report dated 4/27/06; and in Paragraph 6 of his report of 6/2/06 (his reports are attached as **Exhibit A-3** to Defendants' Motion in Limine; and see Greifinger Depo. at 95-96, **Exhibit 4**).

Dr. Greifinger testified that a rapid strep-test or throat culture should have been obtained and would have diagnosed strep on March 6, 7 and 8 (see Greifinger depo. at 260-65, **Exhibit 4**), and the lack of timely and appropriate medical care in failing to diagnose and treat strep throat led to all of Plaintiff's complications, including the amputation of his left leg (see Greifinger Depo. at 93, **Exhibit 4**).

## **ARGUMENT**

## A.    **DEFENDANTS DID NOT MEET THEIR THRESHOLD BURDEN**

Defendants did not meet their threshold burden to show that the present case is not an "ordinary case where the reliability of an expert's methods is properly taken for granted."  *McCoy v. Whirlpool Corp.,* Not Reported in F.Supp. 2d 2003 WL 1923016, *7 (D.Kan. 2003) (citing *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 152 (1999)) (*McCoy* unpublished disposition attached as **Exhibit 5**).  "In seeking to exclude testimony under *Daubert,* defendants must '[call] sufficiently into

question' the principles, methods, or applications" the expert employed.  *McCoy* at *7 (citing *Daubert v. Merrel Dow Pharms., Inc.,* 509 U.S. 579, 490 (1993) (*McCoy* unpublished disposition attached as **Exhibit 5**).

A trial judge must have the discretionary authority to "avoid unnecessary 'reliability' proceedings in ordinary cases where the reliability of an expert's methods is properly taken for granted, and to require appropriate proceedings in the less usual or more complex cases where cause for questioning the expert's reliability arises." *Kumho Tire Co., Ltd.,* 526 U.S. at 152. "Indeed, the Rules seek to avoid 'unjustifiable expense and delay' as part of their search for 'truth' and the 'just determine[ation]' of proceedings." *Id.* (citing Fed. Rule Evid. 102).

The instant case does not raise a novel medical causation theory.  To the contrary, it is common knowledge, even among the lay public, that crowded, unsanitary conditions can spread communicable disease.  *Daubert* findings are required in the case of a novel medical causation theory which takes the case out of the realm of an ordinary case where the reliability of an expert's methods could properly be taken for granted.  *Dodge v. Cotter Corp.,* 328 F.3d 1212, 1229 (10th Cir. 2003).

It is well established that crowded, unsanitary conditions can spread communicable disease; that strep throat is a communicable disease which is easily treated with antibiotics when timely diagnosed.  If not timely diagnosed and treated, it can lead to pneumonia.  Pneumonia can also be successfully treated if timely diagnosed, and if not treated, can lead to sepsis, septic shock and death.  These are not novel scientific theories, but are well established in medicine.  It is inappropriate to apply *Daubert* under these circumstances, but if applied, the testimony of both Dr. Niederman and Dr. Greifinger satisfies the *Daubert* criteria.

*Daubert's* "four, non-exclusive factors suggested for determining whether an expert's theories are scientifically reliable are 'most relevant in the context of a new and novel scientific theory…'" *Hoy v. DRM, Inc.,* 114 P.3d 1268, 1278-79 (Wyo. 2005) (citing *Kumho Tire,* 526 U.S. at 152). "This step of the analysis does not rquire that all theories must be proven by tests specific to the facts in question." *Id.* at 1279. (finding it inappropriate to "apply the four, non-exclusive factors applicable to the first step of the *Daubert* analysis, which considers whether a theory or technique is sufficiently reliable to support an expert opinion, to the second step of the analysis, which considers whether the theories 'fit' the facts in this case.") *Id.* at 1278. Experts relying on theories that are well-established, such as subsidence of soils caused by dewatering, compaction by heavy equipment and damming are not unreliable due to a "lack of on-site testing to prove their application to the instant facts." *Id.*

