RECEIVED OCT 1 1 2006

# In The Matter Of:

## *MOISES CARRANZA-REYES   v.*
## *THE PARK COUNTY BOARD OF COUNTY COMMISSIONERS*

---

### *MICHAEL S. NIEDERMAN, M.D.*
### *September 8, 2006*

---

*Precise Court Reporting*
*200 Old Country Road*
*Suite 110*
*Mineola, NY  11501*
*(516) 747-9393*

*Original File 44671MN.V1, 178 Pages*
*Min-U-Script® File ID: 1967631022*

## **Word Index included with this Min-U-Script®**

EXHIBIT
2

PENGAD 800-631-6989

Page 9

**M. Niederman**

[1]
[2] University of Kentucky and Dr. Doukas, if I
[3] pronounced that right, case, do you remember
[4] what party you testified for?
[5]   **A:** There I testified on behalf of a
[6] doctor.
[7]   **Q:** For example, the Gosland case, when
[8] you say "undiagnosed pneumonia," what do you
[9] mean by that?
[10]   **A:** That was a case where a patient
[11] developed pneumonia, he was treated with
[12] antibiotics and subsequently died. His
[13] cultures revealed a bacteria that hadn't been
[14] treated by the antibiotics, and the case
[15] revolved around that discussion.
[16]   **Q:** Are all of the cases where you
[17] testified either in deposition or trial what
[18] could be characterized as a medical
[19] malpractice case?
[20]   **A:** All of these are medical
[21] malpractice cases, correct.
[22]   **Q:** Have you ever testified as an
[23] expert in any deposition or any trial in a
[24] case that's not a medical malpractice case?
[25]   **A:** Yes. I was involved once in a

Page 10

**M. Niederman**

[1]
[2] product liability case that involved Copley
[3] Pharmaceuticals, and they were accused of
[4] producing a contaminated nebulizer solution,
[5] and I testified against the company.
[6]   **Q:** When was that?
[7]   **A:** I can't remember the date, but it
[8] was probably about six or seven years ago.
[9]   **Q:** Do you remember the name of the
[10] plaintiff?
[11]   **A:** No. It was a class action suit,
[12] and I don't remember a lot of the details. I
[13] remember the defendant was Copley
[14] Pharmaceuticals.
[15]   **Q:** Do you remember the name of the law
[16] firm or lawyer who retained you as an expert?
[17]   **A:** I don't right now, no.
[18]   **Q:** Other than that instance, have you
[19] provided expert testimony in any case that was
[20] not a medical malpractice case?
[21]   **A:** I can't remember any others.
[22]   **Q:** Would you agree with me that the
[23] scope of your expert opinion in this case that
[24] we're here for today is different or broader
[25] than a medical malpractice opinion?

Page 11

**M. Niederman**

[1]
[2]   **A:** Correct. I'm not commenting
[3] directly on issues related to a doctor's
[4] treatment of this patient.
[5]   **Q:** Or any medical providers; is that
[6] correct?
[7]   **A:** Indirectly I'm going to touch on
[8] some of the medical providers assessments, so
[9] I won't quite go that far.
[10]   **Q:** Understood.
[11]   **MR. RINGEL:** Let's mark this as
[12] number 80.
[13]       (Curriculum vitae was marked as
[14] Exhibit-80 for identification; 9-8-06,
[15] P.W.)
[16]   **Q:** Take a look, doctor, at what's been
[17] marked for purposes of this deposition as
[18] Exhibit Number 80. Can you identify this?
[19]   **A:** Yes. This is a copy of my
[20] curriculum vitae that was updated in April of
[21] 2006.
[22]   **Q:** Do you have one that is more
[23] current than that?
[24]   **A:** There may be — I'm trying to see.
[25] There may be a couple of additions to it, but,

Page 12

**M. Niederman**

[1]
[2] generally, this is pretty up to date.
[3]   **Q:** They would be additions in
[4] vocations or lectures or papers or that kind
[5] of thing?
[6]   **A:** Correct.
[7]   **Q:** You still have the same positions
[8] that are reflected on the first and second
[9] page of this exhibit; is that correct?
[10]   **A:** Correct.
[11]   **Q:** What is your current position?
[12]   **A:** I'm the chairman of the Department
[13] of Medicine at Winthrop University Hospital in
[14] Mineola, New York.
[15]   **Q:** Now, I noticed on your report that
[16] you also hold a faculty position at the State
[17] University of New York at Stony Brook; is that
[18] correct?
[19]   **A:** Correct.
[20]   **Q:** Is Winthrop University Hospital a
[21] teaching institution?
[22]   **A:** Yes. We are a major teaching
[23] affiliate of the SUNY at Stony Brook, and we
[24] have residencies, fellowships here and we have
[25] medical students rotating from medical school

MICHAEL S. NIEDERMAN, M.D.
September 8, 2006

MOISES CARRANZA-REYES   v.
THE PARK COUNTY BOARD OF COUNTY COMMISSIONERS

---

Page 13

M. Niederman

[1]
[2] here.
[3]    Q: But the medical school itself is at
[4] Stony Brook?
[5]    A: Correct.
[6]    Q: So you're a faculty member of both?
[7]    A: Again, I'm on the staff here at
[8] Winthrop Hospital and my teaching appointment
[9] and faculty appointment is at Stony Brook, and
[10] because of my position as the chairman of the
[11] Department of Medicine here, I'm also the vice
[12] chairman for the Department of Medicine at the
[13] medical school.
[14]    Q: Can you give me a sense of what
[15] your day-to-day job is?
[16]    A: I have, of course, administrative
[17] responsibilities here at the hospital related
[18] to quality in the Department of Medicine,
[19] privileging of the physicians, supervision of
[20] the residency, fellowship and faculty,
[21] supervision of the faculty practice. I also
[22] spend probably two half days a week seeing
[23] outpatients and, on average, one week a month
[24] on some sort of service in the hospital, and
[25] then I have my clinical research and other

---

Page 14

M. Niederman

[1]
[2] academic activities.
[3]    Q: So two half days a week you have
[4] direct patient care?
[5]    A: At least two half days a week,
[6] plus, as I said, at least one week a month,
[7] and, actually, the other part is one out of
[8] every seven weekends here in the hospital on
[9] call for the ICUs.
[10]    Q: It sounded like that when you had
[11] your sort of — your responsibility is to do
[12] patient care in a hospital setting, inpatient
[13] versus outpatient, that there might be a
[14] variety of different places where you do
[15] that. Did I understand your answer correctly?
[16]    A: Correct. When we work in the
[17] hospital, we're either working in the ICU or
[18] we're doing pulmonary consultation, so two of
[19] the three rotations that I might do are
[20] ICU-based rotations. One of them is
[21] consultation, and, as I said, one out of every
[22] seven weekends, which is Friday night through
[23] Monday morning, most of that time is spent
[24] working in the ICU.
[25]    Q: Do you have a focus of your

---

Page 15

M. Niederman

[1]
[2] practice?
[3]    A: My practice is in pulmonary and
[4] critical care.
[5]    Q: Has it been that way since you were
[6] at — since you've been at Winthrop University
[7] Hospital or has it changed?
[8]    A: That's been my practice for the
[9] last 23 years.
[10]    Q: Do you have a subspecialty in any
[11] particular thing within the broad category of
[12] pulmonary and critical care medicine?
[13]    A: My clinical research interests have
[14] been in infectious respiratory disease,
[15] particularly pneumonia, and some research
[16] related to sepsis, and that means that I've
[17] focused a lot on that from a research
[18] standpoint and also often, either inpatient or
[19] outpatient, get asked to give opinions about
[20] those disease processes and often those are
[21] second opinions after somebody else has given
[22] an opinion.
[23]    Q: Does your outpatient practice
[24] primarily consist of consultations from other
[25] physicians about particular issues in your

---

Page 16

M. Niederman

[1]
[2] areas of expertise or do you follow patients
[3] on an ongoing basis?
[4]    A: Both. Again, patients usually with
[5] complicated lung diseases are referred by
[6] primary care doctors, and if they need ongoing
[7] care, I follow them along with their primary
[8] care doctor.
[9]    Q: But your initial relationship with
[10] a patient is typically a referral from a
[11] primary care doctor?
[12]    A: Typically it's a referral.
[13] Sometimes patients find out my name and come
[14] to see me, but yeah, it's usually referrals.
[15]    Q: Do you do research, other than
[16] clinical research?
[17]    A: Not currently. In the past I've
[18] done some basic science research on mechanisms
[19] of respiratory colonization and infection, but
[20] not currently.
[21]    Q: At what point in time did that
[22] transition occur?
[23]    A: It's been gradual, but at least for
[24] the last 10 or 12 years.
[25]    Q: Do you have particular people that

---

JAN-05-2007 09:09 FROM- T-703 P003/003 F-353

Case 1:05-cv-00377-WDM-BNB Document 146-2 Filed 01/26/07 USDC Colorado Page 4 of 22

MOISES CARRANZA-REYES v.
THE PARK COUNTY BOARD OF COUNTY COMMISSIONERS

MICHAEL S. NIEDERMAN, M.D.
September 8, 2006

Page 17

M. Niederman

[1]
[2] work with you on ongoing clinical research
[3] projects? Do you run a clinical research
[4] team, in other words?
[5]    A: We have projects, and the people
[6] who are involved in that change over time. We
[7] have other fellows. We have a research
[8] nurse. We've now got a new research clinical
[9] coordinator here at the hospital, so that
[10] those may be pharmaceutical funded research.
[11] We've had fellows that have done investigator
[12] initiated research and chart reviews, and so
[13] the people who do that frequently change
[14] because of the nature of a teaching hospital.
[15]    Q: Fellows are here for a year or two
[16] years, something like that?
[17]    A: Usually three years, but we've also
[18] had visiting fellows from other institutions
[19] who come for a year.
[20]    Q: Let me ask you about sort of the
[21] categories of clinical research. One is
[22] research to test the efficacy of particular
[23] pharmaceuticals; is that correct?
[24]    A: Correct, and that's some of the
[25] research that we have done, correct.

