Westlaw.

Slip Copy

Page 1

Slip Copy, 2006 WL 3533049 (D.Colo.)
**(Cite as: Slip Copy)**

**H**

Briefs and Other Related Documents

Cook v. Rockwell Intern. Corp.D.Colo.,2006.Only the Westlaw citation is currently available.

United States District Court,D. Colorado.

Merilyn COOK, et al., Plaintiffs,

v.

ROCKWELL INTERNATIONAL CORPORATION and the Dow Chemical Company, Defendants.

**No. Civ.A. 90-CV-00181-J.**

Dec. 7, 2006.

Bernadette M. Rappold, David F. Sorensen, Ellen T. Noteware, Eric L. Cramer, Jennifer E. MacNaughton, Jonathan Auerbach, Peter B. Nordberg, Stanley B. Siegel, Merrill Gene Davidoff, Berger & Montague, P.C., Philadelphia, PA, Christopher Thomas Reyna, John David Stoner, Chimicles & Tikellis, L.L.P., Haverford, PA, David Evans Kreutzer, Colorado Department of Law, Gary B. Blum, Holly Brons Shook, Silver & Deboskey, P.C., Denver, CO, Jean Marie Geoppinger, Louise M. Roselle, Waite, Schneider, Bayless & Chesley Co., L.P.A., Cincinnati, OH, Kenneth A. Jacobsen, Jacobsen Law Offices, LLC, Wallingford, PA, R. Bruce McNew, Taylor, Gruver & McNew, P.A., for Plaintiffs.

Amy Horton, Edward J. Naughton, Michael K. Isenman, Timothy P. Brooks, Wendy S. White, Goodwin Procter, LLP, Washington, DC, David M. Bernick, Douglas J. Kurtenbach, Mark S. Lillie, John E. Tangren, Stephanie A. Brennan, S. Jonathan Silverman, Kirkland & Ellis, P.C., Martin Thomas Tully, Katten Muchin Rosenman, LLP, Chicago, IL, Joseph John Bronesky, Sherman & Howard, L.L.C., Lester C. Houtz, Bartlit, Beck, Herman, Palenchar & Scott, Denver, CO, Louis W. Pribila, Dow Chemical Company, Midland, MI, for Defendants.

MEMORANDUM OPINION REGARDING

*DAUBERT* MOTIONS AND MOTIONS IN
LIMINE

KANE, Senior J.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT

**6**

Slip Copy                                                                    Page 2

Slip Copy, 2006 WL 3533049 (D.Colo.)
**(Cite as: Slip Copy)**

*Table of Contents.*

Introduction.                                        1

Standard for Review of Expert Witness Testimony.     6

Analysis.                                            14

I. Defendants' *Daubert* Motions and Motions in Limine.   14

A. Defendants' Relevancy Standard.                   15

B. Motion to Exclude Plaintiffs' Expert Witness Testimony Relating to Risk.   19

1. Dr. Robert Goble.                                 19

2. Dr. Richard Clapp.                                31

3. Dr. Steven Wing.                                  51

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2006 WL 3533049 (D.Colo.)
**(Cite as: Slip Copy)**

|  | 54 |
| 4. Dr. K. Shawn Smallwood. | |
| C. Motion to Exclude Plaintiffs' Expert Witness Testimony Relating to Damages. | 59 |
| 1. Dr. John Radke. | 59 |
| 2. Dr. Paul Slovic and Dr. James Flynn. | 84 |
| 3. Wayne Hunsperger. | 96 |
| D. Defendants' Motion to Exclude Plaintiffs' Expert Witness Testimony Relating to Conduct and Associated Motions in Limine. | 115 |

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                    Page 4

Slip Copy, 2006 WL 3533049 (D.Colo.)
**(Cite as: Slip Copy)**

| | 116 |
|---|---|
| 1. Motions in limine to exclude conduct evidence (Nos.6-12). | |
| 2. Motion to exclude expert testimony by Dr. Robert Budnitz. | 131 |
| 3. Motion to exclude expert testimony by Dr. Thomas Cochran. | 134 |
| E. Defendants' Additional Motions in Limine. | 137 |
| 1. Motions to exclude evidence regarding the FBI raid, grand jury investigation and Rockwell's guilty pleas (Nos.1-3). | 138 |

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Slip Copy, 2006 WL 3533049 (D.Colo.)
**(Cite as: Slip Copy)**

2. Motions to exclude evidence regarding other lawsuits (Nos. 14 & 15). ... 141

3. Motions to exclude evidence involving the Depar tment of Energy (Nos. 4 & 5). ... 143

4. Motion to exclude certain lay witness testimony (No. 13). ... 146

5. Motion to exclude evidence regarding remedi ation costs (No. 16). ... 148

II. Plaintiffs' *Daubert* Motion and Motion in Limine. ... 149

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                              Page 6

Slip Copy, 2006 WL 3533049 (D.Colo.)
**(Cite as: Slip Copy)**

A.          149
Request to
Exclude
Certain
Expert
Testimony
in its
Entirety.
            149
1.
Daniel
Conway.
            154
2. John
Dorchester.
            162
3.
Geneva
Smart.
            164
4. Dr.
Jack M.
Holl.
B.          167
Request to
Limit
Certain
Expert
Testimony.
            167
1. Dr.
Ward
Whicker.
            175
2. Laurie
Van Court.
            176
3.
Expert
testimony
regarding
the ability
to abate
plutonium
contami
nation in
the Class
Area.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Slip Copy, 2006 WL 3533049 (D.Colo.)
**(Cite as: Slip Copy)**

|   |   | 177 |
|---|---|-----|
| 4. Expert testimony regarding RAC and Chem Risk studies. | | |
| | C. Request to Exclude Certain Expert and Lay Evidence. | 178 |
| 1. Evidence of Class Area property values after 1992. | | 178 |
| 2. Evidence of Class Members' knowledge of Rocky Flats problems. | | 183 |
| 3. Evidence of Defendants' alleged compliance with regulatory standards. | | 185 |
| | D. Request to Exclude Certain Lay Evidence. | 186 |

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2006 WL 3533049 (D.Colo.)
**(Cite as: Slip Copy)**

                        186
1.
National
security
evidence.
                        186
2. Lay
testimony
by real
estate
agents.
                        188
3. Lay
testimony
by Roy
Thigpen.
Conclusion.             189

### Introduction

*1 This class action presents claims for trespass and nuisance against the former operators of the Rocky Flats Nuclear Weapons Plant ("Rocky Flats") near Denver. The named Plaintiffs represent a class of individuals and businesses that owned property in a defined area (the "Class Area") adjoining the plant site as of June 7, 1989.[FN1] Plaintiffs seek damages for the diminished value of Class members' properties as a result of Defendants' alleged trespass and nuisance.

