Slip Copy, 2006 WL 3533049 (D.Colo.)
**(Cite as: Slip Copy)**

independent variables" in a regression model are perfectly or highly correlated with each other. *See Ref. Guide on Statistics* at 166; *Ref. Guide on Multiple Regression* at 197, 224. The existence of multicollinearity can cause regression parameters to be estimated imprecisely and thus interfere with the predictive power of the regression analysis. Radke Report at 4; *see Ref. Guide on Multiple Regression* at 197, 224; *In re High Fructose Corn Syrup Antitrust Lit.,* 295 F.3d 651, 660-61 (7 th Cir.2002).

Dr. Radke considered some of the location-based characteristics included in his regression to be highly correlated. To counter this influence, he applied an unquestionably established statistical technique, factor analysis, to extract the common variation shared by the correlated variables. *See* Radke Report at 4, 19-20; Jae-on Kim & Charles W. Mueller, Introduction to Factor Analysis 9-10 (1978). The result of this process was the development of composite variables to replace the highly correlated variables in the regression analysis. Radke Report at 4.

Defendants' expert, Dr. McFadden, a Nobel award winner in econometrics, disagreed with Dr. Radke's use of factor analysis to reduce multicollinearity among the explanatory variables. *See* App. to Defs.' Mot. re: Pls.' Damages Experts (Doc. 1373), Ex. 10 [hereinafter "1999 McFadden Aff."] at 44-45. In his view, factor analysis was unnecessary to improve the predictive power of the regression and could worsen it by introducing bias. *Id.* Defendants do not indicate whether Dr. McFadden provided some alternative method for dealing with multicollinearity, or whether he believed it was not a concern in a regression analysis to determine the relationship between property value and proximity to Rocky Flats.

Defendants cite no authority, other than Dr. McFadden's opinion, that Dr. Radke's use of factor analysis was unsound. In addition, as noted earlier, disputes regarding the failure to include variables in a regression analysis affect the probativeness of the analysis' results, but not its admissibility. *Bazemore,* 478 U.S. at 400; *see Watson,* 857 F.2d at 695. Dr. Radke's omission of highly correlated explanatory variables and replacement of them with

consolidated variables derived through factor analysis falls within this rule. Other courts, moreover, have admitted expert testimony in the face of expert disagreement regarding the proper treatment of multicollinearity in the regression analysis. *See In re High Fructose Corn Syrup Antitrust Litig.,* 295 F.3d at 660-61 (refusing to second-guess district court's admission of regression analyses that addressed multicollinearity in different ways). I see no reason for a different result here.

**\*37** The second methodological flaw alleged by Defendants concerns Dr. Radke's use of an established statistical technique known as "weighted least squares" estimation in Phase II of his analysis. [FN40] Dr. Radke stated he used this technique to balance the influence of 100 percent sampling inside the Class Area and 4 percent sampling in the greater Denver area, so as to ensure that the regression results reflected the property market of these two areas. Radke Report at 45; *see* App. to Defs.' Mot. re: Pls.' Damages Experts (Doc. 1373), Ex. 4 (Radke Dep.) at 393-95. Dr. McFadden asserts this is a blatant statistical error because, he asserts, use of this technique, as opposed to " ordinary least squares," contradicts the Gauss-Markov theorem and is only appropriate to correct for heteroscedasticity. [FN41]

> FN40. Although Defendants assert this as a general criticism of Dr. Radke's study, both Dr. Radke and Dr. McFadden discuss this technique only in relation to Phase II of the study. *See* Radke Report at 45; 1999 McFadden Aff. at 54.

> FN41. Heteroscedascity exists '[w]hen the error associated with a multiple regression model has a nonconstant variance; that is, the error values associated with some observations are typically high, whereas the values associated with other observations are typically low." *Ref. Guide on Multiple Regression* at 223.

Plaintiffs do not dispute that if the conditions of the Gauss-Markov theorem are met, one of which is that the data are homoscedastic, then ordinary or

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2006 WL 3533049 (D.Colo.)
**(Cite as: Slip Copy)**

unweighted least squares is the best technique to employ. *See* Aug. 2, 2005 Tr. at 416. It also appears undisputed that use of weighted least squares is a proper method for correcting for heteroscedasticity of data. *Id.* What is not clear is whether the data here were, in fact, heteroscedastic or whether Dr. McFadden is correct that weighted least squares can *only* be used if this condition is met, so that use of this technique in any other circumstances is improper under accepted statistical principles. Neither party addressed these questions adequately in their briefing and argument.[FN42]

> FN42. Plaintiffs asserted that Defendants' expert Dr. Kenneth Wise testified at deposition that the Phase II data might well be heteroscedastic, but the deposition excerpt referenced and provided by Plaintiffs does not include this statement. *See* Pls.' Cons.*Daubert* Resp. (Doc. 1399), Ex. 37 (Wise Dep.) at 64. Dr. McFadden and Defendants both assert use of weighted least squares in the absence of heteroscedascity violates fundamental regression principles, and cite some statistical authority to this effect, but did not include copies of this authority in the exhibits supporting their motion.

The ultimate question here, however, is whether the use of weighted least squares, even if technically improper, so undermined Dr. Radke's use of an otherwise reliable methodology that his Phase II study must be deemed unreliable and inadmissible under Rule 702. *See Paoli*, 35 F.3d at 746 (flaw in expert's method only warrants exclusion "if the flaw is large enough that the expert lacks good grounds for his or her conclusions;" internal quotation omitted). Defendants argue the alleged error had this effect, because when Dr. McFadden ran Dr. Radke's Phase II analysis with ordinary rather than weighted least squares, he found no property value effect whatsoever due to proximity to Rocky Flats.

In fact, the record reveals that Dr. McFadden modified Dr. Radke's analysis in several significant respects in addition to using an unweighted regression. *See* 1999 McFadden Aff. at 55; Pls.'

Cons.*Daubert* Resp. (Doc. 1399), Ex. 36 [hereinafter "McFadden Dep."] at 85-89. These additional modifications included using ordinary rather than stepwise regression, eliminating factor analysis, adding one or more explanatory variables and revising Dr. Radke's proximity variables "in order to obtain direct estimates of the impact of the FBI raid and publicity." 1999 McFadden Aff. at 55; *see* McFadden Dep. at 85-89.[FN43] Under these circumstances, it is not possible to determine if any effect can be attributed to Dr. Radke's allegedly improper use of weighted rather than ordinary least squares estimation.[FN44]

> FN43. Dr. McFadden reported making similar modifications to Dr. Radke's Phase I study as well. *See* 1999 McFadden Aff. at 49; McFadden Dep. at 85-89.

> FN44. The last "correction" Dr. McFadden made to Dr. Radke's analysis is also instructive. It is clear from this correction and other elements of Dr. McFadden's report that he assumed that the question to be determined was the "price effects of the 1989 FBI raid." 1999 McFadden Aff. at 59; *see id.* at 24-25; Exs. to Pls.' Mem. in Opp'n to Defs.' Mot. Under R. 37(c)(1) (Doc. 1024), Ex. E (McFadden expert report) at 5-6, 13-14. Towards this end, Dr. McFadden criticized Dr. Radke's study for not focusing on property values before and after the FBI raid and for not taking steps to eliminate any proximity-related discount that existed before the raid. *See, e.g.*, 1999 McFadden Aff. at 24-25. Dr. McFadden apparently took these corrective steps in his revision of Dr. Radke's model. The measure of damages in this case, however, is not the price differential before and after the FBI raid, it is the difference in price but for Defendants' alleged trespass and nuisance on designated properties in proximity to Rocky Flats. *See, e.g.*, *Cook IX*, 273 F.Supp.2d at 1209-10. While one of Dr. Radke's objectives in his study was to determine if there was a causative link between the FBI

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Slip Copy, 2006 WL 3533049 (D.Colo.)
**(Cite as: Slip Copy)**

raid and depressed real estate values, *see* Radke Report at 3, the majority of his study and conclusions are focused on determining the market impact, if any, of Rocky Flats on area property values over time, *see, e.g., id.* at 6-8; App. to Defs.' Mot. re: Pls.' Damages Experts (Doc. 1373), Ex. 4 (Radke Dep.) at 442 (study measured effect of proximity to Rocky Flats, not just effect of the FBI raid there). As a result, Dr. Radke's regression model is more consistent with the "but for" question and measure of damages than the narrower and legally erroneous "before and after" the FBI raid question and damages measure assumed by Dr. McFadden. The lack of price effect reported by Dr. McFadden in his revised regressions, therefore, may be explained as much or more by his redefinition of the question to be answered than by his correction of Dr. Radke's alleged methodological errors.

**\*38** After careful consideration of the parties' arguments and the reports of Drs. Radke and McFadden, I am persuaded that Plaintiffs have carried their burden of demonstrating that Dr. Radke's study and testimony are sufficiently reliable to be admissible under Rule 702. The alleged errors in Dr. Radke's otherwise reliable methodology do not rise to a level that warrants exclusion, but rather bear on the probativeness of his testimony and his credibility. [FN45] Dr. Radke explained the basis for his use of factor analysis and least weighted squares in his report and deposition, and Defendants may test his explanation and assumptions on cross-examination and through Dr. McFadden's rebuttal testimony. *See United States v. Cavely,* 318 F.3d 987, 997-98 (10th Cir.2003) (challenges to the assumptions underlying expert's testimony go the weight of expert's testimony, not its admissibility).

