**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 05-cv-00377-WDM-BNB

MOISES CARRANZA-REYES

    Plaintiff,

vs.

PARK COUNTY, a public entity of the State of Colorado and its governing board, THE PARK COUNTY BOARD OF COUNTY COMMISSIONERS; PARK COUNTY SHERIFF'S OFFICE, a public entity of the State of Colorado; FRED WEGENER, individually and in his official capacity as Sheriff of Park County, Colorado; MONTE GORE, individually and in his capacity as Captain of Park County Sheriff's Department; VICKIE PAULSEN, individually and in her official capacity as Registered Nurse for Park County, Colorado,

    Defendants.

_____

**PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION
TO EXCLUDE PLAINTIFF'S EXPERT WITNESS, HELEN M. WOODARD, M.A.**
_____

Plaintiff, through his attorneys, Bill Trine and Cheryl Trine of Trine and Metcalf, P.C., hereby responds to Defendants' Motion to Exclude Plaintiff's Expert Witness, Helen M. Woodard, M.A., and respectfully requests that the Motion be denied for the following reasons:

**ARGUMENT**

**I.   MS. WOODARD'S QUALIFICATIONS AS A REHABILITATION COUNSELOR AND LIFE CARE PLANNER ARE NOT DISPUTED.**

Ms. Woodard is qualified to testify to the life care plan that she wrote for the Plaintiff. She received her M.A. from the University of Northern Colorado in Special Education with a major in rehabilitation counseling (see Woodard's CV at 1, **Exhibit 1**). She has been a rehabilitation

1

counselor since 1978, receiving numerous certifications in the field. She has conducted research on rehabilitation and has been published on life care planning issues.

Ms. Woodard testified that she sends people for medical assessments and does not do them herself (see Woodard Depo. at 50-51, **Exhibit 2**). She testified that it is not her job to decide the reason for problems, but instead to find an appropriate provider who can figure it out (see Woodard Depo. at 35, **Exhibit 2**). Her job is to recognize which type medical assessment is appropriate (see Woodard Depo. at 51, **Exhibit 2**). In this case, Ms. Woodard found that the Plaintiff needs an orthopedic, physiatrist, and prosthetist consult, and may need pain management and psychological assessments (see Woodard Depo. at 35-36, **Exhibit 2**).

Defendants do not dispute Ms. Woodard's qualifications as a life care planner. Instead, the Defendants dispute her choice of experts and data used in formulating the life care plan. Because this dispute goes to her methodology, not to her qualifications as a life care planner, the following cases cited by the Defendants are irrelevant.

*Magdaleno v. Burlington Northern R.,* 5 F.Supp.2d 899, 906 (D.Colo. 1998) is irrelevant because no life care plan was involved, and instead an ergonomics expert was proposing to testify to the plaintiff's medical condition and the cause of that condition. Similarly, in *Lifewise Master Funding v. Telebank,* 374 F.3d 917, 928 (10th Cir. 2004), the expert was not allowed to testify to a complex damages model because he was not an expert in damages analysis; had not had any classes in economics, accounting or finance; had no training in damage analysis or economics; and had never published in the field.

Defendants must present evidence that others in the field, other than their own experts, consider the values used to be unreliable. *Cook v. Rockwell Intern.,* Slip Copy, 2006 WL 3533049, 14 (D.Colo. 2006) (unpublished disposition attached as **Exhibit 3**). The *Cook* Court ruled, "That

2

Defendants' experts apparently disagree with Dr. Goble's choices and believe that more accurate results could have been achieved by use of different inputs does not render Dr. Goble's work unreliable and inadmissible under Rule 702." *Id.* Defendants must cite some scientific or legal authority to support their assertion that an expert's methodology and conclusions are unreliable. *Id.* at 19. It is not the court's role to determine as a threshold matter whose methodology is the most reliable. *Id.* at 20. Sufficiency determinations are distinct from admissibility determinations. *Id.* at 25. Where defendants speculate that an expert's sample is not representative, they must present expert or other evidence suggesting this is so. *Id.* at 53.

## II.   *DAUBERT* FINDINGS ARE UNNECESSARY BECAUSE MS. WOODARD DID NOT EMPLOY NOVEL METHODS IN DEVELOPING A LIFE CARE PLAN.

