**1**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Case No. 2005-WM-377 (BNB)

DEPOSITION OF:  HELEN M. WOODARD, M.A.
July 12, 2006

MOISES CARRANZA-REYES,
Plaintiff,

v.

PARK COUNTY, a public entity of the State of Colorado and
its governing board, THE PARK COUNTY BOARD OF COUNTY
COMMISSIONERS; PARK COUNTY SHERIFF'S OFFICE, a public
entity of the State of Colorado; FRED WEGENER,
individually and in his official capacity as Sheriff of
Park County, Colorado; MONTE GORE, individually and in
his capacity as Captain of Park County Sheriff's
Department; VICKIE PAULSEN, individually and in her
official capacity as Registered Nurse for Park County,
Colorado; JAMES BACHMAN, M.D., individually and in his
official capacity as Medical Director of the Park County
Jail,

Defendants.

TAKEN PURSUANT TO NOTICE on behalf of the Defendant Park
County at 1435 Reed Street, Lakewood, Colorado 80214-5368
at 4:04 p.m. before Sylvia E. Noneff, Registered
Professional Reporter and Notary Public within Colorado.

**2**

APPEARANCES

For the Plaintiff:        JOSEPH J. ARCHULETA, ESQ.
                         Law Office of Joseph J. Archuleta
                         1724 Ogden Street
                         Denver, Colorado 80218

For the Defendants       ANDREW D. RINGEL, ESQ.
Park County, Park        Hall & Evans, LLC
County Board of          1125 17th Street
Commissioners, Park      Suite 600
County Sheriff's         Denver, Colorado 80202
Office, Wegener and
Gore:

For the Defendant        MELANIE B. LEWIS, ESQ.
Paulsen:                 Berg Hill Greenleaf & Ruscitti LLP
                         1712 Pearl Street
                         Boulder, Colorado 80302

For the Defendant        ANDREW W. JURS, ESQ.
Bachman:                 Johnson McConaty & Sargent, P.C.
                         400 South Colorado Boulevard
                         Suite 900
                         Glendale, Colorado 80246

Also Present:            None

**3**

                                I N D E X
EXAMINATION OF HELEN M. WOODARD, M.A.:              PAGE
July 12, 2006

By Mr. Archuleta                                     ---

By Mr. Ringel                                         4

By Ms. Lewis                                        115

By Mr. Jurs                                         106

                                                  INITIAL
DEPOSITION EXHIBITS:                              REFERENCE
46  Curriculum vitae of Helen M. Woodard, M.A.        5
47  Federal and State District Court Testimony        5
    of Helen M. Woodard, 1/3/02 - 4/20/06

48  Preliminary Report by Woodard and Morgan         22
    re Carranza-Reyes, 4/28/06; Preliminary
    Life Care Plan re Carranza-Reyes, 4/28/06

49  Woodard's medical records re Carranza-           23
    Reyes, various dates
50  Pacey's handwritten notes of telephone           93
    conversation with Woodard re Carranza-Reyes,
    5/13/06
(Original exhibits attached to original deposition; copy
exhibits included in continuing exhibit file; copies
provided to counsel as requested.)

REQUESTED PORTIONS OF TESTIMONY:                    PAGE

(None.)

REFERENCES TO EXHIBITS MARKED PREVIOUSLY:
(None.)

**4**

1       WHEREUPON, the within proceedings were taken
2   pursuant to the Federal Rules of Civil Procedure:
3       HELEN M. WOODARD, M.A.,
4   having been first duly sworn to state the whole truth,
5   was examined and testified as follows:
6           EXAMINATION
7   BY MR. RINGEL:
8       Q.  Good afternoon, Ms. Woodard.
9       A.  Hi.
10      Q.  We met off the record. My name is Andrew
11  Ringel. I represent the Board of County Commissioners of
12  Park County, Sheriff Fred Wegener, and now-Undersheriff
13  Monte Gore in a lawsuit brought by Moises Carranza-Reyes
14  that we're here today to discuss. Would you state your
15  full name for the record, please.
16      A.  Helen M. Woodard.
17      Q.  Ms. Woodard, I know you've probably had your
18  deposition taken hundreds of times, so I'm not going to
19  spend time going over the rules because I know you know
20  them. But what I would ask you is, if you don't
21  understand one of my questions, tell me that, and I will
22  repeat it or rephrase it. If you answer my question, I'm
23  going to assume that you understood it. Is that fair?
24      A.  Sure. Sometimes you know by the answer that
25  I misunderstood it.

Coffman Reporting

303.893.0202
303.893.2230 FAX
WWW.COFFMANREPORTING.COM

EXHIBIT
2

Pages 1 to 4

* SUBJECT TO CONFIDENTIALITY DESIGNATIONS *

5

```
1      Q.    That's true, absolutely.  Okay.
2            MR. RINGEL:  This, I believe, is 46.  We
3   marked 45 this morning, right?
4            MR. JURS:  Yes, I believe we did.
5            (Deposition Exhibit 46 was marked.)
6      Q.    (BY MR. RINGEL) Ms. Woodard, directing your
7   attention to what's been marked for purposes of this
8   deposition as Exhibit 46, can you identify this document
9   for me?
10     A.    This is the curriculum vitae that I am using
11  presently.
12     Q.    It's your current CV; is that correct?
13     A.    I believe so, yes.
14     Q.    All right.  And it's accurate; is that fair?
15     A.    Yes.
16           (Deposition Exhibit 47 was marked.)
17     Q.    Directing your attention, Ms. Woodard, to
18  what's been marked for purposes of this deposition as
19  Exhibit 47, can you identify this document for me?
20     A.    This is a list of my trial testimony for the
21  last four years, and it's both trials and depositions,
22  and it was last updated April 20, 2006.
23     Q.    And that update is reflected on page 39, the
24  last page of this document; is that correct?
25     A.    Yes.
```

6

```
1      Q.    And I assume that this is your most recent
2   one; is that true?
3      A.    Well, my secretary updates it every time I
4   do something --
5      Q.    Okay.
6      A.    -- and so if you asked for one that was
7   current, it would have a few more things on it.
8      Q.    And then after today, at some point it will
9   have today's deposition on it as well?
10     A.    Once she gets back from vacation.
11     Q.    Understood.  But other than its date, it was
12  accurate as of April 20, 2006, the date that this list
13  was generated?
14     A.    Yes.
15     Q.    And it reflects your trial and deposition
16  testimony from 2002 to April 20th of '06?
17     A.    Yes.
18     Q.    Okay.  What I want to understand, you
19  created a life care plan for Moises Carranza-Reyes that's
20  the subject of your expert opinion in this case; is that
21  correct?
22     A.    Yes.  I did a vocational assessment and a
23  life care plan.
24     Q.    Okay.  Can you describe for me your general
25  methodology for creating a vocational assessment and life
```

7

```
1   care plan for an individual such as Mr. Carranza-Reyes?
2      A.    We use a pretty straightforward process.
3   And so typically I see the client and interview them, try
4   to get an understanding from their perspective of what
5   their problems are, what the history is, look at the
6   basic psychosocial issues, and then the history of the
7   disability and the history of their treatment.
8            And following that, I review medical
9   records -- that's what's sitting on the corner of this
10  desk -- and do a short summary of medical records.  I
11  mean, sometimes a short summary is still pretty long --
12  and then outline a life care plan based on my experience
13  and the medical records and begin to make contacts with
14  the treating people in the case.
15           And I'm particularly interested in current
16  treaters of the client, because those are the people who
17  usually have been seeing them about what their current
18  problems are.  And that's what we did in this case.
19     Q.    Okay.
20     A.    As part of that, we did a vocational
21  assessment with testing and a survey in Mexico of
22  problems that people with disabilities have in obtaining
23  and retaining employment, and we also looked at some of
24  the issues here.
25     Q.    Persons with disabilities such as Mr.
```

8

```
1   Carranza-Reyes has?
2      A.    Yes.
3      Q.    Or if it -- I mean, I don't know.  Would
4   you -- is it fair to call it a disability, or should it
5   be characterized as limitations, or both?
6      A.    Well, it depends on how you want to talk
7   about it, but it's a disability.  Having a lower
8   extremity amputation is a disability, and he has
9   limitations as a result.  And when you superimpose those
10  kinds of issues in the economy different things happen,
11  depending on how well that person is educated, where they
12  live, what kinds of jobs are available in the places
13  where they live.
14     Q.    Okay.  What is -- what kind of data do you
15  need to create a -- to do a vocational assessment and a
16  life care plan?  And let me back up.  When you talk about
17  the vocational assessment, is that the piece of
18  vocational testing and then the analysis of, given his
19  disability and resulting limitations, what employment he
20  could have in both the United States and Mexico?
21     A.    Yes.
22     Q.    Okay.  And then the life care plan would be
23  the part of your analysis which is what he will need in
24  terms of medical equipment, supplies, social, personal
25  assistance and medical assistance over the course of the
```

*  SUBJECT TO CONFIDENTIALITY DESIGNATIONS  *

Carranza-Reyes v. Park County

Helen M. Woodard, M.A.

**9**

1  remainder of his lifetime?
2      A.   Yes, and assistance with other psychosocial
3  issues, like you have to solve issues of transportation.
4  And you need to try to figure out how that person can
5  return to having some kind of quality of life, so that
6  they have some recreational opportunities and leisure
7  opportunities and, hopefully, the opportunity to do what
8  all the rest of us want to do, which is usually, you
9  know, get married, raise families, work.
10     Q.   Understood. Lead as normal life as
11  possible, given the individual's disabilities and
12  limitations resulting from those disabilities?
13     A.   In their particular circumstances.
14     Q.   Okay. Do you think of a vocational
15  assessment, as we've just talked about it, and a life
16  care plan, as we've talked about it, as different things,
17  or are they part and parcel of the same kind of analysis
18  that you would typically do?
19     A.   I think of them as separate analysis --
20  analyses, although they overlap, and the skills that you
21  need to do them overlap. And so when you look at what it
22  is that rehabilitation counselors do in various settings,
23  they help people get to medical appointments, they go to
24  the doctor with them, they try to make arrangements for
25  the follow-up, whether it's purchase of equipment or

**10**

1  purchase of technology, they set up therapy appointments,
2  they may go to therapy appointments with the client if
3  that's necessary, and they oftentimes write
4  authorizations for funding those things.
5          And with life care planning, you're looking
6  at optimizing someone's ability to function with their
7  disability. And so not only do you need to know about
8  what the costs are of things that are basic, but you also
9  need to look at what's necessary to enable that person to
10  have the same kind of lifestyle that he would have had
11  absent the disability, or the opportunity for the same
12  kind of lifestyle.
13     Q.   Okay. The process that you described for me
14  at the outset of this discussion, I assume you followed
15  that in the case of Mr. Carranza-Reyes; is that correct?
16     A.   Pretty much.
17     Q.   And how consistently have you followed that
18  general methodology for the years that you've been doing
19  life care and vocational -- life care plans and
20  vocational assessments?
21     A.   I've been doing this since 1970, and it's --
22     Q.   Is it basically the same methodology?
23     A.   It's basically the same means of gathering
24  information.
25     Q.   Okay.

