Slip Copy

Page 21

Slip Copy, 2006 WL 3533049 (D.Colo.)
**(Cite as: Slip Copy)**

drew his velocity value from an expert judgment elicitation assessing dispersion and deposition uncertainties in modeling the consequences of a nuclear accident. *See* Goble Report at 37 (citing U.S. Nuclear Regulatory Commission and Commission of European Communities, *Probabilistic Accident Consequence Uncertainty Analysis: Dispersion and Deposition Uncertainty Assessment, Vols. I-III*, NUREG/CR-6244 (1995) [hereinafter 'NUREG/CR-6244'] ). The elicitation was funded and directed jointly by the U.S. Nuclear Regulatory Commission and the Commission of European Communities to "develop credible and traceable uncertainty distributions" for these input variables. NUREG/CR-6244, Vol. I (Main Report) at ES-1.[FN18] The deposition velocity used by Dr. Goble was the result of the equal weighting scheme used by the NRC and European authors to aggregate and report the results of the experts' assessments. *See id.* at 3-9 to 3-10.

> FN18. In spite of their extensive argument concerning this document in connection with Defendants' challenge to Dr. Goble's testimony, neither party included a copy of it in any court filings made in connection with Defendants' motion. Although it is likely the document can be found elsewhere in the voluminous, 15-year long record for this case, I have not searched for it there and instead, to the extent necessary, take judicial notice of this government document, which is publically available through numerous sources, including the Internet. *See* NUREG/CR-6244 (Main Report), http://www.osti.gov/bridge/p roduct.biblio.jsp?query_id=2 & page=0 & osti_id=10125585.

*14 Defendants assert Dr. Goble was not justified in relying on the deposition velocities reported in NUREG/CR-6244 because the equal weighting scheme used in the study to aggregate the results of the participating experts was itself unreliable. Defendants base this contention entirely on Appendix D to NUREG/CR-6244, in which the study authors discuss alternate, performance-based weighting methods for aggregating the distributions elicited from experts, and apply one such method to the elicited results for comparison purposes. *See id.,* Vol. III, Appendix D; *see also id.,* Vol. I, at 3-10. Using the performance-based method selected, the deposition assessments of seven of the eight experts received a calibration score below the significance level. *Id.,* Vol. III at D-5.

It is clear from the entirety of Appendix D that the NRC and European researchers who directed the study did not consider this result to be determinative of the credibility of these experts' work, and did not view the particular performance-based weighting scheme applied in Appendix D with the same confidence as the equal weighting method they used to derive the deposition velocity relied upon by Dr. Goble. *See, e.g., id.* at D-4 to D-5; *see also* Goble Decl. at 14 (discussing Appendix D). Defendants also do not dispute that equal weighting of expert results has been used in other expert elicitation studies in this field, *see id.* at D-4, or the reliability of the expert elicitation process itself. It was the results of the equal weighting scheme that were published as the study's findings, not the alternate scheme discussed in Appendix D. Finally, Defendants have not presented evidence that anyone other than its paid experts considers the NUREG/CR-6244 velocities used by Dr. Goble to be unreliable. For all of these reasons, I find no basis to hold Dr. Goble's work unreliable and inadmissible as a result of his use of deposition velocities published in NUREG/CR-6244.

Moving beyond their general challenge to Dr. Goble's reliance on NUREG/CR-6244, Defendants assert Dr. Goble erred in selecting from it the velocities stated for one micron particles. Observed data from Rocky Flats, Defendants argue, demonstrate that the average particle size is much larger than one micron, and that the estimated concentration of plutonium in air decreases by several orders of magnitude if deposition velocities from NUREG/CR-6244 corresponding to this larger size are used.

Dr. Goble responded in his 1999 Declaration to both this criticism and the related complaint that the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Page 22

Slip Copy, 2006 WL 3533049 (D.Colo.)
**(Cite as: Slip Copy)**

NUREG/CR-6244 deposition velocities he utilized were based on different wind speeds than occurred during some of the wind-borne plutonium releases from the 903 pad in the 1965-70 period. *See* Goble Decl. at 16-18. This response included a reasoned explanation by Dr. Goble for his choice of the one micron deposition velocity and his decision not to stratify for different wind speeds. That Defendants' experts apparently disagree with Dr. Goble's choices and believe that more accurate results could have been achieved by use of different inputs does not render Dr. Goble's work unreliable and inadmissible under Rule 702.

**\*15** Last but not least, Defendants complain vigorously that Dr. Goble's analysis is unreliable because he improperly used a "multiplier" of plutonium releases in 1965-70 to estimate plutonium releases and exposures in other time periods. Defendants contend courts assessing *Daubert* issues have identified use of a multiplier as a "telltale sign" of a lack of reliability, Aug. 2, 2005 Tr. at 497; *see* Defs.' Intro. & Overview to Mot. to Exclude Expert Witness Test. (Doc. 1378) at 12, and that Dr. Goble arbitrarily selected the multiplier he used.

There are at least two fundamental problems with Defendants' argument. First, they cite no authority supporting their assertion that courts consider use of a multiplier a sign that an expert analysis is unreliable. The only authority cited in support of this proposition, *In re Paoli R.R. Yard PCB Litigation,* 35 F.3d 717 (3rd Cir.1994), does not address this issue. Instead, it affirms the district court's holding that there was no scientific justification for an expert's recalculation of certain blood test results. *Id.* at 772-73. That this recalculation involved the use of a multiplier played no part in this decision. Moreover, the Third Circuit noted that the recalculation, presumably using a multiplier, might be acceptable in other circumstances. *Id.* at 773.

Second, Defendants misstate Dr. Goble's methodology in making this argument. As he made clear in his expert report and 1999 Declaration, Dr. Goble did not rely on a multiplier to estimate plutonium releases and air concentrations in the periods preceding and following the 1965-70 releases from the 903 pad. Instead, Dr. Goble used various period-specific data, including air monitoring data he considered of sufficient reliability, to estimate plutonium releases from 1954 to 1964 and from 1971 to 1989. Goble Report at 13-14, 38-41; Goble Decl. at 18 & n.15. He then converted the estimated plutonium releases for each period into a percentage of the 1965-70 releases for computational ease in calculating exposure and dose ranges and to capture what he considered to be the better characterization of uncertainty in the 1965-70 data. *See* Goble Report at 41-42, Table 4.2; Goble Decl. at 18. Thus, while Dr. Goble *expressed* his estimated plutonium releases for these other periods as a multiplier of the 1965-70 releases for purposes of subsequent calculations, he did not *base* these estimates on the 1965-70 releases or some multiplier thereof. What little effort Defendants made to challenge the method by which Dr. Goble arrived at these multipliers is incomplete and not persuasive. Defendants' contention that Dr. Goble relied on arbitrarily selected multipliers of 1965-70 plutonium releases for these other periods, therefore, and their arguments against admission of his testimony on this basis, are without merit.

For all of the reasons stated above, I find no merit in Defendants' challenges to the relevance and reliability of Dr. Goble's intended testimony under Rule 702. Plaintiffs have demonstrated that Dr. Goble's testimony is relevant to this action and that it is the product of the "same level of intellectual rigor that characterizes the practice of an expert in the field." *Kumho Tire,* 526 U.S. at 152. Dr. Goble's expert testimony is therefore admissible under Rule 702.

### 2. Dr. Richard Clapp

**\*16** Dr. Clapp is an epidemiologist with a Master of Public Health degree from Harvard University and a Doctor of Science degree from Boston University's School of Public Health, where he is currently a Professor in the Department of Environmental Health. From 1980-89, Dr. Clapp served as Director of the Massachusetts Cancer Registry in the Massachusetts Department of Public Health. He is a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Page 23

Slip Copy, 2006 WL 3533049 (D.Colo.)
**(Cite as: Slip Copy)**

member of several professional organizations and has published a number of studies on cancer and other diseases in peer-reviewed scientific journals. He also has advised graduate students and had other experience in research on the health effects of emissions from U.S. nuclear facilities, and has been qualified as an expert in numerous federal and state courts. Pls.' Cons.*Daubert* Resp. (Doc. 1399), Ex. 4 [hereinafter "Clapp Report"] ¶ 1.

Epidemiological studies seek to determine whether there is an association between exposure to a particular agent or agents and disease. Michael D. Green *et al, Reference Guide on Epidemiology,* in *Reference Manual on Scientific Evidence* 333, 337, 348 (2d ed.2000) [hereinafter *"Ref. Guide on Epidemiology"* ]. An association exists when exposure and disease occur more frequently together than one would expect by chance. *Id.* at 348. Epidemiological studies frequently express the existence and strength of any observed association between exposure and disease as "relative risk." *Id.* A relative risk of 1.0, also referred to as the "null hypothesis," signifies that no association between exposure and disease was observed. *Id.* at 349; *see DeLuca v. Merrell Dow Pharms., Inc.,* 911 F.2d 941, 945, 947 (3rd Cir.1990). If the relative risk is greater than 1.0, then there is a positive association because the risk in the exposed individuals or group is greater than the risk in unexposed individuals or groups. *Ref. Guide on Epidemiology* at 349.

Where there is a positive association between the exposure and disease, epidemiologists consider further whether the association represents a causal relationship between exposure to the agent and the disease. *See id.* at 348-49, 374-75. However, " epidemiology cannot objectively prove causation; rather causation is a judgment by epidemiologists and others interpreting epidemiological data." *Id.* at 374.

