# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

In the Matter of:

## Moises Carranza-Reyes v. Park County, et al.

05-cv-377-WDM-BNB

DEPOSITION OF:

# MEREDITH POPPISH

DATE TAKEN:    August 22, 2006

PAGES:    1-105

REPORTED BY:    Stacy Armstrong, RMR


PENGAD 800-631-6989
EXHIBIT
8

Hunter + Geist, Inc.    **(303) 832-5966**

■ www.huntergeist.com
■ depo@huntergeist.com

1900 Grant Street, Suite 800
Denver, Colorado 80203
Fax (303) 832-9525
Toll Free: 1-800-525-8490

**Carranza-Reyes v. Park County**          **MEREDITH POPPISH**                    8/22/2006

---

**5**

1  answer, if you could say yes or no instead of uh-huh or
2  huh-uh because it's hard to distinguish that on the
3  record.
4       A.  Okay.
5       Q.  Also, if you could wait until I finish my
6  question to answer, and then I'll try to wait until you
7  finish your answer to the question, because she can't
8  write both of us down at the same time.
9       A.  Sure.
10      Q.  And if you don't understand a question, please
11 tell me and I'll do my best to rephrase it.
12      A.  Okay.
13      Q.  And if you answer a question I'm going to
14 assume you understand it.
15      A.  Okay.
16      Q.  What did you do to prepare for your deposition
17 today?
18      A.  I reviewed Moises's file.  It's not incredibly
19 large at the clinic, so I reviewed his file, and that
20 was about it.
21      Q.  Did you meet with any of Mr. Carranza-Reyes's
22 attorneys?
23      A.  No.
24      Q.  Have you talked with any of them about his
25 treatment and care at any point?

---

**6**

1       A.  No.
2       Q.  And by that I'm talking about Mr. Trine or
3  Lloyd Kordick.
4       A.  No one.
5       Q.  Okay.  Could you please go over your
6  educational background, starting with college for me?
7       A.  Sure.  I graduated in 1999 from the University
8  of Florida with my bachelor of science in community
9  health education.  In 2005 I graduated from the
10 Massachusetts General Hospital Institute of Health
11 Professions with my master of science in nursing.
12      Q.  And in what states are you licensed as a
13 nurse?
14      A.  As an R.N.?
15      Q.  Well, what type of licenses do you have?
16      A.  I am licensed as a registered nurse in the
17 state of Massachusetts and the state of Colorado.  And I
18 am licensed as a nurse practitioner in the state of
19 Colorado.
20      Q.  And when did you become licensed in
21 Massachusetts?
22      A.  To become an R.N.?
23      Q.  Yes.
24      A.  I became licensed in Massachusetts in March of
25 2004.

---

**7**

1       Q.  Do you have any other professional licenses in
2  Massachusetts?
3       A.  No.
4       Q.  And you said March of 2004 --
5       A.  When I became licensed as an R.N., yes.
6       Q.  Okay.  And in Colorado when did you become
7  licensed as an R.N.?
8       A.  In June of 2005.
9       Q.  And when did you become licensed as a nurse
10 practitioner?
11      A.  In August of 2005.  And I obtained my board
12 certification in September of 2005.
13      Q.  Can you explain the process for becoming a
14 nurse practitioner as opposed to the process for
15 becoming a registered nurse?
16      A.  Sure.  Becoming a registered nurse, you can do
17 that several different ways, through an associate's
18 degree or through a bachelor's.  I already had a
19 bachelor's degree, so then I obtained my R.N.  Becoming
20 a nurse practitioner requires an additional -- depending
21 on what program you go through, it's about a year and a
22 half to two years of master's level education, graduate
23 level education, including clinical rotations and a
24 variety of concentrations for me.  Because I'm a family
25 nurse practitioner, I went through clinical rotations in

