**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 05-cv-00377-WDM-BNB

MOISES CARRANZA-REYES

   Plaintiff,

vs.

PARK COUNTY, a public entity of the State of Colorado and its governing board, THE PARK COUNTY BOARD OF COUNTY COMMISSIONERS; PARK COUNTY SHERIFF'S OFFICE, a public entity of the State of Colorado; FRED WEGENER, individually and in his official capacity as Sheriff of Park County, Colorado; MONTE GORE, individually and in his capacity as Captain of Park County Sheriff's Department; VICKIE PAULSEN, individually and in her official capacity as Registered Nurse for Park County, Colorado,

   Defendants.

_____

**PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION
TO EXCLUDE PLAINTIFF'S EXPERT WITNESS, PATRICIA L. PACEY, PH.D.**
_____

   Plaintiff, by and through his counsel, Bill Trine and Cheryl Trine of Trine and Metcalf, P.C., hereby submits this Response to Defendants' Motion to Exclude Plaintiff's Expert Witness, Patricia L. Pacey, Ph.D., and respectfully requests that the Motion be denied for the reasons herein after stated:

**ARGUMENT**

**I. DR. PACEY'S QUALIFICATIONS AS AN ECONOMIST ARE NOT DISPUTED.**

   The Defendants do not dispute that Dr. Pacey is qualified by reason of education, training and experience to do the type of economic analysis that she conducted in the present case. Dr. Pacey received a B.A. in Mathematics, cum laude from University of Florida in 1971, and a Ph.D. in Economics (Labor Economics / Industrial Organization / Econometrics / Taxation) from the

1

University of Florida in 1976. [See Pacey CV at 1, attached as **Exhibit 1**]. She has conducted research and published extensively. [See Pacey CV at 3-7, **Exhibit 1**). Among the topics Dr. Pacey taught as an economics professor for the University of Colorado System and for the George Mason University in Washington, D.C. is managerial economics, which includes the study of markets. [See Pacey CV at 2, **Exhibit 1**]. Dr. Pacey describes her expertise as including economic valuation of loss in personal injury matters, including issues of occupational mobility, labor force participation, age-earnings profiles, disabled workers in the labor market, and costs for additional medical care or services.[See Pacey CV at 1, **Exhibit 1**].

## II.   DR. PACEY'S METHODOLOGY

In the present case, Dr. Pacey discounted future loss amounts to reflect the probable net level of interest earnings relative to inflation and/or wage growth, assuming that probable future average annual wage growth will be less than the probable annual interest returns on a lump-sum payment. For medical care items, she used a net one-half discount rate for the net present value analysis, recognizing that the probable future annual inflation of medical costs is still somewhat greater than the price increases of other goods and services but less than the relevant interest earnings. She references her Appendix for more detail. [See Pacey Report at 7, attached to Defendants' Motion as **Exhibit A-2**].

For her economic loss calculations, she analyzed earnings, essential/home services, and medical/life care expenses. [See Pacey Report at 7, **Exhibit A-2**].

Under earnings, Dr. Pacey analyzed two scenarios: one if the Plaintiff remains in the U.S., and one if the Plaintiff returns to Mexico. She assumed a specific work life and earnings to establish pre-injury and post-injury wages for each scenario. She applied a net discount rate of 1.0% in the

future period for both scenarios, and did not include any benefits losses. [See Pacey Report at 8-9, **Exhibit A-2**].

Under essential/home services, Dr. Pacey identified the amount of time contribution expected, which she decreased over time for both scenarios. She identified the sources of her information as the rehabilitation specialist, interview with the client, and labor market studies. She assigned a dollar rate for the services under each scenario based on area wage rates for managing a household, finding the rates to be low relative to professional agency/service costs. She applied a net discount rate of 1.0% in the future time period, and noted that past loss reflects the value of time while in the future a fund of money is provided to meet the needs. [See Pacey Report at 10-11, **Exhibit A-2**].

