9

1  Q. Okay. Have you ever been stricken as an
2  expert witness by a judge or court or been denied -- or
3  have you ever had a court not allow you to testify in a
4  case?
5  A. Not to my knowledge. I mean, I think there
6  may have been a case I vaguely recall where reports were
7  asked and requested post a deadline, and I think there
8  might have been a case where they weren't allowed in
9  because of a deadline. But it wasn't due to my deadline.
10 I think I was asked to do it after a deadline.
11 Q. Okay.
12 A. I think that might have happened years ago,
13 if I -- if I recall correctly.
14 Q. Okay. But never because your work was
15 speculative or that you weren't competent to testify in a
16 given area that you were trying to testify in?
17 A. Not to my knowledge.
18 Q. Okay. Have you ever actually testified and
19 then had the judge, after your testimony, strike your
20 testimony?
21 A. I'm aware of at least one case that that
22 happened about 15 or 20 years ago in a court outside of
23 Colorado.
24 Q. What happened?
25 A. Well, the short story is, it was a

10

1  commercial matter -- or a bankruptcy matter. And I
2  relied upon the bankruptcy expert, who indicated this
3  two-page bankruptcy document could be interpreted in a
4  certain fashion, and my calculations were based on that
5  fashion. And the court disallowed that interpretation.
6  Q. Okay.
7  A. Excuse me. The appellate court did,
8  disallowed it.
9  Q. Oh.
10 A. The regular court not only allowed it, but I
11 think the jury came in with that -- with those
12 calculations. But I think at an appellant level it was
13 overturned --
14 Q. I understand.
15 A. -- for those reasons, as I understand it.
16 Q. But not the trial -- I was asking about -- I
17 was wondering about the trial judge.
18 A. No, the trial judge allowed it in. And
19 apparently all the exhibits and documents were lost
20 somewhere between the trial court and appellate court.
21 But in the end, it was not allowed in, as I understand
22 it, due to some claim of the underlying assumption that
23 was made through a bankruptcy lawyer.
24 Q. Okay. I'd like you to go to pages 4, 5 and
25 6, just glance at them, of your report, Exhibit 51.

11

1  These, if I understand correctly, basically represent --
2  well, four represent the various documents that you've
3  examined in the case, correct?
4  A. That are particular to the case, yes.
5  Q. Right. And then page 5 relates to, more or
6  less, people that you have talked to about the case; is
7  that correct?
8  A. Yes.
9  Q. I presume you've talked to the attorneys
10 about the case too. But -- well, I guess you -- well, I
11 guess you listed correspondence with them, so that would
12 cover that. And then -- and any additional research that
13 you had done specific to the case, correct?
14 A. Yes.
15 Q. Okay. And I see there's no specific
16 research that you did; is that correct?
17 A. Actually, it's specific inquiries. And we
18 should have had in here that we did do -- track down some
19 specific information on Mexico wage rates and prices that
20 was in my file, and I believe you got a copy of the file.
21 So we probably should have also included on there that we
22 did download some data regarding Mexican exchange rates
23 and Mexican wage and cost information.
24 Q. Okay. And then page 6 is more of a
25 general --

12

1  A. Overview.
2  Q. Yeah, of the data that's available --
3  A. Yes.
4  Q. -- is that correct, and that you typically
5  use in a case like this?
6  A. Right. It is a pretty standard page in my
7  report, and it tries to give everyone who is not familiar
8  with the reports an overview of the areas of information
9  that I keep up to date on and rely upon to greater or
10 lesser degrees, depending on the nature of the case.
11 Q. Okay. And then you also provide -- and I
12 don't want to get into it -- but a rather extensive
13 bibliography of all kinds of sources of statistics
14 information and whatnot; is that --
15 A. Yes, at the bottom of page 6, it also refers
16 you to what we refer to as an appendix, which is also
17 about 30 pages of as comprehensive as I think is possible
18 or reasonable of what economists do, what net present
19 value is, what data sources we rely on.
20     So it's a biography as well as an
21 explanation of certain areas of -- that are oftentimes
22 inquired about in a litigation matter, like net present
23 value or displaced workers or disabled workers. So it's
24 a more comprehensive explanation and bibliography than
25 page 6 provides.

PLAINTIFF'S
EXHIBIT
2

Page 13

1  Q.  And neither the bibliography nor page 6 are
2  case-specific: is that -- I mean, that basically goes
3  into all your reports; is that --
4  A.  They're not case-specific, that's correct,
5  other than they're relevant to, probably, all cases --
6  Q.  Right.
7  A.  -- but, again, greater or lesser portions of
8  them.
9  Q.  Okay. You've done two scenarios -- well,
10 let me back up. Going back to page 5, what -- with
11 respect to research, what, specifically, research should
12 we have included in here?
13 A.  The research that we did and downloaded at
14 least representative information on was included in the
15 copy of materials we sent to your office. And it would
16 be the monthly average data from -- on exchange rates
17 between the U.S. and Mexico. It also included -- so it
18 had the currency conversion information.
19 Q.  That was for -- excuse me. That was for the
20 year 2000; is that correct?
21 A.  Well, it gave it for 2000. It also -- yes.
22 Q.  Okay.
23 A.  Also, we had con -- we had basic information
24 about Mexico in 2001 to 2005 dollars regarding GDP and
25 per capita and labor force, some general macroeconomic

Page 14

1  data.
2  Q.  Did you rely on any of that data?
3  A.  More just as a reconfirmation of my general
4  understanding of the Mexican economy, but there wasn't
5  anything specific in that particular document. And then
6  we had a Mexican labor and news and analysis document
7  that talked -- that gave us some information regarding
8  minimum wages that had been adopted in Mexico, so we had
9  sort of that information. We had -- and I did rely upon
10 that information. I believe it's noted.
11 Q.  Is that where you got the 60-cent-per-hour
12 rate for home services?
13 A.  Yes. It's -- the minimum was $4.50 a day --
14 Q.  Okay.
15 A.  -- and we translated that into an average
16 hourly rate. And then we also had some health care
17 information regarding costs of health care. And these
18 are more generic articles, not what I would call
19 primary-source articles, but it gave us a little bit of
20 an understanding about costs down there. This is more in
21 confirmation of some information that Reentry were
22 putting together.
23 Q.  That's Helen Woodard?
24 A.  Yes.
25 Q.  Okay.

Page 15

1  A.  And so -- and then there was some data from
2  OECD on health data about costs in Mexico compared to --
3  how do costs in Mexico compare to here. So that was
4  more -- because of my background, I felt like I could at
5  least track down a little bit of information to see how
6  the rates compared in Mexico with the U.S. if, in fact,
7  Mr. Carranza-Reyes was required to go back to Mexico.
8  Q.  Okay.
9  A.  More sort of supportive information of what
10 Ms. Woodard's office had been doing than trying to
11 specifically identify the costs, which I would not be
12 comfortable doing. But generically or generally trying
13 to identify the relationship of U.S. costs to Mexican
14 costs was what I was trying to get a handle on.
15 Q.  So you would not be comfortable trying to
16 figure out the cost of a physician or, say, a family
17 practitioner or a pulmonologist in Mexico or equipment,
18 medical equipment, down there; is that -- that would be
19 more Ms. Woodard's -- is it Ms. Woodard, or Dr. Woodard?
20 A.  It's Ms. Woodard.
21 Q.  Okay. That would be more Ms. Woodard's
22 bailiwick?
23 A.  The short answer is largely, yes, that would
24 be Ms. Woodard's bailiwick. To the extent that I can
25 do -- and in the U.S. we'll do some -- you know, labor

Page 16

1  market wage rates and things like that, I can do some
2  cross-checks to see if the range that a life care planner
3  has identified would be in the range I would reasonably
4  expect to see in the labor market.
5      But I can't really identify how the skills
6  of a physician in another area or what it is that they do
7  compared to the U.S. and whether those rates are
8  appropriate or not, so I'm largely relying upon the life
9  care plan in this case. But to the best of my ability, I
10 try to do a cross-check as to the overall rates compared
11 to U.S. And that's all I did in this case.
12     So normally I can do some modicum of
13 cross-checks on certain items, but I would not be the
14 person that would be comfortable identifying the cost of
15 a wheelchair, because I don't know what else might need
16 to go on a wheelchair and how that might differ in price
17 if I knew all the details of it. And so I would defer
18 those things to the life care planner.
19 Q.  So, like, a prosthesis, you wouldn't want to
20 go in and try to price a comparable prosthesis in Mexico
21 versus the one that she came up with for the United
22 States; is that correct?
23 A.  I would -- I would not be comfortable doing
24 that. I think there's a lot of detail about the
25 specifics of the medical equipment that I would not be

