IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 05-cv-00377-WDM-BNB

MOISES CARRANZA-REYES,

      Plaintiff,

v.

THE PARK COUNTY BOARD OF COUNTY COMMISSIONERS;
FRED WEGENER, individually and in his official capacity as Sheriff of Park County, Colorado;
MONTE GORE, individually and in his official capacity as Captain of Park County Sheriff's Department; and
VICKIE PAULSEN, individually, and in her official capacity as Registered Nurse for Park County, Colorado,

      Defendants

---

## REPLY BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

---

      Defendants Park County Board of County Commissioners, Fred Wegener, and Monte Gore, by and through their counsel, Andrew D. Ringel, Esq. and Jennifer L. Veiga, Esq. of Hall & Evans, L.L.C., hereby submit this Reply Brief in Support of Motion for Summary Judgment, as follows:

### INTRODUCTION

      Plaintiff Moises Carranza-Reyes brings this action pursuant to 42 U.S.C. § 1983 and Colorado law against the Defendants arising from his incarceration in the Park County Jail from March 1, 2003, through March 8, 2003. Plaintiff's remaining claims are: (1) a claim pursuant to 42 U.S.C. § 1983 against Defendants Park County Board of County Commissioners, Fred Wegener, and Monte Gore alleging violations of the Plaintiff's rights protected by the Eighth and

Fourteenth Amendments to the United States Constitution; (2) a claim pursuant to 42 U.S.C. § 1983 against Defendant Vicki Paulsen, R.N. for violations of his Eighth and Fourteenth Amendment rights to adequate medical care; and (3) negligence against Ms. Paulsen.

Defendants Board of County Commissioners of Park County ("Board"), Fred Wegener, the Sheriff of Park County, and Monte Gore, at the time of Plaintiff's detention a Captain of Park County, filed their Motion for Summary Judgment ("Defendants' MSJ") on December 13, 2006. Plaintiff submitted his Response to Motion for Summary Judgment from Defendants Park County Board of County Commissioners, Fred Wegener and Monte Gore ("Plaintiff's Response") on January 11, 2007. Now, the Board, Sheriff Wegener, and Captain Gore respectfully submit this Reply Brief in Support of Motion for Summary Judgment. None of the facts, arguments, or authorities relied upon by the Plaintiff detract from the propriety of this Court granting summary judgment to these Defendants on all of Plaintiff's remaining claims.

## REPLY CONCERNING PLAINTIFF'S RESPONSE TO DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS

Pursuant to this Court's Pretrial and Trial Procedures governing motions for summary judgment [*see* Pretrial and Trial Procedures, § 6.3], Defendants provided a Statement of Undisputed Facts consisting of 138 separately numbered facts supported by specific references to the record submitted to this Court. [*See* Defendants' MSJ, at 3-138]. In response, Plaintiff attempts to dispute a total of 44 of the 138 facts. [*See* Plaintiff's Response, at 2]. However, in attempting to do so, Plaintiff fails to follow this Court's Pretrial and Trial Procedures governing responses to motions for summary judgment. Plaintiff asserts 44 of the 138 facts presented by the Defendants are disputed, but the Plaintiff's denials do not "include a brief factual explanation of the reasons with specific reference to material in the record supporting the denial." [*See*

Pretrial and Trial Procedures, § 6.4; Plaintiff's Response, at 2].  As a result of the Plaintiff's failure to follow this Court's Pretrial and Trial Procedures concerning motions for summary judgment, the Plaintiff has not provided any support from the summary judgment record before this Court for the denials of the Defendants' Statement of Undisputed Facts.  Neither this Court nor the Defendants, therefore, have any ability to evaluate whether in fact any of these material facts are really in dispute based upon admissible evidence contained in the summary judgment record.  Further, the Defendants have no ability to challenge the Plaintiff's denials or any actual facts offered by the Plaintiff to support the denials.  Fundamentally, Plaintiff's presentation thwarts the laudable goal behind this Court's Pretrial and Trial Procedures concerning motions for summary judgment that require litigants to make specific references to the summary judgment record with all factual statements and denials made in summary judgment briefing.

Fortunately, the Federal Rules of Civil Procedure specifically contemplate the failure to appropriately oppose a motion for summary judgment.  Fed. R. Civ. P. 56(e) provides, in pertinent part, as follows:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response, by affidavits or as otherwise provided by this rule, must set forth specific facts that there is a genuine issue for trial.  If the party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Fed. R. Civ. P. 56(e).  Here, while the Plaintiff responded to the Defendants' Motion for Summary Judgment, Plaintiff's failure to provide any specific support for his denials of the undisputed facts contained in the Defendants' MSJ represents a failure to adequately support his response pursuant to Fed. R. Civ. P. 56(e). After all, "[w]here, as here, the non-movant bears the burden of proof at trial, the non-movant must point to specific evidence establishing a genuine

issue of material fact with regard to each challenged element." *Murphy v. Gardner,* 413 F.Supp.2d 1156, 1162 (D.Colo. 2006) (alteration added).   Plaintiff's failure to provide any evidentiary support for his denials of the Defendants' statement of undisputed facts represents a failure to meet his summary judgment burden under Fed. R. Civ. P. 56(e).   Under these circumstances, this Court is justified in considering the Plaintiff's failure to support his denials of the Defendants' statement of undisputed facts as a waiver of "the right to respond or to controvert the facts asserted in the summary judgment motion." *Reed v. Nellcor Puritan Bennett,* 312 F.3d 1190, 1195 (10th Cir. 2002).   Otherwise, this Court will be required to search the entirety of the summary judgment record to find support for the Plaintiff's denials and the Defendants will have absolutely no opportunity to contest the Plaintiff's unsupported denials at all.   In *Gross v. Burggraf Constr. Co.,* 53 F.3d 1531 (10th Cir. 1995), the Tenth Circuit addressed the fundamental problem with an approach such as the Plaintiff's here:

> To withstand a motion for summary judgment, 'the nonmovant must do more than refer to allegations of counsel contained in a brief . . . ." *Thomas v. Wichita Coca-Cola Bottling Co.,* 968 F.2d 1022, 1024 (10th Cir.), *cert. denied,* 121 L.Ed.2d 566, 113 S.Ct. 635 (1992).   "Sufficient evidence (pertinent to the material issue) must be identified by reference to an affidavit, a deposition transcript or a specific exhibit incorporated therein." *Id.* at 1024.   Without a specific reference, "we will not search the record in an effort to determine whether there exists dormant evidence which might require submission of the case to a jury." *Id.* at 1025; *accord United States v. Dunkel,* 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in briefs."). We cannot consider these unsubstantiated allegations in reviewing this appeal.

*Id.* at 1546.

## RESPONSE CONCERNING PLAINTIFF'S STATEMENT OF
## ADDITIONAL DISPUTED AND UNDISPUTED FACTS[1]

Plaintiff presents a Statement of Additional Disputed and Undisputed Facts consisting of 152 additional factual assertions. Several issues with respect to the Plaintiff's Statement of Additional Disputed and Undisputed Facts require comment. First, many of the Plaintiff's additional facts are duplicative of the undisputed facts presented by the Defendants. Second, many of the Plaintiff's additional facts are not relevant to the issues raised by the Defendants on summary judgment. Third, many of the Plaintiff's additional facts are not supported by admissible evidence and evidence considered by this Court for purposes of summary judgment must be admissible. *See, e.g., **Pastran v. K-Mart Corp.***, 210 F.3d 1201, 1203 n. 1 (10th Cir. 2000); **Wright-Simmons v. City of Oklahoma City**, 155 F.3d 1264, 1269 (10th Cir. 1998). These considerations must inform this Court's review of the Plaintiff's Statement of Additional Disputed and Undisputed Facts and this Court's application of the applicable summary judgment standard in this case.

1.      Defendants admit the Park County Jail Policy and Procedure Manual provides: "It is the policy of the Sheriff's office that inmates are housed in cell or dormitory sleeping areas that provide at least 80 square feet of total living space per occupant." [*See* Policy and Procedure Manual, J-108-A, Pl. Exh. 1].

2.      Defendants admit Captain Gore testified that it sounded reasonable that D-Pod contained 740 square feet on its upper tier and 735 square feet on its lower tier. [*See* Gore Dep.,

---

[1]      Defendants' representations concerning the facts in this Reply Brief, as in the Defendants' original Motion for Summary Judgment, are for the purposes of summary judgment only. Defendants specifically reserve the right to contest each and every one of these facts at any later stage of these proceedings including at trial.

at 24, Pl. Exh. 2].  However, Captain Gore's testimony does not support that in fact the upper and lower tiers of D-Pod were those square feet.  Defendants deny the maximum capacity of D-Pod was 18 people as Captain Gore never so testified.  [*See* Gore Dep., at 24-25, Pl. Exh. 2].

3.      Defendants admit the Park County Jail was privately constructed in 1994.  [*See* Defendants' Statement of Undisputed Material Facts ("DSUMF"), ¶ 1].  Defendants deny D-Pod was originally designed for 8 double-bunk beds to sleep 16 inmates.  The deposition testimony of Sheriff Wegener does not support this fact.  During his deposition, Sheriff Wegener was shown an architectural sketch of the Park County Jail.  [*See* Wegener Dep., at 17, Exh. A-42; Park County Jail Architectural Sketch, Exh. A-43].  Based on the architectural drawing, the following colloquy occurred during Sheriff Wegener's deposition:

Q.      Can you count the number of bunks that are shown on the original drawing?

A.      Looks like there's one, two, three, four, five, six, seven, eight.

Q.      Okay.

A.      And I don't know if this is nine or not.  The way it's shaded in, it makes it look like there's another bunk right here.

Q.      That's kind of a question mark?

A.      Yes.

Q.      Because it also looks like it has a wall around that area?

A.      Yeah.

Q.      So if it were –

A.      That's a dormitory-style pod, so that's what's throwing me off with that wall. Dormitory-style pod normally don't have that.

Q.      Okay.  So if it were eight beds and it were double beds, it would be for 16 inmates.

A.      Yes, correct.

Q.      If it were nine beds, it would be for 18 inmates, correct?

A.      Correct.

[*See* Wegener Dep., at 20-21, Exh. A-42 (objections and comments by counsel omitted)]. Plaintiff's effort to establish D-Pod of the Park County Jail was originally constructed for 16 or 18 inmates based on this deposition testimony is flawed.  Sheriff Wegener's interpretation of an architectural drawing that he did not create establishes nothing concerning D-Pod's original design.

4.      Defendants admit the Park County Jail Policy and Procedure Manual provides: "It is the policy of the Sheriff's office that inmates are housed in cell or dormitory sleeping areas that provide at least 80 square feet of total living space per occupant."  [*See* Policy and Procedure Manual, J-108-A, Pl. Exh. 1].  Defendants deny D-Pod of the Park County Jail was designed for 18 people.  The deposition testimony of Sheriff Wegener relied upon by the Plaintiff does not support this as an actual fact.  Sheriff Wegener actually testified as follows:

Q.      Now, assuming that the architectural drawing at the time of the construction of the jail shows 18 occupants, that there are 18 seats available for inmates to sit at the dining tables, and that there is 1,475 square feet upstairs and downstairs in the facility, and divided by 80, that equals 18.4 prisoners in D Pod, it's true that D Pod was designed for 18 prisoners, isn't it?

Mr. Ringel:      Object to the form and the foundation.

A.      Yes, that's correct.

[*See* Wegener Dep., at 62, Pl. Exh. 3].  Even assuming Sheriff Wegner's response is admissible, again, Sheriff Wegener's interpretation of an architectural drawing that he did not create

establishes nothing concerning D-Pod's original design.  Sheriff Wegener lacks personal knowledge to testify and never testified about the original design of D-Pod in terms of the number of inmates it could accommodate anywhere in his deposition.

5.      Defendants admit Sheriff Wegener walked through the Park County Jail approximately once every two weeks.  [*See* DSUMF, ¶ 31].  Defendants admit Sheriff Wegener had access to the total number of inmates housed in the Park County Jail at any given time through his office computer.  [*See* Wegener Dep., at 13 & 63, Exh. A-42].  However, Sheriff Wegener was not aware of the daily inmate population of D-Pod.  [*See* Wegener Dep., at 63-64, Exh. A-42].

6.      Defendants admit former Park County Jail Deputy Edward Allen testified he believed D-Pod was originally designed for 18 people because when he began working at the Park County Jail there were 18 bunks in D-Pod and he step-measured D-Pod.  [*See* Allen Dep., at 40-41, Pl. Exh. 4].  Mr. Allen's deposition testimony, however, does not support the proposition the deputies who worked in the Park County Jail understood D-Pod was designed for 18 people because it presents only Mr. Allen's own perspective.  [*See* Allen Dep., at 40-41, Pl. Exh. 4].  In addition, Mr. Allen lacks any personal knowledge concerning the original design of D-Pod since he did not begin working at the Park County Jail until April 1, 2002, and the Park County Jail was constructed in 1994.  [*See* Allen Dep., at 29, Exh. A-44; DSUMF, ¶ 1].

7.      Defendants admit bunks were added to D-Pod and placed upstairs until there were a total of 42 bunk beds in D-Pod in March 2003.  [*See* DSUMF, ¶ 44].

8.      Defendants admit bunks were added to D-Pod and placed upstairs until there were a total of 42 bunk beds in D-Pod in March 2003.  [*See* DSUMF, ¶ 44].

