**EXHIBIT A-42**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Case No. 2005-WM-377 (BNB)

---

DEPOSITION OF: FREDERICK WILLIAM WEGENER, III
January 20, 2006

---

MOISES CARRANZA-REYES,

Plaintiff,

v.

PARK COUNTY, a public entity of the State of Colorado and its governing board, THE PARK COUNTY BOARD OF COUNTY COMMISSIONERS; PARK COUNTY SHERIFF'S OFFICE, a public entity of the State of Colorado; FRED WEGENER, individually and in his official capacity as Sheriff of Park County, Colorado; MONTE GORE, individually and in his capacity as Captain of Park County Sheriff's Department; VICKIE PAULSEN, individually and in her official capacity as Registered Nurse for Park County, Colorado; JAMES BACHMAN, M.D., individually and in his official capacity as Medical Director of the Park County Jail,

Defendants.

---

TAKEN PURSUANT TO NOTICE on behalf of the Plaintiff at 824 Costilla, Fairplay, Colorado at 9:23 a.m. before Theresa A. Coffman, Federal Certified Realtime Reporter, Registered Professional Reporter and Notary Public within Colorado.

*Coffman Reporting*
303.893.0202
303.893.2230 FAX

* SUBJECT TO CONFIDENTIALITY DESIGNATIONS *

13

1    Q.    Okay. But would it be fair to say that you
2  would go into the central area where the pods are at
3  least once a week? Maybe not a full walk-through of the
4  jail, but just in there?
5    A.    I wouldn't say once a week, no.
6    Q.    Once every two weeks?
7    A.    Yeah. Once every two weeks.
8    Q.    And do you have a running total of the
9  population of the jail, how many people are being held in
10 the jail?
11   A.    If I look on the screen, I mean, for that
12 day I would know, yes.
13   Q.    It's available to you every day?
14   A.    Yeah. Pretty much, yes.
15   Q.    Now, there are certain -- I was provided by
16 your attorney, Mr. Ringel, at our request certain
17 documents concerning the personnel manual and procedure
18 for the jail facility, and there's a policy and procedure
19 manual. Is that something that you're familiar with?
20   A.    Yes.
21   Q.    And there's an introduction to that
22 document, and tragically, I don't have a copy of it, as
23 I've advised counsel. It's Park 1324. I'll just show it
24 to you. Are you familiar with this?
25   A.    Yes, I am.

* SUBJECT TO CONFIDENTIALITY DESIGNATIONS *

17

1  comply.

2       Q.      It's my understanding that the population of
3  the jail was pretty low at that time; is that correct?
4               MR. RINGEL:  Object to the form and the
5  foundation.
6       A.      I think -- trying to remember.  I don't
7  remember what their daily population was.  I do know they
8  had difficulty, yeah, keeping that population up.  But I
9  don't recall.
10      Q.      (BY MR. KORDICK)  Okay.  Now, I was provided
11 an architectural drawing of the first report.  And I
12 believe that's Park 2278?
13              MR. SARGENT:  What exhibit number is that?
14              MR. KORDICK:  It's Exhibit 29.
15      Q.      (BY MR. KORDICK)  It appears to be the
16 original architectural drawings, special systems plan,
17 second floor, the Western Corrections Group.  Do you know
18 what the Western Corrections Group --
19      A.      I think that's it.  I think that's what
20 Wesley Box -- I think that was Wesley Box's company is
21 what it was called, but I don't remember.
22      Q.      That built the facility?
23      A.      Yeah, I think that was it.  Don't quote me
24 on that.
25      Q.      Now, it says, "As built on 4/3/95."  You see

* SUBJECT TO CONFIDENTIALITY DESIGNATIONS *

Case 1:05-cv-00377-WDM-BNB   Document 157-1   Filed 02/12/07   USDC Colorado   Page 4 of 16
Carranza-Reyes v. Park County                                         Frederick William Wegener III

20

1   A.   Yes, that's correct.

2   Q.   And they were losing money, is my
3   understanding, when they were operating the jail?

4        MR. RINGEL:   Object to the foundation.

5   Q.   (BY MR. KORDICK)   Or they were losing money
6   for the county?

7        MR. RINGEL:   Object to the foundation.

8   A.   I know they were having hard times, yes.

9   Q.   (BY MR. KORDICK)   Can you count the number
10  of bunks that are shown on the original drawing?

11       MR. RINGEL:   Object to the form and
12  foundation.

13  A.   Looks like there's one, two, three, four,
14  five, six, seven, eight.

15  Q.   (BY MR. KORDICK)   Okay.

16  A.   And I don't know if this is nine or not.
17  The way it's shaded in, it makes it looks like there's
18  another bunk right here.

