**EXHIBIT**

**A-48**

4 of 14 DOCUMENTS



Analysis
As of: Feb 06, 2007

SUZANNE M. BARTH, Plaintiff, v. VILLAGE OF MOKENA, STEPHEN J.
POLLAK, CHIEF OF THE VILLAGE OF MOKENA POLICE DEPARTMENT, in
his official and individual capacity, DONALD DREESBACH, in his individual ca-
pacity, SERGEANT JOHN GORMAN, in his individual capacity, Defendants.

No. 03 C 6677

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF
ILLINOIS, EASTERN DIVISION

*2006 U.S. Dist. LEXIS 19702; 97 Fair Empl. Prac. Cas. (BNA) 1764*

**March 31, 2006, Decided**

**PRIOR HISTORY:** *Barth v. Mokena, 2004 U.S. Dist.
LEXIS 8316 (N.D. Ill., May 7, 2004)*

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff former police
officer sued defendants, a village, its police chief, and
two police sergeants, under Title VII of the Civil Rights
Act of 1964, 42 U.S.C.S. § 2000e et seq., for hostile
work environment sexual harassment and retaliation and
under 42 U.S.C.S. § 1983 for First Amendment and
equal protection violations. The parties consented to the
jurisdiction of a magistrate. Defendants filed motions for
summary judgment and to strike.

**OVERVIEW:** The officer alleged, inter alia, that she
was subjected to derogatory and sexually explicit com-
ments, that the sergeants ignored her complaints of har-
assment, and that the sergeants failed on multiple occa-
sions to provide her with police backup. Portions of the
officer's filings were stricken for failure to comply with
N.D. Ill. Loc. R. 56.1. The Title VII retaliation claim
against the village was not shown to have been timely
filed. The Title VII hostile environment claim against the
village survived, as the alleged failure to provide backup
was sufficient to allow a jury to find an objectively hos-
tile work environment. There was a sufficient showing of
a custom of harassment and discriminatory intent to sup-
port the equal protection claims against the village and
the sergeants. The First Amendment retaliation claim

against the village failed absent evidence of a policy or
custom, but the claims against the sergeants survived, as
the officer's complaints concerning backup were consti-
tutionally protected and there were fact issues as to cau-
sation. The chief was entitled to qualified immunity on
the 42 U.S.C.S. § 1983 claims; there was no showing of
deliberate indifference.

**OUTCOME:** Defendants' motions to strike were granted
as to certain portions of the officer's summary judgment
filings and were otherwise denied. The village's motions
for summary judgment were granted as to the Title VII
retaliation and First Amendment retaliation claims and
were otherwise denied. The sergeants' summary judg-
ment motions were denied. The chief's summary judg-
ment motion was granted.

**LexisNexis(R) Headnotes**

*Civil Procedure > Summary Judgment > Motions for
Summary Judgment > General Overview*
*Civil Procedure > Summary Judgment > Supporting
Materials > General Overview*
[HN1] The language of the United States District Court
for the Northern District of Illinois's Standing Order on
Summary Judgment is quite clear that strict compliance
with N.D. Ill. Loc. R. 56.1 is expected. The United States
Court of Appeals for the Seventh Circuit, moreover, has
repeatedly held that a district court is entitled to expect

Case 1:05-cv-00377-WDM-BNB   Document 157-7   Filed 02/12/07   USDC Colorado   Page 2 of 37

Page 2
2006 U.S. Dist. LEXIS 19702, *; 97 Fair Empl. Prac. Cas. (BNA) 1764

strict compliance with Rule 56.1. As substantial compliance is not strict compliance, it logically follows that neither is incomplete compliance.

*Civil Procedure > Summary Judgment > Motions for Summary Judgment > General Overview*
[HN2] Motions for summary judgment and responses must comply with N.D. Ill. Loc. R. 56.1(a) and (b), as well as the procedures outlined in the United States District Court for the Northern District of Illinois's Standing Order on Summary Judgment. Failure to abide by the Local Rules may result in the court striking briefs, disregarding statements of fact, deeming statements of fact admitted, or denying summary judgment.

*Civil Procedure > Summary Judgment > Motions for Summary Judgment > General Overview*
*Civil Procedure > Summary Judgment > Opposition > Supporting Materials*
*Civil Procedure > Summary Judgment > Supporting Materials > General Overview*
[HN3] Under N.D. Ill. Loc. R. 56.1, a movant must file a statement of material facts as to which the moving party contends there is no genuine issue and that entitle the moving party to a judgment as a matter of law. The statement shall consist of short numbered paragraphs, including within each paragraph specific references to the affidavits, parts of the record, and other supporting materials relied upon to support the facts set forth in that paragraph. Rule 56.1(a)(3). As to a non-movant's response and statement of additional facts, the United States District Court for the Northern District of Illinois has similarly construed Rule 56.1 to set out requirements for a non-movant that are identical to obligations imposed on a movant's statement of facts. Stated another way, for movants and non-movants alike, three operative concepts animate this rule: facts, short, and specific.

*Civil Procedure > Summary Judgment > Supporting Materials > Affidavits*
*Civil Procedure > Summary Judgment > Supporting Materials > Discovery Materials*
[HN4] Courts in the Seventh Circuit have long construed "specific references to the affidavits, parts of the record, and other supporting materials" under N.D. Ill. Loc. R. 56.1 (and its predecessor N.D. Ill. Loc. R. 12(n)) to include answers to interrogatories. The purpose of summary judgment is to determine whether there is any genuine issue of material fact in dispute and, if not, to render judgment in accordance with the law as applied to the established facts. The facts must be established through one of the vehicles designed to ensure reliability

and veracity--depositions, answers to interrogatories, admissions and affidavits.

*Civil Procedure > Summary Judgment > Supporting Materials > Memoranda of Law*
[HN5] N.D. Ill. Loc. R. 56.1 statements do not abrogate a party's obligation to recite its version of the facts in its supporting memorandum; it is simply inappropriate in one's memo to simply refer the court to the Rule 56.1 statement.

*Civil Procedure > Summary Judgment > Motions for Summary Judgment > General Overview*
*Civil Procedure > Summary Judgment > Opposition > General Overview*
*Civil Procedure > Summary Judgment > Supporting Materials > General Overview*
[HN6] A court is tasked with holding both sides to the same strict standards of compliance with N.D. Ill. Loc. R. 56.1.

*Civil Procedure > Summary Judgment > Opposition > General Overview*
*Civil Procedure > Summary Judgment > Supporting Materials > General Overview*
[HN7] N.D. Ill. Loc. R. 56.1 does not allow for either replies or surreplies to an opponent's fact response.

*Civil Procedure > Summary Judgment > Supporting Materials > General Overview*
[HN8] N.D. Ill. Loc. R. 56.1(a) paragraphs must include specific references to the affidavits, parts of the record, and other supporting material relied upon to support the facts set forth. Rule 56.1(a)(3). "Specific reference" means including proper Bluebook citations, which must include page (or paragraph) numbers, as opposed to simply citing an entire deposition, affidavit, or other exhibit document. Factual allegations not properly supported by citation to the record are nullities.

*Civil Procedure > Summary Judgment > Supporting Materials > General Overview*
[HN9] A court is fully capable of examining parties' factual statements under N.D. Ill. Loc. R. 56.1 to determine which facts should be considered and which should not.

*Civil Procedure > Summary Judgment > Supporting Materials > General Overview*

2006 U.S. Dist. LEXIS 19702, *; 97 Fair Empl. Prac. Cas. (BNA) 1764

[HN10] It is inappropriate to allege legal conclusions in an N.D. Ill. Loc. R. 56.1(a) statement on the off-chance that one's opponents might not file a correct response.

*Evidence > Hearsay > Rule Components > General Overview*
[HN11] Fed. R. Evid. 801(c) defines hearsay as a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.

*Evidence > Hearsay > Rule Components > General Overview*
[HN12] Not all out-of-court declarations amount to inadmissible hearsay. For example, an out-of-court statement offered to establish a statement was made and it had an effect on the listener is not contrary to the general hearsay rule.

*Evidence > Relevance > General Overview*
*Labor & Employment Law > Discrimination > Harassment > Sexual Harassment > Hostile Work Environment*
[HN13] Evidence relating to conduct not witnessed by a plaintiff can be relevant and admissible on issues of hostile work environment, employer liability, and municipal liability.

*Civil Procedure > Summary Judgment > Evidence*
*Civil Procedure > Summary Judgment > Supporting Materials > Discovery Materials*
[HN14] While use of answers to interrogatories are acceptable under N.D. Ill. Loc. R. 56.1 to support a statement, there still must be grounds to admit the statement.

*Civil Procedure > Summary Judgment > Supporting Materials > General Overview*
[HN15] An N.D. Ill. Loc. R. 56.1 statement should contain only factual allegations.

*Civil Procedure > Summary Judgment > Opposition > Supporting Materials*
*Civil Procedure > Summary Judgment > Supporting Materials > General Overview*
[HN16] N.D. Ill. Loc. R. 56.1 imposes a brevity requirement on non-movants. It also, however, imposes brevity on movants. The numbered paragraphs should be short; they should contain only one or two individual allegations, thereby allowing easy response. Rule

56.1(b)(3)(B) corresponds to Rule 56.1(a)(3); it sets out requirements for the non-movant's statement of additional facts that are identical to the obligations imposed on the movant's statement of facts.

*Civil Procedure > Summary Judgment > Supporting Materials > Affidavits*
[HN17] See Fed. R. Civ. P. 56(e).

*Civil Procedure > Summary Judgment > Opposition > Supporting Materials*
*Civil Procedure > Summary Judgment > Supporting Materials > General Overview*
[HN18] Supporting documents submitted with a summary judgment motion that are not referred to in a statement of facts will be ignored, as will unused portions of documents accompanying responses or additional statement of facts.

*Civil Procedure > Summary Judgment > Opposition > Supporting Materials*
[HN19] N.D. Ill. Loc. R. 56.1(b)(3)(B) provides the only acceptable means of presenting additional facts.

*Civil Procedure > Summary Judgment > Opposition > Supporting Materials*
[HN20] An N.D. Ill. Loc. R. 56.1(b)(3)(A) response is not the place for purely argumentative denials.

*Civil Procedure > Summary Judgment > Burdens of Production & Proof > Movants*
*Civil Procedure > Summary Judgment > Evidence*
*Labor & Employment Law > Discrimination > General Overview*
[HN21] Familiar Fed. R. Civ. P. 56 principles impose on summary judgment movants the burden of establishing the lack of a genuine issue of material fact necessitating trial. At this stage, courts do not weigh evidence or determine the truth of matters asserted. Instead, courts must consider the evidentiary record in the light most favorable to the non-moving party and draw all reasonable inferences in its favor as well. The general standard is also applied with rigor in employment discrimination cases, where intent is inevitably the central issue.

*Civil Procedure > Summary Judgment > Burdens of Production & Proof > Absence of Essential Element of Claim*

2006 U.S. Dist. LEXIS 19702, *; 97 Fair Empl. Prac. Cas. (BNA) 1764

*Civil Procedure > Summary Judgment > Burdens of Production & Proof > Scintilla Rule*
[HN22] To avoid summary judgment a non-movant must produce more than a scintilla of evidence to support her position that a genuine issue of material fact exists. Nevertheless, if a non-moving party fails to make a sufficient showing on an essential element of her case, the moving party is entitled to judgment as a matter of law.

*Civil Procedure > Summary Judgment > Standards > Appropriateness*
[HN23] For the purpose of summary judgment, where facts are contested a court accepts the legitimate factual assertions of the non-moving party.

*Civil Procedure > Justiciability > Exhaustion of Remedies > Administrative Remedies*
*Evidence > Procedural Considerations > Burdens of Proof > Allocation*
*Governments > Legislation > Statutes of Limitations > Pleading & Proof*
[HN24] The burden of proving that a plaintiff has exhausted her administrative remedies and timely filed suit rests with the defendants.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Affirmative Defenses*
*Civil Procedure > Pleading & Practice > Pleadings > Answers*
[HN25] Fed. R. Civ. P. 8(c) requires a defendant to plead affirmative defenses in its answer to a complaint.

*Labor & Employment Law > U.S. Equal Employment Opportunity Commission > Exhaustion of Remedies > General Overview*
[HN26] Generally, claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C.S. § 2000e et seq., not raised before the Equal Employment Opportunity Commission (EEOC) will not be allowed. Courts, nevertheless, have allowed litigants to proceed on claims not explicitly set forth in an agency filing if (1) the claim is like or reasonably related to the EEOC charge, and (2) the claim in the complaint reasonably could be expected to grow out of an EEOC investigation of the charge. The claims are not alike or reasonably related unless there is a factual relationship between them. This means that the EEOC charge and the complaint must, at minimum, describe the same conduct and implicate the same individuals.

*Labor & Employment Law > U.S. Equal Employment Opportunity Commission > Time Limitations > General Overview*
[HN27] In general, a plaintiff in a federal employment discrimination case must file a charge of discrimination with the Equal Employment Opportunity Commission (EEOC) within 180 days of the unlawful employment practice underlying the complaint. 42 U.S.C.S. § 2000e-5(e). Illinois, however, is a "deferral state," which grants an extension for a plaintiff to file her charge until 300 days after the alleged unlawful employment practice.

*Labor & Employment Law > Discrimination > Actionable Discrimination*
*Labor & Employment Law > Discrimination > Harassment > Sexual Harassment > Hostile Work Environment*
*Labor & Employment Law > Discrimination > Harassment > Sexual Harassment > Statutes of Limitations*
[HN28] Discrete acts of discrimination occur when they happen. Title VII of the Civil Rights Act of 1964, 42 U.S.C.S. § 2000e et seq., precludes recovery for discrete acts of discrimination or retaliation that occur outside the statutory time period. Consideration of the entire scope of a hostile work environment claim, including behavior alleged outside the statutory time period, is permissible for the purposes of assessing liability, so long as an act contributing to that hostile environment takes place within the statutory time period.

*Labor & Employment Law > Discrimination > Actionable Discrimination*
*Labor & Employment Law > Discrimination > Retaliation > General Overview*
[HN29] Retaliatory incidents, unlike harassment, need not accumulate to be actionable. Each retaliatory adverse employment decision constitutes a separate actionable unlawful employment practice that starts a new clock.

*Civil Procedure > Summary Judgment > Supporting Materials > General Overview*
[HN30] As courts often repeat to litigants at the summary judgment stage, it is not the duty of the courts to scour a record. Judges are not like pigs, hunting for truffles buried in the record.

*Governments > Legislation > Statutes of Limitations > General Overview*
[HN31] By its nature, an untimeliness defense is a time-specific inquiry.

2006 U.S. Dist. LEXIS 19702, *; 97 Fair Empl. Prac. Cas. (BNA) 1764

*Labor & Employment Law > Discrimination > Harassment > Sexual Harassment > Hostile Work Environment*
[HN32] A Title VII of the Civil Rights Act of 1964, 42 U.S.C.S. § 2000e et seq., violation can occur if a plaintiff can prove she was subjected to a hostile work environment. In order for a plaintiff to make a prima facie case of actionable hostile environment sexual harassment, she must demonstrate that: (1) she was subjected to unwelcome sexual harassment; (2) the harassment was based on sex; (3) the harassment was sufficiently severe or pervasive to alter the conditions of her employment and create an intimidating, hostile or offensive working environment; and (4) there is a basis for employer liability.

*Labor & Employment Law > Discrimination > Harassment > Sexual Harassment > Hostile Work Environment*
[HN33] In order to prevail under the third element of a hostile work environment claim--that the harassment sufficiently severe or pervasive to alter the conditions of her employment and create an intimidating, hostile or offensive working environment--a plaintiff must show that the her work environment was both subjectively and objectively hostile.

*Labor & Employment Law > Discrimination > Harassment > Sexual Harassment > Hostile Work Environment*
[HN34] A hostile work environment determination is to be made in the light of the record as a whole and the totality of circumstances, such as the nature of sexual advances and the context in which the alleged incidents occurred. The resolution of this fact-intensive inquiry is not, and by its nature cannot be, mathematically precise test. Courts are to consider the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.

*Labor & Employment Law > Discrimination > Harassment > Sexual Harassment > Hostile Work Environment*
[HN35] For purposes of a hostile work environment sexual harassment claim, comments by co-workers and superiors not directed at a plaintiff but made in her presence would be classified as "second-hand" harassment. While relevant, such "second-hand" harassment is considered to be less objectionable than harassment directed

at the plaintiff. Moreover, a handful of gender-based comments over the course of several years are too isolated and sporadic to constitute severe and pervasive harassment.

*Labor & Employment Law > Discrimination > Harassment > Sexual Harassment > Employment Practices > General Overview*
*Labor & Employment Law > Discrimination > Harassment > Sexual Harassment > Hostile Work Environment*
[HN36] Courts have found failure to provide backup, even on isolated occasions, as sufficiently severe and pervasive to alter the conditions of a police officer's employment and create a hostile work environment. It is not a stretch of reason for a trier of fact to conclude that failure to provide backup to be sufficiently severe (i.e., threatening to the wellbeing of an officer, demoralizing and humiliating at the very least, and interfering with an officer's carrying out her job functions on the street) that the officer's place of employment becomes a hostile and offensive one.

*Labor & Employment Law > Discrimination > Harassment > Sexual Harassment > Defenses & Exceptions > Antiharassment Policy*
*Labor & Employment Law > Discrimination > Harassment > Sexual Harassment > Hostile Work Environment*
[HN37] Once a court concludes that discriminatory conduct was sufficiently severe or pervasive to create an abusive working environment, an employer's liability for hostile work environment sexual harassment is triggered. The fourth prong of the hostile work environment test focuses on whether liability will attach, and that question turns on the United States Supreme Court's companion decisions in Ellerth and Faragher. The Ellerth/Faragher affirmative defense is comprised of two elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.

*Labor & Employment Law > Discrimination > Harassment > Sexual Harassment > Defenses & Exceptions > Antiharassment Policy*
*Labor & Employment Law > Discrimination > Harassment > Sexual Harassment > Employer Liability > Coworkers*

*Labor & Employment Law > Discrimination > Harassment > Sexual Harassment > Employer Liability > Supervisors*
[HN38] Sexual harassment by a supervisor triggers strict liability if there was a tangible employment action. If there was no tangible employment action or the harasser was a mere co-worker, then, and only then, is the Ellerth/Faragher affirmative defense available. Whether a plaintiff has developed a sufficient record to get to trial can be established under either the supervisor or the co-worker "fork in the road."

*Labor & Employment Law > Discrimination > Harassment > Sexual Harassment > Defenses & Exceptions > Antiharassment Policy*
[HN39] The Ellerth/Faragher affirmative defense to sexual harassment is only available in the absence of a tangible employment action.

*Labor & Employment Law > Discrimination > Harassment > Sexual Harassment > Defenses & Exceptions > Antiharassment Policy*
[HN40] For purposes of the Ellerth/Faragher affirmative defense to sexual harassment, an employer's knowledge of misconduct is what is critical, not how the employer came to have that knowledge.

*Civil Rights Law > Practice & Procedure > Continuing Violations*
*Civil Rights Law > Practice & Procedure > Limitation Periods*
[HN41] The statute of limitations for 42 U.S.C.S. § 1983 actions in Illinois is two years. The United States Supreme Court's Morgan decision, although framed around Title VII of the Civil Rights Act of 1964, 42 U.S.C.S. § 2000e et seq., is applicable to 42 U.S.C.S. § 1983.

*Civil Rights Law > Immunity From Liability > Local Officials > Customs & Policies*
[HN42] A government entity, such as a municipality, is only liable under 42 U.S.C.S. § 1983 when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts injury.

*Civil Rights Law > Immunity From Liability > Local Officials > Customs & Policies*
*Civil Rights Law > Immunity From Liability > Local Officials > Direct Causal Links*

*Civil Rights Law > Immunity From Liability > Respondeat Superior Distinguished*
[HN43] Municipal liability under 42 U.S.C.S. § 1983 is had when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts injury. However, municipality liability under § 1983 cannot be based upon theories akin to respondeat superior. To prevail, a plaintiff must establish both the requisite culpability (a "policy or custom" attributable to municipal policymakers), and the requisite causation (the policy or custom was the "moving force" behind the constitutional depravation. Actionable policies or customs under § 1983 take three forms: (1) express policy that, when enforced, causes a constitutional deprivation; (2) a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a "custom or usage" with the force of law; or (3) an allegation that the constitutional injury caused by a person with final policymaking authority. An express municipal policy need not be alleged in order for a plaintiff to state an actionable claim.

*Civil Procedure > Trials > Jury Trials > Province of Court & Jury*
*Civil Rights Law > Immunity From Liability > Local Officials > Customs & Policies*
[HN44] The question of whether a government official is a final policymaker for purposes of 42 U.S.C.S. § 1983 is a question of law for the court. United States Supreme Court cases on the liability of governments under § 1983 instruct courts to ask whether governmental officials are final policymakers for the local government in a particular area, or on a particular issue. Generally, courts are to turn to state or local law to identify those officials or government bodies who speak with final policymaking authority. Final policymaking authority, however, can be found off the pages of a municipal ordinance or code, namely where a municipal official with final policymaking authority ratifies a subordinate's unconstitutional act. Delegation by a final decisionmaker is insufficient to impose municipal liability, but adoption or ratification of subordinate's act as the decisionmaker's own act makes the municipality the author of the action for purposes of § 1983.

