**EXHIBIT A-50**

LEXSEE

LUZ E. UNZUETA, as Special Administrator of the Estate of Alan Unzueta;
FELICITAS UNZUETA on behalf of Alan Martinez, a minor child; and KANSAS
ADVOCACY AND PROTECTIVE SERVICES, INC., Plaintiffs, vs. JANET
SCHALANSKY; CONNIE HUBBELL; LAURA HOWARD; MANI LEE; DENNIS
STEELE; MICHAEL H. TUDOR; PHILIP A. SCHREIBER and BETHANY
SMITH, Defendants.

Case No. 99-4162-RDR

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF KANSAS

*2003 U.S. Dist. LEXIS 14656*

June 13, 2003, Decided

**SUBSEQUENT HISTORY:** Partial summary judgment denied by, Summary judgment granted, in part, summary judgment denied, in part by, Motion granted by *Unzueta v. Steele, 291 F. Supp. 2d 1230, 2003 U.S. Dist. LEXIS 20721 (D. Kan., Oct. 29, 2003)*

**PRIOR HISTORY:** *Unzueta v. Schalansky, 2002 U.S. Dist. LEXIS 23644 (D. Kan., Nov. 4, 2002)*

**DISPOSITION:** [*1] Defendants' motion for summary judgment granted. Plaintiffs' motion for partial summary judgment denied.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff representatives of a decedent's estate and his minor child sued defendant state hospital officials, alleging that the officials' failure properly to train and supervise hospital employees caused the decedent's death through the unconstitutional use of excessive force. The officials moved for summary judgment, and the representatives cross-moved for partial summary judgment.

**OVERVIEW:** The decedent was an involuntary mental patient who died after being restrained by hospital employees during an altercation. The representatives contended that the officials were deliberately indifferent to the use of excessive force by the employees under their supervision, improperly permitted the use of ambulatory restraints on the decedent, and failed to ensure that proper medical care was provided after the decedent's injuries became apparent. The court first held that the officials were not liable for the alleged use of excessive force by the employees since there was no evidence that the officials acquiesced in the use of such force, that a history of similar incidents provided the officials with constructive knowledge of the use of such force, or that the officials' policy permitted the use of such force. Further, the use of ambulatory restraints on the decedent, in accordance with professional medical judgment, was presumptively valid and there was no showing that the officials departed from accepted professional standards. Finally, there was no evidence that the decedent's medical care was inadequate or that different treatment would have produced a different result.

**OUTCOME:** The officials' motion for summary judgment was granted, and the representatives' cross-motion was denied.

**CORE TERMS:** training, patient, deliberate indifference, staff, seclusion, minute, supervisor, floor, ambulatory, auditorium, trained, staff members, blue, summary judgment, arrived, arm, professional judgment, supervision, subordinate, takedown, failure to train, superintendent, deliberately, indifferent, emergency, oxygen, choke, chair, involuntarily committed, constructive knowledge

**LexisNexis(R) Headnotes**

*Civil Rights Law > Section 1983 Actions > Scope*
[HN1] To establish liability under *42 U.S.C.S. § 1983* for excessive force caused by inadequate training, supervision, or discipline of officers, the plaintiff must show the following elements: (1) that the officers exceeded constitutional limitations on the use of force; (2) that the use of force arose under circumstances that constituted a usual

and recurring situation with which detention officers must deal; (3) that defendant's inadequate training, supervision, or discipline demonstrated a deliberate indifference on the part of the defendant toward persons with whom the officers come into contact; and (4) that there is a direct causal link between the constitutional deprivation and the inadequate training, supervision, or discipline.

*Civil Rights Law > Section 1983 Actions > Scope*
[HN2] To be liable, a supervisor must have participated or acquiesced in the constitutional deprivations of which complaint is made.

*Civil Rights Law > Section 1983 Actions > Scope*
[HN3] If a plaintiff merely shows that a supervisor should have known that a subordinate was violating someone's constitutional rights and it is not established that the supervisor actually had such knowledge, the plaintiff will not have established a deliberate, intentional act by the supervisor to violate constitutional rights. At most the plaintiff will have established only that the supervisor was negligent in not observing what he should have seen.

*Civil Rights Law > Section 1983 Actions > Scope*
[HN4] Constructive knowledge requires a showing that the underlying unconstitutional misconduct was so widespread or flagrant that in the proper exercise of its official responsibilities the governing body should have known of it.

*Civil Rights Law > Immunity From Liability > Local Officials > General Overview*
[HN5] Previous widespread or flagrant instances of unconstitutional conduct are not required to prove constructive knowledge of a municipality necessary to prove deliberate indifference. Evidence of a single violation of federal rights, with a showing that a governmental entity has failed to train its employees to handle recurring situations presenting an obvious potential for such violation, is sufficient to trigger liability. Still a violation by a municipality must be a highly predictable or plainly obvious consequence of the municipality's action and the municipal policy must be the moving force behind the violation.

