IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 05-cv-00377-WDM-BNB

MOISES CARRANZA-REYES,

      Plaintiff,

v.

THE PARK COUNTY BOARD OF COUNTY COMMISSIONERS;
FRED WEGENER, individually and in his capacity as sheriff of Park County, Colorado;
MONTE GORE, individually and in his capacity as captain of Park County Sheriff's
Department; and
VICKI PAULSEN, individually and in her official capacity as registered nurse for Park County,
Colorado,

      Defendants.

---

## DEFENDANT VICKI PAULSEN'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

---

      Defendant Vicki Paulsen ("Paulsen" or "Nurse Paulsen"), by and through her counsel,

respectfully submits her Reply Brief in Support of Motion for Summary Judgment as follows:

## I.    <u>INTRODUCTION</u>

      Plaintiff's Response to Defendant Vicki Paulsen's Motion for Summary Judgment

("Plaintiff's Response") fails to demonstrate that any genuine issue of material fact exists

warranting a trial on his 42 U.S.C. § 1983 claim against Nurse Paulsen.  While Plaintiff states

that he disputes several of Paulsen's material facts, Plaintiff fails to cite any record evidence to

support his broad-brush denials.  Plaintiff's failure to specify any evidence showing that the facts

that he disputes are actually in dispute warrants entering summary judgment in favor of Paulsen.

## II.    STATEMENT REGARDING PLAINTIFF'S
## UNSUPPORTED DENIALS OF MATERIAL FACTS

Contrary to this Court's practice standards, Plaintiff does not respond individually to Nurse Paulsen's enumerated Statement of Undisputed Material Facts ("Paulsen's Facts"). Instead, Plaintiff simply states that he disputes 29 paragraphs of Paulsen's Facts with no explanation of whether his disagreement rests on actual evidence. Specifically, Plaintiff disputes ¶¶ 6, 16, 20, 21, 28-31, 35, 38-40, 45-55, 57, 58, 62, 65, and 66 of Paulsen's Facts. (See Pl.'s Resp. at 2). Plaintiff's Response fails to address head-on any of these facts, however, and instead sets forth his own statement of facts, many that are duplicative and repetitive of Paulsen's facts. (See Pl.'s Statement of Disputed and Undisputed Material Facts Which Support Pl.'s Claim for Relief [hereinafter "Plaintiff's Facts"], at Pl.'s Resp., pp. 1-20).

A careful comparison of Plaintiff's Facts and Paulsen's Facts reveals that, despite Plaintiff's assertions to the contrary, the evidence is not in dispute on several key facts concerning Plaintiff's § 1983 claim against Nurse Paulsen. Because Plaintiff failed to identify any basis for his denials, this section of Paulsen's Reply compares the facts that he presents as undisputed with Paulsen's Facts to determine whether any disputed issues actually exist. As detailed below, there are no genuine disputes on the following key facts:

### Plaintiff's Prior Requests for Medical Attention

Although Plaintiff disputes that Paulsen was unaware that he wanted to see her prior to March 6, 2003, there are no facts supporting his position. (See Paulsen's Facts, at ¶ 16; Pl.'s Resp. to County Mot. for S.J., at ¶¶ 53-58)).[1] Even though Plaintiff testified that he requested to

---

[1]    Because Plaintiff's Response to Paulsen's Motion for Summary Judgment cross-references and relies on facts presented in his Response to the Park County Defendants' Motion for

2

see the nurse on March 4, 2003, when he began feeling ill, he admits she was not at work due to oral surgery that date and that deputies denied his request.  (Pl.'s Resp. to County Mot. for S.J., at ¶¶53-58).  In addition, although Plaintiff testified that he wanted to see Paulsen on March 5, 2003, he concedes he was not able to get to the pod door in time to catch her on her medication rounds and that, although other detainees shouted at her that there were sick people in the pod upstairs, these shouts were in Spanish and he does not know if she heard them.  (See id. at ¶¶ 58, 60 (citing Plaintiff's Depo., at 274-275, Pl.'s Exh. 8 and Paulsen's A-16 attached hereto)).

### The March 6 and 7, 2003 Exams

In addition, despite Plaintiff's broad-brush denial, no evidence disputes Paulsen's testimony that following her examination of him on March 6, 2003, she "didn't feel that what was going on with him was anything major." (See Paulsen's Facts, at ¶ 20; Pl.'s Resp. to County Mot. for S.J., at ¶¶ 64-65).  Likewise, a comparison of Plaintiff's Facts with Paulsen's Facts shows it is undisputed that Paulsen determined, after examining Plaintiff on March 7, 2003, that his symptoms did not indicate a condition that warranted a call to Dr. Bachman.  (See Paulsen's Facts, at ¶ 28; Pl.'s Resp. to County Mot. for S.J., at ¶ 66).

### Nurse Paulsen's Contacts with the Jail and Plaintiff on March 8, 2003

Additionally, contrary to Plaintiff's vague denial of this fact, no evidence disputes that Deputy Fikejs informed Paulsen, at approximately 3:00 to 3:45 a.m. on March 8, 2003, that Plaintiff had complained of shortness of breath, nausea and vomiting, but that he received oxygen and was feeling better.  (See Paulsen's Facts, ¶ 38; Pl.'s Resp. to County Mot. for S.J., at

---

Summary Judgment, this Reply cites facts contained in both Plaintiff's Response to her Motion and in his Response to the County Defendants' Motion.  For clarity, Paulsen cites Plaintiff's Response to the County Defendants' Motion as "Pl.'s Resp. to County Mot. for S.J.," whereas she refers to Plaintiff's Response to her motion simply as "Plaintiff's Response" and to the facts cited in that response as "Plaintiff's Facts."

