1/18/2006  Vicki Ann Paulsen, R.N.

```
0001
 1   IN THE UNITED STATES DISTRICT COURT
     FOR THE DISTRICT OF COLORADO
 2
     Case No. 2005-WM-377 (BNB)
 3   _____

 4   DEPOSITION OF:  VICKI ANN PAULSEN, R.N.
     January 18, 2006
 5   _____

 6   MOISES CARRANZA-REYES,
 7   Plaintiff,
 8   v.
 9   PARK COUNTY, a public entity of the State of Colorado and
     its governing board, THE PARK COUNTY BOARD OF COUNTY
10   COMMISSIONERS; PARK COUNTY SHERIFF'S OFFICE, a public
     entity of the State of Colorado; FRED WEGENER,
11   individually and in his official capacity as Sheriff of
     Park County, Colorado; MONTE GORE, individually and in
12   his capacity as Captain of Park County Sheriff's
     Department; VICKIE PAULSEN, individually and in her
13   official capacity as Registered Nurse for Park County,
     Colorado; JAMES BACHMAN, M.D., individually and in his
14   official capacity as Medical Director of the Park County
     Jail,
15
     Defendants.
16   _____
17
18
19   TAKEN PURSUANT TO NOTICE on behalf of the Plaintiff at
20   1125 17th Street, Suite 600, Denver, Colorado 80202 at
21   9:04 a.m. before Theresa A. Coffman, Federal Certified
     Realtime Reporter, Registered Professional Reporter and
22   Notary Public within Colorado.
23
24
25
                                                            1
```

1/18/2006  Vicki Ann Paulsen, R.N.

```
 1                    APPEARANCES
 2   For the Plaintiff:      WILLIAM A. TRINE, ESQ.
                             Trine & Metcalf, P.C.
 3                           1435 Arapahoe
                             Boulder, Colorado 80302
 4
                             LLOYD C. KORDICK, ESQ.
 5                           805 South Cascade
                             Colorado Springs, Colorado 80903
 6
                             JOSEPH J. ARCHULETA, ESQ.
 7                           Law Office of Joseph J. Archuleta
                             1724 Ogden Street
 8                           Denver, Colorado 80218
 9   For the Defendants      JENNIFER L. VEIGA, ESQ.
     Park County, Park       Hall & Evans, LLC
10   County Board of         1125 17th Street
     Commissioners, Park     Suite 600
11   County Sheriff's Office, Denver, Colorado 80202
     Wegener and Gore:
12
     For the Defendant       MELANIE B. LEWIS, ESQ.
13   Paulsen:                Berg Hill Greenleaf & Ruscitti LLP
                             1712 Pearl Street
14                           Boulder, Colorado 80302
15   For the Defendant       CRAIG A. SARGENT, ESQ.
     Bachman:                ANDREW W. JURS, ESQ.
16                           Johnson McConaty & Sargent, P.C.
                             400 South Colorado Boulevard
17                           Suite 900
                             Glendale, Colorado 80246
18
     Also Present:           Moises Carranza-Reyes
19
20
21
22
23
24
25
                                                            2
```

1/18/2006  Vicki Ann Paulsen, R.N.

```
 1                     I N D E X
 2   EXAMINATION OF VICKI ANN PAULSEN, R.N.           PAGE
     January 18, 2006
 3
 4   By Mr. Trine                                  5, 225
 5   By Mr. Archuleta                                --
 6   By Mr. Kordick                                  --
 7   By Ms. Veiga                                    --
 8   By Mr. Sargent                                  --
 9   By Mr. Jurs                                    223
10   By Ms. Lewis                                   220
11                                                INITIAL
     DEPOSITION EXHIBITS:                        REFERENCE
12
     20    Paulsen Park County personnel file        5
13
     21    Pass-On records                          55
14
     22    Code of Colorado Regulations, Department 12
15         of Public Health and Environment Consumer
           Protection Section,
16
     23    Park County Sheriff's Office Detention   46
17         Center INS Detainee Intake Form, 3/6/03
18   24    Summit Medical Center records           135
19   25    Park County Sheriff's Office Detention  173
           Center Job Description
20
     26    INS Detention Standard, Medical Care    215
21
22   (Original exhibits attached to original deposition; copy
     exhibits included in continuing exhibit file; copies
23   provided to counsel as requested.)
24
25
                                                            3
```

1/18/2006  Vicki Ann Paulsen, R.N.

```
 1   REQUESTED PORTIONS OF TESTIMONY:               PAGE
 2   Request for document production                 --
     or information
 3
 4   Certified question                              --
 5   Instruction not to answer                       77
 6   Other requests or marked testimony              --
 7
 8   REFERENCES TO EXHIBITS MARKED PREVIOUSLY:
 9   Exhibit No.    Page Reference
10       2              201
         3               69
         4              183
```

Paulsen's A-17

```
                                                            4
```

1/18/2006 Vicki Ann Paulsen, R.N.

```
 1   day or night?
 2       A.   Yes.
 3       Q.   What information did he give you on what you
 4   should do if he was unavailable?
 5       A.   Then if it was during the week, I could talk
 6   to his nurse practitioner.  Otherwise I would have to
 7   transport to another facility, and that would probably be
 8   Frisco, Summit Medical Center.
 9       Q.   Now, did you meet Dr. Bachman at the Frisco
10   Medical Center?
11       A.   Yes.
12       Q.   And what was your understanding of where
13   patients would be transported for emergency care?
14       A.   Frisco Medical Center.
15       Q.   And did you understand they had an emergency
16   department there, emergency room?
17       A.   Yes.  That was my understanding.
18       Q.   Did he give you the name of any other
19   physician that you should contact if he was on vacation
20   or unavailable?
21       A.   No, he did not.
22       Q.   Did you meet his nurse practitioner?
23       A.   Yes, I did.
24       Q.   Did she participate in this meeting with Dr.
25   Bachman?
```

21

1/18/2006 Vicki Ann Paulsen, R.N.

```
 1       A.   No, she did not.
 2       Q.   Did you meet her on that day, the same day?
 3       A.   No, I did not.
 4       Q.   When did you meet the nurse practitioner?
 5       A.   We were taking female inmates over for -- I
 6   don't remember, but we transport over there.  She saw the
 7   female inmates, and that's when I met her.
 8       Q.   And what is her name?
 9       A.   I don't recall.
10       Q.   Did you only meet her on that one occasion?
11       A.   There were several occasions when I went
12   over to the office with inmates.
13       Q.   Was it always the same nurse practitioner?
14       A.   Yes.
15       Q.   Until you terminated your employment?
16       A.   Yes.
17       Q.   Did you have any conversation with Dr.
18   Bachman about standing protocols or standing orders that
19   might be available to you --
20       A.   No, I did not.
21       Q.   That might be available to you at the Park
22   County Jail?
23       A.   No, I did not.
24       Q.   Did you ask about that?
25       A.   No, I did not.
```

22

1/18/2006 Vicki Ann Paulsen, R.N.

```
 1       Q.   Did you ever discover that there were
 2   protocols and standing orders available for your use at
 3   Park County?
 4       A.   I did not see them, no.
 5       Q.   During your employment there, did you ever
 6   request that standing orders be drafted for your use
 7   under any medical circumstances?
 8       A.   No, I did not.
 9       Q.   Were standing orders used at any of the
10   correctional facilities you worked at previously?
11       A.   There were protocols, yes.
12       Q.   Any similar protocols in use at Park County?
13       A.   Yes, because -- yes.
14       Q.   In what areas?
15       A.   The protocols were from Department of
16   Corrections.
17       Q.   So you were using the DOC protocols at Park
18   County?
19       A.   Yes.
20       Q.   Were there DOC -- excuse me.  Were there
21   physician standing orders available for your use at Buena
22   Vista?
23       A.   No.  Oh, yes.  Excuse me.  Yes, there were.
24       Q.   And at Territorial?
25       A.   You had some standing orders.  You have some
```

23

1/18/2006 Vicki Ann Paulsen, R.N.

```
 1   standing orders in every facility.
 2       Q.   So Dr. Bachman then explained to you that he
 3   would be present one day per week at the Park County Jail
 4   to see inmates?
 5       A.   Yes.
 6       Q.   And was that a particular day of each week?
 7       A.   Usually Wednesdays.
 8       Q.   And he explained to you that any inmates
 9   that you felt he should see, you would schedule for those
10   appointments?
11       A.   Yes.
12       Q.   Was he, then, there every Wednesday after
13   you started working at Park County?
14       A.   He missed a couple of weeks, but yes, he was
15   there every week.
16       Q.   What time would he normally arrive?
17       A.   Usually right after lunch.
18       Q.   And would you customarily have scheduled
19   appointments for him in the afternoon on Wednesdays?
20       A.   Yes.
21       Q.   And approximately how many inmates would he
22   see, on the average, on a Wednesday afternoon?
23       A.   It could vary anywhere from three to seven
24   or eight.  It just depended on how many needed to be
25   seen.
```

24

1/18/2006 Vicki Ann Paulsen, R.N.

