## Page 1

11/4/2005 Bellantonio, John

```
 1    IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLORADO
 2    Case No. 2005-WM-377 (BNB)
 3    _____
 4    DEPOSITION OF:  JOHN BELLANTONIO November 4, 2005
 5    _____
 6    MOISES CARRANZA-REYES,
 7    Plaintiff,
 8    v.
 9    PARK COUNTY, a public entity of the State of Colorado and its governing board
10    THE PARK COUNTY BOARD OF COUNTY COMMISSIONERS; PARK COUNTY SHERIFF'S OFFICE, a public entity of the State of
11    Colorado; FRED WEGENER, individually and in his official capacity as Sheriff of Park County, Colorado; MONTE GORE, individually
12    and in her official capacity as Captain of the Park County Sheriff's Department; VICKIE PAULSEN, individually and in her official
13    capacity as Registered Nurse for Park County, Colorado; JAMES BACHMAN, M.D., individually and in his official capacity
14    Defendants.
15    _____
16
17
18    TAKEN PURSUANT TO NOTICE AND AGREEMENT on behalf of the
19    Plaintiff at 824 Castello, Fairplay, Colorado 80440 at 8:31
20    a.m. before Theresa A. Coffman, Federal Certified Realtime
21    Reporter, Registered Professional Reporter and Notary Public
22    within Colorado.
23
24
25          COFFMAN REPORTING         303.893.0202
```

## Page 2

11/4/2005 Bellantonio, John

```
 1                APPEARANCES
 2    For the Plaintiff:      LLOYD C. KORDICK, ESQ.
 3                            802 South Nevada
                              Colorado Springs, Colorado 80903
 4                            JOSEPH J. ARCHULETA, ESQ.
 5                            1724 Ogden Street
                              Denver, Colorado
 6    For the Defendants      ANDREW D. RINGEL, ESQ.
 7    Park County, Park       Hall & Evans, LLC
      County Board of
      Commissioners, Park     Suite 600
 8    County Sheriff's Office, 1125 17th Street
      Wegener and Gore:       Denver, Colorado 80202
 9
10                            STEPHEN A. GROOME, ESQ.
                              P.O. Box
11                            501 Main Street
                              Fairplay, Colorado
12    For the Defendant       SARA HOLMES, ESQ.
13    Paulsen:                Berg Hill Greenleaf & Ruscitti LLP
14                            Boulder, Colorado 80302
15    For the Defendant       ANDREW W. JURS, ESQ.
                              Bachman:
16                            400 South Colorado Boulevard
17                            Glendale, Colorado 80246
18    Also Present:           None
```

## Page 3

11/4/2005 Bellantonio, John

```
 1                I N D E X
 2    EXAMINATION OF JOHN BELLANTONIO       PAGE November 4, 2005
 3    By Mr. Kordick                          4
 4    By Mr. Archuleta                       --
 5    By Mr. Ringel                          110
 6    By Mr. Groome                          --
 7    By Ms. Holmes                          --
 8    By Mr. Jurs                            166
 9
10                                  INITIAL DEPOSITION EXHIB
11    6-A   Continuation of Exhibit 6, Park 2000    75
12    (Original exhibits attached to original deposition; copy
13    as exhibits included in continuing exhibit file; copies provided to counsel)
14    REQUESTED PORTIONS OF TESTIMONY:         PAGE
15    Request for document production           --
16    or information
17    Certified question                        --
18    Instruction not to answer                161
19    Other requests or marked testimony        --
20    REFERENCES TO EXHIBITS MARKED PREVIOUSLY:
21    Exhibit No.     Page Reference
22       1              21
23       2              15    3    14
24       4             172    5    13
25    * SUBJECT TO CONFIDENTIALITY DESIGNATIONS *
```

