IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 05-cv-00377-WDM-BNB

MOISES CARRANZA-REYES,

      Plaintiff,

v.

THE PARK COUNTY BOARD OF COUNTY COMMISSIONERS;
FRED WEGENER, individually and in his official capacity as Sheriff of Park County, Colorado;
MONTE GORE, individually and in his official capacity as Captain of Park County Sheriff's Department; and
VICKIE PAULSEN, individually, and in her official capacity as Registered Nurse for Park County, Colorado,

      Defendants

---

### DEFENDANTS' REPLY IN SUPPORT OF MOTION TO LIMIT EXPERT TESTIMONY BY MICHAEL S. NIEDERMAN, M.D. AND ROBERT B. GREIFINGER, M.D.

---

      Defendants Park County Board of County Commissioners, Fred Wegener, Monte Gore, and Vicki Paulsen, by and through their respective counsel, Andrew D. Ringel, Esq. and Jennifer L. Veiga, Esq. of Hall & Evans, L.L.C. and Josh A. Marks, Esq. and Melanie B. Lewis, Esq. of Berg Hill Greenleaf and Ruscitti, LLP, pursuant to Fed. R. Evid. 702, hereby submit this Reply in Support of Motion to Limit Expert Testimony by Michael S. Niederman, M.D. and Robert B. Greifinger, M.D., as follows:

### INTRODUCTION

      Defendants filed their Motion to Limit Expert Testimony by Michael S. Niederman, M.D. and Robert B. Greifinger, M.D. (hereinafter "Defendants' Motion") on January 2, 2007. Plaintiff filed his Response to Defendants' Motion to Limit Expert Testimony by Michael S. Niederman,

M.D. and Robert B. Greifinger, M.D. (hereinafter "Plaintiff's Response") on January 26, 2007. Now, Defendants respectfully submit this Reply in Support of Motion to Limit Expert Testimony by Michael S. Niederman, M.D. and Robert B. Greifinger, M.D.

Nothing contained in the Plaintiff's Response alters the propriety of this Court concluding the proposed expert testimony to be procured from Dr. Niederman and Dr. Greifinger with respect to the cause of the Plaintiff's illness does not satisfy the tests of reliability and relevance under Fed. R. Evid. 702 as interpreted and applied by *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579 (1993), and its progeny. Further, the arguments and authorities presented in the Plaintiff's Response also do not support allowing Dr. Niederman to testify that earlier treatment of the Plaintiff by a physician would have made any difference to the ultimate outcome of his illness. This Court must not allow Drs. Niederman and Greifinger to testify as experts in this case based on their unsupported expert opinions that fail to meet the evidentiary requirements of Fed. R. Evid. 702 as a matter of law.

## ARGUMENT

### A.  DR. NIEDERMAN'S MEDICAL CAUSATION OPINION IS NOT SUFFICIENTLY RELIABLE UNDER *DAUBERT* AND MUST BE EXCLUDED[1]

Plaintiff begins his Response by proclaiming Dr. Niederman to be "one of the world's leading authorities on community-acquired and hospital-acquired (nosocomial) pneumonia." [*See* Plaintiff's Response, at 1]. In an effort to demonstrate Dr. Niederman's expertise, Plaintiff purports to attach a list of invited lectures, publications, and publication reviews from his curriculum vitae, [*see* Plaintiff's Response, 1-2], but in reality attaches only the list of invited

---

[1]  For ease of reference, Defendants follow the order of the Plaintiff's Response for this Reply Brief.

lectures.  [*See* Plaintiff's Response, at Exh. 1].  A review of the invited lectures reveals numerous lectures by Dr. Niederman on the diagnosis and treatment of pneumonia, but no mention of lectures discussing the causation of pneumonia, and no mention at all of pneumonia resulting from infection by Group A beta-hemolytic streptococcal ("Strep A") bacteria.  [*See* Plaintiff's Response, at Exh. 1].  In fact, Dr. Niederman admits Strep A bacteria is a very unusual bacteria to cause pneumonia, and he has seen no more than three or four patients with this disease in his entire career.  [*See* Niederman Dep., at 62, Exh.A-4].  As a result, his extensive experience lecturing on the general topic of pneumonia has little bearing on the issues in this case.

Plaintiff also attempts to buttress Dr. Niederman's opinion by reference to research on the overall topic of pneumonia, [*see* Plaintiff's Response at 2-3], but while Dr. Niederman testified there had been "a lot of research" on Strep A, he does not state he was ever personally involved in such research and in fact states only that he "pulled out a few relevant clinical studies . . . ." [*See* Niederman Dep., at 65–66, Exh.A-4].  With one exception (discussed below), these studies consist solely of abstracts, several of which don't even involve Strep A bacteria, and neither Dr. Niederman nor Plaintiff makes any attempt to explain how these studies are actually relevant to Dr. Niederman's opinions.[2]  Plaintiff also references Dr. Niederman's current clinical research project on community-acquired pneumonia, [*see* Plaintiff's Response, at 2-3], but according to Dr. Niederman the purpose of this project is to find ways to "improve the delivery of care in community-acquired pneumonia in the hospital," [Niederman Dep., at 19, Exh.A-4], and there is

---

[2]  Plaintiff did not attach any of these studies to his Response.  [*See* Plaintiff's Response and Exhibits 1-14].

no indication this study has anything to do with the opinions offered by Dr. Niederman with respect to the causation and progression of Plaintiff's illness.

Regardless, however, Defendants do not challenge Dr. Niederman's qualifications as an expert, but instead challenges the relevance and reliability of his proffered expert opinion in this particular case under Fed. R. Evid. 702.  "It is axiomatic that an expert, no matter how good his credentials, is not permitted to speculate."  *Goebel v. Denver & Rio Grande Western R.*, 215 F.3d 1083, 1088 (10th Cir. 2000); *see also Dodge v. Cotter Corp.,* 328 F.3d 1212, 1222 (10th Cir.), *cert. denied,* 540 U.S. 1003 (2003) ("It is critical that the district court determine whether the evidence is genuinely scientific, as distinct from being unscientific speculation offered by a genuine scientist.") (citation omitted).  The expert report and deposition testimony cited in the Defendants' Motion make clear Dr. Niederman is doing nothing more than speculating regarding the cause of Plaintiff's illness and what the outcome would have been had he received earlier treatment, and as a result these opinions must be excluded regardless of his expertise and research in the general field of pneumonia.

