COPY

EXHIBIT
A - 8

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Case No. 2005-WM-377 (BNB)

---

DEPOSITION OF:   ROBERT B. GREIFINGER, M.D.
Volume I
August 25, 2006

---

MOISES CARRANZA-REYES,

Plaintiff,

v.

PARK COUNTY, a public entity of the State of Colorado and
its governing board, THE PARK COUNTY BOARD OF COUNTY
COMMISSIONERS; PARK COUNTY SHERIFF'S OFFICE, a public
entity of the State of Colorado; FRED WEGENER,
individually and in his official capacity as Sheriff of
Park County, Colorado; MONTE GORE, individually and in
his capacity as Captain of Park County Sheriff's
Department; VICKIE PAULSEN, individually and in her
official capacity as Registered Nurse for Park County,
Colorado; JAMES BACHMAN, M.D., individually and in his
official capacity as Medical Director of the Park County
Jail,

Defendants.

---

TAKEN PURSUANT TO NOTICE on behalf of the Defendants at

1435 Arapahoe Street, Boulder, Colorado 80302 before

Laura L. Corning, Federal Certified Realtime Reporter,

Certified Shorthand Reporter and Notary Public within

Colorado.

*Coffman Reporting*
303.893.0202
303.893.2230 FAX
WWW.COFFMANREPORTING.COM

\* SUBJECT TO CONFIDENTIALITY DESIGNATIONS \*

DISK ENCLOSED
(INSIDE BACK COVER)

1  about them, other than in perhaps general terms before
2  they are published. Is that a restriction that you
3  understand exists on you, or --
4       A.   I can mention what they're about.
5       Q.   Yeah. That's what I mean. I don't want to
6  know what journal or anything like that. Generally
7  speaking, what I want to understand is do you have any
8  background in terms of publications on the infection
9  streptococcus A?
10      A.   I'm not sure what you mean by do I have any
11 background.
12      Q.   Have you written anything on the infectious
13 disease streptocuccus A? I didn't see anything on this
14 list of publications. Is any of the forthcoming
15 publications on that topic?
16      A.   No. Except that it may be discussed in a
17 chapter in my textbook that won't be published until
18 October of 2007.
19      Q.   And is that --
20      A.   That's not a chapter authored by me. I'm
21 the editor of the book.
22      Q.   Okay. I understand. I understand. Are
23 you an author of any of the chapters in the books -- or
24 in that book?
25      A.   I don't know yet.

1    Q.    Okay.  Depends on whether you can get
2  someone else to do it or not?
3    A.    Yes.
4    Q.    I understand.  Okay.  Now, the general
5  topic of that forthcoming book is what?
6    A.    Public health in criminal justice.
7    Q.    So it's kind of a follow-up to the Clinical
8  Practice in Correctional Medicine book that you were an
9  associate editor of that was published this year?
10   A.    No.  It's different.  This -- this is
11  about -- a lot of about prevention and reentry.
12   Q.    You mean reentry into society?
13   A.    Yes.
14   Q.    And what the potential impact of reentry of
15  people in a correctional setting who have diseases to
16  come back into society -- what that might mean to
17  society, generally speaking?
18   A.    Well, it -- it -- it's about the impact of
19  the health status of returning inmates on the community
20  and what can be done to not only ease those inmate's
21  reentry for -- inevitably almost all return to the
22  community, but to lessen the impact healthwise on the
23  community.
24   Q.    Have you, as a doctor, ever treated someone
25  with streptococcus A?

36

1       A.      Certainly.

2       Q.      When's the last time that you provided
3   primary medical care to anyone?

4       A.      1985.

5       Q.      Okay.  And when you -- so your treatment of
6   streptococcus A would have been 1985 or before?

7       A.      Yes.

8       Q.      In what context did you treat streptococcus
9   A?

10      A.      I was a pediatrician.

11      Q.      So you treated children with streptococcus
12  A?

13      A.      Yes.

14      Q.      Is streptococcus A the common version of
15  what I might think of in lay terms as strep throat?

16      A.      Yes.

17      Q.      So this was something that you saw in your
18  pediatric practice on probably a daily basis?

19      A.      Yes.

20      Q.      Okay.  Would you consider yourself an
21  expert in streptococcus A and it's infection mechanisms?

22      A.      No.

23      Q.      And am I -- is it fair to say that you're
24  not offering an opinion in this case about the infection
25  mechanisms of streptococcus A?

* SUBJECT TO CONFIDENTIALITY DESIGNATIONS *

1   basic human needs of detained people.

2   Q.   Okay.  Paragraph 30 addresses Nurse Vicki
3   Paulsen; is that correct?

4   A.   Yes.

5   Q.   Is your opinion in this case related at all
6   to whether or not Ms. Paulsen committed nursing
7   malpractice?

8   A.   I believe she did.

9   Q.   Okay.  And you believe you have the
10  expertise to opine about the standard of care applicable
11  to registered nurses in the state of Colorado?

12  A.   I have testified in other states as to the
13  standard of care of nurses.  I don't know how a court
14  would respond to a motion to keep me from testifying in
15  that area.  I've survived Daubert and Frye motions in
16  several courts.

17  Q.   Have you ever been stricken or limited in
18  your testimony as an expert by any court?

19  A.   I have been limited mildly on causation in
20  two courts, but not as to standards of care for
21  correctional facilities.

22  Q.   Okay.

23  A.   One case, just for example, was a patient
24  with HIV who developed cryptococcal meningitis, and the
25  court did not want me to comment on the pathophysiology

Case 1:05-cv-00377-WDM-BNB   Document 168-2   Filed 02/19/07   USDC Colorado   Page 6 of 6
Carranza-Reyes v. Park County                                        Robert G. Greifinger, M.D., Volume I

92

1  of the cryptococcal meningitis relative to HIV, but I
2  certainly was able to testify about the delivery of
3  timely inadequate care to that patient.
4      Q.   What court was that, Doctor?
5      A.   Northern District of Georgia.
6      Q.   And what's the other time that you were
7  limited in your testimony?
8      A.   I don't -- I certainly don't recall.  But
9  there have been multiple times when I was -- when motions
10 were wholly denied.  You can look at Woodward v. Myers,
11 M-y-e-r-s, in an appellate decision for the -- wherever
12 the Northern District of Illinois was, and in New Jersey.
13     Q.   Okay.  Have you testified at a Daubert or
14 Frye hearing in front of the court in any of these
15 instances, either where your testimony was limited or
16 otherwise challenged under those two --
17     A.   No.
18     Q.   -- cases?
19     A.   Another decision you may want to look at is
20 Collins v. Fowler.  It's Western District of
21 Pennsylvania.
22     Q.   And what happened in that decision?
23     A.   I got to -- the -- the court supported my
24 ability to testify on all matters involved in that case.
25     Q.   Does the scope of your expert opinion in

*  SUBJECT TO CONFIDENTIALITY DESIGNATIONS  *