EXHIBIT

A-11

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 04-cv-00363-EWN-OES (Consolidated with 04-cv-00840-EWN-OES)

PAM FORAKER, and
LARRY SCHMIDT,

Plaintiff(s),

v.

JAMES R. SCHAUER, et al.,

Defendant(s).

---

## ORDER GRANTING DEFENDANTS' MOTION TO EXCLUDE EXPERT TESTIMONY AND ORDER DENYING PLAINTIFFS' MOTION TO AMEND AND ADD ADDITIONAL EXPERT

---

ORDER ENTERED BY MAGISTRATE JUDGE O. EDWARD SCHLATTER

### INTRODUCTION AND PROCEDURAL BACKGROUND

This is an employment discrimination case that was filed by two former employees of Fremont County. Both plaintiffs were simultaneously terminated from their employment with the County. On August 24, 2005, District Judge Edward W. Nottingham ruled on defendants' Motion for Summary Judgment, and as a result of his ruling the claims remaining for both defendants are claims for denial of procedural due process under 42 U.S.C. § 1983, and breach of contract. Additionally, plaintiff Pam Foraker has a third claim remaining for denial of liberty interest under § 1983.

Plaintiff retained an expert named Jerry D. Boswell, D.B.A., CFA ("Boswell"), to evaluate plaintiffs' damages, and to offer opinions with regard to their monetary losses. His combined report with regard to both plaintiffs was prepared, and presumably submitted to defendants, on September 10, 2004.  *See* Defts' Mtn Excl, Ex. A.

Defendants deposed Boswell on October 22, 2004.  On November 30, 2004, plaintiffs provided to defendants a document prepared by Boswell that plaintiffs have entitled "Amendment Sheet."  <u>Id</u>., Ex. D.  The Amendment Sheet is 6½ pages long, and contains various corrections and additions to the substance of the answers that were given by Boswell during the course of his deposition.  Additionally, on or about the same date, defendants state that they received from plaintiffs a one-page document entitled "Opinion (Revised)," which purported to be further changes by Boswell to his opinion, but which is a bare one paragraph long, with no explanations for the changes.  <u>Id</u>., Ex. B, *and see* text of mtn at 22.  Finally, on January 27, 2005, Boswell prepared and submitted yet another report, this one entitled "OPINION, Revised as of January 27, 2005."  <u>Id</u>., Ex. E.

On March 1, 2005, defendants filed ther Motion to Exclude the testimony of Boswell from trial.  In their motion, defendants challenge the methodologies and calculations employed by Boswell, as well as the absence of data for certain of his conclusions.  Plaintiffs filed their Response on April 15, 2005, and defendants their Reply on May 9, 2005.  I took the motion under advisement pending the resolution by

Judge Nottingham of defendants' Motion for Summary Judgment.

On August 17, 2005, plaintiffs filed their "Motion to Amend Preliminary Pretrial Order and to Name an Additional Expert Witness." In this motion, plaintiffs state, "[i]n view of the fact that Defendants have challenged the qualifications, competence and conclusion of [Boswell], the Plaintiffs have retained another expert to do a similar analysis of the past and future wage losses of the Plaintiffs." Pltfs' Mtn Am. at 2, ¶ 5. Plaintiffs assert in their motion that they "wish to retain a second expert to substantiate the conclusions of Dr. Boswell which have been challenged or to use him as a replacement for the originally named expert." Id., ¶ 6.

Defendants have asked for a hearing on their Motion to Exclude, to which plaintiff objected. I conclude that the matter has been adequately briefed, and no hearing is necessary.

**Summary of ruling.** I conclude that plaintiffs have failed to provide any basis upon which to justify the submission of their expert's "Amendment Sheet" or "revised opinions," and I will disregard the contents of those documents. Based upon the testimony contained in Boswell's original opinion and deposition testimony, I conclude that his opinions are not competent or reliable, and I will grant defendants' Motion to Exclude Boswell as an expert.

I will deny plaintiffs' requests either to designate an additional expert, or to substitute an expert for Boswell.

