Foraker was terminated from her employment with Fremont County approximately two-thirds of the way through 2002. At the time that she was terminated, her W-2 reflected that she had earned $14,367. Based upon those earnings, Boswell calculated that Foraker would have earned an additional $7,684 through the end of 2002 for total earnings in 2002 of $22,051. *See* Defts' Mtn Excl., Ex. C at 58:5-7.

Boswell states that if Foraker had remained with the County, her wages there would have increased by 7 percent from 2002 to 2003. Id. at 57, 6:12. However, he also states that plaintiff's expected earnings with the County for 2003, had she remained employed there, would have been $24,524. This number, Boswell admitted, represents an increase in her wages of $2,473, which is a percentage increase of slightly over 11 percent. Id. at 58:17-24. The percent of increase that Boswell claimed that Foraker would enjoy, 7 percent, is in conflict with the actual increase in salary that Boswell calculates. No explanation for the conflict is ever provided.

Boswell points to no accepted standard, no study, and no part of the evidence that had been provided to him that would justify his selection of 7 percent as the anticipated growth rate for plaintiff's earnings. Counsel for plaintiff states in his Response that from 1991 to 2002, plaintiff had received annual "performance increases" of 2 percent, and "from time to time, the County adjusted wages for cost of living and other reasons as well." Pltfs' Resp. at 7. In response to questions from

22

defense counsel, Boswell stated that his figure of 7 percent was based upon "5 percent cost of living and 2 percent based on performance." Id. at 57:9. However, in reviewing Boswell's report and deposition testimony, I find no evidence that Boswell had obtained any such data from any of the information that had been provided to him. Foraker's annual wage increases before 2002 appear to have been more in the nature of increases of 3 to 4 percent. See id., Ex. A (Boswell report) at 8. If the number "7" has no basis in the evidence or any known and accepted growth rate, it cannot provide a reliable basis from which to determine projected wage losses.

Even if the figure of 7 percent was supported by some rational basis, Boswell himself ignored this figure, and calculated Foraker's future wage losses using some different, and unexplained basis. Using the figure of 7 percent, Foraker's annual wages would not grow from $22,051 to $24,524 between 2002 and 2003. Boswell is unable to explain the discrepancy between his selection of 7 percent as the multiple for Foraker's earnings growth, and an increase in salary of $2,473. Id., Ex. C at 60:69-61. He states at one point that the difference springs, in part, from the fact that he was not using $22,051 as the base number for plaintiff's earnings in 2002, but was using instead $23,051. However, Boswell never states why he did not use the numbers that he himself provided for Foraker's earnings ($14,367 for part of 2002, and a projection of $7,684 for the remainder of the year, for a total of $22,051), and uses instead the number $23,051. Boswell pointed to nothing in the evidence, or even in his own computations, to support his use of the latter figure as the amount Foraker would

23

have earned in 2002.

I would stress that I am unconcerned with the outcome of the numbers that are reached in any of the calculations or computations. Defendants have challenged the methodology employed by Boswell in charting Foraker's percentage increase in wages over time, and, in response to the challenge, Boswell has provided no rational explanation for his selection of certain numbers, such as 7 percent as his multiple for income growth, no rational explanation for an earnings growth of 11 percent instead of 7 percent between 2002 and 2003, and no explanation at all for his use of an earnings figure for 2002 that was $1,000 higher than the total of the numbers that he himself had provided as Foraker's earnings for 2002.

In projecting the difference in earnings between what Foraker would earn at Re/Max, as opposed to what she would have earned at the County, Boswell testified that she would suffer an income differential of $2,000 per year. *See*, id., Ex. C at 61:16 to 63:11. Boswell provided no basis at all for his use of this number, and the evidence and data available to him, including data that he himself provided, suggested that the differential would be less than $2,000 per year.

For 2004, Boswell calculated Foraker's earning loss for the first eight months at $997. Id. at 61:16-22. Projecting that loss forward to annualize her losses for 2004, Boswell determined that she would suffer a difference in pay at Re/Max of $1,300. Id. 62:9-10. However, Boswell nowhere provided an explanation for why, going forward in time, Foraker would suffer a differential in pay of $2,000 per year, as

24

opposed to the $1,300 per year that he had actually calculated.  The $2,000 per year
was based upon no data, and upon no calculation.

