Westlaw.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 1998 WL 673595 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d)

EXHIBIT
A-13

Page 1

**H**
Briefs and Other Related Documents
Otis v. Doctor's Associates, Inc.N.D.Ill.,1998.Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois.
David OTIS, Plaintiff,
v.
DOCTOR'S ASSOCIATES, INC., Frederick A. Deluca, and Peter H. Buck, Defendant(s).
No. 94 C 4227.

Sept. 14, 1998.

MEMORANDUM OPINION AND ORDER
WILLIAMS, J.
*1 Plaintiff David Otis ("Otis") is suing defendants Doctor's Associates, Inc., Frederick DeLuca, and Peter Buck (collectively referred to as "defendants") for fraud arising out of a failed fast food franchise restaurant known as Cajun Joe's Chicken ("Cajun Joe's"). Otis became involved with Cajun Joe's as a Development Agent ("DA"), which meant that he agreed to promote Cajun Joe's restaurants in the Chicago area by selling Cajun Joe's franchises and assisting the new franchisees. The only claim remaining in this case is whether defendants fraudulently induced Otis into his Development Agent Agreement ("DA Agreement") by misrepresenting that Cajun Joe's was a fully-developed franchise. Currently before the court is Defendants' Motion to Preclude Testimony of Plaintiff's Damage Expert and Bar Other Evidence Regarding Plaintiff's Alleged Lost Profit Damages. For the following reasons, the court grants defendants' motion.

*Background*

*1 The court incorporates by reference the statement of facts from its March 17, 1998 Memorandum Opinion and Order. *See Otis v. Doctor's Associates, Inc.,* No. 94 C 4227, 1998 WL 142383, at *1-4 (N.D.Ill. March 17, 1998). For purposes of this opinion, however, the court will set forth additional facts necessary to understand the motion presently before the court. The court notes that Otis does not dispute any of the following facts.

*1 Otis's fraud case involves a damages claim for lost profits under the benefit-of-the-bargain theory. In short, Otis claims that one of the appropriate measures of his compensatory damages is the money he would have earned during the 20 year life of his DA Agreement if Cajun Joe's had been successful. To support his claim that defendants' alleged fraud entitles him to lost profits under this benefit-of-the-bargain theory, Otis retained a certified public accountant named Kevin M. Carlie ("Carlie").[FN1]

> FN1. Although Carlie is a CPA, the record fails to establish that Carlie has any expertise in projecting sales of any kind twenty years into the future, not to mention franchise fast food sales forecasts.

*1 Carlie performed damages calculations which purport to determine Otis's lost future profits over the anticipated 20 year term of Otis's DA Agreement. Carlie's calculations were, however, based exclusively on projections contained in Otis's May 22, 1990 DA Agreement. (*See* Defs.'s Mot.[FN2] at 5-7, quoting Carlie Dep. at 69, 85-86, 106-07, 110.) Carlie did not perform any independent market analysis to verify the reasonableness or accuracy of the projections in the DA Agreement. Nor did Carlie perform any comparative analysis which measured the DA Agreement's projections against actual results achieved by other fast food chicken franchise restaurants.

> FN2. "Defs.'s Mot." refers to "Defendants' Motion to Preclude Testimony of Plaintiff's Damage Expert and Bar Other

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d  Page 2
Not Reported in F.Supp.2d, 1998 WL 673595 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

> Evidence Regarding Plaintiff's Alleged Lost Profit Damages."

*1 The DA Agreement upon which Carlie based his future lost profits calculations required Otis to establish up to 121 Cajun Joe's franchise restaurants in the Chicago area over a period of years.[FN3] Alternatively, the DA Agreement required Otis to set up at least 89 Cajun Joe's franchise stores in Chicago. (*See id.* at 2-3.) The DA Agreement provided an interim development time schedule during which Otis was to establish these Cajun Joe's restaurants. Specifically, the DA Agreement required Otis to set up Cajun Joe's restaurants as follows:

> FN3. This number arose out of the requirement that Otis "[e]stablish that number of units which will equal the number of units operated by the fast food chain with the most units in the Territory." When Otis signed his DA Agreement, McDonald's operated the most fast food restaurants in Chicago with 121.

| Total Number of Units To Be Operating Including Existing Units | Date Required By |
|---|---|
| 1 | January 1, 1991 |
| 3 | July 1, 1991 |
| 6 | January 1, 1992 |
| 21 | January 1, 1993 |
| 28 | July 1, 1993 |
| 36 | January 1, 1994 |

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 3

Not Reported in F.Supp.2d, 1998 WL 673595 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

| | |
|---|---|
| 51 | January 1, 1995 |
| 58 | July 1, 1995 |
| 66 | January 1, 1996 |
| 73 | July 1, 1996 |
| 81 | January 1, 1997 |
| 89 | July 1, 1997 |

*2 (Defs.'s Mot., Ex. A at 2-3.)

