---

**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Case No. 2005-WM-377 (BNB)

DEPOSITION OF: ROBERT B. GREIFINGER, M.D.
Volume I
August 25, 2006

MOISES CARRANZA-REYES,

Plaintiff,

v.

PARK COUNTY, a public entity of the State of Colorado and its governing board, THE PARK COUNTY BOARD OF COUNTY COMMISSIONERS; PARK COUNTY SHERIFF'S OFFICE, a public entity of the State of Colorado; FRED WEGENER, individually and in his official capacity as Sheriff of Park County, Colorado; MONTE GORE, individually and in his capacity as Captain of Park County Sheriff's Department; VICKIE PAULSEN, individually and in her official capacity as Registered Nurse for Park County, Colorado; JAMES BACHMAN, M.D., individually and in his official capacity as Medical Director of the Park County Jail,
Defendants.

TAKEN PURSUANT TO NOTICE on behalf of the Defendants at 1435 Arapahoe Street, Boulder, Colorado 80302 before Laura L. Corning, Federal Certified Realtime Reporter, Certified Shorthand Reporter and Notary Public within Colorado.

---

**Page 2**

APPEARANCES

For the Plaintiff:
WILLIAM A. TRINE, ESQ.
CHERYL TRINE, ESQ.
Trine & Metcalf, P.C.
1435 Arapahoe
Boulder, Colorado 80302
JOSEPH J. ARCHULETA, ESQ.
Law Office of Joseph J. Archuleta
1724 Ogden Street
Denver, Colorado 80218

For the Defendants
Park County, Park
County Board of
Commissioners, Park
County Sheriff's Office,
Wegener and Gore:
ANDREW D. RINGEL, ESQ.
Hall & Evans, LLC
1125 17th Street
Suite 600
Denver, Colorado 80202

For the Defendant
Paulsen:
MELANIE B. LEWIS, ESQ.
Berg Hill Greenleaf & Ruscitti LLP
1712 Pearl Street
Boulder, Colorado 80302

For the Defendant
Bachman:
CRAIG A. SARGENT, ESQ.
Johnson McConaty & Sargent, P.C.
400 South Colorado Boulevard
Suite 900
Glendale, Colorado 80246

Also Present:    None

---

**Page 3**

EXHIBIT 1
INDEX

| EXAMINATION OF ROBERT B. GREIFINGER, M.D. | PAGE |
|---|---|
| August 25, 2006 | |
| By Mr. Trine: | -- |
| By Mr. Archuleta: | -- |
| By Ms. Trine: | -- |
| By Mr. Ringel: | 5 |
| By Ms. Lewis: | -- |
| By Mr. Sargent: | 107 |

| DEPOSITION EXHIBITS: | | INITIAL REFERENCE |
|---|---|---|
| 71 | Curriculum Vitae of Robert B. Greifinger, M.D. | 3 |
| 72 | Publications | 33 |
| 73 | Expert Testimony at Trial or by Deposition within the Past Four Years | 40 |
| 74 | Letter/Report to Trine from Greifinger, 7/29/05 | 55 |
| 75 | Letter/Report to Trine from Greifinger, 4/27/06 | 56 |
| 76 | Letter/Report to Trine from Greifinger, 6/2/06 | 57 |
| 77 | File | 55 |
| 78 | Various documents not attached to file | 59 |

(Original exhibits attached to original deposition; copy exhibits included in continuing exhibit file; copies provided to counsel as requested.)

---

**Page 4**

INDEX
(Continued)

