EXHIBIT A-54

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Case No. 2005-WM-377 (BNB)

DEPOSITION OF: VICKI ANN PAULSEN, R.N.
January 18, 2006

MOISES CARRANZA-REYES,

Plaintiff,

v.

PARK COUNTY, a public entity of the State of Colorado and its governing board, THE PARK COUNTY BOARD OF COUNTY COMMISSIONERS; PARK COUNTY SHERIFF'S OFFICE, a public entity of the State of Colorado; FRED WEGENER, individually and in his official capacity as Sheriff of Park County, Colorado; MONTE GORE, individually and in his capacity as Captain of Park County Sheriff's Department; VICKIE PAULSEN, individually and in her official capacity as Registered Nurse for Park County, Colorado; JAMES BACHMAN, M.D., individually and in his official capacity as Medical Director of the Park County Jail,

Defendants.

TAKEN PURSUANT TO NOTICE on behalf of the Plaintiff at

1125 17th Street, Suite 600, Denver, Colorado 80202 at

9:04 a.m. before Theresa A. Coffman, Federal Certified

Realtime Reporter, Registered Professional Reporter and

Notary Public within Colorado.

*    SUBJECT TO CONFIDENTIALITY DESIGNATIONS    *
20406869-8af3-49a8-ba93-3152f149474f

1    medical issues. That was from the protocols.
2        Q.    In other words, you read protocols that
3    indicated that would occur, and therefore, you assume it
4    did?
5        A.    It did not occur while I was there.
6        Q.    But what's your assumption, then? It
7    occurred before you came on board?
8        A.    I didn't ask. I assumed that it did, yes.
9        Q.    Did you ever request that Dr. Bachman come
10   to the jail and instruct deputies on any particular
11   medical issues?
12       A.    No.
13       Q.    Did you ever feel that there was a need to
14   do that?
15       A.    No.
16       Q.    Now, do you presently have any memory, apart
17   from documents, of Moises Carranza-Reyes?
18       A.    Yes.
19       Q.    Okay. And do you have any present memory of
20   any contact you had with him?
21       A.    Yes.
22       Q.    And what is your memory of your first
23   contact with him?
24       A.    I saw him on the 6th of March, and he came
25   to me with an interpreter, and he was complaining of a

*   SUBJECT TO CONFIDENTIALITY DESIGNATIONS   *

20406869-8af3-49a8-ba93-3152f149474f

```
 1   headache, congestion, stuffy nose, sore throat, achy.
 2        Q.    You mean you remember all that without
 3   reference to notes --
 4        A.    Yes, I do.
 5        Q.    -- or records?  Why does that stand out in
 6   your mind that he came to you with those --
 7        A.    There are many inmates that stand out in my
 8   mind.  Or detainees.  I work with it.
 9        Q.    And what was his appearance at that time in
10   March when you first saw him?
11        A.    When I first saw him?
12        Q.    Yeah.
13        A.    He was walking, his color was good.  He came
14   in.  Through the interpreter we talked back and forth
15   about his problems, and I examined him.  At that time I
16   didn't feel that what was going on with him was anything
17   major.
18        Q.    Now, you see him here with us in the
19   deposition today?
20        A.    Um-hum.
21        Q.    Is that basically how he looked at that
22   time?
23        A.    He was thinner, and he was -- he was -- he
24   was -- how do you want me to say he looked?  I mean, he
25   walked in, he was alert, he was . . .
```

*   SUBJECT TO CONFIDENTIALITY DESIGNATIONS   *

20406869-8af3-49a8-ba93-3152f149474f

Carranza-Reyes v. Park County					Vicki Ann Paulsen, R.N.

Page 79

1	A.	Right.  They had so many deputies on the
2	floor, and you had to have one on the floor, and one was
3	free to bring back inmates.
4	Q.	Wasn't it the custom and practice to bring
5	inmates in one at a time?
6	A.	I didn't -- oh, you mean into my office?
7	Q.	Yes.
8	A.	Oh.  One at a time, yes.  I thought you
9	meant back to the holding -- where they were sitting.  So
10	I misunderstood.
11	Q.	The custom and practice was to bring them to
12	your office one at a time?
13	A.	Right.
14	Q.	Do you know why they brought five in at once
15	on this day?
16	A.	They didn't bring them all into my office at
17	one time.  They brought them to the back and had them sit
18	there so I could see them one at a time.
19	Q.	Was that standard practice?
20	A.	Yes.
21	Q.	With all inmates or just INS detainees?
22	A.	All inmates.
23	Q.	Do you know who the interpreter was that you
24	referred to?
25	A.	No, I do not.

Carranza-Reyes v. Park County					Vicki Ann Paulsen, R.N.

