**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 2005-WM-377 (BNB)

MOISES CARRANZA-REYES

      Plaintiff,

vs.

PARK COUNTY, a public entity of the State of Colorado and its governing board, THE PARK COUNTY BOARD OF COUNTY COMMISSIONERS; PARK COUNTY SHERIFF'S OFFICE, a public entity of the State of Colorado; FRED WEGENER, individually and in his official capacity as Sheriff of Park County, Colorado; MONTE GORE, individually and in his capacity as Captain of Park County Sheriff's Department; VICKIE PAULSEN, individually and in her official capacity as Registered Nurse for Park County, Colorado,

      Defendants.

_____

**PLAINTIFF'S RESPONSE TO SUPPLEMENTAL MOTION FOR SUMMARY
JUDGMENT FROM DEFENDANTS PARK COUNTY BOARD OF COUNTY
COMMISSIONERS, FRED WEGENER AND MONTE GORE**

_____

Plaintiff, Moises Carranza-Reyes, by and through his counsel, Bill Trine and Cheryl Trine of Trine & Metcalf, P.C., hereby responds to the Supplemental Motion for Summary Judgment filed by the Park County Board of County Commissioners, Fred Wegener, and Monte Gore (collectively hereinafter referred to as the "Defendants"), and requests that the Motion be denied for the reasons hereinafter stated.

**<u>INTRODUCTION</u>**

      Defendants asserted that Plaintiff waived his due process and equal protection claims against Defendant Paulsen based on the wording of Plaintiff's Second Amended Complaint (Supplemental Motion for Summary Judgment (SMSJ) at 3, FN1). Plaintiff disputes that he waived any claims

1

against Defendant Paulsen.  Plaintiff's Complaint for Damages brought a due process and equal protection claim against all defendants at paragraph 49; incorporated by reference against Paulsen in subsequent complaints at paragraph 50; and the Final Pretrial Order states, "Each of the Defendants' conduct constitutes cruel and unusual punishment and a violation of due process and equal protection under the law." (Final Pretrial Order at 5(c)).   The Tenth Circuit has held the Final Pretrial Order supplants the earlier pleadings in the case.  *Expertise, Inc. v. Aetna Finance Co*., 810 F.2d 968, 973 (10th Cir. 1987).  *See Voelkel v. General Motors Corp*., 846 F.Supp. 1468, 1473 (D.Kan. 1994) (Final pretrial order controls claims and theories available for trial).

Defendants claim that Plaintiff failed to dispute a footnote in their Motion For Leave To Submit Supplemental Motion For Summary Judgment ("Motion For Leave") by offering "no suggestion" that Plaintiff's equal protection and due process claims were against Paulsen (SMSJ at FN1).  Plaintiff disputes that any claims against Paulsen were waived based on a footnote in a motion for leave to submit a motion. Any failure to specifically dispute the footnote was an oversight. However, Defendants cannot claim Plaintiff offered no suggestion his claims were against Paulsen when the PreTrial Order explicitly makes due process and equal protection claims against all Defendants including Nurse Paulsen, and when the nurse played a central role in Plaintiff's claims of denial of medical care (Plaintiff's Response to "Motion For Leave" at 2, 3, 4, 7, 8).

## STATEMENT OF DISPUTED AND UNDISPUTED MATERIAL FACTS

Pursuant to Fed. R. Civ. P. 10(c), Plaintiff incorporates in its entirety herein by reference Plaintiff's Statement of Disputed And Undisputed Facts, paragraphs 1-152 in Plaintiff's Response to Motion For Summary Judgment by Defendants and paragraphs 2-98 in Plaintiff's Response to Motion For Summary Judgment by Paulsen.

Plaintiff disputes Paragraphs 139 and 140 of Defendants' SMSJ.  The only detainee interpreter was deported on March 7, 2003, and as a result, there was no interpreter on March 8, 2003 (See paragraphs 20-24 *Infra*).  Throughout their communications, Paulsen failed to understand Plaintiff's symptoms (See paragraphs 11, 12, 15, 16 *Infra*); and Plaintiff did not understand the proposed treatment (See paragraphs 11, 15, 20, 24, 28 *Infra*).

**Need For Qualified Interpreter**

1.      Park County Jail did not have any employed interpreters available on-call (See Frye Depo. at 93, **Exh. 4**) **Exhibits are attached**.

2.      A few detainees in Block D spoke a little English, but only one spoke English well enough to communicate with the officers (See Plaintiff Depo. at 148-49, **Exh. 1**).

3.      On March 4, 2003, Plaintiff asked a guard through a detainee interpreter to see the nurse, but was denied medical care (See Plaintiff Depo. at 214-17, **Exh. 1**).

