**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Case No. 2005-WM-377 (BNB)

DEPOSITION OF: VICKI ANN PAULSEN, R.N.
January 18, 2006

MOISES CARRANZA-REYES,
Plaintiff,
v.
PARK COUNTY, a public entity of the State of Colorado and its governing board, THE PARK COUNTY BOARD OF COUNTY COMMISSIONERS; PARK COUNTY SHERIFF'S OFFICE, a public entity of the State of Colorado; FRED WEGENER, individually and in his official capacity as Sheriff of Park County, Colorado; MONTE GORE, individually and in his capacity as Captain of Park County Sheriff's Department; VICKIE PAULSEN, individually and in her official capacity as Registered Nurse for Park County, Colorado; JAMES BACHMAN, M.D., individually and in his official capacity as Medical Director of the Park County Jail,

Defendants.

TAKEN PURSUANT TO NOTICE on behalf of the Plaintiff at 1125 17th Street, Suite 600, Denver, Colorado 80202 at 9:04 a.m. before Theresa A. Coffman, Federal Certified Realtime Reporter, Registered Professional Reporter and Notary Public within Colorado.

**Page 2**

APPEARANCES

For the Plaintiff:
WILLIAM A. TRINE, ESQ.
Trine & Metcalf, P.C.
1435 Arapahoe
Boulder, Colorado 80302

LLOYD C. KORDICK, ESQ.
805 South Cascade
Colorado Springs, Colorado 80903

JOSEPH J. ARCHULETA, ESQ.
Law Office of Joseph J. Archuleta
1724 Ogden Street
Denver, Colorado 80218

For the Defendants
Park County, Park
County Board of
Commissioners, Park
County Sheriff's Office,
Wegener and Gore:
JENNIFER L. VEIGA, ESQ.
Hall & Evans, LLC
1125 17th Street
Suite 600
Denver, Colorado 80202

For the Defendant Paulsen:
MELANIE B. LEWIS, ESQ.
Berg Hill Greenleaf & Ruscitti LLP
1712 Pearl Street
Boulder, Colorado 80302

For the Defendant Bachman:
CRAIG A. SARGENT, ESQ.
ANDREW W. JURS, ESQ.
Johnson McConaty & Sargent, P.C.
400 South Colorado Boulevard
Suite 900
Glendale, Colorado 80246

Also Present: Moises Carranza-Reyes

**Page 3**

EXHIBIT 2
I N D E X
EXAMINATION OF VICKI ANN PAULSEN, R.N.
January 18, 2006

| | PAGE |
|---|---|
| By Mr. Trine | 5, 225 |
| By Mr. Archuleta | --- |
| By Mr. Kordick | --- |
| By Ms. Veiga | --- |
| By Mr. Sargent | --- |
| By Mr. Jurs | 223 |
| By Ms. Lewis | 220 |

DEPOSITION EXHIBITS: INITIAL REFERENCE

| | | |
|---|---|---|
| 20 | Paulsen Park County personnel file | 5 |
| 21 | Pass-On records | 55 |
| 22 | Code of Colorado Regulations, Department of Public Health and Environment Consumer Protection Section. | 12 |
| 23 | Park County Sheriff's Office Detention Center INS Detainee Intake Form, 3/6/03 | 46 |
| 24 | Summit Medical Center records | 135 |
| 25 | Park County Sheriff's Office Detention Center Job Description | 173 |
| 26 | INS Detention Standard, Medical Care | 215 |

(Original exhibits attached to original deposition; copy exhibits included in continuing exhibit file; copies provided to counsel as requested.)

**Page 4**

REQUESTED PORTIONS OF TESTIMONY: PAGE

| | |
|---|---|
| Request for document production or information | --- |
| Certified question | --- |
| Instruction not to answer | 77 |
| Other requests or marked testimony | --- |

REFERENCES TO EXHIBITS MARKED PREVIOUSLY:

| Exhibit No. | Page Reference |
|---|---|
| 2 | 201 |
| 3 | 69 |
| 4 | 183 |

### 29

1   A.  Right.
2   Q.  And you would only forward the information
3  that you placed on the computer to Dr. Bachman if you
4  felt it was something that he should see right away?
5   A.  Yes.
6   Q.  Otherwise you didn't forward it to him?
7   A.  No. He would see it when he came weekly.
8   Q.  Yeah, I know, but otherwise you wouldn't
9  immediately forward it to him on the computer?
10  A.  No, no.
11  Q.  Now, how would you know that an inmate
12 wanted an appointment with you?
13  A.  They could either fill out what we call a
14 kite or they could ask me.
15  Q.  Okay. Now, do you speak Spanish?
16  A.  No, I do not.
17  Q.  Did you understand when you took the job at
18 Park County that you would at times be dealing with
19 Spanish-speaking --
20  A.  Yes, I did.
21  Q.  -- people who didn't understand English?
22  A.  Yes, I understood that.
23  Q.  Did Monte Gore tell you that?
24  A.  Yes, he did.
25  Q.  What instructions were you given with regard

