SHEET 1 PAGE 1

**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Case No. 2005-WM-377 (BNB)

DEPOSITION OF: MONTE GORE, VOLUME 1
October 31, 2005

MOISES CARRANZA-REYES,

Plaintiff,

v.

PARK COUNTY, a public entity of the State of Colorado and its governing board, THE PARK COUNTY BOARD OF COUNTY COMMISSIONERS; PARK COUNTY SHERIFF'S OFFICE, a public entity of the State of Colorado; FRED WEGENER, individually and in his official capacity as Sheriff of Park County, Colorado; MONTE GORE, individually and in his capacity as Captain of Park County Sheriff's Department; VICKIE PAULSEN, individually and in her official capacity as Registered Nurse for Park County, Colorado; JAMES BACHMAN, M.D., individually and in his official capacity as Medical Director of the Park County Jail,

Defendants.

TAKEN PURSUANT TO NOTICE AND AGREEMENT on behalf of the Plaintiff at 824 Castello, Fairplay, Colorado at 9:04 a.m. before Theresa A. Coffman, Federal Certified Realtime Reporter, Registered Professional Reporter and Notary Public within Colorado.

**Page 2**

APPEARANCES

For the Plaintiff:
WILLIAM A. TRINE, ESQ.
Trine & Metcalf, P.C.
1435 Arapahoe
Boulder, Colorado 80302

LLOYD C. KORDICK, ESQ.
805 South Cascade
Colorado Springs, Colorado 80903

JOSEPH J. ARCHULETA, ESQ.
Law Office of Joseph J. Archuleta
1724 Ogden Street
Denver, Colorado 80218

For the Defendants Park County, Park County Board of Commissioners, Park County Sheriff's Office, Wegener and Gore:
ANDREW D. RINGEL, ESQ.
Hall & Evans, LLC
1125 17th Street
Suite 600
Denver, Colorado 80202

STEPHEN A. CROOME, ESQ.
P.O. Box 1373
501 Main Street
Fairplay, Colorado 80440

For the Defendant Paulsen:
MELANIE B. LEWIS, ESQ.
Berg Hill Greenleaf & Ruscitti LLP
1712 Pearl Street
Boulder, Colorado 80302

For the Defendant Bachman:
ANDREW W. JURS, ESQ.
Johnson McConaty & Sargent, P.C.
400 South Colorado Boulevard
Suite 900
Glendale, Colorado 80246

Also Present: None

**Page 3**

EXHIBIT 3
I N D E X

| | EXAMINATION OF MONTE GORE Volume I October 31, 2005 | PAGE |
|---|---|---|
| | By Mr. Trine | 5 |
| | By Mr. Kordick | -- |
| | By Mr. Archuleta | -- |
| | By Mr. Ringel | -- |
| | By Mr. Croome | -- |
| | By Ms. Lewis | -- |
| | By Mr. Jurs | -- |

| DEPOSITION EXHIBITS: | | INITIAL REFERENCE |
|---|---|---|
| 1 | Park County Jail Sergeants Daily Logs, various dates and attachments | 144 |
| 2 | The Park County Jail's Response to the Consulate General of Mexico Regarding the Medical Concerns of Moises Carranza, 3/14/03 | 64 |
| 3 | Master Control Logs, 3/1 through 3/10 | 70 |
| 4 | Park County Jail Policies and Procedures, Establishment of Health Care Unit Policy and Procedure Manual | 193 |
| 5 | Park County Sheriff's Office Policy and Procedure Manual, 11/1/00, three pages | 22 |
| 6 | Policy, "Communicable Diseases" | 39 |
| 7 | Policy and Procedure Manual, Housekeeping, description of cleaning/disinfecting, Bates Nos. 0416, 1530, 1528, 1529 | 190 |

(Original exhibits attached to original deposition; copy exhibits included in continuing exhibit file; copies provided to counsel as requested.)

**Page 4**

| REQUESTED PORTIONS OF TESTIMONY: | PAGE |
|---|---|
| Request for document production or information | -- |
| Certified question | -- |
| Instruction not to answer | 43 |
| Other requests or marked testimony | -- |

REFERENCES TO EXHIBITS MARKED PREVIOUSLY:

(None.)

Notes:

Coffman Reporting
303.893.0202
303.893.2230 FAX

*** SUBJECT TO CONFIDENTIALITY DESIGNATIONS ***

**Page 21**

1  because a lot of the jails up in that area did not have
2  room for the detainees.
3      Q.  Do you remember on March 1 telling INS, "We
4  don't have room for them, we're overcrowded already"?
5      A.  I do not remember specifically telling
6  anyone that. What I'm giving you is a generality as far
7  as some of the conversations that I do recall.
8      Q.  And then were you aware that by March 6,
9  there were 61 detainees housed in Unit D?
10     A.  I believe that's correct.
11     Q.  And did the same thing happen, that is, INS
12 called saying, "We've got these additional detainees,
13 will you take them?"
14     A.  I would say that's probably what happened.
15     Q.  Do you remember at times bragging to some of
16 your deputies that we're making a fortune off of these
17 detainees, the county is?
18         MR. RINGEL: Object to the form.
19     A.  I don't recall bragging to deputies that
20 we're making a fortune.
21     Q.  (BY MR. TRINE) Do you remember bragging to
22 deputies that we're making a profit off of all these
23 detainees?
24     A.  As far as making a profit, I think most of
25 the deputies were aware of that.

**Page 22**

1      Q.  And you were aware of that?
2      A.  Yes.
3      Q.  So there would be no reason for you to not
4  make that statement?
5      A.  Let me correct that. At that time I don't
6  know that we were making a profit. We were offsetting
7  cost.
8      Q.  Now, at that time, that is, in March of
9  2003, Park County had a written policy that you had to
10 provide 80 square feet per inmate in Pod D; is that
11 correct?
12     A.  I'd have to review that policy.
13         (Discussion off the record.)
14     Q.  Mr. Gore, I'll hand you what has been marked
15 for identification as Deposition Exhibit 5, and can you
16 identify Exhibit 5, which consists of three pages marked
17 1450 through Park 1452 as pages out of the Park County
18 policy and procedure manual?
19     A.  Yes, I can.
20     Q.  And the effective date of this policy and
21 procedure was November 1 of 2000; is that correct?
22     A.  That's reflected as the date.
23     Q.  And this was a policy and procedure that was
24 in effect when you became the jail captain; is that
25 right?

**Page 23**

1      A.  Correct.
2      Q.  And when you became jail captain, you had to
3  familiarize yourself with all of the policies and
4  procedures; is that correct?
5      A.  That's correct.
6      Q.  Because you were responsible for
7  implementing those policies and procedures throughout the
8  jail, weren't you?
9      A.  Correct.
10     Q.  There's a reference here to ACA Standard
11 3-4128, and am I correct that since you've been jail
12 captain, the Park County Jail has used the ACA standards
13 and adopted them; is that correct?
14     A.  We're in the process of trying to become ACA
15 accredited.
16     Q.  That wasn't my question. Am I correct that
17 since you've been jail captain, you have utilized and
18 adopted the ACA standards?
19         MR. RINGEL: Object to the form and the
20 foundation.
21     A.  Actually, that would be incorrect. We've
22 probably adopted components of the ACA and not adopted
23 some of those components.
24     Q.  (BY MR. TRINE) And does Exhibit 5 represent
25 some of the components of the ACA standards that you did

**Page 24**

1  adopt?
2      A.  That would be correct.
3      Q.  And ACA Standard 3-4128 indicates that the
4  purpose of this particular standard is to ensure that
5  inmates are housed in sleeping areas that are safe,
6  clean, with proper lighting and heating, correct?
7      A.  Correct.
8          MR. RINGEL: Object to the form and the
9  foundation.
10     Q.  (BY MR. TRINE) And the policy states that
11 "It is the policy of the sheriff's office that inmates
12 are housed in cell or dormitory sleeping areas that
13 provide at least 80 square feet of total living space per
14 occupant"; is that correct?
15     A.  That's what that policy states.
16     Q.  And Unit D, in March of 2003, contained 740
17 square feet in the upper tier; is that right?
18     A.  That sounds reasonable.
19     Q.  And 735 square feet in the lower tier?
20     A.  I think that sounds reasonable.
21     Q.  And so the maximum capacity in Pod D would
22 be 18.3 inmates at 80 square feet per inmate; is that
23 right?
24     A.  I didn't do the math. I'd have to take your
25 word for that.

