Carranza-Reyes v Park County

Don Stanley Frye

### SHEET 1 PAGE 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Case No. 2005-WM-377 (BNB)

DEPOSITION OF:  DON STANLEY FRYE
November 1, 2005

MOISES CARRANZA-REYES,

Plaintiff,

v.

PARK COUNTY, a public entity of the State of Colorado and its governing board, THE PARK COUNTY BOARD OF COUNTY COMMISSIONERS; PARK COUNTY SHERIFF'S OFFICE, a public entity of the State of Colorado; FRED WEGENER, individually and in his official capacity as Sheriff of Park County, Colorado; MONTE CORE, individually and in his capacity as Captain of Park County Sheriff's Department; VICKIE PAULSEN, individually and in her official capacity as Registered Nurse for Park County, Colorado; JAMES BACHMAN, M.D., individually and in his official capacity as Medical Director of the Park County Jail,

Defendants.

TAKEN PURSUANT TO NOTICE AND AGREEMENT on behalf of the Plaintiff at 824 Castello, Fairplay, Colorado 80440 at 9:00 a.m. before Theresa A. Coffman, Federal Certified Realtime Reporter, Registered Professional Reporter and Notary Public within Colorado.

### PAGE 2

APPEARANCES

For the Plaintiff:
WILLIAM A. TRINE, ESQ.
Trine & Metcalf, P.C.
1435 Arapahoe
Boulder, Colorado 80302

LLOYD C. KORDICK, ESQ.
805 South Cascade
Colorado Springs, Colorado 80903

JOSEPH J. ARCHULETA, ESQ.
Law Office of Joseph J. Archuleta
1724 Ogden Street
Denver, Colorado 80218

For the Defendants Park County, Park County Board of County Commissioners, Park County Sheriff's Office, Wegener and Core:
JENNIFER L. VEIGA, ESQ.
Hall & Evans, LLC
1125 17th Street
Suite 600
Denver, Colorado 80202

STEPHEN A. GROOME, ESQ.
P.O. Box 1373
501 Main Street
Fairplay, Colorado 80440

For the Defendant Paulsen:
MELANIE B. LEWIS, ESQ.
Berg Hill Greenleaf & Ruscitti LLP
1712 Pearl Street
Boulder, Colorado 80302

For the Defendant Bachman:
ANDREW W. JURS, ESQ.
Johnson McConaty & Sargent, P.C.
400 South Colorado Boulevard
Suite 900
Glendale, Colorado 80246

Also Present: None

### PAGE 3

EXHIBIT 4

I N D E X

| | PAGE |
|---|---|
| EXAMINATION OF DON STANLEY FRYE November 1, 2005 | |
| By Mr. Trine | 4 |
| By Mr. Archuleta | -- |
| By Mr. Kordick | -- |
| By Ms. Veiga | -- |
| By Mr. Groome | -- |
| By Ms. Lewis | -- |
| By Mr. Jurs | 132 |

| DEPOSITION EXHIBITS: | INITIAL REFERENCE |
|---|---|
| 8    Hand-drawn diagram | 84 |

| REQUESTED PORTIONS OF TESTIMONY: | PAGE |
|---|---|
| Request for document production or information | -- |
| Certified question | -- |
| Instruction not to answer | 35 |
| Other requests or marked testimony | 75 |

REFERENCES TO EXHIBITS MARKED PREVIOUSLY:

| Exhibit No. | Page Reference |
|---|---|
| 1 | 64 |
| 2 | 50 |
| 3 | 29 |
| 4 | 119 |
| 6 | 53 |

### PAGE 4

       WHEREUPON, the within proceedings were taken pursuant to the Federal Rules of Civil Procedure:
       (At this time Mr. Groome was not present in the deposition room.)
       DON STANLEY FRYE,
having been first duly sworn to state the whole truth, was examined and testified as follows:
       EXAMINATION
BY MR. TRINE:
   Q.   Would you please state your full name and office address for the record.
   A.   Office address?
   Q.   Or home address, whichever you prefer using.
       MS. VEIGA:  Why don't you give them your work address.
   A.   My name is Don Stanley Frye, and my work address is 1180 County Road 16, Fairplay, Colorado 80440.
   Q.   (BY MR. TRINE)  And what is your occupation or profession?
   A.   I am a detentions deputy.
   Q.   And you're employed at the Park County Jail?
   A.   That's correct.
   Q.   What is your educational background?
   A.   I have two years of college.
   Q.   Okay. And your work history and summary

Notes:

Coffman Reporting
303.898.0202
303.893.2230 FAX

*** SUBJECT TO CONFIDENTIALITY DESIGNATIONS ***

**Page 25**

1  then, during your shift?
2      A.   That's correct.
3      Q.   And depending on the number of inmates, the
4  time would vary somewhat on how long it would take to do
5  a walk?
6           MS. VEIGA:  Objection as to form and
7  foundation.
8      A.   I pretty much made three an hour. I didn't
9  typically have much difficulty in doing that unless I had
10 a particular problem.
11     Q.   (BY MR. TRINE)  Earlier you said something
12 about doing a count. Did you routinely do a count when
13 you first came on duty?
14     A.   Yes. Every shift turnover, we did a count.
15 We do three counts during the eight-hour period.
16     Q.   Did you do that count alone, or did someone
17 assist you?
18     A.   Sometimes I would do it, sometimes one of
19 the other deputies would do it.
20     Q.   Whoever did the count, would they then log
21 that and initial the fact that you did the count?
22     A.   We have a count sheet that would be filled
23 out. On that sheet lists all the locations where inmates
24 might be. So when we do a count, we freeze all movement.
25 Wherever someone is, they don't go anywhere until the

