SHEET 1  PAGE 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Case No. 2005-WM-377 (BNB)

DEPOSITION OF: DANIEL MULDOON
November 1, 2005

MOISES CARRANZA-REYES,

Plaintiff,

v.

PARK COUNTY, a public entity of the State of Colorado and its governing board, THE PARK COUNTY BOARD OF COUNTY COMMISSIONERS; PARK COUNTY SHERIFF'S OFFICE, a public entity of the State of Colorado; FRED WEGENER, individually and in his official capacity as Sheriff of Park County, Colorado; MONTE GORE, individually and in his capacity as Captain of Park County Sheriff's Department; VICKIE PAULSEN, individually and in her official capacity as Registered Nurse for Park County, Colorado; JAMES BACHMAN, M.D., individually and in his official capacity as Medical Director of the Park County Jail,

Defendants.

TAKEN PURSUANT TO NOTICE AND AGREEMENT on behalf of the Plaintiff at 825 Castello, Fairplay, Colorado 80440 at 1:48 p.m. before Theresa A. Coffman, Federal Certified Realtime Reporter, Registered Professional Reporter and Notary Public within Colorado.

PAGE 2

APPEARANCES

For the Plaintiff:
WILLIAM A. TRINE, ESQ.
Trine & Metcalf, P.C.
1435 Arapahoe Avenue
Boulder, Colorado 80302

LLOYD C. KORDICK, ESQ.
805 South Cascade
Colorado Springs, Colorado 80903

JOSEPH J. ARCHULETA, ESQ.
Law Office of Joseph J. Archuleta
1724 Ogden Street
Denver, Colorado 80218

For the Defendants Park County, Park County Board of Commissioners, Park County Sheriff's Office, Wegener and Gore:
JENNIFER L. VEIGA, ESQ.
Hall & Evans, LLC
1125 17th Street
Suite 600
Denver, Colorado 80202

STEPHEN A. GROOME, ESQ.
P.O. Box 1373
501 Main Street
Fairplay, Colorado 80440

For the Defendant Paulsen:
MELANIE B. LEWIS, ESQ.
Berg Hill Greenleaf & Ruscitti LLP
1712 Pearl Street
Boulder, Colorado 80302

For the Defendant Bachman:
ANDREW W. JURS, ESQ.
Johnson McConaty & Sargent, P.C.
400 South Colorado Boulevard
Suite 900
Glendale, Colorado 80246

Also Present: None

PAGE 3

EXHIBIT 5

I N D E X

EXAMINATION OF DANIEL MULDOON                              PAGE
November 1, 2005

By Mr. Trine                                                  4
By Mr. Archuleta                                             --
By Mr. Kordick                                               --
By Ms. Veiga                                                 --
By Mr. Groome                                                --
By Ms. Lewis                                                 --
By Mr. Jurs                                                  --

                                                          INITIAL
DEPOSITION EXHIBITS:                                     REFERENCE

9    Intero-Office Memorandum from Muldoon to               58
     Gore, 9/30/05

(Original exhibits attached to original deposition; copy exhibits included in continuing exhibit file; copies provided to counsel as requested.)

REQUESTED PORTIONS OF TESTIMONY:                           PAGE

Request for document production or information
Certified question                                          --
Instruction not to answer
Other requests or marked testimony

REFERENCES TO EXHIBITS MARKED PREVIOUSLY:

| Exhibit No. | Page Reference | Exhibit No. | Page Reference |
|---|---|---|---|
| 1 | 25 | 6 | 76 |
| 2 | 39 | | |
| 3 | 32 | | |
| 4 | 66 | | |

PAGE 4

         WHEREUPON, the within proceedings were taken pursuant to the Federal Rules of Civil Procedure:
         (At this time Messrs. Groome and Kordick were not present in the deposition room.)
         DANIEL MULDOON,
having been first duly sworn to state the whole truth, was examined and testified as follows:
         EXAMINATION
BY MR. TRINE:
    Q.   Please state your full name and address for the record.
    A.   Daniel Muldoon.
         MS. VEIGA: And why don't you provide your work address.
    A.   1180 Park County Road 16, Fairplay, 80440.
    Q.   (BY MR. TRINE) And what is your educational background?
    A.   I have a high school diploma, and I'm in the process of getting an associate's degree right now.
    Q.   Associate's degree in what?
    A.   Criminal justice.
    Q.   And where are you getting that degree?
    A.   It's through the mail.
         THE REPORTER: It's through the mail?
         THE DEPONENT: Ashworth College,

