## SHEET 1 PAGE 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Case No. 2005-WM-377 (BNB)

DEPOSITION OF: GREGORY SCOTT FLINT
November 2, 2005

MOISES CARRANZA-REYES,

Plaintiffs

v.

PARK COUNTY, a public entity of the State of Colorado and its governing board, THE PARK COUNTY BOARD OF COUNTY COMMISSIONERS; PARK COUNTY SHERIFF'S OFFICE, a public entity of the State of Colorado; FRED WEGENER, individually and in his official capacity as Sheriff of Park County, Colorado; MONTE GORE, individually and in his capacity as Captain of Park County Sheriff's Department; VICKIE PAULSEN, individually and in her official capacity as Registered Nurse for Park County, Colorado; JAMES BACHMAN, M.D., individually and in his official capacity as Medical Director of the Park County Jail,

Defendants.

TAKEN PURSUANT TO NOTICE on behalf of the Plaintiff at 824 Costella, Fairplay, Colorado 80440 at 8:31 a.m. before Laura L. Corning, Federal Certified Realtime Reporter, Certified Shorthand Reporter and Notary Public within Colorado.

## PAGE 2

APPEARANCES

For the Plaintiff:    WILLIAM A. TRINE, ESQ.
                      Trine & Metcalf, P.C.
                      1435 Arapahoe Avenue
                      Boulder, Colorado 80302-6390

                      LLOYD C. KORDICK, ESQ.
                      805 South Cascade
                      Colorado Springs, Colorado 80903

                      JOSEPH J. ARCHULETA, ESQ.
                      Law Office of Joseph Archuleta
                      1724 Ogden Street
                      Denver, Colorado 80128

For the Defendants    JENNIFER L. VEIGA, ESQ.
Park County, Park     Hall & Evans, LLC
County Board of       1125 17th Street
Commissioners, Park   Suite 600
County Sheriff's      Denver, Colorado 80202-2037
Office, Wegener,
Gore:                 STEPHEN A. GROOME, ESQ.
                      P.O. Box 1373
                      501 Main Street
                      Fairplay, Colorado 80440

For the Defendant     MELANIE B. LEWIS, ESQ.
Paulsen:              Berg Hill Greenleaf & Ruscitti LLP
                      1712 Pearl Street
                      Boulder, Colorado 80302

For the Defendant     ANDREW W. JURS, ESQ.
Bachman:              Johnson McConaty & Sargent, P.C.
                      400 South Colorado Boulevard
                      Suite 900
                      Glendale, Colorado 80246

Also Present:         None

## PAGE 3

EXHIBIT 6
INDEX

EXAMINATION OF GREGORY SCOTT FLINT:                        PAGE
November 2, 2005

By Mr. Trine                                                  4
By Mr. Kordick                                               --
By Mr. Archuleta                                             --
By Ms. Veiga                                                 --
By Mr. Groome                                                --
By Ms. Lewis                                                 --
By Mr. Jurs                                                 127

                                                          INITIAL
DEPOSITION EXHIBITS                                     REFERENCE

10   Inmate Worker Trustee Program                          119

(Original exhibits attached to original deposition; copy exhibits included in continuing exhibit file; copies provided to counsel as requested.)

REQUESTED PORTIONS OF TESTIMONY:                           PAGE

(None.)

REFERENCES TO EXHIBITS MARKED PREVIOUSLY:

Exhibit No.      Page Reference
     1               14
     2               84
     3               15
     6               98

## PAGE 4

                                                            4
1        WHEREUPON, the within proceedings were
2   taken pursuant to the Federal Rules of Civil
3   Procedure:
4           GREGORY SCOTT FLINT,
5   having been first duly sworn to state the whole truth,
6   was examined and testified as follows:
7              EXAMINATION
8   BY MR. TRINE:
9       Q.   Please state your full name and office
10  address for the record.
11      A.   Detective Corporal Gregory Scott Flint,
12  and that's F-l-i-n-t. I work for the Park County
13  Sheriff's office. The address would be 1180 Park
14  County Road 16, Fairplay, Colorado. Zip Code is 80440.
15      Q.   And what is your educational background?
16      A.   Varied. I have about 2 1/2 years in
17  criminal justice, some other college as it relates to
18  the law enforcement field, Agan Tech, and approximately
19  4,000 hours in specialized training in law enforcement,
20  including three police academies and Marietta training
21  through the FBI and other trains of thought.
22      Q.   And what did you first go to work at the
23  Park County Jail?
24      A.   It would be May of 1999. I'm sorry.
25  That's when I started employment with the sheriff's

