## SHEET 1 PAGE 1

**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Case No. 2005-WM-377 (BNB)

DEPOSITION OF: JOHN BELLANTONIO
November 4, 2005

MOISES CARRANZA-REYES,

Plaintiff,

v.

PARK COUNTY, a public entity of the State of Colorado and its governing board, THE PARK COUNTY BOARD OF COUNTY COMMISSIONERS; PARK COUNTY SHERIFF'S OFFICE, a public entity of the State of Colorado; FRED WEGENER, individually and in his official capacity as Sheriff of Park County, Colorado; MONTE GORE, individually and in his capacity as Captain of Park County Sheriff's Department; VICKIE PAULSEN, individually and in her official capacity as Registered Nurse for Park County, Colorado; JAMES BACHMAN, M.D., individually and in his official capacity as Medical Director of the Park County Jail,

Defendants.

TAKEN PURSUANT TO NOTICE AND AGREEMENT on behalf of the Plaintiff at 824 Castello, Fairplay, Colorado 80440 at 8:31 a.m. before Theresa A. Coffman, Federal Certified Realtime Reporter, Registered Professional Reporter and Notary Public within Colorado.

## PAGE 3

**Page 3**

EXHIBIT 7

INDEX

| EXAMINATION OF JOHN BELLANTONIO November 4, 2005 | PAGE |
|---|---|
| By Mr. Kordick | 4 |
| By Mr. Archuleta | -- |
| By Mr. Ringel | 110 |
| By Mr. Groome | -- |
| By Ms. Holmes | -- |
| By Mr. Jurs | 166 |

| DEPOSITION EXHIBITS: | INITIAL REFERENCE |
|---|---|
| 6-A   Continuation of Exhibit 6, Park 2000 | 75 |

(Original exhibits attached to original deposition; copy exhibits included in continuing exhibit file; copies provided to counsel as requested.)

| REQUESTED PORTIONS OF TESTIMONY: | PAGE |
|---|---|
| Request for document production or information | -- |
| Certified question | -- |
| Instruction not to answer | 161 |
| Other requests or marked testimony | -- |

REFERENCES TO EXHIBITS MARKED PREVIOUSLY:

| Exhibit No. | Page Reference |
|---|---|
| 1 | 21 |
| 2 | 15 |
| 3 | 14 |
| 4 | 172 |
| 5 | 13 |

## PAGE 2

**Page 2**

APPEARANCES

For the Plaintiff:
LLOYD C. KORDICK, ESQ.
805 South Cascade
Colorado Springs, Colorado 80903

JOSEPH J. ARCHULETA, ESQ.
Law Office of Joseph J. Archuleta
1724 Ogden Street
Denver, Colorado 80218

For the Defendants Park County, Park County Board of Commissioners, Park County Sheriff's Office, Wegener and Gore:
ANDREW D. RINGEL, ESQ.
Hall & Evans, LLC
1125 17th Street
Suite 600
Denver, Colorado 80202

STEPHEN A. GROOME, ESQ.
P.O. Box 1373
501 Main Street
Fairplay, Colorado 80440

For the Defendant Paulsen:
SARA HOLMES, ESQ.
Berg Hill Greenleaf & Ruscitti LLP
1712 Pearl Street
Boulder, Colorado 80302

For the Defendant Bachman:
ANDREW W. JURS, ESQ.
Johnson McConaty & Sargent, P.C.
400 South Colorado Boulevard
Suite 900
Glendale, Colorado 80246

Also Present: None

## PAGE 4

**Page 4**

1   WHEREUPON, the within proceedings were taken
2   pursuant to the Federal Rules of Civil Procedure:
3           JOHN BELLANTONIO,
4   having been first duly sworn to state the whole truth, was
5   examined and testified as follows:
6           EXAMINATION
7   BY MR. KORDICK:
8       Q.  Sir, could you please state your full name.
9       A.  John Frank Bellantonio.
10      Q.  Mr. Bellantonio, could you please explain
11  for the record what your educational background is,
12  starting with high school and the year you graduated from
13  high school.
14      A.  I graduated from Valley Stream High School
15  in Valley Stream, New York in 1966, attended Adelphi
16  University, receiving a bachelor of arts in sociology in
17  1970. That's about it.
18      Q.  Now, let me take your work history. I don't
19  need to know about jobs you had for six months or
20  anything like that, but just your general work history
21  from 1970.
22          (At this time Mr. Archuleta left the
23  deposition room.)
24      A.  Do you want specific years and stuff like
25  that?

