## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Case No. 2005-WM-377 (BNB)

DEPOSITION OF: FREDERICK WILLIAM WEGENER, III
January 20, 2006

MOISES CARRANZA-REYES,
Plaintiff,
v.
PARK COUNTY, a public entity of the State of Colorado and its governing board, THE PARK COUNTY BOARD OF COUNTY COMMISSIONERS; PARK COUNTY SHERIFF'S OFFICE, a public entity of the State of Colorado; FRED WEGENER, individually and in his official capacity as Sheriff of Park County, Colorado; MONTE GORE, individually and in his capacity as Captain of Park County Sheriff's Department; VICKIE PAULSEN, individually and in her official capacity as Registered Nurse for Park County, Colorado; JAMES BACHMAN, M.D., individually and in his official capacity as Medical Director of the Park County Jail,

Defendants.

TAKEN PURSUANT TO NOTICE on behalf of the Plaintiff at 824 Costilla, Fairplay, Colorado at 9:23 a.m. before Theresa A. Coffman, Federal Certified Realtime Reporter, Registered Professional Reporter and Notary Public within Colorado.

## Page 2

APPEARANCES

For the Plaintiff:
WILLIAM A. TRINE, ESQ.
Trine & Metcalf, P.C.
1435 Arapahoe
Boulder, Colorado 80302

LLOYD C. KORDICK, ESQ.
805 South Cascade
Colorado Springs, Colorado 80903

JOSEPH J. ARCHULETA, ESQ.
Law Office of Joseph J. Archuleta
1724 Ogden Street
Denver, Colorado 80218

For the Defendants
Park County, Park
County Board of
Commissioners, Park
County Sheriff's Office,
Wegener and Gore:
ANDREW D. RINGEL, ESQ.
Hall & Evans, LLC
1125 17th Street
Suite 600
Denver, Colorado 80202

STEPHEN A. GROOME, ESQ.
P.O. Box 1373
501 Main Street
Fairplay, Colorado 80440

For the Defendant
Paulsen:
SARA HOLMES, ESQ.
Berg Hill Greenleaf & Ruscitti LLP
1712 Pearl Street
Boulder, Colorado 80302

For the Defendant
Bachman:
CRAIG A. SARGENT, ESQ.
Johnson McConaty & Sargent, P.C.
400 South Colorado Boulevard
Suite 900
Glendale, Colorado 80246

Also Present: None

## Page 3

EXHIBIT 9

I N D E X
EXAMINATION OF FREDERICK WILLIAM WEGENER, III          PAGE
January 20, 2006

By Mr. Trine                                            --
By Mr. Archuleta                                        --
By Mr. Kordick                                          4
By Mr. Ringel                                           --
By Ms. Holmes                                           --
By Mr. Sargent                                          --

                                                       INITIAL
DEPOSITION EXHIBITS:                                  REFERENCE

31  Copy of online article from Summit Daily             24
    News, "Park County to expand its money-
    making jail" by Linda Balough, 11/21/03

32  Copy of online article from Summit Daily             34
    News, "Park County Jail hits record
    income" by Linda Balough, 3/26/04

33  Copy of Denver Post article, "Officials              38
    aim to lock in profits from jail" by
    Kirk Mitchell, unknown date

(Original exhibits retained by Mr. Kordick; copies
included in continuing exhibit file and provided to
counsel as requested.)

REQUESTED PORTIONS OF TESTIMONY:                        PAGE

Request for document production                          --
or information
Confidentiality Designation by Mr. Ringel                48
REFERENCES TO EXHIBITS MARKED PREVIOUSLY:
Exhibit No. Page Reference       Exhibit No. Page Reference
    5           64                   21          54
    6           79                   29          17

## Page 4

1   WHEREUPON, the within proceedings were taken
2   pursuant to the Federal Rules of Civil Procedure:
3       (At this time Mr. Groome was not present in
4   the deposition room.)
5       FREDERICK WILLIAM WEGENER, III,
6   having been first duly sworn to state the whole truth,
7   was examined and testified as follows:
8           EXAMINATION
9   BY MR. KORDICK:
10      Q.  Could you please state your full name for
11  the record.
12      A.  Full name. Frederick William Wegener III.
13      Q.  Mr. Wegener, are you the elected sheriff for
14  Park County?
15      A.  Yes, I am.
16      Q.  Can you tell me, before you were sheriff,
17  did you have any kind of personal experience in law
18  enforcement?
19      A.  Oh, yes. Let's see. I started -- in 1981 I
20  was in the Air Force as a military police officer until
21  1987. Went to work for Park County in '87 for eight and
22  a half years. I was a patrol deputy, patrol sergeant and
23  investigator. Left Park County in 1995 and started for
24  the Aurora Police Department. I was a detention officer
25  opening their new jail. Was there for -- till '97, and

