---

**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Case No. 2005-WM-377 (BNB)

DEPOSITION OF: ROBERT B. GREIFINGER, M.D.
Volume I
August 25, 2006

MOISES CARRANZA-REYES,

Plaintiff,

v.

PARK COUNTY, a public entity of the State of Colorado and
its governing board, THE PARK COUNTY BOARD OF COUNTY
COMMISSIONERS; PARK COUNTY SHERIFF'S OFFICE, a public
entity of the State of Colorado; FRED WEGENER,
individually and in his official capacity as Sheriff of
Park County, Colorado; MONTE GORE, individually and in
his capacity as Captain of Park County Sheriff's
Department; VICKIE PAULSEN, individually and in her
official capacity as Registered Nurse for Park County,
Colorado; JAMES BACHMAN, M.D., individually and in his
official capacity as Medical Director of the Park County
Jail,
Defendants.

TAKEN PURSUANT TO NOTICE on behalf of the Defendants at
1435 Arapahoe Street, Boulder, Colorado 80302 before
Laura L. Corning, Federal Certified Realtime Reporter,
Certified Shorthand Reporter and Notary Public within
Colorado.

---

**Page 2**

APPEARANCES

For the Plaintiff:
WILLIAM A. TRINE, ESQ.
CHERYL TRINE, ESQ.
Trine & Metcalf, P.C.
1435 Arapahoe
Boulder, Colorado 80302
JOSEPH J. ARCHULETA, ESQ.
Law Office of Joseph J. Archuleta
1724 Ogden Street
Denver, Colorado 80218

For the Defendants
Park County, Park
County Board of
Commissioners, Park
County Sheriff's Office,
Wegener and Gore:
ANDREW D. RINGEL, ESQ.
Hall & Evans, LLC
1125 17th Street
Suite 600
Denver, Colorado 80202

For the Defendant
Paulsen:
MELANIE B. LEWIS, ESQ.
Berg Hill Greenleaf & Ruscitti LLP
1712 Pearl Street
Boulder, Colorado 80302

For the Defendant
Bachman:
CRAIG A. SARGENT, ESQ.
Johnson McConaty & Sargent, P.C.
400 South Colorado Boulevard
Suite 900
Glendale, Colorado 80246

Also Present: None

---

**Page 3**

EXHIBIT 10
INDEX

EXAMINATION OF ROBERT B. GREIFINGER, M.D.       PAGE
August 25, 2006

By Mr. Trine:                                    --
By Mr. Archuleta:                                --
By Ms. Trine:                                    --
By Mr. Ringel:                                   5
By Ms. Lewis:                                    --
By Mr. Sargent:                                  107

                                              INITIAL
DEPOSITION EXHIBITS:                         REFERENCE
71  Curriculum Vitae of Robert B. Greifinger, M.D.   8
72  Publications                                    33
73  Expert Testimony at Trial or by Deposition      40
    within the Past Four Years
74  Letter/Report to Trine from Greifinger,         55
    7/29/05
75  Letter/Report to Trine from Greifinger,         56
    4/27/06
76  Letter/Report to Trine from Greifinger,         57
    6/2/06
77  File                                            58
78  Various documents not attached to file          59
(Original exhibits attached to original deposition; copy
exhibits included in continuing exhibit file; copies
provided to counsel as requested.)

---

**Page 4**

INDEX
(Continued)

EXHIBITS PREVIOUSLY MARKED:    EXHIBIT    PAGE
                                  24        59
                                  60        60

---

Coffman Reporting
303.893.0202
303.893.2230 FAX
WWW.COFFMANREPORTING.COM

Pages 1 to 4

* SUBJECT TO CONFIDENTIALITY DESIGNATIONS *

**121**

1  just referred to are the standards for health services in
2  jails. J -- was it 41? -- J41 assessment protocols.
3  These don't require that nursing protocols be implemented
4  or used in jail systems such as the Park County Jail,
5  true?
6      A.   That's correct.
7      Q.   But --
8      A.   The 1996 standards don't.
9      Q.   And specifically with regard to the sore
10 throat nursing protocol, there is nothing anywhere that
11 says a jail, like Park County Jail, in order to comply
12 with national standards of care must have in place a
13 nursing protocol for patients who present with sore
14 throat, true?
15     A.   That's correct.
16     Q.   What is your opinion -- or do you have an
17 opinion, as to what the source of or the -- the mechanism
18 of invasion was of the strep A for Mr. Carranza-Reyes?
19     A.   If I understand you correctly, you're
20 asking me how did the strep get into his body and where
21 did it go through his body? How did it get to his lungs
22 and his blood? Is that the question?
23     Q.   Right.
24     A.   Well, he had a sore throat and other
25 respiratory symptoms. So, presumably, it began as a

