## Page 1

12/13/2006 Volz, Anthony

```
0001
 1   IN THE UNITED STATES DISTRICT COURT
     FOR THE DISTRICT OF COLORADO
 2
     Case No. 2005-WM-377 (BNB)
 3   _____
 4   DEPOSITION OF:  ANTHONY G. VOLZ, MSN, RNC, ANP
     December 13, 2006
 5   _____
 6   MOISES CARRANZA-REYES,
 7   Plaintiff,
 8   v.
 9   PARK COUNTY, a public entity of the State of Colorado and
     its governing board, THE PARK COUNTY BOARD OF COUNTY
10   COMMISSIONERS; PARK COUNTY SHERIFF'S OFFICE, a public
     entity of the State of Colorado; FRED WEGENER,
11   individually and in his official capacity as Sheriff of
     Park County, Colorado; MONTE GORE, individually and in
12   his capacity as Captain of Park County Sheriff's
     Department; VICKIE PAULSEN, individually and in her
13   official capacity as Registered Nurse for Park County,
     Colorado; JAMES BACHMAN, M.D., individually and in his
14   official capacity as Medical Director of the Park County
     Jail,
15
     Defendants.
16   _____
17
18   TAKEN PURSUANT TO NOTICE on behalf of the Defendant
19   Paulsen at 805 South Cascade Avenue, Colorado Springs,
20   Colorado 80903 at 9:10 a.m. before Sylvia E. Noneff,
21   Registered Professional Reporter and Notary Public within
22   Colorado.
23
24
25
```

## Page 2

12/13/2006 Volz, Anthony

```
 1                       APPEARANCES
 2   For the Plaintiff:  LLOYD KORDICK, ESQ.
                         Lloyd C. Kordick & Associates
 3                       805 South Cascade Avenue
                         Colorado Springs, Colorado 80903
 4
     For the Defendants  JENNIFER L. VEIGA, ESQ.
 5   Park County, Park   Hall & Evans, LLC
     County Board of     1125 17th Street
 6   Commissioners, Park Suite 600
     County Sheriff's    Denver, Colorado 80202
 7   Office, Wegener and
     Gore:
 8
     For the Defendant   MELANIE B. LEWIS, ESQ.
 9   Paulsen:            Berg Hill Greenleaf & Ruscitti LLP
                         1712 Pearl Street
10                       Boulder, Colorado 80302
11   Also Present:       None
12
...
25
```

**Exhibit C**

## Page 3

12/13/2006 Volz, Anthony

```
 1                         I N D E X
 2   EXAMINATION OF ANTHONY G. VOLZ, MSN, RNC, ANP:    PAGE
     December 13, 2006
 3
     By Mr. Kordick                             144, 160, 163
 4
     By Ms. Veiga                       116, 159, 162, 166
 5
     By Ms. Lewis                         4, 144, 159, 162
 6
                                                     INITIAL
 7   DEPOSITION EXHIBITS:                           REFERENCE
 8   102  Curriculum vitae of Anthony G. Volz,            9
          MSN, RNC, ANP, not dated
 9
     103  Case review by Volz re Carranza-Reyes,         10
10        6/20/06
11   104  Fax cover sheet from Elizabeth to Knox,        16
          5/25/05; transcript of telephone meeting
12        between Kordick, Archuleta, Carranza-
          Reyes, 2/16/05
13
     105  Handwritten notes by Volz re Paulsen's        159
14        deposition transcript, not dated
15   106  Park County Jail chart notes re              159
          Carranza-Reyes, 3/6/03 and 3/7/03
16
     107  Notes by Volz re Park County Policy and       160
17        Procedure Manual, not dated
18   (Original exhibits attached to original deposition; copy
     exhibits included in continuing exhibit file; copies
19   provided to counsel as requested.)
20
21   REQUESTED PORTIONS OF TESTIMONY:                  PAGE
     (None.)
22
23
     REFERENCES TO EXHIBITS MARKED PREVIOUSLY:
24
     Exhibit       Page
25      2           16
```

