```
              UNITED STATES DISTRICT COURT
                  DISTRICT OF COLORADO
MOISES CARRANZA-REYES,       )
                             )
            Plaintiff,       )
                             )
       v.                    ) No. 05CV-00377-WD-BNB
                             )
THE PARK COUNTY BOARD OF     )
COUNTY COMMISSIONER; FRED    )
WEGENER, individually and in )
his official capacity as     )
Sheriff of Park County,      )
Colorado; MONTE GORE,        )
individually and in his      )
official capacity as Captain )
of Park County Sheriff's     )
Department; VICKIE PAULSEN,  )
Individually, and in her     )
official capacity as         )
Registered Nurse for Park    )
County Colorado; and JAMES   )
BACHMAN, M.D., individually  )
and in his official capacity )
as Medical Director of the   )
Park County Jail,            )
                             )
            Defendants.      )
                             )
```

              DEPOSITION OF
           CATHERINE M. KNOX
        Taken in behalf of Defendants
                 * * *
              October 4, 2006
            805 Broadway Street
              Portland, Oregon

Shon McClements
Court Reporter

**Exhibit D**

---

```
                    APPEARANCES:
1
2   For the Plaintiff:    MR. WILLIAM A. TRINE
                          Attorney at Law
3                         1435 Arapahoe Avenue
                          Boulder, CO 80302
4
    For the Defendants,   MS. MELANIE B. LEWIS
5   Paulsen:              Attorney at Law
                          1712 Pearl Street
6                         Boulder, CO 80302

7   For the Defendants,   MR. ANDREW W. JURS
    Bachman:              Attorney at Law
8                         Suite 900
                          400 South Colorado Blvd
9                         Glendale, Colorado 80246

10  For the Defendants,   MS. JENNIFER L. VEIGA
    Park County, Wegener, Attorney at Law
11  Gore:                 Suite 600
    (Via Phone)           1125 17th Street
12                        Denver, Colorado 80202
13
    Also Present:         (None)
14
15                        INDEX
16  EXAMINATION BY:                      PAGE NO.
17  Ms. Lewis                            4 - 109
18  Mr. Jurs                             109 - 138
19  Ms. Veiga                            138 - 142
20  Ms. Lewis                                142
21  Mr. Trine                            142 - 147
```

---

```
1                    EXHIBITS
2   No. 88   E-mail to Mr. Trine from Ms. Knox,      9
             5/11/05
3
    No. 89   Catherine M. Knox Time and              11
4            Expense Report
5   No. 90   CV for Catherine M. Knox                16
6   No. 91   Report of Catherine M. Knox             29
7   No. 92   Pages from APIC Text of Infection       31
             Control and Epidemiology
8
    No. 93   State of Colorado Nurse Practice Act    49
```

---

1   PORTLAND, OREGON; WEDNESDAY, OCTOBER 4, 2006
2                      8:17 a.m.
3                       * * *
4                 CATHERINE M. KNOX
5   called as a witness in behalf of the Defendants,
6        having first been sworn by the Reporter,
7                 testifies as follows:
8                      EXAMINATION
9   BY MS. LEWIS:
10      Q. Could you please state your name and
11  business address for the record.
12      A. My name is Catherine M. Knox. My business
13  address is One Lincoln Center, Suite 380, 10300 S.W.
14  Greenburg Road, Portland, Oregon, 97223.
15      Q. Have you ever been deposed before?
16      A. I have been deposed before.
17      Q. I will go over some rules anyway to try to
18  make this process a little bit easier. Basically if
19  you could wait until I finish asking my questions
20  before you answer, it helps the court reporter get a
21  cleaner record down.
22          Also, if you can answer verbally instead of
23  nodding your head because the court reporter can't
24  get that on the record. If you could answer by
25  saying yes or no when the question calls for that

## Page 17

10/4/2006 Knox, Catherine

1  A. I haven't worked in that type of setting for
2  years. My area of practice has been psychiatric
3  nursing. I worked with children in a mileau,
4  M-I-L-E-A-U, therapy. I have -- my other area of
5  specialty is nursing administration.
6  Q. And how long did you work in a clinical
7  setting? You said with children, correct?
8  A. For I believe two and a half years.
9  Q. Did you ever work with adults in a clinical
10 setting as I have defined it?
11 A. No, I have not. I guess let me just add one
12 clarification. I think part of being an
13 administrator is the ability to work clinically, and
14 so I have on occasion for brief periods of time --
15 for instance, there have been two or three occasions
16 where in my employment there has been a union action
17 causing a strike, and I have provided direct clinical
18 care as a manager in a strike situation.
19     I have had some other occasions where
20 because of staffing I have gone in and provided
21 direct care, but it is not really -- in my opinion I
22 don't consider myself facile in the provision of
23 direct patient care.
24 Q. And have you done what you have just
25 described in the correctional setting?

## Page 18

10/4/2006 Knox, Catherine

1  A. Yes.
2  Q. Gone in and treated patients or worked with
3  patients?
4  A. Yes.
5  Q. And was that in Oregon or Washington?
6  A. Both.
7  Q. Do you supervise registered nurses?
8  A. Yes, I do.
9  Q. How many nurses now do you supervise?
10 A. I haven't counted. There are 16 facilities
11 in the State of Washington that employ nurses, and I
12 have a supervisory responsibility for their clinical
13 practice. The nurse group who I supervise more
14 directly would be considered the nursing managers or
15 nursing supervisors, and there are I believe 27 of
16 those. There are perhaps another 200 line-registered
17 nurses supervised by the supervising authority
18 currently.
19 Q. So if I understand it, there is about 200
20 line nurses, as you have described it, and then above
21 them there is a layer of supervision; is that
22 correct?
23 A. Correct.
24 Q. But that's not you, right?
25 A. That's correct.

