IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 05-cv-00377-WDM-BNB

MOISES CARRANZA-REYES,

      Plaintiff,

v.

THE PARK COUNTY BOARD OF COUNTY COMMISSIONERS;
FRED WEGENER, individually and in his official capacity as Sheriff of Park County, Colorado;
MONTE GORE, individually and in his official capacity as Captain of Park County Sheriff's Department; and
VICKIE PAULSEN, individually, and in her official capacity as Registered Nurse for Park County, Colorado,

      Defendants

---

### REPLY IN SUPPORT OF SUPPLEMENTAL MOTION FOR SUMMARY JUDGMENT

---

      Defendants Park County Board of County Commissioners, Fred Wegener, and Monte Gore, by and through their counsel, Andrew D. Ringel, Esq. and Jennifer L. Veiga, Esq. of Hall & Evans, L.L.C., hereby submit this Reply in Support of Supplemental Motion for Summary Judgment, as follows:

### INTRODUCTION

      Plaintiff Moises Carranza-Reyes brings this action pursuant to 42 U.S.C. § 1983 and Colorado law against the Defendants arising from his incarceration in the Park County Jail from March 1, 2003, through March 8, 2003.  On April 25, 2007, this Court granted these Defendants' Motion for Leave to Submit Supplemental Motion for Summary Judgment.  [*See* Minute Order, April 25, 2007 (Doc. 192)].  Defendants filed their Supplemental Motion for Summary Judgment

on May 11, 2007 ("Supplemental MSJ").  Plaintiff submitted his Response to Supplemental Motion for Summary Judgment on May 30, 2007 ("Plaintiff's Response to Supplemental MSJ"). Now, these Defendants respectfully submit this Reply in Support of Supplemental Motion for Summary Judgment.

**REPLY CONCERNING PLAINTIFF'S RESPONSE TO
DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS**

1-138.  Pursuant to Fed. R. Civ. P. 10(c), Defendants incorporate herein by reference their Response Concerning Plaintiff's Statement of Additional Disputed and Undisputed Facts, ¶¶ 1-152.  [*See* Defendants' Reply MSJ, at 5-34].

139-140.        Plaintiff disputes the facts in Defendants' ¶¶ 139-140 by reference to the ¶¶ 11-12, 15-16, 20-24 & 28 in the Plaintiff's Statement of Disputed and Undisputed Material Facts.  [*See* Plaintiff's Response to Supplemental MSJ, at 3].   Accordingly, Defendants incorporate herein by reference their Response Concerning Plaintiff's Statement of Additional Disputed and Undisputed Material Facts, ¶¶ 11-12, 15-16, 20-24 & 28 below.  Importantly, however, none of the Plaintiff's factual references actually dispute the fact neither Plaintiff nor Nurse Paulsen described any problem with communication between the two of them through the detainee interpreter.

**RESPONSE CONCERNING PLAINTIFF'S STATEMENT
OF ADDITIONAL DISPUTED AND UNDISPUTED FACTS[1]**

As with the Plaintiff's Statement of Additional Disputed and Undisputed Facts contained

---

[1]   Defendants' representations concerning the facts in this Reply, as in all of the prior summary judgment briefs in this case, are for the purposes of this summary judgment only. Defendants specifically reserve the right to contest each and every one of these facts at any later stage of these proceedings including at trial.

in the Plaintiff's Response to Defendants' Motion for Summary Judgment, several issues with respect to the Plaintiff's Statement of Additional Disputed and Undisputed Facts in the Plaintiff's Supplemental Response to MSJ require comment.  First, many of the Plaintiff's additional facts are duplicative of the undisputed facts previously presented by the Defendants or the additional facts previously presented by the Plaintiff in prior summary judgment briefing.  Second, many of Plaintiff's additional facts are not relevant to the issues raised by the Defendants in their Supplemental MSJ.  These considerations must inform this Court's review of Plaintiff's Statement of Additional Disputed and Undisputed Facts and this Court's application of them in the context of its review of the propriety of summary judgment in this case.

1.      Defendants admit that in March 2003 there was not an interpreter employed by the Park County Jail and instead Deputies regularly utilized Spanish-speaking inmates and detainees to communicate with the Spanish-speaking INS detainee population.  However, the Park County Jail provided a Handbook in Spanish for the INS Detainees.  [*See* Defendants' Statement of Undisputed Material Facts contained in Defendants' MSJ ("DSUMF"), ¶ 11.  In its September 2002 inspection of the Park County jail, the INS determined a Handbook for INS detainees in Spanish was provided and gave the INS detainees appropriate information.  [*See* DSUMF, ¶ 38].

2.      Defendants admit Plaintiff so testified.  *See* Response to ¶ 1 above.

3.      Duplicative.  [*See* Plaintiff's Statement of Disputed and Undisputed Material Facts contained in Plaintiff's Response to MSJ ("PSDUMF"), ¶ 54; Defendants' Response Concerning Plaintiff's Statement of Additional Disputed and Undisputed Facts contained in Defendants' Reply MSJ ("DRPF"), ¶ 54].

4.      Defendants admit Plaintiff so testified.

5.      Defendants admit Deputy Don Frye testified during his deposition as follows:

Q.      Now, during March, March 1 through March 10 of 2003, do you recall any detainees in Pod D filling out a kite form or getting help in filling out a kite form?

A.      I don't specifically remember the number of kites, no.

Q.      I'm not asking you for the number.  Do you remember any—whether there were any coming out of there between March 1 and March 10, do you have any specific memory of any kite forms?

