EXHIBIT 1

UNITED STATES DISTRICT COURT

DISTRICT OF COLORADO

MOISES CARRANZA-REYES,                )
                                      )
              Plaintiff,              )
                                      )
       v.                             )  No. 05CV-00377-WD-BNB
                                      )
THE PARK COUNTY BOARD OF              )
COUNTY COMMISSIONER; FRED             )
WEGENER, individually and in          )
his official capacity as              )
Sheriff of Park County,               )
Colorado; MONTE GORE,                 )
individually and in his               )
official capacity as Captain          )
of Park County Sheriff's              )
Department; VICKIE PAULSEN,           )
Individually, and in her              )
official capacity as                  )
Registered Nurse for Park             )
County Colorado; and JAMES            )
BACHMAN, M.D., individually           )
and in his official capacity          )
as Medical Director of the            )
Park County Jail,                     )
                                      )
              Defendants.             )
                                      )

DEPOSITION OF
CATHERINE M. KNOX
Taken in behalf of Defendants
*   *   *
October 4, 2006
805 Broadway Street
Portland, Oregon

Shon McClements
Court Reporter



400 Columbia, Suite 140          Schmitt & Lehmann, Inc.          121 SW Morrison St., Suite 850
Vancouver, WA 98660                                               Portland, OR 97204
(360) 695-5554                                                    (503) 223-4040

Catherine knox, 10/4/2006                    Carranza vs. Park County Board of County Commissioner

**37**

1    Q.  What else?

2    A.  It depends.  Sometimes you will see 02 sats.

3  It depends on what the presenting complaint is.

4    Q.  How do you measure for 02 sats?

5    A.  It's with a little machine.

6    Q.  Do you know what the normal range for a

7  temperature is?

8    A.  Yes.

9    Q.  98.6; is that right?

10    A.  Yes.

11    Q.  Is anything other than 98.6 within normal

12  range?

13    A.  You mean is there a range?

14    Q.  Right.

15    A.  Yes, there is.

16    Q.  What's the range?

17    A.  Anywhere from, I don't know, 98 to 99.  This

18  is a low temperature.

19    Q.  And low you mean above the normal range?

20    A.  Correct.

21    Q.  But a low fever?

22    A.  Yes.

23    Q.  And pulse, what's the normal range for a

24  pulse?

25    A.  Well, it's a wider range for what would be

**38**

1  considered normal, but somewhere between 60 to 80.

2    Q.  And how about respirations?

3    A.  Again, the range may be a little bit more

4  narrow.  Well, anywhere from 14 to 20.

5    Q.  How does a nurse determine if a patient has

6  a history of heart, stomach or gastrointestinal

7  problems?

8    A.  I beg your pardon?

9    Q.  In your experience how does a nurse go about

10  determining if a patient has a history of heart,

11  stomach or gastrointestinal problems?

12    A.  By asking a series of questions.  Do you

13  have a history of heart problems.  Do you have a

14  history of stomach problems.

15    Q.  From looking at this can you tell whether

16  Ms. Paulsen asked the patient about his history?

17    A.  I believe she did ask him about his history

18  for these problems, yes.

19    Q.  In your report you state that Ms. Paulsen

20  did not look at his throat.  Why did you reach that

21  conclusion?

22    A.  Because I would -- if she had looked at his

23  throat, she would have described it, and she did not.

24    Q.  Are you aware that she testified under oath

25  that she did look at his throat?

**39**

1    A.  I have a recollection that she said that she

2  did.  It would be expected that she would.

3    Q.  Despite that testimony you still believe she

4  did not look at the throat; is that right?

5    A.  That's correct.  I think part of what

6  weighed into that is, one, it's not documented that

7  she did.  With a complaint of a sore throat you would

8  expect to see some documentation of what the inside

9  of the throat looked like, and I believe that

10  Carranza-Reyes described her not doing that as well.

11    Q.  So if I understand it, you're deciding to

12  disbelieve Ms. Paulsen on that point, correct?

13    A.  Correct.

14    Q.  You said she did not take a complete set of

15  vital signs.  Do you see that in the first paragraph?

16    A.  Yes.

17    Q.  And from what you've just said, I'm

18  determining that you think she should have taken

19  blood pressure; is that right?

20    A.  I think blood pressure would have been

21  appropriate.  This is his first opportunity to see

22  her, so it basically is what would be considered the

23  entry health appraisal and the opportunity to collect

24  baseline data, so other, quote, vital signs, would be

25  his body weight.  Blood pressure would be important.

**40**

1  I think that's it.

2    Q.  You state that her examination was not

3  adequate.  How do you reach that conclusion?

4    A.  When I say that, what I'm meaning is both

5  the combination of what I consider the subjective and

6  the objective portion of the assessment, so it's the

7  things that we have already talked about.  It's the

8  asking of the questions about the subjective

9  complaint to gather more information, the physical

10  examination, the looking at the throat and the

11  collection of vital signs.

12    Q.  How would that information, collecting of

13  the additional vital signs, more questions to the

14  patient, have changed the examination in your

15  opinion?

16    A.  Well, since this is the first contact I

17  think the most important thing that would have been

18  established is a more solid baseline of what his

19  condition was and the length of time that he had been

20  experiencing these symptoms.

21    Q.  In other words, if she had done the things

22  that you think she should have done, would it have

23  changed her examination, the steps she took to

24  examine the patient?

