Carranza-Reyes v. Park County

EXHIBIT 3
Anthony Volz, MSN, RNC, ANP

**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Case No. 2005-WM-377 (BNB)

DEPOSITION OF: ANTHONY G. VOLZ, MSN, RNC, ANP
December 13, 2006

MOISES CARRANZA-REYES,
Plaintiff,
v.
PARK COUNTY, a public entity of the State of Colorado and its governing board, THE PARK COUNTY BOARD OF COUNTY COMMISSIONERS; PARK COUNTY SHERIFF'S OFFICE, a public entity of the State of Colorado; FRED WEGENER, individually and in his official capacity as Sheriff of Park County, Colorado; MONTE GORE, individually and in his capacity as Captain of Park County Sheriff's Department; VICKIE PAULSEN, individually and in her official capacity as Registered Nurse for Park County, Colorado; JAMES BACHMAN, M.D., individually and in his official capacity as Medical Director of the Park County Jail,

Defendants.

TAKEN PURSUANT TO NOTICE on behalf of the Defendant Paulsen at 805 South Cascade Avenue, Colorado Springs, Colorado 80903 at 9:10 a.m. before Sylvia E. Noneff, Registered Professional Reporter and Notary Public within Colorado.

**Page 2**

APPEARANCES

For the Plaintiff:
LLOYD KORDICK, ESQ.
Lloyd C. Kordick & Associates
805 South Cascade Avenue
Colorado Springs, Colorado 80903

For the Defendants Park County, Park County Board of Commissioners, Park County Sheriff's Office, Wegener and Gore:
JENNIFER L. VEIGA, ESQ.
Hall & Evans, LLC
1125 17th Street
Suite 600
Denver, Colorado 80202

For the Defendant Paulsen:
MELANIE B. LEWIS, ESQ.
Berg Hill Greenleaf & Ruscitti LLP
1712 Pearl Street
Boulder, Colorado 80302

Also Present: None

**Page 3**

I N D E X
EXAMINATION OF ANTHONY G. VOLZ, MSN, RNC, ANP: PAGE
December 13, 2006

| | |
|---|---|
| By Mr. Kordick | 144, 160, 163 |
| By Ms. Veiga | 116, 159, 162, 166 |
| By Ms. Lewis | 4, 144, 159, 162 |

DEPOSITION EXHIBITS: INITIAL REFERENCE
102  Curriculum vitae of Anthony G. Volz, MSN, RNC, ANP, not dated — 9
103  Case review by Volz re Carranza-Reyes, 6/20/06 — 10
104  Fax cover sheet from Elizabeth to Knox, 5/25/05; transcript of telephone meeting between Kordick, Archuleta, Carranza-Reyes, 2/16/05 — 16
105  Handwritten notes by Volz re Paulsen's deposition transcript, not dated — 159
106  Park County Jail chart notes re Carranza-Reyes, 3/6/03 and 3/7/03 — 159
107  Notes by Volz re Park County Policy and Procedure Manual, not dated — 160

(Original exhibits attached to original deposition; copy exhibits included in continuing exhibit file; copies provided to counsel as requested.)

REQUESTED PORTIONS OF TESTIMONY: PAGE
(None.)

REFERENCES TO EXHIBITS MARKED PREVIOUSLY:
Exhibit    Page
  2          16

**Page 4**

1  WHEREUPON, the within proceedings were taken
2  pursuant to the Federal Rules of Civil Procedure:
3      ANTHONY G. VOLZ, MSN, RNC, ANP,
4  having been first duly sworn to state the whole truth,
5  was examined and testified as follows:
6          EXAMINATION
7  BY MS. LEWIS:
8      Q.  Would you please state your name and
9  business address for the record.
10     A.  Anthony Gerard Volz; V, as in Victor, o-l-z,
11 as in zebra. My business address is -- we just moved --
12 2222 North Nevada, Suite 2100, 80907.
13     Q.  We met just a moment ago. And my name is
14 Melanie Lewis, and I represent Nurse Vicki Paulsen in
15 this case.
16     A.  Okay.
17     Q.  And I noticed from the materials that you
18 have provided that you have been deposed before; is that
19 right?
20     A.  Correct.
21     Q.  Okay. And is that just one time you were
22 deposed?
23     A.  Correct, yeah.
24     Q.  I'll still go over some ground rules to try
25 to make this process a little easier. If you could

Coffman Reporting
303.893.0202
303.893.2230 FAX
WWW.COFFMANREPORTING.COM

(Pages 1 to 4)

* SUBJECT TO CONFIDENTIALITY DESIGNATIONS *

Carranza-Reyes v. Park County
Anthony Volz, MSN, RNC, ANP

**21**

1  guide their points of care.
2  Q. Did you print out any of those research
3  materials?
4  A. No, I did not.
5  Q. So the materials you brought with you today
6  wouldn't contain that --
7  A. No.
8  Q. -- research, right?
9  A. No.
10  Q. And do you remember the name of the first
11  professional organization for expert witnesses?
12  A. No, I don't.
13  Q. And you don't remember the name of the
14  second group either, correct?
15  A. No.
16  Q. Okay. Any other research?
17  A. The use of the Nurse -- Colorado Nurse
18  Practice Act at that time.
19  Q. What assumptions did you make in preparing
20  this report?
21  A. I don't understand.
22  Q. I'll talk about it more specifically. On --
23  et's see. Let's look at page 3, the last sentence --
24  well, actually, the second full paragraph, it's in the
25  middle of that paragraph. It says, "I assume all written

