```
                 IN THE UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF COLORADO

Civil Action No. 05-cv-00377-WDM
                                                    EXHIBIT 1
MOISES CARRANZA-REYES,

     Plaintiff,

vs.

PARK COUNTY BOARD OF COUNTY COMMISSIONERS, et al.,

     Defendants.
```

---

**REPORTER'S TRANSCRIPT**
Oral Ruling

---

Proceedings before the HONORABLE WALKER D. MILLER, Judge, United States District Court for the District of Colorado, commencing at 9:00 a.m., on the 28th day of September, 2007, in Courtroom A902, United States Courthouse, Denver, Colorado.

Proceeding Recorded by Mechanical Stenography, Transcription Produced via Computer by Janet M. Coppock, 901 19th Street, Room A-257, Denver, Colorado, 80294, (303) 893-2835

1   were at trial and ruling on the objection at trial.  I advise
2   the jury that the fact that an individual is qualified and
3   allowed to express opinion is an exception to the general rule
4   and certainly I am not endorsing the opinions expressed.
5          The defendants' motion specifically with regard to
6   Dr. Niederman does not really challenge his qualifications.
7   There is a challenge of the Greifinger, Dr. Greifinger
8   qualifications which I conclude that Dr. Greifinger would be
9   allowed to testify in the areas he seeks.  The objections to
10  the remoteness of his actual treatment and practice experience
11  is a matter that's for cross-examination and challenge as to
12  the weight and so forth that may be presented by the
13  defendants, so I think both would be qualified or recognized as
14  qualified.
15         With the specific challenge of the defendants, it of
16  course becomes the burden of the plaintiff to establish that
17  their opinion testimony passes muster, and defendant has made
18  three specific objections applicable to both doctors:  The
19  opinion that the plaintiff became infected in the jail as a
20  result of the crowded and unsanitary conditions.  Second
21  objection is that regardless of when the plaintiff was infected
22  by the strep A bacteria, the conditions triggered a latent
23  disease or made it worse.  And with regard to Niederman only,
24  that prior treatment may have avoided some of the
25  complications.  Those are the three specific objections that

1   the defendants made.

2          The bases for both opinions were the records,
3   depositions, as well as the background of each's experience and
4   knowledge of diseases and disease pathophysiology.  The facts
5   that were emphasized were that plaintiff was asymptomatic on
6   the 1st of March when he was taken to jail and that there were
7   inmates with preexisting respiratory illnesses in which the
8   individual plaintiff was injected and his particular
9   circumstances were sleeping on the floor below those with
10  respiratory illnesses.

11         Both testify as to how strep A is transmitted and that
12  if untreated can result in pneumonia and emphasize the
13  progression of symptoms with some complaint, I think March 4
14  fever and other symptoms by March 5, first seen by the nurse on
15  March 6, and had an elevated temperature and pulse on March 7.
16  The symptoms are worsened on the 8th.

17         The nurse is called, Defendant Paulsen, early morning,
18  but she does not see him until 8 o'clock.  The plaintiff
19  collapses and she orders his transport to the clinic, but
20  doesn't stay there and leaves.  And at least as presented, the
21  direct order to do it now didn't come until she returned to the
22  prison and that was around the noon hour, I don't recall
23  specifically now looking at my notes.  And when taken to the
24  center he was diagnosed with pneumonia and septic shock and
25  treatment resulted.

1        It was also established that after this event the
2   other six cellmates were treated with antibiotic which would be
3   consistent with treatment of strep A, although they were not
4   tested for strep as such.  That is the evidence in general that
5   was presented and I felt important in my considerations.
6        702 presents three matters which we are to consider.
7   First is whether there is sufficient factual or database for
8   the opinion.  My conclusion here is that it's unclear whether
9   there is sufficient data.  The both relied entirely on the
10  record presented to them, including depositions, of course.
11  Neither conducted an independent investigation of other facts.
12  Neither, for example, interviewed the plaintiff, his brother or
13  his brother's wife who were part of the traveling party, and
14  certainly one of the issues of the case is whether he was
15  infected coming into the prison or was he entirely free of
16  disease, nor was there any testing or analysis of any type that
17  at least was demonstrated to me.
18       The second factor to be considered is whether the
19  testimony itself is a product of reliable principles and
20  methods.  And the factors suggested in Daubert are not directly
21  applicable to this case.  We are not talking about a particular
22  theory or technique being proposed by the experts to be tested
23  by those standard Daubert references.
24       Generally, as I understand it, and again referring to
25  Bitler, there needs to be a relationship between the method

