1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

2

Civil Action No. 05-cv-00377-WDM

3                                    **EXHIBIT 2**

MOISES CARRANZA-REYES,

4

     Plaintiff,

5

vs.

6

PARK COUNTY BOARD OF COUNTY COMMISSIONERS, et al.,

7

     Defendants.

8

_____

9

**REPORTER'S TRANSCRIPT**
Hearing on Motions

10

11

_____

12          Proceedings before the HONORABLE WALKER D. MILLER,

13    Judge, United States District Court for the District of

14    Colorado, commencing at 9:08 a.m., on the 18th day of July,

15    2007, in Courtroom A902, United States Courthouse, Denver,

16    Colorado.

17

18

19

20

21

22

23

24    Proceeding Recorded by Mechanical Stenography, Transcription
      Produced via Computer by Janet M. Coppock, 901 19th Street,
25         Room A-257, Denver, Colorado, 80294, (303) 893-2835

**APPEARANCES**

1
2          Joseph James Archuleta, Law Office of Joseph
3  Archuleta, 1724 Ogden Street, Denver, CO 80218; and
4          William A. Trine of Trine & Metcalf, PC, 1435 Arapahoe
5  Avenue, Boulder, CO 80302, appearing for the Plaintiff.
6          Andrew David Ringel of Hall & Evans, L.L.C.-Denver,
7  1125 17th Street, Suite 600, Denver, CO 80202-5817; and
8          Josh Adam Marks, Berg Hill Greenleaf & Ruscitti, LLP,
9  1712 Pearl Street, Boulder, CO 80302, appearing for Defendants.
10                         *   *   *   *   *

11                         **PROCEEDINGS**

12          THE COURT:  We are here on Case No. 05-CV-377, Moises
13  Carranza Reyes versus Park County Board of County
14  Commissioners, et al.  Counsel, enter your appearance.
15          MR. TRINE:  Bill Trine for the plaintiff.
16          MR. RINGEL:  Good morning, Your Honor.  Andrew Ringel.
17  Oh, I am sorry.
18          MR. ARCHULETA:  Joseph Archuleta, for the plaintiff.
19          MR. TRINE:  Your Honor, my daughter Cheryl Trine who
20  is a lawyer will be joining us, but probably will be coming in
21  late, so when she --
22          THE COURT:  She is not here.  I will assume she will
23  be late.  All right.
24          MR. RINGEL:  I apologize, Your Honor.  Andrew Ringel
25  on behalf of defendants Park County Board of County

1 | Commissioners, Fred Wegener and Monte Gore.

2 |      *MR. MARKS:* Josh Marks on behalf of defendant Vicki

3 | Paulsen.

4 |      *THE COURT:* All right.  Counsel discussed previously

5 | how we might proceed today.  Are there any further instruction

6 | you can give me or how are we going to go forth?

7 |      *MR. TRINE:* Your Honor, Dr. Niederman was scheduled to

8 | be here at 1:00 o'clock.  He called this morning and was stuck

9 | on the runway for two hours and the plane finally took off, but

10 | he probably won't be arriving at DIA until 1:00 and probably

11 | won't be here until 2:00 or 2:30.  So we asked Dr. Pacey to

12 | come in at 1:00.  And if need be, we can probably even call

13 | nurse Tony Volz in if Dr. Niederman is running any later than

14 | that, so we rearranged the schedule somewhat.

15 |      *THE COURT:* All right.  And how are we going to

16 | proceed this morning?

17 |      *MR. TRINE:* Well, we are calling Dr. Greifinger as our

18 | first witness and he is here, Your Honor.

19 |      *THE COURT:* All right.  And have counsel worked out

20 | how they wish to proceed in terms of questioning and

21 | presentation of evidence?

22 |      *MR. TRINE:* Yes, we have, Your Honor.  And I think we

23 | would like to know how informed Your Honor already is with

24 | regard to the basic facts of the case and whether you have had

25 | an opportunity to look at the motions.

1      THE COURT:  Well, I am aware of the facts and we are

2  working on the motion for summary judgment, so I have a factual

3  background.

