Carranza-Reyes v. Park County                                                                       Briselda Gomez-Villalobos

---

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Case No. 2005-WM-377 (BNB)

DEPOSITION OF: BRISELDA GOMEZ-VILLALOBOS
February 7, 2006

MOISES CARRANZA-REYES,
Plaintiff
v.
PARK COUNTY, a public entity of the State of Colorado
and its governing board, THE PARK COUNTY BOARD OF COUNTY
COMMISSIONERS; PARK COUNTY SHERIFF'S OFFICE, a public
entity of the State of Colorado; FRED WEGENER,
individually and in his official capacity as Sheriff of
Park County, Colorado; MONTE GORE, individually and in
his capacity as Captain of Park County Sheriff's
Department; VICKIE PAULSEN, individually and in her
official capacity as Registered Nurse for Park County,
Colorado; JAMES BACHMAN, M.D., individually and in his
official capacity as Medical Director of the Park County
Jail,

Defendants.

TAKEN PURSUANT TO NOTICE on behalf of the Defendant
Paulsen at 1125 17th Street, Suite 600, Denver, Colorado
80202 at 11:10 a.m. before Laura L. Corning, Federal
Certified Realtime Reporter, Certified Shorthand
Reporter and Notary Public within Colorado.

---

                                          3
                                     EXHIBIT 5
                                     I N D E X
EXAMINATION OF BRISELDA GOMEZ-VILLALOBOS:          PAGE
February 7, 2006

By Mr. Kordick                                      --

By Mr. Archuleta                                   103

By Mr. Ringel                                       85

By Mr. Marks                                         5

By Mr. Jurs                                        103

                                          INITIAL
DEPOSITION EXHIBITS                       REFERENCE
(None marked.)

REQUESTED PORTIONS OF TESTIMONY:                  PAGE
(None.)

REFERENCES TO EXHIBITS MARKED PREVIOUSLY:
Exhibit No.      Page Reference
    15                56
    16                50
    17                51

---

                                                      2

                   APPEARANCES
For the Plaintiff:    LLOYD C. KORDICK, ESQ.
                      805 South Cascade
                      Colorado Springs, Colorado 80903
                      JOSEPH J. ARCHULETA, ESQ.
                      Law Office of Joseph Archuleta
                      1724 Ogden Street
                      Denver, Colorado 80218

For the Defendants    ANDREW D. RINGEL, ESQ.
Park County, Park     Hall & Evans, LLC
County Board of       1125 17th Street
Commissioners, Park   Suite 600
County Sheriff's      Denver, Colorado 80202-2037
Office, Wegener,
Gore:

For the Defendant     JOSH A. MARKS, ESQ.
Paulsen:              Berg Hill Greenleaf
                        & Ruscitti, LLP
                      1712 Pearl Street
                      Boulder, Colorado 80302

For the Defendant     ANDREW W. JURS, ESQ.
Bachman:              Johnson McConaty & Sargent, P.C.
                      400 South Colorado Boulevard
                      Suite 900
                      Glendale, Colorado 80246

Also Present:         Bety Ziman, Interpreter
                      Moises Carranza-Reyes

---

                                                        4

 1          WHEREUPON, the within proceedings were
 2   taken pursuant to the Federal Rules of Civil
 3   Procedure:
 4               BETY ZIMAN,
 5   having been first duly sworn to interpret Spanish to
 6   English and English to Spanish, and
 7               BRISELDA GOMEZ-VILLALOBOS,
 8   having been first duly sworn to state the whole truth,
 9   was examined and testified through the interpreter as
10   follows:
11               EXAMINATION
12   BY MR. MARKS:
13      Q.   Could you please tell us your full name.
14      A.   Briselda Gomez-Villalobos.
15      Q.   May I call you Briselda for purposes of
16   this?
17      A.   Yes, that's fine.
18      Q.   Briselda, have you ever been in a
19   deposition like this before?
20      A.   No.
21      Q.   Let me explain a few ground rules to you.
22   This is a question-and-answer session. If you do not
23   understand one of my questions, I would ask that you
24   tell me so I can rephrase it. Is that fair?
25      A.   Yes, that's fine.

