Niederman depo

EXHIBIT 6

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

----------------------------------------------X

MOISES CARRANZA-REYES,
                    Plaintiff,
      -against-
THE PARK COUNTY BOARD OF COUNTY COMMISSIONERS;
FRED WEGENER, individually and in his official
capacity as Sheriff of Park County, Colorado;
MONTE GORE, individually and in his official
capacity as Captain of Park County Sheriff's
Department;
VICKIE PAULSEN, individually, and in her
official capacity as Registered Nurse for Park
County, Colorado; and
JAMES BACHMAN, M.D., individually and in his
official capacity as Medical Director of the
Park County Jail;
                    Defendants.
Civil Action No. 05CV-00377-WD-BNB

----------------------------------------------X

                  222 Station Plaza North

                  Mineola, New York

                  September 8, 2006

                  9:15 A.M.

        EXPERT DEPOSITION of MICHAEL S. NIEDERMAN, M.D., taken pursuant to the Federal Rules of Civil Procedure, and Notice, held at the above-mentioned time and place before Patricia Wor, a Notary Public of the State of New York.

        PRECISE COURT REPORTING
  (516) 747-9393  (718) 343-7227  (212) 581-2570

2

Page 1

Niederman depo

7   don't think that anybody knows exactly what
8   that is just yet.
9       Q.   There's not that kind of precision
10  in the data that is available, as far as you
11  know?
12      A.   No, because, again, from a
13  practical standpoint, when epidemic outbreaks
14  like this are identified, everybody gets
15  prophylaxis.  In other words, it's not
16  targeted prophylaxis at certain high risk
17  individuals.
18      Q.   Generally speaking, what kinds of
19  events or background in someone's life could
20  make them more susceptible, from your
21  experience, to have something like this
22  transfer from a strep in a throat to
23  strep-induced pneumonia or strep-caused
24  pneumonia?
25      A.   Probably the most common thing is

PRECISE COURT REPORTING
(516) 747-9393 (718) 343-7227 (212) 581-2570

68

1           M. Niederman
2   altered immune response from an acquired viral
3   infection, but, in general, for any infection,
4   and the formula is simple, we all encounter
5   bacteria.  Some of us get infected, some
6   don't, and it's usually that balance between
7   the bacteria and our own host defenses.  Some
8   bacteria like this can be very virulent and

Niederman depo

9  overcome even a normal host defense system,
10 particularly if the concentration of the
11 bacteria is very high or even a low
12 concentration of bacteria could lead to
13 infection, if the host defenses were impaired
14 as a result of, say, viral infection,
15 medications, coexisting chronic illnesses, any
16 of those are possibilities.
17     Q.   You didn't make any analysis in
18 this case of anything about Mr. Carranza-Reyes
19 specifically that may have led him to be one
20 of the unlucky ones that had strep in his
21 throat become strep pneumonia?
22     A.   No. The only thing, I think, that
23 was striking is he really didn't have any
24 predisposing factors that were identifiable.
25 He wasn't on chronic medications. He didn't

PRECISE COURT REPORTING
(516) 747-9393 (718) 343-7227 (212) 581-2570

                                          69
1           M. Niederman
2  have chronic illness. He wasn't diabetic. He
3  was really -- there's really no clear
4  precipitating factor. We do know that there
5  are genetic variations in the immune system
6  that make some people predisposed, but, I
7  mean, this case you almost have a biologic
8  experiment that tells you that didn't happen
9  because he had a twin brother in the same
10 environment who didn't get the same illness.
11     Q.   What's the basis for your knowledge

Niederman depo

12  about what Mr. Carranza-Reyes' prior medical
13  history or condition is?
14      A.    Just his deposition and deposition
15  of his brother.
16      Q.    You don't have any access to any
17  medical record or medical information of
18  Mr. Carranza-Reyes from any previous medical
19  encounter he had in Mexico?
20      A.    No, I have not seen any records of
21  his.
22      Q.    Let me direct your attention to the
23  third paragraph on Exhibit-83, your report.
24  The second sentence in that paragraph
25  indicates "his deposition," and I assume you