Defendants argue that Plaintiff failed to conduct a controlled epidemiological study at the jail to prove the cause of Plaintiff's medical condition (see Defendants' Motion at page 6). This is not necessary because the theory that crowded and unsanitary conditions can spread communicable disease is well-tested, as is the theory that the treatment of strep throat with penicillin is well-accepted and successful. Further, the treatment of pneumonia in its early stages (within 4 hours) is likewise well-accepted and successful. The Tenth Circuit addressed the lack of testing of well-accepted theories stating that the practice of testing hypotheses to determine whether they can withstand critical scrutiny is "aimed at theories purporting to explain the causal relations among regularly occurring natural phenomena." *Bitler v. A.O. Smith Corp.,* 391 F.3d 1114, 1122 (10th Cir. 2004). The *Bitler* court found no such theory to be in question in that case as the plaintiffs needed only to establish by a preponderance of the evidence that copper sulfide particles caused a one-time occurrence: the gas explosion in their basement. *Id.* (finding "their experts do not present any

controversial or novel explanations concerning regularly occurring natural phenomena" and testing to establish causation to a near certainty is not required.) *Id.* Testing is not required where "the only phenomenon of regular occurrence at issue here is one that is undisputed: copper sulfide particles of sufficient size or quantity if lodged on the valve seat may cause a gas leak." *Id.*

Likewise, "the Tenth Circuit has noted that, after *Daubert,* the court has continued to apply a traditional rule 702 analysis 'except in cases involving unique, untested, or controversial methodologies or techniques.'" *Cochrane v. Schneider Nat. Carriers, Inc.,* 980 F.Supp. 374, 378 (D. Kan. 1997) (citing *Compton v. Subaru of Am., Inc.,* 82 F.3d 1513, 1519 (10th Cir.), *cert. denied,* 519 U.S. 1042 (1996). *Daubert* "is unwarranted in cases where expert testimony is based solely on experience of training." *Compton* at 1518. The *Daubert* factors should only be considered "if an expert witness offers testimony based upon a particular methodology or technique." *Id.* at 1519.

Further, "[T]he factors identified in *Daubert* may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular exertise, and the subject of his testimony." *Hynes v. Energy West, Inc.,* 211 F.3d 1193, 1205 (10th Cir. 2000) (trial court did not abuse its discretion when it chose to admit expert testimony concerning industry practice and neutralization and oxidation theories based on expert's extensive scientific credentials and the ability of the expert to articulate a scientific process by which neutralization and oxidation occurs). Where a dispute involves primarily the application of scientific principles to local conditions, it is largely a matter of cross-examination and impeachment. *Id.* ("The primary dispute was as to the application of these principles to the soil conditions prevailing in Cody, and that was largely a matter of cross-examination and impeachment."). It is a misapplication of the *Daubert* analysis to require on-site testing, irrespective of whether such testing is feasible. *Hoy v. DRM, Inc.,* 114 P.3d 1268, 1279

(Wyo. 2005).  Expert testimony must be supported by appropriate validation "based on what is known."  *Daubert* 509 U.S. at 590.

Defendants do not dispute the fact that Pod D was overcrowded forcing the Plaintiff and other detainees to sleep on the floor; that other detainees were sick; that Plaintiff was not sick on arrival at the jail and became sick with a strep infection at the jail; and that he developed sepsis and pneumonia which was diagnosed on March 8 at Summit County Medical Center.  Dr. Niederman has identified multiple national organizations who have adopted the standard of treating pneumonia with antibiotics within 4 hours of developing symptoms, with a high rate of successful treatment.  Testimony is reliable when it is the result of an expert having researched and applied standards promulgated by a widely recognized organization.  *Alfred v. Caterpillar, Inc.,* 262 F.3d 1083, 1088 (10th Cir. 2001).  (*Daubert* criteria met by expert that researched and applied standards promulgated by an internationally recognized organization of engineers.)  *Id.*  Testimony based on standards is relevant but not dispositive.  *Id.*  "[E]vidence of adherence to a practice within an industry implies a significant degree of reliability."  *Hynes,* 211 F.3d at 1205.