Page 18

M. Niederman

[1]
[2]    Q: Is that the majority of your
[3] research or a minority?
[4]    A: I would say it's probably about
[5] half. Again, that's the pharmaceutical funded
[6] research.
[7]    Q: And then another category, you
[8] talked about chart review. What is that?
[9]    A: We might have a specific clinical
[10] question and would collect a number of charts
[11] and go through them and try to answer that
[12] question.
[13]    Q: Are there any other types of
[14] clinical research that you conduct?
[15]    A: I've also collaborated with
[16] physicians that I've met at different meetings
[17] and reviewed their research and helped them
[18] write-up their data, and we've also got one
[19] big community-acquired pneumonia project that
[20] we conducted as a trial here at the hospital
[21] that we're in the process of finishing and
[22] writing up.
[23]    Q: I understand that you wouldn't want
[24] to say anything, and I'm not going to ask you
[25] anything, if it might be considered

Page 19

M. Niederman

[1]
[2] proprietary with ongoing research, but can
[3] give me a sketch of what you mean by the
[4] "community-acquired pneumonia project"?
[5]    A: We were looking at ways to improve
[6] the delivery of care in community-acquired
[7] pneumonia in the hospital, and we tested the
[8] value of having a set of guidelines versus not
[9] or versus an intensive application with
[10] additional help, and we were trying to
[11] evaluate the most effective way to improve the
[12] length of stay and outcomes of our pneumonia
[13] patients.
[14]    Q: That makes sense to me. Thank
[15] you.
[16]    Are there any other types of
[17] clinical research that we haven't covered?
[18]    A: I think that covers it.
[19]    Q: When you were doing what I would
[20] consider basic science research to distinguish
[21] it from clinical research, is that a fair —
[22]    A: Correct.
[23]    Q: Did you have any particular
[24] focuses?
[25]    A: At that time we were interested in

Page 20

M. Niederman

[1]
[2] problems related to hospital-acquired
[3] pneumonia, and we looked at the interaction
[4] between pseudomonas aeruginosa,
[5] P-S-E-U-D-O-M-O-N-A-S, and then separate word,
[6] A-E-R-U-G-I-N-O-S-A, so interaction between
[7] that particular bacteria and airway epithelial
[8] cells and mechanisms of colonization of the
[9] airway is the first step to the development of
[10] hospital-acquired pneumonia.
[11]    Q: When you say "colonization in the
[12] airway," can you describe what you mean?
[13]    A: Bacteria frequently grow in the
[14] lung or on other sites in the body without
[15] actually invading and causing infection, and
[16] that often is the first step before infection,
[17] and that process is referred to as
[18] colonization.
[19]    Q: The bacteria essentially colonizing
[20] the human host, is that the notion?
[21]    A: Correct. So we were studying the
[22] cellular mechanisms that allowed that to
[23] occur.
[24]    Q: Because, presumably, each different
[25] human host, some kind of trigger has to happen

MICHAEL S. NIEDERMAN, M.D.                          MOISES CARRANZA-REYES  v.
September 8, 2006                       THE PARK COUNTY BOARD OF COUNTY COMMISSIONERS

Page 21

*M. Niederman*

[1]
[2] in their body to go from a colonization stage
[3] to a disease stage; is that fair?
[4]    A: Well, we were even farther back
[5] than that. We were trying to understand why
[6] some patients become colonized and others
[7] don't.
[8]    Q: Assuming that the two patients are
[9] exposed to the same potential bacteria?
[10]   A: Correct.
[11]   Q: When was sort of the time frame
[12] that you were doing that kind of research?
[13]   A: I started that research in 1980 and
[14] continued that into the mid 1990s. We still
[15] have a basic science lab here at the
[16] hospital. It's continuing that research, but
[17] I'm really only very peripherally involved, so
[18] I have very little input into that right now.
[19]   Q: Who is your colleague or colleagues
[20] that are doing that now here?
[21]   A: There's a Dr. Kazzaz, K-A-Z-Z-A-Z.
[22]   Q: What's his or her first name?
[23]   A: Jeffrey.
[24]   Q: When you do critical care work in
[25] the ICU, either during a one week a month

Page 22

*M. Niederman*

[1]
[2] rotation or on a weekend when you're on call,
[3] is the nature of your critical care practice
[4] consultative or would you have primary
[5] responsibility of a patient in the ICU at this
[6] institution?
[7]    A: It's both, and it's probably more
[8] oriented towards primary responsibility,
[9] because when we're making rounds, for example,
[10] in the medical ICU, we're not only seeing
[11] patients that we're — were the attending for
[12] or the consultant, but we're making quality
[13] and teaching rounds with the house staff, and
[14] so we're seeing all the patients and
[15] commenting on all of their management issues.
[16]   Q: And the medical ICU at this
[17] institution, I would assume, is broader than
[18] just pulmonary issues?
[19]   A: Correct.
[20]   Q: It would be anything that could
[21] occur to get someone in a medical ICU unit?
[22]   A: Correct. We don't deal as much in
[23] that unit with cardiac disease because there's
[24] a separate cardiac ICU, but, otherwise, we
[25] deal with all of the other medical issues that

Page 23

*M. Niederman*

[1]
[2] come up.
[3]    Q: So one gets shot, for instance, and
[4] gets to the emergency room and gets put in the
[5] ICU, you might follow that or is that —
[6]    A: That would be surgical, so we
[7] probably don't follow that. Someone who has
[8] surgery or trauma usually goes to the surgical
[9] ICU. If they have a head injury, they go to
[10] our neuroscience ICU. Medical ICU would be
[11] medical illnesses, so a GI bleed, diabetic
[12] ketoacidosis, sepsis, lung disease, asthma.
[13]   Q: If someone has a bad epileptic
[14] attack, they would end up in the neurological
[15] ICU?
[16]   A: It really depends. We would
[17] sometimes take care of those patients. It
[18] depends on what else is going on with that
[19] patient and what our bed availability is.
[20]   Q: There are four ICUs here; cardiac,
[21] medical, surgical and neuroscience?
[22]   A: There's a cardiac surgical ICU,
[23] which is for patients who specifically have
[24] had heart surgery.
[25]   Q: It's a post surgery ICU where they

Page 24

*M. Niederman*

[1]
[2] would go immediately after their heart
[3] surgery?
[4]    A: Correct.
[5]    Q: I have a few questions about some
[6] of the things on Exhibit-80, on your CV, if
[7] you could turn to page three for me.
[8]    A: Okay.
[9]    Q: The certification in critical care
[10] medicine, who certifies you for that?
[11]   A: This is the American Board of
[12] Internal Medicine.
[13]   Q: So that's your general
[14] certification and then the sub certifications
[15] in critical care medicine and pulmonary
[16] subspecialty are also under the auspices of
[17] the American Board of Internal Medicine?
[18]   A: Correct.
[19]   Q: Take a look at page 48.
[20]   A: Okay.
[21]   Q: The last item, number 33,
[22] "Guidelines for the initial management of
[23] community-acquired pneumonia," do you see
[24] where I am?
[25]   A: Yes.

MOISES CARRANZA-REYES   v.
THE PARK COUNTY BOARD OF COUNTY COMMISSIONERS

MICHAEL S. NIEDERMAN, M.D.
September 8, 2006

---

Page 57

*M. Niederman*

[1]
[2] that supports that expert opinion.
[3]   **A:** Correct.
[4]   **Q:** So it sounds like you may, based on
[5] the new information, have some more data that
[6] you would believe supports your expert opinion
[7] but your expert opinion, all the expert
[8] opinions you have are reflected in this
[9] report, is that —
[10]   **A:** The only thing that's not in this
[11] report relates to, I guess, as I've looked at
[12] the facts and reread the data, there's one
[13] more opportunity for intervention that I did
[14] not include in my report, and that is an
[15] opportunity that could have involved the
[16] actual prevention of this patient developing
[17] pneumonia with a timely throat culture and
[18] administration of antibiotics, and that, I
[19] think, is relevant, but it's not in this
[20] report.
[21]   **Q:** Explain for me that opinion of
[22] yours.
[23]   **A:** Again, I included in the report the
[24] fact that Mr. Carranza-Reyes was seen by the
[25] nurse on March 6th and that he had complaints,

---

Page 58

*M. Niederman*

[1]
[2] which included a sore throat, and he was
[3] treated symptomatically and came back again
[4] with worse complaints and again was treated
[5] symptomatically, and, again, in thinking about
[6] those facts and looking at the course of
[7] events, it's my opinion that if he had had a
[8] more thorough evaluation of his symptoms and a
[9] throat culture, a rapid strep-test, for
[10] example, and that had been positive, he would
[11] have been treated with antibiotics at that
[12] point, and had that happened, I think there
[13] would have been a much lower chance that he
[14] actually would have ever even developed this
[15] serious pneumonia that he had, because that's
[16] not in this report.
[17]   **Q:** Do you have an opinion about when
[18] it would have been appropriate for him to have
[19] been given a strep test based on the
[20] information that was available on any
[21] particular day? Can you put it in a time
[22] frame?
[23]   **A:** Yes. Again, I'm having a little
[24] trouble with the timing of his illness,
[25] because he was clearly seen by the nurse on

---

Page 59

*M. Niederman*

[1]
[2] March 6th, so that's the time for sure there
[3] was an opportunity to do that. In his
[4] deposition and his brother's deposition he
[5] claims to have been sick since March 4th and
[6] was asking to see someone and wasn't given
[7] that opportunity until March 6th, so if those
[8] facts are correct, then he could potentially
[9] have been diagnosed and treated even earlier.
[10]   **Q:** Based on the records that you
[11] reviewed from Nurse Paulsen's visit with
[12] Mr. Carranza-Reyes on March 6th, do
[13] Mr. Carranza-Reyes' symptoms lead you to
[14] conclude that at that time it would have been
[15] appropriate for him to have a throat culture?
[16]   **A:** Yes.
[17]   **Q:** So the first time that any medical
[18] person who saw Mr. Carranza-Reyes could have
[19] made an assessment that a throat culture was
[20] appropriate would have been Ms. Paulsen's
[21] visit with him on March 6th; is that right?
[22]   **A:** Correct.
[23]   **Q:** And then there's an issue about
[24] whether or not he tried to access health care
[25] previous to that?