> FN1. Plaintiffs also assert medical monitoring claims in this action and were initially successful in certifying a separate class with respect to them. *See Cook v. Rockwell Int'l Corp. (Cook IV),* 151 F.R.D. 378, 389 (D.Colo.1993). The medical monitoring class was later decertified, *see Cook v. Rockwell Int'l Corp. (Cook VIII),* 181 F.R.D. 473, 480 (D.Colo.1998), and Plaintiffs' individual medical monitoring claims have been severed for trial, Order (Doc. 1235) at 15. All references to trial in this memorandum opinion are to trial on the property class claims for trespass and nuisance.

In February 2005, I set the class claims for an eight to ten week jury trial commencing on October 3, 2005. *See* Order (Doc. 1325).[FN2] As part of the run-up to trial, I ordered the parties to file any motions challenging the admissibility of expert witness testimony (*"Daubert* motions") and any other motions in limine no later than June 16, 2005. *See* Order on Scheduling and Jury Instruction Issues (Doc. 1338) at 1 (May 17, 2005)[hereinafter "May 2005 Order"]; Minute Order (Doc. 1340).

> FN2. For additional information on the nature of this action and the challenges in bringing it to trial, see *Cook v. Rockwell International Corp. (Cook IX),* 273 F.Supp.2d 1175, 1178-79 (D.Colo.2003), Order (Doc. 1235) at 1-4, 10-11 (May 28, 2004), and Memorandum and Order in Advance of February 28, 2001 Hearing (Doc. 1176) at 3-9.

Defendants responded by filing nineteen motions seeking to exclude all testimony by Plaintiffs' eleven designated expert witnesses and much of Plaintiffs' anticipated lay evidence. Defs.' Mot. to Exclude Expert Witness Test. Relating to Damages (Doc. 1371); Defs.' Mot. to Exclude Expert Witness Test. Relating to Defs.' Conduct (Doc. 1374); Defs.' Mot. to Exclude Expert Witness Test. Relating to Risk (Doc. 1376/1380); Defs.' Mots. in Limine Nos. 1-16 (Docs.1354-69). Plaintiffs filed two, more

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                        Page 9

Slip Copy, 2006 WL 3533049 (D.Colo.)
**(Cite as: Slip Copy)**

limited motions seeking to exclude or limit the testimony of eleven of the eighteen or more expert witnesses designated by Defendants and to exclude certain lay evidence. *See* Pls.' Mot. to Exclude Test. of Certain Defense Expert Witnesses (Doc. 1350); Pls.' Omnibus Mot. in Limine (Doc. 1341). By the time briefing was completed on these motions, Plaintiffs had submitted nearly 300 pages of argument and Defendants had submitted more than 700 pages. Together, the parties provided approximately 5400 additional pages of exhibits to be considered in connection with their motions.

I heard oral argument on the parties' *Daubert* motions and motions in limine on July 28-29 and August 2-3, 2005. I offered the parties the opportunity to present live testimony at this hearing, but both declined. *See* Order (Doc. 1349); Jt. Statement re: Hr'g on *Daubert* Mots. and Mots. in Limine (Doc. 1403). Upon review of the parties' *Daubert* motions, I also determined that live testimony was not necessary for me to decide them.

After careful consideration of the parties' arguments, exhibits and authorities, I decided their respective motions in a series of pretrial bench rulings. Aug. 22, 2005 Tr. (Doc. 1430) at 3-9, 14-15 (ruling on Defendants' *Daubert* motions and Motions in Limine Nos. 1-12, 14-15); Sept. 13, 2005 Tr. (Doc. 1443) at 4-10 (ruling on all of Plaintiffs' motions except those seeking to exclude national security evidence and certain lay opinion testimony); Sept. 22, 2005 Tr. (Doc. 1459) at 4-10 (ruling on all remaining motions). I also granted Defendants leave to file an additional *Daubert* motion regarding one of Plaintiffs' expert witnesses, *see* Defs.' Mot. to Exclude Test. of Dr. Steven Wing (Doc. 1444), and decided that motion before trial as well, *see* Order (Doc. 1483). In general, I denied Defendants' *Daubert* motions and granted in part and denied in part their motions in limine, and granted in part and denied in part Plaintiffs' *Daubert* motion and motion in limine. All of these rulings were reported in summary fashion so they could be provided to the parties as soon as possible and incorporated in their trial preparations.[FN3]

    FN3. I described these rulings as "

preliminary" when they were issued to convey to the parties that the rulings would be reported with additional explanation in a written opinion and that they might be fine-tuned in minor ways in the process. *See* Aug. 22, 2005 Tr. at 4; Sept. 13, 2005 Tr. at 4; Sept. 22, 2005 Tr. at 4.

**\*2** At the time of these summary rulings, I recognized my obligation under governing Tenth Circuit authority to make specific findings on the record sufficient for the appellate court to review my conclusions regarding the admissibility of the challenged expert witness testimony and to confirm that I had properly exercised my "gatekeeping" function with regard to this testimony. Aug. 22, 2005 Tr. at 4; Sept. 13, 2005 Tr. at 4; Sept. 22, 2005 Tr. at 4; *see Bitler v. A.O. Smith Corp.*, 400 F.3d 1227, 1232 (10th Cir.2004); *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1225 (10th Cir.2003). In light of the number, length and complexity of the parties' *Daubert* motions, meeting this obligation required a written opinion reporting my findings and rationale. Given the nature of the parties' *Daubert* motions, however, as well as the need to complete the jury instructions and to deal with a plethora of additional pretrial motions and other matters,[FN4] it was not possible to prepare this written opinion before trial. Delaying the start of trial to allow the opinion to be completed was not an option given the difficulty of scheduling a trial of this length and the long delays the parties had already suffered in this action. The parties were prepared to go to trial in this fifteen year old case, and any further delay would have imposed an undue hardship on them and their counsel.

    FN4. It is my practice to instruct the jury at the beginning of trial and to provide jurors with copies of the instructions at this time so they are informed about the issues they are to decide when the parties present their evidence. If changes to the instructions are required by events during trial, these changes are made and communicated to the jury. *See generally* Mem. Op. re: Jury Instructions (Dec. 7, 2006).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2006 WL 3533049 (D.Colo.)
**(Cite as: Slip Copy)**

Accordingly, my intent at the time I made my rulings was to transform the notes and preliminary drafts that I had relied on in rendering them into a comprehensive written decision meeting the Tenth Circuit's requirements during the course of what ultimately became a four and half month trial. This too proved impossible, however, as the parties filed approximately 300 additional substantive motions, written objections, proposed jury instructions and related legal memoranda during the trial that required my attention when I was not presiding in the courtroom.[FN5] *See* Order Limiting Mots. Practice During Trial (Doc. 1626) (describing trial motion practice). These filings presented well in excess of a thousand additional pages of legal argument and thousands of pages of supporting material regarding issues that in most instances had to be decided almost immediately in order for the trial to continue. This daily deluge of filings as well as matters raised during the parties' courtroom presentations consumed all of my and my staff's time during trial. This pace continued through the three weeks of jury deliberations, as every question from the jury prompted new disputes and argument by the parties.