> FN45. The same is true of Defendants' additional arguments that Dr. Radke erred in his calculation of damages to vacant land due to proximity to Rocky Flats and that Dr. Radke's control area may be

biased in one or more respects.

### Disclosure issues

Finally, Defendants argue Dr. Radke's expert testimony must be excluded as a discovery sanction or under *Daubert* because he did not produce certain information requested by Defendants. This contention has an extensive history in this case, which is relevant to my decision here.

This history begins in August 1996 when Plaintiffs timely served Defendants with Dr. Radke's lengthy and detailed expert report. Defendants subsequently requested by letter that Plaintiffs and Dr. Radke provide documents and computer files in forty-four enumerated categories to enable Defendants "to evaluate" his report. Defs.' Mot. to Compel (Doc. 992), Ex. B (Letter dated Jan. 13, 1997, from S. Jonathan Silverman to Merrill G. Davidoff) at 1. Some of these requests were relatively specific, while others were extremely broad and/or would have required Dr. Radke to create new documents and databases for Defendants. *See id.*

In response to these informal discovery requests, Plaintiffs and Dr. Radke provided Defendants with extensive computerized data, documents, direction and explanation in nine separate transmittals. Dr. Radke reported that he and his staff devoted over 300 hours to this effort. *See* Pls.' Mem. in Opp'n to Defs.' Mot. Under R. 37(c)(1) (Doc. 1023), Attach. (Radke Decl.). Plaintiffs repeatedly requested that Defendants pay for the expert fees and other costs of producing these materials, but Defendants refused.

In March, 1997, after Defendants' informal discovery requests and Plaintiffs' responses, Defendants deposed Dr. Radke for two days. A month later, Defendants' expert, Dr. McFadden, issued a thirty-page rebuttal report to Dr. Radke's study. *See* Exs. to Pls.' Mem. in Opp'n to Defs.' Mot. Under R. 37(c)(1) (Doc. 1024), Ex. E [hereinafter "McFadden Report"]. In it, Dr. McFadden asserted Dr. Radke had made several important methodological errors, as previously described. He also complained that Dr. Radke had not produced certain documentation that the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Slip Copy, 2006 WL 3533049 (D.Colo.)
(Cite as: Slip Copy)

National Science Foundation and major journals required be retained and made available regarding published economic studies so that interested scientists could replicate the studies.[FN46] *Id.* at 4. Nonetheless, Dr. McFadden reported that he had " examined the methodological, statistical, and technical procedures followed by Dr. Radke," *id.* at 4, and that an associate was able to replicate Dr. Radke's Phase I regression analysis and his Phase II analysis and results, *see id.* at 2, 15, 21.[FN47]

> FN46. Specifically, Dr. McFadden criticized Dr. Radke for not maintaining a log of certain portions of his analysis that he performed interactively and for providing incomplete documentation on the method he used to sample single-family residential sales in the control area, the models he used to construct certain location-based variables, and details on certain of his damages calculations. *See* McFadden Report at 4, 6, 8, 18, 29.

> FN47. In his deposition, Dr. McFadden explained that he used "replicable" to mean that "I can take someone's description background documentation in which they say what they have done and, by using their descriptions and their data and so forth, I can reproduce mechanically what they did." Exs. to Pls.' Mem. in Opp'n to Defs.' Mot. Under R. 37(c)(1) (Doc. 1024), Ex. G (excerpts from McFadden deposition) at 179.

**\*39** Several months later, Defendants moved to exclude Dr. Radke's report and expert testimony under Rule 702 and *Daubert.* Defs.' Mot. to Strike Pls.' Experts (Doc. 981). In support of their motion, Defendants argued, based on their evaluation of Dr. Radke's report, the additional information he produced and Dr. McFadden's rebuttal report, that Dr. Radke's intended expert testimony was neither relevant nor reliable. Defs.' Br. in Supp. of Mot. to Strike Pls.' Experts (Doc. 984) at 29-36. Notably, Defendants did not assert that Dr. Radke's expert report or subsequently produced documentation was inadequate for any purpose.[FN48]

> FN48. This motion to strike was itself later stricken. *See supra* note 7.

Shortly thereafter, Plaintiffs sought to depose Dr. McFadden regarding his rebuttal report. Defendants responded by filing a motion for protective order to postpone Dr. McFadden's deposition. The basis of this motion was Defendants' assertion that Plaintiffs should be compelled to produce additional information regarding Dr. Radke's analysis before Dr. McFadden was deposed. *See* Defs.' Mot. to Compel and for Protective Order (Doc. 992). Defendants detailed seven categories of information they believed should be produced, all of which they asserted should have been but were not produced in response to their previous informal letter requests.[FN49] *See id.* at 1 & Ex. A.

> FN49. Defendants had not requested any of this information through interrogatories or the other traditional discovery methods authorized by the Federal Rules.

Plaintiffs opposed Defendants' motions on various grounds, including Dr. Radke's testimony in deposition that the information already produced, *i.e.,* his expert report and the additional materials produced in 1997, were sufficient to enable a researcher knowledgeable in the field to understand Dr. Radke's methodology and reproduce the same results from his data (except for random variation in the sampling process). *See* Pls.' Resp. to Defs.' Mot. to Compel (Doc. 998), Ex. K (excerpts from Radke deposition) at 129. Plaintiffs further pointed to Dr. McFadden's rebuttal report and Defendants' motion to strike Dr. Radke's testimony as evidence that Defendants had more than sufficient information to evaluate and challenge Dr. Radke's work. In addition, Plaintiffs reported they had already produced much of the requested information to Defendants or that it was otherwise available to Defendants. They also reported that certain of Defendants' requests would unnecessarily require Dr. Radke to generate new documents or computer files and that Dr. Radke estimated it would require one full time staff person four months to search for and retrieve the additional, exceedingly detailed information Defendants sought from the University

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Slip Copy, 2006 WL 3533049 (D.Colo.)
**(Cite as: Slip Copy)**

of California at Berkeley's back-up computer media. Pls.' Resp. to Defs.' Mot. to Compel at 3-7.

In a heated reply, Defendants characterized Plaintiffs' response as an admission that all of the information they requested had either been lost or destroyed. *See* Defs.' Reply in Supp. of Mot. to Compel (Doc. 1002). They further asserted that Rule 26 required Plaintiffs and Dr. Radke to disclose the requested information and moved that Dr. Radke be precluded from testifying as a sanction for his alleged misconduct and failure to disclose. *See, e.g., id.* at 5, 10, 19, 27. Plaintiffs did not have an opportunity to respond to Defendants' latest assertions and request for sanctions before Defendants' motion was decided.

**\*40** Essentially all of Defendants' motion was denied by Magistrate Judge Borchers, to whom all discovery matters were referred at that time, in an order entered on March 31, 1998. *See* Mem. Op. and Order (Doc. 1003) [hereinafter "March 1998 Order"]. The rationale for his decision on the motion to compel was that the information sought by Defendants did not exist and therefore could not be produced.[FN50] At two points, the magistrate judge speculated about whether it was possible to replicate Dr. Radke's work without certain of this information and, if not, that this might be a basis on which to exclude his testimony. *See id.* at 6, 7. He stated that sanctions were not available under Federal Rule 37, however, because no discovery order had yet been violated. *See id.* at 8-9. He also denied Defendants' request to postpone Dr. McFadden's deposition.

> FN50. Magistrate Judge Borchers granted the motion to compel with respect to some limited geographic data. *See* March 1998 Order at 7, 9.

Defendants did not file any objections to the magistrate judge's order. Instead, some weeks later they filed a separate motion in the district court to exclude Dr. Radke's testimony under Rule 37(c)(1). Defendants based their motion on the magistrate judge's alleged findings that Plaintiffs had violated Rule 26(a)(2) by failing to produce the information

sought by Defendants in their Motion to Compel and that this lack of compliance was neither substantially justified nor harmless. *See* Defs.' Mot. Under R. 37(c)(1) (Doc. 1004); Defs.' Mem. in Supp. of Mot. Under R. 37(c)(1) (Doc. 1007). Plaintiffs opposed the motion on numerous grounds, including that Defendants had mischaracterized the magistrate judge's findings and order and were improperly attempting an end-run around his refusal to impose sanctions under Rule 37. Pls.' Mem. in Opp'n to Defs.' Mot. Under R. 37(c)(1) (Doc. 1023).

I denied Defendants' motion for sanctions, holding t hat it was premature because Plaintiffs had not yet sought to rely on Dr. Radke's expert testimony. *Cook v. Rockwell Int'l Corp. (Cook VIII),* 181 F.R.D. 473, 488-89 (D.Colo.1998). I also found at that time that "[t]he facts relied on and relief sought in this motion are identical to the facts considered and the relief denied by the magistrate judge. Defendants' more appropriate course of action would have been to seek reconsideration or to file an objection to the magistrate judge's denial of Rule 37(c)(1) sanctions." *Id.* at 489 n. 16.

Now, seven years later, Defendants have renewed their argument that Dr. Radke's testimony should be excluded under Rule 37(c)(1) as a sanction for his failure to provide the information requested in Defendants' January, 1998 Motion to Compel. I again deny Defendants' motion.