Defendants have failed to meet their threshold burden of showing this is not an "ordinary case where the reliability of an expert's methods is properly taken for granted." *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 152 (1999). A trial judge must have the discretionary authority to "avoid unnecessary 'reliability' proceedings in ordinary cases where the reliability of an expert's methods is properly taken for granted, and to require appropriate proceedings in the less usual or more complex cases where cause for questioning the expert's reliability arises." *Id.* "Indeed, the Rules seek to avoid 'unjustifiable expense and delay' as part of their search for 'truth' and the 'just determin[ation]' of proceedings." *Id.* (citing Fed.R.Evid. 102).

*Daubert* findings are required in the case of a novel medical causation theory which takes the case out of the realm of an ordinary case where the reliability of an expert's methods could properly be taken for granted. *Dodge v. Cotter Corp.,* 328 F.3d 1212, 1229 (10th Cir. 2003). *Daubert's* "four, non-exclusive factors suggested for determining whether an expert's theories are scientifically

3

reliable are 'most relevant in the context of a new and novel scientific theory…" *Hoy v. DRM, Inc.,* 114 P.3d 1268, 1278-79 (Wyo. 2005) (citing *Kumho Tire,* 526 U.S. at 152).

Defendants must demonstrate that a methodology lacks support in the relevant scientific community by calling "'sufficiently into question' the principles, methods, or applications" the expert employed. *McCoy v. Whirlpool Corp.,* Not Reported in F.Supp.2d, 2003 WL 1923016, 7 (D.Kan. 2003) (citing *Daubert v. Merrel Dow Pharms., Inc.,* 509 U.S. 579, 592 (1993)) (*McCoy,* unpublished disposition, attached as **Exhibit 4**). Defendants must articulate how an expert's test is inconsistent with established standards. *McCoy* at 4 (unpublished disposition attached as **Exhibit 4**). "To the extent that different investigators might utilize the same methodologies and arrive at different conclusions, the matter involves the credibility of witnesses and the weighing of the evidence – both of which are well suited for resolution by the jury." *Id.*

Ms. Woodard's methodology in developing Plaintiff's life care plan is not novel. Ms. Woodard testified that first she interviews the client, then she reviews and writes a short summary of the medical records, then she outlines a life care plan based on her experience and the medical records, and finally she begins to contact the treating providers with a particular interest in current providers and current problems. (See Woodard Depo. at 7, **Exhibit 2**).

The following cases illustrate the methodology commonly used and accepted in the field of life care planning. The cases show that life care planners commonly rely on health care providers, medical records, research and statistics, all of which were used by Ms. Woodard in the instant case.

For example, in 1994, Helen Woodard presented a range of reasonable costs for each component of a life care plan for a five-year-old who was severely brain damaged as an infant in *Hill v. U.S.,* 854 F.Supp. 727, 729 (D.Colo. 1994). Woodard's life care plan included medical care for the rest of the plaintiff's life; medications and supplies; personal care; psychological counseling and

4

family support services; case management services; travel and transportation expenses; development assessments; rehabilitation services; special equipment; home modification costs; and future loss in earnings capacity. *Id.* at 729-732. Costs for the plaintiff's medical care were based on designating which specialists the plaintiff would need to visit in order to determine her future care needs, and on the likelihood that she would be hospitalized frequently throughout her life, to which an average of seven days per year was assigned. *Id.* at 729-730.

Further, in *O'Shea v. Welch,* Not Reported in F.Supp.2d, 2002 WL 1974046, *2 (D.Kan. 2002) (unpublished disposition attached as **Exhibit 5**), the life care planner testified she discussed and confirmed the plaintiff's future medical needs with his treating physician. Based on those communications alone, the life care planner projected the amount of future medical expenses the plaintiff would incur. *Id. See also Merryweather v. Callister,* Not Reported in P.3d, 2002 WL 1291987, *2 (Utah App., 2002) (holding analysis used by physician to create a life care plan by discussing future medical needs with treating doctors and researching the costs of the items and services where plaintiff lived not a "newly discovered procedure") (*Merryweather,* unpublished disposition attached as **Exhibit 6**); *Morales v. E.D. Etnyre & Co.,* 382 F.Supp.2d 1273 (D.N.M. 2005) (treating physician who examined the plaintiff, interviewed his wife, evaluated his medical records and consulted life care statistics could testify on future medical expenses but not on retraining, lifestyle changes or special clothing because he was not a trained life care planner).