**11**

1      A.   And, you know, over the years -- when I
2  first started doing this, if I traveled someplace to see
3  a client, I had to bring back a telephone book so I'd
4  have local phone numbers. Now we can actually get them
5  on the Internet, so technology changes us, too. But, you
6  know, it's basically the same kind of information that
7  you're trying to get.
8      Q.   Okay. What -- can you give me a sense of
9  whether this particular life care plan and vocational
10  assessment for Mr. Carranza-Reyes, how it was in
11  comparison to others that you've done in terms of level
12  of complexity and complication?
13     A.   Well, this is not a very complicated life
14  care plan --
15     Q.   Okay.
16     A.   -- if you compare it to plans for children
17  who have cerebral palsy and, you know, G. tubes and
18  traches and things like that, or to people who have
19  spinal cord injuries. So it's not particularly
20  complicated in that regard.
21     Q.   Okay. About how many hours did you spend
22  creating -- or doing the analysis that was required and
23  ending up with the report that we will look at?
24     A.   Well, we have a lot of hours in this --
25     Q.   Understood.

**12**

1      A.   -- in part because Mr. -- what are we going
2  to call him for the purposes of the deposition?
3      Q.   Mr. Carranza-Reyes is how I call him.
4      A.   Okay. We will call him his whole name,
5  then. Because he doesn't speak English --
6      Q.   Right.
7      A.   -- and so we've had an interpreter in the
8  interviews. We had an interpreter for the testing. And
9  that always makes things take quite a lot longer. And
10  then we hired an interpreter to come and to help us get
11  information when we were looking at Mexican employment
12  issues. So we have quite a lot of time in this. I would
13  suppose more than 40 hours.
14     Q.   Okay. And I understood that you supervise
15  others on your team in doing what you need to do to do a
16  life care plan and vocational assessment; is that true?
17     A.   Yes.
18     Q.   Who else worked on this particular file?
19     A.   Well, Scott Smith did the vocational
20  assessment in terms of the testing. He did the actual
21  testing. And Char Morgan, Charlene Morgan, was the other
22  counselor assigned to this case.
23     Q.   And it's your practice to assign yourself
24  and another counselor to all your cases?
25     A.   No. Sometimes I'm not on the case at all.

* SUBJECT TO CONFIDENTIALITY DESIGNATIONS *

13

1 One of the other counselors is, and she has someone
2 assigned to her.
3    Q.   Got it. But two counselors for every case?
4    A.   Yes.
5    Q.   And how many counselors work here?
6    A.   Nine -- well, two of them aren't working
7 because they just had babies, but they're coming back.
8    Q.   Understood. Okay. And how long has Miss
9 Morgan worked with you?
10   A.   I think she's been here three years, maybe a
11 little bit longer than that, even.
12   Q.   And during -- does she have prior experience
13 being a counselor? I guess it would be a rehabilitation
14 counselor.
15   A.   She did not. She has training in case work.
16   Q.   Okay.
17   A.   And I can't remember what her undergraduate
18 agree is offhand. And then I trained her in life care
19 planning --
20   Q.   Right.
21   A.   -- and she's been to some seminars.
22   Q.   About how many life care plans has Miss
23 Morgan assisted you with?
24   A.   She probably has a better idea of that than
25 I do, but I suppose 40.

14

1    Q.   How many would you -- how many life care
2 plans would this office produce on an annual basis? Do
3 you have any idea?
4    A.   We don't have any idea. We just do whatever
5 walks in the door, and I don't have any way of keeping
6 track of that.
7    Q.   I understand. And is it fair to say that
8 this office does life care plans in contexts other than
9 litigation?
10   A.   Yes.
11   Q.   Many other contexts?
12   A.   There are quite a few other contexts at this
13 point. There didn't used to be, but there are now.
14   Q.   Understood. Does Mr. Smith work with you
15 here as well in this building?
16   A.   Yes.
17   Q.   And how long has he worked with you?
18   A.   I think he's been here about two years or
19 two and a half years.
20   Q.   And his role is to do vocational testing?
21   A.   He does vocational testing primarily, and
22 then he does some surveys, labor market surveys.
23 Sometimes he does cost surveys.
24   Q.   All right. And then I believe that the
25 interpreter was a woman named Deena Valenzuela; is that

15

1 right?
2    A.   Yes.
3    Q.   Did anybody else serve as an interpreter?
4    A.   No.
5    Q.   Ms. Valenzuela helped with contact with Mr.
6 Carranza-Reyes to communicate with him?
7    A.   Exactly.
8    Q.   And then helped with surveying information,
9 presumably in conjunction with Miss Morgan, for data out
10 of Mexico?
11   A.   That's right.
12   Q.   I understand. Okay. Have you ever done a
13 life care plan involving the kind of data that we're
14 talking about here with the country of Mexico before?
15   A.   Yes.
16   Q.   How many?
17   A.   It's not real common, but I've probably had,
18 in the course of the last 10 or 12 years, half a dozen.
19   Q.   Would there be any way, if you refer to
20 Exhibit 47, that you could tell me any that involved
21 that, that are on this list or --
22   A.   Well, if they happen to be on the list.
23   Q.   Because they may or may not be, because they
24 may not have involved testimony?
25   A.   Right.

16

1    Q.   Okay.
2    A.   I know one of them didn't involve testimony
3 because the client died before anything happened. But we
4 did all the work before he died --
5    Q.   Sure.
6    A.   -- and I visited him in a small town outside
7 of Guadalajara. So I can think of that one, but I don't
8 remember his name offhand.
9    Q.   And do you remember any of the names of the
10 10 or 12 that -- or half a dozen that you're talking
11 about over the past 10 or 12 years?
12   A.   I don't really.
13   Q.   Okay. Or any of the lawyers that may have
14 been involved?
15   A.   That would be even less likely.
16   Q.   I know that the bar is less memorable to you
17 than a client, and I think that is a good thing.
18   A.   Well, that's because I spend much less time
19 with the attorneys --
20   Q.   I understand.
21   A.   -- than with the clients.
22   Q.   I understand. Okay. Before this one, do
23 you remember the last one in terms of time, when it might
24 have been that you did a life care plan or a vocational
25 assessment that involved obtaining data from Mexico?

* SUBJECT TO CONFIDENTIALITY DESIGNATIONS *

Carranza-Reyes v. Park County                                                Helen M. Woodard, M.A.

---

17

1   A.   Well, it would have been the one where the
2   fellow died.
3   Q.   Okay. And what year was that?
4   A.   It was probably not last year, but the year
5   before. Probably it was 2004.
6   Q.   Okay. And the one before that, do you have
7   any idea when that would have been?
8   A.   No.
9   Q.   I understand. All right. What kind of
10  sources of data do you need to do a life care plan? And
11  we'll break it up like we've done previously, and we'll
12  talk about a vocational assessment later.
13  A:   In terms of resources, we start with the
14  client and get information from the client about current
15  treatment and what his current problems are. And we
16  review the medical records, which sometimes gives you
17  more than a little bit of information about future
18  treatment needs.
19        In a case like Moises, his major problem is
20  apparent. He has an amputation. His leg's gone. And he
21  has a prosthesis that isn't working for him very well.
22  And so that's the basic information about his major
23  disability.
24        He has some other issues that were -- that
25  arose in the initial hospitalization which probably could

---

18

1   use some additional diagnostics, and I understand there's
2   not -- he doesn't have insurance. There isn't a resource
3   for that.
4         And his current person who treats him is a
5   registered nurse, and she made recommendations for some
6   of those evaluations, which we included. And she -- she
7   provided some information about both current status and
8   future needs, and so we used that information in the life
9   care plan.
10        And then we got information about costs.
11  And we used costs in the United States, although we did a
12  little bit of a survey to find out how costs in Mexico
13  compare and to understand how the Mexican health care
14  system works.
15  Q.   Okay. How much time would the -- well, let
16  me ask it this way: Were you present for the interview
17  with Mr. Carranza-Reyes?
18  A.   I did the interview.
19  Q.   You did the interview. How long was it?
20  A.   I'll have to look at my intake notes, but it
21  was probably -- I mean, not my notes, but my time sheet.
22  It was probably two hours.
23  Q.   With -- do you speak Spanish?
24  A.   No.
25  Q.   So you were needing the interpretation of

---

19

1   Miss Valenzuela to communicate with Mr. Carranza-Reyes?
2   A.   Yes.
3   Q.   Was anyone else present?
4   A.   No.
5   Q.   So just the three of you?
6   A.   Yes.
7   Q.   Do you have a kind of standard set of
8   questions that you ask someone in that kind of interview?
9   A.   I have a pretty structured initial interview
10  I go through. And sometimes, you know, you wander off
11  base with the client, but I usually try to get the same
12  information in the initial interview of every client.
13  Q.   Okay. And that information is the kind of
14  things that you've already talked about?
15  A.   Yes.
16  Q.   Would -- when you are analyzing someone in
17  terms of their needs, I assume part of it is medical, and
18  part of it is kind of -- I think your terminology might
19  be psychosocial resulting from their medical issues or
20  their disability or their limitations; is that fair?
21  A.   Yes.
22  Q.   So when you're asking a client like Mr.
23  Carranza-Reyes questions, are you wanting to figure out,
24  Okay, what can you not do on a day-to-day basis because
25  of your limitations, or are you asking him, How much does

---

20

1   the use of the prosthesis with your amputated leg hurt
2   you, or both?
3   A.   Maybe both.
4   Q.   Okay.
5   A.   And really, in an initial interview, I'm
6   probably much more focused on factual questions. And so,
7   as I did in this interview, I want to know where he's
8   living, who's living with him, where he was born, what
9   his birthday is, what kind of work he's done in the past,
10  how the injury happened, and what problems he's having
11  now. And that's sort of in a nutshell what I'm trying to
12  get.
13  Q.   Okay. Would you -- you have a document that
14  I saw in your file called a Personal Data Sheet.
15  A.   Yes.
16  Q.   Would you have that prior to the interview?
17  A.   Yes.
18  Q.   Okay. So you'd have that kind of basic
19  information, and then you would get more detailed
20  information from the two-hour interview you had with Mr.
21  Carranza-Reyes?
22  A.   Yes. I use the data sheet partly because
23  it's a good way for the client to settle, because it's,
24  you know, real basic information. And he had to have
25  someone fill the data sheet out for him. He couldn't do

---

* SUBJECT TO CONFIDENTIALITY DESIGNATIONS *

Carranza-Reyes v. Park County                                    Helen M. Woodard, M.A.