For this case, Dr. Clapp conducted an epidemiological study to assess the pattern of cancer incidence in relation to an exposure source, the Rocky Flats plant. *Id.;* Pls.' Cons.*Daubert* Resp. (Doc. 1399), Ex. 5 [hereinafter "Clapp Dep."] at 214. To accomplish this, Dr. Clapp analyzed cancer incidence data obtained from the Colorado Central Cancer Registry to compare the odds of a person developing lung or bone cancer in a target geographic area immediately east and south of the Rocky Flats plant with the odds of developing these cancers in more distant areas of Jefferson County. Dr. Clapp used zip codes to define the target area, which includes all or most of the Class Area, and also to define the separate reference area. Clapp Report ¶ 8 & App. 3. Dr. Clapp selected the zip codes for the target area based on whether the centroid of the zip code area was found within the inner two contours of Krey and Hardy's mapping of plutonium contamination in soil around Rocky Flats. *Id.* Krey and Hardy's plutonium contours also define the Class Area.

*17 Dr. Clapp employed a standard epidemiologic methodology, known as age-standardized odds ratio analysis, to perform his comparison.[FN19] *See id.* ¶ 8. The methodology used by Dr. Clapp is also known as an ecological study or analysis. Dr. Clapp performed comparisons for three time periods, 1979-83, 1984-88 and 1989-92, and, in the case of lung cancer, analyzed the data for men and women separately.

> FN19. Defendants' expert, Dr. Geoffrey R. Howe, referred to this method as proportionate cancer incidence analysis. *See* Pls.' Cons. *Daubert* Resp., Ex. 35 at 164-65.

By calculating and comparing the odds ratios for the target area population with the corresponding odds ratios for the reference area population, Dr. Clapp found there was an increased incidence of both bone and lung cancers in the target population in the two plutonium contours closest to Rocky Flats, *see id.* ¶ 8-10, which he concluded was " indicative of an on-going health effect" related to proximity to Rocky Flats, *id.* ¶ 12. Dr. Clapp testified in deposition that he had used the exact same methodology employed in reaching these conclusions in several published, peer-reviewed works and in expert testimony admitted in at least four trials. *See* Clapp Dep. at 300-03.

Defendants argue Dr. Clapp's expert testimony

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Slip Copy, 2006 WL 3533049 (D.Colo.)
(Cite as: Slip Copy)

Page 24

should be excluded in its entirety under Rule 702 because it is not relevant to the issues to be tried and because both his methodology and the conclusions he drew from it are unreliable. Defendants do not challenge Dr. Clapp's qualifications, which are clearly sufficient.

*Relevance/fit*

Defendants' principal argument here is that Dr. Clapp did not analyze risks for persons who owned property in the Class Area as of the Class membership, June 7, 1989, with the result that the increased cancer incidence he reported is neither common to the Class nor class-wide.[FN20] As a result, according to Defendants, Dr. Clapp's study cannot demonstrate a common or class-wide risk and is therefore irrelevant to this action. Defendants' argument misses the point. It is not Plaintiffs' burden to show that all or some Class members have been diagnosed with cancer or some other disease because of exposure to plutonium or other hazardous substances released from Rocky Flats. The issue, as presented by Plaintiffs' nuisance claims, is one of risk, *e.g.*, whether Defendants interfered with the use and enjoyment of Class properties because past, current or potential future exposure to plutonium or other toxic substances released from Rocky Flats poses an increased health risk to occupants of the Class Area. Evidence that the population residing in the reportedly plutonium-contaminated area adjoining the plant has experienced an increased incidence of lung and bone cancer is relevant to this question and will assist the jury in deciding it.

> FN20. Specifically, Defendants point to the fact that members of the Class purchased their properties at different periods, including just before the Class membership date, and to Dr. Clapp's testimony that the latency period for lung cancer is approximately 20-35 years and for bone cancer is approximately 10-25 years. *See* App. to Defs.' Mot. re: Pls.' Risk Experts (Doc. 1377), Ex. 5 (excerpts from Clapp deposition) at 100-03. Taken

together, Defendants assert, this means that Dr. Clapp's study of cancer incidences between 1979 and 1992 fails to address any actual increase in lung and bone cancer incidences among Class members, because the latency period for many Class members has not yet run, and, turning this proposition around, does not reflect the results of any plutonium exposure to the many Class members who purchased their Class properties after 1982, the last period of exposure reflected in Dr. Clapp's results using his latency periods.

Defendants next argue Dr. Clapp's testimony is irrelevant because his target area is larger than the Class Area. There is no dispute, however, that Dr. Clapp's zip-coded defined target area encompasses all or most of the Class Area. This renders his study relevant to the question of risk to persons in the Class Area. That his target area includes some additional areas slightly further from the plant, and presumably having lower levels of plutonium in soil and fewer airborne contaminants as a result, does not change this conclusion.

*18 Defendants finally contend that Dr. Clapp's work is irrelevant because he failed to take into account or assess plutonium exposure. This argument misreads Dr. Clapp's study. As described above, Dr. Clapp defined his target area by reference to the Class Area, which itself is defined by the reported pattern of plutonium contamination caused by releases of plutonium from the plant. Thus his study takes account of plutonium exposure. Defendants' further complaint that Dr. Clapp did not perform a formal exposure assessment as part of his study has no bearing on the relevance or "fit" of his intended testimony.[FN21]

> FN21. Defendants also make no showing that such a formal assessment is required to establish the reliability of the type of epidemiological study Dr. Clapp performed.

*Reliability*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Slip Copy, 2006 WL 3533049 (D.Colo.)
**(Cite as: Slip Copy)**

Defendants argue Dr. Clapp's study and conclusions are unreliable and hence inadmissible for numerous reasons, starting with his use of an ecology study as his method of analysis. Relying primarily on the opinion of their rebuttal expert, Dr. Geoffrey Howe, Defendants assert that ecological studies are inherently unreliable and therefore inadmissible under Rule 702. Ecological studies, however, are one of several methods of epidemiological study that are well-recognized and accepted in the scientific community.[FN22] *See, e.g., Ref. Guide on Epidemiology* at 344-45; Kenneth J. Rothman & Sander Greenland, *Modern Epidemiology* 77, 459-80 (2d ed.1998). Both the scientific community and courts considering such studies view them as useful for establishing associations between exposure to a particular condition and disease, but as relatively weak evidence for establishing a conclusive or definitive causal relationship between exposure and the disease in question. *See, e.g., Ref. Guide on Epidemiology* at 344 (ecological studies " may be useful for establishing associations but they rarely provide definitive causal answers"); *Modern Epidemiology* at 78 (ecological studies useful for detecting associations between exposure and disease occurrence); *Ruff v. Ensign-Bickford Indus., Inc.*, 168 F.Supp.2d 1271, 1282 (D.Utah 2001) (ecological studies generally provide "relatively weak evidence for establishing a conclusive cause and effect relationship"); *In re Hanford Nuclear Reservation Litig.*, No. CY-91-3015-AAM, 1998 WL 775340 at *106 (E.D.Wash. Aug.21, 1998) (same), *rev'd on other grounds*, 292 F.3d 1124 (9th Cir.2002). This relative weakness as to causation goes to the weight to be accorded ecological studies in proving causation, and does not render these studies or opinions based on them *per se* unreliable as a matter of science or law. *See In re Hanford*, 1998 WL 775340 at *106. Dr. Clapp, in fact, reported he has testified as an expert based on this same methodology on at least four occasions, Clapp Dep. at 300-03, and Defendants cite no case in which a court excluded expert testimony regarding an ecological study on the ground that such testimony was inherently unreliable. [FN23]

FN22. An "ecological" or "aggregate" epidemiology study focuses on a comparison of groups, rather than individuals as is the case in other types of epidemiological studies. *See, e.g., Ref. Guide on Epidemiology* at 344; *Modern Epidemiology* at 77. Ecological studies are widely used in the field because they offer many practical advantages over other types of epidemiological studies. *See Modern Epidemiology* at 462, 469.

FN23. The only evidence cited or provided by Defendants concerning the reliability of ecological studies, other than their expert's affidavit, is an excerpt from a 1995 National Research Council publication. The excerpt provided by Defendants is too incomplete to determine the context informing its comments on ecological studies. *See* App. to Defs.' Mot. re: Pls.' Risk Experts (Doc. 1377), Ex. 28. Even taken at face value, however, the comments there are not determinative in light of the scientific and legal authority cited above.

Defendants next claim that Dr. Clapp's study and the conclusions he drew from it are unreliable because they failed to comply with four factors or criteria for drawing causal interferences from epidemiological studies: accounting for known confounders, temporal trend, biological plausibility, and dose-response relationship.

**\*19** Defendants cite no authority, scientific or legal, that compliance with all, or even one, of these factors is required for Dr. Clapp's methodology and conclusions to be deemed sufficiently reliable to be admissible under Rule 702. The scientific consensus is, in fact, to the contrary. It identifies Defendants' list of factors as some of the nine factors or lenses that guide epidemiologists in making judgments about causation. *Ref. Guide on Epidemiology* at 375. These factors are not tests for determining the reliability of any study or the causal inferences drawn from it, as Austin Bradford Hill, the author of these factors, made clear:
What I do not believe-and this has been suggested-[is] that we can usefully lay down some hard-and-fast rules of evidence that must be obeyed

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Slip Copy, 2006 WL 3533049 (D.Colo.)
(Cite as: Slip Copy)

Page 26

before we can accept cause and effect. None of my nine viewpoints [factors] can bring indisputable evidence for or against the cause-and-effect hypothesis and none can be required as *sine qua non.*

A.B. Hill, *The Environment and Disease: Association or Causation,* 58 Proceedings of the Royal Society of Medicine 295, 299 (1965). The Reference Manual on Scientific Evidence and other authority are in accord with this view. *See, e.g., Ref. Guide on Epidemiology* at 375; *Modern Epidemiology* at 28 ("there is no necessary or sufficient criterion for determining whether an observed association is causal").