---

**8**

1  adult health, obstetrics, and pediatrics.  And I also
2  took a national certification board which is not
3  required in the state of Colorado.  However, I did
4  complete my boards.
5       Q.  And what can a nurse practitioner do that a
6  regular R.N. can't do?
7       A.  We're licensed to diagnose and treat illness.
8  We can write prescriptions.  We can manage patients as
9  primary care providers.  Registered nurses are not
10 licensed or -- I guess just licensed to diagnose medical
11 illness or prescribe any medications.  They're not
12 licensed to make medical diagnoses.
13      Q.  Does a physician have to countersign any of
14 your orders?
15      A.  No.
16      Q.  Do you speak Spanish?
17      A.  I do.
18      Q.  And how did you learn to speak Spanish?
19      A.  Through Pimsleur's Spanish.  It's like a
20 60-C.D. set.  And then also I've learned so much working
21 at the clinic.  About 85 percent of my patients are
22 Spanish-speaking only.  So when you pick up a new
23 language, you learn a lot of it just through practice.
24 So I had a base before I started at the clinic and then
25 learned quite a bit more over the past year.

**2 (Pages 5 to 8)**

Carranza-Reyes v. Park County          **MEREDITH POPPISH**                    8/22/2006

---

**13**

1    Q.  Is he the one who would see Carranza-Reyes if
2  there was a need to do that?
3    A.  I don't know what that is.  Rons Reyes?
4    Q.  Carranza-Reyes.
5    A.  Oh, oh.  Is he the one who would see him?
6    Q.  Yeah.  Since you work under Dr. Moore, then
7  if --
8    A.  I do not work under Dr. Moore; I work with
9  Dr. Moore.  So he's not like my supervising physician,
10  but I see Moises.  Moises is my patient.  I'm his
11  primary care provider.  Is that your question?
12    Q.  Okay.  Yeah.
13    A.  Is that what you mean?
14    Q.  Yeah.
15    A.  I don't believe that Dr. Moore has ever seen
16  Moises.  Moises has seen -- I believe this relates to
17  your question as well.  He has seen Dr. Wu, David Wu,
18  D-a-v-i-d, Wu, W-u, who is a physician on another pod in
19  our clinic.  He knows quite a bit about pain management.
20  So when our patients don't have access to specialist
21  care, we'll often send them for a pain consult over to
22  see Dr. Wu.  But, to my knowledge, Dr. Wu is the only
23  other physician at the clinic that Moises has seen.
24        (Deposition Exhibit 65 was marked.)
25    Q.  I've just handed you what's been marked as

---

**14**

1  Deposition Exhibit 65.  You've seen this before, I
2  understand?
3    A.  Yes.
4    Q.  And you're here today pursuant to that
5  subpoena?
6    A.  Correct.
7    Q.  And we gave you a witness fee, I believe, in
8  the amount of $50.90.  Did you receive that?
9    A.  I did.
10        (Deposition Exhibit 66 was marked.)
11    Q.  Could you tell me the first time you saw
12  Mr. Carranza-Reyes at Clinica Campesina?
13    A.  The 12th of December, 2005.
14    Q.  And I notice that you're referring to what's
15  been marked as Deposition Exhibit 66.
16    A.  Correct.  I don't have the date memorized.
17    Q.  Okay.  Had you met him before that date?
18    A.  No.
19        MR. TRINE:  Excuse me.  What was that exhibit
20  number?
21        MS. LEWIS:  66.  I'm sorry.  Can we just go
22  off the record for a second?
23        (Pause in the proceedings.)
24    Q.  (BY MS. LEWIS) All right.  If you could
25  take a look at that.  It looks like you saw him on