Under medical/life care expenses, she based the expenses on the life care plan and applied a net discounting rate of one-half percent for those expenses driven by the medical price index (MPI), whereas for those expenses more closely associated with the consumer price index (CPI), she applied a net discount rate appropriate to the designated time frame. She based the decrease in Mexican costs on the costs identified by the rehabilitations specialist, which were estimated to be 50 to 60 percent of costs in the United States, and based on her own research which found a similar cost relationship. [See Pacey Report at 12]. She used specific rates for price increases and interest rates, recognizing that over the long-term there is a range of reasonable rates which would afford similar net present values. [See Pacey Report at 14, **Exhibit A-2**].

Dr. Pacey established a fund amount that would compensate for the probable losses from the date of the incident to the date of her report, and would replace the future lost stream of earnings and other future needs for each scenario. She took into account living/earnings growth and interest earned from funds. [See Pacey Report at 15, **Exhibit A-2**].

**III.   *DAUBERT*  FINDINGS ARE UNNECESSARY BECAUSE DR. PACEY DID NOT EMPLOY NOVEL METHODS IN DEVELOPING AN ECONOMIC APPRAISAL PLAINTIFF'S LOSSES.**

The Defendants claim that Dr. Pacey's methodology is not based on an acceptable scientific or technical methodology.  However, the Defendants have not met their threshold burden to show Dr. Pacey's methodology lacks support in the economic community.  A trial judge must have the discretionary authority to avoid unnecessary proceedings in "ordinary cases" where the reliability of an expert's methods may be taken for granted. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999).  Defendants must demonstrate that a methodology lacks support in the relevant scientific community by calling "'sufficiently into question' the principles, methods, or applications" the expert employed.  *McCoy v. Whirlpool Corp*, Not Reported in F.Supp.2d, 2003 WL 1923016, 7 (D.Kan. 2003) (citing *Daubert v. Merrel Dow Pharms., Inc.,* 509 U.S. 579, 592 (1993)).  Defendants must cite some scientific or legal authority to support their assertion that an expert's methodology and conclusions are unreliable. *Cook v. Rockwell Intern*., Slip Copy, 2006 WL 3533049, 19 (D.Colo. 2006).

The cases cited by the Defendants support the requirement that a methodology be novel before application of Daubert's factors. See *Cochrane v. Schneider Nat. Carriers, Inc*., 980 F.Supp.374, 379 (D.Kan. 1997) ("Because Dr. Olson's testimony on this issue would be based on a novel methodology, the court should consider the four *Daubert* factors here."); *Blue Dane Simmental Corp. v. American Simmental Ass'n*, 178 F.3d 1035, 1041 (8th Cir. 1999) (applying *Daubert* because no evidence other economists use before-and-after modeling to support causes of market fluctuation); *Atlantic Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1164 (10th Cir. 2000) (applying *Daubert* because the expert's testimony is based on a novel theory).

4

In the present case, the only authority cited by the Defendants to support their claim that Dr. Pacey's methodology is unreliable are three papers on English proficiency, and a quote on life expectancy which the Defendants misapply to earnings. These sources do not support the Defendants' claims.

The three papers on English proficiency do not support the Defendants' proposition that being less proficient in English negatively impacts wages in low-paying jobs. Instead, their sources show that English fluency makes no difference in low-paying jobs.

The author of the Defendants' first paper states, "I find that the direct effect of English language deficiency on earnings is virtually nonexistent for immigrants with low education and experience levels. The results show that only immigrants with at least a high school education or some US labor market experience will make less than their immigrant counterparts who speak English very well." [See *English Language Proficiency and Wage Rates of Mexican Immigrants*, by Jeremy Sandford, Illinois Wesleyan University (2002) at 3, **Defendants' Exh. A-4**]. "[A]t low levels of experience and education, the data actually show that those speaking 'not well' or 'well' earn more than those who speak English fluently." [See *English Language Proficiency and Wage Rates of Mexican Immigrants* at 14, **Defendants' Exh. A-4**]. "The labor market cost of English language deficiency is negligible or even negative at low levels of experience and education. This would seem to say that English is not required in entry-level, low-paying jobs that do not demand many skills….The fact that unskilled natives earn less than unskilled immigrants supports this possibility." [See *English Language Proficiency and Wage Rates of Mexican Immigrants* at 19, **Defendants' Exh. A-4**].