Page 17

1  educated enough to address --
2  Q.  Okay.
3  A.  -- at least in that area.
4  Q.  All right. You've done two scenarios; is
5  that correct? Well, the first one is -- well, that is
6  right, isn't it?
7  A.  Yeah.
8  Q.  The first one is if he were to stay in the
9  United States?
10 A.  Correct.
11 Q.  And the second one is if he, Mr. Reyes --
12 does he go by Carranza-Reyes or Reyes?
13     MR. TRINE: Carranza-Reyes.
14 Q.  (BY MR. ZARLENGO) Carranza-Reyes. And the
15 second would be if Mr. Carranza-Reyes went back to Mexico
16 and lived there the rest of his life; is that correct?
17 A.  Yeah.
18 Q.  Of the two, which one is, in your opinion,
19 more likely or probable?
20 A.  I don't know that I'm the person that can
21 address which one is more likely or probable, because it
22 appears to not be an economic issue. It appears to be a
23 noneconomic issue.
24 Q.  What kind of issue is it, then?
25 A.  Well, I would assume it's an immigration

Page 18

1  issue --
2  Q.  Okay.
3  A.  -- or a legal issue, which is really outside
4  of my area of expertise.
5  Q.  You understand that at the time he was
6  arrested, he had agreed to return to Mexico; is that --
7  did you know that?
8  A.  I don't know that I knew it one way or the
9  other.
10 Q.  I believe you had it in your report. Let me
11 look. Maybe not.
12 A.  I don't recall that I did.
13 Q.  Well, maybe not. And, of course, if he went
14 back to Mexico and stayed in Mexico and never came back
15 to the United States, he would be treated by Mexican
16 doctors, he'd be given medicine from Mexican pharmacies,
17 and he would buy his medical equipment from Mexican
18 equipment -- medical equipment providers; is that not
19 correct? Wouldn't that be how it would probably happen?
20 A.  That would be my understanding.
21 Q.  He was from, what, Mexico City, is that
22 correct, or thereabouts?
23 A.  In the area is my recollection.
24 Q.  Okay. Have you ever done a financial
25 analysis in a personal injury case involving a foreign

Page 19

1  national who lives in a foreign country?
2  A.  I'm not quite sure I understand what you
3  mean by "a foreign national living in a foreign country."
4  Q.  Well, a foreign -- a citizen of a foreign
5  country who lives in that foreign country. Let's say
6  that the citizen -- well, as is pretty much what we have
7  in this instance. The citizen of the foreign country
8  comes to United States -- legally or illegally. It
9  doesn't matter -- but then returns to the foreign
10 country, but files a lawsuit here in the United States --
11 say, gets injured, files a lawsuit here in the United
12 States, but goes back to the foreign country, where he or
13 she will stay for the foreseeable future, if not the rest
14 of their lives.
15 A.  It seems to me I may have had one or two of
16 those over the years.
17 Q.  You can't remember anything specific?
18 A.  I had one out of Korea that that happened
19 to. I think it was Korea, or it might have been Taiwan
20 or China. I've had one or two over there. I may have
21 had one in Mexico as well, but it's been quite a while.
22 Q.  Okay. Have you had any training in how to
23 analyze economic losses for foreign nationals living in
24 their native country --
25 A.  Well --

Page 20

1  Q.  -- other than --
2  A.  -- to the extent that, as a labor economist
3  and as an economist in general, we certainly understand
4  that wage markets in different areas might have different
5  rates. They all still, in the free-market economies or
6  relatively free-market economies, they still meet the
7  same economic principles. But obviously, you need to
8  know a little bit more about that country's wages.
9       I take it back. I have recalled one in
10 Australia as well, and I think also another case in
11 Spain. So yes, I've done a few cases where you're
12 dealing with wage rates from -- from another country
13 because that person was here visiting, or something, and
14 injured.
15      So -- and to the extent my training as a
16 Ph.D.-trained economist certainly allows me to recognize
17 that different markets in different countries might have
18 different levels of wage rates. But the nature of those
19 wage rates, if it's a relatively Western civilization or
20 a free market type of economy, capital economy, works
21 similarly.
22 Q.  But each different economy -- each different
23 country, would have different economic dynamics; is that
24 not correct?
25 A.  Well, there will be a little bit. There are

21

1  always going to be differences. There are differences in
2  regions, let alone -- within a country. But in terms
3  of -- unless you're in a noncapital-market economy, you
4  are still going to see -- interest rates are global.
5  They're not -- they're not particular to a particular
6  city or state or country. And wage rates can vary in
7  terms of opportunities and mobility, so there is a little
8  bit of nuances associated with that.
9      Q.   You could have high inflation in one
10 country, low inflation in another, disinflation in
11 another; is that not --
12     A.   Well, those things can -- can affect it,
13 depending on the nature of the country you are looking
14 at --
15     Q.   Right.
16     A.   -- sure.
17     Q.   But, I mean, it varies from country to
18 country, though; is that not correct?
19     A.   The general principles are the same, but
20 there will be particular nuances in any given country.
21     Q.   The general principle being, you have a
22 growth rate and a discount rate that you apply to come up
23 with a present value; is that correct?
24     A.   Well, the general principle is that growth
25 rates and interest rates all are driven in part by the

22

1  underlying inflationary increases, so they still tend
2  to -- to move together over time. And they should, even
3  in countries that have higher inflation rates or lower
4  inflation rates.
5      Q.   You mentioned wage analysis. I don't know
6  if I'm using your exact words. But what about
7  analysis -- analyses of costs in these foreign countries
8  of things such as life-care-plan-type things? Have you
9  done any analysis of that for a foreign national living
10 in his foreign country?
11     A.   Well, to the extent the interest returns --
12 to address your question specifically, have I done any
13 specific wage cost or price analysis over time --
14     Q.   Price or cost analysis.
15     A.   -- in a particular -- or cost analysis over
16 time, no, I have not.
17     Q.   All right. So the cases you did do related
18 more to lost wages, lost income, lost benefits, that side
19 of the equation; is that correct?
20     A.   Well, I don't know that I recall
21 specifically if any of them had life care plan or other
22 cost information in them or not, so I don't know that I
23 can answer that.
24     Q.   But to the best of your knowledge, you can't
25 remember one that did have a life care plan; is that

23

1  correct?
2      A.   I wouldn't necessarily, as I'm sitting here,
3  recall a particular case and the details of a case. So
4  whether those cases that you've inquired about that are
5  with foreign nationals, whether there were life care
6  plans or not would require me to do some homework to
7  see --
8      Q.   Okay.
9      A.   -- if, in fact, there was a life care plan
10 attached to them. But the basic concept of cost or price
11 increases, inflation and interest rates, is global. It
12 is not unique to the U.S.
13     Q.   But you're not saying that the cost of a
14 widget in the United States would be the same as the cost
15 of a widget in Mexico or Canada or Italy, would you? Are
16 you?
17     A.   No, not necessarily. It could be, but it
18 doesn't necessary have to be. But the rate of change
19 over time may not be dramatically different. Or if, in
20 fact, it's a high-inflation state or country, and
21 interest rates being global, then we may have understated
22 by using more standard net discounting processes that we
23 use in the U.S. for -- for costs or price increases may
24 understate the damages if inflation is dramatically
25 higher in those places, because interest rates aren't

24

1  dramatically higher, because they're clearly very global.
2          So if anything -- by using the standard
3  that's more clearly applicable to the U.S., if anything,
4  we may be understating the net present value of a life
5  care plan if, in fact, other countries where costs are --
6  have greater inflation rates than the U.S.
7      Q.   You could be overstating them, too, if they
8  have a lower inflation rate than the U.S. or -- I mean,
9  don't you -- is that not correct?
10     A.   To the best of my recollection -- and I
11 haven't looked at it in detail lately -- but I think the
12 U.S. has, if not the lowest one, of the lowest persistent
13 inflation rates in the world. So that's a possibility,
14 but it's not much of a probability.
15     Q.   You also have to take into consideration
16 currency translation, too, don't you?
17     A.   Well, when you start with the cost, and it's
18 already been translated into a base figure, so -- I mean,
19 you don't have to keep doing it every year. So if you
20 start with X in pesos, and you covert it, and you have a
21 base point, then the issues are inflationary increases
22 and interest earnings on that. So no, I don't think that
23 would be relevant -- would matter. You do it, you get to
24 the same place.
25     Q.   All right. Just so I'm clear on it -- I