9.      Admitted.  [*See* DSUMF, ¶ 44].

10.      Admitted.  [*See* DSUMF, ¶ 45].

11.      Admitted.

12.      Defendants admit the Park County Jail billed INS for 810 total inmate days in January 2003 which represents a daily average of 26.1 INS detainees being housed in the Park County Jail in January 2003.   [*See* Muldoon Letter to US Immigration and Naturalization Service, 2/10/03, Pl. Exh. 6].

13.      Defendants admit that the Park County Jail billed INS for 883 total inmate days in February 2003 which represents a daily average of  31.1 INS detainees being housed in the Park County Jail in February 2003.   [*See* Muldoon Letter to US Immigration and Naturalization Service, 3/13/03, Pl. Exh. 6].

14.      Defendants admit the Park County Jail billed INS for 632 total inmate days in March 2003 which represents a daily average of 20.3 INS detainees being housed in the Park County Jail in March 2003.  [*See* Muldoon Letter to US Immigration and Naturalization Service, 4/14/03, Pl. Exh. 6].   Plaintiff's reference to Captain Gore's deposition, however, does not support the assertion D-Pod was vacant for two weeks in March 2003.   Captain Gore never agrees with this statement made by counsel for the Plaintiff.  [*See* Gore Dep., at 267, Pl. Exh. 2].

15.      Defendants admit Sheriff Wegener was aware that when more INS detainees than 42 were housed in D-Pod that any additional INS detainees would receive mattresses to place on the floor.  [*See* Wegener Dep., at 68, Pl. Exh. 3].  Defendants admit Sheriff Wegener did not place any limitation on the number of individuals who could be housed in D-Pod and indicated

that such a determination would be the responsibility of the Jail Administrator.  [*See* Wegener Dep., at 70, Pl. Exh. 3].

16.     Denied.  [*See* DSUMF, ¶ 73].

17.     Admitted.  [*See* DSUMF, ¶ 91].

18.     Admitted.  [*See* DSUMF, ¶ 103].

19.     Admitted.  [*See* DSUMF, ¶¶ 110-112].

20.     Defendants admit Plaintiff so testified.  However, the policy of the Park County Jail was to provide clean clothing and bedding for all incoming INS detainees.  [*See* DSUMF, ¶¶ 13-15].

21.     Defendants admit Plaintiff so testified.

22.     Defendants admit Plaintiff so testified.

23.     Defendants admit Plaintiff so testified.  However, the policy of the Park County Jail was to provide cleaning supplies to the detainees in D-Pod for them to clean the entire Pod including the bathroom area.  [*See* DSUMF, ¶¶ 17-20].  Further, the records of the Park County Jail reflect deputies provided cleaning supplies to D-Pod on at least nine occasions during the time Plaintiff was detained there.  [*See* DSUMF, ¶¶ 76, 81, 86, 94, 101 & 108].  Plaintiff has specifically admitted all of these facts.  [*See* Plaintiff's Response, at 2].

24.     Defendants admit Plaintiff so testified.  However, the policy of the Park County Jail was to provide cleaning supplies to the detainees in D-Pod for them to clean the entire Pod including the bathroom area.  [*See* DSUMF, ¶¶ 17-20].  Further, the records of the Park County Jail reflect deputies provided cleaning supplies to D-Pod on at least nine occasions during the

time Plaintiff was detained there.  [*See* DSUMF, ¶¶ 76, 81, 86, 94, 101 & 108].  Plaintiff has specifically admitted all of these facts.  [*See* Plaintiff's Response, at 2].

25.     Defendants admit Plaintiff so testified.  However, the policy of the Park County Jail was to address any issues regarding the heating system and the temperature of the Pods as soon as possible through the maintenance person for the Park County Jail, Jim Deathrage.  [*See* DSUMF, ¶¶ 26-27].

26.     Defendants admit Plaintiff so testified.  However, the policy of the Park County Jail was to provide cleaning supplies to the detainees in D-Pod for them to clean the entire Pod including the bathroom area.  [*See* DSUMF, ¶¶ 17-20].  Further, the records of the Park County Jail reflect deputies provided cleaning supplies to D-Pod on at least nine occasions during the time Plaintiff was detained there.  [*See* DSUMF, ¶¶ 76, 81, 86, 94, 101 & 108].  Plaintiff has specifically admitted all of these facts.  [*See* Plaintiff's Response, at 2].

27.     Denied.  The records of the Park County Jail reflect deputies provided cleaning supplies to D-Pod on at least nine occasions during the time Plaintiff was detained there.  [*See* DSUMF, ¶¶ 76, 81, 86, 94, 101 & 108].  Plaintiff has specifically admitted all of these facts. [*See* Plaintiff's Response, at 2].

28.     Defendants admit Plaintiff so testified.  However, the policy of the Park County Jail was to provide cleaning supplies to the detainees in D-Pod for them to clean the entire Pod including the bathroom area.  [*See* DSUMF, ¶¶ 17-20].  Further, the records of the Park County Jail reflect deputies provided cleaning supplies to D-Pod on at least nine occasions during the time Plaintiff was detained there.  [*See* DSUMF, ¶¶ 76, 81, 86, 94, 101 & 108].  Plaintiff has specifically admitted all of these facts.  [*See* Plaintiff's Response, at 2].  In addition, the policy of

the Park County Jail was to address any maintenance problems with the toilets as soon as possible. [*See* Allen Dep., at 70-76, Exh. A-44].

29.     Defendants admit Plaintiff so testified.  However, the policy of the Park County Jail was to not allow one detainee to obtain a food tray for another detainee.  [*See* Allen Dep., at 86-87, Exh. A-44].

30.     Defendants admit Plaintiff so testified.

31.     Defendants admit Plaintiff so testified.  However, the first time Park County Jail deputies reported any inmates in D-Pod experiencing any symptoms of illness was on March 4, 2003.  [*See* DSUMF, ¶ 90].

32.     Defendants admit on March 5, 2003, 50 INS detainees were housed in D-Pod, and on March 6, 2003, 61 INS detainees were housed in D-Pod.  [*See* DSUMF, ¶¶ 95 & 103].  Five INS detainees, including the Plaintiff, were seen by Nurse Paulsen for medical issues on March 6, 2003.  [*See* DSUMF, ¶ 98].  The policy of the Park County Jail was to provide cleaning supplies to the detainees in D-Pod for them to clean the entire Pod including the bathroom area. [*See* DSUMF, ¶¶ 17-20].  Further, the records of the Park County Jail reflect deputies provided cleaning supplies to D-Pod on at least nine occasions during the time Plaintiff was detained there.  [*See* DSUMF, ¶¶ 76, 81, 86, 94, 101 & 108].  Plaintiff has specifically admitted all of these facts.  [*See* Plaintiff's Response, at 2].

33.     Defendants admit Plaintiff's brother so testified.  However, the policy of the Park County Jail was to provide clean clothing and bedding for all incoming INS detainees.  [*See* DSUMF, ¶¶ 13-15].

34.     Defendants admit Plaintiff's brother so testified.

35.     Defendants admit Plaintiff's brother so testified.

36.     Defendants admit Plaintiff's brother so testified.  However, the policy of the Park County Jail was to provide cleaning supplies to the detainees in D-Pod for them to clean the entire Pod including the bathroom area.  [*See* DSUMF, ¶¶ 17-20].  Further, the records of the Park County Jail reflect deputies provided cleaning supplies to D-Pod on at least nine occasions during the time Plaintiff was detained there.  [*See* DSUMF, ¶¶ 76, 81, 86, 94, 101 & 108]. Plaintiff has specifically admitted all of these facts.  [*See* Plaintiff's Response, at 2].

37.     Defendants admit Plaintiff's brother so testified.  However, the policy of the Park County Jail was to provide cleaning supplies to the detainees in D-Pod for them to clean the entire Pod including the bathroom area.  [*See* DSUMF, ¶¶ 17-20].  Further, the records of the Park County Jail reflect deputies provided cleaning supplies to D-Pod on at least nine occasions during the time Plaintiff was detained there.  [*See* DSUMF, ¶¶ 76, 81, 86, 94, 101 & 108]. Plaintiff has specifically admitted all of these facts.  [*See* Plaintiff's Response, at 2].

38.     Defendants admit Plaintiff's brother so testified.  However, the first time Park County Jail deputies reported any inmates in D-Pod experiencing any symptoms of illness was on March 4, 2003.  [*See* DSUMF, ¶ 90].

39.     Defendants admit Plaintiff's brother so testified.

40.     Defendants admit Deputy Allen testified there were problems with the showers not draining and the toilets overflowing between March 1-8, 2003, and those problems were addressed every time they occurred.  [*See* Allen Dep., at 70-76, Exh. A-44].

41.     Defendants admit Deputy Allen testified there were problems with the showers not draining and the toilets overflowing between March 1-8, 2003, and those problems were addressed every time they occurred.  [*See* Allen Dep., at 70-76, Exh. A-44].

42.     Defendants admit Deputy Allen testified there were problems with the showers not draining and the toilets overflowing between March 1-8, 2003, and those problems were addressed every time they occurred.  [*See* Allen Dep., at 70-76, Exh. A-44].

43.     Deputy Allen testified he placed a small trash can upstairs in D-Pod at some time but did not know whether it was between March 1-8, 2003.  [*See* Allen Dep., at 82, Pl. Exh. 4].

44.     Admitted.

45.     Defendants admit Plaintiff's brother so testified.  Defendants admit Deputy Allen so testified.

46.     Defendants admit uniforms were exchanged in D-Pod on March 4, 2003, at 10:33 p.m.  [*See* DSUMF, ¶ 89].  Defendants admit that laundry may not have been exchanged in D-Pod for five days before that time.  [*See* Flint Memorandum, 3/4/03, Pl. Exh. 7, at p. 45].  However, Plaintiff arrived the night of March 1, 2003.  [*See* DSUMF, ¶¶ 70-71].  Defendants admit the detainees in D-Pod wrapped themselves in blankets while their uniforms were washed. [*See* Allen Dep., at 126-128, Pl. Exh. 4].

47.     Defendants deny paragraph 47 to the extent it suggests Deputy Allen testified he observed or knew of toilet overflow reaching the area of the sinks or of any detainees actually stepping in the overflow.  To the contrary, Deputy Allen testified there were problems with the showers not draining and the toilets overflowing between March 1-8, 2003, and those problems were addressed every time they occurred.  [*See* Allen Dep., at 70-76, Exh. A-44].  When asked

14

his opinion regarding a hypothetical scenario in which fluids overflowed from the toilet and were

not addressed or cleaned, Deputy Allen testified as follows:

> Q.   So if a person was going to not even use the toilet, just use the sink, the
>       overflow from the toilet, they'd have to step in it, wouldn't they?
>
> MR. RINGEL:  Object to the form.
>
> A.   If it wasn't cleaned up, they would be standing in it, yes.
>
> Q.   And in order to go to the shower, you would have to walk through this
>       water from the overflowed toilets to get to the shower, correct?
>
> MR. RINGEL:  Object to the form and the foundation.
>
> A.   Yes.

[*See* Allen Dep., at 186, Pl. Exh. 4].

48.   Defendants admit Deputy Allen testified it would be difficult to mop the pod

when 61 detainees were housed in that pod.  [*See* Allen Dep., at 187, Pl. Exh. 4].  Defendants

deny the remainder of the allegations of paragraph 48 to the extent they suggest that Deputy

Allen testified that he observed or knew of any incident in which toilet overflow was not cleaned

up or that detainees actually stepped in any such overflow.  [*See* Defendants' Response to

Plaintiff's Statement of Additional Undisputed and Disputed Facts, ¶ 47].

49.   Defendants admit Deputy Allen in his deposition agreed with hypothetical

scenarios posed by counsel, but he did not testify he ever witnessed anyone stepping on bodily

fluids or papers containing bodily fluids.  [*See* Allen Dep., at 187-189, Pl. Exh. 4].  Instead, the

testimony at issue is as follows:

> Q.   And these paper shoes they were wearing, if they had to go to the sink in the
>       morning to brush their teeth or wash their hair, they're right by the toilet if the
>       toilet's overflowing, they're going to be stepping in this liquid, aren't they, that's
>       on the floor?

MR. RINGEL:  Object to the form and the foundation.

A.      If there was any type of fluid on the floor in that area, there would be no way not to step into it, yes.

Q.      And even if the toilet's cleaned up, whatever bacterial, fecal material, whatever's on their shoes is going to be continued to be tracked around the cell, aren't they?

MR. RINGEL:  Object to the form and the foundation.

A.   Yes, sir.

[*See* Allen Dep., at 187-188, Pl. Exh. 4].

50.     Defendants admit Deputy Allen testified the plumbing and heating problems he described as occurring between March 1-8, 2003, also occurred previously at any unspecified time.  [*See* Allen Dep., at 160, Pl. Exh. 4].

51.     Defendants admit Deputy Allen so testified.

52.     Defendants admit Plaintiff so testified.  However, the first time Park County Jail deputies reported any inmates in D-Pod experiencing any symptoms of illness was on March 4, 2003.  [*See* DSUMF, ¶ 90].

53.     Defendants admit Plaintiff so testified.  However, the first time Park County Jail deputies reported any inmates in D-Pod experiencing any symptoms of illness was on March 4, 2003.  [*See* DSUMF, ¶ 90].

54.     Defendants admit the Plaintiff testified he made a request to see the nurse to an unidentified deputy on March 4, 2003, through a detainee interpreter, and was told he could not see the nurse until tomorrow.  [*See* Plaintiff's Dep., at 212-217, Pl. Exh. 8].