19  Q.   That's kind of a question mark?

20  A.   Yes.

21  Q.   Because it also looks like it has a wall
22  around that area?

23  A.   Yeah.

24  Q.   So if it were --

25       MR. RINGEL:   It's top-secret special

Case 1:05-cv-00377-WDM-BNB Document 157-1 Filed 02/12/07 USDC Colorado Page 5 of 16
Carranza-Reyes v. Park County                                    Frederick William Wegener III

21

1   segregation in the D Pod.

2                MR. SARGENT: They actually had 100 inmates

3   in that little area.

4        A.      That's a dormitory-style pod, so that's

5   what's throwing me off with that wall. Dormitory-style

6   pod normally don't have that.

7        Q.      (BY MR. KORDICK) Okay. So if it were eight

8   beds and it were double beds, it would be for 16 inmates,

9   correct?

10       A.      Yes, correct.

11       Q.      If it were nine beds, it would be for 18

12  inmates, correct?

13       A.      Correct.

14       Q.      In relationship to this Exhibit 29, it

15  doesn't show the whole jail facility, just the areas

16  where the cells are at and the central area between the

17  cells and maybe the rec room. This is the rec room,

18  isn't it?

19       A.      I believe it is.

20       Q.      Where would your office be located in

21  relationship to this?

22       A.      About right here.

23       Q.      Okay. So you're pointing to an area outside

24  of the drawing but in relatively close proximity to this

25  area, correct?

1   Q.   (BY MR. KORDICK) Okay. As a sheriff that's
2   an elected official, are you cognizant of newspaper
3   coverage of the jail and the sheriff's office?
4   A.   Yes.
5   Q.   And do you track that when articles talk
6   about -- you mentioned your quote. Is that something you
7   try to be aware of?
8   A.   One way or another, yes.
9   Q.   Are you aware of a Linda Balough, I believe
10  her name is, from the Summit Daily News?
11  A.   It's actually Balough.
12  Q.   "Baylow"?
13  A.   "Baylow."
14  Q.   So you do know who she is?
15  A.   Yes. She lives here.
16  Q.   Is that something that you normally would
17  read or permit yourself to be interviewed for? And I'm
18  referring to a nonmarked document which is not part of
19  the production, and it's a Summit Daily News article
20  dated November 21, 2003.
21  A.   Yes.
22  Q.   That's an article that you would have read,
23  correct?
24  A.   I remember talking to Linda.
25  Q.   And she quotes you in the article, doesn't

25

1  she?

2      A.      Let's take a look.  Yes, that's correct.

3              MR. RINGEL:  Lloyd, do you have any

4  objection to, subsequent to the deposition, producing any

5  newspaper articles as a supplemental disclosure?

6              MR. KORDICK:  No, I don't.  I tried to get a

7  copy machine, but they're not accessible.

8              MR. RINGEL:  I understand.

9              MR. KORDICK:  It should be marked, actually.

10             MR. RINGEL:  I'm not criticizing you of

11 anything.  I'm just wanting to get it produced.

12             MR. KORDICK:  In fact, if she would like to

13 mark the ones I'm going to mention, I could copy them

14 later.  I don't know where we're at.

15             MR. SARGENT:  What are we on?  31.

16             (Deposition Exhibit 31 was marked.)

17             MS. HOLMES:  What about Park 1234?  Are you

18 going to mark that?

19             MR. KORDICK:  No, we've already produced

20 that.  It's available to everybody.

21             MR. RINGEL:  So for purposes of the record,

22 Exhibit 31 is a Summit Daily News article.

23             MR. KORDICK:  November 21, 2003.

24             MR. RINGEL:  By?

25             MR. SARGENT:  Linda Balough.

* SUBJECT TO CONFIDENTIALITY DESIGNATIONS *

1   Q.   (BY MR. KORDICK)   Is it "Balouf"?

2   A.   Balough.

3   Q.   And it's entitled "Park County to expand its
4   money-making jail." It says, "Fairplay - Park County
5   commissioners have given Sheriff Fred Wegener and jail
6   Captain Monty Gore the go-ahead to work out a contract
7   for construction of a 100-bed expansion of the Park
8   County Jail. Most of the occupants of the jail are
9   prisoners from other counties as well as state and
10  federal agencies. The expansion will allow the jail to
11  bring in more income from outside the county," and then
12  it quotes you as saying, "We have 142 inmates right now,
13  and only 22 of them are from Park County." Is that an
14  accurate quotation of what you told her?