*Governments > Local Governments > Administrative Boards*
*Governments > Local Governments > Police Power*
[HN45] A municipal board of commissioners may be the final policymaker under 65 Ill. Comp. Stat. 5/10-2.1-17 with respect to removal and discharge of police officers, but the statute does not purport to address all matters of

2006 U.S. Dist. LEXIS 19702, *; 97 Fair Empl. Prac. Cas. (BNA) 1764

police department policy, such as policies establishing the terms and conditions of employment.

*Civil Procedure > Summary Judgment > Opposition > Supporting Materials*
[HN46] N.D. Ill. Loc. R. 56.1(b)(3)(B), not Rule 56.1(b)(3)(A), provides the only acceptable means of presenting additional facts.

*Civil Procedure > Summary Judgment > Opposition > Memoranda in Opposition*
*Civil Procedure > Summary Judgment > Supporting Materials > Memoranda of Law*
[HN47] For summary judgment purposes, courts are under no obligation to scour a record to find support for either side. A court will not scour a record to locate evidence supporting a party's legal argument.

*Civil Rights Law > Immunity From Liability > Local Officials > Customs & Policies*
*Civil Rights Law > Immunity From Liability > Respondeat Superior Distinguished*
[HN48] For purposes of municipal liability under 42 U.S.C.S. § 1983, delegation of authority is clearly distinct from ratification of a subordinate's bad acts. For if a municipality were liable for employees' actions that it authorized but did not direct, courts would be back in the world of respondeat superior.

*Civil Procedure > Summary Judgment > Opposition > Memoranda in Opposition*
*Civil Procedure > Summary Judgment > Opposition > Supporting Materials*
[HN49] For summary judgment purposes, simply providing additional facts in one's responsive memorandum is insufficient to put those facts before the court. Factual allegations not properly supported by the record are nullities.

*Civil Rights Law > Immunity From Liability > Local Officials > Knowledge*
[HN50] For purposes of municipal liability under 42 U.S.C.S. § 1983, a plaintiff must show that there was some knowledge or awareness--actual or imputed--of a custom and its consequences showing the municipality's approval, acquiescence, or encouragement of an alleged unconstitutional violation.

*Civil Rights Law > Immunity From Liability > Local Officials > Customs & Policies*
*Civil Rights Law > Immunity From Liability > Local Officials > Knowledge*
[HN51] For purposes of a 42 U.S.C.S. § 1983 claim against a municipality, the usual way in which an unconstitutional policy is inferred, in the absence of direct evidence, is by showing a series of bad acts and inviting the court to infer from them that the policymaking level of government was bound to have noticed what was going on and by failing to do anything must have encouraged or at least condoned, thus in either event adopting, the misconduct of subordinate officers.

*Civil Rights Law > Section 1983 Actions > Elements > General Overview*
*Constitutional Law > Bill of Rights > Fundamental Freedoms > Freedom of Speech > Public Employees*
[HN52] In evaluating a 42 U.S.C.S. § 1983 claim for retaliation in violation of a public employee's First Amendment rights, courts are to apply a three-step analysis derived out of the United States Supreme Court's Mt. Healthy decision. The court, the plaintiff, and the defendant all play a part in the inquiry. First, a court must determine the employee's speech was constitutionally protected. Second, the plaintiff must demonstrate that the speech was either a substantial or motivating factor in the retaliation. Lastly, the defendant has an opportunity to establish the same employment action would have been taken in the absence of the speech. Yet, § 1983 creates a cause of action based on personal liability and predicated upon fault; thus, liability does not attach unless the individual defendant caused or participated in a constitutional deprivation.

*Civil Procedure > Trials > Jury Trials > Province of Court & Jury*
*Constitutional Law > Bill of Rights > Fundamental Freedoms > Freedom of Speech > Public Employees*
[HN53] To qualify as protected by the First Amendment, a public employee's speech must be that of a citizen on a matter of public concern. The public concern determination is a question of law to be decided by the court. Whether speech qualifies as a public concern must be determined by the content, form, and context of a given statement, as revealed by the record as a whole. Of this trio, the content of the speech is the most important consideration.

*Constitutional Law > Bill of Rights > Fundamental Freedoms > Freedom of Speech > Public Employees*

Case 1:05-cv-00377-WDM-BNB   Document 157-7   Filed 02/12/07   USDC Colorado   Page 8 of 37

Page 8

2006 U.S. Dist. LEXIS 19702, *; 97 Fair Empl. Prac. Cas. (BNA) 1764

[HN54] For purposes of a First Amendment claim, a police officer's complaints about being denied backup raise the issues of officer safety and public safety, both matters of public concern. Speech related to law enforcement that has an impact on public safety is speech touching on a matter of public concern, even if the speaker was partly motivated by personal concerns.

*Constitutional Law > Bill of Rights > Fundamental Freedoms > Freedom of Speech > Public Employees*
[HN55] For purposes of a First Amendment claim by a public employee, while sexual harassment and gender discrimination are inherently subjects of public interest, speech about harassment and discrimination do not rise to the level of public concern if the expression addresses only the personal effect upon the employee.

*Civil Procedure > Summary Judgment > Burdens of Production & Proof > Nonmovants*
*Civil Rights Law > Immunity From Liability > Local Officials > Customs & Policies*
*Constitutional Law > Bill of Rights > Fundamental Freedoms > Freedom of Speech > Public Employees*
[HN56] In order to survive a municipality's summary judgment effort against an employee's First Amendment claim, the employee must establish that the deprivation of her constitutional right to free speech was caused by a municipality policy or custom.

*Civil Rights Law > Immunity From Liability > Local Officials > General Overview*
*Civil Rights Law > Section 1983 Actions > Government Actions*
[HN57] For 42 U.S.C.S. § 1983 purposes, proof that a municipality's authorized decisionmaker has intentionally deprived a plaintiff of a federally protected right necessarily establishes that the municipality acted culpably. Municipal liability, however, can only attach to the actions of an employee who lacks final policymaking authority if the municipality ratified the employee's acts. A plaintiff seeking to establish a § 1983 claim against a municipality based on a "ratification" theory must allege that a municipal official with final policymaking authority approved the subordinate's decision and the basis for it.

*Civil Rights Law > Section 1983 Actions > Elements > Protected Rights*
*Constitutional Law > Equal Protection > General Overview*

[HN58] In order to prevail on an equal protection claim under 42 U.S.C.S. § 1983, a plaintiff must show that (1) the defendants acted with nefarious discriminatory purpose, and (2) discriminated against her based on her membership in a definable class. Moreover, a plaintiff must demonstrate intentional or purposeful discrimination to establish an equal protection violation. Discriminatory purpose, however, implies more than intent as volition or intent as awareness of consequences. It implies that a decisionmaker singled out a particular group for disparate treatment and selected his course of action at least in part for the purpose of causing its adverse effects on the identifiable group. In other words, a showing of intentional action or action with deliberate indifference is sufficient for § 1983 liability to take hold.

*Civil Procedure > Summary Judgment > Standards > General Overview*
*Evidence > Testimony > Credibility > General Overview*
[HN59] At the summary judgment stage, it is not a court's role to make a credibility determination.

*Constitutional Law > Equal Protection > General Overview*
[HN60] The core of any equal protection case is, of course, a showing of intentional discrimination. A plaintiff must show the defendant acted either intentionally or with deliberative indifference. A single discriminatory act against one individual can amount to intentional discrimination for equal protection purposes. An equal protection plaintiff need not prove a discriminatory policy against an entire class; discrimination against the plaintiff because of her membership in the class by itself is enough.

*Civil Rights Law > Section 1983 Actions > Elements > Protected Rights*
*Constitutional Law > Bill of Rights > Fundamental Freedoms > Freedom of Speech > General Overview*
*Constitutional Law > Equal Protection > Scope of Protection*
*Labor & Employment Law > Discrimination > Retaliation > Statutory Application > Title VII of the Civil Rights Act of 1964 > General Overview*
[HN61] Claims of retaliation are traditionally vindicated under the First Amendment (through 42 U.S.C.S. § 1983) or Title VII of the Civil Rights Act of 1964, 42 U.S.C.S. § 2000e et seq., but not the Equal Protection Clause. What might be construed as retaliatory conduct for a First Amendment or Title VII claim needs to be shown to be based on gender animus for it to fit within a 42 U.S.C.S. § 1983 equal protection framework.

Case 1:05-cv-00377-WDM-BNB   Document 157-7   Filed 02/12/07   USDC Colorado   Page 9 of 37

Page 9

2006 U.S. Dist. LEXIS 19702, *; 97 Fair Empl. Prac. Cas. (BNA) 1764

*Civil Rights Law > Section 1983 Actions > Elements > Protected Rights*
*Constitutional Law > Bill of Rights > Fundamental Freedoms > Freedom of Speech > Public Employees*
[HN62] To state a claim under 42 U.S.C.S. § 1983 for retaliation based on free speech: (1) a court must determine that the speech in question was on a matter of public concern; (2) the plaintiff must show that her speech was a motivating factor in the defendant's retaliatory action; and (3) the defendant cannot show that her interests outweigh the plaintiff's rights.

*Civil Procedure > Trials > Jury Trials > Province of Court & Jury*
*Constitutional Law > Bill of Rights > Fundamental Freedoms > Freedom of Speech > Scope of Freedom*
[HN63] Whether a plaintiff's speech is constitutionally protected is a question of law for a court to reach and not the plaintiff.

*Civil Procedure > Counsel > General Overview*
[HN64] Courts are not equipped to act as auxiliary lawyer for a represented party, and identification, framing, and argument of the issues is a task for counsel, not the courts.

*Civil Procedure > Summary Judgment > General Overview*
*Constitutional Law > Bill of Rights > Fundamental Freedoms > Freedom of Speech > Public Employees*
[HN65] To state a claim under 42 U.S.C.S. § 1983 for retaliation based on free speech, a plaintiff must show that her speech was a motivating factor in the defendant's retaliatory action. A motivating factor is a factor that played a substantial part in the retaliatory act. Courts should be particularly leery of resolving issues involving state of mind on summary judgment, including the motivating factor.

*Civil Rights Law > Section 1983 Actions > Elements > Causal Relationship*
*Constitutional Law > Bill of Rights > Fundamental Freedoms > Freedom of Speech > Public Employees*
[HN66] Credibility and questions of intent or bad faith are part of the causation calculus in an action under 42 U.S.C.S. § 1983 for retaliation based on free speech.

*Civil Rights Law > Immunity From Liability > Defenses*
[HN67] Once an officer raises the qualified immunity defense, courts follow a two-step analysis to determine whether the defendant is entitled to this defense. First, courts determine whether the alleged conduct, if true, sets out a constitutional violation. If a violation is sustained, courts then seek to determine whether the right was so clearly established at the time of the alleged violation that a reasonable officer would know that his actions were unconstitutional.

*Civil Rights Law > Immunity From Liability > Local Officials > Deliberate Indifference*
*Civil Rights Law > Immunity From Liability > Local Officials > Knowledge*
*Civil Rights Law > Section 1983 Actions > Elements > Color of State Law > General Overview*
*Civil Rights Law > Section 1983 Actions > Elements > Protected Rights*
[HN68] To state a claim under 42 U.S.C.S. § 1983 requires proof that a defendant acted under color of law and that this defendant's conduct violated a plaintiff's right secured by the United States Constitution or a federal law. To be held liable for conduct of their subordinates, supervisors must have been personally involved in that conduct or facilitate it, approve it, condone it, or turn a blind eye. They must in other words act either knowingly or with deliberate, reckless indifference.

*Civil Rights Law > Immunity From Liability > Defenses*
[HN69] Qualified immunity protects all but the plainly incompetent or those who knowingly violate the law. The qualified immunity defense provides ample room for mistakes in judgment.

*Constitutional Law > Equal Protection > Gender & Sex*
[HN70] It has been plain in the Seventh Circuit for quite some time that arbitrary gender-based discrimination violates the Equal Protection Clause. In 1986, the United States Court of Appeals for the Seventh Circuit held that sexual harassment constitutes sex discrimination in violation of the Equal Protection Clause. In 1997, it was well established that perpetrating, tolerating or willfully ignoring gender-based harassment violates the Fourteenth Amendment.

*Constitutional Law > Bill of Rights > Fundamental Freedoms > Freedom of Speech > Public Employees*

2006 U.S. Dist. LEXIS 19702, *; 97 Fair Empl. Prac. Cas. (BNA) 1764

[HN71] The United States Court of Appeals for the Seventh Circuit has long held an employee has a right to speak on matters of public concern. It has been well-established for many years that a public employer may not retaliate against an employee who exercises his First Amendment speech rights.

**COUNSEL:** [*1] For Suzanne M Barth, Plaintiff: Dana L. Kurtz, Kurtz Law Offices, LLC, Lockport, IL.; Christopher N. Mammel, Roy R Brandys, Ryan A Haas, Childress Duffy Goldblatt, Ltd, Chicago, IL.

For Village of Mokena, Defendants: Patrick John Ruberry, Jeannine Stephanie Gilleran, Philip F Cuevas, Dowd & Dowd, Ltd, Chicago, IL.; Christopher Scott Ward, McKeown, Fitzgerald, Zollner, Buck, Sangmeister & Hutchison, Joliet, IL.

For Chief of Police, Chief of the Village of Mokena Police Department, in his official and individual capacity., Defendant: Christopher Scott Ward, McKeown, Fitzgerald, Zollner, Buck, Sangmeister & Hutchison, Joliet, IL.; Jeannine Stephanie Gilleran, Dowd & Dowd, Ltd, Chicago, IL.

For Donald Dreesbach, in his individual capacity, Defendant: Patrick John Ruberry, Jeannine Stephanie Gilleran, Philip F Cuevas, Dowd & Dowd, Ltd, Chicago, IL.

For Sgt John Gorman, in his individual capacity, Defendant: Jeannine Stephanie Gilleran, Dowd & Dowd, Ltd, Chicago, IL.

**OPINION BY:** Maria Valdez

**OPINION:**

**MEMORANDUM OPINION AND ORDER**

Plaintiff Suzanne M. Barth, former police officer with the Village of Mokena ("Mokena") Police Department, sues the municipality [*2] and three of her then-ranking officers. Through her four-count, amended complaint, Barth alleges violations of *42 U.S.C. § 1983* and Title VII of the Civil Rights Act of 1964, *42 U.S.C. § 2000e, et. seq.*

Counts I and II are *§ 1983* actions brought against all four defendants. Count I seeks recovery for violations of the *Equal Protection Clause of the Fourteenth Amendment* and Count II for violations of the *First Amendment*. Whereas, Counts III and IV are brought solely against defendant Mokena, alleging a Title VII hostile work environment claim in the former and a Title VII retaliation claim in the latter. On March 18, 2004, the

parties consented to the jurisdiction of the United States Magistrate Judge pursuant to *28 U.S.C. § 636(c)*.

This matter is before the Court on five separate *Federal Rule of Civil Procedure 56* motions for summary judgment and seven motions to strike. The set of five *Rule 56* motions includes defendant Mokena's motions for summary judgment directed at Counts I and II [92] and Counts III and IV [95], defendant Chief of Police ("Chief") Stephen [*3] J. Pollack's summary judgment motion aimed at Counts I and II [98], defendant Sgt. Donald Dreesbach's motion regarding Counts I and II [103], and defendant Sgt. John Gorman's own motion concerning Counts I and II [131]. The remaining seven motions seek to strike portions of Barth's summary judgment responses [132, 134, 136, 138, 148], her statement of additional facts [146], and an entire affidavit [140].

For the reasons set out below: (1) motions for summary judgment [92, 95, 98] are GRANTED in part and DENIED in part; (2) motions for summary [103, 131] are DENIED; (3) motions to strike [132, 134, 136, 138, 146, 148] are GRANTED in part and DENIED in part; and (4) motion [140] is DENIED. Thereby (1) Count II of the Complaint as against defendant Mokena, (2) Count IV of the Complaint as against defendant Mokena, and (3) Counts I & II of the Complaint as against defendant Pollak are DISMISSED with prejudice.

*I. Discussion*

*A. Local Rule 56.1*

At the outset, prior to reciting the factual background of this case or analyzing the various motions, the Court finds it necessary to note the parties' incomplete compliance with both this Court's Standing [*4] Order on Summary Judgment n1 ("standing order") and the District Court's *Local Rule 56.1*. [HN1] The language of this Court's standing order is quite clear that strict compliance with *Local Rule 56.1* is expected. The Seventh Circuit, moreover, has "repeatedly held that a district court is entitled to expect strict compliance with *[Local] Rule 56.1*." *Ammons v. Aramark Unif. Servs., Inc., 368 F.3d 809, 817 (7th Cir. 2004)* (citing *Bordelon v. Chicago Sch. Reform Bd. of Trs., 233 F.3d 524, 527 (7th Cir. 2000)* and *Waldridge v. American Hoechst Corp., 24 F.3d 918, 922 (7th Cir. 1994)*). As "substantial compliance is not strict compliance," *Ammons, 368 F.3d at 817*, it logically follows that neither is incomplete compliance.

n1 *See* Hon. Maria Valdez, *Judicial Home Page,* http://www.ilnd.uscourts.gov/JUDGE/VALDEZ/mvpage.htm [HN2] ("Motions for summary

2006 U.S. Dist. LEXIS 19702, *; 97 Fair Empl. Prac. Cas. (BNA) 1764

judgment and responses must comply with Local Rules 56.1(a) and 56.1(b), as well as the procedures outlined herein. . . . Failure to abide by the Local Rules may result in the Court striking briefs, disregarding statements of fact, deeming statements of fact admitted, or denying summary judgment.").

[*5]

[HN3] Under *Local Rule 56.1*, a movant must file "a statement of material *facts* as to which the moving party contends there is no genuine issue and that entitle the moving party to a judgment as a matter of law . . . . The statement . . . *shall* consist of *short* numbered paragraphs, including within each paragraph *specific* references to the affidavits, parts of the record, and other supporting materials relied upon to support the facts set forth in that paragraph." L.R. 56.1(a)(3) (emphasis added). As to a non-movant's response and statement of additional facts, the District Court has similarly construed *Local Rule 56.1* to set out requirements for a non-movant that are identical to obligations imposed on a movant's statement of facts. *Malec v. Sanford, 191 F.R.D. 581, 584 (N.D. Ill. 2000)*. Stated another way, for movants and non-movants alike, "three operative concepts animate this rule: facts, short, and specific." *Malec, 191 F.R.D. at 583.*

Simply stated, the defendants in this matter struggle with specificity and support n2 while the plaintiff fumbles on the proper use of her facts. For example, many of the defendants' citations went unsupported. [*6] (*See, e.g.,* Def. Vill.'s Counts I & II L.R. 56.1(a) Stmt. PP 12 (affidavit not signed), 14-16 (lack of pinpoint cite), 19 (cited evidence not attached), 23 (deposition not attached); Def. Poliak's L.R. 56.1(a) Stmt. PP 38 (wrong support attached); Def. Dreesbach's Counts L.R. 56.1(a) Stmt. PP 25, 27 (lack of pinpoint cite); Def. Gorman's L.R. 56.1(a) Stmt. PP 14, 24 (cited record did not support).)

n2 The Court takes this opportunity to dispense with an "argument" that defense counsel raises. Through the motions to strike and for entry of summary judgment, defense counsel asks this Court to strike a significant share of the plaintiff's Local Rule 56.1(b)(3)(B) additional statement of facts for citing to Barth's interrogatory answers. Defense counsel offers no legal basis to support his request. [HN4] Courts in this circuit have long construed "specific references to the affidavits, parts of the record, and other supporting materials" under *Local Rule 56.1* (and its predecessor Local Rule 12(n)) to include answers

to interrogatories. *See, e.g., Martz v. Union Labor Life Ins. Co., 757 F.2d 135, 138 (7th Cir. 1985)* ("It bears repeating that the purpose of summary judgment is to determine whether there is any genuine issue of material fact in dispute and, if not, to render judgment in accordance with the law as applied to the established facts. The facts must be established through one of the vehicles designed to ensure reliability and veracity -- depositions, answers to interrogatories, admissions and affidavits."); *Kinney v. Hamilton Partners, 2004 U.S. Dist. LEXIS 5980, No. 03 C 3905, 2004 WL 765882, at *2 (N.D. Ill. Apr. 7, 2004).* As such, the Court denies the defendants' requests to "disregard" additional statement of facts supported by Barth's answers to interrogatories.

[*7]

The plaintiff, in turn, failed to provide the Court with a narrative of the facts in her memoranda of law in opposition to summary judgment. Instead, the plaintiff incorporates by reference her lengthy statement of additional facts. This too is improper under the Local Rule. *See Malec, 191 F.R.D. at 585* [HN5] ("*[Local Rule] 56.1* statements do not abrogate a party's obligation to recite its version of the facts in its supporting memorandum; it is simply inappropriate in one's memo to simply refer the Court to the *56.1* statement."). Thus, the Court will do its best to work with what the parties offer.

Next, the Court begins with the motions to strike and then turns to establish the material facts pertaining to each motion for summary judgment. Lastly, the Court weighs the arguments for and against summary judgment.

*A. Motions to Strike*

Defendants, through their seven motions to strike, move this Court to strike significant portions of Plaintiff's Local Rule 56.1(b)(3) filings through strict adherence to *Local Rule 56.1*. Movant defendants methodically list non-movant plaintiff's purported noncompliance with the local rule in her: (1) responses to movant's statement [*8] of facts; (2) statement of additional facts; and (3) execution of an affidavit. The combined effect of the seven motions is to call in question the majority of the plaintiff's paragraphs -- those responsive to the movants' statement of facts and her own statement of additional facts -- as argumentative, unsupported, nonfactual, or otherwise in noncompliance with *Local Rule 56.1*.