*Civil Rights Law > Section 1983 Actions > Scope*
[HN6] Adequately trained officers occasionally make mistakes; the fact they do says little about the training program or the legal basis for holding a defendant liable for constitutional violations.

*Civil Procedure > Judgments > General Overview*
*Constitutional Law > Bill of Rights > Fundamental Rights > Procedural Due Process > Scope of Protection*
*Public Health & Welfare Law > Social Services > Institutionalized Individuals > Confinement Conditions*
[HN7] There is a due process right against arbitrary bodily restraint that extends to persons who have been involuntarily committed. This right, of course, is not absolute. The state retains the authority to restrain persons to protect themselves and others from violence. The decision to restrain a person, if made by a professional, is presumptively valid; liability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment.

*Civil Rights Law > Immunity From Liability > Local Officials > Customs & Policies*
[HN8] A civil rights defendant is entitled to fair warning that his conduct deprived his victim of a constitutional right.

COUNSEL: For Luz E Unzueta, Felicitas Unzueta, James S Phillips, Jr, Plaintiffs: Robert D. Ochs, Carpenter & Beavers Law Office, L.L.C., Topeka, KS, LEAD ATTORNEY.

For Connie Hubbell, Mani Lee, Defendants: Bruce A. Roby, Waggener, Arterburn & Standiferd, Topeka, KS, LEAD ATTORNEY. Carl W. Ossmann, Kansas Dept. of Social & Rehabilitation Services, Topeka, KS, LEAD ATTORNEY.

For Dennis Steele, Defendant: David R. Cooper, Fisher, Patterson, Sayler & Smith, Topeka, KS, LEAD ATTORNEY. Donald Patterson, Fisher, Patterson, Sayler & Smith, Topeka, KS, LEAD ATTORNEY.

For Michael H Tudor, Philip A Schreiber, Defendants: Donald A. Frigon, Frigon Law Firm, Dodge City, KS, LEAD ATTORNEY.

For Bethany Smith, Defendant: Carl W. Ossmann, Kansas Dept. of Social & Rehabilitation Services, Topeka, KS, LEAD ATTORNEY.

For Joyce Allegrucci, Movant: Roberta S. McKenna, Kansas Department of SRS, Topeka, KS, LEAD ATTORNEY.

For Larned State Hospital, Movant: Brenda W. Hagerman, Larned State Hospital, Larned, KS, [*2] LEAD ATTORNEY.

JUDGES: Richard D. Rogers, United States District Judge.

OPINION BY: Richard D. Rogers

OPINION:

MEMORANDUM AND ORDER

This case primarily involves an incident which occurred at an auditorium on the grounds of the Larned State Hospital on October 27, 1998 at the annual Halloween/Fall Festival party. Alan Unzueta, a 16-year-old involuntary patient at the hospital died after an altercation at the auditorium. There is also an issue in this case regarding the use of ambulatory restraints upon Alan Unzueta for approximately two weeks in September 1998. The Larned State Hospital (LSH) is a mental health care facility under the control of the Kansas Department of Social and Rehabilitation Services (SRS). This case is now before the court upon the motion for summary judgment filed on behalf of Dr. Mani Lee and Connie Hubbell and upon plaintiffs' motion for partial summary judgment as it applies to defendants Lee and Hubbell. Dr. Lee was the superintendent of LSH in October 1998. Connie Hubbell was the Commissioner of Mental Health and Developmental Disabilities for SRS from December 1997 until November 1999. Plaintiffs in this case are the special administrator of the estate of [*3] Alan Unzueta and the limited conservator of Alan Jelinek, who is alleged as the minor child of Alan Unzueta. n1

> n1 There is a dispute pending as to the proper plaintiff in this case. The resolution of that dispute is not necessary to the decision in this order.

The following facts appear to be uncontroverted. n2 The superintendent of LSH (defendant Lee) appoints institution employees except for physicians. As superintendent, Dr. Lee was responsible for the general administration of LSH at the time of the incident. There were several subordinate managers below him. The commissioner of mental health and developmental disabilities (defendant Hubbell) was responsible for the appointment of physicians. Lee was appointed by and subject to removal by Hubbell, but she deferred to him in the operation of LSH. Lee's immediate supervisor was the deputy commissioner of mental health and developmental disabilities.

> n2 In determining the instant summary judgment motion, the court has not considered the testimony of the witnesses targeted in plaintiffs' motions to exclude. Doc. Nos. 296, 298 and 301. The court also has not stricken the evidence and statements targeted in defendants' motions to strike. Doc. Nos. 410, 411, 424 and 430.

[*4]

Alan Unzueta ("Alan") was admitted to LSH pursuant to a court order on September 2, 1998. He was 6 feet 3 inches tall and weighed 245 pounds. He was diagnosed with intermittent explosive disorder and major depression with personality disorder not otherwise specified.

On the evening of October 27, 1998 there was a Halloween party at LSH. Before Alan entered the auditorium at LSH where the party was being held, he was scowling and indicated to Beth Smith, an activity therapist, that the staff was "pissing me off."

The auditorium was decorated for the party. There was loud music and the lights were dimmed. Some of the staff and patients were dressed or wore make-up for Halloween.