¶¶ 68-69).[2]  Plaintiff cites no evidence to support his denial of ¶ 39 of Paulsen's Facts, which states that Paulsen left instructions for deputies to give Plaintiff Motrin 800mg and Pepto Bismol, and to contact her if Plaintiff's condition changed.  (See Paulsen's Facts, at ¶ 39; Pl.'s Resp. to County Mot. for S.J., at ¶¶ 68-69).

Further, despite Plaintiff's denial of the following facts, a comparison of his facts and Paulsen's Facts shows they are not genuinely in dispute.  Plaintiff offers no evidence countering Paulsen's testimony that she called the Jail shortly before 6:00 a.m. to check on Plaintiff's condition, and was told that he was resting and used the bathroom once.  (See Paulsen's Facts, at ¶ 40; Pl.'s Resp. to County Mot. for S.J., at ¶¶ 69-72).  Plaintiff also provides no evidence disputing Paulsen's testimony that shortly after she arrived at the Jail at approximately 8:00 a.m., she went to assess Plaintiff in the pod, and Plaintiff complained of pain in his kidney area radiating to his groin.  (See Paulsen's Facts, at ¶ 43; Pl.'s Resp. to County Mot. for S.J., at ¶ 72).

Similarly, although Plaintiff disputes the following facts, Plaintiff fails to back any of his broad denials with evidence; thus, the following facts are not genuinely in dispute:  Nurse Paulsen determined, after seeing Plaintiff around 8:00 a.m., that he should be evaluated by a physician; Plaintiff had to go to the hospital for such evaluation due to Dr. Bachman's absence from his office that date; Paulsen did not believe Plaintiff was in need of emergency medical care or that an ambulance was necessary to transport Plaintiff; Corporal Crawford told Paulsen that the Jail had to get permission from INS before transporting Plaintiff; Paulsen called Ben Baca of the INS to relay Plaintiff's symptoms and to tell him that she believed Plaintiff should be

---

[2]      As the County Defendants point out in their Reply Brief, Deputy Frye did not call Paulsen.  The record shows that Deputy Fikejs called Nurse Paulsen to relay to her what Deputy Frye had relayed to him regarding Plaintiff.  (See Park County's Reply Brief, at ¶ 68).

transported to see a physician; and Baca told Paulsen that INS would do the transport, that it would take up to three hours for INS to arrive at the Jail, but that Park County deputies could transport earlier than that if Plaintiff's condition worsened. (See Paulsen's Facts, at ¶¶ 45-50; Pl.'s Resp. to County Mot. for S.J., at ¶¶ 75, 77). Paulsen testified that she believed, after speaking with Baca, that a transport officer from INS would be arriving within three hours, that Jail staff would notify her if Plaintiff's condition worsened and transport Plaintiff before then if his condition worsened, and that it was not necessary for her to stay with Plaintiff until the transport arrived because she considered Plaintiff's condition non-emergent. (See Paulsen's Facts, at ¶¶ 52-55; Pl.'s Resp. to County Mot. for S.J., at ¶ 79).

By failing to produce any controverting evidence, Plaintiff admits that Paulsen called in to check whether he had been transported at 11:00 a.m., which is almost three hours after she called Baca, and that, after being told that Plaintiff had not been transported yet and that the facility had not heard from INS, she instructed Corporal Crawford to go ahead and transport Plaintiff. (See Paulsen's Facts, at ¶ 58; Pl.'s Resp. to County Mot. for S.J., at ¶ 79).

### Plaintiff's Examination at Summit Medical Center

Plaintiff provides no evidence to dispute ¶ 62 of Paulsen's Facts, which states that Dr. Keeling saw no evidence of a strep infection in Plaintiff's throat when he arrived at Summit Medical Center. (Paulsen's Facts, at ¶ 62 (citing Dr. Keeling's testimony); Pl.'s Resp. to County Mot. for S.J., at ¶¶ 83-86 (detailing events at Summit Medical Center and not refuting Dr. Keeling's testimony)). Likewise, the facts are undisputed that Dr. Keeling decided to transport him by ambulance without lights and sirens (as opposed to helicopter), and that Dr. Keeling testified that Plaintiff's symptoms were consistent with many conditions, not just sepsis and

5

pneumonia. (Paulsen's Facts, at ¶¶ 65-66; Pl.'s Resp. to County Mot. for S.J., at ¶ 89). In sum, although Plaintiff disputed several key facts presented by Paulsen, a comparison of Plaintiff's and Paulsen's facts shows that the large majority of these facts are not actually in dispute.

## III.    REPLY CONCERNING ADDITIONAL DISPUTED OR UNDISPUTED FACTS

Paulsen admits that Plaintiff's characterization of the deposition testimony and evidence in the following paragraphs is generally correct, and therefore these facts are undisputed for purposes of summary judgment:  ¶¶ 2-7, 9-10, 12, 18-20, 22-23, 30-31, 33, 38, 40-42, 45-46, 56, 57, 58-59, 61.[3]  In addition, in response to the paragraphs in Plaintiff's Response in which he incorporates and relies on paragraphs contained in his Response to the County Defendant's Motion for Summary Judgment, Paulsen incorporates by reference the reply to those paragraphs contained in Park County's Reply Brief in Support of Motion for Summary Judgment ("County Reply Brief".  Thus, in response to ¶¶ 1, 21, 26, 39, 47-52, and 62 of Plaintiff's Facts, Paulsen incorporates by reference ¶¶ 1-152 of the County Reply Brief.