1  courier to pick up.
2      Q.   So if you were in a rush, you would get the
3  results within what? 24 hours?
4      A.   Probably.
5      Q.   Any other diagnostic-type equipment that you
6  had available?
7      A.   Otoscope, you know, stethoscope. I mean, I
8  don't know what you're asking. I don't know.
9      Q.   Did you request any additional diagnostic
10 equipment that you didn't receive?
11     A.   No.
12     Q.   What instructions or information, if any,
13 were you given with regard to the budget, or how much was
14 available to you for purposes of sending inmates or
15 patients for treatment or using an ambulance --
16     A.   I wasn't -- it was never discussed.
17     Q.   When and under what circumstances could you
18 request or order that an inmate be transferred to Frisco
19 or Summit County for emergency care and treatment?
20     A.   If I saw them, I would ask whoever -- the
21 sergeant on duty or whoever and tell them that I needed
22 him transported, and they would talk to Captain Gore, and
23 then we'd get the -- by then, of course, the ambulance
24 was en route, and so -- if we needed an ambulance to
25 transport.

37

1/18/2006 Vicki Ann Paulsen, R.N.

1      Q.   Did you ever request that an inmate be
2  transported to see Dr. Bachman in Frisco when the request
3  was denied for any reason?
4      A.   No, I don't believe so.
5      Q.   So it was your understanding you had the
6  ultimate authority or power to have an inmate transferred
7  to Dr. Bachman? You didn't have to get anyone's
8  permission?
9      A.   I had to talk to security. I mean, there
10 was a security issue. I had to tell them I wanted a
11 person transported. If we were taking people to his
12 office, then we made a time with the transport officer so
13 that he could take them over. So we'd take them over.
14 It had to be set up if I had someone to take over. In an
15 emergency situation -- I never transported to his office
16 in a emergency situation.
17     Q.   But did you ever have patients transported
18 to Frisco to be evaluated by Dr. Bachman when it was not
19 an emergency?
20     A.   Yes.
21     Q.   Okay. And you made that decision as the
22 nurse?
23     A.   Un-hum. Yes.
24     Q.   You didn't have to get someone's permission
25 to do that? You just had to make the arrangements?

38

1/18/2006 Vicki Ann Paulsen, R.N.

1      A.   I had to see that the arrangements were
2  made, see when I could do it.
3      Q.   And if I understand what you're saying, if
4  you decided an inmate should be examined by Dr. Bachman
5  at his office, you would simply arrange that with
6  security and for transportation and probably call Dr.
7  Bachman --
8      A.   Yes, and tell him who I had and why.
9      Q.   To let him know; is that right?
10     A.   Yes.
11     Q.   And when you did that, would you generally
12 fax any medical charts or documents that you had that
13 might be relevant to that appointment?
14     A.   If he requested them, yes.
15     Q.   Only if Dr. Bachman requested them?
16     A.   Yes.
17     Q.   You didn't do it as a matter of course?
18     A.   Not normally, no.
19     Q.   Okay. What if you were transporting an
20 inmate to Frisco or Summit County to the emergency
21 department? Would you customarily fax them any
22 medical -- any relevant medical records you had?
23     A.   If they went by ambulance, I made copies and
24 sent them with the ambulance driver or the ambulance
25 company, and I called ahead and told them what was

39

1/18/2006 Vicki Ann Paulsen, R.N.

1  coming.
2      Q.   And did you understand that that was
3  actually one of the sheriff's policy rules and
4  procedures, and that is that you were obligated to send
5  any medical charts or records that you had with a patient
6  going to a hospital or emergency department?
7      A.   Right.
8           MS. LEWIS: Object to the form of the
9  question.
10     Q.   (BY MR. TRINE) You understood as a nurse
11 that that could be very important to the people receiving
12 a patient, to know what had been done previously and --
13     A.   Correct.
14     Q.   -- what the chart showed?
15     A.   Correct.
16     Q.   Now, during the time that you were at Park
17 County as a nurse, how many inmates or detainees on the
18 average did you actually send to Bachman at his office
19 for further diagnostic work or treatment?
20     A.   I sent -- I can't tell you for appointments.
21 I mean, that was -- if he couldn't come to Park County,
22 they were sent to him for appointments, but I can't tell
23 you the number.
24     Q.   Okay. Can you give me an average of how
25 many per week or per month?

40

1/18/2006 Vicki Ann Paulsen, R.N.

1  Q.   When you saw that there were two toilets and
2  knew at times that there were more than 30 inmates in
3  there, did you ever say anything to Monte Gore or any of
4  the deputies about the overcrowding?
5       MS. LEWIS:  Object to the form of the
6  question.
7       A.   I did say, you know, how long are they going
8  to be there, is INS picking up, they're -- it's not a
9  good thing to have that many people in there.  But other
10 than that, I did not talk to Monte Gore about it.
11      Q.   (BY MR. TRINE)  Who are these conversations
12 with that you were just describing?
13      A.   Corporal Crawford, Sergeant Muldoon.
14      Q.   And when you had said it's not a good idea
15 to have that many people in there, what was their
16 response?
17      A.   That INS would probably be picking them
18 up -- the extra up.  Because they were in and out all the
19 time.  I mean, I didn't have detainees there for long
20 periods.  I think I had two, but they were going to
21 court.  I mean, I can remember two or three cases where I
22 had detainees that were longer than that, but they were
23 going to court, so they were there longer.  But other
24 than that, they picked them up weekly.
25      Q.   Were you personally concerned about the

45

1/18/2006 Vicki Ann Paulsen, R.N.

1  potential health hazards of having an overcrowded pod?
2       A.   Any nurse would be.
3       MR. SARGENT:  I didn't hear the answer.
4  Would be?
5       MS. VEIGA:  I didn't hear.
6       THE DEPONENT:  Any nurse would be.
7       Q.   (BY MR. TRINE)  And what were your concerns?
8       A.   Just health issues.  You know, I mean, if
9  someone got a cold, then everyone got the cold.  That
10 type of thing.
11      MR. TRINE:  Why don't we take a short break.
12      (Break from 10:10 a.m. to 10:25 a.m.)
13      (Deposition Exhibit 23 was marked.)
14      Q.   (BY MR. TRINE)  I'll hand you what has been
15 marked Deposition Exhibit 23, and there is a stamp on
16 that exhibit stating, "Any medical info can be located in
17 the nurse's office."  Do you remember when and under what
18 circumstances that stamp was used?
19      A.   I would assume when he -- when they came
20 into the facility.
21      Q.   Did you stamp --
22      A.   No, I didn't.
23      Q.   Did you use this stamp?
24      A.   I didn't use that stamp, no.
25      Q.   Well, let me explain that there were 50

46

1/18/2006 Vicki Ann Paulsen, R.N.

1  detainees who were transported out of Park County on
2  March 7, 2003, and we received this face sheet for all 50
3  detainees, but only 33 of them had this stamp marked on
4  them.  And the rest didn't.
5       A.   I don't know.
6       Q.   That's why I asked you if you knew when and
7  under what circumstances they actually stamped these
8  sheets.
9       A.   I would --
10      MS. LEWIS:  Object to form and foundation.
11      A.   I would assume when they were -- when they
12 came in.
13      Q.   (BY MR. TRINE)  Well, did every detainee
14 have a separate medical chart in your office that was
15 locked up?
16      A.   Every detainee had their -- what they filled
17 out in a little folder in my office.  You know, the
18 little medical questionnaire.
19      Q.   That they filled out when they were booked
20 in?
21      A.   Right.  And I would assume that this was
22 done at the same time.  I don't know.
23      Q.   Okay.
24      A.   I had not ever seen one of these.
25      MR. SARGENT:  Bill, just so I'm clear, this

47

1/18/2006 Vicki Ann Paulsen, R.N.