## Page 4

11/4/2005 Bellantonio, John

```
 1            WHEREUPON, the within proceedings were taken
 2    pursuant to the Federal Rules of Civil Procedure:
 3            JOHN BELLANTONIO,
 4    having been first duly sworn to state the whole truth, was
 5    examined and testified as follows:
 6                EXAMINATION
 7    BY MR. KORDICK:
 8       Q.   Sir, could you please state your full name.
 9       A.   John Frank Bellantonio.
10       Q.   Mr. Bellantonio, could you please explain
11    for the record what your educational background is,
12    starting with high school and the year you graduated from
13    high school.
14       A.   I graduated from Valley Stream High School
15    in Valley Stream, New York in 1966, attended Adelphi
16    University, receiving a bachelor of arts in sociology in
17    1970.  That's about it.
18       Q.   Now, let me take your work history.  I don't
19    need to know about jobs you had for six months or
20    anything like that, but just your general work history
21    from 1970.
22            (At this time Mr. Archuleta left the
23    deposition room.)
24       A.   Do you want specific years and stuff like
25    that?
```

Paulsen's A-18

11/4/2005 Bellantonio, John

1  worked from 2001 to this time, did the number of bunks
2  continue to increase in D Pod, or do you remember?
3         MR. RINGEL:  Object to the form and the
4  foundation.
5     A.  I remember a gradual increase in bunks, yes,
6  and also there was bedding made available with mattresses
7  on the floor.
8     Q.  (BY MR. KORDICK)  Okay.  Were you aware
9  of -- are you aware of the ACA standards?  Are you
10 generally aware of what those are?
11        MR. RINGEL:  Object to the form and the
12 foundation.
13    A.  There are so many ACA standards, and I
14 forget the exact amount, that cover just about every
15 aspect of correctional environment.  I'm aware of many of
16 the standards in a general sense.
17    Q.  (BY MR. KORDICK)  Okay.  Do you know what
18 ACA standards -- is that the golden rule in the -- I
19 guess I could call it the industry now because it's
20 privately operated in many cases.  But is that the golden
21 rule in the -- should I call it detention business?
22        MR. RINGEL:  Object to the form and the
23 foundation.
24    A.  The ACA standards are the goals that all
25 correctional facilities -- I shouldn't say all -- but

29

11/4/2005 Bellantonio, John

1  most correctional facilities try to attain.
2     Q.  Now, some correctional or government
3  entities actually adopt them as their regulations, and
4  some don't, correct?
5         MR. RINGEL:  Object to the form and the
6  foundation.
7     A.  In my experience, the regulations were
8  guided by the ACA standards, and the regulations were
9  written to conform with ACA regulations.  And then
10 practice -- the actual practice would be verified against
11 the written standards and regulations to show that
12 compliance was in accord with ACA standards.
13    Q.  (BY MR. KORDICK)  Would you look at Exhibit
14 5.  It's a small exhibit.  I think it's right here.
15    A.  Okay.
16    Q.  Yeah.  You've got it in your hand there.
17 With reference to this particular exhibit, this was
18 produced by Park County as a standard Park County
19 Sheriff's Office policy and procedure manual standard
20 that was effective on November 1, 2000, and it references
21 a Standard 3-4128, which is an ACA standard, and it
22 requires that the inmates be housed in sleeping areas
23 that are safe, clean, proper lighting and heating, and it
24 is the policy of the sheriff's office that inmates are
25 housed in cell or dormitory sleeping areas that provide

30

11/4/2005 Bellantonio, John

1  at least 80 square feet of living space per occupant;
2  proper lighting, both artificial and natural.  Lighting
3  in inmate housing units is at least 20 foot-candles at
4  desk level and in personal grooming areas.
5         Was this standard that had been adopted by
6  the county, was that followed with reference,
7  particularly, to the D Pod or any of the other pods?
8         MR. RINGEL:  Object to the form and
9  foundation.
10    A.  I don't have the exact measurements, but I'm
11 sure that -- I'm sure that this standard was not
12 followed.
13    Q.  (BY MR. KORDICK)  It's been represented to
14 us the square footage, up and down, of D Pod is 1,475
15 feet, and -- 1,475 square feet -- I'm sorry -- and at 80
16 square feet per inmate, that would only allow 18.3
17 inmates in this particular D Pod.  If that were the case,
18 would it be true that the county was not following their
19 own standard?
20        MR. RINGEL:  Object to the form and the
21 foundation.
22    A.  Well, it's apparent to me that the standard
23 was not being followed.
24    Q.  (BY MR. KORDICK)  Were you ever told or
25 advised as to what the design capacity was for D Pod as