With respect to the actual topic of the Motion, Plaintiff begins his effort to defend Dr. Niederman's opinion on causation by stating Dr. Niederman "conducted studies of the cellular mechanisms that allow bacteria to colonize the host to understand why some patients become colonized and others don't with some exposure."  [*See* Plaintiff's Response, at 4].  However, these studies involved pseudomonas aeruginosa bacteria rather than Strep A bacteria, and Dr. Niederman has not been involved in these studies since the mid-1990's. [*See* Niederman Dep., at 20 – 21, Exh.A-4].  Further, Dr. Niederman never stated he utilized his findings in these studies

to determine why Plaintiff became colonized in this particular case, and does not attempt to support any of his proposed expert opinions in this case by reference to these studies.

Plaintiff next claims "[m]edical research and studies" show that while Strep A is not a common cause of pneumonia and usually remains a sore throat, "a crowded environment facilitates the spread of the disease and it can progress to pneumonia in a small percent of the people colonized." [*See* Plaintiff's Response, at 4 (citing Niederman Dep., at 66, Exh.A-4)]. Initially, Plaintiff does not explain how, if only a "small percent" of the people colonized with Strep A progress to pneumonia in crowded conditions, Dr. Niederman can testify to a reasonable degree of medical certainty it was the alleged crowded conditions of the Park County Jail that actually caused Plaintiff's infection to proceed to pneumonia in this case. In fact, Dr. Niederman states "[w]hether that's purely statistical or whether it's related to the stress of the crowding and the multiple people together, I think, ***isn't really clear***." [*See* Niederman Dep., at 66, Exh.A-4 (emphasis added)]. Dr. Niederman goes on to testify that while everyone assumes there is a factor leading a particular person to develop pneumonia from Strep A, "I don't think that anybody knows exactly what that is just yet." [*See* Niederman Dep., at 67, Exh. A-4]. Because Dr. Niederman himself acknowledges it is unclear why any particular Strep A infection develops into pneumonia, he cannot plausibly testify that the conditions in the Park County Jail caused Plaintiff to develop pneumonia in this case.

Further, despite reference to "studies" in the plural, Plaintiff relies on only a single study, reviewed by Dr. Niederman, of an outbreak of Strep A in a military facility. [*See* Plaintiff's Response, at 4; *see also* Pneumonia Outbreak Associated with Group A Streptococcus Species at a Military Training Facility (the "Military Study"), attached as Exh. A-7]. Contrary to Plaintiff's

characterization, however, the Military Study found only that military trainees "are at particular risk for streptococcal infection because of their crowded living conditions," [*See* Military Study, at 515, Exh. A-7], and nowhere says anything about the impact on crowded living conditions on the progression of Strep A from infection to pneumonia.  Given that Dr. Niederman specifically admits there is no way to determine when Plaintiff developed the infection, [*see* Niederman Dep., at 71, Pl. Exh. 2], this study does not support either of Dr. Niederman's alternative causation theories in this case.  In particular, nothing in the Military Study provides any scientific data or evidence that support Dr. Niederman's conclusion that crowded living conditions cause or contribute to an individual previously colonized with Strep A to develop symptomatic Strep A that proceeds to pneumonia and the other complications suffered by Plaintiff.

Plaintiff also cites the Military Study for the proposition that 3% of the military personnel infected with Strep A developed pneumonia, likening this to 1 out of 60 at the Park County Jail.[3] [*See* Plaintiff's Response, at 4 (citing Niederman Dep., at 71–75, Pl. Exh. 2)].  In reality, only 56 of the 127 people who developed pneumonia in the Military Study were infected with Strep A, [*see* Military Study, at 514, Exh. A-7], and the study found 16% of the total population on the base to be infected with Strep A.  [*See* Military Study, at 513, Exh. A-7].  As a result, almost 8% of the people infected with Strep A caught pneumonia, which would correlate to between 4 and 5 out of 60, rather than 1.  Regardless, it is not possible to extrapolate any definitive opinion from

---

[3]  There is no evidence any inmate other than Plaintiff developed Strep A pneumonia at the Park County Jail during the time period Plaintiff was detained in the Park County Jail from March 1, 2003, to March 8, 2003, and Plaintiff points to no such evidence in the Plaintiff's Response.

the Military Study, given that we do not know how many other inmates in the Park County Jail were infected with Strep A bacteria while Plaintiff was there.  In addition, other than stating generically that military trainees live in crowded quarters, the Military Study does not specifically describe the living conditions at the military base studied, and neither the Military Study nor the single case study that is Plaintiff's case made any effort to control any of the multitude of other issues possibly affecting the genesis and progression of Strep A infection.  As a result, the Military Study does not provide a proper basis for Dr. Niederman's proposed expert opinion the conditions at the Park County Jail did in fact cause Plaintiff's injuries.

Plaintiff's own argument appears to recognize the lack of any scientific basis for Dr. Niederman's opinion on causation, first acknowledging it is ***possible*** Plaintiff was colonized prior to his incarceration at the Park County Jail, and then stating if Plaintiff was previously colonized the "conditions of confinement ***could*** cause him to become symptomatic if he was in an environment where he was emotionally and physically stressed and not sleeping well."  [*See* Plaintiff's Response, at 4 (emphasis added)].  However, Plaintiff then proceeds without explanation from these hypothetical possibilities to Dr. Niederman's conclusion that "Plaintiff either came to the jail colonized, but not infected, and the jail environment interfered with his immune function and allowed it to progress, or he acquired it from the conditions he was in at the jail and the combination of acquiring it at the jail and stress allowed it to progress."  [*See* Plaintiff's Response, at 4; *see also* Plaintiff's Response, at 5].  Plaintiff does not attempt to overcome the leap in reasoning from the ***possibility*** the jail conditions caused either the infection or its progression, to the untested assertion that the jail conditions ***actually*** in fact ***caused*** Plaintiff's illness in this case.  *See **In re Breast Implant Litig.**, 11 F. Supp. 2d 1217, 1224 (D.