**BOSWELL'S "AMENDMENTS" TO TESTIMONY**

3

**1**

**Boswell's "Amendment Sheet."** Plaintiffs' "Amendment Sheet" apparently is intended as an errata sheet that was submitted pursuant to the provisions contained in Fed.R.Civ.P. 30(e). The nature of Boswell's two "revised" opinions is never explained.

Defendants offer their objection to Boswell's corrections and additions at pages 21-22 of their Motion. They assert that Boswell's purported modifications are "lacking any explanation whatever of the basis for any such modifications." Defts' Mtn Excl. at 22. Defendants state that "[m]ost if not all, of these changes came about as the result of matters brought to Dr. Boswell's attention during his deposition," and they argue that "[i]t is not the job of the defense to correct all of Dr. Boswell's errors and miscalculations and then allow him to issue corrected reports only after his errors are uncovered by the defense." Id.

In response, plaintiff asserts that Boswell's changes to his report and testimony were not "improperly made." Plaintiff argues further:

> This is permitted under the Rules, and the Defendants cite no case law to suggest that it can't be done. We see nothing wrong with the fact that Dr. Boswell revised his figures to address the criticisms leveled against him at his deposition.

Pltfs' Resp. at 7.

Plaintiffs' reference to "the Rules" is presumably a reference to Rule 30(e), which addresses corrections to deposition testimony. Fed.R.Civ.P. 30(e). Rule 30(e)

4

does allow a deponent to make corrections to the transcript of his testimony following his deposition. The rule states, in part, "the deponent shall have 30 days . . . in which to review the transcript or recording and, if there are changes in form or substance, to sign a statement reciting such changes and the reasons given by the deponent for making them." Id.

However, plaintiff is attempting to stretch the rule to allow his expert the equivalent of a second deposition, without the burden of questioning by opposing counsel. The changes made by Boswell do not merely correct mistakes made by the reporter. They completely alter and reverse various of his answers and opinions. In one example out of numerous, Boswell answered a question during his deposition by saying, "[w]e've got to have at least 7,500 today." Def't's Mtn Excl., Ex. C, 42-11. In the Amendment Sheet, Boswell states, "We've got to have at least 3,669 today and invest it at 6 percent for 11.53 years to equal the 7,184." Id., Ex. D at 2. As a reason for the change, plaintiffs state, "Answer based on further research and review." Id.

The Tenth Circuit Court of Appeals has stated that "[a] deposition is not a take home examination." Garcia v. Pueblo Country Club, 299 F.3d 1233, 1242 (10th Cir. 2002).

> "The purpose of Rule 30(e) is obvious. Should the reporter make a substantive error, i.e., he reported 'yes' but I said 'no,' or a formal error, i.e., he reported the name to be 'Lawrence Smith' but the proper name is 'Laurence Smith,' then corrections by the deponent would be in order. The Rule cannot be interpreted to allow one to alter what was said under oath. If that were the case, one could merely

> answer the questions with no thought at all, then return
> home and plan artful responses."

Id., n. 5, *quoting* Greenway v. International Paper Co., 144 F.R.D. 322, 325 (W.D.La.

1992) (holding that Rule 30(e) may not be used to alter what has been said under

oath);*see also, e.g.,* Coleman v. Southern Pac. Transp. Co., 997 F.Supp. 1197, 1205

(D.Ariz. 1998) (a change in a deposition statement does not eradicate the deponent's

original answers); S.E.C. v. Parkersburg Wireless, L.L.C., 156 F.R.D. 529, 535 (D.D.C.

1994) (noting modern trend in which courts do not allow a party "to make any

substantive change she so desires" in deposition testimony); Rios v. Bigler, 847

F.Supp. 1538, 1546-47 (D.Kan. 1994) (stating that the court will consider only those

changes that clarify the deposition, and not those which materially alter it).

In Barlow v. Esselte Pendaflex Corp., 111 F.R.D. 404, 406 (M.D.N.C. 1986), the

court refused to consider a plaintiff's changes to her deposition because of the sheer

number of changes that she sought.  The court also noted that a large number of

changes places an inappropriate burden upon the court reporter who is responsible

for correcting any alleged errors in the transcript.  The reasoning in this case

illustrates the error of plaintiff's arguments.  That is, Rule 30(e) provides a vehicle for

litigants to correct what was reported in the transcript, not to create an entirely new

transcript.