Boswell also acknowledged that Foraker's salary at Re/Max between October
15, 2002 and November 21, 2003 increased from $19,250 to $23,500, a gain of 22
percent in earnings.  Id. at 67:7-23.  Although admitting that Foraker's earnings at
Re/Max had increased by 22 percent, Boswell admitted that he ignored this data in
reaching his conclusion in regard to the alleged difference between Foraker's
earnings at the County as opposed to her earnings at Re/Max.  However, he provided
no reason or justification for this decision.  He merely determined that the figure of 22
percent was not entitled to "much weight."  Id. at 68:11-12.

Defendants also challenge Boswell's conclusions in regard to Foraker's
potential for earnings at the County, because Boswell failed to "consider the possible
effects of the Colorado Taxpayer Bill of Rights, commonly referred to as TABOR."
Defts' Mtn Excl. at 16.  In defendants' view, Foraker's earnings would be subject to
decreases or reductions because of the possible effects of TABOR on county
budgeting decisions.

Contrary to defendants' argument on this point, I do not agree that Boswell's
failure to consider TABOR in determining Foraker's wages at the County undermines
the reliability of Boswell's computations.  I agree that TABOR is a factor that an
economist could, or even should, consider in weighing the prospects for increased
wages from a public employer, but I disagree that this factor can be reduced to a

25

number or a percent that can be applied against any projected wages. Rather, TABOR is simply one of those factors that provide fodder for the cross-examination of any expert who has attempted to calculate the future wages of a person who was employed by a public agency.

In summary, Boswell's opinions in regard to Foraker's projected earnings at the County are not supported by any data, or by any standard that is accepted by professionals in Boswell's field. His selection of 7 percent as a multiple for earnings' growth is not supported by any evidence available to him, and is even undermined by the history of earnings that he provides as a part of his report. Boswell's opinion that Foraker will suffer a difference in pay of $2,000 for the next 24 years is supported by no data or evidence, and is even contradicted by Boswell's own calculations of her losses at Re/Max, and by the data that reflects a percentage increase of earnings at Re/Max of 22 percent over her initial earnings period.

Therefore, I conclude that Boswell's opinions in regard to Foraker's projected income losses lack the degree of validity and reliability that is associated with professionals in the area of economics, and he has failed to demonstrate the "same level of intellectual rigor that characterizes the practice of an expert in the relevant field." Kumho at 1176. For those reasons, I will grant defendants' motion to prohibit Boswell from offering an opinion in regard to Foraker's projected income losses.

### 4. Differences in employers' matching contributions to retirement.

Foraker contributed to the County retirement plan while she was employed

26

there, and contributed as well to the plan that was available to her at Re/Max. Boswell received information from Foraker that she received matching contributions from the County of 4 percent, and matching contributions from Re/Max of 3 percent, a difference of 1 percent. Nevertheless, he calculated Foraker's loss of retirement benefit the same as if she was receiving 2 percent less at Re/Max than she had received at the County, instead of 1 percent.

While being deposed, Boswell appeared to admit that he had used the wrong percentage multiple in order to calculate Foraker's losses in regard to her retirement benefits. When asked why he used 2 percent instead of 1 percent, when his notes reflected that the difference was only 1 percent, Boswell answered, "[o]ffhand, I can't think why I did that. * * * I'll have to review it, but it probably should be 1." Defts' Mtn Excl., Ex. C at 82-83.

The attorneys for both sides acknowledge that Boswell corrected his error in one of his revised opinions. However, for the reasons stated above, his revised opinions have been stricken from my consideration of Boswell's expert opinions. Thus, for whatever reason, Boswell used the wrong percentage multiple to calculate for Foraker the difference between the County's plan and the plan with Re/Max.

Boswell's calculation of Foraker's claimed loss in regard to retirement benefits lacks credibility or reliability, and, as I stated previously, an expert report is not a trial balloon, nor is a deposition a training session. Therefore, Boswell will not be permitted to offer an opinion on this matter.