*2 Otis's DA Agreement also provided that the total sales of all Cajun Joe's franchise restaurants in Otis's area must equal an average of $6,750 per restaurant. (*See* Defs.'s Mot., Ex. A.) In other words, if Otis had set up one Cajun Joe's restaurant, the DA Agreement required that its weekly sales must equal $6,750; if Otis had set up two restaurants, those two Cajun Joe's restaurants combined must produce weekly sales of $13,500; after Otis established three Cajun Joe's franchises, those three restaurants must combine to have made a total of $20,250 in sales every week. (*See* Defs.'s Mot. at 3 & n. 4.)

*2 Finally, Otis's DA Agreement provided a formula for calculating Otis's share of the profits from the gross sales made by Cajun Joe's restaurants in Otis's territory. Neither party has supplied the court with a detailed explanation of precisely how this formula operates; however, Otis's "Schedule G-Itemized Statement of Damages" ("Schedule G") filed with the Final Pretrial Order sets forth a relatively simple formula for calculating Otis's alleged lost profits. According to Schedule G, Otis arrives at his lost future profits under one of three alternative methods.

*2 (1) $6,750 (the projected average weekly sales of one Cajun Joe's restaurant) x 89 (the minimum total number of Cajun Joe's restaurants the DA Agreement required Otis to establish) x 1.3% (one-half of Otis's one-third of 8% royalty on franchisee's gross sales of royalties) x 52 (number of weeks in a year) x 20 (number of years the DA Agreement was supposed to last) = $8,122,140 in lost future profits.

*2 (2) $6,750 (projected average weekly sales) x 121 (the target number of Cajun Joe's restaurants) x 1.3% (royalty calculation) x 52 (weeks) x 20 (years) = $11,042,460 in lost future profits.

*2 (3) $3,450 (actual average weekly sales of Cajun Joe's restaurants in Otis's territory) x 20 (actual number of Cajun Joe's restaurants Otis opened in his territory) x 1.3% (royalty calculation) x 52 (weeks) x 20 (years) = $932,880.

*2 Based on the DA Agreement's (1) projected average weekly sales requirement, (2) schedule by which Otis was to establish the required number of Cajun Joe's franchise restaurants, and (3) formula for calculating Otis's share of the profits, Carlie made two separate damages calculations. Carlie first determined that Otis would have earned $8,568,031 over the 20 year life of his DA Agreement if Otis had established the goal of 121 Cajun Joe's franchise restaurants. (Defs.'s Mot., Ex. C.) Carlie based his second lost profits calculation on the premise that Otis could only set up 89 Cajun Joe's restaurants during the predicted 20 year life of the DA Agreement. (*Id.*) Using that estimate, Carlie concluded that Otis would have reaped $6,709,610 in lost profits. (*See* Defs.'s Mot., Ex. D.) It is clear from comparing Carlie's lost profit estimates and Otis's lost profit estimates in Schedule G that the two are very inconsistent. Neither party has attempted to explain why Otis's calculations in Schedule G so greatly exceed Carlie's "expert" calculations. This discrepancy, however, does not interfere with the court's analysis of the admissibility of Carlie's expert testimony or Otis's

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                          Page 4

Not Reported in F.Supp.2d, 1998 WL 673595 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

other evidence of lost future profits.

*Analysis*

\*3 Defendants argue that the court must exclude Carlie's proffered expert testimony because Carlie's calculations fail to meet the requirements imposed on expert testimony by Rule 702 of the Federal Rules of Evidence. The court agrees. Specifically, Rule 702 provides that:

\*3 [i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

\*3 The leading case interpreting Rule 702 is *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). In *Daubert,* the Supreme Court held that the trial court must, under Rule 702, exercise "some degree of regulation of the subjects and theories about which an expert may testify." 509 U.S. at 589. When construing Rule 702, the Supreme Court explained that "the adjective 'scientific' implies a grounding in the methods and procedures of science " and "the word 'knowledge' connotes more than subjective belief or unsupported speculation." *Daubert,* 509 U.S. at 590.