| EXHIBITS PREVIOUSLY MARKED: | EXHIBIT | PAGE |
|---|---|---|
| | 24 | 59 |
| | 60 | 60 |

---

Coffman Reporting
303.893.0202
303.893.2230 FAX
WWW.COFFMANREPORTING.COM

* SUBJECT TO CONFIDENTIALITY DESIGNATIONS *

```
                                    33                                              35
 1  been marked for purposes of this deposition as    1   Q.   Okay. Depends on whether you can get
 2  Exhibit 72, can you identify that document for me? 2  someone else to do it or not?
 3      A.   Yes. This is a three-page list of my     3   A.   Yes.
 4  publications dated January, 2006.                 4   Q.   I understand. Okay. Now, the general
 5      Q.   How much -- how many additions to this have 5 topic of that forthcoming book is what?
 6  occurred since January of 2006?                   6   A.   Public health in criminal justice.
 7      A.   None.                                    7   Q.   So it's kind of a follow-up to the Clinical
 8      Q.   So is this current, as far as you're     8  Practice in Correctional Medicine book that you were an
 9  concerned?                                        9  associate editor of that was published this year?
10      A.   It's current for actual publications, yes. 10  A.   No. It's different. This -- this is
11      Q.   Okay. I assume that there are some that 11  about -- a lot of about prevention and reentry.
12  are in the pipeline, so to speak, that wouldn't be 12   Q.   You mean reentry into society?
13  appropriate to put on this list?                 13   A.   Yes.
14      A.   Yes, sir.                               14   Q.   And what the potential impact of reentry of
15         MR. SARGENT:  That are somewhere in the  15  people in a correctional setting who have diseases to
16  United airplane system.                          16  come back into society -- what that might mean to
17         THE DEPONENT:  That's correct.           17  society, generally speaking?
18      Q.   (BY MR. RINGEL)  How many of those are 18   A.   Well, it -- it -- it's about the impact of
19  there that are in the pipeline, so to speak?     19  the health status of returning inmates on the community
20      A.   There are three scholarly articles and one 20 and what can be done to not only ease those inmate's
21  book.                                            21  reentry for -- inevitably almost all return to the
22      Q.   Okay. Fair enough. And I understand the 22 community, but to lessen the impact healthwise on the
23  issue of -- I'm not going to ask you specifically about 23 community.
24  those, because I understand the issue of things being in 24  Q.   Have you, as a doctor, ever treated someone
25  the pipeline and your potential restrictions on talking 25 with streptococcus A?

                                    34                                              36
 1  about them, other than in perhaps general terms before  1   A.   Certainly.
 2  they are published. Is that a restriction that you    2   Q.   When's the last time that you provided
 3  understand exists on you, or --                        3  primary medical care to anyone?
 4      A.   I can mention what they're about.            4   A.   1985.
 5      Q.   Yeah. That's what I mean. I don't want to   5   Q.   Okay. And when you -- so your treatment of
 6  know what journal or anything like that. Generally    6  streptococcus A would have been 1985 or before?
 7  speaking, what I want to understand is do you have any 7   A.   Yes.
 8  background in terms of publications on the infection  8   Q.   In what context did you treat streptococcus
 9  streptococcus A?                                      9  A?
10      A.   I'm not sure what you mean by do I have any 10  A.   I was a pediatrician.
11  background.                                         11   Q.   So you treated children with streptococcus
12      Q.   Have you written anything on the infectious 12 A?
13  disease streptococcus A? I didn't see anything on this 13  A.   Yes.
14  list of publications. Is any of the forthcoming     14   Q.   Is streptococcus A the common version of
15  publications on that topic?                         15  what I might think of in lay terms as strep throat?
16      A.   No. Except that it may be discussed in a  16   A.   Yes.
17  chapter in my textbook that won't be published until 17  Q.   So this was something that you saw in your
18  October of 2007.                                    18  pediatric practice on probably a daily basis?
19      Q.   And is that --                             19   A.   Yes.
20      A.   That's not a chapter authored by me. I'm  20   Q.   Okay. Would you consider yourself an
21  the editor of the book.                             21  expert in streptococcus A and it's infection mechanisms?
22      Q.   Okay. I understand. I understand. Are    22   A.   No.
23  you an author of any of the chapters in the books -- or 23  Q.   And am I -- is it fair to say that you're
24  in that book?                                       24  not offering an opinion in this case about the infection
25      A.   I don't know yet.                         25  mechanisms of streptococcus A?
```

## Page 89

1  time, where the toilets have not been repaired and there
2  is no mop and no disinfectant and no soap and no waste
3  containers, certainly can fall far below the standard of
4  correctional care.
5  Q.   And do you believe all of those other
6  things that you just described were not present in the
7  Park County Jail in March of 2003?
8  A.   I'm sorry. I'm having trouble with the
9  negative in your question.
10       I believe, on the basis of the materials
11 that I reviewed, that the sanitary conditions were
12 egregious and unconscionable on D pod during the period
13 of March 1 through March 8, 2003.
14 Q.   You listed a bunch of different things.
15 You are -- you indicated that -- in your earlier answer
16 that the -- the fact of a backup -- a toilet backing up
17 might not be a problem, but the absence of things such as
18 a mop and cleaning supplies and soap and, I think,
19 others, in your answer --
20 A.   Timely repair.
21 Q.   -- and timely repair is. I guess what I'm
22 asking you is, do you believe that there was an absence
23 of a mop and cleaning supplies to address any problem
24 associated with backed-up toilets at the Park County Jail
25 during the time that Mr. Carranza-Reyes was there?