*   SUBJECT TO CONFIDENTIALITY DESIGNATIONS   *

20406869-8af3-49a8-ba93-3152f149474f

Carranza-Reyes v. Park County                           Vicki Ann Paulsen, R.N.

Page 102

1   THE REPORTER: I'm sorry. I couldn't hear
2   you.
3   THE DEPONENT: The deputy was helping him
4   down the stairs.
5       Q.   (BY MR. TRINE) And where were you when this
6   was happening?
7       A.   I was right behind him.
8       Q.   Okay. Just one deputy?
9       A.   As I remember, yes.
10      Q.   And who was that?
11      A.   It seemed like it was Theobald, but I would
12  not be certain. He's the one that walked me to the pod,
13  so . . .
14      Q.   And you apparently had some conversation
15  with Carranza-Reyes. Who did you use as an interpreter?
16      A.   There was someone in the pod.
17      Q.   Can you describe that person?
18      A.   No, not really.
19      Q.   Was it the same person that you used as an
20  interpreter on the 6th and 7th?
21      A.   Yes.
22      Q.   And how do you know the interpreter was from
23  that pod?
24      A.   Because he was in the pod, and that's where
25  he slept.

*   SUBJECT TO CONFIDENTIALITY DESIGNATIONS   *

20406869-8af3-49a8-ba93-3152f149474f

Carranza-Reyes v. Park County                Vicki Ann Paulsen, R.N.

Page 103

```
 1      Q.    Okay.  Where was he when you saw him, the
 2  interpreter?
 3      A.    He was with Mr. Carranza-Reyes.
 4      Q.    So he was behind Carranza-Reyes, who was on
 5  a mat on the floor?
 6      A.    He was kneeling beside him talking to him.
 7      Q.    So what did you do besides talk to
 8  Carranza-Reyes and watch him be assisted down below?  Did
 9  you examine him?
10      A.    Looked him over, and then I --
11      Q.    What do you mean, "looked him over"?
12  Visually looked him over?
13      A.    I palpated his back and his abdomen to see
14  where his pain was.
15      Q.    He didn't first point out where his pain
16  was?  You palpated it?
17      A.    No.  He described his pain as here
18  (indicated), and so I palpated to make sure exactly where
19  his pain was.
20      Q.    And you have a distinct memory of that
21  today?
22      A.    Yes, I do.
23      Q.    Of palpating for pain?
24      A.    Yes.
25      Q.    What else did you do?
```

*   SUBJECT TO CONFIDENTIALITY DESIGNATIONS   *

20406869-8af3-49a8-ba93-3152f149474f

1    there should be some more information.

2         Q.    (BY MR. TRINE)  What kind of information
3    were you looking for?

4         A.    Okay.  He had been treated for an illness.
5    It said something about his colon.  When I talked to Mr.
6    Candelaria, he denied anything like this, so I wanted to
7    know what -- you know, was it some really bad colon
8    problem or simple or . . .

9         Q.    When you say when you talked to Mr.
10   Candelaria he denied having -- any problems with his
11   colon?

12        A.    No, not Mr. Candelaria.  Mr. Carranza-Reyes.

13        Q.    When you talked to Carranza-Reyes, you asked
14   him if he had had problems with his colon?

15        A.    No, not with his colon.  I asked him if he
16   had ever had any stomach problems, lung problems, asthma,
17   that type of thing.

18        Q.    When did you ask him that?

19        A.    When I saw him.

20        Q.    When?

21        A.    On the 6th.

22        Q.    Okay.  You remember asking him those
23   questions on the 6th?

24        A.    Yes, I do.

25        Q.    Or are you saying that would have been your

1   custom and practice?
2       A.      No, that is not my custom and practice.
3       Q.      Oh, it's not your custom and practice to ask
4   those questions?
5       A.      I'm not saying that's my custom and
6   practice.  I would have asked him if he had -- there's no
7   medical background on these people.  You have to ask
8   questions.
9       Q.      And the interpreter understood the medical
10  terms you were asking and transmitted them on to
11  Carranza-Reyes?
12      A.      I tried to do it as simply as possible.
13      Q.      Okay.  So what questions did you ask him?
14      A.      If he'd ever had any lung problems, asthma,
15  abdominal problems -- stomach problems, to put it in
16  laymen's terms.
17      Q.      And so you now wanted to find out, after
18  Carranza-Reyes left the facility, whether his brother and
19  sister-in-law could add additional information?  Is that
20  what you were trying to do?
21              MS. LEWIS:  Object to the form.
22      A.      Mr. Theobald and Clarence Candelaria talked
23  to the family.  I was not present and I was not around
24  when the discussion took place.
25      Q.      (BY MR. TRINE)  And you didn't even know it

*   SUBJECT TO CONFIDENTIALITY DESIGNATIONS   *

20406869-8af3-49a8-ba93-3152f149474f