4.      On March 5, 2003, an interpreter twice filled out a form in English asking for the nurse and both times a guard threw it away (See Plaintiff Depo. at 244-45, 247-48, **Exh. 1**).

5.      Deputy Frye has no memory of any KITES or written requests for medical care coming out of Pod D between March 1-10, 2003 (See Frye Depo. at 129-30, **Exh. 4**).

6.      Deputy Muldoon testified he would not ensure that a detainee who requested medical attention during the night saw the nurse the next morning because the detainee would have to see the nurse when she went around at med pass, and then the detainee could talk to her (See Muldoon Depo. at 29-30, **Exh. 5**).

7.      Similarly, Gore testified that even though there were no forms to request medical care in Spanish, detainees could see the nurse when she did med call and could communicate to her if they had complaints (See Gore Depo. at 68, **Exh. 3**).

8.      Nurse Paulsen did not speak Spanish, was given no instructions on how to deal with people who speak no English, and testified she would not talk to a detainee without an interpreter (See Paulsen Depo. at 29-30, **Exh. 2**).

9.      The records indicate Paulsen only did med call one time from March 1 through March 10, 2003 (See Gore Depo. at 70, 88-89, **Exh. 3**).

10.     When the nurse came by on March 7, 2003, people were shouting in Spanish that there were sick people upstairs but she did not enter the pod or offer medical assistance (See Plaintiff Depo. at 274-75, **Exh. 1**).

11.     When Plaintiff saw the nurse on March 6, 2004, he told the detainee interpreter to tell her he was feeling really bad, with a sore throat, headache, stomachache, dizziness and shakes, but the nurse only asked where he was from and did not examine or treat him (See Plaintiff Depo. at 263-65, **Exh. 1**).

12.     Paulsen testified Plaintiff did not complain of dizziness to her (See Paulsen Depo at 139, **Exh. 2**).

13.     Plaintiff began to vomit wherever he was because he could not make it to the bathroom and there were about 30 people vomiting, with no chemicals to clean it up (See Plaintiff Depo. at 276-77, **Exh. 1**).

14.     The night of March 6, 2003, Plaintiff began to cough, and when he coughed it hurt his chest and throat (See Plaintiff Depo. at 271-72, **Exh. 1**).

15.     On March 7, 2003, Plaintiff told the nurse through a detainee interpreter that he was worse and had new symptoms of coughing, vomiting and pain in his stomach, and she told him he had altitude sickness and prescribed pills without telling him what the pills were (See Plaintiff Depo. at 279-80, **Exh. 1**).

16.     Plaintiff's history taken at Summit Medical Center indicates he had been short of breath and had chest pain on the right side for 3 days, but Paulsen testified Plaintiff did not indicate to her that he had right-sided chest pain until the morning of the 8th.  (See Paulsen Depo. at 148-49, **Exh. 2**).

17.     Plaintiff told Deputy Allen his symptoms but Allen could not understand until a detainee figured out how to express "diarrhea" the next day (See Allen Depo. at 109, **Exh. 8**).

18.     Deputy Allen testified a group of detainees would usually all talk in order to help communicate (See Allen Depo. at 118, **Exh. 8**).

19.     The night of March 7, 2003, Plaintiff was feverish and his condition had deteriorated, but he received no medical care (See Plaintiff Depo. at 281-82, **Exh. 1**).

20.     On March 8, 2003, there was no translator because the translator had been released and a deputy asked Plaintiff questions and gave him medicine, but Plaintiff could not understand him or what he told the nurse over the phone (See Plaintiff Depo. at 287-89, **Exh. 1**).

21.     A different detainee who spoke a little English checked on Plaintiff, but not the man who had been the interpreter (See Plaintiff Depo. at 296-97, **Exh. 1**).

22.     Deputy Flint testified he did not know if anyone could interpret after March 7, 2003 when the detainee population decreased from 61 to 10 (See Flint Depo. at 108, **Exh. 6**).

23.     Deputy Frye did not speak Spanish and could only talk to detainees through an interpreter (See Frye Depo. at 47, **Exh. 4**).

24.     On March 8, 2003, Frye asked Plaintiff if he was feeling better, worse or the same using hand gestures, which he agreed meant he could not have asked Plaintiff questions about spitting up blood, whether he had diarrhea, a fever, felt chilled faint or dizzy, or whether there was blood in his diarrhea (See Frye Depo. at 107-110, **Exh. 4**).

25.     It was Frye's custom and practice to decide whether to call a nurse based on the answers to his medical history questions and whether the detainee thinks he should see a nurse or doctor (See Frye Depo. at 99-100, **Exh. 4**).