### 30

1  to how to deal with Spanish-speaking people who didn't
2  speak English?
3   A.  I wasn't given any instructions.
4   Q.  You weren't told that an interpreter would
5  be made available for you?
6   A.  No, but I would not even talk to them
7  without an interpreter.
8   Q.  And when you took the job as nurse at Park
9  County, did you understand that one of the pods was being
10 used for INS detainees?
11  A.  Yes.
12  Q.  What information were you provided about
13 that?
14  A.  Information as to detainees or the pod
15 or . . .
16  Q.  INS detainees.
17  A.  That they took in INS detainees. They were
18 held anywhere from 7 to 14 days. They came in usually at
19 all hours. They would fill out a brief medical form, and
20 I would review them. That was basically -- and then see
21 them if they needed something.
22  Q.  And the population of INS detainees in Pod D
23 varied from what number?
24  A.  7 or 8 to 30.
25      MR. SARGENT: I'm sorry, I didn't hear.

### 31

1      THE DEPONENT: 7 or 8 to 30.
2   Q.  (BY MR. TRINE) What was your practice on a
3  daily basis when you first took the job as nurse at Park
4  County? About what time would you come to work?
5   A.  Usually at 6:00.
6   Q.  And you were required to put in a 40-hour
7  week?
8   A.  Yes.
9   Q.  You usually arrived at 6:00. Why at 6:00?
10  A.  Because when I started, we had two
11 diabetics, and they were insulin-dependent, and they
12 needed their insulin prior to breakfast, and so I would
13 take their insulin and do med rounds at that time, or
14 right after 6:00, and I just continued with that
15 schedule.
16  Q.  Okay. So you'd arrive at 6:00, do your
17 rounds, meaning passing out meds --
18  A.  Medication, morning medication.
19  Q.  You probably spent some time getting
20 medications ready?
21  A.  Um-hum.
22  Q.  And about what time would you usually pass
23 out medications?
24  A.  Anywhere from 20 after 6:00 to 6:30.
25  Q.  Then what were your activities after that?

### 32

1   A.  Then I would go back, and if I got any
2  requests from inmates just talking to me or they gave me
3  a kite to be seen, then I'd make a list and take it to
4  control and tell them these are the people I needed to
5  see after breakfast, and usually I started seeing
6  patients right after breakfast, as soon as breakfast
7  trays were up. As soon as I could get an officer to
8  bring them back.
9   Q.  Then what were your activities during the
10 day? Just seeing inmates all day?
11  A.  Seeing inmates usually in the morning. We
12 did PBTs. I mean, there's . . .
13  Q.  What is that?
14  A.  That's a TB test. Gosh. My day was full.
15 I just know I was busy the whole time, so . . .
16  Q.  What was your understanding of who would
17 receive TB tests?
18  A.  Basically, any new inmate into the facility.
19 The only ones that would not would be boot camp -- those
20 are DOC inmates that they held for boot camp at Buena
21 Vista. They had already been screened and been through
22 the procedure.
23  Q.  Now, when you were off duty on weekends,
24 what was your understanding of the procedure with new
25 inmates coming in?

## 93

1  congestion and for his upset stomach and diarrhea.
2  Q. And in order to make sure that everyone is
3  on the same page and knows what your instructions are,
4  wouldn't you put that in the pass-on record?
5  A. Yes.
6  Q. Did you find that anywhere in the pass-on
7  record --
8  A. No, I did not.
9  Q. -- those instructions?
10 A. No, I did not.
11 Q. It would have been your custom and practice,
12 however, to enter some kind of note in the pass-on record
13 if you wanted an inmate to be watched carefully, wouldn't
14 you?
15 A. Yes.
16     MS. LEWIS: Object to the form.
17 Q. (BY MR. TRINE) Do you know why that wasn't
18 done here?
19 A. No, I do not.
20 Q. What's your next memory, then, of any
21 contacts with anyone related to Carranza-Reyes after
22 Friday, March 7?
23 A. They called me the early morning of the 8th
24 that he had become short of breath. They had to take him
25 back to medical, and he -- Deputy Frye had taken his

## 94

1  vital signs and had given him some oxygen.
2  Q. And when were you called? About what time?
3  A. About 3:00.
4  Q. And was it your impression, then, that his
5  condition had deteriorated from the time you saw him on
6  the 7th?
7  A. Yes.
8  Q. Did you at that time consider coming in
9  immediately to assess him?
10 A. I did, and I talked to the deputies, and
11 they didn't feel at that point that it was necessary for
12 me to come in right then.
13 Q. Which deputy did you talk to?
14 A. I talked to Deputy Fikejs.
15     MR. SARGENT: I'm sorry. I didn't hear you.
16     THE DEPONENT: Deputy Fikejs.
17 Q. (BY MR. TRINE) And what was your
18 understanding of what medical training, if any, Deputy
19 Fikejs had?
20 A. Deputy Frye was taking care of Mr.
21 Carranza-Reyes.
22 Q. But you spoke to Mr. Fikejs?
23 A. Deputy Frye was with him and in medical, and
24 so it was Deputy Fikejs, and he was relating to me
25 what -- and I could hear what Mr. Frye was saying.