Page 25

1  Q.  Okay. Well, assuming that the maximum
2  capacity, based on that standard, is 18.3 inmates in Pod
3  D, by housing 61 inmates, you were way overloaded and
4  overcrowded, weren't you?
5  A.  According to this policy.
6  Q.  Well, that was the jail's policy, right?
7  A.  Um-hum.
8  Q.  Okay. Now, am I correct that this pod was
9  originally designed to hold no more than 18 inmates and
10 at one time had 18 bunks or beds in that pod?
11 A.  I have never seen a time when that pod had
12 18 bunks. I think the ACA standard would actually be 35
13 square feet per inmate. Even in a lock-down situation, I
14 think, where you actually lock an inmate down for
15 administrative seg, I think at that point you only have
16 to give them 70 square feet. So I think that the jail
17 policy would have actually been in excess of ACA standard
18 as far as per-square-footage requirements.
19 Q.  Do you dispute that Exhibit 5 is, in fact,
20 the ACA standard at 80 square feet per inmate? Is that
21 what that says?
22 A.  I believe it's actually 35 square feet per
23 inmate.
24 Q.  Do you recall that there is another
25 standard, not the ACA standard, that requires 35 square

Page 26

1  feet in the day room but 80 square feet in the living
2  quarters?
3  A.  Typically, most of our cells are actually
4  designed to have a hundred square feet. I am aware of
5  that 35-square-foot standard. I am not aware of an
6  80-square-foot standard other than the one that's in this
7  policy.
8  Q.  Well, this was the jail's policy, correct?
9  A.  That's correct.
10 Q.  Can you tell, just from the dining room
11 seating arrangement or area of the dining facility, where
12 the inmates eat was really designed for only about 18
13 inmates from Pod D? The seating capacity?
14 A.  I would have to review that.
15 Q.  Now, how many bunks or how many beds,
16 permanent beds, were in Pod D when you came on board in
17 September of 2000?
18 A.  I think there's always been about 41 to 42
19 spaces in that cell block.
20 Q.  So you deny that additional bunk beds were
21 being moved into Pod D from time to time, expanding the
22 number of beds while you were there?
23 A.  No, I do not deny that additional bunks were
24 moved in from time to time. We still move additional
25 bunks in today from time to time if we need additional

Page 27

1  bunk space.
2  Q.  In March of 2003, there were a total of 42
3  bunk beds in there, weren't there?
4  A.  I believe that's correct.
5  Q.  Now, how many bunk beds were in there when
6  you came on board in September of 2003?
7  A.  I believe it would have been a number around
8  that specific number. I'm not sure.
9  Q.  Well, when you agreed earlier that
10 additional bunk beds have been moved in expanding that
11 number, when did that expansion occur? When were
12 additional bunk beds moved in?
13     MR. RINGEL: Object to the form.
14 A.  Let me clarify. Depending on the amount of
15 inmates, if there's a need to put more bunks in there to
16 support more inmates, we'd put more bunks in. That's
17 even currently being done today. As inmate numbers drop,
18 we will remove those bunks, typically.
19 Q.  (BY MR. TRINE) Am I correct that with 42
20 bunks in the upper tier of Pod D, that the upper tier is
21 filled and there's not room for additional bunk beds?
22 A.  If -- you actually could get additional bunk
23 beds into the lower level if you had to.
24 Q.  I didn't ask about the lower level. Let me
25 rephrase the question.

Page 28

1  A.  Okay.
2  Q.  Am I correct that with 42 bunk beds in the
3  upper tier of Pod D, it's filled, and you can't get more
4  bunk beds in that upper tier?
5  A.  I would say that if you had 42 beds in the
6  upper tier, I believe it would be sufficiently full.
7  Q.  So that if you're filled to maximum capacity
8  in the upper tier with 42 inmates, you know if you take
9  more inmates, they're going to have to sleep on
10 mattresses on the floor, right?
11 A.  Correct.
12     MR. RINGEL: Object to the form.
13 Q.  (BY MR. TRINE) And how much space is left
14 on the upper tier to place mattresses on the floor when
15 you have 42 bunks in there?
16 A.  I would say probably there would be no room
17 left on the upper tier. Most of the mattresses would
18 have had to have been placed on the lower level to handle
19 any overflow.
20 Q.  Okay. And how many toilets in Pod D?
21 A.  Two.
22 Q.  And where are they located?
23 A.  They're located on the lower level.
24 Q.  How many urinals?
25 A.  I believe there's two.

### Page 49

1  or opinion?
2      A.   Well, I'm not sure that the jail was
3  designed -- that particular part of the jail was designed
4  to meet ACA regulations.
5      Q.   Okay. So when the jail adopted the ACA
6  regulations that we earlier referred to, the call for 80
7  square feet per inmate, how did you expect to comply with
8  those ACA regulations if the space was not designed for
9  those regulations?
10          MR. RINGEL: Object to the form and the
11 foundation.
12     A.   Well, if that was the -- once again, ACA is
13 a guideline, and while we want to move closer to ACA and
14 become ACA accredited, I'm not sure that those cell
15 blocks were designed to meet ACA to begin with.
16     Q.   (BY MR. TRINE) But you understood when you
17 took over as jail captain in September of 2000 that
18 certain ACA standards had been adopted as the policy of
19 the jail?
20     A.   We were trying --
21     Q.   Is that correct?
22     A.   Correct.
23          (At this time Mr. Groome left the deposition
24 room.)
25     Q.   Now, in March of 2003, am I correct that no

### Page 50

1  specific inmates were assigned to clean Pod D on a daily
2  basis?
3          MR. RINGEL: Object to the form and the
4  foundation.
5      A.   Typically we have inmates that are assigned,
6  and I think at the time Deputy Ellis was in charge of
7  making those assignments, in order to keep those
8  facilities clean.
9      Q.   (BY MR. TRINE) What records would you have
10 showing that assignments were made to specific inmates
11 between March 1 and March 10 of 2003?
12     A.   I'm not sure if we have records that would
13 indicate that, but I know that between those dates
14 indicated, once again, we were housing inmates for the
15 state, feds, different counties, and typically, it's my
16 directive that we keep the entire facility clean because
17 we can be inspected at any time.
18     Q.   And when do you recall assigning Deputy
19 Ellis the task of appointing inmates in Pod D to clean
20 Pod D?
21     A.   Once again, my assignment would not have
22 been that specific. My assignment would have been to get
23 trustees and make sure that the facilities are clean.
24     Q.   Oh. Are you saying that trustees would be
25 assigned to clean Pod D?

### Page 51

1      A.   If there was a need for it, yes.
2      Q.   And the detainees in Pod D would not be
3  assigned that task; is that right?
4      A.   No, that's not what I'm saying. Typically
5  we have pod janitors within the jail. The pod janitors
6  are actually paid to perform janitorial duties within the
7  pod and keep it clean, keep it squared away, keep the
8  showers clean, keep the trash up, things like that.
9  Typically, if we can't find a janitor or if I have
10 inmates that would refuse to clean something like that,
11 then typically we would go in with staff and have
12 trustees clean that cell block.
13          (At this time Mr. Groome entered the
14 deposition room.)
15     Q.   Now, if --
16     A.   We also put in -- typically, we put in
17 cleaning equipment after every meal as well, or three
18 times a day.
19     Q.   Now, if your answers to interrogatories
20 indicate that the inmates in Pod D were expected to clean
21 Pod D, would that be incorrect?
22     A.   No, that would not be incorrect.
23     Q.   Well, are you saying that your -- I need to
24 know what your testimony is. Are you saying the trustees
25 were assigned to clean Pod D?