**Page 26**

1  count is cleared. We sign the bottom of that, put the
2  total number, turn that in to the controller. Controller
3  looks at it, approves it, initials it. The supervisor
4  will initial it.
5           And it's generally logs -- I don't know if
6  they log it back in as count clear, but that was the
7  sheet that shows when the count was conducted, where
8  everyone in the jail was, and if the controller was the
9  supervisor, they initialed it twice. But it was
10 basically initialled by everyone who counted. If I would
11 count part of the jail, then the person who would be
12 responsible for counting the back part of the jail, we
13 put both our sets of initials on there. This is our
14 count.
15     Q.   Did you distribute medications on your shift
16 at times?
17     A.   The medications typically that I did were
18 the common ones: Cold tablets, ibuprofen for headaches.
19 I can't remember. I think we did -- on weekends when we
20 didn't have a nurse there. The packets were all made up
21 that had their prescription medication, and we were
22 assigned what we were allowed by regulations to give. If
23 an inmate has a headache, what were we allowed to give
24 them. We knew what those were. They were written down.
25 So, yeah, there were times when we could pass out

**Page 27**

1  medications.
2      Q.   That would usually occur on weekends when
3  the nurse was not on duty?
4      A.   At that time, I think so.
5      Q.   And you would know when you came on duty if
6  there were certain inmates that were supposed to receive
7  medications at certain times, there would be a packet
8  there for you to deliver at those times?
9      A.   That's correct. We usually had med pass, I
10 think it's three times a day. I think it occurred once
11 on our shift early in the morning, and everything was
12 premade up with their names and what cell they were in,
13 so we knew who was supposed to get what.
14     Q.   Now, during the week, when meds were passed
15 out in the early morning before 8 o'clock, did you
16 customarily do that in 2003, or did one of the other
17 three people?
18     A.   On the days when the nurse wasn't there --
19 she would be on call, and sometimes it would be me,
20 sometimes it would be one of the other deputies.
21     Q.   Okay. Forgetting the weekend, but during
22 the week --
23     A.   The nurse came in.
24     Q.   What time would the nurse come in?
25     A.   Well, depends. I can't remember what time

**Page 28**

1  they came in during that time, but if we did it on our
2  shift, they would come in -- well, they come in at 6
3  o'clock now. I can't remember two and a half years ago
4  exactly what time they came in.
5      Q.   What time the nurse came in?
6      A.   Yeah.
7      Q.   I noticed in reviewing the records that
8  between March 1 and March 10 of 2003, the nurse, Vicki
9  Paulsen, only initialed the meds being passed out on one
10 occasion. Did you occasionally pass out meds when the
11 nurse was not there?
12          MS. VEIGA:  Objection, foundation.
13     Q.   (BY MR. TRINE)  During the week?
14     A.   And I can't remember what the schedule was
15 back then. It's changed over two and a half years. If
16 the nurse wasn't there or if they had us -- if the nurse
17 came in after 8 o'clock, then obviously we did do it
18 before then. Obviously, in two and a half years, that's
19 changed a number of times with various other activities
20 we've had to do. So as best I recall, if the nurse came
21 in after 8 o'clock, then we would have passed out morning
22 meds. If she came in before 8 o'clock during the week,
23 then we wouldn't have, and she would have passed it out.
24     Q.   And is the person who passed out the meds
25 then responsible for initialing that, indicating that

**45**

1  Q.  I want you to assume that all of the floor
2  space upstairs was covered at night by mattresses with
3  detainees sleeping on the floor. Would you have been
4  able to do a floor walk up there -- a pod walk upstairs
5  if that were the situation?
6      MS. VEIGA: Objection, form and foundation.
7  A.  I've always been able to make my way through
8  the pod and do a pod walk.
9  Q.  (BY MR. TRINE) Okay. Were there any
10 wastebaskets upstairs at that time?
11 A.  I don't remember.
12 Q.  Monte Gore testified that there were none,
13 and the only wastebasket is a very, very big, large
14 container kept on the lower floor. Does that sound
15 reasonable to you?
16 A.  That sounds reasonable.
17 Q.  And if, in fact, there were a number of
18 detainees sleeping on the upper tier in March 2003 who
19 had the flu, sore throats, who were sick, who were at
20 times vomiting, at times coughing up into tissue and
21 throwing their tissue on the floor, would that be
22 something that you think you would have noticed on a pod
23 walk if that was the condition?
24     MS. VEIGA: Objection, form and foundation.
25 A.  Yes, I would have noticed that.