Notes:

Coffman Reporting
303.893.0202
303.893.2230 FAX

*** SUBJECT TO CONFIDENTIALITY DESIGNATIONS ***

**Page 29**

1  Q.  Do you know why it's addressed to you and
2  not the graveyard shift supervisor?
3  A.  Because I was day shift supervisor.
4  Q.  I thought the interoffice memorandum idea
5  was to let the very next shift know what had happened
6  during that --
7  A.  No, sir.
8  Q.  -- previous shift?
9  A.  Everybody. When I come in -- when I came in
10 today, I read swing shift pass-on from last night, I read
11 graveyard's pass-on from last night, and anything else
12 that was put into the pass-on book.
13 Q.  Now, there's an indication here that Inmate
14 Herbert Maprazo-Hazariegos is complaining of serious
15 pains on his left side, D Pod. Recommend he see the
16 nurse as soon as possible. If this was being passed on
17 to the evening shift, the nurse wouldn't be in during the
18 night, would she?
19 A.  I don't believe so.
20 Q.  So would you be responsible, then, for
21 seeing that this inmate saw the nurse when you came on
22 the day shift the next day?
23 A.  No, sir.
24 Q.  Who would be?
25 A.  The inmate.

**Page 30**

1  Q.  He would be responsible for going in to see
2  the nurse?
3  A.  No. When she comes around, he can approach
4  the nurse. What I do is I would be apprised of the
5  situation here, recommend he see the nurse as soon as
6  possible, but that's a medical issue, not a security
7  issue.
8  Q.  So you wouldn't follow up on that?
9  A.  Not necessarily. I might advise medical
10 there's a guy in David pod that needs to see you, but
11 when she goes around at med pass, he has every
12 opportunity in the world to go up and talk to her.
13 Q.  Now, what record do you have that would
14 indicate that the nurse saw the inmates and passed
15 medications out on every med pass?
16     MS. LEWIS:  Object to the form of the
17 question.
18 A.  The only thing I would have possibly would
19 be the sergeant's log, if it was checked off that med
20 pass occurred on my shift. But as far as what inmates
21 medical saw that day, I have no records of that at all.
22 Q.  (BY MR. TRINE)  Right. And the sergeant's
23 records would only -- the sergeant's records would
24 indicate who, in fact, participated in the med pass,
25 wouldn't it?

**Page 31**

1  A.  No, sir.
2  Q.  Where do we find out who participated in the
3  med pass that was done?
4  A.  It's just that med pass was done. That's
5  the only thing on the sergeant log.
6  Q.  There are no records of who passes out the
7  meds?
8      MS. VEIGA:  Objection, foundation.
9  Q.  (BY MR. TRINE)  Is that right?
10 A.  I have no records of who passes out meds.
11 Medical doesn't work for me.
12 Q.  Okay. So there are no records, outside of
13 the medical department itself, that indicate who passed
14 out the meds; is that right?
15     MS. LEWIS:  Objection to the form.
16 A.  We have a different form of keeping a daily
17 log than we did in 2003, so I don't know what entries
18 were made in 2003 in the handwritten log, but who did med
19 pass or who participated with medical when they went
20 around.
21 Q.  (BY MR. TRINE)  Okay. You say you use a
22 different form now?
23 A.  Yeah. Now we have a computer form.
24 Q.  And you don't remember what was used at that
25 time?

**Page 32**

1  A.  I believe it was a handwritten log.
2  Q.  Is that it? I'm looking now at Exhibit 1.
3  A.  It would be more of that form -- no, it
4  wouldn't.
5  Q.  Glance through there and tell me if you see
6  any records being made at that time on who, in fact,
7  would pass out the meds.
8  A.  I don't see any log entries.
9  Q.  And what about the exhibit --
10 A.  Master control log, yeah.
11 Q.  Exhibit 3, the master control log. Does
12 that indicate to you who, in fact, was passing out the
13 meds?
14 A.  I have no idea. What day are we looking at?
15 Q.  No, I just want to know if the name of the
16 person is reflected on that master control log that
17 actually passed out the meds.
18     MS. LEWIS:  Object to the form and
19 foundation.
20     MS. VEIGA:  Same.
21 A.  Not necessarily. The log was kept by the
22 master controller. So depending on what they wrote in
23 the log, it may or may not have who passed out meds on
24 it. It may just say meds started.
25 Q.  Okay. Let's look at that Exhibit 3, Park