Notes:

*Coffman Reporting*
303.893.0202
303.893.2230 FAX

**Page 37**

1 criminal element within their group. But generally
2 speaking, the average detainee was very cooperative. I
3 would station an officer outside her main corridor
4 there, and she would see the detainees. I don't
5 know -- I don't know her exact procedures. I don't
6 know how many she saw at a time or what -- what she did
7 in that regard.
8     Q.    Okay. You never really observed what her
9 procedures were?
10    A.    No, sir.
11    Q.    Or whether she would meet with three or
12 four at a time or one at a time?
13    A.    Right.
14    Q.    Or where she would meet with them?
15    A.    It would always be in the medical -- the
16 little infirmary-type office that she had.
17    Q.    Okay.
18    A.    That's where she conducted additional --
19 the more intense screenings. She would make rounds
20 every morning, visiting with folks, when she came on
21 duty, and she'd make morning rounds and generally
22 evening rounds.
23    Q.    And then once the nurse saw one of the
24 new INS detainees, would a medical file be opened for
25 that detainee?

**Page 38**

1     A.    You know, I can make an educated guess on
2 that, but I really don't know her exact internal
3 procedures. She -- I was there as a liaison for her,
4 as any sergeant would be, but she directly reported to
5 the captain, so I don't -- I don't know what deadlines
6 she was under. I know that we operated under Dr.
7 Bachman's authorities and under his licensing. I know
8 he did a lot of visits to the jail. He even did some
9 training classes with us over a period of time, but I
10 don't know her exact procedure.
11    Q.    Now, did someone in the controller's
12 office stamp the -- the INS record if an INS detainee
13 was then seen by the nurse? In other words, did you
14 keep a record of -- in the controller's office of -- of
15 which detainees were going through the examination by
16 the nurse?
17    A.    Not -- not as a general rule. We would
18 keep an -- an entry on a master control log, like, you
19 know, six detainees to -- to the nurse's office or
20 something to that effect. But we didn't -- we didn't
21 stamp anything. That would have been -- I mean, her
22 records were her records. They were private anyways.
23 They were protected, you know, for the patient-client
24 [sic] relationship, and so -- I mean, we never looked
25 at those records. I mean, not the health records.

**Page 39**

1           Once they were completed by them, they
2 went right into the nurse. So I don't know if she
3 created a file for each and every one or for each
4 group. I don't -- I don't know how she -- how she
5 managed those.
6     Q.    Okay. I'll get back to that stamp later,
7 because I don't have those right in front of me, but we
8 have a list of 50 INS detainees that were picked up by
9 the INS and transported out of the facility.
10    A.    Um-huh.
11    Q.    And on -- not on the medical files but on
12 the -- on the booking file of those detainees, 33 of
13 the 50 had a stamp on it just indicating that for the
14 medical records you had to go to the medical
15 department. And were you familiar with a stamp like
16 that?
17        MS. VEIGA: Objection as to form and
18 foundation. You can answer.
19    A.    I don't recall a stamp like that. It may
20 have been something that was starting to be utilized as
21 I was getting ready to transfer out. I -- I just don't
22 really have any recollection of that. I'm not saying
23 it doesn't exist --
24    Q.    (BY MR. TRINE) Yeah.
25    A.    -- I'm not directly aware of it.

**Page 40**

1     Q.    Okay. And to your knowledge is the jail
2 still taking INS detainees?
3     A.    I believe they are.
4     Q.    Okay. Do you know how often that
5 contract would -- would be renewed with the INS? Was
6 that an annual, or do you know?
7     A.    I believe it was a yearly contract, but
8 I'm not totally sure on that.
9     Q.    Do you know the name of anyone at the INS
10 that dealt directly with Monte Gore in dealing with
11 that contract on an annual basis?
12    A.    I don't recall any names. I recall
13 meeting with those folks occasionally when they took
14 tours or inspections of the jail, which was fairly
15 frequent, but -- I remember faces; I really don't
16 recall any names at this time.
17    Q.    Okay. Next I want to talk to you a
18 little bit about what the routine was on cleaning the
19 pods --
20    A.    Okay.
21    Q.    -- because we -- we notice in the -- the
22 master log that apparently buckets, I gather, with a
23 mop were placed in the pods routinely.
24    A.    Right.
25    Q.    But why don't you describe what the