Notes:

Coffman Reporting

303.893.0202
303.893.2230 FAX

*** SUBJECT TO CONFIDENTIALITY DESIGNATIONS ***

**Page 57**

1  bring to us, I would authorize it if I was on the phone,
2  okay?
3      Q.   (BY MR. KORDICK) Right.
4      A.   And early in my stay at Park County, they
5  called and said we have X amount of detainees, and I
6  didn't know any better. I said, "Well, we've got more
7  than we can handle right now. Don't bring them," okay?
8  And the next day I was corrected.
9      Q.   Really? By whom?
10     A.   By Sergeant Muldoon and told that when
11 they -- when they call, that we will take them. We will
12 make accommodations. And that was very early in the INS
13 process. We hadn't really -- we didn't have that many,
14 so to speak. But I was told, you know, basically, make
15 room for them, you know, this is our moneymaker. Make
16 room for them.
17     Q.   When you say that this was your moneymaker,
18 what was conveyed to you about how much they were paying?
19 Did they tell you?
20         MR. RINGEL: Object to the form and the
21 foundation.
22     A.   If I remember right, it was -- let's see.
23 We had a DOC contract, and they had one amount, I think
24 was $45 a day, and I think INS was $55 a day. I think.
25 Or vice versa.

**Page 58**

1      Q.   (BY MR. KORDICK) But that was a big deal
2  for the jail to make that revenue?
3          MR. RINGEL: Object to the form and the
4  foundation.
5      A.   Oh, absolutely. It was a very big deal.
6      Q.   (BY MR. KORDICK) And even though exercising
7  your judgment as a person with a lot of experience as a
8  corrections officer, you were overridden in exchange for
9  them having more prisoners to make more money; is that
10 right?
11         MR. RINGEL: Object to the form and the
12 foundation.
13     A.   As I pointed out, I was relatively new, so I
14 thought it was within my scope of authority to say, you
15 know, we have enough, we can't take the next load. But I
16 was told that that was not what was desired and that we
17 would make accommodations.
18         And I don't remember why I felt that there
19 was enough at that point, but I just remember telling the
20 INS person, "Well, you know, no, we've got enough. We're
21 at capacity as far as I'm concerned." But I was -- we
22 expanded greatly after that. More bunks were added. I
23 was never told of a -- I would ask, "What is the
24 capacity? When do we say no?" And I was told just make
25 room for them, basically.

**Page 59**

1      Q.   (BY MR. KORDICK) There is no "no"?
2      A.   I was never told of a top cap, no. That
3  kind of bothered me. I'd never worked in a facility that
4  didn't have a parameter in terms of capacity.
5      Q.   Did you ever have to house people in the
6  recreation room for the D Pod?
7      A.   Yes.
8      Q.   What was the problem with having to house
9  people in the recreation room in D Pod?
10     A.   The recreation room was very small. It had
11 gym equipment, weightlifting equipment, stuff like that,
12 and it had no restroom facility or showers or restroom
13 facility or sinks or any water facilities. So if they
14 were locked in there, if they had to use the restroom, it
15 would require an escort to one of the units where they
16 could use the restroom.
17     Q.   When you got into these crowded positions --
18 and I'd like you to refer back, if we could, to Exhibit
19 Number 1, to the census that was conducted on the 7th.
20 Take a look at that. First of all, if we could look at
21 53, this is dated the 6th of March. What was the
22 population of D Pod on the 6th of March?
23         MR. RINGEL: Object to the form and the
24 foundation.
25     A.   55 individuals.