Coffman Reporting
303.893.0202
303.893.2230 FAX

Page 9

1  A.  No, I don't. Not that I recall, no.
2  Q.  Are you familiar just generally with the
3  statutory duties of the sheriff?
4  A.  Title XXX. I mean, I don't have it
5  memorized.
6  Q.  Of course not.
7  A.  But yeah.
8  Q.  The statute provides that you're in charge
9  of the jail; is that correct?
10  A.  Correct. That is correct.
11  Q.  And it also provides that there's a training
12  course, a required training course?
13  A.  For . . .
14      MR. RINGEL: Object to the form.
15  Q.  (BY MR. KORDICK) Sheriff, elected sheriff.
16      MR. RINGEL: Object to the form.
17  A.  Each sheriff has to be a certified -- or has
18  to go through an academy within a year of becoming
19  sheriff.
20  Q.  (BY MR. KORDICK) Did you attend the
21  academy?
22  A.  Yes.
23  Q.  And where is the academy held at?
24  A.  Well, it's no longer in existence, but I
25  went -- and I have to explain that the statute says

Page 10

1  unless you're -- unless you're not already a current
2  peace officer. I was already a current certified peace
3  officer so I didn't attend any training other than we
4  have what we call a new sheriffs institute, which our
5  state organization gives a two-week class down at one of
6  the -- our facility or Jeffco, I think, at that time.
7  But since I was already certified, I went through CLETA,
8  which was the Colorado Law Enforcement Officers Training
9  Academy, which is held at the state patrol
10  headquarters -- or state patrol training facility.
11  Q.  And how many weeks was that?
12  A.  Great. I knew you'd ask. I'm saying 10. I
13  think it was 10.
14  Q.  Did you commute to that or did you stay down
15  there at that time?
16  A.  No. I stayed down there and just came home
17  whenever they'd let us, which was usually on the
18  weekends.
19  Q.  So they had a housing arrangement for you?
20  A.  Yes, that's correct.
21  Q.  Did that deal with issues in detention?
22  A.  Just on a broad base. You know, like if you
23  had to, you know, book a prisoner in or as far as making
24  sure that weapons were taken off before you enter the
25  facility and stuff like that. But just general.

Page 11

1  Q.  Did they talk about incarceration and
2  management of jails?
3  A.  Talked about where somebody would be
4  incarcerated, like if you were incarcerated for a
5  misdemeanor, you probably were sentenced to the county
6  jail; if you were sentenced for a felony, the chances are
7  you would be going to the state facility.
8  Q.  But was there any discussion of maintenance
9  of facilities?
10  A.  Oh, no. Huh-uh. Not at all.
11  Q.  Any ACA discussions about what those
12  standards were?
13  A.  No.
14  Q.  Now, there are a number of issues I'd like
15  to discuss with you. As I understand it, I was at the
16  jail, and your office is located in the jail?
17  A.  No. It's located outside the jail in a --
18  upstairs.
19  Q.  It's in the same building?
20  A.  Same building, yes. That's correct.
21  Q.  When I say "the jail," I'm thinking of the
22  jail as that building.
23  A.  Oh, the whole facility. Yes, it's at that
24  same building, that's correct.
25  Q.  I thought when I walked in the door and

Page 12

1  there's a control area there and a visitors center, isn't
2  your office to the side? There's a sign that says
3  "Sheriffs"?
4  A.  Yeah. It's through that door, and you have
5  to walk around and upstairs. Correct. Correct.
6  Q.  So how often do you go to work?
7  A.  Well, they get upset if I don't go Monday
8  through Friday. Just a normal workweek.
9  Q.  So you're there at that facility Monday
10  through Friday unless you're on vacation, I assume?
11  A.  Yeah, or, you know, I'm at one of the
12  substations or something like that. Sure.
13  Q.  And being on the facility at the same
14  building as the jail, do you have occasion to walk around
15  the facility?
16  A.  Oh, yes.
17  Q.  And do you walk around the facility and
18  inspect it at least once a week?
19  A.  Oh, probably -- I'd probably not say once a
20  week. I'm probably in there maybe every other week.
21  It's just whenever. If I go into control, I might want
22  to find out what our current population would be for that
23  day. I usually try and walk around, though, probably
24  once a month just to see how the facility's being
25  maintained and if everything's okay.