**122**

1  throat infection, and then he developed a pneumonia, and
2  subsequently developed an infection of his bloodstream,
3  which is called sepsis or septicemia.
4      Q.   Now, you're aware from having reviewed the
5  Summit Medical Center, when they looked at his throat,
6  there didn't appear to be any exudate or redness or
7  infection, true?
8      A.   Right. But they're not necessary. As a
9  matter of fact, that's why throat cultures are done. If
10 the appearance of exudate was the diagnostic criteria,
11 then we could all save ourselves the money of doing
12 throat cultures.
13     Q.   Was it your training -- and I know it's
14 been a while since you practiced, and your practice, from
15 my understanding, was limited primarily to pediatric
16 patients, but was it your practice and your training that
17 any patient who presents with a sore throat, regardless
18 of physical examination or clinical presentation, the
19 standard of care required or your training taught you to
20 do a throat culture for each and every patient?
21     A.   Yes. At the time. Now, since that time
22 there has been a rapid strep screen that's quite a bit
23 quicker and easier, but we cultured every patient with a
24 sore throat.
25     Q.   And you understand that's not the standard

**123**

1  of care. Is it your testimony that that's required by
2  all physicians now treating even adult patients, that
3  patients who present with sore throat require some sort
4  of step test?
5      A.   I think a patient with his symptoms -- sore
6  throat, chills, and then later the developing of
7  vomiting -- certainly should have been tested for strep.
8      Q.   Let me ask you, kind of working back the
9  timeline of events -- my question is going to be to you,
10 when in the timeline of events -- if Mr. Carranza-Reyes
11 would have been transferred to Summit Medical Center at
12 whatever time, when, in your opinion, then, does he get
13 whatever medical treatment he needs and not go on to have
14 the amputation and the subsequent medical course that
15 you've seen reflected in the records?
16          Let me ask it this way:  If -- so with
17 that -- that basis or that presumption, let me start by
18 asking my series of questions.
19          If Mr. Carranza-Reyes arrives at Denver
20 Health Medical Center sooner, if Dr. Keeling, after
21 seeing him at Summit Medical Center decides to him, let's
22 say, by helicopter or by ambulance with lights and
23 sirens, if he arrives at Denver Health Medical Center
24 sooner, does Mr. Carranza-Reyes avoid the need for
25 amputation?

**124**

1      A.   Well, he first complained on September 4.
2  Had he been seen --
3          MR. TRINE:  March.
4      A.   I'm sorry. March 4, 2003. Had he been
5  seen on March 4 or March 5, the standard of care in the
6  national commission standards is for all -- for all
7  requests to be reviewed within 24 hours, he might have
8  had a throat culture and -- or a rapid test for strep,
9  and they would have known that he had a strep infection
10 of his throat and would have treated him by March 5 or
11 March 6, at which point he'd be fine. He'd be fine
12 today. So he certainly could have been treated that
13 early. By March --
14     Q.   (BY MR. SARGENT)  Can we work -- can you
15 answer my question?
16     A.   So -- I'm -- I'm trying to. I'm sorry.
17 If -- but you want to know -- you're asking me about the
18 latest time?
19     Q.   Yeah. I thought it might be easiest to
20 kind of work our way backwards, because we have some
21 contacts, I guess early morning March. You had mentioned
22 earlier about time that elapsed between 8:00 in the
23 morning and 11:00 in the morning in response to Mr.
24 Ringel's question, and I was going to kind of work my way
25 back through this.