## Page 4

12/13/2006 Volz, Anthony

```
 1              WHEREUPON, the within proceedings were taken
 2   pursuant to the Federal Rules of Civil Procedure:
 3              ANTHONY G. VOLZ, MSN, RNC, ANP,
 4   having been first duly sworn to state the whole truth,
 5   was examined and testified as follows:
 6                        EXAMINATION
 7   BY MS. LEWIS:
 8        Q.    Would you please state your name and
 9   business address for the record.
10        A.    Anthony Gerard Volz; V, as in Victor, o-l-z,
11   as in zebra.  My business address is -- we just moved --
12   2222 North Nevada, Suite 2100, 80907.
13        Q.    We met just a moment ago.  And my name is
14   Melanie Lewis, and I represent Nurse Vicki Paulsen in
15   this case.
16        A.    Okay.
17        Q.    And I noticed from the materials that you
18   have provided that you have been deposed before; is that
19   right?
20        A.    Correct.
21        Q.    Okay.  And is that just one time you were
22   deposed?
23        A.    Correct, yeah.
24        Q.    I'll still go over some ground rules to try
25   to make this process a little easier.  If you could
```

12/13/2006 Volz, Anthony

### Page 25

1  communicable diseases, how to evaluate them, how to
2  prevent them.
3      Q.   Are you familiar with the other expert
4  reports that have been issued in this case?
5      A.   The only ones that I've seen were Knox and
6  the --
7      Q.   Greifinger?
8      A.   Thank you, Greifinger. Those are the ones
9  that I've seen.
10     Q.   So you haven't seen a report of a Dr.
11 Niederman?
12     A.   Only by name in the other two depositions.
13     Q.   And have you seen a report of a Dr. Kearns?
14     A.   Again, only by name in the other two
15 depositions.
16     Q.   Do you believe you have more expertise than
17 a physician in infectious disease issues?
18     A.   I guess I look -- we may be talking about a
19 little bit of two different things: infectious disease
20 and infection control. Okay? As far as infectious
21 disease and that specialty, I would defer to a physician
22 with regards to that.
23          But as far as infection control and
24 prevention of spread of communicable diseases, that is
25 well within the scope of nursing, and you don't

### Page 26

1  necessarily have to be a specialist in that, though there
2  are professional organizations for that. We practice
3  infection control on a day-to-day basis in our daily
4  practice as a registered nurse, and that's prevention and
5  communication of infection.
6      Q.   And so, then, how would you define
7  infectious disease, just to make sure I understand your
8  distinction?
9      A.   If we're talking about a specialist in
10 infectious disease, this is a -- and there are registered
11 nurses and nurse practitioners that specialize in that as
12 well -- but these are individuals that have advanced
13 training in the treatment of diseases that are
14 transmitted between individuals. And it is the higher
15 level of care once they've acquire that disease, taking
16 care of that disease and further spreading prevention of
17 communicating that disease to others.
18     Q.   So would you defer to someone that you just
19 described as an infectious disease expert on issues such
20 as incubation periods of infectious disease?
21     A.   Not necessarily. I mean, it's -- some of
22 this is basic knowledge in nursing as well, so no. I
23 mean, there -- if you get into specialized diseases -- I
24 don't hold myself out as an infectious disease expert. I
25 will tell you that. But I do hold myself out as

### Page 27

1  competent as a registered nurse in the prevention and
2  spread of infectious diseases.
3      Q.   So if an infectious disease physician had an
4  opinion that transmission of a certain disease could
5  occur a certain way, would you feel competent to
6  challenge that opinion?
7           MR. KORDICK: You know, object to the form
8  again.
9           THE DEPONENT: I would defer to the
10 infectious disease . . .
11     Q.   (BY MS. LEWIS) When you say that, in the
12 sense we just talked about a moment ago --
13     A.   Yes.
14     Q.   -- that "The conditions are obvious even to
15 the medically untrained person" --
16     A.   Yes.
17     Q.   -- the question I have is, because it would
18 be obvious to the medically untrained, do you feel that
19 it's necessary to have an expert's testimony to make the
20 conclusion you've reached in this paragraph?
21     A.   No, I don't.
22     Q.   Let's look at the review of Summary 1. You
23 conclude in this review that "Nurse Paulsen had a duty to
24 ensure that the risk of transmission of communicable
25 disease was minimized by advising the uniformed officers