## Page 19

10/4/2006 Knox, Catherine

1  Q. But you're above that layer of supervision?
2  A. Yes.
3  Q. So when you say you supervise registered
4  nurses, what type of things do you do to supervise
5  them?
6  A. I, for example, in the last, say, six months
7  have revised the position description for LPNs and
8  RNs in the Washington Department of Corrections to be
9  more explicit and to -- more -- be more closely
10 aligned to the Practice Act in the State of
11 Washington.
12     I worked with a group of supervising
13 registered nurses to ensure that the description and
14 expectations that go along with that were reasonable
15 in terms of the practice expectations for nurses in
16 that setting. I review incidents of -- where there
17 are performance problems and make decisions about
18 discipline of registered nurses relative to their
19 practice. I develop protocols or instructions about
20 how to accomplish certain kinds of tasks in the
21 correctional setting.
22 Q. When you say you review disciplinary type of
23 actions, what level are you involved in that? What
24 I'm trying to figure out is does the middle
25 supervisor come up with a recommendation for you or

## Page 20

10/4/2006 Knox, Catherine

1  do you come up with your own recommendation? How
2  does that work?
3  A. In Washington -- I guess I want to
4  editorialize a little bit and I shouldn't. In
5  Washington the appointing authority, which is the
6  level that I am at, is the level within the
7  organization that is required to make decisions, and
8  the advice that we have been given by the attorney
9  general is that you don't want to receive
10 recommendations from subordinates within the
11 organization because it ties your hands relative to
12 discipline.
13     In that regard I have both investigated --
14 we call it investigation, but it is the collection of
15 information, the interview of people, to develop the
16 facts around the case, to look at or to compare the
17 actual facts against policy, procedure and so forth,
18 what should have happened, then from that to make a
19 decision.
20     I have also reviewed investigations that
21 have been done by others and have used that to
22 basically make a decision about discipline.
23 Q. Do you have any experience with nursing in
24 Colorado?
25 A. No, I do not. As a direct -- I'm not

## Page 21

10/4/2006 Knox, Catherine

1  licensed in Colorado, and I have not practiced in
2  Colorado.
3     Q.  And you have not supervised any nurses
4  working in Colorado, correct?
5     A.  Correct.
6     Q.  Have you ever worked in a county jail
7  setting?
8     A.  It depends on your definition.  I have --
9  did have a consulting agreement with the Yuma County
10 Jail and in that capacity was responsible for helping
11 a vendor kind of establish the health care operations
12 at that facility and in that capacity supervised the
13 nursing staff.
14    Q.  Is that Yuma County in?
15    A.  Arizona.
16    Q.  Arizona.  Okay.
17    A.  I'm sorry.  Your question was have I worked
18 in a county jail?
19    Q.  Correct.
20    A.  And so that would be the only situation
21 where I have had -- that's the most direct
22 responsibility that I have had.
23    Q.  When you did that role, were you actually
24 there on site?
25    A.  Yes, I was.

## Page 22

10/4/2006 Knox, Catherine

1     Q.  How long were you there?
2     A.  Three and a half weeks.
3     Q.  If you could look at the first page of your
4  CV, the paragraph that is under the heading
5  Consultant, there is a line that says, Evaluated
6  nursing services at Pierce County on behalf of the
7  court monitor and provided recommendations on
8  staffing, scheduling and program development.
9        Do you see that?
10    A.  Yes, I do.
11    Q.  What does that mean, that you evaluated
12 nursing services at Pierce County on behalf of the
13 court monitor?
14    A.  Pierce County is in Tacoma, Washington, and
15 had been involved in a -- what I understand is a
16 class action lawsuit about adequacy of care for
17 several years and had a court monitor appointed.  The
18 court monitor asked or recommended to the County that
19 they retain my services to do exactly that, evaluate
20 how the health nursing services were organized, the
21 number of FTE, where they were allocated, what
22 functions -- and what functions they performed, and
23 so that is the basis of the advice for consultation
24 that I gave them.
25    Q.  Did you give written recommendations?

## Page 23

10/4/2006 Knox, Catherine

1     A.  I thought that I did.  I believe so.  That
2  would have been in I think 2001, and I might have a
3  vivid recollection of verbal recommendations than I
4  do of the written report, but I believe a written
5  report was required.
6     Q.  Do you know if that report was filed in any
7  court?
8     A.  I do not know.
9     Q.  What were the recommendations regarding
10 staffing for Pierce County?
11    A.  Pierce County was constructing a new
12 facility, and so the staffing recommendations were
13 what FTEs and what types of FTEs were necessary to
14 operate in the old jail during the time of transition
15 to the new facility, and then once the new facility
16 was fully operational what kind of staffing would be
17 necessary to deliver services.
18    Q.  Do you know what the inmate population was
19 there?
20    A.  I don't remember specifically.  I would say
21 that it's a medium-sized jail in an urban setting.
22    Q.  So it's not like 50 inmates, you know, a
23 ballpark?  It would be more than that, right?
24    A.  It was more like 400 to 600.
25    Q.  Were nurses working at Pierce County

## Page 24

10/4/2006 Knox, Catherine

1  responsible for setting the staffing levels?
2     A.  No.
3     Q.  Who was responsible?
4     A.  The health care administrator and the County
5  Sheriff.
6     Q.  So is it your experience that the decision
7  of how many registered nurses to have on staff is
8  made by administration --
9        MS. VEIGA:  Objection as to form.
10    Q.  (By Ms. Lewis) -- at a county jail?
11    A.  I'm sorry.  Would you repeat the question?
12    Q.  Is it your experience that a decision about
13 how many nurses to have on staff is made by
14 administration or the nurses?
15       MS. VEIGA:  Objection as to form.
16    Q.  (By Ms. Lewis) Which one?
17    A.  What I would -- here is my -- I will answer
18 your question the best I can.  It is my experience
19 that the health authority, whoever that is, and in
20 some cases that may be a nurse, is in a position to
21 make recommendations about the staffing at a
22 facility.  Usually there are many other people who
23 also have input into the process as well, but the
24 health authority -- and if the health authority is
25 not a nurse, many times some nurse who is in a