A.      Not to any specific kite that would ring a bell to me, no.

[*See* Frye Dep., at 129-130, Pl. Exh. 4].[2]

6.      Plaintiff mischaracterizes Sergeant Daniel Muldoon's deposition testimony.   In

reality, Sergeant Muldoon testified as follows:

Q.      So would you be responsible then, for seeing that this inmate saw the nurse when you came on the day shift the next day?

A.      No, sir.

Q.      Who would be?

A.      The inmate.

Q.      He would be responsible for going in to see the nurse?

A.      No.  When she comes around, he can approach the nurse.  What I do is I would be apprised of the situation here, recommend he see the nurse as soon as possible, but that's a medical issue, not a security issue.

Q.      So you wouldn't follow up on that?

---

[2]   Unless otherwise specified, references to the Plaintiff's Exhibits are to the exhibits from the Plaintiff's Response to Supplemental MSJ.

A.      Not necessarily.  I might advise medical there's a guy in David pod that needs to see you, but when she goes around at med pass, he has every opportunity in the world to go up and talk to her.

[*See* Muldoon Dep., at 29-30, Pl. Exh. 5].

7.      Defendants admit that Captain Gore testified he was not sure that any kite forms were in Spanish in March 2003, not that there were not any Spanish language kite forms. Defendants admit Captain Gore testified detainees could request to see the nurse during medical call three times daily.  [*See* Gore Dep., at 68, Pl. Exh. 3].  In addition, Defendants admit it was the policy of the Park County Jail for either Nurse Paulsen or Deputies to deliver medication to each Pod typically three times a day in the morning, afternoon, and evening.  The Nurse delivered medications when on duty to allow her to observe the physical conditions of the detainees and to allow detainees to communicate with the Nurse about any medical issues. Deputies conducting medication deliveries were trained to note any medical issue and forward that information to the Nurse.  Deputies were also trained to note any medical issue on routine Pod walks and in the engagement of their normal everyday duties and forward that information to the Nurse as well.  [*See* DSUMF, ¶¶ 24-25].

8.      Defendants admit Nurse Paulsen did not speak any Spanish and communicated with the Plaintiff through an interpreter.  [*See* Brief in Support of Defendant Vicki Paulsen's MSJ, Statement of Undisputed Material Facts ("Paulsen SUMF"), ¶¶ 16-27].

9.      Denied.  Captain Gore's deposition testimony does not support this fact.  Captain Gore testified as follows:

Q.      Now, at 1409 it shows, "Med rounds started."  Do you see that?

A.      Yes, I do.

Q.      And this time Vicki Paulsen accompanied Walker on distributing those medications; is that right?

Mr. Ringel:     Object to the form and foundation.

A.      Well, Vicki, it looks like in an initial—

Q.      Vicki P?

A.      For Vicki P, and Walker.

Q.      Did you have any other employees by the first name of Vicki other than Vicki Paulsen?

A.      I don't believe so, and I do believe that was probably Vicki Paulsen.

Q.      And that would probably indicate to you that that's the first time since we've been going through the master log that Vicki Paulsen's name has appeared as accompanying a deputy to distribute medications; isn't that right?

Mr. Ringel:     Object to the foundation.

A.      It's the first time that her name has appeared on the log.  I don't know that that's the first time – or I don't know that that indicates that she was not accompanying officers on these med calls.

[*See* Gore Dep., at 88-89, Pl. Exh. 3].  Moreover, both Captain Gore and Sergeant Muldoon testified that whether Nurse Paulsen participated in a medicine deliveries would not be reflected in the Master Control Log relied upon by Plaintiff.  [*See* Gore Dep., at 89, Pl. Exh. 3; Muldoon Dep., at 30-32, Pl. Exh. 5].  Nurse Paulsen testified it was her practice to participate in medication rounds two of the three daily medication rounds.  [*See* Paulsen SUMF, ¶ 4].  Finally, the Master Control Log reveals between March 2, 2003, and March 8, 2003, while Plaintiff was at the Park County Jail, medication rounds occurred at least 14 times.  [*See* DSUMF, ¶¶ 74, 79, 84, 92, 99, 106].

10.     Defendants admit Plaintiff so testified.  However, Plaintiff also testified he was asleep at the time Nurse Paulsen made her morning medication rounds on March 7, 2003.  [*See* Plaintiff Dep., at 273, Pl. Exh. 1].

11.     Defendants admit Plaintiff so testified.

12.     Defendants admit Nurse Paulsen so testified.

13.     Defendants admit Plaintiff so testified.  However, the policy of the Park County Jail was to provide cleaning supplies to the detainees in D-Pod for them to clean the entire Pod including the bathroom area.  [*See* DSUMF, ¶¶ 17-20].  Further the records of the Park County Jail reflect deputies provided cleaning supplies to D-Pod on at least nine occasions during the time Plaintiff was detained there.  [*See* DSUMF, ¶¶ 76, 81, 86, 94, 101 & 108].  Finally, Nurse Paulsen specifically treated Plaintiff's vomiting.  [*See* DSUMF, ¶¶ 96-97, 104-105, 116 & 118].

14.     Defendants admit Plaintiff so testified.

15.     Defendants deny that Nurse Paulsen did not explain to Plaintiff what the medication she gave him on March 7, 2003, was for.  [*See* DSUMF, ¶ 105].

16.     Defendants admit Nurse Paulsen so testified.

17.     Defendants admit Deputy Allen so testified.

18.     Defendants admit Deputy Allen so testified.

19.     Defendants admit Plaintiff so testified.  However, at no time did Plaintiff request any medical attention from anyone the night of March 7, 2003.