25    A.  Would it have changed the outcome?

Catherine knox, 10/4/2006                                    Carranza vs. Park County Board of County Commissioner

41

1     Q.  Would it have changed not the outcome but
2   what she did to determine the outcome?  Do you
3   understand what I'm saying?
4     A.  No, I don't.
5     Q.  Okay.  If she had obtained the additional
6   information, would she have done other examination of
7   him that wasn't done, other than the vital signs and
8   asking questions?
9     A.  I'm not sure I yet understand your question,
10   but let me try to answer what I think you're asking
11   me.  What I'm trying to convey is that her
12   examination was so narrowly focused that I think she
13   missed important information that she would have
14   collected had she asked questions and established a
15   broader basis for this initial contact against which
16   she could evaluate his symptoms and progression in
17   subsequent contacts.
18         It's hard for me to speculate what she would
19   have done differently had she asked these questions.
20   Since she did not, I don't know.
21     Q.  Okay.
22     A.  Am I understanding your question?
23     Q.  I think you answered what I was trying to
24   find out, in that you said that you think she missed
25   important information that would have given her --

42

1   that would have guided her overall assessment,
2   correct?
3     A.  Correct.
4     Q.  And what information is that?
5     A.  I believe that most important what -- well,
6   I need to think about this, but my first reaction is
7   that the most important information that she missed
8   was the length of time that he had been experiencing
9   symptoms, the fact that he had requested medical
10   attention I believe the day before.  He had been
11   having symptoms I think for two days prior to the day
12   that she saw him; that if she did not already know
13   would have had information about others in the block
14   experiencing similar symptoms, which might have
15   resulted in a different conclusion that she reached.
16     Q.  Can you say with a reasonable degree of
17   certainty that that information would have resulted
18   in a different conclusion or just that it might have?
19     A.  I can say with a reasonable degree of
20   certainty that knowing more specifically how long he
21   had been experiencing symptoms was significant.
22     Q.  But that's a different issue from what I was
23   asking, which is would this information to a
24   reasonable degree of certainty have altered the
25   outcome or would it just might have altered it?

43

1     A.  Define what you mean.  The outcome of this
2   episode of contact here or the ultimate outcome in
3   the case?
4         MS. LEWIS:  Can you read two questions back.
5         (The Reporter read back lines 16 through 18
6   of Page 42.)
7     Q.  (By Ms. Lewis) Do you understand that
8   question?
9     A.  I would ask you the same question.
10   Different conclusion at the end of this encounter or
11   a different conclusion in terms of the case?
12     Q.  A different conclusion at the end of this
13   encounter.
14     A.  Okay.  What I think the difference it would
15   have made is -- when she says she asked the
16   interpreter to tell him to let medical know if he is
17   not improving, that she's -- and she does say in
18   the -- she is treating -- in my opinion, she's
19   treating this as though it is a more recent
20   complaint, and a person who has experienced symptoms
21   like these already for two days who is not improving
22   when she saw him the following day, I believe that
23   would have changed the outcome.  That's probably not
24   as clearly stated as it could be.
25     Q.  So if I understand you correctly, you

44

1   believe that that additional information would have
2   changed her conclusions at the end of that visit,
3   right, not just that it might have?
4     A.  The end of the second visit I believe it
5   would have changed her conclusions.
6     Q.  So the first visit was March 6th, correct?
7     A.  Correct.
8     Q.  And so you're saying at the end of the
9   second visit on March 7th, is that right, it would
10   have changed her conclusions?
11     A.  I believe so.
12     Q.  So with respect to what she did on
13   March 6th, the first visit, do you believe she acted
14   below the standard of care?
15     A.  Well, on March 6th where I think she acted
16   outside of or below the standard of care is that she
17   is treating him symptomatically for body aches, the
18   nasal congestion and the nausea with symptomatic
19   treatment that she has no protocols to use or to do.
20         If she had sought medical direction at this
21   point, I believe that at least there would have been
22   consideration of whether or not to do any lab work at
23   this point to try to identify the cause of the sore
24   throat, whether he had influenza.
25     Q.  To be clear, what would the standard of care

Catherine knox, 10/4/2006                                   Carranza vs. Park County Board of County Commissioner

---

**61**

1  it's two parts, these are symptoms that have been in
2  place since Monday night or Tuesday day, and that
3  that's a long period of time for symptoms like these
4  to kind of continue to be reported as getting worse
5  rather than better.
6      Q.  What's a typical period of time?
7      A.  Two to three days.  If you kind of look at
8  the typical instructions, typical instructions I have
9  seen and I'm familiar with that have to do with
10  fever, nausea and vomiting, the patient presents a
11  second time or the fever continues for a period of
12  48 hours, that at that point you need to contact a
13  medical provider for more specific orders.
14      Q.  Do we know whether his fever persisted for
15  more than 48 hours?
16      A.  Well, we know that on the 6th he had a fever
17  and that he reported being warm to touch I thought
18  for a couple of days earlier than that.  He reported
19  a fever.  Here under the A it says the skin is warm
20  and dry to touch.  It may very well be that he has
21  got a fever and it was an improperly taken
22  temperature.  I guess that's the problem I have with
23  relying on a single vital sign.
24      Q.  Does symptomatic treatment make a difference
25  in the run-of-the-mill viral infection as I have

**62**

1  described it?
2      A.  A person will feel more comfortable.  They
3  will report having some relief of symptoms.
4      Q.  From which medications; do you know?
5      A.  When you said symptomatic, to me that
6  includes also rest, water, fluids, warmth, all of
7  those things.
8      Q.  Is it your experience in corrections that
9  inmates who are incarcerated frequent medical
10  providers more often than the general population
11  does?
12      A.  I want to be thoughtful in my answer to you.
13      There is a general belief that that is so,
14  and yet when you look more carefully at it there are
15  many reasons why people who are incarcerated request
16  medical attention more frequently, and that is
17  largely because in the first place they're unable to
18  go to the grocery store and by symptomatic treatment.
19  They have to see a medical provider for it.  There
20  are many visits that are a result of that.  Almost
21  any request for any kind of medical device has to be
22  sought based on having an encounter.
23      Then I think the population itself is one
24  that has been underserved, and so there are very
25  likely once medical care is available, and you see