**22**

1  records to be accurate and MCR's" -- which is Moises
2  Carranza-Reyes, correct?
3  A. That's correct.
4  Q. -- "statements to be true." So when you say
5  you "assume all written records to be accurate," what
6  exactly do you mean by that?
7  A. Basically, that what was stated in these
8  records had not been changed, okay? In other words, what
9  I got is what Lloyd had given me and what is consistent
10  with what Lloyd still had. Okay?
11  Q. Okay.
12  A. Does that make sense?
13  Q. Yes. And just to clarify, you're not saying
14  that you're assuming the actual information recorded is
15  correct; is that right?
16  A. That's correct.
17  Q. So you're not making that assumption?
18  A. No, I'm not.
19  Q. You're just assuming that this is a true and
20  accurate copy?
21  A. Right.
22  Q. And you assume that Mr. Carranza-Reyes's
23  statements are true, right?
24  A. Well, that his statements are what he's
25  stating as his personal feedback. In other words, he's

**23**

1  not being prompted, that this is how he felt the
2  situation went down, yes.
3  Q. Did you assume he was being truthful?
4  A. Yes, I did.
5  Q. And on occasions where the records, the
6  written records, were in conflict with what Mr.
7  Carranza-Reyes said, how did you decide which information
8  to go with?
9  MR. KORDICK: What are you talking about
10  specifically?
11  THE DEPONENT: I'm not sure what you're --
12  MR. KORDICK: Object to the form, because
13  it's --
14  THE DEPONENT: Yeah. I'm not sure I
15  understand what you're saying specifically, because
16  there's some things that -- I'm sure we'll get into it
17  later -- where I took Moises' word versus what Ms.
18  Paulsen had in her deposition.
19  Q. (BY MS. LEWIS) Okay. Then I'll just wait
20  and address that in specific instances --
21  A. Okay.
22  Q. -- as we go --
23  A. Okay.
24  Q. -- instead of asking it in a general sense.
25  A. Okay.

**24**

1  Q. In Summary Number 1, did the information all
2  come from the records that are in Exhibit Number 2 that I
3  showed you and the statement that you heard Mr.
4  Carranza-Reyes giving over the telephone?
5  A. That's correct.
6  Q. Okay. At the end of Summary Number 1,
7  there's a sentence which starts out, "Such conditions."
8  And it says, "Such conditions are an obvious set up to
9  even the medically untrained to produce an environment
10  highly conducive to the transition of communicable
11  diseases, in particular those common during that time of
12  year, such as influenza, viral upper respiratory
13  illnesses, bronchitis, streptococcal respiratory
14  infections such as strep throat." Do you see that?
15  A. Yes.
16  Q. That's your opinion, correct?
17  A. That is my professional opinion as a
18  registered nurse, yes.
19  Q. Do you have any training in infectious
20  disease?
21  A. Yes, I do.
22  Q. And what is that training?
23  A. As a registered nurse with a bachelor's
24  degree of nursing, we are taught basic infectious
25  disease, transmission of infectious diseases,

(Pages 21 to 24)

Carranza-Reyes v. Park County                                           Anthony Volz, MSN, RNC, ANP

Page 25

1 communicable diseases, how to evaluate them, how to
2 prevent them.
3  Q. Are you familiar with the other expert
4 reports that have been issued in this case?
5  A. The only ones that I've seen were Knox and
6 the --
7  Q. Greifinger?
8  A. Thank you, Greifinger. Those are the ones
9 that I've seen.
10  Q. So you haven't seen a report of a Dr.
11 Niederman?
12  A. Only by name in the other two depositions.
13  Q. And have you seen a report of a Dr. Kearns?
14  A. Again, only by name in the other two
15 depositions.
16  Q. Do you believe you have more expertise than
17 a physician in infectious disease issues?
18  A. I guess I look -- we may be talking about a
19 little bit of two different things: infectious disease
20 and infection control. Okay? As far as infectious
21 disease and that specialty, I would defer to a physician
22 with regards to that.
23   But as far as infection control and
24 prevention of spread of communicable diseases, that is
25 well within the scope of nursing, and you don't

Page 26

1 necessarily have to be a specialist in that, though there
2 are professional organizations for that. We practice
3 infection control on a day-to-day basis in our daily
4 practice as a registered nurse, and that's prevention and
5 communication of infection.
6  Q. And so, then, how would you define
7 infectious disease, just to make sure I understand your
8 distinction?
9  A. If we're talking about a specialist in
10 infectious disease, this is a -- and there are registered
11 nurses and nurse practitioners that specialize in that as
12 well -- but these are individuals that have advanced
13 training in the treatment of diseases that are
14 transmitted between individuals. And it is the higher
15 level of care once they've acquire that disease, taking
16 care of that disease and further spreading prevention of
17 communicating that disease to others.
18  Q. So would you defer to someone that you just
19 described as an infectious disease expert on issues such
20 as incubation periods of infectious disease?
21  A. Not necessarily. I mean, it's -- some of
22 this is basic knowledge in nursing as well, so no. I
23 mean, there -- if you get into specialized diseases -- I
24 don't hold myself out as an infectious disease expert. I
25 will tell you that. But I do hold myself out as