1  employed, the factual circumstances of the case and the
2  ultimate conclusion or opinion when we are determining
3  reliability.  And in addition to those factors that are
4  outlined, there has been several others and the law generally
5  indicates that many different factors may well be appropriate.
6         The Weinstein's Evidence Manual was referred to when I
7  was looking at this and considering different matters, in
8  particular as summarized in Section 13.02{4}{b}.  And one
9  factor that is a legitimate consideration and was used by the
10 physicians in this instance is temporal proximity between the
11 defendant's -- or plaintiff's evolution of symptoms, his
12 placement in the jail.  And in general, it's recognized that
13 that can be a factor, but at least in the 10th Circuit it is
14 emphasized that it should not be the sole factor.  And I would
15 cite to Goebel v. Denver and Rio Grande, 346 F.3d 987, 999
16 (10th Circuit, 2003).
17        Another matter that is recognized as being legitimate
18 is the process of differential diagnoses is a recommended
19 method of resolving issues such as those presented here in the
20 medical profession.  It isn't -- the law is not real precise as
21 to what is or what is not recognized in that process.
22 Generally it should be, as I understand it, the observation of
23 the evidence and from that deducing a likely cause similar to
24 what is done with the accident reconstruction as well.  And I
25 should generally in doing this consider again the

1    qualifications, the methodology, the type of observations made
2    and the deductive reasoning and, if appropriate, that is
3    considered a reliable methodology.  And I would cite to <u>Bitler</u>
4    again at 400 F.2d 1235.
5              In looking at this, something that's frequently quoted
6    as counsel knows is that simply because an expert has an
7    opinion does not mean it's admissible.  The most frequently
8    cited quote from the Supreme Court is from <u>General Electric Co.</u>
9    <u>v. Joiner</u>, 522 U.S. 136 at 146, 1997 case that nothing requires
10   me to admit evidence which is connected to existing data only
11   by the ipse dixit of the expert.  And the circuit has said in
12   <u>Dodge v. Cotter Corp</u>, 328 F.3d 1212 at 1222, (10th Circuit,
13   2003) that unscientific speculation offered by a genuine
14   scientist is not necessarily genuine or admissible.
15             And here I conclude that from what has been presented,
16   that the only methodology of these experts is deductive from
17   some of the existing data.  Neither seems to go through a
18   careful differential diagnosis procedure that I have referred
19   to.  Identify possible causes and eliminate causes until the
20   most probable cause remains, and that again is a description
21   from <u>Bitler</u>.  I don't find either one of these experts
22   articulated this methodology.  The primary conclusion of each
23   is that he was either infected at the jail or if he was at the
24   jail his condition worsened because of the jail condition.  And
25   I just am not satisfied that that is reliable.

1          I don't know that it, such an opinion is any different
2   than what a jury would conclude, but if he testifies he was
3   healthy when he went in and other people were sick and he was
4   sick as a result or afterwards, I just don't know that we
5   have -- I conclude we do not have sufficient analysis to have
6   an expert opinion as to cause.
7          Now, this lack of methodology or weakness in applying
8   the facts to any possible methodology does not prohibit these
9   experts from testifying as to other matters.  I am speaking
10  strictly as to the three objections that were made that I have
11  previously articulated.  How strep A is transmitted from one
12  person to another or how strep A causes pneumonia or how long
13  it takes strep A to cause pneumonia or what impact delay in
14  treatment may have upon a patient with strep A bacteria, at
15  least Dr. Niederman would appear qualified to render opinion or
16  testify as to those specific items without the conclusion of
17  the ultimate cause.
18         That deals with and the record should reflect, Kathy,
19  that document No. 127 is granted as stated on the record.
20         The related motions deal with the nurses Catherine
21  Knox and Anthony Volz.  And what I have said generally about
22  Drs. Niederman and Greifinger apply here as well.  I won't
23  recite each's background.  It is fairly significant.  The
24  objections by defendants are generally that neither should be
25  prevented to opine that Paulsen was deliberately indifferent.