4      MR. TRINE:  Okay.

5      THE COURT:  I wouldn't pretend to indicate that I have

6  a complete grasp of your disagreements as to the 702 issues.

7      MR. TRINE:  Well, I think the way we wish to proceed,

8  Your Honor, is we will call each of the witnesses and I will

9  ask each witness to focus on the issue being raised in the

10  Daubert motion rather than any other testimony they might be

11  giving, and I hope to be able to accomplish that within 30 or

12  40 minutes which will allow some time for cross-examination as

13  well as questions by the Court.

14      THE COURT:  All right.  Sounds good.  So we will

15  start, then, with the motion concerning Niederman and

16  Greifinger, and obviously we are going to have to deal with

17  Niederman this afternoon.

18      MR. TRINE:  Okay.  That being the case, Your Honor,

19  Dr. Greifinger is here and we can call him as our first

20  witness.

21      THE COURT:  All right.

22    (**Robert Greifinger** was sworn.)

23      THE WITNESS:  Yes, I do.

24      THE COURT DEPUTY:  Please state your full name and

25  spell your last name for the record.

1      *THE WITNESS:*  Robert Greifinger, G-R-E-I-F-I-N-G-E-R.

2                        **DIRECT EXAMINATION**

3  *BY MR. TRINE:*

4  Q.  And your address, Dr. Greifinger?

5  A.  32 Parkway Drive, Dobbs Ferry, New York.

6  Q.  And what is your medical specialty or specialties?

7  A.  I am a physician.  I am originally trained in pediatrics

8  and practice pediatrics.  Since that time I have been involved

9  in correctional healthcare and public health.

10  Q.  And Dr. Greifinger, I know that you already rendered

11  extensive opinions regarding deliberate indifference issues as

12  it relates to the defendants, but that's not the focus of this

13  hearing.  And so what I would like to do is address your

14  opinion that the overcrowding conditions at the Park County

15  Jail caused the plaintiff to develop strep throat.  And you are

16  of that opinion; is that right?

17  A.  Yes, I am.

18  Q.  Would you explain to the Court the information that you

19  relied upon in arriving at that opinion.

20  A.  I reviewed medical records, jail records, deposition

21  testimony.  I also considered all of that information in light

22  of my experience as a physician and my experience as a public

23  health physician.  I looked at medical literature, reflected on

24  my experience with communicable disease that is transmitted by

25  droplets, for example, tuberculosis and streptococcus A, and I

Robert Greifinger - Direct

1   formed opinions based on all that information.

2   Q.  And Doctor, would you briefly, then, explain to the Court

3   your methods in arriving at your opinion, your rationale and

4   reasoning in arriving at the opinion that it was the

5   overcrowding conditions at Park County Jail that caused the

6   plaintiff to develop strep A.

7   A.  As far as all the information that I reviewed, it seems

8   that Mr. Carranza-Reyes arrived at the jail in good health.

9   Reportedly he was feeling well, well fed, well nourished and

10  well clothed during the period from the time that he left

11  Mexico until he arrived in Arizona and then eventually came to

12  Colorado and got arrested.  There is nothing in the

13  documentation that suggests that he was ill or that anyone else

14  was ill.

15          On arrival at the jail from the medical screening

16  there was no apparent signs or symptoms of illness.  He was

17  placed in a dormitory that was -- had a design capacity of 18

18  inmates and during the period between March 1st and March 8th

19  when he was incarcerated at the Park County Jail.  The census

20  in that dormitory designed for 18 went up as high as 61 on a

21  day or two prior to the day that he was transferred to the

22  hospital.  Reportedly, and it seemed to be valid testimony,

23  including by a correctional officer that he was sleeping on a

24  mattress on the floor in between two triple bunks, so that he

25  was between six people, several of whom were ill with coughing

Robert Greifinger - Direct

1   and sneezing and nasal discharge, and there was a lot of facial

2   tissue with secretions from these ill inmates on the floor

3   around the area where he was bunked.