---

Coffman Reporting
303.898.0202
303.893.2230 FAX
Pages 1 to 4

* SUBJECT TO CONFIDENTIALITY DESIGNATIONS *

Carranza-Reyes v. Park County                                                                 Briselda Gomez-Villalobos

17

1  your husband had to pay to get you across the border?
2     A.    No, I don't recall.
3     Q.    Can you describe for me how you got from
4  Mexico City to the border?
5     A.    By bus.
6     Q.    How long do you recall the bus ride?
7     A.    I would think about two or three days.
8     Q.    On the same bus?
9     A.    With my brother and -- excuse me. With
10 my husband and my brother-in-law?
11    Q.    Yes.
12    A.    Yes.
13    Q.    But did you -- were you on the same bus
14 from Mexico City to the border?
15    A.    Yes.
16    Q.    Can you estimate how many other people
17 were on this bus?
18    A.    It was full. I don't know.
19    Q.    Did you pay much attention to the other
20 people who were on this bus?
21    A.    No.
22    Q.    So can you tell me if there were other
23 people who were sick or coughing on the bus?
24    A.    No.
25    Q.    Did you get off the bus in a particular

18

1  city or town?
2     A.    The bus would stop, but I don't know
3  where.
4           MR. MARKS: But ultimately she got off
5  the bus at a town, I presume, near the border. I want
6  to know what the name of that city was.
7           THE DEPONENT: Oh, when I got off? Agua
8  Prieta.
9     Q.    (BY MR. MARKS) How long did you stay in
10 Agua Prieta?
11    A.    About three to four days.
12    Q.    Did you and your husband and brother-in-
13 law all stay together?
14    A.    Yes.
15    Q.    Where did you stay in Agua Prieta?
16    A.    A hotel.
17    Q.    In a room by yourselves?
18    A.    Yes.
19    Q.    And after those three or four days, what
20 did you do?
21    A.    We crossed.
22    Q.    Did you cross with other people?
23    A.    There were other people.
24    Q.    Did you cross as a group with these other
25 people?

19

1     A.    Yes, it was a group.
2     Q.    How large was the group?
3     A.    About 10 to 11 people.
4     Q.    Prior to your crossing with these other
5  people, did you have any contact with the people who
6  led you across the border?
7     A.    No.
8     Q.    Did your husband?
9     A.    With my husband and my brother-in-law.
10    Q.    That's what I was asking. Did -- who
11 spoke to the person who helped you across the border
12 before you left for Agua Prieta? I'm sorry. Before
13 you left from Agua Prieta.
14    A.    Oh, my husband spoke with some men.
15    Q.    Do you recall whether you had to submit
16 any information about your fitness or medical condition
17 before crossing the border?
18    A.    Yes.
19    Q.    What did you have to tell these people or
20 submit to these people prior to crossing the border?
21    A.    I don't understand.
22    Q.    I thought you just told me that you had
23 to submit some information about your physical
24 condition to the people who were going to help you
25 across the border.

20

1     A.    I did not understand correctly.
2     Q.    Okay. Let's start over. Did you have to
3  submit or give any information to the people who
4  were -- who you were paying to help you cross the
5  border?
6     A.    My husband spoke with the men.
7     Q.    Okay. And you did not; is that right?
8     A.    No.
9     Q.    Do you know if your husband had to
10 provide them with any information about your physical
11 condition?
12    A.    About our -- whatever you just said, no.
13    Q.    In other words, did you have to provide
14 them --
15          MR. KORDICK: I don't think she
16 understands. I object.
17    Q.    (BY MR. MARKS) Did you have to tell the
18 people who were helping you across the border about any
19 handicaps or sicknesses that you had?
20    A.    No.
21    Q.    Did you know anything about the physical
22 condition or health of the people you crossed the
23 border with?
24    A.    No, I don't.
25    Q.    Did you walk across the border?