PRECISE COURT REPORTING
(516) 747-9393 (718) 343-7227 (212) 581-2570

70

1           M. Niederman
2   mean Mr. Carranza-Reyes' deposition, "and the
3   information from the Park County Jail indicate
4   that he arrived at the jail completely
5   healthy."
6       A.    Correct.
7       Q.    When you say "the information from
8   the Park County Jail," is that the form in
9   Spanish that Mr. Carranza-Reyes filled out
10  upon his intake?
11      A.    I don't remember all of the
12  information I used to make that statement, but
13  I remember, again, having read through the

Page 64

Niederman depo

7    A.    Process is to read the data and try
8 to understand specifically what happened and
9 have an opinion about that, and, again, I will
10 say that added to that process I had a letter
11 from Mr. Trine that asked very specific
12 questions, so that when I reviewed those
13 records, I was trying to answer those
14 questions.
15    Q.    That focused your analysis?
16    A.    Correct.
17    Q.    Is it fair to say that the
18 methodology you did in this case is analogous
19 to the kind of case study methodology you
20 might do in a clinical research project?
21    A.    It's analogous. It's not exactly
22 the same. It's a little broader. If we're
23 doing a case study, we might be focused on a
24 very specific question and very specific data
25 elements, and this is sort of more

PRECISE COURT REPORTING
(516) 747-9393 (718) 343-7227 (212) 581-2570

106

1    M. Niederman
2 open-ended.
3    Q.    But in terms of a process, it's a
4 similar process, it's review of the data you
5 have about a particular case?
6    A.    Correct.
7    Q.    And the -- I don't know, I used
8 methodology, the method that you would employ
9 in that clinical research context and this

Niederman depo

10 context is at least similar?
11     A.    In that we were reviewing
12 retrospectively the available data, yes.
13     Q.    Other than in an expert opinion
14 context, have you done any kind of research or
15 published anything or anything like that as
16 reflected on your CV for any kind of issue of
17 trying to figure out what caused someone to
18 have a particular --
19     A.    We have to do this all the time in
20 the hospital for quality assurance, so, for
21 example, we have a mortality committee in the
22 Department of Medicine.  Every death in the
23 department gets evaluated, and there's a
24 committee that reviews that, and if the cases
25 fail review, often I get involved to review

PRECISE COURT REPORTING
(516) 747-9393  (718) 343-7227  (212) 581-2570

107

1          M. Niederman
2 those cases, review the opinions and sit down
3 and talk with people involved.  We have poor
4 outcomes where we do root cause analyses and
5 dissect the whole case and all the elements,
6 so this type of retrospective look at data is
7 a pretty common way of looking at outcomes.
8     Q.    But that, the data in the
9 mortality, the context of the mortality
10 committee or quality review that you just
11 described doesn't look to see when the patient

Niederman depo

12  got whatever led the patient to be at the
13  hospital, right?
14      A.    Well, again, not usually that, but,
15  for example, when a patient developments a
16  complication in the hospital, we're
17  effectively doing that same analysis but the
18  patient came to the hospital without it,
19  developed it in the hospital, and we're trying
20  to -- so, yeah, it's really the same process.
21      Q.    Are you familiar with MRSA?
22      A.    Yes.
23      Q.    Does the fact that
24  Mr. Carranza-Reyes, at least at some point,
25  developed MRSA change your opinion at all?

PRECISE COURT REPORTING
(516) 747-9393 (718) 343-7227 (212) 581-2570

108

1           M. Niederman
2       A.    About these events, no.
3       Q.    Is it your understanding that he --
4   that he acquired MRSA at Denver Health?
5       A.    Yes.
6       Q.    Did his acquiring of that -- was
7   that an added complication to the ultimate
8   outcome of what happened to him that was
9   unrelated, except for the fact that he was in
10  the hospital from the illness mechanisms that
11  he had at the Park County Jail or at Summit
12  Medical Center?
13      A.    Again, I only know about this
14  through Dr. Douglas' deposition. I haven't

Page 99