The *Hynes* court allowed expert testimony regarding odorization of gas under *Daubert* based on the expert's theory that a neutralization reaction occurs in alkaline soils such as those found in Cody, Wyoming, which eliminates the odor of natural gas.  *Hynes,* 211 F.3d at 1203.  The expert in *Hynes* testified that his knowledge of the neutralization reaction was based on three pieces of information:  (1) a conversation in the 1950's between himself and a gas company chemist; (2) a test he performed at his home; and (3) a statement in a handbook published by Natural Gas Odorizing.  *Id.* at 1204.  The expert in *Hynes* testified that he had acted as a consultant to the gas industry and had recommended the use of thiophene as an odorant where there are alkaline soils because it does

not undergo a neutralization reaction.  *Id.*  The expert testified that this reaction is well-known in the area of gas odorization and that he had done independent research on the reaction.  *Id.*

**B.**     **THE TEST OF RELIABILITY IS FLEXIBLE AND LIBERAL**

A trial court may consider one or more of the more specific factors that *Daubert* mentioned when doing so will help determine that testimony's reliability.  *Kumho Tire Co., Ltd.,* 526 U.S. at 141.  The test of reliability is flexible and *Daubert's* list of specific factors neither necessarily nor exclusively applies to all experts or in every case.  *Id.*  The factors identified in *Daubert* may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony.  *Id.* at 150.  The list of factors was meant to be helpful, not definitive.  *Id.* at 151.  "[A] trial court should consider the specific factors identified in *Daubert* where they are reasonable measures of the reliability of expert testimony."  *Id.* at 152.

*Daubert* was intended to relax traditional barriers to admission of expert opinion testimony. *Cook v. Rockwell Intern.,* Slip Copy, 2006 WL 3533049 (D.Colo. 2006) (citing *Daubert* 509 U.S. at 588) (*Cook,* unpublished disposition attached as **Exhibit 6**).  Rule 702 mandates a liberal standard for the admissibility of expert testimony.  *Id.*  A review of the case law after *Daubert* shows that the rejection of expert testimony is the exception rather than the rule.  *Id.*

Plaintiff's experts are highly qualified to testify that the overcrowded, filthy and unsanitary conditions at the jail were a substantial factor in Plaintiff becoming ill with strep throat; that failure to diagnose and treat the strep throat with antibiotics permitted it to develop into pneumonia; that failure to treat the pneumonia then led to sepsis and septic shock.  As a pediatrician, Dr. Greifinger successfully treated many cases of strep throat (see Greifinger Depo. at 35-36, **Exhibit 4**).  Both Dr. Niederman and Dr. Greifinger have extensive experience with the spread of communicable disease of the lungs (pneumonia and TB) and Dr. Niederman explained in detail how crowded, unsanitary

conditions result in the spread of strep throat and pneumonia.  This is not new science and is so basic that the lay public has knowledge that crowded conditions create exposure from carriers of bacteria who themselves may or may not be ill.

To make a finding on reliability, a court must first determine whether the expert is qualified by "knowledge, skill, experience, training, or education" to render the proffered opinions.  *McCoy*, at *1 (unpublished disposition attached as **Exhibit 5**).  An expert's proffered testimony must be within the scope of his established expertise.  *Cook,* at *6 (unpublished disposition attached as **Exhibit 6**).  Expertise in a specialized area directly related to the issue in question is "generally not required as long as the expert 'stays within the reasonable confines of his subject area.'"  *Id. (citing Ralston v. Smith & Nephew Richards, Inc.,* 275 F.3d 965, 970 n.4 (10th Cir. 2001).  Both Dr. Niederman and Dr. Greifinger are eminently qualified by knowledge, skill, experience, training and education to render their proffered opinions.