---

Page 60

*M. Niederman*

[1]
[2]   **A:** Correct.
[3]   **Q:** What does it mean when you note
[4] that the nurse reported that
[5] Mr. Carranza-Reyes' lungs were clear
[6] bilaterally on March 6th?
[7]   **A:** Means that she did not find any
[8] evidence on her examination that would support
[9] him having findings of pneumonia at that
[10] time.
[11]   **Q:** And that's also true on her visit
[12] with him on March 7th, correct?
[13]   **A:** Correct.
[14]   **Q:** Does it make sense to you from a
[15] disease mechanism perspective that there
[16] wouldn't be signs of pneumonia given
[17] ultimately how Mr. Carranza-Reyes presented at
[18] Summit Medical Center at 12:45 p.m. on the
[19] 8th?
[20]   **A:** I think so, and, again, that's
[21] where I've been spending a little more time
[22] thinking in the last day about the time line
[23] that I was referring to earlier. I think my
[24] assessment is that probably he did not have
[25] pneumonia on the 6th. He probably did not

---

MICHAEL S. NIEDERMAN, M.D.                          MOISES CARRANZA-REYES   v.
September 8, 2006                    THE PARK COUNTY BOARD OF COUNTY COMMISSIONERS

---

Page 61

M. Niederman

[1]
[2] have pneumonia when he was seen on the 7th.
[3] Although, he may have, and, again, I'm not
[4] sure whether the examination was incorrect or
[5] if he didn't have pneumonia, but clearly, when
[6] he was seen on the 8th in the afternoon, had a
[7] far advanced form of pneumonia, so there's
[8] really only two possibilities; either this was
[9] slowly progressing for days or this is a
[10] rapidly progressive pneumonia and the natural
[11] history of this infection is that it can be a
[12] rapidly progressing pneumonia, so I would
[13] think that probably he developed — he made
[14] that transition from streptococcal sore throat
[15] to streptococcal pneumonia some time during
[16] the day of the 7th, either shortly before or
[17] shortly after the nurse saw him, but that he
[18] was very sick with advanced pneumonia on the
[19] 8th.
[20]     Q: The way I understand it is that
[21] what the blood culture revealed, the bacteria
[22] in this case was Group A beta-hemolytic strep?
[23]     A: Correct.
[24]     Q: Is there particular biological
[25] courses related to that bug, for lack of a

---

Page 62

M. Niederman

[1]
[2] better word?
[3]     A: I'm not sure I understand your
[4] question.
[5]     Q: Fair enough. It's not a very clear
[6] question.
[7]     Can you describe for me if there's
[8] a particular way that that infection presents
[9] itself or the course of its infection in a
[10] patient like Mr. Carranza-Reyes or is there a
[11] variant of how it would present itself?
[12]     A: I think any infection can have
[13] variability, but this is a very unusual
[14] bacteria to cause pneumonia, and so just its
[15] identification, I think, raises a number of
[16] issues. This is not a normal pneumonia
[17] bacteria. The source is very likely to be a
[18] preceding sore throat. Although, many
[19] pneumonias begin with colonization of the
[20] mouth and then aspiration into the lung, but
[21] this could have been an invasive sore throat
[22] that progressed to pneumonia, but what we do
[23] know, and, again, we don't see a lot of this,
[24] I mean, I've probably seen no more than three
[25] or four patients with this disease ever, it

---

Page 63

M. Niederman

[1]
[2] can be a very rapidly progressive necrotizing
[3] pneumonia and patients can go from okay to
[4] very sick over a 24-hour period.
[5]     Q: And that's what leads you to
[6] believe that at least the possibility exists
[7] that he didn't have pneumonia at the time he
[8] was seen by the nurse on March 7th?
[9]     A: Correct. I think — I wasn't —
[10] I'm not entirely sure, but I think that it's
[11] very possible that, assuming her exam was
[12] accurate, either he didn't have pneumonia or
[13] had early pneumonia on the 6th or the 7th, but
[14] it seems much more likely he didn't have it on
[15] the 6th, maybe not on the 7th, and it
[16] progressed some time during the 7th into the
[17] 8th, and, again, that's why I said I do have
[18] the opinion, which is not in the letter,
[19] thinking about that time line a little bit
[20] more, that there might have been an
[21] opportunity to intervene and prevent this
[22] pneumonia, if they had diagnosed his strep
[23] throat on the 6th.
[24]     Q: Would it have been appropriate for
[25] the nurse on the 6th to do a blood — you

---

Page 64

M. Niederman

[1]
[2] know, do a strep culture of this individual?
[3]     A: That's what I said earlier, yes.
[4]     Q: Is that within the scope of
[5] practice of a nurse in Colorado?
[6]     A: I don't know.
[7]     Q: Is that within the scope of
[8] practice of a registered nurse in New York?
[9]     A: Certainly in that setting nurses do
[10] that all the time in doctors' offices.
[11]     Q: Make a decision on their own that a
[12] throat culture is appropriate?
[13]     A: Well, rapid strep screen. I mean,
[14] I could tell you that — I mean, to give you
[15] the context of this, I spent a summer, two
[16] summers working as a camp doctor and the
[17] nurses in the infirmary did this all the
[18] time. When kids came in with sore throats and
[19] if they were positive, they told me about it
[20] and then we made a decision about antibiotic
[21] therapy.
[22]     Q: What is a rapid strep screen?
[23]     A: It's a swab in the back of the
[24] throat looking for the antigenic material in
[25] strep. You could get a result in minutes, so

---

THE PARK COUNTY BOARD OF COUNTY COMMISSIONERS

MICHAEL S. NIEDERMAN, M.D.
September 8, 2006

---

Page 65

[1]                    M. Niederman
[2] that even though cultures can take 24 hours,
[3] this test can be positive quickly and it gets
[4] supported by a culture.
[5]     Q: Growing up in Colorado, strep
[6] throat, it's fairly prevalent. I don't know
[7] whether you know that or not. As a child, we
[8] would go to the doctor's office and get
[9] swabbed to exercise our gag reflex when they
[10] thought we had sore throats. They were doing
[11] a rapid strep screen of me, in all likelihood?
[12]     A: Probably.
[13]     Q: When did that start?
[14]     A: Oh, I don't know the history of
[15] that. I know it's been available for a long
[16] time.
[17]     Q: So if I grew up in the '70s, it
[18] probably was available?
[19]     A: Probably.
[20]     Q: Are you aware of either empirical
[21] evidence based medicine or basic science
[22] research on Group A beta-hemolytic strep?
[23]     A: There's been a lot of research on
[24] it. I have not tried to extensively review
[25] that literature. I pulled out a few relevant

Page 66

[1]                    M. Niederman
[2] clinical studies, both in abstract and full
[3] article form, that I included in the material
[4] that I sent to you and that I looked through
[5] again last night.
[6]     Q: Can you describe for me how this
[7] infection differs from other either streps or
[8] pneumonia?
[9]     A: Well, again, it's not a common
[10] cause of pneumonia. Usually it remains a sore
[11] throat, but what's been described in epidemic
[12] settings where there's crowding, close contact
[13] of people, particularly, for example, in
[14] military recruits, which is the large series
[15] that I looked at, having people very close
[16] together facilitates the spread of this
[17] organism person to person, and in a small
[18] percentage of those people who get colonized
[19] and infected, they can progress to pneumonia.
[20] Whether that's purely statistical or whether
[21] it's related to the stress of the crowding and
[22] the multiple people together, I think, isn't
[23] really clear.
[24]     Q: Is there anything about a
[25] particular person that may lead them to be one

Page 67

[1]                    M. Niederman
[2] of the unlucky people that have this go to
[3] pneumonia or is there no data on that one way
[4] or the other?
[5]     A: Well, I think everybody assumes
[6] that there's a factor that does that, but I
[7] don't think that anybody knows exactly what
[8] that is just yet.
[9]     Q: There's not that kind of precision
[10] in the data that is available, as far as you
[11] know?
[12]     A: No, because, again, from a
[13] practical standpoint, when epidemic outbreaks
[14] like this are identified, everybody gets
[15] prophylaxis. In other words, it's not
[16] targeted prophylaxis at certain high risk
[17] individuals.
[18]     Q: Generally speaking, what kinds of
[19] events or background in someone's life could
[20] make them more susceptible, from your
[21] experience, to have something like this
[22] transfer from a strep in a throat to
[23] strep-induced pneumonia or strep-caused
[24] pneumonia?
[25]     A: Probably the most common thing is

Page 68

[1]                    M. Niederman
[2] altered immune response from an acquired viral
[3] infection, but, in general, for any infection,
[4] and the formula is simple, we all encounter
[5] bacteria. Some of us get infected, some
[6] don't, and it's usually that balance between
[7] the bacteria and our own host defenses. Some
[8] bacteria like this can be very virulent and
[9] overcome even a normal host defense system,
[10] particularly if the concentration of the
[11] bacteria is very high or even a low
[12] concentration of bacteria could lead to
[13] infection, if the host defenses were impaired
[14] as a result of, say, viral infection,
[15] medications, coexisting chronic illnesses, any
[16] of those are possibilities.
[17]     Q: You didn't make any analysis in
[18] this case of anything about Mr. Carranza-Reyes
[19] specifically that may have led him to be one
[20] of the unlucky ones that had strep in his
[21] throat become strep pneumonia?
[22]     A: No. The only thing, I think, that
[23] was striking is he really didn't have any
[24] predisposing factors that were identifiable.
[25] He wasn't on chronic medications. He didn't

---

MICHAEL S. NIEDERMAN, M.D.
September 8, 2006

MOISES CARRANZA-REYES  v.
THE PARK COUNTY BOARD OF COUNTY COMMISSIONERS

---

**Page 69**

**M. Niederman**

[1]

[2] have chronic illness. He wasn't diabetic. He

[3] was really — there's really no clear

[4] precipitating factor. We do know that there

[5] are genetic variations in the immune system

[6] that make some people predisposed, but, I

[7] mean, this case you almost have a biologic

[8] experiment that tells you that didn't happen

[9] because he had a twin brother in the same

[10] environment who didn't get the same illness.

[11]    Q: What's the basis for your knowledge

[12] about what Mr. Carranza-Reyes' prior medical

[13] history or condition is?

[14]    A: Just his deposition and deposition

[15] of his brother.

[16]    Q: You don't have any access to any

[17] medical record or medical information of

[18] Mr. Carranza-Reyes from any previous medical

[19] encounter he had in Mexico?

[20]    A: No, I have not seen any records of

[21] his.

[22]    Q: Let me direct your attention to the

[23] third paragraph on Exhibit-83, your report.

[24] The second sentence in that paragraph

[25] indicates "his deposition," and I assume you

---

**Page 70**

**M. Niederman**

[1]

[2] mean Mr. Carranza-Reyes' deposition, "and the

[3] information from the Park County Jail indicate

[4] that he arrived at the jail completely

[5] healthy."

[6]    A: Correct.

[7]    Q: When you say "the information from

[8] the Park County Jail," that the form in

[9] Spanish that Mr. Carranza-Reyes filled out

[10] upon his intake?

[11]    A: I don't remember all of the

[12] information I used to make that statement, but

[13] I remember, again, having read through the

[14] depositions of the people who saw him when he

[15] arrived from the jail and nobody commented on

[16] him being sick at that time.

[17]    Q: The mechanism of a Group A

[18] beta-hemolytic streptococcal pneumonia is that

[19] it would initially colonize in the throat or

[20] mouth; is that true?

[21]    A: Initially colonize, and in this

[22] case probably infect the oral pharynx,

[23] correct.

[24]    Q: Is there a latency period?

[25]    A: It can be variable between

---

**Page 71**

**M. Niederman**

[1]

[2] progressing from sore throat to pneumonia,

[3] and, again, there isn't a specific absolute

[4] time period.

[5]    Q: Is there a time period for the

[6] colonization?

[7]    A: I'm not sure I understand.

[8]    Q: Let me ask it more directly.

[9] Mr. Carranza-Reyes arrived at the jail March

[10] 1st. Is there any way to know when he caught

[11] the bug that eventually colonized that

[12] eventually led him to be sick?

[13]    A: No.

[14]    Q: Could that have been prior to March

[15] 1st of 2003?

[16]    A: He conceivably could have been

[17] colonized prior to arrival, but he had no

[18] symptoms of infection when he arrived.