> FN5. Defendants were responsible for approximately two-thirds of these filings, which included additional motions in limine to strike Plaintiffs' expert and lay testimony and written objections to most of the more than 600 exhibits offered by Plaintiffs.

I am issuing this written opinion today as one of four memorandum opinions setting out the rationale for my rulings on various motions and disputes that were decided before, during and after the class trial. [FN6] I opted to issue all of these opinions at one time rather than in seriatim as they were completed because some of them address related issues and because I wanted to ensure that the parties had all relevant opinions in hand before they filed any final motions in this case.

> FN6. In addition to this opinion, I have today issued two opinions setting out the

basis for my rulings on jury instructions proposed by the parties before and during trial, *see* Mem. Op. re: Jury Instructions.; Mem. Op. re: Defs.' Theory of Plutonium Removal, and a third decision ruling on Defendants' most recent post-trial motion for mistrial, *see* Mem. Op. re: Defs.' Second Renewed and New Mot. for Mistrial.

**\*3** This opinion reports my findings and rationale for ruling as I did on the parties' pretrial evidentiary motions. It is based on the arguments and materials presented by the parties in connection with their June, 2005 motions. In some instances, such as when the parties cited evidence or authorities but did not provide adequate (or any) excerpts of these materials in their supporting exhibits, I made an effort to locate and retrieve the cited material from the pretrial case record or from public sources.[FN7] I did not, however, make a comprehensive search of the thousands of filings in this case or all potential sources to find materials that were cited but not adequately produced in connection with these motions.

> FN7. Defendants filed an earlier motion to strike Plaintiffs' expert witness testimony, Defs.' Mot. to Strike Pls.' Experts (Doc. 981) (Aug. 29, 1997), which I struck initially because it was premature, *see Cook v. Rockwell Int'l Corp. (Cook VIII),* 181 F.R.D. 473, 487-88 (D.Colo.1998), and later declined to reconsider because the extensive relevancy arguments advanced in it did not reflect my subsequent decisions defining the issues to be tried in the class trial, *see* Order (Doc. 1220) at 24 (Apr. 14, 2004). I did, however, consider some of the complete expert reports and affidavits produced in connection with this 1997 motion when the excerpted versions produced with the parties' June, 2005 motions were not adequate for my review.

Many of the parties' pretrial motions sought exclusion of broad categories of evidence, and my

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Slip Copy, 2006 WL 3533049 (D.Colo.)
**(Cite as: Slip Copy)**

pretrial rulings were correspondingly broad. Some of these rulings were refined during trial to address discrete issues that emerged concerning specific testimony or items of evidence falling within these categories. The analysis in this decision, however, is written from the broad, pretrial perspective and does not, with one exception noted in the text, include consideration of arguments, issues or rulings that occurred during trial. The analysis is written in the present tense because it reflects my thinking at the time I issued my pretrial rulings and reports the findings that would have accompanied these rulings if circumstances had permitted it.

This opinion begins with a statement of the standard I utilized in reviewing the parties' motions to exclude expert witness testimony. It next reports my analysis of first Defendants' expert witness motions and motions in limine and then Plaintiffs' motions. The decision concludes with a summary of the rulings on each of the parties' motions, as initially reported in my pretrial bench rulings.

*Standard for Review of Expert Witness Testimony*

My review of the parties' motions to exclude expert testimony is governed by Rule 702 of the Federal Rules of Evidence and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and its progeny. In *Daubert*, the Supreme Court held that Rule 702 had replaced the former standard for admission of expert witness testimony with a "flexible" inquiry focused on determining whether the proffered expert testimony is both relevant and reliable. *Daubert*, 509 U.S. at 589, 594-95. The Court stated Rule 702 requires a trial judge faced with a proffer of scientific expert testimony to determine at the outset whether the testimony is admissible under this standard. *Id.* at 592. The Supreme Court clarified in its subsequent *Kumho Tire* decision that this "gatekeeping" obligation and Rule 702's relevance and reliability standard also applies to proffers of non-scientific expert testimony. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999).

In 2000, the Supreme Court approved amendments

to Rule 702 to conform it to the principles of *Daubert* and its progeny. As amended, Rule 702 states the following requirements for admission of expert testimony: (1) the proffered expert testimony must "assist the trier of fact to understand the evidence or to determine a fact in issue;" (2) the witness must be "qualified as an expert by knowledge, skill, experience, training, or education; " and (3) the proffered testimony must be "based upon sufficient facts or data," "the product of reliable principles and methods;" and the product of the reliable application of these principles and methods to the facts of the case. Fed.R.Evid. 702. Like the parties in this case, I will refer to these requirements in short-hand as "relevance" or "fit," " qualifications" and "reliability."

*4 To fulfill the mandatory gatekeeper function declared by *Daubert* and Rule 702, I must conduct a two-part inquiry. In one part, I determine if the expert's proffered testimony has "a reliable basis in the knowledge and experience of his [or her] discipline." *Bitler*, 400 F.3d at 1232-33 (citing *Daubert*, 509 U.S. at 592). This requires that I conduct "a preliminary inquiry" into the expert's qualifications and "whether the reasoning or methodology underlying the testimony" is reliable under the standards set by Rule 702. *Id.* at 1233. In the second part, I consider "whether the proposed testimony is sufficiently 'relevant to the task at hand." ' *Id.* at 1234 (quoting *Daubert*, 509 U.S. at 597). As directed by the Tenth Circuit, I must also make "specific factual findings on the record that are sufficient for an appellate court to review" my conclusions on these points. *Id.* at 1232. Within this framework, I have "broad discretion ... both in deciding how to assess an expert's reliability, including what procedures to utilize in making that assessment, as well as in making the ultimate determination of reliability." *Dodge*, 328 F.3d at 1223; *see Kumho Tire*, 526 U.S. at 141-42; *Bitler*, 400 F.3d at 1232.