First, as I stated in 1998, the proper method for Defendants to raise this issue before me was to file an objection to the magistrate judge's denial of Rule 37 sanctions. Rule 72 requires a party to file any objection to a magistrate judge's order on a matter such as this within 10 days of being served with the order. Fed.R.Civ.P. 72(a). Defendants did not timely or otherwise file objections to the magistrate judge's order.[FN51] By failing to object, Defendants waived the right to challenge the magistrate judge's denial of Rule 37 sanctions and, necessarily, waived the right to seek the same relief before me through a separate motion for Rule 37 sanctions. *See* Fed.R.Civ.P. 72(a) (party that fails to timely object may not assert error in magistrate judge's ruling); *Frontier Refining, Inc. v. Gorman-Rupp Co.,* 136 F.3d 695, 706 (10th Cir.1998) (failure to file timely

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2006 WL 3533049 (D.Colo.)
**(Cite as: Slip Copy)**

objection waives right to appeal magistrate judge ruling); *Sunview Condominium Ass'n v. Flexel Int'l, Ltd.,* 116 F.3d 962, 964 (1st Cir.1997) (party that fails to file timely objection to magistrate judge ruling may not resurrect issue in different venue).

> FN51. Even if Defendants' Rule 37 motion could be construed as an objection to the magistrate judge's order, it would have been untimely under Fed.R.Civ.P. 72(a) because it was filed nearly three weeks after service of the order.

**\*41** Defendants' request for Rule 37 sanctions is also subject to denial on the merits. Defendants assert that the magistrate judge's March 31, 1998 order adjudicated and found that Dr. Radke's expert report was incomplete and therefore violated Rule 26(a)(2).[FN52] They further assert that the magistrate judge found this lack of disclosure was neither substantially justified nor harmless, which would trigger the automatic sanction of precluding Dr. Radke's testimony under Rule 37(c)(1).[FN53] *See* Defs.' Mem. in Supp. of Mot. Under R. 37(c)(1) (Doc. 1007); Defs.' Mot. re: Pls.' Damages Experts at 28-29 (incorporating 1998 Rule 37 motion). The magistrate judge, however, made no findings with respect to Dr. Radke's expert report or his compliance with Rule 26(a)(2). He also made no findings as to whether any lack of disclosure was substantially justified or harmless. Moreover, notwithstanding his misgivings about some of Dr. Radke's disclosures, the magistrate judge affirmatively denied Defendants' request for sanctions under Rule 37. Under these circumstances, there is no basis for asserting that the magistrate judge made findings that require the imposition of sanctions under Rule 37(c)(1).[FN54]

> FN52. As relevant here, Rule 26(a)(2) requires a party to produce a written report for each expert witness that contains "a complete statement of all opinions to be expressed and the basis and reasons therefor" and "the data or other information considered by the witness in forming the opinions." Fed.R.Civ.P.

26(a)(2)(B).

> FN53. Rule 37(c)(1) provides that "[a] party that without substantial justification fails to disclose information required by Rule 26(a) ... is not, unless such failure is harmless, permitted to use as evidence at a trial, at a hearing, or on a motion any witness or information not so disclosed." Fed.R.Civ.P. 37(c)(1).

> FN54. Defendants also assert that the magistrate judge found that the information Defendants requested "no longer exis[ted]" or had "disappeared," thus implying that he had found some kind of misconduct or spoliation of relevant evidence by Dr. Radke or Plaintiffs. *See, e.g.,* Defs.' Mot. re: Pls.' Damages Experts at 28, 29; Defs.' Mem. in Supp. of Mot. Under R. 37(c)(1) at 1. In fact, the magistrate judge stated only that most of the material "does not exist," without addressing whether it had ever existed in the form requested by Defendants. *See, e.g.,* March 1998 Order at 4, 5, 7. Even these statements by the magistrate judge are subject to question, however, as the record before him was that most of the information at issue was available in the back-up files of the University of California at Berkeley's computing system or from third-party vendors, had already been produced, and/or existed in a form other than that requested by Defendants. Thus, the magistrate judge's statements that most of these materials did not exist at best oversimplified an admittedly complicated factual situation and at worst were clearly erroneous. Because Plaintiffs were the prevailing party under the magistrate judge's order, they had no reason or basis to file objections to the order to correct the magistrate judge's statements.

I have also examined Dr. Radke's expert report and disclosures in light of Defendants' complaints and find no violation of Rule 26(a)(2). Defendants assert Rule 26(a)(2) was violated, because, they

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2006 WL 3533049 (D.Colo.)
**(Cite as: Slip Copy)**

argue, without the detailed working notes, intermediate results and computer records they requested, their rebuttal expert could not replicate all of Dr. Radke's results when he reviewed and tested the methodology set forth in Dr. Radke's expert report and other disclosures. Rule 26(a)(2)'s requirements that the expert's report include his opinions and reasoning and "the data or other information considered by the witness in forming the opinions" do not, however, require that the expert report contain, or be accompanied by, all of the expert's working notes or recordings. *Gillespie v. Sears, Roebuck & Co.*, 386 F.3d 21, 35 (1st Cir.2004). Nor is there any suggestion in Rule 26(a)(2) that an expert report is incomplete unless it contains sufficient information and detail for an opposing expert to replicate and verify in all respects both the method and results described in the report.[FN55]

> FN55. Nor does Rule 26(a)(2) require that an expert report contain all the information that a scientific journal might require an author of a published paper to retain or all of the information that the authors of the Reference Manual on Scientific Evidence suggest can be helpful in resolving disagreements about statistical studies.

The purpose of Rule 26(a)(2)'s expert disclosure requirements is to eliminate surprise and provide the opposing party with enough information regarding the expert's opinions and methodology to prepare efficiently for deposition, any pretrial motions and trial. *See Sylla-Sawdon v. Uniroyal Goodrich Tire. Co.*, 47 F.3d 277, 284 (8th Cir.1995); *Nguyen v. IBP, Inc.*, 162 F.R.D. 675, 682 (D.Kan.1995). Dr. Radke's detailed, 82-page expert report (including appendices) and other disclosures were sufficient to enable Defendants to depose Dr. Radke, to retain a rebuttal expert who prepared a lengthy rebuttal report analyzing and critiquing Dr. Radke's methodology, and to file a motion to strike Dr. Radke's testimony based on this critique. Based on these circumstances and my own review of Dr. Radke's expert report, I find it complied with Rule 26(a)(2).

*42 Defendants' argument also confuses the expert reporting requirements of Rule 26(a)(2) with the considerations for assessing the admissibility of an expert's opinions under Rule 702 of the Federal Rules of Evidence. Whether an expert's method or theory can or has been tested is one of the factors that can be relevant to determining whether an expert's testimony is reliable enough to be admissible. *See* Fed.R.Evid. 702 2000 advisory commitee's note; *Daubert*, 509 U.S. at 593. It is not a factor for assessing compliance with Rule 26(a)(2)'s expert disclosure requirements.

I have also considered Dr. McFadden's complaints regarding inadequate disclosure in deciding whether Dr. Radke's testimony satisfies the requirements for admission under Rule 702 and *Daubert*. I find these complaints do not warrant exclusion of Dr. Radke's expert testimony. First, Dr. McFadden's rebuttal report and various affidavits establishes that he was in fact able to evaluate, test and indeed replicate much of Dr. Radke's work and results, including his Phase I and Phase II methodology and his Phase II results. *See, e.g.,* McFadden Report at 2, 15, 21; 1999 McFadden Aff. at 4, 49, 55. Thus, Dr. Radke's methodology could be and was tested by Dr. McFadden, notwithstanding Dr. Radke's allegedly inadequate disclosures.

The gist of Dr. McFadden's complaints is that he was not able to replicate Dr. Radke's construction of some location-based variables or "verify" all of his regression results. Dr. McFadden blames both circumstances on inadequate disclosure by Dr. Radke, and presumably Dr. McFadden would have had more success in his efforts if Dr. Radke had produced all of the voluminous information requested by Defendants. Dr. Radke, however, testified that he produced sufficient information that "persons knowledgeable in the relevant disciplines" would be able to reproduce his methodology and results. Pls.' Mem. in Opp'n to Defs.' Mot. Under R. 37(c)(1) (Doc. 1023), Attach. (Radke Decl., dated June 11, 1998), ¶¶ 6, 9; Pls.' Resp. to Defs.' Mot. to Compel (Doc. 998), Ex. K (Radke Dep.) at 129. The dispute between the two experts about whether Dr. Radke's methods and results could be fully replicated, at all or from the information he provided, presents a jury question that requires

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Slip Copy, 2006 WL 3533049 (D.Colo.)
**(Cite as: Slip Copy)**

consideration of both experts' qualifications and methodology.[FN56] Any suggestion that an opposing expert must be able to "verify" the correctness of an expert's work before it can be admitted also misstates the standard for admission of expert evidence under Rule 702. *See Bitler,* 400 F.3d at 1233 (not necessary for party to demonstrate expert is indisputably correct to establish reliability under Rule 702); *Paoli,* 35 F.3d at 744 (" evidentiary requirement of reliability is lower than the merits standard of correctness"). As a result of these considerations and the fact that Dr. McFadden admittedly was able to test and evaluate most of Dr. Radke's work, I find that his remaining complaints go to the weight and credibility of Dr. Radke's proffered testimony, and not to whether it is admissible.

> FN56. For example, Dr. McFadden's chief complaint concerns his inability to replicate Dr. Radke's use of GIS and gravity modeling techniques to construct certain location-based variables. It is unclear from the record, however, whether Dr. McFadden has experience or expertise in these fields.