Also, in *Williams v. Missouri Pacific R.,* 11 F.3d 132, 134 (10th Cir. 1993), both defendant's and plaintiff's witnesses testified plaintiff, who had a below knee amputation would probably be restricted to light or sedentary work without specifying which jobs the plaintiff might perform, and the plaintiff's lost earnings included the possibility that he might never work again, which produced the greatest dollar figure.

The cases cited by Defendants in their Motion do not support Defendants' argument that Ms. Woodard's methods are novel and her conclusions based on speculation. The plaintiff in *Balance v. Wal-Mart Stores, Inc.,* 1999 U.S. App. LEXIS 18995 (4th Cir. 1999), had a progressive disease. Two life care plans were presented: one based on a scenario in which the plaintiff had a recommended surgery and her condition stabilized, and the other assumed she became wheelchair-bound. *Id.* at 3. In that case, medical experts testified to the eventual consequences of the disease and the treatment options available as part of the case in chief. *Id.* at *16-17. The *Balance* Court did not rule that a life care plan must be based on the assessments of medical experts to be reliable.

Similarly, the court in *Joseph Israel v. Springs Industries, Inc.,* 2006 U.S. Dist. LEXIS 80863, 26-27 (E.D.N.Y. 2006), criticized the life care plan because it relied on inadequate conclusions about causation; it did not attempt to separate out which costs related to which conditions; and the physician who completed the life care plan did not speak with any treating physicians or review any medical records in formulating the plan. *Id.* at 25. The court found the physician's opinion that the plaintiff would be "virtually unemployable" to be speculation because the physician was not a vocational specialist and did not explain the foundation for his conclusory conclusion. *Id.* at 32.

Finally, *Garay v. Missouri Pacific R.,* 60 F.Supp.2d 1168, 1173 (D.Kan. 1999) is distinguishable from the present case because in that case the expert wholly failed to take into account the fact that illegal status could potentially preclude future employment in the U.S. In the present case, Ms. Woodard took into account the fact that Plaintiff might return to Mexico and fully explained her methodology and reasoning for the conclusions she reached.

### III. DEFENDANTS' CRITICISMS GO TO THE WEIGHT, NOT THE ADMISSIBILITY OF THE LIFE CARE PLAN.

In the present case, the Defendants claim Ms. Woodard's life care plan, which identifies which assessments need to be made throughout the Plaintiff's life, must be based on assessments by medical experts rather than on the recommendations of the current treating medical care provider, medical records, interviews with the patient and the planner's own expertise. Without providing any scientific or legal evidence that life care planning is a novel methodology or that Ms. Woodward's methodology differs from that used by others in her field, the Defendants' complaints go to the weight, not admissibility of evidence.

"Perceived flaws in expert's testimony, including that an expert relied on an allegedly unreliable opinion by another expert, 'are matters properly tested in the crucible of adversarial proceedings; they are not the basis for truncating that process.'" *Cook v. Rockwell Intern.,* Slip copy, 2006 WL 3533049, 14 (D.Colo. 2006) (citing *United States v. 0.161 Acres of Land,* 837 F.2d 1036, 1039-41 (11th Cir. 1988) (*Cook,* unpublished disposition attached as **Exhibit 3**). "[V]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert,* 509 U.S. at 596.

In the instant case, Defendants complain about Ms. Woodard's scope of analysis and which details must be included in a life care plan without showing that Ms. Woodard's methodology differs from others in her field. As a result, their complaints go to the weight and not the admissibility of Ms. Woodard's testimony. Where the Defendants complain that Ms. Woodard's employee conducted interviews and that all Ms. Woodard's information must be verified for accuracy, this complaint goes to the quality, not quantity, of data and is not cognizable under *Daubert.*

"By its terms, the *Daubert* opinion applies only to the qualifications of an expert and the methodology or reasoning used to render an expert opinion." *U.S. v. Lauder,* 409 F.3d at 1264

(citing *Daubert*, 509 U.S. at 592-93). "Daubert generally does not, however, regulate the underlying facts or data that an expert relies on when forming her opinion." *Id.* (citing Fed.R.Evid. 703) ("The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing"). The reference to "sufficient facts or data" in Federal Rule of Evidence 702 refers to a quantitative rather than a qualitative analysis. *Id.* at 1264, FN 5 (citing Fed.R.Evid. 702 advisory committee notes (2000 amends.)).