33

1  then you run the risk of having problems in your opposing
2  leg or your back.
3        And so he hasn't had that kind of
4  continuance of care that would let you know what the
5  problems are and whether they're easily solved or not
6  easily solved. I mean, you can -- it's not just a matter
7  of he goes, and it gets fixed. It can be really
8  difficult problems to deal with. We don't know whether
9  it will be for him or not.
10    Q.   Okay. I understand. I assume that anyone
11 who has a prosthesis has ongoing issues with that? It's
12 not atypical for someone to have issues to integrate
13 themselves with what is essentially a replacement body
14 part?
15    A.   Some people have few problems, and some
16 people have massive problems.
17    Q.   Okay. And there's a continuum in between?
18    A.   There are. I mean, everybody has -- even a
19 person who has a well-fitting prosthesis, got lucky on
20 the first try kind of thing, generally has some ongoing
21 issues with stump shrinkage or if they gain weight. And
22 then these things wear out. If you -- if you do really
23 well on them and you use them for everyday life, then
24 they wear out.
25    Q.   And if Mr. Carranza-Reyes had access to

34

1  medical care in the United States, either through
2  insurance or private resources, he could have these kind
3  of issues addressed?
4     A.   It depends on the insurance. A lot of
5  insurance doesn't really deal very well with durable
6  medical equipment. And so if he had a Cadillac insurance
7  policy that did revisions and replacements of
8  prosthetics, and he had the 20 percent copay, or whatever
9  it is, yeah, he would probably do better. You can't say
10 that's 100 percent, because sometimes even people who
11 have access to the very best of prosthetics still have a
12 lot of problems with the prosthesis for a variety of
13 reasons.
14    Q.   Okay. And the way that I understand what
15 we've talked about today, his principal medical issues
16 are related to the prosthesis?
17    A.   I think they are, but I wouldn't be
18 absolutely certain without the additional assessments.
19    Q.   Okay. By the specialists that we've already
20 talked about?
21    A.   Well, and the ones recommended by the nurse.
22    Q.   Okay. You don't have the -- I mean, you
23 obviously work with medical issues on a daily basis and
24 have for 35 years. But is it fair to say that it's
25 beyond your expertise to sort of know exactly what is

35

1  causing all of his constellation of issues from a medical
2  perspective?
3     A.   Yeah. My job isn't to decide what the
4  reason is, but to see if I can get him to an appropriate
5  provider who can figure it out.
6     Q.   Got it. And your assessment, based on
7  your -- the additional information you would like to have
8  to help you refine your assessment is an orthopedic
9  consult, a physiatrist consult and a prosthetist consult?
10    A.   Yes. The nurse at the clinic thinks he
11 should have a pulmonology consult. If he still has a lot
12 of pain after the physiatrist and the prosthetist have
13 looked at him and he has whatever treatment he needs
14 there, he might need pain management. But I would put
15 that off until after he had the basics reevaluated and
16 taken care of.
17    Q.   Because it may be that whatever -- the pain
18 that he's having is related to an improper prosthetic,
19 ill-fitting, all of that kind of thing?
20    A.   I don't want to say "improper" --
21    Q.   Okay.
22    A.   -- because it's probably not improper. It
23 probably just doesn't fit as it's supposed to at this
24 point in time.
25    Q.   Got it.

36

1     A.   It was probably okay when he first got it.
2     Q.   And he would have gotten it in April or May
3  of '03?
4     A.   Yeah. That's a long time.
5     Q.   Any other information that you would have
6  liked to have had that you didn't have at your disposal?
7     A.   Ideally -- and again, the nurse at the
8  clinic has recommended this -- a psychological
9  assessment. We left that as a to-be-determined kind of
10 cost. He indicates he's pretty depressed. The nurse
11 indicates he's pretty depressed. He seems fairly
12 depressed when you talk to him. And so it would be
13 reasonable for him to be seen by someone who could
14 evaluate that. Ideally, that person would be
15 Spanish-speaking or would be someone who is accustomed to
16 utilizing an interpreter.
17    Q.   Got it. Okay. Any other sort of
18 information holes that you would like to have filled to
19 make a more complete analysis of Mr. Carranza-Reyes in
20 terms of life care plan and vocational assessment?
21    A.   I'd like to know what his legal status is
22 going to be, because if he's able to stay in this
23 country, then it would really be useful for him to have
24 services to become English speaking. And I think he's
25 fairly smart, and so he could probably get some

Pages 33 to 36

*  SUBJECT TO CONFIDENTIALITY DESIGNATIONS  *

Carranza-Reyes v. Park County                                        Helen M. Woodard, M.A.

---

37

1  education. And at least that would give him something to
2  do, an outlet.
3      Q.   What do you know of his immigration status?
4      A.   He's allowed to stay here -- what did he
5  say? He doesn't have a green card, so he's not able to
6  work. And he said his father was a citizen, and he
7  therefore ought to be entitled to become a citizen. But
8  I don't know where in the process that is.
9      Q.   Okay.
10     A.   Let me see what he -- I think that's all I
11 know about it.
12     Q.   Okay. Do you have an understanding of how
13 the immigration system in the United States works for
14 someone like Mr. Carranza-Reyes?
15     A.   Probably about as well as the people reading
16 the newspaper. I've had a lot of clients who were here
17 illegally who became injured, and some of them have
18 become citizens, and others of them are still allowed to
19 stay here because of their medical situation. But they
20 don't have a legal status, so they can't get a driver's
21 license, and they can't get a job.
22     Q.   Okay. So there's a -- I mean, is it your
23 understanding that there's some federal government policy
24 that indicates if you get injured in the United States,
25 we will give you some kind of permit to allow you to stay

38

1  in the United States?
2      A.   I don't think so.
3      Q.   Okay.
4      A.   I don't think there's a policy that says
5  that. I think that people who have serious injuries
6  here, where treatment is centered here, end up being
7  ignored in terms of deportation, but I don't think they
8  actually have a legal status. Does that --
9      Q.   Sure.
10     A.   That's what I think.
11     Q.   It's a resource allocation -- a resource
12 allocation and decision-making process by the immigration
13 authorities?
14     A.   I think that that's correct. But, you know,
15 it's a real problem.
16     Q.   But when you -- take a look at page 4 of
17 your report, Exhibit 48, the last paragraph. You
18 indicate that "Mr. Carranza-Reyes holds a permit to
19 reside in the United States." What are you referring to?
20     A.   That's what he thought.
21     Q.   All right.
22     A.   But I didn't see it, and I don't know what
23 that would be.
24     Q.   Okay. I haven't seen it either, so that's
25 why I'm asking you.

39

1      A.   Um-hum. I don't know.
2      Q.   Okay. Have you spoken to Mr.
3  Carranza-Reyes' counsel on immigration issues?
4      A.   Just briefly, to wish that he wasn't in
5  limbo.
6      Q.   And that would be Mr. Archuleta or Mr.
7  Trine?
8      A.   Mr. Trine.
9      Q.   Are you aware that Mr. Carranza-Reyes may
10 have separate representation for his immigration status?
11     A.   No.
12     Q.   If he does, you haven't talked to that
13 lawyer?
14     A.   That's correct.
15     Q.   Okay. What I want to do now is talk about
16 your expert report. And it may -- we may need to refer
17 to some of the stuff in Exhibit 49, but let's try not to
18 at the beginning. But if you need to refer to anything,
19 tell me that. Okay?
20     A.   I'll do what I need to do.
21     Q.   Good. All right. The History portion of
22 this report is information that you would have received
23 from Mr. Carranza-Reyes; is that correct?
24     A.   Yes.
25     Q.   In the personal data form and your interview

40

1  with him?
2      A.   Yes.
3      Q.   Did you have more than one interview with
4  him?
5      A.   I talked with him on three separate
6  occasions --
7      Q.   Okay.
8      A.   -- the last being this morning.
9      Q.   Okay.
10     A.   And I didn't use an interpreter this morning
11 because I thought, Oh, I can get through the easy
12 questions with him, but I actually did need an
13 interpreter.
14     Q.   And when you say "the easy," how long did
15 you talk to Mr. Carranza-Reyes this morning?
16     A.   Probably a half an hour, 45 minutes.
17     Q.   What did you talk about?
18     A.   We talked about the fact that he's not
19 working. He's living with his brother and sister-in-law.
20 His brother is working, so he pays for everything. He's
21 still getting all of his care at the Clinica Campasina
22 and the nurse there, and sees them at the clinic every
23 month or two.
24          And he has very severe pain in his legs,
25 both legs. His pain in his good leg is really severe,

---

Pages 37 to 40

*  SUBJECT TO CONFIDENTIALITY DESIGNATIONS  *

Carranza-Reyes v. Park County                                              Helen M. Woodard, M.A.

41

1 and pain like his leg had not been amputated, which is
2 what we call phantom pain, in his amputated leg. And he
3 thinks he needs more surgery because the stump is always
4 sore all the time, but he doesn't have any money for
5 medicine for the pain. He uses Tylenol or Aleve.
6        He said his prosthesis is bad, but his stump
7 is no good. He probably identified the problem perfectly
8 there. He thinks maybe he needs an amputation higher up.
9 He doesn't sleep well at night. He wakes up with the
10 pain. He takes those over-the-counter meds I described.
11 He's going to see a prosthetist again. He gets tired
12 with walking. His good leg gets tired, and his
13 amputation gets sore.
14    Q.    Anything else about that conversation this
15 morning that you remember?
16    A.    He seems very depressed.
17    Q.    Okay. And the Medical Records Review of
18 your -- portion of your report, I think we've already
19 talked about that. It is the review that you and Miss
20 Morgan did and then typed directly into the computer to
21 make it part of this report?
22    A.    Yes.
23    Q.    Take a look at page 3, the last paragraph.
24 You talked to Miss Poppish. Were you talking to her, or
25 did somebody else talk to her?

42

1    A.    Char did.
2    Q.    Okay. And then you got the information that
3 Miss Poppish conveyed to you -- conveyed to Char from
4 Char?
5    A.    Yes.
6    Q.    Okay.
7    A.    She actually wrote a little note about it.
8 It's in the file.
9    Q.    And Miss Poppish is a nurse practitioner?
10    A.    That's true.
11    Q.    Okay. Then the Current Status -- take a
12 look at the next page, page 4. It looks like Miss
13 Poppish was interviewed for a second time on April 17th
14 of '06.
15    A.    Yes.
16    Q.    Would that have been Miss Morgan again?
17    A.    Yes.
18    Q.    Okay. And again, she conveyed the
19 information from Miss Poppish. She took notes, and then
20 you talked to her and reviewed the notes; is that right?
21    A.    Yes.
22    Q.    The Current Status part of this report is
23 based on information from who?
24    A.    It's information from Moises, from the
25 provider, and a little from the medical records.

43

1    Q.    The medical records from Clinica Campasina?
2    A.    Yeah.
3    Q.    Because other than that, that provider
4 organization, as far as I know -- and tell me if you know
5 any different -- he's not seeing anybody else on any kind
6 of a regular basis?
7    A.    He's not.
8    Q.    The Vocational Testing is the information
9 from the testing done by --
10    A.    Scott, under my supervision.
11    Q.    -- Scott Smith, under your supervision?
12    A.    Um-hum.
13    Q.    Okay. And then the Needs Assessment, where
14 does that come from?
15    A.    That's my description of his issues.
16    Q.    Okay.
17    A.    And this is, of course, the first report we
18 wrote in this case. And I haven't written a follow-up
19 report, although I would kind of expect to do that since
20 I saw him today.
21    Q.    Now, you saw him today, or you talked to him
22 today?
23    A.    I saw him today.
24    Q.    Oh, I misunderstood. I understood that you
25 said you talked to him on the phone today.