Defendants' specific complaints regarding each factor as a basis for challenging the reliability and admissibility of Dr. Clapp's study and conclusions are also unsupported or unpersuasive. As defense expert Dr. Howe acknowledged, ecological studies in general do not account for known confounders. *See* App. to Defs.' Mot. Re: Pls.' Risk Experts (Doc. 1377), Ex. 27 [hereinafter "Howe Aff."] ¶ 16; Pls.' Cons.*Daubert* Resp. (Doc. 1399), Ex. 34 [hereinafter "Howe Report"] at 12-13. This is one of the reasons that ecological studies, while recognized and accepted in the scientific community, are viewed as less probative of causation than some other types of epidemiological studies. As stated earlier, the relative weakness of ecological studies on causation issues, because of confounding or other standard concerns, goes to the weight to be accorded to these studies, and does not render them inadmissible.[FN24]

> FN24. The same is true of Defendants' contention that Dr. Clapp's methodology is unreliable because, due to migration in and out of the target area, he could not guarantee that each individual who reported a cancer incidence while living in the target area had actually been exposed to releases of plutonium or other toxic chemicals from Rocky Flats. *See* Defs.' Mot. re: Pls.' Risk Experts at 49. This migration-related problem is, according to Dr. Howe, another standard limitation on ecological studies, *see* Howe Report at 12-13, and as a result goes to the weight of Dr. Clapp's testimony.

Defendants next assert Dr. Clapp's conclusions are scientifically unreliable because he testified at his deposition that he found no consistent temporal trend in the incidence of lung and bone cancer. Defendants do not explain why this fact is of significance here, and did not include in the record enough of Dr. Clapp's deposition testimony for me to determine exactly what Dr. Clapp and the questioner were referring to in their discussion of temporal trends. The scientific literature establishes, however, that the focus of this "factor" is more properly on the temporal or chronological relationship of exposure and disease, that is, whether the putative cause preceded the putative effect. *See, e.g., Ref. Guide on Epidemiology* at 376; *Modern Epidemiology* at 25. Defendants do not and cannot make any argument that the excess lung and bone cancer incidences found by Dr. Clapp during the 1979-92 study period preceded Defendants' activities at Rocky Flats.

\*20 Defendants' assertion that Dr. Clapp's expert testimony must be excluded because his opinions are not biologically plausible is also not persuasive. Defendants cite only the opinion of their rebuttal expert, Dr. Howe, for this position. Dr. Howe based his opinion in part on his view that ecological studies assessing radiation exposure and cancer incidence do not produce biologically plausible results as compared to the results of his preferred methodology, risk projection modeling. *See* Howe Aff. ¶ 17; Howe Report at 4-5, 11-12, 13, 21. Dr. Howe also criticized the biological plausibility of Dr. Clapp's study and conclusions because Dr. Clapp did not design and interpret his ecological study according to Dr. Howe's preferred approach for such studies. Howe Report at 15-17, 21. It is not my role here, however, to determine whether Dr. Howe or Dr. Clapp's methodology is the most reliable. It is only to decide, as a threshold matter, whether Dr. Clapp's testimony is the product of reliable principles and methodologies reliably applied to sufficient and appropriate data. Fed.R.Evid. 702; *see Ruiz-Troche v. Pepsi Cola,* 161 F.3d 77, 85 (1st Cir.1998) ("*Daubert* neither

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                              Page 27

Slip Copy, 2006 WL 3533049 (D.Colo.)
**(Cite as: Slip Copy)**

requires nor empowers trial courts to determine which of several competing scientific theories has the best provenance.") (quoted with approval in Fed.R.Evid.2000 advisory committee's notes). The disagreements between Drs. Clapp and Howe on the best methodology to use and the biological plausibility of the results obtained from their competing methodologies do not cast doubt on this threshold question, but rather go to the weight of their respective testimony.

Defendants also argue Dr. Clapp's testimony must be excluded because "Plaintiffs failed to meet their burden of establishing Dr. Clapp's rate of error." Defs.' Mot. re: Pls.' Risk Experts at 51. Defendants cite no authority establishing that Plaintiffs have a "burden" of establishing Dr. Clapp's rate of error or that a study that does not include a calculated "rate of error" is *per se* inadmissible.[FN25] Moreover, Defendants ignore that Dr. Clapp calculated confidence intervals for his results, which is a recognized and accepted statistical method for assessing whether these results were the result of random error. *See Ref. Guide on Epidemiology* at 354. In his deposition, Dr. Clapp testified there was no way to provide a more general estimate of the possibility that the results of his study did not reflect the truth. *See* App. to Defs.' Mot. re: Pls.' Risk Experts (Doc. 1377), Ex. 5 (excerpts from Clapp deposition) at 307. Defendants have not argued or presented evidence that this statement was inaccurate or that there is, in fact, a method by which an overall "rate of error" can be calculated for an epidemiological study.

>   FN25. The Supreme Court in *Daubert* identified the "rate of error" in an expert's work as one of the factors that may be relevant to deciding its reliability, *see* 509 U.S. at 594, but that does not make production of a "rate of error" a litmus test for determining the admissibility of an expert's work. *See, e.g., Kumho Tire,* 526 U.S. at 149-50; *Bitler,* 400 F.3d at 1233.

Finally, Defendants assert that Dr. Clapp's expert testimony is unreliable and must be excluded because his study did not produce statistically significant results. "Statistical significance" assesses the probability that a particular outcome is due to random variation in the study population, that is, is due to chance rather than a true association between the exposure and disease. *See Ref. Guide on Epidemiology* at 354; *DeLuca,* 911 F.2d at 946-47. With respect to an epidemiological study, it involves the calculation of the *"p*-value" for any association between an agent and disease observed in the study, and a comparison of this value to a preselected significance level. *See Ref. Guide on Epidemiology* at 357; *Modern Epidemiology* at 184; *DeLuca,* 911 F.2d at 947. The most commonly utilized significance level in science is .05, but this is recognized to be an arbitrary selection and other significance levels can and have been used. *See, e.g., Ref. Guide on Epidemiology* at 357-58.

*21 If the *p*-value for a particular study result is less than the selected significance level, then that result is said to be "statistically significant," which means the probability that the observed association is the result of chance rather than a true association is less than the stated significance level. *Ref. Guide on Epidemiology* at 357 & n.64; *De Luca,* 911 F.2d at 947. If the *p*-value is greater than the significance level, then the result is said to be statistically insignificant, which means there is insufficient evidence at the selected significance level to reject the "null hypothesis" of the observed association being a product of chance rather than a true association. Sander Greenland, *The Need for Critical Appraisal of Expert Witnesses in Epidemiology and Statistics,* 39 Wake Forest L.Rev. 291, 298 (2004). It is important to note that "statistically insignificant" results do *not* indicate that it is probable the results were a product of chance or that they otherwise do not reflect a true association. *See id.; Ref. Guide on Epidemiology* at 357 n.64 (commenting that some courts have confused this issue); *id.* at 358 n. 67 (significance testing does not assess whether the null hypothesis, *i.e.,* that there is no real association, is true).[FN26]

>   FN26. The statistical significance or nonsignificance of study results also does not address the magnitude of any

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                           Page 28

Slip Copy, 2006 WL 3533049 (D.Colo.)
**(Cite as: Slip Copy)**

association found by the study. For example, a study may find a very weak association between an agent and disease and yet be "statistically significant," or may find a strong association but, because of the sample size, not be statistically significant. *See, e.g., Ref. Guide on Epidemiology* at 359 & n.71. In other words, "[s]tatistically significant results are not necessarily significant (important), and significant (important) results are not necessarily 'statistically significant.'" David Egilman et al., *Proving Causation: The Use and Abuse of Medical and Scientific Evidence Inside the Courtroom-An Epidemiologists' Critique of the Judicial Interpretation of the Daubert Ruling,* 58 Food & Drug L.J. 223, 238 (2003).

An alternate means of assessing the probability of random error in study results is through the use of confidence intervals. *Ref. Guide on Epidemiology* at 354-55; *DeLuca,* 911 F.2d at 947-48. A confidence interval is a range of values, calculated from the results of a study, within which the true value is likely to fall. *Ref. Guide on Epidemiology* at 360; *see DeLuca,* 911 F.2d at 948. A 95% confidence interval for an epidemiological study, for example, " is constructed with enough width so that one can be confident that it is only 5% likely that the relative risk attained would have occurred if the true parameter, i.e., the actual unknown relationship between the two studied variables, were outside the confidence interval." *DeLuca,* 911 F.2d at 948. The width of the interval reflects the possibility that the relative risk, that is the observed association between exposure and disease, is a product of random error. *See Ref. Guide on Epidemiology* at 360. This method of assessing study results is viewed as superior to significance testing by some leading epidemiologists. *See DeLuca,* 911 F.2d at 946-48 (describing views of Kenneth J. Rothman in his epidemiology text book, *Modern Epidemiology* ); *Ref. Guide on Epidemiology* at 360 & n.75 (" Calculation of a confidence interval permits a more refined assessment of appropriate inferences about the association found in an epidemiological study," citing views of Rothman and others).