---

**15**

1  December 12, 2005, like you just said.
2    A.  Yes.
3    Q.  And do you remember the reason why he came in?
4    A.  For his chronic pain secondary to his
5  amputation.  I would say that was his primary concern.
6  As we went through the visit he had several other
7  concerns, but everything was centered around that.
8    Q.  Now, if you look at Exhibit 66, it looks like
9  pages -- You see there's little numbers on the bottom?
10    A.  Uh-huh.
11    Q.  Pages 14 and 10 are filled out by the patient;
12  is that right?
13    A.  14 and 15?
14    Q.  And 10.  15 would be as well, but --
15    A.  Si.  Oh, sorry.  Yes.
16    Q.  Is that all the paperwork that a patient fills
17  out when they come to the clinic?
18    A.  Yes.
19    Q.  If you look at page 14, could you help me with
20  the translation --
21    A.  Yes.
22    Q.  -- of an item on there.  On the line that says
23  otros problemas, I assume that means other problems?
24    A.  Okay.  Yes.
25    Q.  And what is that entry next to otros

---

**16**

1  problemas?
2    A.  General physical.
3    Q.  Do you know what that means?
4    A.  I think he means like general physical
5  problems.  He came in to talk about a lot of things,
6  but, as you can see, below that he wrote about his
7  hospitalization regarding his leg.  But he had multiple
8  concerns centering around his leg.  But I don't know
9  what he was thinking when he wrote that.
10    Q.  I understand.
11    A.  Okay.
12    Q.  The next line appears to say amputation leg?
13    A.  Yes.
14    Q.  And then what is after pierna?
15    A.  I don't know.
16    Q.  Okay.
17    A.  Sorry about that.  Looks like 129, but I don't
18  know why he would have written that.
19    Q.  And right below that, habitos.  Can you tell
20  me what that line says, please?
21    A.  Sure.  Habits.  And do you exercise regularly?
22  And then he marked yes.
23    Q.  And then what's the next question on that
24  line?
25    A.  What type of exercise do you do?

---

4 (Pages 13 to 16)

Carranza-Reyes v. Park County        **MEREDITH POPPISH**        8/22/2006

## 33

1  hypertension.
2      Hypertension is a well documented and well
3  known side effect of severe chronic pain. And I felt
4  that Moises describing the pain that he was in, and
5  particularly since the systolic blood pressure wasn't
6  particularly elevated, it was his diastolic, I felt that
7  it was likely secondary to pain, but I needed to recheck
8  him several times in order to actually diagnose him with
9  the hypertension as being a hypertension secondary to
10  some sort of morbidity cardiovascularly or whether it
11  was only secondary to pain, and if you could remove the
12  pain, then you could remove the hypertension. He was in
13  a significant amount of pain that first day that he came
14  in.
15      Q.  So on that date you couldn't rule out other
16  causes of the hypertension?
17      A.  I could not.
18      Q.  Here you also write "at next visit will have
19  him fill out a PRIME MD." What is that?
20      A.  A PRIME MD is the tool that we use at the
21  clinic to measure -- it's a depression scale that will
22  quantify someone's emotions of depression, quantify
23  whether or not they're suicidal, if they're able to
24  perform their activities of daily living.
25      Q.  And then you write "will assess further for

## 34

1  PTSD/depression." What made you believe that it was
2  necessary to assess further for those conditions?
3      A.  The impotence in particular because he felt
4  that the impotence was related to his experience. And
5  impotence is also a known side effect of -- side effect
6  isn't correct, though -- an associated result or
7  morbidity of posttraumatic stress disorder. And also
8  just his -- just his frustration that he wanted to have
9  a normal life, you know. And that's something with any
10  patient: when someone comes in and they're facing
11  something really huge, we try to be really aggressive
12  about depression at the clinic, and we try to offer that
13  resource to our patients. So it was something that I
14  wanted to evaluate further. And if I had had an hour to
15  see him that day, I would have done it that day, but
16  since, you know, the time limit of the visit, he has to
17  come back for that.
18      Q.  Did he self-report any depression symptoms?
19      A.  Really sad, and wanted really hard to be
20  hopeful. From the very first visit he came across to me
21  as a sort of motivated, hopeful kind of guy, and he felt
22  really walled in by what he couldn't do for his health,
23  really walled in by what he wasn't able to do to
24  recover, and he wanted to have a normal life. He really
25  wanted a relationship. He really wanted to have a