The Defendants' second study compared the earnings of immigrants as a whole to natives as a whole without differentiating between low- and high-paying jobs. It found an inability to speak English imposes a real cost on some immigrant workers, but 'the earnings equations used may simply be capturing the earnings of people in different occupational strata within the broad groups." [See *English Language Ability and the Labor Market Opportunities of Hispanic and East Asian Immigrant Men*, by Sherrie A. Kossoudji, University of Michigan (2001) at 224-25, **Defendants' Exh. A-5**].

The Defendants' third paper found that three-quarters of workers from Mexico and Central America but only one-quarter of native workers are in the relatively low-education occupations such as construction and restaurants, and few Mexican workers are in the high-education occupations. [See *The Role of Immigrants in the U.S. Labor Market* at 13, **Defendants' Exh. A-6**]. "[M]uch of the difference in the earnings of workers from Mexico and Central America can be linked to their lower educational attainment." [See *The Role of Immigrants in the U.S. Labor Market,* Congressional Budget Office (Nov. 2005) at 15, **Defendants' Exh. A-6**].

Finally, the Defendants cited *Life and Worklife Expectancies* to support their claim that Dr. Pacey should have used a Hispanic origin table to calculate earnings. However, this source specifically relates to worklife expectancy, not earnings. [See *Life and Worklife Expectancies* at 48, **Defendants' Exh. A-8**]. The Defendants did not question Dr. Pacey during her deposition on her reasoning regarding Plaintiff's worklife expectancy, which she based on a retirement age of 65. [See Pacey Report at 3, Defendants' **Exhibit A-2**].

**IV.   DAUBERT IS FLEXIBLE**

Without first showing Dr. Pacey is employing a novel methodology, the Defendants argue that Dr. Pacey's methodology must have been tested for validity; published or peer reviewed; and have a known or potential rate of error. However, *Daubert's* list of specific factors neither necessarily nor exclusively applies to all experts or in every case. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999). "[The reliability] step of the analysis does not require that all theories must be proven by tests specific to the facts in question." *Hoy v. DRM, Inc.,* 114 P.3d 1268, 1279 (Wyo. 2005). The law does not require an expert to back his or her opinion with independent tests that unequivocally support his or her conclusions. *McCoy*, Not Reported in F.Supp.2d, 2003 WL 1923016 at 3. See *Bonner v. ISP Techs., Inc.*, 259 F.3d 924 (8th Cir. 2001).

The Defendants also argue that Dr. Pacey's bibliography is so broad and all encompassing that it is of no practical value in determining how she reached the opinions to which she will testify. However, Dr. Pacey explained her reasoning and sources of information in detail throughout her deposition. For example, see Pacey deposition at 10-24; 27-40; 64-70; 86-89, **Exhibit 2**.

The Supreme Court has held that an expert may draw a conclusion from a set of observations based on extensive and specialized experience. *Kumho*, 526 U.S. at 156. Where an expert sets out the process he followed in arriving at his estimate and identifies the information considered in that process, including adequate identification of the studies believed to be most relevant to his analysis, this information should be sufficient to allow defendants to evaluate and challenge the reasoning and results. *Cook*, Slip Copy, 2006 WL 3533049 at 54 (citing *Daubert*, 509 U.S. at 593).

## VI. DEFENDANTS' CRITICISMS GO TO WEIGHT, NOT THE ADMISSIBILITY OF DR. PACEY'S ECONOMIC APPRAISAL OF LOSS.

The Defendants argue that it is speculative to provide a scenario in which the Plaintiff remains in the U.S. because the Plaintiff agreed to return to Mexico when the INS picked him up.