Page 25

1  think we talked a little about it -- you're staying
2  totally away from the issue of whether or not he's going
3  to get a green card and be able to stay in the United
4  States; is that correct?
5      A.   I'm not --
6      Q.   Other than that did you two calculations?
7      A.   I'm making -- I have no opinions as to that
8  and would not have opinions as to that issue.
9      Q.   Okay.
10     A.   So I don't know that I'd say I'm totally
11 staying away from it by anything other than it is not my
12 area of expertise, and I have no expectations of opining
13 as to whether he will or will not obtain a green card.
14     Q.   Very good. Okay. That's fine. Okay. Mr.
15 Carranza-Reyes had a junior high equivalence; is that
16 correct?
17     A.   Approximately, yes.
18     Q.   Okay. And what do you base that on?
19     A.   Our understanding of the documents from the
20 documents that he had. There were, I think, two sources.
21 One was in -- I think Ms. Woodard notes that in her
22 report. I believe it was also in his deposition, is my
23 recollection. I don't see it any other place right
24 offhand. But we assumed he had less than a high school
25 degree, and it was our understanding that he had less

Page 26

1  than a high school degree.
2      Q.   But you believe that he had more than an
3  eighth-grade education; is that correct?
4      A.   I don't know that I made any other
5  assumption regarding the level of grade he went through,
6  unless it was in the documents, but I don't have a
7  specific notation of it.
8      Q.   Okay. Are you familiar with the school
9  system and structure in Mexico or any other country
10 besides the United States?
11     A.   I'm not sure in what fashion you mean.
12     Q.   Well, in terms of if I complete 12 years of
13 Mexican schooling, is that, in fact, the equivalent of a
14 United States high school diploma?
15     A.   Well, as it translates to earnings in the
16 U.S., probably not. It would take some time to make a
17 transition over. But in terms of the number of years of
18 schooling, I think they're fairly similar. They might be
19 a year or two less in Mexico.
20     Q.   Okay. Now, going to page 8 of your report,
21 in Scenario II, I think you say -- the very first
22 paragraph, I think you mean to say -- the third line down
23 where it's -- after the words "United States," you say
24 "in Scenario I." I think you probably mean Scenario II;
25 is that correct? Because you talk about Scenario I. Oh,

Page 27

1  no. I'm sorry. I'm sorry. Never mind. Never mind.
2      A.   Okay.
3      Q.   "In Scenario I, the pre-injury earnings
4  opportunities anticipate that [he] would likely have
5  wages comparable to other males in the United States with
6  less than a high school education"; is that correct?
7      A.   That's what I say, yes.
8      Q.   He doesn't even speak English. Wouldn't you
9  anticipate that he could expect lower wages than what you
10 would find in a government table showing what average
11 earnings for someone with less than a high school
12 education would have?
13     A.   I wouldn't think so.
14     Q.   Why not?
15     A.   Well, first of all, most of the time the
16 types of jobs they would do would be more physical, more
17 construction. And those jobs are still likely to fall in
18 that same range, with or without English-speaking skills.
19 And one would assume over time he would acquire some
20 English-speaking skills as well.
21     Q.   What do you have to support that opinion?
22     A.   Well, the jobs that you typically would
23 expect somebody with limited educational training to be
24 in, particularly for men, are going to be the semiskilled
25 or unskilled construction and labor types of jobs. And

Page 28

1  the wage rates for those types of jobs range from, on the
2  low end, 8 or 9 dollars an hour, to, on the high end, 14,
3  15 dollars an hour. And I've used in the neighbor -- and
4  the 10 or 11 dollars an hour that's identified as
5  less-than-high-school-educated earnings really falls
6  within that same range.
7      Q.   But other than your opinion, I mean, what do
8  you have to support this opinion?
9      A.   Well, all of the labor market data from the
10 Bureau of Census that shows earnings by occupations and
11 the types of occupations that somebody who is going to
12 rely on their physical skills are going to fall into that
13 range. Even the secondary labor market jobs are almost
14 close to the $22,000.
15          I mean, nobody really makes minimum wage
16 anymore. Even the jobs in the -- as secondary cooks in
17 the McDonald's are 8, 9 dollars an hour in many places.
18 So there's a wide range of jobs between that 8 and 9
19 dollars on the low end to the 12 to 15 dollars on the
20 higher end that he would qualify for without any basic
21 skills in the labor field, or even in the
22 behind-the-scenes retail occupations.
23     Q.   So you don't think it's important that he
24 speak English and understand instructions, be able to
25 communicate to his supervisors and his coworkers? You

29
1  don't think that would have any bearing on his ability to
2  earn money; is that correct?
3      A.   That isn't what I said at all.
4      Q.   Well, you're assuming that he would earn the
5  equivalent of someone with less than a high school
6  education. And I'm asking -- and I don't want to beat
7  this horse to death, but I'm just asking if -- so in your
8  opinion -- maybe I ought to just back up. In your
9  opinion, the fact that he doesn't speak English would not
10 have any effect on his ability to earn the same as anyone
11 else in the United States with less than a high school
12 education; is that correct?
13     A.   Ultimately, for different reasons, the
14 earnings are likely to be similar.
15     Q.   Similar. Similar, or the same?
16     A.   Well, you lawyers always want to split
17 hairs.
18     Q.   Yeah.
19     A.   When we say "similar," we mean the same
20 22,000 -- I believe the 22,000-odd dollars is consistent
21 that less-than-high-school-educated males in the U.S.
22 make. It's also consistent with the type of earnings
23 that Mr. Carranza-Reyes could make.
24          The reasons for it may not always be exactly
25 the same reasons, because -- but given the nature and

30
1  types of jobs you would expect Mr. Carranza-Reyes to
2  have, whether he initially didn't have English skills or
3  whether he ultimately acquired some, he may be able to
4  have more mobility within that -- for occupations within
5  that 22,000 with English-speaking skills. But he's still
6  likely to make that kind of money without
7  English-speaking skills because of the nature and types
8  of jobs, but a smaller array of opportunities.
9           So the array of opportunities without
10 English-speaking skills may be more the back-room cook in
11 a place where there are Spanish-speaking supervisors, and
12 it's not as necessary. And it might be on those end. Or
13 it could be in construction, where he is a basic laborer
14 making the 9, 10, 12 dollars an hour where there's also a
15 supervisor of a crew that has bilingual skills. It's not
16 uncommon.
17          But could he become -- without
18 English-speaking skills be able to deal in the front
19 office of some of those places? Probably not. So he
20 might have a reduced access to certain types of jobs.
21 But the access to the types of jobs he has are still
22 likely to pay similar wages because, frankly, they're
23 basically, outside of the few minimum-wage jobs that are
24 left out there, they're the lowest wage rates that we see
25 in our economy.

31
1      Q.   And that is your opinion on this; is that
2  correct?
3      A.   Well, it's my opinion based on my
4  understanding of his function preincident, that he was
5  physically able to handle those types of jobs, and that
6  he would -- he would be able to, with basic functional
7  skills, physically functional skills, with nonacademic
8  skills, that's the labor market that he would likely be
9  assigned to, as a labor economist and as an economist.
10     Q.   And then, just so we can get off the
11 subject, you don't have any independent resource --
12 government studies, private studies or anything of the
13 kind -- to support your opinion that he will earn the
14 same -- that a non-English-speaking worker can expect the
15 same as an English-speaking worker; is that correct?
16          I mean, do you have anything -- any -- any
17 support other what you have just now told us? And I
18 don't want you to go through that whole explanation
19 again. But do you just -- do you have anything that you
20 can point to, any government study or a private study
21 that says that?
22          MR. TRINE: Object to form. Go ahead.
23     A.   Other than what I've already explained to
24 you, the Bureau of Census data and any number of the
25 academic articles that I've cited in my appendix that

32
1  talk about immigrants and their earnings profiles, et
2  cetera, would support what I just said.
3      Q.   (BY MR. ZARLENGO) Well, would you show us
4  that, then, in the Bureau of Census or these studies that
5  you're talking about?
6      A.   Well, what I said is that the Bureau of
7  Census wages and the Dictionary of Occupational Titles
8  identify what skills you have to have for certain jobs.
9  And the jobs that we're talking about are the jobs that
10 are largely secondary labor market jobs. That will
11 support it. And my appendix identifies the various
12 publications. There are books on them, as well as
13 studies on it.
14          And then, I haven't got them readily
15 available, but I certainly can get you a series of
16 academic articles and studies that have dealt with
17 immigrants coming to the U.S. that actually particularly
18 focus on the Hispanic immigrants coming to the U.S. and
19 how their profile changes over time as they enter.
20          And so it's a fairly common field or subset
21 of data or articles that deals with how immigrants
22 assimilate in terms of their earnings. But no, I can't
23 cite it off the top of my head. But yes, I can certainly
24 provide it if you request it.
25     Q.   I went through your file, and I looked at