55.     Admitted.  [*See* DSUMF, ¶ 90].

56.     Defendants admit Plaintiff so testified.

57.     Defendants admit Nurse Paulsen was not present at the Park County Jail on March 4, 2003, due to her scheduled oral surgery.  [*See* Paulsen Dep., at 63-64, Pl. Exh. 10].

58.     Defendants admit Plaintiff so testified.

59.     Defendants admit Plaintiff's brother so testified.

60.     Defendants admit Deputy Allen so testified.

61.     Defendants admit Deputy Allen so testified.

62.     Defendants admit Deputy Allen so testified.

63.     Defendants admit Plaintiff so testified.

64.     Admitted.  [*See* DSUMF, ¶¶ 96-97].

65.     Defendants admit Plaintiff was seen by Nurse Paulsen on March 6, 2003, complaining of aches, headache, nausea, diarrhea, nasal congestion and a sore throat. Defendants admit Nurse Paulsen treated Plaintiff on March 6, 2003, by providing him with over-the-counter medications of Motrin/Ibuprofen for body aches and headache, Chlortrimeton (CTM) for nasal congestion, and Pepto Bismol for nausea.  [*See* DSUMF, ¶¶ 96-97].

66.     Defendants admit Plaintiff was seen by Nurse Paulsen on March 7, 2003, complaining of headache, nausea, vomiting, body aches, diarrhea and nasal congestion. Defendants admit Nurse Paulsen treated Plaintiff on March 7, 2003, by continuing the over-the-counter medications of Motrin/Ibuprofen for body aches and headache, Chlortrimeton (CTM) for nasal congestion, and Pepto Bismol for nausea.  [*See* DSUMF, ¶¶ 104-105].  Defendants deny the allegation Nurse Paulsen told Plaintiff again he was suffering altitude sickness; the only source Plaintiff cites for this information is the inadmissible hearsay testimony of Abraham

Carranza-Reyes, who testified his brother reported to him Nurse Paulsen told his brother he was suffering from altitude sickness.  [*See* Abraham Carranza-Reyes Dep., at 154, Pl. Exh. 9].

67.     Admitted.  [*See* DSUMF, ¶ 113].

68.     Admitted except that Deputy Fikejs not Deputy Frye, contacted Nurse Paulsen by telephone concerning the Plaintiff.     [*See* DSUMF, ¶¶ 115-116].

69.     Admitted.  [*See* DSUMF, ¶¶ 115-116].

70.     Defendants admit Plaintiff so testified.  However, Deputy Frye did not record these actions of the Plaintiff in his incident report.  [*See* Frye Incident Report, 3/8/03, Exh. A-33].

71.     Defendants admit Deputy Frye observed the Plaintiff several times between 5:20 a.m. an 6:40 a.m. on his pod walks "kneeling on the floor with his upper body on the bunk.  This indicated signs of discomfort."  [*See* Frye Incident Report, 3/8/03, Exh. A-33; Frye Dep., at 113, Pl. Exh. 13].

72.     Defendants admit Nurse Paulsen arrived at the Jail at approximately 8:00 a.m. on March 8, 2003.  At 8:10 a.m. on March 8, 2003, Plaintiff collapsed to the floor of D-Pod.  Nurse Paulsen was called to check on the Plaintiff.  Nurse Paulsen noted Plaintiff had acute pain on his right side over his right kidney, radiating to his right flank and down into the right lower abdomen slightly above his groin.  Nurse Paulsen had Jail staff move Plaintiff to the lower tier of D-Pod for his safety.  Nurse Paulsen also spoke with Ben Baca at INS and received permission to transport Plaintiff for evaluation by a physician if his condition worsened.  When Mr. Baca asked Nurse Paulsen what she thought Plaintiff's problem was she responded that it could be anything from possibly kidney stones to gall bladder to something else.  [*See* DSUMF, ¶¶ 120-121].

73.     Defendants admit Plaintiff so testified.

74.     Admitted.  [*See* DSUMF, ¶ 124].

75.     Plaintiff's statement of facts in ¶ 75 are not complete, as they omit the following undisputed facts:  At 8:10 a.m. on March 8, 2003, Plaintiff fell to the floor of D-Pod.  Nurse Paulsen was called to check on the Plaintiff.  Nurse Paulsen noted Plaintiff had acute pain on his right side over his right kidney, radiating to his right flank and down into the right lower abdomen slightly above his groin.  Nurse Paulsen had Jail staff move Plaintiff to the lower tier of D-Pod for his safety.  Nurse Paulsen also spoke with Ben Baca at INS and received permission to transport Plaintiff for evaluation by a physician if his condition worsened.  When Mr. Baca asked Nurse Paulsen what she thought Plaintiff's problem was she responded that it could be anything from possibly kidney stones to gall bladder to something else.  [*See* DSUMF, ¶¶ 120-121].

76.     At 8:53 a.m. on March 8, 2003, Corporal Crawford noted Plaintiff had a small amount of blood in his saliva.  [*See* DSUMF, ¶ 125].

77.     Admitted except that Nurse Paulsen testified that at the time, the two main things she was considering to be the likely cause of Plaintiff's condition was kidney or appendix, although she thought it could be many other things.  [*See* Paulsen Dep., at 112, Pl. Exh. 10].

78.     Admitted.

79.     Admitted.  [*See* DSUMF, ¶ 127].

80.     Defendants admit Plaintiff so testified.

81.     Defendants admit Plaintiff so testified.

82.     Admitted.  [*See* DSUMF, ¶ 130].

83.     Admitted.

84.     Admitted.

85.     Denied.  Dr. Keeling testified that he was not entirely sure whether Plaintiff was unstable when he arrived at Summit Medical Center or when the vital signs referenced by the Plaintiff were taken.  [*See* Keeling Dep., at 95-96, Pl. Exh. 17].

86.     Admitted.

87.     Defendants admit Dr. Keeling prescribed antibiotics, oxygen, IV fluids and potassium chloride for the Plaintiff.  However, Dr. Keeling did not testify he made those prescriptions to stabilize Plaintiff for transfer to Denver Health Medical Center.  [*See* Keeling Dep., at 28-29, Pl. Exh. 17].

88.     Defendants admit Nurse Paulsen testified, in light of Plaintiff's report to Summit Medical that he had chest pains and shortness of breath for three days, that she "guessed" Plaintiff had pneumonia for those three days.   [*See* Paulsen Dep., at 149, Pl. Exh. 10]. Defendants deny Nurse Paulsen agreed that Plaintiff's complaints to her on March 6 "were signs and symptoms of the beginning of a septic condition or sepsis."  To the contrary, Nurse Paulsen agreed only that symptoms such as general body aches, headaches, nausea, diarrhea, and a red sore throat were ***possible*** signs and symptoms of the beginning of a septic condition or sepsis. [*See* Paulsen Dep., at 81, Pl. Exh. 10].

89.     Admitted, except Mr. Rowher lacks personal knowledge of Plaintiff's condition upon Plaintiff's arrival at Summit Medical Center since Mr. Rowher was not present at that time. [*See* Rowher Dep., at 17-32, Pl. Exh. 18; Summit Ambulance Service Prehospital Care Report, 3/8/03, Exh. A-38].

90.     Admitted.   However, Plaintiff's references to Dr. Markovchick's deposition testimony are incomplete.  [*See also* Markovchick Dep., at 28, Exh. A-45].

91.     Admitted.  However, Plaintiff's references to Dr. Douglas' deposition testimony are incomplete.  [*See generally* Douglas Dep., at 16-44, Pl. Exh. 20].

92.     Admitted.  However, Plaintiff's references to Dr. Douglas' deposition testimony are incomplete.  [*See generally* Douglas Dep., at 16-44, Pl. Exh. 20].

93.     Admitted.

94.     Denied.  Dr. Douglas did not testify that Plaintiff got Streptococcus A March 1, 2003, or later.  In fact, Dr. Douglas specifically testified when Plaintiff got Streptococcus A was not knowable, as follows:

Q:      If—is it possible that Mr. Carranza-Reyes—let me ask it a different way. Streptococcus A, okay?  Can one get streptococcus A and it lie dormant in one's body for any period of time before there would be any manifestation of symptoms about that infection?

A.      So that is a matter of conjecture and a matter of scientific research, and the reason is, there is no question that, as I stated an hour ago, any one of us could be harboring a streptococcus A in our throat.  Whether that is the bug that then ultimately becomes invasive or, more likely, there is a second organism that is gained, is a matter of conjecture, is a matter or area of scientific research.  And I don't know that we have a conclusive answer in general or in specific in this case.

I think it's very clear that super infection, new infections happen all the time, and we have very good data there.  One school will get the bug and it goes from school to sibling to home to community, and it's all the same fingerprint of the bug. That clearly is what's called horizontal transmission, and there's no question those are all new infections.  The question you're asking is, could you have that bug in your throat and it gains a new mutation that makes it invasive, and that is the area that is of scientific debate, and the answer is it's possible but nobody knows for sure.

Q.      The reason I'm asking, not to hide the ball from you, so you understand, Mr. Carranza-Reyes hit the Park County jail March 1.

A.      Okay.

Q.      Okay?  The—this lawsuit in part is about whether he contacted streptococcus A and the other things that he got that you treated him for during the time he was in the Park County jail.

A.      I understand.

Q.      Is there any way, based on your understanding of the infectious mechanism of what you treated him for, to tell one way or the other?

A.      Well, let's look at that.  There's a seven-day period of time between the time that he's in an environment and he presents with the symptoms.  That's the most I can say.  Yeah, that's consistent with an incubation period for new exposure.

        Other evidence of horizontal transmission in the environment would be suggestive.  In other words, if there were others that got sick around the same time that would be strong evidence that there was concomitant contraction in an environment.

        Comparable symptoms, now, for example, if the other—the bug elaborated the same toxin and made people similarly sick, not always the case but that would be suggestive.  And then, you know, if there were sophisticated tests available where they all had the same genetic fingerprints, even more consistent.

        I think the time course and the question of whether others in the same environment had exposure or there was an identified common source, those would be important pieces of information to make that determination.

Q.      But absent that kind of information, can you, based on what you know, say he got it March 1 or later?

A.      Your question has a tautology in it which I can't resolve.  Yes, he must have got it on March 1 or later, because those are the only times he got it.  The question is, did he get it before that?  I can't answer that question.  Did he have it sometime within the seven days he came to the hospital?  I mean, just based on the natural biology, the answer is yes.

Q.      Well, based on the natural biology, could he have gotten it February 24?

A.      I can't exclude that.

Q.      Okay.  Based on the current scientific understanding and your knowledge of it, about streptococcus A, you can't exclude that possibility?

22

A.    I can't exclude that possibility.

[*See* Douglas Dep., at 107-110, Pl. Exh. 20].

95.    Admitted.  However, Dr. Douglas has no personal knowledge of Plaintiff's condition during his detention in the Park County Jail.

96.    Defendants admit the Communicable Diseases Policy was in effect at the Park County Jail in March 2003.  Defendants state the Communicable Diseases Policy in its entirety, including the brief excerpt quoted by the Plaintiff, speaks for itself.  [*See* Communicable Diseases Policy, Pl. Exh. 21].

97.    Defendants admit the Communicable Diseases Policy was in effect at the Park County Jail in March 2003.  Defendants state the Communicable Diseases Policy in its entirety, including the brief excerpt quoted by the Plaintiff, speaks for itself.  [*See* Communicable Diseases Policy, Pl. Exh. 21].

98.    Defendants admit the Communicable Diseases Policy was in effect at the Park County Jail in March 2003.  Defendants state the Communicable Diseases Policy in its entirety, including the brief excerpt quoted by the Plaintiff, speaks for itself.  [*See* Communicable Diseases Policy, Pl. Exh. 21].  Plaintiff's reference to the Communicable Diseases Policy in this paragraph is not entirely accurate.  The referenced excerpt actually states:  "The disposition protocol should indicate what to do if you suspect that an inmate has such a disease; generally, the protocol will indicate that he or she should be isolated from other inmates."  [*See* Communicable Disease Policy, Pl. Exh. 21].

99.    Defendants admit the Communicable Diseases Policy was in effect at the Park County Jail in March 2003.  Defendants state the Communicable Diseases Policy in its entirety,

including the brief excerpt quoted by the Plaintiff, speaks for itself. [*See* Communicable Diseases Policy, Pl. Exh. 21].

100.    Defendants admit the Communicable Diseases Policy was in effect at the Park County Jail in March 2003.  Defendants state the Communicable Diseases Policy in its entirety, including the brief excerpt quoted by the Plaintiff, speaks for itself.  [*See* Communicable Diseases Policy, Pl. Exh. 21].

101.    Defendants admit the Communicable Diseases Policy was in effect at the Park County Jail in March 2003.  Defendants state the Communicable Diseases Policy in its entirety, including the brief excerpt quoted by the Plaintiff, speaks for itself.  [*See* Communicable Diseases Policy, Pl. Exh. 21].

102.    Defendants admit the Communicable Diseases Policy was in effect at the Park County Jail in March 2003.  Defendants state the Communicable Diseases Policy in its entirety, including the brief excerpt quoted by the Plaintiff, speaks for itself.  [*See* Communicable Diseases Policy, Pl. Exh. 21].