15  A.   As far as -- oh, the inmates we had right
16  then?

17  Q.   Yes.

18  A.   Yeah, it sounds like it.

19  Q.   So you were tracking the number of inmates
20  because it was a source of revenue, wasn't it?

21       MR. RINGEL:   Object to the form and
22  foundation.

23  A.   No. I was tracking it to know how many
24  inmates I had in the jail.

25  Q.   (BY MR. KORDICK) Okay. So "The lawmen plan

1   to continue and expand contracts with other agencies to
2   increase revenue.  Currently, the facility receives $45 a
3   day per inmate."  And then it says, "I was a little" --
4   this is a quote -- "I was a little unsure at first that
5   the state could pay us (for housing inmates,) but it is
6   so short on space that we expect to continue to expand
7   the contracts over time.  If we do this and it is
8   successful, this will be a big help to Park County," and
9   that's the quote from you; is that correct?
10       A.      That's correct.
11       Q.      And then it says, "Gore has managed the jail
12  for the last three years, building its profit margin each
13  year by bringing in paying prisoners from other counties
14  and agencies."  That accurate, that statement?
15       A.      That we've been bringing in paying
16  prisoners?
17       Q.      Building a profit margin each year by
18  bringing in paying prisoners.
19       A.      Yes.  We've been bringing in paying
20  prisoners.
21       Q.      But it's increasing your profit margin when
22  you're bringing in paying prisoners, isn't it?
23       A.      It depends.  If more staff is needed, then
24  it's -- you know, cuts down on there.  And then more
25  staff means there's more food that has to be prepared and

63

1  A.  Sure.
2  Q.  Once every two weeks, you walk through the
3  entire jail facility, more or less, correct?
4  A.  Yes.
5  Q.  And you're aware of the number of prisoners
6  that are being housed in the facility, aren't you?
7       MR. RINGEL:  Object to the form and the
8  foundation.
9  A.  I'm aware of the total number.
10 Q.  (BY MR. KORDICK)  Did you know that -- are
11 you aware that from March 1 through March 8 that prisoner
12 totals were 48, 50, 51 and got as high as 61 prisoners in
13 the D Pod?
14      MR. RINGEL:  Object to the form and the
15 foundation.
16 A.  No.
17 Q.  (BY MR. KORDICK)  You're not aware of that?
18 A.  No.  Huh-uh.
19 Q.  Were those figures available to you on your
20 computer in your office?
21 A.  No.  The only thing that's available to me
22 is the total number of prisoners in the jail.
23 Q.  Why is that?
24 A.  Because we don't break it down by pods.
25 Q.  Well, we've had materials produced to us

* SUBJECT TO CONFIDENTIALITY DESIGNATIONS *

64

1    that show that these, in fact, are broken down by pods,
2    and they show a total number of prisoners. Is that a
3    document that you didn't have?
4         A.    That's a document that I probably don't get,
5    that's correct.
6         Q.    Well, is it up to you to see that you get
7    it?
8         A.    No. I have a jail administrator to take
9    care of that.
10        Q.    And who is that?
11        A.    Monte Gore.
12              MR. RINGEL: Well, object to the form and
13   the foundation. Belatedly. Apologize. Also, I
14   apologize for interrupting, but I need to make a record.
15   For purposes of the record, with respect to the issue of
16   the incompleteness of the policy and procedure manual, I
17   would note for the record that it appears that Exhibit 5
18   is page 69 of the policy and procedure manual, and that's
19   marked Bates Number Park Reyes 1450, so it looks like
20   that maybe --
21              MR. KORDICK: Maybe it takes off again?
22              MR. RINGEL: Maybe it takes off again, but
23   it's fairly clear that this is part of the policy and
24   procedure manual and after the page 51 that Mr. Kordick
25   referred to earlier in this deposition.

76

1      Q.      (BY MR. KORDICK)  You don't recall?

2      A.      No.  That would be up to the jail

3   administrator.

4      Q.      You weren't advised that they had to clear

5   that out until the infection issue was taken care of?

6              MR. RINGEL:  Object to the form and the

7   foundation.

8      A.      They may have.  It was up to the jail

9   administrator.

10     Q.      (BY MR. KORDICK)  Now, as part of the

11  procedure manuals that you had to adopt, you adopted

12  Deposition Exhibit Number 6, didn't you, which is

13  produced at Park 1995?

14     A.      I don't know about this document.

15     Q.      Well, it was represented to us by your

16  attorney that this was a regulation that was in effect in

17  your jail that was adopted by you to regulate the

18  facility that you were in charge of.

19             MR. RINGEL:  Object to the form and the

20  foundation.

21     Q.      (BY MR. KORDICK)  Do you know if it was --

22             MR. RINGEL:  Mischaracterizes the

23  representation made by me.