Although Barth did not file her own motions to strike the defendants' Local Rule 56.1(a) workproduct, the Court notes that the defendants themselves frequently

falter in complying with the local rule. Thus, "what's sauce for the goose is sauce for the gander." *The New Dictionary of Cultural Literacy* 57 (3d ed. 2002). As mentioned above, [HN6] this Court is tasked with holding both sides to the same strict standards of compliance with *Local Rule 56.1*.

Finally, the Court notes that the defendants' motions to strike at times read as replies to the plaintiff's Local Rule 56.1(b)(3)(A) responses. As [HN7] *Local Rule 56.1* does not allow for either replies or surreplies to an opponent's fact response, the Court did not consider or credit movants' excesses. The Court begins with the set of seven motions to strike.

### [*9] *1. Mokena's Counts I & II Motion to Strike*

Mokena moves to strike paragraphs 4 through 18, 20, and 24 through 26 of Barth's response to Mokena's Count I and II statement of facts for failure to comply with Local Rule 56.1(b)(3)(A). After reviewing Plaintiff's responses, the Court agrees that the following response paragraphs do not comply with the local rule: paragraphs 6 (neither admission nor denial, thereby constituting admission) and 18 (argumentative denial). As such, Mokena's motion to strike [132] is GRANTED in part as to response paragraphs 6 and 8.

The Court, however, deems moot Mokena's objections to plaintiff's response paragraphs 9, 10, 12, and 14 through 16 as the village failed to cite proper support for its corresponding paragraphs. [HN8] Local Rule 56.1(a) paragraphs must include "*specific references* to the affidavits, parts of the record, and other supporting material relied upon to support the facts set forth." L.R. 56.1(a)(3) (emphasis added). As clearly articulated in *Malec v. Sanford, 191 F.R.D. 581 (N.D. Ill. 2000)*, a decision the village cites in its motion to strike, "specific reference" means including proper Bluebook citations, [*10] which "must include page (or paragraph) numbers, as opposed to simply citing an entire deposition, affidavit, or other exhibit document." *Malec, 191 F.R.D. at 583* ("Factual allegations not properly supported by citation to the record are nullities."). The Court also deems moot movant Mokena's objections to Barth's response paragraphs 5 and 7 as the material relied upon by the village in its corresponding paragraphs did not support the facts it asserted. Furthermore, Mokena's objections to Barth's responses 11 and 17 fail as well as the village did not offer *any* reference to the record or supporting material. Again, Local Rule 56.1(a) expressly requires specific reference to supporting materials to carry a fact.

As for the remaining paragraphs that Mokena asks to have stricken, [HN9] "the Court is fully capable of examining parties' factual statements to determine which facts should be considered and which should not." *Johal v. Little Lady Foods, Inc., 2004 U.S. Dist. LEXIS 14777,*

*No. 02 C 8481, 2004 WL 1745749, at *7 (N.D. Ill. July 30, 2004)* (citing *Ogborn v. United Food & Commer. Workers Local No. 882, 2000 U.S. Dist. LEXIS 14092, No. 98 C 4623, 2000 WL 1409855, at *3 (N.D. Ill. Sept. 25, 2000)*). [*11] Thus, the remainder of Mokena's Count I & II motion to strike [132] is DENIED.

### *2. Pollak's Motion to Strike*

Defendant Pollak moves to strike paragraphs 2, 3, 5, 6, 9 through 19, 21, 23, 25 through 49 of Barth's responses for failure to comply with Local Rule 56.1(b)(3)(A). Yet, by the Court's count, there are only forty-six total numbered responses. Without elaboration, motion DENIED in part as to Pollak's objections to "responses" 47 through 49.

The Court, however, agrees with Pollak's objections to paragraphs 5 (argumentative denial), 27 (argumentative denial), 28 (argumentative denial), 30 (citations failed to give rise to a dispute), 33 (argumentative denial), and 39 (argumentative denial) of Barth's Local Rule 56.1(b)(3)(A) response. Pollak's motion to strike [136] is GRANTED in part as to responses 5, 27, 28, 30, 33, and 39.

Pollak's objections as to response paragraphs 18, 26, 35, 38, and 49, however, are moot. The Court finds that Pollak does not carry his Local Rule 56.1(a) burden with respect to these paragraphs. Pollak's paragraphs 18 and 44 asserted legal conclusions, not factual allegations. [HN10] "It is inappropriate to allege legal conclusions in a 56.1(a) [*12] statement on the off-chance that one's opponents might not file a correct response." *Malec, 191 F.R.D. at 583*. Also, the materials Pollak cites do not support the facts as he asserted in paragraphs 26 (attached board ruling reduced two-day suspension to a day and then without explanation raised it back to two days) and 38 (attached Exhibit B is an oath of office, not a resignation letter). Pollak also fails to offer *any* reference to the record or supporting material relied upon to establish paragraphs 35 and 46. As the Court is fully capable of compiling the universe of material facts in compliance with *Local Rule 56.1*, the remainder of Pollak's motion to strike [136] is DENIED.

### *3. Dreesbach's Motion to Strike*

Defendant Dreesbach moves to strike Barth's responses 1 through 3, 5 through 9, 12 through 15, 17, 21, 22, 24, 25, 27, and 28 for lack of compliance with Local Rule 56.1(b)(3)(A). Dreebach's motion to strike [134] is GRANTED in part as to response paragraphs 3 (argumentative denial), 5 (argumentative denial), 6 (neither admission nor denial nor offer any support any material in support), 9 (failure to offer any support any material in support), 14 (non-specific citation), 17 (argumentative [*13] denial), 24 (non-specific citation and argumentative denial). The Court, however, finds that

2006 U.S. Dist. LEXIS 19702, *; 97 Fair Empl. Prac. Cas. (BNA) 1764

Dreesbach's objections to response paragraphs 25 and 27 to be moot. With regard to these two factual assertions, Dreesbach only offers non-specific references to supporting material, which are insufficient under Local Rule 56.1(a). Dreesbach's motion to strike [134] is DENIED as moot with regard to response paragraphs 25 and 27. Moreover, the remainder of his motion to strike [134] is DENIED as the Court is capable of weighing parties' compliance on its own.

#### 4. Gorman's Motion to Strike

Next, defendant Gorman moves the Court to strike Barth's response paragraphs 2 through 14, 16 through 22, and 24 for noncompliance with Local Rule 56.1(b)(3)(A). The Court agrees with Gorman's objections as to the following: the first sentence of response paragraph 2 and the entirety of response paragraphs 17 and 18 (argumentative denials); response paragraphs 3, 4, 7, 8, and 10 (failure to offer any material in support); and response paragraphs 11 and 21 (failure of support to give rise to a dispute). Gorman's motion to strike [138] is GRANTED in part with regard to the first sentence of paragraph [*14] 2 and the whole of response paragraphs 3, 4, 7, 8, 10, 11, 17, 18, and 21.

The Court, however, deems moot Gorman's objections as to the second sentence of response paragraph 2 and all of response paragraphs 14 and 24. Under his Local Rule 56.1(a) showing, Gorman fails to offer any reference to the record or supporting material relied upon to establish the second sentence of his paragraph 2. Similarly, the cited record Gorman points to for paragraphs 14 and 24 fail to support his assertions of fact. Gorman's motion to strike [138] is DENIED as to response paragraphs 2, 14, and 24. Lastly, the remainder of his motion to strike [138] is DENIED as the Court reaches the questions of compliance with the local rule and admissibility on its own.

#### 5. Mokena's Counts III & IV Motion to Strike

As to Counts III & IV, defendant Mokena moves to strike Barth's response paragraphs 3, 4, 7, 11, 13, 14 through 26, 28 through 31, and 33 through 35 as out of compliance with Local Rule 56.1(a). The Court agrees with movant Mokena that following should be stricken: response paragraphs 7, 15, 24, 29, and 30 (argumentative denials); the second sentences of response paragraphs 21 and 23; [*15] and the portion related to causes of hearing delay in response paragraph 28. Mokena's motion to strike [148] is GRANTED in part as to responsive paragraphs 7, 15, 21 (second sentence only), 23 (second sentence only), 24, 28, 29, and, 30.

The Court, however, finds movant Mokena's objections as to responses 3, 13, 19, 20, 26, 31, 34, and 35 moot as the village fails to carry its Local Rule 56.1(a)

burden of support with respect to these. For example, Mokena fails to attached its referenced support for paragraph 26 (no Exhibit 0 [sic] attached). Also, movant Mokena fails to offer any reference to the record or supporting material relied upon to establish paragraph 31. Similarly faulty, the village offers non-specific references to the supporting material relied upon to establish paragraphs 3 (as to Barth), 13 (as to wording of Barth's report), and 34. Lastly, the cited record did not support the overarching assertions in the village's paragraphs 19, 20, and 35. With respect to paragraph 35, Mokena cites to Exhibit K, which it believes to be a copy of a sexual harassment policy when it is actually an administrative filing. Finally, due to non-movant's failure to admit or deny [*16] statement of fact paragraph 33, her response is construed as an admission, making Mokena's request to strike response 33 moot. In addition to these aforementioned grounds, the Court's ability to weigh responses for compliance with the applicable local rule leads the Court to deny the rest of the village's request. The remainder of Mokena's motion to strike [148] is DENIED.

#### 6. Defendants' Joint Motion to Strike Additional Facts

Defendants jointly move this Court to strike the entirety of Plaintiff's Local Rule 56.1(b) statement of additional facts. The joint motion to strike [146] the plaintiff's statement of 125 additional facts is DENIED as too broad and for lack of proper support.

In the alternative, Defendants move to strike forty of Plaintiff's statement of additional facts, either in full or in part, on hearsay grounds, (Pl.'s L.R. 56.1(b)(3)(B) Stmt. PP 7-14, 17-20, 23, 25, 26, 30, 32, 42, 45, 46, 48, 50, 66, 70, 71, 73-77, 79-83, 86, 88, 91, 92, 95, 113); five of her additional assertions as non-factual, (id. PP 59, 63, 94, 107, 125); twenty-five of her additional facts as too long and not concise, (id. PP 19, 43, 46, 61, 63, 64, 66, 70, 74, 78, 80-85, 90, [*17] 96, 101, 105, 109, 113, 124, 125); and four for lack of relevance to this suit (id. PP 54, 56-58).

##### i. Hearsay

The majority of the defendants' "hearsay" challenges, however, fail to recognize the proper scope of the hearsay prohibition. [HN11] *Federal Rule of Evidence 801(c)* defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."

Contrary to the defendants' insinuations, [HN12] not all out-of-court declarations amount to inadmissible hearsay. For example, an out-of-court statement offered to establish a statement was made and it had an effect on the listener is not contrary to the general hearsay rule.

2006 U.S. Dist. LEXIS 19702, *; 97 Fair Empl. Prac. Cas. (BNA) 1764

*See, e.g., Cooper-Schut v. Visteon Auto. Sys., 361 F.3d 421, 430 (7th Cir. 2004)* (finding proper a district court's limitation of an out-of-court statement to show effect on a listener in a sexual harassment case). Over half of the defendants' hearsay challenges, however, attack out-of-court statements that are *not* offered for the truth of the matters asserted. Plaintiff's additional statements found in paragraphs [*18] 7 through 14, 18 (Sgt. O'Donnell's comments to Plaintiff), 20, 23, 25, 26 (first sentence), 32, 66, 70, 71, 73 through 76, 79 through 83, and 86, which the defendants' seek to strike, amount to alleged comments of a sexual nature or threats of reprisal for alleging sexual harassment made by others in the presence of or directed to the plaintiff herself. For the limited purpose of demonstrating effect on the listener, the Court will allow these paragraphs. The joint motion [146] is DENIED as to the additional fact statements found in paragraphs 7 through 14, 18 (part of second sentence), 20, 23, 25, 26 (first sentence), 32, 66, 70, 71, 73 through 76, 79 through 83, and 86. Defendants' remaining hearsay challenges in motion [146] are GRANTED in part (Pl.'s L.R. 56.1(b)(3)(A) PP 17, 19, 30, 48, 50, 77) and DENIED in part (Pl.'s L.R. 56.1(b)(3)(A) PP 18, 42, 45, 46, 88).

Plaintiff's additional paragraphs 17, 48, and 77 contain purported statements (one sexual and the others about Barth) between her co-workers. [HN13] Evidence relating to conduct not witnessed by a plaintiff can be relevant and admissible on issues of hostile work environment, employer liability, and municipal liability. [*19] *See Collins v. Vill. of Woodbridge, 96 F. Supp. 2d. 744, 757 (N.D. Ill. 2000)* (citing *Smith v. Sheahan, 189 F.3d 529, 534 (7th Cir. 1999)); accord Gleason v. Mesirow Fin. Inc., 118 F.3d 1134, 1144 (7th Cir. 1996)* (holding incidents of harassment of female customers, female relatives when visting or calling into work, and other female employees are relevant to demonstrate the existence of a hostile work environment).

Nevertheless, for these three alleged comments to come in Barth must still meet the evidentiary markers of admissibility. Here, in all three cases, there are no affidavits or portions of depositions used to support the alleged incidents. Rather, Barth cites her answers to an interrogatory. [HN14] While use of answers to interrogatories are acceptable under *Local Rule 56.1* to support a statement, there still must be grounds to admit the statement. As worded by the plaintiff, it is not clear to the Court that Barth has personal knowlege or another foundation to carry these exchanges into the record. Without more, Barth's additional paragraphs 17, 48, and 77 qualify as inadmissible hearsay and are stricken per the defendants' request. [*20]

Similarly, additional statement paragraphs 19, 30, and 50 fail to disclose the identify of the declarants and

will be stricken as inadmissible hearsay. The Court, however, cannot honor the defendants' request to strike additional statement paragraph "46" and "88" as language from these paragraphs in movants' motion do not correspond with Plaintiff's statement of additional facts. Moreover, the Court will allow additional statement paragraphs 18 and 42 as statements of party-opponent. Finally, the defendants' request to strike additional statement paragraph 45 is moot as the Court deems this additional statement as lacking relevance.

### ii. Nonfactual Assertions

Defendants contend that additional statement paragraphs 59, 63, 94, 107, and 125 should be stricken for proffering conclusory statements and/or legal conclusions. As the district court aptly noted in *Malec,* [HN15] "a . . . statement should contain *only* factual allegations. It is inappropriate to allege legal conclusions . . . on the off-chance that one's opponent might not file a correct response. . . . This approach invariably results in a motion to strike and, thus, wastes the judicial time that summary judgment [*21] was intended to save." *Malec, 191 F.R.D. at 583* (discussing a movant's statements, but also noting the applicability to a non-movant's additional statements). Plaintiff's additional paragraphs 59 (in full) and 63 (in part) are rooted in speculation, not fact, and are hereby stricken. Plaintiff's paragraphs 94 and 125 allege legal conclusions. Additional paragraph 94 attempts to substitute as fact the legal question of constructive discharge and paragraph 125 seeks to shift the burden of production on to the defendants. Thus, paragraph 94 and 125 are stricken. Paragraph 107, however, does not contain a legal conclusion. Instead it contains the statements of an official charged with enforcing a workplace policy and will not be stricken. Defendants' motion to strike [146] for nonfactual assertions is GRANTED in part, (Pl.'s L.R. 56.1(b)(3)(B) PP 59, 63 (first sentence), 94, 125), and DENIED in part, (*id.* P 107).

### iii. Long Paragraphs

Defendants press for Plaintiff's lengthy paragraphs in her additional statement of facts to be stricken. They point, in part, to examples of paragraph containing multiple propositions such as paragraphs 19 (asserting twelve), [*22] 43 (asserting five), 46 (asserting six), 54 (asserting three), 56 (asserting seven), 57 (asserting seven), and 58 (asserting four).

The defendants are correct that [HN16] *Local Rule 56.1* imposes a brevity requirement on non-movants. It also, however, imposes brevity on movants too. "The numbered paragraphs should be short; they should contain only one or two individual allegations, thereby allowing easy response." *Malec, 191 F.R.D. at 583.* "Local Rule 56.1(b)(3)(B) corresponds to [Local] Rule 56.1(a)(3); it sets out requirements for the nonmovant's

statement of additional facts that are identical to the obligations imposed on the movant's statement of facts." *Id. at 584.* Review of the defendants' statement of fact filings shows similar struggles with the concept of "short." *(See, e.g.,* Def. Vill.'s Counts I & II L.R. 56.1(a) Stmt. P 20 (asserting three facts); Def. Dreesbach L.R. 56.1(a) Stmt. P 24 (asserting four facts); Def. Gorman's L.R. 56.1(a) Stmt. P 9 (asserting three facts).)

While the Court's standing order on summary judgment and *Local Rule 56.1* place litigants on notice that strict enforcement will follow, this Court will exercise discretion [*23] here to balance out some of the parties' respective shortcomings. In all but one of the parties' failure to adhere to the requirement of short paragraphs, the Court will simply encourage both sides to conform future filings to applicable standing orders and local rules. Paragraph 19 of the plaintiff's statement of additional facts, however, is beyond a reasonable take on "short." Defendants' motion to strike [146] for lack of brevity is GRANTED as to paragraph 19 and DENIED as to the rest.

### iv. Relevance

Lastly, the defendants ask that paragraphs 54 and 56 through 58 be stricken, in part, for lack of relevancy to this matter. These four paragraphs generally aim to establish that Sgts. Dreesbach and Gorman corrected Barth's police reports differently than from male colleagues and elaborates on a "to/from" memoranda explaining report inaccuracies. At the very least, these exchanges have bearing on the effect they had on the plaintiff (i.e., her subjective belief she was working in a hostile work environment) or relate to her retaliation claim. Motion to strike [146] for lack of materiality is DENIED.

### 7. Defendants' Joint Motion to Strike Barth's Affidavit [*24]

In support of her opposition to the defendants' motions for summary judgment, the plaintiff submitted a seven-paragraph affidavit. Defendants take issue with all but one of the affidavit paragraphs on grounds they do not comply with *Federal Rule of Civil Procedure 56(e)*. According to *Rule 56(e)*, [HN17] "opposing affidavits shall be made on personal knowledge [and] shall set forth such facts as would be admissible in evidence."

Review of the plaintiff's responses and additional statement of facts reveals that she only relies on five of the six paragraphs called into question by the defendants. As Plaintiff does not rely on paragraph 4 of the affidavit in her summary judgment filings, the defendants' request to strike said paragraph becomes moot. [HN18] "Supporting document submitted with a motion that are not referred to in a statement of facts will be ignored," *Malec, 191 F.R.D. at 583*, as will unused portions of documents accompanying responses or additional statement of facts, *id. at 584.*

Moreover, review of the plaintiff's use of affidavit paragraphs 2, 3, and 5 through 7 reveals that she used them *only* to support [*25] denials and, curiously enough, admissions to certain fact assertions of the defendants. *(See* Pl.'s L.R. 56.1(b)(3)(A) Stmt. to Vill.'s Counts I &II Stmt. P 4 (citing affidavit P 3); Pl.'s L.R. 56.1(b)(3)(A) Stmt. to Dreesbach's Stmt. P 28 (citing affidavit P 3); Pl.'s L.R. 56.1(b)(3)(A) Stmt. to Pollak's Stmt. PP 2 (citing affidavit P 3), 3 (citing affidavit P 3), 8 (citing affidavit P 7 in support of an admission), 11 (citing affidavit P 7 in support of an admission), 12 (citing affidavit P 3), 14 (citing affidavit P 3), 17 (citing affidavit P 3), 26 (citing affidavit P 5), 32 (citing affidavit P 3); Pl.'s L.R. 56.1(b)(3)(A) Stmt. to Vill.'s Counts III & IV Stmt. PP 17 (citing affidavit P 3), 27 (citing affidavit PP 5, 6).)

Why the defendants chose to challenge the affidavit paragraphs used to support the plaintiff's *admissions* to an opposing party's facts is beyond this Court. Either way, an admission to an opponent's facts stands with or without evidentiary support. Thus, it is · irrelevant whether the Court strikes the affidavit paragraphs that the plaintiff uses to support her admission to Pollak's statement of fact paragraphs 8 and 11. Motion [*26] [140] is DENIED in part as moot to the extent it reaches Plaintiff's admissions.

As [HN19] Local Rule 56.1(b)(3)(B) "provides the *only* acceptable means of . . . presenting additional facts," *Midwest Imports, Ltd. v. Coval, 71 F.3d 1311, 1317 (7th Cir. 1995),* the greatest impact that the plaintiff's affidavit would have on the universe of material facts is to sustain her denials to certain of the defendants' facts. Assuming the Court were to strike affidavit paragraphs 2, 3, and 5 through 7, most of the plaintiff's related denials would stand through the additional, independent support she cited. *(See* Pl.'s L.R. 56.1(b)(3)(A) Stmt. to Vill.'s Counts I & II Stmt. P 4 (citing affidavit P 3); Pl.'s L.R. 56.1(b)(3)(A) Stmt. to Dreesbach's Stmt. P 28 (citing affidavit P 3); Pl.'s L.R. 56.1(b)(3)(A) Stmt. to Pollak's Stmt. PP 2 (citing affidavit P 3), 12 (citing affidavit P 3), 14 (citing affidavit P 3), 26 (citing affidavit P 5), 32 (citing affidavit P 3); Pl.'s L.R. 56.1(b)(3)(A) Stmt. to Vill.'s Counts III & IV Stmt. PP 17 (citing affidavit P 3), 27 (citing affidavit P 5).) To the extent the motion to strike affidavit paragraph would not lessen the impact of the plaintiff's [*27] denials, motion [140] is DENIED.