Alan sat by himself in the auditorium for a short time, then got up to use the drinking fountain and returned to a chair. As he walked past Beth Smith, she inquired if there was anything the staff could do for him. Alan did not respond. After Smith discussed her concerns about Alan with Joel Keith, an LSH employee, Keith approached Alan and sat down with one chair vacant between Alan and himself. Alan suddenly stood up and hit Keith in the face very hard. Smith observed the blow and immediately [*5] blew her whistle and yelled for assistance. Several staff members responded to the call for help. Carolyn Hunt approached Alan and sat him down in a chair. Then she turned to assist Keith. Mike Tudor arrived and grabbed Alan's left arm. Phil Schreiber arrived and grabbed Alan's right arm. Both arms were placed behind his back while he was seated in the chair. Then, Dennis Steele approached. Alan rose from his chair and was taken down to the floor by the men holding him. Either before or after he was taken down, Smith ran to the foyer and asked other staff to call for security. Security staff received the call to respond at 7:08 p.m. and arrived one minute later. Alan was not slammed to the floor or thrown to the floor.

Steele had his left arm underneath Alan's chest as Alan went down face first on the floor. Alan swung his head toward Steele's face, butting Steele with the back of his head. When Donald Keeslar, a security officer, arrived, Steele was lying on the floor in a prone position at Alan's head area, and Alan's face was turned into Steele's chest and Steele had his arm up around the head area.

Tudor and Schreiber held Alan on his stomach with his arms behind his [*6] back until security arrived. Schreiber was laying on the floor with his body parallel to Alan's. At one point, Schreiber placed his leg over Alan's right leg to prevent Alan from kicking. Beth Smith ultimately took over holding Alan's right leg, holding his right ankle and calf area below the knee. Schreiber returned to lying parallel to Alan.

Security officers placed handcuffs on Alan. Tudor and Schreiber had been holding Alan on the floor for three to four minutes. Steele asked Schreiber to help him get Steele's arm out from underneath Alan.

Alan was on the floor for less than six minutes when Beth Smith called first for a medical emergency and then for a code blue at 7:16 p.m. The code blue was called because the people attending to Alan noticed his hands, lips and eyelids turning blue. It appeared that Alan was not breathing. He had only a weak pulse. Alan was turned over and he gasped for air. Steele gave Alan a couple of rescue breaths and Alan started breathing on his own. Vanessa Paige ran to a building across the street to retrieve an oxygen bottle. Other emergency medical equipment was also summoned.

Lee Flamik, a program director at LSH, did not see anyone [*7] place Alan in a choke hold. Nor did he see anyone place weight on Alan's back during the time he was present in the auditorium. However, he left the area of the auditorium intermittently during the incident.

Keeslar, who has worked at LSH since 1980, is unaware of a patient dying or suffering anything more than minor scrapes or bruises as a result of being taken to the floor. This is consistent with the recollection of other long-term employees. See affidavits of Charlotte Biays and Billie Broils. Doc. No. 460.

Dr. Masferrer was the doctor on duty at the hospital on the night of the incident. It took him three or four minutes to arrive at the auditorium after hearing the code blue call. Other members of the code blue team took Alan's pulse, checked his respiration and took his blood pressure. LSH has a policy concerning the provision of emergency medical care in code blue situations. Team members are familiar with the responsibilities involved in administering CPR and delivering other basic emergency care.

The Larned Ambulance Service received a call to dispatch an ambulance to LSH at 7:16 p.m. The ambulance arrived at 7:25 p.m. Alan was taken first to a hospital in [*8] Larned, Kansas and Later to a Great Bend, Kansas hospital. Alan died at 2:05 a.m. on October 28, 1998 at the Central Kansas Medical Center in Great Bend.

LSH was an accredited institution at the time of the incident. Deposition Ex. 143 to Deposition of Dr. Larry Carver. The accrediting agencies have promulgated rules and regulations regarding seclusion and restraint. Deposition of Mani Lee, p. 92. Phil Schreiber testified that he "took down" patients at LSH on an average of once or twice a year over a period of 20 years. Deposition of Schreiber at p. 28-29. Prior to the incident he did not have training in how to take a patient down to the floor. Id. at p. 61. Michael Tudor's testimony was similar in this regard to Schreiber's. Deposition at p. 35.

Dennis Steele testified that he "just did what I could" and that whatever hold was used was not "taught at the state hospital." Deposition at p. 46.

LSH had a written policy regarding the use of restraints at the time of the incident. The policy stated in part: "Seclusion or restraints are used as the least restrictive measures necessary to prevent immediate substantial bodily injury to the patient or others and when other [*9] alternative methods to prevent such injury are not sufficient to accomplish this purpose. Seclusion and restraints shall never be used as a punishment or for the convenience of staff. . . . Patients placed in seclusion or physical restraints must be released when they no longer pose an immediate threat of injury to themselves or others. Restraints and seclusion may be initiated and discontinued only with the guidance of trained nursing personnel." Exhibit D, Doc. 467. The purpose of the policy was stated as follows: "To ensure that seclusion or restraints are emergency interventions used only to prevent immediate substantial bodily injury to the patient or others. To ensure the patient's rights to freedom from seclusion or restraints, except when necessary to prevent immediate substantial bodily injury to the patient or others." Exhibit A, Part 1, Doc. No. 366. LSH had a policy which prohibited the physical abuse of patients. Deposition of Connie Hubbell, p. 37. In addition, LSH had a policy encouraging de-escalation techniques. Doc. No. 460, Ex. 68.