The remaining paragraphs of Plaintiff's Facts are addressed in numbered paragraphs corresponding to the numbered paragraphs of Plaintiff's Facts.

8.     Paulsen denies the characterization of her testimony in ¶ 8. When asked if, when she saw more than thirty detainees housed in the pod, she discussed "overcrowding" with anyone, Paulsen testified that she said to Cpl. Crawford and Sgt. Muldoon "how long are they going to be there, is INS picking up, they're -- it's not a good thing to have that many people in there." (Paulsen Depo., at 45, Pl.'s Exh. 1 and Paulsen's A-17 attached hereto).

---

[3]     Paulsen's admission of facts for the sole purpose of summary judgment is not a waiver of her right to contest any of these facts in further proceedings in this matter, including at trial.

11.     Paulsen admits she testified that she had some concerns about the enforcement of general policies and procedures at the Park County Jail and the continuity of care provided to inmates. (Id. at 198-200, Pl.'s Exh. 1). Paulsen did not testify that the jail "needed another nurse for continuity of care." Instead, Paulsen said she thought it "would have been better" for continuity of care if there was a nurse at the jail when she was away and agreed that having an extra nurse would reduce the risk of anything falling through the cracks. (Id.).

13-16. Paulsen admits that Bellantonio so testified. His testimony is not relevant to the claims against her, however, and he lacked foundation to provide that testimony. (See Bellantonio Depo., at 30-31, Pl.'s Exh. 2 and Paulsen's A-18 attached hereto).

17.     Nurse Paulsen admits Bellantonio testified that when he conducted shakedowns of pods, it was common to find tissue stuffed under and about inmates' mattresses. (See id. at 44). Bellantonio did not specify when this occurred, however. (See id.).

24.     Paulsen disputes ¶ 24 of Plaintiff's Facts. Bellantonio did not testify that he told the INS he believed the conditions were substandard and the jail was overcrowded. (See Bellantonio Depo., at 133-136, Pl.'s Exh. 2). Bellantonio testified that he made several "off the cuff" comments to INS employees commiserating about the volume of detainees that both the INS employees and he had to deal with. (Id. at 135-136).

25.     Paulsen denies Bellantonio testified Sgt. Flint was aware of "substandard" conditions. Bellantonio testified that he talked with Sgt. Flint about the deputies' needs and stress level, Jail conditions, and although he never used the term "substandard," believes he "made ... the general meaning of that clear to him." (Id. at 144). Bellantonio said he talked with

Sgt. Muldoon matters such as "[w]e got way too many people in this pod; we need sheets; we need -- would you get hold of Jim and get the damn heating fixed." (Id. at 145-146).

27.     Paulsen denies the conclusion in ¶ 27 that she was "obligated to transfer any inmate needing medical attention without even calling the INS." Captain Gore did not testify to that. Instead, he testified that in the context of a *medical emergency*, staff could transport a detainee without obtaining the permission of the INS. (See Gore Depo., at 119, Pl.'s Exh. 3 and Paulsen's A-19 attached hereto).

28.     Paulsen denies the characterization of her testimony. Paulsen testified that while she had the authority to order transports, she was still required to make non-emergency transport arrangements with security. (See Paulsen Depo., at 38-39, Pl.'s Exh. 1 and Paulsen's A-17).

29.     Paulsen admits that she so testified but emphasizes that this testimony was in relation to transports via ambulance. (See id. at 39-40).

32.     Paulsen disputes the characterization of her testimony. Specifically, Paulsen denies "admitting" that the "INS did not refuse to allow the transport of Plaintiff, unless his condition got worse." (See id. at 221-222). To the contrary, Paulsen testified that an INS employee told her that they would transport Plaintiff, but it would take them up to three hours to have an officer there to do the transport. She also testified that she understood, at the time she left the Jail on March 8, that transport arrangements were in process. (Id.).

34.     Paulsen disputes the characterization of her testimony. In her deposition, counsel asked Paulsen whether she had an explanation for the delay in transport, and she stated, following an objection to question, that she did not. (See id. at 206-207). Paulsen testified at length in other portions of her deposition, which are not cited by Plaintiff, however, regarding

the events that occurred between 8 and 11 a.m. on March 8, 2003, and the reasons for her actions. (See Def. Vicki Paulsen's Brief in Support of Mot. S.J., at ¶¶ 43-58).[4]

36.     Paulsen disputes ¶ 36 as incomplete and misleading.  Paulsen explained that, with the benefit of hindsight and the knowledge of Plaintiff's ultimate outcome that she presently has, she feels it was an error on her part to leave Plaintiff and return home the morning of March 8, 2003. (See Paulsen Depo., at 222-223, Pl.'s Exh. 1 and Paulsen's A-17).  Paulsen testified, however, that at the time, given the symptoms Plaintiff presented to her, she felt that Plaintiff was comfortable, that transport arrangements were in progress, and that she did not need to stay with him until he was transported. (See id. at 222:20 to 223:2).