1  is not one for Mr. Carranza-Reyes, right?
2       MR. TRINE:  Obviously not.
3       MR. SARGENT:  I didn't know if I was missing
4  something.
5       THE DEPONENT:  I was going to say -- I don't
6  know.
7       Q.   (BY MR. TRINE)  So your testimony is that
8  you would open a new file on every detainee that was
9  booked in and would keep that locked up in your file
10 cabinet?
11      A.   It would be a folder with their medical
12 information that they gave us in there, in the file
13 cabinet locked up, yes.
14      Q.   And someone else would stamp this stamped
15 information on the form?
16      A.   Evidently.
17      Q.   Now, did you understand from any source that
18 Dr. Bachman had a specialty, if you will, in altitude
19 sickness?
20      A.   No.
21      Q.   He never informed you of that?
22      A.   No.
23      Q.   Did he give you any specific information
24 about altitude sickness?
25      A.   No.

48

1/18/2006 Vicki Ann Paulsen, R.N.

```
 1     A.    A slightly red throat.
 2     Q.    And a slightly red throat can be a sign of
 3  strep infection; isn't that right?
 4     A.    Not necessarily.
 5     Q.    A red throat is a sign, a possible sign, of
 6  a strep infection; isn't that correct?
 7     A.    Possible.
 8           MS. LEWIS:  Mr. Trine, I think it's 11:30
 9  now.
10           MR. TRINE:  It's 11:27.  Let me have three
11  minutes.
12     Q.    (BY MR. TRINE)  And am I correct that
13  general body aches, a headache, nausea, diarrhea, and a
14  red, sore throat are also signs and symptoms of the
15  beginning of a septic condition of sepsis?
16     A.    They can be.
17     Q.    And his skin was warm and dry to the touch?
18     A.    Correct.
19     Q.    And he was slightly tender over his stomach
20  area?
21     A.    Correct.
22     Q.    And you apparently didn't palpate his
23  throat --
24           MS. LEWIS:  Object to the form of the
25  question.  Foundation.
```

81

1/18/2006 Vicki Ann Paulsen, R.N.

```
 1     Q.    (BY MR. TRINE)  -- for any swelling of lymph
 2  nodes?
 3     A.    Yes, I did.
 4     Q.    Where do you indicate you did that?
 5     A.    I did not indicate that.
 6     Q.    Excuse me?
 7     A.    I did not indicate that.
 8     Q.    But today you just have a memory of actually
 9  touching him and palpating him for lymph nodes; is that
10  right?
11     A.    If you have a sore throat, you palpate for
12  lymph nodes.
13     Q.    I know you're supposed to do that.  Do you
14  have a memory of doing that?
15     A.    Yes, I do.
16     Q.    You have a memory today of touching him and
17  palpating for lymph nodes?
18     A.    Yes.
19     Q.    Is that right?
20     A.    Correct.
21           MR. TRINE:  Okay.  Let's take a break.
22           (Break from 11:29 a.m. to 12:33 p.m.)
23           (Deposition Exhibit 24 was marked.)
24     Q.    (BY MR. TRINE)  Ms. Paulsen, when we broke
25  for lunch, we were discussing from Exhibit 21, Park 3525,
```

82

1/18/2006 Vicki Ann Paulsen, R.N.

```
 1  the document that contains your name and James Bachman
 2  that's dated March 6, '03, and at that time you chart
 3  that he had an elevated temperature of 100.2; is that
 4  correct?
 5     A.    Correct.
 6     Q.    And that would be consistent with your
 7  assessment of his having warm skin, dry to the touch?
 8     A.    Correct.
 9     Q.    And you indicate that you asked the
10  interpreter to tell him to let medical know if he's not
11  improving?
12     A.    Yes.
13     Q.    And at that time you apparently knew that
14  Bachman would probably not be in, at the earliest, until
15  the following Wednesday?
16     A.    Correct.
17     Q.    And March 6 was a Thursday?
18     A.    Um-hum.  Yes.
19     Q.    Did you consider calling Bachman just to
20  tell him that Carranza-Reyes had symptoms of a possible
21  strep throat?
22     A.    No, because --
23           MS. LEWIS:  Object to the form of the
24  question.
25     A.    Because his -- his symptoms were not
```

83

1/18/2006 Vicki Ann Paulsen, R.N.

```
 1  consistent with what I've seen with strep.
 2     Q.    (BY MR. TRINE)  What symptom was not
 3  consistent with --
 4     A.    Elevated temperature of over 101.
 5     Q.    That's consistent with a sepsis condition,
 6  isn't it?
 7     A.    Or strep.  Yeah.
 8     Q.    Okay.
 9     A.    101 temp.
10     Q.    Did you consider calling Bachman to tell him
11  that he had not only possible symptoms of a strep throat
12  but of septicemia or a septic condition?
13     A.    No, I didn't --
14           MS. LEWIS:  Object to form.
15     A.    No, I did not.
16     Q.    (BY MR. TRINE)  There's no indication on
17  Park 3525 as to what your nursing diagnosis was.  Did you
18  have a nursing diagnosis?
19     A.    No.
20     Q.    So you had no thoughts at all on what was
21  causing his condition at that time?
22     A.    It could have been a number of things.
23     Q.    But since you couldn't eliminate any of
24  those things, you didn't make a nursing diagnosis in your
25  assessment?
```

84

1/18/2006 Vicki Ann Paulsen, R.N.

1  congestion and for his upset stomach and diarrhea.
2      Q.   And in order to make sure that everyone is
3  on the same page and knows what your instructions are,
4  wouldn't you put that in the pass-on record?
5      A.   Yes.
6      Q.   Did you find that anywhere in the pass-on
7  record --
8      A.   No, I did not.
9      Q.   -- those instructions?
10     A.   No, I did not.
11     Q.   It would have been your custom and practice,
12 however, to enter some kind of note in the pass-on record
13 if you wanted an inmate to be watched carefully, wouldn't
14 you?
15     A.   Yes.
16          MS. LEWIS:  Object to the form.
17     Q.   (BY MR. TRINE)  Do you know why that wasn't
18 done here?
19     A.   No, I do not.
20     Q.   What's your next memory, then, of any
21 contacts with anyone related to Carranza-Reyes after
22 Friday, March 7?
23     A.   They called me the early morning of the 8th
24 that he had become short of breath.  They had to take him
25 back to medical, and he -- Deputy Frye had taken his

93

1/18/2006 Vicki Ann Paulsen, R.N.

1      Q.   You didn't directly talk to Frye?
2      A.   Not until I went in.
3      Q.   So your understanding was that Deputy Fikejs
4  was relaying to you information he was getting from Frye?
5      A.   Yes.
6      Q.   And they were both in the same room
7  together?
8      A.   Yes.
9      Q.   Did you ask to speak to Frye?
10     A.   He was busy with Mr. Carranza-Reyes.
11     Q.   He was busy with Carranza-Reyes?
12     A.   Yes, yes.
13     Q.   Doing what?
14     A.   Taking his vital signs and keeping check on
15 him.
16     Q.   So the phone conversation took place while
17 Frye was actually examining --
18     A.   While he was with him.
19     Q.   Is that right?
20     A.   Yes.
21     Q.   Were you giving instructions on the
22 examination:  Do this, do that?
23     A.   I asked if they had taken his blood pressure
24 and pulse and respiration and just what his appearance
25 was, what was going on.

95

1/18/2006 Vicki Ann Paulsen, R.N.

1  vital signs and had given him some oxygen.
2      Q.   And when were you called?  About what time?
3      A.   About 3:00.
4      Q.   And was it your impression, then, that his
5  condition had deteriorated from the time you saw him on
6  the 7th?
7      A.   Yes.
8      Q.   Did you at that time consider coming in
9  immediately to assess him?
10     A.   I did, and I talked to the deputies, and
11 they didn't feel at that point that it was necessary for
12 me to come in right then.
13     Q.   Which deputy did you talk to?
14     A.   I talked to Deputy Fikejs.
15          MR. SARGENT:  I'm sorry.  I didn't hear you.
16          THE DEPONENT:  Deputy Fikejs.
17     Q.   (BY MR. TRINE)  And what was your
18 understanding of what medical training, if any, Deputy
19 Fikejs had?
20     A.   Deputy Frye was taking care of Mr.
21 Carranza-Reyes.
22     Q.   But you spoke to Mr. Fikejs?
23     A.   Deputy Frye was with him and in medical, and
24 so it was Deputy Fikejs, and he was relating to me
25 what -- and I could hear what Mr. Frye was saying.