31

11/4/2005 Bellantonio, John

1  far as the number of inmates?
2         MR. RINGEL:  Object to the form and the
3  foundation.
4     A.  There were no capacities delineated to me.
5  It was an open-ended capacity.  Not design capacity but
6  operational capacity was an open-ended number.
7     Q.  (BY MR. KORDICK)  So operationally, if you
8  had 70 or 80 people, there was no cap or limitation on
9  that?
10    A.  Not to my knowledge.
11        MR. RINGEL:  Object to the form and the
12 foundation.
13    Q.  (BY MR. KORDICK)  What about design
14 limitations?  Were you ever advised there were design
15 limitations on D Pod when it was built?
16        MR. RINGEL:  Object to the form and the
17 foundation.
18    A.  I was never advised as to design
19 limitations.  My own observation would indicate that the
20 unit was designed for approximately 18 people, and that
21 was -- or the pod was designed for 18 people, and I base
22 that assumption on the seating capacity at the tables
23 that were provided for eating.  It appeared that there
24 were 18 -- there were three tables that seated six each.
25 It appeared that the initial design -- this is only my

32

11/4/2005 Bellantonio, John

1 foundation.
2 A. During the distribution of medications,
3 which involved many, many inmates -- this doesn't only
4 regard the D Pod. This involved all inmates housed
5 there. The deputy was required to roll a medication cart
6 to the entrance of the pod door, announce medications,
7 and then distribute the medications from bulk containers.
8 For an example, if you were given X medication, you
9 know -- if Joe Smith was issued -- I can't think of
10 something right now, whatever -- brand X or medication X
11 in dosage 100 milligrams, the deputy was required to pull
12 that medication from a bulk container, sometimes divide
13 that medication in halves or thirds to administer to the
14 individual, and then record that.
15         There was a lot of room, in my opinion, for
16 error -- not intentional, just for error -- which could
17 have devastating results to the individual, liability
18 coming back to the deputy and liability coming back to
19 the jail.
20         I checked with the person who was the head
21 nurse, the head medical administrator at Buena Vista who
22 had retired and was then working for the American
23 Correctional Association monitoring their standards, and
24 I asked her about that, and she indicated that that was
25 not the correct way to do it, which verified what I had

41

11/4/2005 Bellantonio, John

1 already believed, that the medications should be packaged
2 by the nurse, and the deputy should then distribute it
3 and check to make sure that it's taken properly.
4         And I brought that up to the nurse and was
5 told that it was physically impossible. She didn't have
6 time to do it. I pursued the issue and brought it up to
7 the captain, and it was subsequently corrected.
8     Q. (BY MR. KORDICK) Okay. So that was the
9 modified procedure that was in effect at the time that my
10 client was there?
11    A. Correct.
12         MR. RINGEL: Object to the form and the
13 foundation.
14    Q. (BY MR. KORDICK) Now, going back to Exhibit
15 Number 5, it requires that beds be made upon rising and
16 that the beds -- there's a provision in the other -- not
17 in this provision, but another provision that requires
18 that the beds be off the ground. Were the beds actually
19 on the floor, the mattresses on the floor, when there was
20 an overload situation?
21         MR. RINGEL: Object to the form and the
22 foundation.
23    A. We routinely had mattresses on the floor.
24    Q. (BY MR. KORDICK) Did the prisoners that
25 were in the upper area, did they have a wastebasket in

42

11/4/2005 Bellantonio, John

1 the upper area?
2    A. I don't recall.
3    Q. Mr. Gore has testified that the only waste
4 area was a large bucket in the lower area, that there was
5 no wastebasket in the upper area. Would you disagree
6 with that or agree with it?
7         MR. RINGEL: Object to the form and the
8 foundation.
9    A. I don't recall what provisions were on the
10 upper floor for disposal of waste. I do remember large
11 containers on the lower floor. And now that I think
12 about it, I think the only formal or for-real container
13 was on the lower floor.
14    Q. (BY MR. KORDICK) When prisoners were
15 sleeping in the upper area -- which was designed as a
16 sleep area; is that right? The upper area was designed
17 as a sleep area?
18    A. That's correct.
19    Q. When they were sleeping, of course, you were
20 there in the swing shift, if they had colds or blew their
21 nose, would they -- do they have something to blow their
22 nose on or spit into?
23         MR. RINGEL: Object to the form and the
24 foundation.
25    A. Inmates were given -- or detainees were