Colo. 1998) (plaintiff must show both general causation, meaning that the activity is capable of causing injury, and specific causation, that the activity was the cause in fact of the injury at issue).  Dr. Niederman's proposed expert opinion on causation establishes neither general nor specific causation here.

With respect to Dr. Niederman's opinion Plaintiff's prognosis would have improved had he been treated with antibiotics earlier, Plaintiff again relies primarily on conclusory repetitions of Dr. Niederman's report, which was and remains unsupported by scientific foundation in any empirical data, survey, study, or literature.  [*See* Plaintiff's Response, at 6-7].  Plaintiff also cites to a "standard of care for health care providers" requiring antibiotics to be started within four hours of the appearance of symptoms, [*see* Plaintiff's Response, at 6-7], but other than Dr. Niederman's deposition testimony no evidence has been provided of this claimed standard of care.  Similarly, Plaintiff asserts that beyond four hours, there is data showing that every hour of delay adds to mortality, [*see* Plaintiff's Response, at 6], but relies solely on Dr. Niederman's testimony and never provides any documentation of this purported data, assuming any even actually exists.  More importantly, even accepting this claimed scientific data as true, it does nothing to establish how Plaintiff's outcome might have changed had he been treated with antibiotics at any earlier time.  In fact, Dr. Niederman admitted there is no data exploring the relationship between delays in providing antibiotics and any type of bad outcome short of mortality, as occurred here.  [*See* Niederman Dep., at 98, Pl. Exh. 2].

The complete lack of any scientific basis for Dr. Niederman's opinion on treatment is further enforced by Plaintiff's attempted defense of his proposed expert opinion, stating:  "[a] *majority* of patients with pneumonia do not develop these complications," and "[i]f he had

received antibiotics by 8:00 a.m., it is **much less likely** he would have had complications," and "[i]t is **more likely than not** had Plaintiff received antibiotics in a timely way, he would have been spared the amputation." [*See* Plaintiff's Response, at 6 (emphases added)].  Even if these assertions were supported by any reviewable methodology or were reliable and scientific at all, the mere possibility, or even probability, that delayed treatment caused any specific injury to Plaintiff does not provide a scientific basis for Dr. Niederman's opinion the delay in providing Plaintiff with antibiotics did, in fact, cause his specific injuries.  *See **Implant Litigation***, 11 F.Supp.2d at 1233 ("[A] suggestion or possibility of a relationship is insufficient for a causation opinion under Colorado law, the Federal Rules of Evidence, and ***Daubert***." (citations omitted)).

Finally, Plaintiff makes no effort whatsoever to address ***McDowell v. Brown,*** 392 F.3d 1283, 1299-1302 (11th Cir. 2004), which specifically rejected a similar effort to offer testimony regarding the effect of a delay in treatment, without any scientific support.  [*See* Defendants' Motion, at 13-14].  Just as the expert in ***McDowell***, Dr. Niederman makes a quantum, illogical and unsupported leap from the presumably scientific principle that earlier intervention is preferable, to an unsupported scientific principle that a delay of more than four hours caused Plaintiff's injuries, but provides "no research detailing the extent of injury or recovery at different time intervals." *Id.* at 1301–2.  Therefore, just as in ***McDowell***, this Court must find Dr. Niederman's opinion on treatment delay to be "legally unreliable and inadmissible under the standards set by ***Daubert*** and its progeny." *Id.* at 1302.

**B.  DR. GREIFINGER'S MEDICAL CAUSATION OPINION IS NOT SUFFICIENTLY RELIABLE UNDER *DAUBERT* AND MUST BE EXCLUDED**

As with Dr. Niederman, Plaintiff begins his defense of Dr. Greifinger's expert report with a discussion of Dr. Greifinger's qualifications in the field of correctional medicine, but nothing in

Dr. Greifinger's expert report, curriculum vitae, or deposition testimony provides any indication he has ever studied Strep A bacteria or the progression of a Strep A infection in a prison population or indeed in a population of any kind.   Regardless, as with Dr. Niederman, Defendants do not challenge Dr Greifinger's qualifications as an expert witness, but instead challenge the reliability of his proposed expert opinion the conditions at the Park County Jail caused Plaintiff illness and injuries.

Plaintiff's discussion of Dr. Greifinger's expert opinion on causation makes even less effort to provide any scientific basis than he did for Dr. Niederman's opinion.   After discussing his qualifications, Plaintiff does nothing more than repeat Dr. Greifinger's assertion the sanitary conditions did not meet American Correctional Association standards, and then repeat his conclusory and unsupported assertions these conditions caused Plaintiff to become ill and sustain injuries.   Plaintiff does not attempt to address the complete lack of any epidemiological studies, testing, peer review, known or potential rate of error or control standards, or general acceptance in the scientific community for Dr. Greifinger's opinion, and simply ignores the requirement that an expert's methodology be sufficiently defined that a Court can perform its gatekeeping function.   Dr. Greifinger's opinion is nothing more than speculation unsupported by science, and Plaintiff's Response does nothing to demonstrate otherwise.   [*See* Plaintiff's Response, at 7-8].