The changes to the deposition that are attempted by plaintiffs' expert fall within

the abuses that are discussed in Garcia and the other cases.  The changes are a

6

patent effort to completely alter the responses that were made under oath, and an effort to provide additional testimony that is not subject to questioning by opposing counsel. For those reasons, I decline to consider any of the answers that are provided in plaintiff's Amendment Sheet, and I will ignore them the same as if the errata sheet was stricken.

**Boswell's "Revised" opinions.** Boswell's "revised opinions," dated November 30, 2004, and January 27, 2005, appear to be simply more of the same type of "correction" that Boswell attempted in his errata sheet. Plaintiffs nowhere state that the revised opinions are being offered pursuant to Rule 26(e).

Rule 26(a)(2)(B) states that expert witnesses must provide the court and opposing counsel with a written report that contains, among other things, "a complete statement of all opinions to be expressed and the bases and reasons therefore; the data or other information considered by the witness in forming the opinions; [and] any exhibits to be used as a summary of or support for the opinions." Fed.R.Civ.P. 26(a)(2)(B). In the circumstances of this case, counsel were directed to designate their experts and provide expert reports in accordance with the deadlines set in the scheduling order, or in accordance with any extensions that were granted, which would be the same circumstances for expert deadlines for every case that is filed in this district. Fed.R.Civ.P. 26(a)(2)(C).

The purpose of Rule 26(a)(2)(C) is to prevent unfair surprise at trial and to permit the opposing party to prepare rebuttal expert reports, to depose the expert in

7

advance of trial, and to prepare for depositions and cross-examination at trial. *See* Coles v. Perry, 217 F.R.D. 1, 4 (D.D.C. 2003) (noting that "the very purpose of the rule is nullified" when an expert "supplements" his report by addressing a new matter after discovery has ended). The Rule also prevents experts from "lying in wait" to express new opinions at the last minute, thereby denying the opposing party the opportunity to depose the expert on the new information or closely examine the expert's new testimony. *See* Keener v. United States, 181 F.R.D. 639, 641 (D.Mont. 1998).

In light of the purposes of Rule 26(a), Rule 37(c)(1) provides for the exclusion at trial of any information not disclosed pursuant to Rule 26(a), unless the failure to disclose is harmless, or if there was substantial justification for such failure. Fed.R.Civ.P. 37(c)(1). Plaintiffs have not articulated any facts that would bring Boswell's "revisions" within either of the exceptions to Rule 37(c)(1). Discovery began well over a year ago, and the deadlines for discovery and designation have long since passed. The next date in this matter is Judge Nottingham's final pretrial and trial preparation conference, and that date is October 14, 2005. No time remains for defendants to depose Boswell on the amendments and revisions to his conclusions.

Rule 26(e)(1) provides a limited exception to the deadlines that are provided in Rule 26(a)(2)(C), or, as in this case, the deadlines that are set by the scheduling orders. The rule requires that an expert witness supplement his report if he "learns that in some material respect the information disclosed is incomplete or incorrect and if the additional or corrective information has not been made known to the other

8

parties during the discovery process or in writing." Fed.R.Civ.P. 26(e)(1). The rule does not permit parties to file supplemental reports whenever they believe such reports would be desirable, or necessary to their case. Instead, the Rule permits supplemental reports only for the narrow purpose of correcting inaccuracies or adding information that was not available at the time of the initial report. Keener v. United States, 181, F.R.D. at 640. Specifically, supplemental reports are permitted under Rule 26(e)(1) only (a) upon court order; (b) when the party learns that the earlier information is inaccurate or incomplete; or (c) when answers to discovery requests are inaccurate or incomplete. Id.