27

### 5. Schmidt's future wage losses.

#### (a)

After being terminated by the County, Schmidt began working for Reynolds Construction earning $15.00 per hour. Boswell sought to determine the future losses in wages that would be suffered by Schmidt as a result of this re-employment. He stated in his report that his conclusions with regard to future wage losses for Schmidt were based upon a comparison of Schmidt's last earnings at the County, annualized to reflect a full year, and his first year earnings at Reynolds, again annualized to reflect a full year. In his report, Boswell stated:

> The loss of future earnings is based mainly on the difference in annual wage levels between what he was earning at the appraisal date [September 1, 2004] and what is estimated he would have been earning with the County at the same date, absent his termination, with a difference in annual wages of about $9,764 plus additional factors related with construction, e.g., weather, time between projects, and the general uncertainty of the business comprising an additional 10% of his wage level ($2,980). The two amounts total $12,744. It is assumed that this difference would extend throughout his remaining worklife of 11.53 years. Therefore, the estimated future earnings loss is calculated as $146,938 (2004 present value).

Defts' Mtn Excl., Ex. A at 4 (parentheses in original).

Defendants challenge Boswell's methodology in reducing Schmidt's hourly wage from $15.00 per hour to $14.33 per hour. They argue that Boswell had no basis, or used an improper basis, to reduce Schmidt's hourly wage. They point out

28

that this reduction may be only .67 cents per hour, but over Schmidt's projected employment life of 11.3 years the .67 cents causes a difference in outcome of over $16,000. *See* Defts' Mtn Excl. at 18.

I agree that Boswell used an improper methodology for calculating Schmidt's future wage losses. However, I disagree, in part, with the basis upon which defendants challenge his methodology.

The formula used by Boswell to determine Schmidt's future wage losses is meaningful and understandable. That is, Boswell stated that he annualized Schmidt's earnings at both the County and Reynolds, and subtracted one from the other, resulting in a number that reflects the difference in annual wages between 2003 and 2004. Boswell calculated the difference in annual wages to be "about $9,764. Id.

Beyond his rather basic formula for determining a wage differential, Boswell's numbers and computations become utterly confusing and conflicting. Indeed, in calculating Schmidt's future wage losses, Boswell appears not to have followed the basic formula with which he allegedly began, and pursued instead some unstated methodology.

Boswell does not provide in his report the number that he determined would represent Schmidt's annualized earnings at Reynolds for 2004. However, using the data provided by Boswell in his report, I would be compelled to conclude that Schmidt's annualized earnings at Reynolds for 2004 were $24,493. That is the net

29

result that is reached when $12,744, the figure that Boswell determined was the difference in pay between the two employers, is subtracted from the annualized wages earned by Schmidt at the County, which were $37,237 ($37,237 - $12,744 = $24,493). However, that is not the number that Boswell actually calculates for Schmidt's annualized earnings.

Boswell testified during his deposition that he, in fact, had actually calculated Schmidt's annualized earnings at Reynolds, and the number he reached was $29,799. See Pltfs' Resp., Ex. 3 (Boswell depo) at 87-88; see also Defts' Mtn Excl., Ex. C at 85:6-11; 89:21. Thus, the number that Boswell actually calculates for Schmidt's annual earnings at Reynolds is over $5,000 greater than the number that results when you follow the formula that he provides in his report. That number, as noted, is $24,493.

To obtain the number that would reflect Schmidt's annualized earnings at Reynolds, i.e., $29,799, Boswell used the figure that represented the wages that Schmidt had actually earned between January 13 and August 31, 2004. Schmidt's pay receipts reflected that he had earned gross pay of $19,125 for that 7½ month period. Boswell then, apparently, extrapolated from Schmidt's earnings of $19,125 for the 7½ months, and reached annualized earnings of $29,799. Id. This set of computations is understandable and makes sense, as far as it goes.