\*3 Accordingly, a trial judge faced with a proffer of expert scientific testimony:
\*3 must determine at the outset ... whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.

\*3 *Id.* at 592-593. The Seventh Circuit has interpreted *Daubert* to require a two-step inquiry, where both steps must be met before the testimony is admissible. According to the Seventh Circuit, *Daubert:*\*3 [first] directs the district court to determine whether the expert's testimony pertains to scientific knowledge. This task requires that the district court consider whether the testimony has been subjected to the scientific method; it must rule out "subjective belief or unsupported speculation." Second, the district court must determine whether the evidence or testimony assists the trier of fact in understanding the evidence or in determining a fact in issue. That is, the suggested scientific testimony must fit the issue to which the expert is testifying.

\*3 *O'Conner v. Commonwealth Edison Co.,* 13 F.3d 1090, 1106 (7th Cir.) (citing *Porter v. Whitehall Lab., Inc.,* 9 F.3d 607, 613, 616 (7th Cir.1993)); *see also Deimer v. Cincinnati Sub-Zero Prods., Inc.,* 58 F.3d 341, 344 (7th Cir.1994); *Dukes v. Illinois Cent. R.R. Co.,* 934 F.Supp. 939, 947-948 (N.D.Ill.1996).

\*3 *Daubert* provides four nonexhaustive guideposts to assist district courts in determining whether the proffered scientific expert testimony can be fairly characterized as "scientific knowledge" within the meaning of Rule 702. The nonexclusive factors in *Daubert* are: (1) whether the theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error; and (4) the general acceptance of the theory in the scientific community. *Daubert,* 509 U.S. at 591-95; *Gruca v. Alpha Therapeutic Corp.,* 51 F.3d 638, 643 (7th Cir.1995); *Porter,* 9 F.3d at 613; *Dukes,* 934 F.Supp. at 948. The most important factor in the Daubert analysis is whether the proffered scientific theory can be and has been tested by the scientific method. *Bradley v. Brown,* 42 F.3d 434, 438 (7th Cir.1994); *Stanczyk v. Black & Decker, Inc.,* 836 F.Supp. 565, 567 (N.D.Ill.1993). "Scientific methodology today is based on generating hypotheses and testing them to see if they can be falsified." *Daubert,* 509 U.S. at 593 (citation omitted). Accordingly, a scientific theory that is not supported by appropriate validation is not admissible under Rule 702. *Id.* at 590. Courts must exclude "subjective belief or unsupported speculation." *Porter,* 9 F.3d at 614 (citing *Daubert,* 509 U.S. at 590).

\*4 Importantly, for purposes of this case, the court

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Page 5

Not Reported in F.Supp.2d, 1998 WL 673595 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

notes that several courts have applied the *Daubert* requirements not only to proffered expert "scientific " evidence, but also to the expert "mathematical" lost profits evidence at issue in this case. *See Target Mkt. Publ'g, Inc. v. Advo, Inc.,* 136 F.3d 1139, 1142-44 (7th Cir.1998) (applying *Daubert* test to lost profits calculation in breach of contract case); *Tuf Racing Prods., Inc. v. American Suzuki Motor Corp.,* No. 94 C 50392, 1998 WL 299300, at *1 (N.D.Ill. June 3, 1998) (same); *Terrell v. Childers,* No. 93 C 2460, 1996 WL 385310, at *8-11 (N.D.Ill. July 3, 1998) (applying *Daubert* analysis to lost profits calculation based on benefit-of-the-bargain theory in common law fraud case). Additionally, as the proponent of the proffered expert testimony, Otis bears the burden of establishing the admissibility of Carlie's testimony by a preponderance of the evidence. *See Dukes,* 934 F.Supp. at 946; *Bradley v. Brown,* 852 F.Supp. 690, 697 (N.D.Ind.1994). With these legal principles in mind, the court evaluates Carlie's proffered expert testimony concerning Otis's alleged lost profits.