## Page 90

1  A.   Yes.
2  Q.   Okay. And you believe that there was a
3  problem with untimely correction of the problem with
4  respect to backed-up toilets; is that right?
5  A.   Yes.
6  Q.   The problem wasn't addressed in a timely
7  fashion, fair?
8  A.   Yes.
9  Q.   And you believe there was a lack of soap;
10 is that true?
11 A.   Yes. Cleaning materials.
12 Q.   Okay.
13 A.   And I also believe that the crowding was a
14 significant factor in the creation of an unsanitary and
15 stressful situation to the immune systems of the inmates
16 confined on D pod, including Mr. Carranza-Reyes.
17 Q.   Okay. Take a look at number 29. Is Mr.
18 Carranza-Reyes making a right-to-privacy-related claim in
19 this lawsuit?
20 A.   I don't recall. I don't believe so.
21 Q.   Why is this in your report?
22 A.   It's because I'm trying to describe a
23 system of care and a system of inattention to the human
24 rights and civil rights of people. I'm trying to
25 demonstrate that it's a systematic failure to address the

## Page 91

1  basic human needs of detained people.
2  Q.   Okay. Paragraph 30 addresses Nurse Vicki
3  Paulsen; is that correct?
4  A.   Yes.
5  Q.   Is your opinion in this case related at all
6  to whether or not Ms. Paulsen committed nursing
7  malpractice?
8  A.   I believe she did.
9  Q.   Okay. And you believe you have the
10 expertise to opine about the standard of care applicable
11 to registered nurses in the state of Colorado?
12 A.   I have testified in other states as to the
13 standard of care of nurses. I don't know how a court
14 would respond to a motion to keep me from testifying in
15 that area. I've survived Daubert and Frye motions in
16 several courts.
17 Q.   Have you ever been stricken or limited in
18 your testimony as an expert by any court?
19 A.   I have been limited mildly on causation in
20 two courts, but not as to standards of care for
21 correctional facilities.
22 Q.   Okay.
23 A.   One case, just for example, was a patient
24 with HIV who developed cryptococcal meningitis, and the
25 court did not want me to comment on the pathophysiology

## Page 92

1  of the cryptococcal meningitis relative to HIV, but I
2  certainly was able to testify about the delivery of
3  timely inadequate care to that patient.
4  Q.   What court was that, Doctor?
5  A.   Northern District of Georgia.
6  Q.   And what's the other time that you were
7  limited in your testimony?
8  A.   I don't -- I certainly don't recall. But
9  there have been multiple times when I was -- when motions
10 were wholly denied. You can look at Woodward v. Myers,
11 M-y-e-r-s, in an appellate decision for the -- wherever
12 the Northern District of Illinois was, and in New Jersey.
13 Q.   Okay. Have you testified at a Daubert or
14 Frye hearing in front of the court in any of these
15 instances, either where your testimony was limited or
16 otherwise challenged under those two --
17 A.   No.
18 Q.   -- cases?
19 A.   Another decision you may want to look at is
20 Collins v. Fowler. It's Western District of
21 Pennsylvania.
22 Q.   And what happened in that decision?
23 A.   I got to -- the -- the court supported my
24 ability to testify on all matters involved in that case.
25 Q.   Does the scope of your expert opinion in