26.     Paulsen considered coming in to evaluate Plaintiff on March 8 when Frye called her, but the guard did not think it was necessary (See Paulsen Depo. at 94, **Exh. 2**).

27.     Frye commonly treated detainees and was permitted to give them non-prescription medications during the night without a nurse's order "upon request" (See Frye Depo. at 69, **Exh. 4**).

28.     An officer gave Plaintiff red juice without explaining what was happening and Plaintiff vomited, but the officers wanted Plaintiff to keep drinking even though he kept vomiting (See Plaintiff Depo. at 301-02, **Exh. 1**).

29.     Plaintiff had trouble breathing during transport, and he tried to communicate in Spanish for help but there was no interpreter (See Plaintiff Depo. at 304-07, **Exh. 1**).

30.     Summit Medical Center had a translator (See Plaintiff Depo. at 309, **Exh. 1**).

31.     Muldoon, who transported Plaintiff to the hospital, did not carry any documents or inform the emergency room staff of Plaintiff's symptoms (See Muldoon Depo. at 53, **Exh. 5**).

32.     Paulsen made no arrangements to have any of Plaintiff's medical records or charts delivered with transport (See Paulsen Depo. at 146, **Exh. 2**).

**Failure To Implement Policies; And To Train And Supervise Staff**

33.     Wegener's office is in the same building as the jail, and he inspected the jail and often knew how many people were being held daily (See Wegener Depo. at 11-13, **Exh. 9**).

34.     Administration of management of the jail is the responsibility of the sheriff and he is responsible for what goes on in the jail (See Wegener Depo. at 48-49, **Exh. 9**).

35.     Wegener knew before Plaintiff was in the Park County Jail that it was common practice to have people sleeping on mats on the floor, and he did not place limitations on the number of detainees that could be housed in D Pod (See Wegener Depo. at 68, 70, **Exh. 9**).

36.     Wegener knew that regulations limit the number of people per cell in part because sickness can rapidly spread in a crowded environment (See Wegener Depo. at 57-58, **Exh. 9**).

37.     Gore is responsible for ensuring jail operations comply with all local, state and federal laws (See Gore Depo. at 206, **Exh. 3**).

38.     Under Colorado regulations, Gore is required to ensure that the quality and quantity of medical treatment is in accord with the jail's policies and procedures (See Gore Depo. at 209, **Exh. 3**).

39.     Gore was aware that inmates had flu-like symptoms the week Plaintiff was ill (See Gore Depo. at 141, **Exh. 3**).

40.     Paulsen never segregated sick detainees (See Paulsen Depo. at 158, **Exh. 2**).

41.     Paulsen reported directly to Gore (See Flint Depo. at 38, **Exh. 6**).

42.     Paulsen admitted she should have stayed with Plaintiff on March 8, 2003 until he was transported according to policy (See Paulsen Depo. at 196-97, **Exh. 2**).).

43.     Gore did not admonish Paulsen for vacating the facility rather than continuing with assessment and treatment of Plaintiff until transport (See Gore Depo. at 214-15, **Exh. 3**).

44.     Paulsen testified the jail needed better continuity of care and she was concerned that jail policies and procedures were not being enforced (See Paulsen Depo. at 198-99, **Exh. 2**).

45.     Gore testified he believes he specified the procedures Paulsen was to follow, but did not strictly enforce them (See Gore Depo. at 284, **Exh. 3**).

46.     Paulsen was under no contractual obligation to come in the middle of the night and was discouraged from coming because there was no overtime (Gore Depo. at 259, **Exh. 3**).

47.     Gore testified he would have no problem with his deputies rendering treatment such as putting Plaintiff on oxygen before calling the nurse (See Gore Depo. at 167, **Exh. 3**).

48.     Paulsen did not have any standing orders (See Paulsen Depo. at 224, **Exh. 2**).

49.     Gore testified the jail has no policy and does not restrict the number of detainees that can be placed in Pod D (See Gore Depo. at 250-51, **Exh. 3**).

50.     Gore agreed the jail was way overcrowded at 61 detainees (See Gore Depo. at 25, **Exh. 3**).

52.     Gore knew in September of 2000 that the jail had adopted ACA standards as jail policy (See Gore Depo. at 49, **Exh. 3**).

53.     Muldoon never reviewed the jail policy and procedure manual and was not familiar with it (See Muldoon Depo. at 66, **Exh. 5**).

54.     Bellantonio had never seen the policy requiring guards to call a doctor immediately for symptoms similar to what Plaintiff experienced, and testified guards were instead instructed to call the nurse (See Bellantonio Depo. at 96-97, **Exh. 7**).