## 95

1  Q. You didn't directly talk to Frye?
2  A. Not until I went in.
3  Q. So your understanding was that Deputy Fikejs
4  was relaying to you information he was getting from Frye?
5  A. Yes.
6  Q. And they were both in the same room
7  together?
8  A. Yes.
9  Q. Did you ask to speak to Frye?
10 A. He was busy with Mr. Carranza-Reyes.
11 Q. He was busy with Carranza-Reyes?
12 A. Yes, yes.
13 Q. Doing what?
14 A. Taking his vital signs and keeping check on
15 him.
16 Q. So the phone conversation took place while
17 Frye was actually examining --
18 A. While he was with him.
19 Q. Is that right?
20 A. Yes.
21 Q. Were you giving instructions on the
22 examination: Do this, do that?
23 A. I asked if they had taken his blood pressure
24 and pulse and respiration and just what his appearance
25 was, what was going on.

## 96

1  Q. Were you informed that the vital signs were
2  abnormal?
3     MS. LEWIS: Object to the form.
4  A. No.
5  Q. (BY MR. TRINE) You were informed that the
6  vital signs were normal and stable?
7  A. Yes.
8  Q. What do you remember --
9  A. I don't remember the vital signs.
10    MS. LEWIS: Wait until he finishes his
11 question.
12    THE DEPONENT: Okay.
13 Q. (BY MR. TRINE) What do you remember about
14 the conversation specifically? What did they tell you
15 about his condition, that is, what did Deputy Fikejs tell
16 you about his condition?
17 A. That they had taken him back to medical,
18 that he was short of breath -- complained of shortness of
19 breath, and he still had nausea and vomiting.
20 Q. What about his temperature?
21 A. I don't remember.
22 Q. Did you take handwritten notes at home of
23 this information, this conversation?
24 A. Yes.
25 Q. And what did you do with those notes?

* SUBJECT TO CONFIDENTIALITY DESIGNATIONS *

137

1 phone in now when you called between 8:00 and 9:00 in the
2 morning?
3   A.  That he had side pain, that I'd seen him two
4 days, and his symptoms were headache, nausea, vomiting,
5 congestion, sore throat.
6   Q.  Under the triage assessment, it indicates
7 that for three days the patient -- can you interpret
8 that? Three days, patient -- right-sided chest pain?
9 Does CP stand for chest pain?
10  A.  Yeah.
11  Q.  And fever. Now, if he had been complaining
12 of right-sided chest pain for the previous three days, on
13 the 5th, 6th, and 7th, were you ever made aware of that?
14  A.  No, not right-sided chest pain.
15  Q.  Now, would right-sided chest pain be
16 consistent with pneumonia in the right lung as well as
17 accumulation of fluid in the right lung?
18  A.  Possibly, yes.
19  Q.  And do you know what the N in VND stands
20 for?
21  A.  Nausea, vomiting and diarrhea.
22  Q.  So for three days -- at least they're being
23 told in the emergency room that for three days he had
24 right-sided chest pain, fever, nausea, vomiting and
25 diarrhea; is that correct?

138

1   A.  Correct.
2   Q.  And apparently he was taken to the restroom
3 and was unable to void; is that correct?
4   A.  Correct.
5   Q.  And that would mean what? That he's
6 dehydrated?
7   A.  Possibly, yes.
8   Q.  Then under Skin, they checked off that he's
9 both pale and jaundiced, and do you remember his being
10 both pale and jaundiced when you saw him that morning?
11  A.  He was pale. I didn't notice jaundice.
12  Q.  And for chest discomfort, they indicate
13 again that he'd been having chest discomfort or pain for
14 three days. Do you see that under Cardiopulmonary?
15  A.  Yes.
16  Q.  And under Abdominal Pain had had right-sided
17 abdominal pain for three days; is that correct?
18  A.  I see that, yes.
19  Q.  And you had actually discovered that he had
20 some abdominal pain on the 6th and 7th; is that right?
21  A.  He had some tenderness.
22  Q.  And as you become septic, if organs start to
23 fail, you can have abdominal pain; is that right?
24  A.  You can -- that can be a number of things,
25 not just sepsis.

139

1   Q.  Then under the Neuro, it indicates that --
2 they checked off headache, dizziness, light-headed. You
3 see that?
4   A.  Um-hum. Yes.
5   Q.  And he had had headaches when you saw him?
6   A.  Yes.
7   Q.  And had he complained of dizziness?
8   A.  He did not complain of dizziness to me. He
9 said he had a headache.
10  Q.  Now, do you recall one of the deputies
11 informing you that he saw Carranza-Reyes with blankets
12 wrapped around him and was chilled on the upper tier and,
13 as he was coming down the stairs, couldn't make it all
14 the way and had to sit for a while?
15      MS. LEWIS:  Object to the form and
16 foundation.
17  Q.  (BY MR. TRINE) Do you remember hearing that
18 from any deputy?
19  A.  No, I do not remember that.
20  Q.  And did he have blankets wrapped around him
21 when he was on the upper tier when you watched the deputy
22 assist him downstairs?
23  A.  He had a blanket over him.
24  Q.  Around his shoulders?
25  A.  Over him.