### Page 52

1      A.   I'm not saying that. What I'm telling you
2  is if we have inmates in that particular cell block, say,
3  they refuse to clean, we would still go in there and
4  clean that pod.
5      Q.   Now, how would we determine which detainees
6  in Pod D during the first week of March were assigned the
7  task of cleaning Pod D?
8      A.   Well, if we don't have any records to that
9  effect -- and I don't know that we do or don't at this
10 point, and we'd have to reflect on those. Typically,
11 once again, cleaning equipment will be put into A
12 Pod three times a day. We do have pod janitors, and we
13 have a program in place where the pod janitors will
14 clean, but the inmates are expected to clean those pods
15 and will keep them clean.
16     Q.   Am I correct the practice and procedure the
17 first week of March 2003 was to put buckets inside the
18 pod with a mop and some cleansing fluid once a day, and a
19 couple hours later, come back and pick up those buckets?
20          MR. RINGEL: Object to the form and the
21 foundation.
22     A.   I don't believe that was correct. I believe
23 that we typically put stuff in three times a day.
24     Q.   (BY MR. TRINE) That you put cleaning
25 supplies --

Page 65

1   MR. RINGEL: Object to the foundation.
2   A. I don't know.
3   Q. (BY MR. TRINE) And do you have the files,
4   the medical files, if there are any, for those detainees?
5   A. I would have to check to see if we have the
6   medical files or if they were retained by the doctor.
7   Q. If Nurse Vicki Paulsen saw INS detainees on
8   sick call at the jail, would those records be maintained
9   at the jail?
10  A. I would think so.
11  Q. Would copies be sent to the doctor?
12  A. They could be.
13  Q. Well, do you know?
14  A. I don't know.
15  Q. You don't know what the practice or
16  procedure was with regard to whether the nurse's records
17  were transmitted to the doctor routinely?
18  A. I do not know.
19  Q. Now, the records that we've received from
20  the Park County Jail show that in March 2003, Dr.
21  Bachman's checks of $450 were paid through the Park
22  County Jail Inmate Welfare Fund.
23  A. Correct.
24  Q. What is that?
25  A. Essentially, I established an inmate welfare

Page 66

1   fund, kind of on a model of what DOC does with their
2   inmate welfare fund, and those funds are -- typically I
3   will make a percentage off of commissary and a percentage
4   off of phones, that then that goes into the inmate
5   welfare fund, and I believe I paid Dr. Bachman out of
6   that fund. I would purchase TVs, inmate games, things
7   like that out of that fund.
8   Q. What percentage of phone calls were put into
9   that fund?
10  A. All of them.
11  Q. Well, do you have a contract with the --
12  A. Phone carrier.
13  Q. With the phone carrier?
14  A. Yes.
15  Q. And that contract provides that the phone
16  carrier will remit back to the jail a certain portion of
17  the long distance charges?
18  A. I believe that's correct.
19  Q. And do you know what percentage of those
20  charges would be remitted back to the jail by the phone
21  carrier?
22  A. I believe it's about 47 percent.
23  Q. Is that a negotiable contract with the phone
24  company?
25  A. Yes.

Page 67

1   Q. Has that percentage changed over the years?
2   A. No.
3   Q. And does the contract permit the phone
4   company to charge a certain amount per minute for long
5   distance calls?
6   A. I believe so. We also sell the inmates
7   phone cards.
8   Q. Was Nurse Vicki Paulsen also paid out of
9   that welfare fund?
10  A. No.
11  Q. She was paid directly from the jail?
12  A. She was a jail employee.
13  Q. Was she prohibited from moonlighting, that
14  is, also working for other correctional facilities, at
15  the time she was employed at Park County?
16  A. I don't think she would have been
17  prohibited. I don't know that she was working -- or if
18  she was working for anybody besides us.
19  Q. Now, in a request for documents from the
20  jail, we asked for all kites completed by all inmates
21  requesting to see the nurse or requesting medical
22  attention between January 1, 2003 and March 9, 2003, and
23  we received copies of three kites. Do you believe that
24  only three inmates and detainees during that three-month
25  period filed only three kites asking for nursing care?

Page 68

1   A. That seems a little short to me. I would
2   have figured there would have been more.
3   Q. With regard to the detainees in Pod D, did
4   you have kites in Spanish that they could complete, or
5   were they in English?
6   A. I'm not sure that we had the kites in
7   Spanish, but any request could have been made -- if it
8   was just a piece of notebook paper -- if they have an
9   issue. And they could submit that. Also, they have the
10  opportunity to see the nurse when she's serving meds and
11  doing med call. So they have an opportunity to actually
12  approach the nurse and advise her of an ailment or
13  illness or whatever the situation may be.
14  Q. But it was part of the nurse's duties to
15  make med call, that is, deliver medications to inmates
16  and INS detainees three times a day?
17  A. I believe so.
18  Q. And that would be what? Morning, afternoon
19  and evening?
20  A. Typically sometime in the morning, afternoon
21  and evening.
22  Q. And that was important because the nurse
23  could physically observe the inmates getting medications
24  and note whether or not some of them are ill?
25  A. Correct.

**69**

1  Q.  It would also be important because inmates
2  or detainees could communicate to her if they did have
3  complaints?
4  A.  Correct.
5  Q.  Now, if Nurse Paulsen didn't accompany the
6  deputy in delivering those medications, she apparently
7  wouldn't be aware of the condition of the inmate unless
8  it was reported to her by the deputy; is that right?
9       MR. RINGEL:  Object to the form and the
10 foundation.
11 A.  You're saying if a deputy served meds --
12 Q.  (BY MR. TRINE)  Without the nurse.
13 A.  -- without the nurse?  And that would
14 actually occur, like on the weekends and things like that
15 where we'd have deputies giving out the medication.
16      But if a deputy was serving meds or had --
17 if an inmate would approach the deputy and let him know
18 that he was sick, I'm sure that the deputy would probably
19 take notes and forward that information on to the nurse.
20 Information would also be forwarded to the nurse on pod
21 walks or on just some of the routine duties that the
22 officers engage in every day on a daily basis.
23 Q.  Now, we'll go through these records in a
24 little bit, but my review of the master control records
25 and of the daily logs indicated that between March 1 and

**70**

1  March 10 of 2003, the nurse accompanied a deputy on meds
2  on one occasion in those ten days.
3       Would that be a violation of your policy --
4  to have her only accompany the deputy on one occasion
5  instead of three times a day?
6       MR. RINGEL:  Object to the form and the
7  foundation.
8  A.  I don't believe it would be a violation of
9  policy, and I'm not sure if those control logs -- they
10 might have been generalized.  I don't know whether the
11 nurse accompanied a deputy more or not.  I think you'd
12 probably have to check with the nurse.
13 Q.  (BY MR. TRINE)  Well, let's look at Exhibit
14 3 while we're at it.
15      MR. TRINE:  Let's see what happened to
16 Exhibit 3.  1, 4, 5, 2.  I had a copy of Exhibit 3 around
17 here somewhere.
18      THE DEPONENT:  Be right back.  While you're
19 looking for that, I'm going to go to the restroom.
20      (Discussion off the record.)
21 Q.  (BY MR. TRINE)  Mr. Gore, I'll hand you what
22 has been marked Deposition Exhibit 3, which are master
23 control log records from March 1, 2003 through March 10,
24 2003.
25 A.  Okay.

**71**

1  Q.  And if you'll look at those records, and we
2  might as well start, I guess, with the first page, which
3  is Park 0966 for March 1, 2003.  It appears that meds
4  were circulated, or they started circulating meds at 7:15
5  a.m.  Do you see that?
6  A.  Start meds, yes, I do.
7  Q.  At 7:15, "Start meds," and at 7:30, "meds
8  completed"?
9  A.  Yes.
10 Q.  And who are the two people who circulated
11 the meds?  Do you know who RG is and DF?
12 A.  I'm not sure.
13 Q.  Do you remember the names of any deputies
14 who had those initials at that time?
15 A.  I'm not sure right off the top of my head.
16 Q.  And the controller up at the top, it looks
17 like there's a signature there?
18 A.  Looks like WI or WF.
19 Q.  Well, there's a signature at 4:40 a.m. under
20 "Controller" and then initials after that.  Do you know
21 who that is?
22 A.  It's a little difficult to read the
23 signature.
24 Q.  Do you know what the initials WF stand for
25 under "Controller" at the bottom?