**46**

1  Q.  (BY MR. TRINE) And do you feel that if you
2  had noticed something like that, that you'd have a
3  responsibility to do something about it?
4      MS. VEIGA: Same --
5  A.  I would have.
6  Q.  (BY MR. TRINE) What would you have done?
7  A.  If there was something on the floor that
8  shouldn't be, I would have got some pod janitors in there
9  and cleaned it up.
10 Q.  On your shift?
11 A.  Yes.
12 Q.  And who were the pod janitors?
13 A.  They're trustee inmates.
14 Q.  And they're on call to do that at any time
15 of the day or night?
16 A.  They're on call to do whatever we need them
17 to do, and if I had to wake them up to do that, yes, I
18 would have.
19 Q.  And would you have made a record of doing
20 that?
21 A.  I may have considered that to be not a huge
22 event, depending on what's on the floor. If it's paper
23 or tissue, I just would have gotten it cleaned up.
24 Whether there would be a record of that, I can't recall.
25 Q.  Do you know whether the inmates who appeared

**47**

1  to be sick with chest colds and the flu or whatever
2  during the day, whether those inmates were in worse
3  condition during the night or the same condition or
4  better condition --
5      MS. LEWIS: Object to the foundation.
6  Q.  (BY MR. TRINE) -- when you came on duty?
7  A.  Typically, when I came on duty, I go in the
8  pods and meet with the individuals or talk with them,
9  obviously. I'm in very close proximity with them.
10 Q.  You speak Spanish?
11 A.  No.
12 Q.  How do you talk to them?
13 A.  Get an interpreter.
14 Q.  Well, you did that every time you did a pod
15 walk? You had an interpreter to talk to them?
16 A.  No. But if you have an interpreter in there
17 and you address the pod, if you have anybody who needs
18 this or that based on what I'm instructed to give by the
19 nurse, whether it be ibuprofen or whether it be
20 Pepto-Bismol or whatever the case might be, I'm right in
21 there with them, so I have an opportunity to find that
22 out.
23 Q.  Do you have any memory of the condition of
24 those inmates who had been sick during the day?
25     MS. LEWIS: Objection to foundation.

**48**

1  Q.  (BY MR. TRINE) Do you have any memory of
2  those inmates?
3  A.  Not specifically.
4      MS. VEIGA: Counsel, when it's convenient,
5  if we could take a short break.
6      MR. TRINE: Sure. It's a good time.
7      (Break from 10:08 a.m. to 10:20 a.m., after
8  which time Mr. Groome was not present in the deposition
9  room.)
10 Q.  (BY MR. TRINE) Referring again to that same
11 Exhibit 1 at page 45, if you look down to that fourth
12 paragraph, Sergeant Flint is reporting that there had
13 been no laundry changes in B, C and D Pods for over five
14 days. "We had our laundry person (Forrester) out our
15 whole shift to deal with D Pod. Could somebody check
16 with day shift laundry trustee where we are breaking
17 down? We have had numerous complaints on Hanson."
18     Do you remember, when coming on duty at
19 midnight, learning that there had been no laundry changes
20 for over five days?
21     MS. LEWIS: Object to the foundation.
22 A.  I don't recall specifically.
23 Q.  (BY MR. TRINE) And it would probably be an
24 unusual event to have all of the inmates in Pod D strip
25 down and cover themselves with blankets while their

Page 49

1 laundry is being done, wouldn't it?
2           MS. LEWIS: Object to form.
3           MS. VEIGA: Same objection.
4      A.   Typically what occurs -- and, of course, we
5  don't do this on my shift, it's a day shift thing -- is
6  that they bring uniforms, and they exchange them.
7      Q.   (BY MR. TRINE) So it would be unusual to
8  have inmates just strip down and be naked for a couple
9  hours while someone's doing their laundry, right?
10          MS. LEWIS: Object to the foundation.
11          MS. VEIGA: Same.
12     A.   I don't think that's how they do it.
13     Q.   (BY MR. TRINE) So if that, in fact,
14 occurred and it was reported to you, do you think you'd
15 remember that?
16     A.   I don't recall that happening, but that
17 might be unusual. I might remember it if it would have
18 occurred, but I don't recall that.
19     Q.   Okay. Our client has reported to us that at
20 about 10:30 p.m. that night on the 4th, that that's what
21 happened; that they were all asked to strip down, remove
22 their clothing, stand around with blankets on them for a
23 couple hours while their laundry was done. If, in fact,
24 that happened just before you came on duty at midnight,
25 wouldn't you have learned of that from some source?

Page 50

1           MS. VEIGA: Objection, form and foundation.
2      A.   I might have known that at the time, but I
3  have no recollection of that occurring.
4      Q.   (BY MR. TRINE) Now, I want you to refer to
5  Exhibit 2, which is this document, and the pages again
6  are in the lower right-hand corner. And refer to Park
7  0141, if you would, and this is a document that contains
8  the name of Vicki Paulsen, R.N., and James Bachman, M.D.,
9  and was provided to us as part of the formal discovery in
10 this case as Vicki Paulsen's meeting with Carranza-Reyes
11 on March 6, 2003. And you'll note that Vicki Paulsen
12 indicates that Carranza-Reyes's symptoms at that time, on
13 the 6th when he was brought to medical with an
14 interpreter, was that he was complaining of body aches,
15 headache, nausea and diarrhea, and states he has nasal
16 congestion and a sore throat. And her assessment was
17 skin was warm, and his abdomen was nonrigid but slightly
18 tender over the stomach.
19          Just with that information, do you have any
20 memory at all of being informed on shift change that
21 night of Carranza-Reyes's condition?
22     A.   I recall being told that there were several
23 inmates who had flulike symptoms that we were treating
24 them for. Flulike symptoms.
25     Q.   You don't recall anyone identifying

Page 51

1  Carranza-Reyes as an inmate who had to see the nurse who
2  had these particular symptoms that we described here; is
3  that right?
4           MS. VEIGA: Objection, form.
5      A.   His name may have been mentioned. I think I
6  knew specifically that he was someone I was supposed to
7  watch during the night.
8      Q.   (BY MR. TRINE) On the night of March 6?
9      A.   (Deponent nodded head.)
10     Q.   And now, with the medical background that
11 you describe, would you agree that that description of
12 symptoms is consistent with any number of communicable
13 diseases?
14          MS. VEIGA: Objection, form and foundation.
15     A.   That's certainly a possibility. I was told
16 the nurse had looked them over, checked them out, and
17 that we were treating them for flulike symptoms.
18     Q.   (BY MR. TRINE) Which of those symptoms,
19 based on your own medical training, are consistent with
20 any number of communicable diseases?
21          MS. VEIGA: Objection, form and foundation.
22     A.   Well, they could be symptoms for a lot of
23 things.
24     Q.   (BY MR. TRINE) For an infection?
25     A.   Possibly.