**Page 53**

1  sample and was unsuccessful. I had to stand next to him
2  at the toilet.
3      Q.   I understand that, but did she tell you she
4  was doing it because of the suspected kidney stone?
5      A.   Possibly.
6      Q.   Did you at any time relate to the emergency
7  room staff that for several days he had had a sore
8  throat, had been vomiting, had diarrhea, had headaches?
9      A.   No, sir.
10         MS. LEWIS: Object to the form and
11  foundation.
12      Q.   (BY MR. TRINE) Was it your understanding
13  that that was the nurse's responsibility to supply all of
14  the information that was necessary that had occurred at
15  the jail to the emergency room department?
16      A.   Yes, sir.
17      Q.   Did you carry any documents with you related
18  to Carranza-Reyes' condition that you gave to the
19  emergency department?
20      A.   Not that I recollect.
21      Q.   You don't recall any reports from the nurses
22  that you gave them?
23      A.   I don't remember, no, sir.
24      Q.   You state that "The doctor explained to me
25  that Carranza-Reyes had pneumonia and needed to be

**Page 54**

1  transported to Denver Health Medical Center"?
2      A.   I remember them showing me an X-ray that I
3  thought indicated he had half a lung, and they said he
4  has to go down to Denver Medical.
5      Q.   Did the doctor explain to you that
6  Carranza-Reyes had pneumonia?
7      A.   I believe so.
8      Q.   Did he also tell you that the blood tests
9  showed that he had septicemia? Was septic?
10      A.   No, sir.
11         MS. VEIGA: Objection to form and
12  foundation.
13      Q.   (BY MR. TRINE) Did the doctor tell you that
14  all of their testing indicated that he could be going
15  into septic shock?
16         MS. VEIGA: Objection to form and
17  foundation.
18      A.   No, sir.
19      Q.   (BY MR. TRINE) Did you object to the
20  recommendation that he be transported to Denver Health?
21      A.   No, sir, not to the need to go to Denver
22  Health.
23      Q.   Well, did you object about something else
24  that was occurring?
25      A.   No, sir. No. My question was -- I was

**Page 55**

1  dealing with INS, and I was hoping they were going to
2  come take charge of their inmate.
3      Q.   You had been in contact by phone with INS;
4  isn't that right?
5      A.   I believe sporadically, yes, sir.
6      Q.   Did you contact INS before you left for
7  Summit County?
8      A.   I don't remember whether I did or Corporal
9  Crawford did. I do remember talking to them on occasion
10  at the Summit Medical Center on my own cell phone, but
11  cell service was sporadic in that building.
12      Q.   What was the gist of the conversations you
13  had with INS when you were in Summit County?
14      A.   My recollection is that they were unable to
15  come and take charge of their inmate, so we needed to
16  continue with the transport. I was hoping to have been
17  relieved at Summit so that they could continue on down to
18  Denver.
19      Q.   So instead, you followed the ambulance to
20  Denver?
21      A.   Yes, sir. And that's my recollection of
22  dealing with the ambulance drivers.
23      Q.   Now, when you were called at 8:35 that
24  morning -- I assume you were home; is that right?
25      A.   Yes, sir.

**Page 56**

1      Q.   When you were called at home at 8:35 that
2  morning, were you informed that INS had been asked to
3  come to the jail and take Carranza-Reyes to Summit County
4  but that they had no transportation available?
5      A.   I don't remember that, sir.
6      Q.   Were you told that INS had been asked
7  permission to transport Carranza-Reyes to Summit County?
8      A.   I don't remember that, but that would have
9  been typical.
10      Q.   Was it the custom and practice to always get
11  the INS approval on a transport for medical when a
12  detainee needed medical attention?
13         MS. LEWIS: Object to the form.
14      A.   That would be my preference, yes, sir.
15      Q.   (BY MR. TRINE) And was it ever explained to
16  you why INS had to first approve a transport to medical
17  before a transport occurred?
18      A.   No, sir.
19      Q.   You just knew that was the custom and
20  practice?
21      A.   Yes, sir. That's what we do with all
22  contract inmates.
23      Q.   And if INS refuses the request to have an
24  inmate transferred for medical, the inmate apparently
25  doesn't go to medical, huh?