**Page 105**

1  the flu.
2    A.   No, I don't.
3    Q.   Okay. And -- and then on page 95 --
4  oops -- do I have the right -- no. I'm sorry. That
5  would be page 96. It looks like this is the sergeant's
6  daily log for the evening shift on March 9. And by the
7  way, is -- is any of this in your handwriting, or is
8  all of it in your handwriting?
9    A.   It's all in my handwriting.
10   Q.   Okay. So when you filled -- when you
11 were the sergeant on duty in the evening and filled out
12 the sergeant -- sergeant's daily log, most of that or
13 all of that would customarily be in your handwriting?
14   A.   Yeah, unless they made a little notation
15 or something for me off to the side, but generally,
16 yes, it would always be my handwriting.
17   Q.   Okay. And I notice at the very bottom of
18 that page, under Other Information/Comments, it states
19 that -- "Made several inquiries as to the nature of
20 illness in D Pod, names, places of contact, and types
21 of symptoms regarding INS detainees. Notes
22 forthcoming." Is that in your handwriting?
23   A.   Yes.
24   Q.   When -- when -- when you said "Made
25 several inquiries," did you make those inquiries?

**Page 106**

1    A.   It would have been myself or the pod
2  officers that were most familiar with the folks in
3  there.
4    Q.   Now, to bring you up to date, there were
5  61 detainees in Pod D, and during the day, on March 7,
6  50 of those detainees were removed from Pod D and
7  transferred out by INS so that there were only 11 left
8  in Pod D. Then Carranza-Reyes was transferred out to
9  Summit County on March 8 and ended up in the hospital
10 in Denver, so there -- there were only 10 detainees
11 left in -- in Pod D by March the 9th.
12       Now, do you know why inquiries were then
13 being made on the evening of March 9 of the remaining
14 detainees in Pod D regarding the nature of their
15 illness, their names, the places of contact, the types
16 of symptoms and so forth?
17       MS. VEIGA: Objection to form and
18 foundation.
19   A.   I'm sure it was just a follow-up to why
20 these people were sick and, you know, maybe possibly
21 where they contracted the disease to maybe give INS or
22 us an idea of where we need to be looking in the groups
23 they were transporting.
24   Q.   (BY MR. TRINE) Do you have any
25 independent recollection of meeting with the detainees

**Page 107**

1  to obtain this information?
2        MS. LEWIS: Object to the form of the
3  question.
4    A.   Not on this particular incident, no.
5    Q.   (BY MR. TRINE) Well, were there -- are
6  there other incidents where you have specific
7  recollection of meeting with detainees to gather this
8  sort of information?
9    A.   I recall meeting with detainees and other
10 inmates on several occasions throughout my stay in the
11 jail where, you know, I would inquire as to what their
12 symptoms were and so on and so forth, just as a first
13 responder and the shift supervisor, but this particular
14 incident, I don't have any recollection.
15   Q.   Now, when you chart that notes would be
16 forthcoming, is that an indication to you that
17 you've -- you've completed this inquiry, you've
18 gathered this information, and -- and now you're going
19 to prepare some sort of report?
20   A.   I think the context that I wrote this in
21 was the notes would be forthcoming from the officers
22 that were doing the inquiries.
23   Q.   Well, do you believe that you assigned
24 other officers on that shift to -- to do the inquiries?
25   A.   I'm sure that I did.

**Page 108**

1    Q.   And it looks like the officers on that
2  shift were Bellantonio, Thomas and Woodward; is that
3  right?
4    A.   That's correct.
5    Q.   Do you know which of those officers were
6  assigned the task of interviewing the remaining
7  detainees to gather this information?
8    A.   I don't recall at this time.
9    Q.   Do you know what interpreter was
10 available or could be used to gather that information?
11   A.   It would have been whoever the in-pod
12 interpreter was at that time. Quite often many of the
13 detainees had folks within their group that could speak
14 English and, actually, Thomas was married to a Hispanic
15 lady from Mexico, and he spoke some Spanish. But other
16 than that, you know, we would have utilized in-pod
17 interpreters.
18   Q.   Okay. Now, the population has decreased
19 from 61 to -- to 10 by the evening of -- of the 9th.
20 Do you know whether there was anyone left in those 10
21 who could interpret?
22       MS. VEIGA: Objection to form and
23 foundation.
24   Q.   (BY MR. TRINE) Among those 10.
25   A.   I don't recall at this time.