**Page 60**

1      Q.   (BY MR. KORDICK) And if you could look at
2  57. Now, this particular document, it looks like there
3  are four different count sheets on here. This is Exhibit
4  1, 57, and it appears that your name is on all four of
5  these. These were produced pursuant to a request -- an
6  Open Records Act request from the county. And it looks
7  like 3/6/03, 1700, there's 55 inmates, and then it seems
8  fixed at 55, and then it goes up to 61 inmates in D, but
9  there's no date or time on that. Do you see that?
10     A.   Oh, yeah. Hum.
11     Q.   The way it was produced was for that same
12 date. Would you assume that that was the same date?
13         MR. RINGEL: Object to the form and the
14 foundation.
15     A.   I can't assume anything on that one.
16     Q.   (BY MR. KORDICK) Okay. Let's look at your
17 3/6 -- Exhibit 3, see if we can confirm the count went
18 up -- and I haven't check this myself -- to 163. If we
19 look on Exhibit 3, 995, at -- it looks like there's a
20 notation from Ed Allen on 2107? Do you see the count's
21 163, which corresponds with 57, the one that's not dated,
22 the same count as 163?
23         MR. RINGEL: Object to the form and the
24 foundation.
25     A.   Correct.

**93**

1  Q. (BY MR. KORDICK) I'm talking about you
2  personally.
3  A. Yes.
4  Q. The other one is use disposable dinnerware
5  with the inmate: Plates, cups, forks, spoons, et cetera.
6  Did you use disposable . . .
7  A. Yes, we did, but --
8  MR. RINGEL: Object to the form and the
9  foundation. I'm sorry. I just -- "use disposable," it
10 seemed to me that you were going to finish the question,
11 and you didn't, and since you admonished me about waiting
12 till you finished, I waited. I apologize.
13 A. If the question is did we use disposable
14 dinnerware --
15 Q. (BY MR. KORDICK) Yes.
16 A. Yes, we did.
17 Q. Okay. And then Number 4, wash your hands
18 after every contact with an inmate.
19 A. I washed my hands frequently. I can't say
20 it was after every contact with every inmate. Can we go
21 back to the disposable dinnerware thing?
22 Q. Yes.
23 A. I just don't remember how we dealt with -- I
24 was thinking about this all last night. I started
25 thinking about different things, and I don't remember if

**94**

1  we issued them a spork. A spork is a plastic device that
2  is part spoon and part fork, and it's called a spork, and
3  it's made out of durable, disposable material. I don't
4  remember if we collected those at every meal and then
5  washed them in a machine or how we did that, or if they
6  were issued one and they were to use that forever. I
7  don't remember how that worked.
8  I know when I worked in the Department of
9  Corrections, it became a big issue that we had to reissue
10 eating utensils and cups every meal and then have them
11 washed in the machines that were made to wash these
12 things. We couldn't issue them an eating utensil and a
13 cup and expect them to wash that in their sink because
14 there wasn't adequate disinfectant and so forth to do
15 that. It was just -- I don't know. I don't know if it's
16 relevant or not. Just throwing that out there.
17 Q. Okay. So you don't remember whether they
18 used disposable, exactly, or not?
19 MR. RINGEL: Object to the form and the
20 foundation.
21 A. We used disposable. We used disposable. I
22 just don't remember -- we certainly didn't throw them out
23 every time and get new ones. They were either rewashed
24 or reused.
25 Q. (BY MR. KORDICK) Then it says -- Number 5

**95**

1  is allow him to keep his own clothes. Wash clothes
2  separately from those of other inmates.
3  MR. RINGEL: Is there a question?
4  Q. (BY MR. KORDICK) That was one of the
5  standards. Were you able to do that with a prisoner?
6  MR. RINGEL: Object to form and the
7  foundation.
8  Q. (BY MR. KORDICK) All of these questions I'm
9  asking if you were able to do that, as a deputy?
10 MR. RINGEL: Object to the form and the
11 foundation.
12 A. I don't remember ever doing that.
13 Q. (BY MR. KORDICK) And 6 was ask physician
14 about special care needed -- any special care needed for
15 clothes, bedding, pillows and mattresses?
16 MR. RINGEL: Is there a question?
17 Q. (BY MR. KORDICK) Was that something you had
18 authority to do, or did you do that?
19 MR. RINGEL: Object to the form and the
20 foundation.
21 Q. (BY MR. KORDICK) And that's the same
22 question with each one of these.
23 A. We could have consulted with medical staff
24 concerning the special instructions for a sick
25 individual.