45

1  statement, and I don't have a copy of that, so I'm going
2  to show that to you. Okay. Are you familiar with this?
3      A.   Yes.
4      Q.   And it calls -- it says, "The Park County
5  office and jail provides protection and public safety by
6  managing pretrial and sentenced offenders in a controlled
7  environment that is safe, humane and appropriately
8  secure." The statement "safe and humane," what does that
9  include?
10         MR. RINGEL: Object to the form and the
11 foundation.
12     A.   Same and humane?
13     Q.   (BY MR. KORDICK) Yes, sir.
14     A.   Well, I say we keep them from -- obviously
15 keep them in an area designated as the jail. We them
16 from running amuck throughout the streets of the town.
17 We keep safe -- we try and provide them a nutritious
18 meal, we provide them a -- hopefully a warm bed. We
19 provide them clean clothes, sanitary conditions so they
20 don't get diseased or sick, if at all. Safe from harm
21 from other inmates. Hopefully the -- or we're able to
22 jump in should a fight ensue because of some argument.
23     Q.   Okay.
24     A.   Probably about it.
25     Q.   Who is the undersheriff?

46

1      A.   Right now? Monte Gore.
2      Q.   Okay. So when it says the jail captain
3  reports directly to the undersheriff, would Monte Gore be
4  both the jail captain and the undersheriff?
5      A.   If you're talking in the contents [sic] of
6  when those were written, Monte Gore was the jail captain,
7  and he reported to the then undersheriff, which was Don
8  Lamb.
9      Q.   Was Don Lamb -- how do you spell Mr. Lamb's
10 name?
11     A.   D-o-n, then L-a-m-b.
12     Q.   Is he still with the Park County Sheriff's
13 Office?
14     A.   No. He retired.
15     Q.   I see. Is he still living here in this
16 county?
17     A.   No, he's not.
18     Q.   Okay. Where has he gone, do you know?
19     A.   I think he went out East, eastern Colorado.
20     Q.   Okay. Do you know what town he's in?
21     A.   It's Limon.
22     Q.   Limon?
23     A.   Limon, I believe, yeah.
24     Q.   And how many years was he with the sheriff's
25 department here in Park County?

47

1      A.   Four years.
2      Q.   Four years?
3      A.   Um-hum.
4      Q.   And when did he resign as undersheriff, do
5  you know?
6      A.   At the end of my first term.
7      Q.   When would that have occurred?
8      A.   2002? Yeah. 2002.
9      Q.   So in March of 2003 when my client, Mr.
10 Carranza-Reyes, was admitted to the jail through March of
11 2003 when he was taken out of the jail, Mr. Gore was both
12 the captain and the undersheriff?
13     A.   No. Don Anthony was the undersheriff.
14     Q.   I'm sorry, Don Anthony. Is he still with
15 the --
16     A.   No. He left November of 2005.
17     Q.   And is he still in town?
18     A.   He still lives in the county, yeah.
19     Q.   And what is he doing now?
20     A.   I don't know. He's just not law
21 enforcement.
22     Q.   He wasn't terminated?
23     A.   Yes, he was.
24     Q.   He was terminated?
25     A.   Yeah.

48

1      Q.   For malfeasance of some sort?
2          MR. RINGEL: For purposes of the record, can
3  we designate the discussion of the former undersheriff's
4  termination as confidential under a protective order?
5          MR. KORDICK: Are you directing him not to
6  answer?
7          MR. RINGEL: No, no, it's just confidential
8  under the protective order. He can answer and tell you
9  about it. It just has to be designated as confidential
10 under the protective order.
11         MR. KORDICK: Fine with me. Go ahead.
12     A.   Sexual harassment.
13     Q.   (BY MR. KORDICK) And were there any kind of
14 criminal charges filed on him?
15     A.   No. Not against him, no.
16     Q.   Did that involve other sheriff's personnel
17 or inmates or ...
18     A.   Other sheriff's office personnel.
19     Q.   I see. Okay. When 1332 says the
20 administration of management of the Park County Sheriff's
21 Office jail division is the responsibility of the
22 sheriff, that means that basically the buck stops with
23 you, correct?
24     A.   It's my responsibility, correct.
25     Q.   And you're responsible for what goes on in