### Page 129

1 you about your opinions completely about the nursing
2 protocol. You said that even though not required by any
3 national standards, a nursing protocol on sore throats or
4 abdominal pain or chest pain should have been in place
5 here. Is that your testimony?
6    A.   I think it should have been. But if there
7 was not, there should have been explicit training and
8 supervision about what to do for each of those symptoms,
9 it's just easier to put it to paper.
10   Q.   You understand Nurse Paulsen's significant
11 nursing experience. I think she had been a nurse for
12 42 years or something like that. Is that your
13 understanding?
14   A.   Significant in terms of time.
15   Q.   Time?
16   A.   Yes.
17   Q.   Right. Any reason from her training or
18 experience over 42 years to think that she is anything
19 other than well-trained and experienced?
20   A.   If she hadn't had a refresher course in
21 physical diagnosis, physical assessment, and she's not
22 trained to do the kind of nursing assessment that she was
23 doing.
24   Q.   Do you know that to be a fact, that she
25 didn't have any refresher courses?

### Page 130

1    A.   It wouldn't have been "refresher." It
2 would have been "fresher," because physical assessment
3 for acute medical problems was not part of nursing
4 training 42 years ago.
5    Q.   But you don't know what her training or
6 experience has been since then in terms of evaluating
7 patients who present with the sorts of complaints that
8 Mr. Carranza-Reyes presented with.
9    A.   No. That's correct. You're correct.
10   Q.   And no reason to think that Dr. Bachman was
11 aware of any deficiencies in Nurse Paulsen's training or
12 experience in terms of her ability to evaluate patients
13 who present with the sorts of medical condition that Mr.
14 Carranza-Reyes presented with, true?
15   A.   Well, had he been looking at her records,
16 he would know.
17   Q.   These records here (indicated) from Mr.
18 Carranza-Reyes on March 6th and 7th?
19   A.   Yes.
20   Q.   Prior to, let's say, March 6, no reason for
21 you to conclude that Dr. Bachman had any information
22 that would cause him to question Nurse Paulsen's training
23 or experience in terms of her ability to evaluate
24 patients who present with the sorts of medical condition
25 that Mr. Carranza-Reyes presented with on March 6th and

### Page 131

1 7th, true?
2    A.   The nurses are not typically trained to do
3 this kind of assessment. Typically in -- it's only in
4 jails and prisons where they're asked to do this, and
5 there is no -- would be no reason for him to assume that
6 she was trained.
7    Q.   The protocols and the standards that I've
8 seen allow nurses -- registered nurses to evaluate
9 inmates as the first-line health care provider in jail
10 clinics. Is that consistent with national standards, to
11 have a registered nurse doing what Nurse Paulsen was --
12 was asked to do here?
13   A.   Yes, to the extent that they're trained as
14 to what to look for and when to call for help.
15   Q.   And do you know what Nurse Paulsen's
16 training is prior to March 6, 2003 in that regard?
17   A.   No.
18   Q.   And my question specifically before was,
19 was there any indication before March 6 of -- of 2003 of
20 any deficiency in Nurse Paulsen's training or experience
21 or abilities that Dr. Bachman was aware of?
22   A.   No. He only would have been aware had he
23 done -- taken his responsibility for quality improvement
24 seriously and performed reviews of her care, but he
25 apparently didn't. So he wouldn't have known, because he

### Page 132

1 wasn't looking, even though looking was part of his
2 responsibility.
3    Q.   What leads you to conclude that Dr. Bachman
4 was not evaluating or supervising or reviewing Nurse
5 Paulsen's abilities in that regard?
6    A.   I think he testified that he was not
7 involved in any quality improvement activities.
8    Q.   What about just rather than committee
9 involvements? And I want to talk to you about that in a
10 minute, but what sort of -- from the deposition, what
11 sort of interaction did Dr. Bachman have with Nurse
12 Paulsen in terms of chart review, education, training and
13 supervision?
14   A.   I'd have to look back at the deposition. I
15 don't recall.
16   Q.   As you sit here, and as you just testified
17 that you didn't think that Dr. Bachman carried out his
18 responsibilities in supervising her or training her, are
19 you aware of what Dr. Bachman said in that regard in his
20 deposition in terms of his -- the time that he spent with
21 her, talking to her, training her, supervising her, and
22 evaluating her abilities as a nurse?
23   A.   I don't recall him saying anything about
24 reviewing her records, and so just talking with her would
25 not be sufficient, in my opinion.