### Page 28

1  the need for adequate patient hygiene and the need for a
2  clean facility at a minimum." With -- do you need a
3  moment to try to find that reference?
4      A.   Yes, I do.
5      Q.   Okay. It's at the end of the first full
6  paragraph on page 4.
7      A.   I found it. And your question was?
8      Q.   I haven't asked it yet.
9      A.   Okay.
10     Q.   Are you saying that the Nurse Practice Act
11 requires you to assess the living conditions of a cell
12 block?
13     A.   Yes, I do.
14     Q.   And what part of the Act specifically are
15 you relying on?
16     A.   I actually reference it there.
17     Q.   So that would be C.R.S. --
18     A.   12-38-101.
19     Q.   Okay. And is that the only authority that
20 you're relying on for that conclusion?
21     A.   No. That's just common practice for a
22 registered nurse that's working in a facility. And my
23 understanding is that the prisons are held to the same
24 standard as a small hospital setting. We, as registered
25 nurses in a hospital setting, not only by our Nurse

1  reflected in here, as you understand it, right? Correct?
2     A.   Right.
3     Q.   But assume that this is what she knew. Just
4  go with me on that for a second.
5     A.   Sure, um-hum.
6     Q.   Do you think that that information would
7  lead a nurse to conclude that he was in danger of
8  becoming seriously ill?
9     A.   No. But she's now had two visits with him.
10 He's not improving. She should have called the physician
11 and gotten him involved at that point.
12    Q.   Okay. On March 7th, do you conclude that
13 Mr. Carranza-Reyes was dehydrated at that point?
14    A.   Highly likely.
15    Q.   And why do you reach that conclusion?
16    A.   Because he's been ill going on four days
17 now -- or, actually, three days. I believe the fourth
18 was the first time that he reported being ill and having
19 some fevers and some nausea. He's been throwing up for
20 two to three days. He's had diarrhea for two to three
21 days. She's made no effort in her plan of care to do any
22 hydration measures.
23    Q.   And what --
24    A.   She's not -- she's not asked him any
25 information with regards to how many times he's

1  urinating, what color is his urine. You just -- you
2  don't have an adequate assessment at this point for
3  somebody that's had three days of nausea and vomiting.
4  She hasn't performed the nursing process to evaluate him
5  properly. When I apply the nursing process to this, I
6  find that he is at high risk for developing dehydration.
7     Q.   Do you know whether she was informed that he
8  had sought medical attention earlier than March 6th?
9     A.   No.
10    Q.   Do you agree that if someone -- if you're
11 treating a patient or you're examining a patient who
12 speaks Spanish, and you're using an interpreter, that
13 some of the information could be lost in the translation?
14    A.   I agree.
15    Q.   Particularly, would you agree with that if
16 the translator is not an official translator? They are
17 just someone who speaks Spanish and English, and it's
18 unknown how much of each they speak.
19    A.   I agree.
20    Q.   Do you know whether any of the information
21 that you claim or that you contend that Ms. Paulsen
22 didn't obtain from Mr. Carranza-Reyes was information
23 that was lost in a translation?
24    A.   Ask that again?
25    Q.   Do you know whether -- well, let me

1  rephrase. You're critical of Ms. Paulsen for failing to
2  obtain certain information or not documenting certain
3  information that you think was received from the patient,
4  right?
5     A.   Correct.
6     Q.   Do you know whether any of that information
7  is information that was somehow lost in translation
8  between the interpreter and her?
9     A.   I can't answer that. I don't know.
10    Q.   Do you usually credit a patient's
11 self-assessment of their condition over a medical
12 professional's assessment?
13    A.   What are you asking?
14         MR. KORDICK:  Object to form.
15         THE DEPONENT:  I'm not sure I understand the
16 question.
17    Q.   (BY MS. LEWIS) You've dealt with many
18 patients over your years of experience, right?
19    A.   Correct, yeah.
20    Q.   And do you find that patients sometimes
21 think their condition is one thing; They have an opinion
22 about it; they assess themselves as having a certain
23 ailment?
24    A.   Yes.
25    Q.   And as a medical professional, you might

1  have a different assessment; would you agree?
2     A.   Yes.
3     Q.   Do you find that the patient's assessment is
4  usually accurate, or do you rely -- let me rephrase.
5  Strike that. Do you usually rely on the patient's
6  self-assessment in the terms I just talked about more so
7  than the assessment that a medical professional would
8  make about what's going on with that patient?
9          MR. KORDICK:  I object to the form of that
10 question.
11         THE DEPONENT:  There's -- there's a
12 difference between assessment and diagnosis. I put a
13 great deal of weight upon a patient's assessment or
14 presentation of symptoms. As far as what their decision
15 is as to what they have, I put all that information
16 together to make the appropriate diagnosis.
17    Q.   (BY MS. LEWIS) Let's look at Summary Number
18 4, which is on page 6, and it talks about blood in Mr.
19 Carranza-Reyes's urine.
20    A.   Um-hum, yes.
21    Q.   Do you agree that no one told this
22 information to Nurse Paulsen?
23    A.   I agree.
24    Q.   So that's not something you're faulting
25 her --