10/4/2006 Knox, Catherine

1  Q. Would it have changed not the outcome but
2  what she did to determine the outcome? Do you
3  understand what I'm saying?
4  A. No, I don't.
5  Q. Okay. If she had obtained the additional
6  information, would she have done other examination of
7  him that wasn't done, other than the vital signs and
8  asking questions?
9  A. I'm not sure I yet understand your question,
10 but let me try to answer what I think you're asking
11 me. What I'm trying to convey is that her
12 examination was so narrowly focused that I think she
13 missed important information that she would have
14 collected had she asked questions and established a
15 broader basis for this initial contact against which
16 she could evaluate his symptoms and progression in
17 subsequent contacts.
18    It's hard for me to speculate what she would
19 have done differently had she asked these questions.
20 Since she did not, I don't know.
21 Q. Okay.
22 A. Am I understanding your question?
23 Q. I think you answered what I was trying to
24 find out, in that you said that you think she missed
25 important information that would have given her --

10/4/2006 Knox, Catherine

1  A. Define what you mean. The outcome of this
2  episode of contact here or the ultimate outcome in
3  the case?
4     MS. LEWIS: Can you read two questions back.
5     (The Reporter read back Lines 16 through 18
6  of Page 42.)
7  Q. (By Ms. Lewis) Do you understand that
8  question?
9  A. I would ask you the same question.
10 Different conclusion at the end of this encounter or
11 a different conclusion in terms of the case?
12 Q. A different conclusion at the end of this
13 encounter.
14 A. Okay. What I think the difference it would
15 have made is -- when she says she asked the
16 interpreter to tell him to let medical know if he is
17 not improving, that she's -- and she does say in
18 the -- she is treating -- in my opinion, she's
19 treating this as though it is a more recent
20 complaint, and a person who has experienced symptoms
21 like these already for two days who is not improving
22 when she saw him the following day, I believe that
23 would have changed the outcome. That's probably not
24 as clearly stated as it could be.
25 Q. So if I understand you correctly, you

10/4/2006 Knox, Catherine

1  that would have guided her overall assessment,
2  correct?
3  A. Correct.
4  Q. And what information is that?
5  A. I believe that most important what -- well,
6  I need to think about this, but my first reaction is
7  that the most important information that she missed
8  was the length of time that he had been experiencing
9  symptoms, the fact that he had requested medical
10 attention I believe the day before. He had been
11 having symptoms I think for two days prior to the day
12 that she saw him; that if she did not already know
13 would have had information about others in the block
14 experiencing similar symptoms, which might have
15 resulted in a different conclusion that she reached.
16 Q. Can you say with a reasonable degree of
17 certainty that that information would have resulted
18 in a different conclusion or just that it might have?
19 A. I can say with a reasonable degree of
20 certainty that knowing more specifically how long he
21 had been experiencing symptoms was significant.
22 Q. But that's a different issue than what I was
23 asking, which is would this information to a
24 reasonable degree of certainty have altered the
25 outcome or would it just might have altered it?

10/4/2006 Knox, Catherine

1  believe that that additional information would have
2  changed her conclusions at the end of that visit,
3  right, not just that it might have?
4  A. The end of the second visit I believe it
5  would have changed her conclusions.
6  Q. So the first visit was March 6th, correct?
7  A. Correct.
8  Q. And so you're saying at the end of the
9  second visit on March 7th, is that right, it would
10 have changed her conclusions?
11 A. I believe so.
12 Q. So with respect to what she did on
13 March 6th, the first visit, do you believe she acted
14 below the standard of care?
15 A. Well, on March 6th where I think she acted
16 outside of or below the standard of care is that she
17 is treating him symptomatically for body aches, the
18 nasal congestion and the nausea with symptomatic
19 treatment that she has no protocols to use or to do.
20    If she had sought medical direction at this
21 point, I believe that at least there would have been
22 consideration of whether or not to do any lab work at
23 this point to try to identify the cause of the sore
24 throat, whether he had influenza.
25 Q. To be clear, what would the standard of care

10/4/2006 Knox, Catherine

1  Let's see. She fails again to inquire about
2  the history and frequency and so forth of all of the
3  symptoms, not just the new ones. Vital signs are
4  incomplete, again, without a blood pressure. She had
5  a -- again, she had -- on the first encounter on the
6  6th she asked him to return if he wasn't getting
7  better. He returns because he's not getting better
8  and in addition has new symptoms. It's the second
9  opportunity again to do a more thorough physical
10 examination which would include looking at his ears,
11 as I have said here, nose and throat.
12      Let's see if there is anything else. I
13 think that's it.
14     Q. Again, you don't know for a fact whether she
15 did inquire how much, how long, how often of the --
16 he was experiencing diarrhea or vomiting, correct?
17     A. If she had, she would have documented it.
18     Q. So you're assuming from the fact that she
19 did not document it that she therefore did not
20 inquire; is that right?
21     A. Correct.
22     Q. But you weren't there. You don't know
23 whether she did or didn't, right?
24     A. Well, there is her deposition, and there is
25 Moises Carranza-Reyes' deposition, and my