20.     Defendants admit Plaintiff so testified.  However, at no time did Plaintiff suggest he had any difficulty communicating with Nurse Paulsen or anyone else about his medical

condition on March 8, 2003.  [*See* Moises Carranza-Reyes Dep., at 263-264, 278-279 & 297-298, Exh. A-52].

22. Defendants admit Plaintiff so testified.  However, at no time did Plaintiff suggest he had any difficulty communicating with Nurse Paulsen or anyone else about his medical condition on March 8, 2003.  *See* Response to ¶ 20 above.

22. Defendants admit Deputy Greg Flint testified he did not recall whether any of the remaining detainees in D-Pod on March 8, 2003, could interpret.  [*See* Flint Dep., at 108, Pl. Exh. 6].

23. Defendants admit Deputy Frye so testified.

24. Plaintiff's recitation of Deputy Frye's care for the Plaintiff is incomplete. Defendants admit on March 8, 2003, at 1:00 a.m., Deputy Frye gave Plaintiff Motrin/ Ibuprofen and Pepto Bismol.  Between 1:00-3:00 a.m., Deputy Frye conducted pod walks of D-Pod and received no complaints from Plaintiff.  At 3:00-3:30 a.m. on March 8, 2003, Deputy Frye checked on Plaintiff and assisted him to medical where he took his vital signs and gave Plaintiff oxygen.  At between 5:20-5:40 a.m., on March 8, 2003, Deputy Frye offered Plaintiff more oxygen but Plaintiff declined.  Deputy Frye also checked Plaintiff's side and found no swelling. At 7:00 a.m. on March 8, 2003, Deputy Frye gave Plaintiff Motrin/Ibuprofen and Pepto Bismol. Deputy Frye believed Plaintiff appeared to be better because he was walking around.  Plaintiff again declined oxygen.  [*See* DSUMF, ¶¶ 113-115, 117 & 119].

25. Defendants admit Deputy Frye so testified.

26. Defendants admit Nurse Paulsen so testified.

27.     Defendants admit Deputy Frye testified that during the night he was "allowed to give ibuprofen, Pepto-Bismol, nonprescription type of meds during the night to those upon request."  [*See* Frye Dep., at 69, Pl. Exh. 4].

28.     Defendants admit at 8:50 a.m. on March 8, 2003, Corporal Crawford sent Deputy Scott Theobald out for cranberry juice for Plaintiff because of a possible kidney stone and the cranberry juice was provided to Plaintiff.  [*See* DSUMF, ¶ 124].

29.     Defendants admit Plaintiff so testified.  However, Sergeant Muldoon testified he communicated with the Plaintiff during the transport by asking him whether he was doing all right and Plaintiff responding that he needed to vomit.  [*See* Muldoon Dep., at 59, Exh. A-55].

30.     Defendants admit an employee of Summit Medical Center interpreted for the Plaintiff.

31.     Defendants admit Sergeant Muldoon testified he did not recall providing any medical records for the Plaintiff to Summit Medical Center.  Defendants admit Sergeant Muldoon did not inform anyone in the emergency room of Plaintiff's symptoms because he was not qualified to do so.  [*See* Muldoon Dep., at 53, Pl. Exh. 5].

32.     Defendants admit Nurse Paulsen so testified.

33.     Defendants admit Sheriff Wegener's office is in the same building as the Park County Jail and he walked through the Jail approximately once every two weeks.  [*See* DSUMF, ¶ 31; DRSF, ¶ 5].  Defendants admit Sheriff Wegener has access to the total number of inmates housed in the Jail at any given time through his office computer.  However, Sheriff Wegener was not aware of the daily inmate population of D-Pod.  [*See* DRSF, ¶ 5].

34.     Defendants admit Sheriff Wegener is statutorily responsible for overseeing the operations of the Park County Jail.  [*See* DSUMF, ¶ 3].  Defendants admit Captain Gore, as Jail Administrator, is responsible for the overall daily operations of the Jail.  [*See* DSUMF, ¶ 6].

35.     Duplicative.  [*See* PSDUMF, ¶ 15; DRPF, ¶ 15].

36.     Defendants admit Sheriff Wegener testified he was generally aware one of the reasons not to have individuals in overcrowded conditions was due to the prospect of communicable diseases spreading.  [*See* Wegener Dep., at 59-60, Pl. Ex. 9].

37.     Defendants admit Captain Gore as Jail Administrator was responsible for ensuring the Jail operations complied with all local, state and federal laws.

38.     Defendants admit Captain Gore so testified.

39.     Denied.  Captain Gore testified he was aware that there were some inmates who were experiencing flu-like symptoms and were being monitored by Nurse Paulsen and that Plaintiff was transported to Summit Medical Center on March 8, 2003.  [*See* Gore Dep., at 141, Pl. Exh. 3].

40.     Admitted.

41.     Denied.  Captain Gore was Nurse Paulsen's supervisor for purposes of jail operations, but Dr. Bachman was her supervisor for medical issues.  [*See* Gore Dep., at 284, Pl. Exh. 3].

42.     Admitted.

43.     Admitted.

44.     Defendants admit Nurse Paulsen so testified.

45.     Admitted.  Captain Gore testified he did so because of the need for Nurse Paulsen to exercise her own medical judgment.  [*See* Gore Dep., at 284-85, Pl. Exh. 3].

46.     Incomplete.  Captain Gore testified as follows:  "She may not have been under a contractual agreement, but I know that as far as the way the operation went, I know she was called a lot, and there were times when she did come in."  [*See* Gore Dep., at 258-59, Pl. Exh. 3].