**63**

1  this in insured populations as well, there is an
2  increase in the number of requests for medical
3  attention when a person is first covered.  When you
4  first come to jail, if someone has been without
5  medical coverage, you will see an increase in request
6  for attention because of that.
7      When you add to that his own story of kind
8  of crossing the border and so forth, it would -- yes.
9  I think there is a lot of reasons to come to the
10  conclusion that people who are incarcerated will seek
11  medical attention more frequently than people in the
12  general community.
13      Q.  I want to go back to something you said
14  about the strep infection.  I want to make sure I
15  understand your position or the extent of your
16  opinions in this case.
17      Do you have an opinion that Ms. Paulsen
18  should have recognized a strep infection in
19  Mr. Carranza-Reyes on March 6th and March 7th?
20      A.  First of all, I don't think I have even used
21  the term that he had a strep infection.  I think that
22  is a term that you've used.
23      Q.  That's correct.
24      A.  And it's my opinion that it would not be --
25  I'm not sure exactly how to phrase this.  I don't

**64**

1  think that a nurse necessarily would recognize or be
2  able to diagnose strep infection based on his
3  presentation on his second encounter.
4      Q.  So your opinion is that she should have done
5  more than she did on March 6th and 7th to track down
6  the cause of whatever was bothering him but not
7  necessarily that he presented with definite signs of
8  a strep infection --
9      A.  That's correct.
10      Q.  -- that she didn't recognize?
11      A.  That's correct.  I'm sorry.  I interrupted
12  you.
13      Q.  That's okay.
14      A.  That's correct.
15      Q.  If we could go to March 8th now.
16      A.  Good.  We're moving along.
17      Q.  I won't take that personally.
18      A.  No.  Please don't.  I think you are being
19  very thorough.  Are you referring to my report?
20      Q.  Yeah.
21      Now, she gets called at 3:00 a.m.,
22  March 8th, 2003, right?
23      A.  Correct.
24      Q.  About Mr. Carranza-Reyes, right?
25      A.  Correct.

---

Catherine knox, 10/4/2006

Carranza vs. Park County Board of County Commissioner

69

1    Q.  When she comes in at eight in the morning
2    and sees Mr. Carranza-Reyes, do you have an opinion
3    whether he was emergent at that point?
4    A.  I'm comfortable saying that my opinion was
5    that he was urgent at that point.  I don't know that
6    I could speculate on whether he was emergent at that
7    point.
8    Q.  Your report states that Ms. Paulsen was
9    negligent in not contacting or consulting a physician
10   or other provider about his worsening condition at
11   8:00 a.m. on March the 8th, 2003, and specifically I
12   see you looking at your report.  I'm looking at page
13   3 of 7, second paragraph down, at the end of that
14   paragraph.
15   A.  Okay.
16   Q.  Why in your opinion did she need to do this
17   if she knew he was already going to be transported to
18   be evaluated by a physician?
19   A.  The reason that I think this was important
20   is that if there were work or interventions that
21   could be started now and transported or continued at
22   the urgent care center or wherever he was sent, it
23   would have been important to -- I guess if there was
24   something that could be initiated now, like lab work
25   or, for example, putting in an IV, given that

70

1    transport was going to occur she had an obligation to
2    do that, to initiate what care she could.
3    Q.  Do you whether she had the capability of
4    initiating an IV at the jail?
5    A.  Actually, I don't know specifically that she
6    did.  If she did not, I think my understanding is
7    that there was an ambulance service close by, that
8    they should have been able to put an IV in even
9    before transport.
10   Q.  Do you know whether his condition warranted
11   calling an ambulance at that point?
12   A.  Let me think here.  My recollection of the
13   description of his condition I think warranted
14   ambulance transport because of the distance to the
15   emergency room.
16   Q.  So it's your opinion that she should have
17   ordered an ambulance transport of Mr. Carranza-Reyes?
18   A.  Well, I would like to just qualify that in
19   this way: she needed to -- I believe that he needed
20   to be transported in a way that would allow the
21   initiation of kind of life-support measures and other
22   treatment measures, IVs and so forth, while he was in
23   transport.
24   Q.  Do you know what his condition was on
25   arrival at Summit Medical Center?

71

1    A.  I reviewed the records from the ER admission
2    at Summit.
3    Q.  Do you recall sitting here today what those
4    records said about his condition when he arrived
5    there?
6    A.  Not without looking at them.
7    Q.  Okay.  I'm giving the witness what was
8    marked previously as Exhibit 24.  If you could take a
9    look at those.  Are those the Summit medical records
10   you were mentioning?
11   A.  Yes.
12   Q.  Looking at them now do you know what his
13   condition was when he arrived?
14   A.  I'm looking at this page.
15   MS. LEWIS:  That one has, for the record,
16   the Plaintiff's Bate number of a lot of zeros and
17   then page 4.
18   THE WITNESS:  Which I believe is the kind of
19   initial documentation that the nurse did when she saw
20   him upon arrival at the ER.
21   Q.  (By Ms. Lewis) What's the title of that
22   document?  Does it have one?
23   A.  I don't actually see one on it.
24   MR. TRINE:  At the very bottom lower
25   left-hand corner it states Emergency Services Flow

72

1    Sheet.
2    MS. LEWIS:  Yes.  I see that.  Thank you,
3    Bill.
4    THE WITNESS:  And the other one that I guess
5    I think is most pertinent is this one with a lot of
6    zeros and a 1 on it.
7    Q.  (By Ms. Lewis) Okay.  That one is -- it just
8    says Emergency Department Record.
9    A.  Then the last one I think that's pertinent
10   is 002 and 003, which is I think a dictated summary.
11   Q.  Yes.  And that looks like it was done by a
12   Dr. Keeling, is that correct, at the bottom?
13   A.  Yes.  So 001, this is a -- they note his
14   condition.  They have got orders.  He has got IVs
15   that were put in place.  These would be orders
16   following his workup in the ER.  They put IV fluids
17   in.  They have ordered labs, chest X-ray.  They are
18   noting here his condition on transfer, that he's
19   stable.
20   I believe that this indicates -- it's
21   written at 12:45.  I'm not sure if this is transport
22   from Summit to Denver or from at arrival in Summit.
23   Q.  So what does that indicate to you about what
24   kind of shape he was in when he arrived at the
25   emergency room at Summit?