Page 27

1 competent as a registered nurse in the prevention and
2 spread of infectious diseases.
3  Q. So if an infectious disease physician had an
4 opinion that transmission of a certain disease could
5 occur a certain way, would you feel competent to
6 challenge that opinion?
7   MR. KORDICK: You know, object to the form
8 again.
9   THE DEPONENT: I would defer to the
10 infectious disease . . .
11  Q. (BY MS. LEWIS) When you say that, in the
12 sense we just talked about a moment ago --
13  A. Yes.
14  Q. -- that "The conditions are obvious even to
15 the medically untrained person" --
16  A. Yes.
17  Q. -- the question I have is, because it would
18 be obvious to the medically untrained, do you feel that
19 it's necessary to have an expert's testimony to make the
20 conclusion you've reached in this paragraph?
21  A. No, I don't.
22  Q. Let's look at the review of Summary 1. You
23 conclude in this review that "Nurse Paulsen had a duty to
24 ensure that the risk of transmission of communicable
25 disease was minimized by advising the uniformed officers

Page 28

1 the need for adequate patient hygiene and the need for a
2 clean facility at a minimum." With -- do you need a
3 moment to try to find that reference?
4  A. Yes, I do.
5  Q. Okay. It's at the end of the first full
6 paragraph on page 4.
7  A. I found it. And your question was?
8  Q. I haven't asked it yet.
9  A. Okay.
10  Q. Are you saying that the Nurse Practice Act
11 requires you to assess the living conditions of a cell
12 block?
13  A. Yes, I do.
14  Q. And what part of the Act specifically are
15 you relying on?
16  A. I actually reference it there.
17  Q. So that would be C.R.S. --
18  A. 12-38-101.
19  Q. Okay. And is that the only authority that
20 you're relying on for that conclusion?
21  A. No. That's just common practice for a
22 registered nurse that's working in a facility. And my
23 understanding is that the prisons are held to the same
24 standard as a small hospital setting. We, as registered
25 nurses in a hospital setting, not only by our Nurse

(Pages 25 to 28)

* SUBJECT TO CONFIDENTIALITY DESIGNATIONS *

**65**

1  reflected in here, as you understand it, right? Correct?"
2      A.  Right.
3      Q.  But assume that this is what she knew. Just
4  go with me on that for a second.
5      A.  Sure, um-hum.
6      Q.  Do you think that that information would
7  lead a nurse to conclude that he was in danger of
8  becoming seriously ill?
9      A.  No. But she's now had two visits with him.
10 He's not improving. She should have called the physician
11 and gotten him involved at that point.
12     Q.  Okay. On March 7th, do you conclude that
13 Mr. Carranza-Reyes was dehydrated at that point?
14     A.  Highly likely.
15     Q.  And why do you reach that conclusion?
16     A.  Because he's been ill going on four days
17 now -- or, actually, three days. I believe the fourth
18 was the first time that he reported being ill and having
19 some fevers and some nausea. He's been throwing up for
20 two to three days. He's had diarrhea for two to three
21 days. She's made no effort in her plan of care to do any
22 hydration measures.
23     Q.  And what --
24     A.  She's not -- she's not asked him any
25 information with regards to how many times he's

**66**

1  urinating, what color is his urine. You just -- you
2  don't have an adequate assessment at this point for
3  somebody that's had three days of nausea and vomiting.
4  She hasn't performed the nursing process to evaluate him
5  properly. When I apply the nursing process to this, I
6  find that he is at high risk for developing dehydration.
7      Q.  Do you know whether she was informed that he
8  had sought medical attention earlier than March 6th?
9      A.  No.
10     Q.  Do you agree that if someone -- if you're
11 treating a patient or you're examining a patient who
12 speaks Spanish, and you're using an interpreter, that
13 some of the information could be lost in the translation?
14     A.  I agree.
15     Q.  Particularly, would you agree with that if
16 the translator is not an official translator? They are
17 just someone who speaks Spanish and English, and it's
18 unknown how much of each they speak.
19     A.  I agree.
20     Q.  Do you know whether any of the information
21 that you claim or that you contend that Ms. Paulsen
22 didn't obtain from Mr. Carranza-Reyes was information
23 that was lost in a translation?
24     A.  Ask that again?
25     Q.  Do you know whether -- well, let me

**67**

1  rephrase. You're critical of Ms. Paulsen for failing to
2  obtain certain information or not documenting certain
3  information that you think was received from the patient,
4  right?
5      A.  Correct.
6      Q.  Do you know whether any of that information
7  is information that was somehow lost in translation
8  between the interpreter and her?
9      A.  I can't answer that. I don't know.
10     Q.  Do you usually credit a patient's
11 self-assessment of their condition over a medical
12 professional's assessment?
13     A.  What are you asking?
14     MR. KORDICK: Object to form.
15     THE DEPONENT: I'm not sure I understand the
16 question.
17     Q.  (BY MS. LEWIS) You've dealt with many
18 patients over your years of experience, right?
19     A.  Correct, yeah.
20     Q.  And do you find that patients sometimes
21 think their condition is one thing: They have an opinion
22 about it; they assess themselves as having a certain
23 ailment?
24     A.  Yes.
25     Q.  And as a medical professional, you might