4          Officer Allen testified that many of the inmates in

5   that dormitory were ill during the period of March 1st through

6   March 7th when 50 of the 61 inmates were taken by the INS to

7   another facility.

8          So based on the evidence and the documentation that I

9   saw that he was not ill, based on what I know about

10  transmission of droplet infection, which is that crowding

11  contributes to the transmission of infections like strep A.  As

12  a matter of fact, there is a direct correlation between the

13  proximity of the people who are sleeping in the dormitory and

14  the risk of infection and the stress of the crowding in a

15  facility which is unhygienic led me to the conclusion that he

16  was either not colonized with strep A when he came in or if he

17  was, he was exposed to the stresses of the environment and more

18  of the bacteria as he was lying on the floor between these two

19  triple bunks.  So the bacteria itself, the crowding, the time

20  that he was in this, the timing fits the development of this

21  illness.

22  Q.  And Doctor, you mentioned that if he was colonized at the

23  time he arrived at the jail.  What do you mean by colonized?

24  A.  Colonized just means that he would have the bacteria in his

25  throat.  And from time to time most people get infected with

Robert Greifinger - Direct

1  different bacteria, strep A is one of them, but usually the

2  bodies, if there aren't a lot of bacteria, the body can deal

3  with it.  The immune system can head it off, but once people

4  are stressed, the immune system compromised or crowding or

5  exposed to more bacteria, the body just can't keep up and the

6  immune system can't keep up and fight it, and then folks can

7  become deathly ill like Mr. Carranza-Reyes did.

8  Q.  And Doctor, from all of the documents and deposition

9  testimony you reviewed, was there any evidence that he may have

10  been colonized with strep A even though he had no symptoms

11  before he arrived at the jail?

12  A.  No, there was no evidence at all.  Not only was he not

13  feeling ill, there are no reports in the documentation that I

14  reviewed that anyone around him had been ill, so it would be

15  speculative to say that he may have been colonized.

16  Q.  And Doctor, when from all the records did you determine

17  that he began developing the symptoms of the strep throat?

18  A.  Well, he began -- I believe he put in a request for care on

19  March 4th, so he arrived at the jail on March 1st.  March 4th

20  he puts in a request for care, and I would have to refer back

21  to my report to find the specific symptoms.  He wasn't seen

22  until March 6th when he was seen by Nurse Paulsen.  Nurse

23  Paulsen also saw him on March 7th.  And between March 6th and

24  the early morning of March 8th he progressively got sicker and

25  sicker, so much so that about eight to 10 hours before he was

Robert Greifinger - Direct

1  transferred to the hospital the correctional officer found him

2  with difficulty breathing and actually administered oxygen to

3  him.

4  Q.  And Doctor, what is the usual incubation period for

5  developing symptoms once you become colonized with strep A?

6  A.  It's pretty much the same as it is for colds.  It's one to

7  three days.  We all know from our experience if we are with

8  someone who is shedding a lot of discharge and we have one to

9  three days later, if you are not sick by three days, you are

10  usually not going to catch it, but often you do develop those

11  symptoms one to three days after the exposure.

12  Q.  Doctor, do you agree that all of the evidence that you have

13  referred to, jail records, charts, nurse's notes indicate that

14  he had no symptoms and was healthy on arrival at the jail on

15  March 1?

16  A.  Yes.  That's clearly documented by the jail staff.

17  Q.  And then what were the initial symptoms that he developed?

18  A.  May I refer to my report?

19  Q.  Sure.

20  A.  Initially on March 4, 2003, he reported he had chills and a

21  sore throat.  Chills, as you know, is a symptom of fever and

22  it's a condition that in my opinion requires a medical

23  diagnosis and treatment.

24        MR. RINGEL:  Just for the record, Dr. Greifinger

25  issued four reports in the case.  If he could clarify which

Robert Greifinger - Direct

1  report he is referring to, that would be helpful for me.

2      *THE COURT:*  That would be fine.