Pages 17 to 20

* SUBJECT TO CONFIDENTIALITY DESIGNATIONS *

**21**

1  A. Yes.
2  Q. And for how long did you have to walk?
3  A. 14 hours; however, we would take a break
4  for about a half an hour, an hour there.
5  Q. Was it physically exhausting for you to
6  cross the border?
7  A. No.
8     MR. MARKS: How many miles or kilometers
9  would she estimate that --
10 Q. (BY MR. MARKS) -- would you estimate
11 that you walked during this border crossing?
12 A. No. A truck picked us up.
13 Q. At some point I thought you just said
14 that you walked for about 14 hours.
15 A. While we were crossing the border.
16 Q. Right. But before a truck picked you up,
17 how long would you estimate -- or how far would you
18 estimate you walked?
19 A. From the hotel, we went to a truck.
20 Q. Oh, I see. I misunderstood. So what
21 you're telling me is that a truck picked you up at the
22 hotel and then you crossed the border in a truck?
23 A. No. He dropped us off for us to walk.
24 Q. Okay. So from the hotel a truck picked
25 you up and dropped you off at a place where you then

**22**

1  walked across the border?
2  A. For me to cross the border with my
3  husband and my brother-in-law.
4  Q. After this truck dropped you off, how
5  long did you walk for?
6  A. For about 14 hours, more or less.
7  Q. And during those 14 hours, can you
8  estimate for me how far you believe you walked?
9  A. How far did these things -- we would
10 rest, and then we would start up again.
11    MR. ARCHULETA: Just for clarification,
12 she says that the -- she said no, she couldn't
13 calculate it. She would rest.
14 Q. (BY MR. MARKS) Did your husband or your
15 brother-in-law discuss how long they thought the walk
16 was?
17 A. No.
18    MR. MARKS: Does she recall any of the --
19 well, let me back up. When she walked during those
20 14 hours, was there someone who was leading the group?
21    THE DEPONENT: Excuse me? I did not
22 understand.
23 Q. (BY MR. MARKS) Was there someone leading
24 this group that was crossing the border?
25 A. Yes.

**23**

1     MR. MARKS: And did that person tell them
2  how far they would have to walk?
3     THE DEPONENT: No.
4     MR. MARKS: During the 14 hours that they
5  walked --
6  Q. (BY MR. MARKS) -- did you have a chance
7  to observe the health of the other people in the group?
8  A. Observed? Yes.
9  Q. Did you observe people coughing or sick?
10 A. No.
11 Q. I presume you could not -- you did not
12 know if any of these people were carrying diseases or
13 infections with them.
14 A. Infection, no.
15 Q. You couldn't -- you could not observe
16 that; is that right?
17 A. No.
18    MR. MARKS: I just want to clarify that
19 she is agreeing with me.
20    THE DEPONENT: What did you say?
21    MR. MARKS: I asked her if she was -- if
22 she could observe whether these people were carrying
23 infections or diseases.
24    THE DEPONENT: No, I did not see.
25 Q. (BY MR. MARKS) What happened at the end

**24**

1  of the 14-hour walk?
2  A. A van picked us up.
3  Q. Did your husband have any difficulties in
4  walking across the border?
5  A. No.
6  Q. Did Moises have any difficulty crossing
7  the border?
8  A. No.
9  Q. Did the van pick up the whole group?
10 A. Yes.
11 Q. Were there any other persons in the van
12 besides the group that crossed the border?
13 A. The one who was driving.
14 Q. How long was the van ride?
15 A. I don't recall.
16 Q. Was it nighttime or daytime when you were
17 picked up by this van?
18 A. It was nighttime.
19 Q. Okay. And was it nighttime or daylight
20 when the van stopped?
21 A. It was nighttime.
22 Q. And do you know where the van stopped?
23 A. He said it was Phoenix.
24 Q. Where did you go next after the van
25 dropped you off in Phoenix?