Defendants complain that Drs. Niederman and Greifinger did not have measured or quantitative data to support their opinions.  Defendants do not explain what data is missing other than information on travel conditions and a family history from Mexico.  Defendants claim this information is necessary to determine what specific historical factors might make infection more or less likely or to determine if any patient-specific historical factors may have caused the progression from strep throat to pneumonia.  However, this information goes to the weight, not admissibility of an expert's opinions.

However, as previously demonstrated, both doctors identified substantial objective and subjective data to support their opinions.  Further, subjectivity in data does not necessarily make the resulting opinion untenably speculative if the underlying data is of the type generally relied on by other practitioners; any potential bias therein can be fully explored on cross-examination or by

presentation of competing evidence.  *Potter ex rel. Potter v. Bowman,* Slip Copy, 2006 WL 3760267

(D. Colo. 2006) (citing *Daubert* 113 S.Ct. at 2979-98) (*Potter,* unpublished disposition attached as

**Exhibit 7**).

**C.     RELIABLE PRINCIPLES AND METHODOLOGIES**

        "The second area of inquiry is whether the expert used reliable principles and methodologies

in reaching his opinion." *Cook,* at *7 (unpublished disposition attached as **Exhibit 6**).  *Daubert* set

out four, non-exclusive factors on whether the expert's methodology, principles and reasoning

underlying the proposed experts opinions:  (1) can be or have been empirically tested; (2) have been

subjected to peer review and publication; (3) have a known or potential error rate of the

methodology; and (4) have gained general acceptance in the relevant scientific community.  *Daubert,*

509 U.S. at 593-94.

        The Supreme Court in *Kumho Tire* made it clear that the *Daubert* factors are not to be used as

a checklist for making the reliability determination.  *Cook* at *7 (unpublished disposition attached as

**Exhibit 6**).  Other factors that a court may consider include "reliance on anecdotal evidence (as in

case reports), temporal proximity, and improper extrapolation (as in animal studies)."  *Allison v.*

*McGhan Medical Corp.,* 184 F.3d 1300, 1312 (11th Cir. 1999).  A temporal relationship remains a

factor that can support an expert's causation conclusions.  (No symptoms before exposure and

symptoms beginning with exposure is a temporal relationship that can support a causation

conclusion.)  (*Easum v. Miller,* 92 P.3d 794, 804 (Wyo. 2004)).

        The court must ensure that the "expert, whether basing testimony upon professional studies

or personal experience, employs in the courtroom the same level of intellectual rigor that

characterizes the practice of an expert in the relevant field."  *Cook* at *6 (citing *Kumho Tire,* 526

U.S. at 152) (*Cook,* unpublished disposition attached as **Exhibit 6**).  If this test is met, "it is up to the

15

jury to decide whether the expert used the best or most reliable methodology, what weight to accord to his testimony and which of competing experts' opinions should be credited." *Cook* at *6 (unpublished disposition attached as **Exhibit 6**). "the ultimate determination of whether expert testimony is correct and 'reliable' in this sense remains with the jury." *Id.*

Defendants complain that because Dr. Greifinger's methodology consisted of reading the documents, organizing and recording the significant findings and forming opinions, his opinion is "unexplained, unsupported, and unscientific speculation." Defendants claim that Dr. Niederman's opinion is speculation because he did not describe his methodology. However, Dr. Niederman did describe his methodology.

Further, the Supreme Court has held that an expert may draw a conclusion from a set of observations based on extensive and specialized experience. *Kumho,* 526 U.S. at 156. Experts may testify based on experience alone, or experience in conjunction with other knowledge, skill, training or education where the methodology used is explained in detail. See *U.S. v. Jones,* 107 F.3d 1147 (6th Cir. 1997) (handwriting examiner with years of practical experience and extensive training who explained his methodology in detail was permitted to testify).

Defendants complain that Dr. Niederman's opinion was not derived from any prior study of the subject, but instead arrived at solely for the purposes of this litigation. However, Dr. Niederman has published extensively on the subject of pneumonia, all of which was independent of litigation. In addition, Dr. Niederman has had numerous patients with pneumonia caused by Strep A, despite its being relatively rare.