[19]    Q: If he was colonized prior to

[20] arrival, would the conditions of his

[21] confinement make any difference to whether the

[22] colonization became an infection?

[23]    A: Certainly it's possible that if he

[24] was in an environment where he was not

[25] sleeping well, if he was in an environment

---

**Page 72**

**M. Niederman**

[1]

[2] where he was emotionally and physically

[3] stressed, all of those could have interfered

[4] with his immune function to the point that the

[5] colonization could have progressed to

[6] infection.

[7]    Q: So it would be his environment's

[8] reaction —

[9]    A: His reaction to the environment.

[10]    Q: Yes.

[11]    A: It could interfere with his — in

[12] other words, I think there's two possibilities

[13] here, either he came in colonized but not

[14] infected and the environment he was in

[15] interfered with his immune function and

[16] allowed this to progress or he came in without

[17] it and acquired it from the conditions he was

[18] in and the combination of the acquisition and

[19] the stress allowed it to progress.

[20]    Q: Let's talk about number two first.

[21] Okay? One possibility is he acquired it in

[22] the jail?

[23]    A: Correct.

[24]    Q: If he acquired this in the jail,

[25] based on your understanding of the mechanism

---

JAN-23-2007 04:23P FROM:                                                TO:3034437677                    P.11

THE PARK COUNTY BOARD OF COUNTY COMMISSIONERS

MICHAEL S. NIEDERMAN, M.D.
September 8, 2006

Page 73

[1]                          *M. Niederman*
[2] of this type of infection, what is the likely
[3] outcome for other people that were in the
[4] jail?
[5]      A: If he acquired it in the jail, then
[6] presumably other people in the jail could have
[7] acquired it as well.
[8]      Q: If no one else in the jail, either
[9] an inmate or a staff member acquired this,
[10] what does that do to your analysis, if
[11] anything?
[12]     MR. TRINE: Objection, lack of
[13] foundation. Go ahead and answer. I'm
[14] just objecting for the record.
[15]     A: I'm not sure. I would have to know
[16] more specifically how you came up with the
[17] conclusion that nobody acquired it. In other
[18] words, I mean, in the studies that have been
[19] done, acquisition is defined by cultures.
[20]     Q: So the only way to know whether
[21] anyone else in the jail had this infection is
[22] presumably two ways; one, a culture of
[23] everybody who was in the jail at the same
[24] time, and, two, empirical evidence about what
[25] anybody who is in the jail symptoms might have

Page 74

[1]                          *M. Niederman*
[2] been?
[3]     A: Correct.
[4]     Q: And the best evidence, back to the
[5] hierarchy we were talking about before the
[6] type of hierarchy we were talking about
[7] before, would have been a culture of everybody
[8] in the jail?
[9]     A: Our best evidence would have been
[10] both, would have been — best evidence would
[11] have been a culture of everybody and a
[12] thorough medical evaluation and follow-up on
[13] everybody, none of which we really have here.
[14]     Q: The study that you referred to
[15] is in your file on the military outbreak, was
[16] it this infection or a similar type infection?
[17]     A: It was this infection.
[18]     Q: They did both in that case, right?
[19]     A: They did cultures, they had
[20] clinical data, correct.
[21]     Q: In that study of that military
[22] base, do you recall, and take a look at it, if
[23] you need to, how many of those people got
[24] pneumonia?
[25]     A: Again, I don't remember here, so I

Page 75

[1]                          *M. Niederman*
[2] would have to look. My recollection is that
[3] it was a surprisingly high number. 127 out of
[4] 4,500 patients developed pneumonia, so that
[5] was — 4,500 people that were — having
[6] respiratory symptoms, I'm sorry 4,500 people
[7] were looked at, 127 had pneumonia.
[8]     Q: And that, from a percentage
[9] standpoint, is a pretty high number, isn't it?
[10]     A: It's about three percent.
[11]     Q: And that strikes you as an expert
[12] in this field as a lot in terms of how this
[13] might develop, is that what —
[14]     A: Again, it's not a low number here.
[15] I mean, 127 patients with pneumonia is a large
[16] number. Although, there were a large number
[17] exposed. If we translate it into this setting
[18] here where there were supposedly 60 patients
[19] or 60 persons in the cell, three percent there
[20] could be just one person.
[21]     Q: That's what I was going to ask
[22] you. If the data, the empirical data turns
[23] out to be that only Moises Carranza-Reyes got
[24] pneumonia from this infection, does that
[25] eliminate the possibility that he got it in

Page 76

[1]                          *M. Niederman*
[2] the jail?
[3]     MR. TRINE: Objection, form and
[4] foundation.
[5]     A: Again, I don't think it does, and,
[6] again, without really thorough medical records
[7] on all of those people over the subsequent
[8] week to 10 days, I don't think we really know
[9] whether others did or did not have pneumonia,
[10] but doing it as a percentage, again, one or
[11] two people could fall well within the realm of
[12] the percentages in this study.
[13]     Q: Is it fair to say that you cannot
[14] definitively say one way or the other when
[15] Mr. Carranza-Reyes got — was colonized with
[16] the bug that ultimately led him to have
[17] this —
[18]     A: I have no way to know when he
[19] became colonized, but I have information here
[20] that when he had symptoms of a sore throat and
[21] when he had symptoms and findings of
[22] pneumonia.
[23]     Q: And the findings of pneumonia, the
[24] first time that there's any finding of
[25] pneumonia is when?

Page 77

M. Niederman

[2] A: Well, there's no question he had
[3] pneumonia on the 8th, and it's likely, given
[4] the severity of the pneumonia when it was
[5] diagnosed on the 8th, that it was at least
[6] present on the 7th, if not before.
[7] Q: But the data that you're relying on
[8] in terms of his symptoms is his own testimony,
[9] his brother's testimony and then whatever
[10] other data existed about his condition when he
[11] was at the Park County Jail?
[12] A: Right, and, again, looks like he
[13] arrived in the jail on March 1st, he and his
[14] brother, and, again, some of the other
[15] observations from the jail, I think Mr. Allen,
[16] for example, says that he was beginning to
[17] have symptoms of being sick on the 4th or the
[18] 5th, so I think everybody agrees it was a two
[19] or three-day period when he was in the jail
[20] and had absolutely no symptoms of illness.
[21] Q: But it's fair to say that he could
[22] have caught the bug prior to the time he got
[23] into the jail and just been asymptomatic?
[24] A: It's certainly possible he was
[25] colonized without symptoms when he arrived. I

Page 78

M. Niederman

[2] don't think we have anyway of knowing.
[3] Q: If the facts were that someone who
[4] Mr. Carranza-Reyes encountered prior to the
[5] time that he was in the jail developed
[6] pneumonia, what does that do to your opinion?
[7] A: Again, I need to know that it was
[8] the same type of pneumonia and what his
[9] exposure was, whether it was coincidental or
[10] whether he really had enough close contact
[11] that he could have acquired it from that
[12] person.
[13] Q: Would riding in a vehicle with
[14] someone for a few hours give sufficient close
[15] contact, assuming that it was the same bug?
[16] A: Again, is that person coughing, how
[17] close are they, what's the — again, I don't
[18] know the answer to that.
[19] Q: Does that additional fact tip the
[20] scale one way or the other about whether or
[21] not it was more likely that — assuming that
[22] that fact is true, whether it was more likely
[23] that he caught the bug prior to March 1st or
[24] after March 1st?
[25] MR. TRINE: Objection, lack of

Page 79

M. Niederman

[2] foundation.
[3] A: Again, I don't know. I think
[4] either is still possible. I don't think it
[5] changes it a lot, because he had no symptoms.
[6] Again, some of that would relate to timing as
[7] well, how long — if he was in the van with
[8] somebody two weeks earlier, I doubt it's
[9] relevant. If he was in the van with someone
[10] the day before, maybe. Again, I just don't —
[11] there's too many speculations there to know
[12] for sure.
[13] Q: If the facts are that he was in the
[14] van with this individual on March 1st, that
[15] might be relevant to the analysis, right?
[16] A: It might. Again, it doesn't relate
[17] to the issue of, wherever he acquired it, why
[18] did it progress in him and was there an
[19] opportunity to interfere with that progression
[20] with medical intervention when he was in the
[21] jail.
[22] Q: I understand that. You understand
[23] that one of the issues in this case is when he
[24] caught the bug?
[25] A: Correct.

Page 80

M. Niederman

[2] Q: And that's what I wanted to ask
[3] you. I understand that your opinion is
[4] broader than that and one of the issues
[5] that — one of the opinions that you give is
[6] that he should have been — there should have
[7] been medical intervention for him earlier and
[8] that caused the ultimate outcome?
[9] A: Right, and also, my opinion, as I
[10] said, was that I believe that the environment
[11] in which he was kept may have either led him -
[12] to acquire this bacteria or, if not acquire
[13] it, may have contributed to it progressing the
[14] way it did.
[15] Q: What is the basis for your
[16] understanding of the environment that
[17] Mr. Carranza-Reyes was in at the jail, what
[18] are the sources of your information?
[19] A: There's his deposition, his
[20] brother's deposition and there's — again, I
[21] know the corroboration from Mr. Allen and, I
[22] can't remember, I think Nurse Paulsen
[23] mentioned it as well in her deposition.
[24] Q: But other than the sources of
[25] information that you have reviewed that we

Page 81

**M. Niederman**

[1]
[2] talked about earlier, you don't have any other
[3] source of information about whatever the
[4] conditions were during the time that
[5] Mr. Carranza-Reyes was incarcerated in the
[6] Park County Jail; is that right?
[7]     A: Only the information I have looked
[8] at, correct.
[9]     Q: So if there's additional
[10] information about what the conditions were
[11] like in the jail during that period of time,
[12] you don't know it?
[13]     A: Correct.
[14]     Q: What is the basis for your
[15] statement in paragraph three on the first page
[16] of your report that there "were individuals
[17] with respiratory illness, including cough and
[18] sore throat"?
[19]     A: That was Dr. Bachman's — I think
[20] in his deposition, and I think I had some
[21] sheets from the Mexican Consul that showed
[22] there were other detainees who were diagnosed
[23] and treated for sore throat who had been in
[24] that cell.
[25]     Q: Are you aware one way or another

Page 82

**M. Niederman**

[1]
[2] whether any of those detainees were cultured?
[3]     A: I don't know. I didn't see any
[4] culture data.
[5]     Q: What would culture data look like?
[6]     A: It would be a lab report with the
[7] patient's name on it, says what was growing in
[8] his throat.
[9]     Q: Do you see where your sentence says
[10] in that same paragraph "the bacteria that was
[11] isolated from the claimant's blood cultures is
[12] Group A beta-hemolytic strep." do you see that
[13] sentence?
[14]     A: Yes.
[15]     Q: Two sentences after that is the one
[16] I want to ask you about. "It is my opinion
[17] that if Mr. Reyes has been" — I assume that
[18] should be had been?
[19]     A: Had been, correct.
[20]     Q: "Had been put in a better
[21] maintained holding cell, with less crowding,
[22] he would have been much less likely to have
[23] acquired this communicable respiratory
[24] illness," do you see that sentence?
[25]     A: Correct.