A key but sometimes forgotten principle of Rule 702 and *Daubert* is that Rule 702, both before and after *Daubert*, was intended to relax traditional barriers to admission of expert opinion testimony. *See, e.g., Daubert*, 509 U.S. at 588. Accordingly, courts are in agreement that Rule 702 mandates a liberal

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2006 WL 3533049 (D.Colo.)
**(Cite as: Slip Copy)**

standard for the admissibility of expert testimony. *See Daubert*, 509 U.S. at 588 (Rule 702 is part of " liberal thrust" of Federal Rules of Evidence); *see generally* 4 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence* § 702.02[1] (2d ed.2005) (collecting cases). As the Advisory Committee to the 2000 amendments to Rule 702 noted with apparent approval, "[a] review of the caselaw after *Daubert* shows that the rejection of expert testimony is the exception rather than the rule."

That being said, the proponent of an expert witness must demonstrate that the expert's proffered testimony meets Rule 702's requirements-relevance/fit, qualifications and reliability-before the expert's testimony will be admitted. *See Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 970 n. 4 (10th Cir.2001); *Mitchell v. Gencorp Inc.*, 165 F.3d 778, 781-82 (10th Cir.1999). Not surprisingly given the contentious nature of this case, the parties disagree on the showing that must be made to satisfy each of these requirements. Accordingly, I set out below the standard I employed in deciding the parties' *Daubert* motions.

### Relevance/fit

Rule 702 requires that the proffered expert testimony "assist the trier of fact to understand the evidence or to determine a fact in issue." Fed.R.Evid. 702. The Supreme Court stated in *Daubert* that this requirement goes primarily to relevance, because "expert testimony that does not relate to any issue in the case is not relevant and, ergo, non-helpful." 509 U.S. at 591. It is also well-settled that expert testimony explaining general principles is admissible, without application of these principles to the facts of the case, if the explanation would assist the trier of fact and is found to be reliable. Fed.R.Evid. 702 2000 advisory committee's note.

**\*5** Consistent with these authorities, the Tenth Circuit has set the standard for this Rule 702 requirement by reference to Federal Rule of Evidence 401, which defines relevant evidence as "

'evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." ' *Bitler*, 400 F.3d at 1234 (quoting Fed.R.Evid. 401). Scientifically valid and reliable expert testimony that is not relevant to an issue of consequence to the case does not "fit" because it will not assist the trier of fact. *See id.; Daubert*, 509 U.S. at 591.

The Tenth Circuit takes a liberal approach to the question of whether proffered expert testimony will assist the jury. "Doubts about whether an expert's testimony will be useful should generally be resolved in favor of admissibility unless there are strong factors such as time or surprise favoring exclusions. The jury is intelligent enough to ignore what is unhelpful in its deliberations." *Robinson v. Mo. Pac. R.R. Co.*, 16 F.3d 1083, 1090 (10th Cir.1994) (quotation omitted); *see also Weinstein*, § 702.03[2][c] (concluding based on case review that trial judges should approach exclusion based on this Rule 702 requirement gingerly "and should admit the testimony if there is any chance at all it will be beneficial to the finder of fact.").

In their *Daubert* motions, Defendants assign a much more restrictive meaning to the "assist the trier of fact" requirement. Relying on *Daubert's* reference to "fit" as a short-hand for this requirement and language they incorrectly attribute to the Supreme Court, Defendants argue that the proffered testimony of virtually all of Plaintiffs' experts does not "fit" this case because the testimony is not sufficient to prove one or more of the elements of Plaintiffs' claims.[FN8] This is an incorrect statement of the relevance/fit standard for the reasons just stated, and because it confuses the threshold question of whether an expert's evidence is admissible with the separate question of whether it is sufficient to prove a particular point. *See In re Joint E. & S. Dists. Asbestos Litig.*, 52 F.3d 1124, 1132 (2nd Cir.1995) (distinguishing between inquiry into admissibility of expert evidence and "a sufficiency inquiry, which asks whether the collective weight of a litigant's evidence is adequate to present a jury question."). Neither Rule 702 nor *Daubert* require that an expert's testimony prove an element of the offering party's case for it to be

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2006 WL 3533049 (D.Colo.)
**(Cite as: Slip Copy)**

admissible. *See, e.g., Adams v. Ameritech Servs., Inc.*, 231 F.3d 414, 425 (7th Cir.2000) ('First, the question before us is not whether the reports proffered by the plaintiffs prove the entire case; it is whether they were prepared in a reliable and statistically sound way, such that they contained relevant evidence that a trier of fact would have been entitled to consider."); *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 564-65 (11th Cir.1998) (expert's study and testimony "need not prove plaintiffs' case by themselves; they must merely constitute one piece of the puzzle that the plaintiffs endeavor to assemble before the jury."); *Ambrosini v. Labarraque*, 101 F.3d 129, 135 (D.C.Cir.1996) ("fitness prong of the *Daubert* admissibility analysis primarily concerns relevance" and "not whether the testimony satisfies the plaintiffs' [burden of proof]"). Defendants' confusion of the distinct concepts of the admissibility of evidence and its sufficiency as a matter of proof is a recurring flaw in their arguments as will be demonstrated shortly.

> FN8. Defendants asserted in their briefing that the Supreme Court declared in *Daubert* that in order for expert testimony to "fit" and thereby assist the trier of fact, it must " logically advance[ ] a material aspect of the proposing party's case." Defs.' Intro. and Overview to Mot. to Exclude Expert Witness Test. (Doc. 1378) at 3, 12. In fact, this language is not found in the Supreme Court's *Daubert* decision, but rather in the Ninth Circuit's *Daubert II* decision on remand from the Supreme Court. *See* 43 F.3d 1311, 1315 (9th Cir.1994). Contrary to Defendants' suggestion, I also do not find that this statement supports a higher standard for "relevance" or "fit" than the Tenth Circuit standard described above.

### Qualifications

**\*6** As part of the reliability inquiry under Rule 702, I must determine whether the witness is qualified to testify as an expert. The standard for this determination is whether the witness is an expert on the subject in question based on his knowledge,

skill, experience, training or education. Fed.R.Evid. 702. The Tenth Circuit and other courts have held that this standard should be construed and applied liberally. *See, e.g., United States v. Gomez*, 67 F.3d 1515, 1526 (10th Cir.1995); *Weinstein*, § 702.04[1][a] (summarizing cases).

The expert's proffered testimony must, of course, be within the scope of his established expertise. Expertise in a specialized area directly related to the issue in question is generally not required, however, as long the expert "stays within the reasonable confines of his subject area." *Ralston*, 275 F.3d at 970 (internal quotation omitted); *Wheeler v. John Deere Co.*, 935 F.2d 1090, 1100 (10th Cir.1991); *see generally Weinstein*, § 702.04[1][a]. In general " a lack of specialization does not affect the admissibility of [the expert] opinion, but only its weight." *Ralston*, 275 F.3d at 970 (internal quotation omitted); *Wheeler*, 935 F.2d at 1100.