*43 Finally, Defendants' authority for excluding Dr. Radke's expert testimony under *Daubert* based on his allegedly inadequate disclosure does not withstand scrutiny. Defendants assert "[w]here, as here an expert has failed to document his work and make it available for review-thereby rendering his opinions non-replicable and non-testable-courts have consistently excluded such testimony under *Daubert.* " Defs.' Mot. re: Pls.' Damages Experts at 29 (citing *Reed v. Binder,* 165 F.R.D. 424 (D.N.J.1996) and *Nguyen v. IBP, Inc.,* 162 F.R.D. 675 (D.Kan.1995)). In addition to over-stating Dr. McFadden's actual complaints, this statement is not supported by either of the cited cases. Neither case addresses the admissibility of expert testimony under *Daubert* or Rule 702. Nor did the courts in these cases address a situation in which an expert's opinion was "non-replicable or non-testable" due to lack of disclosure. They instead considered whether expert reports that were grossly deficient in failing to provide multiple categories of information

required by Rule 26(a)(2) warranted sanctions. *See Reed,* 165 F.R.D. at 429-31; *Nguyen,* 162 F.R.D. at 679-82. In neither case did the court exclude the expert's testimony.[FN57] Accordingly, neither case supports any element of the proposition for which they are cited, or Defendants' more general argument that Dr. Radke's regression analysis and testimony should be excluded for lack of adequate disclosure.

> FN57. In *Reed,* the court found barring the expert's testimony to be unduly harsh and instead required the party whose experts had made the inadequate disclosure to bear the fees charged by their experts for the discovery depositions. 165 F.R.D. at 431. In *Nguyen,* the court allowed the offending party to provide a supplemental disclosure to correct the deficiencies in the expert's report. 162 F.R.D. at 682.

### 2. Dr. Paul Slovic and Dr. James Flynn

Drs. Slovic and Flynn are social scientists associated with Decision Research Institute, a nonprofit research institute specializing in the study of human judgment, decision making and risk assessment. Pls.' Cons.*Daubert* Resp. (Doc. 1399), Ex. 25 [hereinafter "Slovic Report"] at 1; *id.,* Ex. 11 (Flynn curriculum vitae) at 1. Dr. Slovic, the President of Decision Research, holds a Ph.D. in psychology from the University of Michigan and is a professor of psychology at the University of Oregon. His lengthy curriculum vitae demonstrates that he has more than 30 years experience in researching human behavior in situations of risk, and is recognized as a leading authority in the field of risk perceptions and their effects on human decision-making. *See* Slovic Report at 1-2 & attach. (Slovic curriculum vitae). His work is extensively published and he has served as a consultant to numerous companies and government agencies. His experience includes service on the Board of Directors for the National Council on Radiation Protection and Measurements and the Board on Radioactive Waste Management of the National Research Council/National Academy of Sciences. *See id.*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2006 WL 3533049 (D.Colo.)
**(Cite as: Slip Copy)**

Dr. James Flynn is a senior research associate at Decision Research who specializes in risk communications, survey research, socioeconomic impact assessment, community studies and public planning. Pls.' Cons.*Daubert* Resp., Ex. 1 (Flynn curriculum vitae) at 1. He has over 20 years experience directing, managing and conducting research in these fields for a wide range of federal, state and local governments and private-sector clients. *Id.* at 1-2. He has significant experience in the study of public perception of risk, especially regarding risks from radiation. *See id.* at 2-3. This experience includes surveys and other research performed for the U.S. Nuclear Regulatory Commission and the U.S. Department of Energy's Low Dose Research Program on Risk Communication. *Id.* at 2. Dr. Flynn's work in this and related fields is widely published. *See id.*; Pls.' Cons.*Daubert* Resp. (Doc. 1399), Ex. 12 [hereinafter " 'Flynn Dep."] at 212-14.

**\*44** Drs. Slovic and Flynn prepared three expert reports regarding their intended expert testimony in this case. The first, authored by both experts, is their "Final Report: Rocky Flats Health and Housing Survey." Pls.' Cons. *Daubert* Resp. (Doc. 1399), Ex. 13 [hereinafter "Survey Report"]. It reports the results of a public opinion survey designed by Decision Research Institute and executed by the University of Maryland Survey Research Center to obtain information relating to the effects of the Rocky Flats plant on property values in the potentially affected communities of Arvada and Westminster (which include the Class Area). *See id.* at 1-3. In a second expert report, " Factors Influencing Risk Assessment, Risk Perception, and Risk Acceptance," Dr. Slovic describes the social and psychological factors that influence the perception and acceptance of risk in society and relates these factors to the perception and acceptance of risks associated with the release of radioactive materials from Rocky Flats. *See* Slovic Report. In a third report, titled "The June 6, 1989 FBI Raid at Rocky Flats, Colorado: Risk, Media, and Stigma," Drs. Flynn and Slovic present the results of an examination of Denver area newspaper stories resulting from the FBI raid and relate them to the perception of risk and the potential stigma associated with Rocky Flats. Exs.

to Pls.' Resp. to Defs.' Mot. to Strike Pls.' Experts (Doc. 1079), Ex. 8 [hereinafter "Media Report"]. The Survey Report and Media Report have been peer reviewed and published. *See* James Flynn, *et al., Risk, Media, and Stigma at Rocky Flats,* 18 Risk Analysis 715 (1998).

Although Defendants seek to exclude all expert testimony by Drs. Flynn and Slovic, their arguments are directed almost exclusively to their proffered testimony regarding the public opinion survey that is the subject of the Survey Report. Accordingly, I will address the admissibility of this testimony first before addressing the admissibility of the expert testimony disclosed in the Slovic and Media Reports.

a. Survey Report

The Survey Report describes a public opinion survey Drs. Slovic and Flynn designed to assess the public's perception of Rocky Flats and its effect on the desirability and value of properties in the Class Area ("Flynn/Slovic survey"). The survey's target population was residents of the Denver metropolitan area and of Arvada and Westminster who had purchased or been actively involved in the housing market the previous five years or who planned to purchase a home in the area in the next few years. Survey Report at 1-2. The survey was conducted by telephone interview between August 31, 1995 and October 1, 1996. *Id.* at 2-3. All interviews were conducted by staff from the University of Maryland Survey Research Center Telephone Facility, *id.,* and neither the interviewers nor the respondents knew the identity of the party that had commissioned the survey, Pls.' Cons. *Daubert* Resp. (Doc. 1399), Ex. 10 [hereinafter " Flynn & Hunsperger Resp."] at 12.

**\*45** In the first half of the survey, the interviewer asked a series of questions to determine whether the respondent was part of the target population of actual or likely home buyers. Survey Report at 4. If so, then the interviewer proceeded to ask general questions about Arvada and Westminster, which encompass the Class Area, and another Denver area community. *Id.* Respondents were asked to rate the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Page 50

Slip Copy, 2006 WL 3533049 (D.Colo.)
**(Cite as: Slip Copy)**

communities on a list of ten community characteristics and to answer open-ended questions about them. *Id.* None of the questions during this portion of the interview mentioned Rocky Flats. *Id.* at 5.

The second half of the interview was designed to isolate the respondents perception of Rocky Flats. *Id.* at 6. It began with questions asking if the respondent had heard about the Rocky Flats nuclear weapons plant and where it is located relative to Denver. *Id.* The interviewer then asked the respondent to state up to three things that came to mind when they thought of Rocky Flats, and to provide an overall impression of the plant using a scale of "strongly positive" to "strongly negative." *Id.* Respondents were then asked if Rocky Flats made homes in the Arvada/Westminster area more or less desirable. *Id.* at 7. Next, they were asked whether they believed the existing two-mile buffer zone around the facility provided adequate protection or whether a 4-6 mile zone or some greater distance would be adequate. *Id.* at 9.

The interviewer then presented a progression of scenarios to respondents that were designed to determine how Rocky Flats would influence the decision to purchase a home. Respondents were first asked whether they would purchase an otherwise desirable house located 2-4 miles from Rocky Flats and, if not, whether they would purchase the same house at a distance of 4-6 miles from Rocky Flats. *Id.* at 11. Respondents who answered "no" to both scenarios were then asked if they would purchase the same house at a distance of 4-6 miles from Rocky Flats at a $5000 discount and, if that was refused, at a $10,000 discount. *Id.* Respondents who were not willing to purchase with either discount were then given the opportunity to state the discount at which they would purchase the house. *Id.* at 11-12. Respondents who answered that they would not purchase a house within 4-6 miles of Rocky Flats at any discount were recorded as having rejected distance and price discounts for property within six miles of Rocky Flats.[FN58] *Id.* at 11-12. Respondents who were willing to purchase a house 4-6 miles from Rocky Flats at a discounted price of some amount were also asked if they would accept a house within 2-4 miles of Rocky Flats with

the same or another discount. *Id.* at 12.

> FN58. The Class Area extends approximately six miles from Rocky Flats.

Finally, following these housing scenario questions, the interviewers asked respondents about their knowledge or opinions about specific issues involving Rocky Flats. Questions included whether the respondent believed Rocky Flats posed a health risk, whether it had affected the value of near-by properties and was safe, and whether they had heard about the FBI raid. *Id.* at 17-21.

**\*46** The Survey Report included statistical summaries of the responses to each set of questions, generally distinguishing between residents of the Denver metro area and of the Arvada/Westminster area. Based on the survey results, most notably including that 46.2 % of Denver area residents reported they would not purchase a house within six miles of Rocky Flats at any price, Drs. Flynn and Slovic concluded that the history and reputation of Rocky Flats made housing near the plant less desirable and caused downward pressure on property values in this area. *Id.* at 21-23.