Further, subjectivity in data does not necessarily make the resulting opinion untenably speculative if the underlying data is of the type generally relied on by other practitioners; any potential bias therein can be fully explored on cross-examination or by presentation of competing evidence. *Potter ex rel. Potter v. Bowman,* Slip Copy, 2006 WL 3760267, 2 (D.Colo. 2006) (citing *Daubert* 113 S.Ct. at 2797-98) (*Potter,* unpublished disposition attached as **Exhibit 7**).

Also, Defendants complain that an analysis that includes the Plaintiff's current residence is irrelevant if a possibility of moving to Mexico exists. In contrast, the Tenth Circuit has set the standard for the relevancy/fit requirement by reference to Federal Rule 401, which defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *Cook* at *5 (unpublished disposition attached as **Exhibit 3**) (citing *Bitler v. A.O. Smith Corp.,* 400 F.3d 1227, 1234 (10th Cir. 2004), quoting Fed.R.Evid. 401). Evidence "need not be conclusive or highly probative to satisfy Rule 401 – "even a minimal probability" that the asserted fact exists will suffice. *Cook* at *8 (citing *United States v. McVeigh,* 153 F.3d 1166, 1190 (10th Cir. 1998)) (*Cook,* unpublished disposition attached as **Exhibit 3**). There is at least a minimal probability that the Plaintiff in the present case will remain in the U.S. rather than return to Mexico. Ms. Woodard testified the Plaintiff's legal status is still undecided (see Woodard Depo. at 74, **Exhibit 2**).

8

She has had many clients here illegally who remained in the U.S. because they became citizens or because of their medical situation (see Woodard Depo. at 37, **Exhibit 2**).

Finally, the Defendants in the present case complain that in order for Ms. Woodard's opinions to have a scientific basis, she must have empirically tested for erroneous results by determining whether former clients eventually needed every recommendation that she made. However, the burden is on the Defendants to provide some evidence that life care planning is a novel methodology or principle, for which "testing" might be required. The Defendants misconstrue *Daubert* as requiring testing in every situation. In this case, such testing would be inappropriate because, as Ms. Woodard testified, to the extent litigation is a compromise and there is not enough money, people get fewer services than needed or recommended (see Woodard Depo. at 119, **Exhibit 2**).

Ms. Woodard is well qualified, by education and experience, to evaluate Plaintiff's needs for services in a life care plan. During her career, she has had over 100 clients with amputations and neuropathic pain and currently has 6-8 clients with amputations in her caseload (see Woodard Depo. at 117, **Exhibit 2**). So-called "additional testing" is not necessary or even helpful to determine Ms. Woodard's reliability. A trial court may consider one or more of the more specific factors that *Daubert* mentioned when doing so will help determine that testimony's reliability. *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. at 141. The test of reliability is flexible and *Daubert's* list of specific factors neither necessarily nor exclusively applies to all experts or in every case. *Id.*

Further, "[The reliability] step of the analysis does not require that all theories must be proven by tests specific to the facts in question." *Hoy,* 114 P.3d at 1279. Where testimony is generally consistent with national standards regarding appropriate methodology, then there is no need for independent testing. *McCoy* at 2 (attached as **Exhibit 4)**. The law does not require an

9

expert to back his or her opinion with independent tests that unequivocally support his or her conclusions. *Id.* at 3 (attached as **Exhibit 4**). See *Bonner v. ISP Techs., Inc.,* 259 F.3d 924 (8th Cir. 2001). Where an expert otherwise reliably utilizes scientific methods to reach a conclusion, lack of independent testing may go to the weight, not the admissibility. *Zuchowicz v. United States,* 140 F.3d 381, 387 (2nd Cir. 1998).

The Supreme Court has held that an expert may draw a conclusion from a set of observations based on extensive and specialized experience. *Kumho,* 526 U.S. at 156. Experts may testify based on experience alone, or experience in conjunction with other knowledge, skill, training or education where the methodology used is explained in detail. *U.S. v. Jones,* 107 F.3d 1147 (6th Cir. 1997). Reliability may be established by reference to the expert's experience with similar situations if there is some explanation of how that experience and knowledge renders the proffered opinion reliable. *Hoy v. DRM, Inc.,* 114 P.3d at 1283.

Also, "[E]vidence of adherence to a practice within an industry implies a significant degree of reliability." *Hynes v. Energy West, Inc.,* 211 F.3d 1193, 1205 (10th Cir. 2000). See *Tassin v. Sears, Roebuck, & Co.,* 946 F.Supp. 1241, 1248 (M.D.La. 1996) (design engineer's testimony can be admissible when the expert's opinions "are based on facts, a reasonable investigation, and traditional technical/mechanical expertise, and he provides a reasonable link between the information and procedures he uses and the conclusions he reaches").