44

1    A.    I wouldn't even attempt to talk to him on
2 the phone --
3    Q.    Okay.
4    A.    -- without an interpreter.
5    Q.    Okay. You visited with Mr. Carranza-Reyes
6 for about a half an hour this morning?
7    A.    Half an hour or 45 minutes here in my
8 office.
9    Q.    Got it. Okay.
10    A.    And this just says -- the life care plan
11 describes what we think he needs. And the life care plan
12 is in current dollars. We don't include inflation. The
13 economist would do that. And this is a very basic life
14 care plan, given his present issues. It could change if
15 we had current information from new assessments.
16    Q.    Okay. From the additional specialists that
17 we've already talked about, or others?
18    A.    Yeah -- well, particularly the ones that we
19 talked about. They might think he needs to be seen by
20 someone else, but those are the three I would like him to
21 see.
22    Q.    And my understanding is the -- the figures
23 cost -- the cost figures in the life care plan that
24 you've prepared that's part of Exhibit 48 are in United
25 States dollars?

Pages 41 to 44

*  SUBJECT TO CONFIDENTIALITY DESIGNATIONS  *

Carranza-Reyes v. Park County                                               Helen M. Woodard, M.A.

---

45

1   A.   These are United States costs.
2   Q.   Okay. And there isn't -- you didn't do, as
3   part of your life care plan, Mexico pesos; is that
4   correct?
5   A.   We did not convert this to Mexico pesos, and
6   we didn't convert it to costs in Mexico.
7   Q.   But you did some of that data in -- some of
8   that data research is in your file?
9   A.   That's right.
10  Q.   Okay. How come it wasn't done in the
11  preliminary life care plan?
12  A.   The issue of whether he stays here or goes
13  to Mexico is kind of an interesting one, and it's -- it's
14  caught up in that legal issue that I don't know about,
15  as -- as we discussed earlier. If he stays here, which
16  is where he is, this plan would be generally valid for
17  the United States.
18      If he were to go to Mexico, if he were to be
19  deported, he would have an option of receiving medical
20  care two different ways. The first would be under the
21  medical system, under the national medical system, which
22  has a lot of faults. And then the other way would be to
23  purchase private care in Mexico, which might be somewhat
24  cheaper than here, but would be hard to access without
25  American dollars.

---

46

1   Q.   So --
2   A.   And he would still probably want American
3   technology, particularly with regard to the prosthetics.
4   Q.   Okay. Let me see if I understand you.
5   Mexico has national health care?
6   A.   Yeah, they have a national health care
7   system.
8   Q.   And then overlaid on that is the ability for
9   people of means to purchase private health care outside
10  of that system?
11  A.   Right, or to go where they want for health
12  care.
13  Q.   The United States, Europe, wherever?
14  A.   Right, Thailand, wherever.
15  Q.   I mean, that -- I mean, I'm familiar with
16  the health care system in Italy, for instance, and it
17  works exactly the same way. The doctors participate in
18  the national health care system and see people in the
19  hospital, and then they have their own private offices at
20  home and would see people who would pay them for those
21  services at home.
22  A.   Well, or there are some physicians who don't
23  participate in the national health care system at all and
24  hospitals that are not affiliated with the national
25  health care system at all.

---

47

1   Q.   And they would see people who have the
2   ability to pay for them --
3   A.   Right.
4   Q.   -- pay for their services?
5   A.   Yes.
6   Q.   Can one get private health insurance to get
7   that kind of thing paid for at that secondary system in
8   Mexico?
9   A.   I don't think so. I looked for it, but I
10  didn't find it.
11  Q.   Okay. So it's --
12  A.   I think you either have the means to pay, or
13  you're thrown into that three-tier (sic) system in -- in
14  the national health system.
15  Q.   Okay. Let me sort of ask you some kind of
16  macroquestions about your report before we move on to
17  something else. Does your -- does this expert report,
18  dated April 28, '06, marked as Exhibit 48, accurately
19  reflect the scope of your expert opinion in this case?
20  A.   With the caveat that if we had additional
21  information, we might be able to fill out some of the
22  things that we left to be determined or to narrow the
23  range of costs in some cases. And probably the thing
24  that it doesn't address is what I told you before, which
25  is with his -- in his current situation he's not

---

48

1   employable here, and he's likely not employable in
2   Mexico, and so he's in the worst of all -- of both
3   possible worlds.
4       If -- if his legal status were to change
5   here, and he had good circumstances with regard to his
6   medical care, then maybe we could do some rehabilitation
7   with him. And that would be an additional cost to
8   everything that's in here.
9   Q.   Okay. Do you hold any opinions about Mr.
10  Carranza-Reyes that aren't reflected in this report?
11  A.   He's a really nice guy.
12  Q.   Okay.
13  A.   I think he's a nice guy.
14  Q.   Well, I spent two days with him taking his
15  deposition. I agree with you. He's a nice guy. Okay.
16  Is it fair to say that an opinion of yours, other than the
17  fact that your client's a nice guy, isn't -- if such an
18  opinion is not reflected in your report, you don't
19  anticipate testifying about such an opinion in Federal
20  Court if this were to go to trial?
21  A.   Or unless I've expressed the opinion in my
22  deposition.
23  Q.   Fair enough. Okay. Why is your report
24  called a preliminary report?
25  A.   Because it's missing information. And if we

---

Pages 45 to 48

* SUBJECT TO CONFIDENTIALITY DESIGNATIONS *

49

1  had the additional assessments, we would expect that
2  there would be services that would be recommended that
3  are not included here.
4      Q.    You indicated an intent a little bit ago,
5  after a meeting with Mr. Carranza-Reyes today, to
6  potentially do a supplemental report; is that true?
7      A.    I probably should have done it before you
8  got here so I could hand it to you.
9      Q.    What would that supplemental report consist
10 of?
11     A.    It would say -- it would say essentially the
12 information that I gave you that I got from him this
13 morning.  It would reiterate the need for him to be seen
14 currently by medical providers who could deal with his
15 issues of the problem with the prosthetic and possible
16 stump revision, because that would be important
17 information, and it would be critical to know that to
18 make the report complete.
19     Q.    Okay.  But other than those issues which
20 we've talked about today in this deposition, there
21 wouldn't be any other content to a supplemental report
22 that you might do?
23     A.    Not at this point in time.  As I say, if
24 he -- if his legal status were clarified, then, you know,
25 we might want to do vocational rehab services with him.

50

1      Q.    Okay.  The medical needs analysis that you
2  have done in your report, is there a basis for the
3  medical needs analysis other than information you
4  received from Miss Poppish?
5      A.    And my experience?
6      Q.    And your experience.  That's the only other
7  thing?
8      A.    Those are the primary things.  And, you
9  know, there's not anyone who's seeing him to give an
10 opinion, other than Miss Poppish and, apparently, me.
11     Q.    Understood.  Okay.  Am I correct in
12 understanding that you don't have a specific medical
13 background; is that --
14     A.    Only as it applies to rehabilitation
15 counseling.  And that means that I'm supposed to
16 understand what medical conditions are and what kinds of
17 providers people should be seeing, and that I should be
18 able to make appropriate assessment referrals.
19     Q.    And that -- is it fair to draw a distinction
20 between -- that what you do is a rehabilitation
21 assessment, as opposed to a medical assessment?
22     A.    Sure.  It's rehabilitation.
23     Q.    And that would be a distinction that makes
24 sense to you to draw?
25     A.    Yeah.  I don't do medical assessments --

51

1      Q.    Okay.
2      A.    -- but I send people for medical
3  assessments.
4      Q.    I understand.  And you would -- your
5  expertise as a rehabilitation counselor would allow you
6  to know what type of medical assessment might be
7  appropriate for a particular client, based on what their
8  needs are?
9      A.    Yeah.  I'm supposed to recognize that if
10 somebody comes in with an amputation, the right kind of
11 doctor to see would be a rehab doctor or an orthopedist.
12     Q.    Okay.  And if they come in with headaches,
13 it would be a neurologist?
14     A.    Or a pain management specialist.
15     Q.    Okay.  Does it -- does the fact that Miss
16 Poppish is a nurse practitioner instead of a physician
17 undercut any of the information that is -- you've gotten
18 from her in terms of a medical assessment, in your
19 opinion?
20     A.    I don't think so in this matter.
21     Q.    Okay.
22     A.    I think a lot of medical care, especially to
23 poor people in our country, is provided by nurse
24 practitioners.  And people rely on them and get all of
25 their primary care and a lot of their specialty care from

52

1  nurse practitioners.  So I think she's reliable in that
2  regard.
3      Q.    Do you -- am I correct in understanding that
4  under Colorado law, a physician has to review a nurse
5  practitioner's charts and countersign them?
6      A.    That's what I understand.
7      Q.    Do you know who that physician is in Mr.
8  Carranza-Reyes' case?
9      A.    I don't.
10     Q.    And you've not spoken to that physician?
11     A.    No.  And, in fact, I don't know that he ever
12 has seen Moises.
13     Q.    He may have just reviewed the charts and
14 signed off on them without ever seeing Mr.
15 Carranza-Reyes?
16     A.    It's possible.  I don't know what has
17 happened.  But when I talk to Moises, with or without an
18 interpreter, he believes he has not seen a doctor there.
19     Q.    Okay.  He doesn't recall seeing anybody
20 other than Miss Poppish?
21     A.    Or one of the other nurses.
22     Q.    Okay.  Have you been to Clinica Campasina?
23     A.    No.
24     Q.    Do you have any idea what the scope of it
25 is?

Pages 49 to 52

*  SUBJECT TO CONFIDENTIALITY DESIGNATIONS  *

---

**53**

1    A.   I don't. I know they're really busy. I've
2  had other clients who have been treated there, but I
3  don't know anything about them other than that.
4    Q.   Do you know how Mr. Carranza-Reyes is paying
5  for the services at Clinica Campasina?
6    A.   No.
7    Q.   All right. Let's go look at the life care
8  plan part of Exhibit 48, if you would. And what I want
9  to ask you globally is, you indicated that this life care
10  plan is based on Mr. Carranza-Reyes staying in the United
11  States; is that right?
12    A.   These are United States costs. The life
13  care plan would still be the same, but the costs would
14  change to pesos, and the range of costs could conceivably
15  change.
16    Q.   Okay. Did you do any assessment of the
17  availability of all of the services that are on this life
18  care plan in Mexico?
19    A.   Yeah. You've got them. Many of the
20  services are -- are there.
21    Q.   Okay. So it's a resource issue in Mexico;
22  it's not a health care availability issue?
23    A.   Well, it depends to a large extent on where
24  you're living as to what's available. And access to --
25  to pure medical resources is probably less of an issue

---

**54**

1  than access to technology and, more importantly, to
2  accessibility. Because there are not -- Mexico is a
3  really old country with a lot of places that are just
4  basically inaccessible to someone with mobility
5  impairments, even mild mobility impairments.
6    Q.   If -- do you know where Mr. Carranza-Reyes
7  lived when he was last residing in Mexico?
8    A.   Mexico City.
9    Q.   Presumably, that would have the most access
10  to medical care of anyplace that he could live in Mexico,
11  or is that wrong?
12    A.   I think that it has the variety of medical
13  specialists that he would need. I think access is a real
14  big issue, because it's huge. It's, what, 22 million or
15  24 million. And just finding the people and being able
16  to get to where they are could be a huge issue for him.
17    Q.   Because of his mobility limitations?
18    A.   Because of his mobility.
19    Q.   Did you do any analysis of the availability
20  of the items listed in the life care plan if Mr.
21  Carranza-Reyes' only access to medical care in Mexico is
22  through the national health insurance?
23    A.   It -- he would probably be treated in their
24  Level I hospitals, which are the lowest level of care,
25  because he -- it wouldn't be an acute medical situation

---

**55**

1  for him and not a particularly unusual medical situation.
2  And so he would probably spend a lot of time trying to
3  get services.
4    Q.   But could he have gotten -- could -- given
5  those circumstances, could he get all the services in
6  medical -- medical and other services that are listed on
7  your life care plan?
8    A.   I don't think we will know that until he
9  tries, or unless he tries.
10    Q.   Okay. Fair enough. Have you read Dr.
11  Pacey's report about Mr. Carranza-Reyes?
12    A.   No.
13    Q.   Take a look at page 3 of your life care
14  plan. What is the vocational evaluation that you're
15  talking about there?
16    A.   That would be a closer look at him than we
17  took in terms of testing and getting him placed into
18  appropriate classes to learn English, math, reading.
19  He's really -- he doesn't read English, and those
20  services would help to place him into appropriate
21  programming. I was thinking of that as avocational, not
22  vocational per se.
23    Q.   Okay. Would he need such an evaluation if
24  he was going to not be in the United States, but would be
25  in Mexico?