Although it need not be used for this purpose, a confidence interval can also be used to infer the $p$-value and thus can be used as a surrogate test for significance. A 95% confidence interval, for example, that does not include the null hypothesis (relative risk of 1.0, which indicates no association between the agent and disease) indicates that there is a less than 5% chance that the observed association is the result of random error or chance. *See Ref. Guide on Epidemiology* at 361. This is equivalent to a $p$-value of less than .05, meaning the study result is "statistically significant." *Id.* Conversely, if the null point falls within the 95% confidence interval, then the study result is not deemed "statistically significant" under a significance level of .05. *See id.; DeLuca,* 911 F.2d at 948.

**\*22** In this case, Dr. Clapp calculated confidence intervals for the results of his study, but did not calculate their $p$-value. *See* App. to Defs.' Mot. re: Pls.' Risk Experts (Doc. 1377), Ex. 5 (excerpts from Clapp deposition) at 226. He also testified at his deposition that he did not consider statistical significance in interpreting these results and that this was consistent with his general practice in interpreting studies such as this. *Id.* at 126-27.

When questioned on the subject, Dr. Clapp further testified that the confidence intervals for his results did not indicate an excess of lung cancer in any time period or for any exposure scenario that would be considered statistically significant under the conventional .05 significance level. *Id.* at 128. This testimony differs from that of defense expert Dr. Howe, who acknowledged finding a statistically significant increase in the incidence of lung cancer in the 1989-92 period for men residing within the plutonium contours closest to Rocky Flats in the confidence levels he generated in a recreation of Dr. Clapp's study. *See* Pls.' Cons.*Daubert* Resp. (Doc. 1399), Ex. 35 [hereinafter "Howe Dep."] at 194; Howe Report, Table 5. Dr. Howe discounted this outcome because he preferred a different method of grouping the study population that did not produce any statistically significant results, and because he considered a finding of one or more statistically significant results itself a matter of chance given the number of results generated under Dr. Clapp's study

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                Page 29

Slip Copy, 2006 WL 3533049 (D.Colo.)
**(Cite as: Slip Copy)**

design.[FN27] *See* Howe Report at 19-20; Howe Dep. at 194.

> FN27. Defendants allege Dr. Clapp, by dividing his study population into 24 overlapping groups, deliberately "designed his analysis so as to substantially increase his chances of finding a statistically significant result purely by random chance." Defs.' Mot. re: Pls.' Risk Experts at 44 n.11. I find no basis for this personal attack on Dr. Clapp and the integrity of his study. Dr. Clapp provided a reasoned, science-based explanation for his study design and study groups, and nothing in the record suggests any improper purpose in his design or analysis.

Defendants argue that the lack of statistically significant results reported by Dr. Clapp renders his study unreliable as a matter of science and inadmissible as a matter of law under Rule 702.[FN28] In addition to disregarding the statistically significant results for excess lung cancer reported by Dr. Howe, this contention is based on Defendants' assertion that "[t]o *prove* with expert evidence that it is more likely than not that plaintiffs were placed at an increased risk by exposure to hazardous substances, a party must make a threshold showing that the expert's study reveals statistically significant results." Defs.' Mot. re: Pls.' Risk Experts at 44 (emphasis added). This argument, of course, confuses the threshold question of admissibility of expert evidence with the separate question of its sufficiency to prove a factual issue. *See, e.g., In re Joint E. & S. Dists. Asbestos Litig.,* 52 F.3d at 1132 (distinguishing inquiry into threshold question of whether expert evidence is admissible from inquiry into whether this and other evidence is sufficient to present jury question); *see also Obrey v. Johnson,* 400 F.3d 691, 696 (9th Cir.2005) (same and stating "[a]s a general matter, so long as the evidence is relevant and the methods employed are sound, neither the usefulness nor the strength of statistical proof determines admissibility under Rule 702.").

> FN28. Defendants do not challenge the reliability of Dr. Clapp's work based on the confidence intervals he reported.

**\*23** Defendants nonetheless implied in their briefs and in oral argument that statistical significance is a threshold requirement for establishing the admissibility of expert testimony involving the use of statistics. They failed, however, to cite any scientific or legal authority for this proposition with respect to epidemiological studies or in general.

In fact, as admitted by Defendants' own expert, Dr. Howe, there is a considerable dispute in the scientific community about the necessity or even relevance of statistical significance testing to epidemiological studies. Howe Dep. at 201-203; *see Ref. Guide on Epidemiology* at 359-60; Greenland, *The Need for Critical Appraisal,* 39 Wake Forest L.Rev. at 299 ("Significance testing is neither necessary nor appropriate as a requirement for drawing inferences from epidemiological data;" internal quotation omitted); *Modern Epidemiology* at 183-84 (explaining historical basis of significance testing and its limits as applied to epidemiological studies). This dispute, and the corresponding move by some in this field away from using *p*-values and "statistical significance" as a means of determining what conclusions and inferences can be reliably drawn from an epidemiological study, has been recognized by the courts, *see, e.g., DeLuca,* 911 F.2d at 946-48, and influential commentators and epidemiologists.[FN29] *See, e.g.,* Greenland, *Need for Critical Appraisal,* 39 Wake Forest L.Rev. at 297-301 (criticizing misuse of statistical significance in legal proceedings, and particularly improper assumption that a finding of nonsignificance demonstrates that an observed association is false because it is most likely a product of chance); David Egilman et al., *Proving Causation: The Use and Abuse of Medical and Scientific Evidence Inside the Courtroom-An Epidemiologist's Critique of the Judicial Interpretation of the Daubert Ruling,* 58 Food & Drug L.J. 223, 236-41 (2003) (significance testing " is merely a statistical tool that is frequently-and often inappropriately-utilized in the process of testing inferences. The notion expressed by some courts that epidemiologists only draw inferences

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Slip Copy, 2006 WL 3533049 (D.Colo.)
**(Cite as: Slip Copy)**

Page 30

from data that demonstrate 'statistical significance' is not true."). Defendants' assertion that an epidemiological study must produce "statistically significant" results to satisfy the "reliability" prong of Rule 702 is thus contrary to some of the evolving views in this field of science and provides no basis for excluding Dr. Clapp's testimony.[FN30] The statistical significance or insignificance of Dr. Clapp's results may affect the weight given to his testimony, but does not determine its admissibility under Rule 702.[FN31]

> FN29. Dr. Howe described the movement in epidemiology away from use of statistical significance as "reasonably widespread." Howe Dep. at 203.
>
> FN30. Reliance on statistical significance to determine the admissibility of expert evidence has been rejected by courts in other contexts as well. *See, e.g., Kadas v. MCI Systemhouse Corp.*, 255 F.3d 359, 362 (7th Cir.2001) (age discrimination suit). As Judge Posner observed in criticizing such reliance, "[l]itigation generally is not fussy about evidence; much eyewitness and other nonquantitative evidence is subject to significant possibility of error, yet no effort is made to exclude it if it doesn't satisfy some counterpart to the 5 percent significance test." *Id.*
>
> FN31. Some courts have stated or suggested that statistically significant epidemiological studies are required for a party to meet its burden of producing *prima facie* evidence of medical causation. *See, e.g., Brock v. Merrell Dow Pharms., Inc.*, 874 F.2d 307, 312, as amended, 884 F.2d 166 (5th Cir.1989); *but see, e.g., Allen v. United States*, 588 F.Supp. 247, 417 (D.Utah 1984) ("The cold statement that a given relationship is not 'statistically significant' cannot be read to mean there is no probability of a relationship."). In light of the reevaluation of "statistical significance" in epidemiology as described above, *Brock* and other decisions using statistical significance as a bright-line test for the sufficiency of causation evidence may be subject to reevaluation. Even if this were not the case, the showing necessary to meet the burden of proof on medical causation is distinct from the question presented here, which is whether Dr. Clapp's epidemiological study is sufficiently grounded in reliable principles and methodology for its results to be admitted and considered by the jury in connection with Plaintiffs' nuisance claim.

In sum, after considering all of the parties' arguments concerning Dr. Clapp's methodology, I find that Dr. Clapp, in conducting his study and reporting its conclusions, employed scientifically sound methods and based his conclusions on facts that satisfy Rule 702's reliability requirements. I therefore find Plaintiffs have met their burden of demonstrating that Dr. Clapp's methodology is reliable within the meaning of Rule 702 and that it is admissible in this action. Defendants' criticisms of Dr. Clapp's methods and conclusions, considered singly or collectively, are matters that go to the weight of his testimony and that may be tested through vigorous cross-examination and the presentation of rebuttal evidence.

*24 I will break here from reporting the basis of my pretrial rulings on the parties' *Daubert* motions to address briefly an additional motion to exclude Dr. Clapp's testimony filed by Defendants, this time during trial in the middle of Dr. Clapp's testimony. I denied the motion from the bench after a recess, but told the parties at the time that I would address it further in this written decision. *See* Order Limiting Mots. Practice During Trial (Doc. 1626) at 2.