## 35

1  relationship, and he really felt that he couldn't do
2  that in the state that he was in. He wanted to move on,
3  but he didn't know how. I guess, would be the best way
4  for me to say that.
5      Q.  Did he report any like difficulty sleeping,
6  changes in appetite?
7      A.  He reported difficulty in sleeping because of
8  the pain. So, you know, it would be really hard for me
9  to distinguish that. But I would say that his
10  difficulty in sleeping was because of the pain. It was
11  more just a feeling of trying to be hopeful and not sure
12  if there was really anything to hope for, and some
13  sadness because of his situation, really wanting his
14  life back.
15      Q.  Do you know whether he had been medically
16  treated before he came to your clinic and after the
17  amputation?
18      A.  Treated for like stuff related to the
19  amputation?
20      Q.  I guess do you know whether he had gone to any
21  provider for these problems of leg pain before he came
22  to you?
23      A.  To my knowledge, no. His treatment, as he
24  told me, ended at Denver Health after he was discharged.
25  He does see a physician for his prosthesis, but I can't

## 36

1  recall his name. But, other than that, no, he hadn't
2  been able to get any other treatment.
3      We initially took Moises on as a patient
4  because his family member, his brother, I believe it
5  was, had been a patient at the clinic for quite some
6  time. And my medical assistant was putting in someone
7  from his family, and I don't know who that was. And
8  they asked about Moises and his situation. At the time
9  the clinic was not taking patients -- not taking new
10  patients, but as providers we have the ability to make
11  the decision of whether to take someone. And my medical
12  assistant had been sort of touched by the story and, you
13  know, felt really awful, and they had told her, you
14  know, that he had no access to treatment. So that was
15  why I said, oh, okay, you can send this guy in. So
16  based on that, I would say no, that he hadn't had any
17  treatment between me and Denver Health.
18      Q.  Did he complain of the pain occurring since
19  2003 when he had the amputation?
20      A.  Yes. Like he had never been able to get a
21  hold on it. After the surgery he felt like the pain was
22  going to get better, his condition was going to improve,
23  and he felt that he couldn't make that happen, that he
24  didn't have access to what he needed.
25      Q.  Can you tell me what the line says, also will

Carranza-Reyes v. Park County   **MEREDITH POPPISH**   8/22/2006

---

**61**

1   what the narcotic drugs could do for him pain
2   management-wise?
3       A.   Narcotics are indicated for the treatment of
4   chronic severe pain, particularly neuropathic pain,
5   which is particularly documented as being difficult to
6   control.  And while I did not feel that it was going to
7   make his pain go away, I felt that some combination of
8   benzodiazepines, likes Valium, and a low-dose narcotic,
9   even if he just took it before bed, might give him some
10   relief.  And, remember, at this point he's got no
11   relief.
12          So I'm really looking at sort of, you know,
13   what could we do to at least make it a little bit
14   better?  Given the fact that we're given these limited
15   resources in this family practice clinic, what could we
16   possibly do?  And I felt that pain-wise we might be able
17   to make it better.  But quality of life-wise maybe it
18   would make it worse because he didn't want to be sleepy,
19   he didn't want to be dizzy.
20       Q.   Are you familiar with Colorado's new
21   immigration law they just passed?
22       A.   I am.
23       Q.   Does that impact the ability of Moises to get
24   treatment there at your clinic?
25       A.   No, it does not.