7

However, the Plaintiff was "released" by the INS while he was in the hospital. [See Briselda Gomez-Villalobos Dep. at 73-74, **Exhibit 3**]. In addition, the plaintiff's father filed a petition for the Plaintiff to become a resident alien prior to 2002. [See Moises Carranza-Reyes Dep. at 344-45, **Exhibit 4**]. There is at least a minimal probability that the Plaintiff will remain in the U.S. rather than return to Mexico. The Tenth Circuit has set the standard for relevancy/fit by reference to Federal Rule 401. *Cook*, Slip Copy, 2006 WL 3533049 at *5 (citing *Bitler v. A.O. Smith Corp.*, 400 F.3d 1227, 1234 (10th Cir. 2004). Evidence "need not be conclusive or highly probative to satisfy Rule 401 – 'even a minimal probability' that the asserted fact exists will suffice." *Cook* at *8 (citing *United States v. McVeigh*, 153 F.3d 1166, 1190 (10th Cir. 1998)).

Defendants assert that Dr. Pacey should have used a Hispanic origin table to calculate potential earnings in the U.S. However, the Defendants' authority pertains to worklife expectancy, not earnings. [See *Life and Worklife Expectancies* at 48, **Defendants' Exh. A-8**]. Furthermore, the courts have found that reliance on disputed facts does not render the expert's opinion unreliable. *Cook*, Slip Copy, 2006 WL 353304. at 7.

Dr. Pacey based her reasoning on sufficient authority. She testified that she based her wage rate for the Plaintiff if he remains in the U.S. on labor market data from the Bureau of Census that shows earnings by occupations, with those who rely on physical skills falling in the range of $8.00 to $15.00 per hour. [See Pacey Dep. at 28, **Exhibit 2**]. Additionally, she relied on the Dictionary of Occupational Titles which identifies skills needed for certain jobs, and her Appendix identifies various publications including a series of academic articles and studies that identify how the profile of Hispanic immigrants changes over time. [See Pacey Dep. at 32, **Exhibit 2**]. The $10.00 to $12.00 figure is based first on her 25 years of experience using wage data, and second on the sources she cited. [See Pacey Dep. at 67, **Exhibit 2**]. The Bureau of Census data establishes $10.00 per hour for

8

less than 9th grade for ages 25 to 29, and $13.00 per hour for 9th to 12th grade. [See Pacey Dep. at 70, **Exhibit 2**]. She also looked at other data sources which are listed in her appendix, which have hourly and annual wage rates by specific occupations, or which have information about availability over the long term and the functional skills required. [See Pacey Dep. at 70, **Exhibit 2**]. The Plaintiff has a junior high school level education based on his deposition and documents noted in Ms. Woodard's report. [See Pacey Dep. at 26, **Exhibit 2**].

The Defendants also argue that Dr. Pacey should have analyzed the "illegal" versus "legal" immigrant labor market in the U.S. Dr. Pacey explained that in her analysis, wages from legal residence in the U.S. are at the high end of a continuum and wages from work in Mexico are at the low end of a continuum, with wages from working illegally falling somewhere in between. [See Pacey Dep. at 110, **Exhibit 2**]. A criticism of the scope of the focus goes to the credibility and weight of the analysis, "and does not render the analysis inadmissible." *Cook*, Slip Copy, 2006 WL 3533049 at 55.

The Defendants claim that Dr. Pacey inflated the worklife expectancy for the Plaintiff by assuming he would work from day of injury to age 65 with no periods of unemployment and no consideration of possible early death or disability. However, had Plaintiff not been injured, he either would have been deported to Mexico and obtained employment there (Pacey scenario II), or been released and become a documented worker in the U.S. (Pacey scenario I). [See Pacey Report at 3, **Exhibit A-2**]. The Defendants provide no evidence that others in the economic field would not use similar assumptions. The Supreme Court has ruled that "Daubert generally does not, however, regulate the underlying facts or data that an expert relies on when forming her opinion." *U.S. v. Lauder*, 409 F.3d 1254, 1264 (10th Cir. 2005). Subjectivity in data does not necessarily make the resulting opinion untenably speculative if the underlying data is of the type generally relied on by

9

other practitioners; any potential bias therein can be fully explored on cross-examination or by presentation of competing evidence. *Potter ex rel. Potter v. Bowman*, Slip Copy, 2006 WL 3760267, 2 (D.Colo. 2006) (citing *Daubert* 113 S.Ct. at 2797-98).