**33**

1  what you've listed as research that you've done. I
2  didn't see any such articles or data either mentioned
3  specifically in this case or in any of your files. I
4  presume you did not look at any of that in preparing your
5  report; is that correct?
6      A.   Well, again, you have a couple questions
7  there. Your last question about presuming I didn't look
8  at any of it is incorrect, because the articles are
9  available in all -- multiple journals that I've cited in
10 my appendix. So no, I don't cite out each and every
11 article I've read over the last 25 years.
12          But I keep up with those journals: the
13 Journal of Labor Economics, the Journal of Human
14 Resources, the American Economics Review, et cetera, and
15 in many of those there are specific articles. But I
16 don't cite the thousands of articles that I've read and
17 kept up with as part of my background and experience.
18 But if you have a special request for some, I can sort
19 through those that I keep up with and provide them. Did
20 I read them specifically before issuing this report?
21     Q.   That was my question.
22     A.   Well, I don't know that that was your
23 question. But that aside, I would say that I don't know
24 that I pulled them out specifically. But do I read these
25 articles on a monthly or quarterly basis so that I can

**34**

1  keep up with that knowledge when I do these reports?
2  Absolutely. Did I pull each and every one of those out
3  to specifically make a decision on this report? No.
4      Q.   Okay. On page 8, in the second paragraph --
5  now we're talking about Scenario II -- you say, "Also,
6  based on information by the rehabilitation specialist" --
7  that would be Ms. Woodard, correct?
8      A.   Yes, or her office.
9      Q.   -- "and our own research, costs for medical
10 and life care needs are anticipated to be some 50 to 60
11 percent of U.S. costs under Scenario II." Let's take
12 that in -- I see two parts in there. The one is, you
13 spoke with Ms. Woodard, correct --
14     A.   Yes.
15     Q.   -- about how much it would cost in Mexico
16 versus the United States?
17     A.   That was part of our discussion.
18     Q.   What exactly -- tell me about the
19 discussion. Just describe the conversation. What did
20 you say, what did she say, and so forth?
21     A.   Well, I don't know that I can describe it
22 verbatim. But I talked to her, and my notes on that
23 indicated that their research had suggested it was -- the
24 cost would be -- if, in fact, you could get the same
25 items, or something like that, it would be in the

**35**

1  neighborhood of 50 to 60 percent of what it would cost in
2  the U.S. And I think that's on an interview note I had
3  with her. Let me see if I can find it. Yes. 50 to 60
4  percent of U.S. costs is what she ultimately indicated
5  their information suggested.
6      Q.   What information did she have; do you know?
7      A.   You'd have to ask her what the specific
8  information she had was.
9      Q.   Oh, let me back up. Did you ask her what
10 information she had?
11     A.   Maybe generically. I don't have any note
12 that I asked her, but I would imagine in the course of
13 the conversation she made reference to what it was. But
14 I didn't try to track down her information.
15     Q.   So you didn't ask how she got that data; is
16 that correct?
17     A.   I wouldn't ask her how she got her data. I
18 would rely on her information. And I did -- I told her
19 I'd do a little cross-checking on my own, or maybe had
20 already done it.
21     Q.   Okay. Are you aware that she had done a
22 considerable amount of research into various -- well,
23 costs of services, at least, in Mexico versus the United
24 States? Did you know that, or not?
25     A.   That was my general understanding, that she

**36**

1  had done some research. I don't know how extensive it
2  was. It sounded like she had done some research, and I
3  didn't know the -- I don't recall asking her how
4  extensive it was.
5      Q.   Okay. Then you say, "and then based on your
6  own research." What research is that?
7      A.   The articles I mentioned earlier and the
8  data I mentioned earlier.
9      Q.   Okay. You have a specific number, 50 to 60
10 percent. Would you show me where you got that amount --
11     A.   Well --
12     Q.   -- in your file?
13     A.   Well, I used the 50 to 60 -- I guess I don't
14 understand your question.
15     Q.   Well, you say, "Based on information from
16 Ms. Woodard," okay, "and our own research, costs for
17 medical and life care needs are anticipated to be some 50
18 to 60 percent of U.S. costs." So what I am -- what I
19 would like to see is what you looked at that led you to
20 the 50 to 60 percent range.
21     A.   Well, I ultimately relied on Ms. Woodard's.
22 But the data that I pulled out as a cross-check for my
23 own purposes were in the articles that you were provided,
24 where one says in Mexico, health care costs are about 40
25 to 50 percent lower than in California --

* SUBJECT TO CONFIDENTIALITY DESIGNATIONS *

**37**

1  Q. Okay.
2  A. -- which is 50 -- lower, so look at the
3  reverse: It's 50 to 60 percent of costs. California
4  costs tend to be -- I have no information that California
5  costs are different than Colorado costs when it comes to
6  cost of a wheelchair, but I would defer to Ms. Woodard on
7  that.
8      A second article we tracked down indicated
9  that health plans cost 40 to 50 percent less than in the
10 U.S. A third article that you received regarding health
11 care indicated that prescription drugs manufactured in
12 Mexico cost, on average, about 50 percent less than the
13 same drugs in the U.S.
14     So to the extent that I tracked down a few
15 articles to see if it was confirmatory of what Ms.
16 Woodard's 50 to 60 percent costs were, all the
17 information that we had looked at appeared to fall in
18 that same range. So I ultimately relied on Ms.
19 Woodard's. But I did, to the best of my information, be
20 able to do at least a minor cross-check to make sure it
21 didn't seem to be significantly out of line with what she
22 said.
23     Obviously, had it been dramatically
24 different than what she was saying, I'd do more homework
25 and ask more questions. But because our cross-checks

**38**

1  seemed to be -- fall in line with that, I relied upon
2  her, as I typically do, for those costs, but felt
3  compelled to do a little homework because it was more
4  unusual to have to deal with that.
5  Q. So if you had seen some data, or if you were
6  to see some data today that would show some dramatic
7  differences, you'd want to do some more research; is that
8  what you said?
9  A. I wouldn't necessarily want to do more
10 research. What I'd want to do is ask more questions --
11 Q. Okay.
12 A. -- about why.
13 Q. Okay.
14 A. Just like I would if there was a cost that
15 seemed out of line from my experience in the U.S.-based
16 life care plan. So if it looked out of line, I would
17 still likely defer to the rehab specialist, because it's
18 their area of expertise. But I would certainly red-flag
19 it and ask questions to make sure I understand why it's
20 different than what I would have otherwise expected.
21 Q. You mentioned three articles; is that
22 correct?
23 A. I did mention three.
24 Q. Who wrote these articles?
25 A. These came off of the Internet. One was --

**39**

1  I just have the initials -- A Passport to Health Care at
2  Lower -- actually, some of these are through -- are
3  summaries of data and appear in publications called --
4  well, one is through the Washington Post, but it's pooled
5  information from Mexican resources. And one is through
6  Internationalliving.com, so it's pooled data through
7  those. And one is the OECD health care data.
8  Q. What in the OECD health care data did you --
9  what in there did you use to come up with this wording --
10 A. I didn't use --
11 Q. -- "50 to 60 percent"?
12 A. -- anything in particular in there. They
13 were just to get me familiar with what was going on in
14 another area and to see if there was anything that would
15 suggest that I needed to make further inquiry of Ms.
16 Woodard.
17 Q. OECD, the Organization for Economic
18 Cooperation and Development, correct?
19 A. I think it's Cooperation. It might be
20 Community, but . . .
21 Q. What is that?
22 A. It's a -- it's an international
23 organization.
24 Q. That does what?
25 A. Well, it does a lot of things.

**40**

1  Q. Are you familiar with them?
2  A. In just very general terms. But I don't
3  have a history of what it does, other than I know it is
4  involved internationally in looking at a wide variety of
5  economic issues across different countries.
6  Q. Is Mexico a member of the OECD?
7  A. I believe so.
8  Q. Okay. Why don't we go ahead and mark these.
9  These are the articles that we're . . .
10     (Deposition Exhibits 52 and 53 were marked.)
11 Q. Okay. Now, which one is which? I didn't
12 see -- let me just borrow that a second.
13     MR. JURS: Could you tell us which one is
14 which, Vince?
15     MR. ZARLENGO: The one that says
16 "Healthcare," that's 52. And the next one is --
17 "Healthcare is Migrating" is 53. And "Passport to
18 Health" is 54.
19     THE REPORTER: I don't have that.
20     MR. ZARLENGO: Oh.
21     (Deposition Exhibit 54 was marked.)
22 Q. (BY MR. ZARLENGO) Okay. I'm going to hand
23 you Exhibits 52, 53 and 54. Are these the articles that
24 you're referring to?
25 A. They are.