103.    Sheriff Wegener did not recognize the Communicable Disease Policy during his deposition and had no personal knowledge it was actually in effect in March 2003 so any testimony from Sheriff Wegener concerning the Communicable Diseases Policy is inadmissible. [*See* Wegener Dep., at 76-80, Exh. A-42].  Defendants admit the facts concerning Deputy Frye except the following:  Deputy Frye testified he reported Plaintiff's condition to control, who in turn reported it to Nurse Paulsen, and the jail deputies received instructions concerning the treatment of the Plaintiff from Nurse Paulsen.  [*See* Frye Dep., at 57-60 & 65-68, Pl. Exh. 13; Frye Dep., at 61-64, Exh. A-46].

104.    Sergeant Flint was not aware of any detainees with any symptoms of illness on March 6, 2003.  Therefore he lacks personal knowledge of any symptoms reported to Nurse Paulsen so his testimony is inadmissible.  [*See* Flint Dep., at 85-87, Pl. Exh. 23].[2]  Defendants admit the remaining facts in paragraph 104.  [*See* DSUMF, ¶¶ 89-90; Defendants' Response to Plaintiff's Statement of Additional Disputed and Undisputed Facts, ¶ 46].

105.    Admitted.

106.    Defendants deny Plaintiff's characterization of Sergeant Flint's testimony. Defendants admit Sergeant Flint testified "It would be a possibility" in response to the inquiry whether anyone who had read the Communicable Diseases Policy would have been alerted to a possible communicable disease based on Plaintiff exhibiting symptoms of headaches, coughing, diarrhea, sore throat and joint pain.  [*See* Flint Dep., at 100, Pl. Exh. 23].

107.    Admitted except that Nurse Paulsen testified the Colorado Department of Corrections regulations required one toilet for every 12 inmates.  [*See* Paulsen Dep., at 44, Pl. Exh. 10].

108.    Defendants admit on the visit of March 6, Plaintiff presented to Nurse Paulsen with complaints of general body aches, headache, nausea, diarrhea, nasal congestion, a slightly red, sore throat, and that she did not swab his throat.  [*See* Paulsen Dep., at 80-81, Pl. Exh. 10]. Defendants deny the suggestion that Nurse Paulsen knew Plaintiff's red throat was a sign of a strep infection or the beginning of a septic condition or sepsis, as she did not testify to this fact. To the contrary, Nurse Paulsen testified a slightly red throat was a "possible" sign of a strep

---

[2]  Plaintiff incorrectly refers to Sergeant Flint's deposition as Exhibit 22 when it is really Exhibit 23 attached to Plaintiff's Response.  [*See* Plaintiff's Response, ¶ 104].

infection, and that general body aches, a headache, nausea, diarrhea, and a red, sore throat "can be" signs and symptoms of the beginning of a septic condition of sepsis. [*Id.*]. Nurse Paulsen further testified Plaintiff's symptoms were not consistent with a strep infection or sepsis because they were not accompanied by a temperature over 101 degrees. [*Id.* at 83-84]. Nurse Paulsen testified because Plaintiff did not have a temperature over 101, she did not believe he had strep or a septic condition and therefore did not consider calling Dr. Bachman about Plaintiff. [*Id.*].

109.    Admitted.    However, Plaintiff's references to Nurse Paulsen's deposition testimony are incomplete. [*See* Paulsen Dep., at 93-97, Pl. Exh. 10].

110.    Defendants admit Nurse Paulsen does not recall segregating detainees from Pod-D because of a possible communicable disease. However, Nurse Paulsen testified "[t]hey could be left there, yes," in response to the question of whether detainees would be left in Pod-D if they had symptoms of flu or an infection. [*See* Paulsen Dep., at 158-159, Pl. Exh. 10].

111.    Admitted. However, Nurse Paulsen's post-incident request for a rapid strep test and the alleged response is irrelevant and inadmissible evidence. *See* Fed. R. Evid. 407.

112.    Defendants admit Dr. Bachman served as the physician overseeing medical care at the Park County Jail in March 2003. [*See* DSUMF, ¶ 8]. Defendants admit Dr. Bachman was not consulted concerning the Plaintiff before he was transported to Summit Medical Center. Defendants admit Dr. Bachman expected Nurse Paulsen to call him when anything unusual medically was happening at the Jail. [*See* Bachman Dep., at 115-116, Pl. Exh. 24].

113.    Defendants admit on March 7, 2003, at 3:45 p.m., the INS picked up 51 detainees from the Park County Jail leaving 10-11 INS detainees in D-Pod on March 8, 2003, the day Plaintiff was transported to Summit Medical Center. [*See* DSUMF, ¶¶ 111-112 & 128-133].

Defendants admit Leticia Calzada-Gomez, Consul General of Mexico, wrote to Scott Weber of the Immigration and Customs Enforcement on March 10, 2003, following the hospitalization and diagnosis of Plaintiff.  Defendants admit the letter from the Consul General to the INS, in its entirety, not just the limited excerpts quoted by the Plaintiff speaks for itself.  [*See* Calzada-Gomez Letter to Weber, 3/10/03, Pl. Exh. 25].  However, the Consul General's correspondence and what occurred after the Plaintiff left the Park County Jail is not relevant.  *See* Fed. R. Evid. 407.  Defendants deny the statement that "none of the sick detainees" at Park County Jail received medical care; Plaintiff does not cite supporting evidence for this statement, and the source is unknown.  The evidence cited in the previous paragraphs demonstrates Plaintiff received medical care at the Park County Jail.

114.    Admitted.  However, events occurring after the Plaintiff left the Park County Jail are not relevant.  *See* Fed. R. Evid. 407.

115.    Admitted.   However, events occurring after the Plaintiff left the Park County Jail are not relevant.  *See* Fed. R. Evid. 407.

116.    Admitted.

117.    Admitted.

118.    Admitted.  However, events occurring after the Plaintiff left the Park County Jail are not relevant.  *See* Fed. R. Evid. 407.

119.    Admitted.  However, events occurring after the Plaintiff left the Park County Jail are not relevant.  *See* Fed. R. Evid. 407.

120.    Admitted.  However, events occurring after the Plaintiff left the Park County Jail are not relevant.  *See* Fed. R. Evid. 407.

121.    Admitted.  However, events occurring after the Plaintiff left the Park County Jail are not relevant.  *See* Fed. R. Evid. 407.

122.    Admitted, except that Captain Gore testified it was his intent "to run the best jail that I could and try to be profitable.  If I'm bringing in revenue, then I can put that money back in the facility."  [*See* Gore Dep., at 7, Pl. Exh. 2].

123.    Admitted.

124.    Admitted.

125.    Admitted.  However, pursuant to the contract between the INS and Park County, INS detainees were not charged for medications or medical visits and were not allowed to work outside of the Jail.  [*See* Intergovernmental Service Agreement for Housing Federal Detainees, Art. VI, § D & Art. VII, Exh. A-15].

126.    Defendants admit the Park County Jail billed the INS $38,247.50 for housing INS detainees in January 2003, $41,227.00 for housing INS detainees in February 2003, and $29,561.60 for housing INS detainees in March 2003.  [*See* Muldoon Letters to US Immigration and Naturalization Service, 2/10/03, 3/13/03 & 4/14/03, Pl. Exh. 6].  Defendants deny Pod-D was overcrowded.

127.    Defendants admit Captain Gore testified the Board of County Commissioners was happy with the management of the Park County Jail and believed he was doing a good job.  [*See* Gore Dep., at 37-38, Pl. Exh. 2].  However, Captain Gore cannot testify about any actual knowledge of any member of the Board of County Commissioners and no evidence exists in the summary judgment record concerning any such knowledge.  Defendants admit Sheriff Wegener testified he was accurately quoted in a newspaper article dated November 21, 2003, that the Park

County Jail at that time had 142 inmates and 22 of them were from Park County.  [*See* Wegener

Dep., at 25-26, Pl. Exh. 3].

128.    Denied.  Sheriff Wegener did not accept the accuracy of the statement as a whole.

Instead, he testified as follows:

> Q.    And then it says, "Gore has managed the jail for the last three years, building its profit margin each year by bringing in paying prisoners from other counties and agencies."  That accurate, that statement?
>
> A.    That we've been bringing in paying prisoners?
>
> Q.    Building a profit margin each year by bringing in paying prisoners.
>
> A.    Yes.  We've been bringing in paying prisoners.
>
> Q.    But it's increasing your profit margin when you're bringing in paying prisoners, isn't it?
>
> A.    It depends.  If more staff is needed, then it's you know, cuts down there.  And then more staff means there's more food that has to be prepared and medical needs, so I don't know what the profit margin would be.

[*See* Wegener Dep., at 27, Pl. Exh. 3].

129.    Denied.  Sheriff Wegener testified some of the bunks in Pod-D could have been

empty when he took over operation of the Park County Jail.  [*See* Wegener Dep., at 28-29, Pl.

Exh. 3].

130.    Admitted.  However, the expansion of the Park County Jail occurred after the

Plaintiff's detention so it is not relevant.  [*See* Wegener Dep., at 24-27, Exh. A-42].

131.    Denied.   No practice of overcrowding existed in the Park County Jail for

detainees in Pod-D at any time.  Further, Captain Gore testified since the expansion of the Park

County Jail, the Jail has not required any detainees to be issued mattresses, but acknowledged the

possibility that if the INS had a major raid and needed to place INS detainees in the Park County

Jail that some detainees could be issued a mattress to sleep on. [*See* Gore Dep., at 250-252, Pl. Exh. 2].

132.    Defendants admit Sheriff Wegener testified he did not monitor the number of inmates held in the Park County Jail following the incident involving the Plaintiff.  Defendants admit Sheriff Wegener also testified he was not aware of any changes in policy that occurred after the incident involving the Plaintiff.  However, any policy changes made after the incident are irrelevant.  *See* Fed. R. Evid. 407.  Sheriff Wegener did not testify about any policy of having 18 people only in D-Pod and Sheriff Wegener's interpretation of the architectural drawing he was shown proves nothing.  *See* Defendants' Response to Plaintiff's Statement of Additional Disputed and Undisputed Facts, ¶¶ 3-4.

133.    Defendants admit a quality improvement committee for the Park County Jail did not exist.  However, the responsibilities for a quality improvement committee were given to Dr. Bachman.  [*See* Gore Dep., at 212-213, Pl. Exh. 2].

134.    Defendants admit that an infection control committee for the Park County Jail did not exist.

135.    Defendants admit Nurse Paulsen read the Park County Jail Policy and Procedure Manual when she became employed at the Jail.  [*See* Paulsen Dep., at 183, Pl. Exh. 10]. Defendants deny Nurse Paulsen stated she was responsible for any activities as the health services administrator because she clearly testified that she did not know who the health services administrator was at the time she worked in the Jail.  [*See* Paulsen Dep., at 184-185, Pl. Exh. 10].

136.    Defendants admit Nurse Paulsen testified she was concerned after finding out that committees referenced in the Policy and Procedure Manual did not exist.  However, Defendants

deny Nurse Paulsen asked anyone about their absence.  Nurse Paulsen actually testified:  "I believed I asked about it, and nothing was done."  [*See* Paulsen Dep., at 188, Pl. Exh. 10].

137.    Defendants admit Nurse Paulsen testified she had concerns about continuity of care and implementation of policies at the Park County Jail but she did not raise any such concerns with any of the other personnel at the Jail including Captain Gore.  Defendants admit Nurse Paulsen stated her concerns had something to do with her not returning to work at the Park County Jail upon her return to Colorado.  [*See* Paulsen Dep., at 198-200, Pl. Exh. 10].

138.    Denied.  Plaintiff's expert Manual D. Romero may not appropriately testify any of the Defendants violated the Plaintiff's constitutional rights or were deliberately indifferent to the Plaintiff because any such proposed testimony is on the ultimate issue and inappropriately invades the province of the jury because it does nothing more than offer a legal conclusion that tells the jury what result to reach.  Mr. Romero's proposed expert testimony is not admissible and not properly considered on summary judgment.  *See, e.g., **United States v. Wood,*** 207 F.3d 1222, 1236 n. 10 (10th Cir. 2000) (noting the Tenth Circuit precludes experts from testifying as to ultimate issues of law in civil cases and citing ***Woods v. Lecureux,*** 110 F.3d 1215, 1219-20 (6th Cir. 1997) as "holding an expert could not testify that defendant acted with deliberate indifference because that mental state was an element of the alleged statutory violation); ***Salas v. Hermosillo,*** 980 F.2d 299, 305 (5th Cir. 1992) (excluding proffered expert testimony on deliberate indifference of defendant for purposes of summary judgment); ***Woodhull v. County of Kent,*** 2006 U.S. Dist. Lexis 54028 at *9 (W.D. Mich. Aug. 3, 2006) ("No one, including an expert, can delve into a defendant's subjective state of mind.  Objective facts and circumstances may provide evidence of a defendant's state of mind, but conclusory statements that a defendant

acted with deliberate indifference do not assist the trier of fact.  Proffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments.  Deliberate indifference is a legal term.  An expert may not opine on the question of deliberate indifference because this expresses a legal conclusion.";  citations and internal quotation marks omitted) (unpublished disposition attached as Exh. A-47).

139.    The qualifications and alleged expertise of Plaintiff's expert Robert B. Greifinger, M.D. are irrelevant unless he can present admissible evidence for summary judgment purposes.

140.    The qualifications and alleged expertise of Plaintiff's expert Robert B. Greifinger, M.D. are irrelevant unless he can present admissible evidence for summary judgment purposes.