24     A.      No, I don't know about the document.

25     Q.      (BY MR. KORDICK)  Okay.  So I want you to

77

1  assume that this was in effect at the time that this

2  occurrence, March 1 through March 8, 2003, occurred, that

3  this was adopted by the county. It talks about -- if you

4  look at the --

5          MR. SARGENT: Let me just object to the

6  assumption to the hypothetical that you're asking him to

7  assume, that it assumes facts not in evidence.

8          MR. RINGEL: Join. Object to the entire

9  line of questioning.

10         MR. KORDICK: Are you saying this wasn't in

11 effect at the time?

12         MR. RINGEL: You can ask him any question

13 that you want.

14         MR. KORDICK: I'm asking you.

15         MR. RINGEL: It's not my deposition.

16         MR. KORDICK: You produced this.

17         MR. RINGEL: I produced this, and it's

18 produced, but you can assume whatever you want on it.

19         MR. KORDICK: Good.

20         MR. RINGEL: It's not appropriate to assume

21 something with a witness that doesn't have any knowledge

22 of a particular document.

23         MR. SARGENT: Lloyd, my comments were based

24 on what we learned at Dr. Bachman's deposition when he

25 said he wasn't aware of it and hadn't seen that document

78

1   at that time.  So that was the basis for my objection.
2       Q.      (BY MR. KORDICK)  Well, do you know if --
3   first of all, do you know, is there some way to determine
4   whether or not this communicable disease document that
5   was produced to us as part of your regulation in fact is
6   part of your regulation?
7       A.      I'd have to ask the jail administrator if
8   this was an amendment to something.  I don't know.  I'd
9   have to --
10      Q.      Is it fair to say you've never read your own
11  regulations?
12              MR. RINGEL:  Object to the form and the
13  foundation.
14      A.      Do I read every single -- every single one?
15      Q.      (BY MR. KORDICK)  Is it fair to say that you
16  haven't read the regulations?
17              MR. RINGEL:  Object to the form and the
18  foundation.
19      A.      There are ones I read.  There are some I
20  don't.
21      Q.      (BY MR. KORDICK)  So you haven't read all
22  the regulations?
23      A.      No.  I don't read all the regulations.
24      Q.      And you presented these regulations to be
25  adopted because you had to adopt them to be able to take

* SUBJECT TO CONFIDENTIALITY DESIGNATIONS *

```
                                                                79
```

1   Department of Corrections prisoners and detainees from

2   the department -- from the INS; is that right?

3              MR. RINGEL:  Object to the form and the

4   foundation.

5        A.    No.

6        Q.    (BY MR. KORDICK)  No?

7        A.    No.

8        Q.    Why didn't you read them if you adopted

9   them?

10             MR. RINGEL:  Object to the form and the

11  foundation.

12       A.    Why don't I read every single one?

13       Q.    (BY MR. KORDICK)  Yes.

14       A.    I don't have that much time on my hands, but

15  the jail administrator probably looked over them, and I

16  go with what his recommendation was.

17       Q.    Let's assume hypothetically that this is one

18  of your regulations, and let's go to the second paragraph

19  of Deposition Exhibit 6.  Well, the first paragraph.  It

20  says, "A communicable or infectious disease is one which

21  can be transmitted from one person to another.  There are

22  various methods of transmission, some direct and others

23  indirect."  Correct?

24             MR. RINGEL:  Object to the form and the

25  foundation.

* SUBJECT TO CONFIDENTIALITY DESIGNATIONS *

80

1    A.    Yeah. That's what it says.

2    Q.    (BY MR. KORDICK) Do you agree with that,
3    based upon your knowledge as a sheriff and running jails?

4    A.    Yeah. That's probably true.

5    Q.    Okay. And the second paragraph says, In a
6    jail, like any place where people are obliged to live
7    together in close contact, communicable diseases can be a
8    big problem. Disease can spread rapidly through the jail
9    infecting inmates and staff alike. For that reason, it
10   is very important to be aware of the possibility that an
11   inmate has an infectious disease and then to know what to
12   do about it." Would you agree with that?

13         MR. SARGENT: Form and foundation.

14         MR. RINGEL: Join.

15   A.    Same.

16   Q.    (BY MR. KORDICK) Is this an appropriate
17   regulation?

18   A.    Oh, yes.

19         MR. SARGENT: Object to the farm.

20         MR. RINGEL: Form and foundation.

21   A.    It could be a very good regulation.

22         MR. SARGENT: Lloyd, can I just have a
23   continuing objection to form and foundation so I don't
24   have to keep interrupting --

25         MR. KORDICK: Yes.

* SUBJECT TO CONFIDENTIALITY DESIGNATIONS *