Similarly, the Court need not reach the plaintiff's denial to the village's Count III & IV statement of fact paragraph 28, which cites for support contested affidavit paragraphs 5 and 6, as the support to which movant Mokena cites to fails to support its fact assertion. Motion to

Case 1:05-cv-00377-WDM-BNB   Document 157-7   Filed 02/12/07   USDC Colorado   Page 16 of 37

Page 16

2006 U.S. Dist. LEXIS 19702, *; 97 Fair Empl. Prac. Cas. (BNA) 1764

strike [140] DENIED in part as moot to the extent movant's statement of facts are unsupported.

Finally, in her responses to Pollak's statement of facts paragraphs 3 and 17, the plaintiff cites, in part, paragraph 3 of the challenged affidavit. The Court need not reach the admissibility of affidavit paragraph 3, however, as the plaintiff impermissibly cites it to support an argumentative denial. In both responses, the plaintiff admits to Pollak's statement of fact, but continues on with a lengthy explanation sounding more in denial than admission. Essentially, the plaintiff offers up in these two examples an "admission" followed by a lengthy "but." As, [HN20] "[Local] Rule 56.1(b)(3)(A) response is not the place for purely argumentative denials," *Malec, 191 F.R.D. at 584*, the Court is duty bound to construe these two responses as full admissions. Thus, motion [*28] to strike [140] is DENIED in part as moot to the extent it reaches argumentative denials.

### B. Motions for Summary Judgment

The defendants here chose *not* to file a single, combined motion for summary judgment. Rather, each movant opted to file his own motion (with the exception of Mokena, which filed two motions). Each of the five summary judgment motions were accompanied by a separate statement of facts, affidavits, and other supportive material. With leave of Court, the plaintiff, in turn, filed five corresponding responses and one combined statement of additional facts. The Court handles each set of corresponding filings in turn.

### I. Summary Judgment Standard

[HN21] Familiar *Rule 56* principles impose on movants the burden of establishing the lack of a genuine issue of material fact necessitating trial. *Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)*. At this stage, courts do not weigh evidence or determine the truth of matters asserted. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*. Instead, courts must consider the evidentiary record in the light most favorable to the non-moving party and draw all reasonable [*29] inferences in their favor as well. *Ezell v. Potter, 400 F.3d 1041, 1046 (7th Cir. 2005)* (citation omitted). The general standard is also applied with rigor in employment discrimination cases, where intent is inevitably the central issue. *Sarsha v. Sears, Roebuck & Co., 3 F.3d 1035, 1038 (7th Cir. 1993)* (citation omitted).

[HN22] To avoid summary judgment a non-movant "must produce more than a scintilla of evidence to support [her] position" that a genuine issue of material fact exists. *Pugh v. City of Attica, Ind., 259 F.3d 619, 625 (7th Cir. 2001)* (citation omitted). Nevertheless, if a non-moving party fails to make a sufficient showing on an

essential element of their case, the moving party is entitled to judgment as a matter of law. *Lewis v. Holsum of Fort Wayne, Inc., 278 F.3d 706, 709 (7th Cir. 2002)* (citing *Celotex Corp., 477 U.S. at 323*).

### 2. Mokena's Counts III & IV Motion for Summary Judgment

#### i. Facts n3

Barth joined the Mokena Police Department in September 1998, becoming the first female on the village's force. (Def. Vill.'s Counts III & IV L.R. 56.1(a) Stmt. P 6; Pl.'s [*30] L.R. 56.1(b)(3)(B) Stmt. P 2.) Her tenure at the department lasted through August 23, 2002, when Barth resigned her post. (*Id.* P 93.)

> n3 Unless otherwise noted, the following facts are undisputed and/or deemed admitted pursuant to *Local Rule 56.1*. Further, [HN23] for purpose of summary judgment, where facts are contested the Court accepts the legitimate factual assertions of the non-moving party. *Pardo v. Hosier, 946 F.2d 1278, 1280 (7th Cir. 1991)*.

Prior to Barth's arrival, Mokena adopted a sexual harassment policy and generally included it in its personnel manual. (Def. Vill.'s Counts III & IV L.R. 56.1(a) Stmt. P 3.) The village's sexual harassment policy expressly prohibits sexual harassment, defines certain behaviors as sexual harassment, encourages employees facing such behavior to bring such encounters to the attention of a supervisor, a department head, or the Village Administrator, and contains a bypass provision allowing an employee to bypass the chain of command if superiors are involved [*31] in the underlying behavior at issue. (*Id.* P 35; Pl.'s L.R. 56.1(b)(3)(B) Stmt. Ex. 12 P 11.11.)

It reads, in pertinent part, as follows:

> The Village of Mokena will not tolerate sexual harassment of its employees. Therefore, the following types of behavior will be grounds for disciplinary action:
>
> > 1. Unwelcome sexual advances;
> >
> > 2. Requests for sexual acts or favors;
> >
> > 3. Abusing the dignity of an employee through in-

Case 1:05-cv-00377-WDM-BNB   Document 157-7   Filed 02/12/07   USDC Colorado   Page 17 of
37

Page 17

2006 U.S. Dist. LEXIS 19702, *; 97 Fair Empl. Prac. Cas. (BNA) 1764

sulting or degrading sexual remarks or conduct;

4. Threats, demands or suggestions that an employee's work status is contingent upon his toleration of acquiescence to sexual advances; or

5. Retaliation against employees for complaining about such behaviors.

If employees encounter such behavior from anyone, including supervisors and fellow employees, they should bring the problem to the attention of their supervisor, Department Head or the Village Administrator.

(Def. Vill.'s Counts I & II L.R. 56.1(a) Stmt. Ex. A P 11.11; Pl.'s L.R. 56.1(b)(3)(B) Stmt. Ex. 12 P 11.11.)

On September 18, 1998, Barth executed an acknowledgment wherein she certified receipt and review of the village personnel [*32] manual. (Def. Vill.'s Counts III & IV *L.R. 56.1* P 4.) Parties, however, disagree whether Barth was aware of the policy. Barth claims at the time of hiring she was not aware of the antisexual harassment policy. (Pl.'s L.R. 56.1(b)(3)(B) Stmt. P 3.) During her time on the force, Barth attended an in-house, anti-sexual harassment training session in January 2002. (Pl.'s L.R. 56.1(b)(3)(B) Stmt. P 67.) The parties disagree on what was discussed at the training. Barth, however, asserts that the Village's written, sexual harassment policy was *not* discussed. (*Id.* P 67.)

While Barth complained to supervisors on matters she felt were sexual harassment and/or gender discrimination, (*Id.* PP 18, 21, 23, 26-28, 31, 33, 52, 62, 64, 69, 84, 93, 101), she never filed a complaint with Village Administrator Scott Downes, (Def. Vill.'s Counts III & IV L.R. 56.1(a) Stmt. P 18). Overall, Barth alleges multiple incidents of supervisor and co-worker harassment amounting to a hostile work environment, lack of follow-up by supervisors on the occasions she complained, and retaliation against her for complaining. Mokena disputes Barth's allegations of sexual [*33] harassment and retaliation. Thus, what follows below, by and large, is in dispute.

*Recruit Period:* Early in Barth's tenure, in either September or October 1998, while she was a recruit at the Police Training Institute, her then-supervisors, Field Training Officers ("FTO") Boardman and Keller, warned her not to complain and to watch herself because she was the first female on the force. (Pl.'s L.R. 56.1(b)(3)(B) Stmt. P 2.) In either January or February 1999, FTO Keller became Barth's supervisor and spoke of his sex life with her with some frequency. (*Id.* P 8.) FTO Keller warned Barth not to "rock the boat," (*Id.* P 9), and told her that filing a complaint with Chief Pollak would not accomplish anything, (*Id.* P 10.) FTO Keller informed Barth that if she had a problem to go through the chain of command, but that then she should not expect backup if she "stirred the pot." (*Id.* P 13.) FTO Keller also offered that if Barth had problems with Chief Pollak she should flee his office yelling, "Don't touch me there." (*Id.* P 12.) And, FTO Keller told Barth of a female officer on a nearby police force [*34] was "taking notes" and warned her to not think of doing anything like that because "the revenge would not be pretty." (*Id.* P 11.)

During her recruit period, Officer Quinn shared his sex life with Barth and stated to her that women should be at home "servicing their man." (*Id.* P 7.) At another point during her recruit term, Barth informed FTO Keller, her immediate supervisor, that she was uncomfortable around Officer Quinn. (*Id.* P 14.) FTO Keller responded that Barth should "get use to it," that he had been there longer, and stated to her that she did not "want to piss him off, he'll hurt you." (*Id.* P 14.) Around this time, FTO Boardman allowed male officers to drive squad cars, but did not allow Barth. (*Id.* P 4.) FTO Boardman allowed male recruits to conduct multiple stops over the course of their training sessions and only allowed Barth to conduct one stop. (*Id.* P 6.) Finally, Barth alleged that FTO Boardman would target women and teenage girls on traffic stops. (*Id.* P 5.)

*March 1999:* In or about March 1999, Barth completed training. (*Id.* P 17.) [*35] In or about March 1999, as a member of the force, she complained to Sgts. O'Donnell and Dreesbach that police report statistics posted under her name were incorrect. (*Id.* P 18.) Sgt. Dreesbach told her not to worry about statistical inaccuracies. (*Id.* P 18.) In spite of this assurance, eventually, in September 2001, Chief Pollak suspended Barth for statistical inaccuracies. (Def. Vill.'s Counts III & IV L.R. 56.1(a) Stmt. P 25.)

*April 1999:* In or about the following month, Officer Brown approached Barth in a booking room and told her he could make her a "better woman" and the "happier she was in bed, the happier she would be on the street." (Pl.'s L.R. 56.1(b)(3)(B) Stmt. P 20.) Barth complained to Sgt. Gorman about workplace harassment, but he failed to act on her complaint. (*Id.* P 21.)

*May 1999:* Then, in or about May 1999, while Barth was in the roll call room, Sgt. Gorman entered and

2006 U.S. Dist. LEXIS 19702, *; 97 Fair Empl. Prac. Cas. (BNA) 1764

turned on the department's television to the Howard Stern Show. (*Id.* P 22.) She conveyed to Sgt. Gorman that she did not appreciate the program because she believed it degrading to women. (*Id.* P 22.) [*36] Sgt. Gorman responded with a laugh and walked out of the room. (*Id.*) Also in or about May 1999, while in the booking room, Officer Brown approached Barth and told her that she did not like the Howard Stern Show because she did not have "big enough tits" to "be on the show." (*Id.* P 23.) Immediately after this exchange, Barth complained to Sgt. Gorman about Officer Brown's comments. (*Id.* P 23.) Sgt. Gorman did not act on Barth's complaint. (*Id.*)

*June 1999:* In or about June 1999, Officer Brown stood next to Barth while she was seated so that his crotch was eye-level to her and stated, "You are the perfect height to give me a blow-job." (*Id.* P 25.) Barth found the incident offensive, stood, told her colleague to stop, and walked out of the room. (*Id.*)

*Summer/Fall 1999:* Later, in or about the Summer/Fall 1999, when Barth was in the police garage, Officer Brown stated to Officer Garbs, in her presence, "Sue's tits are bigger than this [spotlight]." (Pl.'s L.R. 56.1(b)(3)(B) Stmt. P 26.) Upon seeing her, the two officers walked out of the garage laughing. (*Id.*) Barth complained to Sgt. O'Donnell about [*37] the incident. (*Id.*) Also, in or about Summer/Fall 1999, Barth noticed that she was receiving less backup from her fellow officers. (*Id.* P 29.) Although not able to recall specific dates, Barth asserts she requested backup in 1999 and 2000 and did not receive it. (Def. Vill.'s Counts III & IV L.R. 56.1(a) Stmt. P 11.)

*November 1999:* In or about November 1999, Barth again noticed that her statistics were posted incorrectly. (Pl.'s L.R. 56.1(b)(3)(B) Stmt. P31.) Like before, she complained to Sgt. Dreesbach and he told her not to worry. (*Id.*) Again, in or about November 1999, Barth was in the booking room when Officer Brown stated to her that she should leave her husband for "a real man." (*Id.* P 32.) When she stood to leave, Officer Brown placed his hands on her chest and stated, "See, I told you that you would like it." (*Id.*) Barth found this conduct offense and unwelcome. (*Id.*) Thereafter, Barth left a written complaint for Commander Surdel about the booking room incident, but she never received a response. (*Id.* P 33.)

*Fall 1999/Winter 2000:* From November 15, 1999 through January 2000, Barth was [*38] on leave from the force due to a work-related injury. (Def. Vill.'s Counts III & IV *L.R. 56.1* P 8.)

*Summer 2000:* In or about June 2000, Barth informed Chief Pollak that she was pregnant and requested light duty. (Pl.'s L.R. 56.1(b)(3)(B) Stmt. P 37.) By July 2000, the police department placed Barth on light duty. (*Id.* P 40.) Starting in or about July 2000, Sgt. Dreesbach directed Barth to lift heavy objects, work in an unconditioned garage in mid-summer, pick up lead-based guns and ammunition, and search female prisoners. (*Id.* P 38.) Barth complained to Sgt. Dreesbach about the heavy lifting assignments, assignments in an evidence cage, and the impact such assignments might have on her pregnancy. (*Id.* P 39.) Sgt. Dreesbach responded, "I did not tell you to get pregnant." (*Id.*) In or about July or August 2000, Barth overheard Sgt. Dreesbach recommend to Chief Pollak that she should not receive "special treatment" due to her pregnancy. (*Id.* P 40.)

In or about August 2000, Barth retrieved workbooks from North Riverside and upon return she twice requested assistance from Sgt. Dreesbach. (*Id.* P 43.) [*39] Sgt. Dreesbach told Barth she needed to unload the items herself. (*Id.*) As she was unloading, Commander Surdel told her she should not be performing that task. (*Id.*)

*January 19, 2001 through May 22, 2001:* Barth went on maternity leave from January 19, 2001 through May 22, 2001. (Def. Vill.'s Counts III & IV L.R. 56.1(a) Stmt. P 37.)

*May 2001:* Barth returned from maternity leave in late-May 2001. (Pl.'s L.R. 56.1(b)(3)(B) Stmt. P 46.) Again, upon her return, Barth noticed reduced backup from her fellow officers. (*Id.* P 51.)

*June 2001:* In or about June 2001, Sgt. Gorman turned on the Howard Stern Show in the roll call room with Barth present. (*Id.* P 52.) As before, Barth complained that she found the show offensive. (*Id.*) Sgt. Gorman responded that his wife does not let him watch it at home and stated, "I need to watch it somewhere." (*Id.*) Then, Sgt. Gorman and Officer Stumpf discussed women, referring to their "tits" in front of Barth. (*Id.*) Offended, Barth left the room. (*Id.*) Beginning in early June 2001, Barth claims to have received decreased backup from her fellow officers. (Def. Vill.'s [*40] Counts III & IV L.R. 56.1(a) Stmt. P 12.)

*August 2001:* In or about August 2001, Sgts. Gorman and Dreesbach began to return to Barth her police reports, marking them with red ink in such a way as to require her to rewrite entire reports. (Pl.'s L.R. 56.1(b)(3)(B) Stmt. P 54.) The standard practice, however, was for supervisors to note corrections with "sticky" notes or on a photocopy of the original report so that officers could incorporate the noted changes and save them from re-writing the entire report. (*Id.*) At some point prior to August 2001, Chief Pollak ordered an audit of Barth's report statistics covering a month's span. (*Id.* P 124.) Barth was the only target of this audit. (*Id.*) Furthermore, on or about August 24, 2001, Sgt. Dreesbach ordered Barth to write up a "to/from" memorandum re-

Case 1:05-cv-00377-WDM-BNB   Document 157-7   Filed 02/12/07   USDC Colorado   Page 19 of 37

Page 19

2006 U.S. Dist. LEXIS 19702, *; 97 Fair Empl. Prac. Cas. (BNA) 1764

garding three dates her statistics were inaccurately posted. (*Id.* P 56.) On August 30, 2001, Sgt. Dreesbach requested that Barth meet him offsite and instructed her to revise her memorandum to include that he saw her falsify her statistics on a couple of occasions. (*Id.* P 57.) Barth believed such requested a "correction" was false and did not make it. (*Id.*) [*41] Thereafter, she resubmitted a second memorandum without the requested change and informed her supervisor she would not comply. (*Id.*)

*September 2001:* On or about September 18, 2001, Barth received a negative performance evaluation from Sgt. Dreesbach. (*Id.* P 59.) On September 19, 2001, Chief Pollak gave Barth a two-day suspension for falsely reporting the number of traffic citations she issued. (Def. Vill.'s Counts III & IV L.R. 56.1(a) Stmt. P 25.) On either September 24 or 25, 2001, Barth began her suspension related to inaccurate statistics. (Pl.'s L.R. 56.1(b)(3)(B) Stmt. P 60.)

*October 2001:* On or about October 8, 2001, Sgt. Dreesbach denied Barth backup on a police call. (*Id.* P 61.) After Barth made two requests for backup, Sgt. Dreesbach responded he was "busy eating lunch," he could not provide backup, and he failed to assign other officers to provide Barth assistance. (*Id.*) Barth lodged a verbal complaint with Sgt. Dreesbach about the lack of backup response. (*Id.* P 62.) In relation to the denials of backup, Barth never filed a written complaint with any member of the command staff, (Def. Vill.'s Counts III & IV L.R. 56.1(a) Stmt. P [*42] 14), or verbally addressed her backup concerns to Chief Pollak, (*Id.* P 17.)

*January 2002:* On or about January 14, 2002, Barth was ordered to handle another officer's call, which resulted in a lowering of her arrest statistics for the day. (Pl.'s L.R. 56.1(b)(3)(B) Stmt. P 64.) She complained to Sgt. Gorman. (*Id.*) She received a response she found unsatisfactory. (*Id.*) On January 25, 2002, Barth called for backup on a traffic arrest she was making. (*Id.* P 65.) No backup was provided. (*Id.*) Barth complained to Sgt. Gorman about the denial of backup and he responded that is she wanted to do a "man's job, she could do it by herself." (*Id.*) Barth was unable to name the officers responsible for the denial of backup. (Def. Vill.'s Counts III & IV L.R. 56.1(a) Stmt. P 16.) Later that month, on January 31, 2002, Barth was in the roll call room with Sgt. Gorman and other officers present with an exercise program playing on the television set. (Pl. Vill.'a L.R. 56.1(a) Stmt. P 66.) Officer Stumpf stated to Officer Kowalczyk, both present in the roll call room, "We should watch this every morning. It gets my blood pumping in all the rights places," and pointed [*43] to his crotch. (*Id.*) Officer Kowalszyki agreed. (*Id.*) Barth looked at Sgt. Gorman to do something and he laughed in response. (*Id.*) Finally, on or about the last day in January 2002, Barth requested and was denied backup on a police call. (*Id.* P 68.)

*February 2002:* On February 2, 2002, in front of Barth, Sgt. Gorman simulated masturbation and made reference to "homemade mayonnaise." (*Id.* P 69.) Sgt. Gorman laughed when Barth complained to him that such conduct was "sexual harassment." (*Id.*) Officer Brown left the department in February 2000. (Def. Vill.'s Counts III & IV L.R. 56.1(a) Stmt. P 39.)

*March 2002:* During roll call on or about March 4, 2002, with Barth in attendance, Sgt. Gorman and other offices discussed an ice sculpture of a penis. (Pl.'s L.R. 56.1(b)(3)(B) Stmt. P 70.) One officer present, Officer Carlson, stated that he "posed for it," but told the sculptors to make it "smaller than his" because he did not want to make anyone "jealous." (*Id.*) Sgt. Gorman laughed and stated to Carlson, "You were probably out there stroking it for them." (*Id.*) Carlson responded by simulating masturbation and making obscene noises. ( [*44] *Id.*) Barth was offended by the exchange. (*Id.*) Sgt. Gorman did nothing to stop the exchange. (*Id.*) Later that day, Sgt. Gorman yelled down the hall of the station to O'Donnell, in ear shot of Barth, "Next time you see a giant penis, knock it down for me." (*Id.* P 71.) O'Donnell responded, "I posed for it." (*Id.*) On March 11, 2002, Barth conducted a traffic stop, requested backup, and never received it. (*Id.* P 72.) On March 12, 2002, during roll call and in the presence of Barth, Sgt. Gorman asked Officer Carlson about a hairstylist, "How is she at trimming?" (*Id.* P 73.) Carlson responded, "You fucker!" (*Id.*) Barth inferred a sexual connotation from this exchange. (*Id.*) Then, on March 29, 2002, during another roll call with Barth present, Sgt. Gorman and other officers discussed a female date of an Officer Sederook. (*Id.* P 74.) Officer Stumpf stated, "If they don't fuck him, he roughs them up a little bit" and then made a punching motion. (*Id.*) Officer Carlson responded, "We all need a little action some time, no matter how we get it." (*Id.* P 74.) Finally, at some point during March 2002, at least four male officers were allowed to work [*45] in investigations while Barth was not. (*Id.* PP 99, 100.) As a result, Barth complained to Commander Surdel that she was not allowed to work investigations. (*Id.* P 101.) Nothing was done in response. (*Id.*) Barth also complained to Detective Keller about not being allowed to work in investigations. (*Id.*) He responded, "Four weeks was enough time with you," and laughed. (*Id.*)

*April 2002:* On or about April 15, 2002, during roll call with Barth present, Officer Stumpf told Sgt. Gorman, "I could see the nipples on [a female suspect's] tits . . . and I got a hard on." Sgt. Gorman laughed in response. (*Id.* P 75.) On or about April 24, 2002, in front of Barth, Officer Minas passed around a picture of a nude female. (*Id.* P 76.) Minas stated to Barth that she could not see

2006 U.S. Dist. LEXIS 19702, *; 97 Fair Empl. Prac. Cas. (BNA) 1764

the photo because it would be "sexual harassment," and proceeded to show it to other officers present. (*Id.* P 76.) Finally, in April 2002, Officer Kowalczykl, a male officer, was allowed to work in investigations more than once while Barth was not. (*Id.* P 102.)