Plaintiffs' federal claims against Lee and Hubbell in this case are based largely on their alleged failure to properly supervise [*10] and train employees at LSH. Plaintiffs claim that Alan was injured and died because staff mem-

bers at LSH were not properly trained or supervised to address the incident with Alan, that the staff improperly used a choke hold and other force against Alan which caused his death, and that medical care was not adequately afforded and administered to Alan. Plaintiffs also make a federal claim alleging the unlawful use of ambulatory restraints prior to the incident in the auditorium. Plaintiffs raise some claims under the *Kansas Tort Claims Act* as well.

Excessive force

[HN1] To establish liability under *42 U.S.C. § 1983* for excessive force caused by inadequate training, supervision or discipline of officers, the plaintiff must show the following elements: 1) that the officers exceeded constitutional limitations on the use of force; 2) that the use of force arose under circumstances that constituted a usual and recurring situation with which detention officers must deal; 3) that defendant's inadequate training, supervision or discipline demonstrated a deliberate indifference on the part of the defendant toward persons with whom the officers come into contact; [*11] and 4) that there is a direct causal link between the constitutional deprivation and the inadequate training, supervision or discipline. See *Allen v. Muskogee, Okla., 119 F.3d 837, 841-42 (10th Cir. 1997)* cert. denied, *522 U.S. 1148, 140 L. Ed. 2d 176, 118 S. Ct. 1165 (1998)*; *Lewis v. Board of Sedgwick County Commissioners, 140 F. Supp.2d 1125, 1132 (D.Kan. 2001)*.

In this order, the court shall assume that the first two requirements can be established to the satisfaction of a reasonable jury. The court will focus upon the third and fourth requirements that deliberate indifference linked to the constitutional violation must be shown.

The standard for liability applied to an individual officer or supervisor as opposed to a municipality, may be somewhat different. The standard announced in case law for individuals appears to accentuate the requirement of personal knowledge or participation. In *Meade v. Grubbs, 841 F.2d 1512, 1527 (10th Cir. 1988)* the court stated: [HN2] "To be liable, a supervisor must have 'participated or acquiesced in the constitutional deprivations of which complaint is made.'" Quoting *Kite v. Kelley, 546 F.2d 334, 337 (10th Cir. 1976)*. [*12] In *Langley v. Adams County, Colorado, 987 F.2d 1473, 1481 (10th Cir. 1993)*, summary judgment on behalf of county commissioners was sustained where the plaintiff alleged that she was terminated from employment without due process. The court determined that there was no evidence that the commissioners were aware of or involved in the process of termination. In *Green v. Branson, 108 F.3d 1296, 1302 (10th Cir. 1997)*, while addressing the alleged liability of a prison warden for lack of medical care, the Tenth Circuit stated: "To be guilty of 'deliberate indifference', the defendant must know he is 'creating a substantial risk of bodily harm.'" Quoting, *Billman v. Indiana Department of Corrections, 56 F.3d 785, 788 (7th Cir. 1995)*. The need to show actual knowledge was also emphasized in *Woodward v. City of Worland, 977 F.2d 1392, 1399 (10th Cir. 1992)* cert. denied, *509 U.S. 923 (1993)*:

[HN3] "If a plaintiff merely shows that a supervisor 'should have known' that a subordinate was violating someone's constitutional rights and it is not established that the supervisor actually had such knowledge, the plaintiff [*13] will not have established a deliberate, intentional act by the supervisor to violate constitutional rights. At most the plaintiff will have established only that the supervisor was negligent in not observing what he should have seen."

In *Jojola v. Chavez, 55 F.3d 488, 490 (10th Cir. 1995)*, the court held that to impose liability upon a school principal and superintendent the plaintiff had to prove that they knew of or acquiesced in a school district employee's pattern of sexual abuse. Although acknowledging that constructive knowledge might be sufficient, the court applied a rather strict definition of constructive knowledge. [HN4] Constructive knowledge required a showing "that the underlying unconstitutional misconduct was 'so widespread or flagrant that in the proper exercise of its official responsibilities the governing body should have known of [it].'" *55 F.3d at 491*, quoting *Thelma D. ex rel. Delores A. v. Board of Educ., 934 F.2d 929, 933 (8th Cir. 1991)*.