37.     Disputed.  Paulsen created her notes contemporaneously with the events that occurred; the notes were made by 2:30 p.m. on the same date as the events. (See id. at 129-130, Pl.'s Exh. 1; See also Pl.'s Exh. 5).  There is no support for Plaintiff's speculation that Paulsen's notes were "authored to explain Paulsen's conduct that day."

40.     Paulsen disputes the characterization of her testimony in ¶ 40.  Paulsen agreed that the Summit Medical Center triage assessment stated that Plaintiff complained he had right-sided chest pain for 3 days. (Id. at 137).  Paulsen also testified, however, that she was never made aware of this pain while Plaintiff was at the jail, and that such pain could "possibly" be consistent with pneumonia in the right lung and accumulation of fluid in the right lung. (Id.).

43.     Paulsen admits she charted abdominal tenderness on March 6 and 7, but denies that she testified this signified sepsis to her at the time.  To the contrary, Paulsen testified that abdominal pain can indicate a number of things, one of which is sepsis. (Id. at 138).

_____

[4]        Notably, while Plaintiff's Response disputes ¶¶ 43-55 and ¶¶ 57-58, Plaintiff provides no countervailing evidence showing that any such disputed issues exist.

44.     Disputed.  Paulsen testified that gram-positive cocci in chains in the bloodstream would indicate septicemia.  (Id. at 141).  Paulsen did not state that Plaintiff had pneumonia and septicemia on arrival at Summit Medical Center.  (See id.).

53-54.  Denied.  Paulsen testified that she did not understand that she was serving as the health service administrator and did not know who the health service administrator for the jail was.  (See Paulsen Depo., at 184-186, Pl.'s Exh. 1 and Paulsen's A-17).

55.     Denied.  Paulsen testified that she asked why the committees did not exist, but did not receive an answer.  (See id. at 187-188).

60.     Paulsen admits she testified to this in relation to DOC facilities.  (See Paulsen Depo., at 23-24, Pl.'s Exh. 1 and Paulsen's A-17).

63-98.  Paragraphs 63-98 deal with the qualifications and opinions of Plaintiff's retained nursing experts:  Catherine Knox, R.N. and Anthony Volz, R.N.   As explained below in Argument IV.A, infra, Knox's and Volz's opinions are inadmissible and irrelevant to the issues before this Court on summary judgment.  Thus, in response to ¶¶ 63-98 of Plaintiff's Facts, Paulsen incorporates her argument in Argument IV.A, infra.  In addition, Paulsen notes that the exclusive evidentiary sources for the facts in ¶¶ 63-98 are the depositions of Knox and Volz, even though some of those facts concern the actual events that occurred at the Park County Jail in 2003, of which neither Knox nor Volz has personal knowledge.  Because they lack personal knowledge of those events, their testimony cannot serve as evidence of what occurred in 2003. Indeed, Knox and Volz's iteration of the events of 2003 at times deviates from what the evidence showed actually transpired.  (Compare Plaintiff's Facts at ¶ 72 (citing Knox Depo., at 86-87 (testifying that Plaintiff complained of chest pains at 3 a.m. on March 8), with Pl.'s Resp. to

County Mot. for S.J., at ¶ 68 (citing Jail records and Frye's deposition testimony as evidence of Plaintiff's presentation at 3:00 a.m., which notably includes no mention of chest pains)).[5]

## IV.    ARGUMENT

### A.    THE PROFERRED TESTIMONY OF PLAINTIFF'S NURSING EXPERTS IS IRRELEVANT TO HIS 42 U.S.C. § 1983 CLAIM AND IS INADMISSIBLE.

Plaintiff's Response relies heavily on the opinions and testimony of his two nursing experts, Knox and Volz. To the extent these experts opine that Paulsen knew of certain facts, or that she acted with deliberate indifference, their testimony is inadmissible because it invades the province of the jury. Further, even assuming *arguendo* that testimony on deliberate indifference is admissible, Knox's and Volz's conclusions on this issue are irrelevant to the merits of Plaintiff's 42 U.S.C. § 1983 claim because they rely on the wrong standard – i.e., negligence.

This Court, in determining the absence of material undisputed facts, can only rely upon the evidence whose content or substance would be admissible at trial. See F.R.C.P. 56(e); Argo v. Blue Cross and Blue Shield of Kansas, Inc., 452 F.3d 1193, 1199 (10th Cir. 2006). The testimony of Knox and Volz on the ultimate issue of deliberate indifference is inadmissible under FRE 702. Expert testimony on whether a defendant acted with deliberate indifference tells the jury little more than what verdict to reach. See Woods v. Lecureux, 110 F.3d 1215, 1221 (6th Cir. 1997). In Woods, an expert witness testified that he believed a defendant was deliberately indifferent to a known risk of harm to the plaintiff. When the expert began to testify regarding his definition of the terms "deliberately indifferent," the court stopped his testimony. See id. at 1220-1221. In affirming the exclusion of the evidence, the Sixth Circuit stated the evidence was

---

[5]    Paulsen intends to file a Daubert motion on Knox's and Volz's opinions in the near future. Until and unless the Court finds the opinions admissible, they are not properly considered on summary judgment.

properly excluded because it attempted to tell the jury what result to reach. See id. at 1221. In addition, the court noted that "whether a prison official acted with deliberate indifference depends on that official's state of mind. Thus, by expressing the opinion that [the defendant] was deliberately indifferent, [the expert] gives the false impression that he knows the answer to this inquiry, which depends on [the defendant's] mental state." Id.    (cited with approval in United States v. Wood, 207 F.3d 1222, 1236 n. 10 (10th Cir. 2000)).