94

1/18/2006 Vicki Ann Paulsen, R.N.

1      Q.   Were you informed that the vital signs were
2  abnormal?
3           MS. LEWIS:  Object to the form.
4      A.   No.
5      Q.   (BY MR. TRINE)  You were informed that the
6  vital signs were normal and stable?
7      A.   Yes.
8      Q.   What do you remember --
9      A.   I don't remember the vital signs.
10          MS. LEWIS:  Wait until he finishes his
11 question.
12          THE DEPONENT:  Okay.
13     Q.   (BY MR. TRINE)  What do you remember about
14 the conversation specifically?  What did they tell you
15 about his condition, that is, what did Deputy Fikejs tell
16 you about his condition?
17     A.   That they had taken him back to medical,
18 that he was short of breath -- complained of shortness of
19 breath, and he still had nausea and vomiting.
20     Q.   What about his temperature?
21     A.   I don't remember.
22     Q.   Did you take handwritten notes at home of
23 this information, this conversation?
24     A.   Yes.
25     Q.   And what did you do with those notes?

96

1/18/2006 Vicki Ann Paulsen, R.N.

1  team before you left?
2      A.    No, I did not.
3      Q.    Well, wasn't that your custom and practice?
4      A.    Yes, it was.
5      Q.    Why didn't you copy his chart before you
6  left so that the transport team would have it?
7      A.    I -- I don't know. I didn't.
8      Q.    Is it because you didn't believe he was
9  going to be transported?
10     A.    No.
11     Q.    You believed he was going to be?
12     A.    Yeah.
13     Q.    Did Corporal Crawford ask for a copy of his
14 chart to take with the transport team?
15     A.    No, he did not.
16     Q.    Did you know how he was going to be
17 transferred?
18     A.    I assumed he would go by vehicle to Summit
19 County.
20     Q.    By ambulance?
21     A.    No.
22     Q.    You didn't feel he needed an ambulance?
23     A.    No.
24     Q.    You felt he should be transported right away
25 but not necessarily by ambulance, right?

117

1/18/2006 Vicki Ann Paulsen, R.N.

1      A.    Correct.
2      Q.    Had any of the arrangements been made yet
3  when you left by about 9 o'clock?
4      A.    I thought they were in the process of
5  getting transport because they would have had to have
6  brought somebody in from the outside to transport him.
7      Q.    So you didn't leave any instructions on what
8  to look for in the way of his condition getting worse so
9  that they could then transport because you assumed he was
10 going to be transported, right?
11           MS. LEWIS: Object to the form.
12     A.    I talked to them about his condition and
13 that he needed to be transported, that any -- any
14 worsening of symptoms, he needed to go, period. I wanted
15 him gone.
16     Q.    (BY MR. TRINE) If you look at Exhibit 21
17 again at that same page, at 3530, it indicates that at
18 8:53, a small amount of blood was observed in the
19 inmate's spittle. Do you remember being informed of
20 that --
21     A.    No.
22     Q.    -- or observing that?
23     A.    No, I did not observe that.
24     Q.    Would that have been of concern to you?
25     A.    Yes.

118

1/18/2006 Vicki Ann Paulsen, R.N.

1      Q.    And why is that?
2      A.    Because he would have had something going on
3  in his chest.
4      Q.    And it's probably in his lungs, right?
5      A.    And it's probably in his lungs, yes.
6      Q.    And no one informed you of that?
7      A.    No.
8      Q.    And at 9:20 a.m., it indicates that Corporal
9  Crawford authorized a chair be placed in D Block to aid
10 the inmate in his discomfort. Were you there when that
11 happened, or had you left?
12     A.    I had gone.
13     Q.    Did anyone call you about that?
14     A.    No.
15     Q.    Or describe his discomfort?
16     A.    No.
17     Q.    Did you ask to be called if his condition
18 got worse?
19     A.    Yes.
20     Q.    Who did you ask?
21     A.    Corporal Crawford. He was in the control.
22     Q.    Now, why would you ask Corporal Crawford to
23 call you at home if his condition got worse if you
24 assumed they were transporting him when you left?
25     A.    You just cover all the bases, say keep me

119

1/18/2006 Vicki Ann Paulsen, R.N.

1  informed.
2      Q.    Now, again, that same page of Exhibit 21
3  indicates that at 11:07 a.m., the nurse called and
4  recommended the inmate, Carranza-Reyes, Moises, be taken
5  to Summit Medical Center for evaluation and treatment.
6  Do you remember making that call?
7      A.    Not at 11:00. At 10:30.
8      Q.    So you think that this is erroneous, this
9  11:07?
10     A.    I do.
11     Q.    What record do you have of having made the
12 call at 10:30?
13     A.    I don't have it.
14     Q.    Is there any record?
15     A.    My -- I have a -- what happened that
16 morning, I made a whole record of it.
17     Q.    Okay. You're talking now about the nurse's
18 report that you drafted for Captain Gore after he was
19 taken to Summit County?
20           MS. LEWIS: Object to the form and
21 foundation.
22     A.    I made it. I made it when -- right after it
23 happened, but it was at 10:30 that I called. It was not
24 at 11 o'clock.
25     Q.    (BY MR. TRINE) Okay. So you're saying the

120

1/18/2006 Vicki Ann Paulsen, R.N.

1  A. No, I did not.
2  Q. -- about Carranza-Reyes?
3  A. No, I did not.
4  Q. So your only contact was that one call
5  between 8:00 and 9:00 in the morning?
6  A. Correct.
7  Q. And you never talked to anyone after that?
8  A. No.
9  Q. To this day?
10 A. No.
11 Q. Now, if you'll refer to 3543 in Exhibit 21.
12 Or actually I guess it starts on 3542. Okay. This is a
13 nurse report, 3/8/03, and this is the nursing report we
14 were earlier referring to; is that right?
15 A. Yes.
16 Q. And it's dated March 8, '03, and did you
17 print this? Is this a print-off of a computer entry?
18 A. Yes.
19 Q. When did you make these entries on the
20 computer?
21 A. I made them late afternoon.
22 Q. Late afternoon?
23 A. On the 8th.
24 Q. Of the 8th?
25 A. I was at home. I made them at home on the

129

1/18/2006 Vicki Ann Paulsen, R.N.

1  8th.
2  Q. On your computer?
3  A. Yes.
4  Q. Not the computer at Park County?
5  A. No.
6  Q. And that was about what time?
7  A. I don't know what time it was.
8  Q. Well, the last time of an entry on Park 3543
9  is 2300 hours.
10 A. Right. And I believe I added that after.
11 Q. Well, what part of these entries did you do
12 earlier?
13 A. Up to 1430.
14 Q. Why did you draft this nurse report?
15    MS. LEWIS: Objection, asked and answered.
16 Go ahead and answer again.
17 A. I -- I guess it comes from a DOC
18 perspective. You just document everything. Still do to
19 this day.
20 Q. (BY MR. TRINE) Did you decide to document
21 everything in a nurse report when you learned that
22 Carranza-Reyes, in fact, had been diagnosed at Summit
23 County with pneumonia and sepsis?
24    MS. LEWIS: Object to the form.
25 A. No.

130

1/18/2006 Vicki Ann Paulsen, R.N.

1  Q. (BY MR. TRINE) And was in critical
2  condition?
3  A. No.
4  Q. Did you decide to draft this report when you
5  learned that he had been transported to the hospital and
6  might not live?
7     MS. LEWIS: Object to the form and
8  foundation.
9  A. No.
10 Q. (BY MR. TRINE) Did you feel that all of
11 those facts would be important and that you would have to
12 draft a report that would explain what happened at the
13 jail?
14 A. I felt that it was important in the fact
15 that Captain Gore had asked me what happened that day.
16 Q. When did Captain Gore ask you what had
17 happened?
18 A. That was on Monday, I believe, when I went
19 back to work. He had called me, but we -- he talked to
20 me about it after that.
21 Q. When did he call you?
22 A. He called me at 11 o'clock that night.
23 Q. On the 8th?
24 A. Yes.
25 Q. At home?