43

11/4/2005 Bellantonio, John

1 given rolls of toilet paper each. Each. Pretty much as
2 much as they needed.
3    Q. (BY MR. KORDICK) When they did cough or
4 blow their nose, did they place that, in your
5 observation, next to their bed while they were sleeping?
6         MR. RINGEL: Object to the form and the
7 foundation.
8    A. I don't remember ever seeing some -- you
9 know, I don't remember noticing anybody blowing their
10 nose or coughing into tissue and then putting it in their
11 mattress, but I do know that when I conducted shakedowns
12 and when I went through the area, it was very common to
13 find soiled tissue paper stuffed under the mattresses and
14 about the mattresses.
15    Q. (BY MR. KORDICK) Okay. And around the area
16 of the mattresses?
17    A. Yes.
18         MR. RINGEL: Object to the form.
19    Q. (BY MR. KORDICK) I'd like to talk to you
20 about the ACA standards adopted by the county. If there
21 were a standard of one toilet per 12 inmates, 50 inmates
22 would have far exceeded that, wouldn't it?
23         MR. RINGEL: Object to the form and the
24 foundation.
25    A. Yes.

44

11/4/2005 Bellantonio, John

1  individuals who worked for the INS?
2  A.  Yes, I did.
3  Q.  And what are the names of those individuals?
4  A.  I don't remember last names. There was a
5  Ben and a Dan.
6  Q.  And what was your understanding of the
7  positions that Ben and Dan held with the INS?
8  A.  They were field agents.
9  Q.  And what does a field agent for the INS do,
10  as far as you understand?
11  A.  They assume custody of individuals and
12  arrange for their transfer and detention with Park
13  County.
14  Q.  Okay. Did you ever have any communication
15  with Ben from the INS about the conditions of confinement
16  at the Park County Jail?
17  A.  I don't remember specifically, but it would
18  be hard to imagine that we didn't discuss that.
19  Q.  Did you ever communicate to Ben at the INS
20  that you believed the conditions of confinement at Park
21  County Jail were substandard?
22  A.  Yes.
23  Q.  Approximately how many times did you
24  communicate that to Ben of the INS?
25  A.  I would just say several. I don't know.

133

11/4/2005 Bellantonio, John

1  Q.  Okay. Were those communications in writing
2  or orally?
3  A.  Orally.
4  Q.  Describe generally what your communications
5  with Ben about the issue of conditions of confinement at
6  the Park County Jail being substandard were.
7  A.  Oh, just basically overcrowded.
8  Q.  Okay.
9       MR. KORDICK: Andrew, can we take a break?
10  And if you want to go through the lunch hour, that would
11  be fine with me. I just need to take a break.
12       MR. RINGEL: Sure.
13       MR. KORDICK: Instead of breaking for lunch,
14  we're willing to -- because we have to get back to
15  Colorado Springs -- I'll do it any way you want.
16       MR. RINGEL: Can we go off the record?
17       (Discussion off the record.)
18       (Break taken from 12:02 p.m. to 12:40 p.m.)
19  Q.  (BY MR. RINGEL) When we broke for our
20  modest break, we were talking about Ben of the INS. You
21  indicated that you had complained to Ben of the INS
22  orally about the conditions of confinement at the Park
23  County Jail?
24       MR. KORDICK: Objection as to form and
25  substance, because I don't think he said "complain." I

134

11/4/2005 Bellantonio, John

1  think he just mentioned it or talked about it.
2       MR. RINGEL: Mr. Kordick, please refrain
3  from making a speaking objection.
4  A.  Ben and I discussed the conditions.
5  Q.  (BY MR. RINGEL) How many conversations
6  would you estimate you had about the conditions at the
7  Park County Jail with Ben?
8  A.  Several.
9  Q.  In what time frame did these conversations
10  occur?
11  A.  I don't recall. Ben and I had a job to do,
12  and, you know, we might have mentioned something here and
13  there. It wasn't like I went to see him or he came to
14  see me to discuss the conditions of confinement. It was
15  just off-the-cuff comments.
16  Q.  What is your recollection of Ben's response
17  to your raising the issues of the conditions of
18  confinement with him?
19  A.  I think we just both commiserated on the
20  volume of individuals we had to process and deal with.
21  He had his side of it and I had my side of it, and we
22  commiserated.
23  Q.  You indicated that you had similar
24  conversations with someone named Dan with the INS; is
25  that correct?