Dr. Greifinger's proffered expert opinions here fail in their reliability in similar fashion as his proposed expert opinions did in a recent decision from the United States District Court for the Northern District of Georgia.   In **Dukes v. State of Georgia,** 428 F.Supp.2d 1298 (N.D. Ga. 2006), *aff'd,* 2006 U.S. App. LEXIS 32150 (11th Cir. Dec. 28, 2006), the District Court excluded the proposed expert opinions of Dr. Greifinger pursuant to Fed. R. Evid. 702 as both unreliable

and irrelevant.  *Id.* at 1313-16.  Several conclusions made by the District Court in ***Dukes*** warrant

mention.  First, the District Court in ***Dukes*** concluded Dr. Greifinger was not qualified to be an

expert in infectious diseases.  ***Dukes,*** 42 F.Supp.2d at 1313.[4]  Second, the District Court's

analysis of Dr. Greifinger's proposed expert testimony in ***Dukes*** demonstrates the methodology

employed by Dr. Greifinger there is remarkably similar to the instant case and is improper under

Fed. R. Evid. 702, ***Daubert*** and its progeny.   The District Court analyzed Dr. Greifinger's

proposed expert opinions as follows:

> The court is unable to find that the opinions set forth in Dr. Greifinger's
> expert report are sufficiently reliable.  With regard to Dr. Greifinger's statements
> concerning the standard of care for laboratories, Plaintiff has offered no argument
> as to why his statements are reliable.  Moreover, in his expert report, Dr.
> Greifinger himself offered no support for his statements concerning the
> laboratories.  With regard to this statements about the treatment of cryptoccocal
> meningitis, Dr. Greifinger provides no basis for his conclusions.  While Plaintiff
> contends that Defendants' own experts support Dr. Greifinger's findings, the issue
> before the court is what Dr. Greifinger based his conclusions upon.   Dr.
> Greifinger has cited no support for his conclusions save his experience.  However,
> Dr. Greifinger has never seen a patient with cryptococcal meningitis.  Greifinger
> Dep. at 214-15.   Therefore, Dr. Greifinger's theory that earlier treatment of
> cryptoccocol meningitis would have prevented Plaintiff's blindness is without
> support and unreliable.
>
> With regard to this statements concerning standards for correctional health
> care, Dr. Greifinger provides little quantifiable support for his conclusions.  In his
> expert report, except for the (i) the third sentence which provides "[w]ith my
> experience in correctional health care for more than 16 years, my opinions are to a
> reasonable degree of medical certainty and based on standards for correctional
> facilities such as the Coweta County Jail," and (ii) a general listing of his
> background experience in health care, Dr. Greifinger makes no reference to any
> specific experience or material upon which he relied in making his conclusions.
> In fourteen of his sixteen conclusions, Dr. Greifinger states that the actions of

---

[4]   Defendants acknowledge they have not heretofore challenged Dr. Greifinger as an
expert on this basis.  Defendants specifically reserve the right to supplement their Motion to raise
this argument, to provide the Plaintiff with an opportunity to respond, at a later date.  Defendants
intend to file a supplement with this Court as soon as possible.

various Defendants fall below the standard of correctional health care and demonstrate deliberate indifference to Mr. Dukes' serious medical needs.

However, Dr. Greifinger does not specify what experiences or what standards he relied upon in making any of these determinations. In order to find Dr. Greifinger's opinion testimony reliable and connected to scientific data, this court would need to take a leap of faith and rely on Dr. Greifinger's *ipse dixit* and assurance that his testimony is based on nationally accepted standards. Reliance on naked assurances of the purported expert is exactly what the Eleventh Circuit in ***Cook*** and ***McClain*** warned against. Accepting Dr. Greifinger's experience alone as evidence of the reliability of his statements is tantamount to disregarding the reliability prong of the ***Daubert*** analysis.

***Id.*** at 1314-15. Dr. Greifinger's proposed expert opinions here fail for the same reasons as the District Court concluded they were inadmissible in ***Dukes.***[5]

## C.  PLAINTIFF ERRONEOUSLY ASSERTS THAT DEFENDANTS FAILED TO MEET THEIR THRESHHOLD BURDEN

Initially, Plaintiff's argument is premised upon the unsupported assertion Defendants bear a "threshold burden" of showing that the disputed expert opinions fall outside the ordinary case where the reliability of an expert's methods is taken for granted. [*See* Plaintiff's Response, at 8 (citing ***McCoy v. Whirlpool Corp.***, 2003 WL 1923016, *7 (D. Kan. 2003) (unpublished opinion attached to Plaintiff's Response as Exh. 5))]. In reality, it is the party offering expert testimony that bears the burden of establishing its admissibility under Fed. R. Evid. 702 and ***Daubert***. *See, e.g.,* ***In re Breast Implant Litig.***, 11 F. Supp. 2d 1217, 1244 (D. Colo. 1998) (plaintiffs, as proponents of the expert testimony, failed to meet their burden of proof of establishing that the expert opinions on causation were based on valid, scientific principles and reliable scientific

---

[5]  Interestingly, during his deposition, Dr. Greifinger described the District Court in ***Dukes*** as limiting him mildly on causation. [*See* Greifinger Dep., at 91-92, Exh. A-8]. Defendants believe that the District Court in ***Dukes*** did much more than Dr. Greifinger implies as this Court can review for itself.

methods, processes, reasoning, and data; were based upon data reasonably relied upon by experts in the field, and would assist the trier of fact in resolving a factual dispute in these actions); *Mitchell v. Gencorp, Inc.,* 165 F.3d 778, 781 (10th Cir. 1999) ("Instead, the plaintiff [as the proponent of the proposed expert testimony] must show that the method employed by the expert in reaching the conclusion is scientifically sound and that the opinion is based on facts which sufficiently satisfy Rule 702's reliability requirements."; alteration added); *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1312 (11th Cir. 1999) ("Thus, the proponent of the testimony does not have the burden of proving that it is scientifically correct, but that by a preponderance of the evidence, it is reliable.") (citing *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 744 (3rd Cir.1994)).