Plaintiffs have not expressed or delineated the purpose for Boswell's revisions to his opinions. If plaintiffs are seeking to "supplement" Boswell's testimony or report pursuant to Rule 26(e)(1), neither they nor Boswell ever stated what new information was received that prompted Boswell to make the supplementation. If plaintiffs are seeking to "correct" either his deposition testimony or his report, Rule 26(e)(1) states that such corrections are proper only when the testimony or report "is incomplete or incorrect." If this is plaintiffs' intent, Boswell does not state, or does not state with particularity, what error he made, where the error appears in his testimony or report, the reason that he made the error, and the nature of the correction that he is making in his revised reports. At best, as asserted by counsel for defendants, all of the changes being made by Boswell appear to be little more than his morning-after efforts to answer the deposition questions of defense counsel better than he did

9

during the deposition. For these reasons, I will disregard Boswell's revised opinions, the same as if the revised opinions were stricken.

2

In summary, opposing counsel and the court are not obligated to pick through an array of errata sheets or "revised opinions" that contain answers that contradict or expand upon an expert report or deposition testimony in order to determine what the deponent's "true" answer is, and on what basis. An expert report is not a trial balloon, and a deposition is not a dry run or training session. Thus, for purposes of determining defendant's Motion to Exclude Boswell as an expert, I rely exclusively upon Boswell's expert report and his deposition testimony.

### DAUBERT AND KUMHO TESTS

1

Defendants challenge the scientific bases or methodologies which were utilized by Boswell. They argue that under the tests which are established in the Daubert and Kumho cases Boswell should be stricken as a witness. Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993); Kumho Tire Co. v. Carmichael, 526 U.S. 137, 119 S.Ct. 1167 (1999).

Plaintiffs argue, first, that Daubert does not apply to this case because, unlike the Daubert case, this case does not involve a question of causation. Pltfs' Resp. at 2-4. They argue, second, that the Daubert line of cases does not apply to expert opinions in the area of economics. Id. at 3. Third, they argue that defendants may not

10

dispute the reliability of Boswell's opinions unless defendants themselves present counter-opinions from their own expert. Id. Fourth, plaintiffs argue that an economist such as Boswell "merely calculates, using logical and accepted arithmetic formulas. . . ." Pltf's Resp. at 3. Finally, they assert that the methodologies and opinions contained in Boswell's initial report and deposition testimony satisfy any tests for reliability or admissibility under the rules – apparently meaning to refer to Rules 104 and 702 of the Federal Rules of Evidence.

I need not address plaintiff's first four arguments, except briefly. Counsel for plaintiff apparently is unfamiliar with Daubert, and with the line of cases that have emerged since Daubert was decided. To the extent that plaintiffs' first three arguments challenge the applicability of the Daubert principles to the expert testimony that is at issue here, I decline to address those arguments except to the extent that I describe Daubert and Kumho briefly below.

To the extent that plaintiffs assert in their fourth argument that Boswell, as an economist, "merely calculates" using "accepted arithmetic formulas," plaintiffs must recognize that expert testimony is unnecessary for such limited purposes. Rule 702 has three major requirements: (1) the proffered witness must be an expert; (2) the expert must testify about matters requiring scientific, technical or specialized knowledge; and (3) the expert's testimony must assist the trier of fact. See Paoli R.R. Yard PCB Litig., 35 F.3d 717, 741-42 (3rd Cir. 1994). Jurors can add and subtract, and if Boswell's sole function is to perform this role, plaintiffs do not need an expert.

11

However, the court is required by Daubert itself to address defendants' challenge to the reliability of Boswell's opinions. I do that below.

**2**

In Daubert, the United States Supreme Court held that trial courts must engage in a "gatekeeping" role with regard to the introduction of expert testimony. Daubert, 509 U.S. at 592-97. In considering scientific or expert testimony, the courts are concerned, in part, with the application of Rules 104 and 702 of the Federal Rules of Evidence.

> Faced with a proffer of expert scientific testimony, then, the trial judge must determine at the outset, pursuant to Rule 104(a), whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.

Id. at 592. Once the court is aware that scientific evidence is at issue, judges are obligated to ensure that "any and all scientific testimony or evidence admitted is not only relevant, but reliable." Id. at 589. The Court stated, "Rule 702 . . . clearly contemplates some degree of regulation of the subjects and theories about which an expert may testify." Id.