Taking Schmidt's annualized earnings at the County of $37,237, and subtracting from that number his wages at Reynolds of $29,799, leads to $7,438, not

30

$9,764 as calculated by Boswell. In fact, I cannot find anywhere in Boswell's report any basis or source for the number $9,764, and Boswell has provided no explanation of the methodology that he utilized in order to obtain that number.

Boswell states in his report that he reduced Schmidt's earnings at Reynolds by 10 percent in order to reflect what he referred to as factors associated with "weather, time between projects, and the general uncertainty of the business...." Id., Ex. A at 4. Boswell applied the 10 percent against Schmidt's annualized wages of $29,799 to obtain the figure $2,980, and concluded that his annualized salary should be reduced by that amount. Id. Thus, in Boswell's view, Schmidt's salary is $2,980 less than what Boswell calculated Schmidt's *actual* annualized salary to be, or $26,819 instead of $29,799. However, the figure of $26,819 appears nowhere either in Boswell's report, or in his deposition testimony.

Boswell was asked during his deposition to provide the data or source that would justify his use of 10 percent as a percentage for the alleged "downtime" for Schmidt. Boswell admitted that he did not have any data to support such a conclusion, either from Schmidt or from Reynolds. In Boswell's words, the use of 10 percent was "a subjective estimate on my part." Defts' Mtn Excl., Ex. C at 90:10.

First, an expert cannot pick numbers out of the air, with no supporting data, study or evidence of any type. Without some evidence that Reynolds' employees, including Schmidt, typically work less than 100 percent of the days that are contained in a work year, Boswell's use of his 10 percent figure is purely speculative. Counsel

31

for plaintiff defends Boswell's 10 percent reduction by stating that such a loss of days or hours of work is "a fact that is well known in the industry." Pltfs' Resp. at 10. Well known or not, plaintiffs' expert is nevertheless required to point to *some* basis for what is otherwise an unjustified assumption.

Second, even if Schmidt could be expected to have downtime of 10 percent, that 10 percent of downtime already is contained in Boswell's calculations of Schmidt's annualized earnings, and Boswell's method for the use of this 10 percent has the effect of reducing Schmidt's earnings at Reynolds by a *second* 10 percent.

As described above, Boswell calculated Schmidt's annualized earnings at Reynolds to be $29,799. He reached that number by starting with Schmidt's actual earnings from January 13 to August 31, 2004, which he found to be $19,125. Id., Ex. A at 8 (Ex. III to report). If Boswell is correct in assuming that construction workers will work 10 percent less because of factors associated with that industry, then by August of 2004 Schmidt had, in fact, worked 10 percent less than he otherwise could have worked if he were not employed in construction. In other words, assuming 10 percent fewer work days, Schmidt's pay of $19,125, is *ipso facto* ten percent shy of what he could have earned, had he worked every day. To view his earnings any other way is to conclude that between January and August he was *not* working fewer days than 100 percent.

Thus, even if Boswell's assumption about 10 percent downtime was correct, Schmidt's pay by the end of August already contained within it the reduction of 10

32

percent for days lost through weather and other factors.  Because Boswell used this eight months of pay to extrapolate an annualized salary for Schmidt, then his projections for the remaining four months necessarily contained the same *pro rata* reduction of 10 percent.

In summary, apart from the fact that Boswell has no justification in any data or evidence for applying *any* 10 percent reduction to Schmidt's pay for downtime, Boswell certainly can provide no rational basis for applying a *second* 10 percent reduction.  The second 10 percent reduction, standing alone, represents a total reduction of Schmidt's actual projected earnings over 11.53 years of $34,359 (11.53 x $2,980 = $34,359).

Boswell has provided no evidence that he followed his own methodology in attempting to determine Schmidt's future wage losses.  If Boswell subtracted the number that he determined to be Schmidt's salary at Reynolds, $29,799, from what he determined to be Schmidt's salary at the County, $37,237, he should have reached a net salary differential of $7,438 ($37,237 - $29,799 = $7,438).  Instead, he obtained a number that appears to have no justification, $9,764.  Boswell then added this latter number to the 10 percent reduction that he created, $2,980, and reached a total salary differential of $12,744.  Over a period of 11.53 years, Boswell's number results in lost future wages of $146,938 (11.53 x $12,744 = $146,938).  Using the figure of $7,438 as the actual difference in annualized salary for Schmidt, he would have future wage losses of $85,709.  Boswell has not justified his number for future wage losses by

33

any methodology, or by any references to the data that had been provided to him.