*4 The court finds that Otis has failed to show that Carlie's lost profit calculations are based on " scientific knowledge" as Rule 702 requires. Most importantly, Otis has made no showing that the formula and projected values Carlie relied on is accurate or has been tested for accuracy. Carlie himself admitted that he had not performed any independent analysis of the reliability or factual accuracy of the figures used in the DA Agreement. Other than citing the target estimates in the DA Agreement, Otis has failed to establish that the average weekly sales estimates in the DA Agreement have any basis in fact or fast food market reality. For example, Otis has not demonstrated that other fast food chicken franchises in the Chicago market consistently average sales of approximately $6,750 per week. Nor has Otis supplied any proof which shows that a fast food chicken franchise could establish and operate 89 or 121 restaurants in the Chicago marketplace in the limited time period provided by the DA Agreement. Finally, Otis has not shown that Carlie's lost profits formula accounts for possible future trends in the fast food business. Basically, Otis has failed to show any proof that Carlie's lost profits estimates have been subjected to any testing to verify the accuracy of the numbers Carlie used or the accuracy of Carlie's conclusions.[FN4]

> FN4. Although not addressing the issue at length, the court does not hesitate to conclude that Otis could have subjected Carlie's calculations to some sort of scrutiny or market analysis to verify their accuracy and reliability. *See Daubert,* 509 U.S. at 593 ("a key question to be answered in determining whether a theory or technique is scientific knowledge that will assist the trier of fact will be *whether it can be* (and has been) tested") (emphasis added).

*4 Likewise, the other *Daubert* factors also require the court to exclude Carlie's proffered expert testimony. Aside from failing to subject Carlie's formula to actual testing, Otis also fails to show that the theory Carlie relied on has been subjected to peer review and publication. In fact, Otis has shown no evidence indicating that the methodology Carlie used is anything more than an exercise in arithmetic based on inherently unreliable values. Additionally, Otis has not provided the court with the known or potential rate of error in Carlie's calculations. Finally, Otis has not shown that Carlie's theory of calculating lost future profits for a fast food franchise has been generally accepted by other experts who frequently predict future sales for similar franchise operations. Because Otis fails to show evidence that satisfies any of the *Daubert* factors, the court grants defendants' motion to exclude the expert testimony of Kevin Carlie.

*5 Rather than respond to defendants' argument that Carlie's methodology does not pass the *Daubert* analysis,[FN5] Otis simply insists that Illinois law entitles him to recover the benefit of his bargain on his fraud claim. Otis argues that defendants are attempting to confuse the *fact* of fraud damages with the *amount* of fraud damages in this case. This argument, however, appears to be a response to a separate argument advanced by defendants. Specifically, defendants argued in their brief that this court's March 17, 1998 Memorandum Opinion and Order eliminates any claim Otis may have for

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                            Page 6

Not Reported in F.Supp.2d, 1998 WL 673595 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

lost profits. On this point, the court agrees with Otis. The court's March 17, 1998 ruling was not fatal to Otis's claim for lost profits. The court must therefore determine whether, aside from the now-excluded Carlie expert testimony, Otis may introduce any remaining evidence of lost profits at trial.

> FN5. Otis's one paragraph response to the *Daubert* issue is woefully incomplete. (*See* Pl.'s Resp. at 11.)

*5 Under Illinois law, when "a misrepresentation induced the victim to consummate the bargain, benefit-of-the-bargain damages are appropriate to give the victim the rewards he reasonably expected under the contract." *Roboserve v. Kato Kagaku Co., Ltd.,* 78 F.3d 266, 274 (7th Cir.1996). However, Illinois law also enforces the "new business rule" which precludes a plaintiff from recovering lost profits in some circumstances. Under Illinois law, " a new business generally has no right to recover lost profits." *Stuart Park Assocs. Ltd. Partnership v. Ameritech Pension Trust,* 51 F.3d 1319, 1328 (7th Cir.1995). Rather, "this element of damages is recoverable only if the business was previously established." *Id.* (citing *Hill v. Brown,* 166 Ill.App.3d 867, 117 Ill.Dec. 687, 520 N.E.2d 1038, 1043 (Ill.App.Ct.1988)). Moreover, proffered evidence demonstrating lost profits must provide " ' a reasonable basis for the computation of damages' and cannot be 'conjecture or sheer speculation." ' *Real Estate Value Co. v. USAIR, Inc.,* 979 F.Supp. 731, 741 (N.D.Ill.1997) (quoting *Midland Hotel Corp. v. Reuben H. Donnelley Corp.,* 118 Ill.2d 306, 113 Ill.Dec. 252, 515 N.E.2d 61, 66 (Ill.1987)).