Page 93

1  this case include the issue of causation?
2    A.  Yes.
3    Q.  So describe your expert opinion about
4  causation in this case.
5    A.  I believe that the crowded and the
6  unsanitary conditions on D pod in the Park County Jail
7  during the period of March 1 through March 8 of 2003
8  caused Mr. Carranza-Reyes to get sick with streptococcal
9  disease, and that the lack of timely and appropriate
10 medical care for him led to his death -- or near-death
11 and to his amputation and to all the other complications
12 he suffered from his illness. It led to his
13 hospitalization at Summit Medical Center, to his
14 hospitalization at Denver Health and to get his current
15 compromised medical condition.
16   Q.  What basis do you have to know what Mr.
17 Carranza-Reyes's current medical condition is today?
18   A.  Well, I know from the records of Denver
19 Health that he lost a good part of his lung and he lost a
20 leg. And I've -- through conversations with Mr. Trine,
21 I'm aware of some other medical problems that he has.
22   Q.  What are those medical problems of which
23 you're aware today?
24   A.  Well, I'm aware of his -- his pain, his --
25 I'm aware of his -- of pain that he testifies to in his

Page 94

1  deposition. I'm aware of pain with urination he has.
2  I'm aware of difficulties he has with fitting his
3  prosthesis and his lack of ability to get physical
4  therapy and diagnosis and treatment for other maladies
5  that he suffers.
6    Q.  Okay.
7    A.  All of which were, as I understand it, a
8  consequence of the illness in question.
9    Q.  It seems to me that there are two aspects
10 of your opinions in this case: One, the issue of
11 causation, vis-a-vis whether or not Mr. Carranza-Reyes
12 caught the illness of streptococcus A and related
13 complications in the Park County Jail; and the second
14 part of your causation opinion being the -- the extent of
15 Mr. Carranza-Reyes's illness because of what you're
16 concluding to be not timely medical intervention. Is
17 that a fair split of --
18   A.  Not exactly. I think your first is a
19 little too simplistic. The -- many people carry
20 streptococcus A, as they do carry other bacteria, and I'm
21 saying that either he caught it there or he had it in his
22 body, which many of us do, and the stressful conditions
23 of crowding and unhygienic clothing, unhygienic
24 toiletting, unhygienic conditions generally, stressed his
25 body so much that it caused his body to relax its immune

Page 95

1  system and allow the streptococcal bacteria to cause
2  illness. So that would be for number one.
3        For number two I would say that that
4  illness could have been diagnosed and treated easily if
5  he had been seen by an appropriate medical professional
6  in a timely way. He was prevented from doing that for a
7  variety of reasons. Barriers that were created by the
8  County, by the medical director and by the Nurse Paulsen
9  prevented him from timely treatment, and as a consequence
10 of not getting timely treatment, he was close to death
11 and he suffered all that he did during the next four
12 months and later.
13   Q.  All right. I think I understand your
14 causation opinion. Show me in any of your reports where
15 that first part of the causation opinion is articulated.
16   A.  Paragraph 28, first sentence, second
17 sentence, third sentence, fourth sentence, fifth
18 sentence, and then I have conclusions based on that.
19   Q.  Okay. And is that -- is that articulation
20 of the first part of your causation opinion articulated
21 anywhere else in any of your three reports that you can
22 point out to me?
23   A.  I want to say that it's part of my
24 causation opinion. It's also part of my deliberate-
25 indifference opinion.

Page 96

1    Q.  I understand that, Doctor.
2    A.  I guess the first sentence of paragraph 36
3  regarding the policies and practices that were encouraged
4  or tolerated, and then in my report dated April 17 --
5    Q.  You mean April 27?
6    A.  -- 27th -- I'm sorry -- paragraph 15,
7  paragraph 16, mention of the infection control program
8  specifically and mention of the crowding in the jail,
9  people sleeping on the floor, paragraph 17 with there
10 being inadequate place to isolate patients, and my report
11 dated June 2, paragraph 6, that Dr. Bachman declined to
12 participate in environmental inspections and infection
13 control committee. Although those were requirements.
14 Dr. Paulsen's [sic] ignorance about the crowding can have
15 adverse health consequences. And that's all for Part 1.
16       I would like to add, with reference to our
17 earlier discussion about mention of National Commission
18 on Correctional Health Care standards, that I do mention
19 them in paragraph 1 of my report dated June 2, 2006.
20   Q.  And I believe we already talked about that,
21 because we talked about the footnote --
22   A.  Okay.
23   Q.  -- and the differences and your reference
24 to both of 2003 and 1996 standards.
25   A.  Okay.

* SUBJECT TO CONFIDENTIALITY DESIGNATIONS *