55.     Bellantonio had never seen the policy and procedure manual and was not provided a copy of it; nor was he aware of any specific policies and procedures that relate to medical care (See Bellantonio Depo. at 172-174, **Exh. 7**).

56.     Allen received no training when he began working at the Park County Jail, there was no handbook and he does not remember reviewing any policies and procedures of the jail or seeing an inmate handbook (See Allen Depo. at 35-37, **Exh. 8**).

57.     Allen testified his shift was the only one doing face counts properly, which would require the guard to visualize each detainee with their name (See Allen Depo. at 192-93, **Exh. 8**).

58.     Throughout his employment, Bellantonio had reported his concerns of specific substandard conditions to Gore (See Bellantonio Depo. at 143, **Exh. 7**).

59.     National Commission Standards require all medical requests be reviewed within 24 hours (Greifinger Depo. at 124, **Exh. 10**).

60.     Jail had a practice of taking two days to respond to a sick-call request, and a practice of Paulsen making diagnoses when she should call for physician's advice which prevented Plaintiff from being seen in a timely manner (See Greifinger Depo. at 149, **Exh. 10**).

61.     Jail should have nurse protocols in place, and if not, should have had explicit training and supervision (See Greifinger Depo. at 129, **Exh. 10**).

**Similarly Situated In State Prisons**

62.     When the jail first started taking INS, they were only there a day or two but it got to the point where they were staying considerably longer (See Allen Depo. at 54, **Exh. 8**).

63.     The Department of Corrections (DOC) had medical care present at state facilities 24 hours a day, and if the nurse was there alone, she could call and have a physician's assistant there within 30 minutes (See Allen Depo. at 161-62, **Exh. 8**).

64.     Allen did not see the overcrowding problems in the DOC state prisons that he saw in the Park County Jail (See Allen Depo. at 190, **Exh. 8**).

65.     At DOC state prisons, for Plaintiff's symptoms the guard would call medical and escort the person there (See Allen Depo. at 207, **Exh. 8**).

**Profit Motive Not Legitimate Penological Interest**

66.     The more detainees, the more revenue generated (Wegener Depo. at 96, **Exh. 9**).

9

67.     The jail was run for profit under conditions that were less than standard (See Bellantonio Depo. at 122, **Exh. 7**).

68.      Bellantonio was reprimanded for telling INS not to bring more detainees and was told to make room because this is the jail's moneymaker (See Bellantonio Depo. at 57, **Exh. 7**).

69.     Gore agreed he was aware that by March 6, 2003 there were 61 detainees in Unit D, and stated that he as well as most of his deputies were aware they were making a profit off the detainees (See Gore Depo. at 21-22, **Exh. 3**).

## ARGUMENT

## I.     PLAINTIFF STATED VIABLE DUE PROCESS CLAIMS AGAINST ALL DEFENDANTS INDIVIDUALLY AND IN THEIR OFFICIAL CAPACITIES.

Defendants argue Plaintiff's due process claims should be dismissed based on the deliberate indifference arguments made in Defendants' Motion for Summary Judgment, which they never asserted applied to due process [SMSJ at 5-6.]  Defendants' argument must fail for the reasons set forth in Plaintiff's Response to Defendants' "Motion for Leave," incorporated herein by reference in its entirety; Plaintiff's Responses to Motions For Summary Judgment by Defendants and Paulsen incorporated herein by reference in their entirety; and for the following additional reasons.

### A.     Due Process Offers Greater Protection Than Eighth Amendment.

The Tenth Circuit and U.S. Supreme Court have held that the Fourteenth Amendment guarantees detainees **at least** the protections of the Eighth Amendment.  *Bell v. Wolfish*, 441 U.S. 520, 535-37 (1979); *Winton v. Board of Com'rs of Tulsa County, Okl.*, 88 F.Supp.2d 1247, (10th Cir. 2000); *Lopez v. LeMaster*, 172 F.3d 756, 759 n.2 (10th Cir 1999).  The U.S. Supreme Court has held that a pretrial detainee may be subjected to the conditions of the detention facility "so long as those conditions and restrictions do not amount to punishment" because, as opposed to a prisoner who may

be punished so long as such punishment is not cruel or unusual, due process requires that a detainee not be punished. *Bell v. Wolfish*, 441 U.S. 520, 536-37 (1979). A detainee's condition of confinement must be "reasonably related to a legitimate governmental objective" in order to avoid being punishment. *Id*. at 537. See also *Washington v. Harper*, 494 U.S. 210, 224-26 (1990).