140

1   Q.  And did he appear to you to be chilled?
2   A.  I can't say that he appeared to be chilled.
3   Q.  You don't remember one way or the other?
4   A.  No.
5   Q.  Then at the very bottom of that page,
6 there's some handwritten information indicating that they
7 noted an increased shortness of breath; is that right?
8   A.  Correct.
9   Q.  And in listening to his lungs, he had rales?
10  A.  I see that.
11  Q.  And they apparently drew blood for labs at
12 that time, is that right, and sent him to --
13  A.  Yes.
14  Q.  And sent him for a chest X-ray?
15  A.  Yes.
16  Q.  Apparently sent him to a chest X-ray at 1410
17 hours? That would be 2:10 p.m.?
18  A.  Yes.
19  Q.  And he continued to have a reduced blood
20 pressure. Do you see that? Continued to have a
21 reduction in blood pressure?
22  A.  Right, decrease.
23  Q.  But was able to stand?
24  A.  Right. And then a blood pressure increase.
25  Q.  And the blood pressure increased when they

### Page 145

1  Q.  And you saw five people the next day?
2  A.  I did.
3  Q.  In the morning?
4  A.  Yes.
5  Q.  And you now believe one of them was
6  Carranza-Reyes?
7  A.  I don't know that. I don't believe I saw
8  him on Wednesday.
9  Q.  Okay. Then if you look at the bottom of
10 page 2, it indicates that his O2 saturation was 91
11 percent when he was on oxygen by mask, right?
12 A.  Right.
13 Q.  So it would be much lower than that if it
14 was on --
15 A.  Room air.
16 Q.  On room air?
17 A.  Correct.
18 Q.  And then the X-ray, of course, showed the
19 large right middle lobe and right lower lobe pneumonia.
20 and if you look at page 3 of that Exhibit 24, it
21 indicates that the EKG that they took was abnormal, and
22 that's also typical of someone with sepsis to have an
23 abnormal EKG; is that right?
24 A.  Correct.
25 Q.  Did you ever consider performing an EKG on

### Page 146

1  Carranza-Reyes while he was at Park County?
2  A.  No, I didn't.
3  Q.  And under Discussion, it says, "Medical
4  records unavailable." You had not made any arrangements
5  to have any of your charting or medical records delivered
6  with the transport; is that right?
7  A.  That's correct.
8  Q.  Now, under Diagnosis, it indicates right
9  middle lobe and right lower lobe pneumonia, sepsis and
10 hypokalemia, and what do you understand hypokalemia to
11 be?
12 A.  Potassium.
13 Q.  And with low potassium, if it gets too low,
14 that's life-threatening, isn't it?
15 A.  That's right.
16 Q.  And the elevated creatinine and abnormal
17 chemistries that you looked at were all consistent with
18 sepsis?
19 A.  Correct.
20     MS. LEWIS: Object to that last question.
21     MR. TRINE: Excuse me?
22     MS. LEWIS: I'm interjecting an objection as
23 to the form of that last question.
24 Q.  (BY MR. TRINE) Now, on page 2, on
25 examination of the lungs, it indicates that on the right

### Page 147

1  side, rales were auscultated, and what do you understand
2  rales to be?
3  A.  Noise, just very noisy.
4  Q.  And you would expect that if you've got
5  pneumonia with fluid building up, wouldn't you?
6  A.  Yes.
7  Q.  And it also indicates bilateral rhonchi
8  auscultated. What's the difference between rales and
9  rhonchi?
10 A.  Rhonchi are more wheezes, rales are more --
11 how do you -- rubs. Noisy.
12 Q.  But you didn't examine him on the morning of
13 the 8th to determine whether or not he had rales or
14 rhonchi or wheezes in breathing; is that right?
15 A.  I believe I listened to his chest, yes. I
16 listened to his back.
17 Q.  Earlier when I asked you, you said that you
18 palpated his back --
19 A.  And groin area, yes.
20 Q.  -- around to the front, and I asked if you
21 conducted any other examination in addition to that,
22 vitals, anything, and you said no. Do you remember now
23 that you listened to his lungs?
24 A.  I cannot say for sure.
25 Q.  You don't believe that he developed

### Page 148

1  pneumonia and sepsis after leaving the jail on his ride
2  to Summit County, do you?
3  A.  I don't know.
4  Q.  Well, in retrospect, looking at these
5  medical records?
6  A.  No.
7  Q.  You know now he had pneumonia and sepsis
8  while he was in jail; isn't that right?
9      MS. LEWIS: Object to form.
10 Q.  (BY MR. TRINE) Correct?
11 A.  Correct.
12 Q.  Thank you. And you know now that his
13 symptoms commenced at least by the time you saw him the
14 first time; is that right?
15     MS. LEWIS: Object to the form.
16 A.  He had symptoms but not symptoms of
17 pneumonia.
18 Q.  (BY MR. TRINE) And least you weren't aware
19 of them? In other words, he says he'd had shortness of
20 breath for three days, he had had chest pain on the right
21 side for three days before he came there. Would that
22 indicate to you that he probably had pneumonia for three
23 days?
24     MS. LEWIS: Object to the form.
25 A.  He did not indicate to me that he had