**72**

1  A.  Could be Bill Fikejs.  He goes by William
2  Fikejs.
3  Q.  Is he still with you?
4  A.  He is.  He's assigned to patrol division
5  right now.
6  Q.  And do you consider him to be a good,
7  honest, credible employee?
8  A.  Yes.
9  Q.  And I see that the controller at 8:00 a.m.
10 was Crawford.
11 A.  Correct.
12 Q.  Is he still with you?
13 A.  Yes, he is.
14 Q.  Do you consider him to be a good, credible,
15 honest employee?
16 A.  Yes, I do.
17 Q.  Reliable?
18 A.  Yes.
19 Q.  Then on the next page, 0967, it looks like
20 the next med round was at 1339 hours on March 1.  Do you
21 see that?
22 A.  Yes, I do.
23 Q.  And the officer apparently responsible for
24 those meds was Walker; is that right?
25 A.  Correct.

SHEET 22  PAGE 85

**85**

1 equipment was picked up.
2   Q.   (BY MR. TRINE) So that the only entry on
3 March 2 indicating that buckets were actually taken to
4 the pods is at 1535 hours?
5       MR. RINGEL: Object to the form and the
6 foundation.
7   Q.   (BY MR. TRINE) Is that correct?
8       MR. RINGEL: Object to the form and the
9 foundation.
10  A.   Well, it looks like at 1006 hours, mop
11 buckets were picked up, which I'm making an assumption,
12 but -- which I would assume that cleaning equipment was
13 placed out early in the morning, probably failed to be
14 logged, and was picked up at 1006 hours.
15  Q.   (BY MR. TRINE) That's an assumption on your
16 part?
17  A.   Correct.
18  Q.   You could also assume that the mop buckets
19 were picked up to later be distributed and were finally
20 distributed at 1535 hours; isn't that right?
21  A.   Based on my knowledge of jail operations, I
22 don't think that would be correct.
23  Q.   Then going on to March 3, '03, it looks like
24 medications were again distributed in the morning around
25 7:10 a.m.; is that right?

PAGE 86

**86**

1   A.   Which page are you on?
2   Q.   That's 0974.
3       MR. RINGEL: Object to the foundation.
4   A.   Okay. Referring to 0974 . . .
5   Q.   (BY MR. TRINE) Excuse me?
6   A.   I said referring to 0974.
7   Q.   Yes. At 7:10 in the morning, apparently
8 medications were again distributed?
9   A.   It says, "Meds completed."
10  Q.   Does that indicate to you that they were
11 probably distributed?
12  A.   Correct.
13  Q.   And by DF. Who is DF?
14  A.   I'm not sure.
15      MR. KORDICK: It could be Frye. Is it --
16      THE DEPONENT: Could be Don Frye.
17  Q.   (BY MR. TRINE) And the controller is WF.
18 Who would that be?
19  A.   That could be Bill Fikejs, who --
20      MR. KORDICK: William Fikejs?
21      THE DEPONENT: Goes by William.
22  Q.   (BY MR. TRINE) And do you consider Don Frye
23 to be a reliable, honest and trustworthy employee?
24  A.   Yes.
25  Q.   And the same with William Fikejs?

PAGE 87

**87**

1   A.   Correct.
2   Q.   Are they still employees?
3   A.   Yes, they are.
4   Q.   And then on March 3 at 1250 hours -- now I'm
5 on 0976 again -- buckets were placed in the units, and
6 this time by Ellis; is that right?
7   A.   Let me see. What was the time entry?
8   Q.   12:50.
9       MR. RINGEL: Object to the foundation.
10  A.   On log entry 097633, at 12:50, it says,
11 "Buckets in units."
12  Q.   (BY MR. TRINE) And Officer Ellis signed
13 that entry?
14  A.   That's correct.
15      MR. RINGEL: Object to the foundation.
16  Q.   (BY MR. TRINE) And if you were looking at
17 these logs, that would indicate to you that it was
18 Officer Ellis who put those buckets in the units; is that
19 right?
20  A.   That would be correct.
21  Q.   And at 1409 on March 3, again, med rounds
22 were started; is that correct?
23  A.   Correct.
24  Q.   And at 1421, those buckets were still out
25 that were placed in the units at 12:50; is that right?

PAGE 88

**88**

1       MR. RINGEL: Object to the form and the
2 foundation.
3   A.   It says buckets out.
4   Q.   (BY MR. TRINE) And again, that was by
5 Ellis; is that right?
6   A.   Correct.
7   Q.   Now, at 1409 it shows, "Med rounds started."
8 Do you see that?
9   A.   Yes, I do.
10  Q.   And this time Vicki Paulsen accompanied
11 Walker on distributing those medications; is that right?
12      MR. RINGEL: Object to the form and the
13 foundation.
14  A.   Well, Vicki, it looks like in an initial --
15  Q.   (BY MR. TRINE) Vicki P?
16  A.   For Vicki P, and Walker.
17  Q.   Did you have any other employees by the
18 first name of Vicki other than Vicki Paulsen?
19  A.   I don't believe so, and I do believe that
20 was probably Vicki Paulsen.
21  Q.   And that would probably indicate to you that
22 that's the first time since we've been going through the
23 master log that Vicki Paulsen's name has appeared as
24 accompanying a deputy to distribute medications; isn't
25 that right?

### Page 89

1    MR. RINGEL: Object to the foundation.
2    A.   It's the first time that her name has
3  appeared on the log. I don't know that that's the first
4  time -- or I don't know that that indicates that she was
5  not accompanying officers on these med calls.
6    Q.   (BY MR. TRINE) Was it the practice, policy
7  and procedure of the jail to have the officer and/or
8  Vicki Paulsen identified, or the people identified, who
9  actually distributed medications?
10    MR. RINGEL: Object to the form and the
11  foundation.
12    A.   I don't know that I have a specific policy.
13  I instruct staff to be as accurate as possible, and
14  different staff are probably a little bit more
15  detail-oriented than others.
16    Q.   (BY MR. TRINE) And then at 1920 hours on
17  March 3, there is an indication there was a minor medical
18  problem, D Pod. Do you see that?
19    A.   Yes, I do.
20    Q.   Do you know what that was all about?
21    A.   No, I don't.
22    Q.   And the initials for that entry are EA and
23  DW. Do you know who EA is?
24    A.   No.
25    Q.   Did you have someone by the name of Ed

### Page 90

1  Allen?
2    A.   Could be Ed Allen. And the other one could
3  be Don Woodward.
4    Q.   Did you consider Eddie Allen to be a
5  credible, honest and trustworthy employee?
6    A.   He was an okay employee.
7    Q.   Okay. Now, why do you say he was only okay
8  as opposed to honest, trustworthy, credible?
9    A.   I'd have to go back and look at his file.
10    Q.   Did you have some conflict with him?
11    A.   I think there was some issues with Mr.
12  Allen.
13    Q.   And what were those issues?
14    A.   I can't recall in detail. That's why I'd
15  have to go back to his file.
16    Q.   To his -- to Eddie Allen's personnel file?
17    A.   Correct.
18    Q.   Did Mr. Allen at times, or at any time,
19  complain to you about overcrowding in Pod D?
20    A.   Not that I can recall.
21    Q.   Did he complain to you about any of the jail
22  conditions?
23    A.   Not that I can recall.
24    Q.   So you don't recall what happened that would
25  cause you to say he was only an okay employee?