Page 52

1      Q.   A Streptococcus A infection?
2           MS. VEIGA: The same objection.
3      A.   Possibly.
4      Q.   (BY MR. TRINE) Okay. And then if you look
5  at the next page, 142, there's a similar-type form note,
6  but it's dated March 7, 2003, and again, it's with regard
7  to Carranza-Reyes, Moises, and the nurse apparently again
8  saw Carranza-Reyes on the next day, again brought to
9  medical with an interpreter, and complaining of a
10 headache, nausea, vomiting, body aches and diarrhea, and
11 still has nasal congestion. Were you informed when you
12 came on duty that night that Carranza-Reyes was still
13 sick, still seeing the nurse, still having those
14 symptoms?
15          MS. LEWIS: Object to the foundation.
16     A.   Now, is this the day he went to the
17 hospital?
18     Q.   (BY MR. TRINE) No.
19     A.   It's the day prior to that?
20     Q.   No, the 8th. We haven't got there yet.
21     A.   Okay. I still have to stay with my answer
22 that we treated him for flulike conditions because that's
23 what these are symptoms of.
24     Q.   And they're also symptoms of any number of
25 communicable diseases; isn't that correct?

69

1    A.    That is my initials.
2    Q.    But is that your handwriting, DF, or is that
3 someone else putting your initials down?
4    A.    That is not my handwriting, so it would be
5 the controller.
6    Q.    And how would you interpret that entry? Is
7 that something that you did?
8    A.    Evidently, yes.
9    Q.    And who was Forester?
10    A.    Forester was an inmate.
11    Q.    And he was a trustee, wasn't it?
12    A.    Forester? I don't recall.
13      MR. KORDICK: Ask him if it was a man or a
14 woman.
15    Q.    (BY MR. TRINE) And do you remember that
16 incident? Do you remember what Forester's symptoms were?
17    A.    No, sir, I don't.
18    Q.    Do you know whether you were giving him an
19 ibuprofen because of complaints he made to you or because
20 the nurse had already ordered it --
21      MR. JURS: Form.
22    Q.    (BY MR. TRINE) -- as part of the protocol?
23    A.    I was allowed to give ibuprofen,
24 Pepto-Bismol, nonprescription type of meds during the
25 night to those upon request.

70

1    Q.    And then you have an entry at 3:29. Is that
2 in your handwriting, or is that the controller's?
3    A.    Controller's.
4    Q.    And that entry indicates that
5 Carranza-Reyes, Moises, reported to Frye that he is not
6 feeling well and is having trouble breathing. Was put on
7 oxygen and called the nurse. Do you remember what time
8 that happened?
9      MS. VEIGA: Objection to form and
10 foundation.
11    A.    I don't remember specifically, but it says
12 3:29 here.
13    Q.    (BY MR. TRINE) That would be the time that
14 the controller entered it, at 3:29?
15    A.    Yes.
16    Q.    So that it happened either at 3:29 or
17 sometime before that, and then you reported it to him?
18      MS. LEWIS: Object to the form.
19    A.    Typically if I move an inmate, I report what
20 I'm doing, so it would have been real close.
21    Q.    (BY MR. TRINE) Now, who did you use as an
22 interpreter at that time?
23    A.    I used someone he knew from his hometown. I
24 don't remember his name or what relationship he had.
25    Q.    Someone out of Pod D?

71

1    A.    Yes. It was someone in close proximity to
2 him. We were right across the hall.
3    Q.    Right across the hall?
4    A.    Walkway, hallway.
5    Q.    In Pod D?
6    A.    Yes.
7    Q.    Oh, okay. And you don't remember who it
8 was?
9    A.    No.
10    Q.    How did you select an interpreter?
11    A.    I don't recall specifically, but I asked. I
12 talked to the inmates. I found out someone that knew
13 him, that was friends with him, that was from the same --
14 as I recall, same place that he came from.
15    Q.    Do you remember anything about him? His
16 appearance?
17    A.    Could I pick him out of a lineup? Probably
18 not.
19    Q.    Okay. Do you remember about what age he
20 appeared to be?
21    A.    I would say they were in their mid to latter
22 twenties.
23    Q.    And what do you remember about how fluently
24 he spoke or understood English?
25      MS. LEWIS: Object to the form.