### Page 65

1  strike?
2  A.  Oh, it happened on a few occasions. I don't
3  remember it happening in D Pod, but it happened on
4  occasions.
5  Q.  And this doesn't refresh your memory of
6  there being a disturbance in D Pod related to no
7  medications?
8       MS. VEIGA: Objection, foundation.
9  A.  No, sir. I'd have to know more about it.
10 Q.  (BY MR. TRINE) In any event, if such a
11 disturbance took place, you would probably report that in
12 the pass-on log at shift change; is that right?
13 A.  Possibly, if it was significant.
14 Q.  Back in March of 2003, is it your memory
15 that the nurse kept regular hours or irregular hours at
16 the jail?
17 A.  My impression was regular hours, but . . .
18 Q.  And were those usually daytime hours?
19 A.  I believe so.
20 Q.  Was the nurse generally there when you were
21 there on day shift?
22 A.  That's my recollection.
23 Q.  And would you customarily arrive at around
24 8:00 a.m. when you were on day shift?
25 A.  Yes, sir.

### Page 66

1  Q.  And would you observe the nurse arriving
2  about that time or later? Or earlier?
3  A.  None. I wouldn't have observed the nurse
4  arriving at all, so . . . Whether she got there before
5  me or after me, I have no recollection.
6  Q.  But you knew she was working day shifts
7  because you would see her from time to time?
8  A.  Yes, sir.
9  Q.  Now, if you'll look at Exhibit 4, please,
10 which is a policy and procedure manual. Is this a manual
11 that you reviewed and became familiar with as an employee
12 of Park County?
13 A.  No, sir.
14 Q.  You were never asked to familiarize yourself
15 with this manual and read it and become familiar with it?
16 A.  No, sir.
17 Q.  Have you ever reviewed this manual?
18 A.  No, sir.
19 Q.  Did you ever learn from any source that
20 there was a health services administrator working 40
21 hours a week at the jail?
22      MS. LEWIS: Object to the form of the
23 question, foundation.
24 A.  I don't understand that question.
25 Q.  (BY MR. TRINE) Did anyone have the title at

### Page 67

1  the jail of health services administrator that you were
2  aware of?
3  A.  Yes, sir.
4  Q.  Who had that title?
5  A.  Dr. James Bachman.
6  Q.  Did anyone have the title of responsible
7  physician that you were aware of?
8  A.  I've never heard that term, sir.
9  Q.  Okay. Anyone have the title of medical
10 director?
11 A.  Dr. Bachman.
12 Q.  As far as you knew, Dr. Bachman was both the
13 medical director and the health services administrator?
14 A.  Yes, sir.
15 Q.  And who told you that? How were you
16 informed of that?
17 A.  I have no idea, sir.
18 Q.  It's just that from whatever sources, that
19 was your understanding?
20 A.  That was my understanding, yes, sir.
21 Q.  Did anyone hold the title at any time of
22 administrative sergeant?
23 A.  No, sir.
24 Q.  Or division commander?
25 A.  That would be Captain Gore.

### Page 68

1  Q.  Now, page 559 of that policy and procedure
2  manual indicates that there shall be a quality
3  improvement committee, and it describes the committee's
4  duties and functions: That they'll meet no less than
5  twice annually and monitor and evaluate the quality of
6  health care, and it states that the committee should be
7  composed of the following: the responsible physician,
8  who in these documents is named as Dr. Bachman, by the
9  way, and the health service administrator, the
10 administrative sergeant, and you don't know who the
11 administrative sergeant is, right?
12      MR. JURS: I'm going to object to form.
13 That question is unrelated to the previous paragraph of
14 discussion. I think it's confusing to talk about things
15 for a while and then talk -- ask questions that are
16 unrelated.
17 Q.  (BY MR. TRINE) And you don't know who the
18 administrative sergeant is, correct, that's a member of
19 that committee?
20 A.  No, sir.
21 Q.  And do you know the personnel or person
22 responsible for case management?
23 A.  Now or then?
24 Q.  Well, let's talk about then.
25 A.  Yes, sir.