**96**

1  Q. But not generally the doctor directly,
2  correct?
3  MR. RINGEL: Object to the form and the
4  foundation.
5  A. We wouldn't, in general, talk directly to
6  the doctor, no. Or at least in my case, I didn't.
7  Q. (BY MR. KORDICK) There was also a standard
8  for emergency situations at 1999. It says, "A
9  communicable disease can result in a medical emergency."
10 It says, "If you notice any of the following signs or
11 symptoms, consider the situation an emergency. Call M.D.
12 immediately, describe the signs and symptoms, and follow
13 his advice." It says, Fever and headache, confusion,
14 comma, stupor or coma. Respiratory distress, comma, such
15 as rapid breathing or great difficulty breathing. And
16 extreme weakness which may be due to fever,
17 uncontrollable vomiting, very swollen joints.
18 Do you remember ever seeing this or having
19 this being distributed to you, or were you told that this
20 was a standard? If you saw, for instance, respiratory
21 distress, to call an M.D. immediately?
22 MR. RINGEL: Object to form and the
23 foundation.
24 A. There were two parts to your question. One
25 is I've never seen this document until today, and the

97

1 other one was, was I ever instructed to -- if -- you
2 know, I don't remember any instruction to that regard,
3 but I've been in the business long enough to know that if
4 a person is having severe signs of any kind of distress,
5 whether it be extreme weakness or breathing or heart
6 attack symptoms, that we would get immediate attention.
7      Q.   (BY MR. KORDICK) So if a person were having
8 respiratory distress, like shallow breathing, that would
9 be a -- just as a commonsense thing, you might call an
10 M.D. in that situation?
11          MR. RINGEL: Object to the form and
12 foundation.
13     A.   We were instructed to call the nurse first.
14     Q.   (BY MR. KORDICK) Now, Officer, do you
15 remember -- you apparently booked my -- I don't know if
16 the right term is "booked." Maybe the term is processed.
17 Do you remember him and his twin brother, vaguely or
18 specifically?
19          MR. RINGEL: Object to the form.
20     A.   Very vaguely. And the only thing I do
21 remember is we had two INS detainees, brothers, and one
22 of them claimed to have been a policeman in Mexico, and
23 that's the only reason I even remember it.
24     Q.   (BY MR. KORDICK) Okay. And did you learn
25 that sometime after he was in the jail --

98

1          MR. RINGEL: Object --
2      Q.   (BY MR. KORDICK) -- or at the time that he
3 was first brought in? Do you remember?
4          MR. RINGEL: Object to the form.
5      A.   I have a very, very vague recollection of
6 the whole thing. If I remember right, it was as he was
7 being processed or as he was being -- I don't remember
8 what my role was specifically that night. I'm sure if I
9 could review some records, I could determine that, but it
10 might have been in the booking area when they were first
11 received, and I remember there was a bunch of laughter
12 that, you know, hey, he used to be a policeman, you know.
13         My own personal style in dealing with INS
14 detainees was to make it as light as possible and try to
15 defuse some of the tension and anxiety, so I just
16 remember a little bit of laughter about him having been a
17 cop.
18     Q.   (BY MR. KORDICK) Okay. And you don't
19 remember him being sick or anything at that point or you
20 would have noted it, correct?
21         MR. RINGEL: Object to the form and
22 foundation.
23     A.   Yeah. I don't remember him being sick. I
24 remember a couple of chuckles. That's all.
25     Q.   (BY MR. KORDICK) And there would have been

99

1 pass-along logs or pass-off logs. Would those help
2 refresh your recollection if those were available?
3          MR. RINGEL: Object to the form.
4      A.   If I remember right, the pass-on log was
5 used for more confidential-type information that wasn't
6 recorded in the general time chronological log.
7      Q.   (BY MR. KORDICK) Yes.
8      A.   So it wasn't something that was filled out
9 every day, every time a shift changed, if I remember
10 correctly. It was only if something needed to be kept
11 confidential or something like that.
12     Q.   Okay. If those logs were available, would
13 that help you refresh your recollection?
14         MR. RINGEL: Object to the form.
15     A.   Yes.
16     Q.   (BY MR. KORDICK) Were you aware -- did you
17 work on the 7th? Let's see. It looks like you have some
18 entries here.
19     A.   To answer your question, yes, I did work on
20 the 7th.
21     Q.   And is it possible for you to determine who
22 was working with you on the 7th?
23     A.   I can look at the master control log and try
24 to re-create some of it. It appears that Edward Allen,
25 John Thomas, Mic Guerin.