49

1  the jail, correct?
2   A.  Correct.
3   Q.  I was provided an index of different things
4  that is more extensive than was actually produced, and
5  I'm going to give you this index and ask you if -- it
6  starts at 1323, 1325, 26, 27, 28, 29 and 1330. Portions
7  of these materials were produced as part of this index,
8  but then it references things that aren't materials that
9  were produced. Were portions of the original manual at
10 some time repealed or withdrawn? It looks like the
11 manual material that I have stops at 1381.
12      MR. SARGENT:  The index, Lloyd, is that what
13 you're looking at?
14      MR. KORDICK:  The index references things
15 that are more extensive than what appear in the manual.
16      MR. SARGENT:  The table of contents?
17      MR. KORDICK:  Yeah. The table of contents
18 doesn't correspond.
19   Q.  (BY MR. KORDICK) See, it stops at page 51,
20 the policy and procedure manual, and the index that
21 accompanied it goes on and has sections that deal with
22 records 57 through -- I'm sorry, 57, DOC case file
23 management, inmate access records, release of
24 information, voluntary screening and training, building
25 and safety codes, page 65; inmate sleeping areas, page

50

1  69; house area furnishings, 70; inmate housing showers,
2  71. Then it goes on through what appears to be page 229.
3  Are those parts of the manual repealed for some reason,
4  or do you know?
5   A.  I know that we added some parts in there.
6  When Monte took over as jail administrator, he had some
7  additional policies he brought in. We had the core
8  policies I approved under Jerry Sylvia, which is the
9  introduction that you read earlier, and so there were
10 probably some additional policies that were probably
11 brought in. And I'm not sure how they were formatted.
12      MR. RINGEL:  Let me just state for the
13 record that I don't know whether the missing pages of the
14 policy and procedure manual referenced in the index that
15 Mr. Kordick's representing he didn't receive were or were
16 not produced. One of the things I can think of is that
17 perhaps the request for production asks for the policies
18 and procedures that were in effect in 2003, and perhaps
19 the ones in issue were after that. I don't know, but
20 I'll look into the issue of whether they've been
21 produced, and if they haven't, we're happy to produce to
22 you the remainder of the policy and procedure manual.
23      MR. KORDICK:  That's what I'm trying to find
24 out. I'm not suggesting you did or didn't produce it.
25 But if you look at the last page of the materials

51

1  produced, it's actually page 550, and it's page 1381, and
2  then 1382 goes into INS detention standards, so that the
3  manual ends as far as what was produced.
4       MR. RINGEL:  Well, I know that there was a
5  variety of different documentation that was produced as
6  part of responses to discovery requests in this case. I
7  have boxes of it in my office, but I don't -- as I'm
8  sitting here right now, I don't know whether pages 52 to
9  wherever the end of the manual were or were not produced.
10 And if they weren't, I apologize that they weren't, but
11 this is the first that I've ever heard about it.
12   Q.  (BY MR. KORDICK) The material that -- okay.
13 Is there any health issue -- as a person with some
14 experience in maintaining a facility for incarcerating
15 prisoners, is there a health concern with putting too
16 many prisoners in a confined space?
17      MR. SARGENT:  Form and foundation.
18      MR. RINGEL:  Join.
19   A.  There could be.
20   Q.  (BY MR. KORDICK) Is there a limit on the
21 number of people that can be confined in a limited space?
22   A.  I mean, you'd have to -- I guess the
23 condition of the individuals when they're put in there.
24 I mean, the medical folks probably speak better to that.
25   Q.  But I want to know what you know as the