* SUBJECT TO CONFIDENTIALITY DESIGNATIONS *

149

1  diagnosis, has that physician committed or has that
2  health care provider acted negligently in not making the
3  diagnosis, based on the evidence and the symptoms
4  presented at that time?
5      A.   They may not have.
6      Q.   You testified earlier that Mr. Carranza-
7  Reyes was, quote, prevented, close quote, from being seen
8  in a timely manner, and I want to ask you what policies
9  or procedures or protocols that Dr. Bachman, in your
10 opinion, was responsible for that prevented Mr. Carranza-
11 Reyes from being seen in a timely manner?
12     A.   Well, it was the practices of taking two
13 days, first of all, to respond to his sick-call request,
14 which should have been responded to within 24 hours.
15 Secondly, the practice of Nurse Paulsen making diagnoses
16 when she should be calling for a physician's advice on
17 March 6 and March 7 and March 8.
18     Q.   You'd agree that there was no protocol --
19 nursing protocol, policy or procedure that Dr. Bachman,
20 at least in your opinion, was responsible for that
21 precluded Nurse Paulsen from seeing Mr. Carranza-Reyes
22 before March 6 of 2003, true?
23     A.   That's true. My criticism is of him
24 tolerating the practice.
25     Q.   And again, what information, then, do you

150

1  have prior to March 6 of 2003 that leads you or allows
2  you to conclude that there was a practice within Park
3  County Jail that Dr. Bachman allowed Nurse Paulsen, or
4  anyone there, to not see an inmate for two days or to not
5  call Dr. Bachman to see an inmate?
6      A.   None.
7      Q.   You'd agree with me, also, that there is no
8  policy, protocol or procedure that precluded or prevented
9  or discouraged Nurse Paulsen from calling Dr. Bachman if
10 she thought, in her nursing judgment, that the inmate
11 needed to be evaluated by a physician, true?
12     A.   That's correct. Just the practice, not the
13 policy or procedure.
14     Q.   And again, other than Mr. Carranza-Reyes on
15 March 6 or March 7, you don't have any information that
16 would allow you to conclude that there was some
17 prevailing practice at the Park County Jail that Nurse
18 Paulsen refused or failed to call Dr. Bachman when, in
19 her nursing judgment, she thought an inmate needed to be
20 seen by a physician, true?
21     A.   True.
22     Q.   You'd also agree that there was no policy
23 or procedure or protocol that prevented or precluded or
24 discouraged Nurse Paulsen from transferring a patient to
25 Summit Medical Center, Dr. Bachman's office, Denver

151

1  Health Medical Center, or any other health facility, if
2  she thought, in her nursing judgment, the inmate needed
3  that sort of increased level of care, true?
4      A.   That's correct.
5      Q.   What's the Bromeen Group?
6      A.   Bromeen Group was a -- the name of my sole
7  proprietorship for a while.
8      Q.   No longer practicing or using that name
9  to --
10     A.   No longer using that name.
11     Q.   How long did you use that name as -- my
12 understanding, just so you and I are talking about the
13 same thing, the Bromeen Group was a, I guess, sole
14 proprietorship not licensed or not registered with any
15 state, but just a name that you marketed yourself under
16 or practiced under to provide consulting services and
17 expert witness services, true?
18     A.   Yes. It was just a name I put on my
19 letterhead as soon as I became a consultant.
20     Q.   When did --
21     A.   And then I started getting too many
22 questions at depositions about what it was and whether it
23 was licensed and whether it was insured and whether it
24 was everything, and it was very hard to explain that it
25 was really nothing but me and any associates I worked

152

1  with at the moment.
2      Q.   But you had actually set up the name of a
3  company through which you then offered your expert
4  witness services?
5      A.   No, no, no, no. I -- there was no company,
6  there was no corporation. There was no partnership, no
7  employees, no tax identification number. It was just at
8  the top of my letterhead, the Bromeen Group. It would be
9  like saying Bob Greifinger and friends.
10     Q.   Did you have business cards that had
11 Bromeen group on them?
12     A.   I -- likely I did.
13     Q.   When did you last use the Bromeen Group as
14 a sole proprietorship or name, whatever you want to call
15 it, to offer your expert witness services under?
16     A.   Perhaps six years ago. And it wasn't just
17 expert witnesses only. I worked as a consultant. I used
18 that letterhead for a while, and then I stopped.
19     Q.   I thought I saw in a deposition in 2002
20 that you were still doing that. Does that help refresh
21 your recollection?
22     A.   It's possible. I don't recall.
23     Q.   And you list your name with witness-
24 finding agencies?
25     A.   Just one.