12/13/2006 Volz, Anthony

1  A. No, I'm not.
2  Q. -- for not doing?
3  A. No.
4  Q. Okay. Review of Summary Number 5, you, in
5  this first paragraph of Summary Number 5, conclude that
6  both the jail and Nurse Paulsen are negligent for not
7  enacting universal medical precautions on March 7, 2003,
8  as far as I understand it, and tell me I'm wrong; is that
9  right?
10 A. Yes.
11 Q. What would the enactment of universal
12 medical precautions on March 7th have done for Mr.
13 Carranza-Reyes? In other words, would they have changed
14 the outcome of his condition?
15 A. No, they would not have changed his outcome.
16 Q. Now, if you assume that the detainees in D
17 Pod were suffering from a common cold, do you still feel
18 like universal medical precautions should have been
19 enacted on March 7th?
20 A. Absolutely.
21 Q. And so when, in your opinion, would
22 medical -- universal medical precautions need to be
23 enacted in the jail?
24 A. You have to understand that the universal
25 precautions includes proximity of patients. There are

12/13/2006 Volz, Anthony

1  specific guidelines and protocols to prevent transmission
2  of communicable diseases with a number of square footage
3  per patient, bed space between patients. That's the
4  start of the universal precautions.
5           And my understanding in this particular
6  situation -- and I'm not privy to what all the square
7  footages are, and such. I work basically in a
8  hospital -- but I assume that jails and prisons have
9  square-footage space per prisoner. And that's not just
10 for comfort. That's to prevent disease as well.
11          And this is a facility that was grossly
12 overcrowded and had, to my understanding, patients on the
13 floor. And in a situation like this, where there's
14 inadequate place to put trash, debris, it's going to wind
15 up on the floor. So now you've got patients -- excuse
16 me -- prisoners that are sleeping with the trash.
17          You've got a situation where you have
18 inadequate hygiene with regards to enough toilet
19 facilities, enough shower facilities. You have a
20 situation, from what I understand both from the guards
21 and Moises, where the prisoners were not given proper
22 clothing exchanges on a regular basis. That's going to
23 promote infection. So you look at this from when a
24 person enters a prison or any situation where there's a
25 large group setting that you have adequate spacing. And

12/13/2006 Volz, Anthony

1  it just goes down the line from general hygiene
2  principles.
3           Once somebody acquires a communicable
4  disease, you better be looking at what is going to worsen
5  the situation and remediate it so that you can decrease
6  the number of people that are going to be cross-infected
7  with those that are already ill. That might take the
8  measures of, you take these people that are ill out of
9  that situation and put them in another environment where
10 they can be, for lack of a better word, quarantined.
11 These measures weren't taken.
12          Or at a minimum, you're going to go in, and
13 you're going to be making sure the trash is emptied on a
14 more routine basis. You're going to take care of all
15 those measures that we addressed earlier of adequate
16 trash, adequate cleaning, scrubbing. From my
17 understanding, these things did not happen.
18 Q. So to summarize, my question was, when, in
19 your opinion, do you need to enact universal medical
20 precautions. And in your answer, I understood you to say
21 when square footage -- when a certain number of people
22 per square feet --
23 A. Exceeds the square foot --
24 Q. -- exceeds a certain number of square feet,
25 which we don't know what it is, right?

12/13/2006 Volz, Anthony

1  A. Correct.
2  Q. You're not saying -- and then, also, if
3  someone has a communicable disease. And that is
4  regardless of whether or not the square-footage
5  requirement is exceeded or not, or is that just on top of
6  the square-footage requirement?
7  A. That's on top of the square footage.
8  Q. Okay. What's the normal range for
9  respirations at high altitude?
10 A. That's --
11          MR. KORDICK: Object to the form of the
12 question.
13          THE DEPONENT: That's not -- the normal
14 range for respirations at high altitude are the same as
15 those at low altitude for people living at high altitude.
16 Q. (BY MS. LEWIS) Okay. Maybe I should have
17 laid a little foundation. Do you have experience or
18 knowledge or training in what the normal rate of
19 respirations is for a person living at high altitude?
20 A. It's the same as it is for people living at
21 low altitude.
22 Q. Do you have any knowledge about people who
23 are used to living at a different altitude, but then who
24 go visit high altitudes, if their respirations are
25 affected by the altitude?