6/18/2007 1:35 PM                                                53

10/4/2006 Knox, Catherine

1  recollection of both of those is that it confirms
2  that -- not specifically, but I came away with the
3  opinion that it confirmed or was consistent with what
4  she had charted in that her inquiries were very much
5  focused on what he told her his presenting symptoms
6  were and not any background or additional
7  questioning.
8      Q. But you have previously testified today that
9  you're disbelieving her sworn testimony, right?
10     A. I think your question was that in
11 relationship to something specific about the first
12 encounter. There was her testimony. There is the
13 written documentation, and then there is Moises
14 Carranza-Reyes. That had to do with checking his
15 neck, if I recall, and I said that, yes, I was not
16 believing that she had examined his throat I think is
17 what I recall.
18     Q. Are you giving more weight in this case to
19 Moises Carranza-Reyes' version of events than
20 Ms. Paulsen's version of events?
21     A. I don't believe that I am.
22     Q. Do you agree that their description of the
23 events that transpired on March 6th and March 7th are
24 different?
25     A. I think there is a lot of consistency

6/18/2007 1:35 PM                                                54

10/4/2006 Knox, Catherine

1  between their description of events.
2      Q. Again, when you say didn't get the full set
3  of vital signs, we were talking about the blood
4  pressure is the one that you think she should have
5  obtained on March 7th, right?
6      A. Correct.
7      Q. And later in that paragraph you say, She did
8  not examine his ears, nose or throat or look more
9  closely at the extent to which he may be dehydrated.
10 Do you see that?
11     A. Yes, I do.
12     Q. With regard to the throat, again, are you
13 disbelieving her testimony that she did look at the
14 throat to reach that conclusion?
15     A. I don't recall any specific testimony from
16 her on this occasion about whether she looked at his
17 throat. I -- my recollection is that had to do with
18 the contact on the 6th, so I'm relying on what's
19 charted here and not her testimony.
20     Q. In the next paragraph on page 2 it says,
21 Ms. Paulsen, RN, did not consider the possibility
22 that the illness Mr. Carranza-Reyes had was
23 infectious and communicable.
24     A. You know, I'm not tracking you. Where are
25 you?

6/18/2007 1:35 PM                                                55

10/4/2006 Knox, Catherine

1      Q. That's my fault. I'm on Exhibit 91 which is
2  your report, second page, second paragraph.
3      A. Starts with, She did not collect?
4  Ms. Paulsen was negligent?
5      Q. Yes. Actually, the second sentence of the
6  second paragraph. Do you see that sentence?
7      A. Yes.
8      Q. How do you know she didn't consider those
9  issues on March 7th?
10     A. Because there is nothing documented that
11 would indicate that she did.
12     Q. Again, it's your opinion that she should
13 have documented all of this type of information in
14 the record, right?
15     A. Absolutely.
16     Q. What actions should have been taken before
17 the weekend to ensure that Moises Carranza-Reyes'
18 condition didn't deteriorate over the weekend?
19     A. The things I was thinking about at this
20 point were that the weekends are generally without
21 medical coverage at the jail, so she knew she was not
22 going to be present on Saturday and Sunday. So
23 Moises' condition would be monitored by what are
24 called deputies in the jail, and I don't see that
25 there are -- I think she gave maybe some general

6/18/2007 1:35 PM                                                56

10/4/2006 Knox, Catherine

1  expectations but nothing specific about what to look
2  for to monitor his condition, whether it was getting
3  better or deteriorating.
4      I believe that she -- given that -- and
5  there are some standards to back this up, that he was
6  presenting a second time for the same complaint, and,
7  in fact, his -- he had additional symptoms, so it
8  should have been clear that the symptomatic efforts
9  to treat him were not working and at that point to
10 have called and obtained more specific either orders
11 or medical direction to be implemented before what is
12 essentially a 48-hour wait for the next time health
13 care staff are present in the jail.
14     I think the -- so what I was I guess trying
15 to say and what she did not consider, what actions,
16 the two that I can think of is to have discussed with
17 the physician or the nurse practitioner his case and
18 whether or not lab work or medications, more than
19 these over-the-counter, could be ordered and to have
20 provided I think -- not I think, but more specific
21 instructions to the officers about the things like
22 how much fluid he needed, monitoring his vomiting and
23 diarrhea, being sure that he was kept warm in terms
24 of his convalescence.
25     Q. You said something interesting just now.

10/4/2006 Knox, Catherine

1  You said that his condition on the 7th suggested that
2  the treatment modalities used on the 6th were not
3  working, correct?
4      A. Correct.
5      Q. What about with regard to his temperature?
6  Isn't it true that his temperature decreased from the
7  first day to the second day?
8      A. His temperature did decrease.
9      Q. Wouldn't that suggest that the ibuprofen was
10 working?
11     A. I think you're drawing a -- it's not a
12 conclusion that I would draw.
13     Q. And please explain why not.
14     A. The reason is that you're -- yes. The
15 temperature is lower. It could be a subnormal
16 temperature which could be significant. You
17 generally can't take a single vital sign out of a
18 group of vital signs and use it in isolation from
19 everything else to predict whether someone is getting
20 better or not.
21     He has a more rapid pulse here. I think
22 he's got -- based on what's here, he continues to be
23 at risk of dehydration, and the rapid pulse would be
24 evidence of that. He now has vomiting in addition to
25 all of the other symptoms. I do not believe that on

10/4/2006 Knox, Catherine

1  the basis of temperature alone you could come to the
2  conclusion that he was getting better and not worse.
3      Q. Is it your opinion that the symptoms he
4  presented with on the 6th and the 7th indicated he
5  had a strep infection to a nurse at the time being
6  presented with that?
7      A. No, I do not. I think on the 7th it would
8  be reasonable for the nurse to not know, and I think
9  it would be reasonable for the nurse to see that
10 this -- again, assuming that the nurse had collected
11 the data to know that these symptoms started
12 within -- would it be three -- three days before the
13 7th? Am I correct on my time frame? He had had
14 symptoms two days before the 6th which was Thursday.
15 They started Tuesday, so now he's three days on the
16 7th; that he is continuing to have these kinds of
17 symptoms. He is reporting back -- do you remember
18 her instructions were that if his condition is worse,
19 report back? He is reporting back; that you would
20 come to the conclusion that he has -- there is some
21 generalized problem here that needs to be worked up.
22     Q. How did his symptoms differ, if they do,
23 from a run-of-the-mill viral infection?
24     A. Do you want to describe for me what you mean
25 by run-of-the-mill viral infection?