47.     Defendants admit Captain Gore testified, "I would not have an issue with the officer putting the inmate on oxygen."  [*See* Gore Dep., at 167, Pl. Exh. 3].

48.     Admitted.

49.     Plaintiff mischaracterizes Captain Gore's deposition testimony.  Captain Gore testified the Park County Jail has not enacted any specific policy restricting the number of people that could be placed in Pod D because it would be left to the discretion of the on-duty supervisor who might need to work with INS under particular circumstances.  [*See* Gore Dep., at 250-51, Pl. Exh. 3].

50.     Denied.  Plaintiff mischaracterizes Captain Gore's testimony.  Captain Gore testified  based on a standard of 80 square feet per person a total of 61 detainees in D-Pod would have violated that policy.  However, Captain Gore never agreed D-Pod was "overcrowded." [*See* Gore Dep., at 24-25, Pl. Exh. 3].

51.     Plaintiff does not have a paragraph 51.

52.     Denied.  Plaintiff mischaracterizes Captain Gore's testimony.  Captain Gore testified that ACA standards represent a guidelines and that in September of 2000 the Park County Jail had adopted only certain ACA standards.  [*See* Gore Dep., at 49, Pl. Exh. 3].

53.     Plaintiff's reference to Sergeant Muldoon's testimony is misleading.  Sergeant Muldoon was shown Deposition Exhibit 4 which was the Park County Jail Policies and Procedures Establishment of Health Care Unit Policy and Procedure Manual.  [*See* Muldoon Dep., at 66, Pl. Exh. 5; Health Care Unit Policy and Procedure Manual, Exh. A-56].  As such, it is not surprising that Sergeant Muldoon might not have reviewed the Health Care Unit Policy and Procedure Manual.

54.     Defendants admit Deputy Bellantonio testified he had never previously seen the Communicable Disease Policy.  [*See* Bellantonio Dep., at 96-97, Pl. Exh. 7].

55.     Plaintiff's reference to Deputy Bellantonio's testimony is also misleading. Deputy Bellantonio was also shown Deposition Exhibit 4 which was the Park County Jail Policies and Procedures Establishing of Health Care Unit Policy and Procedure Manual.  [*See* Bellantonio Dep., at 172-74, Pl. Exh. 7; Health Care Unit Policy and Procedure Manual, Exh. A-56].  Similar to Sergeant Muldoon, it is therefore not surprising that Deputy Bellantonio may not have reviewed this particular policy before.

56.     Defendants admit Deputy Allen so testified.

57.     Defendants admit Deputy Allen so testified.

58.     Denied.  Deputy Bellantonio actually testified as follows:

Q.      Did you ever report your concerns of the substandard conditions at the Park County Jail to Captain Gore at any time?

A.      Yes.

Q.      When?

A.      I couldn't give you an exact date.

Q.      How many times?

A.      I don't know how may times.  To clarify, we spoke about specific issues. I wouldn't go to the captain and say, oh, boy, this place is horrible.  I wouldn't do that.  It was more we need more sheets, we need more towels, we need more soap, we need more space, we need the doors fixed, we need the heating fixed, we need the showers fixed.  That kind of stuff.

Q.      Did you ever say anything to Captain Gore along the lines of the following:  "I believe the conditions at the Park County Jail are substandard"?

A.      I don't think I did.

[*See* Bellantonio Dep., at 143].

59.     Defendants admit Dr. Griefinger so testified.

60.     Defendants admit Dr. Griefinger so testified.

61.     Defendants admit Dr. Griefinger so testified.

62.     Defendants admit Deputy Allen so testified.

63.     Denied.  Deputy Allen testified the only Colorado Department of Corrections facility he worked at in housing and security was the Buena Vista Correctional Facility.  [*See* Allen Dep., at 9, Exh. A-57].  Thus, the only evidence Plaintiff actually presents is Deputy Allen's personal opinion about the medical care he observed as correctional officer at the Buena Vista Correctional Facility.  Plaintiff's assertion Deputy Allen can somehow testify about state prisons or the Colorado Department of Corrections facilities generally is not supported by the actual evidence.  Defendants admit Deputy Allen testified there were medical personnel at the Buena Vista Correctional Facility 24 hours a day.  [*See* Allen Dep., at 161-162, Pl. Exh. 8].

64.     *See* Response to ¶ 63 above.  Moreover, Deputy Allen actually testified there were also problems of overcrowding at the Buena Vista Correctional Facility, as follows:

Q.      Did you ever see the kind of overcrowding problems in the DOC as you saw in the Park County Jail?

13

A.    There was—in my opinion, any time a physical plant gets bigger than the physical plant's able to—designed for, its not good.  But I didn't see things quite like what I was seeing in Park County, no.

[*See* Allen Dep., at 190, Pl. Exh. 8].

65.    *See* Response to ¶ 63 above.  Defendants admit Deputy Allen so testified.

66.    Defendants admit Sheriff Wegener so testified.  However, Sheriff Wegener also testified that additional detainees being housed in the Park County Jail also would result in additional costs.  [*See* Wegener Dep., at 27, Exh. A-58].

67.    Defendants admit Deputy Bellantonio so testified.

68.    Defendants admit Captain Gore testified he may have been aware of the number of detainees in D Pod on March 6, 2003.  Defendants also admit Captain Gore testified the Park County Jail was offsetting costs in March 2003 not making a profit.  [*See* Gore Dep., at 21-22, Pl. Exh. 3].