Catherine knox, 10/4/2006                    Carranza vs. Park County Board of County Commissioner

85

1     Q.  Talking about deliberate indifference now
2   and not negligence, you understand there is a
3   difference between the two, right?
4     A.  Uh-huh.
5     Q.  What did she have reason to know or knew at
6   3:00 a.m. on the 8th that Mr. Carranza-Reyes was in a
7   potential of great harm?
8     A.  I believe that when she received the call at
9   3:00 a.m., it's premised on her having already seen
10  him twice and leaving I think some general
11  instructions to the officers to watch him and to call
12  if he got worse.  They called.  He was worse.  They
13  called as instructed.  I think therefore you have to
14  conclude he was worse.  The description of symptoms
15  that they gave would verify that, in fact, his
16  condition was worse, and her response was to call her
17  if his symptoms worsened further.
18        So I -- my conclusion is that she knew that
19  his condition had worsened yet again, and she was --
20  she did not act at three o'clock in the morning when
21  she received that information in a way that would
22  have prevented harm or reduced risk.
23     Q.  Let's focus on just part of that, which is
24  what did she know at 3:00 a.m. that would have or
25  should have suggested to her that absent intervention

86

1   at that point Mr. Carranza-Reyes was at risk of
2   substantial or great harm?
3     A.  Okay.  What she knew was that in the
4   deputy's opinion his condition had worsened enough to
5   call her for advice, direction or action, and that my
6   recollection of the deputy's report is that his -- he
7   was having trouble breathing.  His respirations I
8   think were something like 36 a minute, so much higher
9   respirations, and I don't recall, but I believe he
10  had complaints of pain, chest pain.
11        So what is new for Ms. Paulsen is the change
12  in respiratory rate, the deputy's concern and the
13  patient's continued or more urgent complaints of pain
14  and discomfort and that in the context of the third
15  day and the middle of the night she failed to
16  appreciate the significance of his condition.
17     Q.  Okay.  When you say she failed to appreciate
18  the significance of his condition, does the
19  information you just described suggest that -- what
20  does it suggest about what his prognosis is at that
21  point?
22     A.  I think it suggests someone who has got the
23  potential for -- who's going to be really ill and has
24  a medical problem that has been insufficiently
25  identified and treated, and I guess the -- I think at

87

1   this point the, what would you call it, universe of
2   symptoms, the rapid respiration, the difficulty
3   breathing, that it's highly likely that he has a
4   condition that's going to require intervention that
5   exceeds the capacity of what she can provide or the
6   jail can provide.
7     Q.  And how much time would it require
8   intervention?  How soon after 3:00 a.m. would she
9   have to do something with this patient in your
10  opinion?
11     A.  She needed to do something at that time, and
12  I think that the least she could have done was to
13  call -- to call a provider, call the on-call provider
14  and say, This is the situation, and to have provided
15  more specific information to the deputy about
16  additional data to collect, and if she elected not to
17  order an ambulance at that point, to have called back
18  30 minutes later for new signs and symptoms.
19     Q.  So is it your position that at that point
20  she should have known or foreseen that this patient
21  was going to become gravely ill?
22     A.  Yes.  I believe she should have.
23     Q.  And she should have predicted that based on
24  what she was informed about his symptoms at that
25  point?

88

1     A.  Yes.
2     Q.  And so to draw that conclusion don't you
3   have to assume or understand that she would have also
4   known or been able to tell how rapidly his condition
5   was going to deteriorate?
6     A.  I think I need to have you ask it again.
7     Q.  If I understand it, you're criticizing her
8   and saying she's deliberately indifferent for not
9   doing something at 3:00 a.m. with respect to this
10  patient in terms of getting him transported right
11  away, correct?
12     A.  Correct.
13     Q.  And that at that point she should have
14  realized that absent intervention he was going to
15  become gravely ill?
16     A.  Yes.
17     Q.  And that --
18     A.  I would like to rephrase that.  He had the
19  potential to become gravely ill.  There was enough
20  evidence to lead a person to conclude that he was at
21  risk of becoming gravely ill.
22     Q.  But you would agree with me that he didn't
23  become gravely ill until 6:00 p.m. on March 8th; is
24  that right?
25     A.  No.  I would not agree with you about that.

Catherine knox, 10/4/2006                                    Carranza vs. Park County Board of County Commissioner

**89**

1    Q.  When do you think he became gravely ill?
2    A.  I don't know.  I think that it was before
3  6:00 p.m. of the day that you describe, but I don't
4  know specifically when.
5    Q.  When he arrived at Summit, do you believe he
6  was gravely ill?
7    A.  I do believe that he was gravely ill when he
8  arrived.
9    Q.  You do believe that he was gravely ill?
10   A.  Yes.  But that's based upon the intervention
11  that they did at Summit.
12   Q.  What I'm trying to determine is at 3:00 a.m.
13  is it your opinion that Ms. Paulsen should have known
14  how soon Mr. Carranza-Reyes needed to be treated in
15  order to prevent him from deteriorating to the point
16  he eventually did?
17   A.  Let me say back what I think you're asking.
18  That Vickie Paulsen should have known at 3:00 a.m.
19  how urgently he needed to be transported in order to
20  prevent the grave harm or the potential for grave
21  harm?
22   Q.  Well, she's called at 3:00 a.m., right?
23   A.  Correct.
24   Q.  She gets in there at about 8:00 a.m., right?
25   A.  Correct.