**68**

1  have a different assessment; would you agree?
2      A.  Yes.
3      Q.  Do you find that the patient's assessment is
4  usually accurate, or do you rely -- let me rephrase.
5  Strike that. Do you usually rely on the patient's
6  self-assessment in the terms I just talked about more so
7  than the assessment that a medical professional would
8  make about what's going on with that patient?
9      MR. KORDICK: I object to the form of that
10 question.
11     THE DEPONENT: There's -- there's a
12 difference between assessment and diagnosis. I put a
13 great deal of weight upon a patient's assessment or
14 presentation of symptoms. As far as what their decision
15 is as to what they have, I put all that information
16 together to make the appropriate diagnosis.
17     Q.  (BY MS. LEWIS) Let's look at Summary Number
18 4, which is on page 6, and it talks about blood in Mr.
19 Carranza-Reyes's urine.
20     A.  Um-hum, yes.
21     Q.  Do you agree that no one told this
22 information to Nurse Paulsen?
23     A.  I agree.
24     Q.  So that's not something you're faulting
25 her --

Carranza-Reyes v. Park County                                      Anthony Volz, MSN, RNC, ANP

**81**

1  A. Yes.
2  Q. And you write here that "Ben Baca agreed and
3  stated it would be at least three hours before he could
4  arrange a transport," right?
5  A. Correct.
6  Q. Do you know whether he said "at least three
7  hours" or "up to three hours"?
8  A. If I recall, it said "two to three hours" in
9  somebody's deposition. It may have been in Nurse
10 Paulsen's.
11 Q. But you didn't have the benefit of that
12 deposition when you wrote this report, right?
13 A. No, huh-uh.
14 Q. Later on in the same page, under Review of
15 Summary 8, you write that "A transport might take three
16 to four hours to arrange." And that's in the last
17 paragraph on page 8.
18 A. Yes, okay.
19 Q. Where did you get the four hours?
20 A. That was the time frame from when she first
21 arrived back at the jail that morning.
22 Q. So she --
23 A. So she got there at 6:00 and made a
24 decision -- I'm trying to recall now -- made a decision
25 to consider transport at 8:00. He was finally

**82**

1  transported after 12:00. So it was basically a four-hour
2  time frame before he was eventually transported, I think.
3  Q. Okay. And just to clarify, I believe the
4  records show that she came in at about 7:50 or 7:45, not
5  6:00 in the morning --
6  A. Oh, that's right, yeah.
7  Q. -- would you agree?
8  A. Yeah. There was something else that
9  happened at 6:00, I think. Yeah.
10 Q. All right. So you're using the four hours
11 based on what actually happened, not what she was told?
12 A. Correct.
13 Q. Okay. Would you agree that no one told Ms.
14 Paulsen on -- after 8:00 a.m. or at any time before 8:00
15 a.m. that Moises Carranza-Reyes had coughed up spittle
16 containing blood?
17 A. I agree.
18 Q. And no one told her also about any blood in
19 his urine by that point, right?
20 A. Correct.
21 Q. Based on the information she had at the
22 time, at 8:00 in the morning, where -- do you think she
23 knew he was unstable at this point? Well, first of all,
24 do you think he was unstable?
25 A. Yes, I do think he was unstable.

**83**

1  Q. And what suggests to you that he was
2  unstable?
3  A. We have, again, the persistence of the
4  symptoms that he's had going on -- gosh, from the 4th, no
5  real change in his nausea, vomiting, all these symptoms
6  that we've addressed prior. And then at 3:00 in the
7  morning, or whenever that phone call was to her at her
8  home, he had a change in respiratory rate.
9     A respiratory rate of 34 is excessively
10 high, regardless of altitude. His baseline respiratory
11 rate was 24, and that's high end of normal. I might
12 consider 24 in somebody that's having some mild symptoms
13 of an altitude-type process, trying to adjust and adapt,
14 and consider that that's his baseline. And she's already
15 established a baseline.
16    Now he's at a respiratory rate of 34.
17 That's like breathing once every two seconds. That would
18 fatigue all of us here. That's a critical change in
19 status for this gentleman. There's something going on in
20 his airways that's making it difficult for him to
21 breathe. He was, in my opinion, critical at 3:00 in the
22 morning.
23 Q. Critically ill?
24 A. Critically ill.
25 Q. What --

**84**

1  A. And she should have come in to evaluate him
2  and determine the best approach to take care of him.
3  Q. I'll just make sure you're done.
4  A. Sure.
5  Q. What mode of transport do you think he
6  needed at that time?
7  A. He needed an ambulance. And this is one
8  thing that, after reading the different documents that
9  Lloyd had given me, I thought he had been transported by
10 ambulance and those were the arrangements that were made.
11 I found out after some of the material that he had given
12 me last week that he was transported in a private
13 vehicle, with no medical support with him. That was
14 extremely risky on her part.
15 Q. Are there any criteria that you use as a
16 registered nurse to determine whether someone's critical
17 or stable?
18 A. Respiratory is one of them. It's the ABCs:
19 airway, breathing, circulation. His breathing was
20 compromised.
21 Q. So the three ways you determine if someone
22 is critical is the ABCs --
23 A. Um-hum.
24 Q. -- which is airway, breathing --
25 A. Breathing.