3  *A.*  Yes, sir.  I am referring to my initial report dated

4  July 29, 2005, and I am reading from Paragraph 21.

5  *BY MR. TRINE:*

6  *Q.*  Can you briefly summarize how his symptoms progressed after

7  March 4?

8  *A.*  On March 6 when he was seen by Nurse Paulsen, he was

9  complaining of fever, body aches, headache, nausea and

10  diarrhea, so it's become more systemic.

11  *Q.*  And after that?

12  *A.*  After that he was seen for the same symptoms on March 7 by

13  Nurse Paulsen, but he also had vomiting and a tender abdomen,

14  so this together tells me that his symptoms were progressing

15  from the 4th to the 6th to the 7th, and he was getting

16  progressively sicker.

17  *Q.*  And then in the early morning hours of the 7th you

18  mentioned something earlier about giving him oxygen.  What

19  symptoms did he have at that time?

20  *A.*  He had -- he had a respiratory rate of 34 breaths per

21  minute which is very, very high.  Most of us breathe between 10

22  and 14 times a minute.  The upper limit of normal is 20.  34

23  times a minute is an indication of very serious disease.

24  *Q.*  And Doctor, what experience have you had with the treatment

25  and diagnosis of strep A infection?

Robert Greifinger - Direct

1   A.  Well, strep A infection is probably the most common

2   bacterial illness in children, and as a practicing pediatrician

3   for many years I treated streptococcal disease every day of my

4   practice.  I treated literally hundreds and hundreds of

5   patients with streptococcal infection of the throat.

6   Q.  And Doctor, what experience or background do you have in

7   the spread of communicable disease and conditions like those

8   found at Park County?

9   A.  First of all, through my training I train not only

10  pediatrics, but in social medicine, which is a broad field that

11  includes among other things public health and the transmission

12  of communicable diseases.  Beginning in my tenure as running

13  the medical care of Rikers Island, which is New York City's

14  jail, and then later as chief medical officer for the New York

15  State Department of Corrections, I developed probably more

16  experience than I had ever looked for in containing the

17  transmission of communicable disease.

18        In the early 1990s we had a devastating outbreak of

19  multi-drug resistant tuberculosis which led to the deaths of

20  more than 30 people.  During the several years of the

21  investigation and the work on containing that outbreak, I

22  learned a very substantial amount.  Tuberculosis is also a

23  bacteria.  It's different from strep A, but it's a bacteria.

24  It's also a bacteria that causes pneumonia and that can lead to

25  death.

Robert Greifinger - Direct

1    Furthermore, during my years working for the New York

2  State Department of Correctional Services, I investigated

3  outbreaks of other bacterial diseases such as legionella, viral

4  diseases such as HIV, hepatitis B and hepatitis C.  I have done

5  research and published many articles on the transmission of

6  communicable disease behind bars.

7    Further, in September I have a book coming out, a book

8  that I edited which is called Public Health Behind Bars.  And

9  it deals among other things with the transmission of

10  communicable disease behind bars and into the community.

11  Q.  And Doctor, is there literature, studies or statistics to

12  support your opinion that the crowded and unsanitary jail

13  conditions caused plaintiff's condition?

14  A.  Yes, there is substantial literature.  This is the basic

15  germ theory that we have known about for more than a hundred

16  years, 150 years probably.  It's something that we all learn in

17  medical school and our residency training.  Recently I looked

18  in a textbook of infectious disease called The Principles and

19  Practice of Infectious Diseases edited by Mandell which is one

20  of the foremost infectious disease textbooks, and there are

21  charts in the chapter on streptococcus that document the

22  physical proximity and crowded conditions enhance the risk of

23  transmission of streptococcal disease.  The chapter also goes

24  on to say that it's spread by droplets from person to person in

25  crowded conditions.