Carranza-Reyes v. Park County                                    Briselda Gomez-Villalobos

**33**

1   MR. KORDICK: Object to the form.
2   A.   About how long? I don't remember how
3   long.
4   Q.   (BY MR. MARKS) Was this the van that was
5   eventually stopped by the police?
6   A.   Yes.
7   Q.   My question was how long do you remember
8   being in the van from the time you started until it was
9   stopped by the police?
10  A.   No, no, I don't recall exactly.
11  Q.   About how many people would you say were
12  in this van?
13  A.   When I boarded the van in Phoenix?
14  Q.   Sure. Let's start there.
15  A.   About six or seven people.
16  Q.   And did the van pick up any more people
17  besides yourselves?
18  A.   No.
19  Q.   Did the van drop off anybody before it
20  was stopped by the police?
21  A.   No, no.
22  Q.   How many persons would you say this van
23  could seat?
24  A.   Well, at the front there was the main
25  part of the -- of the -- of the van, and four of us

**34**

1   were sitting there, and I wasn't able to see what was
2   behind.
3   Q.   Were there additional people in the rear
4   of this vehicle?
5   A.   My brother-in-law and my husband and
6   other people.
7   Q.   Were you in the back of the car?
8   A.   Yes.
9        MR. ARCHULETA: I wanted to object to the
10  form of the question. You've been talking about a van,
11  and you said a car.
12       MR. KORDICK: Automobile.
13       MR. MARKS: Vehicle.
14       MR. JURS: I also would like to raise a
15  concern at this point. Either Mr. Archuleta or Mr.
16  Kordick is to perform this deposition, but I don't
17  believe it's appropriate for both of them to do so, and
18  the last 15 minutes or so we've had one or both of you
19  to make an objection. I would request one or the other
20  of you be the official representative of the plaintiff
21  at this deposition.
22  Q.   (BY MR. MARKS) Was this -- it was a van
23  that you were in?
24  A.   It was like a truck with a cabin and
25  separate on the back.

**35**

1   Q.   Do you know what a truck with a camper
2   is?
3   A.   No.
4        MR. MARKS: Did it appear to her that
5   there was a front cabin separated from a rear
6   compartment?
7        THE DEPONENT: Yes.
8   Q.   (BY MR. MARKS) In terms of the amount of
9   time that you spent in this van from Phoenix to the
10  point at which it was stopped by the police, do you
11  think it was more than a few hours that you spent in
12  that car -- I'm sorry -- in that van?
13  A.   Yes, hours. Hours, yes. Hours, a day.
14  Q.   Did you spend more than one day in that
15  car -- I'm sorry -- in that van?
16  A.   I don't know exactly.
17  Q.   How many persons would you say were in
18  the back compartment?
19  A.   Around five or six people.
20  Q.   Did you have a chance to see what kind of
21  physical condition those people were in in the back?
22  A.   All I saw was that they had comforters.
23  I did not see his face. I wasn't in the back.
24  Q.   Did you have any opportunity to talk to
25  the people who were in the back of the van or the

**36**

1   truck?
2   A.   No.
3   Q.   Could you hear what was happening in the
4   back of the truck, such as if people were talking?
5   A.   I -- they were talking. I could hear
6   them talking.
7   Q.   Could you hear any coughing or sneezing
8   that was happening in the back of the truck?
9   A.   No.
10  Q.   No, you could not hear that?
11  A.   Not coughing.
12  Q.   You did not hear any coughing is what
13  you're telling me; is that right?
14  A.   Yes.
15  Q.   I did not ask you this: What kind of
16  condition was your husband in at the time that you were
17  in this van? How was his health, in other words?
18  A.   Normal.
19  Q.   How about yourself, how were you feeling?
20  A.   Fine.
21  Q.   By this time, how long would you say --
22  how many days would you say you were into your trip
23  from the Mexico City?
24  A.   No, I don't understand.
25  Q.   By the time the van was stopped by the