When an expert has personally conducted research in the area and has had numerous patients with the condition, his methodology is reliable and the accuracy of his conclusions presents a jury question that must be presented at trial. *Easum,* 92 P.3d at 804.

The Defendants complain that Drs. Niederman and Greifinger did not prove that the Plaintiff was not infected before arriving at the jail or that his own susceptibility did not cause him to become ill with pneumonia.  However, an expert is not required to eliminate every potential cause of the plaintiff's condition for his or her opinion to be admissible; only to offer a reasonable explanation why the expert believes that the defendant's action or product was a substantial factor in bringing about the plaintiff's condition.  *Perkins v. Origin Medsystems, Inc.,* 299 F.Supp.2d 45 (D.Conn. 2004).

Defendants rely heavily on toxic tort cases in which the general causation of illnesses by specific chemicals has not generally been accepted in the scientific community.  These cases are not applicable to the instant case where conditions giving rise to the spread of communicable disease is well-known.  It is so well-known that the jail had a Communicable Disease Policy informing jail personnel that:  "Disease can spread rapidly through the jail, infecting inmates and staff alike.  For that reason, it is very important to be aware of the possibility that an inmate has an infectious disease, and then to know what to do about that" (see **Exhibit 8**, Park 1995).  The very symptoms which Plaintiff displayed with strep throat are listed in that policy and jail personnel are instructed to isolate any inmate displaying these signs and symptoms so that the disease will not be spread to other inmates (see **Exhibit 8**, Park 1995).  Jail personnel were informed of the various ways communicable diseases can be spread and be transmitted, including contact with an infected person, with contaminated objects such as soiled dressings or clothing, from inhaling droplets spread with an infected person sneezes or coughs (see **Exhibit 8,** Park 1996 and 1997).  In short, Park County recognized the danger of sick inmates spreading communicable disease to other inmates in a crowded jail, yet Defendants now argue that there is no basis for Plaintiff's experts arriving at the same conclusion with respect to Plaintiff becoming ill with strep throat at the jail when other sick

inmates were not isolated and Plaintiff was living under the very conditions conducive to the spread of Strep A bacteria.

Defendants rely upon *In re Breast Implant Litigation,* 11 F.Supp.2d 1217, 1224 (C.Colo. 1998).  However, the *Breast Implant Litigation* Court decided that "Epidemiology is the best evidence of causation in the mass torts context." *Id.* (citing Linda A. Bailey, et al., *reference Guide on Epidemiology,* REFERENCE MANUAL ON SCIENTIFIC EVIDENCE at 126 (1994)). ("**In the absence of an understanding of the biological and pathological mechanisms by which disease develops,** epidemiological evidence is the most valid type of scientific evidence of toxic causation") (emphasis added). *Id.*  In this case, the biological and pathological mechanisms by which strep throat develops and, without treatment, can lead to pneumonia, is well understood, is well documented, and the mechanism is explained by Dr. Niederman.  That Strep A causes strep throat and pneumonia is generally accepted in the scientific community.

**D.    RELEVANCY**

The Defendants in the present case assert that Dr. Niederman was speculating by testifying that the Plaintiff would have been "much less likely" to have acquired the disease had jail conditions been better.  The Defendants claim that to avoid "blatant speculation," Dr. Niederman would have to state unequivocally that Plaintiff would not have developed the disease if jail conditions had been better.

In contrast, the Tenth Circuit has set the standard for the relevancy/fit requirement by reference to Federal Rule 401, which defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action **more probable or less probable** than it would be without the evidence." *Cook,* at *5 (citing *Bitler,* 400 F.3d at 1234, quoting Fed.R.Evid. 401) (emphasis added) (*Cook,* unpublished disposition attached as

**Exhibit 6**) Direct and circumstantial evidence, as well as evidence that is essentially background or contextual in nature, may be relevant. *Cook* at *8 (unpublished disposition attached as **Exhibit 6**).