Page 83

**M. Niederman**

[1]
[2]     Q: Now, that sentence assumes that he
[3] acquired it in the jail; is that right?
[4]     A: Correct.
[5]     Q: But we've already established today
[6] that you can't say that he did in fact acquire
[7] it in the jail, right?
[8]     A: Right. I think that that sentence
[9] would apply if he acquired it in the jail. If
[10] he didn't acquire it in the jail, it would
[11] still apply to the impact — the same
[12] environment, on his immunologic function and
[13] whether or not that in any way contributed to
[14] him progressing the way he did.
[15]     Q: That second opinion that you've
[16] just given and interpret in that sentence
[17] doesn't appear anywhere in this report, does
[18] it?
[19]     A: Correct.
[20]     Q: Why not?
[21]     A: Again, as I explained, I was
[22] thinking this through recently and I realized
[23] exactly the issue that you're raising and
[24] trying to think about what happened here and
[25] the unusual nature of this infection. It was

Page 84

**M. Niederman**

[1]
[2] another possibility that could be relevant
[3] here that I hadn't considered.
[4]     Q: Take a look at page two. Is the
[5] first sentence in the first paragraph still
[6] true?
[7]     A: It's my opinion that
[8] Mr. Carranza-Reyes first became ill while he
[9] was an inmate at the Park County Jail, yes.
[10]     Q: When you say "ill," you mean
[11] symptomatically ill; isn't that right?
[12]     A: Correct. I don't think you know
[13] you're ill if you don't have symptoms.
[14]     Q: And we've already discussed that
[15] colonization does not mean ill? That just
[16] the distinction that I want to understand.
[17]     In that same paragraph you talk
[18] about his report on March 5th of being unable
[19] to eat breakfast because of malaise and
[20] anorexia?
[21]     A: Correct.
[22]     Q: Is malaise a symptom of pneumonia?
[23]     A: Malaise is a symptom of being
[24] sick. It can be a symptom of virtually any
[25] illness.

MICHAEL S. NIEDERMAN, M.D.
September 8, 2006

MOISES CARRANZA-REYES v.
THE PARK COUNTY BOARD OF COUNTY COMMISSIONERS

---

Page 93

**M. Niederman**

[1]
[2] factors that played a role? And yes, in
[3] retrospect, these issues are probably
[4] relevant.
[5]   **Q:** Can you offer an opinion about when
[6] medical intervention for Mr. Carranza-Reyes
[7] would have made a difference in his outcome?
[8]   **A:** Well, there's several medical
[9] interventions. Again, if you assume, as I
[10] have and as we talked about, that he did not
[11] have pneumonia on the 6th, then doing a rapid
[12] strep test and giving him penicillin might
[13] have prevented this whole thing. That's one
[14] medical attention that could have made none of
[15] this happen.
[16]   **Q:** Let's talk about the 8th. Is there
[17] any way to put a point in time where him
[18] arriving at Summit Medical Center, instead of
[19] at 12:45, at some time earlier than that would
[20] have made a difference to him getting sepsis
[21] and all of the, you know, pretty horrible
[22] things that happened to him after that?
[23]   **A:** Again, we know with severe
[24] pneumonia the sooner it's treated the
[25] better the outcome, and timing is important,

---

Page 94

**M. Niederman**

[1]
[2] and the more severely ill patients are, the
[3] more important timing is, so I would believe
[4] that he probably, again, this relates to the
[5] records I don't have that we talked about,
[6] probably somebody observed him even late on
[7] the 7th and if they had observed him late on
[8] the 7th, they might have thought he was sick,
[9] brought him to a medical center and taken care
[10] of him. I think if he hadn't been
[11] incarcerated and he was with his brother on
[12] the 8th and he was as sick as it was described
[13] at 3:45 in the morning, I would — I believe
[14] he would have sought medical attention at that
[15] point and might have gotten antibiotics as
[16] much as six or eight hours earlier than he
[17] actually did, and that's a huge time frame
[18] where it's very likely some of these
[19] complications could have been avoided.
[20]   **Q:** Can you testify to a reasonable
[21] degree of medical probability that the
[22] complications would have been avoided had he,
[23] say, gotten antibiotics at 5 o'clock a.m. on
[24] the 8th?
[25]   **A:** I think so, because, again, what I

---

Page 95

**M. Niederman**

[1]
[2] can say is that he got these complications and
[3] that the majority of patients with pneumonia
[4] don't get these complications and that there
[5] had to be a time where if he had been treated
[6] he would not have gotten these complications,
[7] and, as I said in the report, I was trying to
[8] really not be too demanding in terms of what
[9] they did. They probably could have and should
[10] have treated him before 3:45, but 3:45 was an
[11] obvious time to have intervened, and it took
[12] nine hours after that before he got anything
[13] done.
[14]   **Q:** How close to 12:45 would his
[15] earlier arrival at Summit Medical Center have
[16] made a difference? How fine can you make that
[17] distinction if — do you understand what I'm
[18] getting at?
[19]   **A:** Well, as I tried to say in the
[20] report, this sort of standard for giving
[21] antibiotic therapy sooner is better, and for
[22] as sick as he was described at 3:45, I would
[23] have probably not been critical of his care if
[24] he got antibiotics within four hours of that.
[25] Say by 8:00 a.m. he got antibiotics, I would

---

Page 96

**M. Niederman**

[1]
[2] have said that's pretty reasonable. I think
[3] beyond that he's at greater risk for all of
[4] the complications he got.
[5]   **Q:** If he had gotten the antibiotics at
[6] 8 o'clock, can you say that he wouldn't have
[7] had the complications or is there really no
[8] way to know?
[9]   **A:** I think it's much less likely,
[10] because, again, by experience and
[11] statistically, majority of patients with
[12] pneumonia don't get the complications he got.
[13]   **Q:** Let me see if I'm understanding
[14] it. The general proposition that nobody can
[15] argue with is earlier treatment with
[16] antibiotics with patients with pneumonia is
[17] better and patients who have pneumonia who get
[18] antibiotics sooner have better outcomes?
[19]   **A:** Correct.
[20]   **Q:** And you are trying to extrapolate
[21] from your knowledge of that data and your
[22] experience of treating patients with pneumonia
[23] how that might have impacted
[24] Mr. Carranza-Reyes in this instance?
[25]   **A:** Correct.

---

THE PARK COUNTY BOARD OF COUNTY COMMISSIONERS

MICHAEL S. NIEDERMAN, M.D.
September 8, 2006

---

Page 97

[1]                    *M. Niederman*
[2]    Q: Your understanding of the general
[3] standard of care is within four hours of
[4] presentation to a health care provider in the
[5] community, that health care provider, if
[6] they're doing their job, should have known
[7] enough to figure out to start antibiotics?
[8]    A: Correct.
[9]    Q: And so anybody who interacted with
[10] Mr. Carranza-Reyes who was a health care
[11] provider failed in that general standard of
[12] care if they didn't do something within four
[13] hours of when they should have known it was
[14] pneumonia or could have been pneumonia?
[15]    A: Yes, but I think more relevant to
[16] your question is what's the time period where
[17] if they had treated him the outcome might have
[18] been better, and, as I said, I don't think I
[19] would have been critical if he had gotten
[20] antibiotics by, say, 8:00 a.m., and you're
[21] asking about is there a time that I could fine
[22] tune it. He got antibiotics — he didn't even
[23] get to Summit County until after 1:00, and I
[24] don't know the exact moment he got
[25] antibiotics, but it was well after that 8:00

---

Page 98

[1]                    *M. Niederman*
[2] a.m.
[3]    Q: But you don't have the ability to
[4] predict what would have been different in his
[5] outcome based on when he would have gotten
[6] antibiotics, because nobody can predict that;
[7] is that fair?
[8]    A: No, but I think a reasonable way to
[9] look at it is that if you talk about
[10] 50 percent probabilities, 50 percent of
[11] patients who get treated for pneumonia within
[12] four hours don't end up with the complications
[13] he got.
[14]    Q: Then how does that kind of
[15] percentage change if it's five hours or six
[16] hours or seven hours or eight hours?
[17]    A: Beyond four hours — at least in
[18] terms of mortality, there is data that every
[19] hour adds — of delay adds to mortality.
[20]    Q: Is there data about the kinds of
[21] bad outcomes that Mr. Carranza-Reyes had short
[22] of mortality?
[23]    A: Not specifically.
[24]    Q: Is there any way to tell, based on
[25] the data that you reviewed, when

---

Page 99

[1]                    *M. Niederman*
[2] Mr. Carranza-Reyes' pneumonia became sepsis?
[3]    A: Well, he had sepsis when he arrived
[4] at Summit County ER, so it may have been
[5] present all of that morning. Anybody who
[6] measured his vital signs documented findings
[7] consistent with sepsis and septic shock. It
[8] could have been going on for a long time. It
[9] probably was to account for the fact that he
[10] developed all these complications, and, again,
[11] to put it in context, he got outstanding
[12] medical care when he got to Denver, but
[13] technically he died. I mean, his heart
[14] stopped. He was dead. And they were able to
[15] bring him back, and that was fortunate, but he
[16] did progress to the point of dieing on March
[17] 8th.
[18]    Q: And the outcome that was achieved,
[19] given how sick he was, was pretty remarkable
[20] by Denver Health, right?
[21]    A: They did a great job. His outcome,
[22] to have been resuscitated and to have survived
[23] and apparently with intact neurologic function
[24] is a very good outcome, correct.
[25]    Q: And Denver Health, are you familiar

---

Page 100

[1]                    *M. Niederman*
[2] with Denver Health at all?
[3]    A: Only a little bit. I know some of
[4] the doctors.
[5]    Q: Do you know Ivor Douglas?
[6]    A: Don't know him. I know Rick
[7] Albert.
[8]    Q: In what context, a professional
[9] context, at meetings and that sort of thing?
[10]    A: Right.
[11]    Q: You understand that Denver Health -
[12] is a level one trauma facility and all of that
[13] kind of stuff?
[14]    A: Correct.
[15]    Q: I assume this institution is too;
[16] is that correct?
[17]    A: Correct.
[18]    Q: When you reviewed Dr. Douglas'
[19] deposition and had his descriptions of how
[20] they do trauma care, it's similar to what you
[21] do here?
[22]    A: Yes. Again, I think that they did
[23] a great job. They recognized how sick he was,
[24] they did an immediate stabilization, the ICU
[25] team came down and met him in the ER and took

---

MICHAEL S. NIEDERMAN, M.D.                    MOISES CARRANZA-REYES  v.
September 8, 2006                    THE PARK COUNTY BOARD OF COUNTY COMMISSIONERS