### Reliable methodology

Expert testimony must be based on a reliable methodology to be admissible. *See, e.g., Bitler*, 400 F.3d at 1232. This does not mean, however, that the offering party must prove "that the expert is indisputably correct" for the expert evidence to be admissible. *Id.* at 1233 (quoting *Mitchell*, 165 F.3d at 781). Rather, the party need only prove that "the method employed by the expert in reaching the conclusion is scientifically sound and that the opinion is based on facts which sufficiently satisfy Rule 702's reliability requirements." *Id.* at 1233. " The evidentiary requirement of reliability is lower than the merits standard of correctness," *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 744 (3d Cir.1994) (quoted with approval in Fed.R.Evid. 702 2000 advisory committee's note), and gaps or inconsistencies in an expert's reasoning may go to the weight of the expert evidence, not its admissibility, *see, e.g., Campbell v. Metro. Prop. & Cas. Ins. Co.*, 239 F.3d 179, 186 (2nd Cir.2001). As the Supreme Court acknowledged in *Daubert*, expert evidence can be "shaky" and yet still admissible, and may be attacked through the traditional means of "[v]igorous cross-examination, presentation of contrary evidence, and careful

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2006 WL 3533049 (D.Colo.)
**(Cite as: Slip Copy)**

instruction on the burden of proof." *Daubert*, 509 U.S. at 596. Maintaining this distinction between the evidentiary requirement of reliability and the higher standard of whether the expert's conclusions are correct or sufficient to prove the merits "is indeed significant as it preserves the fact finding role of the jury." *In re TMI Litig.*, 193 F.3d 613, 665 n. 90 (3rd Cir.1999).

Accordingly, my task in considering the reliability of each of the challenged expert's methodology is to ensure that the "expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire*, 526 U.S. at 152. If this test is met and the expert's testimony is otherwise admissible, it is up to the jury to decide whether the expert used the best or most reliable methodology, what weight to accord to his testimony and which of competing experts' opinions should be credited. The ultimate determination of whether expert testimony is correct and "reliable" in this sense remains with the jury.

*7 The nature of my reliability review under Rule 702 is further informed by the Rule's statement of the three areas of inquiry for determining whether an expert's methodology is sufficiently reliable for his testimony to be admitted. The first of these is whether the testimony is based on sufficient facts or data. *See* Fed.R.Evid. 702(1). This is a quantitative rather than a qualitative standard, *i.e.*, the question is whether the expert considered *enough* information to make the proffered opinion reliable. Fed.R.Evid. 702 2000 advisory committee's note. That the expert relied on disputed facts in reaching his opinion does not render the expert's opinion unreliable under this test. *Id.*

The second area of inquiry is whether the expert used reliable principles and methodologies in reaching his opinion. Fed.R.Evid. 702(2). In *Daubert*, the Supreme Court noted a number of factors that could be relevant to deciding the reliability of a scientific method or principle, including whether the method can be tested in some objective sense, its known or potential rate of error, any peer review or publication, and its general

acceptance in the scientific community. 509 U.S. at 593-94; *see* Fed.R.Evid. 702 2000 advisory committee's note (summarizing *Daubert* factors). Even though the Supreme Court took pains to describe this list as non-exclusive and non-dispositive, and the inquiry in general as flexible and fact-driven, *see* 509 U.S. at 593-94, some courts, commentators and counsel have seized on these "*Daubert* factors" as a checklist for making the reliability determination. *Kumho Tire* and other authority have since clarified that this is not the case and that, depending on the circumstances presented, the *Daubert* factors and/or any number of other factors may be relevant to determining the reliability of the methodology used to produce a particular expert opinion. *See, e.g., Kumho Tire*, 526 U.S. at 150; *Bitler*, 400 F.3d at 1233; Fed.R.Evid. 702 2000 advisory committee's note (summarizing cases).

The third component of the reliability inquiry assumes the witness used reliable principles and methods in forming his opinions, and focuses instead on whether the witness applied these principles and methods reliably to the facts of the case. Fed.R.Evid. 702(3). This by necessity is a fact-specific inquiry.

Finally, in considering the parties' *Daubert* motions, I have kept in mind the Supreme Court's admonition in *Daubert* that Rule 702 is not designed to promote an "exhaustive search for cosmic understanding," but rather provides a means "for the particularized resolution of legal disputes." 509 U.S. at 597. As a result, "it is the specific relation between an expert's method, the proffered conclusions, and the particular factual circumstances of the dispute, and not asymptotic perfection, that renders testimony both reliable and relevant." *Bitler*, 400 F.3d at 1234.

*Analysis*

I. Defendants' *Daubert* Motions and Motions in Limine

*8 Defendants filed a multitude of lengthy motions seeking to exclude most of Plaintiffs' proffered

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2006 WL 3533049 (D.Colo.)
**(Cite as: Slip Copy)**

evidence in this case. Some of Defendants' arguments were sound and supported by appropriate authority, but many others were not. Rather, Defendants appear to have employed in these motions an approach aptly described by the Tenth Circuit in another context as " throw-as-much-mud-against-the-wall-a s-you-can-and-hope-some-of-it-sticks." *Dodd Ins. Servs., Inc. v. Royal Ins. Co.,* 935 F.2d 1152, 1158 (10th Cir.1991). This approach resulted in an undifferentiated mass of plausible and implausible arguments, which complicated the process of deciding and reporting on these motions.

My review also revealed that in a number of instances Defendants misreported the relevant evidence, prior rulings in this case and/or relevant legal authority in making their arguments. In other instances, Defendants relied on what they declared was the governing legal standard without providing authority that the standard existed or applied in this situation. Examples of these practices are included in the analysis of Defendants' individual motions.

A. Defendants' Relevancy Standard

Most of Defendants' *Daubert* motions and motions in limine regarding Plaintiffs' evidence of risk and conduct are based in whole or in part on the premise that the only evidence relevant to the property class claims is evidence that can be tied directly to common and class-wide contamination or health risk. *See infra* Section I.B (regarding Defendants' motions to exclude risk evidence), Section I.D (regarding Defendants' motions to exclude conduct evidence). Defendants further assert that evidence of many incidents and practices at Rocky Flats is irrelevant because Plaintiffs will not be able prove that it meets this test. *See, e.g., id.* This relevancy standard, purportedly based on my past rulings defining the parties' claims and defenses, is flawed in several fundamental respects.

Defendants' first error is in defining relevant evidence only as direct evidence pertaining to certain issues. The Federal Rules of Evidence define relevant evidence broadly as "evidence having *any tendency* to make the existence of *any*

*fact that is of consequence* to the determination of the action more probable or less probable than it would be without the evidence." Fed.R.Evid. 401 (emphasis added). This is a liberal standard that incorporates notions of both materiality and probativity. *United States v. McVeigh,* 153 F.3d 1166, 1190 (10th Cir.1998). Both direct and circumstantial evidence, as well evidence that is essentially background or contextual in nature, may be relevant under this rule. Fed.R.Evid. 401 & advisory committee's note. In addition, evidence need not be conclusive or highly probative to satisfy Rule 401-"even a minimal probability" that the asserted fact exists will suffice. *McVeigh,* 153 F.3d at 1190.