*Qualifications*

Defendants assert neither Dr. Flynn nor Dr. Slovic has any credentials that qualify them to design, conduct or testify as an expert regarding a public opinion survey. This assertion is belied by both witnesses' extensive experience and training in decision-making and opinion research, including the design and performance of public opinion surveys. In fact, Defendants' rebuttal expert, Dr. Daniel Kahneman, testified that Dr. Slovic has made important contributions to this field. Supplemental App. to Defs.' Reply Br. in Supp. of Mot. to Strike Pls.' Experts (Doc. 1092), Vol. III, Ex. 12 [hereinafter "Kahneman Report"] at 2.[FN59] Defendants' further complaint that Drs. Flynn and Slovic are not experts in real estate valuation improperly assumes that such expertise was required to design and perform the public opinion survey and to testify regarding its results. I find Drs.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Page 51

Slip Copy, 2006 WL 3533049 (D.Colo.)
**(Cite as: Slip Copy)**

Flynn and Slovic are qualified to testify as experts regarding the public opinion survey that is the subject of their Survey Report.

> FN59. Defendants submitted only short excerpts from Dr. Kahneman's rebuttal report in support of their June 2005 motion to exclude Plaintiffs' damages experts. *See* App. to Defs.' Mot. re: Pls.' Damages Experts (Doc. 1373), Ex. 17. Defendants previously submitted Dr. Kahneman's complete report, which is cited above and elsewhere in this opinion, in connection with their 1997 motion to strike Plaintiffs' experts.

*Relevance/fit*

Defendants assert that expert testimony regarding the Flynn/Slovic survey and report is inadmissible under Rule 702 because it does not "fit" any issue in the case. I disagree. The survey and other work of Drs. Flynn and Slovic was directed at determining how the public perceived Rocky Flats and whether activities at the plant and publicity related to it had resulted in a stigma that negatively affected the value of properties in the Class Area. *See* Hunsperger & Flynn Resp. at 2-4; Survey Report at 1, 21-23. Drs. Flynn and Slovic's testimony on their survey, therefore, is relevant to and will assist the jury in determining whether Rocky Flats, and Defendants' alleged misconduct there, caused a diminution in the value of properties in the Class Area. [FN60]

> FN60. To the extent Defendants dispute the relevance of the Flynn/Slovic survey results based on "mere proximity" and other arguments discussed above with respect to Dr. Radke's testimony, these arguments are rejected for the reasons stated there. *See supra* Section I.C.1.

Defendants' true complaint regarding the Flynn/Slovic survey and their Survey Report is that Wayne Hunsperger, Plaintiffs' appraisal and lead damages expert, should not have relied on their

survey results in reaching his own conclusions about the existence and especially the amount of damages caused by Defendants. This contention, however, goes to the reliability of Mr. Hunsperger's methodology in arriving at his opinions, and not to the relevance of the Flynn/Slovic survey to the issues to be decided in this case. The survey is relevant to and fits this case without reference to Mr. Hunsperger's use of it. [FN61]

> FN61. I address Mr. Hunsperger's use of the Flynn/Slovic survey results later in this opinion. *See infra* Section I.C.3.e.

*Reliability*

**\*47** The Flynn/Slovic survey and Drs. Flynn and Slovic's analyses of its results have been peer reviewed and published, *see* James Flynn, *et al., Risk, Media, and Stigma at Rocky Flats,* 18 Risk Analysis 715 (1998), which is an indicator of reliability under Rule 702. *See Daubert,* 509 U.S. at 593-94. The Survey Report and the more recent statement of Dr. Flynn and others, *see* Flynn & Hunsperger Resp. at 9-14, also makes a strong showing that the Flynn/Slovic survey was conducted according to generally recognized survey principles as identified in the Federal Judicial Center's Manual for Complex Litigation and Reference Manual on Scientific Evidence. *See* Manual for Complex Litigation, Fourth § 11.493 (2004); Shari S. Diamond, *Reference Guide on Survey Research,* in *Reference Manual on Scientific Evidence* [hereinafter *"Ref. Guide on Survey Research"* ] 229 (2$^d$ ed.2000).[FN62] Defendants, however, assert the survey design was unreliable in several respects and that all testimony regarding it must be excluded as a consequence. None of Defendants' complaints warrants exclusion of this testimony.

> FN62. Relevant factors to be considered in determining whether the survey conformed to these standards include whether: (1) the survey was designed to address relevant questions; (2) the population was properly chosen and defined; (3) the sample chosen

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                    Page 52

Slip Copy, 2006 WL 3533049 (D.Colo.)
**(Cite as: Slip Copy)**

was representative of that population; (4) the data gathered was accurately reported; (5) the data was analyzed in accordance with accepted statistical principles; (6) the questions asked were clear and not leading; (7) the survey was conducted by qualified persons following the proper interview procedures; and (8) the process was conducted so as to ensure objectivity. *See* Manual for Complex Litigation, Fourth § 11.493; *Ref. Guide on Survey Research* at 236-72.

Defendants first invoke the rebuttal report of their expert, Dr. Daniel Kahneman, to argue that the survey design was inherently biased and unrealistic in ways that resulted in inflated estimates of any adverse effect of Rocky Flats on neighboring property values. Even if these allegations had merit, the rule in the Tenth Circuit is that "[t]echnical and methodological deficiencies in the survey ... bear on the weight of the evidence, not the survey's admissibility." *Harolds Stores, Inc. v. Dillard Dept. Stores, Inc.,* 82 F.3d 1533, 1544 (10th Cir.1996); *see also E. & J. Gallo Winery v. Gallo Cattle Co.,* 967 F.2d 1280, 1292-93 (9th Cir.1992) (same). Alleged "deficiencies" that bear only on the weight of survey evidence under this authority include allegations that the survey questions did not accurately reflect market conditions and were " slanted, leading, and ambiguous." *Harolds,* 82 F.3d at 1546 n. 9. Thus, Dr. Kahneman's criticisms of the survey design are matters to be raised at trial and considered by the jury and are not grounds for excluding Drs. Flynn and Slovic's testimony regarding their public opinion survey.

My independent review of the Survey Report and Dr. Kahneman's rebuttal report confirms that his criticisms do not provide grounds for excluding testimony regarding the Flynn/Slovic survey. The sequence of the survey questions, for example, does not appear inherently biased, and any doubts on this score can be addressed through the traditional adversary process before the jury. While Defendants complain that the survey contains an upwards "anchoring bias" in its use of $5000 and $10,000 as initial discount options in the housing scenario portion of the survey, Dr. Kahneman only

speculated that this could be the case. *See* Kahneman Report at 11. Drs. Flynn and Slovic, meanwhile, explained how and why these discount amounts were chosen, *see* Pls.' Cons.*Daubert* Resp. (Doc. 1399), Ex. 26 [hereinafter "Slovic Dep."] at 160-63; *id.,* Ex. 12 (Flynn Dep.) at 201-04, and Dr. Slovic disagreed that an upward anchor bias necessarily resulted from them, *see* Slovic Dep. at 162-63, 167-69. The dispute between these experts regarding possible upward anchor bias in the stated discount amounts and its implications goes to the weight of the survey evidence and does not warrant exclusion. Dr. Kahneman's additional concerns that the survey results might have been skewed by presenting an unrealistic representation of how Rocky Flats and any risks it poses would be considered in a house purchase decision similarly are matters that may be decided by the jury.

**\*48** Defendants also assert the Flynn/Slovic survey is unreliable and must be excluded because it does not meet the guidelines for a contingent valuation survey performed as part of a natural resource damages assessment under the federal Oil Pollution Act. *See* Defs.' Mot. re: Pls.' Damages Experts at 36-37 (citing Report of the NOAA Panel on Contingent Valuation, 58 Fed.Reg. 4601, App. I (Jan. 11, 1993)). The short answer to this assertion is that Defendants have failed to show these guidelines have any application here. The NOAA guidelines describe contingent valuation as a survey-based method for determining the economic value of "existence" or "passive-use" values in natural resources where there is no direct market or other behavioral evidence of that economic value. *See* 58 Fed.Reg. at 4602-03. Dr. Ralph C. d'Arge, Defendants' rebuttal expert on this subject, and Dr. Slovic similarly agree that a contingent valuation survey is a survey that seeks to determine the economic value of something that is not ordinarily bought and sold and thus does not have a well defined market or market price. *See* Defs.' Supplemental App. to Defs.' Reply Br. in Supp. of Mot. to Strike Pls.' Experts (Doc. 1092), Vol. III, Ex. 10 [hereinafter "D'Arge Suppl. Report"] at 3; Slovic Dep. at 207-08. There is a market for Class properties, and Drs. Flynn and Slovic designed their survey to assess that market's response to problems at Rocky Flats. *See, e.g.,* Flynn & Hunsperger Resp.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Slip Copy, 2006 WL 3533049 (D.Colo.)
**(Cite as: Slip Copy)**

at 13-14 (survey directed at possible causal link between market effects and Rocky Flats). Drs. Flynn and Slovic also both testified that they did not design their survey to be a contingent valuation study, Slovic Dep. at 129; Flynn Dep. at 47, and Defendants have not cited to anything in the NOAA panel guidelines or other authority in the field suggesting it should be evaluated as a contingent valuation study. Hence, the NOAA panel guidelines have no application here.