**IV.   MS. WOODARD'S LIFE CARE PLAN IS SUPPORTED BY RELIABLE AND RELEVANT EVIDENCE.**

To support her vocational assessment, Ms. Woodard did a survey in Mexico of problems that people with similar disabilities have in obtaining and retaining employment (see Woodard Depo. at 7-8, **Exhibit 2**). She analyzed the employment opportunities for Plaintiff in both the U.S. and

10

Mexico (see Woodard Depo. at 8, **Exhibit 2**). For a life care plan, Ms. Woodard analyzed what Plaintiff will need in terms of medical equipment, supplies and assistance over the course of his lifetime (see Woodard Depo. at 8-9, **Exhibit 2**).

As a rehabilitation counselor, she is authorized to arrange and attend medical or therapy appointments with her clients and make arrangements for follow-up, including the purchase of equipment or technology, and to write authorizations for funding (see Woodard Depo. at 9-10, **Exhibit 2**).

Ms. Woodard testified she based Plaintiff's current status on information from him, from his current treatment provider and from his current medical records at Clinica Campesina (see Woodard Depo. at 43, **Exhibit 2**). She included in her report the recommendations and information provided by the Plaintiff's current medical provider, Ms. Poppish (see Woodard Depo. at 18, **Exhibit 2**). Ms. Poppish testified that she is licensed to diagnose and treat illness, write prescriptions and manage patients as a primary care provider without needing a physician to countersign her orders (see Poppish Depo. at 8, **Exhibit 8**). Furthermore, Ms. Poppish testified that she is the Plaintiff's primary care provider (see Poppish Depo. at 13, **Exhibit 8**). The Plaintiff has no other current treatment providers (see Poppish Depo. at 35-36, **Exhibit 8**).

Defendants claim that Ms. Poppish, a licensed nurse practitioner, is not competent to project Plaintiff's future medical needs. However, Ms. Poppish testified that it is within her area of expertise to recommend consults with medical experts (see Poppish Depo. at 68, **Exhibit 8**). She testified that it is within her scope of practice to develop a treatment plan that may include collaboration with other providers (see Poppish Depo. at 72-73, **Exhibit 8**).

Ms. Poppish did in fact determine that the Plaintiff needs orthopedic, rehabilitation services, chronic pain, and possibly neurologist consults (see Poppish Depo. at 69, **Exhibit 8**). He is not

11

getting those consults due to his finances (see Poppish Depo. at 64, **Exhibit 8**). She testified that the Plaintiff needs a full workup with a team of specialists including frequent consults with an orthopedic surgeon or orthopedist (see Poppish Depo. at 65-66, **Exhibit 8**). In addition, she testified the Plaintiff needs a specialist to determine his adaptive equipment needs and he needs regular counseling, including possibly cognitive behavioral counseling (see Poppish Depo. at 70-71, **Exhibit 8**). The pain specialist at the clinic, Dr. Wu, felt that the Plaintiff's pain was the result of damaged nerve endings and that he needed a surgical consult and possibly reconstructive surgery around the amputation site to repair nerve ends because of the horrible pain at the amputation site upon urination (see Poppish Depo at 51-52, **Exhibit 8**).

The Defendants complain that Ms. Woodard provided no reasoning or facts indicating why Plaintiff cannot receive appropriate medical treatment in Mexico and ignore that he would likely live in Mexico. In contrast, Ms. Woodard testified that the life care plan would remain the same whether the Plaintiff is in the U.S. or not, with only the costs and range of costs conceivably changing (see Woodard Depo. at 53, **Exhibit 2**). Ms. Woodard explained that while many of the services in the Plaintiff's plan are available in Mexico, availability depends to a large extent on where the Plaintiff is living because access to technology is more of an issue and because parts of the country are inaccessible to someone with even a mild mobility impairment (see Woodard Epo. At 53-54, **Exhibit 2**). She testified that even in Mexico City, finding medical specialists and being able to get to them due to mobility limitations could be a huge problem (see Woodard Depo. at 54, **Exhibit 2**). Because the Plaintiff would probably be treated in Level I hospitals as his condition is not acute or unusual, Ms. Woodard estimates he will probably spend a lot of time trying to get services (see Woodard Depo. at 54-55, **Exhibit 2**).