---

**56**

1    A.   He still needs to have things to do in his
2  day. And so trying to get him into a situation where he
3  can do things that will be attractive to him, stimulate
4  him, help him be less depressed because he has something
5  going on in his life is really important. So I would
6  think it would be critical in either case.
7    Q.   Okay. The line item "Intensive private ESL
8  instruction," I assume that means English as a Second
9  Language?
10    A.   Yes.
11    Q.   What does that have to do with his injuries?
12    A.   It has to do with his ability to interface
13  with health care providers and other people in the social
14  situation. And if you can't describe your problems, if
15  you can't tell someone about your situation, if you can't
16  tell someone how you got from point A to point B when
17  they ask for a history, and if you have to always use an
18  interpreter, it's very difficult. Doctors are very busy.
19  They don't want to spend the time with an interpreter to
20  get all of the information.
21        And what ESL would do would give him the
22  ability to communicate here. If he goes to Mexico, give
23  him the ability to communicate if he gets his treatment
24  in this country or some other country. He should go to
25  Finland. Everybody speaks really good English there. I

---

*  SUBJECT TO CONFIDENTIALITY DESIGNATIONS  *

Carranza-Reyes v. Park County                                     Helen M. Woodard, M.A.

---

**57**

1  just came back. I was amazed.
2      Q.    I understand. Take a look at the equipment
3  on the last page of your life care plan, if you would.
4  Were all of these available in -- would all of this --
5  terrible question. I apologize. Are all of the items of
6  equipment that you have listed here available in Mexico?
7      A.    Of course. You might order them from a
8  medical supplier in Texas, or you might order them from a
9  medical supplier down there, but with today's shipping --
10  I mean, DHL will deliver anything anywhere.
11      Q.    That's true. Okay. Let me ask you about a
12  couple of these. When you -- the item "Manual
13  wheelchair," the cost is $2,000 to $4,000 in United
14  States dollars, correct?
15      A.    Yes.
16      Q.    And that's a range based on the type of
17  manual wheelchair; is that right?
18      A.    Yes.
19      Q.    And then your opinion is, the sort of
20  half-life, if you will, of a manual wheelchair as a
21  durable medical equipment is, it would require
22  replacement every five to seven years; is that right?
23      A.    In this circumstance. It could be more
24  frequent than that if it was used hard or daily.
25      Q.    When I would do an average of that cost,

---

**58**

1  what I would do is take $3,000 as the average cost of a
2  manual wheelchair, and then say that it needed another
3  wheelchair on average every six years for the remainder
4  of Mr. Carranza-Reyes' life. Does that seem like a
5  correct analysis to you?
6      A.    That would be one way to do it.
7      Q.    Is there another way to do it?
8      A.    Well, you could -- if you're thinking about
9  it in a spreadsheet sort of way, you could say, Buy one
10  now, buy one in six years, and it's the full cost each
11  time.
12      Q.    Okay. Does it make sense to you to take an
13  absolute high and an absolute low and then average it
14  that way?
15      A.    I'm not sure what question you're asking.
16      Q.    Okay.
17      A.    We give things in ranges where they are
18  generally ranged. And different economists do different
19  things with the range of costs. They may give you the
20  very low cost, the very high cost and the mid-range cost,
21  or they may just do a mid-range cost. And --
22      Q.    And you think of that --
23      A.    -- that's not my part of --
24      Q.    You think of that as an economist's issue,
25  not your issue?

---

**59**

1      A.    Once in a while we're asked, for a variety
2  of reasons, to provide spreadsheets, and I usually
3  provide the low, the high and the mid-range --
4      Q.    Okay.
5      A.    -- if I have to do a spreadsheet. But I
6  don't like to do spreadsheets, and I think an economist
7  does them better.
8      Q.    I understand. Okay. All right. Let's look
9  at Exhibit 49, if we can. What I'm going to do is refer
10  to what I call Bates numbers, which are -- have your name
11  and then a number on it --
12      A.    Okay.
13      Q.    -- just so you know what we're talking
14  about. Take a look at what's been -- the packet of
15  information that begins at Number 6. Are you with me?
16      A.    Yes.
17      Q.    Okay. This is a comparison of average
18  medical costs in the United States versus Mexico City.
19  Who prepared this information?
20      A.    I had one of my staff people do this.
21      Q.    Who was that?
22      A.    This was Mike Daly.
23      Q.    And what's Mr. Daly's background and
24  experience?
25      A.    Well, he's worked for me for the last three

---

**60**

1  or four years. His undergraduate degree is, I believe,
2  in psychology. Once I hire them and they work out, I
3  forget.
4      Q.    I understand. That's fine. What does he do
5  for you?
6      A.    He does things like this. If I want to --
7  if I just want to know a comparison of some things, he
8  tries to get the data and does that. He does a lot of
9  cost -- gets a lot of cost information, and he does
10  research some fairly esoteric questions I have that may
11  not have any relevance to anything, but I want to know
12  the answers to.
13      Q.    I understand. He's a go-to researcher for
14  you?
15      A.    Yeah.
16      Q.    Let me -- I want to understand what the data
17  on this chart is saying, because I'm a little confused,
18  and if you can help me, that would be great. Take a look
19  at the line item of "Orthopedist." I understand U.S.
20  average cost of 99 U.S. dollars. Is that how you would
21  understand that?
22      A.    Yes.
23      Q.    What I don't understand is Mexico average
24  costs. Is that in Mexican pesos?
25      A.    No. That's in dollars.

---

* SUBJECT TO CONFIDENTIALITY DESIGNATIONS *

Carranza-Reyes v. Park County                                    Helen M. Woodard, M.A.

61

```
1    Q.    That would be in United States dollars?
2    A.    That's in dollars.
3    Q.    Okay. So --
4    A.    We were careful that everything was in
5  dollars.
6    Q.    So you would get -- how did you get the
7  data, if you know, or how did your staff get the data to
8  do it in dollars?
9    A.    Well, some of the places we contacted
10 because they want paid in dollars.
11   Q.    Just said, This is our fee in dollars?
12   A.    Right. And others we used whatever the
13 conversion rate was, which is probably about 10 and a
14 half pesos to a dollar.
15   Q.    And then you would -- if you got a quote of
16 it in pesos, you'd convert it based on whatever the
17 then-prevailing exchange rate would be, and then put it
18 in this chart, or Mr. Daly did, in dollars?
19   A.    Right.
20   Q.    Okay. Whose handwriting is at the bottom of
21 this chart?
22   A.    I'm not entirely sure. It looks like
23 Char's, but I can't swear to that.
24   Q.    Okay. Do you know what is meant by
25 "R-s-c-h" -- which I assume is research -- that says, "66
```

62

```
1  percent less in Mexico"?
2    A.    Right.
3    Q.    What does that mean?
4    A.    That means what it says: Research says 66
5  percent less in Mexico.
6    Q.    And --
7    A.    But that isn't what we found.
8    Q.    And what you found was about a 48 percent --
9    A.    Right. And it varies quite a bit by -- I
10 mean, I don't think you can average these, because it is
11 a lot different based on different aspects of the care.
12   Q.    Okay. Depending on what the nature of the
13 care is?
14   A.    That's right.
15   Q.    Let me understand the C.N.A. care systems
16 piece. When it says 22 hours -- $22 in United States
17 dollars an hour with a four-hour minimum, what does that
18 mean?
19   A.    That means that the agencies that provide
20 that care, the average cost was $17, but they won't come
21 in for one hour. They only come in for a four-hour
22 shift --
23   Q.    Okay.
24   A.    -- or more.
25   Q.    And when the data there is $88 per day, how
```

63

```
1  many hours is that?
2    A.    I think that that's eight hours --
3    Q.    Okay. And do you know --
4    A.    -- but let me make sure. Let me see if I
5  can find it here and make sure so that I don't tell you
6  incorrect information.
7    Q.    Take a look at pages 44 and 45.
8    A.    I'm not there yet. Ah. They're using a
9  $12 -- 12-hour day.
10   Q.    For Mexico?
11   A.    For Mexico; that's right.
12   Q.    And would you assume that a C.N.A. in the
13 United States would be an eight-hour day, or would that
14 be a 12 hour day too?
15   A.    Well, we got an hourly rate --
16   Q.    Okay.
17   A.    -- and so we are using the hourly rate. And
18 we know that it's generally a four-hour minimum.
19   Q.    Okay. So the -- so 73 hours -- $73 a day
20 converted from -- well, let me ask you this so that I
21 understand it: Do you know whether this kind of personal
22 care assistance in Mexico requires payment in dollars, or
23 was it converted?
24   A.    I expect it varies hugely with the agency.
25   Q.    But that's $73 a day for a 12-hour day, as
```

64

```
1  opposed to $22 an hour in the United States?
2    A.    With a four-hour minimum.
3    Q.    Okay. So if you were going to compare the
4  costs, you would need to multiply $22 an hour by 12?
5    A.    No. We would need to find less than 12-hour
6  care, because he doesn't need 12 hours of care. And so
7  we would need to find a provider who would provide less
8  care, and we would need to know if that care cost goes up
9  on an hourly basis in Mexico.
10   Q.    Okay. And do you -- from the data that
11 you've reviewed, do you know that information --
12   A.    I don't --
13   Q.    -- or is that information --
14   A.    I don't have that information.
15   Q.    Does Mr. Daly speak Spanish?
16   A.    No.
17   Q.    So he would have used Miss Valenzuela to
18 help translate --
19   A.    That's right.
20   Q.    -- to get this data?
21   A.    Yes.
22   Q.    When you -- on the stuff that has the
23 information about providers in Mexico, the number there,
24 is that a telephone number?
25   A.    Yes.
```

Pages 61 to 64

*  SUBJECT TO CONFIDENTIALITY DESIGNATIONS  *

Carranza-Reyes v. Park County                                              Helen M. Woodard, M.A.