In their second attempt to strike and exclude Dr. Clapp's testimony, Defendants renewed their unsuccessful argument that Dr. Clapp's testimony was inadmissible because his epidemiological study did not produce statistically significant results. The only difference between Defendants' original and renewed argument was their assertion for the first time that the Tenth Circuit had specifically rejected "Dr. Clapp's blasé attitude towards statistical

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                           Page 31

Slip Copy, 2006 WL 3533049 (D.Colo.)
**(Cite as: Slip Copy)**

significance" and "adopted statistical significance at the 95-percent confidence level as a[sic] evidentiary threshold for epidemiological studies." Defs.' Mot. to Strike and Exclude Test. of Dr. Richard Clapp (Doc. 1620) at 4. Defendants represented the Tenth Circuit had established this unequivocal rule in two decisions, *Renaud v. Martin Marietta Corp.*, 972 F.2d 304 (10th Cir.1992), and *Boughton v. Cotter Corp.*, 65 F.3d 823 (10th Cir.1995). [FN32] In fact, neither decision stands for any such proposition.

> FN32. Defendants offered no explanation for failing to mention either of these allegedly controlling decisions in their June, 2005, motion to exclude Dr. Clapp's expert testimony.

In *Renaud*, residents of a Denver suburb alleged they had been exposed to toxic chemicals released from the defendant's manufacturing facility and that this exposure had caused them to suffer a variety of injuries. *See Renaud*, 972 F.2d at 305. Plaintiffs' theory of exposure, based on expert reports and testimony, was that waste water containing a certain level of toxic chemicals had been discharged by the defendant into local surface and ground waters on a regular basis for more than a decade, and that these chemicals had made their way to a near-by water treatment plant and from there to the plaintiffs' homes through the city water supply system. *Id.* at 307. All of the expert evidence offered in support of this theory rested on a single data point, a water sample collected in a wastewater pond at the defendant's facility. *Id.*

On summary judgment, the district court considered whether the plaintiffs had presented a *prima facie* case that contaminants from the defendant's facility had reached the plaintiffs' taps in quantities sufficient to cause the injuries they alleged. *Renaud v. Martin Marietta Corp.*, 749 F.Supp. 1545, 1548 (D.Colo.1990). Invoking the testimony of the court's appointed geochemical expert that "[i]t is unsound scientific practice to select one concentration measured at a single location and point in time and apply it to describe continuous releases of contaminants over an 11-year period," the district court excluded the conclusions of plaintiffs' exposure experts, *id.* at 1553, and therefore granted summary judgment against the plaintiffs based on their failure to present evidence that they were ever exposed to toxic chemicals from the defendant's facility. *Id.* at 1555.

*25 In its decision, the district court also commented in dicta that the *Renaud* plaintiffs could have but did not offer epidemiological studies as indirect or circumstantial evidence of exposure, [FN33] and that "even if plaintiffs had been able to prove exposure by their direct evidence, they would have been required to submit epidemiological evidence in support of their causation contentions." [FN34] *Id.* at 1554-55. In the course of these comments, the court observed that the Fifth Circuit, "when addressing a similar argument," had found that a plaintiff's "failure to present statistically significant epidemiological proof that Bendectin causes limb reduction defects to be fatal to their case." *Id.* at 1555 (quoting *Brock v. Merrell Dow Pharms., Inc.*, 874 F.2d 307, 313, 315, as amended, 884 F.2d 166 (5th Cir.1989)).[FN35]

> FN33. The Reference Manual on Scientific Evidence criticizes this assertion, reporting that the district court in *Renaud* "confused the role of epidemiology in proving causation with the issue of plaintiffs' exposure to the alleged carcinogen." *Ref. Guide on Epidemiology* at 344 n.28.
>
> FN34. Although Plaintiffs did not present epidemiological evidence to prove causation, they did present Dr. Clapp and another expert to testify in rebuttal to an epidemiological study offered by the defendants. *See* 749 F.Supp. at 1551.
>
> FN35. It should go without saying that the district court did not by this statement " adopt[ ] statistical significance at the 95-percent confidence level" as the test for proof of medical causation, and even if it had, that this test would go to the sufficiency of epidemiological evidence to prove this issue, and not to the separate question of whether an epidemiological

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 3533049 (D.Colo.)
(Cite as: Slip Copy)

Page 32

study is admissible for this or some other purpose. *See supra* note 31.

On appeal, the Tenth Circuit stated that the central issue before it was "the propriety of the District Court's observation regarding the single water sample used as a basis for plaintiffs' extrapolations." *Renaud*, 972 F.2d at 308. The Tenth Circuit agreed this extrapolation was unsound, and affirmed the district court's decision to exclude the conclusions of the plaintiffs' exposure experts and to grant summary judgment against plaintiffs based on their failure to make a *prima facie* showing of exposure. *See id.* The Tenth Circuit's only comment on epidemiological studies was to "question, but leave for another day, the dicta of the Court below that a supporting epidemiological study was required here even had there been acceptable direct proof of exposure." *Id.* at 308 n. 7. The court made no mention of statistical significance or any test for the admission of epidemiological studies. In short, there is nothing in the Tenth Circuit's decision in *Renaud*, and next to nothing in the lower court's decision, to support Defendants' repeated declarations in their trial motion and at oral argument, *see* Nov. 10, 2005 Trial Tr. at 4891-4901, that the Tenth Circuit (or any other court) has adopted a rule barring admission of any epidemiological study that was not statistically significant at the 95-percent confidence level.

Defendants fare no better in their reliance on *Boughton v. Cotter Corporation*. Defendants represent that the Tenth Circuit in *Boughton* " affirmed the exclusion of another cancer study on the grounds that none of the observed levels of cancer were elevated to a statistically significant level." Defs.' Mot. to Strike and Exclude Test. of Dr. Clapp at 4 (quoting *Boughton*, 65 F.3d at 835 n. 20). This is simply incorrect. In *Boughton*, the Tenth Circuit considered whether the district court had abused its discretion in excluding evidence of the plaintiffs' fears of cancer and other disease to show damages for "annoyance and discomfort" under nuisance and trespass theories of recovery. *Boughton*, 65 F.3d at 831. The district court's decision was based on its legal conclusion that fear of contracting a disease is compensable under Colorado law as part of "annoyance and discomfort" damages only if the fear of disease is grounded in substantial evidence. [FN36] *See id.* at 834-35. The Tenth Circuit affirmed this legal interpretation, and also found no abuse of discretion in the trial court's decision to exclude evidence of the plaintiffs' fears, because the sole evidence of risk offered by the plaintiffs, an epidemiological cancer study that did not produce statistically significant results, was insufficient to meet this test. *Id.* at 835 & n. 20. The Tenth Circuit never considered, let alone decided, whether the cancer study was admissible, but rather considered only whether it was sufficient to demonstrate a factual basis for the plaintiffs' claimed fear of cancer. Again, this is a sufficiency determination, which is distinct from an admissibility determination. *Boughton*, therefore, sets no threshold for the admission of epidemiological studies under Rule 702.

> FN36. This is not an issue in this case because Plaintiffs do not seek damages for annoyance and discomfort, which is a separate category of damages for nuisance and trespass under Colorado law. *See Cook IX*, 273 F.Supp.2d at 1206-07.

### 3. Dr. Steven Wing

*26 Dr. Wing is a professor of epidemiology who specializes in studying the health effects of radiation and has extensive experience in evaluating radiation health effects among workers at U.S. Department of Energy (DOE) nuclear facilities. In his expert report, Dr. Wing addressed two subjects: (1) the state of scientific knowledge on human health effects resulting from exposure to plutonium; and (2) the DOE's role in research regarding radiation health effects. Based on his survey of relevant literature and professional experience with both subjects, Dr. Wing concluded that DOE's control of research into radiation health issues has led to gaps in current scientific knowledge about the health effects of plutonium, an understatement of the risks associated with exposure to plutonium, and the promulgation of standards for radiation exposure based on inadequate information regarding the human health effects of plutonium exposure. *See* Pls.' Opp'n to Defs.' Mot. to Exclude

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Page 33

Slip Copy, 2006 WL 3533049 (D.Colo.)
(Cite as: Slip Copy)

Test. of Dr. Wing (Doc. 1472), Ex. 1 [hereinafter "Wing Report"] at 5.

Defendants do not challenge Dr. Wing's qualifications to testify as proposed, and I find he is qualified to do so.

Defendants argue I must exclude Dr. Wing's proposed expert testimony in its entirety because it will not assist the trier of fact and is the product of unreliable methodology and insufficient facts and data. For the reasons stated below, I disagree and find Dr. Wing's proffered testimony admissible under Rule 702.

*Relevance/fit*

Dr. Wing's testimony regarding the state of knowledge concerning the health effects of plutonium exposure and the adequacy of current radiation exposure standards will assist the jury in deciding whether exposure to plutonium poses a health risk, which is relevant to Plaintiffs' contention, in connection with their nuisance claims, that the health risk posed by plutonium exposure has interfered with the use and enjoyment of property. *See* May 2005 Order at 5. Dr. Wing's intended testimony regarding radiation exposure standards, and the DOE's role in the research on which they are based, is also relevant to the jury's consideration of Defendants' evidence and arguments that rely in whole or in part on these standards or on the current state of knowledge regarding the health effects of plutonium exposure. *See, e.g.,* Pls.' Opp'n to Defs.' Mot. to Exclude Test. of Dr. Steven Wing (Doc. 1472), Ex. 2 (excerpts of report by Defendants' expert Dr. Auxier) & Ex. 3 (excerpts of report by Defendants' expert Dr. Frazier). Defendants' contention that Dr. Wing's testimony is irrelevant because it does not address the conduct of Dow or Rockwell or seek to determine the actual health risk to Class members from exposure to Rocky Flats plutonium are both strawman arguments, as neither subject need be addressed for Dr. Wing's testimony to be relevant and helpful to the jury. Lastly, I find no merit in Defendants' assertion that Dr. Wing's testimony would not assist the jury and/or would usurp its function of weighing the evidence because the jury could just as easily review all of the voluminous scientific materials Dr. Wing collected and reviewed and draw its own conclusions from them. The scientific expertise and experience utilized by Dr. Wing in his review cannot be duplicated by the jury.