---

**62**

1       Q.   Okay.  Also in this note it says you discussed
2   options for consultation.  Do you know what you
3   discussed?
4       A.   The providers that in a perfect world I would
5   really love to send him to and providers that if he ever
6   found that he had -- I mean, this is my stock speech for
7   all of my patients without insurance.  If you can, if
8   it's possible in the life that you live, set aside a
9   small amount of money every week and maybe I could find
10   someone who might be willing to donate you a little bit
11   of time in addition to the time that you could pay for,
12   and maybe we might be able to get at least one consult.
13          It's my professional obligation to always tell
14   my patients, hey, you know, I'm not a chronic pain
15   specialist, I'm not an orthopedic surgeon; I'm a family
16   nurse practitioner in a generalist family clinic.  This
17   is what we can do for you.  And if you had insurance,
18   this is what I would do for you and this is what you
19   really need.  So, you know, basically we're doing the
20   very best we can with what we have, and there's more out
21   there that you just don't have access to.
22       Q.   Do you recall speaking with someone named Char
23   Morgan or Charlene Morgan?
24       A.   I don't.
25       Q.   Did you speak with anybody from Helen

---

**63**

1   Woodard's office about Moises Carranza-Reyes?
2       A.   I don't think so.  I don't know who Helen
3   Woodard is.
4       Q.   She's a life care planning expert.  Do you
5   recall any conversations with life care persons about
6   his future needs?
7       A.   I don't.  That doesn't mean -- I'm so sorry.
8   It doesn't necessarily mean that there wasn't a phone
9   conversation that may have happened at some point, but I
10   have no recollection of that at all.
11       Q.   Well, I'll represent to you that Helen Woodard
12   has in her notes that she had a conversation with you on
13   December 14, 2005.
14       A.   Okay.
15       Q.   Which appears to be about two days after you
16   first saw Moises.
17       A.   Yeah.
18       Q.   Does that refresh your memory at all?
19       A.   It doesn't.  I'm so sorry.  It's not like I --
20   I haven't really been thinking about this too much, so I
21   don't recall.
22       Q.   She states that you told her that
23   Mr. Carranza-Reyes had high blood pressure related to
24   his pain.  It sounds from your testimony today that that
25   isn't accurate.

---

**64**

1       A.   That would be in line with something I would
2   have said.  There may have been other things that I said
3   about it, but, yeah, I would say that that would be
4   perfectly reasonable.
5       Q.   Do you believe he's in need of extensive care
6   that he wasn't getting -- that he's not getting due to
7   his finances?
8       A.   Unfortunately, yeah, I do.
9       Q.   And what extensive care is that?
10       A.   I feel, again, that he needs a consult with an
11   orthopedic specialist, he needs extended physical
12   therapy and rehabilitation services, he needs to meet
13   with a chronic pain specialist and possibly a
14   neurologist.
15       Q.   How about a pulmonologist?
16       A.   Well, given that he had part of his lung taken
17   out, I suppose that would be okay, but I don't recall
18   saying that at all.  I don't recall the conversation at
19   all.
20       Q.   Yeah, I understand.  Is a consult with a
21   pulmonologist something you believe he needs?
22       A.   Not based on what I've talked with him about.
23   But, again, given that part of his lung was removed, in
24   a perfect world, if someone felt that it was warranted,
25   certainly I would refer him there.

---

**16 (Pages 61 to 64)**

**Carranza-Reyes v. Park County**   **MEREDITH POPPISH**   8/22/2006

**65**

1    Q.  Well, I guess I'm confused.  Are you saying
2  that you do feel it's warranted?
3    A.  I feel that he or anyone else in his situation
4  would need a full workup with a team of specialists.  So
5  if something came up where he was symptomatic with me,
6  then I would probably refer him to a pulmonologist.  But
7  if he was asymptomatic and doing well and we had the
8  chest x-rays and everything else that you would want for
9  a person like this to have, I don't think that a regular
10  consultation would be necessary.  But if he ever got
11  like a real bad pulmonary disease, I for sure would send
12  him to a pulmonologist.
13    Q.  But we haven't seen anything in your records
14  on your visits that would indicate he needs to see a
15  pulmonologist?
16    A.  I don't think so, no.
17    Q.  Okay.  Why do you believe that he needs to
18  have an ortho consult?
19    A.  Because he's a person with a below-the-knee
20  amputation.
21    Q.  Is it your experience that everyone with a
22  below-the-knee amputation has those consults?
23    A.  Moises is my only patient with a
24  below-the-knee amputation.  However, with my experience
25  as a registered nurse on an orthopedics surgical floor,