In arguing that Dr. Pacey failed to utilize any Mexican costs for her valuation of the life care plan, the Defendants distort Ms. Helen Woodard's testimony. Ms. Woodard testified that she researched and compared costs of medical services in the U.S. and Mexico, but made a considered decision not to include Mexican costs for equipment because it was unnecessarily complicated while making up only a small part of the life care plan. [See Woodard Dep. at 63-67, **Exhibit 5**].

The Defendants also claim that Dr. Pacey failed to verify her conclusions on Mexican costs with any articles about how medical costs in Mexico compare to those in the U.S. In contrast, the deposition testimony quoted by the Defendants shows that Dr. Pacey did conduct her own research to perform a cross-check on Ms. Woodard's data, and she provided the articles she used to the Defendants. [See Pacey Dep. at 36]. Dr. Pacey testified that one article showed health costs to be 50-60% less in Mexico; one showed health plans cost 40-50% less in Mexico; and a third article indicated that prescription drugs cost about 50% less in Mexico. [Pacey Dep. at 36-37, **Exhibit 2**].

Dr. Pacey explained that, other than a cross-check of some very broad areas to see if there were dramatic differences, she relied on costs in the life care plan because Ms. Woodard told her that it is very difficult to make comparisons because things bearing the same name have different natures and offer different types of care in Mexico. [See Pacey Dep. at 49, **Exhibit 2**]. Dr. Pacey testified that making specific comparisons where not comparing apples to apples is outside her area of expertise. [See Pacey Dep. at 50, **Exhibit 2**].

The Defendants failed to provide any evidence to support their conclusory claim that Ms. Woodard's data, upon which Dr. Pacey based her calculations, was "dubious and of no actual

10

reliability and relevance." Furthermore, a Colorado federal district court has ruled that "Perceived flaws in expert's testimony, including that an expert relied on an allegedly unreliable opinion by another expert, 'are matters properly tested in the crucible of adversarial proceedings; they are not the basis for truncating that process.'" *Cook*, Slip Copy, 2006 WL 3533049 at 53 (citing *United States v. 0.161 Acres of Land*, 837 F.2d 1036, 1039-41 (11th Cir. 1988). "[V]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

The Defendants further claim that Dr. Pacey based her assumptions and calculations for Plaintiff's economic losses in Mexico on U.S. statistics because she failed to study the differential net discount rate. The Defendants failed to show any evidence that Dr. Pacey's methodology is not accepted within the economic community. Dr. Pacey explained that growth rates and interest rates are driven in part by underlying inflationary increases, and so they tend to move together over time. [See Pacey Dep. at 21-22, **Exhibit 2**]. She testified that each country's economic dynamic will be a little different, but interest rates are global. [See Pacey Dep. at 20-21, **Exhibit 2**]. Thus, the cost for an item in different countries may be different, but the rate of change over time may not be dramatically different. [See Pacey Dep. at 23, **Exhibit 2**]. She testified that using the net discounting standard applicable to the U.S. may understate the net present value of a life care plan if other countries have higher inflation, and that the U.S. has, if not the lowest then one of the lowest persistent inflation rates in the world. [See Pacey Dep. at 24, **Exhibit 2**].

The Defendants argue that Dr. Pacey did not explain how she arrived at four hours per week of home services. In contrast, the Defendants quoted deposition testimony in which Dr. Pacey explains her reasoning. She explained that she based her conclusion on published studies that show

11

that even a married male does 12 to 18 hours a week of household activities such as yard work, house and car maintenance. [See Pacey Dep. at 79-80, **Exhibit 2**]. She explained that the studies designate the hours it takes to do certain chores, and she identified four hours a week based on her understanding of the Plaintiff's limitations, with the expectation that he would require more time at certain times of the year for example to clean the gutters. [See Pacey Dep. at 79-80, **Exhibit 2**].