49

1  nor would I, nor do I believe it's appropriate.
2  Q. No, I'm not asking, you know, if you did.
3  All I want to know is that, seeing this 38 percent
4  instead of 50 to 60 percent, that didn't cause you to
5  want to, quote, ask more questions, did it?
6  A. Well --
7  Q. Well, you didn't ask more questions, did
8  you?
9  A. I -- in the original conversation with Ms.
10 Woodard, she said it's very difficult -- my recollection
11 was that they did -- they did research on it, and it was
12 difficult to make comparisons because the nature and the
13 type of care there for what they call the same thing is
14 different. Like looking at a prosthesis, we don't
15 know -- or a wheelchair, whether it has all the whistles
16 and gadgets, et cetera, on it. So I understood that it
17 was difficult to make a comparison.
18    I simply tried to do a cross-check through
19 some very broad areas to see if, in fact, there was
20 dramatic differences. And Ms. -- and that's all I've
21 done with this stuff. So when I saw that there were
22 differences, that it wasn't 40 to 50 or 50 to 60 percent
23 every single time, I wasn't concerned about it, because
24 Ms. Woodard had already advised me that they had done
25 their own homework on it, and they were comfortable with

50

1  that range.
2  Q. What if you found out some of Ms. Woodard's
3  homework was largely incorrect, and a very significant
4  number of yours?
5  A. Well --
6  Q. Would that cause you to ask more questions?
7  A. Well, I would still -- it would cause me to
8  make adjustments if, in fact, adjustments were necessary
9  because the costs were different. But you've already
10 asked the questions about making the comparisons, and my
11 understanding is that this is outside my area of
12 expertise, and I'm not comfortable making anything but
13 broad-based comparisons.
14    And I recognized or understood that their
15 level or type of care was different. So if it was less
16 about 30 or 40 or 50 or 60 percent, I didn't take issue
17 with it, because I knew that we weren't necessarily
18 comparing applies and apples.
19    The level of health care coverage in Mexico
20 is -- my understanding, is not the same as the nature and
21 type of health care coverage we have here. But I am not
22 an expert on it, and I defer to Ms. Woodard for those,
23 other than to try and track down things that seemed to
24 fall in that same range.
25 Q. Would you show me in your notes with respect

51

1  to your telephone call with Ms. Woodard where she --
2  where you at least made a note of her talking to you
3  about all of this?
4  A. I didn't make --
5     MR. TRINE: Objection to form. Go ahead.
6  A. I didn't make any detailed notations, nor do
7  I typically, so my notes aren't verbatim. You asked me
8  simply to recall the conversation, and as I sit here, I
9  recall the conversation.
10 Q. (BY MR. ZARLENGO) Okay. Let's go to page 4
11 of 6. They're talking about, one, two -- well, you see
12 right at the bottom where it says "Personal Touch"?
13 A. Yes.
14 Q. The paragraph right above that, "Excel" --
15 which is a Mexican hospital or clinic or something --
16 "charges a fraction of those at U.S. hospitals. The
17 daily charge for room and care in Excel's intensive care
18 is about $1,200. At Scripps Clinic, a large hospital in
19 San Diego, the cost is about $4,000." That 1,200 is only
20 30 percent of the U.S. cost; isn't that correct?
21 A. That's correct. The arithmetic is correct.
22 Q. Okay. Did that cause you to ask more
23 questions?
24 A. No.
25 Q. Okay. Let's go to Exhibit 54. Well, hang

52

1  on a minute. And this was written by Sonia Geis, or
2  "Gise," a Washington Post staff writer, correct?
3  A. That's correct.
4  Q. And who is she?
5  A. She's a Washington Post staff writer.
6  Q. What does she know about health care costs?
7  A. She's simply reporting information that
8  she's compiled.
9  Q. And where did she get this information?
10 A. Well, various places in the article she says
11 where she gets it.
12 Q. Okay. So we don't know if she knows what
13 she's talking about or not either, correct?
14 A. These would not be what I considered primary
15 sources. They were only confirmatory or anecdotal
16 information for me.
17 Q. If we go to the last paragraph on the first
18 page, it says, "Lower-priced labor, malpractice insurance
19 and overhead in Mexico mean both basic and sophisticated
20 medical procedures can be performed at a small fraction
21 of the cost. A hysterectomy that averages $2,025 in the
22 United States costs $810 in Mexico." That's only 40
23 percent of the U.S. charge, isn't it?
24 A. That's correct arithmetic, yes.
25 Q. Okay. And -- so you didn't do any of this

61

1  A.  The arithmetic would be approximately 72
2  percent.
3  Q.  (BY MR. ZARLENGO) Okay. Does that cause
4  you to want to ask any more questions about this 50 to 60
5  percent that she was giving you?
6  A.  As a follow-up to my deposition, I'll ask
7  her if she has further explanations for your explanations
8  of her explanations.
9  Q.  Very good. It works for me.
10     THE DEPONENT: I always like it when I get
11 quizzed on their stuff instead of my stuff.
12     MR. TRINE: Yeah.
13     THE DEPONENT: Can I take a quick break?
14     MR. ZARLENGO: Sure.
15     (Break taken from 11:32 a.m. until 11:39
16 a.m.)
17 Q.  (BY MR. ZARLENGO) We were talking earlier
18 about education equivalence. What would you say Mr.
19 Carranza-Reyes' education equivalent would be in the
20 United States, what grade?
21 A.  What grade did he go through? I think I
22 already indicated I don't know the exact grade he went
23 through.
24 Q.  So you don't know what his education -- you
25 know that he didn't graduate high school; is that

62

1  correct?
2  A.  That's correct.
3  Q.  Okay. But -- so you don't know what his
4  education equivalent would be?
5  A.  I don't.
6  Q.  It could be eighth grade?
7  A.  It could be.
8  Q.  Okay. Getting back to your report, on page
9  16 you have "Past losses -- earnings, $73,300." Where
10 did that come from?
11 A.  If you turn to my -- page 16?
12 Q.  Yes.
13 A.  If you turn to the work papers, what you'll
14 see is, I've considered that he would find a job making
15 this average 10 to 12 dollars an hour and work full time
16 over the past time frame of 3.2 years.
17 Q.  At 22,900; is that correct?
18 A.  At 10 to 12 dollars an hour, with no
19 benefits.
20 Q.  But the number you're using is 22,9; is
21 that correct?
22 A.  Well, we used an average of $11 an hour,
23 yeah.
24 Q.  Okay. And you're assuming that he would
25 have started working essentially the moment he got out of

63

1  jail; is that correct?
2  A.  This does consider that, yes.
3  Q.  It's also in 2006 dollars; isn't that
4  correct?
5  A.  Well, it says that. But we're actually
6  using 10 to 12 dollars an hour back when this happened,
7  and that we've not assumed any wage increases, so it
8  probably shouldn't have the '06 there. We're talking
9  about 10 to 12 dollars an hour at the time frame, and
10 that would be market rates for those types of jobs.
11 Q.  Okay. Could you show me where you got that?
12 A.  I used 10 to 12?
13 Q.  Yes. What authority do you have for that?
14 A.  Well, I used the Bureau of Census data in
15 2006 dollars, but I assumed no wage increases or similar
16 wages over the past three years as well, it looks like.
17 Q.  Okay. Could you show me the Bureau of
18 Census data that you used?
19 A.  Well, I can -- I don't have it accessible
20 right here, but I can get a copy of it.
21 Q.  Do you have somebody in your office here
22 that can pull it out for us?
23 A.  Let me see if I can do that.
24 Q.  Okay.
25     (Break taken from 11:42 a.m. until 11:45

64

1  a.m.)
2  Q.  What exactly are you getting?
3  A.  I'm getting Bureau of Census data for males
4  by educational levels and age brackets. I believe it's
5  the last -- I think it's in 2000 --
6     (Interruption of the proceedings by a knock
7  at the door.)
8     THE DEPONENT: Oh, could you make about four
9  copies of that? Thanks.
10 A.  -- and to demonstrate that the 10 to 12
11 dollars an hour that we used is consistent with less than
12 a high school degree.
13 Q.  (BY MR. ZARLENGO) You didn't list that as
14 one of the materials that you relied upon, did you?
15 A.  Of course I do. It's in my appendix. It's
16 one I rely upon. It's a standard one. Again, I simply
17 said it's consistent with it, so I haven't relied
18 exclusively on that. I've simply indicated that it is
19 consistent. I'll give you two copies of it.
20     And you'll see it in my appendix on two
21 places. It's on the last page of the appendix, which is
22 the Website, which all this information is now on
23 Websites. It's not hard-copied to us anymore. And it's
24 also listed in the appendix under the Bureau of U.S. --
25 Bureau of Commerce. Let me -- you have a copy of my