141.    Denied.  Dr. Greifinger's causation opinions are the subject of the Defendants' pending Motion to Limit Expert Testimony by Michael S. Niederman, M.D. and Robert B. Greifinger filed on January 2, 2007.  Dr. Greifinger's causation opinions cannot be considered for purposes of summary judgment until this Court rules on their admissibility.

142.    Denied.  Dr. Greifinger's causation opinions are the subject of the Defendants' pending Motion to Limit Expert Testimony by Michael S. Niederman, M.D. and Robert B. Greifinger filed on January 2, 2007.  Dr. Greifinger's causation opinions cannot be considered for purposes of summary judgment until this Court rules on their admissibility.

143.    Denied.    Dr. Greifinger's opinions concerning the Board of County Commissioners of Park County are inadmissible for summary judgment purposes.  *See* Defendants' Response to Plaintiff's Statement of Additional Facts, ¶ 138.

144.    Denied.  Dr. Greifinger's opinions concerning Sheriff Wegener are inadmissible for summary judgment purposes.  *See* Defendants' Response to Plaintiff's Statement of Additional Facts, ¶ 138.

145.    Denied.  Dr. Greifinger's opinions concerning Captain Gore are inadmissible for summary judgment purposes.  *See* Defendants' Response to Plaintiff's Statement of Additional Facts, ¶ 138.

146.    The qualifications and alleged expertise of Plaintiff's expert Robert B. Greifinger, M.D. are irrelevant unless he can present admissible evidence for summary judgment purposes.

147.    Denied.  Dr. Greifinger's opinions concerning Nurse Paulsen are inadmissible for summary judgment purposes.  *See* Defendants' Response to Plaintiff's Statement of Additional Facts, ¶ 138.

148.    The qualifications and alleged expertise of Plaintiff's expert Catherine M. Knox, R.N. are irrelevant unless she can present admissible evidence for summary judgment purposes.

149.    Denied.  Ms. Knox's opinions concerning Nurse Paulsen are inadmissible for summary judgment purposes.  *See* Defendants' Response to Plaintiff's Statement of Additional Facts, ¶ 138.

150.    Denied.  The qualifications and alleged expertise of Plaintiff's expert Michael S. Niederman, M.D. are irrelevant unless he can present admissible evidence for summary judgment purposes.  Dr. Niederman's causation opinions are the subject of the Defendants' pending Motion to Limit Expert Testimony by Michael S. Niederman, M.D. and Robert B. Greifinger filed on January 2, 2007.  Dr. Niederman's causation opinions cannot be considered for purposes of summary judgment until this Court rules on their admissibility.

151.    Dr. Niederman's causation opinions are the subject of the Defendants' pending Motion to Limit Expert Testimony by Michael S. Niederman, M.D. and Robert B. Greifinger filed on January 2, 2007.  Dr. Niederman's causation opinions cannot be considered for purposes of summary judgment until this Court rules on their admissibility.

152.    Dr. Niederman's causation opinions are the subject of the Defendants' pending Motion to Limit Expert Testimony by Michael S. Niederman, M.D. and Robert B. Greifinger filed on January 2, 2007.  Dr. Niederman's causation opinions cannot be considered for purposes of summary judgment until this Court rules on their admissibility.

## ARGUMENT

The Board of County Commissioners of Park County, Sheriff Fred Wegener, and Captain Monte Gore are entitled to summary judgment on all of Plaintiff's remaining 42 U.S.C. § 1983 claims.  None of the arguments, authorities or evidence presented by the Plaintiff alter the propriety of summary judgment for these Defendants in this matter.  First, the Board is not liable to the Plaintiff.  Initially, under Colorado law, the Board is not appropriately held liable to the Plaintiff because it lacks oversight responsibility over the operations of the Park County Jail. Further, no custom, policy or practice attributable to the Board caused the Plaintiff any injury.  Second, Sheriff Wegener is entitled to qualified immunity from the Plaintiff's 42 U.S.C. § 1983 claims against him in his individual capacity because Plaintiff demonstrates no personal participation by the Sheriff in any alleged constitutional violation or that the Sheriff participated in any violation of Plaintiff's constitutional rights as the official ultimately responsible for the Park County Jail.  Third, Sheriff Wegener in his official capacity cannot be held liable because Plaintiff demonstrates no custom, policy or practice of the Park County Jail violated his constitutional rights.  Fourth, Captain More

Gore is also entitled to qualified immunity from Plaintiff's claims against him in his individual capacity because Captain Gore never personally participated in any alleged violation of Plaintiff's constitutional rights and also never violated Plaintiff's constitutional rights as a supervisor as Jail Administrator for the Park County Jail.  Careful review by this Court of the actual facts established by the Plaintiff with admissible evidence and contained in the summary judgment record before this Court against the background of the applicable legal principles demonstrates summary judgment is appropriate for these Defendants as a matter of law.

### I.  THE BOARD OF COUNTY COMMISSIONERS OF PARK COUNTY HAS NO SUPERVISORY RESPONSIBILITY OVER THE PARK COUNTY JAIL AS A MATTER OF COLORADO LAW AND NO CUSTOM, POLICY OR PRACTICE OF THE BOARD OF COUNTY COMMISSIONERS VIOLATED PLAINTIFF'S CONSTITUTIONAL RIGHTS

Plaintiff's 42 U.S.C. § 1983 claims against the Board of County Commissioners of Park County ("Board") fail for two distinct reasons.  First, under Colorado law, the Board is not responsible for the operations of the Park County Jail.  Second, no custom, policy or practice of the Board violated any of Plaintiff's constitutional rights.  [*See* Defendants' MSJ, at 22-29].  Plaintiff's Response attempts to avoid the impact of these two principles on his claims against the Board.  [*See* Plaintiff's Response, at 33-37].  However, examination of the Plaintiff's arguments and authorities demonstrates no basis exists to hold the Board liable here.

First, Plaintiff asserts three Colorado statutory provisions support the Plaintiff's conclusion the Board is responsible for the operations of the Park County Jail.  [*See* Plaintiff's Response, at 33].  Initially, Plaintiff relies upon C.R.S. § 30-11-107(2)(a), which provides:

> (2)(a)  Subject to the provisions of part 1 of article 1 of title 29, C.R.S., the board of county commissioners of each county has exclusive power to adopt the annual budget for the operation of the county government, including all offices, departments, boards, commissions, other spending agencies of the county

government, and other agencies which are funded in whole or in part by county appropriations. All such entities shall make appropriate budget recommendations each year to the board of county commissioners for the operation of their respective offices; but the final budget determination of each board of county commissioners shall be binding upon each of the respective offices, departments, boards, commissions, other spending agencies of the county government, and other agencies which are funded in whole or in part by county appropriates.

C.R.S. § 30-11-107(2)(a). Next, Plaintiff invokes C.R.S. § 30-15-401(1)(f), which states:

> (1) In addition to those powers granted by sections 30-11-101 and 30-11-107 and by parts 1, 2, and 3 of this article, the board of county commissioners has the power to adopt ordinances for control or licensing of those matters of purely local concern which are described in the following enumerated powers:
>
> . . . .
>
> (f) To use the county jail for the confinement or punishment of offenders, subject to such conditions as are imposed by law and with the consent of the board of county commissioners.

C.R.S. § 30-15-401(1)(f). Last, Plaintiff relies upon C.R.S. § 17-26-126, which reads:

> It is the duty of the board of county commissioners to make personal examination of the jail of its county, its sufficiency, and the management thereof during each session of the board and to correct all irregularities and improprieties therein found.

C.R.S. § 17-26-126.

None of the three statutory provisions relied upon by the Plaintiff, however, contradict the other statutory provisions cited by the Defendants for the proposition the county sheriff and not the board of county commissioners has the authority and responsibility to oversee the *operations* of the county jail. Two Colorado statutes specifically designate the county sheriff as the custodian of the county jail and the county official responsible for the operations of the county jail. C.R.S. § 30-10-511 provides:

> Except as provided in section 16-11-308.5, C.R.S.,[3] the sheriff shall have charge and custody of the jails of the county, and of the prisoners in the jails, and shall supervise them himself or herself or through a deputy or jailer.

C.R.S. § 30-10-511.  And C.R.S. § 17-26-102 states:

> The sheriff of the county, in person or by deputy appointed for that purpose, shall be the keeper of the county jail.  He shall be responsible for the manner in which the same is kept.  He shall see that the same is kept clean, safe, and wholesome.  The expenses of keeping the jail in good order and repair and of lighting and warming that part thereof wherein prisoners are confined and the office in the jail shall be paid by the county wherein the jail is situated.  Nothing in this section shall authorize the lighting or warming of that part of the jail occupied by the keeper thereof as a dwelling house.

C.R.S. § 17-126-102.  These two provisions demonstrate the county sheriff is the county official responsible for the operations of the county jail.  Indeed, elsewhere in the Plaintiff's Response, Plaintiff describes the sheriff "[a]s the person primarily responsible under state law for the general management and administration of the jail."  [*See* Plaintiff's Response, at 38].  The question is whether the statutory provisions relied upon by the Plaintiff--C.R.S. § 30-11-107(2)(a); C.R.S. § 30-15-401(1)(f); and C.R.S. § 17-26-126--that provide the Board of County Commissioners with budgetary authority, allow the Board to utilize the county jail to house offenders, and require the Board to periodically inspect the county jail are sufficient to impose responsibility on the board for the operations of the county jail.  No question the Board has some limited oversight responsibility over the Park County Jail.  However, the extent of that oversight responsibility does not include the ability to tell the Sheriff how to operate the Jail.  None of the statutes relied upon by Plaintiff provide the Board any such operational authority over the Jail.

---

[3]  C.R.S. § 16-11-308.5 provides the Executive Director of the Colorado Department of Corrections retains jurisdiction over any person within his or her custody placed pursuant to a contract for incarceration in a county jail.

Absent that type of authority, the Sheriff, and not the Board, must be considered the county official responsible for the operations of the Park County Jail.

Second, Plaintiff contends the fact Colorado law requires counties be sued in the name of the board of county commissioners supports inclusion of the Board here.  [*See* Plaintiff's Response, at 33].  Plaintiff is correct that C.R.S. § 30-11-105 requires suits against counties in Colorado to be brought against the board of county commissioners of the county to be sued.  *See* C.R.S. § 30-11-105.  However, the fact that Park County must be sued in the name of its board is not the equivalent as it being appropriate to hold the Board liable to the Plaintiff here pursuant to Plaintiff's 42 U.S.C. § 1983.  Rather, because the Sheriff of Park County is the responsible county official for the operations of the Park County Jail, the appropriate recourse for the Plaintiff is to sue the Sheriff in his official capacity as the Plaintiff has also done in this litigation.  Because a suit against the Sheriff in his official capacity is treated as a claim against Park County, by suing Sheriff Wegener in his official capacity, the Plaintiff has effectively sued Park County.  *See generally* **McMillian v. Monroe County, Ala.,** 520 U.S. 781, 785 n. 2 (1997); **Kentucky v. Graham,** 473 U.S. 159, 165 (1985).  However, Plaintiff's official capacity claim against Sheriff Wegener while effectively a claim against Park County, does not require the Board to be named as a separate entity pursuant to C.R.S. § 30-11-105 because the Sheriff in his official capacity is a suable entity under Colorado law.  *See, e.g.,* C.R.S. § 30-10-522; **Cortese v. Black,** 838 F.Supp. 485, 496 (D.Colo. 1993).

Third, Plaintiff challenges the Defendants' reliance on **Richart v. Board of County Commissioners of Boulder County,** 33 P.2d 971 (Colo. 1934), and **Van Cleave v. Board of County Commissioners of the County of Adams,** 518 P.2d 1371 (Colo. App. 1973), for the

proposition that a board of county commissioners lacks authority over the operations of a county jail.  [*See* Plaintiff's Response, at 33-34].  Plaintiff much too narrowly reads *Richart* and *Van Cleave*.  These decisions, in contrast to the interpretation advanced by Plaintiff, specifically compare the authority of a county sheriff in Colorado over the operations of the county jail with the limited oversight authority of a board of county commissioners over the county jail.  Plaintiff is correct that in *Richart* the Colorado Supreme Court held that when the general powers of the county commissioners conflict with the specific powers of the sheriff the sheriff's specific authority must govern.  *Richart,* 33 P.2d at 972-73.  [*See* Plaintiff's Response, at 33-34].  However, Plaintiff ignores how the Colorado Supreme Court in *Richart* discussed and applied this general legal principle.  In *Richart,* the court concluded:  "A sheriff, in his capacity as jailer, has a great responsibility, and he cannot perform his duties properly if subject to interference by a board of county commissioners."  *Richart,* 33 P.2d at 973.  Further, immediately after this statement, the court continued:

> The plaintiff's [the board of county commissioners] authority under section 8898, supra, [the precursor to C.R.S. § 17-26-126] to correct irregularities and improprieties found in the jail, does not authorize the plaintiff to dictate to the defendant where the defendant shall clean the prisoners and permit consultation between them and their lawyers, or to require him to use the room in question for such purposes and for no other.

*Richart,* 33 P.2d at 973 (alterations added).  The clear import of *Richart* is the Colorado Supreme Court concluded the county sheriff, not the board of county commissioners, possesses the authority under Colorado law concerning the operations of the county jail.  Indeed, this interpretation is supported by the Colorado Court of Appeals' discussion of *Richart* in *Van Cleave* as follows:

> The issue in ***Richart*** was whether the board of county commissioners' general authority to control the county's property took precedence over the sheriff's more specific authority, as county jailer, to administer the functioning of the jail.  The Supreme Court concluded that the board's general powers must yield to the particular powers conferred upon the sheriff with reference to the jail, and held that the board had no authority to forbid the defendant [sheriff] from occupying the room as part of the sheriff's living quarters.