*May 2002:* On or about May 9, 2002, while in the roll call room and in the presence of Barth, Commander Surdel [*46] and other officers were discussing Officer McVicker having sexual relations with gas station attendants. (*Id.* P 79.) Officer Stumpf stated, "See badge, it gets you pussy. See pussy, it gets you badge." (*Id.*) Commander Surdel laughed in response. (*Id.*) On May 25, 2002, during roll call and in the presence of Barth, officers were discussing a haircut by a female hairstylist. (*Id.* P 80.) Officer Kowalczyk asked, "Does she get in nice and close down under?" and pointed to his crotch. (*Id.*) Sgt. Gorman, present as well, responded, "Watch out for the little guys," and laughed. (*Id.*)

*June 2002:* On or about June 3, 2002, during roll call and in the presence of Barth, Officer Stumpf referred to a female movie actor, placed his hands on his chest, and made a comment about how endowed the actress was. (*Id.*) On or about June 5, 2002, during another roll call with Barth present, Sgt. Gorman commented that reason Officer Stumpf received free coffee from a local gas station was that he walked passed the female attendant with his zipper open. (*Id.* P 82.) Officer Stumpf responded, "Yeah she saw me," and he opened his mouth stuck out his tongue. (*Id.*) At [*47] another point during the roll call, Sgt. Gorman commented about the female employees at a local hair salon, declaring that there was "a lot of young tail" that worked there. (*Id.* P 83.) Officer Stumpf concurred and stated, "Yes, there are a lot of 'boxes' in there." (*Id.*) Later that day, Barth asked Sgt. Dreesbach if she could leave her shift early like a male officer. (*Id.* P 84.) He denied her request. (*Id.*) Barth complained to Dreesbach about the denial, he stated that she could not go home early because "she was complaining too much," and he laughed as he left. (*Id.*)

On or about June 27 or 28, 2002, in the lunch room with Barth present, Officer Keller turned to Barth and compared her to a recently fired male officer. (*Id.* P 87.) Keller stated to Barth, "he was like you, not doing anything and we haven't fired you yet," and laughed. (*Id.*) On or about June 30, 2002, Officers Stumpf and Sgt. Gorman, in front of Barth, discussed sexual intercourse with a female. (*Id.* P 90.) Sgt. Gorman asked Stumpf, "Would you 'do her'?" (*Id.*) Stumpf made a motion suggesting he ogled her breasts and responded, "We watch her walk across the parking lot." (*Id.* [*48] P 90.) Sgt. Gorman laughed. (*Id.*) Also, at some point in June 2002, Barth requested backup after she made a traffic stop. (*Id.* P 85.) However, she received no backup. (*Id.*) Barth believed the lack of backup subjected her to a life threaten-

ing situation. (*Id.*) Finally, at some point in June 2002, a male officer, Officer Louthan, was allowed to work in investigations on several occasions while Barth was not. (*Id.* P 98.)

*Unspecified Times:* Throughout her employment, Officer Brown stated to Barth that she "should leave her husband" and that he "could make her happy." (*Id.* P 27.) Barth complained to Sgts. Gorman and Dreesbach about Brown's comments and nothing was done. (*Id.*) At some point during her employment, Barth also complained to Sgts. Gorman and Dreesbach about harassment and a hostile work environment, but nothing was done. (*Id.* P 28.) At another point, Barth related to Sgt. Rancovich that Officer Carlson (male), with the assistance of another officer, Kim Malone (female), falsified an attendance sheet for a training course. (*Id.* P 113.) Officer Malone was not disciplined for falsifying information. (*Id.*) At some point in Barth's [*49] tenure, Sgt. Gorman informed Officer Malone that her statistics were inaccurate, but she was not disciplined. (*Id.* P 115.)] Barth had an opportunity to litigate the issue of whether she falsified her ticket totals before an administrative board hearing. (Def. Vill.'s Counts III & IV L.R. 56.1(a) Stmt. P 29.) Finally, at some point Barth received a written reprimand for losing a ticket book. (Def. Vill.'s L.R. 56.1(a) Stmt. P 21.)

*August 2002:* On or about August 14, 2002, Barth complained to Chief Pollak about health problems and work-related stress. (Pl.'s L.R. 56.1(b)(3)(B) Stmt. P 93.) Then, on or about, August 23, 2002, Barth resigned citing an intolerable hostile work environment. (*Id.* P 94.) Barth filled out an exit interview statement in which she rated her training period as "good." (Def. Vill.'s Counts III & IV L.R. 56.1(a) Stmt. P 32.) After leaving the police department she worked for the Calumet Parks Elementary School District. (*Id.* P 32.)

*March 2003:* Barth filed with the U.S. Equal Employment Opportunity Commission "EEOC") on March 17, 2003. (*Id.* P 38.)

### ii. Title VII -- Failure to Exhaust & Untimeliness

In the third count [*50] of Barth's complaint, she alleges Mokena violated Title VII by subjecting her to sexual harassment through a hostile work environment. Through her fourth count, Barth alleges the village violated Title VII by retaliating against her for her complaints of sexual harassment. Mokena raises, n4 in part, two affirmative defenses -- (1) untimely filing; and (2) failure to exhaust administrative remedies n5 -- to which the burden of establishing falls to the defendant village. *Poulos v. Vill. of Lindenhurst, 2002 U.S. Dist. LEXIS 16596, No. 00 C 5603, 2002 WL 31001876, at \*4 (N.D. Ill. Aug. 30, 2002)* [HN24] ("The burden of proving that plaintiff exhausted her administrative remedies and

2006 U.S. Dist. LEXIS 19702, *; 97 Fair Empl. Prac. Cas. (BNA) 1764

timely filed suits rests with defendants.") (citing *Massey v. Helman, 196 F.3d 727, 735 (7th Cir. 2000)*; *Williams v. Runyon, 130 F.3d 568, 573 (3d Cir. 1997))*. The Court considers these defenses in reverse order.

> n4 Mokena filed original and "revised" memoranda of law in support of its Counts I-IV motions for summary judgment. The Court notes that Mokena failed to request leave of Court to file the revised memoranda. The Court could easily ignore the later filings in each set. In the exercise of discretion, however, the Court will allow them. As the plaintiff responded to the original memoranda, the Court moving forward ascribes a full and proper denial to the plaintiff as to any substantive, additional arguments Mokena inserted into the "revised" documents.

[*51]

> n5 [HN25] *Federal Rule of Civil Procedure 8(c)* requires a defendant to plead affirmative defenses in its answer to the complaint. *See Fed.R.Civ.P. 8(c)*. Here, review of the defendants' response to the first amendment complaint shows that both the untimely filing and failure to exhaust defenses were timely plead.

### *Failure to Exhaust*

Mokena argues that the plaintiff failed to exhaust her prerequisite administrative remedies to bring her fourth count (retaliation) properly before the Court. [HN26] Generally, claims under Title VII not raised before the EEOC will not be allowed. *Peters v. Renaissance Hotel Operating Co., 307 F.3d 535, 550 (7th Cir. 2002)* (citing *Harper v. Godfrey Co., 45 F.3d 143, 147-48 (7th Cir. 1995))*. Courts, nevertheless, have allowed litigants to proceed on claims not explicitly set forth in an agency filing if (1) the claim is like or reasonably related to the EEOC charge, and (2) the claim in the complaint reasonably could be expected to grow out of an EEOC investigation [*52] of the charge. *Peters, 307 F.3d at 550* (internal quotation marks and citation omitted). "The claims are not alike or reasonably related unless there is a factual relationship between them. This means that the EEOC charge and the complaint must, at minimum, describe the *same conduct* and implicate the *same individuals*." *Haugerud v. Amery School Dist., 259 F.3d 678, 689 (7th Cir. 2001)* (emphasis added) (quoting *Cheek v. W. & S. Life Ins. Co., 31 F.3d 497, 501 (7th Cir. 1994))*.

Barth's retaliation claim clears the "same conduct" and "same individuals" hurdles. Review of the amended complaint in this matter reveals that the plaintiff imports into her fourth count (retaliation) a subset of the conduct and individuals at the center of her administrative charge/third count (hostile work environment). This is sufficient to sustain a reasonable relationship between counts three and four.

Here, moreover, it is reasonable to expect the EEOC investigation to have looked at some of the conduct that gave rise to the alleged retaliation through the agency's inquiry into incidents that evolved into the alleged hostile work environment. [*53] *See Geist v. Glenkirk, 2001 U.S. Dist. LEXIS 17366, No. 01 C 0700, 2001 WL 1268574, at *5 (N.D. Ill. Oct. 23, 2001)* (finding an EEOC investigation into retaliation was likely to look into conduct underlying a hostile work environment claim); *Juszczak v. Blommer Chocolate Co., 1999 U.S. Dist. LEXIS 17230, No. 97 C 9000, 1999 WL 1011954, at *8 (N.D. Ill. Sept. 30, 1999)* ("An investigation of plaintiff's disparate treatment and retaliation claim would uncover [the plaintiff's] complaints of harassment."). *But see Cheek, 31 F.3d at 503* (holding a hostile work environment complaint could not be reasonably inferred from allegations of sex discrimination in an EEOC charge). In sum, the Court here finds sufficient interrelation between the two Title VII claims that the administrative investigation into Barth's hostile work environment claim would likely have generated the alleged incidents that could ground a latter retaliation claim.

Mokena's motion for summary judgment [95] on Count IV on failure to exhaust grounds is DENIED.

### *Untimely Filing*

As to Mokena's untimely filing defense, the defendant village contends that any Title VII claim grounded on acts that occurred more than [*54] 300 days before Barth filed her EEOC charge is time-barred. [HN27] In general, a plaintiff in a federal employment discrimination case must file a charge of discrimination with the EEOC within 180 days of the unlawful employment practice underlying the complaint. *See 42 U.S.C. § 2000e-5(e)*. Illinois, however, is a "deferral state," which grants an extension for a plaintiff to file her charge until 300 days after the alleged unlawful employment practice. *See, e.g., EEOC v. Harvey L. Walner & Assocs., 91 F.3d 963, 970 (7th Cir. 1996)* (noting limitation period in Illinois runs for 300 days).

As to the third count (hostile work environment), Mokena hones in on a portion of the plaintiff's deposition testimony whereby she airs her layperson belief that she was working in a hostile work environment in November 1999. Mokena urges the Court to consider this the point that starts the 300-day clock running. This argument fails for two reasons. First, this statement of fact was not supported by the cited passage of the deposition and, accord-

2006 U.S. Dist. LEXIS 19702, *; 97 Fair Empl. Prac. Cas. (BNA) 1764

ingly, is not part of the available record. Second, the Supreme Court's holding in *National Railroad Passenger Corporation v. Morgan, 536 U.S. 101, 122 S. Ct. 2061, 153 L. Ed. 2d 106 (2002),* [*55] continues to elude defense counsel. n6

n6 Judge Denlow, in *Barth v. Village of Mokena, 2004 U.S. Dist. LEXIS 8316, No. 03 C 6677, 2004 WL 1093284, at *1 (N.D. Ill. May 10, 2004),* devoted a fair amount of ink to correct defense counsel's (mis)construction of *National Railroad Passenger Corporation v. Morgan, 536 U.S. 101, 122 S. Ct. 2061, 153 L. Ed. 2d 106 (2002),* and his avoidance of related and applicable Seventh Circuit case law. *Barth, 2004 U.S. Dist. LEXIS 8316, 2004 WL 1093284, at *2 (Denlow, J.).*

The central holding in *Morgan* is two-fold. First, under *Morgan,* [HN28] discrete acts of discrimination occur when they happen. *Morgan, 536 U.S. at 110* (stating "'[a] discrete retaliatory or discriminatory act 'occurred' on the day that it 'happened.'"). Thus, the *Morgan* Court held that Title VII "precludes recovery for discrete acts of discrimination or retaliation that occur outside the statutory time period." *Id. at 105.* Mokena's falter is in giving short shrift to the sentence of the Supreme Court's opinion that [*56] directly follows. Second, the *Morgan* Court continued, "we also hold that consideration of the entire scope of a hostile work environment claim, including behavior alleged outside the statutory time period, is permissible for the purposes of assessing liability, so long as an act contributing to that hostile environment takes place within the statutory time period." *Id.*

The relevant marker here is March 17, 2003, the date that Barth filed her administrative charge. Because a number of the events Barth alleges in her Title VII hostile work environment count occurred within the 300-day filing period, the Court may consider all of the allegedly harassing events, regardless of when they occurred, in connection with the plaintiff's third count.

The outcome is different for Barth's Title VII retaliation claim. [HN29] Retaliatory incidents, unlike harassment, need not accumulate to be actionable. The *Morgan* Court stated, "each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice'" that starts a new clock. *Id. at 114.*

Here, however, the plaintiff developed her response to the failure to exhaust defense at the expense [*57] of her untimely filing response. Whereas reliance on the amended complaint guided the Court in the failure to exhaust analysis above, it fails to shed light on untimeli-

ness. Review of Barth's memorandum shows that she devotes only a *single,* conclusory line to guide the Court on what actions of Mokena's she alleges constitute retaliation. She asserts, "Defendant Village was provided with adequate notice of Plaintiff's allegations that would constitute retaliation, *e.g.,* she complained about sexual harassment and then was subject to unwarranted disciplinary action, treated differently, and ultimately constructively discharged." (Pl.'s Counts III & IV Resp. Mem. 14.) [HN30] As courts often repeat to litigants at the summary judgment stage, it is *not* the duty of the courts to scour a record. *Roger Whitmore's Auto. Servs., Inc. v. Lake County, Ill., 424 F.3d 659, 664 n.2 (7th Cir. 2005)* (*Carter v. Am. Oil Co., 139 F.3d 1158, 1163 (7th Cir. 1998); United States v. Dunkel, 927 F.2d 955, 956 (7th Cir.1991)* ("Judges are not like pigs, hunting for truffles buried in" the record.)). [HN31] By its nature, an untimeliness defense is a time-specific [*58] inquiry. As Barth fails to argue and pull from the record time lines and dates associated with the occasions she "was subject to unwarranted disciplinary action [and] treated differently" under her retaliation theory, the Court will not relieve her of her burden. Without more, her retaliation claim fails as a matter of law.

Mokena's motion for summary judgement [95], as it related to untimeliness, is DENIED as to Count III and GRANTED as to Count IV.

### iii. Title VII - Hostile Environment Sexual Harassment (Count III)

[HN32] A Title VII violation can occur if a plaintiff can prove she was subjected to a hostile work environment. *Robinson v. Sappington, 351 F.3d 317, 328-29 (7th Cir. 2003).* In order for a plaintiff to make a *prima facie* case of actionable hostile environment sexual harassment, she must demonstrate that: (1) she was subjected to unwelcome sexual harassment; (2) the harassment was based on sex; (3) the harassment was sufficiently severe or pervasive to alter the conditions of her employment and create an intimidating, hostile or offensive working environment; and (4) there is a basis for employer liability. *Robinson, 351 F.3d at 328;* [*59] *Parkins v. Civil Constructors of Ill., Inc., 163 F.3d 1027, 1032 (7th Cir. 1996)).* Here, Mokena does not dispute that first and second elements are met. Accordingly, the Court begins with the third prong.

### Hostile or Offensive Work Environment

[HN33] In order to prevail under the third element, a plaintiff must show that the her work environment was both subjectively and objectively hostile. *Silk v. City of Chi., 194 F.3d 788, 804 (7th Cir. 1999)* (citing *Harris v. Forklift Sys., Inc., 510 U.S. 17, 21, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993)).* Mokena would have the Court don blinders and limit its review to the record falling within

Case 1:05-cv-00377-WDM-BNB   Document 157-7   Filed 02/12/07   USDC Colorado   Page 23 of
37

Page 23

2006 U.S. Dist. LEXIS 19702, *; 97 Fair Empl. Prac. Cas. (BNA) 1764

300 days prior to the EEOC charge filing. As discussed above, the *Morgan* decision states otherwise.

[HN34] This hostile work environment determination, instead, is to be made "in the light of 'the record as a whole' and 'the totality of circumstances, such as the nature of the sexual advances and the context in which the alleged incidents occurred.'" *Bohen v City of E. Chi., Ind.,* 799 F.2d 1180, 1186 (7th Cir. 1986) (citing *Meritor Savings Bank v. Vinson,* 477 U.S. 57, 69, 106 S. Ct. 2399, 91 L. Ed. 2d 49 (1986)); *see also Robinson,* 351 F.3d at 329 [*60] ("The resolution of this fact-intensive inquiry 'is not, and by its nature cannot be, mathematically precise test.'" (quoting *Harris,* 510 U.S. at 22)). Courts are to consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Robinson,* 351 F.3d at 329 (quoting *Harris,* 510 U.S. at 23).

The plaintiff's tenure on the force was interrupted twice; from mid-November, 1999 through January 2000 Barth was on medical leave and from mid-January 2001 through mid-May 2001 she was on maternity leave. Thus, the alleged harassment that Barth centers on occurred between September 1998 and mid-November 1999, between February 2000 and mid-January 2001, and between mid-May 2001 and August 23, 2002.

Barth points to a lengthy list of alleged harassing conduct, n7 however, not all purported incidents made it into the record. The available record to which Barth points, viewed in the light most favorable to her, indicates that: (1) male officers, including Sgt. Gorman, regularly made lewd [*61] and derogatory comments about women in general and the plaintiff in particular; n8 (2) male officers, including Sgt. Gorman, frequently made explicit sexual and offensive comments, gestures, and jokes about women in general and the plaintiff in particular; n9 (3) male supervisors, including Sgts. Dreesbach and Gorman, repeatedly laughed off or failed to respond to Barth's complaints of sexual harassment; n10 (4) male officers, including Sgts. Dreesbach and Gorman, on multiple occasions failed to provide the plaintiff with police backup; n11 (5) during her recruit period, then supervisors and training officers (both male) on at least five occasions warned the plaintiff never to complain or reprisal, in the form of denied backup, would follow; n12 (6) during her recruit period, a then-supervisor and trainer (male) at least twice afforded the plaintiff less training than male trainees; n13 (7) in the first two years of her employment, a male officer engaged in at least one offensive touching of the plaintiff and at least three unwelcome sexual advances; n14 (8) during her pregnancy, Sgt. Dreesbach on at least two occasions ordered the plaintiff to perform activities that were outside [*62] of her approved light duty accommodation and at least once lobbied for the lifting of her "special treatment;" n15(9) in the final year of her tenure, Sgts. Gorman and Dreesbach frequently singled out the plaintiff's work product in a manner that forced her, and her alone, to redo reports from scratch; n16 (10) in her final five months with the force, male supervisors granted male officers desirable work assignments denied to the plaintiff and denied her request for leave when it was granted to a male officer; n17 (11) in her final four months, Chief Pollak ordered a targeted investigation of Barth; n18 (12) Sgt. Dreesbach on one occasion attempted to pressure Barth into making false, incriminating statements; n19 and (13) she was once disciplined by Chief Pollak for falsifying information when a male colleague was not reprimanded for falsifying information as well. n20 Finally, on August 23, 2002, Barth resigned from the force citing a hostile work environment. (Pl.'s L.R. 56.1(b)(3)(B) Stmt. P 93; *id.* Ex. 13.)

n7 Curiously enough, Mokena does not challenge that the alleged harassment was based on sex. As such, the Court, for purposes of this opinion, accepts Barth's position that the conduct was based on sex.

[*63]

n8 (Pl.'s L.R. 56.1(b)(3)(B) Stmt. PP 7 (women should be at home "servicing their man"), 23 (plaintiff did not like the Howard Stern show because she did not have "big enough tits" to "be on the show"), 26 ("Sue's tits are bigger than this [spotlight]."), 52 (discussion of "tits" in Barth's presence); 74 (male officer discussion of forced sex with a female in Barth's presence), 79 ("See badge, it gets you pussy. See pussy, it gets you badge."), 90 ("Would you 'do her?'").) "Shock Jock" Radio host Howard Stern has had a handful of televised shows over the years. Parties do not specify which of the series was aired in the Mokena roll call room. The Court, however, notes that during the applicable time frame, the E! Network, a cable channel, aired episodes of a program called *Howard Stern. See generally* http://en.wikipedia.org/wiki/Howard_Stern.

n9 (Pl.'s L.R. 56.1(b)(3)(B) Stmt. PP 66 ("We should watch this [exercise program] every morning. It gets my blood pumping in all the rights places," and pointing to crotch); 69 (Sgt. Gorman's "homemade mayonnaise" and simulated masturbation); 70 (discussion of ice sculp-

2006 U.S. Dist. LEXIS 19702, *; 97 Fair Empl. Prac. Cas. (BNA) 1764

ture of penis); 75 ("I could see the nipples on [a female suspect's] tits . . . and I got a hard on."); 81 ("Does [the female hairstylist] get it nice and close down under?" and pointing to crotch); 83 ("Yes, there are a lot of 'boxes' in [the hair salon].").) The term "box" in certain contexts can be vulgar slang for the vulva or vagina. *See, e.g.,* http://dictionary.reference.com/search?q=box.