Municipal or county defendants appear to be treated somewhat differently when a failure to train or supervise is alleged. [HN5] Previous "widespread or flagrant" instances of [*14] unconstitutional conduct are not required to prove constructive knowledge necessary to prove deliberate indifference. In *Allen, 119 F.3d at 842*; *Barney v. Pulsipher, 143 F.3d 1299, 1307-08 (10th Cir. 1998)*; *Brown v. Gray, 227 F.3d 1278, 1286 (10th Cir. 2000)*; and *Olsen v. Layton Hills Mall, 312 F.3d 1304, 1317 (10th Cir. 2002)*, the Tenth Circuit has referred to Supreme Court case law holding that evidence of a single violation of federal rights, with a showing that a governmental entity has failed to train its employees to handle recurring situations presenting an obvious potential for such violation, is sufficient to trigger liability. See *City of Canton v. Harris, 489 U.S. 378, 390, 103 L. Ed. 2d 412, 109 S. Ct. 1197 (1989)*; *Board of County Commissioners v. Brown, 520 U.S. 397, 409, 137 L. Ed. 2d 626, 117 S. Ct. 1382 (1997)*. Still a violation by a municipality must be a "highly predictable" or "plainly ob-

vious" consequence of the municipality's action and the municipal policy must be the "moving force" behind the violation. *Olsen, 312 F.3d at 1318*, citing *Barney, 143 F.3d at 1307* [*15] and *Brown, 520 U.S. at 399*.

It is clear on this record that neither Hubbell nor Lee are liable under the standards applied in the above-cited cases to supervisors. There is no evidence of personal participation or acquiescence in instances of excessive force. Nor is there evidence of widespread and flagrant instances of unconstitutional conduct. Hubbell and Lee were perhaps more in the position of policymakers than supervisors. So, arguably the standard applied more often to counties and municipalities should be applied here, i.e., whether Hubbell and Lee were deliberately indifferent to a need to train LSH staff differently regarding takedown and restraint and whether this caused the constitutional violation alleged in this case.

In this respect there is no evidence that either Hubbell or Lee had actual knowledge of a need for different training. Nor was there a history of incidents from which to imply a constructive knowledge of a need for different training. The issue is whether the alleged need for training in this case was so "plainly obvious" that the alleged constitutional violation was a highly predictable result of the failure to implement different [*16] training.

The evidence from persons who might be considered experts does not support a material fact issue as to whether there was deliberate indifference. In reaching this conclusion we shall consider the evidence presented in the summary judgment record without deciding the hearsay objections made by defendants to the evidence.

Plaintiffs have made reference to a survey and report made by Dr. Maldonado. This report criticized LSH for using seclusion and restraints upon patients too frequently as well as too often taking a confrontational approach to patients. But, the report did not address takedown situations or the reaction of staff to a patient who has struck a staff member. Nor did the report discuss the need for more or different training of staff in these areas. Indeed, the report acknowledged the need to restrain a patient temporarily when the patient is out of control. Nothing in the report was sufficiently relevant to the circumstances of the October 27th incident to find that either Hubbell or Lee (if they were or had been made aware of the report) were deliberately indifferent to the alleged unconstitutional conduct.

Plaintiffs have also made reference to [*17] reports written by Dr. Klaus Hartmann. But, Dr. Hartmann's potential testimony as represented in these reports would not create a material issue of fact regarding the question of deliberate indifference. Dr. Hartmann's first report makes the following conclusions relevant to training and supervision: 1) that appropriate standards of care were not met by failing to properly de-escalate the situation because alternatives to restraints were not sufficiently considered; 2) that staff members used excessive force and an inappropriate take-down procedure which did not follow established policy; 3) that policies in existence were inadequate because they permitted a patient to be placed in seclusion or restraints when he no longer posed an immediate threat of injury to himself or others and because restraint or seclusion should be initiated and discontinued only with the guidance of trained nursing personnel; and 4) that staff members were improperly trained on the proper methods of de-escalation and restraint because there was an incorrect application of restraint in this situation and because information indicated that the recommended standard of annual training on "high-risk procedures" [*18] was not met. Exhibit L to Doc. No. 469. In a supplemental report, Dr. Hartmann stated:

"There is also a significant question as to the adequacy of the training at LSH. The training materials viewed seem generally adequate but there appears to be a disconnect in the actual implementation of policies. Most recent policies reflect the requirement for annual training in the management of aggressive patients. This requirement should have been implemented years ago as restraint and take downs are high risk procedures. The minutes of a number of past meetings reflect the concern of physicians and others that direct care staff may not be trained well enough with the regard to seclusion and restraints. Repeatedly throughout the minutes mention is made of shortage of staff and inadequate preparation of individuals working in front line positions. In reading the materials, I gained the impression that leadership is inadequately involved. . . .

A number of documents allude to the inadequacy of training. It should be noted that the ABM [aggressive behavior management] Policy does not require training prior to contact with patients. That is only tenable if enough trained staff members [*19] are on the wards to handle an emergency such that a trainee does not have to intervene in an emergency. Given the numerous concerns regarding staff shortages, it is quite likely that untrained or inadequately trained new employees will be asked to assist in case of a take down. A similar line of thinking applies to the CPR training . . .