Other courts reach similar conclusions. In Sellers v. Butler, 2006 WL 2714274 (D. Kan. Sept. 22, 2006), the plaintiff moved to exclude an expert's testimony that he believed that none of the medical providers was deliberately indifferent to the plaintiff's medical needs. The court held such testimony was inadmissible under FRE 702, reasoning that such testimony would not be helpful to the trier of fact and, instead, was effectively a legal conclusion "that encompasses the entirety of plaintiff's burden of proof on an essential element of his claim." Id. See also Ledford v. Sullivan, 105 F.3d 354, 359 (7th Cir. 1997) (noting that, because deliberate indifference is subjective, it "was not so complicated that an expert was required to establish [the plaintiff's] case" because "whether the prison officials displayed deliberate indifference toward [plaintiff's] serious medical needs did not demand that the jury consider probing, complex questions concerning medical diagnosis and judgment"); Dukes v. Georgia, 428 F.Supp.2d 1298, 1315 (N.D. Ga. 2006) (refusing to admit the opinion of one of Plaintiff's experts in this case, Dr. Greifinger, on deliberate indifference because "his stamp of approval on the Plaintiff's contentions does nothing to advance a material aspect of Plaintiff's case").

Similar to the expert opinions in these precedents, Knox's and Volz's conclusions regarding deliberate indifference are no different than the arguments Plaintiff will advance in

closing argument and therefore are not admissible. Neither Knox nor Volz has any way of determining Paulsen's mental state, and allowing the admission of their opinions regarding Paulsen's mental state leaves the false impression that they know the answer to this inquiry. Thus, just as in <u>Woods</u> and the other cases above, their opinions regarding Paulsen's knowledge and/or deliberate indifference are inadmissible and cannot be considered on summary judgment.

Further, even assuming *arguendo* that their testimony on deliberate indifference was admissible, those opinions must be disregarded for yet another reason: both are based on an incorrect standard for determining a violation of the Constitution and hence are unreliable under FRE 702. Plaintiff's § 1983 claim requires a showing that Paulsen acted with deliberate indifference to his serious medical needs. <u>See</u> <u>Estelle v. Gamble</u>, 429 U.S. 97, 104 (1976). A person acts with deliberate indifference only if she "'consciously disregard[s] a substantial risk of serious harm.'" (Pl.'s Resp., at 24 (<u>citing</u> <u>Farmer v. Brennan</u>, 511 U.S. 825, 837-838 (1994)). As the Tenth Circuit explained, "Deliberate indifference requires more than a showing of simple or heightened negligence." <u>Verdecia v. Adams</u>, 327 F.3d 1171, 1175 (10th Cir. 2003).

Knox's understanding of deliberate indifference is based on an incorrect definition. In her deposition, Knox explained her understanding of deliberate indifference as follows:

> I believe that deliberate indifference is when a person, in this case a registered nurse, *had reason to know* or knew of something that caused grave danger or the potential for medical harm and did not act to either prevent the harm or to mitigate the risk.

(Knox Depo., at 84, Paulsen's A-20 attached hereto (emphasis added)). Knox's reliance on a "should have known" standard confuses deliberate indifference with negligence. As <u>Farmer</u> made clear, though, deliberate indifference focuses on what a defendant's knowledge *was*, not what it *should have been*. <u>Farmer</u>, 511 U.S. at 838, 839. Thus, Knox's opinion that Paulsen was

"deliberately indifferent" must be disregarded because it relies on a flawed understanding of what that means. (See Plaintiff's Facts, at ¶ 69 (citing Knox's testimony that Paulsen was deliberately indifferent); ¶ 71 (citing Knox to support the conclusion that Paulsen was deliberately indifferent "because she knew, or had reason to know"); ¶ 75 (same)).

With regard to Volz, he testified that he did not know what deliberate indifference was and did not have an understanding of what was required to violate the Eighth or Fourteenth Amendments, although he had read those amendments. (See Volz Depo., at 97-98, Paulsen's A-21 attached hereto). Thus, Plaintiff cannot rely on Volz's opinions that Paulsen violated the Constitution because those opinions are not based on the correct standard.

Further, to the extent Volz and Knox opine on negligence, such opinions are entirely irrelevant to the analysis of Plaintiff's § 1983 claim and should be disregarded by the Court. See Verdecia, 327 F.3d at 1175. Most of the evidence cited from Plaintiff's experts deal only with negligence. (See Plaintiff's Facts, at ¶¶ 67, 69, 74 (all citing Knox to support the conclusion that Paulsen was "negligent"); ¶¶ 71, 72, 75, 80 (all citing Knox to define Paulsen's duties, what she "should have known," and what the symptoms "should have" suggested to her); ¶¶ 82-83, 85, 87, 88, 90, 94, 96 (all citing Volz's conclusion that Paulsen was either negligent or that she "should have known" of certain facts)). None of these opinions regarding negligence or what Paulsen "should have known" are relevant to the merits of Plaintiff's § 1983 claim against Paulsen. Accordingly, none of these facts should be considered on summary judgment.