131

1/18/2006 Vicki Ann Paulsen, R.N.

1  A. Yes.
2  Q. And what did he tell you?
3  A. He told me that Mr. Carranza-Reyes was in
4  critical condition at Denver General.
5  Q. What else did you discuss? Did he ask you
6  to document what had happened that day?
7  A. No. No.
8  Q. Why was he calling you at 11 o'clock at
9  night? Did he say?
10 A. He called me at all hours, so it was not out
11 of the ordinary.
12 Q. Did he tell you why he was calling you at 11
13 o'clock at night?
14 A. To inform me of Mr. Carranza-Reyes'
15 condition, I assume.
16 Q. Did Captain Gore seem to be upset?
17 A. I guess he was upset.
18 Q. Did he ask you why he hadn't been treated
19 earlier?
20    MS. LEWIS: Object to the form.
21 A. He asked me if we had treated him at Park
22 County.
23 Q. (BY MR. TRINE) Okay. And what did you tell
24 him?
25 A. I told him yes.

132

1/18/2006 Vicki Ann Paulsen, R.N.

1  phone in now when you called between 8:00 and 9:00 in the
2  morning?
3       A.   That he had side pain, that I'd seen him two
4  days, and his symptoms were headache, nausea, vomiting,
5  congestion, sore throat.
6       Q.   Under the triage assessment, it indicates
7  that for three days the patient -- can you interpret
8  that?  Three days, patient -- right-sided chest pain?
9  Does CP stand for chest pain?
10      A.   Yeah.
11      Q.   And fever.  Now, if he had been complaining
12 of right-sided chest pain for the previous three days, on
13 the 5th, 6th, and 7th, were you ever made aware of that?
14      A.   No, not right-sided chest pain.
15      Q.   Now, would right-sided chest pain be
16 consistent with pneumonia in the right lung as well as
17 accumulation of fluid in the right lung?
18      A.   Possibly, yes.
19      Q.   And do you know what the N in VND stands
20 for?
21      A.   Nausea, vomiting and diarrhea.
22      Q.   So for three days -- at least they're being
23 told in the emergency room that for three days he had
24 right-sided chest pain, fever, nausea, vomiting and
25 diarrhea; is that correct?

137

1/18/2006 Vicki Ann Paulsen, R.N.

1       A.   Correct.
2       Q.   And apparently he was taken to the restroom
3  and was unable to void; is that correct?
4       A.   Correct.
5       Q.   And that would mean what?  That he's
6  dehydrated?
7       A.   Possibly, yes.
8       Q.   Then under Skin, they checked off that he's
9  both pale and jaundiced, and do you remember his being
10 both pale and jaundiced when you saw him that morning?
11      A.   He was pale.  I didn't notice jaundice.
12      Q.   And for chest discomfort, they indicate
13 again that he'd been having chest discomfort or pain for
14 three days.  Do you see that under Cardiopulmonary?
15      A.   Yes.
16      Q.   And under Abdominal Pain had had right-sided
17 abdominal pain for three days; is that correct?
18      A.   I see that, yes.
19      Q.   And you had actually discovered that he had
20 some abdominal pain on the 6th and 7th; is that right?
21      A.   He had some tenderness.
22      Q.   And as you become septic, if organs start to
23 fail, you can have abdominal pain; is that right?
24      A.   You can -- that can be a number of things,
25 not just sepsis.

138

1/18/2006 Vicki Ann Paulsen, R.N.

1       Q.   Then under the Neuro, it indicates that --
2  they checked off headache, dizziness, light-headed.  You
3  see that?
4       A.   Um-hum.  Yes.
5       Q.   And he had had headaches when you saw him?
6       A.   Yes.
7       Q.   And had he complained of dizziness?
8       A.   He did not complain of dizziness to me.  He
9  said he had a headache.
10      Q.   Now, do you recall one of the deputies
11 informing you that he saw Carranza-Reyes with blankets
12 wrapped around him and was chilled on the upper tier and,
13 as he was coming down the stairs, couldn't make it all
14 the way and had to sit for a while?
15           MS. LEWIS:  Object to the form and
16 foundation.
17      Q.   (BY MR. TRINE) Do you remember hearing that
18 from any deputy?
19      A.   No, I do not remember that.
20      Q.   And did he have blankets wrapped around him
21 when he was on the upper tier when you watched the deputy
22 assist him downstairs?
23      A.   He had a blanket over him.
24      Q.   Around his shoulders?
25      A.   Over him.

139

1/18/2006 Vicki Ann Paulsen, R.N.

1       Q.   And did he appear to you to be chilled?
2       A.   I can't say that he appeared to be chilled.
3       Q.   You don't remember one way or the other?
4       A.   No.
5       Q.   Then at the very bottom of that page,
6  there's some handwritten information indicating that they
7  noted an increased shortness of breath; is that right?
8       A.   Correct.
9       Q.   And in listening to his lungs, he had rales?
10      A.   I see that.
11      Q.   And they apparently drew blood for labs at
12 that time, is that right, and sent him to --
13      A.   Yes.
14      Q.   And sent him for a chest X-ray?
15      A.   Yes.
16      Q.   Apparently sent him to a chest X-ray at 1410
17 hours?  That would be 2:10 p.m.?
18      A.   Yes.
19      Q.   And he continued to have a reduced blood
20 pressure.  Do you see that?  Continued to have a
21 reduction in blood pressure?
22      A.   Right, decrease.
23      Q.   But was able to stand?
24      A.   Right.  And then a blood pressure increase.
25      Q.   And the blood pressure increased when they

140

1/18/2006 Vicki Ann Paulsen, R.N.

1    gave him IV fluids, right?
2        A.    Yes.
3        Q.    So that he'd been dehydrated?
4        A.    Yes.
5        Q.    Then they got the results of the chest X-ray
6    on page 5 of Exhibit 24, indicating that he had extensive
7    consolidation of the right middle lobe and likely the
8    right lower lobe, and there was some minimal patchy
9    infiltrate likely present in the left base, the left
10   lobe. Do you see that?
11       A.    Yes.
12       Q.    And they did a blood test that eventually
13   cultured out -- if you look at page 9 -- that cultured
14   out to be gram-positive cocci in chains?
15       A.    Yes.
16       Q.    And that would indicate to you, together
17   with his other clinical -- together with the other
18   clinical observations that he had at least bacteremia?
19             MS. LEWIS:  Object to the form of the
20   question.
21       A.    Possibly, yes.
22       Q.    (BY MR. TRINE)  Well, if he had gram-
23   positive cocci in chains in the bloodstream, that would
24   indicate septicemia, wouldn't it?
25       A.    Yes.

141

1/18/2006 Vicki Ann Paulsen, R.N.

1        Q.    I'm sorry?
2        A.    Yes.
3        Q.    And then if you look at page 13, lab results
4    from the complete blood count, the elevated bands with
5    low lymphocytes and the seg neutrophils being low would
6    all indicate that he had a shift to the left that would
7    be also consistent with septicemia; is that right?
8        A.    That's correct.
9        Q.    And what significance do you attach as a
10   nurse to his low platelet count?
11       A.    Where is that?
12       Q.    118.
13       A.    He has an infection, a massive infection,
14   and his platelet count is terribly low.
15       Q.    The platelet count continues to drop as you
16   are starting to go into septic shock; isn't that right?
17       A.    Right. Correct.
18       Q.    And if you look at page 14, the abnormal lab
19   results you see there with the high creatinine and low
20   potassium, all of that is consistent with a septicemia,
21   isn't it?
22       A.    Correct.
23       Q.    Then looking at page 2, under Chief
24   Complaint at the top, when he arrived at the Summit
25   Medical Center, it indicates that he was complaining of

142

1/18/2006 Vicki Ann Paulsen, R.N.