135

11/4/2005 Bellantonio, John

1  A.  Yes.
2  Q.  Is there any difference that you -- well,
3  let me just ask it this way: Describe your conversations
4  with Dan of the INS about the conditions at the Park
5  County Jail.
6  A.  I can't recall anything specific. It was
7  just general comments about, boy, I have a lot of people
8  to process, a lot of people to house, you know, it's
9  tight, it's crowded, you know, is it going to slow down
10  anytime soon. That kind of stuff.
11  Q.  Do you recall anything else about your
12  communications with Dan from the INS along those line?
13  A.  No.
14  Q.  Did you communicate with anyone else from
15  the INS other than Ben or Dan about the conditions of the
16  Park County Jail?
17  A.  No.
18  Q.  Do you have any sense of the rank of Ben or
19  Dan at the INS?
20  A.  I have a sense.
21  Q.  What is your sense?
22  A.  My sense is that they were essentially field
23  workers -- guys that made the job happen. They weren't
24  administrators.
25  Q.  During the time that you worked at the Park

136

11/4/2005 Bellantonio, John

```
 1   you know, I wish I did.  When the INS population was at
 2   its height -- and it might have been during the time in
 3   question with this particular lawsuit -- there was a
 4   forthcoming INS inspection, and I secretly hoped that
 5   they would come when we were packed because -- let's face
 6   it.  When the conditions become very, very crowded and
 7   resources are stretched very, very thin, it's not only a
 8   strain and stress on the detainees and the inmates, it's
 9   a tremendous strain on the deputies and staff to make
10   things work.  The tension is very high, the conditions
11   are very hard on the deputies.  So I secretly hoped that
12   INS would inspect and visually see what the heck was
13   going on in terms of people sleeping on the floors and it
14   being very, very crowded and poor ventilation and poor
15   conditions in general.
16            And I thought Mr. Gore was rather lucky that
17   there was this giant movement of 50 inmates out, and then
18   INS inspected, like, the next day or the day after when
19   we had ten detainees, and I thought, what a stroke of
20   luck for Mr. Gore.
21       Q.   Do you think that INS was not aware of the
22   number of detainees that they were housing at the Park
23   County Jail at any particular time?
24       A.   They knew how many inmates were detained.
25       Q.   Right.
```

141

11/4/2005 Bellantonio, John

```
 1       A.   Yes, they did.
 2       Q.   Did you ever go to any member of the Board
 3   of County Commissioners of Park County to raise your
 4   concerns about the substandard conditions in the Park
 5   County Jail?
 6       A.   No.
 7       Q.   Why not?
 8       A.   As I said, I had a chain of command.  I had
 9   a sergeant above me, I had a captain above me who were in
10   the jail on a daily basis, or nearly.  Conditions were
11   obvious.  This is my opinion.  It wasn't something that
12   you had to look very hard to see.  It was very obvious
13   what the conditions were, and if this is the type of
14   place they wanted to run and they were hiring me to do a
15   job, I did the best I could.
16       Q.   Okay.  Did you ever report your concerns
17   with the substandard conditions of confinement at the
18   Park County Jail to the county attorney of Park County at
19   any time?
20       A.   No.
21       Q.   Did you ever report your concerns of the
22   substandard conditions of the Park County Jail to the
23   sheriff at any time?
24       A.   No.
25       Q.   Did you ever report your concerns of the
```

142

11/4/2005 Bellantonio, John

```
 1   substandard conditions at the Park County Jail to the
 2   undersheriff at any time?
 3       A.   No.
 4       Q.   Did you ever report your concerns of the
 5   substandard conditions at the Park County Jail to Captain
 6   Gore at any time?
 7       A.   Yes.
 8       Q.   When?
 9       A.   I couldn't give you an exact date.
10       Q.   How many times?
11       A.   I don't know how many times.  To clarify, we
12   spoke about specific issues.  I wouldn't go to the
13   captain and say, oh, boy, this place is horrible.  I
14   wouldn't do that.  It was more we need more sheets, we
15   need more towels, we need more soap, we need more space,
16   we need the doors fixed, we need the heating fixed, we
17   need the showers fixed.  That kind of stuff.
18       Q.   Did you ever say anything to Captain Gore
19   along the lines of the following:  "I believe the
20   conditions at the Park County Jail are substandard"?
21       A.   I don't think I did.
22       Q.   Why not?
23       A.   Because I believed in going through the
24   chain of command, and I had enough -- my sergeant was
25   aware of the conditions, we spoke about them frequently,
```