Further, even if Defendants did bear the burden of proving the unreliability of Plaintiff's experts' opinions, Plaintiff's assertion that Defendants did not call sufficiently into question the principles, methods, or applications employed by the experts is baseless.  [*See* Plaintiff's Response, at 8-9 (quoting *McCoy*, 2003 WL 1923016, at *7].  That is precisely what the Defendants' Motion does, supported by a detailed discussion of the expert opinions, a recitation of relevant deposition testimony demonstrating the lack of any scientific basis for those opinions, and citation to a large body of case law supporting Defendants' arguments.  Most fundamentally, Defendants pointed out experts are required to describe the methodology they used and the scientific data supporting their determinations and expert opinions.  Each of these experts, when asked to describe their methodology, stated only that they reviewed the materials provided to them and formed an opinion.  [*See* Niederman Dep., at 105, Exh. A-4; Greifinger Dep., at 62,

Exh. A-5].  This is the antithesis of a scientific methodology, and instead constitutes nothing more than pure speculation under the guise and with the trappings of an expert opinion.

Plaintiff next attempts to defend the experts' causation opinion by stating because the case "does not raise a novel medical causation theory," the reliability of theses opinions should be taken for granted.  [*See* Plaintiff's Response, at 9 (citing ***Dodge v. Cotter Corp.***, 328 F.3d 1212, 1229 (10th Cir. 2003))].  Plaintiff asserts it is "common knowledge, ***even among the lay public***, that crowded, unsanitary conditions can spread communicable disease."  [*See* Plaintiff's Response, at 9 (emphasis added)].  Plaintiff continues his defense of the expert opinions as not novel, stating it is also well established that strep throat is a communicable disease easily treated with antibiotics, that untreated strep throat can lead to pneumonia, that pneumonia can be treated if timely diagnosed, and that untreated pneumonia can lead to sepsis, septic shock, and death. [*See* Plaintiff's Response, at 9].

Initially, if these principles are so well established, even among the lay public, there is a no need for any expert testimony on the subject.  Pursuant to Fed. R. Evid. 702, expert testimony should be allowed only when "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue . . . ."  Fed. R. Evid. 702. According to Plaintiff, the topics listed above are common knowledge rather than scientific, technical or other specialized knowledge, and there is no need to assist the trier of fact to understand something that is already common knowledge.  As a result, none of the statements described by Plaintiff are proper areas of expert testimony.

However, the opinions of Drs. Niederman and Greifinger go far beyond the generic principles cited by Plaintiff in an effort to avoid reliability review.  Rather than testifying that

crowded, unsanitary conditions can spread communicable disease, these doctors testify far more specifically that either Plaintiff caught Strep A bacteria while he was in the Park County Jail as a result of the conditions in the facility, or, he had it prior to entering the jail and the conditions in the jail caused it to progress into a symptomatic infection.  Similarly, rather than testifying that untreated strep throat can lead to pneumonia and untreated pneumonia can lead to other complications, Plaintiff's experts attempt to testify far more specifically the delay in treatment of Plaintiff's infection caused him to develop strep throat and pneumonia and caused his specific injuries.  These opinions are a far cry from the "common knowledge" described by Plaintiff, and given that Plaintiff's own expert admits Strep A is an extremely uncommon bacteria to cause pneumonia, Plaintiff cannot persuasively argue that opinions on when an inmate caught an unusual type of bacteria and how his living conditions affected its presentation or the progression of his illness is not novel.  In fact, if these experts' opinions on causation were not novel, they would have been able to provide some sort of scientific backing for their proposed expert opinions in the form of an epidemiological study, testing, or a peer-reviewed article.  However, Drs. Niederman and Greifinger actually provide no such evidence for their unsupported and speculative conclusions.

Plaintiff next continues his efforts to refute the novel nature of his experts' opinions, referencing cases discussing soil subsidence, the cause of a gas explosion, and neutralization of gas odor, [*see* Plaintiff's Response, at 10-12], but not a single case discussing the causation of any illness.  Nowhere in Plaintiff's discussion of the "well-established," "well-tested," and "well-accepted" nature of his experts' theories does he refer to any case in which any expert testified to the genesis of a Strep A bacteria or the relation of such genesis or its progression to prison

conditions. While Plaintiff again attempts to refer to more generic versions of his experts' opinions to avoid any inference of novelty, [*see* Plaintiff's Response, at 10-12], the fact remains that Drs. Niederman and Greifinger are *not* testifying only that "crowded and unsanitary conditions *can* spread communicable disease," or that strep throat *can* be successfully treated with penicillin and pneumonia *can* be successfully treated within four hours. [*See* Plaintiff's Response, at 10-12 (emphasis added)].

Instead, these experts intend to testify that the conditions in the Park County Jail did in fact cause Plaintiff to either catch Strep A bacteria or develop an infection from such bacteria, and the delay in treatment did in fact cause him to develop pneumonia and caused the resulting injuries. This is not, as Plaintiff asserts, a "regularly occurring natural phenomena," [*See* Plaintiff's Response, at 10-12 (citing *Bitler v. A.O. Smith Corp.*, 391 F.3d 1114, 1122 (10th Cir. 2004))], and if it were Plaintiff would be citing to studies supporting his experts' theories instead of American Correctional Association standards and a single uncontrolled study of an outbreak in a military training facility. Contrary to Plaintiff's disingenuous assertions, the genesis and progression of Plaintiff's infection presents a completely unique scenario, and his experts' unsupported theories of causation plainly require scrutiny under *Daubert*.