To carry out their role as gatekeeper, trial courts must weigh and evaluate the admissibility of expert testimony according to several factors, including the following: (1) whether the theory or technique at issue has been subjected to testing, (2)

12

whether the theory or technique has been subjected to publication and peer review,

(3) whether the theory or technique has a known or potential rate of error, and (4)

whether the theory or technique has achieved general acceptance in the particular

technical or scientific community. Id. at 593-94. The Supreme Court has emphasized

that "the test of reliability is 'flexible,'" and that the list of specific factors contained in

Daubert "neither necessarily nor exclusively applies to all experts or in every case."

Kumho, 526 U.S. at 141, 119 S.Ct. at 1171.

> Rather, the law grants a district court the same broad
> latitude when it decides how to determine reliability as it
> enjoys in respect to its ultimate reliability determination.

Id. at 142.

In the Kumho case, the Supreme Court was asked to decide whether the

gatekeeping role of a trial judge is limited to an evaluation of "scientific testimony"

only, or whether the same role should be performed with regard to all expert

testimony. The Supreme Court held that the language of Rule 702 "makes no

relevant distinction between 'scientific' knowledge and 'technical' or 'other

specialized' knowledge." Id. at 1174. Thus, Daubert's general principles apply to all

expert matters which fall within the ambit of Rule 702. Id. at 1175. Regardless of the

scientific or technical field from which an expert springs, the objective of the

gatekeeping requirement is "to make certain that an expert, whether basing testimony

upon professional studies or personal experience, employs in the courtroom the

same level of intellectual rigor that characterizes the practice of an expert in the

relevant field." Id. at 1176. The focus of the court's inquiry must be "solely on principles and methodology, not on the conclusions that they generate." Daubert, 509 U.S. at 594.

## CHALLENGES TO BOSWELL'S METHODOLOGIES

### 1. Calculation of present value.

One of the primary elements of damage for which plaintiffs seek recovery is future wage loss. Plaintiffs assert that as a result of their wrongful termination from employment by defendants, they have been compelled to accept employment at lesser pay and/or with decreased benefits.

Defendants challenge Boswell's methodology for computing plaintiff's future wage losses. They note that Boswell calculated the present value of future losses by multiplying plaintiffs' claimed current annual loss amounts by the number of future years of earnings they expect to experience. Defendants argue that Boswell's methodology for computing plaintiffs future wage losses is improper because in reducing their claims to present value he failed to consider either the growth rate (inflation) or the discount rate (interest). See Defts' Mtn Excl. at 7, and Ex. A at 4-5. Boswell states in his report:

> For the purpose of this appraisal of economic loss, future losses are adjusted upward at the same rate as the discount rate used to derive present values of the future losses. Therefore, the rates cancel each other. This methodology is known as the "net offset method."

Id., Ex. A at 5. Defendants point out that Colorado courts have explicitly rejected

14

Boswell's version of the "net offset method."  *See* <u>McDonald's Corp. v. Brentwood Center, Ltd.</u>, 942 P.2d 1308, 1311 (Colo.App. 1997); <u>Brady v. Burlington Northern Railroad Co.</u>, 752 P.2d 592, 594 (Colo.App. 1988).

In the <u>Brady</u> case, the Colorado Court of Appeals determined that an award for future monetary damages "must be adjusted to present value," and a jury must "receive evidence and appropriate mathematical guidance on the method of adjusting future losses to present worth." <u>Brady</u> at 594. The Court held that the fairest award of damages for future losses is that which takes into account both discount and inflation rates. "This computation allows the plaintiff to be made whole without receiving a windfall." <u>Id.</u>

The Court of Appeals stated that the inflation and discount rates must be demonstrated with competent evidence, and once either or both of these rates are established, the trial court may consider one of two "approved approaches" to the mathematical calculation.

> First, the "inflation-reduction" or "independent incorporation" method requires increasing the entire lump sum award by the compounded rate of inflation and then applying the discount rate to reduce the inflated sum.
>
> The second method, the "offset" method, requires that the inflation rate be subtracted from the discount rate, to achieve the "real" interest rate, which is then applied to the lump sum, with the result being added to or subtracted from the original lump sum.