**(b)**

Defendants assert that Boswell calculated Schmidt's 2004 earnings at

Reynolds based on a wage of only $14.33 per hour, as opposed to the $15.00 per

hour wage at which Schmidt had been hired. They reach this conclusion by

assuming that a work year is 2,080 hours, and by pointing out that 2,080 hours

divided into Schmidt's annual earnings of $29,799 yields $14.33 per hour. They

argue that this conclusion by Boswell means that he has effectively understated

Schmidt's earnings by $.67 per hour. In defendants' view, $.67 per hour may not

seem like much, but when projected over Schmidt's employment life of 11.53 years, it

totals approximately $16,000. Defendants argue that Boswell has understated

Schmidt's earnings in this regard by at least $16,000. Defts' Mtn Excl. at 18; *see also*

Boswell depo., Pltfs' Resp., Ex. 3 at 88. They argue that Boswell has provided no

explanation for this error. Id.

I agree that Boswell's decision to divide Schmidt's annualized earnings at

Reynolds by the total number of hours worked in a normal, full employment year to

reach an effective hourly salary for Schmidt is a methodology that cannot be justified.

First, Schmidt's hourly wage is undisputed, and it is $15,00 per hour, not $14.33.

Second, Schmidt's so-called effective hourly wage cannot be determined by dividing

his actual annualized earnings of $29,799 by the number of hours in a normal work

year. If Schmidt were a salaried employee, as opposed to an hourly employee, such

34

a calculation would yield an effective hourly wage.  But Schmidt is admittedly not a salaried employee, so the calculation is completely meaningless.

### (c)

In summary, Boswell has failed to demonstrate an appropriate methodology, or that he followed an appropriate methodology, for the calculation of Schmidt's future wage losses.  For these reasons, I will grant defendants' motion to prohibit Boswell from offering an opinion with regard to any alleged future wage losses that may be suffered by Schmidt.

### 6. Loss of fringe benefits.

Boswell states in his report that Foraker and Schmidt both suffered past and future losses of fringe benefits as a result of their terminations from employment with the County, and re-employment with employers who offered less valuable, or no, fringe benefits.  In his report, Boswell does not name these fringe benefits, but states that they are the "specific items[] as set out on page 58 in the County's "Personnel Policies & Procedures."" Defts' Mtn Excl., Ex. A at 5.  In his deposition, he agrees with counsel's summary of those benefits as holidays, vacation and sick leave.  Id., Ex. C at 92:20-23.

Boswell added the benefits with regard to each plaintiff, and reached a number that represented the amount that each plaintiff lost in past fringe benefits, that is, from the date of termination to the date of Boswell's appraisal, which was September 1, 2004.  For Foraker, that number is $13,578, and for Schmidt it is $23,782.  Boswell

then did a calculation to determine the amount that each would lose over the years of their projected employment life.  For Foraker, that number is $127,507, and for Schmidt it is $106,480.

Defendants argue that Boswell has utilized an improper methodology for his calculation of plaintiffs' losses in regard to fringe benefits.  In their view, Boswell counted plaintiffs' fringe benefits twice.  They point out that Boswell admits that the amounts attributable to fringe benefits are contained within plaintiffs' respective salaries.  Id. at 94:2-7.  In their view, that is counting the fringe benefits once.  They argue that Boswell's addition of these benefits to plaintiffs' wage losses is a second counting of the amounts represented by the fringe benefits.

First, Boswell did not provide in his report or in his deposition testimony any evidence of the computations that he made in reaching the various numbers that he projects in regard to plaintiffs' alleged losses of the economic value of fringe benefits.  He has not provided the values that he attributes to each of the benefits, and the manner in which they can be carried forward over time as losses.  His methodology for reaching his numbers remains a mystery.