*5 Defendants argue that because Cajun Joe's was a new franchise with no proven track record of profitability, Illinois law precludes Otis from recovering lost profits. The court points out that Otis's response brief completely fails to address defendants' argument that the "new business rule" precludes Otis from recovering lost profits. Additionally, when this court questioned Otis's counsel during the hearing on defendants' motions in limine, counsel failed to provide any principled reason why the new business rule should not preclude Otis's claimed lost profits.

*5 Based on the facts of this case, the court finds that Cajun Joe's was a start-up venture and therefore subject to the new business rule. Otis himself admitted at his deposition that Cajun Joe's was start-up business venture that might very well fail. (*See* Defs.'s Mot., Ex. B, Otis Dep. at 118.) Additionally, the undisputed facts of this case clearly show that Cajun Joe's was a brand new fast food franchise. Since Cajun Joe's was a new business without a history of losses or profits, there is no "baseline against which the post-breach situation may be measured to arrive at a reasonably certain calculation of lost profits." *Real Estate Value Co.,* 979 F.Supp. at 741. Accordingly, the court holds that Illinois's new business rule precludes Otis from introducing any evidence of future lost profits.

*6 Assuming, arguendo, that the "new business rule" did not preclude evidence of Otis's theory of lost profits, Otis's proffered evidence still fails to provide the reasonable degree of certainty necessary to obtain future lost profits. As the court has already explained, Otis has provided no factual basis for the court to conclude that the DA Agreement's estimated average weekly profits of Cajun Joe's restaurants was reasonable. Nor has Otis shown that establishing the target numbers of 89 or 121 Cajun Joe's franchises in Chicago was a reasonable goal that could be achieved in the time period provided by the DA Agreement. Without some foundation to substantiate the legitimacy of these fundamental elements of the DA Agreement, any lost profits calculations based on these figures are speculative and inherently unreliable.

*6 The court finds Otis's reliance on the projected average weekly sales and estimated number of stores strikingly similar to the marketing plan relied on by the plaintiff in *Target Market Publishing, Inc. v. Advo,* 136 F.3d 1139, 1145 (7th Cir.1998). In that case, the plaintiff cited a market report that estimated profits of more than $31,000 per month as its measure of lost profits damages. *Id.* The Seventh Circuit discredited the report because it was "identifying a target profit, not making a projection of actual profits." *Id.* The court also

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                               Page 7

Not Reported in F.Supp.2d, 1998 WL 673595 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

rejected the market report because the plan sought to demonstrate what "profits might be given certain assumptions that had not yet, and might never, come to pass." *Id.*

\*6 Similarly, Otis has failed to show that the projected average weekly profits and the estimated number of Cajun Joe's franchises in the DA Agreement represent anything more than aspirational hopes of a successful fast food franchise. As the court has explained, Otis provides no basis for the reasonableness of these projections. Accordingly, the court concludes that Otis's theory of lost profits is speculative and fails to establish lost profits with a reasonable degree of certainty. Because Otis fails to establish lost profits with a reasonable degree of certainty, the court precludes any evidence of future lost profits.

\*6 The court notes, however, that Otis may be entitled to recover his actual (as opposed to future) lost profits. Those actual lost profits could be easily calculated by determining the total gross sales actually made by the Cajun Joe's restaurants that Otis actually established during his tenure as a DA. The court does not now hold that Otis is entitled to those damages. Rather, the court merely suggests that applying the profit formula in Otis's DA Agreement to the actual gross sales made by the 20 Cajun Joe's that Otis actually opened would be a logical and reasonable method by which to calculate Otis's actual lost profits.

*Conclusion*

\*6 The court grants Defendants' Motion to Preclude Testimony of Plaintiff's Damage Expert and Bar Other Evidence Regarding Plaintiff's Alleged Lost Profit Damages. The court bars any expert testimony from Kevin Carlie and precludes Otis from introducing any evidence of future lost profits based exclusively on the DA Agreement. The court instructs the parties to discuss settlement of this case. The court orders the parties to call the court on Friday, September 11, 1998 at 3:00 p.m. to report on the progress of settlement discussions.

N.D.Ill.,1998.

Otis v. Doctor's Associates, Inc.
Not Reported in F.Supp.2d, 1998 WL 673595 (N.D.Ill.)

Briefs and Other Related Documents (Back to top)

• 1:94cv04227 (Docket) (Jul. 12, 1994)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.