Similarly, the Tenth Circuit has found due process violations that were based on "pain and suffering which no one suggests would serve any penological purpose." *Ramos v. Lamm,* 485 F.Supp. 122, 158 (D.C.Colo. 1979), rev'd. in part on other grounds. Other jurisdictions have held that a pretrial detainee stated a substantive due process claim when "conditions of confinement are not reasonably related to a legitimate, non-punitive governmental objective." *Alexis v. U.S. Dept. of Homeland Security*, Not Reported in F.Supp.2d, 2005 WL 1502068, 10 (D.N.J. 2005), citing *Bell v. Wolfish*, 441 U.S. 520, 538-39 (1979), **Exh. 11**. Without conducting a deliberate indifference analysis, the *Alexis* Court ruled severe overcrowding, sleeping and eating in close proximity to dirty toilets, and poor ventilation stated a due process claim. *Alexis* at 10, **Exh. 11**.

A denial of medical care that violates due process may rise to an Eighth Amendment violation. *Ramos v. Lamm,* 485 F.Supp. at 158. *See also Pabon v. Wright*, 459 F.3d 241, 253 (2nd Cir. 2006) (failure to impart information regarding medical treatment may rise to an Eight Amendment violation when it constitutes cruel and unusual punishment).

### B.        Defendants Violated Plaintiff's Due Process Rights.

Plaintiff incorporates herein by reference the arguments made in Plaintiff's Response to Defendants' "Motion For Leave." "[N]egligent conduct by law enforcement officials which causes or contributes to the death or bodily injury of a person in custody may violate the victim's substantive due process rights." *Holland v. Breen*, 623 F.Supp. 284, 288 (D.Mass. 1985). The right to bodily security, "the most fundamental aspect of personal privacy – is unmistakably

established in our constitutional decisions as an attribute of the ordered liberty that is the concern of substantive due process." *Id.*, *citing Hall v. Tawney*, 621 F.2d 607, 613 (4th Cir. 1980).

Defendants asserted that the U.S. Supreme Court has urged extreme caution "in recognizing" rights protected by substantive due process. [SMSJ at 9]. However, the cases cited by Defendants show the Supreme Court uses extreme caution when "asked to break new ground" *Reno v. Flores*, 507 U.S. 292, 302 (1993). It is well established that the Due Process Clause requires conditions of confinement to satisfy certain minimal standards. *Collins v. Harker Heights*, 503 U.S. 115, 127-128 (1992) (claim advanced by city employee unprecedented and dissimilar from detainee in jail).

In the present case, Plaintiff's due process claim is based on injuries caused by overcrowded and unsanitary conditions, the lack of a qualified interpreter, and denial of medical care. These conditions of confinement are not related to any legitimate, penological purpose. Defendants were not obligated to accept additional detainees, and chose to violate jail policies in order to make a profit (See Statement Disputed and Undisputed Material Facts Paragraphs 65-68, *Supra*). Profit has never been recognized as a legitimate, non-punitive penological purpose.

### C.        Plaintiff Had A Due Process Right To A Qualified Interpreter.

Plaintiff has a constitutional right to a qualified interpreter in the receipt of medical care based on the Due Process right to informed consent and based on the Eighth Amendment right to avoid unnecessary suffering, which were clearly established by Supreme Court cases and by the clearly established weight of authority in other jurisdictions in 2003.

Inmates have a significant liberty interest in avoiding the unwanted administration of medical treatment. *Washington v. Harper,* 494 U.S. 210, 221 (1990); *Cruzan v. Director, Missouri Dept. of Health*, 497 U.S. 261 (1990). Consequently, inmates have a right to information sufficient to reach an informed judgment on whether to consent to a particular treatment or to refuse it. *White v.*

*Napoleon*, 897 F.2d 103, 113 (3rd Cir. 1990) (prisoner allergic to penicillin has reasonable right to know whether proposed medical treatment contains penicillin). The Fourteenth Amendment protects a fundamental liberty interest in making decisions that effect health and bodily integrity, and which recognize the right to make these decisions as well as the corollary right to the information necessary to make them intelligently. *Pabon v. Wright*, 459 F.3d at 253. *See also Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1203, 1207 (10th Cir. 2003).