### Page 149

1  right-sided chest pain until the morning of the 8th.
2     Q.   (BY MR. TRINE) Assuming hypothetically that
3  he had right-sided chest pain for three days before he
4  arrived, you would agree that that was probably caused by
5  the pneumonia he was diagnosed with; isn't that right?
6          MS. LEWIS: Form.
7     A.   It could be pneumonia, it could be pleurisy.
8     Q.   (BY MR. TRINE) Do you think he had
9  pleurisy --
10    A.   I don't think he had pleurisy. I did not
11 say that.
12    Q.   Okay.
13    A.   I said it could be.
14    Q.   Would you agree that, based on the diagnosis
15 made at Summit Medical Center and his symptoms at that
16 time and his description of having right-sided chest pain
17 for three days and shortness of breath for three days,
18 that he probably had had pneumonia for three days?
19         MS. LEWIS: Object to the form.
20    A.   Yes, I guess.
21    Q.   (BY MR. TRINE) And on page 3 of those same
22 medical records, apparently dictated by Dr. Keeling, it
23 indicates that the risk of complications and morbidity if
24 untreated are potentially high, and based on what you've
25 just reviewed in these records, would you agree with

### Page 150

1  that?
2     A.   Yes.
3          (At this time Mr. Kordick left the
4  deposition room.)
5     Q.   Now, if we could go back to the pass-on
6  records, which was Exhibit 21, and refer to Park 3545,
7  please. This is a record dated March 9, '03 from
8  Corporal Crawford to all staff, and in that first
9  paragraph it indicates, "Talked with Nurse Paulsen about
10 cleaning all pods with a 10 percent bleach solution, and
11 she concurs." And then it talks about removing mold and
12 a complete linen exchange done in D and C pods along with
13 uniform and underwear exchange in D Block. Do you recall
14 that conversation or discussion?
15         (At this time Mr. Kordick entered the
16 deposition room.)
17    A.   Yes. Yes.
18    Q.   Where did that take place? By phone or at
19 the facility?
20    A.   By phone.
21    Q.   Let's see. The 9th would have been Sunday,
22 so you would have been --
23    A.   At home.
24    Q.   -- at home. And had you had conversations
25 with anyone after your conversation with Captain Gore at

### Page 151

1  11 o'clock the night of the 8th and before this
2  conversation?
3     A.   No.
4     Q.   So this would have been the next contact
5  with anyone about the Carranza-Reyes matter on the 9th,
6  or did you talk to someone else first?
7     A.   I talked to Dr. Bachman on Sunday.
8     Q.   Tell us about that conversation. Did you
9  call or did he?
10    A.   He called me.
11    Q.   And about what time Sunday?
12    A.   I don't remember what time it was.
13    Q.   Called you at home?
14    A.   Called me at home.
15    Q.   And what was the gist of the conversation?
16    A.   That he had heard from the emergency room
17 and what had gone on -- I mean, what they had diagnosed
18 with him, where he went, and asked me about when I had
19 seen him prior to that.
20    Q.   What information did you provide him with?
21    A.   With my findings and then that he was
22 eventually transported.
23    Q.   Did you forward him a copy of your computer
24 notes?
25    A.   I believe he has a copy of those, yes.

### Page 152

1     Q.   No. Did you forward a copy of those to him
2  at that time when he asked what had happened or what his
3  condition had been?
4     A.   Yes. He has those notes. Not on that day.
5  I'm sure I did it on Monday.
6     Q.   But you had that on your home computer?
7     A.   Right.
8     Q.   And you could have just faxed it right from
9  your home to him?
10    A.   No, I --
11    Q.   Not faxed. You could have just e-mailed?
12    A.   I don't have that ability on my computer.
13    Q.   You can't forward an e-mail or --
14    A.   No.
15    Q.   -- send something by e-mail?
16    A.   No, I cannot.
17    Q.   Did you have those notes on your monitor, on
18 your screen, when you talked to him and use those notes
19 to tell him what had happened?
20    A.   No.
21    Q.   Did you have your notes from the 6th and
22 7th --
23    A.   No.
24    Q.   -- on your computer?
25    A.   No.

Page 157

1   A.   That would just be part of taking care of
2   cleaning the pod.
3   Q.   That was also his suggestion or --
4   A.   I don't recall.
5   Q.   And if you look at 3546, the next page, is
6   that your note stating, "D Pod needs to be cleaned and
7   disinfected daily until we are over the flu symptoms"?
8   A.   Yes.
9   Q.   And when did you enter that note?
10  A.   I don't recall. It would probably be the
11  Monday that I went back to work.
12  Q.   March 10?
13  A.   Probably, yes.
14  Q.   Now, by that time on March 10, there were
15  only 10 detainees left in D Pod. 50 had been moved out
16  on March 7?
17  A.   Right.
18  Q.   And were you concerned about the 50 who had
19  been moved out on March 7? In other words, on March 10
20  did you have concern about the 50 that had been moved out
21  on March 7 and how many of those may have had an
22  infectious process going on?
23  A.   No, not really.
24  Q.   What do you mean, "not really"?
25  A.   Mainly because the pods always had inmates