### Page 91

1    A.   I know that we had some issues with Mr.
2  Allen.
3    Q.   But you don't remember what those issues
4  were?
5    A.   I remember what some of the issues were.
6  I'm not sure if I should be giving out personal
7  information at this point.
8    MR. RINGEL: Well, at some point -- I don't
9  have any problem with you deciding, you know --
10  testifying to what you remember. You know, when it comes
11  time to designate as confidential, anything that is of a
12  personal nature involving Mr. Allen's employment with
13  Park County will be designated as confidential, so you
14  have my commitment that when I go through this deposition
15  that I will designate this portion of it as confidential.
16    A.   Once again, for specifics, I'd have to go
17  back, but once again, I believe him to be a little bit of
18  a disgruntled employee.
19    Q.   (BY MR. TRINE) Do you know why he was
20  disgruntled? Did he tell you why he was disgruntled or
21  unhappy?
22    MR. RINGEL: Object to the foundation.
23    A.   Not that I can recall off the top of my
24  head. I know there were some incidents with inmates and
25  different things like that.

### Page 92

1    Q.   (BY MR. TRINE) You don't recall anything
2  specific?
3    A.   I think one specific issue was he didn't
4  like the way that an inmate was taken down to the floor.
5  I believe that may have been one issue.
6    Q.   And who took that inmate down to the floor?
7    A.   That would have been me.
8    Q.   Okay. So he was a witness to your, what,
9  attacking an inmate?
10    MR. RINGEL: Object to the form and the
11  foundation.
12    A.   No. It wasn't attacking an inmate. I was
13  actually protecting Mr. Allen. The inmate was attempting
14  to pull away from him.
15    Q.   (BY MR. TRINE) So an inmate attacked Mr.
16  Allen?
17    A.   The inmate was restrained. I would say the
18  inmate was attempting to pull free from Mr. Allen.
19    Q.   And what did you do?
20    A.   I restrained the inmate, took him to the
21  floor.
22    Q.   What do you mean, "took him to the floor"?
23  Describe what you did.
24    A.   That would be -- I think we ended up hitting
25  a wall and ended up on the floor.

### Page 141

1  first week of March?
2       MR. RINGEL: Object to the form and the
3  foundation.
4       A.   Well, according to what you said, there are
5  two inmates who reported fevers and didn't have any
6  symptoms at the time they were seen by the doctor.
7       Q.   (BY MR. TRINE) Were any of the INS
8  detainees seen by a doctor between March 1 and March 10,
9  2003 other than Carranza-Reyes?
10      A.   I'd have to go back and check records.
11      Q.   Do you have any memory of there being
12  inmates sick, an epidemic within the facility, that
13  caused one or more inmates to be seen by a doctor that
14  week?
15      A.   I recall that some of the inmates were
16  experiencing flulike symptoms. They were being monitored
17  and treated by our nurse. I remember that on the 8th,
18  Carranza-Reyes was transported to Summit Medical Center,
19  and then later to Denver County, then later became
20  critical. At that point I had all the inmates in D Block
21  taken to the doctor and checked out because I was
22  concerned about their welfare and what they might have.
23      Q.   Now, were you served a set of what is called
24  formal discovery on Park County in the form of requests
25  for documents and answers to certain questions? Were you

### Page 142

1  given a copy of those interrogatories and requests for
2  production of documents to review so that the jail could
3  provide all of that information?
4       A.   Yes, I was.
5       Q.   And was that information provided under your
6  direction and supervision?
7       A.   There was an awful lot of information that
8  was requested, so I actually got office staff together,
9  made specific assignments so that that information could
10  be given within the timeline requested.
11      Q.   One of the requests for production of
12  documents was Request Number 8, asking you produce Park
13  County Jail documents which provide the date of
14  incarceration, the date of transfer or release, and the
15  names and addresses of all INS detainees incarcerated in
16  Pod D when it was occupied by the plaintiff in March
17  2003, and you provided us with a list of all of those
18  detainees. Where and how did you compile that list?
19      A.   I believe I assigned that to a specific
20  staff member. How it was compiled, I'm not sure.
21      Q.   And then in Interrogatory Number 8, we asked
22  you to provide this information: State the general
23  health and physical condition of each of the INS
24  detainees who were transferred out of Pod D on March 7,
25  2003, and for each detainee who was sick or ill at time

### Page 143

1  of transfer, describe the nature of the sickness or
2  illness. And your response -- or the county's response
3  to that was that eight inmates were evaluated at either
4  Summit Medical Center or Frisco Medical Center, and the
5  treatment authorization requests regarding those inmates
6  are produced herewith, and those are the ones we just
7  went over, inmates that were seen on the 10th and 11th of
8  March.
9       Do you know why the medical information was
10  not provided for the 50 inmates who were transferred out
11  on March 7 as we requested?
12      A.   No.
13      Q.   Who was responsible for gathering that
14  information?
15      A.   I believe that assignment was made to
16  medical.
17      Q.   Meaning the nurse?
18      A.   The two nurses that we have.
19      Q.   The two nurses. And who are they?
20      A.   That would be Rusty Wittner and Robin.
21      Q.   And Rusty Wittner is an R.N.?
22      A.   Correct.
23      Q.   And the other is Robin?
24      A.   Correct.
25      Q.   Robin who?

### Page 144

1       A.   We just hired her.
2       Q.   But she may have participated in this?
3       A.   I believe I assigned them both to
4  participate.
5       Q.   Is she an R.N.?
6       A.   Yes.
7       MR. RINGEL: Just for the record, pursuant
8  to a request by Mr. Trine via e-mail and a request by Mr.
9  Kordick on the telephone, we are in the process of seeing
10  if there are any additional records responsive to that
11  particular discovery request, and if there are, we will
12  produce them to the plaintiff.
13      MR. TRINE: Thank you.
14      Q.   (BY MR. TRINE) Let's see. You can put that
15  aside now. You won't need it. And let me refer you to
16  Deposition Exhibit 1, which are the Park County Jail
17  sergeant's daily logs, which were supplied to us in
18  response to our request for production of documents.
19      MR. RINGEL: Clarification for the record.
20      MR. TRINE: Yeah.
21      MR. RINGEL: These documents were provided
22  to Cherie Trine of your office pursuant to an open
23  records request, not in response to the request for
24  production of documents in this litigation.
25      MR. KORDICK: Which presents a question as

**Page 165**

1  A. I don't know if it would have been on the
2  8th. It would have probably been -- I'm not sure if I
3  asked her on the 8th, if that's your question.
4  Q. Oh, okay. But did you ask her to submit a
5  report on what she recalls having happened on the 8th?
6  A. I believe I did.
7  Q. Now, looking at page 143, she indicates that
8  she arrived at the jail at 7:50 a.m. Do you see that?
9  A. Okay. Top of the third paragraph, 7:50,
10 "Arrived at Park County Jail."
11  Q. Now, prior to her arrival at the Park County
12 Jail on the 8th, had you been informed by anyone as to
13 what had been happening during the night with regard to
14 Carranza-Reyes?
15  A. I don't believe so.
16  Q. This report by Vicki Paulsen indicates that
17 at 3:45 a.m. on the 8th, she got a call from Deputy
18 Fikejs, who told her that Carranza was having trouble
19 breathing and had been vomiting and had nausea. You
20 don't recall receiving a call from Vicki Paulsen at any
21 time during the night telling you about those symptoms or
22 his condition; is that right?
23  MR. RINGEL: Object to the form and the
24 foundation.
25  A. I don't recall getting a call from Vicki. I

**Page 166**

1  may have been notified that we had a sick inmate, and I
2  may have notified officers to get Vicki in there to check
3  him out.
4  Q. (BY MR. TRINE) Well, do you remember doing
5  that?
6  A. I have a vague recollection.
7  Q. Of receiving a call from someone?
8  A. Of receiving a call from someone. It might
9  have been to notify me on the 9th too, but I do remember
10 being notified on the 8th as this started. As typically
11 after Vicki got there, did an assessment, recommended
12 that he see a doctor, and we started contacting INS for
13 transport and placing Sergeant Muldoon on stand-by, I
14 believe, to do the transport.
15  Q. Okay. Well, getting back to the early
16 morning hours, 3:45 in the morning, when Vicki Paulsen
17 received a telephone call from Deputy Fikejs, she was
18 informed that he had had trouble breathing and was
19 vomiting and that Deputy Fikejs had placed him on oxygen.
20 Were your deputies authorized to render treatment in the
21 absence of the nurse?
22  MR. RINGEL: Object to the form and the
23 foundation.
24  A. I don't know if they had contacted the nurse
25 and the nurse had authorized them to put on oxygen or