72

1    A.    The interpreter spoke English very well, and
2 they seemed to be good friends and have a history.
3    Q.    (BY MR. TRINE) So you thought he spoke
4 pretty good English, whoever you were using?
5    A.    Yes.
6    Q.    And why did you give oxygen or administer
7 oxygen?
8    A.    I could see that he didn't feel well. I
9 felt that altitude might have an impact on it. I thought
10 if the oxygen would make him feel better, I'd give him
11 oxygen.
12    Q.    If you look down further, at the bottom of
13 that page, after entries at earlier times, 3:40, 4:20,
14 4:57, 5:00, 5:20, then there's another 3:29 entry. Do
15 you see that?
16    A.    Yes, I do.
17    Q.    And that's not in your handwriting, is it?
18    A.    No.
19    Q.    None of it is?
20    A.    I don't think anything on that page is my
21 handwriting.
22    Q.    Okay. And so do you know what that B/C or 6
23 is, whatever that is, under Date?
24    A.    It's his blood pressure, pulse.
25    Q.    No. Right under the column under Date, next

**93**

1 A. Yes.
2 Q. And which ones? Do you remember them by
3 name?
4 A. I can remember only one that I remember by
5 name.
6 Q. Who is that?
7 A. Candelaria.
8 Q. I'm sorry. Were you aware of the fact that
9 there were employed interpreters who were not inmates
10 that were available on call by the jail?
11      MS. LEWIS: Object to foundation.
12 A. I was aware that we had trusteed inmates
13 that we used on a variety of occasions that spoke
14 Spanish.
15 Q. (BY MR. TRINE) So it was your understanding
16 that you had to use trustee inmates, that there wasn't an
17 outside, independent contract interpreter that you could
18 call; is that right?
19 A. An outside, contracted interpreter?
20 Q. Right, right, right.
21 A. I don't know if I was aware of that or not
22 at that time. All I know is there was an ample number of
23 people who spoke Spanish that we used on a regular basis.
24 Q. Okay. Then again looking at that incident
25 report, Park 0155, you indicate that at 3:00 a.m., you

**94**

1 again entered D Block for a routine pod walk, and Inmate
2 Carranza again stated he was sick. "I got an interpreter
3 and took the interpreter and Inmate Carranza back to
4 medical." I assume that he again said that he was sick
5 through an interpreter; is that right?
6      MS. VEIGA: Counsel, what time did you ask
7 him about?
8      MR. TRINE: At 3:00 a.m. on March 8.
9 Q. (BY MR. TRINE) It indicates you again
10 entered the pod, and Carranza stated he was sick. "I got
11 an interpreter and took the interpreter and Inmate
12 Carranza back to medical." I'm assuming that, again, he
13 didn't say he was sick, but you used an interpreter; is
14 that right?
15 A. I believe so.
16 Q. (BY MR. TRINE) And why did you take him
17 back to medical on this occasion as opposed to taking him
18 back at 1:00 in the morning? Was his condition worse?
19 A. No. He just then decided he wanted -- he
20 would try some oxygen.
21 Q. He decided that? He said, "I want oxygen"?
22 A. No. I offered oxygen at various points
23 during the night. I don't remember the exact times. At
24 that time he said, "Yeah, I'll try it," as well as I
25 recall. I don't remember specifically what times I

**95**

1 offered oxygen. I know that -- I recall offering it to
2 him several times after this. I don't remember at what
3 times I offered oxygen. All I know is at that point he
4 said, "Yeah, I'll try some."
5 Q. Well, now, if you had offered him oxygen at
6 1:00 in the morning when you dictated this incident
7 report or drafted it 12 hours or 15 hours later, you
8 would have remembered it, wouldn't you?
9 A. I assume that I would, but I can't recall at
10 this point.
11 Q. Well, relying on your 1 o'clock entry, you
12 didn't offer him oxygen at that time, did you?
13      MS. LEWIS: Object to the form.
14      MS. VEIGA: Same.
15 A. It's not in the report. I don't recall what
16 time I offered it. That's what I stated. I don't recall
17 what times I offered it.
18 Q. (BY MR. TRINE) Do you feel your memory was
19 better when you drafted this incident report than it is
20 now?
21 A. Probably not.
22 Q. Feel you have the same memory now as you had
23 on March 8 or 9, 2003 of the events on that night; is
24 that right?
25 A. Probably not.

**96**

1 Q. Well, which is it? Do you think you have a
2 better memory now than you had on March 8 of those
3 events?
4 A. Of this event? No.
5 Q. Okay. Do you think your memory was better
6 on March 8 of the events that occurred at that time than
7 it is now?
8 A. Yes.
9 Q. Okay. Again, at 3:00 a.m. in the morning,
10 you decided to take him back to medical, and is it your
11 testimony that you only took him back to medical because
12 he requested to go back to medical?
13 A. I do not believe he requested to go to
14 medical.
15 Q. Did you feel that it would be good to take
16 him back to medical because you were concerned about him?
17 A. Yes.
18 Q. And were you concerned because he wasn't
19 getting any better, he seemed to be sick?
20 A. I noticed he had discomfort. I felt oxygen
21 might help.
22 Q. What discomfort did you believe he had that
23 oxygen would help?
24 A. I felt, since it had been mentioned about
25 the elevation, that oxygen might give him more comfort.