100

1      Q.   Okay.
2      A.   Looks like that would be it. Now, at 1625
3 hours on 3/7, we have -- excuse me. 1647 hours on 3/7,
4 we have William Sallee returning from Boulder with ten
5 inmates of some type. So Sallee wasn't working that
6 shift, but he was on the road prior to us getting there,
7 and he returned at 1647.
8      Q.   Which folio number is that on the bottom?
9      A.   0998.
10     Q.   Now, it looks like you went off duty at
11 midnight, correct, or thereabouts?
12         MR. RINGEL: Object to the form and the
13 foundation.
14     A.   My last entry was at -- on 3/8 at 0005, so
15 five minutes after midnight I was still there, at least
16 until count cleared. Yes.
17     Q.   (BY MR. KORDICK) And Mr. Allen, would he
18 have been the person walking the D Pod, or would it have
19 been you as well? Do you remember?
20         MR. RINGEL: Object to the form and the
21 foundation.
22     A.   More than likely it appears that I was the
23 control room person that day, and I don't see any
24 indication of Mr. Flint being there. More than likely, I
25 would have been in the control room, and Mr. Allen and

*** SUBJECT TO CONFIDENTIALITY DESIGNATIONS ***
Coffman Reporting & Litigation Support Inc.   Ph: 303.893.0202   Toll Free: 800.831.6322   Fax: 303.893.2230

**121**

1  Q.  Other than Buena Vista Correctional
2  Facility, how many of the other prisons of the Colorado
3  Department of Corrections have you visited?
4  A.  Oh, wow.  Let me think for a minute.
5  Q.  You can just name them for the record if you
6  know you've been there.
7  A.  Off the top of my head, the women's
8  facility, CSP, Shadow Mountain, Fremont Correctional
9  Facility, Arkansas Correctional Facility, Denver
10 Diagnostic and Reception Unit.  Some of the work release
11 programs.  There are more than that, probably, I'm sure.
12 Q.  How many county jails in New York state did
13 you visit during the time that you were a probation
14 officer?
15 A.  There were two jails, but they were both run
16 by the Nassau County, under the auspices of Nassau
17 County.
18 Q.  The Nassau County Sheriff's Department ran
19 that?
20 A.  Nassau County Sheriff's Department ran the
21 big jail, but the police department had a small jail as
22 well.
23 Q.  And what were the names of those two jails?
24 A.  Oh, wow.  Nassau County Jail, and I don't
25 remember what the name of the precinct jail was.

**122**

1  Q.  Does Nassau County essentially consist of
2  Long Island?
3  A.  Nassau County consists of the west end of
4  Long Island.
5  Q.  Anything else you remember in terms of an
6  opinion that you have that was discussed with Mr. Kordick
7  in your telephone conversation with him last night that
8  wasn't brought out during the deposition today?
9  A.  I don't know if it was last night or just in
10 conversation -- I want to be up front about all this
11 stuff, and in my conversation with Mr. Kordick, I believe
12 I offered the opinion that the jail was run for profit,
13 that profit was a very big issue, and that the conditions
14 were less than standard.
15 Q.  Have you ever reviewed the budget of the
16 Park County Jail?
17 A.  No.
18 Q.  Has anyone informed you of any profit or
19 loss information regarding the profit -- regarding the
20 Park County Jail at any time?
21 A.  Captain Gore would occasionally comment
22 about the -- about the profitability of contractual
23 agreements with the state and with INS.
24 Q.  During the time that you worked at the --
25 I'll get to that in a minute.  I apologize.  Anything

**123**

1  else about any conversation that you had with Mr. Kordick
2  that you recall that wasn't discussed during today's
3  deposition?
4  A.  We might have commented on some of our
5  opinions of character of different employees.
6  Q.  Which employees specifically do you recall
7  commenting on the character of?
8  A.  Sergeant Muldoon.
9  Q.  Okay.  What is your opinion of Sergeant
10 Muldoon's character?
11 A.  What is my opinion of Sergeant Muldoon's
12 character?
13 Q.  Correct.
14 A.  He's an honest, moral individual who would
15 tell you the truth.  That's my opinion.
16 Q.  Do you recall commenting on anyone else's
17 character?
18 A.  Yes.
19 Q.  Who?
20 A.  Darlene Ellis.
21 Q.  Okay.  What's your opinion of Miss Ellis's
22 character?
23 A.  My opinion is that she would -- she would
24 portray things in her favor rather than telling the plain
25 truth.