52

1  manager of the jail. First of all, are you familiar with
2  pass-on logs?
3       MR. RINGEL:  Object to the form and the
4  foundation.
5   A.  Yes, I do know they do pass-ons.
6   Q.  (BY MR. KORDICK) Okay. What is a
7  pass-along log?
8   A.  It's information from the shift before that
9  they pass along to the following shift.
10  Q.  So any materials that were produced or
11 presented in the previous shift, like a note or
12 something, would be included in the pass-along log to the
13 next shift?
14  A.  It could be, true.
15  Q.  Where would that stuff be placed? For
16 instance, if I were a deputy and I wanted to say that one
17 of the inmates, you know, appeared to have a bloody eye
18 or something, where would I write that? Could I write
19 that on a piece of paper and put it in the pass-along
20 log?
21  A.  Two parts to your question. The first one,
22 where would it be, I'm not sure of the exact location.
23 The second part of your question, yeah, that would
24 probably go into the pass-on log.
25  Q.  Where would it be? Would I write it on a

## 57

1  others, but a crowded environment like a dormitory,
2  school or an institution setting can make it easier for
3  the bacteria to spread.
4       Are you aware of that as a jailer, that
5  people in a crowded environment like a dormitory or an
6  institution, it makes it easier for these kind of
7  contagions to spread?
8       MR. RINGEL: Object to the form and the
9  foundation.
10  A.  That's what it says right there.
11  Q.  (BY MR. KORDICK) Are you aware of that just
12  generally?
13  A.  Oh, yes. I have kids in school. They get
14  strep throat going to school.
15  Q.  When they go to preschool and are around
16  other kids, they get all kinds of stuff?
17  A.  Yes.
18  Q.  And that's true of adults as well, isn't it?
19  A.  Well, I didn't get it, but . . .
20  Q.  I'm sorry?
21  A.  I didn't get it.
22  Q.  Well, you weren't in the cell, were you?
23  A.  No. I was just in the jail.
24  Q.  But is that one of the reasons for
25  limitations on overcrowding, the fact that if a person

## 58

1  gets sick and they're in a crowded environment, it
2  rapidly spreads to other people?
3  A.  It can.
4  Q.  That's a concern. That's why they have
5  regulations that limit the number of people in a cell,
6  isn't it?
7       MR. RINGEL: Object to the form and the
8  foundation.
9  A.  That could be, yes.
10  Q.  (BY MR. KORDICK) I'm sorry?
11  A.  That could be, yes.
12  Q.  As a sheriff, is that your understanding why
13  you wouldn't put -- for instance, you couldn't put 300
14  people in a cell, could you?
15  A.  Right. You wouldn't want to, no.
16  Q.  You wouldn't want to do it?
17  A.  Right.
18  Q.  And one of the reasons you wouldn't want to
19  do it is because they're liable to all get sick with what
20  one of them might have, right?
21       MR. RINGEL: Object to the form and the
22  foundation.
23  A.  Among that and other things, sure. You
24  know, there wouldn't be adequate space for them to move
25  around or whatnot.

## 59

1  Q.  (BY MR. KORDICK) Okay. I'd like you to
2  tell me, with the eating spaces in the D Pod -- we've
3  talked about how many beds there were originally in the
4  plan.
5  A.  Um-hum.
6  Q.  And with eating spaces, how many seats were
7  there for people to eat in Pod D?
8       MR. RINGEL: Object to the form and the
9  foundation.
10  A.  I'd have to -- it was adequate space. I'm
11  not sure how much it was.
12  Q.  (BY MR. KORDICK) Well, if Monte Gore
13  testified that there were spaces for 18 people to sit,
14  you wouldn't disagree with that, would you?
15       MR. RINGEL: Object to the form and the
16  foundation.
17  A.  He testified that there was room for only 18
18  people to sit down?
19  Q.  (BY MR. KORDICK) Yeah, at the tables.
20  A.  I'd have to look at the tables and figure it
21  out.
22  Q.  You wouldn't disagree with that? That's
23  consistent with the number of beds that were shown on the
24  original drawing for the pod, isn't it?
25       MR. RINGEL: Object to the form and the