12/13/2006 Volz, Anthony

1   A.  Yes.
2   Q.  And you write here that "Ben Baca agreed and
3   stated it would be at least three hours before he could
4   arrange a transport," right?
5   A.  Correct.
6   Q.  Do you know whether he said "at least three
7   hours" or "up to three hours"?
8   A.  If I recall, it said "two to three hours" in
9   somebody's deposition. It may have been in Nurse
10  Paulsen's.
11  Q.  But you didn't have the benefit of that
12  deposition when you wrote this report, right?
13  A.  No, huh-uh.
14  Q.  Later on in the same page, under Review of
15  Summary 8, you write that "A transport might take three
16  to four hours to arrange." And that's in the last
17  paragraph on page 8.
18  A.  Yes, okay.
19  Q.  Where did you get the four hours?
20  A.  That was the time frame from when she first
21  arrived back at the jail that morning.
22  Q.  So she --
23  A.  So she got there at 6:00 and made a
24  decision -- I'm trying to recall now -- made a decision
25  to consider transport at 8:00. He was finally

12/13/2006 Volz, Anthony

1   transported after 12:00. So it was basically a four-hour
2   time frame before he was eventually transported, I think.
3   Q.  Okay. And just to clarify, I believe the
4   records show that she came in at about 7:50 or 7:45, not
5   6:00 in the morning --
6   A.  Oh, that's right, yeah.
7   Q.  -- would you agree?
8   A.  Yeah. There was something else that
9   happened at 6:00, I think. Yeah.
10  Q.  All right. So you're using the four hours
11  based on what actually happened, not what she was told?
12  A.  Correct.
13  Q.  Okay. Would you agree that no one told Ms.
14  Paulsen on -- after 8:00 a.m. or at any time before 8:00
15  a.m. that Moises Carranza-Reyes had coughed up spittle
16  containing blood?
17  A.  I agree.
18  Q.  And no one told her also about any blood in
19  his urine by that point, right?
20  A.  Correct.
21  Q.  Based on the information she had at the
22  time, at 8:00 in the morning, where -- do you think she
23  knew he was unstable at this point? Well, first of all,
24  do you think he was unstable?
25  A.  Yes, I do think he was unstable.

12/13/2006 Volz, Anthony

1   Q.  And what suggests to you that he was
2   unstable?
3   A.  We have, again, the persistence of the
4   symptoms that he's had going on -- gosh, from the 4th, no
5   real change in his nausea, vomiting, all these symptoms
6   that we've addressed prior. And then at 3:00 in the
7   morning, or whenever that phone call was to her at her
8   home, he had a change in respiratory rate.
9       A respiratory rate of 34 is excessively
10  high, regardless of altitude. His baseline respiratory
11  rate was 24, and that's high end of normal. I might
12  consider 24 in somebody that's having some mild symptoms
13  of an altitude-type process, trying to adjust and adapt,
14  and consider that that's his baseline. And she's already
15  established a baseline.
16      Now he's at a respiratory rate of 34.
17  That's like breathing once every two seconds. That would
18  fatigue all of us here. That's a critical change in
19  status for this gentleman. There's something going on in
20  his airways that's making it difficult for him to
21  breathe. He was, in my opinion, critical at 3:00 in the
22  morning.
23  Q.  Critically ill?
24  A.  Critically ill.
25  Q.  What --

12/13/2006 Volz, Anthony

1   A.  And she should have come in to evaluate him
2   and determine the best approach to take care of him.
3   Q.  I'll just make sure you're done.
4   A.  Sure.
5   Q.  What mode of transport do you think he
6   needed at that time?
7   A.  He needed an ambulance. And this is one
8   thing that, after reading the different documents that
9   Lloyd had given me, I thought he had been transported by
10  ambulance and those were the arrangements that were made.
11  I found out after some of the material that he had given
12  me last week that he was transported in a private
13  vehicle, with no medical support with him. That was
14  extremely risky on her part.
15  Q.  Are there any criteria that you use as a
16  registered nurse to determine whether someone's critical
17  or stable?
18  A.  Respiratory is one of them. It's the ABCs:
19  airway, breathing, circulation. His breathing was
20  compromised.
21  Q.  So the three ways you determine if someone
22  is critical is the ABCs --
23  A.  Um-hum.
24  Q.  -- which is airway, breathing --
25  A.  Breathing.