10/4/2006 Knox, Catherine

1      Q. Sure. It's my experience just as a person
2  that everybody gets stomach bugs. They get bugs and
3  fevers at various times throughout the year. That's
4  what I would describe as kind of the run-of-the-mill
5  viral infection. You have a fever. You feel ill.
6  You don't go to the doctor. You recover on your own.
7  It's non-eventful.
8      My question is: Did Mr. Carranza-Reyes
9  present with symptoms that indicated he had something
10 more than what the average person, you know,
11 experiences, doesn't go to the doctor for, to the
12 extent you know?
13     A. The way I would answer your question is that
14 I believe that Vickie Paulsen knew that there were
15 other people in the same pod who were having symptoms
16 of an upper respiratory infection, maybe some nausea
17 and diarrhea. I have a clear recollection about the
18 flu-like symptoms. What is different is that this
19 person is seeking her out amongst all others for
20 attention to a sore throat. He has vital signs that
21 are -- have some abnormalities in them, and
22 symptomatic treatment isn't making a difference.
23 He's not feeling better as a result of this.
24     The last I guess fact that I think is
25 important in distinguishing this is that, and maybe

10/4/2006 Knox, Catherine

1  stay would have been appropriate for her to do as a
2  registered nurse.
3      Q.  Well, don't you agree that once you know the
4  outcome of a patient's -- if the outcome happens to
5  worse or bad, that you would go back in hindsight
6  and --
7      A.  I very much agree.
8      Q.  You very much agree?
9      A.  Uh-huh.
10     Q.  So are your opinions about Ms. Paulsen based
11 on what you know with the benefit of hindsight, of
12 looking back and saying she should have done this,
13 she should have done that, only because you know what
14 happened eventually to Mr. Carranza-Reyes?
15     A.  No, they're not.  I think that's a risk, you
16 know, that you run every time you're asked to review
17 a case where you know the outcome, and I guess -- so
18 once you have acknowledged that you can set it aside
19 and look very carefully at what in the norm you would
20 expect given these presenting facts or symptoms or
21 descriptions, what action would you reasonably expect
22 to have occurred, even if the outcome, you know, was
23 less or something else, and so that is the
24 methodology in evaluating these contacts that I used.
25     Q.  So given the facts that Ms. Paulsen was

10/4/2006 Knox, Catherine

1  presented with at 9:00 a.m. on March 8th, is it your
2  opinion that she should have known that unless he was
3  transported immediately he was going to go into
4  septic shock?
5      MR. TRINE:  Objection.  Lack of foundation.
6      THE WITNESS:  My opinion is that at
7  nine o'clock on Saturday morning she should have
8  known that it was important to stay with him until
9  transport occurred.
10     Q.  (By Ms. Lewis)  And what would she have done
11 if she stayed with him?
12     A.  She would have continued to do assessments
13 of his condition and have documented those.  If -- I
14 guess at this point I do think she should already
15 have contacted a medical provider.  She would have
16 had the opportunity to have contacted a medical
17 provider for more specific direction and advice about
18 urgency had she stayed.
19     If he had collapsed or more urgently become
20 ill, she would have been able to intervene as a first
21 responder, and I guess that's my answer.
22     Q.  In your report you're critical of
23 Ms. Paulsen for not preparing copies of the record,
24 the health records of Mr. Carranza-Reyes, and sending
25 them to Summit Medical; is that right?

10/4/2006 Knox, Catherine

1      A.  Correct.
2      Q.  Why do you reach that opinion?
3      A.  That she did not prepare copies?
4      Q.  That's a fair question.  That --
5      A.  That she should have?
6      Q.  That she should have.
7      A.  Any time there is a transfer of a patient
8  from one provider to another, it is important to the
9  provider who is going to receive that patient to have
10 the benefit of any records, especially those that are
11 pertinent to the kind of presenting complaint, at the
12 time that they receive the patient.
13     Q.  Is it negligence not to provide them?
14     A.  The result of not providing it is that the
15 receiving provider is without important information,
16 has to collect that information again and sometimes
17 makes an error as a result of not having that
18 information.
19     So my point here is that it is a common
20 practice that is expected that you provide at least a
21 verbal report, if not copies.  The point I'm trying
22 to make here is had she stayed she would have had
23 time to make copies and fax those to Summit.
24     Q.  Do you know whether she called in the same
25 information that was contained in her written records

10/4/2006 Knox, Catherine

1  to the medical center?
2      A.  Well, in her deposition she recalls having
3  called.  There isn't any clear, that I could tell,
4  documentation on the part of either Summit or her
5  records that she did make that phone call.  Summit --
6  on the Summit, the 01 sheet, I think there is a
7  little notation that she called, but I believe that
8  that's after he had arrived and not before, based on
9  the information that was provided.
10     She was unsure I thought in -- my
11 recollection is that she was -- she thought she had,
12 but she wasn't clear.  She thought she had
13 telephoned, but neither the physician -- the
14 physician at the ER could not recall, and there is no
15 documentation to support it.
16     Q.  You make the opinion in your report that
17 Ms. Paulsen was deliberately indifferent to
18 Mr. Carranza-Reyes.  How do you define deliberate
19 indifference?
20     A.  I believe that deliberate indifference is
21 when a person, in this case a registered nurse, had
22 reason to know or knew of something that caused grave
23 danger or the potential for medical harm and did not
24 act to either prevent the harm or to mitigate the
25 risk.