## ARGUMENT

### I.  PLAINTIFF NEVER PREVIOUSLY ATTEMPTED ANY DUE PROCESS OR EQUAL PROTECTION CLAIM AGAINST DEFENDANT VICKI PAULSEN

In response to these Defendants' Supplemental MSJ, Plaintiff argues that he brings a 42 U.S.C. § 1983 claim grounded on alleged due process and equal protection violations against Defendant Paulsen.  Plaintiff's argument ignores the reality his Second Amended Complaint does not bring a due process or equal protection claim against Defendant Paulsen and overlooks discussion on the record during the Final Pretrial Conference that such claims were brought against these Defendants only.

First, Plaintiff disputes the reality the Second Amended Complaint does not assert a claim of violation of due process and equal protection against Defendant Paulsen.  [*See* Plaintiff's

14

Response to Supplemental MSJ, at 1-2].  It remains the case, however, that Plaintiff's Second Amended Complaint's only reference to the Plaintiff's due process and equal protection theories appears in the First Claim for Relief, which attempts a claim against Defendants Park County Board of County Commissioners, Fred Wegener, and Monte Gore only.  [*See* Plaintiff's Second Amended Complaint, ¶ 47].  Plaintiff does not dispute this reality.  Instead, Plaintiff contends that the Plaintiff's Complaint for Damages brought due process and equal protection claims against all of the Defendants.  [*See* Plaintiff's Response to Supplemental MSJ, at 2].  However, the Second Amended Complaint, not the Plaintiff's original Complaint for Damages, is the operative complaint in this matter.  *See, e.g., **Murray v. Archambo,*** 132 F.3d 609, 612 (10th Cir. 1998); ***Davis v. TXO Production Corp.,*** 929 F.2d 1515, 1517 (10th Cir. 1991).  As a result, it is irrelevant how the Complaint for Damages framed the issue because the Complaint for Damages no longer has any legal effect after the filing of an amended complaint.

Second, Plaintiff asserts the Final Pretrial Order's reference to all of the Defendants alleging violating the Plaintiff's due process and equal protection rights is sufficient to encompass Defendant Paulsen.  [*See* Plaintiff's Response to Supplemental MSJ, at 2].  Plaintiff is correct that as a general rule the Final Pretrial Order supersedes earlier pleadings.  However, in this case, all of the Defendants objected in the Final Pretrial Order itself to the Plaintiff's attempt to include due process and equal protection theories.  [*See* Final Pretrial Order, at 50-51].  During the Final Pretrial Conference, counsel for the parties addressed the issue of the Plaintiff's inclusion of due process and equal protection theories.  At that time, counsel for these Defendants and counsel for Defendant Paulsen both specifically recall reference being made to the Second Amended Complaint and the fact that the Plaintiff's due process and equal protection

theories could therefore not be against Defendant Paulsen.  In fact, counsel for the Defendants believes counsel for the Plaintiff specifically represented during the Final Pretrial Conference that Defendant Paulsen was not a defendant for the Plaintiff's equal protection and due process claims.[3]   As a result of the Final Pretrial Conference, only counsel for these Defendants requested leave of this Court to file a Supplemental Motion for Summary Judgment because there was no need for Defendant Paulsen to do so.

Third, Plaintiff suggests his failure to contest these Defendants' representation that the Plaintiff's equal protection and due process claims were not against Defendant Paulsen was "an oversight."  [*See* Plaintiff's Response to Supplemental MSJ, at 2].  However, the Defendants' representation was unequivocal and should have resulted in some response from the Plaintiff if he believed there were actually due process and equal protection claims against Defendant Paulsen.  [*See* Motion for Leave to Submit Supplemental Motion for Summary Judgment, at 2 n.1].  Because Plaintiff's Second Amended Complaint does not allege a due process or equal protection claim against Defendant Paulsen, and because Plaintiff did not state he was brining such a claim when the issue was discussed at the Final Pretrial Conference or in response to these Defendants' Motion for Leave to Submit Supplemental Motion for Summary Judgment, Plaintiff should not be allowed to proceed on such a theory against Defendant Paulsen now.[4]

---

[3]  Counsel for the Defendants has ordered a transcript of the Final Pretrial Conference. As soon as it is available it will be submitted to this Court.

[4] Alternatively, and particularly in light of the representations of counsel for the Plaintiff at the Final Pretrial Conference, it would be unjust to allow Plaintiff to now attempt equal protection and due process theories against Defendant Paulsen without giving Defendant Paulsen the opportunity to brief those issues on summary judgment.

## II.  PLAINTIFF STATES NO VIABLE DUE PROCESS
## CLAIM AGAINST THESE DEFENDANTS

First, Plaintiff contends the Fourteenth Amendment Due Process Clause provides greater protection than the Eighth Amendment.  [*See* Plaintiff's Response to Supplemental MSJ, at 10-11].  Plaintiff's argument is unavailing for several reasons.  Initially, under Tenth Circuit law, it is clear that a Fourteenth Amendment Due Process claim brought by a pretrial detainee challenging his conditions of confinement in a jail is analyzed under the traditional Eighth Amendment conditions of confinement standard.  In *Craig v. Eberly,* 164 F.3d 490 (10th Cir. 1998), the Tenth Circuit concluded, "[a]though the Due Process Clause governs a pretrial detainee's claim of unconstitutional conditions of confinement, the Eighth Amendment standard provides the benchmark for such claims."  *Id.* at 495; *see also* *Ledbetter v. City of Topeka, Kan.,* 318 F.3d 1183, 1188 (10th Cir. 2003)  (following *Craig*).  Under this precedent, any Due Process conditions of confinement claim is therefore subject to the Eighth Amendment standard previously analyzed in detail by these Defendants.  [*See* Defendants' MSJ, at 29-54; Defendants' Reply MSJ, at 46-60].  Further, even assuming *arguendo* that the Due Process Clause of the Fourteenth Amendment protects detainees to a greater extent than convicted persons under the Eighth Amendment, Plaintiff offers no precedent and no analysis of any specific quantum of additional protection provided by the Due Process Clause.  In other words, Plaintiff offers no precedent or analysis demonstrating how the Plaintiff states a Due Process claim if the Plaintiff does not state a viable Eighth Amendment conditions of confinement claim.  [*See* Plaintiff's Response to Supplemental MSJ, at 10-11].  Thus, even if the Plaintiff is correct, nothing Plaintiff provides in response demonstrates how Plaintiff states any viable Due Process claim here.