**90**

1    Q.  And you're saying it was deliberately
2  indifferent of her not to do something at 3:00 a.m.,
3  right?
4    A.  Correct.
5    Q.  So there is a window of five hours between
6  3:00 a.m. and 8:00 a.m.  Do you see that?
7    A.  Yes.
8    Q.  Is it your opinion that at 3:00 a.m. she
9  knew that he had a risk of -- a potential of
10  substantial or great harm over the next five hours
11  until she got into the office?
12   A.  I believe that she knew that there was risk
13  of great harm if she waited, if she took no action
14  and elected instead to wait.  She should have known.
15   Q.  For the five-hour period?
16   A.  For that five-hour period.
17   Q.  Okay.  And how do you reach that conclusion?
18   A.  I reach that conclusion based on the two
19  prior contacts that she had with him and the
20  instructions that she gave to the officers and then
21  the officer's description of why he called her.
22   Q.  And then the same kind of timeline question,
23  which relates to 8:00 a.m. and when he eventually got
24  into Summit which I'm recollecting was about noon.
25   A.  Okay.

**91**

1    Q.  I could be wrong a little bit on that time
2  frame.
3        MR. TRINE:  12:45.
4        MS. LEWIS:  Thank you, Bill.
5    Q.  (By Ms. Lewis)  So you think when she left at
6  9:00 a.m., again, she knew he was at risk of great or
7  serious harm if she left that would result between
8  nine and 12:45 when he eventually got there?
9    A.  Yes.  I believe that she knew or should have
10  known that he was at risk as a result of her leaving
11  him and his not being transported from 9:00 a.m. to
12  12:45.
13   Q.  So it's your opinion that she deliberately
14  disregarded a known risk about this patient and
15  decided just to go home?
16   A.  Yes.
17   Q.  Do you have any idea why she would do that?
18   A.  No.
19   Q.  Back to your answer on that point.  You said
20  she knew or should have known.  Just to clarify, are
21  you saying she knew or should have known or that in
22  your opinion she knew the facts, she was presented
23  with the facts that led her to know this information
24  and she deliberately chose to ignore it?
25   A.  I believe that the facts were there and that

**92**

1  her leaving, in fact, was an act of ignoring it.
2    Q.  So the answer is you think she knew of the
3  risk and deliberately chose to ignore it?
4    A.  Yes.
5    Q.  Not that she just should have recognized it
6  and didn't appreciate it, right?
7    A.  (Witness nodding head.)
8    Q.  You have to answer out loud.
9    A.  I know.  I'm thinking.  I guess my yes head
10  was I'm hearing your question.
11       Yes.  I believe that she knew at
12  nine o'clock when she left that there was risk of
13  some grave harm or danger and she left instead.  She
14  left knowing that was potentially there.
15   Q.  In your report on page 5, paragraph 1B, it
16  says she made no arrangements to provide health care
17  coverage at the jail when she was not able to provide
18  services.
19       Do you see that?
20   A.  Yes.
21   Q.  Is that something that you understand was
22  her responsibility to do?
23   A.  Yes.  In this respect:  looking at the kind
24  of description of -- I'm not sure if it was the
25  duties, she's also the kind of on-site health

Catherine knox, 10/4/2006                        Carranza vs. Park County Board of County Commissioner

**97**

1   workweek, right?

2       A.  It's not acceptable for more routine

3   requests to go without the ability to request medical

4   attention for periods of time in excess of 24 hours.

5       Q.  Well, if they're routine medical requests,

6   then why do they need emergency treatment or someone

7   to be seen right away?  Why is that reckless and

8   callous disregard?  I'm not understanding.

9       A.  Again, I will back up and say that the

10  jail's expectations were that there be a nurse on

11  duty Monday through Friday to provide routine care.

12  She made no arrangements to provide coverage for

13  those routine duties when she was absent.  That to me

14  is callous and reckless disregard for the medical

15  needs of the people who are incarcerated at that

16  facility.

17         Specifically she also didn't -- she didn't

18  consider the effect of her absence on the offender's

19  ability to access medical attention when she's

20  absent.

21      Q.  Well, do you know if the people that she was

22  unable to see on the days she was gone were, in fact,

23  able to see her the day she came back?

24      A.  What I know is that -- what I know is that

25  Moises Carranza-Reyes' deposition is that he

**98**

1   requested to be seen I believe on Tuesday and was

2   told he couldn't be seen until the next day, and he

3   was not seen on Wednesday.  He was seen on Thursday.

4       Q.  Do you know why he wasn't seen on Wednesday?

5       A.  What is reported I believe in his or his

6   brother's deposition is that they understood that the

7   request had been torn up.

8       Q.  Again, let's go back to March 7th with

9   regard to the reckless and callous disregard issue.

10  Your opinion is that Ms. Paulsen's conduct on

11  March 7th with regard to Carranza-Reyes constituted

12  reckless and callous disregard?

13      A.  Yes.

14      Q.  And the specific conduct that is reckless

15  and callous is that she didn't call Dr. Bachman at

16  that point to discuss this case; is that right?

17      A.  Yes.  Or another prescribing provider.

18      Q.  And you say if she had called, it's more

19  than likely he would have been treated with

20  antibiotics, hydrated and provided supportive medical

21  convalescence.

22         Do you see that?

23      A.  Yes.

24      Q.  But earlier I thought you said that he

25  didn't present with signs of a strep infection in

**99**

1   your opinion on March 7th, right?

2       A.  I thought your question was whether or not

3   Ms. Paulsen would have been able to tell whether he

4   had strep, and I said I didn't -- it was not my

5   opinion that she would .* able to know.

6       Q.  But it's your opinion that if she had talked

7   about his case with a provider, such as Dr. Bachman

8   or a nurse practitioner, that it would have been

9   apparent that this is something that needs to be

10  treated with antibiotics?

11      A.  And on these other -- these other things

12  that are listed here, yes.  I can also qualify it.

13  You know, I can't predict what a provider would have

14  said -- what advice a provider would have given if

15  Ms. Paulsen had called for that direction.

16      Q.  If she couldn't have appreciated that this

17  was a strep infection that required antibiotics on

18  her own, then why is it reckless and callous in your

19  opinion for her not to call a doctor to discuss the

20  case with him to try to get antibiotics?