(Pages 81 to 84)

* SUBJECT TO CONFIDENTIALITY DESIGNATIONS *

### 89

1  Q.  Do you --
2  A.  -- and -- go ahead.
3  Q.  Do you know whether she had knowledge that
4  he was critical at this point, as you say he was
5  critical?
6  A.  Did somebody tell her that he was critical,
7  or her observations that he was critical?
8  Q.  Let me backtrack.
9  A.  Okay.
10  Q.  What I understand you saying is that she
11  should have known he was critical, right?
12  A.  Yes.
13  Q.  Are you saying that she knew he was
14  critical?
15  A.  Can you give me a distinction between the
16  two?
17  Q.  Well, is it your opinion that she knew this
18  patient was in need of emergency treatment, transport by
19  ambulance, and that she disregarded that and just decided
20  to wait and transport him via --
21  A.  Okay.
22  Q.  -- vehicle?
23  A.  She should have known, had she applied the
24  nursing process to assess him properly. She should have
25  known.

### 90

1       (Discussion off the record.)
2  Q.  All right. In Review of Summary Number 8,
3  you write in the middle of that paragraph that Ms.
4  Paulsen was given permission by Ben Baca to go ahead and
5  coordinate transport earlier than the three hours if she
6  felt it was necessary.
7  A.  Yes.
8  Q.  Do you see that?
9  A.  Yes.
10  Q.  Would you agree with me Ms. Paulsen's note
11  and her deposition stated that Mr. Baca told her she
12  could transport if his condition worsened?
13  A.  Yes.
14  Q.  Okay.
15  A.  Yes.
16  Q.  So you're not saying Ben Baca told her
17  something different than that --
18  A.  No.
19  Q.  -- right? Okay. In Summary Number 9, on
20  page 9, the second line down, you say that Nurse Paulsen
21  was advised at 10:30 -- this is after she left the
22  facility and came back -- that Mr. Carranza-Reyes was
23  vomiting more fre -- sorry -- after she left the facility
24  and called in that he was vomiting more frequently. Do
25  you see that?

### 91

1  A.  Yes.
2  Q.  Where did you get that information?
3  A.  It would probably be in one of the timelines
4  or in her notes. Let's see. Yeah, actually, it's in her
5  own nurse report.
6  Q.  It's on page?
7  A.  Page 2.
8       MR. KORDICK: 144.
9       THE DEPONENT: 0144. She called for an
10  update on Carranza and was told by Deputy Theobald that
11  he was vomiting more frequently --
12  Q.  (BY MS. LEWIS) Okay.
13  A.  -- and that she was concerned about Carranza
14  becoming -- actually, I think what it is is, Teobald
15  (sic) was concerned that the patient was becoming more
16  dehydrated, concerned about his right-side pain.
17       MR. KORDICK: And it's actually "Theobald."
18  It starts with a T on one page --
19       THE DEPONENT: Yeah.
20       MR. KORDICK: -- and then it goes -- it's
21  "Theobald."
22       THE DEPONENT: "Theobald."
23  Q.  (BY MS. LEWIS) And you're just referring to
24  the sentence that says, "being concerned about Mr.
25  Carranza becoming dehydrated" --

### 92

1  A.  Yeah.
2  Q.  -- "and concerned about his right side
3  pain" --
4  A.  Actually, she says that, yes.
5  Q.  -- "I asked that he be transported to Summit
6  Medical for evaluation," right?
7  A.  Correct.
8  Q.  Okay. And again, you feel that at this
9  point he was critical?
10  A.  Yes.
11  Q.  Do you know what condition Summit Medical
12  Center assessed him to be in?
13  A.  Well, one thing that sticks out in my mind
14  is that the initial blood pressure that they got, they
15  weren't able to get a diastolic blood pressure. That's
16  critical. His -- I'm trying to recall what his systolic
17  was. But if you can't get a diastolic blood pressure,
18  there's gross dehydration and possible body failure.
19  That was upon arrival.
20  Q.  And when a patient is critical on arrival to
21  a hospital, do you expect a doctor to see them right
22  away?
23  A.  It's a team effort. Having worked in
24  emergency rooms, it's going to be a group of people that
25  are gathering information as quick as they can. So it

**93**

1  could be nurses, along with physicians or
2  advanced-practice individuals: PAs, nurse practitioners.
3  But a doctor would be involved fairly quickly. The staff
4  in an emergency room are trained to triage. I don't know
5  what was going on in that emergency room, but the staff
6  are trained to do basic stabilization, run a code,
7  independent of a physician.
8      Q.  If it took 45 minutes for a physician to see
9  Mr. Carranza-Reyes, would that indicate to you anything
10 about his condition, how the staff at the hospital
11 considered his condition to be?
12     A.  Not for him to actually see him. He's
13 probably giving orders during that time to do -- put in
14 IV lines, do labs, studies. In a busy emergency room,
15 it's not uncommon for a physician to be given the raw
16 data on a patient, especially since he came in by a
17 private vehicle. By ambulance -- ambulance patients are
18 going to get first priority. He came in by private
19 vehicle. The team is going to gather information, run it
20 by him. At that point he's going to make recommendations
21 for more data-gathering and stabilization before he might
22 even go see the patient.
23     Q.  Do you know whether -- do you know who Dr.
24 Keeling is?
25     A.  Was he the ER doctor at Summit?