Robert Greifinger - Direct

1          I have an article that was available on the internet
2    published by the National Institutes of Health on group A
3    streptococcal infections.  And it says very clearly in the
4    section on transmission that, and I quote, "Most people do not
5    get group A strep infections from casual contact with others,
6    but a crowded environment like a dormitory, school or an
7    institutional setting can make it easier for the bacteria to
8    spread."
9          Further, in an on-line textbook of medicine called E
10   Medicine, I have an article that was last updated on
11   August 1st, 2006, on bacterial pharyngitis or sore throats
12   caused by bacteria that affirms that droplets are the method of
13   infection and that crowded promotes the transmission of
14   streptococcal A infection.
15        MR. TRINE:  Your Honor, I wonder if we could have
16   those documents that he has been referring to marked as
17   exhibits for the purpose of just this hearing.
18        THE COURT:  All right.  They have not been previously
19   tendered?
20        MR. TRINE:  No, Your Honor.  He brought those with him
21   this morning.
22        MR. RINGEL:  I don't object to them being marked for
23   exhibits for the purposes of this hearing, but I would note
24   this is the first I have seen them this morning and they
25   weren't part of any of the papers on the Greifinger, Niederman

Robert Greifinger - Direct

1  motion.  They weren't part of Greifinger's file.  They weren't

2  ever previously disclosed at all.

3       THE COURT:  Let's mark them as Court Exhibit 1 for the

4  sequence for this hearing alone.  So they will be part of the

5  record.  Let's identify what they are for the record.

6  BY MR. TRINE:

7  Q.  As each of those are marked, Doctor, can you identify by

8  title which document is being numbered?

9  A.  Yes.  Court Exhibit 1 is a cover page and two pages of text

10  from The Principles and Practice of Infectious Disease, Fourth

11  Edition.  The primary editor is Mandell, Gerald Mandell.

12       Court Exhibit No. 2 is a printout from the internet

13  accessed on the 16th of June -- of July, I am sorry, of 2007

14  published by the National Institutes for Allergy and Infectious

15  Disease, which is part of the National Institutes of Health,

16  and its subject matter is grade A streptococcal infection.

17       And the third is also an article that I accessed on

18  the internet on July 16, 2007 on bacterial pharyngitis from a

19  website called E Medicine.

20  Q.  Now, Doctor, in your review of all the documents and

21  materials that you earlier referred to, do you believe you are

22  able to rule out any other causes of plaintiff's developing the

23  strep A infection other than the crowded unsanitary conditions

24  you described?

25  A.  I, thinking very carefully about it, I cannot rule out any

Robert Greifinger - Direct

1   other potential cause for his development of symptoms and signs
2   of streptococcal disease between March 4th and March 8th and
3   for his deterioration through that time.  We know that he had a
4   diagnosis of strep A.  That was made in the hospital after his
5   incarceration while he was being treated and recuperating.  And
6   we know that Dr. Bachman, the physician at the facility, chose
7   to treat several inmates with antibiotics for bacterial
8   infection, so Dr. Bachman apparently agreed there was a
9   bacterial infection present.

10          So I can't think of any other cause but the bacteria
11  itself, the presence of the bacteria in Mr. Carranza-Reyes, the
12  stress of the crowding, the risk of droplet infection from
13  several sick inmates whose nasal discharges and coughing, their
14  droplets would naturally fall to the floor, and there he was
15  sleeping on the floor between two triple bunks.
16  Q.  Exploring all of the evidence and information available,
17  was there any evidence that he had been subjected to another
18  sick person or being exposed to another sick person before
19  arriving at the jail?
20  A.  No, there was not.
21  Q.  Now, Doctor --
22          THE COURT:  I am not sure I am understanding the
23  question or the answer in terms of the negative.  Maybe it's
24  just myself, but what are you asking with regard to other
25  possible causes?  I guess that's the question you are

Robert Greifinger - Direct

1  answering.

2          MR. TRINE:  Okay.  Let me clear that up.

3          THE COURT:  I am not sure that you and the witness

4  used the same negative.

5  BY MR. TRINE:

6  Q.  Doctor, my question is:  Were you able to rule out any

7  other possible causes of his strep throat other than the

8  environment at the jail?

9  A.  Well, as I said, it's possible that he was colonized when

10  he came into the jail, although I think that's very unlikely.