Pages 33 to 36

*  SUBJECT TO CONFIDENTIALITY DESIGNATIONS  *

Carranza-Reyes v. Park County                                          Briselda Gomez-Villalobos

**37**

1 police, how many days would you say you were -- you had
2 been traveling?
3    A.    When I was in the van, I don't recall if
4 it was a day or two days or hours.
5    Q.    I may not be asking very good questions.
6 I'm trying to find out from you -- I'm trying to find
7 out from you how many days had gone by since you left
8 Mexico City.
9    A.    About 10, 11, 12 days. I don't recall.
10 I don't recall exactly.
11    Q.    And during those 10 or 11 days, you had
12 not slept in a bed that you were used to sleeping in;
13 is that right?
14    A.    I had slept in a bed.
15    Q.    But you had slept in strange places.
16    A.    Strange, yeah.
17    Q.    All right. And had you eaten the foods
18 that you were accustomed to eating in Mexico?
19    A.    Yes.
20    Q.    Same foods?
21    A.    Well, the usual thing, what we always
22 eat.
23    Q.    How was your husband's health by the time
24 the van was stopped by the police?
25    A.    Fine.

**38**

1    Q.    And Moises, how was his health?
2    A.    Fine.
3    Q.    What do you recall happening when the
4 police stopped the van that you were -- or truck that
5 you were traveling in?
6    A.    I remember that I woke up, because I was
7 sleeping at the time, and he spoke with the sheriff,
8 but I did not understand what.
9    Q.    Who spoke with the sheriff?
10    A.    The one who was driving.
11    Q.    In English?
12    A.    Yes.
13    Q.    And then what happened after the driver
14 spoke with the sheriff?
15    A.    A second car arrived.
16    Q.    And after the second car arrived, what do
17 you recall happening?
18    A.    And about 40 minutes later a white van
19 arrived.
20    Q.    And during this time, did you stay in the
21 car -- or the van?
22    A.    No. They took us down.
23    Q.    Outside of the van?
24    A.    Yes.
25    Q.    And were you asked to sit down or stand

**39**

1 outside of the van?
2    A.    No. They said nothing.
3    Q.    Were you allowed to walk around the --
4 you know, however -- wherever you wanted to walk?
5    A.    No. They kept us there. standing.
6    Q.    Okay. Was anyone -- strike that. Did
7 any of the police or sheriff's people speak Spanish,
8 that you could tell?
9    A.    One man from Immigration.
10    Q.    He showed up before or after the white
11 van?
12    A.    He arrived in the white van.
13    Q.    Okay. Before he arrived in the white
14 van, did you understand what was happening?
15    A.    No.
16    Q.    When the sheriff stopped the van, did you
17 realize that your attempt to cross into the United
18 States -- that you had been caught trying to cross into
19 the United States without the proper papers?
20    A.    I don't understand.
21    Q.    When you decided to come into the United
22 States without permission, did you realize that there
23 was a risk that you would be caught doing that?
24    A.    Yes.
25    Q.    Okay. And when the van was stopped by

**40**

1 the police, did you understand that your group had been
2 caught crossing into the United States without
3 permission?
4    A.    No, I didn't realize that.
5    Q.    Had you ever been caught trying to cross
6 into the United States before this time?
7    A.    Immigration had, yes.
8    Q.    Immigration had caught you previously?
9    A.    Yes.
10    Q.    How many times?
11    A.    Once.
12    Q.    And what happened on that one occasion
13 when you were caught crossing the border?
14    A.    They took us to the Immigration offices.
15 That's what I remember.
16    Q.    Were you close to the border when you
17 were caught the first time?
18    A.    I don't know.
19    Q.    The first time that you were caught
20 crossing into the United States, was that before or
21 after you lived in Chicago?
22    A.    Before I got to know United States.
23    Q.    So it was -- was it before you lived in
24 Chicago?
25    A.    Yes.

Pages 37 to 40

* SUBJECT TO CONFIDENTIALITY DESIGNATIONS *