Further, the Tenth Circuit takes a liberal approach to the question of whether proffered expert testimony will assist the jury. *Cook* at *5 (unpublished disposition attached as **Exhibit 6**). Doubts about admissibility should generally be resolved in favor of admissibility unless there are strong factors such as time or surprise favoring exclusions because the jury is intelligent enough to ignore what is unhelpful in its deliberations. *Cook,* at *5 (citing *Robinson v. Mo. Pac. R.R. Co.,* 16 F.3d 1083, 1090 (10th Cir. 1994) (*Cook,* unpublished disposition attached as **Exhibit 6**).

Evidence "need not be conclusive or highly probative to satisfy Rule 401 - even a minimal probability" that the asserted fact exists will suffice. *Cook* at *8 (citing *United States v. McVeigh,* 153 F.3d 1166, 1190 (10th Cir. 1998)) (*Cook,* unpublished disposition attached as **Exhibit 6**). Neither Rule 702 nor *Daubert* require that an expert's testimony prove an element of the offering party's case for it to be admissible. *Cook,* at *5 (unpublished disposition attached as **Exhibit 6**).

## CONCLUSION

Defendants have not met their threshold burden showing that this case presents a novel medical causation theory requiring the application of *Daubert.* However, the testimony of Dr. Niederman and Dr. Greifinger with respect to the cause of Plaintiff's illness does satisfy the tests of reliability and relevance under Fed.R.Evid. 702 as interpreted and applied by *Daubert* and its progeny. These witnesses are highly qualified to testify that the conditions at the Park County Jail were a substantial factor in causing Plaintiff to acquire Strep A infection, and that the lack of treatment of that infection resulted in Plaintiff developing pneumonia, sepsis, and then septic shock. Defendants' Motion in Limine should therefore be denied.

Dated this _23rd_ day of January, 2007.

Respectfully submitted,


By:  s/ William A. Trine, Esq.____
          William A. Trine, #577
          Cheryl L. Trine, #38150
          Trine & Metcalf, PC
          1435 Arapahoe Avenue
          Boulder Colorado 80302-6390
          (303) 442-0173

          Joseph J. Archuleta, #19426
          Joseph J. Archuleta and Associates
          1724 Ogden Street
          Denver Colorado 80218
          (303) 837-1642

          Lloyd C. Kordick, #6298
          Lloyd C. Kordick & Associates
          805 S. Cascade Avenue
          Colorado Springs Colorado 80903
          (719) 475-8460

          Adele Kimmel, Esq.
          Trial Lawyers for Public Justice
          1717 Massachusetts Avenue, N.W.
          Suite 800
          Washington, D.C. 20030
          (202) 797-8600

          Attorneys for Plaintiff

## <u>CERTIFICATE OF MAILING/SERVICE</u>

The undersigned hereby certifies that on this _23rd_ day January, 2007, a true and correct copy of the foregoing pleading was e-served via Electronic Case Filing and/or placed in the United States Mail, postage prepaid, and properly addressed to:

Joseph Archuleta
Attorney at Law
1724 Ogden Street
Denver, Colorado 80218-1018
*Co-Counsel for Plaintiff*

Lloyd C. Kordick,
Attorney at Law
805 S. Cascade
Colorado Springs, CO 80903
*Co-Counsel for Plaintiff*

Adele P. Kimmel
Richard H. Frankel
Trial Lawyers for Public Justice
1717 Massachusetts Avenue, N.W.
Suite 800
Washington, D.C. 20030
*Co-Counsel for Plaintiff*

Andrew Ringel
Jennifer L. Veiga
Hall & Evans
1125 17th Street, Suite 600
Denver, CO 80202-2052
*Counsel for Defendant Park County, Park County Board of County Commissioners, Park County Sheriff's Office, Fred Wegener, and Monte Gore*

Josh A. Marks
Berg, Hill, Greenleaf & Ruscitti
1712 Pearl Street
Boulder, CO  80302
*Counsel for Defendant Vicki Paulsen*

<u>s/ Elizabeth Peach</u>

21