Page 101

*M. Niederman*

[1]
[2] over his care immediately, and that's the way
[3] it should be done, and they did a great job.
[4]    Q: Have you ever heard of methylene
[5] blue being used in this kind of context
[6] before?
[7]    A: I've read about it, but I actually
[8] haven't heard about a case where it's been
[9] done, so yes, it was interesting.
[10]    Q: It's clearly a dramatic treatment
[11] option?
[12]    A: Correct.
[13]    Q: How does sepsis present itself, and
[14] let me be more specific, is there any way to
[15] tell either from the documents and data that
[16] you have or from your own experience about
[17] when it was likely that Mr. Carranza-Reyes
[18] started having sepsis?
[19]    A: Well, again, sepsis to me means an
[20] inflammatory response to infection, and he
[21] probably had it at 3:45 in the morning. I
[22] don't know exactly when he progressed to
[23] septic shock, but I know that he had a lot of
[24] the findings of septic shock. As I recall, he
[25] really could barely get up and move and he was

Page 102

*M. Niederman*

[1]
[2] laid down, all of which suggests he may have
[3] had a low blood pressure from the very
[4] beginning.
[5]    Q: What is the definition of septic
[6] shock?
[7]    A: Septic shock is a low blood
[8] pressure and low profusion of vital organs as
[9] a result of an uncontrolled infection.
[10]    Q: So, essentially, septic shock is
[11] the infection has gotten into all of the
[12] systems of the body because it's in the blood
[13] and results in general — your organs and
[14] systems generally start to fail, is that —
[15]    A: Well, it's — what probably is
[16] happening in septic shock is the infection is
[17] widespread and the body's response to that
[18] infection leads to all of the organs
[19] dysfunctioning. In other words, the rapidity
[20] with which septic goes to septic shock can't
[21] really be explained by bacteria invading each
[22] of these organs that rapidly. It's really the
[23] body's inflammatory response to the bacteria
[24] which causes the rapid development of the
[25] findings in and the injury to the organs.

Page 103

*M. Niederman*

[1]
[2]    Q: Is the progression of this disease
[3] mechanism here colonization, infection of the
[4] mouth or throat, pneumonia sepsis or sepsis
[5] and pneumonia at the same time, how does that
[6] work?
[7]    A: I think it could be both. In other
[8] words, when he developed pneumonia, again, I
[9] think our assumption is you develop pneumonia
[10] that's initially a very small spot of
[11] pneumonia that gets larger and larger and at
[12] some point it initiates an inflammation
[13] response both in the lungs and in the rest of
[14] the body that causes injury, and so in animal
[15] models, it's very unlikely that there wouldn't
[16] be some period where there's pneumonia without
[17] sepsis, but that time period could be pretty
[18] compressed.
[19]    Q: Is there anything in the data that
[20] you have from Vicky Paulsen's observations of
[21] Mr. Carranza-Reyes on either the 6th or the
[22] 7th that is consistent with sepsis?
[23]    A: Not directly. Again, fever and an
[24] elevated respiratory rate could be a sign of
[25] sepsis, and so he had them, but not to the

Page 104

*M. Niederman*

[1]
[2] degree that he had them on the 8th.
[3]    Q: He had signs of sepsis on the
[4] morning, in the early morning of the 8th, is
[5] what I'm understanding you?
[6]    A: Correct.
[7]    Q: And that's his inability to —
[8]    A: Well —
[9]    Q: — ambulate?
[10]    A: Those are more signs of septic
[11] shock. Again, if you are to go outside now
[12] and run a mile, you would have signs of sepsis
[13] too.
[14]    Q: I understand.
[15]    A: So sepsis is pretty nonspecific.
[16]    Q: Septic shock is pretty specific,
[17] and the early morning of the 8th he has — the
[18] empirical data you have is he's at least —
[19] has things that are consistent with septic
[20] shock?
[21]    A: Right.
[22]    Q: Let me understand the methodology
[23] that you used to come up with your expert
[24] opinions in this case, and can you describe
[25] that for me?

THE PARK COUNTY BOARD OF COUNTY COMMISSIONERS     MICHAEL S. NIEDERMAN, M.D.
September 8, 2006

---

**Page 113**

M. Niederman

[1]
[2] complaining about being sick two days earlier
[3] and nobody put that together and said, boy,
[4] this is a problem, let's get him out of here
[5] and get him some medical attention, so those
[6] are all the — the criticisms I have. I'm not
[7] sure I could point a finger at individuals
[8] every step of that way there.
[9]     Q: Whoever was responsible for those
[10] decisions or non-decisions —
[11]     A: Correct.
[12]     Q: — is the people that you are
[13] critical of in this drama?
[14]     A: Correct.
[15]     Q: But you don't know what role, if
[16] any, the Board of County Commissioners of Park
[17] County played in any of those decisions?
[18]     A: I have no idea what — which of
[19] those decisions they were responsible for,
[20] what environment they created that would have
[21] led to people making those decisions.
[22]     Q: And the same is true with respect
[23] to Sheriff Fred Wegener and Captain Monte
[24] Gore?
[25]     A: Correct.

---

**Page 114**

M. Niederman

[1]
[2]     Q: What do you know about
[3] Mr. Carranza-Reyes' journey from Mexico to the
[4] United States?
[5]     A: I guess I only know what I read in
[6] the deposition, that he had crossed over the
[7] border, that I think he had somehow paid
[8] someone to allow him to sneak in and was in
[9] the back of a van from Mexico into Colorado
[10] before he was pulled over by the INS, and I
[11] can't remember exactly how many days that
[12] represented, seemed like, if I recall, three
[13] or four days after he entered the country
[14] before he was pulled over.
[15]     Q: Based on your knowledge of the
[16] conditions of Mr. Carranza-Reyes' travels from
[17] Mexico to the United States, would those
[18] conditions be the type of conditions that
[19] could, in terms of crowding or stress or
[20] whatever that you had talked about before,
[21] vis-a-vis the Park County Jail, could those
[22] conditions also be either a contributor or
[23] cause to the type of infection that he
[24] ultimately got?
[25]     A: I think they could contribute in

---

**Page 115**

M. Niederman

[1]
[2] theory in the same way. You know, the only
[3] fact that's — that I'm — reason I'm not
[4] thinking about that a lot is that he spent at
[5] least two or three days in the jail afterwards
[6] not being sick.
[7]     Q: Does the infection mechanism of
[8] Group A beta-hemolytic streptococcal pneumonia
[9] have to be colonized in the throat?
[10]     A: I believe so. Again, this is not a
[11] common bacteria that leads to pneumonia. It's
[12] occurred in these epidemic settings, and, in
[13] general, almost all bacterial infections are
[14] acquired by aspiration from a colonized oral
[15] pharynx, and this is the sort of classic
[16] bacteria that resides in the throat.
[17]     Q: So one couldn't get it from an
[18] infected wound or something like that?
[19]     A: It would be real unusual to have —
[20] again, the only mechanism I could think of
[21] from an infected wound is that it would invade
[22] the bloodstream from the infected wound and in
[23] the course of spreading through the
[24] bloodstream reach the lung, and what's against
[25] that in this case is that he did have a sore

---

**Page 116**

M. Niederman

[1]
[2] throat and he also, when he presented to the
[3] hospital, had a necrotizing pneumonia with
[4] empyema, a pleural space infection, which
[5] usually is a consequence of a respiratory
[6] infection that's gone on for a while, so,
[7] presumably, this was in the lung for a while
[8] before he became sick.
[9]     Q: Which leads you to believe that it
[10] originally presented —
[11]     A: Began as pneumonia and led to
[12] sepsis, rather than the sepsis that just
[13] happened to spread to the lung.
[14]     Q: The mechanism of getting an
[15] infection through a wound, for example, it
[16] would have to have been sepsis and then
[17] pneumonia?
[18]     A: Correct.
[19]     Q: Do you have any idea who was
[20] responsible for any delay in the transport of
[21] Mr. Carranza-Reyes to Summit Medical Center?
[22]     A: Again, to me the delay was — began
[23] when Nurse Paulsen was contacted at 3:45 in
[24] the morning and her response wasn't call an
[25] ambulance and bring him to the hospital, so

---

MICHAEL S. NIEDERMAN, M.D.                          MOISES CARRANZA-REYES  v.
September 8, 2006               THE PARK COUNTY BOARD OF COUNTY COMMISSIONERS

---

**Page 125**

M. Niederman

[1]
[2] in this deposition. We met earlier, but
[3] I wanted to reintroduce myself. I have
[4] the privilege of following up
[5] Mr. Ringel's questions, so I'm going to
[6] jump around a little bit. If you have
[7] any confusion about where I am or what
[8] specific part of his questioning I'm
[9] referencing, just ask me. I understand
[10] that could be a little confusing.
[11]    THE WITNESS: Sure.
[12]        EXAMINATION BY
[13]            MR. JURS:
[14]    Q: For your conclusions in this case,
[15] your opinions, you had the assumption that
[16] other inmates had symptoms of respiratory
[17] illness, including cough or sore throat; is
[18] that correct?
[19]    A: Correct.
[20]    Q: And you got that from the
[21] depositions of the brothers, Moises and
[22] Abraham Carranza-Reyes?
[23]    A: And from — I believe it was
[24] Dr. Bachman's deposition and records that he
[25] had treated some of the inmates for sore

**Page 126**

M. Niederman

[1]
[2] throat. I could pull that out, if you like.
[3]    Q: Yes, that would be fine.
[4]    A: I know there is the report here
[5] from the Mexican Consulate. I think that that
[6] is one of the — here it is.
[7]    Q: Could you tell me what page is on
[8] the bottom of that?
[9]    A: This is not in your records. I
[10] would have to find it, but it was from the
[11] Mexican Consulate. It was from the Park
[12] County Department Correction Center referred
[13] from the Park County Jail, and it's got the
[14] names of different inmates. Let's see. There
[15] was one here who had bronchitis, one who had
[16] acute pharyngitis and fever, another one with
[17] pharyngitis, another diagnosed no illness.
[18] This one I can't quite make out what they
[19] diagnosed. No complaints, no acute illness,
[20] fever last week, cold symptoms. There were,
[21] again, a bunch of evaluations of patients
[22] who — I believe that, as I recall,
[23] Dr. Bachman had done some of these
[24] evaluations. In fact, his name is on these
[25] requisitions.