Defendants' relevancy standard is further flawed in its narrow definition of the facts "of consequence to the determination of this action" to include only the physical invasion element of Plaintiffs' trespass claims and the interference element of their nuisance claims. A fact is "of consequence" under Rule 401 "when its existence would provide the fact-finder with a basis for making some inference, or chain of inferences, about an issue that is necessary to a verdict." *McVeigh,* 153 F.3d at 1190. The class trial in this action will require the jury to determine facts beyond these two elements and their focus on the existence of or potential for class-wide contamination or risk attributable to Rocky Flats. These additional issues include, but are not limited to, whether the conduct that caused or contributed to any physical invasion or interference was negligent or intentional, the property market's knowledge of and response to the alleged trespass and nuisance, and whether Defendants' conduct was wilful and wanton so that punitive damages should be awarded. *See, e.g., Cook v. Rockwell Int'l Corp. ( "Cook IX"),* 273 F.Supp.2d 1175, 1199-1212 (D.Colo.2003) (stating elements of Plaintiffs' trespass and nuisance claims and standards for determining damages). Facts beyond these may also be of consequence because they provide a basis for making an inference about these or other issues necessary to the verdict. *See McVeigh,* 153 F.3d at 1190; Fed.R.Evid. 401 advisory committee's note (" fact to be proved may be ultimate, intermediate, or evidentiary; it matters not, so long as it is of consequence to the determination of the action.").

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Slip Copy, 2006 WL 3533049 (D.Colo.)
(Cite as: Slip Copy)

**\*9** Defendants also err in asserting that evidence relating to contamination or risk is only relevant if it applies in common to every Class member or the entirety of the Class Area. It should be self-evident that the question to be decided is not whether a single item of evidence demonstrates a common or class-wide effect, but rather whether Plaintiffs' evidence as a whole demonstrates class-wide liability and damages. Defendants' argument in this regard confuses the sufficiency of an item of evidence with its relevance.

Defendants' relevancy arguments also frequently misstate the forms of interference with the use and enjoyment of property to be tried in connection with the class nuisance claims. I have previously examined Plaintiffs' asserted forms of interference and identified two that could support a finding of class-wide interference with the use and enjoyment of property: (1) alleged interference in the form of current human health risk arising from past or on-going exposure to plutonium released from Rocky Flats as a result of one or both of Defendants' activities there; FN9 and (2) alleged interference in the form of a demonstrable risk of future harm to Class properties based on objective conditions caused by Defendants' activities at Rocky Flats. May 2005 Order at 4-6. Many of Defendants' relevancy arguments omit any mention of the second potential basis for a class-wide finding of interference, and when it is addressed, Defendants appear to assume this basis only makes relevant evidence proving that some common, class-wide health risk *will* occur in the future. *See, e.g.,* Defs.' Combined Reply in Supp. of Mots. in Limine (Doc. 1410) at 8. This is not correct. Evidence that has any tendency to show that objective conditions caused by Defendants create a demonstrable *risk* of harm that has the *potential* to affect all of the Class Area is relevant to this potential form of class-wide interference. *See* Mem. Op. re: Jury Instructions, Section II.C.2 (regarding Defendants' proposed revisions to Instruction No. 3.6 (elements of nuisance claim)).

> FN9. I also allowed proof of such class-wide interference arising from exposure to non-plutonium substances if

Plaintiffs demonstrated that all Class members were exposed to such substances and all suffered some increased health risk as a result. May 2005 Order at 5. Plaintiffs have since stated they do not intend to assert interference on this basis. *See* Pls.' Cons.Mem. in Opp'n to Defs.' Mots. in Limine (Doc. 1395) at 21.

In addition, Defendants' relevancy arguments largely ignore a third form of interference with the use and enjoyment of property that I held may be determined in part at the class trial, which is whether Defendants' conduct at Rocky Flats was capable of causing Class members to be fearful, anxious or otherwise disturbed by the real or perceived risks posed by the facility. The "generic causation" question of whether Defendants' conduct is capable of causing this form of interference with the use and enjoyment of Class properties will be decided by the jury in the class trial, leaving to future proceedings (if necessary) the separate question of whether particular Class members in fact suffered this form of interference with the right to use and enjoy property.FN10 *See* May 2005 Order at 6-7.

> FN10. Although the parties and I sometimes refer to this generic causation question as "generic emotional distress," I note that this question is not part of an emotional distress claim, but rather addresses a form of interference with the right to use and enjoy property that can establish liability for nuisance if the other elements of a nuisance claim are proved. *See, e.g., Cook IX,* 273 F.Supp.2d at 1203-04.

This summary identifies the major, persistent flaws Defendants advanced in the relevance and fit arguments in their *Daubert* motions and motions in limine. In light of the extensive briefing and oral argument by Defendants on these motions, however, I cannot say that I have addressed all such flaws in this section. Accordingly, the parties should not assume that a particular interpretation of my past rulings or asserted standard for determining relevant

evidence in the class trial has been approved simply because I have not called it out and corrected it here.

### B. Motion to Exclude Plaintiffs' Expert Witness Testimony Relating to Risk

*10 Plaintiffs offered four expert witnesses to testify at trial regarding the health and other risks posed by Rocky Flats: Dr. Robert Goble, Dr. Richard Clapp, Dr. K. Shawn Smallwood and Dr. Steven Wing. Defendants moved to exclude testimony by Drs. Goble, Clapp and Smallwood on June 16, 2005,[FN11] *see* Defs.' Am. Mot. to Exclude Expert Test. Relating to Risk (Doc. 1380) [hereinafter "Defs.' Mot. re: Pls.' Risk Experts"], and subsequently moved to exclude Dr. Wing's testimony, Defs.' Mot. to Exclude Test. of Dr. Steven Wing (Doc. 1444).[FN12] I address the admissibility of each of these witnesses' proffered testimony in turn.

> FN11. Defendants also sought in this motion to exclude testimony by Dr. Lawrence Mayer, another of Plaintiffs' previously designated risk experts. This portion of Defendants' motion was rendered moot by Plaintiffs' decision not to call Dr. Mayer. *See* Pls.' Cons.Mem. in Opp'n to Defs.' Mots. to Exclude Expert Test. (Doc. 1399) at 1 n.1.