Defendants also asserted in passing in their reply brief and more strongly at oral argument that the Flynn/Slovic survey and related testimony are unreliable because the group surveyed was not limited to persons already living in Arvada and Westminster or those who affirmed they would consider living there. Although Defendants stated that Defendants' rebuttal expert Dr. d'Arge identified this as a significant problem in his report, his criticism there was brief and only in the context of the survey's presumed status as a contingent valuation study directed at those claiming to have been damaged by Rocky Flats, *i.e.,* residents of Arvada and Westminster. *See* D'Arge Suppl. Report at 7, 10. Dr. d'Arge's testimony does not, therefore, support Defendants' much broader argument that the survey group was improperly large. Even if it did, I would find that this issue also goes to the weight to be accorded to the survey by the finder of fact.[FN63]

> FN63. Defendants' tardy assertion of this argument may be an attempt to seek exclusion pursuant to the Tenth Circuit's statement in *Harold* that a survey should be excluded " 'when the sample is clearly not representative of the universe it is intended to reflect." 82 F.3d at 1544 (quoting *Bank of Utah v. Commercial Sec. Bank,* 369 F.2d 19, 27 (10 th Cir.1966)). As stated above, Defendants presented no evidence that the survey sample here was clearly unrepresentative, and I find no basis for excluding it on this ground.
> In their reply brief, Defendants also argue that exclusion is required under *Harold* because the survey does not meet the criteria for the admission of survey

evidence as an exception to the hearsay rule. *See* Defs.' Reply in Supp. of Mot. to Exclude Expert Witness Test. (Doc. 1411) at 23-24; *Harold,* 82 F.3d at 1544. This, of course, is not a challenge to the reliability of the survey or its admission under Rule 702, and, is a contention that should have been raised by the June 16, 2005 deadline for filing all motions challenging the admission of expert testimony. I nonetheless have considered it and find it to be without merit.

### b. Slovic Report

Defendants argue Dr. Slovic's proffered testimony as disclosed in this separate report is inadmissible under Rule 702 because it will not assist the jury in deciding either liability or damages. I disagree. The testimony proffered in this report addresses risk perception generally and only as it relates to Rocky Flats. *See* Slovic Report. Dr. Slovic's testimony on these subjects will assist the jury in understanding why the market has acted as Plaintiffs allege in response to the types of environmental problems reported at Rocky Flats. It is, therefore, relevant to the jury's determination of damages. There is also no question that expert testimony that seeks "to educate the factfinder about general principles, without ever attempting to apply these principles to the specific facts of the case" is admissible under Rule 702. Fed.R.Evid. 702 2000 advisory committee's note. In light of these considerations, Dr. Slovic's undisputed qualifications to testify on these subjects and the absence of any questions regarding the reliability of the methods he used in arriving at the opinions stated in this report, I find the expert testimony disclosed in the Slovic Report is admissible under Rule 702.

### c. Media Report

**\*49** Although Defendants' motion seeks to exclude all expert testimony by Drs. Flynn and Slovic, Defendants' briefing in support of their motion does not address the testimony proffered in these experts' Media Report. When questioned on this point at oral argument, Defendants responded that the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                              Page 54

Slip Copy, 2006 WL 3533049 (D.Colo.)
**(Cite as: Slip Copy)**

opinions and information disclosed in this report should be excluded because they concern the FBI raid and related publicity, all evidence of which, according to Defendants, is irrelevant to any issue in this action.

This contention is the subject of Defendants' Motion in Limine No. 1, which is discussed below. I reject this contention with respect to the testimony disclosed in Drs. Slovic and Flynn's Media Report for the same reasons I state below for denying Defendants' Motion in Limine No. 1. *See infra* Section I.E.1. There is no question that Drs. Slovic and Flynn are qualified to undertake this kind of social science research and, as demonstrated by the peer review and publication of the Media Report, that their methodology was sound. Accordingly, the expert opinions expressed in the Media Report meet Rule 702's requirements and are admissible.

### 3. Wayne Hunsperger

Wayne L. Hunsperger is Plaintiffs' primary property damages expert. He is a certified real estate appraiser and property consultant with more than thirty years of experience in valuing and appraising real property. *See* Pls.' Cons. *Daubert* Resp. (Doc. 1399), Ex. 19, Attach. (Hunsperger *vitae* ). He is the president of Hunsperger & Weston, a Colorado-based real estate appraisal and consulting firm, and holds the highest designation (MAI) from the Appraisal Institute, the leading association of professional real estate appraisers. *Id.* at 2.

Mr. Hunsperger has particular knowledge and experience regarding the effect of hazardous materials on the value of real property and the valuation of environmentally impaired properties. He has written and taught extensively on these subjects for many years and has performed valuations of Superfund sites in Colorado and numerous other area-wide analyses of property affected by toxic waste sites. *Id.* at 3. Mr. Hunsperger's clients for this and other appraisal work have included the United States Department of Justice, the U.S. Environmental Protection Agency, the United States Army, the cities of Denver, Colorado Springs, and Aurora, and major

banks and businesses. *Id.* He has also qualified and testified as an expert witness on property valuation issues in federal and state courts. *Id.* at 4.

In this action, Mr. Hunsperger and his firm conducted an analysis of real property in the Class Area to determine if Class property values had been impacted by Rocky Flats and, if so, to what extent. Pls.' Cons.*Daubert* Resp. (Doc. 1399), Ex. 19 [hereinafter "Hunsperger Report"] at 1, 2. The analysis incorporated five different, multi-disciplinary approaches to these questions: real estate market research; review of analogous case studies; analysis of market sales data and information; multiple regression analysis; and review of public opinion surveys. *Id.* at 2. The latter two approaches incorporate the work of Dr. Radke and Drs. Flynn and Slovic.

*\*50 Mr. Hunsperger's methodology and the results of his analysis are detailed in his exhaustive 260-page expert report and accompanying appendices. *See* Hunsperger Report. Based on consideration of all five approaches, Mr. Hunsperger concluded that Rocky Flats had diminished the value of property in the Class Area, and estimated the amount of this diminution in value, in 1995 dollars, at $169 million for residential properties and $21 million for vacant land. *Id.* at 259.

Defendants argue Mr. Hunsperger's proffered expert testimony is inadmissible in its entirety under Rule 702 for multiple reasons. Upon a thorough review of Mr. Hunsperger's report and careful consideration of the parties' arguments and other submissions, I find his proffered testimony is admissible. Mr. Hunsperger is unquestionably qualified to testify as proposed, his analysis is reliable within the meaning of Rule 702 and it will assist the jury in determining a fact in issue, namely damages. The basis for this decision and for rejecting Defendants' many contrary arguments is set out below.

Defendants begin their challenges to Mr. Hunsperger's testimony with the summary assertion that his entire approach is unreliable because it did not include a "mass appraisal" or utilize any of the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2006 WL 3533049 (D.Colo.)
**(Cite as: Slip Copy)**

three approaches traditionally used by professional appraisers for estimating the market value of properties, *i.e.,* the "Cost Approach," "Income Capitalization Approach," and "Sales Comparison Approaches." Defendants have not, however, pointed to any evidence stating that these methods are appropriate for investigating and assessing the diminution in property value caused by environmental concerns on an area-wide basis, or, even if they are, that these approaches are the exclusive methods for performing such an analysis. Mr. Hunsperger and Plaintiffs, meanwhile, have presented evidence that the Appraisal Standards Board and authorities in the field recognize that " [e]stimating the effects of environmental contamination on real property value usually involves the application of one or more specialized valuation methods," including the specialized methods utilized by Mr. Hunsperger in his analysis. Pls.' Cons.*Daubert* Resp. (Doc. 1399), Ex. 42 (Uniform Standards of Professional Appraisal Practice (USPAP), Advisory Opinion 9 (2004)); *see id.,* Ex. 38 (Thomas O. Jackson, *Methods and Techniques for Contaminated Property Valuation,* The Appraisal Journal 311 (Oct.2003)) [hereinafter "Jackson, *Contaminated Property"* ].[FN64] In addition, an assignment such as this may be considered real estate consulting and/or market impact analysis, and thus may involve the use of methods and techniques other than the three traditional methods for appraising individual properties. *See* Hunsperger Report at 64; Pls.' Cons. *Daubert* Resp. (Doc. 1399), Ex. 39 (Richard J. Roddewig, *Choosing the Right Analytical Tool for the Job,* The Appraisal Journal 320 (July 1998)). Accordingly, there is no merit to this challenge to Mr. Hunsperger's work and proffered testimony.

> FN64. At least one commentator has noted, in fact, that the value of environmentally impaired property "can rarely be estimated through one of the traditional approaches to value," and that other approaches must be used. Jackson, *Contaminated Property* at 314.

*51 Defendants next renew their arguments that the work of Mr. Hunsperger and Plaintiffs' other damages experts is irrelevant for various reasons, including that Mr. Hunsperger did not specify that the diminution in value he determined was attributable to Defendants' alleged trespass and nuisance towards the Class Area, as opposed to mere proximity to Rocky Flats. I addressed this and Defendants' other relevance arguments earlier, in connection with Defendants' arguments to exclude Dr. Radke's testimony, and reject them here for reasons stated earlier. *See supra* Section I.C.1.[FN65]

> FN65. In addition, I note that Mr. Hunsperger in fact specified that his study assessed the "stigma" effect of Rocky Flats, which did not "relate simply to proximity to Rocky Flats," Hunsperger Report at 74, but rather to "past, present and future risk associated with Rocky Flats, including the likelihood that the class area has been exposed to plutonium" from the site, *id.* at 71. This definition is consistent with Plaintiffs' claim for damages resulting from Defendants' alleged trespass and nuisance.