12

Ms. Woodard also testified that the Plaintiff can receive medical care under Mexico's national medical system or can purchase private care in Mexico, which would be somewhat cheaper than in the U.S., but would be harder to access without U.S. dollars (see Woodard Depo. at 45, **Exhibit 2**). She found some physicians don't participate in the national health care system (see Woodard Depo. at 46-67, **Exhibit 2**). Ms. Woodard looked for private health insurance for private care in Mexico, but could not find it (see Woodard Depo at 47, **Exhibit 2**). She based here analysis of how Mexican health care is provided and what resources are available on 86 pages of data that she provided to Defendants (see Woodard Depo. at 71, **Exhibit 2,** and pp. 148-234, **Exhibit 9**)

Ms. Woodard did not ignore the possibility that the Plaintiff would live in Mexico. She explained that she would recommend classes in English as a Second Language (ESL), math and reading whether he is in the U.S. or Mexico (see Woodard Depo. at 55-56, **Exhibit 2**). She explained that ESL classes are necessary even if he goes to Mexico because they will give him the ability to communicate if he gets treatment in other countries (see Woodard Depo. at 56, **Exhibit 2**).

The Defendants complain that there is a conflict in the testimony over the cost of medical services and equipment in Mexico. However, Ms. Woodard explained that although some research says costs are 66% less in Mexico, she found in her research that costs are actually about 48% less in Mexico with big variations based on different aspects of care (see Woodard Depo. at 62, **Exhibit 2**). Relying on disputed facts does not render an expert's opinion unreliable (*Cook,* at 7, unpublished disposition attached as **Exhibit 3**). This goes to the weight of testimony, not its admissibility.

The Defendants claim Ms. Woodard failed to obtain cost information for medical equipment in Mexico. Ms. Woodard testified that she created a cost comparison for medical services for the U.S. and Mexico, using some prices that were quoted in U.S. dollars and by converting others to U.S. dollars (see Woodard Depo. at 61, **Exhibit 2**). Ms. Woodard performed 66 pages of cost

13

estimates and comparisons, which were provided to Defendant (see pp. 2-68, **Exhibit 9**). However, Ms. Woodard testified that she did not include Mexican costs for equipment in her life care plan because it was unnecessarily complicated while making up only a small part of the life care plan (see Woodard Depo. at 63-67, **Exhibit 2**). In addition, she testified that the Plaintiff would still probably want U.S. technology in Mexico, especially prosthetics (see Woodard Depo. at 46-47, **Exhibit 2**), and that all the equipment listed in the life plan is available in Mexico, but may be ordered from the U.S. (see Woodard Depo. at 57, **Exhibit 2**). Ms. Woodard calculated prices for equipment based on a range of costs (see Woodard Depo. at 57, **Exhibit 2**).

A criticism of the scope of the focus goes to the credibility and weight of the analysis, "and does not render the analysis inadmissible." (*Cook* at 55, unpublished disposition attached as **Exhibit 3**). The fact that an expert does not know specific details does not necessarily make him unqualified to testify. (*Mcoy* at 1, unpublished disposition attached as **Exhibit 4**). "[G]aps or inconsistencies in an expert's reasoning may go to the weight of the expert evidence, not its admissibility." (*Cook,* at *6, unpublished disposition attached as **Exhibit 3**) (see *Campbell v. Metro. Prop. & Cas. Ins. Co.,* 239 F.3d 179, 186 (2nd Cir. 2001). "Maintaining this distinction between the evidentiary requirement of reliability and the higher standard of whether the expert's conclusions are correct or sufficient to prove the merits 'is indeed significant as it preserves the fact finding role of the jury.'" (*Cook,* at *6, unpublished disposition attached as **Exhibit 3**).

The Defendants complain that Ms. Woodard did not conduct a vocational assessment. However, Ms. Woodard testified she conducted a vocational assessment, including a survey in Mexico of problems that people with similar disabilities have in obtaining and retaining employment (see Woodard Depo. at 7-8, **Exhibit 2**). She explained that an assessment is based on a person's education, residence, and the kinds of jobs available for someone with their limitations (see Woodard

14

Depo. at 8, **Exhibit 2**). She found the Plaintiff would have to get an unskilled, sedentary job, whereas most sedentary, unskilled jobs have fled overseas, not to Mexico (see Woodard Depo. at 88-89, **Exhibit 2**). She testified that the Plaintiff would have a better chance of working if he stays in the U.S., and that if he got some English and skills training, obtained a green card, and resolved his medical problems, he could probably find some kind of work in the U.S. for 20 to 40 hours per week (see Woodard Depo. at 95-96, **Exhibit 2**). Ms. Woodard gathered 100 pages of data on the U.S. labor market (see pp. 314-414, **Exhibit 9**).