---

65

1    Q.    Without country codes and that sort of
2  thing?
3    A.    Well, you know the country code.
4    Q.    No, I understand that. But other than --
5  that's what that refers to?
6    A.    Yes.
7    Q.    Okay. Take a look at page 21, if you would.
8  I'm confused a little bit, because when we were looking
9  at that chart at the beginning, which is page 6, you
10  indicated that the numbers on that chart are put back
11  into United States dollars. But it looks like, if you
12  look at page 21, for instance, the hospital Angeles
13  Mexico at $500 per visit, that suggests to me that might
14  be in pesos, particularly since --
15    A.    Yeah, that was pesos, and we converted it
16  over here in handwriting to dollars.
17    Q.    Understood. So the raw data on the surveys
18  are -- even though it has a dollar sign, it's your
19  understanding that's pesos. And then when it got into
20  the comparison of average medical costs, it became United
21  States dollars?
22    A.    If -- if it was given in pesos.
23    Q.    Okay.
24    A.    I mean, in Mexico they use the dollar sign
25  in front of the pesos, which always confuses tourists.

66

1    Q.    Oh, okay. All right. So when --
2    A.    So when you go shopping, and it says this is
3  $650, and you think, My God, that's an expensive pair of
4  earrings --
5    Q.    They're using that as a shorthand. They
6  don't have a symbol for the pesos, other than the dollar?
7    A.    Well, they use a dollar sign in front of it.
8    Q.    Got it. Okay. That's helpful. Take a look
9  at -- beginning on page 52.
10    A.    It's blank.
11    Q.    I understand. But what I wanted to show you
12  is that this is your equipment part of your folder, of
13  your file that begins, and then on 53 is the data on
14  equipment. Does that seem right to you?
15    A.    Well, this is just, yeah, different kinds of
16  equipment.
17    Q.    Right. Okay. I don't see any information
18  about the cost of equipment in Mexico. Am I missing
19  something --
20    A.    No.
21    Q.    -- or was that not something you did?
22    A.    We didn't do that.
23    Q.    Why?
24    A.    First of all, because we didn't -- we didn't
25  contact Mexican suppliers and try to describe what we

67

1  were doing. That was -- that would be very complicated.
2  And so we just -- because it's a small part of the life
3  care plan, and I was using U.S. costs. I decided to not
4  do that.
5    Q.    Okay.
6    A.    It was a considered decision.
7    Q.    I understand. Take a look at page 80.
8    A.    On page what?
9    Q.    80. 8-0. I'm sorry. Do you know whose
10  handwriting this is?
11    A.    This is Char's handwriting, actually, so I'm
12  wrong about whose handwriting that was on the other page.
13  I don't know whose handwriting that was.
14    Q.    This reflects, I believe, a conversation
15  between Miss Morgan and Mr. Carranza-Reyes dated on
16  December 14th of '05; is that correct?
17    A.    Um-hum, that's correct, with Deena as the
18  interpreter.
19        THE REPORTER: Wait.
20        (Break taken from 5:36 p.m. until 5:44 p.m.)
21    Q.    (BY MR. RINGEL) Back to Exhibit 80, I
22  believe that the court reporter's coughing caused her to
23  not get the last series of questions, so I'm going to ask
24  you again --
25    A.    Okay.

68

1    Q.    -- just to make sure we have a record of it.
2  Page 80 of your file is -- reflects a telephone
3  conversation between Miss Morgan with Mr. Carranza-Reyes
4  of December 14, 2005, using Miss Valenzuela as an
5  interpreter?
6    A.    Yes.
7    Q.    And you weren't present for that
8  conversation; is that correct?
9    A.    That's correct.
10    Q.    The next page, page 81, is information that
11  you -- that Miss Morgan asked of Mr. Trine's office; is
12  that right?
13    A.    These are things that we knew we were
14  missing that we needed.
15    Q.    Okay. And --
16    A.    You know, it's really hard to know what
17  you're missing.
18    Q.    I understand. And this information is now
19  amongst the medical records that you have in your
20  possession?
21    A.    Yes.
22    Q.    You got this information?
23    A.    Yes.
24    Q.    Take a look at page 82. Do you recognize
25  this handwriting?

---

* SUBJECT TO CONFIDENTIALITY DESIGNATIONS *

Carranza-Reyes v. Park County                                    Helen M. Woodard, M.A.

---

69

1    A.   That's me.
2    Q.   Okay.  And this reflects what?
3    A.   This is a conversation I had with him on
4  July 6th, 2005.
5    Q.   Okay.  And give me a sense of what you --
6  what your process is when you would take notes of a
7  conversation like the one that's reflected in these notes
8  of July 6th of 2005.
9    A.   They're just notes of the conversation.  I
10 mean, I ask a question.  He answers it, or he volunteers
11 information.  I write it down.
12   Q.   The fact that there's only one page of notes
13 suggests to me that it's a relatively short conversation;
14 is that fair?
15   A.   He was here on that day, I think, for
16 testing.
17   Q.   Oh, okay.  That makes sense.
18   A.   And so this was -- yes, he was here for
19 testing.  And I saw him during that day, and so I didn't
20 have a very extended conversation with him.
21   Q.   Was this conversation on July 6, 2005 using
22 Miss Valenzuela as an interpreter?
23   A.   I'm sure.
24   Q.   Okay.  All right.  Take a look at -- and it
25 should be stapled, and if it's not, I apologize -- pages

---

70

1  83 through 93.
2    A.   Yes.
3    Q.   I assume that this is the notes from your
4  initial interview with Mr. Carranza-Reyes that you said
5  was about two hours?
6    A.   Yes, that's correct.
7    Q.   And these are your notes?
8    A.   That's right.
9    Q.   Okay.  All right.  Pages 94 through 97 is
10 the personal data sheet?
11   A.   Right, which was actually completed by Deena
12 Valenzuela.
13   Q.   Okay.
14   A.   So that's her handwriting and his signature
15 on the signature block.
16   Q.   Right.  And it would -- this is dated the
17 same date as your notes of your initial meeting with him,
18 so I -- from a process standpoint, he came into your
19 offices and completed the personal data sheet here --
20   A.   Yes.
21   Q.   -- with the assistance of Miss Valenzuela?
22   A.   Yeah.
23   Q.   The next section is what's -- it looks like
24 a two-page sort of write-up of what's called The Mexico
25 Economy.  And if I'm guessing, S.B. is the individual who

---

71

1  wrote this up; is that right?
2    A.   Yes.
3    Q.   Who is S.B.?
4    A.   Shannon.  I don't remember her last name.
5  Shannon.  She's a new employee.
6    Q.   Okay.  We won't tell.
7    A.   Um-hum.  I don't remember her last name.
8  That's terrible.
9    Q.   But S.B. is Shannon.  The last name B. -- or
10 the first initial of her last name is B, and she's a new
11 employee of yours --
12   A.   Yes.
13   Q.   -- who works in this office?
14   A.   Yes.
15   Q.   And then there's a section of this file that
16 looks like it's sort of Mexico economic data.
17   A.   That's right.
18   Q.   That will be from pages 100 through 147; is
19 that right?
20   A.   Yes.
21   Q.   And is it fair to say that the data, pages
22 100 to 147, provides the basis for this two-page write-up
23 or memo, if you will, created by S.B.?
24   A.   Yes.
25   Q.   Did you review pages 98 and 99, or did you

---

72

1  review the entirety of the data?
2    A.   I always read the articles that are
3  attached.
4    Q.   Okay.  And then the next section is pages
5  148, and 149 is a write-up by S.B. of Mexico health care?
6    A.   Yes.
7    Q.   With similar data behind it, which is pages
8  150 through, it looks like, 234?
9    A.   What about it?
10   Q.   That's the backup data that is from the memo
11 on Mexico health care; is that a fair --
12   A.   That's the things that she attached, yes.
13   Q.   Okay.  And you reviewed both of them?
14   A.   Yes.
15   Q.   Did you tell her what sources of information
16 to utilize to get data on Mexico?
17   A.   No.  I just wanted to have a good overview.
18 And so when I tell -- when I give an assignment to my
19 staff people, I don't tell them where to look.  I want
20 them to look at things I haven't thought of.
21   Q.   Okay.  Well, it strikes me that there are a
22 variety of other sources about data in Mexico that don't
23 seem to be included in your -- in the data that was
24 reviewed by your office.
25   A.   It's a big -- it's a big country.  There's a

---

Pages 69 to 72

*  SUBJECT TO CONFIDENTIALITY DESIGNATIONS  *

Carranza-Reyes v. Park County                                          Helen M. Woodard, M.A.

73

1 huge amount of data that I don't have.
2     Q.    Okay. Well, I want to ask you about some of
3 the sources that at least I thought of. And did you make
4 the decision which sources were utilized, or did Shannon
5 make the decision?
6     A.    Shannon. I just asked for information, and
7 I wanted an overview. And then I didn't pursue it much
8 farther.
9     Q.    Okay. Did you -- when you were reviewing
10 the overviews of the areas that you asked her for
11 information, did the information that you were provided
12 by Shannon seem complete enough for the purposes that you
13 needed it for?
14    A.    For the purposes I needed it for.
15    Q.    What were those purposes?
16    A.    I wanted to know in general how health care
17 was provided in Mexico, and under what circumstances
18 people -- I mean, it's common for people to come from
19 Mexico to here to get medical treatment. And so I wanted
20 to know what the resources were.
21          When people come here from Canada, it's
22 usually because they can't get services under their
23 nationalized health system fast enough. You know, they
24 have waiting lists for a very long time, and so they come
25 here for services. That doesn't appear to be exactly the

74

1 same case as in Mexico.
2     Q.    Okay.
3     A.    So I was just interested in an overview.
4     Q.    So if there was data, for instance, from a
5 national statistical institute that publishes data by --
6 from Mexico or the Bank of Mexico, if it's not reflected
7 in the data that Shannon developed, you don't have access
8 to that data?
9     A.    Of course I have access. I don't have it,
10 but I could get -- presumably pull it up --
11    Q.    Okay.
12    A.    -- either write for it or get it online.
13    Q.    Okay. But that wasn't data that was
14 utilized by you in preparing your expert report in this
15 case; is that correct?
16    A.    No. In fact, I didn't deal with Mexico in
17 my expert report.
18    Q.    Why not?
19    A.    I think we already discussed that. But in
20 terms of Moises, his preference would be to stay in the
21 United States, if that's possible. And from a legal
22 standpoint, I think he still has to work that out. It
23 seemed unnecessarily complicated, since his desire is to
24 get treatment here and to remain here. And so I got
25 information that would allow me to issue a report if I

75

1 needed to, but I decided not to.
2     Q.    Okay. Got it. The next --
3     A.    And I didn't discuss it with the attorney
4 before I issued my report.
5     Q.    Okay. So that was your own decision,
6 independent of any communication you had with anyone
7 who's an attorney representing Mr. Carranza-Reyes?
8     A.    Yes.
9     Q.    Okay. Did you discuss that issue with Dr.
10 Pacey?
11    A.    I did.
12    Q.    The next part, 235 to 239, looks like it's
13 information from the ESL program at CCD; is that right?
14    A.    Yes.
15    Q.    All right. The next sort of section of this
16 file that I have, 240, and I think it's the rest of them,
17 the rest of the file, is either vocational testing
18 information or information about vocational opportunities
19 in the United States. Does that seem right to you?
20    A.    Okay. What we have, first of all, is the --
21 is the information on the testing. And technically,
22 they're not supposed to cover anything -- copy anything
23 but the cover sheets, because it's all copyrighted.
24    Q.    Okay.
25    A.    And so please don't use it outside of this

76

1 case.
2     Q.    I won't. I promise.
3          THE DEPONENT:  And the same for you guys.
4 All right?
5          MR. ARCHULETA:  Absolutely.
6          THE DEPONENT:  Only in this case.
7          MS. LEWIS:  Right.
8          THE DEPONENT:  Okay. Thank you.
9          MS. LEWIS:  That's fine.
10         THE DEPONENT:  But this gives you the tests
11 and the test results.
12    Q.    (BY MR. RINGEL) And that's pages 240
13 through --
14    A.    313.
15    Q.    Okay. And then what's the next part of
16 this?
17    A.    Well, I would say that this is basic labor
18 market information that got misfiled into this file.
19    Q.    This next part is for a different client?
20    A.    Yes.
21    Q.    Do you recognize the name of that client?
22    A.    Yes.
23    Q.    All right. We will ignore 314 through 317,
24 because it shouldn't be in this file; is that right?
25    A.    Well, yeah.