*Reliability*

*27 With respect to reliability, Defendants allege Dr. Wing "formulated his opinions based on a few historical documents selected by plaintiffs' counsel," and assert on this basis that his intended testimony is based on insufficient facts and data. Defs.' Mot. to Exclude Test. of Dr. Steven Wing (Doc. 1444) at 7. This statement and argument misrepresent Dr. Wing's expert report, in which he detailed the exhaustive search he and his assistants conducted of international biomedical literature to collect and review information concerning the health hazards of plutonium, their search for and review of relevant documents in the database of the Health Division of the Los Alamos National Laboratory and their review of other relevant materials gathered from national and international sources. *See* Wing Report at 5. That Plaintiffs' counsel provided Dr. Wing with a relative handful of documents is neither improper nor any grounds to disregard the vast amount of material Dr. Wing and his assistants collected and that he reviewed to prepare his expert report and testimony.

Defendants also seek to exclude Dr. Wing's testimony based on the rule that any expert testimony that "does not lend itself to any means of testing or verification" must be excluded as unreliable. Defs.' Mot. to Exclude Test. of Dr. Wing at 5. Defendants cite no authority for this supposed rule. To the extent Defendants are relying on the *Daubert* court's statement of this and other factors for assessing the reliability of expert testimony, it is beyond question that these factors do not apply in all instances and are not automatically determinative in any event. *See, e.g., Kumho Tire Co.,* 526 U.S. at 150-51; *Bitler,* 400 F.3d at 1233. Defendants have not, moreover, identified any means of "testing" Dr. Wing's literature search and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Slip Copy, 2006 WL 3533049 (D.Colo.)
**(Cite as: Slip Copy)**

Page 34

review. They also have not pointed to any omissions in his literature review or any other errors in the method Dr. Wing used to arrive at his conclusions. My review of Dr. Wing's report also failed to disclose any reason to doubt the reliability of his methodology.

Defendants disagree with the conclusions Dr. Wing reached based upon his review. This fact does not render his method or conclusions unreliable under Rule 702. Their further allegation that Dr. Wing was biased in his review based on his involvement in the *TMI* litigation is a matter that goes to his credibility and the weight to be accorded his opinions.

### 4. Dr. K. Shawn Smallwood

Dr. Smallwood is an ecologist who specializes in systems ecology. Systems ecologists assess ecological conditions, pressures and vulnerabilities across large geographic areas using a multi-disciplinary approach that identifies and integrates information relevant to the assessment. Pls.' Cons.*Daubert* Resp. (Doc. 1399), Ex. 27 [hereinafter "Smallwood Report"] at 1. Dr. Smallwood holds a Ph.D in ecology and has extensive professional experience in systems ecology. *See id.* & Smallwood curriculum vitae. His research, including the results of a six-year study of pocket gophers, has been published in peer-reviewed journals. *See id.*

*28 For this action, Dr. Smallwood performed a study to evaluate the role of soil bioturbation, or soil turnover due to biological activity, as a mechanism for exposing Rocky Flats contaminants to winds that could transport them to other locations, including off-site. As part of his study, Dr. Smallwood made three visits to the Rocky Flats site over a three month period to evaluate the activities of pocket gophers, other burrowing animals and plants at specific waste disposal areas identified by Defendants, DOE and its contractors at the plant site, including the area in and around the 903 pad. In a lengthy and detailed expert report, Dr. Smallwood reported his observations of "abundant" animal burrowing and soil excavation in and around the 903 pad, in buried waste trenches and in other areas of known soil contamination at the plant site. Smallwood Report at 3-14.

Dr. Smallwood synthesized the information gathered during his site visits with information obtained through an extensive literature review on burrowing animals and soil and other physical and biological characteristics of the Rocky Flats Plant and environs to assess the impacts of burrowing animals on soil contamination at Rocky Flats and beyond. *Id.* at 14-44. Based on this study, Dr. Smallwood concluded that the hazardous materials released, spilled, dumped and buried at the site by Defendants had been and would continue to be redistributed and brought to the surface through bioturbation of soils, where these materials could be entrained by the characteristic high winds in the area and transported to other locations, including off-site. *Id.* at 14, 45-49. He concluded this exposure pathway had not been adequately studied or monitored in the past. Finally, he concluded that, as a result of the process of bioturbation, a substantial quantity of toxic material released at Rocky Flats likely had been transported off-site, and that people off-site and downwind of the plant site " have been and continue to be at risk of exposure to dangerous materials generated by Rocky Flats operations." *Id.* at 49.

There is apparently no dispute that Dr. Smallwood has published the core elements of his Rocky Flats study and site-specific research in eight separate articles in established scientific journals. He has also presented key elements of his Rocky Flats study to several peer conferences. *See* Pls.' Cons. *Daubert* Resp. at 85-86 & n.66.

Defendants assert all of Dr. Smallwood's proffered testimony should be stricken for a variety of reasons, none of which have merit. Defendants protest, for example, that Dr. Smallwood's testimony does not "fit" this action because Dr. Smallwood did not relate his opinions directly to the Class Area. This argument assumes a requirement that does not exist. It is or should be undisputed that the Class Area is located downwind of the Rocky Flats plant and its potential sources of soil contamination. Dr. Smallwood's proffered

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Slip Copy, 2006 WL 3533049 (D.Colo.)
**(Cite as: Slip Copy)**

Page 35

testimony regarding the processes by which contaminant-bearing soils from Rocky Flats are available for dispersion to downwind areas, and his conclusions regarding the current and future risk of continuing exposure to plutonium and other toxic materials through this process, are relevant to the interference element of Plaintiffs' nuisance claims and will assist the jury in deciding them.

*29 Defendants also assert that Dr. Smallwood is not qualified to render any opinions relating to the fate and transport of Rocky Flats contaminants through the process of bioturbation and wind entrainment because he is not qualified to quantify the amount of plutonium or other dangerous contaminants transported to off-site locations, to model the alleged dispersion of these air-borne contaminants, or to quantify radiation doses or the resulting health risk. This argument errs in assuming that any or all of these tasks are a prerequisite to forming the opinions set forth in Dr. Smallwood's report. Defendants provide no scientific or legal support for these assumptions and none is apparent to me. Dr. Smallwood's conclusions regarding the past dispersion of contaminant-bearing soils made available through bioturbation and the risk of future exposure through this pathway all flow from and are part of his analysis of the process of bioturbation at the plant site and the biological and physical characteristics of the Rocky Flats site. These subjects and analyses are all within Dr. Smallwood's area of expertise. His conclusion, for example, that quantities of dangerous materials from Rocky Flats have been transported off-site through the process set out in his report is based on his calculation of the fraction of contaminant-bearing soils that is made available for wind dispersion each year, a subject that is within his area of expertise. Defendants' challenge to Dr. Smallwood's qualitative description of this amount as "substantial " goes to the weight of his testimony and may be addressed on cross-examination.[FN37]

> FN37. Defendants also argue Dr. Smallwood's conclusions regarding future risk are unreliable and without foundation because the waste and disposal areas he examined in 1996 have all now been fully remediated. This factual assertion is largely unsupported in the pretrial record and is undoubtedly disputed by the parties. Whether Dr. Smallwood's study and conclusions are now incorrect because of evidence of changed conditions at the plant site is, moreover, a matter that the jury can decide in assessing the weight and credibility of his testimony.

Defendants contend Plaintiffs intend to elicit trial opinions from Dr. Smallwood on the potential health risk to Class members from off-site releases of Rocky Flats contaminants, and that he is unqualified to testify on this subject. Dr. Smallwood concluded in his report that the suspended and resuspended plutonium at Rocky Flats is respirable based on studies of plutonium uptake by three species of animals in the vicinity of Rocky Flats. Smallwood Report at 45. This conclusion is within his area of expertise.

The only other portion of Dr. Smallwood's report that touches on potential health risk is a short discussion on how the rate of soil bioturbation can be used to estimate airborne releases of specific contaminants in Rocky Flats soil. To illustrate how this could be accomplished, Dr. Smallwood provided a calculation, based on certain conditions and assumptions, regarding the amount of hexavalent chromium released from Rocky Flats and, in the calculation's final line, the predicted lifetime risk from the calculated releases. Dr. Smallwood's report made clear this was merely an " illustrative example" of how the rate of soil bioturbation could be used to estimate releases and risk. Id. at 46. Dr. Smallwood, as a systems ecologist trained to collect and integrate information from multiple disciplines, is qualified to illustrate how the information on soil bioturbation that he collected and generated can be used for these purposes.