**66**

1  that's where those amputations happen, and they very
2  much follow up and consult with an orthopedic surgeon or
3  an orthopedist.
4    Q.  Do you know how often they would follow up
5  with them?
6    A.  No, I don't.
7    Q.  Do you know whether he'd need yearly consults
8  or --
9    A.  I would think that for the first several years
10  after the amputation he would need yearly consults.  I
11  don't know, again, what the long-term follow-up needs
12  are other than yearly consults for a person with the --
13  For someone with the level of symptoms that he has, I
14  would think that the consult would be fairly frequent,
15  if I were to base that on my own practice.  If he were
16  asymptomatic, doing well, functioning well in his life
17  and without complaint, I would think that his follow-up
18  care five, six years down the road after an amputation
19  would be annually.
20    Q.  And you said it would be for the first seven
21  years, is that what you said, or did I mishear you?
22    A.  I think five to six years afterwards.
23    Q.  Okay.
24    A.  Again, it's hard for me to speak to that.
25    Q.  How about a rehabilitation services

**67**

1  professional, what would that --
2    A.  For the first year after an amputation,
3  particularly the first six months, it's intensive.  It's
4  something that should happen at least biweekly, I would
5  think, and after that I can't say, but I would feel that
6  it would be regular.  And for someone with symptoms like
7  Moises's, physical therapy would be a documented,
8  indicated, you know, necessity for someone with this
9  kind of pain and difficulty in functioning.
10    Q.  He's had his amputation for almost three
11  years, right?
12    A.  Correct.
13    Q.  And you said biweekly for the first year
14  following the amputation for the rehabilitation
15  services.  Do you still believe he needs rehabilitation
16  services --
17    A.  I do because he never got them.  He never got
18  the rehabilitation that he needed, so better late than
19  never, I guess, is kind of what I'm shooting for.
20    Q.  So you think he would need them biweekly for
21  the next year?
22    A.  At least, yeah.  But, again, I'm not a
23  rehabilitation expert; that would be up to someone
24  else's assessment of what he needs.  I would never be
25  the person to assess what he needs for treatment;

**68**

1  someone else would do that assessment, which is why we
2  refer patients out for specialist care.
3    Q.  So you don't think that's within your area of
4  expertise whether to recommend --
5    A.  It is not.  That's why I would send him out,
6  that's why I would send him to a specialist.
7    Q.  Would it be within your area of expertise,
8  though, to recommend a consult with an orthopedic
9  surgeon?
10    A.  Yes, absolutely.
11    Q.  And how about with a chronic pain specialist?
12    A.  Yes.
13    Q.  And how often do you think he'd need to see a
14  chronic pain specialist?
15    A.  I don't know; that would be up to the chronic
16  pain specialist to determine.
17    Q.  You just would like him to go for an
18  evaluation?
19    A.  For evaluation and consult, yes, and a
20  treatment plan.
21    Q.  But you don't know what that treatment plan
22  would consist of, correct?
23    A.  I don't.
24    Q.  Okay.  It looks like we got these documents.
25  If we could just take a break --

**17 (Pages 65 to 68)**

**69**

1      A. Yeah, sure.
2      MS. LEWIS: Well, let's go ahead and mark it
3 first.
4      (Deposition Exhibit 69 was marked.)
5      (Recess taken from 10:43 a.m. to 10:48 a.m.)
6      Q. (BY MS. LEWIS) I have in my notes that
7 you said he would need an orthopedic consult, a
8 rehabilitation services consult, a chronic pain
9 specialist, and then there was something else I
10 didn't quite catch.
11      A. Possibly a neurologist, which the referral for
12 that would more than likely come from the orthopedic
13 specialist or the chronic pain specialist.
14      Q. So at this point you don't know whether
15 it's --
16      A. Yeah, based on their evaluation.
17      Q. Okay. So the ones that you are sure in your
18 professional opinion he needs are the orthopedic and the
19 rehabilitation services and the chronic pain?
20      A. Yes, if physical therapy is under the umbrella
21 of rehabilitation services.
22      Q. And physical therapy. Okay. And how often do
23 you think he needs to go to physical therapy?
24      A. Again, that would be the evaluation of the
25 physical therapist.