The Defendants also argue that the Plaintiff does not need any home services because he does not presently own a home, and that Dr. Pacey is not qualified to determine what limitations the Plaintiff would have. However, the Defendants failed to show that other economists would only consider home services if a person owns a home, or that a "home services" cost projection is beyond the expertise of an economist. The Defendants quoted Dr. Pacey's testimony in which she explained that the medical documents identified what kinds of problems the Plaintiff is experiencing. [See Pacey Dep. at 80, **Exhibit 2**]. Dr. Pacey's expert opinion is based on sufficient facts in the form of published studies and the Plaintiff's medical records. The Defendants' arguments go to the weight of the expert's testimony, not its admissibility.

The Defendants complain that Dr. Pacey only disclosed the following specific research: telephone interviews with client and with Ms. Helen Woodard. In contrast, Ms. Pacey additionally disclosed the specific documents she reviewed in analyzing the case, and she set forth a summary of the economic data that she typically relies upon in any economic evaluation with a listing of citations in her Appendix. [See Pacey Report at 4-6, **Exhibit A-2**]. During her deposition, Dr. Pacey explained in detail which sources she used for each of her opinions, all of which were disclosed pursuant to Fed. R. Civ. P. 26(a)(2)(B).

## **CONCLUSION**

Defendants' motion seeks to exclude all of Dr. Patricia Pacey's testimony, arguing that her conclusions are not supported by documentation and that she did not conduct an acceptable, recognized methodology of any kind. Further, that Dr. Pacey's assumptions "are grounded upon numbers without basis or support." However, courts only exclude that testimony that does not meet *Daubert's* standards. See *Cochrane v. Schneider Nat. Carriers, Inc.*, 980 F.Supp. 374, 378-80 (D.Kan. 1997) (excluding only those parts that were based on unreasonable assumptions or on a novel methodology that was not like the method commonly employed by others in the expert's field). In the instant case, all of Dr. Pacey's testimony meets *Daubert's* standards and none of her opinions and testimony should therefore be excluded. It is respectfully submitted that Defendants' Motion should be denied in its entirety.

Dated this 1 day of February 2007.

                Respectfully submitted,

            By: <u>s/ William A. Trine, Esq.___</u>
              William A. Trine, #577
              Cheryl L. Trine, #38150
              Trine & Metcalf, PC
              1435 Arapahoe Avenue
              Boulder Colorado 80302-6390
              (303) 442-0173

              Joseph J. Archuleta, #19426
              Joseph J. Archuleta and Associates
              1724 Ogden Street
              Denver Colorado 80218
              (303) 837-1642

              Lloyd C. Kordick, #6298
              Lloyd C. Kordick & Associates
              805 S. Cascade Avenue

                                                     Colorado Springs Colorado 80903
                                                     (719) 475-8460

                                                     Adele Kimmel, Esq.
                                                   Trial Lawyers for Public Justice
                                                   1717 Massachusetts Avenue, N.W.
                                                   Suite 800
                                                   Washington, D.C. 20030
                                                   (202) 797-8600

                                                   Attorneys for Plaintiff

## **CERTIFICATE OF MAILING/SERVICE**

       The undersigned hereby certifies that on this 1st day February 2007, a true and correct copy of the foregoing pleading was e-served via Electronic Case Filing and/or placed in the United States Mail, postage prepaid, and properly addressed to:

Joseph Archuleta
Attorney at Law
1724 Ogden Street
Denver, Colorado 80218-1018
*Co-Counsel for Plaintiff*

Lloyd C. Kordick,
Attorney at Law
805 S. Cascade
Colorado Springs, CO 80903
*Co-Counsel for Plaintiff*

Adele P. Kimmel
Richard H. Frankel
Trial Lawyers for Public Justice
1717 Massachusetts Avenue, N.W.
Suite 800
Washington, D.C. 20030
*Co-Counsel for Plaintiff*

Andrew Ringel
Jennifer L. Veiga
Hall & Evans
1125 17th Street, Suite 600

14

Denver, CO 80202-2052
*Counsel for Defendant Park County, Park County Board of*
*County Commissioners, Park County Sheriff's Office,*
*Fred Wegener, and Monte Gore*


Josh A. Marks
Berg, Hill, Greenleaf & Ruscitti
1712 Pearl Street
Boulder, CO  80302
*Counsel for Defendant Vicki Paulsen*


                                                   s/ Ashley Ronan_____