**Page 65**

1 appendix. It's in the appendix, under either the
2 Department of Labor or Bureau of Census data, yes. And
3 it's a standard document I use in almost every case,
4 because it is --
5 Q. So in other words --
6 A. Excuse me. It's U.S. Department of
7 Commerce. So it's the earnings by occupation and
8 education, page 826, and money income of households,
9 families and persons in the U.S. And it's a standard
10 publication that I use on a regular basis.
11 Q. So in other words, for me or for anyone --
12 an expert that I might want to hire, if we wanted to find
13 out what you relied on, it would be up to us to dig
14 through that eight-page appendix and try to ferret out
15 and figure out what exactly you used to come up with
16 this -- what was it? -- 10-to-12-dollar-an-hour number;
17 is that correct?
18 A. What I used is 10 to 12 dollars an hour, and
19 I indicated in my report that it was consistent with that
20 of U.S. males with less than a high school education
21 working year-round full time.
22 Q. Okay.
23 A. I --
24 Q. Consistent with. So does this mean that
25 you're confirming it with this data; is that correct?

**Page 66**

1 A. Right. I've used 10 to 12 dollars an hour
2 in recognition of a young male with limited skills doing
3 physical labor type of work would make a wage rate in
4 that area. I cross-checked it with the Bureau of Census
5 data. Although typically we say "Bureau of Census"
6 specifically in the bullet, it is pretty standard for
7 anybody in this arena to know that that's the sort of
8 standard data. But I generally make it even more
9 specific.
10      And the Bureau of Census data makes it very
11 clear that for those with less than a high school degree,
12 the average earnings is in the neighborhood of -- even
13 entry level, in the neighborhood of $25,205, even with
14 less a ninth-grade education is $24,000. And I'm simply
15 saying that it's consistent with the other, wider array
16 of opportunities that may be available to him.
17 Q. So you're using this to double-check against
18 your 10-to-12-dollar-an-hour number; is that what you're
19 saying?
20 A. I used them both, and I'm simply trying to
21 note that they're consistent, that that wage rate is
22 consistent with a wide array of opportunities in the
23 labor market.
24 Q. Okay. Where, then -- okay. If you're using
25 this to say that it's consistent with this, where did the

**Page 67**

1 original 10-to-12-dollar-an-hour number come from?
2 A. Well, from 25 years of experience using wage
3 data, both in this type of work as well as other work I
4 do, Number 1. Number 2, the sources that I cite in the
5 Department of Commerce and the Department of Labor online
6 sites that are also identified on the appendix on page
7 832, and the Websites where it will identify by specific
8 types of occupations and even specific regions of the
9 country.
10      But I don't -- I don't compile it or
11 download it because it's part of my professional library,
12 and it's too cumbersome to download every wage survey or
13 data survey that's utilized, and I didn't.
14 Q. But you didn't --
15      MR. ZARLENGO: Let's mark that.
16      (Deposition Exhibit 57 was marked.)
17 Q. (BY MR. ZARLENGO) Okay. That's Exhibit 57.
18 And this came from where, again?
19 A. The Bureau of Census. At the very top it
20 says -- identifies the source.
21 Q. Okay. And so you referred to this
22 particular document to say that it was consistent with
23 the government studies, correct?
24 A. Yes.
25 Q. Okay.

**Page 68**

1 A. Well, no. This document is the government
2 surveys data.
3 Q. Or survey, I'm sorry.
4 A. All right. And I used the 10 to 12 because,
5 in going through and matching semiskilled, low-skilled
6 jobs, given the nature of his likely employment would be
7 in construction, probably a laborer in construction or
8 any number of jobs similar to that, that the wage rate
9 data will talk about wages in that
10 10-to-12-dollar-an-hour range.
11 Q. But my question was, you used Exhibit 57 to
12 support, if you will, if we can use that term, your
13 statement in there that it's consistent with whatever you
14 say?
15 A. I used 10 to 12 dollars an hour as my
16 opinion of the likely preincident earnings he would make
17 here in the U.S. And I cross-checked that --
18 Q. Okay.
19 A. -- with the Bureau of Census data, in
20 addition to the wage data that I would have used, to come
21 with up with the 10 to 12 to indicate that that is
22 consistent with people with less than a high school
23 degree; in fact, more in the area of people with a less
24 than a ninth-grade education.
25 Q. So Exhibit 57 was your cross-check? That's

69

1  my question.
2     A.    I don't know that I'd call them a
3  cross-check. All of it matters. There's not one table
4  or chart I go to. So I look at all of it, and then I
5  make a professional judgment on the data I'm using. So I
6  don't -- there's not, like, a table. I assume in your
7  business either, that you go to and it tells you what to
8  do.
9          I use all of it, and I come with up what I
10 believe is consistent with the general economic data to
11 make -- to -- for the foundation that my assumption
12 regarding the wage level is reasonable and probable, and
13 it's based on all of the academic literature and surveys
14 and studies.
15    Q.    So show me in Exhibit 57 where the
16 10-to-12-dollar-an-hour number comes from.
17    A.    Well, if you take less than a high school
18 degree, which is ninth to 12th grade -- we'll start with
19 that one --
20    Q.    Okay.
21    A.    -- you'll see the $29,00 -- for under age
22 65, all right, you'll see the $29,866.
23    Q.    Okay.
24    A.    Let's make it simple, round it to 30,
25 divided by 2,000 hours, it's $15 an hour. That's higher

70

1  than what I used. I used $11 an hour, on average.
2     Q.    Okay.
3     A.    If you go to less than ninth grade, you see
4  approximately $24,000. That's approximately $12 dollars
5  an hour, and that's approximately the high end of the
6  10-to-12-dollar range I'm looking at.
7     Q.    Okay.
8     A.    If you look at, then, the categories in
9  between, the 18 to 24, in this case 25 to 29, you're
10 going to see lower wages for the less than ninth grade,
11 in the neighborhood of around $10 an hour, and then those
12 with ninth to 12th grade around $13 an hour, if you
13 translate this into a wage rate.
14         If you go to the other data sources that are
15 identified in my appendix, you can find it by specific
16 occupations, by hourly wage rates, as well as annual wage
17 rates. If you go to OOH, you can find out all kinds of
18 other information about the availability of the jobs and
19 the prospects of those jobs over the long term, as well
20 as the functional skills required to do the jobs.
21    Q.    This also has it by Hispanic origin, too, is
22 that correct; age, race, Hispanic origin and sex?
23    A.    It would, yes.
24    Q.    Why didn't you use the Hispanic origin,
25 since Mr. Carranza-Reyes is Hispanic?

71

1     A.    I typically don't differentiate by ethnic
2  backgrounds, and I don't believe I ever have used that.
3  But I think for less than a high school degree, it's
4  probably not significantly different.
5     Q.    Well, there's an easy way to tell, isn't
6  there, by just looking at the second or third page of
7  this table to see what it says for one of Hispanic
8  origin; isn't that correct?
9     A.    It would be easy to find that out, yes. I
10 don't have those downloaded and copied off because I
11 typically don't use them, particularly when I'm talking
12 about long-term earnings, and, again, when I'm talking
13 about earnings of a person who I expect to be in a
14 physical labor market opportunity; that to the best of my
15 knowledge, they don't pay a Hispanic doing a labor job
16 differently than a first-year Caucasian doing a labor job
17 in the construction industry.
18    Q.    But the dollar amounts would be different
19 for a Hispanic, wouldn't it? Isn't that your experience?
20    A.    I think I've already indicated to you I've
21 never used them, so I don't have a detailed experience
22 with using them. But if I looked them up -- I would have
23 to look them up in order to answer that question
24 professionally.
25    Q.    So you don't know?