***Van Cleave,*** 518 P.2d at 1373.  The Colorado Court of Appeals' reference to the sheriff's specific authority "to administer the functioning of the jail" describes the sheriff's responsibility over the operations of the jail.  ***Richart*** and ***Van Cleave*** demonstrate the Board has no authority over the operations of the Park County Jail under Colorado law making it inappropriate to hold the Board liable pursuant to 42 U.S.C. § 1983.

Fourth, Plaintiff attempts to distinguish ***Tunget v. Board of County Commissioners of Delta County,*** 992 P.2d 650 (Colo. App. 1999), and ***Bristol v. Board of County Commissioners of the County of Clear Creek,*** 312 F.3d 1213 (10th Cir. 2002) (en banc), on the ground those cases are only applicable to circumstances where a plaintiff attempts to hold a board of county commissioners liable on a vicarious liability theory.  [*See* Plaintiff's Response, at 34 and n. 1].  Plaintiff's effort to distinguish these cases is misguided.  The purpose in citing these precedents was simply to underscore the general principle underlying ***Richart*** and ***Van Cleave*** that under the Colorado Constitution, Colorado statutes, and Colorado case law, sheriffs and boards of county commissioners are treated as separate and distinct public entities with different powers and responsibilities.  Both ***Tunget*** and ***Bristol*** describe this status under Colorado law and make this important point.  *See* ***Tunget,*** 992 P.2d at 650-51; ***Bristol,*** 312 F.3d at 1219-21.

Fifth, Plaintiff inappropriately relies upon ***Robertson v. Board of County Commissioners of County of Morgan,*** 985 F.Supp. 980 (D.Colo. 1997).  [*See* Plaintiff's Response, at 35].  At

issue in *Robertson* was whether the plaintiffs who were patrol officers, investigators, jail officers, and dispatchers who worked under the authority of the Sheriff had standing to sue the Board of County Commissioners of Morgan County for alleged violations of the Fair Labor Standards Act.  *Id.* at 982 & 984-85.  The District Court concluded standing to sue the Board existed based on the fact that while the Sheriff designates the salary amount for his employees, the Board of County Commissioners must approve the amount of the salaries pursuant to C.R.S. § 30-2-106 and also must approve the Sheriff's overall budget.  *Id.* at 985.  Importantly, the District Court's conclusion in *Robertson* was in the FLSA context which has an extremely broad definitions of "employee" and "employer."  *See Robertson v. Board of County Commissioners of the County of Morgan,* 78 F.Supp.2d 1142, 1150-52 (D.Colo. 1999) (addressing whether the Board was the plaintiffs' employer for purposes of the FLSA).  Nothing about *Robertson,* however, addresses the respective authority of the sheriff and the board of county commissioners concerning the operations of the county jail.  As such, the District Court's statement relied upon by the Plaintiff concerning the board's alleged authority over the sheriff because of its funding power adds nothing to the actual issue before this Court concerning the Board's lack of authority over the operations of the Park County Jail.

Sixth, Plaintiff mistakenly invokes *Miller v. Ouray Electric Light & Power Co.,* 70 P. 447 (Colo. App. 1902).  [*See* Plaintiff's Response, at 35].  In *Miller,* the Colorado Court of Appeals addressed whether the precursor to C.R.S. § 17-26-126 provided a basis to hold the individual county commissioners liable for a fire that occurred in the county jail allegedly caused by defective wiring in the jail.  *Miller,* 70 P. at 447-48.  Critically, however, nothing in *Miller* addresses the comparative authority of the county commissioners and the sheriff over the

operations of the county jail.  *Miller,* 70 P. at 447-49.  Therefore, nothing contained in *Miller*

undermines the subsequent decisions in *Richart* and *Van Cleave* concerning the lack of authority

of the Board over the operations of the county jail.

Seventh, Plaintiff also inappropriately relies upon *Winton v. Board of Commissioners of*

*Tulsa County, Oklahoma,* 88 F.Supp.2d 1247 (N.D. Okla. 2000).  [*See* Plaintiff's Response, at

35 & 37].  In *Winton,* the District Court addressed on summary judgment whether the 42 U.S.C.

§ 1983 claims was appropriate on an inmate's claims of failure to protect from harm by other

inmates and denial of medical care.  *Id.* at 1251.  *Winton* is readily distinguish for multiple

reasons.  Initially, *Winton* never addresses the relationship between or the responsibility over the

operations of the county jail between the sheriff and the board of county commissioners of Tulsa

County, Oklahoma.   Nothing contained in *Winton* even suggests the board there made any

argument akin to the one being made by the Board in this case.  *Id.* at 1252-1270.  Further, the

District Court in *Winton* repeatedly suggests the county's liability is based on the fact the sheriff

is the final policymaker for the county jail.  *See, e.g., Winton,* 88 F.Supp. at 1267 ("The County

was also aware of the risk because the Sheriff, a final policymaker with respect to jail

administration, was aware of the risk."); *Winton,* 88 F.Supp. at 1270 ("The Sheriff's actions or

inactions, as the final policy maker for the Jail, are attributable to the County.").  The District

Court's analysis in *Winton* demonstrates it never attempted to differentiate between the role and

responsibility of the sheriff and the board over the operations of the county jail.  Accordingly,

*Winton* is inapposite to the issue presented by the Board here.

Plaintiff's reliance on *Winton*, as well as much of the Plaintiff's arguments on this issue,

demonstrate a failure to appreciate the actual argument made by the Board.  The Board is not

arguing that Park County cannot be held liable for the actions of the Sheriff in his official capacity as the final policymaker for the Park County Jail.  As discussed above, Defendants acknowledge if the Plaintiff prevails on his official capacity claim against Sheriff Wegener the nature of an official capacity claim effectively means Park County would be responsible. Indeed, Defendants separately address the Plaintiff's official capacity claim against Sheriff Wegener in Section II(B) below.  [*See also* Defendants' MSJ, at 39-50].   However, Park County's ultimate potential fiscal responsibility for the Plaintiff's official capacity claim against Sheriff Wegener presents an all together different question than whether the Board itself is appropriately held liable to the Plaintiff based on the Board's lack of authority over the operations of the Park County Jail under Colorado law.   Plaintiff's reliance on ***Winton*** demonstrates Plaintiff fails to appreciate the important distinction between these two concepts.

Eighth, Plaintiff asserts there was a custom, policy or practice of the Board that caused injury to the Plaintiff.  [*See* Plaintiff's Response, at 34-35].  The sum total of the Plaintiff's argument concerning the existence of a custom, policy or practice of the Board consists of the following:

> Defendants argue that there was no custom, policy, or practice of the Board that caused injury to the Plaintiff.  To the contrary, the Board encouraged and approved the practice of overcrowding, which created unsanitary conditions in Pod D, by approving revenue-producing budgets creating greater and greater profits for the county by increasing the number of inmates and detainees through contracts approved by the county with state and federal agencies, including the INS.  In its quest to turn the jail into a county profit center, the Board ignored the conditions of confinement created by this practice.

[*See* Plaintiff's Response, at 34-35].  Plaintiff's assertion of the existence a custom, policy or practice of the Board fails any real scrutiny from both a factual and a legal standpoint.  Plaintiff does not cite to the summary judgment record to support his argument.  Review of the Plaintiff's

Statement of Disputed and Undisputed Facts reveals the only facts that reference the Board at all are paragraphs 127, 130, 138 and 143. [*See* Plaintiff's Statement of Disputed and Undisputed Facts, ¶¶ 127, 130, 138 & 143]. None of the facts presented by the Plaintiff, however, establish any custom, policy or practice by the Board concerning the Park County Jail. At most, the Plaintiff has proven the Board was aware the Park County Jail made a profit and the expansion of the Park County Jail was financially feasible with a 50% occupancy rate. [*See* Plaintiff's Statement of Disputed and Undisputed Facts, ¶¶ 127 & 130].[4] Nothing the Plaintiff has presented establishes the Board actually approved any particular budget for the Park County Jail. And even acknowledging the Board undoubtedly did approve such a budget pursuant to C.R.S. § 30-11-107(2)(a) although never actually established by the Plaintiff, no evidence exists any budget for the Park County Jail reviewed or approved by the Board contained any particular assumption, requirement, or understanding of the number of INS detainees or other contract inmates that would need to be housed in the Park County Jail for the Jail operations to meet budget. Absent some evidence along those lines, nothing about the fact the Board may have approved a Jail budget establishes any decision-making role by the Board in the number of inmates or detainees housed in the Jail generally or specifically during March 1-8, 2003, during the Plaintiff's detention.

---

[4] The conclusions of Plaintiff's experts Manual D. Romero and Robert B. Greifinger, M.D. reflected in paragraphs 138 and 143 are not appropriately considered by this Court. [*See* Response Concerning Plaintiff's Statement of Additional Disputed and Undisputed Facts, ¶¶ 138 & 143]. However, even if considered by this Court for purposes of summary judgment, nothing about the conclusions of Mr. Romero or Dr. Greifinger establishes any additional factual predicate for holding the Board of County Commissioners of Park County liable here.

Essentially, Plaintiff's effort to hold the Board liable under a respondeat superior or vicarious liability theory premised on the Board's approval or awareness of the budget of the Park County Jail and the need for the Jail to house inmates and detainees pursuant to contracts with other governmental agencies to generate revenue.  Plaintiff's attempt runs squarely afoul of the United States Supreme Court's direction that to succeed with a municipal liability claim the plaintiff must establish the municipality was the "moving force" in causation terms for the alleged injury.  "That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Board of County Commissioners of Bryan County v. Brown,* 520 U.S. 397, 404 (1997).  Here, Plaintiff has not established any policy decision by the Board in reviewing or approving the budget of the Park County Jail or otherwise directly caused him any constitutional injury.  One could imagine a board making a deliberate policy choice concerning the budget for the county jail that could directly impact the jail's ability to provide constitutionally adequate conditions of confinement or services to those detained.  However, here, Plaintiff has not provided any evidence whatsoever demonstrating any causal connection between any specific policy decision made by the Board regarding the Park County Jail and the conditions of his confinement at the Jail from March 1-8, 2003.  Absent such causation evidence, Plaintiff's claim against the Board fails.

Ninth, Plaintiff maintains Park County may be held liable for the sheriff's policies, practices and procedures because the sheriff is a final policymaker for Park County and therefore his actions are attributable to Park County.  [*See* Plaintiff's Response, at 36-37].  Defendants have not disputed the Sheriff is a final policymaker for Park County.  However, again, the issue

is not whether Park County is potentially responsible for the Sheriff's actions based on the Plaintiff's official capacity claim against Sheriff Wegener.  Rather, the issue is whether the Board is appropriately held liable separate and distinct from the Plaintiff's official capacity claims against Sheriff Wegener.  No such liability against the Board is proper here based upon all of the above arguments and authorities.

## II.  PLAINTIFF STATES NO VIABLE CLAIM FOR ANY ALLEGED CONSTITUTIONAL VIOLATION AGAINST SHERIFF FRED WEGENER IN EITHER HIS INDIVIDUAL OR OFFICIAL CAPACITIES

Plaintiff's 42 U.S.C. § 1983 claims against Sheriff Wegener in both his official and individual capacities fail as a matter of law.  First, Sheriff Wegener is entitled to qualified immunity from the Plaintiff's claims against him in his individual capacity because Plaintiff has failed to demonstrate Sheriff Wegener violated his constitutional rights either personally or in his supervisory capacity as Sheriff.  Second, Plaintiff's official capacity claim against Sheriff Wegener fails because Plaintiff has not proven any custom, policy, or practice of the Park County Jail was the moving force behind any violation of his constitutional rights during his detention in the Park County Jail from March 1-8, 2003.[5]

---

[5]   Defendants discussed the Plaintiff's individual and official capacity claims against Sheriff Wegener separately in their Motion for Summary Judgment because of the distinct legal standards and principles applicable to these different claims.  Defendants further divided their analysis of the individual capacity claims against Sheriff Wegener in terms of his personal participation and his supervisory role as Sheriff.  [*See* Defendants' MSJ, at 29-50].  Unfortunately, Plaintiff's Response does not follow suit and addresses the liability of the Sheriff in both his official and individual capacities together.  [*See* Plaintiff's Response, at 37-48].  Defendants believe it is of critical importance for this Court in reviewing the parties' summary judgment submissions to differentiate between the individual and official capacity claims against Sheriff Wegener and the all together different legal principles applicable to each of them.  Defendants have attempted to place the Plaintiff's various scattered arguments with the claims that they refer to.  However, the nature of the Plaintiff's arguments has made doing so difficult.

**A.  SHERIFF FRED WEGENER IS ENTITLED TO QUALIFIED IMMUNITY FROM THE PLAINTIFF'S CLAIMS AGAINST HIM IN HIS INDIVIDUAL CAPACITY**

Sheriff Wegener is entitled to qualified immunity from the Plaintiff's 42 U.S.C. § 1983 claims against him in his individual capacity because Plaintiff cannot demonstrate Sheriff Wegener personally participated in any violation of his constitutional rights or violated his constitutional rights in his supervisory capacity as Sheriff.  [*See* Defendants' MSJ, at 35-38].