[*64]

n10 (Pl.'s L.R. 56.1(b)(3)(B) Stmt. PP 14 (Barth complains about male trainee's disclosure of his sexual activities and male supervisor responds, "get use to it."), 21 (Barth complains about unwelcome sexual advance by male colleague and Sgt. Gorman fails to respond), 22 (Barth complains that the Howard Stem show is inappropriate to air in a workplace and Sgt. Gorman laughs and walks away), 28 (Barth complains about sexual harassment and a hostile work environment to Sgts. Dreesbach and Gorman and they do not respond), 33 (Barth files a written complaint to a male superoir about a male colleague's unwelcome, physical assualt, but never recieves a response), 39 (Barth complains about assignments contrary to her light duty accommodation and Sgt. Dreesbach responds, "I did not tell you to get pregnant."), 52 (Barth complains about the Howard Stern show and Sgt. Gorman responds, "I need to watch it somewhere."), 65 (Barth complains about lack of backup and Sgt. Gorman respons that if she wanted to do a "man's job, she should do it by herself."), 68 (Barth looked at Sgt. Gorman to complain about sexual comments made about an exercise show and Sgt. Gorman laughed).)

n11 (Pl.'s L.R. 56.1(b)(3)(B) Stmt. PP 61, 65, 68, 72, 85.)

[*65]

n12 (Pl.'s L.R. 56.1(b)(3)(B) Stmt. PP 2, 9, 11 ("the revenge would not be pretty"), 12, 13, (denial of backup is she "stirred the pot"), 14.)

n13 (Pl.'s L.R. 56.1(b)(3)(B) Stmt. PP 4, 6.)

n14 (Pl.'s L.R. 56.1(b)(3)(B) Stmt. PP 20 ("better woman" and the "happier she was in bed, the happier she would be on the street" comments directed at the plaintiff); 25 ("You are the perfect

height to give me a blow-job."); 27 (invitation to leave her husband); 32 (physical grabbing of Barth's chest and "see, I told you would like it" comment).)

n15 (Pl.'s L.R. 56.1(b)(3)(B) Stmt. PP 38, 40, 43.)

n16 (Pl.'s L.R. 56.1(b)(3)(B) Stmt. P 54.)

n17 (Pl.'s L.R. 56.1(b)(3)(B) Stmt. PP 84, 99, 100.)

n18 (Pl.'s L.R. 56.1(b)(3)(B) Stmt. PP 124.)

n19 (Pl.'s L.R. 56.1(b)(3)(B) Stmt. PP 56, 57.)

n20 (Def. Vill.'s Counts III & IV L.R. 56.1(a) Stmt. P 25; Pl.'s L.R. 56.1(b)(3)(B) Stmt. PP 113.)

Courts must consider *all* the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it was physically threatening or humiliating; or a mere offensive [*66] utterance; and whether it unreasonably interferences with an employee's work performance." *Harris, 510 U.S. at 23*. Many of the above categories of alleged harassment, if weighed alone, might be insufficient for Barth to carry her claim of actionable harassment. n21 Taken together, however, the above record, all of which is in dispute, is more than a mere scintilla of evidence, thereby it is sufficient for the plaintiff to establish her burden under prong three and reach trial. Even if the court were to look at a subset of the record, namely the failure to provide police backup, the Court still concludes the issues in dispute present a question for trial.

n21 For example, [HN35] comments by co-workers and superiors not directed at Barth but made in her presence would be classified as "second-hand" harassment. While relevant, such "second-hand" harassment is considered to be less objectionable than the harassment directed at Barth. *See, e.g., Moser v. Ind. Dep't of Corr., 406 F.3d 895, 903 (7th Cir. 2005); Ezell v. Potter, 400 F.3d 1041, 1048 (7th Cir. 2005)*. Moreover, a handful of gender-based comments over the course of several years are too isolated and sporadic to constitute severe and pervasive harass-

2006 U.S. Dist. LEXIS 19702, *; 97 Fair Empl. Prac. Cas. (BNA) 1764

ment. *Patt v. Family Health Sys., Inc., 280 F.3d 749, 754 (7th Cir. 2002)* (mixture of eight direct and "second-hand" comments).

[*67]

Even if this Court were to only consider the alleged superior officers' threats of and the superior officers' purported follow through on such threats on just five occasions, this subset of actions alone is sufficient to allow a reasonable trier of fact to find an objectively hostile work environment existed at the Mokena Police Department. *See, e.g., Collins, 96 F. Supp. 2d at 744, (N.D. Ill. Mar. 17, 2000)* (statements by superior officer that backup would be denied to a plaintiff female officer, though isolated, were sufficient to reach a jury); *Kramarski v. Vill. of Orland Park, 2002 U.S. Dist. LEXIS 14662, No. 00 C 2487, 2002 WL 1827637, at *9 (N.D. Ill. Aug. 9, 2002).*

[HN36] Courts have found failure to provide backup, even on isolated occasions, as sufficiently severe and pervasive to alter the conditions of an officer's employment and create a hostile work environment. *Collins, 96 F. Supp. 2d at 750; Kramarski, 2002 U.S. Dist. LEXIS 14662, 2002 WL 1827637, at *9.* It is not a stretch of reason for a trier of fact to conclude that failure to provide backup to be sufficiently severe (i.e., threatening to the wellbeing of an officer, demoralizing and humiliating at the very least, [*68] and interfering with an officer's carrying out her job functions on the street) that the officer's place of employment becomes a hostile and offensive one. Moreover, pairing the alleged five occasions of failed backup with the alleged derogatory comments made about the plaintiff, the evidence suggesting a history of general departmental animus toward female officers, the plaintiff's status as the first female to integrate this police force, and the lack of evidence suggesting that male officers were ever subjected to failed backup establishes that Barth has carried her burden under the third prong. *See e.g. Kramarski, 2002 U.S. Dist. LEXIS 14662, 2002 WL 1827637, at *9.*

### Basis for Employer Liability

[HN37] "Once [a court] conclude[s] that the discriminatory conduct was sufficiently severe or pervasive to create an abusive working environment, the employer's liability is triggered." *Silk, 194 F.3d at 805.* The fourth prong focuses on whether liability will attach and that question turns on the Supreme Court's companion decisions in *Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 118 S. Ct. 2257, 141 L. Ed. 2d 633 (1998),* and *Faragher v. City of Boca Raton, 524 U.S. 775, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1998). [*69]*

Mokena argues, in part, that it cannot be held liable because it can successfully establish the *Ellerth/Faragher* affirmative defense. n22 This affirma-

tive defense is comprised of two elements: "(a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Ellerth, 524 U.S. at 765; accord Faragher, 524 U.S. at 807.* Mokena's proclamation of victory, however, is premature.

> n22 Mokena also argues that Barth cannot establish liability under either the "supervisor" or "mere co-worker" paths to liability. [HN38] Harassment by a supervisor triggers strict liability *if* there was a tangible employment action. *Parkins v. Civil Constructors of Ill., Inc., 163 F.3d 1027, 1032 (7th Cir. 1998).* If there was no tangible employment action and the harasser was a mere co-worker, then, and only then, is the affirmative defense available. Whether Barth has developed a sufficient record to get to trial on liability can be established under either the supervisor or the co-worker "fork in the road." As Mokena spends a greater share of their argument on the affirmative defense, the Court opts to begin there. And, as the Court reaches, *infra* at 43-44, the conclusion that the record, in the light most favorable to her, supports her getting to trial, the Court forgoes the other analytical path in the interest of brevity. Whether or not, Barth can establish strict liability is an open question for another day.

[*70]

[HN39] This defense is only available in the absence of a tangible employment action. *Pa. State Police v. Suders, 542 U.S. 129, 137, 124 S. Ct. 2342, 159 L. Ed. 2d 204 (2004)* (citing *Ellerth, 524 U.S. at 765; Faragher, 524 U.S. at 807).* Assuming *arguendo* that there was no tangible employment action, Mokena is not entitled to summary judgment, for three primary reasons. First, there are genuine issues of material fact as to whether the superior officers exercised reasonable care to prevent or timely correct harassing behavior. The village's anti-sexual harassment policy by itself does not entitle Mokena to summary judgment on its affirmative defense in light of the evidence suggesting that a hostile work environment may have been common, known to the departmental supervising officers, and allowed to continue. The whole of the alleged hostile work environment to which Barth cites at the very least raises whether Mokena and its supervising officers were on constructive notice. *Rhodes v. Ill. Dept. of Transp., 359 F.3d 498, 507 (7th Cir. 2004)* (citing *Mason v. Southern Ill. Univ., 233 F.3d 1036, 1046, n.8 (7th Cir. 2000); Zimmerman v. Cook*

2006 U.S. Dist. LEXIS 19702, *; 97 Fair Empl. Prac. Cas. (BNA) 1764

*County Sheriff's Dep't, 96 F.3d 1017, 1018 (7th Cir. 1996)).* [*71] It is for a jury to weigh the credibility and sufficiency of this type of evidence at trial.

Second, there are genuine issues of material fact concerning whether the departmental response to Barth's failed backup complaints, regardless of their verbal nature or to which commanding officer they were directed, constituted reasonable care to correct the incidents of future failed backup. [HN40] "The employer's knowledge of the misconduct is what is critical, not how the employer came to have that knowledge." *Cerros v. Steel Techs. Inc., 398 F.3d 944, 952 (7th Cir. 2005)* (citing *Durkin v. City of Chicago, 341 F.3d 606, 612, (7th Cir. 2003); Silk, 194 F.3d at 807 (7th Cir. 1999)).*

Finally, whether or not Barth complained is also worthy of jury review. The availability of Mokena's defense rises and falls on whether a reasonable a trier of fact believes Barth or the defendants on whether complaints were lodged and how effective (if at all) they may have been. The reasonableness of Barth's efforts -- may they have been written memoranda or oral complaints -- is in dispute and not to be resolved in the context of a motion for summary judgement. [*72]

Mokena's motion for summary judgment [95] as to Count III is DENIED.

### *3. Mokena's Counts I & II Motion for Summary Judgement*

#### *i. Facts* n23

Barth joined the Mokena Police Department in September 1998. (Def. Vill.'s Counts I & II L.R. 56.1(a) Stmt. P 1.) She was the first female on the force. (Pl.'s L.R. 56.1(b)(3)(B) Stmt. P 2.) Barth's tenure lasted through August 23, 2002, when she resigned. (*Id.* P 93.)

> n23 Unless otherwise noted, the following facts are undisputed and/or deemed admitted pursuant to *Local Rule 56.1.* Further, for purpose of summary judgment, where facts are contested the Court accepts the legitimate factual assertions of the non-moving party. *Pardo, 946 F.2d at 1280.*

Prior to Barth joining the force, Mokena adopted a sexual harassment policy and generally included it in its employee personnel manual. (Def. Vill.'s Counts I & II L.R. 56.1(a) Stmt. PP 18, 25, 26.) The Mokena sexual harassment policy expressly prohibits sexual harassment, defines certain [*73] behaviors as sexual harassment, and encourages employees facing such behavior to bring such encounters to the attention of a supervisor, a department head, or the Village Administrator. (*Id.* PP 18,

25; *see also id.* Ex. A P 11.11; Pl.'s L.R. 56.1(b)(3)(B) Stmt. Ex. 12 P 11.11.)

On September 18, 1998, Barth executed an acknowledgment wherein she certified receipt of a Mokena personnel manual. (*Id.* P 26.) Barth claims at the time of hiring she was not aware of the anti-sexual harassment policy. (Pl.'s L.R. 56.1(b)(3)(B) Stmt. P 3.) Starting in 1996, Chief Pollak instituted periodic sexual harassment training for department personnel. (Def. Vill.'s Counts I & II L.R. 56.1(a) Stmt. P 23.) During her time on the force, Barth attended one such training session in January 2002. (*Id.* P 3; Pl.'s L.R. 56.1(b)(3)(B) Stmt. P 67.) Parties disagree on what was discussed at the training. Barth, however, asserts that the Village's written, sexual harassment policy was *not* discussed. (*Id.* P 67.)

Overall, Barth alleges multiple incidents of supervisor and co-worker harassment amounting to a hostile work environment, lack of followup by supervisors on [*74] the occasions she complained to superiors, and retaliation against her for complaining. In accordance with the written anti-sexual harassment policy, Barth never raised the issue of or complained about sexual harassment or retaliation to the Village's Board of Police and Fire Commissioners, (Def. Vill.'s Counts I & II L.R. 56.1(a) Stmt. P 17), or the Village Administrator, (*Id.* P 22).

In the interests of brevity and efficiency, the Court incorporates here the statements of *additional* facts found in Mokena's Counts I and II fact recitation, *supra* at 21-31, beginning with the facts found in the paragraph entitled *Recruit Period* through the paragraph entitled *August 2002.* Again, the vast majority of these statements are contested. To these incorporated additional facts, the following is added:

*February 2002:* Barth's problems with Officer Brown ended when he left the force in February 2000. (Def. Vill.'s Counts I & II L.R. 56.1(a) Stmt. P 27.)

#### *ii. Statute of Limitations*

Mokena argues that Barth's dual *§ 1983* claims are time-barred and summary judgment should be entered in its favor. [HN41] The statute of limitations for *§ 1983* actions [*75] in Illinois is two years. *See Barth v. Vill. of Mokena, 2004 U.S. Dist. LEXIS 8316, No. 03 C 6677, 2004 WL 1093284, at *1 (N.D. Ill. May 10, 2004)* (Mason, J.) (citing *Licari v. City of Chi., 298 F.3d 664, 667-68 (7th Cir. 2002)).* The Seventh Circuit has held that the Supreme Court's *Morgan* decision, although framed around Title VII, is applicable to *§ 1983. Hildebrandt v. Ill. Dep't of Natural Res., 347 F.3d 1014, 1036 n.18 (7th Cir. 2003)* (citing *Sharpe v. Cureton, 319 F.3d 259, 267 (6th Cir. 2003); RK Ventures, Inc. v. City of Seattle, 307 F.3d 1045, 1058-61 (9th Cir. 2002)); Barth, 2004 U.S.*

*Dist. LEXIS 8316, 2004 WL 1093284, at \*2* (noting defense counsel's failure to address *Hildebrant*).

[HN42] A government entity, such as a municipality, is only liable under § 1983 "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts injury." *Monell v. Dep't of Soc. Servs. of N.Y., 436 U.S. 658, 694, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978).* The policy and custom at issue in Count I, as Barth asserts it, is Mokena's "condoning and perpetuating a [\*76] hostile work environment against Plaintiff and other women." In support of Count I, she has alleged facts that fall within the applicable two year window. Under *Morgan* that is sufficient to allow her to rely on the entire scope of the facts (i.e., those inside and outside of the two year cap) to further her Count I claim. And, the policy and custom Barth points to in Count II is a code of silence and retaliation against officers that spoke to matters of public concern. Consequently, as consistent with *Morgan*, the Court focuses its review on those discrete acts of *First Amendment* retaliation that fall within the two year statutory cap.

Mokena's motion for summary judgment on Counts I and II [92] on grounds that the plaintiff is time-barred is DENIED. The other defendants offer substantially similar untimeliness arguments in their own motions for summary judgment. Accordingly, Pollak's motion for summary judgment [98], Dreesbach's motion for summary judgment [103], and Gorman's motion for summary judgment [131] on ground of untimeliness are DENIED as well.

### iii. § 1983 Equal Protection Claim (Count I)

[HN43] Municipal liability under § 1983 is had "when execution [\*77] of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts injury." *Monell, 436 U.S. at 694.* However, municipality liability under § 1983 cannot be "based upon theories akin to *respondeat superior.*" *City of Oklahoma City v. Tuttle, 471 U.S. 808, 818, 105 S. Ct. 2427, 85 L. Ed. 2d 791 (1985).* To prevail, Barth must establish both "the requisite culpability (a 'policy or custom' attributable to municipal policy-makers), and the requisite causation (the policy or custom was the 'moving force' behind the constitutional depravation." *Gable v. City of Chicago, 296 F.3d 531, 537 (7th Cir. 2002)* (citing *Monell, 436 U.S. at 691-94*). Actionable policies or customs under § 1983 take three forms: "(1) express policy that, when enforced, causes a constitutional deprivation; (2) a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a 'custom or

usage' with the force of law; or (3) an allegation that the constitutional injury caused by a person with final policymaking authority. [\*78] " *Palmer v. Marion County, 327 F.3d 588, 594-95 (7th Cir. 2003).*

An express municipal policy need not be alleged, as is the case here, in order for a plaintiff to state an actionable claim. Instead, Barth argues that (1) Mokena had a widespread practice of "condoning and perpetuating a hostile work environment;" and (2) Mokena is liable through Chief Pollak's status as final policymaker for his "condoning and perpetuating a hostile work environment." The Court addresses these arguments in reverse order.

### Final Policymaker

In furtherance of Barth's final policymaker theory, she names Pollak as the official with final authority for Mokena on police personnel matters (i.e., discipline, training, special assignments, and (non)enforcement of the sexual harassment prohibition) and the one responsible for her constitutional harm. She incorrectly implies this determination is one for the finder of fact. Instead, [HN44] it is a question of law for the Court.

Supreme Court "cases on the liability of governments under § 1983 instruct [courts] to ask whether governmental officials are final policymakers for the local government in a *particular area*, or a *particular* [\*79] *issue.*" *McMillan v. Monroe County, Ala., 520 U.S. 781, 785, 117 S. Ct. 1734, 138 L. Ed. 2d 1 (1997)* (emphasis added). Generally, courts are to turn to state or local law to identify those officials or government bodies who speak with final policy making authority. *City of St. Louis v. Praprotnik, 485 U.S. 112, 125, 108 S. Ct. 915, 99 L. Ed. 2d 107 (1988); Kujawski v. Bd. of Comm'rs, 183 F.3d 734, 737 (7th Cir. 1999).* Final policymaking authority, however, can be found off the pages of a municipal ordinance or code, namely where a municipal official with final policymaking authority ratifies a subordinate's unconstitutional act. *See, e.g., Gernetzke v. Kenosha Unified Sch. Dist. No. 1, 274 F.3d 464, 468-69 (7th Cir. 2001)* (delegation by a final decisionmaker is insufficient to impose municipal liability; but adoption or ratification of subordinate's act as the decisionmaker's own act makes the municipality the author of the action for purposes of § 1983).

To counter Barth's argument that Pollak was the final decisionmaker, Mokena argues that an Illinois statute, *see 65 ILCS 5/10-2.1-17,* vests all final policymaking with the Board of Fire and [\*80] Police Commissioners ("Board"). This same argument, however, was reviewed and declined by the district court in a fairly recent case that declared this argument "flawed." Judge Gottschall succinctly observed, [HN45] "the Board may be the final policymaker under *65 ILCS 5/10-2.1-17* with

respect to removal and discharge of police officers, but the statute *does not* purport to address all matters of police department policy, such as policies establishing the terms and conditions of employment." *Nebel v. City of Burbank, 2003 U.S. Dist. LEXIS 4942, No. 01 C6403, 2003 WL 1606087, at *5 (N.D. Ill. Mar. 27, 2003)* (emphasis added). Thus a matter of law, this Court finds that the Board is not the final policymaker on the daily operations of the Mokena Police Department.

In its reply, Mokena shifts gears and makes a curious concession: "Moreover, it shows that Stephen Pollak did in fact have 'final policymaking authority.'" (Def. Mokena's Counts I & II Reply 14.) Mokena's closing salvo stands out because the tenor prior to the reply sounds as if it would argue that Pollak *lacked* final policymaking authority. Nevertheless, Mokena's last minute concession stands n24 and the Court accepts [*81] parties' concurrence that Pollak is the final policymaker.

> n24 On November 2, 2005, the Court advised both sides of its intent to construe the official record "as is." Due in part to the Court's receipt of courtesy copies containing *additional* pages that were not in the official record, the Court issued a minute order [160] that (1) advised the parties of filing irregularities, (2) invited both sides to review their filings related to summary judgment for accuracy and completeness, and (3) warned parties that the Court would proceed with the official record as it appeared on November 9, 2005.

While Barth prevailed on a finding that Pollak was a policymaker, she fails to pull from the available record those specific facts to support a finding that Pollak was involved or condoned a hostile work environment for female personnel (i.e., ratification). The Court declines Barth's bare assertion there are "sufficient facts in the record" to make this leap. Barth's burden under *Local Rule 56.1* is to highlight those [*82] for the Court.

As to involvement, Barth improperly supports her assertions that Chief Pollak himself contributed to the hostile work environment through discriminatory discipline, unwarranted investigation, denial of special assignments, and failing to take action to remedy the hostile work environment. First, it is unclear if she is drawing the Court's attention to her Local Rule 56.1(b)(3)(A) response or 56.1(b)(3)(B) statement of additional facts. To clarify, [HN46] Local Rule 56.1(b)(3)(B), not 56.1(b)(3)(A), provides "the *only* acceptable means of . . . presenting additional facts." *Midwest Imports, 71 F.3d at 1317.* Even assuming Barth's cloudy citation is directing the Court to 94 of her 125 statements of additional

facts does not help her make her case. For example, the facts related to Pollak's initiation of an investigation or Barth's denial of special assignments by others is not found in the range of statements of additional facts she cites. Again, [HN47] courts are under no obligation to scour a record to find support for either side. *See, e.g., Estate of Moreland v. Dieter, 395 F.3d 747, 759 (7th Cir. 2005)* ("We will not scour a record to locate [*83] evidence supporting a party's legal argument."). In sum, Barth offers nothing more than an bare assertion to support a finding that Pollak was directly involved in a hostile work environment.