Throughout many reports, staff members at all levels, including top management, express concern about the adequacy of funding and the number of staff members available.

Testimony consistent with these reports would not support a finding of deliberate indifference for the following reasons. First, most of Dr. Hartmann's conclusions do not address the question of the takedown procedure. Dr. Hartmann might assert that de-escalation could have avoided the ultimate result in this case. But this would be pure conjecture. Dr. Hartmann does not contend that the alleged injury to Alan Unzueta was the plainly obvious consequence of failing to de-escalate the situation. n3 Second, Dr. Hartmann concludes that the takedown in this case did not follow established policy. Thus, to the extent that defendants Hubbell and Lee are sued as policymakers, this [*20] opinion of Dr. Hartmann does not fault their policy for the harm done to Alan Unzueta during the takedown. Third, Dr. Hartmann may fault the determination that Alan Unzueta was still a threat to others or himself when he was taken down. But, he does not conclude that this decision was obviously wrong or reckless as opposed to negligent. Nor does Dr. Hartmann indicate that other policies or training would have led the staff to decide that Alan Unzueta was no longer a threat or that a different conclusion was plainly correct. Fourth, Dr. Hartmann draws the conclusion that training was improper in this case from the "incorrect application of restraint in this situation." However, the Supreme Court has stated that [HN6] "adequately trained officers occasionally make mistakes; the fact they do says little about the training program or the legal basis for holding [a defendant] liable." *Canton v. Harris, 489 U.S. 378, 391, 103 L. Ed. 2d 412, 109 S. Ct. 1197 (1989)*. Furthermore, there is no evidence that mandatory standards of training were not satisfied, only recommended standards. Indeed, it is admitted that LSH was an accredited institution and generally complied with minimum [*21] professional standards of operation. Finally, Dr. Hartmann concluded that training materials were adequate, but not implemented as vigorously as should be the case. This conclusion does not support a finding of deliberate indifference; nor does it link the alleged improper implementation to the injury which occurred to Alan Unzueta.

> n3 Some of Dr. Hartmann's report regards the use of restraints and seclusion over a longer period of time and are not relevant to the application of force and restraint in the relatively brief episode here.

This case is unlike Tenth Circuit cases where the court found an issue of deliberate indifference. In *Allen v. Muskogee, Oklahoma, 119 F.3d 837 (10th Cir. 1997)*, there was expert testimony that the officers' actions were diametrically opposed to proper police procedures and plain foolish. There was further evidence that the officers were trained to act recklessly or in a manner that created a high risk of death and that the officers followed their training. [*22] In *Brown v. Gray, 227 F.3d 1278 (10th Cir. 2000)*, there was evidence that the officers acted according to an admittedly risky "always armed/always on duty" policy for which there was no special training. Finally, in *Olsen v. Layton Hills Mall, 312 F.3d 1304 (10th Cir. 2002)*, the staff of a jail allegedly ignored the needs of an arrestee who told them that he suffered from obsessive-compulsive disorder, that he was having panic attacks, and that he needed medication. The Tenth Circuit held that a jury could determine that the failure to train the staff regarding obsessive-compulsive disorder constituted deliberate indifference which led to the alleged neglect of the person.

In the instant case, the policy of LSH discouraged the use of excessive force. The training materials were adequate. There was no training which was consistent with using choke holds or other risky maneuvers. Under all the circumstances in this case, the court does not believe there is a factual issue which prevents summary judgment for defendants Lee and Hubbell on the question of their liability for the alleged application of excessive force. See *Nelson v. City of Wichita, 217 F. Supp.2d 1179, 1185 (D.Kan. 2002)* [*23] (failure to train policy officers regarding a particular procedure for taking a handcuffed suspect to the ground is not such a glaring omission that a reasonable jury could infer deliberate indifference); *Owens v. City of Fort Lauderdale, 174 F. Supp.2d 1298, 1314 (S.D.Fla. 2001)* (no deliberate indifference in public hospital's failure to train off-duty officers concerning the application of neck restraints or choke holds upon mental patients) *Guseman v. Martinez, 1 F. Supp.2d 1240, 1261 (D.Kan. 1998)* (granting summary judgment to City of Wichita in a case involving death of a woman who was shackled and handcuffed in a prone position for more than eight to ten minutes in part because the failure to provide further training on positional asphyxia would not obviously lead to a deprivation of constitutional rights).

In sum, the evidence which might be presented to a jury would not support a reasonable finding of deliberate indifference by defendants Hubbell and Lee to training deficiencies that led to the injury to Alan Unzueta. There is no evidence from plaintiffs' experts or otherwise leading to a reasonable conclusion that it was highly predictable [*24] that the alleged failure to train in this case would lead to the kind of injury suffered by Alan Unzueta. In fact, according to an expert offered by plaintiffs, the takedown and alleged use of a choke hold was contrary to existing policy.

Ambulatory restraints

The evidence regarding the use of ambulatory restraints upon Alan Unzueta, considered in a light most favorable to plaintiffs, does not support a cause of action against defendants Lee and Hubbell.