**B.    PLAINTIFF'S ARGUMENT REGARDING QUALIFIED IMMUNITY RELIES ON INCORRECT FACTS AND IGNORES OTHER, UNDISPUTED FACTS.**

Plaintiff's Response ignores several key facts that are undisputed and that demonstrate Nurse Paulsen is entitled to qualified immunity from his § 1983 claim. Although the Court must

14

take the facts in the light most favorable to Plaintiff in ruling on Ms. Paulsen's summary judgment motion, this standard does not mean that facts that are not disputed by any admissible evidence should be ignored simply to allow Plaintiff's claim to survive summary judgment. Plaintiff's Response states that numerous facts are disputed, but fails to provide any controverting evidence to generate a legitimate dispute. (See Section II, supra). Statements by counsel in a brief are not sufficient to overcome summary judgment, however. Thomas v. Wichita Coca-Cola Bottling Co., 968 F.2d 1022, 1025 (10th Cir. 1992).

### A.    Plaintiff's Response Ignores Undisputed Facts that Show Paulsen Did Not Act with Deliberate Indifference.

When all of the undisputed facts are considered, even construing them in a light most favorable to Plaintiff, there is insufficient evidence that Nurse Paulsen violated Plaintiff's constitutional rights. Therefore, Plaintiff's claim fails for lack of a constitutional violation.

When the complete and accurate facts are evaluated, it is clear that Paulsen did not act with deliberate indifference to Plaintiff's serious medical needs. In order to show deliberate indifference, Nurse Paulsen had to understand that Plaintiff's condition posed a substantial risk of harm. Garrett v. Stratman, 254 F.3d 946, 949 (10th Cir. 2001). The undisputed evidence shows that Paulsen did not know that Plaintiff's vague symptoms were indicative of any serious medical condition that required emergency treatment. Although Plaintiff argues that Paulsen knew that his symptoms "were an indication of a strep infection and could also be the beginning of a septic condition," this ignores Paulsen's testimony that she did not believe he had either ailment because he had other symptoms that were *not* consistent with strep or sepsis. Namely, he did not have a temperature of over 101 degrees. (See Park County's Reply Brief, at ¶ 108). Accordingly, although Paulsen agreed that Plaintiff had some symptoms that could, in some

circumstances, be "possible" signs of a strep infection or sepsis, she did not believe Plaintiff had either condition due to other symptoms. (See id. (citing Paulsen Depo., at 83-84, Pl.'s Exh. 1 and Paulsen's A-17)).

There is simply no evidence creating a disputed issue regarding Paulsen's subjective belief. Indeed, other evidence is consistent with Paulsen's testimony that she did not realize strep was the cause of Plaintiff's slightly red throat or other symptoms. Dr. Keeling, the physician who examined Plaintiff at Summit Medical Center, testified that Plaintiff's throat did not have exudate or other symptomology typically accompanied by strep. (See Paulsen's Facts, at ¶ 62; Pl.'s Resp. to County Mot. for S.J., at ¶¶ 83-86 (not refuting Dr. Keeling's testimony)). Additionally, even Knox agrees that a reasonable nurse in Paulsen's position would not have had enough information on March 6 or 7 to conclude that Plaintiff had strep or the onset of sepsis. (See Knox Depo., at 59, 63-64 attached hereto as Paulsen's A-20).[6]  Accordingly, the evidence fails to show Paulsen knew Plaintiff had either condition, or and that he was going to become seriously ill. Simply put, there is insufficient evidence that Paulsen had the requisite mental state to hold her liable under § 1983.

Similarly, with regard to the early morning hours of March 8, 2003, there is no evidence supporting Plaintiff's assertion that Plaintiff was "in critical condition" (Pl.'s Resp., at 21-22). much less that Paulsen knew of and disregarded any such condition. The physician who examined Plaintiff at Summit Medical Center found Plaintiff was *not* in critical condition on his

---

[6]     Paulsen cites this portion of Knox's testimony simply to demonstrate the extent to which Plaintiff's Response deviates from the evidence – including the evidence Plaintiff seeks to offer from his own expert witness. The citation of this testimony should not be misconstrued as implying that the subjective component of deliberate indifference considers what a reasonable nurse should have known or done. (See Argument IV.A., supra).

arrival to that facility. (See Keeling Depo, at 26, Paulsen's A-22 attached hereto (stating that Plaintiff was alert and cooperative and was not critical)). Further, the record evidence shows that when Plaintiff arrived at Denver Health, the emergency room physician classified him as in serious condition -- not in critical condition and "near death" as Plaintiff claims. (Compare Markovchick Depo., at 28, Paulsen's A-23 attached hereto, with Pl.'s Resp., at 22). It was only when Plaintiff suddenly deteriorated about an hour after his arrival that he was downgraded to critical condition. (Markovchick Depo., at 28, Paulsen's Exh. A-23). Thus, the evidence does not support Plaintiff's assertion that he was critical at the Park County Jail or Summit Medical Center, or even on his arrival to Denver Health. Moreover, Plaintiff provides no evidence showing that Paulsen knew Plaintiff was critical at the Jail and intentionally disregarded it.