1    right pleuritic nonradiating chest pain, and what is
2    right pleuritic nonradiating chest pain?
3        A.    That would be in the lung area.
4        Q.    In the lung area. And pleuritic, meaning in
5    the lung area?
6        A.    Yes.
7        Q.    And indicates that there had been multiple
8    episodes of vomiting for three days prior to that, and
9    you were aware of that, weren't you?
10       A.    Over two days. For one day and one evening.
11   One night.
12       Q.    So you weren't aware of the vomiting he was
13   doing over a period of three days?
14       A.    No.
15       Q.    And indicates he had had mild cold symptoms
16   for the past week?
17       A.    Yes.
18       Q.    Did you ever see him early on for cold
19   symptoms?
20       A.    I saw him on the 6th and 7th.
21       Q.    Now, there's an indication in the record
22   that there were several detainees in Pod D who seemed to
23   have flu symptoms on the 4th. Was that ever called to
24   your attention?
25       A.    I believe it was.

143

1/18/2006 Vicki Ann Paulsen, R.N.

1        Q.    And you would have no way of knowing whether
2    Carranza-Reyes was one of those detainees with flu
3    symptoms on the 4th?
4        A.    Not by name, no.
5        Q.    No one called that to your attention on the
6    4th?
7        A.    I was not there on the 4th.
8        Q.    Okay. Did anyone call that to your
9    attention when you arrived on the 5th?
10       A.    Yes, I believe that -- and I'm sure that
11   those are some of the five that I saw.
12       Q.    You think those are some of the five you saw
13   on the 5th?
14       A.    Yes.
15       Q.    So you think that the inmates that had flu
16   symptoms on the 4th included Carranza-Reyes; is that
17   right?
18             MS. LEWIS:  Object to the form.
19       A.    As far as -- I mean, I wouldn't know. I
20   don't know the names of those that had . . .
21       Q.    (BY MR. TRINE)  I thought you said that the
22   ones that were complaining on the 4th, you thought you
23   saw on the morning of the 5th.
24       A.    If I had someone who was ill and
25   complaining, I would have seen them the next day.

144

1  A.  Yes.
2  Q.  And you did that on your own or through
3  Monte Gore? Who authorized you to do that?
4  A.  No. Monte.
5  Q.  Monte Gore did?
6  A.  Yeah.
7  Q.  Then on March 26 at 8:55 p.m., Laura Bublef
8  charted, "Will update Vicki Paulsen, R.N., Park County,
9  regarding status and discussion of rehab needs. Will
10 update team if there is any alternative with payer
11 source." Do you recall what that was about, a discussion
12 regarding rehab needs?
13  A.  No. I think that we -- down the road I was
14 asking, you know, what comes next when he's better or
15 whatever happens, and she said that he would be going to
16 rehab.
17  Q.  And there were two or three additional calls
18 with Laura Bublef indicating that the discussion was
19 regarding rehab options. Do you recall what that was
20 about?
21  A.  I don't recall what that was about.
22  Q.  And also requested by Vicki Paulsen to allow
23 Captain Gore to discuss patient with INS and not to call
24 updates directly to them until we hear from Captain Gore.
25 Did there come a time when you understood that Denver

1  Health would be dealing directly with the INS and no
2  longer communicating with you about Carranza-Reyes?
3  A.  I didn't -- I didn't get that. No, I
4  didn't.
5  Q.  Then on April 8, at 8:50 a.m., another
6  nurse, a Laura Buklegum, B-u-k-l-e-g-u-m, Buklegum, R.N.,
7  had a conversation with you. Does that name sound
8  familiar?
9  A.  No.
10  Q.  And provided you with a clinical update.
11 Okay. You don't remember that?
12  A.  I don't remember. I mean, I remember
13 getting updates but not the name.
14  Q.  And then there were several additional calls
15 you had with this Laura Buklegum. But you were
16 continuing to get updates?
17  A.  Right.
18  Q.  Why was that?
19  A.  Because I was concerned about him.
20  Q.  Did you have any additional conversations
21 with anyone at INS about Carranza-Reyes after March the
22 8th or 9th?
23  A.  I don't recall if I did or not. I don't
24 remember having any, but that's not -- I don't recall.
25  Q.  What was your understanding of who

1  ultimately was going to be responsible for the bills
2  being incurred at Denver Health?
3  A.  To begin with, Park County, and then it was
4  to be signed over to INS, and that's all I was told.
5  MR. TRINE: Let's take a short break. It's
6  about time for one.
7  THE DEPONENT: Let's go to 4:00. My husband
8  will be here at 4:00.
9  MR. TRINE: You want to go to 4:00?
10  THE DEPONENT: My husband will be here at
11 4:00.
12  MR. TRINE: Let's do that.
13  Q.  (BY MR. TRINE) Why don't you now refer to
14 Exhibit 4 that's in the binder. And it's also identified
15 by Bates stamp as Park 550 through 694, and these were
16 furnished to us by the jail and represented as being the
17 policies and procedures that were in effect in 2003. Are
18 these the policies and practices that you became familiar
19 with when you became employed there?
20  A.  Yes.
21  Q.  How soon after you became employed did you
22 familiarize yourself with this document or --
23  A.  The first week I was there.
24  Q.  And did you review the policies and
25 procedures with anyone else or ask questions about them?

1  A.  No. I read them myself.
2  Q.  And were they similar to what you were
3  familiar with in working for the DOC?
4  A.  Similar. Similar.
5  Q.  If you'll refer, please, to 555, which
6  relates to the responsible health authority and indicates
7  that there will be a health services administrator and a
8  responsible physician, was it your understanding that you
9  were serving as the health services administrator?
10  A.  No.
11  Q.  Do you know who was serving as the health
12 services administrator?
13  A.  No.
14  Q.  Do you know whether there was a health
15 services administrator?
16  A.  I do not.
17  Q.  It indicates a responsible physician is a
18 physician who supervises the medical judgments regarding
19 the care provided to patients at this facility. This
20 role is also known as the medical director. When you
21 first reviewed this, you assumed, I guess, that Dr.
22 Bachman was the responsible physician, correct?
23  A.  Yes.
24  Q.  Did you ever ask anyone who the health
25 services administrator was?

1/18/2006 Vicki Ann Paulsen, R.N.

```
1    A.   No, I didn't.
2    Q.   It states under Policy that the health
3  services administrator is routinely on-site at least 40
4  hours per week and is responsible for health care
5  services pursuant to a written agreement, contract or job
6  description, and you don't believe that was you?
7    A.   Evidently it was.
8    Q.   You don't know of anyone else that was doing
9  that?
10   A.   No.
11   Q.   That's what you were doing, right?
12   A.   That's right.
13   Q.   It states also under Policy that the health
14 services administrator, as the responsible health
15 authority for the Park County Jail is responsible for all
16 clinical, ancillary and operational aspects of the jail's
17 health care services, including arrangements for all
18 levels of health care and ensuring of quality and
19 accessibility of all health services provided to
20 patients," and that's essentially also what you were
21 doing; is that right?
22   A.   Right.
23   Q.   And under Procedure at the bottom Procedure,
24 it states that the health services administrator, in
25 cooperation with the responsible physician, is
```

185

1/18/2006 Vicki Ann Paulsen, R.N.

```
1  responsible for the development and implementation of all
2  programs and practices related to jail medical services.
3  All final medical judgments rest with the responsible
4  physician, and was that your understanding?
5    A.   Yes.
6    Q.   And if you look at Park 558, Exhibit 4,
7  under Policy, second paragraph, it states, "The health
8  service administrator shall record minutes of
9  administrative infection control and continuous quality
10 improvement meetings," and did you attend such meetings
11 and record minutes of those meetings?
12   A.   No, I did not.
13   Q.   Was there an infection control committee
14 that you served on?
15   A.   No.
16   Q.   To your knowledge, was there ever an
17 infection control committee at the Park County Jail?
18   A.   I do not know.
19   Q.   Was there a continuous quality improvement
20 committee?
21   A.   Not to my knowledge.
22   Q.   You didn't serve on a committee like that?
23   A.   No.
24   Q.   It states in that next paragraph that the
25 health services administrator shall produce on a monthly
```