143

11/4/2005 Bellantonio, John

```
 1   and I felt it wasn't my place to take it any further.
 2       Q.   And when your sergeant -- when you say your
 3   sergeant, who are you referring to?
 4       A.   Sergeant Flint.
 5       Q.   Describe to me your communications with
 6   Sergeant Flint about the conditions at the Park County
 7   Jail.
 8       A.   Well, we worked under those conditions
 9   daily, and, you know, it was -- our needs were discussed,
10   and the stress level and the conditions were discussed on
11   an ongoing basis.
12       Q.   When you were having these conversations
13   with Sergeant Flint, did you say anything along the lines
14   of I believe the conditions at the Park County Jail are
15   substandard?
16       A.   I might not have used those exact words, but
17   I'm sure I made that type of estimate or that -- the
18   general meaning of that clear to him.
19       Q.   Did it ever occur to you that maybe you
20   should report your concerns of the conditions at the Park
21   County Jail to somebody?
22       A.   Outside of the organization?
23       Q.   Based on this -- based on our conversation
24   during this deposition, it appears to me that -- and
25   correct my summary if I'm wrong -- that the only people
```

144

11/4/2005 Bellantonio, John

1  you raised this issue with were Ben and Dan of the IRS,
2  Sergeant Flint, and Captain Gore. Am I wrong about that?
3      A.  And coworkers.
4      Q.  And coworkers. What are the names of those
5  coworkers?
6      A.  Edward Allen.
7      Q.  Any others?
8      A.  John Thomas.
9      Q.  Any others?
10     A.  Kim Guerrero.
11     Q.  Okay.
12     A.  Let's see. Jack Stanek, who wasn't there at
13 the time frame of this particular incident. Sergeant
14 Muldoon.
15     Q.  Let's use Sergeant Muldoon as an example.
16 Describe your communications with Sergeant Muldoon
17 related to the substandard conditions at the Park County
18 Jail. How would you have raised that issue to Sergeant
19 Muldoon?
20     A.  Simple statements: We got way too many
21 people in this pod; we need sheets; we need -- would you
22 get hold of Jim and get the damn heating fixed. You
23 know, those kind of things.
24     Q.  So that's the way you would raise it to
25 Sergeant Muldoon and your coworkers? Is that a fair

145

11/4/2005 Bellantonio, John

1  context?
2      A.  It's in the context of trying to make things
3  as livable as possible with the resources I had.
4      Q.  Did you ever have such a conversation with
5  William Fikejs?
6      A.  I would imagine -- I don't know. I would
7  imagine that I might have had a comment, but I couldn't
8  tell you specifically.
9      Q.  Have you ever had such a conversation with
10 Rod Greeley?
11     A.  Not likely.
12     Q.  Have you ever had such a communication with
13 Donald Frye?
14     A.  Not likely.
15     Q.  Have you ever had such a communication with
16 Don Woodward?
17     A.  Yes.
18     Q.  Along similar lines as we were talking about
19 when we used Sergeant Muldoon as an example?
20     A.  Right. Operational issues that needed to be
21 improved.
22     Q.  So specific operational issues -- and when
23 you say "operational issues," you're talking about the
24 heat, the number of sheets, the number of blankets, that
25 kind of thing?