Plaintiff also argues that *Daubert* review is not necessary where an expert's opinion is based on experience or training, rather than on some principle or methodology. [*See* Plaintiff's Response, at 11 (citing *Compton v. Subaru of Am., Inc.*, 82 F.3d 1513, 1519 (10th Cir.), *cert. denied,* 519 U.S. 1042 (1996))]. Initially, *Compton* is no longer good law. "The viability of *Compton* has been questioned generally by some district courts given the fact that it was based on the premise that a *Daubert* analysis was inapplicable to expert opinions not based on a

particular methodology or technique.  That premise has since been rejected by **Kuhmo**, 526 U.S. at 141 (holding that district court's gatekeeping function 'applies not only to testimony based on scientific knowledge, but also to testimony based on technical or other specialized knowledge.'" **Ralston v. Smith & Nephew Richards, Inc.,** 275 F.3d 965, 970 n. 2 (10th Cir. 2001) (citations omitted).  Furthermore, while Dr. Niederman has experience and training in the treatment of diseases generally, and Dr. Greifinger has experience in the administration of prison medical facilities, neither one has any experience or training that would allow them to state, without any study or testing, when and why a particular inmate became colonized with a particular bacteria, why that colonization turned to infection, or why that infection caused any particular result. Plaintiff is attempting to compare apples and oranges, and his experts' training and expertise simply do not give them the authority to make speculative assumptions regarding the progression of a disease without any need for an established and defensible methodology.

Plaintiff next argues that Dr. Niederman's testimony is reliable because he "researched and applied standards promulgated by a widely recognized organization," referring to the claimed standard that pneumonia must be treated within four hours after symptoms appear.[6] Aside from the fact Dr. Niederman never provided any documentation of this claimed standard, it is not the generic opinion that pneumonia should be treated within four hours of symptoms that is

_____

[6] Within this section, Plaintiff claims Defendants do not dispute various claims made by Plaintiff regarding the conditions at the Park County Jail.  [*See* Plaintiff's Response, at 12].  The fact that Defendants do not specifically attempt to refute these claims in the context of the Defendants' Motion does not mean these facts are admitted, as Plaintiff implies, but instead means only that they are not relevant to the reliability of the expert opinions at issue.  Instead, Defendants have accepted Plaintiff's version of facts as true for purposes of their challenge to Plaintiff's experts pursuant to Fed. R. Evid. 702 similarly to the Defendants' approach on summary judgment.

challenged by Defendants.  Instead, the Defendants' Motion challenges the reliability of both experts' opinions the conditions in the Park County Jail either caused Plaintiff to catch the Strep A bacteria or caused an already existing bacteria to manifest itself, and that the delay in treatment caused Plaintiff's specific injuries.   Neither Plaintiff nor his experts cites any standard promulgated by any widely recognized organization, or any actual standard or generally accepted principle at all, permitting them to make these assertions without any testing or methodology.

### D.  THE RELIABILITY TEST IS NOT SUFFICIENTLY FLEXIBLE OR LIBERAL TO PERMIT BLATANT SPECULATION BY EXPERTS

Plaintiff repeatedly emphasizes the four factors described in *Daubert* are not intended to be exclusive, and that the Court can consider other factors bearing on reliability for any given methodology.  [*See* Plaintiff's Response, at 13 & 15].  The Motion itself acknowledges this proposition, and does not rely solely on the failure of these experts' opinions to satisfy any of the four *Daubert* factors, [*see* Motion, at p.4-5], but instead goes on to point out that nothing in Dr. Niederman's report or testimony provides any other support for the reliability of his method of determining causation.  [*See id.* at p.12].  In fact, Dr. Niederman specifically acknowledged that because Plaintiff was the "index case," it would not be possible to design a study to retrospectively determine the pathogenesis of his illness.  [*See* Niederman Dep., at 110-11, Exh. A-4].

The problem with Plaintiff's reliance on the flexible nature of the *Daubert* inquiry is that he fails to provide any measures of reliability outside of the four factors to support his experts' opinions.   Instead, Plaintiff reverts back to repeating his experts' conclusory opinions on causation, supported by assertions that Dr. Greifinger "successfully treated many cases of strep throat" as a pediatrician, and that both doctors "have extensive experience with the spread of

communicable disease of the lungs (pneumonia and TB) . . . ."  [*See* Plaintiff's Response, at 13-14].  Plaintiff's reference to Dr. Griefinger's experience as a pediatrician is rather disingenuous given that it occurred more than 20 years in the past, but in any event neither doctor's "extensive experience" with communicable diseases provides them the expertise to testify, without any testing or explainable methodology, that the conditions at the Park County Jail caused the Plaintiff to acquire or develop this unusual form of strep throat, or that the delay in treatment actually caused him to develop the particular complications that resulted.

Plaintiff next asserts the complete lack of any quantitative data supporting his experts' opinions goes to the weight, and not the admissibility, of the opinions, and asserts Defendants "do not explain what data is missing other than information on travel conditions and a family history from Mexico."  [*See* Plaintiff's Response, at 14].  This is an obvious mis-statement of Defendants' argument.  Defendants do point out the lack of any consideration by Plaintiff's experts of the effects of Plaintiff's past medical history or of the conditions of his travels across the border and across several states, which both doctors candidly admit could impact the acquisition and progression of his illness.  [*See* Defendants' Motion, at 10-11 & 16]  But more than this, Defendants point out the complete lack of any methodology whatsoever supporting the Plaintiff's experts' leap from general propositions of disease progression to the very specific causation opinions offered in this case.  Contrary to Plaintiff's unsupported argument, the multitude of precedents cited in the Defendants' Motion demonstrate blatant speculation of the type offered by Drs. Niederman and Greifinger does not affect only its weight, but instead renders it inadmissible under ***Daubert***.  *See, e.g.,* ***Dodge,*** 328 F.3d at 1222 ("To be reliable under ***Daubert,*** an expert's scientific testimony must be based on scientific knowledge, which 'implies

a grounding in the methods and procedures of science' based on actual knowledge, not 'subjective belief or unsupported speculation.'"; quoting *Daubert*, 509 U.S. at 590).  [*See also* Defendants' Motion, at 5-6].