<u>Id.</u> (internal citations omitted).

15

Finally, the Court acknowledged the existence of a third method, apparently the one adopted by Boswell. This method uses "a set formula which assumes a constant relationship between the two rates." Id. The Court stated:

> However, there is no logical basis for assuming that the discount rate and the inflation rate will net to zero. Therefore, we reject that approach, although recognizing that in a particular case the two rates could offset each other.

Id. (internal citation omitted); *see also* McDonald's, 942 P.2d at 1311 (holding that in a non-jury trial the trial judge must make explicit findings regarding the appropriate discount and inflation rates).

These cases appear to make clear at least two propositions. First, the party who seeks to establish the present value of a claim for future loss must present "competent evidence" of the rates for discount and inflation. Brady at 594. Second, no party may assume that the discount and inflation rates negate one another. Rather, competent evidence as to each of the rates must be presented, and only if the rates, *in fact*, negate one another may the jury be allowed to consider any methodology in the nature of a "net offset method." Id.

Plaintiffs argue that they "do not agree with this analysis." Pltfs' Resp. at 5. They quote from the Brady opinion (although without providing a citation to that opinion), where the court of Appeals stated:

> If neither party provides competent evidence of either the inflation rate or the discount rate, a lump sum award not adjusted for present value is appropriate. If competent

16

> evidence of the discount rate is presented but there is a
> failure of proof as to the inflation rate, the award must be
> reduced to present value with no adjustment for inflation.
> Similarly, if there is competent evidence as to the inflation
> factor but a failure of proof as to the discount rate, the lump
> sum must be adjusted only for inflation. Last, if competent
> evidence of both the discount and inflation rate is
> presented, the fact finder must consider both in computing
> the award.

Brady, 752 P.2d at 594 (internal citations omitted); and see Pltfs' Resp. at 5.

Plaintiffs are correct in their assessment of the legal principles that will govern

Judge Nottingham in his weighing of the instructions of law to be given to the jury,

depending upon the state of the evidence at the conclusion of the trial. But the motion

before me at this time is one to exclude the opinion of plaintiffs' expert, because he

failed to obtain and utilize any evidence at all with regard to the discount and inflation

rates. Instead, he merely assumed, without any evidence, that they would offset one

another. The Court of Appeals stated unequivocally that such a method for computing

present value is unacceptable and improper.

Plaintiffs argue that if defendants wish, they can present their own "evidence of

discount rates and inflation rates, and show that they would change the result. . . ."

Pltfs' Resp. at 6. Or, according to plaintiffs, "[i]n the alternative, Dr. Boswell can plug in

[defendants'] figures in a revised report, [but] in no case should these facts support a

disqualification of a witness." Id.

At this point, the test is not whether Boswell should be disqualified, but whether

he should be permitted to offer an opinion with regard to the present value of plaintiffs'

17

future losses. Neither his expert report nor the testimony he provided during his deposition provide any basis for him to be allowed to do so. Boswell failed to provide any competent evidence of either the discount or the inflation rate, and he used a legally improper methodology for calculating plaintiffs' future losses. Therefore, I will grant defendants' motion to prohibit Boswell from offering an opinion in regard to plaintiffs' future losses.

As plaintiffs have observed in their Response, and as pointed out by the Colorado Court of Appeals in Brady, "a lump sum award not adjusted for present value" may be the means by which they jury will determine any future losses that may be suffered by plaintiffs. Brady at 594. However, the calculation of such an award is little more than a mathematical computation, and no expert is required for such a purpose.

### 2. Loss of interest on Schmidt's retirement fund withdrawal.

Plaintiff Larry Schmidt claims that he withdrew $7,500 from his retirement fund with Fremont County for living expenses after he was terminated from his employment. As part of his damages, Schmidt claims that he has lost interest on the $7,500. Boswell projected an interest rate of 6 percent for determining Schmidt's losses as a result of his premature withdrawal of the $7,500, and computed the losses of interest to be $7,184. See Defts' Mtn Excl. at 12, and refs. to depo testimony cited there.