For example, many employers limit the number of days or hours of vacation or sick days that an employee may "bank," and require employees to use a certain number of days per year or lose them.  Boswell does not explain how an employee can both take all, or a part, of his or her vacation days, but expect to be compensated for them again after having "used the value of those days," as it were.  Additionally,

36

upon an employee's termination from employment, many employers will pay to the employee – in addition to the final pay check – the value of a certain number of vacation or sick days. Boswell does not provide any data that would reflect whether this occurred in regard to plaintiffs when they were terminated from employment with the County. In other words, Boswell's numbers for the losses of back fringe benefits does not provide an accounting for any additional compensation that may have been provided, or not provided, to plaintiffs in their final statements of earnings. Boswell appears to be of the opinion that the values of the fringe benefits for plaintiffs remains the same, whether they have used their benefits or not, and whether they have been previously compensated for them or not, but he has failed to provide any explanation of the methodology that he utilized in order to reach such conclusions.

Second, I agree with the arguments of defense counsel. Boswell has failed to provide a methodology that would demonstrate the validity of his conclusion that the value of the fringe benefits to plaintiffs was "an economic benefit" that can be *added* to their salaries. Id. at 95:8. Boswell states that plaintiffs had an "economic benefit" through their abilities to take off work on holidays, yet be paid for those holidays. Id. at 95-96.

Counsel for plaintiff attempts to explain this problem by arguing that defendants "fail to understand that a person who is on vacation can secure other employment during that time to supplement his income. Indeed, many people do just that in our society, and benefit with a 'double income' during vacation time." Counsel

37

provided no data to support this conclusion, and in the absence of any data his statement is nothing more than conclusory speculation on his part.

In summary, in calculating plaintiffs' alleged losses in regard to fringe benefits, Boswell failed to provide explanations of his methodologies, failed to provide the data that he utilized in making his computations, and failed to provide a depiction or explanation of the computations that would lend support to his conclusions. For that reason, I will grant defendants' motion to exclude Boswell's opinions in regard to plaintiffs' alleged losses in regard to fringe benefits.

### 7. Proper rate of pay for Schmidt's lost paid time off.

While Schmidt was employed by the County, he continued to earn his salary for holidays, even though he did not work. At Reynolds Construction, Schmidt earned no pay for the holidays that he did not work, such as the 4th of July. As a result of this difference in compensation schemes, Boswell attempted to determine the amount of the loss that was suffered by Schmidt because he was no longer paid for certain holidays or days off.

Boswell determined that Schmidt's effective hourly rate while he was working at the County was $19.02 per hour. He reached this number by dividing Schmidt's annual salary of $37,237 by 2,080, the normal number of work hours in a year. After determining that Schmidt's rate of pay at the County was $19.02 per hour, Boswell concluded that Schmidt's loss at Reynolds Construction for holidays that he did not work, and for which he was not paid, was $19.02 per hour. *See generally*, Defts' Mtn

Excl., Ex. C at 99-100.

Defendants challenged Boswell's methodology and conclusion. In their view, "[t]here is no justification whatever for using more than $15.00 per hour, Mr. Schmidt's hourly rate at Reynolds Construction." Id. at 21. They argued that Schmidt's compensation for paid holidays was already contained within his annualized salary with the County. Thus, they assert, when Boswell deducts the equivalent of a day's pay at the rate he made as a County employee, Boswell has, in effect, duplicated Schmidt's loss in earnings for the difference in pay between $19.02 and $15.00 per hour, which is approximately $4.00 an hour, for the uncompensated days that Boswell counted. Defendants argue that Schmidt earned $15.00 per hour working at Reynolds. Therefore, his losses for uncompensated holidays should be calculated at $15.00 per hour.

Neither Boswell nor defendants have provided explanations that adequately explain to me why one methodology or the other yields the more accurate determination of loss in these circumstances. However, plaintiffs have the burden to demonstrate the reliability of Boswell's opinions, and I, therefore, conclude that they have failed to meet their burden in regard to this issue.