The failure to impart information regarding medical treatment may rise to an Eighth Amendment violation when it constitutes cruel and unusual punishment. *See Wellman v. Faulkner*, 715 F.2d 269, 272 (7th Cir. 1983) (deliberate indifference such that unnecessary suffering inevitable where an impenetrable language barrier between doctor and patient could readily lead to misdiagnoses); *Camberos v. Branstad*, 73 F.3d 174, 176-77 (8th Cir. 1995) (recognizing due process right to interpreter but finding no deliberate indifference where prisoner spoke adequate English to communicate effectively with medical staff); *Anderson v. Kern*, 45 F.3d 1310, 1316-17 (9th Cir. 1995) (citing 7th Circuit in holding that the district court did not abuse its discretion in ordering a non-inmate translator be made available upon an inmate's request); *Clarkson v. Coughlin*, 898 F.Supp. 1019, 1024-1052 (S.D.N.Y.1995) (violation of constitutional due process for failure to provide qualified interpreters during medical treatment, and of Eighth Amendment where communication essential to the efficacy of medical treatment). Contrary to Defendants' assertion, the *Clarkson* Court found a statutory definition of informed consent to be "of interest," but based its holding on U.S. Supreme Court decisions. *Id.* at 1048-50.

It is undisputed that Plaintiff spoke only Spanish, and that Park County failed to hire or train a translator. At times another detainee translated and at times there was no translator. The inability of Plaintiff to communicate interfered with his medical treatment. Plaintiff was unable to effectively

communicate his symptoms, and unable to consent to treatment.  Paulsen testified that she did not

know Plaintiff's symptoms despite the use of a detainee interpreter. Plaintiff was misdiagnosed as

having altitude sickness and kidney stones, and treated without knowing what pills he was receiving

or why he was forced to drink juice despite vomiting and difficulty breathing. A substantial portion

of the jail population spoke Spanish, and yet no reasonable measures were implemented to abate the

risk, such as training staff and especially the nurse to speak Spanish.

### D.       Defendants Are Not Entitled To Qualified Immunity

The violations of Plaintiff's constitutional rights were clearly established in 2003.  Plaintiff

incorporates herein in its entirety his arguments concerning qualified immunity pertaining to each

Defendant in his Responses to Motions for Summary Judgment by Defendants and by Paulsen.  In

addition, U.S. Supreme Court and Tenth Circuit rulings in 2003 clearly establish the due process

right to safe and humane conditions of confinement, and to bodily integrity.  The constitutional due

process right to a qualified interpreter to obtain the medical information necessary to make an

informed decision and to avoid misdiagnoses that amount to cruel and unusual punishment was

clearly established in 2003 by U.S. Supreme Court decisions and by the weight of authority in those

jurisdictions to have ruled on the issue, as discussed *Supra*.  In contrast, a fundamental right to

privacy is not argued here, and those separate and distinct court rulings are inapplicable.

### E.       Due Process Violations That Rose To Eighth Amendment Violations.

Plaintiff incorporates herein by reference in its entirety his Eighth Amendment arguments

against Defendants Park County Board of County Commissioners, Wegener, Gore and Paulsen in

their individual and official capacities in Plaintiff's Responses to Motions for Summary Judgment by

Defendants and by Paulsen.  By violating jail standards for rated capacity, contagious illness, and

medical care, defendants created a substantial risk that Plaintiff would become seriously ill.  (See

14

Plaintiff's Statement of Disputed and Undisputed Material Facts in Plaintiff's Responses to Motions For Summary Judgment by Defendants and by Paulsen).   Defendants knew of the dangerous conditions (See paragraphs 27, 35, 36, 39, 40, 47, 49, 50, 54, 58, 68, 69 *Supra*) but failed to take reasonable measures to abate the risk, such as training staff to contact a doctor rather than diagnosing and treating illness themselves.

## II.     PLAINTIFF STATED VIABLE EQUAL PROTECTION CLAIMS AGAINST ALL DEFENDANTS INDIVIDUALLY AND IN THEIR OFFICIAL CAPACITIES.

Plaintiff incorporates herein by reference the arguments made in Plaintiff's Response to "Motion For Leave" at 5-11.  Plaintiff is alleging the violation of his fundamental right to safe and humane confinement (Complaint for Damages at Paragraph 49).  Defendants claim that to allege the violation of a fundamental right, Plaintiff must allege differential treatment from those similarly situated and discriminatory intent [SMSJ at 13].  However, Defendants cited selective prosecution cases and decisions that were not based on fundamental rights.[1]

The Court in *Eisenstad* found the statute failed rational basis review and thus did not use a fundamental rights analysis. *Eisenstadt v. Baird*, 405 U.S. 438, 447, FN 7 (1972).  However, the *Eisenstad* Court defined "similarly situated" as those to whom the fundamental right applied, which in that case were married and unmarried women who were in need of contraceptives.  *Id*. at 1038-39.  The Court reasoned:

> There is no more effective practical guaranty against arbitrary and unreasonable government than to require that the principles of law which officials would impose upon a minority must be imposed generally.  Conversely, nothing opens the door to arbitrary action so effectively as to allow those officials to pick and choose only a few to whom they will apply legislation.  *Id*.