Page 158

1   in them who had colds and that kind of thing, and it just
2   wasn't -- it wasn't a contagious process that went on.
3   Just was not.
4   Q.   In other words, detainees were coming in and
5   out of Pod D frequently; is that right?
6   A.   That's correct.
7   Q.   Usually for short stays?
8   A.   For short stays.
9   Q.   And with that kind of turnover coming in and
10  out, there was always someone with a cold or flu or
11  something?
12  A.   Sinusitis. Something.
13  Q.   Something going on?
14  A.   Yeah. Not -- I mean, a lot of it was just a
15  stuffy nose, that type of thing.
16  Q.   Do you remember ever segregating detainees
17  and taking them out of Pod D because of any possible
18  communicable disease?
19  A.   No.
20  Q.   Flu, infection?
21  A.   No.
22  Q.   They'd be left in Pod D if they had signs
23  and symptoms of the flu or an infection?
24       MS. LEWIS: Object to the form.
25  A.   Trying to think if we . . .

Page 159

1   Q.   (BY MR. TRINE) Is that right?
2        MS. LEWIS: Same objection.
3   A.   They could be left there, yes.
4   Q.   (BY MR. TRINE) So you usually didn't really
5   have an opportunity, with Pod D inmates coming in and
6   out, to constantly -- you usually didn't have an
7   opportunity to just clear the pod and totally disinfect
8   it, remove mold and clean it up; is that right?
9   A.   Right.
10  Q.   But now, with only 10 detainees left in Pod
11  D and after what happened with Carranza-Reyes, you
12  indicated it really needed to be cleaned and disinfected
13  daily?
14  A.   Right.
15  Q.   Were you also informed at that time by
16  anyone that the jail wasn't going to accept any more
17  detainees until the pod had been disinfected for a number
18  of days and they were certain that it was now okay to
19  move new people in there?
20  A.   No, I was not.
21  Q.   You weren't informed of that by anyone?
22  A.   No.
23  Q.   And if you look at 3544, again, Exhibit 21,
24  at the bottom paragraph there, and this is on a shift
25  update by Sergeant Muldoon, and it states, "Per medical,

Page 160

1   each housing unit will be cleaned daily with a 10 percent
2   bleach solution, and linen will be exchanged daily, if
3   possible. Also per medical, every attempt will be made
4   to ensure at least one-half hour of outside recreation
5   each day."
6        Now, do you recall having or making that
7   recommendation to Sergeant Muldoon on the 10th?
8   A.   Yes.
9   Q.   And why did you want to make sure that
10  people got outside recreation each day?
11  A.   Just to be out in the fresh air. Just good
12  for you to be out in the fresh air.
13  Q.   And was it because that hadn't been
14  occurring?
15  A.   It had, but in bad weather, a lot of times
16  it's not possible, so they'd go to the inside rec room.
17  But on nice days, if they could get out, it was just a
18  good idea to get everybody out.
19  Q.   Now, did you hear from any source that the
20  Mexican consulate had contacted the INS, and the INS had
21  called Park County Jail on the 9th requesting that all
22  the remaining INS detainees be examined by a physician?
23  A.   I didn't know that the consulate had asked.
24  That was not told to me.
25  Q.   What information did you receive?

193

1   A.   That's the lab I initiated services with,
2   yes.
3   Q.   And that was located where?
4   A.   That's here in Denver.
5   Q.   In Denver?
6   A.   Yes.
7   Q.   And it states that Timberline Clinic will
8   manage the processing of lab work. Where was Timberline
9   Clinic located?
10  A.   That's in Fairplay.
11  Q.   So how would that work? You would give the
12  blood to Timberline Clinic?
13  A.   No. I used LabCorp exclusively. Timberline
14  did not want to process that any longer, so I used
15  LabCorp.
16  Q.   Timberline wasn't involved --
17  A.   No.
18  Q.   -- when you were there?
19  A.   No.
20  Q.   In that next paragraph, it talks about the
21  service being provided by Timberline Clinic, Silverheels
22  Clinic and/or Summit Medical Center. Did you ever use
23  Silverheels Clinic?
24  A.   I never used Timberline or Silverheels
25  because they did not want to do radio -- I mean do X-rays

194

1   anymore.
2   Q.   Okay. So for X-rays, you would use Summit?
3   A.   Summit, yes.
4   Q.   Then if you look at 603, toward the bottom
5   of that page, 603, it talks about the nurse or physician,
6   upon assessment of need, will determine the need for
7   emergency room care and/or hospitalization.
8   A.   Um-hum.
9   Q.   And in that next paragraph states, "The
10  nurse will need to determine the appropriate receiving
11  hospital and mode of transport." Did you understand it
12  was up to you to decide whether or not an ambulance
13  should be used as opposed to a jail vehicle to transport
14  inmates?
15  A.   Yes. Yes.
16  Q.   And you had the authority to make that
17  decision?
18  A.   Yes.
19  Q.   And the next paragraph indicates, "The nurse
20  will call the receiving facility and give a complete
21  telephone report to a receiving nurse. The telephone
22  report will include the nature of the illness or injury,
23  the medical history of the patient, including allergies,
24  vital signs, physical findings, treatment rendered and
25  the estimated time of arrival," and I believe that you