**Page 167**

1  administer oxygen.
2  Q. (BY MR. TRINE) Well, assuming that Deputy
3  Fikejs called the nurse and informed the nurse that he
4  had trouble -- that Carranza-Reyes had trouble breathing,
5  was vomiting and that he, Deputy Fikejs, had placed him
6  on oxygen, would he have authority to do that before
7  calling the nurse?
8  MR. RINGEL: Object to the form and the
9  foundation.
10  A. If one of the officers felt that one of the
11 inmates was having trouble breathing -- and as far as the
12 oxygen, it's not going to hurt them. I would not have an
13 issue with the officer putting the inmate on oxygen.
14  Q. (BY MR. TRINE) And do you have a vague
15 recollection of telling whoever called you to have the
16 nurse come in and examine the detainee?
17  A. I do.
18  Q. Then according to Vicki Paulsen's nurse
19 report, she arrived at the jail at 7:50 a.m. to assess
20 Carranza-Reyes and shortly after arriving was told he had
21 fallen in the tier, and she went to the upper D Pod tier
22 with Corporal Crawford and assessed Carranza-Reyes
23 through an interpreter. Do you know who that interpreter
24 was?
25  MR. RINGEL: Object to the form.

**Page 168**

1  A. I do not at this point.
2  Q. (BY MR. TRINE) And she states further down
3  in that paragraph that Carranza was then moved to the
4  lower tier for his safety and protection, and do you know
5  what she's referring to there, why he would have to be
6  moved to the lower tier for his safety and protection?
7  MR. RINGEL: Object to the form and the
8  foundation.
9  A. Anything I would offer would be a
10 speculation or assumption.
11  Q. (BY MR. TRINE) Okay.
12  A. But if he was feeling sick and falling and
13 he was on the upper tier, rather than risking him falling
14 downstairs or something, they could have moved him to the
15 lower tier.
16  Q. Then Nurse Paulsen states that she asked
17 that INS be called because, quote, I felt that Mr.
18 Carranza needed to be transported to Summit Medical for
19 evaluation by a physician. Do you see that?
20  A. Yes, I do.
21  Q. And that, quote, I talked to Ben at INS and
22 appraised him of the situation with Mr. Carranza. He
23 stated it would be at least three hours before they could
24 get someone here to transport Mr. Carranza, and he gave
25 us permission to transport if his condition worsened. Do

206

1  Q. I understand that. Was this also the job
2  description in effect when you became jail captain?
3  A. I believe so.
4  Q. And under Primary Duties, there's an
5  indication about four lines down that you would work with
6  the sheriff in planning short- and long-range goals of
7  the department and ensure detention center operations are
8  in compliance with local, state and federal laws, and
9  develop policies and procedures to accomplish this
10 compliance. Did you understand that that was one of your
11 primary duties?
12 A. That's what it says under Primary Duties.
13 Q. And you understood that to be the case?
14 A. Yes.
15 Q. And I understand the exhibits may be sort of
16 mixed up in there, if you can refer to Exhibit 22, if you
17 can find it. And Exhibit 22 is identified as a Code of
18 Colorado Regulations, Department of Public Health and
19 Environment Consumer Protection Section, and this
20 contains the sanitary standards for penal institutions.
21 Is this one of the rules or regulations -- state rules or
22 regulations that you became familiar with under your duty
23 to make sure that you're complying with all local, state
24 and federal laws?
25      MR. RINGEL: Object to the form and the

207

1  foundation.
2  A. Take a few minutes to read it?
3  Q. (BY MR. TRINE) You bet.
4  A. That would appear to be Colorado code of
5  regulations for sanitary standards for penal
6  institutions.
7  Q. And is this one of the codes that you
8  reviewed and became familiar with under your obligation
9  to make sure that the jail is in compliance with local,
10 state and federal laws?
11 A. I'm not sure.
12 Q. Does it look at all familiar to you?
13 A. There's components that look familiar. I
14 think the one that I might have looked at may have been a
15 jail standard, not a penal standard.
16 Q. What do you mean, a jail standard?
17 A. I believe rather than the word "penal," it
18 may have said "jail."
19 Q. May have said jail standards or something?
20 A. Correct.
21 Q. So you're not really sure if you've ever
22 reviewed Exhibit 22?
23 A. I'm not sure.
24 Q. Under your specific duties, one of them, in
25 paragraph three, not numbered three, the third paragraph

208

1  down, was to respond to emergencies and/or incidents that
2  occur within the detention setting, such as violent
3  inmates, medical emergencies, disturbances,
4  malfunctioning of security devices, et cetera. And you
5  understood that that was one of your specific duties,
6  correct?
7  A. Right.
8       MR. RINGEL: Object to the form and the
9  foundation.
10 Q. (BY MR. TRINE) Is that correct?
11 A. Correct.
12 Q. And on Park 1336, the second page of that
13 exhibit, in that fourth paragraph down, it indicates that
14 you were to ensure the quality and quantity of medical
15 treatment to detention inmates are in accordance with the
16 facility, the state and the federal standards; is that
17 right?
18 A. That would appear to be correct.
19 Q. And you understood that that was one of your
20 specific duties, is to make sure that the quality and
21 quantity of medical treatment was in accordance with your
22 own facility standards; is that right?
23      MR. RINGEL: Object to the form and the
24 foundation.
25 A. Repeat the question.

209

1  Q. (BY MR. TRINE) Yeah. You understood that
2  one of your duties was to make sure that the quality and
3  quantity of medical treatment to detention inmates was in
4  accordance with your own policies and procedures, your
5  own facility standards?
6  A. Correct.
7  Q. Okay. Now, did you have an opportunity to
8  read your previous deposition testimony in this case?
9  A. Not really in detail, no.
10 Q. Okay. So you haven't read it carefully to
11 see whether there are any corrections or changes you
12 wanted to make to that testimony?
13 A. No, I have not.
14 Q. When you say you haven't read it to any
15 detail, what work have you done in reviewing it?
16 A. I have briefly looked at it. Probably did
17 not read every page.
18 Q. Okay. Well, I won't hold you to this, but
19 at the moment, did anything stand out in your mind as
20 being erroneous that you would want to change?
21 A. Not at this moment.
22 Q. And, of course, you'll have the opportunity
23 to make changes.
24 A. Okay.
25 Q. Any other documents you reviewed related to

* SUBJECT TO CONFIDENTIALITY DESIGNATIONS *

214

1  administrator designee and presented to the medical
2  director at least quarterly. Do you know whether that
3  infection control program had ever been initiated and
4  reports submitted?
5     A.   No.
6     Q.   Then looking at Park 617 and 618 on
7  emergency services?
8     A.   616 and 618?
9     Q.   617. There's an indication on 617 that it
10 was the policy of the jail that while awaiting the
11 arrival of an ambulance and/or EMS response, a nurse will
12 assume on-site care of the inmate and continue with
13 assessment, treatment and emergency medical procedures
14 until the arrival of the ambulance, and then upon arrival
15 of the ambulance, the nurse will provide the emergency
16 personnel with a report listing physical findings,
17 interventions, history and treatment.
18        Now, when you learned on the morning of
19 March 8, 2003 that the nurse had evaluated Carranza-Reyes
20 and recommended transport to the emergency room, did you
21 instruct her to stay with Carranza-Reyes until the
22 ambulance arrived or until he was transported?
23    A.   No.
24    Q.   Did you understand that she was going to
25 vacate the facility and go home and leave Carranza-Reyes