97

1  Q. That "it had been mentioned about
2  elevation." What had been mentioned?
3  A. I think sometime earlier when we were told
4  it was flulike conditions, that the altitude might have
5  something to do with it.
6  Q. Who told you that?
7  A. I don't recall.
8  Q. Do you remember Nurse Paulsen at some time
9  telling you or stating in your presence that all these
10 detainees just had altitude sickness, don't worry about
11 it, it's just altitude sickness?
12     MS. VEIGA: Objection to form and
13 foundation.
14 A. No.
15 Q. (BY MR. TRINE) Did you feel that that's all
16 he had, was altitude sickness?
17 A. No. I felt that he had flulike symptoms,
18 but my experience tells me that, with the altitude,
19 sometimes that's a problem. People get altitude sickness
20 up this high.
21 Q. So you decided to treat him for altitude
22 sickness with oxygen?
23     MS. LEWIS: Object to the form.
24     MS. VEIGA: Join.
25 A. No. What I decided to do was offer oxygen

98

1  to see if it gave him any additional comfort.
2  Q. (BY MR. TRINE) But the reason you did that
3  is, if he had altitude sickness, apparently that might
4  help, right?
5  A. If -- yes.
6  Q. And you indicate that at 3:00 in the
7  morning, you took his blood pressure, and the result was
8  143 over 78. You probably looked at some records later
9  on to dictate this because you wouldn't have remembered
10 the precise vital signs 15 hours later, would you?
11 A. I don't remember specifically. I may have
12 gotten them from the log, I may have got them on a sheet
13 of paper. I don't recall.
14 Q. And did you feel the blood pressure was
15 within normal range?
16     MR. JURS: Foundation.
17 Q. (BY MR. TRINE) For a his age and size?
18 A. Did I feel it was within range?
19 Q. Within normal range.
20     MS. LEWIS: Same objection.
21 A. It's not that bad of a blood pressure. Not
22 knowing his history, I wouldn't know whether that would
23 be normal for him or not.
24 Q. (BY MR. TRINE) So why did you take it?
25 A. As a standard procedure of what I do when

99

1  I'm taking somebody to medical.
2  Q. Okay. When do you become at all concerned
3  about blood pressure? At what range?
4      MR. JURS: Foundation.
5  Q. (BY MR. TRINE) Based on your own medical
6  training and background?
7      MR. JURS: Foundation.
8  A. I guess it would depend on the nature of an
9  injury. If it was sickness, one thing; trauma, something
10 else. Mainly, I gather this information to report it.
11 Q. (BY MR. TRINE) Okay. You thought that he
12 was sick, and part of it might be altitude sickness.
13 What blood pressure would alarm you, thinking of those
14 conditions?
15 A. It depends. I might have -- I can't recall
16 whether I checked this with previous blood pressure
17 things or just gave it to control. As a matter of
18 standard operation procedure, if I take somebody to
19 medical, I try to do their vitals.
20 Q. Well, why did you take his blood pressure?
21     MS. VEIGA: Objection to form.
22 A. Because that's what I do. That's what a
23 medical first responder does. Takes vitals, asks medical
24 history questions.
25 Q. (BY MR. TRINE) And then you look at those

100

1  vitals and try to decide whether or not to call a nurse,
2  don't you?
3      MR. JURS: Form.
4  A. More so based on questions that he answers
5  about medical history and whether or not he thinks he
6  needs to see a doctor, nurse, or go to the hospital.
7  Q. (BY MR. TRINE) Oh, you let -- you let the
8  patient or the inmate decide whether or not he thinks his
9  condition is so bad he should see a nurse or go to the
10 hospital; is that right?
11     MS. VEIGA: Objection to form.
12 Q. (BY MR. TRINE) You don't make that
13 decision?
14 A. It's hard for me to determine how sick a
15 person feels, but if you tell me that you need to see a
16 nurse, a doctor or go to the hospital, then I would
17 report that to medical. If you're sick enough to believe
18 that that's what you need, that's what I pass on.
19 Q. I see. And you took his pulse, and the
20 result was 62. Was that within normal limits?
21 A. Yes.
22 Q. And what do you consider normal limits to
23 be?
24     MR. JURS: Foundation.
25 A. Well, certainly I don't consider that to be

**105**

1  A. No.
2  Q. And why not?
3  A. I got no information on anything other than
4  that he had the flu. He looked like a guy that had the
5  flu.
6  Q. So you were probably surprised that he
7  called Nurse Paulsen; is that right?
8      MS. LEWIS: Object to the form.
9  Q. (BY MR. TRINE) Because he just had the flu
10 as far as you were concerned. Didn't that surprise you,
11 then, that he would call Nurse Paulsen because Nurse
12 Paulsen already knew he had the flu?
13     MS. LEWIS: Same objection.
14 A. I don't recall what I thought about that at
15 that time.
16 Q. (BY MR. TRINE) Okay. You don't remember
17 whether you were surprised or not surprised that the
18 controller called Paulsen and then reported to you on
19 what Paulsen stated?
20 A. I would have been surprised if he hadn't
21 called the nurse if there was any indication that he was
22 getting worse or that I had gained any information other
23 than -- that would support anything other than flulike
24 condition. I would have been surprised if he hadn't
25 called under those circumstances, yes.

**106**

1  Q. At any rate, your memory at the time you
2  drafted this incident report was that the supervisor
3  informed you that he talked to Paulsen and that Paulsen
4  stated that it was flulike symptoms, and she was aware of
5  his condition and advised to call her back if he got
6  worse; is that right?
7  A. That was my understanding.
8  Q. And do you know what symptoms you reported
9  to the controller that he describes as being flulike
10 symptoms?
11 A. The only thing I recall reporting would have
12 been his vitals, that I had no -- based on my medical
13 history questions, I had no reason to think it was other
14 than flulike conditions.
15 Q. Well, the only thing you reported to the
16 controller were the vitals, and that's it? Or did you
17 report any other symptoms to the controller?
18 A. I would have reported any symptoms that he
19 gave me, but I don't recall specifically.
20 Q. What they were?
21 A. I don't recall specifically calling the
22 controller and telling him what we already knew I guess
23 is the way I would put it.
24 Q. And you already knew what?
25 A. He had flulike conditions.