**124**

1  Q.  Okay.  Do you recall commenting on anyone
2  else's character?
3  A.  I made a comment about Mr. Fikejs.
4  Q.  Okay.  What is your opinion of Mr. Fikejs's
5  character?
6  A.  That he's somewhat guarded in his -- that I
7  would expect him to be somewhat guarded in his responses
8  and somewhat paranoid.
9  Q.  Was there any discussion of Captain Gore's
10 character with Mr. Kordick?
11 A.  Yes.
12 Q.  Did you provide Mr. Kordick with any opinion
13 about Mr. Gore's character?
14 A.  I'm trying to be as honest as I can here and
15 try to think.  Did I?  I might have said something to the
16 effect that he will -- he will -- how did I say it?
17 Cover his tracks, that he will -- something to that
18 effect.
19 Q.  Okay.  Was there any conversation with Mr.
20 Kordick of Sheriff Wegener's character?
21 A.  No.
22 Q.  Do you have an opinion of Sheriff Wegener's
23 character?
24 A.  No -- yes, I do.
25 Q.  What is your opinion of Sheriff Wegener's

**141**

you know, I wish I did. When the INS population was at its height -- and it might have been during the time in question with this particular lawsuit -- there was a forthcoming INS inspection, and I secretly hoped that they would come when we were packed because -- let's face it. When the conditions become very, very crowded and resources are stretched very, very thin, it's not only a strain and stress on the detainees and the inmates, it's a tremendous strain on the deputies and staff to make things work. The tension is very high, the conditions are very hard on the deputies. So I secretly hoped that INS would inspect and visually see what the heck was going on in terms of people sleeping on the floors and it being very, very crowded and poor ventilation and poor conditions in general.

And I thought Mr. Gore was rather lucky that there was this giant movement of 50 inmates out, and then INS inspected, like, the next day or the day after when we had ten detainees, and I thought, what a stroke of luck for Mr. Gore.

Q. Do you think that INS was not aware of the number of detainees that they were housing at the Park County Jail at any particular time?
A. They knew how many inmates were detained.
Q. Right.

**142**

A. Yes, they did.
Q. Did you ever go to any member of the Board of County Commissioners of Park County to raise your concerns about the substandard conditions in the Park County Jail?
A. No.
Q. Why not?
A. As I said, I had a chain of command. I had a sergeant above me, I had a captain above me who were in the jail on a daily basis, or nearly. Conditions were obvious. This is my opinion. It wasn't something that you had to look very hard to see. It was very obvious what the conditions were, and if this is the type of place they wanted to run and they were hiring me to do a job, I did the best I could.
Q. Okay. Did you ever report your concerns with the substandard conditions of confinement at the Park County Jail to the county attorney of Park County at any time?
A. No.
Q. Did you ever report your concerns of the substandard conditions of the Park County Jail to the sheriff at any time?
A. No.
Q. Did you ever report your concerns of the

**143**

substandard conditions at the Park County Jail to the undersheriff at any time?
A. No.
Q. Did you ever report your concerns of the substandard conditions at the Park County Jail to Captain Gore at any time?
A. Yes.
Q. When?
A. I couldn't give you an exact date.
Q. How many times?
A. I don't know how many times. To clarify, we spoke about specific issues. I wouldn't go to the captain and say, oh, boy, this place is horrible. I wouldn't do that. It was more we need more sheets, we need more towels, we need more soap, we need more space, we need the doors fixed, we need the heating fixed, we need the showers fixed. That kind of stuff.
Q. Did you ever say anything to Captain Gore along the lines of the following: "I believe the conditions at the Park County Jail are substandard"?
A. I don't think I did.
Q. Why not?
A. Because I believed in going through the chain of command, and I had enough -- my sergeant was aware of the conditions, we spoke about them frequently,