## 60

1  foundation.
2  A.  I guess because it -- I mean, there may be
3  more. I may have somebody in there that's only 5 foot 5,
4  weighs 110 pounds, he may not have any difficulty with
5  room at all but yet I may have somebody else who weighs
6  300 pounds. It depends on -- you'd have to look at the
7  individuals in the pod.
8  Q.  (BY MR. KORDICK) Is there -- the ACA
9  standards for jails, in order for you to have a contract
10  with the Department of Corrections, you're required to
11  comply with those standards, aren't you?
12  A.  You try to meet those standards, that's
13  correct.
14  Q.  Well, you've adopted those standards as the
15  official standards of your jail, haven't you?
16  A.  Yes. We've adopted standards, yes.
17  Q.  Okay. And you've adopted the American
18  Correction Association standards, haven't you?
19  A.  Yes.
20  Q.  And you're required to do that as part of
21  your responsibility to house Department of Corrections
22  prisoners, isn't it?
23  A.  Well, there are standards. You try and meet
24  those standards. There may be construction issues with
25  your facility that don't allow you to meet those

Page 65

1  MR. KORDICK: Yeah. And according to my --
2  what I'm looking at here, it looks like it goes through
3  76, and then it ends again -- page 76, by the way, is
4  1457, then it starts with the INS detention standard at
5  1458.
6  MR. RINGEL: It may be, and I'm only
7  speculating at this point, that some of the INS detention
8  standards are put in as applicable in the sections of the
9  manual where they would apply, and so therefore, the
10  manual is probably complete, and the INS standards are
11  interspersed amongst it. Does that make sense to you?
12  MR. KORDICK: It may be. That's what I was
13  trying to figure out.
14  MR. RINGEL: I understand.
15  Q. (BY MR. KORDICK) Do you think that's true?
16  That the INS standards are put in the middle of your
17  book?
18  A. Yes, that's correct.
19  Q. So now let's get back to what we were
20  talking about.
21  MR. RINGEL: I apologize for the
22  interruption. I just wanted to clarify that.
23  Q. (BY MR. KORDICK) You knew that there were
24  more than 18 prisoners being held in the D Pod, didn't
25  you?

Page 66

1  MR. RINGEL: Object to the form and the
2  foundation.
3  A. No.
4  Q. (BY MR. KORDICK) Never knew that?
5  A. No. Like I say, I have a jail administrator
6  to take care of the administration of the jail.
7  Q. This standard, you knew about this standard
8  because you're responsible for adopting it, aren't you?
9  You took over the jail facility before these were
10  adopted, correct?
11  A. Yeah. I don't read each individual
12  standard. The jail administrator would take care of
13  that.
14  Q. Well, you understand why crowding,
15  overcrowding, is a potential problem, aren't you?
16  A. Yes, I do.
17  Q. It's a health problem, isn't it?
18  MR. RINGEL: Object to the form and the
19  foundation.
20  A. Amongst others, yes.
21  Q. (BY MR. KORDICK) Now, you indicated earlier
22  that as you understood your mission statement, you were
23  supposed to provide a warm bed; is that correct?
24  A. My mis -- correct, yes.
25  Q. Do you know if, in fact, the prisoners even

Page 67

1  all had beds to sleep in?
2  MR. RINGEL: Object to the form and the
3  foundation.
4  A. Yeah. They usually all were provided a
5  mattress.
6  Q. (BY MR. KORDICK) That's not a bed, is it?
7  MR. RINGEL: Object to the form and the
8  foundation.
9  A. I'm sorry. As far as -- your definition of
10  a bed, I guess?
11  Q. (BY MR. KORDICK) There are beds in Pod D,
12  aren't there?
13  A. There are beds, yes, correct.
14  Q. And you're aware that there were prisoners
15  in D Pod that were not allowed to sleep in a bed; they
16  had to sleep on the floor on a mat?
17  MR. RINGEL: Object to the form and the
18  foundation.
19  A. I understand that there were some that had
20  to be put on mats, yes.
21  Q. (BY MR. KORDICK) And you knew that before
22  Mr. Carranza-Reyes was admitted in March of 2003, and you
23  knew that that continued even after he was out of the
24  jail; is that correct?
25  MR. RINGEL: Object to the form and the

Page 68

1  foundation.
2  A. Did I know it -- no. No.
3  Q. (BY MR. KORDICK) You didn't know that there
4  were people sleeping on mats upstairs?
5  A. Your question was did I know it after he
6  left, and I --
7  Q. Did you know before he was in the jail,
8  there were people sleeping on mats before he was in the
9  jail?
10  A. Oh, yes. Yes, I did.
11  Q. That was common practice, wasn't it?
12  A. Sure.
13  MR. RINGEL: Object to form and the
14  foundation.
15  Q. (BY MR. KORDICK) They didn't have beds, did
16  they?
17  MR. RINGEL: Object to the form and the
18  foundation.
19  A. Correct.
20  Q. (BY MR. KORDICK) In fact, there was an
21  ongoing issue in the jail with the heating system in the
22  jail, wasn't there?
23  A. As far as -- I'm sorry.
24  Q. Well, for instance, in February, did the
25  administrative office where your staff was have to leave