12/13/2006 Volz, Anthony

```
1     Q.    Do you --
2     A.    -- and -- go ahead.
3     Q.    Do you know whether she had knowledge that
4  he was critical at this point, as you say he was
5  critical?
6     A.    Did somebody tell her that he was critical,
7  or her observations that he was critical?
8     Q.    Let me backtrack.
9     A.    Okay.
10    Q.    What I understand you saying is that she
11 should have known he was critical, right?
12    A.    Yes.
13    Q.    Are you saying that she knew he was
14 critical?
15    A.    Can you give me a distinction between the
16 two?
17    Q.    Well, is it your opinion that she knew this
18 patient was in need of emergency treatment, transport by
19 ambulance, and that she disregarded that and just decided
20 to wait and transport him via --
21    A.    Okay.
22    Q.    -- vehicle?
23    A.    She should have known, had she applied the
24 nursing process to assess him properly. She should have
25 known.
```

12/13/2006 Volz, Anthony

```
1           (Discussion off the record.)
2     Q.    All right. In Review of Summary Number 8,
3  you write in the middle of that paragraph that Ms.
4  Paulsen was given permission by Ben Baca to go ahead and
5  coordinate transport earlier than the three hours if she
6  felt it was necessary.
7     A.    Yes.
8     Q.    Do you see that?
9     A.    Yes.
10    Q.    Would you agree with me Ms. Paulsen's note
11 and her deposition stated that Mr. Baca told her she
12 could transport if his condition worsened?
13    A.    Yes.
14    Q.    Okay.
15    A.    Yes.
16    Q.    So you're not saying Ben Baca told her
17 something different than that --
18    A.    No.
19    Q.    -- right? Okay. In Summary Number 9, on
20 page 9, the second line down, you say that Nurse Paulsen
21 was advised at 10:30 -- this is after she left the
22 facility and came back -- that Mr. Carranza-Reyes was
23 vomiting more fre -- sorry -- after she left the facility
24 and called in that he was vomiting more frequently. Do
25 you see that?
```

12/13/2006 Volz, Anthony

```
1     A.    Yes.
2     Q.    Where did you get that information?
3     A.    It would probably be in one of the timelines
4  or in her notes. Let's see. Yeah, actually, it's in her
5  own nurse report.
6     Q.    It's on page?
7     A.    Page 2.
8           MR. KORDICK: 144.
9           THE DEPONENT: 0144. She called for an
10 update on Carranza and was told by Deputy Theobald that
11 he was vomiting more frequently --
12    Q.    (BY MS. LEWIS) Okay.
13    A.    -- and that she was concerned about Carranza
14 becoming -- actually, I think what it is is, Teobald
15 (sic) was concerned that the patient was becoming more
16 dehydrated, concerned about his right-side pain.
17          MR. KORDICK: And it's actually "Theobald."
18 It starts with a T on one page --
19          THE DEPONENT: Yeah.
20          MR. KORDICK: -- and then it goes -- it's
21 "Theobald."
22          THE DEPONENT: "Theobald."
23    Q.    (BY MS. LEWIS) And you're just referring to
24 the sentence that says, "being concerned about Mr.
25 Carranza becoming dehydrated" --
```

12/13/2006 Volz, Anthony

```
1     A.    Yeah.
2     Q.    -- "and concerned about his right side
3  pain" --
4     A.    Actually, she says that, yes.
5     Q.    -- "I asked that he be transported to Summit
6  Medical for evaluation," right?
7     A.    Correct.
8     Q.    Okay. And again, you feel that at this
9  point he was critical?
10    A.    Yes.
11    Q.    Do you know what condition Summit Medical
12 Center assessed him to be in?
13    A.    Well, one thing that sticks out in my mind
14 is that the initial blood pressure that they got, they
15 weren't able to get a diastolic blood pressure. That's
16 critical. His -- I'm trying to recall what his systolic
17 was. But if you can't get a diastolic blood pressure,
18 there's gross dehydration and possible body failure.
19 That was upon arrival.
20    Q.    And when a patient is critical on arrival to
21 a hospital, do you expect a doctor to see them right
22 away?
23    A.    It's a team effort. Having worked in
24 emergency rooms, it's going to be a group of people that
25 are gathering information as quick as they can. So it
```