10/4/2006 Knox, Catherine

1  specific intervention. To me the way your question
2  is phrased is that you would understand me to be
3  saying that she should have talked to Dr. Bachman
4  about antibiotics, and that's not what I intended to
5  say in this report.
6  Q. My understanding of this paragraph is that
7  you're saying that it was reckless and callous
8  disregard for her not to escalate the situation to
9  the physician so that he could have evaluated it
10 because if he had evaluated it, then Carranza-Reyes
11 probably would have gotten antibiotics, hydrated and
12 provided supportive medical convalescence; is that
13 correct?
14 A. I'm just saying it's more likely that he
15 would have. I do not know that he would have.
16 Q. Well, isn't it the fact that you think it's
17 more likely is what makes her failure to do it
18 reckless and callous?
19 A. Yes.
20 Q. Right?
21 A. Yes. Okay.
22 Q. Reckless and callous implies that she's
23 disregarding something that she knows could happen to
24 this patient if she doesn't act. Would you agree
25 with that?

10/4/2006 Knox, Catherine

1  A. Okay. Yes.
2  Q. And so if she couldn't appreciate based on
3  what he presented with that he had a strep infection,
4  then why is it reckless and callous for her not to
5  call the doctor?
6  A. What I think she should have been able to
7  recognize was that this is a patient who is not
8  improving and is going into a weekend where there is
9  no coverage.
10 Q. Well, would you agree with me that it was
11 possible that he could have improved the next day?
12 A. No. I don't think he would have improved
13 the next day.
14 Q. Well --
15 A. Was it possible?
16 Q. Based on the symptoms that she had in front
17 of her was it reasonable to assume that he could have
18 gotten better on his own?
19 A. No. Everything that I have looked at in
20 terms of directions that are provided to nurses about
21 patients who present with these conditions, if he had
22 gone as long as he would -- as he has in this case,
23 you would be -- you would be calling a physician for
24 advice and direction.
25 Q. And that's based on what she had in front of

10/4/2006 Knox, Catherine

1  her on March 6th and March 7th?
2  A. Absolutely.
3  MS. LEWIS: I think it's a good point to
4  take a break, if that's okay.
5  THE WITNESS: Thank you.
6  (A recess was taken from 11:17 a.m. to 11:31
7  a.m.)
8  Q. (By Ms. Lewis) If I understand you, you're
9  saying it's callous disregard for Ms. Paulsen not to
10 call the doctor on March 7th because it was more
11 likely that if she had called that Carranza-Reyes
12 would have gotten additional treatment that he didn't
13 receive; is that right?
14 A. Correct.
15 Q. Can you say that it was more likely he would
16 have gotten additional treatment to a medical
17 probability?
18 A. I need to ask you the definition of medical
19 probability.
20 MR. TRINE: More likely than not, according
21 to the Colorado cases.
22 THE WITNESS: Do you want me to use that
23 definition?
24 Q. (By Ms. Lewis) Well, when you say that it's
25 more likely that he would have received additional

10/4/2006 Knox, Catherine

1  treatment, what do you mean by more likely? How do
2  you come up with that determination? Is it based on
3  your experience, training, in the field of nursing?
4  A. That conclusion is drawn from my experience
5  in correctional health care and the relationship
6  between nurses and providers who are trying to
7  provide appropriate care to patients in this setting.
8  Q. So is it your experience that when a nurse
9  talks to a doctor about a case it's more likely that
10 the doctor is going to give additional care than the
11 nurse would otherwise provide?
12 A. Not in all cases. Sometimes the physician
13 will order more specific kinds of monitoring and
14 intervals to report data back before giving more
15 definitive treatment orders.
16 It's my experience that a nurse would --
17 again, I just would -- again, I'm not sure I'm going
18 to answer your question, but that a nurse needs to
19 shift the responsibility for decisions about care to
20 a physician at this point.
21 Q. Now, when a nurse calls a doctor about a
22 patient, isn't it true that sometimes the doctor will
23 say, you know, What you're doing is fine. I don't
24 need to do anything else?
25 A. Sometimes they will say that. In this case,

10/4/2006 Knox, Catherine

1 expert in the effects of altitude on inmate
2 respiration rates?
3   A. No, I'm not.
4   Q. Okay. So the general idea would be that the
5 respiration range could be higher and still be normal
6 at a higher elevation?
7   A. Yes.
8   Q. On March 6th you indicated that Nurse
9 Paulsen should have contacted a higher medical
10 authority; is that true?
11   A. Yes.
12   Q. And what would have been the result of that?
13   A. Well, the reason I'm saying that she needed
14 to -- if she were going to provide the Motrin, the
15 CTMs and the Pepto-Bismol, my understanding under the
16 Nurse Practice Act is that that would need to be as a
17 part of a medical plan, either delegated or provided
18 as a direct order, and she did prescribe those in her
19 notes.
20   Q. Are you saying that that is what the
21 result -- on March 6th the reason to call a higher
22 medical authority is related to the administration of
23 the over-the-counter medications for the symptoms
24 only?
25   A. Well, let's look at what I said.