Second, Plaintiff suggests a Due Process claim might exist based on pain and suffering that lacks any penological purpose.  Plaintiff cites the District Court's decision in ***Ramos v. Lamm,*** 485 F.Supp. 122, 158 (D.Colo. 1979), *aff'd in part, rev'd in part,* 639 F.2d 539 (10th Cir. 1980), *cert. denied,* 450 U.S. 1041 (1981), for this proposition.  [*See* Plaintiff's Response  to Supplemental MSJ, at 11].  However, the language cited by Plaintiff from ***Ramos*** consists of a quotation from ***Estelle v. Gamble,*** 429 U.S. 97, 103-104 (1976), which is indisputably an Eighth Amendment case.  *See* ***Estelle,*** 429 U.S. at 101-102. Similarly, Plaintiff's reliance on ***Alexis v. U.S. Dept. of Homeland Security,*** 2005 WL 1502068 (D.N.J. 2005) (unpublished disposition attached as Pl. Exh. 11), is also misplaced.  Plaintiff apparently cites ***Alexis*** for the proposition that an Eighth Amendment deliberate indifference analysis is not required in a Due Process conditions of confinement claim.   [*See* Plaintiff's Response to Supplemental MSJ, at 11]. Unfortunately, Plaintiff fails to explain how ***Alexis*** alters the clear Tenth Circuit law from ***Ledbetter*** and ***Craig.***

Third, Plaintiff also relies on ***Ramos*** for the proposition that a denial of medical care that violates due process may rise to an Eighth Amendment violation.  [*See* Plaintiff's Response to Supplemental MSJ, at 11].  In contrast to Plaintiff's earlier argument, Plaintiff here appears to agree the Eighth Amendment standard governs the Plaintiff's denial of medical care claim. Defendants have made this point throughout the summary judgment briefing and have previously analyzed Plaintiff's denial of medical care under the Eighth Amendment standard in considerable detail.   [*See* Supplemental MSJ, at 6; Defendants' MSJ, at 31-33, 37, 47-49 & 50-51; Defendants' Reply MSJ, at 50-51-56-57 & 58-59].

18

Fourth, Plaintiff suggests he can state a Due Process claim for his conditions of confinement and the failure to provide him with an interpreter. [*See* Plaintiff's Response to Supplemental MSJ, at 11-12]. Fundamentally, Plaintiff misunderstands the Defendants' argument concerning the caution the United States Supreme Court has demonstrated in recognizing other substantive due process rights. Defendants argued that other than the conditions of confinement, medical care and interpreter arguments, no other substantive due process right was even potentially available to Plaintiff. [*See* Supplemental MSJ, at 9]. In his response, Plaintiff offers no other potential substantive due process theory. [*See* Plaintiff's Response to Supplemental MSJ, at 10-15]. As such, Plaintiff appears to agree that the only due process theories available here are based on the conditions of confinement, access to medical care, and the availability of an interpreter. Thus, the only new issue raised by the Plaintiff's Due Process claim is the availability of an employee interpreter for his visits with Nurse Paulsen.

Fifth, Plaintiff argues he had a due process right to a qualified interpreter. [*See* Plaintiff's Response to Supplemental MSJ, at 12-14]. Plaintiff contends as a detainee he possesses a liberty interest in the unwanted administration of medical treatment and therefore he has a right to understand and make an informed decision concerning any medical treatment provided to him. Based on these unremarkable propositions, Plaintiff goes on to assert that the failure to provide a foreign language speaking detainee with an interpreter violates the Due Process Clause of the Fourteenth Amendment. [*See* Plaintiff's Response to Supplemental MSJ, at 12-14]. As previously discussed, multiple fundamental barriers exist with respect to the Plaintiff's claim.

Initially, as a factual matter, Plaintiff ignores that he was provided with a detainee Spanish-English Interpreter during his interactions for medical care with Nurse Paulsen. [¶¶ 96-

98, 104-105, 121 & 139-140].  Further, while the Plaintiff's factual recitations contained in his Supplemental Response clearly evidence an effort on his part to suggest he and Nurse Paulsen had difficulty communicating with each other, review of the actual references contained in the depositions of the Plaintiff and Nurse Paulsen referenced by the Plaintiff and elsewhere demonstrates that at no time does the Plaintiff ever specifically assert he had difficulty understanding Nurse Paulsen or that he received any allegedly inadequate medical care because of any language barrier or inadequate interpretation.  Plaintiff asserts in conclusory fashion that he was unable to communicate effectively with Nurse Paulsen, but the actual facts contained in the summary judgment record simply do not support any such assertion.  Moreover, even assuming *arguendo* that the Plaintiff did have difficulty communicating with Nurse Paulsen, there is absolutely no evidence whatsoever in the summary judgment record to even suggest any such communication barrier caused Plaintiff any injury.  Causation is an essential element of a § 1983 claim, and the Plaintiff simply cannot establish that "but for" any alleged interpretation failure he would have received different nursing care from Nurse Paulsen and therefore would not have been injured.  *See, e.g., Crawford-El v. Britton*, 523 U.S. 574, 598 (1998) (discussing causation as an element of a § 1983 claim); *Warth v. Seldin*, 422 U.S. 490, 509 (1975) (same); *Scott v. Hern*, 216 F.3d 897, 911 (10th Cir. 2000) (same).  If Nurse Paulsen made any errors respecting her nursing assessment of Plaintiff, it had nothing to do with the fact they spoke different primary languages.  Finally, Plaintiff does not even respond to the arguments that no member of the Board of County Commissioners of Park County participated in any decision concerning an interpreter for the Park County Jail, no custom, policy or practice of Park County existed in this respect, and neither Sheriff Wegener nor Captain Gore personally participated in