21      A.  Well, you're focusing almost totally on the

22  antibiotics, and I would respond to you more

23  generally.  We're going -- she's going into the

24  weekend where the only coverage that's available is

25  emergency coverage.  She has a patient who has had

**100**

1   symptoms for four days now which are not being

2   relieved by symptomatic treatment, and the point I'm

3   making is that it was callous disregard and reckless

4   to not have called a provider at that point for any

5   direction or for some direction.  This is a person

6   whose condition is deteriorating, and she's not

7   taking action to intervene, correct or mediate this

8   deterioration.

9          MS. LEWIS:  Can you read back the question I

10  asked.

11         (The Reporter read back the last question.)

12         THE WITNESS:  Did I not answer the question?

13      Q.  (By Ms. Lewis) I believe your answer talked

14  about generalities where as my question was on a

15  specific issue.

16      A.  Having to do with the antibiotics why didn't

17  she call to discuss the case with a physician?

18      Q.  What I'm trying to do is break down your

19  opinion and instead of glomming it all together, look

20  at the individual components and talk about them one

21  by one.  Now I'm talking about the antibiotics.

22      A.  Well, the reason that I have difficulty or

23  am resistant to trying to break it down is that a

24  nurse in this situation is calling for medical

25  direction and advice and shouldn't be seeking a

101

1  specific intervention.  To me the way your question
2  is phrased is that you would understand me to be
3  saying that she should have talked to Dr. Bachman
4  about antibiotics, and that's not what I intended to
5  say in this report.
6       Q.  My understanding of this paragraph is that
7  you're saying that it was reckless and callous
8  disregard for her not to escalate the situation to
9  the physician so that he could have evaluated it
10  because if he had evaluated it, then Carranza-Reyes
11  probably would have gotten antibiotics, hydrated and
12  provided supportive medical convalescence; is that
13  correct?
14       A.  I'm just saying it's more likely that he
15  would have.  I do not know that he would have.
16       Q.  Well, isn't it the fact that you think it's
17  more likely is what makes her failure to do it
18  reckless and callous?
19       A.  Yes.
20       Q.  Right?
21       A.  Yes.  Okay.
22       Q.  Reckless and callous implies that she's
23  disregarding something that she knows could happen to
24  this patient if she doesn't act.  Would you agree
25  with that?

102

1       A.  Okay.  Yes.
2       Q.  And so if she couldn't appreciate based on
3  what he presented with that he had a strep infection,
4  then why is it reckless and callous for her not to
5  call the doctor?
6       A.  What I think she should have been able to
7  recognize was that this is a patient who is not
8  improving and is going into a weekend where there is
9  no coverage.
10       Q.  Well, would you agree with me that it was
11  possible that he could have improved the next day?
12       A.  No.  I don't think he would have improved
13  the next day.
14       Q.  Well --
15       A.  Was it possible?
16       Q.  Based on the symptoms that she had in front
17  of her was it reasonable to assume that he could have
18  gotten better on his own?
19       A.  No.  Everything that I have looked at in
20  terms of directions that are provided to nurses about
21  patients who present with these conditions, if he had
22  gone as long as he would -- as he has in this case,
23  you would be -- you would be calling a physician for
24  advice and direction.
25       Q.  And that's based on what she had in front of

103

1  her on March 6th and March 7th?
2       A.  Absolutely.
3            MS. LEWIS:  I think it's a good point to
4  take a break, if that's okay.
5            THE WITNESS:  Thank you.
6            (A recess was taken from 11:17 a.m. to 11:31
7  a.m.)
8       Q.  (By Ms. Lewis) If I understand you, you're
9  saying it's callous disregard for Ms. Paulsen not to
10  call the doctor on March 7th because it was more
11  likely that if she had called that Carranza-Reyes
12  would have gotten additional treatment that he didn't
13  receive; is that right?
14       A.  Correct.
15       Q.  Can you say that it was more likely he would
16  have gotten additional treatment to a medical
17  probability?
18       A.  I need to ask you the definition of medical
19  probability.
20            MR. TRINE:  More likely than not, according
21  to the Colorado cases.
22            THE WITNESS:  Do you want me to use that
23  definition?
24       Q.  (By Ms. Lewis) Well, when you say that it's
25  more likely that he would have received additional

104

1  treatment, what do you mean by more likely?  How do
2  you come up with that determination?  Is it based on
3  your experience, training, in the field of nursing?
4       A.  That conclusion is drawn from my experience
5  in correctional health care and the relationship
6  between nurses and providers who are trying to
7  provide appropriate care to patients in this setting.
8       Q.  So is it your experience that when a nurse
9  talks to a doctor about a case it's more likely that
10  the doctor is going to give additional care than the
11  nurse would otherwise provide?
12       A.  Not in all cases.  Sometimes the physician
13  will order more specific kinds of monitoring and
14  intervals to report data back before giving more
15  definitive treatment orders.
16            It's my experience that a nurse would --
17  again, I just would -- again, I'm not sure I'm going
18  to answer your question, but that a nurse needs to
19  shift the responsibility for decisions about care to
20  a physician at this point.
21       Q.  Now, when a nurse calls a doctor about a
22  patient, isn't it true that sometimes the doctor will
23  say, you know, what you're doing is fine.  I don't
24  need to do anything else?
25       A.  Sometimes they will say that.  In this case,

Catherine knox, 10/4/2006                    Carranza vs. Park County Board of County Commissioner

---

**105**

1  if you look at the data that Ms. Paulsen had
2  collected, it's pretty brief.  So when she called
3  Bachman I would assume that even with brief
4  information that Bachman would likely have ordered
5  maybe some lab work.  He might have ordered
6  medication beyond the OTCs that are here, that she
7  used for supportive care.  He likely would have
8  ordered more close monitoring of his intake and
9  output to assess for dehydration.
10     Q.  What I want to focus on is you said you
11  would assume he would do these things.  How do you
12  reach that assumption?  What do you base that on?
13     A.  Based on my experience in this -- in the
14  correctional health care setting and how care is
15  delivered.
16     Q.  And specifically what experiences leads you
17  to that assumption?
18     A.  Probably most concretely the types of
19  nursing protocols that I'm aware of are in place for
20  things like sore throat, common cold, nausea and
21  vomiting, which would say contact the physician after
22  48 hours if there is no improvement, would have
23  given -- they usually include more specific direction
24  about lab, some things like that.  That's a concrete
25  example.  The other would be review of other cases.