**94**

1      Q.  Yes.
2      A.  Yeah. I just recall the name on the
3  records.
4      Q.  Did you read his deposition?
5      A.  No.
6      Q.  Do you know whether he assessed the patient
7  as being critical?
8      A.  I don't recall.
9      Q.  Is "critical" the same as "stable"?
10     A.  No.
11     Q.  And what does "stable" mean?
12     A.  Stable means that the vital signs are
13 stable; in other words, the systolic blood pressure is
14 greater than 90; diastolic, you can at least hear it. It
15 can be at low as 40. Pulse rate, which was not normal
16 for Moises, is going to run between 60 to 90, which is
17 the average rate. His was 120 when he got to the
18 emergency room.
19         Respiratory rate, we could give Moises the
20 benefit of the doubt of being in the 20-to-24 range.
21 That would be stable. He would be alert, oriented,
22 coherent, urinating. Pain might be stabilized. That's
23 what I would consider as a stable situation.
24         I know that when he was transported to
25 Denver General, he was stable on transport. That is most

**95**

1  likely due to the measures that they implemented,
2  including IV therapy to rehydrate him, and I believe they
3  started antibiotics as well. But his condition
4  apparently deteriorated by the time he got to Denver
5  General.
6      Q.  Did it deteriorate by the time he got to
7  Denver General?
8      A.  I recall somewhere in the notes that -- oh,
9  let's see. And I think -- was it her notes? She had --
10 somewhere in her deposition or in the notes, she had
11 called one of the deputies, and they had told her that
12 upon arrival to Denver General his condition had
13 deteriorated, and that he was on ventilators and a bunch
14 of IVs.
15     Q.  You're just basing that on her notes, right?
16 You haven't reviewed --
17     A.  Well, I reviewed the Denver General notes,
18 too.
19     Q.  Oh, you did?
20     A.  Yeah, yeah. I didn't see any ambulance
21 record, so I don't know what transpired in the ambulance.
22 But upon arrival, he was a critical patient.
23     Q.  On pages 8 to 9 of your report, you conclude
24 that there was a violation of the 8th and 14th
25 Amendments. And as I understand that, you're talking

**96**

1  about -- your conclusion about that violation is limited
2  to Ms. Paulsen's actions at 8:00 a.m.?
3      A.  Well, that's just one more example of when
4  there were violations. There were a series of them that
5  went along that included the conditions of the jail in
6  general. But this was one more example where there was a
7  violation of those amendments.
8      Q.  Okay. Since you say that's one example, I
9  need to ask you everything that you think -- all of Ms.
10 Paulsen's actions that you consider to be a violation of
11 the 8th and 14th Amendments.
12     A.  No, no --
13     Q.  Okay.
14     A.  -- I'm not saying that.
15     Q.  So -- well, let me rephrase.
16     A.  Go ahead. Go ahead, yeah.
17     Q.  Are you saying any actions of hers are a
18 violation of the 8th and 14th Amendments?
19     A.  In his -- in her delay of transport, her
20 decision-making resulted in a violation of those. But
21 the prior care, no, because it's my opinion that he
22 should have been transferred much sooner, and she did not
23 give him that opportunity for earlier transfer.
24     Q.  And the delay in transport that you're
25 talking about is the delay from 8:00 a.m. to when he

Carranza-Reyes v. Park County                                                                                     Anthony Volz, MSN, RNC, ANP

**97**

1 eventually was transported, or was it -- is it some other
2 time frame?
3      A.   In my opinion, he should have been
4 transferred at 3:00 in the morning.
5      Q.   At 3:45 a.m. --
6      A.   Yes --
7      Q.   -- when she was called?
8      A.   -- when she got that call.
9      Q.   Okay. Are you offering expert testimony on
10 the issues of deliberate indifference?
11     A.   I don't understand what that question is.
12     Q.   Well, do you understand -- do you have an
13 understanding what it means to violate the 8th or 14th
14 Amendments?
15     A.   No, I don't.
16     Q.   So how are you concluding that there was an
17 apparent violation?
18     A.   On recall of looking at this right now. But
19 looking -- I had the amendments in front of me at that
20 time, and I made that conclusion at that time.
21     Q.   Do you --
22     A.   So I would have to have those amendments in
23 front of me to reevaluate what that -- what the
24 definitions are of those.
25     Q.   So you don't have any specialized training