11  Q.  Okay.  Now, let me interrupt you.  In order to be

12  colonized, would he have to be subjected to someone with strep

13  A infection?

14  A.  Yes.

15  Q.  Is there any evidence that he was subjected to anyone else

16  with strep A infection?

17  A.  There was none.

18  Q.  Okay.  So did you find any evidence that the cause of this

19  strep A occurred from some source before he arrived at the

20  jail?

21  A.  It's not -- I am sorry.  Could you repeat that?

22  Q.  Yeah.  Did you find any evidence in the records that the

23  cause of his strep A occurred before he arrived at the jail?

24  A.  No, there was no evidence in the record that the cause of

25  strep A transmission to him began before his incarceration.

Robert Greifinger - Direct

1    *Q.* And can you state with reasonable medical probability that

2    the crowded conditions with sick inmates caused plaintiff to

3    develop strep throat which when not treated progressed to

4    pneumonia, sepsis and eventually septic shock?

5    *A.* Yes.

6    *Q.* In your opinion, Doctor, have the sources that you relied

7    upon, are the sources you relied upon reliable sources?

8    *A.* Well, yes. I relied on the documents that have been

9    entered as court exhibits, but I also relied on my many years

10   of experience as a physician and my experience in public

11   health, particularly my experience behind bars understanding

12   the nature of transmission of communicable disease in crowded

13   and unsanitary environments.

14            *MR. TRINE:* That's all I have. Thank you.

15            *THE COURT:* Cross-examination.

16                    **CROSS-EXAMINATION**

17   BY MR. RINGEL:

18   *Q.* Dr. Greifinger, the first thing that I wanted to talk to

19   you about was your background and experience, okay? You

20   indicated that you are a licensed physician; is that correct?

21   *A.* Yes.

22   *Q.* And that you have training and experience in pediatrics,

23   correct?

24   *A.* Yes.

25   *Q.* Isn't it true, Doctor, that the last time you provided

Robert Greifinger - Cross

1   direct patient care to a patient was 1985?

2   A.   Yes, that's correct.  I don't do hands-on medical care.

3   Q.   And that would be 22 years ago, correct?

4   A.   Yes.

5   Q.   From 1985 through 1999 you served as the deputy

6   commissioner and chief medical officer for the New York State

7   Department of Correctional Services, correct?

8   A.   Yes.

9   Q.   Not to be pejorative, but your role in that position was as

10  an administrator and policy maker, not a doctor, correct?

11  A.   No, that's not correct.  We talked about that in my

12  deposition.  Yes, I was a manager, but I was also a supervisor

13  of all the clinical services for the department and the 68,000

14  inmates who were behind bars on an average day.

15  Q.   But you provided no direct medical care to any of those

16  68,000 inmates in that role; is that correct?

17  A.   That's correct.

18  Q.   Since 1995 you have been a consultant on correctional

19  healthcare and related issues, correct?

20  A.   That's correct.

21  Q.   And in your role as a consultant, you provided primary

22  medical care to no one, correct?

23  A.   That's correct.

24  Q.   And in fact, you would not consider yourself an expert in

25  the infectious disease mechanisms of strep A, would you?

Robert Greifinger - Cross

1    *A.*   I am not sure what you mean by mechanisms.

2    *Q.*   Okay.  You have talked about the manner in which conditions

3    can, from a public health perspective, can contribute to

4    communicable disease and illness generally speaking and strep A

5    particularly, correct?

6    *A.*   Yes.

7    *Q.*   Okay.  There is a difference, isn't there, between how

8    strep A works from a bacterial or a pathophysiological

9    perspective than what you have testified to, correct?

10   *A.*   Yes.  I would say I have expertise in the prevention and

11   transmission of infections such as strep A that are transmitted

12   by airborne droplets.

13   *Q.*   But you don't have expertise in the bacterial mechanisms

14   and most particularly the pathophysiology of strep A, correct?

15   *A.*   That's correct.

16   *Q.*   You have never written any publication on strep A, correct?

17   *A.*   That's correct.