**Page 127**

M. Niederman

[1]
[2]    Q: Was there any of those that
[3] indicated any other inmate at the Park County
[4] Jail, inmate or detainee had Group A Strep?
[5]    A: I don't think it's possible,
[6] because I don't think there were cultures
[7] done.
[8]    Q: Was there any inmate that was
[9] diagnosed with having pneumonia?
[10]    A: I don't know.
[11]    Q: Based on the records that you have?
[12]    A: Not in this record, no.
[13]    Q: As far as you know, based on the
[14] records that you've been provided,
[15] Carranza-Reyes is the sole inmate or detainee
[16] at the Park County Jail who had either Group A
[17] Strep or pneumonia in the time period that
[18] we're referencing?
[19]    A: From all the information that I've
[20] seen, yes.
[21]    Q: In your report, on page one,
[22] paragraph three, you indicated that it's your
[23] opinion that Mr. Reyes, if he had been put in
[24] a better maintained cell, with less crowding,
[25] he would have been less likely to have

**Page 128**

M. Niederman

[1]
[2] acquired this communicable respiratory
[3] illness. Today you discussed that he either
[4] acquired or the conditions contributed to the
[5] development of the disease after he had
[6] acquired it; isn't that true?
[7]    A: Well, I'm looking at the wording
[8] there. The wording as it's in here is still
[9] correct. In other words, even if it's true
[10] that he arrived at the jail colonized, there's
[11] no evidence that he arrived at the jail ill,
[12] and he acquired the illness, the symptoms
[13] after he was in the jail, so either the
[14] mechanism was that he acquired the bacteria
[15] and then became ill in the jail or arrived
[16] with the bacteria and progressed from
[17] colonization to infection while he was in the
[18] jail. In either instance, the crowding
[19] conditions, I believe, contributed.
[20]    Q: My question is regarding the
[21] crowding conditions. Do you have an opinion
[22] to a degree of medical probability what the
[23] number of inmates in that facility would
[24] prevent that from contributing to the
[25] progression or development of disease?

---

Page 125 · Page 128  (34)                   Min-U-Script®                Precise Court Reporting

───────────────── REYES  v.

THE PARK COUNTY BOARD OF COUNTY COMMISSIONERS

MICHAEL S. NIEDERMAN, M.D.
September 8, 2006

Page 129

M. Niederman

[1]
[2]    A: I don't have that number. What I
[3] did read in several depositions is that the
[4] jail was designed to hold 16 people in that
[5] pod, and I'm assuming that in the design of
[6] the jail somebody considered health issues and
[7] that that was a number that was thought to be
[8] safe.
[9]    Q: But you can't state that as an
[10] expert witness in this case, can you?
[11]    A: No. I can state that people claim
[12] that this jail was designed to hold 16 people
[13] and it held many more.
[14]    MR. TRINE: I think it was 18,
[15] for the record. Just so you're not —
[16]    THE WITNESS: I thought somewhere
[17] it said 16, but okay.
[18]    MR. TRINE: Just so you're not
[19] misleading anyone.
[20]    Q: Have you ever consulted with a jail
[21] guard and the number of inmates in which a
[22] specific pod or cell can hold?
[23]    A: No.
[24]    Q: Is this something that people that
[25] you work with have done?

Page 130

M. Niederman

[1]
[2]    A: No.
[3]    Q: So you can't tell me whether, from
[4] an infectious disease standpoint, 18 was the
[5] correct number for this pod or it possibly
[6] could have held more than that safely?
[7]    A: I can't tell you that. What I
[8] could tell you is that what's described in the
[9] depositions is that there were up to 60 and
[10] that some of the inmates were sleeping on
[11] mattresses on the floor, and it sounded like
[12] there were wall to wall people and that the
[13] amount of physical space between people was
[14] close enough that that sounded like both a
[15] stress and a potential vector mechanism for
[16] communicable diseases.
[17]    Q: Isn't it true that if plaintiff had
[18] been placed in that pod with just a single
[19] other person there's the potential for the
[20] transfer of communicable disease between those
[21] two individuals?
[22]    A: Absolutely, but there's a greater
[23] possibility with different and less favorable
[24] conditions.
[25]    Q: That's one vector that could

Page 131

M. Niederman

[1]
[2] contribute to the disease. I'm going to ask
[3] you about some other ones.
[4]    A: That's one possible factor that
[5] could play a role, correct.
[6]    Q: Could the lack of sleep contribute
[7] to the development or progression of the
[8] disease process in plaintiff?
[9]    A: Yes.
[10]    Q: Could the lack of proper hydration
[11] be a factor in the development or progression
[12] of the disease?
[13]    A: Yes.
[14]    Q: Could the lack of proper nutrition
[15] in the week preceding be a factor in the
[16] development and progression of this disease in
[17] the plaintiff?
[18]    A: If it happened, yes.
[19]    Q: I think we covered this one, but
[20] could the close contact with other individuals
[21] during the time plaintiff crossed the border
[22] and then traveled to the State of Colorado be
[23] a factor in the progression or development of
[24] disease?
[25]    A: Not probably in the development of

Page 132

M. Niederman

[1]
[2] the disease, but in the — possibly in the
[3] acquisition of the colonization of this
[4] bacteria.
[5]    Q: Do you know if Moises
[6] Carranza-Reyes had a proper amount of water
[7] for the journey across the Arizona desert,
[8] which he took to cross the United States
[9] border?
[10]    A: I don't have any information about
[11] how much water he drank during his journey.
[12]    Q: Same with food?
[13]    A: Correct.
[14]    Q: Do you know how much sleep he got
[15] during that period of time?
[16]    A: I don't. As I said, I didn't
[17] really focus on those issues, because we know
[18] there was a two or three-day period at least
[19] when he arrived at the jail where he was not
[20] sick.
[21]    Q: Do you know what the period from
[22] colonization to onset of symptoms is for Group
[23] A Strep like this particular bug?
[24]    A: Again, it can be very rapid in 24
[25] to 48 hours and it can be more prolonged.

MOISES CARRANZA-REYES  v.

MICHAEL S. NIEDERMAN, M.D.                    THE PARK COUNTY BOARD OF COUNTY COMMISSIONERS

September 8, 2006

---

Page 133

**M. Niederman**

[1]
[2]   Q: How prolonged?
[3]   A: Probably — again, there are people
[4] who are colonized with this bacteria for
[5] months and then progress to infection, so
[6] there's a very wide range.
[7]   Q: So just as a hypothetical, I could
[8] have this particular bacteria in the back of
[9] my throat and I could be walking around
[10] everyday asymptomatic, however, as a result of
[11] missing a couple nights of sleep or not eating
[12] well and feeling tired, all of a sudden I
[13] should start to show symptoms?
[14]   A: It's not well studied, but that's
[15] certainly a possibility.
[16]   Q: You indicated that the care at the
[17] Denver Health Medical Center was appropriate
[18] due to the progressing condition of the septic
[19] shock and the pneumonia when he presented at
[20] that location?
[21]   A: I think what I said was that I
[22] thought he got a good quality of care because
[23] he arrived there very sick, ended up dieing
[24] that afternoon and was successfully
[25] resuscitated and left the hospital alive.

---

Page 134

**M. Niederman**

[1]
[2]   Q: Do you have an opinion as to his
[3] condition when he entered the Summit Medical
[4] Center at 12:45?
[5]   A: Yes. I think the record pretty
[6] clearly documents that he was in septic shock
[7] at that time.
[8]   Q: Do you believe that he was in
[9] critical condition when he entered the Summit
[10] Medical Center?
[11]   A: Yes.
[12]   Q: Is that based on the clinical
[13] observations of the physician on duty or is
[14] that based on the growing out of the cultures
[15] of his blood which was done later?
[16]   A: That's based on the clinical
[17] observations.
[18]   Q: Are you critical of Dr. Keeling for
[19] not agreeing with you that he was in critical
[20] condition at that moment?
[21]   A: I'm not sure who Dr. Keeling is.
[22]   Q: Dr. Keeling is the emergency room
[23] physician at the Summit Medical Center who
[24] evaluated the plaintiff.
[25]   A: In which context did he say he was

---

Page 135

**M. Niederman**

[1]
[2] not critically ill?
[3]   Q: Are you aware of his position on
[4] plaintiff's condition?
[5]   A: No.
[6]   Q: If Dr. Keeling did not designate
[7] plaintiff as critically ill in his deposition
[8] at that moment, would that surprise you?
[9]   A: Yes.
[10]   MR. TRINE: Objection, lack of
[11] foundation.
[12]   A: Well, it would surprise me
[13] tremendously since he made a decision to
[14] transfer him to a higher level of care.
[15]   Q: Do you know why he transferred
[16] plaintiff to a higher — a different facility?
[17]   A: I have no idea. I assume because
[18] he felt he needed more specialized care than
[19] he could get there.
[20]   Q: Do you know that Summit Medical
[21] Center doesn't have an overnight facility?
[22]   A: No.
[23]   Q: If that was the case, would that
[24] effect the decision making that Dr. Keeling
[25] had to make at that time?

---

Page 136

**M. Niederman**

[1]
[2]   A: Well, if, as you said, he wasn't
[3] critically ill, then I'm not sure why he
[4] needed an overnight facility. I'm not sure
[5] why he needed hydration, I'm not sure why he
[6] needed oxygen. In other words, none of their
[7] actions fit with an assessment that he wasn't
[8] critically ill.
[9]   Q: What's your definition of
[10] critically ill?
[11]   A: Somebody who might die as a result
[12] of their acute illness.
[13]   Q: If I had a patient, if I was a
[14] physician and I was treating a patient and I
[15] felt they needed a transfer and they were
[16] critically ill, by your definition, I would
[17] get them to that other facility as soon as
[18] possible because this is a life or death
[19] situation?
[20]   A: Depends, again, on the
[21] circumstances. You can't just transport
[22] someone until they're stabilized, so they
[23] may — again, to me everything they did points
[24] to him being critically ill at Summit Medical
[25] Center. They give him fluids. They give him

---

MICHAEL S. NIEDERMAN, M.D.
September 8, 2006

MOISES CARRANZA-REYES  v.
THE PARK COUNTY BOARD OF COUNTY COMMISSIONERS

---

**Page 141**

*M. Niederman*

[1]
[2] skin was warm, and I'm not sure I understand
[3] why it was warm if his temperature was 97, so
[4] no, it doesn't, and, in fact, a low
[5] temperature can sometimes occur with sepsis.
[6] There's complaints here of vomiting, body
[7] aches, diarrhea. He sounds unwell, so no, it
[8] doesn't change my opinion.
[9]     Q: Doesn't it also sound consistent
[10] with flu-like symptoms?
[11]     A: Certainly could be flu-like
[12] symptoms.
[13]     Q: That would also take into account
[14] the lack of fever as well?
[15]     A: You could have fever with flu. I
[16] don't think that that helps one way or the
[17] other.
[18]     Q: You could have no fever with flu as
[19] well; isn't that true?
[20]     A: You could have no fever with
[21] pneumonia.
[22]     Q: Is that a yes to my question?
[23]     A: You could have no fever with flu or
[24] any other illness, correct.
[25]     Q: Let me make sure I have this