> FN12. I permitted Defendants to file their motion to exclude Dr. Wing's testimony after the pretrial deadline because Plaintiffs had inadvertently omitted Dr. Wing from the witness list they submitted in the December 10, 2003 Joint Status Report, which was the most recent witness list exchanged by the parties before the June, 2005 deadline. I rejected Defendants' request that I exclude Dr. Wing's testimony solely on the basis of Plaintiffs' omission, however, as Plaintiffs had long ago properly designated Dr. Wing as an expert in this proceeding and Defendants had ample notice after the December, 2003 Status Report that Plaintiffs intended to

call him. *See* Aug. 22, 2005 Tr. at 15-16.

### 1. Dr. Robert Goble

Dr. Goble is Plaintiffs' dose reconstruction expert. He holds a Ph.D. in physics and since 1976 has taught and conducted research on energy and environmental science and policy at Clark University. He has performed research on human health risk and risk assessment in the past for the United States Environmental Protection Agency, the National Science Foundation and the United States Department of Energy, among others. *See* Pls.' Cons.Mem. in Opp'n to Defs.' Mots. to Exclude Expert Test. (Doc. 1399) [hereinafter "Pls.' Cons. *Daubert* Resp."], Ex. 15, App. A at 1-2.

Dr. Goble authored an 82-page expert report for this case that addressed a number of subjects, including exposure to plutonium released from Rocky Flats and associated health risks. Pls.' Cons. *Daubert* Resp., Ex. 15 [hereinafter "Goble Report" ]. This is the only subject on which Plaintiffs offer Dr. Goble's testimony in the property class trial.[FN13] Defendants do not challenge Dr. Goble's qualifications to render opinions on this subject, and I find Dr. Goble qualified to testify as an expert on it.

> FN13. In his report, Dr. Goble also assessed risks arising from the release of four toxic substances from Rocky Flats in addition to plutonium. *See* Goble Report. Defendants' motion to exclude Dr. Goble's testimony at the property class trial regarding these additional, non-plutonium substances is moot as a result of Plaintiffs' decision not to present Dr. Goble's testimony on these substances.

In his report, Dr. Goble estimated the exposures to plutonium to people living near Rocky Flats and assessed the risks experienced as a result. His risk assessment is based on inhalation of plutonium, and he relied on information regarding plutonium concentrations in soil and other data to estimate the concentration of plutonium in air, and hence exposure, at various periods from 1954 to 1989. He

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

then used these exposure estimates to estimate the radiation doses that resulted and the associated risk of disease. *Id.* at 14-16.

Dr. Goble reported the existence of substantial uncertainty and variability in the underlying data and each step in his analysis. Accordingly, a key component of Dr. Goble's assessment was a quantitative treatment of both uncertainty and variability as they relate to plutonium exposure and risk.[FN14] *See, e.g.,* Goble Report at 13. Dr. Goble employed the widely recognized Monte Carlo simulation method to accomplish this and to develop estimates of the quantitative ranges within which plutonium releases, exposures, doses and risks have likely fallen. He expressed his estimates at stated levels of confidence. [FN15]

> FN14. "Uncertainty" in this context refers to the "imperfect knowledge" of the level of exposure to plutonium, doses and the likelihood of disease attributable to them, while "variability" is the certainty that some individuals will have higher exposures than average, some will have higher doses for the same exposure and some are particularly likely to have a disease caused by doses. *See* Goble Report at 7, Fig. 2.2.

> FN15. "Confidence levels" or "intervals" are a common method of expressing the likelihood that the true value falls within the stated range. *See, e.g.,* Michael D. Green et al., *Reference Guide on Epidemiology,* in *Reference Manual on Scientific Evidence* 333, 360-61 (2d ed.2000). For example, if a value is estimated as falling in a certain range at a 90 percent confidence level, then there is a probability of 90 percent that the true value falls within the given range. *Id.* at 360.

Defendants do not dispute that the principles and methods relied upon by Dr. Goble are reliable and that he utilized sufficient facts and data in conducting his analysis, as required by Rule 702.

They contend, however, that Dr. Goble's expert testimony regarding plutonium exposure and risk should nonetheless be excluded in its entirety because it does not fit the issues to be decided in the class trial and because he did not apply his methods reliably to the facts of this case.

*Relevance/fit*

**\*11** Defendants principally argue that Dr. Goble's plutonium exposure and risk testimony does not fit the issues to be tried because the dose and health estimates he calculated showed a large variability of exposure and risk and he did not attempt to quantify the magnitude of any plutonium exposure and risk experienced in common by every class member. This, Defendants argue, violates the supposed rule that all evidence of any kind must be applicable and common to the class as a whole in order to be relevant to and fit the class trial. As stated earlier, however, no such rule exists in this case. Evidence regarding plutonium releases to the Class Area and the resulting exposure and risk is relevant to the Plaintiffs' claim that Defendants' activities at Rocky Flats constitute a nuisance because they have caused some increment of health risk to the class. *See* May 2005 Order at 4-5 (describing one form of interference with use and enjoyment of property to be tried on a class-wide basis). Dr. Goble's intended testimony will assist the jury in deciding this issue. That Dr. Goble's analysis describes a range of exposures and risks does not change this conclusion.

Defendants also argue Dr. Goble's estimates are not relevant because they do not apply to the Class Area. Defendants contend this is so because Dr. Goble based his estimates of plutonium-in-air concentrations during the key 1965-70 time period on data from three locations, none of which is in the Class Area. [FN16] As Dr. Goble stated in his report, however, these locations were selected to provide a reasonable representation of conditions inside the proposed medical monitoring region. Goble Report at 29. The proposed medical monitoring region generally encompasses the property Class Area. *See, e.g., id.* at Figure 2.1a (depicting the proposed medical monitoring region and the plutonium contour that defines the property class area). Dr.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Page 19

Slip Copy, 2006 WL 3533049 (D.Colo.)
**(Cite as: Slip Copy)**

Goble's analysis regarding air concentrations in 1965-70 is, therefore, relevant to the property Class Area.

> FN16. It was during the 1965-70 period that plutonium was released into the environment from leaking barrels at the 903 pad at Rocky Flats. It is undisputed that releases from the 903 pad were a major source of off-site plutonium exposure and contamination.

*Reliability*

Defendants assert Dr. Goble made multiple errors in applying his methodology to assess plutonium exposure and risk arising from Rocky Flats, and that these alleged errors render his expert testimony unreliable and inadmissible under Rule 702. I disagree for the following reasons.