Defendants also allege that each of the five approaches utilized by Mr. Hunsperger is deficient under Rule 702 for one or more reasons, and that these deficiencies alone or in combination require that his testimony be excluded. None of these approaches stands alone, however, and all must ultimately be considered in the context of Mr. Hunsperger's study as a whole. With this consideration in mind, I examine each approach and Defendants' arguments in turn.

### a. Real estate market research

In this portion of his study, Mr. Hunsperger conducted field research regarding the property market in the area around Rocky Flats, including the Class Area. This research consisted of interviews with a host of market participants, including representatives from eight municipalities, two counties, the State of Colorado, various quasi-public entities, residential lenders, mortgage insurers, real estate appraisers, realtors, builders and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2006 WL 3533049 (D.Colo.)
**(Cite as: Slip Copy)**

individual property owners, and review of documents relating to governmental land use policies and risks posed by Rocky Flats. *See* Hunsperger Report at 7-15, 78-120. The purpose of this research was to allow Mr. Hunsperger to form a qualitative opinion about the impact of Rocky Flats on the Class Area property market and values and to inform and support his other work in analyzing this impact. *See id.* at 78, 253.

Based on this research and his training and experience, Hunsperger concluded, among other things, that "the after effects of the 1989 FBI raid and proximity to the Rocky Flats Nuclear Weapons Plant combine to reduce the overall market demand for properties in [the Class Area]. The resulting loss in demand clearly places downward pressure on real estate prices." Hunsperger Report at 15. Mr. Hunsperger did not rely on this market research approach to quantify any diminution in value caused by Rocky Flats.

There is no question that this type of field research is widely and properly used by real estate professionals in assessing the impact of environmental disamenities on property values. *See, e.g.,* Jackson, *Contaminated Property* at 311. Mr. Hunsperger is qualified by his training, knowledge and experience to engage in this kind of research.

Nor should there be any question that the results of Mr. Hunsperger's research regarding the market's perception of Rocky Flats and its impact on area property values will assist the jury. It is relevant to the jury's determination of damages standing alone and as one of the bases for Mr. Hunsperger's ultimate conclusion, based on the totality of his work, that Rocky Flats has caused a diminution in the value of Class properties.

**\*52** Defendants nonetheless contend Mr. Hunsperger's testimony regarding his market research is not admissible under Rule 702 because it does not quantify any diminution in property value due to a trespass or nuisance on the date on which the alleged injury became complete and comparatively enduring. This argument fails for the reasons stated earlier in this opinion. *See supra* Section I.C.1.

Defendants also argue that Mr. Hunspergers' proffered testimony regarding his market interviews and research must be excluded because it is an improper effort to admit hearsay testimony. Rule 703, however, states that if the facts or data relied upon by an expert are "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject," then these facts or data need not be admissible in evidence in order for the expert's opinion or inference to be admitted. Fed.R.Evid. 703. Market research that includes interviews with market participants is a common component of a study regarding valuation of an environmentally impaired property, *see* Jackson, *Contaminated Property* at 318, and so the results of these interviews are "of a type reasonably relied upon by experts" in this field. Rule 703, therefore, permits Mr. Hunsperger to testify regarding the opinions and inferences he reached based on his interviews with market participants.

Rule 703 also provides that an expert witness may not disclose to the jury any inadmissible facts or data he relied upon without prior court approval. Fed.R.Evid. 703. If Mr. Hunsperger seeks to testify at trial regarding specific conversations he had with market participants, I will then consider whether this testimony should be admitted under Rule 703. His conclusions and findings based on these conversations, however, are admissible under both Rules 702 and 703 for the reasons just stated.[FN66]

> FN66. Defendants cite excerpts from the trial transcript in "*Escamilla v. Asarco, Inc.,* No. 91 CV 5716 (D.Colo.1993)," in support of their argument for exclusion of Mr. Hunsperger's market research testimony. Defendants err in identifying *Escamilla* as a case brought in the federal district court. It was brought and tried in Colorado state court. *See Escamilla v. Asarco, Inc.,* No. 91-CV-5716 (Dist. Ct. Denver Cty., Colo.). Defendants also did not attach the cited transcript pages to their motion, but I was able to locate them in a previous filing. *See* Defs.' Supplemental App. to Defs.' Reply Br. in Supp. of Mot. to Strike Pls.' Experts (Doc. 1092), Vol.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2006 WL 3533049 (D.Colo.)
**(Cite as: Slip Copy)**

III, Ex.13. Consistent with my just stated ruling, the state judge in that case only sustained objections to Mr. Hunsperger testifying about specific conversations he had with market participants. *See id.* He did not bar Mr. Hunsperger from testifying regarding his research process and the conclusions he drew from these interviews. *See id.*

b. Analogous case study

In this portion of his study, Mr. Hunsperger collected information regarding thirteen area-wide property studies, including academic, government-funded and litigation-related analyses, that examined the impact on neighboring properties of more than thirty sites posing contamination or other environmental concerns. [FN67] *See* Hunsperger Report at 121-77; *see also id.* at 16-22. Mr. Hunsperger analyzed these studies and conducted follow-up interviews with most of their authors. *See id.* at 16, 121. His purposes in doing so were to identify appropriate methodologies for assessing the property effects of environmental problems, to examine the effects of environmental problems in other settings, to consider how the real estate market reacts to actual or perceived risk, to study how that reaction translates into an effect on property values and then to apply the results of this analysis to Rocky Flats and the neighboring Class Area. *See id.*

> FN67. Two of the cited case studies addressed multiple sites. *See* Hunsperger Report at 141-43 (Case Study No. 7), 144-47 (Case Study No. 8).

Based on his review and analysis, Mr. Hunsperger concluded, among other things, that multiple regression analyses and public opinion surveys are commonly used techniques for measuring market reaction to environmental conditions. *Id.* at 22, 176. He also concluded that in almost all cases properties suffer some loss in value due to actual contamination and/or proximity to a negative environmental condition, with the amount of the loss varying from nominal to as much as 50 percent.

*Id.* at 22, 175-77. Based on the latter finding and his review of the individual case studies, Mr. Hunsperger further concluded that these studies indicated a likely 10 percent average diminution in the value of residential property across the Class Area following the FBI raid. *Id.* at 177. Applying this percentage to the 1995 average sales prices for single family and attached residences in the Class Area, Mr. Hunsperger estimated the total loss in value to residential properties to be $166 million in 1995 dollars. *Id.* Mr. Hunsperger considered this damages estimate in arriving at his final opinion on the amount of damages to residential properties in the Class Area. *Id.* at 259.

**\*53** Defendants' primary challenge to Mr. Hunsperger's case study method is that it simply is not a valid or reliable property valuation methodology. Plaintiffs, however, have presented ample evidence that this method has been recognized and endorsed by the Appraisal Institute [FN68] and other authorities in the property valuation field for situations in which large numbers of properties are affected by an environmental risk or stigma. *See, e.g.,* Jackson, *Contaminated Property* at 311; Pls.' Cons.*Daubert* Resp. (Doc. 1399), Ex. 40 (Richard J. Roddewig, *Classifying the Level of Risk and Stigma Affected Contaminated Property,* The Appraisal Journal 98 (Jan.1999)) at 98-99; Exs. to Pls.' Surreply re: Defs.' Mot. to Strike Pls.' Experts (Doc. 1116), Ex. 8 (Appraisal Institute, *Environmental Risk and the Real Estate Appraisal Process,* at M-9 to M-11 (Mar.1994)).[FN69]

> FN68. The Appraisal Institute is the non-profit corporation that sets professional standards for real estate appraisers and consultants.
>
> FN69. The use and acceptance of the case study method to assess price effects also disposes of Defendants' related argument that the case studies considered by Mr. Hunsperger and any conclusions he drew from them are irrelevant and must be excluded from this action because they concern different properties in different markets and thus are not probative of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Page 58

Slip Copy, 2006 WL 3533049 (D.Colo.)
**(Cite as: Slip Copy)**

damages here.

Defendants next contend Mr. Hunsperger's use of this methodology is unreliable because the case studies he utilized are neither representative nor demonstrably reliable, and do not include studies that found no damage from an environmental disamenity. In fact, however, Mr. Hunsperger collected and reviewed studies from a variety of sources that examined properties across the country that were affected by relevant environmental conditions. The selected studies report a range of impacts on these properties, including negligible or no loss in value. *See* Hunsperger Report at 18-21, 123-63. Although Defendants speculate that Mr. Hunsperger's sample is not representative, they did not present expert or other evidence suggesting this was so.[FN70] The same is true with respect to Defendants' assertion that the case studies considered by Mr. Hunsperger may be unreliable because Mr. Hunsperger did not independently verify the validity and reliability of the multiple regression analyses and public opinion surveys that informed some of them.

> FN70. In support of this argument Defendants reference a list of case studies summarized in an undated addendum to a seminar titled 'Environmental Risk and the Real Estate Appraisal Process.' *See* App. to Defs.' Mot. re: Pls.' Damages Experts (Doc. 1373), Ex. 22. Many of these case studies, drawn solely from professional literature, concern municipal landfills, electrical transmission lines, asbestos and other environmental risks of little or no relevance here. Several of the remaining case studies were considered by Mr. Hunsperger. Defendants made no showing that their case study list was itself complete or representative.