The Defendants claim that Ms. Woodard's opinion on employment must be grounded in some actual data that can be verified or contradicted by others in the field and that her opinion is not supported by any such data because it is not based on the most current labor market data in Mexico. In contrast, Ms. Woodard testified to having 47 pages of Mexican economic data (see Woodard Depo. at 71, **Exhibit 2**). As a result, she based her opinion on actual data, all of which was provided to Defendants (see pp. 98-147, **Exhibit 9**). Furthermore, Ms. Woodard testified she has done 20-30 labor market surveys of the U.S. over the past 10 years, all involving mobility impairments (see Woodard Depo. at 96-97, **Exhibit 2**) and she has surveyed Mexico about 6 times during the last 10 or 12 years, most recently in 2004 (see Woodard Depo. at 16-17, **Exhibit 2**). Defendants' criticisms go to the quality, not quantity, of the data relied upon. See *U.S. v. Lauder,* 409 F.3d at 1264, FN 5 (finding the reference to "sufficient facts or data" in Federal Rule of Evidence 702 refers to a quantitative rather than a qualitative analysis). Furthermore, Ms. Woodard relied in part on her lengthy experience with similar situations through the numerous labor market surveys she has conducted. Reliability may be established by reference to the expert's experience with similar situations if there is some explanation of how that experience and knowledge renders the proffered

15

opinion reliable. *Hoy v. DRM, Inc.,* 114 P.2d at 1283. The Defendants' criticisms go to the weight, not admissibility, of testimony.

## **CONCLUSION**

For all of the reasons above-stated, Defendants' Motion to Exclude Plaintiff's Expert Witness, Helen M. Woodard, M.A., should be denied.

Dated this _30th_ day of January, 2007.

    Respectfully submitted,


By: s/ William A. Trine, Esq.___
    William A. Trine, #577
    Cheryl L. Trine, #38150
    Trine & Metcalf, PC
    1435 Arapahoe Avenue
    Boulder Colorado 80302-6390
    (303) 442-0173

    Joseph J. Archuleta, #19426
    Joseph J. Archuleta and Associates
    1724 Ogden Street
    Denver Colorado 80218
    (303) 837-1642

    Lloyd C. Kordick, #6298
    Lloyd C. Kordick & Associates
    805 S. Cascade Avenue
    Colorado Springs Colorado 80903
    (719) 475-8460

    Adele Kimmel, Esq.
    Trial Lawyers for Public Justice
    1717 Massachusetts Avenue, N.W.
    Suite 800
    Washington, D.C. 20030
    (202) 797-8600

    Attorneys for Plaintiff

### **CERTIFICATE OF MAILING/SERVICE**

The undersigned hereby certifies that on this _30th_ day January, 2007, a true and correct copy of the foregoing pleading was e-served via Electronic Case Filing and/or placed in the United States Mail, postage prepaid, and properly addressed to:

Joseph Archuleta
Attorney at Law
1724 Ogden Street
Denver, Colorado 80218-1018
*Co-Counsel for Plaintiff*

Lloyd C. Kordick,
Attorney at Law
805 S. Cascade
Colorado Springs, CO 80903
*Co-Counsel for Plaintiff*

Adele P. Kimmel
Richard H. Frankel
Trial Lawyers for Public Justice
1717 Massachusetts Avenue, N.W.
Suite 800
Washington, D.C. 20030
*Co-Counsel for Plaintiff*

Andrew Ringel
Jennifer L. Veiga
Hall & Evans
1125 17th Street, Suite 600
Denver, CO 80202-2052
*Counsel for Defendant Park County, Park County Board of*
*County Commissioners, Park County Sheriff's Office,*
*Fred Wegener, and Monte Gore*

Josh A. Marks
Berg, Hill, Greenleaf & Ruscitti
1712 Pearl Street
Boulder, CO  80302
*Counsel for Defendant Vicki Paulsen*

s/ Elizabeth Peach