* SUBJECT TO CONFIDENTIALITY DESIGNATIONS *

Carranza-Reyes v. Park County                                        Helen M. Woodard, M.A.

85

1  test. And this -- what this measures is how fast you are
2  with common hand tools.
3      Q.   Right. Okay.
4      A.   And we found that he was at least average in
5  all the dexterity testing.
6      Q.   Do you think it matters that the norm is
7  English speakers in those kind of dexterity tests?
8      A.   Not really. Usually people kind of like
9  these tests. It gives them a chance to compete against
10 themselves, because you give more than one trial. And if
11 they understood the instructions, which you know pretty
12 quick if they're able to do the test, then I think it's
13 usually a pretty valid representation of their skills.
14     Q.   Are there any vocational tests that you're
15 aware of that have a norm of more of a worldwide
16 population?
17     A.   Not -- no, huh-uh. There -- you can find a
18 few tests that are not normed for Spanish, but where
19 Spanish -- where the Spanish language is used --
20     Q.   Okay.
21     A.   -- and you wouldn't need an interpreter.
22     Q.   Okay. But the norm wouldn't be a
23 Spanish-language population?
24     A.   No.
25     Q.   The infrastructure of this kind of testing

86

1  is in English, essentially?
2      A.   These are essentially an American
3  phenomenon, I think. And if you go to other countries,
4  they may have some tests for employment purposes that
5  they use in various settings, but they wouldn't be
6  something that you would purchase the way -- I mean,
7  these are all commercial tests --
8      Q.   I understand.
9      A.   -- and we buy them commercially.
10     Q.   I understand. Okay. But do you have any
11 idea -- you would presume that there are some commercial
12 tests like this available in Mexico?
13     A.   I don't know whether there are. I haven't
14 run across them. And I have a pretty large Mexican
15 population on my caseload, and I haven't run across
16 anyone who has ever said, Oh, I did tests like this in
17 Mexico.
18     Q.   Oh, okay. Fair enough. And you would
19 assume that that might be the case if -- if this kind of
20 test is readily done in Mexico?
21     A.   Yeah, I would. Over the years, I think at
22 least one person would have said to me --
23     Q.   Yeah, I know what this is.
24     A.   -- yeah, I did something like this.
25     Q.   Okay. Based on the vocational testing that

87

1  you -- your office did, do you have an opinion of Mr.
2  Carranza-Reyes' ability to work from a physical
3  perspective?
4      A.   I don't think he can work right now. I
5  think that, first of all, he has the problem with the
6  prosthesis and the pain. And for him to tolerate even
7  standing and walking around a work site, that has to be
8  resolved. Secondly, he has no green card, and that's
9  going to be a big issue. And we don't advise people to
10 go get a job if they don't have legal documents. And so
11 that's going to be an issue for him here.
12          And I think in Mexico it's a huge problem,
13 because the economy is not as good, and the jobs there
14 tend to be a lot harder, and the work settings tend to be
15 a lot harder. And so I guess I think that the likelihood
16 is, he is not going to work with his present level of
17 education in English without a green card here and
18 without resolving his physical issues.
19     Q.   And when you say "his physical issues,"
20 you're talking about what we talked about before, related
21 to his prosthesis?
22     A.   Related to the prosthesis. And, of course,
23 the nurse's concern is from a pulmonological standpoint,
24 because he has a lot of fatigue, and, of course,
25 operating a prosthesis takes a lot of energy. So if you

88

1  also have a pulmonary problem that makes you have less
2  breath, then it can be a big issue, particularly in jobs
3  where you have to walk around. I think that needs to be
4  evaluated. I don't know how -- what the interplay might
5  be there.
6      Q.   Okay. But there are jobs that exist in the
7  American economy -- and setting aside his inability to
8  work on a legal basis in the United States, assuming he
9  had an ability to work legally in the United States -- he
10 could do -- there are jobs that exist that are -- that
11 would be within his education and experience level that
12 he could be sitting at a workbench, correct, working with
13 his hands?
14     A.   Well, it would have to be an unskilled,
15 sedentary job where English wasn't a requirement, and
16 those are relatively few. A lot of the jobs which are
17 done by immigrants are not bench work. They're heavier
18 physical labor.
19          I mean, you walk into meat-processing
20 plants, turkey-processing plants, a lot of the heavy
21 warehousing, you go do job surveys in those places, and
22 there's a huge immigrant population doing those jobs.
23 And they're heavy, and they occur in environments that he
24 wouldn't be able to tolerate.
25     Q.   Understood.

Pages 85 to 88

*  SUBJECT TO CONFIDENTIALITY DESIGNATIONS  *

---

**89**

1    A.   I would think that if -- he will have a real
2   limited access to jobs of an unskilled, sedentary nature
3   because there are relatively few of those. They fled
4   overseas to a huge degree, or to Mexico, maybe, although
5   I don't think Mexico is getting a lot of them.
6        But without speaking English, it's going to
7   be hard for him. And he's fairly bright. If he had the
8   opportunity for education, I would think that that would
9   increase his options very significantly.
10   Q.   Sort of to summarize what you're saying, it
11  strikes me that you're saying he has a variety of
12  different barriers that will make it difficult for him to
13  find employment in the United States: One, his legal
14  immigration status?
15   A.   Well, that's a real barrier.
16   Q.   Right. No, I agree. Two, his disability
17  and physical limitations?
18   A.   That's a huge barrier because of his
19  educational level.
20   Q.   Right. So -- but presumably, when he came
21  to the United States, he at least himself had the
22  expectation that he would find work that he would be able
23  to do, given his language issues and his education
24  issues, right?
25   A.   He could have. He could have worked in the

---

**90**

1   local Taco Bell or McDonald's or the foundry or the
2   meat-processing plant or the janitorial service or, you
3   know, all of those heavy and hot kinds of jobs.
4    Q.   That he can't do now because of his physical
5   limitations?
6    A.   Right.
7    Q.   So what you're saying is, until he learns
8   English and obtains sufficient education in the United
9   States, the number of jobs that he could do is relatively
10  limited, even assuming that he legalized his immigration
11  status?
12   A.   Yeah, it would be very limited.
13   Q.   What's your sense of how long it should
14  reasonably take him to obtain the -- assuming that cost
15  is not an issue. Assuming that he wins this lawsuit or
16  we settle the lawsuit, and he earns sufficient money
17  to -- or from whatever source he earns -- he has
18  sufficient money to pay for what I'm about to ask you.
19  That aside, how long should it reasonably take Mr.
20  Carranza-Reyes to get the English training and the
21  educational training to broaden his vocational
22  requirements in the United States?
23   A.   Well, you have to think about it
24  sequentially, because the first thing you have to do is
25  get his medical circumstances improved. And that's

---

**91**

1   likely to take six months or a year.
2    Q.   Even with costs not being an option?
3    A.   Even with costs not being an option.
4    Q.   Because the nature of his medical
5   circumstances are such that it would require repeat
6   visits with providers to get everything right?
7    A.   And it takes a long time to get a prosthetic
8   made, and then to get all the adjustments and then be
9   able to tolerate the new prosthesis.
10   Q.   Okay.
11   A.   And so -- and he might need a few sessions
12  of physical therapy after that, and so you've got that
13  situation. So you've got six to 12 months there if
14  everything is ideal. And you've got to deal to some
15  extent with his depression and make sure that he's able
16  to concentrate.
17       And if you solved -- if you solved the issue
18  of his financial circumstances where he could concentrate
19  on English classes, if he had a driver's license and a
20  vehicle that was accessible, then he could go to classes,
21  you're probably at another two or three years of English
22  language, and superimposing on that some skills training.
23   Q.   Okay.
24   A.   And then another year to two years probably
25  to finish that up, get into the labor market at some

---

**92**

1   level and see if he could tolerate it. That would be an
2   ideal world for him.
3    Q.   Okay. He is 27 years old, right?
4    A.   Yes.
5    Q.   So, you know, he has a -- in either the
6   United States or Mexico, has a fairly lengthy remainder
7   of his working lifetime, or what would be considered a
8   working lifetime, correct?
9    A.   Sure.
10   Q.   So it's not out of the -- out of reason
11  to think at age -- I think the time that you just
12  described adds up to about six to eight years. Does that
13  seem right to you?
14   A.   Yeah, I think -- yeah, probably.
15   Q.   So assuming that he had the financial means
16  and everything else was right, within six to eight years
17  he should be able to -- assuming he can tolerate it
18  physically and emotionally, he should be able to enter
19  the workforce and have gainful employment; is that fair?
20   A.   Yeah, on at least a part-time if not a
21  full-time basis. I mean, if you -- if you give someone
22  skills that let them do a job within their physical
23  capacities, they still encounter problems in the labor
24  market.
25   Q.   Oh, I understand that.

---

Pages 89 to 92

\* SUBJECT TO CONFIDENTIALITY DESIGNATIONS \*

93

1  A.  But you really make it much easier for them
2  to function.  And if you have -- if you have no skills,
3  and you're illiterate, and you can't drive to work, and
4  you -- you know, the barriers he faces here or presently
5  in Mexico are really severe, so it's less likely than not
6  that he will return to work.
7  Q.  Do you understand that -- or do you know
8  that Mr. Carranza-Reyes regularly drives a car?
9  A.  I know he does.
10  Q.  So he at least physically can?
11  A.  Yes.  But in the long run, you have to worry
12  about legally.
13  Q.  All right.  As part of this vocational
14  assessment, did you do a labor market survey for Mr.
15  Carranza-Reyes in either the United States or Mexico?
16  A.  No.
17  Q.  Why not?
18  A.  I relied on my past experience in both those
19  places.  And we already had a huge amount of time into
20  this case, and it didn't seem reasonable to me to repeat
21  what I already knew.
22  Q.  I understand.
23  (Deposition Exhibit 50 was marked.)
24  Q.  I'm handing you what's been marked as
25  Exhibit Number 50.  Do you recognize this?