*30 In his expert report Dr. Smallwood also concluded that the ambient air monitoring stations on and off the Rocky Flats site were inadequate to detect and measure the past and chronic releases of contaminants caused by the resuspension of surface soils through soil bioturbation. See id. at 28.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Page 36

Slip Copy, 2006 WL 3533049 (D.Colo.)
**(Cite as: Slip Copy)**

Defendants assert this opinion must be excluded because Dr. Smallwood is not qualified to testify as an air monitoring expert and because the opinion is based on insufficient facts and data. Dr. Smallwood is not, however, testifying as an expert on all aspects of Rocky Flats' air monitoring program, but only on whether the monitoring stations at Rocky Flats would capture the kind of contaminant releases that were the subject of his report. Dr. Smallwood has experience evaluating air monitoring programs, *see* Pls.' Cons.*Daubert* Resp. (Doc. 1399), Ex. 28 [hereinafter "Smallwood Dep."] at 65-66, and his work evaluating environmental surveillance and monitoring at nuclear weapons production facilities, including Rocky Flats, has been published in a peer-reviewed journal. *See* Pls.' Cons.*Daubert* Resp., Ex. 29 (Michael L. Morrison, K. Shawn Smallwood & Jan Beyea, *Monitoring the dispersal of contaminants by wildlife at nuclear weapons production and waste storage facilities*, 17 The Environmentalist 289 (1997)). He reported reviewing various information sources, including maps showing the locations of air monitoring stations, some air monitoring data, and other information, to support his opinion that the Rocky Flats air monitoring stations were too diffuse in the landscape and were not the appropriate height to detect the chronic release of materials through bioturbation. *See* Smallwood Report at 28; Smallwood Dep. at 56, 64. Dr. Smallwood is sufficiently qualified to testify regarding this subject under Rule 702, and his opinion is based on sufficient facts and data. That he does not specialize in evaluating air monitoring systems does not affect the admissibility of his opinion but rather its weight. *See, e.g., Ralston,* 275 F.3d at 970.

For the reasons stated above, I find Dr. Smallwood's proposed expert testimony satisfies the requirements for admission under Rule 702. Defendants' motion to exclude his testimony and the testimony of Drs. Goble, Clapp and Wing is denied.

### C. Motion to Exclude Plaintiffs' Expert Witness Testimony Relating to Damages

Plaintiffs offered the testimony of four expert witnesses relating to damages: Drs. John Radke, James Flynn and Paul Slovic and Mr. Wayne Hunsperger. Mr. Hunsperger is Plaintiffs' primary damages expert, and he incorporates the work of Drs. Radke, Flynn and Slovic into his expert report and opinions.

Defendants move to exclude the proffered testimony of each of these witnesses on the grounds that each is unqualified, their proffered testimony will not assist the trier of fact and none used a reliable methodology. *See* Defs.' Am. Br. in Supp. of Mot. to Exclude Expert Witness Test. Relating to Damages (Doc. 1379) [hereinafter 'Defs.' Mot. re: Pls.' Damages Experts"]. I address the admissibility of each expert's testimony in turn.

### 1. Dr. John Radke

*31 Dr. Radke holds a Ph.D. in geography from the University of British Columbia. He has held teaching and research positions at Temple University and the University of Pennsylvania. He is currently a tenured professor at the University of California at Berkeley, where he holds appointments in the Department of Landscape Architecture and Environmental Planning, the Department of City and Regional Planning, and the Department of Geography. He is also the director of the Applied Environment Geographic Information Systems ("AEGIS") Laboratory at Berkeley, and has served as an associate dean of computing at the university.

Dr. Radke's proposed expert testimony reports on a three-phase market impact analysis he conducted to assess the effect of proximity to Rocky Flats on property values. *See* Pls.' Cons.*Daubert* Resp. (Doc. 1399), Ex. 23 [hereinafter 'Radke Report"] at 2. To perform this analysis, Dr. Radke developed a computerized model that used multiple regression analysis to identify, quantify and explain differences in the value of properties near Rocky Flats and properties located elsewhere in the Denver area. *Id.* at 3.

Multiple regression analysis is a standard quantitative method for understanding the relationship between a "dependent variable," a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Slip Copy, 2006 WL 3533049 (D.Colo.)
**(Cite as: Slip Copy)**

Page 37

variable to be explained, and "explanatory" or "independent" variables that are thought to produce or be associated with changes in the dependent variable. See Daniel L. Rubinfeld, *Reference Guide on Multiple Regression*, in *Reference Manual on Scientific Evidence* 179, 181 (2d ed.2000) [hereinafter *"Ref. Guide on Multiple Regression"*]. For his regression analysis, Dr. Radke established property value as the dependant variable and developed a large number of explanatory variables with a potential to affect property value. Dr. Radke's analysis, for example, incorporated standard variables regarding the physical attributes of the individual property being analyzed, such as the size of the parcel and the size, age and attributes of any buildings on it. Radke Report at 4, 11-12, 24, 32-33. Employing his expertise in geographic information systems ("GIS") and spatial modeling, Dr. Radke also developed and incorporated additional variables relating to location-based characteristics of the property, such as neighboring land use, employment levels, demographic data, crime and poverty, traffic volume, accessibility to open space, topography, viewshed and auto travel time to employment and other locations. *Id.* at 4, 12, 25-32, 33.

In Phase I of his study, Dr. Radke and his staff at the AEGIS laboratory measured the effect of proximity to Rocky Flats on the value of three categories of property: commercial properties, multi-residential properties and vacant land. *Id.* at 2, 23-32. His Phase I data set consisted of records for approximately 10,000 real estate transactions for these categories of property obtained from a commercial source. *Id.* at 23. The data set included all transactions in these categories that occurred from 1983 to the end of 1993. *Id.* Because there was not sufficient data to perform a year-by-year analysis for each property category, Dr. Radke pooled the sales records for each property category for this 11-year period. *Id.* at 5. For the period as a whole, Phase I of Dr. Radke's study reported mean undervaluations for Rocky Flats area properties of approximately 22 percent for multi-residential properties, 32 percent for vacant land and 53 percent for commercial properties. *Id.* at 6. The confidence level reported for these results ranged from 85 to 93 percent. *Id.* at 6-7.

*32 In Phase II of his study, Dr. Radke analyzed the effect of proximity to Rocky Flats on the value of a fourth category of properties, single family residential properties. His data set consisted of sales records obtained from the Multiple Listing Service ("MLS") for the Denver area for the period of 1988 to 1995. *Id.* at 32. This data set contains almost 100 percent of the transactions involving single family residences in the Class Area, and was large enough to permit a regression analysis for each of these years that compared the sales prices for these Class Area properties to prices of randomly selected single family residential properties elsewhere in the Denver region. *Id.* at 32. Based on this analysis, Dr. Radke reported undervaluation attributable to proximity to Rocky Flats in each of these years ranging from 5.45 percent to 9.33 percent. The confidence levels for these results approached or equaled 100 percent. *Id.* at 6.

In Phase III of his study, Dr. Radke determined the actual number of properties and acreage of vacant land tracts in the Class Area and evaluated the loss in property value for each property category based on the results of Phases I and II of his study. *Id.* at 7, 47-48.

*Qualifications*

Defendants argue Dr. Radke is not qualified to testify regarding his Rocky Flats study because he has not previously performed a multiple regression analysis regarding property values and has virtually no education or experience that is relevant to his study. This contention is based on a distorted account of Dr. Radke's deposition testimony. In fact, Dr. Radke testified that his collegiate and graduate level work included extensive course work and study in quantitative (statistical) analysis, which includes multiple regression analysis. He also testified that he teaches quantitative methods, including regression analysis, at the University of California at Berkeley, has performed multiple regression analyses on a number of occasions in the AEGIS lab and has performed a multiple regression analysis for the purpose of valuing property for instructional purposes. Pls.' Cons.*Daubert* Resp. (Doc. 1399), Ex. 24 (Radke Dep.) at 56-59, 85-86;

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Page 38

Slip Copy, 2006 WL 3533049 (D.Colo.)
**(Cite as: Slip Copy)**

Supplement to Defs.' Mot. to Strike Pls.' Expert Witnesses (Doc. 1426), Ex. 2 (Radke Dep.) at 171. As a result, Dr. Radke has expertise in the field of regression analysis. It is not necessary that he specialize in regression analyses regarding the value of real estate for him to qualify as an expert regarding the regression analysis he performed for this case. *See, e.g., Wheeler,* 935 F.2d at 1100 (' lack of specialization does not affect the admissibility of the opinion but only its weight"); *Stagl v. Delta Air Lines,* 117 F.3d 76, 81-82 (2nd Cir.1997) (rejecting contention that specific expertise required when expert had general expertise in the relevant field). Dr. Radke's analysis and intended testimony also are based in part on his undisputed expertise in geographic information systems, spatial modeling and computing. In light of Dr. Radke's education, experience and knowledge in these fields and in multiple regression analysis, I find Dr. Radke is qualified to testify regarding the matters addressed in his expert report.

*Relevance/fit*

**\*33** Defendants maintain Dr. Radke's study and expert testimony, as well as the testimony of Plaintiffs' other damages experts, must be excluded because it is not relevant to and does not fit this action. Defendants' primary argument here is that Plaintiffs' damages experts assessed the diminution in property value based on the proximity of properties to Rocky Flats, instead of any diminution in these properties' value due to Defendants' alleged trespass or nuisance.

I am not persuaded by this argument. First, it assumes that proximity to Rocky Flats and Defendants' alleged trespass and nuisance are independent concepts. *See, e.g.,* Defs.' Mot. re: Pls.' Damages Experts at 8 ("Any property diminution caused by proximity to Rocky Flats is not actionable in this case.") This is not correct. There is a close relationship between proximity to Rocky Flats and the alleged trespass and nuisance, because proximity to the plant determines whether properties are subject to the off-site contamination and alleged risks that underlie these claims. It is for this reason that I previously held that '[e]vidence that class properties have a lower value than comparable properties not in proximity to Rocky Flats, coupled with evidence of Defendants' alleged contamination of these properties and mismanagement of Rocky Flats, is sufficient to allow the jury to infer that diminution in the value of class properties is the result of Defendants' activities and not the result solely of the proximity of these properties to the Plant." *Cook IX,* 273 F.Supp.2d at 1210. The testimony of Dr. Radke and others regarding reduced property values based on proximity to Rocky Flats is, therefore, relevant to and 'fits" this action, and will assist the jury in deciding whether Defendants' alleged trespass and nuisance to the neighboring Class properties caused a diminution in these properties' value.