**70**

1      Q. So you don't feel qualified to say how often?
2      A. I don't. I'm so sorry. I'm not trying to be
3 difficult, but -- I mean, I could conjecture, but I'm
4 not a physical therapist, so I would send him to see the
5 physical therapist to determine his treatment plan.
6      Q. And I understand; I'm just trying to
7 understand what you feel your qualifications are.
8      Do you feel like he needs adaptive equipment
9 to help him function in his daily life?
10      A. I don't know because I wouldn't make that
11 assessment. You know what I mean? I wouldn't be the
12 person to do that. I would send him somewhere else for
13 that, as would a physician at the clinic, because we're
14 not -- we're generalists. No matter what is our
15 professional designation, whether physician's assistant
16 or N.P. or doctor, we would never be the people to
17 determine that.
18      Q. Who would be the person to determine that?
19      A. The specialist whom we referred him to, like
20 rehabilitative services for that type of evaluation
21 because we don't provide rehabilitation services at the
22 clinic.
23      Q. What type of mental health services do you
24 believe he needs?
25      A. I believe that Moises -- I believe that he

**71**

1 needs regular counseling to follow up on what happened,
2 and counseling, and possibly cognitive behavioral
3 counseling until the point where his PRIME MD, which is,
4 again, the tool that we use to evaluate depression, is
5 at a level that feels acceptable and good to him.
6 Depression control and PTSD control are pretty
7 subjective as far as, you know, what the patient feels
8 is good for them.
9      Q. What's the difference between regular
10 counseling and cognitive behavioral counseling?
11      A. Well, that can happen within counseling. So I
12 guess what I'm thinking, I'm thinking in terms of what
13 we have at the clinic. I would send him to our mental
14 health professional, Michel Holien. And then cognitive
15 behavioral therapy is something that sort of works on
16 behavior change and changes in your thought process to
17 deal with whatever you're going through. And, again,
18 that's -- I don't perform cognitive behavioral therapy,
19 but that would be what I would think that he would need.
20      Q. Are there any mental health services you feel
21 he needs that are not provided at your clinic?
22      A. That would be a question for Michel Holien. I
23 would -- I don't believe that Michel -- well, no, I
24 think she does. I believe that she does treat PTSD, but
25 that would be a question for her. I'm not quite sure

**72**

1 what her assessment there would be.
2      Q. Do you know what her educational background
3 is, like what --
4      A. She has a master's in health counseling, I
5 believe. I think I can tell you if I just look at her
6 note here. She's an LCSW. So she has a master's in
7 social work. She's a mental health professional.
8      Q. And you're looking at Exhibit 69?
9      A. Yes.
10      Q. And it looks like she has seen Carranza-Reyes
11 a few times --
12      A. Correct.
13      Q. -- from these notes?
14      A. Correct.
15      Q. And you don't know whether he needs to have
16 further mental healthcare?
17      A. I don't. That's kind of up to her. My scope
18 of practice would be to determine that there is a
19 problem, come up with a treatment plan, which would
20 include collaboration with other providers, and would be
21 to depend on the expertise of those other providers as
22 well as my own expertise.
23      Q. How often do you think Moises Carranza-Reyes
24 needs to come see you per year?
25      A. Not too often. I mean, if he has acute