72

1     A.    I don't know if their profile for a category
2  we're identifying here would be similar -- I would expect
3  it would be relatively similar dealing with the low-end
4  category. I would expert in the high-end categories
5  there might be more of a difference.
6     Q.    Do you think it would be appropriate in this
7  particular case -- since Mr. Carranza-Reyes does not
8  speak English, do you think it would be appropriate in
9  this particular case to use the table for Hispanic?
10    A.    No. I think the 10 to 12 dollars an hour is
11 what I would expect Mr. Carranza-Reyes to make in the
12 labor market.
13    Q.    So your answer is "no"?
14    A.    My answer I've given you, and it's more full
15 than a simple "no," because life isn't quite as simple as
16 your question.
17    Q.    Well, I didn't ask you to elaborate. I
18 asked you what you thought was appropriate. If I want
19 you to elaborate --
20    A.    And I think it's appropriate to elaborate to
21 qualify the question properly so that it isn't
22 misinterpreted.
23    Q.    Then I would appreciate it if you would tell
24 me you can't answer it yes or no. I think this
25 deposition would go a lot faster if we did it that way,

77

1  A. The rehab person indicates in her life care
2  plan that he needs more than -- let's see. She indicates
3  that at this point in time he needs about $5,900 a year
4  of personal care assistance --
5  Q. Okay.
6  A. -- going forward. And I used 5,900 over the
7  past -- approximately 5,900 per year over the past time
8  frame.
9  Q. Where did she indicate this?
10 A. In her --
11 Q. Show me in her --
12 A. -- life care plan, it's $5,700.
13 Q. All right. Well, show me in her life care
14 plan where this -- that's Exhibit, what, 55.
15 A. The life care plan says 20 to 24 per hour,
16 five hours per week, ranging from 5,200 to 6,240, and the
17 midpoint of that being approximately 57, 58 hundred.
18 Q. That's for the personal assistant?
19 A. In the future. And I used eight to 12 hours
20 at a lower hourly value over the past time frame, but
21 it's approximately the same amount of money on a
22 year-to-year basis. And I decrease that into the future
23 based on my understanding that, given his limitations as
24 he -- into the future, he would need less of the personal
25 care assistance that's being provided for in the life

78

1  care plan. But because of his limitations, I've given
2  him four hours a week for him to be able to better handle
3  his household chores and maintenance chores into the
4  future.
5  Q. Okay. So that's his personal care
6  assistant. And her pages aren't numbered where she has
7  all the various categories of life care in the life care
8  plan, okay, but just so we know, we're talking about the
9  personal care assistant category that's right above the
10 equipment; is that correct?
11 A. Right. The comparison -- when you asked me
12 what the rehab specialist indicates, and I said in the
13 future she indicates the same amount of money going
14 forward for strictly personal care. In the past I've
15 identified it being that level, but then going into the
16 future, I have it down to four hours a week for other
17 home service types of services outside of personal care.
18 Q. Okay. And that's based on this personal
19 care assistant that we were just -- right above
20 equipment; is that right?
21 A. What's based on?
22 Q. The future calculations.
23 A. No. The future is based on -- the four
24 hours a week is based on other nonpersonal-care
25 assistance.

79

1  Q. Well, where did that come from, the four
2  hours a week?
3  A. That's what I determined based on my
4  understanding of his limitations for additional
5  assistance around the house.
6  Q. Understanding from whom?
7  A. From -- from my understanding of his
8  limitations and the labor market studies that identify
9  that even if you're married and you're settled into a
10 seminormal lifestyle that the male in the household still
11 does 12 to 18 hours a week of household activities, like
12 yard work or house maintenance or car maintenance, and
13 some of those things he either can't do or shouldn't be
14 doing. And I've identified four hours a week for either
15 chores that he otherwise would have done or more time he
16 takes to do them.
17 Q. And how did you identify four hours a week?
18 What's your source for that? Where did this come -- show
19 me how you got that. Walk me through it.
20 A. Using the studies that say 12 to 18 if
21 you're married and you have -- maintain a household of
22 some kind, those are the typical contributions a male
23 makes to the household. Based on my understanding of his
24 limitations, in terms of he's got reduced functionality,
25 I've made a provisional opinion that four hours to help

80

1  with the yard work as he -- as he moves into a normal
2  household environment would help to maintain the cars and
3  the yards and some nominal indoor cleaning.
4         So if you look at those studies, they'll
5  talk about hours it takes to do those chores, and I've
6  simply identified four hours a week. Again, I note that
7  doesn't have to be every week. It could be more like
8  heavy spring cleaning or heavy fall cleaning or cleaning
9  the roof or the gutters or the windows or things that he
10 would have more difficulty handling.
11 Q. Where did you get this understanding of his
12 limitations?
13 A. Through the documents that --
14 Q. Well, show me that in the documents.
15 A. Well, the medical documents identify what
16 kinds of problems he has.
17 Q. Okay. And how did you calculate four hours?
18 A. Based on the parameter -- the maximum
19 parameter being 12 to 18 for household services, and
20 based on my understanding that he is -- he had a
21 below-the-knee amputation, that the types of chores that
22 he either shouldn't be doing or would benefit from having
23 assistance in handling would be things like getting on
24 ladders and cleaning gutters on the house, or getting on
25 the roof to repair the roof, or painting the house, where

**85**

1  Q.  Under 5 percent?
2  A.  I don't know without looking at each number.
3  Q.  I did it, and I came up with 11,717, instead
4  of the 13,000 that you came up with.
5      MR. TRINE: Objection to form. Is that a
6  question?
7  Q.  (BY MR. ZARLENGO) Is that more than --
8      MR. ZARLENGO: Well, we can walk through it
9  and have her to do it for each number. I'm just trying
10 to shorten things up here.
11 Q.  (BY MR. ZARLENGO) But that's more than 10
12 percent, isn't it?
13 A.  If you use the midpoints of each in the way
14 that you -- in the alternative way, yes.
15 Q.  Right.
16 A.  But we --
17 Q.  Yours produced a higher number than that,
18 though, didn't it?
19 A.  Apparently, if in fact your arithmetic was
20 correct. But it's still, in our view, the more
21 appropriate way to find the per-year amount.
22 Q.  Going to his earnings if he were to go back
23 to Mexico and work there, where did that number come
24 from? Let's go to the past earnings of $20,800 on page
25 17 of your report.

**86**

1  A.  We started with the $7,300, which was the
2  average earnings, or at least represented what we
3  understood to be, given his -- the interrogatory answers
4  about his estimated wages per week in the various jobs he
5  had in the years leading up to his -- his last work
6  experiences in Mexico, and then we converted those to
7  dollars, and then we --
8  Q.  How many years did you -- and then you
9  averaged them, correct?
10 A.  We used the 2000 through 2002, based on
11 estimated earnings from the interrogatories.
12 Q.  And how many years did you go back?
13 A.  I said from 2000 to 2002.
14 Q.  Oh, I'm sorry. Was there no -- that's only
15 three years. There was no information prior to that?
16 A.  Well, it wasn't that there wasn't
17 information. But we had anticipated that the more recent
18 jobs would be the more relevant jobs in terms of his
19 wages.
20 Q.  Oh. Then why did you average? Why -- I
21 see -- if we look at 2000 to 2002, we see a very -- I
22 see, and I'll ask you if you see the same thing, a very
23 definite decline from one year to the next in what he
24 earned; isn't that correct?
25 A.  There was. And we anticipated that his

**87**

1  earnings, though, would fall in that range.
2  Q.  Did you anticipate that his earnings would
3  continue to fall?
4  A.  No. We wouldn't have done that.
5  Q.  Had you used prior years, say 1999, 1998? I
6  believe it -- I don't know. How far back does his
7  earnings history go in his interrogatories; do you know?
8  A.  Well, we don't have precise information
9  regarding that. He just generally identifies from '94 to
10 '98, so we have sort of an idea back to maybe '98.
11 Q.  Did you consider that he may go back to
12 Mexico and get some more education and get a more
13 sedentary job in Mexico -- or here, for that matter?
14 A.  I need to understand in what context you're
15 talking about.
16 Q.  Well, in terms of his earning capacity.
17 A.  Yeah. I considered his earnings, with his
18 limited skills and education, back in Mexico to be in
19 that 7,500-to-$8000 range.
20 Q.  Okay. But did you consider that he might
21 conceivably go back to school, get a high school diploma,
22 get a college degree and go get a job earning maybe lots
23 and lots more than he could have earned --
24 A.  I didn't. And if I would have, the number
25 would be larger in terms of the loss amount because he