**1.  SHERIFF FRED WEGENER HAD NO PERSONAL PARTICIPATION WITH RESPECT TO ANY ALLEGED VIOLATION OF THE PLAINTIFF'S CONSTITUTIONAL RIGHTS**

First, Plaintiff alleges the Defendants' analysis of the Plaintiff's individual capacity claims is somehow limited to only the personal participation of Sheriff Wegener rather than his role as a supervisor.  [*See* Plaintiff's Response, at 44-47].  Plaintiff's argument is perplexing because the Defendants' MSJ contained separate sections addressing Sheriff Wegener's potential liability based on his own personal participation as well as his potential liability in his supervisory capacity as Sheriff.  [*See* Defendants' MSJ, at 35-37 (personal participation) and 37-38 (supervisory capacity)].   Indeed, in their discussion of Sheriff Wegener's potential supervisory liability to the Plaintiff, Defendants quote the same language employed by the Tenth Circuit relied upon by Plaintiff.  [*Compare* Defendants' MSJ, at 37-38 *with* Plaintiff's Response, at 44-45].

Second, Plaintiff challenges the proposition to hold Sheriff Wegener liable to Plaintiff in his individual capacity, Plaintiff must demonstrate Sheriff Wegener knew of and disregarded an excessive risk of harm to Plaintiff.  Plaintiff does so by suggesting that ***Lankford v. City of Hobart***, 73 F.3d 283, 297 (10th Cir. 1996), is a Title VII employment discrimination case.  [*See* Plaintiff's Response, at 47].  Plaintiff seriously misreads ***Lankford***.  Initially, ***Lankford*** is clearly

both a Title VII *and* a 42 U.S.C. § 1983 case.  *See* ***Lankford,*** 73 F.3d at 285 ("Plaintiffs now

appeal the dismissal of their § 1983 and Title VII claims against the City of Hobart.").  Further,

the Defendants' reference to ***Hobart*** clearly supports the notion that actual knowledge not

constructive knowledge is required.  [*See* Defendants' MSJ, at 38].  Defendants rely on the

following passage from ***Lankford*** to support this proposition:

> Plaintiffs also allege that Hobart city officials knew or should have known
> of Mr. Medrano's conduct yet failed to take appropriate measures.  In ***Woodward***
> ***v. City of Worland,*** 977 F.2d 1392, 1400 (10th Cir. 1992), *cert. denied,* 113 S.Ct.
> 3038 (1993), we adopted the Third Circuit's test for supervisory liability under §
> 1983 as requiring "allegations of personal direction or of actual knowledge and
> acquiescence." ***Id.***

***Lankford,*** 73 F.3d at 287.  Moreover, the actual knowledge requirement adopted by the Tenth

Circuit is not limited to ***Lankford***, but appears in a variety of other cases relied upon by the

Defendants such as ***Craig v. Eberly,*** 164 F.3d 490, 495 (10th Cir. 1998); ***Barney v. Pulsipher,***

143 F.3d 1299, 1310 (10th Cir. 1998).  [*See* Defendants' MSJ, at 31].

Third, Plaintiff argues Sheriff Wegener "participated in the violation of Plaintiff's

constitutional rights both individually and in his supervisory capacity as sheriff of Park County

by permitting the practice of overcrowding in Pod D in violation of the jail's own policies, which

resulted in filthy and unsanitary conditions and the prevalence of illness among detainees." [*See*

Plaintiff's Response, at 37-38].  To support this conclusion, Plaintiff asserts Sheriff Wegener

"was aware of the limitation on number of inmates that could be housed in Pod D, he walked

through the facility every two weeks and was aware of the total number of inmates being housed,

and acquiesced in the custom and practice of overcrowding, which created unsanitary and filthy

conditions." [*See* Plaintiff's Response, at 38].  Unfortunately, Plaintiff refers to nothing

contained in the summary judgment record to support Sheriff Wegener's personal participation

in the manner asserted by the Plaintiff.  Review of the actual facts established in the summary judgment record, however, belies any conclusion Sheriff Wegener personally participated in any violation of Plaintiff's constitutional rights.

At best, Plaintiff has established that the Park County Jail Policy and Procedure Manual had a requirement that inmates housed in the Jail have at least 80 square feet of total living space per occupant.  [*See* Defendants' Response Concerning Plaintiff's Statement of Additional Undisputed and Disputed Facts, ¶¶ 1-4].  However, Plaintiff has not presented any evidence that Sheriff Wegener had any actual knowledge that this Jail policy was being violated based on the number of detainees housed in D-Pod.  Plaintiff has also established Sheriff Wegener walked through the Park County Jail approximately once every two weeks.  [*See* Defendants' Response Concerning Plaintiff's Statement of Additional Undisputed and Disputed Facts, ¶ 5].  And Plaintiff has demonstrated Sheriff Wegener had access to the total number of inmates housed in the Park County Jail at any given time.  [*See* Defendants' Response Concerning Plaintiff's Statement of Additional Undisputed and Disputed Facts, ¶ 5].  However, what Plaintiff has not proven, and has absolutely no evidence concerning, is any actual and specific awareness by Sheriff Wegener of the number of inmates housed in D-Pod during the Plaintiff's detention between March 1-8, 2003, or at any other time.  Plaintiff also has not proven, and has absolutely no evidence, Sheriff Wegener knew any prior problem existed in the Park County Jail or D-Pod of any kind even remotely analogous to what Plaintiff alleges occurred to him there based on the number of inmates incarcerated in the Jail generally or D-Pod specifically.  Further, Plaintiff has no evidence Sheriff Wegener was aware of any prior practice in the Jail not to follow the Jail policy of providing 80 square feet of living space to all inmates before the Plaintiff's detention.

Finally, Plaintiff has no evidence Sheriff Wegener ever personally observed any conditions in D-Pod that he concluded were overcrowded.

Absent any admissible evidence contained in the summary judgment record concerning the above critical facts concerning Sheriff Wegener's actual knowledge concerning the conditions of the Park County Jail including the number of detainees housed in D-Pod, no basis exists to hold Sheriff Wegener individually liable pursuant to 42 U.S.C. § 1983.

Fourth, Plaintiff contests the Defendants' analysis that individuals who are not medically trained are entitled to rely on the medical treatment decisions of medical professions.  [*See* Plaintiff's Response, at 42-44 & 48].  However, Plaintiff's effort to distinguish or limit the precedents relied upon by the Defendants for this unremarkable proposition fails.  Plaintiff is correct that the Tenth Circuit in *McCraken v. Jones,* 562 F.3d 22 (10th Cir. 1997), addressed the issue of when a warden could rely on medical treatment decisions by medical professionals in the factual context of the inmate having been seen by a physician working at a hospital.  *Id.* at 24.  However, nothing about the Tenth Circuit's discussion in *McCraken* evidences any intent to limit the proposition that a prison official may rely upon the medical treatment decisions of a medical professional to hospital physicians.  Indeed, the other cases relied upon by the Defendants for this general proposition do not limit its application in the manner advanced by the Plaintiff.  *See, e.g., Johnson v. Dougherty,* 433 F.3d 1001, 1012 (7th Cir. 2006) ("A non-medical prison official, such as Jones, cannot be held deliberately indifferent simply because he failed to respond directly to the medical complaints of a prisoner who was already being treated by the prison doctor."); *Spruill v. Gillis,* 372 F.3d 218, 236 (3d Cir. 2004) ("Accordingly, we conclude that, absent a reason to believe (or actual knowledge) that prison doctors or their assistants are

mistreating (or not treating) a prisoner, a non-medical prison official like Gooler will not be chargeable with the Eighth Amendment scienter requirement of deliberate indifference."). Plaintiff is again correct that this Court does not have to rely on Circuit Courts of Appeal decisions from outside the Tenth Circuit.  However, Plaintiff offers no persuasive reason why this Court should not do so.  Indeed, the underlying analysis of these decisions demonstrates it has equal applicability to a sheriff being able to rely on the professional judgment of a prison nurse.  *See, e.g., Spruill,* 372 F.3d at 236 (describing the policy reasons why non-medical prison officials should not have disincentives placed on them not to delegate to medical prison officials concerning the medical care of prisoners).

Finally, even assuming this Court does not apply the above precedent to hold Sheriff Wegener could reasonably rely upon Nurse Paulsen's medical judgments, Plaintiff's claim against Sheriff Wegener based on the medical care he received during his detention in the Park County Jail still cannot succeed.  Defendants argued "no evidence exists Sheriff Wegener was aware of any medical issue or concern involving the Plaintiff or any other detainees in D-Pod at the Park County Jail from March 1-8, 2003."  [*See* Defendants' MSJ, at 37].  Plaintiff offers nothing to rebut this argument and none of the facts presented by the Plaintiff demonstrate Sheriff Wegener had any knowledge whatsoever in any medical care provided to the Plaintiff or not provided to the Plaintiff during his detention in the Park County Jail.

## 2.  SHERIFF FRED WEGENER DID NOT VIOLATE THE PLAINTIFF'S CONSTITUTIONAL RIGHTS IN HIS SUPERVISORY CAPACITY

First, Plaintiff argues Sheriff Wegener violated Plaintiff's constitutional rights in his supervisory capacity by permitting overcrowding, failing to train Captain Gore, Nurse Paulsen and the deputies to implement and enforce the Jail's policies and procedures.  [*See* Plaintiff's

Response, at 37-38].  Plaintiff's assertions concerning Sheriff Wegener's knowledge of the actual conditions of the Plaintiff's confinement in the Park County Jail including the alleged overcrowded conditions are addressed in the section above.  As previously outlined, no evidence actually exists that Sheriff Wegener as a supervisor was aware of any unconstitutional conditions of Plaintiff's confinement.  Accordingly, Plaintiff is left with a failure to train theory to support his claim against Sheriff Wegener.

Defendants acknowledge Sheriff Wegener can be held liable in his supervisory capacity for an unconstitutional failure to train those under his supervision as Sheriff of Park County. *See, e.g.,* ***Currier v. Doran,*** 242 F.3d 905, 925 (10th Cir. 2001); ***Meade v. Grubbs,*** 841 F.2d 1512, 1528 (10th Cir. 1988).  However, vigorous causation requirements exists before a plaintiff can establish a failure to train claim.   To establish a failure to train theory, Plaintiff must establish the following elements:  (1) Park County Jail officials violated his constitutional rights; (2) the violation of Plaintiff's constitutional rights arose under circumstances that constitute a usual and recurring situation with which jail officials must deal; (3) the inadequate training demonstrates a deliberate indifference on the part of Sheriff Wegener to persons with whom jail officials come into contact; and (4) there is a direct causal link between the constitutional deprivation and the inadequate training.  ***Carr v. Castle,*** 337 F.3d 1221, 1228 (10th Cir. 2003); ***Brown v. Gray,*** 227 F.3d 1278, 1286 (10th Cir. 2000).[6]

---

[6]  Defendants recognize this test has been developed in the context of a failure to train claim against a municipality.  However, nothing about a failure to train theory against an individual supervisor pursuant to 42 U.S.C. § 1983 suggests another standard should apply. Indeed, other district courts in the Tenth Circuit have applied this test to failure to train claims brought against an individual supervisor.  *See, e.g.,* ***Unzueta v. Schalansky,*** 2003 U.S. Dist. LEXIS 14656, at *7 (D. Kan. June 13, 2003) (unpublished disposition attached as Exh. A-50);

Application of these failure to train standards to the facts contained in the summary judgment record before this Court demonstrates unequivocally Plaintiff establishes no such claim here.  Plaintiff's essential argument on his failure to train theory is that the Plaintiff was subject to unconstitutional conditions of confinement and therefore Sheriff Wegener is responsible because those under his supervision did not implement the policies of the Park County Jail and therefore the training they received must be inadequate.  [*See, e.g.,* Plaintiff's Response, at 36].  However, Plaintiff has presented absolutely no actual evidence concerning his failure to train theory.  Nothing contained in the summary judgment record provides any facts on any of the following critical questions concerning any alleged failure to train by Sheriff Wegener:  What training was provided to Captain Gore, Nurse Paulsen, and the jail deputies?  What specific training was provided in the areas where Plaintiff alleges his constitutional rights were violated?  What specific training was provided on the Park County Jail Policies and Procedure Manual?  What alleged deficiencies exist in the training provided?  What facts exist that Sheriff Wegener was aware of these deficiencies in training?  How did any alleged deficiency in training cause the Plaintiff to suffer an injury to his constitutional rights?  Nothing contained in the Plaintiff's Response provides any facts on these critical questions underlying any failure to train theory against Sheriff Wegener.  Plaintiff cannot defeat Sheriff Wegener's entitlement to summary judgment on his failure to train theory by simply asserting in conclusory fashion that a failure to train exists.  Instead, Plaintiff must put forth admissible evidence on these critical issues to demonstrate his failure to train claim is supported by actual admissible evidence.  Plaintiff's

---

*Teets v. Board of County Commissioners of the County of Osage, Kan.,* 2003 U.S. Dist. LEXIS 4648, at * 12 (D. Kan. Mar. 24, 2003) (unpublished disposition attached as Exh. A-51).

failure to provide any evidence to support his failure to train theory against Sheriff Wegener entitles the Sheriff to summary judgment as a matter of law.