As to ratification, Barth marshals facts that reasonably support a delegation but not ratification. [HN48] Delegation of authority is clearly distinct from ratification of a subordinate's bad acts. "For if a police department . . . were liable for employees' actions that it authorized but did not direct, we would be back in the world of *respondeat superior.*" *Gernetzke, 274 F.3d at 469; see also Gujawski, 183 F.3d at 739-40* (clarifying delegation of authority to set policy can impose a basis for municipal liability, whereas delegation of authority to carry out a policy may not).

Barth asserts that Pollak's ranking officers were under an affirmative duty to report violations of the sexual harassment policy, thus Pollak ratified subordinate inaction through his failure to remediate. Setting aside the liberal inferences contained within this argument, the Court turns to focus on what the plaintiff cites as support -- a portion of Pollak's deposition testimony. Three [*84] reasons undermine Barth's reliance on the deposition. She raises this "fact" in her response to *another* defendant's statement of facts, thus it is not part of the factual record tied to Mokena's Counts I and II motion for summary judgment. Moreover, she raises it only through a responsive memorandum and not in her statement of additional fact. [HN49] "Simply providing additional facts in one's responsive memorandum is insufficient to put those facts before the Court." *Malec, 191 F.R.D. at 584.* Even if this Court were to rely upon this information, the passage of the deposition she cites to does not support her alleged "fact." "Factual allegations not properly supported by the record are nullities." *Id. at 583.* Barth also relies on the testimony of Sharen Fabiszak, which is excluded from the record, in part, on inadmissible hearsay grounds. Finally, Barth points to party-opponents' admissions of sexually charged workplace exchanges, but the particular statement of additional fact she points to does not support her assertion.

Thus, the available record reviewed in the light most favorable to Barth reveals that she only addressed the Chief on three occasions: (1) [*85] to request light duty followed by maternity leave; (2) to address a health condition and work-related stress; and (3) to document her

2006 U.S. Dist. LEXIS 19702, *; 97 Fair Empl. Prac. Cas. (BNA) 1764

concern about a hostile work environment. Barth's writing regarding the hostile work environment was bundled with her resignation from the force. She essentially complained and resigned in the same stroke, preventing Pollak from either redressing or ratifying the abuse she faced. Without more a reasonable factfinder could not infer that Pollak, as policymaker, ratified the bad acts of others. On this record, municipal liability through final policymaker injury cannot be had.

### *Widespread Practice or Custom*

Barth asserts municipal liability through a widespread practice or custom of condoning sexual harassment and discrimination. [HN50] A plaintiff "must show that there was some knowledge or awareness -- actual or imputed -- of the custom and its consequences showing the municipality's approval, acquiescence, or encouragement of the alleged unconstitutional violation." *Durkin, 199 F. Supp. 2d 836, 843* (internal quotations omitted) (citing *Jones v. City of Chi., 787 F.2d 200, 204 (7th Cir. 1986)*).

Mokena challenges [*86] Barth's widespread custom assertion based on a lack of evidence of other female employee victims. Mokena's assertion that police department employees Sharen Fabiszak, Carol Fitzgerald, and Ann Lyons deny they were subjected to sexual harassment, however, falls flat as the village lacks the evidence to back these denials. In particular, Mokena fails to cite with specificity to the affidavits it relies to back paragraphs 10, 11, and 14-16 of its Count I and II statement of facts. As previously mentioned, such noncompliance with *Local Rule 56.1* fails to get these "facts" into the record.

[HN51] "The usual way in which an unconstitutional policy is inferred, in the absence of direct evidence, is by showing a series of bad acts and inviting the court to infer from them that the policymaking level of government was bound to have noticed what was going on and by failing to do anything must have encouraged or at least condoned, thus in either event adopting, the misconduct of subordinate officers." *Jackson v. Marion County, 66 F.3d 151, 152 (7th Cir. 1995)* (citation omitted). In this inquiry, Chief Pollak serves as the relevant policymaking level of government.

In support of her [*87] argument that the harassment custom was widespread, Barth relies on a list of facts, some on point and others not. Her reliance on alleged incidents of officer-on-female citizen "harassment" is of some relevance, but those based on what unnamed male officers said amount to inadmissible hearsay. In the end, Barth offers the totality of her own alleged encounters with workplace harassment (direct and "second-hand") over *four years,* admissions by party-opponent managers that they were unclear on how the sexual har-

assment policy should be implemented; five alleged incidents of failed backup; her observation that a superior would target women and teenage girls for traffic stops and officers' alleged comments as to the physique of a female suspect in custody, and party-opponent admission's that foul language was used on occasion within the department.

In the light most favorable to the plaintiff, the length of time and numerous players in the alleged harassment could support a reasonable factfinder's conclusion that a departmental custom was sufficiently widespread for *§ 1983* liability to attach to the defendant village. *Cf. Durkin, 199 F. Supp. 2d at* (evidence of two non-policymaker [*88] superiors mistreatment of female employee over the course of a few days was not enough to rise to a widespread practice).

Mokena's motion for summary judgment [92] on Count I is DENIED.

### *iv. § 1983 First Amendment Retaliation Claim (Count II)*

[HN52] In evaluating a *§ 1983* claim for retaliation in violation of a public employee's *First Amendment* rights, courts are to apply a three-step analysis derived out of the Supreme Court's *Mt. Healthy City School District Board of Education v. Doyle, 429 U.S. 274, 97 S. Ct. 568, 50 L. Ed. 2d 471 (1977),* decision. *Spiegla v. Hull, 371 F.3d 928, 935 (7th Cir. 2004).* The court, the plaintiff, and the defendant all play a part in the inquiry. First, a court must determine the employee's speech was constitutionally protected. *Spiegla, 371 F.3d at 935* (citing *Sullivan v. Ramirez, 360 F.3d 692, 697 (7th Cir. 2004)).* Second, the plaintiff must demonstrate that the speech was either a substantial or motivating factor in the retaliation. *Spiegla, 371 F.3d at 941-42* (disavowing prior Seventh Circuit cases requiring but-for causation). Lastly, the defendant has an opportunity to establish the same [*89] employment action would have been taken in the absence of the speech. *Id. at 935.* Yet, "*section 1983 creates a cause of action based on personal liability and predicated upon fault; thus, liability does not attach unless the individual defendant caused or participated in a constitutional deprivation.*" *Rasche v. Vill. of Beecher, 336 F.3d 588, 597 (7th Cir. 2003)* (internal quotation marks and citations omitted).

[HN53] To qualify as protected, an employee's speech must be that of a citizen on a matter of public concern. *Ashman v. Barrows, 438 F.3d 781, 784 (7th Cir. 2006)* (citing *Connick v. Myers, 461 U.S. 138, 103 S. Ct. 1684, 75 L. Ed. 2d 708 (1983); Pickering v. Bd. of Educ., 391 U.S. 563, 88 S. Ct. 1731, 20 L. Ed. 2d 811 (1968)).* The public concern determination is a question of law to be decided by the court. *Taylor v. Carmouche, 214 F.3d 788, 792 (7th Cir. 2000); Kokkinis v. Ivkovich,*

2006 U.S. Dist. LEXIS 19702, *; 97 Fair Empl. Prac. Cas. (BNA) 1764

*185 F.3d 840, 843 (7th Cir. 1999)*. Whether speech qualifies as a public concern must be determined "by the content, form, and context of a given statement, as revealed by the record as a whole." *Delgado v. Jones, 282 F.3d 511, 516 (7th Cir. 2002)* [*90] (quoting *Connick, 461 U.S. at 147-48*). Of this trio, the content of the speech is the most important consideration. *Delgado, 282 F.3d at 517*.

A review of the available record reveals that Barth alleges she was denied timely backup on October 8, 2001, January 25 and 31, 2002, March 3, 2002, and an unspecified date in June 2002 and she complained to superiors about the lack of backup after the first two incidents. Here, as a matter of law and under the law of this case, [HN54] Barth's two complaints to supervisors about being denied backup raise "the issues of officer safety and public safety, both matters of public concern." *Barth v. Vill. of Mokena, 2004 U.S. Dist. LEXIS 2789, No. 03 C 6677, 2004 WL 434195, at *2 (N.D. Ill. Feb. 25, 2004)* (Lingberg, J.) ("Speech related to law enforcement that has an impact on public safety is speech touching on a matter of public concern, even if the speaker was partly motivated by personal concerns."). *See also Delgado, 282 F.3d at 517* ("In terms of content, [the Seventh Circuit] has determined that police protection and public safety are generally a matter of public concern."); *Auriemma v. Rice, 910 F.2d 1449, 1460 (7th Cir. 1990)* [*91] (en banc) ("It would difficult to find a matter of greater public concern in a large metropolitan area than police protection and public safety."). Barth's speech on (lack of) backup, as a matter of law, is constitutionally protected. n25

n25 Barth's response to Mokena's Counts 1 & II motion for summary judgment lacks clarity as to what speech she asserts constitutional protection. Turning to her other speech -- namely, her objections to sexual harassment and gender discrimination during her tenure -- the Court, based on the available record, cannot conclude it warrants constitutional protection. [HN55] While sexual harassment and gender discrimination are inherently subjects of public interest, *Marshall v. Allen, 984 F.2d 787, 795 (7th Cir. 1993)*, speech about harassment and discrimination do not rise to the level of public concern if "the expression addresses only the personal effect upon the employee," *Button v. Kibby-Brown, 146 F.3d 526, 529-30 (7th Cir. 1998)* (citation omitted). *See also Barth v. Vill. of Mokena, 2004 U.S. Dist. LEXIS 2789, No. 03 C 6677, 2004 WL 434195, at *2 (N.D. Ill. Feb. 25, 2004)* (Lindberg, J.). Here, the facts in the light most favorable to the plaintiff, demonstrate that while Barth did not com-

plain of all the harassing conduct and every discriminatory event she encountered, she did report a significant share to superiors. Most of Barth's complaints were verbal and the ones that were memorialized in writing were never uncovered. It appears from the available record that "the content, form, and context" of Barth's other complaints covered *only* her own experiences and *not* those of other females employed at the Mokena Police Department. *See Gray v. Lacke, 885 F.2d 399, 411 (7th Cir. 1989)* (employee's complaint to supervisors about sexual harassment against her addressed matter of private concern). The Court concludes that the only speech offered by Barth that warrants *First Amendment* protection from employer retaliation are her alleged expressions regarding lack of backup. Reaching this conclusion, the Court carries forward the municipal liability analysis only as to Barth's speech on backup.

[*92]

Prior to proceeding farther along the "well-established three-step analytical framework," *Rasche, 336 F.3d at 596* (citation omitted), the Court turns to focus on Mokena's role (if any) in retaliation aimed at Barth due in part to her protected speech. [HN56] In order to survive Mokena's summary judgment effort against Count II, Barth must establish that the deprivation of her constitutional right to free speech was caused by a municipality policy or custom. *Rasche, 336 F.3d at 597* (citing *Kujawski, 183 F.3d at 737*). To that end, Barth does not point to any express policy of the village to suppress speech or sanction retaliation against employees who complain. Instead, she argues that (1) Mokena had a widespread practice; and (2) Mokena is liable through Chief Pollak's status as final policymaker for his "acquiescence and perpetuation of the code of silence and fear of retribution."

### Widespread Practice or Custom

Under her widespread practice theory, Barth alleges that Mokena has an established practice of allowing and condoning retaliation against officers who complain. The statements of facts to which Barth points to, however, [*93] do not carry her argument. Many of the facts Barth cites to are not admissible or improperly plead and, accordingly, are not part of the record.

Even assuming they had come in, a reasonable fact-finder could not find them remotely tied to a widespread practice of retaliation against officers speaking to matters of officer or public safety. For example, running vehicles, in-house statistical inaccuracies, and falsifying a computer class attendance roll do not make for matters of

2006 U.S. Dist. LEXIS 19702, *; 97 Fair Empl. Prac. Cas. (BNA) 1764

public concern. The closest Barth comes is the purported warning then-training officer/supervisor Keller issued to trainee Barth that if she ever complained she would be denied backup. In compiling the fact universe here, the Court did not accepted the Keller warning to establish the truth of the matter asserted. Instead, the Court allowed it in for the limited purpose of establishing the effect on the listener -- i.e., Barth. On her widespread practice theory, Barth is left with only a scintilla of evidence insufficient to warrant trial.

### Final Policymaker

The plaintiff also furthers a final policymaking authority theory, again naming Chief Pollak as the one with final authority on police department [*94] matters and responsible for her constitutional harm. As discussed above, the Court accepts Chief Pollak as the final policymaker.

[HN57] "Proof that a municipality's . . . authorized decisionmaker has intentionally deprived a plaintiff of a federally protected right necessarily establishes that the municipality acted culpably." *Bd. of the County Comm'rs of Bryan County v. Brown, 520 U.S. 397, 405, 117 S. Ct. 1382, 137 L. Ed. 2d 626 (1997).* Yet, Barth does not appears to contend that Chief Pollak himself denied her backup or authored the code of silence resulting in denial of backup. Barth instead points toward Sgts. Gorman and Dreesbach as enforcing the code of silence. Municipal liability, however, can only attach to the actions of an employee who lacks final policymaking authority if the municipality ratified the employee's acts. *Killinger v. Johnson, 389 F.3d 616, 772, (7th Cir. 2004)* (citing *Baskin v. City of Des Plaines, 138 F.3d 701, 705 (7th Cir.1998)).*

"[A] plaintiff seeking to establish a *§ 1983* claim against a municipality based on a 'ratification' theory must allege that a municipal official with final policy-making authority approved the subordinate's decision [*95] and the basis for it." *Killinger, 389 F.3d at 772* (quoting *Baskin, 138 F.3d at 705*). To this end, Barth offers a single, conclusory assertion, without evidentiary backing, that "there is also sufficient support in the record that [Pollak] knew or should have known of . . . the denial of backup . . . and took no remedial action." As stated above, this Court declines to scour the record to carry either side's argument. *See, e.g., Estate of Moreland v. Dieter, 395 F.3d 747, 759 (7th Cir. 2005).*

The court, accordingly, forgoes the remainder of the causation and same-result-absent-speech analysis under *Spiegla, 371 F.3d 928.* Without evidence of Pollak's ratification of Sgts. Gorman or Dreesbach's alleged unconstitutional acts, there is no basis for municipal liability. Mokena's motion for summary judgment [92] against the plaintiff on Count II is GRANTED.

### 4. Dreesbach's Motion for Summary Judgment

#### i. Facts n26

Barth joined the Mokena Police Department in September 1998. (Pl.'s L.R. 56.1(b)(3)(B) Stmt. P 2.) She resigned on August 23, 2002. (*Id.* P 93.) During Barth's time on the force, Sgt. [*96] Dreesbach never engaged in lewd conduct or made sexual overtures toward Barth. (Def. Dreesbach's L.R. 56.1(a) Stmt. P 1.)

> n26 Unless otherwise noted, the following facts are undisputed and/or deemed admitted pursuant to *Local Rule 56.1*. Further, for purpose of summary judgment, where facts are contested the Court accepts the legitimate factual assertions of the non-moving party. *Pardo, 946 F.2d at 1280.*

In the interests of brevity and efficiency, the Court incorporates here the statements of *additional* facts found in Mokena's Counts I and II fact recitation, *supra* at 21-31, beginning with the facts found in the paragraph entitled *Recruit Period* through the paragraph entitled *August 2002.* Again, the vast majority of these facts are contested by the parties. To these incorporated additional facts, the following is added:

*March 1999:* The Mokena Police Department compiles statistics on a monthly basis, including the number of arrests made, the number of traffic [*97] tickets issues, and the number of traffic warnings issues. (*Id.* P 10.)

*November 1999:* Barth never advised Sgt. Dreesbach that she had been assaulted by a fellow officer. (*Id.* PP 2, 26.)

*March 2002:* Field training officers are responsible for scheduling or recommending officers for training or selecting them for "special assignments." (*Id.* P 9.) Sgt. Dreesbach was not the plaintiff's field training officer. (*Id.*)

*September 2001:* Sgt. Dreesbach recommended that Barth receive a two-day suspension and be removed from her DARE assignment. (*Id.* P 16.)

*October 2001:* Parties dispute that Dreesbach denied Barth backup on October 8, 2001.

*Unspecified Times:* Barth is unable to recall some of dates on which she complained to Sgt. Dreesbach. (*Id.* P 3.) She never complained to Sgts. Rajewski or Rankvoich about sexual harassment or being denied backup. (*Id.* P 5.) Barth never complained to Chief Pollak or Commander Surdel about not receiving backup. (*Id.* P 8.) Also, she never asked verbally or in writing why she was

Case 1:05-cv-00377-WDM-BNB  Document 157-7  Filed 02/12/07  USDC Colorado  Page 32 of 37

Page 32

2006 U.S. Dist. LEXIS 19702, *; 97 Fair Empl. Prac. Cas. (BNA) 1764

denied backup. (*Id.* PP 6, 7.) Sgt. Dreesbach made discipline recommendations for several officers, [*98] including male officers. (*Id.* P 24.) Sgt. Dreebsach was once disciplined for failing to respond to a call for assistance by a male officer. (*Id.* P 23.)

### ii. Count I: § 1983 Equal Protection Claim (Count I)

[HN58] In order to prevail on an equal protection claim under *§ 1983*, a plaintiff must show that (1) the defendants "acted with nefarious discriminatory purpose," and (2) discriminated against her based on her membership in a definable class. *Nabozny v. Podlesny, 92 F.3d 446, 453 (7th Cir. 1996)* (citing *Pers. Adm'r. of Mass.v. Feeney, 442 U.S. 256, 279, 99 S. Ct. 2282, 60 L. Ed. 2d 870 (1979); Albright v. Oliver, 975 F.2d 343 348 (7th Cir. 1992), aff'd, 510 U.S. 266, 114 S. Ct. 807, 127 L. Ed. 2d 114 (1994); Falls v. Town of Dyer, 875 F.2d 146, 148 (7th Cir. 1989)).* Moreover, a plaintiff must demonstrate intentional or purposeful discrimination to establish an equal protection violation. *Nabozny, 92 F.3d at 453* (citing *Shango v. Jurich, 681 F.2d 1091, 1104 (7th Cir. 1982)).* "Discriminatory purpose, however, implies more than intent as volition or intent as awareness of consequences. It implies that a decisionmaker singled [*99] out a particular group for disparate treatment and selected his course of action at least in part for the purpose of causing its adverse effects on the identifiable group." *92 F.3d at 453* (citing *Shango, 681 F.2d at 1104*). In other words, a showing of intentional action or action with deliberate indifference is sufficient for *§ 1983* liability to take hold. *Nabozny, 92 F.3d at 453* (citing *Archie v. City of Racine, 847 F.2d 1211, 1219 (7th Cir. 1988), cert. denied, 489 U.S. 1065, 109 S. Ct. 1338, 103 L. Ed. 2d 809 (1989); Jackson v. City of Joliet, 715 F.2d 1200, 1203 (7th Cir. 1983), cert. denied, 465 U.S. 1049, 104 S. Ct. 1325, 79 L. Ed. 2d 720 (1984); Shango, 681 F.2d at 1104*).

Here, defendant Dreesbach contends that: (1) he was not directly involved in the alleged harassment of the plaintiff, (2) the plaintiff is incapable of showing she worked under a hostile work environment, and (3) that plaintiff has no evidence of discriminatory intent on his part. The Court begins by dispensing of Dreesbach's second argument. As noted above, the whole of the record (i.e., direct and "second-hand" harassment together) as cobbled [*100] together by Barth, is sufficient to raise issues of marterial fact on the question of hostile work environment to require a trial. In the alternative, the Court concluded, as noted above, that even a subset of Barth's alleged facts (i.e., that related to failed backup) n27 is sufficient to warrant trial. Either way, this Court need not rehash the arguments around hostile work environment.

n27 Defendant Dreesbach recycles arguments that have been addressed previously in this case. Namely, Dreesbach asserts that Barth's facts can only be read as she complained about backup and not failed backup. This Court finds, like its predecessor, that a reasonable interpretation of Barth's backup claims and facts as inclusive of failed backup and its functional equivalent (i.e., untimely backup). As Judge Lindberg noted in this case, "Defendants observe that the complaint does not explicitly allege that plaintiff complained about a failure to provide backup. However, given that the complaint alleges that plaintiff was discriminated against by being denied backup, and that the subsequent paragraph alleges that plaintiff complained about the discrimination, the court will infer that plaintiff complained about a failure to provide backup." *Barth, 2004 U.S. Dist. LEXIS 2789, 2004 WL 434195, at *2 n.2 (Lindberg, J.).*

[*101]

The Court turns to Dreesbach's assertion that the record could not support his involvement in Barth's hostile work environment. This assertion fails as well.

The available record, cast in the light most favorable to Barth, shows she took several of her on-the-job complaints to Dreesbach directly and complained about failed backup to him on at least one occasion. Of course, Dreesbach contests she ever complained. [HN59] At the summary judgment stage, however, it is not a court's role to make a credibility determination.

Dreesbach also argues that the record is devoid of evidence related to discriminatory intent. [HN60] "The core of any equal protection case is, of course, a showing of intentional discrimination." *Bohen, 799 F.2d 1180, 1186 (7th Cir. 1986)* (citing *Batson v. Kentucky, 476 U.S. 79, 89-94, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986)).* Again, Barth must show Dreesbach acted either intentionally or with deliberative indifference. *Nabozny, 92 F.3d at 453; Johnson v. City of Fort Wayne, Ind., 91 F.3d 922, 944-45 (7th Cir. 1996)* (citations omitted). As the plaintiff points out, the Seventh Circuit has held, "a single discriminatory act against one individual [*102] can amount to intentional discrimination for equal protection purposes." *Bohen, 799 F.2d at 1187* ("An equal protection plaintiff . . . need not prove a discriminatory policy against an entire class; discrimination against the plaintiff because of her membership in the class by itself is enough.") (citing *Adickes v. Kress & Co., 398 U.S. 144, 152, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970)).*

Barth argues that the record supports her claims that Dreesbach discriminated against her in special assignments, training, and discipline because of her gender. The record on these issues came about because of Barth's admissions -- some in earnest and the rest through non-compliance with Local Rule 56.1(b)(3)(A) -- support only a reasonable finding that Dreesbach lacked authority over special assignments or training and he could only recommend terms of discipline.