The ambulatory restraints were, in this instance, leather restraints restricting the movement of a person's arms and/or legs, but allowing the person to walk. Deposition of Martin Maldonado, p. 84. Ambulatory restraints were ordered for Alan Unzueta for the period of September 16, 1998 through September 29, 1998. The order was made by his treatment team and renewed periodically. During this time Alan was monitored visually every two to four hours. The persons monitoring Alan checked boxes on forms indicating quite often that the restraints were ordered because Alan was a threat to himself and others. However, when there were handwritten comments, these comments only occasionally substantiated a threat by Alan to [*25] himself or others and did not address the immediacy of that threat. A few times the written comments indicated that Alan was pleasant or sleeping. The ambulatory restraints were applied only to defendant's hands after September 23, 1998. There were times when the restraints were removed so that Alan could shower or do other activities. During this period, the official policy of LSH, effective September 13, 1998, was that restraints would not be used unless the patient posed an immediate threat of injury to himself or others. Plaintiffs do not claim that this policy was unconstitutional. Dr. Dara Johnson was responsible for overseeing the implementation of this policy, among others, at LSH. He reported to defendant Lee. Dr. Johnson relied upon other designees to monitor the use of restraints. He was not aware of the specific treatment plan or care given to Alan Unzueta prior to Alan's death. Defendant Hubbell was even further removed from Alan Unzueta's care and treatment than defendant Lee.

In *Youngberg v. Romeo, 457 U.S. 307, 316, 73 L. Ed. 2d 28, 102 S. Ct. 2452 (1982)*, the Court recognized that [HN7] there was a due process right against arbitrary bodily restraint [*26] that extended to persons who have been involuntarily committed. This right, of course, is not absolute. The state retains the authority to restrain persons to protect themselves and others from violence. *457 U.S. at 320*. "The decision [to restrain a person], if made by a professional, is presumptively valid; liability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *457 U.S. at 323*.

In the case at bar, we find that defendants Hubbell and Lee are entitled to summary judgment upon any claim arising from the use of ambulatory restraints for the following reasons. First, there does not appear to be evidence in the record that the actions of Hubbell and Lee were a substantial departure from accepted professional judgment, practice or standards. Thus, even assuming the use of restraints, which in this case was ordered by professional persons, was contrary to such judgment and practice, there is no evidence that the monitoring, supervision and policy-making [*27] role of defendants Hubbell and Lee was so deficient that it amounted to an acquiescence in or de facto adoption of an unconstitutional departure from accepted professional judgment, practice and standards. Second, there is no evidence that the absence of training or supervision caused the alleged violation of Alan Unzueta's rights in this instance. Third, there is no evidence that Hubbell and Lee approved, condoned or acted with deliberate indifference to this or similar alleged misconduct. The following cases offer similar holdings requiring a stronger connection between the actions of supervisory officials and the conduct which allegedly caused injury: *Dolihite v. Maughon, 74 F.3d 1027, 1052-54 & 1056* (11th Cir.) cert. denied, *519 U.S. 870, 136 L. Ed. 2d 123, 117 S. Ct. 185 (1996)* (nonprofessional director of state adolescent hospital and state mental health commissioners not liable for failure to protect plaintiff from injuries incurred after he attempted suicide); *Terrance v. Northville Regional Psychiatric Hosp., 286 F.3d 834, 846 (6th Cir. 2002)* (role as hospital medical director and policy maker is insufficient to subject [*28] him to liability for death of plaintiff who was involuntarily committed); *Sanville v. McCaughtry, 266 F.3d 724, 739-40 (7th Cir. 2001)* (alleged failure of prison wardens to train guards on suicide prevention does not support a finding of liability for suicide of mentally ill inmate); *Pacelli v. deVito, 972 F.2d 871, 878 (7th Cir. 1992)* (superintendent of mental hospital cannot be personally liable for error of subordinate in failing to release person committed to mental institution after he was ruled no longer in need of mental treatment); *M.H. v Bristol Board of Education, 169 F. Supp.2d 21, 35-36 (D.Conn. 2001)* (Board of Education and supervisory officials who had no previous knowledge of use of mechanical restraint and other aversive techniques upon a severely retarded fourteen-year old middle school student could not be liable under § 1983); *Sisk v. Manzanares, 262 F. Supp.2d 1162, 2002 U.S. Dist. LEXIS 26604, 2002 WL 32093126 (D. Kan. 2002)* (fact that supervisor was not integrally involved in day-to-day activities of his subordinates does not mean he was deliberately indifferent to the need to provide medical care to jail inmates). [*29]

Finally, even if there was a constitutional violation, defendants Hubbell and Lee are entitled to qualified immunity. [HN8] "A civil rights defendant is "entitled to 'fair warning' that his conduct deprived his victim of a constitutional right.'" *Roska v. Peterson, 328 F.3d 1230, 1247 (10th Cir. 2003)* (quoting, *Hope v. Pelzer, 536 U.S. 730, 739-40, 153 L. Ed. 2d 666, 122 S. Ct. 2508 (2002)*. The court is unaware of any prior holding which would warn defendant Hubbell or defendant Lee that their reliance upon subordinate officers to carry out a new undisputedly constitutional policy with regard to ambulatory restraints was objectively unreasonable or a violation of clearly established constitutional rights.