To the contrary, the evidence shows that Paulsen believed Plaintiff was stable and non-emergent prior to his transport from the Jail. It is undisputed that Deputy Fikejs called Paulsen at approximately 3:45 a.m. on March 8 and told her that Deputy Frye, who had training and experience as a medical first responder, administered oxygen to Plaintiff for shortness of breath and that Plaintiff was feeling better (See Paulsen's Facts, ¶ 38; Pl.'s Resp. to County Mot. for S.J., at ¶¶ 68-69).[7]   Paulsen asked Deputy Fikejs if Frye had taken Plaintiff's blood pressure, pulse and respiration and for a description of Plaintiff's appearance. (See Paulsen Depo., at 95-96, Paulsen A-17). Paulsen was told that Plaintiff's vital signs were normal and stable, and she instructed Deputy Fikejs to keep an eye on Plaintiff and call her if he became any worse than he

---

[7]   Although Deputy Frye testified that the oxygen did not make Plaintiff feel better, there is no evidence this fact was ever communicated to Paulsen. To the contrary, her notes shows that she was informed by Deputy Fikejs, who was relaying information to her for Deputy Frye, that the oxygen helped Plaintiff. Neither Deputy Frye nor Deputy Fikejs contested these facts.

was at that time. (See id. at 97). There is no evidence showing that at that time, Paulsen knew Plaintiff had any serious medical condition requiring immediate emergency intervention.

Although Plaintiff argues that it was obvious to a layperson that Plaintiff was a serious condition requiring medical attention, the evidence on which Plaintiff relies does not support this assertion. Plaintiff claims that Deputy Frye administered oxygen to Plaintiff at 3:00 a.m. because even as a layperson, he recognized Plaintiff had an obvious need for emergency room treatment, (Pl.'s Resp., at 25). This argument does not comport with the evidence. Instead, Deputy Frye testified that he gave oxygen to Plaintiff because he thought, if Plaintiff was suffering from altitude sickness, that oxygen may make Plaintiff more comfortable or feel better. (Frye Depo., at 40, 72, Paulsen's A-24 attached hereto). Deputy Frye did not testify that he thought Plaintiff was in need of emergency medical intervention. Thus, contrary to Plaintiff's argument, Frye, as a layperson, did not believe Plaintiff needed emergency treatment.

Further evidence bearing on Paulsen's subjective mental state is that when she called the Jail shortly before 6:00 a.m. to check on Plaintiff's condition, she was told that he was resting and used the bathroom once. (See Paulsen's Facts, at ¶ 40; Pl.'s Resp. to County Mot. for S.J., at ¶¶ 69-72). These facts show that during the early morning hours of March 8, Paulsen knew that Plaintiff had a new symptom of shortness of breath, but that oxygen made him feel better; that his vital signs were normal and stable; and that he was resting and used the bathroom once.

Later that morning, after seeing Plaintiff in the pod around 8:00 a.m., Paulsen determined that he had something going on that required evaluation by a physician, but she did not feel that he was in need of emergency medical care. While Paulsen testified that she preferred Plaintiff to be transported earlier, she also testified that she believed he was stable and non-emergent, and

that an immediate transport was not necessary.  (See id. at Paulsen's Facts, at ¶¶ 52-55 (citing Paulsen Depo., at 117, Paulsen's Exh. A-1 and 17, and Paulsen Affidavit, Paulsen Exh. A-4)).

Because she did not believe Plaintiff was emergent, her actions of promptly arranging for a transport, and waiting for one to occur, does not constitute reckless disregard of a substantial risk of serious harm to Plaintiff.  It is undisputed that Jail staff told Paulsen that they needed permission from INS before they could transport Plaintiff, and Paulsen promptly called Baca of the INS to inform him of Plaintiff's symptoms and to request permission for a transport.  (See id.).  Plaintiff provides no contravening evidence, and thereby admits, that Paulsen believed, after speaking with Baca, that a transport officer from INS would be arriving within three hours, that Jail staff would notify her if Plaintiff's condition worsened, in which case Jail staff could transport. (See id. at ¶¶ 52-55; Pl.'s Resp. to County Mot. for S.J., at ¶ 79).  Thus, although in hindsight Paulsen wishes she had stayed with Plaintiff pending his transport, at the time Paulsen did not feel it was necessary for her to stay to monitor him until the transport team arrived.  (See Paulsen Depo., at 117, 221-223, Paulsen Exhs. A-1, A-17; Paulsen Affidavit, Exh. A-4, at ¶¶ 8-12).  When Paulsen left the Jail, she understood that transport arrangements were in process, that Plaintiff was stable, and that Jail staff would notify her of any worsening of his condition.

This testimony regarding Paulsen's understanding is undisputed by any evidence and shows that Paulsen did not act with deliberate indifference to Plaintiff's needs on March 8. Further, there is no evidence that had she stayed with Plaintiff, the transport would have occurred any sooner than it actually did.

The absence of deliberate indifference is further demonstrated by Paulsen's actions later that morning.  Despite not having heard from deputies that Plaintiff's condition worsened,

approximately three hours after she spoke to Baca, Paulsen called in on her own initiative to check on Plaintiff and to ensure that transport was in process. Upon learning that the transport was not yet in process, and that Plaintiff was vomiting more frequently, Paulsen ordered that Jail staff go ahead and transport Plaintiff to Summit Medical Center. (See Paulsen's Facts, at ¶ 58; Pl.'s Resp. to County Mot. for S.J., at 79). Again, there is no evidence that Plaintiff was in "critical condition" when he left the Jail, or that Paulsen knowingly disregarded a substantial risk of serious harm to Plaintiff by ordering a regular transport rather than an ambulance transport.