186

1/18/2006 Vicki Ann Paulsen, R.N.

```
1  basis a statistical report indicative of the health
2  unit's activities. Did you supply a report like that on
3  a monthly basis outlining your activities for the month?
4    A.   No, I did not.
5    Q.   Were you ever requested to do that?
6    A.   No.
7    Q.   And then the next paragraph states, "A
8  statistical report shall be prepared monthly and compiled
9  again annually to track the number of inmates receiving
10 health services. At a minimum this report shall include
11 the following," then there's a whole list of items.
12   A.   Correct.
13   Q.   Did you ever see such a report?
14   A.   No, I did not.
15   Q.   Were you ever asked to compile such a
16 report?
17   A.   No, I was not.
18   Q.   When you became familiar with this document,
19 did you question anyone about these committees and
20 whether they existed and whether you should be serving on
21 them?
22   A.   No, I didn't.
23   Q.   Do you remember what your thought process
24 was when you reviewed this for the first time? Did you
25 wonder if such committees existed?
```

187

1/18/2006 Vicki Ann Paulsen, R.N.

```
1    A.   Yes.
2    Q.   Did you ask anyone?
3    A.   No, I did not.
4    Q.   Was it your understanding from having worked
5  with the DOC and then at Park County that the DOC
6  required that Park County have these policies and
7  procedures in effect before they would contract with Park
8  County?
9    A.   Yes.
10   Q.   Was that of concern to you, knowing that and
11 finding out that these committees didn't exist?
12   A.   Yes.
13   Q.   But you didn't talk to anyone about that or
14 mention it?
15   A.   I believe I asked about it, and nothing was
16 said to me.
17   Q.   Did Monte Gore at any time tell you that
18 they simply enacted these policies and procedures in
19 order to get DOC business and didn't intend to follow
20 them?
21   A.   No, he never told me that.
22   Q.   Do you know whether the INS requested that
23 Park County have a policy and procedure manual before
24 they would contract with Park County?
25   A.   No, I do not.
```

188

1/18/2006 Vicki Ann Paulsen, R.N.

1  Q.  And so why did you decide to leave the
2  facility on the morning of the 8th and go home,
3  essentially abandoning Carranza-Reyes and not staying
4  with him until he was transported?
5      MS. LEWIS:  Object to the form and also
6  asked and answered.  Go ahead.
7  A.  Okay.  I should have stayed with him.  I
8  admit that I should have stayed with him.
9  Q.  (BY MR. TRINE)  In other words, that was
10 just an error on your part?
11 A.  That's right.  It was an error on my part.
12 Q.  Could you give me just a chronological brief
13 summary of what fields of nursing you worked in before
14 going into correctional work.
15 A.  Neonatal intensive care, pediatrics.
16 Q.  About how many years in neonatal care?
17 A.  Six.  And pediatrics, family practice care.
18 Q.  How many years in family practice?
19 A.  Family practice, four, and I participated
20 part-time in some drug research at the old Fitzsimons.
21 Q.  What research?  I didn't hear you.
22 A.  Drug research.
23 Q.  Drug research?
24 A.  Um-hum, at the old Fitzsimons.  And then I
25 have done hospice and geriatric care and corrections.

197

1/18/2006 Vicki Ann Paulsen, R.N.

1  Q.  Okay.  And has almost all of that
2  experience -- or all of it -- been in a clinical setting
3  as opposed to an administrative position?
4  A.  Well, in geriatrics, it's in a nursing home
5  type, and then neonatal would be in an intensive care
6  unit, and family practice would be in a family practice
7  office.  Pediatrics was in a pediatric office.
8  Q.  It was all clinical?
9  A.  Right, um-hum.
10 Q.  As opposed to spending several years in some
11 kind of administrative position?
12 A.  No, not my --
13 Q.  So you've had a considerable amount of
14 clinical experience, then?
15 A.  Um-hum.
16 Q.  And based on all of that experience, when
17 you went to work at Park County, were you concerned about
18 their general policies and procedures as it would relate
19 to the care of detainees?
20 A.  I had some concerns, yes.
21 Q.  And what was the gist of your concerns?
22 A.  Continuity, I mean, as far as . . .
23 Q.  Continuity of care?
24 A.  Yeah.  And that there were times I felt like
25 some of what they had in policies and procedures were not

198

1/18/2006 Vicki Ann Paulsen, R.N.

1  enacted.
2  Q.  Were not what?
3  A.  Enacted.  I mean, they weren't in . . .
4  Q.  They weren't really enforcing policies and
5  procedures?
6  A.  Right.  Right.
7  Q.  And that concerned you?
8  A.  Yes, it did.
9  Q.  And on continuity of care, would you explain
10 that in more detail.
11 A.  Well, you know, instead of having one nurse
12 24 hours a day -- I mean, you're there, but then you're
13 not there -- it would have been better to have even two
14 shifts, a night shift and a day shift, so that you had
15 that continuity, that you didn't have to rely on an EMT
16 or your jail personnel to, you know, let you know what
17 was going on.  That you had another license there.
18 Q.  With better continuity of care, there's less
19 risk or chance of something falling through the cracks,
20 so to speak?
21 A.  True.  True.
22 Q.  I know that you were a new employee there.
23 A.  Yes.
24 Q.  But nevertheless, did you at any time
25 discuss your concerns with any of the other personnel or

199

1/18/2006 Vicki Ann Paulsen, R.N.

1  Monte Gore?
2  A.  No, I didn't.
3  Q.  Were you reluctant to do that because you
4  were a new employee?
5  A.  Yes.
6  Q.  Did your concerns have anything to do with
7  your not returning to Park County when you came back to
8  Colorado?
9  A.  Yes.
10 Q.  Where did you then become employed after you
11 returned to Colorado?
12 A.  I work for Supplemental Health Care.  It's
13 an agency, and I work at DOC, Department of Corrections.
14 Q.  And you've been doing that since you
15 returned?
16 A.  Yes.
17 Q.  Do you work out of any particular facility?
18 A.  Buena Vista.
19 Q.  Okay.  So it's a longer commute, but --
20 A.  It's a longer commute.
21 Q.  But you prefer doing that to working in Park
22 County?
23 A.  Yes.
24 Q.  If you'd now please refer to Exhibit 2
25 again, which is in the binder, to page 155?

200

1/18/2006 Vicki Ann Paulsen, R.N.

### Page 205

1  would be your estimate on how often he actually came to
2  Park County on Wednesdays?
3      A.   Every week except for, like I said, maybe
4  three or four the whole time I was there.
5      Q.   Missed just three or four the whole time you
6  were there?
7      A.   Yeah.  And what we would do was make
8  appointments at his office for those weeks that he
9  couldn't be there.
10     Q.   Did you ever sit down with Dr. Bachman and
11 go over any of the policies and procedures --
12     A.   No.
13     Q.   -- and review them with him?
14     A.   No.
15     Q.   Were any new policies and procedures
16 implemented by you and Dr. Bachman that you approved?
17     A.   No.
18     Q.   Were any new policies and procedures
19 implemented by the Park County Jail that you were asked
20 to review and approve?
21     A.   No.
22     Q.   So no changes were made while you were
23 there --
24     A.   No.
25     Q.   -- as far as you know in the policies and

### Page 206

1  procedures?
2      A.   As far as I know, correct.
3      Q.   Did you recommend any changes to the
4  policies and procedure manual?
5      A.   No.
6      Q.   Did you at any time recommend that you be
7  provided with standing orders of any type?
8      A.   No.
9      Q.   Scott Flint testified in his deposition at
10 page 87 that at 8:50 a.m. on the 8th, that the nurse
11 stated that she wanted them to go to the store and get
12 juice for Carranza-Reyes, so he sent a deputy out to buy
13 juice for him.  Do you remember that incident?
14     A.   I remember them asking whether it would help
15 if he had juice or that type of thing, and they didn't
16 have any in the kitchen at that time, and I told them it
17 would be fine for them to go get some juice.
18     Q.   He wanted to know if it would help his
19 condition if you gave him juice?
20     A.   No, I mean -- no.  They -- why it was
21 brought up, I don't know.
22     Q.   Do you have any explanation today for why
23 there was a three-hour delay from 8:00 in the morning
24 until 11:00 in the morning for transport to be arranged
25 to take Carranza-Reyes to Summit Medical?