146

11/4/2005 Bellantonio, John

1      A.  Correct. And overcrowding in general.
2      Q.  Do you recall using the word "overcrowding"
3  with any of your coworkers at the Park County Jail at any
4  time?
5      A.  Not specifically.
6      Q.  When you were working at the Buena Vista
7  Correctional Facility, was it your responsibility to
8  comply with ACA standards?
9      A.  It was, yes.
10     Q.  Did you have any direct responsibility for
11 making sure that the facility complied with ACA
12 standards, or was that someone else's responsibility?
13     A.  No. In my areas of supervision, I had
14 direct responsibility.
15     Q.  Okay. Are you aware of whether or not,
16 during the 23 years that you worked at the -- no, sorry,
17 the -- yeah, 23 years eight months that you worked at
18 Buena Vista Correctional Facility, was that facility
19 always in compliance with ACA standards?
20     A.  No.
21     Q.  Is it a fair statement that many correction
22 facilities don't comply with ACA standards?
23     A.  That's a fair statement, yes.
24     Q.  And it's a -- is it a fair statement that
25 ACA standards are aspirational to a certain extent?

147

11/4/2005 Bellantonio, John

1      A.  Yes. Some are. Some are mandatory, some
2  are aspirational.
3      Q.  Can you describe, if you were going to do a
4  printout of every ACA standard that would apply to a
5  correctional facility, how much paper are we talking
6  about?
7      A.  We're talking about a file that would be
8  probably half the length of that wall, and so we're
9  talking, like, 15 foot long by 5 feet high.
10     Q.  Entire file cabinet?
11     A.  Yeah.
12     Q.  So is it fair to say that it sometimes is
13 difficult to comply with every single ACA standard?
14     A.  Absolutely.
15     Q.  At the time that you worked at the Park
16 County Jail, it was not ACA accredited; is that correct?
17     A.  That is correct.
18     Q.  What does ACA accreditation mean to you?
19     A.  It means that a certain amount of -- well,
20 that the mandatory standards are met and that the -- I
21 forget what they're called -- discretionary standards are
22 mostly met, and that attempts are being made for all
23 standards to be met.
24     Q.  Does the ACA standards have -- you just
25 talked about it in three categories, right?

148

11/4/2005 Bellantonio, John

```
1      COFFMAN REPORTING & LITIGATION SUPPORT, INC.        1440 Blake Street, Suite 320
2               Denver, Colorado 80202                     303.893.0202
3
4
5   November 10, 2005
6
7   Mr. John Bellantonio 29025 Pinon Circle Drive
8   Buena Vista, Colorado 81211
9
10  Re: Carranza-Reyes v. Park County, et al. Deposition of: JOHN BELLANTONIO
11  Date of Deposition: November 4, 2005 Trial Date: None set
12
13  Dear Mr. Bellantonio:
14  Enclosed is a copy of your deposition taken in the above
15  matter and the original signature page and amendment sheets for changes, if needed.
16  After the signature page and amendment sheets have been
17  signed, have them notarized and return them to . . .
18       this office within 30 days pursuant       to Rule 30.
19  Any charges for your time should be handled through counsel.
20  Thank you.
21  Sincerely,
22  COFFMAN REPORTING
23  cc: Attending counsel
24      Deponent
25       COFFMAN REPORTING     303.893.0202      * SUBJECT TO CONFIDENTIALITY DESIGNATIONS *
```

181

11/4/2005 Bellantonio, John

```
1      COFFMAN REPORTING & LITIGATION SUPPORT, INC.        1440 Blake Street, Suite 320
2               Denver, Colorado 80202                     303.893.0202
3
4
5   LLOYD C. KORDICK, ESQ. 805 South Cascade
6   Colorado Springs, Colorado 80903
7
8   Re: Carranza-Reyes v. Park County, et al. Deposition of: JOHN BELLANTONIO
9   Date of Deposition: November 4, 2005 Trial Date: None set
10  Enclosed is:
11  ( ) ORIGINAL TRANSCRIPT. Please retain unopened
12      original until it is required by any party in a    trial or hearing in the above matter.
13  ( ) ORIGINAL SIGNATURE PAGE
14      ___with ___without corrections; copies provided to    other counsel; please append these sealed originals
15      to original transcript in your possession.
16  ( ) No signature or correction sheets received.
17  ( ) Review of transcript not requested.
18  ( ) 30-day review unavailable. Signature/correction    pages forwarded to counsel handling signature.
19      Original filed in anticipation of trial date.     See letter within deposition.
20  ( ) Copy of deposition, signature and correction pages
21      sent to deponent. See letter within deposition.
22  ( ) Signature not applicable.
23  Original transcript filed on_____via_____
24  Follow-up documentation filed on_____via_____
25  cc: Attending counsel
```

182