Plaintiff also argues "both doctors identified substantial objective and subjective data to support their opinions."  [*See* Plaintiff's Response, at 14].  With respect to objective data, Plaintiff fails to point to a single item of objective data supporting these experts' opinions.  With respect to subjective data, Plaintiff argues subjectivity does not render an opinion speculative "if the underlying data is of the type generally relied on by other practitioners . . . ."  [*See* Plaintiff's Response, at 14].  However, Plaintiff cites to no studies, reports, or case law demonstrating that descriptions of prison conditions are generally relied on by practitioners to come up with specific opinions as to how a specific inmate acquired a disease and how that disease progressed, without any consideration of any other factors affecting such inmate's health.  [*See* Plaintiff's Response, at 1-21].

### E.  PLAINTIFF'S EXPERTS OFFER NO RELIABLE PRINCIPLES OR METHODOLOGIES

Plaintiff here returns to his emphasis on alternative methods of demonstrating the reliability of an expert opinion, pointing to such factors as "reliance on anecdotal evidence (as in case reports), temporal proximity, and improper extrapolation (as in animal studies)."  [*See* Plaintiff's Response, at 15 (quoting *Allison v. McGhan Medical Corp.*, 184 F.3d 1300, 1312 (11th Cir. 1999))].  Initially, the expert opinions in *Allison* were supported by far more significant scientific data (including in one instance four epidemiological studies) than the conclusory opinions offered by Drs. Niederman and Greifinger here, and yet were rejected as unreliable by the Eleventh Circuit.  *See Allison*, 184 F.3d at 1313–1322.  Further, the sole anecdotal evidence

offered by Plaintiff (but not even attached to the Plaintiff's Response) is the Military Study, which as discussed above does not demonstrate the reliability of the experts' opinions in this case, and no animal studies or any other "improper extrapolation" has been cited.  With respect to temporal proximity, this alone cannot establish the reliability of a claimed scientific method if other potential causes, also in close temporal proximity, are not eliminated as the actual cause of injury.  *See Implant Litigation,* 11 F.Supp.2d at 1225-26.

Plaintiff cites *Easum v. Miller*, 92 P.2d 794 (Wyo. 2004), for that proposition that "[n]o symptoms before exposure and symptoms beginning with exposure is a temporal relationship that can support a causation conclusion."  [*See* Plaintiff's Response, at 15].  This is a gross oversimplification of the Wyoming Supreme Court's opinion, and review of the opinion as a whole actually demonstrates some of the flaws in Plaintiff's experts' opinions.  In *Easum*, the defendant challenged the reliability of an expert who relied on a differential diagnosis technique to determine the plaintiff's injuries were caused by electrocution from a transformer upgraded by the defendant.  *See Easum*, 92 P.3d at 796.  The plaintiff first saw his family physician in relation to his physical symptoms and was referred to a rehabilitative medicine physician and psychiatrist, who ordered an EMG and an MRI and prepared an extensive medical report.  *See id.* at 797.  The plaintiff was then referred to another specialist who ruled out a brain cyst as the cause of the plaintiff's symptoms.  *See id.* at 797.  The plaintiff then saw a rheumatologist for extensive diagnostic testing to rule out rheumatoid arthritis, and a neurologist specializing in electrical injury cases, who himself had seen thirteen similar cases.  *See id.* at 798.  Under the direction of the neurologist, the plaintiff underwent fourteen days of extensive diagnostic testing, including qualitative sensory testing, infrared thermography imaging, electroencephalography

21

tests, visual evolved response tests, and neurophyschometric testing.  *See id.*  Yet another specialist determined the electroencephalogram and thermography tests to be abnormal and consistent with electrical injury.  *See id.*  Based on all of these tests, the plaintiffs physicians diagnosed the plaintiff with Reflex Sympathetic Dystrophy, and by ruling out other potential causes, determined the cause to be exposure to electrical current.  *See id.*

Even if testing this extensive is not required in every case, for Plaintiff to legitimately rely on *Easum*, he would have to demonstrate Drs. Niederman and Greifinger conducted a reliable differential diagnosis to rule out other potential causes for his illness and injury.  *See id.* at 803; *see also Hollander v. Sandoz Pharms. Corp.*, 289 F.3d 1193, 1211 (10th Cir.), *cert. denied,* 537 U.S. 1088 (2002).  To the contrary, each doctor admits the made no effort to eliminate any of the other potential factors, unrelated to any action of the Defendants, which might have caused his illness and injuries.  [*See* Niederman Dep., at 105 & 110-11, Exh. A-4; Greifinger Dep., at 62, Exh. A-5; Supp. Greifinger Dep., at 203-4, Exh. A-6].  Neither of Plaintiff's experts even tried to perform a differential diagnosis, and Plaintiff's attempted reliance solely on the temporal relationship between his incarceration and his illness provides insufficient reliability to support their opinions.[7]

---

[7]   Plaintiff later argues, on the same subject, he is not required to eliminate every potential cause of his condition, but only to offer a reasonable explanation as to why he believes the Defendants' actions were a substantial factor in bringing about his condition.  [*See* Response, at p.17 (citing *Perkins v. Origin Medsystems Inc.*, 299 F. Supp. 2d 45, 61 (D. Conn. 2004))].  Plaintiff's experts in this case did not even attempt to explore other potential causes of Plaintiff's illness, and their "reasonable explanation" consists of nothing more than their own conclusory assertions that the jail conditions were the actual cause of Plaintiff's injuries.  Therefore, even if this case were persuasive, it provides Plaintiff no support here.

Plaintiff attempts to defend Dr. Greifinger's methodology, which consisted solely of reviewing the materials he was provided and forming an opinion, [*see* Greifinger Dep., at 62, Exh. A-5], by stating "an expert may draw a conclusion from a set of observations based on extensive and specialized experience." [*See* Plaintiff's Response, at 16 (citing **Kumho Tire Co. v. Carmichael**, 526 U.S. 137, 156 (1999))]. However, Dr. Greifinger does not have extensive and specialized experience in the cause and progression of Strep A bacteria because he does not even consider himself an expert in the infection mechanisms of Strep A, and this holding is therefore inapposite. [*See* Greifinger Dep., at 34-36, Exh. A-8]. Plaintiff also misstates Defendants as claiming Dr. Niederman did not describe his methodology, when in fact Defendants referred specifically to Dr. Niederman's own description of his methodology, which again consisted of reviewing the materials and forming an opinion. [*See* Defendants' Motion, at 11 (citing Niederman Dep., at 105, Exh. A-4)]. As noted in the Motion, these are generic explanations defying examination, *see* **Implant Litigation**, 11 F.Supp.2d at 1243, and Plaintiff's repeated assertions of reliability, unsupported by any scientific data or relevant case law, do not magically transform Plaintiff's experts opinions into reliable ones.