When asked, Boswell could provide no source or rationale for his use of 6

18

percent as the appropriate interest rate to use. Boswell testified that the basis for that rate was "not in my file. It's in my head." Id., Ex. C, p. 45, ll 1-17. Defendants argue that Boswell's use of 6 percent as the appropriate rate to assess is "no more than rank speculation." Id. at 12.

Defendants also argue that any losses Schmidt may suffer as a result of his withdrawal of these funds is a projection of a loss in future dollars. In defendants' view, Boswell cannot accurately project the amount of these losses unless he applies a discount rate to reduce Schmidt's losses to present value. Id.

Plaintiffs argue that defendants "make a highly technical argument concerning the discounting of future dollars to present value." Pltfs' Resp. at 6. In plaintiffs' view:

> This argument is best left to the finder of fact for adjustments but in no way relates to Dr. Boswell's ability to testify. We submit that this represents a present loss because the plaintiff is losing interest in this money and any use to which it may be put.

Id.

Plaintiffs' argument that Schmidt's loss is a "present loss," and therefore need not be reduced to present value, is simply not correct. Boswell himself was attempting to calculate the *projected* loss that Schmidt would suffer over a period of approximately 11 years as a result of the premature withdrawal of the funds. Losses that do not accrue until a date in the future, including such losses as wages, are future losses, and under Colorado law must be reduced to present value.

Plaintiff's argument that Schmidt's loss is a present loss because he is

19

"losing interest in this money *and any use to which it may be put*" simply misses the point of retirement funds. Under the tax laws that govern the use of retirement funds, Schmidt could not "use" any of his retirement funds (except in very particular exceptions) without penalty until age 59½. Plaintiffs may be correct in their argument that plaintiff was caused to suffer a tax penalty as a result of the premature withdrawal of the funds, and assuming that plaintiffs present competent evidence at trial as to the amount of the penalty that Schmidt suffered, the jury can do a computation of his loss. However, no expert is required or necessary for such a purpose.

The question for me to resolve is whether Boswell should be allowed to testify that Schmidt will lose $7,184, or any amount, as a result of his premature withdrawal of a portion of his retirement funds. First, Boswell provided no data with regard to his selection of 6 percent as the rate to be applied in calculating Schmidt's loss over time, and I fail to understand why Boswell selected an interest rate apparently out of thin air. For example, Boswell could have looked to the past performance of Boswell's retirement fund for an appropriate rate of gain over a certain number of years. That would provide, at the very least, a data base upon which justified projections could be made in regard to future losses. Whatever his reasons, Boswell failed to provide *any* justification for his selection of 6 percent as a rate of gain.

Second, Boswell also failed to reduce Schmidt's future losses to present value. Thus, he failed to follow either of the methods that the Colorado Court of Appeals has determined are the proper means by which to calculate the value of a

20

party's future loss, that is, the "inflation-reduction" method, or the "offset" method. Brady, 752 P.2d at 594.

In summary, in attempting to calculate Schmidt's losses as a result of his premature withdrawal of retirement funds, Boswell has failed to provide any justification for his use of 6 percent as the multiple for future losses, and has failed to utilize a proper methodology under Colorado law. For these reasons, I will grant defendants' motion to prohibit Boswell from offering an opinion on Schmidt's alleged loss of interest.

### 3. Foraker's future wage losses.\

The data and calculations that are contained in Boswell's report and deposition testimony in regard to Foraker's claimed future wage losses are very difficult to understand. In reaching conclusions about Foraker's future wage losses, Boswell appears to have relied upon a limited sample of wage growth for Foraker in her employment with the County, used a number for percentage increase in wages (i.e., 7 percent) that had no basis in any evidence or any standards that were acceptable in Boswell's profession, and in making calculations for wage growth ignored the data that he himself provided. In comparing and calculating the difference in wage growth between Foraker's employment with the County and her subsequent employment with Re/Max, Boswell used percentage increases in wages that had no basis in any known evidence, and ignored a percentage increase in Foraker's wages at Re/Max that *did* have a basis in the known evidence.

21