Additionally, Boswell appeared to have contradicted his own opinion in response to questioning from defense counsel, and his contradictions undermine the reliability of his opinion. During his deposition, the following two discussions occurred:

39

Q      Okay.  Let's assume that [Schmidt] takes the 4th of

July off in his current job.  How much is he out?

A      He's out the – whatever his wage rate is for those

eight hours.

Q      $15 an hour; is that not right?

A      Right.

Id., Ex. C at 98:18-24.

And at another point in the deposition, Boswell testified as follows:

A      The County, he would get the holiday. * * *  He would

get the holiday and be paid for it at the $19.02 rate.  With

Reynolds, he takes a holiday and he gets nothing.

Q      And that nothing represents how much an hour?

A      $15 an hour.

These remarks by Boswell seem to indicate that Schmidt's losses, if any, for

uncompensated holidays and other days, after commencing employment with

Reynolds, should be measured by the rate of pay that he received from Reynolds, and

not the County.  If that is the meaning of Boswell's remarks, it appears to contradict

Boswell's theme, that the losses should be measured in accordance with the rate of

pay that Schmidt received at the County.

In summary, plaintiffs have failed to demonstrate the reliability of the theory of

damages upon which Boswell relies in regard to uncompensated days off, and

40

Boswell's remarks during his deposition appear to reflect his own uncertainty with his theory.  For these reasons, I will grant defendants' motion to prohibit Boswell from offering an opinion that Schmidt's losses for uncompensated days off should be calculated through reference to Schmidt's salary at the County.

### SUMMARY OF RULING

Whether my rulings address all of the opinions that have been offered by Boswell is not clear to me.  However, in light of the fact that I have determined that Boswell's opinions are unreliable in regard to the major points that are addressed by him, I conclude that his opinions, taken as a whole, do not meet the standards for reliability that are described in Daubert and Kumho.  Therefore, I will grant defendants' motion to exclude the testimony of Boswell from trial.

I hasten to add that I blame Boswell less for his errors than I blame counsel for plaintiffs.  The errors presented in Boswell's report are the type of errors that counsel could have, and should have, caught and discussed with Boswell before the report ever was provided to counsel for defendants.  For example, I do not fault Boswell for failing to know that in determining future losses the Colorado appellate courts require an expert to reach an explicit determination of the inflation and discount rates.  Rather, this is an error that should have been captured and corrected by counsel.  Similarly, the failed effort to "correct" Boswell's deposition testimony through the use of an "Amendment Sheet" or "Revised Opinions" is an effort that counsel should have known would be fruitless.  The same may be stated with regard to Boswell's hunch

41

that a construction worker has downtime equal to 10 percent of the total possible hours that may be worked. Counsel for plaintiffs could have, and should have, corrected that speculation by Boswell either by eliminating it, or by conducting an investigation to obtain data to support it.

## PLAINTIFFS' "MOTION TO AMEND PRELIMINARY PRETRIAL ORDER
## AND TO NAME AN ADDITIONAL EXPERT WITNESS"

On August 17, 2005, plaintiffs filed a motion in which they asked the court to amend the preliminary pretrial order and to name an additional expert witness to testify with regard to damages, namely, Jerome C. Darnell. Plaintiffs state in their motion, "[i]n view of the fact that defendants have challenged the qualifications, competence and conclusion of this expert, the Plaintiffs have retained another expert to do a similar analysis of the past and future wage losses of the Plaintiffs." Pltfs' Mtn Am. at 2. Plaintiffs state that they wish to use the second expert either "to substantiate the conclusions of Dr. Boswell which have been challenged or to use him as a replacement for the originally named expert." Id.

I find that plaintiffs have not sought to add Darnell as an expert in timely fashion. For that reason, I will deny their motion.

Plaintiffs' Motion to Amend reflects an awareness on their part that the challenges leveled at Boswell's opinions by defendants had sufficient merit to them to cause plaintiffs to be concerned about the potential that defendants' motion to exclude Boswell as an expert would be granted. As a result of this concern, plaintiffs

42

seek through their motion to provide a means whereby, regardless of the outcome of defendants' motion to exclude Boswell, they will have an expert on damages -- if not Boswell, then Darnell.