---

[1] *Powers v. Harris*, 379 F.3d 1208, 1215 (10th Cir. 2004) (state economic regulation did not affect fundamental right); *Gehl Group v. Koby*, 63 F.3d 1528, 1538 (10th Cir. 1995) (selective prosecution claim by police organizations for commercial soliciting); *Attorney General of New York v. Soto-Lopez*, 476 U.S. 898, 911 (1986) (law created different classes of residents).

In the present case, Defendants assert those "similarly situated" are the detainees at the Park County Jail, and that Plaintiff must show a decision made or a policy implemented by Defendants that treated Plaintiff differently than some other detainee incarcerated in the Park County Jail. [SMSJ at 12]. Defendants' definition of "similarly situated" is drawn too narrowly and is not supported by precedent. Under Defendants' reasoning, an impoverished African American has the "fundamental" right to vote of other impoverished African Americans, but not the "fundamental" right to vote of wealthy Caucasians as they would not be similarly situated.

In contrast, the Third Circuit analyzed a prisoner's equal protection claim by determining whether (1) the prisoner is a member of a suspect class or (2) a fundamental right is implicated. *Abdul-Akbar v. McKelvie*, 239 F.3d 307, 317 (3rd Cir. 2001). Because neither a suspect class nor fundamental right was involved, the Court applied rational basis review, without requiring any comparison to similarly situated individuals or showing of discriminatory intent. *Id*. at 318.

A Maryland district court applied rational basis review after finding (1) the classification between smokers and non-smokers was not a suspect class; and (2) smoking did not implicate a fundamental right. *Brashear v. Simms*, 138 F.Supp.2d 693, 694 (D.Md. 2001). The *Brashear* Court did not require an additional similarly situated class or a discriminatory intent. *Id*.

Defendants failed to cite even one case of a detainee in a jail alleging equal protection violations for unsafe conditions of confinement and denial of medical care. Most courts conducting equal protection analyses for unsafe and inhumane conditions of confinement do not conduct a similarly situated analysis. Of cases that made some type of comparison, one court stated, "medical care must be comparable in quantity and availability to that obtainable by the general public." *Barnes v. Government of Virgin Islands,* 415 F.Supp. 1218, 1234-35 (D.C.

Virgin Island 1976). Another court required that detainees at jails receive at least the care of prisoners in the state prison. *Ahrens v. Thomas,* 34 F.Supp. 873, 897-98 (W.D. Missouri 1977). Courts compare conditions of confinement to required standards, holding that overcrowding in excess of rated capacity violates the equal protection rights of the inmates therein. *Cooper v. Morin*, 398 N.Y.S.2d 36, 71-72 (N.Y.S. 1977); *Detainees of Brooklyn House of Detention for Men v. Malcolm*, 520 F.2d 392, 399 (2nd Cir. 1975); *Costello v. Wainwright*, 397 F.Supp. 20 (D.C.Fla. 1975), *aff'd* (5th Cir.), 525 F.2d 1239, *vac.*, 539 F.2d 547, *rev'd.*, 430 U.S. 325 (1977).

In order to receive detainees and DOC inmates, Defendants adopted jail policies that met state and national laws and standards. Where Plaintiff shows Defendants violated these policies, Plaintiff has defined how he was treated differently than those similarly situated by being denied equal protection under the law. Defendants violated policies including those pertaining to capacity, sanitation, communicable disease and medical care. In addition, prison staff testified that state DOC prisons follow the standards that Defendants violated (paragraphs 57, 63-65, 67, *Supra*).

Defendants did not cite any authority in support of a requirement of discriminatory intent for the violation of a fundamental right, and Plaintiff disputes that intent is required in this case. In the alternative, Defendants' discriminatory intent was the motive to make a profit.

Infringement of fundamental constitutional rights in the prison context must be rationally related to legitimate penological interests. *Washington v. Harper*, 494 U.S. 210, 224-26 (1990). Defendants violated Plaintiff's fundamental right to safe and humane prison conditions in order to make a profit. Profit is not a legitimate penological interest, as discussed under Due Process, *Supra*.

III.     **DEFENDANTS ARE LIABLE IN THEIR OFFICIAL CAPACITIES.**

Plaintiff's arguments in his Responses to Motions for Summary Judgment by Defendants and by Paulsen and are incorporated herein in their entirety by reference. The county may be held liable

for conditions at the jail due to its own actions including a failure to fund the jail, or due to the sheriff's actions because he is a final policymaker with regard to the jail. *Lopez v. LeMaster*, 172 F.3d 756, 762-63 (10th Cir. 1999). A supervisor is liable if there is an affirmative link between the deprivation and either the supervisor's personal participation, his exercise of control or direction, or his failure to supervise. *Green v. Bransom*, 108 F.3d 1296, 1303 (10th Cir. 1997). A supervisor may be held liable for failing to implement policies and procedures that lead guards to disregard the risk. *Winton v. Board of Com'rs of Tulsa County, Okl*., 88 F.Supp.2d 1247, 1265 (N.D. Okla. 2000).