195

1   stated that you did do that with Carranza-Reyes between
2   8:00 and 9:00 in the morning on the 8th; is that right?
3   A.   Yes.
4   Q.   But you don't know who you talked to?
5   A.   I don't know who I talked to.
6   Q.   Would you have expected the person you
7   talked to to have taken notes and recorded that
8   information?
9   A.   They should have put it down somewhere, yes.
10  Q.   And would you expect it to be in the
11  patient's Summit County files that we looked at?
12  A.   I would assume it should be, yes.
13  Q.   Okay. There's no indication in there --
14  A.   No indication?
15  Q.   -- of any conversation with you, but you
16  believe that there was such a conversation?
17  A.   Yes, I do.
18       MR. TRINE: It's about two or three minutes
19  to 4:00. Off the record.
20       (Discussion off the record.)
21       (Break taken from 3:58 p.m. to 4:08 p.m.)
22  Q.   (BY MR. TRINE) If you'll refer now to page
23  614 of Exhibit 4, which is the policy and procedure for
24  handling of inmate medical request forms, and were these
25  forms available when you were there for inmates to fill

196

1   out for medical requests?
2   A.   Yes.
3   Q.   And did you have a form in Spanish at that
4   time?
5   A.   Yes.
6   Q.   Or were all the kites in English?
7   A.   I thought we had both. I mean . . .
8   Q.   Do you remember there being a period of time
9   when they were in English, and a request was made for
10  forms in Spanish?
11  A.   No, I don't. I don't remember that.
12  Q.   And if you look at 617, please, which is the
13  policies and procedures for emergency services, and the
14  next-to-last paragraph on page 617 indicates that while
15  awaiting the arrival of an ambulance and/or other EMS
16  response, a nurse will assume on-site care of the inmate
17  and continue with assessment, treatment and emergency
18  medical procedures. And did you understand that that was
19  one of your duties under these policies, that after you
20  arranged for transport, you were to stay with the patient
21  and continue with your assessment until the patient was
22  transported out of there?
23  A.   Yes.
24  Q.   Is that correct?
25  A.   Yes, correct.

**Page 197**

1  Q.  And so why did you decide to leave the
2  facility on the morning of the 8th and go home,
3  essentially abandoning Carranza-Reyes and not staying
4  with him until he was transported?
5      MS. LEWIS: Object to the form and also
6  asked and answered. Go ahead.
7  A.  Okay. I should have stayed with him, I
8  admit that I should have stayed with him.
9  Q.  (BY MR. TRINE) In other words, that was
10 just an error on your part?
11 A.  That's right. It was an error on my part.
12 Q.  Could you give me just a chronological brief
13 summary of what fields of nursing you worked in before
14 going into correctional work.
15 A.  Neonatal intensive care, pediatrics.
16 Q.  About how many years in neonatal care?
17 A.  Six. And pediatrics, family practice care.
18 Q.  How many years in family practice?
19 A.  Family practice, four, and I participated
20 part-time in some drug research at the old Fitzsimons.
21 Q.  What research? I didn't hear you.
22 A.  Drug research.
23 Q.  Drug research?
24 A.  Um-hum, at the old Fitzsimons. And then I
25 have done hospice and geriatric care and corrections.

**Page 198**

1  Q.  Okay. And has almost all of that
2  experience -- or all of it -- been in a clinical setting
3  as opposed to an administrative position?
4  A.  Well, in geriatrics, it's in a nursing home
5  type, and then neonatal would be in an intensive care
6  unit, and family practice would be in a family practice
7  office. Pediatrics was in a pediatric office.
8  Q.  It was all clinical?
9  A.  Right, um-hum.
10 Q.  As opposed to spending several years in some
11 kind of administrative position?
12 A.  No, not my --
13 Q.  So you've had a considerable amount of
14 clinical experience, then?
15 A.  Um-hum.
16 Q.  And based on all of that experience, when
17 you went to work at Park County, were you concerned about
18 their general policies and procedures as it would relate
19 to the care of detainees?
20 A.  I had some concerns, yes.
21 Q.  And what was the gist of your concerns?
22 A.  Continuity, I mean, as far as . . .
23 Q.  Continuity of care?
24 A.  Yeah. And that there were times I felt like
25 some of what they had in policies and procedures were not

**Page 199**

1  enacted.
2  Q.  Were not what?
3  A.  Enacted. I mean, they weren't in . . .
4  Q.  They weren't really enforcing policies and
5  procedures?
6  A.  Right. Right.
7  Q.  And that concerned you?
8  A.  Yes, it did.
9  Q.  And on continuity of care, would you explain
10 that in more detail.
11 A.  Well, you know, instead of having one nurse
12 24 hours a day -- I mean, you're there, but then you're
13 not there -- it would have been better to have even two
14 shifts, a night shift and a day shift, so that you had
15 that continuity, that you didn't have to rely on an EMT
16 or your jail personnel to, you know, let you know what
17 was going on. That you had another license there.
18 Q.  With better continuity of care, there's less
19 risk or chance of something falling through the cracks,
20 so to speak?
21 A.  True. True.
22 Q.  I know that you were a new employee there.
23 A.  Yes.
24 Q.  But nevertheless, did you at any time
25 discuss your concerns with any of the other personnel or