215

1  that morning?
2     A.   No.
3     Q.   Did you subsequently learn that she had done
4  that?
5     A.   Yes.
6     Q.   And was she admonished for doing that
7  because she violated this policy?
8     A.   No.
9     Q.   And why was she not admonished for violating
10 the policy?
11    A.   Well, based on the information I had, which
12 was pretty limited, is that we needed to get him to be
13 evaluated by a physician, and I believed that Sergeant
14 Muldoon was contacted to do that transport.
15        Depending on the situation, once relayed to
16 me, we can certainly do -- we can have officers take
17 inmates to medical facilities or doctors' appointments.
18 And based on the information I had, I think that's how
19 we -- how we actually arranged the transport. Upon
20 review, it probably wouldn't have been a bad idea to have
21 an ambulance take him.
22    Q.   I'm sorry. We're not communicating. It's
23 probably my fault. Here's my question: Under this
24 policy, once it's determined that there is an emergency
25 and either an ambulance or other response is going to

216

1  take someone in transport, the nurse will assume the
2  on-site care of the inmate and continue with the
3  assessment, treatment and emergency medical procedures.
4  And my question to you was, why was Nurse Paulsen not
5  admonished for violating that policy and leaving the
6  facility, knowing that the inmate was going to be
7  transferred?
8         MR. RINGEL: Object to the form and the
9  foundation.
10    A.   I'm not sure that anybody realized the
11 seriousness of Mr. Carranza's illness. In answering your
12 question, I know that I rely heavily on the opinion of my
13 medical staff to make the right decision, and if they
14 want or feel that an ambulance is needed or that they
15 need to stay with the individual, I leave it to their
16 discretion. If they feel it's something that an officer
17 can transport the individual, I leave that to their
18 discretion.
19        Also, depending on when this policy -- I
20 think it was in effect when I became the jail
21 administrator, but typically in an ambulance -- in this
22 area, we now have enough paramedics to kind of assume the
23 medical care of those -- of an inmate that we maybe
24 transport out of the jail, leaving the nurse at the jail
25 to continue her duties there.

217

1     Q.   (BY MR. TRINE) Now, Captain, when you
2  earlier said that probably an ambulance should have been
3  used, when did you make that conclusion?
4         MR. RINGEL: Object to the form.
5     A.   After I realized the serious health
6  condition of Mr. Carranza.
7     Q.   (BY MR. TRINE) You mean after the fact?
8  After he was transferred and then you learned of what the
9  medical problem was?
10    A.   Yes.
11    Q.   Nurse Paulsen in her deposition indicated
12 that certainly in retrospect, she believes that that was
13 a mistake and she should have stayed with Carranza-Reyes
14 during that time. Did she ever tell you that?
15        MR. RINGEL: Object to the form.
16    A.   No.
17    Q.   (BY MR. TRINE) Now, Nurse Paulsen also
18 testified that she did not have copies of the medical
19 chart or any of her entries in Carranza-Reyes' medical
20 chart prepared so that the transport team would have
21 those and transport those charts to the Summit facility.
22 Were you aware that she had not made copies for Summit
23 County?
24        MR. RINGEL: Object to the form.
25    A.   No.

250

1  it clear to the staff, all the people on your staff, that
2  there was, in fact, a maximum occupancy that you expected
3  to be enforced in Pod D?
4           MR. RINGEL: Object to the form and the
5  foundation.
6      A.   I don't believe so. I think I left a lot of
7  that to the discretion of the supervisors.
8      Q.   (BY MR. TRINE) And to your knowledge, did
9  detainees in Pod D at times continue to be placed on mats
10 or mattresses on the floor when all the bunk beds were
11 filled after the Carranza-Reyes incident?
12     A.   I believe so.
13     Q.   And is that true to the present day?
14     A.   Typically we have not -- with the jail
15 expansion, I believe we don't have the same -- we added
16 approximately 110 beds, and there may be an occasion
17 where somebody ends up on the floor on a mat, but I think
18 that's pretty -- pretty sparse at this point.
19     Q.   But if INS wanted to move a large group into
20 the jail and you had to use a considerable number of mats
21 on the floor, there's no rule or regulation in existence
22 at the present time that would prevent that?
23     A.   Actually, we're looking at purchasing boats,
24 which are plastic kind of bunks that stack real nice. I
25 know -- I believe after Carranza-Reyes, we ordered cots,

251

1  aluminum-framed cots, and ended up having to dispose of
2  those because the inmates tore them up and made weapons
3  and things. Now we're looking primarily at the boats in
4  case something like that were to happen. Right now, I
5  think I actually have about a hundred open beds, so it's
6  not really an issue at this time.
7      Q.   So if I understand you -- correct me if I'm
8  wrong -- what you're telling me is that, no, you have not
9  enacted any policy restricting the number of people that
10 could be placed in Pod D, but you're looking at other
11 ways of accommodating them in Pod D, other types of
12 sleeping facilities?
13     A.   Once again, I think I leave a lot of that to
14 the discretion of the on-duty supervisor. Typically,
15 if -- as an example, I guess if INS did a major raid and
16 didn't have anyplace to house inmates, rather than
17 keeping them in a van somewhere, if we had to make
18 accommodation, we'd probably work with them to do that.
19     Q.   In other words, if INS has problems, you'll
20 make them your problem?
21     A.   Well, we try to resolve the problems.
22     Q.   By accommodating INS?
23     A.   Well, if need be.
24     Q.   Now, Pod D hasn't changed in size since the
25 Carranza-Reyes incident, has it?

252

1      A.   No.
2      Q.   It's the same size as it was then?
3      A.   Correct.
4      Q.   And has the same number of bunk beds,
5  three-tiered, on that upper tier?
6      A.   I believe so.
7      Q.   And nothing has changed in terms of any
8  restrictions on the number of people that will be placed
9  in Pod D, right?
10          MR. RINGEL: Object to the form and the
11 foundation.
12     A.   Well, once again, I stated earlier I leave
13 that typically to the discretion of the supervisors.
14     Q.   (BY MR. TRINE) Well, they had that
15 discretion before Carranza-Reyes, right?
16     A.   Um-hum.
17     Q.   So nothing has changed?
18     A.   In that regard.
19     Q.   In that regard?
20     A.   Correct.
21     Q.   Now, have you at any time had a discussion
22 with the sheriff about the Carranza-Reyes incident?
23     A.   Yes.
24     Q.   And when was the first conversation with the
25 sheriff?

253

1      A.   He might not have remembered, but the night
2  that I got the telephone call indicating that he was in
3  critical condition, I placed a telephone call to the
4  sheriff and advised him.
5      Q.   And what was his response?
6      A.   I know he was sleepy, but he was, I believe,
7  kind of shocked.
8      Q.   And that would have been the night of the
9  8th when Carranza-Reyes was transferred from Summit
10 County to the hospital?
11     A.   I believe so. I believe it was that same
12 night that I contacted Vicki Paulsen.
13     Q.   And did he suggest that you keep him
14 informed on the status of Carranza-Reyes?
15     A.   I believe I suggested or told him that I
16 would.
17     Q.   And did you?
18     A.   Yes.
19     Q.   And over the course of what period of time
20 did you have contact with the sheriff to keep him
21 up-to-date?
22     A.   I believe the letter that I prepared for the
23 Mexican consulate, which I felt was kind of a complete
24 synopsis with a timeline of events and would give him a
25 pretty good understanding what happened, I believe I

258

1 the middle of the night, had there been a nurse on duty
2 during the night, there would have been a nurse there to
3 perhaps assess and evaluate him; is that right?
4         MR. RINGEL: Object to the form and the
5 foundation.
6    A.   What time was it that he was assessed?
7    Q.   (BY MR. TRINE) Between 1:30 and 3:00 in the
8 morning.
9    A.   I'm not sure that even having an evening
10 nurse, he would have been assessed at that time in the
11 morning.
12   Q.   And Nurse Paulsen was under no obligation
13 under her duties and responsibilities to come to the jail
14 in the middle of the night if she didn't want to; is that
15 right?
16         MS. HOLMES: Object to form and foundation.
17   A.   Well, I believe she had the discretion to
18 come in if she felt it warranted it; not come in and see
19 them in the morning if she felt it warranted it; or
20 advise the staff to call an ambulance if she felt it was
21 emergent.
22   Q.   (BY MR. TRINE) Captain Gore, she was under
23 no contractual obligation with the county, with the jail,
24 to come in in the middle of the night; isn't that right?
25         MR. RINGEL: Object to the form and the