**107**

1  Q. Okay. But you didn't tell the controller
2  that you were so concerned that you would want the
3  controller to call the nurse? You didn't say that?
4  A. No.
5  Q. Okay. And then you indicate that between
6  the hours of 5:20 to 6:40 a.m. on March 8, while on
7  routine pod walk, you asked Inmate Carranza if he was
8  feeling better, worse or the same by using hand gestures.
9  So this time you weren't using an interpreter, right?
10 You were using hand gestures?
11 A. We'd established these while he was back in
12 medical (indicated), and I used those most of the
13 evening. That was not the last time I used the
14 interpreter.
15 Q. I thought you had an interpreter when you
16 took him back.
17 A. That's correct. That's how we established
18 better and worse.
19 Q. So you didn't have to use hand gestures at
20 that time, right?
21     MS. VEIGA: Objection to form.
22 Q. (BY MR. TRINE) Right? You had an
23 interpreter with you?
24 A. That's correct.
25 Q. On this occasion, you did not have an

**108**

1  interpreter with you and were using hand gestures,
2  correct?
3      MS. VEIGA: Objection to form and
4  foundation.
5  Q. (BY MR. TRINE) Between 5:20 and 6:40, when
6  you asked Carranza if he was feeling better, worse or the
7  same by using hand gestures, you were using hand
8  gestures. You weren't using an interpreter at that time,
9  correct?
10 A. That's true.
11 Q. How were you able to question him about
12 specific symptoms using hand gestures?
13 A. I'd already established that when he was
14 back in medical with --
15 Q. Okay. How did you ask him, "Have you been
16 vomiting blood?" How did you do that with hand gestures?
17     MS. LEWIS: Object to the form of the
18 question and foundation.
19 A. I didn't say that I had established that
20 with hand gestures. That's what you're saying.
21 Q. (BY MR. TRINE) Okay. So you didn't ask him
22 that question, correct?
23     MS. VEIGA: Objection to form and
24 foundation.
25 A. I asked him those questions when he was --

**Page 109**

1  Q.  (BY MR. TRINE) I'm talking now about when
2  you saw him again as indicated at the bottom of page 155,
3  on routine pod walk between 0520 and 0640 hours, did you
4  ask him the questions through hand gestures of whether he
5  had been spitting up blood?
6  A.  No. I asked that earlier when he was in
7  medical.
8  Q.  Oh. You did?
9  A.  I asked a variety of medical questions --
10  Q.  Did you ask him earlier when he was in
11  medical if he had been spitting up blood? I thought you
12  said you didn't remember the specific questions.
13  A.  I asked him about all his symptoms at that
14  time. I don't specifically remember if he stated that he
15  was spitting up blood. I think that was your question.
16  Q.  Okay. Did you ask him again between 5:20
17  and 6:40 hours, through hand gestures, whether he was
18  spitting up blood?
19  A.  Not through hand gestures.
20  Q.  Okay. Well, you didn't use an interpreter
21  at that time, did you?
22  A.  I don't recall specifically to that hour. I
23  was in there every 20 minutes most of the evening.
24  Q.  Well, you indicate in your written report
25  that you talked to him by using hand gestures.

**Page 110**

1  A.  To ask about his condition: Are you getting
2  better, worse or the same (indicated)?
3  Q.  Okay. There's no indication here you used
4  an interpreter. Do you remember using an interpreter at
5  that time?
6  A.  Not specifically, no.
7  Q.  If you had, you wouldn't have had to use
8  hand gestures, would you?
9  A.  Depending on what response I got with the
10  hand gesture.
11  Q.  Did you ask him at that time -- and again,
12  I'm referring to the 0520 to 0640 hours -- if he was
13  still having diarrhea?
14  A.  I don't recall specifically.
15  Q.  Did you ask him if he had a fever, if he
16  felt hot or chilled?
17  A.  I don't recall specifically.
18  Q.  Did you ask him if there had been any blood
19  in his diarrhea at that time?
20  A.  I don't recall at that time.
21  Q.  Did you ask him if he felt faint or dizzy?
22  A.  I asked about his overall condition: Do you
23  feel better, worse or the same? That's what I asked him.
24  Q.  And you indicate that you offered him oxygen
25  at that time, and he declined. How did you do that with

**Page 111**

1  hand gestures?
2  A.  I didn't. I'm sure I used the interpreter.
3  Q.  There's no indication here you used the
4  interpreter. Do you remember using the interpreter at
5  that time?
6  A.  Not specifically at that time. I did a
7  number of times through the evening.
8  Q.  And you state that you lifted his shirt to
9  observe the area. Why did you do that?
10  A.  Now, are you going back to the time in
11  medical?
12  Q.  No, no. This is on March 8 between 0520 and
13  0640 hours in the morning. This is after you took him
14  back to medical. You indicate "I lifted his shirt to
15  observe the area." What area?
16  A.  I guess I'm not exactly sure when you're
17  questioning is referring to.
18  Q.  The question is referring to your entry on
19  March 8, 2003 between 5:20 and 6:40 a.m. in the morning
20  when you indicated that you were on routine pod walk, and
21  as a part of that entry, you state, "I lifted his shirt
22  to observe the area." What area did you observe and why
23  did you do that?
24  A.  I would have done that because -- and I
25  don't remember this this way. Like I say, it's been a