**144**

and I felt it wasn't my place to take it any further.
Q. And when your sergeant -- when you say your sergeant, who are you referring to?
A. Sergeant Flint.
Q. Describe to me your communications with Sergeant Flint about the conditions at the Park County Jail.
A. Well, we worked under those conditions daily, and, you know, it was -- our needs were discussed, and the stress level and the conditions were discussed on an ongoing basis.
Q. When you were having these conversations with Sergeant Flint, did you say anything along the lines of I believe the conditions at the Park County Jail are substandard?
A. I might not have used those exact words, but I'm sure I made that type of estimate or that -- the general meaning of that clear to him.
Q. Did it ever occur to you that maybe you should report your concerns of the conditions at the Park County Jail to somebody?
A. Outside of the organization?
Q. Based on this -- based on our conversation during this deposition, it appears to me that -- and correct my summary if I'm wrong -- that the only people

169

1  not been brought up.
2      Q.   And that was brought up in the conversation
3  with Mr. Kordick? Is that what you're saying?
4      A.   Yeah.
5      Q.   And that was the only time you discussed his
6  role as the Park County medical director with anyone?
7      A.   As far as I know.
8      Q.   I just need to know --
9      A.   I'm trying to rack my brain. I haven't.
10     Q.   Okay. You indicated just a moment ago that
11 you told or volunteered to Mr. Kordick that you didn't
12 see Dr. Bachman at the time that you were working at the
13 Park County Jail. Is that true?
14     A.   I didn't see him at the jail. I did see him
15 at the Summit clinic.
16     Q.   I'm going to get to that in just a moment.
17     A.   Okay.
18     Q.   Do you know if there's any specific reason
19 why you didn't see him at the jail?
20     A.   I'm guessing, and my recollection tells me,
21 that he made his visit or visits on the day shift, so at
22 4 o'clock, he would have been gone.
23     Q.   Were you ever told that he had been there
24 but you missed him?
25     A.   I never had a need to speak to him, but I

170

1  kind of remember in the back of my mind that "Dr. Bachman
2  was here today," something like that.
3      Q.   Would that be something that would be in the
4  master log, that he had been present for that day?
5      A.   I never remember seeing that.
6      Q.   Did you know if Dr. Bachman was available
7  for questions, if you had one, regarding medical policy
8  in the jail?
9      A.   Regarding medical policy?
10     Q.   Policies and procedures.
11     A.   Just ask me again, please.
12     Q.   Do you know if Dr. Bachman was available if
13 you had a question regarding medical policies and
14 procedures at the Park County Jail?
15     A.   It never occurred to me to consult with Dr.
16 Bachman regarding medical procedures, no.
17     Q.   That is to say, you never tried to?
18     A.   That's to say it never occurred to me that
19 he was in the loop for policy and procedure at the jail.
20     Q.   You didn't know that he had anything to do
21 with policies and procedures at the jail? Is that --
22     A.   That's correct.
23     Q.   I understand. As part of that answer, but I
24 have to ask the question, you never attended a training
25 session in which Dr. Bachman was discussing the policies

171

1  and procedures at the jail?
2      A.   That's correct, and I'll go one step
3  further. I never knew he offered any training. At least
4  while I was there.
5      Q.   So you took prisoners to see him over at
6  Summit Medical Center; is that correct?
7      A.   I have a vague recollection, yes, and I
8  remember at least one instance where during the night we
9  had an inmate taken to -- I took an inmate to Summit
10 County, and Dr. Bachman attended to him.
11     Q.   Is that the sole time you traveled to the
12 Summit Medical Center transporting a prisoner there?
13     A.   No.
14     Q.   Is that the sole time that you transported a
15 prisoner to Summit Medical Center and Dr. Bachman was the
16 treating physician, to your knowledge?
17     A.   He may have been the treating physician on
18 several other occasions. I just don't remember.
19     Q.   Did you have an impression of his care of
20 the prisoner that you recall being treated at the Summit
21 Medical Center that you transported there?
22     A.   My impression was that it was all business,
23 you know, and I have no comment on it. In terms of the
24 quality of the care, I have no opinion on that at all,
25 positive or negative. It was businesslike.

172

1      Q.   Basically, it was what you expected?
2      A.   Yes.
3      Q.   Do you have a general opinion of Dr. Bachman
4  in any way?
5      A.   No.
6      Q.   In front of you there should be an exhibit
7  marked Exhibit Number 4. Wondering if you can pull that
8  out and if you could take a moment to look at that. I'm
9  not going to ask you any specific questions. It's not
10 going to be a quiz or anything. I just want you to
11 familiarize yourself with generally what that is. And
12 when you're done, if you could look up, and then I'm
13 going to ask you a couple questions.
14     A.   Okay.
15     Q.   Have you had a chance to look that over in a
16 brief sense?
17     A.   In a very brief sense, yes.
18     Q.   Have you ever seen this document before?
19     A.   No.
20     Q.   Do you know if you were ever provided with a
21 copy of that document?
22     A.   I was not provided with a copy of this
23 document.
24     Q.   And that's Exhibit 4 that we're referring
25 to?