69

1 the building because there was no heat in the building in
2 February of 2003?
3         MR. RINGEL: Object to the form and the
4 foundation.
5    A.   I don't recall.
6    Q.   (BY MR. KORDICK) You don't remember that?
7    A.   Oh, no, huh-uh.
8    Q.   If that's recorded in the log, would that be
9 something that you wouldn't remember or you wouldn't take
10 account of?
11   A.   Would I account for the log? No, I don't
12 read the log, so I have no idea.
13   Q.   See if I can locate that quickly here. What
14 was your understanding of the number of people that were
15 being held in D Pod?
16        MR. RINGEL: Object to the form and the
17 foundation.
18   A.   I don't know.
19   Q.   (BY MR. KORDICK) Do you know if the running
20 average was 30? Would that surprise you if the running
21 average was at least 30?
22   A.   Like I say, I don't know who's in what pod.
23   Q.   Well, when you physically went into the
24 facility and made your inspections, you would have seen
25 the number of people in there, wouldn't you?

70

1    A.   I've seen people in there, yes, probably.
2    Q.   Did you authorize putting any bunks into D
3 Pod?
4    A.   No. I mean, it's not something that would
5 have been authorized through me, but through the jail
6 administrator.
7    Q.   But you noticed that more bunks were going
8 in there, didn't you?
9    A.   No, I didn't.
10   Q.   You didn't see a change in the D Pod?
11   A.   I don't pay any attention to how many bunks
12 there are in there, no.
13        (Discussion off the record.)
14   Q.   Did you have any limitations, as the person
15 in charge of the jail, on the number of prisoners that
16 could be housed in the D Pod?
17   A.   No.
18   Q.   So there was no limitation?
19   A.   No. Again, that was up to the jail
20 administrator.
21   Q.   Did you know a Deputy Bellantonio?
22        MR. RINGEL: Object to the form and the
23 foundation.
24   A.   Bellantonio?
25   Q.   (BY MR. KORDICK) Bellantonio.

71

1    A.   Yeah. He was one of the detention officers.
2    Q.   Was he pretty experienced in detention, his
3 background? Do you know?
4    A.   I don't recall his background.
5    Q.   How did you know him?
6    A.   He was a detention officer.
7    Q.   Do you know that his deposition was taken in
8 this case?
9    A.   No, I don't.
10   Q.   Do you know that he testified that on one
11 occasion, he tried to tell INS that the jail was filled
12 to overcapacity and they couldn't handle any more
13 prisoners --
14   A.   No.
15   Q.   You didn't know that?
16   A.   No, I didn't know that.
17   Q.   Do you know that he was told by his
18 superiors that he was never supposed to turn down
19 prisoners, no matter how overcrowded the conditions were?
20   A.   No, I don't know that.
21   Q.   Is that something that concerns you?
22   A.   If he said it? Oh, yeah, it would be pretty
23 concerning, yeah.
24   Q.   Why would it concern you?
25   A.   That he felt it was overcrowded? Yeah.