12/13/2006 Volz, Anthony

```
1    eventually was transported, or was it -- is it some other
2    time frame?
3        A.    In my opinion, he should have been
4    transferred at 3:00 in the morning.
5        Q.    At 3:45 a.m. --
6        A.    Yes --
7        Q.    -- when she was called?
8        A.    -- when she got that call.
9        Q.    Okay. Are you offering expert testimony on
10   the issues of deliberate indifference?
11       A.    I don't understand what that question is.
12       Q.    Well, do you understand -- do you have an
13   understanding what it means to violate the 8th or 14th
14   Amendments?
15       A.    No, I don't.
16       Q.    So how are you concluding that there was an
17   apparent violation?
18       A.    On recall of looking at this right now. But
19   looking -- I had the amendments in front of me at that
20   time, and I made that conclusion at that time.
21       Q.    Do you --
22       A.    So I would have to have those amendments in
23   front of me to reevaluate what that -- what the
24   definitions are of those.
25       Q.    So you don't have any specialized training
```

6/18/2007 2:29 PM                                                 97

12/13/2006 Volz, Anthony

```
1    or experience in determining whether a violation of the
2    8th Amendment occurred --
3        A.    No, I don't.
4        Q.    -- or the 14th Amendment, right?
5        A.    No.
6        Q.    And do you feel like you're more qualified
7    than a jury to determine whether there was a violation of
8    the 8th Amendment in regards to medical care?
9        A.    I don't --
10             MR. KORDICK: Object to the form of the
11   question.
12             THE DEPONENT: I don't know if the jury is
13   any more expert than I would be if you explain the -- if
14   I had an opportunity to rereview what the amendments are.
15       Q.    (BY MS. LEWIS) Well, let's put it this way:
16   You reviewed the amendments --
17       A.    Correct.
18       Q.    -- when you were preparing your report,
19   right?
20       A.    Correct.
21       Q.    And is that the first time you actually sat
22   down and read them?
23       A.    And reviewed them and applied them, correct.
24       Q.    And you would agree with me that's the same
25   exact exercise a jury would go through --
```

6/18/2007 2:29 PM                                                 98

12/13/2006 Volz, Anthony

```
1        A.    Oh, I --
2              THE REPORTER: Wait.
3              THE DEPONENT: Oh, that was me.
4        Q.    (BY MS. LEWIS) Yeah, you've got to wait.
5              (The question on page 98, lines 24 through
6    25 was read back.)
7        Q.    -- meaning they would look at the law and
8    try to determine whether there was a violation of the
9    law, right?
10       A.    I agree.
11       Q.    And you're not saying you're in a better
12   position than a jury to evaluate that question?
13       A.    I agree.
14       Q.    Okay. Was there any information that you
15   saw that Ms. Paulsen knew Mr. Carranza-Reyes had a strep
16   A infection?
17       A.    No.
18       Q.    Is there any information you had or you saw
19   that led you to believe that Ms. Paulsen knew Mr.
20   Carranza-Reyes had a life-threatening condition?
21       A.    Yes.
22       Q.    And at what time did she --
23       A.    At 3:00, or whatever that time is that the
24   deputy called.
25       Q.    3:45?
```

6/18/2007 2:29 PM                                                 99

12/13/2006 Volz, Anthony

```
1        A.    3:45 --
2        Q.    And that's --
3        A.    -- on the 8th.
4        Q.    That was me. I'm sorry. And that's based
5    on the respirations, right?
6        A.    Correct.
7        Q.    Okay. On your Review of Summary Number 9,
8    the middle paragraph, you say, "Nurse Paulsen had been
9    given the option by INS to transport earlier than waiting
10   the three to four hours of INS transport coordination."
11   Do you see that?
12       A.    Yes.
13             (Interruption of the proceedings by a knock
14   at the door.)
15             MR. KORDICK: Don't say I never bought you
16   nothing for Christmas.
17             MS. VEIGA: I should have ordered chips, or
18   something.
19             MS. LEWIS: I know it.
20       Q.    (BY MS. LEWIS) And again, you're not --
21   you're not saying that Ms. Paulsen was told anything
22   but -- by INS that she could transport if his condition
23   worsened?
24       A.    They did tell her that it could take two to
25   three hours to arrange transport on their part.
```