10/4/2006 Knox, Catherine

1   Q. If you could tell me where you are.
2   A. I'm on page 1 of my report.
3   Just look at the third -- would be the third
4 paragraph under section A, that she would not have
5 needed to call a provider if there were protocols in
6 place that said when someone presents with these
7 symptoms that are described above, do this, do this,
8 do this and do this.
9   In the absence of those and with her
10 decision then to treat in the way that she's
11 described here, the only way that I understand that
12 she could do that and be within the Practice Act
13 would be to have called a provider and received
14 orders to do that. In response I think to your
15 question I'm really saying that she implemented
16 treatment without orders.
17   Q. You are not saying then that at this point
18 on March 6th if she would have called a higher
19 medical authority there would have been lab work
20 done?
21   A. I'm not saying that. You are correct.
22   Q. And you're not saying that there would have
23 been any specific intervention different than that
24 which Nurse Paulsen did order?
25   A. I think that's likely. There might have

10/4/2006 Knox, Catherine

1 been an order for lab. I'm not sure. I'm not making
2 that point here.
3   Q. So even if she had called a higher medical
4 authority, the result could have been exactly the
5 same? She would have taken Motrin, Pepto-Bismol and
6 treating symptomology?
7   A. And if she had done that, I would not
8 have -- my only faults would have been in the
9 adequacy of the initial assessment.
10   Q. Again, the treatment could have been the
11 same though?
12   A. Yes. I agree with you.
13   Q. So let's talk about March 7th. One of your
14 criticisms was that the nurse did not get full vital
15 signs, and by that I believe you meant that she
16 didn't get a blood pressure. Is there anything else
17 in the vital signs area besides blood pressure that
18 you thought she should have gotten?
19   A. Nope.
20   Q. Okay. So let's say she did get a blood
21 pressure. What would that show?
22   A. I said before that vital signs in and of
23 themselves don't necessarily show anything
24 particular. The point I'm trying to make here is we
25 have inconsistent or incomplete sets of vital signs

10/4/2006 Knox, Catherine

1 over time, and so it's very difficult to determine
2 change in status other than his reported symptoms.
3   Q. Because vital signs in and of themselves
4 can't be taken one at a time, isn't it true that even
5 if a blood pressure had been taken the treatment plan
6 could have remained identical?
7   A. On Friday the 7th?
8   Q. Yes.
9   A. It's my opinion that it's likely that it
10 would be different for these -- are you only asking
11 me to comment in relationship to the vital signs?
12   Q. I'm asking for you to comment regarding the
13 blood pressure measurement that your opinion is that
14 Nurse Paulsen should have gotten on that day.
15   A. I don't know. I see that his pulse is
16 elevated, and I would wonder what his blood pressure
17 was.
18   Q. And so are you saying that if she had
19 received a certain measurement that would change
20 something or are you just saying that she needs to
21 get full vital signs?
22   A. If she would have obtained the blood
23 pressure and it was normal, you would still have a
24 high pulse. You would have to consider that in
25 relationship to what the patient's presenting

10/4/2006 Knox, Catherine

1   symptoms are and consider whether it was significant
2   or not.
3       Q.  So what you're saying is that the blood
4   pressure along with the pulse or the blood pressure
5   along with the presenting symptoms would have
6   resulted in a different treatment plan?
7       A.  It would have resulted in a more complete
8   assessment of the patient on which to determine
9   treatment.
10      Q.  But isn't it also true that you believe
11  there should have been a more complete assessment of
12  the patient based on the presenting symptoms alone?
13      A.  I do believe that, yes.
14      Q.  And that you also believe there should have
15  been a more complete assessment based on the pulse
16  reading alone?
17      A.  I'm not sure why you're making the
18  differentiation.  My conclusion is that the
19  assessment was incomplete.  If a blood pressure was
20  included, I would not have said she failed to take a
21  complete set of vital signs, but I would have said
22  that she failed to do a full assessment.
23      Q.  The reason I'm asking is because you're
24  saying that if she had taken the blood pressure it
25  would have resulted in her doing a more complete

6/18/2007 1:35 PM                                                            121

10/4/2006 Knox, Catherine

1   assessment, but I also believe that you have said
2   that she should have done a more complete assessment
3   anyway, so I'm wondering what difference the blood
4   pressure has to do with that opinion of yours.  Does
5   that make sense?
6           MR. TRINE:  Objection, foundation.
7           Go ahead and answer that, if you can.
8           THE WITNESS:  Let me try to answer.
9       Q.  (By Mr. Lurs) Does the question make sense?
10      A.  Well, no, it doesn't make sense.
11      Q.  What about it doesn't make sense?
12      A.  Well, if she had taken the blood pressure
13  and it was, I don't know, abnormal or normal, she
14  still should have taken a more complete assessment.
15  If all of the vital signs were normal, she still
16  should have taken and done a more complete
17  assessment.
18      Q.  So the blood pressure reading doesn't change
19  your opinion that based on his presenting symptoms
20  she should have done a more complete assessment?
21      A.  The absence of the blood pressure does not
22  change my conclusion -- the absence of the presence
23  of the blood pressure doesn't change my conclusion
24  that she should have done a more complete assessment.
25      Q.  I will move on.

6/18/2007 1:35 PM                                                            122

10/4/2006 Knox, Catherine

1       I believe you said that it was -- you do not
2   have the opinion that on the 6th or 7th he presented
3   with something that should have been seen as strep.
4   I'm going to ask you, have you dealt with sore
5   throats in the past as a nurse?
6       A.  Yes.
7       Q.  In what respect?
8       A.  I have helped to develop treatment protocols
9   for sore throats.  I have reviewed complaints about
10  sore throats.  I have responded to requests for
11  medical attention because of a sore throat.
12      Q.  So you have been the nurse who has evaluated
13  a patient with a presenting symptom of a sore throat?
14      A.  I believe I have.
15      Q.  Can you tell me what percentage of sore
16  throat presenting symptoms are viral in nature?
17      A.  No, I cannot.
18      Q.  Do you know if there is literature that
19  indicates what percentage of presenting sore throats
20  in a general population would be viral in nature?
21      A.  I could not tell you that -- what literature
22  there is.
23      Q.  You're not aware of any?
24      A.  I'm not aware of any literature that
25  describes what percentage of sore throats present as