what type of interpreter Plaintiff received.  [*See* Supplemental MSJ, at 7-8; Plaintiff's Response to Supplemental MSJ, at 10-15].  And none of the facts presented by the Plaintiff create any factual question concerning these issues either.

Sixth, Plaintiff asserts Sheriff Wegener and Captain Gore are not entitled to qualified immunity asserting the violations of Plaintiff's constitutional rights to have a qualified interpreter were clearly established in 2003.  [*See* Plaintiff's Response to Supplemental MSJ, at 14].  The decisions cited by the Plaintiff to support the conclusion that a detainee has any due process right to an interpreter are decisions from the Seventh, Eighth and Ninth Circuits and the Southern District of New York.  None of the other cases relied upon by the Plaintiff have anything whatsoever to do with providing an interpreter to a detainee in conjunction with the provision of medical care.  [*See* Plaintiff's Response to Supplemental MSJ, at 12-14].  The decisions from three Circuit Courts of Appeal and one district court are simply not enough to constitute the overwhelming weight of authority required under Tenth Circuit law for a right to be clearly established for qualified immunity purposes.  ***Wilson v. Meeks,*** 52 F.3d 1547, 1552 (10th Cir. 1995); ***Medina v. City & County of Denver,*** 960 F.2d 1493, 1498 (10th Cir. 1992).

Seventh, Plaintiff argues in conclusory fashion the Board of County Commissioners of Park County and the three individual Defendants created conditions of confinement that created a substantial risk Plaintiff would become ill.  [*See* Plaintiff's Response to Supplemental MSJ, at 14-15].  Plaintiff's effort is merely an attempt to re-litigate issues already fully briefed by the parties.  Defendants direct this Court to the prior briefs on the lack of any merit to the Plaintiff's Eighth Amendment claims and the fundamental legal barriers to holding the Board of County Commissioners of Park County, Sheriff Wegener and Captain Gore liable to the Plaintiff under

the Eighth Amendment.   [*See* Supplemental MSJ, at 4; Defendants' MSJ, at 22-29 and

Defendants' Reply MSJ, at 35-46 (BOCC of Park County); Defendants' MSJ, at 29-50 and

Defendants' Reply MSJ, at 46-57 (Sheriff Wegener); and Defendants' MSJ, at 50-54 and

Defendants' Reply MSJ, at 58-60 (Captain Gore)].

## III.  PLAINTIFF ALSO STATES NO COGNIZABLE
## EQUAL PROTECTION CLAIM AGAINST THESE DEFENDANTS

First, Plaintiff questions the applicability of traditional equal protection principles to his

claim.  Plaintiff suggests that somehow the type of equal protection claim he advances here

makes a different analysis applicable.  [*See* Plaintiff's Response to Supplemental MSJ, at 15-16].

Plaintiff is wrong.   Defendants cited a variety of different cases from the Tenth Circuit

establishing the equal protection principles of intentional differential treatment from those

similarly situated from the Plaintiff apply to ***all*** equal protection theories.   Nothing about the

cases cited by the Defendants holds that any different equal protection principles apply here.

*See, e.g., **Powers v. Harris**,* 379 F.3d 1208, 1215 (10th Cir. 2004), *cert. denied,* 544 U.S. 920

(2005); ***Henigh v. City of Shawnee,*** 155 F.3d 1249, 1257 (10th Cir. 1998); ***Campbell v. Buckley,***

11 F.Supp.2d 1260, 1269 (D. Colo. 1998), *aff'd,* 203 F.3d 738 (10th Cir.), *cert. denied,* 531 U.S.

823 (2000).

Second, Plaintiff relies on a variety of different cases from other jurisdictions to support

the notion that a different equal protection analysis applies and that Plaintiff does not have to

meet the similarly situated and intentional discrimination requirements.  Plaintiff relies on cases

from the Second and Third Circuits, Maryland, the Virgin Islands, Missouri, New York and

Florida.  [*See* Plaintiff's Response to Supplemental MSJ, at 16-17].  However, simply because

other federal courts do not follow the Tenth Circuit does not mean the Plaintiff is not required to

do so here.  Tenth Circuit law is clear and unless Plaintiff can establish an equal protection claim under Tenth Circuit law his claim fails.  It is no matter that no case in the Tenth Circuit has analyzed an equal protection theory of the type advanced by the Plaintiff.  Tenth Circuit law, not the law of any other circuit still applies.