---

**106**

1     Q.  Do protocols differ in your experience from
2  facility to facility?  By that I'm not just talking
3  about within the Washington Department of
4  Corrections.  I'm talking more about Oregon versus
5  Washington versus New Mexico.
6     A.  Yes.  They do differ for several reasons.
7  The protocol has to be written to take into account
8  the physician's preferences about approaches to
9  treatment, also considers the nurse's skills and
10  abilities and training to carry out the protocols.
11  They are -- they may be formulated somewhat
12  differently.
13        What I do see that is consistant in
14  situations that I have experience with is that
15  protocols include instructions for -- more specific
16  instructions for when the nurse is to contact the
17  physician for additional orders.
18     Q.  Okay.  Now, is it your experience when the
19  nurse contacts the physician pursuant to the protocol
20  that the physician always does additional workup or
21  examination beyond that?
22     A.  More often than not, yes.
23     Q.  Is the Washington Nurse Practice Act
24  different from the Colorado Nurse Practice Act?
25     A.  Yes.

---

**107**

1     Q.  How is it different?
2     A.  I already described one of the differences.
3  The Colorado Nurse Practice Act is pretty explicit in
4  the nurse's ability to provide care delegated by the
5  physician to use the protocols.  That's one area that
6  is pretty explicit in the Colorado Nurse Practice
7  Act.
8        Most of the rest is very similar.  I was
9  looking at the definition of the practice of nursing.
10  They use some different terminology, but basically it
11  describes the nursing process.
12     Q.  And is the nursing process the same in
13  between the two, as you understand it?
14     A.  Nursing process is very consistant across
15  the nation.
16     Q.  So in your opinion, even though you haven't
17  practiced nursing in Colorado, you believe you have
18  experience practicing under similar acts that make
19  you qualified to testify as a nursing expert
20  regarding a Colorado nurse?
21     A.  I believe so, yes.
22     Q.  I have some questions just to summarize what
23  I understand your opinions are as it relates to the
24  different days in here, and we have talked
25  extensively about the reasons for those opinions, so

---

**108**

1  I don't want to get into that, but my understanding
2  is that your opinion is that Nurse Paulsen was
3  negligent with her conduct on March 6th, right?
4     A.  Correct.
5     Q.  But you are not saying that she was
6  deliberately indifferent on that date; is that right?
7     A.  Correct.
8     Q.  On March 7th you have an opinion that she
9  was both negligent and deliberately indifferent; is
10  that right?
11     A.  Correct.  That's the Friday.
12     Q.  Right.  And then on March 8th you have an
13  opinion that she was both on that date; is that true?
14     A.  Correct.
15     Q.  Are you planning on doing a supplement to
16  your report?
17     A.  No.
18     Q.  You brought in some additional materials
19  here today that you have reviewed.  Have any of those
20  materials changed or modified the opinions in your
21  report?
22     A.  Sorry.  I just want to check to make sure.
23     Q.  That's fine.
24     A.  No, they do not.
25     Q.  For the record, you just looked through this

---

129

1    Q.  He is one of the experts retained by the

2  plaintiffs.  I didn't know if you had had a chance to

3  review his report.

4    A.  I don't think I received it.  It's not

5  familiar to me at all.

6    Q.  Would you defer to an infectious disease

7  physician in the evaluation of the progression of

8  infectious disease within a patient?

9    A.  I would defer -- I would not defer to an

10  infectious disease specialist about the actions that

11  a nurse would take based on presenting symptoms.

12    Q.  Because that's nursing care?

13    A.  Correct.

14    Q.  But as far as seeing a patient and being

15  able to tell what the future path and progression of

16  the disease is, would you defer to an infectious

17  disease specialist physician on that issue?

18    A.  Yes.

19    Q.  Who was the Health Services Administrator at

20  the Park County Jail on March 1st through 8th of July

21  of 2003?

22    A.  I believe that it is the nurse, Nurse

23  Paulsen.

24    Q.  Page 5 of 7 in Exhibit 91, paragraph 3C, you

25  indicate, if she, meaning Nurse Paulsen, had called

---

130

1  Dr. Bachman or another prescribing provider on

2  Friday, it is more likely that Mr. Carranza-Reyes

3  would have been treated with appropriate antibiotics,

4  hydrated and provided supportive medical

5  convalescence.

6        It's your opinion that the chances of him

7  receiving those interventions would be increased had

8  she called Dr. Bachman or another provider, yes?

9    A.  Yes.

10    Q.  Is that to say that it's more likely than

11  not he would have received those medical

12  interventions?

13    A.  How is your second question different from

14  your first?

15    Q.  The first one is the chances of him getting

16  those things is higher than it would otherwise be.

17  Say the chances initially were five percent and the

18  chances after making that phone call were 25 percent.

19  I'm asking you whether or not you can say that the

20  chances of plaintiff receiving those interventions

21  would be greater than 50 percent.

22    A.  I'm still really having trouble

23  differentiating.

24    Q.  One is more likely, meaning an increased

25  chance, and the other is more likely than not

---

131

1  meaning --

2    A.  It's a level of certainty --

3    Q.  -- 50 percent or higher.

4    A.  It's a level of certainty about what

5  interventions would have taken place?

6    Q.  That's correct.

7    A.  Thank you for explaining that.

8        I think it's the earlier definition of

9  probability than the latter.

10    Q.  Not over 50 percent but more than likely

11  than if she had not made the phone call?