**98**

1 or experience in determining whether a violation of the
2 8th Amendment occurred --
3      A.   No, I don't.
4      Q.   -- or the 14th Amendment, right?
5      A.   No.
6      Q.   And do you feel like you're more qualified
7 than a jury to determine whether there was a violation of
8 the 8th Amendment in regards to medical care?
9      A.   I don't --
10         MR. KORDICK: Object to the form of the
11 question.
12         THE DEPONENT: I don't know if the jury is
13 any more expert than I would be if you explain the -- if
14 I had an opportunity to rereview what the amendments are.
15     Q.   (BY MS. LEWIS) Well, let's put it this way:
16 You reviewed the amendments --
17     A.   Correct.
18     Q.   -- when you were preparing your report,
19 right?
20     A.   Correct.
21     Q.   And is that the first time you actually sat
22 down and read them?
23     A.   And reviewed them and applied them, correct.
24     Q.   And you would agree with me that's the same
25 exact exercise a jury would go through --

**99**

1      A.   Oh, I --
2          THE REPORTER: Wait.
3          THE DEPONENT: Oh, that was me.
4      Q.   (BY MS. LEWIS) Yeah, you've got to wait.
5          (The question on page 98, lines 24 through
6 25 was read back.)
7      Q.   -- meaning they would look at the law and
8 try to determine whether there was a violation of the
9 law, right?
10     A.   I agree.
11     Q.   And you're not saying you're in a better
12 position than a jury to evaluate that question?
13     A.   I agree.
14     Q.   Okay. Was there any information that you
15 saw that Ms. Paulsen knew Mr. Carranza-Reyes had a strep
16 A infection?
17     A.   No.
18     Q.   Is there any information you had or you saw
19 that led you to believe that Ms. Paulsen knew Mr.
20 Carranza-Reyes had a life-threatening condition?
21     A.   Yes.
22     Q.   And at what time did she --
23     A.   At 3:00, or whatever that time is that the
24 deputy called.
25     Q.   3:45?

**100**

1      A.   3:45 --
2      Q.   And that's --
3      A.   -- on the 8th.
4      Q.   That was me. I'm sorry. And that's based
5 on the respirations, right?
6      A.   Correct.
7      Q.   Okay. On your Review of Summary Number 9,
8 the middle paragraph, you say, "Nurse Paulsen had been
9 given the option by INS to transport earlier than waiting
10 the three to four hours of INS transport coordination."
11 Do you see that?
12     A.   Yes.
13         (Interruption of the proceedings by a knock
14 at the door.)
15         MR. KORDICK: Don't say I never bought you
16 nothing for Christmas.
17         MS. VEIGA: I should have ordered chips, or
18 something.
19         MS. LEWIS: I know it.
20     Q.   (BY MS. LEWIS) And again, you're not --
21 you're not saying that Ms. Paulsen was told anything
22 but -- by INS that she could transport if his condition
23 worsened?
24     A.   They did tell her that it could take two to
25 three hours to arrange transport on their part.

(Pages 97 to 100)

\* SUBJECT TO CONFIDENTIALITY DESIGNATIONS \*

Case 1:05-cv-00377-WDM-BNB   Document 209-3   Filed 07/09/07   USDC Colorado   Page 9 of 10

Carranza-Reyes v. Park County                                    Anthony Volz, MSN, RNC, ANP

**113**

THE DEPONENT: You're asking two questions: Did she know that he was in an emergent situation? And I will say again, she should have known. The second question, my understanding is, is did she have disregard for -- knowingly disregarded his need for emergency transport by delaying the transport?

Q. (BY MS. LEWIS) Right.
A. Yes.
Q. And when did she do that? Like, I'm trying to --
A. Yeah.
Q. You said she didn't do that at 8:00 a.m., but you feel like she did do that at some other time, if I'm understanding you correctly.
A. She should have transported him at 3:00 in the morning.
Q. Right. And I really want to focus on the knowledge aspect --
A. Okay.
Q. -- like, the second part of the question we were just talking about.
A. Okay.
Q. Because I understand your position is that she should have done this, she should have known, and she should have done these things because she should have

**114**

known, but I want to focus on what you believe she actually knew. And if she knew it and didn't do it, that would suggest she disregarded it; would you agree?
A. I would agree with that. Okay.
Q. Okay. And so do you have an opinion that she knew he was in a life-threatening state, condition, and that she disregarded that at any point in time?
A. I believe she did. I believe she knew.
Q. And when do you believe she knew?
A. I believe she knew when she decided to come in on Saturday morning.
Q. And when she decided to come in, you believe that means she knew he was in a life-threatening condition?
A. Yes, because of the change in respiratory rate that he was experiencing.
Q. So now you're -- if I understand it, before you said you didn't think she knew at 8:00 a.m., but now you're saying you think she knew as early as 3:45 a.m., and that was based on the respiratory rate information?
A. Did I say that she did not know that he was ill at 8:00 a.m., that he was urgent at 8:00 a.m.? I don't know that I said that.
Q. I recollect that you said she should have known at that time --