18   *Q.*   And you have never written any publication on a topic of

19   pneumonia other than related to tuberculosis, correct?

20   *A.*   I have never published an article on a pneumonia other than

21   tuberculosis.

22   *Q.*   You have never written a publication about sepsis?

23   *A.*   That's correct.

24   *Q.*   You wouldn't consider yourself an expert in sepsis, would

25   you?

Robert Greifinger - Cross

1   A.  No, just that my understanding that certain diseases can

2   lead to sepsis if they are untreated, so my expertise is as a

3   primary care physician on the lookout for bacterial infections

4   and treating those infections to prevent them from leading to

5   dire consequences.

6   Q.  But again, we have established that your expertise is 22

7   years old as a primary care physician, correct?

8   A.  No.  I maintain -- I am current in medical care.  I need

9   that for the work I do as an investigator and as a consultant

10  to the correctional health programs across the country.

11  Q.  You read up in the field, but you don't treat patients,

12  correct?

13  A.  That's correct.

14  Q.  Now, you were an expert in a case called Dukes v. The State

15  of Georgia that was pending in the United States District Court

16  for the Northern District of Georgia, correct?

17  A.  That's correct.

18  Q.  And in that case the issue was when an individual allegedly

19  became infected with a disease called cryptococcal meningitis,

20  right?

21  A.  It had to do with an inmate patient who was infected with

22  HIV and developed cryptococcal meningitis.

23  Q.  And isn't it true, Doctor, that the Court in that case

24  under Daubert and Rule 702 did not allow you to testify as an

25  infectious disease expert in the infectious disease mechanism

Robert Greifinger - Cross

1   of cryptococcal meningitis?

2   A.   Yes.   It's my understanding the court ruled on the state

3   law claim I was unable to testify, but I need to add that

4   Georgia has a rule that requires expert testimony on causation,

5   that the experts be practicing medicine within the three years

6   of the time of the case or be actively teaching at a medical

7   school, which I do not.

8   Q.   Now, I understand that rule of Georgia law, Doctor, but

9   isn't it also true that the court said the only area of

10  expertise that you could give testimony to in that case was in

11  the area of correctional healthcare?

12  A.   That was the other area in question and the court allowed

13  my testimony in that area.

14  Q.   And your background hasn't changed since the court in the

15  United States District Court for the Northern District of

16  Georgia made that determination in 2006; is that correct?

17  A.   That's correct.

18  Q.   Let's talk about your causation opinions, Doctor.   If I

19  understand it right, you have either one causation opinion or

20  two, one with two parts or two causation opinions, and let me

21  go over them with you in series.   Your opinion is that either

22  the conditions of confinement in the Park County Jail caused

23  Mr. Carranza-Reyes to become infected with streptococcus A or

24  he had been infected by the bacterial or colonized by the

25  bacteria prior to being in the jail and the conditions of

Robert Greifinger - Cross

1   confinement caused the strep A to become symptomatic.  Have I

2   accurately stated your two opinions?

3   A.   Yes, although it's -- the first is much more likely than

4   the second.

5   Q.   I understand.

6   A.   The acquiring the infection in the jail.

7   Q.   Okay.  You have already testified that there is no way that

8   you can rule out that he became colonized with the strep A

9   bacteria prior to March 1st, 2003, when he arrived at the jail;

10  is that correct?

11  A.   That's correct.

12  Q.   And in response to questions from Mr. Trine, you talked

13  about the fact that there is no evidence that he was in contact

14  with anyone prior to March 1st who had streptococcus A, right?

15  A.   Yes.

16  Q.   Isn't it also true that there is no evidence that he was in

17  contact with anyone that had streptococcus A during the time he

18  was in the Park County Jail?

19  A.   Yes, because the jailhouse staff did not do cultures,

20  throat cultures as they ought to have done.

21  Q.   But the fact remains no person other than

22  Mr. Carranza-Reyes was diagnosed with having streptococcus A

23  who was in the jail between March 1 and March 8, 2003, correct?

24  A.   Dr. Bachman diagnosed bacterial disease, but not

25  specifically strep A.