---

**Page 142**

*M. Niederman*

[1]
[2] correct regarding your — I'm done with that
[3] medical record, doctor, thank you.
[4]     The opinion in your report
[5] regarding 3:45 a.m. on March 8th, is it your
[6] opinion that at that point had he been given
[7] antibiotics he would have been spared the
[8] hospital course and amputation which resulted
[9] in this case?
[10]     A: It's my opinion that it's more
[11] likely than not he would not have had the
[12] complications he did if he had gotten — if he
[13] had gone to a hospital and gotten antibiotics
[14] in a timely way.
[15]     Q: And that also is true for an
[16] additional four hours after that time period?
[17]     A: I believe what I said is that if
[18] they had transported him to the hospital so
[19] that he could have gotten antibiotics roughly
[20] within four hours, it's more likely than not
[21] he would have not had the complications he
[22] had.
[23]     Q: You could say that to a medical
[24] probability?
[25]     A: I could say it based on the fact

---

**Page 143**

*M. Niederman*

[1]
[2] that patients who get antibiotics within four
[3] hours more likely than not don't get the
[4] complications he got.
[5]     Q: And determining which antibiotic to
[6] provide to an individual patient is something
[7] that's — based on your experience, as you
[8] discussed earlier, you have to make some
[9] assumptions about what the person's history
[10] and illness is to determine what would be the
[11] most appropriate antibiotic; isn't that true?
[12]     A: Correct.
[13]     Q: So in some respects you're — this
[14] plaintiff would have been relying on
[15] Dr. Keeling's knowledge of antibiotics and
[16] infectious agents to determine which treatment
[17] course to provide before he got the cultures
[18] back?
[19]     A: Correct.
[20]     Q: So even if Dr. Keeling had been
[21] practicing appropriately but had confusion
[22] about which antibiotic to provide, it's
[23] possible that he could have provided an
[24] incorrect one until the cultures came back;
[25] isn't that true?

---

**Page 144**

*M. Niederman*

[1]
[2]     A: It's possible.
[3]     Q: And, therefore, it's possible that
[4] even if plaintiff had been receiving adequate
[5] medical care from Dr. Keeling and any other
[6] medical provider up to the time the cultures
[7] come back, he would not have received the
[8] proper antibiotic up to that point?
[9]     A: It's possible, but it turns out
[10] that the bacteria he had was so sensitive to
[11] so many antibiotics, it's very unlikely.
[12]     Q: Mr. Ringel asked you whether or not
[13] you had criticism of specific jail staff
[14] members or Fred Wegener, the sheriff of Park
[15] County, or Monte Gore, the captain of the
[16] jail. My client is the medical director,
[17] Dr. James Bachman. Do you have specific
[18] criticisms of his role in this case?
[19]     A: Again, I don't know what his
[20] opportunity was by the structure of the jail
[21] and his responsibilities to know where in the
[22] points I am critical of the management of
[23] Mr. Carranza-Reyes he could have intervened,
[24] so if he had supervisory function over the
[25] nurse, if he could have developed a policy

---

THE PARK COUNTY BOARD OF COUNTY COMMISSIONERS

MICHAEL S. NIEDERMAN, M.D.
September 8, 2006

---

**Page 145**

M. Niederman

[1]
[2] that demanded that certain symptoms be
[3] evaluated in certain ways, if he ran then
[4] appropriate quality controls, reviewing charts
[5] intermittently or inmates had certain symptoms
[6] to see if procedures were being followed,
[7] again, I just don't know the scope of what his
[8] job is, so I can't comment specifically on him
[9] and criticism of him, I'm critical of the way
[10] things happened, but I don't know enough about
[11] the structure to know who individually is
[12] responsible for each of those errors.
[13]    Q: You don't intend to offer standard
[14] of care opinions regarding his role as a
[15] medical director in corrections medicine?
[16]    A: I don't know enough about the
[17] standards of care of his role to comment on
[18] that.
[19]    Q: You've never served as a medical
[20] director in a jail?
[21]    A: Correct.
[22]    Q: Have you consulted with jail
[23] medical directors before in your practice?
[24]    A: As I said, I think I may have in
[25] relation to tuberculosis in the past, but I

---

**Page 146**

M. Niederman

[1]
[2] can't remember much more specifically than
[3] that.
[4]    Q: Is it fair to say that that's a
[5] vague recollection in your mind?
[6]    A: Correct.
[7]    Q: And that would have been something
[8] that occurred 10 years or more ago?
[9]    A: Correct.
[10]    Q: Do you deal with patients from
[11] rural areas?
[12]    A: Sometimes they end up here in the
[13] big city, but not commonly.
[14]    Q: Where would they be coming from?
[15]    A: Again, they could be coming from
[16] anywhere. Again, what would bring them here
[17] is family or business in this area.
[18]    Q: So that's not a standard part of
[19] your practice?
[20]    A: We take care of people who come
[21] here, but if you're asking do people who live
[22] in rural areas occasionally come here and get
[23] medical care, yes.
[24]    Q: Do you have an association with any
[25] rural hospitals or physicians, say in eastern

---

**Page 147**

M. Niederman

[1]
[2] Long Island or in New England or upstate New
[3] York?
[4]    A: Yes. Personally I have some
[5] relationship with eastern Long Island doctors
[6] so that that — there are parts of that that
[7] are fairly rural and we do see patients from
[8] them from time to time.
[9]    Q: Do you believe that there's a
[10] difference in the level of treatment provided
[11] to patients in a rural setting as opposed to
[12] your facility, which is a level one trauma
[13] center?
[14]    A: In the hospital itself, yes.
[15]    Q: Is that something you took into
[16] account when forming your opinions in this
[17] case?
[18]    A: My opinions weren't about the care
[19] that was given at the hospital, so no.
[20]    Q: But your opinions do involve health
[21] care professionals in a rural setting, Nurse
[22] Paulsen, for example, and Dr. Bachman?
[23]    A: I don't think the rural setting has
[24] anything to do with my opinions.
[25]    Q: You indicated that after four hours

---

**Page 148**

M. Niederman

[1]
[2] every hour in which a patient does not receive
[3] antibiotic medication can add to the potential
[4] mortality of a disease?
[5]    A: Correct.
[6]    Q: Do you remember mentioning that
[7] earlier?
[8]    A: Correct.
[9]    Q: And you said that that's either
[10] well-known or in the literature or something
[11] of that nature. Can you cite to me where that
[12] proposition is?
[13]    A: Well, it's become a national
[14] standard for Medicare, so that Medicare, for
[15] example, reviews charts of their beneficiaries
[16] that have community-acquired pneumonia, and
[17] it's become a national standard that every
[18] hospital should try to give antibiotics within
[19] four hours of the patient's arrival to the
[20] hospital. Joint Commission for the
[21] Accreditation of Health Care Organizations has
[22] made it their standard. National Quality
[23] Forum is — has agreed with that and is
[24] evaluating that still. It's been in the
[25] guidelines of the Infectious Disease Society

---

MICHAEL S. NIEDERMAN, M.D.

September 8, 2006

MOISES CARRANZA-REYES v.

THE PARK COUNTY BOARD OF COUNTY COMMISSIONERS

---

Page 149

**M. Niederman**

[1]
[2] of America, and it's been published by Peter
[3] Houck most recently in the Archives of
[4] Internal Medicine, most recently in 2004.
[5]     Q: If I ran a search on Houck, I
[6] should find a 2004 article which references
[7] that issue?
[8]     A: Correct.
[9]     Q: Do you recall the name of that
[10] article?
[11]     A: I don't remember the name, but,
[12] again, it was in the Archives of Internal
[13] Medicine in 2004.
[14]     Q: You indicated that the guards
[15] provided oxygen in an unsupervised setting.
[16] Was that something that struck you as unusual
[17] about the care provided to plaintiff in this
[18] case? Do you remember discussing that with
[19] Mr. Ringel?
[20]     A: What I believe I said is if he was
[21] sick enough to require oxygen, I was surprised
[22] that they didn't transport him to a health
[23] care facility then for a more detailed
[24] evaluation to figure out why he needed the
[25] oxygen.

---

Page 150

**M. Niederman**

[1]
[2]     Q: The fact that this jail is above
[3] 9,000 feet of elevation doesn't in fact change
[4] that evaluation at all?
[5]     A: It would, if they were giving
[6] oxygen to every inmate that arrived there, but
[7] they felt something happened on that morning
[8] that required him to get oxygen when he didn't
[9] require it the day before, so it is true that
[10] 9,000 feet you might use oxygen quicker than
[11] at sea level, yes, but I think it still
[12] doesn't answer the question what changed that
[13] he didn't need oxygen on the 7th and he needed
[14] it on the 8th.
[15]     Q: If he was experiencing the symptoms
[16] of altitude sickness, couldn't oxygen provide
[17] some relief and comfort from those symptoms?
[18]     A: If that was their diagnosis, yes,
[19] then that would have been the correct
[20] treatment. I don't think the context of him
[21] having gone to the infirmary for two days in a
[22] row with his symptoms and then presenting the
[23] way he did on the 8th probably suggested to
[24] anyone that the most likely diagnosis was
[25] altitude sickness.

---

Page 151

**M. Niederman**

[1]
[2]     MR. JURS: Josh, do we still have
[3] you on the telephone?
[4]     MR. MARKS: Yes.
[5]     Q: When you wrote your report, you
[6] placed in it your opinions regarding the
[7] issues in this case as asked to evaluate them
[8] by Mr. Trine; isn't that true?
[9]     A: Correct.
[10]     Q: Mr. Trine didn't limit what you
[11] could write in your report in any way, did he?
[12]     A: No, but I tried to focus on the
[13] questions he asked.
[14]     Q: So you could have stated in your
[15] report any opinion that you felt was relevant
[16] to the issues Mr. Trine asked you in this
[17] case?
[18]     A: Correct.
[19]     Q: So I can assume that this will
[20] remain the summation of your opinions in the
[21] case until trial?
[22]     A: Correct.
[23]     Q: Have you been asked to go to trial
[24] in this case and testify in front of a jury?
[25]     A: Not specifically. It was my

---

Page 152

**M. Niederman**

[1]
[2] understanding that if I was going to be an
[3] expert and it came to that I would go to
[4] trial.
[5]     Q: Would you travel to Denver to do
[6] so?
[7]     A: If I had to. I would prefer not
[8] to, but if I have to, I will.
[9]     Q: Is it fair to say you haven't
[10] really gone over that issue yet?
[11]     A: Correct.
[12]     Q: But it's not out of the question
[13] for you to come and testify?
[14]     A: No. If I had to, I would do it.
[15]     Q: What is your fee for doing so?
[16]     A: We haven't really negotiated that.
[17] I haven't really worked that out. I've done
[18] it once before, and then my fee was $5,000.
[19]     Q: Per day missed at Winthrop
[20] University Hospital?
[21]     A: Correct. Correct.
[22]     MR. RINGEL: Inclusive or
[23] exclusive of expenses?
[24]     THE WITNESS: Exclusive of
[25] expenses.

---