First, Defendants argue that the range of estimated exposures, doses and risks found by Dr. Goble at the various confidence levels are simply too broad to be reliable. It is true that for a given confidence level, a narrower range indicates a more precise estimate, while a broad range indicates an estimate that may include substantial random error. David H. Kaye & David A. Freedman, *Reference Guide on Statistics,* in *Reference Manual on Scientific Evidence* 83, 119 & n.120 (2$^d$ ed.2000) [hereinafter *"Ref. Guide on Statistics"* ]. Defendants do not, however, point to any mistake in Dr. Goble's method or analysis that caused the broad ranges he reports for various confidence intervals. Rather, Dr. Goble explained in his 1996 expert report and 1999 declaration that these ranges resulted from the large uncertainties in the available information and variability in individual responses to plutonium exposure. *See* Goble Report at 36-48; Pls.' Cons. *Daubert* Resp., Ex. 16 [hereinafter "Goble Decl."] at 8-10. It is undisputed that risk assessors commonly deal with such uncertainties in their analyses and that broad estimated ranges of exposure, dose and risk may result from them. The existence of such uncertainties, and the consequences that flow from them in estimating plutonium exposure, dose and health risk associated

with Rocky Flats, may affect the weight to be accorded to Dr. Goble's testimony but do not provide a basis for finding his work and conclusions unreliable within the meaning of Rule 702.

*12 Defendants cite three cases for the proposition that courts have found statistical estimates thousands of times narrower than Dr. Goble's " scientifically unreliable" and hence inadmissible under Rule 702. *See* Defs.' Mot. re: Pls.' Risk Experts at 8-9. None of the cited cases stand for this proposition, as all concern instances in which the court or fact finder admitted and considered the statistical evidence in reaching a decision on the merits. *See Turpin v. Merrell Dow Pharm., Inc.,* 959 F.2d 1349, 1353, 1357 (6 $^{th}$ Cir.1992) (deciding case on basis of sufficiency of the evidence and specifically finding that the challenged statistical studies "constitute evidence on which a jury might ground" its verdict); *United States v. Am. Society of Composers,* Civ. 13-95(WCC), (S.D.N.Y. Oct. 12, 1989) (magistrate judge sitting as trier of fact accords little weight to statistical evidence having broad confidence intervals), *aff'd sub nom. Am. Society of Composers v. Showtime/The Movie Channel, Inc.,* 912 F.2d 563 (2nd Cir.1990) (magistrate judge decision reprinted as appendix, 912 F.2d 572, 591); *Haim v. Sec'y of Dept. of Health & Human Servs.,* No. 90-1031V, 1993 WL 346392, at *6 (Fed.Cl.Ct. Aug. 27, 1993) (special master sitting as finder of fact weighs expert testimony). Thus, these cases demonstrate that Defendants' complaints regarding the breadth of Dr. Goble's ranges go to the weight that the finder of fact may assign them, and not to the separate question of whether his testimony is admissible.

Defendants' second basis for asserting that Dr. Goble's work is unreliable is that he failed to engage in hypothesis-testing, which Defendants assert is necessary for any reliable scientific endeavor. There should be no question, however, that scientific endeavor takes many forms, many of which do not involve hypothesis testing. *See* Goble Decl. at 2-3 (citing, among others, the work of Darwin and Einstein). Dr. Goble explained at length in his 1999 Declaration why hypothesis testing frequently is not feasible or appropriate in the risk assessment

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                    Page 20

Slip Copy, 2006 WL 3533049 (D.Colo.)
**(Cite as: Slip Copy)**

context, and why this mode of inquiry was not appropriate to his analysis of risk arising from Rocky Flats. *Id.* at 3-9. Defendants offer no rebuttal to this reasoned explanation.

Defendants next argue Dr. Goble's expert testimony must be stricken due to his allegedly improper reliance on 95th percentile estimates. The portion of Dr. Goble's report cited by Defendants, however, conveys Dr. Goble's recommendation that the 95th percentile risk level be considered in designing a medical monitoring program. *See* Goble Report at 22-25. Medical monitoring is not part of the trial on Plaintiffs' property class claims. Plaintiffs intend in the property class trial to offer Dr. Goble's testimony regarding the various ranges he calculated for exposure, dose and risk. There is no " reliance" on the 95th percentile range, improper or otherwise, in reporting these ranges to the jury in the property class trial.

*13 Defendants further assert Dr. Goble's proposed testimony is unreliable because he failed to compare and calibrate his estimates of plutonium-in-air concentrations for the 1965-70 time period, which Dr. Goble modeled from plutonium soil concentration data, with available air monitoring data from this period. Defendants contend such a comparison of computer-modeled estimates and " real world data" is a mandatory component of any modeling exercise, and that the results of any computerized model that omits this step are *per se* unreliable and inadmissible under Rule 702. Defendants cite their experts' statements and excerpts from scientific authority quoted by their experts in support of this proposition. They submitted no legal authority supporting this alleged rule. Defendants further assert that the actual plutonium-in-air concentrations measured at Rocky Flats establish that Dr. Goble's soil-based air concentration estimates are as much as 1,000 times too high, which in turn render his dose and risk estimates unreliable.

The scientific authority quoted by Defendants' experts is consistent with what common sense tells us: that a comparison of modeled estimates and " real world data" can aid in establishing the credibility of the modeled results, but is not always

possible or informative. *See, e.g.,* App. to Defs.' Mot. re: Pls.' Risk Experts (Doc. 1377), Ex. 10, ¶¶ 11-12 (quoting scientific papers describing the desirability of comparing simulation models against environmental monitoring results "whenever possible"). Relevant environmental monitoring data, for example, may not be available or may itself be suspect.

The accuracy of the air monitoring data on which Defendants rely is a vigorously disputed issue in this case. Dr. Goble explained in his 1996 expert report and 1999 declaration why he believed the available air monitoring data were too sparse and unreliable to set bounds on his estimated exposures based on plutonium soil concentrations.[FN17] *See* Goble Report at 29; Goble Decl. at 10-12. Defendants and their experts disagree, and assert the available air monitoring data are the most reliable indicator of the concentration of plutonium in air. This is a classic disagreement between experts that goes to the credibility of each expert's opinions, not to the reliability of their methodology within the meaning of Rule 702. It is the jury's function in this instance to weigh the expert's competing views and determine their respective credibility.

> FN17. In addition, Dr. Goble used some air monitoring data from 1971-1989 to estimate the ranges of exposure during this time period, and explained why he viewed this observed data as more reliable than that available for the 1965-70 time period. *See* Goble Decl. at 12.

Defendants make two further arguments challenging the reliability of Dr. Goble's methodology as he applied it, both relating to his estimates for plutonium air concentrations. First, Defendants argue that Dr. Goble used an improper value in estimating plutonium air concentrations in the 1965-70 time period. As stated earlier, Dr. Goble based his estimated ranges of exposure during this period on plutonium soil concentrations. One of the factors in the model he used to estimate air concentration from soil data was the velocity at which airborne plutonium is deposited. Dr. Goble

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.