Furthermore, to the extent Defendants' complaints here have any merit, they go to alleged weaknesses in the data relied upon by Mr. Hunsperger. Such weaknesses "go to the weight the jury should ... give[ ][his] opinions, they [do] not render [his] testimony too speculative as a matter of law" to be admitted. *Gomez v. Martin Marietta Corp.,* 50 F.3d 1511, 1519 (10th Cir.1995); *see United States v. 14.38 Acres of Land,* 80 F.3d 1074, 1079 (5th Cir.1996) (perceived flaws in expert's testimony, including that expert relied on an allegedly unreliable opinion by another expert, "are matters properly tested in the crucible of adversarial proceedings; they are not the basis for truncating that process."); *United States v. 0.161 Acres of Land,* 837 F.2d 1036, 1039-41 (11th Cir.1988) (same with regard to expert opinion based on information regarding 145 land sales where expert was not familiar with the specifics of the sales). This is particularly true given that Mr. Hunsperger's analagous case study method and conclusions are only part of the basis for his ultimate conclusions regarding the existence and amount of damages caused by Rocky Flats.

**\*54** Finally, Defendants argue the damages estimate Mr. Hunsperger made based on this approach is unreliable because it is not reproducible. Mr. Hunsperger's report, however, sets out the process he followed in arriving at this estimate and identifies the information he considered in this process. *See* Hunsperger Report at 121-77. Mr. Hunsperger's discussion of the case studies in his report, including his comments relating and comparing many of them to the situation at Rocky Flats, adequately identifies the studies that he believed were most relevant to his analysis. *See id.* at 164-74. This information was or should have been sufficient to allow Defendants or their experts to evaluate and challenge Mr. Hunsperger's reasoning and results. *See Daubert,* 509 U.S. at 593 . Defendants' disagreement with the conclusions Mr. Hunsperger reached based on this process and his knowledge and experience in the real estate field is not a basis for finding these conclusions unreliable. Mr. Hunsperger's proffered testimony regarding this portion of his study is reliable within the meaning of Rule 702 and is admissible.

c. Market sales analysis

In this component of his study, Mr. Hunsperger considered market sales data and information to assess the possible impact of Rocky Flats on the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2006 WL 3533049 (D.Colo.)
**(Cite as: Slip Copy)**

price of single-family housing and vacant land in the Class Area. Hunsperger Report at 23-33, 178-220.

With respect to single-family housing, Mr. Hunsperger sought to compare the rate of appreciation or depreciation in housing prices over time within the Class Area with the rate of price appreciation or depreciation in other metropolitan submarkets. *Id.* at 202. To accomplish this, Mr. Hunsperger obtained data from the MLS on residential sales from 1989 to 1995 in the Class Area, other non-mountain, suburban submarkets within Jefferson County and four other MLS submarkets. *Id.* Mr. Hunsperger used these data to calculate the compound appreciation/depreciation rate for this six-year period for condominium and detached single-family housing in each submarket. As part of this analysis, Mr. Hunsperger also commissioned a local marketing firm to compare the pricing of new home construction in the Class Area with comparable new residential construction in these same areas. *Id.* at 217-220.

Based on the results of both sets of comparisons, Mr. Hunsperger concluded that existing and new single-family residences in the Class Area had the lowest appreciation rates of the areas studied, which resulted in a loss in value relative to homes in other areas over the typical seven-year holding period. *Id.* at 30, 33, 256. He did not quantify the amount of this loss in this component of his study.

With respect to vacant land, Mr. Hunsperger obtained sales data on all vacant land sales in the Class Area and four other areas he viewed as similar for the period 1988 through 1995, and used these data to calculate an overall average price per acre for each area for each year. *See id.* at 178-92. Mr. Hunsperger also investigated the circumstances of a number of individual land sales in detail. *Id.* at 193-98.

**\*55** Based on these vacant land sales data and investigations, Mr. Hunsperger concluded that vacant land within the Class Area had the lowest average price per acre of any of the five areas studied, with the average price differential ranging from 3 percent to 146 percent. *Id.* at 199. He also

concluded the relatively low average price per acre for the Class Area was attributable to several factors, including proximity to Rocky Flats. *Id.* Based on all of the data and information, he estimated the overall diminution in vacant land value attributable to proximity to Rocky Flats to be 30 percent. *Id.* at 199-200. He then applied this percentage diminution in value to estimate total damages to vacant land in the Class Area at \$21 million (in 1995 dollars). *Id.* at 200-01.

Defendants argue none of Mr. Hunsperger's conclusions or analysis as just described are admissible under Rule 702. Specifically, Defendants assert Mr. Hunsperger's analysis of residential sales data and relative rates of appreciation is irrelevant and that both his residential property and vacant land analyses are unreliable. I find no merit to these contentions.

Mr. Hunsperger's market sales analysis of residential sales is relevant because it supports his opinion that residential property has been diminished in value due to Rocky Flats and will assist the jury in deciding this issue more generally.

As to the reliability of this study, there can be no question that the analysis of sales data is a sound and accepted method for addressing real estate valuation issues, and that Mr. Hunsperger's method for calculating the relative rates of appreciation was also sound. Defendants assert Mr. Hunsperger's analysis of residential sales is nonetheless unreliable because he did not show his results were statistically significant, but they fail to provide any evidence or authority that significance testing is necessary or even possible for this type of market data analysis. Defendants' final challenge, that Mr. Hunsperger should have designed his residential sales analysis to focus more narrowly on the Class Area, is a matter that goes to the credibility and weight of Mr. Hunsperger's analysis, and does not render it inadmissible.

Defendants' primary challenge to the reliability of Mr. Hunsperger's vacant land analysis is that it is based on too few land sales with too much variance in pricing for any reliable conclusions to be drawn. They do not dispute, however, that Mr. Hunsperger

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2006 WL 3533049 (D.Colo.)
**(Cite as: Slip Copy)**

incorporated all available land sales data in his analysis, and that the methodology he used in his analysis and in reaching his conclusions is clearly stated and capable of testing.[FN71] Defendants' challenges to Mr. Hunsperger's vacant land analysis are matters to be raised through the adversarial process, and do not provide a basis for exclusion.

> FN71. "Testing" in this context means the method is capable of being challenged in some objective sense or can be reasonably assessed for reliability. *See Daubert,* 509 U.S. at 593; Fed.R.Evid. 702 2000 advisory committee's note. It does not mean that the method has been tested or " verified" and found to be correct. *See, e.g., Bitler,* 400 F.3d at 1233; *Paoli,* 35 F.3d at 744 ("evidentiary requirement of reliability is lower than the merits standard of correctness").

### d. Multiple regression analysis

In this approach, Mr. Hunsperger considered and applied the results of Dr. Radke's multiple regression analysis. Hunsperger Report at 34-36, 221-24. Based on these results, Mr. Hunsperger concluded that diminution in property value is persistent within the Class Area and that the loss in value spiked after the 1989 FBI raid. *Id.* at 35, 222-23. He also used the annual diminution in value reported by Dr. Radke for 1988 through 1995 to calculate an 8 percent average loss in value during this period, which he used to calculate an area-wide diminution in value for single-family detached and attached housing in the Class Area totaling $131 million (in 1995 dollars). *Id.* at 36, 223.

**\*56** It is undisputed that multiple regression analysis is an accepted method for estimating the effects of environmental contamination and risks on real property. *See, e.g.,* Jackson, *Contaminated Property* at 311. I previously examined Dr. Radke's regression analysis and found it admissible under Rule 702. *See supra* Section I.C.1. Contrary to Defendants' suggestion, there is no requirement that Mr. Hunsperger also be qualified as an expert in regression analysis in order to incorporate the

results of this analysis in his own work. Mr. Hunsperger's application of Dr. Radke's results is also straightforward and capable of being tested. Accordingly, I find no basis to exclude Mr. Hunsperger's testimony based on the multiple regression component of his damages study.

### e. Review of public opinion surveys

In this final approach to assessing the effect of Rocky Flats on area property values, Mr. Hunsperger reviewed the results of three public opinion surveys prepared for the City of Broomfield, City of Arvada and Rocky Flats Community Relations Department, respectively, that measured the public's perceptions of Rocky Flats and its effects on neighboring areas. Hunsperger Report at 37-62, 225-52. Mr. Hunsperger also commissioned a fourth, more in-depth opinion survey from Decision Research, which is the Flynn/Slovic survey discussed earlier in this decision. *Id.* at 37, 225. Two of the surveys were conducted soon after the 1989 FBI raid, and the others in 1994 and 1995. *Id.* at 37, 43, 45, 47.

Mr. Hunsperger considered the surveys' results to assess how the public perceived technological, environmental and/or health risks relating to Rocky Flats and the extent of their knowledge concerning these matters. *Id.* at 37-62, 225-52. Based on his review, Mr. Hunsperger concluded the surveys' results indicated that a large majority of the public held a negative perception of Rocky Flats, was concerned about health risks caused by the plant and believed that Rocky Flats had negatively affected property values in the area. *Id.* at 61-62, 251. He further concluded these negative perceptions and concerns were persistent and adversely affected area property values. *Id.*

Mr. Hunsperger also used the results of the housing scenario/discount questions from the Flynn/Slovic survey to estimate the average diminution in value to single-family homes in the Class Area as a result of apprehension about Rocky Flats. *Id.* at 251-52. Based on this calculation and the estimated number of residential properties in the Class Area, Mr. Hunsperger estimated the total diminution in value

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.