94

1  A.  You know what?  I think it's probably Pat
2  Pacey's notes of her conversation with me.
3  Q.  I will represent to you that this is from
4  Dr. Pacey's file, and it purports to be her notes of a
5  conversation she had with you on May 13th of '06.  Do you
6  recall such a conversation?
7  A.  I recall talking to her.
8  Q.  How long did you talk to her?
9  A.  Oh, I don't know.  You know, usually
10  conversations about clients are somewhere between 15 and
11  30 minutes.
12  Q.  Okay.
13  A.  I don't keep notes because nothing she says
14  is important to me.
15  Q.  Oh, I understand.  You are a resource to
16  her, not vice versa.
17  A.  Yeah.
18  Q.  I understand that.  So you were providing
19  information --
20  (Interruption of the deposition by a
21  telephone call.)
22  (Break taken from 6:23 p.m. until 6:25 p.m.)
23  (Page 94, lines 14 through 18 were read
24  back.)
25  Q.  You were providing information to Dr. Pacey,

95

1  not vice versa --
2  A.  Exactly.
3  Q.  -- for her to complete her report in this
4  case?
5  A.  Exactly.
6  Q.  Okay.  Take a look at -- well, let me ask
7  you this first:  What do you remember of your
8  conversation with Dr. Pacey on May 13th?
9  A.  We really talked about the vocational
10  issues, and not the life care plan.
11  Q.  Okay.
12  A.  She had the life care plan or was going to
13  get it -- I don't remember which -- and so we weren't
14  concerned with that.  We were just addressing the
15  vocational issues.  And essentially what I said to you a
16  few minutes ago and what I said to her was, if he stays
17  here, his chances of working are higher than if he goes
18  to Mexico.  And there are multiple reasons for that.
19  But again, I think he's fairly bright.  And
20  if his medical situation were under control, and if he
21  were able to get some training, both English language
22  training and specific skills training, then I think he
23  would be able to find some kind of work over the course
24  of his life.  I told her I thought probably 20 to 40
25  dollars an hour -- 20 to 40 hours a week, I'm sorry, at

96

1  10 bucks an hour.
2  Q.  Is a reasonable expectation of his economic
3  earning potential --
4  A.  Here.
5  Q.  -- here in the United States for the
6  remainder of his life?
7  A.  Once he gets training, if he has a green
8  card, if he has the problems with the prosthesis and the
9  pain resolved.
10  Q.  Okay.  How many labor market surveys have
11  you done in Mexico?
12  A.  Oh, quite a number.  I mean, over the course
13  of time, probably, I suppose, 20 or 30 in the last 10
14  years.
15  Q.  When's the last one?
16  A.  It would have been last year.
17  Q.  Do you remember the name of the client?
18  A.  I can see him in his mind's eye -- in my
19  mind's eye.  He had a spinal cord injury.
20  Q.  Was it litigation?
21  A.  Yes.
22  Q.  Did you testify?
23  A.  I don't think so.
24  Q.  So it wouldn't be reflected on your list of
25  testimony?

Pages 93 to 96

* SUBJECT TO CONFIDENTIALITY DESIGNATIONS *

Carranza-Reyes v. Park County                                    Helen M. Woodard, M.A.

---

97

1   A.   Probably not.

2   Q.   Okay. Have you ever done a labor market

3   survey in Mexico related to someone who had disabilities

4   similar to Mr. Carranza-Reyes?

5   A.   I think all the ones that I've done have had

6   mobility impairments of one kind or another.

7   Q.   Okay. Can you read Dr. Pacey's notes that

8   are Exhibit 50?

9   A.   I think mostly.

10   Q.   Would you read them all to yourself?

11   A.   "Teleconference" --

12   Q.   Just --

13   A.   -- "with Woodard" --

14   Q.   -- to yourself.

15   A.   Oh, okay.

16   Q.   Just read the whole thing, and then I'll ask

17   you some questions about the whole thing.

18   A.   Okay.

19   Q.   Do you know what Dr. Pacey's referring to in

20   the last line, "50 to 60 percent of U.S. costs"?

21   A.   I think we had a brief conversation about

22   the value or cost of services there versus here.

23   Q.   All right. And am I right in thinking

24   that -- did you tell her that you believed that certain

25   costs of services in Mexico was 50 to 60 percent less

---

98

1   than -- or of U.S. costs?

2   A.   I can't remember whether she said that's

3   what they found. I mean, they did a separate survey from

4   the one that we did.

5   Q.   Okay.

6   A.   And I can't remember how that came about. I

7   don't -- you'd have to ask her what this note exactly

8   means.

9   Q.   Dr. Pacey's deposition is tomorrow --

10   A.   Oh, okay.

11   Q.   -- so she will be asked. Do you -- what

12   makes you think they did a separate survey of costs than

13   you?

14   A.   I think she said they did.

15   Q.   But other than that, you don't have any

16   source of information or --

17   A.   That's right.

18   Q.   Okay. All right. And this conversation

19   reflected in these notes was your only conversation with

20   Dr. Pacey about Mr. Carranza-Reyes; is that right?

21   A.   I can't swear that it's the only one, but

22   it's the one that I remember. I mean, over the course of

23   time, if you're working on a case with someone, you might

24   call them back three or four times to clarify some small

25   thing.

---

99

1   Q.   Okay. And you regularly work with Dr. Pacey

2   on cases; is that fair?

3   A.   Yeah, one of about 30 economists.

4   Q.   Oh, I understand. But she's one that

5   you know and have worked with for years?

6   A.   Sure. She's been in business in Colorado --

7   not as long as I have, but almost as long.

8   Q.   Understood. And it's not uncommon that in a

9   litigation, at least, there would be both the need for

10   someone with your background and experience and someone

11   with -- someone like Dr. Pacey's?

12   A.   That's right.

13        MR. RINGEL:   What I need to do is just look

14   at my notes. I think we are just about finished, if

15   people will bear with me.

16        (Discussion off the record.)

17   Q.   (BY MR. RINGEL)  Okay. A couple more

18   questions. I think I asked this, but I'm not -- I wanted

19   to clarify something. I think we established that your

20   file -- well, let me ask it without saying what we

21   established. The documents that are Exhibits 49 plus all

22   the medical records are your file on Mr. Carranza-Reyes.

23   What else is in your file?

24   A.   I think you got copies of my file --

25   Q.   Okay.

---

100

1   A.   -- so I think that that's everything.

2   Q.   Would there be any correspondence between

3   you and anyone that wouldn't have been -- that -- because

4   the only piece of correspondence that I have seen is the

5   one from Mr. Trine that was in that file.

6   A.   I have a letter from Elizabeth Peach on

7   November 22nd that forwarded additional medical records.

8   Q.   Okay. Would you have e-mailed anyone about

9   this case?

10   A.   Not typically.

11   Q.   Okay.

12   A.   It would be in the file if we had, if we had

13   sent an e-mail to a doctor, or something.

14   Q.   And got information, it would have been

15   printed out?

16   A.   Yes.

17   Q.   Okay. Do you have any -- what's your

18   process of drafting a report?

19   A.   Whoever is working on it puts in the

20   information. We use the same sort of format all the

21   time. And we don't have a format in the computer. We

22   just put it in. And then if two people are working on

23   something, like if we divide up the medical records, you

24   do it in two separate documents, and it gets combined

25   into the one document. And the extraneous things get

---

Pages 97 to 100

---

**117**

1  over time on any studies?
2      A.   No. That's based on my experience. And
3  there's quite a bit written on aging with disability, but
4  I didn't consult it specifically for this.
5      Q.   How many clients have you had with lower
6  extremity amputations and neuropathic pain?
7      A.   A lot of clients with both, a lot of clients
8  who have neuropathic lower extremity pain. It's pretty
9  common on the caseload. With amputations and neuropathic
10 pain, quite a few. You know, luckily, amputations aren't
11 a huge percentage of our caseload, but it's significant
12 enough that I could probably, with thinking about it,
13 name six or eight clients currently on our caseload.
14     Q.   So over your career, can you quantify it as
15 100 or more?
16     A.   I hate this guessing, but it's more than
17 100, I'm sure.
18     Q.   Okay.
19     A.   But it's a guess, and you should realize
20 it's a guess.
21     Q.   Could you please turn to page 7 of your
22 report, which is the same exhibit. Under the paragraph
23 with the heading "Needs Assessment," there's a sentence
24 that begins, "The life care plan reflects recommendations
25 made per Miss Poppish and using our experience with

---

**118**

1  patients with lower extremity amputations and neuropathic
2  pain." Can you describe what the experience you're
3  referencing is in terms of? Are you talking about just
4  interactions with them, or what -- what is the
5  experience?
6      A.   Well, we've done life care plans over many
7  years of people who have to deal with neuropathic pain on
8  an ongoing basis, and so I'm familiar with the kinds of
9  treatment that people with neuropathic pain are typically
10 prescribed if they're being seen by a specialist in pain
11 management. We didn't include any of those treatment
12 modalities in this plan, hoping that he would be seen by
13 a specialist, and we would have specific recommendations.
14          With regard to the equipment, I relied on my
15 experience for knowing that he should have a cane, a
16 walker, a manual wheelchair for getting up at night
17 for when his prosthesis hurts too much for him to use it.
18 And the problem with crutches as a substitute for a
19 prosthesis is that it affects shoulders and elbows, and
20 in the long run it's a bad accommodation. And so I used
21 my experience to include those kinds of things in the
22 equipment list.
23     Q.   So it's your experience reviewing the
24 medical information related to other patients with
25 similar types of disabilities and recommendations made by

---

**119**

1  providers as to those people; is that --
2      A.   Well, in doing life care plans, you review a
3  lot of medical records and talk to people about their
4  problems. But we also do case management, where we see
5  people over time, and so have pretty good experience with
6  understanding what the problems are as people go through
7  the process of adjusting to the disability, getting
8  themselves back into a situation where they're at least
9  accepting and fairly happy with their lives. And then,
10 as their physical capacities decrease, the depression
11 that goes with that.
12     Q.   Through your case management role, have you
13 had a means to evaluate whether the life care plan you've
14 created for a particular client has worked for that
15 person?
16     A.   We don't do very much of that. We see life
17 care -- we see some clients for case management after a
18 case has settled. And to the extent that the life care
19 plan is fully funded, then people tend to get the
20 services. To the extent that litigation is a compromise,
21 and there's not enough money, they get less of the
22 services. So that's my experience, but we don't do any
23 research.
24          MS. LEWIS: Okay. Those are all the
25 questions I have.

---

**120**

1          MR. ARCHULETA: I have no questions.
2          THE DEPONENT: Do you have a set of these I
3  can have? I need to be able to -- well, I can just look
4  in the pocket part it came from, I guess.
5          MR. RINGEL: I don't have an extra set, but
6  Joe does, and so --
7          THE DEPONENT: Can I borrow it?
8          MR. ARCHULETA: Sure.
9          THE DEPONENT: It would just be easier to me
10 to show somebody than if I have to flop through my file.
11         MR. RINGEL: In terms of what shouldn't be
12 in there?
13         THE DEPONENT: (The deponent nodded.)
14         THE REPORTER: Before we go off the record,
15 can we put on the record how signature will be handled?
16         MR. RINGEL: Ms. Woodard, you, as you know,
17 have the opportunity to review and sign your deposition,
18 or waive.
19         THE DEPONENT: I'll waive.
20         IT WAS STIPULATED AND AGREED between
21 counsel, with the consent of the deponent, that the
22 reading and signing of the within deposition is waived.
23         WHEREUPON, the within proceedings were
24 concluded at the approximate hour of 7:02 p.m. this 12th
25 day of July, 2006.

---

*  SUBJECT TO CONFIDENTIALITY DESIGNATIONS  *