Defendants ignore this prior ruling and insist that the testimony of Dr. Radke and Plaintiffs' other damages experts should be excluded because, in effect, these experts did not determine whether some or all of the diminution in value they report might be the product of a general concern about the risk of living near a nuclear facility, as opposed to a response to Defendants' specific operations at Rocky Flats and the trespass and nuisance that allegedly resulted from these operations. Defendants may present evidence and argue to the jury that this is the case. *See Cook IX,* 273 F.Supp.2d at 1210 n. 39. The jury will also be instructed that they may only award damages caused by any trespass or nuisance they find was committed, and may not award damages based only on a property's proximity to Rocky Flats. Mem. Op. re: Jury Instructions, Attach. A ("Start of Trial Instructions"), No. 3.24 (Dec. 7, 2006). The fact remains, however, that the properties allegedly harmed by Defendants' tortious conduct are proximate to Rocky Flats, which renders evidence that these properties have a diminished value relevant to the jury's determination of damages.

**\*34** In addition, in terms of Dr. Radke's regression analysis, Defendants' complaint would have required Dr. Radke to develop and include additional explanatory variables that differentiated between any price effect caused by generalized concerns about proximity to a nuclear facility and any effect caused by Defendants' alleged

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Slip Copy, 2006 WL 3533049 (D.Colo.)
**(Cite as: Slip Copy)**

Page 39

misconduct in operating this particular nuclear facility. Even if this were possible,[FN38] the Supreme Court and other courts have held that the actual or alleged omission of explanatory variables from a regression analysis normally affects the weight of the analysis, but does not render it inadmissible. *See Bazemore v. Friday,* 478 U.S. 385, 400, 106 S.Ct. 3000, 92 L.Ed.2d 315 (1986); *Watson v. City of Kansas City,* 857 F.2d 690, 695 (10th Cir.1988); *Cullen v. Ind. Univ. Bd. of Trs.,* 338 F.3d 693, 701 n. 4 (7th Cir.2003). A regression analysis "that includes less than all measurable variables" may also be sufficient to prove a plaintiff's case. *Bazemore,* 478 U.S. at 400 (internal quotation omitted). This is a matter for the finder of fact to decide. *See, e.g., Maitland v. Univ. of Minn.,* 155 F.3d 1013, 1017 (8th Cir.1998) (it is for the finder of fact to consider any omitted variables in determining the weight to accord study results). Thus, there is no merit to Defendants' contention that Dr. Radke's regression analysis must be excluded because it does not include additional variables.

> FN38. Defendants do not suggest how or even if Dr. Radke could have modified his statistical analysis to quantify or differentiate between the price effect of proximity to Rocky Flats and the trespass and nuisance allegedly created by Defendants' activities there and any price effect based on the proximity to a generic nuclear facility that did not have this history.

Defendants also maintain that exclusion is required under *Koger v. Reno,* 98 F.3d 631 (D.C.Cir.1996). In *Koger,* the D.C. Circuit considered whether the district court was clearly erroneous in an age discrimination suit in finding at the close of a non-jury trial that the plaintiffs had failed to carry their burden of proving discriminatory intent. *Id.* at 632, 634. The sole evidence offered in support of discrimination at the stage of promotion was a regression analysis showing that younger employees in general had a greater chance of promotion than older employees. *Id.* at 636-37. The district court found this evidence was not sufficient to prove discriminatory intent because it did not show a disparity in promotions that disfavored employees who were 40 or older and thus protected under the ADEA. *Id.* at 637. This decision, therefore, speaks to the probative weight and sufficiency of a regression analysis to the finder of fact, and not to whether an analysis is relevant and admissible under Rule 702.

At this point, Defendants also have not presented anything more than speculation that all or some of the diminution in property values measured by Dr. Radke may be attributable to what they call "non-actionable" factors, such as generalized aversion to nuclear facilities, rather than to Defendants' "actionable conduct" of operating this particular nuclear facility in a manner that imposed a trespass and/or nuisance on neighboring properties. Even if Defendants had presented evidence supporting this view, moreover, this consideration would go to the weight and sufficiency of Dr. Radke's testimony to prove the damages caused by Defendants' conduct, and not to the separate question of whether Dr. Radke's testimony is relevant and admissible under Rule 702.

**\*35** Defendants cite six cases as establishing that an expert's analysis on damages "is *inadmissible* under *Daubert*" if it does not distinguish "the impact of a defendant's actionable conduct ... from a defendant's non-actionable conduct." Defs.' Mot. re: Pls.' Damages Experts at 9-10 (emphasis in original). First, because of the close relationship between the proximity of a property to Rocky Flats and the alleged trespass and nuisance, I do not believe this case presents the clear-cut distinction between "actionable" and "non-actionable" conduct that was present in the cases cited by Defendants. Second, Defendants have again confused the issues of admissibility of evidence and its sufficiency to prove a material issue, as five of the cited cases do not address the admissibility of the expert's analysis under *Daubert* or otherwise, but rather consider the sufficiency of this evidence to prove different matters. *See Schmidt & Schmidt, Inc. v. Nordisco Corp.,* 969 F.2d 410, 415 (7th Cir.1992) (cited in Defs.' Mot. re: Damages Experts at 9-10); *City of Vernon v. S. Cal. Edison Co.,* 955 F.2d 1361, 1372 (9th Cir.1992) (same); *Isaken v. Vermont Castings,*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Page 40

Slip Copy, 2006 WL 3533049 (D.Colo.)
**(Cite as: Slip Copy)**

*Inc.*, 825 F.2d 1158, 1165 (7th Cir.1987) (same); *Farley Transp. Co. v. Santa Fe Transp. Co.*, 786 F.2d 1342, 1352 (9th Cir.1985) (same); *In re Oracle Sec. Litig.*, 829 F.Supp. 1176, 1181 (N.D.Cal.1993) (same). I am not persuaded that the one cited case that does exclude an expert's damages analysis under *Daubert, In re Executive Telecard, Ltd. Sec. Litig.*, 979 F.Supp. 1021, 1025-26 (S.D.N.Y.1997), establishes the general rule asserted by Defendants or requires exclusion of Dr. Radke's study.[FN39]

> FN39. Nor am I persuaded by Defendants' argument that exclusion is required by the discussion of damages apportionment in the Reference Manual on Scientific Evidence. *See* Robert E. Hall & Victoria A. Lazear, *Reference Guide on Estimation of Economic Losses in Damages Awards,* in *Reference Manual on Scientific Evidence* 277, 305-07 (2d ed.2000). Even assuming I was bound by these authors' views, their discussion concerns cases in which it was relatively undisputed that something more than the defendant's actionable conduct had caused at least part of the claimed damages. That is not the case here. The authors' discussion also does not appear directed at the admissibility of a damages analysis, but rather at its sufficiency to prove damages caused by a defendant's actionable conduct.

Defendants also argue that Dr. Radke's proffered testimony and that of Plaintiffs' other damages experts does not fit and therefore must be excluded because: (1) none of their opinions states in so many words the date or period on which the " injurious situation became complete and comparatively enduring," which is the date on which damages are to be measured in this case pursuant to § 930 of the Restatement (Second) of Torts, *Cook IX*, 273 F.Supp.2d at 1210, and (2) the experts otherwise fail to couch their analysis and conclusions in the same language as Restatement § 930. These experts' opinions, however, all pertain to diminution in Class Area property values (which is the measure of damages for prospective invasions under Restatement § 930) during the period (1989-1992) that Plaintiffs assert is the proper time for damages to be measured. There is no basis, therefore, for Defendants' assertion that this expert testimony does not "fit" the issues to be decided in this action.

Finally, Defendants argue that Dr. Radke's study and testimony and that of Plaintiffs' other damages experts is irrelevant because it is over or under-inclusive of the Class in one or more respects. Some of these arguments are based on misconceptions regarding Plaintiffs' burden of proof, including that Plaintiffs are required to prove the diminution in property value at the time each class member purchased their properties. *See* May 2005 Order at 17-18 (Defendants bear burden of proving any setoff for Class members purchasing their properties at a discount). Others improperly assume that only transactions involving class members are probative of the diminution in Class property values. There is no basis for excluding Dr. Radke's regression analysis and testimony on these grounds.

*Reliability*

**\*36** Defendants do not dispute that the type of regression analysis performed by Dr. Radke, referred to as hedonic price modeling, is an accepted and reliable method for assessing the effect of a variable on property values. *See, e.g., In re Polypropylene Carpet Antitrust Litig.*, 93 F.Supp.2d 1348, 1359 (N.D.Ga.2000) ("Regression analysis is a well-worn statistical technique used in a variety of contexts to examine the nature of the relation, if any, between two or more variables."). They assert, however, based on the testimony of their rebuttal expert witness, Dr. Daniel McFadden, that Dr. Radke's study and proffered testimony are unreliable and hence inadmissible under Rule 702 because Dr. Radke made two "fundamental methodological errors" in performing his analysis.

The first alleged error concerns Dr. Radke's application of "factor analysis" to account for and eliminate the problem of multicollinearity. Multicollinearity exists when two or more of the "

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.