**18 (Pages 69 to 72)**

**73**

1   needs -- and, again, this would all change if he had
2   insurance because I would be following up on all of
3   these places that we're sending him and all of these
4   treatments that he's getting. But since we don't have
5   those available, I need to see Moises for an annual
6   physical, and I need to see him when he has acute needs
7   and when he has any concerns or he wants to change his
8   treatment plan based on what we can do at the clinic.
9       Q.  Well, let's assume for the sake of argument he
10  has resources.
11      A.  Okay.
12      Q.  What would you recommend he needs to see in
13  terms of primary care physician or a nurse practitioner
14  such as yourself?
15      A.  If I was prescribing the medications, which I
16  likely would be, which were recommended by the other
17  providers, I would need to see him around every three
18  months just to check in and see how he's doing with his
19  control and then additionally when he had consults with
20  specialist providers. In order to provide continuity of
21  care, I would want to see him after I got that note from
22  orthopedics and I saw what they recommended and I wanted
23  to talk about those recommendations with Moises. Does
24  that make sense? Does that answer your question?
25      Q.  That makes sense. But as far as projecting,

**74**

1   out, like on a yearly basis I would need to see him this
2   many times, assuming he had the resources to go see
3   you --
4       A.  Four to ten times a year? That's hard to do.
5       Q.  It would depend on the consults?
6       A.  It would really, really depend. I would say a
7   minimum of five times a year, but then it would depend
8   on the consults and how many treatment changes were
9   recommended and sort of what happened within those
10  visits.
11      Q.  And why would he need to see you five times a
12  year?
13      A.  When I prescribe medications for patients, I
14  generally see them about every three months, so that's
15  four visits there, and then another visit for a
16  physical. So that's why I was thinking five, around
17  there.
18      Q.  Okay. Assuming he had resources again, are
19  there mental health services that you believe in your
20  professional opinion he needs that aren't provided at
21  your clinic?
22      A.  I can't really say. I mean, I believe that he
23  needs regular counseling several times a month with a
24  mental health professional, which he can obtain at the
25  clinic; however, I don't know what Michel's opinion as

**75**

1   the mental health professional would be for that. So my
2   opinion would be, you know, once or twice a month. But
3   it's also important to remember that everything I do is
4   limited by what I can get. It's not the same kind of
5   medicine that you see everywhere else. Everything is
6   determined by, okay, what's reasonable for this patient.
7       So I would think that a couple of times a
8   month, several times a month, would be okay. And the
9   clinic provides great services, but I don't know if he
10  would need more. And, again, I would never make the
11  assessment, ever, no matter what the specialist is, for
12  how often he would see that specialist.
13      Q.  I understand. How about if he had resources,
14  would you refer him to a pulmonologist?
15      A.  Without anything acute? No. If he had
16  pneumonia, yes.
17      Q.  Would you make any different recommendations
18  than what we already talked about in terms of
19  rehabilitation services specialist, the pain management
20  specialist --
21      A.  As far as if I would want him to see those
22  specialists?
23      Q.  Right, if he had resources to do --
24      A.  Those would be what I would want for him if he
25  did have resources, yeah. So those would definitely be

**76**

1   what I would want. And then if other referrals stemmed
2   off of that, those would likely come from the specialist
3   providers themselves.
4       Q.  Are there medications that could be prescribed
5   for his pain management that are -- other than the ones
6   we've mentioned here today, the clonidine and the
7   Neurontin, that he could get if he had resources to do
8   so?
9       A.  And you just said the lidocaine? The
10  lidocaine patch particularly would be worth trying.
11  There are a ton of other treatment modalities for
12  chronic pain, some of which are medications, some of
13  which are other types of therapy. So I would think that
14  there would be many, many things that they would try for
15  Moises; however, what they do with medications is often
16  off-label, so you don't really know what they're doing
17  unless you're that person. Does that make sense?
18      Q.  I understand.
19      A.  Okay.
20      Q.  If you could look at Exhibit 69, these are
21  the --
22      A.  Sure.
23      Q.  And when we went off the record, I'm not sure
24  if this was on the record, these are records that we had
25  faxed here during the break from your office. And if

**19 (Pages 73 to 76)**