**88**

1  can't handle it now.
2  Q.  So you're saying that if he were to go back
3  to Mexico, get a college degree, become, let's say, a
4  physician or, as he said in his deposition, the president
5  of Mexico, you think the damages would be more; is that
6  correct?
7  A.  Well, if in fact his earning capacity is
8  greater than the $7,500 to $8,000 I considered preinjury,
9  preincident, if in fact he would have gone back and done
10 that, then his earnings would have been higher, and we'd
11 have to offset it by what he could now handle in his more
12 limited capacity. So it -- you can't ignore one half --
13 the other half of the equation.
14 Q.  I'm not understanding you.
15 A.  Well, if in fact he had the capacity to go
16 back to Mexico even prior to this injury and become a
17 physician, then his preinjury earnings would have been
18 dramatically higher than what I've considered. And to
19 the extent that if that would have allowed him to work, I
20 would assume he'd still have, then, some postinjury
21 earnings.
22      But I would expect that the differential
23 between those two would probably be greater than the 7 or
24 8 thousand dollars I've identified. And since the
25 measure would technically be earning capacity, if you're

89

1  going to make that hypothetical, then you would need to
2  make the hypothetical consistent on both sides of the
3  equation.
4       Q.   Let's see where I want to -- okay. In his
5  deposition, at page 67 he is asked:
6            "If you were living in Mexico today, are
7  there jobs available that you believe you could do, given
8  your present physical abilities?
9            "Answer: I could even rise to be the
10 president of Mexico, I suppose.
11           "Question: What I am trying to understand,
12 whether you believe that your physical limitations
13 prevent you from working today.
14           "Answer: I have limitations. I have pain.
15 I have a lot of pain in working. I could maybe work an
16 hour or two, and that's all I could work. As far as
17 studying goes, like I'm sitting down here right now
18 studying, I suppose I could study for hours.
19           "Okay. So if you could do a job that was
20 sedentary, that didn't require physical ability, you
21 believe you could do that full-time?
22           "Answer: Yeah. But how much I would make?
23 It's a manual job. How much could I make?"
24      So what I'm asking is, if he's able to
25 study, study, study and do something sedentary, don't you

90

1  think he would have full earning capacity at that
2  juncture if he's able to do that?
3       A.   I would be surprised.
4       Q.   Why?
5       A.   Because if he was able to study, study,
6  study and do something without a handicap, then I would
7  assume with that, with the limitations he now has,
8  whether it's his prosthesis or whether it's his pain, he
9  would do even better in the workforce without pain and
10 without limitations.
11      Q.   And what do you base that on?
12      A.   All the labor market data that exists
13 indicates that pain and limitations reduce productivity.
14      Q.   Would you show --
15      A.   Reduced productivity reduces earnings.
16      Q.   Would you show me that, please?
17      A.   You know, it's my library of -- every labor
18 economics textbook will talk about productivity being the
19 measure of wages. And every textbook -- I shouldn't say
20 textbook. But all information regarding pain indicates
21 that pain limits your concentration. Reducing your
22 concentration is likely to reduce your productivity.
23           And I don't know that I can find a page in a
24 particular book that tells you it in exactly that
25 fashion. But if you'll read all of the literature, the

91

1  consensus of opinions, well-trained labor economists
2  would make it clear that pain, concentration, efficiency
3  all affect productivity.
4       Q.   Okay. And so --
5       A.   So I suppose if you don't believe pain
6  limits your concentration or affects your ability to do
7  anything, then I suppose you have no reduction. But I
8  don't know anyone that would say that.
9       Q.   Does he have pain when he's sitting down?
10      A.   I understand he has pain on an ongoing
11 basis, and it's aggravated by activities.
12      Q.   My question was, does he have pain when he's
13 sitting down --
14      A.   Well --
15      Q.   -- if you know?
16           MR. TRINE: Objection, asked and answered.
17      A.   I think my answer was, it's my understanding
18 that he always has pain, and it's aggravated by activity.
19      Q.   (BY MR. ZARLENGO) So --
20      A.   So I imagine sitting down is -- at any point
21 in time he always has it, so whether he's standing or
22 sitting, he has it. But my understanding is, it's more
23 aggravated when he's moving about or he has to use it
24 more.
25      Q.   You say you imagine that he has pain; is

92

1  that correct?
2       A.   No.
3            MR. ZARLENGO: Would you read her answer
4  back so we can get on with this, please?
5            (The audio on page 91, lines 9 through page
6  92, line 2 was played back.)
7       Q.   (BY MR. ZARLENGO) Would you tell me where
8  you got that understanding, please?
9       A.   I don't know that there's any particular
10 document that I can point to as I sit here.
11      Q.   Okay.
12      A.   That's my understanding is, he has pain.
13      Q.   Okay. If he goes back to Mexico -- I think
14 we talked about this -- he would be working, living,
15 buying, saving, spending, what have you, in a Mexican
16 economy; is that correct?
17      A.   I would expect so.
18      Q.   And the dynamics of the Mexican economy
19 would apply, wouldn't it, to him, as opposed to the U.S.
20 economy?
21           MR. TRINE: Objection to form.
22      A.   I would expect so.
23      Q.   (BY MR. ZARLENGO) Okay. I think we
24 established that -- well, never mind. We've already
25 established that. To what extent did you study the

**109**

1 alternative is if he could not stay here, if he came up
2 here and found out that he could not properly do that and
3 had to return, what he would make back in Mexico.
4    Q.   One last question and I'm done is, do you
5 still believe that the 50 to 60 percent conversion ratio
6 or percentage from Scenario I to Scenario II, do you
7 still believe that is appropriate?
8    A.   I don't know that I would change it. But I
9 do believe I will go back and try to ferret out some
10 other, more specific, primary research, or at least talk
11 with Ms. Woodard in terms of having a better
12 understanding of why she ultimately settled on that
13 ratio. And if by doing that research I discover some
14 more specific information that leads me to believe an
15 adjustment is necessary, I'll do so.
16        MR. ZARLENGO:  Okay.
17        MR. JURS:  I have follow-ups. I'm sorry.
18              EXAMINATION
19 BY MR. JURS:
20    Q.   So can I assume that Scenario I is for
21 plaintiff if he remains in the United States and becomes
22 properly documented?
23    A.   Yes.
24    Q.   And that Scenario II covers any other
25 contingent?

**110**

1    A.   No. Scenario II assumes that if he goes
2 to -- back to Mexico, those are the likely wages in
3 Mexico, given his skill set, and any other scenarios
4 likely to fall between the two of them.
5    Q.   But you don't know, because you haven't done
6 it?
7    A.   That's right. I only know from basic labor
8 economic phenomena that he's likely to not get benefits
9 if he's not documented, so the number is likely to be
10 lower if he stays here undocumented because there
11 wouldn't be the benefit of some core benefits on it. And
12 whether -- so I know it would be probably lower.
13        I don't expect it to be higher than Scenario
14 I. And I don't -- I have no reason or information in the
15 labor market to expect what he can do in Mexico could
16 really be lower than what I've identified there. So
17 obviously, by default, everything else sort of falls in
18 between.
19    Q.   Do you have any knowledge that Mr.
20 Carranza-Reyes has applied for United States citizenship?
21    A.   Subsequently? Not to my -- I don't know one
22 way or the other.
23    Q.   At any point?
24    A.   I don't know.
25    Q.   Do you have any knowledge of whether or not

**111**

1 Mr. Carranza-Reyes has as any point applied for a work
2 permit or a green card?
3    A.   Not -- to my knowledge, he had not prior to
4 his being picked up.
5    Q.   Do you know if he has since he's been picked
6 up, since March 1, 2003?
7    A.   Whether he's applied?
8    Q.   Applied for a green card or a work permit of
9 any sort.
10    A.   I don't know that he had at the time that we
11 talked to him, but I'm not real sure one way or the
12 other.
13    Q.   Did you ask him?
14    A.   Not specifically.
15    Q.   So you're assuming that he's going to be a
16 documented worker, but you don't know if he's even
17 started the process of becoming documented? Can you
18 explain that?
19    A.   I think I've explained it as best I can
20 already.
21        MR. JURS:  That's the end of my questions.
22        MS. LEWIS:  I'm done.
23        THE DEPONENT:  No questions?
24        MR. TRINE:  Absolutely not.
25        THE DEPONENT:  Darn.

**112**

1        THE REPORTER:  Before we go off the record,
2 can we put on the record how signature will be handled?
3        MR. JURS:  Dr. Pacey, you have the right to
4 review your deposition and review it and change anything
5 that you feel was erroneously recorded. Do you wish to
6 do that?
7        THE DEPONENT:  Yes.
8        MR. JURS:  Mr. Trine, would you handle that,
9 or should we handle it through --
10        MR. TRINE:  Sure.
11        MR. JURS:  -- one of our offices?
12        MR. TRINE:  No. I can do that.
13        WHEREUPON, the within proceedings were
14 concluded at the approximate hour of 12:47 p.m. this 13th
15 day of July, 2006.
16              *    *    *

* SUBJECT TO CONFIDENTIALITY DESIGNATIONS *