## B.  PLAINTIFF'S OFFICIAL CAPACITY CLAIM AGAINST SHERIFF WEGENER FAILS

None of the facts presented by the Plaintiff nor any of the arguments contained in the Plaintiff's Response demonstrate any custom, policy or practice of the Park County Jail caused him a constitutional injury.  Absent a custom, policy or practice of the Park County Jail that caused Plaintiff a constitutional injury, Plaintiff's official capacity claim against Sheriff Wegener necessarily fails.

First, Plaintiff does not argue any official written policy of the Park County Jail violated his constitutional rights.  Instead, Plaintiff relies upon unwritten policies and procedures of the Park County Jail as violating his constitutional rights.  [*See* Plaintiff's Response, at 37-38, & 48]. Based on the Plaintiff's argument, the issue before this Court on summary judgment is whether the Plaintiff has presented sufficient evidence to establish the unwritten policies and practices he claims violated his constitutional rights represent an official custom of the Park County Jail sufficient to impose liability pursuant to 42 U.S.C. § 1983.  A custom is a persistent and widespread practice that ultimately constitutes the standard operating procedure of the local governmental entity such that it has the force and effect of law.  *See generally Jett v. Dallas Indep. Sch. Dist.,* 491 U.S. 701, 737 (1989); *David v. City & County of Denver,* 101 F.3d 1344, 1357 (10th Cir. 1996), *cert. denied,* 522 U.S. 858 (1997); *Gates v. Unified Sch. Dist. No. 449,* 996 F.2d 1035, 1040 (10th Cir. 1993); *Lankford,* 73 F.3d at 286.

Here, Plaintiff attempts to create a custom of the Park County Jail based on his own eight days of confinement in the Jail and the contention that overcrowding in D-Pod existed at least

several months prior to the Plaintiff's detention.  [*See* Plaintiff's Response, at 40-41].  Review of the actual facts contained in the summary judgment record reveals that Plaintiff's only evidence of alleged overcrowding in D-Pod other than his own eight day confinement is the number of INS detainees held in the Park County Jail from January through March 2003.  [*See* Defendants' Response to Plaintiff's Statement of Additional Undisputed and Disputed Facts, ¶¶ 12-14].  Accordingly, Plaintiff requests this Court declare the alleged conditions of confinement he experienced represent a custom of the Park County Jail based on his own eight days of confinement and some evidence at most a total of three months.  Any comparison of the Plaintiff's attempt to create a custom on this basis with other federal precedent demonstrates the Plaintiff has simply not established any widespread or persistent practice of the Park County Jail.  *Compare* **Hackett v. Fulton County Sch. Dist.,** 238 F.Supp.2d 1330, 1363 (N.D. Ga. 2002) (failure of school district to conduct a thorough background check on one job applicant does not equate to a custom or policy of conducting inadequate background checks on all job applicants; **Durkin v. City of Chicago,** 199 F.Supp.2d 836, 844 (N.D. Ill. 2002) (incidents that occurred over the span of a few days insufficient to create a custom or practice of sexual harassment), *aff'd,* 341 F.3d 606 (7th Cir. 2003); **Barth v. Village of Mokena,** 2006 U.S. Dist. LEXIS 19702, at * 29 (N.D. Ill. Mar. 31, 2006) (custom or practice established based on four years of alleged harassment of the plaintiff) (unpublished disposition attached hereto as Exh. A-48); **Perrin v. City of Elberton,** 2005 U.S. Dist. LEXIS 13230, at * 12 (M.D. Ga. July 1, 2003) (custom or practice established when process of submitting unsworn warrant applications occurred hundreds of times over a period of at least eight years) (unpublished disposition attached hereto as Exh. A-

49).  No precedent exists holding that a county jail can create a custom or practice cognizable

pursuant to 42 U.S.C. § 1983 based solely on evidence of eight days or even three months.

Second, Plaintiff claims the evidence supports a violation of his constitutional rights to

appropriate conditions of confinement.   [*See* Plaintiff's Response, at 40-41].   However, to

succeed with his official capacity claim against Sheriff Wegener, it is insufficient for the Plaintiff

to attempt to demonstrate his conditions of confinement themselves were unconstitutional.

Instead, Plaintiff must demonstrate a custom, policy or practice of the Park County Jail violated

his constitutional rights pursuant to the applicable municipal liability legal principles.   [*See*

Defendants' MSJ, at 25-27].   Defendants have provided this Court with a detailed analysis of

how the actual policies and procedures of the Park County Jail were constitutional in terms of the

allegations raised by the Plaintiff in his Second Amended Complaint.   [*See* Defendants' MSJ, at

39-50].   Nothing contained in the Plaintiff's Response challenges this analysis.   Instead, Plaintiff

hinges his entire official capacity claim against Sheriff Wegener on the assertion the unwritten

policies and procedures of the Park County Jail violated his constitutional rights.   As argued

above, however, Plaintiff's attempt to create liability on this basis fails.

Third, Plaintiff argues the evidence establishes violation of the Plaintiff's right to

constitutional adequate medical care.   [*See* Plaintiff's Response, at 41-42].   Again, however,

Plaintiff does absolutely nothing to link any alleged violation of his Eighth Amendment right to

constitutionally adequate medical care to a custom, policy or practice of the Park County Jail.

Defendants argued the Park County Jail had policies designed to provide access to medical care

for detainees such as the Plaintiff.   [*See* Defendants' MSJ, at 47-49].   Plaintiff does not challenge

the adequacy of the Park County Jail access to medical care policies in his Response.   Rather,

Plaintiff's argument is entirely focused on the alleged inadequacies in medical care he received during his detention.  [*See* Plaintiff's Response, at 41-44].  Even assuming *arguendo* the Plaintiff is correct that he received constitutionally inadequate medical care from Nurse Paulsen, Plaintiff has not established any custom, policy or practice of the Park County Jail caused Nurse Paulsen to provide him with constitutionally deficient medical care.  Plaintiff does not even argue Nurse Paulsen is a final policymaker for the Park County Jail nor could he successfully do so.  Plaintiff points to no policy of the Park County Jail concerning access to medical care that is constitutionally deficient.  And Plaintiff cannot create any custom or practice of the Park County Jail based solely on the medical care he received during his detention.

Fourth, Plaintiff challenges the Defendants' point that proof the Defendants did not follow the Park County Jail policies is insufficient to establish municipal liability.  [*See* Defendants' MSJ, at 41; Plaintiff's Response, at 47-48].  Plaintiff engages in logical contortions in an effort to distinguish ***Davis v. Scherer,*** 468 U.S. 183, 194 (1984), and ***Hovater v. Robinson,*** 1 F.3d 1063, 1068 n. 4 (10th Cir. 1993).  However, Plaintiff misunderstands the Defendants' point.  Defendants cite ***Davis*** and ***Hovater*** for the simple proposition that it is insufficient for the Plaintiff to prove only that the Defendants failed to follow the policies and procedures of the Park County Jail.  Instead, to succeed with his claim, Plaintiff must identify a custom, policy or practice of the Park County Jail that is unconstitutional and demonstrate how that unconstitutional custom, policy or practice deprived him of his constitutional rights.  Plaintiff has not done so here entitling Sheriff Wegener to summary judgment on the Plaintiff's official capacity claim against him.  [*See* Defendants' MSJ, at 39-50].

### III.  CAPTAIN MONTE GORE IS ALSO ENTITLED TO QUALIFIED IMMUNITY FROM THE PLAINTIFF'S CLAIMS AGAINST HIM AS A MATTER OF LAW

Plaintiff's 42 U.S.C. § 1983 claim against Captain Gore in his individual capacity fails to overcome Captain Gore's entitlement to qualified immunity.  Plaintiff has not and cannot demonstrate Captain Gore personally participated in any violation of his constitutional rights or violated the Plaintiff's constitutional rights as the Jail Administrator of the Park County Jail for any supervisory decision respecting the Plaintiff.  Further, Plaintiff cannot demonstrate that any alleged constitutional right violated by Captain Gore concerning the number of detainees housed in D-Pod was clearly established for qualified immunity purposes.

### A.  INSUFFICIENT PERSONAL PARTICIPATION OF CAPTAIN GORE EXISTS TO HOLD HIM INDIVIDUALLY LIABLE TO THE PLAINTIFF

Defendants argued there was no evidence contained in the summary judgment record establishing Captain Gore personally participated in any decision allegedly violative of the Plaintiff's constitutional rights because Captain Gore was not personally involved in any specific decision concerning the Plaintiff's conditions of confinement in the Park County Jail.  [*See* Defendants' MSJ, at 50-51].  Plaintiff offers no evidence or even argument to contest this proposition.  [*See* Plaintiffs' Response, at 48-49].

### B.  CAPTAIN GORE MAY NOT APPROPRIATELY BE HELD SUPERVISORY LIABLE

Plaintiff's effort to hold Captain Gore liable is premised on the conclusory assertion that "Gore was even more directly involved than Wegener in the supervision of the jail, in implementing the jail's policies, and in implementing or condoning unwritten customs and practices previously described in this response."  [*See* Plaintiff's Response, at 48-49].  Plaintiff's

58

attempt to hold Captain Gore liable in his supervisory capacity fails for the same reasons as Plaintiff's attempt to hold Sheriff Wegener liable in his supervisory capacity does.

First, Plaintiff has offered no evidence Captain Gore had any actual knowledge concerning any of the alleged conditions of Plaintiff's confinement in the Park County Jail. Second, Plaintiff has offered no evidence to support the conclusion Captain Gore was involved in any medical decision involving the Plaintiff or that Captain Gore inappropriately relied on the professional nursing judgment of Nurse Paulsen.  Third, Plaintiff has not established any evidence to support any failure to train theory against Captain Gore.

### C.  NO ALLEGED VIOLATION OF PLAINTIFF'S CONSTITUTIONAL RIGHTS BY CAPTAIN GORE WAS CLEARLY ESTABLISHED FOR QUALIFIED IMMUNITY PURPOSES AS A MATTER OF LAW

Defendants argued Plaintiff's claim against Captain Gore based on his alleged involvement in the number of detainees housed in D-Pod could not survive either part of the qualified immunity analysis.  [*See* Defendants' MSJ, at 52-54].  Specifically, Defendants argued it was not clearly established that anything Captain Gore did regarding the number of INS detainees housed in D-Pod in the Park County Jail was violative of the Plaintiff's or anyone else's constitutional rights.  [*See* Defendants' MSJ, at 53-54].  Plaintiff recognizes the need to demonstrate a particular constitutional right is clearly established for qualified immunity purposes.  [*See* Plaintiff's Response, at 46].  However, nowhere in the Plaintiff's Response does the Plaintiff point to any precedent from the United States Supreme Court, the Tenth Circuit, or any other federal court that clearly establishes what Plaintiff alleges Captain Gore did respecting the number of detainees in D-Pod violated the United States Constitution.  Plaintiff bears the burden of proving the law was clearly established to overcome Captain Gore's qualified

immunity.  ***Mick v. Brewer,*** 76 F.3d 1127, 1134 (10th Cir. 1996); ***Albright v. Rodriguez,*** 51 F.3d

1531, 1534 (10th Cir. 1995); ***Pueblo Neighborhood Health Centers, Inc. v. Losavio,*** 847 F.2d

642, 646 (10th Cir. 1988).  Plaintiff has entirely failed to meet his burden here entitling Captain

Gore to qualified immunity as a matter of law.

<u>**CONCLUSION**</u>

In conclusion, for all of the foregoing reasons, as well as based on all of the arguments

and authorities presented in their initial Motion for Summary Judgment, Defendants Board of

County Commissioners of Park County, Fred Wegener and Monte Gore respectfully request this

Court grant them summary judgment on all of the Plaintiff's claims against them, dismiss the

Plaintiff's claims against them in their entirety with prejudice, and for all other and further relief

as this Court deems just and appropriate.

Dated this 12th date of February, 2007.

Respectfully submitted,


s/ Andrew D. Ringel
Andrew D. Ringel, Esq.
Jennifer L. Veiga, Esq.
Hall & Evans, L.L.C.
1125 17th Street, Suite 600
Denver, Colorado 80202-2052
ringela@hallevans.com
veigaj@hallevans.com
Tel:  (303) 628-3300
Fax:  (303) 293-3238

**ATTORNEYS FOR DEFENDANTS
BOARD OF COUNTY
COMMISSIONERS OF PARK
COUNTY, FRED WEGENER
AND MONTE GORE**

## <u>CERTIFICATE OF SERVICE (CM/ECF)</u>

I HEREBY CERTIFY that on the 12th day of February, 2007, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses:

Joseph J. Archuleta, Esq.
archuletalaw@qwest.net

Lloyd C. Kordick, Esq.
lloyd@kordicklaw.com

William A. Trine, Esq.
btrine@trine-metcalf.com

Adele P. Kimmel, Esq.
akimmel@tlpj.org

Josh A. Marks, Esq.
jam@bhgrlaw.com

Melanie B. Lewis, Esq.
mbl@bhgrlaw.com

s/Loree Trout,   Secretary
Andrew D. Ringel, Esq.
Jennifer L. Veiga, Esq.
Hall & Evans, L.L.C.
1125 17th Street, Suite 600
Denver, CO 80202-2052
303-628-3300
Fax: 303-293-3238
ringela@hallevans.com
veigaj@hallevans.com

**ATTORNEYS FOR DEFENDANTS PARK COUNTY BOARD OF COUNTY COMMISSIONERS, FRED WEGENER AND MONTE GORE**

H:\Users\RINGELA\park\Carranza-Reyes\reply summary judgment.doc