The remaining aspect of the record, viewed in the light most favorable to Barth, suggests that Dreesbach's failed to backup both a male officer and a female officer (i.e., Barth), but was only disciplined for the lack of assistance to the male officer. Both the appellate and district court in the Seventh Circuit recognize that failure to [*103] backup a police officer is a serious matter. *See, e.g., Auriemma, 910 F.2d at 1460* (en banc); *Collins, 96 F. Supp. 2d at 750; Kramarski, 2002 U.S. Dist. LEXIS 14662, 2002 WL 1827637, at \*9.* Here, a reasonable fact-finder could infer that complaints were lodged in both scenarios (with Barth being the person who directly complained about her lack of backup to Dreesbach), but that Dreesbach only acted to accept the consequences of the inaction with a male colleague. The fact that Dreesbach failed to act on her complaint, even at his own expense, might be sufficient for a reasonable trier of fact to find intentional discrimination against Barth *because she was female,* not because she complained of sexual harassment. n28

n28 [HN61] Claims of retaliation are traditionally vindicated under the *First Amendment* (through *§ 1983*) or Title VII, but not the *Equal Protection Clause. Boyd v. Ill. State Police, 384 F.3d 888, 898* (7th Cir. 2004.) What might be construed as retaliatory conduct for a *First Amendment* or Title VII claim, needs to be shown to be based on gender animus for it to fit within a *§ 1983* equal protection framework.

[*104]

The district court in *Collins* recognized this analytical distinction, allowing the survivors of a female officer plaintiff to proceed against one defendant superior under Title VII for alleged isolated threats of denying her backup, but not allowing them to proceed under *§ 1983.* In granting summary judgment on the *§ 1983* claims in *Collins,* the district court noted that the non-movant had *not* alleged her retaliation was because of gender. Here in this matter, Barth's Count III and related argumentation in opposition to summary judgment assert, in part, that the alleged denial of backup was because of her gender,

not her speech. The Court believes that Barth has sufficiently argued herself over the line drawn in *Collins.*

"Forcing women and not men to work in an environment of sexual harassment is no different than forcing women to work in a dirtier or *more hazardous* environment than men simply because they are women." *Bohen, 799 F.2d at 1187* (emphasis added). Here, it is within reason that a trier of fact might reach an inference of intentional animus against or find deliberate indifference toward females through Dreesbach's inaction and failure [*105] to provide backup to the first female officer to join the Mokena Police Department. The likelihood of a jury reaching this inference depends on credibility and weight determinations, which are not for the Court to decide in the confines of summary judgment.

Dreesbach's motion for summary judgment [103] as to Count I is DENIED.

### iii. § 1983 First Amendment Retaliation Claim (Count II)

Dreesbach argues that Barth cannot make her *prima facie* case for free speech retaliation. As noted earlier, [HN62] to state a claim under *§ 1983* for retaliation based on free speech: (1) a *court* must determine that the speech in question was on a matter of public concern; (2) the plaintiff must show that her speech was a motivating factor in the defendant's retaliatory action; and (3) the defendant cannot show that her interests outweighs the plaintiff's rights. *Ashman, 438 F.3d at 784;* (citing *Mt. Healthy, 429 U.S. 274, 97 S. Ct. 568, 50 L. Ed. 2d 471 (1977)); Spiegla, 371 F.3d at 942; Gustafson v. Jones, 290 F.3d 895, 906 (7th Cir. 2002).*

Dreesbach, however, appears to misconstrue the allocation of burdens. He spends the wealth of his argument focused [*106] on whether Barth's speech is *First Amendment* protected and fails to address the *First Amendment* issue in his reply memorandum. [HN63] Whether the plaintiff's speech is constitutionally protect is a question of law for the Court to reach and not the plaintiff, as Dreesbach asserts. Here, the Court finds, as stated above, Barth's speech on backup worthy of constitutional protection.

Moreover, Dreesbach fails to challenge the sufficiency of the record as it relates to the plaintiff's burden (causation) and his own (defendant's overriding interest).[HN64] Courts are "not equipped to act as auxiliary lawyer for a [represented] party," and "identification, framing, and argument of the issues" is a task for counsel, not the courts. *Hudgens v. Wexler & Wexler, 391 F. Supp. 2d 634, 642* (quoting *Tyler v. Runyon, 70 F.3d 458, 466 (7th Cir. 1999))*

Dreesbach's motion for summary judgment [103] on ground that the plaintiff's speech is not constitutionally protected is DENIED.

### 5. Gorman's Motion for Summary Judgment

#### i. Facts n29

Barth joined the Mokena Police Department in September 1998. (Pl.'s L.R. 56.1(b)(3)(B) Stmt. P 2.) She left the department [*107] on August 23, 2002. (Id. P 93.) In 1989, Gorman was promoted to the rank of Sergeant. (Def. Gorman's L.R. 56.1(a) Stmt. P 1.) During Barth's tenure, Gorman did not have the authority to promote, transfer, demote, discipline, schedule training, or recommend training for officers. (Id. PP 2, 3, 4.)

n29 Unless otherwise noted, the following facts are undisputed and/or deemed admitted pursuant to Local Rule 56.1. Further, for purpose of summary judgment, where facts are contested the Court accepts the legitimate factual assertions of the non-moving party. Pardo, 946 F.2d at 1280.

In the interests of brevity and efficiency, the Court incorporates here the statements of additional facts found in Mokena's Counts I and II fact recitation, supra at 21-31, beginning with the facts found in the paragraph entitled Recruit Period through the paragraph entitled August 2002. The Court notes the vast majority of these facts are in dispute. To these incorporated additional [*108] facts, the following statement of facts are added:

Summer/Fall 1999: Barth is unable to recall specific instances of denied backup in either 1999 or 2000. (Id. P 19.)

August 2001: Gorman never asked Barth to author a "to/from" memorandum. (Id. P 12.) Nor was Gorman involved in an audit of tickets in August 2001. (Id. P 10.) The number of police reports marked up with red marker is unknown. (Id. P 21.)

September 2001: Gorman had no involvement in the recommendation or the decision to discipline Barth for falsified statistics. (Id. P 7.)

Unspecified Time: Gorman had no involvement in the decision to discipline Barth for a lost ticket book or other violation of department procedures. (Id. PP 8, 11.) Barth noticed that the failed backup followed her complaints about what male officers were saying to her. (Id. P 20.)

#### ii. Count I: § 1983 Equal Protection Claim (Count I)

Through his motion for summary judgment, defendant Gorman contends that the plaintiff: (1) cannot demonstrate she worked under a hostile work environment; (2) has no evidence that he was directly involved in the alleged harassment or of his [*109] discriminatory intent; and (3) may not rely on backup evidence to further her equal protection claim. The Court takes each argument in turn.

First, the Court has already addressed whether the record Barth has amassed (namely through her additional statement of facts on backup complaints and failed backup) is sufficient for a reasonable trier of fact to find a hostile work environment. Moreover, this portion of the record is hotly disputed between the parties. Sufficient to say, the Court opts not to reiterate what is laid out above.

Gorman's argues he was not involved in Barth's workplace harassment and, as such, there is no evidence of discriminatory intent. The available record, cast in the light most favorable to Barth, shows Gorman failed to act on Barth's complaints to him, including one particular complaint concerning failed backup. Barth also points to Gorman's alleged response to the backup complaint she addressed to him. The record reasonably construed in Barth's favor, shows that Gorman stated that if Barth wanted to a "man's job, she could do it by herself." Gorman, of course, disputes this was ever stated.

As "a single discriminatory act against one individual can amount [*110] to intentional discrimination for equal protection purposes," Bohen, 799 F.2d at 1187, it might be possible for a reasonable jury to find Gorman's alleged failure to remediate Barth's concerns as involvement and his omission as direct evidence gender animus. Gorman's inaction and isolated statement is sufficient for a reasonable jury to reach a finding of discriminatory intent or deliberative indifference.

Gorman's final argument is that the record on failed backup may only support the First Amendment or Title VII retaliation claims. For the reasons articulated above, supra at 63, the Court disagrees. In short, Barth has cast her complaint and § 1983 equal protection arguments, in part, on a theory that she was denied back due to her gender, not speech. Again, the available record around backup is sufficient to reach a jury. In addition to being in dispute, it would suffice for reliance on by a reasonable trier of fact.

Gorman's motion for summary judgment [131] as to Count II is DENIED.

#### iii. § 1983 First Amendment Retaliation Claim (Count II)

Gorman's final argument is that the plaintiff cannot make her prima facie case for free speech retaliation.

[*111]  As the Court found *only* Barth's speech related to backup qualified as a matter of public concern, *supra* at 55, 55 n.25, Gorman's matter-of-public-concern argument and causation argument tied to "unwarranted discipline" are moot. The Court turns instead to Gorman's argument that the available record is insufficient for Barth to establish causation.

[HN65] To state a claim under *§ 1983* for retaliation based on free speech, a plaintiff must show that her speech was a motivating factor in the defendant's retaliatory action. *Ashman, 438 F.3d at 784* (clarifying that a motivating factor is a factor that played a substantial part in the retaliatory act) (citing *Spiegla, 371 F.3d at 941-43*). The Seventh Circuit cautions that courts should be "particularly leery of resolving issues involving state of mind on summary judgment," including the "motivating factor." *Ashman, 438 F.3d at 784* (citing *Alexander v. Wis. Dep't of Health & Family Servs., 263 F.3d 673 (7th Cir. 2001)*).

Review of the available record here, in the light most favorable to Barth, reveals that her first protected communication directed to Gorman occurred [*112] on January 25, 2002. Within a week of that complaint, Barth was again purportedly denied backup. n30 She also alleged failed backup on March 12, 2002. At the very least, the alleged events of January 25th and January 31st are central to the causation question and Gorman's motivation (or lack thereof) to retaliate against the plaintiff for her speech. [HN66] Credibility and questions of intent or bad faith are part of the causation calculus. Thus, out of an abundance of caution and as the facts after January 25, 2002 are in dispute, the issue of causation is one for the trier of fact. Whether or not this record is sufficient is a question for jury.

> n30 Barth also cites alleged incidents of hostile environment sexual harassment occurring after her alleged complaint to Gorman. The Court, however, limits it review on summary judgment tied to alleged subsequent incidents of failed backup.

Gorman's motion for summary judgment [131] is DENIED.

### 5. Pollak's Motion for Summary Judgment

#### i. Facts n31

Barth [*113] joined the Mokena Police Department in September 1998. (Pl.'s L.R. 56.1(b)(3)(B) Stmt. P 2.) She attended a sexual harassment course in January 2002. (*Id.* P 22.) Her tenure lasted through August 23, 2002, when Barth resigned. (*Id. P 93*.) Pollak served as

Chief of the Mokena Police Department between 1989 and October 2003. (Def. Pollak's L.R. 56.1(a) Stmt. P 1.)

> n31 Unless otherwise noted, the following facts are undisputed and/or deemed admitted pursuant to *Local Rule 56.1*. Further, for purpose of summary judgment, where facts are contested the Court accepts the legitimate factual assertions of the non-moving party. *Pardo, 946 F.2d at 1280*.

The Village maintained a sexual harassment policy that expressly prohibits sexual harassment, defines certain behaviors as sexual harassment, and encourages employees facing such behavior to bring such encounters to the attention of a supervisor, a department head, or the Village Administrator. (Pl.'s L.R. 56.1(b)(3)(B) Stmt. Ex. 12 P 11. [*114]  11.) The policy also contains a bypass provision that allows an employe to go around a harassing supervisor. (*Id.*)

In the interests of brevity and efficiency, the Court incorporates here the statements of *additional* facts found in Mokena's Counts I and II fact recitation, *supra* at 21-31, beginning with the facts found in the paragraph entitled *Recruit Period* through the paragraph entitled *August 2002*. Again, the vast majority of these facts are contested by the parties. To these incorporated additional facts, the following statement of facts are added:

*November 1999:* Officer Brown physically assaulted Barth in the booking room on November 11, 1999. (Def. Pollak's L.R. 56.1(a) Stmt. P 8.) On that date, there was a video camera in the room, (*Id.* P 8), but Barth never requested that command staff preserve the videotape, (*Id.* PP 9, 11). Barth never complained to Pollak about Brown's physical assault of her on November 11, 1999. (*Id.* P 5.) Barth never reported to members of the command staff that she submitted a written complaint on or about November 12, 1999 about the Brown assault. (*Id.* PP 6, 7.)

*May 2001:* Barth never [*115]  complained to Pollak about the failure of fellow officers to provide backup. (*Id.* P 14.)

*August 2001:* Pollak suspended Barth for two days for falsifying the number of tickets she wrote. (*Id.* P 23.) Before Pollak issued the suspension, he directed Commander Surdel to conduct an audit of issued tickets. (*Id.* P 25.) Parties dispute whether Pollak ordered Surdel to conduct a department wide audit, (*Id.* P 25), or to target Barth alone, (Pl.'s L.R. 56.1(b)(3)(B) Stmt. P 124.) Barth appealed the two-day suspension to the Board of Police and Fire Commissioners. (Def. Pollak's L.R. 56.1(a) Stmt. P 24.)

2006 U.S. Dist. LEXIS 19702, *; 97 Fair Empl. Prac. Cas. (BNA) 1764

*Unspecified Times:* Pollak rarely attended roll calls. (*Id.* P 4.) At some point, Barth misplaced a ticket book. (*Id.* P 27.) Barth was given a written warning for the loss. (*Id.* P 31.) Moreover, Barth is unable to identify a male officer who lost his ticket book and did not receive a write-up. (*Id.* P 29.) No officer ever told Barth that she was denied backup because she alleged sexual harassment. (*Id.* P 36.)

*August 2003:* In Barth's exit evaluation form that she executed, she characterized the training she received was "good." [*116] (*Id.* P 39.)

### ii. *Qualified Immunity*

Pollak raises a qualified immunity defense. [HN67] Once an officer raises the qualified immunity defense, courts follow a two-step analysis to determine whether the defendant is entitled to this defense. *Sornberger v. City of Knoxville, Ill.,* 434 F.3d 1006, 1013 (7th Cir. 2006); *Lanigan v. Vill. of E. Hazel Crest, Ill.,* 110 F.3d 467, 471-72 (7th Cir. 1997) (citations omitted). First, courts determines whether the alleged conduct, if true, sets out a constitutional violation. *Sornberger,* 434 F.3d at 1013 (citing *Saucier v. Katz,* 533 U.S. 194, 201, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001)); *Leaf v. Shelnutt,* 400 F.3d 1070, 1080 (7th Cir.2005)). If a violation is sustained, courts then seek to determine whether the right was "so clearly established at the time of the alleged violation that a reasonable officer would know that his actions were unconstitutional." *Sornberger,* 434 F.3d at 1013 (citing *Saucier,* 533 U.S. at 202; *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987)).

[HN68] To state a claim under § 1983 requires proof that a defendant acted under [*117] color of law and that this defendant's conduct violated a plaintiff's right secured by the United States Constitution or a federal law. *Yang v. Hardin,* 37 F.3d 282, 284 (7th Cir. 1994). To be held liable for conduct of their subordinates, "supervisors must have been personally involved in that conduct" or "facilitate it, approve it, condone it, or turn a blind eye." *Jones,* 856 F.2d 985, 992 (7th Cir. 1988). "They must in other words act either knowingly or with deliberate, reckless indifference." *Id.* at 992.

Parties here do not dispute that Pollak was acting under color of state law. Rather, parties dispute whether the available record supports a finding of a depravation of Barth's rights under the *First* and *Fourteenth Amendments* and a finding of supervisor liability. In an earlier section of the Court's analysis, *supra* at 60-63, 66-67, the Court determined that the available record construed in the light most favorable to the plaintiff could sustain a finding that Dreesbach and Gorman violated Barth's right to equal protection. Elsewhere, the Court also found, *supra* at 64, 67-68, that the record here could sustain a

finding [*118] that Dreesbach and Gorman violated Barth's rights to free speech.

Nevertheless, viewed in the light most favorable to the plaintiff, the available record in connection to Pollak reveals: (1) party-opponent admissions that they were unclear what constituted a violation of the village sexual harassment prohibition and that foul language was used at the station; (2) a single offering of sexual harassment training in the course of four years where the policy against sexual harassment was not discussed; (3) subordinate supervisors laughing off sexual harassment and backup complaints; (4) Pollak rarely attend roll calls, the scene for many of the alleged incidents; (5) the videotape evidence of an assault against Barth was never preserved or brought to Pollak's attention; (6) Barth never partook in the bypass provision of the sexual harassment policy to complain directly to Pollak with specificity about the failure of backup, a coworker assault, or Commander Surdel's failure to respond to her written complaint regarding the assault; and (7) Barth had only one direct communication with Pollak about the hostile work environment that was paired with her resignation letter. These factors are [*119] insufficient to conclude reasonably that Pollak "turn[ed] a blind eye" or showed a "deliberate, reckless indifference."

As Pollak notes in his motion, [HN69] qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs,* 475 U.S. 335, 341, 106 S. Ct. 1092, 89 L. Ed. 2d 271 (1986). The qualified immunity defense provides ample room for mistakes in judgment, *Malley,* 475 U.S. at 336, and is broad enough to cover Pollak's negligent entrustment of second-tier supervisors to do their job, to enforce department anti-discrimination policy, and to ensure that a police force comported themselves like professional public servants (as opposed to juvenile delinquents).

Reaching this conclusion, the Court need not proceed farther under the qualified immunity analysis. n32 *County of Sacramento v. Lewis,* 523 U.S. 833, 841 n.5, 118 S. Ct. 1708, 140 L. Ed. 2d 1043 (1998) (citation omitted). As such, the Court's finding that the defense of qualified immunity is applicable to Pollak, there is no need for him to stand trial. Pollak's motion for summary judgment [98] is GRANTED.

n32 While of little bearing at this stage, the Court notes it agreement with Barth on the second prong of the qualified immunity test. On equal protection, the Seventh Circuit recently noted, [HN70] "It has been plain in this circuit for quite some time that arbitrary gender-based discrimination . . . violates the *equal protection clause.* In 1986, we held that sexual harassment

2006 U.S. Dist. LEXIS 19702, *; 97 Fair Empl. Prac. Cas. (BNA) 1764

constitutes sex discrimination in violation of the *equal protection clause.*" *Nanda v. Moss,* 412 *F.3d 836, 844 (7th Cir. 2005)* (citing *Bohen v. City of E. Chi., Ind., 799 F.2d 1180, 1185 (7th Cir. 1986)); see also Poulos v. Vill. of Linden-hurst, 2002 U.S. Dist. LEXIS 16596, 00 C 5603, 2002 WL 31001876, at *11 (N.D. Ill. Sept. 3, 2002)* ("In 1997, it was well established that . . . perpetrating, tolerating or willfully ignoring gender-based harassment, violated the *Fourteenth Amendment.*"). And, on the free speech, [HN71] the Seventh Circuit has long held an employee has a right to speak on matters of public concern. *Gustafson, 290 F.3d at 912* ("The key elements of this case have been clear for years: a public employer may not retaliate against an employee who exercises his *First Amendment* speech rights."); *Delgado v. Jones, 282 F.3d 511, 520 (7th Cir. 2002)* (finding it has been well-established for many years that public employer may not retaliate against employee who exercises his *First Amendment* speech rights).

[*120]

### 6. Punitive Damages

Defendants assert that under the available record Barth is not entitled to punitive damages. The Court hereby takes Mokena's motions for summary judgment [92, 95], Dreesbach's motion for summary judgment [103], and Gorman's motion for summary judgment [131] on the issue of punitive damages under advisement. Pollak's motion for summary judgment [98] on the topic of punitive damages is deemed moot as he is entitled to qualified immunity.

### CONCLUSION

Defendant Mokena's first motion for summary judgment [92] is GRANTED in part and DENIED in part. Count II of the Complaint as against defendnat Mokena is DISMISSED with prejudice. Defendant Mokena's second motion for summary judgment [95] is GRANTED in part and DENIED in part. Count IV of the Complaint as against defendant Mokena is DISMISSED with prejudice. Defendant Pollak's motion for summary judgment [98] is DENIED in part and GRANTED in part. Counts I & II of the Complaint as against defendant Pollak are DISMISSED with prejudice.

Denfendant Dreesbach's motion for summary judgment [103] is DENIED. Defendant Gorman's motion for summary judgment [131] is DENIED.

Defendant Mokena's [*121]   first motion to strike [132] is GRANTED in part and DENIED in part. Defendant Dreebach's motion to strike [134] is GRANTED in part and DENIED in part. Defendant Pollak's motion to strike [136] is GRANTED in part and DENIED in part. Defendant Gorman's motion to strike [138] is GRANTED in part and DENIED in part. Defendants' second joint motion to strike [146] is GRANTED in part and DENIED in part. Defendant Mokena's second motion to strike [148] is GRANTED in part and DENIED in part.

Defendants' first joint motion to strike [140] is DENIED.

Further, the dates for pre-trial conference and trial in this matter STAND.

**So ordered.**

Hon. Maria Valdez

MAR 31 2006

Date