Inadequate Medical Care

Plaintiffs assert that after a code blue was called at 7:16 p.m., it took five minutes for a staff person (Vanessa Paige) to retrieve an oxygen bottle and ten minutes for an ambulance to arrive. Plaintiffs attribute this delay to inadequate or contradictory policies. According to plaintiffs, once the oxygen bottle was delivered, there was a delay in obtaining a key or wrench to open the bottle. In addition, plaintiffs [*30] contend that oxygen was started at 4 liters per minute, contrary to the alleged protocol of 10 liters per minute, and was not increased to 10 liters per minute until the EMTs arrived. Plaintiffs also assert that the code blue team had minimal emergency medical care training and that physicians at LSH had not had any recent training in emergency medicine. Plaintiffs also contend that LSH lacked a pulseoximeter to determine a patient's oxygen saturation levels and that the dark lighting and loud music interfered with the treatment efforts.

Plaintiffs, however, fail to respond to defendants' allegation that plaintiffs have developed no expert evidence that the emergency care given to Alan Unzueta was below par or that different care would have made a difference in the result. Nor is there a response to the affidavits of staff members who stated that no additional training or equipment would have made a difference in the emergency care provided to Alan. Affidavits of Charlotte Biays and Billie Broils, Doc. No. 460.

We believe the standard applicable to plaintiffs' claim in this situation is deliberate indifference. In other words, plaintiffs must demonstrate that there was a [*31] serious medical need and that defendants were deliberately indifferent to that need. See *Olsen, 312 F.3d at 1315* (applying standard to pretrial detainees) *Estate of Hocker v. Walsh, 22 F.3d 995, 998 (10th Cir. 1994)* (same); *Terrance v. Northville Regional Psychiatric Hospital, 286 F.3d 834, 842-43 (6th Cir. 2002)* (applying standard to involuntarily committed mental patient); but see, *Patten v. Nichols, 274 F.3d 829 (4th Cir. 2001)* (applying professional judgment standard to care afforded to involuntarily committed mental patient). Assuming the truth of the facts alleged by plaintiffs in plaintiffs' response to the instant motion, the undisputed facts in this matter demonstrate an immediate and significant application of people and resources to attempt to meet plaintiff's medical needs. At worst, plaintiffs make a claim of negligence which does not rise to the level of deliberate indifference or a substantial departure from professional judgment. See *Yvonne L. By and Through Lewis v. New Mexico Dept. of Human Services, 959 F.2d 883, 894 (10th Cir. 1992)* (applying professional judgment standard to placement [*32] of foster children, suggesting that the standard in that context is not much different than deliberate indifference, and finding that it does not mean "mere negligence"). Even then, plaintiffs appear to admit that they cannot prove that the alleged lapses caused the injuries and death in this case. Moreover, there is no attempt to establish that defendants Hubbell and Lee were deliberately indifferent in their roles as supervisors or policymakers.

For all of these reasons, plaintiffs' federal claim of inadequate medical care against defendants Hubbell and Lee must be dismissed.

KTCA claims

Finally, the court shall grant judgment against any state law claims against defendants Hubbell and Lee. These claims have to be brought under the Kansas Tort Claims Act, *K.S.A. 75-6101 et seq.* There are three reasons for granting summary judgment. First, the absence of personal involvement by defendants Hubbell and Lee in the care of Alan Unzueta indicates that neither defendant had a duty of care to Unzueta. A reasonable jury could not infer that Hubbell and Lee had reasonable grounds to know that their actions or omissions in overseeing the operations of LSH would lead to [*33] the events of this case. Second, there is no authority for holding defendants Hubbell and Lee liable vicariously for the actions of subordinate employees in this matter. Moreover, plaintiff cites no authority under Kansas law for holding supervisory officials, as opposed to employers, liable under a theory of negligent supervision. Finally, any claim under the KTCA would be barred in this instance under the discretionary immunity exception. See *Estate of Fuentes v. Thomas, 107 F. Supp.2d 1288, 1305 (D.Kan. 2000)* (discretionary immunity applies to supervisor of police officer who allegedly used excessive force); *Green v. City of Wichita, 47 F. Supp.2d 1273, 1278 (D.Kan. 1999)* (exception applied to decisions made in enforcing housing code); *Hesler v. Osawatomie State Hospital, 266 Kan. 616, 971 P.2d 1169, 1180 (Kan. 1999)* (exception

applied to decision to grant weekend furlough to mental patient).

Conclusion

The motion for summary judgment on behalf of defendants Lee and Hubbell shall be granted. Plaintiffs' motion for partial summary judgment as it applies to defendants Lee and Hubbell shall be denied.

IT IS SO [*34] ORDERED.

Dated this 13th day of June, 2003 at Topeka, Kansas.

s/Richard D. Rogers United States District Judge