The facts here are strikingly similar to the facts in Self v. Crum, 439 F.3d 1227 (10th Cir. 2006), in which the court found there was no violation of the Eighth Amendment. As explained in detail in Paulsen's summary judgment brief, the medical providers in Self, like Paulsen., were confronted with vague symptoms that were consistent with a variety of conditions, some of which were benign such as a respiratory infection. Id. at 1234. In Self, the court stated that the mere possibility that the symptoms could also point to serious medical conditions was not sufficient to create an inference of deliberate indifference. Id. While the "failure to connect the dots" may create a fact issue on the issue of negligence, it was not enough to create an inference of deliberate indifference. Id. at 1235.

Likewise, construing the facts here in the light most favorable to Plaintiff, at best there is a fact issue on medical negligence. The evidence does not reasonably support an inference, however, that Paulsen knew Plaintiff was in need of emergency care or was going to suffer serious harm absent an immediate, ambulance transport to Summit Medical, and that she knowingly disregarded that risk. Thus, Paulsen is entitled to summary judgment.

**B.**     **Paulsen is Entitled to Qualified Immunity**

Although the above demonstrates there is no violation of the Constitution, which alone entitles Paulsen to qualified immunity, there is an additional, equally important reason why Paulsen should be granted such immunity.  This reason is the lack of clearly established law in 2003 that would instruct a nurse, when confronted with vague symptoms, what course of treatment would be considered unconstitutional.  As Paulsen details in her summary judgment brief, in 2003 the law was clearly established that a failure to treat an obvious serious medical need was unlawful.  (Paulsen Br. in Support of Mot. for S.J., at 27-30).  The law was not clearly established, however, regarding the legality of what treatment decisions to make when confronted with vague symptoms.  (See id.).  Plaintiff cites no case law in his Response showing that the law was clearly established for such scenarios.

Further, another dimension to the qualified immunity analysis is whether Paulsen acted reasonably, but perhaps mistakenly, in making her treatment decisions of Plaintiff.  As explained in Saucier v. Katz, 533 U.S. 194, 205 (2001), even if the law is clearly established, an official will be entitled to qualified immunity if he acts under the reasonable but mistaken conclusion as to what the law requires.  (Paulsen Br. In Support of Mot. for S.J., at 27-28).  Although Plaintiff contends that Saucier is inapplicable because it concerns the Fourth Amendment, rather than the Eighth Amendment (Pl.'s Resp., at 30, n. 1), other cases have applied its principles in the Eighth Amendment context.  See Hope v. Pelzer, 536 U.S. at 739; Estate of Ford v. Ramirez-Palmer, 301 F.3d 1043 (9th Cir. 2002).

Thus, Nurse Paulsen's conclusions, even if mistaken, about the seriousness of Plaintiff's condition entitle her to qualified immunity if they are reasonable.  The varying opinions of the

medical experts regarding whether or when it was possible to diagnose Plaintiff prospectively for his very rare pneumonia show that Paulsen's evaluation of Plaintiff was reasonable. (*See* Dr. Donald H. Kearns, M.D., Expert Report, Paulsen Exh. A-13, at 2; Dr. Ivor Garlick, MD, CCHP's Expert Report, Paulsen Exh. A-14, at 4; Expert Report of Elizabeth Kraft, M.D., Paulsen Exh. A-15, at 4). For this additional reason, she is entitled to qualified immunity from Plaintiff's claim.[8]

### CONCLUSION

The undisputed evidence demonstrates that Nurse Paulsen did not act with deliberate indifference to Plaintiff's medical condition, and therefore did not have the culpable state of mind that is required to find her liable under § 1983. In addition, Paulsen is entitled to qualified immunity from Plaintiff's claims. Accordingly, Defendant Vicki Paulsen respectfully requests that the Court **GRANT** her Motion for Summary Judgment and dismiss Plaintiff's claims against her.

Respectfully submitted:  February 15, 2007

s/ Melanie B. Lewis
_____

Josh A. Marks
Melanie B. Lewis
BERG HILL GREENLEAF & RUSCITTI LLP
1712 Pearl Street
Boulder, CO 80302
Phone: (303) 402-1600
Fax: (303) 402-1601
Email: jam@bhgrlaw.com

*Attorneys for Defendant*

---

[8]      Plaintiff challenges the admissibility of these expert reports based on hearsay.  To remedy this technical flaw, Paulsen attaches the Declaration of Dr. Kearns verifying his report. (See Paulsen Exh. A-25).  Paulsen is obtaining similar declarations from Dr. Kraft and Dr. Garlick, and will supplement this reply with the declarations on their receipt.

## CERTIFICATE OF SERVICE

I hereby certify that on February 15, 2007, I electronically filed the foregoing **DEFENDANT VICKI PAULSEN'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** with the Clerk of the Court using the CM/ECF system which will send notification to such filing to the following e-mail addresses,

Joseph Archuleta
Law Offices of Joseph Archuleta
1724 Ogden Street
Denver, CO 80218
archuletalaw@qwest.net

Lloyd Kordick
Lloyd C. Kordick & Associates
805 S. Cascade Avenue
Colorado Springs, CO 80903
lloyd@kordicklaw.com

William Trine
Trine & Metcalf PC
1435 Arapahoe Avenue
Boulder, CO 80302
btrine@trine-metcalf.com

Adele P. Kimmell
Trial Lawyers for Public Justice, PC
1825 K Street, N.W.
Suite 200
Washington, D.C. 20006
akimmell@tlpj.org

Andrew Ringel
Jennifer Veiga
Hall & Evans LLC
1125 17th Street, Suite 600
Denver, CO 80202
ringela@hallevans.com
veigaj@hallevans.com

s/ Julie Bozeman

_____
Julie Bozeman