### Page 207

1      MS. LEWIS:  Object to form.
2      A.   No, I do not.
3      Q.   (BY MR. TRINE)  By the way, did you know
4  John Bellantonio when he was at Buena Vista?
5      A.   No.
6      Q.   The two of you there?
7      A.   No.
8      Q.   What about Edward Allen?  Did you know him
9  at Buena Vista?
10     A.   No.
11     Q.   Do you recall there being any inspections by
12 the INS or DOC during the time that you were at Park
13 County?
14     A.   DOC was there several times, and they did
15 walk-throughs.  INS, I can't tell you.  I don't remember
16 that.
17     Q.   When you say DOC was there several times and
18 they did walk-throughs, who from DOC?
19     A.   It would be from central office.  I don't
20 know the individuals' names, but they were from central
21 office, and they would walk through the pod area and then
22 back around into booking and medical and the case
23 manager's office.
24     Q.   Did you participate in any meetings or
25 discussions with the DOC when they were on the premises?

### Page 208

1      A.   No.
2      Q.   When you observed them, they were there for
3  about how long?
4      A.   Oh, probably an hour, maybe a little more.
5      Q.   So what did they do in addition to walking
6  through the pods?
7      A.   I don't know.  I was in my office.  I didn't
8  follow them around.
9      Q.   Well, how do you know they were there an
10 hour?
11     A.   We were -- they would always announce that
12 they were on the premises, and they always announced when
13 they left, so . . .
14     Q.   You don't know what they were doing while
15 they were there?
16     A.   No.
17     Q.   Or who they might have been meeting with
18 or --
19     A.   Captain Gore.
20     Q.   Excuse me?
21     A.   Captain Gore.
22     Q.   But they didn't come into the medical and
23 interview you and talk to you?
24     A.   No.
25     Q.   Or ask you any questions?

1/18/2006 Vicki Ann Paulsen, R.N.

1  A. Right.
2  Q. -- I understand from your testimony that
3  there were occasions that you relayed information to jail
4  staff of a medical nature through the pass-on. Is that
5  correct?
6  A. True.
7  Q. How did you relay that information?
8  A. I would tell -- there were times I would
9  write it in the book, and there were other times where I
10 would tell the officer in control about it, and he would
11 put it in the book.
12 Q. So the information you relayed would not
13 necessarily be in writing every time?
14 A. Correct.
15 Q. Going back to the conversation with Ben at
16 the INS on the morning of March 8, do you remember that?
17 A. Um-hum.
18 Q. During that conversation, did Ben tell you
19 that INS refused to transport unless he got worse or that
20 INS agreed to transport Carranza-Reyes, but it would take
21 up to three hours to do so?
22 A. They would -- it wasn't if he got worse. I
23 mean, they didn't refuse, but we could -- they said it
24 would take them up to three hours to have an officer
25 there.

221

1/18/2006 Vicki Ann Paulsen, R.N.

1  Q. So at the time you left the morning of March
2  8, was it your understanding that transport arrangements
3  were in process?
4  A. Yes.
5  Q. Was it just a matter of when that transport
6  occurred as far as you knew?
7  A. Yes.
8  Q. You testified earlier that you think it was
9  an error on your part to leave the morning of March 8
10 when you did at 9:00 a.m. or so. Do you reach that
11 conclusion today with the benefit of hindsight of what
12 eventually happened to Mr. Carranza-Reyes?
13 A. Yes.
14 Q. If Carranza-Reyes had ended up being fine
15 and had not gotten as sick as he eventually did, would
16 you still feel like it was an error on your part to leave
17 the morning of March 8?
18    MR. TRINE: Objection, form and foundation.
19 A. Yeah.
20 Q. (BY MS. LEWIS) Well, given the symptoms he
21 presented to you at the time, did you feel like you
22 needed to stay that morning?
23 A. At the time I saw him, he was fairly
24 comfortable and -- no, not at that time.
25 Q. So as far as you knew, there was a transport

222

1/18/2006 Vicki Ann Paulsen, R.N.

1  being arranged --
2  A. Yes.
3  Q. -- to come pick him up, right?
4  A. Yes.
5     MS. VEIGA: No questions.
6     MS. LEWIS: That's all I have.
7     MR. JURS: Is it okay if I sit down here if
8  I project?
9            EXAMINATION
10 BY MR. JURS:
11 Q. I'd like you to look at Exhibit 26, INS
12 detention standards, and I believe your testimony was
13 that you were not provided a copy of these. Is that
14 true?
15 A. I didn't have one in the office, no.
16 Q. I'd like you to turn to the page marked Park
17 1699 and examine that page and the pages that appear
18 after that. Have you had a chance to look at all those
19 documents, 1699 through 1705?
20 A. Yes.
21 Q. And were those Park County Sheriff's Office
22 policies and procedures?
23 A. Yes, they are.
24 Q. Would you have been provided those policies
25 and procedures?

223

1/18/2006 Vicki Ann Paulsen, R.N.

1  A. I should have been.
2  Q. Because you were provided with the other
3  Park County policies and procedures?
4  A. Yes.
5  Q. I'm going to ask you a question, and this is
6  specifically with regard to Mr. Carranza-Reyes and his
7  medical condition during the period of time he was in the
8  Park County Jail. Did you need any further standing
9  orders, protocols, policies or procedures from Dr.
10 Bachman in order for you to provide appropriate care and
11 treatment to Mr. Carranza-Reyes based on how he presented
12 to you?
13 A. Not on how he presented in the beginning,
14 no. I didn't -- I don't feel that I did, no.
15 Q. So you had all the standing orders,
16 protocols, procedures and policies that you needed, based
17 on his clinical presentation?
18 A. If -- for -- I didn't have any standing
19 orders to go by at that time. At least there were none
20 in there in the office. But based on what he presented
21 with, I don't know that a policy and procedure would have
22 been advantageous.
23    MR. JURS: Okay. I don't have any other
24 questions. Thank you for your time today.
25

224

1/18/2006 Vicki Ann Paulsen, R.N.

```
 1           COFFMAN REPORTING & LITIGATION SUPPORT, INC.
                   1440 Blake Street, Suite 320
 2                    Denver, Colorado 80202
                          303.893.0202
 3
 4      February 1, 2006
 5
 6      MELANIE B. LEWIS, ESQ.
        Berg Hill Greenleaf & Ruscitti LLP
 7      1712 Pearl Street
        Boulder, Colorado 80302
 8
 9      Re:  Carranza-Reyes v. Park County, et al.
        Deposition of:  VICKI ANN PAULSEN, R.N.
10      Date of Deposition:  January 18, 2006
        Trial Date:  None Set
11
12      Dear Ms. Lewis:
13      Enclosed is the original signature page of the above
        deposition.  It was agreed you would arrange for the
14      witness's signature with your copy of the transcript.
15      Amendment sheets are included.  After the signature page
        and amendment sheets are signed, please have both
16      notarized and return for filing to . . .
17           this office within 30 days pursuant
             to Rule 30.
18
        Thank you for your prompt attention to this matter.
19
        Sincerely,
20
21      COFFMAN REPORTING
22      cc:  Attending counsel
23
24
25
```

229

1/18/2006 Vicki Ann Paulsen, R.N.

```
 1           COFFMAN REPORTING & LITIGATION SUPPORT, INC.
                   1440 Blake Street, Suite 320
 2                    Denver, Colorado 80202
                          303.893.0202
 3
 4      LLOYD C. KORDICK, ESQ.
        805 South Cascade
 5      Colorado Springs, Colorado 80903
 6
        Re:  Carranza-Reyes v. Park County, et al.
 7      Deposition of:  VICKI ANN PAULSEN, R.N.
        Date of Deposition:  January 18, 2006
 8      Trial Date:  None Set
 9      Enclosed is:
10      ( )  ORIGINAL TRANSCRIPT.  Please retain unopened
             original until it is required by any party in a
11           trial or hearing in the above matter.
12      ( )  ORIGINAL SIGNATURE PAGE
             ___with  ___without corrections; copies provided to
13           other counsel; please append these sealed originals
             to original transcript in your possession.
14
        ( )  No signature or correction sheets received.
15
        ( )  Review of transcript not requested.
16
        ( )  30-day review unavailable.  Signature/correction
17           pages forwarded to counsel handling signature.
             Original filed in anticipation of trial date.
18           See letter within deposition.
19      ( )  Copy of deposition, signature and correction pages
             sent to deponent.  See letter within deposition.
20
        ( )  Signature not applicable.
21
        Original transcript filed on_____via_____
22
        Follow-up documentation filed on_____via_____
23
24
25      cc:  Attending counsel
```

230