Plaintiff next makes a disingenuous attempt to avoid the fact that Dr. Niederman's opinion was derived solely for the purposes of litigation, claiming "Dr. Niederman has published extensively on the subject of pneumonia, all of which was independent of litigation." [*See* Plaintiff's Response, at 16]. However, nothing in Dr. Niederman's curriculum vitae provides any indication he has published on the subject of Strep A bacteria, and there is no question Dr. Niederman's opinions with respect to Plaintiff was developed for purposes of this litigation and not as part of any study he may have been conducting. Plaintiff further demonstrates his

desperation by claiming Dr. Niederman "has had **numerous** patients with pneumonia caused by Strep A," [*See* Plaintiff's Response, at 16 (emphasis added)], when in fact Dr. Niederman testified he had seen no more than three or four patients with this disease during his entire lengthy career.  [*See* Niederman Dep., at 62, Exh. A-4].

Plaintiff also attempts to distinguish the toxic tort cases, particularly **Implant Litigation**, in which cause of illnesses has not been generally accepted in the scientific community, from this case, in which "conditions giving rise to the spread of communicable disease is well-known." [*See* Plaintiff's Response, at 17-18].  As discussed in detail above, if this issue is so well-known, no expert testimony would be needed, but the generic proposition that living conditions can affect the spread of communicable disease is a far cry from the expert opinions of Drs. Niederman and Greifinger that the conditions at the Park County Jail actually cause Plaintiff to develop Strep A infection or caused an existing infection to progress to pneumonia and cause his specific injuries which are at issue here..  For this reason, Plaintiff's extended citation of various jail policies regarding communicable disease, [*see* Plaintiff's Response,  at 17-18], does nothing to support his argument.

### E.  PLAINTIFF'S ARGUMENT REGARDING RELEVANCY IS IRRELEVANT

Plaintiff closes his Response with a discussion of the second prong of the **Daubert** test, which is the requirement of relevancy, but ignores the fact that Defendants' Motion is focused solely on the reliability requirement, and does not address the relevancy requirement.  Because these arguments are irrelevant to the Defendants' Motion, they will not be addressed. Defendants note, however, they have separately challenged Dr. Greifinger's ability to testify as an expert that the Defendants' actions were "deliberately indifferent" under the relevance prong

of ***Daubert***.  [*See* Reply Brief in Support of Motion for Summary Judgment from Defendants Park County Board of County Commissioners, Fred Wegener, and Monte Gore, 2/12/07, at 31-33].

## CONCLUSION

In conclusion, for all of the foregoing reasons, as well as based upon all of the arguments and authorities contained in their original Motion, Defendants Board of County Commissioners of Park County, Fred Wegener, Monte Gore and Vicki Paulsen respectfully request this Court issue an order prohibiting Plaintiff's expert witnesses Dr. Niederman and Dr. Greifinger from testifying that the conditions at the Park County Jail either caused Plaintiff to become infected with Strep A bacteria, or caused any existing infection to manifest itself and develop into pneumonia and sepsis, and an order precluding Dr. Niederman from testifying that earlier treatment of the Plaintiff by a physician would have made a difference in the ultimate outcome of the Plaintiff's illness, and for all other and further relief as this Court deems just and appropriate.

Dated this 19th day of February, 2007.

Respectfully submitted,

s/ Andrew D. Ringel
Andrew D. Ringel, Esq.
Jennifer L. Veiga, Esq.
Hall & Evans, L.L.C.
1125 17th Street, Suite 600
Denver, Colorado 80202-2052
Tel:  (303) 628-3300
Fax:  (303) 293-3238
**ATTORNEYS FOR DEFENDANTS
BOARD OF COUNTY
COMMISSIONERS OF PARK
COUNTY, FRED WEGENER
AND MONTE GORE**

and

Josh A. Marks, Esq.
Melanie B. Lewis, Esq.
Berg Hill Greenleaf & Ruscitti, LLP
1712 Pearl Street
Boulder, CO 80302
Tel: (303) 402-1600
Fax: (303) 402-1601
jam@bhgrlaw.com
mbl@bhgrlaw.com

**ATTORNEYS FOR DEFENDANT
VICKI PAULSEN**

## <u>CERTIFICATE OF SERVICE (CM/ECF)</u>

I HEREBY CERTIFY that on the 19th day of February, 2007, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses:

Joseph J. Archuleta, Esq.
archuletalaw@qwest.net

Lloyd C. Kordick, Esq.
lloyd@kordicklaw.com

William A. Trine, Esq.
btrine@trine-metcalf.com

Adele P. Kimmel, Esq.
akimmel@tlpj.org

Josh A. Marks, Esq.
jam@bhgrlaw.com

Melanie B. Lewis, Esq.
mbl@bhgrlaw.com

s/Loree Trout,   Secretary
Andrew D. Ringel, Esq.
Jennifer L. Veiga, Esq.
Hall & Evans, L.L.C.
1125 17th Street, Suite 600
Denver, CO 80202-2052
303-628-3300
Fax: 303-293-3238
ringela@hallevans.com

**ATTORNEYS FOR DEFENDANTS
PARK COUNTY BOARD OF COUNTY
COMMISSIONERS, FRED WEGENER
AND MONTE GORE**

H:\Users\RINGELA\park\Carranza-Reyes\reply motion limine Niederman and Greifinger.doc