Defendants' Motion to Exclude was filed on March 1, 2005. The evidence and arguments in regard to Boswell were available to plaintiffs at that time. If plaintiffs were nervous about the outcome of defendants' motion, the time to act upon that concern was shortly after the filing of the motion. Instead, plaintiffs waited almost 6 months before filing their motion to name an expert to serve in lieu of Boswell if defendants' motion was granted.

At this stage, the preliminary pretrial order has been completed, and Judge Nottingham is now set for his final trial preparation conference on October 14. At that conference, he frequently sets his cases for trial in a very expeditious manner, and at a relatively early date. If plaintiffs' motion was granted, an entirely new round of discovery would be necessary, including, at the very least, the potential need for defendants to designate a rebuttal expert, a new round of depositions, and, very possibly, another set of Daubert motions, with the attendant needs for hearings and/or rulings. These activities could have the effect of extending this case at least for another six months or more. Had plaintiffs filed their motion in timely fashion, including a timely designation of Darnell as their new expert, the need to re-open discovery and extend this case by six months could have been avoided.

I am aware that the striking of an expert because of an untimely designation is

43

a drastic action.  <u>Summers v. Missouri Pacific Railroad System</u>, 132

F.3d 599, 604 (10th Cir. 1997).   Before taking such an action, the

Tenth Circuit has directed trial judges to consider four factors:

> (1) the prejudice or surprise in fact of the party
> against whom the excluded witnesses would
> have testified, (2) the ability of that party to
> cure the prejudice, (3) the extent to which
> waiver of the rule against calling unlisted
> witnesses would disrupt orderly and efficient
> trial of the case or of other cases in court, and
> (4) bad faith or willfulness in failing to comply
> with the court's order.

<u>Id</u>.  Here, the lateness of the effort by plaintiffs to add or substitute

Darnell as their expert has undermined the ability of the court to cure

plaintiffs' problem, ameliorate the obvious prejudice to defendants

and preserve the orderly and efficient trial of this case.  The pretrial

order is done, discovery is closed, and Judge Nottingham is set to

schedule the trial in this matter.  Plaintiffs are asking for the

equivalent of a "do over," and their request simply has come too late.

*See, e.g.*, <u>Mounger v. Goodyear Tire & Rubber Co.</u>, 2000 WL

1466198 *3 (D.Kan. 2000) (expert report stricken for failure to

comply with the disclosure requirements of Fed.R.Civ.P. 26(a)(2)(B)).

Plaintiffs argue that Rule 26 "allows the disclosure of experts at

least 90 days before trial," citing Federal Rules of Civil Procedure

26(a)(2)(c).  However, the preceding text of that rule states that

expert disclosures may be made within 90 days of trial "[i]n the

absence of other directions from the court. . . ." Fed.R.Civ.P. 26(a)(2)(c). When the court sets deadlines for the designations of experts, as has been done in this case in the Scheduling Order, the disclosures of experts is to be accomplished in accordance with the terms of the Scheduling Order, and not according to the time allowed by the rule. This is the procedure that is followed for virtually all cases that are filed in this district.

Plaintiffs argue that a refusal by the court to allow them to add Darnell as an expert would result in a "manifest injustice." Pltfs' Mtn Am. at 2. At this point, Judge Nottingham is the only party who can determine whether manifest injustice can only be avoided through the granting of plaintiffs' motion. I decline to make such a finding.

## CONCLUSION

It is therefore ORDERED as follows:

1. Defendants' Motion to Exclude the Testimony of Plaintiffs' Expert Witness Jerry Boswell from Trial [filed March 1, 2005] is GRANTED.

2. Plaintiffs' Motion to Amend Preliminary Pretrial Order and to Name an Additional Expert Witness [Doc. 75, Filed August 17, 2005] is DENIED.

3. Defendants' Motion for a Hearing on Motion to Exclude Testimony [Doc. 73-1, filed August 16, 2005] is DENIED AS MOOT.

Dated at Denver this day of September 8, 2005

BY THE COURT:

s/ O. Edward Schlatter
_____
O. Edward Schlatter
U.S. Magistrate Judge