Management of the jail is Sheriff Wegener's responsibility. (See Paragraph 34 of Plaintiff's Disputed and Undisputed Material Facts, *Supra*). Wegener inspected the jail and knew the number of people being held there daily (See Paragraph 33, *Supra*). Wegener knew it was common practice to have people sleep on mats on the floor before Plaintiff arrived at the jail, and he did not place limitations on the number of detainees that could be housed in Pod D (See Paragraph 35, *Supra*). He understood that one purpose of regulations limiting cell capacity was to prevent the risk of spread of communicable disease (See Paragraph 36, *Supra*).

Monte Gore failed to implement or enforce policies and failed to adequately train staff. Gore was responsible for ensuring jail operations complied with all laws and jail policies (See Paragraphs 37-38, *Supra*). Gore was aware of overcrowding and substandard conditions (See Paragraphs 50, 58, Supra). He knew detainees were suffering from flu-like symptoms, and had no problem with deputies rendering treatment in the place of the nurse (See Paragraphs 39, 47). Gore testified he did not strictly enforce the procedures Paulsen was to follow, and expected detainees to have sick call whenever Paulsen happened to distribute medications (See Paragraphs 7, 45, *Supra*). Paulsen testified that jail policies and procedures were not enforced, there was inadequate nursing staff, she was not trained to deal with non- English speakers, and she had a

custom of violating policies (See Paragraphs 44, 8, 9, 32, 40, 42, 60 *Supra*).  Multiple deputies testified they never saw the jail's policy and procedure manual (See Paragraphs 52-56, *Supra*). The jail had a custom and practice of severe overcrowding (See 35, 49, 68-69 *Supra*) and substandard conditions (See Paragraphs 1-11, 13, 15, 20, 24-29, 31-32, 40, 42-49, 57-69, *Supra*).

## **CONCLUSION**

In conclusion, for all of the foregoing reasons, the Park County Defendants' Supplemental Motion for Summary Judgment should be denied.

Dated this 30th day of May, 2007.

Respectfully submitted,


By:    /s/ William A. Trine, Esq.
          William A. Trine, #577
          Cheryl L. Trine, #38150
          Trine & Metcalf, PC
          1435 Arapahoe Avenue
          Boulder Colorado 80302-6390
          (303) 442-0173

          Joseph J. Archuleta, #19426
          Joseph J. Archuleta and Associates
          1724 Ogden Street
          Denver Colorado 80218
          (303) 837-1642

          Lloyd C. Kordick, #6298
          Lloyd C. Kordick & Associates
          805 S. Cascade Avenue
          Colorado Springs Colorado 80903
          (719) 475-8460

          Adele Kimmel, Esq.
          Trial Lawyers for Public Justice
          1717 Massachusetts Avenue, N.W.
          Suite 800
          Washington, D.C. 20030

(202) 797-8600

**Attorneys for Plaintiff**

## CERTIFICATE OF MAILING/SERVICE

The undersigned hereby certifies that on this 30th day May, 2007, a true and correct copy of the foregoing pleading was e-served via Electronic Case Filing and/or placed in the United States Mail, postage prepaid, and properly addressed to:

Joseph Archuleta
Attorney at Law
1724 Ogden Street
Denver, Colorado 80218-1018
*Co-Counsel for Plaintiff*

Lloyd C. Kordick,
Attorney at Law
805 S. Cascade
Colorado Springs, CO 80903
*Co-Counsel for Plaintiff*

Adele P. Kimmel
Richard H. Frankel
Trial Lawyers for Public Justice
1717 Massachusetts Avenue, N.W.
Suite 800
Washington, D.C. 20030
*Co-Counsel for Plaintiff*

Andrew Ringel
Jennifer L. Veiga
Hall & Evans
1125 17th Street, Suite 600
Denver, CO 80202-2052
*Counsel for Defendant Park County, Park County Board of*
*County Commissioners, Park County Sheriff's Office,*
*Fred Wegener, and Monte Gore*

Josh A. Marks
Berg, Hill, Greenleaf & Ruscitti
1712 Pearl Street
Boulder, CO 80302
*Counsel for Defendant Vicki Paulsen*

/s/ Elizabeth Peach