**Page 200**

1  Monte Gore?
2  A.  No, I didn't.
3  Q.  Were you reluctant to do that because you
4  were a new employee?
5  A.  Yes.
6  Q.  Did your concerns have anything to do with
7  your not returning to Park County when you came back to
8  Colorado?
9  A.  Yes.
10 Q.  Where did you then become employed after you
11 returned to Colorado?
12 A.  I work for Supplemental Health Care. It's
13 an agency, and I work at DOC, Department of Corrections.
14 Q.  And you've been doing that since you
15 returned?
16 A.  Yes.
17 Q.  Do you work out of any particular facility?
18 A.  Buena Vista.
19 Q.  Okay. So it's a longer commute, but --
20 A.  It's a longer commute.
21 Q.  But you prefer doing that to working in Park
22 County?
23 A.  Yes.
24 Q.  If you'd now please refer to Exhibit 2
25 again, which is in the binder, to page 155?

**221**

1  A.  Right.
2  Q.  -- I understand from your testimony that
3  there were occasions that you relayed information to jail
4  staff of a medical nature through the pass-on. Is that
5  correct?
6  A.  True.
7  Q.  How did you relay that information?
8  A.  I would tell -- there were times I would
9  write it in the book, and there were other times where I
10 would tell the officer in control about it, and he would
11 put it in the book.
12 Q.  So the information you relayed would not
13 necessarily be in writing every time?
14 A.  Correct.
15 Q.  Going back to the conversation with Ben at
16 the INS on the morning of March 8, do you remember that?
17 A.  Um-hum.
18 Q.  During that conversation, did Ben tell you
19 that INS refused to transport unless he got worse or that
20 INS agreed to transport Carranza-Reyes, but it would take
21 up to three hours to do so?
22 A.  They would -- it wasn't if he got worse. I
23 mean, they didn't refuse, but we could -- they said it
24 would take them up to three hours to have an officer
25 there.

**222**

1  Q.  So at the time you left the morning of March
2  8, was it your understanding that transport arrangements
3  were in process?
4  A.  Yes.
5  Q.  Was it just a matter of when that transport
6  occurred as far as you knew?
7  A.  Yes.
8  Q.  You testified earlier that you think it was
9  an error on your part to leave the morning of March 8
10 when you did at 9:00 a.m. or so. Do you reach that
11 conclusion today with the benefit of hindsight of what
12 eventually happened to Mr. Carranza-Reyes?
13 A.  Yes.
14 Q.  If Carranza-Reyes had ended up being fine
15 and had not gotten as sick as he eventually did, would
16 you still feel like it was an error on your part to leave
17 the morning of March 8?
18     MR. TRINE: Objection, form and foundation.
19 A.  Yeah.
20 Q.  (BY MS. LEWIS) Well, given the symptoms he
21 presented to you at the time, did you feel like you
22 needed to stay that morning?
23 A.  At the time I saw him, he was fairly
24 comfortable and -- no, not at that time.
25 Q.  So as far as you knew, there was a transport

**223**

1  being arranged --
2  A.  Yes.
3  Q.  -- to come pick him up, right?
4  A.  Yes.
5     MS. VEIGA: No questions.
6     MS. LEWIS: That's all I have.
7     MR. JURS: Is it okay if I sit down here if
8  I project?
9         EXAMINATION
10 BY MR. JURS:
11 Q.  I'd like you to look at Exhibit 26, INS
12 detention standards, and I believe your testimony was
13 that you were not provided a copy of these. Is that
14 true?
15 A.  I didn't have one in the office, no.
16 Q.  I'd like you to turn to the page marked Park
17 1699 and examine that page and the pages that appear
18 after that. Have you had a chance to look at all those
19 documents, 1699 through 1705?
20 A.  Yes.
21 Q.  And were those Park County Sheriff's Office
22 policies and procedures?
23 A.  Yes, they are.
24 Q.  Would you have been provided those policies
25 and procedures?

**224**

1  A.  I should have been.
2  Q.  Because you were provided with the other
3  Park County policies and procedures?
4  A.  Yes.
5  Q.  I'm going to ask you a question, and this is
6  specifically with regard to Mr. Carranza-Reyes and his
7  medical condition during the period of time he was in the
8  Park County Jail. Did you need any further standing
9  orders, protocols, policies or procedures from Dr.
10 Bachman in order for you to provide appropriate care and
11 treatment to Mr. Carranza-Reyes based on how he presented
12 to you?
13 A.  Not on how he presented in the beginning,
14 no. I didn't -- I don't feel that I did, no.
15 Q.  So you had all the standing orders,
16 protocols, procedures and policies that you needed, based
17 on his clinical presentation?
18 A.  If -- for -- I didn't have any standing
19 orders to go by at that time. At least there were none
20 in there in the office. But based on what he presented
21 with, I don't know that a policy and procedure would have
22 been advantageous.
23     MR. JURS: Okay. I don't have any other
24 questions. Thank you for your time today.
25