259

1 foundation.
2    A.   She may not have been under a contractual
3 agreement, but I know that as far as the way the
4 operation went, I know she was called a lot, and there
5 were times that she did come in.
6    Q.   (BY MR. TRINE) And, Captain Gore, she was
7 discouraged from coming in in the middle of the night
8 because she wasn't paid any overtime if she did; isn't
9 that right?
10         MS. HOLMES: Object to form and foundation.
11   A.   I believe she was a salaried employee.
12   Q.   (BY MR. TRINE) And, as a salaried employee,
13 was not paid overtime if she did come in in the middle of
14 the night; isn't that correct?
15   A.   I do not believe she would have been
16 compensated for coming in.
17   Q.   She was only compensated for 40 hours a
18 week, Monday through Friday; isn't that correct?
19   A.   I believe so.
20         MS. HOLMES: A late objection, but object to
21 form and foundation.
22   Q.   (BY MR. TRINE) Are you acquainted with a
23 Katie Young, nurse practitioner?
24   A.   Yes.
25   Q.   Here in Fairplay?

260

1    A.   (Deponent nodded head.)
2    Q.   Did you have any contractual relationship
3 with Katie Young to provide ancillary medical or nursing
4 care, when needed, at the jail?
5    A.   We have used Katie Young.
6    Q.   And what instructions was Nurse Paulsen
7 given, if any, when and under what circumstances she
8 could call upon Katie Young to assist?
9    A.   I had contacted Katie Young and actually
10 asked her if she wanted to come work in the jail. She
11 related that she'd had experience in Buena Vista and
12 would never do that again I believe is what was relayed
13 to me. I know that we used her on occasion if we had
14 suspicion of a broken bone or something like that because
15 she has X-ray capability. But it was pretty limited.
16   Q.   Okay. Dr. Bachman testified that Katie
17 Young used to come to his clinic to assist him one day a
18 week and would sometimes do that on a Wednesday when he
19 was up here to take care of his patients. Were you aware
20 of what arrangements had been made between Dr. Bachman
21 and Katie Young?
22   A.   I wasn't specifically made aware of what
23 arrangements they had made.
24   Q.   Dr. Bachman also testified that he
25 understood that Katie Young was available to handle blood

261

1 cultures and throat cultures if they were delivered to
2 her by the jail here in Fairplay and get lab results. Do
3 you know whether she was ever utilized by the jail for
4 those purposes?
5    A.   No, I don't.
6    Q.   Did you at any time inform Nurse Paulsen
7 that she could be used for those purposes if Nurse
8 Paulsen, in her discretion, wanted to?
9         MR. RINGEL: Object to the form.
10   A.   I don't recall ever having a conversation
11 with Nurse Paulsen about that.
12   Q.   (BY MR. TRINE) Did you ever observe Katie
13 Young actually on the premises at the jail in medical
14 assisting in any way?
15   A.   I believe so.
16   Q.   And do you know how that came about?
17   A.   No, I do not.
18   Q.   Let me hand you what has been marked Exhibit
19 35. For the record, this is Park 443 through 446. In
20 looking at 443, this appears to be a document authored by
21 Sherrie Muldoon, business manager for the Park County
22 Jail, dated February 10, 2003, stating that this is a
23 billing invoice for January 2003 for the INS holds. Was
24 Sherrie Muldoon -- was Sherrie Muldoon the wife of
25 Sergeant Muldoon?

282

1  Q. Would that be something that would pass
2  through your hands or just bypass you and go on to Mrs.
3  Muldoon or the sheriff -- undersheriff or someone else?
4  A. Any of the above. If he received -- if we
5  did pay for some hospital care or medical care and were
6  billed, I typically would not get the bill. I might --
7  that would probably go to our budget officer, and then I
8  might get a voucher -- or actually, I wouldn't get a
9  voucher. Probably the undersheriff at the time or the
10 sheriff may have to sign off on a voucher to pay for
11 those services.
12       MR. TRINE: Okay. I think that's all I
13 have, but let me check first with cocounsel here, see if
14 they have anything they want me to address. Sorry we
15 took so long.
16       THE DEPONENT: Not a problem.
17       (Break from 3:06 p.m. to 3:08 p.m.)
18       MR. TRINE: Nothing further from me.
19       MR. SARGENT: Let me just ask a question or
20 two.
21            EXAMINATION
22 BY MR. SARGENT:
23 Q. Are you still captain?
24 A. I'm the undersheriff.
25 Q. I'm Craig Sargent. We talked earlier and

283

1  met earlier. I represent Dr. Bachman. Let me ask you,
2  from your perspective, back in March of 2003 and in and
3  around that time frame when Dr. Bachman was the medical
4  director, from your perspective as jail captain, was Dr.
5  Bachman doing what he was required to do pursuant to his
6  contract in meeting the expectations and your
7  expectations in the policy and procedure manuals and
8  whatever other expectations may have been placed on him
9  as medical director?
10 A. To the best of my knowledge, yes.
11 Q. And would Dr. Bachman, I guess, on occasion
12 provide training to the staff there on various medical
13 issues?
14 A. Yes.
15 Q. Would he also train or advise the medical
16 staff or the jail staff on when and how to contact him,
17 if need be, if they had questions or concerns or needed
18 him to see an inmate?
19 A. There was very specific training in that
20 regard, yes.
21       MR. SARGENT: I don't have any more
22 questions. Thank you.
23            EXAMINATION
24 BY MS. HOLMES:
25 Q. Undersheriff Gore, my name is Sara Holmes,

284

1  and we represent Nurse Paulsen. And if I could just draw
2  your attention back to Deposition Exhibit 34, that is,
3  your job description, and you testified that that was the
4  job description in place when you were hired. This job
5  description states that your responsibility's to plan,
6  coordinate and supervise the operations of the detention
7  center. Does that mean that you were the supervisor of
8  Nurse Paulsen?
9  A. It was kind of a unique relationship. I was
10 probably cosupervisor. Under the rules, she would have
11 to work under a doctor's license, so typically I left all
12 the supervision to the doctor.
13 Q. Okay. And then the job description further
14 states that you would specify procedures. Did you
15 specify -- part of your authority over Nurse Paulsen, did
16 you specify procedures that she was to comply with?
17 A. I believe I would have.
18 Q. If I could draw your attention, then, to
19 Deposition Exhibit Number 4. This is the policies and
20 procedures. I have a couple questions generally. Did
21 you strictly enforce these policies and procedures that
22 are set forth in this document?
23 A. I wouldn't say I strictly enforced them, no.
24 Q. Would you say that there was an element of
25 employee discretion in Nurse Paulsen's position in regard

285

1  to policies and procedures?
2  A. I would say that, especially regarding
3  medical issues. I'm not a medical professional. I
4  regard the nurse and, even more so, the doctor to be
5  medical professionals and to advise me of what we need to
6  do and what we need to take care of, and I rely heavily
7  on that, and I would give a certain level of discretion
8  to them.
9  Q. So given what you just said, and a simple
10 yes or no, is there an element of discretion in Nurse
11 Paulsen's position?
12 A. Yes.
13 Q. And therefore, given your immediately
14 preceding testimony, would you say that a violation of
15 the black letters set forth in this document is an
16 accurate characterization for noncompliance with this
17 document?
18 A. No.
19 Q. Did you have authority to initiate
20 disciplinary action against Nurse Paulsen?
21 A. Yes.
22 Q. And did you ever initiate disciplinary
23 action against her in regard to the Carranza-Reyes
24 matter?
25 A. No.