**Page 112**

1  long time ago. What I remember is doing that in medical,
2  because that was one of his symptoms.
3  Q.  What was one of his symptoms?
4  A.  That he had a pain in -- I don't remember
5  where. Maybe it was in the side. Wherever it says here.
6  I don't remember looking at it then, but maybe that's
7  what I did. It's been a long time ago. But if he
8  indicated that he had a pain in a spot that he had pain
9  in, I would have looked at it.
10  Q.  Observed the skin?
11  A.  Yes.
12  Q.  If he said that I have shoulder pain, you
13  wouldn't examine the shoulder, you'd look at the skin?
14  A.  You can't look at the shoulder without
15  looking at the skin, can you?
16  Q.  Well, why would you only examine his skin?
17  Were you afraid that maybe he had an infection?
18  MS. LEWIS: Object to the form of the
19  question.
20  Q.  (BY MR. TRINE) Is that why you were looking
21  at his skin?
22  MS. LEWIS: Same objection.
23  A.  I was looking at what he pointed to and
24  indicated that he had a pain or discomfort from.
25  Q.  (BY MR. TRINE) At the time that you

### 129

1  and --
2      A.   Well, we have a specific form for that, but
3  any type of complaint that an inmate would have.
4      Q.   Any kind?
5      A.   Any complaint.
6      Q.   Could go on the kite form?
7      A.   Yes.
8      Q.   How often have you seen those kite forms
9  used by detainees in Pod D?
10     A.   I would assume that there are some number of
11 kites flowing every day.
12     Q.   Well, have you seen that? Have you seen
13 kites coming out of Pod D literally every day?
14     A.   I've seen them come out of pods. Most every
15 day there's a kite about something.
16     Q.   I'm talking about Pod D.
17     A.   I can't specifically recall the number of
18 kites or did some come out every day or whatever, but
19 that's generally true.
20     Q.   Now, during March, March 1 to March 10 of
21 2003, do you recall any detainees in Pod D filling out a
22 kite form or getting help in filling out a kite form?
23     A.   I don't specifically remember the number of
24 kites, no.
25     Q.   I'm not asking you for the number. Do you

### 130

1  remember any -- whether there were any coming out of
2  there between March 1 and March 10, do you have any
3  specific memory of any kite forms?
4      A.   Not to any specific kite that would ring a
5  bell to me, no.
6      Q.   And where are those forms kept and
7  maintained after they're filled out? Do you know?
8      A.   They go through a kite officer or other
9  officers that can answer the kites, and eventually they
10 work their way to their file.
11     Q.   Who is the kite officer?
12     A.   At that time -- I can't remember who it was
13 at that time. I don't know who the kite officer was
14 then.
15     Q.   Is there a designated kite officer that
16 handles all the kites, no matter where they come from?
17     A.   I wouldn't say that handles all of them.
18 There is a kite officer, but each shift handles a variety
19 of things that they can't handle. As an example, if you
20 had soiled your linen and I got that kite on my shift,
21 I'd get you a new set of linens. That's something I
22 would do.
23     Q.   But would you also file that kite somewhere
24 so it's kept as a permanent record?
25     A.   Those kites would be put in an alphabetical

### 131

1  thing, and then when that fills up, they're gone back and
2  filed under their file.
3      Q.   Filed into their file, meaning in the
4  inmate's file?
5      A.   That's correct. That's where they would end
6  up.
7      Q.   So any kites filed by detainees in Pod D
8  between March 1 and March 10 should be in that detainee's
9  file; is that correct?
10          MS. LEWIS:  Object to the form.
11     A.   As far as I know.
12          MR. TRINE:  Okay. That's what I wanted to
13 find out. That's all I have.
14          MR. KORDICK:  We're done. Wait a minute.
15 One more question Joe suggested. A disturbance note.
16 Where's that?
17          MR. TRINE:  I'm sorry. I do have a couple
18 additional questions.
19     Q.   (BY MR. TRINE) Do you remember there being
20 a protest in the way of a hunger strike in Pod D in March
21 of 2003?
22     A.   I don't recall.
23     Q.   That would probably not occur on your shift
24 in any event, would it? Do you serve meals on your
25 shift?

### 132

1      A.   We do now, but we didn't at that time.
2      Q.   You didn't at that time?
3      A.   No.
4          MR. KORDICK:  Ask him --
5      Q.   (BY MR. TRINE) And with regard to the
6  showers in Pod D, were there complaints of the -- with
7  regard to the showers that the temperature could go
8  suddenly from cold to almost scalding hot and back to
9  cold again, and were efforts made by maintenance to try
10 to correct that?
11     A.   I don't recall any of that occurring on my
12 shift.
13     Q.   And you don't remember any complaints about
14 that?
15     A.   Not specifically.
16          MR. TRINE:  That's all.
17                  EXAMINATION
18 BY MR. JURS:
19     Q.   I just have a couple quick questions. I
20 want to put this on the record. I represent Dr. Bachman.
21 I just wanted to follow up on the issue of these policies
22 and procedures that you've been talking about in this
23 deposition. You have been trained in the policies for
24 the jail for medical administration and medical care
25 provided to the inmates; isn't that true?