---

**173**

1  A. That's correct.
2  Q. Do you know if any copy of the policies and
3  procedures was available for your use at the Park County
4  Jail if you had wanted to find one? Let me rephrase
5  that --
6  A. Probably, yes.
7  Q. If you said to yourself, hey, I wonder what
8  the official policy is on this issue, would there be
9  somewhere you could look for that?
10 A. Yes.
11 Q. And do you know where that would be in the
12 Park County Jail?
13 A. Yes.
14 Q. It's fair to say that didn't come up?
15 A. Can I explain? Would you like an
16 explanation?
17 Q. Sure.
18 A. I don't know if --
19 Q. Go right ahead.
20 A. This isn't very flattering toward the Park
21 County Jail, but the policies and procedures I were
22 provided with were so poorly written that -- some of them
23 were poorly written -- they were still under development,
24 and the practice of the facility wasn't in accord with
25 the policies that were written. So I had a very low

---

**174**

1  opinion of reading these policies.
2  Q. Are you aware of any specific policies and
3  procedures as they relate to medical care and treatment
4  from the time that you were working at the Park County
5  Jail?
6  A. No.
7  Q. Was there a medical policy and procedure at
8  the Department of Corrections at Buena Vista when you
9  were there?
10 A. Yes.
11 Q. Were you familiar with that?
12 A. Yes.
13 Q. I think you said, and correct me if I'm
14 wrong, that at the Park County Jail there was some sort
15 of, I think you said understanding, that if someone was
16 sick, you talk to the nurse and you go from there; is
17 that correct?
18 A. Yes.
19 Q. Was there a similar -- and I'm going to use
20 the same word -- understanding at Buena Vista as far as
21 treatment of prisoners?
22 A. Yes.
23 Q. So that was something you were familiar from
24 your 23 years and eight months?
25 A. Yes. Yes.

---

**175**

1  Q. You talked earlier with both counsel about
2  your personal opinion of specific individuals who worked
3  at the Park County Jail, and I think we went over most of
4  the characters in this lawsuit. However, I'm not sure if
5  we discussed John Thomas. I'm wondering if you have a
6  specific opinion of Mr. Thomas's character as a deputy
7  with the Park County Sheriff's Office.
8  A. He was a good deputy, he followed orders.
9  He wasn't a ball of fire, or, you know, he didn't
10 initiate -- he wouldn't initiate something, but he was a
11 level-headed, good deputy.
12 Q. Was he someone that you trusted?
13 A. Yes.
14 Q. Did you believe him to be honest and
15 reliable?
16 A. Yes.
17 Q. I'm going to switch gears here. You
18 indicated that you retired from the Park County Sheriff's
19 Office in April 2003, I believe?
20     MR. KORDICK: I object to the form. I don't
21 think that's correct.
22     MR. JURS: If that's not correct, then tell
23 me when you retired.
24 A. I didn't retire. I separated myself from
25 employment. From Park County.

---

**176**

1  Q. (BY MR. JURS) I see. You resigned from
2  Park County?
3  A. Correct.
4  Q. On good terms, I think you said?
5  A. Absolutely. Yes.
6  Q. And what's your current age?
7  A. 57.
8  Q. Oftentimes people retire at about age 65 in
9  this country, somewhere in their sixties. Do you have
10 any specific plans about what you're going to be doing in
11 the future?
12 A. Yes.
13 Q. And what are those plans?
14 A. I want to assist my wife with her real
15 estate business in terms of, you know, menial duties, and
16 take care of my home and take care of my hobbies.
17 Q. And what are your hobbies?
18 A. I'm an avid motorcycle tourist.
19 Q. Do you have any plans to look for or pursue
20 employment in any way from this point forward in your
21 life?
22 A. Do I have any plans?
23 Q. Yes.
24 A. No.
25 Q. That's something you're not interested in