72

1 That he never told his folks in his line of supervision,
2 that he never gave any information to me. It would be
3 very concerning.
4    Q.   Well, if Mr. Bellantonio said that he was
5 told by the supervisor, Mr. Gore, that there was no
6 limitation on the number of people who could be admitted,
7 would that be something that you would want to know
8 about?
9    A.   Yes.
10   Q.   Did Captain Gore ever tell you that?
11   A.   No. Or not that I can recall. Not that I
12 can recall.
13   Q.   Now, I want you to tell me if you were aware
14 of the standard at 1451, which is the next one, Park
15 1451. Do you see this, that it requires a sleeping area
16 with a bed, a mattress and a writing surface? Do you see
17 that?
18        MR. RINGEL: Object to the form and the
19 foundation.
20   A.   Yes, I do see where it's written there.
21   Q.   (BY MR. KORDICK) And you knew before Mr.
22 Carranza-Reyes was in the jail that prisoners were being
23 housed without beds, that they were sleeping on mats on
24 the floor; is that right?
25   A.   Sleeping on mattresses.

```
                          93                                              95
 1   A.  That would be an assumption, yes.            1   keep warm?
 2   Q.  (BY MR. KORDICK) You were touring the        2       MR. RINGEL: Object to the form and the
 3   facility, and you didn't know that the facility wasn't  3   foundation.
 4   operating and the prisoners had dirty clothes?   4   A.  Not that I'm aware of.
 5       MR. RINGEL: Object to form and the           5   Q.  (BY MR. KORDICK) You're not aware of that?
 6   foundation.                                      6   A.  No.
 7   A.  Like I said, the laundry was working when I  7   Q.  When you saw that a guy had lost his leg in
 8   went through.                                    8   your facility, did you feel compelled to investigate to
 9   Q.  (BY MR. KORDICK) After Mr. Carranza-Reyes    9   see whether something had gone wrong and how to improve
10   left the facility, the INS insisted that the remaining 10   the facility for the future?
11   people in D Pod be taken for medical evaluations; is that 11       MR. RINGEL: Object to the form and the
12   correct?                                        12   foundation.
13       MR. RINGEL: Object to the form and the     13   A.  No.
14   foundation.                                     14   Q.  (BY MR. KORDICK) After this occurred, did
15   A.  That was something that would have gone    15   you monitor the number of people that were being held in
16   through the jail administrator.                 16   the cells to prevent this from happening in the future?
17   Q.  (BY MR. KORDICK) You knew about it, didn't 17       MR. RINGEL: Object to the form and the
18   you?                                            18   foundation.
19   A.  No.                                         19   A.  No.
20   Q.  You didn't find out about it?              20   Q.  (BY MR. KORDICK) Was it the jail policy to
21   A.  Somebody may have said something later on  21   tell the jail personnel that they would take as many
22   about something going on, but the particulars of it, 22   prisoners as they possibly could to earn the $45 a person
23   I . . .                                         23   for the prison?
24   Q.  You read the articles in the newspaper about 24   A.  I don't recall.
25   Mr. Carranza-Reyes, didn't you?                 25   Q.  Well, when you saw the newspaper article we

                          94                                              96
 1   A.  After -- yes. After the incident took place  1   looked at in the Summit Times [sic], it said that Mr.
 2   and he . . .                                     2   Gore is reducing costs per prisoner. What did you think
 3   Q.  And I assume you had meetings concerning     3   he meant by that?
 4   what occurred, didn't you?                       4       MR. RINGEL: Object to the form and the
 5   A.  His allegation?                              5   foundation.
 6   Q.  Yes.                                         6   A.  I'd have to ask you to -- I don't understand
 7   A.  Yes.                                         7   what you mean.
 8   Q.  Who did you meet with?                       8   Q.  (BY MR. KORDICK) Do you know what he meant
 9   A.  Jail captain.                                9   by reducing the per-prisoner costs and expenses?
10   Q.  Is that it?                                 10       MR. RINGEL: Object to the form and the
11   A.  Might have been some other folks from the  11   foundation.
12   staff in there.                                 12   A.  No, I don't.
13   Q.  Who else did you meet with?                 13   Q.  (BY MR. KORDICK) Let me ask you this: If D
14   A.  As I said, there might have been some other 14   Pod -- if you're getting $45 a prisoner in D Pod and you
15   jail staff in there.                            15   have 30 prisoners in D Pod, if you increase the number in
16   Q.  Were you made aware of any attempts to take 16   there to 60, you'd have twice the revenue, wouldn't you?
17   special precautions to clean up the facilities? 17   A.  Probably, yes.
18   A.  No, no.                                     18   Q.  So the more people you had in, the more
19   Q.  Do you know if they took any special       19   revenue you generated from the jail, correct?
20   precautions to clean up the facilities after this 20       MR. RINGEL: Object to the form and the
21   occurred?                                       21   foundation.
22   A.  Not that I'm aware of.                     22   A.  Yeah. The more people you have in the
23   Q.  Do you know if there was a problem with the 23   facility, the more revenue you generate, yeah. That's
24   ventilators being blocked because the cells were too cold 24   correct.
25   and they were blocking the ventilation in the cell to 25   Q.  (BY MR. KORDICK) And in order to generate
```