6/18/2007 2:29 PM                                                 100

12/13/2006 Volz, Anthony

```
1           SIGNATURE OF WITNESS
2              I, ANTHONY G. VOLZ, MSN, RNC, ANP, do hereby
3    certify that I have read the deposition and that the
4    foregoing transcript and accompanying change sheets, if
5    any, constitute a true and complete transcript of my
6    testimony.
7
8
9          _____
           ANTHONY G. VOLZ, MSN, RNC, ANP
10         Date Read and Signed:_____
11
     SUBSCRIBED AND SWORN TO before me this ____ day of
12   _____, _____.
13      ( ) Changes attached     ( ) No changes
14
15         _____
           NOTARY PUBLIC
16
           Address: _____
17
           _____
18
           My commission expires: _____
19
20
     Re:  Carranza-Reyes v. Park County
21   Date of Deposition:  December 13, 2006
     Trial Date:  None Set
22   Volume:  --
     Reporter:  SEN
23   Proofer:  BM
     Return to:  Coffman Reporting
24              1440 Blake Street, Suite 320
                Denver, Colorado 80202
25
```

6/18/2007 2:29 PM                                          169

---

12/13/2006 Volz, Anthony

```
1        COFFMAN REPORTING & LITIGATION SUPPORT, INC.
                  1440 Blake Street, Suite 320
2                   Denver, Colorado 80202
                        303.893.0202
3
4    December 22, 2006
5
     LLOYD KORDICK, ESQ.
6    Lloyd C. Kordick & Associates
     805 South Cascade Avenue
7    Colorado Springs, Colorado 80903
8
     Re:  Carranza-Reyes v. Park County
9    Deposition of:  ANTHONY G. VOLZ, MSN, RNC, ANP
     Date of Deposition:  December 13, 2006
10   Trial Date:  None Set
11
     Dear Mr. Kordick:
12
     Enclosed is the original signature page of the above
13   deposition.  It was agreed you would arrange for the
     witnesses's signature with your copy of the transcript.
14
     Amendment sheets are included.  After the signature page
15   and amendment sheets are signed, please have both
     notarized and return for filing to . . .
16
17      to this office within 30 days pursuant to Rule 30.
18
     Thank you for your prompt attention to this matter.
19
     Sincerely,
20
21   COFFMAN REPORTING
22   cc:  Attending counsel
23
24
25
```

6/18/2007 2:29 PM                                          170

---

12/13/2006 Volz, Anthony

```
1        COFFMAN REPORTING & LITIGATION SUPPORT, INC.
                  1440 Blake Street, Suite 320
2                   Denver, Colorado 80202
                        303.893.0202
3
4    MELANIE B. LEWIS, ESQ.
     Berg Hill Greenleaf & Ruscitti LLP
5    1712 Pearl Street
     Boulder, Colorado 80302
6
7    Re:  Carranza-Reyes v. Park County
     Deposition of:  ANTHONY G. VOLZ, MSN, RNC, ANP
8    Date of Deposition:  December 13, 2006
     Trial Date:  None Set
9
     Enclosed is:
10
     ( )  ORIGINAL TRANSCRIPT.  Please retain unopened
11        original until it is required by any party in a
          trial or hearing in the above matter.
12
     ( )  ORIGINAL SIGNATURE PAGE
13        ___with  ___without corrections; copies provided to
          other counsel; please append these sealed originals
14        to original transcript in your possession.
15   ( )  No signature or correction sheets received.
16   ( )  Review of transcript not requested.
17   ( )  30-day review unavailable.  Signature/correction
          pages forwarded to counsel handling signature.
18        Original filed in anticipation of trial date.
          See letter within deposition.
19
     ( )  Copy of deposition, signature and correction pages
20        sent to deponent.  See letter within deposition.
21   ( )  Signature not applicable.
22   Original transcript filed on_____via_____
23   Follow-up documentation filed on_____via_____
24   cc:  Attending counsel
25
```

6/18/2007 2:29 PM                                          171