6/18/2007 1:35 PM                                                            123

10/4/2006 Knox, Catherine

1   a viral -- having a viral basis.
2       Q.  So you can't say that a majority of sore
3   throats would be bacterial in nature?
4       A.  From a nursing perspective you -- what --
5   what you're looking at is not so much -- you're
6   looking at it from a diagnostic perspective I
7   believe.  A nurse's view of a sore throat is to
8   define it, to describe it, to look at it, to inquire
9   about it and to think about what are the
10  possibilities that are the reason for the sore throat
11  but not to do a differential diagnosis about the
12  cause of the sore throat.
13      Q.  If I take that answer as meaning you can't
14  say that a sore throat -- a majority of sore throats
15  are bacterial in nature; is that fair?
16      A.  I wouldn't say that.
17      Q.  You can't say that?
18      A.  I can't say that.
19      Q.  You indicated that on the 7th, March 7th,
20  Nurse Paulsen took a temperature that indicates that
21  Moises Carranza-Reyes was afebrile; isn't that true?
22      A.  It's noted in her charting that she took a
23  temperature on the 7th, and she has charted it as
24  afebrile.
25      Q.  And do you believe that he was afebrile that

6/18/2007 1:35 PM                                                            124

10/4/2006 Knox, Catherine

1  you're saying that if a more complete history of his
2  complaint had been taken on March 6th by Nurse
3  Paulsen that she would have understood that on the
4  day she did see him, Thursday the 6th, that he had
5  been experiencing the symptoms of sore throat for
6  three days?
7      Q. Yes.
8      A. And had requested attention and hadn't
9  received it?
10     Q. Right.
11     A. Yes. I think -- I believe that that is so.
12     Q. No. My question was what in your opinion
13  would a reasonably careful and prudent registered
14  nurse do with that additional history?
15         MS. LEWIS: Same objection.
16         Go ahead.
17         THE WITNESS: I'm of the opinion that it
18  raises the bar -- it's what -- one, should she have
19  done something different on the 6th had she known
20  that?
21     Q. (By Mr. Trine) Yes.
22     A. And I'm inclined to believe that a
23  reasonably prudent nurse would -- given the length of
24  time he had been experiencing symptoms that was not
25  self-correcting, that this was a problem that was

10/4/2006 Knox, Catherine

1  going to need some kind of medical intervention.
2      Q. That being the case, my question is: What
3  in your opinion would a reasonably careful and
4  prudent nurse do?
5         MR. JURS: Form and foundation.
6         THE WITNESS: I would like to have seen her
7  contact a provider for orders, in particular the
8  consideration for the lab work, and to have made
9  arrangements to better ensure that he was hydrated
10  and so forth. The possibility exists that he would
11  have been treated with a legend medication rather
12  than an over-the-counter medication.
13     Q. (By Mr. Trine) Now, when you said earlier
14  that registered nurses are trained to do nursing
15  assessments but they can't make a medical diagnosis,
16  correct?
17     A. Correct.
18     Q. And in doing nursing assessments does a
19  nurse consider all of the possibilities that they
20  have been trained to consider as a cause of a
21  condition even though they don't make a medical
22  diagnosis of that condition?
23     A. Yes, they do.
24     Q. And in considering the various possible
25  causes of a condition, if one of the possible causes

10/4/2006 Knox, Catherine

1  is a very serious condition or life-threatening
2  condition, does that effect the nurse's conduct in
3  determining whether to call a doctor or not?
4         MS. LEWIS: Form.
5         THE WITNESS: Yes, it does.
6      Q. (By Mr. Trine) Would you expect a reasonably
7  careful and prudent nurse to at least consider all of
8  the possibilities in making a nursing assessment in
9  determining what further action to take?
10     A. I agree with you, although I would phrase it
11  just a little bit differently. A nurse should be
12  considering a range of possibilities, perhaps not all
13  possibilities but kind of a reasonable range of
14  possibilities in determining their assessment and the
15  conclusions that they draw.
16     Q. Okay. That's fine.
17        MR. TRINE: That's all I have.
18        MS. LEWIS: No more questions from me.
19        MR. LURS: I don't have any further
20  questions. Thank you for your time.
21        MS. VEIGA: None for me.
22        (Signature reserved.)
23        (The deposition concluded at 12:44 p.m.)
24
25

10/4/2006 Knox, Catherine

1                   C E R T I F I C A T E
2     STATE OF OREGON      )
                           ) ss.
3     COUNTY OF CLACKAMAS  )
4         I, Shon McClements, a Notary Public for
5     Oregon, do hereby certify that, pursuant to
6     stipulation of counsel for the respective parties
7     hereinbefore set forth, CATHERINE M. KNOX personally
8     appeared before me at the time and place set forth in
9     the caption hereof; that at said time and place I
10    reported in Stenotype all testimony adduced and other
11    oral proceedings had in the foregoing matter; that
12    thereafter my notes were reduced to typewriting under
13    my direction; and that the foregoing transcript,
14    pages 1 to 148, both inclusive, constitutes a full,
15    true and accurate record of all such testimony
16    adduced and oral proceedings had, and of the whole
17    thereof.
18        Witness my hand and Notary Seal at Milwaukie,
19    Oregon, this 9th day of October, 2006.
20
21                    _____
                      SHON McCLEMENTS
22                    Notary Public of Oregon
                      Commission No. 382384
23                    My commission expires: 7/05/08
24
25

```
 1                    CATHERINE M. KNOX
 2           I have read the transcript of the deposition
     taken on October 4, 2006, at Portland, Oregon, and
 3   make the following additions or corrections:
 4   PAGE    LINE    CORRECTION AND REASON FOR CORRECTION
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17                   _____
18                         CATHERINE M. KNOX
19   Subscribed and sworn to before me this _____ day of
     _____, 2006.
20
                         _____
21                       Notary Public for the State
                         of _____
22                       residing at _____
                         My Commission Expires: _____
23
     Re:    US District Court District of Colorado
24          Carranza-Reyes v. Park County
            No. 05CV-00377-WD-BNB
25          SM
```