Third, Plaintiff contends the Defendants' analysis of the similarly situated requirement is "drawn to narrowly."   [*See* Plaintiff's Response to Supplemental MSJ, at 16].   Plaintiff fundamentally misunderstands the nature of any equal protection claim.  As the Tenth Circuit made clear in ***Powers,*** the Equal Protection Clause does not provide anyone with a substantive right.   Instead, it precludes government from making an improper differentiation between persons on improper grounds.  ***Powers,*** 379 F.3d at 1215.   Accordingly, to hold any of the Defendants liable for an equal protection violation requires the Plaintiff to come forward with evidence that the Defendants through their own personal actions or the policies of the Park County Jail made an inappropriate distinction and therefore treated Plaintiff differently from others who are similarly situated to the Plaintiff.  None of the Defendants can be held liable under an equal protection theory unless they treated Plaintiff differently from someone else.  As such, the only possible comparators for the Plaintiff are others in custody in the Park County Jail because those others are the only persons who the Defendants could treat differently than the Plaintiff.

Fourth, Plaintiff relies on the testimony of Deputy Allen for the proposition that Plaintiff was treated differently than inmates in the custody of the Colorado Department of Corrections at the Buena Vista Correctional Facility.  [*See* Plaintiff's Response to Supplemental MSJ, at 16]. Unfortunately for the Plaintiff, none of the Defendants have any authority to impact the

conditions of confinement of anyone incarcerated at the Buena Vista Correctional Facility. Therefore, such individuals cannot be considered similarly situated to the Plaintiff.  Moreover, Deputy Allen was testifying about the conditions of confinement during his prior employment with the Colorado Department of Corrections which occurred before his work at the Park County Jail.  This different time frame also makes the Plaintiff's attempted comparison inappropriate. Finally, Plaintiff was a detainee assigned to the Park County Jail by the INS and the Colorado Department of Corrections does not house INS detainees.  This difference also renders the Plaintiff's offered comparison inapposite.

Fifth, Plaintiff suggests discriminatory intent can be demonstrated by the alleged profit motive of the Defendants.  [*See* Plaintiff's Response to Supplemental MSJ, at 17].  Even assuming *arguendo* that the Defendants had a profit motive, which Defendants categorically deny, Plaintiff's evidence establishing such a motive does not demonstrate Plaintiff was treated differently than anyone else.  If Defendants did in fact have a profit motive and therefore wanted to house additional persons in the Park County Jail, such a motive applied to all persons incarcerated in the Park County Jail and no basis exists to suggest that any such motive resulted in disparate treatment of the Plaintiff because of his fundamental rights.

## IV.  DEFENDANTS ARE NOT LIABLE IN THEIR OFFICIAL CAPACITIES

Lastly, Plaintiff argues Defendants are liable in their official capacities.  [*See* Plaintiff's Response to Supplemental MSJ, at 17-19].  Here, Plaintiff repeats his analysis from prior briefing and does not address any of the arguments actually made by the Defendants in their Supplemental Motion for Summary Judgment.  Moreover, Plaintiff's analysis of the official capacity claims against the Board of County Commissioners of Park County, Sheriff Wegener,

and Captain Gore fundamentally misconstrues and misapplies applicable law as Defendants have previously articulated.  [*See* Defendants' MSJ, at 22-29 and Defendants' Reply MSJ, at 35-46 (BOCC of Park County); Defendants' MSJ, at 29-50 and Defendants' Reply MSJ, at 46-57 (Sheriff Wegener); and Defendants' MSJ, at 50-54 and Defendants' Reply MSJ, at 58-60 (Captain Gore)].  No need exists to reiterate the fundamental flaws in Plaintiff's analysis here.

## CONCLUSION

In conclusion, for all of the foregoing reasons, as well as based on all of the arguments and authorities presented in their Supplemental Motion for Summary Judgment, their Motion for Summary Judgment and Reply in Support of Motion for Summary Judgment, Defendants Board of County Commissioners of Park County, Fred Wegener and Monte Gore respectfully request this Court grant them summary judgment on all of the Plaintiff's claims against them, dismiss the Plaintiff's claims against them in their entirety with prejudice, and for all other and further relief as this Court deems just and appropriate.

Dated this 25th day of June, 2007.

Respectfully submitted,

s/ Andrew D. Ringel_____
Andrew D. Ringel, Esq.
Jennifer L. Veiga, Esq.
Hall & Evans, L.L.C.
1125 17th Street, Suite 600
Denver, Colorado 80202-2052
ringela@hallevans.com
Tel:  (303) 628-3300
Fax:  (303) 293-3238
**ATTORNEYS FOR DEFENDANTS BOARD OF COUNTY COMMISSIONERS OF PARK COUNTY, FRED WEGENER AND MONTE GORE**

## CERTIFICATE OF SERVICE (CM/ECF)

I HEREBY CERTIFY that on the 25th day of June, 2007, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses:

Joseph J. Archuleta, Esq.
archuletalaw@qwest.net

Lloyd C. Kordick, Esq.
lloyd@kordicklaw.com

William A. Trine, Esq.
btrine@trine-metcalf.com

Adele P. Kimmel, Esq.
akimmel@publicjustice.net

Josh A. Marks, Esq.
jam@bhgrlaw.com

Melanie B. Lewis, Esq.
mbl@bhgrlaw.com

s/Loree Trout,   Secretary
Andrew D. Ringel, Esq.
Jennifer L. Veiga, Esq.
Hall & Evans, L.L.C.
1125 17th Street, Suite 600
Denver, CO 80202-2052
303-628-3300
Fax: 303-293-3238
ringela@hallevans.com
veigaj@hallevans.com

**ATTORNEYS FOR DEFENDANTS PARK COUNTY BOARD OF COUNTY COMMISSIONERS, FRED WEGENER AND MONTE GORE**

H:\Users\RINGELA\park\Carranza-Reyes\reply supplemental motion summary judgment.doc