12    A.  Okay.  Thanks.  I appreciate that.

13        So let me try to rephrase how I understand

14  what you're saying.

15    Q.  Okay.

16    A.  Had Ms. Paulsen called a provider, is it my

17  opinion that there is a 51-percent-or-greater chance

18  that he would have received orders for any of these

19  things?

20    Q.  Greater than 50 percent.

21    A.  Greater than 50 percent?

22    Q.  Yes.

23    A.  Yes.

24    Q.  And that is on March 7th?

25    A.  March 7th, Friday.

---

132

1    Q.  So you are saying that he would have

2  received those interventions to a probability?

3    A.  Yes.

4    Q.  And what do you base that on?

5    A.  The fact that they're going into a weekend.

6  He has had these symptoms since Tuesday, and they

7  have not gotten better and that there would be -- I

8  would expect that there would be some consideration,

9  if not antibiotics, at least some kind of lab or

10  throat culture.  Some providers will elect to treat

11  on the basis of symptoms alone.  I most certainly

12  believe that there would have been orders relative to

13  his hydration, including only keeping track, and that

14  there would have been consideration of whether or not

15  he should be moved from the block to a housing area

16  that provided the chance of better convalescence and

17  monitoring.

18    Q.  So Nurse Paulsen on March 7th after the

19  visit should have been able to know that had she

20  called Dr. Bachman there would have been antibiotics,

21  hydration and convalescence ordered?

22        MR. TRINE:  Objection.  It's asked and

23  answered two or three times.

24        MR. LURS:  It hasn't been answered yet.

25  That's the problem.

Catherine knox, 10/4/2006                    Carranza vs. Park County Board of County Commissioner

141

1   Q.  So is the point of your -- the opinions
2   stated in that paragraph of the report, was directed
3   at the conduct of Nurse Paulsen and not intended to
4   be directed or stating an opinion as to the conduct
5   of Deputy Fikejs?
6   A.  Correct.
7   Q.  I believe I saw a reference to an e-mail
8   wherein you were provided copies of the expert
9   reports of Tom Rosazza, who is an expert designated
10  by Park County, as well as Dr. Donald Kearns; is that
11  correct?
12  A.  I do have those copies.
13  Q.  And did you reviews those expert reports?
14  A.  Yes, I did.
15  Q.  Were you asked to express any opinions
16  concerning the opinions stated in either of those,
17  the Rosazza or the Kearns report?
18  A.  No, I was not.
19  Q.  Have you been asked in the future to express
20  opinions concerning those opinions stated in the
21  Rosazza or Kearns report?
22  A.  I have been -- I have not been asked to
23  express an opinion about those reports.
24  Q.  Do you know why those reports were provided
25  to you?

142

1   A.  No.  I believe it's to be fully informed.
2   Q.  And as I understood your testimony earlier
3   upon questioning from Ms. Lewis, that none of the
4   supplemental documents, including the reports of
5   Rosazza or Kearns, altered or in any way changed your
6   opinions as set forth in your report marked as
7   Exhibit 9?
8   A.  No, they do not.
9   MS. VEIGA:  That's all I have.
10  MS. LEWIS:  Just one quick clarification
11  question.
12              EXAMINATION
13  BY MS. LEWIS:
14  Q.  Were you asked to offer an opinion about a
15  report prepared by Shelly Fischer, if you have that
16  one?
17  A.  Is that the nurse expert?
18  Q.  Right.
19  A.  I was not asked to express an opinion.  I do
20  have it and reviewed it.
21  MS. LEWIS:  Okay.
22  MR. TRINE:  I have some follow-up questions.
23              EXAMINATION
24  BY MR. TRINE:
25  Q.  Am I correct that registered nurses are

143

1   trained to do nursing assessments?
2   A.  Yes.
3   Q.  And would a registered nurse know that a
4   sore red throat could be caused by strep throat as
5   one possibility?
6   A.  Yes.
7   MS. VEIGA:  Object to form and foundation.
8   Q.  (By Mr. Trine) As a matter of fact, is this
9   something, as far as you know, is common knowledge
10  among lay people, especially parents of little
11  children, that a red sore throat could possibly be a
12  strep throat?
13  MS. VEIGA:  Objection, form and foundation.
14  MR. LURS:  Foundation.
15  THE WITNESS:  What I would say that it is --
16  in my opinion it is recognized commonly.  I haven't
17  practiced in an outpatient setting that serves
18  children, so the latter part of your example I can't
19  really comment on, but in the kind of just general
20  layperson's understanding a sore throat often will --
21  people are concerned whether it's strep throat or
22  not.
23  Q.  (By Mr. Trine) Then I want to further
24  question you about Nurse Paulsen's failure to get a
25  complete history when she first saw Moises

144

1   Carranza-Reyes on March 6th of '03, and in that
2   regard I want to you to assume that if she had obtained
3   a detailed history at that time that based on the
4   testimony of Moises Carranza-Reyes, Abraham
5   Carranza-Reyes and Ed Allen she would have learned
6   that Moises had developed a sore throat and headache
7   and had become ill on March 4th and had through Ed
8   Allen requested to see a nurse or get medical
9   assistance on the evening of March 4th and on
10  March 5th that his symptoms remained and he did not
11  see a nurse on March 5th and that on the evening of
12  March 5th, again, through Ed Allen, requested to see
13  a nurse and that he then did see the nurse on
14  March 6th, and if she had taken a detailed history,
15  she would have learned that he had been complaining
16  of a sore throat and headache and feeling fever-ish
17  on March 4, 5 and 6, and based on that kind of
18  history what would you expect a reasonably careful
19  and prudent registered nurse to do on seeing Moises
20  Carranza-Reyes on March 6th?
21  MS. LEWIS:  Form and foundation.
22  Q.  (By Mr. Trine) If she had obtained that
23  history.
24  MS. LEWIS:  Same.
25  THE WITNESS:  As I understand your question,