**115**

1   A.   Okay.
2   Q.   -- but not that she knew and intentionally disregarded it. That's my understanding. Earlier in your testimony you, as an aside, I think, said she was concerned enough to come in on her day off, right?
6   A.   Correct.
7   Q.   In light of the fact she was concerned enough to come in on her day off, do you believe that she was intentionally disregarding --
10  A.   Oh, okay. I see.
11  Q.   -- a risk she knew was going to happen to this patient if she didn't act sooner?
13  A.   I don't believe she was disregarding that.
14  Q.   And do you believe she knew that he was at risk of serious harm if she didn't do something at 3:45 a.m.?
17  A.   Yes, I do.
18  Q.   And that's something you think she knew?
19  A.   Yes, I do.
20  Q.   Based on the respiratory rate?
21  A.   Yes, I do. And that she -- and that's what drove her to come in on her day off.
23  Q.   Now, if she testified she didn't know, do you think you're better qualified to -- I mean, you're not offering an expert opinion on whether or not she

**116**

knew, are you?
A.   I can't tell you what she thought.
Q.   But no matter what she says, you have an opinion she knew?
       MR. KORDICK: Asked and answered.
       THE DEPONENT: That's correct.
       MS. LEWIS: I think I want to look through my notes, but I'm happy to let Ms. Veiga ask questions while I do that to make it as efficient as possible.
       THE DEPONENT: Sure.
              EXAMINATION
BY MS. VEIGA:
Q.   Mr. Volz, we met at the beginning of this deposition, but to remind you, my name is Jennifer Veiga. I represent the Park County Commissioners and the sheriff and the Park County Jail administrator, Captain Gore, in this litigation.
       THE REPORTER: Captain?
       MS. VEIGA: Gore. Sorry. I will try to speak up.
Q.   (BY MS. VEIGA) In the file documents that were provided to my office, you had several cases in here that I believe said they were provided by Mr. Archuleta. What were the significance of those cases from your perspective?

(Pages 113 to 116)

* SUBJECT TO CONFIDENTIALITY DESIGNATIONS *

Carranza-Reyes v. Park County                                                Anthony Volz, MSN, RNC, ANP

**Page 165**

1  should have followed her orders.
2  Q.  (BY MR. KORDICK) She made that
3  recommendation immediately, didn't she, after she saw the
4  patient --
5     MS. VEIGA: Form and foundation.
6  Q.  (BY MR. KORDICK) -- that he needed to be
7  transferred, seen by a physician?
8  A.  She made the recommendation, but made the
9  decision to call INS, for whatever reason, to let them
10 know of her decision. And based upon that, that
11 influenced her -- my sense is, her decision-making.
12 Q.  If that "for whatever reason" was because
13 the jail required her to do that, that would have been
14 the jail's lack of appropriate procedure, wouldn't it?
15 A.  Actually --
16    MS. LEWIS: Objection to form and
17 foundation.
18    THE DEPONENT: -- there was somebody in the
19 jail that advised her to call INS, so that was counter to
20 their policy and procedure, if I recall now, yes.
21 Q.  (BY MR. KORDICK) Okay. So that would have
22 been negligence on the part of the jail as well as Ms.
23 Paulsen?
24    MS. LEWIS: Object to the form.
25    THE DEPONENT: Yeah, it would be negligent,

**Page 166**

1  because it was counter to their policy and procedure.
2     MR. KORDICK: No further questions.
3              EXAMINATION
4  BY MS. VEIGA:
5  Q.  Do you know whether anyone at the jail
6  prohibited Ms. Paulsen from transporting Mr.
7  Carranza-Reyes at any time prior to calling the INS; in
8  other words, did they make that a precondition, to your
9  knowledge?
10 A.  There was -- and I don't recall who, but
11 somebody told her that she had to call INS first.
12 Q.  And do you know who that was?
13 A.  It was one of the guards that was on duty.
14 I believe it was from the night shift. I don't recall.
15 Q.  And do you know whether Nurse Paulsen had
16 the authority to transport an inmate, an INS detainee
17 inmate, if she felt it was an emergency situation without
18 calling INS?
19 A.  Yes.
20 Q.  Yes, she did?
21 A.  She had that right to call -- I mean, she
22 had that right to make that decision without calling
23 anybody.
24    MS. VEIGA: Okay. No further questions.
25    MS. LEWIS: I have no questions.

**Page 167**

1     THE REPORTER: Before we go off the record,
2  can we put on the record how signature will be handled?
3  Will you take care of signature, Mr. Kordick?
4     MR. KORDICK: Yeah. You can send it to my
5  address, and we'll review it.
6     WHEREUPON, the within proceedings were
7  concluded at the approximate hour of 1:48 p.m. this 13th
8  day of December, 2006.
9              *   *   *

**Page 168**

CERTIFICATION

I, SYLVIA E. NONEFF, Registered Professional Reporter, appointed to take the deposition of
ANTHONY G. VOLZ, MSN, RNC, ANP, certify that prior to the deposition the witness was sworn by me to tell the truth; that the deposition was taken by me at 805 South Cascade Avenue, Colorado Springs, Colorado 80903 on December 13, 2006; that the proceedings were reduced to typewritten form by computer-aided transcription consisting of 171 pages herein; that the foregoing is an accurate transcript of the proceedings.

I certify review of the transcript was requested.

I further certify I am not related to any party herein nor their counsel and have no interest in the result of this litigation.

IN WITNESS WHEREOF, I have hereunto set my hand this 22nd day of December, 2006.

SYLVIA E. NONEFF
Registered Professional Reporter